**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR  97204-3730
Telephone: (503) 295-3085
Fax: (503) 323-9105

**Laura L. Ho** (*pro hac vice* application forthcoming)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (*pro hac vice* application forthcoming)
bgoldstein@gbdhlegal.com
**Byron Goldstein** (*pro hac vice* application forthcoming)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (*pro hac vice* application forthcoming)
kfisher@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Telephone: (510) 763-9800
Fax: (510) 835-1417

**Craig Ackerman** (*pro hac vice* application forthcoming)
cja@ackermanntilajef.com
ACKERMANN & TILAJEF PC
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Telephone: (310) 277-0614
Fax: (310) 277-0635

**India Lin Bodien** (*pro hac vice* application forthcoming)
india@indialinbodienlaw.com
INDIA LIN BODIEN, ATTORNEY AT LAW
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Telephone: (253) 503-1672
Fax: (253) 276-0081

Attorneys for Plaintiffs and Opt-In Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL and SARA JOHNSTON, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477<br><br>**CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**<br><br>**Federal Equal Pay Act; Oregon Equal Pay Act; Oregon Equality Act**<br><br>**DEMAND FOR JURY TRIAL** |

1.      At Nike, the numbers tell a story of a company where women are devalued and demeaned.  For many women at Nike, the company hierarchy is an unclimbable pyramid—the more senior the job title, the smaller the percentage of women.  The inequity for women at Nike starts before they do, with decisions about starting pay.

2.      But the story is not just about numbers.  Women's career trajectories are blunted because they are marginalized and passed over for promotions.  Nike judges women more harshly than men, which means lower salaries, smaller bonuses, and fewer stock options.  Women's complaints to human resources about discrimination and harassment, including sexual assault, are ignored or mishandled.  Male bad behavior is rarely penalized.  For a woman to succeed at Nike, she must far outshine her male counterparts.

3.      To stop Nike's discrimination of women, plaintiffs Kelly Cahill and Sara Johnston ("Plaintiffs") bring this sex discrimination class and collective action against Nike, Inc. ("Nike"), on behalf of themselves and all other women who are similarly situated ("Class/Collective Members"), and allege as follows:

**Page 2 -   CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

## I.    SUMMARY OF CLAIMS

4.      Nike pays and promotes women less than men at Nike Headquarters.  The gender disparities occurred, and continue to occur, because of specific employment policies or practices that are developed and carried out in a workplace that is hostile towards women and where the ultimate arbiters of these policies or practices are a small group of high-level executives who are majority male.  Nike has thus violated, and continues to violate, the Federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d); the Oregon Equal Pay Act, ORS 652.220; and the Oregon Equality Act, ORS 659A.030.  The Class/Collective Members seek an order ending Nike's discriminatory policies and making the Class/Collective Members whole.

5.      In this workplace environment, and with a small group of majority male decision-makers, the following policies, patterns, or practices each independently caused, and continue to cause, an adverse impact on Class/Collective Members.

6.      First, Nike sets starting pay and other compensation-related terms based, in part, on prior compensation.  The collection of prior compensation history causes women to receive lower starting salaries and other less favorable compensation-related terms.[1]  Around May 2018, Nike stated that it will "remove bias from critical moments of the hiring process by . . . *eliminating* the collection of candidate salary history . . . ."[2] (emphasis added).

7.      Second, as part of its annual performance evaluation process, Nike rates each of

---

[1] As the Ninth Circuit recently stated, "the wage gap between men and women is not some inert historical relic of bygone assumptions and sex-based oppression," and "[r]eliance on past wages simply perpetuates the past pervasive discrimination that the Equal Pay Act seeks to eradicate." *Rizo v. Yovino*, 887 F.3d 453, 468 (9th Cir. 2018).  The Ninth Circuit thus found "that past salary may not be used as a factor in initial wage setting, alone or in conjunction with less invidious factors." *Id.*

[2] *See Nike, Inc. FY16/17 Sustainable Business Report*, 56, https://sustainability-nike.s3.amazonaws.com/wp-content/uploads/2018/05/18175102/NIKE-FY1617-Sustainable-Business-Report_FINAL.pdf. (Nike states that it will "remove bias from critical moments of the hiring process by . . . eliminating the collection of candidate salary history . . . .").

**Page 3 -    CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

its corporate employees at Nike Headquarters.  The ratings are a forced ranking system because Nike utilizes a curve that limits the number of employees at Nike Headquarters who can receive ratings in the top two levels.  This system causes Class/Collective Members to receive lower ratings than their male colleagues.  Lower ratings cause women to receive less compensation, including smaller annual salary increases, lower annual bonuses, and smaller equity distributions. Lower ratings preclude promotions whereas higher ratings can lead to promotions.

8.      Third, Nike's budgeting system for finalizing annual salary increases and annual bonuses adversely impacts women.  Each year, Nike creates a set pool of money for each of its organizations that is to be used to provide annual salary increases and bonuses.  Each organization then allocates its budget to the employees within its organization.  The allocation of the budget adversely impacts women because a disproportionately low amount of the budget is distributed towards women's annual salary increases and bonuses.

9.      Fourth, Nike's Organizational Talent Planning system identifies a disproportionately low number of women for promotional opportunities.

10.     Fifth, Nike has a pattern or practice of channeling women into positions and job assignments that Nike views as less valuable, less likely to lead to promotions, and less likely to lead to increased compensation.

11.     Nike has never validated or established the job relatedness of its policies and practices for its systems that determine starting pay, ratings, pay raises, bonuses, equity distributions, and promotions.

12.     In addition, Nike has intentionally and willfully discriminated against Class/Collective Members with respect to pay, promotions, and conditions of employment.  Nike has been aware that Class/Collective Members receive less pay and fewer promotions than male

**Page 4 -   CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

employees at Nike Headquarters.  Nike is also aware that its work environment is hostile towards

women.  Numerous women have reported hostility and sexual harassment to Nike's Employee

Relations department, which is the department within Nike Human Resources that is primarily

tasked with addressing workplace complaints, and to Nike's Human Resources department

("HR").  Instead of addressing these complaints, HR reinforced and exacerbated the hostile work

environment.  Regardless of the evidence, HR has regularly found such complaints

unsubstantiated, avoided taking any meaningful corrective or preventive actions, and otherwise

failed to act to end the hostility towards women in the workplace.

## II.    PARTIES

**A.    Plaintiff Sara Johnston.**

13.    Plaintiff Sara Johnston worked at Nike from June 2008 to November 2017.

14.    Before working at Nike, Ms. Johnston received her B.A. in Economics and an

M.B.A., with a focus on quantitative analytics and human resources, from Willamette University.

Ms. Johnston had also completed most of the coursework for a B.S. in Business Systems

Analysis from the Oregon Institute of Technology.  Before becoming an Account Service

Representative at Nike, Ms. Johnston worked in human resources and analytics positions for four

years.

15.    From June 2008 to February 2010, Ms. Johnston worked part-time for Nike in the

Employee Services department while simultaneously working a full-time job in the human

resources department of a non-profit.  In February 2010, Nike promoted Ms. Johnston to an

Account Service Representative position, in which she remained until August 2012.  From

August 2012 to sometime during the first six months of 2014, Ms. Johnston worked as a Junior

Business Systems Analyst at Nike, and then she worked as an Intermediate Business Systems Analyst until November 1, 2017.

16.　　Ms. Johnston resigned from Nike because she was paid less and received fewer promotions than male employees doing substantially equal work.  She also resigned because of a hostile work environment towards women and the failure of Nike's HR department to assure a non-hostile work environment that provided equal opportunity.[3]  Ms. Johnston seeks reinstatement upon the remediation of Nike's discriminatory systems for pay, promotion, and employee complaints.  When she resigned, Ms. Johnston requested a meeting with a senior manager in HR.  In that meeting, Ms. Johnston told HR about the unequal and hostile treatment she was subjected to, and Ms. Johnston requested that corrective actions be taken.

17.　　Ms. Johnston consents to be a party plaintiff in the EPA collective action pursuant to 29 U.S.C. § 216(b).[4]

18.　　Ms. Johnston is a resident of Oregon.  While working for Nike, Ms. Johnston was based in Washington County, Oregon.

**B.　　Plaintiff Kelly Cahill.**

19.　　Plaintiff Kelly Cahill worked at Nike from October 2013 to July 26, 2017, in a Director position.

20.　　Before working at Nike, Ms. Cahill received a B.S. in Sports Marketing from the University of Oregon in 2004 and a Project Management Certification from the University of Washington in 2011.  From 2004 to November 2012, Ms. Cahill worked in marketing, business development, and digital advertising.

---

[3] *See* Section IV(C)(2), *infra*, for details of Nike's failure to assure a non-hostile work environment with respect to Ms. Johnston.

[4] *See* Ex. A.

**Page 6 -   CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

21.     From November 2012 to October 2013, Ms. Cahill worked for Nike in a Senior Producer position, a position that Nike classified as an independent contractor.

22.     Ms. Cahill resigned from Nike because of the hostile work environment, HR's ineffective response to her complaints, and the lack of promotion opportunities because of her gender.[5]  Ms. Cahill was paid less than male employees doing substantially equal work.

23.     Ms. Cahill consents to be a party plaintiff in the EPA collective action pursuant to 29 U.S.C. § 216(b).[6]

24.     Ms. Cahill filed a timely charge against Nike for violations of ORS 659A.030 with the Oregon Bureau of Labor and Industries on July 25, 2018.

25.     Ms. Cahill is a resident of Oregon.  While working for Nike, Ms. Cahill was based in Washington County, Oregon.

**C.     Opt-In Plaintiffs Samantha Phillips and Tracee Cheng.**

26.     Samantha Phillips opts in to the EPA claim.  Ms. Phillips worked for Nike at Nike Headquarters, in and around Beaverton, Oregon, from June 2015 to approximately August 10, 2016.

27.     Ms. Phillips was in a Director position throughout her employment with Nike. Ms. Phillips was paid less than male Nike employees for substantially equal work.

28.     Tracee Cheng opts in to the EPA claim.  Ms. Cheng worked for Nike at Nike Headquarters, in and around Beaverton, Oregon, from August 2013 to October 2017.

29.     Ms. Cheng was in a Manager position throughout her employment with Nike. Ms. Cheng was paid less than male Nike employees for substantially equal work.

---

[5] *See* Section IV(C)(3), *infra*, for details of Nike's failure to assure a non-hostile work environment with respect to Ms. Cahill.

[6] *See* Ex. B.

D.    **Defendant Nike.**

30.    Nike is the largest seller of athletic footwear and apparel in the world.  Its principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services.

31.    Nike is a corporation formed under the laws of Oregon and headquartered in Beaverton, Oregon.  Its fiscal year is from June 1st to May 31st.

32.    Nike Headquarters consists of campuses in and around Beaverton, Oregon ("Nike Headquarters").  The Class/Collective Members all work or worked at Nike Headquarters.  The administration of these campuses is centralized, and the operations at Nike Headquarters are integrated.  For example, according to Nike, it is organized and operates as a "matrix organization, where team members often report into two areas, such as a geography and a global function;" in Nike Brand, for example, the Teams "work across . . . product engines[,] . . . categories[,] . . . and in our four geographies - North America; Europe, Middle East & Africa (EMEA); Greater China; and Asia Pacific & Latin America (APLA)."

33.    All of Nike's highest-level executives are located at Nike Headquarters, as are its HR and administrative functions.  There are approximately 10,800 Nike employees at Nike Headquarters.

34.    During all relevant times, Nike was Class/Collective Members' employer within the meaning of all applicable statutes.

### III.    VENUE AND JURISDICTION

35.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Class/Collective Members assert federal claims under the Equal Pay Act.

36.    This Court has supplemental jurisdiction over the Oregon law claims, ORS 652.220 and ORS 659A.030, because they arise from a common nucleus of operative facts with

the federal claim and are so related to the federal claim as to form part of the same case or controversy under Article III of the United States Constitution.  For example, the same high-level executives, hostile work environment, and policies, patterns, and practices caused the pay disparities in violation of the EPA and caused the violations of the Oregon Equal Pay Act and the Oregon Equality Law.

37.     This Court has personal jurisdiction over Nike.  There is general jurisdiction over Nike because Nike Headquarters is located within this district in Beaverton, Oregon and Hillsboro, Oregon.  Nike conducts substantial business throughout this district and in the State of Oregon, and Nike employs thousands of workers in the state.

38.     Declaratory and injunctive relief are sought and authorized by 28 U.S.C. §§ 2201 and 2202.

39.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c), because Nike maintains offices in this district, Nike conducts business in this district, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and records relevant to those events and omissions are maintained and administered in this district.

## IV.     FACTUAL ALLEGATIONS

**A.     Nike employees at Nike Headquarters and organizational structure.**

40.     At Nike, the more senior the job title, the smaller the percentage of women.  The most senior job titles during Nike's 2017 fiscal year, after CEO, included President and Vice-President.  Lower-level positions, in descending order, included Senior Director, Director, Manager, and additional lower-level positions.

41.     Nike stated that, globally, during its 2017 fiscal year, 71% of its Vice-Presidents were men and 62% of its Directors and Senior Directors were men.[7]  Men make up significantly more than 62% of Senior Directors.  At Nike Headquarters, the breakdown of men and women in the Vice-President, Senior Director, and Director positions has been approximately the same as the global breakdown.

42.     Nike places all employees at Nike Headquarters in Band Levels.  There are six Band Levels; the Band Levels spell out the word "VALUES."  The S-Band is the highest level.  All salaried corporate employees are in either the L, U, E, or S-Band.  These Band Levels are a corporate-wide system.  This system uniformly affects the salaries and annual bonuses of employees at Nike Headquarters.  The higher the Band Level, the greater the size of the annual bonus and the higher the range of potential salaries.

43.     As the Band Levels increase, the percentage of women decreases.

**B.     Forms of compensation.**

44.     Nike's compensation policies and practices are uniform for all employees at Nike Headquarters who hold a lower-level position than Vice-President.

45.     Employees at Nike Headquarters receive two forms of cash compensation, salary and annual bonus.

46.     Band Levels impact salary.  Within each Band Level, there is a range of salaries.

47.     Band Level also impacts an employee's annual bonus, which is determined according to Nike's "Performance Sharing Plan" ("PSP Bonus").  The PSP Bonus has been, and continues to be, calculated according to a centrally-determined, uniform formula that consists of

---

[7] *See Nike FY 16/17 Sustainable Business Report*, 56, https://sustainability-nike.s3.amazonaws.com/wp-content/uploads/2018/05/18175102/NIKE-FY1617-Sustainable-Business-Report_FINAL.pdf.

two components.  One component is the "Team Award" and the other component is the

"Discretionary Award."  Both components include an input based on the employee's Band Level

and an input based on the amount of salary paid during the relevant fiscal year.  The

Discretionary Award component also includes an input that is based on the employee's annual

rating.[8]  The higher the Band Level, salary, or annual rating, the greater the PSP Bonus.

48.     Nike also distributes equity to some employees at Nike Headquarters.  Like the

PSP Bonus, Band Level affects the amount of equity distribution.

49.     At least once per year, Nike implements its "Two Times Pay" policy and practice.

During Two Times Pay, some employees at Nike Headquarters receive salary increases and/or

other additional compensation.

## C.     Nike's hostile work environment devalues its female employees and adversely impacts their compensation and their promotional opportunities.

50.     Nike has not had a regular training for its employees at Nike Headquarters that is

specifically focused on addressing and preventing sexual harassment, until March 2018 at the

earliest.

51.     Meanwhile, throughout the last several years, Nike HR has received numerous

complaints about male supervisors, including Directors, Senior Directors, Vice-Presidents, and

Presidents that described hostility towards women and/or sexual harassment directed at women.[9]


///

///

---

[8] *See* Section IV(E)(2), *infra*, for a description of Nike's rating system.

[9] *See* Alexia Campbell, *Report: HR Managers at Nike Ignored Complaints from Women Employees for Years*, Vox (Apr. 30, 2018), https://www.vox.com/policy-and-politics/2018/4/30/17302130/nike-women-harassment-discrimination-survey (numerous women reported that they found HR unhelpful and sometimes disrespectful).

**Page 11 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

1.      **Two of Nike's most-senior executives caused and reinforced a hostile workplace for women.**

52.      Two executives, who were among the most significant arbiters of the policies, patterns, and practices concerning the compensation and promotional opportunities of employees at Nike Headquarters, caused and exacerbated a hostile work environment towards Class/Collective Members.  These executives were Trevor Edwards, who, from July 2013 to August 2018, was the Nike Brand President and the second most senior executive after the CEO, and David Ayre, who was the Vice-President in charge of HR from 2007 through July 2017.

53.      Mr. Edwards was forced to resign from Nike because he caused and exacerbated a hostile workplace environment towards women.  Prior to March 2018, Nike intended for Mr. Edwards to be the next Nike CEO.  Less than one year before Mr. Edwards' departure was announced, Nike's Board of Directors ("Board") proposed awarding him a $6 million "retention award," which, according to the Board, is "intended to further promote retention of key leaders . . . ."[10]  The Board also proposed a 14.3% increase to Mr. Edwards' 2018 salary, which was a larger percent increase than the proposed salary increases for any other top Nike executive, including the CEO.[11]

54.      After Nike proposed that Mr. Edwards receive a $6 million retention award and a 14.3% increase to his salary, on or around March 5, 2018, a group of female employees

---

[10] *See Nike Inc. 2018 Notice of Annual Meeting*, 17, https://www.sec.gov/Archives/edgar/data/320187/000032018718000144/nke-2018xdef14a.htm; *see also* Matthew Kish, *Exclusive: Departing Nike Executive Trevor Edwards was Company's Highest Paid*, Portland Bus. J. (July 25, 2018), https://www.bizjournals.com/portland/news/2018/07/25/exclusive-departing-nike-executive-trevor.html?ana=yahoo&yptr=yahoo.

[11] *See Nike Inc. 2018 Notice of Annual Meeting*, 20, https://www.sec.gov/Archives/edgar/data/320187/000032018718000144/nke-2018xdef14a.htm.

**Page 12 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

presented the CEO with a survey of female employees about gender discrimination at Nike.[12]

Ten days later, the CEO sent a letter to all employees at Nike Headquarters, stating: "Over the

past few weeks, we've become aware of reports of behavior occurring within our organization

that do not reflect our core values of inclusivity, respect and empowerment . . . ."[13]  The CEO

further wrote: "in light of my desire to accelerate change, I've made the decision to restructure

my leadership team into a different alignment that will allow for closer management and a

sharper focus on our culture . . . Trevor Edwards has decided to resign as Nike Brand President

and will retire in August."[14]  On or around May 3, 2018, the CEO told employees during a

company-wide meeting that recent executive departures were related to workplace behavior.[15]

55.     Mr. Ayre was the Vice-President in charge of HR from 2007 through

approximately June 2017.  Mr. Ayre caused and fostered a hostile work environment towards

female Nike employees.  Nike conducted at least two internal investigations concerning whether

Mr. Ayre had caused or otherwise contributed to a hostile work environment towards female

employees at Nike, including Class/Collective Members.

56.     Mr. Edwards and Mr. Ayre were responsible for supervising performance

evaluation, compensation, and promotion practices as well as the system for reviewing and

investigating workplace discrimination and harassment complaints.  As the second highest-level

executive at Nike after the CEO, Mr. Edwards directly oversaw "all category and geographic

---

[12] *See* Julie Creswell, *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/nike-women.html.

[13] *See* Mike Rogoway, *Nike Sheds Second Top Executive Amid Inquiry into Workplace 'Behavior,'* The Oregonian (Mar. 16, 2018), https://www.oregonlive.com/business/index.ssf/2018/03/nike_sheds_second_top_executiv.html.

[14] *Id.*

[15] *See* Kevin Draper, *Nike's C.E.O. Vows Changes After Claims of Workplace Harassment and Bias*, N.Y. Times (May 5, 2018), https://www.nytimes.com/2018/05/05/business/mark-parker-nike.html.

business units, the Jordan Brand, Action Sports which includes Hurley International LLC,

Digital Sport and brand management throughout the world" as well as Nike's "wholesale, retail

and e-commerce operations."[16]  Mr. Edwards had control and influence over all employees at

Nike Headquarters with respect to compensation, promotions, job assignments, and other

employment terms and conditions.  As the head of HR, Mr. Ayre had "responsibility for Talent

Management, Compensation, and Performance Management and Rewards"[17] as well as

workplace complaints.  Mr. Ayre's responsibilities and actions thus affected all employees at

Nike Headquarters.

57.    A Nike spokesperson said that Nike's gender discrimination issues are restricted

to "an insular group of high-level managers" who "protected each other and looked the other

way."[18]  A longtime Nike executive similarly stated, "Edwards and his team had an autocratic

streak," and "everything had to get the blessing of the senior guys."[19]  Likewise, a former

executive of one of Nike's affiliate companies said that Mr. Edwards "demanded obedience" and

Nike "became very authoritarian."[20]

### 2.    Plaintiff Johnston.

58.    Plaintiff Johnston was subject to and witnessed hostility towards women, was

herself sexually harassed, and saw no meaningful corrective actions result from her several

complaints to HR.

---

[16] See NIKE Announces Strategic Leadership Changes (Jun. 20, 2013),
https://news.nike.com/news/nike-announces-strategic-leadership-changes.

[17] See Nike's Employment Offer Letter to David Ayre (Jul. 5, 2007),
https://www.sec.gov/Archives/edgar/data/320187/000032018707000105/exhibit101.txt.

[18] See Julie Creswell, At Nike, Revolt Led by Women Leads to Exodus of Male Executives,
N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/nike-women.html.

[19] See Jeff Manning, Inside Nike's Purge: More than a #MeToo Moment, The Oregonian
(Jul. 7, 2018), https://www.oregonlive.com/expo/news/erry-
2018/07/93d33bff127706/vanquishing_team_edwards_a_new.html.

[20] Id.

**Page 14 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

59.     Around December 2015, after a Nike-organized party, Ms. Johnston received inappropriate sexual propositions in messages from a male co-worker who Ms. Johnston had to work with regularly and who contributed to Ms. Johnston's performance reviews.  Shortly thereafter, this co-worker sent nude photographs of himself to Ms. Johnston.  Although Ms. Johnston told him to stop sending her any messages not related to work, he continued to do so. He then treated her negatively at work.  He blamed her unjustifiably for problems at work, refused to attend meetings she organized, and withheld information from her that she needed to successfully complete her work.

60.     Around February 2016, Ms. Johnston reported this harassment to Directors who supervised her.  In response, one of the Directors said, in effect, that Nike has a culture that revolves around alcohol, that Ms. Johnston should let the incidents go, that the rise of the internet and cell phones have made drunk messages part of this generation, that she should be less sensitive to these messages, and that people should expect more such messages.  Ms. Johnston sought to move to a position that did not require interaction with the harassing male co-worker, but the Directors told her that she could not move positions.  Neither of these Directors, nor anyone else at Nike, took any meaningful corrective actions.

61.     Shortly after this conversation with her Directors, Ms. Johnston was told that this same male co-worker who had harassed her had pushed a female co-worker against a wall and reached his hand up her skirt during the same Nike-organized party in December 2015.  A different male co-worker pulled this male co-worker away from this female co-worker, and several Nike employees, including Directors, witnessed this assault.

62.     Around March 2016, Ms. Johnston complained to HR.  She reported the harassment and hostility she had been subjected to; a confrontation she witnessed between a

female co-worker and the same male co-worker about harassing messages he had sent this female co-worker; and what she heard about the male co-worker's assault of a female co-worker. Later, around May 2016, Ms. Johnston learned that the same male co-worker had sent sexual messages to several additional women at Nike.  Ms. Johnston then met with HR to report this additional information.  During this meeting, HR told Ms. Johnston that it had completed its investigation and that no disciplinary or other measures were needed.

63.    Shortly after Ms. Johnston's initial complaints to the Directors and HR, this male co-worker was promoted into a Manager position that would require Ms. Johnston to work more closely with him.  Ms. Johnston then complained about this to the Directors she reported to as well as to HR.  HR's only response to Ms. Johnston was that it would train supervisors to better handle sexual harassment complaints; but, no such training was provided to any of Ms. Johnston's supervisors.

64.    After making the complaints to her Directors and HR, Ms. Johnston did not receive the Highly Successful Rating that her Director had previously told her she would receive. Ms. Johnston's Director refused to recommend this Rating even though he wrote, in her annual written performance evaluation, that Ms. Johnston was "performing a very difficult role that is a stretch role beyond the expectations of an Intermediate [Business Systems Analyst] and would normally be performed by someone with the experience of a [Senior Business Systems Analyst] or Lead [Business Systems Analyst] position."  Ms. Johnston was denied the higher Rating in retaliation for her complaints about sexual harassment.

65.    Ms. Johnston was subject to hostility on other occasions.  For example, Ms. Johnston participated in a Nike-organized golf tournament where she was paired with Directors and a Senior Director.  After a Director hit a tee shot that did not go past the women's tee box, a

Senior Director said to Ms. Johnston, in front of the Directors, that the Director who hit that tee shot should have to walk to the next hole with his genitals exposed.  That same Senior Director, on other occasions, gave Ms. Johnston unsolicited suggestions about how she should style her hair, including an occasion when he was simultaneously stroking Ms. Johnston's hair.  The work desk of a different Director had a photograph, from a Nike "team-building" event, that was visible to anyone who walked by of a male Director appearing to whip a female Director's backside.

### 3.    Plaintiff Cahill.

66.    Plaintiff Cahill was subject to and witnessed hostility towards Class/Collective Members from a former Vice-President at Nike, Daniel Tawiah.  Mr. Tawiah referred to women as "dykes" on several occasions.

67.    Around April 2016, Ms. Cahill, Mr. Tawiah, and several other employees at Nike Headquarters, including a male Director on her Team, were at a restaurant for dinner.  During the dinner, Mr. Tawiah said that a new Director was getting hired onto their Team.  Ms. Cahill asked Mr. Tawiah about the status of the hiring process because this Director would impact Ms. Cahill's work.  In response, Mr. Tawiah said to Ms. Cahill, in front of the other Nike employees at dinner, that she did not need to know the status of the hiring process and that her opinion did not matter even though the male Director on her Team was included in the hiring process.

68.    Ms. Cahill witnessed Mr. Tawiah, when he was a Senior Director, berate a female co-worker.  Around May 2016, Mr. Tawiah yelled at this female employee in front of Ms. Cahill and several other employees at Nike Headquarters.  Around July 2016, Mr. Tawiah again yelled at this female co-worker in front of several other employees.  Mr. Tawiah asserted that this female co-worker was a failure and that the failure of a project was all her fault.  Mr. Tawiah's

criticisms were not only public and harsh but also false since Mr. Tawiah was mostly responsible for the failure to timely complete the project.

69.     Ms. Cahill complained to HR on four separate occasions, including about the above-described incidents.  None of her complaints resulted in any meaningful corrective action. Following several of these complaints, as well as complaints from other women to HR and senior managers about Mr. Tawiah, in January 2017, Nike promoted Mr. Tawiah to Vice-President.[21]

        **4.      Other female employees.**

70.     Nike-organized recruiting parties perpetuated and reinforced Nike's devaluation of women.  For example, a Nike-organized recruiting party in August 2015 had "Nike branding almost everywhere" alongside "scantily clad [female] go-go dancers."[22]

71.     When Nike was recruiting Opt-In Plaintiff Phillips, she was invited to and did attend a Nike recruiting party.  After Nike hired Ms. Phillips, Nike organized a recruiting party during a conference that Ms. Phillips attended, but did not invite Ms. Phillips even though several of her male peers were invited.  Nike also invited several lower-level female employees who directly reported to Ms. Phillips and who were approximately fifteen years younger than Ms. Phillips.

72.     A different female corporate employee in Oregon reported that, at a Nike-organized event at a restaurant in Las Vegas, Nike hired women for the event who "did not have much clothes on, and toward the end of the event, a lot of our male colleagues were drinking and

---

[21] Mr. Tawiah was terminated around April 2018.

[22] *See* Andrea Peterson, *Nike is partying in Vegas with Hackers*, The Wash. Post (Aug. 10, 2015), https://www.washingtonpost.com/news/the-switch/wp/2015/08/10/nike-is-partying-in-vegas-with-hackers/?noredirect=on&utm_term=.fa06fa37c10a.

dancing with them," which was "a really uncomfortable position to be in as far as a work-sponsored event."[23]

73.    In addition to the above-described incidents, there are additional examples of incidents where women were subject to sexual harassment and a hostile work environment.

    a.    On April 7, 2017, a female employee emailed numerous colleagues proposing "a friendly game of hoops."  A male Vice-President of the Jordan Brand replied all to the email within ten minutes writing, "Even girls?"  Shortly thereafter, this Vice-President's email was forwarded to HR, but no meaningful corrective action was taken.

    b.    A senior manager mentioned a female employee's breasts in an email. After HR received a complaint about this email, HR's only response was to give a verbal warning to this senior manager.[24]

    c.    A female employee's male manager bragged to her about the condoms he always carried and the magazines he kept on his desk with scantily clad women on the covers.  This female employee complained to HR, which told her that she had made a mistake by not confronting him first.[25]

    d.    Women said that their male supervisors discussed women's bodies and called women vulgar names, including, for example, "stupid bitch."[26]

---

[23] *See* Erica Morrison, *Nike Sees Executive Departures in Harassment Reckoning*, Nat'l Pub. Radio (May 15, 2018), https://www.npr.org/2018/05/15/610445057/nike-sees-executive-departures-in-harassment-reckoning.

[24] *See* Julie Creswell, *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/nike-women.html.

[25] *Id*.

[26] *See* Alexia Campbell, *Report: HR Managers at Nike Ignored Complaints from Women Employees for Years*, Vox (Apr. 30, 2018), https://www.vox.com/policy-and-politics/2018/4/30/17302130/nike-women-harassment-discrimination-survey.

**Page 19 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

**D.    Class/Collective Members are paid and promoted less than male employees at Nike Headquarters.**

74.    Nike recognized, in a May 3, 2018 speech by the CEO, that it needs to change its hiring, compensation, and promotion systems.[27]

75.    Still, Nike has failed to eliminate the wage differentials between men and women. Nike has also failed to make reasonable and substantial progress towards eliminating wage differentials between men and women at Nike.

76.    Nike's pay and promotion decisions are made in the same hostile environment and affected by the same high-level executives.  For example, Plaintiff Cahill was paid approximately $20,000 less during Nike's 2017 fiscal year than a male Director on her Team who was doing substantially similar work as she was doing.

77.    Ms. Cahill was in the E-Band for her entire Nike employment.  After Ms. Cahill left Nike, her position was filled by a man who was given the title of Senior Director, placed in the S-Band, and received greater compensation than Ms. Cahill received.

78.    Likewise, Nike paid Ms. Johnston less than her male colleagues.  When Plaintiff Johnston was hired as an Account Service Representative ("ASR") in 2012, Nike set her starting salary at $33,000.  Approximately two months after Ms. Johnston was hired, a male ASR was hired onto her Team with a starting salary of $35,000.  Ms. Johnston had more relevant experience than this male ASR, who, when he started, was unable to successfully complete his work.  Ms. Johnston, whose desk was located near this male ASR's desk, trained him on how to successfully complete his tasks, which were the same tasks Ms. Johnston performed.  In addition, while Ms. Johnston had relevant work experience, a college degree, and a graduate school

---

[27] *See* Kevin Draper, *Nike's C.E.O. Vows Changes After Claims of Workplace Harassment and Bias*, N.Y. Times (May 5, 2018), https://www.nytimes.com/2018/05/05/business/mark-parker-nike.html.

degree, this male ASR's highest-level credential was a high school diploma and his work experience consisted of selling goods at a kiosk in a mall.

79.     When Ms. Johnston applied for and received a Junior Business Systems Analyst ("BSA") position at Nike, there were two male Junior BSAs hired around the same time. Those two male Junior BSAs had recently graduated from college and neither had relevant work experience. Ms. Johnston was placed on a Team that received less compensation and fewer promotions as compared to the Team the two men were placed on for jobs that were substantially similar. About one year after Ms. Johnston and the two male Junior BSAs were hired into that role, the two male Junior BSAs were promoted to Intermediate BSAs. After two years, those two BSAs were promoted to Senior BSA and placed in the U-Band. Ms. Johnston, by contrast, was not promoted to Intermediate BSA until two years after getting hired as a Junior BSA. Ms. Johnston was placed in the L-Band when she was hired as an ASR in 2012 and she remained in the L-Band until she departed Nike in November 2017.

80.     As an Intermediate BSA, Ms. Johnston took on responsibilities that were in addition to her own responsibilities and typically the work of a more senior-level employee. For example, Ms. Johnston's direct manager wrote, in her fiscal year 2014 written performance evaluation, that Ms. Johnston "has continued[sic] to exceed . . . expectations for an[sic] entry level [Business Systems Analyst] as she continues to consistently perform the same work as the Senior [Business Systems Analysts] with little assistance required."

81.     Around May 2015, Ms. Johnston became the primary Tableau Developer on her project, which was typically the responsibility of a more senior Application Engineer or Application Developer. Starting in October 2016, Ms. Johnston became a Product Owner. The Director to whom Ms. Johnston reported wrote her around the end of September 2016 and said

that she was in "the role of product owner, where [she] will be evaluated based on this being a stretch role . . . since this role aligns organizationally with [a Senior Business Systems Analyst] and Lead [Business Systems Analyst] job class, and the role of Product Analyst . . . ." Employees at Nike Headquarters who held any of those three positions—Application Engineer, Senior BSA, and Lead BSA—were typically in the U-Band and were compensated at a higher level than the compensation that Ms. Johnston was receiving while placed in the L-Band.

82.    After Ms. Johnston departed Nike, her position was split into two positions, a man was hired into each of those positions, and both men were placed in the U-Band.

**E.    Nike's employment policies, patterns, and practices adversely impact women.**

**1.    Nike's system for setting starting salaries and Band Levels adversely impacts women.**

83.    Nike admitted in approximately May 2018 that it has had a policy or practice of setting employees' starting salaries and Band Levels based, in part, on the employee's past compensation.

84.    Nike requested Plaintiff Cahill's compensation history when she was hired as a full-time employee.  Nike then set Ms. Cahill's starting salary at approximately the same level of pay she was receiving in her prior position and she was placed in the Band Level that contained this salary.  Ms. Cahill's prior compensation was a significant factor in Nike's determination of Ms. Cahill's starting salary and Band Level.

85.    The consideration of prior compensation when setting starting salary disadvantages women because women are generally paid less than men in the marketplace even when men and women have similar knowledge, skills, abilities, and experiences.  When setting starting salary and Band Level, Nike has a policy, pattern, or practice of attributing significant weight to prior compensation history.

**Page 22 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

86.     Nike's disproportionate placement of women in lower Band Levels causes Class/Collective Members to receive smaller PSP Bonuses in addition to having lower salaries and less access to equity distribution.

**2.      Nike's Rating system adversely impacts women.**

87.     Nike assigns a rating, on an annual basis, to each of its corporate employees in Oregon who hold a lower-level position than Vice-President.  The ratings, in descending order, are: Exceptional, Highly Successful, Successful, Inconsistent, and Needs Improvement ("Rating" or "Ratings").[28]

88.     The Rating affects the size of annual salary increases and PSP Bonuses.  There is a centrally-determined range of salary increases and PSP Bonus percentages that correspond to each Rating.  The higher the Rating, the higher the high-end and low-end of the range of salary increases and PSP Bonuses.  For example, a Highly Successful Rating entitles an employee to a higher range of salary increases and PSP Bonuses than an employee who receives a Successful Rating.

89.     The rating process is as follows:  First, each employee's direct manager makes an initial proposed Rating.  Then, there are "calibration" meetings, which include higher-level managers, before the final decisions on the Ratings, which occur before the end of Nike's fiscal year on May 31.  At the calibration meetings, each employee's Rating is reviewed and many of the proposed Ratings are changed, especially the Exceptional and Highly Successful Ratings.  Because the higher-level managers at Nike are majority male, the participants in the initial and subsequent calibration meetings are majority male.  Likewise, after the calibration meetings, the ultimate arbiters of the Ratings are a small, majority male group of senior executives at the

---

[28] For employees hired shortly before the Ratings are finalized, Nike marks them as: Too New To Rate.

**Page 23 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

highest levels of management.  The ultimate arbiters regularly change the Ratings that they receive from the calibration meetings, especially the proposed Exceptional and Highly Successful Ratings.

90.    These modifications and final decisions are made pursuant to standardized criteria and corporate-wide policies, patterns, and/or practices.

91.    The standardized criteria include, first, a uniform definition for each Rating level.

92.    Second, there is a forced ranking of all employees on a curve.  Nike policy states that no more than a certain percentage of employees can receive certain Ratings.  For example, in 2016, Nike stated that no more than 5% of employees can receive an Exceptional Rating, no more than 20% of employees can receive a Highly Successful Rating, and at least 10% of employees must receive an Inconsistent Rating.

93.    Third, each Class/Collective Member is rated on a curve against employees who are in many different job levels.  For example, employees in Senior Director, Director, Manager, or lower-level positions are all rated against one another on the same curve.

94.    Rating employees on the curve against other employees in the same organization causes the lower-level employees to receive lower Ratings because the higher-level employees are more visible to the ultimate arbiters of the Ratings.  Higher-level employees are also more likely to have previously received higher Ratings.

95.    In addition, Nike has a policy or practice of further limiting the number of Exceptional and Highly Successful Ratings that are assigned to the lowest-level positions.  For example, Plaintiff Cahill was directed by a senior manager to not suggest an Exceptional Rating for any of her direct reports and to suggest a Highly Successful Rating for no more than two of her direct reports.  Senior Directors receive a disproportionately high number of Exceptional and

Highly Successful Ratings as compared to employees in lower-level positions.  Accordingly, since women hold a disproportionately low amount of higher-level positions, this process contributes to women receiving lower Ratings than men.

96.    Nike's Rating system includes criteria that are determined in an unreliable manner and that are not valid and job-related.

97.    This Rating system causes Class/Collective Members to receive smaller salary increases, annual bonuses, and equity distributions than similarly-situated male employees.

98.    The Rating system also adversely impacts the promotional opportunities available for Class/Collective Members because receiving a Rating that is below Successful precludes promotions and high Ratings can lead to promotions.

**3.    Nike's Budgeting system for annual salary increases and bonuses adversely impacts women.**

99.    Nike allocates a set pool of money for each of its organizations that is to be used for salary increases and PSP Bonuses ("Budget" or "Budgeting").  This Budget is less than the sum of money needed to award each employee the highest increase in salary and PSP Bonus that is within the range assigned to their Rating.  Like the Rating system, the Budget for salary increases and PSP Bonuses means that not all employees in the organization will receive the largest percent increase for salary or bonus that corresponds to their Rating.

100.    The higher-level managers that make the allocation determinations are majority male.  The Budget allocation, like Nike's other policies, patterns, and practices, occurs within a workplace that is hostile to women.  The Budgeting process thus causes women to receive salary increases and PSP Bonuses that are closer to the low-end of the range associated with their Rating than the salary increases and PSP Bonuses that their male colleagues receive.

**Page 25 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

4.    **Additional Nike systems that adversely impact women.**

101.    Nike's systems for identifying employees for promotions, including its Organizational Talent Planning system, adversely impact Class/Collective Members' promotional opportunities because the ultimate arbiters are majority male and they make determinations within a workplace that is hostile towards women.

102.    Nike also has a pattern or practice of channeling Class/Collective Members into positions that are less likely to lead to promotions and increased compensation.  Meanwhile, male employees are more likely to get channeled into more valuable positions with greater opportunities for advancement and increased compensation.

103.    Class/Collective Members are discouraged from applying for management positions.  Class/Collective Members are judged according to a higher standard than men.  They are provided fewer opportunities to make themselves visible to the ultimate arbiters within Nike.

104.    These patterns or practices cause Class/Collective Members to receive fewer promotions, smaller salary increases, smaller bonuses, and equity.

105.    The organizations and teams with higher percentages of women get smaller budgets to distribute for annual salary increases and PSP Bonuses.

106.    For example, when Ms. Johnston became a Junior BSA at the same time as two men, Ms. Johnston was placed on a Team whose members had fewer promotional and increased-compensation opportunities than the two men who were placed on a different Team.

107.    Likewise, many women said that they were marginalized, harassed, and thwarted in their careers while working at Nike Headquarters.[29]

---

[29] *See* Julie Creswell, *5 More Nike Executives Are Out Amid Inquiry Into Harassment Allegations*, N.Y. Times (May 8, 2018), https://www.nytimes.com/2018/05/08/business/nike-harassment.html (based on interviews of more than 50 current and former Nike employees).

**Page 26 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

**F.     Although Nike has been aware of the inequality in compensation and promotions, Nike has maintained its employment policies, patterns, and practices.**

108.    Nike has a pattern or practice of ignoring complaints against male employees for sexual harassment and workplace hostility.  Often, Nike even promoted and otherwise rewarded these male employees.

109.    Nike has long been aware of the disproportionately low percentage of women in its Director, Senior Director, and Vice-President roles.  For example, in April 2018, the current Vice-President of HR, Monique Matheson, stated, "[w]hile we've spoken about this many times, and tried different ways to achieve change, we have failed to gain traction—and our hiring and promotion decisions are not changing senior-level representation as quickly as we have wanted."[30]

110.    Nike is aware of the pay disparities between its female and male employees because Nike "conducts an annual pay analysis."[31]

111.    Likewise, around June 2017, Nike's former Vice-President of HR, Mr. Ayre, sent an email to all Corporate employees stating that Nike was going to examine whether there was a pay disparity between men and women.  About one month later, Mr. Ayre sent another company-wide email stating that Nike had reviewed whether there was gender discrimination, that any issues that had been identified were corrected, and that there were no remaining gender

---

[30] *See* Sara Germano, *Nike's HR Chief Says Company Fails to Promote Enough Women, Minorities—Memo* (April 4, 2018), https://www.wsj.com/articles/nikes-hr-chief-says-company-fails-to-promote-enough-women-minoritiesmemo-1522871805.

[31] *See* Kathy Gurchiek, *Nike Shoots for Pay Equity with Changes to Reward Program,* Society for Human Resource Management (July 27, 2018), https://www.shrm.org/resourcesandtools/hr-topics/behavioral-competencies/pages/nike-shoots-for-pay-equity-with-changes-to-reward-program.aspx.

**Page 27 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

discrimination issues.  Absent from Mr. Ayre's email was any data or other support for his

assertions that there were no remaining gender discrimination issues.

## V.    COLLECTIVE ACTION ALLEGATIONS

112.    Plaintiffs and the Collective Action Members re-allege and incorporate the

preceding paragraphs as alleged above.

113.    Plaintiffs bring this collective action for injunctive, declaratory, and monetary

relief pursuant to 29 U.S.C. § 216(b) on behalf of the following Collective Action:

> All female current and former Nike employees at Nike Headquarters in
> Oregon, who were employed by Nike at any time from three years prior to
> opting-in through the resolution of this action, in a salaried, corporate
> position that was or is a lower-level position than Vice-President
> ("Collective Action Definition," "Collective Action," or "Collective
> Action Members").

114.    Excluded from the Collective Action are Nike retail store employees and

employees in Nike's Legal, Finance, and HR departments.  Plaintiffs reserve the right to amend

the definition of the Collective Action based on discovery or legal developments.

115.    Nike has engaged in systemic gender discrimination in pay against

Class/Collective Members.  Nike paid Collective Action Members less than it paid male

employees with substantially equal job duties that required substantially similar skill, effort, and

responsibility, and were performed under similar working conditions within the same

establishment.

116.    Nike has caused, contributed to, and perpetuated gender-based pay disparities

through common policies, patterns, and practices, including but not limited to those relating to

starting salary and Band Level, annual ratings, promotions, performance management policies or

practices, centralized decision-making, and a work environment hostile to women.  Plaintiffs and

the Collective Action Members are similarly situated pursuant to 29 U.S.C. § 216(b) because

**Page 28 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

Plaintiffs and the Collective Action Members were paid less than male employees who had substantially equal job duties that required substantially similar skill, effort, and responsibility, and were performed under similar working conditions within the same establishment.

117.    Plaintiffs seek to be appointed as representatives of the Collective Action.

118.    There are many similarly situated collective members who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit.  Notice should be sent to the Collective Action Members pursuant to 29 U.S.C. § 216(b).

119.    Questions of law and fact common to Plaintiffs and Collective Action Members include, but are not limited to, the following:

a.    Whether Nike's starting salary and Band Level policies, patterns, and/or practices caused Collective Action Members to receive less compensation than their male colleagues;

b.    Whether Nike has a policy, pattern, or practice of requesting prior compensation history upon hiring that discriminates against Collective Action Members;

c.    Whether Nike's annual Ratings of employees at Nike Headquarters discriminates against Collective Action Members;

d.    Whether the curve and/or employee groupings for the Ratings discriminates against Collective Action Members; and

e.    Whether Nike's campuses in and around Beaverton, Oregon are part of the same "establishment" according to the EPA.

**Page 29 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

120.    Nike is aware or should have been aware that federal law requires it to pay its female employees at a rate commensurate to that of male employees performing substantially similar work.

121.    As part of its regular business practice, Nike willfully, and repeatedly, engaged in a uniform pattern, practice, and/or policy of violating the Equal Pay Act with respect to Plaintiffs and Collective Action Members.

122.    Nike's deceptive conduct prevented Collective Action Members from discovering or asserting their claims earlier than they did because Nike, for example, expressly and inaccurately told employees at Nike Headquarters that there was no gender inequality in compensation.

## VI.    CLASS ACTION ALLEGATIONS

123.    Plaintiffs and the Class Members re-allege the foregoing paragraphs of this Complaint as though fully set forth herein.

124.    Plaintiffs bring this action as a class action for injunctive, declaratory, and monetary relief pursuant to Rule 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure for violations of ORS 652.220 and ORS 659A.030 on behalf of the following Class:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed by Nike at any time from two years prior to the filing of the Complaint through the resolution of this action, in a salaried, corporate position that was or is a lower-level position than Vice-President ("Class Definition," "Class," or "Class Members").

125.    Excluded from the Class are Nike retail store employees and employees in Nike's Legal, Finance, and HR departments.  Plaintiffs reserve the right to amend the definition of the Class based on discovery or legal developments.

126.    Plaintiffs are members of the Class they seek to represent.

127.    This action is properly maintained as a class action.  The Class satisfies all the requirements of Rule 23 for maintaining a class action.

128.    **Ascertainability.**  The members of the Class are known to Nike.  Nike's business records memorialize their names, gender, compensation, promotions, annual Ratings, job titles, and other relevant records.  Moreover, the Class Definition enables every putative class member to identify herself as a member of the Class.

129.    **Numerosity.**  The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  There are at least 500 members of the Class.

130.    **Existence and predominance of common questions of law or fact.**  There are questions of law or fact that are common to the Class, and these common questions predominate over questions affecting any individual Class Member.  Nike's uniform employment policies, patterns, and practices adversely impact all Class Members.  The uniform policies, patterns, and practices relate to: the setting of starting salary and Band Level; Nike's annual Ratings; Nike's Organizational Talent Planning System; a small group of high-level executives who are majority male and the ultimate arbiters with respect to Nike's policies, patterns, and practices; and a work environment that is hostile towards women.  The common nucleus of operative facts also includes: Nike's Band Levels; the Budgeting related to the annual salary increases and the amount of the PSP Bonuses; and the formula used for the PSP Bonus calculation.  Common questions of law or fact include without limitation:

a.      Whether Nike's policies or practices discriminate against Class Members holding a job title that is lower than Vice-President;

b.     Whether Nike's starting salary and Band Level policies, patterns, and/or practices discriminate against Class Members;

c.     Whether Nike has a policy, pattern, or practice of requesting prior compensation upon hiring discriminates against Class Members;

d.     Whether Nike's annual Ratings of employees at Nike Headquarters discriminates against Class Members;

e.     Whether the curve and/or employee groupings for the Ratings discriminates against Class Members;

f.     Whether Nike's compensation system discriminates against Class Members;

g.     Whether Nike's promotion system discriminates against Class Members;

h.     Whether Class Members are disproportionately and discriminatorily assigned to and retained in lower Band Levels;

i.     Whether a small group of mostly male senior executives are the ultimate arbiters with respect to compensation, Ratings, and promotions;

j.     Whether Trevor Edwards and/or David Ayre caused and/or fostered a hostile work environment towards women;

k.     Whether a hostile work environment further contributes to discrimination against Class Members by causing them to receive less compensation and fewer promotional opportunities than male employees at Nike Headquarters; and

l.     Whether Nike's practices for setting compensation and making promotions are valid, job-related, and consistent with business necessity.

**Page 32 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

131.  **Typicality.**  Plaintiffs' claims are typical of those of the Class Members because they were subject to the same employment policies and practices, and Nike has no defenses that are unique to Plaintiffs.

132.  **Adequacy of representation.**  Plaintiffs will fairly and adequately protect the interests of the class and have no interests adverse or antagonistic to the interests of the other members of the Class.  Plaintiffs have retained competent counsel who are experienced in the prosecution of discrimination class actions.

133.  **Superiority.**  A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein.  A class action will permit the large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of time and expense that the prosecution of numerous individual actions would entail.

134.  Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Nike has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  The Class Members are entitled to injunctive relief to end Nike's common, uniform, unfair, and discriminatory policies and practices.

135.  Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Nike's common, uniform, unfair, and discriminatory policies, patterns, and practices have damaged Class Members and they are entitled to recovery.  Nike has computerized account data, payroll data, and personnel

data that will make calculation of damages for specific Class Members efficient and manageable. The propriety and amount of punitive damages are based on Nike's conduct, making these issues common to the Class.

**FIRST CLAIM FOR RELIEF**
**Federal Equal Pay Act**
**(The Fair Labor Standards Act of 1938, as amended by**
**The Equal Pay Act, 29 U.S.C. §§ 206, *et seq*.)**
**(On Behalf of Plaintiffs and the Collective Action Members)**

136.    Plaintiffs and the Collective Action Members re-allege and incorporate the preceding paragraphs as alleged above.

137.    Nike has discriminated against Plaintiffs and the Collective Action Members in violation of the EPA, 29 U.S.C. § 206(d).  Nike has paid Plaintiffs and the Collective Action Members less than similarly situated male colleagues performing substantially similar work on jobs the performance of which requires similar skill, effort, and responsibility, and which are performed under similar working conditions within the same establishment.

138.    The differential in pay between male and female employees is due to gender and not due to seniority, merit, quantity, or quality of production.

139.    Nike did not act in good faith, and caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Nike has willfully violated the EPA, a three-year statute of limitations applies to the claims of Plaintiffs and Collective Action Members, pursuant to 29 U.S.C. § 255(a).

140.    As a direct result of specific employment policies, patterns, or practices, Collective Action Members have suffered damages including, but not limited to, lost past and future income, compensation, equity distributions, and other benefits.

141.    Plaintiffs and the Collective Action Members request relief as hereinafter described.

## SECOND CLAIM FOR RELIEF
### Oregon Equal Pay Act
### (ORS 652.220)
### (On Behalf of Plaintiffs and the Class Members)

142.    Plaintiffs and the Class Members re-allege and incorporate the preceding paragraphs as alleged above.

143.    Nike has violated ORS 652.220 because Nike has paid Plaintiffs and Class Members less than Nike's male employees for work of comparable character and the performance of which requires comparable skills.

144.    The pay differential between Class Members and comparable male employees at Nike Headquarters was not due to a seniority system or a merit system that is free of discrimination based on sex.

145.    The pay differential between Class Members and comparable male employees at Nike Headquarters was not based in good faith on factors other than sex.

146.    Plaintiffs and the Class Members request relief as hereinafter described.

## THIRD CLAIM FOR RELIEF
### Oregon Equality Act – Disparate Impact
### (ORS 659A.030)
### (On Behalf of Plaintiffs and the Class Members)

147.    Plaintiffs and the Class Members re-allege and incorporate the preceding paragraphs as alleged above.

148.    Nike's policies, patterns, standards, and/or practices have adversely impacted Class Members with respect to starting salary, Band Level, annual Ratings, annual salary increases, PSP Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.

**Page 35 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

149.    Nike has violated ORS 659A.030 because its employment policies, patterns, and/or practices have caused Plaintiffs and Class Members to be compensated less, promoted less, and to receive less favorable terms related to compensation and promotions than male employees at Nike Headquarters.

150.    Nike has violated ORS 659A.030 because its employment policies, patterns, and/or practices have caused Plaintiffs and Class Members to receive less valuable conditions and privileges of employment than male employees at Nike Headquarters.

151.    Plaintiffs and the Class Members request relief as hereinafter described.

**FOURTH CLAIM FOR RELIEF**
**Oregon Equality Act – Intentional Discrimination**
**(ORS 659A.030)**
**(On Behalf of Plaintiffs and the Class Members)**

152.    Plaintiffs and the Class Members re-allege and incorporate the preceding paragraphs as alleged above.

153.    Nike has violated ORS 659A.030 because Nike knowingly and purposefully discriminated against Class Members based on their sex.

154.    Nike's discrimination against Class Members has been, and continues to be, with respect to starting salary, starting Band Level, annual Ratings, annual salary increases, PSP Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.

155.    Plaintiffs and Class Members were qualified for their jobs and performed as well or better than similarly situated male employees.

156.    Nike has violated ORS 659A.030 because its employment policies, patterns, and/or practices have caused Plaintiffs and Class Members to receive less valuable conditions and privileges of employment than male employees at Nike Headquarters.

157.    Plaintiffs and the Class Members request relief as hereinafter described.

**Page 36 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class/Collective Members pray for relief as follows:

A.     Certify this action as a collective action under the EPA on behalf of Plaintiffs and the Collective Action Members;

B.     Designate Plaintiffs as the representatives of the Collective Action;

C.     Promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated Collective Action Members, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing individual Consent to Join as Party Plaintiff forms pursuant to 29 U.S.C. § 216(b);

D.     Toll the statute of limitations on the claims of all Collective Action Members from the date the original Complaint was filed until the Collective Action Members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in to the Collective Action;

E.     Certify this action as a class action on behalf of the proposed Class for violations of ORS 652.220 and ORS 659A.030;

F.     Designate Plaintiffs as the representatives of the class action;

G.     Designate Plaintiffs' counsel of record as Class counsel for the Class;

H.     A declaratory judgment that the practices complained of herein are unlawful and violate 29 U.S.C. §§ 216(b), ORS 652.220, and ORS 659A.030;

I.     A preliminary and permanent injunction against Nike and its partners, officers, agents, successors, employees, representatives, and all persons acting in concert with them, from engaging in policies, patterns, and/or practices that discriminate against Plaintiffs, Class Action Members, and Collective Action Members because of their gender;

**Page 37 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

J.      An order that Nike institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of gender, and that it eradicate the effects of their past and present unlawful employment practices;

K.      An order requiring Nike to develop and institute reliable, validated, and job-related standards for evaluating performance, determining pay, and making promotion decisions;

L.      An order appointing a monitor to ensure that Nike complies with the injunction provisions of any decree that the Court orders;

M.      An order retaining jurisdiction over this action to ensure that Nike complies with such a decree;

N.      An order restoring Plaintiffs and Class and Collective Action Members to their rightful positions at Nike (i.e., reinstatement), or in lieu of reinstatements, an order for front pay benefits;

O.      Back pay for lost compensation and equity distribution (including interest and benefits) for Plaintiffs and Class and Collective Action Members;

P.      Liquidated damages;

Q.      Exemplary and punitive damages in an amount commensurate with Nike's ability to pay and to deter future conduct;

R.      Reasonable attorneys' fees and costs to the extent allowable by law, including, but not limited to, ORS 659A.885(1) and 29 U.S.C. § 216(b);

S.      Pre-judgment and post-judgment interest, as provided by law; and

T.      Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

**Page 38 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and 29 U.S.C. § 216(b),

Plaintiffs and the Class/Collective Members demand a trial by jury in this action.

DATED this 9th day of August, 2018.

MARKOWITZ HERBOLD PC

By:    *s/ Laura Salerno Owens*

Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Anna M. Joyce, OSB #013112
(503) 295-3085

-and-

GOLDSTEIN, BORGEN, DARDARIAN & HO
Laura L. Ho (*pro hac vice* application forthcoming)
Barry Goldstein, Of Counsel (*pro hac vice* application
forthcoming)
Byron Goldstein (*pro hac vice* application forthcoming)
Katharine L. Fisher (*pro hac vice* application
forthcoming)
(510) 763-9800

ACKERMANN & TILAJEF PC
Craig Ackerman (*pro hac vice* application forthcoming)
(310) 277-0614

INDIA LIN BODIEN, ATTORNEY AT LAW
India Lin Bodien (*pro hac vice* application forthcoming)
(253) 503-1672

Of Attorneys for Plaintiffs and Opt-In Plaintiffs

**Page 39 - CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**