**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1211 SW Fifth Avenue, Suite 3000
Portland, OR  97204-3730
Telephone: (503) 295-3085
Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (*pro hac vice* application forthcoming)
bgoldstein@gbdhlegal.com
**James Kan** (*pro hac vice* application forthcoming)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Telephone: (510) 763-9800
Fax: (510) 835-1417

Attorneys for Plaintiffs and Opt-In Plaintiffs
[Additional Counsel of Record Listed on Signature Page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477<br><br>**FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**<br><br>**Title VII of the Civil Rights Act of 1964; Federal Equal Pay Act; Oregon Equal Pay Act; Oregon Equality Act**<br><br>**DEMAND FOR JURY TRIAL** |

**Page 1 -  FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

1.      At Nike headquarters, the numbers tell a story of a company where women are devalued and demeaned.  For many women at Nike, the company hierarchy is an unclimbable pyramid—the more senior the job title, the smaller the percentage of women.  The inequity for women at Nike starts before they do, with decisions about starting pay.

2.      But the story is not just about numbers.  Women's career trajectories are blunted because they are marginalized and passed over for promotions.  Nike judges women more harshly than men, which means lower salaries, smaller bonuses, and fewer stock options.  Women's complaints to human resources about discrimination, including unequal pay, unequal promotions, and harassment are ignored or mishandled.  Male bad behavior is rarely penalized.  For a woman to succeed at Nike, she must far outshine her male counterparts.

3.      To stop Nike's discrimination of women, plaintiffs Kelly Cahill, Sara Johnston, Heather Hender, and Lindsay Elizabeth ("Plaintiffs") bring this sex discrimination class and collective action against Nike, Inc. ("Nike"), on behalf of themselves and all other women who are similarly situated ("Class/Collective Members"),[1] and allege as follows.

## I.      SUMMARY OF CLAIMS

4.      Nike pays and promotes women less than men at Nike headquarters.  These disparities occurred, and continue to occur, because of specific employment policies or practices that are developed and carried out in a workplace that is hostile towards and devalues women, and where the ultimate arbiters of these policies or practices are a small group of majority-male high-level executives.  Nike has thus violated, and continues to violate, the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"); the Federal Equal Pay Act ("EPA"), 29 U.S.C. §

---

[1] *See* Sections V and VI for the collective action and class action definitions.

**Page 2 -   FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
               **COMPLAINT**

206(d); the Oregon Equal Pay Act, ORS 652.220; and the Oregon Equality Act, ORS 659A.030. The Class/Collective Members seek an order ending Nike's discriminatory policies, patterns, and/or practices and making the Class/Collective Members whole.

5.     In this workplace environment, and with a small group of majority male decision-makers, the following policies, patterns, or practices each independently caused, and continue to cause, an adverse impact on and otherwise discriminate against Class/Collective Members based on their sex.

6.     First, Nike sets starting pay and other compensation-related terms based, in part, on prior compensation.  Around May 2018, Nike stated that it will "remove bias from critical moments of the hiring process by . . . *eliminating* the collection of candidate salary history . . . ."[2] (emphasis added).  The collection of prior compensation history causes women to receive lower starting salaries and other less favorable compensation-related terms.[3]

7.     Second, as part of its annual performance evaluation process, Nike rates each of its corporate employees.  The ratings are assigned according to a forced ranking system.  Nike utilizes a curve that limits the number of employees at Nike headquarters who can receive ratings in the top two levels.  This system causes Class/Collective Members to receive lower ratings than their male colleagues.  Lower ratings cause women to receive less compensation, including smaller annual salary increases, lower annual bonuses, and smaller equity distributions.  Ratings

---

[2] *See Nike, Inc. FY16/17 Sustainable Business Report*, 56, https://sustainability-nike.s3.amazonaws.com/wp-content/uploads/2018/05/18175102/NIKE-FY1617-Sustainable-Business-Report_FINAL.pdf. (Nike states that it will "remove bias from critical moments of the hiring process by . . . eliminating the collection of candidate salary history . . . .").

[3] As the Ninth Circuit recently stated, "the wage gap between men and women is not some inert historical relic of bygone assumptions and sex-based oppression," and "[r]eliance on past wages simply perpetuates the past pervasive discrimination that the Equal Pay Act seeks to eradicate."  *Rizo v. Yovino*, 887 F.3d 453, 468 (9th Cir. 2018).  The Ninth Circuit thus found "that past salary may not be used as a factor in initial wage setting, alone or in conjunction with less invidious factors."  *Id.*

**Page 3 -**  **FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

also affect promotions.  Lower ratings preclude promotions whereas higher ratings can lead to promotions.

8.      Third, Nike's budgeting system for finalizing annual salary increases and annual bonuses adversely impacts and otherwise discriminates against women.  Each year, Nike creates a set pool of money for each of its organizations that is then used to provide annual salary increases and bonuses.  A disproportionately low amount of these budgets is distributed towards women's annual salary increases and bonuses.

9.      Fourth, Nike's Organizational Talent Planning system identifies a disproportionately low number of women for promotional opportunities.

10.     Fifth, Nike has a pattern or practice of channeling women into positions and job assignments that Nike views as less valuable and that are less likely to lead to promotions or increased compensation.

11.     Nike has neither validated nor established the job relatedness of its policies or practices for its systems that determine starting pay, ratings, pay raises, bonuses, equity distributions, and promotions.

12.     Nike has intentionally and willfully discriminated against Class/Collective Members with respect to pay, promotions, and conditions of employment.  Two of Nike's most-senior executives – Trevor Edwards (Nike Brand President and the second most senior executive after the CEO from July 2013 to August 2018) and David Ayre (Vice-President in charge of HR from 2007 through July 2017) – caused and reinforced a workplace that was, and continues to be, hostile towards women and that devalues women.  The above-described policies or practices reflect Nike's discriminatory intent.  In addition, since before the class and collective action periods, Nike has been aware that Class/Collective Members are paid and promoted less than

male employees at Nike headquarters.  Nike has known that the above-described policies or

practices caused women to receive less pay and fewer promotions.  Nike has likewise long

known that Nike headquarters' workplace is hostile towards and devalues women.  For years,

women have reported hostility, sexual harassment, and inequality in pay and promotions to

Nike's Employee Relations department, which is the department within Nike Human Resources

that is primarily tasked with addressing workplace complaints, and to Nike's Human Resources

department ("HR").  Instead of addressing these complaints, HR has reinforced and exacerbated

the hostile work environment.  Regardless of the evidence, HR has regularly found such

complaints unsubstantiated, avoided taking any meaningful corrective or preventive actions, and

otherwise failed to act to end either the inequality in pay and promotions or the hostility towards

women in the workplace.

## II.    PARTIES

### A.    Plaintiff Heather Hender.

13.    Plaintiff Heather Hender is a current employee who has worked for Nike since

April 2015.  Her initial title was Manufacturing Engineer II, which Nike re-titled to "Process

Engineer" in 2016.  Ms. Hender was a Process Engineer II until September 2018, when she was

promoted to Senior Process Engineer I.

14.    When Nike hired Ms. Hender, she had nearly twenty years of engineering and

technical experience.  From 1989 through 2009, she was employed at Hewlett Packard in

technical and engineering positions, including as an Electro-Mechanical Technician and a

Process/Manufacturing Engineer.  After Hewlett Packard, Ms. Hender continued working as an

engineer, including as a Process Engineer for SolarWorld Industries America.

15.    Ms. Hender earned her A.S. in Electronics Engineering Technology from Linn-

Benton Community College in 1996.  While working at Hewlett Packard, Ms. Hender completed

**Page 5 -    FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
            COMPLAINT**

her Bachelor of Sciences degree in Manufacturing Engineering from The Institute of Technology Tallaght, which she received in 2006.

16.     Coinciding with the filing of this First Amended Complaint, Ms. Hender is filing her consent to be a party plaintiff in the EPA collective action pursuant to 29 U.S.C. § 216(b).

17.     Ms. Hender filed a sex discrimination charge with the EEOC on November 9, 2018.  By notice dated November 15, 2018, the EEOC issued a Notice of Right to Sue to Plaintiff Hender.

18.     Ms. Hender's charge was filed on behalf of herself and all other similarly situated female employees of Nike in the United States who worked in Nike's Corporate Division (non-retail Nike employees).  The similarly situated female employees include current and former female employees who worked at Nike headquarters.  The charge alleges that Ms. Hender and similarly situated female employees were, and continue to be, harmed by Nike's continuing policy, pattern, or practice of sex discrimination with respect to performance evaluations, pay, promotions, and other terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*., as well as the Oregon Equality Act, O.R.S. §§ 659A.001, *et seq.*

19.     Ms. Hender is a resident of Oregon.  Ms. Hender works for Nike in Washington County, Oregon.

**B.     Plaintiff Sara Johnston.**

20.     Plaintiff Sara Johnston worked at Nike from June 2008 to November 2017.

21.     From June 2008 to February 2010, Ms. Johnston worked part-time for Nike in the Employee Services department while simultaneously working a full-time job in the human resources department of a non-profit.  Ms. Johnston became a full-time Nike employee in February 2010 when she was hired as a Senior Account Service Representative.  She remained in

that position until August 2012, when she became a Junior Business Systems Analyst.  Ms. Johnston became an Intermediate Business Systems Analyst during the first six months of 2014 and remained in that position until she left Nike around November 1, 2017.

22.     Ms. Johnston resigned from Nike because she was paid less and received fewer promotions than male employees doing substantially equal work.  She also resigned because of a hostile work environment towards women and the failure of HR to assure a non-hostile work environment that provided equal opportunity.[4]  Ms. Johnston seeks reinstatement upon the remediation of Nike's discriminatory systems for pay, promotion, and employee complaints. When she resigned, Ms. Johnston followed Nike's complaint resolution procedure.  She requested a meeting with a vice-president in HR.  After that request, Ms. Johnston met with HR and told HR about the unequal and hostile treatment she was subjected to, and Ms. Johnston requested that corrective actions be taken.

23.     Before working at Nike, Ms. Johnston received her B.A. in Economics and an M.B.A., with a focus on quantitative analytics and human resources, from Willamette University. Ms. Johnston had also completed most of the coursework for a B.S. in Business Systems Analysis from the Oregon Institute of Technology.  Before becoming an Account Service Representative at Nike, Ms. Johnston worked in human resources and analytics positions for four years.

24.     On August 9, 2018, Ms. Johnston filed her consent to be a party plaintiff in the EPA collective action pursuant to 29 U.S.C. § 216(b).

---

[4] *See* Section IV(C)(2), *infra*, for details of Nike's failure to assure a non-hostile work environment with respect to Ms. Johnston.

**Page 7 -   FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
             COMPLAINT**

25.     Ms. Johnston filed a sex discrimination charge with the EEOC, which was cross-filed with Oregon Bureau of Labor and Industries ("BOLI"), on August 7, 2018.  By notice dated September 28, 2018, the EEOC issued a Notice of Right to Sue to Plaintiff Johnston.

26.     Ms. Johnston's charge was filed on behalf of herself and all other similarly situated female employees of Nike in the United States who worked in Nike's Corporate Division (non-retail Nike employees).  The similarly situated female employees include current and former female employees who worked at Nike headquarters.  The charge alleges that Ms. Johnston and similarly situated female employees were, and continue to be, harmed by Nike's continuing policy, pattern, or practice of sex discrimination with respect to performance evaluations, pay, promotions, and other terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*., as well as the Oregon Equality Act, O.R.S. §§ 659A.001, *et seq.*

27.     Ms. Johnston is a resident of Oregon.  Ms. Johnston worked for Nike in Washington County, Oregon.

**C.     Plaintiff Kelly Cahill.**

28.     Plaintiff Kelly Cahill was a full-time Nike employee from October 2013 to July 26, 2017, in a Director position.  From November 2012 to October 2013, Ms. Cahill worked for Nike in a Senior Producer position, a position that Nike classified as an independent contractor.

29.     Ms. Cahill resigned from Nike because of the hostile work environment, HR's ineffective response to her complaints, and the lack of promotion opportunities because of her sex.[5]

---

[5] *See* Section IV(C)(3), *infra*, for details of Nike's failure to assure a non-hostile work environment with respect to Ms. Cahill.

**Page 8 -    FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

30.     Before working at Nike, Ms. Cahill received a B.S. in Sports Marketing from the University of Oregon in 2004 and a Project Management Certification from the University of Washington in 2011.  From 2004 to November 2012, Ms. Cahill worked in marketing, business development, and digital advertising.

31.     On August 9, 2018, Ms. Cahill filed her consent to be a party plaintiff in the EPA collective action pursuant to 29 U.S.C. § 216(b).

32.     On July 25, 2018, Ms. Cahill filed a timely charge against Nike for violations of ORS 659A.030 with BOLI.  By notice dated August 27, 2018, BOLI issued a notice that Ms. Cahill's charge had been withdrawn due to the filing of the Complaint on August 9, 2018.

33.     Ms. Cahill's charge was filed on behalf of herself and all other similarly situated female employees of Nike in the United States who worked in Nike's Corporate Division (non-retail Nike employees).  The similarly situated female employees include current and former female employees who worked at Nike headquarters.  The charge alleges that Ms. Cahill and similarly situated female employees were, and continue to be, harmed by Nike's continuing policy, pattern, or practice of sex discrimination with respect to performance evaluations, pay, promotions, and other terms and conditions of employment.

34.     Ms. Cahill is a resident of Oregon.  Ms. Cahill worked for Nike in Washington County, Oregon.

**D.     Plaintiff Lindsay Elizabeth.**

35.     Plaintiff Lindsay Elizabeth worked for Nike from March 2015 to October 2018. From March 2015 to January 2017, Ms. Elizabeth worked in a design position that Nike classified as an independent contractor.  In January 2017, Ms. Elizabeth became a full-time employee with the title of Apparel Designer I.

**Page 9 -   FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

36.     Ms. Elizabeth received her Bachelor of Fine Arts in Apparel Design at the Art Institute of Portland in 2011.  Prior to joining Nike in 2015, Ms. Elizabeth was a product designer for various companies as well as her own brand.

37.     On August 24, 2018, Ms. Elizabeth filed her consent to be a party plaintiff in the EPA collective action pursuant to 29 U.S.C. § 216(b).

38.     Ms. Elizabeth filed a sex discrimination charge with the EEOC, which was cross-filed with BOLI, on August 23, 2018.  By notice dated September 28, 2018, the EEOC issued a Notice of Right to Sue to Plaintiff Elizabeth.

39.     Ms. Elizabeth's charge was filed on behalf of herself and all other similarly situated female employees of Nike in the United States who worked in Nike's Corporate Division (non-retail Nike employees).  The similarly situated female employees include current and former female employees who worked at Nike headquarters.  The charge alleges that Ms. Elizabeth and similarly situated female employees were, and continue to be, harmed by Nike's continuing policy, pattern, or practice of sex discrimination with respect to performance evaluations, pay, promotions, and other terms and conditions of employment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*., as well as the Oregon Equality Act, O.R.S. §§ 659A.001, *et seq.*

40.     Ms. Elizabeth is a resident of Oregon.  Ms. Elizabeth worked for Nike in Washington County, Oregon.

**E.     Defendant Nike.**

41.     Nike is the largest seller of athletic footwear and apparel in the world.  Its principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services.

42.     Nike is a corporation formed under the laws of Oregon and headquartered in Beaverton, Oregon.  Its fiscal year is from June 1st to May 31st.

43.     Nike headquarters consists of campuses in and around Beaverton, Oregon ("Nike Headquarters").  The Class/Collective Members all work or worked at Nike Headquarters.  The administration of these campuses is centralized, and the operations at Nike Headquarters are integrated.  For example, according to Nike, it is organized and operates as a "matrix organization, where team members often report into two areas, such as a geography and a global function;" in Nike Brand, for example, the Teams "work across . . . product engines[,] . . . categories[,] . . . and in our four geographies - North America; Europe, Middle East & Africa (EMEA); Greater China; and Asia Pacific & Latin America (APLA)."

44.     All of Nike's highest-level executives are located at Nike Headquarters, as are its HR and administrative functions.  There are approximately 10,800 Nike employees at Nike Headquarters.

45.     During all relevant times, Nike was Class/Collective Members' employer within the meaning of all applicable statutes.

### III.     VENUE AND JURISDICTION

46.     This Court has subject matter jurisdiction over the Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3) because Class/Collective Members assert federal claims arising under the laws of the United States and are brought to recover damages for deprivation of equal rights.  This Court has subject matter jurisdiction over the Equal Pay Act claim pursuant to 28 U.S.C. § 1331.

47.     This Court has supplemental jurisdiction over the Oregon law claims, ORS 652.220 and ORS 659A.030, because they arise from a common nucleus of operative facts with

**Page 11 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.  For example, the same high-level executives, hostile work environment, and policies, patterns, or practices caused the pay disparities in violation of Title VII and the EPA and caused the violations of the Oregon Equal Pay Act and the Oregon Equality Law.

48.    This Court has personal jurisdiction over Nike.  There is general jurisdiction over Nike because Nike Headquarters is located within this district in Beaverton, Oregon and Hillsboro, Oregon.  Nike conducts substantial business throughout this district and in the State of Oregon, and Nike employs thousands of workers in the state.

49.    Declaratory and injunctive relief are sought and authorized by 28 U.S.C. §§ 2201 and 2202 as well as 42 U.S.C. § 2000e-5(g)(1).

50.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3), because Nike maintains offices in this district, Nike conducts business in this district, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and records relevant to those events and omissions are maintained and administered in this district.

51.    Plaintiffs have exhausted their administrative remedies and complied with all statutory prerequisites to their Title VII claims.  Plaintiffs Johnston, Elizabeth, and Hender[6] filed charges of sex discrimination with the Equal Employment Opportunity Commission ("EEOC") on behalf of themselves and all other similarly situated female employees who worked at Nike Headquarters in a salaried, corporate position lower than Vice-President.  The charges include disparate impact and disparate treatment claims, including that Nike intentionally and willfully

---

[6] Plaintiff Cahill filed a charge with BOLI.

**Page 12 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
        COMPLAINT**

discriminated against Class/Collective Members with respect to pay, promotions, and conditions

of employment.  The charges allege that Plaintiffs and similarly situated female employees were

paid and promoted less than their male colleagues.  The charges allege that these disparities

occurred, and continue to occur, because of specific employment policies or practices that are

developed and carried out in a workplace that is hostile towards women.  The charges include

allegations that these alleged policies or practices include: basing starting pay and other

compensation-related terms on prior compensation; rating women lower than men in annual

ratings; distributing a disproportionately low amount of the budget used for salary increases and

annual bonuses to women; identifying a disproportionately low number of women for

promotional opportunities; channeling women into positions and job assignments that Nike

views as less valuable and that are less likely to lead to promotions or increased compensation.

52.      The EEOC issued a Notice of Right to Sue to Plaintiffs Johnston and Elizabeth on

September 28, 2018 and to Plaintiff Hender on November 15, 2018.  The First Amended

Complaint is being filed within ninety days of each Plaintiff receiving a Notice of Right to Sue.

Where applicable, under the Ninth Circuit's application of the single-filing rule, Plaintiffs

Elizabeth and Hender may "piggyback" off the previous filing of Plaintiff Johnston because

Plaintiff Johnston's EEOC charge relates to the same claims that the other Plaintiffs assert.

## IV.    FACTUAL ALLEGATIONS

**A.    Nike Headquarters has a disproportionately low number of women in higher-level positions and Band Levels.**

53.      At Nike, the more senior the job title, the smaller the percentage of women.  The

most senior job titles during Nike's 2017 fiscal year, after CEO, included President and Vice-

President.  Lower-level positions, in descending order, included Senior Director, Director,

Manager, and additional lower-level positions.

**Page 13 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

54.     Nike stated that, globally, during its 2017 fiscal year, 71% of its Vice-Presidents were men and 62% of its Directors and Senior Directors were men.[7]  Men make up significantly more than 62% of Senior Directors.  At Nike Headquarters, the breakdown of men and women in the Vice-President, Senior Director, and Director positions has been approximately the same as the global breakdown.

55.     Nike places all employees at Nike Headquarters in Band Levels.  There are six Band Levels; the Band Levels spell out the word "VALUES."  The S-Band is the highest level. All salaried corporate employees are in either the L, U, E, or S-Band.  These Band Levels are a corporate-wide system.  This system uniformly affects the salaries and annual bonuses of employees at Nike Headquarters.  The higher the Band Level, the greater the size of the annual bonus and the higher the range of potential salaries.

56.     As the Band Levels increase, the percentage of women decreases.

**B.     Forms of compensation.**

57.     Nike's compensation policies or practices are uniform for all employees at Nike Headquarters who hold a lower-level position than Vice-President.

58.     Employees at Nike Headquarters receive two forms of cash compensation, salary and annual bonus.

59.     Band Levels impact salary.  Within each Band Level, there is a range of salaries.

60.     Band Level also impacts an employee's annual bonus, which is determined according to Nike's "Performance Sharing Plan" ("PSP Bonus").  Nike has, and continues to, calculate the PSP Bonus according to a centrally-determined, uniform formula that consists of

---

[7] *See Nike FY 16/17 Sustainable Business Report*, 56, https://sustainability-nike.s3.amazonaws.com/wp-content/uploads/2018/05/18175102/NIKE-FY1617-Sustainable-Business-Report_FINAL.pdf.

**Page 14 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

two components.  One component is the "Team Award" and the other component is the "Discretionary Award."  Both components include an input based on the employee's Band Level.  Both components also include an input based on the amount of salary paid during the relevant fiscal year.  The Discretionary Award component also includes an input that is based on the employee's annual rating.[8]  Thus, the higher the Band Level, salary, or annual rating, the greater the PSP Bonus.

61.    Nike also distributes equity to some employees at Nike Headquarters.  Like the PSP Bonus, Band Level affects the amount of equity distribution.

62.    At least once per year, Nike implements its "Two Times Pay" policy or practice. During Two Times Pay, some employees at Nike Headquarters receive salary increases and/or other additional compensation.

63.    Nike does not provide its employees with compensation-related information that would permit employees to see whether there was pay equity between women and men.  Nike also discourages employees from discussing their compensation with each other.  When women ask HR for compensation-related information to assess whether there is pay equity, HR refuses to share the requested information.

**C.    Nike's hostile work environment devalues its female employees and adversely impacts their compensation and their promotional opportunities.**

64.    Nike did not have regular training for its employees at Nike Headquarters that specifically focused on addressing and preventing sexual harassment until, at the earliest, March 2018.

---

[8] *See* Section IV(E)(2), *infra*, for a description of Nike's rating system.

**Page 15 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
           COMPLAINT**

65.    Meanwhile, throughout the last several years, Nike HR has received numerous complaints about male supervisors, including Directors, Senior Directors, Vice-Presidents, and Presidents that described hostility towards women and/or sexual harassment directed at women.[9]

**1.    Two of Nike's most-senior executives caused and reinforced a hostile workplace for women.**

66.    Among the most significant arbiters of the policies, patterns, or practices concerning the compensation and promotional opportunities of employees at Nike Headquarters, were two executives who caused and exacerbated a hostile work environment towards Class/Collective Members.  These executives were Trevor Edwards, who, from July 2013 to August 2018, was the Nike Brand President and the second most senior executive after the CEO, and David Ayre, who was the Vice-President in charge of HR from 2007 through July 2017.

67.    Mr. Edwards was forced to resign from Nike because he caused and exacerbated a hostile workplace environment towards women.  Prior to March 2018, Nike intended for Mr. Edwards to be the next Nike CEO.  Less than one year before Mr. Edwards' departure was announced, Nike's Board of Directors ("Board") proposed awarding him a $6 million "retention award," which, according to the Board, is "intended to further promote retention of key leaders . . . ."[10]  The Board also proposed a 14.3% increase to Mr. Edwards' 2018 salary, which was a larger percent increase than the proposed salary increases for any other top Nike executive,

---

[9] *See* Alexia Campbell, *Report: HR Managers at Nike Ignored Complaints from Women Employees for Years*, Vox (Apr. 30, 2018), https://www.vox.com/policy-and-politics/2018/4/30/17302130/nike-women-harassment-discrimination-survey (numerous women reported that they found HR unhelpful and sometimes disrespectful).

[10] *See Nike Inc. 2018 Notice of Annual Meeting*, 17, https://www.sec.gov/Archives/edgar/data/320187/000032018718000144/nke-2018xdef14a.htm; *see also* Matthew Kish, *Exclusive: Departing Nike Executive Trevor Edwards was Company's Highest Paid*, Portland Bus. J. (July 25, 2018), https://www.bizjournals.com/portland/news/2018/07/25/exclusive-departing-nike-executive-trevor.html?ana=yahoo&yptr=yahoo.

**Page 16 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

including the CEO.[11]

68.    After Nike proposed that Mr. Edwards receive a $6 million retention award and a

14.3% increase to his salary, on or around March 5, 2018, a group of female employees

presented the CEO with a survey of female employees detailing sex discrimination at Nike.[12]

Ten days later, the CEO sent a letter to all employees at Nike Headquarters, stating: "Over the

past few weeks, we've become aware of reports of behavior occurring within our organization

that do not reflect our core values of inclusivity, respect and empowerment . . . ."[13]   The CEO

further wrote: "in light of my desire to accelerate change, I've made the decision to restructure

my leadership team into a different alignment that will allow for closer management and a

sharper focus on our culture . . . Trevor Edwards has decided to resign as Nike Brand President

and will retire in August."[14]   On or around May 3, 2018, during a company-wide meeting, the

CEO told employees that recent executive departures were related to workplace behavior.[15]

69.    Mr. Ayre was the Vice-President in charge of HR from 2007 through

approximately June 2017.  Mr. Ayre caused and fostered a hostile work environment towards

female Nike employees.  Nike conducted at least two internal investigations concerning whether

Mr. Ayre had caused or otherwise contributed to a hostile work environment towards female

employees at Nike, including Class/Collective Members.

---

[11] *See Nike Inc. 2018 Notice of Annual Meeting*, 20,
https://www.sec.gov/Archives/edgar/data/320187/000032018718000144/nke-2018xdef14a.htm.

[12] *See* Julie Creswell, *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*,
N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/nike-women.html.

[13] *See* Mike Rogoway, *Nike Sheds Second Top Executive Amid Inquiry into Workplace
'Behavior,'* The Oregonian (Mar. 16, 2018),
https://www.oregonlive.com/business/index.ssf/2018/03/nike_sheds_second_top_executiv.html.

[14] *Id.*

[15] *See* Kevin Draper, *Nike's C.E.O. Vows Changes After Claims of Workplace
Harassment and Bias*, N.Y. Times (May 5, 2018),
https://www.nytimes.com/2018/05/05/business/mark-parker-nike.html.

**Page 17 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
        COMPLAINT**

70.    Mr. Edwards and Mr. Ayre were responsible for supervising performance evaluation, compensation, and promotion practices as well as the system for reviewing and investigating workplace discrimination and harassment complaints.  As the second highest-level executive at Nike after the CEO, Mr. Edwards directly oversaw "all category and geographic business units, the Jordan Brand, Action Sports which includes Hurley International LLC, Digital Sport and brand management throughout the world" as well as Nike's "wholesale, retail and e-commerce operations."[16]  Mr. Edwards had control or influence over all employees at Nike Headquarters with respect to compensation, promotions, job assignments, and other employment terms and conditions.  As the head of HR, Mr. Ayre had "responsibility for Talent Management, Compensation, and Performance Management and Rewards"[17] as well as workplace complaints.  Mr. Ayre's responsibilities and actions thus affected all employees at Nike Headquarters.

71.    Nike said that its sex discrimination issues are restricted to "an insular group of high-level managers" who "protected each other and looked the other way."[18]  A longtime Nike executive stated, "Edwards and his team had an autocratic streak," and "everything had to get the blessing of the senior guys."[19]  Likewise, a former executive of one of Nike's affiliate companies said that Mr. Edwards "demanded obedience" and Nike "became very authoritarian."[20]

---

[16] *See NIKE Announces Strategic Leadership Changes* (Jun. 20, 2013), https://news.nike.com/news/nike-announces-strategic-leadership-changes.

[17] *See* Nike's Employment Offer Letter to David Ayre (Jul. 5, 2007), https://www.sec.gov/Archives/edgar/data/320187/000032018707000105/exhibit101.txt.

[18] *See* Julie Creswell, *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/nike-women.html.

[19] *See* Jeff Manning, *Inside Nike's Purge: More than a #MeToo Moment*, The Oregonian (Jul. 7, 2018), https://www.oregonlive.com/expo/news/erry-2018/07/93d33bff127706/vanquishing_team_edwards_a_new.html.

[20] *Id.*

**Page 18 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
        COMPLAINT**

### 2.    Plaintiff Johnston.

72.    Plaintiff Johnston was subject to and witnessed hostility towards women, was herself sexually harassed, and saw no meaningful corrective actions result from her several complaints to HR.

73.    Around December 2015, after a Nike-organized party, Ms. Johnston received inappropriate sexual propositions in messages from a male co-worker.  Ms. Johnston had to regularly work with this male co-worker and he contributed to Ms. Johnston's performance reviews.  Shortly thereafter, this co-worker sent nude photographs of himself to Ms. Johnston.  Ms. Johnston told him to stop sending her any messages not related to work, but he continued to do so.  He then treated her negatively at work, including blaming her unjustifiably for problems at work, refusing to attend meetings she organized, and withholding information from her that she needed to successfully complete her work.

74.    Around February 2016, Ms. Johnston reported this harassment to Directors who supervised her.  In response, one of the Directors said, in effect, that Nike has a culture that revolves around alcohol, that Ms. Johnston should let the incidents go, that the rise of the internet and cell phones have made drunk messages part of this generation, that she should be less sensitive to these messages, and that people should expect more such messages.  Ms. Johnston sought to move to a position that did not require interaction with the harassing male co-worker, but the Directors told her that she could not move positions.  Neither of these Directors, nor anyone else at Nike, took any meaningful corrective actions.

75.    Shortly after this conversation with her Directors, Ms. Johnston was told that the male co-worker who had harassed her had pushed a female co-worker against a wall and reached his hand up her skirt during the Nike-organized party in December 2015.  A different male co-

**Page 19 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
        COMPLAINT**

worker pulled this male co-worker away from the female co-worker who was getting assaulted. Several Nike employees, including Directors, witnessed this assault.

76.    Around March 2016, Ms. Johnston complained to HR.  She reported the harassment and hostility she had been subjected to; a confrontation she witnessed between a different female co-worker and the same male co-worker that was about harassing messages he had sent this female co-worker; and what she heard about the same male co-worker's December 2015 assault of a female co-worker (*see* ¶ 75).  Later, around May 2016, Ms. Johnston learned that the same male co-worker had sent sexual messages to several additional women at Nike. Ms. Johnston then met with HR to report this additional information.  During this meeting, HR told Ms. Johnston that it had completed its investigation, that no disciplinary or other measures were needed, and that, if she talked about the sexual harassment with other employees, she could be disciplined for harassing the male co-worker.

77.    Shortly after Ms. Johnston's initial complaints to the Directors, this male co-worker was promoted into a Manager position that would require Ms. Johnston to work more closely with him.  Ms. Johnston then complained about this to the Directors she reported to as well as to HR.  HR's only response to Ms. Johnston was that it would train supervisors to better handle sexual harassment complaints; but, no such training was provided to any of Ms. Johnston's supervisors.

78.    After making the complaints to her Directors and HR, Ms. Johnston did not receive the Highly Successful rating that her Director had previously told her she would receive. Ms. Johnston's Director refused to suggest this rating for Ms. Johnston even though he wrote, in her annual written performance evaluation, that Ms. Johnston was "performing a very difficult role that is a stretch role beyond the expectations of an Intermediate [Business Systems Analyst]

**Page 20 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

and would normally be performed by someone with the experience of a [Senior Business Systems Analyst] or Lead [Business Systems Analyst] position." Ms. Johnston was denied the higher rating in retaliation for her complaints about sexual harassment.

79.    Ms. Johnston was subject to hostility on other occasions.  For example, Ms. Johnston participated in a Nike-organized golf tournament where she was paired with Directors and a Senior Director.  After a Director hit a tee shot that did not go past the women's tee box, a Senior Director said to Ms. Johnston, in front of the Directors, that the Director who hit that tee shot should have to walk to the next hole with his genitals exposed.  That same Senior Director, on other occasions, gave Ms. Johnston unsolicited suggestions about how she should style her hair, including an occasion when he was simultaneously stroking Ms. Johnston's hair.  In another example, the work desk of a different Director had a photograph, from a Nike "team-building" event, that was visible to anyone who walked by of a male Director appearing to whip a female Director's backside.

### 3.    Plaintiff Cahill.

80.    Plaintiff Cahill was subject to and witnessed hostility towards women, and she saw no meaningful corrective actions result from her several complaints to HR.

81.    For example, a Vice-President who worked in the same department as Ms. Cahill, Daniel Tawiah, referred to women as "dykes" on several occasions.

82.    Around April 2016, Ms. Cahill, Mr. Tawiah, and several other employees at Nike Headquarters, including a male Director on her Team, were at a restaurant for dinner.  During the dinner, Mr. Tawiah said that a new Director was getting hired onto their Team.  Ms. Cahill asked Mr. Tawiah about the status of the hiring process because this Director would impact Ms. Cahill's work.  In response, Mr. Tawiah said to Ms. Cahill, in front of the other Nike employees

at dinner, that she did not need to know the status of the hiring process and that her opinion did not matter, even though the male Director on her Team was included in the hiring process.

83.    Ms. Cahill witnessed Mr. Tawiah, when he was a Senior Director, berate a female co-worker.  Around May 2016, Mr. Tawiah yelled at this female employee in front of Ms. Cahill and several other employees at Nike Headquarters.  Around July 2016, Mr. Tawiah again yelled at this female co-worker in front of several other employees.  Mr. Tawiah said that this female co-worker was a failure and that the failure of a project was all her fault.  Mr. Tawiah's criticisms were not only public and harsh but also false since Mr. Tawiah was mostly responsible for the failure to timely complete the project.

84.    Ms. Cahill complained to HR on four separate occasions, including about the above-described incidents.  None of her complaints resulted in any meaningful corrective action. Following several of these complaints, as well as complaints from other women to HR and senior managers about Mr. Tawiah, in January 2017, Nike promoted Mr. Tawiah to Vice-President.[21]

### 4.    Plaintiff Elizabeth.

85.    Plaintiff Elizabeth was subject to and witnessed hostility towards women and saw no meaningful corrective action when she complained to HR.

86.    On March 21, 2017, a female employee emailed numerous colleagues, including Ms. Elizabeth, proposing "a friendly game of hoops."  A male Vice-President who worked in the same department as Ms. Elizabeth responded to this group email within ten minutes writing, "Even girls?"  Shortly thereafter, Ms. Elizabeth forwarded this Vice-President's email to HR. Although this Vice-President then apologized for his comment, he was increasingly dismissive of Ms. Elizabeth's work product and ideas.

---

[21] Mr. Tawiah was terminated around April 2018.

**Page 22 -  FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
**COMPLAINT**

87.     Ms. Elizabeth's Design Director interrupted Ms. Elizabeth's work on numerous occasions to demand that Ms. Elizabeth clean the workspace that she shared with five to nine other employees on the Team, including the other employees' messes.  Ms. Elizabeth was the only female Designer on the Team and the only Designer told to clean.

88.     Ms. Elizabeth's supervisor did not allow her to present her work to the team. Instead, another male employee presented Ms. Elizabeth's work.  The male employees on Ms. Elizabeth's team presented their own work.

### 5.     Plaintiff Hender.

89.     Plaintiff Hender has been subject to and has witnessed hostility towards women.

90.     For example, there was a password that engineers on her Team needed to do their work.  A male Senior Engineer, who worked with Ms. Hender, told her, in front of numerous other Nike employees, that the new password was "for engineers only," even though Ms. Hender had been and was an engineer.  He then told Ms. Hender that she would need to ask one of three specific male engineers to input the password.  Among this group of male engineers was a new hire.

### 6.     Other female employees.

91.     Nike-organized recruiting parties perpetuated and reinforced Nike's devaluation of women.  For example, a Nike-organized recruiting party in August 2015 had "Nike branding almost everywhere" alongside "scantily clad [female] go-go dancers."[22]

---

[22] *See* Andrea Peterson, *Nike is partying in Vegas with Hackers*, The Wash. Post (Aug. 10, 2015), https://www.washingtonpost.com/news/the-switch/wp/2015/08/10/nike-is-partying-in-vegas-with-hackers/?noredirect=on&utm_term=.fa06fa37c10a.

**Page 23 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

92.     When Nike was recruiting Opt-In Plaintiff Samantha Phillips, she was invited to and did attend a Nike recruiting party.[23]  After Nike hired Ms. Phillips, Nike organized a recruiting party during a conference that Ms. Phillips attended, but did not invite Ms. Phillips even though several of her male peers were invited.  Nike also invited several lower-level female employees who directly reported to Ms. Phillips and who were approximately fifteen years younger than Ms. Phillips.

93.     A different female corporate employee in Oregon reported that, at a Nike-organized event at a restaurant in Las Vegas, Nike hired women for the event who "did not have much clothes on, and toward the end of the event, a lot of our male colleagues were drinking and dancing with them," which was "a really uncomfortable position to be in as far as a work-sponsored event."[24]

94.     On a separate occasion, a senior manager mentioned a female employee's breasts in an email.  After HR received a complaint about this email, HR's only response was to give a verbal warning to this senior manager.[25]

95.     Another female employee's male manager bragged to her about the condoms he always carried and the magazines he kept on his desk with scantily clad women on the covers.

---

[23] Ms. Phillips filed her consent to join the EPA claim on August 9, 2018.  Nike employed Ms. Phillips from June 2015 to approximately August 10, 2016.  She was in a Director position throughout her employment with Nike.  Ms. Phillips was paid less than male Nike employees for substantially equal work performed under similar working conditions at Nike Headquarters, in and around Beaverton, Oregon.

[24] *See* Erica Morrison, *Nike Sees Executive Departures in Harassment Reckoning*, Nat'l Pub. Radio (May 15, 2018), https://www.npr.org/2018/05/15/610445057/nike-sees-executive-departures-in-harassment-reckoning.

[25] *See* Julie Creswell, *At Nike, Revolt Led by Women Leads to Exodus of Male Executives*, N.Y. Times (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/nike-women.html.

**Page 24 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

This female employee complained to HR, which told her that she had made a mistake by not confronting him first.[26]

96.    Women said that their male supervisors discussed women's bodies and called women vulgar names, including, for example, "stupid bitch."

**D.    Nike's employment policies, patterns, or practices discriminate against women.**

**1.    Nike's system for setting starting salaries and Band Levels discriminates against women.**

97.    Nike admitted in approximately May 2018 that it has had a policy or practice of setting employees' starting salaries and Band Levels based, in part, on the employee's past compensation.

98.    Nike requested Plaintiff Cahill's compensation history when she was hired as a full-time employee. Nike then set Ms. Cahill's starting salary at approximately the same level of pay she was receiving in her prior position, and Nike placed her in the Band Level that contained this salary. Ms. Cahill's prior compensation was a significant factor in Nike's determination of Ms. Cahill's starting salary and Band Level.

99.    Nike asked Plaintiff Hender for her prior salary when she was hired. After receiving Ms. Hender's prior compensation, Nike set Ms. Hender's starting salary within $2,000 of what she would have been paid in her prior position had she worked full-time there for a full year.

100.    When Nike hired Plaintiff Elizabeth as a full-time employee, Nike utilized her prior salary. Ms. Elizabeth's starting salary was approximately the amount she would have been paid for a year of working at the hourly rate that she was paid as a contractor for Nike.

---

[26] *Id.*

**Page 25 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

101.    Ms. Elizabeth sought to negotiate for a higher salary but, in response to this request, she was told that Nike was unwilling to negotiate her salary.

102.    The consideration of prior compensation when setting starting salary discriminates against women because women are generally paid less than men in the marketplace even when men and women have similar knowledge, skills, abilities, and experiences.  When setting starting salary and Band Level, Nike has a policy, pattern, or practice of attributing significant weight to prior compensation history.

103.    Nike's disproportionate placement of women in lower Band Levels causes Class/Collective Members to receive smaller PSP Bonuses in addition to having lower salaries and less access to equity distribution.

**2.      Nike's rating system discriminates against women.**

104.    Nike assigns a rating, on an annual basis, to each of its corporate employees in Oregon who hold a lower-level position than Vice-President.  The ratings, in descending order, are: Exceptional, Highly Successful, Successful, Inconsistent, and Needs Improvement.[27]

105.    The rating affects the size of annual salary increases and PSP Bonuses.  There is a centrally-determined range of salary increases and PSP Bonus percentages that correspond to each rating.  The higher the rating, the higher the high-end and low-end of the range of salary increases and PSP Bonuses.  For example, a Highly Successful rating entitles an employee to a higher range of salary increases and PSP Bonuses than an employee who receives a Successful rating.

106.    The rating process is as follows:  First, each employee's direct manager makes an initial proposed rating.  Then, there are "calibration" meetings, which include higher-level

---

[27] For employees hired shortly before the ratings are finalized, Nike marks them as: Too New To Rate.

managers, before the final decisions on the ratings, which occur before the end of Nike's fiscal year on May 31.  At the calibration meetings, each employee's rating is reviewed and many of the proposed ratings are changed, especially the Exceptional and Highly Successful ratings.  Because the higher-level managers at Nike are majority male, the participants in the initial and subsequent calibration meetings are majority male.  Likewise, after the calibration meetings, the ultimate arbiters of the ratings are a small, majority male group of senior executives at the highest levels of management.  The ultimate arbiters regularly change the ratings that they receive from the calibration meetings, especially the proposed Exceptional and Highly Successful ratings.

107.    These modifications and final decisions are made pursuant to standardized criteria and corporate-wide policies, patterns, or practices.

108.    The standardized criteria include, first, a uniform definition for each rating level.

109.    Second, there is a forced ranking of all employees on a curve.  Nike policy states that no more than a certain percentage of employees can receive certain ratings.  For example, in 2016, Nike stated that no more than 5% of employees can receive an Exceptional rating, no more than 20% of employees can receive a Highly Successful rating, and at least 10% of employees must receive an Inconsistent rating.

110.    Third, each Class/Collective Member is rated on a curve against employees who are in many different job levels.  For example, employees in Senior Director, Director, Manager, or lower-level positions are all rated against one another on the same curve.

111.    Rating employees on the curve against other employees in the same organization causes the lower-level employees to receive lower ratings because the higher-level employees

are more visible to the ultimate arbiters of the ratings. Higher-level employees are also more likely to have previously received higher ratings.

112.    In addition, Nike has a policy or practice of further limiting the number of Exceptional and Highly Successful ratings that are assigned to the lowest-level positions. For example, Plaintiff Cahill was directed by a senior manager not to suggest an Exceptional rating for any of her direct reports and to suggest a Highly Successful rating for no more than two of her direct reports. Senior Directors receive a disproportionately high number of Exceptional and Highly Successful ratings as compared to employees in lower-level positions. Accordingly, since women hold a disproportionately low amount of higher-level positions, this process contributes to women receiving lower ratings than men.

113.    Nike's rating system includes criteria that are determined in an unreliable manner and that are not valid and job-related.

114.    This rating system causes Class/Collective Members to receive smaller salary increases, annual bonuses, and equity distributions than similarly-situated male employees.

115.    The rating system also adversely impacts the promotional opportunities available for Class/Collective Members because receiving a rating that is below Successful precludes promotions and high ratings can lead to promotions.

### 3.    Nike's budgeting system for annual salary increases and bonuses discriminates against women.

116.    Nike allocates a set pool of money for each of its organizations that is to be used for salary increases and PSP Bonuses ("Budget" or "Budgeting"). This Budget is less than the sum of money needed to award each employee the highest increase in salary and PSP Bonus that is within the range assigned to their rating. Like the rating system, the Budget for salary

increases and PSP Bonuses means that not all employees in the organization will receive the largest percent increase for salary or bonus that corresponds to their rating.

117.    The higher-level managers that make the allocation determinations are majority male.  The Budget allocation, like Nike's other policies, patterns, or practices, occurs within a workplace that is hostile to women.  The Budgeting process thus causes women to receive salary increases and PSP Bonuses that are closer to the low-end of the range associated with their rating than the salary increases and PSP Bonuses that their male colleagues receive.

**4.      Additional Nike systems discriminate against women.**

118.    Nike's systems for identifying employees for promotions, including its Organizational Talent Planning system, discriminate against Class/Collective Members' promotional opportunities because the ultimate arbiters are majority male and they make determinations within a workplace that is hostile towards women.

119.    Nike also has a pattern or practice of channeling Class/Collective Members into positions that are less likely to lead to promotions and increased compensation.  Meanwhile, male employees are more likely to get channeled into more valuable positions with greater opportunities for advancement and increased compensation.

120.    Class/Collective Members are discouraged from applying for management positions.  Class/Collective Members are judged according to a higher standard than men.  They are provided fewer opportunities to make themselves visible to the ultimate arbiters within Nike.

121.    These patterns or practices cause Class/Collective Members to receive fewer promotions, smaller salary increases, smaller bonuses, and less equity.

122.    The organizations and teams with higher percentages of women get smaller budgets to distribute for annual salary increases and PSP Bonuses.

123.    For example, when Ms. Johnston became a Junior Business Systems Analyst at the same time as two men, Ms. Johnston was placed on a Team whose members had fewer promotional and increased-compensation opportunities than the two men who were placed on a different Team.

124.    Likewise, many women said that they were marginalized, harassed, and thwarted in their careers while working at Nike Headquarters.[28]

**E.    Although Nike has been aware of the inequality in compensation and promotions, Nike has maintained its discriminatory employment policies, patterns, or practices.**

125.    Nike has a pattern or practice of ignoring complaints about inequality in pay and promotions as well as complaints against male employees for sexual harassment and workplace hostility.  Often, Nike even promoted and otherwise rewarded these male employees.

126.    Nike has long been aware of the disproportionately low percentage of women in its Director, Senior Director, and Vice-President roles.  For example, in April 2018, the current Vice-President of HR, Monique Matheson, stated, "[w]hile we've spoken about this many times, and tried different ways to achieve change, we have failed to gain traction—and our hiring and promotion decisions are not changing senior-level representation as quickly as we have wanted."[29]

127.    Nike is aware of the pay disparities between its female and male employees because Nike "conducts an annual pay analysis."[30]

---

[28] *See* Julie Creswell, *5 More Nike Executives Are Out Amid Inquiry Into Harassment Allegations*, N.Y. Times (May 8, 2018), https://www.nytimes.com/2018/05/08/business/nike-harassment.html (based on interviews of more than 50 current and former Nike employees).

[29] *See* Sara Germano, *Nike's HR Chief Says Company Fails to Promote Enough Women, Minorities—Memo* (April 4, 2018), https://www.wsj.com/articles/nikes-hr-chief-says-company-fails-to-promote-enough-women-minoritiesmemo-1522871805.

[30] *See* Kathy Gurchiek, *Nike Shoots for Pay Equity with Changes to Reward Program,* Society for Human Resource Management (July 27, 2018),

**Page 30 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
            COMPLAINT**

128.    Likewise, around June 2017, Nike's former Vice-President of HR, Mr. Ayre, sent an email to all corporate employees stating that Nike was going to examine whether there was a pay disparity between men and women.  About one month later, Mr. Ayre sent another company-wide email stating that Nike had reviewed whether there was sex discrimination, that any issues that had been identified were corrected, and that there were no remaining sex discrimination issues.  Absent from Mr. Ayre's email was any data or other support for his assertions that there were no remaining sex discrimination issues.

**F.    Class/Collective Members are paid and promoted less than male employees at Nike Headquarters.**

129.    Nike recognized, in a May 3, 2018 speech by the CEO, that it needs to change its hiring, compensation, and promotion systems.[31]

130.    Still, Nike has failed to eliminate, or even make reasonable and substantial progress on, the wage differentials between men and women.  Nike has also failed to fix its promotions systems, which discriminate against women.

131.    The same high-level executives make Nike's pay and promotion decisions and do so within the workplace's hostile environment towards women.

**1.    Plaintiff Cahill.**

132.    Nike paid and promoted Ms. Cahill less than her male colleagues.  When Ms. Cahill left Nike in July 2017, she was a Director in the E-Band.  Shortly thereafter, Nike replaced Ms. Cahill with a man who was given the title of Senior Director and placed in the S-Band.

---

https://www.shrm.org/resourcesandtools/hr-topics/behavioral-competencies/pages/nike-shoots-for-pay-equity-with-changes-to-reward-program.aspx.

[31] *See* Kevin Draper, *Nike's C.E.O. Vows Changes After Claims of Workplace Harassment and Bias*, N.Y. Times (May 5, 2018), https://www.nytimes.com/2018/05/05/business/mark-parker-nike.html.

**Page 31 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

Because the man who replaced Ms. Cahill was a Senior Director in the S-Band, he had a higher salary, received a larger bonus, and was granted more stock options than Ms. Cahill.

133.    As a Director in North America Marketing, Digital, Ms. Cahill managed the current and future seasonal initiatives on Nike.com.  This included overseeing brand campaigns on Nike.com, aligning Nike campaigns with wholesalers and retail stores, and improving customer experiences on Nike websites.  Ms. Cahill coordinated the strategy and execution of these digital campaigns with Nike's various sports categories.  The male Senior Director who replaced Ms. Cahill had substantially the same responsibilities.

134.    Plaintiff Cahill was paid approximately $20,000 less during Nike's 2017 fiscal year than a male Director on her Team who was doing substantially similar work as she was doing.  Like Ms. Cahill, this male Director worked in North America Marketing, Digital and he oversaw digital brand campaigns and coordinated the strategy and execution of these campaigns with Nike's various sports categories.

135.    At Nike, Ms. Cahill consistently met or exceeded the expectations for her position.  Ms. Cahill received a Highly Successful rating in 2014, 2015, and 2017 and she received a Successful rating in 2016.  Ms. Cahill also handled an increasing amount of work and responsibilities while she was a Director.  For example, in addition to her existing responsibilities, around the fall of 2016, Ms. Cahill took on the responsibilities formally assigned to a Director who left Nike, including the supervision of ten additional employees.

136.    In 2017, Ms. Cahill requested a promotion to Senior Director in North America Marketing, Digital.  Although Ms. Cahill was a Director in the E-Band for four years, had received a Highly Successful rating in 2014, 2015, and 2017, and had increasing responsibility, Nike never promoted her to Senior Director, an S-Band Level position.

**Page 32 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

2.      **Plaintiff Johnston.**

137.    Nike paid and promoted Ms. Johnston less than her male colleagues.  Ms.

Johnston became a full-time Nike employee in 2010, when she was hired as an Account Service

Representative ("ASR").   Approximately two months after Ms. Johnston was hired, Nike hired a

male ASR.  This male ASR and Ms. Johnston did substantially the same work and in the same

working conditions.  The male ASR's workspace was near Ms. Johnston's workspace, and they

both worked within the same Team.  Ms. Johnston trained this male ASR on their responsibilities

and tasks.  Both Ms. Johnston and this male ASR assisted with logistics for product orders, and

they both focused on a specific account that was purchasing Nike products.  They both entered

data for the orders, tracked the orders, and communicated with representatives from the account

about the orders.  Yet, Ms. Johnston's starting salary was $33,000 and this male ASR's starting

salary was $35,000.  This inequality occurred despite Ms. Johnston's more significant relevant

work experience, college degree, and graduate school degree.  In contrast, the male ASR's

highest-level credential was a high-school diploma and whose only work experience was selling

goods at a kiosk in a mall.

138.    Ms. Johnston's next position at Nike was a Junior Business Systems Analyst ("Jr.

BSA") position.  Ms. Johnston became a Jr. BSA around August 2012 and remained in that

position until she was promoted to Intermediate Business Systems Analyst ("Intermediate

BSA"), which happened during the first six months of 2014.

139.    BSAs help integrate Nike's business operations with its technology operations.

To do this, BSAs communicate with employees in the business operations to understand their

goals.  BSAs then communicate with employees in the technology operations to get software

developed that will meet the business operations' goals.  Until the software supports the desired

business functions, the BSAs work in an iterative process with the business operations and

**Page 33 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
             **COMPLAINT**

technology operations.  Jr. BSAs are the lowest-level BSAs, it is an entry-level role, and, as Jr. BSAs are trained and gain experience, they are supposed to advance to Intermediate BSA and other higher-level BSA positions.  The higher-level BSA positions do substantially the same work as the lower-level BSA positions but with greater responsibilities for the product.  There are BSAs on different Teams, and BSAs on different Teams do substantially the same work as described above.

140.    The Jr. BSAs on certain Teams are paid more and promoted faster than the Jr. BSAs on other Teams.  When Ms. Johnston applied for and became a Jr. BSA, there were many Jr. BSA openings within Nike's technology organization.  Two of those openings were on a Team that focused on SAP software.  Ms. Johnston had experience with SAP, but Nike placed her on a different Team.  Around the same time, Nike placed two male Junior BSAs on the team that focused on SAP software even though neither of them had any SAP experience.  Ms. Johnston and these two male Jr. BSAs were hired from the same pool of applicants and were placed on their respective Teams from the same pool of recently-hired Jr. BSAs.  The Jr. BSAs on the Team that focused on SAP were paid more and promoted faster than Jr. BSAs on other Teams, including Ms. Johnston's Team.  Ms. Johnston's Team was majority-female and the Team focusing SAP was majority-male.

141.    Ms. Johnston was promoted later and not as high as the above-mentioned two male Jr. BSAs.  Those two male Jr. BSAs were promoted to Intermediate BSAs within one year of their hire and to Senior BSAs, a U-Band position, within two years of their hire.  By contrast, even though her manager recommended her for promotion to Intermediate BSA in both 2015 and 2016, Ms. Johnston was not promoted to Intermediate BSA until 2017, two years after she began working as a Jr. BSA, a L-Band position.  Even with her promotion, Ms. Johnston remained at

**Page 34 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

the L-Band Level, not the higher U-Band Level to which the male BSAs were promoted.

142.    Even once she was promoted, Ms. Johnston was paid less than the two male Jr.

BSAs.  Ms. Johnston was performing substantially the same work as higher-level BSAs, but she

was paid less than these higher-level BSAs.  For example, Ms. Johnston's direct manager wrote,

in her fiscal year 2014 written performance evaluation, that Ms. Johnston "has continued[sic] to

exceed . . . expectations for an[sic] entry level [Business Systems Analyst] as she continues to

consistently perform the same work as the Senior [Business Systems Analysts] with little

assistance required."

143.    After Ms. Johnston was promoted to Intermediate BSA, she continued to perform

the work of higher-level positions but without the corresponding salary and Band Level increase.

For example, starting around October 2016, Ms. Johnston became a product owner, which meant

that she was the person responsible for the success of her product that the BSAs were helping to

develop.  As a product owner, she made decisions about what work needed to be done, outlined

the tasks for her team, and ensured the work was completed.  BSAs did not become a product

owner, typically, unless they were a Senior BSA or Lead BSA, which are both U-Band level

positions.  These are U-Band positions with higher compensation than Ms. Johnston, who

remained an Intermediate BSA, an L-Band position.  The Director to whom Ms. Johnston

reported wrote her around the end of September 2016 and said that she was in "the role of

product owner, where [she] will be evaluated based on this being a stretch role . . . since this role

aligns organizationally with [a Senior Business Systems Analyst] and Lead [Business Systems

Analyst] job class, and the role of Product Analyst . . . ."

144.    Ms. Johnston was also paid less than and did not receive the promotions of male

BSAs who replaced Ms. Johnston after Ms. Johnston left Nike.  Shortly after Ms. Johnston left,

Nike split her work and responsibilities into two positions, a man was hired into each of those positions, and both men were placed in the U-Band. As a result, these two men were each just responsible for part of Ms. Johnston's workload, yet both had larger salaries and bonuses than Ms. Johnston.

### 3.    Plaintiff Elizabeth.

145.    Plaintiff Elizabeth was paid and promoted less than similarly situated male employees. When Ms. Elizabeth was hired to work as a contractor in Design for Nike, in about March 2015, Nike hired a male intern. Before Ms. Elizabeth was re-classified to a full-time employee, this male intern had been promoted to Designer I and then promoted to Designer II.

146.    When Nike made her a full-time employee in January 2017, Ms. Elizabeth was labeled an Apparel Designer I, which placed her in the L-Band. Around February 2018, Ms. Elizabeth was transferred from a Team in Nike's Jordan Brand to another category. Later that Spring, Nike filled Ms. Elizabeth's former role in Nike's Jordan Brand with a male employee. This male employee thus had Ms. Elizabeth's former responsibilities and the position required substantially the same amount of skill and effort. In contrast to Ms. Elizabeth, Nike provided her male replacement with a higher-level title, Designer II, paid him a larger salary, and he received a larger annual bonus.

147.    Like her male replacement, Nike should have made Ms. Elizabeth a Designer II because she did the work of a Designer II. A Senior Designer working in Nike's Jordan Brand said, on several occasions throughout Ms. Elizabeth's time working in Nike's Jordan Brand, that she was doing the work of a Designer II.

148.    Like other Designers at Nike, Ms. Elizabeth conceptualized and created plans for making Nike apparel. The bulk of this work entailed planning and determining the aesthetics and properties of specific apparel items. Ms. Elizabeth's workspace was in the same room as

**Page 36 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
              COMPLAINT**

many other apparel designers, including Apparel Designer IIs.  Ms. Elizabeth and the other

Apparel Designers spent a substantial amount of time discussing how to plan and determine the

aesthetics and properties of the apparel items.  In addition, following the conceptualization

process, Ms. Elizabeth, like the other Apparel Designers, used Adobe Illustrator, a computer-

aided software program, to communicate the design to other members of her Team.  After the

Team's review of this design, Ms. Elizabeth, like the other Apparel Designers, used Adobe

Illustrator to create a more technically detailed design that would be sent to the manufacturing

facility to make the apparel.  To complete these tasks, an Apparel Designer had to understand

construction of apparel, textiles, the consumer, and Nike's seasonal strategy.

149.    Around January 2017, Ms. Elizabeth requested that she become an Apparel

Designer II, but Nike designated her an Apparel Designer I.  Meanwhile, Nike promoted a male

Designer I on her Team to Designer II.  Ms. Elizabeth had been working longer at Nike in

Design than this male Designer who was promoted, Ms. Elizabeth had been meeting or

exceeding expectations in her role, and she had at least as much relevant experience as this male

Designer.

150.    At Nike, Ms. Elizabeth consistently met or exceeded the expectations for her

position.  For example, around June 2017, the Senior Design Director of Apparel said that Ms.

Elizabeth would have gotten a Highly Successful rating, instead of Successful, had she been a

full-time employee for longer.  While Ms. Elizabeth was a Designer I, she had the

responsibilities of the Designer IIs who worked nearby her.

### 4.    Plaintiff Hender.

151.    Nike has and continues to pay and promote Ms. Hender less than her male peers.

When Nike hired Ms. Hender as a Manufacturing Engineer II (later re-titled to Process Engineer

II), Nike placed her in the L-Band and Nike paid her a salary that was in the lower end of the

**Page 37 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
          COMPLAINT**

salary range for that Band Level.  Although Ms. Hender's title was Manufacturing/Process

Engineer II, her duties and responsibilities were substantially the same as a male Senior Process

Engineer I on her Team who had his workspace near Ms. Hender's workspace.

152.    Ms. Hender, both when she was a Manufacturing/Process Engineer II and then as

a Senior Engineer I, worked on the processes and equipment that are used to turn raw materials

into components of Nike footwear.  A male Senior Engineer I had the same job duties, including

working on the processes and equipment that are used to turn raw materials into components of

Nike footwear.  Both Ms. Hender and the male Senior Engineer I specify, integrate, and monitor

the equipment and processes that manufacture these components of Nike footwear.  The Process

Engineers work with people across the manufacturing system at Nike to align the manufacturing

with the business strategy and goals.  To accomplish these tasks and responsibilities, the Process

Engineers need to have competence in design software, communication with others working in

manufacturing, and project management.

153.    This male Senior Process Engineer I had a higher-level title and a higher Band

Level (U-Band) than Ms. Hender.  As a result, this male Senior Process Engineer I had a higher

salary and received larger bonuses than Ms. Hender did for, at least, the time that Ms. Hender

was a Manufacturing/Process Engineer II.

154.    Since Ms. Hender was promoted to Senior Process Engineer I in the U-Band in

September 2018, Ms. Hender's work level, responsibilities, requirements, and direct manager

have stayed substantially the same.  Ms. Hender has also continued to work on the same

engineering Team and within the same Organization, Air Manufacturing Innovation, as when she

was a Manufacturing/Process Engineer II.

155.    At Nike, Ms. Hender consistently met or exceeded the expectations for her position.  For example, Ms. Hender received a Successful rating in both 2016 and 2017 and a Highly Successful rating in 2018.  Before Ms. Hender's September 2018 promotion to Senior Process Engineer I, her direct supervisor said, in both 2017 and 2018, that Ms. Hender was doing the work of a Senior Process Engineer.

### 5.    Opt-in Plaintiff Olson.

156.    Ms. Olson was paid and promoted less than similarly situated male employees. For example, as described below, shortly after Ms. Olson left Nike in June 2017, Nike assigned Ms. Olson's responsibilities and work to a male employee who was given a higher-level title and Band Level than Ms. Olson.

157.    Nike employed Ms. Olson from 1991 through June 2017.[32]  From 2000 through June 2017, Ms. Olson was a Manager in World Headquarters Security.  On that Team, there were approximately seven Nike employees in World Headquarters Security who reported directly to Ms. Olson, and Ms. Olson was indirectly responsible for managing the approximately seventy employees in World Headquarters Security.  Ms. Olson reported directly to the Senior Director of Global Security.  Before Ms. Olson's Nike employment ended, there were no Senior Managers, other Managers, or Directors in World Headquarters Security.

158.    Ms. Olson was responsible for ensuring that the security procedures at Nike Headquarters were in place and working well.  This included coordinating with law enforcement, planning event security, monitoring security patrols, coordinating access for Nike employees, and ensuring proper procedures for visitors.

---

[32] Ms. Olson filed a consent to join the EPA claim on November 8, 2018.  As of the filing of this First Amended Complaint, there are nine opt-in plaintiffs for the EPA claim.

**Page 39 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

159.    Ms. Olson regularly attended meetings with Nike Directors and other managers from other Nike Organizations and Teams, where the meetings focused on how Nike business operations interacted effectively with established security standards.  Ms. Olson was also responsible for coordinating with the other security Teams at Nike during a weekly staff meeting.  There, Ms. Olson and Directors in Nike Security updated one another regarding the status of security-related items and coordinated security.

160.    Ms. Olson met or exceeded the expectations for her position.  For example, Ms. Olson received a Successful rating in 2015 and 2016, and she received a Highly Successful rating in 2013, 2014, and 2017.   When Ms. Olson left Nike, a Senior Director in Global Security sent an announcement: "over the course of her outstanding career, [Ms. Olson] has developed the WHQ campus security team into what I feel is the best campus security organization in the world, bar none. Her work has influenced countless projects throughout the world, and it's safe to say, Nike would not be as secure as it is, without her tireless leadership. She will be greatly missed by everyone who has had the pleasure of working with her."

161.    Ms. Owen was in the U-Band throughout her entire seventeen years as a Manager in World Headquarters Security, where she was he most-senior level employee below the Senior Director.  Yet, even by the time Ms. Olson left Nike in June 2017, Ms. Olson was not at the higher end of the U-Band's salary range.

162.    On numerous occasions, including in 2017, Ms. Olson asked her direct supervisor and other higher-level managers for a promotion to Director and for a Manager to be hired under her to help manage World Headquarters Security.  But, Nike never promoted Ms. Olson. Meanwhile, the Senior Director who was Ms. Olson's direct supervisor said that Ms. Olson

**Page 40 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

should be a Director and that, if Ms. Olson left Nike, her replacement would be a Director.  Ms. Olson's supervisor made these statements in both 2016 and 2017.

163.    Within approximately four months of Ms. Olson leaving Nike, she was replaced by a man who was given the title that Ms. Olson had requested on numerous occasions, Director in World Headquarters Security.  Like Ms. Olson, this male Director worked at Nike Headquarters and reported directly to the Senior Director of Global Security.  This male Director's position required substantially the same, or less, responsibility, effort, and skill as was required of Ms. Olson's position.  In contrast to Ms. Olson, this male Nike employee received the Director title and was placed in the E-Band.  This male Director was thus paid a higher salary than Ms. Olson, received a larger annual bonus than Ms. Olson, and received stock options whereas Ms. Olson did not receive any stock options.

## V.    COLLECTIVE ACTION ALLEGATIONS

164.    Plaintiffs and the Collective Action Members re-allege and incorporate the preceding paragraphs as alleged above.

165.    Plaintiffs bring this collective action for injunctive, declaratory, and monetary relief pursuant to 29 U.S.C. § 216(b) on behalf of the following Collective Action:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed by Nike at any time from three years prior to opting-in through the resolution of this action, in a salaried, corporate position that was or is a lower-level position than Vice-President ("Collective Action Definition," "Collective Action," or "Collective Action Members").

166.    Excluded from the Collective Action are Nike retail store employees, lawyers within Nike's Legal department and employees in Nike's Finance and HR departments. Plaintiffs reserve the right to amend the definition of the Collective Action based on discovery or legal developments.

**Page 41 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
        COMPLAINT**

723323.14

167.    Nike has engaged in systemic sex discrimination in pay against Class/Collective Members.  Nike paid Collective Action Members less than it paid male employees with substantially equal job duties that required substantially similar skill, effort, and responsibility, and were performed under similar working conditions within the same establishment.

168.    Nike has caused, contributed to, and perpetuated sex-based pay disparities through common policies, patterns, or practices, including but not limited to those relating to starting salary and Band Level, annual ratings, promotions, performance management policies or practices, centralized decision-making, and a work environment hostile to women.  Plaintiffs and the Collective Action Members are similarly situated pursuant to 29 U.S.C. § 216(b) because Plaintiffs and the Collective Action Members were paid less than male employees who had substantially equal job duties that required substantially similar skill, effort, and responsibility, and were performed under similar working conditions within the same establishment.

169.    Plaintiffs seek to be appointed as representatives of the Collective Action.

170.    There are many similarly situated Collective Action Members who would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the present lawsuit.  Notice should be sent to the Collective Action Members pursuant to 29 U.S.C. § 216(b).

171.    Questions of law and fact common to Plaintiffs and Collective Action Members include, but are not limited to, the following:

> a.    Whether Nike's starting salary and Band Level policies, patterns, or practices caused Collective Action Members to receive less compensation than their male colleagues;

**Page 42 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

723323.14

    b.     Whether Nike has a policy, pattern, or practice of requesting prior compensation history upon hiring that discriminates against Collective Action Members;

    c.     Whether Nike's annual ratings of employees at Nike Headquarters discriminates against Collective Action Members;

    d.     Whether the curve and/or employee groupings for the ratings discriminate against Collective Action Members; and

    e.     Whether Nike's campuses in and around Beaverton, Oregon are part of the same "establishment" according to the EPA.

172.    Nike is aware or should have been aware that federal law requires it to pay its female employees at a rate commensurate to that of male employees performing substantially similar work.

173.    As part of its regular business practice, Nike willfully, and repeatedly, engaged in a uniform pattern, practice, or policy of violating the EPA with respect to Plaintiffs and Collective Action Members.

174.    Nike's deceptive conduct prevented Collective Action Members from discovering or asserting their claims earlier than they did because Nike, for example, expressly and inaccurately told employees at Nike Headquarters that there was no sex inequality in compensation.

## VI.    CLASS ACTION ALLEGATIONS

175.    Plaintiffs and the Class Members re-allege the foregoing paragraphs of this Complaint as though fully set forth herein.

**Page 43 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

176.    Plaintiffs bring this action as a class action for injunctive, declaratory, and monetary relief pursuant to Rule 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure for violations of Title VII, ORS 652.220 and ORS 659A.030 on behalf of the following Class:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed by Nike at any time from October 11, 2017 through the resolution of this action for claims under Title VII, and for the period from August 9, 2017 through the resolution of this action for claims under ORS 652.220 and ORS 659A.030, in a salaried, corporate position that was or is a lower-level position than Vice-President ("Class Definition," "Class," or "Class Members").

177.    Excluded from the Class are Nike retail store employees, lawyers within Nike's Legal department and employees in Nike's Finance and HR departments. Plaintiffs reserve the right to amend the definition of the Class based on discovery or legal developments.

178.    Plaintiffs are members of the Class they seek to represent.

179.    This action is properly maintained as a class action. The Class satisfies all the requirements of Rule 23 for maintaining a class action.

180.    **Ascertainability.**  The members of the Class are known to Nike. Nike's business records memorialize their names, sex, compensation, promotions, annual ratings, job titles, and other relevant records. Moreover, the Class Definition enables every putative class member to identify herself as a member of the Class.

181.    **Numerosity.**  The Class is so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court. There are at least 500 members of the Class.

182.    **Existence and predominance of common questions of law or fact.**  There are questions of law or fact that are common to the Class, and these common questions predominate over questions affecting any individual Class Member. Nike's uniform employment policies,

**Page 44 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
        COMPLAINT**

patterns, or practices discriminate against all Class Members. The uniform policies, patterns, or practices relate to: the setting of starting salary and Band Level; Nike's annual ratings; Nike's Organizational Talent Planning System; a small group of high-level executives who are majority male and the ultimate arbiters with respect to Nike's policies, patterns, or practices; and a work environment that is hostile towards women. The common nucleus of operative facts also includes: Nike's Band Levels; the Budgeting related to the annual salary increases and the amount of the PSP Bonuses; and the formula used for the PSP Bonus calculation. Common questions of law or fact include without limitation:

    a.    Whether Nike's policies or practices discriminate against Class Members holding a job title that is lower than Vice-President;

    b.    Whether Nike's starting salary and Band Level policies, patterns, or practices discriminate against Class Members;

    c.    Whether Nike has a policy, pattern, or practice of requesting prior compensation upon hiring that discriminates against Class Members;

    d.    Whether Nike's annual ratings of employees at Nike Headquarters discriminates against Class Members;

    e.    Whether the curve and/or employee groupings for the ratings discriminate against Class Members;

    f.    Whether Nike's compensation system discriminates against Class Members;

    g.    Whether Nike's promotion system discriminates against Class Members;

    h.    Whether Class Members are disproportionately and discriminatorily assigned to and retained in lower Band Levels;

i.    Whether Nike continued pay, promotion, and other terms and conditions of employment systems that it knew or should have known have discriminated against Class Members;

j.    Whether a small group of mostly male senior executives are the ultimate arbiters with respect to compensation, ratings, and promotions;

k.    Whether Trevor Edwards and/or David Ayre caused and/or fostered a hostile work environment towards women;

l.    Whether a hostile work environment further contributes to discrimination against Class Members by causing them to receive less compensation and fewer promotional opportunities than male employees at Nike Headquarters;

m.    Whether Nike's policies or practices related to setting compensation and making promotions disparately impacts women compared to men based on sex;

n.    Whether Nike's policies or practices related to compensation and making promotions are valid, job-related, and consistent with business necessity; and

o.    Whether, even if such systems or policies could be justified by business necessity and shown to be job-related, less discriminatory alternatives exist and would equally serve any alleged necessity.

183.    **Typicality.**  Plaintiffs' claims are typical of those of the Class Members because they were subject to the same employment policies or practices, and Nike has no defenses that are unique to Plaintiffs.

**Page 46 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
          COMPLAINT**

184.    **Adequacy of representation.**  Plaintiffs will fairly and adequately protect the interests of the class and have no interests adverse or antagonistic to the interests of the other members of the Class.  Plaintiffs have retained competent counsel who are experienced in the prosecution of discrimination class actions.

185.    **Superiority.**  A class action is superior to other methods for the fair and efficient adjudication of the claims asserted herein.  A class action will permit the large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of time and expense that the prosecution of numerous individual actions would entail.

186.    Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(2) because Nike has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole.  The Class Members are entitled to injunctive relief to end Nike's common, uniform, unfair, and discriminatory policies, patterns, and/or practices.

187.    Class certification is also appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Nike's common, uniform, unfair, and discriminatory policies, patterns, or practices have damaged Class Members and they are entitled to recovery.  Nike has computerized account data, payroll data, and personnel data that will make calculation of damages for specific Class Members efficient and manageable. The propriety and amount of punitive damages are based on Nike's conduct, making these issues common to the Class.

**Page 47 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
                 COMPLAINT**

723323.14

**FIRST CLAIM FOR RELIEF**
**Federal Equal Pay Act**
**(The Fair Labor Standards Act of 1938, as amended by**
**The Equal Pay Act, 29 U.S.C. §§ 206, *et seq*.)**
**(On Behalf of Plaintiffs and the Collective Action Members)**

188.    Plaintiffs and the Collective Action Members re-allege and incorporate the preceding paragraphs as alleged above.

189.    Nike has discriminated against Plaintiffs and the Collective Action Members in violation of the EPA, 29 U.S.C. § 206(d).  Nike has paid Plaintiffs and the Collective Action Members less than similarly situated male colleagues performing substantially similar work on jobs the performance of which requires similar skill, effort, and responsibility, and which are performed under similar working conditions within the same establishment.

190.    The differential in pay between male and female employees is due to sex and not due to seniority, merit, quantity or quality of production, or any other factor other than sex.

191.    Nike did not act in good faith, and caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA. The foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Nike has willfully violated the EPA, a three-year statute of limitations applies to the claims of Plaintiffs and Collective Action Members, pursuant to 29 U.S.C. § 255(a).

192.    As a direct result of specific employment policies, patterns, or practices, Collective Action Members have suffered damages including, but not limited to, lost past and future income, compensation, equity distributions, and other benefits.

193.    Plaintiffs and the Collective Action Members request relief as hereinafter described.

**SECOND CLAIM FOR RELIEF**
**Title VII – Disparate Impact**
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the**
**Lilly Ledbetter Fair Pay Act of 2009)**
**(On Behalf of Plaintiffs and the Class Members)**

194.    Plaintiffs and the Class Members re-allege and incorporate the preceding paragraphs as alleged above.

195.    Plaintiffs Johnston, Elizabeth, and Hender each filed a timely charge with the EEOC on behalf of herself and the Class Members.  Plaintiffs Elizabeth and Hender may "piggyback" off the previous filing of Plaintiff Johnston because Plaintiff Johnston's EEOC charge relates to the same claims that the other Plaintiffs assert.

196.    Nike's policies, patterns, or practices have adversely impacted Class Members with respect to starting salary, Band Level, annual ratings, annual salary increases, PSP Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.

197.    Nike has violated Title VII because its employment policies, patterns, or practices have caused Plaintiffs and Class Members to be compensated less, promoted less, and to receive less favorable terms related to compensation and promotions than male employees at Nike Headquarters.

198.    Nike has violated Title VII because its employment policies, patterns, or practices have caused Plaintiffs and Class Members to receive less valuable conditions and privileges of employment than male employees at Nike Headquarters.

199.    Nike's reliance on systems, practices, or criteria that are neither job related nor validated to evaluate employee performance, set compensation, select individuals for promotion, and determine other terms and conditions of employment, have an adverse impact on female employees in violation of Title VII and are not, and cannot be, justified as job related for the positions in question or consistent with business necessity.  Even if such systems or policies

**Page 49 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

could be justified by business necessity, less discriminatory alternatives exist and would equally serve any alleged necessity.

200.    Nike has maintained these discriminatory policies, patterns, or practices both within and outside the liability period in this case.

201.    As a direct result of Nike's discriminatory policies, patterns, or practices, as described above, Plaintiffs and the Class Members have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

202.    The foregoing policies, patterns, or practices have an unlawful disparate impact on women in violation of 42 U.S.C. §§ 2000e *et seq.*

203.    Plaintiffs and the Class Members request relief as hereinafter described.

### THIRD CLAIM FOR RELIEF
### Title VII – Disparate Treatment
**(Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Lilly Ledbetter Fair Pay Act of 2009)**
**(On Behalf of Plaintiffs and the Class Members)**

204.    Plaintiffs and the Class Members re-allege and incorporate the preceding paragraphs as alleged above.

205.    Plaintiffs Johnston, Elizabeth, and Hender each filed a timely charge with the EEOC on behalf of herself and the Class Members.  Plaintiffs Elizabeth and Hender may "piggyback" off the previous filing of Plaintiff Johnston because Plaintiff Johnston's EEOC charge relates to the same claims that the other Plaintiffs assert.

206.    Nike has violated Title VII because Nike has knowingly and purposefully discriminated against Class Members based on their sex.  Nike has engaged in an intentional, company-wide, and systematic policy, pattern, or practice of discrimination against its salaried female employees below Vice-President at Nike Headquarters.

**Page 50 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

207.    Nike has intentionally discriminated against Class Members in violation of Title VII with respect to, among other things, starting salary, starting Band Level, annual ratings, annual salary increases, PSP Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.  These company-wide policies, patterns, or practices are intended to and do have the effect of discriminating against Class Members because of their sex.  Nike continued these company-wide policies, patterns, or practices even after it knew or should have known of their discriminatory impact based on sex.

208.    Plaintiffs and Class Members were qualified for their jobs and performed as well or better than similarly situated male employees.

209.    Nike has violated Title VII because its employment policies, patterns, or practices have caused Plaintiffs and Class Members to receive less valuable conditions and privileges of employment than male employees at Nike Headquarters.

210.    The discriminatory acts that constitute Nike's pattern and/or practice of discrimination have occurred both within and outside the liability period in this case.

211.    As a direct result of Nike's discriminatory policies, patterns, or practices as described above, Plaintiffs and the Class Members have suffered damages including, but not limited to, lost past and future income, compensation, and benefits.

212.    The foregoing conduct constitutes illegal, intentional discrimination and unjustified disparate treatment prohibited by 42 U.S.C. §§ 2000e *et seq.*

213.    Plaintiffs and the Class Members request relief as hereinafter described.

**FOURTH CLAIM FOR RELIEF**
**Oregon Equal Pay Act**
**(ORS 652.220)**
**(On Behalf of Plaintiffs and the Class Members)**

214.     Plaintiffs and the Class Members re-allege and incorporate the preceding

paragraphs as alleged above.

215.     Nike has violated ORS 652.220 because Nike has paid Plaintiffs and Class

Members less than Nike's male employees for work of comparable character and the

performance of which requires comparable skills.

216.     The pay differential between Class Members and comparable male employees at

Nike Headquarters was not due to a seniority system or a merit system that is free of

discrimination based on sex.

217.     The pay differential between Class Members and comparable male employees at

Nike Headquarters was not based in good faith on factors other than sex.

218.     Plaintiffs and the Class Members request relief as hereinafter described.

**FIFTH CLAIM FOR RELIEF**
**Oregon Equality Act – Disparate Impact**
**(ORS 659A.030)**
**(On Behalf of Plaintiffs and the Class Members)**

219.     Plaintiffs and the Class Members re-allege and incorporate the preceding

paragraphs as alleged above.

220.     Nike's policies, patterns, standards, or practices have adversely impacted Class

Members with respect to starting salary, Band Level, annual ratings, annual salary increases, PSP

Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.

221.     Nike has violated ORS 659A.030 because its employment policies, patterns, or

practices have caused Plaintiffs and Class Members to be compensated less, promoted less, and

**Page 52 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION**
**COMPLAINT**

to receive less favorable terms related to compensation and promotions than male employees at Nike Headquarters.

222.    Nike has violated ORS 659A.030 because its employment policies, patterns, or practices have caused Plaintiffs and Class Members to receive less valuable conditions and privileges of employment than male employees at Nike Headquarters.

223.    Plaintiffs and the Class Members request relief as hereinafter described.

**SIXTH CLAIM FOR RELIEF**
**Oregon Equality Act – Intentional Discrimination**
**(ORS 659A.030)**
**(On Behalf of Plaintiffs and the Class Members)**

224.    Plaintiffs and the Class Members re-allege and incorporate the preceding paragraphs as alleged above.

225.    Nike has violated ORS 659A.030 because Nike knowingly and purposefully discriminated against Class Members based on their sex.

226.    Nike's discrimination against Class Members has been, and continues to be, with respect to starting salary, starting Band Level, annual ratings, annual salary increases, PSP Bonuses, equity distributions, promotions, job assignments, and a hostile work environment.

227.    Plaintiffs and Class Members were qualified for their jobs and performed as well or better than similarly situated male employees.

228.    Nike has violated ORS 659A.030 because its employment policies, patterns, or practices have caused Plaintiffs and Class Members to receive less valuable conditions and privileges of employment than male employees at Nike Headquarters.

229.    Plaintiffs and the Class Members request relief as hereinafter described.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class/Collective Members pray for relief as follows:

A.    Certify this action as a collective action under the EPA on behalf of Plaintiffs and the Collective Action Members;

B.    Designate Plaintiffs as the representatives of the Collective Action;

C.    Promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly situated Collective Action Members, which (1) apprises them of the pendency of this action and (2) permits them to assert timely EPA claims in this action by filing individual Consent to Join as Party Plaintiff forms pursuant to 29 U.S.C. § 216(b);

D.    Toll the statute of limitations on the claims of all Collective Action Members from the date the original Complaint was filed until the Collective Action Members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in to the Collective Action;

E.    Certify this action as a class action on behalf of the proposed Class for violations of Title VII, ORS 652.220, and ORS 659A.030;

F.    Designate Plaintiffs as the representatives of the class action;

G.    Designate Plaintiffs' counsel of record as Class counsel for the Class;

H.    A declaratory judgment that the practices complained of herein are unlawful and violate 29 U.S.C. §§ 216(b), Title VII, ORS 652.220, and ORS 659A.030;

I.    A preliminary and permanent injunction against Nike and its partners, officers, agents, successors, employees, representatives, and all persons acting in concert with them, from engaging in policies, patterns, or practices that discriminate against Plaintiffs, Class Action Members, and Collective Action Members because of their sex;

**Page 54 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

J.      An order that Nike institute and carry out policies, practices, and programs that provide equal employment opportunities for all employees regardless of sex, and that it eradicate the effects of their past and present unlawful employment practices;

K.      An order requiring Nike to develop and institute reliable, validated, and job-related standards for evaluating performance, determining pay, and making promotion decisions;

L.      An order appointing a monitor to ensure that Nike complies with the injunction provisions of any decree that the Court orders;

M.      An order retaining jurisdiction over this action to ensure that Nike complies with such a decree;

N.      An order restoring Plaintiffs and Class and Collective Action Members to their rightful positions at Nike (i.e., reinstatement), or in lieu of reinstatements, an order for front pay benefits;

O.      Back pay for lost compensation and equity distribution (including interest and benefits) for Plaintiffs and Class and Collective Action Members;

P.      Liquidated damages;

Q.      Exemplary and punitive damages in an amount commensurate with Nike's ability to pay and to deter future conduct;

R.      Reasonable attorneys' fees and costs to the extent allowable by law, including, but not limited to, 42 U.S.C. § 2000e-5(k), ORS 659A.885(1), and 29 U.S.C. § 216(b);

S.      Pre-judgment and post-judgment interest, as provided by law; and

T.      Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

**Page 55 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION COMPLAINT**

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and 29 U.S.C. § 216(b),

Plaintiffs and the Class/Collective Members demand a trial by jury in this action.

DATED this 19th day of November, 2018.

GOLDSTEIN, BORGEN, DARDARIAN & HO

By:    *s/Laura L. Ho*
_____

Laura L. Ho (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (*pro hac vice*
application forthcoming)
James Kan (*pro hac vice* application
forthcoming)
Byron Goldstein (admitted *pro hac vice*)
Katharine L. Fisher (admitted *pro hac vice*)
(510) 763-9800

-and-

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Anna M. Joyce, OSB #013112
(503) 295-3085

ACKERMANN & TILAJEF PC
Craig Ackermann (admitted *pro hac vice*)
cja@ackermanntilajef.com
ACKERMANN & TILAJEF PC
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Telephone: (310) 277-0614
Fax: (310) 277-0635

INDIA LIN BODIEN, ATTORNEY AT LAW
India Lin Bodien (admitted *pro hac vice*)
india@indiabodienlaw.com
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Telephone: (253) 212-7913
Fax: (253) 276-0081

Of Attorneys for Plaintiffs and Opt-In Plaintiffs

**Page 56 - FIRST AMENDED CLASS AND COLLECTIVE ACTION ALLEGATION
COMPLAINT**
723323.14