**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Attorneys for Plaintiffs, Opt-In Plaintiffs, and Putative Class

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**CLASS ACTION ALLEGATIONS**<br>[Fed. R. Civ. P. 23]<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**Title VII of the Civil Rights Act of 1964; Oregon Equal Pay Act; Oregon Equality Act**<br><br>**FILED UNDER SEAL**<br>**ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

Page

LR 7-1(A) CERTIFICATION ................................................................................1

MOTION .............................................................................................................1

MEMORANDUM OF LAW ..................................................................................1

I.    INTRODUCTION .......................................................................................1

II.   SUMMARY OF PLAINTIFFS' CLASS CLAIMS.........................................4

III.  PROCEDURAL HISTORY..........................................................................7

IV.   STATEMENT OF FACTS ...........................................................................8

    A.   Nike's Job Architecture Organizes All WHQ Positions Consistently and
        Defines Comparable Work. ...................................................................8

        1.   Nike Uses Its Uniform Job Architecture's Type and Level of Work
            to Organize All Covered Positions. ..............................................8

        2.   Nike Consistently Defines Comparable Work Based on Jobs
            Sharing the Same Type and Level of Work...............................10

    B.   Two Components of Nike's Compensation Policies and Practices
        Adversely Impact Women's Compensation. .........................................12

        1.   Nike's Classwide Policy for Setting Starting Salaries, Which
            Included Consideration of Prior Pay, Disadvantaged Women. ...........12

        2.   Nike's Classwide Practices for Awarding Annual Merit Increases
            and Bonuses Perpetuated Gender Disparities Because They Are
            Based on a Percentage of Current Salary....................................15

            a.   Nike Calculates Annual Merit Pay Increases as Percentage
                of Base Pay. ...............................................................15

            b.   Nike Calculates Annual Bonus Awards as a Percentage of
                Base Pay.....................................................................17

            c.   These Poor Practices Exacerbate Existing Gender
                Differences in Pay.......................................................18

        3.   Nike Pays Women Less than Men for Performing Comparable
            Work, Which Is Driven by Lower Starting Pay and Exacerbated by
             Merit Increases and Annual Bonuses.........................................19

C.   Nike's Fill Strategy Policy or Practice for Determining Whether to Fill
     Promotions Non-Competitively or Competitively Adversely Impacts
     Women. ...........................................................................................................22

     1.   Nike's Fill Strategy Determines Whether to Promote Employees
          Either Non-Competitively or Competitively ..............................................22

     2.   Nike Promotes Women Less Often Than Men Because it
          Overwhelmingly Chose to Fill Positions Through its Non-
          Competitive Practice. .................................................................................24

D.   Nike's Initial Job Assignment Policies or Practices Adversely Impact
     Women. ...........................................................................................................26

E.   Women Raised Serious Gender Discrimination Complaints, Including the
     2018 Starfish Survey, But HR Has Been Ineffective in Addressing
     Discrimination. ................................................................................................28

     1.   The Starfish Survey Raises Systemic Complaints of Gender
          Discrimination at Nike. ..............................................................................28

     2.   Nike's Inadequate Responses to Discrimination, Including HR's
          Admitted Failures........................................................................................31

F.   The Representative Plaintiffs Suffered Under the Same Nike Policies or
     Practices. .........................................................................................................33

V.   ARGUMENT ...............................................................................................................34

A.   Plaintiffs Meet the Rule 23 Standards for Class Certification ...............................34

B.   The Rule 23(a)(1) Numerosity Requirement Is Met. ............................................35

C.   The Rule 23(a)(2) Commonality Requirement Is Met Because the
     Determination of Common Questions Will Resolve Issues Central to the
     Claims. ............................................................................................................35

     1.   Plaintiffs' Disparate Impact Claims Are Capable of Classwide
          Resolution. .................................................................................................36

          a.   Plaintiffs' *Prima Facie* Case that Nike' Classwide Starting
               Pay Policy and Practice Caused a Disparate Impact on
               Women Is Capable of Classwide Resolution. ...............................38

          b.   Plaintiffs' *Prima Facie* Case that Nike's Classwide Annual
               Merit Increase and Annual Bonus Policies and Practices
               Caused a Disparate Impact on Women Is Capable of
               Classwide Resolution. ..................................................................40

c.    Plaintiffs' *Prima Facie* Case that Nike's Classwide Practice of Implementing Its Fill Strategy to Fill Positions Non-competitively Caused a Disparate Impact on Women Is Capable of Classwide Resolution. ..................................................43

d.    Plaintiffs' *Prima Facie* Case that Nike's Classwide Practice of Hiring Caused a Disparate Impact on Women Is Capable of Classwide Resolution. ...............................................45

e.    Classwide Evidence Will Show Nike Cannot Meet Its Burden of Showing the Challenged Practices Are Job Related and Consistent with Business Necessity..........................46

2.    Plaintiffs' Disparate Treatment Claims Are Capable of Classwide Resolution. ..................................................................48

3.    Plaintiffs' Oregon Equal Pay Act Claim Are Capable of Classwide Resolution. ..................................................................50

D.    The Rule 23(a)(3) Typicality Requirement Is Met Because Plaintiffs' and the Class Claims Are Based on the Same Classwide Policies or Practices. ..........51

E.    The Rule 23(a)(4) Adequacy Requirement is Met.................................................52

F.    Plaintiffs Meet the Requirements of Rule 23(b)(2) and 23(b)(3). .........................54

1.    Plaintiffs' Injunctive and Declaratory Relief Claims Based on Sex Discrimination Are Well Suited for Rule 23(b)(2) Certification..............54

2.    Plaintiffs Satisfy Rule 23(b)(3)'s Requirements of Predominance and Superiority.................................................................55

a.    Common Issues Predominate for Disparate Impact Claims ..........56

b.    Common Issues Predominate for Disparate Treatment Claims. ...............................................................57

c.    Commons Issues Predominate for Oregon EPA Claims................58

d.    A Class Trial Is Manageable With a Bifurcated Trial Proceeding...............................................................58

e.    Superiority of Class Action Procedure .........................................58

VI.    CONCLUSION................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.,*
    731 F.3d 952 (9th Cir. 2013) ..................................................................59

*Albemarle Paper Co. v. Moody,*
    422 U.S. 405 (1975)..............................................................................55

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)..........................................................................54, 55

*Ass'n of Mexican-Am. Educators v. California,*
    231 F.3d 572 (9th Cir. 2000) ..................................................................46

*In re AutoZone, Inc., Wage & Hour Emp. Pracs. Litig.,*
    289 F.R.D. 526 (N.D. Cal. 2012)..............................................................53

*Bazemore v. Friday,*
    478 U.S. 385 (1986)..............................................................................19

*Bouman v. Block,*
    940 F.2d 1211 (9th Cir. 1991) ................................................................47

*Buchanan v. Tata Consulting Servs. Ltd.,*
    No. 4:15-cv-01696-YGR, 2017 WL 6611653 (N.D. Cal. Dec. 27, 2017)...............5

*Butler v. Home Depot, Inc.,*
    No. 3:94-cv-04335-SI, 1997 WL 605754 (N.D. Cal. Aug. 29, 1997) ..................5

*Campbell v. City of Los Angeles,*
    903 F.3d 1090 (9th Cir. 2018) ..................................................................8

*Chen-Oster v. Goldman, Sachs, & Co.,*
    325 F.R.D. 55 (S.D.N.Y. 2018) ........................................................ *passim*

*Contreras v. City of Los Angeles,*
    656 F.2d 1267 (9th Cir. 1981) ................................................................20

*Dawson v. Entek Int'l,*
    630 F.3d 928 (9th Cir. 2011) ...................................................................4

*E.E.O.C. v. Farmer Bros. Co.,*
    31 F.3d 891 (9th Cir. 1994) ....................................................................5

*E.E.O.C. v. Inland Marine Indus.*,
　729 F.2d 1229 (9th Cir. 1984) .......................................................................5, 50

*Ellis v. Costco Wholesale Corp.*,
　285 F.R.D. 492 (N.D. Cal. 2012) ................................................................. *passim*

*Franks v. Bowman Transp. Co.*,
　424 U.S. 747 (1976) .............................................................................................55

*Gen. Tel. Co. v. Falcon*,
　457 U.S. 147 (1982) .............................................................................................51

*Griggs v. Duke Power Co.*,
　401 U.S. 424 (1971) .............................................................................................46

*Gulino v. N.Y. State Dep't of Educ.*,
　460 F.3d 361 (2d Cir. 2006) .................................................................................48

*Hanlon v. Chrysler Corp.*,
　150 F.3d 1011 (9th Cir. 1998) ........................................................................35, 52

*Hanon v. Dataproducts Corp.*,
　976 F.2d 497 (9th Cir. 1982) ...............................................................................52

*Hazelwood Sch. Dist. v. United States*,
　433 U.S. 299 (1977) .............................................................................................20

*Hemminger v. Tidyman's Inc.*,
　285 F.3d 1174 (9th Cir. 2002) ..........................................................................4, 36

*Hollander v. Am. Cyanamid Co.*,
　895 F.2d 80 (2d Cir. 1990) ....................................................................................5

*Int'l Bhd. of Teamsters v. United States*,
　431 U.S. 324 (1977) ...............................................................................4, 35, 57, 58

*Jones v. City of Boston*,
　752 F.3d 38 (1st Cir. 2014) ..................................................................................46

*Kassman v. KPMG LLP*,
　416 F. Supp. 3d 252 (S.D.N.Y. 2018) ..................................................................36

*Levya v. Midline, Indus. Inc.*,
　716 F.3d 510 (9th Cir. 2013) ...............................................................................57

*McClain v. Lufkin Indus., Inc.*,
　519 F.3d 264 (5th Cir. 2008) ............................................................................4, 45

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir. 2012) ................................................................37, 47, 54

*McReynolds v. Sodexho Marriott Servs.*,
    208 F.R.D. 428 (D.D.C. 2002) ........................................................................53

*Moussouris v. Microsoft Corp.*,
    No. 2:15-cv-01483-JLR, 2018 WL 3328418 (W.D. Wash. June 25, 2018) ...........................36

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005) ................................................................4, 5, 48

*Paige v. California*,
    291 F.3d 1141 (9th Cir. 2002) ................................................................4, 43

*Pena v. Taylor Farms Pac., Inc.*,
    305 F.R.D. 197 (E.D. Cal. 2015) ...................................................................53

*Pettway v. Am. Cast Iron Pipe Co.*,
    494 F.2d 211 (5th Cir. 1974) .........................................................................57

*Rizo v. Yovino*,
    950 F.3d 1217 (9th Cir. 2020) ................................................................40, 51

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018) .........................................................................34

*Scott v. Family Dollar Stores, Inc.*,
    No. 3:08-cv-00540-MOC-DSC, 2016 WL 9665158 (W.D.N.C. June 24, 2016) ........37, 39, 43

*Segar v. Smith*,
    738 F.2d 1249 (D.C. Cir. 1984) .....................................................................36

*Senne v. Kansas City Royals Baseball Corp.*,
    934 F.3d 918 (9th Cir. 2019) .........................................................................54

*Smith v. L.A. Unified Sch. Dist.*,
    830 F.3d 843 (9th Cir. 2016) .........................................................................59

*Stagi v. Nat'l R.R. Passenger Corp.*,
    391 Fed. Appx. 133 (3d Cir. 2010) ...............................................................42

*Staton v. Boeing*,
    327 F.3d 938 (9th Cir. 2003) .........................................................................53

*Stender v. Lucky Stores, Inc.*,
    803 F. Supp. 259 (N.D. Cal. 1992) ...............................................................46

*Stockwell v. City & Cty. of San Francisco*,
   749 F.3d 1107 (9th Cir. 2014) ....................................................................34, 35, 38

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)...........................................................................................42, 56, 57

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)...................................................................................... *passim*

*Wells Fargo Home Mortg. Overtime Pay Litig.*,
   571 F.3d 953 (9th Cir. 2009) ...................................................................................59

**State Cases**

*Ellis v. Google, LLC*,
   No. CGC-17-561299, 2021 WL 4169813 (Cal. Super. Ct. May 27, 2021).....................43, 51

*Jewett v. Oracle Am., Inc.*,
   No. 17CIV02669, 2020 WL 11036307 (Cal. Super. Ct. Apr. 30, 2020)..........................43, 51

*Smith v. Bull Run Sch. Dist. No. 45*,
   80 Or. App. 226 (1986)...........................................................................................50

**Federal Statutes**

Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et seq.* ......................................4, 8, 45, 46

**State Statutes**

O.R.S.
   § 652.210(16)...........................................................................................................6
   § 652.220..............................................................................................................1, 6
   § 659A.001 *et seq.* ..................................................................................................4
   § 659A.030.............................................................................................................1

**Rules**

Fed. R. Civ. P.

23 ............................................................................................................. *passim*
23(a) ........................................................................................................ 34
23(a)(1) ................................................................................................... 35
23(a)(2) ................................................................................................... 35
23(a)(3) ................................................................................................... 51
23(a)(4) ................................................................................................... 52
23(b)(2) ................................................................................................... *passim*
23(b)(3) ................................................................................................... *passim*
23(b)(3)(A) .............................................................................................. 55
23(b)(3)(B) .............................................................................................. 55
23(b)(3)(C) .............................................................................................. 55
23(c)(4) ................................................................................................... 37
23(g) ........................................................................................... 1, 3, 59
30(b)(1) ..................................................................................................... 9
30(b)(6) ................................................................................................... *passim*
42(b) ........................................................................................................ 35

## Regulations

29 C.F.R.

§ 1607.3(A) ............................................................................................ 47
§ 1607.5(C) ............................................................................................ 47
§ 1607.14(A) .......................................................................................... 47

## Other Authorities

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression* (Fed. Judicial Ctr.
    3d ed. 2011) ........................................................................................ 19

Manual for Complex Litigation (Fourth) (2004) ......................................... 35

## LR 7-1(a) CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Named Plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender ("Plaintiffs"), certify that they have conferred with defendant's counsel by telephone, email, and exchange of letters regarding the subject of this motion, but the parties could not reach a resolution.

## MOTION

Plaintiffs hereby move the Court to certify this case as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3).[1]  Plaintiffs ask the Court to certify a class of

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed at any time from October 11, 2017 through the resolution of this action for claims under Title VII, and for the period from August 9, 2017 through the resolution of this action for claims under ORS 652.220 and ORS 659A.030, in a salaried, corporate position in Bands L, U, E, or S[2] ("Putative Class")

Excluded from the Putative Class are Nike retail store employees and employees in Nike's Finance, Human Resources ("HR"), and Legal Job Functions.  Plaintiffs also ask the Court to appoint the four Named Plaintiffs as Class Representatives and to appoint Plaintiffs' counsel as Class Counsel, pursuant to Rule 23(g).

## MEMORANDUM OF LAW

### I.    INTRODUCTION

Nike pays women lower starting salaries than men.  It assigns them to lower-level and lower-paying jobs upon hire.  Once hired, Nike widens the pay gap with lower annual bonuses, annual merit increases that perpetuate the disparities, and fewer promotions.  This means thousands of women underpaid on day one continue to fall further and further behind their male peers with each

---

[1] All citations hereinafter to the Federal Rules of Civil Procedure will be in the form of "Rule __" unless otherwise specified.

[2] Nike places employees under the executive level in six bands, known as VALUES.  *See* Section IV.A.1, *infra*.

passing year. All the while, Nike fails to protect these women from harassment and other forms of sex discrimination. Accordingly, Plaintiffs, on behalf of themselves and a Putative Class of women who have worked at Nike's world headquarters ("WHQ") around Beaverton, Oregon, bring this class action to stop this discrimination.

Plaintiffs challenge four policies or practices that Nike applied across the Putative Class. First, Nike's use of prior pay when setting starting pay caused women to start with lower salaries than men. While Nike eventually stopped this prior pay policy, it never adjusted or remedied the lower pay of women hired under this admittedly "biased" policy. Second, Nike's continuing policy or practice of awarding annual merit increases and bonuses calculated as a percentage of current salary perpetuates or exacerbates the starting pay disparities because smaller salaries mean smaller salary increases and bonus awards. Third, through its "fill strategy," Nike chose to fill most job openings non-competitively instead of competitively which caused women to receive fewer promotions despite having similar or better backgrounds, performance ratings, and talent assessments. Fourth, Nike consistently hires women into lower-level and lower-paying jobs even though they had equal or better educational backgrounds and prior work experiences.

Taken together, these four challenged practices resulted in Nike paying women roughly ███ less than men per year even though women had the same or better performance ratings, educational background, and work experience.[3]

Nike is well aware of the discriminatory effects of these challenged policies and practices because Nike admits it. In 2018, Nike's Chief Human Resources Officer ("CHRO") told employees that Nike had to remove "bias" from critical parts of its hiring process, including stopping its

---

[3] Declaration of Dr. David Neumark ("Neumark Decl."), filed herewith, Ex. A ("Neumark Report") ¶¶ 8(a)-d(d) & 54, Table 2, col. 2, Panel C; Neumark Decl. Ex. B ("Neumark Rebuttal") 22, Table R6, col. 2, Panel C. *See* Section IV.B.3, *infra*.

collection and use of prior pay when setting starting pay.  The CHRO further admitted that Nike had

failed to "gain traction" in promoting women and that Nike needed to improve "female

representation" at all levels.  Around the same time, Nike's CEO admitted that Nike's HR

department had "underserved" the company for years.

Moreover, women at Nike raised concerns about discrimination and HR's ineffectiveness at

stopping it prior to the filing of this case.  In early 2018, Nike employees, including several female

Vice Presidents, provided Nike with a survey that described a pattern of sex discrimination at Nike.

According to one female executive, "[o]ur culture is broken."  Another had a "loss of faith in a fair

and equitable promotion process."  According to another female employee, "ER and HR at this

company are a joke" and "unreliable."

Because of this survey and related complaints before and after the survey, Nike was forced to

admit the pervasiveness of its discrimination and that its policies, top management, and HR caused or

condoned this discrimination.  The CEO announced the reorganization of his leadership team,

including the departure of Trevor Edwards, Nike's second most senior executive, and Nike forced

the resignation of other executives because of these discrimination complaints.  While Nike has made

some attempts to address the serious gender discrimination it long perpetuated, it has not corrected all

the problems it already knows exist, and women continue to work in an unequal capacity.  This case

seeks to make it finally possible for female employees to be paid fairly and equally and be

recognized fully for their contributions to Nike.

Accordingly, this Court should certify the proposed class of nearly 5,000 women who have

worked at Nike WHQ under Rule 23(b)(2) and (b)(3) and appoint Class Counsel pursuant to Rule

23(g) because, as set forth in detail below, all the requirements of Rule 23 are satisfied.

## II.    SUMMARY OF PLAINTIFFS' CLASS CLAIMS

Plaintiffs seek Rule 23 certification of three types of class claims: (1) disparate impact under the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the Oregon Equality Act, Oregon Revised Statutes section 659A.001 *et seq.* ("OEA"); (2) disparate treatment under Title VII and the OEA; and (3) pay discrimination under the Oregon Equal Pay Act ("OEPA"). The analysis under Title VII and the OEA is the same. *Dawson v. Entek Int'l*, 630 F.3d 928, 934-35 (9th Cir. 2011).

Disparate impact claims concern "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335, n.15 (1977). "Proof of discriminatory motive … is not required …." *Id.*  To establish a *prima facie* case, plaintiffs must show a significant disparate impact on a protected class resulting from a specific employment practice. *Hemminger v. Tidyman's Inc.*, 285 F.3d 1174, 1190 (9th Cir. 2002).[4]  If plaintiffs establish a *prima facie* case, the employer then has the burden of "demonstrat[ing] that a challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2k(1)(A)(i).  A class disparate impact claim is often proved through statistical evidence.  *See e.g.*, *Paige v. California*, 291 F.3d 1141, 1145 (9th Cir. 2002).

In a disparate treatment class action, the focus is on whether there was a "pattern or practice" of disparate treatment , which means that discrimination is the employer's "standard operating procedure—the regular rather than the unusual practice." *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (quoting *Teamsters*, 431 U.S. at 336).  Plaintiffs can prove disparate treatment through

---

[4] Title VII provides that if it is not possible to separate different employment practices then the adverse impact caused by several practices may establish a *prima facie* case.  42 U.S.C. § 2000e-2(k)(1)(B)(i); *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 276, 278 (5th Cir. 2008), *cert. denied*, 555 U.S. 881 (2008).

"direct, circumstantial, or ... statistical evidence, and all evidence that the plaintiff presents in that regard can contribute to the inference in a cumulative manner." *Butler v. Home Depot, Inc.*, No. 3:94-cv-04335-SI, 1997 WL 605754, at *2 (N.D. Cal. Aug. 29, 1997) (citations omitted).[5] Like disparate impact, "[s]tatisical disparities in the treatment of women alone may be sufficient to establish a *prima facie* case" of disparate treatment.  ECF No. 64 at 9 (citing *Buchanan v. Tata Consulting Servs. Ltd.*, No. 4:15-cv-01696-YGR, 2017 WL 6611653, at *12 (N.D. Cal. Dec. 27, 2017)).  In addition, anecdotal evidence helps "establish a general discriminatory pattern." *Obrey*, 400 F.3d at 698.[6]  "The burden of establishing a prime facie case is not designed to be onerous…the plaintiff need only provide evidence that suggests that the employment decision was based on a discriminatory criterion." *Buchanan*, 2017 WL 6611653, at *12 (internal citations and quotations omitted).

It is well established that maintaining policies or practices that an employer knows have a discriminatory effect is evidence of disparate treatment.  *See e.g.*, *E.E.O.C. v. Inland Marine Indus.*, 729 F.2d 1229, 1235 (9th Cir. 1984), *cert. denied*, 469 U.S. 855 (1984) ("By refusing to change ... wage-setting policies or to bring black wages in line with those of whites, [the employer] ratified the existing disparities," and the employer's "ratification constituted all the intent the court needed to find Inland Marine guilty on a disparate treatment theory.") (citation omitted).

The OEPA prohibits paying women less than men for "work of comparable character," which means "work that requires substantially similar knowledge, skill, effort, responsibility and

---

[5] Indeed, disparate treatment is typically established through circumstantial, not direct, evidence. *See e.g., Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990).

[6] *See also* *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) ("Because hostility against women underlies decisions to discharge or hire women because of their gender, evidence of sexual harassment often will be relevant to claims of gender-based discrimination."); *Chen-Oster v. Goldman, Sachs, & Co.*, 325 F.R.D. 55, 76-77 (S.D.N.Y. 2018) (same).

working conditions in the performance of work, regardless of job description or job title." O.R.S. §§ 652.210(16), 652.220.  The OEPA does not require plaintiffs to show that a specific practice caused the disparities or an employer's intent to discriminate.  *See* O.R.S. § 652.220.

In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court confirmed that disparate impact and disparate treatment discrimination claims can meet Rule 23's commonality requirement and proceed on a class basis.  Commonality is met where the classwide proceeding has the "capacity … to generate common *answers* apt to drive the resolution of the litigation." 564 U.S. 338, 350 (2011) (emphasis in original, internal quotation omitted).  Since *Wal-Mart*, courts have found commonality where Plaintiffs' challenge classwide policies with common proof.  *See* Section V.C.1, *infra*.

In *Wal-Mart*, commonality was not met because there were no classwide practices covering the nationwide proposed class of 1.5 million employees who worked at 3,400 different locations. 564 U.S. at 355-57.  Managers were left to their "own devises" with unguided discretion to make decisions, which the Court described as the "opposite" of a uniform policy or practice.  *Id.* at 355.

This action presents facts far different from *Wal-Mart*.  The Putative Class is less than five thousand.  They all worked at the same location.  More importantly, Nike's decision-makers and managers are not "left to their own devises," but rather Nike provides classwide policies, guidance, and training for decisions about pay, promotions, and initial job assignments.  Nike explicitly articulates that its goal is to have "consistent" compensation, promotion, and job assignment practices.  Furthermore, Nike embeds HR employees with managers and supervisors, what it terms as "business facing" HR employees or HR business partners ("HRBPs"), to oversee and reinforce consistency of these policies and practices.  Plus, any manager recommendations regarding compensation, promotion, or job assignment are reviewed and ultimately determined by HR and high-level executives.

In addition to Nike's common policies and practices, Plaintiffs present common evidence in the form of expert reports from two experienced experts.  The report of Dr. Lundquist, an Industrial/Organizational ("I/O") psychologist, provides common evidence that Nike's well-defined classwide job architecture identifies which jobs at Nike perform comparable work and that Nike seeks to implement its various pay, promotion, and initial assignment policies consistently.  Relying on Dr. Lundquist's report, Dr. Neumark finds statistically significant disparities for women in pay (caused by a starting pay gap and exacerbated by bonuses and merit increases), in promotion, and in initial assignments, when comparing them to men doing comparable work.

Buttressing this statistical evidence are Nike's admissions that it knew about this systemic discrimination, including that it needed to remove bias from its starting pay and hiring practices, that it failed to gain traction in increasing female representation in the company, and that employees had distrusted Nike's non-competitive promotion practices due to a lack of transparency.  In response to the 2018 survey of gender discrimination and harassment complaints, Nike's leaders admitted that addressing the discrimination required changes to HR, its policies, and its leadership.  The Named Plaintiffs and Opt-in Plaintiffs likewise provide similar anecdotes about Nike's devaluation of women.  Although Nike has known about this systemic discrimination for years, Nike has failed to fully correct it.

Plaintiffs' claims, as well as Nike's affirmative defenses, will rise and fall on this common evidence.  Class certification should be granted.

### III.    PROCEDURAL HISTORY

Plaintiffs filed a class action complaint on August 9, 2018, and a First Amended Complaint ("FAC") on November 19, 2018.  ECF Nos. 1, 42.[7]  Nike filed a partial motion to dismiss the class

---

[7] In addition to the four Named Plaintiffs, ten female employees or former employees have filed

and collective claims except for the disparate impact claims.  ECF No. 64, *findings and recommendation adopted*, ECF No. 74.  The Court denied Nike's motion in its entirety.  *Id*.

Over the last three years, Plaintiffs pursued written and deposition discovery, which included multiple requests for orders compelling non-expert document or deposition discovery.  Declaration of Byron Goldstein ("Goldstein Decl.") ¶¶ 9-20, filed herewith.  The Court has issued several orders compelling Nike to produce discovery.  ECF Nos. 89, 99, 108, 111, 128, 130, 131, 135, 136.  The Parties also exchanged expert witness reports, including initial expert reports from Plaintiffs' I/O Psychology expert, Kathleen Lundquist and Labor Economics expert, David Neumark, reports from Nike's I/O Psychology expert, Chester Hanvey, and Labor Economics expert, Ali Saad, and then rebuttal reports from Plaintiffs' experts.[8]

## IV.    STATEMENT OF FACTS

**A.    Nike's Job Architecture Organizes All WHQ Positions Consistently and Defines Comparable Work.**

### 1.    Nike Uses Its Uniform Job Architecture's Type and Level of Work to Organize All Covered Positions.

Nike has a well-defined system for organizing its WHQ jobs within a uniform hierarchy according to "type of work" and "level of work" performed.  Declaration of Mengfei Sun ("Sun Decl."), filed herewith, Ex. 12 at slide 24.  This job architecture applies to all Covered Positions,[9]

---

notices to assert their federal Equal Pay Act claims ("Opt-in Plaintiffs").  ECF Nos. 1-1, 1-2, 2, 3, 20, 37, 40, 43, 60, 66, 95, 100, 109, 132.  Plaintiffs do not request that the Court send notice about the filing of a consent to join form for the federal Equal Pay Act.  *See Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018).  Given the context of this litigation and the overlap with the other causes of action, the notice process is not consistent with the most efficient litigation of this action.

[8] *See* Declaration of Kathleen Lundquist ("Lundquist Decl.") filed herewith, Exs. A ("Lundquist Report") & B ("Lundquist Rebuttal").

[9] For this brief, "Covered Positions" refer to the positions held by the Putative Class; "Class Period" refers to August 7, 2016 to the present based on the Putative Class's ability to recover back pay up to two years before the earliest filed charge (August 7, 2016 charge filed by Plaintiff Johnston).  42 U.S.C. § 2000e-5(g).

and it has been in place since at least 2010.  *See* Neumark Report ¶ 35; Sun Decl. Ex. 78, Stuckey Dep. 43:2-4.[10]  Applied "consistently across [its] … business units ….," "type of work" sorts jobs based on the work performed, and "level of work" sorts jobs based on the scope and complexity of the work.  Lundquist Report 2, 17; *see also* Sun Decl. Ex. 27 at slide 3 ("Nike's Job Architecture is driven off two elements which are consistent across the globe ….").  An illustration of Nike's organization of jobs according to "Type of Work" and "Level of Work" is presented in Figure 1 of the Lundquist Report.  Attachment A, hereto; Lundquist Report 17.

Type of Work has three components: Job Function,[11] Job Family, and Job Subfamily.  Sun Decl. Ex. 27 at slide 10.  Moving from broad to more specific groupings, Nike uses Job Function, Job Family, and Job Subfamily to identify "categories of work that can be logically grouped together based on having similar characteristics or prerequisite skills."  Sun Decl. Ex. 12 at slide 25; *id.* Ex. 27 at slides 12-13.[12]  Nike describes this uniform job architecture "of [Job Function], Family, Subfamilies [as] very much like the Dewey decimal system at a library."  *Id.* Ex. 27 at slide 10; *see* Attachment B hereto, Lundquist Report 18 (example of structure of a Job Function).

Level of Work has two components: Band (the broader category) and Job Level (dividing work within Bands).  Sun Decl. Ex. 27 at slides 5-6.  The lowest six Bands at Nike spell "VALUES," with V being the lowest Band.  *Id.*  Above Band S, Nike's executives, who are Vice Presidents and above, are assigned to Bands E7 through E1, with E1 being the highest.  *Id.* Ex. 74, Matheson Dep. 181:7-16.  Within each Band, Nike further assigns jobs to one of ten Job Levels.  *Id.* Ex. 12 at slide

---

[10] Jessica Stuckey was designated as a corporate witness pursuant to Rule 30(b)(6).  All other cited Nike deponents were also designated corporate witnesses other than Monique Matheson, Chief Human Resources Officer ("CHRO"), who testified pursuant to Rule 30(b)(1).

[11] Job Function is sometimes referred to as "Pipeline," but these terms "are interchangeable." Sun Decl. Ex. 81, Walker Dep. 45:14-17.

[12] Not all Job Families have subfamilies, and thus Nike's most differentiated Type of Work is either Job Subfamily or, when there is no Job Subfamily, it is Job Family.

26; *id.* Ex. 10; Walker Dep. 52:9-10.  The Job Levels within the four Bands of L through Bands S

range from "entry professional" in Band L to "senior director" in Band S.  Sun Decl. Ex. 10.[13]

Each unique combination of "Type of Work with the Level of Work results in a job code."

*Id.* Ex. 12 at slide 27.  Nike assigns a job code to each job.  Stuckey Dep. 67:11-18.  There are

"consistent job code titles, bands across businesses, geographies, and affiliates …."  *Id.* 58:7-24.

"For each job code, there is a single global job description."  Sun Decl. Ex. 53.

### 2.    Nike Consistently Defines Comparable Work Based on Jobs Sharing the Same Type and Level of Work.

Dr. Lundquist's expert report explains that:

> according to Nike's job architecture, Subfamily (within Job Function and Job Family) is the most differentiated Type of Work variable and job level within band is the most differentiated Level of Work variable.  Jobs at the same job level within Subfamily have been designated by Nike as similar in job content or type of work and require a similar level of knowledge, experience, scope, effort and responsibility based on the leveling criteria.

Lundquist Report 21-22.  Dr. Lundquist's opinions regarding Nike's job structure and system for

evaluating the comparability of the knowledges, skills, and abilities required by jobs are

uncontradicted by any opinion presented by Nike's experts.  Lundquist Rebuttal 3, 19, 23-26.[14]

Nike's classwide job architecture, documents, and witness testimony support Dr. Lundquist's

unrebutted expert opinion of comparable work at Nike.  Nike documents state, "[a]t Nike, Inc., our

VALUES bands group together a large number of comparable jobs," and "Nike's job bands group

together jobs with similar levels of responsibilities and accountabilities."  Sun Decl. Ex. 58.  In

---

[13] The band and level structure is illustrated in Figure 3 to the Lundquist Report.  Attachment C hereto; Lundquist Report 20.

[14] Unlike Dr. Lundquist, Nike's experts, Drs. Hanvey and Saad, did not analyze how Nike organized its jobs.  Dr. Hanvey neither understood the process Nike used to categorize jobs pursuant to its job architecture nor evaluated whether Dr. Lundquist had properly described Nike's "leveling" process.  Sun Decl. Ex. 69, Hanvey Dep. 117:5-118:21.  Dr. Saad testified that he was neither offering an opinion concerning job content, the leveling process nor opining about what constituted substantially similar work.  *Id.* Ex. 77, Saad Dep. 81:20-82:13, 96:7-25.

addition, Nike's uses uniform "Leveling Criteria" to make "grouping[s] of [] jobs with similar level of expertise, impact, experience and leadership …." *Id*. Ex. 34 at NIKE_00024576 (defining the grouping of jobs possible under Banding and Leveling criteria); Lundquist Report 20 (opining that Nike "determines a job's level using consistent criteria across the company").[15]  Nike's Leveling Criteria is "the framework that we use, so each job would have generally the same level of responsibility across those [levelling] criteria."  Walker Dep. 53:10-54:5; *see also* Sun Decl. Ex. 1 at NIKE_00000026; *id.* Ex. 58 at PLF_001989-90; Stuckey Dep. 77:24-78:12.  Further, Nike's guidelines state that a lateral job change (within the same Job Level) does not itself change an employee's compensation regardless of whether the lateral job change is across Job Function, Job Family, or Job Subfamily.  Sun Decl. Ex. 26 at slide 4.

Nike's centralized job descriptions reinforce the importance of its job architecture and specifically its Leveling Criteria in identifying similar work.  Stuckey Dep. 66:9-19 (most of the job descriptions' content is standardized and consistent across Nike), 77:24-78:23 (job descriptions mirroring uniform job architecture and the classwide Leveling Criteria); Lundquist Report 22. Nike's corporate witness confirmed that Nike relies upon its uniform Leveling Criteria in its job descriptions to "determine the actual level of work" and to ensure that "the expectations of the, you know, business expertise and impact and leadership are consistent from our WHQ job to a job anywhere else in the world."  Stuckey Dep. 75:5-19.[16]

Nike also uses centralized pay ranges to consistently manage pay.  As "a structure for managing base pay," Nike places all Covered Positions into one of eleven pre-determined pay ranges.  Sun Decl. Ex. 12 at slide 28; Walker Dep. 123:4-8 (confirming Nike aims "to be consistent

---

[15] Nike has used uniform Leveling Criteria.  *See* Walker Dep. 54:13-22, 90:3-14.

[16] Nike's compensation and promotion policies did not consider or rely upon the limited parts of Nike's job descriptions that do not reflect standard content.  Lundquist Report 22-23.

in" its implementation of pay ranges); Sun Decl. Ex. 28 at slide 5.  Nike creates these pay ranges

through "benchmarking and market assessment" processes whereby Nike uses its Leveling Criteria

to "match our jobs at Nike to the jobs that are in the market …."  Walker Dep. 113:10-12, 62:13-

64:2; *see also id*. 395:4-396:6 (Nike determines its pay ranges "based on data for jobs with similar

functions and comparable scope of responsibility," which means, respectively, "type of work" and

"level of work.").  Pay ranges are then "used to guide pay decisions and provide a common span of

pay for people in similarly valued jobs."  Sun Decl. Ex. 2 at NIKE_C_00001662-63 (using its

centralized pay ranges to implement "NIKE's pay philosophy around competitive pay and managing

pay for jobs we value similarly."); Walker Dep. 349:5-350:11 (confirming centralized guidelines for

setting starting pay and positioning pay within its ranges).

 Nike recognizes that its global job architecture "allows the business to level jobs across the

organization, regardless of the location of the role, and facilitates career pathing, talent planning, and

organizational design."  Sun Decl. Ex. 58 at PLF_001989.  Thus, even Nike's definitions of

promotions and lateral moves are based on its Leveling Criteria.  *Id.* Ex. 44 (defining a lateral move

as one that is within "the same level (as defined by NIKE's job banding and leveling criteria)" and a

promotion as a move "to a higher-level job (as defined by NIKE's job banding and leveling

criteria).").

**B.** **Two Components of Nike's Compensation Policies and Practices Adversely Impact
Women's Compensation.**

 **1.** **Nike's Classwide Policy for Setting Starting Salaries, Which Included
Consideration of Prior Pay, Disadvantaged Women.**

 Throughout the Class Period, Nike has had a classwide policy or practice for setting the

starting salaries of new hires.  This included the use of a new hire's prior pay as one of six factors

when Nike set starting pay.  Sun Decl. Ex. 45 (identifying "historical salary progression" as one of

six factors used classwide to set starting salary); *id.* Ex. 79, Thomas Dep. 226:15-230:9 (testifying

that "prior salary to Nike" is more accurate than "historical salary progression" in Sun Decl. Ex. 45).

Nike acknowledged, in a 2019 training document, that "[i]n the past, we often focused on the new

hires (sic) prior salary and/or the size of the increase the new hire would receive." *Id.* Ex. 32 at slide

6; Walker Dep. 102:1-103:11; *see also* Sun Decl. Ex. 12 at slide 41 (in another 2019 training

document, Nike stated "*we no longer ask* new hires their prior salary or focus on the size of the

increase the new hire would receive.") (emphasis added).

    In September 2017, after Oregon announced its ban on the collection of prior salary, Nike

made a "policy change" to cease its collection and usage of prior salary.  Thomas Dep. 214:4-215:4.

According to Nike's internal directive, this meant that "Nike employees *may no longer* … ask

candidates or their employers questions about their compensation history."  Sun Decl. Ex. 6 at

NIKE_00002070 (emphasis added); Thomas Dep. 213:21-215:4 (confirming this change in Nike

policy).  It also meant that "Nike employees *may no longer* … record salary history information in"

Nike's hiring and recruiting data systems.  *Id.* (emphasis added); *see also* Thomas Dep. (Errata)

216:2-12.

    Nike replaced using prior pay with the newer classwide practice ████████████████

███████████████████████  Thomas Dep. 206:14-208:1; Sun Decl. Ex. 30.  In this modified

practice, "Nike will use ██████████████████████████████████████to

inform and create our offers."  Sun Decl. Ex. 30.

    Nike ensured the consistent application of its starting salary policies or practices through the

active involvement of HR, uniform guidelines, and approvals of various stakeholders.  All decisions

related to hiring had to be approved by Talent Acquisition, which is a Center of Excellence within

HR specifically tasked with managing the process for external hiring, competitive promotions, and

other job changes.  *Id*. Ex. 42 at NIKE_00029825 ("All decisions related to hiring should be

approved by Talent Acquisition."); Thomas Dep. 49:25-50:7 (at a minimum, Talent Acquisition approval is needed for all hiring decisions), 28:17-29:6 (confirming HR role of Talent Acquisition). Talent Acquisition also made starting salary recommendations for new hires based on centralized guidelines and processes. Sun Decl. Ex. 33 at NIKE_00024196 (Talent Acquisition employees are told to "Recommend a competitive salary for a New Hire" based on "the Base Pay positioning guide in the [Talent Acquisition] Playbook"). In turn, pursuant to Nike guidelines, starting pay offers should be approved by HRBPs and business leaders. *Id.* Ex. 11.[17]

Nike repeatedly admitted that its use of prior pay in setting starting salaries was biased, perpetuated "poor" pay practices, and that its elimination supported "pay and hiring equity." In an April 4, 2018 companywide email, Nike's CHRO stated Nike would "remove bias from critical moments of the hiring process by … eliminating the collection of candidate salary history." *Id.* Ex. 7 at NIKE_00002235; *see also id.* Ex. 5 at NIKE_00002052 (in its Sustainable Business Report Nike published in 2018, Nike again stated that it would "remove bias from critical moments of the hiring process by … eliminating the collection of candidate salary history."). A 2019 Nike training document states Nike sought to "shift" from "often focus[ing] on the new hires prior salary" to avoid "carry[ing] over poor pay practices from a prior company or start[ing] a candidate at a disadvantage – we want to create an equal playing field from day one." *Id.* Ex. 32 at slide 6.

"Researchers note that gender differences in starting salary are the biggest reason for gender-based pay inequity (Kaman & Hartel, 1994)." Lundquist Report 33. Accordingly, Dr. Lundquist confirmed Nike's admissions when she concluded "Nike's practice of setting starting pay based on

---

[17] Though Nike's Rule 30(b)(6) witness sought to minimize this written guideline, she could not identify a single Nike document from 2015 to the present that stated Talent Acquisition did not need HRBP and business leader approval. Thomas Dep. 120:1-121:16. Nike also did not produce any pre-2018 versions of "Hiring Process." Goldstein Decl. ¶ 4(a).

prior pay only worked to perpetuate the ongoing pay gap consistently cited in the United States (Blau & Kahn, 2017)." *Id*. 32.[18]

Though Nike stopped its admittedly "biased" collection and consideration of prior pay, Nike did not commit to awarding back pay for the damages this policy caused. *See, e.g.,* Sun Decl. Ex. 6. Nor did Nike produce evidence showing it either analyzed the adverse impact its "prior pay" policy caused or took any specific steps to compensate class members for the pay lost due to this policy. *See* Walker Dep. 301:20-302:1 (refusing to answer whether Nike paid back wages for employees Nike determined were not paid equitably under its Competitive Pay Management program pursuant to instruction by counsel).[19]

### 2.    Nike's Classwide Practices for Awarding Annual Merit Increases and Bonuses Perpetuated Gender Disparities Because They Are Based on a Percentage of Current Salary.

Since 2015, Nike's use of a percentage of an employee's current salary to calculate their annual merit increases to salary[20] and annual bonuses has perpetuated existing disparities in pay because the smaller an employee's salary, the smaller the merit increases and annual bonuses.

#### a.    Nike Calculates Annual Merit Pay Increases as Percentage of Base Pay.

Throughout the Class Period, Nike has calculated annual merit increases for all employees in Covered Positions based in part on a percentage of existing base pay.  From 2015 through 2018, Nike used a percentage of an employee's current base pay when calculating merit increases.  Walker Dep. 357:11-16.  To set the range of the potential merit increase percentages, Nike used its classwide

---

[18] This opinion is unrebutted by any opinion presented by Nike's experts.  Lundquist Rebuttal 2, 3, 12, 14-15.

[19] *See also* ECF No. 117 (order denying Plaintiff's motion to compel pay equity analyses documents based on Nike's objections of attorney-client privilege and work product protection).

[20] Nike has referred to salary as "merit pay," "base pay," and "core pay."

performance rating system, Coaching For Excellence ratings ("CFE ratings"),[21] which was the "primary decision driver" for the percentage increases of base pay.  Sun Decl. Ex. 17 at NIKE_00003281; *id*. Ex. 2 at NIKE_C_00001666.  In 2019, Nike adjusted its annual salary increase policy to account for an employee's position within Nike's pay range in addition to performance, but Nike continued to base the increases to salary on a percentage of current salary.  *Id*. Ex. 35 at slides 34-35; *id*. Ex. 16 at NIKE_00003276 (Under the new policy, "core pay percent" meant the "percent increase to base pay as a result of Core Pay adjustment.").

Nike also provided managers with detailed guidelines directing them to recommend merit increases consistent with Nike's operative policy.  For example, from 2015 to 2018, Nike assigned a corresponding range of possible salary increases for each CFE Rating, and these were a "minimum and maximum percentage [salary increase] for each rating …."  Walker Dep. 360:17-25, 366:6-367:3 (describing Nike's uniform "performance rating guidelines" that applied to all Bands and were centrally set by the HR compensation team).  Starting in 2019, Nike limited managers to four options for making recommendations ("max invest," "invest," "market," or "zero") and used a centralized process to "prepopulate" a recommended percentage increase.  Sun Decl. Ex. 35 at slide 35.  Further, Nike issued detailed guidance on how to recommend one of the four options for merit increases (now called "core pay") – for example, directing managers to recommend "invest" only in roughly 20% of employees based on "their achievements or performance."  *Id*. at slides 14, 34-35 (a managers' role is to "[u]nderstand the new Annual Pay Review process and how pay recommendations will be made" and "[i]nfluence pay recommendations").

---

[21] CFE Ratings have been used on an annual basis from at least 2015 to the present.  Sun Decl. Ex. 83, White Dep. 127:2-5.  Nike "uses five performance ratings with definitions that are consistently applied so that performance ratings are consistent and objective across NIKE."  *Id*. Ex. 9.  The definitions of those five ratings have remained the same since 2015.  *See e.g., id*. Exs. 37 (2016) & 16 (2019); White Dep. 132:18-25.

"Although merit award recommendations are made by the immediate manager of employees in the Covered Positions, they are not finalized until several levels of leadership successively review and approve the initial recommendation." Lundquist Report 28 (citations omitted); *see also* Sun Decl. Ex. 18 (describing the Executive Review process under Nike's Annual Pay Review); White Dep. 196:21-200:1 (Rule 30(b)(6) witness confirming accuracy of deposition exhibit 610 (Sun Decl. Ex. 18) and process of executives reviewing and adjusting recommendations made by subordinate managers); Sun Decl. Ex. 36 at slide 13 (explaining the role of leaders during Executive Review is to "align, and approve awards for all employees below them in the organization" and "ensure pay outcomes align with talent perspective and make any necessary changes"); *id*. Ex. 43 at NIKE_00030247 (for merit and PSP awards prior to 2018, "Additional approvals by Senior Leadership … will be required before awards are finalized or activated)."

       **b.**    <u>**Nike Calculates Annual Bonus Awards as a Percentage of Base Pay.**</u>

Nike consistently uses a percentage of the employee's base pay when calculating its annual cash bonuses, called the "Performance Sharing Plan" ("PSP"), for all employees in Covered Positions. Since 2015, Nike has used the same centrally-set formula to calculate all PSP awards. Sun Decl. Ex. 22, "FY17 PSP Brochure"; White Dep. 105:13:4-107:17 (confirming Nike used the same PSP formula from 2015 to 2018). In 2019, while keeping the same formula, Nike modified its practice to make two inputs in its formula the same for all employees. Sun Decl. Ex. 4 at NIKE_00001974 (announcing all Nike employees will be assigned to the same plan, which means the same "Weighted Achievement" input for all employees); *id*. Ex. 35 at slide 11 (provides that starting in FY20, calendar year 2019, the "Performance Modifier" would be 100% for all employees).

From 2015 to the present, Nike has calculated PSP awards using an input for "Fiscal Earnings" or a salaried employee's base pay. White Dep. 122:9-21, 124:1-6 ("Fiscal Earnings"

means base pay and confirming "Fiscal Earnings" has been a factor in PSP calculations from at least 2015 to the present. All but one of the remaining inputs to Nike's PSP formula have been essentially pre-determined – either by tenure ("Time in Plan"), assigned Band (1/2 Band Target), or a uniform multiplier based on assignment to a specific plan ("Weighted Achievement"). White Dep. 108:14-109:11, 122:3-8, 122:22-123:5. The remaining factor, "Performance Modifier," has been fixed at 100% from 2019 onward and, from 2015 to 2018, was based on CFE ratings. Sun Decl. Ex. 35 at slide 11 (confirming 2019 change to 100% Performance Modifiers for all employees); White Dep. 126:7-131:7 (testifying that, prior to 2019, Nike provided preset ranges for the Performance Modifier based on CFE ratings to guide PSP recommendations from managers). "Therefore, all other inputs in either PSP formula being equal, the higher the salary earned during the fiscal year or the higher the band level of the employee, the greater the PSP award amount." Lundquist Report 30.

Like merit increases, Nike made PSP bonus awards during the same annual pay review process wherein managers made recommendations, and awards were not finalized until executive review and approval. *See* Section IV.B.2.a, *supra*; *see also* Sun Decl. Ex. 43 at NIKE_00030247 (communication to all HRBPs confirming that "PSP recommendation" are subject to "[a]dditional approvals of Senior Leadership" before those PSP awards were "finalized or activated."); White Dep. 204:17-21 ("the business leaders at the top were responsible for approving" the budget for the PSP bonuses).

### c.     <u>These Poor Practices Exacerbate Existing Gender Differences in Pay.</u>

Nike's approach of awarding merit increases using a percentage of base pay "is problematic because gender differences in starting salary tend to be perpetuated, and sometimes exacerbated, over time when increases are based on a percentage of base pay (Baker, 2003, pp. 221-222)." Lundquist Report 32. Similarly, Nike's training documents acknowledge that its practice of "focus[ing] on % increase as [the] primary decision driver" "leads to an array of pay position outcomes with often

undesirable long-term consequences."  Sun Decl. Ex. 2 at NIKE_00001666; *see also id.* Ex. 29 at

slide 9 (Nike recognizing underpayment at hire means that "[e]ven with a full merit increase, the

employee is still below the minimum.").  Dr. Lundquist concluded that raises based on percentage

increases at Nike ensured that "employees paid lower than others who are doing the same job can

never catch up to their more highly-paid peers" and bonuses "based on a percentage of the

employee's base pay will continue to exacerbate existing gender differences in pay."  Lundquist

Report 33-34.[22]

3. <u>**Nike Pays Women Less than Men for Performing Comparable Work, Which Is
Driven by Lower Starting Pay and Exacerbated by Merit Increases and Annual
Bonuses.**</u>

Despite performing comparable work and having equal or superior backgrounds and

performance ratings, Nike pays women significantly less than men.

Dr. Neumark, a labor economist at the University of California at Irvine, examined the base

pay and bonuses data of employees in the Covered Positions by means of a multiple regression

analysis.[23]  Dr. Neumark's multiple regression analysis controlled for comparable work by relying on

the unrebutted expert opinion of Dr. Lundquist for the appropriate controls of comparable jobs at

Nike (the unique interaction of Job Sub-family and Job Level), which tracks Nike's use of its

regimented job architecture and Leveling Process (*see* Section IV.A.2, *supra*).  Neumark Report ¶¶

38-39.

---

[22] Dr. Lundquist's opinions regarding Nike's merit increase and PSP bonus policies are
unrebutted by any opinion presented by Nike's experts.  Lundquist Rebuttal 2, 3, 12-15.

[23] A multiple regression is a statistical methodology that "holds constant" or "controls for"
various factors so that, for example, the compensation paid to female employees may be
compared to compensation paid to male employees.  Neumark Report ¶¶ 19-21.  Multiple
regression analyses have long been used in employment discrimination actions in order to
determine whether there are significant statistical disparities in the treatment of different groups.
*See, e.g., Bazemore v. Friday*, 478 U.S. 385, 399 (1986) (Brennan, J. concurring in part); Daniel
L. Rubinfeld, *Reference Guide on Multiple Regression*, 306 n.5 (Fed. Judicial Ctr. 3d ed. 2011)
("Discrimination cases using multiple regression analysis are legion.") (collecting cases).

Dr. Neumark's report shows that Nike paid women less in base pay and bonuses by roughly ███ per year (or ████ less) than men working in comparable jobs and even after controlling for age, tenure, time in the position, and performance ratings for the period of 2015 to 2019. *Id.* ¶¶ 46-47 & 53, Table 2, col. 4, Panel C; Neumark Rebuttal ¶ 39 & 22, Table R6, col. 4, Panel C. The probability that this result occurred by random chance is less than 1 in 1 billion – an extraordinary statistically significant disparity of 9.47 standard deviations ("SDs").[24]

Dr. Neumark also determined that much of this female pay disparity is attributable to Nike's policy of using prior pay as a factor when setting starting pay. Nike paid women roughly ████ less per year (or ████ less) in starting base pay than men who were hired into the same jobs. Neumark Report ¶ 58 & 57, Table 6, col. 4; Neumark Rebuttal 92, Table D1, col. 4 (reporting statistical significance with 3.38 standard deviations). After Nike's policy change, the female starting pay gap remained, but dropped by over half and was no longer statistically significant. Neumark Report ¶ 59 & 57, Table 6, cols. 5 & 6; Neumark Rebuttal 92, Table D1, cols. 5 & 6.

Moreover, differences in education or prior work experience do not explain this starting pay gap for women because adding education and prior work controls actually increases the female pay gap ████████████ Neumark Report ¶ 63 ("on balance, education and prior experience do not contribute at all to lower starting pay of women, and instead that women have more of the education and types of prior experience that is valued by Nike"); *Compare* Neumark Rebuttal 92, Table D1, col. 4 *with* 60, Table R11, col. 1.

---

[24] A "difference of 1.96 standard deviations would be statistically significant at the 5% level, meaning that the likelihood of observing this value if compensation was neutral with respect to gender is 1 in 20." Neumark Report ¶ 26. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308-11, nn.14 and 17 (1977) (holding that a disparity of greater than "two or three" standard deviations "would undercut the hypothesis that decisions were being made randomly with respect to race"); *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1273 n.3 (9th Cir. 1981), *cert. denied*, 102 S. Ct. 1719 (1982) (0.05, or 5%, level of statistical significance generally recognized as point at which statisticians draw conclusions from statistical data).

Dr. Neumark's analysis further confirmed that Nike's policy of awarding merit increases and PSP bonuses as percentages of base pay "essentially locks in the pay disadvantage of women at Nike" caused by its starting pay policy.  Neumark Report ¶ 82 & 60, Table 9, cols. 1 & 2 (finding that merit increases perpetuate existing pay disparities); Neumark Rebuttal 22, Table R6, col. 4, Panel B (reporting a female bonus shortfall of ████ per year with 5.41 SDs); *see* Neumark Report ¶ 86 (annual pay disparity equates to roughly ████).

After Nike changed its policy to eliminate consideration of prior pay, Nike continued to underpay incumbent women.  Neumark Report 55, Table 4, col. 6, Panel C (from 2017 to 2019, Nike paid incumbent women ████ less in base pay and bonuses than men in similar jobs, with 8.5 SDs). This continuing disparity was driven by a persistent pay gap for women *hired before* September 2017[25] and exacerbated by Nike's annual merit increase and bonuses.  *Id.* ¶ 53 ("even if starting pay gaps for women became smaller (and statistically insignificant) for those hired in September 2017 or later, pay gaps for women *employed* in that period, but hired earlier, remained sizable and statistically significant.").

The pay disparity for women increases even more when Dr. Neumark accounts for the discriminatory effects of Nike's initial job assignment and promotion practices (Sections IV.C-D, *infra*).  His report calculates a total estimated pay shortfall of ██████ or ██████ with 12.73 SDs) per woman per year as result of the combined adverse impact of all four challenged practices.  Neumark Report ¶¶ 8(a)-(d) & 54, Table 2, col. 2, Panel C; Neumark Rebuttal 22, Table R6, col. 2, Panel C.

---

[25] These results confirm Nike failed to correct the wage disparities that the years of its prior pay policy caused.  Furthermore, Nike failed to produce pay data since September 2019 (Neumark Report ¶ 10), so the more current data may show that Nike's ongoing starting pay practice continued to cause a statistically significant gender disparity, not just a pay disparity.

**C.**    **Nike's Fill Strategy Policy or Practice for Determining Whether to Fill Promotions Non-Competitively or Competitively Adversely Impacts Women.**

    **1.**    **Nike's Fill Strategy Determines Whether to Promote Employees Either Non-Competitively or Competitively**

Before any promotion is made at WHQ, Nike first determines whether to fill an open position through its non-competitive or competitive process – Nike calls this decision its "fill strategy." Sun Decl. Ex. 70, Heinle Dep. 123:25-124:22, 128:12-129:8, 131:5-132:14; Sun Decl. Ex. 3 at NIKE_C_00001858. Nike, through its Talent Planning[26] and Talent Acquisition teams, promulgates "guidelines" on the implementation of the fill strategy. Heinle Dep. 132:15-134:1.

Nike's fill strategy is determined at the time of the job opening either during Nike's workforce planning process or during its annual Talent Planning Cadence. *Id.* 177:17-182:11, 200:19-201:2; Sun Decl. Ex. 39 at slide 16 (illustrating annual Talent Planning Cadence). During workforce planning sessions, Nike seeks "consistency in position management" by, among other things, updating its "fill strategy" for open positions. Sun Decl. Ex. 3 at NIKE_C_00001863; Heinle Dep. 132:12-14. Promotion decisions handled by Nike's Talent Planning team also "use a consistent, thoughtful and practical approach to making talent decisions," which includes administering the same company-wide talent assessment tools to identify high potential talent. Sun Decl. Ex. 40 at slide 2; Lundquist Report 36.

Both non-competitive and competitive promotion processes involve the participation of HR, an established approval process, and procedures to follow. Thomas Dep. 28:17-29:6 (HR involvement in competitive promotions), 49:11-50:7 (certain Nike approvers, including HR, for all

---

[26] Talent Planning is a part of HR focused on identifying future needs for talent at Nike and developing current employees and plans for filling position openings, often non-competitively, when they occur. Sun Decl. Ex. 42 at slide 2; Heinle Dep. 68:11-19; Sun Decl. Ex. 39 at slide 5 (stating that Talent Planning has "an enterprise view of our talent plans, results, forecasted decisions…").

hiring decisions), Sun Decl. Ex. 11 (description of competitive hiring process); *Id.* Ex. 15

(description of non-competitive promotion process), *Id.* Ex. 38 (process for talent planning non-

competitive promotions), Heinle Dep. 62:9-63:14 (describing part of the approval process for non-

competitive promotions); *see also* Lundquist Report 39; Sun Decl. Ex. 41 at NIKE_00028010-11

(Nike HR telling an E-Band Director that a promotion must be done competitively instead of non-

competitively).

Nike's fill strategy matters because it dictates whether a non-competitive or competitive

process applies.  Competitive promotions involve additional "guardrails and transparency" because

they require a job posting, the submission of applications for employees who want to be considered,

and interviews; in contrast, a non-competitive promotion precludes a job posting and occurs without

interviews.  Heinle Dep. 45:2-6, 56:20-25, 72:20-73:3; Lundquist Report 39.

Until December 2018, any opening in a Covered Position was subject to being filled by either

the non-competitive or competitive process.  Heinle Dep. 211:8-212:14 (confirming no limitation on

use of non-competitive promotions for filling any position prior to the 2018 policy change).  In

December 2018, Nike modified its policy to require the posting of all open E-band and below

positions through a competitive process.  Sun Decl. Ex. 20 at NIKE_00013858.  Nike stated that, at

least in part, it made this change because a "recent All-Employee Survey results revealed that

employees feel excluded from career opportunities due to a perceived lack of transparency and

visibility into open roles."  *Id.* Ex. 21 at NIKE_00013865.  During this 2018 policy change, Nike

recognized that its competitive process "prioritizes equal access and opportunity" (Thomas Dep.

65:22-66:2; Sun Decl. Ex. 20), but "made no such claim for the non-competitive process" (Lundquist

Report 39).  Notably, Nike chose its non-competitive process for around ██ of its promotions out

of Covered Positions from 2013 through September 2019.  *See* Neumark Report 77, Table B6

(identifying 5,688 non-competitive promotions out of a total of 7,662 promotions).

Nike knew or strongly suspected its promotion practice caused an adverse impact by at least

2018 when CHRO Matheson publicly admitted that Nike needed "to improve [its] representation of

women" and, "[w]hile we've spoken about this many times, … we have failed to gain traction."  Sun

Decl. Ex. 13.  CHRO Matheson also announced Nike would "be studying time-in-job and the pace of

promotion across our employee base – with a strong focus on women and POC – to understand how

this impacts representation."  *Id.* Ex. 13 at NIKE_00003199.  But Nike affirmatively chose not to

examine this adverse impact when Nike halted the promotion analysis before it could be completed.

Matheson Dep. 185:21-187:1 (confirming promotion impact study was stopped in 2018 on the

advice of counsel), 186:13-187:1 (at direction of counsel, refusing to answer why Nike stopped its

promotion impact study).

Nike executives and HR are the key drivers of promotions at Nike.  In recognizing the long-

standing need for Nike "to improve [its] representation of women," Ms. Matheson wrote, Nike

would first focus its "efforts to improve … at the Vice President (VP) level[] because representation

at this level provides a foundation for us to grow representation at all levels" and VPs, "[a]s a group,

… recognize and promote our internal talent … are charged with [the] tone for our culture[, and]

serve as … advocates for talent in the organization."  Sun Decl. Ex. 14.

    **2.**     **<u>Nike Promotes Women Less Often Than Men Because it Overwhelmingly</u>**
                   **<u>Chose to Fill Positions Through its Non-Competitive Practice.</u>**

When Nike applied its fill strategy to use the non-competitive promotion process, women

were adversely impacted.

Dr. Neumark's analysis of Nike's promotion data shows a female shortfall when Nike chose

its non-competitive practice and no statistically significant gender disparity when Nike chose its

competitive practice.[27]  When promotions were made pursuant to Nike's non-competitive practice,

women experienced a ██████ lower rate of promotion (relative to the baseline promotion rate of men)

despite having similar qualifications, performance ratings, and doing comparable jobs as men.

Neumark Rebuttal ¶ 59 & 34, Table R8, col. 1, Panel C (reporting a statistically significant disparity

with 2.5 SDs); Neumark Report ¶ 97 & 61, Table 10, col. 3, Panel C.  Furthermore, there are

numerous promotions that are multi-level, where an employee may move higher by two or more

levels, and women have a "statistically significant lower probability" of receiving multi-level

promotions at Nike.  Neumark Report ¶¶ 99-100 & 78, Table B7.  For example, female employees

have a ██████ lower chance of receiving a promotion of 2 or more levels than similarly situated

male employees, a disparity of 3.16 SDs, pursuant to the non-competitive promotion practice.

Neumark Rebuttal ¶ 64 & 39, Table R9, col. 1, Panel C.[28]

Because of Nike's promotion policy changes in 2018, Dr. Neumark examined whether there

was a difference in the gender disparity before and after April 2018 and confirmed there was.  The

gender disparity in the promotion rate for non-competitive promotions was statistically significant for

the period prior to April 2018 but not for the period after April 2018. Neumark Report ¶ 98 & 61,

Table 10, cols. 4-5; Neumark Rebuttal ¶ 59 & 34, Table R8, cols. 4-5.[29]

---

[27] Dr. Neumark's pay analysis also indicated a female disparity in promotions because the "widening gap" in compensation (from starting pay to pay during the entire Class Period) paid to female and male employees when not controlling for job levels indicates that men were promoted more quickly to higher levels than women.  Neumark Report ¶ 91.

[28] Dr. Neumark also confirmed that this female promotion shortfall was not due to differences in talent/leadership potential characteristic.  Female and male employees received similar talent/high potential evaluations.  Neumark Report 73, Table B2; *see* Lundquist Report 38.

[29] Nike produced personnel data production only to September 2019.  If more current data was produced it may well have shown significant gender disparities or that Nike had returned to the implementation of its non-competitive practice in a discriminatory manner.  The critical point for class certification is that these are common issues and the resolution of these issue will be based upon common proof.

Dr. Lundquist's report explains that this promotion disparity for women is unsurprising given the lack of additional guardrails and transparency when Nike overwhelmingly chose to use non-competitive promotions instead of competitive promotions.  Lundquist Report 38-41.

**D.**    **Nike's Initial Job Assignment Policies or Practices Adversely Impact Women.**

Although women come to Nike with equal or better educational background and prior work experience compared to men, Nike disproportionately hires women into lower Job Levels than men. Neumark Report ¶¶ 102-111.

Nike HR has a centralized and proactive hiring process, which includes making initial job assignments for new hires.  Nike's Talent Acquisition team actively manages the hiring process from the time a job is posted until a candidate is selected and approves all hiring decisions.  Sun Decl. Ex. 42 at NIKE_00002925 ("All hiring decisions relating to hiring should be approved by Talent Acquisition."); Thomas Dep. 24:22-25:8, 28:17-23; Sun Decl. Ex. 21 at NIKE_00013867 (Nike's Hiring Guidelines and Philosophy stating that Talent Acquisition's roles and responsibilities include: "ensure compliance and provide guidance throughout the competitive hiring process.").  Further, Nike's policy is to make "[h]iring decisions … according to objective criteria related to the specific requirements of the job."  Sun Decl. Ex. 14.  To that end, Nike instructs "[a]ll employees, managers and talent acquisition (TA)" to "follow consistent guidelines during each stage of the hiring process." *Id*. Ex. 21 at NIKE_00013864.  For example, the "Talent Acquisition Playbook" is the main source of policies and guidelines for members of the Talent Acquisition organization.  Thomas Dep. 204:18-22.

As part of its hiring process, Nike also has company-wide practices that influence which candidates apply for and are considered for open positions.  For instance, the Talent Acquisition team regularly invites candidates to apply for open positions either through its "proactive sourcing" process in its Avature system or its "passive candidate correspondence" process in its Taleo

system.[30]  Thomas Dep. 45:12-21 (Avature's proactive sourcing contacts prospects about not yet posted positions at Nike); Sun Decl. Ex. 75, Miller Dep. 68:25-70:15 (Taleo's passive candidate correspondence involves recruiters inviting candidates to apply for specific open positions); *see also* Sun Decl. Ex. 31 (Nike's "standard hiring process" includes Talent Acquisition sourcing candidates). Through its "matched to job" process, Nike also empowers Talent Acquisition recruiters to apply for job openings on behalf of candidates that the candidates did not themselves apply for.  Miller Dep. 98:7-100:5 (confirming recruiters have Nike guidelines to follow when submitting "matched to job" applications), 106:13-110:2 (confirming matched to job application Sun Decl. Ex. 19 for Opt-in Plaintiff Cheng); Sun Decl. Ex. 19 at NIKE_00007070 (Nike printout form Taleo reflecting a "Matched to Job" entry for an Opt-In Plaintiff).[31]

Nike has repeatedly admitted that its hiring process was "bias[ed]."  In a public report, Nike stated that it "will … remove bias from critical moments of the hiring process by creating more inclusive job descriptions … and using data to inform hiring decisions."  Sun Decl. Ex. 5 at NIKE_00002052; *see also e.g., id.* Ex. 7 at NIKE_00002235 (same statement in an April 4, 2018 email to Nike employees, from CHRO Matheson).  Ms. Matheson explained that her reference to "job descriptions" referred to job postings for external candidates and that "[i]nclusive job descriptions are intended to remove the types of things that can create unnecessary or artificial barriers to access to jobs."  Matheson Dep. 197:8-22, 198:5-13.

---

[30] Avature is "a tool …. primarily used for proactive sourcing of prospects."  Goldstein Decl. Ex. 4, Thomas Dep. 42:20-43:7.  The Taleo system houses application history for candidates who have applied to Nike's open roles.  Goldstein Decl. Ex. 4, Thomas Dep. 237:7-1.

[31] Because Nike withheld numerous documents and data concerning its hiring process, including its specific processes for assigning Job Level to new hires (Goldstein Decl. ¶¶ 3-8), Plaintiffs challenge the impact caused by Nike's hiring process more broadly.  Dr. Lundquist similarly confirmed that missing documents, testimony, and data precluded her confirming whether Nike had a specific channeling policy or practice.  Lundquist Report 42.

The data confirms that "Nike hires women disproportionately into Covered Positions at lower Job Levels than men despite women if anything having advantages in education and prior experience." Neumark Report ¶ 102. As with promotions, the drop in starting pay disparity when Dr. Neumark adds a control for Job Level demonstrates that Nike assigns women to lower Job Levels than men. *Id.* ¶¶ 103-104. The gender disparity in initial job assignment is further illustrated by an examination of the actual Job Levels into which women are placed; for example, at the supervisor level and below, that is, the three lowest of Nike's ten Job Levels, Nike placed ███████ of the female new hires compared to ██████ of male new hires. *Id.* ¶ 105 & 64, Figure 1. Finally, a multiple regression analysis controlling for educational level and prior experience demonstrates that similarly qualified women are assigned to lower job levels than men to a statistically significant extent. *Id.* ¶¶ 106-10 & 63, Table 12, cols. 1-2. As Dr. Lundquist Report's notes: "[t]here are processes used by Nike's recruiters that could have contributed to" Nike disproportionately hiring women into lower job levels than men, including Nike recruiters soliciting candidates to apply for specific positions or applying for them (via matched to job). Lundquist Report 41-42.[32]

**E.     Women Raised Serious Gender Discrimination Complaints, Including the 2018 Starfish Survey, But HR Has Been Ineffective in Addressing Discrimination.**

> **1.     The Starfish Survey Raises Systemic Complaints of Gender Discrimination at Nike.**

In early 2018, Nike received a survey, commonly referred to as the "Starfish Survey,"[33] that women at Nike filled out regarding "discrimination or other harassment" and "sexual harassment" at

---

[32] Both of Nike's experts failed to address either Dr. Lundquist's explanation of missing evidence related to Nike's initial job assignment process or her identification of potential Nike's practices that could have caused the Job Level disparities confirmed by Dr. Neumark's analysis. Lundquist Rebuttal 15-16.

[33] Sun Decl. Ex. 46 at NIKE_00032844 (referring to "Nike Project Starfish").

Nike.  *See, e.g.,* Sun Decl. Ex. 48 (Survey Complaint of ▮▮▮▮▮) at NIKE_0003338; Matheson

Dep. 75:21-76:10; Sun Decl. Ex. 24.

      The Starfish Survey complaints alleged serious problems, including allegations of gender

discrimination in pay and promotion.  *Id.* Ex. 67, Daugherty Dep. Vol. I 199:8-12, Vol. II 402:15-19.

▮▮▮▮▮▮, a Vice President and long-time employee, wrote that "[o]ur culture is broken" and that

she was "speaking out as I believe I have normalized negative, manipulative and sexist behavior over

the course of my career at Nike.  I am speaking out for the younger generation of female leaders."[34]

Sun Decl. Ex. 48 at NIKE_000033340-43 (also viewing a 2017 company-wide email by CHRO

Dave Ayre touting Nike's record of "pay equity globally" as "a real setback" and "tone deaf.").

Another Vice President, ▮▮▮▮▮ alleged a male executive, ▮▮▮▮▮, who was more senior

than her (*e.g., id.* Ex. 54), discriminated in the making of a promotion decision and concluded that

she had a "loss of faith in a fair and equitable promotion process" and that it was a "massive

disappointment."  *Id.* Ex. 50 at NIKE_00033353.

      The complaints contained numerous allegations of executives and HR causing or condoning

discrimination.[35]  For example, in two complaints, ▮▮▮▮▮ a senior executive who reported

directly to Nike's CEO (*id.* Ex. 55), was alleged to have sexually harassed lower-level employees.

*Id.* Exs. 51 & 52.  A different complaint recounted how one woman was "not able to do anything

about" being called a "bitch" by her manager because HR refused to act after a Nike Vice-President,

▮▮▮▮▮, "phoned in a favor" to HR to protect his friend.  *Id.* Ex. 49.  Another complaint

---

[34] Ms. Matheson testified that there was an investigation into ▮▮▮▮▮ s complaint, that there would be a report of the investigation and that she "believe[d] that Nike would have maintained a copy of the report."  Matheson Dep. 83:8-12, 84:13-20.  Nike did not produce these documents, asserting attorney-client privilege.

[35] Goldstein Decl. ¶¶ 15-16 (production of unredacted complaints, in response to Plaintiffs' motion to compel, confirmed that approximately 22 high-level managers had been charged with discrimination).

alleged that "ER [Employee Relations] and HR at this company are a joke. These groups have

proven over and over that they are unreliable…. It's a disgrace. ███████████ was a well-

known sexual harasser." *Id.* Ex. 47. ████████████████████████████████████

███████████████████████████████████████ *Id.* Ex. 61; Matheson Dep. 29:17-

31:19.  Nike's counsel directed Ms. Matheson not to answer questions concerning whether the

investigation of HR caused by the filing of survey complaints led to an investigation of misconduct

by ████████ *Id.* 111:9-112:25.

The complaints of gender discrimination from the Starfish Survey represented the same type

of harassment and discrimination experienced by the Named Plaintiffs and Opt-in Plaintiffs.[36]  For

example, several women complained to HR about ███████████ discriminatory behavior towards

women, including shoving his crotch in Opt-in Plaintiff Anderson's face and telling her to "suck it,"

but he was still promoted to Vice President.  Azavedo Dep. 222:19-224:22; Sun Decl. Ex. 25 (MOR

complaint against ███████; Cahill Dep. 226:22-227:24, 228:13-229:20, 231:7-21, 232:10-16;

Anderson Dep. Vol. II 204:22-209:7.  While ███████ was initially protected as a friend of ███████

███████ (Azavedo Dep. 211:20-212:21), he was later exited from Nike in 2018 along with several

other senior leaders after the Starfish Survey (Anderson Dep. Vol. II 220:15-24; Daugherty Dep. Vol.

I 172:24-173:2 (confirming part of Nike's response to the Starfish Survey included forcing some

employees to exit).

---

[36] Sun Decl. Ex. 65, Cahill Dep. 218:10-219:25, 221:10-225:19, 280:20-281:4; *id.* Ex. 68,
Elizabeth Dep. 60:24-64:14, 68:12-69:21, 76:20-77:25; *id.* Ex. 71, Hender Dep. 202:4-205:8; *id.*
Ex. 72, Johnston Dep. 244:16-251:23, 267:16-270:17, 274:9-275:10, 276:1-279:22; *id.* Ex. 76,
Phillips Dep. 218:25-220:7, 221:8-223:3; *id.* Ex. 66, Cheng Dep. 106:14-108:20; *id.* Ex. 64,
Baumel Dep. 165:2-165:21; *id.* Ex. 73, Junkins Dep. 53:11-54:14, 56:6-9; 56:19-57:25, 59:5-13,
61:2-65:21, 71:7-75:25, 83:17-84:6, 84:16-86:2, 86:9-91:4, 96:16-98:17, 221:19-223:11; *id.* Ex.
80, Tucker Dep. 40:7-44:8; *id.* Ex. 63, Azavedo Dep. 178:2-183:10, 202:19-203:19; *id.* Ex. 62,
Anderson Dep. Vol. I 123:11-124:16; *id.* Ex. 82, Westerhof Dep. 94:3-95:2, 99:4-22, 222:18-
224:20.

Despite the relevance of the Starfish Survey and Nike's responses to Plaintiffs' pattern or practice class claim, Nike refused to provide the testimony and documents that would show Nike's factual investigations, findings, and actions taken in response to the complaints in and related to the Starfish Survey.  Daugherty Dep. Vol. II 331:8-12 (Nike counsel asserting attorney-client privilege over all investigations conducted by outside counsel, including the Starfish Survey).  As a result, there is no evidence in the record that Nike either conducted a complete and adequate investigation into the Starfish Survey and related complaints or took appropriate remedial steps in response to them.[37]

### 2.    Nike's Inadequate Responses to Discrimination, Including HR's Admitted Failures.

On March 5, 2018, Nike's CEO, Mark Parker, received a copy of the Starfish Survey discrimination complaints.  *See* Sun Decl. Ex. 24 (a Nike spokesperson stated, the CEO "was provided a packet of completed, employee-led surveys on March 5[, 2018]").  Ten days later, CEO Parker sent a company-wide email stating that "we've heard from strong and courageous employees" and "we've become aware of behavior occurring within our organization that do (sic) not reflect our core values …."  *Id*. Ex. 8.[38]  In the same email, CEO Parker announced that he had "made the decision to restructure [his] leadership team" and that Trevor Edwards would be leaving Nike – just

---

[37] In addition, Nike did not produce notes taken by Ms. Matheson, summarizing interviews that she had with at least four identified complainants.  Matheson Dep. 87:23-25, 81:15-23, 89:18-23, 91:1-5.  Nike took the position that the notes were privileged and included the notes on its privilege log number 9, (July 6, 2021).

[38] Daugherty Dep. Vol. I 155:8-156:13, 161:3-16 (confirming that CEO Parker's reference to "strong and courageous employees" meant the women who submitted their complaints with the Starfish Survey and that his remarks about problematic "behavior" meant the allegations of gender discrimination contained within those complaints).

eight months after Nike recommended that Mr. Edwards receive a 14.3% salary increase and

significant long-term cash incentives, stock, and stock options.  *Id*.; *id*. Ex. 56 at PLF_000032-35.[39]

     In May 2018, Mr. Parker made a speech to Nike employees in which he further discussed the

Starfish Survey.  Daugherty Dep. Vol. I 166:3-9; Sun Decl. Ex. 4.  Mr. Parker described that "[w]e

continue to review our HR processes from top to bottom ... *to improve processes that underserved us*

*in recent years … and to restore trust in places where it has eroded*."  *Id*. at NIKE_00001966

(emphasis added).  Also, Mr. Parker explained that the "main set of complaints that gave rise to this

process have been acted on and employee exits from this, *larger investigation* will be behind us after

next week."  *Id*. at NIKE_00001965 (emphasis in original).  Daugherty admitted that "some"

employees were forced to exit as a result of the complaints in the survey, but was directed by counsel

not to identify them.  Daugherty Dep. Vol. I 172:15-173:2, 175:20-176:8.[40]

     Nike ascribed the problems described by CEO Parker and raised by the Starfish Survey as

resulting from "conduct where an insular group of high-level managers in pockets of the organization

protected each other and looked the other way, this is something that Nike will not tolerate."  Sun

Decl. Ex. 23 at NIKE_000019527-78.[41]

---

[39] As a result of Nike's restructuring of the leadership team and his resignation, Mr. Edwards forfeited in full restricted stock units (RSU) in the amount of $6,000,000.  Sun Decl. Ex. 56 at 29 n.7.  Nike's Rule 30(b)(6) witness could not "speculate" on the reasons that Mr. Parker announced Mr. Edwards' "retire[ment]" in the email in which he informed Nike employees that he had "become aware of reports of behavior" inconsistent with Nike's "values."  Daugherty Dep. Vol. II 396:18-397:22.

[40] Nike confirmed to the New York Times that executives left Nike soon after the review of the Starfish Survey complaints.  "Besides the resignation of Trevor Edwards and Jayme Martin, Nike has confirmed the departures of Antoine Andrews, Vikrant Singh, a senior brand director for basketball, Daniel Tawiah, a V.P. for global brand innovation, and Greg Thompson, the V.P. for footwear …."  Sun Decl. Ex. 23 at NIKE_00019527; Daugherty Dep. Vol. II 385:19-386:19.  Antoine Andrews was the V.P. of Diversity and Inclusion.  Daugherty Dep. Vol. II 387:20-388:3, Sun Decl. Ex. 59.  Jayme Martin was a Vice President who left the employ of Nike in the Spring 2018.  Daugherty Dep. Vol. II 309:10-21.

[41] Mr. KeJuan Wilkins was a member of Nike's "communications team."  Daugherty Dep. Vol. I 183:10-13.  His representation that Nike's problems were caused by an "insular group of high

As described above, Nike admitted that it had to remove "bias" from critical parts of the hiring process, IV.B.1 and IV.D *supra*, and made changes in its promotion policies or practices because it "need[ed] to improve representation of women" and "had failed to gain traction" in doing so in the past, IV.C.1, *supra*.

After evaluating Nike's HR practices, Dr. Lundquist concluded that Nike's HR department had a "dysfunctional role" and "found a lack of internal controls at the company to monitor and correct bad practices." Lundquist Rebuttal 12; Lundquist Report 42-47.[42] Notably, Named Plaintiffs and Opt-in Plaintiffs similarly testified that HR was and remains ineffective at investigating complaints of discrimination and harassment and cannot be trusted to protect women after they raise such complaints.[43]

**F.    The Representative Plaintiffs Suffered Under the Same Nike Policies or Practices.**

All four representative Plaintiffs worked in Covered Positions during the Class Period and, like other women in the Putative Class, were subject to the same policies and practices challenged on their behalf. *See* ECF No. 64 at 4-5 (describing the background and employment history of the

level managers" was quoted in an article in the New York Times. Sun Decl. Ex. 57, "At Nike, Revolt Led by Women Leads to Exodus of Male Employees (July 29, 2018)." Attempting to distance this admission from the complaints of gender discrimination, Ms. Daugherty opined that the problematic behavior described by ▮▮▮▮▮▮▮▮ was "in crowd/ out crowd … and people feeling like they were in an out crowd and their careers were different than people in the in crowd." Daugherty Dep. Vol. II 377:9-25.

[42] The credibility of Dr. Lundquist's opinions concerning HR practices is buttressed by her "work as a court-appointed expert in the settlement of employment class actions" where the "evaluation of HR practices has been particularly central." Lundquist Rebuttal 10. Moreover, Dr. Lundquist's opinions regarding the "dysfunction" of Nike's HR department is unchallenged by any expert opinion presented by Nike. Dr. Hanvey, Nike's expert, did not examine Nike's HR practices, Hanvey Dep. 66:4-6, the complaints included in the Starfish Survey, *id.*. at 64:13-24, or the statements by Nike's CEO concerning the operation of the HR department, *id.*. at 64:25-66:3.

[43] Cahill Dep. 226:22-227:24, 228:13-229:20, 231:7-21, 232:10-16; Elizabeth Dep. 89:4-92:11; Hender Dep. 83:12-84:23, 98:6-20, 110:12-20, 247:18-22; Johnston Dep. 217:12-218:18, 230:19-231:18, 255:24-256:5; Phillips Dep. 136:7-21; Cheng Dep. 38:13-39:2, 113:12-115:12, 131:4-20; Junkins Dep. 59:14-61:1, 78:3-79:13, 190:16-191:21, 252:5-253:8; Azavedo Dep. 222:19-224:22; Anderson Dep. Vol. II 204:22-209:7; Westerhof Dep. 219:13-222:13.

representative Named Plaintiffs).  Plaintiff Cahill worked at Nike WHQ from October 2013 through

July 2017, where she held a Director, E-Band position (Global Digital Cross-Category for Global

Nike.com and Digital Brand for North America Nike.com).  Cahill Dep. 76:18-77:25, 79:20-24,

88:9-23, 89:24-90:2, 148:6-9.  Plaintiff Johnston worked as a full-time Nike employee at Nike WHQ

from August 2012 through October 2017, as an L-Band Junior Business Systems Analyst and then

Intermediate Business Systems Analyst position.  Johnston Dep. 134:24-135:23, 181:23-25.  Plaintiff

Hender worked as a full-time Nike employee at Nike WHQ from April 2015 to October 2020, where

she held a L-band, Manufacturing Engineer II position and then a U-band, Senior Process Engineer I

position.  Hender Dep. 180:11-17, 199:25-200:10, 253:10-12.  Plaintiff Elizabeth worked as a full-

time Nike employee at Nike WHQ from January 2017 to October 2018, in a L-band position as

Apparel Designer I.  Elizabeth Dep. 103:22-104:6.

## V.    ARGUMENT

### A.    Plaintiffs Meet the Rule 23 Standards for Class Certification

Plaintiffs' challenges to Nike's classwide, centralized compensation, initial assignment and

promotion practices meet the four threshold requirements of Rule 23(a), numerosity, commonality,

typicality, and adequacy of representation, as well as the requirements for Rule 23(b)(2) and (b)(3).

Class certification "is proper only 'if the trial court is satisfied, after a rigorous analysis that

prerequisites of Rule 23(a) have been satisfied.'"  *Wal-Mart*, 564 U.S. at 350-51 (quoting *Gen. Tel.*

*Co. v. Falcon*, 457 U.S. 147, 161 (1982)).  This analysis "often will entail some overlap with

the merits of the plaintiff's underlying claim," but "merits questions may be considered to the

extent—*but only to the extent*—that they are relevant to determining whether the Rule

23 prerequisites for class certification are satisfied."  *Stockwell v. City & Cty. of San Francisco*, 749

F.3d 1107, 1111 (9th Cir. 2014) (quoting *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S.

455, 466 (2013)) (emphasis in original and additional citation omitted); *see also e.g., Sali v. Corona*

*Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) ("For practical reasons, we have never equated a

district court's rigorous analysis at the class certification stage with conducting a mini-trial.").

Courts typically bifurcate disparate treatment and disparate impact class claims into liability

and remedial phases.  *Wal-Mart*, 564 U.S. at 352 n.7 (reaffirming the bifurcated, burden-shifting trial

approach to disparate treatment claims initially set forth in *Teamsters*); *see also Ellis v. Costco*

*Wholesale Corp.*, 285 F.R.D. 492, 545-46 (N.D. Cal. 2012) (certifying disparate impact and disparate

treatment claims and bifurcating both claims into liability and remedial stages); Manual for Complex

Litigation (Fourth) § 32.45 (2004) ("Employment discrimination class actions have commonly been

tried in separate stages under Rule 42(b).").  In the first phase, Plaintiffs seek to establish that the

employer has engaged in a pattern or practice of discrimination; if the Plaintiffs prevail, then there is

a second remedial phase.  *Wal-Mart*, 564 U.S. at 352 n.7.

**B.**     **The Rule 23(a)(1) Numerosity Requirement Is Met.**

Because Nike's personnel data shows there are 4,913 class members during the Class Period

(Neumark Rebuttal ¶ 27), Plaintiffs satisfy the numerosity requirement.  *See Hanlon v. Chrysler*

*Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (Numerosity is met if the "class is so large that joinder of

all members is impracticable.") *overruled on other grounds by Wal-Mart*, 564 U.S. 338.

**C.**     **The Rule 23(a)(2) Commonality Requirement Is Met Because the Determination of**
        **Common Questions Will Resolve Issues Central to the Claims.**

Commonality means "there are questions of law or fact common to the class."  Fed. R. Civ.

P. 23(a)(2).  To meet this requirement, the common question "must be of such a nature that it is

capable of classwide *resolution*—which means that determination of its *truth or falsity* will resolve

an issue that is central to the validity of each one of the claims in one stroke."  *Stockwell*, 749 F.3d at

1112 (quoting *Wal-Mart,* 564 U.S. at 350) (emphasis in original).  A single common question is

sufficient. *Wal-Mart*, 564 U.S. at 359.

The Supreme Court in *Dukes* confirmed that commonality is satisfied where plaintiffs present "significant proof" that the employer "operated under a general policy of discrimination." *Chen-Oster*, 325 F.R.D. 55, 72-74 (S.D.N.Y. 2018) (quoting *Wal-Mart*, 564 U.S. at 353). While the specific proof required for disparate impact, disparate treatment and OEPA claims have differences, "an important point of convergence exists in class actions like the present case [because] [b]oth pattern or practice disparate treatment claims and disparate impact claims are attacks on the systemic results of employment practices." *Segar v. Smith*, 738 F.2d 1249, 1267 (D.C. Cir. 1984).

1.    **Plaintiffs' Disparate Impact Claims Are Capable of Classwide Resolution.**

Under Title VII and the OEA, a *prima facie* showing of disparate impact liability requires plaintiffs to: "(1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) and show a causal relationship between the challenged practices and the disparate impact." *Hemminger*, 285 F.3d at 1190.

Courts find commonality is met when the challenged practices are classwide and involve a common process for decision-making as opposed to just a framework that dictates who will make decisions. *Compare e.g., Chen-Oster*, 325 F.R.D. at 72-75 (where class certification granted, commonality met because the challenged pay and promotion practices were classwide common modes of exercising discretion) *with e.g., Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 277-79 (S.D.N.Y. 2018) (where class certification denied, commonality not met because the challenged pay and promotion practices were more of "a framework that dictates who will make discretionary decisions rather than how they will exercise their discretion.").[44]

---

[44] Like *Kassman*, the district court in *Moussouris v. Microsoft Corp.*, found commonality was not met because "in their briefing, [plaintiffs] unequivocally predicate their challenge on the discretion allowed under Microsoft's Calibration Process" and "how [managers] came to their decisions[] "was entirely discretionary." No. 2:15-cv-01483-JLR, 2018 WL 3328418, at *18, *20 (W.D. Wash. June 25, 2018).

In *Chen-Oster*, the court granted certification of the class disparate impact claim because the female class challenged discrimination caused by classwide job evaluation and promotion policies. 325 F.R.D. at 74-75. Although the challenged "processes permitted managers to exercise discretion," the policies "pervade[] the entire company;" and thus, "[w]hether Goldman Sachs discriminated against the class via its use of [the challenged practices] raises yes-or-no-questions that can each be answered 'in one stroke.'" 325 F.R.D. at 74-75 (quoting *Wal-Mart*, 564 U.S. at 350, 356). The court further recognized that statistical evidence of these policies adversely impacting women by itself constituted "significant proof" of commonality. *Id.* at 75-76.

Similarly, in *Ellis*, where the Northern District Court of California certified a nationwide disparate impact class on behalf of women, commonality was met because the plaintiffs there "identified such specific employment practices within Costco's promotion system," including, *inter alia*, promotions "without an application or interview[], the mandated lack of posting for open positions," … [and] reliance on common but unvalidated criteria for assessing candidates …" that disadvantaged women. 285 F.R.D. at 531-33; *see also McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488-90 (7th Cir. 2012) (reversing denial of class certification because the plaintiffs-brokers challenged two company-wide practices that provided a common mode of decision-making despite their allowance of some discretion; noting that the challenged practices were "practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim.") *abrogated on other grounds by Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541 (7th Cir. 2016);[45] *Scott v. Family Dollar Stores, Inc.*, No. 3:08-cv-00540-MOC-DSC, 2016 WL 9665158, at *6 (W.D.N.C. June 24, 2016) (certifying gender discrimination class and finding commonality based

---

[45] The Seventh Circuit certified both a Rule 23(b)(2) injunctive class and a Rule 23(c)(4) issue class on the question of discrimination liability. 672 F.3d at 490-92. While Rule 23(c)(4) certification is also available here, Plaintiffs seek certification under Rule 23(b)(2) and (b)(3) given the evidentiary record.

on evidence of company-wide policies, including the use of prior pay when setting pay and pay raise by percentage, adversely impacting women).

Courts also recognize that statistical proof of classwide disparities strongly supports commonality because it is common evidence that can provide classwide resolution of a *prima facie* disparate impact claim. *See e.g., Stockwell*, 749 F.3d at 1116 ("And whether there is a disparate impact on the putative class, to be established through statistical proof, is a single *significant* question of fact," [citation] the resolution of which is central to the validity of each of the class members's claims [citation].") (internal quotations and ellipses omitted); *Chen-Oster*, 325 F.R.D at 75 ("The significant proof [that the challenged practices were discriminatory], offered by Plaintiffs, is contained in the report of [plaintiffs' labor economist], which analyzed the impact of gender on evaluation, compensation, and promotion at Goldman Sachs and found statistically significant gender disparities.").

Here, Plaintiffs provide significant proof that their *prima facie* showing for disparate impact is capable of classwide resolution based on the four challenged Nike policies or practices: (1) using prior pay or salary expectations when setting starting salary; (2) using a percentage of current salary when awarding annual merit increases and bonuses; (3) determining whether to fill promotions non-competitively or competitively; and (4) using hiring policies or practices that place women into lower Job-Levels based on initial job assignments.

    a.    **Plaintiffs' *Prima Facie* Case that Nike' Classwide Starting Pay Policy and Practice Caused a Disparate Impact on Women Is Capable of Classwide Resolution.**

Plaintiffs have presented significant proof that, prior to September 2017, Nike maintained a classwide policy or practice of collecting and using a new hire's prior pay when setting their starting salary. In September 2017, Nike made a company-wide change to this admittedly "biased" policy by

stopping its collection and use of a candidate's prior compensation history and instead, replacing it

with ███████████████████████. *See* Section IV.B.1, *supra*.

In addition to Nike's classwide starting pay policy, Plaintiffs also present common proof that
Nike uniformly guided the implementation of its starting pay policy through a combination of: (1)
active involvement of various HR teams (i.e., confirming Talent Acquisition's central role in
managing hires and recommending starting salary offers, Thomas Dep. 28:17-29:6 and Sun Decl. Ex.
33 at NIKE_00024196), and (2) reviews and final decision-making by HR and executives (i.e.,
having multiple points of approval, including HRBPs, Talent Acquisition, and business leaders, for
salary offers before they are made, Sun Decl. Ex. 11).  *See* Section IV.B.1, *supra*.

Dr. Lundquist, provides additional common evidence that Nike HR "is, and has been over the
relevant period, significantly involved in the design, implementation and execution of employment
processes" and "it is clear that Nike's HR function was highly involved in developing and executing
HR processes consistently across the organization …."  Lundquist Report 7; Lundquist Rebuttal 3
(confirming that these findings were unrebutted by Nike's experts).

Nike's admissions and classwide statistical evidence are further common evidence that will
show that Nike's starting pay policy caused lower pay for women.  *See, Scott*, 2016 WL 9665158, at
*6 (finding classwide policy of using prior pay to set pay and statistical evidence of pay disparities
for women supported a finding of commonality).  Nike has repeatedly admitted that that its use of
prior pay when setting starting salaries was biased, perpetuated "poor" pay practices, and the
elimination of this policy and practice supported "pay and hiring equity."  *See* Section IV.B.1, *supra*.
The Ninth Circuit has similarly explained that the "history of pervasive wage discrimination in
the American workforce prevents prior pay from satisfying the employer's burden to show that

sex played no role in wage disparities between employees of the opposite sex." *Rizo v. Yovino,* *950 F.3d 1217, 1228 (9th Cir. 2020) (en banc)*.

Dr. Neumark also presents compelling statistical evidence that the pay gap for women begins at hire because Nike systematically paid women about $1,200 less per year than men hired into comparable jobs. This "starting pay gap for women directly tracks Nike's policy of using prior pay as a factor in setting starting pay at Nike as well as its cessation of that policy in late 2017." Neumark Rebuttal Report ¶ 2.b.[46] Dr. Neumark's analysis controlled for comparable jobs based on unique interaction of Job Sub-family and Job Level based on the unrebutted expert opinion of Dr. Lundquist. Neumark Report ¶ 38; *see* Section IV.A.2, *supra*.

> **b.    Plaintiffs' *Prima Facie* Case that Nike's Classwide Annual Merit Increase and Annual Bonus Policies and Practices Caused a Disparate Impact on Women Is Capable of Classwide Resolution.**

There is also significant common proof that, throughout the Class Period, Nike has consistently calculated merit increases to base pay and annual bonuses based on a percentage of existing salary. *See* Walker Dep. 357:11-16; Sun Decl. Ex. 35 at slides 34-35; White Dep. 124:1-6; *see also* Section IV.B.2(a)-(b), *supra*.

In addition, common evidence demonstrates that Nike sought consistent implementation because it distributed detailed, classwide guidelines to managers for recommending merit increases and annual bonuses based on these classwide policies. *See,* Walker Dep. 360:17-25, 366:6-367:3; Sun Decl. Ex. 35 at slides 14, 34-35; White Dep. 122:9-21, 108:14-109:11, 122:3-8, 122:22-123:5, 126:7 -131:7; Sun Decl. Ex. 35 at slide 11; *see also* Section IV.B.2(a)-(b), *supra*.

---

[46] Nike's cessation of its prior pay policy in 2017 did not eliminate the pay disparity for women because women hired before September 2017 remained underpaid and Nike's merit increase and bonuses policies exacerbated existing pay disparities. *See* Section IV.B.3, *supra*.

Nike HR and executives had extensive involvement and control over these annual pay decisions through a combination of reviews and final decision-making responsibilities. *See* Sections IV.B.2(a)-(b), *supra*. For example, a key role of HRBPs is to "[h]old Managers/Leaders accountable for completing all pay recommendations, reinforcing consistent practices" and "utilize reporting to ensure recommendations align with talent perspectives." Sun Decl. Ex. 35 at slide 15; Walker Dep. 287:12-288:8. Likewise, executives "align, and approve awards for all employees below them in the organization" and "ensure pay outcomes align with talent perspective and make any necessary changes." Sun Decl. Ex. 36 at slide 13; *id*. Ex. 43 at NIKE_00030247 (requiring "[a]dditional approval by Senior Leadership…before [merit increase and PSP] awards are finalized or activated").

Dr. Neumark's classwide statistical analysis further confirms that Nike's policies for awarding merit increases and annual bonuses exacerbate the starting pay gap for women in Covered Positions by "essentially lock[ing] in the pay disadvantage of women at Nike." Neumark Report ¶ 82 & 60, Table 9, col. 1 & 2; Neumark Rebuttal 22, Table R6, col. 4, Panel B (reporting an annual female bonus shortfall of ██████ with 5.41 SDs); *see also* Section IV.B.3. The combined effect of Nike's prior pay, merit increase, and bonus policies resulted in Nike paying women, throughout the Class Period, about ██████ less per year than men doing comparable work and even when controlling for potentially legitimate factors that may otherwise explain the compensation disparities. Neumark Report ¶¶ 46-47 & 53, Table 2, col. 4, Panel C; Neumark Rebuttal ¶ 39 & 22, Table R6, col. 4, Panel C.

Nike's admission that the use of percentage of salary "leads to an array of pay position outcomes with often undesirable long-term consequences" (Sun Decl. Ex. 2 at NIKE_0001666) provides further common evidence that its use of salary has a discriminatory effect. In addition, Dr. Lundquist concluded that raises and bonuses based on percentage increases at Nike ensure that

"employees paid lower than others who are doing the same job can never catch up to their more highly-paid peers."  Lundquist Report 34, 32-33 (explaining long-standing research confirming the discriminatory effect against women for using prior pay in compensation decisions).  Notably, the combined effect of Nike's prior pay, merit increase, and bonus policies resulted in Nike paying women, throughout the Class Period, about ███ less per year than men doing comparable work and even when controlling for potentially legitimate factors that may otherwise explain the compensation disparities.  Neumark Report ¶¶ 46-47 & 53, Table 2, col. 4, Panel C; Neumark Rebuttal ¶ 39 & 22, Table R6, col. 4, Panel C.

The principal disagreement between Nike's labor economist expert, Dr. Ali Saad, and Dr. Neumark centers on whether the multiple regressions analyses here should use aggregated or disaggregated data.  *See e.g.,* Saad Dep. 36:14-17 ("I don't believe that an aggregated analysis tells you what you need to know from an economic perspective and certainly from a legal perspective.").  However, issues concerning competing statistical analyses presented by the parties, such as, whether aggregation of data is proper and which variables are appropriate, are themselves common questions capable of being answered by class wide proof.  *See e.g., Ellis*, 285 F.R.D. at 527-28 ("In short, Defendant offers numerous competing explanations for the observed gender disparity in promotions.  None of these explanations undermine the companywide nature of the challenged policies and their disparate effects discussed above.");  *Stagi v. Nat'l R.R. Passenger Corp.*, 391 Fed. Appx. 133, 145 (3d Cir. 2010) (disputes between experts regarding the proper level of aggregation can be resolved by common evidence);  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452-460 (2016) (recognizing

that expert statistical analysis and disputes related to those analyses present issues common to a class).[47, 48]

Because the question of whether Nike's merit increase and PSP bonus practices applied to the entire class and adversely impacted women can be answered in the same way for all class members, commonality is satisfied. *See Scott*, 2016 WL 9665158, at *6 (confirming that common evidence that pay raises by percentage disadvantage women supports commonality); *Chen-Oster*, 325 F.R.D. at 74-75.

        c.        **Plaintiffs' *Prima Facie* Case that Nike's Classwide Practice of Implementing Its Fill Strategy to Fill Positions Non-competitively Caused a Disparate Impact on Women Is Capable of Classwide Resolution.**

Plaintiffs have presented common evidence that will establish that Nike's classwide fill strategy caused an adverse impact on women in promotions.

Common evidence confirms that Nike has a classwide practice for determining whether to make promotions non-competitively or competitively through its fill strategy. Prioritizing consistency, Nike controls the implementation of this process through centralized guidelines, the

---

[47] In two pending gender discrimination class actions in California State court, Drs. Saad and Neumark offered competing expert opinions at class certification regarding the appropriate levels of aggregation. In both cases, the trial court ruled that these competing expert opinions were capable of resolution by common classwide evidence and certified a class of female employees alleging pay discrimination. *Ellis v. Google, LLC,* No. CGC-17-561299, 2021 WL 4169813, at *4-6 (Cal. Super. Ct. May 27, 2021) ("The Neumark and Saad competing analyses are common evidence a fact finder can evaluate"); *Jewett v. Oracle Am., Inc.*, No. 17CIV02669, 2020 WL 11036307, at *4-7 (Cal. Super. Ct. Apr. 30, 2020).

[48] On the merits, it is a "generally accepted principle that aggregated statistical data may be used when it is more probative than subdivided data." *Paige*, 291 F.3d at 1148. For example, in certifying a nationwide Title VII class action, Judge Chen rejected this disaggregation argument advanced by Dr. Saad; finding there was "good reason" to use the aggregated sample and that the "larger aggregate numbers allow for … meaningful statistical results." *Ellis*, 285 F.R.D. at 523-24. In addition, the challenged policies or practices apply to all employees in the Covered Positions, which supports the use of an aggregated model. *See e.g., Chen-Oster*, 325 F.R.D. at 76 ("it is perfectly appropriate for the [statistical] model to include data across business units when it is being used to explore the impact of a firm-wide policy ….").

involvement of HR (including its Talent Acquisition and Talent Planning teams), and an established approval process.  The classwide application of Nike's fill strategy is confirmed by the fact that, prior to 2018, any position in Bands L through S could and was filled competitively and non-competitively, but in 2018, Nike implemented a company-wide change to its promotions policy by requiring that all open positions in E-Band and below be posted as part of the competitive promotion process.  While both competitive and non-competitive promotions involve guidelines, HR involvement, and a set approval process, the competitive promotion process for all Covered Positions has the added requirements of a job posting, the submission of applications, and an interview process before selection, which non-competitive promotions do not.  *See* Section IV.C.1, *supra*.

Common statistical evidence demonstrates that Nike's decision to use its non-competitive process over its competitive process to fill open positions caused an adverse impact on women.  By contrast, when Nike chose the competitive process, there was no statistically significant disparity.  Neumark Rebuttal ¶ 59 & 34, Table R8, col. 1, Panel C (women had a ▮▮▮▮ lower rate of promotion with non-competitive promotions compared to men with similar backgrounds and jobs, but no such disparity with competitive promotions).  Yet, Nike chose its non-competitive process for around 74% of its promotions out of Covered Positions from 2013 through September 2019.  *See* Neumark Report 77, Table B6.

Plaintiffs have presented additional common evidence of the adverse impact of Nike's fill strategy, including Nike's acknowledgement that its 2018 policy change was necessary in light of "All-Employee Survey results" reporting a lack of transparency and visibility into open roles; CHRO Matheson's admission that Nike was aware of the need to improve representation of women despite repeated discussions and lack of progress; and Dr. Lundquist's unrebutted expert opinion that Nike's

choice of using non-competitive promotions unsurprisingly caused an adverse impact on women given the lack of additional guardrails and transparency.  *See* Section IV.C, *supra*.

  d. **Plaintiffs' *Prima Facie* Case that Nike's Classwide Practice of Hiring Caused a Disparate Impact on Women Is Capable of Classwide Resolution.**

  Plaintiffs' claim that Nike's hiring policy or practice resulted in the assignment of women into lower Job-Level positions when compared to men with equal or inferior backgrounds will be resolved on a classwide basis.  Nike documents and Rule 30(b)(6) testimony show that HR runs Nike's hiring process, provides centralized guidelines, and approves all new hires.  As part of this centralized hiring process, HR personnel proactively "sourced" or recruited candidates to apply for open positions at Nike.  In some instances, Nike recruiters submitted applications on behalf of candidates for open positions they had not applied for – using the "matched to job" process.  *See* Section IV.D, *supra*.

  Because Nike failed to produce sufficient documents, data or Rule 30(b)(6) witness testimony about Nike's consistent hiring practice, which includes its sourcing and matching components, for assigning initial Job Level at hire,[49] Plaintiffs challenge Nike's consistent hiring process as a whole.  *See McClain*, 519 F.3d at 277-79 (affirming that practices not capable of separation under Title VII provision providing that "a plaintiff to demonstrate that the elements of the employer's decision-making process are not capable of separation for analysis and thus that the process should be analyzed as one employment practice").  Dr. Lundquist confirmed her inability to make conclusions about Nike's alleged initial assignment practice because Nike had failed to produce relevant documents, data, and testimony.  Lundquist Report 42.  Notably, Nike's experts did not address or rebut Dr. Lundquist's findings.  Lundquist Rebuttal 15.

---

[49] Goldstein Decl. ¶¶ 3-8.

The statistical evidence confirms that Nike placed women in lower starting Job Levels compared to men despite having equal or better educational background and prior work experience and controlling for similar characteristics.  *See* Section IV.D, *supra*.  This disparity in initial Job Levels is further illustrated by Nike's disproportionate concentration of women in Nike's lower Job Levels compared to men.  Neumark Report ¶ 105 & 64, Figure 1.  Indeed, Nike's admission, prior to this litigation, that its hiring practices were "bias[ed]" and explained that it should implement more inclusive job postings "to remove the types of things that can create unnecessary or artificial barriers to jobs" (Matheson Dep. 197:8-22, 198:5-13) is further evidence of impact supporting commonality.

### e.    Classwide Evidence Will Show Nike Cannot Meet Its Burden of Showing the Challenged Practices Are Job Related and Consistent with Business Necessity

Once Plaintiffs establish their *prima facie* case of disparate impact through common evidence, "the 1991 Civil Rights Act shifts both the burden of production and the burden of proof to the employer to show that a challenged employment practice is job related and is consistent with business necessity." *Stender v. Lucky Stores, Inc.,* 803 F. Supp. 259, 321 (N.D. Cal. 1992) (citation omitted).  The express purpose of the 1991 Civil Rights Act was to "codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs* ... and in other Supreme Court decisions prior to *Wards Cove Packing Co.* [decided in 1989]." *Jones v. City of Boston*, 752 F.3d 38, 54 n.17 (1st Cir. 2014) (citation omitted).  Under *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), business necessity requires the employer to show that its "decision making policies are a business necessity which bear a manifest relationship to the employment in question …." *Stender*, 803 F. Supp. at 335 (quoting *Griggs,* 401 U.S. at 432).

In applying the disparate impact standard, the *Griggs* court also declared that the EEOC's Guidelines on Employee Selection Procedures are "entitled to great deference." 401 U.S. at 434; *see also Ass'n of Mexican-Am. Educators v. California*, 231 F.3d 572, 585 (9th Cir. 2000) (same)

(citation omitted)).  Under the Uniform Guidelines, a practice causing an adverse impact requires the employer to show the practice is "validated in accordance with these guidelines" (29 C.F.R. § 1607.3(A)), and the guidelines are intended to be "consistent with professional standards" (29 C.F.R. § 1607.5(C).  *See also Bouman v. Block*, 940 F.2d 1211, 1228 (9th Cir. 1991), *cert. denied*, 502 U.S. 1005 (1991) ("once [plaintiff] proved a *prima facie* case of disparate impact, the [defendant] was obligated to validate" the selection practice).[50]  The Uniform Guidelines further provide that "[v]alidity studies should be based on a review of information about a job," which "should include a job analysis ...."  29 C.F.R. § 1607.14(A).

Whether Nike can show that the challenged employment practices are job-related and consistent with business necessity presents a common question and the answer will drive the resolution of the disparate impact claims.  *See Chen-Oster*, 325 F.R.D. at 82 (finding "[w]hether the challenged processes are job related or consistent with business necessity is a question of generalized proof" because the business necessity of the challenged processes would "require proof on a general level"); *McReynolds*, 672 F.3d at 489 (whether the employer's practice has an adverse impact and "whether it nonetheless is justified by business necessity are issues common to the entire class and therefore are appropriate for class-wide determination").

Here, testimony from Nike's Rule 30(b)(6) witnesses and CHRO are common proof that Nike cannot prove this affirmative defense because they were all unaware of any validation studies, impact studies or job analyses, and they were unfamiliar with the Uniform Guidelines.  *E.g.,* Walker Dep. 43:4-6, 178:16-179:24, 184:20-185:5; Heinle Dep. 225:15-18, 227:14-20, 228:16-22; Stuckey Dep. 43:8-16; Matheson Dep. 100:12-15, 101:3-102:10, 103:15-104:5.  Nike's CHRO also admitted

---

[50] Nike's expert testified that the Uniform Guidelines and SIOP Principles are "authoritative sources for professional and legal standards applicable to the field of personnel section." Hanvey Dep. 91:25-92:5.

that Nike publicly announced the need to examine the impact on women caused by its promotion

practices in 2018 ███████████████████████████████ Matheson Dep. 185:21-187:1.

Dr. Lundquist's Report provides additional classwide evidence that Nike cannot meet its

burden of establishing its affirmative defense.  Because the evaluation of Title VII's "job related"

affirmative defense is informed by professional standards, it is necessary for courts to consider the

"expertise of test validation experts."  *Gulino v. N.Y. State Dep't of Educ.*, 460 F.3d 361, 383 (2d Cir.

2006), *cert. denied,* 554 U.S. 917 (2008) (internal quotation and citation omitted).  Dr. Lundquist

opined the challenged practices have not been developed in accordance with professional standards

because, *inter alia*, Nike has conducted no job analysis "to inform its job architecture and leveling

decisions, compensation policies and practices … non-competitive process or any other purpose …,"

and "produced no evidence regarding any adverse impact analysis consistent with the Uniform

Guidelines."  Lundquist Report 34-36, 41.  Since Nike has presented no contrary expert opinion,

these conclusions are unrebutted.  Lundquist Rebuttal 13.[51]

## 2.  Plaintiffs' Disparate Treatment Claims Are Capable of Classwide Resolution.

Whether discrimination is Nike's standard operating procedure is a common question, and

there is significant common proof that will provide a classwide answer.  *Obrey*, 400 F.3d at 694.

Plaintiffs can make their *prima facie* showing of disparate treatment through classwide statistical

evidence, common anecdotal evidence (including admissions by Nike of discriminatory behavior and

refusal to correct them), and classwide expert testimony.

First, statistical evidence common to the Putative Class shows Nike's compensation,

promotion and job assignment practices caused a statistically significant disadvantage for the

---

[51] Dr. Hanvey was "not aware of any job analysis" done by Nike, Hanvey Dep. 96:12-17, nor was he aware of any validity study performed by Nike, *Id*., 96:20-25.  Furthermore, Dr. Hanvey made no determination as to whether Nike's compensation practices complied with the standards set forth in the SIOP Principles.  *Id*., 99:13-20.

compensation and job opportunities of women.  Sections IV.B.2.(b)(1)-(5).  Dr. Neumark's Report

provides common evidence that Nike paid women over █████ less per year (or over █████ at

12.73 SDs) versus comparable men.  Even removing the discriminatory effect of Nike's promotion

and initial assignment practices, a significant adverse impact in compensation remains with Nike still

paying women about █████ less per year (or █████ at 9.47 SDs).  There is less than a 1 in 1 billion

chance that these disparities occurred by random chance.  Section IV.B.3, *supra*.  Because proof of

statistically significant impact disfavoring women can establish a *prima facie* showing of disparate

treatment, this classwide evidence establishes commonality for the disparate treatment claims.  *See,*

*e.g., Ellis*, 285 F.R.D. at 521-24 (statistical evidence of a nationwide gender disparity in promotions

supported commonality of disparate treatment claim); ECF No. 64 at 9 ("Statistical disparities in the

treatment of women alone may be sufficient to establish a prima facie case.").

      Second, Plaintiffs have presented powerful and common testimonial evidence supporting

their disparate treatment claims.  The complaints filed with the Starfish Survey raise substantial

discrimination issues, including against executives and HR for causing or condoning discrimination.

Section IV.E.1, *supra*.  Nike's reactions to the Starfish Survey and related complaints about

discrimination show it recognized the structural discrimination at Nike, including the CEO's and the

CHRO's various admissions of "biased practices," that HR had "underserved" the company, and that

Nike needed to improve its representation of women, but had repeatedly failed to "gain traction."  *Id.*

Nike also ascribed the cause of these complaints to "conduct where an insular group of high level

managers … protected each other and looked the other way," and Nike forced numerous executives

to leave Nike.  *Id.*  Further, Nike modified numerous policies related to the challenged practices.  *Id.*

The Named Plaintiffs, Opt-in Plaintiffs, and other women experienced similar sex discrimination and

harassment during their tenures and have confirmed HR's ineffectiveness at protecting them when complaints were made.  Section IV.E.2, *supra*.

Plaintiffs also present unrebutted classwide expert testimony concluding that Nike's HR department and its practices "were ineffective in safeguarding the concerns of employees" and [b]y its own admissions, Nike clearly needed to make improvements to its HR processes."  Lundquist Report 7; Lundquist Report 15.

In addition, common evidence will establish that Nike knew or strongly suspected that its challenged practices adversely impacted women, but refused to take appropriate steps to address the discrimination.  For example, despite publicly announcing the need and making plans to study the impact of its promotion policies, Nike decided not to complete this analysis.  Likewise, though Nike recognized that practices based on percent increase can have negative effects, it continued using percentage of base pay when calculating its merit increase and bonus processes.  *See Inland Marines Indus.*, 729 F.2d at 1235.

The combination of statistical evidence, Nike's admission concerning executives and HR, the serious complaints in the Starfish Survey, the other anecdotal evidence, and unrebutted expert testimony provides significant proof that class proceedings will generate answers regarding whether Nike has engaged in a pattern or practice of disparate treatment.  *See, e.g.*, *Chen-Oster*, 325 F.R.D. at 76-77 (commonality met with anecdotal evidence that included "sexualization," public and private "verbal abuse," "slander and libel," "denial of employment opportunities," and "retaliation" coupled with employer's failure to adjust behavior despite awareness of gender disparities and bias).

### 3.    Plaintiffs' Oregon Equal Pay Act Claim Are Capable of Classwide Resolution.

Under the OEPA, plaintiffs establish a *prima facie* case by showing that "they were performing work comparable to that of male [comparators] and they were paid less than male [comparators]."  *Smith v. Bull Run Sch. Dist. No. 45*, 80 Or. App. 226, 229 (1986).  The expert

reports of Drs. Neumark and Lundquist showing women were paid less than men for comparable work provide significant proof that the OEPA claim is capable of classwide resolution.  Sections IV.B-D, *supra*.

Once Plaintiffs make their *prima facie* showing of equal pay discrimination (where neither discriminatory intent nor a specifically identified policy is required), the burden shifts to Nike to prove that a job-related reason explains the wage disparity.  *Rizo*, 950 F.3d at 1222, 1229 (holding that a wage disparity "associated with an employee's prior job does not qualify as a factor other than sex").  Here, the resolution of Nike's affirmative defense, including whether it can show that the class' pay gap is due to "a factor other than sex" are capable of classwide resolution using common evidence, including Nike's admittedly biased policy of using prior pay when setting starting salaries. *See* Section IV.B, *supra*.

Thus, Plaintiffs' OEPA claims meet the commonality requirements under Rule 23.[52]

**D.    The Rule 23(a)(3) Typicality Requirement Is Met Because Plaintiffs' and the Class Claims Are Based on the Same Classwide Policies or Practices.**

The "typicality" requirement of Rule 23(a)(3) seeks to ensure that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  The Supreme Court has explained that the commonality and typicality requirements are closely aligned.  *Falcon*, 457 U.S. at 157 n.13 (noting that both seek to determine whether "the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.").  Thus, courts assess typicality by determining "whether other members [of the putative class] have the same or similar injury, whether the action is based on conduct which

---

[52] *See, Ellis v. Google*, 2021 WL 4169813, at *4-6 (certifying California Equal Pay Act ("CEPA") class based on common evidence of identifying employees performing similar work, company-wide statistical proof of pay disparities, and affirmative defenses); *Jewett*, 2020 WL 11036307, at *5-8 (certifying CEPA class based on common evidence of statistical disparities and of Oracle's uniform process for identifying substantially equal or similar work).

is not unique to the named plaintiffs, and whether other class members have been impaired by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1982).

Here, the evidence and arguments illustrating the commonality of the compensation, promotion and assignment claims, Sections IV.B-D, *supra*, also demonstrate that the claims of representative Plaintiffs are typical of the claims of the Putative Class members. *See*, *e.g.*, *Hanlon*, 150 F.3d at 1020 ("Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members ….").

In addition, the representative Plaintiffs' claims of gender discrimination are based on the same claims as the Putative Class claims challenging Nike's compensation, promotion and assignment practices described in sections IV.B-D, *supra*, not on the basis of any "conduct unique to" them. Any differing factual scenarios concerning the claim of a representative plaintiff do not defeat typicality where the plaintiff's claim is of the same nature as that of other class members. *See Hanon*, 976 F.2d at 508; *Ellis*, 285 F.R.D. at 534-35. Given that the representative Plaintiffs' claims are based upon company practices that apply to all Putative Class members, the typicality requirement has been satisfied. *See* Section IV.F, *supra*.

**E.     The Rule 23(a)(4) Adequacy Requirement is Met.**

Adequacy means that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel." *Ellis*, 285 F.R.D. at 535 (citation omitted).

There are no conflicts of interest between the representative Plaintiffs and the Putative Class. As set forth in Sections, IV.B-D, *supra*, the representative Plaintiffs challenge Nike's practices that apply alike to supervisory and non-supervisory employees within Covered Positions. There is no

conflict since their interest is coextensive in challenging Nike's classwide practices. *Staton v. Boeing*, 327 F.3d 938, 958-59 (9th Cir. 2003); *Pena v. Taylor Farms Pac., Inc.*, 305 F.R.D. 197, 215 (E.D. Cal. 2015) (no conflict where general policies affect supervisors and non-supervisors similarly); *In re AutoZone, Inc., Wage & Hour Emp. Pracs. Litig.*, 289 F.R.D. 526, 536 (N.D. Cal. 2012) (no conflict because "Plaintiffs' theory is that Defendant's policies, not the store managers are at fault"); *McReynolds v. Sodexho Marriott Servs.*, 208 F.R.D. 428, 447-48 (D.D.C. 2002) ("to thwart a class action because of the presence of both supervisors and non-supervisors in the class" where the plaintiffs alleged a pattern or practice of discrimination against both groups "would actually reward the defendant for its alleged discrimination.")

Nike's practice where employees within Covered Positions regularly move from supervisory to non-supervisory positions further supports the lack of conflict. Neumark Report 78, Table B7 (showing that the 64 employees who promoted from a supervisor job level, 29 or 45% moved into a non-supervisory job level; and, of the 393 employees who promoted from a manager job level, 84 or 21% promoted to a non-supervisory job level). This interchange of employees back and forth between supervisory and non-supervisory job levels along with the challenged classwide practices shows the Plaintiffs and the class have the same, not conflicting, interests.

Proposed Class Counsel have significant experience and a proven track record covering several decades in representing classes of workers and others in complex litigation. Declaration of James Kan, ¶¶ 3-17; Declaration of Laura Salerno-Owens, ¶¶ 5-15; Declaration of Craig J. Ackermann, ¶¶ 3-15; Declaration of India Lin Bodien, ¶¶ 3-10 (all filed herewith).

**F.**　　　**Plaintiffs Meet the Requirements of Rule 23(b)(2) and 23(b)(3).**

**1.**　　　**Plaintiffs' Injunctive and Declaratory Relief Claims Based on Sex Discrimination Are Well Suited for Rule 23(b)(2) Certification.**

Rule 23(b)(2) is satisfied if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole …."  Plaintiffs' Title VII disparate impact claims apply generally to the class since those claims depend upon whether Nike's policies or practices have a discriminatory impact on the class as whole rather than on any particular individual in the class. *Wal-Mart*, 564 U.S. at 361 ("As we observed in *Amchem*, '[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of what (b)(2) is meant to capture.'') (internal citation omitted).  Unlike under Rule 23(b)(3), there is no "cohesiveness" or "predominance" requirement for a Rule 23(b)(2) class. *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 937-38 (9th Cir. 2019), *cert. denied*, 114 S. Ct. 248 (2020).

Once plaintiffs have established common issues concerning whether practices or policies have a disparate impact, then certification under Rule 23(b)(2) follows since, if proved, injunctive and declaratory relief are required to halt those practices and provide appropriate non-monetary remedies. *McReynolds*, 672 F.3d at 491-92 (it is appropriate in a pay discrimination, disparate impact case to certify a Rule 23(b)(2) class); *Ellis*, 285 F.R.D. at 536-37 (granting Rule 23(b)(2) certification because "'class members complain of a pattern or practice that is generally applicable to the class as a whole,' and any classwide injunctive relief would address said pattern or practice"). Injunctive and declaratory relief remain necessary here because, as Dr. Neumark's findings of a persisting disparity adverse to women throughout the Class Period show, the challenged pay,

promotion, and initial assignment policies or practices continue to adversely impact the Putative Class.[53]

Certification pursuant to Rule 23(b)(2) is also appropriate for Plaintiffs' disparate treatment claims. As set forth in Section V.C.2, *supra*, Plaintiffs have presented questions for a class liability trial concerning whether Nike has engaged in a pattern or practice of disparate treatment discrimination. If that discrimination is proved, it is the "duty" of the Court to provide an injunctive remedy. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (district courts have "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future") (internal quotation omitted); *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 770-71 (1976) (same).

## 2. Plaintiffs Satisfy Rule 23(b)(3)'s Requirements of Predominance and Superiority.

In order to satisfy Rule 23(b)(3), Plaintiffs must meet two requirements: common questions must "predominate over any questions affecting only individual class members" and a class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy."[54]

Predominance determines whether the class is "sufficiently cohesive" to merit representative adjudication. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). In applying this standard,

---

[53] Plaintiffs have standing to pursue injunctive and declaratory relief because Plaintiff Hender was a current employee when the FAC was filed (ECF No. 42 at ¶ 13), and Plaintiff Johnston testified that she would seek to work for Nike in the future if it changed its discriminatory policies and practices (Johnston Dep. 297:25-298:23).

[54] There are four "matters pertinent" to the (b)(3) findings, Rule 23(b)(3)(A)-(D). The "matters" (A)-(C) support class certification pursuant to Rule 23(b)(3). The Putative Class members' have no interest "in individually controlling the prosecution … of separate actions." They have not commenced any other litigation "concerning the controversy" presented in this civil action. All of the claims presented by this action arise within the jurisdiction of this "forum" and thus there is no question but that it is "desirab[le]" to litigate the claims in this forum. The fourth factor, the "likely difficulties in managing a class action" is addressed in the body of the brief above.

courts must "give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods,* 577 U.S. at 453 (defining a common question as "one where the same evidence will suffice for each member to make a prima facie case [or] the issue is susceptible to generalized, class-wide proof.") (internal quotations omitted).  Individualized questions or the potential for separate hearings need not be absent for a court to find that Plaintiffs meet the predominance standard; the predominance inquiry simply asks "whether the common aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation defeating individual issues." *Id.* (internal quotation omitted).  Here, they are.

### a.    Common Issues Predominate for Disparate Impact Claims

Statistical analyses, classwide policies or practices, centralized guidelines, HR involvement and, executive review and approval, and expert testimony provide the basis for Plaintiffs' *prima facie* disparate impact claims.  These statistical analyses present common evidence related to the impact of Nike's use of prior pay in setting starting pay, the perpetuation or increase in the gender disparity resulting from Nike's practices related to the award of annual merit increases and bonus awards, the impact of Nike's fill strategy involving non-competitive promotions, and consequences of Nike's hiring policy in making initial job assignments.

In addition, the determination of Nike's affirmative defense to the disparate impact claims is based on expert opinions (here just Dr. Lundquist) and the testimony of Nike witnesses.  These are the controlling issues for the disparate impact claims are common issues "susceptible to generalized, class-wide proof."  *See*, *Ellis*, 285 F.R.D. at 538 ("with respect to the disparate impact claim, whether Defendant's facially neutral policies and practices have a disparate impact on class members, and whether those practices are nonetheless justified by business necessity, are … best addressed with respect to the entire class"); Sections V.C.1, *supra*.

**b.**    **Common Issues Predominate for Disparate Treatment Claims.**

For disparate treatment pattern or practice class actions, courts bifurcate the proceedings with a Stage I classwide liability trial and, if liability is found, then proceed with a Stage II remedial phase of trial to determine appropriate monetary relief. *Teamsters*, 431 U.S. at 361-62. During the Stage II remedial phase of the trial, "the burden rests on the employer to demonstrate that the individual [class member] was denied an employment opportunity for lawful reasons." *Id.* at 362; *see also Wal-Mart*, 564 U.S. at 366 (approving the "established … procedure for trying pattern-or-practice cases" set forth in *Teamsters*). In class cases, in appropriate situations, monetary relief may be determined by "representative" evidence such as statistical analyses. *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 260-61 (5th Cir. 1974) ("unrealistic exactitude" is not required and back pay awards need not be calculated on an individual basis where to do so would involve a "quagmire of hypothetical judgment"); *see Tyson Foods,* 577 U.S. at 459. The method and process for calculating and allocating monetary relief need not be addressed until the Stage II remedy trial.[55]

Whether Nike engaged in a pattern or practice of discrimination is a common issue that predominates "because it has a direct impact on every class member's entitlement to" the presumption of discrimination during remedial proceeding in Phase II. *Ellis,* 285 F.R.D. at 538 (quoting *Ingraham v. The Coca-Coca Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)). Resolving this common question of classwide liability is subject to generalized proof including statistical evidence, inferences that may be drawn from anecdotal evidence, common expert testimony and the weight accorded to Nike's admissions of "bias" and misconduct. Section V.C.2, *supra*.

---

[55] The possible need for individual damage calculations "cannot defeat class certification" because such calculations can be effectively managed during Phase II of trial. *Levya v. Midline, Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (quoting *Yokayama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)).

c.    **Commons Issues Predominate for Oregon EPA Claims.**

Because Plaintiffs' *prima facie* showing of liability and Nike's statutory affirmative defense will be resolved with common evidence, like Plaintiffs' disparate impact and treatment claims above, Plaintiffs' OEPA claims satisfy the predominance requirement of Rule 23(b)(3).

d.    **A Class Trial Is Manageable With a Bifurcated Trial Proceeding**

The Court can effectively manage the class claims in several ways, including by the well-established two-phased trial process set forth in *Teamsters* and endorsed in *Wal-Mart* and the *Manual for Complex Litigation*.  *See* Section V.A, *supra*.  At class certification, courts set forth the two-stage process as the proper approach and undertake to define the specific application of the liability phase during pre-trial and case management proceedings and the specific application of the remedial phase after a determination of liability, if any.  *See* Section V.A, *supra*.

For example, a two-stage approach may proceed with Phase I focusing on classwide liability (*prima facie* showings for disparate impact, disparate treatment, and OEPA claims) and class wide affirmative defenses (*i.e.,* if challenged practices are job related or consistent with a business necessity or the pay disparity can be explained by a factor other than sex), which will involve overlapping common evidence.  Phase I can also resolve whether the class is entitled to injunctive relief, declaratory relief, and/or punitive damages.  If Phase I results in findings of liability or relief, then Phase II can address the scope of injunctive relief, the amount of monetary relief owed to the class (calculated using classwide statistical and representative evidence), and, to the extent appropriate, Nike will have the opportunity to raise defenses related to the class' entitlement to relief.

e.    **Superiority of Class Action Procedure**

The class procedure is superior to "other available methods" for the simple reason that there are no other such methods.  Only through a class procedure is it feasible to marshal sufficient resources, including the retention of experts and processing of complicated data files, in order to

present issues related to the disparate impact and treatment claims. *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 863 (9th Cir. 2016) ("Class actions are used to 'vindicate … the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'") (quoting *Amchem*, 521 U.S. at 617).

Moreover, the class action procedure is superior since it would make no sense to litigate claims multiple times in individual proceedings that are based on classwide issues, such as whether Nike's practices produce an adverse impact and, if so, whether the practices are "job related" and "consistent with business necessity." Class actions have a "principal purpose … to promote efficiency and economy of litigation." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 964 (9th Cir. 2013) (quoting *Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009)).  Given the issues raised in this action, "classwide adjudication is far more manageable than the alternative individual proceedings on all issues, because it has the potential to resolve multiple issues in one proceeding before proceeding to individual hearings on relief." *Ellis*, 285 F.R.D. at 540.

## VI.    CONCLUSION

For the reasons set forth above, the Court should certify Plaintiffs' proposed class as meeting the requirements of Rule 23, appoint the Named Plaintiffs as Class Representatives, and appoint Class Counsel pursuant to Rule 23(g) as requested.

Dated: January 10, 2022                Respectfully submitted,

                                      GOLDSTEIN, BORGEN, DARDARIAN & HO


                                       _/s/ James Kan_____
                                      Laura L. Ho (admitted *pro hac vice*)
                                      Barry Goldstein, Of Counsel (admitted *pro hac vice*)
                                      James Kan (admitted *pro hac vice*)
                                      Byron Goldstein (admitted *pro hac vice*)
                                      Katharine L. Fisher (admitted *pro hac vice*)
                                      Mengfei Sun (admitted *pro hac vice*)

                                      MARKOWITZ HERBOLD PC
                                      Laura Salerno Owens, OSB #076230
                                      David B. Markowitz, OSB #742046
                                      Harry B. Wilson, OSB #077214
                                      Anna M. Joyce, OSB #013112
                                      Kathryn P. Roberts, OSB #064854

                                      ACKERMANN & TILAJEF PC
                                      Craig Ackerman (admitted *pro hac vice*)
                                      cja@ackermanntilajef.com
                                      1180 S Beverly Drive, Suite 610
                                      Los Angeles, CA 90035
                                      Tel:   (310) 277-0614
                                      Fax:   (310) 277-0635

                                      INDIA LIN BODIEN LAW
                                      India Lin Bodien (admitted *pro hac vice*)
                                      india@indialinbodienlaw.com
                                      2522 North Proctor Street, #387
                                      Tacoma, WA 98406-5338
                                      Tel:   (253) 503-1672
                                      Fax:   (253) 276-0081

                                      Attorneys for Plaintiffs, Opt-In Plaintiffs, and Putative
                                      Class