UNITED STATES DISTRICT COURT
DISTRICT OF OREGON, PORTLAND DIVISION

______________________________

KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,

Plaintiffs,

vs.

Case No.: 3:18-cv-01477-JR

NIKE, INC., an Oregon corporation,

Defendant.

______________________________

VIDEO-RECORDED ZOOM VIDEOCONFERENCE DEPOSITION OF DONNA OLSON

Friday, December 11, 2020

Volume I

Reported by:
MICHELLE BULKLEY
CSR #13658
Job #4347602
PAGES 1 - 265

Q Did you ever learn who did get that position? 12:04
A No.
Q Okay. And then the second application you said you submitted was for a security supervisor position -- 12:05
A Yes.
Q -- at Nike?
Do you recall how you learned about that opening? 12:05
A A newspaper.
Q There was like a -- if you recall, like an advertisement for a vacancy?
A Yeah. It was in the "Help Wanted" section where all the jobs were listed. 12:05
Q Okay. You submitted your application for the security supervisor position. Was that also via mail, if you can recall?
A I believe so, yes.
Q Do you recall the contents of the application? 12:06
A No.
Q Okay. And then what happened?
A I believe a couple of weeks later, I got a call for an interview, and I went in and was 12:06

interviewed by Josh Harris and Dan Marin. And when I left and got home, my phone was ringing, and they offered me the job. 12:06

Q Dan Marin, do you know how to spell his last name? 12:06

A M-A-R-I-N.

Q Do you recall their job titles?

A Dan Marin was the day shift supervisor, and Josh Harris was the manager.

Q Security manager? 12:07

A Yes.

Q And then Dan Marin was the day shift supervisor for security?

A Yes.

Q You interviewed with them both at the same time? 12:07

A Yes.

Q And did you say -- was that in person?

A Yes.

Q And what about the job opportunity as a security supervisor interested you? 12:07

A Well, it was basically what my background was, was security supervision. And the other thing that was attractive is it wasn't a contract security agency; it was an in-house security program. 12:08

Q Had you been interested in working at Nike before? 12:08

A Basically I was, like, applying for a job. I actually had another job offer from Multnomah County as a security officer for the courts, and I chose Nike over Multnomah County. 12:08

Q Why did you choose Nike?

A I think partly my brother ran track, and Steve Prefontaine was a big hero, and that was part of it. And Nike, on the other hand, was closer to my house, and I wouldn't have to drive downtown. 12:09

Q Anything else?

A No.

Q So when you had your in-person interview with Josh Harris and Dan Marin about the security supervisor position, did you discuss compensation at all? 12:09

A I don't remember.

Q Okay. And then you said that they called you that same day as the interview -- 12:09

A Yes.

Q -- to offer you the job.

Do you recall if you received an offer letter?

A I think I did. 12:10

Q And when you spoke to Josh Harris and Dan Marin on the phone when they offered you the job, did they discuss compensation with you then, if you recall? 12:10

A Actually, the person that called me -- I forgot. There was another person in the interview, an HR person, and I forget her name. I can't remember her name. But she's actually the one that called me. I think it was Sue Parette or something like that. 12:10 12:11

Q Okay. Okay. I guess so. Maybe just to back up and confirm, so Sue Parette was present in the interview that you had with Josh Harris and Dan Marin?

A I believe that was her name, yes. 12:11

Q Was anyone else in that interview meeting?

A No.

Q And did you interview with anyone else at Nike --

A No. 12:11

Q -- after that?

A No.

Q So is it accurate that you had one interview at Nike with Dan Marin, Josh Harris, and Sue Parette, to the best of your recollection? 12:11

A Yes. 12:11

Q Okay. All right. And you believe it was Sue Parette who called you that same day and offered you the job?

A Yes. 12:11

Q And was the job that she was offering you the one that you had applied for, security supervisor?

A Yes.

Q And do you recall if Sue Parette discussed compensation with you at all? 12:12

A I think she told me what the job paid, and I want to say it was like $9.75 or $9.95, something -- something in the 9 range. Plus --

Q Was that per hour? 12:12

A Yes. Plus shift differential. 7 percent for swing shift and 10 percent for graveyard.

Q Okay. When did you accept the offer?

A When she called me.

Q So on the phone, that same conversation? 12:13

A Yeah.

Q Okay. Did you try to negotiate compensation with her at all?

A No.

Q Okay. So I think based on Nike's records, 12:13

it looks like your starting hourly rate was $10.41 an hour. Does that sound -- 12:13

A It does --

Q -- accurate to you? Yeah.

A I guess so. It was so long ago I don't -- if that's what they say, that -- I guess that's it. 12:13

Q Okay. Any reason to think it's not accurate as you sit here today?

MR. KAN: Objection. Lacks foundation; assumes facts not in evidence. 12:13

THE WITNESS: If that's what the record shows, I don't have any reason to dispute it, I suppose.

BY MS. ZABELE:

Q Okay. Did you think your starting pay was fair? 12:14

MR. KAN: Objection. Vague and ambiguous.

THE WITNESS: Well, my unemployment was running out, and I needed a job. So, yeah, I thought it was -- it was -- it was fair, in that, if I had gone to any other contract agency, I don't think I would have made that much money. So I was satisfied with it. 12:14

BY MS. ZABELE:

Q Okay. And out of curiosity, do you 12:14

remember what the offer you received from Multnomah County was in terms of compensation? 12:14

A Seems to me they were comparable, but I don't remember.

Q Okay. Did you discuss any other compensation terms with Sue Parette when she called to offer you the job of security supervisor? 12:15

A No.

Q Do you know who made the decision to hire you? 12:15

A I have a feeling it was a consensus.

Q Okay. But you don't know for sure?

A No.

Q Okay. Okay. And for your starting pay, do you have any reason to believe that the dollar amount was based on your gender in any way? 12:16

A I have no idea. I --

Q But as you sit here today, are there any facts or evidence you can think of?

A Not that I can think of. 12:16

Q Do you believe it was based on your gender in any way?

MR. KAN: Objection. Asked and answered.

THE WITNESS: I don't think so.

BY MS. ZABELE: 12:16

Q Okay. All right. So you joined Nike as a security supervisor in October 1991; is that accurate? 12:16

A Yes.

Q Do you recall what band that position would have been in, if you know? 12:17

A You know, I don't think they had bands at that time. I think they rated their jobs like 04, 05, 06 kind of thing. So officers, I think, were 04s and supervisors were 05s. 12:17

Q Okay. So as far as you recall, not a band like one of the VALUEs bands that you had mentioned earlier?

A That came later, yeah.

Q Okay. Do you recall -- actually, scratch that. 12:17

How long were you a security supervisor at Nike?

A From '91 until, like, '97, I went to risk management, and then I went back to security supervisor, I think, a couple of years later. And I was a security supervisor until March 2000. 12:18

Q Okay. Do you recall when it would have been that you left the risk management position and returned to security supervisor where you worked 12:18

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 12/28/2020

MICHELLE BULKLEY, CSR No. 13658

The dismantling of transcript will void Reporter's certificate.

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: December 11, 2020 (Volume 1); December 22, 2020 (Volume 2)

Deponent: Donna J. Olson

| Vol. | Page | Line(s) | Reads | Should Read | Reason |
|---|---|---|---|---|---|
| 1 | 5 | 13 | 16 | 15 | To correct transcription error |
| 1 | 6 | 23 | The plaintiff | an opt-in plaintiff | To correct transcription error |
| 1 | 8 | 22 | O-S-S-N-A [sic] | O-S-S-A-N-N-A | To correct spelling error |
| 1 | 19 | 1 | Yes. I believe it was the 8th. | Actually, I believe it was Monday the 7th. | Corrected response to question |
| 1 | 20 | 13 | That's my recollection, yes | I also met with James for an hour on December 3, 2020 and for approximately four hours on December 8, 2020. | To correct transcription error and provide full response to question. |
| 1 | 36 | 18 | Said that, I assumed it was true. | Said that, I assumed it was true, but I don't know for sure. | Full response to question. |
| 1 | 37 | 16 | Crane | Krane | To correct spelling error |
| 1 | 38 | 1 | He didn't… | He didn't know what to say. | Full response to the question asked |
| 1 | 79 | 23 | Satisfied with it. | Satisfied with it at the time. | Full response to the question asked |
| 1 | 80 | 24 | I don't think so | I don't think so, but I can't be sure. | Full response to the question asked |
| 1 | 86 | 24 | For Nafall [phonetic] event | Four in the Fall | To correct transcription error |
| 1 | 88 | 8-9 | I believe a couple of other people went to some sales meetings as well. | Other security supervisors performed similar roles to me. And a couple of other people went to | Misheard the question; full answer to question asked |

| | | | | | |
|---|---|---|---|---|---|
| | | | | some sales meetings as well. | |
| 1 | 93 | 9 | [inaudible] | ambiguous | To correct transcription error |
| 1 | 96 | 15 | Of the duties that you had to perform | Of the duties that you had to perform specific to the time of day or night. | Full response to the question asked. |
| 1 | 98 | 4 | Again, just the job differences were | Again, just the job difference that were | To correct transcription error |
| 1 | 99 | 19 | Kris Stein | Chris Stine | To correct spelling error |
| 1 | 100 | 18 | Kris | Chris | To correct spelling error |
| 1 | 101 | 1 | Kris | Chris | To correct spelling error |
| 1 | 102 | 6 | Kris | Chris | To correct spelling error |
| 1 | 120 | 6-7 | He gave me what he could give me | He gave me what he could give me under Nike policies. | Full response to the question asked. |
| 1 | 124 | 11-12 | I had no reason to think it wasn't fair. | I had no reason to think it wasn't fair at that time. | Full response to the question asked. |
| 1 | 125 | 5 | At that time, I don't think | At that time, I didn't think | To correct transcription error |
| 1 | 130 | 4-6 | One of the nice things about supervisors, you had to have someone report to you | security supervisors had to have a direct report | To correct transcription error |
| 1 | 133 | 15 | S-Q-U-E-E-Z-I [sic]. | S-Q-U-E-E-Z-A-R-I | To correct spelling error |
| 1 | 135 | 13 | AirMI | Air MI | To correct spelling error |
| 1 | 135 | 21 | AirMI | Air MI | To correct spelling error |
| 1 | 140 | 20-21 | I don't remember. Probably in early -- | I don't remember. | To correct transcription error |
| 1 | 144 | 1-2 | John Woodman for two years. So 2005, 2006. Then I reported to Jim | After Robison, I reported to Jim Petsche from 2005 through 2008. Then I reported to John Woodman for two years. | Corrected response to question |

| | | | | | |
|---|---|---|---|---|---|
| | | | Petsche for two years. | | |
| 1 | 144 | 19-25 | No. I think -- so Dave was 2000 to 2002. Jim was 2003 to 2005. John was the next two years. I started reporting to Deb Hellmer-Steele in 2000 to 2012, and then Joe from 2000 -- you know, the middle of the year 2012 till -- it was June to June. It seemed to be a June-to-June cycle. So that's why the years -- | No. I think -- so Dave was 2000 to 2002. Jim Robison was 2003 to 2005. Jim Petsche was the next few years. John Woodman was 2008 to 2010. I started reporting to Deb Hellmer-Steele in 2010 to 2012, and then Joe Marsico from 2013 to 2015 -- you know, the middle of the year 2013 till -- it was June to June. It seemed to be a June-to-June cycle. So that's why the years got fuzzy. | Corrected response to question |
| 1 | 145 | 7 | Right. | The few years before John Woodman. | Corrected response to question. |
| 1 | 145 | 10-11 | That's only one year. I reported for two years. | That's only one year. I reported to John Woodman from 2008 to 2010. | Corrected response to question |
| 1 | 145 | 14-15 | Right. And then Jim Petsche from 2008 to June 2010. And then Deb from 2010 to 2012 -- | I reported to Jim Petsche from 2005 to 2008. Then John Woodman from 2008 to 2010. And then Deb from 2010 to 2012 -- | Corrected response to question |
| 1 | 146 | 13 | From 2000 to -- to 2017 | From 2015 to – to 2017 | To correct transcription error |
| 1 | 146 | 24 | AirAMI | Air MI | To correct spelling error |

| | | | | | |
|---|---|---|---|---|---|
| 1 | 154 | 11-12 | Because, I mean, everybody wants everybody to get paid fairly. | Because, I mean, I was told that everybody wants everybody to get paid fairly according to Nike policies. | Full response to the question asked. |
| 1 | 164 | 3 | Yes | Yes, they informed me of the final decisions, but I'm not sure if they were the final decision maker. | Full response to the question asked. |
| 1 | 164 | 11 | Yes | Yes, they informed me of the final decisions, but I'm not sure if they were the final decision maker. | Full response to the question asked. |
| 1 | 167 | 20 | Dan [sic] | Don | To correct spelling error |
| 1 | 170 | 24 | Ridarti's | Rodarte's | To correct spelling error |
| 1 | 171 | 3 | Because IH – AirAMI | Because –Air MI | To correct transcription error |
| 1 | 171 | 5 | AirAMI | Air MI | To correct spelling error |
| 1 | 175 | 25 | Objection. [Inaudible]. | Objection. Vague and ambiguous | To correct transcription error |
| 1 | 175 | 13 | We did –we did different things. | Our duties were similar in that we had a common goal to establish global security standards for our areas of responsibility ,but we had different areas of responsibility. | Misheard the question; full answer to question asked. |
| 1 | 176 | 7 | Beale | Veal | To correct spelling error |
| 1 | 182 | 24 | Crane | Krane | To correct spelling error |
| 1 | 183 | 1 | Crane | Krane | To correct spelling error |
| 1 | 192 | 1 | Bush | Carter | To correct transcription error |
| 1 | 206 | 3 | so | So no | To correct transcription error |
| 1 | 208 | 2 | Unfair | Unfair for work expected of a | Full response to question asked |

| | | | | | |
|---|---|---|---|---|---|
| | | | | security manager as opposed to a Director. | |
| 1 | 218 | 1 | I don't know. No, I guess. | I don't know. | Corrected response. |
| 1 | 219 | 7 | WHQ-centric manager, yeah. | WHQ-centric manager, yeah, but not for the Director level work I performed. | Full response to the question asked |
| 1 | 224 | 22 | It would be fair. | It would be fair for a manager, but it wasn't for the Director level work I performed. | Full response to the question asked |
| 1 | 227 | 7 | For a WHQ-centric manager, yeah. | For a WHQ-centric manager, yeah. No for my Director level work. | Full response to question asked. |
| 1 | 228 | 20 | Yes | Yes and possibly others. | Full response to question asked. |
| 1 | 228 | 25 | For a WHQ manager yes. | For a WHQ manager yes. For my Director level work, no. | Full response to question asked. |
| 1 | 230 | 4 | This would be Tyson. | This would be Tyson and possibly others. | Full response to question asked. |
| 1 | 234-35 | 25-3 | But if they are, then 3 percent would have been probably what it would have been, but the performance sharing plan would have been 20 percent. | But if they are, then 3 percent would have been probably what it would have been, but the performance sharing plan would have been 20 percent, and with a higher base, the 3 percent would be more money. Also, I would have received stock | Full response to question asked |

| | | | | | |
|---|---|---|---|---|---|
| | | | | options as a director. | |
| 1 | 252 | 12 | John McLaughlin, Scott Beale | John McLachlan, Scott Veal | To correct spelling error |
| 1 | 252 | 14 | Beale | Veal | To correct spelling error |
| 1 | 252 | 13 | Ramp | Ranft | To correct spelling error |
| 1 | 252 | 15 | Ramp | Ranft | To correct spelling error |
| 1 | 254 | 10 | John McLaughlin | John McLachlan | To correct spelling error |
| 2 | 270 | 25 | Other plaintiff | Other plaintiffs | To correct transcription error |
| 2 | 279 | 7 | Discriminating against women? No, I don't. | Discriminating against women in CFE feedback? No, I don't. | Corrected and full response to questions asked. |
| 2 | 279 | 11-12 | Needs to be done in a manner of respect type of tone | Needs to be done in a manner of respect – a respectful type of tone | To correct transcription error |
| 2 | 303 | 11 | McLachlen | McLachlan | To correct spelling error |
| 2 | 303 | 22 | McLachlen | McLachlan | To correct spelling error |
| 2 | 304 | 1 | McLachlen | McLachlan | To correct spelling error |
| 2 | 304 | 19 | McLachlen's | McLachlan's | To correct spelling error |
| 2 | 305 | 10 | McLachlen | McLachlan | To correct spelling error |
| 2 | 305 | 19 | McLachlen's | McLachlan's | To correct spelling error |
| 2 | 306 | 8 | McLachlen | McLachlan | To correct spelling error |
| 2 | 306 | 11 | McLachlen | McLachlan | To correct spelling error |
| 2 | 307 | 4 | McLachlen | McLachlan | To correct spelling error |
| 2 | 307 | 11 | Ami | MI | To correct spelling error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on 1/22/2021 in Sun City West, Arizona.

DocuSigned by:
Donna J. Olson
8A6294A808B2444...
Donna J. Olson