```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF OREGON

 3                   PORTLAND DIVISION

 4

 5   KELLY CAHILL, SARA JOHNSTON,     )

 6   LINDSAY ELIZABETH, and HEATHER   )

 7   HENDER, individually and on      )

 8   behalf of others similarly       )

 9   situated,                        )

10              Plaintiffs,           )

11        v.                          )  3:18-cv-01477-JR

12   NIKE, INC., an Oregon            )

13   corporation,                     )

14              Defendant.            )

15

16         DEPOSITION OF PAIGE AZAVEDO

17              January 29, 2021

18                   Friday

19                 10:02 A.M.

20

21         THE VIDEOCONFERENCE VIDEO-RECORDED

22   DEPOSITION OF PAIGE AZAVEDO was taken at Portland,

23   Oregon, before Jan R. Duiven, CSR, FCRR, RPR, CRC,

24   Certified Shorthand Reporter in and for the State

25   of Oregon.
```

Page 1

Pedersen Decl. Exhibit G, Page 1 of 24

| | | |
|---|---|---|
| 1 | kind of a discussion about where their passion | 11:32:15 |
| 2 | kind of lied.  You know, Daniel, in particular, | 11:32:18 |
| 3 | you know, that was -- he was really into men's | 11:32:24 |
| 4 | training and football and that type of thing so it | 11:32:26 |
| 5 | made sense for him to align there. | 11:32:28 |
| 6 | Danielle was really, really focused on | 11:32:30 |
| 7 | women's initiatives and that was a big passion of | 11:32:34 |
| 8 | hers.  So I tried to align -- and we -- you know, | 11:32:37 |
| 9 | it was -- it was a conversation that -- that we | 11:32:40 |
| 10 | had over the course of not only the recruiting | 11:32:43 |
| 11 | process, but also as part of, you know, their | 11:32:46 |
| 12 | development within the organization. | 11:32:50 |
| 13 | As opportunities came up, it was a | 11:32:53 |
| 14 | conversation that we would have about, you know, | 11:32:55 |
| 15 | where -- where did they see themselves, you know, | 11:32:57 |
| 16 | kind of wanting to fit in and work. | 11:32:59 |
| 17 | Q.    Okay.  And who would decide which | 11:33:05 |
| 18 | accounts they would focus on? | 11:33:07 |
| 19 | A.    That was -- that was my role as their | 11:33:08 |
| 20 | leader. | 11:33:11 |
| 21 | Q.    Okay.  So sounds like you would | 11:33:16 |
| 22 | consider like their -- their interest and | 11:33:17 |
| 23 | experience in figuring out where to slot them in? | 11:33:19 |
| 24 | A.    That's right. | 11:33:24 |
| 25 | Q.    And for the individuals we mentioned, | 11:33:25 |

Page 54

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 2 of 24

```
1    did you hire any of them for your team?  You        11:33:32

2    mentioned recruitment.                              11:33:37

3              MR. BLAKE:  Objection.  Vague.            11:33:38

4         A.    Yeah.  Every single one of them I        11:33:40

5    hired onto my team.                                 11:33:41

6    BY MS. ZABELE:                                      11:33:43

7         Q.    Oh, okay.  So I know we spoke earlier     11:33:43

8    about promotions for Tracy White and Danielle       11:33:53

9    Weiss from marketing specialist to manager.  So     11:34:00

10   maybe just focusing on Ms. White, did you hire her  11:34:05

11   into the marketing specialist role on your team?    11:34:09

12        A.    That is my recollection, yes.            11:34:13

13        Q.    Do you recall when it was?  It was       11:34:17

14   probably a long time ago, but to the extent you     11:34:25

15   can.                                                11:34:27

16        A.    Yeah.  I don't.  It would have been --   11:34:27

17   it would have been early in that -- in that move    11:34:30

18   over to DTC.  So if I look at my resume, it would   11:34:34

19   have been in that 2011-2012 time period.            11:34:38

20        Q.    Okay.  And if you can recall, what       11:34:45

21   factors did you consider in deciding to hire        11:35:03

22   Ms. White for the marketing specialist role?        11:35:08

23        A.    Yeah.  My recollection is that she had   11:35:11

24   a pretty good resume from external sources.  So     11:35:15

25   she came from, I believe, a radio station where     11:35:19
```

Page 55

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 3 of 24

| | | |
|---|---|---|
| 1 | she was doing a lot of their digital work, even | 11:35:22 |
| 2 | did some kind of on-camera -- sorry, on-microphone | 11:35:25 |
| 3 | work, and I believe she also had come recommended | 11:35:30 |
| 4 | by somebody within the organization as somebody | 11:35:35 |
| 5 | to -- to -- to talk to. | 11:35:38 |
| 6 | So there was a number of factors, both | 11:35:41 |
| 7 | her experience, you know, her -- her prior digital | 11:35:43 |
| 8 | experience and then her ability to communicate, | 11:35:49 |
| 9 | which was really important when you're getting in | 11:35:52 |
| 10 | front of accounts. | 11:35:54 |
| 11 | Q.    Okay.  Any other factors you | 11:36:00 |
| 12 | considered in deciding to hire Ms. White? | 11:36:02 |
| 13 | A.    No. | 11:36:08 |
| 14 | Q.    Okay.  And let's see.  What about | 11:36:09 |
| 15 | Kerry Blake?  Did you hire her into the -- into a | 11:36:19 |
| 16 | marketing specialist role on your team? | 11:36:23 |
| 17 | A.    I did. | 11:36:25 |
| 18 | Q.    Do you recall when that was? | 11:36:27 |
| 19 | A.    It would have been around the same | 11:36:30 |
| 20 | time period.  Probably -- she was a bit after -- | 11:36:33 |
| 21 | after Tracy.  So probably, you know, either late | 11:36:38 |
| 22 | 2011 or into 2012. | 11:36:42 |
| 23 | Q.    And what factors did you consider that | 11:36:47 |
| 24 | you can recall in deciding to hire Tracy into the | 11:37:01 |
| 25 | marketing specialist role? | 11:37:08 |

Page 56

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 4 of 24

```
 1          A.    You mean Kerry?                    11:37:09

 2          Q.    Kerry.  Yeah.  Sorry.  Kerry.      11:37:11

 3          A.    It's okay.  So Kerry -- Kerry actually   11:37:13

 4    was -- what I remember is she's a Stanford grad   11:37:16

 5    who was doing all of their digital work from a    11:37:21

 6    basketball perspective.  So she was -- she was    11:37:24

 7    their digital kind of specialist within the       11:37:28

 8    Stanford org.                                     11:37:31

 9          She was also somebody who came as an        11:37:35

10    internal recommendation from the -- the basketball   11:37:37

11    team, somebody they had interviewed and didn't end   11:37:42

12    up having a spot for her, and so they felt like   11:37:49

13    she would be a good fit if we had another role    11:37:52

14    open.  So that was -- that's my recollection of   11:37:54

15    how she -- she came into the mix.                 11:37:56

16          Q.    Okay.  Anything else?              11:38:12

17          A.    No.                                11:38:14

18          Q.    And what about Chelsea Gunter?  Did   11:38:16

19    you hire her into a marketing specialist role on   11:38:24

20    your team?                                        11:38:26

21          A.    Yes.                               11:38:27

22          Q.    Do you recall when that was?       11:38:30

23          A.    It probably would have been in the   11:38:31

24    2012 time period as well.                         11:38:34

25          Q.    Okay.  What factors did you consider   11:38:42
```

Page 57

1    in deciding to hire Ms. Gunter?                    11:38:45

2        A.    Chelsea -- I actually can't remember     11:38:51

3    the conversations that we had.  I believe she was  11:38:54

4    part of a -- my recollection is that Chelsea was   11:38:56

5    part of just a basic loop.  You know, there was a  11:38:59

6    bunch of candidates that we were looking for -- we 11:39:04

7    were looking to hire from a bunch -- kind of a     11:39:06

8    list of candidates.                                11:39:10

9            She came in and interviewed, and --        11:39:13

10   and my recollection is that she just felt like a   11:39:15

11   good fit for Nike and she felt like a good fit for 11:39:17

12   the team and the role.                             11:39:20

13           So, yeah, I think that was just part       11:39:22

14   of kind of the interview process that -- that --   11:39:24

15   that worked.                                       11:39:27

16       Q.    And when you say, "She felt like a       11:39:28

17   good fit for Nike," what do you recall about that? 11:39:37

18   Like what would make someone a good fit for Nike?  11:39:40

19       A.    It was just passion --                   11:39:43

20       Q.    Or what -- sorry.  I'll strike.          11:39:44

21           What made Ms. Gunter a good fit for        11:39:46

22   Nike?                                              11:39:48

23       A.    Yeah.  Yeah.  She was really             11:39:48

24   passionate about sport.  She was passionate about, 11:39:50

25   you know, women's sport in particular, and -- and, 11:39:52

Page 58

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 6 of 24

```
 1    she was -- you know, she was somebody who was      11:40:02

 2    very -- from -- from the conversations we had, and 11:40:03

 3    then subsequently in the role, she was, you know,  11:40:06

 4    someone who was very kind of detailed oriented     11:40:08

 5    and -- and -- and really -- really good with --    11:40:11

 6    with her ability to kind of communicate with       11:40:17

 7    relationships.                                     11:40:20

 8         Q.    Makes sense.  Anything else?           11:40:26

 9         A.    No.                                     11:40:31

10         Q.    And I guess like thinking broadly, not 11:40:35

11    just about Ms. Gunter in particular, but was       11:40:39

12    whether a candidate would be a good fit for Nike   11:40:43

13    something you would consider for generally like    11:40:47

14    all candidates when you interviewed them?          11:40:50

15         A.    Yeah.  I mean, you know, there's        11:40:53

16    always a -- going back to kind of the Nike         11:40:55

17    principles and making sure that there's -- you     11:40:59

18    know, that they -- they feel right against those   11:41:02

19    key principles that Nike has.  And, you know, for  11:41:06

20    me, also just being able to -- to have a passion   11:41:11

21    for sport and -- and know that, you know, athletes 11:41:15

22    and the -- and that world is something that they   11:41:19

23    care about.                                        11:41:22

24         Q.    When you mentioned the Nike's key       11:41:27

25    principles, what are those?                        11:41:43
```

Page 59

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 7 of 24

```
 1        A.    Oh, I'd have to go back and look.        11:41:44

 2   It's like "do the right thing" and, you know --     11:41:47

 3   it's been a while.  I used to be able to recite     11:41:52

 4   them by memory.  But, you know, customer            11:41:54

 5   obsession.  Now -- now I'm mixing between my        11:41:59

 6   current role and Nike, but, you know, it's the "do  11:42:03

 7   the right thing" and -- I -- I'd have to go back     11:42:05

 8   and -- and refresh on them, but it's -- it's all    11:42:13

 9   of the kind of core attributes that Nike uses       11:42:16

10   to -- as part of their hiring process.              11:42:20

11        Q.    Okay.  And you would assess candidates   11:42:23

12   against those principles when you're making hiring  11:42:28

13   decisions?                                          11:42:31

14        A.    Absolutely.                              11:42:31

15        Q.    Okay.  You also -- let's see.  I just    11:42:33

16   want to check to make sure I'm not repeating        11:42:49

17   myself.                                             11:42:51

18             Okay.  So maybe how about Daniel          11:42:59

19   Cogan?  Did you hire him into a marketing           11:43:04

20   specialist role on your team?                       11:43:06

21        A.    I did.                                   11:43:08

22        Q.    Recall when that was?                    11:43:08

23        A.    Around the same time period.  He was a   11:43:11

24   little bit later than the others, if I recall.  So  11:43:12

25   probably 2012-ish.                                  11:43:15
```

Veritext Legal Solutions
866 299-5127

```
 1        Q.    Okay.  And what factors did you        11:43:19

 2   consider in hiring Mr. Cogan into the marketing    11:43:24

 3   specialist role?                                   11:43:33

 4        A.    Yeah.  With Daniel in particular, my    11:43:33

 5   recollection is he had been working at Adidas      11:43:35

 6   doing a very similar role there already.  So he    11:43:38

 7   had the relevant experience.  And -- and so --     11:43:40

 8   and, again, had a -- had a big passion for sport   11:43:46

 9   and for the categories that we were hiring into in 11:43:50

10   particular, which at the time were training and    11:43:53

11   football.  So he -- he was -- so he was somebody   11:43:56

12   that -- that, again, he had the experience.        11:43:58

13        Q.    Anything else?                          11:44:03

14        A.    No.                                     11:44:06

15        Q.    So when you mentioned that he worked    11:44:08

16   at Adidas, I'm thinking not just related to        11:44:18

17   Mr. Cogan, but more broadly to the -- all of the   11:44:24

18   employees that you hired, would you consider like  11:44:27

19   the type of experience, prior work experience that 11:44:31

20   someone had like with certain -- working at a      11:44:37

21   certain place being more relevant to what you were 11:44:41

22   hiring for versus others?                          11:44:43

23             MR. BLAKE:  Vague and ambiguous.         11:44:46

24        A.    It -- yeah.  I mean, all the folks on   11:44:47

25   my team came from very diverse backgrounds as I    11:44:50
```

Page 61

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 9 of 24

| | | |
|---|---|---|
| 1 | mentioned.  You know, Kerry came from, you know, a | 11:44:57 |
| 2 | college role.  Tracy came from a radio station.  I | 11:45:01 |
| 3 | don't recall Chelsea's role before.  You know, | 11:45:07 |
| 4 | Daniel came from Adidas. | 11:45:13 |
| 5 | So from my perspective, there was -- | 11:45:14 |
| 6 | there were key criteria that cut across, and it | 11:45:17 |
| 7 | was, you know, do -- do you -- do you meet the | 11:45:22 |
| 8 | sort of criteria and needs that -- that are | 11:45:25 |
| 9 | established by the -- the Nike key principles?  Do | 11:45:27 |
| 10 | you -- you know, do you have a passion for the | 11:45:32 |
| 11 | brand and for the -- the sports and -- and for | 11:45:35 |
| 12 | sports, and do you then have a specific abilities | 11:45:41 |
| 13 | for the -- for these particular roles? | 11:45:45 |
| 14 | So, you know, can you build | 11:45:47 |
| 15 | relationships with accounts?  Can you -- can you | 11:45:49 |
| 16 | work across the matrix and -- and build strategic | 11:45:53 |
| 17 | plans?  Can you execute against those plans?  And | 11:45:59 |
| 18 | can you show me examples of where you've been able | 11:46:03 |
| 19 | to do that? | 11:46:05 |
| 20 | So -- I -- I would say just by virtue | 11:46:05 |
| 21 | of the -- where each of these came from, I was not | 11:46:09 |
| 22 | looking for experience from specific companies at | 11:46:13 |
| 23 | all.  It was more about their experience and their | 11:46:16 |
| 24 | ability to do the role. | 11:46:19 |
| 25 | (Reporter inquiry.) | 11:46:27 |

Page 62

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 10 of 24

| | | |
|---|---|---|
| 1 | THE WITNESS:  She was -- she | 11:46:28 |
| 2 | actually came from -- my recollection is that she | 11:46:29 |
| 3 | was a Stanford graduate who was doing -- she was | 11:46:32 |
| 4 | being -- she was their digital specialist or | 11:46:36 |
| 5 | digital social person on -- for their basketball | 11:46:38 |
| 6 | or athletic department. | 11:46:43 |
| 7 | MS. ZABELE:  So sorry.  Maybe I'll | 11:46:52 |
| 8 | just ask for the record.  Jan, were you able to | 11:46:53 |
| 9 | record Ms. Azavedo's answer for -- I believe I | 11:46:59 |
| 10 | asked her what factors she considered when hiring | 11:47:02 |
| 11 | Kerry Blake into the role?  I'm just wondering if | 11:47:04 |
| 12 | we're covered here or if I should reask it. | 11:47:09 |
| 13 | THE REPORTER:  I think I got it.  I | 11:47:20 |
| 14 | just didn't hear the -- I think the word I missed | 11:47:22 |
| 15 | was Stanford. | 11:47:22 |
| 16 | MS. ZABELE:  Ah, okay.  No problem. | 11:47:22 |
| 17 | BY MS. ZABELE: | 11:47:28 |
| 18 | Q.   Okay.  And let's see.  Also, Danielle | 11:47:28 |
| 19 | Weiss?  Did you hire her for your team in a | 11:47:41 |
| 20 | marketing specialist role? | 11:47:46 |
| 21 | A.   I did. | 11:47:47 |
| 22 | Q.   Do you remember when that was? | 11:47:50 |
| 23 | A.   Around the same time, 2012-ish.  I | 11:47:51 |
| 24 | think she was one of my -- | 11:47:59 |
| 25 | Q.   Okay.  And -- | 11:48:00 |

Page 63

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 11 of 24

```
 1        A.    One of my early hires, so it would      11:48:01
 2   have been either 2011 or 2012.                     11:48:03
 3        Q.    And what factors did you consider in    11:48:06
 4   deciding to hire Ms. Weiss for the marketing       11:48:12
 5   manager -- marketing specialist position?         11:48:15
 6        A.    Yeah.  So Danielle was a little bit of  11:48:17
 7   a unique situation in that she was actually        11:48:19
 8   working in one of our agencies as a program        11:48:22
 9   manager working with us on -- on some different    11:48:24
10   agency work.  So she was our -- she was our        11:48:29
11   account manager on the other side.                 11:48:31
12            And when the role came open, because      11:48:34
13   we had had such a great relationship with her and  11:48:38
14   was able to view her abilities face -- you know,   11:48:41
15   directly because of the work she was doing on our  11:48:45
16   account.  We -- you know, she was interested in    11:48:48
17   coming to Nike.                                     11:48:51
18            We interviewed her alongside other --     11:48:53
19   other candidates, to my recollection, and -- and   11:48:55
20   so she was somebody that -- that we felt very      11:48:59
21   confident hiring because we had done -- again, had 11:49:01
22   direct access to her work on our behalf.           11:49:04
23            (Reporter inquiry.)                        11:49:14
24            THE WITNESS:  Sorry.  And it's not        11:49:14
25   Schindler.  It's Streicher.  It's Streicher-Weiss. 11:49:19
```

Page 64

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 12 of 24

```
 1    Danielle Streicher.  S-T-R-E-I-C-H-E-R.  And then        11:49:20

 2    she's hyphenated now.  Weiss, W-E-I-S-S.                  11:49:25

 3                  I apologize.  It's not Schindler.           11:49:29

 4    I'm getting a couple -- it's -- it's                      11:49:32

 5    Streicher-Weiss.                                          11:49:36

 6    BY MS. ZABELE:                                            11:49:36

 7        Q.    That's okay.  If you -- yeah.  If at            11:49:37

 8    any point you realize like you need to correct any        11:49:39

 9    other names or anything like that, just speak up.         11:49:44

10        A.    Okay.  Thank you.                               11:49:47

11        Q.    No problem.  Okay.  Any other                   11:49:48

12    individuals that you recall hiring when you were          11:50:01

13    in the director of digital NA role?                       11:50:04

14        A.    Yeah.  I hired Ryan McDonald                    11:50:07

15    (phonetic) and Stephanie Gray are the other two,          11:50:10

16    and then Lauren Anderson.                                 11:50:13

17        Q.    Okay.  Maybe let's start with Ryan              11:50:19

18    McDonald.  What role did you hire him for?                11:50:27

19        A.    He was our -- he was our --                     11:50:36

20    responsible for our kids category.  So primarily          11:50:39

21    accounts like Kids Foot Locker and Dick's Sporting        11:50:42

22    Goods and their kids' business.  Or young                 11:50:47

23    athletes, I guess.                                        11:50:51

24        Q.    And did you hire him for a marketing            11:50:53

25    manager or a marketing specialist role?                   11:50:58
```

Page 65

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 13 of 24

```
 1            A.    Marketing specialist.                  11:51:01

 2            Q.    And do you recall when you hired him   11:51:04

 3      into the marketing specialist role?               11:51:16

 4            A.    I -- I don't, and the reason I can't   11:51:18

 5      recall exactly is that he worked for us, I        11:51:25

 6      believe, as a temp, sort of -- a temp employee for 11:51:28

 7      a while, and then we were able to transition him  11:51:34

 8      into a full-time role.  And so I don't remember   11:51:37

 9      exactly what part of his work was temp and when -- 11:51:42

10      versus when he was full time.                     11:51:48

11            Q.    Okay.  So he was -- okay.  So he was   11:51:51

12      employed with another company and like on         11:52:01

13      assignment at Nike?                               11:52:05

14            A.    Yeah.  My -- my recollection is that  11:52:06

15      we brought him in originally as -- as a -- as a   11:52:08

16      temporary worker, ETW, and -- and then were able  11:52:12

17      to transition his role into a full-time head      11:52:22

18      position.                                         11:52:26

19            Q.    Okay.  And what factors did you       11:52:31

20      consider in deciding to hire Mr. McDonald into the 11:52:33

21      marketing specialist role?                        11:52:38

22            A.    Again, kind of similar to Danielle.   11:52:39

23      He was someone who, you know, we were able to see 11:52:41

24      him working on the -- on the job through his      11:52:44

25      temporary -- ETW role.  And so based on that, we  11:52:47
```

Page 66

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 14 of 24

```
 1   were able to -- to -- to feel confident about his       11:52:51
 2   ability to do the job and to come into Nike as          11:52:55
 3   a -- as a full-time employee to -- to do the -- to      11:52:59
 4   step into that kids' role, kids' marketing role.        11:53:04
 5        Q.    Okay.  Anything else?                         11:53:11
 6        A.    No.                                           11:53:12
 7        Q.    All right.  And you mentioned                 11:53:16
 8   Stephanie Gray.  Is it G-R-A-Y?                          11:53:19
 9        A.    G-R- -- I think it is an A, yes.              11:53:25
10        Q.    Okay.  And did you hire her into a            11:53:31
11   marketing specialist role as well?                      11:53:36
12        A.    I believe she was a marketing                11:53:45
13   specialist, yes.                                         11:53:46
14        Q.    And did she -- when she became a             11:53:50
15   marketing specialist on your team, did she have a       11:54:00
16   particular group of accounts that she was               11:54:04
17   responsible for?                                         11:54:06
18        A.    Yeah.  She -- I -- I can't remember          11:54:08
19   exactly what the -- the overlap was, but she kind       11:54:16
20   of came in to manage -- I believe our -- some of        11:54:19
21   our training categories, the men's training work.       11:54:28
22   That's my recollection.                                 11:54:34
23           And the reason we brought her in is             11:54:39
24   that she had been doing a bunch of -- I believe         11:54:42
25   she worked either by contract or directly with         11:54:45
```

Page 67

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 15 of 24

```
 1    Microsoft doing some large-scale event work with      11:54:50

 2    them, digital event and physical events.  And we      11:54:53

 3    knew -- I knew that we were going to have, with       11:54:58

 4    training in particular and -- and events like         11:55:01

 5    Super Bowl, that there was a potential for us          11:55:04

 6    to -- to need someone to -- to engage with our        11:55:05

 7    training team on -- and our accounts on what that     11:55:10

 8    could look like.                                       11:55:13

 9            So she -- she fit the bill from that           11:55:13

10    perspective because she had some good, kind of        11:55:16

11    on-the-ground event-specific work with Microsoft.     11:55:18

12        Q.    What's a digital event?                      11:55:35

13        A.    I believe she, you know, would send          11:55:37

14    out social campaigns and, you know, create --         11:55:42

15    create registrations for people to come onsite        11:55:50

16    through digital means.  So, you know, you could --    11:55:55

17    you could sign up and register to be part of the      11:55:57

18    event that was -- that was happening in a specific    11:56:00

19    location, that type of thing.  I don't exactly        11:56:02

20    recall what she was doing, but that was my            11:56:04

21    recollection, is that she did some kind of            11:56:07

22    large-scale event planning with them that            11:56:09

23    happened --                                            11:56:12

24        Q.    Oh, okay.                                     11:56:13

25        A.    That happened digitally and                  11:56:13
```

                                                        Page 68

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 16 of 24

```
 1   physically.                                      11:56:15

 2        Q.   And when she joined your team, did she 11:56:16

 3   do digital and physical events for Nike?         11:56:22

 4        A.   She was -- she was responsible for our 11:56:26

 5   digital work specifically.                       11:56:29

 6        Q.   Okay.  And when you say she was         11:56:48

 7   responsible for your digital work specifically, is 11:57:06

 8   that like as compared to something else?         11:57:09

 9        A.   No.  You just asked me if she did       11:57:12

10   physical and she was responsible for digital, not 11:57:15

11   physical events.                                 11:57:17

12        Q.   I see.  Okay.  Thanks.                  11:57:19

13             Okay.  And I think I might not have     11:57:42

14   asked you yet what factors you considered in     11:57:46

15   deciding to hire Ms. Gray as a marketing         11:57:48

16   specialist on your team.                         11:57:52

17        A.   Yeah.  Again, she was -- I knew of her  11:57:54

18   experience with Microsoft and doing similar work 11:57:57

19   with them, and so the -- you know, she seemed like 11:58:01

20   a good fit for the role that we were looking for. 11:58:05

21        Q.   Got it.  Anything else?                 11:58:12

22        A.   No.                                     11:58:13

23        Q.   Okay.  And then you mentioned Lauren    11:58:15

24   Anderson.                                         11:58:21

25        A.   Yeah.                                   11:58:22
```

                                                Page 69

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 17 of 24

```
 1          Q.    And Ms. Anderson's an opt-in plaintiff    11:58:24

 2   in this case.  Correct?                                11:58:27

 3          A.    That's right.                             11:58:28

 4          Q.    Okay.  What role did you hire             11:58:29

 5   Ms. Anderson for?                                      11:58:33

 6          A.    She was hired in as a director, and       11:58:34

 7   what I recall is she was -- she was going to be        11:58:45

 8   more of a senior leader on my team to manage -- to     11:58:47

 9   come in and manage -- we were kind of moving           11:58:52

10   accounts around, so she was -- I believe she was       11:58:58

11   coming in to manage the Eastbay account                11:58:59

12   specifically.                                          11:59:02

13          Q.    Okay.  And I think Ms. Anderson was       11:59:05

14   already working at Nike at the time that you hired     11:59:19

15   her.  Correct?                                         11:59:22

16          A.    That's right.                             11:59:22

17          Q.    So I guess when you hired her into        11:59:24

18   your group, was that a -- like a lateral?  Would       11:59:28

19   that have been considered a lateral move?              11:59:31

20          A.    Yes.  Lateral move from a -- I would      11:59:33

21   say a smaller category.  I think she was in the        11:59:37

22   golf team at the time into a larger kind of            11:59:39

23   opportunity.  So from a scope perspective, it was      11:59:43

24   a larger scope, but a lateral move from an HR          11:59:47

25   perspective.                                           11:59:51
```

Page 70

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 18 of 24

```
 1         Q.    Got it.  And when you say that it was      11:59:53

 2    a larger scope as compared to the golf team, how      11:59:58

 3    so?                                                   12:00:01

 4         A.    Eastbay's business is -- at the time       12:00:02

 5    was multi, multimillions of dollars with Nike.        12:00:05

 6    You know, they were one of our biggest accounts.      12:00:11

 7    They were moving quickly with us.  And so, you        12:00:14

 8    know, I think from a scope perspective, they cover    12:00:17

 9    every category, not just one category.  And so the    12:00:20

10    role was -- was pretty -- pretty complex and in       12:00:25

11    depth.                                                12:00:31

12         Q.    And maybe I'll just close up for her.      12:00:31

13    What factors did you consider in deciding to hire     12:00:46

14    Ms. Anderson onto your team in the director role?     12:00:52

15         A.    You know, with Lauren, there's a few       12:00:55

16    different pieces.  One, you know, we interviewed      12:00:57

17    and her and she seemed like, you know, passion,       12:01:00

18    capability, able to do the job just from the --       12:01:05

19    from the Nike principles.                             12:01:09

20              And then I would say a couple other         12:01:10

21    things.  We had history.  Right?  We had all of       12:01:12

22    her coaching for excellence documentation so we       12:01:14

23    were able to look back and see what that -- see       12:01:18

24    what -- what -- how she had performed over the        12:01:22

25    course of her tenure at Nike.                         12:01:25
```

Page 71

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 19 of 24

```
 1              And then she came highly recommended    12:01:26

 2    by an internal team member, Cindy King, who knew  12:01:29

 3    her well and recommended her as somebody to bring 12:01:33

 4    into the team.                                    12:01:35

 5         Q.    Okay.  Any other factors that you      12:01:40

 6    considered in deciding to hire Ms. Anderson?      12:01:42

 7         A.    No.                                    12:01:45

 8         Q.    And did you tell me when that was that 12:01:48

 9    you hired her?                                    12:01:52

10         A.    She --                                 12:01:53

11         Q.    I can't remember.                      12:01:54

12         A.    -- would have come in a little bit     12:01:55

13    later, kind of towards the end of my time.  Maybe 12:01:56

14    in the 2013-2014.  I can't recall exactly, but it 12:02:00

15    was later than the others.                        12:02:04

16         Q.    Okay.  And -- and I think you          12:02:08

17    mentioned that -- you said, We had interviewed her 12:02:13

18    or we interviewed her.  Who else interviewed      12:02:16

19    Ms. Anderson for the role that you can remember?  12:02:18

20         A.    Cindy -- Cindy King did.  My manager   12:02:23

21    at the time -- I'll forget his name.  Who was it? 12:02:25

22    I can't -- I can't remember his name.  He was not 12:02:31

23    my manager for very long.  So kind of the -- you  12:02:34

24    know, the -- the key folks that she would be      12:02:39

25    working with.                                     12:02:41
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | what factors did you consider in deciding to offer | 12:14:03 |
| 2 | Ms. Anderson the $108,000 as a starting salary in | 12:14:09 |
| 3 | that director role? | 12:14:14 |
| 4 | A.   I -- I mean, for the most part, we -- | 12:14:17 |
| 5 | I relied on HR to make those recommendations and | 12:14:22 |
| 6 | very rarely questioned them.  And so they made the | 12:14:26 |
| 7 | recommendation.  It seemed reasonable.  And it | 12:14:30 |
| 8 | was -- it was based on, you know, prior work | 12:14:34 |
| 9 | experience and compensation.  It gave her a good | 12:14:38 |
| 10 | kind of reason to come over to the team if she was | 12:14:42 |
| 11 | having any questions because it was an increase in | 12:14:44 |
| 12 | salary.  So that was -- that was all that goes | 12:14:47 |
| 13 | into the decision. | 12:14:49 |
| 14 | Q.   Got it.  And do you recall approving | 12:14:51 |
| 15 | compensation for the other members of your team | 12:15:08 |
| 16 | that you hired that we've discussed? | 12:15:13 |
| 17 | MR. BLAKE:  Objection.  Vague and | 12:15:16 |
| 18 | ambiguous. | 12:15:21 |
| 19 | A.   Yes.  Yes.  I would have approved | 12:15:21 |
| 20 | their salaries as part of the hiring process. | 12:15:22 |
| 21 | BY MS. ZABELE: | 12:15:32 |
| 22 | Q.   Okay.  Okay.  Anyone else you recall | 12:16:16 |
| 23 | hiring on your team when you were in the director | 12:16:17 |
| 24 | of digital NA role? | 12:16:20 |
| 25 | A.   Not that I recall, no. | 12:16:23 |

Page 80

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 21 of 24

```
 1          Q.    Did you ever make any hiring          13:37:25

 2   recommendations or decisions for an employee at    13:37:26

 3   Nike based on their gender?                         13:37:29

 4               MR. BLAKE:  Objection.  Vague and       13:37:32

 5   ambiguous.  Compound.                               13:37:32

 6          A.    No.  I never made a decision on hiring 13:37:33

 7   based on gender.                                     13:37:38

 8   BY MS. ZABELE:                                       13:37:41

 9          Q.    What about compensation?  Did you ever 13:37:41

10   make any compensation decisions or recommendations  13:37:44

11   for an employee at Nike based on their gender?       13:37:46

12               MR. BLAKE:  Objection.  Vague and       13:37:48

13   ambiguous.  Compound.                               13:37:50

14          A.    No.                                     13:37:51
```

```
15   BY MS. ZABELE:                                       13:37:54

16          Q.    Oh.  One thing I wanted to ask.  When   13:38:05

17   you were the director of digital,                   13:38:07

18   direct-to-consumer in that role at Nike from         13:38:09

19   October 2007 to May 2011, were there any employees  13:38:13

20   who were performing similar roles to yours?          13:38:17

21          A.    Yeah.  Jeff Lyman was in a very         13:38:19

22   similar role managing work and campaigns that        13:38:24

23   were -- that were similar to mine.                   13:38:30

24               (Reporter inquiry.)                      13:38:42

25               THE WITNESS:  Yeah.  It's L-Y-M-A-N.     13:38:43
```

                                          Page 103

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 22 of 24

```
 1                       CERTIFICATE

 2

 3

 4              I, Jan R. Duiven, CSR, FCRR, CRC,

 5    RPR, a Certified Shorthand Reporter for the State

 6    of Oregon, do hereby certify that, pursuant to

 7    stipulation of counsel for the respective parties

 8    hereinbefore set forth, PAIGE AZAVEDO appeared

 9    virtually before me at the time and place set

10    forth in the caption hereof; that at said time and

11    place I reported in Stenotype all testimony

12    adduced and other oral proceedings had in the

13    foregoing matter; that thereafter my notes were

14    reduced to typewriting under my direction; and

15    that the foregoing transcript, pages 1 to 245,

16    both inclusive, constitutes a full, true, and

17    accurate record of all such testimony adduced and

18    oral proceedings had, and of the whole thereof.

19              Witness my hand at Eugene, Oregon,

20    this 12th day of February, 2021.

21

22

23           Jan R. Duiven, CSR, FCRR, CRC, RPR

24           CSR No. 96-0327

25    Expiration Date:  September 30, 2023


                                           Page 246
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit G, Page 23 of 24

Cahill, et al v. Nike
Paige Azavedo Deposition Errata

| Page : Line | Reads | Should Read | Reason |
|---|---|---|---|
| 132 : 16 | Sysco | Cisco | To correct a transcription error |
| 142 : 8 | Yes | I'm not sure if the role exists today. | To clarify and correct an inadvertent error |
| 169 : 20 | Tim Parks | Tim Perks | To correct a transcription error |
| 170 : 11 | Tim Parks | Tim Perks | To correct a transcription error |
| 219 : 20 | Tim Parks | Tim Perks | To correct a transcription error |
| 242 : 17 | Bruce Stall | Bruce Stahl | To correct a transcription error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the

United States that my deposition transcript is true and correct.

Executed on ___03 / 12 / 2021___ in ___Portland, OR___ .

_____
Paige Azavedo

1106158

Pedersen Decl. Exhibit G, Page 24 of 24

Doc ID: 1de047fc18dc628473fee6db2c5854e236b3b22b