```
         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF OREGON
                PORTLAND DIVISION

KELLY CAHILL, et al.,              )
individually and on behalf of      )
of others similarly situated,      )
                                   )
              Plaintiffs,          )
                                   )
         vs.                       )    No. 3:18cv-01477-JR
                                   )
NIKE, INC., an Oregon              )
corporation,                       )
                                   )
              Defendant.           )

             VIDEOCONFERENCE DEPOSITION
                        OF
                   SHANE WALKER
                     VOLUME I

DATE TAKEN:   December 17, 2020
TIME:         9:30 a.m.
PLACE:        Virtual
```

1   specific to each benchmark job that we have at Nike.  And
2   in particular, we're looking at the 50th percentile of
3   the market for various data points, whether it be base
4   pay, bonus programs, long-term incentives like stock or
5   long-term cash.
6       Q.  Is it fair to say that you use these surveys in
7   setting compensation for the jobs that are in bands L
8   through S at Nike World Headquarters?
9       A.  So we use the data to set the pay structures
10  and the guidance that we provide, but not to establish
11  individual pay rates for employees.
12      Q.  But you use these surveys as part of the
13  compensation process.  Is that fair?
14          MS. DAVIS:  The question is vague and
15  ambiguous.
16          Go ahead.
17          THE WITNESS:  How do you define compensation
18  process?
19  BY MR. BARRY GOLDSTEIN:
20      Q.  Well, you're setting pay ranges for jobs, are
21  you not?
22      A.  Yes.
23      Q.  And in doing so, you're setting base pay; is
24  that correct?
25      A.  We are not setting base pay.

```
 1            MS. DAVIS:  The question is vague and
 2   ambiguous.
 3            THE WITNESS:  We're setting pay ranges and the
 4   structures.  Managers are responsible for making pay
 5   decisions for their employees.
 6   BY MR. BARRY GOLDSTEIN:
 7       Q.  Managers, as reviewed by vice presidents in
 8   E7+?
 9       A.  Not always.  So we typically are a manager plus
10   one in most cases.
11       Q.  Well, we'll talk about the review process
12   later.
13            Are the -- is the business-facing part of HR
14   working with the managers as far as setting pay?
15       A.  The HR business partners, on occasion, yes,
16   there would be times when they would be eventually
17   providing guidance or helping make a recommendation to
18   the manager.
19       Q.  In setting the pay ranges, are the surveys used
20   by these companies part of the process?
21       A.  Yes.
22       Q.  Now, before there were pay ranges, there were
23   market zones; is that correct?
24       A.  Yes.
25       Q.  In setting the market zones, were there surveys
```

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Pedersen Decl. Exhibit H, Page 3 of 12

```
 1                          CERTIFICATE
 2
 3    STATE OF OREGON      )
 4                         ) ss
 5    COUNTY OF MULTNOMAH  )
 6
 7
 8
 9            I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
      certify that said witness appeared before me via Zoom at
10    the time and place set forth in the caption hereof; that
      at said time and place I reported in stenotype all
11    testimony adduced and other oral proceedings had in the
      forgoing matter; that thereafter my notes were
12    transcribed through computer-aided transcription, under
      my direction; and that the foregoing pages constitute a
13    full, true and accurate record of all such testimony
      adduced and oral proceedings had, and the whole thereof.
14            I further certify review of the transcript was
      not requested
15            Witness my hand at Portland, Oregon, this 27th
      day of December 2020.
16
17
18
19
20                                  [signature: Teresa L. Rider]
21    [seal: CERTIFIED SHORTHAND REPORTER
           OREGON CSR 12-0421
22         TERESA L. RIDER]
                                    Teresa L. Rider
23                                  Oregon CSR No. 12-0421
                                    Washington CCR No. 2119
24                                  Expires 12-03-23
25
```

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF OREGON
                 PORTLAND DIVISION

KELLY CAHILL, et al.,                )
individually and on behalf of        )
of others similarly situated,        )
                                     )
              Plaintiffs,             )
                                     )
     vs.                             )   No. 3:18cv-01477-JR
                                     )
NIKE, INC., an Oregon                )
corporation,                         )
                                     )
              Defendant.             )

             VIDEOCONFERENCE DEPOSITION
                         OF
                    SHANE WALKER
                     VOLUME II

DATE TAKEN:  December 18, 2020
TIME:        9:30 a.m.
PLACE:       Virtual


COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR
```

1  ~~practice~~ would have been partially based on CFE rating.
2       Q.   So as I understand what this chart shows is
3  that -- if someone got the same CFE rating, all other
4  things being equal, they would receive the same
5  percentage increase whether they were in the lower third,
6  the middle third or the upper third of the pay range; is
7  that correct?
8       A.   If the employee received the same rating, the
9  guidelines would have shown the same for each of those
10 employees.  The actual application of whether or not that
11 employee received an increase that was the same would
12 have been different.
13      Q.   I'm sorry.  I don't understand that.
14      A.   Can you ask the question again?
15      Q.   How is CFE, under the current practice as
16 defined here, which was GPR merit increase, if someone
17 got a CFE rating of successful, they would be entitled to
18 a certain percentage increase in their base pay pursuant
19 to the guidelines; is that correct?
20      A.   No.
21      Q.   Okay.  We haven't gone into the coaching for
22 excellence discussion yet, but in order to understand
23 this chart, could you explain the basis for merit
24 increases under GPR related to coaching for excellence?
25      A.   So merit guidelines -- this chart does not show

1  question and we'll see how many questions I may have.
2  Let me try to simplify this, because I don't really want
3  to go into a discussion of CFE at this point.
4          If a manager had decided to give three
5  individuals under the current practice a 3 percent
6  increase and -- change the question.
7          Let's just say a manager determined that the
8  employees were worthy of the same merit increase.  It
9  wouldn't matter whether or not those employees were
10 located in the lower, middle or upper third of the pay
11 range; is that correct?
12     A.  The actual application of the increases is up
13 to the manager, and so they very well could have taken
14 into account where someone was positioned in the pay
15 range, but the guidance that we provided to the managers,
16 did not take into account where someone was positioned in
17 the pay range.
18     Q.  And explain how the new Compa-ratio is
19 different than the current practice.
20          MS. DAVIS:  Asked and answered.
21          You can answer again.
22          THE WITNESS:  The new Compa-ratio guidelines or
23 the new guidelines we provide as part of the annual pay
24 review, we provide based on country, budget and position
25 and range.  There are -- there is a default best and a

```
 1                        CERTIFICATE
 2
 3    STATE OF OREGON    )
 4                       ) ss
 5    COUNTY OF MULTNOMAH )
 6
 7
 8
 9         I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
      certify that said witness appeared before me via Zoom at
10    the time and place set forth in the caption hereof; that
      at said time and place I reported in stenotype all
11    testimony adduced and other oral proceedings had in the
      forgoing matter; that thereafter my notes were
12    transcribed through computer-aided transcription, under
      my direction; and that the foregoing pages constitute a
13    full, true and accurate record of all such testimony
      adduced and oral proceedings had, and the whole thereof.
14         I further certify review of the transcript was
      not requested.
15         Witness my hand at Portland, Oregon, this 29th
      day of December 2020.
16
17
18
19
20                         Teresa L. Rider
                           Teresa L. Rider
21                         Oregon CSR No. 12-0421
                           Washington CCR No. 2119
22                         Expires 12-03-23
23
24
25
```

*Cahill, et al v. Nike*

Shane Walker Deposition Errata

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 8:1 | "Mr. Benton" | "Mr. Vinton" | To correct a transcription error |
| 9:3 | "community resource officer" | "Chief Human Resource Officer" | To correct a transcription error |
| 11:20 | "I lead our enroll programs" | "I lead our annual programs" | To correct a transcription error |
| 21:7 | "Mr. Benton" | "Mr. Vinton" | To correct a transcription error |
| 25:12 | "OSA" | "FLSA" | To correct a transcription error |
| 25:16 | "OSA" | "FLSA" | To correct a transcription error |
| 29:23 | "footwear, a partial" | "footwear, apparel" | To correct a transcription error |
| 52:21-22 | "cover things like spoken impact, communication influence and knowledge and experience" | "cover things like scope and impact, communication, influence, and knowledge and experience" | To correct a transcription error |
| 71:20 | "Bradford" | "Radford" | To correct a transcription error |
| 86:11 | "hot lip" | "Outlook" | To correct a transcription error |
| 124:18 | "shows the new from market zones" | "shows the move from market zones" | To correct a transcription error |
| 137:14 | "Deloit" | "Deloitte" | To correct a transcription error |
| 140:20 | "Anybody of a direct report | "Anybody with a direct report" | To correct a transcription error |
| 144:12 | | Add: Note that during the second day of the deposition I identified a number of documents using the term "decisions." | To account for later testimony |
| 162:14-15 | "when we hold the RS pay review that is to provide pay adjustments at employees" | "when we hold the 2X pay review that is to provide pay adjustments for employees" | To correct a transcription error |
| 167:22 | "David Eric" | "David Ayre" | To correct a transcription error |
| 175:2-3 | "they would need an increase to get into that pay range" | "they would not need an increase to get into that pay range" | To correct a transcription error |
| 198:18 | "Mr. Benton | "Mr. Vinton" | To correct a transcription error |

1

Pedersen Decl. Exhibit H, Page 9 of 12

| | | | |
|---|---|---|---|
| 227:14 | "refers to four stock awards" | "refers to our stock awards" | To correct a transcription error |
| 229:12 | "additional words" | "additional awards" | To correct a transcription error |
| 275:6 | "for the role-out" | "for the rollout" | To correct a transcription error |
| 322:19 | "in 20719" | "in 2019" | To correct a transcription error |
| 325:25-326:1 | "And it did mean that somebody couldn't exceed" | "And it did not mean that somebody couldn't exceed" | To correct a transcription error |
| 328:21 | "Yes, merit increase guidelines is part of GPR." | "Merit increase guidelines were a part of GPR, but GPR is not current practice." | To conform to the facts, consistent with other testimony |
| 328:25-329:1 | "So the merit increase guidelines in current practice would have been partially based on CFE rating." | "So the merit increase guidelines in GPR would have been partially based on CFE ratings." | To conform to the facts, consistent with other testimony |
| 410:11-12 | "As stated on the slide, 2 percent. That was not always the rule." | "As stated on the slide, the guidance for VALUES band was 5 to 20 percent. That was not always the rule." | To conform to the facts, consistent with other testimony |
| 421:20 | "looking at the low" | "looking at below" | To correct a transcription error |
| 447:9 | "composition experts" | "compensation experts" | To correct a transcription error |
| 472:6-7 | "we made other results public" | "we made our results public" | To correct a transcription error |

I attest that the above-referenced changes are true and correct.

Date: February 11, 2021

*DocuSigned by:*
*Shane Walker*
5B97C30509694BB... _____
Shane Walker

2

Pedersen Decl. Exhibit H, Page 10 of 12

# Byron Goldstein

| | |
|---|---|
| **From:** | Davis, Felicia A. <feliciadavis@paulhastings.com> |
| **Sent:** | Tuesday, December 8, 2020 7:26 PM |
| **To:** | Byron Goldstein; Barry Goldstein; James Kan; Mengfei Sun |
| **Cc:** | Prince, Daniel; Zabele, Laura |
| **Subject:** | Cahill v. Nike – Shane Walker and Alison Daugherty Depositions |



Counsel,

Mr. Walker can sit for a virtual deposition on December 17, 2020. Mr. Walker will be designated as Nike's 30(b)(6) deponent on the following topics, as defined below. The time period for which Mr. Walker will be prepared to testify with respect to each topic is set forth in parenthesis following each topic:

- **Topic 1**: The organizational structure of Nike's compensation department (2015 to present).
- **Topic 2**: The establishing of job codes, job levels, bands, sub-families, families, and/or functions for the Covered Positions (2016 to present).
- **Topic 3**: The formation, review, modification, and use of job codes for the Covered Positions; related policies and procedures; the individuals who developed, consolidated, and/or organized job codes (2016 to present). This does not include the assignment of employees to job codes.
- **Topic 5**: Nike HQ executives' involvement, knowledge and responsibilities related to employee compensation; executives' knowledge regarding potential disparities between men and women in compensation; executives' involvement, knowledge, and responsibilities concerning the formation, review, and/or changing of policies and practices related to compensation (2015 to present).
- **Topic 6**: Pay ranges relating to the Covered Positions, including "internal" and "external" ranges, market zones, market surveys, and how pay ranges are formed, review, changed and used; related policies and practices; the individuals who were involved in the formation, review and/or modification of pay ranges or related policies (2015 to present).
- **Topic 7**: Development and implementation of starting pay guidelines; the individuals who were involved in the formation, changing and implementation of starting pay guidelines (2017 to present).
- **Topic 8**: Effect of performance evaluations and potential appraisal ratings on employee compensation; related policies and procedures (2015 to present).
- **Topic 9**: "Total rewards philosophy and interactions between philosophy and compensation," as Nike understands this phrase (2017 to present); offer modeling tool (2016 to present).
- **Topic 10**: Setting and modifying salaries and lump sum payments for Covered Positions (excluding the setting of starting salary); policies and practices related to recommendations and determinations concerning merit, base pay, increases, lump sum payments (excluding the setting of starting salary); the individuals who make determinations regarding merit, base pay, increases, lump sum payments, and how (2015 to present).
- **Topic 11**: General systems used to maintain employee compensation data; systems used to communicate recommendations or determinations concerning compensation (2015 to present.)
- **Topic 13**: To the extent not privileged, recommendations and determinations of Competitive Pay Management ("CPM") and Active Pay Management ("APM") for Covered Positions; formation, components, uses, processes, and changes related to CPM and APM; related policies and practices; the individuals who are involved in the formation, use, changes, implementation, and/or supervision of CPM and APM; compa-ratios; the use of pay ranges, market analyses, and/or surveys in the CPM and APM process (2017 to present).
- **Topic 16**: Guidance regarding compensation at promotion or lateral job transfer; the individuals who make such decisions and how; related policies and procedures; the individuals involved in forming and/or changing the policies and procedures; how the policies and practices were formed, reviewed and/or changed (2017 to present).

1

Pedersen Decl. Exhibit H, Page 11 of 12

- **Topic 17**: Responsibilities and authority of Human Resources at Nike HQ related to compensation processes (2016 to present).
- **Topic 21**: To the extent not privileged, policies and practices regarding anti-discrimination in compensation (2017 to present).
- **Topic 24**: "Validation" of any compensation policy or practice, as Nike understands this term, and to the extent it applies to compensation policies or practices (2016 to present).
- **Topic 25**: "Compliance with the Uniform Guidelines" with respect to compensation policies or practices, as Nike understands this term, and to the extent it applies to compensation policies or practices (2016 to present).
- **Topic 26**: Policies and practices relating to the training of managers, directors, VPs and other employees with respect to making compensation decisions and implementing Nike's policies and practices related to compensation decisions (2017 to present).
- **Topic 27**: Nike's use of job analyses in establishing, modifying, or implementing compensation policies and practices, or establishing job codes, job levels, bands, sub-families, families, or functions (2016 to present).

We plan to submit formal objections to the 30(b)(6) deposition notice as well, but wanted to get you the topics as soon as possible so you have time to prepare. In providing this list of topics, Nike does not consent to or agree with the scope or breadth of the topics noticed by Plaintiffs (i.e., Nike reserves its rights with respect to objections, and as provided in its Motion for Protective Order), nor does Nike consent to the defined terms contained in Plaintiffs' deposition notice. Use of terms above does not necessarily mean that Nike's definition and Plaintiffs' definition are the same.

As set forth above, the term "compensation" is given its typical meaning, except that Mr. Walker will not be Nike's 30(b)(6) witness on the following compensation-related topics: PSP awards, equity, stock options, or other long-term incentive payments.

\*\*\*

Separately, Ms. Daugherty is available for deposition on January 7, 2021. Ms. Daugherty likely will be designated as Nike's witness for certain 30(b)(6) deposition topics. We are working through those now and will provide them in advance of the deposition.

Best,
Felicia



**Felicia Davis | Partner, Employment Law Department**
Paul Hastings LLP | 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, CA 90071
Direct: +1.213.683.6120 | Main: +1.213.683.6000 | Fax: +1.213.996.3120 |
feliciadavis@paulhastings.com | www.paulhastings.com

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. If you reply to this message, Paul Hastings may collect personal information including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

2

Pedersen Decl. Exhibit H, Page 12 of 12