AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA E. ZABELE, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Attorneys for Defendant NIKE, INC.


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No.: 3:18-cv-01477-JR |
| Plaintiffs, | DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D. |
| v. | REQUEST FOR ORAL ARGUMENT |
| NIKE, INC., an Oregon Corporation, | FILED UNDER SEAL |
| Defendant. | |


DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

# TABLE OF CONTENTS

**Page**

LOCAL RULE 7.1(A) CERTIFICATION ................................................................... 1

MOTION ..................................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

INTRODUCTION ....................................................................................................... 1

LEGAL STANDARD.................................................................................................. 2

ARGUMENT .............................................................................................................. 3

    I.      Dr. Neumark's Opinions Are Not Relevant And, Therefore, Inadmissible........... 3

         A.      Dr. Neumark's Opinions And Analyses Are Irrelevant To Plaintiffs' Pay Discrimination Claims Because His Aggregated Analysis Fails To Compare Women And Men Performing Comparable Or Substantially Equal Work. ............................................... 5

         B.      Aggregated Data Presumes Commonality; It Does Not Prove It. ............. 8

         C.      Dr. Neumark's Opinions And Analyses Are Irrelevant To Plaintiffs' Disparate Treatment Claims Because He Fails To Conduct An Analysis By Decision-Maker. ............................................. 12

         D.      Dr. Neumark's Analyses Include Decisions Made Outside Of The Applicable Claim Periods. .......................................................... 13

    II.     Dr. Neumark's Opinions Are Not Reliable And Therefore Are Inadmissible. ......................................................................................... 15

         A.      Dr. Neumark's Opinions Regarding Starting Pay Are Unreliable........... 16

             1.      Dr. Neumark's Starting Pay Opinion Is Based On Insufficient Facts And Data Because Prior Pay Data Is Not Available. ...................................................................................... 16

             2.      Dr. Neumark's Starting Pay Opinions Are Based On An Unsound Analysis Of Prior Work Experience............................ 18

             3.      Dr. Neumark's Starting Pay Opinions Are Based On A Grossly Flawed Analysis Of Educational Background. .............. 22

             4.      Dr. Neumark's Prior Experience And Education Variables Further Highlight The Flaws Of An Aggregated Analysis.......... 24

             5.      Dr. Neumark Fails To Account For Fundamental Variables And Uncritically Relies On The Opinions Of Other Experts. ...................................................................................... 25

         B.      Dr. Neumark's Opinions Regarding Initial Leveling Are Unreliable......................................................................................... 27

             1.      Dr. Neumark's Leveling Analysis Is Based On The Same Flawed Prior Experience And Education Variables. .................. 27

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

2.    Dr. Neumark's Leveling Analysis Is Based On Unsubstantiated Assumptions And Ignores Critical Variables. ................................................................... 27

C.    Dr. Neumark's Opinions Regarding Promotions Are Unreliable. ........... 30

1.    Dr. Neumark Did Not Find Any Statistically Significant Disparity Against Women In Overall Promotions. ..................... 30

2.    Dr. Neumark's Promotion Analyses Employ Scientifically Unsound Methodology That Fails to Consider This Case's Facts. ................................................................... 31

CONCLUSION ................................................................................. 33

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)..................................................................16

*Anderson v. Westinghouse Savannah River Co.*,
    406 F.3d 248 (4th Cir. 2005) ...............................................................25

*Arjangrad v. JPMorgan Chase Bank, N.A.*,
    2012 WL 1890372 (D. Or. May 23, 2012) ......................................15, 32

*Atl. Specialty Ins. v. AE Outfitters Retail Co.*,
    970 F. Supp. 2d 278 (S.D.N.Y. 2013).....................................................4

*Att'y Gen. of Okla. v. Tyson Foods, Inc.*,
    565 F.3d 769 (10th Cir. 2009) ..............................................................20

*Bazemore v. Friday*,
    478 U.S. 385 (1986)..............................................................................12

*Bolden v. Walsh Const. Co.*,
    688 F.3d 893 (7th Cir. 2012) .............................................................7, 10

*Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*,
    78 F. Supp. 3d 208 (D.D.C. 2015)........................................................17

*Claar v. Burlington N. R.R. Co.*,
    29 F.3d 499 (9th Cir. 1994) ..................................................................11

*Cooper v. Brown*,
    510 F.3d 870 (9th Cir. 2007) ..............................................................3, 4

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ...............................................3, 4, 15, 16

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).................................................................. *passim*

*Domingo ex rel. Domingo v. T.K.*,
    289 F.3d 600 (9th Cir. 2002) ................................................................29

*Dukes v. Wal-Mart Stores, Inc.*,
    964 F. Supp. 2d 1115 (N.D. Cal. 2013) .............................................11, 15

*E.E.O.C. v. Bloomberg L.P.*,
   2010 WL 3466370 (S.D.N.Y. Aug. 31, 2010) .......................................................4

*Ellis v. Costco Wholesale Corp.*,
   285 F.R.D. 492 (N.D. Cal. 2012) ...........................................................................12

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ................................................................................2, 3

*Forsberg v. Pac. Nw. Bell Tel. Co.*,
   840 F.2d 1409 (9th Cir. 1988) .................................................................................5

*Forte v. Liquidnet Holdings, Inc.*,
   675 F. App'x 21 (2d Cir. 2017) (unpublished) ......................................................27

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
   618 F.3d 1025 (9th Cir. 2010) ...............................................................................15

*Fosmire v. Progressive Max Ins. Co.*,
   277 F.R.D. 625 (W.D. Wash. 2011) ......................................................................26

*Gabbard v. Linn-Benton Hous. Auth.*,
   219 F. Supp. 2d 1130 (D. Or. 2002) ........................................................................4

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) .................................................................................................3

*Giuliano v. Sandisk Corp.*,
   2015 WL 10890654 (N.D. Cal. May 14, 2015) .......................................................5

*Grodzitsky v. Am. Honda Motor Co., Inc.*,
   957 F.3d 979 (9th Cir. 2020) ................................................................................2, 3

*Gunther v. Washington Cnty.*,
   623 F.2d 1303 (9th Cir. 1979), *aff'd*,
   452 U.S. 161 (1981) ...............................................................................................25

*Henricksen v. ConocoPhillips Co.*,
   605 F. Supp. 2d 1142 (E.D. Wash. 2009) .........................................................16, 29

*In re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014) ..........................................................................26

*Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*,
   34 F. Supp. 3d 896 (N.D. Ill. 2014) ......................................................................12

*Kempner Mobile Elecs., Inc. v. Sw Bell Mobile Sys.*,
   428 F.3d 706 (7th Cir. 2005) .............................................................................24, 29

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

*Kumho Tire Co., Ltd. v. Carmichael,*
　526 U.S. 137 (1999) ........................................................................................15

*Lawrey v. Good Samaritan Hosp.,*
　751 F.3d 947 (8th Cir. 2014) ........................................................................24, 29

*Lust By & Through Lust v. Merrell Dow Pharms., Inc.,*
　89 F.3d 594 (9th Cir. 1996) ...............................................................................2

*Matrixx Initiatives, Inc. v. Siracusano,*
　563 U.S. 27 (2011) .............................................................................................9

*Moussouris v. Microsoft Corp.,*
　2018 WL 3328418 (W.D. Wash. June 25, 2018), *aff'd,*
　799 F. App'x 459 (9th Cir. 2019) ....................................................................9, 10

*Murray v. S. Route Mar. SA,*
　870 F.3d 915 (9th Cir. 2017) ..............................................................................2

*Ollier v. Sweetwater Union High Sch. Dist.,*
　768 F.3d 843 (9th Cir. 2014) .............................................................................30

*Penk v. Or. State Bd. Of Higher Educ.,*
　1985 WL 25631 (D. Or. Feb. 13, 1985), *aff'd,*
　816 F.2d 458 (9th Cir. 1987) .............................................................................10

*Powell v. Anheuser-Busch Inc.,*
　2012 WL 12953439 (C.D. Cal. Sept. 24, 2012) ................................................32

*Rose v. Wells Fargo & Co.,*
　902 F.2d 1417 (9th Cir. 1990) ...........................................................................16

*Smith v. Pac. Bell Tel. Co., Inc.,*
　649 F. Supp. 2d 1073 (E.D. Cal. 2009)..............................................................33

*Sudre v. The Port of Seattle,*
　2016 WL 7035062 (W.D. Wash. Dec. 2, 2016) .................................................29

*Tagatz v. Marquette Univ.,*
　861 F.2d 1040 (7th Cir. 1988) ...........................................................................25

*U.S. v. Artero,*
　121 F.3d 1256 (9th Cir. 1997) ...........................................................................13

*Wal-Mart Stores, Inc. v. Dukes,*
　564 U.S. 338 (2011) ......................................................................................3, 7, 8

　　　　　DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
　　　　　　　　　PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

*Yeti by Molly Ltd v. Deckers Outdoor Corp.,*
    259 F.3d 1101 (9th Cir. 2001) ...........................................................................19

**STATUTES**

42 U.S.C. § 2000e-2 (TITLE VII) .................................................................5, 12, 13

OR. REV. STAT. § 652.210(16) .......................................................................................5

OR. REV. STAT. § 652.220 ..............................................................................................5

**RULES**

FED. R. CIV. P. 26 .............................................................................................19, 33

FED. R. CIV. P. 26(a)(2) .......................................................................................11

FED. R. CIV. P. 26(a)(2)(B)(i) ..............................................................................19

FED. R. CIV. P. 26(a)(2)(B)(iv) ...........................................................................19

FED. R. EVID. 402 ..................................................................................................4

FED. R. EVID. 403 ..................................................................................................4

FED. R. EVID. 702 ........................................................................................ *passim*

**OTHER AUTHORITIES**

Fed. Judicial Ctr., *Reference Manual on Scientific Evid.* (3d ed. 2011), *available
    at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf* (last accessed
    March 4, 2022) ...............................................................................................9

Marinescu, Ioan, and Ronald Wolthoff, 2020, "Opening the Black Box of the
    Matching Function: The Power of Words," *Journal of Labor Economics*, Vol.
    38 .................................................................................................................19

Richard M. Clark, Administrative Law Judge, U.S. Dep't of Labor,
    "Recommended Decision and Order," *In the Matter of Off. of Fed. Cont.
    Compliance Programs, U.S. Dep't of Labor v. Oracle America, Inc.,* Case No.
    2017-OFC-00006, 2020 WL 6112340, Sept. 22, 2020 .......................................28

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

## LOCAL RULE 7.1(a) CERTIFICATION

In compliance with Local Rule 7-1(a), counsel for Defendant Nike, Inc. has conferred in good faith with Plaintiffs' counsel regarding the subject of this Motion, but the parties were unable to resolve their dispute.

## MOTION

Pursuant to Local Rule 7 and Federal Rule of Evidence 702, Nike respectfully moves to exclude the expert reports and testimony of David Neumark, Ph.D., a statistical expert retained by Plaintiffs. Dr. Neumark's opinions should be excluded for failing to satisfy the admissibility requirements under Rule 702, *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993), and its progeny. Accordingly, the Court should not consider Dr. Neumark's opinions or testimony in ruling on Plaintiffs' Motion for Class Certification.

This Motion is supported by the following Memorandum of Points and Authorities and exhibits thereto, and such further oral argument and documentary evidence as may be presented at or before the hearing on this Motion.

Dated:  March 25, 2022                      Respectfully submitted,


<u>/s/ Amy Joseph Pedersen</u>
Amy Joseph Pedersen, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  (503) 294-9408
Facsimile:  (503) 220-2480

Daniel Prince, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
Felicia A. Davis, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
Laura E. Zabele, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
        PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

In their Motion for Class Certification ("Motion"),[1] Plaintiffs rely on the opinions[2] of David Neumark, Ph.D. to support Plaintiffs' theory that Nike systematically discriminates against women in pay and promotions, and channels women into lower-level jobs. They also claim that Dr. Neumark's opinions and analyses demonstrate the commonality required for class certification and present the type of common evidence that can be used to adjudicate this case as a class action. However, none of Dr. Neumark's opinions meet the standards required for expert testimony and evidence under Federal Rule of Evidence 702 or the standard announced in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Specifically, Dr. Neumark's expert opinions here are irrelevant, unreliable, and inadmissible as follows:

- Dr. Neumark's opinions are based on the kind of aggregated analyses that the United States Supreme Court found were insufficient to establish whether pay discrimination claims can be proved on a classwide basis.

- Dr. Neumark's report and underlying analyses do not show whether women are paid less than men for performing comparable or substantially equal work.

- Dr. Neumark failed to consider the effect that different decision-makers have on the pay and promotion decisions challenged by Plaintiffs.

- Dr. Neumark's analyses incorporate data from outside of the relevant claims periods with data from within the claim period, which leads to misleading and irrelevant results.

---

[1] Cited hereafter as "Plaintiffs' Mot."
[2] Expert Report of David Neumark, Ph.D. in the matter of *Cahill et al. v. Nike, Inc.* (corrected on August 5, 2021), Dkt. 149-1, and Expert Report (Rebuttal) of David Neumark, Ph.D. in the matter of *Cahill et al. v. Nike, Inc.* (November 29, 2021), Dkt. 149-2, hereafter cited as "Neumark R." and "Neumark Reb.," respectively.

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

- Dr. Neumark's opinions are based on analyses that fail to account for fundamental variables and rely on unsubstantiated assumptions.

- Dr. Neumark's opinions are based on a purported disparity that is not statistically significant or derives from the misapplication of his own models and standards.

- Opinions in Dr. Neumark's report are based on scientifically unsound and unreliable analyses of prior work experience and education background that fail to apply the facts of this case, and lack support within the scientific community.

- Dr. Neumark accepted the reliability of the opinions of Dr. Kathleen Lundquist, Ph.D. without question, despite admitting that he never analyzed her report.

For all the foregoing reasons, the Court should strike Dr. Neumark's report.

## <u>LEGAL STANDARD</u>

The proponent of expert testimony has the burden of proving, based on a preponderance of the evidence, admissibility in accordance with Rule 702, and *Daubert* and its progeny. *See* Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments); *Daubert*, 509 U.S. at 592-93; *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Applying Rule 702, the district court must act as a gatekeeper to ensure that the proffered expert is qualified, and that the testimony "both rests on a **reliable** foundation and is **relevant** to the task at hand." *Daubert*, 509 U.S. at 597 (emphasis added); *accord Grodzitsky v. Am. Honda Motor Co., Inc.*, 957 F.3d 979, 984 (9th Cir. 2020) ("Under *Daubert*, 'the district court judge must ensure that all admitted expert testimony is both relevant and reliable.'") (citation omitted); *see also Murray v. S. Route Mar. SA*, 870 F.3d 915, 923, 925 (9th Cir. 2017) (describing district court's gatekeeping role as "active and important," noting that the Ninth Circuit has found abuse of discretion when district court abdicates that role) (citing cases); *Ellis v. Costco Wholesale*

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

*Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (district court must "act as a gatekeeper").

To be **relevant**, the expert testimony must "logically advance[] a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*") (Supreme Court refers to the relevance prong as the "fit" requirement) (citation omitted). **Reliability** probes whether "the principles and methodology used by an expert are grounded in the methods of science." *Grodzitsky*, 957 F.3d at 984 (citation omitted); *Ellis*, 657 F.3d at 982 ("[A]n expert's 'inference or assertion must be derived by the scientific method' to be admissible") (citation omitted). The court must analyze "the soundness of the [expert's] methodology," *Daubert II*, 43 F.3d at 1318, and the analytical connection between the data, the methodology, and the expert's conclusions. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Ultimately, "the court's task is to analyze not what the experts say, but what basis they have for saying it." *Grodzitsky*, 957 F.3d at 984-85 (citation omitted).

Even on a motion for class certification, the Court must conduct a full *Daubert* inquiry before considering Dr. Neumark's opinions. *See Grodzitsky*, 957 F.3d at 984-85 (holding that district court properly excluded expert opinion under *Daubert* at class certification); *Ellis*, 657 F.3d at 982 (district court "correctly applied the evidentiary standard set forth in *Daubert*" at class-certification stage); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) (criticizing district court's holding that "*Daubert* did not apply to expert testimony at certification stage of class-action proceedings").

## ARGUMENT

### I.    Dr. Neumark's Opinions Are Not Relevant And, Therefore, Inadmissible.

Under *Daubert*, relevance means that the evidence "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007) (quoting Fed. R. Evid. 702 and citing *Daubert*, 509 U.S. at 589). "Encompassed

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

in the determination of whether expert testimony is relevant is whether it is helpful to the jury." *Id.* at 942 (internal quotation marks and citation omitted). The Ninth Circuit has observed that, "obviously," the Supreme Court "did not intend [this] prong of Rule 702 to be merely a reiteration of the general relevancy requirement of Rule 402." *Daubert II*, 43 F.3d at 1321 n.17 (citing *Daubert*, 509 U.S. at 589). Rather, this heightened relevance standard is necessary, as "scientific expert testimony carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Id.* (quoting *Daubert*, 509 U.S. at 595). Thus, the Ninth Circuit instructs that "[f]ederal judges **must** . . . **exclude** proffered scientific evidence under Rules 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case." *Id.* (emphasis added).

To be relevant, proffered expert testimony must also "fit" the relevant legal theory and be "sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute." *E.E.O.C. v. Bloomberg L.P.*, 2010 WL 3466370, at *6 (S.D.N.Y. Aug. 31, 2010) (citation omitted); *Daubert,* 509 U.S. at 591 (same); *see also Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130, 1134 n.9 (D. Or. 2002) ("In assessing relevance, the district court must determine whether the methodology or reasoning underlying the expert opinion relates to the issue at hand, i.e., whether it assists the trier of fact in understanding the evidence or a fact in issue.") (internal citation and quotation marks omitted). As such, courts must rigorously examine "the facts on which the expert relies . . . and how the expert applies the facts and methods to the case at hand." *Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 285 (S.D.N.Y. 2013) (citation omitted).

In determining a class certification motion, the only relevant question is whether the expert's testimony tends to show that a common question of fact exists across *all* members of the

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

putative class. *See Giuliano v. Sandisk Corp.*, 2015 WL 10890654, at *10 (N.D. Cal. May 14, 2015) ("At the class certification stage, the issue is not which expert is the most credible, or the most accurate modeler, but rather whether the plaintiffs have advanced a plausible methodology to demonstrate that [] injury can be proved on a class-wide basis.") (citation omitted). The analyses and opinions offered by Dr. Neumark do not show commonality among the putative class, and because of their aggregated nature are not even designed to do so. Neither the questions he poses, nor the answers and conclusions he offers, fit Plaintiffs' legal theory of disparate impact and disparate treatment gender discrimination. Therefore, Dr. Neumark's opinions are not relevant to an issue of dispute in this case and should be excluded.

A. **Dr. Neumark's Opinions And Analyses Are Irrelevant To Plaintiffs' Pay Discrimination Claims Because His Aggregated Analysis Fails To Compare Women And Men Performing Comparable Or Substantially Equal Work.**

To determine whether Plaintiffs prevail on their claims under the Oregon Equal Pay Act, the jury must determine whether women are paid less than men "for work of comparable character." Or. Rev. Stat. § 652.220; Or. Rev. Stat. § 652.210(16) ("'Work of comparable character' means work that requires substantially similar knowledge, skill, effort, responsibility and working conditions in the performance of work, regardless of job description or job title."). To prevail under Title VII, Plaintiffs similarly must show that women are paid less than men for "substantially equal" work. *See Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) ("Equal pay claims asserted under Title VII must satisfy the same substantial equality test applied to claims asserted under the EPA."). Thus, the only relevant question for Dr. Neumark to answer is whether women are paid less compared to men performing "comparable" or "substantially equal" work at Nike.

There are more than 1,200 Job Codes among the putative class and more than 900 Job Subfamily-Level interactions (which is the level at which Plaintiffs contend "comparable" or

"substantially equal" work exists). Thus, to answer the relevant question based on Plaintiffs' theory of the case—are women paid less than men in the same Subfamily-Level interaction—we would expect Dr. Neumark's report to tell us, for each of the 900+ employee groupings, whether women were underpaid compared to men, overpaid compared to men, or paid equitably compared to men. ***Yet those results do not exist in either of Dr. Neumark's reports.***

In fact, Dr. Neumark concedes that his aggregated analysis ***cannot*** tell the jury whether, within any specific Job Subfamily-Level interaction, women are paid less than men. For example, according to Plaintiffs' theory of the case, Plaintiff Sara Johnston was paid less than men in the "Business Systems Analyst-Lead Professionals" group. Thus, for the jury to determine whether Ms. Johnston and other women in her comparator group were paid less than their male peers, Dr. Neumark must show whether women in the "Business Systems Analyst-Lead Professionals" group are paid less than men in the "Business Systems Analyst-Lead Professionals" group. Dr. Neumark admits his report does not provide this result; in fact, his report does not tell us whether women are paid less than men in ***any*** group of alleged peers. For instance:

> Q:    Is there a page I can look at in your report that will tell me whether women in the business operations, lead professionals grouping are paid statistically significantly less than men in the business operations, lead professionals group during the relevant class period?
> . . .
> A:    . . . There are no pages or tables . . . which study the data for that subfamily level pair in isolation, i.e., discarding all of the other data.
> Q:    And I assume if I grabbed any one of the other 900 groupings and asked you the same question, you would not be able to point to a page or tell me where in your report I could find a result for that specific job subfamily level grouping; is that correct?
> A:    I would give you the exact same answer, yes.

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

Neumark Tr.[3] 52:18-53:15; *see also* Neumark Tr. 29:9-25.

Instead, Dr. Neumark pooled data across *all* 1,200+ different jobs (shoe designers, software engineers, airplane pilots, etc.), in all compensation levels, and reported a single, percentage difference in pay between all female and all male employees in all jobs combined. *See e.g.,* Neumark R. at p. 6 ("Summary Table: Key Findings"); Neumark Tr. 20:9-20, 65:19-69:1. According to Dr. Neumark, this one average shortfall applies to all women, including those who were paid more than all of the men in their Job Subfamily-Level group (Neumark Tr. 295:19-297:11) and who worked in Job Subfamily-Level groups that never contained a single male peer (*Id.* 71:2-72:14). But this average result does not answer whether any group of women, or even a single woman, was paid less than men performing comparable work. *See Bolden v. Walsh Const. Co., 688 F.3d 893, 896 (7th Cir. 2012)* (data from multiple work sites with multiple working conditions should not be pooled).

This is exactly the kind of aggregated analysis summarily rejected by the U.S. Supreme Court in *Dukes*. In *Dukes*, the plaintiffs offered statistical analyses, aggregated across workgroups, locations, and thousands of different managers in support of class certification. Plaintiffs claimed that this aggregated analysis showed statistically significant pay differences between men and women that, according to plaintiffs, "can be explained only by gender discrimination." *Dukes, 564 U.S. at 356* (citation omitted). But in rejecting plaintiffs' models, the Supreme Court found that such aggregated statistical evidence was "insufficient to establish that respondents' theory can be proved on a classwide basis." *Id.* This is because "[i]nformation about disparities at the regional and national level does not establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is

---

[3] Exhibit A Transcript of the Deposition of David Neumark, Ph.D. (Aug. 31, 2021).

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

implemented." *Id.* at 356-57 (citation omitted).

Similarly, Dr. Neumark's aggregated compensation models say nothing about whether any woman or group of women were paid less than men performing comparable work. It likewise is possible that Dr. Neumark's finding of a disparity "may be attributable to only a small set of [Nike managers], and cannot by itself establish the uniform, [manager-by-manager] disparity upon which the [P]laintiffs' theory of commonality depends." *Id.* at 357; *see also* Neumark Tr. 297:1-11 (admitting that it "could be true that there are couple of or a handful of large job subfamily and level groupings that are driving that negative . . . result[s]"). Dr. Neumark's aggregated analysis does not answer the question of whether women are paid less than men within the same Subfamily-Level. Thus it is not relevant and should be excluded.

### B.    Aggregated Data Presumes Commonality; It Does Not Prove It.

While Plaintiffs suggest that Dr. Neumark's analyses provide evidence of commonality sufficient to certify a class, an aggregated analysis does not prove commonality—it **assumes** commonality—by its very design.[4] An aggregated analysis is designed to return one outcome for the entire analysis group. Here, Dr. Neumark agrees that his analysis was designed to return a single alleged pay shortfall for all 5,200+ putative class members in all jobs, regardless of whether variability exists within the group. Neumark Tr. 296:11-15 (admitting that the results of his analysis are "constrained to be the same"). Thus, it is not a surprise that Dr. Neumark's

---

[4] *See* Concurrently filed Declaration of Ali Saad, Ph.D., Exhibit A (Expert Report of Ali Saad, Ph.D. In the Matter of *Cahill v. Nike, Inc.* (Oct. 1, 2021)) ("Saad R."), ¶ 73 ("From a statistical perspective, the problem with using an aggregated analysis from the start, like Dr. Neumark did, is that rather than answer the relevant question of whether it makes sense to treat women as a unitary group, an aggregated analysis forces the outcome to be "common" because it returns just one result. In other words, using a single female variable averaged across jobs would seem to assume statistical "commonality," or assume a "pattern" rather than examine whether one is present.").

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

analysis, designed to return one common result, in fact, returned one common result. This is not evidence of commonality. In fact, it is well established among statistical experts that "aggregation can distort patterns of data," which is particularly problematic at class certification, where the precise question to be answered is whether a pattern exists, and whether the putative class shares a common harm.[5]

A simple hypothetical demonstrates the error in relying on aggregated statistics. Assume two job codes: Senior Designer and Junior Designer, populated and paid as follows:

- Senior Designer – 10 men each paid $200,000 per year, and 10 women each paid $200,000 per year.

- Junior Designer – 10 men each paid $150,000 per year, and 10 women each paid $145,000 per year.

Assume for simplicity that all Senior Designers and all Junior Designers are similarly productive, regardless of gender. Not one of the women in the Senior Designer role has a pay discrimination claim; men and women are paid identically. But an aggregated model, where Senior and Junior Designers are combined into a single model with a control for job—like Dr. Neumark's model— suggests that **all** female Designers are paid, on average, $2,500 less than **all** male Designers ($172,500 average pay for women vs. $175,000 average pay for men). Moreover, this average shortfall actually is not accurate for **any** of the women analyzed; it overestimates the pay difference for Senior Designers, and underestimates the difference for Junior Designers.[6]

---

[5] Fed. Judicial Ctr., *Reference Manual on Scientific Evid.*, 235 (3d ed. 2011), *available at* https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf (last accessed March 4, 2022). Courts frequently rely on the Reference Manual in cases requiring evaluation of statistical evidence. *See, e.g., Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39-40 n.6 (2011).

[6] The *Moussouris v. Microsoft Corp.* court illustrated this effect: "if Microsoft had 25 managers, 5 of whom discriminated in making pay and promotion decisions, aggregate data would show

"[A]ggregating statistical results over [all decision-making units] in order to prove that a pattern or practice of discrimination exists at each [unit] 'puts the cart before the horse'" – for "[i]f plaintiffs' statistical evidence does not show statistically significant sex-based differences at four of the eight [units], for example, this is information that must be considered by the court when it determines both whether a system-wide class is appropriate and whether system-wide aggregation is appropriate." *Penk v. Or. State Bd. Of Higher Educ.*, 1985 WL 25631, at *35 (D. Or. Feb. 13, 1985), *aff'd*, 816 F.2d 458 (9th Cir. 1987). Dr. Neumark does not conduct such unit-by-unit analysis that would allow him—or the Court—to determine whether aggregation is appropriate. Dr. Saad, in contrast, finds a wide variety of outcomes across the hundreds of analysis groups. *See* Saad R. ¶¶ 95-104. These disparate results are not the kind that can, or should, be aggregated.

Plaintiffs may argue that disaggregating the analysis is not possible and reduces the accuracy of the calculations,[7] because some of the job groupings are too small to analyze through Dr. Neumark's preferred regression model. This is not the proper response. If a group is too small to analyze using his preferred model, the appropriate response is to find a better or a different model or approach, or to admit that the "preferred" analysis is not possible. Dr. Neumark, by contrast, forces all of the data into one aggregated model that does not answer the legal question presented. As courts in the Ninth Circuit have noted, "elevating the level of

---

that female employees fared worse than male employees. But 'that result would not imply that all 25 [managers] behaved similarly, so it would not demonstrate commonality.'" 2018 WL 3328418, at *24 n.20 (W.D. Wash. June 25, 2018), *aff'd*, 799 F. App'x 459 (9th Cir. 2019) (quoting *Bolden*, 688 F.3d at 896); *see also* Saad R. ¶¶ 58-62.

[7] Unlike Dr. Neumark, Dr. Saad did perform analyses that can answer the question of whether women in any particular job earn more than men in that same job because he estimates separate regressions by Job Subfamily-Level (and also by job code). *See* Saad R. ¶ 14. Like Dr. Neumark, Dr. Saad's analysis consisted of regression analyses, but for groups that were too small to estimate a regression, he utilized other accepted or qualitative techniques.

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

analysis," because the appropriate groupings are "too small to generate significant results," "runs afoul of the Supreme Court's objection" because higher-level aggregated analyses may or may not actually reflect consistent results across the lower levels. *Dukes v. Wal-Mart Stores, Inc.*, 964 F. Supp. 2d 1115, 1120 (N.D. Cal. 2013) ("*Dukes II*"). Additionally, Dr. Neumark never attempted to determine whether it was possible to run a regression analysis on any of the Job Subfamily-Level groupings before choosing to perform an aggregated analysis across the entire putative class. Neumark Tr. 55:2-8 ("Q: Did you do any analysis to determine whether any of the job subfamily level groupings were large enough or had sufficient magnitude or precision to run an analysis on their own? A: No. . . .").[8]

This is not a question about whether aggregated analyses can ever be a useful tool, or whether aggregation is generally a valid statistical method, but rather whether Dr. Neumark's analyses (and resulting opinions) are *relevant* in this case, where they do not answer a question before the Court. As the Supreme Court has explained, "'[f]it' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other unrelated purposes." *Daubert*, 509 U.S. at 591. To prevail on their pay discrimination claims, Plaintiffs must show women are paid less than men for performing comparable or substantially equal work. Dr. Neumark's analyses and opinions do not answer this question, and thus are irrelevant.

---

[8] Dr. Neumark performed a post-report disaggregated analysis of certain Job Subfamily-Level groups. *See* Neumark Reb. ¶¶ 104-105. His efforts to provide a justification *after* producing his opinions in his opening report are counter to the scientific method. *See Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. . . . [S]cientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method."). Further, such a post-report justification should be struck as a violation of Fed. R. Civ. P. 26(a)(2), which requires Dr. Neumark to include the basis for his opinions in his opening report.

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

**C.**    **Dr. Neumark's Opinions And Analyses Are Irrelevant To Plaintiffs' Disparate Treatment Claims Because He Fails To Conduct An Analysis By Decision-Maker.**

Dr. Neumark's analyses also do not consider, let alone evaluate, whether any of his outcomes vary depending on the particular manager to whom an employee reports. He thus fails to consider the impact that many different decision-makers have on the relevant inquiries.[9]

The overwhelming evidence shows that the starting pay, merit increase, bonus, and promotion decisions challenged by Plaintiffs are made by myriad individual managers, and, at most, approved by the Manager +1. *See* Nike's Opp.,[10] pp. 7-19. In contrast, Dr. Neumark's aggregated analyses implicitly assume one person makes all of the decisions (essentially, whomever is the top person at Nike) which is false, unrealistic, and for which there is zero evidence. Post-*Dukes*, statistical studies in support of a disparate treatment claim, like Plaintiffs' Title VII claim, must "conform[] to the level of decision for the challenged practices." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 523 (N.D. Cal. 2012) ("*Ellis II*"). Specifically, when decisions are made at the discretion of each individual supervisor, courts have found aggregated statistical evidence inadequate, particularly where the decisions at issue are "derived from hundreds of employment decisions made by myriad decision makers, at different times, under mutable procedures and guidelines, in different departments, and in different office locations, concerning employees at varying levels of experience, responsibilities, and education." *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*, 34 F. Supp. 3d 896, 909 (N.D. Ill. 2014). Dr. Neumark's failure to account for such important factors makes his statistical analysis and resulting opinions "so incomplete as to be inadmissible as irrelevant." *Bazemore v. Friday,*

---

[9] *See* Neumark Tr. 293:18-295:18 (Dr. Neumark admits that he did not consider the decision-maker in his analyses regarding leveling at hire, starting pay, merit increases, incumbent pay, and bonuses.).

[10] Concurrently filed Nike's Opposition to Plaintiffs' Motion for Class Certification.

478 U.S. 385, 400 n.10 (1986); *see also U.S. v. Artero*, 121 F.3d 1256, 1262 (9th Cir. 1997) ("A statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible.") (citation omitted).

      **D.**      **Dr. Neumark's Analyses Include Decisions Made Outside Of The Applicable Claim Periods.**

Dr. Neumark's opinions also are irrelevant because his analyses incorporate decisions made outside of the relevant claim periods, which leads to misleading and irrelevant results. Specifically, Dr. Neumark's analyses jumble data from outside of the claim period with data from within the claim period, which he essentially averages together to arrive at a single, time-averaged shortfall per challenged policy. Because Dr. Neumark mixes data from the relevant and irrelevant time periods in this way, it is impossible to determine from his analyses whether any of the alleged shortfall or disfavor occurred outside of the claim period, for which Nike cannot be held liable.

Plaintiffs claim that the putative class periods for their claims run from **August 9, 2017** to the present for their Oregon state law claims, and from **October 11, 2017** to present for their Title VII claims. Plaintiffs' Mot., p. 1 (emphasis added). However, hidden in a footnote, Plaintiffs misleadingly define the "Class Period" as **August 7, 2016** to present, which clearly does not align with either of the applicable statutory periods. Plaintiffs' Mot., p. 8 n.9 (emphasis added). Dr. Neumark's report also misleadingly attempts to incorporate data beyond the applicable claim periods. Specifically:

- **Starting Pay:** Dr. Neumark purports to find a shortfall in starting pay for women, but his analysis includes starting pay data beginning **January 1, 2012,** which

reflects decisions *five years* beyond the putative class period. Neumark R. at p. 60 (Table 7) (emphasis added).

- **Starting Job Level:** Dr. Neumark purports to find that women are hired into lower level jobs than men, but again, his analysis includes women hired as far back as **January 1, 2012**, *five years* beyond the statutory period. *See id.* ¶ 107; p. 65 (Table 12) (emphasis added).

- **Promotions:** Dr. Neumark purports to find a shortfall in non-competitive promotions for women, but his analysis includes promotions starting in **2013**, *four years* beyond the putative class period. *See id.* at p. 63-64 (Table 10, Table 11) (emphasis added).

- **Merit Pay:** Dr. Neumark purports to find a shortfall in merit pay, but again, uses merit pay data starting in **2013**, *four years* beyond the statutory period. *See id.* at p. 62 (Table 9) (emphasis added).

While aggregated analyses are not relevant for the reasons outlined above, aggregating irrelevant data before the claim period with relevant data from within the claim period further erodes their relevance.[11] Moreover, the analyses are confusing and misleading because it is impossible to tell whether women were disfavored during the claim period, which is the only relevant inquiry. For example, suppose that all else constant, Nike promoted women twice as frequently as men from 2013 to 2016, but then from 2017 to 2019, the ratios swapped, and men were promoted twice as frequently as women. Aggregating the results over the entire six-year period would show no issue—neutral statistical results—even though during the relevant

---

[11] Dr. Neumark repeatedly admits that he did not perform his analyses limiting the data to the years relevant to the applicable statutes of limitation, and also did not separately analyze each year of data. *See, e.g.,* Neumark Tr. 247:8-248:7; 259:8-260:12; 277:19-278:20.

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

statutory period, from 2017 to 2019, women actually were disfavored. Of course, the reverse may be true as well, where unfavorable (but irrelevant) pre-claim period results corrupt neutral outcomes during the relevant claim period. This kind of cross-year aggregated statistical analysis "fail[s] to account for the possibility that discrimination [if it occurred] was an isolated problem skewing" the aggregated results in either direction. *Dukes II*, 964 F. Supp. 2d at 1120. This is yet another reason why Dr. Neumark's aggregated results are irrelevant to the issues before the Court.

## II.    Dr. Neumark's Opinions Are Not Reliable And Therefore Are Inadmissible.

Reliability "focuses on the scientific validity of the principles and methodology used by the expert." *Arjangrad v. JPMorgan Chase Bank, N.A.*, 2012 WL 1890372, at *4 (D. Or. May 23, 2012) (citing *Daubert*, 509 U.S. at 592-95; *Daubert II*, 43 F.3d at 1317-18). The purpose of this review to is to "ensure that expert testimony, whether it is based on 'professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1035-36 (9th Cir. 2010) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).[12] "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on

---

[12] Rule 702 sets forth the basic test for reliability: (1) "the testimony [must be] based on sufficient facts or data;" (2) "the testimony [must be] the product of reliable principles and methods;" and (3) "the expert [must have] reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In addition, the Supreme Court has created a non-exhaustive list of factors for determining the reliability of expert testimony, including: "(1) whether [the scientific] theory or technique . . . can be (and has been) tested;" (2) "whether the theory or technique has been subjected to peer review and publication;" (3) whether there is a "known or potential rate of error;" and (4) whether the theory or technique is generally accepted in the "relevant scientific community." *Daubert*, 509 U.S. at 593-94 (citation omitted). Notably, "[t]hese factors apply to testimony based on technical and specialized knowledge, not just scientific knowledge." *Arjangrad*, 2012 WL 1890372, at *4 (citing *Kumho Tire Co.*, 526 U.S. at 141).

which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Ultimately, "[t]he party presenting the expert must demonstrate that the expert's findings are based on sound principles and that they are capable of independent validation." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1154 (E.D. Wash. 2009) (citing *Daubert II*, 43 F.3d at 1316). Dr. Neumark's opinions are unreliable because they are not "based on sound science," which "require[s] some objective, independent validation of the expert's methodology." *Daubert II*, 43 F.3d at 1316. They should be excluded.

## A.    <u>Dr. Neumark's Opinions Regarding Starting Pay Are Unreliable.</u>

A plaintiff asserting a disparate impact claim must identify a "specific employment practice" that allegedly causes a disparate impact to members of a protected group. *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990). Plaintiffs contend that Nike's alleged use of prior pay disadvantaged women, leading to lower starting pay. *See* Plaintiffs' Mot., p. 40. Despite evidence that Nike hiring managers did not, in fact, consistently use prior pay to set starting pay, Plaintiffs argue that Dr. Neumark's analysis "proves" Nike's use of prior pay to set starting pay, and that this allegedly "common" practice disadvantaged women. *See* Plaintiffs' Mot., p. 20. His analysis, and thus his opinions, are unreliable for several reasons.

### 1.    <u>Dr. Neumark's Starting Pay Opinion Is Based On Insufficient Facts And Data Because Prior Pay Data Is Not Available.</u>

Nike does not collect or retain data on employees' prior pay; accordingly, neither Dr. Neumark nor Dr. Saad have access to this data point. It thus was impossible for Dr. Neumark to analyze the relationship between prior and starting pay because he does not have prior pay data. *See* Neumark Tr. 292:22-293:4 (confirming he did not receive "applicant's prior pay

information" and has no way to analyze "whether women reported lower pay when they applied to Nike"). Therefore, although Dr. Neumark opines on Nike's purported reliance on prior pay and its impact on the pay of female employees, he did not analyze the relevant data necessary to support such a finding.

Instead, Dr. Neumark claims to measure the impact of prior pay by analyzing starting pay data before and after September 2017, the date Plaintiffs agree Nike ceased any inquiry into prior pay information. Neumark R. ¶ 59. Dr. Neumark opines that the data shows the difference in starting pay between men and women before September 2017 is statistically significant and negative for women, while the results after September 2017 are not significant. *Id.* at ¶¶ 59, 64. He concludes this is consistent with his hypothesis that Nike used prior pay to set starting pay prior to September 2017 (but not after), and that doing so harmed women. *Id*. But this opinion, in the absence of any actual data on prior pay, is purely circumstantial, and, thus, unreliable as the basis for conclusions about the role of prior pay at Nike. *See Chesapeake Climate Action Network v. Exp.-Imp. Bank of the U.S.*, 78 F. Supp. 3d 208, 219-20 (D.D.C. 2015) (report unreliable where expert "reached his conclusion regarding [defendant's] financial dependence on [particular source] without ever actually reviewing [defendant's] financials").

Dr. Saad's response demonstrates the unreliable nature of this analysis. Dr. Saad repeated the same analysis as Dr. Neumark, but split the data at September 2016—a date before the claim period (and unrelated to any alleged practice change at Nike). Dr. Saad found that the difference in starting pay between men and women before September 2016 is statistically significant and negative for women, while the results after September 2016 are not significant. Saad R. ¶135. In other words, Dr. Neumark's conclusions based on his September 2017 cutoff would have been the same had he examined starting pay using a September 2016 cutoff (and probably before and

after many other randomly selected dates). Thus, Dr. Neumark's interpretation of his results indirectly linking starting pay differences to the collection of prior pay information is not supported by the data—there was no statistically significant gap in starting pay for women for a period of time starting at September 2016, a full year before any changes to Oregon laws or presumed Nike policies. Saad R. ¶136.

### 2.    Dr. Neumark's Starting Pay Opinions Are Based On An Unsound Analysis Of Prior Work Experience.

Starting pay at Nike (like most companies) is driven largely by the applicant's prior experience. A newly-hired law clerk with 20 years of prior experience in the role is likely to be paid more than a recent law school graduate without experience. The relevance of the prior experience also is critical. The former law clerk is likely to be paid more than a peer with 20 years of experience producing country music records. If the job involved working for a country music label, the opposite may be true. Thus, for a compensation analysis to accurately reflect the realities of the labor market, it must accurately account for prior *relevant* experience.

Dr. Neumark claims to have accounted for relevant prior experience by categorizing the prior experience of 6,823 different Nike applicants into twenty "clusters," which he contends represent common types and levels of prior experience. *See* Neumark R. ¶ 62. In other words, Dr. Neumark contends that the job titles in each cluster are so similar to one another that, all else constant, employees with the same years of experience in each of the clusters should be paid the same at hire. But this methodology defies common sense and is scientifically unsound. As a preliminary matter, "clustering" analysis uses a text-based computer program to group job titles that the program thinks are similar. The job titles in the resulting clusters should thus reflect similar prior experiences. However, upon inspection, they do not. Dr. Neumark implements the clustering analysis to control for prior experience in his starting salary analysis by placing the

Page 18        DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

more than 15,000 different job prior titles into 20 "clusters." This method of analysis should be rejected by the Court for a number of reasons.

First, as Dr. Neumark admits, *there are no academic studies* that apply this kind of text-based analysis techniques to the limited text of simple job titles. *See* Neumark Tr. 97:20-99:22 ("I don't know of somebody who has done specifically what I have done, just similar approaches, not the same concept."); 116:2-9 ("I already said I'm not aware of a paper that has done something on job titles alone in this context . . . .").[13] While such text-based matching programs have been applied to similar work using complete job descriptions, which contain much longer bodies of text that provide more information for the program to identify the key common components, there is no support for the use of this technology on simple job titles that are, *at most*, two or three words long. *See* Saad R. ¶ 161[14]; *Daubert*, 509 U.S. at 594

---

[13] In his Rebuttal, Dr. Neumark cites to (post-report) research that he claims supports the use of job titles in his "clustering" methodology. Neumark Reb. ¶¶ 82-83. But none of the research publications he cites use job titles in the same manner that he does. For example, he cites to a 2020 study in the *Journal of Labor Economics*, which analyzed job titles, but did not apply clustering. *See* Marinescu, Ioan, and Ronald Wolthoff, 2020, "Opening the Black Box of the Matching Function: The Power of Words," *Journal of Labor Economics*, Vol. 38. As Dr. Neumark acknowledges, the issue is "an even narrower one – over exactly how to use job titles." Neumark Reb. ¶ 83. Moreover, Dr. Neumark's post-report purported support for his "clustering" methodology should be stricken as a violation of the requirement that an expert's opening report contain "a complete statement of all opinions the witness will express and the basis and reasons for them," along with expert's "qualifications." *See* Fed. R. Civ. P. 26(a)(2)(B)(i), (iv); *see also Yeti by Molly Ltd v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (exclusion sanction for violating Rule 26's disclosure requirements is "self-executing" and "automatic").

[14] *See* Saad ¶ 23 ("In my work in this area I have never seen clustering techniques applied to simple labels of anything – the techniques are essentially 'content analysis' methods, which take longer sections of descriptive text and subject them to specialized 'big-data' analytical methods designed to reduce the complexity and dimensionality of such descriptive material to cognizable and useable metrics or measures. In other words, these methods when applied correctly take multiple bodies of highly heterogeneous text fields and find natural groupings within these text fields that are more homogeneous, such that analysis can utilize the more homogeneous sub-groupings and create variables for further analysis. . . . However, if one does not start with

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

("Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism.") (internal citation and quotation marks omitted). As a result, Dr. Neumark's clustering methodology is unreliable, and should be excluded. *See Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009) ("[W]hen experts employ established methods in their usual manner, a district court need not take issue under *Daubert*; however, where established methods are employed in new ways, a district court may require further indications of reliability.").

Second, Dr. Neumark's scientifically unsound clustering methodology produces results that are absurd on their face. As Dr. Neumark acknowledges, his methodology grouped the following job titles as "similar work": Library Page; Deckhand; Spanish-English GED Tutor; Nanny; CEO; Handyman; Armory Chief; Journeymen; Bank Teller; Sign Painter; Penetration Tester; Tennis Captain; Model; Master Black Belt; and Caregiver. *See* Neumark Tr. 107:12-110:13; 113:9-114:25; 117:4-118:10 (that his "clusters" include widely differing types of jobs). This means that all of the statistical models that use his prior experience variable assume that, all else constant, an applicant with 10 years of experience as a Nanny should be paid and leveled the same as an applicant with 10 years of experience as a CEO. This is just one example of Dr. Neumark's absurd results. There are many.[15]

---

descriptive bodies of text, there is little hope the procedure will produce anything of value."); ¶¶ 157-159 ("Other research has concluded that job titles alone do not provide sufficient information to distinguish differences in job content.").

[15] *See* Saad R. ¶¶ 170, 171 (examines cluster with a large number of "Specialist" titles, noting that "'Specialist' is simply a hierarchical type of label, but it does nothing to account for the nature of the skills and experiences the person had. Yet, it seems the clustering methods, with virtually nothing to work with, seized upon this word because it was found in many places. Thus, according to Dr. Neumark's method, the value of three years of work as a Digital Specialist is

Third, since the clustering technique relies on two to three word job titles, data issues like abbreviations and misspellings often result in the *same* job titles being assigned to *different* clusters. *See* Neumark Tr. 120:12-23 ("account management rep" and "account management representative" assigned to different clusters); 123:21-126:3 ("VP" and "Vice President" in different clusters; "SR SWE," "Senior Software Engineer" and "SNR Software Engineer" in different clusters).[16] Moreover, the clustering analysis is seemingly unable to differentiate among various levels of work that may be within the same job family, for example, clustering Junior, Intermediate, and Senior Software Engineers together, though the job titles quite obviously denote work of varying levels and complexities. *Id.* 128:23-131:9, 134:18-135:24. The analysis also does not consider the company where an applicant's prior experience occurred, for example, treating experience with a direct competitor and a small startup company, or employment in a completely different industry, as equivalent.

Dr. Neumark's attempts to explain this methodology only reinforce its unreliability:

Q:      . . . I would like to know why you believe it is accurate that lead trainer, fitness instructor should be grouped with vice president, supply chain strategy. How are you going to explain that to the court?

A:      . . . [I]t's inevitably going to lead to some things that don't match well. . . . But **there's no other way to do this**. And I should say, you know, it's important to say that, you know – this is – these 20 clusters or the, whatever it is, 240 separate experience terms I use in the other analysis – this is way beyond the level of detail that labor economists in their research use to study discrimination. . . . **One can't possibly incorporate all the detail. It's simply not possible**.

---

the equivalent of three years as a Warehouse Specialist for any and all jobs applied to at Nike. This is absurd and produces variables that are the very definition of measurement error.").

[16] *See* Saad R. ¶ 163 ("Dr. Neumark's attempt to clean and standardize job titles with respect to abbreviations does not appear to have worked very well. The consequence of this is that even if job titles were suitable raw material for use with clustering techniques, failing to standardize words correctly would make it even more difficult for appropriate clusters to be formed by the algorithms applied to the body of job titles.").

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

Neumark Tr. 110:14-112:17 (emphasis added).[17] *See also* Neumark Tr. 88:3-91:25 ("[T]here probably would be some that kind of don't fit at all, right, but since our assignment was to put them in some cluster, **we've got to put them in somewhere**, and they get put the place that's closest.") (emphasis added).

As highlighted above, Dr. Neumark admits that "it's simply not possible" to accurately account for employees' prior relevant experience with the "clusters" in his models. That is precisely the point, on which Nike agrees. It is not possible by simply knowing the applicants' prior job titles at a wide array of prior employers to accurately account for the myriad prior experiences that the thousands of putative class members and thousands of male comparators bring to Nike. Yet it is undisputed that prior relevant experience is a legitimate factor that can explain pay (and leveling[18]) differences. It can also explain differences in promotion rates. If Dr. Neumark cannot model prior experience accurately—which he admits above that he cannot do—that does not mean that the Court or jury should accept a less reliable model. That means that the case cannot be tried on a class basis.

### 3.    Dr. Neumark's Starting Pay Opinions Are Based On A Grossly Flawed Analysis Of Educational Background.

Dr. Neumark also attempts to account for the varied educational backgrounds of the approximately 7,000 applicants in a common analysis, using another unreliable methodology

---

[17] In response to Nike's identification of errors and incongruities in his data and analyses, Dr. Neumark conducted "further cleaning" of his "clustering" analysis and education analysis. *See* Neumark Reb. ¶ 70 ("I have also done additional cleaning along these lines, although this is not to say that one could not potentially find more cases in which further cleaning would lead to additional modifications."; ¶ 91 ("I have done additional cleaning, although one must understand that with over 14,000 job titles it is always possible that two apparently different job titles should be the same."). His post-report attempts to correct such errors, including his admission that such errors will continue, reinforce the unreliability of his prior job experience analysis.

[18] Dr. Neumark's unreliable clustering methodology is used as part of both his starting pay and leveling analysis. *See* Neumark R. ¶¶ 110, 124.

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

with unsurprisingly flawed results.[19] Like prior relevant experience, the level and quality of a new hire's educational background could be a legitimate factor impacting starting pay and level. For example, a candidate for a Software Engineering role may receive higher pay (and be hired into a higher level) if she has a Master's Degree in Computer Science from MIT, than someone with a Master's Degree in French Literature from a non-technical school.

Recognizing that education is a legitimate factor that can impact pay and leveling, Dr. Neumark attempted to create an education variable to account for these different labor market returns. To do so, he coded level of education (*e.g.*, college degree), as well as the rank of the school based on three "top 500" world university ranking lists. *See* Neumark R. ¶¶ 112, 120. But he did so without regard for Nike's business and its operations. Nike is in large part a clothing and footwear *design* company, yet *not a single design school* appears on Dr. Neumark's lists of "top schools." *See* Saad R. ¶¶ 26, 142-144; Neumark Tr. 158:10-160:25 (admitting his model treats design schools the same as unranked schools and that he did not consider that Nike is in the business of the design and production of athletic apparel). Because design schools are "unranked" in Dr. Neumark's analysis, individuals who attended top design schools, like Parsons or FIDM, are considered the same as individuals who attended any other unranked schools—yielding unreliable results.[20] *See id.* Moreover, Dr. Neumark *assumes* that such public rankings are relevant to Nike and the starting pay (and job level) of its employees, rather than considering the facts of the case, including the nature of the work performed or Nike's industry:

---

[19] Dr. Neumark's analysis of education background is used in his starting pay, incumbent pay, and starting level analysis. *See* Neumark Tr. 146:19-147:25.

[20] In his Rebuttal, Dr. Neumark attempts to dismiss the flaws in his methodology as inconsequential by performing an analysis of what he contends accounts for the design schools. *See* Neumark Reb. ¶¶ 71-74. Such post-hoc analysis is not only improper, and should be stricken as a violation of Fed. R. Civ. P.'s 26 disclosure requirements, *supra* n.8, but it demonstrates the ad hoc nature of his analysis of education background.

Q:    . . . And in any of your education analysis, did you take into account the schools or places of education that may be important to Nike or that Nike may preference in hiring or in placing employees in a job level or in pay?

. . . .

A:    So I have no direct information. I don't know if any has been provided at all about what those preferences might be. I mean, I would -- I would -- I would find it -- well, I don't know. I mean, I -- I think most employers like -- you know, all else the same, value better schools more than not-as-good schools. I don't know if they have other preferences than that. **So I thought the rank- -- I would assume the rankings to be relevant, but that's a guess.** But, again, in my estimation -- and I use this information to study starting pay, current pay, i.e., class period pay and -- and starting job levels. . . . .

Neumark Tr. 146:19-147:25 (emphasis added). Such assumptions are both improper as a basis for expert analysis and opinions and ignore the facts of the case. *See Kempner Mobile Elecs., Inc. v. Sw Bell Mobile Sys., 428 F.3d 706, 712-13 (7th Cir. 2005)* (expert evidence properly excluded where it was based upon inaccurate assumptions); *Lawrey v. Good Samaritan Hosp., 751 F.3d 947, 948-53 (8th Cir. 2014)* (expert testimony properly excluded when the expert's opinion relied on assumptions that did not match the facts of the case).

### 4.    Dr. Neumark's Prior Experience And Education Variables Further Highlight The Flaws Of An Aggregated Analysis.

Although Plaintiffs and Dr. Neumark contend that his aggregated models "control" for job, the use of prior experience and education variables demonstrates why merely "controlling" for job is not enough. Take the example above: one new hire has a Master's Degree in Computer Science from MIT, while another has a Master's Degree in French Literature from a non-technical state school. If both employees were hired at Nike into IT roles, one would expect that the new hire with the Computer Science degree would earn more, and potentially work at a higher level, than the new hire with a French Literature degree. But that may not hold true for all jobs. If the job was copy editor for a French language website, perhaps the inverse would be true. If the job was lifeguard, the two degrees may have equivalent value. The point being that the

    DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

value of certain types and levels of education—in addition to the school attended—will vary by job. The same is true of relevant education and prior experience. What is "relevant" is highly job specific. But Dr. Neumark's aggregated analysis does not account for these nuances; it assumes the returns on a Master's Degree from MIT are the same for every one of the 1,200+ Covered Positions. Common sense tells us that cannot be true.

### 5.    Dr. Neumark Fails To Account For Fundamental Variables And Uncritically Relies On The Opinions Of Other Experts.

It is well established that the identification of (and comparison to) the appropriate set of male counterparts is an integral part of any equal pay claim. *See, e.g., Gunther v. Washington Cnty., 623 F.2d 1303, 1321 (9th Cir. 1979)* (Similar to the Equal Pay Act claims, Title VII wage discrimination claims require a showing that "job requirements are substantially equal . . . to that of a similarly situated male."), *aff'd*, 452 U.S. 161 (1981). Dr. Neumark's starting pay analysis ignores this essential element of any equal pay analysis because he did not attempt to evaluate which jobs perform comparable or substantially equal work. This is a fatal flaw. *See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 263 (4th Cir. 2005)* (excluding analysis that failed to control for "the actual job title or the job duties"); *Tagatz v. Marquette Univ., 861 F.2d 1040, 1045 (7th Cir. 1988)* (expert's "failure to control for difference in rank" made his analysis "essentially worthless").

Instead, Dr. Neumark relies uncritically on Dr. Lundquist's opinion that Job Subfamily-Level appropriately groups employees performing comparable or substantially equal work:

> Q:    Did you learn anything about the content of any of Nike's jobs that made you feel confident that grouping job subfamily and job level together was properly grouping employees who performed substantially similar work?
>
> A:    So I did not do any what is called "job analysis," which is not something people in my field do, so. I hope I'm defining it correctly as what industrial organization psychologists do. I did not observe work. I did not talk to workers or anything of that sort. **I relied on**

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

> **Dr. Lundquist's opinion on this**, and that is her area of expertise,
> to my understanding, and I would say I relied secondarily on things
> Nike said . . .

Neumark Tr: 38:7-38:25 (emphasis added); *see id.* 41:11-42:3 ("I didn't read her report. I didn't

assess her report."); 213:15-214:3 ("[C]olumn 4 [of Table 2] is probably more appropriate for

equal pay claim, and that's based . . . reason number one would be Dr. Lundquist's opinion that –

that subfamily times level interactions have the appropriate level of analysis – unit of analysis for

an equal pay claim. . . .").

In doing so, Dr. Neumark ignores the fact that Dr. Lundquist never studied the work

performed at Nike, performed no job analysis, and interviewed no employees (whether subject

matter experts, managers, or class members). *See generally* Nike's Motion to Exclude the

Opinions of Plaintiffs' Expert Dr. Lundquist. As set forth in Nike's concurrently filed Motion to

Exclude the Opinions of Plaintiffs' Expert Dr. Lundquist, the opinions contained in

Dr. Lundquist's report are irrelevant and unreliable. Therefore, Dr. Neumark's findings that are

based on Dr. Lundquist's unreliable opinions likewise are flawed and should be excluded. *See In

re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556-57 (C.D. Cal. 2014) (excluding expert opinion at

class certification in part for relying on opinions of other experts without performing an

independent analysis or evaluation); *see also Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D.

625, 630 (W.D. Wash. 2011) ("The [R]ules [of Evidence] do not permit an expert to rely upon

opinions developed by another expert for purposes of litigation without independent verification

of the underlying expert's work."). Similarly, Dr. Neumark did not consider whether there was

any variability in job duties within a Job Subfamily-Level group, which one would expect where

multiple different Job Codes are grouped. *See* Saad R. ¶ 80 (identifying examples and

distinctions regarding multiple job codes in a single job subfamily/level interactions and varied

pay). *See* Nike's Opp., pp. 4-7.

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

Dr. Neumark's failure to account for fundamental variables that bear on type and scope of work (including through his blind reliance on Dr. Lundquist's opinions) undercuts the heart of his analysis. As a result, the alleged disparities he identifies do not reliably indicate whether Nike has any common practices that harm women, or whether any differences are caused by legitimate variables for which he does not, or cannot, control. *See, e.g., Forte v. Liquidnet Holdings, Inc., 675 F. App'x 21, 23-24 (2d Cir. 2017) (unpublished)* (expert report unreliable where it failed to control for a variable "which might have independently affected compensation"). They should be excluded.

**B.    Dr. Neumark's Opinions Regarding Initial Leveling Are Unreliable.**

Dr. Neumark opines that "Women are hired at lower Job Levels than are men who come to Nike with similar human capital." Neumark R. ¶ 8b. His analysis, and thus his opinions, are unreliable for several reasons.

**1.    Dr. Neumark's Leveling Analysis Is Based On The Same Flawed Prior Experience And Education Variables.**

In performing his leveling analysis, Dr. Neumark uses the same flawed prior experience and education variables that, as explained above, are scientifically unsound and unsupported, and lead to unreliable results. For these reasons, as set forth in detail above in Sections II(A)(2)-(4), Dr. Neumark's leveling analysis should be similarly excluded.

**2.    Dr. Neumark's Leveling Analysis Is Based On Unsubstantiated Assumptions And Ignores Critical Variables.**

In opining that Nike placed women into lower level jobs than men with comparable education, skills, and experience, Dr. Neumark chose to ignore the level of the job to which each applicant applies. *See* Neumark Tr. 280:18-281:3; Saad R. ¶ 29.

Given that Plaintiffs' under-leveling claim is based on how employees were assigned to their starting job level—*i.e.,* that Nike placed women into lower level jobs—understanding how

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

and why women ended up at their starting job is critical. *See* Richard M. Clark, Administrative Law Judge, U.S. Dep't of Labor, "Recommended Decision and Order," *In the Matter of Off. of Fed. Cont. Compliance Programs, U.S. Dep't of Labor v. Oracle America, Inc*., Case No. 2017-OFC-00006, 2020 WL 6112340, slip op. at 264, Sept. 22, 2020 ("In a steering discrimination claim, steering should be the object of study and some attention should be paid to how employees end up in jobs. In the employment process being studied, **the major factor influencing outcomes is the job an individual applied for**, so an inferentially powerful analysis should take some account of that.") (emphasis added).[21] Notably, when Dr. Saad added a control for "the job level applied to," he found that there was no statistically significant difference in the proportion of men and women hired into the job level they applied for. *See* Saad R. ¶¶ 214-224.

Dr. Neumark's decision to omit such a critical variable is based on nothing more than unsupported speculation. He admits that, although he was aware that "at Nike, when jobs are posted and people apply, there is a level associated with the job at the time of posting," and that he could have included information regarding the job to which an applicant applied in his analysis, he decided not to do so, based on his personal assumption that this variable is tainted by discrimination. *See* Neumark Tr. 278:21-283:18. Dr. Neumark's assumptions were not based on

---

[21] *See id.,* slip op. at p. 251 ("Disparities and discrimination in education or societal pressures might produce a situation whereby the 'input' to Oracle already contains troubling imbalances. It may be that there are more people of certain races or genders that have been equipped to do certain types of work than others, resulting in skewing of compensation due to the skills that individuals bring to Oracle and the sorts of work they have been trained to perform. This may well be improper and unacceptable from a policy standpoint, and could point to discrimination that should be redressed. But it would not be Oracle's discrimination or something to be remedied in a legal claim for discrimination made against Oracle. Oracle cannot be held liable here for disparities that it cannot control and does not cause or exacerbate. It can only held liable for *its* discrimination.").

his review or analysis of any particular facts or data related to Nike, but rather merely consist of

unsupported conjecture.[22] *See Henricksen*, 605 F. Supp. 2d at 1169-50 ("[E]xpert opinions 'must

be based on facts which enable the expert to express a reasonably accurate conclusion as

opposed to conjecture or speculation.'") (citation and alternation omitted); *Kempner*, 428 F.3d at

712-13 (expert evidence based upon inaccurate assumptions properly excluded); *Lawrey*, 751

F.3d at 948-53 (expert testimony properly excluded when opinion relied on assumptions that did

not match the facts of the case).

As such, these omissions, based on unsubstantiated assumptions, render Dr. Neumark's

leveling opinions unreliable as speculative *ipse dixit*, which the Court may properly exclude. *See*

Fed. R. Evid. 702, Advisory Committee Notes (2000) (court must find that expert testimony is

"properly grounded, well-reasoned and not speculative before it can be admitted"); *see also*

*Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (affirming the exclusion of

the *ipse dixit* testimony of plaintiff's expert that was not based upon objective, verifiable

evidence); *Sudre v. The Port of Seattle*, 2016 WL 7035062, at *22-23 (W.D. Wash. Dec. 2,

2016) ("If admissibility could be established merely by the *ipse dixit* [*i.e.*, the 'say so'] of an

admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed

by the qualification prong.") (citation omitted, alterations in original); *Daubert*, 509 U.S. at 590

(noting that expert testimony based on mere "subjective belief or unsupported speculation" is

---

[22] Notably, not a single Plaintiff testified that they were "assigned" to a lower-level job at hire by a recruiter or anyone else at Nike; to the contrary, all confirmed that they were hired for the specific role to which they applied. *See* Exhibit B, **Cahill** Tr. 105:13-108:2 (encouraged to apply to a *higher* level position than the one to which she originally planned to apply); Exhibit C, **Azavedo** Tr. 111:7-11 (applied to and was hired for same role); Exhibit D, **Elizabeth** Tr. 138:9-139:8 (applied to job opening and was hired for that role). It is also worth noting that applicants apply to job postings that do not show the job level; the applicant does not actually know the level of the job(s) to which they apply. *See* Saad R., ¶ 214.

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
          PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

inadmissible); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014)

("speculative testimony is inherently unreliable"). Dr. Neumark's leveling opinions and analysis

should be stricken as unreliable.

### C.      Dr. Neumark's Opinions Regarding Promotions Are Unreliable.

Dr. Neumark opines that "[o]nce hired, women are promoted more slowly than men; this

is driven by non-competitive promotions." Neumark R. ¶ 8c. Dr. Neumark's promotions

opinions are not supported by his own analyses, and are unreliable for several reasons.

#### 1.      Dr. Neumark Did Not Find Any Statistically Significant Disparity Against Women In Overall Promotions.

Plaintiffs contend that Dr. Neumark finds statistically significant shortfalls for women

compared to men "doing comparable work." Plaintiffs' Mot., p. 7. But Dr. Neumark actually did

*not* find a statistically significant difference in overall promotion rates between men and women,

as he admits. *See* Neumark R. ¶ 96; Neumark Tr. 262:5-263:21 ("Q: So there's no statistically

significant results for or against women with respect to the all-promotions group, correct? A: . . .

[B]y most people's standards of statistically significant, that's five or ten, correct."); 272:20-

275:7.

Instead, faced with results that do not support Plaintiffs' theory, Dr. Neumark changes his

analysis, claiming that "competitive" and "non-competitive" promotions must be analyzed

separately (though he provides no explanation as to why this analysis should be disaggregated,

when the rest of his analyses are aggregated). In doing so, Dr. Neumark finds that women are

favored in competitive promotions, but disfavored in non-competitive promotions, for a net

neutral promotion rate overall. *See* Neumark R. ¶¶ 96, 97. Therefore, Dr. Neumark's own

analysis concludes that men and women are promoted at statistically equal rates at Nike.

2. <u>**Dr. Neumark's Promotion Analyses Employ Scientifically Unsound Methodology That Fails to Consider This Case's Facts.**</u>

Despite no finding of any statistically significant gender disparities in promotion, Plaintiffs and Dr. Neumark still maintain that women are disfavored in promotions at Nike. *See* Neumark Tr. 270:1-271:4. Dr. Neumark's competitive promotion analyses are inherently flawed:

- Only promotions to jobs for which he can identify applicants are considered competitive. Yet Dr. Neumark's data does not include all employees and therefore he cannot determine whether any employees actually applied for the role. *See* Neumark Tr. 264:13-25; 265:1-266:20. He therefore mis-identifies some competitive promotions as non-competitive.

- Dr. Neumark's analysis ignores Nike's job architecture. At Nike, higher-level roles divide into two tracks: Individual Contributor and Management. Each has a distinct career progression, as set forth in the following chart:

| Band | Job Levels | |
|------|-----------------------------|------------------------|
| | **Individual Contributor** | **Management** |
| E7+ | | Vice President |
| S | Professional Consultant (130) | Senior Director (140) |
| E | Expert Professional (110) | Director (120) |
| U | Lead Professional (90) | Manager (100) |
| | Senior Professional (80) | |
| L | Intermediate Professional (60) | Supervisor (70) |
| | Entry Professional (50) | |
| A | Lead Support(40) | |
| | Senior Support (30) | |
| V | Intermediate Support | |
| | Entry Support | |

Exhibit 29
Nike Bands and Job Levels

Saad R. p. 140, Ex. 29. As a result, for the most part, an individual in the Supervisor level (level 70) typically would promote into the Manager level (level 100) next. A Supervisor, already on the Management-track, generally would not promote into the Senior Professional

(level 80) and then Lead Professional (level 90) roles on the Individual Contributor-track, before moving back to the Management-track Manager level (level 100). In other words, although each level is assigned a number, it is not the case that promotions occur sequentially (*i.e.*, from level 60 to 70, 70 to 80, 80 to 90, 90 to 100, etc.).

Ignoring this fact, Dr. Neumark's analysis assumes promotions at Nike do occur sequentially. Thus, he concludes that when an employee is promoted from Supervisor (level 70) to Manager (level 100), that employee actually "skips" two levels, and then using this flawed analysis, says women are disfavored in "multi-level" promotions. *See* Neumark R. ¶ 99, n. 80, and ¶100. Dr. Neumark's failure to account for Nike's two distinct career progression tracks supports exclusion of his promotions analysis and opinions as unreliable. S*ee Powell v. Anheuser-Busch Inc.*, 2012 WL 12953439, at *7 (C.D. Cal. Sept. 24, 2012) (expert's opinion unreliable where expert "failed to sufficiently consider the relevant underlying facts necessary to support his opinions and conclusions"); *Arjangrad*, 2012 WL 1890372, at *6 (same).

- Dr. Neumark's promotions analyses use the same promotion "pool" for competitive and non-competitive promotions. In other words, his model assumes every employee is eligible for a competitive ***and*** a non-competitive promotion every year. Putting aside the issue that the pool for competitive promotions should be the employees who actually applied and were at least minimally qualified for the role (as set forth above), Dr. Neumark's analysis fails to account for the fact that it is very unlikely one would be promoted on a competitive **and** non-competitive basis in the same year.[23] As a result, those who received a

---

[23]  Dr. Neumark's Rebuttal identifies in the data occurrences when employees received both types of promotions in a single year. Neumark Reb. ¶ 53. He identifies a total of 73 observations,

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.

competitive promotion are coded as "not promoted" in the non-competitive

promotions analysis (even though they did in fact receive a promotion). *See*

Neumark Tr. 270:15-271:3. Because women are favored in the competitive

promotions analysis, those women who actually were promoted, but who are

coded as not promoted in the non-competitive analysis, improperly drag down the

non-competitive numbers.

When asked why he chose to construct his analysis in this manner, Dr. Neumark

explained that, to do otherwise, would be "a little trickier to do statistically. . . ." *See* Neumark

Tr. 270:1-272:12.[24] That is not a response. If it is too "tricky" to analyze a challenged process

accurately through a common model, then the analysis does not support class action treatment.

Dr. Neumark's incomplete promotions analysis and opinions are unreliable, and should be

excluded. *See Smith v. Pac. Bell Tel. Co., Inc.*, 649 F. Supp. 2d 1073, 1096 (E.D. Cal. 2009)

("Opinions that are derived from erroneous [or incomplete] data are appropriately excluded.").

## CONCLUSION

For all of the foregoing reasons, Nike respectfully requests that the Court strike Dr.

Neumark's opinions and decline to consider them in ruling on Plaintiffs' Motion.

---

compared to 7,469 that received only one type of promotion. *Id.* ¶ 53, n. 29. Such post-report reliance on outlier observations does not demonstrate the reliability of Dr. Neumark's selected methodology. Additionally, such post-report analysis is a violation of Fed. R. Civ. P. 26's disclosure requirements. *See supra* n. 8.

[24] *See also* Saad R. ¶ 31 ("Dr. Neumark models these types of promotions separately but in each of these subanalyses he includes *all* employees in his promotion 'pool.' This is completely incorrect from an analytical perspective, for an obvious reason. First, Dr. Neumark's analysis of competitive promotions assumes that every employee applies for a competitive promotion, but that is not the case. . . . Second, employees who receive a competitive promotions are coded as 'not promoted' in the non-competitive analysis, and vice versa. This is of course nonsensical on its face.") (emphasis in original).

Dated:  March 25, 2022                    Respectfully submitted,


/s/ Amy Joseph Pedersen
Amy Joseph Pedersen, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  (503) 294-9408
Facsimile:  (503) 220-2480

Daniel Prince, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
Felicia A. Davis, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
Laura E. Zabele, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC

DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF
PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D.