AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA E. ZABELE, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No.:  3:18-cv-01477-JR |
| Plaintiffs, | DEFENDANT NIKE, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |
| v. | |
| NIKE, INC., an Oregon Corporation, | FILED UNDER SEAL |
| Defendant. | ORAL ARGUMENT REQUESTED |

DEFENDANT NIKE, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION .................................................................................................. 1

FACTS ................................................................................................................... 3

   I.     The Named Plaintiffs And Their Proposed Class. ...................................... 3

   II.    Plaintiffs' Proposed Class Consists Of Employees Working In More Than 1,200 Different Job Codes, Reflecting Work Requiring Diverse Skills, Duties, Responsibilities, And Effort, Under A Variety Of Dissimilar Working Conditions. ..................................................................................... 4

       A.    Nike's Job Architecture. ................................................................. 5

       B.    Job Codes–Not Subfamily And Level–Are The Most Differentiated Type And Level Of Work In Nike's Job Architecture. ..................................................................................... 5

       C.    Even Within Job Code, The Content Of Nike Jobs Can Vary Significantly. ................................................................................... 6

   III.   Nike's Discretionary Pay, Performance, And Promotions Processes Reflect Its Varied Workforce And Trust In Local Direct Managers. ................... 7

       A.    Starting Pay. .................................................................................... 7

            1.    Thousands Of Individual Hiring Managers Set Starting Pay By Considering A Wide Range Of Factors. .................................. 8

            2.    Nike Has Not Allowed Recruiters Or Hiring Managers To Inquire Into Applicant's Prior Salary For The Past Four-And-A-Half Years. ....................................................................... 9

            3.    Nike Never Consistently Asked About Or Used Candidates' Prior Salary To Set Starting Pay. .............................. 9

            4.    "Talent Acquisition" Does Not Approve Starting Pay Decisions. ........................................................................... 11

       B.    Annual Base Pay Increases And Bonuses. ............................... 12

            1.    Nike's Discretionary Performance Ratings, Which Anchor Merit Increase And Bonus Decisions, Favor Women. ................ 13

            2.    Thousands Of Individual Managers Exercise Discretion In Making Merit Increase Decisions For Their Team Members. ................................................................................ 14

            3.    Nike's Annual Performance Sharing Plan ("PSP") Bonus Plans And Processes Have Changed Significantly During The Putative Class Periods, And Also Are Awarded Based on Manager Discretion. .......................................................... 16

       C.    Promotions. .................................................................................. 17

    1. Thousands Of Individual Managers Make Individual Promotion Decisions Following Their Decisions On Fill Strategy. .................................................................. 17

  D. Initial Job Level Assignment. ................................................. 19

    1. Managers Decide The Appropriate Level (And Job Code) To Fill Their Team's Needs Before Posting Requisitions — To Which Candidates Then Apply. ............................. 19

 IV. Nike's Deep Commitment To Equity, Inclusion, And Diversity ...................... 21

ARGUMENT ................................................................................................. 25

 I. Plaintiffs Fail To Meet Their Burden Of Proving Compliance With Rule 23(a). ...................................................................................... 26

  A. Plaintiffs Fail To Prove Rule 23(a)(2) Commonality For Any Of Their Claims. ........................................................................ 26

    1. Plaintiffs' Disparate Impact Claims Do Not Satisfy Commonality .................................................................... 27

      a. Plaintiffs' disparate impact claim is predicated on discretion; they have failed to identify a specific employment practice or policy ........................................... 29

      b. Plaintiffs have failed to prove a common mode of exercising discretion pervades Nike. ............................. 32

      c. Plaintiffs' expert opinions do not move the needle. ........ 35

        i. Dr. Lundquist's opinions are unreliable, legally irrelevant, and cannot support commonality. ..................................................... 35

        ii. Dr. Neumark's aggregate statistics are legally irrelevant, fatally flawed, and show why the class cannot be certified. ...................... 36

    2. Plaintiffs' Disparate Treatment Claims Do Not Satisfy Commonality .................................................................... 39

    3. Plaintiffs Fail To Prove Commonality For Their Oregon Equal Pay Act Claim .......................................................... 44

  B. Plaintiffs Fail To Establish Typicality Under Rule 23(a)(3). ................. 45

  C. Plaintiffs Fail To Prove Adequacy Under Rule 23(a)(4). ...................... 49

 II. Plaintiffs Cannot Satisfy The Requirements For A Rule 23(b)(2) Class. ............ 51

 III. Plaintiffs Cannot Satisfy The Requirements For A Rule 23(b)(2) Monetary Class. ....................................................................................... 54

  A. Plaintiffs Fail To Prove Predominance. ...................................... 54

  B. Plaintiffs Fail To Prove Superiority. .......................................... 58

CONCLUSION ............................................................................................. 59

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Aldapa v. Fowler Packing Co., Inc.*,
    323 F.R.D. 316 (E.D. Cal. 2018) ..........................................................................51

*Am. Express Co. v. Italian Colors Rest.*,
    570 U.S. 228 (2013) ...........................................................................................25

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ..............................................................................49, 54, 58

*Andrews v. Plains All Am. Pipeline, L.P.*,
    2017 WL 10543402 (C.D. Cal. Feb. 28, 2017) .....................................................53

*Bell v. Lockheed Martin Corp.*,
    2011 WL 6256978 (D.N.J. Dec. 14, 2011) .....................................................26, 34

*Bolden v. Walsh Constr. Co.*,
    688 F.3d 893 (7th Cir. 2012) .......................................................................31, 37, 38

*Buckland v. Maxim Healthcare Servs., Inc.*,
    2012 WL 3705263 (C.D. Cal. Aug. 27, 2012) .....................................................26

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ...............................................................................................1

*Campbell v. Nat'l R.R. Passenger Corp.*,
    311 F. Supp. 3d 281 (D.D.C. 2018) ...............................................................36, 42

*Chen-Oster v. Goldman, Sachs & Co.*,
    325 F.R.D. 55 (S.D.N.Y. 2018) ..................................................................32, 33, 35

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ............................................................................... *passim*

*Converse v. Vizio, Inc.*,
    2020 WL 2922490 (W.D. Wash. June 3, 2020) .....................................................57

*Davidson v. O'Reilly Auto Enters., LLC*,
    968 F.3d 955 (9th Cir. 2020) ................................................................................25

*Donaldson v. Microsoft Corp.*,
    205 F.R.D. 558 (W.D. Wash. 2001) ......................................................................49

*Dukes v. Wal-Mart Stores, Inc.*,
  964 F. Supp. 2d 1115 (N.D. Cal. 2013) ........................................................................ *passim*

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez*,
  431 U.S. 395 (1977)........................................................................................................47, 48

*Ellis v. Costco Wholesale Corp.*,
  285 F.R.D. 492 (N.D. Cal. 2012)..........................................................................32, 33, 35, 37

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ........................................................................................ *passim*

*Fiandaca v. Cunningham*,
  827 F.2d 825 (1st Cir. 1987)....................................................................................................50

*Gen. Tel. Co. of the Sw. v. Falcon*,
  457 U.S. 147 (1982)....................................................................................................25, 40, 48

*Grosz v. Boeing Co.*,
  2003 WL 22971025 (C.D. Cal. Nov. 7, 2003), *aff'd*,
  136 F. App'x 960 (9th Cir. 2005) ............................................................................................57

*Handloser v. HCL Techs. Ltd.*,
  2021 WL 879802 (N.D. Cal. Mar. 9, 2021)..............................................................................33

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998), *overruled on other grounds by*
  *Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..................................................................................................................54

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ...................................................................................................47

*Heredia v. Sunrise Senior Living LLC*,
  2021 WL 811856 (C.D. Cal. Feb. 9, 2021).............................................................................. 48

*Hodgers-Durgin v. de la Vina*,
  199 F.3d 1037 (9th Cir. 1999) .................................................................................................51

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018)......................................................................................................56

*In re Autozone, Inc., Wage & Hour Emp. Practices Litig.*,
  289 F.R.D. 526 (N.D. Cal. 2012), *aff'd*,
  789 F. App'x 9 (9th Cir. 2019) (unpublished).........................................................................49

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014)..............................................................................................51

*In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*,
   708 F.3d 704 (6th Cir. 2013) ................................................................29

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
   725 F.3d 244 (D.C. Cir. 2013) ..............................................................56

*Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*,
   34 F. Supp. 3d 896 (N.D. Ill. 2014) ........................................ *passim*

*Kartman v. State Farm Mut. Auto. Ins. Co.*,
   634 F.3d 883 (7th Cir. 2011) ................................................................53

*Kassman v. KPMG LLP*,
   416 F. Supp. 3d 252 (S.D.N.Y. 2018), *petition denied*,
   2019 WL 2498769 (2d Cir. Mar. 19, 2019).................................. *passim*

*Kayes v. Pac. Lumber Co.*,
   51 F.3d 1449 (9th Cir. 1995) ................................................................50

*Kohen v. Pac. Inv. Mgmt. Co., LLC*,
   571 F.3d 672 (7th Cir. 2009) ................................................................39

*Lambert v. Nutraceutical Corp.*,
   870 F.3d 1170 (9th Cir. 2017), *rev'd on other grounds*, 139 S. Ct. 710 (2019).....................56

*Leyva v. Medline Indus., Inc.*,
   716 F.3d 510 (9th Cir. 2013) ..........................................................56, 57

*Lindsley v. Omni Hotels Mgmt. Corp.*,
   2019 WL 2743892 (N.D. Tex. July 1, 2019)............................33, 41, 43

*Lott v. Vial Fotheringham, LLP*,
   2020 WL 1890539 (D. Or. Apr. 15, 2020) ........................................54, 58

*Lucas v. Breg, Inc.*,
   212 F. Supp. 3d 950 (S.D. Cal. 2016)..................................................53

*Maeda v. Kennedy Endeavors, Inc.*,
   2021 WL 2582574 (D. Haw. June 23, 2021).........................................52

*MAI Sys. Corp. v. Peak Computer, Inc.*,
   991 F.2d 511 (9th Cir. 1993) ................................................................54

*Mattson v. New Penn Fin., LLC*,
   2021 WL 2888394 (D. Or. July 9, 2021)..............................................47

*Maxwell v. City of Tucson*,
   803 F.2d 444 (9th Cir. 1986) ................................................................47

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ................................................................... 39

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir. 2012) ..................................................... 32, 33, 34

*McReynolds v. Sodexho Marriott Servs.*,
    208 F.R.D. 428 (D.D.C. 2002) .................................................................. 49

*Mendell v. Am. Med. Response, Inc.*,
    2021 WL 1102423 (S.D. Cal. Mar. 23, 2021) ......................................... 55

*Moheb v. Nutramax Labs. Inc.*,
    2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) .......................................... 57

*Moore v. Apple Inc.*,
    309 F.R.D. 532 (N.D. Cal. 2015)............................................................... 39

*Moore v. Publicis Grp. SA*,
    2014 WL 11199094 (S.D.N.Y. May 15, 2014) ............................... 57, 58

*Moussouris v. Microsoft Corp.*,
    2018 WL 3328418 (W.D. Wash. June 25, 2018), *aff'd*,
    799 F. App'x 459 (9th Cir. 2019*)* ................................................. *passim*

*O'Connor v. Boeing N. Am., Inc.*,
    197 F.R.D. 404 (C.D. Cal. 2000) .............................................................. 46

*O'Hearn v. Les Schwab Warehouse Ctr., Inc.*,
    2014 WL 6654207 (W.D. Wash. Nov. 24, 2014) .................................... 57

*Ortega v. J.B. Hunt Transp., Inc.*,
    2018 WL 6118572 (C.D. Cal. Aug. 7, 2018)............................................ 57

*Pena v. Taylor Farms Pac., Inc.*,
    305 F.R.D. 197 (E.D. Cal. 2015) .............................................................. 49

*Perez v. Performance Food Grp., Inc.*,
    2017 WL 8239633 (C.D. Cal. Oct. 2, 2017)............................................. 51

*Puffer v. Allstate Ins. Co.*,
    255 F.R.D. 450 (N.D. Ill. 2009), *aff'd*,
    675 F.3d 709 (7th Cir. 2012) ............................................... 53, 57, 58, 59

*Rizo v. Yovino*,
    950 F.3d 1217 (9th Cir. 2020) .................................................................. 44

*Robinson v. Metro-North Commuter R.R.*,
   267 F.3d 147 (2d Cir. 2001)............................................................................48

*Ross v. Lockheed Martin Corp.*,
   267 F. Supp. 3d 174 (D.D.C. 2017) ..........................................................31, 33

*Scott v. Family Dollar Stores, Inc.*,
   2016 WL 9665158 (W.D.N.C. June 24, 2016) ..........................................33, 34

*Slayman v. FedEx Ground Package Sys., Inc.*,
   765 F.3d 1033 (9th Cir. 2014) ........................................................................51

*Smith v. Bull Run Sch. Dist. No. 45*,
   80 Or. App. 226 (1986)....................................................................................44

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ..........................................................................49

*Tabor v. Hilti, Inc.*,
   703 F.3d 1206 (10th Cir. 2013) ......................................................................32

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016)....................................................................39, 55, 56

*Valerino v. Holder*,
   283 F.R.D. 302 (E.D. Va. 2012) ..............................................33, 46, 48, 49

*Vaquero v. Ashley Furniture Indus., Inc.*,
   824 F.3d 1150 (9th Cir. 2016) ........................................................................57

*Victorino v. FCA US LLC*,
   2018 WL 2455432 (S.D. Cal. June 1, 2018)....................................................51

*Victorino v. FCA US LLC*,
   326 F.R.D. 282 (S.D. Cal. 2018) ....................................................................57

*Vuyanich v. Republic Nat'l Bank of Dallas*,
   82 F.R.D. 420 (N.D. Tex. 1979) ....................................................................50

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)..................................................................... *passim*

*Washington Cnty. v. Gunther*,
   452 U.S. 161 (1981)........................................................................................45

*Williams v. Boeing Co.*,
   2006 WL 126440 (W.D. Wash. Jan. 17, 2006)................................................47

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...................................................................58

*Zuniga v. Bernalillo Cnty.*,
    319 F.R.D. 640 (D.N.M. 2016*)* .................................................................33

**STATUTES**

42 U.S.C. § 2000e-2 (TITLE VII) ..................................................... *passim*

OR. REV. STAT. § 652.210(16) ................................................................44, 47

OR. REV. STAT. § 652.220 .............................................................................48

RULES ENABLING ACT ..................................................................................56

**RULES**

FED. R. CIV. P. 23 ......................................................................... *passim*

FED. R. CIV. P. 23(a) ..................................................................... *passim*

FED. R. CIV. P. 23(b) ..................................................................... *passim*

FED. R. CIV. P. 23(g) ....................................................................................53

FED. R. CIV. P. 65 ........................................................................................53

OR. ADMIN. R. 839-008-0010 .....................................................................47

## INTRODUCTION

Plaintiffs ask the Court to depart from the default rule that litigation must be "conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348, (2011) (quoting *Califano* v. *Yamasaki*, 442 U.S. 682, 700-701 (1979)). Yet, after three years of fact and expert discovery—including Nike's production of thousands of pages of documents and nearly one million unmasked personnel records for more than 13,400 current and former employees, and almost 30 depositions of Nike's corporate designees and other fact witnesses (some lasting two days)—Plaintiffs are back where they started in 2018. They cannot certify a class of more than 5,200 female employees with highly individualized claims that are not joined by any common questions that generate common answers. Federal Rule of Civil Procedure 23 and *Dukes* preclude class certification here, where Plaintiffs have hitched their cart to a handful of news reports and vague allegations of "classwide" policies or practices that ostensibly disfavor women."

Nike World Headquarters ("WHQ") in Beaverton, Oregon employs thousands of individuals who, in turn, hold thousands of different job titles, each with different requirements, performance standards, and responsibilities. Nike employees bring myriad backgrounds, experiences, and qualifications to these roles, where they work in hundreds of different departments, for thousands of different managers (including many women). Despite the varied and disparate nature of Nike's work—and its workforce—Plaintiffs seek to certify a class that includes almost every woman who has worked at WHQ since mid-2017, save for a few functions Plaintiffs chose to leave out.

The Named Plaintiffs are four former Nike employees, one of whom did not work for Nike during the putative class period (and thus, by definition, is not a putative class member). They assert intentional discrimination claims related to thousands of hiring, pay (and

performance), and promotion decisions made by thousands of different decision-makers (including other putative class members), as well as pay equity claims for women holding more than 1,200 different roles. Mindful of *Dukes*, Plaintiffs superficially cast their allegations to attack Nike's processes *in toto*, which they claim are "common," "uniform," and/or "consistent." Other than sharing a common employer, little else ties Plaintiffs to each other, much less their putative class, or the thousands of disparate employment decisions made over the last five years.

Plaintiffs have not provided evidence of a company policy or practice that uniformly applies to—and equally harmed—the entire putative class. No glue binds thousands of individualized decisions together in a single case. In fact, Plaintiffs' evidence of commonality is so weak that, at one point, they cite Nike's Bribery and Corruption Policy as evidence that "Talent Acquisition" must approve all hiring decisions (they do not). Plaintiffs fail to show that the crucial question in any discrimination claim—"*why was I disfavored?*"—can be resolved with a common answer. *Dukes*, 564 U.S. at 352 (emphasis in original).

Nor do Plaintiffs offer "significant proof" that Nike has a general policy of intentional gender discrimination in hiring, pay (and performance), or promotions, such that discrimination was Nike's "standard operating procedure." Instead, they rely on anecdotes from the Named Plaintiffs' individual experiences and flawed, aggregated statistical analyses to argue that some common thread unites them all. These analyses fail to account for the way in which managers actually make employment decisions; and, most importantly, they fail to reflect that women— just like men—have varied career paths and experiences at Nike (just like they do at any large employer). This alleged evidence is neither common nor substantial enough to conclude that Nike *intentionally* discriminated against *all* women at WHQ.

Even if Plaintiffs could overcome the commonality hurdle, they still fail to demonstrate

compliance with the remaining Rule 23. That is fatal, as follows:

- First, Plaintiffs fail to establish that their highly individual claims are typical of other putative class members. In fact, the Named Plaintiffs admit that they did not each consistently experience the "practices" they now challenge.

- Second, because thousands of putative class members themselves made the allegedly discriminatory decisions that are now contested, Plaintiffs are unable to meet the adequacy requirement.

- Finally, while Plaintiffs argue both for Rule 23(b)(2) and (b)(3) certification, under either standard, they cannot avoid the class-member-by-class-member inquiries that would be required to try this case without violating Nike's Due Process rights. For example, Plaintiffs fail to identify how a jury could try Plaintiffs' Oregon Equal Pay Act class through common proof, given the thousands of disparate jobs, levels, experiences, expertise, and areas of responsibility encompassed within their putative class—not to mention the thousands of individual defenses that Nike, by law, is entitled to assert. Such inquiries would require thousands of mini-trials that—far from creating efficiencies—would result in unmanageable chaos.

Plaintiffs' Motion for Class Certification should be denied.

## FACTS

## I.    **The Named Plaintiffs And Their Proposed Class.**

Named Plaintiffs Kelly Cahill and Sara Johnston initiated this lawsuit in August 2018, alleging a putative collective claim under the Federal Equal Pay Act ("EPA"), a putative class claim under the Oregon Equal Pay Act ("Oregon EPA), and putative class claims for disparate impact and intentional discrimination under the Oregon Equality Act. Dkt. # 1. Months later, Plaintiffs amended the complaint to add Plaintiffs Lindsay Elizabeth and Heather Hender, as well as putative class claims for disparate impact and disparate treatment under Title VII. Dkt. # 42.

Plaintiffs ask this Court to certify a class of at least 5,200 current and former female employees at WHQ in "salaried, corporate position[s] in Bands L, U, E, or S." Br. at 1; Saad R. at ¶ 43.[1] Plaintiffs exclude retail store employees and three Nike Job Functions (Finance, HR,

---

[1] Where a single cite is given for several sentences, it supports all such preceding text. Plaintiffs' opening brief is cited as "Br." Cites to Plaintiff or opt-in testimony begin with bold font. Nike

and Legal) from their proposed class, which leaves at least 1,200 Job Codes—nearly the entirety of WHQ—within Plaintiffs' putative class definition. *Id.* at ¶ 44. Plaintiffs seek to certify a class of female employees who worked in these positions (1) from **August 9, 2017 to present** for their Oregon Equality Act and Oregon EPA claims (the "Oregon Class Period"), and (2) from **October 11, 2017 to present** for their Title VII claims ("Title VII Class Period") (collectively, the "Putative Class Periods").[2] Br. at 1. Plaintiffs never moved to conditionally certify their Federal EPA claim and do not pursue it in their Motion. Br. at 7 n. 7.

## II.    Plaintiffs' Proposed Class Consists Of Employees Working In More Than 1,200 Different Job Codes, Reflecting Work Requiring Diverse Skills, Duties, Responsibilities, And Effort, Under A Variety Of Dissimilar Working Conditions.

Nike, a complex, matrixed organization, is engaged in the design, development, marketing, and selling of athletic footwear, apparel, equipment, and accessories. Founded as Blue Ribbon Sports in 1964, Nike has maintained its Oregon roots. In its 300-acre Beaverton WHQ, over 11,000 employees with diverse backgrounds and skillsets gather to perform a mosaic of jobs in a wide-range of specialized areas.[3] Indeed, employees at WHQ are not just shoe and apparel designers, they are manufacturing and software engineers; event planners; sports marketers; IT and facility security professionals; supply chain experts; and even airplane pilots and mechanics—to name a few. All of these disparate positions, and thousands more, make up the "Covered Positions" in Plaintiffs' proposed class. Br. at 1, 8 n.9; Saad R. Appx. D.

---

exhibits are cited as "Nx _ [:page no.] or [¶ _]" referring to the Exhibit compendium attached to the Declaration of Felicia A. Davis. Declarations are identified by the declarant's last name and [¶ _]. Plaintiffs' exhibits attached to declaration of Mengfei Sun are cited as "Px." Expert reports are cited by the expert's last name and "R." or "Rep." (for main or reply report).

[2] Plaintiffs assert that Johnston filed her EEOC/BOLI charge on August 7, 2016. Br. at 9 n.9. **That is false**. Johnston filed her administrative charge on August 7, **2018**. *See* FAC, Dkt. # 42 at ¶ 25; Nx 89, p. 1.

[3] *See* https://s1.q4cdn.com/806093406/files/doc_downloads/2021/08/Nike10k2021.pdf; https://jobs.nike.com/whq; Saad R. at ¶ 43.

A.    <u>Nike's Job Architecture.</u>

Due to the highly diversified nature of its business, the Covered Positions span 21 different Job Functions, such as "Product Creation" and "Design," which are further subdivided into Job Families and Subfamilies. From August 2017 to September 2019, the Covered Positions spread across 109 different Job Families and 198 different Job Subfamilies. Saad R. ¶¶ 44-45.[4] Overlaying Job Functions, Families, and Subfamilies are Nike's Job Levels, which are assigned one of six "Bands" that spell "VALUES," with "S Band" being the highest.

| Exhibit 29 Nike Bands and Job Levels | | |
|---|---|---|
| **Band** | **Job Levels** | |
| | **Individual Contributor** | **Management** |
| E7+ | | Vice President |
| S | Professional Consultant (130) | Senior Director (140) |
| E | Expert Professional (110) | Director (120) |
| U | Lead Professional (90) | Manager (100) |
| | Senior Professional (80) | |
| L | Intermediate Professional (60) | Supervisor (70) |
| | Entry Professional (50) | |
| A | Lead Support (40) | |
| | Senior Support (30) | |
| V | Intermediate Support | |
| | Entry Support | |

Within Plaintiffs' proposed class of L through S Band employees, Job Levels range from Entry Professional (Level 50) to Senior Director (Level 140), and fall into "Management" (for those who are people managers) or "Individual Contributor" (for those who are not) career tracks. Saad R. p. 140, Ex. 29. Of the more than 5,200 women in the putative class, at least 29.5% held a "Management" track position during the Putative Class Periods. Saad R. at ¶ 47.

B.    <u>Job Codes–Not Subfamily And Level–Are The Most Differentiated Type And Level Of Work In Nike's Job Architecture.</u>

Job Level combines with Job Function, Family, and Subfamily to place each Nike job into a Job Code. At least 1,200 different Job Codes make up the Covered Positions. Saad R. ¶ 44. Important for this case, each Job Code has its own pay range, which managers use to position new hires and manage pay for their employees.[5] Walker Tr. 60:3-5, 86:7-13, 411:19-412:4, Ex.

_____

[4] Employees at WHQ are broadly distributed with no significant concentration of employees in a single Job Family. *Id.* at ¶ 46, Ex. 1.

[5] Plaintiffs erroneously contend that "Nike places all Covered Positions into one of eleven pre-determined pay ranges." Br. at 11. The documents and deposition quote Plaintiffs cite do not support this contention. *Id.*

500, slide 33; Stuckey Tr. 67:19-22, 68:10-13. Pay ranges are discussed further in Section III.A.1.

Ignoring Job Codes without explanation, Plaintiffs and their experts coined their own variable, "Job Subfamily-Level interaction," which does not exist in Nike's job architecture and is not used by Nike for any purpose. Br. at 10; Lundquist R. at p. 47; Neumark R. at p. 5; ¶¶ 37-38; *see also* Saad R. ¶¶ 78-81. Without any analysis or presenting any supporting authority, they argue that this fabricated variable is the most granular way to group Nike employees performing substantially similar work for comparison.[6] *Id*. They are wrong. They are wrong. First, many Job Codes share the same Job Subfamily and Level. *See* Saad R. ¶ 49.[7]

Second, as Nike witness Jessica Stuckey (Senior Director, Global Retail Compensation) stated: "Nike's **job codes** are the most differentiated type of work and level of work within our corporate architecture (but even then, individuals working in the same job code do not necessarily perform similar work)." Stuckey Decl. ¶¶ 2; 4. Stuckey further confirmed, "Job codes that share the same Job Subfamily and Job Level may not be the same from a compensation survey or actual day-to-day perspective at Nike – it depends on the job." *Id.* Put simply, Plaintiffs improperly combine many Job Codes together for analysis, without any evidence that employees within those many Job Codes are appropriate comparators for any of their claims.

### C.    Even Within Job Code, The Content Of Nike Jobs Can Vary Significantly.

Even within Nike Job Code, work is not necessarily homogenous, as positions within the same Job Code can, and often do, involve widely varied work.[8] For example, within a Job Code,

---

[6] Nike explains these issues more fully in its concurrently-filed *Daubert* motions.

[7] For example, Plaintiff Elizabeth worked in Job Code A0246 (PROF INTER: PROD DES – APP), in the Product Design-Intermediate Professional Subfamily-Level group. Two more Job Codes share that same Subfamily and Level: A0258 (PROF INTER: PROD DES – FTW) and A0252 (PROF INTER: PROD DES – EQUIP). Saad R. at Ex. 19; Appx. D.

[8] Leenhouts Decl. ¶ 13 ("roles can differ within job codes . . . employees working in Business

employees are further dispersed into Position Titles, which leadership and employees agree more accurately reflect the work performed, even more so than Job Codes. Hanvey R. at ¶ 14. From August 2017 to September 2019 alone, over 13,000 Position Titles appear in Nike's employee data for the Covered Positions. *Id.* at ¶ 14 n.6. Even Plaintiff Cahill used her Position Title to describe her Nike jobs in deposition ("Global Digital Cross-Category Director for Nike.com" and "North America Nike.com Digital Brand Director"). Cahill Tr. 76:22-25; 88:17-23; 89:24-90:2. Cahill did not recognize her Job Codes (DIR: PROD PRES and DIR: BRAND/CATG MKTG). *Id.* at 79:25-81:15; 166:19-167:6.

## III.    Nike's Discretionary Pay, Performance, And Promotions Processes Reflect Its Varied Workforce And Trust In Local Direct Managers.

Given the varied and oftentimes highly specialized nature of its employees' work, Nike recognizes that individual managers are best suited to assess their employees' pay and performance, and to make promotion decisions, based on their team's unique goals and objectives. Therefore, Nike delegates discretion to its thousands of managers to evaluate and make individual pay, performance, and promotion decisions for their teams. Though Plaintiffs strain to characterize these processes as "consistent" or "classwide" "practices" to support their Motion, those efforts fall flat, as detailed below.

### A.    Starting Pay.

Although Plaintiffs contend that Nike maintained a "classwide" or "consistent" policy of "collecting" candidates' prior salary and using that information as the sole or primary factor in

---

Product Management positions share the same job code as employees working in Technical Product Management roles, but the two roles are not similar"); Peale Decl. ¶ 12 (discussing that Merchandising Operations Directors "differ in the level of ownership and responsibilities"); Bond Decl. ¶¶ 5, 9, 10 ("there were other Studio Directors with less responsibility and smaller scope than I held in my role"); Harris Decl. ¶¶ 7, 11, 13; Levison Decl. ¶ 11; Baird Decl. ¶ 10; Thornton Decl. ¶ 9; Hansen Decl. ¶ 10; Lore Decl. ¶ 13; Spencer Decl. ¶ 11; Ratchuk Decl. ¶ 9.

setting starting pay (Br. at 12-15), the evidence belies this assertion. Starting salary decisions at Nike are made by thousands of different individual hiring managers based on a variety of factors that vary depending on the role, the candidate, and the manager.

### 1. Thousands Of Individual Hiring Managers Set Starting Pay By Considering A Wide Range Of Factors.

After selecting a candidate at the conclusion of the interview process, hiring managers receive the salary range for the Job Code, prepared by Nike's Compensation Department based on a market analysis of similar roles. Walker Tr. 48:23-49:4; 60:19-21; 62:5-12; 176:8-11; 276:4-9; 313:4-17. Hiring managers then determine where to place each new hire within that salary range, though they may exceed the range at their discretion. *Id.* at 60:3-5 ("We're setting pay ranges and the structures. Managers are responsible for making pay decisions for their employees"); 411:19-412:4 (guidance for managers is to position new hires between 85% to the maximum of the pay range, but individual situations may call for an increase); Croll Decl. ¶ 11.

Nike documents confirm that managers may consider factors such as the external market and internal equity, the applicant's relevant work experience, education and skills, and the business's financial conditions when setting an employee's starting pay. Px. 45; *see also* Thomas Tr. 226:15-235:5; Thomas Decl. ¶¶ 4-7. Yet managers are also free to, and do, consider and weigh whatever factors they deem relevant to the position being hired. *See, e.g.,* Peele Decl. ¶ 9 (emphasizing a candidate's experience and certifications, and the industry, type, and caliber of prior employers; "I know that candidates from Microsoft have a lot of technical experience, so I would likely give someone from Microsoft a higher salary than someone from a smaller, less technical company"); Levison Decl. ¶¶ 14-15 (considering pay range, education, prior relevant experience, potential for promotion, expectations for the role, and "mastery of certain 'soft skills'"); Caputo Decl. ¶¶ 9-11 ("What differentiates an excellent candidate, and can lead to a

higher starting salary, will be nuanced and vary based on the particular business unit, the role, and the functions they support.").[9]

### 2. Nike Has Not Allowed Recruiters Or Hiring Managers To Inquire Into Applicant's Prior Salary For The Past Four-And-A-Half Years.

Plaintiffs base much of their Motion on their assertion that Nike used applicants' prior pay to set starting salary. Br. at 12-15; 19-21; 38-40. But as Plaintiffs acknowledge, effective September 2017, Nike instructed recruiters and hiring managers that they may not ask candidates about their prior salary or salary history during the recruiting or hiring process. Br. at 13, 20; *see also* Thomas Tr. 214:1-215:4, Ex. 513. Thus, it is undisputed that this alleged practice (which was never common or consistent) only occurred for one month during the Oregon Putative Class Period, and *never* occurred during the Title VII Putative Class Period. As a result, putative class members hired after September 2017 could *not* possibly have been harmed by it.

### 3. Nike Never Consistently Asked About Or Used Candidates' Prior Salary To Set Starting Pay.

Even before the aforementioned September 2017 change, Nike never required candidates to provide prior salary during the hiring process, nor were candidates asked about their prior salary in every instance.[10] There is no evidence that, when candidates did provide their prior salary, it factored into hiring managers' starting pay decisions in any consistent way.

---

[9] *See also* Worboys Decl. ¶¶ 16-17; Leenhouts Decl. ¶ 14; Hackenmiller-Paradis Decl. ¶ 22; Snashall Decl. ¶ 11; Hopkins Decl. ¶ 5, 10; Scire Decl. ¶ 12; Yoon Decl. ¶¶ 10-11; Louder Decl. ¶ 18; Thomas Tr. 197:8-18 (there are multiple data points for each individual offer); 226:15-235:5 ("We have so many jobs and so many types of jobs, you know, what's relevant, it varies with every single job."); **Cahill** Tr. 76:13-17;112:1-114:18; 236:18-245:13 (hiring and starting pay decisions based on pay range for position and overall work experience, not gender); **Azavedo** Tr. 54:25-72:7; 80:14-20; 103:1-14 (for hiring decisions, considered factors like passion, fit, existing relationships, internal recommendations, communication skills, education, prior relevant experience, and prior employers; made or approved salary decisions for all individuals she hired; never made any hiring or pay decisions based on gender).
[10] Lore Decl. ¶ 6 ("I am confident that I did not provide any information about my prior salary or salary expectations before I was hired.").

Before September 2017, Nike's guidelines *permitted* inquiry into candidates' prior salary; the individual recruiter or hiring manager had discretion whether or not to ask about prior pay. Thomas Tr. 118:4-119:6 (denying that Nike has been "collecting" prior salary or had a policy to do so since 2015); 215:20-216:1. An applicant's prior salary was merely a **data point** that hiring managers *could* consider, in addition to other data points such as a candidate's skills, experience, and qualifications, and the weight of each factor varied depending on the role, the candidate, and the hiring manager. Nike witness Shine Thomas (Senior Director, Talent Acquisition), testified unequivocally in that regard:

> Q.    Would you agree that that statement's accurate if it's dated prior to October 2017, "We often focused on a new hire's prior salary and/or the size of the increase the new hire would receive"?
>
> A.    I would say that's **inaccurate**. I would say that prior salary was **a data point** that we looked at, but it was always, our guideline has always been that [it] is a data point. The position and the range is also a data point. **Every single offer is unique and every single offer has different nuances associated with the candidate and their experiences and qualifications**. So I would say that that is what, your statement is not correct.

Thomas Tr. 220:7-21 (emphasis added); *see also id.* 221:22-222:1.

While the pre-September 2017 Nike document cited by Plaintiffs suggests hiring managers *could* consider an applicant's "historical salary progression" when determining starting salary, the document clearly shows that it was one potential factor among many, and Nike witnesses and putative class members confirm that starting pay decisions were not based solely or even primarily on prior pay; in fact, they were (and remain) highly individualized. *See* Thomas Tr. 197:8-16 (there are multiple data points for each individual offer); 226:15-235:5 ("what's relevant, it varies with every single job"). As Talent Acquisition ("TA") recruiter Matthew Bowman confirmed, "whether the hiring manager used prior salary to determine a candidate's

offer was up to the individual hiring manager. And prior salary, even if it was used, could only factor so much into the consideration—hiring managers were still encouraged to fall within the range set for the job." Bowman Decl. ¶¶ 8-12; *see also, e.g.,* Hopkins Decl. ¶¶ 11-12; Hunter Decl. ¶ 16.

Nike recruiters and hiring managers similarly confirm they did not consistently request or use candidates' prior pay before September 2017, and many Plaintiffs and putative class members agree they were ***never*** asked about their prior salaries before receiving a job offer.[11] It would be impossible to base a candidate's starting salary on information that was not provided. In short, the role of prior pay in setting starting pay was anything *but* consistent at Nike.

### 4.    "Talent Acquisition" Does Not Approve Starting Pay Decisions.

Plaintiffs erroneously contend that "Talent Acquisition" (suggesting an omnipotent body as opposed to the reality: hundreds of individual recruiters) is responsible for making all starting salary decisions. Br. at 13-14. Not so. While hiring managers work with recruiters to develop a candidate's offer, those thousands of different hiring managers ultimately are responsible for making starting pay decisions, generally without the need for additional approval. Thomas Tr. 123:11-15 ("The onus of the decision making for the offer rests on the hiring manager. The recruiter is involved in facilitating that process, but the decision is made by the hiring manager."); 120:5-9 (regarding Px. 11, "Q. So talent acquisition has to contact HRBP and business leaders for approval of the offer? A. We do not. We contact the hiring manager to approve the offer.").[12] Nike recruiters and individual hiring managers, including putative class

---

[11] **Elizabeth** Tr. 144:2-149:16; **Johnston** Tr. 109:24-111:7; **Anderson** Tr. Vol. II, 10:8-14, 14:12-24; **Tucker** Tr. 70:9-12; 72:4-22; **Linebaugh** Tr. 70:14-17; **Olson** Tr. 74:4-80:24; **Phillips** Tr. 101:19-105:13; 119:5-122:4; Ex. 53; Louder Decl. ¶¶ 4-6; Stallard Decl. ¶¶ 4-5; Peale Decl. ¶¶ 5-6; Thornton Decl. ¶¶ 4-5; Saxton Decl. ¶¶ 4-5; Spencer Decl. ¶ 4; Worboys Decl. ¶¶ 4-5; Hackenmiller-Paradis Decl. ¶ 7.

[12] Also with respect to Px. 11, Thomas testified repeatedly that it was a guideline, "not a rule."

members, confirm that individual hiring managers maintain this discretion. *See, e.g.*, Hunter Decl. ¶ 15 ("the ultimate decision is mine. If the starting salary is within the range for the role, I do not need to obtain any approvals."); Levison Decl. ¶ 15 (no approval if starting pay decision is within the pay range).[13]

Unfortunately, Plaintiffs resort to out-of-context statements to rebut this point. For instance, Plaintiffs argue that Nike's purported "hiring policy" states: "All decisions related to hiring should be approved by Talent Acquisition." Br. at 13-14. Rather, this quote appears in a Q&A in Nike's ***Bribery and Corruption Policy***, not its hiring materials, where the context relates to ethical issues arising out of the potential hiring of the relative of a friend employed by the Department of Customs. Px. 42 p. 18.[14] Plaintiffs' reliance on this passage is misleading, at best. Indeed, when Plaintiffs asked Ms. Thomas if this statement—again, from the Bribery and Corruption Policy—accurately reflected Nike's hiring practices, she responded, "It really depends. Every, every situation is different, and it depends on the role and the position." Thomas Tr. 48:19-49:24; *see* Br. at 14.

**B.    Annual Base Pay Increases And Bonuses.**

Plaintiffs next challenge "Nike's use of a percentage of employees' current salary to

---

Thomas Tr. 87:6-93:9; *see also id.* 185:15-17 ("Q. Does talent acquisition determine the final offer? A. We do not."); 194:22-24 ("[T]he hiring manager always makes the final decision, just to be clear, around the offer for all of our candidates."); Walker Tr. 60:3-18 ("Managers are responsible for making pay decisions for their employees."); *id.* at Ex. 500 (Nike provides pay ranges tied to each job code as a starting point, and hiring managers determine where to place hires within that range); *id.* 411:19-412:4.

[13] Yoon Decl. ¶ 10; Scire Decl. ¶ 14; Lozito Decl. ¶¶ 5-6; Worboys Decl. ¶¶ 16-17; Caputo Decl. ¶ 9; Hopkins Decl. ¶ 10; Morton Decl. ¶ 8; Fangan Decl. ¶ 16-17.

[14] *See* Px. 42 p. 18 ("All decisions relating to hiring should be approved by Talent Acquisition. Offering the official's relative a position or ensuring they receive special consideration in the hiring process could be considered a form of bribery. Please direct all requests for employment or internships to Talent Acquisition or reach out to Human Resources or the Ethics & Compliance Office for help.").

calculate their annual merit increases to salary and annual bonuses" by claiming that they "perpetuat[e]" or "exacerbate[e]" "gender differences in starting salary." Br. at 15, 18-19.  Thus, Plaintiffs predicate their base pay and bonus challenges on their starting pay challenge, which, in turn, is based on Nike's alleged use of candidates' prior pay to set starting pay. Because this undisputedly did not occur after September 2017, putative class members hired after September 2017 cannot have any "harm" in their starting salaries to "perpetuate" or "exacerbate." Plaintiffs do not refute this. Br. at 13, 20; Neumark R. ¶ 52; Lundquist R. at pp. 3-4; 32-34.

Setting that aside, Plaintiffs' descriptions of Nike's programs confirm that Nike's base pay increase and bonus awards changed forms during the Putative Class Periods and are not purely percentage based—in fact, Nike's managers have discretion to make salary increase and bonus decisions for their employees based on a range of factors, leading to a variety of pay outcomes. *Id*. at 15-18.

1. **Nike's Discretionary Performance Ratings, Which Anchor Merit Increase And Bonus Decisions, Favor Women.**

Plaintiffs do not challenge Nike's performance review process (Coaching for Excellence or CFE), by which managers award one of five ratings to their direct reports every year. Heinle Tr. 85:17-86:14; Nx 76. Individual managers are empowered to evaluate their direct reports' performance based on criteria that managers subjectively interpret and apply to their teams' specific roles, often employing their own unique processes, such as peer feedback surveys, which managers tailor to their teams and each employee's individual goals. *See, e.g.,* Nopper Decl. ¶¶ 16-17 (considers annual personal and business goals as well as "360" feedback from cross-functional teammates through qualitative feedback survey).[15] Individual CFE ratings need not be

---

[15] *See also id.*; Louder Decl. ¶ 17; Levison Decl. ¶ 12; Hunter Decl. ¶ 9; Hackenmiller-Paradis Decl. ¶ 18; Spencer Decl. ¶ 13; Harris Decl. ¶ 16; Louder Decl. ¶ 17; **Anderson** Tr. Vol. II, 183:4-185:24 (she prepares questions to solicit feedback that are customized to her reports'

approved by higher-level managers, and Nike does not impose a forced distribution of CFE ratings. Edington Decl. ¶ 13; Mack Decl. ¶ 14; Heinle Tr. 40:3-4 (no manager approval of CFE ratings); Nx 87, p. 3. Plaintiffs' expert, Dr. Neumark, even found that women receive, on average, CFE ratings "as high or higher than men." Neumark R. ¶ 8a; p. 40 n. 62; Table 3.

As Plaintiffs admit, these discretionary CFE ratings are a critical component of merit increase and bonus decisions. Br. at 16. Thus, as described below, Nike's merit increase and bonus processes operate as manager discretion on top of manager discretion.

### 2. Thousands Of Individual Managers Exercise Discretion In Making Merit Increase Decisions For Their Team Members.

Nike's process for awarding annual pay increases has evolved during the Putative Class Periods. Before 2019, Nike referred to its annual salary increase process as Merit Pay. Walker Tr. 352:19-20. As part of Merit Pay, Nike provided managers with "Merit Guidelines," a range of suggested salary increases for managers to consider based on employees' CFE ratings. *Id.* 330:1-6.[16] However, the Merit Guidelines were just "a starting place for managers to make decisions from" (*id.*); "[t]he actual application of the increases is up to the manager." *Id.* 331:12-17. Thus, even employees with the same CFE rating could receive different percent merit increases, based on the manager's discretion. *Id.* 329:8-12; Worboys Decl. ¶ 12 ("I do not always provide the same base pay increase to employees with the same rating."). As set forth in Nike's guidelines:

---

particular jobs or goals for the year; "there were no standardized questions that were sent out").
[16] The specific Merit Guideline ranges during the Putative Class Periods were as follows: Exceptional = 4.5 – 6.5%; Highly Successful = 3.0 – 5.0%; Successful = 2.5 – 3.5%; Inconsistent = 0.0 – 1.5%; Unsuccessful = 0.0%; "Too New to Rate" = 0.0 – 3.5%. Walker Decl. ¶ 5-6.

> Merit awards are discretionary and merit award guidelines vary within each performance rating category. When determining the size of increase, managers should consider a variety of factors:
>
> o **Performance:** employee's performance for the entire fiscal year, and the most important factor in merit pay decisions.
> o **Position to Market:** employee's pay relative to external market zone
> o **Internal Equity:** employee's pay relative to peers in similar jobs within NIKE
> o **Employee's experience, skill levels, etc.**
> o **Available Budget**
>
> Employee performance is the primary driver of merit pay decisions. Merit awards are intended to reward performance over the entire fiscal year and differentiate pay for better performers.

Nx 88, p. 1; *see also* Walker Tr. 371:9-11.[17]

In 2019, Nike introduced its current "Core Pay" process for annual salary increases. *Id.* 352:19-20. For Core Pay, managers initially receive a proposed default salary adjustment, typically referred to as a "Market" increase, for every employee. Individual managers then exercise their discretion to increase the recommended salary adjustment by selecting "Invest" or "Max Invest," or to decrease the recommended adjustment by selecting "Zero." *Id.* 363:22-365:1; Ex. 500, Slide 51. The actual amount of the employee's salary adjustment will depend on their then-current position in their pay range (*i.e.*, employees lower in the pay range will receive a higher percentage increase relative to peers receiving the same "investment"). *Id.*

**IMPACT OF POSITION-IN-RANGE**

ILLUSTRATIVE EXAMPLE OF CORE PAY INVESTMENT TABLE

|  | LOWER SECTION OF PAY RANGE | MIDDLE SECTION OF PAY RANGE | UPPER SECTION OF PAY RANGE |
|---|---|---|---|
| **MAX INVEST** (INCREASE) | 7.0% | 5.5% | 4.0% |
| **INVEST** (INCREASE) | 5.5% | 4.5% | 3.5% |
| **MARKET** (DEFAULT) | 4.0% | 3.0% | 2.5% |
| **ZERO** (REMOVE) | 0.0% | 0.0% | 0.0% |

MARKET WILL PREPOPULATE BASED ON COUNTRY AND POSITION IN RANGE

MANAGERS THEN HAVE THE ABILITY TO FURTHER INVEST USING A DROPDOWN LIST

---

[17] *See also id.* ("Annual merit awards are part of NIKE's base pay program. Managers should review base pay to award merit during Performance Rewards in August if the employee changes jobs. Performance Rewards is an opportunity for managers to review an employee's base pay, and merit awards reflect the annual Coaching for Excellence (CFE) assessment of results achieved over the last fiscal year, available budget, and other relevant factors such as market data and internal equity.").

Page 15    -    DEFENDANT NIKE, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Nike guidelines list subjective criteria for managers to consider when deciding employees' Core Pay adjustments, with CFE ratings included as a data point. Nx 76 ("Performance is an important factor for determining pay. **Other inputs include current position in range, future potential, impact of loss, risk of loss, time in role, and pay relative to peers.**") (emphasis added); Nx 83, p. 3, 6. *See also* Walker Tr. 354:11-18; 359:4-5 (Core Pay decisions "vary based on the manager, based on the year").

The evidence is clear that each manager is responsible for making merit and bonus decisions, and that, at most, the manager's manager (referred to as "Manager +1") approves these adjustments. Walker Tr. 60:3-10 (confirming same and denying executive review); Edington Decl. ¶¶ 11-12; Mack Decl. ¶¶ 13-14. Putative class members confirm that managers make merit increase decisions based on a variety of factors, and that the decisions are not subject to executive review.[18] Plaintiffs present no evidence to the contrary.

### 3. Nike's Annual Performance Sharing Plan ("PSP") Bonus Plans And Processes Have Changed Significantly During The Putative Class Periods, And Also Are Awarded Based on Manager Discretion.

Performance Sharing Plan ("PSP") awards are Nike's annual cash bonuses, awarded to employees who receive CFE ratings above "Unsatisfactory." White Tr. 15:17-25; 17:8-23. The PSP plans and award process also have changed during the Putative Class Periods in significant ways. For example, in 2017 and 2018, Nike had 18 and 11 different PSP plans, respectively; each employee's PSP depended on their cost center (of which Nike has "hundreds"). White Tr.

---

[18] Levison Decl. ¶ 12 ("When making base pay salary adjustments, I consider where an employee falls in their job's salary range, their specific performance on the job, feedback from their peers, and their CFEs. I have never had my base pay salary adjustment decision rejected."); Baird Decl. ¶ 11 (describing providing raise "in order to reflect [direct report's] contribution to the team"); Worboys Decl. ¶ 12; Hunter Decl. ¶ 8; Spencer Decl. ¶ 14; Bond Decl. ¶¶ 11-12; Leenhouts Decl. ¶ 15; Thornton Decl. ¶10; Oda Decl. ¶ 16-18; Stallard Decl. ¶11; Hackenmiller-Paradis Decl. ¶ 15.

107:18-109:5; 114:12-115:13; Exs. 598, 601. PSP awards were comprised of both "Team" and "Discretionary" components. The "Discretionary" portion of the award was determined in part by the individual employee's manager through assignment of a "Performance Modifier."[19] *Id.* 104:14-107:17; Exs. 598, 601. While the "Performance Modifier" was based on the employee's CFE rating, Nike's guidelines presented a range from which individual managers could chose, or even exceed, in their discretion to award PSP bonuses for their employees (*see* figure to the left). *Id.* 124:16-128:14; Exs. 598, 601, 613.[20] Since 2019, Nike has used one PSP plan with one company financial performance metric and individual modifiers set at 100%. *Id.* 109:6-110:4.

| CFE DISCRETIONARY MODIFIER GUIDELINES | |
|---|---|
| CFE Ratings | Performance Modifier* |
| Exceptional | 75-150% |
| Highly Successful | 50-125% |
| Successful | 25-110% |
| Inconsistent | 0-75% |
| Unsatisfactory | 0% |
| Too New to Rate | 0-110% |

As with Merit Awards and Core Pay adjustments, individual managers determine the amount of the PSP award, and then the Manager +1 approves. *Id.* 68:15-69:2 (denying "additional business leader review" of PSP awards; "the responsibility of business leaders to stay within the budget"); Ex. 613 ("Manager +1 will need to approve any amounts submitted.").

## C.    Promotions.

### 1.    Thousands Of Individual Managers Make Individual Promotion Decisions Following Their Decisions On Fill Strategy.

Plaintiffs and their experts do not dispute that women and men at Nike are promoted at the same rates. Neumark R. at ¶ Table 10, Panel A; Neumark Tr. 261:16-262:4; 263:1-21; *see also* Saad R. at ¶¶ 30, 199-204, Ex. 26. To create an issue where none exists, Plaintiffs instead challenge only "non-competitive promotions." Br. at 22-25. Yet still, Plaintiffs do not contend

---

[19] Both the Team and Discretionary shares were calculated based in part on the EBIT target for the specific PSP Plan, which varied by cost center. White Tr. 107:18-109:5; 114:12-115:13; 120:2-24; Exs. 598, 601.

[20] *See, e.g.*, Hackenmiller-Paradis Decl. ¶¶16-17; Hunter Decl. ¶ 10; Harris Decl. ¶ 15.

that these processes were common, consistent, or classwide. *Id.* To the contrary, thousands of individual managers make decisions on whether to post vacancies (*i.e.*, their "fill strategy"), and following that decision, select candidates (whether non-competitive or competitive) based on a range of factors that vary depending on the role and the candidate's credentials and experience.

First, it is important to understand what Plaintiffs mean by the phrase "non-competitive promotion." That term refers to promotions that do **not** occur through the job posting process—that is, a "competitive" process, during which positions are posted, the applicants' backgrounds are considered in view of the desired qualifications, there are rounds of interviews, and the hiring manager selects a successful candidate. Plaintiffs do not challenge "competitive" promotions because, according to their expert, women obtain promotions through this process at a significantly higher rate than men. Neumark R. p. 62, Table 10.

Plaintiffs instead challenge only "non-competitive promotions." These typically occur when a role has expanded in scope, and the person holding the role at the time is selected to expand with it. For example, a role may expand from Designer I to Designer II when the work becomes more complex, has a larger scope, or requires less supervision. Once it is determined that the role should expand, the individual manager then decides whether the employee currently in the role has the potential to expand with it. If so, the employee generally will be selected for the "non-competitive" promotion. If not, the role generally will be posted for others to apply.

Plaintiffs do not explain this process (Br. at 23), probably because non-competitive promotions epitomize individual manager discretion. Plaintiffs instead attempt to "centralize" this process by misrepresenting "fill strategy" and the involvement of TA or HR in the process. The record refutes their descriptions. Individual *hiring managers* determine "fill strategy" for their teams' needs, which means deciding whether the role should be posted, or whether the

hiring manager should promote someone into the position. Thomas Tr. 80:23-81:23.

Putative class members, including Plaintiffs, confirm individual managers make promotion decisions based on a range of factors that vary by role and manager.[21] And, like fill strategy, promotions decisions (whether competitive or non-competitive) do not require approval from HR or anyone else (beyond possibly the hiring manager's direct supervisor). *See*, *e.g.*, Heinle Tr. 62:9-63:14; 196:4-13; Edington Decl. ¶ 16 (Vice President reports: "Similarly, the hiring manager is typically the one who makes the final decision on hiring decisions, and I do not get involved."); Fagan Decl. ¶ 13. Thus, much like the pay processes above, Nike's promotion processes function as manager discretion on top of manager discretion.").

Notably, while Plaintiffs assert that "Nike executives and HR are the key drivers of promotions," their sole citation is a company-wide email from Nike's Chief Human Resources Officer ("CHRO"), Monique Matheson, discussing Nike's desire to increase representation of women and people of color at the Vice President level. Br. at 2; Px. 14. That email says nothing about Nike executives making individual fill strategy or promotion decisions.

**D.    Initial Job Level Assignment.**

**1.    Managers Decide The Appropriate Level (And Job Code) To Fill Their Team's Needs Before Posting Requisitions — To Which Candidates Then Apply.**

Plaintiffs allege that Nike's "initial job assignment policies or practices adversely impact women." Br. at 26-28. Plaintiffs do not understand (or intentionally misrepresent) how Nike's hiring processes work. First, before a position is posted, the individual hiring managers

---

[21] Hunter Decl. ¶ 17 ("The particular factors I consider in recommending someone for a promotion varies from job to job, but there is a focus on work results."); Levison Decl. ¶ 13; Thornton Decl. ¶ 6 ("Even though I had not discussed my desire for a promotion with my manager, I believe that because of my strong work performance, my male manager promoted me to Apparel Designer II even though I did not apply or interview for the role.").

determine the appropriate Level (and Job Code) for the role. This assessment turns on the unique circumstances of their team's needs.[22] The hiring manager may consult with an HRBP about the best approach, but regardless of whether an HRBP is involved, "**the hiring manager** will make the decision because it is their team and their business around what the open position should be." *Id.* 107:14-18 (emphasis added). Plaintiffs' attempt to "centralize" Nike's hiring processes based on the vague "involvement" of HR or TA is a non-starter. Br. at 26-27.

Second, once the hiring manager determines the appropriate Level (and Job Code) for a role and the job is posted, the Level and Job Code cannot be changed. In other words, no one at Nike is "leveling" candidates or "assigning" them to jobs upon hire; rather, candidates apply to open roles *where the Job Level and Job Code are pre-determined*.[23]

Third, Plaintiffs similarly overlook another important part of the process: even if recruited, applicants decide the role(s) to which they apply, and applicants must submit applications for such position(s). While Plaintiffs' contend—citing no evidence—that Nike recruiters apply or match candidates to jobs (the implication being that recruiters "channel" men to higher level openings), this is not true. While recruiters may, in their discretion, use various tools to find candidates they believe are qualified for open positions, especially if those positions are difficult to fill, candidates must decide whether to apply to those jobs or not. Thomas Tr. 42:20-46:1; *see also* Miller Tr. 68:1-69:14.

As to "matching" candidates to open positions, Julian Miller, Product Manager in Nike

---

[22] Baird Decl. ¶ 13 (describing how hiring manager sets level based on role and team needs).
[23] *See, e.g.*, Worboys Decl. ¶ 15 ("The level for each role is set when the job is approved for headcount and cannot be changed once the job is approved."); Peele Decl. ¶ 9 (level and job title are "pre-set and cannot change based on the candidate or any other factor"); Caputo Decl. ¶ 13; Yoon Decl. ¶ 12; Scire Decl. ¶ 15; Hopkins Decl. ¶ 7; Mangan Decl. ¶ 11; Collins Decl. ¶ 5; Harris Decl. ¶ 17; Hunter Decl. ¶ 13; Slaughter-Beveridge Decl. ¶ 5; Leenhouts Decl. ¶¶ 11-12; Hackenmiller-Paradis Decl. ¶ 21; Croll Decl. ¶ 5.

Technology, testified that "matching" rarely occurs and, even then, only in the narrow situations where there are multiple open requisitions at the same time for **exactly the same job**. *Id.* 100:6-22 (explaining Nike's "very specific" guidelines: requisition must be for the same Job Code, Band and Level, have the same screening criteria and qualifications, and be open within the same time frame). Sworn testimony from recruiters confirms all of the above.[24]

Plaintiffs' experiences confirm they were not "channeled" to lower level roles. Plaintiff Cahill testified that a female Senior Director and male Vice President encouraged her to apply to a *higher* level position (Director) than the one to which she originally planned to apply (Manager), and that she was hired into the Director position. Cahill Tr. 105:13-111:2. Not a single Plaintiff said they were "assigned" into a lower-level job at hire by a recruiter or anyone else at Nike; to the contrary, Plaintiffs and putative class members confirmed that they were hired for the specific role to which they applied, and that they learned about the open positions through the newspaper, career websites, Nike.com, or word-of-mouth.[25] There is **zero evidence** that women are channeled into lower-level jobs at Nike.

## IV.    <u>Nike's Deep Commitment To Equity, Inclusion, And Diversity.</u>

Nike is committed to fostering an inclusive culture, where all employees have the opportunity to realize their full potential. To achieve this, Nike has robust Equal Employment Opportunity policies overlaying its hiring, compensation, and promotion processes. If employees

---

[24] Caputo Decl. ¶ 14; Bowman Decl. ¶¶ 13-14; Snashall Decl. ¶ 12; Flores-Sandoval Decl. ¶¶ 7, 10; Morton Decl. ¶ 12; Hopkins Decl. ¶ 12; Collins Decl. ¶ 9; Lozito Decl. ¶ 7; Mangan Decl. ¶ 12; Yoon Decl. ¶¶ 12-13; Scire Decl. ¶ 17.

[25] **Elizabeth** Tr. 139:4-8; **Hender** Tr. 168:15:-169:1; **Anderson** Tr. Vol. I, 112:25-113:18; **Tucker** Tr. 71:9-17; **Linebaugh** Tr. 66:17-67:16; **Westerhof** Tr. 118:16-120:15; **Baumel** Tr. 119:17-120:21; **Olson** Tr. 74:4-19, 78:6-9, 81:1-4; **Azavedo** Tr. 111:7-11; *See* Worboys Decl. ¶ 4; Nopper Decl. ¶ 5; Peale Decl. ¶ 4; Spencer Decl. ¶ 4; Thornton Decl. ¶ 4; Louder Decl. ¶¶ 5-6; Harris Decl. ¶ 4; Saxton Decl. ¶ 4; Stallard Decl. ¶¶ 4-5; Hackenmiller-Paradis Decl. ¶¶ 5, 8; Bond Decl. ¶ 4; Slaughter-Beveridge Decl. ¶¶ 4-5.

have concerns, there are many avenues to raise them (anonymously, if desired), which are publicized on Nike's internal portals, like Nike ZERO and its HR Readiness site.[26] Nike's dedicated Employee Relations team is responsible for investigating employees' concerns about potential policy violations. Daugherty Tr. 38:8-12; 67:1-10.

As part of Nike's commitment to diversity and inclusion, the Company continually evaluates and evolves its processes with hiring, pay, and promotions in mind. For example, in 2018, Nike implemented "Competitive Pay Management" or pay adjustments for individuals who were below the minimum of their pay ranges or identified as a result of Nike's pay equity analyses. Walker Tr. 163:13-23. Nike also has taken, and continues to take, steps to increase the representation of women and people of color in leadership positions.[27]

Throughout their brief, Plaintiffs repeatedly cite an April 4, 2018 message from Nike's CHRO, Monique Matheson, to claim that Nike "admitted" its processes were "biased." Br. at 2, 7, 14-15, 27, 33, 38-39, 46, 49, 51, 57; Px. 8, 14. False. The message was (and is) an aspirational statement about increasing diversity at the Vice President level, and that Nike wanted to accelerate its progress in this area. *Id. See also* Matheson Decl. ¶ 5-7.

When Nike employees have voiced concerns or proposed ways to improve existing processes, Nike listens. For example, in response to the Company's 2018 "all-employee survey"

---

[26] *See* Nx 75; Nx 77; Nx 78; Nx 79; Nx 80; Nx 81; Nx 82; Nx 84; Nx 85; Nx 86; *see also* https://jobs.nike.com/diversity-and-inclusion.

[27] In October 2021, Nike announced its 2025 target goal of "50% female representation in the global corporate workforce and 45% representation in leadership positions," noting that the Company had "increased representation of racial and ethnic minorities in the U.S. to more than 29% of our VP leadership team—an 8% increase in the last two years—and aim to reach 35% by 2025." *See* https://news.nike.com/news/how-nike-is-building-on-diversity-and-inclusion-to-advance-sustainability; https://purpose.nike.com/diversity-equity-inclusion; https://purpose-cms-preprod01.s3.amazonaws.com/wp-content/uploads/2022/03/17210319/FY21_NIKE-Impact-Report.pdf.

(distributed to all employees, male and female, with anonymized results), employees expressed generally that they wanted greater access to information about their career progression and more transparency on available roles and career paths. Matheson Decl. ¶ 8-9. Nike then implemented some changes to its hiring and job posting practices so that available opportunities were more widely known. *Id.* (refuting Plaintiffs' suggestion that Nike changed practices in response to complaints of discrimination by female employees).[28]

Plaintiffs contend that an informal collection (in early 2018) of about 30 complaints—mostly anonymous[29]—provides classwide evidence of discrimination. That is wrong. These complaints (which Plaintiffs refer to as the "Starfish" survey) are no survey at all. There is no evidence, for example, that these complaints were collected from a random sample of women or other employees across Nike (to control for selection bias); that information was gathered and processed in any systematic way; or, that there was a clear question that the alleged survey was designed to measure in the first instance.

In fact, Plaintiffs' expert, Dr. Lundquist, though critical of Nike based on the alleged "survey," admitted that she **did not know**: (1) who created the purported "survey," though she "believe[d]" (without facts) that it was a female employee; (2) to whom the "survey" was distributed (though she believed, again without facts, that it was "completed by females"); (3) how the recipients were selected, who selected them, or the response rate; or (4) whether the recipients were current or former employees. Lundquist Tr. 275:22-280:21. Nor did Dr. Lundquist perform any analysis to determine the job levels or positions of the participants,

---

[28] *See also* Lundquist Tr. 208:22-209:5 (agreeing companies may change their practices over time and that doing so does not mean that a prior practice was unlawful).

[29] *See* Lundquist Tr. 278:21-279:4 (Dr. Lundquist testified that the "Starfish" complaints numbered "someplace in the neighborhood of 30 or so.").

despite claiming (without facts, a common theme) that they were "mostly higher-level women." *Id.*; *see also id.* 273:23-274:3 (Dr. Lundquist agreeing that organizations relying on best practices in HR and other functions still may receive internal complaints of discrimination).

Notwithstanding, Nike took seriously the concerns raised. They were provided to Nike's General Counsel, Hilary Krane, and CHRO Matheson in mid-February 2018. Matheson Tr. 72:6-13; 93:6-17; Daugherty Tr. 192:24-193:5. Ms. Krane and Ms. Matheson made themselves available to employees for meetings, and Nike engaged an outside law firm to thoroughly investigate the concerns and any other contemporaneous submissions. This includes opt-in Plaintiff Anderson's March 2018 complaint about an incident with her former manager, Daniel Tawiah (which occurred in October 2015 and was allegedly observed by her manager, Plaintiff Cahill, whom failed to report it). Matheson Tr. 86:16-21, 97:23-98:8; Anderson Tr. Vol. II 205:2-221:1; Exs. 206-208 (Anderson confirmed the investigators took her complaint seriously). In addition, then-CEO Mark Parker sent an employee-wide email that the submissions "disturb[ed] and sadden[ed] him" and "[did] not reflect our core values of inclusivity, respect and empowerment." Px. 9. In a subsequent speech, Parker commended employees for speaking up. Px. 5. In or about Spring 2018, some individuals, including Daniel Tawiah, exited Nike. Matheson Tr. 122:13-16.

Plaintiffs' limited anecdotes are not indicative of the range of women's' experiences at Nike. Diana Stallard, a Director who has worked for Nike since 2008, aptly stated:

> I understand that the Plaintiffs in this case have asserted that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. That has not been my experience at Nike. I do not believe that gender has impacted my pay, performance ratings or promotional opportunities during my Nike employment. I do not believe that any of my managers at Nike have treated me differently because of my gender.

Stallard Decl. ¶ 14. Testimony from many putative class members is in accord.[30]

## ARGUMENT

Rule 23 does not set forth a mere pleading standard, nor does it "establish an entitlement to class proceedings for the vindication of statutory rights"; instead, it "imposes stringent requirements for certification that in practice most claims." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013); *accord Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 967 (9th Cir. 2020) ("Parties seeking class certification **bear the burden** of satisfying each of the four requirements of Rule 23(a) of the Federal Rules of Civil Procedure and at least one of the requirements of Rule 23(b).") (emphasis added); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

A court considering a motion for class certification must conduct a "**rigorous analysis**" and find, by a preponderance of the evidence, that the requirements of Rule 23 are met before it can certify a class. *Dukes*, 564 U.S. at 350-51 (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable")) (alterations in original). Such rigorous analysis requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-83 (9th Cir. 2011). The Supreme Court has repeatedly emphasized that such "rigorous analysis" will "frequently entail overlap with the merits of the plaintiff's underlying claim" because "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the

---

[30] Nopper Decl. ¶ 20; Harris Decl. ¶ 18; Hunter Decl. ¶ 18; Louder Decl. ¶ 20; Ratchuk Decl. ¶ 11; Spencer Decl. ¶ 15; Bond Decl. ¶ 14; Peale Decl. ¶ 14; Leenhouts Decl. ¶ 20; Worboys Decl. ¶ 19; Saxton Decl. ¶ 10; Thornton Decl. ¶ 13; Hackenmiller-Paradis Decl. ¶ 25; Levison Decl. ¶ 16; Peele Decl. ¶ 10.

plaintiff's cause of action." *Comcast*, 569 U.S. at 33-34 (quotation marks and citations omitted);

*see also Ellis*, 657 F.3d at 983 ("The district court [must] resolve any factual disputes necessary

to determine whether there was a common pattern and practice that could affect the class *as a*

*whole*.") (emphasis in original).

Failure to satisfy even one requirement of Rule 23 precludes certification. *Id.* at 979-80

(plaintiffs must show "they have met **each** of the four requirements of Federal Rule of Civil

Procedure 23(a) and at least one of the requirements of Rule 23(b)") (emphasis added). Plaintiffs

fail to meet their burden here.[31] The Court should deny certification.

## I.    **Plaintiffs Fail To Meet Their Burden Of Proving Compliance With Rule 23(a).**

### A.    **Plaintiffs Fail To Prove Rule 23(a)(2) Commonality For Any Of Their Claims.**

Rule 23(a)(2) requires Plaintiffs to demonstrate the existence of "questions of law or fact

common to the class" the "truth or falsity" of which will "resolve an issue that is central to the

validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 349-50. As the Supreme

Court observed, Rule 23(a)(2) "is easy to misread, since '[a]ny competently crafted class

complaint literally raises common "questions"'" such as "Do our managers have discretion over

pay? Is that an unlawful employment practice? What remedies should we get?" *Id.* at 349

(citation omitted). But "[r]eciting these questions is not sufficient to obtain class certification;"

---

[31] In their Motion and supporting papers, Plaintiffs raise alleged discovery issues, despite having conducted discovery for nearly three years and the fact that discovery closed months ago. These purported issues do not obviate the need for Plaintiffs to meet their Rule 23 burden. *See, e.g., Bell v. Lockheed Martin Corp.*, 2011 WL 6256978, at *8 (D.N.J. Dec. 14, 2011) ("The burden of showing that class certification is appropriate always remains on the plaintiff. . . . Plaintiffs have had adequate time to conduct discovery, and have received numerous documents and taken numerous depositions. Similar to the plaintiffs in *Dukes*, Plaintiffs here have been unable to 'identif[y] a common mode of exercising discretion that pervades the entire company.'") (quoting *Dukes*, 564 U.S. at 356); *see also Buckland v. Maxim Healthcare Servs., Inc.*, 2012 WL 3705263, at *7-8 (C.D. Cal. Aug. 27, 2012) (denying certification and finding counsel inadequate to represent the class for failing to pursue necessary discovery for the case).

rather, "'[w]hat matters to class certification . . . [is] the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation.'" *Id.* at 349-50 (citation omitted) (emphasis in original). In a discrimination class action[32] such as this, commonality requires that "all the class members' claims for relief . . . produce a common answer to the crucial question *why was I disfavored*." *Id.* at 352 (emphasis in original). Plaintiffs do not meet this standard.

### 1.    Plaintiffs' Disparate Impact Claims Do Not Satisfy Commonality.

The U.S. Supreme Court's decision in *Dukes* forecloses commonality here. The *Dukes* plaintiffs were three Wal-Mart employees who alleged discrimination on the basis of sex due to unequal pay and promotions, in violation of Title VII. *Dukes*, 564 U.S. at 343. Pay and promotion decisions at Wal-Mart were generally committed to local managers' broad discretion, which was exercised "in a largely subjective manner." *Id.* The plaintiffs claimed that their local managers' discretion over those processes was exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees. *Id.* at 344. The plaintiffs further claimed, because Wal-Mart was aware of the effect but refused to cabin its managers' authority, that amounted to disparate treatment. *Id.* at 345.

The plaintiffs' theory of commonality was that Wal-Mart's "strong and uniform 'corporate culture' permits bias against women to infect . . . the discretionary decisionmaking of each one of Wal-Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." *Id.* They sought to litigate the Title VII claims of 1.5 million female employees as the their proposed class, relying on (1) aggregated statistical evidence about pay and promotion disparities between men and women at the

---

[32] Plaintiffs offer no independent certification analysis as to their Oregon Equality Act claims, save to confirm that they will rise and fall with their Title VII claims. Nike responds in kind.

company; (2) anecdotal reports of discrimination from about 120 of Wal-Mart's female

employees; and (3) the testimony of a sociologist, Dr. William Bielby, who conducted a "social

framework analysis" of Wal-Mart's "culture" and personnel practices, and concluded that the

company was "vulnerable" to gender discrimination. *Id.* at 346. The district court certified the

proposed class, which the Ninth Circuit substantially affirmed. *Id.* at 347.

        In setting the standard by which all discrimination class actions are evaluated, the

Supreme Court reversed certification, finding the plaintiffs could not establish commonality.

Said the Court. Said the Court, "[t]he only corporate policy that the plaintiffs' evidence

convincingly establishes is Wal-Mart's 'policy' of *allowing discretion* by local supervisors over

employment matters." *Id.* at 355 (emphasis in original). Such a policy of discretion is, "[o]n its

face . . . **just the opposite of a uniform employment practice that** would provide the

commonality needed for a class action; it is a policy *against having* uniform employment

practices." *Id.* Although delegating "discretion to lower-level supervisors *can be* the basis of

Title VII *liability*," the Supreme Court explained, it does not automatically "lead to the

conclusion that every employee in a company using a system of discretion has such a claim in

*common*." *Id.* (emphasis added). That is because there is a "wide gap" between "an individual's

claim that [s]he has been denied a promotion" and "the existence of a class of persons who have

suffered the same injury as that individual." *Id.* at 352-53 (citation omitted). Since

"demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate

the invalidity of another's," a party basing commonality on such a system of discretion "will be

unable to show that all the employees' Title VII claims will in fact depend on the answers to

common questions." *Id.* at 355-56.

        Plaintiffs give *Dukes* short shrift, save for an unsuccessful attempt to distinguish it by

*overstating* the degree of discretion afforded to Wal-Mart managers and *understating* the degree of discretion granted to managers by Nike. Br. at 6. The plaintiffs in *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*, 34 F. Supp. 3d 896, 905 (N.D. Ill. 2014) tried a similar tactic to no avail. As the *Jones* court explained, "Wal-Mart did not vest its managers with unfettered discretion to pay and promote employees as they saw fit." *Id.* Rather, "and as the Supreme Court carefully noted, although the company granted broad discretion to managers to increase wages and to select employees for promotion, that discretion had limits and was subject to corporate oversight." *Id.*

Like Nike, "Wal-Mart imposed limits on the size of raises that could be awarded and established compensation ranges for employees at various levels within the company[,]" just as "[p]romotions to higher positions were 'similarly at the discretion of the employee's superiors after the prescribed objective factors are satisfied.'" *Id.* (citing *In re Countrywide Fin. Corp. Mortg. Lending Practices Litig.*, 708 F.3d 704, 708 (6th Cir. 2013) (noting that Wal-Mart cabined supervisor discretion within limits defined by objective criteria)). "None of these limitations, however, rendered Wal-Mart's approach to pay and promotions as anything other than one in which pay and promotion decisions were 'generally committed to local managers' broad discretion.'" *Id.* at 905-06 (quoting *Dukes*, 564 U.S. at 343). The same holds true at Nike, notwithstanding the fact that managerial discretion in determining hiring, pay, and promotions is not unfettered. Plaintiffs cannot escape *Dukes*.

         **a.**    **Plaintiffs' disparate impact claim is predicated on discretion; they have failed to identify a specific employment practice or policy.**

A "specific employment practice" is "all the more necessary [for a disparate impact

claim] when a class of plaintiffs is sought to be certified." *Dukes*, 564 U.S. at 357.[33] Plaintiffs fail to identify any specific employment practice or policy that allegedly disfavors women. Br. at 12-28. Nor can Plaintiffs avoid *Dukes* by affixing an imprecise label (*i.e.*, "starting pay policy" or "merit increase" or "fill strategy") to highly individualized procedures. *Id.* at 38-46.

For example, on remand, the *Dukes* plaintiffs narrowed their class significantly. *Dukes v. Wal-Mart Stores, Inc.*, 964 F. Supp. 2d 1115 (N.D. Cal. 2013) ("*Dukes II*"). Similar to Plaintiffs here, they identified several corporate policies, such as a "tap on the shoulder" system for promotions, and company-wide guidelines for pay decisions, which allegedly provided "common direction." *Id.* at 1119, 1124-25. They alleged that Wal-Mart limited managers' discretion by requiring managers to consider various criteria, such as "interpersonal skills," "adaptability," "leadership ability," "communication skills" or "ability to learn." *Id.* at 1126. The district court rejected the plaintiffs' characterization as "**Repackaged Delegated Discretion**," concluding that the identified criteria "were so vague or numerous that they imposed no real constraints" on discretion, and that Wal-Mart did not prohibit managers from considering other factors of their own choosing. *Id.* (emphasis added). Thus, although plaintiffs identified some company-wide policies, the plaintiffs did not challenge the policies themselves or the faithful application of those policies; instead, they continued to challenge the "broad discretion managers retained in applying the vague criteria." *Id.* at 1126-27. The court observed that plaintiffs were "right back

---

[33] "To establish a *prima facie* case of disparate impact, plaintiffs must: (1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices at issue; and (3) show a causal relationship between the challenged practices and the disparate impact. . . . If plaintiffs establish a *prima facie* case, the burden shifts to the employer to show that its challenged practices are consistent with business necessity and that there was no less discriminatory alternative." *Moussouris v. Microsoft Corp.*, 2018 WL 3328418, at *14 (W.D. Wash. June 25, 2018), *aff'd*, 799 F. App'x 459 (9th Cir. 2019) (internal citations omitted); *accord Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 281 (S.D.N.Y. 2018), *petition denied*, 2019 WL 2498769 (2d Cir. Mar. 19, 2019).

where they started: challenging Wal-Mart's practice of delegating discretion to local managers,

which the Supreme Court held was *not* a specific employment practice supplying a common

question sufficient to certify a class." *Id.* (emphasis in original).

    Similarly, in *Jones*, the court rejected the same tactic, explaining:

> [T]he plaintiffs have attempted to avoid the import of *Wal-Mart* by
> combining what they had previously characterized as different
> policies and downplaying the degree of discretion afforded by those
> policies to supervisors by describing the combined system as a
> single "forced," *i.e.,* a mandatory, non-discretionary, 'employment
> practice.' . . . [A]t that level of generality, every company—even
> Wal-Mart—could be said to have a company-wide policy, and
> would be liable if there were a disparity in compensation or other
> conditions affecting employees who were members of a protected
> class.

*Jones*, 34 F. Supp. 3d at 904-05 (no commonality where procedures offered many different

avenues for pay raises and promotions, changed over time, and were subject to ad hoc

exceptions, "creating myriad permutations that undermined the plaintiffs' assertion of

uniformity"); *accord Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 898 (7th Cir. 2012) ("[*Dukes*]

tells us that local discretion cannot support a company-wide class no matter how cleverly

lawyers may try to repackage local variability as uniformity."); *Ross v. Lockheed Martin Corp.*,

267 F. Supp. 3d 174, 200 (D.D.C. 2017) (finding no commonality; it is "insufficient to point to

the performance appraisal system *as a whole* and contend, as Plaintiffs do, that it acted as 'an

identical or similar headwind against all class members'") (emphasis in original).

    This case is no different. Plaintiffs' labels of "starting pay policy," "merit increases,"

"bonuses," "fill strategy," "non-competitive promotions," and "initial job assignment" cannot

glue countless individual manager decisions together to clear the commonality threshold under

*Dukes*. This is all the more true when Plaintiffs admit their labels do not apply throughout the

class period. Br. at 13, 15-17, 23; *see* Sections III.A-C; *see also Dukes II*, 964 F. Supp. 2d at

1126 ("Practices that do not apply during the entire class period across the class cannot provide a common question tying the class together.").

           **b.**    **Plaintiffs have failed to prove a common mode of exercising discretion pervades Nike.**

While *Dukes* did not entirely foreclose the ability to establish commonality when an employer operates under a policy of discretion, the Supreme Court made clear that, for certification in such case, plaintiffs must prove "a common mode of exercising discretion that pervades the entire company and ties the alleged reasons for all those individual decisions together." *Moussouris*, 2018 WL 3328418, at *19 (citing *Dukes,* 564 U.S. at 352); *accord Kassman*, 416 F. Supp. 3d at 275; *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1229 (10th Cir. 2013) (recognizing that courts "have generally denied certification when allegedly discriminatory policies are highly discretionary"). Plaintiffs do not and cannot demonstrate that Nike managers exercise discretion in a common way.

*First*, Plaintiffs seek to certify a class of over 5,200 women, which is noticeably larger than the certified classes in cases upon which Plaintiffs rely. *See Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 509 (N.D. Cal. 2012) ("*Ellis II*") (observing, in a class of 700 members, that, "the larger the class size, the less plausible it is that a class will be able to demonstrate a common mode of exercising discretion"); *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 62-63 (S.D.N.Y. 2018) (1,762 – 2,300 members); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) (700 members). Plaintiffs' proposed class also "covers a myriad of positions . . . with an even more varied set of responsibilities within those positions," *Moussouris*, 2018 WL 3328418, at *19, and a "myriad of job descriptions, . . . at levels of seniority ranging from" to Entry Professional to Senior Director. *Kassman*, 416 F. Supp. 3d at 277. This further distinguishes Plaintiffs' cited cases: *Ellis II*, 285 F.R.D. at 509 (two

"closely related" management-level positions sharing "a uniform job description across the class"), *Chen-Oster*, 325 F.R.D. at 63 (finding class members fell into two positions); *McReynolds*, 672 F.3d at 491 (one position); *Scott v. Family Dollar Stores, Inc.*, 2016 WL 9665158, at *2 (W.D.N.C. June 24, 2016) (one position, "Store Manager").

     ***Second***, Nike's processes act as a *framework* that "reinforce[] the discretionary nature of the decisionmaking." *Jones*, 34 F. Supp. 3d at 904-06. How Nike managers make decisions within that framework is up to them, though Nike provides subjective criteria such as "[r]elevant work experience, education and skills" or "future potential" that managers can (and do) interpret and apply differently depending on the role. *See* Sections III.A-D. "Subjective criteria, prone to different interpretations, generally do not provide common direction." *Kassman*, 416 F. Supp. 3d at 279 (citing *Ross*, 267 F. Supp. 3d at 198 ("[T]hat all . . . supervisors used the same allegedly ill-defined numerical rubric . . . says nothing about how individual supervisors exercised what discretion was left to them.")) (alterations in original); *Jones*, 34 F. Supp. 3d at 906 ("That supervisors evaluate candidates according to specific, but subjective, factors . . . does not make the decisions produced by the process meaningfully less discretionary."); *Moussouris*, 2018 WL 3328418, at *20 ("Microsoft's benchmarks are subjective and open to many interpretations—indeed, Microsoft designed the criteria so that managers could adapt it to various employees' roles"); *Dukes II*, 964 F. Supp. 2d at 1126-27.[34] Again, this distinguishes *Ellis II*, 285 F.R.D. at

---

[34] *Accord Handloser v. HCL Techs. Ltd.*, 2021 WL 879802, at *8 (N.D. Cal. Mar. 9, 2021) (no commonality where "Defendants' hiring process empowers a large number of recruiters, HR personnel, and delivery teams with significant discretion to make employment decisions"); *Lindsley v. Omni Hotels Mgmt. Corp.*, 2019 WL 2743892, at *10 (N.D. Tex. July 1, 2019) (no commonality despite salary ranges "set according to a uniform corporate policy" and HR involvement in compensation and promotion decisions*); Zuniga v. Bernalillo Cnty.*, 319 F.R.D. 640, 649 (D.N.M. 2016*)* (no commonality despite "maximum and minimum pay range for each position"); *Valerino v. Holder*, 283 F.R.D. 302, 313 (E.D. Va. 2012) (no commonality where firm-wide procedure merely "set[] up a structure" through which employees were evaluated);

Page 33   -   DEFENDANT NIKE, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR
                      CLASS CERTIFICATION

509-14 (company had a single procedure that controlled the process by which it made decisions and imposed several non-negotiable requirements, such as mandatory promotion from within the company and a prohibition on posting job opening) and *McReynolds*, 672 F.3d at 490 (two company-wide policies required the managers to allow certain practices, rather than leaving managers to make the decision themselves).[35]

**Finally**, Plaintiffs have not shown involvement by top management, much less the significant or consistent involvement that would provide some "glue" to hold the "reasons for all those decisions together." *Dukes*, 564 U.S. at 352. Plaintiffs assert that Nike "executives" (they do not say who or how many) "review and approve" salary increases and PSP bonus amounts, and are "key drivers" in promotions decisions (for the latter, citing only to the CHRO's statement about Nike diversity and inclusion efforts). Br. at 17-18, 24. But "mere approval or limited oversight by higher-level executives, without more, falls short of showing a sufficient common denominator." *Kassman*, 416 F. Supp. 3d at 280 (citing *Jones*, 34 F. Supp. 3d at 908). At most, the evidence shows that upper level managers such as VPs may give final approval of base pay increases and bonuses *in the aggregate*, but "final approval in the aggregate does not show commonality in the exercise of discretion." *Id.* at 280; *see also Dukes II*, 964 F. Supp. 2d at 1123 (plaintiffs' "definition of 'top' management is a bit slippery, which probably could not be avoided given the diversity of decisions they challenge").

---

*Bell*, 2011 WL 6256978, at *6 (plaintiffs challenges to "merit pay raises" that "perpetuates and compound" pay differentials and that "men disproportionately were picked to fill" unposted vacancies for high-level jobs were "substantially similar to the Wal-Mart discretionary policies that the *Dukes* Court found to be immune to a class action suit").

[35] The *Scott* decision Plaintiffs cite contains few specifics on the defendant's actual policies and practices (likely because the briefing remains under seal; *see* Case No. 3:08-cv-00540-MOC-DSC, Dkt. ## 211, 223, 244). *Scott*, 2016 WL 9665158, at *15-22. Its commonality discussion is therefore too vague to be analyzed for, much less relied upon, in this case.

Further, upper-level managers do not revisit or second-guess lower-level managers' decisions. Mack Decl. ¶ 14 (Vice President: "I rarely question a manager's perspective on their direct report's performance or pay. I have never seen a base pay or ratings decision changed by anyone in a higher level."); Edington Decl. ¶ 11 (Vice President: "it is completely up to managers to make [pay] decisions for their direct reports"); *see Moussouris*, 2018 WL 3328418, at *21 (despite final approval of pay and promotion decision, insufficient involvement from top management where they "rarely revisited the recommendations made at the discretion of lower-level managers"); *Jones*, 34 F. Supp. 3d at 908 (no proof "senior management changed pay or promotion recommendations submitted to them for approval with any frequency"). These facts distinguish *Chen-Oster*, 325 F.R.D. at 66, 76, 84 (finding that upper management developed a list of eligible candidates and "[u]ltimately, [the] management committee decide[d] who [wa]s promoted"); and *Ellis II*, 285 F.R.D. at 499, 511-12 (evidence presented that top management actually made the promotion decisions; CEO himself was "directly involved in the process of recruiting and selecting candidates for promotion" and personally "provide[d] instructions to his staff as to criteria for promotion").

### c.    Plaintiffs' expert opinions do not move the needle.

Nike's *Daubert* motions notwithstanding, a Court's obligations at class certification extend beyond *Daubert* admissibility; the Court must also "judg[e] the persuasiveness of the evidence" and "resolve any factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*." *Ellis*, 657 F.3d at 982-83 (emphasis in original). Neither of Plaintiffs' expert opinions support commonality here.

### i.    Dr. Lundquist's opinions are unreliable, legally irrelevant, and cannot support commonality.

As set forth in Nike's *Daubert* motion, the Court should exclude Dr. Lundquist's

opinions because they are unreliable, irrelevant, and exceed the permissible scope of expert

testimony. *See, e.g.*, Hanvey R. ¶¶ 9-11; 235-249; *see also Campbell v. Nat'l R.R. Passenger*

*Corp.*, 311 F. Supp. 3d 281, 318 (D.D.C. 2018) (where expert's opinions were unreliable under

*Daubert*, the court "will not consider [them] in evaluating plaintiffs' commonality arguments").

Even if Dr. Lundquist's opinions withstand *Daubert*, the Court should "safely disregard" them,

like the expert opinions in *Dukes*, 564 U.S. at 353-55, for the following reasons.

       Dr. Lundquist never analyzed whether managers at Nike exercised their discretion in a

common way that pervades the entire complex, matrixed enterprise. This is fatal to Plaintiffs'

disparate impact claim because it is the essential question on which commonality depends.

Moreover, like the expert in *Dukes*, Dr. Lundquist only speculates about what "could have" or

"may have" occurred at Nike. This does not provide the "significant proof" required to find that

Nike processes discriminate against all women in a common way, or that Nike "operated under a

general policy of discrimination." *See Campbell*, 311 F. Supp. 3d at 318 n.8 (expert "do[es] not

show that managers or others at [defendant] applied their discretion in any common way that

caused racial disparities. . .") (citation omitted).

ii.      **Dr. Neumark's aggregate statistics are legally**
              **irrelevant, fatally flawed, and show why the class**
              **cannot be certified.**

       Like in *Dukes*, Dr. Neumark's aggregated analyses—upon which Plaintiffs exclusively

rely to support their disparate impact claims—are insufficient to establish a companywide

practice of discrimination. The *Dukes* plaintiffs offered a similarly aggregated statistical study, in

which regression analyses purportedly showed statistically significant disparities in pay between

men and women that "can be explained only by gender discrimination." *Dukes*, 564 U.S. at 356

(citation omitted). In disregarding the plaintiffs' model, the Supreme Court clearly articulated the

dangers of aggregated analyses, which, by their very nature, cannot establish the existence of

disparities within individual units, let alone provide "the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." _Id._ at 356-57 (citation omitted). For example, a pay disparity could be attributable to a small set of stores or business units, which would be masked with an aggregated analyses, and thus is not probative of whether a "uniform, store-by-store" or unit-by-unit disparity exists. _Id._ at 357. Thus, such higher-level, aggregated statistical models cannot produce a common answer to the question "_why was I disfavored._" _Id._ at 352 (emphasis in original).

Post-_Dukes_, statistical studies must "conform[] to the level of decision for the challenged practices." _Ellis II_, 285 F.R.D. at 523; _accord Kassman_, 416 F. Supp. 3d at 282; _Moussouris_, 2018 WL 3328418, at *24. Where decisions are made at the discretion of individual managers, courts find aggregated statistics inadequate because they are "derived from hundreds of employment decisions made by myriad decision makers, at different times, under mutable procedures and guidelines, in different departments, and in different office locations, concerning employees at varying levels of experience, responsibilities, and education." _Jones_, 34 F. Supp. 3d at 909; _accord Kassman_, 416 F. Supp. 3d at 282 (finding plaintiffs' aggregated statistical evidence "has the same problem as the statistical evidence in [_Dukes_]") (quoting _Bolden_, 688 F.3d at 896); _accord Moussouris_, 2018 WL 3328418, at *24.

Here, the relevant level of decision-maker for the challenged practices remains at the manager level, or at most, the Manager +1 level. _See_ Sections III.A-D. Despite this, Plaintiffs present **zero** statistical studies that are analyzed by decision-maker. In fact, Dr. Neumark does not mention decision-makers once in his Report, and he admits he never studied or modeled Nike's processes or decision-makers at all.[36] _See generally_ Neumark R.; Neumark Tr. 291:5-

---

[36] Dr. Neumark's aggregated analyses assumes that Nike's highest level employee makes all pay,

295:18. The *Moussouris* court illustrated this effect: "if Microsoft had 25 managers, 5 of whom discriminated in making pay and promotion decisions, aggregate data would show that female employees fared worse than male employees. But 'that result would not imply that all 25 [managers] behaved similarly, so it would not demonstrate commonality.'" *Moussouris*, 2018 WL 3328418, at *24 n.20 (quoting *Bolden*, 688 F.3d at 896) (alterations in original); *see also* Saad R. ¶¶ 58-62; Ex. 4. Accordingly, Dr. Neumark's findings of disparities "may be attributable to only a small set of [Nike managers], and cannot by itself establish the uniform, [manager-by-manager] disparity upon which the [P]laintiffs' theory of commonality depends." *Dukes*, 564 U.S. at 357.

Dr. Neumark's rebuttal (that full aggregation is necessary because Nike populations are too small in certain groups to analyze them individually) runs afoul of *Dukes*. *See* Neumark Rep. ¶¶ 20e; 100; 103-104. The plaintiffs in *Dukes II* made the same argument, claiming "the numbers for each store were too small to generate significant results, and so they conducted the analysis at the next highest level." *Dukes II*, 964 F. Supp. 2d at 1120. The court summarily rejected this contention, explaining that "elevating the level of analysis runs afoul of the Supreme Court's objection to Plaintiffs' old statistics: district-level disparities may or may not reflect consistent results across stores, which was the level where support managers were actually selected." *Id.* And, as Dr. Saad illustrated, there are many reliable, alternative methods for analyzing smaller populations when multiple regression is not feasible. Saad R. ¶¶ 95-104.

Even Plaintiffs' analyses, flawed as they may be, show why no class can be certified. For example, Dr. Neumark found ***no disparities*** in starting pay for women hired ***after September***

---

promotion, and hiring decisions, which is not how Nike operates (as reflected in the evidence before the Court.

*2017* (so there is no "gap" to compound; *see* Neumark R. ¶¶ 59, 64, 109), yet Plaintiffs ask the Court to certify a class from *August 2017 to the present*. So too for "non-competitive promotions;" Dr. Neumark found *no disparity* in "non-competitive" promotions *after April 2018*. *Id.* at ¶ 98. In other words, Dr. Neumark found no disparity during nearly the entire putative class period. Without disparity, there is no harm.[37]

Plaintiffs never come to grips with *Dukes*. They challenge Nike's policy of manager discretion yet fail to identify a common mode of exercising discretion that pervades the entire company. As in *Dukes*, without some common direction, it is "quite unbelievable" that all Nike managers supervising over 5,200 putative class members "would exercise their discretion in a common way." *Dukes*, 564 U.S. at 356. Plaintiffs are in the same position as the *Dukes* plaintiffs: "challenging [a] practice of delegating discretion to local managers, which the Supreme Court specifically held was *not* a specific employment practice supplying a common question sufficient to certify a class." *See Dukes II*, 964 F. Supp. 2d at 1127 (emphasis in original). Because Plaintiffs provide no convincing evidence of "some glue" holding together the reasons behind the countless employment decisions they challenge, they have not established a common answer to the question "*why was I disfavored*." *See Dukes*, 564 U.S. at 352 (emphasis in original). Plaintiffs have failed to affirmatively prove commonality. Certification should be denied.

### 2.    Plaintiffs' Disparate Treatment Claims Do Not Satisfy Commonality.

Plaintiffs' disparate treatment claim differs from their disparate impact claim in that it

---

[37] In these circumstances, Rule 23 prohibits class certification for lack of standing. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, J., concurring); see also *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012). The inclusion of admittedly uninjured individuals in the class shows its overbreadth and the "individualized inquiries that would be necessary to determine whether a class member has suffered any injury in the first place." *Moore v. Apple Inc.*, 309 F.R.D. 532, 542-43 (N.D. Cal. 2015) (citing *Kohen v. Pac. Inv. Mgmt. Co., LLC*, 571 F.3d 672, 677 (7th Cir. 2009)).

requires proof of *intentional* discrimination.[38] But their motion to certify their disparate treatment claim has many of the same flaws.

The Supreme Court has observed the "wide gap" that exists between an individual discrimination claim and "the existence of a class of persons who have suffered the same injury as that individual." *Dukes*, 564 U.S. at 352-53 (quoting *Gen. Tel. Co. of the Sw.*, 457 U.S. 147, 157 (1982)). Bridging that gap under Rule 23(a)(2) requires "*[s]ignificant proof* that an employer operated under *a general policy of discrimination*" that "manifested itself in . . . [pay, level at hire, and] promotion practices in the same general fashion." *Id.* (emphasis and second alteration added). To obtain certification, Plaintiffs must show not only that discrimination was "systemwide" such that it was "the regular rather than the unusual practice," but also that Nike directed and approved discrimination as its "standard operating procedure." *Id.* 352 n.7 (citation omitted); *Dukes II*, 964 F. Supp. 2d at 1122 (plaintiffs must prove "discrimination against women was actually directed by Wal-Mart"). Ultimately, Plaintiffs bear the high burden of showing significant proof that a company is so rife with discrimination that it *intentionally* created a de facto policy to discriminate. There is no such significant proof here.

**Statistical evidence.** As discussed above, Dr. Neumark's analyses do not conform to *Dukes*, and they fail to show statistically significant, common disparities between appropriately compared men and women in pay, promotion, and level at hire—much less the kind of gross disparities that would show discriminatory intent on their face. Br. at 48-50. *See* Section

---

[38] *See Kassman*, 416 F. Supp. 3d at 281 ("In a disparate treatment class action, plaintiffs must provide evidence of a 'systemwide pattern or practice' of pervasive discrimination against the class, such that the discrimination is 'the regular rather than the unusual practice.'. . ."); *Moussouris*, 2018 WL 3328418, at *23 ("[P]laintiffs must provide evidence of a 'systemwide pattern or practice' of discrimination, such that the discrimination is 'the regular rather than the unusual practice'") (citation omitted).

I.A.1.c.ii. Nike also explained above why the Court may "safely disregard" Dr. Lundquist's opinions, just as the Supreme Court rejected the expert's opinions in *Dukes*. 564 U.S. at 353-55; *see* Section I.A.1.c.i. Plaintiffs' scant remaining evidence fails to constitute the necessary "substantial proof" that Nike engaged in an enterprise-wide pattern or practice of gender discrimination as its standard operating procedure. Br. at 49-50.

    **Anecdotal evidence.** Plaintiffs submit **zero** class member declarations to support their certification motion, despite receiving confidential compensation and performance data for thousands of female employees more than a year before their filing. Goldstein Decl. Ex. 8 at 3-4 (seeking unmasked employee data on the premise that it "can lead to anecdotal evidence relevant to certification of a disparate treatment claim); Nx 90. Despite the apparent lack of classwide support for this lawsuit,[39] **zero declarations** is well short of the anecdotal evidence courts have found too weak to support an inference of companywide discrimination. *See Dukes*, 431 U.S. at 337-38 (one affidavit for every 12,500 class members); *Moussouris*, 2018 3328418, at *24 (nine declarations for 8,630 class members was "too weak" to establish a general policy of discrimination; post-*Dukes*, courts "have similarly required a significant amount of anecdotal evidence").

    Nor can Plaintiffs' own testimony or unsworn, anonymous complaints make up this fatal deficit. Plaintiffs fail to cite even one case where the plaintiffs' own accounts, spread over many years and involving disparate facts and decision-makers, all from different areas of the business, satisfied the "significant proof" commonality requirement—particularly for a class of this size. Br. at 49-50; *see Lindsley*, 2019 WL 2743892, at *13-43 (no commonality where plaintiff relied

---

[39] After Nike produced the data with employee names, only one opt-in Plaintiff, Jessica Westerhof, joined Plaintiffs' Federal EPA collective action in January 2021, while another former opt-in Plaintiff, Marissa Stromgren, opted out. Dkt. ## 129; 132.

on her own account of pay and promotion discrimination).

Even as to the alleged "Starfish" complaints, Plaintiffs submitted only **six** complaints to support their motion (four of which were anonymous). Br. at 28-30; 49; Px 46-52. Setting aside the issues with these complaints (as provided in Section IV), and even crediting the 14 Named and opt-in Plaintiffs' own accounts, that amounts to 21 pieces of anecdotal evidence for a class of more than 5,200. No authority supports certification on these facts. *See Kassman*, 416 F. Supp. 3d at 284 (finding 150 internal complaints by or on behalf of putative class members "fails to raise any inference that KPMG engaged in a systemwide pattern or practice of discrimination"); *Moussouris*, 2018 WL 3328418, at *26 (finding 238 internal complaints of gender discrimination "does not satisfy the 'significant proof' needed at this stage"); *see also Dukes*, 564 U.S. at 358 n.9 ("[W]hen the claim is that a company operates under a general policy of discrimination, a few anecdotes selected from literally millions of employment decisions prove nothing at all.").

Plaintiffs' limited evidence fails to raise any inference that Nike engaged in a systemwide pattern or practice of discrimination, *i.e.*, it directed discrimination against women as its "standard operating procedure." What it does reinforce, however, is that "[a]necdotal evidence, by definition, raises individual rather than common questions." *Kassman*, 416 F. Supp. 3d at 285; *see also Dukes*, 564 U.S. at 357-58 (finding plaintiffs' anecdotal evidence lacking in part because individual managers undoubtedly have non-discriminatory reasons for their respective compensation and promotion decisions); *Moussouris*, 2018 WL 3328418, at *26 ("Plaintiffs' evidence offer[s], at most, a glimpse into individual incidents that are not sufficiently representative of the entire culture across Microsoft."); *Campbell*, 311 F. Supp. 3d at 321-22 (101 putative class member declarations underscored variability in promotions class action and

not "one common discriminatory practice'") (quoting *Dukes*, 564 U.S. at 345); *Lindsley*, 2019 WL 2743892, at *13 (no commonality in pay and promotions class action; "If anything, [plaintiff]'s declaration and testimony show that she was subject to numerous individualized employment decisions by various different supervisors at the different properties where she worked").

**Other evidence.** Unable to support certification with statistical or anecdotal evidence, Plaintiffs claim that Nike "knew or strongly suspected that its challenged practices adversely impacted women," but "refused to take appropriate steps to address the discrimination." Br. at 50. This mischaracterizes the April 4, 2018 message from Nike's CHRO, Monique Matheson (*see* Section IV), which details Nike's commitment to pay equity and increased representation of women and people of color at the VP level, as well as the accelerated timeline for such progress. Px 7. Plaintiffs also cite a company-wide speech from Nike CEO, Mark Parker, wherein he acknowledged employees (no designation of male or female) had raised concerns, and confirmed that Nike took the concerns seriously. Px 4 ("It took incredible bravery from everyone who stepped up to make their voice heard. So thank you for your courage."). Plaintiffs fail to mention, of course, steps Nike has taken to promote diversity, equity and inclusion, including Nike's complaint investigation procedures; its pay equity studies; and its robust equal employment opportunity policies. *See* Section IV.

Plaintiffs fail to show substantial evidence that gender discrimination was Nike's "standard operating procedure." To the contrary, the evidence shows that Nike is self-reflective, constantly strives to improve its culture, and takes seriously the experiences of its employees, including women and other protected groups. The plaintiffs in *Kassman* attempted to use similar evidence of KPMG's alleged "failure to remedy known disparities" to support their disparate

treatment claim, but came up short. *Kassman*, 416 F. Supp. 3d at 283-84 ("At most, Plaintiffs have shown that KPMG was aware of a pay and promotions gap, and that the firm's efforts have not completely eradicated the gap."). Nike also should not be criticized for these efforts.

For all of the reasons above, Plaintiffs fail to affirmatively demonstrate commonality on their disparate treatment claim.

### 3.    Plaintiffs Fail To Prove Commonality For Their Oregon Equal Pay Act Claim.

Plaintiffs all but abandon their Oregon EPA claim—except to assert, in conclusory fashion, that their claim is "capable of classwide resolution." Br. at 50-51. They offer no separate analysis, citing instead to their failed commonality arguments for their disparate impact and treatment claims, and to two inapposite cases that are not class actions. *Id.* (citing *Smith v. Bull Run Sch. Dist. No. 45*, 80 Or. App. 226 (1986) and *Rizo v. Yovino*, 950 F.3d 1217, 1229 (9th Cir. 2020)). This is waiver and a failure of proof.

Waiver aside, Plaintiffs' argument (scant as it is) glosses over the fundamental nature of an Oregon EPA claim—men and women compared for pay purposes must perform *comparable* work, which Oregon law defines as "similar knowledge, skill, effort, responsibility and working conditions in the performance of work, regardless of job description or job title." Or. Rev. Stat. § 652.210(16). Determining "comparable work" necessarily involves a job-by-job if not individual-by-individual, fact-based inquiry. Dr. Hanvey's job analysis study— unrebutted by Plaintiffs—found that even within the same Job Code, employees showed meaningful differences in work performed and the skill, effort, responsibility, and work conditions to perform their work. *Id.* at ¶¶ 5-8; 65-234. Based on his study, Dr. Hanvey concluded that:

> (1) Nike's roles, whether looking across Function and Job Code, or within Job Code, are not all the same or substantially equal or comparable; and (2) **in order to determine which roles *do* perform substantially equal or comparable work, it would be necessary**

> **to conduct a full assessment of actual job content for each of the
> more than 1,400 Job Codes that goes beyond reliance on Job
> Code (and beyond Job Subfamily and Level**). In other words,
> Nike employees are not sufficiently similar to be examined as a
> single group.

*Id.* at ¶ 3 (emphasis added). Here, there is no common job or comparator, even amongst the

Named Plaintiffs. Among the putative class, there are over 1,200 job codes and 13,000 position

titles spread over 11,000 men and women (some of which contain only women, in which case no

EPA claim can attach). *See* Saad R. ¶ 96 (163 job codes contain only women); *see also*

*Washington Cnty. v. Gunther*, 452 U.S. 161, 178-79 (1981) (explaining that "a woman who is

discriminatorily underpaid" cannot obtain relief under the Equal Pay Act—"no matter how

egregious the discrimination might be—unless her employer also employ[s] a man in an equal

job in the same establishment, at a higher rate of pay").

Likewise, Dr. Neumark's analysis does not show the result for any Job Subfamily-Level

groups, and thus tells the Court nothing about whether the results for all groupings are common.

Neumark Tr. 51:24-54:12. Dr. Saad, on the other hand, analyzed incumbent pay by Job Code,

and found a variety of uncommon pay outcomes, most of which showed no statistically

significant disparities, and in some instances, significantly *favored* women. Saad R. ¶ 5a; ¶ 101-

102, Exs. 10-11. While aggregated models are inherently flawed, *see* Section I.A.1.c.ii, they

provide zero evidence of commonality for Oregon EPA purposes. Plaintiffs fail to meet their

burden to certify this separate class.

### B.    Plaintiffs Fail To Establish Typicality Under Rule 23(a)(3).

Plaintiffs' failure to demonstrate commonality for any of their claims should end the

Court's inquiry. *Ellis*, 657 F.3d at 979-80. Nevertheless, Plaintiffs also fail to prove typicality

(and adequacy, and any of the Rule 23(b) requirements, as discussed below).

In determining typicality, courts ask "whether other members have the same or similar

injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Moussouris, 2018 WL 3328418, at \*27* (quoting *Ellis*, 657 F.3d at 984); *see also* Fed. R. Civ. P. 23(a)(3); *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 412 (C.D. Cal. 2000) ("as goes the claim of the named plaintiff, so go the claims of the class") (citation and quotation marks omitted).

As explained in *Moussouris*, "if the plaintiffs cannot establish that they were injured by the same conduct that injured other class members, then their claims cannot be typical of other members of the class." *Moussouris*, 2018 WL 3328418, at \*27. There, the court found typicality lacking because, although all class members would challenge the same injury—pay and promotions—such general characterizations "obscure[] the many unique facets of the underlying conduct, stemming from the discretion exercised by countless lower-level managers" (*id.*):

> Some individual class members may want to argue that their initial performance rating was flawed.  Or some may want to argue that their accomplishments were not adequately represented in the calibration meeting or people discussion.  Others may have substantial evidence that their particular manager was biased.  And still others may have no qualms with their initial performance rating, the first calibration meeting, or their direct manager, but wish to challenge how successive discussions unfolded in the roll-up process.

*Id.* Or, in another gender discrimination case on which *Moussouris* relied, the court described how a discretionary pay and promotion system (like Nike's) fails typicality:

> This is all to say nothing of the different facts plaintiffs would rely on to prove their disparate claims—different ranking lists, different [manager] notes, different characteristics of individuals like years on the job, district assignments, and collateral duties, different number of applicant applications, etc.  . . . And it is clear that [plaintiffs'] claims at least involve different [managers]. **This alone is sufficient to demonstrate that their claims are not typical of other members of the class**.

*Valerino*, 283 F.R.D. at 318 (emphasis added). The same result should follow here.

First, Plaintiffs present no evidence that a single Named Plaintiff was harmed by a challenged "policy" or "practice," or that they were underpaid compared to male peers performing substantially similar work. Neumark Tr. 28:2-29:8; *see generally* Br., *see also E. Tex. Motor Freight Sys. Inc. v. Rodriguez,* 431 U.S. 395, 403-04 (1977) (plaintiff who "suffered no injury as a result of the alleged discriminatory practices" is "not eligible to represent a class of persons who did allegedly suffer injury"). Nor did all Named Plaintiffs experience the very "policies" or "practices" that they challenge. These facts alone thwart typicality.

Second, the Named Plaintiffs' pay (including Oregon EPA), promotion, and channeling claims are not typical of the class, or even each other, because their experiences relate only to decisions made by their particular managers (many female), in their particular jobs, with their particular alleged male comparators; all fact-intensive, individualized inquiries.[40] *See Dukes,* 564 U.S. at 355-56 ("the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's"); *Mattson v. New Penn Fin., LLC,* 2021 WL 2888394, at *2 (D. Or. July 9, 2021) (Hernández, J.) (plaintiff could not meet the typicality and commonality requirements because "individual questions . . . will predominate the litigation").

Nor does typicality lie where, as here, a Named Plaintiff's "unique background and factual situation require h[er] to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class." *Hanon v. Dataproducts*

---

[40] *See* Or. Rev. Stat. § 652.210(16); Or. Admin. R. 839-008-0010; *Maxwell v. City of Tucson,* 803 F.2d 444, 446 (9th Cir. 1986) ("When a Title VII claimant contends that she has been denied equal pay for substantially equal work, as here, Equal Pay Act standards apply."); *Williams v. Boeing Co.,* 2006 WL 126440, at *2 (W.D. Wash. Jan. 17, 2006) (finding plaintiffs had not proven disparate impact claim where expert's multiple pools and regression analyses did not necessarily compare promotions for similarly-situated employees because it "group[s] together employees with dissimilar circumstances who would not have been candidates for similar promotions").

Page 47    -    DEFENDANT NIKE, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

*Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "Business necessity," for example, is position-specific and individualized. 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 161 (2d Cir. 2001). So too are the EPA affirmative defenses that would apply to Plaintiffs' pay claims. *See* Or. Rev. Stat. § 652.220(2)(a)(A)-(I) (listing nine affirmative defenses to justify single pay differential for Oregon EPA claim); 42 U.S.C. § 2000e-2(h) (2000) (applying federal EPA affirmative defenses to unequal pay claim under Title VII). The *Valerino* court found typicality lacking for exactly these reasons. 283 F.R.D. at 318 ("Given the discretion based system, that individualized inquiry will vary for each plaintiff foreclosing any claim that the named Plaintiffs claims are typical.").

Testimony from the Named Plaintiffs, especially when compared to each other, confirms their **a**typicality: they never worked in the same Function, let alone Job Code; they all identified different alleged male comparators; they never had any of the same managers; and they all had different experiences with respect to hiring, pay, CFEs, and promotions, all at different times— some not even within the class period. *See* Sections II and III. Comparing their experiences with those of the opt-in Plaintiffs just reinforces that fact.

In sum, the number of different jobs at issue (at least 1,200), the number of class members (at least 5,200), and Nike's decentralized and discretionary pay, promotion, and hiring processes render typicality virtually impossible.[41]

---

[41] Finally, as to Cahill in particular, her claims are not typical because she is not a putative class member. The Supreme Court has "repeatedly held that 'a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members.'" *Gen. Tel. Co. of the Sw.*, 457 U.S. at 156 (quoting *E. Tex. Motor Freight Sys.*, 431 U.S. at 403); *accord Heredia v. Sunrise Senior Living LLC*, 2021 WL 811856, at *3 (C.D. Cal. Feb. 9, 2021) ("Typicality requires that the named plaintiffs be members of the class they represent.") (citation omitted). Cahill resigned from Nike on July 25, 2017, before the start of the Oregon Class Period and the Title VII Class Period. Cahill Tr. 98:13-15; Br. at 1, 34. Nike intends to move for summary judgment on Cahill's (and other Plaintiffs') claims after the conclusion of briefing on

### C.    Plaintiffs Fail To Prove Adequacy Under Rule 23(a)(4).

Rule 23(a)(4) requires Plaintiffs to demonstrate that they will "fairly and adequately

protect the interests of the class." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

Courts must determine whether there exist "any conflicts of interest with other class members"

and whether "named plaintiffs and their counsel [will] prosecute the action vigorously on behalf

of the class." *Ellis*, 657 F.3d at 985 (citation omitted). The adequacy requirement demands

*shared interests* among the representatives and the class, not just a promise to advocate for the

class. *Id.*; *accord Moussouris*, 2018 WL 3328418, at *28.

In *Moussouris*, Microsoft argued that the inclusion within the putative class of female

employees who participated as managers in the very processes being challenged presented

irreconcilable conflicts of interest preventing an adequacy finding. *Id.* The court agreed that this

was an "**insurmountable conflict**," observing that one named plaintiff and a "significant number

of potential class members" participated in the system and decisions that were alleged to be

discriminatory. *Id.* at *29 (emphasis added). Because the class "include[d] both those who

implemented the ratings system and those who allegedly suffered under it," plaintiffs failed to

carry adequacy burden.[42] *Id.* (citation omitted); *see also Valerino*, 283 F.R.D. at 318

(recognizing potential conflict if two putative class members were sought the same promotion);

*Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D. Wash. 2001) (no adequacy where

---

Plaintiffs' Motion.

[42] *Moussouris* also helpfully distinguishes *Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) and *Pena v. Taylor Farms Pac., Inc.*, 305 F.R.D. 197 (E.D. Cal. 2015)—the very cases upon which Plaintiffs rely. *Id.* at *28-30; *see* Br. at 53. *In re AutoZone* is inapposite because it did not involve managerial discretion; here, under Plaintiffs' theory, managers in the class *would* be at fault for implementing the very practices Plaintiffs challenge. *In re Autozone, Inc., Wage & Hour Emp. Practices Litig.*, 289 F.R.D. 526, 536 (N.D. Cal. 2012), *aff'd*, 789 F. App'x 9 (9th Cir. 2019) (unpublished). The same is true for *McReynolds*, which, in any event, applies D.C. Circuit law and pre-dates *Dukes* by almost ten years. *McReynolds v. Sodexho Marriott Servs.*, 208 F.R.D. 428, 445-48 (D.D.C. 2002).

plaintiff-supervisors "were obligated to implement the very supervisory system which this litigation challenges" and class members were potentially in conflict).

These cases are directly applicable here. As Dr. Saad observed, from August 2017 to September 2019, 29.5% of the women in the putative class held a manager position, with 393 women identified as Manager +1s. Saad R. ¶ 47. Even amongst the Named and opt-in Plaintiffs, many supervised or were supervised by other class members. *Id.* at ¶ 48. For example, Cahill was a Director throughout her Nike employment and admitted to making hiring, starting pay, CFE, and PSP recommendations, which she denied ever were based on gender. *Id.*; Cahill Tr. 76:13-17; 112:1-114:18; 127:2-11; 189:5-14; 236:9-245:24. From approximately December 2015 – March 2016, Cahill supervised opt-in Plaintiff Anderson and was involved in Anderson's "de-banding," which Anderson believed to be discriminatory. *Id.* at 257:11-14; 258:6-262:4; Anderson Tr. Vol. I 159:1-160:8; Vol. II, 40:21-22; 52:8-22; Ex. 193.[43] Thousands of managers within the putative class have a vested interested in defending the integrity of their decisions (as they have testified), while other class members will challenge the very same decisions as discriminatory. This tension necessarily means that proposed class counsel cannot "prosecute the action vigorously on behalf of the [entire] class," as they cannot zealously represent both the alleged perpetrators and their victims. *Ellis*, 657 F.3d at 985 (citation omitted); *see also* Fed. R. Civ. P. 23(g); *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) ("The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel.") (citation omitted); *accord Fiandaca v. Cunningham*, 827 F.2d 825, 829 (1st Cir. 1987) (same); *Vuyanich v. Republic Nat'l Bank of*

---

[43] Plaintiff Anderson also is a prime example of other types of conflicts in the class. Anderson believes that she was not considered for a promotion based on gender, but the person who received that promotion is a fellow class member. *Id.* at Vol. II 199:18-204:21.

*Dallas*, 82 F.R.D. 420, 434 (N.D. Tex. 1979) (same). As in *Moussouris*, these conflicts are

"insurmountable."[44] Plaintiffs fail to address any of these issues, asserting instead in conclusory

fashion that there are "no conflicts." Br. at 52. This does not save their claims.

## II.    **Plaintiffs Cannot Satisfy The Requirements For A Rule 23(b)(2) Class.**

Plaintiffs lack standing to pursue an injunctive relief class under Rule 23(b)(2) because

they are all former employees of Nike. *See* Section Br. at p. 55 n. 53. The Supreme Court

confirmed in *Dukes* that "plaintiffs no longer employed by [a defendant] lack standing to seek

injunctive or declaratory relief against its employment practices." *Dukes,* 564 U.S. at 364;

*accord Ellis,* 657 F.3d at 988 ("As the Supreme Court explained, only current employees have

standing to seek injunctive relief.").[45] Because Plaintiffs lack standing to pursue injunctive relief,

a Rule 23(b)(2) class cannot be certified. *See Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045

(9th Cir. 1999) ("Unless the named plaintiffs are themselves entitled to seek injunctive relief,

they may not represent a class seeking that relief."); *accord In re ConAgra Foods, Inc.*, 302

---

[44] Cahill is an inadequate class representative for the same reason her claims are not typical—she is not a class member. *Perez v. Performance Food Grp., Inc.*, 2017 WL 8239633, at *14 (C.D. Cal. Oct. 2, 2017) (plaintiff not adequate when his employment terminated prior to the beginning of the class period). And both Cahill and Johnston are inadequate because they admitted to deleting text messages from individuals they identified as harassing or discriminatory actors. Cahill Tr. 173:1-175:1, 217:7-24; Johnston Tr. 229:19-232:23. *See, e.g., Victorino v. FCA US LLC*, 2018 WL 2455432, at *9 (S.D. Cal. June 1, 2018) (class representative inadequate due to his spoliation of evidence).

[45] Plaintiffs assert in a footnote, without any supporting case law, that Hender and Johnston have standing to pursue injunctive and declaratory relief because (1) Hender was a current employee when the FAC was filed, and (2) Johnston might seek to work at Nike in the future. Br. at 55 n. 53. Neither contention has merit. Hender resigned from Nike in October 2020 (Hender Tr. 253:10-12), mooting her standing for prospective relief and the class's as well. *See Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1048 (9th Cir. 2014) ("the plaintiff's claim becomes moot before the district court certifies the class," the class action becomes moot). As to Johnston, her testimony that she might seek to work for Nike at a later date is far too remote and speculative to provide standing. *See, e.g., Aldapa v. Fowler Packing Co., Inc.*, 323 F.R.D. 316, 329-30 (E.D. Cal. 2018) ("[M]erely considering reinstatement if certain remedial actions come to fruition is insufficient" for standing).

F.R.D. 537, 575-76 (C.D. Cal. 2014) (declining to certify classes under Rule 23(b)(2) because none of the named plaintiffs had standing to pursue injunctive relief); *accord Maeda v. Kennedy Endeavors, Inc.*, 2021 WL 2582574, at *14-15 (D. Haw. June 23, 2021) (same).

Even if they had standing, Rule 23(b)(3) requires "final injunctive relief or corresponding declaratory relief [to be] appropriate respecting *the class as a whole*." *Dukes*, 564 U.S. at 365 (criticizing Rule 23(b)(2) certification where many members had no claim for injunctive relief) (emphasis in original). Certification is therefore inappropriate where, as here, a significant percentage of the class lacks standing to pursue an injunction, either because they are former employees or they have—based on Plaintiffs' own analyses—suffered no injury from the alleged discriminatory conduct.[46] *Id.; accord Victorino v. FCA US LLC*, 326 F.R.D. 282, 308 (S.D. Cal. 2018) (denying (b)(2) certification where class included members who would not get the benefit of an injunction); *Moheb v. Nutramax Labs. Inc.*, 2012 WL 6951904, at *6 (C.D. Cal. Sept. 4, 2012) (holding the same and collecting cases). Nor would a class of only current employees who were, for example, hired prior to September 2017 meet the requirements for a Rule 23(b)(2) class. As *Dukes* made clear:

> Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. . . . [not] when each individual class member would be entitled to a *different* injunction or declaratory judgment.

*Dukes*, 564 U.S. at 360 (emphasis in original). With no "glue," what Plaintiffs effectively seek are thousands of individual injunctions. For example, opt-in Plaintiff Anderson claims discrimination by a Senior Director, Daniel Tawiah (her manager in 2015, who left Nike in April

---

[46] *See* Saad R. ¶ 43 (of 5,248 women in the class data from August 2017 to September 2019, 863 (16.4%) were former employees); Neumark R. ¶¶ 59, Table 6, col. 5-6 (finding no statistically significant gender disparities in pay and promotions after September 2017 and April 2018, respectively); Br. at 20; 25.

2018) because he (with Plaintiff Cahill) de-banded her role from Director to Manager in March 2016, and she was not considered for competitive promotions she later applied to, though she was later promoted to a different role and became a Director again. Anderson Tr. Vol. I, 159:1-160:8; Vol. II, 40:14-41:20; 142:10-25; 190:13-191:24. It is unclear what Anderson's injunction even would be—to unwind the clock on denial of consideration for the other promotion? To bar Tawiah, a former employee, from taking such acts?—but it would do nothing for challenges by other class members to different decisions on different facts. This is anathema to Rule 23(b)(2).

Standing issues aside, Plaintiffs' Rule 23(b)(2) motion also fails because they fail to specify what they would seek to enjoin—asserting instead that injunctive or declaratory relief is "required" or is the Court's "duty" if they prevail on their disparate impact or treatment claims. Br. at 54-55. This dubious assertion is a far cry from the specificity requirements of Rule 65,[47] which Plaintiffs' Rule 23(b)(2) certification motion must satisfy. *See, e.g.*, *Andrews v. Plains All Am. Pipeline, L.P.*, 2017 WL 10543402, at *3 (C.D. Cal. Feb. 28, 2017) (denying (b)(2) certification where proposed injunction was "superfluous and overly vague"); *see also Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (declining to certify class where proposed injunction was "far too general to satisfy Rule 65(d)"). Even if an injunction were feasible, the specific "practices" that Plaintiffs target (*e.g.*, asking about prior pay, etc.) are

---

[47] Under Rule 65(d), an injunction must "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained or required." Fed. R. Civ. P. 65(d). Undoubtedly, Plaintiffs failed to specify what Nike policies or practices they would enjoin because the *primary* relief they seek is monetary, not injunctive, and Rule 23(b)(2) money classes are foreclosed under *Dukes*. *Dukes*, 564 U.S. 362-63; *see also Lucas*, 212 F. Supp. 3d at 972 (Rule 23(b)(2) class improper where "it is clear from the pleadings, as well as from the effort and expert fees expended on damages models, that the central focus of this suit is monetary relief"); *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 470 (N.D. Ill. 2009), *aff'd*, 675 F.3d 709 (7th Cir. 2012) (Rule 23(b)(2) certification inappropriate in gender discrimination case where "final relief appears to relate predominantly to money damages").

obsolete, and courts will not certify Rule 23(b)(2) classes seeking an injunction against ceased conduct. *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 520 (9th Cir. 1993) (requiring "threat of continuing violations").

Plaintiffs have failed to meet their burden. Rule 23(b)(2) certification is improper.

## III. Plaintiffs Cannot Satisfy The Requirements For A Rule 23(b)(2) Monetary Class.

Even if Plaintiffs could prove common issues, individual issues will predominate and class resolution is not superior, which precludes certification of their Rule 23(b)(3) class. *See Dukes*, 564 U.S. at 363 (Rule 23(b)(3) requires courts "to make findings about predominance and superiority *before* allowing the class") (emphasis added).

### A. Plaintiffs Fail To Prove Predominance.

To certify a Rule 23(b)(3) damages class, Plaintiffs must prove that common issues will predominate at trial—an "even more demanding" standard than commonality under Rule 23(a). *Comcast*, 569 U.S. at 34 (citing *Amchem*, 521 U.S. at 623-24); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (noting that the Rule 23(b)(3) analysis "presumes that the existence of common issues of fact or law have been established . . . [T]he presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)"), *overruled on other grounds by Dukes*, 564 U.S. at 338. And "[b]ecause class actions are meant to promote efficiency and economy of litigation, the predominance analysis focuses on the relationship between the common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant class treatment." *Lott v. Vial Fotheringham, LLP*, 2020 WL 1890539, at *6 (D. Or. Apr. 15, 2020) (Hernández, J.) (denying class certification despite commonality because "individual inquiries . . . would predominate over any common questions").

To analyze predominance, which calls for "careful scrutiny" from the court, the Supreme Court instructs that "[a]n individual question is one where 'members of a proposed class will

need to present evidence that varies from member to member,' while a common question is one where 'the *same evidence* will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Tyson Foods*, 577 U.S. at 453 (emphasis added). However, "[c]ommon questions do **not** predominate if the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues leading to an inordinate number of evidentiary hearings." *Mendell v. Am. Med. Response, Inc.*, 2021 WL 1102423, at *8 (S.D. Cal. Mar. 23, 2021) (emphasis added). The myriad individualized issues behind each decision would overwhelm any common issues and swamp this Court in thousands of individual trials on liability and damages for each class member.

**Liability.** Plaintiffs' predominance argument recycles their failed commonality arguments with the same bald assurance that evidence is "common." Br. at 55-58. Not so. Should this case proceed as Plaintiffs suggest, it would devolve into a quagmire of individualized inquiries about the actions of each managerial employee who influenced a class member's hiring, promotion (or lack thereof), and pay—including performance reviews. For Plaintiffs' Oregon EPA claim, the Court would need to determine each class member's "comparators" (if any) in each job they held over the past 4.5—itself a fact-intensive inquiry involving diverse areas of specialty, education, past experience, certifications, and more. Added to this are the competing standards for comparators under the Oregon EPA and Title VII (substantially similar, substantially equal, and similarly-situated—*see* footnote 34), as well as unique, individualized defenses, including timeliness, that will exacerbate these complexities. For example, Nike will be entitled to present evidence demonstrating any of the nine affirmative defenses for any class member's Oregon EPA claim and any Title VII pay claim, as well as any legitimate, nondiscriminatory reasons for its employment decisions. *See Dukes*, 564 U.S. at 366-67 (Wal-

Mart "will have the right to raise any individual affirmative defenses it may have, and to 'demonstrate that the individual applicant was denied an employment opportunity for lawful reasons," citing the Rules Enabling Act).

Moreover, if a substantial number of putative class members "in fact suffered no injury," the "need to identify those individuals will predominate." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018). Indeed, if injury cannot be proved or disproved through common evidence, then "individual trials are necessary to establish whether a particular [class member] suffered harm from the [alleged misconduct]," and class treatment under Rule 23 is accordingly inappropriate. *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 252 (D.C. Cir. 2013); *see also Tyson Foods*, 577 U.S. at 466. Such is the case here. Plaintiffs effectively admit their proposed class includes uninjured class members; as for Plaintiffs' Oregon EPA class, it is impossible to tell from Plaintiffs' statistical analysis whether any one class member can make out a *prima facie* case. *See* Section I.A.1.c.ii. The unascertained number of uninjured class members here, who lack standing, defeat predominance. *Id.*

**Damages**. Plaintiffs do not refute the need for individualized damages determinations but claim individualized damages issues "cannot defeat predominance." Br. at 57 n. 55. However categorical that rule may have been, the Ninth Circuit has retreated since *Comcast*: "Uncertainty regarding class members' damages does not prevent certification of a class *as long as a valid method has been proposed for calculating those damages*." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (emphasis added), *rev'd on other grounds*, 139 S. Ct. 710 (2019).[48] Plaintiffs offer no "valid method" for calculating damages for the simple reason that

---

[48] Plaintiffs' footnoted reliance on *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 515-16 (9th Cir. 2013) is misplaced for this and other reasons. Br. at 57 n. 55. In *Leyva*, the only individualized factor the court identified was the amount of pay owed in a wage-and-hour class action that did

such determinations would be highly individualized and extremely complex, intertwining with liability determinations for Plaintiffs' Oregon EPA and Title VII claims, as detailed above. *See Dukes*, 564 U.S. at 366 ("Wal-Mart is entitled to individualized determinations of each employee's eligibility for backpay."). Under *Comcast*, Plaintiffs must present a classwide method to show damages that were *caused by* the same actions that give rise to liability. Absent such showing, "plaintiffs cannot establish predominance." *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154 (9th Cir. 2016) (citation omitted). Plaintiffs present none.

As the *Moore* court explained, "[n]ot only will there need to be individual investigation into liability issues, but there will also need to be individualized calculation of damages—compensatory, punitive, back pay, and front pay—based on the circumstances of each class member's case." *Moore*, 2014 WL 11199094, at *8; *see also Puffer*, 255 F.R.D. at 471 (no predominance; to prove gender discrimination, "an individualized inquiry into each putative plaintiff's circumstances would be necessary to determine whether employment actions taken toward a particular employee were based on gender or instead on legitimate, nondiscriminatory reasons"); *Grosz v. Boeing Co.*, 2003 WL 22971025, at *6-7 (C.D. Cal. Nov. 7, 2003) (liability analysis requires individualized inquiry as to employee performance), *aff'd*, 136 F. App'x 960 (9th Cir. 2005). There is no predominance here.

---

not involve managerial discretion. *See O'Hearn v. Les Schwab Warehouse Ctr., Inc.*, 2014 WL 6654207, at *9 (W.D. Wash. Nov. 24, 2014) (distinguishing *Leyva*, where "the discretion of individual supervisors was not at issue"). Second, as Plaintiffs do not dispute, individual liability inquiries (which any proposed damages model must match) will defeat predominance. *See, e.g., Converse v. Vizio, Inc.*, 2020 WL 2922490, at *4 (W.D. Wash. June 3, 2020) (discussing *Leyva*, finding no predominance where plaintiff did not put forward a common methodology for calculating damages consistent with its liability case); *Ortega v. J.B. Hunt Transp., Inc.*, 2018 WL 6118572, at *3-4 (C.D. Cal. Aug. 7, 2018) (no predominance where individualized liability issues would lead to individualized damages).

### B.    Plaintiffs Fail To Prove Superiority.

Rule 23(b)(3) also requires Plaintiffs to show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement ensures that a class is certified only when it will "achieve economies of time, effort, and expense . . . without sacrificing procedural fairness." Amchem, 521 U.S. at 615 (internal quotation marks and citation omitted). "As the Ninth Circuit has explained, '[i]f each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" Lott, 2020 WL 1890539, at *5 n.3 (Hernández, J.) (quoting Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1192 (9th Cir. 2001) (complexities of class action weighed heavily against certification)).

A class action would be inefficient and unmanageable here, and would require over 5,200 "mini-trials"—a misnomer since they would each require proof on the reasons for each decision as to each class member—far more than have defeated superiority in other, similar cases. See Moore, 2014 WL 11199094, at *4-5 (150 individual trials; recognizing manageability as most important Rule 23(b)(3)(D) factor in pay and promotions class action); Puffer, 255 F.R.D. at 471 (1,700). Plaintiffs' skeletal proposed "trial plan" (Br. at 58) fails to solve these problems and would still require thousands of liability and damages trials, which Plaintiffs entirely gloss over, effectively asking the Court to disregard Rule 23(b)(3)(D)'s direction to consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). But as the Advisory Committee has recognized, "determin[ing] how the case will be tried [is a] critical need" in the Rule 23 analysis. Id.

Nor would "bifurcating. . . remedy this situation—the individual trials must address both liability and damages." Moore, 2014 WL 11199094, at *8. Plaintiffs' "trial plan" also proposes class-wide assessments of backpay and punitive damages. Id. That would be unlawful. Dukes,

564 U.S. at 366 (no trial by formula). Plaintiffs must face the realities of their case: that inherently individualized trials on liability and damages would render proceeding on a class basis utterly unmanageable.

On the other hand, members of this putative class who feel aggrieved can pursue their claims individually. Plaintiffs assert without basis that there is "no other such method[]" than a class procedure, and "it would make no sense to litigate" otherwise. Br. at 58-59. Both are untrue. Comcast, 569 U.S. at 33 (class action is an exception to usual rule that claims are litigated individually); Puffer, 255 F.R.D. at 473 (class action not superior; "Countless gender discrimination claims are brought individually."). Here, putative class members are not of limited means; they have ample financial incentive to pursue claims individually, as is common, and even more so for highly paid professionals with potential remedies of compensatory, liquidated, and punitive damages, and attorneys' fees. These considerations heighten "class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A); see also Puffer, 255 F.R.D. at 473 ("When a class member has a sufficiently large stake in litigation to be able to afford to litigate on [her] own, this consideration weighs against allowing a suit to proceed as a class action."). "[C]oncentrating the litigation" here is not "superior." Rule 23(b)(3).

## CONCLUSION

The members of the putative class "held a multitude of jobs, at different levels . . . for variable lengths of time . . . with a kaleidoscope of supervisors (male and female), subject to a variety of [] policies that all differed . . . . Some thrived while others did poorly. They have little in common but their sex and this lawsuit." Dukes, 564 U.S. at 359-60 (citation omitted).

For all of the foregoing reasons, Nike respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.


Dated:  March 25, 2022                          Respectfully submitted,


                                                /s/ Daniel Prince
                                                ─────────────────────────────
                                                Daniel Prince, Cal. SB# 237112 (*pro hac vice*)
                                                danielprince@paulhastings.com
                                                Felicia A. Davis, Cal. SB# 266523 (*pro hac vice*)
                                                feliciadavis@paulhastings.com
                                                Laura E. Zabele, Cal. SB# 330847 (*pro hac vice*)
                                                laurazabele@paulhastings.com

                                                PAUL HASTINGS LLP
                                                515 South Flower Street, 25th Floor
                                                Los Angeles, CA  90071-2228
                                                Telephone:  (213) 683-6000
                                                Facsimile:  (213) 627-0705

                                                Amy Joseph Pedersen, OSB No. 853958
                                                amy.joseph.pedersen@stoel.com
                                                STOEL RIVES LLP
                                                760 SW Ninth Avenue, Suite 3000
                                                Portland, OR  97205
                                                Telephone:  (503) 294-9408
                                                Facsimile:  (503) 220-2480

                                                Attorneys for Defendant NIKE, INC.