AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA E. ZABELE, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No.: 3:18-cv-01477-JR |
| Plaintiffs, | REDACTED DECLARATION OF AMY JOSEPH PEDERSEN IN SUPPORT OF DEFENDANT NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT, DAVID NEUMARK, PH.D. |
| v. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | REQUEST FOR ORAL ARGUMENT |

Page 1    -    REDACTED PEDERSEN DECLARATION IN SUPPORT OF DEFENDANT
NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS'
EXPERT, DAVID NEUMARK, PH.D.

## DECLARATION OF AMY JOSEPH PEDERSEN

I, Amy Joseph Pedersen, hereby declare as follows:

1.        I am an attorney licensed by the Bar of the State of Oregon and Special Counsel

with the law firm of Stoel Rives LLP, counsel of record for Nike, Inc. ("Nike") in the above-

captioned matter. I make this declaration in support of Nike's Motion to Exclude the Opinions of

Plaintiffs' Expert, David Neumark, Ph.D. I have personal knowledge of the facts contained in

this declaration, or know of such facts by my review of the files maintained by Stoel Rives LLP

in the normal course of its business, and if called upon to do so, could and would competently

testify thereto.

2.        On August 31, 2021, counsel for Nike took the deposition of Plaintiffs' expert,

David Neumark, Ph.D. in this action. A true and correct copy of excerpts from the transcript of

Dr. Neumark's deposition is attached hereto as **Exhibit A**.

3.        On November 28, 2020, counsel for Nike took the deposition of Plaintiff Kelly

Cahill in this action. A true and correct copy of excerpts from the transcript of Ms. Cahill's

deposition is attached hereto as **Exhibit B**.

4.        On January 29, 2021, counsel for Nike took the deposition of Opt-In Plaintiff

Paige Azavedo in this action. A true and correct copy of excerpts from the transcript of

Ms. Azavedo's deposition is attached hereto as **Exhibit C**.

5.        On January 11, 2021, counsel for Nike took the deposition of Plaintiff Lindsay

Elizabeth in this action. A true and correct copy of excerpts from the transcript of

Ms. Elizabeth's deposition is attached hereto as **Exhibit D**.

Page 2    -    REDACTED PEDERSEN DECLARATION IN SUPPORT OF DEFENDANT
NIKE, INC.'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS'
EXPERT, DAVID NEUMARK, PH.D.

115039011.1 0063718-00329

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on this 4th day of April, 2022, at Portland, Oregon.


_s/ Amy Joseph Pedersen_
Amy Joseph Pedersen

```
 1                 UNITED STATES DISTRICT COURT
 2                    DISTRICT OF OREGON
 3                     PORTLAND DIVISION
 4      _____
                                        )
 5      KELLY CAHILL, SARA JOHNSTON,    )
        LINDSAY ELIZABETH, and HEATHER  )
 6      HENDER, individually and on     )
        behalf of others similarly      )
 7      situated,                       )
                                        )
 8              Plaintiffs,             )
                                        )
 9      vs.                             ) No. 3:18-CV-01477-JR
                                        )
10      NIKE, INC., an Oregon           )
        Corporation,                    )
11                                      )
                Defendant.              )
12      _____)
13
14
15    VIDEOTAPED REMOTE DEPOSITION OF DAVID NEUMARK, Ph.D.
16                 San Francisco, California
17                 Tuesday, August 31, 2021
18                       Volume I
19
20
21      Reported by:
        CATHERINE A. RYAN, RMR, CRR
22      CSR No. 8239
23      Job No. 4778006
24
25      PAGES 1 - 299
```

                                                    Page  1

Pedersen Decl. Exhibit A, Page 1 of 98

1      Q    Okay.  And do you know if women in job          09:30:24

2    code A1046 were paid statistically significantly

3    less than men in job code A1046 during the class

4    period?

5      A    I -- I don't know the result of -- I don't      09:30:47

6    know the answer to that question for -- for that job

7    code, if one studied that job code, which I think is

8    the phrase you used, in isolation, no.

9      Q    Okay.  Is there anywhere in your report

10    that I could look to find the answer to the question   09:31:09

11    of whether women in job code A1046 were paid

12    statistically significantly less than men in job

13    code A1046 during the class period?

14      A    So I present an aggregate analysis that

15    average estimates, in effect, across all job codes.    09:31:34

16    It is, of course, meant to be descriptive of what is

17    happening in different job codes.  The extent to

18    which it is is reflected in part in the statistical

19    significance of that coefficient, but there is not a

20    specific estimate for that job code in isolation.      09:31:49

21      Q    Okay.  So, in other words, there is

22    nowhere in your report where I could look to find

23    the answer to the question of whether women in job

24    code A1046 were paid statistically significantly

25    less than men in job code A1046 during the class       09:32:13

Page 20

```
 1    same, that your report does not tell me whether        09:42:24

 2    women are paid statistically significantly less than

 3    men within that same job code, correct?

 4        A    The important qualification would be the

 5    more you ask me about it, the more my report does      09:42:38

 6    speak to that directly because obviously my estimate

 7    is representative of job codes and women and men.

 8    But in isolation, correct.

 9        Q    Correct.  Right.

10             So Sara Johnston, another named plaintiff,    09:42:53

11    worked in job code A0692.

12             I can't find in your report anywhere

13    whether women in job code A0692 were paid

14    statistically significantly less than men in job

15    code A0692, correct?                                   09:43:12

16             MR. KAN:  Objection.  Asked and answered.

17    Lacks foundation.

18             THE WITNESS:  Well, I mean, I'm -- I'll

19    take as -- as true the -- the job you said she

20    worked in.  And, again, my -- you know, the -- as      09:43:27

21    the evidence from an aggregate model is informative,

22    but it does not specifically answer the question of

23    what you would get if you studied that job code in

24    isolation, by which I mean throwing out all of the

25    other data.                                            09:43:42
```

Page 29

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 3 of 98

```
1              MR. KAN:  Objection.  Vague and ambiguous.    09:53:58
2              THE WITNESS:  Can I just ask you to --
3       when you say did I do any analysis of jobs, can I
4       just ask you to explain if you have something
5       specific in mind?                                    09:54:07
6              MS. DAVIS:  Sure.
7         Q    Did you learn anything about the content
8       of any of Nike's jobs that made you feel confident
9       that grouping job subfamily and job level together
10      was properly grouping employees who performed        09:54:25
11      substantially similar work?
12        A    So I did not do any what is called "job
13      analysis," which is not something people in my field
14      do, so.  I hope I'm defining it correctly as what
15      industrial organization psychologists do.  I did not  09:54:41
16      observe work.  I did not talk to workers or anything
17      of that sort.
18             I relied on Dr. Lundquist's opinion on
19      this, and that is her area of expertise, to my
20      understanding, and I would say I relied secondarily   09:54:58
21      on things Nike said -- I think they're cited in this
22      paragraph.  They may be cited elsewhere -- about
23      this being the way in which they organize work
24      and -- you know, and think about -- about workers
25      having similar skills, et cetera.                     09:55:17
```

Page 38

Pedersen Decl. Exhibit A, Page 4 of 98

```
 1    the standards for an equal pay claim, first,        09:58:01
 2    obviously, but -- and that not -- and I -- and I --
 3    and I am aware of the fact that not every difference
 4    about a job under the sun, you know, has to be held
 5    constant for an equal pay claim, but I'm -- you      09:58:15
 6    know, this strikes me as reasonable, and, again, I'm
 7    -- look, first and foremost, I'm basing this on --
 8    on the other expert's conclusion because this is
 9    what she does and, as far as I understand, what she
10    was hired to do, to -- to assess this question.      09:58:29
11        Q    So I'm just trying to figure out if you
12    relied on anything else.
13             So you relied on Dr. Lundquist's report,
14    I'm assuming; is that right?  Is that how you
15    learned of Dr. -- Dr. Lundquist's opinion?           09:58:45
16        A    I relied on the conclusion from her
17    report, which was -- which was conveyed to me by the
                      later
18    attorneys, and^I simply verified it in the place I
19    was told it appeared.  I did not -- I didn't assess
20    her -- I didn't read her report.  I didn't assess    09:59:00
21    her report.  I don't do job analysis.  I don't have
22    expertise in what she does.
23        Q    Okay.  You didn't really read
24    Dr. Lundquist's report?
25        A    No, except as just to get -- except just    09:59:11
```

Page 41

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 5 of 98

1    to verify that conclusion was stated the way -- as          09:59:15

2    relayed to me and where so I could say where it

3    shows up.

4         Q    Okay.  Approximately when were you

5    informed that Dr. Lundquist's conclusion was that          09:59:24

6    the proper grouping of employees for analysis would

7    be the interaction of job subfamily and level?

8         A    I'm glad you said "approximately."

9         So I'm going to say approximately early to

10   mid-July.                                                  09:59:48

11        Q    And other than Dr. Lundquist's conclusion

12   or opinion that was conveyed to you by counsel in

13   early to mid-July, did you rely on anything else to

14   support your conclusion that the interaction of job

15   subfamily and level is the appropriate way to             10:00:15

16   analyze employees at Nike?

17             MR. KAN:  Objection.  Asked and answered.

18             THE WITNESS:  As I said, there are some --

19   there are some -- there are some materials from Nike

20   documents that I cite -- I believe in the same            10:00:30

21   paragraph and maybe elsewhere.  I can't recall at

22   the moment -- that suggest that this is the

23   architecture or the structure that they use to

24   organize jobs, which struck me as reasonable and

25   consistent with what Dr. Lundquist ultimately             10:00:44

                                                    Page 42

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 6 of 98

1           Is -- is there anyplace in your report          10:11:58

2      that I can see whether women in the business

3      operations, lead professional grouping that you've

4      created were paid statistically significantly less

5      than men in the business operations, lead          10:12:14

6      professionals grouping during the relevant class

7      period?

8           A    So, again, I estimate an aggregated model.

9      The aggregated model is informative about job codes

10     because the gender gap is identified within job --      10:12:28

11     sorry.  I'm using "job codes."  I'm looking for a

12     shorthand -- is -- is representative of job

13     subfamily, job level interactions because all the

14     gender gap is identified within those unique

15     combinations of job subfamilies and job levels, but      10:12:43

16     there is no analysis of any of those unique pairs in

17     isolation.

18          Q    Okay.  Is there a page I can look at in

19     your report that will tell me whether women in the

20     business operations, lead professionals grouping are      10:12:59

21     paid statistically significantly less than men in

22     the business operations, lead professionals grouping

23     during the relevant class period?

24               MR. KAN:  Objection.  Asked and answered.

25               THE WITNESS:  There are lots of pages that      10:13:14

                                                      Page 52

Pedersen Decl. Exhibit A, Page 7 of 98

```
 1    report those results from the aggregate analysis,        10:13:16

 2    which, as I said, is informative.  There are no

 3    pages or tables -- I guess those are the same --

 4    which study the data for that subfamily level pair

 5    in isolation, i.e., discarding all of the other          10:13:27

 6    data.

 7    BY MS. DAVIS:

 8        Q    And I assume if I grabbed any one of the

 9    other 900 groupings and asked you the same question,

10    you would not be able to point to a page or tell me      10:13:42

11    where in your report I could find a result for that

12    specific job subfamily level grouping; is that

13    correct?

14        A    I would give you the exact same answer,

15    yes.                                                     10:13:55

16        Q    Okay.  Did you run any analysis by job

17    subfamily level interaction?

18            MR. KAN:  Objection.  Vague and ambiguous.

19            THE WITNESS:  Again, my -- my answers

20    previously, I -- I interpreted the same as about         10:14:15

21    this, although I could see where, you know, it

22    wasn't specifically the same.

23            So I did not do separate analyses by
                                and
24    unique pairs of subfamily^levels.

25    //
```

Page 53

Pedersen Decl. Exhibit A, Page 8 of 98

```
1    BY MS. DAVIS:                                    10:15:51

2        Q    Did you do any analysis to determine

3    whether any of the job subfamily level groupings

4    were large enough or had sufficient magnitude or

5    precision to run an analysis on their own?        10:16:04

6        A    No, I made -- I made a decision that at

7    this stage I would present the aggregate analysis

8    because I think it is the most reliable.

9        Q    If I asked you to determine whether women

10   in any particular job subfamily or level inter- --  10:16:26

11   strike that.  Let me start over again.

12           If I asked you to determine whether women

13   in any particular job subfamily level interaction

14   are paid statistically significantly less than men

15   in that same job subfamily level interaction, would  10:16:46

16   you be able to do that?

17       A    As I said, mechanically you can do it, as

18   long as you can actually estimate there's enough

19   observations, and a couple other conditions have to

20   hold to be able to actually estimate the gender gap  10:17:03

21   for that -- I think you used "combination" or

22   "interaction."  I forget which word you used.  You

23   could do that.  As I said, it would get -- you know,

24   it would be informative for the bigger ones, and

25   there would sure -- there surely would be some with  10:17:18
```

Page 55

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 9 of 98

```
 1    analysis for your other example, childcare workers,       10:28:39

 2    correct?  So there's no way for me to tell by

 3    looking at your report whether female childcare

 4    workers are paid statistically significantly less

 5    than male childcare workers, correct?                     10:28:50

 6         A    There -- there is not a specific analysis

 7    of any function, family, or subfamily in isolation,

 8    throwing out all the other data.

 9         Q    Right.

10              And, in fact, your analysis reports one          10:29:02

11    result for all of the jobs, correct?

12         A    No, I wouldn't say that.  I have a lot of

13    regression estimates for a lot of different periods

14    and a lot of different subperiods.  It's an

15    aggregate model.  It varies by whether I include           10:29:23

16    only subfamily or subfamily -- subfamily and level

17    interactions, but it is an aggregate model, as I've

18    explained, and I've explained why.

19         Q    Right.

20              So the aggregate model gives me one result       10:29:37

21    for all of the jobs in the analysis, correct -- one

22    average result for all of the jobs, right?

23         A    Yes, but it's important to understand that

24    it is -- the variation is identified, as we say,

25    within -- I'll use the word "job" loosely, and             10:29:54
```

Page 65

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 10 of 98

| | | |
|---|---|---|
| 1 | hopefully we can agree that's going to mean | 10:29:57 |
| 2 | subfamily times level interaction, just so I don't | |
| 3 | have to keep saying that. | |
| 4 | It's identified from the variation within | |
| 5 | that, but in a regression model -- in an aggregated | 10:30:08 |
| 6 | model, that within-job gender gap is constrained to | |
| 7 | be the same across all the jobs, and that's -- | |
| 8 | that's in order to gain precision and reliability. | |
| 9 | Q    All right.  So the result for childcare | |
| 10 | workers, if I'm looking at Table 2, column 4, for | 10:30:26 |
| 11 | example -- you want to go there?  It's on page -- | |
| 12 | A    One second. | |
| 13 | Q    -- page 54 of your report. | |
| 14 | A    Fifty-four? | |
| 15 | Q    Yep. | 10:30:38 |
| 16 | A    Okay.  I'm there. | |
| 17 | Q    All right.  Column 4, panel C, log of base | |
| 18 | pay and PSP bonuses. | |
| 19 | Are you there? | |
| 20 | A    Yes. | 10:30:47 |
| 21 | Q    All right.  So column 4 is the interaction | |
| 22 | of -- represents the estimated gender differences in | |
| 23 | pay using the control we talked about, which was the | |
| 24 | interaction of subfamily and job level, correct? | |
| 25 | A    Right. | 10:31:05 |

Page 66

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 11 of 98

```
 1        Q    All right.  And you report, in panel C1,      10:31:06

 2   female shortfall of ███████████████, correct?

 3        A    Correct.

 4        Q    And you say that the implied dollar

 5   shortfall is ██████, correct?                           10:31:19

 6        A    Correct.

 7        Q    Okay.  And you have a 9.55 standard

 8   deviation, correct?

 9        A    Yes.

10        Q    So that result is for childcare workers,      10:31:35

11   accountants, designers, security people, facilities

12   workers.  You report one result for every job,

13   correct, as an average?

14        A    I report one result.  I -- you know, I --

15   I understand what I mean by that average.  It's --      10:31:58

16   and as we discussed, there's not an implication that

17   it would be exactly the same for every one of those

18   categories that you just went through.  The

19   statistical significance --

20        Q    Right.                                         10:32:10

21        A    -- of it -- and it's strong -- speaks to

22   that estimate being precise and not varying

23   tremendously across individuals or job.

24        Q    Okay.

25        A    But, again, it would be -- it would -- I       10:32:25
```

| | | |
|---|---|---|
| 1 | fully expect it to be, you know, quite well | 10:32:27 |
| 2 | representative of the larger and more precise job | |
| 3 | codes.  I would also expect that there would be a | |
| 4 | small number of job code with imprecise estimates | |
| 5 | largely from small numbers of people for which it | 10:32:36 |
| 6 | doesn't provide as good a representation, but that's | |
| 7 | why we average, to get better estimates when we have | |
| 8 | very small cells. | |
| 9 | Q    Right. | |
| 10 | And there's nowhere I could look in your | 10:32:47 |
| 11 | report to actually find out what the results were | |
| 12 | for accountants, for childcare workers, for | |
| 13 | facilities workers, right, for security?  There's no | |
| 14 | -- nothing in your report tells me what the -- the | |
| 15 | answer for each of those groupings is, correct? | 10:33:02 |
| 16 | A    Nothing tell- -- nothing in the report | |
| 17 | tells you that answer for -- for one -- for any one | |
| 18 | group in isolation, throwing out all of the other | |
| 19 | data. | |
| 20 | Q    Okay.  And there are some groups of | 10:33:12 |
| 21 | employees, right -- if we're talking about the | |
| 22 | subfamily level interaction, there are some groups | |
| 23 | that have only women, correct? | |
| 24 | A    I don't know, but it wouldn't surprise me | |
| 25 | if there are some smaller groups for which that is | 10:33:29 |

Page 68

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 13 of 98

1    true.                                                  10:33:31

2         Q    Okay.  And certainly if a group only had

3    women, there would be not a pay shortfall for women

4    within that group, correct?

5         A    Well, that's actually a more subtle          10:33:40

6    question than it might seem.  I mean, certainly if

7    you give me -- I think you used the word "group"

8    now; so that's fine.  We'll use the group to mean

9    subfamily level interaction.

10        Q    That's fine.                                 10:33:53

11        A    If you say can I estimate -- can I take

12   the data just for that group and can I estimate a

13   gender gap, the answer is no, of course you can't.

14   ~~It's like~~ I can't identify **it**.

15            That doesn't mean women -- I think what      10:34:04

16   you said, though -- correct me if I'm wrong -- could

17   there be a female pay shortfall.  As a labor

18   economist would think about it, there could be

19   because if my estimate is an accurate

20   characterization of employee behavior -- of -- of     10:34:19

21   the firm's behavior with respect to setting pay,

22   then women may be getting paid less because they're

23   women.  And I don't mean not only if there's men in

24   the job.  I mean, a different woman -- someone could

25   become CEO, and that person could be female, and if   10:34:34

                                                           Page 69

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 14 of 98

```
1    BY MS. DAVIS:                                      10:35:31

2         Q    How could I tell in your report where --

3    which women fall within a job subfamily level group

4    that have no men?

5         A    You can't tell that in my report.        10:35:40

6         Q    Okay.  Is it your testimony that even

7    women who are in the -- a job subfamily and level

8    with no men -- so it's a group that is a hundred

9    percent made up of women -- that those women also

10   have a ███████████ pay shortfall?                  10:36:03

11        A    Well, I mean, in terms of what the model

12   says, they -- they do.  I mean, the model -- you

13   know, every model makes an assumption, the models --

14   the models you have in mind or the models I have --

15   the models I estimate.  The model I estimate assumes  10:36:20

16   a uniform gender pay gap.

17             Now, it's true that, you know, when it

18   comes to adjudicating equal pay claims, I realize

19   the shortfall you're talking about, you know,

20   that -- that may not exist, and, again, that's a     10:36:33

21   legal question.

22             It's also true, though, that, as a

23   statistical matter, because the gender pay gap is

24   only identified within a job group -- you know, the

25   same interaction we've been talking about -- that,   10:36:50
```

                                                    Page 71

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 15 of 98

```
1     you know, those -- those women actually don't -- the      10:36:54
2     women -- your hypothetical women in the job code
3     with only women do not actually contribute to that
4     estimate.  That's what it means to have a
5     within-job-code estimate -- job group estimate.           10:37:03
6         Q    Okay.  Got it.
7              But I can't tell from your report which
8     women that would -- would be included in that group,
9     right?
10             That's what you told me earlier.                 10:37:17
11        A    I mean, if you include the data that came
12    along with my report, then, yes, you could tell it,
13    but there's not a table or figure in my report that
14    documents that.
15             MS. DAVIS:  Okay.  Let's take a break.           10:37:28
16             MR. KAN:  All right.  Thank you.
17             THE WITNESS:  How long?
18             THE VIDEOGRAPHER:  We're going off the
19    record.  The time is 10:37.
20             (Recess.)                                        10:37:35
21             THE VIDEOGRAPHER:  We're back on the
22    record.  The time is 10:51.
23    BY MS. DAVIS:
24        Q    All right.  Dr. Neumark, did you review
25    any documents during the break?                          10:51:54
```

Page 72

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 16 of 98

| | | |
|---|---|---|
| 1 | stop.  There's an iterative procedure of asking how | 11:11:06 |
| 2 | well the algorithm actually keeps predicting how | |
| 3 | close together words or phrases are.  So it -- you | |
| 4 | know, basically, you make sure you can predict well | |
| 5 | which words and phrases appear together, and those | 11:11:22 |
| 6 | are -- are viewed as computationally -- as | |
| 7 | linguistically similar. | |
| 8 | And then, you know -- and if you look at | |
| 9 | what these things spit out, they are.  You know, | |
| 10 | now, it's an algorithm, right.  No algorithm is | 11:11:36 |
| 11 | perfect.  That's why we call them "algorithms." | |
| 12 | Algorithms are ways to -- to make sense of data by | |
| 13 | reducing dimensionality a lot.  They obviously | |
| 14 | cannot capture the individual variation case to case | |
| 15 | to case because that's the whole point.  The whole | 11:11:51 |
| 16 | point is -- is to shrink or reduce the | |
| 17 | dimensionality of what you're studying. | |
| 18 | Q    And so is the purpose or is your attempt, | |
| 19 | then, to create clusters of job titles that are | |
| 20 | similar to one another? | 11:12:08 |
| 21 | A    Well, I mean, mechanically they're similar | |
| 22 | in the sense in which I just described.  The goal is | |
| 23 | that conceptually they actually are.  There's a | |
| 24 | clear recognition that they won't always be, you | |
| 25 | know.  And there will be exceptions, and that's -- | 11:12:27 |

Page 88

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 17 of 98

```
 1    that's what data shrinkage or reduction is all          11:12:31

 2    about.

 3         Q    What amount -- what percent of exceptions

 4    do you think would be acceptable for the clusters to

 5    actually be reliable for the analysis you use them       11:12:41

 6    for?

 7         A    So there's -- there's actually no way to

 8    answer that question directly or -- or, I mean,

 9    decisively, I should say.  I can answer it directly.

10    I just did.  And that's because, remember, the          11:12:52

11    reason you're doing an algorithm is because if you

12    and I sat down -- let's say not with 15,000 because

13    that would be sort of impossible.  But suppose we

14    sat down with a hundred randomly chosen -- of these

15    randomly chosen job classifications, and you and I      11:13:09

16    independently were asked to kind of put them in ten

17    clusters, let's say -- just choosing a number -- of

18    related jobs, right.  Now, there's some we would

19    clearly agree on, right, because some would be, you

20    know, almost the same.  Some would be -- well, we'd     11:13:24

21    usually get rid of the abbreviations and stuff.  But

22    there's clearly some we wouldn't.  You know, we

23    might -- some might be -- we might both have

24    reasonable views, but they would differ, and there

25    probably would be some that kind of don't fit at       11:13:34
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 18 of 98

```
 1    all, right, but since our assignment was to put them      11:13:37

 2    in some cluster, we've got to put them in somewhere,

 3    and they get put the place that's closest.  It

 4    doesn't mean it's -- it's not matching.  It's not a

 5    perfect match.  It's not -- it's not meant to be.        11:13:49

 6          But the idea of doing it this way as

 7    opposed to some subjective assessment is -- you
                              in
 8    know, I -- it's clearly important^research, and I

 9    would argue it would be in legal work too.  It's

10    replicable and -- and -- and transferable, you know.      11:14:06

11    I can tell your folks exactly what I did.  They can

12    run the same code and get out the same results.

13          If we're going to get in the game of, you

14    know, let me subjectively decide which jobs to

15    cluster with which clus- -- you know, with which,        11:14:17

16    and I'm going to keep running the regression and see

17    what comes out of it, and then I'm going to choose

18    the ones that just give me the answers I want, well,

19    certainly in the research world that's a no-no and

20    something that's undesirable, and I think it would        11:14:27

21    be here too.  But there's no question you're going

22    to find some things that look odd, right, and it's

23    going to be -- I mean, it's probably going to be

24    jobs that a- -- you know, there aren't a lot of

25    people in, but not necessarily, but there -- you         11:14:40
```

Veritext Legal Solutions
866 299-5127

| 1 | know, but there would be exceptions. | 11:14:43 |
| 2 | And that's one reason I maintain in my | |
| 3 | report doing it the other way, which I -- you know, | |
| 4 | which I have done more in earlier analyses where I | |
| 5 | literally string match and make a lot of separate | 11:14:52 |
| 6 | variables for -- for job titles that are literally | |
| 7 | described exactly the same way. But the problem | |
| 8 | there is, you know, you can't do that for every | |
| 9 | single job title because you run out of | |
| 10 | observations. So I do what everyone does. And, | 11:15:08 |
| 11 | again, it's subjective exactly where to cut it off. | |
| 12 | I go down to cells with ten -- ten or more or more | |
| 13 | than ten observations, and then I end up with a | |
| 14 | catchall category of all the other ones. | |
| 15 | And although you can surely find | 11:15:23 |
| 16 | exceptions for my clustering that may look odd, the | |
| 17 | catchall category -- and in the case of job titles, | |
| 18 | it's 70 percent of them. There's no -- there's | |
| 19 | nothing that imposes any similarity on them, an | |
| 20 | algorithm like that. | 11:15:39 |
| 21 | So, you know, better or worse? I kind | |
| 22 | of -- obviously, the one I feature in my main | |
| 23 | tables, ^the appendix tables, is the one I prefer, | |
| 24 | but I think they both have legitimacy and they both | |
| 25 | show qualitatively the same answer, anyways. | 11:15:51 |

Line 23 interlineation: **vs.**

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 20 of 98

```
 1    are -- these are what people entered, right.  So        11:22:42

 2    there may -- there may be some fuzziness between,

 3    you know, what you would call a job ti- -- I mean, I

 4    -- you know, I'm not sure everybody thinks about

 5    their job in terms of a job title versus a job          11:22:51

 6    description.  It's what people wrote.

 7         Q    Fair enough.

 8              But you didn't -- you didn't take into

 9    account the part on a resumé where people describe

10    in a narrative format what the job is that they did,    11:23:04

11    right?  You just took the title, however the

12    applicant typed it into the system, correct?

13         A    We tried to do it as best as we can, yes.

14         Q    Okay.  Got it.

15              And just to be clear, you did not use as      11:23:18

16    an input the description of the job that the

17    applicant may have typed in, correct?

18         A    I believe that is correct.  Yes, I don't

19    -- I don't recall -- I believe that is correct.

20         Q    Okay.  Can you point to any academic          11:23:34

21    studies that cluster on job titles alone and not job

22    descriptions?

23         A    So I -- I -- I don't have a specific

24    reference that does -- that clusters exactly on job

25    title.  I would say this is a new area of research,     11:24:00
```

Page 97

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 21 of 98

```
 1      and labor economists are just starting to use these        11:24:05

 2      machine-learning techniques to, you know, basically

 3      -- and what are you doing here, basically?  You're

 4      turning -- you know, we've been studying numbers as

 5      data for a long time, but now that text are machine         11:24:16

 6      readable, we're trying to figure out how to study

 7      text as data.  And people are starting to do this in

 8      different labor economics contexts, including me,

 9      but I don't know of somebody who has done

10      specifically what I have done, just similar              11:24:32

11      approaches, not the same concept.

12           Q    Right.

13                And you cite a footnote, 61, in your

14      report to an article that you are a coauthor on

15      called "Does Ageist Language in Job Ads Predict Age        11:24:48

16      Discrimination in Hiring"?

17           A    Correct.

18           Q    Do you see that?

19           A    I do.

20           Q    Okay.  And that -- that -- your work on          11:24:55

21      that project looks at job advertisements, correct?

22           A    Yes.

23           Q    And it includes the description of the job

24      in the analysis, correct?

25           A    But that's -- that's very germane to the         11:25:13
```

```
 1    question we're asking in that paper.  That paper is      11:25:16

 2    about looking for stereotype phrases in job

 3    descriptions.  So it had -- it wouldn't --

 4         Q    Right.

 5              In job --                                        11:25:24

 6         A    It wouldn't make any sense if we didn't

 7    look at job descriptions.

 8         Q    Right.

 9              The paper wouldn't have made sense if you

10    didn't look at job descriptions, right --                 11:25:31

11         A    Mm-hmm.

12         Q    -- right?

13              THE REPORTER:  Is that "Yes"?

14    BY MS. DAVIS:

15         Q    Do you -- and didn't you --                     11:25:41

16              Sorry.  Did you say "yes"?

17              THE REPORTER:  I'm sorry.  Did you say

18    "yes"?

19              THE WITNESS:  Me?

20              THE REPORTER:  Correct.  I heard "mm-hmm"        11:25:48

21    as an answer.

22              THE WITNESS:  Oh, I think I did.

23    BY MS. DAVIS:

24         Q    And -- and just again, you're not aware of

25    anyone who has used this analysis purely on job           11:25:57
```

Page 99

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 23 of 98

```
 1    honestly don't remember looking, you know -- looking    11:34:17

 2    -- looking at this -- in this format exactly.  But

 3    it's --

 4        Q    Okay.  So on the first page, we have just

 5    a first list of jobs in cluster zero.                   11:34:42

 6            Do you see that?

 7        A    I do.

 8        Q    Okay.  And you said that here -- what

 9    we're trying to do here is group jobs that are

10    similar, correct?                                       11:34:54

11        A    Yes.

12        Q    Okay.  So you see in cluster zero we have

13    client accountant.

14            Do you see that?

15        A    Mm-hmm.  Yes.  Sorry.                          11:35:04

16        Q    We also have vice -- vice president,

17    supply chain strategy.

18            Do you see that?

19        A    I do.

20        Q    Do those jobs seem similar to you?            11:35:14

21        A    I've de- -- I've defined what "similar"

22    means.  They're -- they tend to get used in -- you

23    know, in the same place in the corpus.  I've also

24    noted that there will be exceptions.  Anybody could

25    go through this and say, Oh, here's one that looks      11:35:30
```

Page 107

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 24 of 98

| | | |
|---|---|---|
| 1 | odd, and here's one that looks odd.  And that | 11:35:32 |
| 2 | doesn't surprise me at all, you know, but you can't | |
| 3 | run a regression -- there must be 300 pages times -- | |
| 4 | well, there's -- there's about 15,000 of these.  You | |
| 5 | can't run a regression on 15,000 of them.  These | 11:35:42 |
| 6 | are -- | |
| 7 | You know, I'm using two different ways to | |
| 8 | try to grapple with this issue of trying to capture | |
| 9 | some of the richness of experience.  You know, | |
| 10 | anything feasible in a system or model is going to | 11:35:55 |
| 11 | have an issue like this.  Some things don't fit as | |
| 12 | well.  One -- you know, what you don't have in this | |
| 13 | table -- and, I mean, I don't -- one could have | |
| 14 | printed it out.  I don't know if we -- it's in our | |
| 15 | data, obviously, even if we didn't produce an Excel | 11:36:09 |
| 16 | with it, is -- is how many people are in these | |
| 17 | clusters, right, how important is this.  I can't | |
| 18 | tell that here because that's not in this table. | |
| 19 | Q    Okay.  We'll take a look at that next, but | |
| 20 | I'd just like to -- I mean, you're using these | 11:36:22 |
| 21 | clusters because you've said that these jobs are -- | |
| 22 | you believe these jobs are similar, and you're using | |
| 23 | it in your analysis, correct? | |
| 24 | A    They're -- | |
| 25 | Q    Correct? | 11:36:34 |

Page 108

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 25 of 98

```
 1        A    They're similar in the way in which I        11:36:35

 2    define them.  They fit better.  The two highlighted

 3    yellow ones that I can see on the page now fit

 4    better using the method I described with these jobs

 5    than with other jobs.                                 11:36:46

 6            If you want to say, Are they identical?

 7    Of course not.  That's -- I mean, I boiled 15,000

 8    job titles into 20 clusters.  That's obvious,

 9    they're not identical.

10        Q    Yeah, it is obvious.  Okay.  Let's go to     11:36:59

11    the next page.  Lead -- lead trainer, fitness

12    instructor is also in cluster zero.

13            Do you think Nike would treat lead

14    trainer, fitness instructor, vice president, supply

15    chain strategy, and client accountant as similar     11:37:16

16    prior experience coming to Nike?

17        A    I mean, I -- I don't know exactly what

18    Nike does.  I don't know how much Nike

19    differentiates these different kind of jobs.  I can

20    tell you, you know, just to -- you can -- you can     11:37:33

21    see -- not so much for the client account, whatever

22    that said, but for the others, you know, you can see

23    why these are treated as linguistically similar,

24    because one has vice president.  One has lead.  You

25    know, these are -- so, remember, the similarity can   11:37:46
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 26 of 98

```
 1    be higher because of a subset of the words in a        11:37:49

 2    phrase, and, as you mentioned before, you know,

 3    levels have sort of leadership kind of things in

 4    some of the titles.  So that's -- you know, that's

 5    why they're being treated as somewhat similar.        11:38:01

 6            Again, it doesn't capture all the

 7    richness.  There's another approach that captures

 8    more that had, you know, other benefits, other

 9    costs, and this is another one.

10    Q    Dr. Neumark, you put this analysis in your        11:38:14

11    report and have -- and are going to present it to

12    the court --

13    A    Yeah.

14    Q    -- as a legitimate way to group prior job

15    experience before coming to Nike.  So I would like    11:38:24

16    to know why you believe it is accurate that lead

17    trainer, fitness instructor should be grouped with

18    vice president, supply chain strategy.

19            How are you going to explain that to the

20    court?                                                11:38:39

21    A    I'm going to --

22            MR. KAN:  Objection.  Argumentative.

23            THE WITNESS:  I'm going to give the same

24    explanation I've given you, that this is a data

25    reduction technique.  I won't go through everything   11:38:49
```

Page 110

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 27 of 98

| | | |
|---|---|---|
| 1 | I said again.  It inevitably is going to group | 11:38:52 |
| 2 | things together -- it's inevitably going to lead to | |
| 3 | some things that don't match as well. | |
| 4 | You know, I would note that you're | |
| 5 | highlighting a row here and there, right, and you're | 11:39:03 |
| 6 | skipping over a lot of rows.  I see on the page I'm | |
| 7 | looking at technician, technician, technician, | |
| 8 | technician, technician, and that's what it's doing. | |
| 9 | And there are exceptions.  You know, if someone | |
| 10 | wants to do it with 30 clusters and see if the | 11:39:14 |
| 11 | answer differs, I -- you know, I'm quite confident | |
| 12 | it won't because adding detail relative to no | |
| 13 | clusters increased the gender gap, but, you know, | |
| 14 | there's -- this is -- it's a data reduction | |
| 15 | technique. | 11:39:29 |
| 16 | And if you really dislike it, the other | |
| 17 | one uses string matching, which, you know, for the | |
| 18 | common jobs will -- will never group things together | |
| 19 | that don't go together, but will obviously lead to a | |
| 20 | lot of other ones that don't go together. | 11:39:44 |
| 21 | But there's no other way to do this.  And | |
| 22 | I should say, you know, it's important to say that, | |
| 23 | you know -- this is -- these 20 clusters or the, | |
| 24 | whatever it is, 240 separate experience terms I use | |
| 25 | in the other analysis -- this is way beyond the | 11:39:57 |

Page 111

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 28 of 98

```
 1    level of detail that labor economists in their        11:40:00

 2    research use to study discrimination.  Now, why?

 3    Because typically, in labor economics research, we

 4    don't have this kind of rich company data.  We have

 5    survey data on workers or firms.                       11:40:14

 6            So the fact that the text -- there are

 7    scores of papers where people conclude there's

 8    discrimination from controls.  Maybe it's just a

 9    good experience measure with no reference to the

10    type of job people did, but just an accurate measure   11:40:29

11    of how long they'd been working.

12            I'm adding a lot of detail.  One could add

13    somewhat more and still have a feasible strategy.

14    I've chosen the number of clusters I chose for

15    reasons explained in my report.  One can't possibly    11:40:43

16    incorporate all the detail.  It's simply not

17    possible.

18    BY MS. DAVIS:

19        Q    Well, Dr. Neumark, you're incorporating

20    detail, but if the detail doesn't mean anything,       11:40:51

21    it's not helpful, correct?

22            MR. KAN:  Objection.  Argumentative.

23            THE WITNESS:  I think that's -- I think

24    that's a mischaracterization of how I view the

25    evidence and how I would, as you say, present it to    11:41:04
```

Page 112

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 29 of 98

1   other people.  Again --                                    11:41:08

2   BY MS. DAVIS:

3        Q    Well, if --

4        A    -- an individualized exception -- an

5   individualized exception does not make -- make it          11:41:12

6   meaningless.  It just means that, yes, you found

7   that individualized exception, and, of course,

8   there's some.

9        Q    Okay.  Well, let's go -- let's look at

10  cluster one.  It starts on page 21.                         11:41:29

11       A    I'm almost there.  Hang on.  Okay.

12  Twenty-one.  Yep.

13       Q    All right.  So you said before I just

14  found a few examples.  Let's look at cluster one.

15  Let's look at the jobs cluster one groups together          11:41:46

16  that you represent are similar:  Library page,

17  footwear, student, BIAA Jordan apparel, Nike CIS,

18  VP, deckhand, Spanish-English G.E.D. tutor, nanny,

19  CEO, handyman, loss prevention, armory chief,

20  journeyman, bank teller, sign painter, KMA arbor           11:42:16

21  [sic] crewman, ITEE -- IT ETS, penetration tester,

22  senior SAPBI, tennis captain, model, master black

23  belt, caregiver.

24            Do these jobs seem similar?

25       A    Well, obviously not.  These are -- this          11:42:40

Page 113

| | |
|---|---|
| 1 | is, I would imagine -- I haven't read the whole list | 11:42:44 |
| 2 | recently.  You know, this is -- I will -- I'm going |
| 3 | to take a wild guess that there aren't a lot of |
| 4 | people who apply to jobs at Nike who were a KMA |
| 5 | armor crewman, whatever KMA is, or were deckhands or | 11:43:01 |
| 6 | were penetration testers.  I don't know what that is |
| 7 | either. |
| 8 | And remember:  You have to go somewhere. |
| 9 | So this may well be a cluster that plays a role |
| 10 | similar to that catchall category when you use the | 11:43:14 |
| 11 | more -- I'll call it more conventional string |
| 12 | matching, but don't assign separate experience |
| 13 | categories for the job titles that show up |
| 14 | infrequently. |
| 15 | Now, you know, I would also venture a | 11:43:28 |
| 16 | guess, not for every one of these, but, you know -- |
| 17 | well, yeah, that's all I'll say.  That's all I can |
| 18 | say.  That -- this is -- this is exactly what you'd |
| 19 | expect to happen.  There are 15,000 job titles, and |
| 20 | they're not -- you know, obviously a lot of people | 11:43:44 |
| 21 | apply to Nike, have -- and any other big company, |
| 22 | you know, a lot of them have somewhat similar |
| 23 | backgrounds, I'm sure, but there's going to be |
| 24 | people all over the map.  And that's the kind of |
| 25 | stuff reflected here. | 11:43:57 |

Page 114

Pedersen Decl. Exhibit A, Page 31 of 98

1      A    I don't know that that's true.                11:44:53

2      Q    Okay.  Can you point to any other expert,

3   any other labor economist who has ever used a

4   cluster analysis like this on job titles alone?

5      A    I already -- I already said I'm not aware    11:45:12

6   of a paper that has done something on job titles

7   alone in this context, but, again, that is by no

8   means a statement it ~~has~~ **hasn't** happened.  This is a

9   very -- this is a new and evolving area of research.

10          So every --                                  11:45:28

11     Q    How about using --

12     A    -- every week I get my National Bureau of

13  Economic Research, you know, list of new working

14  papers, and there's, very commonly, you know, a new

15  paper using something like this in all -- frankly,    11:45:38

16  in all sorts of different contexts, but certainly

17  many in labor.

18     Q    Right.  But I'm asking a very specific

19  question.

20     A    Mm-hmm.                                       11:45:49

21     Q    Can you point to any other experts, any

22  other labor economist who has ever used a cluster

23  analysis on job titles alone?

24     A    I -- I'm not aware of that per se, but it

25  doesn't mean it doesn't exist.  I have not done an    11:46:02

                                                      Page 116

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 32 of 98

| | | |
|---|---|---|
| 1 | exhaustive search of all work, and, as I said, | 11:46:04 |
| 2 | because a lot of it is unpublished, that's very hard | |
| 3 | to do because it's new. | |
| 4 | Q    Got it.  All right. | |
| 5 | So let's look at cluster 15.  These are | 11:46:11 |
| 6 | some examples of the jobs that have been clustered | |
| 7 | into cluster 15.  Just on the first page, we've got | |
| 8 | cofounder/cohost, movement instructor, head trader, | |
| 9 | head basketball coach, IT officer, universal | |
| 10 | associate, intercompany accountant, quality | 11:46:36 |
| 11 | supervisor, plant accountant, college administrative | |
| 12 | assistant, postgraduate teaching fellow, senior | |
| 13 | accountant, cofounder, managing member, | |
| 14 | representative, assistant women's basketball coach, | |
| 15 | vice president logistics, front desk attendant. | 11:46:57 |
| 16 | Do those jobs seem similar to you? | |
| 17 | A    I'm going to say the same thing.  They're | |
| 18 | -- they're obviously -- they're obviously not the | |
| 19 | same.  They're -- obviously some of them are | |
| 20 | unrelated, but this is -- this is the way the | 11:47:14 |
| 21 | algorithm works.  You know, there's -- there's a lot | |
| 22 | of jobs that are similar.  You're, for obvious | |
| 23 | reasons, skipping over all of those.  And there are | |
| 24 | some that aren't.  And that's the nature of data | |
| 25 | reduction, and you'd have the same problem with the | 11:47:29 |

Page 117

Pedersen Decl. Exhibit A, Page 33 of 98

```
 1    other approach.  You know, I capture a lot of        11:47:31

 2    detail, and you don't get all of it, and you can't

 3    get all of it.

 4         Q    Right.

 5              Just to clarify -- because you just          11:47:38

 6    mischaracterized what I did.  I didn't skip over

 7    any.  I read from the first line of cluster 15

 8    through almost the bottom of the page.  So I did not

 9    selectively read anything.  I read every single one.

10    Don't mischaracterize what I've done.                 11:47:52
```

```
11              MR. KAN:  Objection.  Cluster 15 goes

12    beyond page 239 and continues for what I believe is

13    another 50 pages or several more pages.

14              MS. DAVIS:  Right.  We could read them

15    all, but I didn't -- we could read them all, but I    11:48:04

16    didn't selectively read entries.  I read from the

17    very first one.

18              THE WITNESS:  You didn't highlight yellow

19    ones that you thought were more different?  I don't

20    get to ask questions.                                 11:48:16

21    BY MS. DAVIS:

22         Q    I just highlighted them, so I -- yeah, I

23    get to ask the questions.  I highlighted ones so it

24    would catch my eye.  I'm happy to go to any page on

25    here and talk to you about them, but I think you've   11:48:27
```

                                                   Page 118

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 34 of 98

```
 1    some standardization.  So if by the same job title        11:49:39

 2    you mean identical, then yes.  If it's slightly

 3    different, most of the time, but, again -- you know,

 4    I didn't -- I didn't -- I haven't read the whole

 5    corpus of Wikipedia to do the coding.                      11:49:52

 6            So -- so -- so small deviations, you know,

 7    things that are on the margin, can be taken to

 8    different -- can be assigned to different clusters.

 9    It shouldn't happen a lot.  It shouldn't happen

10    systematically, and I hope it doesn't, but it can          11:50:07

11    happen occasionally.

12        Q    All right.  Why don't you go to page 15 of

13    Exhibit 222.

14        A    15.  Okay.

15        Q    All right.  On page 15, you'll see in red         11:50:19

16    account management rep is in cluster zero.

17            Do you see that?

18        A    I do.

19        Q    Okay.  Go to page 79.

20        A    Okay.                                             11:50:40

21        Q    Okay.  Do you see account management

22    representative is in cluster 5?

23        A    I do.

24        Q    Okay.  You would agree that those are the

25    same job titles, correct?                                  11:50:52

                                                   Page 120
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 35 of 98

```
 1    particular one we missed, and I would assume -- I        11:53:05

 2    don't know if it ever happens, but if the word "rep"

 3    and "representative," again, with no periods showed

 4    up that way, this might happen in other cases.  Now,

 5    maybe they don't -- maybe that never happens with        11:53:18

 6    the same two words in front of it; maybe it does.

 7         Q    Could you try to just answer my question?

 8    I think it will go faster.

 9              So my question is:  The spelling of the

10    word defines the cluster, not the job content,           11:53:30

11    correct?

12              MR. KAN:  Objection.  Asked and answered.

13              THE WITNESS:  Well, if what you're saying

14    is the slight difference in spelling, I would -- I

15    would dispute that because most of the time we would     11:53:43

16    have caught that and standardized it.  Obviously, it

17    is the letters that are in the job title that are

18    used, not, you know, the feeling you have when

19    you're on the job, which is in the resumé.

20    BY MS. DAVIS:                                            11:54:02

21         Q    Right.  It's not your job duties or the

22    content of your job.

23              Well, let's just take a look at a few

24    other examples.  So if you go to page 21 --

25         A    Okay.                                          11:54:17
```

Page 123

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 36 of 98

```
 1          Q     -- you see VP in cluster one.              11:54:17

 2                Do you see that?

 3          A     I do.

 4          Q     You -- if you go to page 113 --

 5          A     Page 113, okay.                            11:54:31

 6          Q     -- you see vice president in cluster 7,

 7    correct?

 8          A     Mm-hmm.

 9          Q     "Yes"?

10          A     Yes.  Sorry.  Yes.  Mm-hmm.                11:54:44

11          Q     That's the same job title in two different

12    clusters, correct?

13          A     I would say that's another -- that's a

14    standardization that should have -- that should have

15    been made.  Whether it was because of the space        11:54:54

16    between the V and the P, I don't know for sure.  I

17    don't have the code memorized.

18          Q     Okay.  My question is:  That is the same

19    job title in two different clusters, correct?

20          A     I switched the page, but one was V space P  11:55:07

21    and one was vice president, right?

22          Q     Yes.

23          A     Yes, for the reason I explained.

24          Q     Okay.  If you go to page 26 --

25          A     Okay.                                      11:55:28
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 37 of 98

```
 1          Q    -- do you see SR space SWE in cluster 1?    11:55:29

 2          A    I do.

 3          Q    And you understand that means senior

 4     software engineer, correct?

 5          A    I mean, probably.  I'm less confident than    11:55:43

 6     I am about VP being vice president, but that seems

 7     reasonable.

 8          Q    Okay.  You go to page 232 --

 9          A    Okay.

10          Q    -- do you see the word -- the title senior    11:56:00

11     software engineer in cluster 14, correct?

12          A    I do.

13          Q    Okay.  If you go to page 284 --

14          A    Am I looking for red?  Okay.

15          Q    -- you see the title SNR software engineer    11:56:23

16     in cluster 18, correct?

17          A    I do.

18          Q    Okay.  The same job title in three

19     different clusters, correct?

20          A    Probably in the second two, for sure.    11:56:36

21               Yeah, those are standardization issues

22     that -- they weren't all caught.  You know, you can

23     -- the nature of this is -- you can see how long

24     this document is:  301 pages.  I'm sure one can find

25     refinements.  Isolated cases like these in no way    11:56:53
```

Page 125

Pedersen Decl. Exhibit A, Page 38 of 98

```
 1    implies that it has any material impact on the        11:56:57

 2    estimates, and I'm skeptical it does, very skeptical

 3    it does.
```

```
 4         Q    How would you know?  How would you know?

 5    How would you test if it had a material difference?    11:57:04

 6         A    How would I test?

 7              Oh, I would -- I would -- I would probably

 8    spend more time, if permitted, to -- or ask someone

 9    else to spend more time or maybe you'll do it and

10    then I'll use whatever your experts produce -- to      11:57:19

11    take, let's say, these clear -- you know, where

12    there's a clear case like VP, V space P in vice

13    president, and I would say these -- certainly these

14    second two, and we can call -- throw the first one

15    in there too for senior software engineer, that        11:57:34

16    someone said these are -- these are probably the

17    same, and I would look at them and say, Okay.  I'm

18    willing to assume they're the same.  I would then

19    redo the calculations, and you'd get -- you know,

20    you'd get some people assigned -- you know, some       11:57:48

21    small number of people assigned to different

22    clusters.

23              But, you know, why don't I think it

24    matters?  Because the clustering doesn't even matter.

25    Even if I don't control for type of experience, I      11:57:58
```

Page 126

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 39 of 98

```
 1    fit well.  And that's -- you know, we understand        11:59:23

 2    that, but the proof is not in the pudding there.

 3            You know, the question is -- these are --

 4    you know, you have not highlighted these all in red

 5    or all in yellow for obvious reasons, because a lot     11:59:33

 6    of this works well, and there are exceptions that

 7    don't fit as well.  And, you know, could one refine

 8    it a little more, you know, and move a few of these

 9    jobs around that probably are the same job that got

10    assigned to different clusters?  Sure.  Does that       11:59:47

11    mean it would make any difference?  Absolutely not.

12            And the fact that, you know, you -- your

13    assumption was I have meaningless clusters, that

14    these don't mean anything and, therefore, I can't

15    conclude anything from having clustered the jobs        12:00:01

16    into 20 or, you know, choose your number, instead of

17    just treat them all as just the same experience, but

18    that's a gross mischaracterization because, I mean,

19    I'm looking above the page you have me -- you left

20    me on, page 284.  A lot of these jobs sound similar.    12:00:14

21    A lot of these jobs sound similar, and there's way,

22    way, way, way more.  So I would defend it strongly.

23        Q    All right.  Well, yeah, let's look at that

24    page, 284.  Is that where you said you were?

25        A    Yes.  I would say that was the last senior     12:00:36
```

Page 128

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 40 of 98

```
 1    software engineer.                            12:00:38

 2         Q    Yeah.  So there we've got senior software

 3    engineer on page 284 in cluster 18.  If you go to

 4    page 287, you've got junior software engineer, also

 5    in cluster 18.                                12:00:56

 6              Do you see that?

 7         A    Let me jump pages.  One second.  287?

 8         Q    Yep.

 9         A    I do.

10         Q    All right.  And then on 288, you've got  12:01:07

11    intermediate software engineer and also in cluster

12    18.

13         A    Mm-hmm.

14         Q    Right?

15         A    Mm-hmm.                              12:01:15

16         Q    "Yes"?

17         A    Sorry.  Yes.

18         Q    You have to answer using words.

19         A    I mean -- sorry -- yes.

20         Q    Okay.  So these are all software engineers  12:01:22

21    all in cluster 18, correct?

22         A    Yes.

23         Q    Okay.  We had -- junior software engineer,

24    intermediate software engineer, senior software

25    engineer are all in cluster 18, correct?      12:01:37
```

Page 129

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 41 of 98

```
 1        A    Correct.                              12:01:39

 2        Q    Okay.  But the titles, at least, suggest

 3   different levels of experience, correct?

 4        A    Yeah, this is a data reduction technique.

 5   I'm not accounting for every unique job title, but    12:01:52

 6   they all say software engineer, which, to go back to

 7   your example, is different from that.

 8        Q    Right.  But they --

 9        A    The character- --

10        Q    But their --                          12:02:04

11        A    Is --

12        Q    They differ -- hold on.  Let me ask my

13   question.  Hold on.  Let me ask my question.

14             Yes, they all say software engineer, but

15   the levels of experience for a junior, intermediate,   12:02:11

16   and senior software engineer would be different;

17   would you agree with that?

18        A    Yes, they're not -- they're not identical.

19   That's what I've said.  That's what the clustering

20   is all about.                                    12:02:23

21        Q    Right.

22             So for someone being hired into a software

23   engineer job, that would matter, right?  It would

24   matter if someone had five years of experience as a

25   junior software engineer, five years of experience   12:02:34
```

Page 130

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 42 of 98

1    as an intermediate software engineer or five years          12:02:37

2    of experience as a senior software engineer,

3    correct?

4         A    It might.

5         Q    Okay.  And your clustering doesn't account          12:02:45

6    for that, correct?

7         A    You -- this particular dimension you've

8    highlighted for these particular entries, it treats

9    them as the same.

10             My other analysis -- I don't know, sitting          12:02:57

11   here, whether these were -- had ten or more people

12   in these cells or not.  So I don't know if these got

13   treated separately or not.  But, for sure, the other

14   analysis is a different partition of jobs by prior

15   experience, and that's why I say there is -- there          12:03:14

16   is no perfect answer to this question if you want to

17   try to capture some detail of people's prior --

18   people's prior jobs, which is a good motivation to

19   do two quite different approaches.

20        Q    So does it also suggest that if there's no          12:03:31

21   perfect answer, that it's not possible to accurately

22   capture people's prior experience in a model?

23        A    Well, if you thought that was true, then

24   we'd probably have to throw out, you know, 2,000

25   published labor economics papers.                            12:03:47

                                                  Page 131

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 43 of 98

```
 1    is answering your question over and over again.        12:05:55

 2            MS. DAVIS:  I'm asking the same question

 3    over and over again because I'm not getting an

 4    answer.

 5            MR. KAN:  If you don't like his answer,        12:06:03

 6    that's not his -- his or the witness's problem.  The

 7    witness is here to answer the question that you --

 8    you pose to him to the best that he can.  That's

 9    what he's been doing all morning, and I don't think

10    it's appropriate or --                                 12:06:15

11            MS. DAVIS:  It's not.

12            MR. KAN:  -- professional for you to try

13    to attack him, to impugn that he is somehow avoiding

14    your questions.  He is not.  He's here to answer

15    your questions, and he's doing that.                   12:06:25

16            MS. DAVIS:  The record -- the record

17    speaks for itself.

18        Q    Dr. Neumark, does your cluster analysis

19    assume that junior software engineer, intermediate

20    software engineer, and senior software engineer are    12:06:34

21    the same prior experience?

22        A    I'll -- I'll -- I'll -- I'll start my

23    answer hopefully without saying the same thing, and

24    it's a short answer, but I'll give my whole answer.

25            For those three specific phrasings, yes.       12:06:49
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 44 of 98

```
 1     I've already confirmed that.                    12:06:51

 2              But -- and the rest of my answer was very

 3     short, shorter than that whole discussion.  I see

 4     just below this -- I see other titles with senior

 5     engineer or senior engineering or SR eng- -- and,   12:07:00

 6     you know, senior full stack engineer.  I don't --

 7     those are all engineers.  Some of them are senior.

 8     I don't know that there are intermediate engineers

 9     of those types or junior engineers of those types in

10     the same cluster or not, but those are still senior,  12:07:15

11     and those are still engineers.

12         Q    Your cluster variables have one

13     coefficient for each cluster, correct?

14         A    Two because there's a square d and -- the

15     linear and square d term.                        12:07:34

16         Q    But your -- your clusters return a

17     coefficient -- one coefficient for each cluster,

18     correct?

19         A    Well, it's one -- one pair of

20     coefficients.  I mean, all jobs in the cluster are  12:07:53

21     treated -- experience of all jobs in the cluster is

22     treated the same.  There are two coefficients

23     because there's both a linear and a quadratic or

24     squared term.

25         Q    Okay.  Fair enough.                     12:08:09
```

Page 135

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 45 of 98

```
 1    sense, put in a measure, or multiple measures if        13:19:36

 2    they showed up on multiple rankings, of the quality

 3    of the school.

 4          So that just -- instead of just kind of

 5    control and feature them separately, that imposes       13:19:44

 6    some kind of scale, if you will, on the quality of

 7    the school, the person ~~who~~ got the highest degree from
                                                       ^
```

 8    Q    Okay.  Did you do any analysis of degree

 9    subject, for example, degree in math or engineering

10    or English?  Did you account for any of those          13:20:11

11    differences in your analysis?

12    A    No, I haven't done -- I have not done

13    field-of-study kind of assignments here.

14    Q    Okay.  Why not?

15    A    You know, one could.  It's not --                  13:20:30

16    there's -- I had -- I had -- you know, I had to

17    prioritize what I thought was most important.

18          As I said, the -- you know, the workhorse

19    labor economics is quantity of schooling.  So

20    highest degree is essentially -- essentially a         13:20:42

21    quantity of schooling, although not measured in

22    years of schooling.  There's a lot of attention to

23    school quality.  I rank that as a somewhat higher

24    priority.  Also, it's something that, I mean, I

25    think perhaps most importantly, would not              13:20:56

                                                   Page 145

```
 1    necessarily be reflected in prior experience in any      13:21:02

 2    way; whereas, what you studied might be and what you

 3    got your major in versus what you took a lot of

 4    courses in, you know, might be two different things.

 5    You might -- so -- so someone might not have a           13:21:14

 6    computer science major but done a lot of computer

 7    science, for example, and, therefore, we'll see that
                                   that
 8    reflected in their experience.  So not j̶u̶s̶t̶ a field

 9    doesn't potentially provide additional useful

10    information, but it was lower priority in a world        13:21:28

11    where I couldn't necessarily do everything under the

12    sun.

13         Q    Okay.  Did you just run out of time to do

14    it, or was it never your intention?

15         A    Yeah, I made a -- I mean, rec- -- I            13:21:40

16    didn't -- I didn't run out of time.  Having some

17    sense, going in, how long these things take, I made

18    an early decision that I wasn't going to.

19         Q    Got it.

20              And in any of your education analysis, did     13:21:54

21    you take into account the schools or places of

22    education that may be important to Nike or that Nike

23    may preference in hiring or in placing employees in

24    a job level or in pay?

25              MR. KAN:  Objection.  Compound.  Vague and     13:22:14
```

Page 146

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 47 of 98

```
 1    ambiguous.                                       13:22:15

 2              THE WITNESS:  So I have no direct

 3    information.  I don't know if any has been provided

 4    at all about what those preferences might be.  I

 5    mean, I would -- I would -- I would find it -- well,  13:22:29

 6    I don't know.  I mean, I -- I think most employers

 7    like -- you know, all else the same, value better

 8    schools more than not-as-good schools.  I don't know

 9    if they have other preferences than that.  So I

10    thought the rank- -- I would assume the rankings to   13:22:41

11    be relevant, but that's a guess.

12              But, again, in my estimation -- and I use

13    this information to study starting pay, current pay,

14    i.e., class period pay and -- and starting job

15    levels.  So my analysis is basically letting the      13:22:55

16    data tell me how Nike values those.

17              So if women went to way better schools

18    than men and Nike didn't care about that, well, then

19    adding those quality controls presumably wouldn't do

20    anything to the gender gap.  If women went to way     13:23:13

21    better schools than men and Nike did value that,

22    then controlling for it would probably make the

23    gender gap increase, and obviously you could tell

24    the opposite story because I'm -- I'm just

25    hypothesizing here.                                   13:23:24
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 48 of 98

```
 1    small for-profits.  It doesn't -- you know, it        13:37:11

 2    doesn't surprise me in retrospect that, I mean --

 3    that at least some of these aren't on these lists

 4    because I don't think most -- I'll leave it at that.

 5    I don't -- it doesn't surprise me.                     13:37:23

 6         Q    Okay.  I don't think that was the question

 7    I asked, but let me go back and look.

 8         A    Okay.  We can try again.

 9         Q    Yeah.

10              So did you consider whether a company like   13:37:36

11    Nike that designs and produces clothing,

12    accessories, athletic wear might care that an

13    employee or an applicant has a degree from a design

14    or an art school?

15         A    Sorry.  Yes.  So I -- I started on that      13:37:54

16    answer, but then I think I got -- I got sidetracked.

17              So I did not consider it directly.  My

18    point about the distribution or allocation of

19    employees was meant to say, you know, I don't -- I'm

20    not aware that they have a lot of design employees    13:38:08

21    at the company.  They have a lot of other people,

22    but I did not consider it directly.

23         Q    Do you know how many design employees Nike

24    employs?

25         A    Sitting here, no.  I could compute, it,      13:38:22
```

Page 158

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 49 of 98

```
 1    but I don't know it, sitting here.                  13:38:24

 2         Q    So if all of the design and art schools

 3    are not listed on the rankings or your three ranking

 4    lists, then they're all going to go into that

 5    catchall category, correct?                         13:38:42

 6         A    Correct.

 7         Q    Right.

 8              So someone who graduates -- are you

 9    familiar with the Parsons School of Design in New

10    York City?                                          13:38:53

11         A    I've heard of it, sure.

12         Q    Okay.  So very prestigious design school,

13    right?

14         A    I believe so.  I -- I know more about the

15    architecture side.  So I have no idea what they have  13:39:05

16    to do with designing shoes, but they might, or --

17         Q    Okay.

18         A    That's just --

19         Q    Right.  Clothing?

20         A    -- based on the people I know, not any      13:39:12

21    more knowledge than that.

22         Q    Okay.  You're familiar with the Rhode

23    Island School of Design, correct?

24         A    Not as -- not as much as Parsons, but I've

25    heard of it.                                         13:39:24
```

Pedersen Decl. Exhibit A, Page 50 of 98

```
 1         Q    Okay.  It's also considered a very      13:39:26

 2    prestigious art and design school, correct?

 3         A    I don't know that.

 4         Q    All right.  What about the Fashion

 5    Institute of Technology in New York?            13:39:33

 6         A    I've heard of that.

 7         Q    Okay.  You would agree that that is a

 8    prestigious fashion and design school, correct?

 9         A    I don't know.  I don't know my design

10    schools very well.  I just know I've heard of it.  13:39:45

11    But I had a daughter who lived in New York; so I may

12    have just heard it a lot because of that, but I

13    don't know.

14         Q    Okay.

15         A    It's --                                 13:39:54

16         Q    Right.

17              And your analysis doesn't -- your analysis

18    assumes those schools are the equivalent of any

19    other unranked school throughout the -- throughout

20    the world, actually?                             13:40:03

21         A    That shows up in the data.

22         Q    Right.  Yes?

23         A    Yes.  Sorry.  Yes, as long -- well, I was

24    qualifying your answer.  Yes, among those that show

25    up in the data.                                  13:40:19
```

Page 160

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 51 of 98

```
 1    education --                                    13:54:03

 2         A    Mm-hmm.  Give me one second.

 3         Q    -- you cite an art- -- sure.

 4         A    Just a second.  That's in the appendix,

 5    right?  Okay.  I'm there.                        13:54:11

 6         Q    All right.  You cite an article titled "Is

 7    it where you go or what you study, the relative

 8    influence of college selectivity and college major

 9    on earnings."

10         Do you see that?                            13:54:29

11         A    I do.

12         Q    Okay.  In footnote 83, you describe this

13    study as, quote, "...research tying college quality

14    to earnings, using rankings of colleges."

15         Do you see that in your footnote?           13:54:48

16         A    Well, the sentence says:  "There is

17    academic research tying college quality to earnings,

18    using rankings of colleges."  So I wouldn't say

19    that's a -- maybe we're splitting hairs here.  I

20    wouldn't say that's a full description of the paper,  13:55:04

21    and obviously the title is there.  It's a -- it's

22    a -- it's meant to say:  Here is an example of

23    somebody tying college quality to earnings using

24    rankings.  It's --

25         Q    Right.  You --                          13:55:17
```

Page 170

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 52 of 98

```
1          A    -- which is a -- which is a char- -- a       13:55:18
2     correct characterization of the paper.
3          Q    Okay.  Well, before -- today earlier, I
4     thought you told me that there's really not that
5     much of a correlation between the college ranking    13:55:31
6     and earnings.
7          A    What I said is -- what I said -- and I
8     believe this is a correct summary of the literature.
9     It's not something I've studied on my own, but that
10    there is research studying things like school        13:55:46
11    selectivity.  Sometimes it's a different thing, like
12    the really selective schools versus the others, and
13    there is some evidence that, you know, the really
14    selective schools might offer a higher return than
15    the other schools.                                   13:56:00
16          I'm not aware that there's, you know,
17    strong empirical evidence saying sort of this, you
18    know, continuous ranking of, you know, school 200 to
19    300 on whatever ranking makes a big difference, but
20    I'm -- I hope I stated that with enough -- well,     13:56:13
21    whatever.  Not so firmly -- I was not giving you a
22    summary of the hundred papers I've read, because I
23    haven't done that.  I don't even know if there's a
24    hundred papers, but I think that's a fair
25    characterization of what the evidence says that      13:56:31
```

Page 171

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 53 of 98

```
1    I'm ...                                          13:56:34

2        Q    All right.  Is it a fair characterization

3    -- did you read this article before you cited it in

4    your paper?

5        A    I looked through it.  I didn't read it    13:56:39

6    cover to cover.

7        Q    Oh, you didn't.  Okay.

8             Is it a fair characterization of the

9    article that the study looks at earnings by college

10   major, not by the school attended?              13:56:55

11       A    Well, I didn't -- I certainly didn't

12   review -- I don't -- I don't remember because I

13   certainly didn't review it for the deposition, but

14   my recollection is it looks at both.

15       Q    Okay.  Your analysis did not look at     13:57:12

16   major, correct?

17       A    That's right.  Let me just clarify it.

18   You know, sometimes school will tell you something

19   about major.  Like, if you went to MIT, you probably

20   got an engineering degree, but no explicit         13:57:32

21   independent measure of major.

22       Q    Well, but MIT has math degrees.  MIT has a

23   lot of different degrees.  That's not really an

24   accurate statement, is it?

25       A    Well, it tells you something about major.  13:57:44
```

Page 172

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 54 of 98

```
 1     I'm sure there's a higher share of engineering        13:57:46

 2     undergrads at MIT than at anything that's not an

 3     engineering school anyway.  I said it says something

 4     about it.

 5           Q    All right.                                  13:57:56

 6           A    There's information there.

 7           Q    All right.  A lot of things say something

 8     about something else, right.  Does it -- I guess

 9     that's not really what an expert opines on, but

10     that's fine.                                           13:58:05

11           All right.  I guess I just wanted -- you

12     did read the article, "Is it where you go or what

13     you study" before you finalized your report or you

14     -- you looked through it; is that your testimony?

15           MR. KAN:  Objection.  Asked and answered.        13:58:38

16     BY MS. DAVIS:

17           Q    Go ahead.

18           A    I looked through it, yes.

19           Q    Okay.  Your model also does not include

20     professional licenses in its education or experience   13:58:59

21     controls, correct?

22           A    That's right.

23           Q    Are you aware that the article we were

24     just discussing titled It's where you go -- "Is it

25     where you go or what you study" actually says that     13:59:42
```

Page 173

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 55 of 98

```
 1    your major matters more than the school you attend        13:59:48

 2    for jobs like STEM-related jobs?

 3         A    I -- I don't remember.  I -- I obviously

 4    read that, but I wasn't -- A, I didn't review it.

 5    And, B, I wasn't -- I wasn't citing this as a              14:00:06

 6    defense of looking at rankings and not looking at

 7    the field of study.  I was simply citing it, as the

 8    first sentence says, as an example of somebody using

 9    rankings, and there are other papers, some -- some

10    measure of school quality in an earnings-type             14:00:20

11    regression.  That's the only reason I cited it.

12         Q    Yeah, but it says something else.  That's

13    fine.  The paper says what it says, and you've told

14    us --

15         A    The paper -- I don't cite it with respect       14:00:33

16    to the conclusion.  I cite it with respect to the

17    approach -- the paper -- the paper could have found

18    the opposite.  They could have found they were both

19    important.  It could have found neither was

20    important.  But the approach was to include a             14:00:45

21    ranking measure and see if it affected earnings, and

22    I cited it as an example of doing that.

23         Q    Right.

24         A    That's it.

25         Q    Okay.  Let's go to paragraph 64 of your         14:00:55
```

Page 174

Pedersen Decl. Exhibit A, Page 56 of 98

```
 1    correct?                                         15:03:33

 2        A    I have never -- I have not, in this

 3    report, ever discussed the determination of which
                    you
 4    subfamily^are hired in, which is what I control for

 5    in column 2, as related to discrimination.  Whether   15:03:50

 6    other evidence might be introduced in the future

 7    that suggests it is, I might -- I might -- I might

 8    go back to that differently, but at this point, no.

 9        Q    Column 3 does add job level, correct?

10        A    Yes.                                     15:04:04

11        Q    Right.

12             And then column 4 is the interaction of

13    job subfamily and job level, correct?

14        A    Yes.

15        Q    Between columns 3 and 4, which one do you   15:04:16

16    believe is the most accurate or most appropriate to

17    use in this case?

18             MR. KAN:  Objection.  Vague and ambiguous.

19             THE WITNESS:  I think -- I think what I

20    say and I show here is that column 4 is probably    15:04:30

21    more appropriate for equal pay claim, and that's

22    based -- you know, we discussed this before, but

23    princ- -- you know, reason number one would be

24    Dr. Lundquist's opinion that -- that subfamily times
                              are
25    level interactions ~~have~~ the appropriate level of   15:04:46
```

Page 213

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 57 of 98

```
 1      analysis -- unit of analysis for an equal pay claim.        15:04:49

 2      It turns out column 3 estimates are almost the same,

 3      but that's neither here nor there.
```

```
 4      BY MS. DAVIS:

 5          Q    Yeah.  They're almost the same, but           15:04:57

 6      they're not identical?

 7          A    Right.

 8          Q    So -- right.

 9               So what -- so can you just explain in --

10      you know, I'm not an expert like you, so in the          15:05:06

11      easiest, simplest way you can, the difference

12      between column 3 and column 4?

13          A    Sure.

14               So column 3 -- forget about all the other

15      controls, just as -- education, you know, age, all       15:05:19

16      that stuff.  There's -- column 3 has subfamily

17      controls, and that allows the wages to differ

18      systematically by subfamily or by the subfamily

19      algorithm.  Some are paid more; some are paid less.

20      And it allows pay to differ systematically by level.     15:05:35

21      But because there aren't interactions, though, the

22      differences between -- just call it level one and

23      level two, level three and four, et cetera, are

24      constrained to be the same for each subfamily.

25      There's -- there's -- there are -- so there are --       15:05:50
```

Pedersen Decl. Exhibit A, Page 58 of 98

```
 1              (Recess.)                          15:48:39

 2          THE VIDEOGRAPHER:  We're back on the

 3    record.  The time is 4:01.

 4    BY MS. DAVIS:

 5       Q    All right.  Let's look at Table 7 in your    16:01:20

 6    report, page 59.

 7       A    I have it.

 8       Q    Okay.  Does Table 7 represent your

 9    analysis of the gender differences in starting pay

10    from January 2012 through September 21, 2019, but    16:01:37

11    including the job experience clusters or job title

12    clusters in the education analysis we discussed

13    earlier today?

14       A    Yes, and as a result, it's a somewhat

15    smaller sample.                                      16:01:57

16       Q    What's more understandable?

17       A    I'm sorry.  What?

18       Q    Oh, you said it's a somewhat smaller

19    sample?

20       A    Yes.                                         16:02:12

21       Q    Got it.  Sorry.  I misheard you.

22          Okay.  And did you run -- I'm assuming the

23    answer is no.  But did you run Table 7 for the time

24    period 2016 through September 1st, 2019?

25       A    No.                                          16:02:56
```

Page 247

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 59 of 98

```
 1        Q    Did you run Table 7 for the period 2017      16:02:59

 2   through September 1st, 2019?

 3        A    No.

 4        Q    Did you run Table 7 for the period 2018

 5   through September 2019?                                16:03:10
                                          Column 6.
 6        A    No, but that's pretty close to ~~common~~

 7   ~~sense~~.
```

```
 8        Q    Right.

 9             But not -- not 2017 through September 1st,

10   2019, correct?                                         16:03:33

11        A    Oh, I thought you said 2018.  That's why I

12   said it was close.

13             No, I didn't -- I didn't do those

14   subperiods.

15        Q    Table 8.                                     16:03:47

16             What does Table 8 represent?

17        A    So Table 8 is -- I'm going back to the

18   class period, or at least the -- I think what -- the

19   maximum period -- the maximum sample I used for a

20   class period, maximum date range, August 9th, 2015,    16:04:11

21   to September 1, 2019, as in Table 2, but I do it for

22   the subsample from Table 2 for which I have these

23   applications data.

24             So the table we were just talking about

25   was starting pay, but now I'm basically going back     16:04:30
```

Page 248

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 60 of 98

1      Q    Did you run a merit pay increase for the      16:15:59

2    period 2018 through September 1st, 2019?

3      A    No.

4      Q    Your merit pay increase analysis shows

5    that when you are looking at the dollar amount of       16:16:20

6    merit pay increase in the differences between men

7    and women, if you use the individual controls plus

8    the job subfamily but do not control for level, it

9    shows a ███████ percent shortfall for women,

10   the standard deviation of 1.62; is that accurate?       16:16:47

11     A    Yes.

12     Q    And are those results statistically

13   significant and adverse to women?

14     A    Not -- they're not -- that -- you said

15   plural.  That's a singular result.  It is not          16:17:02

16   statistically significant at the 5 percent level.

17   It is statistically significant at about the 11

18   percent level.

19     Q    Do you believe that that result is an

20   indicator of discrimination against women?             16:17:18

21     A    I mean, it's a negative estimate.  It's

22   close to statistically significant, and the -- the

23   estimate above it in levels is more strongly

24   statistically significant.

25          So, you know, I mean, I'm reporting the         16:17:33

Page 257

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 61 of 98

```
 1    results and whether -- you know, in the -- you know,      16:17:36

 2    one estimate among many that is a little more weakly

 3    significant than the 5 percent standard courts often

 4    use.  Whether that undermines -- whether that's

 5    viewed as supporting or not supporting the story is       16:17:48

 6    really not for me to decide, but I'm just -- I'm

 7    reporting the numbers and the standard deviations,

 8    and I don't think I say anything different in my

 9    report.

10         Q    You told me earlier that you were              16:18:00

11    qualified to opine on whether discrimination caused

12    the pay discrimination gap or the pay -- pay

13    difference gap that you allegedly report.  So I'm

14    just asking you for your same opinion with respect

15    to this number.                                          16:18:16

16         Are you able to provide a response?

17         A    Yeah, this is -- this is consistent with

18    it but not as strongly statistically significant.

19         Q    Okay.  And how about when you control for

20    job level?  When you control for the interaction of      16:18:30

21    job subfamily and level, is there evidence there of

22    discrimination?

23         A    So those estimates are positive, not

24    negative, which means that once I look within job

25    level as well, women are not getting smaller merit       16:18:44
```

Pedersen Decl. Exhibit A, Page 62 of 98

```
 1    increases, and what this table highlights is that        16:18:48

 2    merit in- -- you know, the merit increases -- it's

 3    -- it's -- what you can see here is that it's the

 4    presence of women in lower job levels that creates a

 5    disadvantage with respect to merit pay increases,         16:19:03

 6    not -- and it's not different merit increases within

 7    the same level.

 8         Q    What you can see here is that when you're

 9    looking at women and men in the same job subfamily

10    and level, women actually receive larger increases        16:19:16

11    as a dollar amount and they receive larger

12    percentage increases than men, correct?

13         A    That is what -- that's what I just said, I

14    believe, yes.

15         Q    Okay.  Let's look at Table 10.                   16:19:34

16              Table 10 appears to be a promotions

17    analysis you completed for the time period January

18    1st, 2013, through September 1st, 2019; is that

19    accurate?

20         A    It is.                                           16:19:57

21         Q    Did you do a promotions analysis for the

22    period 2014 through September 1st, 2019?

23         A    I don't think I did this for narrower

24    subperiods like that.

25         Q    Did you do a promotions analysis for the        16:20:12
```

```
 1    period 2015 through September 1st, 2019?              16:20:15

 2         A    Same answer.  I don't think so.

 3         Q    Did you do a promotions analysis for the

 4    period 2016 through September 1st, 2019?

 5         A    No, I don't think so.                       16:20:31

 6         Q    Did you do a promotions analysis for the

 7    period 2017 through September 1st, 2019?

 8         A    I don't think so, no.

 9         Q    Did you do a promotions analysis for the

10    period 2018 through September 1st, 2019?             16:20:49

11         A    Not -- not except for the particular month

12    in 2018 indicated here.
```

```
13         Q    Okay.  You have --

14         A    Wait.

15         Q    -- three panels here.                      16:21:06

16         A    Sorry.  One second.  I just scrambled my

17    pages.  Give me a second; otherwise, it's going to

18    get messier.  Okay.  Sorry.  I'm good.

19         Q    Okay.  You have three panels for your

20    promotions analysis, correct?                        16:21:19

21         A    Yes.

22         Q    You have -- you look at all promotions

23    total, correct?

24         A    Yes.

25         Q    And then you look at two different types    16:21:29
```

                                              Page 260

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 64 of 98

```
 1    favored with respect to promotions?              16:22:53

 2        A    The evidence is most consistent with

 3    women, again, not statistically significant, at the

 4    five or 10 percent level.

 5        Q    And when you add the interaction of      16:23:06

 6    subfamily and job level when you're looking at all

 7    promotions, does it appear that women or men are

 8    favored?

 9        A    Now it flip signs.  So men are favored --

10    again, same -- same -- not statistically            16:23:16

11    significant, at the five or 10 percent level.

12        Q    And if you look at pre-April 2018, does it

13    appear that men or women are favored with respect to

14    promotion?

15        A    Not very -- very similar to column 3       16:23:33

16    because it's almost -- it's almost the same data.

17    There isn't that much data after April 2018.  Women

18    are favored -- sorry.  Men are favored; women

19    disfavored, again, not significant, at the five or

20    10 percent level.                                   16:23:46

21        Q    Okay.  And then how about after April

22    2018?  Does it appear that men or women are favored

23    with respect to promotions during that time period?

24        A    That's about as close to zero as you could

25    get.  .0003.  So neither.                           16:23:57
```

Page 262

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 65 of 98

```
 1        Q     Okay.  Okay.  Looking at just -- just        16:24:01

 2    panel A, would you agree that the all-promotions

 3    data does not suggest that women or men are favored

 4    with respect to promotions at Nike?

 5        A     Well, I would say two things.  I would --     16:24:19

 6    I would put -- I think column 3 is a lot more

 7    important than column 1 and 2, and I explain my -- I

 8    explain why in my report, because promotion rates

 9    vary by level.  They're higher at the lower levels

10    at which women are more likely to be employed.  That   16:24:34

11    said, if you look at column 3, the estimate, as I

12    just said, is consistent with a lower promotion rate

13    for women, but it's not statistically significant at

14    the five or 10 percent level.

15        Q     So there's no statistically significant       16:24:49

16    results for or against women with respect to the

17    all-promotions group, correct?

18        A     By -- I mean, I was specific about

19    significance levels, but I think by -- by most

20    people's standards of statistically significant,       16:25:03

21    that's five or ten, correct.

22        Q     All right.  If you look at the next panel,

23    you appear to be analyzing competitive promotions

24    only; is that accurate?

25        A     Yes.                                          16:25:29

                                                      Page 263
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 66 of 98

1       Q    What is a competitive promotion?          16:25:33

2       A    My best understanding is a combination

3   of -- my best understanding of what I recall right

4   now is these are promotions for which requisitions

5   are posted.  There is an opportunity to apply, and    16:25:45

6   these are identified from the Taleo data.

7       Q    Okay.  And so people affirmatively apply

8   for competitive promotions, correct?

9       A    I mean, I -- I -- I assume so.  That seems

10  a reasonable presumption.  You know, whether --       16:26:09

11  whether it's influenced by who's asked or whatever,

12  I have no idea.

13      Q    So why do you have -- why are the number

14  of your observations in the competitive promotions

15  the same observations as all of your other analyses?  16:26:22

16  Are you assuming that every person applies?

17      A    No, no, no.  I'm simply -- I'm not -- I'm

18  not -- I'm not studying did you get promoted among

19  those who applied.  I'm studying in this table,

20  simply, did you get promoted.  So the -- the base,    16:26:43

21  if you will, or the denominator is everybody, which

22  is why the sample doesn't change, and, you know, you

23  could -- you could have one promotion or the other.

24  We didn't talk about panel C yet, but one promotion

25  or the other, and panel A just combines them all.     16:26:59

Page 264

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 67 of 98

```
 1         Q    But if you didn't apply for a promotion,        16:27:03

 2    why would you do a promotions analysis on

 3    competitive promotions that require an application

 4    but not look only at people who applied?

 5         A    Oh, because -- I mean, you know, I can --       16:27:18

 6    I can only tell you anecdotes here, but -- you know,

 7    but it illustrates the point.  My son works at a

 8    consulting firm.  They get a lot of feedback on

 9    whether they're likely to get promoted or not.

10              When we promote assistant professors to        16:27:33

11    tenure, if they -- at some point they have to go up.

12    They don't have a choice, but they will often ask

13    us, Should I go up early?  And we will give them --

14    it's not a commitment.  We'll give them a lot of

15    feedback.  And then they apply to go up early or       16:27:46

16    they don't, or if they really think they're not

17    going to get it when they have to be decided because

18    it's a negative signal to have been turned down for

19    tenure, they will ask for -- you know, they'll ask a

20    lot of the senior people what we think.  And if we    16:27:57

21    say, You're not likely to get tenure, they don't

22    apply.  They just leave.

23              So -- so when -- whether one applies is

24    potentially influenced by what one thinks might

25    happen.  It's not -- not irrelevant.                   16:28:07
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 68 of 98

```
 1          Q    Is it --                              16:28:11

 2          A    It's not irrelevant, but it's not

 3    necessarily a clean thing to study.

 4          Q    Is there any evidence that that is what

 5    happened at Nike?                                16:28:18

 6          A    There's no evidence one way or the other

 7    that I'm aware of.

 8          Q    Okay.  So you -- are you aware of any

 9    literature, any expert anywhere who would study

10    competitive promotions where one has to apply for   16:28:32

11    the promotion and include every person, including

12    those who did not apply?

13          A    I can't -- I can't -- I can't think of a

14    re- -- I mean, I'm not aware of -- I can't think of

15    a research context where we would even know who      16:28:54

16    applied, and I haven't seen -- I haven't seen this

17    -- I just want to be careful here.  I don't think

18    I've seen other experts' analyses in legal case.

19          So the answer would be I'm not aware of

20    that, no, but, you know ...                          16:29:11

21          Q    Okay.  You agree --

22          A    But that --

23          Q    You agree this analysis doesn't make any

24    sense, right?  You agree with me?  It makes no -- it

25    makes no logical sense to do an analysis about       16:29:21

                                             Page 266
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 69 of 98

```
 1          Q    Well, I mean, you -- you do know because    16:32:47

 2     we have column -- we have panel A.  What panel A

 3     shows us is that -- when we're looking at everyone

 4     promoted, right?

 5          A    Right.  And you get promoted --            16:32:58

 6               [Simultaneous speaking.]

 7          Q    -- that was a significant shortfall for

 8     women?

 9          A    There -- there is not a significant

10     shortfall, and when you divide it up, you see a --   16:33:04

11     you know, what we call marginally significant

12     positive shortfall for women in panel B, and a
                           at the
13     significant^five percent level negative shortfall

14     for women in panel C.

15          Q    Okay.  I just want to make sure I'm fully   16:33:21

16     understanding this analysis.

17               So if I am -- if I get a promotion -- if I

18     get a competitive promotion, I'm going to show up as

19     -- in column A, I get, yes, I got a promotion -- I

20     mean in panel A, yes, I got a promotion.  Panel B,   16:33:37

21     yes, I got a promotion.  Panel C, it's going to look

22     like I didn't get a promotion, even though I did,

23     right?

24          A    Well, you -- you -- but you got a

25     competitive one.  You didn't get a noncompetitive    16:33:47
```

```
 1    one.  Let's assume -- let's assume those were both      16:33:49

 2    in the same year.  You didn't get a noncompetitive

 3    one in the same year.

 4         Q    Right.

 5              Why wouldn't you back out the people who      16:33:58

 6    actually got competitive promotions from the

 7    noncompetitive pool and back out the people who got

 8    noncompetitive promotions from the competitive pool

 9    so you're actually measuring who did or didn't get

10    promoted?                                               16:34:12

11         A    Well, I mean, I'm not -- I'm not sure

12    there is any missing information because, as you

13    say, there is panel A.  So you could --

14         Q    Right.

15         A    Right, which tells you, I think, the         16:34:26

16    differential between the two.

17         Q    Right.

18              But, I mean, you would agree it's

19    misleading when you say there's a statistically

20    significant shortfall for women for noncompetitive     16:34:36

21    promotions because that analysis assumes that women

22    who actually got a promotion through the competitive

23    process didn't get one, that they didn't get a

24    promotion that year.  You would agree that's

25    misleading, right?                                      16:34:50
```

Page 271

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 71 of 98

```
 1        A    It's not misleading with respect to        16:34:54

 2   noncompetitive promotions.  You know, what you're --

 3   I'm not -- I'm not -- I'm not saying what you're

 4   saying makes no sense at all.  I'm saying what I --

 5   what I do is well defined, and I think all that       16:35:05

 6   information is there.  You know, backing one -- when

 7   you say can you back one out, that's a little

 8   trickier to do statistically because now you're

 9   modeling two outcomes simultaneously.  I'm not sure

10   anything is missing, but it's a reasonable           16:35:21

11   clarification.  I don't object to that.  I don't

12   have a problem with that.
```

```
13        Q    All right.  Well, I don't think it's a

14   clarification.

15             But can you look at paragraph 101?         16:35:29

16        A    Yeah, let me just try to keep my pages

17   straight here.  Okay.  I'm there.

18        Q    You ready?

19        A    I'm ready.
```

```
20        Q    Paragraph 101, you write:  "Overall, then,  16:35:58

21   the analysis of promotions indicate that women with

22   similar qualifications and performance ratings to

23   men with similar jobs to men are promoted at lower

24   rates."

25             You mean noncompetitive promotions or are   16:36:15
```

Veritext Legal Solutions
866 299-5127

```
 1    you indicating all promotions there?              16:36:17

 2        A    Well, that's an accurate statement about

 3    the point estimate being negative.  I do say that

 4    column 3 is most relevant.  I don't make a statement

 5    there about statistical significance.  And in the    16:36:27

 6    earlier -- in the earlier paragraphs, I think I'm

 7    crystal clear, but you may disagree where it's

 8    significant, where it's not and at what level.  I

 9    always -- I'm always reporting the standard

10    deviation.  So one can read -- one can read all of   16:36:41

11    this off the tables.

12        Q    Okay.  Can you just listen to my question,

13    please?  I'm sorry, but I just want the answer to my

14    question.

15             My question is, when you wrote:  Overall,   16:36:52

16    then, analysis of promotions indicates that women

17    with similar qualifications and performance ratings

18    to men with similar jobs -- I'm sorry -- to -- men

19    with similar jobs to men are promoted at lower

20    rates, are you talking about all promotions or       16:37:10

21    noncompetitive promotions?

22        A    Well, what I'm saying -- I did -- I did

23    hear your question.  I did answer your question.

24             This is a summary of -- that comes after I

25    discuss -- excuse me -- discuss Table 10 and Table   16:37:22
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 73 of 98

```
 1     11.  So Table 10, we just discussed that the          16:37:27

 2     significant evidence is for noncompetitive

 3     promotions.  And the overall result is negative for

 4     women but not significant.

 5          Table 11, which you didn't discuss, but          16:37:38

 6     we're jumping to the conclusion that follows it,

 7     looks at promotions of two or more or three or more

 8     or four or more levels, and there, you know, you

 9     don't have this offsetting positive effect in the

10     competitive promotions.  You just find negative       16:37:55

11     estimates that are significant in columns 1 and 2

12     for promotions by more than one level, which are

13     presumably more valuable than promotions by one

14     level.

15          So I don't -- I don't have any -- I mean,         16:38:08

16     you know, I can -- I can add details to explain what

17     it means, but it's covered earlier, but I don't have

18     any problem with what I wrote here.

19        Q    I just want to know:  Are -- do you -- are

20     you talking about all promotions here, "yes" or       16:38:20

21     "no"?  It's not a trick question.  I just want a

22     clarification.

23          Is this referring to all promotions or

24     just --

25        A    The statement --                               16:38:30
```

Page 274

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 74 of 98

1    Q    -- or does it --                    16:38:31

2         [Simultaneous speaking.]

3    A    -- as written without an explicit

4    reference to one or more levels and without an

5    explicit -- explicit reference to statistical    16:38:34

6    significance is about all promotions and -- and

7    is --

8    Q    Thank you.

9    A    Okay.  Fair enough.

10   Q    That was my question.              16:38:44

11        So if you're using column 3 on Table 10,

12   approximately how many women do you believe have

13   experienced a promotion?  Like, how many female

14   promotions are we short?

15   A    I don't have that calculation explicitly.    16:39:10

16   I have the -- I have the percentage-point

17   difference, and I believe I have raw promotion rates

18   in another appendix table.  So one could get close

19   to that computation, but I don't know it offhand.

20   Q    Okay.  Is it in your report anywhere the    16:39:28

21   number of female shortfall -- female promotion

22   shortfalls you assert with respect to column 3,

23   Table 10?

24   A    The number, no.  I report things in

25   percentage terms.                       16:39:42

Page 275

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 75 of 98

```
1    significant.  .44 standard deviations.              16:41:14

2         Q    And with respect to noncompet- --

3         A    Sorry.

4         Q    With respect to noncompetitive promotions

5    past April 2018 or later, are women favored or       16:41:23

6    disfavored with respect to promotions?

7         A    Again, here -- so here it flips.  It's

8    slightly positive, small and nowhere near

9    statistically significant.

10        Q    If you look at the pre-April 2018 data, so   16:41:38

11   column 4, panel B, were women favored or disfavored

12   with respect to competitive promotions before April

13   2018?

14        A    They were favored based on the point

15   estimate, and it's very, very nearly statistically    16:41:55

16   significant at the 5 percent level.

17        Q    Let's look at Table 12.

18        A    Yes.

19        Q    Does Table 12 represent your analysis of

20   starting job level?                                   16:42:37

21        A    Yes.

22        Q    And it looks like the analysis dates are

23   January 1st, 2012, through September 1st, 2019; is

24   that correct?

25        A    It would have -- yes, it would have the      16:42:50
```

Page 277

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 76 of 98

```
 1    same caveat we discussed earlier with respect to          16:42:51

 2    starting pay for the first six months of the data.

 3    My snapshot data starts at --

 4         Q    Do you run -- sorry.  I didn't mean to

 5    interrupt you.                                             16:43:03

 6              Did you run a starting job level analysis

 7    for the period 2013 through September 1st, 2019?

 8         A    No.

 9         Q    Did you run a starting job level analysis

10    for the period 2014 through September 1st, 2019?          16:43:18

11         A    No.

12         Q    Did you run a starting job level analysis

13    for the period 2015 through September 1st, 2019?

14         A    No.

15         Q    Did you run a starting job level analysis     16:43:33

16    for the period 2016 through September 1st, 2019?

17         A    No.

18         Q    Did you run a starting job level analysis

19    for the period 2017 through September 1st, 2019?

20         A    No.                                             16:43:52

21         Q    Do you understand that at Nike, when jobs

22    are posted and people apply, there is a level

23    associated with the job at the time of posting?

24         A    I believe I've seen some of that.  It's

25    not something I delved into in detail.                    16:44:20
```

Page 278

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 77 of 98

1        Q     Did you account for, in your starting job        16:44:25

2     level analysis, the job that the person applied for?

3        A     No.

4        Q     So, in other words, you are assuming that

5     every person who applied is equally interested in        16:44:43

6     all job levels?

7        A     I think that's too strong a statement,

8     right.  Just to clarify, these are regression models

9     with a lot of controls, including, of course,

10    whether you're female or not.  So the -- the          16:45:05

11    assumption is that, conditional on those things,

12    there are not correlations between ~~these controls~~ **the gender variable** in

13    the model and the interest, if you want to call it

14    that, in jobs in particular levels.

15           I'm -- I'm pretty comfortable with that        16:45:22

16    assumption.  I don't know that there's systematic

17    differences.  And, you know, if you want to argue

18    that women -- women, all else the same, with the

19    same human capital, the same education, same

20    experience, want lower-level jobs than men, I can't     16:45:36

21    reject that.  You know, offhand, I obviously don't

22    know.  I find it highly unlikely.

23           I also -- I'm not entirely sure what is

24    captured in the level at which you apply for.  I

25    know Nike -- and I discuss it in my report -- seemed    16:45:55

Veritext Legal Solutions
866 299-5127

```
 1    to be correcting, in the last couple years covered        16:45:59

 2    by the data, what they call gender bias in the
                        process.  Makes
 3    hiring ~~process, makes~~ me suspicious of, you know,

 4    who got steered into which level, but I -- I don't

 5    know that for sure.                                         16:46:17

 6        Q    Yeah.

 7             You have no evidence of any steering into

 8    any levels, correct?

 9        A    I have evidence that Nike thought there

10    was bias -- gender bias in the hiring process, by           16:46:23

11    which I assume they mean against women because they

12    say that.

13        Q    You have an anecdote from a document.  You

14    didn't -- you didn't do any work to look at any of

15    Nike's practices in that regard, correct?                   16:46:33

16        A    I did not study its practices explicitly,

17    no.

18        Q    Right.  And you actually could have looked

19    to determine whether women preference lower-level

20    jobs by actually looking at the job people applied          16:46:50

21    to and then using that as a control in your starting

22    job level analysis, correct?

23             MR. KAN:  Objection.  Vague and ambiguous.

24             THE WITNESS:  Part of that was not

25    correct.  I could have looked at the data.  You --          16:47:03
```

Veritext Legal Solutions
866 299-5127

1    you -- you -- you used the word "preferences," and        16:47:05

2    the point of my previous answer was I'm not

3    confident that reflects preferences.

4    BY MS. DAVIS:

5        Q    You have no idea.  You have no idea?            16:47:14

6        A    I -- I have -- I wouldn't say I have no

7    idea.  Nike thought there was bias in the hiring

8    process.  Was it explicitly this?  I don't know for

9    sure.  I wouldn't say "no idea."  I have some

10   indication it might have been an issue, but I don't     16:47:31

11   know for sure.

12       Q    What's your indication that it might have

13   been an issue?

14       A    Give me a second.  I'm referring to the

15   email referenced in -- and the deposition in           16:47:52

16   footnote 82 about wanting to --

17       Q    What does that testimony say?

18       A    "Nike's CHRO also wrote that 'we need to

19   improve representation of women'" --

20            THE REPORTER:  I'm sorry.  Can you read         16:48:11

21   more slowly, please.

22            THE WITNESS:  I'm sorry.  I tend to go

23   fast when I'm reading.

24            "Nike's CHRO also wrote that 'we need to

25   improve representation of women.  [W]hile we've          16:48:19

                                        Page 281

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 80 of 98

| 1 | spoken about this many times, and tried different | 16:48:21 |

1     spoken about this many times, and tried different     16:48:21

2     ways to achieve change, we have failed to gain

3     traction - and our hiring...promotion decisions are

4     not changing senior-level representation as quickly

5     as we wanted,' and" -- and quote -- "and confirmed     16:48:31

6     that Nike was going to, quote, 'remove bias from

7     critical moments of the hiring process by creating

8     more inclusive job descriptions...'"  It goes on.

9            Testified that it's -- "CHRO testified that

10    its inclusive job descriptions" -- by which I think     16:48:45

11    I mean the ones they tried to switch to -- "'are

12    intended to remove the type of things that can

13    create unnecessary or artificial barriers to access

14    to the jobs.'"

15           So, you know, that -- I mean, it doesn't     16:48:58

16    strike me, based on that, to be at all unreasonable

17    to think that the -- what levels one applied to is

18    not an untainted variable.

19    BY MS. DAVIS:

20        Q   But you did no analysis to determine if     16:49:19

21    the level someone applied to is a tainted variable?

22        A   I didn't because I don't know what I could

23    have done.  I'd have to know about preferences and

24    then what they applied to at -- I mean, maybe even

25    someone got --     16:49:34

Veritext Legal Solutions
866 299-5127

```
 1        Q    You --                                    16:49:35

 2             [Simultaneous speaking.]
                              steered
 3        A    -- the profits, but just --

 4        Q    You --

 5        A    I'd have to know something like --        16:49:37

 6        Q    You basically -- go ahead.

 7        A    I'd have to know something like what level

 8   were you interested in before interaction with the

 9   company and then what level did you apply to.  I

10   don't think that's in the data.                    16:49:46

11        Q    Right.  Agreed.

12             You basically have to interview a lot of

13   people --

14        A    I'm not even sure --

15        Q    -- do a survey or something like that,    16:49:55

16   correct?

17        A    I'm not even sure how decisive that would

18   be, but fair enough.

19        Q    All right.  Going back to paragraph 101 on

20   page 48 --                                         16:50:12

21        A    One second, please.  Yes.

22        Q    You say:  "The analysis of promotions

23   indicates that women with similar qualifications and

24   performance ratings to men with similar jobs to men

25   are promoted at lower rates."                      16:50:36

                                                        Page 283
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 82 of 98

```
 1    starting job-leveling analysis, is there a way in      17:01:20

 2    your report for me to identify which women were

 3    under-leveled?

 4         A    No.  It's the same as my answer about

 5    promotions.  There's -- there's data with which one    17:01:30

 6    might draw an inference as to who was more likely to

 7    have been under-leveled than not, but, you know,

 8    statistical analysis cannot explain the -- the

 9    specific behavior of an individual, as I've said

10    numerous times.                                         17:01:47

11              MS. DAVIS:  Let's take a break.

12              THE WITNESS:  'Til -- oh, sorry.

13              THE VIDEOGRAPHER:  Going off the record.

14    The time is 5:02.

15              (Recess.)                                     17:02:02

16              THE VIDEOGRAPHER:  We're back on the

17    record.  The time is 5:21.

18    BY MS. DAVIS:

19         Q    Dr. Neumark, did you review any documents

20    during the break?                                       17:21:33

21         A    No.

22         Q    The data that you received from Nike does

23    not have applicants' prior pay information, correct?

24         A    Yeah, that's my understanding.  Correct.

25    Unless somebody happened to put it on a resumé, yes.    17:21:56
```

Page 292

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 83 of 98

```
 1        Q    Okay.  So you don't have a way to analyze      17:22:02

 2   whether women reported lower prior pay when they

 3   applied to Nike than men, correct?

 4        A    Correct.
```

```
 5             Excuse me.  I'm just going to close my         17:22:21

 6   window because now the wind is howling.  Okay.

 7        Q    With respect to your incumbent pay model

 8   -- I'm calling it incumbent pay, Table 2.

 9        Are you there?

10        A    Yes, I am.                                     17:22:54

11        Q    Okay.  Are you -- is Table 2 intended to

12   model any specific compensation process at Nike?

13        A    I would say it's -- it's not specific.

14   It's meant to study the overall outcome.

15        Q    Okay.  Did you do any analysis of what        17:23:13

16   Nike calls "two times pay" or "2X pay"?

17        A    Not -- not explicitly, no.
```

```
18        Q    With respect to leveling decisions at

19   hire, do you -- do you know who makes those

20   decisions at Nike?                                       17:23:51

21        A    I don't.  I did not study processes or

22   decision makers, just outcomes.

23        Q    Okay.  And did you include anything in

24   your analysis to try to model level at hire by

25   decision maker?                                          17:24:05
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 84 of 98

```
 1       A    No.                                    17:24:07

 2            Sorry.  I have a pop-up screen.  One

 3    second.

 4            No, I did not.

 5       Q    With respect to starting pay, do you know   17:24:16

 6    who makes starting pay decisions at Nike?

 7       A    No.  I didn't study that.

 8       Q    Did you include anything in your analysis

 9    to try to model starting pay by decision maker?

10       A    No.                                    17:24:38

11       Q    With respect to merit increases, do you

12    know who makes -- who's the decision maker with

13    respect to merit increases at Nike?

14       A    No, I didn't study decision makers or

15    processes.                                     17:25:02

16       Q    Did you include anything in your analysis

17    to try to model merit increases by decision maker?

18       A    No.

19       Q    With respect to incumbent pay, your Table

20    2, do you know who is responsible for making       17:25:20

21    decisions about incumbent pay at Nike?

22       A    I -- I do not know explicitly.  I did not

23    study that.  I didn't model it.

24       Q    Let me just ask the question.

25            Did you include anything in your analysis   17:25:37
```

Veritext Legal Solutions
866 299-5127

```
 1    to try to model incumbent pay by decision maker?     17:25:38

 2         A    No.  I'm looking at overall outcomes and

 3    the disparities and whether other factors explain

 4    them.

 5         Q    And do you know who makes the decision      17:25:50

 6    with respect to bonuses at Nike?

 7         A    No.

 8         Q    And did you include anything in your model

 9    to try to model bonuses by decision maker?

10         A    I thought you broke out.  So can you just   17:26:16

11    read it again because there was a pause, and I want

12    to make sure I didn't miss anything.

13         Q    Oh, yeah.  Certainly.

14              Yeah.  Did you include anything in your

15    analysis to try to model bonuses -- bonus payments    17:26:26

16    by decision maker?

17         A    I assumed it was the same question.

18              So the answer is no.

19         Q    When we were talking earlier today about

20    the -- your incumbent pay analysis, so specifically   17:26:50

21    Table -- sorry -- column 4, Table 2, and look at

22    panel C, the log of base pay and PSP bonuses, you

23    said that there may be some job family and level

24    group where women are paid more than men within the

25    same group, correct?                                  17:27:30
```

Page 295

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 86 of 98

```
 1          A    You're asking about -- let's -- just to be      17:27:33

 2    clear -- a subfamily level pair?

 3          Q    Correct.

 4          A    Yes, there may be, and I said I would --

 5    you know, I would assume they were small ones where      17:27:41

 6    the estimate's quite imprecise, but I obviously

 7    can't be sure because I didn't do it.

 8          Q    Okay.  And the number that you present

 9    here, the ███████████ percent, you said earlier

10    that was an average, correct?                            17:27:56

11          A    It's a mathematically complicated kind of

12    average, but, yes, it is -- it's an es- -- it's an

13    estimate identified within the subfamily level units

14    constrained to be the same.  So it's a -- it's a

15    kind of an average, yes.                                 17:28:15

16          Q    Okay.  A weighted average; is that a more

17    appropriate --

18          A    It's a matrix --

19          Q    -- term to use?

20          A    -- if you want to know, but yes.              17:28:25

21          I mean, it's -- the point is -- the point

22    is it would be more representative of the cells with

23    more people and more women.  So in that sense, it

24    has the same flavor as what you would expect of a

25    simple average.                                          17:28:39
```

Page 296

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 87 of 98

```
 1        Q    It also could be the fact -- it also could      17:28:40

 2   be true that there are a couple of or a handful of

 3   large job subfamily and level groupings that are

 4   driving that ███████████ percent result, correct?

 5        A    It's possible, yes.  They'd have -- they         17:29:01

 6   would have to go very big for that to happen, and

 7   the other -- well, in the realm of is anything's

 8   possible or almost anything possible, yes.

 9        Q    And like you said, you didn't look at it,

10   so you don't know?                                         17:29:30

11        A    Correct.

12             MS. DAVIS:  I don't think I have any

13   further questions.

14             James, do you have any questions?

15             MR. KAN:  No further questions on our end.       17:29:44

16             MS. DAVIS:  Perfect.

17             Thank you, Dr. Neumark.

18             THE WITNESS:  Thank you.

19             THE VIDEOGRAPHER:  This concludes today's

20   testimony given by Dr. David Neumark.  We are off         17:29:52

21   the record at 5:29 -- actually, I should say 5:30

22   because it's 5:30 now.

23             (TIME NOTED:  5:30 p.m.)

24

25
```

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 88 of 98

```
 1          I, the undersigned, a Certified Shorthand
 2     Reporter of the State of California, do hereby
 3     certify:
 4          That the foregoing proceedings were taken
 5     before me at the time and place herein set forth;
 6     that any witnesses in the foregoing proceedings,
 7     prior to testifying, were administered an oath; that
 8     a record of the proceedings was made by me using
 9     machine shorthand which was thereafter transcribed
10     under my direction; that the foregoing is a true
11     record of the testimony given.
12          Further, that if the foregoing pertains to the
13     original transcript of a deposition in a Federal
14     Case, before completion of the proceedings, review
15     of the transcript [ X ] was [  ] was not requested.
16           I further certify that I am neither
17     financially interested in the action nor a relative
18     or employee of any attorney or any party to this
19     action.
20          IN WITNESS WHEREOF, I have this date
21     subscribed my name.
22     Dated: 09/07/2021
23
24                    Catherine A. Ryan, RMR, CRR
25                    CSR No. 8239
```

Page 299

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit A, Page 89 of 98

Errata Sheet for the Deposition of David Neumark
Taken on August 31, 2021 in the matter of *Cahill et al. v. Nike, Inc.*

Page: 20
Line: 15
Change: "average" to "averages"
Reason: transcription error (TE)

Page: 21
Line: 6
Change: "An" to "The"
Reason: TE

Page: 27
Line: 6
Change: "me" to "me – "
Reason: TE

Page: 32
Line: 3
Change: "statistical" to "statistically"
Reason: TE

Page: 32
Line: 14
Change: "variant" to "variance"
Reason: TE

Page: 33
Line: 10
Change: "criteria" to "criterion"
Reason: TE

Page: 33
Line: 13
Change: "is" to "as"
Reason: TE

Page: 33
Line: 14
Change: "informed." to "informative."
Reason: TE

Page: 35
Line: 10-11
Change: "there. But" to "there – but"
Reason: TE

Page: 35
Line: 20
Change: "any" to "that any"
Reason: Clarification (C)

839552.4

Pedersen Decl. Exhibit A, Page 90 of 98

Page: 38
Line: 14
Change: delete ", so"
Reason: C

Page: 41
Line: 18
Change: "and I simply" to "and later I simply"
Reason: Clarification

Page: 45
Line: 21
Change: "scales" to "skills"
Reason: TE

Page: 46
Line: 7
Change: "moves" to "means"
Reason: TE

Page: 46
Line: 13
Change: "reference" to "referenced"
Reason: TE

Page: 53
Line: 24
Change: "subfamily levels." To "subfamily and levels."
Reason: TE

Page: 57
Line: 23
Change: "some does." to "one does."
Reason: TE

Page: 63
Line: 19
Change: "has" to "as"
Reason: TE

Page: 69
Line: 14
Change: "It's like I can't identify." to "I can't identify it."
Reason: C

Page: 69
Line: 17
Change: "shortfall." to "shortfall?"
Reason: TE

Page: 75
Line: 13
Change: "about. The" to "about – the"

839552.4

Pedersen Decl. Exhibit A, Page 91 of 98

Reason: TE

| |
|---|
| Page: 78<br>Line: 13<br>Change: "simplist" to "simplest"<br>Reason: TE |
| Page: 81<br>Line: 10<br>Change: "of" to "about"<br>Reason: TE |
| Page: 82<br>Line: 10<br>Change: "that that that that" to "that"<br>Reason: TE/C |
| Page: 84<br>Line: 6-7<br>Change: "We got/we got" to "We've got/we've got" (3 X)<br>Reason: TE |
| Page: 90<br>Line: 8<br>Change: "research" to "in research"<br>Reason: TE |
| Page: 91<br>Line: 23<br>Change: "the appendix" to "vs. the appendix"<br>Reason: TE |
| Page: 92<br>Line: 16<br>Change: "corpuses" to "corpora"<br>Reason: Correction |
| Page: 95<br>Line: 25<br>Change: "day" to "data"<br>Reason: TE |
| Page: 116<br>Line: 8<br>Change: "has" to "hasn't"<br>Reason: TE |
| Page: 126<br>Line: 24<br>Change: "matter" to "matters"<br>Reason: TE |
| Page: 127<br>Line: 24 |

839552.4

Pedersen Decl. Exhibit A, Page 92 of 98

Change: "linguistic" to "linguistically"

Reason: TE

---

Page: 127

Line: 25

Change: "say," to "say:"

Reason: TE

---

Page: 135

Line: 14, 15

Change:  "square" to "squared" (2X)

Reason: TE

---

Page: 145

Line: 7

Change: ", the person who got the highest degree." to "the person got the highest degree from."

Reason: C

---

Page: 146

Line: 8

Change: "not just" to "not that"

Reason: TE

---

Page: 149

Line: 12

Change: "spell" to "spelled"

Reason: TE

---

Page: 149

Line: 12-13

Change:  "present it" to "presented"

Reason: TE

---

Page: 150

Line: 24

Change: "everyone. There" to "everyone – there"

Reason: TE

---

Page: 154

Line: 11

Change: "turned down," to "turned on,"

Reason: TE

---

Page: 161

Line: 18

Change: "send me the report" to "send me the quote from the report"

Reason: Clarification

---

Page: 161

Line: 20

Change: "a cite page" to "and cite a page"

Reason: TE

---

Page: 175

839552.4

Pedersen Decl. Exhibit A, Page 93 of 98

Line: 23-24
Change: “estimate, that you did obtain from the data” to “estimate that you did obtain from the data,”
Reason: TE

---

Page: 176
Line: 23-24
Change: “five. One I don’t report. I recorded.” to “, five are recorded.”
Reason: TE

---

Page: 177
Line: 10
Change: “by .56” to “at .56”
Reason: TE

---

Page: 185
Line: 14
Change: change “think to do it” to “think of to do with it.”
Reason: TE

---

Page: 193
Line: 11
Change: “do worse.” to “do better.”
Reason: Correction/TE

---

Page: 197
Line: 18
Change: “P level” to “P value”
Reason: TE

---

Page: 202
Line: 11
Change: “date” to “data”
Reason: TE

---

Page: 204
Line: 11
Change: “Time and” to “Time in”
Reason: TE

---

Page: 209
Line: 20
Change: “could” to “couldn’t”
Reason: TE

---

Page: 209
Line: 24
Change: “having this ranking compensation” to ?
Reason: TE – but I can’t tell from written transcript what I said

---

Page: 213
Line: 4
Change: “are hired” to “you are hired”
Reason: TE

---

Page: 213
Line: 25
Change: "have" to "are"
Reason: TE

Page: 214
Line: 18-19
Change: "by subfamily or by the subfamily algorithm" to "by subfamily."
Reason: TE/Clarification

Page: 217
Line: 1
Change: "unmet" to "always"
Reason: TE

Page: 229
Line: 1
Change: "take" to "make"
Reason: TE

Page: 229
Line: 17
Change: "policy change for the" to "policy change. For the"
Reason: TE

Page: 229
Line: 18
Change: "employees. And note it's 15,000 versus about 3600." to "employees – and note it's 15,000 versus about 3600 --"
Reason: TE

Page: 229
Line: 19
Change: "There" to "there"
Reason:

Page: 233
Line: 4
Change: "2018, '19" to "2018-19"
Reason: TE

Page: 235
Line: 17
Change: "there is" to "merits"
Reason: TE

Page: 237
Line: 6
Change: "time and" to "time in"
Reason: TE

Page: 237
Line: 22

839552.4

Pedersen Decl. Exhibit A, Page 95 of 98

Change: "as respect" to "with respect"

Reason: TE

---

Page: 238

Line: 16

Change: "first" to "for"

Reason: TE

---

Page: 240

Line: 21

Change: "pre-periods" to "pre-period's"

Reason: TE

---

Page: 243

Line: 9

Change: "before, it's September 7 − 27 − '17, is − that's" to "before September '17, that's"

Reason: Clarification

---

Page: 244

Line: 5

Change: "interactives" to "interactions"

Reason: TE

---

Page: 244

Line: 18

Change: "data" to "Stata"

Reason: TE

---

Page: 244

Line: 24

Change: "in" to "on"

Reason: TE

---

Page: 245

Line: 1

Change: "its data" to "Stata"

Reason: TE

---

Page: 246

Line: 3

Change: "report" to "support"

Reason: TE

---

Page: 246

Line: 6

Change: "The best estimate is get" to "The best estimate is women get"

Reason: TE

---

Page: 248

Line: 6-7

Change: "common sense" to "close to Column 6"

Reason: TE

---

Page: 252

Line: 4
Change:  "control" to "controls"
Reason: TE

---

Page: 252
Line: 8
Change: "in the sample" to "with the sample"
Reason: TE

---

Page: 254
Line: 4
Change: After period, add "But this refers to explaining the gender gap in base pay, not explaining variation in base pay."
Reason: Clarification

---

Page: 261
Line: 14
Change: "pose" to "impose"
Reason: TE

---

Page: 267
Line: 8
Change: "professor" to "professor candidates"
Reason: TE/clarification

---

Page: 268
Line: 1
Change: "application" to "applications"
Reason: TE

---

Page: 268
Line: 18
Change: "level of industry" to "cell of industry and"
Reason: TE

---

Page: 270
Line: 13
Change: "five" to "at the five"
Reason: TE

---

Page: 279
Line: 12
Change: "these controls" to "the gender variable"
Reason: TE/clarification

---

Page: 280
Line: 3
Change: "process, makes" to "process. Makes"
Reason: TE

---

Page: 282
Line: 9
Change: "CHR" to "CHRO"

839552.4

Pedersen Decl. Exhibit A, Page 97 of 98

Reason: TE/clarification

| |
|---|
| Page: 283<br>Line: 3<br>Change: "the profits" to "steered"<br>Reason: TE |
| Page: 283<br>Line: 8<br>Change: "interaction" to "interacting"<br>Reason: TE |
| Page: 285<br>Line: 10<br>Change: "looser" to "loose"<br>Reason: TE |
| Page: 288<br>Line: 9<br>Change: "we discuss" to "we discussed"<br>Reason: TE |
| Page: 297<br>Line: 7, 8<br>Change: "anything" to "anything's" 2X<br>Reason: TE |

David Neumark                                                9/23/21

David Neumark                                                Date

839552.4

Pedersen Decl. Exhibit A, Page 98 of 98

```
 1                UNITED STATES DISTRICT COURT

 2                    DISTRICT OF OREGON

 3                    PORTLAND DIVISION

 4

 5

 6    KELLY CAHILL, et al.,           )

 7                     Plaintiffs,    )

 8        VS.                         ) NO. 3:18-CV-01477-JR

 9    NIKE, INC., an Oregon           )

10    Corporation,                    )

11                     Defendants.    )

12    _____)

13

14

15    VIDEOCONFERENCE DEPOSITION OF:

16                 KELLY CAHILL

17                 WEDNESDAY, NOVEMBER 18, 2020

18                 12:10 P.M.

19

20

21

22    REPORTED BY:

23                 Sari M. Knudsen

24                 CSR No. 13109

25
```

Page 1

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit B, Page 1 of 8

| | | |
|---|---|---|
| 1 | THE WITNESS:  To my knowledge, yes. | 03:03:44 |
| 2 | BY MS. DAVIS: | 03:03:44 |
| 3 | Q    And you specifically applied for that | 03:03:48 |
| 4 | director position.  Correct? | 03:03:51 |
| 5 | A    I did at the -- at the request of Nike to | 03:03:56 |
| 6 | apply -- directly apply. | 03:03:59 |
| 7 | Q    Okay.  Yeah.  Let's talk about that, how | 03:04:02 |
| 8 | that changed. | 03:04:03 |
| 9 | So you had been working for Nike -- you had | 03:04:08 |
| 10 | been working for Nike as a contractor for about a | 03:04:11 |
| 11 | year at this point.  Correct? | 03:04:12 |
| 12 | A    Correct. | 03:04:13 |
| 13 | Q    And how did it come about that you decided | 03:04:15 |
| 14 | or you applied for a job with Nike? | 03:04:21 |
| 15 | A    To clarify, as in this -- this current job | 03:04:24 |
| 16 | you are referring to, the director position? | 03:04:27 |
| 17 | Q    Yeah.  The global -- the Nike.com Global | 03:04:30 |
| 18 | Digital Cross-Category Director. | 03:04:35 |
| 19 | A    There -- so in this context. | 03:04:38 |
| 20 | So prior to this role and the Nike.com | 03:04:43 |
| 21 | global organization, there wasn't one.  And I was | 03:04:46 |
| 22 | tasked, along with my boss at the time, Dorinda, as | 03:04:53 |
| 23 | part of a committee to help formulate what a global | 03:04:57 |
| 24 | Nike.com function would look like and how it would | 03:05:01 |
| 25 | operate.  So I was part of that committee. | 03:05:06 |

Page 105

Pedersen Decl. Exhibit B, Page 2 of 8

| | | |
|---|---|---|
| 1 | And then as -- the outcome of part of that | 03:05:12 |
| 2 | was that organization forming, Pamela becoming the | 03:05:18 |
| 3 | leader, the senior director of that organization, | 03:05:25 |
| 4 | earlier in the year, and them filling -- filling | 03:05:30 |
| 5 | positions for that organization. | 03:05:36 |
| 6 | I certainly wanted to be a full-time | 03:05:40 |
| 7 | employee at Nike and was actually interest -- more | 03:05:47 |
| 8 | interested in a position that was becoming open | 03:05:50 |
| 9 | within the Women's digital brand category by someone | 03:05:58 |
| 10 | leaving that position.  So I had initially expressed | 03:06:02 |
| 11 | interest in that position, which was a senior | 03:06:07 |
| 12 | manager, position within the same organization and | 03:06:12 |
| 13 | function that I was currently in as a contractor. | 03:06:18 |
| 14 | So that is where I was actually -- or | 03:06:23 |
| 15 | actually thought I was going where the signs were | 03:06:25 |
| 16 | directing me to go.  I was literally on a plane | 03:06:33 |
| 17 | going to London to shadow the person in that current | 03:06:37 |
| 18 | role because, to me, that was the job I was taking. | 03:06:41 |
| 19 | And I received a phone call from the Vice | 03:06:45 |
| 20 | President of Global Digital Brand that they wanted | 03:06:51 |
| 21 | me to be the director -- this position we're talking | 03:06:57 |
| 22 | about -- global director of Nike.com cross-category | 03:07:01 |
| 23 | and that was the role I was to be taking. | 03:07:07 |
| 24 | So conversations happened around what that | 03:07:11 |
| 25 | looked like.  I spoke with Pamela.  And all these | 03:07:18 |

Page 106

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit B, Page 3 of 8

| | | |
|---|---|---|
| 1 | conversations happened before officially applying to | 03:07:21 |
| 2 | that job in this document as a response that you | 03:07:25 |
| 3 | showed. | 03:07:27 |
| 4 | Q    Okay.  Do you know whether anyone else | 03:07:35 |
| 5 | applied to the Nike.com Global Digital | 03:07:36 |
| 6 | Cross-Category Director role that you ultimately | 03:07:40 |
| 7 | filled? | 03:07:41 |
| 8 | A    I do not know. | 03:07:42 |
| 9 | MR. GOLDSTEIN:  Objection. | 03:07:45 |
| 10 | BY MS. DAVIS: | 03:07:45 |
| 11 | Q    You said you spoke with Pamela about the | 03:07:50 |
| 12 | role before you applied.  Did you consider that to | 03:07:53 |
| 13 | be an interview for the job? | 03:07:59 |
| 14 | A    I did not consider that to be an interview | 03:08:01 |
| 15 | for the job. | 03:08:04 |
| 16 | Q    Did anyone interview you for the role of -- | 03:08:06 |
| 17 | interview you for the role of Nike.com Global | 03:08:09 |
| 18 | Digital Cross-Category Director? | 03:08:14 |
| 19 | A    No official interview, no. | 03:08:25 |
| 20 | Q    The Women's Digital Brand category Senior | 03:08:28 |
| 21 | Manager position, do you know what band that opening | 03:08:32 |
| 22 | was? | 03:08:35 |
| 23 | A    Officially, I do not know.  But typically, | 03:08:38 |
| 24 | to my knowledge, managers are a U band. | 03:08:53 |
| 25 | Q    So a lower-level job than the director job | 03:08:58 |

Page 107

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit B, Page 4 of 8

```
 1   you ultimately took.  Is that correct?          03:09:00

 2       A    That is correct.                        03:09:00
```

```
 3       Q    And you said you got a phone call from the   03:09:03

 4   V.P. Global Digital Brand who wanted you to take the   03:09:06

 5   global director job.  Who was the V.P.  Global    03:09:09

 6   Digital Brand?                                    03:09:10

 7       A    Jesse Stollak.                           03:09:20

 8       Q    Okay.  And Stollak is S-T-O-L-L-A-K.     03:09:24

 9   Right?                                            03:09:26

10       A    I believe so.                            03:09:27

11       MR. GOLDSTEIN:  Objection.  Nike knows this.  03:09:32

12   BY MS. DAVIS:                                     03:09:32

13       Q    And is Jesse a male or female?           03:09:36

14       A    Male.                                    03:09:53

15       Q    You were eventually -- well, let me back  03:10:01

16   up.                                              03:10:01

17            Did you apply to any other jobs at Nike  03:10:05

18   while you were working as a contractor?          03:10:08

19       MR. GOLDSTEIN:  Objection.                    03:10:09

20       THE WITNESS:  To my knowledge, I did not.  But I  03:10:12

21   would -- I would need to see if there are any    03:10:14

22   documents to prove -- to show that I did.         03:10:17

23   BY MS. DAVIS:                                     03:10:17

24       Q    Okay.  You don't remember applying?     03:10:18

25       A    I don't remember, no.                    03:10:31
```

Page 108

Pedersen Decl. Exhibit B, Page 5 of 8

1           I, SARI M. KNUDSEN, CSR NO. 13109, in and

2    for the State of California, do hereby certify:

3           I am the deposition officer that

4    stenographically recorded the testimony in the

5    foregoing deposition;

6           Prior to being examined, the deponent was

7    first duly sworn by me;

8           The foregoing transcript is a true record of

9    the testimony given;

10           Before completion of the deposition, review

11    of the transcript was not requested.  If requested,

12    any changes made by the deponent (and provided to

13    the reporter) during the period allowed are appended

14    hereto.

15

16    Dated the 9th day of December, 2020.

17

18

19

20

21           SARI M. KNUDSEN, CSR NO. 13109

22

23

24

25

                                        Page  313

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit B, Page 6 of 8

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: November 18, 2020

Deponent: Kelly Cahill

| Page | Line(s) | Reads | Should Read | Reason |
|------|---------|-------|-------------|--------|
| 25 | 13 | payee quality | pay equality | To correct a transcription error |
| 25 | 17 | payee quality | pay equality | To correct a transcription error |
| 38 | 9 | selling in new products | selling new products | To correct a transcription error |
| 40 | 8 | then ex-husband | then husband | To correct a transcription error |
| 43 | 20 | Gem Soda | Jones Soda | To correct a transcription error |
| 48 | 23 | 2011 | 2012 | To correct inadvertent error in year |
| 59 | 23 | EPW | ETW | To correct a transcription error |
| 123 | 6 | Insures | Ensures | To correct a transcription error |
| 142 | 3 | CFE's | CFEs | To correct a transcription error |
| 163 | 4 | participants | participates | To correct a transcription error |
| 163 | 18 | participants | participates | To correct a transcription error |
| 173 | 9-10 | Was rated during CFE one year what I saw everyone was getting. Not necessarily the case. | Was rated Successful during CFE one year when I was told everyone was getting Successful. But then I saw that was not necessarily the case. | To correct a transcription error |
| 174 | 6 | media | meeting | To correct a transcription error |
| 177 | 2 | Nike.com right | Nike.com that are right | To correct a transcription error |
| 179 | 5 | manager CFE | manager's CFE | To correct a transcription error |
| 179 | 11 | managing CFE | manager's CFE | To correct a transcription error |
| 180 | 1 | CFE's | CFEs | To correct a transcription error |
| 185 | 22 | Kasatani. | Fisanotti | To correct a transcription error |
| 186 | 4 | up levels from me | a higher level than mine | To correct a transcription error |
| 186 | 7 | It | He | To correct a transcription error |
| 196 | 19 | June 11 | June 1 | To correct a transcription error |
| 196 | 23 | CFE's | CFEs | To correct a transcription error |
| 222 | 2 | dikes | dykes | To correct a transcription error |
| 222 | 8 | dike | dyke | To correct a transcription error |

794325.3

Pedersen Decl. Exhibit B, Page 7 of 8

| 223 | 5 | dikes | dykes | To correct a transcription error |
|-----|----|-------|-------|----------------------------------|
| 251 | 24 | CFAE's | CFEs | To correct a transcription error |
| 254 | 13 | CFE's | CFEs | To correct a transcription error |
| 263 | 7 | D banding | debanding | To correct a transcription error |
| 263 | 17 | D banding | debanding | To correct a transcription error |
| 284 | 19 | Communication's | Communications | To correct a transcription error |
| 297 | 10 | July 27 | July 25 | To correct a transcription error |
| 309 | 14 | opportunity proactively | opportunity to proactively | To correct a transcription error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on <u>1/6/2021</u> in <u>West Newton, MA</u>.

Kelly Cahill

794325.3

Pedersen Decl. Exhibit B, Page 8 of 8

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF OREGON

3                   PORTLAND DIVISION

4

5   KELLY CAHILL, SARA JOHNSTON,     )

6   LINDSAY ELIZABETH, and HEATHER   )

7   HENDER, individually and on      )

8   behalf of others similarly       )

9   situated,                        )

10                 Plaintiffs,        )

11         v.                         )  3:18-cv-01477-JR

12   NIKE, INC., an Oregon            )

13   corporation,                     )

14                 Defendant.         )

15

16            DEPOSITION OF PAIGE AZAVEDO

17               January 29, 2021

18                    Friday

19                  10:02 A.M.

20

21        THE VIDEOCONFERENCE VIDEO-RECORDED

22   DEPOSITION OF PAIGE AZAVEDO was taken at Portland,

23   Oregon, before Jan R. Duiven, CSR, FCRR, RPR, CRC,

24   Certified Shorthand Reporter in and for the State

25   of Oregon.

                                      Page 1

Pedersen Decl. Exhibit C, Page 1 of 4

```
 1        Q.    And sounds like this isn't the case,    13:50:04

 2   but I'll just ask.  Did you hold any other jobs in   13:50:09

 3   between the time that you left Intel Corporation     13:50:13

 4   in October 2007, and started working at Nike in      13:50:15

 5   October of 2007?                                     13:50:19

 6        A.    No.                                       13:50:24

 7        Q.    Okay.  And the -- the role that you       13:50:24

 8   started in at Nike in October 2007, the director     13:50:35

 9   of digital, direct-to-consumer, that's a role that   13:50:39

10   you had applied for.  Right?                         13:50:40

11        A.    That's my recollection, yes.             13:50:42

12        Q.    Do you recall how you learned about       13:50:47

13   that opportunity?                                    13:50:51

14        A.    Yeah.  I remember the recruiter called    13:50:53

15   me, Angel Foss, F-O-S-S.  She called me and          13:50:56

16   reached out for a phone screen is what I remember.   13:51:03

17        Q.    Okay.  Do you recall if you had           13:51:17

18   submitted an application and then Ms. Foss reached   13:51:18

19   out to you or if she -- if Ms. Foss called you out   13:51:20

20   of the blue?                                         13:51:26

21        A.    I don't remember if I applied for this    13:51:27

22   job specifically or if I applied for a job and       13:51:33

23   they reached out to me about this job               13:51:37

24   specifically.  I can't tell you which was -- it's    13:51:40

25   been so long, I don't remember exactly what the --   13:51:42
```

Page 111

Pedersen Decl. Exhibit C, Page 2 of 4

1

CERTIFICATE

2

3

4             I, Jan R. Duiven, CSR, FCRR, CRC,

5       RPR, a Certified Shorthand Reporter for the State

6       of Oregon, do hereby certify that, pursuant to

7       stipulation of counsel for the respective parties

8       hereinbefore set forth, PAIGE AZAVEDO appeared

9       virtually before me at the time and place set

10      forth in the caption hereof; that at said time and

11      place I reported in Stenotype all testimony

12      adduced and other oral proceedings had in the

13      foregoing matter; that thereafter my notes were

14      reduced to typewriting under my direction; and

15      that the foregoing transcript, pages 1 to 245,

16      both inclusive, constitutes a full, true, and

17      accurate record of all such testimony adduced and

18      oral proceedings had, and of the whole thereof.

19                  Witness my hand at Eugene, Oregon,

20      this 12th day of February, 2021.

21

22

23             Jan R. Duiven, CSR, FCRR, CRC, RPR

24             CSR No. 96-0327

25      Expiration Date:  September 30, 2023

Page 246

Pedersen Decl. Exhibit C, Page 3 of 4

Cahill, et al v. Nike
Paige Azavedo Deposition Errata

| Page : Line | Reads | Should Read | Reason |
|---|---|---|---|
| 132 : 16 | Sysco | Cisco | To correct a transcription error |
| 142 : 8 | Yes | I'm not sure if the role exists today. | To clarify and correct an inadvertent error |
| 169 : 20 | Tim Parks | Tim Perks | To correct a transcription error |
| 170 : 11 | Tim Parks | Tim Perks | To correct a transcription error |
| 219 : 20 | Tim Parks | Tim Perks | To correct a transcription error |
| 242 : 17 | Bruce Stall | Bruce Stahl | To correct a transcription error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the

United States that my deposition transcript is true and correct.

Executed on _____03 / 12 / 2021_____ in _____Portland, OR_____ .

_____
Paige Azavedo

1106158

```
 1              UNITED STATES DISTRICT COURT
 2          DISTRICT OF OREGON, PORTLAND DIVISION
 3
 4   KELLY CAHILL, SARA JOHNSTON,    )NO. 3:18-cv-01477-JR
     LINDSAY ELIZABETH, and HEATHER )
 5   HENDER, individually and on     )
     behalf of others similarly      )
 6   situated,                       )
                                     )
 7                  Plaintiffs,      )
                                     )
 8        v.                         )
                                     )
 9   NIKE, INC., an Oregon           )
     corporation,                    )
10                                   )
                    Defendant.       )
11   _____ )
12
13
14
15                   AFTERNOON SESSION
16    REMOTE VIDEOTAPED DEPOSITION OF LINDSAY ELIZABETH
17                Palm Desert, California
18              Monday, January 11, 2021
19
20
21   Reported by:
     Heidi Hummel-Grant
22   CSR No. 12556
23   Pages 119 - 278
24
25
```

                                        Page 119

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit D, Page 1 of 6

1    another category just based on what they enjoy or          02:54

2    what they like to do?

3            A    Yeah, I think so.

4            Q    Okay.  All right.

5            So you became a Nike employee in January of         02:55

6    2017; correct?

7            A    I became a Nike -- yes.

8            Q    Okay.

9            And you were hired -- how -- what do you

10   recall about the process of moving from an ETW to a          02:55

11   Nike employee?

12           A    The -- the process?  I was asked -- I

13   was told that there was going to be position opening

14   and that -- and I was asked to apply for it through

15   the Nike website.  And so I did that.  And then I            02:55

16   was informed that there would be -- when the

17   interview would be.  So I put together a portfolio.

18   There was a panel interview.  And once I learned

19   that they decided to hire me, then the hiring

20   manager talked to me about pay and start date.               02:56

21   There -- there were -- yeah, that's the -- in

22   regards to --

23           THE REPORTER:  I'm sorry, I missed that?

24           MS. DAVIS:

25           Q    Say that again.  You cut out.                   02:56

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit D, Page 2 of 6

```
 1          A    That's just in regards to the process,      02:56

 2     what I remember of the process.

 3          Q    Okay.

 4          You were told there was a position opening

 5     and you were asked to apply.                          02:56

 6          Did you -- did you want to apply for this

 7     Nike's role?

 8          A    Yes.
```

```
 9          MS. DAVIS:   Okay.   All right.

10          I'm showing you -- let's see -- Exhibit 115.     02:57

11          (Exhibit 115 was marked for identification,

12     a copy of which is attached hereto.)

13          MS. DAVIS:   Exhibit 115 is a multipage

14     document Bates stamped Nike8605 through 8613.

15          THE WITNESS:   Okay.   This -- oh, what's the     02:57

16      exhibit number?

17          MS. DAVIS:

18          Q    115, should be.

19          A    Okay.   Hold on a second.

20          Okay.   I'm looking at it.                        02:58

21          Q    Okay.

22          Exhibit 5 [sic] appears to be your

23     application for the Apparel Designer I Jordan role,

24     and it indicates that the application was created

25     November 21st, 2016.                                   02:58
```

                                                    Page 139

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit D, Page 3 of 6

CERTIFICATION OF CERTIFIED SHORTHAND REPORTER

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

The foregoing proceedings were taken before me remotely at the time set forth;

That any witnesses in the foregoing proceedings, prior to testifying, were placed under oath;

That a verbatim record of the proceedings was made by me using machine shorthand, which was thereafter transcribed under my direction;

Further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any of the parties.

IN WITNESS WHEREOF, I hereby subscribe my name this 26th day of January, 2021.

Heidi Hummel-Grant
Certified Shorthand Reporter No. 12556

Page 280

Veritext Legal Solutions
866 299-5127

Pedersen Decl. Exhibit D, Page 4 of 6

Cahill, et al v. Nike
Lindsay Elizabeth Deposition Errata

| Page : Line | Reads | Should Read | Reason |
|---|---|---|---|
| 30:10-11 | "24 Nation" | 24 Notion | To clarify details and correct an inadvertent error |
| 43:12 | "No." | "I did not supervise any Summit employees. However, I did supervise contractors when we brought them on to assist with our workload.  I would give them feedback on their tasks and ensure that they completed them correctly." | To clarify and provide additional details |
| 67:1 | "Phil Hodgson" | Jared Brandt | To correct a transcription error |
| 73:15-18 | "These were things that I had not left around -- she would single me out, and she would frustratingly be like, "Why haven't you cleaned this? Can you please clean this up?" | "These were things that I had not left around and she would single me out. She would frustratingly say, 'Why haven't you cleaned this? Can you clean this up?" | To clarify details and correct an inadvertent error |
| 81:16-18 | "Stevenson" | Stephenson | To correct a transcription error |
| 95:16 | "Jerry" | Jared | To correct a transcription error |
| 183:15 | "She wasn't in a director role, but she was still doing a lot of the design work." | "She was in a director role, but she was still doing a lot of the design work." | To correct a transcription error |

Page 1 – Lindsay Elizabeth Deposition Errata

Cahill, et al v. Nike
Lindsay Elizabeth Deposition Errata

| Page : Line | Reads | Should Read | Reason |
|---|---|---|---|
| 276:12 | "No." | "No. I am not individually seeking emotional distress damages." | To clarify and provide additional details |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on ___02 / 19 / 2021___ in ___02/19/2021___ .


_____
Lindsay Elizabeth

Page 2 – Lindsay Elizabeth Deposition Errata