**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 ǀ Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 ǀ Fax: (510) 835-1417

Counsel for Plaintiffs, Opt-in Plaintiffs and Putative Class

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**PLAINTIFFS' MOTION TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, Ph.D.**<br><br>**FILED UNDER SEAL**<br><br>**ORAL ARGUMENT REQUESTED** |

PLAINTIFFS' MOTION TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.

852530.32

# TABLE OF CONTENTS

Page

LR 7-1(A) CERTIFICATION ................................................................................1

MOTION...............................................................................................................1

MEMORANDUM OF LAW ..................................................................................1

I.      INTRODUCTION ........................................................................................1

II.     BACKGROUND AND OVERVIEW OF DR. HANVEY'S REPORT ...............3

      A.     Dr. Hanvey's Conclusions About Work Performed are Based on His "Job Analysis."..............................................................................................4

      B.     Dr. Hanvey's Job Analysis is Based on Interviews from Two "Independent" Samples he Selected. ..................................................5

            1.     Dr. Hanvey's Sample 1 for His Individualized Job Analysis. ....................5

            2.     Dr. Hanvey's Sample 2 for His Individualized Job Analysis. ......................6

III.    ARGUMENT ................................................................................................6

      A.     Legal Standard for Admissibility of Expert Testimony............................6

      B.     Dr. Hanvey's Conclusions Are Irrelevant to Plaintiffs' Motion for Class Certification. ..................................................................................8

            1.     Dr. Hanvey's Conclusion Based on "Sample 1" Is Irrelevant Because It Is Not "at Issue" for Plaintiffs' Class Certification Motion. ........................................................................................8

            2.     Dr. Hanvey's Conclusions Based on "Sample 2" Are Irrelevant Because Dr. Hanvey Disavowed These Conclusions in His Deposition. ...............................................................................10

            3.     Dr. Hanvey's Conclusions from Both Samples Are Irrelevant Because He Did Not Analyze the Information He Collected. ...................11

      C.     Dr. Hanvey's Opinions Are Inadmissible Because They Are Not Based on Sufficient Facts and Thus *Ipse Dixit*..............................................11

1.    Although Dr. Hanvey's Report Concludes Based on Sample 2 That "A Full Assessment" of All Job Codes in the Covered Positions Is "Necessary", Dr. Hanvey Testified He was Not Generalizing from the 5 Job Codes He Selected for Sample 2. .................................................12

2.    Dr. Hanvey's Report Also Claims Sample 2 Shows Variability in All Job Codes, but Dr. Hanvey Testified That He Was Not Generalizing Beyond the 5 Job Codes in Sample 2. ...................................13

3.    Although Dr. Hanvey's Report Opines That His Job Analysis Shows Variance Concerning Factors That Impact Pay, Dr. Hanvey Testified That His Conclusions Were Not Based on Nike's Compensation Practices. ...........................................................13

4.    Although Dr. Hanvey's Report Opines That Position Titles Are More Specific and Accurate Than Job Codes, Dr. Hanvey Then Testified That He Had No Factual Basis for This Opinion. ...................14

5.    Although Dr. Hanvey's Report Opines That Job Codes Are Broad in Many Cases, Dr. Hanvey's Testimony Demonstrates He Had No Factual Basis for This Opinion. .............................................14

6.    Although Dr. Hanvey's Report Asserts That the Data Nike produced Does Not Accurately Show Its Job Structure, Dr. Hanvey Reached This Conclusion by Showing a Job Structure from 2019 or Earlier to Employees in 2021 Despite Knowing There Was a Recent Reorganization. ..........................................................16

7.    Although Dr. Hanvey's Report Opines About Nike's Job Codes and Job Descriptions, Dr. Hanvey Testified He Didn't Have Knowledge About Nike's Job Codes and Job Descriptions. ...................17

8.    Although Dr. Hanvey's Report Asserts That There Are Distinct Management and Individual Tracks at Nike, Dr. Hanvey Admitted That This Was Just a General Statement Without an Empirical Basis. ..................................................................17

D.    The Conclusions in Dr. Hanvey's Report Based on His Individualized Job Analysis Are Inadmissible Because They Are the Result of Unreliable Methodologies. ..................................................................18

1.   The Reliability of Dr. Hanvey's Methodologies Are Undermined Because They Were Developed for Litigation, Which the Ninth Circuit States Is a "Very Significant Fact" for Determining Reliability...................................................................................18

2.   Dr. Hanvey's Individualized Job Analysis Methodology Is Not Peer Reviewed, Not Widely Accepted, and Otherwise Fails to Meet Any of the *Daubert* Factors. ..............................................19

3.   The Sampling Methodologies Dr. Hanvey Used to Create His Individualized Job Analysis Are Unreliable. .............................................22

   a.   The Sampling Methodologies Dr. Hanvey Used Are Not Peer Reviewed, Not Widely Accepted, and Otherwise Fail to Meet Any of the *Daubert* Factors. ...............................................22

   b.   Dr. Hanvey's Sampling Methodology Is Unreliable Because His Samples Are Too Small to Provide a Reliable Basis to Make Inferences. .....................................24

   c.   Dr. Hanvey's Sampling Methodology Is Unreliable Because He Fails to Address the Significant Nonresponse Rate. .....................................25

   d.   Dr. Hanvey's Sampling Methodology Is Unreliable Because of Selection Bias (Exclusion of Men from The Samples)....................................................27

4.   The Reliability of Dr. Hanvey's Report Is Further Undermined by Its Numerous Misstatements or Errors. ....................................................28

5.   The Combination of Serious and Fundamental Flaws in the Implementation of the Job Analysis Compels the Conclusion That Any Testimony Regarding the Job Analysis Is Unreliable and Inadmissible. ..........................................................31

IV.   CONCLUSION ....................................................................................33

## TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002)....................................................................................31

*Barillas v. City of Los Angeles*,
    No. 2:18-cv-08740-CJC-AS, 2021 WL 4434977 (C.D. Cal. Apr. 12, 2021) ...........................6

*Campbell v. City of Los Angeles*,
    903 F.3d 1090 (9th Cir. 2018) ...............................................................................20

*Chavez v. IBP, Inc.*,
    No. 2:01-cv-05093-RHW, 2004 WL 5520002 (E.D. Wash. Dec. 8, 2004)...........................26

*Chen-Oster v. Goldman, Sachs & Co.*,
    114 F. Supp. 3d 110 (S.D.N.Y 2015).................................................................11, 32

*Cholakyan v. Mercedes-Benz, USA, LLC*,
    281 F.R.D. 534 (C.D. Cal. 2012) ...........................................................................15

*Chong v. STL Int'l, Inc.*,
    No. 3:14-cv-244-SI, 2016 WL 4253959 (D. Or. Aug. 10, 2016) ...................................11, 12

*City of Pomona v. SQM N. Am. Corp.*,
    750 F.3d 1036 (9th Cir. 2014) ...............................................................................32

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir.1995) ..............................................................7, 17, 18, 19

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)................................................................................. *passim*

*DCS Mktg., Inc. v. Homer Laughlin China Co.*,
    No. 8:09-cv-00144-DOC-MLG, 2009 WL 10674051 (C.D. Cal. Nov. 5, 2009) ....................9

*Gabbard v. Linn-Benton Hous. Auth.*,
    219 F. Supp. 2d 1130 (D. Or. 2002) ...................................................................21, 22, 23

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)............................................................................................11

*Guidroz-Brault v. Mo. Pac. R.R. Co.*,
    254 F.3d 825 (9th Cir. 2001) ..................................................................................6

*McClellan v. I-Flow Corp.*,
   710 F. Supp. 2d 1092 (D. Or. 2010) .........................................................6

*Mesfun v. Hagos*,
   No. 2:03-cv-02182-MMM-RNB, 2005 WL 5956612 (C.D. Cal. Feb. 16, 2005).....................7

*Moussouris v. Microsoft Corp.*,
   311 F. Supp. 3d 1223 (W.D. Wash. 2018)................................................ *passim*

*Murray v. S. Route Mar. SA*,
   870 F.3d 915 (9th Cir. 2017) ...............................................................18

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010), *as amended* (Apr. 27, 2010)................................7

*Rosa v. City of Neuberg*,
   No. 3:18-cv-00037-SI, 2021 WL 1348260 (D. Or. Apr. 21, 2021)............................7

*Sali v. Corona Reg'l Med. Ctr.*,
   909 F.3d 996 (9th Cir. 2018) ................................................................8

*Santos v. United Parcel Serv. Inc.*,
   No. 3:18-cv-03177-EMC, 2020 WL 6784220 (N.D. Cal. Nov. 18, 2020)......................23

*Segar v. Smith*,
   738 F.2d 1249 (D.C. Cir. 1984)..............................................................9

*Smith v. City of Boston*,
   144 F. Supp. 3d 177 (D. Mass. 2015) ......................................................28

*Tech. Licensing Corp. v. Gennum Corp.*,
   No. 5:01-cv-04204-RS, 2004 WL 1274391 (N.D. Cal. Mar. 26, 2004).......................18

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) .............................................................11

*Wallace v. Countrywide Home Loans Inc.*,
   No. 8:08-cv-01463-JLS-MLG, 2012 WL 11896333 (C.D. Cal. Aug. 31, 2012) .............24, 26

**State Statutes**

Oregon Equal Pay Act .........................................................................3

**Rules**

Federal Rule of Civil Procedure
   23.....................................................................................20
   30(b)(6) .........................................................................8, 12, 14, 15

Federal Rule of Evidence
702........................................................................................................ *passim*
702(a).............................................................................................................7
702(b).......................................................................................................7, 11
702(c).............................................................................................................7
702(d).......................................................................................................7, 27

Local Rule 7-1(a) ...........................................................................................1

**Regulations**

29 C.F.R. § 1607 *et seq*.................................................................................2

**Other Authorities**

Banks and Cohen, "Wage and Hour Litigation: IO Psychology's New Frontier,"
    Employment Discrimination Litigation (Landy, ed.) .............................20

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression* (Fed. Judicial Ctr.
    3d ed. 2011) ...............................................................................................9

David H. Kaye & David A. Freedman, *Reference Guide on Statistics* (Fed.
    Judicial Ctr. 3d ed. 2011).........................................................................12

*Reference Manual on Scientific Evidence* (Fed. Judicial Ctr. 2d ed. 2000).................................26

## LR 7-1(a) CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Named Plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender ("Plaintiffs"), certify that they have conferred with defendant's counsel in person and through email regarding the subject of this motion, but the parties could not reach a resolution.

## MOTION

Plaintiffs hereby move the Court pursuant to Federal Rule of Evidence 702 to exclude paragraphs 3, 5-8, 16, 19-234, 247-248, and 251-252 of Dr. Chester Hanvey's Expert Report (ECF No. 185-1). These paragraphs, which concern Dr. Hanvey's "Job Analysis" and related opinions about Nike's jobs, are inadmissible because they are irrelevant as well as based on insufficient facts, unreliable methodologies, and misapplication of methodologies to the facts of the case.

## MEMORANDUM OF LAW

### I.    INTRODUCTION

In opposition to Plaintiffs' Motion for Class Certification, Nike relies on the Report of Dr. Chester Hanvey, Nike's Industrial/Organizational ("I/O") psychology expert, for opinions related to Nike's jobs and Dr. Hanvey's "Job Analysis." Federal Rule of Evidence 702 ("Rule 702") and the Supreme Court's *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) decision provide that expert testimony is inadmissible if it is either irrelevant or unreliable. Because Dr. Hanvey's opinions related to Nike's jobs and his Job Analysis are irrelevant and unreliable, the Court should exclude those sections of Dr. Hanvey's Report related to these opinions.

Dr. Hanvey's conclusions based on his "job analysis" are irrelevant because he concludes that not all jobs at Nike are the same as all other jobs at Nike. But Plaintiffs' Motion for Class Certification does not argue that all jobs in the Covered Positions are the same or comparable with all the other jobs. He also concludes that there is variability within Job Codes, but he disavowed this

**PLAINTIFFS' MOTION TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 1**

conclusion when he testified that he was not generalizing from the sample of 0.36% of Job Codes his analysis looked at to the 99.64% of Job Codes in the Covered Positions not included in his sample. Since Dr. Hanvey used this same sample to reach his conclusion that an assessment of each Job Code is "necessary," his testimony that he was not generalizing from this sample likewise retracts this conclusion.

Rule 702 also requires experts to base their opinions on sufficient facts or data. Dr. Hanvey's deposition testimony shows that each of his conclusions in his Report about the jobs at Nike are not based on sufficient facts and thus are *ipse dixit*, as the Supreme Court states. Dr. Hanvey's testimony shows he did not understand Nike's job architecture, Job Codes, Job Descriptions, almost all documents Nike created in the normal course of business, Nike's compensation practices, or any of the practices Plaintiffs challenge.

Aside from a lack of relevance, the significant and numerous reliability concerns related to his opinions about the jobs at Nike demonstrate that they should be excluded. Dr. Hanvey provides no peer reviewed or other objective sources to support his methodologies. Nor does he show his methodologies are generally accepted. Rather, Dr. Hanvey admitted in his deposition that his methodology, an "individualized analysis" or "individualized job analysis," cannot not be found in an article and is not widely recognized. He further admitted that he does not claim his methodology was consistent with sources, like the SIOP Principles and Uniform Guidelines,[1] that he admitted are "authoritative."

---

[1] The "SIOP Principles" refers to the Principles for the Validation and Use of Personnel Selection Procedures by the Society for Industrial and Organizational Psychology ("SIOP"), available at https://www.apa.org/ed/accreditation/about/policies/personnel-selection-procedures.pdf. The "Uniform Guidelines" refers to the Uniform Guidelines on Employment Selection Procedure, 29 C.F.R. Sections 1607 *et seq.* ("Uniform Guidelines").

In addition, the serious fundamental flaws in how Dr. Hanvey conducted the analysis renders his testimony so unreliable that it is inadmissible. Each of the fundamental flaws, too small a sample size, too substantial a nonresponse rate, selection bias caused by Dr. Hanvey's decision to exclude all men from his samples, reliance upon survey respondents who do not have an adequate knowledge of their jobs and the expectations for those jobs, and a process that was implemented under haste causing errors and slipshod practices, would each raise serious question about the admissibility of the job analysis. Taken together, these fundamental flaws compel a determination that Dr. Hanvey's testimony is not relevant and too unreliable to be admitted into evidence.

## II.    BACKGROUND AND OVERVIEW OF DR. HANVEY'S REPORT

Plaintiffs' motion requesting class certification of their disparate impact, disparate treatment, and Oregon Equal Pay Act ("Oregon EPA") claims was filed on January 10, 2022. ECF No. 146. In support of Plaintiffs' motion, they submitted the expert reports of I/O psychologist Dr. Kathleen Lundquist. ECF Nos. 148-1, 148-2.

Nike filed its opposition to class certification on March 25, 2022 (ECF No. 183), which relies on the Expert Report of Chester Hanvey, Ph.D. ("Hanvey Report" or "Report") (ECF No. 185-1). Dr. Hanvey states he is an "expert in Industrial/Organizational (I/O) psychology" who was "retained … by Paul Hastings LLP on behalf of Nike …." Report ¶ 1.

Plaintiffs deposed Dr. Hanvey on October 29, 2021. Declaration of Sun Decl. in Supp. Pls.' Mot to Rule as Inadmissible Part of the Expert Report of Chester Hanvey, Ph.D. ("Sun Decl.") ¶ 2, filed herewith. Dr. Lundquist submitted a Rebuttal Expert Report in which she responded to Dr. Hanvey's criticisms of her original report and opined that Dr. Hanvey's job analysis was not based

upon an accepted and recognized methodology, was flawed in design and execution, and was

unreliable for numerous other reasons.[2]

A.    **Dr. Hanvey's Conclusions About Work Performed are Based on His "Job Analysis."**

Dr. Hanvey's Report states Nike asked him to "analyze the jobs performed by Nike

employees in Covered Positions and provide an opinion on the degree of variability in the work

performed and the skill, effort, responsibility, and working conditions associated with their jobs."

Report ¶ 1.  To provide the requested opinion, Dr. Hanvey states he did a "job analysis."  Report ¶¶

2-3 ("I primarily relied on the job analysis to reach my conclusions in this report ….").  Dr. Hanvey

refers to the method he used as an "individualized analysis" or "individualized job analysis," which is

"meant to indicate that you're examining individual differences as opposed to grouping looking at a

job, so looking at employees rather than an entire job."  Sun Decl. Ex. 1, Deposition of Chester

Hanvey ("Dep.") 108:1-8; Report ¶ 7.

Based on his individualized analysis, Dr. Hanvey concluded: (1) that the jobs in the Covered

Positions, "whether looking across Function and Job Code, or within Job Code, are not all the same

or substantially equal or comparable;" and (2) "in order to determine which roles do perform

substantially equal or comparable work, it would be necessary to conduct a full assessment of actual

job content for each of the more than 1,400 Job Codes that goes beyond reliance on Job Code (and

beyond Job Subfamily and Level)."  Report ¶ 3.  Dr. Hanvey further opined, based on his

individualized analysis, that there was substantial variation in "factors that commonly impact pay"

and "certain factors that impact pay are not uniformly applicable to all Job Codes."  Report ¶¶ 6-7.

---

[2] *See* Rebuttal Expert Report of Dr. Kathleen K. Lundquist ("Lundquist Rebuttal"), Nov. 29. 2021, ECF No. 148-1, filed with Plaintiffs' Motion for Class Certification, ECF No. 146.

**B.**    <u>Dr. Hanvey's Job Analysis is Based on Interviews from Two "Independent"</u>
<u>Samples he Selected.</u>

Dr. Hanvey's job analysis based its conclusions on responses Dr. Hanvey and his team
gathered from interviews of current female employees working in Covered Positions.  Report ¶¶ 5,
63; Report ¶ 33 (The Report states the interviewees' "[r]esponses … would form the basis of my
opinions regarding the degree of variability among the jobs held by Nike employees.").  These
interviews were conducted between July 29, 2021, and September 24, 2021.  Report ¶ 63.

To determine which employees to interview, Dr. Hanvey selected two samples that are
"independent" of each other.  Report ¶ 5.  Dr. Hanvey decided to only interview women, excluding
all men in Covered Positions from his samples, because "one of the issues is the degree of similarity
between putative class members; and so asking questions to male employees would not be relevant to
that inquiry."  Dep. 210:11-21.  Nike's legal department sent the invitations to employees who Dr.
Hanvey had selected for each sample.  Dep. 246:23-247:1.  Dr. Hanvey refers to his two samples as
"Sample 1" and "Sample 2."  Report ¶ 5.

**1.**    <u>Dr. Hanvey's Sample 1 for His Individualized Job Analysis.</u>

Dr. Hanvey states the purpose of Sample 1 was "to evaluate the degree of variability between
jobs held by employees in Covered Positions at Nike."  Report ¶ 49.  Dr. Hanvey decided that a
sample of 60 women was sufficient.  Report ¶ 5.  This sample of 60 was from the overall population
of about 9,475 employees in the Covered Positions, or about 0.6% of the employees in Covered
Positions.  Lundquist Rebuttal 28-29.  Dr. Hanvey states that he selected these 60 women using
stratified random sampling.  Report ¶ 48.  Of the original 60 women Dr. Hanvey selected for Sample
1, 18 women, or 30%, did not participate in the survey and were replaced by other women Dr.
Hanvey selected.  *See* Report ¶ 59.

**2.      Dr. Hanvey's Sample 2 for His Individualized Job Analysis.**

Dr. Hanvey states the purpose of Sample 2 was "to assess the degree of variability *within* the same Job Code." Report ¶ 5 (emphasis in original).  Dr. Hanvey nonrandomly selected 5 Job Codes for Sample 2, from which he selected 5 women each, for a total of 25 women.  Report ¶¶ 5, 54, 252. From the overall population of the more than 1,400 Job Codes in the Covered Positions that Dr. Hanvey identified, Dr. Hanvey selected 5 Job Codes for Sample 2, which is 0.36% of the Job Codes in the Covered Positions.  Lundquist Rebuttal 29-30.  Of the original 30 women Dr. Hanvey selected for Sample 2, 16 women, or 53%, did not participate in the survey and were replaced by other women Dr. Hanvey selected.  Report ¶ 59.[3]

## III.      ARGUMENT

### A.      Legal Standard for Admissibility of Expert Testimony

Under Rule 702 and *Daubert,* 509 U.S. at 589, courts act "as gatekeepers to ensure that any and all scientific testimony is not only relevant, but reliable …." *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001) (citations, internal quotations, and ellipses omitted). This gatekeeper role is a "special obligation" because "unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Barillas v. City of Los Angeles*, No. 2:18-cv-08740-CJC-AS, 2021 WL 4434977, at *3 (C.D. Cal. Apr. 12, 2021) (quoting *Daubert*, 509 U.S. at 592) (additional citation and internal brackets omitted).

The party seeking to rely on expert testimony has the burden of showing it is relevant and reliable. *McClellan v. I-Flow Corp.*, 710 F. Supp. 2d 1092, 1098-99 (D. Or. 2010) (citation omitted).  For the relevancy requirement, the proponent of the expert testimony must show that

---

[3] Dr. Hanvey originally selected a sixth job code with an additional five women for Sample 2, but he did not use these interviews for his analysis.  Report ¶ 54 n.33.

**PLAINTIFFS' MOTION TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 6**

the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). This means that the expert testimony must be "relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1315 (9th Cir.1995) ("*Daubert II*") (citing *Daubert*, 509 U.S. at 597). The Supreme Court "stressed the importance of the 'fit' between the testimony and an issue in the case …." *Id.* (citing *Daubert*, 509 U.S. at 591-92). Thus, as required by Rule 702(b), the proponent of expert testimony must show "the testimony is based on sufficient facts or data."

For the reliability requirement, Rule 702(c)-(d) requires the proponent of expert testimony show that: (i) "the testimony is the product of reliable principles and methods;" and (ii) "the expert has reliably applied the principles and methods to the facts in the case." The "test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert II*. 43 F.3d at 1318 (citation omitted).

A court's review of reliability requirements "is a flexible one" that is "based on the particular circumstances of the particular case." *Rosa v. City of Neuberg*, No. 3:18-cv-00037-SI, 2021 WL 1348260, at *1 (D. Or. Apr. 21, 2021) (quoting *City of Pomona v. SQMN. AM. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014) and *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010)) (additional citation omitted). In this role, the "court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability." *Mesfun v. Hagos*, No. 2:03-cv-02182-MMM-RNB, 2005 WL 5956612, at *2 (C.D. Cal. Feb. 16, 2005) (quoting *Hangarter v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1017 (9th Cir. 2004)) (emphasis in original and additional citation omitted). The focus is on "the soundness of [the expert's] methodology," with the court as "a gatekeeper, not a fact finder." *Primiano*, 598 F.3d at 564-65 (citations omitted).

The standard under Rule 702 and *Daubert* applies at class certification.  *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) ("in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*.") (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (2011)).  Courts apply *Daubert* at class certification in a manner that recognizes "the specific criteria under consideration as well as the differing stage of discovery and state of the evidence." *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1235 (W.D. Wash. 2018) (citation omitted).

## B.  Dr. Hanvey's Conclusions Are Irrelevant to Plaintiffs' Motion for Class Certification.

As described below, the conclusions Dr. Hanvey reached from each of his two independent samples, are not relevant to the task at hand – Plaintiffs' Motion for Class Certification – and therefore should be excluded.

### 1.  Dr. Hanvey's Conclusion Based on "Sample 1" Is Irrelevant Because It Is Not "at Issue" for Plaintiffs' Class Certification Motion.

Based primarily on Sample 1, Dr. Hanvey concludes that jobs in the Covered Positions "are not all the same or substantially equal or comparable."  Report ¶ 2.  But this is not "at issue" because Plaintiffs' Motion does not assert that all the jobs in the Covered Positions are the same or substantially comparable to all the other jobs.

Rather, based on Dr. Lundquist's testimony, Nike documentation created in the normal course of business, and Nike's Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)") testimony, Plaintiffs argue, "*according to Nike's job architecture*, Subfamily (within Job Function and Job Family) is the most differentiated Type of Work variable and job level within band is the most differentiated Level of Work variable."  Pls.' Mot. for Class Cert. 10-12, ECF No. 146 (quoting Expert Report of Dr. Kathleen Lundquist 21-22, ECF No. 148-1) (emphasis

added).  It is Nike that has "designated" jobs "at the same job level within Subfamily … as similar in job content or type of work and require a similar level of knowledge, experience, scope, effort and responsibility based on the leveling criteria." *Id.*

As a result, Plaintiffs' multiple regression analysis appropriately "controls for" or "holds constant" the interaction of Job Sub-family and Job Level in Nike's uniform job architecture so that analysis accounts for comparable work and differences in work.  Pls.' Mot. for Class Cert. 19 & n.23 (citing Expert Report of David Neumark, Ph.D. ¶¶ 19-21, ECF No. 149-1) (additional citations omitted); *see also* Expert (Rebuttal) Report of David Neumark Ph.D. ¶ 3, ECF No. 149-2 (Dr. Neumark's "analysis uses an aggregated model that includes detailed controls for differences across women and men in the job they are in" and other potentially legitimate factors).[4]

As Dr. Lundquist describes, "Dr. Hanvey's 'scientific analysis' of a sample of 60 incumbents (Sample 1) reached the unsurprising conclusion that not all jobs at Nike perform the same work" and thus this "study is not a serious or meaningful contribution to defining substantially similar jobs at Nike."  Lundquist Rebuttal 4.  Indeed, since Nike's Opposition does not rely on Dr. Hanvey's conclusion from Sample 1 that all Covered Positions are not the same as all other Covered Position, Nike effectively concedes that this opinion is irrelevant to class certification.

Because Dr. Hanvey's opinion based on Sample 1 does not concern a fact in issue, the opinions are irrelevant and should be excluded.  *See e.g., DCS Mktg., Inc. v. Homer Laughlin*

---

[4] "In essence, [a multiple] regression measures the impact of each potential explanatory variable upon the dependent variable by holding all other explanatory variables constant." *Segar v. Smith*, 738 F.2d 1249, 1261 (D.C. Cir. 1984).  Multiple Regression is a common method for showing disparities in discrimination class actions.  *See e.g.,* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression* 306 n.5 (Fed. Judicial Ctr. 3d ed. 2011) ("Discrimination cases using multiple regression analysis are legion.") (collecting cases).

PLAINTIFFS' MOTION TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.
PAGE 9

*China Co.*, No. 8:09-cv-00144-DOC-MLG, 2009 WL 10674051, at *4 (C.D. Cal. Nov. 5, 2009) (excluding expert's opinions based on relevance because the opinions concerned issues that were undisputed) (citing *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000)).

### 2.    Dr. Hanvey's Conclusions Based on "Sample 2" Are Irrelevant Because Dr. Hanvey Disavowed These Conclusions in His Deposition.

Dr. Hanvey states the "purpose" of Sample 2 was to determine "whether employees who share the same Job Code … are substantially 'equal' or 'comparable' as is defined in equal pay legislation."  Report ¶ 157; Report ¶ 54 (Dr. Hanvey selected Sampled 2 "to help determine the degree of variability *within* job codes for Covered Positions at Nike.") (emphasis in original).  In his Report, Dr. Hanvey concludes that "roles … within Job Code, are not all the same or substantially equal or comparable."  Report ¶ 3.

However, Dr. Hanvey's testimony makes clear his conclusions are limited to the 0.36% of Job Codes he selected for Sample 2, and that he makes no conclusion about the 99.64% of Job Codes in the Covered Positions that are not included in Sample 2 because he was not generalizing from Sample 2.  Dr. Hanvey selected 5 Job Codes, or 0.36% of Job Codes in the Covered Positions, for Sample 2.  Report ¶ 5.  Dr. Hanvey testified that he was not "generalizing" from these 5 Job Codes to the overall population of all Job Codes in the Covered Positions.  Dep. 232:17-25.[5]  Instead, Dr. Hanvey testified that his conclusion based on Sample 2 is limited to the 5 Job Codes he selected for Sample 2.  *Id.*  Because Dr. Hanvey testified that he did not determine whether there was "variability" within 99.64% of the Job Codes at issue, Dr. Hanvey's conclusions and analyses based on Sample 2 are irrelevant to the determination of Plaintiffs' Motion for Class Certification.

---

[5] By declining to generalize, Dr. Hanvey did not determine whether the sample was sufficiently large or representative.  *See*, Lundquist Rebuttal 30-31.

**PLAINTIFFS' MOTION TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 10**

3.    **Dr. Hanvey's Conclusions from Both Samples Are Irrelevant Because He Did Not Analyze the Information He Collected.**

Dr. Hanvey's testimony will not assist the trier of fact because he did not analyze the responses he gathered from the interviews from either sample.  After gathering statements in the interviews, Dr. Hanvey just organizes the statements under topics.[6]  As Dr. Lundquist described, "Dr. Hanvey was not actually analyzing the job – he simply reported what individuals said they were doing and made no attempt to define what the job entails based on those responses." Lundquist Rebuttal 22; *see also Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 124 (S.D.N.Y 2015) (excluding expert testimony that was "only designed to be 'illustrative'" and finding the expert did not "utilize expertise in order to aid the finder of fact in understanding esoteric or complex evidence").

C.    **Dr. Hanvey's Opinions Are Inadmissible Because They Are Not Based on Sufficient Facts and Thus *Ipse Dixit.***

An expert's testimony must be based on "sufficient facts or data." Fed. R. Evid. 702(b); *see also Chong v. STL Int'l, Inc.*, No. 3:14-cv-244-SI, 2016 WL 4253959, at *2 (D. Or. Aug. 10, 2016) ("the court's 'gatekeeping inquiry must be tied to the facts of a particular case.'") (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).  There is thus "nothing in either *Daubert* or the Federal Rules of Evidence [that] requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  This includes a determination of "[w]hether the methodology or technique the expert uses 'fits' the conclusions …."  *Hankey*, 203 F.3d at 1168 (citing *Joiner*,

---

[6] For Sample 1, the "data," or selected answers provided by the interviews is set forth in the Report at paragraphs 75-156, and for Sample 2, this information is described in the Report at paragraphs 157-234.  Dr. Hanvey attached to his Report the "responses to all interview questions … as Exhibit 9." Report ¶ 71.  In addition, Dr. Hanvey simply reports the background of the survey respondents.  For example, he lists the prior jobs, educational fields, and certifications of the 60 incumbents included in Sample 1.  Report ¶¶ 89, 94.

522 U.S. at 152).  As a result, the "court may exclude expert testimony if it determines that there

is simply too great an analytical gap between the data and the opinion proffered." *Chong*, 2016

WL 4253959, at *2 (citation & quotation marks omitted).

Here, Dr. Hanvey's conclusions are *ipse dixit* because they are not based on sufficient

facts or data.  Indeed, Dr. Hanvey only relied on one excerpt from the 13 days of Nike Rule

30(b)(6) deposition testimony and cites only one Nike document created in the normal course of

business in his Report.  *See generally* Report; Dep. 171:5-14, 172:19-173:21.

1.  **Although Dr. Hanvey's Report Concludes Based on Sample 2 That "A Full Assessment" of All Job Codes in the Covered Positions Is "Necessary", Dr. Hanvey Testified He was Not Generalizing from the 5 Job Codes He Selected for Sample 2.**

Based on Sample 2, Dr. Hanvey concludes, "in order to determine which roles do

perform substantially equal or comparable work, it would be necessary to conduct a full

assessment of job content for each of the more than 1,400 Job Codes that goes beyond reliance

on Job Code (and beyond Job Subfamily and Level)."  Report ¶ 3.  Dr. Hanvey testified, "there's

very clear variability within each of the [five] job codes that we selected [for Sample 2]; so it's

highly likely that we would expect to see some variability elsewhere."  Dep. 232:17-233:12.

Because Dr. Hanvey's conclusion is based on the assertion that "it's highly likely that we

would see some variability elsewhere," Dr. Hanvey is making a generalization from Sample 2.

Yet, Dr. Hanvey admitted in his deposition that he was not generalizing from Sample 2 to the

overall population.  Dep. 232:17-25.[7]  Thus, Dr. Hanvey's opinion that a full assessment of job

content for each of the job codes is necessary before determining which jobs do comparable

work is not based on sufficient facts.

---

[7] A study cannot provide the basis for generalizations to the larger population unless it has both "[i]nternal validity" and "[e]xternal validity."  David H. Kaye & David A. Freedman, *Reference Guide on Statistics* (Fed. Judicial Ctr. 3d ed. 2011), Sun Decl. Ex. 3 (Dep. Exhibit 764) at 222.

2.    **Dr. Hanvey's Report Also Claims Sample 2 Shows Variability in All Job Codes, but Dr. Hanvey Testified That He Was Not Generalizing Beyond the 5 Job Codes in Sample 2.**

Dr. Hanvey states he selected Sample 2 "to help determine the degree of variability *within* job codes for Covered Positions at Nike."  Report ¶ 54 (emphasis in original).  His Report then repeatedly states, without limiting it to the 5 Job Codes in Sample 2, that his analysis demonstrates variability within Job Codes.  *E.g.,* Report ¶ 3 ("Through this job analysis, the data showed that there are meaningful differences in work performed and the skill, effort, responsibility, and work conditions not only across Job Codes and Function, but also within Job Codes, at Nike."); Report ¶ 3 ("I primarily relied on the job analysis to reach my conclusions in this report that (1) Nike's roles, whether looking across Function and Job Code, or *within Job Code*, are not all the same or substantially equal or comparable ….") (emphasis added); Report ¶ 6 ("The study results demonstrate variability between Job Code and within Job Code.").

At his deposition, however, Dr. Hanvey admitted that he was not generalizing from his Sample 2 to the overall population of Job Codes.  Dep. 232:17-25.  Thus, Dr. Hanvey's opinion that there is variability within the Covered Positions' Job Codes is thus not based on sufficient facts.

3.    **Although Dr. Hanvey's Report Opines That His Job Analysis Shows Variance Concerning Factors That Impact Pay, Dr. Hanvey Testified That His Conclusions Were Not Based on Nike's Compensation Practices.**

In his Report, Dr. Hanvey opines: "I found that employees in both samples varied substantially on factors that commonly impact pay" and "that certain factors that impact pay are not uniformly applicable to all Job Codes."  Report ¶¶ 6-7.

However, in his deposition, Dr. Hanvey made clear that his "conclusions weren't based specifically on Nike's compensation practices."  Dep. 60:12-21; *see also* Dep. 99:13-24 (Dr. Hanvey testified that he made no determination about whether Nike's compensation practices

met the requirements of the SIOP Principles or were consistent with the Uniform Guidelines); Dep. 158:14-18 (Dr. Hanvey testified he did not analyze pay); Dep. 167:10-12 (Dr. Hanvey testified, "I don't know details about the process [Nike] went through for setting [its] pay ranges.").

       **4.**       <u>**Although Dr. Hanvey's Report Opines That Position Titles Are More Specific and Accurate Than Job Codes, Dr. Hanvey Then Testified That He Had No Factual Basis for This Opinion.**</u>

      Dr. Hanvey's Report opines, "Position Titles are even more specific than Job Codes and more accurately reflect the work employees perform." Report ¶ 247. But Dr. Hanvey testified that he is not aware of any Nike documents or deposition testimony that support this opinion; he also testified that Nike's snapshot data do not show that position titles are a more accurate reflection than job codes of the work employees perform. Dep. 142:14-143:12. In addition, Dr. Hanvey testified that Nike does not look at position title in any way when determining compensation and he doesn't know whether Nike looks at position title in any way when determining promotions or salary increases. Dep. 147:23-148:4.

       **5.**       <u>**Although Dr. Hanvey's Report Opines That Job Codes Are Broad in Many Cases, Dr. Hanvey's Testimony Demonstrates He Had No Factual Basis for This Opinion.**</u>

      Dr. Hanvey opines that "Job codes … are broad in many cases." Report ¶ 247 (citing Stuckey Decl. ¶ 4, ECF No.187-1 (Davis Decl. Ex. 41)). The basis for this opinion, Dr. Hanvey testified, is the following sentence from the Declaration of Jessica Stuckey, a current Nike employee working in human resources: "Nike's job codes are the most differentiated type of work and level of work within our corporate architecture (but even then, individuals working the same job code do not necessarily perform similar work)." Dep., 129:3-130:5; Stuckey Decl. ¶¶ 2-4. Ms. Stuckey was designated as a Rule 30(b)(6) witness. Stuckey Decl. ¶ 3. She signed the

declaration on September 28, 2021, 3 days before Nike served Dr. Hanvey's Report (Stuckey Decl. 6.), and a Nike attorney provided the declaration to Dr. Hanvey (Dep. 125:25-126:24).

Dr. Hanvey's testimony shows he neither verified Ms. Stuckey's assertions nor even tried to verify them.  Dr. Hanvey testified he: (1) did not recall any Nike document or Nike deponent saying that work within a job code is broad (Dep. 130:8-25); (2) did not compare what Ms. Stuckey's declaration stated with her testimony under oath as a Rule 30(b)(6) witness (Dep. 127:22-25); (3) only "probably read bits of [Ms. Stuckey's deposition]" (Dep. 127:14-16); (4) did not make any inquiry about how the declaration came to be prepared even though he was provided with the declaration by Nike counsel three days before his Report was due to be served (Dep. 126:11-13, 126:22-24, 127:8-10); and (5) did not speak with Ms. Stuckey (Dep.126:20-21).  Moreover, when Dr. Hanvey was shown an example of job descriptions that Ms. Stuckey provided to support her opinion, Dr. Hanvey conceded that he would not have reached the conclusion Ms. Stuckey reached based on these job descriptions.  Dep. 132:14-140:16; Stuckey Decl. ¶ 9.

Because Dr. Hanvey did not independently evaluate the Stuckey Declaration before basing his conclusion that Job Codes are broad on it, Dr. Hanvey's conclusion is not based on sufficient facts.  *See e.g., Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 544 (C.D. Cal. 2012) ("an expert can appropriately rely on the opinions of others if other evidence supports his opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence").

**6.      Although Dr. Hanvey's Report Asserts That the Data Nike Produced Does Not Accurately Show Its Job Structure, Dr. Hanvey Reached This Conclusion by Showing a Job Structure from 2019 or Earlier to Employees in 2021 Despite Knowing There Was a Recent Reorganization.**

Dr. Hanvey's Report asserts that Nike's actual job structure was "not necessarily aligned with the formal SAP structure [a Nike database listing, inter alia, the components of Nike's job architecture for employees] and needs revision to improve its accuracy."  Report ¶ 30.

To reach this conclusion, Dr. Hanvey provided job structure information to employees he interviewed in 2021 that he had created "based on the 'Snapshots' data;" but the "Snapshots" data, as Dr. Hanvey's Report and testimony demonstrate, is from 2019 and earlier.  *See* Report ¶ 14 (Dr. Hanvey defining "Snapshot" data for his Report as data from September 2019 and earlier); Dep. 144:22-24 (same), 187:22-188:11 (confirming that the "Snapshot" data went up to 2019).  Thus, when some Nike employees interviewed in 2021 told Dr. Hanvey that the job structure he showed them was not accurate, Dr. Hanvey was showing these employees job structure information that existed in 2019 or earlier.  Dep. 188:4-189:5.

In addition, the employees interviewed themselves told Dr. Hanvey that there had been a recent reorganization.  Dep. 182:9-15; 185:10-17.  Moreover, even though Dr. Hanvey knew that Nike had a reorganization since 2019, Dr. Hanvey did not know how the reorganization affected specific functions.  Report ¶ 30; Dep. 185:1-9.  Thus, Dr. Hanvey's conclusion should be excluded.  *See Moussouris*, 311 F. Supp. 3d at 1244 ("Opinions that are derived from erroneous or incomplete data are appropriately excluded.") (citation omitted).

7. **Although Dr. Hanvey's Report Opines About Nike's Job Codes and Job Descriptions, Dr. Hanvey Testified He Didn't Have Knowledge About Nike's Job Codes and Job Descriptions.**

Dr. Hanvey concludes that there are "differences within Job Codes" not "captured in Nike's job descriptions." Report ¶ 3. Dr. Hanvey also provides several other opinions and assertions about Nike's Job Codes and job descriptions in his Report. Report ¶¶ 6-8, 30-31.

However, regarding Nike's Job Codes, Dr. Hanvey testified that he: (a) did not understand how Nike determines a particular job code, including whether it is set after Nike determines both the type of work and the level of work according to Nike's leveling criteria (Dep. 117:8-118:21); (b) "didn't directly study" how Nike establishes job codes (Dep. 116:3-12); and (c) did not know what the most specific documentation of job content that Nike maintains or why Nike maintains job content information about job codes (Dep. 151:4-152:3).

Regarding Nike's job descriptions, Dr. Hanvey testified he never asked anyone at Nike how it uses its job descriptions. Dep. 162:17-20. In addition, while Dr. Hanvey's Report states he was "specifically interested in analyzing the "Key Job Accountabilities" section of [Nike's job descriptions] which provides information about job duties for a particular Job Code" (Report ¶ 26), Dr. Hanvey testified he did not know who prepares the Key Job Accountabilities section (Dep. 139:23-140:2) or whether Nike considers the Key Job Accountabilities when setting compensation levels or pay ranges for jobs (Dep. 167:2-12).

8. **Although Dr. Hanvey's Report Asserts That There Are Distinct Management and Individual Tracks at Nike, Dr. Hanvey Admitted That This Was Just a General Statement Without an Empirical Basis.**

Dr. Hanvey's Report asserts, "[m]anagement track employees typically have responsibility for managing the work of other employees while Individual Contributors typically do not manage others," and [t]hose lacking the skillset or desire to advance to a management role can continue to progress in their career through the Individual Contributor track." Report ¶ 16.,

Dr. Hanvey then not only testified that he did not analyze whether employees moved between management and individual contributor jobs but also testified that this statement is just "a general statement" with no empirical basis in his analysis.  Dep. 159:8-160:5.

**D.      The Conclusions in Dr. Hanvey's Report Based on His Individualized Job Analysis Are Inadmissible Because They Are the Result of Unreliable Methodologies.**

In *Daubert*, the Supreme Court provided "factors federal judges can consider" when determining reliability: "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable." *Daubert II*, 43 F.3d at 1316 (citing *Daubert*, 509 U.S. at 593-94).

The *Daubert* "factors are not 'equally applicable (or applicable at all) in every case," and applicability "depends on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Murray v. S. Route Mar. SA*, 870 F.3d 915, 922 (9th Cir. 2017) (citations and internal brackets omitted).  In addition, courts are not limited to the *Daubert* factors.  *See Tech. Licensing Corp. v. Gennum Corp.*, No. 5:01-cv-04204-RS, 2004 WL 1274391, at *3 (N.D. Cal. Mar. 26, 2004) (citing *Kumho Tire Co.*, 526 U.S. at 150-51).

**1.      The Reliability of Dr. Hanvey's Methodologies Are Undermined Because They Were Developed for Litigation, Which the Ninth Circuit States Is a "Very Significant Fact" for Determining Reliability.**

In the Ninth Circuit, a "very significant fact" that a district court "may not ignore" is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert II*, 43 F.3d at 1317.  This is a "very significant fact" because it can provide "objective proof that the research comports with the dictates of good science." *Id.*

Here, Dr. Hanvey's work was not done for business purposes.  Dep. 168:20-23.  Rather, he was not retained until more than two years after the Complaint was filed and he was retained by Nike's counsel instead of directly by Nike.  Dep. 20:16-21:6.  It was not until after the written and deposition discovery periods set by the Court had closed that Dr. Hanvey completed his work.  Report 1; Order, ECF No. 140.  Dr. Hanvey showed no interest in almost all documents Nike created for business purposes.  *See* Sec. III.C, *supra*.  In addition, Nike had not previously attempted to conduct a job analysis concerning the Covered Positions.  *See* Dep. 96:12-17 (Dr. Hanvey was unaware whether Nike has done a job analysis); Pls.' Mot. for Class Cert. 47-48 (citing testimony from Nike Rule 30(b)(6) witnesses and Nike's Chief Human Resources Officer that they were unaware of, inter alia, any job analysis by Nike).

Because Dr. Hanvey's work was developed for litigation, Dr. Hanvey must "explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method …."  *Daubert II*, 43 F.3d at 1318-19 (citation omitted).

## 2.    Dr. Hanvey's Individualized Job Analysis Methodology Is Not Peer Reviewed, Not Widely Accepted, and Otherwise Fails to Meet Any of the *Daubert* Factors.

Dr. Hanvey's Report states he "followed widely recognized and accepted scientific methods to conduct a job analysis of employees for the purpose of gathering data relevant to the case."  Report ¶ 24.  However, Dr. Hanvey admitted: (1) "individualized analysis" is not "really a term that's widely accepted" (Dep. 108:1-8); and (2) "I don't think there's going to be any one single article that details the exact approach that I followed …" (Dep. 113:3-5).  Nor did Dr. Hanvey identify any peer reviewed or other objective source otherwise supporting his individualized job analysis methodology.  Dep. 109:9-113:5 (Dr. Hanvey failing to identify a

single peer reviewed or other objective source that recommends the use of an individualized job analysis for determining issues related to class certification for a Title VII pay discrimination claim).

Nor did Dr. Hanvey identify any peer reviewed or other objective source showing he can meet the third *Daubert* factor, that his methodology can be tested.  *See* Report.  In addition, Dr. Hanvey has never provided expert testimony about an individualized job analysis or anything else in a class action alleging pay or gender discrimination.  *See* Dep. 38:1-39:8 (Dr. Hanvey testified that he did not know whether any of the cases listed in his CV involved a class claim of pay discrimination or gender discrimination).

When Dr. Hanvey does cite an article in his Report, the article fails to support his job analysis methodology.  To support his assertion that "job analysis data [are] used to evaluate variability between employees for class certification purposes" (Report ¶ 20), Dr. Hanvey's single source of support is a chapter titled "Wage and Hour Litigation: IO Psychology's New Frontier."[8]  Report ¶ 20, n.15.  Dr. Hanvey testified he did not know if the chapter even "mentions discrimination class actions" or "Title VII class actions."  Dep. 104:19-105:7.  Indeed, the chapter makes "no mention of discrimination class actions" and "does not discuss the use of a job analysis for determining whether jobs are substantially similar for a pay equity analysis or whether an action brought under the fair employment laws may proceed as a class action."  *See* Lundquist Rebuttal 21;[9]  Sun Decl. Ex. 2.  Nor do the other sources to which Dr. Hanvey cites in

---

[8] Banks and Cohen, "Wage and Hour Litigation: IO Psychology's New Frontier," <u>Employment Discrimination Litigation</u> (Landy, ed.), Sun Decl. Ex. 2 (Dep. Exhibit 757).

[9] The chapter "does discuss the use of a job analysis to evaluate the variability of the work done by employees who have 'opted in' to a wage and hour claim in order to assess whether a collective action is appropriate."  Lundquist Rebuttal 21.  But the standard for whether a collective action is appropriate is different than the standard governing the class certification determination pursuant to Federal Rule of Civil Procedure 23.  *Campbell v. City of Los Angeles,*

his Report show that his individualized job analysis followed widely recognized and accepted

scientific methods to conduct a job analysis.  *See* Lundquist Rebuttal 21-23.

At the same time, Dr. Hanvey did not rely on those sources that he testified are

"authoritative."  Dr. Hanvey testified that the Uniform Guidelines[10] and SIOP Principles are

"authoritative sources for the field of personnel selection."  Dep. 91:25-92:5.  Dr. Hanvey never

asserted that those sources supported his job analysis methodology, and he conceded at

deposition that he had not investigated whether Nike's compensation practices complied with the

standards set forth in either of these "authoritative sources."  Dep. 99:13-24.

Since Dr. Hanvey's individualized job analysis methodology is not generally accepted,

has not been subject to peer review and publication, and has not been tested, the Court should

exclude the sections in Dr. Hanvey's Report based on his "unreliable" individualized job analysis

methodology.  *See Moussouris*, 311 F. Supp. 3d at 1240 (the court struck Dr. Saad's expert

testimony related to "business needs" because of the "vague methodology offered" and that there

was no evidence that the "methodology ha[d] been subjected to peer review…or that the

technique enjoys general acceptance within the relevant scientific community"); *see also*

*Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130, 1139 (D. Or. 2002) ("Although

*Daubert* instructs that none of these four factors are dispositive, the fact that plaintiffs' proffered

evidence fails each one is troubling. After examining the evidence as a whole, and with due

consideration of the four *Daubert* factors, the court is convinced that [the challenged expert

testimony should be excluded because it] is not sufficiently reliable ….").

---

903 F.3d 1090, 1101 (9th Cir. 2018) (The "assumption is unfounded" that class and collective
actions "must be handled in procedurally parallel ways.").

[10] In Title VII and other fair employment cases, the courts give "great deference" to the
standards set forth in the Uniform Guidelines.  *See* Pls.' Mot. for Class Cert. 46-48, ECF No.
146.

3.     **The Sampling Methodologies Dr. Hanvey Used to Create His Individualized Job Analysis Are Unreliable.**

Dr. Hanvey created two samples of female Nike employees to interview and the interviewees "[r]esponses … would form the basis of my opinions regarding the degree of variability among the jobs held by Nike employees."  Report ¶ 33.  But Nike cannot show the methodologies used for these two samples are reliable.

a.     **The Sampling Methodologies Dr. Hanvey Used Are Not Peer Reviewed, Not Widely Accepted, and Otherwise Fail to Meet Any of the *Daubert* Factors.**

With respect to Sample 1, Dr. Hanvey's Report states his methodology was, "[b]ased on my experience" (Report ¶ 49), and he testified he used "30 as a rule of thumb" but he increased the sample size to 60 individuals "given the wide range of jobs at Nike" (Dep. 223:7-14).[11]  To support his rule of thumb, Dr. Hanvey first testified that "in most cases that we've worked on a sample of 30 has been considered sufficient by the Court;" but he then backtracked, admitting that he does not know if "courts ever commented specifically on the sample size …" and that the two cases he had identified in support of his "most cases" claim were not cases in which he had served as an expert.  Dep. 223:3-224:2.  As Dr. Lundquist described, Dr. Hanvey's approach "dismiss[ed] the scientific methods for determining sample size [and] used his own 'rule of thumb' …."  Lundquist Rebuttal 31.

Dr. Hanvey's Report also states, "[t]here are not widely agreed-upon standards for the proper sample size (*see, e.g.*, Kaye & Freedman, 2011) so professional judgment is typically required to determine whether a sample is sufficiently large."  Report ¶ 49 n.28.  This Kaye & Freedman article Dr. Hanvey cites is the "Reference Manual on Statistical Evidence" (Fed.

---

[11] In selecting women for his samples, Dr. Hanvey managed to select one woman for both Sample 1 and Sample 2 even though the probability of doing so by chance is less than 2 in a million (0.0000018).  *See* Lundquist Rebuttal 31.

Judicial Ctr. 3d ed. 2011), which states, with respect to sample size, "[m]uch depends on the level of error that is tolerable and the nature of the material being sampled." Sun Decl. Ex. 3 at 264. However, because Dr. Hanvey does not provide a known or potential rate of error for his sampling methodology (*See* Report),[12] Dr. Hanvey's methodology does not meet the rate of error *Daubert* factor. *See Gabbard,* 219 F. Supp. 2d at 1138 (finding that an expert's methodology fails to meet the error rate *Daubert* factor because it "does not have a known rate of error").

For Sample 2, Dr. Hanvey's Report does not claim that the methodology he used to determine its size has been subjected to peer review and publication, is generally accepted in the scientific community, or was based on his experience. *See* Report ¶¶ 54-55. Thus, the Court should exclude the sections in Dr. Hanvey's Report about or based on Sample 2. *See e.g., Moussouris*, 311 F. Supp. 3d at 1240.

Because both of Dr. Hanvey's sampling methodologies are not the "the product of reliable principles and methods," his related opinions should be excluded. *See Gabbard*, 219 F. Supp. 2d at 1139. Moreover, as described in the following sections, in addition to Dr. Hanvey's failure to meet the *Daubert* factors, there are several other reasons why his job analysis is unreliable.

---

[12] Dr. Hanvey claimed that estimating the "level of error that is tolerable" was "not applicable" to his determination of the sample size for his job analysis because he was not "estimating [a] population parameter," apparently implying that an estimate of "tolerable error" was not relevant when the data was non-numeric or "qualitative," that is the responses of the interviewees in the sample. Dep. 227:5-228:4. However, Dr. Hanvey conceded that "qualitative" data should be of "sufficient quality, but it's not something that you can analyze numerically." Dep. 228:5-17. Moreover, the Reference Guide on Statistics, the one article Dr. Hanvey cites in support, provides no support for an assertion that in determining the size of a sample it is not important to evaluate the level of error whether the data is qualitative. *See* Reference Guide on Statistics 246-47.

     **b.**     **Dr. Hanvey's Sampling Methodology Is Unreliable Because His Samples Are Too Small to Provide a Reliable Basis to Make Inferences.**

An important "preliminary assessment" for a survey based upon a sample is the "size of the sample" because it "cannot be too small." *Santos v. United Parcel Serv. Inc.*, No. 3:18-cv-03177-EMC, 2020 WL 6784220, at *4 (N.D. Cal. Nov. 18, 2020).  "The court must 'determine that a chosen sample size is statistically appropriate and capable of producing valid results within a reasonable margin of error." *Id.* (quoting *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 43 (Cal. S. Ct. 2014) (footnote added).[13]

Here, Dr. Hanvey's Sample 1 included only 0.6% of the employees in Covered Positions. Lundquist Rebuttal 28-29.[14]  Sample 2, which was designed to analyze "the degree to which employees varied within randomly selected Job Codes," only included 0.36% of the job codes for the Covered Positions.  Lundquist Rebuttal 29-30.

These two sample sizes for Nike – 0.6% and 0.36% – stand in stark contrast to Dr. Hanvey's prior expert testimony in another action where he criticized the opposing expert's use of a sample that was 6.6% of the total population, which is eleven times larger than Sample 1 and over eighteen times larger than Sample 2, as too small.  Expert Report of Chester Hanvey, Ph.D., *Davenport v. Charter Communication*, (June 27, 2016), Sun Decl. Ex. 4 (Dep. Exhibit 752), ¶ 33 (emphasis added); Dep. 236:22-237:21.  There, Dr. Hanvey described the problems with too small a sample:

> Attempting to estimate population parameters [that is, generalizing from the sample to the population] based on a small sample is

---

[13] A study cannot provide the basis for generalizations to the larger population unless it has both "[i]nternal validity" and "[e]xternal validity."  *See* Footnote 7.  As set forth in III.C.1, *supra*, Dr. Hanvey did not even attempt to assert that his Sample 2, based upon only 5 Job Codes, could be generalized.

[14] Although there is no justification making only women eligible for the sample, the sample size of the female population is still small at 1.4%.  Lundquist Rebuttal 27 n.12.

> problematic because the assumptions are difficult to validate, confidence levels may be difficult to compute, samples tend to be *unreliable* and estimates have large amounts of error.

Sun Decl. Ex. 4, ¶ 36.  Thus, Dr. Hanvey's prior expert testimony shows that he used too small a sample, which makes generalizing to the population "problematic" and samples that "tend to be unreliable."

### c.    Dr. Hanvey's Sampling Methodology Is Unreliable Because He Fails to Address the Significant Nonresponse Rate.

Even if a sample "begins with a random sample," it is "not the product of reliable principles and methods" when it fails to "take measures to assure that nonresponses are random and provide analysis of the reasons of nonresponse." *Wallace v. Countrywide Home Loans Inc.*, No. 8:08-cv-01463-JLS-MLG, 2012 WL 11896333, at *4 (C.D. Cal. Aug. 31, 2012) (citation and internal quotations omitted).

Here, there was a substantial nonresponse rate for both samples.  Of the original employees Dr. Hanvey selected for the samples, there was a 30% nonresponse rate for Sample 1 and a 53% nonresponse rate for Sample 2.  Report ¶ 59 n.36 (two declined, nine failed to respond, and seven "indicated" no availability for Sample 1, and one declined, twelve did not respond, one was out of the office, and two were unavailable for Sample 2).

In addition, for an unspecified and undisclosed reason, the Nike Legal Department sent the invitations to the women selected.  Report ¶ 58 & Ex. 8 (text of email).  Dr. Hanvey had to "guess that it was a collaborative decision" for the Legal Department to extend the invitation. Dep. 247:2-6 (emphasis added).  Dr. Hanvey could not recall who suggested having Nike Legal send the invitations and he did not know how frequently employees received emails from Nike Legal.  Dep. 247:7-18.  For those who did not respond initially, "up to two follow-up emails were sent asking the employee to respond" from Nike Legal.  Report ¶ 59; Sun Decl. Ex. 5,

(NIKE_HANVEY_00000960-61); Dep. 249:1-4.  A "follow up phone call" was also made to those invited "[i]f necessary," and the caller reminded the invitees that they had "received emails from the Legal Department …."  Report ¶ 59; Sun Decl. Ex. 6 (NIKE_HANVEY_00000819-20).

The nonresponse bias may have resulted from the involvement of Nike Legal and the fact that the women invited were putative class members.  Dr. Hanvey ignored the nonresponse rate as well as the potential effect of having Nike Legal contact putative class members; rather, Dr. Hanvey testified that he did not know if these putative class members had an interest that "might be contrary to that of the company." Dep. 247:25-248:17.  Further, the relationship of Dr. Hanvey's study to the pending class action litigation was withheld from the employees since Dr. Hanvey did not inform the potential survey participants that he had been "retained for the *Cahill v. Nike Litigation*." Dep. 254:21-23.

Dr. Hanvey's failure to account for nonresponse rates weighs against admissibility. *Wallace*, 2012 WL 11896333, at *4 (finding failure to analyze the determinants of nonresponses and take measures to assure nonresponses were random is unreliable); *Chavez v. IBP, Inc.,* No. 2:01-cv-05093-RHW, 2004 WL 5520002, at *10 (E.D. Wash. Dec. 8, 2004) (finding nonresponse bias may render survey unreliable and noting that the "U.S. Office of Statistical Standards suggests that because nonresponse is often not random, a survey should maintain a response rate of 75% or above"); *Reference Manual on Scientific Evidence* 245 (Fed. Judicial Ctr. 2d ed. 2000) ("Potential bias should receive greater scrutiny when the response rate drops below 75%."); Lundquist Rebuttal 32 ("Such a high rate of fallout from the intended sample could indicate a potential systematic bias in the individuals who were willing to participate in the study ….").

**d.** **Dr. Hanvey's Sampling Methodology Is Unreliable Because of Selection Bias (Exclusion of Men from The Samples).**

The sampling methodology also indicates selection bias because Dr. Hanvey chose to use a nonrandom factor, restricting the samples to only female employees (Report ¶ 50; Dep. 210:11-13). Dr. Hanvey testified that he made this decision based "on his understanding that these are the putative class members," and that "at the pre-class certification stage, one of the issues is the degree of similarity between class members …." Dep. 210:14-21, 215:4-12. This basis, however, is not the standard for determining a class certification motion. *See* Footnote 9, *supra*.

In addition, Dr. Hanvey's Report does not cite to a peer reviewed or other objective source to support his decision to exclude men working in Covered Positions for a job analysis or even claim that there is an objective source that is supportive. *See* Report ¶ 50. Nor could Dr. Hanvey because, of course, there is no authority stating that an I/O psychologist should limit their job analysis to employees of one gender. Rather, a job analysis is not a gender-based analysis. Dr. Lundquist explained that "[t]o the extent that there was any difference in the work performed by men and women in a job code … Dr. Hanvey's sampling of only women would prevent him from detecting this information." Lundquist Rebuttal 27. Dr. Lundquist further explained:

> By restricting the sample to only women, Dr. Hanvey made the incomprehensible choice to shift the focus from determining whether the work performed in various jobs at Nike was substantially similar to whether women at Nike were performing similar work. In essence, Dr. Hanvey is not analyzing the jobs, but rather analyzing women's work at Nike.

Lundquist Rebuttal 26.

4.    **The Reliability of Dr. Hanvey's Report Is Further Undermined by Its Numerous Misstatements or Errors.**

An expert must have "reliably applied principles and methods to the facts of the case." Fed. R. Evid. 702(d).  Dr. Hanvey has failed to follow an approach in conducting his job analysis that would lead to reliable results.

First, Dr. Hanvey's Report asserts that the "purpose of Sample 2 was to determine the degree to which employees varied *within randomly selected Job Codes*."  Report ¶ 157 (emphasis added).  However, it is clear elsewhere in his Report that Dr. Hanvey did not randomly select the Job Codes for Sample 2: "I selected Job Codes with a large number of eligible employees …."  Report ¶ 54.

Second, although Dr. Hanvey's job analysis is based on the interviews from his samples (Report ¶ 33), Dr. Hanvey conceded these employees did not have a "thorough knowledge" of the jobs because he testified that does not consider them Subject Matter Experts ("SMEs").  "A job analysis typically involves Subject Matter Experts (again, SMEs) identifying important tasks for the job, followed by identifying Knowledge, Skills, and Abilities (again, KSAs) necessary to perform those tasks, followed by linking the KSAs back to the tasks." *Smith v. City of Boston*, 144 F. Supp. 3d 177, 201 (D. Mass. 2015), *on reconsideration*, 267 F. Supp. 3d 325 (D. Mass. 2017) (citing *United States v. City of New York*, 731 F. Supp. 2d 291, 302 (E.D.N.Y. 2010)).

Dr. Hanvey testified that SMEs are people "knowledgeable about the work performed … and the KSAOs [knowledge, skills, abilities, and other characteristics] needed to perform that work."  Dep. 174:16-175:18.[15]  Dr. Hanvey then testified that he "wouldn't really call [the

_____

[15] Dr. Hanvey also testified that he agreed "generally" with the definition of SMEs in the SIOP Principles, a source Dr. Hanvey testified is "authoritative" for I/O Psychology, which defines SMEs as: "Individuals who have thorough knowledge of the work behavior, activities, or responsibilities of job incumbents, and the KSAOs needed for effective performance on the job." Principles for the Validation and Use of Personnel Selection Procedures at 50, available at

**PLAINTIFFS' MOTION TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 28**

interviewees in Sample 1 and Sample 2] subject matter experts; I would just refer to them as incumbents." Dep. 241:13-22. As Dr. Lundquist explained, Dr. Hanvey "based his entire job analysis on the substantive responses of individuals he did consider knowledgeable enough to be called SMEs." Lundquist Rebuttal 28.

Further, Dr. Hanvey's own data indicates that his job analysis was based at least in part upon responses from employees who explicitly stated that they were unclear about the requirements of their jobs. Of the 60 employees in Sample 1, 13%, or 8 of 60, stated that "their work role was not clear …."[16] Dr. Hanvey admitted he used these employees' responses even though he "categorized" them as not having a "clear" understanding of their job. Dep. 242:4-15. Accordingly, "despite the employees' lack of clarity and understanding about their role [or job], Dr. Hanvey chose to include these 8 individuals' data in his results." Lundquist Rebuttal 33. Of the 25 employees in Sample 2, 20%, or 5 of 25, "indicated that indicated that their role was not clearly defined …. Yet, again, Dr. Hanvey included these five individuals in his analysis despite their lack of understanding of their job." Lundquist Rebuttal 33-34.

Third, Dr. Hanvey has underscored the "effort and time" required when using structured interviews to conduct a job analysis, as was done here, stating the "responses are qualitative and often quite lengthy, a significant amount effort (sic) and time may be required to analyze the data." Sun Decl. Ex. 7 (Dep. Ex. 756), Dep. 100:12-25, 101:5-15. Yet, here, Dr. Hanvey rushed

---

https://www.apa.org/ed/accreditation/about/policies/personnel-selection-procedures.pdf; Dep. 91:25-92:5 (testifying that SIOP principles are "authoritative").

[16] The question reads: "To what degree is your role at Nike clearly defined? In other words, do you understand what is expected of you? Please explain." Report, Ex. 5, question 39; Dep. 240:5-17. *See*, Lundquist Rebuttal 33 (Tables showing responses of the eight interviewees who were "unclear" about their jobs). Dr. Hanvey "designed coding schemes for specific questions to help summarize the data in the most useful way." Report ¶ 72; Dep. 240:12-241:2. By this coding scheme, Dr. Hanvey summarized the answer to one of the survey questions as demonstrating that 13% or 8 of the 60 interviews included in Sample 1 reported that their work was unclear. Hanvey Report ¶ 103; Dep. 240:12-241:2.

**PLAINTIFFS' MOTION TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 29**

his work in a short time.  Of the 89 interviews that Dr. Hanvey conducted for the job analysis, 36 interviews, or 40%, were conducted within one month of when Nike served Dr. Hanvey's Report on October 1, 2021.  Lundquist Rebuttal 39.  Moreover, 9 of these interviews occurred within ten days of when the Report was served, one follow-up interview occurred three days before the Report was served, and one follow-up interview occurred on the day the Report was served. *Id.*[17]  Dr. Lundquist explained that such a process with its "compressed time period for analysis of the interview data apparently did not provide sufficient time to thoroughly analyze and evaluate the data in a manner that would be scientifically precise."  Lundquist Rebuttal 39.

Fourth, in an exhibit to his Report where Dr. Hanvey lists the number of employees per Job Subfamily, the total number of employees listed is almost 430,000, which is not only more than 20 times the actual number of employees in Covered Positions but also clearly, wildly inaccurate.[18]  Lundquist Rebuttal 49.  Given the extent of the error, any cursory review by Dr. Hanvey would have revealed the problem.  When confronted with the error in the Exhibit, Dr. Hanvey testified "whether it makes sense or not, I don't know."  Dep. 154:17-24.  He added that "I believe the numbers are correct.  It's just what the number represents, is the part I'm not sure about."  Dep. 154:25-155:4.

Fifth, although Sample 2 only included five job codes, Dr. Hanvey misidentified one of these Job Codes in Table 12; the heading for the Table refers to "A2543, Prof Entry: Prod

---

[17] Although Dr. Hanvey was retained on October 8, 2020, "to analyze the jobs performed by Nike employees in Covered Positions" (Report ¶ 1; Dep. 20:16-21:6), Dr. Hanvey's analysis did not begin interviewing employees from his samples until the end of July 2021 (Report, ¶ 63) almost 10 months after he was retained.  There is no explanation for Dr. Hanvey delaying the start of interviewing the 89 employees for almost 10 months, though the most recent deadlines to have passed as of the start of the interviews were for deposition discovery to conclude and for Plaintiffs to serve their expert reports on Nike.  *See* Order, ECF No. 140.

[18] Depending upon the relevant time period applied, the number of employees, working in the Subfamilies that included Covered Positions is approximately 12,000 to 13,000.  *See*, Expert Report of David Neumark, Ph.D. ¶ 16, ECF 149-1.

Creation Ops," whereas the data in the table actually pertains to information from Job Code "A0971, Supv:Mfg."  Lundquist Rebuttal 50 (all capitalized in original); Dep. 255:20-256:3.

Sixth, Dr. Hanvey's Report claims he showed current employees in 2021 "the current Job Family structure," but the data Dr. Hanvey used to create this structure was from 2019 or earlier and the employees told Dr. Hanvey they recently went through a reorganization.  *See* Sec. III.C.6, *supra*.

Dr. Lundquist described additional errors in Dr. Hanvey's analysis, for example: (a) failure to evaluate critically the quality of data obtained from the survey respondents (Lundquist Rebuttal 36-38); (b) failure to consider the impact of reorganizations when evaluating the interview responses (Lundquist Rebuttal 40); and (c) failure to analyze interview responses as illustrated by the inaccurate conclusions reached with respect to responses from interviewees who were in the job of Director (Lundquist Rebuttal 43-45).

### 5. <u>The Combination of Serious and Fundamental Flaws in the Implementation of the Job Analysis Compels the Conclusion That Any Testimony Regarding the Job Analysis Is Unreliable and Inadmissible.</u>

The Advisory Committee Notes to the 2000 amendment to Rule 702 explains:

> the amendment specifically provides that the trial court must scrutinize not only the principles and methods used by the expert, but also whether these principles and methods have been properly applied to the facts of the case.  As the court noted in *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994), '*any* step that renders the analysis unreliable renders the expert's testimony inadmissible.'

(Emphasis in original).  In scrutinizing whether an expert's analysis is unreliable a court must examine "rigorous[ly]" the facts relied upon by the expert and the methods by which the expert draws an opinion.  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (The "method by which the expert draws an opinion from those facts" is an important element in determining "whether a step in the expert's analysis is unreliable ….").

As demonstrated in sections III.D.3-4, Dr. Hanvey's flawed methodology caused any testimony regarding the job analysis to be unacceptably unreliable and inadmissible. The sample size, which was determined by a "rule of thumb," not any scientific process, was too small. The unreliability resulting from the small sample size was exacerbated by a substantial nonresponse rate from incumbents invited to participate in the survey. Dr. Hanvey failed to evaluate whether the nonresponse rate biased the results. Nonresponse bias was made more likely by Nike's Legal Department extending invitations to employees to participate in the survey and the failure of Dr. Hanvey to explain in a transparent manner that he was undertaking the job analysis in connection with ongoing litigation. Yet, Dr. Hanvey failed to evaluate whether the nonresponse rate biased the results.

Given that Dr. Hanvey, without any justification provided by professional literature or accepted methods, included only female employees in his study of Nike's jobs, the sample suffered from indisputable selection bias. Moreover, Dr. Hanvey admitted that the employees whose responses provided the "data" upon which he based his job analysis did not qualify as SMEs and thus did not have a "thorough" knowledge of the jobs and the knowledge, skills, abilities, and other experiences required by the jobs. Even though the survey responses of a substantial number of the participants stated that they did not have a clear understanding of the expectations of the job, Dr. Hanvey still used the responses of those participants to describe the job expectations and related matters. Finally, Dr. Hanvey conducted the study in a careless manner, even failing to check the reliability of information upon which he relied and committing numerous errors.

Each of these fundamental flaws provides a sufficient basis for the court to determine that any testimony about the job analysis is inadmissible. Taken together, these flaws compel the exclusion of Dr. Hanvey's testimony based on his job analysis. *See Moussouris*, 311 F. Supp. 3d

1244-45 (excluding expert testimony given the "lack of representativeness" that "combined with sampling error resulting from the small sample size"); *Chen-Oster*, 114 F. Supp. 3d at 124 (expert testimony was excluded because it was "unreliable" for numerous reasons).

The "rationale" for the Ninth Circuit's "flexible" approach determining the admissibility of expert testimony is that a "minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not render expert testimony inadmissible. *City of Pomona*, 750 F.3d at 1048 (quoting *Amorgianos*, 303 F.3d at 267). The serious flaws ingrained in Dr. Hanvey's job analysis are neither "minor" nor "slight." Rather, these flaws demonstrate that Dr. Hanvey has not "reliably applied" any methodology. Accordingly, the Court should exclude his testimony concerning the job analysis.

### IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' request that the sections of Dr. Hanvey's Report concerning Nike's jobs and his job analysis, paragraphs 3, 5-8, 16, 19-234, 247-248, and 251-252, be excluded.

Dated:  April 1, 2022

Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

 /s/Byron Goldstein
Laura L. Ho (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
James Kan (admitted *pro hac vice*)
Byron Goldstein (admitted *pro hac vice*)
Katharine L. Fisher (admitted *pro hac vice*)
Mengfei Sun (admitted *pro hac vice*)

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Anna M. Joyce, OSB #013112
Kathryn P. Roberts, OSB #064854

ACKERMANN & TILAJEF PC
Craig Ackerman (admitted *pro hac vice*)
cja@ackermanntilajef.com
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Tel:  (310) 277-0614
Fax:  (310) 277-0635

INDIA LIN BODIEN LAW
India Lin Bodien (admitted *pro hac vice*)
india@indialinbodienlaw.com
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Tel:  (253) 503-1672
Fax:  (253) 276-0081

Of Attorneys for Plaintiffs and Opt-In Plaintiffs