# DECLARATION OF HEATHER AMANN

I, Heather Amann, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I started working at Nike in January 1997, which was approximately six months after I graduated from high school.  I was hired by Express Services to work as a contract worker for Nike as a Material Handler.  After about six months, I was hired directly by Nike as a full-time employee in the same role, as a Material Handler, working out of Nike's distribution center in Wilsonville, Oregon.  After working as a V-band Material Handler, I was promoted to an A-band role as Distribution Planning Analyst, and then, as a Vendor Analyst in 2002, I transitioned to working at Nike's World Headquarters.  I have worked at Nike's WHQ since 2002.

4.      I pursued a job at Nike (first as a contract worker then as a Nike employee) because my aunt was a Nike employee and she suggested I apply.  I was 18 years old at the time, so I did not know what I wanted to do, but I thought working for Nike would provide stability and opportunities for growth.  I enjoyed the work, so I asked around for opportunities to move into a

Page 1   -   DECLARATION OF HEATHER AMANN

full-time Nike position.  When a position opened up, I submitted an application.  As part of the process, I was interviewed by a panel of seven people, and was hired by Bill Mansfield.

5.      I have held a variety of roles during my 24 years at Nike.  In particular, from June 2014 to September 2017, I held the U-band role of Supply Planning Process Excellence Manager after applying and interviewing for the posted position.  I was then promoted in September 2017 during a re-organization to the E-band role of Director, Responsive Supply Footwear.  In this role, I worked on developing capabilities and running the responsiveness business.  This means I worked on developing capabilities to improve responsiveness to the marketplace and running responsiveness models from a business perspective.

6.      In March 2020, I lateraled into the E-band role of Director, Supply Planning Operational Excellence.  I moved into this position after a re-organization within my overarching organization.  This position was like the Supply Planning Operations Manager position held previously, but with expanded responsibilities to include additional supply planning functional areas.

7.      Then, in August 2021, after another re-organization, I lateraled to my current position of Global Supply and Inventory Operations Director, which is an E-band role.  In this role, I report to Steven Webb, Senior Director, Supply and Inventory Operations.

8.      Although my current role is similar to my role as Director, Supply Planning Operational Excellence, my duties and responsibilities shifted a little bit.  Specifically, I previously focused on process optimization, governance, and project prioritization for supply planning, and now I have a sharper focus on project intake and prioritization across supply and inventory planning (S&IP), and  am no longer focusing on process optimization or governance.

Page 2  -  DECLARATION OF HEATHER AMANN

DocuSign Envelope ID: F0080BC6-9B78-45B4-A25B-DCA1741B5136

9.      I am responsible for making sure that we understand all of our S&IP priorities and initiatives in any given year and that we prioritize the best value and outcome for Nike.  I am also responsible for ensuring that we work with partner functions to plan the work with their available resources.  Some of my recent responsibilities also include developing the strategy for training curriculum for S&IP and the strategy for how to manage content for documentation and training. Part of the job is also portfolio management to ensure we are developing operating models for how to execute intake.

10.      I have supervised employees throughout my various roles at Nike from June 2014 to July 2021, but I do not currently supervise any employees.  In each of my prior teams, I directly supervised two to three employees who held either U or L-band roles.

11.      As a manager, I decided the CFE ratings for my team, which, along with their position in range, influenced the increases to their salary.  Their CFE rating was based on how they performed against the goals we set for the year, which were based on business needs and the responsibilities for the role.  The CFE ratings were also based on the peer feedback they received, and their self-assessment.  I would then collaborate with other managers and my director to figure out how I should rate them.  Although my supervisor had to approve the CFE rating, I do not recall my supervisor ever changing or rejecting the CFE rating I submitted.

12.      I have also been involved in hiring employees to my teams at Nike.  Generally, with the exception of reallocating resources through re-organizations, the vast majority of the positions I have filled on my teams have been posted, the band level had already been set at time of posting, and the job was filled by an internal Nike candidate, although the positions were also open to external candidates.

Page 3  -  DECLARATION OF HEATHER AMANN

DocuSign Envelope ID: F0080BC6-9B78-45B4-A25B-DCA1741BF136

13.     I have not applied for a role since my promotion in September 2017 to Director. Although all of the lateral moves that followed have been as a result of re-organizations, I did express interest in moving into each of these roles as part of my individual development plan. Overall, since 2016, I have not sought a promotion I did not receive.  I believe I have had a good progression of success at Nike over the years, and have never personally felt discriminated against as a woman.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/21/2022_____, at ____Beaverton, Or_____.
                            Date                                   City, State

DocuSigned by:

_Heather Amann_
2398A2164543461...

_____
HEATHER AMANN

Page 4   -   DECLARATION OF HEATHER AMANN

# Exhibit A

DocuSign Envelope ID: F0080BC6-9B78-45B4-A25B-DCA1741B5136

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:        Heather Amann

Interviewer Name:    Deisy Castro

Interviewer Signature:    _(signature)_                    Date: 02/28/22

## DECLARATION OF MAGGIE BAIRD

I, Maggie Baird, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I am currently employed by Nike, Inc. at Nike's World Headquarters.  I received my undergraduate degree from Emory University in 2009.  After graduating, I worked in account manager and sales roles at AT&T and L'Oreal.

4.      My last role at L'Oreal was Director of Sales for Walmart.  While I was in that role, I attended a leadership training, and one of the women who was running it was an executive coach at Nike.  She thought I would be a good fit for Nike, so she happily introduced me to others at the company.  I traveled out to Oregon and met different Nike employees.  Eventually, the Nike employees with whom I met connected me with someone in Human Resources.  I shared exactly what kind of job I was looking for:  I wanted to be within the sales space, but I explicitly shared that I did not want to be in a role where I would be managing a business partner.  I ultimately applied for the role of Category Sales Director for Men's Training, North America.  I had separate one-on-one interviews with people on the team and was ultimately

Page 1   -   DECLARATION OF  MAGGIE BAIRD

DocuSign Envelope ID: BAEEF5AC-F61D-4582-82C5-7539F4793D9D

selected for the role.  I later learned that it was unusual that an external candidate was selected for this job on this team.  The job title and band level that I was offered was exactly the same as the job title and band level I applied to.  I did not try to negotiate my starting salary because I was very happy with the offer and it met my expectations.  I was a Category Sales Director for Men's Training until August 2017.

5.  Around that time (August 2017), Nike went through a reorganization.  As part of that reorganization, I moved into another Category Sales Director position, this time for Running & Women's.  I was in this role until May 2018.  In this role, I was responsible for working with a category merchandising team to build out the assortments, stories, and allocations for business and distribution.  We would often give internal presentations where we would present the stories and focus for a particular season.  We also would have to present products to business partners and guide the allocation process.  I also needed to determine which partners Nike should invest in based on strategy.

6.  In June 2018, I moved into the role of Global Marketplace Director for Jordan Women's and Kids.  I had communicated to my manager at the time that I was interested in a new experience.  He and others I had connected with at Nike told me about a new role for Jordan.  I had a few informal discussions outside of the hiring process to understand the scope of the role and to understand the Jordan brand in general.  I decided I was interested in the position, so I formally applied.  I had four interviews and was selected for the role.  This was considered a promotion, and I received a raise.  In the Global Marketplace Director role, I helped Jordan develop a global marketplace strategy for the Women's category.  I strategized regarding which geographies and which partners to invest in and helped with segmentation of the global product line.  I was in this position until February 2021.

Page 2  -   DECLARATION OF  MAGGIE BAIRD

DocuSign Envelope ID: 9AEEF5AC-F61D-4582-82CF-7549F4783D9D

7.      While I was in the Global Marketplace Director role, I applied for a promotion to Senior Director for Women's and Kid's Merchandising for the Jordan brand.  I was encouraged to apply by a few different leaders based on my contributions to the business and the brand, even though I really did not have the merchandising experience requested for the role.  A female member of the Merchandising team ended up being selected for the role because she had multiple years of merchandising experience, which I did not have.

8.      In early 2021, Nike went through another reorganization, through which I was elevated to the role of Senior Director for Jordan North America, Direct to Consumer.  This was considered a promotion, and I received a raise, even though I did not apply for the position.

9.      In this role, I serve as the general manager and cross-functional leader across a handful of different functions for Jordan North America and Nike Direct, as well as for the Neighborhood (which is the term we use to refer to smaller boutique partners that are connected to youth and street culture).  I determine how we integrate Jordan into the larger Nike Direct ecosystem, including developing operating models and new processes with different functional leaders.  I am also responsible for delivering Nike Direct business across top-line metrics, like demand, and ensuring that we sell what we say we are going to sell.  I also oversee the development of new experiences for Jordan within Nike Direct (for example, being able to shop Jordan on the Nike app).  Because this role did not exist before the reorganization, my responsibilities have changed over time.  It is morphing based on the maturity of the team and the business focus at the relevant time.

10.      My current position as a Senior Director is very different from my previous positions.  The level of decision-making is much more elevated, and I manage a team now.  I manage four Directors, three of whom manage Managers.  Each Director, even though their job

Page 3   -   DECLARATION OF  MAGGIE BAIRD

title and band levels are the same, has very different roles and responsibilities.  For example, the Director of Merchandising is tasked with adoption and assortment for Global Nike Direct.  The Platform Director focuses on developing the business and member growth objectives.  His role is centered on working capabilities and tactics within those capabilities to drive member outcomes. There is also a Director for Neighborhood teams who has Directors (who manage business partners) and Managers (who manage merchandising and branding) reporting to him.  Finally, the Retail Concepts Director is developing and executing the first Jordan store.  I also have a few dotted line teams reporting into me that have very different roles.  There is a team that works on the financial plans, another that works on merchandising, and another that works on consumer direct marketing.

11.     Today, I make pay decisions for the four Directors that report into me.  Last year was the first time that I was involved in this process.  When deciding whether to give an employee a raise, I mainly consider the employee's performance, long-term potential, and where that employee falls within the pay range for that job.  For example, one of the Directors I supervised was performing very well, but he was at the lower end of the range for the Director role.  I chose to give him a raise in order to reflect his contribution to the team and to bring him into a higher end of the pay range.

12.     From my perspective, two different employees at the same level can make different salaries.  This is based mainly on the employee's relevant experience, as well as their tenure within the band.  My managers and I handle the pay decisions within the budget for our team.  I do not need approval from anyone else, including HR, unless we have any major outliers—for example, if an employee rated as "Inconsistent" received a high merit increase (referred to at Nike as "max invest").  While CFE ratings do play a role in the pay decisions, they

Page 4   -   DECLARATION OF  MAGGIE BAIRD

Davis Decl. Exhibit 2, Page 4 to 8

are not the most important factor.  I try to emphasize current and future performance, as well as equity within my team.

      13.     I also have been involved in hiring decisions at Nike.  We typically post an open position both internally and externally.  There was one occasion that we posted the job internally only because we had an immediate business need for a position that managed a category, which comprised 65-70% of the business.  We needed someone who understood the business to come in and pick up the work quickly.  Prior to posting a job, I determine the band level based on what I think the scope of the work is in the current state and what I think the scope will be in the future.  I also look at the work structure of my team, including each employee's band level, and figure out what our needs are.  For example, when we hired the Retail Concepts Director, we knew that position would not have a team at the time of hiring, but we wanted a candidate that had leadership skills because we knew we would build out a team of direct reports into that role eventually.

      14.     I do not consider gender in any employment decisions I make at Nike.  The only time gender comes into play is when we are seeking to have a diverse pool of candidates for a particular position.  We want to make sure we have representation across multiple demographics.  It starts with having diverse representation in our candidate pool, and in the end, the best candidate receives the position.  I do not feel like my gender has ever impacted my pay, performance ratings, or promotional opportunities at Nike, and I do not think I have been treated any differently by my managers because of my gender.

Page 5  -  DECLARATION OF  MAGGIE BAIRD

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/22/2022_____, at ____Portland, OR_____.
                     Date                          City, State

DocuSigned by:

AE57ADE5565847E...

Maggie Baird

Page 6  -  DECLARATION OF  MAGGIE BAIRD

# Exhibit A

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:                    Maggie Baird

Interviewer Name:                Alyssa Tapper

Interviewer Signature:    */s/ Alyssa K. Tapper*    Date: 2/17/2022

## DECLARATION OF JESS BOND

I, Jess Bond, declare and state as follows:

1.       I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.       I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.       I graduated from the University of Puget Sound in 2006 with a BA in Sociology. Prior to working at Nike, I was a stylist and photo producer at Hassler Studio Inc. from July 2007 to February 2011.  From July 2011 to February 2013, I was a program manager for Jager Di Paola Kemp Design.  Subsequently, I worked as an account manager at Industry from November 2012 to February 2014, and as a brand marketing and content manager from February 2014 to January 2015.  Even though I had the term "manager" in my titles, I did not have any direct reports in any of my roles before joining Nike.  While I worked at Hassler Studio Inc. and Industry, Nike was one of our clients.

4.       I was hired as a full-time Nike employee in June 2016, as a Brand Creative Studio Manager.  I did not have any competing offers from other companies at the time I was hired.  I learned of this role when a Nike employee reached out to me about this specific role through LinkedIn.  I was interested because, at the time, I was seeking opportunities to work at a major

Davis Decl. Exhibit 3, Page 1 to 7

brand that paid competitively, and I loved sports and athletics. The role was described to me as a creative operational counterpart to the creative studio team, and I would be responsible for project and account management and supporting the creative studio team generally. I worked for a short time in this role on a temporary basis, and when the position was converted to a full-time role, the job was posted, and I formally applied for the role. At that time, I underwent three interviews: one with the manager to whom I would "dotted line" report as well as the direct hiring manager; one with just the manager to whom I would "dotted line" report; and one with the manager to whom I would "dotted line" report as well as a creative team of four individuals. The manager to whom I would "dotted line" report offered me the job.

5.      In April 2018, I was promoted to Studio Director, Style Guide. I did not apply or interview for this role; rather, my initial role expanded to account for additional responsibilities for the position, including the fact that it had global visibility. My understanding is that my hiring manager decided to offer me this promotion. In this role, my responsibilities included managing the orchestration of a quarterly large-scale photoshoot production, which took place in a different city each quarter. During my time in this role, I also assisted in building a project management tool system that is now widely used by studio management at Nike. Based on my work and observations of other employees, I understand that there were other Studio Directors with less responsibility and a smaller scope than I held in my role.

6.      In June 2020, I lateralled to my current position as Global Production Director. Again, I did not apply or interview for this role. Instead, a reorganization took place, causing my previous role to shift into this one. I currently "solid line" report to Suzanne Donaldson, who is the Senior Production Director of Global Brand Creative Productions, and I also "dotted line" report to Gil Bank.

Page 2  -  DECLARATION OF JESS BOND

DocuSign Envelope ID: 8DA5DEA5-DDBA-482A-87B1-513D88393FF

7.      Since my original hire, I have never applied for a promotion or other position at Nike.

8.      I am one of several production directors who oversee Global Brand Creative Productions, which is a function of Global Brand Marketing. Each of us oversees different studios; basically, every time there is a photo shoot, one of our teams is there to support the shoot. My current job responsibilities include recruiting workers for our team, managing production, overseeing contracts with talent and production, managing team finances and internal metadata, ensuring compliance with Covid-19 policies, engaging in creative work, and overseeing post-production operations. My projects are extremely complex and nuanced; since I work for a global brand, a myriad of stakeholders must be aligned from the beginning of a project to the end of a project.

9.      Even though there are other production directors who work within my organization, we do not necessarily have the same responsibilities. For example, one of the production directors is based in Los Angeles, and she manages studio photography work while I engage in high-level creative work. For us to perform one another's roles, we would both require additional specialist training.

10.      As Brand Creative Studio Manager, I supervised one full-time employee. I now supervise five full-time employees ranging from the "L Band" to the "U Band." Some of these employees are at the manager level, but none of them have direct reports of their own. I supervise multiple Production Coordinators, but while they may have the same job titles and job descriptions, in reality, they often have different responsibilities. That is just the reality of the type of creative work we do. For example, some of them mainly support producers, while other Production

Page 3   -   DECLARATION OF JESS BOND

Coordinators manage smaller productions themselves from end to end. Supporting other producers vs. managing productions on your own are very different jobs.

11.    I have made decisions regarding my employees' pay during the annual pay and performance review cycle. Since 2019, my manager generally has held a meeting with all directors in our organization, during which we discuss what percentage increase each employee should receive. Thus, we align first as an organization regarding pay increases before we then individually input our recommended pay increases into the system. We are allotted a strict budget, so we need to first be aligned regarding how much we can increase each employee's pay. Before 2019, I just made pay decisions on my own and did not meet with the other directors or managers before making these decisions.

12.    In making pay decisions, I consider factors such as work performance, peer feedback, and roles and responsibilities. For example, some even though two employees may have the same title, one may have more substantial responsibilities than the other, and I would consider this when making pay decisions. Nike provides literature regarding how to assess employees' work performances, but I do not heavily rely on this because I feel that it does not provide very clear guidelines. So I make my own determination of each employee's performance.

13.    All of my roles at Nike have been at World Headquarters in Beaverton, Oregon.

14.    I have never considered gender in any of the employment decisions I have been involved with at Nike. Nor do I believe that any of my managers at Nike have treated me differently because of my gender.

Page 4  -  DECLARATION OF JESS BOND

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/24/2022_____, at _____Portland, OR_____.
            Date                        City, State

DocuSigned by:

*Jess Bond*

FE8906CF6898442...

Jess Bond

Page 5   -   DECLARATION OF JESS BOND

# Exhibit A

## **Introduction and Purpose of the Interview**

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

      I appreciate your time and the opportunity to speak with you today.

      I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:      Jess Bond

Interviewer Name:      Maggie Hall

Interviewer Signature:      */s/ Maggie Hall*      Date:  February 17, 2022

## DECLARATION OF REBECCA EDINGTON

I, Rebecca Edington, declare and state as follows:

1.       I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.       I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.       My current role at Nike is Vice President of Footwear Technical Development.  My responsibilities are to manage my team, which is responsible for the engineering and development of all footwear, and acting as product managers and technical experts for products slated for market in the next two years.  I manage a team of approximately 300 individuals across Beaverton, Oregon; Italy; and Asia.

4.       In my current role, I have nine direct reports who "solid line" report to me.  One is General Manager of Nike Italy, who runs the Nike Italy office of about 30 employees.  Another is Senior Director of Asia Technical Development, who manages our Nike teams in Taiwan, Korea, China, Vietnam, and Indonesia.  Six others are Senior Technical Development Directors, who manage our developers and engineers associated with Nike's six different footwear dimensions.  Finally, one of my direct reports has an administrative role and manages my calendar.  All are "S Band" roles, with the exception of my administrative direct report.

Page 1     -     DECLARATION OF REBECCA EDINGTON

5.     I was promoted into my current role as Vice President from my previous role of General Manager – Nike FlyKnit in July 2021.  In my role as General Manager, I managed a team that was responsible for a specific type of footwear that had to be uniquely manufactured using a different product creation process.  In this role, I reported to Clare Hamill, who was the Vice President of Innovation Transition at the time.  I first moved into this role in March 2020.  I laterally moved into this role.

6.     As General Manager, I had five direct reports at the "E Band" level who all "solid line" reported to me.  They consisted of a Functional Director of FlyKnit Programming, a Functional Director of FlyKnit Engineering, two Category Directors of FlyKnit, and a Director of FlyKnit Operations in Vietnam.

7.     Prior to working as General Manager, I worked as Senior Director with Footwear Product Creation – Kids' Footwear from September 2017 to March 2020, and as a Senior Director – Global Footwear Supply Planning from August 2014 to September 2017.  As Senior Director of Footwear Product Creation, I had five direct reports.  They consisted of a Footwear Development Director for Kids' Performance, a Footwear Development Director for Kids' Sportswear, a Director of Kids' Product Testing, a Director of Kids' Cost Engineering, and a Director of Kids' Product Engineering.  As Senior Director of Global Footwear Supply Planning, I had six direct reports, but I do not recall what their exact titles were.

8.     In all these aforementioned positions, I have acted as a Manager +1.  That is, I supervised other people managers, with the exception of my administrative direct report.

9.     I have always worked for Nike at World Headquarters, with the exception of a year in Taiwan from 1997 to 1998, and a year in Korea between 1998 and 1999.

Page 2     -     DECLARATION OF REBECCA EDINGTON

10.     I once sought a role I did not receive at Nike, but it was for a lateral move and not a promotion.  A male employee was selected for the role instead.  My understanding is that there is currently a formal application and interview process for all "E Band" and below jobs at Nike.

11.     Lower-level managers are the ones who make decisions on base pay increases for their direct reports.  They are given a budget with defined parameters, and once their decisions are inputted into the system, I spot-check the system and make sure that we have stayed within the budget provided for my group.  I only make base pay decisions for my own direct reports.  In advance of lower-level managers making these decisions, however, I do conduct meetings with my direct reports and make sure we are all aligned philosophically on how we are approaching pay increase decisions.  Otherwise, it is completely up to managers to make these decisions for their direct reports.  Rather than reviewing and approving every single pay decision, I simply make sure that managers are adhering to the budget and guidelines provided.

12.     Similarly, lower-level managers are the ones who make PSP bonus decisions for their direct reports.  While I spot-check some of these outcomes, I do not review or approve all of them, but ensure that guidelines and budgets are adhered to.

13.     Lower-level managers are also the ones who made decisions on their direct reports' CFE ratings.  While I do run calibration sessions to review the CFE ratings for the higher-level managers in my organization to ensure we are aligned and consistent in how we are rating employees, lower-level employees are reviewed through separate calibration sessions.  I do not rate or review ratings for every single employee in my organization.  I have never encountered a situation where I have over-ridden any manager's rating for his or her direct report.

14.     For my organization, which consists of many ex-patriates, I do typically need to approve all fill strategy decisions.  My understanding is that all job openings at the "E Band" level

Page 3     -     DECLARATION OF REBECCA EDINGTON

and below need to be posted, with two exceptions.  One exception is when an individual has been displaced due to a reorganization and his or her role has been eliminated.  Another exception is when ex-patriates have contracts that are ending and they need to be re-patriated to their home country.  Since I oversee Nike employees in Asia and Italy, I often have to figure out which open roles I need to place ex-patriates in, and whether I need to post certain roles or simply fill them with ex-patriates coming back to the United States.  This is done in collaboration with my peers and Human Resources.

15.     Regarding setting starting salaries, in my experience, recruiters from Talent Acquisition and/or representatives from Human Resources will typically provide recommendations to the hiring manager based on external and internal market salary ranges, as well as other factors, and they also may engage in discussions with the hiring manager regarding the terms of a new hire offer.  Ultimately, however, this is the hiring manager's decision.  If the salary is within the range for the role, I do not get involved in or approve these decisions, unless the salaries are for my direct reports or my opinion is sought to resolve a difficult decision.

16.     Similarly, the hiring manager is typically the one who makes the final decision on hiring decisions, and I do not get involved.

17.     In my personal experience, I feel that my gender has only positively affected my promotional opportunities at Nike, and I do not believe that I have been held back or not received a role because of my gender.

Page 4     -     DECLARATION OF REBECCA EDINGTON

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/24/2022_____, at _____Beaverton, OR_____.
                        Date                                City, State

DocuSigned by:

Rebecca Edington
A0221A585C3C4C7...

Rebecca Edington

# Exhibit A

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:        Rebecca Edington

Interviewer Name:        Maggie Hall

Interviewer Signature:        */s/ Maggie Hall*                    Date:  3/11/2022

DocuSign Envelope ID: BCF1BFB0-B73D-4658-8555-2975CAE9CFA2

## DECLARATION OF RENEE HACKENMILLER-PARADIS

I, Renee Hackenmiller-Paradis, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I received my BS from the University of Washington in Cell and Molecular Biology, my MPH in Health Management and Policy from Portland State University, and my Ph.D. from the University of Chicago in Genetics.   Before I worked at Nike, I was an environmental health program director with the Oregon Environmental Council from February 2007 to July 2012.  Subsequently, I worked at the Oregon Health Authority, Public Health Division as a public health policy advisor from October 2013 to May 2015, and then as an environmental public health section manager from May 2015 to January 2016.  While working at the Oregon Health Authority, I supervised a team of about 40 individuals.

4.      I have always worked out of World Headquarters while at Nike.

5.      I was first hired by Nike as a Global Chemical Legislation & Regulation Manager, a role I held from January 2016 to October 2017.  I found out about this role because a former colleague of mine made me aware of the job posting, which stated that Nike was looking for a

Page 1    -    DECLARATION OF RENEE HACKENMILLER-PARADIS

DocuSign Envelope ID: BCF1BF80-B73D-4658-8555-2975CAE9CEA2

chemical policy expert regarding consumer products.  In this role, according to the posting, I would be evaluating and proposing impacts and helping Nike develop its position to protect its business interests in coordination with the government.  This seemed to be a good fit for me, since I had substantial work experience from both the advocacy side and the regulatory side.  Further, I had a lot of experience at the state, federal, and even international levels.  I had previously partnered with Nike in some of my previous jobs, and I admired the Nike employees I had gotten to know.  Thus, this role at Nike appealed to me.  I applied through the Nike website, and did not apply to any other Nike positions at that time.  No Nike recruiter encouraged me to apply for this opening.

6.      After participating in a phone interview with a Nike recruiter, I had a 30-minute interview with the hiring manager and then a four-person panel interview on the Nike campus.  Two months later, I was invited back for a second four-person panel interview, and I also informally met three colleagues I would be working with directly.  Ultimately, I understand that the hiring manager made the decision to offer me the role.

7.      I recall that the recruiter asked about my salary expectations at the very beginning of the hiring process, but no one asked me what my current salary was at the time.  I do not know what my starting salary was based on.  I did attempt to negotiate for a higher salary, but Nike did not meet my request.  At the time, I had no other competing offers.

8.      In my initial role as Global Chemical Legislation & Regulation Manager, I was responsible for evaluating any potential regulations which could affect Nike's business, and then assess the best course of action.  For example, I considered whether Nike should engage with lobbyists on certain topics, and mapped out strategies to respond to pending regulations.  I was also responsible for SEC-required reporting on Nike's behalf, and I worked with senior leadership on due diligence surrounding such reporting.

Page 2    -    DECLARATION OF RENEE HACKENMILLER-PARADIS

9.      In October 2017, I was promoted to the role of Senior Chemist, Chemistry Center of Excellence, which was an individual contributor role.  I learned about this role when the hiring manager, with whom I had closely worked previously, asked me whether I was applying for it.  I had not known about this job opening even though it was posted, so I met with the (male) senior director within that department, who encouraged me to apply.  After applying for and interviewing for the role, I was hired.  Along with the promotion, I received a 30 percent increase in salary, along with stock options and access to an improved bonus structure.  In this role, I was responsible for understanding Nike's chemical usage and footprint, as well as identifying and developing methodologies to reduce them.

10.      In January 2019, I made the lateral move to my current role of Director, Chemistry Center of Excellence after my predecessor took on an expatriate role in Taiwan and there was a reorganization.  I was placed into this role; I did not need to apply for or interview for this role. This transition came with an increase in salary.  I currently "solid line" report to Erica Swanson, Senior Director of Sustainable Product Operations.  I do not "dotted line" report to anyone.

11.      I have never sought a promotion I did not receive at Nike.

12.      My current responsibilities include coordinating the overall chemistry-related strategies with the appropriate teams and individuals throughout Nike.  My team is responsible for reporting on and carrying out Nike's 2025 sustainable chemistry targets, as well as coordinating the chemistry review process and evaluating new incoming materials for sustainability compliance criteria before introducing them into supply chains.  The scope of the projects I work on is large since it covers multiple areas including footwear, apparel, and accessories, and not only are we focused on product development, but we also work with retail and licensing teams.  Further, our projects are quite complex because our work is very technical, and since we work with many

Page 3    -    DECLARATION OF RENEE HACKENMILLER-PARADIS

people who do not have technical backgrounds, we have to act as translators of technical information. Our projects are also complex because we work with numerous external brand groups.

13.     I am the only one at Nike with my current job title; there is no other individual with the same responsibilities or duties.

14.     In my current role, I supervise two employees at the "U Band" level; one is a Sustainable Project Manager, while the other is a Chemistry Manager. Both "solid line" report to me. I have never supervised other managers with direct reports of their own.

15.     I have previously made a recommendation to increase the Chemistry Manager's base pay during an annual pay and performance review cycle under the newer Core Pay system. Factors I considered included the organization's retention needs, where the Chemistry Manager fell in the competitive pay range, his responsibilities and duties and whether they had been increased, his work performance, and whether he met his goals. I did rely on Nike's Leadership Defined framework as well as Nike's competitive pay ranges to a certain extent, but I relied on the aforementioned factors just as much, if not more. At the time, I perceived that this employee brought a very specific skillset that was needed, and thus I wanted to place him higher in his pay range. My recommendation was adopted.

16.     I have also made decisions regarding PSP bonus awards. I understand that Nike previously had a "Performance Modifier" that managers could apply to their employees' PSP awards to increase or decrease the amount of the PSP award. In making these bonus decisions, I considered factors such as work performance, CFE ratings, overall contributions to specific departmental goals, and overall contributions to Nike goals. However, work performance is the most important factor to me. I do not recall referring to any criteria or guidelines in making PSP

Page 4     -     DECLARATION OF RENEE HACKENMILLER-PARADIS

bonus award decisions.  I do not recall any instance in which my PSP decisions were changed or rejected.

17.     My understanding is that since 2019, Nike has set the Performance Modifier for all employees to 100 percent.  This makes it easier for employees to receive higher bonuses, though this does not change how I make bonus decisions.

18.     For the employees I supervise, I have decided their CFE ratings as well.  Factors I consider include performance throughout the year, attainment of goals or accomplishments laid out in their CFEs, any work they did above and beyond their prescribed duties, additional challenges they have been able to overcome or work with, and peer feedback.  I try my best to take a holistic view of the employees.  While I refer to the high-level guidance provided by Nike in the form of worksheets from HR and Nike's Leadership Defined framework, they do not really impact my decision-making.  Rather, I focus on the aforementioned factors.  My understanding is that my CFE rating decisions do not need to be approved by anyone.  I do not recall any instance in which my CFE ratings were changed or rejected, nor have I ever needed to follow a forced ratings or distribution curve.

19.     I have never been involved in making decisions about "fill strategy" for positions at Nike.  My experience is that all jobs in our department have always been posted.

20.     I have partnered with Talent Acquisition to create a requisition for a role; in fact, I did so just six months ago.  After I put together the job description for the role, I reviewed with Talent Acquisition to see whether changes needed to be made.  However, Talent Acquisition did not change the words themselves, but rather reorganized the information to fit a standard format.  Subsequently, Talent Acquisition recruited external and internal candidates and conducted an initial screening.  Then they passed me the resumes that passed their initial screening, which I then

Page 5    -    DECLARATION OF RENEE HACKENMILLER-PARADIS

Davis Decl. Exhibit 5, Page 5 of 9

reviewed and narrowed down.  After Talent Acquisition conducted initial interviews, we selected a few to invite for individual interviews.  I assigned Leadership Defined questions to interviewers to consistently ask each candidate.  Once all interviewers had assigned ratings to candidates, we gathered to debrief, and submitted the results to the recruiting team.

21.    The Level for a requisition is determined before it is posted.  My understanding is that to even get a role opened, the pay range has to be set ahead of time as part of the budgeting process.

22.    I was recently involved in an external hire, and I was involved in setting the starting pay.  Factors I considered about what starting pay to offer included a combination of what the internal pay scale currently is and what the competitive pay range is externally for the role, whether technical skillsets are required, years of relevant experience of the candidate, where the candidate is in his or her career, and whether and how long the candidate previously worked with Nike as a contractor (if applicable).  Factors can vary based on the role itself; for example, in some roles, technical skillsets can be very important in some subject-matter expert roles, while in more generic roles, education may not mean as much.

23.    It is possible for employees at the same job and level to make different amounts of compensation.  Even at the same level, there can be quite a bit of variability regarding the complexity of roles and what subject-matter expertise is required.

24.    I do not follow any written criteria or guidelines in making starting pay decisions. Rather, I engage in discussions with HR and Talent Acquisition if I wish to offer a candidate a higher salary amount than the job code range dictates.  I also consult my manager regarding starting salary decisions, since such decisions are approved by my manager.  I do not believe my manager

Page 6    -    DECLARATION OF RENEE HACKENMILLER-PARADIS

needs approval from anyone else regarding starting salary, and I have never had a starting pay decision overturned.

25.     I have never considered gender in any of the employment decisions in which I have been involved at Nike; in fact, this has never crossed my mind.  Nor do I feel that my gender has ever impacted my pay, performance ratings, or promotional opportunities at Nike.  I also do not believe that any of my managers at Nike have treated me differently because of my gender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/10/2022_____, at _____Portland, Oregon_____.
                          Date                                    City, State

DocuSigned by:

*Renee Hackenmiller-Paradis*
50EADA276D53454...

Renee Hackenmiller-Paradis

Page 7     -     DECLARATION OF RENEE HACKENMILLER-PARADIS

Davis Decl. Exhibit 5, Page 7 of 9

# Exhibit A

## **Introduction and Purpose of the Interview**

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:        Hackenmiller-Paradis, Renee

Interviewer Name:        Maggie Hall

Interviewer Signature:        */s/ Maggie Hall*                    Date:  2/28/2022

DocuSign Envelope ID: 41899258-5359-4312-82F6-7DB5AB3954F7

## DECLARATION OF JULIA HANSEN

I, Julia Hansen, declare and state as follows:

1.        I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.        I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.        I graduated with a BA in Management from the United States Air Force Academy. Subsequently, I obtained a Masters of Business for Veterans from USC.  I have also received certifications in APDP Program Management Level I and APDP Program Management Level II. Prior to working at Nike, I was a program manager at the Air Force Space Command from August 2012 to May 2016.  In that role, I supervised one to two government contractors.

4.        Since I started working at Nike in 2016, I have always worked out of World Headquarters in Oregon.

5.        In September 2016, I was hired by Nike as Senior Program Manager, which is the role I still hold.  I had moved to Portland after separating from the military, and was searching for work in the Portland area.  By reaching out to others on LinkedIn and taking advantage of veteran networks, I learned about this open position.  Specifically, a Nike employee sent me the job listing for this role and suggested that I would be a good fit.  At the time, the Nike website was undergoing

Page 1      -      DECLARATION OF JULIA HANSEN

geographical expansions, and Nike needed a Program Manager to help with such expansions. Since I was searching for a role that translated to program management, this role seemed like a great fit.  I was a temporary worker until April 2017, when I was hired into a full-time role.

6.      I do not believe anyone asked me about my prior salary or my salary expectations before I received an offer, nor did anyone communicate to me what my starting salary was based on.  I attempted to negotiate my salary amount when my role became full-time, but I was not successful.  I did not have any competing offers at the time.

7.      I have sought one promotion at Nike.  In this situation, I applied for an open position in which I was interested, but the job posting was ultimately removed because the role was merged with an employee's existing role.  I have not applied for or sought any other promotions at Nike.

8.      I currently "solid line" report to Kristina O'Farrell, who is a Program Director.  I do not "dotted line" report to anyone.  My current responsibilities include working on the international expansion project of bringing Nike's Korea website, which is currently off-platform, onto our platform.  I am also responsible for managing conversations across technical teams that are inputting developments into that project and for keeping track of their milestones to ensure smooth transitions.

9.      My responsibilities have evolved over my time in this role.  When I first started, there was only one other Project Manager working alongside me.  Over time, as we have gotten closer to launching this project and the program continues to grow, we have added five to ten other Program Managers to divide work.  Thus, today I am able to solely focus on technological development and engage in that area in a more detailed manner, whereas I used to do a bit of everything at a higher level.  I would say that the scope of my work is moderately broad, and my

Page 2    -    DECLARATION OF JULIA HANSEN

Davis Decl. Exhibit 6, Page 2 of 6

role currently involves the most complex tasks on which I have ever worked, since there are many different stakeholders involved.

10.     All the Program Managers involved on the Korea project focus on different areas of work.  While I focus on technological development, my counterparts focus on other areas, such as reporting needs, retail systems development, marketing needs, digital operations tools, and backend systems.  Each of us Program Managers are deeply embedded in our respective focus areas, and thus it would be difficult for us to try to do one another's jobs.  Each area has its own context and nuances.  If needed, we could learn how to perform one another's roles, but we would need a significant period of time to catch up.

11.     I previously had one direct report, a Program Manager, who "solid line" reported to me.  However, I have never made any decisions regarding other employees' pay, PSP bonuses, or CFE ratings.  Regarding the hiring of full-time employees at Nike, I have only been involved as an interview panelist.

12.     However, I have worked with Talent Acquisition to create requisitions for temporary positions.  First, I give Talent Acquisition a copy of the job description for the role at hand and set up an initial call with them to discuss it.  Subsequently, Talent Acquisition conducts initial screening interviews and passes me the resumes of those they recommended.   From there, I review the resumes and pick the candidates I would like to proceed with panel interviews.  My understanding and experience have been that the Level for a role is determined before it is posted.

13.     I have never been involved in setting starting pay for external hires.

14.     I have never considered gender in any of the employment decisions in which I have been involved at Nike.  Moreover, my personal experience is that I do not feel gender has ever

Page 3    -    DECLARATION OF JULIA HANSEN

Davis Decl. Exhibit 6, Page 3 of 6

affected my pay, performance ratings, or promotional opportunities.  In fact, I feel that my salary

is quite competitive.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on _____, at _____.

Date                              City, State

3/23/2022

Beaverton, OR

Julia Hansen

Page 4    -    DECLARATION OF JULIA HANSEN

# Exhibit A

**Introduction and Purpose of the Interview**

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:        Julia Hansen

Interviewer Name:    Maggie Hall

Interviewer Signature:        */s/ Maggie Hall*              Date:  3/07/2022

## DECLARATION OF MICHELLE HARRIS

I, Michelle Harris, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I am currently employed by Nike as Senior Director, APLA (Asia, Pacific & Latin America) Integrated Business Planning.  I work at Nike World Headquarters (WHQ).  I have a Bachelor of Science degree in Business Administration with a minor in Computer Information Technology from University of Oregon.

4.      I began working at Nike as a Demand Planning Analyst in the U.S. market for apparel in May 2005.  Prior to working at Nike, I worked as an assistant buyer for a family owned company for six months and a division of Macy's for approximately 18 months.  I learned about the role at Nike from a relative whose contact had an open position.  I was not referred or directed to the role by a recruiter.  I applied and participated in the interview process, which included a panel interview with the hiring manager and three others.  I was interested in the Demand Planning Analyst role because of my background in managing product assortments and fulfillment of consumer demand.  The role was an L-band position.

Page 1   -   DECLARATION OF MICHELLE HARRIS

DocuSign Envelope ID: 799DEDBD-AF70-4989-A146-3CB39ED86585

5.      As a Demand Planning Analyst for the U.S. market for apparel, my responsibilities included being responsible for our specific categories (i.e., t-shirts and fleeces) within our apparel business segment.  For that segment, I assessed and projected marketplace demand.  I also managed those plans against the overall merchandising strategy and planned purchases against those strategies to ensure we delivered in full to the marketplace for the targeted timeframe.

6.      By mid-2016, I took on a new role as Senior Planning Director for the NBA at Nike. I oversaw a team that conducted the planning and purchasing for that particular part of the business. This was a lateral transition.  My previous role was working on a global program that was centered around building new processes and capabilities.  My role concluded as the program was ending.  I then transitioned to the Senior Planning Director role.  The role had not been posted, but I was interested in it because of my previous experience.

7.      The position of Senior Planning Director for the NBA was a fairly unique role. While there were other Global Senior Planning Directors at Nike, the NBA was a licensed business so it had a different business model than Nike usually operates.  That created a unique way in which we assembled a planning team.  I was the planning leader over a business segment that was responsible for all NBA apparel (both on-court and for fans).  My responsibilities were different than other Global Senior Planning Directors because I had more accountability through the delivery to the marketplace stage, but I was still within a global part of the business.

8.      In April 2018, I became a Senior Director, leading Supply and Inventory Planning within our Demand and Supply Management function for APLA.  I had been vocal with my team leader, Marc DenBoogart, about the type of experience I was looking for and I had a lot of conversations with him.  He informed me when the opportunity was available and  supported my interest in moving into this role.  I did not formally interview for the position and it was not posted.

Page 2  -  DECLARATION OF MICHELLE HARRIS

In this role, I led a team that was accountable for optimizing supply against projected demand. I led the team accountable for the overall health of the inventory for the APLA business portfolio.

9.      In Summer 2021, I became Senior Director, APLA Integrated Business Planning. This role had been previously held by a peer of mine. Working in this area had been on my career map for quite some time. I previously had a lot of conversations with my leadership about my interest. When the role became available, it was offered to me without being formally posted. I do not know if anyone else interviewed for the role.

10.      I currently report to Tatiana Mendoza, Vice President of APLA Demand and Supply Management. I also have a "dotted line" into Dave Martinez, the Global Senior Director of Integrated Business Planning. My current role combines a focus on the integration of marketplace, financials and inventory health and projections in support of a healthy marketplace. This role is accountable to ensure a business outlook and projection that maximizes opportunity and recognizes risk, so we can forecast any actions or mitigations that need to take place. I have primary responsibility for the function that leads the overall integrated business planning ecosystem. We use an engagement model that includes varying layers of leadership. I am responsible for bringing those various leaders together on a regular cadence to drive awareness, connect on meeting strategic and operational goals, and recognize business risk and opportunities. I am also involved in some projects/programs that move our function forward as we are always trying to innovate. I have only been in the role for approximately six months, but I see opportunities for growing and expanding in the role as I continue to master it.

11.      I have peers who have the same title as me but who sit in the three other geographies. I am certain that our daily lives look different because the geographies have different business and marketplace dynamics. The nature of the marketplaces in which we operate may

Page 3   -   DECLARATION OF MICHELLE HARRIS

make our jobs different as each geography has different needs, demands and partners.  If I had to switch into one of my colleagues' roles, I would have to spend time learning who the relevant players are and how best to bring them together to drive the geography's goals.

12.     In the three Senior Director roles I described above, I have managed direct reports. As Senior Planning Director for the NBA, I had two level "E-band" direct reports: Director of Demand Planning for the NBA and Director of Inventory Planning for the NBA.  Each of them had four to five direct reports of their own.

13.     As Senior Director, APLA Supply and Inventory Planning, I had three "E-band" direct reports (Director of Inventory Operations and two Directors of Inventory Planning). Between these three direct reports they had a team of approximately 40 people with multiple layers of managers.  I managed that entire team.  The two Directors of Inventory Planning have the same accountabilities, but different focuses.  One is focused on Asia Pacific and the other is focused on Latin America.  They also each have a consumer segment that they focus on.  One is focused on Men's and Jordan Brand, while the other is focused on Women's and Kids.

14.     As Senior Director, APLA Integrated Business Planning, I have two direct reports: an "E-band" Integrated Business Planning Director for APLA and a "U-band" Integrated Business Planning Manager.

15.     As a people manager, I have made recommendations relating to base pay adjustments both on and off the annual pay and performance review cycle.  Since 2019, base pay salary adjustments take into account an employee's existing salary, position in the pay range, and CFE performance.  I have also made recommendations regarding PSP bonuses, which was largely driven by an individual's performance rating.  I do not recall ever having my base pay adjustment or PSP bonus recommendation changed or rejected.

Page 4   -   DECLARATION OF MICHELLE HARRIS

16.     I also provide CFE rating recommendations.  I consider the following factors when deciding what CFE ratings to give to my employees: 1) the goals we set at the beginning of the year and the extent to which those goals changed mid-year; 2) an employee's performance against those goals; 3) feedback from peers and partners that I solicit twice a year; and 4) my personal observations.  Those general factors do not vary across employees, but the individual goals and accountabilities for each individual may be different.  Nike has a general descriptor of what behavior at each of the CFE rating levels looks like.  I have referenced that when assessing an employee to make sure my assessment of them falls within that guideline.  I do not recall ever having a CFE rating that I recommended changed or rejected.  I do not recall ever being told to force an employee into a specific CFE rating when I had a reason not to do so.

17.     I have been involved in making decisions about whether to post a job so that people can apply, or to fill it without posting.  The vast majority of the roles I have hired have been posted, but there are times when we did not post because we identified an internal resource who would be an optimal candidate.  As I recall, for all of the roles I hired that existed previously and we were bringing in a new person, the role was posted.  The only roles I have filled without posting occurred when we created a new role or there was a reorganization.  In those instances, we had a strategic conversation with leaders to determine how we consider the talent for those roles.  When the fill strategy was to post a role, I worked with Talent Acquisition to create a requisition: we obtained approval for the role itself, set the level, prepared a job description, and filtered and sourced candidates.  The level for the role was always set before being posted.  To my knowledge a role cannot be posted without a level first being assigned to it, and the level does not change after it is posted.  I have been involved in setting starting pay for an external hire but that was approximately ten to twelve years ago.

Page 5  -  DECLARATION OF MICHELLE HARRIS

18.     I understand that the Plaintiffs in this case have asserted that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  That has not been my experience at Nike.  I do not believe that my gender has impacted my pay, performance ratings or promotional opportunities during my Nike employment.  I do not believe that any of my managers at Nike have treated me differently because of my gender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on _____2/16/2022_____, at _____Beaverton, OR_____.
                          Date                                      City, State



                                                    DocuSigned by:
                                                    Michelle Harris
                                                    FCD43EAB7EAB4A5...

                                                    Michelle Harris


Page 6  -   DECLARATION OF MICHELLE HARRIS

# EXHIBIT A

## **Introduction and Purpose of the Interview**

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:          /s/      Michelle Harris

Interviewer Name:     Lindsey Jackson

Interviewer Signature:  *Lindsey Cecilia Jackson*      Date:  February 1, 2022

## DECLARATION OF CHERYL HUNTER

I, Cheryl Hunter, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I started working at Nike in May 1996 in a retail design role.  Since then, I have a held a variety of roles at Nike, and have always worked out of Nike's World Headquarters in Oregon.

4.      I joined Nike because my husband's job was relocating him nearby.  At the time, I was working at a design firm in Albuquerque, New Mexico, and the partners I worked with there had contacts at Nike to whom they referred me.  I initially joined Nike in a temporary role and then became a full-time employee within two months.  After my initial retail design role, I moved to Global Brand Design in 1999 due to a company reorganization.  My supervisor at the time, who was a woman, drove the process behind the scenes and supported me in getting a promotion to Art Director, Brand Design.

5.      Then, in 2004, an opportunity came up in Brand Design Operations and I was offered the role of Creative & Content Management Director – Global Retail.  After that, I was

Page 1      -      DECLARATION OF CHERYL HUNTER

Davis Decl. Exhibit 8, Page 1 of 8

encouraged to apply and interview for the Consumer Experience Senior Director, U.S. Retail Brand Marketing role, which I moved into in January 2008. This was the only formal interview I have had at Nike since I was first hired. I was then placed into the role Senior Director, Marketing Planning & Operations, North America in May 2009 following another reorganization. Then the leadership in Global Brand Design asked me to set up and define the role of Senior Director Global Brand Creative Operations in December 2013. After that, I transitioned to Senior Director Nike Consumer Code in May 2017 after meeting with a few people for informational discussions. Then, due to another company reorganization, in April 2021, I transitioned to my current role as Senior Director of Apparel Innovation Business Operations. Overall, in my 25+ years at Nike, I have never sought a promotion that I did not receive.

6. Beginning in approximately 1999, I have always supervised other Nike employees. All of my direct reports have been either E, U, or L-band employees. The largest group I have managed at Nike had approximately 35 employees. In my current role, I have a team of 4 in my group, however, I coordinate operationally across 10+ employees (dotted-line).

7. Employees in my groups generally do not all share the same job title/level, as they have different responsibilities. In every group I inherit, I make it a priority to focus on reviewing employee job titles and levels and ensuring people are in the right job codes. I also pay close attention to my team's base pay in three different ways: during the annual pay and performance review process, by cleaning up job codes and then requesting a corresponding pay adjustment, and through mid-year check-ins and reviews. I do not know whether other managers share this same focus.

8. Overall, in making pay increase decisions for my team, I look to a variety of factors and information, including surveys and team member feedback, how the employee has progressed

Page 2    -    DECLARATION OF CHERYL HUNTER

Davis Decl. Exhibit 8, Page 2 of 8

DocuSign Envelope ID: 401A7A2D-43F5-4032-894A-30E594FB03EE

towards his or her goals this year, and whether the employee made any notable achievements, among other factors, which I then balance with where they are in the range compared to others in similar positions.  I have always used my discretion in applying my own experience, including experience with my team, and experience as a supervisor, and weighing the various factors, in order to make pay decisions for my team.  In making such decisions, I believe it is important to look at my team holistically and consider what is fair and what is right, which I have always tried to do.

9.    In addition to the pay decisions described above, I also make decisions about the CFE ratings for the employees I supervise.  Sometimes I will discuss and debate CFE ratings with my peers, including how we rate our employees, but although others may disagree with my rating for my employee, it is ultimately my decision.  Similarly, for the employees on my team who I do not directly supervise, I am able to comment and provide feedback, but the direct supervisor always controls the rating.

10.    For the employees I have supervised, I have also made recommendations about their PSP bonus awards.  Specifically, it used to be that 50% of their bonus was fixed, while 50% was individualized based on a multiplier or performance modifier percentage, which I primarily based on their performance rating.  But there was still a little additional discretion in deciding whether to provide a slightly higher modifier percentage based on additional individualized considerations, such as experience and growth.  As for the fixed portion of the PSP bonus, that was related to our Geography's performance.  For example, if North America had a high achievement compared to their goal.  As such, half of the bonus was previously much more related to the success of the employee's particular division.  Under the current system, the focus is more on the overall success of Nike, rather than just the success of their particular division.

Page 3    -    DECLARATION OF CHERYL HUNTER

11.     In my various roles at Nike, I have also been involved in deciding whether a role we want to fill should be posted.  Because all of my groups at Nike, since my role in Retail Brand Marketing in 2008, have been operational in nature, almost every role has been posted.  I can think of one or two roles over the years that were not posted.

12.     Whenever I have the opportunity to hire for my team, I work with HR/talent acquisition throughout the recruitment process, though I am the decision maker.  Specifically, I prepare the job description, which I then provide it to HR/talent acquisition.  At that point, they may make minor recommendations, such as changing a particular word so that it draws a bigger pool of candidates.  After that, they will go ahead and post the role using the job description I prepared.

13.     I will also have the opportunity to determine the level for any new job requisitions before they are posted.  Specifically, if the role already exists and I am simply backfilling for someone who left, then I just confirm the level before it is posted.  But if it is a new role, then, based on my job description and the criteria provided for the role, there is a framework to help evaluate the proper level for the role.  For example, in general, an L-band role is more task oriented, a U-band role manages and sets strategy, while higher level U-band roles occupy more of a supervisory role.

14.     After a job is posted, HR/talent acquisition performs an initial evaluation and filters some of the applicants based on whether they meet the minimum criteria for the role.  I then take the resumes of the applicants and perform a deeper evaluation to further narrow down the candidates based on my knowledge of the specific skills needed for the role.  I am usually better able to make this assessment than HR/talent acquisition because I live this work every day.  But it is a fluid process.  For example, there may some people who on paper I think do not really fit the

Page 4    -    DECLARATION OF CHERYL HUNTER

Davis Decl. Exhibit 8, Page 4 of 8

role, but HR/talent acquisition may share additional information they learned about their experience or skills that is not captured in their resume, which may prompt me to have a screener interview with the candidate. In addition to conducting screening interviews, I am also involved in coordinating the pool of people who will interview the candidate, including asking each person to cover certain competencies, and preparing the questions that highlight the particular competencies that each will be covering in their interview.

15.     As the hiring manager, I am also involved in setting the starting pay for new hires (internal and external), although HR/talent acquisition actually communicates the offer and interfaces with the applicant for any negotiations. Specifically, before setting the starting pay to offer the candidate, I will discuss the applicable salary range for the role with HR/talent acquisition. HR/talent acquisition typically presents me with a recommendation based on the role, the candidate's experience, and what they have observed in filling other roles. There are multiple data points to consider, such that the salary decision, including how to respond to any salary negotiations, often is an iterative process with many discussions. Although I generally trust the recommendations I receive, the ultimate decision is mine. If the starting salary is within the range for the role, I do not need to obtain any approvals. If the starting salary is outside of the range or scope for the role, I will run it by my supervisor.

16.     Before 2017, a candidate's prior salary would sometimes come up in my discussions of starting pay. But I never treated prior salary as the sole input to use in setting the starting salary. Rather, it was just one of the many considerations, and my focus in setting the starting salary has always been the actual position that is being filled, the candidate's experience, and their skillset, vs just how much they may have earned at their prior job or even their salary expectations. Neither salary history nor salary expectations has been a primary factor that I

Page 5     -     DECLARATION OF CHERYL HUNTER

considered in setting the starting salary. To the contrary, in order to ensure we get the right people for the role and pay equitably, I have always tried very hard to look more holistically.

17.     During my time at Nike, I have also been involved in promotion decisions for Nike employees. The particular factors I consider in recommending someone for a promotion varies from job to job, but there is a focus on work results. This means that the person being promoted has usually already been on the path to doing the higher-level job, based on the quality of their work and overall job performance.

18.     Overall, since the early 2000s, I have not felt that my gender impacted my pay, performance ratings, or promotional opportunities during my time at Nike.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2/20/2022____, at ___Portland Oregon_____.
                       Date                          City, State

DocuSigned by:

*Cheryl Hunter*
8FB0ED235998405...

CHERYL HUNTER

Page 6      -      DECLARATION OF CHERYL HUNTER

Davis Decl. Exhibit 8, Page 6 of 8

# Exhibit A

## **Introduction and Purpose of the Interview**

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

>    I appreciate your time and the opportunity to speak with you today.

>    I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:          Cheryl Hunter

Interviewer Name:     Deisy Castro

Interviewer Signature:                                    Date:  01/28/22

## DECLARATION OF CHELSEA LEENHOUTS

I, Chelsea Leenhouts, declare and state as follows:

1.     I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.     I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.     I attended Georgia Institute of Technology, where I received a Bachelor of Science in Industrial and Systems Engineering.  Prior to joining Nike, I worked as a consultant at IMB and other consulting firms, including the consulting firm Kalypso.  I also gained experience in merchandising operations at The Home Depot.

4.     In June 2016, I started as a full-time employee at Nike as a Director for Product Creation Technology.  I had been working as a consultant at Kalypso on a project at Nike for nearly two years.  The consulting assignment was ending, and I enjoyed my experience with Nike, so I applied online for a position at Nike that was the most similar to the consulting work I was performing at the time.  The hiring manager for the role was a major stakeholder in the consulting project I was working on, so I discussed the role with her.  She encouraged me to apply for the role if I was interested.  Because I was already consulting at Nike, I knew that the level for the role was appropriate for my skillset because it matched the level of the consulting

Page 1     -     DECLARATION OF CHELSEA LEENHOUTS

Davis Decl. Exhibit 9, Page 1 of 8

work I was performing.  I applied for the role through Nike's external website and then I interviewed for the position and received a job offer.  The hiring process felt like a normal hiring process for any candidate, except I knew the people who interviewed me for the role because I worked with them previously.

5.      When I received a job offer, I told the hiring manager and recruiter that I wanted Nike to match my salary at my consulting firm.  The bonus structure was better at Nike than at my consulting firm, so I accepted the role when Nike offered me a salary that was within around $5,000 of my current role.  Nike had recently hired a male peer who was in the same role and level with the same salary.

6.      In my role as Director for Product Creation Technology, I set the roadmaps and scope breakdowns for engineering teams to partner with the business in order to implement technology solutions.  My role focused on managing the team that owned a specific feature, and I would drive the execution and technology solutions for that feature.  I started in the summer of 2016, as an independent contributor without any direct reports, but then in the fall of 2016, Nike reorganized our group so that all directors who were individual contributors on the team became people managers.  As an individual contributor, I was as an expert of the technology the team would implement.  Then I started managing people, so my role expanded to include managerial responsibilities.  I managed five direct reports, all in the U band.  Two of those direct reports managed teams; of those two, one managed employees.

7.      I applied for and received two other jobs in my time at Nike.  Both times the roles were posted both internally and externally.  Both roles were lateral moves in the E band.

8.      In 2019, I became Product Director for Connected Product Technology.  This new role was in a different organization and focused on being a solutions director across a variety of

Page 2    -    DECLARATION OF CHELSEA LEENHOUTS

Davis Decl. Exhibit 9, Page 2 of 8

teams, so the scope of the new role was larger.  In my previous role, I drove scope and requirements for the technology solutions.  In the new role, I worked in a similar platform, but the scope of the role increased.  I owned the overall value outcome and implemented technology solutions from distribution centers to stores.  I ensured that the technology requirements were aligned and at such a scale that Nike could achieve results.  I managed one direct report who was a director at the E band.  The senior director in the organization left, so I backfilled the position by leading the entire technology team.  While I was backfilling the senior director position, I was the dotted line manager for five additional employees—four directors and one U band employee.

9.      In 2021, I became Director for Global Logistics Product Management, which is my current position.  In this role, I stand up global logistics product management teams.  Now, I mentor teams and drive activation and strategic alignment.  This role is an extension of my previous function but with a larger scope.  I do not currently manage employees, but I have approval to hire someone for my team.

10.     As a hiring manager, I always choose to post roles internally and externally. Whenever I am the hiring manager for a role, the Talent Acquisition manager typically asks me whether the role should be posted internally and/or externally, but neither Talent Acquisition nor Human Resources approves the decision to post the role internally and externally.  That is my decision.

11.     I set the job level for the role before the role is posted.  As the hiring manager, I work with the organization leaders such as the Senior Director and Vice President to set the job level.

12.     Typically, the level for a role does not change once it is posted.  However, one time, I was the hiring manager for a U band role that was posted internally and externally.  An

Page 3    -    DECLARATION OF CHELSEA LEENHOUTS

Davis Decl. Exhibit 9, Page 3 of 8

DocuSign Envelope ID: 8F832A99-2CC7-47A1-B522-ABFBD6F30B9A

internal candidate applied for the role because she was looking to leave her current team.  This internal candidate's credentials far exceeded the role's requirements.  After conducting interviews for the role, I thought this internal candidate was the best fit for the position based on her experience and capabilities.  I knew that our team could leverage her skills, but I wanted to use her at a higher level, so I closed the job posting, got approval for headcount at a higher level, and reposted the job at that higher level.  I retooled the job posting to the higher E band level with a broader scope to include the responsibilities of a contractor position we had not yet hired, plus the original position.  The new, higher level role would drive better delegation with peers and work with other teams because the role would be filled by one E band level employee instead of a U band level employee plus a contractor.  The role was posted, and this internal candidate then applied for the role along with other internal and external candidates, interviewed for this role at the higher level, and then I hired her after I decided she was the best candidate for the job, even against the new applicants.  This situation is very rare and only occurred because I was able to get approval for a job posting at the higher level.

13.     There is a lot of flexibility in choosing job codes for each role and roles can differ within job codes.  For example, employees working in Business Product Management positions share the same job code as employees working in Technical Product Management roles, but the two roles are not similar.  For example, the Business Product Management role is a business facing role that requires more business skills than the Technical Product Management role.  Although both roles require product management skills, the outcomes and focus for the roles differ.  Even within the Business Product Management role, employees may be performing different work depending on whether the product manager works in the Global, Demand and Supply Management or Nike Digital organizations.  Each organization is structured differently

Page 4     -     DECLARATION OF CHELSEA LEENHOUTS

so that each product manager would have different roles and responsibilities depending on the organization.  It is difficult to determine the scope and control of each role for a product manager based on the job code alone.  For example, Demand and Supply Management has a Vice President of Product, whereas the Global organization is not centrally organized around product. Nike Digital is structured to have more clearly defined parameters around product management. Therefore, a product manager working in global would have a broader and more complex scope for the role than the Nike Digital product manager.

14.    As the hiring manager, I set starting salary when I make the job offer.  I look at the salary range provided by Talent Acquisition based on the job code and set the starting salary within the range based on the candidate's skills and experience.  I have even set starting salaries above the pay range when the candidate's previous job experience is more complex.

15.    I typically manage base pay increases for the employees I manage through the semi-annual and annual performance review cycle.  I typically increase the base salary for my direct reports based on their performance.  However, performance ratings are not always directly correlated to increases in base pay.  For example, this year I received a higher performance rating and did not receive a larger increase in base pay.  Instead, I received an off-cycle stock award to reward me for high performance.

16.    As a manager, I have discretion in setting performance ratings.  When deciding performance rating, I consider the direct report's business results and leadership defined attributes to measure soft skills.  I measure each teammate's business results by evaluating each employee against the goals I set with that person during the year to align with the broader team goals.  I also use a survey to gather feedback from peers.  I typically let the employee choose

Page 5    -    DECLARATION OF CHELSEA LEENHOUTS

Davis Decl. Exhibit 9, Page 5 of 8

which peers to provide feedback, and then I will include other stakeholders. I also ask the employee to fill out his or her own evaluation.

17.    I have adjusted base pay outside of the typical performance review cycle. One time, I was the dotted line manager for an employee who moved into a new role with a new job code. That person's compensation was not where I felt it should be relative to the pay range for the role so I adjusted his pay upward to ensure that he was what I felt was appropriate based on the salary range for the job code.

18.    I also have discretion to award stock to employees at E band or higher. I award higher stock bonuses for employees who perform outstanding work, or for retention purposes if I am concerned that the employee may leave Nike. When an employee has had an exceptional quarter, I have the ability to award that employee with off-cycle additional stock bonuses.

19.    All my positions at Nike have been at Nike World Headquarters.

20.    I have never considered gender in any of the employment decisions in which I have been involved at Nike. Further, I do not feel that my gender has ever impacted my pay, performance reviews, or promotional opportunities at Nike, and I do not feel that anyone at Nike has ever treated me differently because of my gender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/2/2022_____, at _____Portland, OR_____.
                                    Date                                              City, State

DocuSigned by:

*CHELSEA LEENHOUTS*
1446218C88964E7...

CHELSEA LEENHOUTS

Page 6    -    DECLARATION OF CHELSEA LEENHOUTS

Davis Decl. Exhibit 9, Page 6 of 8

# Exhibit A

## **Introduction and Purpose of the Interview**

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:        Chelsea Leenhouts

Interviewer Name:      Claire Saba

Interviewer Signature:    *Claire Saba*
DocuSigned by:
FC04FCA7644143C...

Date:    2/24/2022

**<u>DECLARATION OF ALYSSA LEVISON</u>**

I, Alyssa Levison, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I am currently the Director, Digital Design Operations at Nike World Headquarters (WHQ).  I have a B.A. in Communications from UC San Diego.  Prior to joining Nike, I worked as a Senior Project Manager for Elephant, which operates under the umbrella of Huge (January 2013 – August 2015), a Project Manager for AKQA (April 2011 – January 2013), a Digital Trafficker for UM Worldwide (December 2009 – April 2011), and an Office Manager for Fishtank Brand Advertising (August 2007 – November 2009).  At UM Worldwide, I worked in digital media to get digital ads to the right publishers and the websites that ran them.  At AKQA, I transitioned from working in advertising to digital product.  At Huge and Elephant, I continued to work in digital product and partnered with the design team that designed and built the website for our clients (e.g., Google and Apple).

4.      I began working at Nike WHQ as a Business Project Manager, Global Brand Marketing, Operations Management & Technology in September 2015.  This was a contractor

Page 1    -    DECLARATION OF ALYSSA LEVISON

Davis Decl. Exhibit 10, Page 1 of 8

role.  I had been looking for jobs at Nike.  Someone I knew saw a posting on LinkedIn for a contractor role in the Digital Marketing organization at Nike.  She connected me to the person who had posted the role.  I reached out to that hiring manager directly through LinkedIn.  She ultimately determined that I was not the right fit for her team, but she passed along my information to another colleague of hers who was also looking for a role.  This role, which I ended up getting, was also in Digital Marketing.  I also interviewed for another contractor Project Manager role on the Global Football Marketing team.  I was offered this role as well, but I declined it.  I really liked the people I met in the Global Brand Marketing team and it seemed like an opportunity to do something different from what I had done previously.

5.      My initial salary offer came in a bit lower than I would have liked, so I negotiated to try to get that number higher before I accepted.  I ultimately received a slight salary bump as a result.

6.      In June 2017, I made a lateral move to become a Senior Producer, Global Digital Design, Nike.com.  Through this move I also became a fulltime employee.  I learned about this role from a former colleague at one of my previous jobs who was now at Nike.  She introduced me to Nike's Digital Product Design organization.  She reached out to me to let me know about the role and ask if I was interested.  The job had separately been posted.  I submitted an application and interviewed for the role.  Upon receiving the role, my salary increased.  I spent the majority of my time on task management, such as setting up meetings, taking notes at meetings, and tracking assets.

7.      In August 2019, I received an in-role promotion to Manager, Digital Design Operations, Core Commerce.  The role was not posted.  I received the role as recognition for the work I had done as our organization grew in size and our work changed.  I also received a salary

Page 2    -    DECLARATION OF ALYSSA LEVISON

Davis Decl. Exhibit 10, Page 2 of 8

increase.  As Manager, Digital Design Operations, Core Commerce, I had three to five direct reports and a design team of 10 or 11 people.  I spent a lot of my time reacting to day-to-day issues. I had meetings with people at my working team level.  I managed L-band Producers and U-band Senior Producers.

8.      In September 2021, I was promoted to Director, Digital Design Operations.  Once again, our organization had continued to grow and, as a result, the scope of my role grew.  This created a need for the Director role that did not exist before.  My boss, Sharr Stark, Senior Director, Design Operations, recognized me for the work I had been doing and promoted me into this role. This job was not posted.  I received a promotion when I took on this role.  I have never sought a promotion at Nike that I did not receive.

9.      As Director, Digital Design Operations, I lead a small team of Producers and Senior Producers who do the day-to-day work.  I spend a significant amount of time coaching and mentoring them.  I also lead more topline operational processes and ways of working cross-functionally and within our design function.  My goal is to handle everything that it takes to work through the development life cycle (i.e., task management, requirements gathering, connecting with different stakeholders, setting up meetings, notetaking, being a strategic partner and thought partner with each member of the design team), so that the designers can focus exclusively on designing.  I also study how the design teams spend their time and try to optimize "head down" working time.  I ensure that our project tracking tool is standardized so that it provides us with data to tell us how to further improve optimization.

10.      This role is an evolution from my Manager role.  The same skillset is involved, but it is applied differently based on the team make-up and projects.  I frequently meet with Senior Directors, Directors and VPs to discuss optimization and strategy.  My role is much more proactive

Page 3      -      DECLARATION OF ALYSSA LEVISON

and strategy focused than reactive. As a manger, I did not have partner or cross-functional relationships.

11.    There are other people at Nike who have the same job title and level as I do, but their day-to-day varies because of the scope of their work and their teams. I am on a team that supports Nike.com and the Nike App; they both have a vast partner list that spans across the entire organization. Nike.com and the Nike App are our highest money-making platforms. Lots of different people across the organization have an opinion or say on these two products. By contrast, a peer of mine on the Activity team supports Nike's running and training apps, which have fewer partners and stakeholders. As a result, he can operate in a more focused manner. The nature of his work has fewer eyes on it and dollars behind it than mine does, so there may be more flexibility and freedom for him to lead and make change, whereas I need to get more buy-in before doing anything. Although we have a similar skillset, I would not be able to change roles with him overnight. It would require onboarding and an understanding of the context of his apps and team.

12.    As a people manager, I have made decisions relating to base pay increases during the annual pay and performance review cycle and other times throughout the year. When making base pay salary adjustments, I consider where an employee falls in their job's salary range, their specific performance on the job, feedback from their peers, and their CFEs. I have never had my base pay salary adjustment decision rejected.

13.    I also decide CFE ratings for my employees. I consider the following factors when making my decisions: individual performance, feedback from co-workers and leaders, and progress on their goals and individual development plan. I will circulate survey questions to people with whom the employees work to get their feedback. To my knowledge, after I decide on a CFE rating, no one needs to approve it. I cannot recall any instance in which my CFE ratings were

Page 4    -    DECLARATION OF ALYSSA LEVISON

Davis Decl. Exhibit 10, Page 4 of 8

changed or rejected.  I have participated in calibration sessions as well.  I will provide feedback on U-band employees with whom I have worked.  I may also use these sessions to advocate for someone to get a promotion.  When making a promotion recommendation, I consider the designer's performance, output and passion, how motivated they are, and how easy it is to work with them.  If I do not have any direct feedback regarding an employee, I simply listen during the calibration sessions.

14.    I have been involved in the hiring process for contractors from different teams who later joined my team as fulltime employees through a backfill.  When deciding to backfill a roll, I consult with teammates on what the team makeup and size should be and the complexity of the work for the role.  I think about skill level and experience needed to support that work and the team when making a hiring decision.  When I make a hiring decision, I am responsible for setting the new hire's starting pay.  To do this, I consult HR and Nike's salary range guidance to ensure fairness, but the ultimate decision is mine.  There also may be negotiations based on the candidate's salary expectations.   When deciding on starting salary, I consider the role, the candidate's education, and their prior relevant experience.  For example, if an incoming hire has more experience and will likely get promoted relatively quickly, they may get a higher starting salary than someone else hired for the same role who is qualified but has a lot of room for growth.  I have never had a starting salary decision rejected or overturned.

15.    I have also been involved in setting starting pay for external hires.  When making the decision on what starting pay to offer a candidate, I always start with HR's recommended salary range for the job.  I also consider the candidate's experiences and my expectations for the role.  I value applicants with a mastery of certain "soft skills" more highly than those who have a mastery of a technical skill set.  I can teach someone a technical skill; teaching someone "soft

Page 5    -    DECLARATION OF ALYSSA LEVISON

Davis Decl. Exhibit 10, Page 5 of 8

skills" is much more difficult.  I then consult with my manager regarding starting salary.  For example, one time when I wanted to give someone a higher salary within the pay range for the offer to be competitive, I let my manager know so we were on the same page, and my manager agreed.  If the starting pay is within the pay range, I do not need approval from HR.

16.    I understand that the Plaintiffs in this case have asserted that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower-level jobs compared to male colleagues.  That has not been my experience at Nike.  I do not believe that my gender has impacted my performance ratings or promotional opportunities during my Nike employment or that my managers have treated me differently because of my gender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on  _3/16/2022_____, at  ___Beaverton, OR_____.
                        Date                               City, State

DocuSigned by:

*Alyssa Levison*

9C562B4CF1D0498...

Alyssa Levison

Page 6    -    DECLARATION OF ALYSSA LEVISON

Davis Decl. Exhibit 10, Page 6 of 8

# Exhibit A

**Introduction and Purpose of the Interview**

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

      I appreciate your time and the opportunity to speak with you today.

      I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:      /s/ Alyssa Levison

Interviewer Name:    Lindsey Jackson

Interviewer Signature: *Lindsey Cecelia Jackson*    Date:  March 7, 2022

## DECLARATION OF ADRIENNE LORE

I, Adrienne Lore, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I graduated from the University of Rhode Island with a Bachelor's degree in Accounting.  Before working at Nike, I was a database manager at United Educators from May 2004 to September 2007.  From September 2007 to May 2010, I was a database administrator at PNGC Power.  I was then a database project contractor for Bonora Services, LLC from May 2010 to January 2014.  From January 2012 to September 2012, I was also a database administrator at Columbia Sportswear. I then worked as a database administrator/developer with Viewpoint Construction Software from September 2012 to May 2015.  I never supervised employees in any of my prior roles.

4.      I have always worked out of Nike's World Headquarters in Oregon since I began working at Nike.

5.      I was hired by Nike in May 2015 as a Software Engineer.  This was a temporary position until five months in, when my role was converted to a full-time role.  I found out about

Page 1    -    DECLARATION OF ADRIENNE LORE

this role when I was approached by former co-workers who were working at Nike and encouraged me to apply.  I was interested in the role because I understood that I would be doing more than just database administration and development, but would also be engaging in software design.  I recall the role being described to me as more data-centric, even though I would have the title of software engineer.  Essentially, this role called for someone with data expertise like mine to help Nike design software.  At the time, my previous employer attempted to negotiate with me to try to convince me to stay.  However, Nike was offering me more money, more interesting work, and more possibilities for upward movement.

6.      I do not recall if anyone asked me about my current salary or salary expectations during the hiring process, but I would not have answered the question if asked.  So I am confident that I did not provide any information about my prior salary or salary expectations before I was hired.

7.      Five months after I started, my role was converted to full-time.  I do not recall whether I needed to interview for the full-time role.  When I received the full-time offer, I did not negotiate because Nike was already offering me $10,000 more than what I had been receiving at my previous full-time job.  Further, because I was working within the very niche role of data-centric software engineer, it would be very difficult to determine what a "standard" salary would be for that role.

8.      I did not have any competing offers at the time I received my full-time offer.  In my initial role, I worked on a single project at a time alongside my teammates, and would participate in meetings regarding stories and codes that we were developing.

9.      In 2019, I was promoted to Lead Software Engineer.  My personal experience in transitioning to this role was very positive in that I had an incredible advocate in my manager, Ben

Page 2     -     DECLARATION OF ADRIENNE LORE

Davis Decl. Exhibit 11, Page 2 of 7

Pickett.  We would meet and discuss my career during our mid-year and end-of-year reviews, and he advocated for my promotion.  Because of his strong advocacy on my behalf, I did not have to ask for a promotion.  Nor did I need to apply for or interview for my promotion.  Further, this promotion came with an increase in salary.  In this role, I began taking on database virtualization work and working with teams outside of my department.  I began doing some coding work for certain special projects.  And I began managing products and process, the onboarding of new employees, and others' day-to-day work.

10.    These responsibilities were further expanded when, in October 2021, I was promoted to my current role of Principal Software Engineer.  Similar to before, my manager Ben Pickett advocated for this promotion on my behalf.  However, Ben never advocated in a vacuum, but always included me in such conversations, and he only advocated for me based on the development plan we had worked on together regarding my career.   Again, I did not need to apply for or interview for this promotion, and this new role also came with a pay increase.

11.    I have never sought a promotion I did not receive at Nike.  In my current role, I "solid line" report to Alex Makarov, Director of Cloud Datastores + NOSQL, and I also "dotted line" report to Alex's senior director.

12.    My current responsibilities include driving the database virtualization and "platformization" of online platform automation.  Not only do I operate as the principal software engineer for my engineering team, but I also engage in day-to-day oversight of contractors and employees early in their career.  My current role has shifted over time; at first, I was responsible for analyzing databases and giving advice to software engineers on products we were developing.  Over time, my role evolved to actually developing those products and engaging in coding work.  From there, I started getting involved in database "platformization" and virtualization.  Thus, the

Page 3     -     DECLARATION OF ADRIENNE LORE

Davis Decl. Exhibit 11, Page 3 of 7

scope of my role is very broad, and the work I am currently doing is the most complex work I have

ever dealt with in my career, as the systems themselves along with the projects I work on are all

highly complex.  Compared to my current role, the scope of my prior roles at Nike was much

narrower, as I worked on fewer products and projects back then, though those projects were still

complex.

13.    There are other Nike employees with the same title as me outside of my department,

but they typically have narrower and different responsibilities.  Many of my counterparts in other

departments typically only have to oversee one or a few products that their engineers are working

on, whereas I oversee and engage in every project and product our team produces.  Further, there

are a sizable number of products and projects I need to oversee because our department is more of

an operations team than a products team.  Thus, our team deals with many more applications than

other teams do; other teams, for example, may only produce one web application to produce

sneakers.

14.    I have not had any full-time direct reports since I started working at Nike.  Thus, I

have not made any decisions on increases to others' base pay or bonuses.

15.    I have never been involved in making decisions about "fill strategy" at Nike, nor

have I ever been involved in setting starting pay for external hires at Nike.  However, I have been

involved in the hiring process for certain roles by participating in interviews.

16.    In the employment decisions I have been involved in at Nike, I have never

considered gender.  Instead, I focus on what the candidates' skillsets are and whether they would

be a good fit for the role.  Nor do I feel that my gender has impacted my pay, performance ratings,

or promotional opportunities.  In my personal experience, my former manager Ben was such an

excellent advocate who not only advocated for me to get promoted, but also made sure that my

Page 4    -    DECLARATION OF ADRIENNE LORE

Davis Decl. Exhibit 11, Page 4 of 7

DocuSign Envelope ID: A5186214-4B39-4EF5-BC68-01184FB8C78E

pay matched my titles.  My current manager also has had a very positive impact on my career.

Specifically, he highly praises my work and assigns me many work assignments, lending to better

job security and opportunities.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on _____3/24/2022_____, at _____Portland, OR_____.
                          Date                          City, State

_____

Adrienne Lore

# Exhibit A

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

      I appreciate your time and the opportunity to speak with you today.

      I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:      Adrienne Lore

Interviewer Name:      Maggie Hall

Interviewer Signature:      */s/ Maggie Hall*      Date:  February 25, 2022

# DECLARATION OF KIMBERLY LOUDER

I, Kimberly Louder, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I attended the University of Pennsylvania, where I received a B.A. in Art History. After college, my first corporate job was at Abercrombie & Fitch ("A&F"), where I was hired in 2006 as an assistant merchant.  Over the next four years, I held several other positions at A&F, including associate merchant, merchant and senior merchant for the company's various brands. All of these roles were in A&F's product merchandising function.  When I started at A&F, my job duties included approving trends in fabric quality, working with various teams to create the right fit for our customers, negotiating costs with vendors, and writing commitments to factories. The scope of my role increased over time, and towards the end of my employment at A&F, I was responsible for setting product strategies (*i.e.*, deciding what products we wanted and when) and making those a reality.  I also had management responsibilities—in my second role at A&F, I supervised one other employee, and by the time I left I was supervising eight or nine other employees who worked on two different brands.

Davis Decl. Exhibit 12, Page 1 of 10

DocuSign Envelope ID: 5C9F1078-5B33-446D-A95F-D990D1C6941F

4.      I started working at Nike in 2010 as a Buyer (a "U band" position) in the direct retail group.  Since then, I have a held a variety of roles at Nike, but have always been based at Nike World Headquarters.

5.      I first became interested in working at Nike in 2008 or 2009.  A friend with whom my husband and I had worked at A&F had recently moved to Nike, and she encouraged both of us to consider positions at Nike.  She introduced my husband (who was my boyfriend at the time) to a recruiter, and he was hired in 2009.  When I decided I was ready to leave A&F, my husband introduced me to the recruiter he used, and that person connected me with a different Nike recruiter because I was interested in different types of roles than my husband.  I worked with the recruiter for about a year—this was during the recession, when the market was not great and it was hard to find a job.  The recruiter and I grew to know each other well, and she recognized that I gravitated towards vertical retail within Nike and was more business-oriented than aesthetics-oriented.  When she suggested that I apply for a Buyer role in Nike's direct retail business, I feel that she was setting me up for success—not only was I thrilled about working for the brand, but I understood what the role was and thought it was the right move for my career.  I would not have been as interested in a role in wholesale buying for multiple brands.

6.      After applying for the Buyer role, I interviewed with a three-person panel that included the hiring manager.  The interview process validated my belief that Nike was a company where I could build a long-term career.  After the hiring manager offered me the job, I asked for a higher starting salary, which she approved.  Nobody at Nike asked me about my prior salary or salary expectations before making the offer.  I did not have competing offers from other companies.

Page 2      -      DECLARATION OF KIMBERLY LOUDER

7.      About a year after I was hired, I was promoted from Buyer to Senior Buyer (a "U band" position) in Nike Basketball and Jordan Brand.  The Senior Buyer role had just been created to distinguish between buyers with different levels of responsibility, and my manager, Mary Beth Laughton, decided to promote me into the role.  I did not apply or interview for the promotion.

8.      About a year later, I was promoted from Senior Buyer to Buying Director (an "E band" position) in Nike Basketball and Jordan Brand.  The Buying Director position was also new.  I did not apply or interview for the promotion.  Instead, my manager explained that he was elevating me into the new position.

9.      The following year, I was promoted to Category Business Director (an "E band" position) by Cathy Sparks, who at the time was the VP/GM of North America Retail Stores and was my manager's manager.  I did not apply or interview for the promotion.  As a Buying Director, I had reported to a Category Business Director who oversaw over my category.  After this promotion, I became responsible for overseeing the category, and Buyers in the category reported to me.  My peers (who oversaw other categories) and I reported to Cathy.

10.     In early 2016, I was promoted to Senior Category Business Director (an "S band" position) for the North America direct-to-consumer Young Athletes category.  I did not apply or interview for this position.  Instead, it came about through a conversation I had with Rick Hoalst, the GM/Vice President of Digital, who became my manager through the promotion.  Compared to my previous role as Category Business Director, I was responsible for a more complex business category with bigger scope, I was accountable for more revenue, I had more visibility to Nike senior leadership, and the number of employees I managed nearly doubled, from five or six to about ten.

Page 3    -    DECLARATION OF KIMBERLY LOUDER

Davis Decl. Exhibit 12, Page 3 of 10

11.      In 2017, I was offered a "de-banded" role as Global Digital Merchandising Director for Men's Footwear (an "E band" position) as part of a business reorganization that eliminated the role of Senior Category Business Director.  As an alternative, I was offered a severance package.  I decided to accept the Director role because I was trying to stay focused on the big picture and my long-term career—I wanted to continue working at Nike and trusted that I could grow the career that I wanted.  My managers assured me that the new role was not a reflection of my performance or of how Nike valued my contributions, but rather about business needs in the reorganization and the limited roles that were available.  One of my peers received the same offer as me: a de-banded "E band" position or a severance package.  He had been promoted to "S band" in early 2016, around the same time as me, and he also decided to accept the de-banded position.  Unlike my previous Director-level roles, I did not supervise other employees as a Global Digital Merchandising Director.  However, I did mentor the other employees on my team.

12.      In 2019, I applied for a promotion to Senior Merchandising Director (an "S band" position) for Nike Kids, North America.  I was interested in this role for several reasons.  First, I knew it would provide opportunities to work in wholesaling as well as direct retail (my previous work focused on direct retail), which would help me understand the bigger picture of Nike's business.  I was also interested because I really value "people development" and would be responsible for leading a team, I was familiar with the market from my previous work in Nike Kids, and I had recently returned from maternity leave after having my second child.  I participated in a panel interview and the hiring manager offered me the position.

13.      In that role, I was the merchandising functional lead for the Nike Kids marketplace.  My core duties included deciding on merchandising strategies for the long-term

Page 4      -      DECLARATION OF KIMBERLY LOUDER

Davis Decl. Exhibit 12, Page 4 of 10

growth of the Kids category; overseeing revenue objectives and performance; and leading the team that drove franchise health, managed product performance, and made decisions on where our product should show up in the marketplace and how much product we should supply.  I was also responsible for influencing global teams on the products that needed to be created to serve the North America geography.  I supervised five or six direct reports.  My Senior Merchandising Director role was similar to my previous Business Director and Senior Directors role in that I was responsible for setting business objectives to achieve revenue targets.  However, the scope of the roles was different.  As a Business Director and Senior Director I had a bigger functional umbrella (I oversaw multiple functions, with merchandising still being a primary reporting line, and acted as a GM of the category I was responsible for in Nike Direct) but was responsible for less revenue.  As Senior Merchandising Director, I oversaw merchandising (*i.e.*, one function) and the geography marketplace (which amounted to $2B in revenue), which was a bigger business responsibility.  In addition, in my previous roles I was responsible for leading direct retail to deliver business results, whereas in the Senior Merchandising Director role I led the total marketplace/geography and was responsible for making decisions that facilitated delivery of results by other teams.

14.    In 2020, I was offered my current role as Senior Merchandising Director for Direct Kids and Equipment, North America (an "S band" position) as part of a business reorganization.  In this role, I manage a team that builds the assortments of products that are delivered through the Nike.com and Nike Stores channels.  I oversee the team in selecting those products, working with planning teams to make the right investments, bringing products to market.  I am also responsible for monitoring and interpreting consumer responses to products and changing or refining our strategy based on those responses.  In addition, because direct retail

Page 5    -    DECLARATION OF KIMBERLY LOUDER

leads the Kids strategy for the overall North America geography, I am responsible for influencing the products that appear throughout the marketplace, as well as ensuring marketing support for those products and alignment with partners who look at the marketplace more holistically.

15.    In the Senior Director role that I held before this one, I had ten peers and each of us owned one of 11 category offenses.  Through the last reorganization, Nike streamlined the business so that I now have two peers and each of us owns a gender or age (Men's, Women's, and Kids).  While the role is not entirely dissimilar from my previous role, the scope has changed dramatically and the expectations are much higher for me to drive the business.  My team is also much larger—I currently have 16+ direct reports, whereas I had five or six in my last Senior Director role.  My counterpart in Men's has about 13 more direct reports than I do because Men's has two additional, unique teams (Team Sports and Sneakers Neighborhood).

16.    Until her recent promotion, I reported to Cari Benson, who was also a Senior Director (an "S band" position).  In that position, Cari led me and my counterparts in Men's and Women's.  As I understand it, she was responsible for influencing organizational leaders to make sure that my peers and I had the path and opportunities to perform our work better and more efficiently.  She also decided on functional priorities to ensure they were consistent across Men's, Women's, and Kids.

17.    I make decisions on CFE ratings for the employees I supervise.  There are several factors I consider when deciding on ratings.  To me, the most important factor is an employee's performance on the projects they have signed themselves up for, engaged in, and (depending on their level) led.  I look holistically at each person's individualized efforts, because there are many aspects of business results that my employees cannot control.  For example, I have given

Page 6    -    DECLARATION OF KIMBERLY LOUDER

Davis Decl. Exhibit 12, Page 6 of 10

DocuSign Envelope ID: 5C9E1078-5B33-446D-A9FF-D980D1C6941E

Highly Successful ratings to employees who drove a concept from start to finish and executed with the quality I expect for a Highly Successful rating, even if the concept ultimately did not work out.  I also consider 360 feedback and feedback from peers who work with my employees. To a lesser extent, I also consider how long an employee has held their role and whether they are in a "learning" or "driving" phase.  I have found that most of my employees are in a learning phase when they start a new role, but others (especially lateral hires) tend to hit the ground running, meaning their contributions to the business are easily recognizable and measurable early on.  Although my manager and organizational leader must approve CFE ratings for my employees, my decisions have never been rejected or changed.  Likewise, I have never changed or rejected the CFE rating decisions of the managers who report to me.  I have never had to follow a forced ratings or distribution curve for CFE ratings.

18.      I have also been responsible for hiring and setting starting pay in my various roles at Nike.  After I choose who to hire for a role, HR typically makes a recommendation on where to set starting pay within the range for the role.  I understand that the recommendation is based on HR's knowledge of the candidate's experience, industry data, and the market where the candidate works (for instance, starting pay recommendations tend to be much higher for candidates coming from large markets like New York City, Los Angeles, and San Francisco). Although I generally trust HR's recommendation, I make the ultimate decision on starting pay. There are several factors I consider in making those decisions.  I place a lot of weight on a candidate's experience and expertise.  If a candidate has relevant certifications, that can strengthen my view of their expertise; however, I do not filter anyone based on education, and I have hired excellent employees who did not have college degrees.  I also consider "intangibles" that I observe during interviews, like leadership profile, level of professional maturity, and

Page 7    -    DECLARATION OF KIMBERLY LOUDER

Davis Decl. Exhibit 12, Page 7 of 10

DocuSign Envelope ID: 5C9E1078-5B33-446D-A95F-D980D1C6941E

ability to work well with others.  I also consider whether a candidate's position within the salary range makes sense compared to the positions of the rest of my team, which involves taking a holistic view of what the candidate brings to the table compared to other employees on the team.

19.    In 2016 or early 2017, when I was a Senior Category Business Director, I decided to hire an external candidate for a role that I had posted.  While a candidate's salary history and/or salary expectations used to be one data point that factored into a starting pay recommendation, neither salary history nor salary expectations has ever influenced my decision on a candidate's starting pay.  Instead, I consider why a candidate is the right person for the role and decide their starting salary based on that.

20.    I have never considered gender in any of my employment decisions at Nike. Further, I do not feel that my gender has ever impacted my pay, performance reviews, or promotional opportunities at Nike, and I do not feel that anyone at Nike has ever treated me differently because of my gender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2/21/2022___, at ___Portland, OR___.
                Date                            City, State



KIMBERLY LOUDER

Page 8    -    DECLARATION OF KIMBERLY LOUDER

Davis Decl. Exhibit 12, Page 8 of 10

# Exhibit A

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:             Kimberly Louder

Interviewer Name:         Anna M. Skaggs

Interviewer Signature:    */s/ Anna M. Skaggs*     Date:  February 9, 2022

## DECLARATION OF KIMBERLY MACK

I, Kimberly Mack, declare and state as follows:

1.       I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.       I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.       I attended the University of Virginia, where I received a B.A. in Sociology and African American Studies.  Before joining Nike, I worked at Abercrombie & Fitch and Ralph Lauren in merchandising in New York City.

4.       In early 2015, a recruiter called to talk to me about job possibilities at Nike.  I had previously spoken with a recruiter at Nike a few years prior to discuss product or merchandising roles at Nike.  This recruiter reached out to me again to discuss roles and whether I was willing to move to the Portland area.  I was exploring possibilities at Nike at the time, and the recruiter told me that there were a few roles he thought I would be a good candidate for.  In June 2015, some executives from Nike were in New York City so the recruiter set up time for me to meet with them.

5.       Ultimately, I applied for a director level product role in the young athletes group.  At the time I was a senior director at Ralph Lauren.  I had questions about joining Nike at what

Page 1     -     DECLARATION OF KIMBERLY MACK

DocuSign Envelope ID: 82FB6BAC-1594-440B-8C72-8DC78C65F862

seemed like a lower level, so I sought clarity on the title and level of the role for which I was interviewing. After a few discussions around the VALUES hierarchy, I felt comfortable with taking a step back in title to join Nike. Job title and level at Nike are not equivalent to the job title and level at other companies. I understood that the director level role would be appropriate even though I was a senior director at Ralph Lauren because Nike is a larger company with a larger business than Ralph Lauren. The scope of responsibility for roles is larger at Nike too. Whereas many companies have linear job titles and job progressions, Nike is a non-linear company with more complexity in the organization structure. My career progression had been very linear at other companies. At Abercrombie, I would receive a promotion but perform the same responsibilities. I would even perform the same responsibilities when I would change the product I was working on. Ralph Lauren was similar; I would receive a promotion but my job responsibilities rarely changed. There was limited variety in roles and responsibilities and growth opportunities at Abercrombie and Ralph Lauren. I wanted more dexterity for my skillset and I thought I could gain a diversity of experience at Nike. I also wanted to join Nike because I was attracted to Nike's career prospects. Nike is so large that employees can gain exposure to lots of different roles and gain lots of experiences without leaving the company. I understood that there would be merit in joining Nike at a lower level and then working towards a promotion within Nike.

      6.    I was also excited to join the young athletes group at Nike with a focus on girls. I started my career at Abercrombie working in kid's apparel so I understood how kids' love for a brand starts early. I love the idea of encouraging kids, particularly girls, to be active and was excited to work on the strategy at Nike to engage girls in sports. I also loved the Nike brand.

Page 2    -    DECLARATION OF KIMBERLY MACK

Davis Decl. Exhibit 13, Page 2 of 8

7.      I interviewed on campus in July 2015, and in August 2015 I received a job offer to join Nike.  During the interview process, I discussed salary expectations with the recruiter and the recruiter asked me about my current salary.  My job offer included a base salary that was significantly higher than my current salary at Ralph Lauren, which leads me to believe it was not based on my Ralph Lauren salary.  I then negotiated an even higher base salary than originally offered.

8.      Since joining Nike in 2015, I have held many different roles at Nike World Headquarters and managed teams based at Nike World Headquarters.  All of my job changes within Nike were part of talent planning; in other words, I did not apply for open positions.  However, I had continual conversations with my managers to identify experiences that I wanted to grow into and possible future roles.

9.      In October 2015, I started at Nike as a Global Product Director for Young Athletes.  In this role, I was resetting the foundational strategy to build the girls business within the kids portfolio.  I worked with design and other cross functional business partners to shape how Nike talks to and interacts with girls through apparel.  This role was an E band position and I managed two U band employees and an L band employee.

10.      In November 2016, I was promoted to Senior Global Product Director for Young Athletes.  This role required different strategic focus because I worked on the boys business within kids apparel.  The boys portfolio is the largest category within the kids business.  I was tasked with strategizing how to make the boys business even bigger by growing the business.  This was especially difficult because boys apparel is a more competitive market compared to girls apparel and therefore the boys athletic apparel has more marketplace saturation and has limited room to grow.  This role was an S band role and I managed one E band employee, one L

Page 3     -     DECLARATION OF KIMBERLY MACK

band employee, and two U band employees.  Some of the employees on my team had the same job title and level but performed different responsibilities and duties.  For example, product line managers performed different work based on the focus of the role.  Some product line managers worked on basketball, whereas the other product line managers worked in sportswear.  Although the product managers in basketball and sportswear both managed products, the scope of the roles differed based on the different sizes of the business and different consumers.  The roles required different business interactions and responsibilities as well.  For example, the product managers in kids basketball work with the product managers for adult basketball partners and work on signature athlete lines that engage professional basketball players.  Although the sportswear product managers work with the product managers for adult sportswear, the sportswear product managers do not work on signature athlete lines.

11.      In October 2019, I became the Global Category Apparel Leader for Men's Training.  Men's Training was the second largest apparel business at Nike at the time.  I drove the strategy for the men's training and yoga business.  This role was an S band role and I managed three E band managers (who had their own direct reports) for a total team of twelve employees.

12.      In October 2020, I was promoted to Vice President for Men's Sport Performance Apparel.  As a Vice President, I perform strategic oversight for nine Men's performance dimensions, which included fitness and yoga, plus running, basketball, global football, American football, baseball, golf, and tennis.  This role is an E7 VP role and I manage one S band manager, one E band manager, and an administrative assistant with a total organization of fifteen people.  The S band manager oversees one E band, three U band, and two L band employees.  The E band manager oversees four U band and two L band employees.

Page 4      -      DECLARATION OF KIMBERLY MACK

Davis Decl. Exhibit 13, Page 4 of 8

13.     For the employees I directly manage, I make decisions about increases to base pay.   These increases typically happen during annual pay and performance review cycles; however, there are pay adjustments that occur outside of this annual review.   For example, I received a pay adjustment in February 2019, and one of the L band employees on the boys young athlete team also received a pay adjustment.   This year, an E band employee who reports to my direct report also received a pay adjustment, a review prompted by his direct manager.

14.     During the annual pay and performance review cycles, I provide a performance rating for each of my direct reports.   I then select a base pay increase for each direct report based on their performance rating.   Each manager on my team rates and reviews each of their direct reports and selects a base pay increase accordingly.   It is the manager's responsibility to select the employee's rating and base pay increase, not mine.   If a manager cannot decide on a rating or base pay increase, that manager and I may have a conversation about ratings and pay, and I may provide input or guidance, but it ultimately is the direct manager's decision.   In fact, I rarely question a manager's perspective on their direct report's performance or pay.   I have never seen a base pay or ratings decision changed by anyone in a higher level.

15.     I trust my managers so I defer to them and support their decision on fill strategy for roles at Nike.   If a manager is struggling to make a decision, sometimes I will have a discussion with them about the fill strategy.   We will discuss how quickly the role needs to be filled and the quality of the potential applicants.   If a role needs to be filled urgently and there is a strong talent pool internally, then the hiring manager may decide to post the job only internally. For example, an L band level product manager role is a role that may be filled internally because there is a strong internal applicant pool, as Nike has a lot of qualified internal applicants.

Page 5     -     DECLARATION OF KIMBERLY MACK

Davis Decl. Exhibit 13, Page 5 of 8

16.     When my team is hiring for a new position, the level for a new role is set before the job is posted.  I have never seen the job level change for a role that was already posted.

17.     After a candidate is selected for a role, HR generally will make a recommendation on where to set the starting salary within the pay range for the role.  But it is up to the hiring manager to determine whether and how much to deviate from the recommendation in setting the starting salary.  For example, a hiring manager may increase the starting salary to make an offer more compelling for candidates, especially senior candidates, and candidates with strong relevant experience.

18.     I really like working at Nike and I want others to enjoy it too.  I have never considered gender in any of my employment decisions at Nike.  Further, I do not feel that my gender has ever impacted my pay, performance reviews, or promotional opportunities at Nike, and I do not feel that anyone at Nike has ever treated me differently because of my gender.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on _____, at _____.

DocuSigned by:

*Kimberly Mack Ireland*

9D391368D5A1413...

_____

KIMBERLY MACK

Page 6     -     DECLARATION OF KIMBERLY MACK

Davis Decl. Exhibit 13, Page 6 of 8

# Exhibit A

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:     Kimberly Mack Ireland

Interviewer Name:     Claire Saba

Interviewer Signature:     *Claire Saba*
DocuSigned by:
FC04FCA7644143C...     Date:     3/24/2022

## DECLARATION OF ALLISON NOPPER

I, Allison Nopper, declare and state as follows:

1.     I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.     I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.     I attended Oregon State University, where I received a B.A. in Psychology and a B.A. in Adult Workplace Education.  During college, I studied abroad at Dún Laoghaire Institute of Art in Dublin.  Before joining Nike, I worked for about two years as a national consultant for my college sorority, Chi Omega.  In that job, I traveled to colleges across the U.S. to conduct leadership training programs for undergraduate women and meet with university officials about the sorority's role on campus.  I also spent six or seven years as a part-time special events employee at Langdon Farms Golf Club.  The Langdon Farms job gave me income during college and supplemented my pay when I worked for Chi Omega.

4.     From October 2010 until August 2011, I worked as a contractor assigned to a Talent Acquisition Coordinator role at Nike.  I knew that I wanted to become a Nike employee, and thought that I wanted to keep working in Talent Acquisition.  However, a senior leader in Talent Acquisition said it would be wise for me to spend time in the business side to diversify

Davis Decl. Exhibit 14, Page 1 of 9

my experience before deciding whether to return to Talent Acquisition.  On his recommendation, I started networking with employees in different roles and organizations.  I narrowed my focus to Nike Golf after doing some "mini" informational interviews, and then I learned through one of those interviews that a role as a Category Information Analyst in Golf was going to be posted soon.  I was interested in applying because I grew up playing golf and because the role had opportunities for stretch assignments, where I could also learn about other parts of Nike's business.  No recruiter suggested or directed me to apply for this role.

5.      After the Category Information Analyst role was posted and I had submitted an application, I interviewed with a four- or five-person panel.  I do not remember whether anyone asked about my current salary or salary expectations.  In August 2011, Nike hired me into the Category Information Analyst role that I had applied for.  I did not have any competing offers from other companies at the time, and I do not think I tried to negotiate the offer—I was just really excited to get a full-time job at Nike.

6.      Since joining Nike in 2011, I have held several roles at Nike World Headquarters. In June 2013, I became an Associate Product Line Manager in Global Women's Training.  In March 2015, less than two years later, I became a Product Line Manager in North America, with a focus on Teen Team Athlete, and in January 2016, I became a Product Line Manager in Global Men's Running.

7.      In 2018, I learned about an open position as a Senior Product Line Manager in Global Men's Running.  After the role was officially posted, I submitted an application and then underwent a formal interview process with a three-person panel that included Eric Schindler, the hiring manager.  I understand that four other candidates were also interviewed for the position, including two other internal candidates.  I received the promotion in August 2018.

Page 2      -      DECLARATION OF ALLISON NOPPER

8.      In the Senior Product Line Manager role, I was responsible for managing production of apparel.  That included analyzing consumer demand, costing data, margin targets, and profitability, as well as "middle-management" tasks like assessing efficiencies, performing day-to-day team leadership, and managing relationships with cross-functional teams.

9.      I also began supervising other employees in that role.  The first employee that I supervised was an Associate Product Line Manager who was already in-role when I was promoted to Senior Product Line Manager.  When that employee left my team in in 2019 or 2020, I worked with Talent Acquisition to post an internal and external opening for the role.  The Associate Product Line Manager position does not require much institutional knowledge; instead, it is a gateway to the Nike apparel pipeline where employees can "get their feet wet" and learn the apparel production side of the business.  Because of that, my personal approach to the hiring process was to find candidates with a really diverse set of backgrounds, and in discussing the role with Talent Acquisition I emphasized that I wanted them to be creative in reviewing applications.  After the job was posted, Talent Acquisition sent me a lot of resumes—maybe 40—to consider.  I narrowed the list to approximately ten candidates who looked promising, and Talent Acquisition narrowed that list to five after conducting phone screening interviews.  I remember that at least four of those five candidates were internal to Nike, but they all worked in completely different functions.   All five candidates underwent panel interviews.   Each interviewer on the panel filled out a competency score sheet for each candidate, and then Talent Acquisition consolidated the feedback and held a debriefing session with the entire panel.  I considered a number of factors in scoring each candidate, including background, relevant skills, potential for growth, and the interview experience.  I also considered how each candidate could impact the team's immediate and long-term business needs.  For example, I thought about

Page 3      -      DECLARATION OF ALLISON NOPPER

Davis Decl. Exhibit 14, Page 3 of 9

whether their strengths were in art, science, or business, and which of those areas was most important to balance out my team's dynamic. During the debriefing session, I learned that the other interviewers on the panel believed a woman who I had scored second- or third-highest had significantly outpaced the other four candidates. Based on that feedback, I decided to offer that woman the position. Human Resources then recommended a salary range that was based on the woman's prior work experience and I believe I chose the highest number in that range. The pay I selected was not based on the candidate's prior salary or salary expectations. When I extended the offer, I encouraged the candidate to think about it for 24 hours before deciding whether to accept it. She did not negotiate, which did not surprise me because the offer was competitive.

10.    So far, I have not hired any other employees. The employees who currently report to me moved into their roles as part of a business reorganization.

11.    In December 2020, I moved into my current role as Global Product Director – Men's Performance Apparel, Sport. I did not go through a formal application or interview process. Instead, I was offered the role as part of a business reorganization. I report to Kimberly Mack, who is a Vice President.

12.    In my current role, I am responsible for Branded Sport, Men's Apparel, which is a portfolio of six sport dimensions (including football, global football, baseball, basketball, tennis, and golf) focused on retail apparel for everyday athletes. My role is focused on strategic visioning of the portfolio, which means developing a long-term vision for the product construct. My primary responsibilities are leading product strategy and the team of six Product Managers who report to me. One of my responsibilities is creating projects for my team (for example, I am currently developing a project to refine our fleece concept) and overseeing their execution. I am

Page 4    -    DECLARATION OF ALLISON NOPPER

also responsible for coordinating with peers who own the elite athlete side of my sport portfolio to ensure that our visions are cohesive.

13.     My work is complex, because it involves consolidating six unique sport offenses folding into one team under the umbrella of branded sport, taking into account consumer demand, production dynamics, and approaches to profitability.  Compared to my previous role as a Senior Product Line Manager, my current role is less focused on the actual execution of the product, and is broader in scope and oversight.  For example, as a Senior Product Line Manager I owned a product collection and was responsible for the insights that lead to the product briefs, as well as the execution of each style.  Now, my focus is heavily on the oversight of product lines and the development of my employees who execute and own their styles.

14.     I would estimate that there are 20-30 other Global Product Directors in my organization.  We all have the same core responsibility, which is leading teams that create apparel.  However, the scope and complexity of our roles differ based on the dynamics of the business we own—some roles are more complex, others are more straightforward.  For example, my business is men's product across multiple sports, whereas some of peers own both men's and women's product under a single sport, or own elite athlete apparel for one or more of the sports in my portfolio.  In addition, some Product Directors own a specific geography, whereas my scope is global.  While I could perform the basic job duties of another Global Product Director, I would first have to spend time learning the business dynamics, the consumer base, and the teams.

15.     Of the two employees I supervised as a Senior Product Line Manager, one left the role before the CFE process, and my best recollection is that the other was too new to rate when I supervised her.  However, I have made and submitted decisions on CFE ratings for the six employees who currently report to me.

Page 5     -     DECLARATION OF ALLISON NOPPER

16.     Factors I consider in deciding on CFE ratings include whether employees have met the annual personal and business goals that we set together.  Personal goals are subjective, while business goals are more objective and involve quantitative and qualitative metrics.  In deciding on CFE ratings, the weight that I place on achievement of business goals really depends on how much control each employee had over various business outcomes.  My reports tend to have pretty good control over things like costing and margin targets, but less control over consumer demand, because consumer demand is influenced by many factors, including the number of other Nike employees that "touch" a particular product; some products have few touches while others could have 100.  For example, although four of my current reports have the same job title, one of the four has a more complex job because it involves higher-touch, higher-impact products, and I take that into account when deciding on CFE ratings.

17.     Another factor I consider in deciding on CFE ratings is "360" feedback from cross-functional teammates.  I always send out surveys to get qualitative feedback on the employees who report to me, and I take that feedback into account when I am deciding on CFE ratings.  I have also given tons of feedback to other people managers—just this year, I estimate that I filled out 15 surveys that I received from other managers.

18.     After I decide on CFE ratings, but before I enter them in the system, I discuss the ratings with my manager because she has better line of sight into calibration across the rest of the organization.  However, I have never had to follow a forced ratings or distribution curve in deciding on CFE ratings, and my manager has never changed or rejected my decisions.

19.     I think about leadership a lot because of my role as a people manager and my Psychology degree, and I recently started reading a book about becoming a coaching leader.  In my view, CFE ratings are inherently subjective, and it is impossible to put one lens on CFE

Page 6     -     DECLARATION OF ALLISON NOPPER

ratings given to thousands of Nike employees by thousands of Nike managers. However, I also believe that CFEs are a really important part of helping employees set goals and grow, and I am not aware of any company that has removed subjectivity from performance reviews and still accomplished that.

20.    I have never considered gender in any of my employment decisions at Nike. Further, I do not feel that my gender has ever impacted my pay, performance reviews, or promotional opportunities at Nike, and I do not feel that anyone at Nike has ever treated me differently because of my gender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2/11/2022_____, at ___4:33pm_____.

DocuSigned by:

*Allison Nopper*

4D6447DC8C164AC...

ALLISON NOPPER

Page 7    -    DECLARATION OF ALLISON NOPPER

Davis Decl. Exhibit 14, Page 7 of 9

# Exhibit A

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:          Allison Nopper

Interviewer Name:      Anna M. Skaggs

Interviewer Signature:   */s/ Anna M. Skaggs*          Date:  February 1, 2022

DocuSign Envelope ID: 89CA15EC-BE09-47CD-B612-4CB64C73A7A2

# DECLARATION OF AKARI ODA

I, Akari Oda, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I started working for Nike Japan in 2004, where I worked as a Customer Service BSA for almost three years.

4.      I first heard about the Customer Service BSA role when I was working at Nike Japan as a consultant.  I was working as an ERP consultant for IBM at the time, and Nike Japan was my client.  When my IBM project at Nike Japan ended, I was "head hunted" by several hiring managers at Nike Japan.  These hiring managers approached me to see if I was interested in working for them, and presented me with several open positions.

5.      The Customer Service BSA position was offered to me by either the Head of Customer Service or the Head of Customer Operations.  The second position was offered by the Head of Supply Chain, and the third by the Head of Footwear Planning.  I was offered and interviewed with the hiring manager and their managers for the Customer Service BSA role I ended up accepting, as well as with the hiring manager and their managers for the supply chain role.

Davis Decl. Exhibit 15, Page 1 of 6

6.      I selected the Customer Service BSA role because that is where I felt I could add the most value, as it was more closely related to the type of work I was performing as a consultant, so there was more of a direct connection and a smooth transition.  I viewed this as a great opportunity to jump into the Nike business.

7.      I did not negotiate the salary they offered to me because this was a position Nike created specifically for me.  I do not recall whether Nike asked about my previous salary.

8.      My next position at Nike was as APHQ CS Business Consulting Sr. BSA, starting in 2007, and I held that role for two years.  I saw this role as a development opportunity, and I did not apply for it, it was presented to me.  This job was based at Nike WHQ in Beaverton, Oregon, it constituted a promotion, as it was an elevated role, and Nike also paid for my cost of living.

9.      My next position at Nike was as Supply Chain Innovation & Performance Sr. Manager, starting in 2009, and I held that role for a little over two-and-a-half years.  This was a jump into a manager title, it came with a promotion, and there was an increase in responsibilities for me.  It was not a role that was posted or that previously existed, rather, it was offered to me as part of an individual development plan I prepared with my manager.  There was a reorganization in 2009, and this Supply Chain Innovation team was created as a result, so this was a new role I filled.  I did not apply or interview for this promotion. I don't believe anyone else was even considered for this role.  The decision to place me in this role was made by the Head of Customer Operations at APHQ and the Head of Supply Chain at APHQ.

10.      My next position at Nike was as Digital Sport Operations Director, starting in 2012, and I held that role for two years.  I applied for this role through more of a standard application process.  The opening was shared with me by my manager at the time and the hiring manager for the role, telling me it was available and asking if I was interested.  I was interested, I applied, I

Page 2      -      DECLARATION OF AKARI ODA

was interviewed by a panel and the hiring manager, and there were other candidates applying for the job as well.  This job was a promotion from my current role as Supply Chain Innovation & Performance Sr. Manager.

11.     Next, I moved into a Digital Commerce Supply Chain Director role.  I took maternity leave in 2014, and when I returned, received a promotion this role, a position I held for approximately two years.  This was considered an elevated role and I did receive a salary increase. I viewed this as a great opportunity.

12.     My next position at Nike was as Senior Director of Category Operations – Running, starting in 2016, and I held that role for a little under two years.  This job was also considered a promotion.  I was placed into this job just before I went out on a second maternity leave.

13.     My next position at Nike was as Senior Director of Global Brand Demand Planning, starting in 2017, and I held that role for a little over three years.  I was placed in this role as part of a reorganization.  This was a lateral move from a talent prospective but an increase in salary.

14.     My next position at Nike was as Senior Director of NA Women's Planning, which is my current role.   I started in 2020, and I have held this role for a little over one year.  I was placed in this role as part of a reorganization.  This was a lateral move from a talent prospective but an increase in salary.

15.     I have supervised employees throughout most of my roles at Nike.  In my current role, I supervise five employees; four Senior Planners, via a solid reporting line, and one Director (who is also a Manager) via a dotted line.  In my role as Senior Director of Global Brand Demand Planning, I supervised eight employees; two Directors (who are also people managers) and six Senior Planners, all via a solid line.  In my role as Digital Commerce Supply Chain Director, I supervised two Analysts, all via a solid line.  In my role as Digital Sport Operations Director, I

Page 3    -    DECLARATION OF AKARI ODA

Davis Decl. Exhibit 15, Page 3 of 6

supervised one Analyst, via a solid line.  In my role as Customer Service BSA at Nike Japan, I supervised five Analysts, one via a solid line, and four via a dotted line.

16.    For the employees I have supervised, I had discretion as to the amount of merit pay increase to award.  In making those decisions, I would consider performance, CFE ratings, and ability to meet goals and deliverables.  I tried to look at each factor equally and I also solicited feedback from the employees' direct reports or other people they were working with.  This is called a "360 feedback process" where I would speak to their peers or other leaders they were working with.  I would determine who to speak to by getting a list of names from the employee's direct reports and I would add a few names myself to keep the process well-rounded.

17.    There are criteria or guidelines I used when making merit pay decisions that all managers use, but it is up to me how I apply them and what weight to give to each category.

18.    After I would make my merit pay decisions, my manager would approve them, but only to make sure I was working within my budget.  There is also a calibration process with my manager and her team to make sure we are all defining "successful" for our employees the same way, in order to make the CFE review process as equitable as possible.  Managers do not approve my performance decisions on a per-person basis, but we do align on criteria.  I cannot recall any instances in which my merit pay or CFE decisions were changed or rejected.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____, at _____.
2/8/2022                          Portland, OR

AKARI ODA

Page 4    -    DECLARATION OF AKARI ODA

# Exhibit A

## **Introduction and Purpose of the Interview**

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees.  They allege that they received lower compensation than male colleagues for equal or comparable work, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  There is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:  Akari Oda

Interviewer Name:  Nicole Lueddeke

Interviewer Signature:        /s/ Nicole Lueddeke              Date:  1/28/2022

## DECLARATION OF KAITLYN PEALE

I, Kaitlyn Peale, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I attended the University of Michigan, where I received a B.S. in Industrial and Operations Engineering.  Prior to joining Nike, I worked as a strategy and operations consultant at Deloitte for nearly three years.  I then received an M.B.A. from the UCLA Anderson School of Management and I returned to Deloitte for four months as a senior consultant.

4.      I grew up running and loved the Nike brand and product.  I wanted to work for Nike based on my admiration for the company so I networked with Nike employees and applied to a few positions online.  I went through the interview process and was offered one of the positions I applied for.  I did not know the hiring manager for the position I ultimately received, but I had networked with people on the team generally before I was hired.

5.      No one asked me about my current salary during the recruitment process at Nike. The hiring manager gave me an offer with a salary that I accepted.  I did not negotiate salary because I was willing to take a pay cut to join Nike.  I knew that I would take a pay cut to move

Page 1    -    DECLARATION OF KAITLYN PEALE

into an industry job from consulting.  Generally, consultants take a pay cut when they leave consulting in exchange for better hours and less stress.  I wanted to work for Nike and knew that joining the business would entail a pay cut.  I was also willing to forgo tuition reimbursement to join Nike.  Deloitte reimburses senior consultants for M.B.A. tuition for each year a senior consultant stays with Deloitte.  By leaving Deloitte after four months for a role at Nike, I left two years of tuition reimbursement on the table with my former employer.  For all of these reasons, I don't believe that my starting pay at Nike was, or could have been, based on my prior salary.

6.      I joined Nike in January 2017 as an Express Lane Operations Strategy Manager.  My role was an operations job that focused on logistics and process management through data analytics.  I supported the express lane team that focused on quicker to market replenishment opportunities.  At first, the team just focused on certain items that should be restocked faster, but later, the vision changed to identify marketplace replenishment opportunities for new products for the replenishment program, using sales data and analytics.  As my role evolved, I defined speed to market and led meetings with partners and stakeholders.  I led weekly planning and strategy across teams in the U.S., Europe, and China.  I started to work with a senior director who managed business operations for a different piece of the business, so I eventually pivoted to work for her.

7.      In February 2018, I became an Express Lane Business Operations Manager.  This role was on the same team as my first role but I had a different scope.  I now focused on product creation and in the merchandising space.  I worked with different partners and stakeholders who were associated with the product creation and global merchandising teams.  This reassignment was an informal lateral move that occurred as the team was growing and shifting reporting

Page 2    -    DECLARATION OF KAITLYN PEALE

structures. I had already pivoted to work for this senior director and then she became my manager and I received a new title.

8. In my role as an Express Lane Business Operations Manager, I focused on products that Nike makes on a shorter timeline, and relevant to specific countries and hyperlocal trends. For example, my team would make Chinese New Year related products for the Chinese market. The products were generally lifestyle products, not sport performance products. I supported strategy and operations by building data and analytics into the product creation process. I integrated speed and responsiveness into Nike product, design, and merchandising processing to allow for closer-to-market and hyperlocal decision-making and product creation. I drove processes and strategy standardization for four close-to-market creation teams located around the world and focused on creating hyperlocal, on-trend, sportswear.

9. In April 2020, I began a stretch project in Global Running Category Operations. For approximately six months, I supported both the express lane and running teams. A manager I had worked for in Express Lanes had moved to Global Category Operations and knew running was my passion. She asked if I was interested in a stretch role for six months related to running and I accepted the assignment. The business wanted to see if there was a need for a role in Global Running Category Operations so I agreed to perform the role for six months with the understanding that I would transition into the role if Nike made the role permanent. At the end of the stretch assignment, Nike instituted a large reorganization that re-categorized products so the Global Running division was dissolved. So I never officially moved into this role.

10. In my stretch role for Global Running Category Operations, I managed the cross-functional seasonal readiness process within the Nike Running category, covering product, merchandising, sales, and marketing. I ensured the team was ready to execute the season

Page 3    -    DECLARATION OF KAITLYN PEALE

Davis Decl. Exhibit 16, Page 3 of 7

effectively in the market and supported the strategy for Nike Running.  I assessed insight tools and process improvements for product, merchandising, and sales.

11.     In November 2020, I changed jobs to become the Consumer Creation Operations Director.  This was an interim position that was created temporarily as part of the larger product reorganization.   In this role, I led the seasonal readiness process by aligning product and marketing priorities and plans for the Global Kids team.  I also built new processes for the go-to-market.   I also acted as the program manager for the establishment of Nike's new global consumer insights organization and integrated consumer insights into Nike's product creation process.  In my opinion, this role required director level job skills even though I was a U band employee at the time.  I supported the new general manager for the kids business organization by ensuring continuity in the business and setting up big moments for the season by aligning brand, product and merchandising.

12.     In April 2021, I was promoted to Merchandising Operations Director for Women's Footwear, an E band role.  In this role I lead the product line planning and seasonal readiness process for the Women's footwear team.   There are five other Merchandising Operations Directors that may be considered somewhat similar roles:  Merchandising Operations Directors for Women's Apparel, Men's Apparel, Men's Footwear, Kid's Apparel, and Kid's Footwear.  Although these counterparts may be considered in similar roles, these roles differ in the level of ownership and responsibilities.   For example, I have more ownership and involvement with my teams than my peers because I lead workshops and work cross-functionally and across-gender organizations (i.e., Men's Apparel).  I also take on stretch assignments within my role to support the Vice President and am akin to a chief of staff.  My counterpart in Men's Footwear has a smaller scope for the role because the Director of Men's Footwear Product

Page 4     -     DECLARATION OF KAITLYN PEALE

Davis Decl. Exhibit 16, Page 4 of 7

Merchandising exerts more control over merchandising operations.  I have more responsibilities as the Merchandising Operations Director for Women's Footwear than the Merchandising Operations Director for Men's Footwear, even though that merchandising operations director has been at Nike longer and has more experience at the Director level.  The Kid's team also has a smaller business; therefore the Merchandising Operations Directors for Kid's Apparel and Kid's Footwear have less complex roles with less scope.

13.     All my roles at Nike have been at Nike World Headquarters.

14.     I have never considered gender in any of the employment decisions in which I have been involved at Nike.  Further, I do not feel that my gender has ever impacted my pay, performance reviews, or promotional opportunities at Nike, and I do not feel that anyone at Nike has ever treated me differently because of my gender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/25/2022_____, at _____Portland, OR_____.
                              Date                                    City, State

DocuSigned by:

*Kaitlyn Peale*
229896DCC1AD4B0...

KAITLYN PEALE

Page 5    -    DECLARATION OF KAITLYN PEALE

# Exhibit A

**<u>Introduction and Purpose of the Interview</u>**

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

      I appreciate your time and the opportunity to speak with you today.

      I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:      Kaitlyn Peale

Interviewer Name:     Claire Saba

Interviewer Signature:               Date:   2/25/2022

DocuSigned by:
*Claire Saba*
FC04FCA7644143C...

DocuSign Envelope ID: 3D727E58-98D5-421D-B584-895ED5B5946C

# DECLARATION OF CYNTHIA PEELE

I, Cynthia Peele, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I am employed by Nike, Inc. at Nike's World Headquarters in Beaverton, Oregon.  My first position with Nike was as a contractor.  In September 2016, I applied to a full time position as a Service Delivery Manager, and I was selected for the job.  Because I was working as a contractor at Nike up until that point, the people on my team suggested that I look out for any positions that opened up on the team, so that I could apply to one.  That is exactly what I did.  I did not apply to any other job at that time.

4.      As a Manager, I was responsible for the vendor relationship for the Global Resource Service Desk.  I would make sure that the vendor was hitting key performance indicators, and I would assess barriers to the vendor achieving those indicators.  My Manager role changed over time.  For example, at one point, we switched vendors.  The day-to-day grind of making sure the vendor was properly staffed shifted away from the Manager role, as the role evolved.  Now, the Manager's role is focused on optimization of Nike specific systems.

Davis Decl. Exhibit 17, Page 1 of 6

5.  In November 2021, the Director for Retail Ops Support left for another opportunity.  I then informally assumed this role and have been in the position ever since.  I did not apply to this position.  The Director role came with more duties and responsibilities.  I oversee the day-to-day operations, strategy, budgeting, and planning for Retail Ops Support, as well as work to stay connected to the larger Nike strategy.  As an example of a project I am working on right now, I am assessing the overall strategy for the Global Retail Service Desk, which includes evaluating future automations and ensuring that we are moving quickly enough. Although I have only been in the role for a short time, the responsibilities have already shifted. For example, since November 2021, there are different people reporting in to me.  I now have an entire automation team that reports to me.  With an extra group to supervise comes additional oversight duties, including ensuring that they can report on their progress and complete their tasks.  My projects can be described as short-term projects that have long-term implications.  I always need to think about the future and where we need to be.

6.  Even though my predecessor in this Director role and I both had the exact same title, the job was not the same.  For example, he was slightly more technically-oriented and had certain additional technical capabilities that I do not have.  I am more business-oriented, so I am approaching the position from an operations and business perspective.  Moreover, when he was in the position he was supervising a team for which I am not responsible.

7.  The biggest change from my Manager to my Director position is that I now will be responsible for pay decisions and employee performance reviews.  I supervise six direct reports, some of whom manage contractors.  I supervise a Lead Software Engineer, Senior Software Engineer, Service Manager for Global Retail Production Support Team, Service Delivery Manager for Field Services and the Depot, and one other Manager position, which is

Page 2    -    DECLARATION OF CYNTHIA PEELE

Davis Decl. Exhibit 17, Page 2 of 6

currently vacant because the employee is on medical leave.  Although the Managers I supervise share similar titles and are of the same band level, the focus of their work is very different.  The Manager on medical leave oversees all of the Level 1 support.  The Service Manager for Global Retail Production Support Team oversees automation.  He manages contractors that are coding and performing data analysis.  The Service Delivery Manager for Field Services and the Depot also oversees contractors, but is responsible for sending equipment, as well as replacement equipment, out to stores and supervising the vendor out on the field.  Each of these Managers spend their days very differently, and each role requires different skill sets and expertise.

8.      Although I will eventually make pay decisions for my team, I have not done so yet.  At this point, I have only conducted a mid-year review and decided the corresponding CFE ratings.   As part of this process, I talked to each employee about their career goals at Nike.  I encouraged them to look at job postings, see what interests them, and determine what skills and qualifications are needed for those roles.  Then using those descriptions, I encouraged them to shape their goals and objectives for their CFE ratings.  I then assessed what they are doing to meet those goals and objectives and whether they are also working on stretch goals to move beyond their current positions.  The goals for each individual employee may look very different.  For example, on the retail solutions support side, it is extremely important to learn more than one language, so that may be reflected in an employee's goals.  For other jobs, it may be more important to take coding classes or obtain other technical certifications.  Other jobs will require more leadership skills.  I try to take these factors into consideration when deciding CFE ratings.  I also think it is important to talk to their peers and other collaborators to get a broad view of their work.  My CFE ratings do not have to be reviewed or approved by anyone else.

Page 3      -      DECLARATION OF CYNTHIA PEELE

Davis Decl. Exhibit 17, Page 3 of 6

9.      I have also been involved in the hiring process in my roles at Nike.  No one has to approve my decision to post a job.  I am typically posting jobs that existed on my team previously, but now are vacant.  Accordingly, the band level and job title are pre-set and cannot change based on the candidate or any other factor.  I also am involved in setting starting salary.  To make this decision, I look at the candidate's experience, whether they have any certifications, and sometimes, what company they are coming from.  For example, I know that candidates from Microsoft have a lot of technical experience, so I would likely give someone from Microsoft a higher salary than someone from a smaller, less technical company.  Certifications are also very important for roles on my team because it shows whether candidates are keeping up with their technical skills.  In IT and Tech Ops, it is easy to fall behind, so it is imperative that candidates actively seek to develop and refine their skills.

10.      I do not consider gender in any of my employment decision at Nike.  I also do not feel like gender has impacted my pay, performance ratings, or promotion opportunities at Nike.  At least in my department, I think people make different amounts based on technical abilities, not gender.  I also do not feel like gender has played any role in how my managers and I have interacted throughout my time at Nike.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on _____2/15/2022_____, at _____Portland,OR_____.
                        Date                                         City, State

Cynthia Peele

Cynthia Peele


Page 4    -    DECLARATION OF CYNTHIA PEELE

# Exhibit A

DocuSign Envelope ID: 3D727E28-98D5-421D-B584-805ED5B6946C

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:             Cynthia Peele

Interviewer Name:          Alyssa Tapper

Interviewer Signature:     */s/ Alyssa K. Tapper*          Date: 2/14/2022

## DECLARATION OF KELLY RATCHUK

I, Kelly Ratchuk, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I graduated from the University of Oregon in 2012 with a BA in Business Administration and Management.  In 2016, I received my MBA from Pacific University in Business Administration and Management.  Before I worked at Nike, I worked as an administrative assistant at Moss Adams from October 2012 to February 2016.  During the time I have worked at Nike, I have always worked out of WHQ (Nike's World Headquarters).

4.      In February 2016, I was hired as a Senior Administrative Assistant with Digital Product as a temporary employee, a role I held until March 2017.  While working as Senior Administrative Assistant, I discussed potential opportunities to be hired by Nike full-time with one of the VPs I knew at Nike.  He helped me identify and apply for various open, full-time positions. I had an informal interview with a hiring manager and received an offer for a full-time position as Portfolio Coordinator with Delivery Engagement, which I held from March 2017 to April 2018. In this role, I worked closely with the marketing strategy team and led end-to-end overall process

Page 1      -      DECLARATION OF KELLY RATCHUK

improvements for the entire organization.  For example, I led a monthly roadmap review to align various teams.

5.    When the portfolio I worked on was disbanded, I made the lateral move to my next role as Program Coordinator with Member and Athlete Services, which I held from May 2018 to January 2019.  I did not need to apply for or interview for this role; instead, I was automatically placed into this new position.  As Program Coordinator, I helped lead the annual planning process to provide visibility into gaps and risks for roadmap commitments for the next fiscal year. Moreover, I managed budget across the retail organization and assisted in the alignment of timelines and priorities based on leadership's goals.

6.    While working as Program Coordinator, I had a great relationship with my manager, who was a big advocate of mine and who told me that he thought I was ready for a promotion with a pay increase.  He really advocated for me, and in January 2019, I was promoted to Program Manager with Retail Commerce and Athlete Tools.  I did not need to apply for or interview for this role.  As I understand it, the scope of my then-current role was expanded and moved to a higher level, which resulted in a promotion.  As Program Manager, I finally began to take ownership of particular projects, and I managed development timelines and was responsible for stakeholder engagement.  The main project I worked on was Nike Store Partner (NSP), during which we launched a service in Nike stores in Italy called Assist in Cloud.

7.    Next, I made the lateral move to Technical Program Manager with CaSA in June 2020 because I was looking for a new challenge.  For this role, I did have to undergo an initial screening interview, as well as interviews with three to four other individuals before I received an offer.  As Technical Program Manager, I coordinated all system access removal plans and helped with entity name changes in Brazil.  I was also responsible for the technological implementation

Page 2    -    DECLARATION OF KELLY RATCHUK

DocuSign Envelope ID: 4410145D-A7C9-4FFC-B93B-12DBB4D8F913

of Nike's website in Chile.  In November 2021, there was a reorganization within the technology department, and I was promoted to Program Director with APLA (Asia, Pacific & Latin America), which is my current role at Nike.  I currently "solid line" report to Matt Evans, who is Senior Director with APLA.

8.      In my current role, I head the connected marketplace portfolio from a program perspective.  I work on building relationships with vendors in India as well.  My day-to-day responsibilities include bringing impacted teams together to finalize design requirements, discussing solution details regarding open issues, communicating with vendors, and tracking our project plans and timelines.  The scope of our projects is quite large, and our projects are complex because we are building relationships across various teams around the globe.

9.      There are others with the same job title as me who work in completely different spaces.  For example, another Program Director with APLA manages the retail portfolio, while I manage the connected marketplace portfolio.  Each space comes with its own nuances and insider knowledge that would take some time to understand and grasp if we were to switch our roles.

10.     I have never supervised other employees or made decisions on other employees' pay.  Nor have I ever been involved in making decisions about "fill strategy" for positions at Nike. I did help interview three candidates to fill my former Technical Program Manager role that opened up once I was promoted to Program Director.  All three candidates were internal candidates, but I am unsure as to whether this role was posted externally as well as internally.  This was a "U Band" role when I had it, and it remained a "U Band" role when it was opened up for applications.  I did not consider gender when interviewing and considering these three candidates.

11.     I feel that any adversity I may have faced at Nike has had more to do with the fact that I began my career at Nike as an administrative assistant, and not so much to do with my

gender.   However, I would describe my overall experience at Nike as very positive.  I attribute this to the great relationships I have developed with my mentors.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/22/2022_____, at _____Beaverton, Oregon_____.
                              Date                                              City, State

DocuSigned by:

*Kelly Ratchuk*
1235C586B37941E...

Kelly Ratchuk

Page 4     -     DECLARATION OF KELLY RATCHUK

Davis Decl. Exhibit 18, Page 4 of 6

# Exhibit A

## __Introduction and Purpose of the Interview__

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

     I appreciate your time and the opportunity to speak with you today.

     I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:     Kelly Ratchuk

Interviewer Name:     Maggie Hall

Interviewer Signature:     */s/Maggie Hall*     Date:  February 16, 2022

DocuSign Envelope ID: 4AB9042C-4D5E-4341-B534-EG16AD7EA4F9

## DECLARATION OF TAYA SAXTON

I, Taya Saxton, declare and state as follows:

1.     I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.     I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.     I attended University of Portland Shiley School of Engineering, where I received a Bachelor of Science and Loyola Marymount University, where I received a Master of Business Administration.   Prior to joining Nike, I was in the United States Air Force and then worked as a Project Manager for Portland General Electric (PGE).

4.     During my time at PGE I connected with fellow military veterans.  One of these fellow military veterans who had left PGE sometime prior encouraged me to apply for a role at Nike.  I applied for a role in Information Technology (IT) Security even though I had limited IT Security Background from my time in the military.   Nike was growing its IT Security Department and was looking to hire bright candidates who would bring fresh perspective to the IT Security team. I applied for the role, went through the interview process, and was offered a role in the IT Security team in January 2015.

Davis Decl. Exhibit 19, Page 1 of 5

5.      I do not recall being asked for my current salary during the interview or hiring process. I recall discussing salary generally and the hiring manager was open about the salary range for the position, so I knew the salary range during the interview process. My starting salary at Nike was higher than my salary at PGE at the time. The hiring manager was also very open about the level for the position – it was set at an "E band" level. I applied for and took the role because I wanted to work at Nike. I am a runner and a fan of Nike products. I was looking to work for an exciting company with products I admired. I also believed that Nike would provide adequate work-life balance.

6.      In January 2015, I joined Nike as a Compliance Validation Manager in the IT Security Department. In February 2020, I became the Global Solutions Delivery Director. In 2021 there was a reorganization and I am now in an IT Service Management position that is still being defined. All my roles at Nike have been at Nike World Headquarters.

7.      As the Compliance Validation Manager, I helped Nike mature its information security practices and strategies. I supported efforts from implementation of the European Union's General Data Protection Regulation and Sarbanes-Oxley requirements, to developing a center of excellence for information security processes and documentation. At the time, Nike had limited internal security policies so my job was to build internal security controls.

8.      In my role as the Global Solutions Delivery Director, I was part of the team that implemented the infrastructure to use RFID chips in product tags. At the time, to fully inventory a store, Nike would need to close the store and conduct a manual inventory review. Retail inventory had an extremely low accuracy rate. By implementing IT solutions, namely incorporating RFID chips in product tags that retail employees can scan, Nike can track inventory with a very high accuracy rate in real-time. I was the Technical Operations global leader for the

Page 2    -    DECLARATION OF TAYA SAXTON

Connected Products program. In my role, I engaged leadership and stakeholders from cross functional work streams to drive seamless integration of RFID infrastructure needs through supply chain into retail rollouts.

9.      My transition from Compliance Validation Manager to Global Solutions Delivery Director was a lateral move, which I had applied for. A teammate had recommended me for the role and passed my resume to the hiring manager. I applied for the role through the internal job posting website and went through a series of interviews. Although the role was a lateral position, the scope of the role was larger than my previous role and I had greater responsibilities. For example, I worked with distribution centers, and retail stores all over the globe. The partners and stakeholders I worked with in the role were also higher-level Nike employees than my previous role.

10.     I have never considered gender in any of the employment decisions in which I have been involved at Nike.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___3/7/2022_____, at ___Lake Oswego, OR_____.
                         Date                         City, State

_____
Taya Saxton
841094247409463...

TAYA SAXTON

Page 3    -    DECLARATION OF TAYA SAXTON

Davis Decl. Exhibit 19, Page 3 of 5

# Exhibit A

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:    Taya Saxton

Interviewer Name:    Claire Saba

Interviewer Signature:    *Claire Saba*
DocuSigned by:
FC04FCA7644143C...    Date:    3/7/2022

## DECLARATION OF SHANNON SLAUGHTER- BEVERIDGE

I, Shannon Slaughter-Beveridge, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I am currently the Director of Service Excellence at Nike, which is a global role and an E-Band position.  I've been in this role for over a year, and I've worked at Nike for over 11.5 years. For the past 7 years, I've been based at Nike WHQ.

4.      I was first hired at Nike as an Assistant Head Coach of Product Presentation for a Nike retail store in Scottsdale, Arizona.  No recruiter contacted me about the role – I found it myself when I was looking at CareerBuilder and saw the posting.  At the time, I was working at Chico's as a Visual Merchandising Director, where I led product presentation and merchandising teams at the corporate level.  My job was field-based and I traveled a lot between Chicos HQ and retail stores.  When I saw the Nike job posting, it seemed like an opportunity to do those same things I'd been doing but for a higher profile brand.  The job posting also said that the role would not require travel, which would be a welcome change for me.

Page 1      -      DECLARATION OF  SHANNON SLAUGHTER-BEVERIDGE

5.      I applied for the position, and Nike flew me to Southern California to attend an interview at Fashion Island.  Nike had a black car pick me up from the airport and take me to the interview, where a recruiter, district manager, and I think some store managers attended.  After returning home, I also had several phone interviews.  I learned during the interviews that Nike was setting up more of a "brand experience" focus for retail and the role would be to assist with brand merchandising standards in a single retail location and manage day to day store business.  It wasn't the elevated role I was anticipating, but I received an offer to become Assistant Head Coach of Product Presentation (the same job I applied to).  During the interviews, I remember that someone asked about my current salary at Chico's.  The offer I received was higher than my salary at Chico's.  I still submitted a counter-offer, but it was not accepted.  I then accepted Nike's offer and became an Assistant Head Coach at the Scottsdale store.

6.      While still working at the Scottsdale store, I later applied for and became a Head Coach. There were multiple candidates for the position.  I sat through an interview panel, and I got the job. There was no discussion about salary during the interview process, but I did receive a raise with the new role, and I received another salary increase after several months in the position.

7.      I was a Head Coach in Scottsdale for 2.5 years, and because it was a new concept for Nike's retail stores, I had good opportunities to network with WHQ teams and build a lot of relationships there.  With the encouragement of Karla Gray, former VP of Global Retail Operations at Nike, someone I met while networking, I looked for different roles at WHQ.  I asked Karla's advice for what kind of roles I should be looking for and she was great about setting me up with contacts at Nike.  I would run trainings for Karla's Leadership Team during offsites in Scottsdale, and she turned into a great mentor.

Page 2     -     DECLARATION OF  SHANNON SLAUGHTER-BEVERIDGE

8.      I told Karla that I was interested in a Director role, which is an E-Band role on her team and she encouraged me to apply.  It was known within retail that it would be hard to go from a U-Band role (my current job as Head Coach) to an E-Band role within WHQ.  In advance of my interview for the E-band role, in conversations several members of the global and geo retail operations teams, I withdrew my application for the e-band role and determined my best course of action was to apply for a U-band role, prove my capabilities, and eventually seek the E-band role I desired. Richard Smith, the then Director of Measurable process on Karla's team alerted me that a Measurable Process Specialist role was available, I applied, interviewed, and was hired for that role, in or around 2015.

9.      After I was hired as a Measurable Process Specialist, my job title changed several times, including to Consumer Experience Specialist and then Athlete Tools Specialist.  Nike was experiencing a lot of changes at this time (around 2016), as things were changing from a strictly brick-and-mortar business to a more digital focus.  I then received an elevated job title as Manager of New Store Environments.  While this was an elevated position, I did not apply for it, and I did not receive a higher level of pay.  I believe at the time that Nike was trying to position the global team above the geography team, and I believe the elevation in title appropriately reflected my level of responsibility.  I was responsible for looking at the operational process innovation needed to support the evolution of Nike flagship stores globally (HOI) and managing the retail innovation intake and project management for the global and geo operations teams.

10.      In 2018, I applied and was hired for the role of Global Retail Operations Director. At the time, I was leading the operational side of the evolution of Nike retail.  The VP above me was Emma Minto, who was the VP of Global Retail Operations & Service Excellence.  I didn't report to Emma directly but she was instrumental in structuring the work I was driving and

Page 3    -    DECLARATION OF  SHANNON SLAUGHTER-BEVERIDGE

providing opportunities to work with a broad audience at Nike. Emma was really good with feedback, and I would describe this as the best development phases of my career. For example, when Nike retail doors opened in Shanghai, China, Emma gave me the opportunity to go China, present my work, and gain an audience on the China side of Nike. This was a great opportunity for me.

11.     While I was on the ground in China, and still Manager of New Store Environments, my direct manager got a promotion, and Emma asked me whether my manager's role as Global Retail Operations Director would be of interest to me. She suggested that I apply. I was definitely interested, and I applied for the position through the internal Nike job site. I was hired after undergoing a formal interview process; I know others interviewed for the position as well. They didn't discuss salary with me, but I received a significant pay bump with my job offer. My job offer came straight from Emma, and when she gave it to me, she said that I should be really proud of myself. I was.

12.     As Global Retail Operations Director, I had up to 9 direct reports in or around 2018. After some reorganization efforts that I put in place, my role narrowed in scope and the larger team grew as a result. I have received salary bumps in this role due to my strong performance reviews. Currently I am reporting directly to a VP. and serve on her direct leadership team. I am the only E-Band on the Leadership Team, everyone else is an S-band. I have been in this role for a little over the year, and mid-year and again at the time of performance reviews, I received pay increases. I also received a milestone bonus this year for work I did on the stores engagement council. I see my current role as having the potential to elevate me to a Senior Director role.

Page 4     -     DECLARATION OF  SHANNON SLAUGHTER-BEVERIDGE

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on _____2/22/2022_____, at _____Hillsboro, OR_____.

_____
SHANNON SLAUGHTER-BEVERIDGE

Page 5    -    DECLARATION OF  SHANNON SLAUGHTER-BEVERIDGE

Davis Decl. Exhibit 20, Page 5 of 7

# Exhibit A

**Introduction and Purpose of the Interview**

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name: Shannon Slaughter-Beveridge

Interviewer Name: Nicole Lueddeke

Interviewer Signature: /s/ Nicole Lueddeke                    Date: 1/24/2022

## <u>DECLARATION OF JESSICA SPENCER</u>

I, Jessica Spencer, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I attended the Fashion Institute of Design & Merchandising (FIDM), where I received an Associate's degree in Fashion Design.  My first job after graduating from FIDM was at JenJen, a boutique children's clothing company, where I worked on everything from apparel design to pattern-making to production.  My next job was at Osiris Shoes beginning in 2005.  Like JenJen, Osiris was a small company and I wore a lot of hats: I was responsible for a combination of merchandising, design, product development and product management for apparel and accessories.  After about three years at Osiris, I accepted a job as a product manager for the men's and women's woven apparel line at DC Shoes in California.  I held that role for about a year, and was responsible for sourcing, pricing negotiations, development sign-offs, and working with cross-functional teams.

4.      In 2010, I moved to Portland with my then-boyfriend, who worked at Nike.  I was unemployed at the time and actively searching for jobs at local companies.  I saw the posting for

Page 1    -    DECLARATION OF JESSICA SPENCER

my first job at Nike on an external job site.  It was an Apparel Developer role in Global

Basketball Apparel (an "L band" position), and I felt like it was the perfect opening because I

wanted to work in basketball and the role lined up well with my profile and background.  After I

applied through the external site, my boyfriend put in a word with the Nike recruiter he had

worked with and that person connected me with the Nike recruiter who was handling the role.

My first interview was a phone interview with the recruiter, and then I had a five-person panel

interview that included the hiring manager, who later offered me the job.  I do not believe

anyone at Nike asked about my prior salary or salary expectations before offering me the job.  I

recall that the salary offered to me was slightly lower than what I had made in my previous job.

However, I was fine with that and didn't negotiate because the cost of living in Oregon was

much lower than it had been in California, plus the country was still in a recession.  I did not

have any competing offers at the time.  I started the Apparel Developer role in April 2010.

5.      I have held several different roles since joining Nike, but I have always been

based at Nike World Headquarters (WHQ).

6.      In Fall of 2010, I learned that Ronnie Stewart, an Associate Product Manager on

my team, was being promoted into a newly created role on another team.  Before leaving the

team, Ronnie encouraged me to ask the hiring manager, John Naekel, about backfilling for him.

I was nervous about approaching John because I had only been in my current role for about six

months.  However, Ryan Aanderud, a Design Director in Basketball, had told me that he saw a

lot of potential in me, and that I had a lot of runway at Nike and the team supported me, which

gave me a lot of confidence.  When I asked John about applying for Ronnie's role, he

encouraged me to do so.  After the role was posted and I submitted an application, I had a panel

interview with John and maybe five other interviewers.  I felt like I did terribly in the interview,

Page 2    -    DECLARATION OF JESSICA SPENCER

Davis Decl. Exhibit 21, Page 2 of 9

but John said that working together for the past six months counted as my interview and he offered me the job.  The offer did not come with a pay raise because it was a lateral move (to another "L band" position).  However, I asked John for higher pay and he approved an increase, which put me back in line with what I had been making at my previous job in California.

7.    In 2012, after spending two years as an Associate Product Manager, I was promoted to Product Line Manager, Global Basketball Apparel, which was a "U band" position. The role was not posted and I did not interview or apply.  I remember that John wrote down my new salary on a Post-It and handed it to me, and it was something like a 50% increase.  He told me that he was personally involved in making this pay decision and that he would always ensure I was compensated appropriately; I've done the same thing since I became a people manager at Nike.

8.    By 2014, I felt ready to take on more responsibility, but wasn't sure whether I should make a lateral move or try for a promotion.  My manager at the time, Jason Miskovic, encouraged me to apply for a promotion, so I set up a networking meeting with a Product Director in Men's Sportswear.  During the meeting, she told me that a position as Senior Product Line Manager (an "E band" position) would be opening soon in Men's Sportswear and she encouraged me to apply.  I was interested in working in Sportswear because I really liked the organization's leadership, and I submitted an application when the position was posted around Christmas 2014.  Jason had left for a new role by that time, but my new manager, Chris Burke, was instrumental in helping me prepare for the interview, including coaching me on how to pitch myself.  In February 2015, I had a four-person panel interview that included the hiring manager. I was selected for the role.

Page 3    -    DECLARATION OF JESSICA SPENCER

9.      Compared to my previous role, as Senior Product Line Manager I had more accountability for strategy oversight and oversaw a larger portion of the product line.  I also contributed to resetting the Men's Sportswear business strategy, and Nike awarded me RSUs (restricted stock options) in recognition of that.  This was also the first time that I had direct reports—when I started the role, the Associate Product Manager on my team reported to me directly, and the Product Line Manager dotted-line reported to me (his direct manager was the Product Director).  About a year after I took the role, the Product Line Manager began reporting directly to me.  I also was responsible for hiring two more people (both were internal hires) as other members of the team moved on to other roles.

10.      A couple years after my promotion to Senior Product Line Manager, I felt ready to move into a new role, but following a business organization there was no headcount for the role that I wanted as Product Director for Women's Sportswear (an "E band" position).  I looked for similar roles at other companies and ended up receiving an offer from The North Face.  Around the same time, I interviewed for a role as Director of Nike's T-Shirt Center of Excellence ("TCOE").  I wasn't especially interested in that position, but the interview went really well and I had been told the position was mine if I wanted it.  While I was considering whether to take the TCOE role or accept the offer from The North Face, I learned that Nike was re-opening the role of Product Director for Women's Sportswear, and a VP told me that I had a good chance of landing this role, based on my performance in the TCOE interview, if I was interested.  I was, and I received the new role.

11.      In addition to working in a different part of the business, my new role as Product Director for Women's Sportswear had a bigger scope than my role as Senior Product Line Manager: I oversaw a team of six people, set strategy for the entire Women's Lifestyle Apparel

Page 4    -    DECLARATION OF JESSICA SPENCER

Davis Decl. Exhibit 21, Page 4 of 9

offering (whereas I previously oversaw just a portion of our Global Basketball Apparel offering), and was part of a cross-functional leadership team. I had two direct reports, both of whom were Product Line Managers. Nike hired a Product Director for Women's Training about a year after I became Product Manager for Women's Sportswear; our jobs may have looked the same on paper, but the personalities that I was responsible for managing presented unique challenges.

12. In late 2020, I was offered my current role as Global Merchandising Director for Women's Sport Lifestyle Apparel (an "E band" position) as part of a business reorganization. This was a lateral move, but my function changed and I now have a completely different set of responsibilities within the product creation process. I still have two direct reports, but they are Merchandising Managers (a "U band" position) instead of Product Line Managers. The Merchandising Managers who report to me have very different strengths, and I have assigned them different responsibilities and projects based on those strengths, as well as the competencies they each want to develop and what the team needs. One of my Merchandising Managers had experience in Nike's Global business, and when I became her manager I recognized that she was very organized, very dialed-in, and could carry a high workload; I assigned her a larger part of the business because I knew she could excel in it. I had known the other Merchandising Manager before he started reporting me, and knew that his strengths were in strategic thinking, creativity, and flexibility; based on that, I assigned him a smaller part of the business that needed more development, which also gave him bandwidth to take on special projects as they came up. The Merchandising Managers share dotted-line management responsibility for the Associate on my team (an "L band" position), which is a reporting relationship that I advocated for.

13. I have made decisions on CFE ratings for the employees who have reported to me. The CFE process has changed since I became a people manager. The examples of

Page 5    -    DECLARATION OF JESSICA SPENCER

Davis Decl. Exhibit 21, Page 5 of 9

behaviors that merited one rating versus another used to be somewhat outdated, but a few years ago Nike implemented "Leadership Defined," which has refined examples of behaviors in the categories of business, team, and self.  I spend a lot of time considering CFE ratings for my team.  One factor that I consider is peer feedback, which tells me whether each of my reports is lifting up others and being remembered for their impact, whether that is their kindness, their collaboration, or something else.  I also check in with my reports and discuss potential ratings with other people managers.  After taking those steps, I review the Leadership Defined example behaviors and decide where on the rating scale my reports place for each one.  For me, the nuance is in assessing how my employees contribute to the team culture—an employee could be performing really well, but if they have had a negative impact on the team, I tend to score them lower.

14.     I have also made decisions on base pay increases for the employees who report to me.  I do not recall the former process, but a couple of years ago Nike started a new system where increases are primarily based on CFE ratings.  I typically recommend the same pay increase for everyone who has the same CFE rating.  However, if I am constrained by budget, I tend to award slightly higher increases to employees who are situated lower in their salary range but in my view have high potential and high talent.

15.     I have never considered gender in any of my employment decisions at Nike.  Further, I do not feel that my gender has ever impacted my pay, performance reviews, or promotional opportunities at Nike, and I do not feel that anyone at Nike has ever treated me differently because of my gender.  In fact, I have always felt supported at Nike and that I have had all of the same opportunities as my male counterparts.

Page 6    -    DECLARATION OF JESSICA SPENCER

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/23/2022_____, at _____Portland OR_____.
                          Date                                         City, State

_____
JESSICA SPENCER

Page 7    -    DECLARATION OF JESSICA SPENCER

# Exhibit A

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:          Jessica Spencer

Interviewer Name:      Anna M. Skaggs

Interviewer Signature:  */s/Anna M. Skaggs*    Date:  February 18, 2022

# DECLARATION OF DIANA STALLARD

I, Diana Stallard, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I am currently employed by Nike as NA (North America) Partners GTM (Go-To Market) Ops Director.  I work at Nike World Headquarters (WHQ).  I have a Bachelor of Science degree in Forestry from Humboldt State University.

4.      I began working at Nike in an Assistant Planner temporary role from mid-2006 to June 2008.  I came to Nike from Moore Electronics, where I was a Customer Service Representative and then Planning Scheduler.  As Planning Scheduler, I managed inventory and order fulfillment.  This position prepared me for the Assistant Planner role at Nike, which was a temporary position.  I enjoyed the work I was doing as an Assistant Planner, so I was eager to pursue a full time position in this same capacity because of Nike's competitive benefits package, the culture and the people.  The Nike manager with whom I worked during this time told me that he expected a Reporting Analyst position was going to open up and he recommended that I apply for it.  I applied for the Reporting Analyst role through Nike's website.  No one from Talent

Davis Decl. Exhibit 22, Page 1 of 8

Acquisition told me which role to apply to. I actually turned down a competitive full time offer at another company while I was waiting to hear if I was selected for the Reporting Analyst role because I did not want to pass up the opportunity to become a Nike employee.

5.    Dan Sixkiller and Rich Hoalst interviewed me for the Reporting Analyst position. No one asked me about my current salary or my salary expectations before I received my offer. When I received the offer I learned what the salary would be for the position. I started in an entry level position. I do not recall my exact starting salary, but I was making at least as much, if not more, than what I had been earning as a temporary employee. While I was in the Reporting Analyst role, it transitioned from an "A-band" position to an "L-band" position. In my new role, I was responsible for point-of-sale reporting for all of Nike Digital Results. I worked with planning teams on reviewing and updating templates, and creating standard weekly reporting to show the results of our sales each week. I increased the scope of my role from managing just digital to also managing in-line stores (i.e., any store that is not just a factory store).

6.    In July 2011, I applied for and was promoted to MPT (Marketplace Transformation) Planning Analyst, a role I learned about by searching Nike's website and through talking to colleagues. In that role, I worked on various concepts with our wholesale partners. I worked directly with planners and the sales representatives in the field and reported out business metrics for the various wholesale accounts. I also built templates for Nike wholesalers so that we could learn more about their business. Through a business reorganization, my role evolved to Senior Marketing Intelligence Planning Analyst. The duties were similar, but the scope of the role increased. As Senior Marketing Intelligence Planning Analyst, I was responsible for all of North America. In my previous role, MPT Planning Analyst, I was only supporting a few wholesale

Page 2    -    DECLARATION OF DIANA STALLARD

Davis Decl. Exhibit 22, Page 2 of 8

accounts that were focused on specific concepts (i.e., House of Hoops, Dick's Sporting Goods, etc.).

7.      I then applied for a Senior Analyst role that was later elevated to a Business Intelligence Manager role.  This was a role I learned about through colleagues; I spoke to my manager about my interest in this role and I was selected.  I began working in this position in September 2013.  My responsibilities continued to increase during this time.  Across these two roles, I managed the same accounts, but the scope of my role increased.  I got to work more directly with my Director and I spent less time reporting and more time managing different parts of the business.

8.      When my boss retired, I applied for and was promoted to a Business Director role in December 2018.  This role was an "E-band."  My responsibilities in this role were more strategic.  I worked directly with the Vice President who ran the whole channel that we managed. "Channel sales" is selling through intermediaries (i.e., affiliates, distributors, or retailers).  I worked more closely with account directors on strategy, worked with other leadership teams on strategy for each of the accounts, went to account meetings, and, on behalf of our Nike wholesale accounts, I attended their sustainability conference.  I received more high level visibility with accounts, directors and leadership.  I also became a manager of one direct report.  There are other people who have similar duties, but depending on the account/channel they supported we could be doing very different things.  For example, the Footlocker Business Director was really deep into the details of the planning organization and he did a lot of work with the planning team; he only had the Footlocker account banners.  Similarly, there was a Dick's Sporting Goods Business Director who only supported that account.  I, on the other hand, managed a channel so I had nine accounts at any given time (including Kohl's, J.C. Penney's, Shoe Carnival, and Famous

Page 3      -      DECLARATION OF DIANA STALLARD

DocuSign Envelope ID: 49635837-6B77-499D-BDAA-D5C6A6685C80

Footwear).   Although I worked with the planning teams, I had other priorities with Sales Representatives, Directors, Merchants and Brand.  Within my role as Business Director, I focused on supporting the Sales Representatives and driving strategy through the account the most.

9.       I was placed into my current role, NA Partners GTM Ops Director, in December 2020, through a reorganization.  I did not apply for the role.  This was a lateral move.  I now have five direct reports (one of whom has a team of eight direct reports) and a full team that sits underneath me.   I work with various account teams and cross-functionally with merchants, planners and sales.  As a manager, I make sure that my team is providing our account teams with the information and tools that they need.  I currently report directly to Bill Olsen, Senior Director of NA Partners GTM.  While there are roles similar to mine in other parts of the business, there are also important differences.  For example, there is an Operations Director within Nike Direct under North America, but Nike Direct is different than my organization.   In Nike Direct, the employees are serving Nike, while in my role, I serve Nike's wholesale account partners.  In Nike Direct, employees are privy to seeing all of an account's information (because Nike is the account). On the wholesale side, I only receive whatever information a customer decides to provide to us. For example, for a number of years Footlocker only gave us point-of-sale units sold, while Dick's Sporting Goods gave us all their relevant data points.  This calls for a different skillset, and the ability to work with many different stakeholders, rather than just Nike.

10.      All of my direct reports are "U-band."  Four of them are Marketplace Managers and one is a Senior NA Samples Manager with a team of eight direct reports.  The four Marketplace Managers focus on different areas of the business for operations.  For example, one focuses on map strategy, another on managing RTVs (Return-to-Vendor) and cancellations, another manages our partner portal, online distribution and search policy processes, and the fourth manages many

Page 4      -     DECLARATION OF DIANA STALLARD

Davis Decl. Exhibit 22, Page 4 of 8

of our tools and platforms, which our marketplace teams use, and is in charge of our sales representative reporting.

11.    As a people manager, I have made recommendations relating to base pay adjustments.  For example, I recall an instance where my direct report and I recognized a pay difference between a tenured employee and a new hire.  The tenured employee had been in the position for several years, but a new employee was hired at a higher rate.  The more tenured employee was training the new person.  I then recommended that my direct report work to ensure that his tenured direct report receive an additional pay increase during the annual pay review cycle, which he ultimately received.  When I am making pay decisions, I consider the employee's CFE ratings, band level and current pay.  I do not rely on any reference documents when making pay decisions.  For employees who are in the same role, I will consider how everyone's salary compares to one another.  I strive to get everyone to the mid-upper level of their pay range.  After I make pay increase decisions, nothing official is sent to my boss.  Instead, we talked and I reviewed and explained all of my decisions to him and he agreed.  I did the same thing when I met with my direct report who has direct reports of his own: we reviewed his recommendations and I agreed with what he chose to do.  I cannot recall an instance where my pay increase decisions were changed or rejected.

12.    I consider overall performance and feedback from colleagues when I am deciding on CFE ratings for employees on my team.  Nike has a CFE guideline that is helpful to review when making CFE assessments.  I use the guideline to see where an employee falls on different metrics on the Successful, Highly Successful, and Exceptional scale.  I have also used a tool that HR provides that allows you to create a survey of questions and send it out to solicit feedback from an employee's team members.  The tool allows me to see how peers evaluate my team's

Page 5    -    DECLARATION OF DIANA STALLARD

performance.  I used that tool for the first time last year.  After I decide on CFE ratings, I review them with my manager, Bill Olsen.  We meet and review the highlights of what my direct reports have done for the year.  Sometimes Bill will give me feedback.  I also review the CFE ratings for the manager that I supervise.  I have shown those to Bill as well so he knows what we are doing.  So far, we have always been aligned.  I cannot recall an instance in which my CFE ratings were changed or rejected.  I have never followed a forced ratings or distribution curve.

13.     At Nike, the scope of projects on which I have worked generally last for a couple of months or one quarter, but I have been on projects that have lasted three to six months.  The projects themselves vary in their complexity.  As I have been promoted across band levels I have taken on more responsibility.  I increasingly focus on managing a team rather than managing the business.  I do not have to do as deep of a dive into the business because I now have a team of people who do that for me.

14.     I understand that the Plaintiffs in this case have asserted that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  That has not been my experience at Nike.  I do not believe that my gender has impacted my pay, performance ratings or promotional opportunities during my Nike employment.  I do not believe that any of my managers at Nike have treated me differently because of my gender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/11/2022_____, at _____Beaverton, OR_____.
                          Date                                        City, State

Diana Stallard

Diana Stallard

Page 6    -    DECLARATION OF DIANA STALLARD

Davis Decl. Exhibit 22, Page 6 of 8

# Exhibit A

Davis Decl. Exhibit 22, Page 7 of 8

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

I appreciate your time and the opportunity to speak with you today.

I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:        /s/ Diana Stallard

Interviewer Name:      Lindsey Jackson

Interviewer Signature: *Lindsey Cecelia Jackson*    Date: January 28, 2022

# DECLARATION OF JESSICA THORNTON

I, Jessica Thornton, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I graduated from Savannah College of Art and Design in 2013 with a BFA in Apparel Design, specializing in menswear.  Prior to working at Nike, I worked as a design apprentice at Reebok from July 2014 to September 2015.  I did not supervise any employees in this role.

4.      I was first hired by Nike as Apparel Designer I in October 2015.  I found out about this role when a recruiter at Nike called me, asking if I would be interested in interviewing for any of three separate Apparel Designer I positions in the Basketball, Nike Pro, and Men's Sportswear categories.  At the time, I was looking for a new role, since my apprenticeship with Reebok was about to end.  The recruiter did not instruct or encourage me to only apply for these specific positions, but simply told me that she thought these roles would be a good fit for me based on my portfolio, which I sent to her along with my resume.  I applied for all three positions through the Nike website.  Subsequently, I interviewed for all three positions, and participated in a series of

Page 1    -    DECLARATION OF JESSICA THORNTON

interviews in one day for all three roles.  I was particularly interested in the position in Basketball because when I spoke with the director, I was impressed with the vision he had for his team.  I initially received an offer as Apparel Designer I with Nike Pro but turned it down.  A few weeks later, I received an offer as Apparel Designer I with Basketball, which I accepted.

5.      Throughout the hiring process, no one asked me about my current salary or salary expectations.  I did not try to negotiate any parts of the offer before accepting.  Although Reebok asked if I was interested in a full-time position there (I was not), I did not have any formal competing offers from other companies at the time.  As Apparel Designer I, I worked on Nike's "Authentic" product lines, including NBA Authentic jerseys.  During my two years as Apparel Designer I, I demonstrated that I was a driven employee, and took on various projects that showed my ability to work at a high level.

6.      I transitioned to my subsequent role as Apparel Designer II in October 2017.  Even though I had not discussed my desire for a promotion with my manager, I believe that because of my strong work performance, my male manager promoted me to Apparel Designer II even though I did not apply or interview for the role.  In this role, I had greater responsibilities in the men's brand collections space as well as in the NBA licensing and promotional space.  I found myself traveling more to interview people about our products as well as having more financial responsibilities to deliver.

7.      I was promoted to my current role of Senior Apparel Designer in December 2020 as a result of a reorganization.  I did not apply for or interview for the role, but I understand that my former manager at the time and current VP advocated for my promotion.

8.      In my current role, I "solid line" report to Daniel Farron, who is the Senior Creative Director of Advanced Chassis Creation.  I do not currently "dotted line" report to anyone.  My

Page 2    -    DECLARATION OF JESSICA THORNTON

DocuSign Envelope ID: 35163755-DB14-4B40-838C-4FE2EE684663

current job responsibilities include leading and managing collections in partnership with other senior designers on my team.  Generally, I am involved in design work for the following sports: baseball, global football, football, and basketball.  My responsibilities change almost weekly, as my organization is fairly new, and we are still strategizing and planning many aspects of the organization.  Thus, I would consider the scope of my duties to be very broad and my job to be quite complex—the most complex job I have ever held.

9.      I work on a diverse team with other Senior Designers, and we work on different aspects of the business.  Although we do our best to stay aligned and our programs run parallel to one another, we all have very different jobs.  For example, I have one direct report.  Some of my peers have more direct reports, while others have none at all.  Further, we focus on different products; one may work on men's uniforms, while another may solely work on women's products, and a third is focused on pipeline innovation between products.  Each area of focus has so many nuances, and the work is so complex, that it would be very difficult for us to perform one another's roles, even though we all bear the title of Senior Designer.

10.     In my current role, I have one direct report, whose title is Apparel Designer I.  This is the first direct report I have had at Nike.  This Apparel Designer I "solid line" reports to me, but also "dotted line" reports to my manager, since I am still new to managing other employees.  I have made decisions about pay for one employee so far.  In making this decision, I considered her job performance, her goals for the year, and feedback from her peers.  I also considered Nike's core values and how her work has aligned with them.  Obviously, discretion as to pay increases is not unlimited, due to budgetary concerns, but I did make the decision on the amount of this employee's increase.

Page 3     -     DECLARATION OF JESSICA THORNTON

11.     While at Nike, I have always worked out of World Headquarters in Beaverton, Oregon.

12.     While at Nike, I have never sought a promotion I did not receive.

13.     I have never considered gender in any of the interviews in which I have participated as a panelist, but have only considered whether that person was right for the job at hand.  Nor have I ever felt that my gender has impacted my pay, performance ratings, or promotional opportunities at Nike.  I do not think that any of my managers at Nike have ever treated me differently because of my gender.  My personal experience is that I have been fortunate to have managers who believe in me and my abilities, and who have given me the promotions I feel I deserve.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/8/2022_____, at _____Beaverton, OR_____.
                        Date                                    City, State

DocuSigned by:

_____
F14CE6D5F8204FD...

Jessica Thornton

Page 4    -    DECLARATION OF JESSICA THORNTON

Davis Decl. Exhibit 23, Page 4 of 6

# Exhibit A

## <u>Introduction and Purpose of the Interview</u>

Thanks for agreeing to meet with me today. I'm an attorney with a law firm called Paul Hastings. We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR). The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike. The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike. Your participation is entirely voluntary. You will not receive any benefit for participating and no negative action will be taken if you do not participate. We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate. If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it. My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually. Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary. Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this? Are you willing to proceed? Can you confirm you are not represented by an attorney in connection with any claims against Nike? Do you have any questions? Would you like a copy of this statement?

      I appreciate your time and the opportunity to speak with you today.

      I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:      Jessica Thornton

Interviewer Name:      Maggie Hall

Interviewer Signature:      */s/ Maggie Hall*      Date: February 22, 2022

## DECLARATION OF RONNI WORBOYS

I, Ronni Worboys, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.  I have also read and understood the "Introduction and Purpose of the Interview" disclosure (attached as Exhibit A), which was shown and read to me by Nike's lawyers when they interviewed me, before signing this declaration.

3.      I attended the University of California, San Diego, where I received a Bachelor's Degree in Communications.   Prior to joining Nike, I worked at Target for over ten years in California and Canada and was ultimately a District Team Leader responsible for the operations and expansion of Target stores.

4.      In January 2016, I joined Nike as the Director of Retail Operations at Nike's World Headquarters.  A friend who worked at Nike recommended me to the hiring manager for the position.  The hiring manager contacted me to encourage me to apply to the role if I was interested in the position.  No recruiter contacted me before I applied.  I applied to the role online and then completed a series of phone interviews and a panel of interviews on site at Nike's World Headquarters.

5.      I do not recall anyone asking me about my current salary or discussing my salary during the hiring process.  I was not working when I received a job offer for Nike, so I would not

Davis Decl. Exhibit 24, Page 1 of 9

have had a current salary to discuss.  Furthermore, my previous job was in Canada, so my most recent salary was in Canadian Dollars.  I did not negotiate my salary but unsuccessfully tried to negotiate more vacation days.

6.      As Director of Retail Operations, I manage the basic processes for Nike stores in North America.  My job has evolved since starting as Director of Retail Operations in 2016, but I have not been promoted or changed positions.  When I first started in the role, I was responsible for facilities management and new store openings.  I managed the facilities management team, which oversees the day-to-day upkeep of stores.  I also managed the process related to opening new Nike stores.  From 2016 to 2019, I focused solely on improving processes for both facilities management and new store openings to ensure that Nike stores open and run smoothly.

7.      Around 2019, my role expanded to include front of house and back of house operations.  I now manage all of the end-to-end processes for all Nike stores and all basic processes, except for payroll.  This scope increase occurred when a teammate left Nike, and the remaining three directors on our team each absorbed part of his role.  My manager told me that she knew I could handle increased scope and responsibility.  My job code did not change when I received this increase of scope and responsibility.

8.      In 2020, my role expanded again when COVID-19 impacted Nike stores.  I now manage the process of adapting evolving COVID-19 protocols for Nike stores across North America.  This dramatic increase in scope feels like a second full-time job because I manage COVID-19 protocols for Nike stores in addition to managing the normally complex processes for Nike stores.  The U.S. and Canada manage the COVID-19 pandemic differently and even within the two countries, each state, county, and sometimes city imposes different laws and guidelines

Page 2    -    DECLARATION OF RONNI WORBOYS

Davis Decl. Exhibit 24, Page 2 of 9

DocuSign Envelope ID: 2DE9483B-7571-48FF-8F59-91A3E3A55731

for COVID-19 that constantly evolve.  I ensure that each Nike store is aware of local guidance, which increases the complexity of my role.

9.      The different teams that I manage and worked with adjusted their work based on COVID-19 in different ways.  I managed facilities managers who had to implement safety protocols for the evolving challenges from COVID-19.  For example, Nike stores implemented social distancing, Plexiglas barriers, and hand sanitizer stations.  I worked with the team that prepares communications for the stores.  That team has to constantly update signage in the Nike stores related to the evolving COVID-19 protocols.  The pandemic did not impact all teams I manage and work with equally.  Although the facilities management team and communications teams had increased their scope of work due to COVID-19, other teams did not have increased scope of work due to COVID-19.

10.     I have always been a manager of people at Nike.  I currently manage two Senior Managers and three Managers.  I am in the E-band at Nike, and my direct reports are in the U-band.  The Senior Managers each manage other employees.  One Senior Manager manages two U-band Managers and two L-band Specialists; the other Senior Manager manages five U-band Managers.

11.     The Senior Managers require the same basic duties and level of leadership, but the jobs they perform are different.  One Senior Manager manages the facilities processes, which would include the day-to-day management of the Nike store facilities.  The other Senior Manager has a more traditional retail job and focuses on retail management for the Nike stores.  I believe these two Senior Managers are in different Nike job codes, further demonstrating the differences in their job duties.

DocuSign Envelope ID: 2DE9483B-7571-48E5-8F59-91A3E3A55731

12.　　As a manager, I make base pay adjustments for the employees I supervise. Every year, I receive a budget for base pay increases for my team that I allocate as I see fit. As a manager, I have the discretion to set base pay increases within this budget. I allocate this budget based on each employee's performance rating and each employee's compensation within a competitive salary range. I try to be as equitable as possible in providing base pay increases for each of the employees I supervise, but I do not always provide the same base pay increases to employees with the same ratings. For example, if two employees both received the same performance rating but one employee's base pay is further from the midpoint of the salary range, I would give that employee a higher base pay increase. My goal is to try to increase pay so that all my employees are situated equitably within the same percentage of the pay range for the job.

13.　　I am also responsible for completing performance evaluations and assigning rating to employees reporting to me. I evaluate a range of factors when setting performance ratings. I typically have goal setting conversations with each person I manage to ensure that each employee's goals are aligned with the overall strategy for the business. Then I typically have check-in conversations with my employees. These conversations vary based on tenure in the role. Some employees I manage are very tenured employees who are not as focused on personal development, so I tailor check-in meetings around progress toward business goals. COVID-19 changed the team's benchmarks and business goals, so my team had to continually adapt performance goals based on COVID-19.

14.　　Depending on my manager, the performance ratings for my team may be adjusted to calibrate the ratings for the broader organization, or they may not be adjusted. My first manager liked to see a distribution of performance ratings across teams, like a bell-curve, that would limit the number of high performance ratings available. Although this manager

Page 4　　-　　DECLARATION OF RONNI WORBOYS

DocuSign Envelope ID: 2DE9483B-7571-48F5-8F59-91A3E3A55731

encouraged the team to set performance ratings according to this bell-curve distribution, I could still give multiple high performance ratings if I provided justification for why those employees deserved higher ratings. Those ratings were not changed. My second manager did not ask us to follow a specific distribution for performance ratings, and managers assigned performance ratings purely at our own discretion. My third manager has only been at Nike during COVID-19 and also has not limited any managerial discretion to provide high performance ratings.

15.    I am involved in the hiring process for my team. As a hiring manager, I work with HR and my manager to set the level for any job posting prior to the job posting. The level for each role is set when the job is approved for headcount and cannot be changed once the job is approved.

16.    As the hiring manager, I also set the starting salary within the predetermined range for each role. I understand that in special circumstances, a manager could set salary above that range. Setting salary outside of the range would require additional business justification. Once the level is set for the role, I will talk to Talent Acquisition and Human Resources who will provide a pay range for the role based on the job code. My understanding is that the pay range is based on the market rate for the job. I do not have any conversations with candidates about salary during the interview stage because I do not want pay to influence my decision about which candidate is the best for the role. Once I decide I want to make a job offer to a candidate, I will set the starting pay. I tend to set starting pay at the higher end of the pay range and I have even set starting salaries above the suggested pay range. I evaluate a variety of factors when setting starting pay, including the candidate's experience, any unique qualities the candidate could bring to the role, and how the pay compares to the overall team.

Davis Decl. Exhibit 24, Page 5 of 9

17.     I have set the starting salary at the top of the pay range when I have found an exceptional candidate that had the exact experience I was looking for.  For example, when I was hiring for the Senior Manager for Facilities position, I was looking for someone with retail experience.  The candidate I chose had the perfect mix of experience from her extensive career at Carter's, a major American designer for children's clothing.  This candidate started working for Carter's in the retail stores as an entry-level retail employee and eventually worked her way up the corporate ladder to a corporate facilities management position at Carter's Headquarters.  Based on her experience and performance in her interviews, I knew that she would be able to perform the role on my team without much training because she understood facilities management at all levels of the retail business.  I set her salary accordingly.

18.     When my team is hiring, the manager decides whether to fill the position with internal candidates only or open the role to internal and external candidates.  I default to posting jobs both internally and externally to get the broadest variety of candidates.  One time, a job on my team was posted only internally.  My direct report was the hiring manager for the role who provided appropriate justification for why the role should only be posted internally.  He explained that the role had to be filled quickly by someone who already understood Nike's internal systems because COVID-19 just increased the work on the team.  Because this specialist role that needed to be filled quickly by someone who understood Nike's internal systems, the hiring manager decided that the roles should only be posted internally.  I agreed with the hiring manager.

19.     I have never considered gender in any of the employment decisions in which I have been involved at Nike.  Further, I do not feel that my gender has ever impacted my pay,

Page 6    -    DECLARATION OF RONNI WORBOYS

Davis Decl. Exhibit 24, Page 6 of 9

performance reviews, or promotional opportunities at Nike, and I do not feel that anyone at Nike has ever treated me differently because of my gender.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/4/2022_____, at _____Portland, Oregon_____.
           Date                    City, State

_____
RONNI WORBOYS

Page 7    -    DECLARATION OF RONNI WORBOYS

# Exhibit A

DocuSign Envelope ID: 2DE9483B-7571-4855-8F59-91A3E3A55731

## Introduction and Purpose of the Interview

Thanks for agreeing to meet with me today.  I'm an attorney with a law firm called Paul Hastings.  We are conducting this interview because of a class action lawsuit that has been filed by several women who are former Nike employees (titled *Cahill, et al. v. Nike, Inc.*, District of Oregon Case No. 3:18-cv-01477-JR).  The plaintiffs allege that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues.  They seek to represent themselves and other women employed at Nike World Headquarters.

I'd like to speak to you about your employment experience at Nike.  The purpose of the interview is to gather information to help Nike defend the lawsuit, and to understand the differences between types of jobs at Nike.  Your participation is entirely voluntary.  You will not receive any benefit for participating and no negative action will be taken if you do not participate.  We will not be sharing the results of this interview with any of your managers at Nike, and anything you share will not be used in any performance evaluation or subject you to any sort of adverse action.

During our conversation today, I will be taking notes and, at the end, I may ask if you would be willing to review and sign a written statement, called a "declaration," that sets forth some of the information you share with me. Before signing, you will be able to review the declaration and confirm that the information it contains is 100% accurate.  If you agree to sign a declaration, it may be used in the litigation by Nike, in which case it's possible that the lawyers for the former Nike employees would have the opportunity to ask you about it.  My goal here is to make sure that the information that I gather from our discussion is as complete and truthful as possible.

Before we get started, I want to make sure you understand that I represent Nike, and that I don't represent you individually.  Nike may use the information that we are gathering through this process to support its interests in this lawsuit and not the interests of the class of which you may be a potential member.

I also want to make sure you understand that your participation in this interview is completely voluntary.  Again, there is no benefit to you for participating, and no action will be taken against you and no negative inferences will be drawn if you decline to participate.

Do you understand all of this?  Are you willing to proceed?  Can you confirm you are not represented by an attorney in connection with any claims against Nike?  Do you have any questions?  Would you like a copy of this statement?

      I appreciate your time and the opportunity to speak with you today.

      I read this statement to the witness and they confirmed their understanding of this statement and their willingness to proceed on the basis set forth in this statement.

Witness Name:      Ronni Worboys

Interviewer Name:    Claire Saba

Interviewer Signature:      *Claire Saba*
                            DocuSigned by:
                            FC04FCA7644143C...

Date:      3/4/2022

## DECLARATION OF MATTHEW BOWMAN

I, Matthew Bowman, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I have been a recruiter for Nike World Headquarters ("WHQ") since 2014.  Prior to that, I worked as a hiring manager for Nike stores in Orlando, Florida.

4.      My first role at WHQ was as a Recruiter, which I held from November 2014 to December 2015.  In that role, I only recruited internal candidates.  I recruited across the entire company for all jobs and levels.  I then transitioned into a Talent Acquisition Manager role from December 2015 to October 2017.  I primarily recruited for external, entry level employees in that role.  In October 2017, I became a Talent Acquisition Director, which is my current role.

5.      My Director position evolved over time.  In the first three years, I managed recruiting for manufacturing roles for Nike Air Manufacturing Innovation ("AirMI").  Now I also oversee recruiting for Corporate Administrators and Executive Assistants.  I recruit for all band levels, and I recruit both internally and externally.

6.      I currently supervise two Senior Recruiters ("U bands") and four Recruiters ("L bands").  They work autonomously, but report to me weekly.  They are empowered as professionals to do their job and make their own decisions, but to leverage me as a sounding board

Page 1      -      DECLARATION OF MATTHEW BOWMAN

and to seek answers to questions that arise. I like to characterize my role as being with their work, but not in their work.

7.      My involvement in the recruiting process begins with the opening of a requisition. Once that requisition is provided to Talent Acquisition, I connect with the hiring manager for the position to determine what the hiring manager is looking for in terms of capabilities, skill sets, experience, competencies, internal or external, etc.  The hiring manager prepares the job description for the posting, using guidelines that I provide to help make the description clear and appealing to a diverse pool of candidates.  After I receive the job description from the hiring manager, I run it through a program called Textio, which makes minor edits to the description to help ensure that it is not overly attractive to a certain group (e.g., the description is gender-neutral, age-neutral, etc.).  I also ask the manager for a rough salary to target.  While there is a range for the role set by Total Rewards based on the market rate for that position in the industry, the hiring manager is allowed to work within the range to set the starting salary.  So I ask the hiring manager initially for what he or she is targeting based on the team's budget, so I can communicate the expectation to the candidates during the interview process. I also ask the hiring manager to confirm the band level, job code, and title during the intake because once the job is posted, those cannot change.  If we needed to change those details for whatever reason, we would have to take down the job entirely and restart the process.  After I have this information, I work with recruiting services to post the job or I post it myself.

8.      After the job is posted, applicants can apply.  I review applications and generally conduct screener interviews.  For the screeners, I have certain broad questions I ask candidates, but many questions are tailored to the specific role.  These are formulated through the intake meeting with the hiring manager and are based on the qualifications, education, skills, etc. that the

Page 2    -    DECLARATION OF MATTHEW BOWMAN

hiring manager is looking for. We want to have tailored questions for different roles because they often involve different hiring considerations. For example, an individual contributor role will have different considerations than a manager role. For the latter, of course, a candidate should have experience with supervising and leading employees, or at least demonstrate the skill set that would make a candidate successful in such tasks. Also, generally speaking, the years of experience and education required for the role increase in tandem with the band levels. After the screener interviews, I recommend a slate of candidates to the hiring manager. The hiring manager generally will have a one-on-one interview with each of the candidates, and then a smaller set of candidates will proceed to one-on-one interviews with other members of the team. We aim to keep all interviews one-on-one.

9.      Once the interviewing process is complete, each of the interviewers will provide documented feedback to me. Each interviewer does this individually, based on their own impressions of the candidate. Then we have a debrief session, generally with the interviewers, hiring manager, and recruiter. Once there is a consensus on the candidate, I work to put together the offer.

10.     The final salary for the candidate filling the position is generally set during the offer stage through a discussion between the hiring manager and myself. The final starting salary should fall within the range set for the job code and band level that is provided at the beginning of the process, but where it is within that range is based on the candidate's experience, qualifications, and skill. Generally, Nike tries to set the starting salary between 90% to 110% of the range. If the salary that the hiring manager wants to set falls within the range, it does not need approval. The hiring manager sometimes decides to offer higher than 110% of the range if the candidate's qualifications and experience justifies it, but Nike generally does not pay below 85% of the range

Page 3      -    DECLARATION OF MATTHEW BOWMAN

for new hires.  If there is a discrepancy between the percent of the range offered to an external vs.

an internal candidate, that generally occurs because an internal candidate is often coming in with

less experience and is receiving a promotion to move into a role with responsibilities and duties

that they have not performed yet.  Accordingly, that internal candidate would be at the lower

percent of the pay range.  The external candidates we hire are almost always coming from a role

that is equivalent or similar to the role that they are seeking at Nike, such that they already have

and are performing the specific skill sets required for the job.  As a result, they tend to start slightly

higher in the range.  So the considerations for the starting salary for internal and external hires are

the same; it is based on the range for the job code, adjusted to account for their skill, experience,

and qualifications.  Because of this, internal hires often receive very large pay increases, because

they are receiving a promotion into a role where the range is significantly higher than the range

for their previous role.  In general, hiring managers take into consideration internal pay equity

when setting starting salary, to avoid large pay disparity between those already holding certain

positions and the new hires.

11.    I generally ask about candidates' salary expectations and competing offers during

the screener process to get an understanding of what they are comfortable with and to let them

know what Nike is able to offer.  If the candidate is qualified, we do not end the conversation with

them because their pay expectations are not aligned with what we are able to offer.  Whether hiring

managers use this information when determining a candidate's starting salary is up to the hiring

manager.  It may be a factor, but it is not required.

12.    While prior to September 2017 Nike recruiters did ask about starting pay, we did

so in order to understand candidates' salary expectations and to try to avoid offering someone a

salary that was significantly below what they were previously making.  It was a way to make sure

Page 4    -    DECLARATION OF MATTHEW BOWMAN

DocuSign Envelope ID: CE636F3E-C202-4D02-9793-4B58293303AA

that we were being competitive in the market and hiring the candidates we thought were right for the job. However, once again, whether the hiring manager used prior salary to determine a candidate's offer was up to the individual hiring manager. And prior salary, even if it was used, could only factor so much into the consideration—hiring managers were still encouraged to fall within the range set for the job. So, if someone's prior pay was considerably less than the lowest end of the range, the starting salary could not be set at or near the prior pay; it would fall within the range.

13.    Sometimes during the recruiting process, I come across candidates that are better suited for another position at Nike than for the one to which they applied. For example, I sometimes meet talent that is better suited for a different band level than to which they applied. In those circumstances, I will present other opportunities to them that they may want to look at and consider. However, they still would have to apply for those roles. I cannot apply for them. Candidates are considered and evaluated for every role to which they apply, even if they are better suited for another position, and candidates can apply for any roles they choose.

14.    Avature is a records system that is used at Nike to track passive talent in the United States. Passive talent means talent who have not applied to work at Nike, but people we might want to recruit in the future. I rarely use Avature. It is not used for candidates to apply to jobs in the United States. If candidates want to apply to a position, they do so in Taleo. Taleo tracks applicants throughout each stage of the hiring process. In Taleo, I am able to see which candidate is where in the interviewing process. Once again, candidates must apply to the jobs themselves; I cannot do it for them.

Davis Decl. Exhibit 25, Page 5 of 6

15.     I do not consider gender in recruiting decisions.  For roles in the "E band" level and above, I do try to ensure that we present a diverse slates of candidates to the hiring manager, as Nike has requested.  Other than that, gender is not considered.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/8/2022_____, at _____Beaverton, Oregon_____.

DocuSigned by:

*Matthew Bowman*

—3B20D2991C4E425...

Matthew Bowman

Page 6    -    DECLARATION OF MATTHEW BOWMAN

Davis Decl. Exhibit 25, Page 6 of 6

## <u>DECLARATION OF MARC CAPUTO</u>

I, Marc Caputo, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I joined Nike in July 2015 as a HR Operations Specialist – Retail Corporate, and moved into a Recruiter – Global Consumer role in June 2016.  After that, I held the roles of Senior Recruiter – Global HR, Corporate Strategy & Operations, and Global HR Program Manager and Change Management Lead.  Since February 2021, I have held the role of Talent Acquisition Manager – Global HR for HR, in which I lead a team of two Lead Recruiters and four Senior Recruiters, in addition to continuing to be involved in the day-to-day recruiting of candidates.

4.      Since I moved into recruiting in June 2016, I recruit for all levels of Nike positions, from entry level to senior director – A-band through S-band – with the exception of internship and vice president roles.  I currently recruit for the Human Resources organization at Nike, but in my prior roles at Nike, I have also recruited for Enterprise Strategy, Global Operations & Logistics, Communications, and Global Brand Marketing.  Throughout my time in recruiting, I have been involved in both external and internal recruiting.

5.      I have received training regarding how to conduct interviews of applicants, including how to evaluate and confirm someone's experience over the phone, what questions are

Page 1      -      DECLARATION OF MARC CAPUTO

DocuSign Envelope ID: 4A07193F-2AF6-4A18-963B-17FFA5D504EE

permissible from a legal perspective, how to dig into the applicant's experience, and how to be consistent across applicants, in addition to how to make starting salary recommendations, and unconscious bias training, that included gender.

6.      Between 50-75% of the questions I use to interview and evaluate candidates are framework questions that are the same regardless of what function or role I am supporting.  The other questions are more nuanced and specific to the role I am working to fill.  These often are designed to elicit information about a specific skillset or experience particular to the role I am recruiting for, based on the information I obtain about the role from the hiring leader, such as experience with a particular software or experience managing people.

7.      Before a job requisition is opened and a job is posted, I meet with the hiring manager to discuss the job itself, including the job duties, how the role fits into the organization, what the organization does, what the manager is looking from a hard skills perspective, and what will be expected of the employee in the job and how that is reflected in the desired experience. We also discuss what type of experience and skills are priorities so that I can ensure the candidates I am speaking with meet those requirements before they move forward.  Although I check-in with the hiring manager throughout the recruitment process, the bulk of our conversations are before the job is posted to make sure the job description accurately reflects what they are looking for and what the job entails.

8.      I am involved in initial conversations with candidates, and I will also follow up with applicants after I receive feedback from the business, such as whether the business leader is interested depending on the applicant's background and experience.  I will inform the candidate if they are moving forward with interviews, in addition to providing them with feedback I received about why they are or are not moving forward, but I do not attend or participate in the applicants'

conversations or interviews with the hiring manager, or the other stakeholders they may meet with as part of the interview process. After they have completed their interviews, I will follow up with the candidate and inform them if they are being offered the job, and will provide any feedback I receive from the business about how the interviews went. After that, there is usually more back and forth to discuss the offer until they accept or decline.

9.      In my recruiting role, I will also make recommendations to the hiring manager regarding where a new hire's initial salary should sit within the applicable salary range for the position. My recommendation is based on a variety of factors, including the experience and capability the applicant articulated during interview process, the difference in market zones, and the applicant's salary expectations. Prior to 2017, the applicant's prior compensation history sometimes could be a factor in my recommendation, but not always. It depended on the situation. Ultimately, while I typically do provide a recommendation to the hiring manger, the hiring manager is responsible for making the final decision on the starting salary. If the offer falls within an acceptable salary range for the job, no approval other than the hiring manager is necessary. If the salary offer happens to fall outside of the applicable salary range, I will then work with the hiring manager to prepare an explanation setting out the basis and reason for an above-range salary offer, which will be sent to the HR business partner and organization leadership for approval.

10.     Throughout my time in Nike recruiting, starting salaries are driven by multiple factors, including: overall years of experience; overall related progressive experience to the job; education; complexity of the applicant's prior organization (i.e., size and whether the organization has a similar complex and matrixed reporting style to the one that exists as Nike); level of prior influence and responsibility; and communication style, if appropriate for the role, among many other possible factors. There is no clear line between any one factor and the starting salary. Rather,

Page 3      -      DECLARATION OF MARC CAPUTO

Davis Decl. Exhibit 26, Page 3 of 6

a lot depends on how the candidate is able to articulate, during the recruiting and interview process, their demonstrated capability for the role, such as how they show their depth of knowledge in that space, which is not always conveyed in their resume. Candidates are also always welcome to negotiate their salary.

11.    What differentiates an excellent candidate, and can lead to a higher starting salary, will be nuanced and vary based on the particular business unit, the role, and the functions they support. Generally, someone that has broader responsibility or deeper knowledge in that space (applicable to that business unit), regardless of role, tends to earn a higher salary. Also, because Nike is highly matrixed, with direct and dotted line reporting relationships, depending on the role and the size of the business unit, an applicant's experience working on a team or responding to multiple levels of leadership may be highly valued, in which case someone coming from a similarly complex organization may receive higher compensation.

12.    At all times during my recruiting experience at Nike, my process has always been not to share any specific compensation information with the hiring manager until after they have decided whom they want to hire. The exception is if the candidate shares that they are looking for a compensation package that is significantly above the approved range for the role. In addition, early in the recruitment process, I will provide the candidate with the typical compensation range for the role. Ultimately, the decision to move forward in the application and employment process is always in the hands of the candidate.

13.    When a candidate applies for a position, the band and level for the job has already been set. In my many years of recruiting at Nike, and the several thousand employees I have seen hired, I have only seen maybe once or twice a situation in which a band or level for a position has not been set before we started looking for available talent. But in this unique and rare situation,

Page 4    -    DECLARATION OF MARC CAPUTO

Davis Decl. Exhibit 26, Page 4 of 6

the role had not yet been created and we were trying to assess what, if any, available talent and

skillsets were out in the marketplace before we structure the role and job posting.  It has also

happened that we have posted for a particular position, but based on further conversations

regarding the needs of the business, the business may realize they may not actually need someone

at that band or level, or their needs change during the time the job is posted.  In those situations,

we pause the recruitment process while we reassess the role.  Once the new role is posted, which

could be either a higher or lower band/level, anyone who may have already begun the recruitment

process in connection with the prior role is invited to reapply to the new role.

14.     I only recommend potential applicants to apply for particular jobs in the situation

of "passive talent."  This refers to my looking for individuals, by searching LinkedIn or through

my network, who may not necessarily express any interest in a particular job at Nike, but whom I

think might be a good candidate, so I reach out and encourage them to apply.  My conversations

with passive talent will vary depending on the scope of my search, so we can discuss whether they

have any interest in a particular role, business unit, or Nike in general.  However, although I may

recommend particular jobs to certain individuals, it is always the applicant's decision which jobs

to apply to.  I do not apply to jobs for applicants.

15.     Throughout my time at Nike, if the open role is Director-level (E band) or below,

deemed a competitive search, and is sent to the recruiting function, then it is posted.  I have never

put someone in a role without going through the posting and application process, although the

minimum posting time has changed over the years.  Specifically, Nike's current guidelines dictate

that all competitive roles are posted for least seven calendar days, regardless of whether it is an

external or internal posting.

Page 5     -     DECLARATION OF MARC CAPUTO

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2/17/2022___, at ___Portland, OR___.
                Date                City, State

DocuSigned by:

*Marc Caputo*
A5E85AC19F60458...

MARC CAPUTO

Page 6    -    DECLARATION OF MARC CAPUTO

Davis Decl. Exhibit 26, Page 6 of 6

## <u>DECLARATION OF ALLY COLLINS</u>

I, Ally Collins, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I am the Lead Recruiter for the Data and Insight function at Nike.  I have held this role since Fall 2021.  I joined Nike as a full-time, Senior Recruiter in May 2021.  Before that I had been recruiting for Nike since February 2021 as a contractor.  Prior to working at Nike I had 12 years of experience as a recruiter, including most recently as a Talent Acquisition Manager at Shutterfly, Inc.

4.      In my role as Lead Recruiter, I recruit for the People Analytics and Workforce Strategy function, Finance Analytics, Commercial Analytics, Consumer Insights, and Consumer Creation, all for data insight roles.  I recruit internally and externally for U-band roles and above.  I work with a lot of different hiring managers, including Tony Truong (People Analytics), Bonnie Flynn (Finance Analytics) and Drew Carpenter (Commercial Analytics).  I report to Rachelli Materun, Director of Talent Acquisition for Data & Insights.  I do not supervise any recruiters.

5.      As a recruiter, I get involved in the hiring process once it is determined that the role is ready to be hired.  By this point the role has been leveled correctly and given the proper

Page 1    -    DECLARATION OF ALLY COLLINS

job code.  Band and job levels are not negotiable during the recruiting or hiring process.  Once the role is ready to be hired, I reach out to the hiring manager to get the job description.  Before a requisition is open, I meet with the hiring manager to go over all of the details for the job requisition and confirm that everything is correct.  We discuss the requirements for the role and what an ideal candidate looks like.  We also discuss whether to post internally only or open up a position externally as well, and what the interview strategy will look like.  Any role that Talent Acquisition posts is supposed to go through a competitive hiring process, which means that the role must be posted for a minimum of seven days.  The seven-day minimum applies to jobs that are posted internally and externally.

6.     After this discussion, I send the job description to recruiting services for posting. The recruiting process starts from there.  Throughout the recruiting process, I am in contact with the hiring manager to discuss candidates and resumes.  After sufficient time has passed for applications to come in (which is at least the seven day minimum posting time), I go through the database and review the applicants, assessing the candidates' resumes against the role requirements that the hiring manager provided to me.

7.     Next, I typically conduct an initial phone screen with candidates.  I provide the list of candidates who made it past the initial phone screen to the hiring manager.  Typically, I will follow up with a candidate regarding whether they will be moving forward.  Sometimes, if the candidate was not selected to move forward, but is currently reporting to the hiring manager or works closely with them, the manager will have a career-based conversation with the candidate.  I do not attend any other interviews for the candidate.

8.     We do not consider an applicant for a role unless the applicant applies for the role. During the course of recruiting, I may talk to a candidate who is a strong talent, but not

Page 2    -    DECLARATION OF ALLY COLLINS

necessarily the right fit for the role to which they applied.  In that case, I may advise the candidate about other relevant available openings and suggest that they may want to apply for one of those positions, if they choose.  However, I have never applied to a role for a candidate or transferred their application to another role.  It is always the candidate's decision if they choose to submit for a role and they must be the one to complete and submit the job application.

9.     I have access to Avature, but it is used more often by our sourcing teams than for recruiting.  Avature is for external candidates.  I have used it to enter information about passive candidates who have not been attached to a specific requisition.  These passive candidates still have to apply for the job; I do not apply for them.  I spend the majority of my time dealing with actual candidates.  As a result, I use Taleo, our applicant tracking system, every day.  I can invite an internal candidate to apply for an open position, but they still need to apply through the portal if they actually want to be considered for the role.  And they can apply for any role they want to apply for.

10.    Certain positions have different hiring considerations based on the skillset required for the job.  For example, for U-Band product positions, the applicant must have agile methodology experience and prior experience with product road-mapping and execution.  An E-Band applicant must have demonstrated the requisite leadership skills, either through people management or expertise in a particular area, or both, depending upon the role.  In the data and insight space, we actually screen applicants to evaluate their standardized technical skills because the technical skills are very important for those roles.  For example, applicants need to be able to perform predictive, proscriptive and regression analyses.  Individual hiring managers also prioritize different candidate attributes depending on the role (e.g., industry experience, specific technology experience, or specific experience in product leadership and data insights).

Page 3    -    DECLARATION OF ALLY COLLINS

Outside of the required technical skills needed to be successful in a role, hiring managers often look at whether the candidate has prior experience that is relevant to the specific role, because all experience is not equally applicable to all roles. The decision of which individual to hire belongs to the hiring manager.

11. When a candidate applies for a job, the salary range for the job has already been set by Nike. Talent Acquisition does not have control over the salary range for the job. I often do ask candidates for their salary expectations but this does not affect the recommended salary range, which is tied to the job, not the candidate. The salary range is then provided to the hiring manager. The hiring manager makes the final decision regarding the compensation that will be offered for the role, including the starting salary. If the starting salary offer falls within the recommended pay range for the role (85-110% of the midpoint and no additional stock or sign-on bonus greater than 10%), the hiring manager does not need to get approval from anyone before extending the offer to the candidate. If the hiring manager wants to exceed the pay range, there are different levels of approval, depending on the proposed offer, but the majority of offers are made within the range. However, some jobs are very difficult to recruit for, so there is more negotiation. For example, data scientists are quite rare, so the hiring manager often has to negotiate not just compensation, but other job requirements, such as a remote working situation.

///

///

///

///

///

///

Page 4    -    DECLARATION OF ALLY COLLINS

DocuSign Envelope ID: DA80E2A0-6DE7-4B52-A37A-9BE423DC4973

///

12.     I have never considered gender in any of the recruiting work I have been involved in at Nike.  However, when we have an opportunity to hire at the leadership level (Director and above), we try to provide a diverse slate of candidates.  We strive to do this because we want to ensure that we are providing the hiring manager with the most qualified talent pool from which to select.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____2/25/2022_____, at _____7:54am_____.

DocuSigned by:

*Ally Collins*

7980A8F2A0B2476...

Ally Collins

Page 5    -    DECLARATION OF ALLY COLLINS

Davis Decl. Exhibit 27, Page 5 of 5

## DECLARATION OF ANDREW CROLL

I, Andrew Croll, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I have worked at Nike as a recruiter for over 15 years and am currently the Director of Global Design Recruitment.  Throughout my career at Nike, I have recruited for Design roles at all levels at Nike World Headquarters.  I currently manage a team of seven recruiters, five Nike employees and two contractors.  In addition to managing recruiters, I recruit for Design positions as well.  My team recruits for Designer roles at all levels.

4.      Once a role has been approved for headcount, I will assign a recruiter to the role. That recruiter will meet with the hiring manager in an intake meeting.  During the intake meeting, the recruiter will discuss the role with the hiring manager.  The hiring manager will write the job description and then the job will be posted.

5.      The level for each role is generally set by the hiring manager as part of the job approval process.  A role level cannot change once the role has been posted.  In very rare occasions, a role may be taken down and then reposted at a different level based on a business change or need.  While this re-leveling seldom occurs, I have mostly seen roles re-posted at a

Page 1    -    DECLARATION OF ANDREW CROLL

Davis Decl. Exhibit 28, Page 1 of 5

higher level.  In those instances, the workload and business need required for the role expanded.

A recruiter cannot change the level for a role; this is a business decision.

6.      The hiring manager decides whether a role is posted internally only or both internally and externally.  The vast majority of roles at Nike are posted both internally and externally.  A hiring manager may post a role only internally if the hiring manager felt that external talent may not be set up for success because the role requires certain Nike insight or Nike brand exposure.

7.      There are generally two broad types of Product Design roles at Nike: footwear and apparel.  Footwear Design includes roles focused on footwear/product design, color, and material.  Apparel Design includes roles focused on apparel/product design, color, and graphic design.  Nike has now started to hire 3-D designers as well.  Within Footwear and Apparel, teams are further broken down into performance categories and lifestyle categories.  There are also Brand Creative roles that focus on different areas such as Jordan, the geographies ("Geos") such as North America, and global product.  From these broader categories, Design roles are further broken-down into gender and product roles.

8.      Hiring considerations are very role specific.  Hiring managers typically look for innovation, technical skills, and industrial design skills when hiring for Performance Category Design roles.  Hiring managers usually look for candidates who can elevate an iconic product, such as Air Force One shoes through color, materials, and a footwear story when hiring for candidates in Lifestyle categories.  When hiring for roles in a specific Geo, such as North America, a hiring manager will assess whether a candidate understands the culture and consumer tastes of that location.  For example, a Footwear Designer in North America will need to understand how styles differ in Los Angeles and New York City.  Furthermore, hiring managers

Page 2     -     DECLARATION OF ANDREW CROLL

DocuSign Envelope ID: 031A5348-D533-428D-8C2A-GF9BFB5FB97A

will make hiring decisions based on the individual teams. For example, a Design manager may look to hire someone who will bring creative tension on the team or hire someone who will bring more balance on the team depending on the team's creative needs.

9.      In my experience, hiring managers assess candidates for Design roles based on a variety of factors, typically focused on the candidate's creative vision. Hiring managers typically focus on the subjective work of each candidate through the candidate's portfolio. The candidate's design portfolio will showcase a candidate's creative passion and storytelling ability. The portfolio will demonstrate a candidate's design process to show how the candidate understands the consumer, problem solves, and uses inspirations to amply concepts and products. Based on the level of the role, the hiring manager will also assess the candidate's leadership skills. The hiring manager typically does not look for any specific school, background, or degree, but this is up to the individual hiring manager. A hiring manager may find a candidate's previous experience working for a competitor is helpful because the candidate will understand the volume and scale of design work at Nike. However, working for a competitor is not the only factor a hiring manager will consider when assessing candidates. A hiring manager will hire the best candidate based on the hiring manager's assessment of the candidate's previous work and the needs of the group. The hiring manager will typically assess the candidate based on that candidate's portfolio and then the hiring manager will look at that candidate's school and credentials. Design roles are not limited to certain schools or degrees. Hiring managers look for a diversity of backgrounds when assessing candidates to promote creativity and better consumer insights.

10.      Candidates must apply to a role to be considered. A recruiter can never apply for a role on behalf of a candidate. Sometimes, there are candidates who apply to one role and could

Page 3      -      DECLARATION OF ANDREW CROLL

be considered for a similar role. In those cases, the recruiter would share the job posting for that other role with the candidate. The candidate would then have to apply to that new role to be considered. For example, recently, a Footwear Design candidate applied to a role in Basketball, but the Basketball team preferred another candidate. The other candidate presented a stronger portfolio, which showcased more innovation skills. The Footwear team was also hiring a Design role in Lifestyle, so I shared the Lifestyle role with the first candidate. The roles were the same level, but had a different focus that I thought may be a better fit for the first candidate based on his skills. It is up to the candidate to decide whether to apply to another job posting.

11. Once a hiring manager has selected the best candidate for the position, the hiring manager will consult with the recruiter about setting the candidate's starting salary. The recruiter will share the role's pay range, which corresponds to the external salary market for the role. The hiring manager will ultimately set the starting salary based on a number of factors, including the candidate's experience and potential for growth in the role for setting salary. For example, if a candidate has relatively little experience and will grow into the role, then the manager will set the salary towards the midpoint of the range. The hiring manager will also consider the salaries of other teammates to ensure there is parity on the team for salary. A hiring manager may increase starting salary for a candidate with a competing offer or when there is a high demand for certain candidates or roles. A hiring manager has discretion to set the candidate's starting salary within the pay range without additional approval of the final amount. However, the hiring manager also may set a candidate's starting salary above the range, with additional approval.

12. Depending on the candidate and the role, I sometimes ask candidates their salary expectations for the role during the recruitment process. I typically ask about salary expectations

Page 4    -    DECLARATION OF ANDREW CROLL

Davis Decl. Exhibit 28, Page 4 of 5

towards the end of the interview process, if I ask at all.  Some candidates do not have a current

salary because they are still in school.  Some recruiters ask about salary expectations early in the

recruitment process.  Generally, discussions around salary expectations are a fluid process that

depends on the candidate.  Before September 2017, I would usually ask a candidate about their

salary expectations or current salary.  Most of the time before September 2017, I would ask a

candidate about their salary expectation rather than the candidate's current salary.  Even when I

asked about a candidate's current salary, that was never the sole or driving factor for a hiring

manager in setting starting pay.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed on _____, at _____.
            3/22/2022              Portland, OR
                                  City, State

DocuSigned by:

*Andrew Croll*

70657CD0F8B34D6...

ANDREW CROLL

Page 5    -    DECLARATION OF ANDREW CROLL

Davis Decl. Exhibit 28, Page 5 of 5

# DECLARATION OF AMBER DOCKTER

I, Amber Dockter, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I started working for Nike full time in 2013, when I was hired as a Project Coordinator in the Consumer Digital Technology Organization.  I applied through the external website and interviewed for the role.  I was not asked about my current or prior salary, and salary was not discussed until after Nike extended me an offer.

4.      As a Project Coordinator, I worked as the Consumer Digital Technology Strategy and Business Operations Team.  My role evolved and I later worked as the middleman between Talent Acquisition (TA) and Human Resources (HR).  I partnered with TA to create talent plans to grow the business and created related training documentation.  I also worked as a liaison with our collegiate recruiting team and created an intern program for Consumer Digital Technology Interns.

5.      In August 2015, I was promoted to Program Manager.  I believe I received this promotion because of the work I had performed to build out people programs at Nike.  This was a promotion L band to U band.

Davis Decl. Exhibit 29, Page 1 of 5

6.      As a Program Manager, I supported college recruiting and managed the summer intern program. Each summer, I created a program plan for incoming interns, created opportunities for the interns to meet Nike leadership, and built summer projects for interns. I also worked with communications and HR to build and maintain employee engagement programs. For example, I organized lunches with Nike leadership and tours of Nike's labs, product libraries, and product archives. My role was moved from the Digital Consumer Technology organization to the HR organization in early 2017. I have worked in the HR organization since this time.

7.      In January 2019, I became the University Relations Program Manager. I applied for this role and received this lateral transfer. As the University Relations Program Manager, I was responsible for executing and communicating the university talent strategy, timeline, and internal talent demand planning across multiple business units, and collaborated with key stakeholders to understand current and future university talent hiring needs and talent strategy aligned with business priorities. I developed the recruitment strategy for which schools Nike should visit and the conferences Nike should attend. I also helped develop the strategy for whether Nike would interview on campus or at the conference and which Nike employees to bring to the campus or conference visits. I executed end-to-end program management goals, timelines, and milestones across business functions and worked collaboratively with TA, HR, and business function leaders. I also organized intern events to ensure that interns heard from Nike leaders, learned how each organization operates, and had ample networking and mentorship opportunities.

8.      In February 2021, I became a Talent Acquisition Program Manager. In this role, I built a recruitment program that enables retail employees to apply for and perform stretch assignments in Nike corporate, if they are interested in moving from the retail stores to other parts of the business. Once I stood up that team, I applied and interviewed for an open director role on

Page 2    -    DECLARATION OF AMBER DOCKTER

Davis Decl. Exhibit 29, Page 2 of 5

the University Relations team. I was selected for this role, which was a promotion, and I became an E band. I am still in this role today.

9.       As the Director of University Relations, I work with Nike's HR teams to establish the compensation for new graduate hires. Compensation for new graduate hires is consistent across the new graduate class and job performed. Therefore, all Nike new graduates hired within the same job and within the same time period should receive the same starting salary. This amount generally is equal to 85% of the midpoint of the pay range for the job in which they work.

10.      Nike generally does not negotiate compensation for new graduates. If a new graduate attempts to negotiate salary or provides information on other job offers, recruiters do share that information with the compensation team as a data point to evaluate compensation for the next year, but it does not impact compensation for the new hire. Nike does not ask new graduate hires for prior salary information and it plays no role in the compensation for new graduate hires.

11.      The starting pay for new graduate hires is not the same for every job. Rather, it varies, at least in part, based on the skillset required for the role. For example, new graduates with Masters' in Business Administration (MBA) are paid more in Strategy and Digital Product Management roles than other MBA new graduates. This higher pay is based on the specific skills required for those roles, market data, and the competitive nature of those roles. Strategy roles require candidates who have flexible skills and are able to operationalize processes. These candidates typically have a background in consulting. Digital Product Management candidates have highly desirable skills which makes it difficult to acquire and retain this talent. Because both Strategy and Digital Product Management roles are highly compensated in the market, Nike places

Page 3      -      DECLARATION OF AMBER DOCKTER

Davis Decl. Exhibit 29, Page 3 of 5

DocuSign Envelope ID: 14EEF693-14F9-4C45-9B79-BEDBE49D95B2

a premium on those new graduate salaries. Computer engineers are also highly compensated based on their specialized skills and the competitive nature of the market for computer engineers.

12. Different new graduate roles have different hiring considerations, which often are based on the degree the candidate is pursuing. For example, a computer science degree is very important for employment in an information technology role. Likewise, to be considered for a finance role, the candidate generally must have a background in accounting or finance.

13. All new graduate hires generally are hired at the same level. New graduates with an undergraduate degree are hired as an L band. New graduates with a graduate degree are hired as a U band.

14. The only exception to the set level and compensation for new graduate hires is when a new graduate has much more experience than a typical new graduate does. For example, I recall one MBA candidate who had 20 years of work experience; most MBA candidates have three to five years of experience. Because this candidate had significantly more experience than is typical, that candidate was hired at a higher level. I cannot recall if he was hired as a higher level U band role or was offered an E band role, one full level above the MBA new graduate level. This happens only on rare occasions, approximately four to seven times over the three years I have been involved with University Relations.

15. All new graduate roles are posted externally. If someone completes an internship at Nike that person is automatically considered for a full time role at Nike. During the internship, managers rate and review the interns based on their performance. Managers then recommend whether Nike should hire the intern into a full time, new graduate role. The full time new graduate role may or may not report to that manager. All intern managers for a function will meet and rank the interns based on their performance. The business then decides how many roles are available

Page 4    -    DECLARATION OF AMBER DOCKTER

Davis Decl. Exhibit 29, Page 4 of 5

for new graduates and then selects the top interns for those roles. For example, finance may have 15 interns and only 12 new graduate roles so they will hire the top 12 interns. The remaining interns will be placed on a waitlist and may be hired if an intern decides not to accept the full time position.

16.     I only consider gender in my work when building a pipeline of candidates, because we strive to present a diverse slate of candidates for roles at Nike. Otherwise, I have never considered gender in any of the recruiting work I have been involved with at Nike.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____, at _____.
                        3/22/2022                  McClusky, North Dakota
                        Date                       City, State

DocuSigned by:

*Amber Dockter*
_____
D562513E4FDA4A3

AMBER DOCKTER

Page 5    -    DECLARATION OF AMBER DOCKTER

## DECLARATION OF SARAH FAGAN

I, Sarah Fagan, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I started recruiting at Nike in May 2015.  Prior to working at Nike, I worked as a recruiter at other companies for over 10 years. I have had wonderful experiences at Nike and enjoy recruiting for Nike.  I feel that Nike has empowered me to take ownership in my career and allowed me many career opportunities.

4.      I have recruited at Nike for seven years and have managed a team of recruiters for five of those years.  I recruited at Nike for roles in Technology for three years.  I then recruited internal candidates in Consumer Marketplace for three years.  Last year, I became a Talent Acquisition Manager for Insights and Data Analytics.  I now manage a team of recruiters that supports all Data and Analytics roles at Nike.  Each role I recruit for requires a different set of skills.

5.      I have recruited for various types of roles at Nike based on the function I support. For example, when I supported Technology, I recruited for cybersecurity, engineering and architecture roles.  Approximately 94% of the roles I recruit for at Nike are at the U and E band

Page 1     -     DECLARATION OF SARAH FAGAN

level.  The overwhelming majority of the roles I recruit for at Nike are U band roles, however, I have recruited for roles at all levels, including many roles at Nike World Headquarters.

6.      I currently recruit for Data Analytics roles.  These roles can be divided into two types of roles: consumer-focused analytics and commercial-focused analytics.  Although both types of data analyst roles require the same core competencies for data analysts, the roles differ based on the focus of the job.  For example, the basic technical skills required for data analysts depends on the program or database language used by the team.  Some teams require knowledge of SQL whereas others require knowledge of Python.  Consumer roles focus on everything that faces the consumer (i.e. marketing, personalization, etc.) whereas commercial roles focus on supply chain (i.e. logistics, manufacturing, etc.).  There may be some core competencies with regard to skillset, however, the business acumen and/or functional requirement can differ.

7.      Each business function works with recruiters in a different way.  Typically, I become involved once a role has been approved.  As a Talent Acquisition manager, I pull a report each week of the new roles in the business I support and assign the roles to members of my team.  Recruiters are usually aligned to specific areas of the business which is how new roles are typically assigned.  I will assign myself roles as well.

8.      Once I assign a recruiter, that recruiter will meet with the hiring manager to discuss the job description.  The hiring manager writes the job description and usually finalizes the job description before meeting with the recruiter.  During this initial meeting, the recruiter and hiring manager will discuss the open role, including the role's scope, number of direct reports, requirements and qualifications, and the soft skills required.  The hiring manager selects the requirements for the role that accompanies the job description and the role is posted so that candidates can apply to the role.  Each role should be posted for at least seven days.

Page 2    -    DECLARATION OF SARAH FAGAN

9.      The hiring manager decides whether to post the job internally only or internally and externally.  Most jobs are posted internally and externally.  However, when there might be significant internal talent, the manager may choose to only post the role internally.

10.      When I recruited for Consumer Marketplace, I only worked with internal candidates within the digital and brand functions.  At the time, Nike received feedback that internal candidates felt they did not have enough contact with recruiters in the job application process.  As a result, each role was assigned two recruiters—one recruiter who would focus on external candidates who applied for the role, and another recruiter who focused on internal candidates who applied for the role.  Each role would have one hiring manager who ultimately decided which candidates were selected for interviews and who was ultimately offered the position.

11.      Before the recruiter meets with the hiring manager, the role has already been approved with a set level and job code. Therefore, the job level for each role is set before a recruiter becomes involved.  I recall only one time in seven years that the level for a position was changed after it was posted.  The role was posted as an L band role and through the interview process, it became clear that the role required a different skillset than was originally planned.  The hiring manager determined that the role actually required a skillset that matched the U band.  To change the level for the position, the hiring manager had to get new approvals to open a U band role.  The L band role was closed and all candidates were sent a notice that the role was no longer available.  The role was reposted as a U band role and remained open for at least seven days.  Candidates had to apply to the new U band role to be considered for the position.  Aside from this rare instance in which the role was closed and reposted at a higher level, I have not seen a role's level change.

12.      I use a system called Taleo to see which candidates apply for each role and track them through the process.  There are two types of candidates: active candidates and passive

Page 3    -    DECLARATION OF SARAH FAGAN

Davis Decl. Exhibit 30, Page 3 of 8

candidates. Active candidates apply to the job posting and then are tracked through Taleo. Passive candidates discuss potential roles with sourcing recruiters who can explain the types of roles and functions within Nike's unique organization structure. Sourcers are aligned to a general job function at Nike, such as commercial analytics, and will help build a pipeline of potential candidates for a certain category of role, such as data scientists. Based on the conversations about a passive candidate's skillset and career goals, a sourcing recruiter may recommend roles to which the passive candidate may apply and send that person job postings. For a passive candidate to become an active candidate, however, the candidate has to apply to the job posting herself before she can be considered for a specific role. A candidate cannot interview for a role unless that candidate has applied to the specific job posting and is an active candidate. As a recruiter, I cannot apply to a role for a candidate.

13.     Once I review the resumes that meet the minimum qualifications for the role, I meet with the hiring manager for a calibration session to review which candidates best fit the job description. Based on the calibration session, I send the hiring manager notes on resumes and suggest the top five or six candidates based on the calibration sessions. The hiring manager will then select the candidates and conduct an initial interview. Based on the interview with the hiring manager, the hiring manager will choose candidates for interviews with other Nike employees. The hiring manager ultimately decides which candidates should move forward to interviews. After the interviews, the hiring manager then selects a candidate to make a job offer.

14.     Each role has a unique set of hiring considerations. For example, technical roles may require that the applicant demonstrate their technical coding, programming, and/or database expertise. The hiring manager will also look at other qualifications based on the role. For example, a hiring manager may look for a candidate with supply-chain experience for a data scientist role

Page 4     -     DECLARATION OF SARAH FAGAN

Davis Decl. Exhibit 30, Page 4 of 8

that is commercially focused. Education also may be important, depending on the role. Many expert-level data scientist roles require PhDs. Specialized PhDs, such as a PhD in optimization, are examples of an education experience that may be considered an additional bonus credential for a role. While these specialized PhDs are not required, they are "nice to have" for a role. Hiring managers also look for relevant prior experience. Years of relevant experience is a very important aspect of each role as well, because the years of relevant experience typically correlates to the level for the position. For example, an internal candidate with a U band role just applied to an E band position. Although he has a PhD, he did not have enough years of relevant experience to be qualified for the E band position. Therefore, the hiring manager did not hire him into that role.

15.      When I hired cybersecurity roles, the hiring managers had unique qualifications for the roles. I hired over 150 hackers to assist Nike in building its cybersecurity operations. Certain roles required specialized skillsets. For example, cyber-threat intelligence analysts troll the dark web looking for nefarious activities to help Nike defend against bad actors. For this type of role, hiring managers value candidates that are fluent in certain Eastern European languages. I recall that one woman I hired for a leadership role within the cyber-threat intelligence group spoke multiple Eastern European languages and had the exact previous work experience the hiring manager had been looking for. The hiring manager hired that candidate based on her language skills and prior experience.

16.      Each role corresponds to a compensation range, based in part on the external job market. The compensation team encourages all hiring managers to set new-hire salaries within 85% to 110% of that compensation range for the role. A hiring manager cannot set the starting salary less than 85% of the range, however, the hiring manager may set the starting salary above 110% in special circumstances or for particularly competitive jobs. For example, data scientists

Page 5    -    DECLARATION OF SARAH FAGAN

Davis Decl. Exhibit 30, Page 5 of 8

across both the consumer and commercial markets are in high demand right now. Other companies, such as Facebook and Amazon, continually pay data scientists increasingly higher salaries. Therefore, hiring managers routinely set the starting pay for these highly competitive roles at 110 to 120% of the midpoint range. Product managers and analytics managers are also competitive jobs but are not as competitive as data scientist roles, so hiring managers typically set starting salaries for product manager and analytics manager positions at the high end of the pay range (i.e. 90 to 100% of the range). Previously, cybersecurity, data engineering, and software architects were highly sought after jobs in competitive job markets so hiring managers would typically set starting pay at the high-end or above the range for those roles. Generally, hiring managers set the starting pay highest for the skillsets that are most in demand. Some hiring managers are more comfortable setting starting pay above the pay range than others and it is ultimately the hiring managers who set starting pay.

17.    A hiring manager will use a variety of factors to set starting salary for both internal and external hires. First, the hiring manager will look at the pay range for each role. The hiring manager will then evaluate the candidate's relevant experience and set a salary that appropriately compensates the candidate for their relevant experience and expected performance in the role. For example, if a role requires three to five years of experience in a specific field or industry, the hiring manager would set a lower starting salary for someone who joins the team with three years of relevant experience, as compared to someone who joins the team with five years of experience. The hiring manager will also set a higher starting salary for people with specific business acumen experience or who can speak certain languages, especially if that skill is unique or highly competitive. Approximately 90% of the candidates I work with negotiate pay, so hiring managers will also consider the candidate's salary expectations during these negotiations as another factor.

Page 6    -    DECLARATION OF SARAH FAGAN

Davis Decl. Exhibit 30, Page 6 of 8

The hiring manager also evaluates the pay of other members on the team to ensure that all members of the team are paid fairly. The hiring manager will typically discuss these factors with the recruiter in setting starting salary.

18.    I generally ask candidates about their salary expectations during the recruitment process, and, until 2017, I generally asked candidates about their current salary. I ask these questions to help gauge the candidate's skills and experience, since pay expectations are one indicator of expertise. I have not asked candidates about their current salary since Nike instructed us to no longer doing so. During my discussions about salary expectations, I share the general pay range for each job based on the 85% to 110% of the midpoint range.

19.    The candidate's salary expectations, and before 2017 the candidate's current salary, is only one factor a hiring manager could use in setting the starting pay. And the hiring manager may not use or consider salary history or expectations at all. For example, even if the salary expectation for a candidate is $50,000 less than 85% of the midpoint range, a hiring manager will offer the candidate at least 85% of salary range. And the hiring manager will also evaluate the candidate's years of relevant experience, the competitive market for the role, the skillset for the role, and the current salaries on the team, which could make the starting salary even higher. The hiring manager will discuss these factors with the recruiter when setting starting salary.

20.    I only consider gender when working towards our diversity efforts to strive to find a diverse slate of candidates for our roles. Otherwise, I have never considered gender in any of the recruiting work I have been involved with at Nike.

Page 7    -    DECLARATION OF SARAH FAGAN

Davis Decl. Exhibit 30, Page 7 of 8

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ____3/21/2022____, at ____Bend, Oregon____.
               Date            City, State

DocuSigned by:

_____
556D097509CD447...

SARAH FAGAN

Page 8    -    DECLARATION OF SARAH FAGAN

# DECLARATION OF PAMELA FLORES-SANDOVAL

I, Pamela Flores-Sandoval, declare and state as follows:

1.  I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.  I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.  I joined Nike as a Talent Acquisition Recruiter in 2018.  I first recruited for Finance and Accounting from 2018 to 2019.  I then recruited for Human Resources from October 2019 to May 2020.  From May 2020 to February 2021, I recruited for distribution centers.  From February 2021 to the present, I have been recruiting for Strategic Planning.  I had two previous recruiting roles before joining Nike: as a Recruiting Assistant at the University of Oregon and as a Recruiter at Insights Global.  Since joining Nike, I have always recruited for multiple band levels, but mainly for "L band" and "U band" roles.  I have occasionally recruited for "E band" roles for Accounting and Strategy, and I recruited "A bands" for the distribution centers.

4.  During my onboarding process at Nike, I received training on the recruiting and hiring process.  Throughout the year, recruiters are required to and participate in both formal and informal training addressing all stages of recruiting, including conducting interviews, evaluating qualifications, holding debrief sessions, etc.  We also have yearly conditioning camps.  Some of that training includes unconscious bias training, which covers gender.

Page 1    -    DECLARATION OF PAMELA FLORES-SANDOVAL

5.      I am involved in the full hiring life cycle, starting with verifying job codes, band levels, and position for an open requisition.  After a requisition for a position is opened, I connect with the hiring manager for an intake meeting.  During that meeting, I will verify the job code and band level of the position.  I also gather information regarding what qualifications, experience, and skills the hiring manager is looking for.  The hiring manager will also often provide me with preliminary interview questions to screen the talent.  I add funneling questions in the job post that narrow the pool of candidates based on, for example, years of experience or ability to use a certain software.  There are different hiring considerations for different roles and teams, even if they are the same title and/or band level.  For example, in Strategic Planning, there are some manager roles that require more skill or experience than other manager roles.  In Accounting, there was a wide range of seniority, even within the same band level.  For example, some roles in Accounting were much more transactional than others.  So, even though they were in the same band, the skill set required was totally different.  This is important for the Recruiter to understand so we can try to identify the best candidates for the role.

6.      The hiring manager also writes the description for the job using certain guidelines that I provide to make the description clear and appealing to the most inclusive group of candidates. I also run the job description through a tool called Textio, which will recommend modifications to the job descriptions that I can edit to ensure that the language used in the job description is appealing to diverse demographics.  I post the job once the job description, band level, job code, and job title are confirmed.  They do not change throughout the rest of the process.  If we need to change any of those factors, we have to take down the requisition completely and restart the process.

Page 2      -     DECLARATION OF PAMELA FLORES-SANDOVAL

7.    I conduct the initial interview with candidates.  While I have a few general questions I ask all candidates regardless of the position (e.g., interest in Nike and willingness to relocate), many of the questions are based on discussions with the hiring manager to target certain skill sets and experience.  Sometimes during the interview process, I determine that certain candidates may be better suited for a different band level, and I will have a candid discussion with them about it.  I have recommended that candidates move both up and down a band level.  That said, candidates ultimately have to make the decision to apply to that band level; I cannot apply for them.  Separately, on some occasions, I have matched certain candidates to open requisitions on the backend after they have applied for another role, but this does not happen often and the rules for doing so are very precise.  We are only allowed to match candidates to jobs if the job the candidate applies to is exactly the same as the job I match them to—i.e., the job description, job code, band level, and funneling questions have to be identical.  The jobs must require the same skill and experience and carry the same level, title, and duties.  This might happen if we have two openings for the same position but only want to create one job posting.  I always have a conversation with the candidate prior to applying them for any other position, and the candidate is still considered for the role they originally applied to.

8.    After the initial screener interview, the candidates that I present to the hiring manager proceed through the interview process with the hiring manager and the team for the role for which they applied.  When I am determining which candidates to present to the hiring manager, I do not take into consideration the applicant's prior salary.  Nor do I share this information, if I receive it from the candidate, with the hiring manager.  The hiring manager then makes the final decision regarding which candidate receives an offer.

Page 3    -    DECLARATION OF PAMELA FLORES-SANDOVAL

Davis Decl. Exhibit 31, Page 3 of 5

9.      I typically recommend a salary to the hiring manager when I put together an offer, but the hiring manager makes the final decision.  During the interview process, I talk openly and candidly with candidates about the salary range for the particular position.  It is my understanding that the salary ranges are evaluated throughout the year based on the market rate.  I personally work very hard to make sure that I am equitable in my pay recommendations.  In general, I try to recommend similar starting salaries for every candidate that I bring into a particular role, but adjust based on experience, skill, education, and ability to answer questions.  For example, I often manage talent days, where we hire multiple people into the same position, but for different subgroups or teams.  If one person negotiates a higher salary, but another candidate is just as qualified, I will recommend to the hiring manager that both candidates should get the increase in starting salary. The hiring manager often agrees with me, but they are not required to do so.   My salary recommendations are not based on the candidate's prior salary or salary expectations.

10.      I use both Avature and Taleo in my recruiting work.  Avature is used primarily for putting together resumes of passive candidates (candidates who have not yet applied for a Nike job) for similar job families.  I can recommend to those candidates to apply to certain similar jobs, but I cannot apply for them.  Those candidates still have to apply, and they can apply for any job openings they choose.  Taleo is used for all external and internal candidates and provides a location for candidates to submit their information and resume and answer a few questions.  Once again, the candidates still have to apply to the jobs on their own.

11.      I do not consider gender in any of my recruiting decisions or recommendations.

Page 4    -    DECLARATION OF PAMELA FLORES-SANDOVAL

Davis Decl. Exhibit 31, Page 4 of 5

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ____2/14/2022____, at ____Beaverton, Oregon____.

Pamela Flores-Sandoval

9CA98B201678428...

Pamela Flores-Sandoval

Page 5    -    DECLARATION OF PAMELA FLORES-SANDOVAL

Davis Decl. Exhibit 31, Page 5 of 5

## DECLARATION OF CHRIS HOPKINS

I, Chris Hopkins, declare and state as follows:

1.    I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.    I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.    From February 2016 to February 2021, I was a Senior Recruiter for Advanced Innovation at Nike.  Since February 2021, I have been the Director of Talent Acquisition for Advanced Innovation and Valiant Labs.  Prior to joining Nike, I worked as a recruiter at Intuit for nearly 15 years and recruited at Convergys for nearly 9 years.

4.    Within Advanced Innovation and Valiant Labs, I have recruited for a wide variety of roles across more than 50 teams and at all levels.  The Advanced Innovation team explores the limits of what is possible when science and engineering solutions are applied to improving athletic performance and athletic products.  For this team, I recruit engineers and scientists across all disciplines, and each discipline has its own unique skillset.  For example, I recruit biomechanical researchers, polymer scientist engineers, sensory scientists, neuroscientists, and many other niche roles at Nike.  I also recruit unique digital technologists who are experts in particular fields of digital technology.

5.    Each position has different hiring considerations.  As one example, one of the engineering teams I recruit for works on low-power consumer wearables, such as smart watches.

Page 1    -    DECLARATION OF CHRIS HOPKINS

The teams require expertise in mechatronics, an interdisciplinary branch of engineering that integrates mechanical, electronic, and electrical engineering systems with a combination of robotics, electronics, computer science, telecommunications, systems engineering, and product engineering.  The hiring managers for roles on the mechatronics team will look for a unique balance of electrical engineering and mechanical engineering backgrounds, but each role is very specific and unique.  Hiring managers also have individual preferences in terms of the skills and experience they are looking for in candidates for a role.  Some hiring managers will want a candidate with more electrical engineering experience, while others may look for more mechanical engineering experience.  Or, some hiring managers put a premium on candidates who have worked at certain companies; some emphasize previous work deliverables; some emphasize industry experience over research lab (i.e., purely academic) experience; some put a premium on advanced degrees.  For biomechanists in particular, managers put a premium on industry experience over purely academic research experiences.  These hiring manager preferences can often drive higher starting salaries at the offer stage.

6.    As a recruiter, I start working with hiring managers once they have a position approved with the budget for headcount.  I set an intake meeting with the manager in which we discuss the role and the core requirements ("must haves") and preferred qualifications for the position, including work experiences or any potential companies of interest.  I then work with the hiring manager closely throughout the recruitment process, from posting the requisition until the role is filled.

7.    When I start working with the hiring manager, the level for the position has already been set.  So, the job level is set for each job before it is posted, because each requisition is tied to a specific job code, and that job level is what candidates apply to and are hired for.  Recruiters and

Page 2    -    DECLARATION OF CHRIS HOPKINS

hiring managers cannot change the level for a role once the job is posted. To adjust the level for a job (and then hire candidates into that position), the active requisition would need to be closed in the system and a new role with the new level would need to be approved and then posted. In such case, the job posting would then stay open for a certain amount of time and the recruitment process would restart, meaning candidates would need to apply and be interviewed for the new role. In rare circumstances — I estimate maybe around three times in the past four years, in my experience — a job posting has been taken down and re-posted at a higher level. This occurred because business needs evolved during the months while the job was posted. In my experience, I have never seen a job that was taken down and reposted at a lower level.

8.      I use a system called Taleo, which tracks all candidates who apply to each job posting. Any internal candidate who applies to a role from within Nike will apply through an internal job portal, whereas external candidates apply to job postings through an external Nike website. Although internal and external candidates apply to job postings through different front-end systems, both the internal and external applicants are sent to Taleo, where I track the candidates who apply for the role. I do not use Avature.

9.      During the hiring process, I review resumes for all candidates who meet the required qualifications for a role and send those resumes to the hiring manager. I also conduct screening interviews by phone with qualified candidates and provide summaries of those calls to the hiring manager. I continually calibrate the screening process based on feedback from the hiring manager on the candidate profiles that the hiring manager is looking for. The hiring manager then follows up with candidates and will decide whether to move forward with an interview. Generally, hiring managers will choose approximately four to six candidates for final interviews with a team of Nike employees, who the hiring manager also chooses. I provide feedback on the interview

Page 3    -    DECLARATION OF CHRIS HOPKINS

Davis Decl. Exhibit 32, Page 3 of 6

panel but the hiring manager makes the final decision on the assigned interview team, as well as the final hiring decision.

10.      Once the hiring manager decides to offer a candidate the position, I work with the hiring manager to put together a job offer, including starting salary as well as benefits and sometimes a signing bonus or a relocation package.  I sometimes partner with Human Resource Business Partners (HRBPs) for this stage of the process.  For starting salaries, there is a pay range for each job code and business group, and we provide the hiring managers with recommendations on salary offers that are fair and competitive, with a view to indexing them appropriately to the team (so that a new hire with less experience would not join a team at a higher salary that would disrupt the pay balance within the team).  We also counsel on paying at least 85-90% of the mid-point of the salary range for any job.  I also provide my thoughts to the hiring manager about various factors they could consider for a starting salary offer, including the candidate's qualifications and experience, overall technical ability, competencies measured in behavioral questions, passion, energy, and excitement for the role, and whether the candidate has competing job offers.  Candidates for the roles I recruit for are very hard to find and there are often competing offers by other employers for one candidate.  If a candidate has a unique background or prior experience they could bring to Nike—that can lead to a higher starting salary.  The hiring manager weighs these and other factors, like their preferred industry and technical experience premiums, to make the ultimate decision for setting the candidate's starting salary.  If the hiring manager's starting salary offer is within the pay range for the job, no approval is required for the starting salary.

11.      During the screening process, I typically ask candidates for their salary expectations.  On or around September 2017, Nike informed recruiters that we could no longer ask

Page 4      -      DECLARATION OF CHRIS HOPKINS

DocuSign Envelope ID: 170F1C9A-96D3-443A-A9ED-E760B240E6AC

for a candidate's current salary.  Prior to September 2017, I would typically not ask candidates about their current salary, but sometimes candidates would voluntarily tell me their current salary without prompt.  To the extent that candidates shared their current salary and I shared that information with hiring managers, the hiring managers would not use that information as the sole or primary basis for setting a candidate's starting salary in their job offer.  Rather, it was a point that hiring managers could consider in making starting pay offers, in addition to many other factors that varied depending on the role and the candidate pool.

12.    As I previously mentioned, I recruit for specialized roles that typically take between four to eight months to fill because they require unique and specialized skills that are in demand.  Because of this longer recruitment process, I spend time building relationships with candidates.  If a candidate is ultimately not considered for a role, I may ask the candidate if I can share their resume with other recruiters or consider them for future roles within Nike Advanced Innovation.  I would only do so with their permission.  If I do share a candidate's resume with another recruiter and the recruiter believes that the candidate may be a match for another open role, that recruiter may reach out to the candidate and encourage them to apply to that open role.  Likewise, I may encourage the candidate to apply to another role within Nike Advanced Innovation.  But it's always the candidate's decision whether to apply to an opening or not.

13.    One time, there were two stellar candidates for a sensory scientist position.  Sensory scientists study the mind/body relationship and inform the development and improvement of new products.  They are extremely difficult to recruit for because they have highly specialized skills that are typically only found in the food industry.  Because there were two candidates who were excellent fits for the role, the business made the decision to add extra budget and approve head

DocuSign Envelope ID: 170F1C9A-96D3-443A-A9ED-E760B240E6AC

count for a second position at the same level. Adding duplicate headcount for a role only occurred in this one specialized situation to my recollection.

14. If a team is looking for balanced diversity, I will work to find diverse candidates by sending the job posting to diversity associations and partnerships. For example, I may send job postings to female professional engineering organizations for engineering roles on teams that are seeking to increase female representation. Otherwise, I have never considered gender in any of the recruiting work I have been involved with at Nike.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___3/1/2022_____, at ___Portland, OR._____.
               Date                    City, State

DocuSigned by:

*Chris Hopkins*

75886593611A466...

CHRIS HOPKINS

Page 6    -    DECLARATION OF CHRIS HOPKINS

DocuSign Envelope ID: 5027D742-AA35-43C5-B93F-0EB505889F32

## DECLARATION OF KIM LOZITO

I, Kim Lozito, declare and state as follows:

1.     I have personal knowledge of the facts contained in this declaration. If called as a witness, I could and would testify competently to those facts.

2.     I make this declaration entirely of my own free will and choice. No promises of benefits or threats have been made to me to persuade me to sign it. I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements. I have reviewed this declaration carefully, and it is truthful and accurate.

3.     I have been a recruiter for Nike since January 2005. In my career at Nike, I have recruited for many types of roles. My current role is Lead Talent Acquisition Partner for Consumer Marketplace, where I recruit for roles in U, E, and S bands in Global Marketing, Communications, and Sports Marketing. I work with hiring managers throughout the recruitment process from when the role is approved for posting to the job offer.

4.     Hiring managers consider different factors and emphasize different skills depending on the role and team. For example, for the Catalyst Brand, hiring managers look for candidates with entertainment industry experience who have worked with high profile individuals and understand the uniquely high-touch contact required to work with influencers. Even within Catalyst, the requisite skills for a position vary based on the Geography. In particular, the Global team requires candidates who can focus on broader strategy, whereas the roles in North America require more executional skills that are tied to that specific Geography. As another example, for Purpose Marketing roles that are focused on sustainability, hiring managers look for prior experience working in the sustainability space.

Page 1    -    DECLARATION OF KIM LOZITO

DocuSign Envelope ID: 5027D742-AA35-43CF-B93F-0EB505889F32

5.      Hiring managers ultimately are responsible for seting starting pay, but they may consider input from the recruiter, HR Business Partner and the salary ranges provided by the from compensation team. Nike provides salary ranges for each job, but hiring managers have discretion to decide the starting pay for each role. I typically give my thoughts to the hiring manager about where to set the starting salary within the range based on a variety of factors, but the decision is ultimately theirs to make. One factor that can influence starting salary is e how difficult it was to recruit for the role. For example, for online marketing roles, talent is generally concentrated in New York City or San Francisco. So those positions are typically more challenging to fill because candidates need to be willing to relocate to the Portland, Oregon area. Other factors that hiring managers consider in setting starting salary include prior relevant experience and skills matched to the position, or if a candidate has a competing offer from another company.

6.      Before September 2017, I would ask candidates their current salary and share this information with the hiring manager, because I found that current salary was indicative of the candidate's experience, which was an important factor for setting starting pay. The hiring manager could then consider the candidate's current salary as one factor (in addition to prior experience, skills, difficulty in filling the role, and other factors) for setting their starting salary. During this time, starting salaries varied more widely based on the hiring manager. Some hiring managers would set starting salaries towards the middle or lower ends of the pay range for the position, whereas other managers would set starting salaries at the top of the range. Managers still have discretion in their starting pay decisions but the guidance is now to set starting pay at or above a certain percentage of the mid-point of the pay range.

7.      In my time recruiting at Nike, I have seen many candidates — both men and women— apply for and accept positions at lower levels just because those roles were available

Page 2    -    DECLARATION OF KIM LOZITO

Davis Decl. Exhibit 33, Page 2 of 3

and the candidates really wanted to work for Nike. For example, some candidates might have experience for an E-band role, but an E-band role wasn't available, so they would choose to apply for and ultimately take an open U-band role instead because they wanted to get their foot in the door at Nike. I would sometimes have discussions with candidates about other job openings at Nike and encourage candidates to apply for open roles if, for example, they did not have the required experience for one role but could be a fit for another open position. But in that case, the candidates would still need to apply to those positions themselves.

8.   I have never considered gender in any of the recruiting work I have been involved with at Nike.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/10/2022_____, at ___Portland, OR___.
                              Date                              City, State

_____

KIM LOZITO

Page 3    -    DECLARATION OF KIM LOZITO

Davis Decl. Exhibit 33, Page 3 of 3

**<u>DECLARATION OF KATELYN MANGAN</u>**

I, Katelyn Mangan, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I joined Nike as a full-time employee in February 2019.  My first role was Internal Talent Acquisition Manager for Innovation, Categories, Design, Product and Merchandising ("ICDPM"), where I was focused on internal recruiting and managed a team of two other recruiters.  In June 2021, I interviewed for and received my current role as Talent Acquisition ("TA") Lead, which is an individual contributor role supporting Nike's Strategic Planning organization.  I currently report to Nicole Scire, who is the TA Director for Corporate functions.  I have also had "stretch" assignments since joining Nike that involved supporting hiring for HR and TA positions.

4.      Since joining Nike, I have recruited for several levels of Nike positions, including a few A- and L-band positions, individual contributor positions in the U- and E-band levels, U-band manager positions, and people manager positions in the E- and S-band levels.  My time has been split fairly evenly between recruiting for individual contributors and people leaders across the U-, E- and S-band levels.  In my current role, I recruit both internal and external candidates. My work at Nike includes recruiting employees to work at Nike's World Headquarters.

Davis Decl. Exhibit 34, Page 1 of 5

5.      Once a requisition opens, I generally set up a Zoom call with the hiring manager to discuss the hiring process and strategy.  During the call, I provide an overview of the hiring process, and go more in-depth if I haven't worked with the hiring manager much or they are new to being a people manager.  I then ask about what their team works on, what the team dynamics and structure are, what's exciting about the open role, the roles and responsibilities for the open role, and any "non-negotiables" from a talent profile perspective to figure out what the hiring manager really needs versus what are "nice to haves."

6.      Since I started at Nike, all job openings have been posted—the only question is whether the hiring manager wants to consider only internal candidates or also is open to external candidates.  After a job is posted, I review resumes and applications and conduct initial phone screens.  Sometimes phone screens are more about asking the candidate how I can support them through the process (for example, with internal candidates), and other times I am focused on assessing whether the candidate is qualified for the role.  For candidates who progress past the phone screen, I stay engaged with them to make sure they feel supported and that their questions are answered.

7.      The Strategic Planning organization conducts one-on-one interviews with candidates.  After interviews are completed, I hold a debrief session with the interviewers to discuss their feedback.  I always kick off these meetings by explaining that the purpose is to discuss candidates' strengths, potential risks and any other considerations—not to decide who to hire—because I think it's really important for the hiring manager to make the hiring decision outside of the group setting.  I also do not let interviewers "force rank" talent during debrief sessions, because in my view that can encourage interviewers to change their independent

Page 2      -      DECLARATION OF KATELYN MANGAN

Davis Decl. Exhibit 34, Page 2 of 5

assessments.  Ultimately, hiring decisions are made by hiring managers and do not need to be approved by anyone else.

8.     There are certain hiring considerations that we always account for—for instance, striving to have a diverse slate of candidates, and thinking about what skillsets a particular team needs to ensure coverage and balance.  Beyond that, different positions have different hiring considerations.  For example, I know from working in ICDPM that roles in Innovation require a much higher level of education than roles in Design, where formal education is not as heavily weighted and self-taught workers can be very successful, and Strategic Planning, where an MBA is valuable but not essential.  Hiring managers also evaluate different types of experience differently.  With people manager openings, for example, some hiring managers prefer candidates who have experience managing direct reports, whereas others are open to candidates who do not have that experience but have overseen cross-functional teams.  Similarly, in Strategic Planning, we consider the scale and scope of the candidates' previous employers (for instance, we often look for candidates who have both "Big 4" experience and in-house experience), their role at those companies (whether they were focused on strategic development versus operations), and whether they have worked for companies that have undergone big changes.  For roles in Design, hiring managers tend to be much more focused on learning about a candidate's creative process and how they would apply it at a company like Nike than they are on total years of experience or what the candidate did in previous roles.

9.     The salary range for a job is always set before the job is posted.  Once the hiring manager selects the candidate they would like to hire, I work with Compensation to make a starting salary recommendation to the hiring manager.  Every business group is drastically different, but in my experience HR has not been very involved in making salary

Page 3    -    DECLARATION OF KATELYN MANGAN

Davis Decl. Exhibit 34, Page 3 of 5

recommendations.  Although I discuss salary expectations with candidates, I never ask what they are making at their current jobs, and salary expectations can influence, but do not drive, my recommendation.  Instead, I base the recommendation on the salary range for the position, as well as the candidate's prior relevant experience and overall skills (and, in some groups, education).  In addition, I may recommend a higher offer to candidates who have competing offers from other companies.  If I sense that a candidate will expect a higher offer than the hiring manager anticipates, I talk with the hiring manager about whether the higher offer would be fair based on what we know about the candidate and the market.   After I present my recommendation, the hiring manager makes the ultimate decision on the package to offer the candidate.  Hiring managers often align with my recommendation, but not always, and it is always up to the hiring manager to make the final decision.

10.     In my experience, most candidates try to negotiate for a higher starting salary and it is up to the hiring manager how they want to respond.  If the candidate's counter-offer is too high, the hiring manager and I will discuss other options for making the compensation package more attractive and to show the candidate we value them.

11.     Band levels are also always set before a position is posted.  There have been times when candidates apply for multiple different positions at levels they are either too junior or senior for.  When that happens, I engage with the candidate in an enterprise-focused conversation to figure out where in our business the candidate would fit best.  For example, I recently recruited for a Senior Director role and felt that two of the candidates would make incredible Nike employees, but were not ready for Senior Director-level work based on overall interview feedback.  I shared that feedback with them and asked whether they would be interested in exploring Director-level roles.  Then it was up to the candidates to decide whether or not they

Page 4      -      DECLARATION OF KATELYN MANGAN

DocuSign Envelope ID: C07D5C62-4335-431B-8745-D65E44E88B89

wanted to apply for the Director-level roles.  I have never changed the level of an opening that a candidate originally applied to.  Likewise, I have never applied a candidate for a position they did not apply for themselves.  On rare occasions, I will transfer a candidate's application to another opening, but only if the new role is the same as the role the candidate applied to and it is on the same team.  And I would only do so if the candidate agreed that they were interested in this role.

12.    Avature is a system used to track passive talent and store basic notes.  I use Avature infrequently—mostly to store new intake notes on talent I am first engaging with, and not to source passive talent.  I use Box or Projects in LinkedIn to pipeline.  I use Taleo, our applicant tracking system (or "ATS") more frequently than Avature.  However, similar to Avature, I do not use Taleo to attract new talent.  Regardless of which system I use (Taleo or Avature), candidates still have to apply for jobs themselves.

13.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/16/2022_____, at _____Beaverton, OR_____.
                          Date                              City, State

DocuSigned by:

_katelyn Mangan_
29341C48EF3F498...
_____
KATELYN MANGAN

Davis Decl. Exhibit 34, Page 5 of 5

# DECLARATION OF LORISE MORTON

I, Lorise Morton, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      From March 2017 to June 2021, I was a Senior Talent Acquisition Recruiter at Nike.  I started at Nike as a temporary worker, and became a Nike employee in September 2018. I am currently the Global Talent Acquisition Product Lead, Human Resources (HR) Modernization, focused on the systems transition to Workday and I no longer recruit candidates. Prior to joining Nike, I gained experience as a recruiter in several other companies, including Walmart, Oracle, and TEKsystems.

4.      In my role as Senior Talent Acquisition Recruiter, I recruited for product managers, program managers, and scrum masters, primarily in digital business at Nike World Headquarters.  I recruited U and E bands but would also recruit S and L bands occasionally.  I also recruited for Global Operations and Logistics if those recruitment teams needed additional assistance.

Page 1     -     DECLARATION OF LORISE MORTON

DocuSign Envelope ID: 02DE838D-1F23-44FF-8BE8-11AB25A85199

5.      As a recruiter, I worked with a hiring manager once that manager became interested in filling a position.  Some managers would reach out to me directly and we would together through the job approval process.  Others would come to me once the job was already approved.  Once the job was approved, I worked with the hiring manager to create a job posting. I assisted the hiring manager in crafting a job description and defining the job requirements. Ordinarily, the hiring manager and I also would discuss, for example, the job location, salary range, and interview process.  I then would send the job posting through Textio, a system that would assist with suggesting language designed to make the posting inviting to a diverse group of applicants.  Once the job posting was finalized, Recruitment Services posted the job and I ensured that the job posting accurately described the requirements and preferred qualifications for the position.  The hiring manager and I remained in constant contact throughout the hiring process.

6.      I conducted initial phone screens but did not attend other interviews.  While I was a recruiter, Nike shifted from panel interviews to individual interviews for candidates.  Now interviews typically involve one Nike interviewer and the candidate.  Sometimes, two Nike interviewers participate in an interview, but typically that is the limit.

7.      The hiring manager ultimately made the hiring decision.  I hosted debrief sessions in which the interviewers and I would provide feedback to the hiring manager, and then the hiring manager would make their decision based on several criteria, including a candidate's experience, background, and performance in the interviews.

8.      The hiring manager also made the ultimate decision about the candidate's starting salary.  The starting salary was not determined prior to the candidate applying for the job.  There was a salary range for each position, and the hiring manager would choose the starting salary

Page 2     -     DECLARATION OF LORISE MORTON

Davis Decl. Exhibit 35, Page 2 of 5

based on the candidate's background, skillset, and the competitive landscape. Further, if the hiring manager felt that the candidate could perform the job immediately upon hire, then the hiring manager may choose a starting salary in the middle or higher portion of the salary range. However, if the candidate would need to grow into the role, then the hiring manager may set the salary at the lower to middle portion of the salary range. No starting salary could be set below the salary range.

9.      Depending on the offer, different teams have visibility into the offer. For example, HR Business Partners (HRBPs) have visibility into standard offers, but if the offer is within Nike's range for the job, HRBPs do not need to approve the offer. If the offer exceeded the hiring range, then my director and possibly the Total Rewards team would have visibility into the offer. Some offers may include other components, such as a cash sign-on bonus or additional stock awards. If the cash sign-on bonus or additional stock awards were out of scope for the role, the Total Rewards team would need to provide additional approval. But if the award was within scope, no approval was necessary.

10.      Hiring managers evaluate candidates' experiences differently based on the type and level of the role. For example, program management and product management roles vary based on the area (or pillar) for the role. The "Activities" pillar is a very engaged and active organization, whereas the "Expansion" pillar organization focuses on global expansion. A backend pillar includes more structured functions, while the "Innovation" pillar includes less structured functions that are focused on creative thinking and seek applicants with more of a start-up mentality. Therefore, relevant experience for product managers or program managers varied based on the pillar for the role, even if the roles otherwise seem similar.

Page 3      -      DECLARATION OF LORISE MORTON

Davis Decl. Exhibit 35, Page 3 of 5

DocuSign Envelope ID: 02DF833D-1F23-44FF-8BE8-11AB25A85199

11.    If a candidate applied for multiple positions or asked about other roles at Nike, then I normally would have a conversation with the candidate about the various pillars for product management and the roles for which they may be best suited.  I did not discuss level with candidates; instead I described the various product management pillars and structure of the business.

12.    Occasionally, if I thought a candidate was a better fit for a role or roles other than those they applied to, I have suggested that the candidate may want to apply for another job, but I have never applied for a job on behalf of a candidate.  It was always a candidate's choice to apply, regardless of my suggestion.  I would send the candidate the job posting so that the candidate could review the job description and make a decision about whether to apply themselves.

13.    Recruiters and hiring managers cannot change the level for a role once the job is posted.  To adjust a level for a job, that job had to be closed in the system and a new role with the new level would need to be approved.  The new role then would stay open for a certain amount of time and candidates would apply and be interviewed for the new role.  This role change was rare; it probably happened less than a handful of times, no more than five, in my four years recruiting for Nike.  Each time the role change happened, it was based on changes in the business that occurred while the job was posted, not based on the qualifications of any candidates.  In such cases, the job was taken down, reapproved, and reposted as a new job.  Candidates then applied to the new job posting and the job was posted for a certain amount of time before interviews began.

14.    I have never considered gender in any of the recruiting work I have been involved with at Nike.

Page 4    -    DECLARATION OF LORISE MORTON

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____, at _____.
               2/28/2022                  Colorado Springs, CO

                                                 City, State

DocuSigned by:

*Lorise Morton*

E623362697BC45E...

_____

LORISE MORTON

Page 5    -    DECLARATION OF LORISE MORTON

## <u>DECLARATION OF RYAN OWEN</u>

I, Ryan Owen, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I have worked in Talent Acquisition at Nike World Headquarters ("WHQ") since August 2018.  My first role at WHQ was Senior Director of Global Talent Acquisition for Innovation, Design, Product, and Merchandise and Converse and Jordan.  I was in that role until October 2020, when I moved into my current role, Senior Director Talent Acquisition for Global Operations, Planning, Manufacturing, & Corporate Functions.  Prior to my roles at WHQ, I worked in Talent Acquisition at Nike in China.  Prior to that, I worked in talent acquisition on the agency side.

4.      I oversee all of the recruiting for my current functions, the Global Operations, Planning, Manufacturing, & Corporate Functions.  My team handles recruiting for entry-level jobs to Senior Director and Vice President roles.  I am only personally involved with hiring Directors, Senior Directors, and Vice Presidents.

5.      I supervise around 50 recruiters, but I have four direct reports.  My direct reports are Directors and each covers different areas of Nike's business.  One manages recruiting for Global Operations and Logistics, another manages Air MI, another manages Global

Page 1    -    DECLARATION OF RYAN OWEN

Manufacturing, and the last one manages Corporate Functions. They each manage their own teams of recruiters. Each of these different areas that my Directors recruit for, as well as each individual job within those areas, have different expectations, targeted skill sets, and desired education. Every single role at Nike is unique and involves unique expectations. For example, Finance may want a CPA background, while Legal may want a bar certification and a certain number of years working as an attorney. And in my previous role, for example, recruiting for a Designer in Footwear would look different than recruiting for a Designer in Apparel, as they each would be targeting experience within their respective and specific groups.

6.      My role in the recruiting process is managing the overall recruiting strategy for the particular function and understanding the key priorities. I also develop strategies for creating diverse teams, working with sourcing partners, attracting talent, university relations, and other events. I do not generally handle the day-to-day recruiting process. Rather, I empower the recruiters I supervise to manage the recruiting process themselves. I am not involved in the individual recruiting practices for certain roles, unless I am personally recruiting for a Senior Director or Vice President role. I am not involved in hiring the final candidate for a position or setting the starting salary for a candidate. Recruiters work with the hiring managers, who make these decisions. I do not approve or disapprove any of these decisions. The only time that I am involved in any hiring decisions or starting pay decisions that are managed by my recruiters is if something is out of the ordinary. For example, recruiters would consult with me if a hiring manager wants to set a starting salary for a candidate that is over 110% of the range set for the role, or wants to offer a significant sign on bonus. Otherwise, the recruiting process is managed from start to finish by the recruiters and the hiring managers, with the hiring managers having ultimate authority over the decisions.

Page 2    -    DECLARATION OF RYAN OWEN

Davis Decl. Exhibit 36, Page 2 of 5

7.      Although the hiring managers are ultimately responsible for these decisions, my team does works with hiring managers throughout the process.  For example, a recruiter generally will have a conversation with the hiring manager at the very beginning of the process to understand what type of candidate they are looking for and what type of role they want to fill.  The recruiter then generally works with the hiring manager throughout the entire process, usually checking in weekly or biweekly, to keep them up-to-date regarding the status of the search and make sure they are involved in any decisions.  The hiring manager is instrumental in this process.  The final say regarding a candidate rests with the hiring manager.  Of course, the hiring manager may work with different stakeholders in the company in certain circumstances to make sure that everyone is aligned with the final decision, especially in higher-level jobs or jobs that require cross-functional work.  For example, a position on the Finance team would often support the Product team, so a hiring manager on the Finance team may reach out to the Product team to ensure that they agree with the hiring decision.

8.      All roles that are "E band" and below are supposed to be competitively posted.  "S band" roles do not necessarily have to be posted, but a hiring manager makes the final decision regarding whether it should be posted or not.  If a job is posted, the band level is set prior to posting, and it cannot change.  If a hiring manager suddenly wants to make the posting a different band level during the recruiting process, we would have to cancel the role entirely, repost as a new role, and restart the competitive process—i.e., new candidates would apply and interview for the role. If a candidate tries to negotiate a higher band level, we decline and recommend that they apply for a different role.  There are sometimes circumstances where a recruiter thinks that an individual is a great candidate, but would be better suited for a different role or band level, whether higher or lower.  In these circumstances, the recruiter would speak to the candidate and recommend that they

Page 3    -    DECLARATION OF RYAN OWEN

DocuSign Envelope ID: DE3C425B-975E-49D3-8463-804DC1A652AF

apply for a different role. However, the decision of which role to apply to always remains with the candidate. The recruiter cannot apply them for any role on the back end, unless the positions are exactly the same—i.e., the band level, title, criteria, ACE questions (screening questions), and assessment are all identical. My recruiters handle these type of conversations without my input.

9.     A new hire's starting salary should be within the range for the role, which stems from the market rate for comparable positions at comparable companies in comparable markets. Hiring managers then work within that range to set the starting pay for a candidate. I am not involved in setting starting pay, unless I am personally involved in the recruiting process for the senior positions, or if the hiring manager wants to offer someone a salary that is outside of 85% to 110% of the range. Generally speaking, for candidates with similar qualifications and backgrounds, we try to offer them a salary in the middle of the range. This allows us to be competitive while also allowing the candidate to grow in the position and receive increases in salary.

10.     However, there are times where candidates are offered different salaries for the same job or band level. For example, if we are filling an "E band" role, we often evaluate whether the candidate is a new "E band" or someone who has been in a similar director role for a few years, whether at Nike or at another company. If a candidate is considered newer to the role, it is more likely that we would offer that candidate the middle of the range. But if a different candidate had been in a similar role for five years, we would likely offer them a higher salary. This is simply because the candidate who has been in a similar role for a longer time has more relevant experience, will likely require less training, and may perform at a higher level than a candidate that is new to the role. If Nike offered everyone in the band level the exact same starting salary, that would not accurately and fairly reflect the employees' experience, skill sets, or contributions

Page 4     -     DECLARATION OF RYAN OWEN

Davis Decl. Exhibit 36, Page 4 of 5

DocuSign Envelope ID: DE3C425B-975E-49D3-8462-804DC1A652AF

to the company. Relevant experience is an important factor in salary considerations. However, it is ultimately up to the hiring manager's discretion with the input of the recruiter to decide if a higher salary should be offered based on experience.

11.     While experience tends to be a constant salary consideration for most roles, there are certainly nuances based on the position and functional areas. For example, a role in Data & Analytics may desire someone with a certain education, certification, or skill set. If a candidate possesses unique qualifications in these areas, a hiring manager may be inclined to offer a higher salary. Nike is a big company with many jobs. Each job will target different skill sets and qualifications. And the hiring process and salary considerations for each will be catered to whatever position is being filled.

12.     Candidates will often try to negotiate higher salaries. Hiring managers may take a candidate's salary expectations into consideration, if the candidate offers them. But, ultimately, salary ranges are tied to the job codes, which are tied to the band levels. We want to work with our candidates, but we also need to be equitable.

13.     At Nike, we have a strong focus on diverse talent for all roles and aim to compose a diverse slate of talent for all roles at "E Band" and above. In this regard, we have a strong focus on female talent during the hiring process in order to meet the requirements of the slate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___3/16/2022___, at ___Portland, OR___.
                Date          City, State

*Ryan Owen*
362730A11A124BC...

Ryan Owen

Page 5    -    DECLARATION OF RYAN OWEN

## <u>DECLARATION OF NICHOLE SCIRE</u>

I, Nichole Scire, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I am the Talent Acquisition Director for the Corporate function at Nike.  I have held this role since May 2021.  From 2019 to 2021, I was the North America HR Talent Manager.  I joined Nike in 2018 as a Senior Recruiter in support of the Product Merchandising function.  Prior to working at Nike I had several years of experience as a recruiter at Resources Global Professionals, Aquent, and Modis.

4.      In my role as Senior Recruiter, I recruited for all L through S Band roles within the Merchandising function.  Because I supported the entire Merchandising function, I worked with many different managers, since it is a very large organization.  I covered North America, APLA (Asia, Pacific & Latin America), Jordan Brand, and the global merchandising teams on external and internal hires.

5.      In my role as North America HR Talent Manager, I was not involved in recruiting.  In that role, I focused on helping our internal workforce to develop and grow their leadership potential at Nike.

Page 1     -     DECLARATION OF NICHOLE SCIRE

6.      In my current role as Talent Acquisition Director for the Nike Corporate function, I report to Ryan Owen, Senior Director of Talent Acquisition.  I work with the Corporate function hiring managers to assist with their hiring needs for roles in the A through S bands.  The Corporate function includes Finance, Accounting, the Strategic Planning group, the Chief Administration Office ("CAO"), and HR for our HR teams.  This involves both internal and external hiring.

7.      I currently manage a team of approximately 16 people: a Talent Acquisition Manager supporting the HR function (with six direct reports), a Talent Acquisition Manager supporting the CAO (with two direct reports), four Finance recruiters, and two Strategic Planning recruiters.  One of the Strategic Planning recruiters supports L and U band hiring for Strategy Analysts and Strategy Manager roles.  The other Strategic Planning recruiter supports hiring at the Director and Senior Director levels (E and S band).

8.      There are certain guidelines for the job posting and hiring process, such as a requirement that we must consider the entire applicant pool, and a requirement that our jobs must be posted for a minimum period of seven days.  There are also some standard interview questions recruiters often use, but there are so many positions at Nike that are distinct, and so many that require different skills, it is important that interviewers tailor their questions to the specific role.  We actually obtain input on our interview questions from the specific hiring manager who will make the hiring decision so we make sure to collect the information most relevant to the role, but once we decide which questions to ask, we try to ask each candidate the same questions, so each applicant has the same opportunity to succeed.

9.      As a recruiter, I get involved in the hiring process once it is determined that the role is ready to be hired.  After the hiring manager determines the Band and level for the job and

Page 2    -    DECLARATION OF NICHOLE SCIRE

Davis Decl. Exhibit 37, Page 2 of 7

prepares a job description in consultation with an HRBP, I schedule an intake meeting with the hiring manager. At the intake meeting, I ask questions about the job description to make sure I understand the role and the specific candidate attributes the hiring manager is looking for. The hiring manager generally will discuss her expectations for the role, as well as the "must-have" skills versus the preferred qualifications. During these meetings, I also try to understand what the role would look like in the day-to-day context.

10.     After this discussion, I generally post the role through our applicant tracking system (Taleo), which allows candidates to apply. After sufficient time has passed for applications to come in (which is at least the minimum posting time), I go through the database and review the applicants, assessing the candidate's resume against the role requirements that the hiring manager provided to me.

11.     Next, I typically conduct an initial phone screen with candidates. During this initial phone screen, I often ask candidates to share their salary expectations. I generally let the candidate know the salary range for the position, and if the candidate is looking for a higher salary range, they may remove themselves from consideration. The hiring manager then narrows down the list of candidates further based on their resumes and phone screen results to get a list of applicants for a first round interview. After the initial phone screen, I do not attend any interviews for the candidate.

12.     Certain positions have different hiring considerations based on the skillset required for the job. For example, applicants for L and U Band roles in the Strategic Planning function have to complete a case study as part of the application process, because part of their role will include analyzing problems and issues and making recommendations to fix or improve processes. There is no need for a Finance candidate to do that. The criteria considered also

Page 3     -     DECLARATION OF NICHOLE SCIRE

Davis Decl. Exhibit 37, Page 3 of 7

DocuSign Envelope ID: B2D174C6-66D5-4559-A2D0-159E21283B99

varies based upon the number of years of experience held by the candidate and the level of the role to which the candidate applied. Individual hiring managers also prioritize different candidate attributes depending on the role. Outside of the required technical skills needed to be successful in a role, hiring managers often look at whether the candidate has prior experience that is relevant to the specific role, because all experience is not equally applicable to all roles. Also, some roles are very complicated and specific to Nike's business, so the hiring manager may prefer to hire someone with inside Nike experience over an external candidate.

13. After candidates go through the final round of interviews, the recruiter generally debriefs with the hiring manager and other business leaders who interviewed the applicant. The interviewers then share their feedback on each individual candidate. We then have a discussion from the interviewers' perspective on who they think is best for the role, but ultimately the decision of which individual to hire belongs to the hiring manager.

14. Once the candidate is selected by the hiring manager, the recruiter generally prepares a salary recommendation range, based on the pay range for the role (which is set before requisitions are posted) and the candidate's background and level of experience. The salary recommendation range should not be solely based on the applicant's salary expectations. The salary recommendation range is then provided to the hiring manager. The hiring manager makes the final decision regarding the compensation that will be offered for the role, including the starting salary. If the starting salary offer falls within the pay range for the role, the hiring manager does not need to get approval from anyone before the recruiter officially extends the offer to the candidate. If the hiring manager wants to exceed the pay range, there are different levels of approval, depending on the proposed offer (e.g., Talent Acquisition Director, Senior Talent Acquisition Director, or the Compensation team). If we are trying to land a candidate

DocuSign Envelope ID: B2D174C6-66D5-4559-A2D9-159E21383B99

who has a competing offer, the hiring manager may be willing to increase the salary offer within the range, but sometimes we simply are not able to compete with offers from larger Silicon Valley tech companies, particularly given our location in Oregon.  The hiring manager also may offer a candidate who interviewed very strongly or has significant relevant experience a higher salary within the range than someone with less relevant skills and experience or who had a weaker interview.

15.    When a candidate applies for a position, the Band and level have already been set by the hiring manager in consultation with their HRBP.  Band and job levels are not negotiable. We do not hire someone who applied to a job in a specific Band or level role into a lower or higher Band or level.  If the applicant is interested in another job with a higher or lower Band or level, they would need to formally apply for this role and, if selected, go through the competitive interview process.

16.    During the course of recruiting, I may talk to a candidate who is a great talent for Nike, but not necessarily right for the role to which they applied.  In that case, I may advise the candidate that we have other openings available and suggest that they may want to apply for additional positions, if they choose.  However, I have never applied to a role for a candidate or transferred their application to another role.  It is always the candidate's decision if they choose to submit for a role.

17.    Avature is our candidate relationship management tool.  I use it when I am sourcing candidates.  For example, for some roles, I use LinkedIn Recruiter to do my own sourcing to pinpoint the talent that I think the hiring manager is looking for.  For those people who engage back, I upload their resumes and/or LinkedIn profile onto Avature.  If I have a conversation with a candidate and they say they are interested in the role, I will send them a link

Page 5    -    DECLARATION OF NICHOLE SCIRE

Davis Decl. Exhibit 37, Page 5 of 7

DocuSign Envelope ID: B2D174C6-66D5-4559-A2D9-159E21283B99

to the job posting so that they can apply online.  But even if I record a candidate in Avature, they still have to apply for the job.  And they do not have to apply for the job I send them only; they are free to apply for any jobs they choose.  I use Taleo every day for internal and external recruiting.  Taleo is our applicant tracking system.  If I invite an internal candidate to consider an opportunity for an open position, they need to formally apply for the role through the Careers website if they actually want to be considered for the role, but I do not typically proactively source internal employees for roles.

18.     When I first started at Nike in 2018, every time I received a role to fill from the hiring manager, there would also be a discussion where the hiring manager would decide whether a job would be posted internally only or both internally and externally.   Since approximately one year after I started at Nike, generally any role that is an E-band and below is supposed to go through a competitive hiring process, which means that the role will be posted. At the Senior Director level and above, roles may or may not be posted.  If the leadership and HR team decide to post a Senior Director level and above position, then it goes to Talent Acquisition to start the recruiting and competitive higher process.

19.     As a recruiter, I work with our Diversity, Equity and Inclusion Sourcing team when we have roles we need to fill at the leadership level (Director level and above).  We strive to source for diverse pools of qualified talent.  We strive to do this because we want to ensure that we are providing the hiring manager with the most qualified talent pool from which to select.

///

///

Page 6    -    DECLARATION OF NICHOLE SCIRE

DocuSign Envelope ID: B2D174C6-66D5-4559-A2D0-159E21283B99

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ____3/18/2022_____, at ____Beaverton, Or._____.

DocuSigned by:

*Nichole Scire*

665A5F402CAC441...

Nichole Scire

Page 7    -    DECLARATION OF NICHOLE SCIRE

DocuSign Envelope ID: F7050DD5-E46E-4331-BF23-60F047A1EE5B

## DECLARATION OF CONNOR SNASHALL

I, Connor Snashall, declare and state as follows:

1.      I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.      I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.      I am a Lead Technical Recruiter for Insights & Analytics at Nike.  My first recruiting role at Nike was as a Technical Recruiter at Nike World Headquarters ("WHQ").  I was hired as a full time employee in August 2018.  I held that position until September 2019.  I then became a Senior Technical Recruiter and held that title until January 2021.  I then relocated from Portland, Oregon to Boise, Idaho.  At that time, working remotely for Nike was not an option, so I worked for a short time at Tesla as a recruiter.  However, nine months after I switched to Tesla, I was able to and happily returned to a remote position at Nike.  I became a Senior Technical Recruiter for Insights & Analytics in September 2021 and held that role until I moved into my current positon in February 2022.  I recruit for WHQ positions, as well as remote positions, at Nike.

4.      I have been involved in hiring different functional areas and band levels in my different roles at Nike.  As a Technical Recruiter, I recruited for the Global Technology Business, mostly recruiting Software Engineers, DevOps Engineers, and Solution Architects.  These were mostly "L band" and "U band" roles.  As a Senior Tech Recruiter, I recruited Technical Product

Page 1     -     DECLARATION OF CONNOR SNASHALL

Manager, Cyber Security, and Tech Ops roles. These roles were primarily "U bands," "E bands," and "S bands," so I recruited for a wide range of skill sets. In my most recent Senior and Lead Technical Recruiter roles, I primarily recruit "L bands," "U bands," and "E bands" into Data Science and Analytics positions. I am involved in both internal and external recruiting.

5.     My involvement in the recruiting process begins after a requisition has been approved and opened. My first step is having a conversation with the hiring manager regarding the job. We call this an intake. During this conversation, I discuss with the hiring manager what the team does and how the new hire will fit into that team, whether it is a new position or a backfill, what kind of projects the new hire will be working on, the hard requirements for the job, reporting requirements, the team dynamic, past career paths to target for candidates, whether the new hire will have a direct report, diversity within the current team, desired industries to target, and whether the hiring manager knows anyone internally or externally who is interested in the position.

6.     I also get the job description from the hiring manager during this meeting. I take that description and run it through a program called Textio, a tool that provides data and information on preparing thoughtful, inclusive language in job descriptions. Then we take the description and the other information we have for the job (e.g., job code, band level, description, etc.) and work with Recruiting Services to post it. The posting also has at least three ace questions associated with it, which will screen candidates who do not meet the minimum qualifications for the job. For example, some jobs will require a bachelor's degree or at least 4-5 years of experience. If the candidate does not meet either of those requirements, the candidate does not meet the minimum qualifications and cannot be considered for the position. These questions are set through my discussions with the hiring manager.

Page 2    -    DECLARATION OF CONNOR SNASHALL

7.      We post jobs internally, but more often than not, we post externally too.  Once the job is posted, applicants apply, and I review resumes and look for the particular skill sets and qualifications needed for the particular role.  For example, in technical roles, hiring managers tend to prefer hands-on technical experience on a candidate's resume, so I look for that when evaluating the resumes.  I then usually conduct a phone screen, but sometimes I will not.  For example, for some "L band" roles, we use a video system where candidates answer similar questions to what we would ask in an initial phone screen.

8.      Sometimes during the interview process, I come across candidates that appear to be better suited for a different band level than the job to which they applied.  For example, I have seen highly qualified candidates that should be applying for positions in higher band levels.  Because the band level for a position does not change once it is posted, I have had candid conversations with candidates about other open positions and have suggested that they apply to another role or band level.  I can only suggest that they seek out another role; they need to make the final decision and apply.

9.       After the screener interviews, I generally choose around three to five candidates to advance to the next stage: an interview with the hiring manager.  After the candidates speak with the hiring manager, they typically have one-on-one interviews with around four to five people on the team.  Once the interview process is complete, the hiring manager, interviewers, and myself have a debrief session.  The hiring manager makes the final decision regarding which candidate to hire.

10.      My interaction with the hiring manager throughout this entire process varies.  For example, some managers want to have weekly meetings from the posting of the job to the offer.  Others want minimal interaction and prefer less frequent check-ins.

Page 3    -    DECLARATION OF CONNOR SNASHALL

Davis Decl. Exhibit 38, Page 3 of 5

11.     The hiring manager sets the final salary for a new hire.  I generally have a conversation with the hiring manager and provide my input, but it is the hiring manager's decision. The final salary generally should fall within 85% and 110% of the range set for the job code.  If the hiring manager's final salary falls within this range, no approval is needed.  Hiring managers consider a number of factors in determining the amount of the final offer; there is no set formula. One factor many hiring managers consider is internal equity.  For example, if there is a Senior Data Scientist on the team already and we are hiring another Senior Data Scientist with similar qualifications, the hiring manager may try to align their salaries so they are similar.  Hiring managers also may consider whether that candidate has any other offers in hand and try to be competitive within our range.  Of course, qualifications also often play a significant role in salary considerations.  For example, we recently hired a candidate into Cyber Security who was exceptionally qualified and skilled.  Based on that, the hiring manager determined that the candidate deserved and was offered the max of the range.

12.     Avature is used to house information regarding candidates who have not yet applied to work at Nike, but whom we might want to recruit in the future (i.e., passive talent).  I do not use Avature much.  If I am working with passive talent, it is typically because I have a role that I think they should apply for and recommend that they apply immediately.  Once they do, they are in Taleo (our applicant tracking system), and I can see where they are in the application process. Whether a candidate is internal or external, the candidates have to apply for the jobs themselves. I do not apply for them.

13.     I also work with hiring managers regarding fill strategy.  In the past, hiring managers could decide to do what is called an in-line promotion—or promoting an internal candidate without a formal application process.  For example, hiring managers sometimes had

Page 4     -     DECLARATION OF CONNOR SNASHALL

Davis Decl. Exhibit 38, Page 4 of 5

DocuSign Envelope ID: F7050DD5-E46E-4331-BF23-60E047A4EE5B

certain internal candidates or contractors in mind that would be perfect and qualified for the role. The thought was that it was better to simply promote someone rather than post the job and waste other candidates' time.  Also, hiring managers sometimes wanted to promote someone because they needed the role filled quickly, and they could quickly determine who was qualified on their team.  Now, in the organization that I recruit for, we always post the job either internally, externally, or both for at least seven days.  Other parts of Nike may handle this differently.

    14.    Other than focusing on diverse candidate slates for "E bands" and above, I do not consider gender in any of my recruiting decisions.

    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___2/10/2022___, at ___Grants Pass, OR___.

DocuSigned by:

*Connor Snashall*

70E7132F529B470...

Connor Snashall

## DECLARATION OF GRACE YOON

I, Grace Yoon, declare and state as follows:

1.    I have personal knowledge of the facts contained in this declaration.  If called as a witness, I could and would testify competently to those facts.

2.    I make this declaration entirely of my own free will and choice.  No promises of benefits or threats have been made to me to persuade me to sign it.  I understand that this declaration is given under penalty of perjury and therefore I must be completely truthful and accurate in my statements.  I have reviewed this declaration carefully, and it is truthful and accurate.

3.    I started recruiting at Nike in December 2019 as a Technical Recruiter.  I started at Nike as a temporary worker, and became a Nike employee in March 2021.  I am currently a Lead Technical Recruiter for Global Technology.  Prior to recruiting at Nike, I worked as a recruiter at DHL and a recruitment agency.

4.    In my role as a Lead Technical Recruiter for Global Technology, I recruit primarily candidates in cyber security.  I recruit for a range of roles from analyst engineers to directors in the L to E bands.  I primarily recruit for roles at Nike World Headquarters.

5.    Initially, I only recruited candidates that were external, but now I recruit for roles that are filled by external and internal candidates.  The Vice President for cyber security mandates that all jobs in this organization must be posted externally so no job can be filled through an internal hiring process.

6.    Once a role in cyber security is approved and is assigned to me, I will meet with the hiring manager to perform an intake interview.  The hiring manager and I will discuss the skillset required for the role and review the job application together.  The job level and job band

Page 1    -    DECLARATION OF GRACE YOON

Davis Decl. Exhibit 39, Page 1 of 4

DocuSign Envelope ID: 23EFD36A-45E1-4FC0-B69D-49D2A393BB5C

are set by the hiring manager in consultation with Human Resources (HR) before I meet with the hiring manager. I am not involved with setting the job level or job band. Once the hiring manager clarifies the role requirements, we finalize the job posting.

7.      I review resumes for each job posting and send the hiring manager batches of candidates that meet the required skills. The hiring manager then reviews these resumes and selects candidates for a phone screen. I conduct these phone screen interviews and send my notes on each candidate to the hiring manager. The hiring manager will then choose candidates for the interviews.

8.      Each candidate is typically interviewed by three to five Nike employees who are typically one or more levels higher than the position. Interviews typically involve one Nike interviewer and the candidate. Sometimes, two Nike interviewers participate in an interview if the interview is focused on technical skills. Two Nike interviewers per interview is typically the limit.

9.      After the interviews, I lead a discussion between the interviewers and the hiring manager so the hiring manager can collect feedback about the candidate. Ultimately, the hiring manager makes the decision on hiring a candidate. Hiring managers make their decision based on several criteria, including experience, technical background, and business need.

10.     The hiring manager sets the starting salary. Once the hiring manager decides to offer a candidate the position, the hiring manager and I will have a discussion about starting salary. Each role has a salary range based on the job code, but that salary range is not a hard boundary and a candidate can receive a higher starting salary above the range. The hiring manager has discretion, without approval, to set the pay within 85% to 110% of the midpoint of the salary range for the role. In special circumstances, a hiring manager may choose a starting salary above 110% of the midpoint, which would require approvals from HR and/or Talent Acquisition leaders,

Davis Decl. Exhibit 39, Page 2 of 4

depending on how far the starting salary is from range. For example, a special circumstance could occur if a hiring manger wanted to hire a "superstar" candidate who typically has a competing offer. A hiring manager might consider a candidate a "superstar" if the candidate has excellent credentials, background, and experience in a similar role, including the right balance of hard and soft skills, if the candidate has demonstrated skills and achievements that could translate to Nike, if they are value-added to the business, and if the candidate has received very positive feedback from interviewers. Based on my experience, the hiring manager would engage HR regarding proposed starting salaries that might exceed the range.

11.    Hiring managers evaluate candidates' experiences differently based on the team. For example, the cloud team uses Amazon Web Services (AWS) tools, the vulnerability team uses Rapid7, and the automation team requires python coding. The years of experience may be similar for the level required, but the tools and hard skills for each team vary based on the functional area of the role. Furthermore, hiring managers evaluate soft skills and depth of experience differently. Some hiring managers place a premium on years of experience and would only hire candidates with many years of experience, whereas other hiring managers would hire someone with fewer years of experience.

12.    Hiring levels are set for a role prior to the job posting. Job level cannot be changed once the job is posted. However, in rare circumstances, a candidate could apply for one job and then apply for and receive a higher-level job on the same team. This situation has only happened two times in two years. Both times, the candidate was a "superstar" candidate who was over qualified for the job to which the candidate applied. The hiring manager wanted to hire this superstar candidate and therefore closed the initial job posting, received approval for a job at a higher level and then posted the new job. The job posting at the higher level remained open for at

Page 3    -    DECLARATION OF GRACE YOON

Davis Decl. Exhibit 39, Page 3 of 4

least seven days.  The candidate then applied for the new job and received the job after a competitive application process.

13.     If a candidate applied for a position at Nike and did not receive the role, but the candidate has a strong background with skills that would match another team, I often discuss other roles at Nike with that candidate.  I share other job descriptions and positions with those candidates and let them know that if they are interested in the roles, the candidate should apply to that role.  I would encourage the person to apply to the role, but it would be up to the candidate to apply for the position.   These roles are in the same level as the roles that the candidate previously applied to.  This situation does not happen frequently because candidates often apply for multiple roles.

14.     I only consider gender when sourcing candidates at Nike to assist in diversity efforts aimed building pipeline of diverse candidates for roles into the cyber security organization.  Otherwise, I have never considered gender in any of the recruiting work I have been involved with at Nike.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____3/18/2022_____, at _____Beaverton, OR_____.
                          Date                                    City, State

_____

GRACE YOON

Page 4     -    DECLARATION OF GRACE YOON

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON, Cal. SB# 234737 (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA E. ZABELE, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No.:  3:18-cv-01477-JR |
| Plaintiffs, | DECLARATION OF MONIQUE MATHESON |
| v. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

Page 1    -    DECLARATION OF MONIQUE MATHESON

## DECLARATION OF MONIQUE MATHESON

I, Monique Matheson, hereby declare as follows:

1.      I am over the age of eighteen and have personal knowledge of the matters set forth in this declaration. I am competent to testify to such matters at a hearing or trial if necessary, and I am authorized to make this declaration.

2.      I have been employed by Nike, Inc. ("Nike") for over twenty-three years. My current position is Executive Vice President, Chief Human Resources Officer, which I have held since approximately July 2017.  Before that, I was in the role of Vice President, Chief Talent and Diversity Officer from approximately July 2012 through July 2017.  Throughout my Nike career, I have held a number of other Human Resources and Employee Relations positions as well.

3.      I had my deposition taken in this matter on February 22, 2021.

4.      In April 2018, I published a message to all Nike employees on Nike's internal intranet site, titled "Representation and Pay Equity Commitments," and sent the same message as an email to Nike employees.  A true and correct copy of that message is attached to this declaration as Exhibit A.  I understand that the Plaintiffs in this case have misrepresented this message, which I would like to correct.  Specifically, I understand that Plaintiffs allege that in this message, where I told employees that Nike needed to "remove bias" from the hiring process, that I was confirming or admitting that Nike's hiring processes were biased.  I also understand that Plaintiffs are attempting to infer from my statement that Nike "needs to improve representation of women," that I was admitting or conceding that Nike's practices were biased or unfair to women.  To be clear, I was not.

5.      My April 2018 message was not an admission or concession that Nike's practices were biased, unlawful, or discriminated against women.  I did not believe that at the time, and I

Page 2    -    DECLARATION OF MONIQUE MATHESON

Davis Decl. Exhibit 40, Page 2 of 10

do not believe that today.  However, as an employer that wants to be a leader in the diversity,

equity and inclusion space, we can and should constantly evaluate our practices to see if we can

do better.  That is why, for months before the April 2018 message, Nike was reviewing our

processes and comparing them against best practices in the industry to see where we could make

them even stronger.  Through this process, we identified some practices that we could

strengthen, and we took steps to do so.  My message to Nike's workforce was not an admission

that Nike's practices were unlawful, it was expressing a desire to implement the most inclusive

and equitable hiring processes possible, so that Nike could create and sustain an even more

diverse workforce.

6.      With respect to my decision to use the term "bias" in my message, again, this is

not because I or others found that Nike's practices contained bias.  Through our months of work

looking at our processes and evaluating best practices, we had spent time learning about various

recruiting and hiring practices, and learned that there were some tools we could implement to

reduce the chance that any bias could creep into our processes.  For example, we implemented a

tool that reviews our job postings to identify words or phrases that could be perceived as more

attractive to candidates that meet a certain demographic profile than others.  The tool also

suggests phrases that could be used to make the postings more attractive to a broader community

of applicants.  Does implementation of this new technology mean that Nike's previous job

postings were biased, discriminatory or unlawful?  Of course not.  But in our constant efforts to

create the most inclusive and diverse workforce possible, we were pleased to implement this tool

into our hiring programs.

7.      I do not believe that a company's decision to evolve its practices should be

considered an admission that the prior practices were biased, unlawful, or discriminatory.  If that

Page 3    -    DECLARATION OF MONIQUE MATHESON

DocuSign Envelope ID: E01D7C1D-2264-4B34-861B-F34C50552F95

were the case, no company would ever try to improve.  To foster the kind of diverse, equitable and inclusive work environments we all desire, we should encourage, not stifle, this kind of change.

8.      I understand Plaintiffs also suggest that Nike changed its practice regarding the posting of open roles in response to complaints of discrimination made by female employees. This is untrue.  In March 2018, Nike sent an "all-employee survey" to all employees, male and female.  In responding to the survey, employees expressed generally that they wanted greater access to information about their career progression at Nike and wanted more transparency on available roles and career paths.  The survey responses were anonymous, so there is no way to know whether this sentiment was expressed by men, women, or both.

9.      Around the same time, through discussions with employees, I also came to understand that there was a perception or appearance that Nike had an "in-group / out-group" culture.  This means that there was a feeling that those in the "in-group" had greater exposure to opportunities than those in the "out-group," including greater exposure to job opportunities.  This was not expressed as a gender-based difference, as there were women in the "in-group," but it was consistent with the feedback received from the all-employee survey that employees wanted more transparency on available roles and career paths.  So, to try to address this perception, we decided to make some changes to Nike's hiring and job posting practices, so that available opportunities were more widely known.

///

///

///

///

Page 4    -    DECLARATION OF MONIQUE MATHESON

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the

United States of America that the foregoing is true and correct.  Executed on this 22nd day of

March, 2022, in _____, California.

Palm Springs

DocuSigned by:

*monique matheson*

000693080980428...

Monique Matheson

Page 5    -    DECLARATION OF MONIQUE MATHESON

Davis Decl. Exhibit 40, Page 5 of 10

# Exhibit A

| Message | |
|---|---|
| **From**: | MMatheson [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6FBEEAB93A734FB3939CC8B7F8EDCCA8-M.MMATHESON] |
| **Sent**: | 4/4/2018 4:00:23 PM |
| **To**: | Lst-Nike.Global [lst-nike.global@nike.com] |
| **BCC**: | Powell, Nigel [nigel.powell@nike.com]; Leonard, Kellie [kellie.leonard@nike.com]; Remuzzi, Mary [mary.remuzzi@nike.com]; Oei, Sabrina [sabrina.oei@nike.com]; Freinquel, Mihal [mihal.freinquel@nike.com]; Favret, Emily [emily.favret@nike.com]; Communications, Internal [internal.communications@nike.com]; Wade, Marcus [marcus.wade@nike.com]; Krane, Hilary [hilary.krane@nike.com]; Matheson, Monique [monique.matheson@nike.com]; Jones, Hannah [hannah.jones@nike.com]; Andrews, Antoine [antoine.andrews@nike.com]; Fuller, Julie [julie.fuller@nike.com]; Leinwand, Robert [robert.leinwand@nike.com]; Thibodeaux, Lauren [lauren.thibodeaux@nike.com]; Lupo, Kim [kimberly.lupo@nike.com]; Simpson, Patrick [patrick.simpson@nike.com]; Smiddy, Alex [alex.smiddy@nike.com]; Small, Carolyn [carolyn.small@nike.com]; Bassett, Lynn [lynn.bassett@nike.com] |
| **Subject**: | Representation & Pay Equity Commitments |
| **Flag**: | Follow Up |



Team –

We are committed to evolving our culture and making NIKE, Inc. an environment focused on respect, equality, inclusion and empowerment. For NIKE to grow and evolve, we need to create meaningful change and put a sharper focus on how we lead our teams and work together.

We're a growth company committed to employing the best and brightest to serve consumers globally. Employees with the necessary skillsets, expertise and diversity are critical to drive our business forward. Diversity allows for a breadth of perspectives and experiences to develop thoughtful and original ideas; it's a key component of innovation.

We also want to create a culture of true inclusion. As part of our plan, we need to improve representation of women and people of color (POC). While we're focused on these two areas in the near term, we will continue to expand representation across other dimensions of diversity over the long term.

While we've spoken about this many times, and tried different ways to achieve change, we have failed to gain traction – and our hiring and promotion decisions are not changing senior-level representation as quickly as we have wanted. We need to accelerate our progress and are committed to being transparent.

I want to walk you through a few elements of this – including where we are now and how we plan to improve. Also, I'd like to help explain some recent pay-related data. It's a lot. Please take some time to get through it.

**OUR CURRENT REPRESENTATION**

Our efforts to improve will begin at the Vice President (VP) level, because representation at this level provides a foundation for us to grow representation at all levels. As a group, these leaders manage broad teams, recognize and promote our internal talent, hire in larger volume, and are charged with leading the business direction for our company and tone for our culture. They also serve as role models and advocates for talent in the organization.

Our FY17 data show that at the VP level, representation is currently at 29% women globally, and 16% POC in the U.S. The U.S. is the only country in which NIKE captures employee race/ethnicity information. Many countries restrict the collection of personal demographic information so we are unable to capture it consistently. Even so, we will continue to make progress against diverse representation globally.

We're also committed to increasing diverse representation across all levels of the company, because we know that our manager and director-level employees will be part of the future senior leadership teams for NIKE. See the FY17 data

Davis Decl. Exhibit 40, Page 7 of 10

CONFIDENTIAL                                                                                                    NIKE_00002233

for all employees, Directors+ and VPs here:

**THE UK GENDER PAY GAP REPORT DETAILS**

I also wanted to share that today, the Nike Brand filed a legally-required government report that measures the

CONFIDENTIAL

difference in average pay for UK women and men at Nike.

The UK Gender Pay Gap is calculated by aggregating all men's pay versus all women's pay – across all bands, levels and jobs – and taking the average of each. The difference in average pay is caused by having fewer UK women in senior-level, higher-paying positions.

Applying the formula, the calculations show that on average, UK men earned 10% more in hourly pay than women in Wholesale (comprised of all Nike employees in the UK minus Retail) and 3% more in Retail. The bonus pay difference between UK men and women was 37% in Wholesale and 15% in Retail. You can learn more about this methodology and data here.

We are working on an action plan to address these results locally in the UK.

**PAY EQUITY IS ONE PART OF THE SOLUTION**

Not to be confused with the UK Gender Pay Gap Report, we also want to provide our most recent data on Global Pay Equity, which we reported last year for the first time. Pay Equity is defined as equal compensation for women, men and all races/ethnicities who undertake the same work at the same level, experience and performance. It's different from the UK Pay Gap analysis because it looks at pay for jobs, rather than average of all pay.

Our FY17 Pay Equity data show that for every ▮ earned by men, women globally earned ▮▮▮ and for every ▮ earned by white employees in the U.S., POC earned ▮▮.

Our approach mirrors that of other leading companies, and allows us to compare across companies and evaluate progress. We've also heard from some of you that this result does not reflect your personal experience, so we have begun supplemental analysis to help us to learn more about specific parts of the company and make speedier progress.

We are monitoring these data, and adjusting where appropriate, driving with 1:1 as our goal for both groups, every year. And while Pay Equity is an important measure, we are also focused on the deeper issue of driving changes in representation, banding and promotions. We will be studying time-in-job and the pace of promotions across our employee base – with a strong focus on women and POC – to understand how this impacts representation.

**DRIVING TOWARD CHANGE**

We are committed to driving change to move us forward. We've done some work overall already, but need to move faster. Here is where we will start:

- **Hold leaders accountable:** There are three ways to increase representation – promotion, retention and hiring – and we're working through strategic initiatives and action plans to enable each of them. Leaders will be held accountable for representation growth within their teams (women globally, and POC in the U.S.).
- **Develop diverse talent:** A multi-faceted approach to investing in our diverse talent. This includes evolving our current development offerings, creating new programs that accelerate emerging diverse leaders, and expanding our employee networks – showcasing our commitment to engaging the diverse talent of the future.
- **Inclusive hiring:** Invest in a dedicated diversity sourcing team to be immersed in the marketplace; increase visibility and accountability to ensure slates of diverse candidates when hiring; and remove bias from critical moments of the hiring process by creating more inclusive job descriptions, enabling blind resume reviews, eliminating the collection of candidate salary history, and using data to inform hiring decisions.
- **Accelerated training:** Focused manager training, beginning in May, to ensure all managers are clear on expectations – when and how they are compelled to act – and have resources to lead in a manner consistent with our values and behaviors. Mandatory Unconscious Bias Awareness training for all employees aimed at creating a stronger, more inclusive culture. Unconscious Bias Awareness training will launch to employees located in the U.S. and Canada in August, with a global launch to all employees in mid-FY19.

Our executive leadership team is committed to action and change. We begin with representation – which we know requires sharp and sustained attention. We will be talking a lot more about our culture, redefining what great leadership looks like and how we model a culture where all leaders are focused on empowering our employees.

We look forward to having a full, open dialogue with everyone. We will also provide opportunities to continue this

Davis Decl. Exhibit 40, Page 9 of 10

CONFIDENTIAL

NIKE_00002235

conversation, and for our communities around the world to share and connect. Over the next couple of weeks and continuing in the months ahead, there will be opportunities to speak directly with leaders face-to-face in small group sessions, 1:1s and D&I-sponsored forums about what this means.

I know you probably have questions, and we've tried to answer some of them here. I believe we are moving in the right direction, and as an Executive Leadership Team, we're encouraged by the passion and voices we hear. We're listening and we'll keep this dialogue going.

We need everyone's help to drive this change, and our leadership team is accountable for making progress against this vision.

I'll connect again soon.

**Mo Matheson**
Chief Human Resources Officer

FOR INTERNAL USE ONLY. © 2018 ALL RIGHTS RESERVED

For more information visit:

Davis Decl. Exhibit 40, Page 10 of 10

NIKE_00002236

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA ZABELE (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br><br>**DECLARATION OF JESSICA STUCKEY** |

Davis Decl. Exhibit 41, Page 1 of 32

    NIKE_HANVEY_00000001

## DECLARATION OF JESSICA STUCKEY

I, Jessica Stuckey, hereby declare as follows:

1.      I am over the age of eighteen and have personal knowledge of the matters set forth in this declaration. I am competent to testify to such matters at a hearing or trial if necessary, and I am authorized to make this declaration.

2.      I have been employed by Nike, Inc. ("Nike") for over ten years. My current position is Senior Director, Global Retail Compensation — a position I have held for approximately eight months. My previous roles at Nike are: Senior Director, Total Rewards Consulting (November 2018-February 2021); Director, Total Rewards Consulting - APLA, North America, & Nike Brand (August 2017-October 2018); Director, Executive Compensation (August 2016-August 2017); Total Rewards Consultant, Converse & Global and North America DTC (November 2014-July 2016); Director, Global Direct to Consumer Compensation (January 2013-Novmber 2014); and Senior Compensation Analyst (November 2010-January 2013).

3.      In this matter, I was designated to testify as Nike's corporate witness on the following (plus one additional) topic: The formation, uses, and review of Nike's SAP job descriptions (i.e., the job descriptions that are substantially similar in format to NIKE_00005318) for Covered Positions, and related policies and practices, if any, for the time period 2015 to present. I sat for deposition on May 14, 2021.

4.      I understand that Plaintiffs' experts have taken the position that, for jobs at Nike, the interaction of Job Subfamily (within Job Function and Job Family) and Job Level is the most differentiated type of work and level of work within Nike's corporate architecture. That is not accurate. Nike's **_job codes_** are the most differentiated type of work and level of work within our corporate architecture (but even then, individuals working in the same job code do not

1    **Davis Decl. Exhibit 41, Page 2 of 32**

necessarily perform similar work). Job codes that share the same Job Subfamily and Job Level

may not be the same from a compensation survey or actual day-to-day perspective at Nike – it

depends on the job. In fact, there are a number of job codes that share the same Job Subfamily

and Job Level but are readily distinguishable, involving the application of differing skillsets.

Here are a few examples:

5.      In December 2017, there were four job codes sharing the same Job Subfamily (Business

Operations) and Job Level (Senior Professional):

| Job Subfamily and Job Level | Job Code | Job Name |
|---|---|---|
| BUSINESS OPERATIONS, SENIOR PROFESSIONAL | A2745 | PROF SR: ANALYTICS |
| BUSINESS OPERATIONS, SENIOR PROFESSIONAL | A2753 | PROF SR: BIZ OPS |
| BUSINESS OPERATIONS, SENIOR PROFESSIONAL | A2898 | PROF SR: DATA SCIENTIST |
| BUSINESS OPERATIONS, SENIOR PROFESSIONAL | A2908 | PROF SR: BUSINESS DATA ANALYTICS |

6.      The differences in skills required between these job codes can be seen in the titles

themselves, but also in their corresponding job descriptions. For example, the job description for

PROF SR: DATA SCIENTIST (A2898) lists the following "Key Job Accountabilities":

**Key Job Accountabilities**

Uses advanced mathematical and statistical concepts and theories to analyze and collect data and construct solutions to business problems. Performs complex statistical analysis on experimental or business data to validate and quantify trends or patterns identified by business analysts. Constructs predictive models, algorithms and probability engines to support data analysis or product functions; verifies model and algorithm effectiveness based on real-world results. Applies and integrates statistical, mathematical, predictive modeling and business analysis skills to manage and manipulate complex high volume data from a variety of sources. Analyzes large quantities of data and presents insights and predictions (e.g., on customer behaviors and preferences, new products and services) to support management planning, execution and monitoring of business decisions.

In contrast, the job description for PROF SR: BUSINESS DATA ANALYTICS (A2908) lists the

following "Key Job Accountabilities":

2      Davis Decl. Exhibit 41, Page 3 of 32

| Key Job Accountabilities |
| --- |
| Analyzes complex business problems and issues using data from internal and external sources to provide insight to decision-makersIdentifies and interprets trends and patterns in datasets to locate influences. Constructs forecasts, recommendations and strategic/tactical plans based on business data and market knowledge. Creates specifications for reports and analysis based on business needs and required or available data elements. Conducts statistical analysis on data and information to ensure correct predictive forecasting or classification. Manages all aspects of end-to-end data processing utilizing customized report building functions of systems. Maintains analytical systems, verifies the accuracy of the data, and acts as liaison with business. |

7.      The presence of multiple job codes in the Business Operations, Senior Professional Job Subfamily-Level is not unique to December 2017. In December 2018, there were also four job codes in that Job Subfamily and Job Level: A2745, A2753, A2898, as well as A2903 (PROF SR: VISUAL INSIGHTS & ANALYTICS). And similarly, in September 2019, there were four job codes in that same Job Subfamily and Job Level:

| Job Subfamily and Job Level | Job Code | Job Name |
| --- | --- | --- |
| BUSINESS OPERATIONS, SENIOR PROFESSIONAL | A2745 | PROF SR: ANALYTICS |
| BUSINESS OPERATIONS, SENIOR PROFESSIONAL | A2196 | PROF SR: BIZ OPS |
| BUSINESS OPERATIONS, SENIOR PROFESSIONAL | A2375 | PROF SR: DATA SCIENTIST |
| BUSINESS OPERATIONS, SENIOR PROFESSIONAL | A2380 | PROF SR: BUSINESS DATA ANALYTICS |

8.      This occurrence – multiple job codes sharing the same Job Subfamily and Job Level – is not unique to Business Operations, Senior Professional, either. For example, looking at the same December 2017/December 2018/September 2019 time periods, the following three job codes all share the same Job Subfamily (Product Category Management) and Job Level (Director) at all three points in time:

| Job Subfamily and Job Level | Job Code | Job Name |
| --- | --- | --- |
| PRODUCT CATEGORY MGMT, DIRECTOR | A1341 | DIR: PROD CATG BUS - APP |
| PRODUCT CATEGORY MGMT, DIRECTOR | A1343 | DIR: PROD CATG BUS - FTW |
| PRODUCT CATEGORY MGMT, DIRECTOR | A1773 | DIR: PROD CATG BUS - EQUIP |

3       Davis Decl. Exhibit 41, Page 4 of 32

9.     But that does not mean the jobs are similar.  First, the job names demonstrate that the job codes relate to different Nike product categories: Apparel (A1341), Footwear (A1343), and Equipment (A1773).  Second, the job descriptions for each of these three job codes demonstrate differences in the skills required for each.  For example, the job description for A1341 lists "Apparel Merchandising / General Management experience in a high image/profile brand" as a specific work experience for that job's "Key Capabilities," and its "Key Job Accountabilities" include "Lead[ing] all aspect of product creation for Apparel for a global category."  In contrast, the job description for A1343 lists "Footwear or Product Merchandising / General Management in high image/profile brands" as a specific work experience for that job's "Key Capabilities," and its "Key Job Accountabilities" includes "Lead[ing] all aspects of product creation for Footwear for a global category."  The same is true for job code A1773, corresponding to the Equipment product category.  And all three job codes require typically eight or nine years' directly relevant work experience (in their particular product area) as a minimum requirement. In sum, the skills necessary to lead all aspects of product creation for Nike Equipment (such as baseball gloves) will differ from the skills necessary to lead all aspects of product creation for Footwear (such as running shoes) or Apparel (such as swimwear).

10.     Two more examples where there are multiples job codes sharing the same Job Subfamily and Job Level in December 2017, December 2018, and September 2019 are as follows:

| Job Subfamily and Job Level | Job Code | Job Name |
|---|---|---|
| INNOVATION, SENIOR DIRECTOR | A1384 | DIR SR: INNOVATION |
| INNOVATION, SENIOR DIRECTOR | A2071 | DIR SR: CHEMISTRY |

4     Davis Decl. Exhibit 41, Page 5 of 32

| Job Subfamily and Job Level | Job Code | Job Name |
|---|---|---|
| FLIGHT, DIRECTOR | A0171 | DIR: MAINT |
| FLIGHT, DIRECTOR | A2229 | DIR: AVIATION |

11.    Again, the differing skills required for the job codes in each grouping can be seen in the titles themselves (Innovation vs. Chemistry, or Maintenance vs. Aviation), but also in their corresponding job descriptions.  For example, per the "Key Job Accountabilities" listed for "DIR SR: CHEMISTRY," the person must be able to "Perform[] qualitative and quantitative analyses to determine chemical and physical properties during chemical syntheses, by verifying their identity, purity, and homogeneity" and "Ascertain[] relationships between molecular structure and physical or biological properties to aid in analysis of compounds and molecules."  In contrast, the job description for "DIR SR: INNOVATION" does not list any of these accountabilities, instead describing how the person must "Direct[] the agenda for innovation and technology developments that result in growth opportunities and competitive advantages in the marketplace[;] Ensure[] ground breaking development of new ideas are consistently delivered and on track with the vision for new products for all Nike business units" (in addition to other Key Job Accountabilities).  Similarly, job code A0171 (DIR: MAINT) requires skills for aircraft maintenance, whereas those in job code A2229 (DIR: AVIATION) must have the skills necessary to fly the aircraft.

12.    For the job codes that I've discussed in this declaration, a copy of all job descriptions that were produced in this case are attached hereto as Exhibit A.

***

5    Davis Decl. Exhibit 41, Page 6 of 32

Confidential                                                                                    NIKE_HANVEY_00000006

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed on this 28th day of September, 2021, at Portland,

Oregon.

DocuSigned by:

*Jessica Stuckey*

2BEFD433BFC04AF...

Jessica Stuckey

Confidential

# EXHIBIT A

Davis Decl. Exhibit 41, Page 8 of 32

Confidential

NIKE_HANVEY_00000008

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2745 | PROF SR: ANALYTICS | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

| Pipeline | PROGRAM/PROCESS EXCELLENCE |
|---|---|
| The nature of the work is focused on defining tools and processes to support overall organizational excellence in program/project management and process definition. | |
| **Family** | **BUSINESS OPERATIONS** |
| | |
| **Sub Family** | **BUSINESS OPERATIONS** |
| | |

| Band Level Criteria & Minimum Requirements for: | U  Band / SENIOR PROFESSIONAL |
|---|---|
| **Overall** | - Requires in-depth knowledge and experience |
| | - Uses best practices and knowledge of internal or external business issues to improve products or services |
| | - Solves complex problems; takes a new perspective using existing solutions |
| | - Works independently; receives minimal guidance |
| | - Acts as a resource for colleagues with less experience; may direct the work of other staff members |
| **Business Expertise** | - Applies best practices and knowledge of internal/external business challenges to improve products, processes or services |
| | - Has developed conceptual and practical expertise in own discipline |
| **Delivering Solutions** | - Solves complex problems; takes a new perspective on existing solutions |
| | - Interprets customer needs, assesses requirements and identifies solutions to non-standard requests |
| **Impact** | - Explains difficult issues and works to build consensus |
| | - Makes decisions within guidelines and policies |
| | - Impacts a range of standard and non-standard customer, operational, process, project or service activities |
| **Resource Management** | - Is accountable for small projects or programs with manageable risks and resource requirements |
| | - Monitors and controls costs of own work and may manage costs for small projects or programs |
| **Brand Protection/Promo** | - Performs work in support of brand plans; demonstrates link between daily work and company mission; participates in initiatives, programs or products with moderate visibility |
| | - Ensures actions protect company image and limits risks |
| | - Decisions and actions impacting company image require management oversight and are constrained by policies |
| **Leadership** | |
| **Minimum Requirements** | - Typically requires a Bachelors Degree and minimum of 5 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 3 yrs; Masters + 4 yrs; Associates degree + 6 yrs; High School + 7 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PROGRAM/PROCESS EXCELLENCE
Davis Decl. Exhibit 41, Page 9 of 32

Confidential
Confidential

NIKE_00005236
NIKE_HANVEY_00000009

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2745 | PROF SR: ANALYTICS | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

### Key Job Accountabilities

Analyzes complex business problems and issues using data from internal and external sources to provide insight to decision-makers.

Constructs forecasts, recommendations and strategic/tactical plans based on business data and market knowledge.

Creates reports for management/leadership on business performance and develops metrics to measure various characteristics of the business.

Defines problems, collects data, establishes facts, and draws valid conclusions.

Applies in-depth understanding of advanced mathematical concepts, operations and/or economics to solve new and complex problems and develop innovative strategies.

| Key Capabilities (beyond minimum requirements for U Band / SENIOR PROFESSIONAL) | |
|---|---|
| **Specific Work Experience** | - |
| **Physical Requirements** | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| **Travel** | No Travel |
| **Irregular Work Hours** | No |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PROGRAM/PROCESS EXCELLENCE
Davis Decl. Exhibit 41, Page 10 of 32

Confidential
Confidential

NIKE_00005237
NIKE_HANVEY_00000010

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2753 | PROF SR: BIZ OPS | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

| Pipeline | PROGRAM/PROCESS EXCELLENCE |
|---|---|
| The nature of the work is focused on defining tools and processes to support overall organizational excellence in program/project management and process definition. | |
| **Family** | **BUSINESS OPERATIONS** |
| | |
| **Sub Family** | **BUSINESS OPERATIONS** |
| | |

| Band Level Criteria & Minimum Requirements for: | U Band / SENIOR PROFESSIONAL |
|---|---|
| Overall | - Requires in-depth knowledge and experience |
| | - Uses best practices and knowledge of internal or external business issues to improve products or services |
| | - Solves complex problems; takes a new perspective using existing solutions |
| | - Works independently, receives minimal guidance |
| | - Acts as a resource for colleagues with less experience; may direct the work of other staff members |
| Business Expertise | - Applies best practices and knowledge of internal/external business challenges to improve products, processes or services |
| | - Has developed conceptual and practical expertise in own discipline |
| Delivering Solutions | - Solves complex problems; takes a new perspective on existing solutions |
| | - Interprets customer needs, assesses requirements and identifies solutions to non-standard requests |
| Impact | - Explains difficult issues and works to build consensus |
| | - Makes decisions within guidelines and policies |
| | - Impacts a range of standard and non-standard customer, operational, process, project or service activities |
| Resource Management | - Is accountable for small projects or programs with manageable risks and resource requirements |
| | - Monitors and controls costs of own work and may manage costs for small projects or programs |
| Brand Protection/Promo | - Performs work in support of brand plans; demonstrates link between daily work and company mission; participates in initiatives, programs or products with moderate visibility |
| | - Ensures actions protect company image and limits risks |
| | - Decisions and actions impacting company image require management oversight and are constrained by policies |
| Leadership | |
| Minimum Requirements | - Typically requires a Bachelors Degree and minimum of 5 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 3 yrs; Masters + 4 yrs; Associates degree + 6 yrs; High School + 7 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PROGRAM/PROCESS EXCELLENCE

Davis Decl. Exhibit 41, Page 11 of 32

Confidential
Confidential

NIKE_00005256
NIKE_HANVEY_00000011

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2753 | PROF SR: BIZ OPS | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

| Key Job Accountabilities |
|---|
| |
| Analyzes plans, conducts and/or prepares plans or procedures that provide operational and/or technical support to business operations to achieve specific objectives. |
| Advises business groups by providing direction to initiative prioritization, integration and resource application. |
| Maintains ongoing communication and engagement with stakeholders. |
| Tracks, maintains and provides current information on the operation's business scorecard. |
| Ensures effective and efficient operations through conducting operations analyses (i.e. operational effectiveness and capacity utilization), and recommends improvements. |

| Key Capabilities (beyond minimum requirements for U  Band / SENIOR PROFESSIONAL) | |
|---|---|
| Specific Work Experience | - |
| Physical Requirements | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| Travel | No Travel |
| Irregular Work Hours | No |
| Certifications | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

Confidential
Confidential

PROGRAM/PROCESS EXCELLENCE
Davis Decl. Exhibit 41, Page 12 of 32

NIKE_00005257
NIKE_HANVEY_00000012

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2898 | PROF SR: DATA SCIENTIST | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

| Pipeline | PROGRAM/PROCESS EXCELLENCE |
|---|---|
| The nature of the work is focused on defining tools and processes to support overall organizational excellence in program/project management and process definition. | |
| **Family** | **BUSINESS OPERATIONS** |
| | |
| **Sub Family** | **BUSINESS OPERATIONS** |
| | |

| Band Level Criteria & Minimum Requirements for: | U Band / SENIOR PROFESSIONAL |
|---|---|
| Overall | - Requires in-depth knowledge and experience |
| | - Uses best practices and knowledge of internal or external business issues to improve products or services |
| | - Solves complex problems; takes a new perspective using existing solutions |
| | - Works independently, receives minimal guidance |
| | - Acts as a resource for colleagues with less experience; may direct the work of other staff members |
| Business Expertise | - Applies best practices and knowledge of internal/external business challenges to improve products, processes or services |
| | - Has developed conceptual and practical expertise in own discipline |
| Delivering Solutions | - Solves complex problems; takes a new perspective on existing solutions |
| | - Interprets customer needs, assesses requirements and identifies solutions to non-standard requests |
| Impact | - Explains difficult issues and works to build consensus |
| | - Makes decisions within guidelines and policies |
| | - Impacts a range of standard and non-standard customer, operational, process, project or service activities |
| Resource Management | - Is accountable for small projects or programs with manageable risks and resource requirements |
| | - Monitors and controls costs of own work and may manage costs for small projects or programs |
| Brand Protection/Promo | - Performs work in support of brand plans; demonstrates link between daily work and company mission; participates in initiatives, programs or products with moderate visibility |
| | - Ensures actions protect company image and limits risks |
| | - Decisions and actions impacting company image require management oversight and are constrained by policies |
| Leadership | |
| Minimum Requirements | - Typically requires a Bachelors Degree and minimum of 5 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 3 yrs; Masters + 4 yrs; Associates degree + 6 yrs; High School + 7 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PROGRAM/PROCESS EXCELLENCE
Davis Decl. Exhibit 41, Page 13 of 32

NIKE_00005262
NIKE_HANVEY_00000013

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2898 | PROF SR: DATA SCIENTIST | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

**Key Job Accountabilities**

Uses advanced mathematical and statistical concepts and theories to analyze and collect data and construct solutions to business problems. Performs complex statistical analysis on experimental or business data to validate and quantify trends or patterns identified by business analysts. Constructs predictive models, algorithms and probability engines to support data analysis or product functions; verifies model and algorithm effectiveness based on real-world results. Applies and integrates statistical, mathematical, predictive modeling and business analysis skills to manage and manipulate complex high volume data from a variety of sources. Analyzes large quantities of data and presents insights and predictions (e.g., on customer behaviors and preferences, new products and services) to support management planning, execution and monitoring of business decisions.

| Key Capabilities (beyond minimum requirements for U Band / SENIOR PROFESSIONAL) | |
|---|---|
| **Specific Work Experience** | |
| **Physical Requirements** | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| **Travel** | <10% |
| **Irregular Work Hours** | No |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

Confidential
Confidential

PROGRAM/PROCESS EXCELLENCE
Davis Decl. Exhibit 41, Page 14 of 32

NIKE_00005263
NIKE_HANVEY_00000014

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2908 | PROF SR: BUSINESS DATA ANALYTICS | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

| Pipeline | PROGRAM/PROCESS EXCELLENCE |
|---|---|
| The nature of the work is focused on defining tools and processes to support overall organizational excellence in program/project management and process definition. | |
| **Family** | **BUSINESS OPERATIONS** |
| | |
| **Sub Family** | **BUSINESS OPERATIONS** |
| | |

| Band Level Criteria & Minimum Requirements for: | U Band / SENIOR PROFESSIONAL |
|---|---|
| Overall | - Requires in-depth knowledge and experience |
| | - Uses best practices and knowledge of internal or external business issues to improve products or services |
| | - Solves complex problems; takes a new perspective using existing solutions |
| | - Works independently; receives minimal guidance |
| | - Acts as a resource for colleagues with less experience; may direct the work of other staff members |
| Business Expertise | - Applies best practices and knowledge of internal/external business challenges to improve products, processes or services |
| | - Has developed conceptual and practical expertise in own discipline |
| Delivering Solutions | - Solves complex problems; takes a new perspective on existing solutions |
| | - Interprets customer needs, assesses requirements and identifies solutions to non-standard requests |
| Impact | - Explains difficult issues and works to build consensus |
| | - Makes decisions within guidelines and policies |
| | - Impacts a range of standard and non-standard customer, operational, process, project or service activities |
| Resource Management | - Is accountable for small projects or programs with manageable risks and resource requirements |
| | - Monitors and controls costs of own work and may manage costs for small projects or programs |
| Brand Protection/Promo | - Performs work in support of brand plans; demonstrates link between daily work and company mission; participates in initiatives, programs or products with moderate visibility |
| | - Ensures actions protect company image and limits risks |
| | - Decisions and actions impacting company image require management oversight and are constrained by policies |
| Leadership | |
| Minimum Requirements | - Typically requires a Bachelors Degree and minimum of 5 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 3 yrs; Masters + 4 yrs; Associates degree + 6 yrs; High School + 7 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PROGRAM/PROCESS EXCELLENCE

Confidential
Confidential

NIKE_00005278
NIKE_HANVEY_00000015

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2908 | PROF SR: BUSINESS DATA ANALYTICS | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

**Key Job Accountabilities**

Analyzes complex business problems and issues using data from internal and external sources to provide insight to decision-makersIdentifies and interprets trends and patterns in datasets to locate influences. Constructs forecasts, recommendations and strategic/tactical plans based on business data and market knowledge. Creates specifications for reports and analysis based on business needs and required or available data elements. Conducts statistical analysis on data and information to ensure correct predictive forecasting or classification. Manages all aspects of end-to-end data processing utilizing customized report building functions of systems. Maintains analytical systems, verifies the accuracy of the data, and acts as liaison with business.

| Key Capabilities (beyond minimum requirements for U  Band / SENIOR PROFESSIONAL) | |
|---|---|
| **Specific Work Experience** | |
| **Physical Requirements** | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| **Travel** | <10% |
| **Irregular Work Hours** | No |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PROGRAM/PROCESS EXCELLENCE
Davis Decl. Exhibit 41, Page 16 of 32

Confidential
Confidential

NIKE_00005279
NIKE_HANVEY_00000016

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2903 | PROF SR: VISUAL INSIGHTS & ANALYTICS | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

| Pipeline | PROGRAM/PROCESS EXCELLENCE |
|---|---|
| The nature of the work is focused on defining tools and processes to support overall organizational excellence in program/project management and process definition. | |
| **Family** | **BUSINESS OPERATIONS** |
| | |
| **Sub Family** | **BUSINESS OPERATIONS** |
| | |

| Band Level Criteria & Minimum Requirements for: | U Band / SENIOR PROFESSIONAL |
|---|---|
| Overall | - Requires in-depth knowledge and experience |
| | - Uses best practices and knowledge of internal or external business issues to improve products or services |
| | - Solves complex problems; takes a new perspective using existing solutions |
| | - Works independently; receives minimal guidance |
| | - Acts as a resource for colleagues with less experience; may direct the work of other staff members |
| Business Expertise | - Applies best practices and knowledge of internal/external business challenges to improve products, processes or services |
| | - Has developed conceptual and practical expertise in own discipline |
| Delivering Solutions | - Solves complex problems; takes a new perspective on existing solutions |
| | - Interprets customer needs, assesses requirements and identifies solutions to non-standard requests |
| Impact | - Explains difficult issues and works to build consensus |
| | - Makes decisions within guidelines and policies |
| | - Impacts a range of standard and non-standard customer, operational, process, project or service activities |
| Resource Management | - Is accountable for small projects or programs with manageable risks and resource requirements |
| | - Monitors and controls costs of own work and may manage costs for small projects or programs |
| Brand Protection/Promo | - Performs work in support of brand plans; demonstrates link between daily work and company mission; participates in initiatives, programs or products with moderate visibility |
| | - Ensures actions protect company image and limits risks |
| | - Decisions and actions impacting company image require management oversight and are constrained by policies |
| Leadership | |
| Minimum Requirements | - Typically requires a Bachelors Degree and minimum of 5 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 3 yrs; Masters + 4 yrs; Associates degree + 6 yrs; High School + 7 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PROGRAM/PROCESS EXCELLENCE
Davis Decl. Exhibit 41, Page 17 of 32

Confidential
Confidential

NIKE_00005272
NIKE_HANVEY_00000017

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2903 | PROF SR: VISUAL INSIGHTS & ANALYTICS | |
| **Band** | **Level** | **FLSA Status** |
| U | SENIOR PROFESSIONAL | Exempt |

### Key Job Accountabilities

● Collects, analyzes and reports management data to support decisions on day-to-day operations, strategic planning and specific business performance issues ● Collates, models, interprets and analyzes data; explains variances and trends ● Identifies and documents enhancements to modeling techniques

| Key Capabilities (beyond minimum requirements for U  Band / SENIOR PROFESSIONAL) | |
|---|---|
| **Specific Work Experience** | |
| **Physical Requirements** | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| **Travel** | <10% |
| **Irregular Work Hours** | No |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PROGRAM/PROCESS EXCELLENCE
Davis Decl. Exhibit 41, Page 18 of 32

Confidential
Confidential

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A1341 | DIR: PROD CATG BUS - APP | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

| Pipeline | PRODUCT MANAGEMENT |
|---|---|
| The nature of the work is focused on product realization including planning & evolution of product lines. | |
| **Family** | **PRODUCT CATEGORY MGMT** |
| Responsible for the leadership of the category product creation team and the direction of category product stories including oversight to evolution of specific product lines. | |
| **Sub Family** | **PRODUCT CATEGORY MGMT** |
| Responsible for the leadership of the category product creation team and the direction of category product stories including oversight to evolution of specific product lines. | |

| Band Level Criteria & Minimum Requirements for: | E  Band / DIRECTOR |
|---|---|
| Overall | - Provides leadership to managers, supervisors and/or professional staff |
| | - Is accountable for the performance and results of multiple related units |
| | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Decisions are guided by resource availability and functional objectives |
| Business Expertise | - Applies business and management expertise to achieve financial and operational objectives within or across disciplines or departments |
| Delivering Solutions | - Identifies and resolves complex technical, operational and organizational problems |
| Impact | - Is accountable for the performance and results of related disciplines or departments |
| | - Makes decisions guided by functional business plans that impact the support and funding of projects, products, services and/or technologies |
| Resource Management | |
| Brand Protection/Promo | - Performs work in support of brand plans; integrates company mission into daily work and planning; leads or participates in key initiatives, programs or products with moderate to wide visibility |
| | - Responsible for actions and managing risks that have shared or moderate impact on own business and have limited short-term impact on company assets |
| | - Decisions and actions impacting company image require senior leadership oversight and/or are constrained by policies |
| Leadership | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Manages resources to ensure financial and operational objectives are met |
| Minimum Requirements | - Typically requires a Bachelors Degree and minimum of 8 or 9 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 6 yrs; Masters + 7 yrs; Associates degree + 9 yrs; High School + 10 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PRODUCT MANAGEMENT
Davis Decl. Exhibit 41, Page 19 of 32

Confidential
Confidential

NIKE_00005098
NIKE_HANVEY_00000019

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A1341 | DIR: PROD CATG BUS - APP | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

| Key Job Accountabilities |
|---|
| Manages team and sets team and individual goals that align with department and function goals. Coaches staff, creates opportunities for staff development, makes hiring decisions, drives performance management, recognition and rewards. Develops team structure that facilitates and maximizes individual and team performance. |
| Leads all aspects of product creation for Apparel for a global category. Creates and directs the implementation of long term business plans to meet category goals. Creates and communications business initiatives, direction, and vision. |
| Directs the development of product strategies to enhance the brand and meet the needs of the customer and consumer. Ensures partnership with the category team to ensure an integrated approach towards the market. |
| Member of the category leadership team. |
| Provides leadership (direct or indirect) to all members of the category product creation team to champion innovation and excellence. |

| Key Capabilities (beyond minimum requirements for E  Band / DIRECTOR) | |
|---|---|
| **Specific Work Experience** | Apparel Merchandising / General Management experience in high image/profile brand. |
| **Physical Requirements** | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| **Travel** | 20-30% |
| **Irregular Work Hours** | No |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PRODUCT MANAGEMENT
Davis Decl. Exhibit 41, Page 20 of 32

Confidential
Confidential

NIKE_00005099
NIKE_HANVEY_00000020

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A1343 | DIR: PROD CATG BUS - FTW | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

| Pipeline | PRODUCT MANAGEMENT |
|---|---|
| The nature of the work is focused on product realization including planning & evolution of product lines. | |
| **Family** | **PRODUCT CATEGORY MGMT** |
| Responsible for the leadership of the category product creation team and the direction of category product stories including oversight to evolution of specific product lines. | |
| **Sub Family** | **PRODUCT CATEGORY MGMT** |
| Responsible for the leadership of the category product creation team and the direction of category product stories including oversight to evolution of specific product lines. | |

| Band Level Criteria & Minimum Requirements for: | E Band / DIRECTOR |
|---|---|
| Overall | - Provides leadership to managers, supervisors and/or professional staff |
| | - Is accountable for the performance and results of multiple related units |
| | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Decisions are guided by resource availability and functional objectives |
| Business Expertise | - Applies business and management expertise to achieve financial and operational objectives within or across disciplines or departments |
| Delivering Solutions | - Identifies and resolves complex technical, operational and organizational problems |
| Impact | - Is accountable for the performance and results of related disciplines or departments |
| | - Makes decisions guided by functional business plans that impact the support and funding of projects, products, services and/or technologies |
| Resource Management | |
| Brand Protection/Promo | - Performs work in support of brand plans; integrates company mission into daily work and planning; leads or participates in key initiatives, programs or products with moderate to wide visibility |
| | - Responsible for actions and managing risks that have shared or moderate impact on own business and have limited short-term impact on company assets |
| | - Decisions and actions impacting company image require senior leadership oversight and/or are constrained by policies |
| Leadership | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Manages resources to ensure financial and operational objectives are met |
| Minimum Requirements | - Typically requires a Bachelors Degree and minimum of 8 or 9 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 6 yrs; Masters + 7 yrs; Associates degree + 9 yrs; High School + 10 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PRODUCT MANAGEMENT
Davis Decl. Exhibit 41, Page 21 of 32

Confidential
Confidential

NIKE_00005102
NIKE_HANVEY_00000021

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A1343 | DIR: PROD CATG BUS - FTW | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

| Key Job Accountabilities |
|---|
| Manages team and sets team and individual goals that align with department and function goals. Coaches staff, creates opportunities for staff development, makes hiring decisions, drives performance management, recognition and rewards. Develops team structure that facilitates and maximizes individual and team performance. |
| Leads all aspects of product creation for Footwear for a global category. Creates and directs the implementation of long term business plans to meet category goals. Creates and communicates business initiatives, direction, and vision. |
| Directs the development of product strategies to enhance the brand and meet the needs of the customer and consumer. Ensures partnership with the category team to ensure an integrated approach towards the market. |
| Member of the category leadership team. |
| Provides leadership (direct or indirect) to all members of the category product creation team to champion innovation and excellence. |

| Key Capabilities (beyond minimum requirements for E  Band / DIRECTOR) | |
|---|---|
| **Specific Work Experience** | Footwear or Product Merchandising / General Management experience in high image/profile brands |
| **Physical Requirements** | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| **Travel** | 20-30% |
| **Irregular Work Hours** | No |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PRODUCT MANAGEMENT

Confidential
Confidential

NIKE_00005103
NIKE_HANVEY_00000022

## NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A1773 | DIR: PROD CATG BUS - EQUIP | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

| Pipeline | PRODUCT MANAGEMENT |
|---|---|
| The nature of the work is focused on product realization including planning & evolution of product lines. | |
| **Family** | **PRODUCT CATEGORY MGMT** |
| Responsible for the leadership of the category product creation team and the direction of category product stories including oversight to evolution of specific product lines. | |
| **Sub Family** | **PRODUCT CATEGORY MGMT** |
| Responsible for the leadership of the category product creation team and the direction of category product stories including oversight to evolution of specific product lines. | |

| Band Level Criteria & Minimum Requirements for: | E Band / DIRECTOR |
|---|---|
| Overall | - Provides leadership to managers, supervisors and/or professional staff |
| | - Is accountable for the performance and results of multiple related units |
| | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Decisions are guided by resource availability and functional objectives |
| Business Expertise | - Applies business and management expertise to achieve financial and operational objectives within or across disciplines or departments |
| Delivering Solutions | - Identifies and resolves complex technical, operational and organizational problems |
| Impact | - Is accountable for the performance and results of related disciplines or departments |
| | - Makes decisions guided by functional business plans that impact the support and funding of projects, products, services and/or technologies |
| Resource Management | |
| Brand Protection/Promo | - Performs work in support of brand plans; integrates company mission into daily work and planning; leads or participates in key initiatives, programs or products with moderate to wide visibility |
| | - Responsible for actions and managing risks that have shared or moderate impact on own business and have limited short-term impact on company assets |
| | - Decisions and actions impacting company image require senior leadership oversight and/or are constrained by policies |
| Leadership | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Manages resources to ensure financial and operational objectives are met |
| Minimum Requirements | - Typically requires a Bachelors Degree and minimum of 8 or 9 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 6 yrs; Masters + 7 yrs; Associates degree + 9 yrs; High School + 10 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PRODUCT MANAGEMENT
Davis Decl. Exhibit 41, Page 23 of 32

Confidential
Confidential

NIKE_00005148
NIKE_HANVEY_00000023

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A1773 | DIR: PROD CATG BUS - EQUIP | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

**Key Job Accountabilities**

Manages team and sets team and individual goals that align with department and function goals. Coaches staff, creates opportunities for staff development, makes hiring decisions, drives performance management, recognition and rewards. Develops team structure that facilitates and maximizes individual and team performance.

Leads all aspects of product creation for Equipment for a global category. Creates and directs the implementation of long term business plans to meet category goals. Creates and communications business initiatives, direction, and vision.

Directs the development of product strategies to enhance the brand and meet the needs of the customer and consumer. Ensures partnership with the category team to ensure an integrated approach towards the market.

Member of the category leadership team.

Provides leadership (direct or indirect) to all members of the category product creation team to champion innovation and excellence.

Responsible for an Equipment category team that creates <$100M product annually.

| Key Capabilities (beyond minimum requirements for E Band / DIRECTOR) | |
|---|---|
| **Specific Work Experience** | Apparel/Product Merchandising / General Management experience in high image/profile brand. |
| **Physical Requirements** | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| **Travel** | 20-30% |
| **Irregular Work Hours** | No |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

Confidential
Confidential

PRODUCT MANAGEMENT
Davis Decl. Exhibit 41, Page 24 of 32

NIKE_00005149
NIKE_HANVEY_00000024

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A1384 | DIR SR: INNOVATION | |
| **Band** | **Level** | **FLSA Status** |
| S | SENIOR DIRECTOR | Exempt |

| Pipeline | PRODUCT CREATION |
|---|---|
| The nature of the work is focused on research and development of products from conception to retail to meet the needs of accounts and consumers. | |
| **Family** | **PRODUCT INNOVATION/R&D** |
| Performs scientific and technological investigation directed toward the acquisition of new knowledge. Research encompasses such endeavors as enlarging and systematizing the organizations knowledge base; understanding the limitations of technology and how to apply its capabilities; developing proof-of-concept prototypes; devising methods and tools for modeling, analyzing and developing products and services. | |
| **Sub Family** | **INNOVATION** |
| Develops ideas that are consistent with the vision for new products by collaborating with product creation on the genesis of new product concepts for all Nike business units. Generates new ways of thinking about aspects of performance based products that result in growth opportunities and competitive advantages in the marketplace. | |

| Band Level Criteria & Minimum Requirements for: | S  Band / SENIOR DIRECTOR |
|---|---|
| **Overall** | - Provides leadership and direction through managers |
| | - Is accountable for the performance and results of related disciplines or a moderate-sized function |
| | - Executes functional business plans and contributes to the development of functional strategies |
| | - Decisions are guided by functional strategies and priorities |
| **Business Expertise** | - Applies broad business and management expertise to drive financial and operational performance across departments |
| **Delivering Solutions** | - Directs the resolution of highly complex or unusual business problems |
| **Impact** | - Is accountable for the performance and results of multiple related disciplines or departments |
| | - Makes decisions guided by functional strategies that impact divisional, regional or functional results |
| **Resource Management** | |
| **Brand Protection/Promo** | - Drives brand plans; integrates company mission into business plans and initiatives; identifies and seizes opportunities; directs initiatives, programs or products with wide visibility |
| | - Responsible for actions and managing risks that have direct, important and significant impact on own business unit but a limited short-term impact on company assets |
| | - Decisions impacting company image typically require executive oversight and/or are constrained by policies |
| **Leadership** | - Executes functional business plans and contributes to the development of functional strategies |
| | - Directs the allocation of resources to meet financial performance requirements |
| **Minimum Requirements** | - Typically requires a Bachelors Degree and minimum of 10 years directly relevant experience; experience should include comprehensive experience as a business/process leader or industry expert |
| | Note: One of the following alternatives may be accepted: - PhD or Law + 8 yrs; Masters + 9 yrs; Associates degree + 11 yrs; High School + 12 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PRODUCT CREATION
Davis Decl. Exhibit 41, Page 25 of 32

Confidential
Confidential

NIKE_00004908
NIKE_HANVEY_00000025

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A1384 | DIR SR: INNOVATION | |
| **Band** | **Level** | **FLSA Status** |
| S | SENIOR DIRECTOR | Exempt |

### Key Job Accountabilities

Directs team(s) and sets direction for team and management goals that align with company goals. Coaches staff, creates opportunities for staff development, and makes decisions on hiring, performance management, recognition and rewards. Addresses talent planning needs and challenges within area of responsibility or within pipeline to ensure future growth and/or profitability. Ensures appropriate staffing and skill mix.

Ideation & Visioning - Directs the agenda for innovation and technology developments that result in growth opportunities and competitive advantages in the marketplace. Ensures ground breaking development of new ideas are consistently delivered and on track with the vision for new products for all Nike business units.

Research/Engineering - accountable for producing technologies and concepts that are ready and scalable as part of long term, company wide, product development strategies.

Senior member of the functional management team working closely with category, design, and manufacturing heads in developing short term and long term agenda to deliver foundational future innovation technologies for product engines.

Champions new technologies and innovations both internally and externally. Acts as lead across the entire company to gain maxim utilization and of new technologies.

Responsible for the direction, motivation, and development of staff. Manages Sr. Innovation Managers to ensure deliverables are met. Inspires team and facilitates collaboration across teams.

| Key Capabilities (beyond minimum requirements for S  Band / SENIOR DIRECTOR) | |
|---|---|
| **Specific Work Experience** | Highly developed motivational and leadership qualities demonstrated in a product innovation team. Industry expert in ideation and research with tangible results. Deep subject matter expert in product construction. Possesses expert understanding in all facets of product creation to include design, development, research, engineering, materials, and manufacturing. Proficient problem solver with the ability to deal with ambiguity. Demonstrated skills at leading management teams with diverse expertise. Must posses a strong client focused approach to work. Effective project and resource management experience with proactive approach to company wide issues. |
| **Physical Requirements** | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| **Travel** | 10-20% |
| **Irregular Work Hours** | No |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

Confidential
Confidential

PRODUCT CREATION
Davis Decl. Exhibit 41, Page 26 of 32

NIKE_00004909
NIKE_HANVEY_00000026

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2071 | DIR SR: CHEMISTRY | |
| **Band** | **Level** | **FLSA Status** |
| S | SENIOR DIRECTOR | Exempt |

| Pipeline | PRODUCT CREATION |
|---|---|
| The nature of the work is focused on research and development of products from conception to retail to meet the needs of accounts and consumers. | |
| **Family** | **PRODUCT INNOVATION/R&D** |
| Performs scientific and technological investigation directed toward the acquisition of new knowledge. Research encompasses such endeavors as enlarging and systematizing the organizations knowledge base; understanding the limitations of technology and how to apply its capabilities; developing proof-of-concept prototypes; devising methods and tools for modeling, analyzing and developing products and services. | |
| **Sub Family** | **INNOVATION** |
| Develops ideas that are consistent with the vision for new products by collaborating with product creation on the genesis of new product concepts for all Nike business units. Generates new ways of thinking about aspects of performance based products that result in growth opportunities and competitive advantages in the marketplace. | |

| Band Level Criteria & Minimum Requirements for: | S  Band / SENIOR DIRECTOR |
|---|---|
| **Overall** | - Provides leadership and direction through managers |
| | - Is accountable for the performance and results of related disciplines or a moderate-sized function |
| | - Executes functional business plans and contributes to the development of functional strategies |
| | - Decisions are guided by functional strategies and priorities |
| **Business Expertise** | - Applies broad business and management expertise to drive financial and operational performance across departments |
| **Delivering Solutions** | - Directs the resolution of highly complex or unusual business problems |
| **Impact** | - Is accountable for the performance and results of multiple related disciplines or departments |
| | - Makes decisions guided by functional strategies that impact divisional, regional or functional results |
| **Resource Management** | |
| **Brand Protection/Promo** | - Drives brand plans; integrates company mission into business plans and initiatives; identifies and seizes opportunities; directs initiatives, programs or products with wide visibility |
| | - Responsible for actions and managing risks that have direct, important and significant impact on own business unit but a limited short-term impact on company assets |
| | - Decisions impacting company image typically require executive oversight and/or are constrained by policies |
| **Leadership** | - Executes functional business plans and contributes to the development of functional strategies |
| | - Directs the allocation of resources to meet financial performance requirements |
| **Minimum Requirements** | - Typically requires a Bachelors Degree and minimum of 10 years directly relevant experience; experience should include comprehensive experience as a business/process leader or industry expert |
| | Note: One of the following alternatives may be accepted: - PhD or Law + 8 yrs; Masters + 9 yrs; Associates degree + 11 yrs; High School + 12 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

PRODUCT CREATION
Davis Decl. Exhibit 41, Page 27 of 32

Confidential
Confidential

NIKE_00005026
NIKE_HANVEY_00000027

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2071 | DIR SR: CHEMISTRY | |
| **Band** | **Level** | **FLSA Status** |
| S | SENIOR DIRECTOR | Exempt |

### Key Job Accountabilities

Directs team(s) and sets direction for team and management goals that align with company goals. Coaches staff, creates opportunities for staff development, and makes decisions on hiring, performance management, recognition and rewards. Addresses talent planning needs and challenges within area of responsibility or within pipeline to ensure future growth and/or profitability. Ensures appropriate staffing and skill mix.

Performs qualitative and quantitative analyses to determine chemical and physical properties during chemical syntheses, by verifying their identity, purity, and homogeneity. Ascertains relationships between molecular structure and physical or biological properties to aid in analysis of compounds and molecules. Conducts research to develop or improve analytical techniques, methodology, procedures, and investigates application of instruments in analysis. Organizes and interprets all data obtained using a wide variety of instrumental technologies. Conducts experimental design before use of mass spectrometry, assists in the analysis and presentation of results. Provides quality control specifications to ensure process consistency, quality and optimal yield performance. Conducts measurements of compounds in biological environments and fluids.

| Key Capabilities (beyond minimum requirements for S Band / SENIOR DIRECTOR) | |
|---|---|
| **Specific Work Experience** | - |
| **Physical Requirements** | Inside Technical: May be required to perform a wide variety of physical tasks which are generally basic, repetitive, and routine in nature. May be required to sit or stand for long periods of time, in addition to being required to walk, stoop, kneel, crouch, push, or pull. May be frequently required to reach with hands and arms, and use hands to finger, handle, or feel small and medium sized components and exert force or lift up to 50 pounds. May be required to work with toxic or caustic chemicals, and be exposed to fumes and gases, airborne particles, and RF energy. May be called upon to perform physical and quality checks requiring sufficient visual acuity to identify quality flaws, distinguish colors on small components, or utilize microscopes. May be required to work with or near small mechanical parts or technical equipment/machinery so they may be subject to higher noise levels, vibration, and there may be a risk of electrical shock. |
| **Travel** | |
| **Irregular Work Hours** | |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

Confidential
Confidential

PRODUCT CREATION

Davis Decl. Exhibit 41, Page 28 of 32

NIKE_00005027
NIKE_HANVEY_00000028

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A0171 | DIR: MAINT | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

| Pipeline | **CORPORATE SERVICES** | |
|---|---|---|
| The nature of the work is focused on providing services which help ensure a safe, healthy, and effective or efficient work environment or providing personal amenities to employees. | | |
| **Family** | **FLIGHT** | |
| Responsible for the safe and efficient management of the corporate aviation program. | | |
| **Sub Family** | **FLIGHT** | |
| Responsible for the safe and efficient management of the corporate aviation program. | | |

| Band Level Criteria & Minimum Requirements for: | E Band / DIRECTOR |
|---|---|
| **Overall** | - Provides leadership to managers, supervisors and/or professional staff |
| | - Is accountable for the performance and results of multiple related units |
| | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Decisions are guided by resource availability and functional objectives |
| **Business Expertise** | - Applies business and management expertise to achieve financial and operational objectives within or across disciplines or departments |
| **Delivering Solutions** | - Identifies and resolves complex technical, operational and organizational problems |
| **Impact** | - Is accountable for the performance and results of related disciplines or departments |
| | - Makes decisions guided by functional business plans that impact the support and funding of projects, products, services and/or technologies |
| **Resource Management** | |
| **Brand Protection/Promo** | - Performs work in support of brand plans; integrates company mission into daily work and planning; leads or participates in key initiatives, programs or products with moderate to wide visibility |
| | - Responsible for actions and managing risks that have shared or moderate impact on own business and have limited short-term impact on company assets |
| | - Decisions and actions impacting company image require senior leadership oversight and/or are constrained by policies |
| **Leadership** | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Manages resources to ensure financial and operational objectives are met |
| **Minimum Requirements** | - Typically requires a Bachelors Degree and minimum of 8 or 9 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 6 yrs; Masters + 7 yrs; Associates degree + 9 yrs; High School + 10 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

CORPORATE SERVICES
Davis Decl. Exhibit 41, Page 29 of 32

Confidential
Confidential

NIKE_00003538
NIKE_HANVEY_00000029

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A0171 | DIR: MAINT | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

### Key Job Accountabilities

Manages team and sets team and individual goals that align with department and function goals. Coaches staff, creates opportunities for staff development, makes hiring decisions, drives performance management, recognition and rewards. Develops team structure that facilitates and maximizes individual and team performance.

Leadership: Accountable for the overall operation of the maintenance department and related safety risk management activities. Lead the NIKE Flight maintenance team inclusive of hiring, coaching and performance

Accountable for the overall operation of the maintenance department and management. Drive timely and effective communication to maximize engagement. Drive timely and effective communication to maximize performance and minimize risk. Ensure that all maintenance operations processes and procedures include risk management mitigation as specified in the safety management system. Prepare strategic plans in support of corporate and departmental objectives.

Functional: Identify and deploy industry best practices across all aspects of maintenance operations. Set and manage annual maintenance operating budgets and financial forecasts. Provide for the continuity of completion of maintenance work and inspection responsibility when personnel or assignments change. Manage programs for the maintenance team that include onboarding, leadership development, proficiency testing (as relevant) and recurrent and technical training (i.e. safety risk management system). Ensure the quality of aircraft engine and avionics maintenance. Establish and maintain records as required by directives, service bulletins). Develop and implement maintenance policies and procedures to ensure the safe, efficient and cost effective operation of the maintenance department. Participate in the development of flight operations departmental policies. Ensure compliance with tool inspections and calibration of precision test equipment used by the department and ensure current records of the inspections and tests are equipment, spares and inventory. Manage the hangar facility, including support contracts. Establish spares and ground support equipment inventories commensurate with the needs of the department.

Technical: Maintain aircraft maintenance proficiency.

| Key Capabilities (beyond minimum requirements for E  Band / DIRECTOR) | |
|---|---|
| **Specific Work Experience** | Hold an Airframe and Powerplant (A&P) certificate. 10-years' experience in a comparable aircraft maintenance capacity. Recent Gulfstream GV/G550 maintenance experienced preferred. Extensive knowledge of IS- BAO preferred. Extensive knowledge of the national regulations and aviation activities, flight operations and the needs and requirements for their support including the ability to learn and use all associated computer programs. Ability to use all maintenance shop tools, equipment and technologies including handling substances, hazardous materials and utilize protective equipment needed to safely perform associated duties. |
| **Physical Requirements** | Outside Operations: May be required to perform a wide variety of physical tasks which are generally basic, repetitive, and routine in nature. May be required to sit, stand, or walk for long periods of time, in addition to being required to stoop, kneel, crouch, push, or pull. May be frequently required to reach with hands and arms, and use hands to finger, handle, or feel small and medium sized equipment and/or machinery and exerting force or lift up to 50 pounds. May be required to work with toxic or caustic chemicals, be exposed to fumes or airborne particles, and outdoor weather conditions. May be required to work with or near large machinery and moving mechanical parts so they may be subject to higher noise levels, vibration, and there may be a risk of electrical shock. |
| **Travel** | 10-20% |
| **Irregular Work Hours** | No |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

CORPORATE SERVICES

Davis Decl. Exhibit 41, Page 30 of 32

Confidential
Confidential

NIKE_00003539
NIKE_HANVEY_00000030

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2229 | DIR: AVIATION | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

| Pipeline | CORPORATE SERVICES |
|---|---|
| The nature of the work is focused on providing services which help ensure a safe, healthy, and effective or efficient work environment or providing personal amenities to employees. | |
| **Family** | **FLIGHT** |
| Responsible for the safe and efficient management of the corporate aviation program. | |
| **Sub Family** | **FLIGHT** |
| Responsible for the safe and efficient management of the corporate aviation program. | |

| Band Level Criteria & Minimum Requirements for: | E Band / DIRECTOR |
|---|---|
| **Overall** | - Provides leadership to managers, supervisors and/or professional staff |
| | - Is accountable for the performance and results of multiple related units |
| | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Decisions are guided by resource availability and functional objectives |
| **Business Expertise** | - Applies business and management expertise to achieve financial and operational objectives within or across disciplines or departments |
| **Delivering Solutions** | - Identifies and resolves complex technical, operational and organizational problems |
| **Impact** | - Is accountable for the performance and results of related disciplines or departments |
| | - Makes decisions guided by functional business plans that impact the support and funding of projects, products, services and/or technologies |
| **Resource Management** | |
| **Brand Protection/Promo** | - Performs work in support of brand plans; integrates company mission into daily work and planning; leads or participates in key initiatives, programs or products with moderate to wide visibility |
| | - Responsible for actions and managing risks that have shared or moderate impact on own business and have limited short-term impact on company assets |
| | - Decisions and actions impacting company image require senior leadership oversight and/or are constrained by policies |
| **Leadership** | - Develops departmental plans, including business, production and/or organizational priorities |
| | - Manages resources to ensure financial and operational objectives are met |
| **Minimum Requirements** | - Typically requires a Bachelors Degree and minimum of 8 or 9 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 6 yrs; Masters + 7 yrs; Associates degree + 9 yrs; High School + 10 yrs |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

CORPORATE SERVICES
Davis Decl. Exhibit 41, Page 31 of 32

Confidential
Confidential

NIKE_00003586
NIKE_HANVEY_00000031

# NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A2229 | DIR: AVIATION | |
| **Band** | **Level** | **FLSA Status** |
| E | DIRECTOR | Exempt |

## Key Job Accountabilities

Manages team and sets team and individual goals that align with department and function goals. Coaches staff, creates opportunities for staff development, makes hiring decisions, drives performance management, recognition and rewards. Develops team structure that facilitates and maximizes individual and team performance.

Leadership: Accountable for leading the Nike Flight pilot team inclusive of hiring, coaching and performance management. Ensure that all flight operations processes and procedures include risk management mitigation as specified in the safety risk management system. Drive timely and accurate communications with the Director and other team members to maximize performance and minimize risk. Accountable for onboarding and development of the pilot team.

Functional: Identify and deploy industry best practices across all aspects of flight operations. Ensure the pilot team participates effectively in the safety risk management system. Partner with the Director to develop standard operating procedures and aircraft checklists. Conduct inflight and simulator evaluations for pilot standardization and proficiency. Partner with the maintenance team to ensure aircraft airworthiness and readiness. Remain informed of the latest developments within the business aviation community. Assist the Director with the management of flight related direct operating costs and preparation of operational budgets and financial forecasts. Manage programs for the pilots that include onboarding, leadership development, proficiency testing (as relevant) and recurrent and technical training. Maintain training records for all department personnel, expense reporting for pilot team, and procurement and contract pilots. Assume responsibilities as delegated by the Director of Aviation in his/her absence.

Technical: Fly approximately 75% of a standard NIKE Captain flight schedule. Maintain aircraft proficiency. Complete all required training satisfactorily and on time, including assigned eLearning courses and other training required by Nike or Nike Flight.

| Key Capabilities (beyond minimum requirements for E  Band / DIRECTOR) | |
|---|---|
| **Specific Work Experience** | 5 years as a member of a corporate flight department or comparable department preferred. Extensive knowledge of IS-BAO preferred. Flight qualifications: Valid Airline Transport License with multiengine and instrument rating. Ability to pass Class I flight physical every six months, FAA examinations and flight proficiency tests. Minimum of 5000 flight hours 2500 hours multiengine and 2000 hours as pilot-in-command |
| **Physical Requirements** | Outside Operations: May be required to perform a wide variety of physical tasks which are generally basic, repetitive, and routine in nature. May be required to sit, stand, or walk for long periods of time, in addition to being required to stoop, kneel, crouch, push, or pull. May be frequently required to reach with hands and arms, and use hands to finger, handle, or feel small and medium sized equipment and/or machinery and exerting force or lift up to 50 pounds. May be required to work with toxic or caustic chemicals, be exposed to fumes or airborne particles, and outdoor weather conditions. May be required to work with or near large machinery and moving mechanical parts so they may be subject to higher noise levels, vibration, and there may be a risk of electrical shock. |
| **Travel** | 75-100% |
| **Irregular Work Hours** | Yes |
| **Certifications** | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

Confidential
Confidential

NIKE_00003587
NIKE_HANVEY_00000032

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA ZABELE (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**DECLARATION OF SHINE THOMAS** |

Page 1    -    DECLARATION OF SHINE THOMAS

## DECLARATION OF SHINE THOMAS

I, Shine Thomas, hereby declare as follows:

1.      I am over the age of 18 and have personal knowledge of the matters set forth in this declaration. I am competent to testify to such matters at a hearing or trial if necessary, and I am authorized to make this declaration.

2.      I have been a recruiter at Nike for over 10 years. My current position is Senior Director for Talent Acquisition (TA), Innovation, Enterprise Data Science, and Analytics, Consumer Creation, which I have held since October 2020. Before that, my roles were: Director, TA, Nike Digital (Product and Program, Data Science, Digital Commerce, Membership); Director, TA, Nike Brand Creative (Digital Design, Brand Design, Retail Design); and Senior Recruiter, TA. In all of my roles, I have recruited for positions at Nike World Headquarters ("WHQ").

3.      In this matter, I was designated to testify as Nike's corporate witness on a range of topics that included (among others, and broadly speaking): setting compensation at hire; competitive promotions and job transfers; determining Job Codes for open positions; and recruiting systems at Nike, all from the time period of 2015 to present.  I sat for deposition on March 26, 2021.

4.      I understand Plaintiffs' expert has taken the position that employees' starting pay at Nike is predictable based on their prior job titles, their level of education, and the name of the schools that they attended. From my perspective, based on my many years of recruiting at Nike WHQ, that is not accurate. Many different factors go into hiring decisions and can lead to higher starting pay for different roles, but it really comes down to assessing the individual candidate as a whole and their skills, capabilities, and experience against the specific role they applied to. As I

Page 2    -    DECLARATION OF SHINE THOMAS

testified during my deposition, every job offer is unique and niche in terms of those data points.

5.    Sometimes this can be more of an art than a science, and designer candidates are a good example of this. During the hiring process for design roles, candidates typically present portfolios showcasing examples of their prior work. The format and content is up to the individual candidate. Most candidate portfolios now are digital and presented either through a candidate's own website or a slide deck. But some candidates will present a physical portfolio with sketches and photos of finished products, or even bring in physical examples from their prior collections. Hiring managers review every aspect of the candidate's unique portfolio and evaluate them based on that. During the interview process, candidates then walk through their portfolios and tell the stories of how their designs came to fruition, such as what their inspiration was, if they had a theme to work with, if they experimented with different materials, and other details that describe their process. Everything at Nike is about storytelling, so how candidates communicate their design stories, weaving themes from concept to execution to market, is an important factor for hiring managers' assessments.

6.    In addition to their portfolios and storytelling, there are many other factors that hiring managers consider for design roles that can drive higher starting salaries, such as the candidate's skills, abilities, and prior work experience as they align to the job requirements. Hiring managers may look at the number of internships the candidate has had, or the companies the candidate has worked for, and what specific design work they did there. For example, if the role is design for running shoes, we may try to source candidates from other companies that are strong in running shoes because we know they have a strong product (but again, it will depend on the candidate's portfolio). Other factors include the candidate's potential, their problem-solving skills, and how scare/competitive talent is for the role.

Page 3    -    DECLARATION OF SHINE THOMAS

DocuSign Envelope ID: 8EE483D5-EE72-4914-8FF5-533A9EFDC4A9

7.      Hiring and pay considerations also vary depending on the type of design role, because designers have very niche skillsets and capabilities. For example, shoe designers have industrial design backgrounds; apparel designers have apparel design backgrounds or something besides industrial design; graphic designers have graphic design backgrounds; and equipment designers have materials design backgrounds. Candidates need to have the unique skills to build the products of their focus, whether materials, apparel, or footwear. Even within just shoes, as a further example, the skillsets needed to align with the job requirements can vary. Footwear design for running shoes is especially technical and candidates need to have the ability to solve complex technical design programs, whereas designers for kid's shoes generally do not need this type of expertise. Because of that, designers' skillsets are not easily interchangeable, and compensation will vary from role to role.

8.      Sometimes we will source candidates from design schools that have strong programs in certain technical areas, because they will feed into a technical product that is strong. For example, the Arts Center College of Design has strong graphic and digital design programs; Rhode Island School of Design has a strong architecture program; and Savannah College of Art and Design has a strong industrial design program. Hiring managers assess the candidates' output from those programs through their portfolios, not just the name of the school. This is true for all roles I have recruited for—not just design—because Nike recognizes not everyone can attend a top-ranked school, and that should not hinder their opportunities. At the end of the day, what drives starting pay is the individual candidate and their skills, experience, and capabilities. If one candidate has a degree from a top-ranked school, it does not automatically mean they will be paid more. It comes down to the role, the candidate, and the hiring manager.

DocuSign Envelope ID: 8EE483D5-EE72-4014-8FF5-533A9EFDC4A9

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America that the foregoing is true and correct.  Executed on this 23rd day of March, 2022, in New York, New York.

DocuSigned by:

*Shine Thomas*

Shine Thomas

Page 5    -    DECLARATION OF SHINE THOMAS

Davis Decl. Exhibit 42, Page 5 of 5

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON, Cal. SB# 234737 (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA E. ZABELE, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705


Attorneys for Defendant NIKE, INC.


IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-JR |
| Plaintiffs, | **DECLARATION OF SHANE WALKER** |
| vs. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |


Page 1    -    DECLARATION OF SHANE WALKER

DocuSign Envelope ID: 2275CF34-BCAF-4427-B551-A69096BCAZC1

## DECLARATION OF SHANE WALKER

I, Shane Walker, hereby declare as follows:

      1.      I am over the age of eighteen and have personal knowledge of the matters set forth in this declaration. I am competent to testify to such matters at a hearing or trial if necessary, and I am authorized to make this declaration.

      2.      I have been employed by Nike, Inc. ("Nike") for over five years.  My current position is Senior Director, Global Compensation, which I have held since approximately April 2018.  Before that, I held the role of Director, Total Rewards Strategy and Planning from approximately November 2017 to April 2018.  Throughout my Nike career, I have also held other roles related to compensation as well.

      3.      In this matter, I was designated to testify as Nike's corporate witness on a number of compensation-related topics.  I sat for deposition on December 17, December 18 and December 21, 2020.

      4.      From at least 2014 through 2018, Nike's annual salary increase process was commonly referred to as Merit Pay.  For Merit Pay, Nike provided guidelines to individual managers known as "Merit Guidelines."  These Merit Guidelines provided suggested salary increase ranges for managers to consider based on employees' Coaching for Excellence (CFE) performance ratings.  As I explained in my deposition testimony, these Merit Guideline ranges were just a starting place for managers to make decisions, and individual managers could use their discretion to award increases that went outside of the recommended range.

      5.      During my deposition, I was asked if I knew exactly what the specific Merit Guidelines were for each rating for each from 2015 to 2018.  I did not recall the exact ranges during the deposition, but I have refreshed my recollection since that time.  The Merit Guidelines

suggested the following ranges for managers to select pay increases based on employees' CFE ratings:

| Rating | Range |
|---|---|
| Exceptional | 4.5 – 6.5% |
| Highly Successful | 3.0 – 5.0% |
| Successful | 2.5 – 3.5% |
| Inconsistent | 0.0 – 1.5% |
| Unsuccessful | 0.0% |
| Too New to Rate | 0.0 – 3.5% |

6.    I have also confirmed that these Merit Guidelines were in place from at least 2014 until approximately 2018.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America that the foregoing is true and correct.  Executed on this 23rd day of March, 2022, in Portland, Oregon.



DocuSigned by:

Shane Walker

5B97C30509694BB...

Shane Walker

Davis Decl. Exhibit 43, Page 3 of 3