```
 1            UNITED STATES DISTRICT COURT

 2               DISTRICT OF OREGON

 3               PORTLAND DIVISION

 4

 5   KELLY CAHILL, SARA JOHNSTON,     )

 6   LINDSAY ELIZABETH, and HEATHER   )

 7   HENDER, individually and on      )

 8   behalf of others similarly       )

 9   situated,                        )

10               Plaintiffs,          )

11        v.                          ) 3:18-cv-01477-JR

12   NIKE, INC., an Oregon            )

13   corporation,                     )

14               Defendant.           )

15

16          DEPOSITION OF LAUREN ANDERSON

17               January 21, 2021

18                  Thursday

19                 9:07 A.M.

20

21        THE VIDEOCONFERENCE VIDEO-RECORDED

22   DEPOSITION OF LAUREN ANDERSON was taken at

23   Portland, Oregon, before Jan R. Duiven, CSR, FCRR,

24   RPR, CRC, Certified Shorthand Reporter in and for

25   the State of Oregon.
```

                                                Page 1

Davis Decl. Exhibit 44, Page 1 of 44

```
 1    applied to a position of golf global digital brand      11:52:31

 2    leader in October 2012.  Is that the other golf         11:52:35

 3    position --                                             11:52:38

 4         A.    Yes.                                          11:52:39

 5         Q.    -- that you think you applied to?            11:52:40

 6               Okay.  So you recall interviewing            11:52:42

 7    either for the golf global brand integration            11:52:48

 8    director position or the golf global digital brand      11:52:51

 9    leader position at Nike.  Correct?                      11:52:54

10         A.    Correct.                                      11:52:56

11         Q.    Okay.  And you were not hired for            11:52:56

12    those positions.  Correct?                              11:53:05

13         A.    Correct.                                      11:53:06

14         Q.    And let's see.  And do you recall also       11:53:07

15    applying for a brand manager Jordan position in         11:53:14

16    October 2012?                                           11:53:19

17         A.    Yes.                                          11:53:19

18         Q.    Okay.  Do you recall if anyone from          11:53:20

19    Nike responded to your application for that             11:53:23

20    position?                                               11:53:26

21         A.    I do not believe they did.                   11:53:26

22         Q.    Okay.  And so you were not hired for         11:53:31

23    that position.  Correct?                                11:53:33

24         A.    Correct.                                      11:53:34

25         Q.    Okay.  And then you applied for the          11:53:35
```

                                                     Page 112

Davis Decl. Exhibit 44, Page 2 of 44

```
 1    position of SPARQ, S-P-A-R-Q, process manager?        11:53:39

 2         A.    Uh-huh.                                    11:53:46

 3         Q.    In November 2012.  Correct?                11:53:46

 4         A.    Yes.                                       11:53:48

 5         Q.    Okay.  And you did get that job.           11:53:49

 6    Correct?                                              11:53:51

 7         A.    Yes, I did.                                11:53:52

 8         Q.    Okay.  Do you recall how you like          11:53:55

 9    learned about these openings at Nike that you         11:53:59

10    applied for?                                          11:54:02

11         A.    Generally, I saw them on Nike.com on       11:54:02

12    the HR site.  I had -- during my whole job hunt,      11:54:07

13    was networking and meeting people and some of them    11:54:13

14    were at Nike, some of them were outside of Nike,      11:54:19

15    but sometimes I heard about positions word of         11:54:21

16    mouth.  But then generally was -- you know, then      11:54:25

17    always you had to apply through the website so        11:54:28

18    then I would go and apply through the website.        11:54:30

19         Q.    Okay.  So your best recollection is        11:54:32

20    that you applied for the positions we just talked     11:54:37

21    about through the Nike website?                       11:54:39

22         A.    Yes.                                       11:54:40

23         Q.    Got it.  And you mentioned also that       11:54:40

24    you were networking and meeting people.  Some of      11:54:58

25    them were outside of Nike.  Were you looking at --    11:55:00
```

                                                         Page 113

Davis Decl. Exhibit 44, Page 3 of 44

```
 1          Q.    And I guess what's the basis for your     13:07:35
 2   belief that you were debanded because you're a         13:07:38
 3   woman?                                                 13:07:39
 4          A.    Well, my ratings were never lower than    13:07:40
 5   successful, and I was successful -- rated              13:07:43
 6   successful -- I've been rated either successful or     13:07:48
 7   highly successful.                                     13:07:50
 8                But prior to Danny debanding me, I --     13:07:52
 9   when that happened, I had a conversation with him      13:07:58
10   and I had never, until I walked into the room that     13:08:00
11   day, been given any indication that anything was       13:08:02
12   wrong, that I wasn't performing up to his              13:08:05
13   expectations, or that it was anything other than      13:08:08
14   he didn't like me because I was a woman.  There        13:08:12
15   was nothing work -- in my work to indicate -- I        13:08:33
16   mean, I had been given no indication that there        13:08:35
17   were any problems with what I was doing.               13:08:37
18          Q.    Okay.  Any other reasons why you          13:08:41
19   believe you were debanded because you're a woman?      13:08:44
20          A.    It's the only reason.                     13:08:48
21          Q.    Okay.  Any other facts or evidence        13:08:59
22   that you haven't already told me about that            13:09:02
23   support your belief that you were debanded because     13:09:06
24   you're a woman?                                        13:09:09
25          A.    Not that I can think of that I haven't    13:09:10
```

Page 159

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 4 of 44

| | | |
|---|---|---|
| 1 | already said. | 13:09:14 |
| 2 | Q.    And -- okay.  So for your particular | 13:09:18 |
| 3 | gender discrimination claims against Nike, are | 13:09:27 |
| 4 | they all grounded in your work with ███████? | 13:09:31 |
| 5 | MR. BLAKE:  Objection.  Calls for a | 13:09:39 |
| 6 | legal conclusion. | 13:09:40 |
| 7 | A.    I -- I think that, yes, that's the | 13:09:42 |
| 8 | best way to state it. | 13:09:50 |
| 9 | MS. ZABELE:  Okay.  Let's take a | 13:09:57 |
| 10 | break. | 13:09:58 |
| 11 | THE VIDEOGRAPHER:  We're now off the | 13:10:00 |
| 12 | record at 1:10 p.m. | 13:10:02 |
| 13 | (Lunch:  1:10 p.m. to 2:34 p.m.) | 14:34:34 |
| 14 | THE VIDEOGRAPHER:  We're now back on | 14:34:34 |
| 15 | the record.  The time is 2:34 p.m. | 14:34:41 |
| 16 | MS. ZABELE:  Thank you.  So I'll | 14:34:46 |
| 17 | just note for the record following a conference | 14:34:47 |
| 18 | with counsel, I informed him that I'm unable to | 14:34:51 |
| 19 | continue for the rest of the day due to a personal | 14:34:55 |
| 20 | issue.  We are going to pause Ms. Anderson's depo | 14:34:57 |
| 21 | right now and reschedule for a later time that is | 14:35:02 |
| 22 | mutually convenient for the parties, but the depo | 14:35:08 |
| 23 | remains open.  We are not closing it. | 14:35:11 |
| 24 | THE REPORTER:  And did you still | 14:35:16 |
| 25 | want to order this transcript? | 14:35:18 |

Page 160

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 5 of 44

```
 1                    CERTIFICATE

 2

 3

 4              I, Jan R. Duiven, CSR, FCRR, CRC,

 5    RPR, a Certified Shorthand Reporter for the State

 6    of Oregon, do hereby certify that, pursuant to

 7    stipulation of counsel for the respective parties

 8    hereinbefore set forth, LAUREN ANDERSON appeared

 9    virtually before me at the time and place set

10    forth in the caption hereof; that at said time and

11    place I reported in Stenotype all testimony

12    adduced and other oral proceedings had in the

13    foregoing matter; that thereafter my notes were

14    reduced to typewriting under my direction; and

15    that the foregoing transcript, pages 1 to 161,

16    both inclusive, constitutes a full, true, and

17    accurate record of all such testimony adduced and

18    oral proceedings had, and of the whole thereof.

19              Witness my hand at Eugene, Oregon,

20    this 30th day of January, 2021.

21

22

23    Jan R. Duiven, CSR, FCRR, CRC, RPR

24    CSR No. 96-0327

25    Expiration Date:  September 30, 2023

                                       Page 162
```

Davis Decl. Exhibit 44, Page 6 of 44

```
 1              UNITED STATES DISTRICT COURT
 2                 DISTRICT OF OREGON
 3                  PORTLAND DIVISION
 4
 5   KELLY CAHILL, SARA JOHNSTON,    )
 6   LINDSAY ELIZABETH, and HEATHER  )
 7   HENDER, individually and on     )
 8   behalf of others similarly      )
 9   situated,                       )
10             Plaintiffs,           )
11        v.                         ) 3:18-cv-01477-JR
12   NIKE, INC., an Oregon           )
13   corporation,                    )
14             Defendant.            )
15
16          DEPOSITION OF LAUREN ANDERSON
17                  VOLUME II
18              February 5, 2021
19                  Friday
20                 9:01 A.M.
21
22
             THE VIDEOCONFERENCE VIDEO-RECORDED
23   DEPOSITION OF LAUREN ANDERSON was taken at
     Portland, Oregon, before Jan R. Duiven, CSR, FCRR,
24   RPR, CRC, Certified Shorthand Reporter in and for
     the State of Oregon.
25
                                        Page 1
```

Davis Decl. Exhibit 44, Page 7 of 44

```
1    here today, you don't recall whether or not you      09:10:10

2    had a separate conversation with Ms. Petzold from     09:10:12

3    the panel interview?                                  09:10:17

4         A.    I don't recall.  It was eight years        09:10:18

5    ago.                                                  09:10:20

6         Q.    Okay.  What do you recall about            09:10:20

7    discuss or -- strike that.                            09:10:25

8               What do you recall discussing in your      09:10:26

9    interviews for the process manager position?          09:10:28

10        A.    I don't recall anything specific.  I       09:10:32

11   would have talked about the role -- the roles and     09:10:42

12   responsibilities and my qualifications.               09:10:48

13        Q.    Okay.  Anything else?                       09:10:49

14        A.    Not that I can recall.                      09:10:51

15        Q.    And to the best of your recollection,       09:10:53

16   were those interviews in person?                       09:10:59

17        A.    Yes.

18        Q.    Okay.  And then --

19              (Reporter inquiry.)

20              THE VIDEOGRAPHER:  We're off the            09:11:10

21   record at 9:10 a.m.                                    09:11:11

22              (Recess.)

23              THE VIDEOGRAPHER:  We're back on the        09:13:39

24   record at 9:13 a.m.                                    09:13:39

25              MS. ZABELE:  Thanks.                        09:13:43
```

Page 10

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 8 of 44

```
 1    talking to.                                09:17:03

 2         Q.    Okay.  And do you recall if your    09:17:03

 3    starting salary -- strike that.            09:17:07

 4            Do you recall if you were successful  09:17:10

 5    at all in negotiating your starting salary at  09:17:11

 6    Nike?                                      09:17:15

 7         A.    I don't --                       09:17:21

 8            MR. BLAKE:  Objection.  Vague and   09:17:21

 9    ambiguous.                                 09:17:25

10            THE WITNESS:  I don't recall.      09:17:25

11    BY MS. ZABELE:                             09:17:26

12         Q.    Okay.  And did anyone at Nike     09:17:26

13    communicate to you what the $90,000-a-year salary  09:17:28

14    was based on?                              09:17:32

15         A.    No.                             09:17:33

16            MR. BLAKE:  Objection.  Vague and   09:17:34

17    ambiguous.  Assumes facts not in evidence.  09:17:35

18            THE WITNESS:  No.                   09:17:39

19    BY MS. ZABELE:                             09:17:40

20         Q.    Okay.  Any reason to believe that the  09:17:40

21    dollar amount was based on your gender at all?  09:17:46

22            MR. BLAKE:  Objection.  Vague and   09:17:48

23    ambiguous.  Assumes facts not in evidence.  09:17:49

24         A.    Not that I know of.             09:17:53

25    BY MS. ZABELE:                             09:18:03

                                             Page 14
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 9 of 44

| | | |
|---|---|---|
| 1 | was based on? | 10:02:33 |
| 2 | MR. BLAKE:  Objection.  Vague and | 10:02:34 |
| 3 | ambiguous. | 10:02:36 |
| 4 | A.    No, they did not. | 10:02:36 |
| 5 | BY MS. ZABELE: | 10:02:39 |
| 6 | Q.    Any reason to believe that the | 10:02:39 |
| 7 | $108,000 annual starting salary in the digital | 10:02:43 |
| 8 | retail brand director role was based on your | 10:02:47 |
| 9 | gender at all? | 10:02:50 |
| 10 | MR. BLAKE:  Objection.  Vague and | 10:02:51 |
| 11 | ambiguous. | 10:02:53 |
| 12 | A.    Not that I know of. | 10:02:53 |
| 13 | BY MS. ZABELE: | 10:03:06 |
| 14 | Q.    And when you were in the digital | 10:03:06 |
| 15 | retail brand director role, who did you report to? | 10:03:08 |
| 16 | A.    I reported to Paige Azavedo, and then | 10:03:11 |
| 17 | when she was no longer there, I reported to Danny | 10:03:18 |
| 18 | Tawiah. | 10:03:37 |
| 19 | Q.    Okay.  Did you report to anyone else? | 10:03:37 |
| 20 | A.    Not that I recall. | 10:03:39 |
| 21 | Q.    What about Kelly Cahill? | 10:03:40 |
| 22 | A.    Yes.  I reported to Kelly Cahill. | 10:03:42 |
| 23 | Q.    Okay.  So you said -- let's see.  So | 10:03:55 |
| 24 | Paige Azavedo, she's an opt-in plaintiff in this | 10:03:59 |
| 25 | case.  Correct? | 10:04:02 |

Page 40

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 10 of 44

```
 1          A.     Correct.                            10:04:03

 2          Q.     And I believe you told me you reported  10:04:07

 3    to her until she left, which you recalled was   10:04:08

 4    sometime in 2015?                               10:04:14

 5          A.     I -- I don't know specifically when 10:04:15

 6    she left.                                       10:04:21

 7          Q.     Okay.  And after Ms. Azavedo left,  10:04:33

 8    then you reported to Mr. Tawiah?                10:04:36

 9          A.     Yes.                                10:04:41

10          Q.     And for how long did you report to him  10:04:44

11    in the digital retail brand director role?      10:04:47

12          A.     I would have reported directly to him  10:04:53

13    until he had me reporting to Kelly Cahill.  I   10:04:55

14    believe the reporting to Kelly was at the end of  10:04:58

15    2015.                                           10:05:00

16          Q.     And for how long did you report to  10:05:08

17    Kelly Cahill?                                   10:05:13

18          A.     I would have reported to her until I  10:05:14

19    believe that letter you referenced for March 1st  10:05:24

20    of 2016.                                        10:05:27

21          Q.     Okay.  So until the time that you   10:05:29

22    moved into the NA digital manager, field,       10:05:32

23    position?                                       10:05:36

24          A.     Yes.                                10:05:37

25          Q.     Okay.  Okay.  And what was          10:05:38
```

Page 41

Davis Decl. Exhibit 44, Page 11 of 44

| | | |
|---|---|---|
| 1 | Nike_00030027.  Ms. Anderson, please let me know | 10:36:03 |
| 2 | when you have Exhibit 193 in front of you. | 10:36:07 |
| 3 | A.    Yes. | 10:36:13 |
| 4 | Q.    Okay.  And please take a moment to | 10:36:14 |
| 5 | review and let me know when you're finished. | 10:36:17 |
| 6 | (Pause.) | 10:38:26 |
| 7 | A.    Okay.  I've read it. | 10:38:33 |
| 8 | Q.    Okay.  Okay.  So is Exhibit 193 an | 10:38:34 |
| 9 | email from you to Geralyn Coopersmith dated | 10:38:40 |
| 10 | January 25, 2016? | 10:38:45 |
| 11 | A.    2016.  Yes. | 10:38:48 |
| 12 | Q.    Okay.  And did you write this email -- | 10:38:50 |
| 13 | A.    I did. | 10:38:52 |
| 14 | Q.    -- to Ms. Coopersmith that's reflected | 10:38:53 |
| 15 | on the Exhibit 193? | 10:39:00 |
| 16 | A.    Yes. | 10:39:01 |
| 17 | Q.    Okay.  Okay.  If I can ask you to look | 10:39:01 |
| 18 | at the second line on Exhibit 193.  You wrote, "I | 10:39:08 |
| 19 | feel like the two biggies they cited in generic | 10:39:15 |
| 20 | bucket of 'things I wasn't doing at E-band | 10:39:19 |
| 21 | level.'"  Do you see that? | 10:39:22 |
| 22 | A.    Yeah. | 10:39:23 |
| 23 | Q.    Okay.  Were you referring to a | 10:39:23 |
| 24 | performance meeting that you had prior to sending | 10:39:25 |
| 25 | this email to Ms. Coopersmith? | 10:39:29 |

Page 52

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 12 of 44

```
1    BY MS. ZABELE:

2         Q.    Okay.  I've marked as Exhibit 200 a        14:06:57

3    one-page document Bates-stamped Nike_00030002,        14:07:00

4    appears to be an offer letter addressed to            14:07:08

5    Ms. Anderson dated -- from Nike dated                 14:07:10

6    September 17, 2019.                                    14:07:15

7              Ms. Anderson, please let me know when       14:07:17

8    you have Exhibit 200 in front of you.                 14:07:18

9         A.    It is open.                                14:07:25

10        Q.    Okay.  And is Exhibit 200 your offer       14:07:26

11   letter from Nike for the position of connected        14:07:28

12   membership director, North America, dated             14:07:31

13   September 17, 2019?                                    14:07:34

14        A.    Yes.                                        14:07:36

15        Q.    Okay.  And you accepted this offer and     14:07:38

16   moved into the connected membership director,         14:07:44

17   North America, role as of October 1, 2019.  Is        14:07:47

18   that correct?                                          14:07:55

19        A.    Yes.                                        14:07:55

20        Q.    Okay.  Was this a role you had applied     14:07:55

21   for?                                                   14:07:59

22        A.    Yes.                                        14:08:00

23        Q.    How did you learn about the opening?       14:08:01

24        A.    It was posted -- it was posted             14:08:04

25   internally, and I had been having conversations       14:08:13

                                                   Page 142
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 13 of 44

```
 1    reports had worked in preparing their CFEs and          15:07:37

 2    making recommendations about their rating?             15:07:41

 3         A.    Absolutely.                                 15:07:46

 4         Q.    And how would you decide whose              15:07:47

 5    feedback to solicit?                                   15:07:50

 6         A.    Typically, at Nike, the employee is         15:07:53

 7    asked by their manager to submit names of people       15:07:56

 8    to give feedback on their work based on who they        15:07:59

 9    worked most closely with.                              15:08:03

10         Q.    And is that what you would do?  You          15:08:06

11    would ask your direct reports who you should           15:08:08

12    solicit feedback from?                                 15:08:11

13         A.    Yes.  And then if there was anybody         15:08:13

14    that was glaringly obvious, like who they worked        15:08:15

15    with that I knew on a consistent daily basis who        15:08:19

16    was not on -- hadn't been included, or teammates        15:08:21

17    that they -- that they worked with on a regular        15:08:25

18    basis, I would also solicit feedback from them.        15:08:27

19         Q.    Okay.  And in terms of how you would        15:08:30

20    solicit the feedback, would you pose certain           15:08:35

21    questions to the individuals whom your direct          15:08:40

22    reports had indicated they wanted you to solicit       15:08:46

23    feedback from or who you otherwise determined you       15:08:50

24    should solicit feedback from?                          15:08:52

25         A.    I would send the people I was being         15:08:54
```

                                                    Page 183

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 14 of 44

| | | |
|---|---|---|
| 1 | looking for feedback from -- and similar -- an | 15:08:58 |
| 2 | email asking them similar questions so that it was | 15:09:00 |
| 3 | on a level playing field. | 15:09:03 |
| 4 | Q.    So I guess -- yeah.  Like thinking | 15:09:07 |
| 5 | about the whole time that you've been involved in | 15:09:13 |
| 6 | making, you know, preparing CFEs and making CFE | 15:09:16 |
| 7 | recommendations for your direct reports, have you | 15:09:19 |
| 8 | always asked the same questions to solicit | 15:09:22 |
| 9 | feedback? | 15:09:27 |
| 10 | A.    Not -- I -- not that I recall. | 15:09:27 |
| 11 | Similar, but they would change and they would | 15:09:31 |
| 12 | often be, you know, customized to the particular | 15:09:35 |
| 13 | job or goals for the year if they were something | 15:09:40 |
| 14 | specific that was a big initiative that we worked | 15:09:43 |
| 15 | on.  I mean, I'd customize them so they weren't | 15:09:45 |
| 16 | generic. | 15:09:49 |
| 17 | Q.    Okay.  So would you customize them | 15:09:51 |
| 18 | based on whose -- based on the direct report for | 15:09:54 |
| 19 | whom you were soliciting feedback? | 15:09:58 |
| 20 | A.    No.  In a given year, I would like -- | 15:10:01 |
| 21 | if I were sending it out, I would have sent out | 15:10:05 |
| 22 | the same thing, for example, for Izzy and Steve | 15:10:07 |
| 23 | even though they worked in different categories. | 15:10:10 |
| 24 | Q.    Okay.  And did you ever do any -- like | 15:10:13 |
| 25 | a survey for people to fill out? | 15:10:21 |

Page 184

Davis Decl. Exhibit 44, Page 15 of 44

1        A.    I mean, some -- some year I may -- I        15:10:28

2    might have used like a SurveyMonkey to send the        15:10:31

3    questions out versus just sending it in an email.        15:10:34

4        Q.    And I guess was it up to you like what        15:10:39

5    questions you wanted to send out to solicit        15:10:47

6    feedback?        15:10:50

7        A.    There was not standardized questions        15:10:50

8    that were sent out.  There were not standardized        15:10:54

9    questions that were sent out [said twice].        15:10:56

10        Q.    Okay.  Okay.  So is it accurate that        15:10:58

11    you would change them based on -- or tailor them        15:11:05

12    based on the -- the individuals you were -- like        15:11:10

13    year to year based on the individuals who you were        15:11:19

14    soliciting feedback for?        15:11:25

15        A.    I would change it based on the job        15:11:26

16    they were doing:  If the job changed, the        15:11:28

17    requirements of the job changed, or the projects        15:11:30

18    they were working on changed.        15:11:32

19        Q.    Okay.  And for the feedback that you        15:11:35

20    received from the individuals that you solicited        15:11:38

21    feedback from, would you then incorporate that        15:11:42

22    into the CFEs you prepared for your direct        15:11:45

23    reports?        15:11:48

24        A.    Yes.        15:11:49

25        Q.    And would the feedback you received        15:11:52

Page 185

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 16 of 44

```
 1                  MS. ZABELE:  Okay.  Let's take a        15:17:24

 2     break.                                               15:17:25

 3                  THE REPORTER:  DaShun, are we off?       15:17:25

 4                  THE VIDEOGRAPHER:  We're off the         15:17:36

 5     record at 3:17 p.m.                                  15:17:37

 6                  (Recess.)                                15:30:43

 7                  THE VIDEOGRAPHER:  We're now back on    15:30:43

 8     the record.  The time is 3:30 p.m.                   15:30:50

 9     BY MS. ZABELE:                                       15:30:52

10          Q.   Ms. Anderson, did you review any           15:30:53

11     documents during the break?                          15:30:54

12          A.   No.                                        15:30:55

13          Q.   Okay.  When we met last time, you told    15:30:57

14     me that you had once applied for an Olympics and     15:31:01

15     lacrosse sports marketing position and you believe   15:31:08

16     you were qualified for the role, but you did not     15:31:12

17     get an interview.  Do you recall that testimony?     15:31:15

18          A.   Yes.                                        15:31:18

19                  MS. ZABELE:  Okay.  All right.           15:31:20

20     Let's look at an exhibit.                             15:31:21

21                  (Deposition Exhibit No. 204

22                  marked for identification.)

23     BY MS. ZABELE:                                       15:32:08

24          Q.   Okay.  I've marked as Exhibit 204 a        15:32:08

25     multipage document Bates-stamped Nike_00006155 to    15:32:10

                                                       Page 190
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 17 of 44

| | | |
|---|---|---|
| 1 | 6563.  Appears to be Ms. Anderson's application | 15:32:22 |
| 2 | for a director of sports marketing, athletic | 15:32:25 |
| 3 | training, North America Olympics sports and | 15:32:28 |
| 4 | lacrosse position at Nike. | 15:32:31 |
| 5 | Ms. Anderson, please let me know when | 15:32:34 |
| 6 | you have Exhibit 204 in front of you. | 15:32:36 |
| 7 | A.   Yes.  I have it in front of me. | 15:32:41 |
| 8 | Q.   Okay.  And is this director, sports | 15:32:43 |
| 9 | marketing, athletic training, North America | 15:32:47 |
| 10 | Olympics sports and lacrosse role the one that you | 15:32:50 |
| 11 | told me that you had applied for and believed you | 15:32:54 |
| 12 | were qualified for but did not get an interview? | 15:32:56 |
| 13 | A.   Yes. | 15:33:00 |
| 14 | Q.   Okay.  And Exhibit 204 shows that -- | 15:33:03 |
| 15 | or it lists a creation date for the application of | 15:33:13 |
| 16 | June 10, 2018.  Do you see that?  Sorry.  I can | 15:33:15 |
| 17 | tell you looking at the top of the first page on | 15:33:20 |
| 18 | the left-hand side, the third header down right | 15:33:23 |
| 19 | above "resume."  Do you see that? | 15:33:28 |
| 20 | A.   Yes. | 15:33:29 |
| 21 | Q.   Okay.  And is that -- is June 10, | 15:33:30 |
| 22 | 2018, on or about the date that you applied for | 15:33:36 |
| 23 | this director role? | 15:33:37 |
| 24 | A.   Yes. | 15:33:39 |
| 25 | Q.   Okay.  And you subsequently emailed | 15:33:40 |

Page 191

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 18 of 44

```
 1    that when something did open up, there was a lot        15:44:31
 2    of competition for those roles because of the           15:44:34
 3    number of people who had been in the group for a        15:44:37
 4    long time.                                              15:44:39
 5         Q.    Okay.  Anything else you recall              15:44:44
 6    discussing with Ms. Moore when you had coffee with      15:44:45
 7    her?                                                    15:44:47
 8         A.    I mean, I recall talking to her about        15:44:47
 9    my background and experience with the sports            15:44:50
10    marketing experience I had had at Adidas, with my       15:44:53
11    experience with the Olympics and with national          15:44:58
12    governing bodies and with U.S. Lacrosse.  So I          15:45:01
13    just wanted to share with her my qualifications         15:45:04
14    for the role that she had hired.                        15:45:12
15         Q.    Okay.  Anything else you recall              15:45:15
16    discussing with her during that coffee meeting?         15:45:19
17         A.    No.  Not that I recall.                      15:45:23
18         Q.    Okay.  Are you aware that a woman            15:45:26
19    named Yumi Ozawa was ultimately hired for the           15:45:33
20    role?                                                   15:45:37
21              MR. BLAKE:  Objection.  Assumes               15:45:38
22    facts not in evidence.                                  15:45:39
23         A.    I believe I saw a notification that          15:45:42
24    that was who got the role.                              15:45:44
25    BY MS. ZABELE:                                          15:45:47

                                                 Page 199
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 19 of 44

```
1        Q.    Okay.  Do you know anything about      15:45:50

2   Ms. Ozawa's educational background?               15:45:50

3        A.    I do not.                              15:45:53

4        Q.    Do you know anything about Ms. Ozawa's 15:45:55

5   work experience before she joined Nike?          15:45:59

6        A.    I do not.                              15:46:01

7             MR. BLAKE:  Objection.  Vague and       15:46:03

8   ambiguous.                                        15:46:05

9             THE WITNESS:  I do not.                 15:46:05

10  BY MS. ZABELE:                                    15:46:05

11       Q.    Okay.  Do you know anything about      15:46:05

12  Ms. Ozawa's work experience at Nike?             15:46:07

13       A.    I do not.                              15:46:10

14       Q.    Okay.  So sounds like the answer will  15:46:11

15  be no, but are you aware she's worked at Nike     15:46:19

16  since 1999?                                       15:46:21

17            MR. BLAKE:  Objection.  Assumes         15:46:23

18  facts not in evidence.                            15:46:25

19       A.    No.                                    15:46:26

20  BY MS. ZABELE:                                    15:46:28

21       Q.    Are you aware that from March 2011 to  15:46:29

22  October 2012, she held the position of sports     15:46:33

23  marketing director, NFL, international business,  15:46:35

24  and Lance Armstrong/Livestrong?                   15:46:37

25            MR. BLAKE:  Objection.  Assumes         15:46:40
```

Page 200

Davis Decl. Exhibit 44, Page 20 of 44

```
1    facts not in evidence.  Lacks foundation.        15:46:41

2         A.    No.                                    15:46:43

3    BY MS. ZABELE:                                     15:46:44

4         Q.    Okay.  Were you aware that from        15:46:45

5    October 2012 until she took the director sports   15:46:49

6    marketing, athletic training, North America       15:46:58

7    Olympic sports and lacrosse position, that she    15:47:00

8    held the position of sports marketing director,   15:47:03

9    NFL, international business, global football,      15:47:05

10   soccer, marketing integration?                    15:47:07

11              MR. BLAKE:  Objection.  Assumes         15:47:10

12   facts not in evidence.                             15:47:13

13        A.    I don't know anything about her so I   15:47:14

14   don't know these things.                           15:47:16

15   BY MS. ZABELE:                                     15:47:17

16        Q.    Okay.  Do you believe you were more    15:47:19

17   qualified for the position than Ms. Ozawa?         15:47:20

18              MR. BLAKE:  Objection.  Vague.          15:47:23

19   Ambiguous.                                         15:47:26

20        A.    I don't know anything about her        15:47:27

21   qualifications other than the titles that you told 15:47:28

22   me that -- of work she's done.                     15:47:31

23   BY MS. ZABELE:                                     15:47:33

24        Q.    So is that, no, you don't believe you  15:47:40

25   were more qualified for the position than          15:47:42
```

Page 201

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 21 of 44

```
 1    Ms. Ozawa?                                    15:47:44

 2              MR. BLAKE:  Misstates prior         15:47:45

 3    testimony.                                    15:47:46

 4    BY MS. ZABELE:                                15:47:47

 5         Q.   As you sit here now.                15:47:47

 6              MR. BLAKE:  Objection.  Asked and   15:47:51

 7    answered.                                     15:47:51

 8         A.   I don't know if I'm more or less    15:47:53

 9    qualified.  I -- it would be hard to say without  15:47:55

10    having gotten an interview.                   15:47:57

11    BY MS. ZABELE:                                15:48:01

12         Q.   Do you have any reason to believe that  15:48:01

13    you were not hired for the position because of  15:48:02

14    your gender?                                  15:48:04

15         A.   I believe I didn't get an interview  15:48:08

16    because of what happened when I was on Danny's  15:48:09

17    team.                                         15:48:12

18         Q.   And what -- well, that wasn't quite my  15:48:14

19    question.  Do you have any reason to believe that  15:48:21

20    you weren't hired for the position because of your  15:48:22

21    gender?                                       15:48:25

22         A.   No.                                 15:48:26

23         Q.   And what's the basis for your belief  15:48:27

24    that you didn't get an interview because of -- you  15:48:33

25    said what happened when you were on Danny's team?  15:48:39
```

                                                   Page 202

Davis Decl. Exhibit 44, Page 22 of 44

```
 1          A.    I feel like with Danny, when I was put      15:48:44

 2   in the position to take the brand -- to take the          15:48:50

 3   digital brand position and take a step backwards,         15:48:53

 4   I feel it derailed my career.  I didn't have the          15:48:55

 5   opportunity or the visibility to network with the         15:48:58

 6   people I wanted to to advance my career.                  15:49:01

 7          In the course of work with baseball                15:49:05

 8   and lacrosse, it was a very small world that was          15:49:06

 9   not -- that was not conducive to sort of doing            15:49:11

10   this networking and having people see your work           15:49:13

11   because it was a very small amount of work.               15:49:17

12          And it just felt like after being in               15:49:20

13   Danny's group that -- and going down a band that I        15:49:23

14   could not catch a break and get my career back on         15:49:27

15   track with jobs that were of interest to me.              15:49:35

16          Q.    But you told me earlier that you, for        15:49:38

17   example, did become a director again.  Correct?          15:49:43

18               MR. BLAKE:  Objection.                        15:49:47

19   Argumentative.                                            15:49:48

20          A.    I became a director after applying for       15:49:52

21   this job.                                                 15:49:55

22   BY MS. ZABELE:                                            15:49:57

23          Q.    No.  I know.  But I'm just -- you said       15:49:58

24   that you felt like he derailed your career so I'm         15:50:00

25   just asking you about your -- how that computes           15:50:02
```

Page 203

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 23 of 44

```
 1    with your prior testimony where you told me that      15:50:09

 2    you became a director again after you took the        15:50:10

 3    U-band role?                                           15:50:14

 4              MR. BLAKE:  Objection.  Vague and            15:50:15

 5    ambiguous.                                             15:50:18

 6        A.    But I hadn't -- if I hadn't been in a        15:50:18

 7    position where I was forced to take a U-band role,     15:50:21

 8    then at the time I took a director role, I would       15:50:23

 9    have hopefully been and probably been competing        15:50:26

10    for senior director roles.                             15:50:29

11    BY MS. ZABELE:                                         15:50:32

12        Q.    Okay.  But you don't know for sure           15:50:32

13    that that would be the case.  You're just             15:50:34

14    speculating.  Right?                                   15:50:35

15        A.    I don't know for sure it's not the           15:50:36

16    case.                                                  15:50:37

17        Q.    I know.  But you don't know for sure         15:50:38

18    that it would have been the case.  Correct?            15:50:41

19              MR. BLAKE:  Objection.                       15:50:42

20    Argumentative.  Calls for speculation.                 15:50:42

21        A.    No.                                          15:50:51

22              MS. ZABELE:  Okay.  So all right.            15:50:52

23    Let's take a look at the MOR complaint.                15:50:56

24              (Deposition Exhibit No. 206

25              marked for identification.)
```

Page 204

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 24 of 44

```
 1   BY MS. ZABELE:                                  15:51:55

 2         Q.    Okay.  I've marked as Exhibit 206 a  15:51:55

 3   multipage document Bates-stamped Nike_00023458 to  15:51:57

 4   00023460.                                        15:52:05

 5         Ms. Anderson, please let me know when      15:52:09

 6   you have Exhibit 206 in front of you.            15:52:10

 7         A.    Yes.                                 15:52:20

 8         Q.    Okay.  So you told me earlier that   15:52:20

 9   after you had a conversation with Lauren Sherman,  15:52:24

10   you submitted a complaint through Nike's Matter of  15:52:26

11   Respect hotline.  Is that right?                 15:52:33

12         A.    Yes.                                 15:52:37

13         Q.    Okay.  So was that a number you called  15:52:39

14   to make the complaint, like a telephone number?  15:52:40

15         A.    Yes.  It was a telephone number.     15:52:44

16         Q.    Okay.  And you -- okay.  So maybe     15:52:45

17   let's -- you may not have seen it in this format  15:52:55

18   before, so maybe let's just go through it.  At the  15:52:57

19   top of Exhibit 206 -- actually, strike that.     15:53:01

20         Let's do this.  If you can look at the     15:53:09

21   second page of Exhibit 206, at the top there's   15:53:11

22   some text that starts, "October 2015."  Do you see  15:53:16

23   that?                                            15:53:19

24         A.    Yes.                                 15:53:23

25         Q.    Okay.  Could you please read that and  15:53:24
```

Page 205

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 25 of 44

| | | |
|---|---|---|
| 1 | let me know if you think that this is an accurate | 15:53:26 |
| 2 | and true reflection of the complaint that you | 15:53:31 |
| 3 | submitted to Nike's Matter of Respect hotline? | 15:53:33 |
| 4 | A.    Yes.  I've read this.  Yes.  It's | 15:54:17 |
| 5 | accurate. | 15:54:19 |
| 6 | Q.    Okay.  Sorry.  Go ahead. | 15:54:20 |
| 7 | A.    I said, yes, it was accurate. | 15:54:23 |
| 8 | Q.    Ah.  Thank you.  Okay.  Okay.  So now | 15:54:25 |
| 9 | if I can ask you to look at the top of the first | 15:54:32 |
| 10 | page of Exhibit 206.  At the very top on the | 15:54:34 |
| 11 | left-hand side, it says, "Report initiated," and | 15:54:39 |
| 12 | then just to the right of that, it says, | 15:54:42 |
| 13 | "2018-03-22."  Do you see that? | 15:54:46 |
| 14 | A.    Yes. | 15:54:48 |
| 15 | Q.    Okay.  Okay.  And is that the date | 15:54:50 |
| 16 | that you submitted this complaint through the | 15:54:52 |
| 17 | Matter of Respect hotline, March 22nd, 2018? | 15:54:54 |
| 18 | A.    Yes. | 15:54:57 |
| 19 | Q.    Okay.  And this was based on an | 15:54:59 |
| 20 | incident that had occurred in October 2015. | 15:55:11 |
| 21 | Correct? | 15:55:13 |
| 22 | A.    Yes. | 15:55:13 |
| 23 | Q.    Okay.  So then looking at, again, the | 15:55:23 |
| 24 | top of the second page, it says, "October 2015, | 15:55:25 |
| 25 | the entire digital" -- sorry.  Strike that. | 15:55:29 |

Page 206

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 26 of 44

```
 1              So I'll just read through your           15:55:30

 2    complaint as reflected on the top of the second   15:55:39

 3    page of Exhibit 206.  So it says, "October 2015,  15:55:41

 4    the entire digital brand group was in Seattle for 15:55:44

 5    an off-site.  After a day of working, we had      15:55:46

 6    dinner and then were out as a group having        15:55:49

 7    drinks."  Do you see that?                        15:55:53

 8         A.    Yes.                                    15:55:55

 9         Q.    Who was the -- who was in attendance?  15:55:55

10    Like who was the group that was out having drinks? 15:56:01

11         A.    The digital brand marketing team.  I   15:56:07

12    think just about the entire team.                 15:56:10

13         Q.    Okay.  And then the second paragraph   15:56:12

14    there just underneath it states, "During the     15:56:32

15    evening our group was sitting around low tables   15:56:36

16    and ████ ended up standing in front of me, crotch 15:56:39

17    in my face, and made a comment about sucking his  15:56:43

18    dick."  Do you see that?                          15:56:45

19         A.    Uh-huh.                                 15:56:48

20         Q.    Okay.  And the next sentence says,     15:56:48

21    "The entire group who was present didn't exactly  15:56:51

22    know what to do."  Do you see that too?           15:56:53

23         A.    Yes.                                    15:56:56

24         Q.    Okay.  So who witnessed ████████ or    15:56:57

25    ████████ standing in front of you, crotch in your 15:57:03
```

Page 207

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 27 of 44

```
 1    face, and making a comment about sucking his dick?      15:57:09

 2          A.    I mean, the -- the team was there.  We      15:57:12

 3    were all sitting around at the table at the bar.        15:57:16

 4    ███████████ and ████████████ were sitting              15:57:21

 5    closest to me, like next to me, and witnessed it        15:57:25

 6    directly.                                               15:57:28

 7          Q.    Who else was there?                         15:57:30

 8          A.    I mean, it was -- it was the whole          15:57:31

 9    group.                                                  15:57:35

10          Q.    Yeah.  Who would that be?                   15:57:36

11          A.    I mean, everybody who was on the            15:57:39

12    digital team.  It would have been -- I mean, I          15:57:41

13    don't -- I don't remember everybody.  I mean, but       15:57:45

14    ███████████████████████████████████████████, a         15:57:47

15    couple of the design guys.  There were some design      15:57:57

16    guys there who were part of the team who did our        15:58:00

17    photo shoots.                                           15:58:04

18                I think at that point in time Kelly         15:58:07

19    was not in the hotel lobby, but had gone back to        15:58:09

20    bed.  I certainly told her about it the next            15:58:12

21    morning as did other people who were there.  I          15:58:16

22    don't remember all the people on the team.              15:58:25

23          Q.    Anyone else that you haven't told me        15:58:27

24    about specifically who witnessed this?                  15:58:30

25          A.    I mean, like I said, I can't -- I           15:58:35
```

                                                    Page 208

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 28 of 44

```
 1   can't remember everybody's name.  This was a while    15:58:38
 2   ago.  And they're not people who --                   15:58:39
 3        Q.   Okay.  I understand you can't remember       15:58:43
 4   everybody, but anyone who was there that you           15:58:44
 5   recall that you haven't listed?                        15:58:46
 6        A.   Not -- not that I recall, but there          15:58:49
 7   were at least a dozen people there at the time.        15:58:55
 8        Q.   Okay.  And then if you look at the           15:59:02
 9   third line/paragraph at the top of the second page     15:59:05
10   of Exhibit 206, you reported, "Kelly Cahill is         15:59:11
11   also a witness to this.  She has since left Nike,      15:59:16
12   but she was my manager at the time of the              15:59:18
13   incident."  Do you see that?                           15:59:20
14        A.   Yes.                                         15:59:21
15        Q.   So did Kelly Cahill witness the              15:59:22
16   incident or not?                                       15:59:25
17        A.   I -- I don't recall that she was still       15:59:28
18   there that night.                                      15:59:31
19        Q.   Okay.  But you said in your complaint        15:59:36
20   to the Matter of Respect hotline that she was?         15:59:38
21        A.   Well, it seems like I did.                   15:59:41
22        Q.   Okay.  And you'd agree it's important        15:59:48
23   to be accurate and truthful when submitting a          15:59:50
24   complaint like this to Nike's internal hotline.        15:59:53
25   Correct?                                               15:59:57
```

Page 209

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 29 of 44

```
 1                    MR. BLAKE:  Objection.  Vague and        15:59:58

 2   ambiguous.  Argumentative.                                15:59:59

 3        A.   Yes.                                            16:00:01

 4   BY MS. ZABELE:                                            16:00:08

 5        Q.   Okay.  So I guess I'm trying to                 16:00:09

 6   understand which one is accurate.  Was Ms. Cahill         16:00:11

 7   there or is it -- is your MOR complaint inaccurate        16:00:14

 8   or -- or would you like to change your testimony?        16:00:18

 9        A.   I can't remember if she was                     16:00:24

10   specifically there or not.                               16:00:25

11        Q.   Okay.  And you said she was your                16:00:30

12   manager at the time of the incident, and you told        16:00:36

13   me earlier that you told -- it -- at least talked         16:00:38

14   to her about it the next day.  Was that correct?         16:00:40

15        A.   Yes.                                            16:00:44

16        Q.   Okay.  And what did Ms. Cahill say to          16:00:45

17   you -- well, strike that.                                 16:00:48

18             What did you -- what do you recall             16:00:49

19   telling Ms. Cahill in that conversation?                  16:00:51

20        A.   All what it says there.  That we were          16:00:54

21   sitting around and he stood in front of me and put       16:01:00

22   his crotch in my face and made that comment.              16:01:02

23        Q.   Okay.  Anything else that you recall           16:01:06

24   telling Ms. Cahill at the time?                           16:01:08

25        A.   No.                                            16:01:13
```

                                                       Page 210

```
 1          Q.    Okay.  And what -- how did Ms. Cahill      16:01:16

 2     respond to you in that conversation?  What did she    16:01:18

 3     say?                                                  16:01:21

 4          A.    I -- I don't remember what she said or     16:01:21

 5     didn't say.                                           16:01:26

 6          Q.    Do you know if Ms. Cahill ever made a      16:01:26

 7     report to ER [sic] about what you had told her or     16:01:35

 8     she had possibly witnessed?                           16:01:40

 9               MR. BLAKE:  Objection.  Compound.           16:01:43

10          A.    I do not know.                             16:01:45

11     BY MS. ZABELE:                                        16:01:54

12          Q.    Do you know if she ever made a report      16:01:55

13     to HR about what you had told her or what she had     16:01:56

14     possibly witnessed?                                   16:01:59

15          A.    I do not.                                  16:02:00

16          Q.    If she was your manager at the time,       16:02:01

17     wouldn't you have expected her to do so?              16:02:05

18               MR. BLAKE:  Objection.  Compound --         16:02:07

19     excuse me.  Argumentative.                            16:02:10

20          A.    I think with any of this, the culture      16:02:12

21     at Nike was that you like -- this is just             16:02:16

22     something you didn't talk about.  It's stuff that     16:02:19

23     happened.  It happened at off-sites.  And I don't     16:02:21

24     know what -- I don't know what managers were          16:02:23

25     expected -- were, were not expected to do.            16:02:27
```

Page 211

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 31 of 44

```
 1            So like I -- like I said, I -- I        16:02:34

 2    didn't -- I didn't want to make a big deal of it   16:02:35

 3    because I didn't want to get labeled as a          16:02:37

 4    troublemaker and get any more on ███████'s bad side 16:02:39

 5    than I already felt I was, and I just kind of let  16:02:42

 6    it go.  It wasn't the right thing to do, and I     16:02:48

 7    certainly shouldn't have done that for all -- you  16:02:51

 8    know, for all those who come after me.  I          16:02:54

 9    shouldn't have done it because it shouldn't have   16:02:56

10    been something that I wasn't strong enough to      16:02:59

11    stand up for and prevent it from happening to      16:03:02

12    other people, but it is what it is.                16:03:04

13    BY MS. ZABELE:                                     16:03:08

14        Q.   But as you sit here today, you don't      16:03:09

15    agree that Ms. Cahill should have reported this as 16:03:11

16    your manager?                                      16:03:14

17             MR. BLAKE:  Objection.                    16:03:16

18    Argumentative.  Asked and answered.                16:03:16

19        A.   I don't know if she did or did not        16:03:18

20    report it.                                         16:03:20

21    BY MS. ZABELE:                                     16:03:25

22        Q.   But based on Nike's records, there's      16:03:25

23    no evidence that she did?                          16:03:27

24        A.   I don't know.                             16:03:29

25        Q.   Did you have any -- ever have any         16:03:31
```

Page 212

```
 1   other conversations with Ms. Cahill about the       16:04:00

 2   incident that's reflected in your Matter of          16:04:03

 3   Respect complaint on Exhibit 206?                    16:04:07

 4        A.    I don't recall this is something that     16:04:12

 5   we had conversation on, extensive conversation on.   16:04:14

 6        Q.    Do you recall if you discussed it with    16:04:17

 7   anyone else at Nike besides Ms. Sherman before you   16:04:20

 8   made this report?                                    16:04:23

 9        A.    Yes.   ████ and I talked about it.        16:04:24

10   ████ and I had talked about it.  I mean, there       16:04:30

11   were people who were there.                          16:04:32

12        Q.    Did you discuss it with anyone else?      16:04:34

13        A.    Not that I recall.  Not -- I don't        16:04:42

14   recall having a conversation with anybody at Nike    16:04:46

15   about it.                                            16:04:48

16        Q.    Okay.  And what was Gina's role at the    16:04:49

17   time of the incident?                                16:04:54

18        A.    Digital director for running.  Digital    16:04:55

19   brand director for running.                          16:04:58

20        Q.    And what was ████'s position at the       16:05:00

21   time of the incident?                                16:05:13

22        A.    I believe she was our director of         16:05:14

23   operations for the group.                            16:05:18

24        Q.    Okay.  And after you submitted this       16:05:39

25   complaint to the Matter of Respect hotline, on       16:05:42
```

Page 213

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 33 of 44

| | | |
|---|---|---|
| 1 | March 22nd, 2018, you were subsequently contacted | 16:05:47 |
| 2 | by a third party investigator.  Do you recall | 16:05:53 |
| 3 | that? | 16:05:57 |
| 4 | A.    I do not. | 16:05:58 |
| 5 | MS. ZABELE:  Okay.  All right. | 16:06:25 |
| 6 | Let's look at a document. | 16:06:26 |
| 7 | (Deposition Exhibit No. 207 | |
| 8 | marked for identification.) | |
| 9 | BY MS. ZABELE: | |
| 10 | Q.    Okay.  I've marked as Exhibit 207 a | 16:07:19 |
| 11 | multipage document Bates-stamped PLF020860 to | 16:07:22 |
| 12 | PLF020862. | 16:07:32 |
| 13 | Ms. Anderson, please take a moment to | 16:07:40 |
| 14 | review Exhibit 207 and let me know when you're | 16:07:41 |
| 15 | finished. | 16:07:44 |
| 16 | A.    Okay.  I've read this. | 16:07:45 |
| 17 | Q.    Okay.  If I can ask you to look at the | 16:09:02 |
| 18 | bottom of the second page of Exhibit 207.  It | 16:09:08 |
| 19 | appears to be an email from Myra Villamor to you | 16:09:13 |
| 20 | dated April 3rd, 2018.  Subject:  Personal and | 16:09:17 |
| 21 | confidential.  To be opened by recipient only. | 16:09:21 |
| 22 | Did you receive this email from Ms. Villamor on | 16:09:26 |
| 23 | April 3rd, 2018? | 16:09:29 |
| 24 | A.    Yes. | 16:09:32 |
| 25 | Q.    Okay.  And she wrote to you, "Hi, | 16:09:33 |

Page 214

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 34 of 44

| | | |
|---|---|---|
| 1 | Lauren.  My name is Myra Villamor.  I'm -- I am | 16:09:41 |
| 2 | the member of the Matter of Respect team who will | 16:09:44 |
| 3 | look into the concerns you raised."  Do you see | 16:09:48 |
| 4 | that? | 16:09:49 |
| 5 | A.   Yes. | 16:09:50 |
| 6 | Q.   Okay.  So did you understand that | 16:09:52 |
| 7 | Ms. Villamor was contacting you in response to the | 16:09:54 |
| 8 | matter of respect complaint that you had | 16:09:56 |
| 9 | submitted? | 16:09:58 |
| 10 | A.   Yes. | 16:09:59 |
| 11 | Q.   Okay.  And Ms. Villamor also wrote, | 16:09:59 |
| 12 | "Although I have a Nike email and dedicated phone | 16:10:08 |
| 13 | number, I am with an outside firm that Nike has | 16:10:11 |
| 14 | retained to assist in this matter."  Do you see | 16:10:13 |
| 15 | that? | 16:10:15 |
| 16 | A.   Yes. | 16:10:15 |
| 17 | Q.   Okay.  And then if you scroll up, | 16:10:18 |
| 18 | Ms. Villamor then wrote you on April 5th, 2018, a | 16:10:26 |
| 19 | copy to Jennifer Nunez, and she said, "Hi, Lauren. | 16:10:36 |
| 20 | My colleague, Jennifer, cc'd on this email will be | 16:10:42 |
| 21 | reaching out to you to schedule a call for today. | 16:10:45 |
| 22 | Please let us know when you're available."  Do you | 16:10:48 |
| 23 | see that? | 16:10:50 |
| 24 | A.   Yes. | 16:10:50 |
| 25 | Q.   Okay.  Did you receive that email from | 16:10:52 |

Page  215

Davis Decl. Exhibit 44, Page 35 of 44

| | | |
|---|---|---|
| 1 | Ms. Villamor as well? | 16:10:54 |
| 2 | A.    Yes.  Because I responded with my | 16:10:57 |
| 3 | availability. | 16:10:59 |
| 4 | Q.    Okay.  And then that's the subsequent | 16:11:02 |
| 5 | email that you're looking at on kind of the top of | 16:11:06 |
| 6 | the second page of Exhibit 207? | 16:11:12 |
| 7 | A.    Yes. | 16:11:13 |
| 8 | Q.    Okay.  And then if you keep scrolling | 16:11:13 |
| 9 | up, Jennifer Nunez appears to have written to you | 16:11:15 |
| 10 | to schedule a time to speak via phone? | 16:11:20 |
| 11 | A.    Yes. | 16:11:24 |
| 12 | Q.    Do you see that? | 16:11:24 |
| 13 | A.    Yes. | 16:11:25 |
| 14 | Q.    Okay.  Okay.  And then did you | 16:11:26 |
| 15 | subsequently speak to Ms. Nunez via phone about | 16:11:28 |
| 16 | the Matter of Respect complaint that you had | 16:11:34 |
| 17 | submitted? | 16:11:36 |
| 18 | A.    Yes. | 16:11:37 |
| 19 | Q.    Okay.  And what do you recall | 16:11:40 |
| 20 | discussing with Ms. Nunez during that phone call? | 16:11:43 |
| 21 | A.    I just recall them reiterating what | 16:11:47 |
| 22 | they said the process was, about going in and talk | 16:11:54 |
| 23 | to him. | 16:11:58 |
| 24 | Q.    Of what process was that? | 16:12:00 |
| 25 | A.    That they were going to talk to ▮▮▮ | 16:12:02 |

Page 216

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 36 of 44

```
 1    and that they, you know, were going to do -- you        16:12:05

 2    know, that they were investigating it and that --       16:12:10

 3    that's what they were doing.                            16:12:15

 4         Q.    Okay.  And did you tell Ms. Nunez            16:12:18

 5    about the -- or any additional details about the        16:12:21

 6    Matter of Respect complaint that you had                16:12:27

 7    submitted?                                              16:12:29

 8         A.    I don't remember.                           16:12:30

 9         Q.    Do you recall anything else that            16:12:31

10    Ms. Nunez told you about the process of                 16:12:47

11    investigating your complaint?                           16:12:50

12         A.    No.                                         16:12:52

13         Q.    Okay.  Do you recall if you spoke to        16:13:02

14    Ms. Nunez after that phone call you had with her?       16:13:03

15         A.    I do not.                                   16:13:09

16         Q.    Do you recall if you spoke to              16:13:11

17    Ms. Villamor about your MOR -- or Matter of             16:13:15

18    Respect complaint after you spoke to Ms. Nunez?         16:13:23

19         A.    I do not.                                   16:13:25

20         Q.    Okay.  And you understood that             16:13:31

21    Ms. Nunez and Ms. Villamor were from an outside         16:13:33

22    law firm Nike had hired to investigate your             16:13:37

23    complaint.  Correct?                                    16:13:40

24         A.    ~~Yes.~~  I did not know they were attorneys 16:13:42
                 at the time of the investigation.

25         Q.    All right.  And then do you recall if       16:13:43
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 37 of 44

```
 1    Ms. Nunez or Ms. Villamor told you which law firm      16:13:54

 2    they were from?                                        16:13:58

 3         A.    I do not.                                   16:14:00

 4         Q.    Do you recall if they said they were        16:14:01

 5    from Seyfarth Shaw?                                    16:14:09

 6         A.    I do not recall.                            16:14:11

 7         Q.    Okay.  And let's see.  Okay.  And then      16:14:12

 8    Ms. Nunez subsequently emailed you to let you know     16:14:24

 9    that the investigation had been completed.  Right?     16:14:27

10    If you don't recall, just let me know and we can       16:14:38

11    look at another document.                              16:14:41

12         A.    No.  I mean, I had remembered -- I          16:14:42

13    mean, I see this document, but it's not on this        16:14:44

14    document.                                              16:14:46

15              MS. ZABELE:  Okay.  Give me a sec.           16:14:47

16              (Deposition Exhibit No. 208

17              marked for identification.)

18    BY MS. ZABELE:

19         Q.    Okay.  I've marked as Exhibit 208 a         16:15:33

20    one-page document Bates-stamped Nike_00006252.         16:15:35

21    Appears to be an email chain between Ms. Anderson      16:15:44

22    and Jennifer Nunez from August 2018.                   16:15:46

23              Ms. Anderson, please let me know -- or       16:15:51

24    take a minute to review Exhibit 208 and let me         16:15:54

25    know when you're finished.                             16:15:56
```

Page 218

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 38 of 44

```
 1          A.    Okay.  I've read it.                    16:16:26

 2          Q.    Okay.  And the -- if I can ask you to   16:16:27

 3    look at the -- the bottom email on Exhibit 208,     16:16:32

 4    Ms. Nunez wrote to you on August 3rd, 2018, and     16:16:38

 5    said, "Hi, Lauren.  I just tried to reach -- I      16:16:42

 6    just tried reaching you on your phone.  I wanted    16:16:47

 7    to thank you again for speaking with me and         16:16:50

 8    voicing your concerns through the Matter of         16:16:52

 9    Respect process.                                    16:16:53

10          "When we last spoke, I shared with you        16:16:58

11    that someone would be reaching out to you once the  16:16:59

12    Matter of Respect investigation concluded."  Do     16:17:02

13    you see that?                                        16:17:06

14          A.    Yes.                                     16:17:07

15          Q.    Okay.  And do you recall if Ms. Nunez   16:17:07

16    shared that with you at some point during the       16:17:10

17    process that they would let you know when the       16:17:14

18    Matter of Respect investigation into your           16:17:16

19    complaint had finished?                             16:17:20

20          A.    Yes.                                     16:17:21

21          Q.    Okay.  And then Ms. Nunez next wrote    16:17:22

22    to you, "We appreciate your patience while we work  16:17:25

23    through the issues.  We are now finishing           16:17:28

24    reviewing the issues you raised and have shared     16:17:30

25    our findings with the appropriate individuals       16:17:32
```

Page 219

```
 1   within Nike.  At this time, we would like to let      16:17:35

 2   you know that steps have been taken to address        16:17:38

 3   your concerns."  Do you see that?                      16:17:41

 4        A.    Yes.                                         16:17:42

 5        Q.    Okay.  And so I guess I'll ask this.        16:17:43

 6   Did you receive this email from Ms. Nunez dated       16:17:56

 7   August 3rd, 2018?                                      16:17:59

 8        A.    Yes.                                         16:18:01

 9        Q.    Okay.  And does this reflect --            16:18:01

10   refresh your recollection that Ms. Nunez contacted    16:18:04

11   you to let you know the investigation into your       16:18:07

12   Matter of Respect complaint regarding ████████        16:18:10

13   had been concluded?                                    16:18:15

14        A.    Yes.                                         16:18:17

15        Q.    And ████████ is no longer with Nike.       16:18:18

16   Correct?                                               16:18:28

17        A.    Correct.                                     16:18:28

18        Q.    Do you know why he's no longer with        16:18:34

19   Nike?                                                  16:18:35

20        A.    I believe he was let go.                    16:18:35

21        Q.    Do you know when that occurred?            16:18:43

22        A.    It was -- I think it was the summer of     16:18:45

23   2018 when all the heads rolled.  There were a lot     16:18:51

24   of senior leaders who left or were let go.            16:18:53

25        Q.    Okay.  And do you feel that Ms. Nunez      16:19:04
```

Page 220

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 40 of 44

```
 1    took your complaint seriously?                16:19:06

 2         A.    Yes.                                16:19:08

 3              MS. ZABELE:  Okay.  Look at one      16:19:33

 4    other document.                               16:19:35

 5              (Deposition Exhibit No. 209

 6              marked for identification.)

 7    BY MS. ZABELE:

 8         Q.    Okay.  I've marked as Exhibit 209 a  16:19:56

 9    three-page document.  Appears to be Ms. Anderson's 16:19:59

10    consent to become party plaintiff in collective  16:20:01

11    action.                                       16:20:04

12              Ms. Anderson, please let me know when 16:20:05

13    you have Exhibit 209 in front of you.         16:20:07

14         A.    It is in front of me.              16:20:09

15         Q.    Okay.  And do you recognize        16:20:11

16    Exhibit 209 as your consent to join this lawsuit? 16:20:15

17         A.    Yes.                               16:20:20

18         Q.    Okay.  And at the top of -- well,  16:20:22

19    let's say the first page, do you see where there's 16:20:32

20    some blue writing?                            16:20:34

21         A.    Yes.                               16:20:35

22         Q.    Blue lettering or typing?          16:20:39

23         A.    Yes.                               16:20:40

24         Q.    Okay.  And do you see where it says, 16:20:40

25    "Filed 01-18-2019"?                           16:20:42
```

Page 221

Davis Decl. Exhibit 44, Page 41 of 44

```
 1                      CERTIFICATE

 2

 3

 4              I, Jan R. Duiven, CSR, FCRR, CRC,

 5   RPR, a Certified Shorthand Reporter for the State

 6   of Oregon, do hereby certify that, pursuant to

 7   stipulation of counsel for the respective parties

 8   hereinbefore set forth, LAUREN ANDERSON appeared

 9   virtually before me at the time and place set

10   forth in the caption hereof; that at said time and

11   place I reported in Stenotype all testimony

12   adduced and other oral proceedings had in the

13   foregoing matter; that thereafter my notes were

14   reduced to typewriting under my direction; and

15   that the foregoing transcript, pages 1 to 229,

16   both inclusive, constitutes a full, true, and

17   accurate record of all such testimony adduced and

18   oral proceedings had, and of the whole thereof.

19              Witness my hand at Eugene, Oregon,

20   this 17th day of February, 2021.

21

22

23   Jan R. Duiven, CSR, FCRR, CRC, RPR

24   CSR No. 96-0327

25   Expiration Date:  September 30, 2023
```

                                        Page  230

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 44, Page 42 of 44

Cahill, et al v. Nike
Lauren Anderson Deposition Errata

| Page : Line | Reads | Should Read | Reason |
|---|---|---|---|
| (Volume 1) 47 : 6 | "Joel Canvick" | "Joel Blechman" | To clarify details and correct an inadvertent error |
| 147 : 4 | "Alex Wang" | "Alyx Wynn" | To correct a transcription error |
| 149 : 7 | "Daniel" | "Daniel Cogan" | To correct a transcription error |
| (Volume 2) 35 : 24 | "Danielle Weiss and Tracy -- I can't remember her last name. It will come to me." | "Danielle Weiss and Tracy Poitras." | To clarify and provide additional details |
| 38 : 16 | "Not that I remember." | "I remember having 1 or 2 direct reports in the running category, but I don't recall their names." | To clarify and provide additional details |
| 60 : 1 | "I -- I don't recall." | "I had a regularly scheduled meeting with the digital managers and eventually Kelly took over that meeting." | To clarify and provide additional details |
| 127 :13 | "There -- there were the -- the digital account managers on the account team side who were doing similar work" | "There were digital account managers and directors on the account side who were doing similar work" | To clarify and provide additional details |
| 128 : 13 | "Jody Fender" | Jodi Pfender | To correct a transcription error |
| 128 : 14 | "Josh Loy" | Josh Loye | To correct a transcription error |
| 151 : 23 | "Worked closely with the football team -- or the Foot Locker team" | "I worked closely with the Foot Locker team" | To clarify details and correct an inadvertent error |
| 175 : 2 | Tracy Wise | Tracy Poitras | To correct a transcription error |
| 178 : 1 | Tracy Wise | Tracy Poitras | To correct a |

Doc ID: d539c6c5b2df94ddfbbbc8228ac067aaef98735f

Cahill, et al v. Nike
Lauren Anderson Deposition Errata

|  |  |  |  | transcription error |
|---|---|---|---|---|
| 178 : 8 | "It would be something I would discuss with HR. So I would assume that Tracy was HR." | "Tracy was a manager on my team, and I believe I would have discussed hiring with her." | | To clarify and provide additional details |
| 216 : 24 | "Yes." | "I did not know they were attorneys at the time of the investigation." | | To clarify details and correct an inadvertent error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the

United States that my deposition transcript is true and correct.

Executed on ___03 / 19 / 2021___ in ___PORTLAND, OR___.

*Lauren Anderson*
_____
Lauren Anderson

1120154

Davis Decl. Exhibit 44, Page 44 of 44

Doc ID: d539c6c5b2df94ddfbbbc8228ac067aaef98735f

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF OREGON

3                    PORTLAND DIVISION

4

5   KELLY CAHILL, SARA JOHNSTON,     )

6   LINDSAY ELIZABETH, and HEATHER   )

7   HENDER, individually and on      )

8   behalf of others similarly       )

9   situated,                        )

10                 Plaintiffs,        )

11        v.                         ) 3:18-cv-01477-JR

12   NIKE, INC., an Oregon            )

13   corporation,                     )

14                 Defendant.         )

15

16             DEPOSITION OF PAIGE AZAVEDO

17               January 29, 2021

18                    Friday

19                  10:02 A.M.

20

21         THE VIDEOCONFERENCE VIDEO-RECORDED

22   DEPOSITION OF PAIGE AZAVEDO was taken at Portland,

23   Oregon, before Jan R. Duiven, CSR, FCRR, RPR, CRC,

24   Certified Shorthand Reporter in and for the State

25   of Oregon.

                                        Page 1

Davis Decl. Exhibit 45, Page 1 of 25

| | | |
|---|---|---|
| 1 | kind of a discussion about where their passion | 11:32:15 |
| 2 | kind of lied.  You know, Daniel, in particular, | 11:32:18 |
| 3 | you know, that was -- he was really into men's | 11:32:24 |
| 4 | training and football and that type of thing so it | 11:32:26 |
| 5 | made sense for him to align there. | 11:32:28 |
| 6 | Danielle was really, really focused on | 11:32:30 |
| 7 | women's initiatives and that was a big passion of | 11:32:34 |
| 8 | hers.  So I tried to align -- and we -- you know, | 11:32:37 |
| 9 | it was -- it was a conversation that -- that we | 11:32:40 |
| 10 | had over the course of not only the recruiting | 11:32:43 |
| 11 | process, but also as part of, you know, their | 11:32:46 |
| 12 | development within the organization. | 11:32:50 |
| 13 | As opportunities came up, it was a | 11:32:53 |
| 14 | conversation that we would have about, you know, | 11:32:55 |
| 15 | where -- where did they see themselves, you know, | 11:32:57 |
| 16 | kind of wanting to fit in and work. | 11:32:59 |
| 17 | Q.    Okay.  And who would decide which | 11:33:05 |
| 18 | accounts they would focus on? | 11:33:07 |
| 19 | A.    That was -- that was my role as their | 11:33:08 |
| 20 | leader. | 11:33:11 |
| 21 | Q.    Okay.  So sounds like you would | 11:33:16 |
| 22 | consider like their -- their interest and | 11:33:17 |
| 23 | experience in figuring out where to slot them in? | 11:33:19 |
| 24 | A.    That's right. | 11:33:24 |
| 25 | Q.    And for the individuals we mentioned, | 11:33:25 |

Page 54

Davis Decl. Exhibit 45, Page 2 of 25

```
 1    did you hire any of them for your team?  You          11:33:32

 2    mentioned recruitment.                                11:33:37

 3                MR. BLAKE:  Objection.  Vague.            11:33:38

 4         A.   Yeah.  Every single one of them I           11:33:40

 5    hired onto my team.                                   11:33:41

 6    BY MS. ZABELE:                                        11:33:43

 7         Q.   Oh, okay.  So I know we spoke earlier        11:33:43

 8    about promotions for Tracy White and Danielle         11:33:53

 9    Weiss from marketing specialist to manager.  So       11:34:00

10    maybe just focusing on Ms. White, did you hire her    11:34:05

11    into the marketing specialist role on your team?      11:34:09

12         A.   That is my recollection, yes.               11:34:13

13         Q.   Do you recall when it was?  It was          11:34:17

14    probably a long time ago, but to the extent you       11:34:25

15    can.                                                  11:34:27

16         A.   Yeah.  I don't.  It would have been --      11:34:27

17    it would have been early in that -- in that move      11:34:30

18    over to DTC.  So if I look at my resume, it would     11:34:34

19    have been in that 2011-2012 time period.              11:34:38

20         Q.   Okay.  And if you can recall, what          11:34:45

21    factors did you consider in deciding to hire          11:35:03

22    Ms. White for the marketing specialist role?          11:35:08

23         A.   Yeah.  My recollection is that she had      11:35:11

24    a pretty good resume from external sources.  So       11:35:15

25    she came from, I believe, a radio station where       11:35:19
```

                                                    Page 55

Davis Decl. Exhibit 45, Page 3 of 25

```
1    she was doing a lot of their digital work, even      11:35:22

2    did some kind of on-camera -- sorry, on-microphone   11:35:25

3    work, and I believe she also had come recommended    11:35:30

4    by somebody within the organization as somebody      11:35:35

5    to -- to -- to talk to.                              11:35:38

6              So there was a number of factors, both     11:35:41

7    her experience, you know, her -- her prior digital   11:35:43

8    experience and then her ability to communicate,      11:35:49

9    which was really important when you're getting in    11:35:52

10   front of accounts.                                   11:35:54

11        Q.    Okay.  Any other factors you              11:36:00

12   considered in deciding to hire Ms. White?            11:36:02

13        A.    No.                                       11:36:08

14        Q.    Okay.  And let's see.  What about         11:36:09

15   Kerry Blake?  Did you hire her into the -- into a    11:36:19

16   marketing specialist role on your team?              11:36:23

17        A.    I did.                                     11:36:25

18        Q.    Do you recall when that was?              11:36:27

19        A.    It would have been around the same        11:36:30

20   time period.  Probably -- she was a bit after --     11:36:33

21   after Tracy.  So probably, you know, either late     11:36:38

22   2011 or into 2012.                                   11:36:42

23        Q.    And what factors did you consider that    11:36:47

24   you can recall in deciding to hire Tracy into the    11:37:01

25   marketing specialist role?                           11:37:08
```

Page 56

Davis Decl. Exhibit 45, Page 4 of 25

```
 1          A.    You mean Kerry?                    11:37:09

 2          Q.    Kerry.  Yeah.  Sorry.  Kerry.      11:37:11

 3          A.    It's okay.  So Kerry -- Kerry actually  11:37:13

 4   was -- what I remember is she's a Stanford grad  11:37:16

 5   who was doing all of their digital work from a    11:37:21

 6   basketball perspective.  So she was -- she was    11:37:24

 7   their digital kind of specialist within the       11:37:28

 8   Stanford org.                                     11:37:31

 9          She was also somebody who came as an      11:37:35

10   internal recommendation from the -- the basketball  11:37:37

11   team, somebody they had interviewed and didn't end  11:37:42

12   up having a spot for her, and so they felt like    11:37:49

13   she would be a good fit if we had another role    11:37:52

14   open.  So that was -- that's my recollection of    11:37:54

15   how she -- she came into the mix.                  11:37:56

16          Q.    Okay.  Anything else?              11:38:12

17          A.    No.                                 11:38:14

18          Q.    And what about Chelsea Gunter?  Did  11:38:16

19   you hire her into a marketing specialist role on   11:38:24

20   your team?                                         11:38:26

21          A.    Yes.                                11:38:27

22          Q.    Do you recall when that was?        11:38:30

23          A.    It probably would have been in the  11:38:31

24   2012 time period as well.                          11:38:34

25          Q.    Okay.  What factors did you consider  11:38:42
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 45, Page 5 of 25

| | | |
|---|---|---|
| 1 | in deciding to hire Ms. Gunter? | 11:38:45 |
| 2 | A.    Chelsea -- I actually can't remember | 11:38:51 |
| 3 | the conversations that we had.  I believe she was | 11:38:54 |
| 4 | part of a -- my recollection is that Chelsea was | 11:38:56 |
| 5 | part of just a basic loop.  You know, there was a | 11:38:59 |
| 6 | bunch of candidates that we were looking for -- we | 11:39:04 |
| 7 | were looking to hire from a bunch -- kind of a | 11:39:06 |
| 8 | list of candidates. | 11:39:10 |
| 9 | She came in and interviewed, and -- | 11:39:13 |
| 10 | and my recollection is that she just felt like a | 11:39:15 |
| 11 | good fit for Nike and she felt like a good fit for | 11:39:17 |
| 12 | the team and the role. | 11:39:20 |
| 13 | So, yeah, I think that was just part | 11:39:22 |
| 14 | of kind of the interview process that -- that -- | 11:39:24 |
| 15 | that worked. | 11:39:27 |
| 16 | Q.    And when you say, "She felt like a | 11:39:28 |
| 17 | good fit for Nike," what do you recall about that? | 11:39:37 |
| 18 | Like what would make someone a good fit for Nike? | 11:39:40 |
| 19 | A.    It was just passion -- | 11:39:43 |
| 20 | Q.    Or what -- sorry.  I'll strike. | 11:39:44 |
| 21 | What made Ms. Gunter a good fit for | 11:39:46 |
| 22 | Nike? | 11:39:48 |
| 23 | A.    Yeah.  Yeah.  She was really | 11:39:48 |
| 24 | passionate about sport.  She was passionate about, | 11:39:50 |
| 25 | you know, women's sport in particular, and -- and, | 11:39:52 |

Page 58

Davis Decl. Exhibit 45, Page 6 of 25

| | | |
|---|---|---|
| 1 | she was -- you know, she was somebody who was | 11:40:02 |
| 2 | very -- from -- from the conversations we had, and | 11:40:03 |
| 3 | then subsequently in the role, she was, you know, | 11:40:06 |
| 4 | someone who was very kind of detailed oriented | 11:40:08 |
| 5 | and -- and -- and really -- really good with -- | 11:40:11 |
| 6 | with her ability to kind of communicate with | 11:40:17 |
| 7 | relationships. | 11:40:20 |
| 8 | Q.    Makes sense.  Anything else? | 11:40:26 |
| 9 | A.    No. | 11:40:31 |
| 10 | Q.    And I guess like thinking broadly, not | 11:40:35 |
| 11 | just about Ms. Gunter in particular, but was | 11:40:39 |
| 12 | whether a candidate would be a good fit for Nike | 11:40:43 |
| 13 | something you would consider for generally like | 11:40:47 |
| 14 | all candidates when you interviewed them? | 11:40:50 |
| 15 | A.    Yeah.  I mean, you know, there's | 11:40:53 |
| 16 | always a -- going back to kind of the Nike | 11:40:55 |
| 17 | principles and making sure that there's -- you | 11:40:59 |
| 18 | know, that they -- they feel right against those | 11:41:02 |
| 19 | key principles that Nike has.  And, you know, for | 11:41:06 |
| 20 | me, also just being able to -- to have a passion | 11:41:11 |
| 21 | for sport and -- and know that, you know, athletes | 11:41:15 |
| 22 | and the -- and that world is something that they | 11:41:19 |
| 23 | care about. | 11:41:22 |
| 24 | Q.    When you mentioned the Nike's key | 11:41:27 |
| 25 | principles, what are those? | 11:41:43 |

Page 59

Davis Decl. Exhibit 45, Page 7 of 25

```
 1          A.    Oh, I'd have to go back and look.        11:41:44
 2    It's like "do the right thing" and, you know --      11:41:47
 3    it's been a while.  I used to be able to recite      11:41:52
 4    them by memory.  But, you know, customer             11:41:54
 5    obsession.  Now -- now I'm mixing between my         11:41:59
 6    current role and Nike, but, you know, it's the "do   11:42:03
 7    the right thing" and -- I -- I'd have to go back     11:42:05
 8    and -- and refresh on them, but it's -- it's all    11:42:13
 9    of the kind of core attributes that Nike uses        11:42:16
10    to -- as part of their hiring process.               11:42:20
11          Q.    Okay.  And you would assess candidates   11:42:23
12    against those principles when you're making hiring   11:42:28
13    decisions?                                           11:42:31
14          A.    Absolutely.                              11:42:31
15          Q.    Okay.  You also -- let's see.  I just    11:42:33
16    want to check to make sure I'm not repeating         11:42:49
17    myself.                                              11:42:51
18          Okay.  So maybe how about Daniel               11:42:59
19    Cogan?  Did you hire him into a marketing            11:43:04
20    specialist role on your team?                        11:43:06
21          A.    I did.                                   11:43:08
22          Q.    Recall when that was?                    11:43:08
23          A.    Around the same time period.  He was a   11:43:11
24    little bit later than the others, if I recall.  So  11:43:12
25    probably 2012-ish.                                   11:43:15
```

Page 60

Davis Decl. Exhibit 45, Page 8 of 25

```
 1         Q.    Okay.  And what factors did you         11:43:19

 2    consider in hiring Mr. Cogan into the marketing    11:43:24

 3    specialist role?                                   11:43:33

 4         A.    Yeah.  With Daniel in particular, my    11:43:33

 5    recollection is he had been working at Adidas      11:43:35

 6    doing a very similar role there already.  So he    11:43:38

 7    had the relevant experience.  And -- and so --     11:43:40

 8    and, again, had a -- had a big passion for sport   11:43:46

 9    and for the categories that we were hiring into in 11:43:50

10    particular, which at the time were training and    11:43:53

11    football.  So he -- he was -- so he was somebody   11:43:56

12    that -- that, again, he had the experience.        11:43:58

13         Q.    Anything else?                          11:44:03

14         A.    No.                                     11:44:06

15         Q.    So when you mentioned that he worked    11:44:08

16    at Adidas, I'm thinking not just related to        11:44:18

17    Mr. Cogan, but more broadly to the -- all of the   11:44:24

18    employees that you hired, would you consider like  11:44:27

19    the type of experience, prior work experience that 11:44:31

20    someone had like with certain -- working at a      11:44:37

21    certain place being more relevant to what you were 11:44:41

22    hiring for versus others?                          11:44:43

23              MR. BLAKE:  Vague and ambiguous.         11:44:46

24         A.    It -- yeah.  I mean, all the folks on   11:44:47

25    my team came from very diverse backgrounds as I    11:44:50
```

Page 61

Davis Decl. Exhibit 45, Page 9 of 25

| | | |
|---|---|---|
| 1 | mentioned.  You know, Kerry came from, you know, a | 11:44:57 |
| 2 | college role.  Tracy came from a radio station.  I | 11:45:01 |
| 3 | don't recall Chelsea's role before.  You know, | 11:45:07 |
| 4 | Daniel came from Adidas. | 11:45:13 |
| 5 | So from my perspective, there was -- | 11:45:14 |
| 6 | there were key criteria that cut across, and it | 11:45:17 |
| 7 | was, you know, do -- do you -- do you meet the | 11:45:22 |
| 8 | sort of criteria and needs that -- that are | 11:45:25 |
| 9 | established by the -- the Nike key principles?  Do | 11:45:27 |
| 10 | you -- you know, do you have a passion for the | 11:45:32 |
| 11 | brand and for the -- the sports and -- and for | 11:45:35 |
| 12 | sports, and do you then have a specific abilities | 11:45:41 |
| 13 | for the -- for these particular roles? | 11:45:45 |
| 14 | So, you know, can you build | 11:45:47 |
| 15 | relationships with accounts?  Can you -- can you | 11:45:49 |
| 16 | work across the matrix and -- and build strategic | 11:45:53 |
| 17 | plans?  Can you execute against those plans?  And | 11:45:59 |
| 18 | can you show me examples of where you've been able | 11:46:03 |
| 19 | to do that? | 11:46:05 |
| 20 | So -- I -- I would say just by virtue | 11:46:05 |
| 21 | of the -- where each of these came from, I was not | 11:46:09 |
| 22 | looking for experience from specific companies at | 11:46:13 |
| 23 | all.  It was more about their experience and their | 11:46:16 |
| 24 | ability to do the role. | 11:46:19 |
| 25 | (Reporter inquiry.) | 11:46:27 |

Page 62

Davis Decl. Exhibit 45, Page 10 of 25

```
 1                    THE WITNESS:  She was -- she        11:46:28
 2    actually came from -- my recollection is that she  11:46:29
 3    was a Stanford graduate who was doing -- she was   11:46:32
 4    being -- she was their digital specialist or       11:46:36
 5    digital social person on -- for their basketball   11:46:38
 6    or athletic department.                            11:46:43
 7                    MS. ZABELE:  So sorry.  Maybe I'll  11:46:52
 8    just ask for the record.  Jan, were you able to    11:46:53
 9    record Ms. Azavedo's answer for -- I believe I     11:46:59
10    asked her what factors she considered when hiring  11:47:02
11    Kerry Blake into the role?  I'm just wondering if  11:47:04
12    we're covered here or if I should reask it.        11:47:09
13                    THE REPORTER:  I think I got it.  I 11:47:20
14    just didn't hear the -- I think the word I missed  11:47:22
15    was Stanford.                                      11:47:22
16                    MS. ZABELE:  Ah, okay.  No problem. 11:47:22
17    BY MS. ZABELE:                                     11:47:28
18         Q.    Okay.  And let's see.  Also, Danielle   11:47:28
19    Weiss?  Did you hire her for your team in a        11:47:41
20    marketing specialist role?                         11:47:46
21         A.    I did.                                  11:47:47
22         Q.    Do you remember when that was?          11:47:50
23         A.    Around the same time, 2012-ish.  I      11:47:51
24    think she was one of my --                         11:47:59
25         Q.    Okay.  And --                           11:48:00
```

Page 63

Davis Decl. Exhibit 45, Page 11 of 25

| | | |
|---|---|---|
| 1 | A.    One of my early hires, so it would | 11:48:01 |
| 2 | have been either 2011 or 2012. | 11:48:03 |
| 3 | Q.    And what factors did you consider in | 11:48:06 |
| 4 | deciding to hire Ms. Weiss for the marketing | 11:48:12 |
| 5 | manager -- marketing specialist position? | 11:48:15 |
| 6 | A.    Yeah.  So Danielle was a little bit of | 11:48:17 |
| 7 | a unique situation in that she was actually | 11:48:19 |
| 8 | working in one of our agencies as a program | 11:48:22 |
| 9 | manager working with us on -- on some different | 11:48:24 |
| 10 | agency work.  So she was our -- she was our | 11:48:29 |
| 11 | account manager on the other side. | 11:48:31 |
| 12 | And when the role came open, because | 11:48:34 |
| 13 | we had had such a great relationship with her and | 11:48:38 |
| 14 | was able to view her abilities face -- you know, | 11:48:41 |
| 15 | directly because of the work she was doing on our | 11:48:45 |
| 16 | account.  We -- you know, she was interested in | 11:48:48 |
| 17 | coming to Nike. | 11:48:51 |
| 18 | We interviewed her alongside other -- | 11:48:53 |
| 19 | other candidates, to my recollection, and -- and | 11:48:55 |
| 20 | so she was somebody that -- that we felt very | 11:48:59 |
| 21 | confident hiring because we had done -- again, had | 11:49:01 |
| 22 | direct access to her work on our behalf. | 11:49:04 |
| 23 | (Reporter inquiry.) | 11:49:14 |
| 24 | THE WITNESS:  Sorry.  And it's not | 11:49:14 |
| 25 | Schindler.  It's Streicher.  It's Streicher-Weiss. | 11:49:19 |

Page 64

Davis Decl. Exhibit 45, Page 12 of 25

| | | |
|---|---|---|
| 1 | Danielle Streicher.  S-T-R-E-I-C-H-E-R.  And then | 11:49:20 |
| 2 | she's hyphenated now.  Weiss, W-E-I-S-S. | 11:49:25 |
| 3 | I apologize.  It's not Schindler. | 11:49:29 |
| 4 | I'm getting a couple -- it's -- it's | 11:49:32 |
| 5 | Streicher-Weiss. | 11:49:36 |
| 6 | BY MS. ZABELE: | 11:49:36 |
| 7 | Q.    That's okay.  If you -- yeah.  If at | 11:49:37 |
| 8 | any point you realize like you need to correct any | 11:49:39 |
| 9 | other names or anything like that, just speak up. | 11:49:44 |
| 10 | A.    Okay.  Thank you. | 11:49:47 |
| 11 | Q.    No problem.  Okay.  Any other | 11:49:48 |
| 12 | individuals that you recall hiring when you were | 11:50:01 |
| 13 | in the director of digital NA role? | 11:50:04 |
| 14 | A.    Yeah.  I hired Ryan McDonald | 11:50:07 |
| 15 | (phonetic) and Stephanie Gray are the other two, | 11:50:10 |
| 16 | and then Lauren Anderson. | 11:50:13 |
| 17 | Q.    Okay.  Maybe let's start with Ryan | 11:50:19 |
| 18 | McDonald.  What role did you hire him for? | 11:50:27 |
| 19 | A.    He was our -- he was our -- | 11:50:36 |
| 20 | responsible for our kids category.  So primarily | 11:50:39 |
| 21 | accounts like Kids Foot Locker and Dick's Sporting | 11:50:42 |
| 22 | Goods and their kids' business.  Or young | 11:50:47 |
| 23 | athletes, I guess. | 11:50:51 |
| 24 | Q.    And did you hire him for a marketing | 11:50:53 |
| 25 | manager or a marketing specialist role? | 11:50:58 |

Page 65

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 45, Page 13 of 25

| | | |
|---|---|---|
| 1 | A.   Marketing specialist. | 11:51:01 |
| 2 | Q.   And do you recall when you hired him | 11:51:04 |
| 3 | into the marketing specialist role? | 11:51:16 |
| 4 | A.   I -- I don't, and the reason I can't | 11:51:18 |
| 5 | recall exactly is that he worked for us, I | 11:51:25 |
| 6 | believe, as a temp, sort of -- a temp employee for | 11:51:28 |
| 7 | a while, and then we were able to transition him | 11:51:34 |
| 8 | into a full-time role.  And so I don't remember | 11:51:37 |
| 9 | exactly what part of his work was temp and when -- | 11:51:42 |
| 10 | versus when he was full time. | 11:51:48 |
| 11 | Q.   Okay.  So he was -- okay.  So he was | 11:51:51 |
| 12 | employed with another company and like on | 11:52:01 |
| 13 | assignment at Nike? | 11:52:05 |
| 14 | A.   Yeah.  My -- my recollection is that | 11:52:06 |
| 15 | we brought him in originally as -- as a -- as a | 11:52:08 |
| 16 | temporary worker, ETW, and -- and then were able | 11:52:12 |
| 17 | to transition his role into a full-time head | 11:52:22 |
| 18 | position. | 11:52:26 |
| 19 | Q.   Okay.  And what factors did you | 11:52:31 |
| 20 | consider in deciding to hire Mr. McDonald into the | 11:52:33 |
| 21 | marketing specialist role? | 11:52:38 |
| 22 | A.   Again, kind of similar to Danielle. | 11:52:39 |
| 23 | He was someone who, you know, we were able to see | 11:52:41 |
| 24 | him working on the -- on the job through his | 11:52:44 |
| 25 | temporary -- ETW role.  And so based on that, we | 11:52:47 |

Page 66

Davis Decl. Exhibit 45, Page 14 of 25

| | | |
|---|---|---|
| 1 | were able to -- to -- to feel confident about his | 11:52:51 |
| 2 | ability to do the job and to come into Nike as | 11:52:55 |
| 3 | a -- as a full-time employee to -- to do the -- to | 11:52:59 |
| 4 | step into that kids' role, kids' marketing role. | 11:53:04 |
| 5 | Q.   Okay.  Anything else? | 11:53:11 |
| 6 | A.   No. | 11:53:12 |
| 7 | Q.   All right.  And you mentioned | 11:53:16 |
| 8 | Stephanie Gray.  Is it G-R-A-Y? | 11:53:19 |
| 9 | A.   G-R- -- I think it is an A, yes. | 11:53:25 |
| 10 | Q.   Okay.  And did you hire her into a | 11:53:31 |
| 11 | marketing specialist role as well? | 11:53:36 |
| 12 | A.   I believe she was a marketing | 11:53:45 |
| 13 | specialist, yes. | 11:53:46 |
| 14 | Q.   And did she -- when she became a | 11:53:50 |
| 15 | marketing specialist on your team, did she have a | 11:54:00 |
| 16 | particular group of accounts that she was | 11:54:04 |
| 17 | responsible for? | 11:54:06 |
| 18 | A.   Yeah.  She -- I -- I can't remember | 11:54:08 |
| 19 | exactly what the -- the overlap was, but she kind | 11:54:16 |
| 20 | of came in to manage -- I believe our -- some of | 11:54:19 |
| 21 | our training categories, the men's training work. | 11:54:28 |
| 22 | That's my recollection. | 11:54:34 |
| 23 | And the reason we brought her in is | 11:54:39 |
| 24 | that she had been doing a bunch of -- I believe | 11:54:42 |
| 25 | she worked either by contract or directly with | 11:54:45 |

Page 67

Davis Decl. Exhibit 45, Page 15 of 25

| | | |
|---|---|---|
| 1 | Microsoft doing some large-scale event work with | 11:54:50 |
| 2 | them, digital event and physical events.  And we | 11:54:53 |
| 3 | knew -- I knew that we were going to have, with | 11:54:58 |
| 4 | training in particular and -- and events like | 11:55:01 |
| 5 | Super Bowl, that there was a potential for us | 11:55:04 |
| 6 | to -- to need someone to -- to engage with our | 11:55:05 |
| 7 | training team on -- and our accounts on what that | 11:55:10 |
| 8 | could look like. | 11:55:13 |
| 9 | So she -- she fit the bill from that | 11:55:13 |
| 10 | perspective because she had some good, kind of | 11:55:16 |
| 11 | on-the-ground event-specific work with Microsoft. | 11:55:18 |
| 12 | Q.    What's a digital event? | 11:55:35 |
| 13 | A.    I believe she, you know, would send | 11:55:37 |
| 14 | out social campaigns and, you know, create -- | 11:55:42 |
| 15 | create registrations for people to come onsite | 11:55:50 |
| 16 | through digital means.  So, you know, you could -- | 11:55:55 |
| 17 | you could sign up and register to be part of the | 11:55:57 |
| 18 | event that was -- that was happening in a specific | 11:56:00 |
| 19 | location, that type of thing.  I don't exactly | 11:56:02 |
| 20 | recall what she was doing, but that was my | 11:56:04 |
| 21 | recollection, is that she did some kind of | 11:56:07 |
| 22 | large-scale event planning with them that | 11:56:09 |
| 23 | happened -- | 11:56:12 |
| 24 | Q.    Oh, okay. | 11:56:13 |
| 25 | A.    That happened digitally and | 11:56:13 |

Page 68

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 45, Page 16 of 25

| | | |
|---|---|---|
| 1 | physically. | 11:56:15 |
| 2 | Q.    And when she joined your team, did she | 11:56:16 |
| 3 | do digital and physical events for Nike? | 11:56:22 |
| 4 | A.    She was -- she was responsible for our | 11:56:26 |
| 5 | digital work specifically. | 11:56:29 |
| 6 | Q.    Okay.  And when you say she was | 11:56:48 |
| 7 | responsible for your digital work specifically, is | 11:57:06 |
| 8 | that like as compared to something else? | 11:57:09 |
| 9 | A.    No.  You just asked me if she did | 11:57:12 |
| 10 | physical and she was responsible for digital, not | 11:57:15 |
| 11 | physical events. | 11:57:17 |
| 12 | Q.    I see.  Okay.  Thanks. | 11:57:19 |
| 13 | Okay.  And I think I might not have | 11:57:42 |
| 14 | asked you yet what factors you considered in | 11:57:46 |
| 15 | deciding to hire Ms. Gray as a marketing | 11:57:48 |
| 16 | specialist on your team. | 11:57:52 |
| 17 | A.    Yeah.  Again, she was -- I knew of her | 11:57:54 |
| 18 | experience with Microsoft and doing similar work | 11:57:57 |
| 19 | with them, and so the -- you know, she seemed like | 11:58:01 |
| 20 | a good fit for the role that we were looking for. | 11:58:05 |
| 21 | Q.    Got it.  Anything else? | 11:58:12 |
| 22 | A.    No. | 11:58:13 |
| 23 | Q.    Okay.  And then you mentioned Lauren | 11:58:15 |
| 24 | Anderson. | 11:58:21 |
| 25 | A.    Yeah. | 11:58:22 |

Page 69

Davis Decl. Exhibit 45, Page 17 of 25

| | | |
|---|---|---|
| 1 | Q.   And Ms. Anderson's an opt-in plaintiff | 11:58:24 |
| 2 | in this case.  Correct? | 11:58:27 |
| 3 | A.   That's right. | 11:58:28 |
| 4 | Q.   Okay.  What role did you hire | 11:58:29 |
| 5 | Ms. Anderson for? | 11:58:33 |
| 6 | A.   She was hired in as a director, and | 11:58:34 |
| 7 | what I recall is she was -- she was going to be | 11:58:45 |
| 8 | more of a senior leader on my team to manage -- to | 11:58:47 |
| 9 | come in and manage -- we were kind of moving | 11:58:52 |
| 10 | accounts around, so she was -- I believe she was | 11:58:58 |
| 11 | coming in to manage the Eastbay account | 11:58:59 |
| 12 | specifically. | 11:59:02 |
| 13 | Q.   Okay.  And I think Ms. Anderson was | 11:59:05 |
| 14 | already working at Nike at the time that you hired | 11:59:19 |
| 15 | her.  Correct? | 11:59:22 |
| 16 | A.   That's right. | 11:59:22 |
| 17 | Q.   So I guess when you hired her into | 11:59:24 |
| 18 | your group, was that a -- like a lateral?  Would | 11:59:28 |
| 19 | that have been considered a lateral move? | 11:59:31 |
| 20 | A.   Yes.  Lateral move from a -- I would | 11:59:33 |
| 21 | say a smaller category.  I think she was in the | 11:59:37 |
| 22 | golf team at the time into a larger kind of | 11:59:39 |
| 23 | opportunity.  So from a scope perspective, it was | 11:59:43 |
| 24 | a larger scope, but a lateral move from an HR | 11:59:47 |
| 25 | perspective. | 11:59:51 |

Page 70

Davis Decl. Exhibit 45, Page 18 of 25

| | | |
|---|---|---|
| 1 | Q.    Got it.  And when you say that it was | 11:59:53 |
| 2 | a larger scope as compared to the golf team, how | 11:59:58 |
| 3 | so? | 12:00:01 |
| 4 | A.    Eastbay's business is -- at the time | 12:00:02 |
| 5 | was multi, multimillions of dollars with Nike. | 12:00:05 |
| 6 | You know, they were one of our biggest accounts. | 12:00:11 |
| 7 | They were moving quickly with us.  And so, you | 12:00:14 |
| 8 | know, I think from a scope perspective, they cover | 12:00:17 |
| 9 | every category, not just one category.  And so the | 12:00:20 |
| 10 | role was -- was pretty -- pretty complex and in | 12:00:25 |
| 11 | depth. | 12:00:31 |
| 12 | Q.    And maybe I'll just close up for her. | 12:00:31 |
| 13 | What factors did you consider in deciding to hire | 12:00:46 |
| 14 | Ms. Anderson onto your team in the director role? | 12:00:52 |
| 15 | A.    You know, with Lauren, there's a few | 12:00:55 |
| 16 | different pieces.  One, you know, we interviewed | 12:00:57 |
| 17 | and her and she seemed like, you know, passion, | 12:01:00 |
| 18 | capability, able to do the job just from the -- | 12:01:05 |
| 19 | from the Nike principles. | 12:01:09 |
| 20 | And then I would say a couple other | 12:01:10 |
| 21 | things.  We had history.  Right?  We had all of | 12:01:12 |
| 22 | her coaching for excellence documentation so we | 12:01:14 |
| 23 | were able to look back and see what that -- see | 12:01:18 |
| 24 | what -- what -- how she had performed over the | 12:01:22 |
| 25 | course of her tenure at Nike. | 12:01:25 |

Page 71

Davis Decl. Exhibit 45, Page 19 of 25

```
 1              And then she came highly recommended        12:01:26

 2    by an internal team member, Cindy King, who knew       12:01:29

 3    her well and recommended her as somebody to bring      12:01:33

 4    into the team.                                         12:01:35

 5         Q.    Okay.  Any other factors that you           12:01:40

 6    considered in deciding to hire Ms. Anderson?           12:01:42

 7         A.    No.                                          12:01:45
```

```
 8         Q.    And did you tell me when that was that      12:01:48

 9    you hired her?                                         12:01:52

10         A.    She --                                       12:01:53

11         Q.    I can't remember.                           12:01:54

12         A.    -- would have come in a little bit          12:01:55

13    later, kind of towards the end of my time.  Maybe      12:01:56

14    in the 2013-2014.  I can't recall exactly, but it      12:02:00

15    was later than the others.                             12:02:04

16         Q.    Okay.  And -- and I think you               12:02:08

17    mentioned that -- you said, We had interviewed her     12:02:13

18    or we interviewed her.  Who else interviewed          12:02:16

19    Ms. Anderson for the role that you can remember?       12:02:18

20         A.    Cindy -- Cindy King did.  My manager        12:02:23

21    at the time -- I'll forget his name.  Who was it?      12:02:25

22    I can't -- I can't remember his name.  He was not      12:02:31

23    my manager for very long.  So kind of the -- you       12:02:34

24    know, the -- the key folks that she would be           12:02:39

25    working with.                                          12:02:41
```

Page 72

Davis Decl. Exhibit 45, Page 20 of 25

```
 1    what factors did you consider in deciding to offer      12:14:03

 2    Ms. Anderson the $108,000 as a starting salary in       12:14:09

 3    that director role?                                     12:14:14

 4          A.    I -- I mean, for the most part, we --        12:14:17

 5    I relied on HR to make those recommendations and       12:14:22

 6    very rarely questioned them.  And so they made the     12:14:26

 7    recommendation.  It seemed reasonable.  And it         12:14:30

 8    was -- it was based on, you know, prior work           12:14:34

 9    experience and compensation.  It gave her a good       12:14:38

10    kind of reason to come over to the team if she was     12:14:42

11    having any questions because it was an increase in     12:14:44

12    salary.  So that was -- that was all that goes         12:14:47

13    into the decision.                                     12:14:49

14          Q.    Got it.  And do you recall approving        12:14:51

15    compensation for the other members of your team        12:15:08

16    that you hired that we've discussed?                   12:15:13

17                MR. BLAKE:  Objection.  Vague and           12:15:16

18    ambiguous.                                             12:15:21

19          A.    Yes.  Yes.  I would have approved           12:15:21

20    their salaries as part of the hiring process.          12:15:22

21    BY MS. ZABELE:                                         12:15:32

22          Q.    Okay.  Okay.  Anyone else you recall        12:16:16

23    hiring on your team when you were in the director      12:16:17

24    of digital NA role?                                    12:16:20

25          A.    Not that I recall, no.                      12:16:23
```

Page 80

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 45, Page 21 of 25

```
 1          Q.    Did you ever make any hiring          13:37:25

 2    recommendations or decisions for an employee at   13:37:26

 3    Nike based on their gender?                        13:37:29

 4              MR. BLAKE:  Objection.  Vague and        13:37:32

 5    ambiguous.  Compound.                              13:37:32

 6          A.    No.  I never made a decision on hiring 13:37:33

 7    based on gender.                                   13:37:38

 8    BY MS. ZABELE:                                     13:37:41

 9          Q.    What about compensation?  Did you ever 13:37:41

10    make any compensation decisions or recommendations 13:37:44

11    for an employee at Nike based on their gender?     13:37:46

12              MR. BLAKE:  Objection.  Vague and        13:37:48

13    ambiguous.  Compound.                              13:37:50

14          A.    No.                                    13:37:51

15    BY MS. ZABELE:                                     13:37:54

16          Q.    Oh.  One thing I wanted to ask.  When  13:38:05

17    you were the director of digital,                 13:38:07

18    direct-to-consumer in that role at Nike from       13:38:09

19    October 2007 to May 2011, were there any employees 13:38:13

20    who were performing similar roles to yours?        13:38:17

21          A.    Yeah.  Jeff Lyman was in a very        13:38:19

22    similar role managing work and campaigns that      13:38:24

23    were -- that were similar to mine.                 13:38:30

24              (Reporter inquiry.)                      13:38:42

25              THE WITNESS:  Yeah.  It's L-Y-M-A-N.     13:38:43
```

Page 103

Davis Decl. Exhibit 45, Page 22 of 25

```
 1        Q.    And sounds like this isn't the case,    13:50:04

 2   but I'll just ask.  Did you hold any other jobs in   13:50:09

 3   between the time that you left Intel Corporation      13:50:13

 4   in October 2007, and started working at Nike in      13:50:15

 5   October of 2007?                                     13:50:19

 6        A.    No.                                       13:50:24

 7        Q.    Okay.  And the -- the role that you       13:50:24

 8   started in at Nike in October 2007, the director     13:50:35

 9   of digital, direct-to-consumer, that's a role that   13:50:39

10   you had applied for.  Right?                         13:50:40

11        A.    That's my recollection, yes.             13:50:42

12        Q.    Do you recall how you learned about       13:50:47

13   that opportunity?                                    13:50:51

14        A.    Yeah.  I remember the recruiter called    13:50:53

15   me, Angel Foss, F-O-S-S.  She called me and          13:50:56

16   reached out for a phone screen is what I remember.   13:51:03

17        Q.    Okay.  Do you recall if you had           13:51:17

18   submitted an application and then Ms. Foss reached   13:51:18

19   out to you or if she -- if Ms. Foss called you out   13:51:20

20   of the blue?                                         13:51:26

21        A.    I don't remember if I applied for this    13:51:27

22   job specifically or if I applied for a job and       13:51:33

23   they reached out to me about this job               13:51:37

24   specifically.  I can't tell you which was -- it's    13:51:40

25   been so long, I don't remember exactly what the --   13:51:42
```

Page 111

Davis Decl. Exhibit 45, Page 23 of 25

1

                          CERTIFICATE

2

3

4              I, Jan R. Duiven, CSR, FCRR, CRC,

5    RPR, a Certified Shorthand Reporter for the State

6    of Oregon, do hereby certify that, pursuant to

7    stipulation of counsel for the respective parties

8    hereinbefore set forth, PAIGE AZAVEDO appeared

9    virtually before me at the time and place set

10   forth in the caption hereof; that at said time and

11   place I reported in Stenotype all testimony

12   adduced and other oral proceedings had in the

13   foregoing matter; that thereafter my notes were

14   reduced to typewriting under my direction; and

15   that the foregoing transcript, pages 1 to 245,

16   both inclusive, constitutes a full, true, and

17   accurate record of all such testimony adduced and

18   oral proceedings had, and of the whole thereof.

19              Witness my hand at Eugene, Oregon,

20   this 12th day of February, 2021.

21

22

23           Jan R. Duiven, CSR, FCRR, CRC, RPR

24           CSR No. 96-0327

25   Expiration Date:  September 30, 2023

                                        Page 246

Davis Decl. Exhibit 45, Page 24 of 25

Cahill, et al v. Nike
Paige Azavedo Deposition Errata

| Page : Line | Reads | Should Read | Reason |
|---|---|---|---|
| 132 : 16 | Sysco | Cisco | To correct a transcription error |
| 142 : 8 | Yes | I'm not sure if the role exists today. | To clarify and correct an inadvertent error |
| 169 : 20 | Tim Parks | Tim Perks | To correct a transcription error |
| 170 : 11 | Tim Parks | Tim Perks | To correct a transcription error |
| 219 : 20 | Tim Parks | Tim Perks | To correct a transcription error |
| 242 : 17 | Bruce Stall | Bruce Stahl | To correct a transcription error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the

United States that my deposition transcript is true and correct.

Executed on ___03 / 12 / 2021___ in ___Portland, OR___.

___Paige Azavedo___

Paige Azavedo

1106158

```
 1                 UNITED STATES DISTRICT COURT
 2                     DISTRICT OF OREGON
 3                     PORTLAND DIVISION
 4
                                         )
 5      KELLY CAHILL, SARA               )
        JOHNSTON, LINDSAY                )
 6      ELIZABETH, and HEATHER           )
        HENDER, individually and on )
 7      behalf of others similarly )  Case No.
        situated,                        )  3:18-cv-01477-JR
 8                                       )
                        Plaintiffs,      )
 9                                       )
                        vs.              )
10                                       )
        NIKE, INC., an Oregon            )
11      corporation,                     )
                                         )
12                      Defendant.       )
                                         )
13
14        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
15                     CHRISTINA BAUMEL
16             Taken in behalf of Defendant
17                        *   *   *
18                   January 26, 2021
19                   Portland, Oregon
20
21
22
23
24      Teresa L. Dunn, CSR, CCR, RPR
25      Court Reporter
```

                                              Page 1

Davis Decl. Exhibit 46, Page 1 of 7

| | | |
|---|---|---|
| 1 | did see those.  They were produced by Nike as | 13:06:12 |
| 2 | part of that subpoena. | 13:06:18 |
| 3 | MS. ZABELE:  Okay.  Well, we can maybe | 13:06:19 |
| 4 | take a look at those later then.  Although, I | 13:06:20 |
| 5 | will say we needed to produce them because the | 13:06:27 |
| 6 | representation was that plaintiffs, including | 13:06:30 |
| 7 | Ms. Baumel, did not have them in her possession. | 13:06:33 |
| 8 | So if Ms. Baumel does have them in her | 13:06:35 |
| 9 | possession it would still be responsive to our | 13:06:38 |
| 10 | discovery and she would need to produce them. | 13:06:40 |
| 11 | Q.   (By Ms. Zabele) All right.  So earlier | 13:06:44 |
| 12 | before the break we were talking about your hire | 13:06:51 |
| 13 | at Nike and you mentioned your offer letter.  So | 13:06:53 |
| 14 | let's take a look at that. | 13:06:56 |
| 15 | (Deposition Exhibit Number 171 marked | 13:06:56 |
| 16 | for identification.) | 13:06:56 |
| 17 | Q.   (By Ms. Zabele) Okay.  I have marked as | 13:07:31 |
| 18 | Exhibit 171 a two-paged document, Bates stamped | 13:07:32 |
| 19 | PLF_025121 to PLF_025122.  It appears to be | 13:07:36 |
| 20 | Ms. Baumel's offer letter from Nike. | 13:07:46 |
| 21 | Ms. Baumel, will you pull up Exhibit 171 | 13:07:49 |
| 22 | and let me know when you have it in front of | 13:07:53 |
| 23 | you. | 13:07:55 |
| 24 | A.   Yes, I see it. | 13:07:55 |
| 25 | Q.   Okay.  And is Exhibit 171 your offer | 13:07:57 |

Page 119

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 46, Page 2 of 7

| | | |
|---|---|---|
| 1 | letter from Nike dated November 17th, 2016, for | 13:08:00 |
| 2 | the position of data platform product manager? | 13:08:04 |
| 3 | A.   Yes. | 13:08:08 |
| 4 | Q.   Okay.  And was data platform product | 13:08:12 |
| 5 | manager your job title when you started at Nike? | 13:08:15 |
| 6 | A.   It must have been if that's what was on | 13:08:19 |
| 7 | the offer letter. | 13:08:20 |
| 8 | Q.   Okay.  So you have no reason to doubt | 13:08:21 |
| 9 | that the position that's listed here is | 13:08:23 |
| 10 | inaccurate? | 13:08:26 |
| 11 | A.   I have no reason to doubt that, no. | 13:08:27 |
| 12 | Q.   Okay.  So you mentioned you had -- I'll | 13:08:30 |
| 13 | just ask this, was data platform product manager | 13:08:38 |
| 14 | the position that you had applied to at Nike? | 13:08:41 |
| 15 | A.   Yes. | 13:08:43 |
| 16 | Q.   Okay.  So you were hired for the | 13:08:44 |
| 17 | position you applied to, correct? | 13:08:47 |
| 18 | A.   Yes. | 13:08:48 |
| 19 | Q.   Earlier you had mentioned you had | 13:08:50 |
| 20 | interviewed for the position, correct? | 13:08:55 |
| 21 | A.   Yes. | 13:08:56 |
| 22 | Q.   Okay.  Who did you interview with? | 13:08:57 |
| 23 | A.   I interviewed with all of the -- well, | 13:09:01 |
| 24 | first I interviewed with the recruiter over the | 13:09:05 |
| 25 | phone, then I interviewed with the hiring | 13:09:07 |

Page 120

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 46, Page 3 of 7

```
 1              C E R T I F I C A T E
 2
 3
 4         I, Teresa L. Dunn, a Certified Shorthand
 5    Reporter for Oregon, do hereby certify that,
 6    pursuant to stipulation of counsel for the
 7    respective parties hereinbefore set forth, CHRISTINA
 8    BAUMEL appeared virtually before me at the time and
 9    place set forth in the caption hereof; that at said
10    time and place I reported in Stenotype all testimony
11    adduced and other oral proceedings had in the
12    foregoing matter; that thereafter my notes were
13    reduced to typewriting under my direction; and that
14    the foregoing transcript, pages 1 to 327, both
15    inclusive, constitutes a full, true and accurate
16    record of all such testimony adduced and oral
17    proceedings had, and of the whole thereof.
18              Witness my hand and CSR stamp at Vancouver,
19    Washington, this 29th day of January, 2021.
20
21
22
23
                   TERESA L. DUNN,
                   Certified Shorthand Reporter
24                 Certificate No. 00-0367
                   Expiration Date:  6/30/2023
25
```

Page 326

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 46, Page 4 of 7

*Cahill v. Nike*

No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: January 26, 2021

Deponent: Christina Baumel

| Page | Line(s) | Reads | Should Read | Reason |
|---|---|---|---|---|
| 34 | 12 | former CEO of Nike | former Pepsi CEO | To correct an inadvertent error |
| 35 | 19 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 36 | 1 | Sattine | Stattine | To correct a misspelling error |
| 39 | 20 | so a company | to a company | To correct an inadvertent error |
| 58 | 18 | Christoph's agreement actually was. | Christoph's job or scope of responsibilities actually was. | To clarify and provide additional details |
| 77 | 20 | Andrea | Andrea Blackman | To clarify and provide additional details |
| 98 | 21 | Dedupe | Hadoop | To correct a transcription error |
| 106 | 2 | uses a communication tool | used as a communication tool | To correct a transcription error |
| 113 | 21-22 | Marci Machaun | Marcy McCoun | To correct a misspelling error |
| 121 | 25 | Marci Machaun | Marcy McCoun | To correct a misspelling error |
| 124 | 1 | Marci | Marcy McCoun | To correct a misspelling error |
| 125 | 19 | Marci Machaun | Marcy McCoun | To correct a misspelling error |
| 127 | 4 | project management | product management | To correct a transcription error |
| 133 | 20 | Marci | Marcy McCoun | To correct a misspelling error |
| 134 | 5 | Ms. Machaun | Ms. McCoun | To correct a misspelling error |
| 138 | 7 | Marci | Marcy McCoun | To correct a misspelling error |
| 141 | 1 | Marci | Marcy McCoun | To correct a misspelling error |
| 141 | 5 | Marci | Marcy McCoun | To correct a misspelling error |
| 141 | 15 | Marci | Marcy McCoun | To correct a misspelling error |
| 145 | 6 | Marci | Marcy McCoun | To correct a misspelling error |
| 145 | 14 | Marci | Marcy McCoun | To correct a misspelling error |
| 145 | 17 | Marci | Marcy McCoun | To correct a misspelling error |
| 146 | 16 | Marci | Marcy McCoun | To correct a misspelling error |
| 146 | 17 | Marci | Marcy McCoun | To correct a misspelling error |
| 146 | 18 | Marci | Marcy McCoun | To correct a misspelling error |
| 147 | 2 | Marci | Marcy McCoun | To correct a misspelling error |
| 148 | 19 | Marci | Marcy McCoun | To correct a misspelling error |
| 150 | 9 | Marci | Marcy McCoun | To correct a misspelling error |
| 160 | 1 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 160 | 5 | Marci | Marcy McCoun | To correct a misspelling error |
| 167 | 3 | sort of Damocles | sword of Damocles | To correct a transcription error |
| 168 | 18 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 190 | 10 | whose name I'm going to forget, | whose name is James Healey, | To clarify and provide additional details |
| 191 | 6 | means always and 1 means never. | means never and 1 means always. | To correct an inadvertent error |

Davis Decl. Exhibit 46, Page 5 of 7

| 191 | 7-9 | So the two questions related to effective communication the rating scale had been switched. | So the rating scale for the two questions related to my communication skills were inverted, and the numbers mean different things for these questions than what they meant for questions on pages 1, 2, and 4. The custom template that Michael Benno created for my performance evaluation was 4 or 5 pages long. By contrast, the standard Product Manager 360-degree feedback survey template mandated by James Healey and used for male comparators like Mark France's performance evaluation, had a far smaller number of questions and were only 1-2 pages long. | To clarify and provide additional details |
|---|---|---|---|---|
| 203 | 11 | name is Wasserman | name is Sullivan | To correct an inadvertent error |
| 205 | 9 | Sattine, S-A-T-T-I-N-E | Stattine, S-T-A-T-T-I-N-E | To correct a misspelling error |
| 205 | 14 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 208 | 17 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 211 | 3 | Marci | Marcy McCoun | To correct a misspelling error |
| 216 | 24 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 218 | 4 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 221 | 24 | Sattine | Stattine | To correct a misspelling error |
| 233 | 4 | Marci | Marcy McCoun | To correct a misspelling error |
| 240 | 12 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 247 | 23 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 248 | 12 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 260 | 13 | Marci | Marcy McCoun | To correct a misspelling error |
| 260 | 21 | Sattine | Stattine | To correct a misspelling error |
| 261 | 11 | $40,000 | $45,000 | To correct an inadvertent error |
| 261 | 18 | $40,000 | $45,000 | To correct an inadvertent error |
| 268 | 21 | March 31st | May 31st | To correct an inadvertent error |
| 268 | 23 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 271 | 12 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 271 | 24 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 273 | 24 | hire box. | higher box. | To correct a transcription error |
| 275 | 7 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 278 | 7 | Drew Sattine | Drew Stattine | To correct a misspelling error |
| 293 | 11 | director-level goal | director-level role | To correct a transcription error |

Davis Decl. Exhibit 46, Page 6 of 7

| 298 | 9 | Bringham | Brigham | To correct a misspelling error |

      Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on _____ in _____Portland, Oregon_____.

3/1/2021 | 9:28 PM PST

DocuSigned by:

*Christina Baumel*

4353AA3A7960495...

Davis Decl. Exhibit 46, Page 7 of 7

```
 1              UNITED STATES DISTRICT COURT

 2                  DISTRICT OF OREGON

 3                  PORTLAND DIVISION

 4

 5

 6   KELLY CAHILL, et al.,            )

 7                  Plaintiffs,    )

 8       VS.                       ) NO. 3:18-CV-01477-JR

 9   NIKE, INC., an Oregon          )

10   Corporation,                   )

11                  Defendants.    )

12   _____)

13

14

15   VIDEOCONFERENCE DEPOSITION OF:

16              KELLY CAHILL

17              WEDNESDAY, NOVEMBER 18, 2020

18              12:10 P.M.

19

20

21

22   REPORTED BY:

23              Sari M. Knudsen

24              CSR No. 13109

25
```

                                              Page 1

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 1 of 46

```
1              (Whereupon Defendants' Exhibit 5      02:08:41

2          was marked for identification)          02:08:41

3   BY MS. DAVIS:                                   02:08:41

4      Q     Okay.  Do you recognize Exhibit 5 as your   02:08:49

5   offer letter to become a Nike employee dated   02:08:53

6   October 16, 2013?                              02:08:55

7      A     Yes.                                   02:09:01

8      Q     Okay.  And this was after the one-year   02:09:04

9   period of time you worked as the Digital Brand   02:09:06

10  Senior Producer for Nike.com as a contractor.   02:09:11

11  Correct?                                        02:09:12

12     A     Yes.  Close to one year.  Correct.     02:09:15

13     Q     Okay.  And when you were originally hired   02:09:17

14  as a Nike employee, your start date was October 21,   02:09:24

15  2013.  At least as reflected on Exhibit 5.      02:09:28

16          Do you see that?                        02:09:29

17     A     Yes.                                    02:09:31

18     Q     Okay.  And do you believe that that was   02:09:33

19  your start date at Nike as a Nike employee,     02:09:36

20  October 21, 2013?                               02:09:37

21     A     I believe that to be correct, yes.     02:09:41

22     Q     Okay.  And your title when you were hired   02:09:43

23  as a Nike employee was Global Digital Cross-Category   02:09:45

24  Director.  Correct?                             02:09:51

25     A     Of Nike.com, yes.                       02:09:53
```

Page 76

```
 1   HQ --                                         02:13:59

 2       MR. GOLDSTEIN:  Objection.               02:14:00

 3   BY MS. DAVIS:                                 02:14:00

 4       Q    -- to the role you were performing?  02:14:02

 5       A    Yeah.  It was in -- it was in global -- 02:14:06

 6   sorry.  Not global.  North America.  So there were 02:14:09

 7   regions -- the regions at HQ had similar      02:14:13

 8   responsibilities.                             02:14:13

 9       Q    And what were the job titles of the people 02:14:18

10   who held those roles, if you know?            02:14:20

11       A    I don't remember.                    02:14:24

12       Q    Do you know the names of any of the people 02:14:25

13   who held those roles?                         02:14:28

14       A    I do not remember.                   02:14:30

15       Q    Okay.  As you sit here today, are there any 02:14:32

16   documents that you believe would refresh your 02:14:34

17   recollection?                                 02:14:35

18       A    If there were -- if there were org charts, 02:14:38

19   that could -- that would help.                02:14:54

20       Q    While you were Global Digital        02:15:12

21   Cross-Category Director for Nike.com, you were Band 02:15:18

22   E5.  Is that accurate?                        02:15:22

23       A    I know it was E.  The 5 -- the 5 is -- I 02:15:26

24   don't recall the 5.                           02:15:28

25       Q    Okay.  And do you know anything about the 02:15:36
```

Page 79

Davis Decl. Exhibit 47, Page 3 of 46

| | | |
|---|---|---|
| 1 | job name that Nike has in its official system for | 02:15:41 |
| 2 | the job you held? | 02:15:45 |
| 3 | A    You mean outside of -- | 02:15:47 |
| 4 | MR. GOLDSTEIN:  Objection. | 02:15:47 |
| 5 | THE WITNESS:  -- the offer letter title?  Is | 02:15:51 |
| 6 | that what you are asking?  If there is something | 02:15:52 |
| 7 | else in the system besides what you are referring to | 02:15:54 |
| 8 | my job title as? | 02:15:57 |
| 9 | BY MS. DAVIS: | 02:15:57 |
| 10 | Q    Sure.  Have you ever heard of a job name | 02:16:00 |
| 11 | Director Product Presentation? | 02:16:04 |
| 12 | A    Oh, you mean within the band of director? | 02:16:08 |
| 13 | Oh, sure.  There's -- I'm sure there's several | 02:16:10 |
| 14 | different director titles at Nike. | 02:16:13 |
| 15 | Q    Okay.  Do you know if -- when you were in | 02:16:16 |
| 16 | the Global Digital Cross-Category Director for | 02:16:19 |
| 17 | Nike.com role, that your kind of job name in Nike's | 02:16:25 |
| 18 | system was Director Product Presentation?  Was that | 02:16:29 |
| 19 | ever communicated to you? | 02:16:32 |
| 20 | A    No. | 02:16:32 |
| 21 | Q    Okay.  Are you familiar with Nike's job | 02:16:36 |
| 22 | families? | 02:16:37 |
| 23 | A    I'm -- I thought I was. | 02:16:43 |
| 24 | Q    Okay.  In the role as Global Digital | 02:16:47 |
| 25 | Cross-Category Director for Nike.com, Nike's data | 02:16:53 |

Page 80

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 4 of 46

```
 1   shows that you were in the job family of Product        02:16:55
 2   Presentation.                                           02:16:57
 3           Do you know one way or the other whether        02:17:00
 4   that was accurate?                                      02:17:01
 5      A    I mean, if it -- if there was a document        02:17:04
 6   that shows that's the structure that myself and the     02:17:10
 7   organization was in, that would be helpful.  Because    02:17:13
 8   I did have peers that were directors in my -- you       02:17:17
 9   know, in my group that should have then had the         02:17:21
10   same -- that same category of role.                     02:17:28
11      Q    Okay.  Have you -- I'm just trying to           02:17:32
12   figure out if you know.  When you were at Nike, did     02:17:35
13   you ever know you were in the job family Product        02:17:37
14   Presentation --                                         02:17:39
15      A    No.                                             02:17:41
16      Q    -- if that means anything to you.  Okay.        02:17:43
17           Did you know that you were in the               02:17:44
18   functional area of marketing?                           02:17:46
19      A    Yes.                                            02:17:48
20      Q    Okay.  Got it.                                  02:17:49
21           Were you aware of any kind of job family or     02:17:55
22   grouping that you were a part of other than kind of     02:17:57
23   a marketing function?                                   02:17:59
24      MR. GOLDSTEIN:  Objection.                           02:18:00
25      THE WITNESS:  I don't other than Nike.com.           02:18:08
```

Page 81

```
 1      A     Yes.  He did have one.  One to my        02:25:43
 2   knowledge, yes.                                   02:25:45
 3      Q     Also a manager?                          02:25:46
 4      A     Also a manager, yes.                     02:25:48
 5      Q     Did he supervise anyone else to your     02:25:50
 6   knowledge?                                        02:25:50
 7      A     Not to my knowledge.                     02:26:03
 8      Q     All right.                               02:26:11
 9            In approximately December of 2014, you   02:26:14
10   moved into a new role called Brand Director for   02:26:19
11   Nike.com.  Is that correct?                       02:26:21
12      MR. GOLDSTEIN:  Objection.                     02:26:23
13      THE WITNESS:  If I could see the -- a document 02:26:26
14   that shows that to jog my memory of the exact title, 02:26:30
15   that would be helpful.                            02:26:31
16   BY MS. DAVIS:                                     02:26:31
17      Q     Okay.  What would -- how would you       02:26:33
18   articulate your title when you changed jobs in    02:26:36
19   December of 2014?                                 02:26:37
20      A     North America Nike.com brand -- Digital  02:26:45
21   Brand Director or as --                           02:26:47
22      Q     Okay.                                    02:26:48
23      A     -- as reflected on my resume.            02:26:49
24      Q     Okay.  Was that considered a promotion?  02:27:08
25      A     No.                                      02:27:08
```

Page 88

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 6 of 46

```
  1        MR. GOLDSTEIN:  Objection.                02:27:10

  2        THE WITNESS:  No -- no.  It was a lateral -- a   02:27:14

  3   lateral move.                                   02:27:16

  4   BY MS. DAVIS:                                    02:27:16

  5        Q    Okay.  Did you apply for the -- for it?   02:27:21

  6        A    I believe I did.  I would have to see the   02:27:27

  7   application to jog my memory officially.        02:27:30

  8        Q    Okay.  We'll look at those in a bit.   02:27:34

  9        A    Okay.                                  02:27:34

 10        Q    Were you responsible -- as a North America   02:27:56

 11   Nike.com Digital Brand Director, were you       02:27:59

 12   responsible for any specific categories?        02:28:00

 13        A    No.  Again, cross-category and all     02:28:08

 14   categories at the time.                         02:28:17

 15        Q    Okay.                                  02:28:17

 16        A    Again, that was -- again, that was a   02:28:23

 17   newly-created role.                             02:28:28

 18        Q    Okay.  By "newly created," you mean that no   02:28:33

 19   one had held the role before you?               02:28:36

 20        MR. GOLDSTEIN:  Objection.                 02:28:37

 21   BY MS. DAVIS:                                    02:28:37

 22        Q    I didn't get your answer.  Sorry.      02:28:41

 23        A    To my knowledge, that is correct.      02:28:45

 24        Q    Okay.  And you held the role of North   02:28:52

 25   America Nike.com Digital Brand Director until you   02:28:55
```

Page 89

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 7 of 46

| | | |
|---|---|---|
| 1 | left Nike in July of 2017.  Correct? | 02:28:59 |
| 2 |    A    Correct. | 02:29:09 |

3    Q    Did you change jobs from Global Digital          02:29:34

4    Cross-Category Director for Nike.com to North         02:29:41

5    America Nike.com Digital Brand Director by choice?     02:29:46

6        A    Yes.                                          02:29:47

7        Q    Why did you want to change jobs?              02:29:50

8        A    I had been in global for a while and done     02:29:55

9    what I thought I wanted to do.  And the new role in    02:30:00

10   North America brought me closer into the brand, the    02:30:07

11   brand roles I was seeking as well as the               02:30:09

12   merchandising roles that had interested me.            02:30:19

13       Q    Okay.  And what do you mean by a "brand       02:30:21

14   role"?                                                 02:30:23

15       A    So there are -- so I was in the digital       02:30:25

16   brand -- what was once known as the digital brand      02:30:30

17   function, and then there are true brand category       02:30:32

18   functions that sit -- kind of sit outside of digital   02:30:38

19   brand within the matrix that were, you know,           02:30:44

20   something I was looking to get into.                   02:30:46

21       Q    Could you give me an example of a brand       02:30:53

22   category function?                                     02:30:55

23       A    Oh, sure.  Like Running.  Like Women's        02:30:57

24   Brand Director, Men -- you know, Running Brand         02:31:01

25   Director.                                              02:31:06

Page 90

Davis Decl. Exhibit 47, Page 8 of 46

```
 1      Q    So --                                    02:41:32

 2      A    -- until January of 2017 maybe, if he -- 02:41:36

 3   that's when he moved.  I don't recall off the top of 02:41:39

 4   my head.  I'd have to see when he actually          02:41:41

 5   officially left.  But...                            02:41:43

 6      Q    Okay.  So it's your testimony that you had 02:41:45

 7   a dotted-line reporting relationship to Mr. Tawiah   02:41:49

 8   from approximately December, 2014 until January,     02:41:55

 9   2017 or whenever Mr. Tawiah moved jobs?              02:41:58

10      A    Yes.  That's correct.                       02:41:59

11      MR. GOLDSTEIN:  Objection.                        02:42:00

12   BY MS. DAVIS:                                        02:42:00

13      Q    Okay.  And then you resigned effective       02:42:02

14   July 25, 2017.  Correct?                             02:42:08

15      A    That is correct.                             02:42:08

16      MR. GOLDSTEIN:  Objection.                        02:42:08

17   BY MS. DAVIS:                                        02:42:08

18      Q    As North America Nike.com Digital Brand     02:42:34

19   Director, did you supervise any employees?           02:42:40

20      A    I did, yes.                                  02:42:41

21      Q    How many?                                    02:42:43

22      MR. GOLDSTEIN:  Objection.                         02:42:44

23      THE WITNESS:  I think to clarify, there was      02:42:48

24   different -- different amounts of people at          02:42:50

25   different times.  So I don't -- I don't know how to  02:42:55
```

Page 98

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 9 of 46

```
 1        THE WITNESS:  To my knowledge, yes.            03:03:44

 2   BY MS. DAVIS:                                       03:03:44

 3        Q     And you specifically applied for that    03:03:48

 4   director position.  Correct?                        03:03:51

 5        A     I did at the -- at the request of Nike to 03:03:56

 6   apply -- directly apply.                            03:03:59

 7        Q     Okay.  Yeah.  Let's talk about that, how 03:04:02

 8   that changed.                                       03:04:03

 9        So you had been working for Nike -- you had    03:04:08

10   been working for Nike as a contractor for about a   03:04:11

11   year at this point.  Correct?                       03:04:12

12        A     Correct.                                 03:04:13

13        Q     And how did it come about that you decided 03:04:15

14   or you applied for a job with Nike?                 03:04:21

15        A     To clarify, as in this -- this current job 03:04:24

16   you are referring to, the director position?        03:04:27

17        Q     Yeah.  The global -- the Nike.com Global 03:04:30

18   Digital Cross-Category Director.                    03:04:35

19        A     There -- so in this context.             03:04:38

20        So prior to this role and the Nike.com         03:04:43

21   global organization, there wasn't one.  And I was   03:04:46

22   tasked, along with my boss at the time, Dorinda, as 03:04:53

23   part of a committee to help formulate what a global 03:04:57

24   Nike.com function would look like and how it would  03:05:01

25   operate.  So I was part of that committee.          03:05:06
```

                                              Page 105

```
 1            And then as -- the outcome of part of that      03:05:12
 2    was that organization forming, Pamela becoming the     03:05:18
 3    leader, the senior director of that organization,      03:05:25
 4    earlier in the year, and them filling -- filling       03:05:30
 5    positions for that organization.                       03:05:36
 6            I certainly wanted to be a full-time            03:05:40
 7    employee at Nike and was actually interest -- more     03:05:47
 8    interested in a position that was becoming open        03:05:50
 9    within the Women's digital brand category by someone   03:05:58
10    leaving that position.  So I had initially expressed   03:06:02
11    interest in that position, which was a senior          03:06:07
12    manager, position within the same organization and    03:06:12
13    function that I was currently in as a contractor.      03:06:18
14            So that is where I was actually -- or          03:06:23
15    actually thought I was going where the signs were      03:06:25
16    directing me to go.  I was literally on a plane        03:06:33
17    going to London to shadow the person in that current   03:06:37
18    role because, to me, that was the job I was taking.    03:06:41
19            And I received a phone call from the Vice      03:06:45
20    President of Global Digital Brand that they wanted     03:06:51
21    me to be the director -- this position we're talking   03:06:57
22    about -- global director of Nike.com cross-category    03:07:01
23    and that was the role I was to be taking.              03:07:07
24            So conversations happened around what that     03:07:11
25    looked like.  I spoke with Pamela.  And all these      03:07:18
```

Page 106

Davis Decl. Exhibit 47, Page 11 of 46

| | | |
|---|---|---|
| 1 | conversations happened before officially applying to | 03:07:21 |
| 2 | that job in this document as a response that you | 03:07:25 |
| 3 | showed. | 03:07:27 |
| 4 | Q    Okay.  Do you know whether anyone else | 03:07:35 |
| 5 | applied to the Nike.com Global Digital | 03:07:36 |
| 6 | Cross-Category Director role that you ultimately | 03:07:40 |
| 7 | filled? | 03:07:41 |
| 8 | A    I do not know. | 03:07:42 |
| 9 | MR. GOLDSTEIN:  Objection. | 03:07:45 |
| 10 | BY MS. DAVIS: | 03:07:45 |
| 11 | Q    You said you spoke with Pamela about the | 03:07:50 |
| 12 | role before you applied.  Did you consider that to | 03:07:53 |
| 13 | be an interview for the job? | 03:07:59 |
| 14 | A    I did not consider that to be an interview | 03:08:01 |
| 15 | for the job. | 03:08:04 |
| 16 | Q    Did anyone interview you for the role of -- | 03:08:06 |
| 17 | interview you for the role of Nike.com Global | 03:08:09 |
| 18 | Digital Cross-Category Director? | 03:08:14 |
| 19 | A    No official interview, no. | 03:08:25 |
| 20 | Q    The Women's Digital Brand category Senior | 03:08:28 |
| 21 | Manager position, do you know what band that opening | 03:08:32 |
| 22 | was? | 03:08:35 |
| 23 | A    Officially, I do not know.  But typically, | 03:08:38 |
| 24 | to my knowledge, managers are a U band. | 03:08:53 |
| 25 | Q    So a lower-level job than the director job | 03:08:58 |

Page 107

Davis Decl. Exhibit 47, Page 12 of 46

| | | |
|---|---|---|
| 1 | you ultimately took.  Is that correct? | 03:09:00 |
| 2 | A    That is correct. | 03:09:00 |
| 3 | Q    And you said you got a phone call from the | 03:09:03 |
| 4 | V.P. Global Digital Brand who wanted you to take the | 03:09:06 |
| 5 | global director job.  Who was the V.P.  Global | 03:09:09 |
| 6 | Digital Brand? | 03:09:10 |
| 7 | A    Jesse Stollak. | 03:09:20 |
| 8 | Q    Okay.  And Stollak is S-T-O-L-L-A-K. | 03:09:24 |
| 9 | Right? | 03:09:26 |
| 10 | A    I believe so. | 03:09:27 |
| 11 | MR. GOLDSTEIN:  Objection.  Nike knows this. | 03:09:32 |
| 12 | BY MS. DAVIS: | 03:09:32 |
| 13 | Q    And is Jesse a male or female? | 03:09:36 |
| 14 | A    Male. | 03:09:53 |
| 15 | Q    You were eventually -- well, let me back | 03:10:01 |
| 16 | up. | 03:10:01 |
| 17 | Did you apply to any other jobs at Nike | 03:10:05 |
| 18 | while you were working as a contractor? | 03:10:08 |
| 19 | MR. GOLDSTEIN:  Objection. | 03:10:09 |
| 20 | THE WITNESS:  To my knowledge, I did not.  But I | 03:10:12 |
| 21 | would -- I would need to see if there are any | 03:10:14 |
| 22 | documents to prove -- to show that I did. | 03:10:17 |
| 23 | BY MS. DAVIS: | 03:10:17 |
| 24 | Q    Okay.  You don't remember applying? | 03:10:18 |
| 25 | A    I don't remember, no. | 03:10:31 |

Page 108

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 13 of 46

```
 1        Q    And so we looked earlier today at          03:10:37

 2   Exhibit 5.  Can you flip back to that?  It's your     03:10:40

 3   offer letter for the Nike.com Global Digital          03:10:42

 4   Cross-Category Director role.                         03:10:48

 5        A    Yes.                                        03:10:49

 6        Q    Okay.  Did you speak with anyone else at    03:10:54

 7   Nike about this job, other than Pamela, before you    03:10:57

 8   received the offer letter?                            03:11:00

 9        A    Jesse Stollak.                              03:11:02

10        Q    Okay.  Anyone else?                         03:11:05

11        MR. GOLDSTEIN:  Objection.                       03:11:05

12        THE WITNESS:  H.R. -- someone in H.R. I would    03:11:10

13   have had to have -- have contacted to apply           03:11:16

14   officially.                                           03:11:20

15   BY MS. DAVIS:                                         03:11:20

16        Q    Anyone else?                                03:11:24

17        A    I don't remember anyone outside of that.    03:11:27

18        Q    Okay.  What do you recall about your        03:11:28

19   conversations with Pamela about this role, Nike.com   03:11:33

20   Global Digital Cross-Category Director?               03:11:38

21        A    I don't remember much.  I just remember her 03:11:43

22   really wanting me to take this role, the opportunity  03:11:47

23   of the role.  We didn't talk -- we didn't talk        03:11:53

24   specific details, high-level job responsibilities     03:11:57

25   given that it was kind of a new organization.  We     03:12:03
```

                                              Page 109

| | | |
|---|---|---|
| 1 | had talked prior to the job.  I knew her.  So you | 03:12:09 |
| 2 | know, we talked about her role in the organization | 03:12:11 |
| 3 | since I was a part of the committee.  But minimal | 03:12:14 |
| 4 | about the job specifically. | 03:12:15 |
| 5 | Q    Okay.  Anything else you recall about your | 03:12:20 |
| 6 | conversation or conversations with Pam about the | 03:12:24 |
| 7 | role? | 03:12:27 |
| 8 | A    Nothing specifically with Pamela about the | 03:12:30 |
| 9 | role. | 03:12:31 |
| 10 | Q    Okay.  How about Jesse Stollak?  What do | 03:12:37 |
| 11 | you recall about your conversation or conversations | 03:12:38 |
| 12 | with Mr. Stollak? | 03:12:41 |
| 13 | MR. GOLDSTEIN:  Objection. | 03:12:43 |
| 14 | THE WITNESS:  That one is a little tougher and | 03:12:46 |
| 15 | more quick. | 03:12:47 |
| 16 | What I do recall is that phone call on the | 03:12:50 |
| 17 | airplane where he said basically this is -- this is | 03:12:55 |
| 18 | the role I need to take and that would be the right | 03:13:03 |
| 19 | role, you know, for me and for Nike.com. | 03:13:07 |
| 20 | BY MS. DAVIS: | 03:13:07 |
| 21 | Q    Okay.  Do you recall any other | 03:13:13 |
| 22 | conversations with Mr. Stollak before you received | 03:13:15 |
| 23 | the offer letter? | 03:13:18 |
| 24 | MR. GOLDSTEIN:  Objection. | 03:13:19 |
| 25 | THE WITNESS:  Not -- I do not recall with | 03:13:21 |

Page 110

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 15 of 46

```
 1    Mr. Stollak.  I'm sure -- I'm sure there were some,    03:13:24
 2    but I don't remember.                                  03:13:25
```

 3    BY MS. DAVIS:                                           03:13:25
 4        Q    Okay.  Do you have any notes or any           03:13:28
 5    documents that would refresh your recollection?        03:13:32
 6        A    I -- I don't have any personally.  But if     03:13:37
 7    there were e-mails that Nike would still have, that    03:13:41
 8    could help refresh.                                    03:13:42
 9        Q    Okay.  And then you said that you likely      03:13:47
10    had a conversation with H.R. before you received the   03:13:51
11    offer letter?                                          03:13:51
12        A    Yes.                                          03:13:52
13        Q    Do you recall who you spoke with in H.R.?     03:13:53
14        A    I don't know.  I don't know who.              03:13:56
15    There's -- it would have been the H.R. person over     03:14:02
16    Pamela's organization.                                 03:14:05
17        Q    Okay.  Do you have a specific recollection    03:14:08
18    of having a conversation with some H.R. -- someone     03:14:11
19    in H.R., or are you assuming that you did based on     03:14:16
20    the sequence of events?                                03:14:18
21        A    No.  I remember specific conversation with    03:14:21
22    H.R. as part of this process.                          03:14:23
23        Q    Okay.  You just don't remember who --         03:14:26
24        A    Yeah.  I don't -- I do not remember the       03:14:28
25    name of who.                                           03:14:30

                                                  Page 111

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 16 of 46

```
 1      Q    Okay.  What do you recall discussing with      03:14:31

 2   H.R.?                                                   03:14:32

 3      A    I recall discussing formal application --      03:14:38

 4   to submit a formal application where I could do        03:14:41

 5   that.  I remember discussing salary and pay.  They     03:14:47

 6   asked me what I had made prior or what I currently     03:14:51

 7   made as a Flex contractor.                             03:14:57

 8           We discussed what the role -- like what the    03:15:01

 9   benefits were of this role moving forward and what     03:15:07

10   that looked like.                                      03:15:12

11      Q    Anything else?                                 03:15:15

12      MR. GOLDSTEIN:  Objection.                          03:15:16

13      THE WITNESS:  Yeah.  Not that I can -- not that     03:15:18

14   I can clearly recall.                                  03:15:20

15   BY MS. DAVIS:                                          03:15:20

16      Q    Do you have any notes or any other             03:15:23

17   documents that would refresh your recollection?        03:15:26

18      A    I don't personally have unless there is,       03:15:28

19   you know, a calendar date with that H.R. person that   03:15:34

20   could help refresh.                                    03:15:36

21      Q    Okay.  You said that you discussed salary      03:15:38

22   and pay and that they asked you what you made at       03:15:43

23   Flex.  What did you tell them that you made at Flex?   03:15:45

24      A    $90,000 as a salary.                           03:15:48

25      Q    And that's what you told the H.R. person?      03:15:55
```

                                                    Page 112

Davis Decl. Exhibit 47, Page 17 of 46

```
 1      A    Yes.                                        03:15:59

 2      Q    At Flex, did you have any opportunity to   03:16:01

 3  earn bonus or any other compensation component?     03:16:04

 4      A    No.                                         03:16:09

 5      Q    Did you discuss -- before you received the 03:16:11

 6  offer letter at Exhibit 5, did you discuss what     03:16:13

 7  you -- what salary you wanted to earn or express any 03:16:18

 8  salary expectations?                                03:16:19

 9      A    No.                                         03:16:27

10      MR. GOLDSTEIN:   Objection.                      03:16:27

11  BY MS. DAVIS:                                        03:16:27

12      Q    Do you recall any other discussions about  03:16:29

13  salary or compensation generally, before you        03:16:34

14  received Exhibit 5, with anyone at Nike about this   03:16:37

15  job?                                                 03:16:39

16      A    Not outside of H.R.  No.                    03:16:42

17      Q    Any other conversations with anyone in H.R. 03:16:45

18  specifically about compensation for this Nike.com    03:16:49

19  Global Digital Cross-Category Director job before    03:16:54

20  you received Exhibit 5 that you haven't already told 03:16:56

21  me?                                                  03:16:57

22      A    No.                                         03:16:58

23      MR. GOLDSTEIN:   Objection.                      03:16:58

24  BY MS. DAVIS:                                        03:16:58

25      Q    Going back to Exhibit 5, it says that you  03:17:12
```

Page 113

Davis Decl. Exhibit 47, Page 18 of 46

| | | |
|---|---|---|
| 1 | were offered an annual salary of $110,000 paid on a | 03:17:19 |
| 2 | biweekly basis.  Was that your actual starting | 03:17:21 |
| 3 | salary when you joined Nike in October of 2013? | 03:17:26 |
| 4 | A    Yes.  I believe it was. | 03:17:28 |
| 5 | Q    Okay.  Did you negotiate that at all, or | 03:17:31 |
| 6 | was that the original offer Nike provided to you? | 03:17:34 |
| 7 | A    That was the original offer. | 03:17:37 |
| 8 | Q    Did you counter or try to negotiate a | 03:17:39 |
| 9 | higher salary? | 03:17:40 |
| 10 | A    No. | 03:17:49 |
| 11 | Q    Did anyone communicate to you what that | 03:17:52 |
| 12 | $110,000 salary was based on? | 03:17:54 |
| 13 | MR. GOLDSTEIN:  Objection. | 03:17:55 |
| 14 | THE WITNESS:  Not to my knowledge, no. | 03:17:58 |
| 15 | BY MS. DAVIS: | 03:17:58 |
| 16 | Q    You also received a sign-on bonus of | 03:18:06 |
| 17 | $7,500.  Correct? | 03:18:09 |
| 18 | A    That is correct. | 03:18:11 |
| 19 | Q    Did you negotiate the sign-on bonus at all? | 03:18:16 |
| 20 | A    No. | 03:18:29 |
| 21 | Q    You were offered a target PSP or | 03:18:38 |
| 22 | Performance Sharing Plan.  Your target PSP | 03:18:44 |
| 23 | percentage was 20 percent initially. | 03:18:47 |
| 24 | Did you negotiate that number at all? | 03:18:51 |
| 25 | A    No.  To my knowledge, that's not | 03:18:53 |

Page 114

```
 1    BY MS. DAVIS:                                    03:35:58
```

 2        Q    Okay.   Sorry.   So my question was how would   03:36:02

 3    you describe your role as a E Band Director in       03:36:06

 4    performance management for the employees who         03:36:09

 5    reported to you?                                     03:36:12

 6        MR. GOLDSTEIN:   Objection.   Asked and answered.   03:36:13

 7        THE WITNESS:   Yeah.   I don't -- I mean, within   03:36:15

 8    those two that are questionable, I recommend -- I    03:36:19

 9    make recommendations on hiring as well as recommend   03:36:23

10    performance management.   I recommend recognition,    03:36:26

11    and I recommend people for rewards.                  03:36:29

12    BY MS. DAVIS:                                        03:36:29

13        Q    Okay.   Is your testimony you make no hiring   03:36:33

14    decisions -- you made no hiring decisions when you    03:36:36

15    were a Nike.com Global Digital Cross-Category         03:36:38

16    Director?                                            03:36:41

17        MR. GOLDSTEIN:   Objection.   Vague.            03:36:42

18        THE WITNESS:   I did not make final hiring       03:36:44

19    decisions.                                           03:36:44

20    BY MS. DAVIS:                                        03:36:44

21        Q    And is it your testimony that you did not    03:36:49

22    make performance management decisions as Nike.com     03:36:52

23    Global Digital Cross-Category Director?              03:36:56

24        A    I did not make performance management        03:36:58

25    decisions.                                           03:36:59

Page 127

```
 1              and operational objectives are met."        05:18:29

 2          Is that an accurate description of your         05:18:30

 3      role as the director?                               05:18:32

 4          A    Yes.                                        05:18:35

 5          Q    You weren't making decisions about how     05:18:37

 6      resources should be allocated yourself?             05:18:40

 7          A    We would make recommendations.             05:18:43

 8          Q    Okay.  But no decisions?                   05:18:45

 9          A    No final decisions, no.                    05:18:49

10      MR. GOLDSTEIN:  Objection.  Vague.                  05:18:51

11      BY MS. DAVIS:                                       05:18:51

12          Q    Okay.  Can you go to page 2 of Exhibit 8,  05:19:04

13      please.                                             05:19:11

14          A    Yes.                                        05:19:14

15          Q    Okay.  Under "Key job accountabilities" -- 05:19:22

16      so let me back up.                                  05:19:23

17              This is a job description dated             05:19:25

18      December 5, 2018 for a job code A1046.              05:19:33

19              Do you know whether you were in job         05:19:36

20      code A1046 while you worked at Nike?                05:19:40

21          A    I do not recall the specific job code, no. 05:19:46

22          Q    Okay.  And the title associated with that  05:19:50

23      job code is Director Brand Category Marketing.  Were 05:19:56

24      you ever in a job title called Director Brand       05:19:59

25      Category marketing?                                 05:20:00
```

Page 166

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 21 of 46

| | | |
|---|---|---|
| 1 | A    Those words were in a job title I would | 05:20:05 |
| 2 | have had but not -- not specifically laid out like | 05:20:09 |
| 3 | that. | 05:20:12 |
| 4 | Q    Okay.  That's the North America Nike.com | 05:20:14 |
| 5 | Digital Brand Director role.  Is that correct? | 05:20:17 |
| 6 | A    Correct. | 05:20:18 |

| | | |
|---|---|---|
| 7 | MR. GOLDSTEIN:  Objection. | 05:20:18 |
| 8 | BY MS. DAVIS: | 05:20:18 |
| 9 | Q    Okay.  Under "Key job accountabilities" -- | 05:20:23 |
| 10 | let's skip the part that's kind of shaded because | 05:20:29 |
| 11 | that's the same as the other job description we | 05:20:31 |
| 12 | looked at. | 05:20:32 |
| 13 | But it says, | 05:20:33 |
| 14 | "At global level, creates the category | 05:20:36 |
| 15 | brand plan and multi-year cat strategy at | 05:20:41 |
| 16 | GEO level, leads the communication of the | 05:20:43 |
| 17 | cat brand plan with the non-key | 05:20:47 |
| 18 | territories, lead execution and partnership | 05:20:49 |
| 19 | with global team for the key territories." | 05:20:52 |
| 20 | Does that seem like one of the key job | 05:20:55 |
| 21 | accountabilities for you in your role as North | 05:20:57 |
| 22 | America Nike.com Digital Brand Manager? | 05:21:00 |
| 23 | A    No. | 05:21:01 |
| 24 | MR. GOLDSTEIN:  Objection. | 05:21:15 |
| 25 | /// | 05:21:15 |

Page 167

Davis Decl. Exhibit 47, Page 22 of 46

| | | |
|---|---|---|
| 1 | Q    Okay.  And then how about when you -- after | 05:30:07 |
| 2 | you moved into the North America Nike.com Digital | 05:30:10 |
| 3 | Brand Director role?  Did you think Mr. Tawiah | 05:30:13 |
| 4 | treated you fairly? | 05:30:16 |
| 5 | A    No. | 05:30:19 |
| 6 | Q    What do you -- what actions do you believe | 05:30:21 |
| 7 | Mr. Tawiah took that were unfair? | 05:30:28 |
| 8 | A    I took on additional responsibilities | 05:30:30 |
| 9 | without change to job description or pay.  Was rated | 05:30:42 |
| 10 | Successful during CFE one year when I was told everyone was ~~during CFE one year what I saw everyone was getting.~~ getting Successful. But then I saw that was not | 05:30:50 |
| 11 | ~~Not~~ necessarily the case.  Was paid less than peers | 05:30:57 |
| 12 | and just witnessed -- was a witness to | 05:31:08 |
| 13 | discriminatory behavior that I shouldn't have been | 05:31:12 |
| 14 | witness to. | 05:31:18 |
| 15 | Q    Anything else? | 05:31:24 |
| 16 | A    Those are the big ones that I can recall. | 05:31:28 |
| 17 | Q    Anything else -- anything else even small? | 05:31:33 |
| 18 | MR. GOLDSTEIN:  Objection. | 05:31:37 |
| 19 | THE WITNESS:  I witnessed -- I mean, I was | 05:31:42 |
| 20 | constantly tasked with more than what I was hired | 05:31:46 |
| 21 | for.  Those added up to big things. | 05:31:51 |
| 22 | BY MS. DAVIS: | 05:31:51 |
| 23 | Q    Anything else? | 05:31:58 |
| 24 | A    I'd say like not favorable communication | 05:32:05 |
| 25 | via text message and phone calls. | 05:32:17 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | Q    Anything else? | 05:32:22 |
| 2 | A    Specifically to my knowledge at this time, | 05:32:23 |
| 3 | I cannot recall. | 05:32:29 |
| 4 | Q    Are there any documents that would help you | 05:32:30 |
| 5 | refresh your recollection? | 05:32:33 |
| 6 | A    If there were any ~~media~~ meeting invites to H.R. to | 05:32:39 |
| 7 | talk about these things, that would be helpful.  Any | 05:32:46 |
| 8 | other communication between him and I that would be | 05:32:51 |
| 9 | on Nike's system could refresh. | 05:32:57 |
| 10 | Q    Anything else? | 05:33:01 |
| 11 | MR. GOLDSTEIN:  Objection. | 05:33:02 |
| 12 | THE WITNESS:  Text messages.  But I don't know | 05:33:05 |
| 13 | where those are.  Those would be helpful. | 05:33:09 |
| 14 | BY MS. DAVIS: | 05:33:09 |
| 15 | Q    Anything else? | 05:33:11 |
| 16 | A    No. | 05:33:15 |
| 17 | Q    Do you still have any text messages between | 05:33:16 |
| 18 | yourself and Mr. Tawiah? | 05:33:18 |
| 19 | A    I do not. | 05:33:21 |
| 20 | Q    What happened to them? | 05:33:24 |
| 21 | A    They are -- when I left and switched jobs, | 05:33:26 |
| 22 | I deleted all communication. | 05:33:37 |
| 23 | Q    Approximately when did you delete the | 05:33:42 |
| 24 | communications between yourself and Mr. Tawiah? | 05:33:45 |
| 25 | A    That probably would have been when I left | 05:33:47 |

Page 174

Davis Decl. Exhibit 47, Page 24 of 46

```
 1    in July of 2017.                              05:33:48
```

```
 2         Q    All right.  I'm going to mark two    05:35:00

 3    documents.  One is Exhibit 9.  Exhibit 9 is a  05:35:10

 4    one-page document.  It's bates stamped NIKE 23837.  05:35:16

 5              (Whereupon Defendant's Exhibit 9     05:35:16

 6              was marked for identification)       05:35:16

 7         MS. DAVIS:  And then I'm going to mark    05:35:19

 8    Exhibit 10.  Exhibit 10 is a multipage document that  05:35:24

 9    is bates stamped Nike 23838 through 23842.  Right.  05:35:45

10              (Whereupon Defendant's Exhibit 10    05:35:45

11              was marked for identification)       05:35:45

12    BY MS. DAVIS:                                  05:35:45

13         Q    Do you recognize Exhibit 10 as your CFE  05:35:49

14    goal-setting document?                         05:35:52

15         A    Let me pull that up.  This looks like a  05:36:01

16    goal-setting document, yes.                    05:36:05

17         Q    Okay.  And Exhibit 9 is an e-mail from you  05:36:09

18    to Ms. Inglesby dated February 6, 2015.  So,   05:36:22

19              "Attached is my goal-setting         05:36:24

20              document."                           05:36:30

21         Does that refresh your recollection about 05:36:33

22    whether Exhibit 10 was your goal-setting document  05:36:35

23    for 2015?                                      05:36:38

24         A    If -- yes.  If that's actually the document  05:36:43

25    that was attached.  Yes.                       05:36:47
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | specifically, it's hard to tell.  I mean, they look | 06:00:07 |
| 2 | rather identical except for a few output numbers | 06:00:12 |
| 3 | because of the modifier. | 06:00:19 |
| 4 | BY MS. DAVIS: | 06:00:19 |
| 5 |     Q    Did you ever recommend PSP awards for your | 06:00:24 |
| 6 | employees? | 06:00:25 |
| 7 |     A    Yes, I did make recommendations. | 06:00:27 |
| 8 |     Q    Okay.  Do you remember -- what would you | 06:00:33 |
| 9 | base those recommendations on? | 06:00:35 |
| 10 |     A    Based on their overall -- a calculation | 06:00:41 |
| 11 | based on their overall CFE evaluation and what those | 06:00:47 |
| 12 | were.  And then it was calculated automatically like | 06:00:50 |
| 13 | this.  So the input was really around their CFE | 06:00:56 |
| 14 | performance. | 06:00:58 |
| 15 |     Q    Okay.  So is it your testimony that if | 06:01:01 |
| 16 | someone receives, for example, a highly successful | 06:01:03 |
| 17 | rating, then their PSP output would just be one | 06:01:08 |
| 18 | number, and there was no ability for you as a | 06:01:10 |
| 19 | manager to change that number or exercise any | 06:01:13 |
| 20 | discretion? | 06:01:14 |
| 21 |     MR. GOLDSTEIN:  Objection.  Facts not in | 06:01:15 |
| 22 | evidence.  No foundation. | 06:01:17 |
| 23 |     THE WITNESS:  We would make recommendations.  We | 06:01:20 |
| 24 | never got to make the final -- the final decision on | 06:01:23 |
| 25 | any PSP calculation. | 06:01:26 |

Page 189

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 26 of 46

```
 1   and any voicemails --                          07:05:56

 2       A    Not -- not e-mails --                 07:05:59

 3       Q    -- when you left Nike.  Correct?      07:06:00

 4       MR. GOLDSTEIN:  Objection.  That totally   07:06:02

 5   misstates the testimony.                       07:06:18

 6       MS. DAVIS:  I'll restate it.               07:06:19

 7       Q    You testified earlier today that you  07:06:21

 8   deleted your text messages between yourself and 07:06:26

 9   Mr. Tawiah when you left Nike.  Correct?       07:06:28

10       MR. GOLDSTEIN:  Objection.  Vague as to time. 07:06:32

11       THE WITNESS:  I deleted them at some point, yes. 07:06:35

12   BY MS. DAVIS:                                  07:06:35

13       Q    Okay.                                 07:06:38

14            Are you unclear now when you deleted the 07:06:41

15   text messages?                                 07:06:43

16       MR. GOLDSTEIN:  Objection.  Misstates testimony. 07:06:47

17       THE WITNESS:  I mean, I'm -- I do not recall the 07:06:49

18   exact date I deleted those text messages.      07:06:54

19   BY MS. DAVIS:                                  07:06:54

20       Q    Okay.  Was it before you filed the lawsuit 07:06:57

21   in this case?                                  07:07:00

22       A    Yes.                                  07:07:02

23       Q    Was it before you contacted counsel -- 07:07:06

24       A    Yes.                                  07:07:06

25       Q    -- regarding your employment with Nike? 07:07:08
```

Page 217

Davis Decl. Exhibit 47, Page 27 of 46

| | | |
|---|---|---|
| 1 | A    Correct. | 07:34:37 |
| 2 | MR. GOLDSTEIN:  Objection. | 07:34:37 |
| 3 | MS. DAVIS:  We'll go just a little bit longer if | 07:35:18 |
| 4 | you are okay since you said you wanted to take a | 07:35:21 |
| 5 | break at 8:00 your time. | 07:35:23 |
| 6 | THE WITNESS:  That's okay. | 07:35:30 |
| 7 | MR. GOLDSTEIN:  Thanks for asking, Felicia. | 07:35:41 |
| 8 | BY MS. DAVIS: | 07:35:41 |
| 9 | Q    You were involved at least somewhat in the | 07:36:03 |
| 10 | hiring process for some employees at Nike.  Correct? | 07:36:07 |
| 11 | A    In the hiring process, yes.  Correct. | 07:36:11 |
| 12 | Q    You interviewed -- you participated in | 07:36:13 |
| 13 | interviews.  Correct? | 07:36:14 |
| 14 | A    Correct. | 07:36:16 |
| 15 | Q    Okay.  And you made recommendations about | 07:36:18 |
| 16 | people you thought should be hired.  Correct? | 07:36:22 |
| 17 | A    That is correct. | 07:36:23 |
| 18 | Q    Okay.  All right.  We'll mark this as | 07:36:44 |
| 19 | Exhibit 18.  Exhibit 18 is a two-page document.  It | 07:36:54 |
| 20 | is bates stamped NIKE 27982 and 27983. | 07:37:02 |
| 21 | (Whereupon Defendant's Exhibit 18 | 07:37:02 |
| 22 | was marked for identification) | 07:37:02 |
| 23 | BY MS. DAVIS: | 07:37:02 |
| 24 | Q    Do you have Exhibit 18 in front of you? | 07:37:05 |
| 25 | A    I do. | 07:37:09 |

Page 236

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 28 of 46

| | | |
|---|---|---|
| 1 | Q    And if you go to the second page of | 07:37:11 |
| 2 | Exhibit 18, there is an e-mail, appears to be from | 07:37:17 |
| 3 | Tracy Wise to you regarding a candidate by the name | 07:37:22 |
| 4 | of Erin, E-R-I-N, Keane, K-E-A-N-E. | 07:37:27 |
| 5 | Did you interview Ms. Keane? | 07:37:31 |
| 6 | A    I did, yes. | 07:37:33 |
| 7 | Q    And did you recommend that Ms. Keane should | 07:37:36 |
| 8 | be hired? | 07:37:36 |
| 9 | A    I made the recommendation after she | 07:37:39 |
| 10 | interviewed with the team, yes. | 07:37:43 |
| 11 | Q    And she was hired.  Correct? | 07:37:44 |
| 12 | A    She was hired.  Correct. | 07:37:46 |
| 13 | Q    And Ms. Keane was hired on your team to | 07:37:49 |
| 14 | work with you.  Correct? | 07:37:51 |
| 15 | A    That is correct. | 07:37:52 |
| 16 | Q    And at the bottom of the second page, which | 07:37:57 |
| 17 | is the first e-mail, Ms. Wise writes to you, | 07:38:01 |
| 18 | "The range for the digital wholesale | 07:38:07 |
| 19 | manager U band role is below.  The mid | 07:38:11 |
| 20 | point is 111,700, and the internal median | 07:38:16 |
| 21 | is 117,015." | 07:38:23 |
| 22 | And then she asks, | 07:38:24 |
| 23 | "What salary are you considering for | 07:38:26 |
| 24 | Erin?" | 07:38:28 |
| 25 | Did you receive that e-mail? | 07:38:29 |

Page 237

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 29 of 46

```
 1       A    Yes.                                        07:38:29

 2       MR. GOLDSTEIN:  Sari, is anyone else having      07:38:31

 3   trouble reading this document?  It's really -- can   07:38:35

 4   barely see the words.  Is it just me, or is it       07:38:39

 5   anyone else?                                         07:38:40

 6       MS. DAVIS:  You can zoom.                         07:38:43

 7       MR. GOLDSTEIN:  Oh, yeah.  If I get it to like    07:38:46

 8   300 percent, yeah.  Okay.                             07:38:58

 9   BY MS. DAVIS:                                         07:38:58

10       Q    Okay.  Let's go back to my question.         07:39:03

11            All right.  I asked did you receive that     07:39:08

12   e-mail.  You said yes.  Did you respond to           07:39:12

13   Ms. Wise's e-mail by saying,                          07:39:14

14                "I was thinking 120,000 salary for       07:39:18

15            her.  So I think 117K is just fine"?         07:39:23

16            Do you see that?                             07:39:25

17       A    Yeah.                                        07:39:25

18       Q    Okay.  And what did you base the 120,000     07:39:30

19   salary on?                                            07:39:33

20       A    Just the range.  I mean, she gave me the     07:39:37

21   mid point range, but there's an overall range that   07:39:41

22   at that point in my career I had access to because I  07:39:43

23   managed U bands.  So I knew what other -- what other  07:39:48

24   managers who worked for me -- what they made.  Then   07:39:51

25   I could assess an entry point for her.                07:39:55
```

Page 238

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 30 of 46

```
 1      Q    Okay.  Was it based on anything else?      07:39:59

 2      A    Her overall like -- like her overall work  07:40:02

 3   experience.  But really within a range.            07:40:07

 4      Q    Okay.  Anything else?                       07:40:08

 5      A    No.                                         07:40:09

 6      MR. GOLDSTEIN:  Objection.                       07:40:10

 7   BY MS. DAVIS:                                       07:40:10

 8      Q    Okay.  All right.  We'll go to -- actually, 07:41:03

 9   I don't have that document loaded up.  So I'm going 07:41:06

10   to come back to that after we break.                07:41:10

11          Sorry.  It's taking a minute to load on my   07:41:43

12   side.                                               07:41:53

13          All right.  Marked as Exhibit 19, two-page   07:42:00

14   document bates stamped 27911 to 27912.              07:42:07

15          (Whereupon Defendant's Exhibit 19            07:42:07

16          was marked for identification)               07:42:08

17   BY MS. DAVIS:                                       07:42:08

18      Q    And do you recognize Exhibit 19 as          07:42:17

19   Ms. Keane's offer letter?                           07:42:22

20      A    Pardon me.                                  07:42:23

21          It looks familiar as an offer letter, yes.   07:42:26

22      Q    Okay.  And if you go to page 2 of           07:42:28

23   Exhibit 19, it's set under your signature.  Do you  07:42:32

24   see that?                                           07:42:32

25      A    Yep.                                        07:42:34
```

                                        Page 239

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 31 of 46

```
 1      Q    Okay.  And if you go back to page 1 of        07:42:37

 2   Exhibit 19, the third paragraph says,                 07:42:41

 3              "We are offering you an annualized          07:42:43

 4         salary of 118,000 which will be paid on a        07:42:48

 5         biweekly basis."                                 07:42:49

 6         Do you see that?                                 07:42:50

 7      A    I do.                                          07:42:51

 8      Q    Okay.  And do you recall the details of how    07:42:55

 9   you got from 117,000 to 118,000 for Ms. Keane's        07:43:00

10   originally offer?                                       07:43:02

11      MR. GOLDSTEIN:  Objection.  Mischaracterizes her     07:43:03

12   testimony.                                              07:43:06

13      THE WITNESS:  I do not.  I can assume she            07:43:09

14   negotiated with hiring.                                 07:43:12

15   BY MS. DAVIS:                                           07:43:12

16      Q    Okay.  And do you recall, was your             07:43:20

17   recommendation -- your initial recommendation was      07:43:22

18   the 117?                                                07:43:25

19      A    My -- I do not recall specifically, but my     07:43:27

20   recommendation would have been what H.R. would have    07:43:35

21   given me as that recommendation.  That is what I       07:43:37

22   would have gone back to Erin with.                      07:43:43

23      Q    Okay.  So if you go back to Exhibit 18, the    07:43:50

24   second page, you say,                                   07:43:56

25              "I was thinking 120,000 salary for          07:43:58
```

                                                Page 240

Davis Decl. Exhibit 47, Page 32 of 46

```
 1              her.  So I think 117 is just fine."        07:44:02
 2      A    Uh-huh.                                       07:44:03
 3      Q    And was that your recommendation to the       07:44:08
 4  company as to what her offer should be?                07:44:09
 5      A    Tracy had recommended -- Tracy had            07:44:13
 6  recommended the range of mid point to median.  So      07:44:21
 7  the high of the median range was 117,015.  So I was    07:44:28
 8  reiterating back to her if that's a maximum, then I    07:44:32
 9  think that is something we can go back to Erin with.   07:44:36
10  So I was going off her recommendation.                 07:44:42
11      Q    Okay.  And you thought that would be a fine   07:44:46
12  recommendation.  Correct?                              07:44:48
13      A    Yes.                                          07:44:50
14      Q    Okay.  And do you know whether anyone else    07:45:01
15  needed to approve the compensation offer?              07:45:06
16      A    Yes.  Danny would have had to approve, and    07:45:10
17  Tyler and H.R. would have had to approve since it      07:45:15
18  comes out of the overall department budget.            07:45:19
19      Q    Okay.  And do you know who -- would anyone    07:45:23
20  else need to approve the actual hire of Ms. Keane?     07:45:30
21      A    Danny would have had to approve.             07:45:34
22      Q    Okay.  And he approved her hire.  Correct?    07:45:36
23      A    He did.  Yes.                                 07:45:47
24      Q    Were you also involved in the hiring of      07:45:58
25  Jeff White?                                            07:46:02
```

Page 241

```
 1        A    I -- I believe so.  Yes.                  07:46:14

 2        Q    What role did Jeff White have on your team?  07:46:22

 3        A    He would have been a specialist on my team.  07:46:29

 4        Q    Okay.  All right.  If you look at         07:47:17

 5   Exhibit -- sorry.  I published Exhibit 20.  It's a  07:47:22

 6   multipage document bates stamped NIKE 27679 through 07:47:26

 7   27684.                                              07:47:32

 8             (Whereupon Defendant's Exhibit 20         07:47:32

 9             was marked for identification)            07:47:32

10   BY MS. DAVIS:                                       07:47:32

11        Q    If you scroll down to page 4 of the       07:47:39

12   document, the e-mail chain kicks off with an e-mail 07:47:46

13   from some kind of automated e-mail to you saying -- 07:47:52

14   with the subject "Talent acquisition notification." 07:47:56

15             It looks like you were opening a          07:47:57

16   requisition for this position.  Do you recall that? 07:48:01

17        A    I do.                                      07:48:03

18        Q    Okay.  And what is the process to open a  07:48:06

19   requisition for hire?                               07:48:09

20        MR. GOLDSTEIN:  Objection.                      07:48:10

21        THE WITNESS:  I do not recall the specifics    07:48:12

22   except you get H.R. permission to open a            07:48:20

23   requisition, and then you -- you submit it into the 07:48:25

24   system so that you can get a requisition number     07:48:30

25   that's open, and then you are able to hire or start 07:48:42
```

                                                 Page 242

| | | |
|---|---|---|
| 1 | the hiring process. | 07:48:44 |
| 2 | BY MS. DAVIS: | 07:48:44 |
| 3 | Q    Okay.  And then if you go slightly up a | 07:48:49 |
| 4 | little higher on the page that is bates marked | 07:48:53 |
| 5 | 27682, there appears to be an e-mail from you to | 07:48:58 |
| 6 | Ms. Wise dated June 6, 2016.  And you write, | 07:49:08 |
| 7 | "Hi.  Let's get moving on this one. | 07:49:10 |
| 8 | We need to slide Jeff White into this role | 07:49:14 |
| 9 | but can post.  See attached." | 07:49:16 |
| 10 | What did you mean by that? | 07:49:19 |
| 11 | A    That it was recommended to us for Jeff | 07:49:22 |
| 12 | White to move into this role, but we needed to | 07:49:25 |
| 13 | follow proper protocol and actually post the job so | 07:49:30 |
| 14 | people can apply. | 07:49:32 |
| 15 | Q    And who recommended to you that Jeff White | 07:49:35 |
| 16 | should obtain the job? | 07:49:37 |
| 17 | A    Danny. | 07:49:37 |
| 18 | Q    Okay.  And did you agree that Jeff White | 07:49:43 |
| 19 | should be hired? | 07:49:44 |
| 20 | A    I did agree. | 07:49:45 |
| 21 | Q    Okay.  Were you involved in any salary | 07:49:50 |
| 22 | discussions with Jeff White? | 07:49:54 |
| 23 | A    With Jeff -- I do not recall specifically | 07:49:58 |
| 24 | with Jeff that I would have been involved in. | 07:50:13 |
| 25 | Q    Okay.  Do you have any reason to believe | 07:50:15 |

Page 243

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 35 of 46

| | | |
|---|---|---|
| 1 | Jeff White's salary -- starting salary was set based | 07:50:19 |
| 2 | on his gender? | 07:50:21 |
| 3 | MR. GOLDSTEIN:  Objection. | 07:50:22 |
| 4 | THE WITNESS:  I don't -- I don't know how his -- | 07:50:25 |
| 5 | how his original salary was set. | 07:50:29 |
| 6 | BY MS. DAVIS: | 07:50:29 |
| 7 | Q   Do you have any reason to believe that | 07:50:33 |
| 8 | Ms. Keane's salary was set based on her gender? | 07:50:37 |
| 9 | MR. GOLDSTEIN:  Objection. | 07:50:38 |
| 10 | THE WITNESS:  I don't know.  It was within a | 07:50:41 |
| 11 | range. | 07:50:45 |
| 12 | BY MS. DAVIS: | 07:50:45 |
| 13 | Q   Okay.  Were you also involved in the hiring | 07:50:47 |
| 14 | of Sara Cassidy? | 07:50:52 |
| 15 | A   I should have been, yes. | 07:50:55 |
| 16 | Q   Okay.  Did you have any conversations with | 07:50:58 |
| 17 | Ms. Cassidy about her salary? | 07:51:00 |
| 18 | A   Possibly, yes. | 07:51:05 |
| 19 | Q   And what do you recall discussing with | 07:51:06 |
| 20 | Ms. Cassidy about her salary? | 07:51:10 |
| 21 | MR. GOLDSTEIN:  Objection.  Mischaracterizes | 07:51:10 |
| 22 | testimony. | 07:51:13 |
| 23 | THE WITNESS:  I do not recall any specifics | 07:51:16 |
| 24 | about -- about a conversation. | 07:51:18 |
| 25 | /// | 07:51:18 |

Page 244

Davis Decl. Exhibit 47, Page 36 of 46

| | | |
|---|---|---|
| 1 | BY MS. DAVIS: | 07:51:18 |
| 2 | Q    Okay.  Do you have any reason to believe | 07:51:32 |
| 3 | Ms. Cassidy's starting salary was based on her | 07:51:34 |
| 4 | gender? | 07:51:35 |
| 5 | MR. GOLDSTEIN:  Objection. | 07:51:38 |
| 6 | THE WITNESS:  I don't.  I don't know. | 07:51:41 |
| 7 | BY MS. DAVIS: | 07:51:51 |
| 8 | Q    Did you ever make any hiring | 07:51:59 |
| 9 | recommendations based on gender? | 07:52:01 |
| 10 | A    Based on gender, no. | 07:52:06 |
| 11 | Q    Did you ever make any salary | 07:52:08 |
| 12 | recommendations based on gender? | 07:52:11 |
| 13 | A    No. | 07:52:13 |
| 14 | Q    Did you ever make any recommendations about | 07:52:14 |
| 15 | an employee's CFE based on their gender? | 07:52:19 |
| 16 | A    No. | 07:52:21 |
| 17 | Q    Did you ever make any recommendations about | 07:52:22 |
| 18 | an employee's merit increase because of their | 07:52:27 |
| 19 | gender? | 07:52:27 |
| 20 | A    No. | 07:52:29 |
| 21 | Q    Did you ever make any recommendations about | 07:52:30 |
| 22 | whether an employee should be promoted based on | 07:52:35 |
| 23 | their gender? | 07:52:36 |
| 24 | A    No. | 07:52:39 |
| 25 | Q    Did you ever make any recommendations about | 07:52:40 |

Page 245

```
1        MR. GOLDSTEIN:  Objection.              08:24:00

2        THE WITNESS:  Without official documentation,   08:24:02

3    it's hard to tell.  But I know she became a manager   08:24:06

4    for me.                                      08:24:07

5    BY MS. DAVIS:                                08:24:07

6        Q    Okay.  Was she working for you before she   08:24:10

7    became a manager?  So she got promoted while she was   08:24:13

8    working for you, or was it she promoted into   08:24:17

9    reporting to you?                            08:24:18

10       A    I do not recall the specifics of that.   08:24:22

11       Q    Okay.  For a period of time, you supervised   08:24:35

12   an employee by the name of Lauren Anderson.   08:24:38

13   Correct?                                     08:24:40

14       A    That is correct.                    08:24:42

15       Q    Okay.  And Ms. Anderson is also a plaintiff   08:24:44

16   in this case.  You understand that.  Correct?   08:24:48

17       MR. GOLDSTEIN:  Objection.              08:24:49

18       THE WITNESS:  Correct.                  08:24:50

19       MS. DAVIS:  What is the objection?      08:24:53

20       MR. GOLDSTEIN:  Mischaracterizes her role.   08:24:58

21       MS. DAVIS:  Okay.                        08:25:00

22       MR. GOLDSTEIN:  She's an opt-in plaintiff in the   08:25:02

23   FSLA.  Technically a party plaintiff.  Not a named   08:25:07

24   plaintiff.  It's confusing.                  08:25:07

25    ///                                         08:25:18
```

Page 257

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 38 of 46

```
 1   BY MS. DAVIS:                                    08:25:18

 2       Q    Approximately what period of time did   08:25:20

 3   Ms. Anderson report to you?                      08:25:22

 4       A    I do not recall a specific period of time.  08:25:24

 5       Q    Okay.                                    08:25:29

 6            Did you end up creating a performance    08:25:30

 7   action plan for Ms. Anderson?                    08:25:36

 8       MR. GOLDSTEIN:  Objection.                    08:25:38

 9       THE WITNESS:  I believe I did.  If you have that  08:25:42

10   document, it would be helpful.                   08:25:44

11   BY MS. DAVIS:                                     08:25:44

12       Q    Do you recall creating a performance action  08:25:47

13   plan for Ms. Anderson?                           08:25:48

14       MR. GOLDSTEIN:  Objection.  Asked and answered.  08:25:50

15       THE WITNESS:  I was asked to create one.      08:25:56

16   BY MS. DAVIS:                                     08:25:56

17       Q    Okay.  And who asked you to create one?  08:26:00

18       A    Danny.                                   08:26:00

19       Q    Okay.  And you agreed that Ms. Anderson had  08:26:13

20   areas she needed to improve in.  Correct?        08:26:16

21       MR. GOLDSTEIN:  Objection.                    08:26:19

22       THE WITNESS:  Some areas, yes.                08:26:25

23   BY MS. DAVIS:                                     08:26:25

24       Q    I'll mark this as Exhibit 22.  Exhibit 22  08:26:50

25   is a multipage document bates stamped NIKE 27365  08:26:54
```

Page 258

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 39 of 46

```
 1   through 27367.                                 08:26:59

 2         (Whereupon Defendant's Exhibit 22        08:26:59

 3         was marked for identification)           08:26:59

 4   BY MS. DAVIS:                                   08:26:59

 5      Q   At the top of page 1 of Exhibit 22 is an  08:27:07

 6   e-mail from you to Tyler Allen and Danny Tawiah  08:27:09

 7   regarding Ms. Anderson.                         08:27:15

 8         Did you write that e-mail?                08:27:16

 9      A   Sorry.  At which -- which one?          08:27:22

10      Q   The very top e-mail.  January 21, 2016 at  08:27:25

11   10:46 P.M.                                      08:27:30

12      A   It appears that I did.  Yes.            08:27:32

13      Q   Okay.  And you wrote at the bottom,     08:27:37

14         "Honestly, though, her communication     08:27:39

15         is really bad."                          08:27:40

16         Were you talking about Ms. Anderson?     08:27:42

17      A   Yes.                                     08:27:44

18      Q      "I would like this highlighted in your  08:27:46

19         conversation tomorrow.  I can provide more  08:27:49

20         info should you need it."                08:27:51

21         Did you mean that?                        08:27:54

22      A   Yes.                                     08:27:55

23      Q   Okay.  Did you think Ms. Anderson's     08:27:58

24   communication was really bad?                   08:28:00

25      A   It needed -- it needed some work, yes.  08:28:03
```

Page 259

```
 1        Q    Okay.  Was your assessment of Ms. Anderson      08:28:12

 2    at all based on her gender?                             08:28:16

 3        A    No.                                            08:28:17

 4        Q    Did you make any employment decisions          08:28:18

 5    related to Ms. Anderson that were based on her          08:28:22

 6    gender?                                                 08:28:22

 7        A    No.                                            08:28:24

 8        MR. GOLDSTEIN:  Objection.  You also have to        08:28:27

 9    give her time to read the document.                     08:28:29

10        MS. DAVIS:  It's not about the document.            08:28:39

11        Q    We'll mark this as Exhibit 23.  Exhibit 23     08:29:10

12    is a multipage document bates stamped NIKE 24423        08:29:24

13    through 24427.                                          08:29:30

14           (Whereupon Defendant's Exhibit 23               08:29:30

15           was marked for identification)                  08:29:30

16    BY MS. DAVIS:                                           08:29:30

17        Q    I'd like to direct your attention to your     08:29:36

18    e-mail to Mr. Tawiah that begins on page 2 of the       08:29:44

19    document dated January 14, 2016.                        08:29:50

20        A    Just a second.                                 08:30:02

21        Q    On the page that's bates marked 24424.         08:30:06

22        A    Okay.  Thank you.                              08:30:20

23        Q    Did you write this e-mail?                     08:30:21

24        MR. GOLDSTEIN:  Would she have time to review       08:30:24

25    the whole document?                                     08:30:25
```

                                              Page 260

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 41 of 46

```
 1    BY MS. DAVIS:                                   08:30:25

 2       Q    Would you like time to review the whole   08:30:28

 3    document, Ms. Cahill?                            08:30:29

 4       A    Yeah.  I'm just reading this one section  08:30:32

 5    you noted.                                       08:30:33

 6       Q    Great.                                    08:30:44

 7       A    It looks like -- like I gathered          08:30:49

 8    information and put into this e-mail, yes.        08:30:53

 9       Q    Okay.  And on the page that is bates marked  08:31:00

10    24426, there's a paragraph that begins,          08:31:05

11             "My assessment of her own ability."      08:31:06

12             Do you see that at the top of the document?  08:31:23

13    A    Yes.  Of her own ability.  Yes.             08:31:25

14    Q    So you wrote,                                08:31:26

15             "My assessment of her own ability is     08:31:27

16             that she needs to be guided in visionary  08:31:31

17             work."                                   08:31:32

18             And that's your statement related to     08:31:33

19    Ms. Anderson.  Correct?                          08:31:36

20    A    Yes.                                         08:31:38

21    Q    You continue to write,                       08:31:40

22             "Visionary work is E band level.  She    08:31:43

23             can do the work stuff at the U level for  08:31:48

24             sure.  I would like to see the action plan  08:31:50

25             more of a stay of execution.  I would like  08:31:54
```

                                                    Page 261

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 42 of 46

```
 1          to assess the work and the plan around        08:31:56

 2          her."                                         08:31:57

 3          Did you write that?                           08:31:59

 4     A    Yes.                                           08:32:00
```

```
 5     Q    Did you mean it?                              08:32:03

 6     MR. GOLDSTEIN:  Objection.  Vague.                 08:32:04

 7     THE WITNESS:  Yeah.  At the time I meant it.  I    08:32:07

 8  wanted her to stay in the level she was in, and I     08:32:10

 9  could coach her to stay in that level.                08:32:12

10  BY MS. DAVIS:                                         08:32:12

11     Q    What level was that?                          08:32:14

12     A    E band.  She's a director.                    08:32:15

13     Q    Okay.  She was a U band director?             08:32:22

14     A    No.  She was an E band director.              08:32:25

15     Q    Okay.  So she -- you said she was U band,     08:32:28

16  but you must have just misspoke, or maybe I misheard  08:32:31

17  you.                                                  08:32:32

18     A    Yeah.  No.  I said she's E band.  All         08:32:34

19  directors are E bands.                                08:32:36

20     Q    Got it.  Thanks.                              08:32:37

21     A    Uh-huh.                                       08:32:38

22     Q    Okay.  So your -- you were basically saying   08:32:44

23  here she can do the work at the U level for sure,     08:32:48

24  and you wanted to help her get to the -- or stay at   08:32:52

25  the E level.  Correct?                                08:32:54
```

Page 262

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 43 of 46

1           I, SARI M. KNUDSEN, CSR NO. 13109, in and

2    for the State of California, do hereby certify:

3           I am the deposition officer that

4    stenographically recorded the testimony in the

5    foregoing deposition;

6           Prior to being examined, the deponent was

7    first duly sworn by me;

8           The foregoing transcript is a true record of

9    the testimony given;

10           Before completion of the deposition, review

11    of the transcript was not requested.  If requested,

12    any changes made by the deponent (and provided to

13    the reporter) during the period allowed are appended

14    hereto.

15

16    Dated the 9th day of December, 2020.

17

18

19

20

21           SARI M. KNUDSEN, CSR NO. 13109

22

23

24

25

                                         Page  313

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 47, Page 44 of 46

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: November 18, 2020

Deponent: Kelly Cahill

| Page | Line(s) | Reads | Should Read | Reason |
|---|---|---|---|---|
| 25 | 13 | payee quality | pay equality | To correct a transcription error |
| 25 | 17 | payee quality | pay equality | To correct a transcription error |
| 38 | 9 | selling in new products | selling new products | To correct a transcription error |
| 40 | 8 | then ex-husband | then husband | To correct a transcription error |
| 43 | 20 | Gem Soda | Jones Soda | To correct a transcription error |
| 48 | 23 | 2011 | 2012 | To correct inadvertent error in year |
| 59 | 23 | EPW | ETW | To correct a transcription error |
| 123 | 6 | Insures | Ensures | To correct a transcription error |
| 142 | 3 | CFE's | CFEs | To correct a transcription error |
| 163 | 4 | participants | participates | To correct a transcription error |
| 163 | 18 | participants | participates | To correct a transcription error |
| 173 | 9-10 | Was rated during CFE one year what I saw everyone was getting. Not necessarily the case. | Was rated Successful during CFE one year when I was told everyone was getting Successful. But then I saw that was not necessarily the case. | To correct a transcription error |
| 174 | 6 | media | meeting | To correct a transcription error |
| 177 | 2 | Nike.com right | Nike.com that are right | To correct a transcription error |
| 179 | 5 | manager CFE | manager's CFE | To correct a transcription error |
| 179 | 11 | managing CFE | manager's CFE | To correct a transcription error |
| 180 | 1 | CFE's. | CFEs | To correct a transcription error |
| 185 | 22 | Kasatani. | Fisanotti | To correct a transcription error |
| 186 | 4 | up levels from me | a higher level than mine | To correct a transcription error |
| 186 | 7 | It | He | To correct a transcription error |
| 196 | 19 | June 11 | June 1 | To correct a transcription error |
| 196 | 23 | CFE's | CFEs | To correct a transcription error |
| 222 | 2 | dikes | dykes | To correct a transcription error |
| 222 | 8 | dike | dyke | To correct a transcription error |

| 223 | 5 | dikes | dykes | To correct a transcription error |
|-----|-----|-------|-------|--------------------------------|
| 251 | 24 | CFAE's | CFEs | To correct a transcription error |
| 254 | 13 | CFE's | CFEs | To correct a transcription error |
| 263 | 7 | D banding | debanding | To correct a transcription error |
| 263 | 17 | D banding | debanding | To correct a transcription error |
| 284 | 19 | Communication's | Communications | To correct a transcription error |
| 297 | 10 | July 27 | July 25 | To correct a transcription error |
| 309 | 14 | opportunity proactively | opportunity to proactively | To correct a transcription error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on  1/6/2021            in  West Newton, MA              .

Kelly Cahill

794325.3

Davis Decl. Exhibit 47, Page 46 of 46

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,   No.

        Plaintiffs,           3:18-cv-01477-JR

     v.

NIKE INC., an Oregon

Corporation,

        Defendant.



VOLUME I


REMOTE VIDEOCONFERENCE 30(b)(6) DEPOSITION OF

ALISON DAUGHERTY

Taken in behalf of Plaintiffs

January 8, 2021

Daugherty, Alison - Vol. 1 - 30(b)(6)                    January 8, 2021

Page 38

```
 1        transcript --
 2   A.   Understood.
 3   Q.   -- if you could say "yes."
 4   A.   Understood.  Sorry.  Apologies.  Yes.
 5   Q.   So --
 6   A.   Yes.  There's employee relations and then
 7        there's also strategy.
 8   Q.   Okay.  Let's discuss employee relations.  What
 9        is the role of employee relations?
10   A.   Employee relations is responsible for receiving
11        and investigating employees' concerns about
12        potential policy violations.
13   Q.   Is that part of your responsibility in your
14        current role of vice president?
15   A.   In my current role directly, no.
16   Q.   Prior role?
17   A.   Yes.
18   Q.   And when was that, Alison?
19   A.   So I led the employee relations group from I
20        believe March or April of 2017 through September
21        of 2020.
22   Q.   So until recently you were --
23   A.   Yes.
24   Q.   -- leading employee relations?
25   A.   Correct.
```

Beovich Walter & Friend
1-800-541-4452            503-228-7201            www.bwfreporters.com

Davis Decl. Exhibit 48, Page 2 of 8

Daugherty, Alison - Vol. 1 - 30(b)(6)                        January 8, 2021

Page 67

1          THE WITNESS:  Complaints regarding potential
2     policy violations are most appropriately handled
3     through the employee relations team.  Complaints
4     not involving policy violations or potential
5     policy violations can be handled by the business
6     functions.
7          So if someone were to bring forward a
8     concern or a complaint about discrimination or
9     harassment, the appropriate place for that to be
10    assessed would be with employee relations.
11  Q.  BY MR. GOLDSTEIN:  Now, this document also
12    provides that a fact-finding team would
13    typically consist of an employee relations
14    manager, business HR generalist and a manager
15    from the employer's business group.  Do you see
16    that?
17  A.  I do.
18  Q.  Have you ever been involved in a fact-finding
19    team when you were in the employee relations
20    department?
21          MR. PRINCE:  Again, questions here about the
22    scope of the topics we're going to object to.
23          THE WITNESS:  I have been a part of, you
24    know, in my ER experience I have been a part of
25    investigations.  I cannot recall off the top of

Beovich Walter & Friend
1-800-541-4452              503-228-7201              www.bwreporters.com

Davis Decl. Exhibit 48, Page 3 of 8

Page 192

1        MR. PRINCE:  Again let me, let me say a few
2    things here.  This, one, it would be the
3    designated scope of the topics.  There's been no
4    testimony whether this witness participated in
5    the preparation of this document or prepared it
6    herself or has even seen it.  And that's
7    certainly outside the scope of her designated
8    Rule 30(b)(6) topics; second, it assumes facts;
9    third, it lacks foundation; vague and ambiguous;
10   and we also continue to assert the privilege
11   objection.
12        MR. GOLDSTEIN:  Are you instructing the
13   witness not to answer?
14        MR. PRINCE:  I don't even know if the
15   question is capable of being answered how
16   phrased, to be candid.  And so that's, that's
17   where we are with our objections.
18   Q.  BY MR. GOLDSTEIN:  So then, therefore, you can
19       answer, Alison, since he did not direct you to
20       not answer.
21   A.  Right.  But my answer is that I can't speculate
22       as to who created this document or at what level
23       of the organization they were at.
24   Q.  Okay.  Thank you for the answer.  When was the
25       Starfish survey complaints received by Nike?

Beovich Walter & Friend
1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 48, Page 4 of 8

Daugherty, Alison - Vol. 1 - 30(b)(6)                    January 8, 2021

Page 193

```
 1            MR. PRINCE:  Same objection to Starfish.
 2            THE WITNESS:  I can't recall the exact date
 3       that I became aware of the survey responses, but
 4       I believe it to be somewhere in the realm of
 5       February 2018.
```

```
 6  Q.   BY MR. GOLDSTEIN:  Do you know how the
 7       complaint, how the Starfish survey complaint was
 8       received?
 9  A.   I'm, by me or by whom?
10  Q.   By Nike.
11  A.   I do not know how or who or the exact date that
12       someone first became aware.
13  Q.   We've uploaded a document that has been marked
14       as 585.  It is an e-mail from KeJuan Wilkins to
15       Hannah (sic) Finley, subject, New York Times Q
16       and A and MP quote, with attachments.  It's an
17       April 2018.  The Bates numbers are 00019537-47.
18  A.   Okay.  I have the document.
19  Q.   Do you know Hannah Finley?
20  A.   I believe actually the name is Ilana Finley.
21  Q.   I'm sorry.
22  A.   It's okay.  It looks like an H.
23  Q.   It does look like an H, but yeah.  I see that
24       it's I L.
25  A.   Yeah.
```

Beovich Walter & Friend
1-800-541-4452                503-228-7201                www.bwfreporters.com

Davis Decl. Exhibit 48, Page 5 of 8

Daugherty, Alison - Vol. 1 - 30(b)(6)                    January 8, 2021

Page 221

1                C E R T I F I C A T E
2            I, Aleshia K. Macom, Oregon CSR No. 94-0296,
3       Washington CCR No. 2095, California CSR
4       No. 7955, RMR, CRR, RPR, do hereby certify that
5       ALISON DAUGHERTY appeared before me remotely at
6       the time and place mentioned in the caption
7       herein; that the witness was by me first duly
8       sworn on oath, and examined upon oral
9       interrogatories propounded by counsel; that said
10      examination, together with the testimony of said
11      witness, was taken down by me in stenotype and
12      thereafter reduced to typewriting; and that the
13      foregoing transcript, pages 1 to 220, both
14      inclusive, constitutes a full, true and accurate
15      record of said examination of and testimony
16      given by said witness, and of all other
17      proceedings had during the taking of said
18      deposition, and of the whole thereof, to the
19      best of my ability.
20           Witness my hand at Portland, Oregon, this
21      18th day of January, 2021.
22      _____
                        Aleshia K. Macom
23                      Oregon CSR No. 94-0296
                        Expires 9-30-2023
24                      Washington CCR No. 2095
                        Expires 7-7-2021
25                      California CSR No. 7955

Davis Decl. Exhibit 48, Page 6 of 8

*Cahill, et al v. Nike*

**Alison Daugherty Deposition Errata**

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 47:14 | "Correct." | "Correct. I am not aware of any complaint of harassment against Mr. Ayre." | To conform to the facts, consistent with other testimony |
| 129:14 | "Yes." | "Yes, on the 2019 playbook." | To correct a transcription error and conform to the facts, consistent with other testimony |
| 172:12-14 | "I believe that the main set of complaints refers to complaints contained in the responses to the anonymous survey." | "I believe that the main set of complaints refers to complaints contained in or made upon investigating the responses to the anonymous survey." | To conform to the facts, consistent with other testimony |
| 172:20-23 | "I believe that refers to the fact that the complaints were reviewed, assessed and appropriate next steps were taken." | "I believe that refers to the fact that complaints were reviewed, assessed and appropriate next steps were taken." | To conform to the facts, consistent with other testimony |
| 176:2 | "THE WITNESS" | "MR. PRINCE" | To correct a transcription error |
| 184:1-2 | "recorded function" | "communications reporting function" | To correct a transcription error |
| 209:20 | "ETW" | "The designation ETW" | To correct a transcription error and conform to the facts, consistent with other testimony |
| 214:3 | "for" | "from" | To correct a transcription error |
| 218:3 | "THE WITNESS" | "MR. PRINCE" | To correct a transcription error |
| 257:22-24 | "Again, I don't know that I can say I prepared in any specific way regarding these two topics." | "Again, I don't know that I can say I prepared in any specific way regarding these two topics, besides meeting with counsel." | To conform to the facts, consistent with other testimony |
| 280:7-12 | "No. We met, we met, the two of us. I believe the, actually I believe the first time I met Ms. Augustine, Monique Matheson introduced her to me. And | "Yes. Monique Matheson was also there. I believe the, actually I believe the first time I met Ms. Augustine, Monique Matheson introduced her to me. And we then proceeded, | To conform to facts |

1

| | | | |
|---|---|---|---|
| | we then proceeded, she and I then proceeded to have a conversation where I intook her complaints." | Ms. Augustine, Ms. Matheson and I then proceeded to have a conversation where I intook her complaints." | |
| 286:6-8 | "but I am aware that that was a concern." | "but I am aware that Mr. Simon being considered for promotion was a concern." | To correct a transcription error and conform to the facts, consistent with other testimony |
| 304:6 | "I believe we had a few followup meetings after" | "I believe we had a few follow up emails after" | To correct a transcription error |
| 311:16-20 | "I think that, you know, actually Monique didn't leave the meeting, but I can't recall if Renee and I simply moved and met alone that same day or if it was at a different time. I can't recall timing." | "I think that, you know actually Monique didn't leave the meeting." | To conform to facts |
| 374:14 | "ware" | "aware" | To correct a transcription error |
| 393:11 | "for" | "were" | To correct a transcription error |
| 403:25 | "amplified" | "Amplify" | To correct a transcription error |
| 406:9 | "dates and gates" | "dates and dates" | To correct a transcription error |
| 425:24 | "No." | "No; not in advance of my deposition." | To conform to the facts, consistent with other testimony |
| 428:19 | "I have not been" | "I have been" | To correct a transcription error |

I attest that the above-referenced changes are true and correct.

Date: March 19, 2021

Alison Daugherty

2

```
 1              UNITED STATES DISTRICT COURT
 2          DISTRICT OF OREGON, PORTLAND DIVISION
 3
 4   KELLY CAHILL, SARA JOHNSTON,    )NO. 3:18-cv-01477-JR
     LINDSAY ELIZABETH, and HEATHER )
 5   HENDER, individually and on     )
     behalf of others similarly      )
 6   situated,                       )
                                     )
 7                 Plaintiffs,       )
                                     )
 8          v.                       )
                                     )
 9   NIKE, INC., an Oregon           )
     corporation,                    )
10                                   )
                   Defendant.        )
11   _____)
12
13
14
15                 AFTERNOON SESSION
16     REMOTE VIDEOTAPED DEPOSITION OF LINDSAY ELIZABETH
17              Palm Desert, California
18            Monday, January 11, 2021
19
20
21   Reported by:
     Heidi Hummel-Grant
22   CSR No. 12556
23   Pages 119 - 278
24
25
```

                                              Page 119

Davis Decl. Exhibit 49, Page 1 of 11

```
 1              A    That's just in regards to the process,      02:56
 2      what I remember of the process.
 3              Q    Okay.
 4              You were told there was a position opening
 5      and you were asked to apply.                            02:56
 6              Did you -- did you want to apply for this
 7      Nike's role?
 8              A    Yes.
 9              MS. DAVIS:  Okay.  All right.
10              I'm showing you -- let's see -- Exhibit 115.     02:57
11              (Exhibit 115 was marked for identification,
12      a copy of which is attached hereto.)
13              MS. DAVIS:  Exhibit 115 is a multipage
14      document Bates stamped Nike8605 through 8613.
15              THE WITNESS:  Okay.  This -- oh, what's the      02:57
16       exhibit number?
17              MS. DAVIS:
18              Q    115, should be.
19              A    Okay.  Hold on a second.
20              Okay.  I'm looking at it.                        02:58
21              Q    Okay.
22              Exhibit 5 [sic] appears to be your
23      application for the Apparel Designer I Jordan role,
24      and it indicates that the application was created
25      November 21st, 2016.                                    02:58
```

                                                        Page 139

```
 1   question.                                          03:04
 2        The Apparel Designer I Jordan position that
 3   you started in in January of 2017, do you know if
 4   there was formerly someone in that role who left or
 5   moved to a new role or if they created that job      03:04
 6   opening for you?
 7        MR. BLAKE:  Objection.  Compound.
 8        THE WITNESS:  That's a -- a trick -- trick
 9    question in the sense that -- so they had posted
10    for a senior designer.  And when they were not able  03:05
11    to fill the role for senior designer, they told me
12    that they wanted to promote from within and that
13    they were going to create a new Designer I position
14    instead of hiring a senior designer.  That is what
15   I was told.                                          03:05
16        I was not told whether or not the position
17   was being made for me.  And the intention of that
18   position -- yeah, that's -- that's all I -- that's
19   what I know about that.
20        MS. DAVIS:  Okay.                              03:05
21        Q   Do you know if other people applied for
22   the Apparel Designer I role?
23        MR. BLAKE:  Objection.  Vague and ambiguous.
24        THE WITNESS:  I was not aware at the time
25    that other people had applied for it.  But I was    03:06
```

Page 144

Davis Decl. Exhibit 49, Page 3 of 11

```
 1      made aware after that someone else -- at least one        03:06
 2       other person had.
 3             MS. DAVIS:
 4             Q   Who was that?
 5             A   I don't know his name.  But                     03:06
 6      Devon Burke -- Devon Burke, Burt -- the man who
 7      became my -- my manager when I moved to Nike told me
 8      that his son had applied for that role and did not
 9      get it.
10             Q   Okay.                                           03:06
11             And you were selected over his son?
12             A   Yes.
13             Q   Okay.
14             With whom did you interview for the role, if
15      you recall?                                                03:07
16             A   It was Michelle Baerncopf, Kenny Matias,
17      Doug -- Barcliff?  I don't know, Doug -- Doug.
18      There was another man, and I can't put a -- I can't
19      remember his name right now, he was product manager.
20      And John -- I think John -- yeah, John Burlo as           03:07
21      well.
22             Q   Okay.
23             Anyone else?
24             A   That's all I can remember.
25             Q   Okay.                                           03:08
```

Page 145

Davis Decl. Exhibit 49, Page 4 of 11

```
 1            Did you discuss compensation at all during    03:08
 2    the interview process?
 3            MR. BLAKE:  Objection --
 4            THE WITNESS:  No.
 5            MR. BLAKE:  -- vague.                          03:08
 6            MS. DAVIS:  Did you get the answer, Court
 7     Reporter?
 8            THE REPORTER:  Yes, I got the answer:  No.
 9            MS. DAVIS:  Thank you.  All right.  Okay.
10            We'll mark this as Exhibit 116.               03:09
11            (Exhibit 116 was marked for identification,
12    a copy of which is attached hereto.)
13            MS. DAVIS:  Exhibit 116 is a two-page
14     document, Bates stamped Nike14657 through 14658.
15            Q   Do you recognize Exhibit 116?             03:09
16            A   Vaguely.
17            Q   Okay.
18            Is exhibit 116 the off -- your offer letter
19    to join Nike in the role of Apparel Designer I
20    Jordan in January of 2017?                            03:09
21            A   Okay.
22            Q   I'm asking you if it is.
23            A   Is -- what's the question?  If it was my
24    offer letter for that position?
25            Q   Yes.  Is Exhibit 116 the offer letter     03:10
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 49, Page 5 of 11

| | | |
|---|---|---|
| 1 | you received from Nike offering you the role of | 03:10 |
| 2 | Apparel Designer I Jordan with a start date of | |
| 3 | January 17th, 2017? | |
| 4 | A   Yes. | |
| 5 | Q   Okay. | 03:10 |
| 6 | When you received this offer letter, had | |
| 7 | someone at Nike already verbally extended the offer | |
| 8 | to you? | |
| 9 | A   Yes. | |
| 10 | Q   Who had done that? | 03:10 |
| 11 | A   Michelle. | |
| 12 | Q   Okay. | |
| 13 | And what did Michelle tell you? | |
| 14 | A   She told me that I had been selected for | |
| 15 | the job, and we talked about compensation. | 03:10 |
| 16 | Q   Okay. | |
| 17 | What did you and Michelle discuss related to | |
| 18 | compensation? | |
| 19 | A   She told me what they were offering and | |
| 20 | that they were unwilling to negotiate, she felt like | 03:11 |
| 21 | it was -- the pay was within the typical pay range | |
| 22 | but a little bit low, and even though they had said | |
| 23 | they were unwilling to negotiate, that I should | |
| 24 | still try and I should still ask for more. | |
| 25 | Q   Okay. | 03:11 |

Page 147

```
 1              And what did she tell you was the rate they      03:11
 2    were going to offer you?
 3         A    She said 67,000.
 4         Q    Okay.
 5              And 67,000 is the rate reflected in              03:11
 6    Exhibit 116; correct?
 7         A    Correct.
 8         Q    All right.
 9              And did you try to negotiate that rate?
10         A    I did.                                           03:11
11         Q    With whom?
12         A    With Michelle.
13         Q    Okay.
14              And what did you tell Michelle?
15         A    I said that I would still like to ask            03:12
16    for a little bit more than that, and so I asked for
17    73,000.
18         Q    Okay.
19              And did Michelle respond to your request?
20         A    As far as I know she asked for that on           03:12
21    my behalf.
22         Q    Okay.
23              And what was the response that -- as far
24    as -- from your perspective?
25         A    The response was that they were                  03:12
```

Page 148

Davis Decl. Exhibit 49, Page 7 of 11

```
 1   unwilling to negotiate and that I could take it or        03:12
 2   leave it.
 3            Q    Okay.
 4            Do you know what the -- did she tell you
 5   what the 67 -- how they arrived at the number of          03:12
 6   67,000?
 7            A    No.
 8            Q    Okay.
 9            Do you have any facts that you believe would
10   show that your offer was 67,000 because of your           03:12
11   gender?
12            MR. BLAKE:  Objection.  Vague and ambiguous.
13            MS. DAVIS:
14            Q    Go ahead.
15            A    I don't -- I don't know.  I don't -- I       03:13
16   can't remember.
17            Q    Okay.
18            Do you know who made the decision to offer
19   you the job?
20            A    No.                                          03:13
21            Q    Do you know who made the decision on
22   your compensation?
23            A    No.
24            Q    Did you receive a signing bonus?
25            A    I don't think so, no.                        03:13
```

Page 149

```
1        CERTIFICATION OF CERTIFIED SHORTHAND REPORTER

2

3            I, the undersigned, a Certified Shorthand

4    Reporter of the State of California, do hereby

5    certify:

6            The foregoing proceedings were taken

7    before me remotely at the time set forth;

8            That any witnesses in the foregoing

9    proceedings, prior to testifying, were placed under

10   oath;

11           That a verbatim record of the proceedings

12   was made by me using machine shorthand, which was

13   thereafter transcribed under my direction;

14           Further, that the foregoing is an accurate

15   transcription thereof.

16           I further certify that I am neither

17   financially interested in the action nor a relative

18   or employee of any of the parties.

19           IN WITNESS WHEREOF, I hereby subscribe my

20   name this 26th day of January, 2021.

21

22

23

             Heidi Hummel-Grant

24           Certified Shorthand Reporter No. 12556

25
```

Page 280

Cahill, et al v. Nike
Lindsay Elizabeth Deposition Errata

| Page : Line | Reads | Should Read | Reason |
|---|---|---|---|
| 30:10-11 | "24 Nation" | 24 Notion | To clarify details and correct an inadvertent error |
| 43:12 | "No." | "I did not supervise any Summit employees. However, I did supervise contractors when we brought them on to assist with our workload. I would give them feedback on their tasks and ensure that they completed them correctly." | To clarify and provide additional details |
| 67:1 | "Phil Hodgson" | Jared Brandt | To correct a transcription error |
| 73:15-18 | "These were things that I had not left around -- she would single me out, and she would frustratingly be like, "Why haven't you cleaned this? Can you please clean this up?" | "These were things that I had not left around and she would single me out. She would frustratingly say, 'Why haven't you cleaned this? Can you clean this up?" | To clarify details and correct an inadvertent error |
| 81:16-18 | "Stevenson" | Stephenson | To correct a transcription error |
| 95:16 | "Jerry" | Jared | To correct a transcription error |
| 183:15 | "She wasn't in a director role, but she was still doing a lot of the design work." | "She was in a director role, but she was still doing a lot of the design work." | To correct a transcription error |

Davis Decl. Exhibit 49, Page 10 of 11

Doc ID: 4765502ff775b573940a5b4ff5cce559ff52b82f

Cahill, et al v. Nike
Lindsay Elizabeth Deposition Errata

| Page : Line | Reads | Should Read | Reason |
|---|---|---|---|
| 276:12 | "No." | "No. I am not individually seeking emotional distress damages." | To clarify and provide additional details |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on ___02 / 19 / 2021___ in ___02/19/2021___.

_____
Lindsay Elizabeth

Page 2 – Lindsay Elizabeth Deposition Errata          Davis Decl. Exhibit 49, Page 11 of 11

Doc ID: 4765502ff775b573940a5b4ff5cce559ff52b82f

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,   No.

       Plaintiffs,             3:18-cv-01477-JR

    v.

NIKE INC., an Oregon

Corporation,

       Defendant.




REMOTE 30(b)(6) VIDEOCONFERENCE DEPOSITION OF

TREASURE HEINLE

Taken in behalf of Plaintiffs

March 16, 2021

Heinle, Treasure - 30(b)(6)                                March 16, 2021

                                                                    Page 40

1   Q.   BY MR. BYRON GOLDSTEIN:  And what did Zach say
2        when you asked him this question?
3   A.   He confirmed what I thought was true, that it
4        does not require a manager approval.
5   Q.   Okay.  How did Zach know the answer to your
6        question?
7   A.   Because the compensation team is, leads the,
8        basically the, the framework for the process and
9        the system that's, that's used for that process.
10  Q.   So is the comp team the one who sets the rules
11       as to whether or not a manager plus one would be
12       required for CFE ratings?
13  A.   No.  I wouldn't say they set the, set the rules.
14  Q.   Who set the rules for that then?
15  A.   There are many people involved in HR in the CFE
16       process.
17  Q.   And from what departments of HR would they be
18       from other than compensation?
19  A.   Sorry.  There would be compensation.  There
20       would be learning, learning and development.
21       There would be HR, HR business, business facing.
22       There would be communications.
23  Q.   Has communications been a part of human
24       resources, as long as you can remember?
25            MS. DAVIS:  Objection to the question as

Beovich Walter & Friend
1-800-541-4452            503-228-7201            www.bwfreporters.com

Davis Decl. Exhibit 50, Page 2 of 10

Heinle, Treasure - 30(b)(6)                    March 16, 2021

Page 62

1    A.    No.  No.

2    Q.    Let me rephrase it.  Let me rephrase it.

3          So let's just say since 2015, have there

4          been times when you or someone else for you has

5          created a report showing your direct reports and

6          the direct reports of your direct reports?

7    A.    I don't recall if I've gone to that level of

8          detail with reports.

9    Q.    Okay.  All right.  To go back to Exhibit 636, it

10         says "Noncompetitive job change must be approved

11         by your manager or HR partner."

12         Regarding manager, I just was, I was trying

13         to figure out.  So is it the manager of the

14         person getting the noncompetitive job change or

15         promotion or is it the manager of the manager of

16         the person getting the noncompetitive job

17         change?

18   A.    Just give me a moment to reread this.

19   Q.    Sure.  Sure.

20   A.    So this is an education, a past education tool

21         for a manager.  So when it indicates, get your

22         manager's approval, it would be the manager of

23         the, the person doing it.

24   Q.    Okay.  So let me see, let me make sure we're on

25         the same page.  So let's say person A is the one

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 50, Page 3 of 10

Heinle, Treasure - 30(b)(6)                           March 16, 2021

Page 63

```
 1        getting a non -- Well, the one who a
 2        noncompetitive job change approval is being
 3        sought.  That was poorly worded.  I'm sorry.
 4            So person A is potentially going to get a
 5        noncompetitive job change and then person B is
 6        person A's manager and person C is person B's
 7        direct manager.
 8            So in that example, approved by your
 9        manager, who would be the one doing the
10        approval, according to this?
11   A.   In this example it would be that person B,
12        manager B would need to get manager C's approval
13        for when this specific education tool was out
14        there.
15   Q.   Specific education tool out there.  So in the
16        metadata that Nike produced it says July 31st,
17        2019.  Is that, is that accurate or not
18        accurate?
19            MS. DAVIS:  Objection; calls for
20        speculation.
21            THE WITNESS:  Yes.  I'm sorry.  I thought
22        you meant originally when you introduced this
23        tool said a date.  So that's why I referred to
24        the date.
25   Q.   BY MR. BYRON GOLDSTEIN:  Sorry.  I can say it
```

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 50, Page 4 of 10

Page 85

1    A.    Yes.

2    Q.    That's an accurate description of the

3          performance ratings in CFE?

4    A.    Yes.  It's accurate of the ratings.  Yes.

5    Q.    Okay.  And then have -- So there's five ratings

6          for CFE.  I was about to say what they are, but

7          it would probably be just quicker if you tell me

8          what they are.  Can you tell me?

9    A.    Yes.  I think so, hopefully, from memory.

10   Q.    I can try it first and then you can correct me.

11   A.    No.  That would be impressive.

12          Exceeding, highly successful, successful,

13         inconsistent and unsatisfactory.

14   Q.    Okay.  Has "exceeding" sometimes been referred

15         to as "excellent"?

16   A.    Not that I recall.

17   Q.    So there's five ratings.  Have those -- There's

18         always been five CFE ratings for as long as

19         you've been at Nike, since 2012?

20   A.    Yes.  That's, that's correct.

21   Q.    And the definitions of each of those five CFE

22         ratings have remained the same since at least

23         2015 through the present?

24   A.    I, I can't say that word for word they are

25         exactly the same.  I would say the intent of

Beovich Walter & Friend
1-800-541-4452                503-228-7201                www.bwfreporters.com

Davis Decl. Exhibit 50, Page 5 of 10

Heinle, Treasure - 30(b)(6)                    March 16, 2021

Page 86

1          those ratings have, have been the same.
2     Q.   Okay.  Thank you.  And with respect to this
3          testimony, we're talking about that includes
4          employees at World Headquarters in bands L
5          through S from 2015 to the present?
6     A.   I'm not, I'm not sure.  Since I've been at Nike,
7          those ratings have applied.
8     Q.   Yes.  And sorry.  What I meant to say is and
9          that includes employees at World Headquarters in
10         bands L through S and it includes from 2015 to
11         the present --
12    A.   Yes.
13    Q.   -- is that right?
14    A.   Yes.  That is correct.
15    Q.   Yeah.  I'm going to introduce Exhibit 528 (sic),
16         which is NIKE_30245.  This document was
17         previously introduced as Exhibit 529.  Bates
18         number is NIKE_3 -- 00030245.  Do you see this
19         document?
20    A.   Yes, I do.
21    Q.   Actually I meant to introduce -- I'm also going
22         to introduce at the same time Exhibit, what's
23         been previously marked as Exhibit 528, and
24         that's NIKE_00030143.  We're going to look at
25         both these exhibits.

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 50, Page 6 of 10

Heinle, Treasure - 30(b)(6)                    March 16, 2021

Page 196

1    Q.   Okay.  So how does the manager or the HR partner
2         decide whether or not to approve the
3         noncompetitive job change?
4    A.   I wouldn't say the HR manager's approving it.
5         They're reviewing it and submitting it.  There
6         are many factors you'd take into consideration.
7         Are there other jobs that are, are the same?
8         Are there jobs that are different?  Contacting
9         HR Direct to get job code information, HR could
10        also --
11   Q.   Okay.
12   A.   -- contact our compensation or Total Rewards
13        partner to inquire about, about a job.
14   Q.   Okay.  So you're saying the approval -- So when
15        we're talking about the approval under
16        definition, is that the approval of the job
17        change or is it the approval of the request for
18        a job change?
19   A.   No.  The approval, the approval is by, it says
20        by your manager or, or HR partner.  So it could
21        be, it could be either/or and then HR would help
22        to process it.
23   Q.   Okay.  So when the HR partner decides, is
24        deciding whether or not to approve a
25        noncompetitive job change pursuant to this

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 50, Page 7 of 10

Heinle, Treasure - 30(b)(6)                                      March 16, 2021

Page 243

1                    C E R T I F I C A T E
2            I, Aleshia K. Macom, Oregon CSR No. 94-0296,
3      Washington CCR No. 2095, California CSR
4      No. 7955, RMR, CRR, RPR, do hereby certify that
5      TREASURE HEINLE remotely appeared before me at
6      the time and place mentioned in the caption
7      herein; that the witness was by me first duly
8      sworn on oath, and examined upon oral
9      interrogatories propounded by counsel; that said
10     examination, together with the testimony of said
11     witness, was taken down by me in stenotype and
12     thereafter reduced to typewriting; and that the
13     foregoing transcript, pages 1 to 242, both
14     inclusive, constitutes a full, true and accurate
15     record of said examination of and testimony
16     given by said witness, and of all other
17     proceedings had during the taking of said
18     deposition, and of the whole thereof, to the
19     best of my ability.
20            Witness my hand at Portland, Oregon, this
21     29th day of March, 2021.
22

       _____

23                    Aleshia K. Macom
                      OR CSR No. 94-0296, Expires 9-30-2023
24                    WA CCR No. 2095, Expires 7-7-2021
                      CA CSR No. 7955, Expires 7-7-2021

25

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 50, Page 8 of 10

*Cahill, et al v. Nike*

**Treasure Heinle Deposition Errata**

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 10:14 | "My position would still remain in tech." | "My position would still remain intact." | To correct a transcription error |
| 11:14 | "Yes." | "Yes, I was in three positions." | To conform to the facts |
| 41:6 | "I don't recall the exact date." | "I don't recall the exact date HR communications became part of HR." | To clarify the record as reflected in later testimony |
| 41:20 | ""Yes." | "Yes, HR communications." | To clarify the record as reflected in later testimony |
| 64:9-10 | "I would assume it's through the period of time you've just said." | "I would assume it's through the period of time you've just said, but I don't know." | To conform to the facts |
| 71:1 | "That I, that I, that I don't know." | "No, it is up to the manager." | To conform to the facts |
| 79:20 | ". . . is Tony Chang.  I think the last name is Chang." | ". . . is Tony Truong.  I think the last name is Truong." | To correct a name spelling |
| 110:19 | "Yes." | "Yes.  It says recommend, but the recommendation is the decision." | To conform to the facts |
| 134:10-11 | "I, I don't know.  I don't know the answer to that." | "It would be the manager and HR." | To conform to the facts |
| 136:18-19 | "I do not know the exact, the exact timeline or time." | "Talent segmentation replaced LPA in calendar year 2018." | To conform to the facts |
| 137:17-22 | "I, I mean, we, we all switched.  I mean, we switched, Nike switched to this new segmentation.  So I would – I don't know, I don't know the exact, exact date.  I would – I'd have to assume that it was around the same time this deck was built." | "Nike switched to this new segmentation in calendar year 2018." | To conform to the facts |
| 155:19 | "Currently Theona Jones leads learning and . . ." | "Currently Fiona Jones leads learning and . . ." | To correct a transcription error |
| 161:11 | "Yes." | "Yes, for some of them." | To conform to the facts |
| 161:15 | "Yes, could." | "Yes, it could." | To correct a transcription error |
| 165:14 | ". . . Sprunk and the HR person and the talent planning . . ." | ". . . Sprunk and their HRBP and the talent planning . . ." | To conform to the facts |

1

| 167:22 | "I don't, I don't know what that means." | "I don't know if this program has been occurring since 2015." | To conform to the facts |
| 199:22-23 | ". . .I believe, the GL – I'm probably saying it wrong, it's a leadership development program . . ." | ". . .I believe, the GLDP, it's a leadership rotational program . . ." | To conform to the facts |

I attest that the above-referenced changes are true and correct.

Date: May 12, 2021

DocuSigned by:

*Treasure Heinle*

045C03BFEC9448A...

Treasure Heinle

2

```
 1                 UNITED STATES DISTRICT COURT
                     DISTRICT OF OREGON
 2                   PORTLAND DIVISION
      _____
 3
      KELLY CAHILL, SARA JOHNSTON,   )
 4    LINDSAY ELIZABETH, and HEATHER)
      HENDER, individually and on    )
 5    behalf of others similarly     )
      situated,                      )
 6                                   )
                    Plaintiffs,      )
 7                                   )
      vs.                            ) No. 3:18-cv-01477-JR
 8                                   )
      NIKE, INC., an Oregon          )
 9    Corporation,                   )
                                     )
10                  Defendant.       )
      _____
11
12       VIDEO-RECORDED REMOTE COUNSEL ZOOM DEPOSITION
13                 UPON ORAL EXAMINATION OF
14                     HEATHER HENDER
15    _____
16
17                      9:10 A.M.
18                THURSDAY, JANUARY 14, 2021
19       (ALL PARTICIPANTS AT THEIR RESPECTIVE LOCATIONS)
20          WITNESS LOCATION:  REDMOND, WASHINGTON
21
22
23
24    Reported by:  Tami Lynn Vondran, CRR, RMR, CCR
      Washington CCR No. 2157, Oregon CSR No. 20-0477
25

                                              Page 1
```

Davis Decl. Exhibit 51, Page 1 of 6

1        A.    Yes.

2        Q.    What about that Manufacturing Engineering II

3   position interested you?

4        A.    Well, it talked about the production.  I was

5   also interested, at the time, in working for Nike, a

6   prominent Beaverton employer with a lot of history, a

7   lot of -- what's word I'm looking for?  A lot of stature

8   in Oregon and the Portland area.

9        Q.    I'm going to upload the next exhibit in order.

10       A.    I have it now, 136.

11       Q.    You have it, great.  It's Exhibit 136.

12             (Exhibit No. 136 was marked remotely for

13                   identification.)

14       A.    I have it open now.

15       Q.    (BY MR. PRINCE)  Is this the -- it's a letter

16   dated March 5, 2015.

17             Is this the offer letter that you received

18   from Nike in connection with the Manufacturing

19   Engineer II position?

20       A.    It appears to be, yes.

21       Q.    This was the same position that you had

22   applied for; correct?

23       A.    I believe so.

24       Q.    And it states that the annual salary is 78,600

25   for that position; right?

Veritext Legal Solutions
866 299-5127

1          A.    It says so, yes.

2          Q.    And you -- you knew that the Manufacturing

3     Engineer II position was an L-Band position; is that

4     correct?

5          A.    I'm not sure I understood the Band system at

6     Nike at this stage -- at that stage.

7          Q.    When you applied or subsequently?

8          A.    When this offer letter was -- was given to me,

9     or made to me.

10          Q.    When you applied for the position, did you

11    understand that you were applying for an L-Band

12    position?

13          A.    I do not -- I do not believe I had knowledge

14    of the Band system or what an L-Band was at that time.

15          Q.    Did you have an understanding of what the pay

16    range might be for the manufacturing engineering

17    position when you applied?

18          A.    I don't recall that I had a pay range for

19    that -- I don't know if -- I do not remember knowing

20    what Nike paid its Engineer IIs at that time.

21          Q.    So when you submitted for the position, you

22    did not have any understanding as to what the pay range

23    might be?

24          A.    I do not recall that I did.

25          Q.    You never attempted to negotiate that starting

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 51, Page 3 of 6

1       A.   He had different roles.   He was a director, he

2    was a manager, he was a lead engineer.   I do not know

3    what his role was at the time.   I know that he was on a

4    retirement strategy with the company that was hashed out

5    and agreed to in higher levels.

6       Q.   Is it possible that other individuals attended

7    the meeting with Mr. Sell because he was a manager?

8       A.   He was a senior employee to myself.   It is

9    possible, yes.

10       Q.   You resigned from Nike in October 2020; is

11    that correct?

12       A.   That is correct.

13       Q.   To whom did you direct a resignation letter?

14       A.   James Stowell.

15       Q.   And what did you tell Mr. Stowell as to why

16    you were resigning?

17       A.   Without having the letter in front of me, I

18    believe I stated that I was leaving Nike and that my

19    last day would be this day.

20       Q.   Did you participate in any exit interview or

21    exit meeting with anyone at Nike?

22       A.   There was a virtual exit meeting with two

23    individuals.   I believe HR.   And that was done virtually

24    due to the COVID restriction.

25       Q.   Do you recall the two individuals who

Page 253

Davis Decl. Exhibit 51, Page 4 of 6

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, TAMI LYNN VONDRAN, the undersigned Certified

 4   Court Reporter, pursuant to RCW 5.28.010, authorized to

 5   administer oaths and affirmations in and for the State

 6   of Washington, do hereby certify that the sworn

 7   testimony and/or proceedings, a transcript of which is

 8   attached, was given before me at the time and place

 9   stated therein; that any and/or all witness(es) were

10   duly sworn to testify to the truth; that the sworn

11   testimony and/or proceedings were by me stenographically

12   recorded and transcribed under my supervision, to the

13   best of my ability; that the foregoing transcript

14   contains a full, true, and accurate record of all the

15   sworn testimony and/or proceedings given and occurring

16   at the time and place stated in the transcript; that a

17   review of which was not requested; that I am in no way

18   related to any party to the matter, nor to any counsel,

19   nor do I have any financial interest in the event of the

20   cause.

21        WITNESS MY HAND AND DIGITAL SIGNATURE THIS 26th

22   day of January, 2021.

23

24

     TAMI LYNN VONDRAN, CRR, RMR, CCR

25   Washington CCR No. 2157, Oregon CSR No. 20-0477

                                           Page 265
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 51, Page 5 of 6

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Dates: January 14, 2021 and March 17, 2021

Deponent: Heather Hender

| **Page** | **Line(s)** | **Reads** | **Should Read** | **Reason** |
|---|---|---|---|---|
| 17 | 21 | practices and pay, performance and | practices in pay, promotions and | To correct an inadvertent error |
| 18 | 4 | pay, performance and | pay, promotions and | To correct an inadvertent error |
| 24 | 9 | performance and evaluations | promotions and evaluations | To correct an inadvertent error |
| 25 | 1 | performance and evaluations | promotions and evaluations | To correct an inadvertent error |
| 26 | 14 | pay, performance and | pay, promotion and | To correct an inadvertent error |
| 49 | 4 | pay, performance and | pay, promotions and | To correct an inadvertent error |
| 227 | 4 | what she [sic] was | what he was | To correct an inadvertent error |
| 274 | 1 | it's where I achieved the pen | it's where I achieved the patent | To correct a transcription error |
| 275 | 3 | there are a few similarities in that | there are few similarities in that | To correct a transcription error |
| 275 | 6 | There are few similarities, so I won't say | There are few similarities, so I would say | To correct a transcription error |
| 276 | 5-6 | and a 50-percent target bonus. | and a 15-percent target bonus. | To correct a transcription error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on April 21, 2021 in King County, WA.

DocuSigned by:
Heather Hender
72E5D0E6364F46D...

```
 1                UNITED STATES DISTRICT COURT

 2                     DISTRICT OF OREGON

 3                     PORTLAND DIVISION

 4

 5   KELLY CAHILL, SARA JOHNSTON,    Case No.: 3:18-cv-01477-JR
     LINDSAY ELIZABETH, and HEATHER
 6   HENDER, individually and on
     behalf of others similarly
 7   situated,

 8              Plaintiffs,

 9        v.

10   NIKE, INC., an Oregon Corporation,

11              Defendant.
     _____

12

13

14

15       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

16                      SARA JOHNSTON

17                   Beaverton, Oregon

18               Tuesday, November 24, 2020

19                       Volume 1

20

21

22   Reported by:
     LESLIE JOHNSON
23   RPR, CCRR, CSR No. 11451

24   Job No.: 4347395

25   PAGES 1 - 312
```

                                                    Page 1

Davis Decl. Exhibit 52, Page 1 of 15

```
 1    approximately.  I don't know starting or ending or        01:40:24
 2    where, but I can name five people that I worked with
 3    on the team.
 4    BY MR. PRINCE:
 5         Q    Five women other than yourself?                  01:40:37
 6         A    I believe that's how they identify.
 7         Q    Can you name them for me, please?
 8         A    Pat.  I don't know how to say or spell her
 9    last name.  If I were to hazard a guess, it would be
10    Bruseau.  Marty.                                           01:40:57
11         Q    What's the first letter?
12         A    Pat, P, like Patricia.  I think it's
13    Bruseau -- Brister.  Brister.  B-R-I-S-T-E-R,
14    Brister.  Sorry.  I got two people mixed up.  Pat
15    Brister.                                                   01:41:19
16              Marty.  I don't remember her last name.
17    Jenny Rhoten.  Emily James.  And there was another
18    woman on our team, and she passed away.  I'm -- I
19    don't remember her name. Also Lori Nearhood.
20         Q    And do you know whether any of those women       01:41:51
21    that were on your team were able to negotiate their
22    starting pay?
23         A    I don't recall.  I don't remember asking.
24         Q    When you had a conversation about your
25    starting pay, I believe you testified earlier that        01:42:10
```

Davis Decl. Exhibit 52, Page 2 of 15

```
 1    you told the recruiter that you had been paid more      01:42:13

 2    at a prior position.

 3            Do you recall that?

 4        A    I believe that I would have made that

 5    argument.                                                01:42:25

 6        Q    You believe you would have or you did?

 7        A    I believe I would have.  I remember

 8    negotiating.

 9        Q    Excuse me.  What was that?

10        A    I remember -- I don't know if I revealed      01:42:50

11    the amount.

12        Q    Did you have a --

13        A    I remember negotiating that.

14        Q    Sorry.  We have to be careful not to talk

15    over one another.                                        01:43:10

16            So did you have a conversation with a

17    recruiter about your prior salary for work that you

18    did before you began the senior account services

19    representative position?

20        A    It was several years ago.  I don't recall    01:43:26

21    if I named the amount.  I do know that I tried to

22    negotiate because I was going to take a pay cut.

23            Typically, if people are taking a pay cut

24    in human resources, we would ask them how much they

25    made and offer to match, if it were close.  So I        01:44:00
```

Page 110

Davis Decl. Exhibit 52, Page 3 of 15

```
 1    think it's in my character with that background that      01:44:06

 2    I would have shared and said "Hey, like, I'm going

 3    to take a pay cut here.  Can we come to a different

 4    amount?"  And they said "We don't negotiate for

 5    entry level."  I recall clearly them saying they         01:44:26

 6    will not negotiate for entry level, that it's take

 7    it or leave it.
```

 8         Q    But you would have advised the recruiter

 9    that you had been paid more highly than the offer

10    that was in front of you at the time.  Is that --        01:44:40

11         A    I believe I would have.

12         Q    You don't know the qualifications of the

13    other individuals that were being considered for

14    that senior account services position, do you?

15              MR. KAN:  Objection.  Lacks foundation.        01:45:09
                                          Colten
16              THE WITNESS:  Other than ~~Colten~~ told me

17    about his background, you know, at a kiosk, I do

18    believe I testified before that I'd seen Emily and

19    Jenny's résumés, but I don't recall -- I don't

20    recall any of what I saw because it was so long ago.     01:45:39

21              THE REPORTER:  You know, I just got bits

22    of that answer.  I'm not sure if everyone else got

23    that, but it did cut out a bit, Sara.  If you could

24    repeat.

25              (Record read.)                                 01:46:03

                                                    Page 111

Davis Decl. Exhibit 52, Page 4 of 15

```
 1              THE WITNESS:  I felt pressured to give a      05:23:55

 2      photo.  I don't -- I mean, I'm a woman.  I don't

 3      feel comfortable with my body.  I don't really want

 4      to take any photos ever.  And he put a lot of

 5      pressure on me to send photos.  I think it's a very   05:24:20

 6      bottom of the chain before the messages.

 7              There's -- there is content that shows

 8      that he was pressuring for photos, so a comment I

 9      made.  But that specific text message or Facebook

10      message I believe was my attempt to flirt because I   05:24:45

11      considered having a relationship with him.  I knew

12      him for three years.  He was a coworker.  He
                                                    did
13      mentored me in a lot of ways.  He was someone I went
         Hood to
14      on the coast with through Nike.

15              You know, we spent a lot of time together.    05:25:08

16      But I did consider at some point dating him, and I

17      would characterize that as flirting.

18      BY MR. PRINCE:

19         Q    Is there a reason that you deleted the

20      photo that you sent but kept the nude photos that     05:25:21

21      ██████████  sent?

22         A    I had deleted a lot of chats as well.  I

23      didn't want his on my phone record.  I didn't want

24      Facebook -- for it to, like, appear, looking at his

25      messages.  I didn't know who was looking at it.       05:25:42
```

Page 229

Davis Decl. Exhibit 52, Page 5 of 15

```
 1              On, you know, the Valentine's Day text        05:25:47

 2    where he sent a dick pic, it actually was sent when

 3    I was at a coworker's house having a glass of wine,

 4    and the coworker saw it.  So I deleted -- I thought

 5    I had deleted all of the photos a long time ago        05:26:03

 6    before I even left Nike.

 7         Q    The question I have is, you preserved the

 8    nude photographs that ████████ sent you and

 9    indeed turned them over to Nike HR.  However, your

10    photos that you sent you deleted; is that correct?     05:26:30

11              MR. KAN:  Objection.  Misstates her

12    testimony.

13              THE WITNESS:  There was a time that I
                                               during
14    considered dating ███.  I viewed everything up to
                  period
15    that point as consensual.  Even the stuff that        05:26:44

16    wasn't consensual at the beginning, in my complaint

17    to HR, it wasn't necessarily that that had -- that

18    we had a consensual relationship.

19              For me, the issue was he was retaliating.

20    I had stopped responding, and he refused to come to    05:27:05

21    meetings -- to two meetings that I held that were

22    necessary to get my job done.  He was effectively

23    preventing me from doing my job, and he started

24    denigrating my work to other coworkers.

25              If I needed to meet with him, he was         05:27:22
```

                                        Page 230

```
 1    punishing me because I wasn't responding, and he          05:27:25

 2    absolutely required that a male or a different

 3    coworker set the meeting.  He wouldn't go to it if I

 4    set it.  He didn't show up.

 5            I then needed to get my work done.  He was        05:27:39

 6    retaliating against me and refusing to help me with

 7    my work because I stopped responding after -- so

 8    there was a period -- I will say at the very

 9    beginning, it was nonconsensual.  There was a period

10    that was consensual.  And I didn't turn any of the        05:27:54

11    material over to HR between either of us because it

12    was consensual.

13            And then the period of nonconsensual

14    activity, I handed that over because I felt like

15    that was when the boundaries were broken between          05:28:09

16    what we agreed to, and I was being retaliated

17    against because I wouldn't respond sexually to him

18    anymore or however.

19    BY MR. PRINCE:

20        Q    In Exhibit 40, where does ███████ ask            05:28:26

21    for nude photo of you?

22            MR. KAN:  Objection.  The document speaks

23    for itself.

24            THE WITNESS:  On December 14th.  I can't

25    see which one, since I -- yeah.  I don't know which       05:28:57
```

                                              Page 231

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 52, Page 7 of 15

| | | |
|---|---|---|
| 1 | time stamp belongs to me versus Facebook user, but | 05:29:01 |
| 2 | between 6:21 and 6:22 I made a comment.  At 6:21 -- | |
| 3 | I believe that's the time stamp, if I'm reading this | |
| 4 | correctly.  "I know I'm good about keeping it under | |
| 5 | wraps.  I'm surprised I didn't send you a dirty pic | 05:29:18 |
| 6 | or something being that drunk." | |
| 7 | And then I respond "or that you didn't | |
| 8 | request one."  That implies that he requested them | |
| 9 | before.  Because he requested several and pressured | |
| 10 | me. | 05:29:33 |
| 11 | I don't have -- I accidentally deleted | |
| 12 | part of our conversation at some point.  So all of | |
| 13 | the beginning text messages I don't have. | |
| 14 | BY MR. PRINCE: | |
| 15 | Q    You accidentally deleted them or did you | 05:29:55 |
| 16 | delete them intentionally? | |
| 17 | A    I think I tried to -- I thought that if I | |
| 18 | did something to them it would put it in a folder or | |
| 19 | somehow archive it, and I accidentally deleted it | |
| 20 | instead of archiving it.  So I don't know what I did | 05:30:20 |
| 21 | or how I did it.  I have spent hours trying to get | |
| 22 | it back from Facebook for my lawyers.  I've | |
| 23 | requested -- I've spent time trying to undo that. | |
| 24 | Q    Did you ever communicate to Nike HR that | |
| 25 | there were consensual text messages as well as | 05:30:42 |

Page 232

```
1              REPORTER'S CERTIFICATION

2

3          I, Leslie Johnson, a Certified Shorthand

4   Reporter of the State of California, do hereby certify:

5          That the foregoing proceedings were taken

6   before me at the time and place herein set forth; that

7   any witnesses in the foregoing proceedings, prior to

8   testifying, were administered an oath; that a record of

9   the proceedings was made by me using machine shorthand

10  which was thereafter transcribed under my direction;

11  that the foregoing transcript is a true record of the

12  testimony given.

13          Further, that if the foregoing pertains to

14  the original transcript of a deposition in a Federal

15  Case, before completion of the proceedings, review

16  of the transcript [ ] was [ ] was not requested.

17  I further certify I am neither financially interested in

18  the action nor a relative or employee of any attorney or

19  any party to this action.

20          IN WITNESS WHEREOF, I have this date

21  subscribed my name.

            Dated:  December 15, 2020

22

23

24

            LESLIE JOHNSON

25          CSR No. 11451, RPR, CCRR

                                        Page  312
```

Davis Decl. Exhibit 52, Page 9 of 15

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: November 24, 2020

Deponent: Sara Johnston

| Page | Line(s) | Reads | Should Read | Reason |
|------|---------|-------|-------------|--------|
| 7 | 11 | Menfei | Mengfei | To correct a transcription error |
| 7 | 25 | Renée | Renee | To correct a transcription error |
| 30 | 5 | Yes. | Not when I was interviewed, but when I was interviewing other people. | Misheard the question |
| 32 | 5 | what | where | To correct a transcription error |
| 33 | 9 | Fallgamwalla | Balgamwalla | To correct a transcription error |
| 33 | 10 | David – I don't remember | David Klasner | To correct spelling |
| 37 | 23 | Maybe the lawyer | Maybe at the lawyers' office | To correct a transcription error |
| 39 | 1 | Acevedo | Azavedo | To correct a transcription error |
| 39 | 6 | Acevedo | Azavedo | To correct a transcription error |
| 39 | 9 | Acevedo | Azavedo | To correct inadvertent error in year |
| 39 | 11 | Acevedo's | Azavedo's | To correct a transcription error |
| 39 | 14 | Acevedo's | Azavedo's | To correct a transcription error |
| 39 | 19 | Acevedo's | Azavedo's | To correct a transcription error |
| 39 | 25 | Acevedo | Azavedo | To correct a transcription error |
| 40 | 5 | Acevedo | Azavedo | To correct a transcription error |
| 40 | 8 | Acevedo | Azavedo | To correct a transcription error |
| 40 | 11 | Acevedo | Azavedo | To correct a transcription error |
| 49 | 2 | To my knowledge, no. | Other than Nike, to my knowledge, no. | Misheard the question. |
| 49 | 22 | recognized the same rate as men | recognized at the same rate as men | To correct a transcription error |
| 49 | 23-24 | individuals who started with | individuals who I started with | To correct a transcription error |
| 53 | 11 | to | Too | To correct a transcription error |
| 55 | 1 | skills. In that more junior ASR, I did not realize | skills in that more junior, Sr. ASR role. I did not realize | To correct a transcription error |
| 55 | 2-3 | To my knowledge, I don't think I | To my knowledge, I don't think I viewed it that way. | To correct a transcription error |

794333.6

Davis Decl. Exhibit 52, Page 10 of 15

| 55 | 18 | When I qualified | Which means to me that I was qualified | To correct a transcription error |
|---|---|---|---|---|
| 71 | 20 | after the same graduate school of management | Atkinson Graduate School of Management | To correct a transcription error |
| 77 | 19 | I also received an on-call. | I transitioned to an on-call role. | To correct a transcription error |
| 80 | 23 | Taleo is an application, a system application | Taleo is an application, an online job application tracking system | Full response to question asked |
| 86 | 16 | SaaS skills that come with that. | Social skills that come with that | To correct a transcription error |
| 88 | 21 | Colton | Colten | To correct a transcription error |
| 89 | 7-8 | I have suggested that two other people apply for the role | I encouraged two other people to apply for the role | To correct a transcription error |
| 90 | 14 | Colton | Colten | To correct a transcription error |
| 90 | 17 | Colton | Colten | To correct a transcription error |
| 91 | 16 | Colton | Colten | To correct a transcription error |
| 92 | 5 | Colton | Colten | To correct a transcription error |
| 92 | 7 | Colton | Colten | To correct a transcription error |
| 92 | 12 | Colton | Colten | To correct a transcription error |
| 93 | 4 | Colton | Colten | To correct a transcription error |
| 99 | 18 | Senior HR position | Senior ASR position | To correct a transcription error |
| 106 | 25 | Colton's | Colten's | To correct a transcription error |
| 107 | 7 | Colton | Colten | To correct a transcription error |
| 107 | 7 | Colton's | Colten's | To correct a transcription error |
| 107 | 11 | Colton | Colten | To correct a transcription error |
| 107 | 13 | Colton | Colten | To correct a transcription error |
| 107 | 16-17 | And Rick said "I'm not going to reveal, but I did negotiate." | And Rick said I'm not going to reveal, but I did negotiate, more than what you make | Full response to the question asked |
| 107 | 23 | Colton | Colten | To correct a transcription error |
| 108 | 3 | Colton | Colten | To correct a transcription error |
| 108 | 6 | Colton | Colten | To correct a transcription error |
| 108 | 10 | Colton | Colten | To correct a transcription error |

794333.6

Davis Decl. Exhibit 52, Page 11 of 15

| 108 | 16 | Colton | Colten | To correct a transcription error |
|---|---|---|---|---|
| 109 | 16 | Marty. I don't remember her last name. Jenny Rhoten. Emily James. And there was another woman on our team, and she passed away. I'm – I don't remember her name. | Marty. I don't remember her last name. Jenny Rhoten. Emily James. And there was another woman on our team, and she passed away. I'm – I don't remember her name. Also Lori Nearhood | Full response to the question asked |
| 111 | 16 | Colton | Colten | To correct a transcription error |
| 122 | 2 | To get the chain of permission. | To go up the chain to get permission. | To correct a transcription error |
| 123 | 24 | Value structure | VALUES structure | To correct a transcription error |
| 124 | 5 | B | V | To correct a transcription error |
| 124 | 7 | B | V | To correct a transcription error |
| 129 | 21 | Colton | Colten | To correct a transcription error |
| 131 | 1 | Colton | Colten | To correct a transcription error |
| 134 | 1 | OAT | OIT | To correct a transcription error |
| 136 | 18-19 | It's my belief. I don't have a solid knowledge. | It's my belief based on my experience. I don't have solid knowledge beyond that. | To correct a transcript error and provide full response to the question asked |
| 140 | 6 | And the nonapplication track | And the application track | To correct a transcription error |
| 154 | 24 | NCS | in CS | To correct a transcription error |
| 155 | 17 | BSA | ASR | To correct a transcription error |
| 162 | 25 | HPs | pieces | To correct a transcription error |
| 167 | 14 | Sladebo | Fladebo | To correct a spelling error |
| 167 | 18 | Yes | Yes, she was also a BSA. | Misheard the question. |
| 170 | 20-23 | They restructured the way we did work, and they promoted Lynn, and they moved her to a different – they changed how our teams were structured. | They restructured the way we did work, and they promoted Lynn, and they moved her to a different team, which was an off-cycle event that enabled | Complete answer to question |

794333.6

Davis Decl. Exhibit 52, Page 12 of 15

| | | | managers to promote people like Lynn and Mrudula – they changed how our teams were structured. | |
|---|---|---|---|---|
| 171 | 25 | She was a BSA1. | She was a BSA 1? | To correct a transcription error |
| 173 | 6 | Has ever trained on a task | Has ever trained me on a task | To correct a transcription error |
| 173 | 22 | Grant and Jim Sherwin | Leon Fabricki and Jim Sherwin | To correct name |
| 174 | 24 | I would say yeah. I mean I don't - | I would say yeah. But I mean I don't know why that should affect his performance assessment. | Full response to the question asked |
| 175 | 14 | I didn't have the same deliverables as Grant | I didn't work on the same deliverables with Noah like I did with Grant | To correct a transcription error |
| 177 | 24 | I made rec- | I made recommendations to my manager when I was involved in phone screens and interviews. | To correct a transcription error |
| 181 | 11 | I didn't know that I could. | No, I didn't know that I could. | Full response to the question asked |
| 181 | 12 | That I acted | That it acted | To correct a transcription error |
| 186 | 7 | I think it would have been | No, I think it would have been | Full response to the question asked |
| 189 | 3 | Lindsay | Lynn Fladebo | To correct a transcription error |
| 192 | 4 | I'm sorry. I'm sorry. | I'm sorry. I'm sorry.  But as I testified earlier, senior BSAs performed the same general duties as junior and intermediate BSAs. | Full response to the question asked |

794333.6

Davis Decl. Exhibit 52, Page 13 of 15

| 192 | 8 | I don't have visibility, to my knowledge. | I don't have visibility, to my knowledge. But as I testified earlier, senior BSAs performed the same general duties as junior and intermediate BSAs. | Full response to the question asked |
| 194 | 7-8 | I did not know that at the time I was made an intermediate BSA, no. | I did not know the salary range at the time I was made an intermediate BSA, no. | Full response to the question asked. |
| 196 | 22 | E band | U band | To correct a transcription error. |
| 199 | 14 | Intermediate 1 | BSA 1 | To correct a transcription error |
| 199 | 24 | initial | Initial phone screen | Full responses to question asked |
| 201 | 15 | And we discussed advanced -- | And discussed the questions we wanted to ask in advance | Full responses to question asked |
| 202 | 18 | If they are not promoted at the same | If they are not promoted at the same rate | To correct a transcription error |
| 220 | 22 | Justin reached out to all of the Cs | Justin reached out to all of the SMEs | To correct a transcription error. |
| 229 | 14 | I went on the coast with | I did Hood to Coast with | To correct a transcription error |
| 230 | 14-15 | I viewed everything up to that point as consensual. | I viewed everything during that period as consensual. | Fully response to the question asked |
| 244 | 22 | Carsecken | Carspecken | To correct a transcription error |
| 254 | 12-13 | Justin Larsen told Juanita Danielson, "You talk to me about her issues with ▮▮▮▮" | Justin Larsen told Juanita Danielson that she should talk to me about her issues with ▮▮▮▮ | To correct a transcription error |
| 257-258 | 25-1 | Against because she was let go and severance. They offered her | Against because she was let go and I suspect was severance. I believe they | Full response to the question asked. |

794333.6

Davis Decl. Exhibit 52, Page 14 of 15

DocuSign Envelope ID: 198EE0C4-732B-4858-85EF-ACE9108527EE

|  |  | severance, and they let her go. | offered her severance, and they let her go. |  |
|---|---|---|---|---|
| 276 | 24 | And I said "Wow, that's – okay." | And I said "Wow, that's shocking, okay." | Full response to the question asked |
| 277 | 2 | OTE | OTP | To correct a transcription error |
| 300 | 10-11 | an intermediate | a junior BSA | To conform to facts |

     Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on <u>1/13/2021</u> in <u>Beaverton, OR</u>.

DocuSigned by:

_[signature]_

9B865B84ECAA43A...

Sara Johnston

794333.6

Davis Decl. Exhibit 52, Page 15 of 15

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF OREGON
 3                   PORTLAND DIVISION
 4    _____
                                   )
 5    KELLY CAHILL, SARA JOHNSTON,  )
      LINDSAY ELIZABETH, and HEATHER)
 6    HENDER, individually and on   )
      behalf of others similarly    )
 7    situated,                     )
                                    )
 8              Plaintiffs,         )
                                    )
 9    vs.                           ) No. 3:18-CV-01477-JR
                                    )
10    NIKE, INC., an Oregon         )
      Corporation,                  )
11                                  )
              Defendant.            )
12    _____)
13
14
15      VIDEOTAPED DEPOSITION OF CINDY LEA LINEBAUGH
16                  Beaverton, Oregon
17              Monday, December 21, 2020
18                      Volume I
19
20
21    Reported by:
      CATHERINE A. RYAN, RMR, CRR
22    CSR No. 8239
23    Job No. 4347608
24
25    PAGES 1 - 309
```

                                                    Page 1

Davis Decl. Exhibit 53, Page 1 of 6

```
 1        Q    Okay.  Okay.  So you said that you joined        10:49:38

 2   Nike in about May or June 2011, correct?

 3        A    I believe it was June of 2011.

 4        Q    Approximately when did you first start

 5   talking to Nike about joining the company?            10:49:56

 6        A    I don't recall when the job was posted.

 7        Q    Oh, so there was a job posting that you

 8   applied for?

 9        A    That's correct.

10        Q    Do you recall where you saw the job           10:50:14

11   posting?

12        A    I don't recall.  It may have been on the

13   Nike job site.

14        Q    Do you recall any other ways that you

15   learned about the job opening?                        10:50:38

16        A    I don't recall.

17        Q    Okay.  So you applied for the position.

18             Then what happened?  Did you interview?

19        A    I applied for the position, and then I

20   interviewed.                                          10:51:02

21        Q    Do you recall who you interviewed with?

22        A    I recall Rich Batchellor, Jay Riverman.  I

23   believe Cheryl Hunter was there, but I'm not

24   positive, and there was a fourth person, but I don't

25   recall who it was.                                    10:51:32
```

Page 66

Davis Decl. Exhibit 53, Page 2 of 6

| | | |
|---|---|---|
| 1 | Q    So did you meet with these individuals all | 10:51:38 |
| 2 | at the same time? | |
| 3 | A    Yes, I met them all at the same time. | |
| 4 | Q    And maybe I should back up for one | |
| 5 | question. | 10:51:50 |
| 6 | What was, if you recall, the position that | |
| 7 | you applied for? | |
| 8 | A    There were three positions open, two at | |
| 9 | a -- at a manager level and one at a specialist | |
| 10 | level.  So two were for a project manager.  One was | 10:52:07 |
| 11 | for a specialist.  I applied for the project | |
| 12 | manager, requesting the NFL account. | |
| 13 | Q    And was project manager the role that you | |
| 14 | were offered? | |
| 15 | A    Yes, I was offered the NFL project manager | 10:52:42 |
| 16 | role. | |
| 17 | Q    So besides your interview with | |
| 18 | Rich Batchellor, Jay Riverman, Cheryl Hunter, and a | |
| 19 | fourth person, did you interview with anyone else at | |
| 20 | Nike? | 10:53:13 |
| 21 | A    No, I did not. | |
| 22 | Q    During that interview with | |
| 23 | Rich Batchellor, Jay Riverman, Cheryl Hunter, and | |
| 24 | the fourth person, do you recall discussing | |
| 25 | compensation at all? | 10:53:27 |

Page 67

Davis Decl. Exhibit 53, Page 3 of 6

```
 1    notice to RTC.                                        10:57:06

 2    BY MS. ZABELE:

 3         Q    Did you accept the offer right away?

 4         A    There was no offer letter.  There was

 5    just -- he said I had been given -- given the         10:57:19

 6    position.

 7         Q    And you accepted in that same

 8    conversation?

 9         A    I said:  Yes, I did.

10         Q    And were you excited about the              10:57:36

11    opportunity?

12         A    I was very excited to work for the NFL --

13    work with the NFL.

14         Q    And when Mr. Batchellor called you in and

15    said that you had gotten the job, did you discuss     10:57:52

16    compensation with him at all at that time?

17         A    No, we did not.

18         Q    Do you recall what your starting salary

19    was at Nike when you joined in June 2011?

20         A    I believe it was in the high 60s.           10:58:15

21         Q    So if Nike's data shows that it was

22    $69,000 a year, does that sound accurate to you?

23         A    That sounds accurate to me.

24         Q    Do you recall if you tried to negotiate

25    compensation at all with Mr. Batchellor?              10:58:41
```

Page 70

Davis Decl. Exhibit 53, Page 4 of 6

1        I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4        That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing is a true

11   record of the testimony given.

12       Further, that if the foregoing pertains to the

13   original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ X ] was [   ] was not requested.

16           I further certify that I am neither

17   financially interested in the action nor a relative

18   or employee of any attorney or any party to this

19   action.

20       IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated: 01/07/2021

23                        *Catherine A. Ryan*

24                        Catherine A. Ryan, RMR, CRR

25                        CSR No. 8239

                                        Page 309

Davis Decl. Exhibit 53, Page 5 of 6

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: December 21, 2020

Deponent: Cindy Linebaugh

| Page | Line(s) | Reads | Should Read | Reason |
|------|---------|-------|-------------|--------|
| 219 | 5 | I don't believe it wasn't | I don't have any reason to believe it wasn't | To clarify testimony |

      Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on <u>2/3/2021 | 5:05 PM PST</u> in <u>Beaverton, or</u>.

DocuSigned by:

*Cindy Linebaugh*

Cindy Linebaugh

```
 1                UNITED STATES DISTRICT COURT
 2                    DISTRICT OF OREGON
 3                     PORTLAND DIVISION
 4      _____
                                       )
 5      KELLY CAHILL, SARA JOHNSTON,   )
        LINDSAY ELIZABETH, and HEATHER )
 6      HENDER, individually and on    )
        behalf of others similarly     )
 7      situated,                      )
                                       )
 8              Plaintiffs,            )
                                       )
 9      vs.                            ) No. 3:18-CV-01477-JR
                                       )
10      NIKE, INC., an Oregon          )
        Corporation,                   )
11                                     )
                Defendant.             )
12      _____)
13
14
15           VIDEOTAPED REMOTE DEPOSITION OF
16            KATHLEEN K. LUNDQUIST, Ph.D.
17              Cape May, New Jersey
18           Friday, September 10, 2021
19                    Volume I
20
21      Reported by:
        CATHERINE A. RYAN, RMR, CRR
22      CSR No. 8239
23      Job No. 4778015
24
25      PAGES 1 - 294
```

                                                    Page 1

Davis Decl. Exhibit 54, Page 1 of 14

```
 1        eliminating the collection of candidate salary
   19:08:58
 2        history and also the admission that she goes on to
 3        say about, "We don't want to carry over poor
 4        practices from a prior company" that would
 5        disadvantage people.
   19:09:12
 6              So that and this -- the training documents
 7        that are talked about on the bottom of page 32, both
 8        are -- not just Dr. Neumark's analyses, but
 9        admissions from Nike that prior pay was perpetuating
10        poor pay practices from prior employers and can lead
   19:09:33
11        to undesirable long-term consequences.
12           Q    And do you know whether Nike conducted any
13        analysis to determine whether collecting candidate
14        salary history, in fact, did disadvantage women?
15           A    If they did, I assume it would be part of
   19:10:00
16        the privilege materials that Nike is not turning
17        over.  All I know is that these admissions by the
18        chief human resources officers to all the employees
19        and various training documents indicate that there
20        was a concern about that and a belief that that was
   19:10:18
21        perpetuating bias.
22           Q    You agree that if a company -- companies
23        are allowed to change their practices over time,
24        correct?
25           A    Companies do.
   19:10:33

                                              Page 208
```

Davis Decl. Exhibit 54, Page 2 of 14

1           Q      Right.
    19:10:36
2                  And changing a practice does not
3       necessarily mean that a prior practice was unlawful,
4       correct?
5           A      Correct.
    19:10:42
6           Q      Okay.  And if -- well, strike that.
7                  Okay.  Did you review any other documents
8       during the break?
9           A      No.
10          Q      On page 34, you state -- I'll let you get
    19:11:26
11      to page 34.
12          A      Okay.
13          Q      The middle of the page, the first
14      paragraph, quote:  "As with merit increases, a
15      reward based on a percentage of the employee's base
    19:11:39
16      pay will continue to exacerbate existing gender
17      differences in pay."
18                 Do you see that?
19          A      I do.
20          Q      And is that sentence related to the --
    19:11:54
21      Nike's PSP bonus calculation?
22          A      Yes.
23          Q      Did you do any analysis of Nike's PSP
24      bonus payments to determine whether, in fact, there
25      was a gender difference in pay?
    19:12:10

                                        Page  209

Davis Decl. Exhibit 54, Page 3 of 14

1    remove bias.  And I cannot find the exact location
21:09:19
2    in the report, but if you'd like me to find that, I
3    will take my time to find it.
4    BY MS. DAVIS:
5         Q    No, it's okay.  I think you've talked
21:09:30
6    about it a number of times today, so I don't think
7    that's really necessary.
8              And so I guess I've -- you've told me --
9    you've told me your scientific process for forming
10   your expert opinion about the role of HR at Nike,
21:09:42
11   correct?
12        A    I've told you my -- my expert basis for
13   the conclusions that I'm reaching about HR and its
14   effectiveness.
15        Q    Okay.  And you've told me all of the
21:09:55
16   methodologies that you used to reach that
17   conclusion, correct?
18        A    I've told you that I've relied on my
19   expertise and my experience and the representations
20   made by Nike in its own documents.
21:10:08
21        Q    Mm-hmm.  Right.  Okay.  We -- we don't
22   need to debate that.
23              Would you agree that even if an
24   organization has accepted HR practices, it could
25   still get internal complaints about discrimination
21:10:23

Page 273

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 54, Page 4 of 14

```
 1        or harassment?
          21:10:26
 2                    MR. GOLDSTEIN:  Object- --
 3                    THE WITNESS:  Yes.
```

```
 4                    MR. GOLDSTEIN:  Go ahead.
 5        BY MS. DAVIS:
          21:10:32
 6            Q    And some of those complaints might be
 7        unfounded, correct?
 8            A    Well, that's why investigations are
 9        conducted, to determine whether the allegation is
10        true or not.
          21:10:42
11            Q    Right.
12            A    We don't have the results of those
13        investigations in this case.
14            Q    Right.
15                 And some of the complaints might be
          21:10:49
16        founded, correct?
17            A    I believe that that's what Ms. Daugherty
18        said, that some of the complaints were founded, but
19        we did not get a complete breakdown of what the
20        bases -- what the evaluations were that were done as
          21:11:04
21        part of the investigations.
22            Q    And you agree that even if an organization
23        has a outstanding HR team and outstanding HR
24        practices, that, occasionally, there may be
25        complaints that are founded even under the best of
          21:11:28
```

Page 274

```
 1        circumstances?
        21:11:33
 2                MR. GOLDSTEIN:  Objection.  Assumes facts
 3        not in evidence.  Incomplete hypothetical and
 4        speculative.
 5        BY MS. DAVIS:
        21:11:45
 6            Q    Go ahead.
 7            A    You're -- you're saying could it be
 8        possible that there would be allegations that were
 9        found to be true even if you had a good HR
10        department?
        21:12:02
11            Q    Correct.
12            A    Could you have a rogue manager?  Possibly.
13        Would you have the level of complaints that went to
14        the alert line and that came through the Starfish
15        survey?  That, in my experience, is atypical; so
        21:12:17
16        that it is the scope of the concerns that would
17        trouble me.  And I think it would also be important
18        to understand what actions were taken and why they
19        were taken, why senior leaders left the
20        organization -- apparently asked to leave the
        21:12:37
21        organization and on what basis.
22            Q    Okay.  Yeah, let's talk about the Starfish
23        survey.
24                Did you conduct an analysis of the
25        Starfish survey?
        21:12:52


                                              Page  275
```

```
1          A    I looked at the information that was
     21:12:53
2     presented in the Starfish survey allegations.  I
3     reviewed them.
4          Q    Did you do any analysis of the information
5     presented in the Starfish surveys?
     21:13:04
6          A    I just reviewed them.  I'm not sure --
7          Q    Okay.
8          A    -- what analysis would be possible without
9     knowing the results of the investigation, which I
10    believe have not been shared with counsel.
     21:13:17
11         Q    And do you know who created the Starfish
12    survey?
13         A    I believe it was a female employee of
14    Nike.
15         Q    Was the Starfish survey developed using
     21:13:32
16    professional guidelines?
17         A    Are you asking me if there is a
18    representative sample that was used?  It's my
19    understanding that the Starfish survey was -- was
20    asking individuals to do self-reports of their
     21:13:51
21    experience and their concerns about discrimination
22    and harassment.
23         Q    Do you know who it was sent to?
24         A    I -- I don't know the specific list of who
25    it was sent to, but I believe it was completed by
     21:14:11
```

Page 276

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 54, Page 7 of 14

```
 1        females in the organization.
   21:14:13
 2            Q    Do you know whether it was only completed
 3        by females or whether men also responded?
 4            A    I don't recall.
 5            Q    Some of the responses are anonymous,
   21:14:22
 6        correct?
 7            A    That is correct.
 8            Q    Okay.  Do you know how large the sample
 9        size was for the survey?
10            A    I don't think this was a sample-type
   21:14:35
11        survey.  I believe that this was asking for
12        self-reports of harassment.  It's not in the same
13        way that one would do, say, the sampling that we did
14        in the Oracle report.
15            Q    And do you know how the recipients of the
   21:14:49
16        survey were selected?
17            A    I do not.
18            Q    Do you know who selected the recipients of
19        the survey?
20            A    I do not.  I only know that there was a
   21:15:00
21        volume of responses about harassment and
22        discrimination, which were deemed by the CEO to be
23        inconsistent -- let me find his exact language.  So
24        obviously I found the -- the individual complaints
25        that I talked about in my report to be disturbing,
   21:15:43
```

Page 277

Davis Decl. Exhibit 54, Page 8 of 14

1       and I believe Mr. Parker, which I -- I think I
21:15:48
2       already testified to, indicated that there was a
3       concern that they had become aware of reports of
4       behaviors covering -- "... occurring within our
5       organization that do not reflect our core values of
21:16:03
6       inclusivity, respect, and empowerment" and that
7       there would be a deep dive, a comprehensive review
8       of the HR systems and that in -- in that communique
9       or another that HR has not been serving the
10      organization well.
21:16:23
11          Q    Did Mr. Parker's response seem appropriate
12      to you?
13          A    I don't have the full context of
14      everything that was going on and the results of the
15      investigations, but, yes, I think it's appropriate,
21:16:39
16      if a very large number of women are expressing
17      concerns -- and that I believe it wasn't simply the
18      Starfish survey but also the Alertline that had a
19      number of human resources issues -- that it would be
20      appropriate to take some sort of action.
21:16:57
21          Q    Do you know how many -- how many women
22      responded to the Starfish survey?
23          A    I don't.  I -- I think it's someplace in
24      the neighborhood of 30 or so, but I don't have the
25      exact number.
21:17:09

                                            Page  278

Davis Decl. Exhibit 54, Page 9 of 14

1          Q    Okay.  Out of how many possible women?
21:17:10
2          A    Well, I already told you I don't know all
3     the women to whom it was sent, so I don't know out
4     of how many possible women.
5          Q    Okay.  Do you know if the Starfish --
21:17:27
6          A    It can only be the women to whom it was
7     sent.
8          Q    Okay.  And were any of the Starfish
9     surveys completed by former employees?
10         A    I don't know that.
21:17:41
11         Q    Okay.  You -- you said that --
12         A    I --
13         Q    -- the allegations --
14         A    Excuse me.  Okay.  I do know that some of
15     the people indicated, who responded to the Starfish
21:17:50
16     survey, that they were concerned about losing their
17     jobs if they brought their complaints forward.  So
18     it's possible that some of them were former
19     employees.
20         Q    Okay.  Did you do any kind of analysis to
21:18:03
21     determine whether the 30 responses were normal,
22     abnormal for the size of Nike's workforce?
23         A    This wasn't a representative survey sent
24     to all of the women at Nike, as far as I understand
25     it.  It is a group that reflects serious concerns.
21:18:29

                                        Page 279

1    I believe they were generally higher-level women who
21:18:35

2    responded, as I recall from what I read, and they

3    were consistent with what was occurring in the

4    Alertline before that period of time and then

5    ultimately were followed by the departure from the
21:18:47

6    company of several senior-level executives who were

7    called an insular group who had engaged in bad

8    behavior.

9        Q    Where is the -- what evidence supports

10   your statement that it was mostly higher-level
21:19:07

11   women?

12       A    I believe in the -- the various responses

13   to the survey that I can recall offhand, people

14   talked about different levels of the organization,

15   their contact with different levels of the
21:19:27

16   organization over a period of time at different

17   levels, so that is my conclusion.

18       Q    Did you do an analysis of the levels of

19   the people who participated in the Starfish survey?

20       A    I did not.  I don't believe that was one
21:19:43

21   of the questions on the survey.

22       Q    Okay.  What is the scientific standard for

23   a complaint being disturbing?

24       A    Is there a context for that or just, in

25   general, if I would be disturbed by something or --
21:20:04

Page 280

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 54, Page 11 of 14

1    I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4    That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were administered an oath; that

8  a record of the proceedings was made by me using

9  machine shorthand which was thereafter transcribed

10  under my direction; that the foregoing is a true

11  record of the testimony given.

12    Further, that if the foregoing pertains to the

13  original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript [  ] was [ X ] was not requested.

16    I further certify that I am neither

17  financially interested in the action nor a relative

18  or employee of any attorney or any party to this

19  action.

20    IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22                                  ed: September 13, 2021

23  *Catherine A. Ryan*

Catherine A. Ryan, RMR, CRR

24  CSR No. 8239

25

                                        Page 291

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 54, Page 12 of 14

```
 1    RE: CAHILL VS. NIKE, INC.
 2    SEPTEMBER 10, 2021, KATHLEEN K. LUNDQUIST, PH.D.,
      JOB NO. 4778015
 3                  E R R A T A   S H E E T
 4    PAGE__20__ LINE__8__ CHANGE "getting" to "when
 5    _____we were getting"
 6    REASON_____
 7    PAGE__32__ LINE__16__ CHANGE "my" to "many"
 8    _____
 9    REASON_____
10    PAGE__80__ LINE__9__ CHANGE "codes" to "roles"
11    _____
12    REASON_____
13    PAGE__94__ LINE__14__ CHANGE "authored" to "offered"
14    _____
15    REASON_____
16    PAGE_148_ LINE_23_ CHANGE "family" to "job"
17    _____
18    REASON_____
19    PAGE_182_ LINE_24_ CHANGE "the two" to "to"
20    _____
21    REASON_____
22
23    Kathleen K Lundquist            9/21/21
24    WITNESS                         Date
25
                                      Page 294
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 54, Page 13 of 14

```
1    RE: CAHILL VS. NIKE, INC.

2    SEPTEMBER 10, 2021, KATHLEEN K. LUNDQUIST, PH.D.,
     JOB NO. 4778015

3              E R R A T A   S H E E T
4    PAGE _218_ LINE __3__ CHANGE _"implecation" to_
5    _____ "indication"_____
6    REASON_____
7    PAGE _282_ LINE __5__ CHANGE _"receives" to "reaches"_
8    _____
9    REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _Kathleen K Lundquist_____    _9/21/21_____
24   WITNESS                           Date
25
                                       Page 294
```

Davis Decl. Exhibit 54, Page 14 of 14

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,   No.

        Plaintiffs,              3:18-cv-01477-JR

     v.

NIKE INC., an Oregon

Corporation,

        Defendant.

REMOTE VIDEOCONFERENCE DEPOSITION OF

MONIQUE MATHESON

Taken in behalf of Plaintiffs

February 22, 2021

Matheson, Monique                                    February 22, 2021

Page 72

1    Q.    What is Project Starfish?

2    A.    I'm not sure who gave the project the name

3          "Starfish."

4    Q.    Do you know what "Project Starfish" refers to?

5    A.    I don't.

6    Q.    Now, the survey -- Do you recall a survey that

7          was presented to Nike in the winter of 2018?

8    A.    I do recall that employees created or filled out

9          a survey and it was shared with Nike sometime in

10         the spring of 2018.

11   Q.    Have you heard that survey referred to as

12         project -- as the Starfish survey?

13   A.    I believe some people refer to it as "Starfish."

14   Q.    Do you recall that it was referred to as

15         "Starfish" because it was the subject line of

16         e-mails relating to that survey?

17   A.    I don't have -- I don't know.

18   Q.    Do you know why it was referred to as the

19         Starfish survey?

20             MR. PRINCE:  Speculation, asked and

21         answered.

22             THE WITNESS:  I don't know why it was

23         referred to as the Starfish survey.

24   Q.    BY MR. BARRY GOLDSTEIN:  Now, on Exhibit 581

25         ███████████ was listed as a person of interest.

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Davis Decl. Exhibit 55, Page 2 of 9

Matheson, Monique                                    February 22, 2021

Page 86

1    Q.    Have you looked in your notebooks to see if you
2          took any notes with respect to your conversation
3          that you had with vice president ████████
4          regarding the complaint that she filed with the
5          Starfish survey?
6    A.    Is there a specific time period that you're
7          asking that question?
8    Q.    Since you took those notes.
9    A.    I have not had occasion to review the notes
10         since I took them.
11   Q.    Has anybody asked you to look for notes that you
12         took with respect to conversations that you had
13         with persons who filed complaints in the
14         Starfish survey or complaints around the time of
15         the Starfish survey?
16   A.    I'm sorry.  I thought I, I thought I had
17         responded to this question earlier.  The entire
18         set of surveys was shared with our third-party
19         counsel who led the investigation and followup
20         for all of those concerns and concerns that were
21         raised around that time period.  So they would
22         have asked to see my notes regarding the general
23         concerns initially shared when the investigation
24         was taken over by our third party in partnership
25         with our employee relations group.  So my notes

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 55, Page 3 of 9

Matheson, Monique                                          February 22, 2021

Page 93

1           Nike?

2    A.     She was.

3    Q.     Do you recall whether Heather made complaints
4           about sex discrimination when you met with her?

5    A.     I don't recall the specifics of her allegations.

6    Q.     How did Nike learn about the Starfish survey?

7    A.     Generally I heard that there was a survey.  I
8           didn't, I didn't know who had created it or who
9           had it or who was filling it out.  Sometime
10          after that a hard copy of surveys was provided
11          and that's how, that's how I learned about the
12          surveys.

13   Q.     You say a hard copy of the surveys was provided.
14          Who provided the hard copy?

15   A.     I can't recall the name of the individual who
16          provided the hard copy of the surveys, but the
17          hard copies were provided to me and Hilary.

18   Q.     Were you and Ms. Krane together when the hard
19          copy was provided?

20   A.     I believe we were.

21   Q.     How did that come about that the two of you were
22          together and a hard copy of the survey was
23          provided?

24   A.     I'm sorry.  Would you repeat that question?

25          MR. BARRY GOLDSTEIN:  Aleshia.

Beovich Walter & Friend
1-800-541-4452            503-228-7201            www.bwfreporters.com

Davis Decl. Exhibit 55, Page 4 of 9

Matheson, Monique                              February 22, 2021

Page 97

1        time, Daniel.  I understand the objection.
2             MR. PRINCE:  I understand.  I was objecting
3        on the basis that there are a few ideas in that
4        paragraph.
5             MR. BARRY GOLDSTEIN:  You're correct.
6             THE WITNESS:  It is correct that in
7        mid-February Hilary and I became aware ~~if~~ of
8        concerns from employees and we began a
9        fact-finding process.  I don't recall when Mark
10        received a packet of the employee surveys.
11   Q.   BY MR. BARRY GOLDSTEIN:  Did Mark, excuse me,
12        Mr. Parker, the CEO, did he receive a packet of
13        the completed surveys?
14   A.   I believe he did receive a packet of the
15        surveys.  I don't recall when or who provided
16        the packet to him.
17   Q.   So I take it you didn't provide the packet to
18        him?
19   A.   I don't recall.
20   Q.   Do you recall if Hilary Krane provided the
21        packet?
22   A.   I don't recall.
23   Q.   What was the fact finding that was begun when
24        you and Ms. Krane became aware of the concerns
25        in mid-February?

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 55, Page 5 of 9

Matheson, Monique                                    February 22, 2021

Page 98

1    A.    When employees came forward with concerns,
2          Hilary and I, we made ourselves available to the
3          employees so that we could hear firsthand their
4          concerns.  These conversations are the fact
5          finding that Hilary and I conducted.  As I've
6          earlier noted, our third party, Seyfarth, led a
7          full investigation process as a supplement to
8          any of the work that Hilary and I did.
9    Q.    When was Seyfarth retained by Nike to
10         investigate the concerns of employees who
11         express those concerns in mid-February 2018?
12   A.    I don't recall the date that Seyfarth was
13         brought on.
14   Q.    Do you recall the month?
15   A.    I don't recall the month.
16   Q.    Do you recall if it was before or after
17         Mr. Parker was provided a packet of the surveys?
18   A.    I don't recall.  I don't recall.
19             MR. PRINCE:  Barry, it's just about 1:00.  I
20         don't want to interrupt your flow here, but it
21         may be time for a lunch break at some point in
22         the near future.
23             MR. BARRY GOLDSTEIN:  Absolutely.
24   Q.    BY MR. BARRY GOLDSTEIN:  Do you know when Katy
25         Tisch left employment at Nike?

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 55, Page 6 of 9

Matheson, Monique                              February 22, 2021

Page 122

1          MR. PRINCE:  Speculation.

2          THE WITNESS:  I'm not sure what Mark was

3     referring to or why those words are underlined.

4   Q.  BY MR. BARRY GOLDSTEIN:  Do you know if -- Do

5     you know Danny Tawiah, T A W I A H?  And I may

6     have mispronounced his name.  Do you know

7     Mr. Tawiah?

8   A.  I know Danny Tawiah was a Nike --

9   Q.  Tawiah.

10  A.  Yeah.  I know he was a Nike employee.

11  Q.  Was Mr. Tawiah a vice president at Nike?

12  A.  He was a vice president at Nike.

13  Q.  Do you know if he exited Nike in the spring of

14     2018?

15  A.  I believe Mr. Tawiah left the company in the

16     spring of 2018.

17  Q.  Do you know a Ms. Lauren Anderson, who is an

18     opt-in plaintiff in this case?

19  A.  I am not familiar with -- Lauren Anderson?

20  Q.  Yes.

21  A.  I am not familiar with her.

22  Q.  Do you know if she filed a complaint in 2018

23     with respect to Mr. Tawiah?

24  A.  I don't recall whether she filed a complaint

25     involving Mr. Tawiah.

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 55, Page 7 of 9

Matheson, Monique                                    February 22, 2021

Page 214

1                 C E R T I F I C A T E

2

3           I, Aleshia K. Macom, Oregon CSR No. 94-0296,

4    Washington CCR No. 2095, California CSR

5    No. 7955, RMR, CRR, RPR, do hereby certify that

6    MONIQUE MATHESON appeared before me remotely at

7    the time and place mentioned in the caption

8    herein; that the witness was by me first duly

9    sworn on oath, and examined upon oral

10   interrogatories propounded by counsel; that said

11   examination, together with the testimony of said

12   witness, was taken down by me in stenotype and

13   thereafter reduced to typewriting; and that the

14   foregoing transcript, pages 1 to 213, both

15   inclusive, constitutes a full, true and accurate

16   record of said examination of and testimony

17   given by said witness, and of all other

18   proceedings had during the taking of said

19   deposition, and of the whole thereof, to the

20   best of my ability.

21          Witness my hand at Portland, Oregon, this

22   3rd day of March, 2021.

23                   _____

24                   Aleshia K. Macom
                     OR CSR No. 94-0296, Expires 9-30-2023
25                   WA CCR No. 2095, Expires 7-7-2021

Beovich Walter & Friend
1-800-541-4452            503-228-7201            www.bwfreporters.com

Davis Decl. Exhibit 55, Page 8 of 9

*Cahill, et al v. Nike*

**Monique Matheson Deposition Errata**

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 42:3 | "employee" | "email" | To correct a transcription error |
| 44:20 | "agreement" | "team/organization" | To correct a transcription error |
| 97:7 | "Hilary and I became aware if" | "Hilary and I became aware of" | To correct a transcription error |
| 109:7 | "revered" | "referred to" | To correct a transcription error |
| 151:14 | "advice" | "request" | To correct a transcription error |
| 172:25 | "in the email" | "in the fifth full paragraph of page 3 of Exhibit 512" | To clarify an ambiguity in the question asked |
| 181:4 | "value" | "values" | To correct a transcription error |
| 182:24 | "We did not conduct this analysis" | "We did not complete this analysis" | To conform to the facts, consistent with other testimony |
| 189:16 | "levels" | "levers" | To correct a transcription error |

I attest that the above-referenced changes are true and correct.

Date: _____    Apr 19, 2021

_____
Monique Matheson

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,

        Plaintiffs,

   v.                    No. 3:18-cv-01477-JR

NIKE INC., an Oregon

corporation,

        Defendant.



DEPOSITION OF JULIAN MILLER

PURSUANT TO FRCP 30(B)(6)

THURSDAY, JUNE 3, 2021




Reported by:   Marilynn Hoover, RPR

               Oregon CSR No. 04-0387

Miller, Julian                                          June 3, 2021

Page 68

1        Q.   Okay.  Is it -- Is it possible for a
2   recruiter, once they are aware of a candidate who
3   applies for, say, job A, and they have job B that's
4   similar, that they could look at that candidate's
5   profile and say, "I think you might be a good fit
6   for job B," and extend them an invitation to apply
7   for that other open position?
8        A.   It's possible.  That would be up to the
9   individual recruiter for that requisition.
10       Q.   On the slide ending in 2160, there's a box
11  that says "job submission" in the middle.
12            Do you see that?
13       A.   Yes.
14       Q.   Okay.  And this is -- it says:
15  "Information submitted by the candidate for the
16  specific position includes answers to screening
17  questions."
18            Is that right?
19       A.   Yes.
20       Q.   Okay.  And so that's basically describing
21  when a candidate -- they specifically fill out a job
22  application for a specific open requisition
23  position?
24       A.   Yes.
25       Q.   Okay.  Right below that is a box that says

Beovich Walter & Friend
1-800-541-4452                503-228-7201                www.bwfreporters.com

Davis Decl. Exhibit 56, Page 2 of 8

Miller, Julian                                          June 3, 2021

Page 69

 1    "passive candidate correspondence."

 2            Do you see that?

 3    A.    Yes.

 4    Q.    Okay.  And it says:  "Recruiters can

 5    invite candidates to apply to the specific

 6    requisition."

 7            Is that true?

 8    A.    Yes.

 9    Q.    Okay.  And what guidelines, if any, are

10    given to recruiters about when it's appropriate to

11    invite candidates to apply for specific

12    requisitions?

13    A.    That's up to the discretion of the

14    individual recruiter for that requisition.

15            THE REPORTER:  I didn't catch your

16    objection, counsel.

17            MS. DAVIS:  Sorry, I was muted.

18            My objection was just that it's outside

19    the scope of the deposition topic.

20    Q.    BY MR. KAN:  Are there -- Are there any

21    parameters within Taleo that limit or cabin what

22    types of invites recruiters can send to candidates

23    to encourage them to apply for a specific

24    requisition?

25    A.    No.

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 56, Page 3 of 8

Miller, Julian                                June 3, 2021

Page 100

1    recruiter from matching a candidate to a different
2    requisition based on, you know, preset limits or
3    parameters.
4           Is that right?
5       A.    That's correct.
6       Q.    Okay.  Now, when it comes to the
7    guidelines that Nike provides recruiters about when
8    they should match a candidate to a different open
9    job, what are those guidelines?
10      A.    The guidelines are very specific.  It has
11   to be a job that meets the same band level.  Right?
12   It's the same seniority, the same job code.  We're
13   recruiting within those roles within a similar time
14   frame, so it's still a valid application.  And the
15   screening criteria, as we mentioned, those
16   pre-screening questions are the same amongst those
17   requisitions.  Those are -- Those are the guidelines
18   that we educate them on.  Right?  So we can show in
19   the system that -- that those roles use the same
20   criteria, that recruiters screen candidates based on
21   the same criteria based on -- across multiple
22   requisitions.
23      Q.    Okay.  Are there any other guidelines that
24   Nike provides?
25      A.    No, not to my knowledge.

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 56, Page 4 of 8

Miller, Julian                                                   June 3, 2021

Page 170

```
 1   STATE OF OREGON         )
                             )  SS.
 2   COUNTY OF MULTNOMAH     )
 3        I, MARILYNN HOOVER, CSR No. 04-0387 for the
 4   State of Oregon, do hereby certify:
 5        That prior to being examined, the witness named
 6   in the foregoing deposition was duly sworn to
 7   testify the truth, the whole truth, and nothing but
 8   the truth;
 9        That said deposition was taken down by me in
10   shorthand at the time and place therein named, and
11   thereafter reduced by me to typewritten form; and
12   that the same is a true, correct, and complete
13   transcript of the said proceedings.
14        Before completion of the deposition, review of
15   the transcript [ ] was [X] was not requested.  If
16   requested, any changes made by the deponent (and
17   provided to the reporter) during the period allowed
18   shall be appended hereto.
19        I further certify that I am not interested in
20   the outcome of the action.
21        Witness my hand this 7th day of June 2021.
22
23   _____
24                    Marilynn Hoover, RPR
25                    CSR No. 04-0387; Exp. 03/31/2023
```

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 56, Page 5 of 8

*Cahill, et al v. Nike*

**Julian Miller Deposition Errata**

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 42:10 | "Correct.  Everything done through Taleo is through an open requisition, so it needs to be an open job that is being hired against.  It is not a sourcing tool for identifying talent that would be interested in working at Nike." | "Correct, Nike does not use Taleo to proactively identify potential candidates.  Everything done through Taleo is through an open requisition, so it needs to be an open job that is being hired against.  It is not a sourcing tool for identifying talent that would be interested in working at Nike." | To clarify an answer, consistent with other testimony |
| 89:5 | "the recruiter's discrepancy." | "the recruiter's discretion." | To correct an incorrect word choice |
| 111:5 | "recruiter, right, based on their discrepancy." | "recruiter, right, based on their discretion." | To correct an incorrect word choice |
| 112:22 | "I'm not." | "I don't." | To correct a transcription error |
| 113:17-18 | "No, not beyond those two data points that you mentioned." | "No, not beyond those two data points that you mentioned, but recruiters are instructed to only match applicants to identical job openings being recruited for at the same time." | To clarify an answer, consistent with other testimony |
| 115:9 | "we've done – esthetic updates," | "we've done – aesthetic updates," | To correct a transcription error |
| 121:2-3 | "Yes, Taleo records offer information." | "Taleo records offer information." | To clarify an answer to a confusing and compound question |
| 131:12-15 | "Those would be the questions itself.  So O and P are the number of questions that are asked as part of the application, and R would be the questions themselves, to my understanding." | "'Qualifications' as reflected in Column R is a subset of the job description information." | To clarify an answer, consistent testimony later corrected at 168:8-24 |
| 135:13-14 | "Ah, yeah, I've seen recruiters use them interchangeably." | "Beaverton and Portland often are used interchangeably, but there are retail stores in Portland that are not WHQ positions.  There is also an employee store in | To clarify an answer |

1

| | | Beaverton and Air MI also is in Beaverton." | |
|---|---|---|---|
| 158:13 | "It doesn't – It would appear that way." | "It doesn't – but I understand how it could appear that way." | To clarify an answer, consistent with other testimony |
| 162:15 | "I will research and get back to you." | "The 'system' designation that appears on Ms. Linebaugh's 2011 record occurred in an older version of the Taleo software used by Nike in 2011. In that version of Taleo, any system action that included a change to more than 10 candidate records at one time was considered a batch action. This included matching more than 10 candidates to a requisition. To complete a batch action, the scheduler service in the Taleo software ran a batch task. This operation was tracked as being performed by the 'System,' rather than by the user who actually performed the request, due to the nature of this scheduler service.  In this instance, we believe that the Recruiter manually matched a number of candidates to requisition number 052046, including but not limited to Ms. Linebaugh. Because the action included more than 10 candidate files, it was run through the Taleo scheduler service and therefore was logged as being performed by the 'System' rather than by the user who actually made the request. The decision regarding which candidates to match to the requisition and executing the steps in the system to match candidates to requisition 052046 were all performed manually by the Recruiter. The | To respond fully to the question after additional research |

2

| | | Taleo system did not make any automated decisions." | |
|---|---|---|---|
| 163:21 | "No, not to my knowledge." | "I am not aware of any written policies, but after the deposition, I reviewed Taleo and confirmed that Nike has not used any of the automated systems discussed during the deposition." | To clarify an answer more fully after additional research |

I attest that the above-referenced changes are true and correct.

Date: 7/27/2021

DocuSigned by:

*Julian Miller*

DEAE0A4DEED24F2...    Julian Miller

3

```
 1                UNITED STATES DISTRICT COURT
 2                   DISTRICT OF OREGON
 3                    PORTLAND DIVISION
 4    _____
                                       )
 5    KELLY CAHILL, SARA JOHNSTON,     )
      LINDSAY ELIZABETH, and HEATHER)
 6    HENDER, individually and on      )
      behalf of others similarly       )
 7    situated,                        )
                                       )
 8             Plaintiffs,             )
                                       )
 9    vs.                              ) No. 3:18-CV-01477-JR
                                       )
10    NIKE, INC., an Oregon            )
      Corporation,                     )
11                                     )
               Defendant.              )
12    _____)
13
14
15    VIDEOTAPED REMOTE DEPOSITION OF DAVID NEUMARK, Ph.D.
16                San Francisco, California
17                Tuesday, August 31, 2021
18                       Volume I
19
20
21    Reported by:
      CATHERINE A. RYAN, RMR, CRR
22    CSR No. 8239
23    Job No. 4778006
24
25    PAGES 1 - 299
```

Page 1

Davis Decl. Exhibit 57, Page 1 of 25

```
1    maybe it is.                                      09:41:08
```

2          Q    Okay.  So back to my original question.

3               If you -- if I asked you to determine --

4    so, again, named Plaintiff Kelly Cahill worked in

5    one job during the class period.  That job was      09:41:24

6    A1046.  You've told me that I cannot look at your

7    report and know whether women in job code A1046 are

8    paid statistically significantly less than men in

9    job code A1046 during the class period, correct?

10              MR. KAN:  Objection.  Asked and answered.  09:41:46

11   Argumentative.

12              THE WITNESS:  You cannot tell for sure

13   because -- because my report does not contain the

14   answer from studying that question for that job code

15   in isolation.                                       09:41:57

16   BY MS. DAVIS:

17         Q    Okay.  And it doesn't contain the results

18   for any job code in isolation, correct?

19         A    Then my -- all of those -- my answer and

20   the previous ones would be the same for any --       09:42:09

21   whichever hypothetical job code you ask me about,

22   not just the specific one you mentioned.

23         Q    Okay.  Right.

24              I could ask you about any job code in the

25   covered positions, and your answer would be the      09:42:22

Page 28

Davis Decl. Exhibit 57, Page 2 of 25

```
 1    same, that your report does not tell me whether       09:42:24

 2    women are paid statistically significantly less than

 3    men within that same job code, correct?

 4        A    The important qualification would be the

 5    more you ask me about it, the more my report does      09:42:38

 6    speak to that directly because obviously my estimate

 7    is representative of job codes and women and men.

 8    But in isolation, correct.
```

```
 9        Q    Correct.  Right.

10             So Sara Johnston, another named plaintiff,    09:42:53

11    worked in job code A0692.

12             I can't find in your report anywhere

13    whether women in job code A0692 were paid

14    statistically significantly less than men in job

15    code A0692, correct?                                   09:43:12

16             MR. KAN:  Objection.  Asked and answered.

17    Lacks foundation.

18             THE WITNESS:  Well, I mean, I'm -- I'll

19    take as -- as true the -- the job you said she

20    worked in.  And, again, my -- you know, the -- as      09:43:27

21    the evidence from an aggregate model is informative,

22    but it does not specifically answer the question of

23    what you would get if you studied that job code in

24    isolation, by which I mean throwing out all of the

25    other data.                                            09:43:42
```

Page 29

Davis Decl. Exhibit 57, Page 3 of 25

```
 1        Q    My question is slightly different.        10:10:26

 2             You didn't analyze the job contents or the

 3    duties of the jobs to know whether you were grouping

 4    employees who actually performed similar work?

 5        A    I didn't -- I did not engage in any         10:10:42

 6    exercise like that.  It's not my expertise.

 7        Q    Okay.  So assuming that I'm correct that

 8    there would be a control for business operations,

 9    lead professionals, that that is a grouping within

10    your data, is there anywhere in your report where I   10:11:04

11    can see whether women in the business operations,

12    lead professional job subfamily level interaction

13    were paid substantially significantly -- sorry --

14    statistically significantly less than men in the

15    business operations, lead professionals grouping?     10:11:27

16        A    So I don't know if this helps shortcut

17    questions or if you care if I shortcut questions or

18    not.  But when I was responding earlier, I think we

19    were throwing around the word "job" or maybe "job

20    code."  I actually don't recall.  I meant that to     10:11:44

21    apply to these unique combinations because -- that

22    are picked up by the interactions.  I view those as

23    essentially the same.  I'm happy to answer --

24        Q    Okay.  So if the -- yeah, I'd like the

25    answer to my question.                                10:11:57

                                              Page 51
```

Davis Decl. Exhibit 57, Page 4 of 25

```
1              Is -- is there anyplace in your report      10:11:58

2     that I can see whether women in the business

3     operations, lead professional grouping that you've

4     created were paid statistically significantly less

5     than men in the business operations, lead            10:12:14

6     professionals grouping during the relevant class

7     period?

8         A    So, again, I estimate an aggregated model.

9     The aggregated model is informative about job codes

10    because the gender gap is identified within job --   10:12:28

11    sorry.  I'm using "job codes."  I'm looking for a

12    shorthand -- is -- is representative of job

13    subfamily, job level interactions because all the

14    gender gap is identified within those unique

15    combinations of job subfamilies and job levels, but  10:12:43

16    there is no analysis of any of those unique pairs in

17    isolation.

18        Q    Okay.  Is there a page I can look at in

19    your report that will tell me whether women in the

20    business operations, lead professionals grouping are 10:12:59

21    paid statistically significantly less than men in

22    the business operations, lead professionals grouping

23    during the relevant class period?

24             MR. KAN:  Objection.  Asked and answered.

25             THE WITNESS:  There are lots of pages that   10:13:14
```

Page 52

Davis Decl. Exhibit 57, Page 5 of 25

```
 1    report those results from the aggregate analysis,        10:13:16

 2    which, as I said, is informative.  There are no

 3    pages or tables -- I guess those are the same --

 4    which study the data for that subfamily level pair

 5    in isolation, i.e., discarding all of the other          10:13:27

 6    data.

 7    BY MS. DAVIS:

 8        Q    And I assume if I grabbed any one of the

 9    other 900 groupings and asked you the same question,

10    you would not be able to point to a page or tell me      10:13:42

11    where in your report I could find a result for that

12    specific job subfamily level grouping; is that

13    correct?

14        A    I would give you the exact same answer,

15    yes.                                                     10:13:55

16        Q    Okay.  Did you run any analysis by job

17    subfamily level interaction?

18          MR. KAN:  Objection.  Vague and ambiguous.

19          THE WITNESS:  Again, my -- my answers

20    previously, I -- I interpreted the same as about         10:14:15

21    this, although I could see where, you know, it

22    wasn't specifically the same.

23          So I did not do separate analyses by
                                    and
24    unique pairs of subfamily^levels.

25    //
```

Page 53

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 57, Page 6 of 25

```
 1    BY MS. DAVIS:                                    10:14:29

 2        Q    Okay.  And just to be clear since you're

 3    telling me now that you assumed my job code question

 4    was this, let me just ask you.

 5            Did you do any analysis by job code?      10:14:36

 6            MR. KAN:  Objection.  Vague and ambiguous.

 7            THE WITNESS:  So do you mean by -- for an

 8    individual job code in isolation?  No --

 9    BY MS. DAVIS:

10        Q    Yes.                                     10:14:52

11        A    -- I did not.  Sorry.

12            No, I did not.

13        Q    Why did you not run any analysis by job

14    subfamily level interaction?

15            MR. KAN:  Objection.  Vague and ambiguous.  10:15:12

16            THE WITNESS:  The -- the answer is the

17    same as before.  The aggregate model is informative

18    for understanding the pattern or practice or the

19    systematic differences and outcomes between men and

20    women, and it's -- and a separate analysis by       10:15:30

21    subfamily level -- excuse me -- would get

22    increasingly uninformative as -- as cells got

23    smaller and/or estimates got very imprecise as a

24    result of doing that.

25    //
```

1    of promotions.  One you call "competitive          16:21:31

2    promotion," and the other you call "noncompetitive

3    promotion," correct?

4        A    Yes.

5        Q    How did you define a promotion in the data   16:21:42

6    for your analysis?

7        A    Moving up a -- one or more job levels,

8    which I believe I cite -- I believe I cited

9    something from deposition testimony that that was --

10   I mean, it makes a lot of sense, but also that was    16:21:57

11   the way.

12       Q    Did you require that there also be a pay

13   increase associated with the job change?

14       A    Not -- no, I did not$\overset{im}{\wedge}$pose that as a

15   criterion.                                            16:22:14

16       Q    Okay.  If you look at all promotions, if

17   you use just the individual controls, does it show

18   that men or women are more likely to be favored in

19   promotions during the time period titled in Table

20   10?                                                   16:22:38

21       A    The estimate is positive, so it favors

22   women, not statistically significant, at the five or

23   10 percent level.

24       Q    And how about when you add job subfamily

25   as a control?  Does it appear that men or women are   16:22:49

                                                          Page 261

Davis Decl. Exhibit 57, Page 8 of 25

1      favored with respect to promotions?                16:22:53

2          A    The evidence is most consistent with

3      women, again, not statistically significant, at the

4      five or 10 percent level.

5          Q    And when you add the interaction of        16:23:06

6      subfamily and job level when you're looking at all

7      promotions, does it appear that women or men are

8      favored?

9          A    Now it flip signs.  So men are favored --

10     again, same -- same -- not statistically            16:23:16

11     significant, at the five or 10 percent level.

12         Q    And if you look at pre-April 2018, does it

13     appear that men or women are favored with respect to

14     promotion?

15         A    Not very -- very similar to column 3        16:23:33

16     because it's almost -- it's almost the same data.

17     There isn't that much data after April 2018.  Women

18     are favored -- sorry.  Men are favored; women

19     disfavored, again, not significant, at the five or

20     10 percent level.                                   16:23:46

21         Q    Okay.  And then how about after April

22     2018?  Does it appear that men or women are favored

23     with respect to promotions during that time period?

24         A    That's about as close to zero as you could

25     get.  .0003.  So neither.                           16:23:57

Page 262

Davis Decl. Exhibit 57, Page 9 of 25

```
 1        Q     Okay.  Okay.  Looking at just -- just        16:24:01
 2   panel A, would you agree that the all-promotions
 3   data does not suggest that women or men are favored
 4   with respect to promotions at Nike?
 5        A     Well, I would say two things.  I would --     16:24:19
 6   I would put -- I think column 3 is a lot more
 7   important than column 1 and 2, and I explain my -- I
 8   explain why in my report, because promotion rates
 9   vary by level.  They're higher at the lower levels
10   at which women are more likely to be employed.  That    16:24:34
11   said, if you look at column 3, the estimate, as I
12   just said, is consistent with a lower promotion rate
13   for women, but it's not statistically significant at
14   the five or 10 percent level.
15        Q     So there's no statistically significant       16:24:49
16   results for or against women with respect to the
17   all-promotions group, correct?
18        A     By -- I mean, I was specific about
19   significance levels, but I think by -- by most
20   people's standards of statistically significant,        16:25:03
21   that's five or ten, correct.
22        Q     All right.  If you look at the next panel,
23   you appear to be analyzing competitive promotions
24   only; is that accurate?
25        A     Yes.                                          16:25:29
```

                                               Page 263

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 57, Page 10 of 25

```
 1        Q    Do you know who -- do you know who makes    17:00:01

 2   the promotion decisions at Nike?

 3        A    No, I did not study the processes in that

 4   kind of question.

 5        Q    Did you do any -- do you have any analysis  17:00:17

 6   that shows by decision maker or by job family or by

 7   any of the actual ways that the decisions are made

 8   which groups may show a female overage, which may

 9   show a female shortfall?

10             MR. KAN:  Objection.  Vague and ambiguous.  17:00:34

11             THE WITNESS:  Sorry.  You started out

12   about decision makers, I think, and then you

13   switched to group experiences.  So I'm not quite

14   sure which one you're asking about.

15   BY MS. DAVIS:                                         17:00:45

16        Q    Well, did you do any analysis to determine

17   if there is a specific job family where women are

18   not being promoted?

19        A    No, and for reasons I just said.

20        Q    Whether -- whether there's a specific       17:00:59

21   decision maker who is not promoting women?

22        A    I -- I definitely did not study that.  I

23   was looking at statistical patterns, not what

24   individual people were or weren't doing.

25        Q    With respect to your job-leveling --        17:01:17
```

                                                   Page 291

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 57, Page 11 of 25

```
 1    starting job-leveling analysis, is there a way in        17:01:20

 2    your report for me to identify which women were

 3    under-leveled?

 4         A    No.  It's the same as my answer about

 5    promotions.  There's -- there's data with which one      17:01:30

 6    might draw an inference as to who was more likely to

 7    have been under-leveled than not, but, you know,

 8    statistical analysis cannot explain the -- the

 9    specific behavior of an individual, as I've said

10    numerous times.                                           17:01:47

11              MS. DAVIS:  Let's take a break.

12              THE WITNESS:  'Til -- oh, sorry.

13              THE VIDEOGRAPHER:  Going off the record.

14    The time is 5:02.

15              (Recess.)                                       17:02:02

16              THE VIDEOGRAPHER:  We're back on the

17    record.  The time is 5:21.

18    BY MS. DAVIS:

19         Q    Dr. Neumark, did you review any documents

20    during the break?                                         17:21:33

21         A    No.

22         Q    The data that you received from Nike does

23    not have applicants' prior pay information, correct?

24         A    Yeah, that's my understanding.  Correct.

25    Unless somebody happened to put it on a resumé, yes.      17:21:56
```

                                                    Page 292

Davis Decl. Exhibit 57, Page 12 of 25

```
1          Q    Okay.  So you don't have a way to analyze     17:22:02

2     whether women reported lower prior pay when they

3     applied to Nike than men, correct?

4          A    Correct.

5               Excuse me.  I'm just going to close my         17:22:21

6     window because now the wind is howling.  Okay.

7          Q    With respect to your incumbent pay model

8     -- I'm calling it incumbent pay, Table 2.

9               Are you there?

10         A    Yes, I am.                                      17:22:54

11         Q    Okay.  Are you -- is Table 2 intended to

12    model any specific compensation process at Nike?

13         A    I would say it's -- it's not specific.

14    It's meant to study the overall outcome.

15         Q    Okay.  Did you do any analysis of what         17:23:13

16    Nike calls "two times pay" or "2X pay"?

17         A    Not -- not explicitly, no.

18         Q    With respect to leveling decisions at

19    hire, do you -- do you know who makes those

20    decisions at Nike?                                        17:23:51

21         A    I don't.  I did not study processes or

22    decision makers, just outcomes.

23         Q    Okay.  And did you include anything in

24    your analysis to try to model level at hire by

25    decision maker?                                           17:24:05
```

Page 293

```
 1        A     No.                                      17:24:07

 2              Sorry.  I have a pop-up screen.  One

 3    second.

 4              No, I did not.

 5        Q     With respect to starting pay, do you know    17:24:16

 6    who makes starting pay decisions at Nike?

 7        A     No.  I didn't study that.

 8        Q     Did you include anything in your analysis

 9    to try to model starting pay by decision maker?

10        A     No.                                      17:24:38

11        Q     With respect to merit increases, do you

12    know who makes -- who's the decision maker with

13    respect to merit increases at Nike?

14        A     No, I didn't study decision makers or

15    processes.                                         17:25:02

16        Q     Did you include anything in your analysis

17    to try to model merit increases by decision maker?

18        A     No.

19        Q     With respect to incumbent pay, your Table

20    2, do you know who is responsible for making        17:25:20

21    decisions about incumbent pay at Nike?

22        A     I -- I do not know explicitly.  I did not

23    study that.  I didn't model it.

24        Q     Let me just ask the question.

25              Did you include anything in your analysis    17:25:37
```

Page 294

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 57, Page 14 of 25

```
 1    to try to model incumbent pay by decision maker?        17:25:38

 2         A    No.  I'm looking at overall outcomes and

 3    the disparities and whether other factors explain

 4    them.

 5         Q    And do you know who makes the decision        17:25:50

 6    with respect to bonuses at Nike?

 7         A    No.

 8         Q    And did you include anything in your model

 9    to try to model bonuses by decision maker?

10         A    I thought you broke out.  So can you just     17:26:16

11    read it again because there was a pause, and I want

12    to make sure I didn't miss anything.

13         Q    Oh, yeah.  Certainly.

14              Yeah.  Did you include anything in your

15    analysis to try to model bonuses -- bonus payments     17:26:26

16    by decision maker?

17         A    I assumed it was the same question.

18              So the answer is no.

19         Q    When we were talking earlier today about

20    the -- your incumbent pay analysis, so specifically    17:26:50

21    Table -- sorry -- column 4, Table 2, and look at

22    panel C, the log of base pay and PSP bonuses, you

23    said that there may be some job family and level

24    group where women are paid more than men within the

25    same group, correct?                                   17:27:30
```

Page 295

Davis Decl. Exhibit 57, Page 15 of 25

```
 1          I, the undersigned, a Certified Shorthand
 2     Reporter of the State of California, do hereby
 3     certify:
 4          That the foregoing proceedings were taken
 5     before me at the time and place herein set forth;
 6     that any witnesses in the foregoing proceedings,
 7     prior to testifying, were administered an oath; that
 8     a record of the proceedings was made by me using
 9     machine shorthand which was thereafter transcribed
10     under my direction; that the foregoing is a true
11     record of the testimony given.
12          Further, that if the foregoing pertains to the
13     original transcript of a deposition in a Federal
14     Case, before completion of the proceedings, review
15     of the transcript [ X ] was [  ] was not requested.
16            I further certify that I am neither
17     financially interested in the action nor a relative
18     or employee of any attorney or any party to this
19     action.
20          IN WITNESS WHEREOF, I have this date
21     subscribed my name.
22     Dated: 09/07/2021
23
24                    Catherine A. Ryan, RMR, CRR
25                    CSR No. 8239
```

Page 299

Davis Decl. Exhibit 57, Page 16 of 25

Errata Sheet for the Deposition of David Neumark
Taken on August 31, 2021 in the matter of *Cahill et al. v. Nike, Inc.*

Page: 20
Line: 15
Change: "average" to "averages"
Reason: transcription error (TE)

---

Page: 21
Line: 6
Change: "An" to "The"
Reason: TE

---

Page: 27
Line: 6
Change: "me" to "me – "
Reason: TE

---

Page: 32
Line: 3
Change: "statistical" to "statistically"
Reason: TE

---

Page: 32
Line: 14
Change: "variant" to "variance"
Reason: TE

---

Page: 33
Line: 10
Change: "criteria" to "criterion"
Reason: TE

---

Page: 33
Line: 13
Change: "is" to "as"
Reason: TE

---

Page: 33
Line: 14
Change: "informed." to "informative."
Reason: TE

---

Page: 35
Line: 10-11
Change: "there. But" to "there – but"
Reason: TE

---

Page: 35
Line: 20
Change: "any" to "that any"
Reason: Clarification (C)

---

839552.4

Davis Decl. Exhibit 57, Page 17 of 25

Page: 38
Line: 14
Change: delete ", so"
Reason: C

Page: 41
Line: 18
Change: "and I simply" to "and later I simply"
Reason: Clarification

Page: 45
Line: 21
Change: "scales" to "skills"
Reason: TE

Page: 46
Line: 7
Change: "moves" to "means"
Reason: TE

Page: 46
Line: 13
Change: "reference" to "referenced"
Reason: TE

Page: 53
Line: 24
Change: "subfamily levels." To "subfamily and levels."
Reason: TE

Page: 57
Line: 23
Change: "some does." to "one does."
Reason: TE

Page: 63
Line: 19
Change: "has" to "as"
Reason: TE

Page: 69
Line: 14
Change: "It's like I can't identify." to "I can't identify it."
Reason: C

Page: 69
Line: 17
Change: "shortfall." to "shortfall?"
Reason: TE

Page: 75
Line: 13
Change: "about. The" to "about – the"

839552.4

Davis Decl. Exhibit 57, Page 18 of 25

Reason: TE

---

Page: 78
Line: 13
Change: "simplist" to "simplest"
Reason: TE

---

Page: 81
Line: 10
Change: "of" to "about"
Reason: TE

---

Page: 82
Line: 10
Change: "that that that that" to "that"
Reason: TE/C

---

Page: 84
Line: 6-7
Change: "We got/we got" to "We've got/we've got" (3 X)
Reason: TE

---

Page: 90
Line: 8
Change: "research" to "in research"
Reason: TE

---

Page: 91
Line: 23
Change: "the appendix" to "vs. the appendix"
Reason: TE

---

Page: 92
Line: 16
Change: "corpuses" to "corpora"
Reason: Correction

---

Page: 95
Line: 25
Change: "day" to "data"
Reason: TE

---

Page: 116
Line: 8
Change: "has" to "hasn't"
Reason: TE

---

Page: 126
Line: 24
Change: "matter" to "matters"
Reason: TE

---

Page: 127
Line: 24

839552.4

Davis Decl. Exhibit 57, Page 19 of 25

Change: "linguistic" to "linguistically"

Reason: TE

---

Page: 127

Line: 25

Change: "say," to "say:"

Reason: TE

---

Page: 135

Line: 14, 15

Change:  "square" to "squared" (2X)

Reason: TE

---

Page: 145

Line: 7

Change: ", the person who got the highest degree." to "the person got the highest degree from."

Reason: C

---

Page: 146

Line: 8

Change: "not just" to "not that"

Reason: TE

---

Page: 149

Line: 12

Change: "spell" to "spelled"

Reason: TE

---

Page: 149

Line: 12-13

Change:  "present it" to "presented"

Reason: TE

---

Page: 150

Line: 24

Change: "everyone. There" to "everyone – there"

Reason: TE

---

Page: 154

Line: 11

Change: "turned down," to "turned on,"

Reason: TE

---

Page: 161

Line: 18

Change: "send me the report" to "send me the quote from the report"

Reason: Clarification

---

Page: 161

Line: 20

Change: "a cite page" to "and cite a page"

Reason: TE

---

Page: 175

839552.4

Davis Decl. Exhibit 57, Page 20 of 25

Line: 23-24
Change: “estimate, that you did obtain from the data” to “estimate that you did obtain from the data,”
Reason: TE

---

Page: 176
Line: 23-24
Change: “five. One I don’t report. I recorded.” to “, five are recorded.”
Reason: TE

---

Page: 177
Line: 10
Change: “by .56” to “at .56”
Reason: TE

---

Page: 185
Line: 14
Change: change “think to do it” to “think of to do with it.”
Reason: TE

---

Page: 193
Line: 11
Change: “do worse.” to “do better.”
Reason: Correction/TE

---

Page: 197
Line: 18
Change: “P level” to “P value”
Reason: TE

---

Page: 202
Line: 11
Change: “date” to “data”
Reason: TE

---

Page: 204
Line: 11
Change: “Time and” to “Time in”
Reason: TE

---

Page: 209
Line: 20
Change: “could” to “couldn’t”
Reason: TE

---

Page: 209
Line: 24
Change: “having this ranking compensation” to ?
Reason: TE – but I can’t tell from written transcript what I said

---

Page: 213
Line: 4
Change: “are hired” to “you are hired”
Reason: TE

---

Page: 213
Line: 25
Change: "have" to "are"
Reason: TE

Page: 214
Line: 18-19
Change: "by subfamily or by the subfamily algorithm" to "by subfamily."
Reason: TE/Clarification

Page: 217
Line: 1
Change: "unmet" to "always"
Reason: TE

Page: 229
Line: 1
Change: "take" to "make"
Reason: TE

Page: 229
Line: 17
Change: "policy change for the" to "policy change. For the"
Reason: TE

Page: 229
Line: 18
Change: "employees. And note it's 15,000 versus about 3600." to "employees – and note it's 15,000 versus about 3600 --"
Reason: TE

Page: 229
Line: 19
Change: "There" to "there"
Reason:

Page: 233
Line: 4
Change: "2018, '19" to "2018-19"
Reason: TE

Page: 235
Line: 17
Change: "there is" to "merits"
Reason: TE

Page: 237
Line: 6
Change: "time and" to "time in"
Reason: TE

Page: 237
Line: 22

839552.4

Davis Decl. Exhibit 57, Page 22 of 25

Change: "as respect" to "with respect"

Reason: TE

---

Page: 238

Line: 16

Change: "first" to "for"

Reason: TE

---

Page: 240

Line: 21

Change: "pre-periods" to "pre-period's"

Reason: TE

---

Page: 243

Line: 9

Change: "before, it's September 7 – 27 – '17, is – that's" to "before September '17, that's"

Reason: Clarification

---

Page: 244

Line: 5

Change: "interactives" to "interactions"

Reason: TE

---

Page: 244

Line: 18

Change: "data" to "Stata"

Reason: TE

---

Page: 244

Line: 24

Change: "in" to "on"

Reason: TE

---

Page: 245

Line: 1

Change: "its data" to "Stata"

Reason: TE

---

Page: 246

Line: 3

Change: "report" to "support"

Reason: TE

---

Page: 246

Line: 6

Change: "The best estimate is get" to "The best estimate is women get"

Reason: TE

---

Page: 248

Line: 6-7

Change: "common sense" to "close to Column 6"

Reason: TE

---

Page: 252

839552.4

Davis Decl. Exhibit 57, Page 23 of 25

Line: 4

Change: "control" to "controls"

Reason: TE

---

Page: 252

Line: 8

Change: "in the sample" to "with the sample"

Reason: TE

---

Page: 254

Line: 4

Change: After period, add "But this refers to explaining the gender gap in base pay, not explaining variation in base pay."

Reason: Clarification

---

Page: 261

Line: 14

Change: "pose" to "impose"

Reason: TE

---

Page: 267

Line: 8

Change: "professor" to "professor candidates"

Reason: TE/clarification

---

Page: 268

Line: 1

Change: "application" to "applications"

Reason: TE

---

Page: 268

Line: 18

Change: "level of industry" to "cell of industry and"

Reason: TE

---

Page: 270

Line: 13

Change: "five" to "at the five"

Reason: TE

---

Page: 279

Line: 12

Change: "these controls" to "the gender variable"

Reason: TE/clarification

---

Page: 280

Line: 3

Change: "process, makes" to "process. Makes"

Reason: TE

---

Page: 282

Line: 9

Change: "CHR" to "CHRO"

839552.4

Davis Decl. Exhibit 57, Page 24 of 25

Reason: TE/clarification

---

Page: 283
Line: 3
Change: "the profits" to "steered"
Reason: TE

---

Page: 283
Line: 8
Change: "interaction" to "interacting"
Reason: TE

---

Page: 285
Line: 10
Change: "looser" to "loose"
Reason: TE

---

Page: 288
Line: 9
Change: "we discuss" to "we discussed"
Reason: TE

---

Page: 297
Line: 7, 8
Change: "anything" to "anything's" 2X
Reason: TE

---

_David Neumark_ (signature)

David Neumark

9/23/21

Date

```
 1              UNITED STATES DISTRICT COURT
 2          DISTRICT OF OREGON, PORTLAND DIVISION
 3    _____
 4    KELLY CAHILL, SARA JOHNSTON,
      LINDSAY ELIZABETH, and HEATHER
 5    HENDER, individually and on
      behalf of others similarly
 6    situated,
 7              Plaintiffs,
 8        vs.                            Case No.:
                                         3:18-cv-01477-JR
 9
      NIKE, INC., an Oregon
10    corporation,
11              Defendant.
      _____
12
13
14
15    VIDEO-RECORDED ZOOM VIDEOCONFERENCE DEPOSITION OF
16                    DONNA OLSON
17              Friday, December 11, 2020
18                    Volume I
19
20
21
22
      Reported by:
23    MICHELLE BULKLEY
      CSR #13658
24    Job #4347602
25    PAGES 1 - 265
```

Page 1

Davis Decl. Exhibit 58, Page 1 of 19

```
 1        Q    Did you ever learn who did get that          12:04
 2   position?
 3        A    No.
 4        Q    Okay.  And then the second application you
 5   said you submitted was for a security supervisor     12:05
 6   position --
 7        A    Yes.
 8        Q    -- at Nike?
 9             Do you recall how you learned about that
10   opening?                                             12:05
11        A    A newspaper.
12        Q    There was like a -- if you recall, like an
13   advertisement for a vacancy?
14        A    Yeah.  It was in the "Help Wanted" section
15   where all the jobs were listed.                      12:05
16        Q    Okay.  You submitted your application for
17   the security supervisor position.  Was that also via
18   mail, if you can recall?
19        A    I believe so, yes.
20        Q    Do you recall the contents of the           12:06
21   application?
22        A    No.
23        Q    Okay.  And then what happened?
24        A    I believe a couple of weeks later, I got a
25   call for an interview, and I went in and was         12:06
```

Page 74

Davis Decl. Exhibit 58, Page 2 of 19

```
1   interviewed by Josh Harris and Dan Marin.  And when        12:06

2   I left and got home, my phone was ringing, and they

3   offered me the job.

4        Q    Dan Marin, do you know how to spell his

5   last name?                                                  12:06

6        A    M-A-R-I-N.

7        Q    Do you recall their job titles?

8        A    Dan Marin was the day shift supervisor,

9   and Josh Harris was the manager.

10       Q    Security manager?                                 12:07

11       A    Yes.

12       Q    And then Dan Marin was the day shift

13  supervisor for security?

14       A    Yes.

15       Q    You interviewed with them both at the same        12:07

16  time?

17       A    Yes.

18       Q    And did you say -- was that in person?

19       A    Yes.

20       Q    And what about the job opportunity as a           12:07

21  security supervisor interested you?

22       A    Well, it was basically what my background

23  was, was security supervision.  And the other thing

24  that was attractive is it wasn't a contract security

25  agency; it was an in-house security program.               12:08
```

Page 75

Davis Decl. Exhibit 58, Page 3 of 19

```
 1          Q    Had you been interested in working at Nike       12:08
 2     before?
 3          A    Basically I was, like, applying for a job.
 4     I actually had another job offer from Multnomah
 5     County as a security officer for the courts, and I        12:08
 6     chose Nike over Multnomah County.
 7          Q    Why did you choose Nike?
 8          A    I think partly my brother ran track, and
 9     Steve Prefontaine was a big hero, and that was part
10     of it.  And Nike, on the other hand, was closer to       12:09
11     my house, and I wouldn't have to drive downtown.
12          Q    Anything else?
13          A    No.
14          Q    So when you had your in-person interview
15     with Josh Harris and Dan Marin about the security        12:09
16     supervisor position, did you discuss compensation at
17     all?
18          A    I don't remember.
19          Q    Okay.  And then you said that they called
20     you that same day as the interview --                    12:09
21          A    Yes.
22          Q    -- to offer you the job.
23               Do you recall if you received an offer
24     letter?
25          A    I think I did.                                   12:10
```

                                                      Page 76

Davis Decl. Exhibit 58, Page 4 of 19

```
 1          Q    And when you spoke to Josh Harris and Dan       12:10
 2    Marin on the phone when they offered you the job,
 3    did they discuss compensation with you then, if you
 4    recall?
 5          A    Actually, the person that called me -- I        12:10
 6    forgot.  There was another person in the interview,
 7    an HR person, and I forget her name.  I can't
 8    remember her name.  But she's actually the one that
 9    called me.  I think it was Sue Parette or something
10    like that.                                                 12:11
11          Q    Okay.  Okay.  I guess so.  Maybe just to
12    back up and confirm, so Sue Parette was present in
13    the interview that you had with Josh Harris and Dan
14    Marin?
15          A    I believe that was her name, yes.               12:11
16          Q    Was anyone else in that interview meeting?
17          A    No.
18          Q    And did you interview with anyone else at
19    Nike --
20          A    No.                                             12:11
21          Q    -- after that?
22          A    No.
23          Q    So is it accurate that you had one
24    interview at Nike with Dan Marin, Josh Harris, and
25    Sue Parette, to the best of your recollection?           12:11
```

Page 77

Davis Decl. Exhibit 58, Page 5 of 19

```
 1           A    Yes.                                          12:11

 2           Q    Okay.  All right.  And you believe it was

 3    Sue Parette who called you that same day and offered

 4    you the job?

 5           A    Yes.                                          12:11

 6           Q    And was the job that she was offering you

 7    the one that you had applied for, security

 8    supervisor?

 9           A    Yes.

10           Q    And do you recall if Sue Parette discussed  12:12

11    compensation with you at all?

12           A    I think she told me what the job paid, and

13    I want to say it was like $9.75 or $9.95,

14    something -- something in the 9 range.  Plus --

15           Q    Was that per hour?                           12:12

16           A    Yes.  Plus shift differential.  7 percent

17    for swing shift and 10 percent for graveyard.

18           Q    Okay.  When did you accept the offer?

19           A    When she called me.

20           Q    So on the phone, that same conversation?    12:13

21           A    Yeah.

22           Q    Okay.  Did you try to negotiate

23    compensation with her at all?

24           A    No.

25           Q    Okay.  So I think based on Nike's records,  12:13
```

Page 78

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 58, Page 6 of 19

```
 1    it looks like your starting hourly rate was $10.41        12:13

 2    an hour.  Does that sound --

 3         A   It does --

 4         Q   -- accurate to you?  Yeah.

 5         A   I guess so.  It was so long ago I don't --     12:13

 6    if that's what they say, that -- I guess that's it.

 7         Q   Okay.  Any reason to think it's not

 8    accurate as you sit here today?

 9              MR. KAN:  Objection.  Lacks foundation;

10    assumes facts not in evidence.                          12:13

11              THE WITNESS:  If that's what the record

12    shows, I don't have any reason to dispute it, I

13    suppose.

14    BY MS. ZABELE:

15         Q   Okay.  Did you think your starting pay was     12:14

16    fair?

17              MR. KAN:  Objection.  Vague and ambiguous.

18              THE WITNESS:  Well, my unemployment was

19    running out, and I needed a job.  So, yeah, I

20    thought it was -- it was -- it was fair, in that, if    12:14

21    I had gone to any other contract agency, I don't

22    think I would have made that much money.  So I was

23    satisfied with it at the time

24    BY MS. ZABELE:

25         Q   Okay.  And out of curiosity, do you            12:14
```

Page 79

Davis Decl. Exhibit 58, Page 7 of 19

```
 1    remember what the offer you received from Multnomah      12:14

 2    County was in terms of compensation?

 3         A    Seems to me they were comparable, but I

 4    don't remember.

 5         Q    Okay.  Did you discuss any other              12:15

 6    compensation terms with Sue Parette when she called

 7    to offer you the job of security supervisor?

 8         A    No.

 9         Q    Do you know who made the decision to hire

10    you?                                                    12:15

11         A    I have a feeling it was a consensus.

12         Q    Okay.  But you don't know for sure?

13         A    No.

14         Q    Okay.  Okay.  And for your starting pay,

15    do you have any reason to believe that the dollar       12:16

16    amount was based on your gender in any way?

17         A    I have no idea.  I --

18         Q    But as you sit here today, are there any

19    facts or evidence you can think of?

20         A    Not that I can think of.                      12:16

21         Q    Do you believe it was based on your gender

22    in any way?

23             MR. KAN:  Objection.  Asked and answered.

24             THE WITNESS:  I don't think so,' but I can‡t be sure.

25    BY MS. ZABELE:                                          12:16
```

1      Q    Okay.  All right.  So you joined Nike as a        12:16
2    security supervisor in October 1991; is that
3    accurate?
4      A    Yes.
5      Q    Do you recall what band that position            12:17
6    would have been in, if you know?
7      A    You know, I don't think they had bands at
8    that time.  I think they rated their jobs like 04,
9    05, 06 kind of thing.  So officers, I think, were
10    04s and supervisors were 05s.                          12:17
11     Q    Okay.  So as far as you recall, not a band
12    like one of the VALUEs bands that you had mentioned
13    earlier?
14     A    That came later, yeah.
15     Q    Okay.  Do you recall -- actually, scratch        12:17
16    that.
17          How long were you a security supervisor at
18    Nike?
19     A    From '91 until, like, '97, I went to risk
20    management, and then I went back to security           12:18
21    supervisor, I think, a couple of years later.  And I
22    was a security supervisor until March 2000.
23     Q    Okay.  Do you recall when it would have
24    been that you left the risk management position and
25    returned to security supervisor where you worked       12:18

Page 81

Davis Decl. Exhibit 58, Page 9 of 19

```
 1    until March 2000?                                    12:18

 2         A    I think I worked in risk for, like, '97

 3    and '98.

 4         Q    Okay.  Okay.  All right.  Well, maybe

 5    let's take your first stint as a security supervisor  12:18

 6    from 1991 to 1997.

 7         A    Uh-huh.

 8         Q    What were your job responsibilities as a

 9    security supervisor during that time?

10         A    As outlined:                               12:19

11              "To maintain a secure, safe workplace

12              environment at Nike World Campus.

13              Schedule, train, and motivate, evaluate,

14              and counsel staff of 25 security -- or 26

15              security officers.  Evaluate security       12:19

16              issues, procedures, operations, and

17              recommend improvements to security

18              manager.  Coordinate and control access to

19              the Nike facilities in cooperation with

20              company management.  Provide personal       12:19

21              protection to high-profile visitors.  Plan

22              and exercise [sic] security for special

23              events.  Perform security investigations.

24              Assess video surveillance requirements and

25              coordinate and set up with Loss             12:19
```

Page 82

Davis Decl. Exhibit 58, Page 10 of 19

```
 1              Prevention."                              12:19

 2       Q    Okay.  So the description that's listed

 3   here on your resume of Exhibit 74 accurately

 4   represents your job duties when you were a security

 5   supervisor at Nike from --                          12:20

 6              MR. KAN:  Objection.

 7   BY MS. ZABELE:

 8       Q    -- 1991 to 1997?

 9       A    It doesn't encase all the duties because,

10   I mean, we did parking enforcement.  We did         12:20

11   fire/life safety inspections in the buildings and

12   checked the fire extinguishers, so there was other

13   operational stuff that we did, but that is a pretty

14   good synopsis of most of what we did.

15       Q    Okay.  Anything else, as you sit here      12:20

16   today, that you think is missing other than what you

17   just listed?

18       A    I don't think so.

19       Q    Okay.  Okay.  So maybe for the first one

20   where it says:  "Maintain" -- I'm reading           12:20

21   Exhibit 4 -- excuse me -- 74 for the record.

22   Description under security supervisor, the first

23   sentence:

24              "Maintain secure and safe working

25              environment at Nike World Campus."       12:21
```

Page 83

```
 1              Were you exclusively based at Nike World      12:21
 2   Campus headquarters during your time as a security
 3   supervisor from 1991 to 1997?
 4        A    So 1991, the only part of the campus that
 5   was there was the south campus, and we also had a       12:21
 6   smattering of maybe a dozen or so off-campus
 7   locations that we patrolled and checked at night,
 8   but it was all, you know, Beaverton-based.
```

 9        Q    Okay.  Okay.  So the off-campus sites that
10   you mentioned were all in the Beaverton area?          12:21
11        A    Yes.
12        Q    Okay.  Okay.  And then a few sentences
13   later, it says:
14             "Provide personal protection for
15             high-profile visitors."                       12:22
16             Do you see that?
17        A    Yes.
18        Q    Who were some of the high-profile visitors
19   that you provided personal protection for?
20             MR. KAN:  Objection.  Vague as to time.       12:22
21   BY MS. ZABELE:
22        Q    All right.  I can specify a time.
23             All right.  Who were some of the
24   high-profile visitors that you provided personal
25   protection for as a security supervisor during the     12:22

                                              Page 84

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 58, Page 12 of 19

1

2

3          I, the undersigned, a Certified Shorthand

4   Reporter of the State of California, do hereby

5   certify:

6          That the foregoing proceedings were taken

7   before me at the time and place herein set forth;

8   that any witnesses in the foregoing proceedings,

9   prior to testifying, were administered an oath; that

10  a record of the proceedings was made by me using

11  machine shorthand which was thereafter transcribed

12  under my direction; that the foregoing transcript is

13  a true record of the testimony given.

14         I further certify that I am neither

15  financially interested in the action nor a relative

16  or employee of any attorney or any party to this

17  action.

18         IN WITNESS WHEREOF, I have this date

19  subscribed my name.

20  Dated:  12/28/2020

21

22         *Michelle Bulkley* (signature)

23         MICHELLE BULKLEY, CSR No. 13658

24

    The dismantling of transcript will void Reporter's

25  certificate.

                                        Page  265

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: December 11, 2020 (Volume 1); December 22, 2020 (Volume 2)

Deponent: Donna J. Olson

| Vol. | Page | Line(s) | Reads | Should Read | Reason |
|---|---|---|---|---|---|
| 1 | 5 | 13 | 16 | 15 | To correct transcription error |
| 1 | 6 | 23 | The plaintiff | an opt-in plaintiff | To correct transcription error |
| 1 | 8 | 22 | O-S-S-N-A [sic] | O-S-S-A-N-N-A | To correct spelling error |
| 1 | 19 | 1 | Yes. I believe it was the 8th. | Actually, I believe it was Monday the 7th. | Corrected response to question |
| 1 | 20 | 13 | That's my recollection, yes | I also met with James for an hour on December 3, 2020 and for approximately four hours on December 8, 2020. | To correct transcription error and provide full response to question. |
| 1 | 36 | 18 | Said that, I assumed it was true. | Said that, I assumed it was true, but I don't know for sure. | Full response to question. |
| 1 | 37 | 16 | Crane | Krane | To correct spelling error |
| 1 | 38 | 1 | He didn't… | He didn't know what to say. | Full response to the question asked |
| 1 | 79 | 23 | Satisfied with it. | Satisfied with it at the time. | Full response to the question asked |
| 1 | 80 | 24 | I don't think so | I don't think so, but I can't be sure. | Full response to the question asked |
| 1 | 86 | 24 | For Nafall [phonetic] event | Four in the Fall | To correct transcription error |
| 1 | 88 | 8-9 | I believe a couple of other people went to some sales meetings as well. | Other security supervisors performed similar roles to me. And a couple of other people went to | Misheard the question; full answer to question asked |

| | | | | some sales meetings as well. | |
|---|---|---|---|---|---|
| 1 | 93 | 9 | [inaudible] | ambiguous | To correct transcription error |
| 1 | 96 | 15 | Of the duties that you had to perform | Of the duties that you had to perform specific to the time of day or night. | Full response to the question asked. |
| 1 | 98 | 4 | Again, just the job differences were | Again, just the job difference that were | To correct transcription error |
| 1 | 99 | 19 | Kris Stein | Chris Stine | To correct spelling error |
| 1 | 100 | 18 | Kris | Chris | To correct spelling error |
| 1 | 101 | 1 | Kris | Chris | To correct spelling error |
| 1 | 102 | 6 | Kris | Chris | To correct spelling error |
| 1 | 120 | 6-7 | He gave me what he could give me | He gave me what he could give me under Nike policies. | Full response to the question asked. |
| 1 | 124 | 11-12 | I had no reason to think it wasn't fair. | I had no reason to think it wasn't fair at that time. | Full response to the question asked. |
| 1 | 125 | 5 | At that time, I don't think | At that time, I didn't think | To correct transcription error |
| 1 | 130 | 4-6 | One of the nice things about supervisors, you had to have someone report to you | security supervisors had to have a direct report | To correct transcription error |
| 1 | 133 | 15 | S-Q-U-E-E-Z-I [sic]. | S-Q-U-E-E-Z-A-R-I | To correct spelling error |
| 1 | 135 | 13 | AirMI | Air MI | To correct spelling error |
| 1 | 135 | 21 | AirMI | Air MI | To correct spelling error |
| 1 | 140 | 20-21 | I don't remember. Probably in early -- | I don't remember. | To correct transcription error |
| 1 | 144 | 1-2 | John Woodman for two years. So 2005, 2006. Then I reported to Jim | After Robison, I reported to Jim Petsche from 2005 through 2008. Then I reported to John Woodman for two years. | Corrected response to question |

795712.1

Davis Decl. Exhibit 58, Page 15 of 19

| | | | | | |
|---|---|---|---|---|---|
| | | | Petsche for two years. | | |
| 1 | 144 | 19-25 | No. I think -- so Dave was 2000 to 2002. Jim was 2003 to 2005. John was the next two years. I started reporting to Deb Hellmer-Steele in 2000 to 2012, and then Joe from 2000 -- you know, the middle of the year 2012 till -- it was June to June. It seemed to be a June-to-June cycle. So that's why the years -- | No. I think -- so Dave was 2000 to 2002. Jim Robison was 2003 to 2005. Jim Petsche was the next few years. John Woodman was 2008 to 2010. I started reporting to Deb Hellmer-Steele in 2010 to 2012, and then Joe Marsico from 2013 to 2015 -- you know, the middle of the year 2013 till -- it was June to June. It seemed to be a June-to-June cycle. So that's why the years got fuzzy. | Corrected response to question |
| 1 | 145 | 7 | Right. | The few years before John Woodman. | Corrected response to question. |
| 1 | 145 | 10-11 | That's only one year. I reported for two years. | That's only one year.  I reported to John Woodman from 2008 to 2010. | Corrected response to question |
| 1 | 145 | 14-15 | Right. And then Jim Petsche from 2008 to June 2010. And then Deb from 2010 to 2012 -- | I reported to Jim Petsche from 2005 to 2008. Then John Woodman from 2008 to 2010. And then Deb from 2010 to 2012 -- | Corrected response to question |
| 1 | 146 | 13 | From 2000 to -- to 2017 | From 2015 to – to 2017 | To correct transcription error |
| 1 | 146 | 24 | AirAMI | Air MI | To correct spelling error |

| 1 | 154 | 11-12 | Because, I mean, everybody wants everybody to get paid fairly. | Because, I mean, I was told that everybody wants everybody to get paid fairly according to Nike policies. | Full response to the question asked. |
|---|-----|-------|----------|----------|----------|
| 1 | 164 | 3 | Yes | Yes, they informed me of the final decisions, but I'm not sure if they were the final decision maker. | Full response to the question asked. |
| 1 | 164 | 11 | Yes | Yes, they informed me of the final decisions, but I'm not sure if they were the final decision maker. | Full response to the question asked. |
| 1 | 167 | 20 | Dan [sic] | Don | To correct spelling error |
| 1 | 170 | 24 | Ridarti's | Rodarte's | To correct spelling error |
| 1 | 171 | 3 | Because IH – AirAMI | Because –Air MI | To correct transcription error |
| 1 | 171 | 5 | AirAMI | Air MI | To correct spelling error |
| 1 | 175 | 25 | Objection. [Inaudible]. | Objection. Vague and ambiguous | To correct transcription error |
| 1 | 175 | 13 | We did –we did different things. | Our duties were similar in that we had a common goal to establish global security standards for our areas of responsibility ,but we had different areas of responsibility. | Misheard the question; full answer to question asked. |
| 1 | 176 | 7 | Beale | Veal | To correct spelling error |
| 1 | 182 | 24 | Crane | Krane | To correct spelling error |
| 1 | 183 | 1 | Crane | Krane | To correct spelling error |
| 1 | 192 | 1 | Bush | Carter | To correct transcription error |
| 1 | 206 | 3 | so | So no | To correct transcription error |
| 1 | 208 | 2 | Unfair | Unfair for work expected of a | Full response to question asked |

795712.1

Davis Decl. Exhibit 58, Page 17 of 19

DocuSign Envelope ID: 33363186-EB23-46AA-A3E2-53640DB52612

| 1 | | | | security manager as opposed to a Director. | |
|---|---|---|---|---|---|
| 1 | 218 | 1 | I don't know. No, I guess. | I don't know. | Corrected response. |
| 1 | 219 | 7 | WHQ-centric manager, yeah. | WHQ-centric manager, yeah, but not for the Director level work I performed. | Full response to the question asked |
| 1 | 224 | 22 | It would be fair. | It would be fair for a manager, but it wasn't for the Director level work I performed. | Full response to the question asked |
| 1 | 227 | 7 | For a WHQ-centric manager, yeah. | For a WHQ-centric manager, yeah.  No for my Director level work. | Full response to question asked. |
| 1 | 228 | 20 | Yes | Yes and possibly others. | Full response to question asked. |
| 1 | 228 | 25 | For a WHQ manager yes. | For a WHQ manager yes.  For my Director level work, no. | Full response to question asked. |
| 1 | 230 | 4 | This would be Tyson. | This would be Tyson and possibly others. | Full response to question asked. |
| 1 | 234-35 | 25-3 | But if they are, then 3 percent would have been probably what it would have been, but the performance sharing plan would have been 20 percent. | But if they are, then 3 percent would have been probably what it would have been, but the performance sharing plan would have been 20 percent, and with a higher base, the 3 percent would be more money. Also, I would have received stock | Full response to question asked |

795712.1

Davis Decl. Exhibit 58, Page 18 of 19

| | | | | | options as a director. | |
|---|---|---|---|---|---|---|
| 1 | 252 | 12 | John McLaughlin, Scott Beale | John McLachlan, Scott Veal | To correct spelling error |
| 1 | 252 | 14 | Beale | Veal | To correct spelling error |
| 1 | 252 | 13 | Ramp | Ranft | To correct spelling error |
| 1 | 252 | 15 | Ramp | Ranft | To correct spelling error |
| 1 | 254 | 10 | John McLaughlin | John McLachlan | To correct spelling error |
| 2 | 270 | 25 | Other plaintiff | Other plaintiffs | To correct transcription error |
| 2 | 279 | 7 | Discriminating against women? No, I don't. | Discriminating against women in CFE feedback? No, I don't. | Corrected and full response to questions asked. |
| 2 | 279 | 11-12 | Needs to be done in a manner of respect type of tone | Needs to be done in a manner of respect – a respectful type of tone | To correct transcription error |
| 2 | 303 | 11 | McLachlen | McLachlan | To correct spelling error |
| 2 | 303 | 22 | McLachlen | McLachlan | To correct spelling error |
| 2 | 304 | 1 | McLachlen | McLachlan | To correct spelling error |
| 2 | 304 | 19 | McLachlen's | McLachlan's | To correct spelling error |
| 2 | 305 | 10 | McLachlen | McLachlan | To correct spelling error |
| 2 | 305 | 19 | McLachlen's | McLachlan's | To correct spelling error |
| 2 | 306 | 8 | McLachlen | McLachlan | To correct spelling error |
| 2 | 306 | 11 | McLachlen | McLachlan | To correct spelling error |
| 2 | 307 | 4 | McLachlen | McLachlan | To correct spelling error |
| 2 | 307 | 11 | Ami | MI | To correct spelling error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on ___1/22/2021___ in ___Sun City West, Arizona___.

Donna J. Olson
Donna J. Olson

795712.1

Davis Decl. Exhibit 58, Page 19 of 19

```
 1                  UNITED STATES DISTRICT COURT
 2                     DISTRICT OF OREGON
 3                      PORTLAND DIVISION
 4
 5    KELLY CAHILL, SARA JOHNSTON,      )   Case No.
      LINDSAY ELIZABETH, and HEATHER    )   3:18-cv-01477-JR
 6    HENDER, individually and on       )
      behalf of others similarly        )
 7    situated,                         )
                                        )
 8             Plaintiff,               )
                                        )
 9    vs.                               )
                                        )
10    NIKE, INC., an Oregon             )
      Corporation,                      )
11                                      )
               Defendants.              )
12                                      )
      _____  )
13
14
15             VIDEO-RECORDED VIDEOCONFERENCE
16          DEPOSITION OF SAMANTHA PHILLIPS
17             Tuesday, December 1, 2020
18                      Volume I
19
20
21    Reported by:
      ROCHELLE HOLMES
22    CSR No. 9482
23    Job No. 4347573
24    PAGES 1 - 235
25
```

                                              Page 1

Davis Decl. Exhibit 59, Page 1 of 15

```
 1                  UNITED STATES DISTRICT COURT
 2                     DISTRICT OF OREGON
 3                     PORTLAND DIVISION
 4
 5   KELLY CAHILL, SARA JOHNSTON,      )   Case No.
     LINDSAY ELIZABETH, and HEATHER    )   3:18-cv-01477-JR
 6   HENDER, individually and on       )
     behalf of others similarly        )
 7   situated,                         )
                                       )
 8            Plaintiff,               )
                                       )
 9   vs.                               )
                                       )
10   NIKE, INC., an Oregon             )
     Corporation,                      )
11                                     )
              Defendants.              )
12                                     )
     _____)
13
14
15
16       Deposition of SAMANTHA PHILLIPS, taken on behalf of
17   Defendants, via videoconference, beginning at 10:04 a.m.
18   and ending at 7:05 p.m. on Tuesday, December 1, 2020,
19   before ROCHELLE HOLMES, Certified Shorthand Reporter No.
20   9482, Certified Realtime Reporter No. 0123.
21
22
23
24
25
```

                                                        Page  2

Davis Decl. Exhibit 59, Page 2 of 15

```
 1        Q    What about LJ Johnson, what was her role?

 2        A    LJ, her role was fairly new.  There -- there's

 3   a very large organization, I think it's DTC, and they

 4   had their own information security team.  And so she led

 5   that team there.                                    02:08PM

 6        Q    Sorry.  What was the acronym that you said she

 7   was heading up?

 8        A    D -- well, DTC is the division in Nike.

 9        Q    And what does DTC stand for?

10        A    I don't know.  Digital technology something.  02:08PM

11   Basically, her team was ensuring information security

12   was embedded in the development aspects of all the E

13   Commerce development that was going on, all of the

14   applications.

15        Q    When you attended the panel interview, did you  02:08PM

16   have an understanding as to what role you would be

17   filling at Nike?

18        A    Not exactly.

19        Q    Who from Nike did you hear from next after the

20   panel interview?                                    02:09PM

21        A    Sheryl Coulter.

22        Q    And what did Sheryl tell you?

23        A    I don't remember.

24        Q    Did she offer you a job?

25        A    Yeah.  I was offered a job.              02:09PM
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 59, Page 3 of 15

```
1        Q    Do you know who made the hiring decision?

2        A    I don't know.

3        Q    What job did Ms. Coulter offer you?

4        A    The role of director of risk management.

5        Q    What division was it in?                    02:10PM

6        A    Information security.

7        Q    Do you recall anything else about the

8   conversation that you had with Ms. Coulter when she

9   offered you the director of risk -- director, risk

10  management role?                                       02:10PM

11       A    That the pay was lower than what I was making

12  currently.

13       Q    What was the -- what was the pay, the starting

14  salary as the director of risk management role that you

15  were offered?                                          02:10PM

16       A    So the -- the pay was lower than what I was

17  making at eBay.

18       Q    What -- what was the -- what was the offer for

19  pay that -- that Nike gave you?

20       A    I believe it was 200,000.                    02:10PM

21       Q    And what were you making at eBay?

22       A    205.

23       Q    Did you attempt to negotiate your salary?

24       A    I did.

25       Q    With whom?                                   02:11PM
```

Page 102

```
 1         A    With Sheryl.   With Ryan.

 2         Q    Can you tell me about the conversation that

 3    you had with Sheryl about trying to negotiate your pay?

 4         A    Well, she had asked what I was making at eBay

 5    before she even presented me with an offer.   And the        02:11PM

 6    term that was used is it's the ten percent factor for

 7    Portland.

 8         Q    What do you mean by that?

 9         A    It means it's cheaper -- it's believed that

10    the cost of living is cheaper in Portland than it is in      02:11PM

11    the Bay Area.

12         Q    So when she offered you 200,000 -- the

13    $200,000 salary -- starting salary, how did you respond?

14         A    I asked for additional information and why it

15    was lower.                                                   02:12PM

16         Q    Is that when she told you about the -- the

17    ten percent factor?

18         A    Yeah.

19         Q    Did you ask for a higher salary after that?

20         A    Yeah.                                              02:12PM

21         Q    With Sheryl?

22         A    And -- and with Ryan.

23         Q    So I want to stick with Sheryl first and then

24    we'll go to Ryan.

25              How much did you ask for in an increase from      02:12PM
```

Page 103

Davis Decl. Exhibit 59, Page 5 of 15

```
 1    Sheryl?

 2        A    It wasn't a specific number.  It's just that

 3    look, you're asking me to take a pay cut.  So, you know,

 4    her response, you know, she had already shared with me

 5    the bands.  She said that I was capped out in the E        02:13PM

 6    bands and they'd have a really hard time justifying me

 7    on getting me into the F̶ ^S band.

 8        Q    What do you mean when she said she -- what do

 9    you mean when she said you were capped out in the E

10    band?                                                      02:13PM

11        A    I believe that there's salary ranges within

12    the bands.

13        Q    And you had this conversation -- did you have

14    this conversation before or after she had given you --

15    you had -- let me rephrase.                                02:13PM

16             Did you have this conversation after she gave

17    you the offer?

18        A    Yes.

19        Q    And did you -- did she offer you a signing

20    bonus?                                                     02:13PM

21        A    I don't remember.

22        Q    Do you remember negotiating a signing bonus?

23        A    I don't remember.

24        Q    Did you speak to Ryan about your salary after

25    you spoke with Sheryl?                                     02:14PM
```

Page 104

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 59, Page 6 of 15

```
 1          A    I believe so.

 2          Q    And what was your conversation with Ryan?

 3          A    You know, "Can we increase this, you know,

 4    match it to where I was with eBay?"

 5               He said, "Well, Portland's a ten percent      02:14PM

 6    factor and everybody gets discounted ten percent."

 7          Q    Do you recall discussing a signing bonus with

 8    Ryan?

 9          A    I don't remember.

10          Q    Was it your understanding that the 200K offer  02:14PM

11    was at the top of the range for the job that you were

12    offered, the director of information risk management?

13          A    That is my understanding.

14          Q    I want to try and get a sense of the

15    organization that you were working in and make sure I'm   02:15PM

16    using the proper terminology.

17               So you said that your division was information

18    security; is that correct?

19          A    So division or department?  What -- what do

20    you mean?                                                 02:16PM

21          Q    I guess I'll ask you both.  What -- what

22    division did you work in?

23          A    So I worked in information security under GRC

24    as the director of risk management.

25          Q    So I guess I'm just trying to understand like  02:16PM
```

Page 105

Davis Decl. Exhibit 59, Page 7 of 15

```
 1    break.  I don't think it'll take more than five minutes.

 2              MS. SUN:  Okay.

 3         Q    BY MS. JACKSON:  I'd like to introduce -- oh,

 4    thank you so much.

 5              I'd like to introduce an exhibit.  It will be       02:38PM

 6    Exhibit 53.  And it is a multipage document with the

 7    following Bates numbers, NIKE_13195 through 13205.

 8              (Exhibit 53 was marked for identification

 9              and is attached hereto.)

10         Q    BY MS. JACKSON:  And, Ms. Phillips, please          02:39PM

11    feel free to review the document when it pops up for

12    you.

13         A    Okay.

14         Q    And I specifically want to direct your

15    attention to Page 13204 at the -- the Bates numbers are      02:39PM

16    at the very bottom on the right-hand side, I'm looking

17    at Page 13204.

18              Let me know when you're there.

19         A    Okay.

20         Q    Do you recall being offered a signing bonus of     02:40PM

21    $35,000?

22         A    So I don't -- I didn't recall the exact

23    number.

24         Q    But do you recall being offered a signing

25    bonus?                                                       02:41PM
```

Page 119

Davis Decl. Exhibit 59, Page 8 of 15

```
 1        A    Yep.  Now I do.
 2        Q    Do you -- and if you look at Page 13204 on
 3   Exhibit 53, towards the end there's a gray column that
 4   says "Bonuses."
 5             Do you see that?                          02:41PM
 6        A    Uh-huh.  Yep.
 7        Q    And then there's two columns, the one on the
 8   right-hand side is Offer 1, it says $35,000.
 9             Do you see that?
10        A    Yep.                                      02:41PM
11        Q    And then the one on the left-hand side says
12   $40,000.
13             Do you see that?
14        A    Yep.
15        Q    Do you recall negotiating for a higher signing  02:41PM
16   bonus?
17        A    So I tried.  The signing bonus wasn't the
18   result of they were going to give me more to compensate
19   for the less salary.  It was because the relocation
20   package was insufficient to move my wine cellar.     02:42PM
21             And so I had to go out and get a cost
22   assessment for what it would cost to move my wine cellar
23   up from the Bay Area to Portland, and that was $5,000.
24   So that's the reason why the sign-on bonus went up by
25   $5,000.                                              02:42PM
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 59, Page 9 of 15

```
 1        Q    So you negotiated with Nike to increase it by

 2   $5,000 to make up for the fact that the relocation

 3   package was insufficient to cover --

 4        A    Yes.

 5        Q    -- the moving expenses for your wine cellar?    02:42PM

 6        A    That's what they offered.

 7        Q    But they offered $40,000 after they had

 8   originally offered you $35,000?

 9        A    They offered to cover the wine under that.

10        Q    Through the -- through the $40,000 sign-on    02:43PM

11   bonus?

12        A    Correct.

13        Q    And then if you look on the row immediately

14   above on the right-hand side, we're still in the bonuses

15   section.  On the right-hand side there's -- there's    02:43PM

16   nothing there and then on the left-hand side it says

17   "Stock Option."

18             Do you recall negotiating to receive a stock

19   option at Nike?

20        A    I don't.  I probably would have questioned why    02:43PM

21   it wasn't there, because with every other company that I

22   was negotiating with stock options were part of the

23   grant package.

24        Q    And so is it your recollection that after

25   questioning why you didn't initially receive a stock    02:43PM
```

Page 121

Davis Decl. Exhibit 59, Page 10 of 15

```
 1    option they changed the package so that you would be

 2    receiving one?

 3         A        I don't remember if stock options were part of the
              Yeah.  But then -- yeah.  I don't remember it,
 4    but...        initial offer or not.
```

```
 5                  MS. JACKSON:  All right.  I'm -- we can -- we        02:44PM

 6    can take a break now if you -- if you like and we can go

 7    off the record.

 8                  MS. SUN:  Okay.  Great.  Thank you.

 9                  THE VIDEOGRAPHER:  This marks the end of Media

10    No. 3 in the deposition of Samantha Phillips.  Going off        02:44PM

11    the record.  The time is 2:44.

12                      (A brief recess was taken.)

13                  THE VIDEOGRAPHER:  This marks the beginning of

14    Media No. 4 in the deposition of Samantha Phillips.

15    We're back on the record.  The time is 3:01.                    03:01PM

16        Q    BY MS. JACKSON:  Good afternoon, Ms. Phillips.

17    I just want to confirm that you still only have your

18    Zoom and Veritext Exhibit Share windows up and nothing

19    else?

20        A    Yes.                                                    03:01PM

21        Q    And that it's just you and your dog in the --

22    in the room right now?

23        A    Snoring.

24        Q    Committed.

25             I want to go back quickly to your -- your role        03:01PM
```

Page 122

Davis Decl. Exhibit 59, Page 11 of 15

```
 1          CERTIFICATE OF CERTIFIED SHORTHAND REPORTER
 2          I, Rochelle Holmes, the undersigned, a Certified
 3    Shorthand Reporter of the State of California, do hereby
 4    certify:
 5          That the foregoing proceedings were taken
 6    before me via videoconference; that any witnesses in the
 7    foregoing proceedings, prior to testifying, were
 8    administered an oath; that a record of the proceedings
 9    was made by me using machine shorthand which was
10    thereafter transcribed under my direction; that the
11    foregoing transcript is a true record of the testimony
12    given.
13          Further, that if the foregoing pertains to the
14    original transcript of a deposition in a Federal Case,
15    before completion of the proceedings, review of the
16    transcript [ ] was [X] was not requested.
17          I further certify I am neither financially
18    interested in the action nor a relative or employee
19    of any attorney or any party to this action.
20          IN WITNESS WHEREOF, I have this date subscribed my
21    name.
22    Dated:  December 18, 2020
23
24                  Rochelle Holmes
                    _____
                    Rochelle Holmes
25                  CSR No. 9482, CCRR No. 0123
```

                                        Page 235

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: December 1, 2020

Deponent: Samantha Phillips

| Page | Line(s) | Reads | Should Read | Reason |
|------|---------|-------|-------------|--------|
| 30 | 22 | F band | S band | To correct a transcription error |
| 31 | 2 | Correct. | Correct, I was told I would be able to participate in 2015 and beyond. | Full answer to question asked |
| 31 | 19 | unable | able | To correct a transcription error |
| 31 | 25 | Correct | No, I did not receive a PSP in 2015 | To conform answer to the facts |
| 33 | 3 | Brandon | Brennon | To correct a transcription error |
| 33 | 5 | Brandon | Brennon | To correct a transcription error |
| 33 | 6 | Brandon | Brennon | To correct a transcription error |
| 33 | 19 | F band | S band | To correct a transcription error |
| 34 | 6 | F band | S band | To correct a transcription error |
| 37 | 11 | risks | risk | To correct a transcription error |
| 37 | 24 | Seahan | Feehan | To correct a spelling error |
| 39 | 4 | F band | S band | To correct a transcription error |
| 40 | 2-3 | two of my teammates out of the company and out of the team. | two of my teammates out - one out of the company, and one out of the team | Full answer to question asked |
| 48 | 17 | C-O-R-B-I-T (sic) | C-O-R-B-I-T-T | To correct spelling error |
| 56 | 9 | Trasclare | Trosclair | To correct a transcription error |
| 56 | 10 | Nordeman | Nordemann | To correct a transcription error |
| 60 | 12 | The IPO | Pre IPO | To correct a transcription error |
| 61 | 10 | I left Nike | I left Visa | To correct a transcription error |
| 67 | 24 | India | EMEA | To correct a transcription error |
| 67 | 25 | India | EMEA | To correct a transcription error |
| 68 | 2 | India | EMEA | To correct a transcription error |
| 69 | 1 | Ambias | MBOs | To correct a transcription error |
| 74 | 17 | ESP | ESPP | To correct a transcription error |
| 74 | 19 | ESP | ESPP | To correct a transcription error |
| 78 | 18 | EFPP | ESPP | To correct a transcription error |

794551.3

Davis Decl. Exhibit 59, Page 13 of 15

| 87 | 1 | Dale Shockley | Dale Compton | To correct spelling error |
|----|----|----|----|----|
| 92 | 16 | G-U-E-R-T-Z-E-N (sic) maybe. | G-E-U-R-T-S-E-N | To correct spelling error |
| 93 | 9 | Dale Shockley | Dale Compton | To correct spelling error |
| 94 | 4 | Ryan | Rob | To correct a transcription error |
| 94 | 24 | Grillo Marketing | Gorilla Marketing | To correct a transcription error |
| 104 | 7 | F band | S band | To correct a transcription error |
| 109 | 13 | Maybe – maybe Ross. I'm not sure | Passmore | To correct spelling error |
| 112 | 13 | 80744 | A0744 | To correct a transcription error |
| 122 | 3-4 | Yeah. But then -- yeah. I don't remember it, but... | I don't remember if stock options were part of the initial offer or not. | Full response to the question asked |
| 129 | 24 | 82260 | A2260 | To correct a transcription error |
| 170 | 17 | FLA | SLA | To correct a transcription error |
| 191 | 20 | F band | S band | To correct a transcription error |
| 193 | 11 | She was not there when I... | She was not there when I recommended ratings | Full response to the question asked |
| 194 | 2 | Seth Fuller, Neal Kerner, Brennon Stewart | Seth Fuller, Neal Kerner, Brennon Stewart, Bill Brock | Full response to the question asked |
| 209 | 11-12 | I was paid less to come to Nike than I was being paid by my peers in any other role. | I was paid less to come to Nike than I was making at eBay and I was being paid less than my peers in any other role. | Full response to the question asked |
| 211 | 4 | Dale Shockley | Dale Compton | To correct spelling error |
| 221 | 16 | Anthony something | Anthony Watson | Full response to the question asked |
| 221 | 18 | Bill. Bill something | Bill Dennings | Full response to the question asked |

794551.3

Davis Decl. Exhibit 59, Page 14 of 15

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on <u>1/16/2021</u> in <u>Lake Oswego, OR</u>.

*Samantha Phillips*

Samantha Phillips

794551.3

Davis Decl. Exhibit 59, Page 15 of 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,    No.

        Plaintiffs,              3:18-cv-01477-JR

    v.

NIKE INC., an Oregon

Corporation,

        Defendant.


REMOTE 30(b)(6) VIDEOCONFERENCE DEPOSITION OF

JESSICA ELIZABETH STUCKEY

Taken in behalf of Plaintiffs

May 14, 2021

Stuckey, Jessica                                                    May 14, 2021

Page 67

1          explanation of job descriptions, that's, that's
2          been accurate for WHQ job codes since, from 2012
3          to the present?
4    A.    Correct.
5    Q.    Great.  So I want to actually now jump back to
6          Exhibit 681, if you could.
7    A.    Sure.
8    Q.    So I'd like to start on the first page, which is
9          Bates 5318.
10   A.    Uh-huh.
11   Q.    And just wanted to go through and just make sure
12         I understand what all the things mean.  So in
13         the very, kind of top under "Nike, Inc. Job
14         description" there's kind of one table.  It says
15         "job code" and under that it says "A1536."  What
16         does job code reflect?
17   A.    It's a randomly generated numeric code that we
18         apply to all of our, all of our jobs.  So there
19         are components that are required.  Every job
20         must have a job code and a job title so that we
21         can link them to each employee, which then
22         drives their pay range, their incentive target.
23         It may drive their stock eligibility, program
24         eligibility more broadly, but that is just a
25         numeric code that we have attached to each job

Page 68

```
 1          title.
 2     Q.   Okay.  And when you say that the, that the job
 3          code can drive or contribute to those types of
 4          pay or compensation determinations, when you say
 5          that, does that mean that the information
 6          contained on documents like Exhibit 681 are
 7          informing those decisions about incentive
 8          compensation, base pay, et cetera?
 9     A.   I would say it's informing the attributes, yes.
10          So everything would be linked.  An employee
11          cannot, not be linked to a job code because it
12          will not drive those other elements of their,
13          you know, the pay range, that is associated to
14          them or the PSP target or stock eligibility
15          without a job code link to each employee.
16     Q.   Okay.  Next to "Job Code" is "Title."  For this
17          one it says "PROF" and then "INTR buying," which
18          looks like professional intermediate buying.
19          What's the title reflect?
20     A.   So we have a standard framework by which we
21          title our, well, again, sort of our SAP job
22          title and it reflects the various levels of jobs
23          with standard frame levels to a point if it's
24          professional, intermediate, and then the
25          specific job.  And it limits, there's a
```

Stuckey, Jessica                                                    May 14, 2021

         1                    C E R T I F I C A T E
         2          I, Aleshia K. Macom, Oregon CSR No. 94-0296,
         3     Washington CCR No. 2095, California CSR
         4     No. 7955, RMR, CRR, RPR, do hereby certify that
         5     JESSICA ELIZABETH STUCKEY remotely appeared
         6     before me at the time and place mentioned in the
         7     caption herein; that the witness was by me first
         8     duly sworn on oath, and examined upon oral
         9     interrogatories propounded by counsel; that said
        10     examination, together with the testimony of said
        11     witness, was taken down by me in stenotype and
        12     thereafter reduced to typewriting; and that the
        13     foregoing transcript, pages 1 to 219, both
        14     inclusive, constitutes a full, true and accurate
        15     record of said examination of and testimony
        16     given by said witness, and of all other
        17     proceedings had during the taking of said
        18     deposition, and of the whole thereof, to the
        19     best of my ability.
        20          Witness my hand at Portland, Oregon this
        21     27th day of May, 2021.
        22
        23     _____
               Aleshia K. Macom
        24     OR CSR No. 94-0296, Expires 9-30-2023
               WA CCR No. 2095, Expires 7-7-2021
        25     CA CSR No. 7955, Expires 7-7-2021

DocuSign Envelope ID: 0077423D-E3CB-4DB0-8752-675EC5617067

*Cahill, et al v. Nike*

**Jessica Stuckey Deposition Errata**

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 15:5-6 | "We looked primarily at an (unintelligible) job description." | "We looked primarily at an existing job description." | To correct a transcription error |
| 20:24 | "compensation analysis of certain rules" | "compensation analysis of certain roles" | To correct a transcription error |
| 22:10-12 | "It can be incentive targets designed to their peer, what I would call peer compensation market data." | "It can be incentive and design relative to peers, what I would call peer compensation market data." | To correct a transcription error |
| 23:18 | "not just the store's business." | "not just the stores." | To correct a transcription error |
| 23:21 | "that we were delivering on our program" | "that we were delivering on our programs" | To correct a transcription error |
| 24:10-11 | "There was an expanded aperture." | "There was an expanded scope." | To clarify testimony |
| 27:9 | "So we work with a business and our HR partners" | "So we work with the business and our HR partners" | To correct a transcription error |
| 27:24 | "I was supporting our Asian Pacific," | "I was supporting our Asia Pacific," | To correct a transcription error |
| 35:3 | "typically variable to our broad population" | "typically available to our broad population" | To correct a transcription error |
| 35:5 | "enabled by rotation" | "enabled by location" | To correct a transcription error |
| 44:20 | "HR to make a document to job descriptions" | "HR to make an update to job descriptions" | To correct a transcription error |
| 45:11-12 | "may be one compensation consultant helping with network." | "may be one compensation consultant helping with the work." | To correct a transcription error |
| 45:16-18 | "there may be more than one compensation consultant chain can be set for the HR business partners." | "there may be more than one compensation consultant aligned across a set of HR business partners." | To correct a transcription error |
| 50:22 | "it to get the technology." | "it to get into the technology." | To correct a transcription error |
| 55:18-19 | "Sets the pay ranges, not the specific employee type." | "Sets the pay ranges, not the specific employee pay." | To correct a transcription error |
| 57:15-16 | "for every manager and how they rate their job posting." | "for every manager and how they wrote their job posting." | To correct a transcription error |
| 82:14-15 | "It's fair they changed that and submit it through SAP." | "If there was a request to make a change, a form should be completed and submitted to Tech to make a change in SAP." | To clarify testimony and conform to the facts |

1

DocuSign Envelope ID: 0077423D-E3CB-4DB0-8752-675ECF617067

| 84:3 | "it was a form that realm served" | "it was a form that really served" | To correct a transcription error |
|---|---|---|---|
| 87:25-88:4 | "It was not compensation pertaining to just the description. We would do interviews or create a template to capture feedback and then drafting a redraft to come to a final description." | "It was not just compensation making changes to the description. We would do interviews or create a template to capture feedback and then drafting and redrafting to come to a final description." | To correct a transcription error |
| 95:9 | "but we did not create new function" | "but we did not create new functions," | To correct a transcription error |
| 101:12 | "like a career lateral or something like that," | "like a career ladder or something like that," | To correct a transcription error |
| 106:9 | "Or the report was running and changed into PDF." | "Or the report was run and saved to PDF." | To correct a transcription error |
| 119:9 | "someone not performing." | "someone is not performing." | To correct a transcription error |
| 122:22 | "senior professional intermediate, there may be" | "senior professional, there may be" | To correct a transcription error |
| 129:17 | "to select job codes based on the core duty and" | "to select job codes based on the core duties and" | To correct a transcription error |
| 130:15 | "consistent use of job codes through out of parts" | "consistent use of job codes throughout all parts" | To correct a transcription error |
| 131:8 | "talked about step titles and job titles they may" | "talked about desk titles and job titles they may" | To correct a transcription error |
| 143:12 | "will be for the PA or the," | "will be for the TA or the," | To correct a transcription error |
| 164:21 | "nontechnical term, ban job postings for language" | "nontechnical term, scan job postings for language" | To correct a transcription error |
| 169:24 | "going in to PPM," | "going into CPM," | To correct a transcription error |
| 173:24 | "what's your sixth-sense feeling," | "what's your sense, feeling," | To correct a transcription error |
| 174:25 | "the TSP payout or things like that." | "the PSP payout of things like that." | To correct a transcription error |
| 175:13 | "If he don't need to," | "If we don't need to," | To correct a transcription error |
| 177:9 | "looking at people relative to the pay rate," | "looking at people relative to the pay range," | To correct a transcription error |
| 179:2-3 | "It was really a pretty inefficient process." | "Pay reviews were really a pretty inefficient process prior to 2X." | To clarify testimony and conform to the facts |
| 179:21-22 | "flagged in getting increases, who was not flagged in getting increases." | "flagged in this sentence, who was not flagged in this sentence." | To correct a transcription error |

2

| 182:7 | "business partners and the top consultants" | "business partners and the comp consultants" | To correct a transcription error |
|---|---|---|---|
| 186:24-25 | "I'm not sure that I remember every year and learned that." | "I'm not sure that I remember every year or ever learned that." | To correct a transcription error |
| 187:10 | "much should we spend in total?" | "much did we spend in total?" | To correct a transcription error |
| 195:19 | "25 percent, maybe a little higher" | "0.5 percent, maybe a little higher | To correct a transcription error |
| 198:11 | "if it went up to the PHR." | "if it went up to the VP of HR." | To correct a transcription error |
| 207:11-13 | "the 2x program, talk about some of the, you know, sliding that was used in the process and then go into a little bit of," | "the 2x program, and then go into a little bit of," | To correct a transcription error; the sentence is unintelligible as written but the witness does not recall the testimony provided |
| 215:9 | "you know, amateurs, they may not have that" | "you know, lower level, they may not have that" | To correct a transcription error |

I attest that the above-referenced changes are true and correct.

Date: June 28, 2021

DocuSigned by:

*Jessica Stuckey* _____

2BEFD433BFC04AF...    Jessica Stuckey

3

                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF OREGON
                      PORTLAND DIVISION

KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,    No.

          Plaintiffs,            3:18-cv-01477-JR

      v.

NIKE INC., an Oregon

Corporation,

          Defendant.




          REMOTE 30(b)(6) VIDEOCONFERENCE DEPOSITION OF
                       SHINE THOMAS
              Taken in behalf of Plaintiffs
                    March 26, 2021

Page 26

1          have been to prepare for the period prior to
2          2015; is that correct?
3              MS. DAVIS:  Objection; calls for a legal
4          conclusion, outside the scope.
5    Q.    BY MR. BYRON GOLDSTEIN:  You can answer, Shine.
6    A.    I don't know.  I don't understand the question.
7              MS. DAVIS:  Object.
8              Sorry.  Go ahead.
9              I'll also object that the tone is becoming
10         argumentative.
11   Q.    BY MR. BYRON GOLDSTEIN:  With respect to posted
12         positions at Nike World Headquarters, the person
13         that is hired into the posted position could be,
14         as you mentioned earlier, either an external
15         candidate or an internal candidate; is that
16         accurate?
17   A.    I don't think I mentioned anything earlier about
18         candidates.
19   Q.    You said that a post -- I'm sorry.  Go ahead,
20         Shine.  I didn't realize you were talking still.
21   A.    Can you clarify the question one more time?
22   Q.    Yes.  I had asked you what a posted position was
23         and you said it could be posted internally or
24         posted externally.
25   A.    Right.

Page 27

1    Q.    So posted position could be posted either
2          internally, externally or externally and
3          internally; is that accurate?
4    A.    That's accurate.
5    Q.    Okay.  Now, so the posted positions can result
6          in either new hires or promotions or other job
7          changes for internal employees; is that correct?
8    A.    Correct.
9    Q.    So talent acquisition manages the process for
10         both new hires and competitive promotions or
11         other job changes at Nike World Headquarters; is
12         that correct?
13             MS. DAVIS:  Objection; the question's vague.
14             You can answer.
15             THE WITNESS:  Can you clarify what you mean
16         by new hires as compared to competitive
17         promotions?
18   Q.    BY MR. BYRON GOLDSTEIN:  So when you said
19         "external" earlier, what did you mean?
20   A.    I said the roles were posted on our external
21         career site as well as our internal career site.
22   Q.    And what's the external website?
23   A.    Can you clarify?  You mean the name?
24   Q.    Well, if you post jobs on external websites, you
25         might get external candidates; is that correct?

Page 28

```
 1   A.   That's correct.  That is the purpose.

 2   Q.   Okay.

 3   A.   I'm sorry.

 4   Q.   Go ahead, Shine.  That's the purpose?

 5   A.   (No audible response.)

 6   Q.   So a posted position could result in an external

 7        candidate, meaning someone who doesn't currently

 8        work at Nike, getting a job at Nike World

 9        Headquarters; is that accurate?

10   A.   That is accurate.

11   Q.   And a posted position could also result in a

12        competitive promotion or other job change at

13        Nike World Headquarters because an internal

14        employee could apply and get the job; is that

15        correct?

16   A.   That is correct.

17   Q.   So talent acquisition manages the process for

18        when external candidates are hired, new hires at

19        Nike, and manages the process for competitive

20        promotions or other job changes; is that

21        correct?

22   A.   Talent acquisition's role is to manage the

23        process.  Correct.

24   Q.   Correct as to both new hires and competitive

25        promotions or other job changes at World
```

*Beovich Walter & Friend*

1-800-541-4452                503-228-7201                www.bwfreporters.com

Davis Decl. Exhibit 61, Page 4 of 47

Thomas, Shine - 30(b)(6)                    March 26, 2021

Page 29

```
 1         Headquarters?
 2    A.   I'd like to clarify.  Talent acquisition manages
 3         the process, but to -- the whole process
                              manager
 4         involves the hiring^and talent acquisition.
 5         Talent acquisition does not manage the process
 6         independent of a hiring manager.
```

```
 7    Q.   So do you see that Exhibit 636 is called a
 8         manager education tool?  Do you see that?
 9    A.   Yes.
10    Q.   And this is provided to managers, I would
11         assume, if it's called the manager education
12         tool; is that right?
13             MS. DAVIS:  Objection; calls for
14         speculation, outside the scope.
15             If you know, you can answer.
16             THE WITNESS:  I don't know who received this
17         at all.
18    Q.   BY MR. BYRON GOLDSTEIN:  In preparation for this
19         deposition, did you look at any documents that
20         were exhibits in prior depositions?
21             MS. DAVIS:  Objection; calls for
22         speculation.
23             If you know.
24             THE WITNESS:  I don't know.
25    Q.   BY MR. BYRON GOLDSTEIN:  Did you look at any
```

Thomas, Shine - 30(b)(6)                    March 26, 2021

Page 42

1          Headquarters?

2    A.    Taleo is our applicant tracking system.  It is

3          the tool, the candidates apply to open

4          requisitions.

5    Q.    Is it used for anything else?

6    A.    It is used to receive applications for open

7          positions.  It is used to move those applicants

8          throughout the stages of the recruiting.  It is

9          used to create an offer letter.  It is used to

10         move the final, finalist candidates into the

11         requisition.

12   Q.    Is it used for noncompetitive job changes?

13   A.    It is not.

14   Q.    Are there any other systems or applications that

15         Nike has used since 2015 to manage the hiring or

16         competitive job change processes?

17   A.    It depends on what you mean by "to manage" and

18         what you mean by tools.  Do you mean internal

19         tools?  External tools?

20   Q.    Let's start with internal tools.  What internal

21         tools have been used other than Taleo during the

22         hiring or competitive job change process since

23         2015?

24   A.    Various tools at our disposal.  Taleo is the

25         primary tool to capture all the applicants.  We

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 61, Page 6 of 47

Page 43

```
 1        have a tool called Avature, which is a CRM,
 2        which is primarily used for proactive sourcing
 3        of prospects.  It is not an applicant tracking
 4        system.  We -- I think I'm trying to understand
 5        definition of tool.  Taleo is our primary tool
 6        that we use.  I'm trying to think of other
 7        tools.  I don't know.
 8   Q.   That was helpful, Shine.  I was -- Tool's one
 9        way to think about it.  Any program, systems or
10        applications.  So you mentioned the CRM.  Can
11        you spell the name of that the CRM?
12   A.   A V A T U R E.
13   Q.   Avature?
14   A.   Correct.
15   Q.   Is Avature integrated with Taleo?
16   A.   No.
17   Q.   Does the information and data that is in Avature
18        automatically get transferred or stored within
19        the Taleo system?
20   A.   No.
21   Q.   Has Nike used Avature since 2015?
22   A.   I don't recall the date.
23   Q.   Well, do you know if it was before or after
24        2015?
25   A.   I truly don't recall the date.  I'm -- It could
```

Beovich Walter & Friend

1-800-541-4452                    503-228-7201                    www.bwfreporters.com

Davis Decl. Exhibit 61, Page 7 of 47

Page 44

```
 1            be.  It could be after 2015, but I don't know
 2            the date it was started, off the top of my head.
 3            Not that I recall.
 4     Q.     Do you remember using any other CRM or has Nike
 5            used any other CRM that you know about?
 6     A.     I do not know of any other.
 7     Q.     Why did you use Avature for proactive sourcing
 8            of prospects and not Taleo?  Sort of just
 9            getting at the functionality and trying to
10            understand what it is.
11     A.     Taleo is our applicant tracking system where
12            candidates can apply for an open position.
13     Q.     And Taleo, does that provide for proactive
14            sourcing of -- Could you do proactive sourcing
15            of prospects in Taleo?
16     A.     You cannot.
17     Q.     How does the proactive sourcing of prospects
18            process work?
19                 MS. DAVIS:  Objection; outside the scope.
20                 You can answer generally.  It's --
21                 MR. BYRON GOLDSTEIN:  Hold on.  Felicia,
22            stop with the instructions, especially saying
23            "you can answer generally" about how she can
24            answer.
25                 MS. DAVIS:  Well --
```

Beovich Walter & Friend

1-800-541-4452                    503-228-7201                    www.bwfreporters.com

Davis Decl. Exhibit 61, Page 8 of 47

Page 45

1    Q.    BY MR. BYRON GOLDSTEIN:  Again, Shine, you

2          don't --

3                Felicia, don't interrupt.

4                Shine, you don't have to wait for Felicia to

5          say you can answer.  You're, you're supposed to

6          answer unless she directs you not to answer.

7                THE WITNESS:  Yeah.  I was --

8                MS. DAVIS:  Go ahead, Shine.

9                THE WITNESS:  I was thinking about my answer

10         so I can provide an accurate description.

11   Q.    BY MR. BYRON GOLDSTEIN:  I appreciate that.

12   A.    Proactive sourcing is a part of -- it is before

13         we have a requisition that is open in our

14         applicant tracking system.  I can give you an

15         example.  For example, if we know that we are

16         hiring a certain number of a particular role, a

17         specific position that is hard to attract

18         applicants through our external career site, we

19         will proactively contact candidates to --

20         prospects, correct, prospects to gather their

21         interest in potential positions at Nike.

22   Q.    Is that used for external candidates only or

23         internal candidates as well?

24   A.    External candidates only.

25   Q.    Okay.  Potential candidates, I should say.

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 61, Page 9 of 47

Thomas, Shine - 30(b)(6)                          March 26, 2021

```
                                                   Page 46
 1    A.    Prospects.  External prospects.  Yeah.
 2    Q.    Okay.  Does Nike's anti-discrimination policies
 3          apply to competitive job changes and new hires?
 4    A.    Can you clarify what policies you mean?
 5    Q.    What anti-discrimination policies at Nike apply
 6          to competitive job changes and new hires?
 7    A.    All of our anti-discriminatory policies apply.
 8    Q.    Okay.  And which -- And what would those be?
 9    A.    Are you asking me to list the policies?
10    Q.    Yes, please.
11    A.    I don't know the exact wording of the policy.
12          So can I answer generally?
13    Q.    Answer as best you can.  I'm not, I'm never
14          asking -- It's always okay to say, Shine, "I
15          don't know" or "I don't know exactly."  It's
16          totally fine.  So whatever you can answer,
17          that's all I ask that you answer.
18    A.    Clarify the question.  You're asking me what our
19          anti-discriminatory policies are?
20    Q.    That apply to --
21    A.    Apply to hiring.
22    Q.    -- competitive job changes or new hires.
23    A.    All of our anti-discriminatory policies apply to
24          competitive hiring or job changes.
25    Q.    Entering Exhibit 659, Bates number NIKE_29808,
```

Thomas, Shine - 30(b)(6)                                   March 26, 2021

1           that's page 18.  It says page 17 on it, but it's
2           page 18 of the document.
3     A.    Okay.  I have it.
4     Q.    Okay.  Do you see on the right column it says --
5           Do you see where it says, "What If?"
6     A.    Yes.
7     Q.    And then in the answer to the question that's
8           there, after it says "No," it says, "All
9           decisions related to" -- "relating to hiring
10          should be approved by talent acquisition."  Is
11          this an accurate statement by Nike's code of
12          conduct Inside the Lines?
13    A.    I need to read the document.
14    Q.    The entire thing or just this?
15    A.    Just that section so I have the context
16          around --
17    Q.    Yeah.  Of course.  It's okay to read whatever
18          you want.  I just wanted to know the timing.
19    A.    Can you repeat the question specifically so I'm
20          answering it accurately?
21              MR. BYRON GOLDSTEIN:  Aleshia, can you
22          repeat the question, please, or read back the
23          question.
24              (Record read as follows:
25              "Q    And then in the answer to the

Beovich Walter & Friend

Thomas, Shine - 30(b)(6)                                March 26, 2021

Page 49

1           question that's there, after it says "No,"
2           it says, "All decisions related to" --
3           "relating to hiring should be approved by
4           talent acquisition."  Is this an accurate
5           statement by Nike's code of conduct Inside
6           the Lines?")
7               THE WITNESS:  I think it depends because --
8       It really depends.  Every, every situation is
9       different, and it depends on the role and the
10      position.
11  Q.  BY MR. BYRON GOLDSTEIN:  So the statement in
12      Inside the Lines, it says "All decisions
13      relating to hiring."  That is not accurate; is
14      that what you're saying?
15  A.  I think it depends on the type of position, the
16      type of division.  There are multiple people
17      involved in hiring positions.
18  Q.  So you would disagree with the statement that
19      all decisions relating to hiring should be
20      approved by talent acquisition?
21  A.  I would, I would tell you that all decisions
22      around hiring are approved by multiple people.
23      And I don't know if there is other information
24      in this document that refers to that.
25  Q.  Fair enough, Shine.  So would it be accurate to

Page 87

1    Q.    So the -- So the manager playbook is directing
2          managers to the hiring process document.  And I
3          can introduce that.  Is that, is that what it's
4          saying?
5    A.    That does seem to be accurate.
6    Q.    So hiring process document will be Exhibit 663
7          and this is NIKE_00003185.
8    A.    I have the document open.
9    Q.    Have you ever seen this document before?
10   A.    I have.
11   Q.    And the, the metadata that Nike produced is, it
12         says the file name is hiring process.  And if
13         you look at the end of the document on the
14         second page it says, date, December 13, 2018.
15         Do you see that?
16   A.    I do.
17   Q.    Prior to December 2018 did Nike have, did they
18         have prior versions of this hiring process
19         document?
20   A.    They may.  I do not know for a fact yes or no.
21   Q.    Did you look at this document in preparation for
22         today?
23   A.    I actually don't recall.  I don't recall.
24   Q.    Do you know -- I'm sorry, Shine.  Were you
25         saying something?

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 61, Page 13 of 47

Thomas, Shine - 30(b)(6)                                March 26, 2021

                                                            Page 88

```
 1   A.   I do not think I did look at this document.
 2   Q.   Okay.  You recognize this as a Nike document?
 3   A.   Yes.
 4   Q.   Do you know what organization or business unit
 5        would have been responsible for this document,
 6        putting it together?
 7   A.   I believe talent acquisition.
 8   Q.   Do you know who in talent acquisition would have
 9        been involved?
10   A.   I do not.
11   Q.   If you wanted to find out the answer to that
12        question, how would you do that?
13   A.   I would probably ask my manager.
14   Q.   Who is your manager?
15   A.   My manager is the VP of talent acquisition.
16   Q.   And who is the VP of talent acquisition?
17   A.   Paula Radloff.
18   Q.   Has Paula worked in talent acquisition for a
19        longer period than you have at Nike?
20   A.   I, I do not know exactly.
21   Q.   If you turn to the second -- Actually sorry.  At
22        the bottom of the first page of Exhibit 663, do
23        you see "Phase five:  Make an offer"?
24   A.   I do.
25   Q.   And then at the top of the document do you see
```

Beovich Walter & Friend

1-800-541-4452            503-228-7201            www.bwfreporters.com

Davis Decl. Exhibit 61, Page 14 of 47

Page 89

 1          how it's described?  It says the hiring process,
 2          it's described as "a quick guide to educate key
 3          players on their roles and responsibilities when
 4          looking to hire great talent at Nike."
 5              Is that an accurate description of this
 6          document?
 7     A.   It's a guideline, but possibly.
 8     Q.   Same question with regards to the second
 9          sentence at the top regarding this document.  It
10          says, "Use this resource to learn about your
11          role as well as when to rely on other
12          stakeholders throughout the process."  Is that
13          an accurate description of this document?
14     A.   I would say that is a description of this
15          guideline in addition to other guidelines that
16          exist.
17     Q.   Do you see that it says "use this resource" and
18          it doesn't say you may use this resource or
19          there's a caveat?  Do you see that it sounds
20          like it's an instruction, not a possibility.  Do
21          you see that?
22              MS. DAVIS:  Objection; document speaks for
23          itself.
24              THE WITNESS:  This is a guideline.
25     Q.   BY MR. BYRON GOLDSTEIN:  So as Felicia just

Thomas, Shine - 30(b)(6)                    March 26, 2021

Page 90

```
 1          said, the document speaks for itself.  So a
 2          document like this where a talent acquisition
 3          created, these would be well thought out
 4          documents?  These weren't haphazard; correct?
 5     A.   I'd like to clarify one point.  My --
 6     Q.   Sure.
 7     A.   My answer, I believe talent acquisition may have
 8          created this, but I do not know the specific
 9          person who created this document.
10     Q.   Do you have any reason to believe that either of
11          the first two sentences in this document are
12          inaccurate?
13     A.   I believe that this is a guideline that a hiring
14          manager can utilize.  It's not a rule that they
15          have to follow.  It is a guideline.
16     Q.   Okay.  So in this document we looked at phase
17          five, make an offer.  But do you see that there
18          are six phases to the hiring process?  Do you
19          see that?
20     A.   I do.
21     Q.   And that making an offer is part of the hiring
22          process?  Do you see that?
23     A.   I do.
24     Q.   And that's correct?
25     A.   That is correct.
```

Thomas, Shine - 30(b)(6)                                      March 26, 2021

```
 1   Q.   For each of the phases here, the document
 2        provides for the roles and responsibilities of
 3        at least some of those involved in the hiring
 4        process; is that accurate?
 5   A.   This document is a guideline that is used in the
 6        hiring process and was involved in the hiring
 7        process.
 8   Q.   Can you turn to the second page, please, in
 9        phase six of the hiring process.
10   A.   Yes.
11   Q.   Do you see that it states in the second-to-last
12        bullet point "For internal hires, partner with
13        former manager on a transition plan"?  Do you
14        see that?
15   A.   I do.
16   Q.   So this hiring process document applies to
17        competitive promotions or other job changes for
18        current Nike employees as well as new hires;
19        correct?
20   A.   Correct.
21   Q.   So the hiring process begins with phase one,
22        "Identify Talent Need."  Do you see that?
23   A.   I do.
24   Q.   So, and do you see the reference, one of the two
25        roles listed here is HR manager/HR business
```

Thomas, Shine - 30(b)(6)                                    March 26, 2021

Page 92

```
 1        partner?  Do you see that?
 2   A.   I do.
 3   Q.   Is that referring to the part of HR that's
 4        business facing?
 5   A.   Yes, it is.
 6   Q.   And then, so in phase one under "Hiring
 7        Manager," do you see that it says in the second
 8        bullet point, "Discuss need with HR manager/HR
 9        business partner"?  Do you see that?
10   A.   I do.
11   Q.   And that's part of the hiring process; is that
12        accurate?
13   A.   It could be.  It's part of the guidelines.  Our
14        hiring manager could discuss the need with an HR
15        manager.
16   Q.   And then do you see the next bullet point,
17        "Receive approvals from leadership and finance
18        to open position"?
19   A.   I do.
20   Q.   So in order to proceed further with the hiring
21        process, must the HR hiring manager receive
22        approvals from leadership and finance to open
23        the position?
24   A.   It's one of our processes, is to make sure that
25        we have the budget to fill a role.  So yes.  It
```

Thomas, Shine - 30(b)(6)                    March 26, 2021

```
 1           is, it is one of the processes.
 2    Q.    How does the hiring manager go about receiving
 3           the approval from leadership and finance to open
 4           the position?  Is there a specific document that
 5           that request is made in?
 6    A.    That process varies depending on the time of
 7           year, when a position is opened, if there is --
 8           It depends on the type of role that is being
 9           opened.
10    Q.    So the next bullet point, do you see the next
11           bullet point under "Hiring Manager"?  It says,
12           "Gathers position details such as job
13           description band, job code, cost center,
14           et cetera, and coordinates with HR Direct to
15           understand which position requirements are
16           necessary to gather prior to position creation."
17               Do you see that?
18    A.    Yes.
19    Q.    Can you, can you turn back to Exhibit 662,
20           please.
21    A.    Okay.
22    Q.    Do you see that there's a list of references in
23           the manager playbook hiring that directed
24           managers to the hiring process?
25    A.    I'm sorry.  Can you clarify?  There's a list of
```

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwreporters.com

Davis Decl. Exhibit 61, Page 19 of 47

Thomas, Shine - 30(b)(6)                    March 26, 2021

Page 107

1        point says, "Recommend position leveling if
2        needed."  Do you see that?
3    A.  Yes.
4    Q.  What does that refer to?
5    A.  I believe that refers to what is the right
6        position for that hiring manager's team at that
7        point.  Again, it's a consultative process.  The
8        hiring manager at times may have a specific
9        knowledge of what level that they would like to
10       create an open position.  There are times when
11       the creation of a position, for example, if
12       someone exits the team, may create in some
13       changes around what capabilities are needed.
14       And so the hiring manager will partner with the
15       HR manager around what is the best approach.
16       Then the hiring manager will make the decision
17       because it is their team and their business
18       around what the open position should be.
19   Q.  How does the business facing HR know if position
20       leveling is needed?
21   A.  Every single scenario is different.  So every
22       single HR manager operates differently with
23       their business.  They, because of the process of
24       approvals, the HR manager is involved in, in
25       that as a central point for coordination,

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 61, Page 20 of 47

Thomas, Shine - 30(b)(6)                                    March 26, 2021

Page 118

```
 1            recruiter.
 2    Q.      Are there any trainings for talent acquisition
 3            concerning how to use Taleo?
 4    A.      There are trainings on how to use Taleo.
 5    Q.      Who gives those trainings?
 6    A.      That is not consistent.  Who gives the training
 7            is not consistent.  Sometimes it is the manager
 8            of the recruiter.  Sometimes it is through an
 9            on-boarding training.  It varies.
10    Q.      So there's, there are on-boarding trainings for
11            talent acquisition new hires?
12    A.      We have some on-boarding training for new hires
13            now.
14    Q.      Has Nike been collecting compensation
15            expectations since 2015 or have a guideline or
16            policy regarding the collection of compensation
17            expectation since 2015?
18    A.      We don't specifically -- I would like to define
19            what you mean by "collecting."
20    Q.      Ask for compensation expectations.
21    A.      I would say that is one of our guidelines for
22            our recruiters, to ask for compensation
23            expectations as a data point.
24    Q.      Has that been a guideline since 2015 to the
25            present?
```

Beovich Walter & Friend

1-800-541-4452            503-228-7201            www.bwfreporters.com

Davis Decl. Exhibit 61, Page 21 of 47

Page 119

1    A.    It is our guideline for recruiters to ask the
2          compensation expectations.
3    Q.    And has that guideline been in existence since
4          at least 2015?  Is that accurate?
5    A.    I would say so.  I would say that is a way of
6          working in recruiting.
7    Q.    And that applies to new hires at Nike World
8          Headquarters in bands for positions in bands L
9          through S?
10   A.    Correct.
11   Q.    Then we get to phase five, "Make an Offer."
12   A.    Okay.
13   Q.    Do you see the, under "Talent Acquisition," the
14         second bullet point says, "Review compensation
15         information with hiring manager and conduct any
16         necessary pre assessment"?
17              Do you see that?
18   A.    I do.
19   Q.    What are the pre assessments?
20   A.    That could mean a variety of things.  I would, I
21         could not answer that conclusively, what that
22         means.  Just give me one minute.  It's such a
23         broad term.  It does not have a specific
24         definition that I could say what does a pre
25         assessment mean.

Thomas, Shine - 30(b)(6)                              March 26, 2021

Page 120

1  Q.   Then do you see the fourth bullet point,
2       "Contact HRBP and business leaders for offer
3       approval"?
4  A.   Correct.  I do see that.
5  Q.   So talent acquisition has to contact HRBP and
6       business leaders for approval of the offer?
7  A.   We do not.  We contact the hiring manager to
8       approve the offer.  It varies from situation to
9       situation because every offer is unique.
10 Q.   Are you saying that this bullet point in the
11      hiring process is incorrect?
12 A.   I would say this bullet point is a guideline
13      that recruiters can apply as needed, and if not
14      needed, they do not need to apply.  This is a
15      guideline.
16 Q.   There is a -- So is it fair to say that there's
17      a guideline that talent acquisition is supposed
18      to contact HRBP's and business leaders for offer
19      approval?
20 A.   I would say that this is the guideline which
21      means that every scenario may be different.
22      Some offers do not need any contact with anyone
23      beyond the hiring manager, most offers actually.
24      So this is the guideline that recruiters can
25      follow, but it's not always needed.

Thomas, Shine - 30(b)(6)                          March 26, 2021

Page 123

```
 1          language in this document or in any policies,
 2          guidelines or other documents that Nike has that
 3          contradict this document because it says the
 4          hiring manager can just make the decision on
 5          their own?
                    other than the New Hire Approval Matrix (Exhibit 672)
 6     A.   I cannot point to documents.  I can tell you
 7          what our ways of working are, that this is a
 8          guideline and this is not a linear process.
 9          This is not a step-by-step process that the
10          recruiter or the hiring manager or all the HRBP
11          follow.  This is a guideline.  The onus of the
12          decision making for the offer rests on the
13          hiring manager.  The recruiter is involved in
14          facilitating that process, but the decision is
15          made by the hiring manager.  And that may not be
16          documented, but it is a way of working at Nike.
17     Q.   How do you know that?
18     A.   I know that from my experience as a recruiter.
19     Q.   When offers are made, whether or not a request
20          for approval is done, is that entered into
21          Taleo?
22     A.   To clarify your question, is the offer entered
23          into Taleo?
24     Q.   Requests for approval of an offer.
25     A.   No.  That is not entered into Taleo.
```

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 61, Page 24 of 47

Thomas, Shine - 30(b)(6)                        March 26, 2021

Page 185

```
 1          used for a final offer.  Taleo has the final
 2          offer amount.
 3   Q.     What policies, guidelines or other documents
 4          describe how recruiters or anyone else at Nike
 5          is supposed to determine starting pay for an
 6          external hire in bands L through S?
 7   A.     So this is a part of a recruiter's job.  It's
 8          not outlined in a document.  It's how we work or
 9          I would refer to it as a way of working, like in
10          determining the final offer, multiple data
11          points.  It's not a l̶i̶n̶e̶a̶l̶ ^linear process and all those
12          data points are taken into consideration when
13          determining the final offer.  It is how we do
14          our job.
15   Q.     Does talent acquisition determine the final
16          offer?
17   A.     We do not.
18   Q.     What guidelines, policies or other documents
19          does Nike have with respect to determination of
20          the final offer for starting pay at Nike World
21          Headquarters for positions in bands L through S
22          that apply to the final decision maker?
23   A.     The hiring manager is the final decision maker
24          on final offers.  The recruiter uses different
25          data points that are not in the policy, not
```

Thomas, Shine - 30(b)(6)                          March 26, 2021

Page 194

1          says, "Enter the base salary to be used in the
2          candidate's offer"; correct?
3    A.    It says that.  Yes.
4    Q.    How does information that's entered here, final
5          base salary, get into the candidate's offer
6          letter?
7    A.    So I would say that this is the tool that a
8          recruiter uses to model different scenarios.
9          Not all recruiters need to use this.  The
10         majority of our offers actually you don't need
11         to use this tool because they're a little bit
12         more straightforward.
13              So if a recruiter uses this, they will model
14         different scenarios and then present those
15         scenarios to the hiring manager who makes the
16         final offer.  And whatever that final offer is,
17         there are many components to an offer, the final
18         base salary is entered into a field in Taleo.
19   Q.    And when it's provided to the hiring manager or
20         whoever else makes the final decision, is, if
21         you look in, is this saved to a PDF and sent?
22   A.    First of all, the hiring manager always makes
23         the final decision, just to be clear, around the
24         offer for all of our candidates.  Typically some
25         recruiters will use this as a tool for a

Thomas, Shine - 30(b)(6)                    March 26, 2021

Page 197

```
 1        sign-on, which we have the different levels, so
 2        it depends on the level of the candidate, can be
 3        more complicated.  If I hire for a marketing
 4        coordinator where they don't have complicated
 5        equity walkaway, depending on the company they
 6        come from, I might not need to look at all those
 7        scenarios.
 8            So my point is that every single offer has a
 9        different situation, has a different set of data
10        points and different types of information points
11        that you look at when you make an offer.
12   Q.   So it sounds like the amount of equity they were
13        receiving in their prior job was a significant
14        factor in how you modeled or recommended
15        starting compensation offers; is that right?
16   A.   It's one of the data points that we look at.
         Equity walkaway is ^
17        There are multiple data points for every single
18        offer.  So no offer is the same.
19   Q.   So this version is from April 2020.  Does Nike
20        have versions of this document from before 2020?
21            MS. DAVIS:  Objection; outside the scope,
22        asked and answered.
23            THE WITNESS:  I don't know.  A tool's a
24        tool.  It's a tool that a recruiter uses.
25   Q.   BY MR. BYRON GOLDSTEIN:  Can you point me to any
```

Page 201

1          the same work at the same level and experience
2          are offered equitable compensation."
3              Do you see that?
4     A.   I do.
5     Q.   So Nike decided to no longer ask candidates
6          about their compensation history because it
7          supports diversity inclusion and equitable
8          compensation; is that correct?
9     A.   I believe the law also changed around legally
10         asking candidates for their compensation history
11         around the same time.  So I think it was a
12         combination of both.
13    Q.   So would your answer to my question be yes, but
14         it was also about the change in the law?
15    A.   I would say yes.  I mean, it's an evolution of
16         that policy.
17    Q.   The main purpose of this e-mail is to inform
18         talent acquisition employees that Nike would,
19         quote, no longer ask candidates about their
20         compensation history; correct?
21    A.   Just reviewing it.  Looks like it.  Yes.
22    Q.   And do you see the subject of the e-mail is
23         "Commitment to pay equity"?
24    A.   I see that.
25    Q.   So the intention of this policy change of no

Page 214

1          previously been introduced as Exhibit 513.  And
2          that is NIKE_00002070.
3     A.   I have the document.
4     Q.   Thank you, Shine.  And the file name in the
5          metadata Nike produced is TA comp history policy
6          change, two-pager, August 24, 2017, and there's
7          also a title of the document listed that says TA
8          policy change one-pager final.  Even though the
9          title of this document, according to Nike's
10         metadata produced is TA policy change, one-pager
11         final, is this the document referenced in 673 TA
12         comp history practice one-pager?
13    A.   I assume so.  It has the same title.
14    Q.   At the bottom of the first page it says, "This
15         policy only applies to external applicants,
16         which includes all ETW's."  Do you see that?
17    A.   I see that.
18    Q.   This document is thus announcing a change in
19         Nike policy; correct?
20    A.   Yes.  So some elements of this is a change in
21         policy and some elements of this is a change in
22         guideline.
23    Q.   Is one of the change in policies, do you see
24         where it says "Nike employees may no longer"?
25    A.   I do.

Page 215

1    Q.    Under that it says, "ask candidates or their

2          employers questions about their compensation

3          history."  Is that one of the policy changes?

4    A.    That would be a policy change.

5    Q.    And it says, "ask their employers."  How did

6          Nike previously ask their employers about their

7          compensation history?

8    A.    I have never asked an employer about someone's

9          previous compensation history.  So I'm not

10         actually sure why it says that.  It's not a

11         standard part of our recruiting process.  We

12         would ask, a follow-on ~~before the~~ change, we would ask a ~~the~~

13         compensation history of a candidate.  I can't

14         think of a single scenario where the question

15         went to their previous employer because of

16         confidentiality.  And currently we ask the

17         candidate expectations, but we also do not

18         contact the candidate's previous employer around

19         compensation.

20   Q.    You were saying that you, in your role as a

21         recruiter, did not yourself ask employers those

22         questions.  Is that what you're saying or are

23         you speaking for all of Nike?

24   A.    I would say our guideline is to only ask the

25         candidate about their compensation and that is a

Page 216

```
 1            Nike guideline.
 2    Q.    And it also says under "Nike employees may no
 3          longer," it says, "Record salary history
 4          information in the ATS/CRM."  So this was
 5          telling -- Well, strike that.  Is that a policy
 6          change, too?
 7    A.    That would, recording salary history, that would
 8          be a salary change because the law changed.
                    policy
 9    Q.    And ATS refers to Taleo?
10    A.    Correct.
11    Q.    CRM refers to, does that refer to Avature?
12    A.    Correct.
13    Q.    Did Nike maintain the salary history information
14          in the ATS, I mean, has Nike maintained that
15          data to the present?
16    A.    Can you clarify what you mean by that question?
17    Q.    Does Taleo currently have information concerning
18          salary history of candidates, external
19          candidates for positions at Nike World
20          Headquarters bands L through S?
21    A.    It should not.  Taleo is not used for that and
22          we don't, since the law changed, we don't record
23          compensation.  So I don't -- I would be -- Taleo
24          is not used to house that information.  Whether
25          it has or not, I don't know.
```

Thomas, Shine - 30(b)(6)                                    March 26, 2021

Page 220

```
 1          course, we look at their expectations.  I'm
 2          looking at this document.  Sorry.
 3     Q.   Sure.
 4     A.   I think this is a, this is a general statement
 5          as a part of a PowerPoint deck, may have been a
 6          talking point.
 7     Q.   Would you agree that that statement's accurate
 8          if it's dated prior to October 2017, "We often
 9          focused on a new hire's prior salary and/or the
10          size of the increase the new hire would
11          receive"?
12     A.   I would say that's inaccurate.  I would say that
13          prior salary was a data point that we looked at,
14          but it was always, our guideline has always been
15          that is a data point.  The position and the
16          range is also a data point.  Every single offer
17          is unique and every single offer has different
18          nuances associated with the candidate and their
19          experiences and qualifications.  So I would say
20          that that is what, your statement is not
21          correct.
22     Q.   I believe you said that external candidate's
23          prior salary was always within the guidelines.
24          Is that what you said?
25               MS. DAVIS:  Objection; vague.
```

Thomas, Shine - 30(b)(6)                                    March 26, 2021

Page 221

1              THE WITNESS:  I don't think I said that.  I
2         don't know if Aleshia can restate what I said.
3              MR. BYRON GOLDSTEIN:  Aleshia, can you read
4         back the last answer from Shine, please.
5              (Record read as follows:
6              "A    I would say that's inaccurate.  I
7              would say that prior salary was a data point
8              that we looked at, but it was always, our
9              guideline has always been that is a data
10             point.  The position and the range is also a
11             data point.  Every single offer is unique
12             and every single offer has different nuances
13             associated with the candidate and their
14             experiences and qualifications.  So I would
15             say that that is what, your statement is not
16             correct.")
17    Q.   BY MR. BYRON GOLDSTEIN:  So can you point to any
18         policies, guidelines or other documents that
19         would show that new hire's prior salary was a
20         data point and not, as this sentence says, often
21         focused on?
22    A.   There isn't a guideline I can point to.  I can
23         point to my experience as a recruiter at Nike.
24         It is absolutely one of the data points in
25         association with qualifications, experience,

Thomas, Shine - 30(b)(6)                           March 26, 2021

Page 222

```
 1          skill sets, capabilities.
 2    Q.    Okay.  I'm introducing what's been previously
 3          marked as Exhibit 509.  Bates numbers
 4          NIKE_00001996 and this is Nike's FY '16/'17
 5          sustainable business report.  Let me know when
 6          you have it up.
 7    A.    This is a large document as well.  So it will
 8          take some time to download.
 9              It's about halfway there, just so you know
10          timing.
11    Q.    Thanks for the update.  I'm sure you could use
12          the break from me talking anyways.
13    A.    I have the document open now.
14    Q.    Just a couple of quick questions.  Can you turn
15          to, so it's page 57 of the document.  On the
16          page it says page 56 and the Bates number is
17          NIKE_00002052.
18    A.    Okay.  Okay.  Got it.
19    Q.    In the lower right-hand column, do you see where
20          it says "FY '18/'19 dedicated talent sourcing?"
21    A.    I do.
22    Q.    And do you see that it states, "We will invest
23          in a dedicated diversity sourcing team to be
24          immersed in the marketplace, increase visibility
25          and accountability to ensure slates of diverse
```

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 61, Page 34 of 47

Page 226

```
 1   A.   Confused by what topics you mean from 2015 or
 2        2016, 2017.  Do you mean the sustainability
 3        report that we just were looking at?
 4   Q.   The review of promotion practices of World
 5        Headquarters that it talked about in the
 6        sustainable business report.  I'm just basically
 7        asking do you know whether Nike did any reviews
 8        of promotion practices at Nike headquarters with
 9        respect to any employees in bands L through S at
10        any time from 2015 through 2017?
11   A.   I do not.
12            MR. BYRON GOLDSTEIN:  Okay.  You want to do
13        a break now?
14            (Break taken from 5:41 to 5:54.)
15   Q.   BY MR. BYRON GOLDSTEIN:  Shine, I'm introducing
16        Exhibit 674 and Bates number is NIKE_00030825.
17        And the Nike metadata states that the file name
18        of this document is base pay circa 2015, maybe
19        beyond.
20            Do you see that, Shine?
21   A.   I have the document open.
22   Q.   Did you look at this document in preparation for
23        this deposition?
24   A.   I don't know if I have looked at this document
25        before.
```

Beovich Walter & Friend

1-800-541-4452                    503-228-7201                    www.bwreporters.com

Davis Decl. Exhibit 61, Page 35 of 47

Page 227

1    Q.    Okay.  Do you see the URL in the lower left-hand
2          corner?
3    A.    I do.
4    Q.    Did that confirm with you that this is a Nike
5          document?
6    A.    Yes.
7    Q.    So the document title is, as I mentioned, base
8          pay circa 2015, maybe beyond.  So is this Nike
9          document something that was in effect around
10         2015 and maybe past that?
11   A.    If that's what the document says, then yes.
12   Q.    The document says "unpublished" on it.  What
13         does that mean?
14   A.    I don't know.
15   Q.    A lot of the documents we've looked at so far
16         were published on Nike's HR website.  Do you
17         recall that at least some that we've looked at
18         so far?
19   A.    Yes.
20   Q.    And are those documents created within Nike's HR
21         website or are they created outside of Nike's
22         website and then uploaded into Nike's HR
23         website?
24   A.    I'm not the most technical, but I assume
25         documents are created outside a website and then

Page 228

1    uploaded.  But I don't know that for a fact.

2  Q.  So is it possible that the phrase "unpublished"

3      here just means that this document could have

4      been on Nike HR website, but this is not a copy

5      of the one that was on the website?  Maybe you

6      don't know.  Sorry.  That was a confusing

7      question.  I'm just trying to figure out what

8      "unpublished" means.  I think did you say you

9      didn't know?

10 A.  I don't know for a fact what that means.

11 Q.  What do you think it means?  What do you think

12     it means?

13 A.  It looks to me to be a draft version of a

14     document and perhaps the final version was

15     uploaded.

16 Q.  Do you know who would have created this

17     document?

18 A.  I don't know who specifically.  It looks like

19     it's around compensation.  So possibly the

20     compensation team.

21 Q.  Would it be fair to -- So you think that the

22     compensation team may have drafted it.  Are you

23     confident that at least some organization or

24     business unit in HR created it?

25 A.  Based on the wording and the content in the URL,

1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 61, Page 37 of 47

Page 229

1        I would assume so.

2   Q.   Thank you.  Under "Beginning a New Job," do you

3        see where that is in the middle of the page?

4   A.   I do.

5   Q.   It states, "Regardless of whether employees are

6        new to Nike or current employees moving into a

7        new role, they will be offered a competitive

8        base salary."

9             So does that show you that this document

10       applies to both new hires and competitive

11       promotions or laterals at Nike World

12       Headquarters, including bands L through S?

13  A.   It does.

14  Q.   Do you see that the document then states,

15       "Managers consider the following factors when

16       making an offer," and then there's seven factors

17       and bullet points?

18  A.   I do.

19  Q.   And do you see the last of the factors listed

20       here, which is past Nike job performance, is

21       followed by a statement in parentheses?  Do you

22       see that?

23  A.   I do.

24  Q.   And the statement in parentheses says, "For

25       internal employees changing jobs."  Do you see

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwreporters.com

Davis Decl. Exhibit 61, Page 38 of 47

Page 230

1         that?

2    A.   I do.

3    Q.   And do you see that the remaining six factors do

4         not have any reference to internal employees?

5    A.   Correct.

6    Q.   So if a candidate was a new hire, the first six

7         factors would apply but not the seventh; is that

8         accurate?

9    A.   That is accurate.

10   Q.   And then one of the factors listed here is

11        internal peer-base salaries, which would apply

12        to both internal competitive promotions and

13        laterals and external applicants who are new

14        hires at World Headquarters.  How did Nike

15        determine what jobs were peers of one another

16        when this document was in effect in 2015?

17   A.   I don't know specifically to 2015.  I can say

18        how we look to the internal equity currently,

19        which I believe is the same consistently across

20        the time period I've been at Nike, which is it's

21        another data point that we look at, is to look

22        at internal comparisons of salaries or internal

23        equity pieces.  It's a data point though.  It's

24        not a decision-making factor.

25   Q.   How is the, the peer in internal peer-based

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 61, Page 39 of 47

Page 231

```
 1           salaries determined?  Who, whose the comparison
 2           or what jobs or however it's characterized?
 3    A.     We would look at peers within that hiring
 4           managers' own team that might have similar
 5           titles and we could also look at peers that were
 6           in similar job codes across other teams.  It
 7           depended on the situation.
 8    Q.     Do you know of any policies or guidelines that
 9           discuss, other than this document, internal
10           peer-base salaries when making decisions about
11           starting pay for external hire at Nike World
12           Headquarters a position in bands L through S?
13    A.     I don't know about documents, but I would say
14           that it was one data point in making that
15           decision, not the data point in making that
16           decision.
17    Q.     So when making -- Can you flip to the top of the
18           next page, "Beginning a New Job" section
19           continues?
20    A.     Yes.
21    Q.     And do you see that it says, "This process is
22           applicable for all job changes"?
23    A.     Yes.
24    Q.     And you see that it also says, "This includes
25           promotions and lateral moves"?
```

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 61, Page 40 of 47

Thomas, Shine - 30(b)(6)                                        March 26, 2021

Page 232

1    A.    It does.

2    Q.    And then the last sentence says -- Sorry.  Go

3          ahead, Shine.

4    A.    I said it does say that.

5    Q.    Okay.  The last sentence there says, "The

6          external market zone creates the range to pay

7          within, while the remaining factors determine

8          where in the zone to pay."

9                Is that an accurate statement?

10   A.    I'd say generally that is.  But there are always

11         nuances for each role and generally that is

12         accurate.

13   Q.    Do you know of any policies, guidelines or other

14         documents that contradict that sentence and were

15         in effect from any time from 2015 until

16         October 2017 and applied to new hires at World

17         Headquarters in bands L through S?

18   A.    I don't know of any myself.

19   Q.    And then can you go back to the first page?

20   A.    Yes.

21   Q.    And so it says, "Managers consider the following

22         factors when making an offer."  And the first

23         one is, "External market zone for the job."

24         That's, is that just referring to pay range or

25         what was a pay range before pay ranges?

Thomas, Shine - 30(b)(6)                    March 26, 2021

Page 233

1    A.    Yeah.  I believe that, I believe that's the same
2          concept, the external market zone for the job or
3          the pay range for the job.
4    Q.    Okay.  Thanks.  We talked about internal
5          peer-based salaries, the second factor.  The
6          third factor is "Relevant work experience,
7          education and skills."  What are the guidelines,
8          policies or reference documents that apply to
9          the determination of what is relevant work
10         experience, education and skills at any point
11         since 2015?
12   A.    I would say I don't know specific guidelines,
13         but it's a part of the recruiting process where
14         you look at someone's work experience as
15         compared to a job description and then the
16         evaluation of their experience, education and
17         skills during interview.
18   Q.    Is it possible that there have been policies or
19         guidelines for determining what is relevant work
20         experience, education and skills say between
21         2015 and 2017 for Nike World Headquarters?
22   A.    We have so many jobs and so many types of jobs,
23         you know, what's relevant, it varies with every
24         single job.  So I think the guideline is to
25         consider this as a data point.

Page 234

1   Q.   The next one's "Total Rewards package."  Does
2        that refer to -- What does that refer to?
3   A.   So Total Rewards package is what we refer to as
4        the total compensation package.  So it refers to
5        base salary, bonus potential, equity, sign on,
6        depending on the level that you're at, other
7        sign on that you might receive as well as
8        potentially the value of benefits that we offer.
9   Q.   Thank you.  The next one is "Historical salary
10       progression."  Is that the pre Nike salary
11       history?
12  A.   Yeah.  I don't know why this is in here.  I
13       would say it's not something that's super
14       relevant to looking at offers.  I don't know.
15       We usually look at their most recent, so
16       currently their expectations around their
17       salary.  We don't really ask for historical
18       salary progression of external candidates.
19  Q.   Got it.  So during the period of 2015 to
20       October 2017, that factor would be more, that
21       would be accurate if it's instead stated prior
22       salary to Nike; is that fair?
23  A.   Sure.  Yeah.
24  Q.   And then what does "Business financial
25       conditions" mean?

Page 235

1    A.    Again, I don't know why that would be a point in
2          here.  This document wasn't published and maybe
3          they changed that because we have our -- That
4          isn't necessarily a factor that we consider when
5          we're making an offer to a candidate.
6    Q.    Okay.  This is Exhibit 675.  Actually, so
7          Exhibit 675 is NIKE_00007038.
8                Do you see that document, Shine?
9    A.    It's opening up.  It's a large document.  It's
10         still opening.  Sorry.
11   Q.    It's okay.
12   A.    I have the document open now.
13   Q.    Do you recognize this as a printout from the
14         Taleo system that Nike uses?
15   A.    Yes.
16   Q.    On the first page it says "Latest Submission
17         Medium."  What does that mean?
18   A.    I believe that means that's the status that the
19         candidate is in.
20   Q.    Do you know what "Matched to Job" means?
21   A.    I don't know what that means.  Sorry.  I don't
22         know.
23   Q.    Based on the top part here, do you see that this
24         was an external applicant who was hired?
25   A.    Yes.

Thomas, Shine - 30(b)(6)                                      March 26, 2021

Page 271

1                    C E R T I F I C A T E

2

3           I, Aleshia K. Macom, Oregon CSR No. 94-0296,

4       Washington CCR No. 2095, California CSR

5       No. 7955, RMR, CRR, RPR, do hereby certify that

6       SHINE THOMAS remotely appeared before me at the

7       time and place mentioned in the caption herein;

8       that the witness was by me first duly sworn on

9       oath, and examined upon oral interrogatories

10      propounded by counsel; that said examination,

11      together with the testimony of said witness, was

12      taken down by me in stenotype and thereafter

13      reduced to typewriting; and that the foregoing

14      transcript, pages 1 to 270, both inclusive,

15      constitutes a full, true and accurate record of

16      said examination of and testimony given by said

17      witness, and of all other proceedings had during

18      the taking of said deposition, and of the whole

19      thereof, to the best of my ability.

20           Witness my hand at Portland, Oregon, this

21      8th day of April, 2021.

22

23      _____

        Aleshia K. Macom

24      OR CSR No. 94-0296, Expires 9-30-2023

        WA CCR No. 2095, Expires 7-7-2021

25      CA CSR No. 7955, Expires 7-7-2021

*Cahill, et al v. Nike*

**Shine Thomas Deposition Errata**

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 25:6-8 | "a requisition was created and open to hire against, a recruiter would be managing that requisition." | "a requisition was created and open to hire against, a recruiter would be managing the administrative process of that requisition." | To clarify the record as reflected in other testimony |
| 29:4 | "involves the hiring and talent acquisition." | "involves the hiring manager and talent acquisition." | To correct a transcription error |
| 50:6-7 | "I would say that is a fair assessment." | "I would say that is a fair assessment but Talent Acquisition does not approve whether a candidate is hired or not." | To clarify the record as reflected in other testimony |
| 67:11 | "might take someone in a specific position." | "might place someone in a specific position." | To correct a transcription error |
| 85:6 | "opinion, externally or internally." | "opinion, externally and internally." | To correct a transcription error |
| 85:15 | "to post it internally or externally." | "to post it internally and externally." | To correct a transcription error |
| 121:6-7 | "I cannot, but I will reiterate this is not a rule that recruiters have to follow." | "I cannot, other than the New Hire Approval Matrix (Exhibit 672), but I will reiterate this is not a rule that recruiters have to follow." | To conform to the facts |
| 123:6 | "I cannot point to documents." | "I cannot point to documents other than the New Hire Approval Matrix (Exhibit 672)." | To conform to the facts |
| 132:15 | "Correct." | "I assume so, but as I said many times, non-competitive promotions are not my area of expertise." | To clarify the record as reflected in other testimony |
| 171:5-6 | "one of multiple data points that we would look at." | "one of multiple data points that we could look at." | To correct a transcription error |
| 180:11-19 | [This question is recorded in the form of an answer.] | | To correct a transcription error |
| 182:21-23 | "I don't know outside of not competitive hiring who uses this tool and for what." | "I don't know outside of competitive hiring who uses this tool and for what." | To correct a transcription error |
| 185:11 | "It's not a lineal process" | "It's not a linear process" | To correct a transcription error |
| 187:17 | "I did not." | "I did not look at specific offers.  I know how offers are made." | To conform to the facts |

1

| 195:12-13 | "There are no written documents that I can think of." | "There are no written documents that I can think of other than the New Hire Approval Matrix." | To conform to the facts |
|---|---|---|---|
| 197:16 | "It's one of the data points that we look at." | "Equity walkaway is one of the data points that we look at." | To clarify the record as reflected in other testimony |
| 215:11-13 | "We would ask, a follow-on change, we would ask a compensation history of a candidate." | "We would ask, before the change, we would ask the compensation history of a candidate." | To correct a transcription error |
| 216:7-8 | "That would, recording salary history, that would be a salary change because the law changed." | "That would, recording salary history, that would be a policy change because the law changed." | To correct a transcription error |
| 251:6 | "screen to see we can hire the candidate." | "screen to see if we can hire the candidate." | To correct a transcription error |

I attest that the above-referenced changes are true and correct.

Date: May 21, 2021

Shine Thomas
5E235634EA0241F...
Shine Thomas

2

1

2                  UNITED STATES DISTRICT COURT

3                     DISTRICT OF OREGON

4                     PORTLAND DIVISION

5

6   KELLY CAHILL, SARA           )
    JOHNSTON, LINDSAY            )
7   ELIZABETH, and HEATHER       )
    HENDER, individually and     )
8   on behalf of others          )
    similarly situated,          )
9                                )
              Plaintiffs,        )
10                               )
       vs.                       )  Case No. 3:18-cv-01477-JR
11                               )
    NIKE, INC., an Oregon        )
12  Corporation,                 )
                                 )
13            Defendant.         )
    _____)

14

15      REMOTE VIDEOTAPED DEPOSITION OF EMILY TUCKER

16                  Portland, Oregon

17              Friday, January 22, 2021

18

19

          REPORTED BY:  Dayna Michelle Glaysher

20                      CSR No. 13079;

                        RPR, CRR No. 28081

21

22

23

24

25

                                            Page 1

Davis Decl. Exhibit 62, Page 1 of 8

1

2                UNITED STATES DISTRICT COURT

3                    DISTRICT OF OREGON

4                    PORTLAND DIVISION

5

6    KELLY CAHILL, SARA         )
     JOHNSTON, LINDSAY          )
7    ELIZABETH, and HEATHER     )
     HENDER, individually and   )
8    on behalf of others        )
     similarly situated,        )
9                               )
              Plaintiffs,        )
10                              )
       vs.                       )   Case No. 3:18-cv-01477-JR
11                              )
     NIKE, INC., an Oregon      )
12   Corporation,               )
                                )
13            Defendant.         )
     _____)

14

15

16

17

18        Remote Videotaped Deposition of EMILY TUCKER,

19   taken before Dayna Michelle Glaysher, a Certified

20   Shorthand Reporter for the State of California, with

21   principal office in the County of Los Angeles,

22   commencing at 8:57 AM, Friday, January 22, 2021.

23   Witness location:  Portland, Oregon.

24

25

                                              Page  2

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 62, Page 2 of 8

```
1    accurate?

2       A.  Uh-huh, yes.

3       Q.  I just need a verbal answer.

4       A.  I didn't hear you.

5       Q.  Oh, I just need a verbal answer.  I only saw you    11:04:43

6    shaking your head.

7       A.  Yes.

8       Q.  Okay.  Thanks.

9           And then you returned to Nike in December of 2005

10   as account services manager, U.S. Customer Service        11:04:56

11   Department; is that accurate?

12      A.  Yes.

13      Q.  Okay.  And was that role back in Oregon?

14      A.  Yes.

15      Q.  Were your first two roles with Nike account         11:05:05

16   representative and account executive -- were those in

17   Oregon as well?

18      A.  Yes.

19      Q.  Okay.  Why did you decide to come back to Nike?

20      A.  I -- so it was a -- you know, it was a nice place   11:05:18

21   to work.  I enjoyed my coworkers.  The work was

22   challenging.  And -- and so I knew that that was an

23   environment I wanted to go back to.

24      Q.  Okay.  And was your supervisor when you returned

25   an individual by the name of Gorgon Barrett?             11:05:44
```

Page 70

Davis Decl. Exhibit 62, Page 3 of 8

1    A.  Gordon.

2    Q.  Oh, Gordon.  I must have a typo.  Sorry.

3    A.  That's okay.

4    Q.  Gordon Barrett.

5        And did you get along well with Mr. Barrett?    11:05:54

6    A.  Yes.

7    Q.  Okay.  Did you feel he treated you fairly?

8    A.  Yes.

9    Q.  Okay.  Did you apply -- was there an open

10   position that you applied for when you returned to Nike?  11:06:09

11   A.  Yes.

12   Q.  Okay.  And you were interviewed for that

13   position?

14   A.  Oh, yes.

15   Q.  Okay.  And you were selected for the position you    11:06:16

16   applied for, correct?

17   A.  Yes.

18   Q.  Okay.  Your starting salary at Nike was $48,000.

19       Does that seem accurate to you?

20          MS. SUN:  Objection.  Lacks foundation.    11:06:31

21          THE WITNESS:  My starting salary for the

22   account service manager?

23   BY MS. DAVIS:

24   Q.  Yes.

25   A.  I actually recall -- I recall -- that's in the    11:06:42

Page 71

```
 1    zone.  I recall a slightly different number actually.

 2        Q.  Okay.  I'll see if I can find any -- any

 3    document.  We'll come back to that.

 4        Do you know how -- did you have any conversations

 5    about your compensation before you were hired at Nike in   11:07:03

 6    the account services manager role?

 7        A.  Did I have any conversations about compensation

 8    with -- like with the hiring manager?

 9        Q.  Right.  With anyone at Nike.

10        A.  Yes.                                                11:07:23

11        Q.  And who did you speak -- with whom did you speak?

12        A.  That would've been Gordon.

13        Q.  Okay.  And what conversations did you and Gordon

14    have about your compensation?

15        A.  I recall him making an offer.  And I -- trying to   11:07:33

16    negotiate a higher number.  And his response was that

17    there was a very extreme time constraint on his end as

18    relating to he needed to make and get an accepted offer

19    in the moment, and that he couldn't negotiate.

20        Q.  Okay.  And do you know how your starting salary     11:08:12

21    was set, what factors the company considered?

22        A.  I don't.

23        Q.  Okay.  Do you recall your CFE rating in 2006 and

24    2007?

25        A.  I mean I could guess.  Not specifically.           11:08:40
```

Page 72

Davis Decl. Exhibit 62, Page 5 of 8

```
 1                       CERTIFICATE

 2                           OF

 3              CERTIFIED SHORTHAND REPORTER

 4

 5

 6              The undersigned certified shorthand reporter

 7     of the State of California does hereby certify:

 8              That the foregoing deposition was taken

 9     before me at the time and place therein set forth, at

10     which time the witness was duly sworn by me.

11              That the testimony of the witness and all

12     objections made at the time of the deposition were

13     recorded stenographically by me and thereafter

14     transcribed, said transcript being a true copy of my

15     shorthand notes thereof.

16              In witness whereof, I have subscribed my

17     name this date: February 4, 2021

18

19

20

21

22              CSR Number 13079

23              RPR, CRR Number 28081

24

25
```

                                                Page 186

Davis Decl. Exhibit 62, Page 6 of 8

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: January 22, 2021

Deponent: Emily Tucker

| Page | Line(s) | Reads | Should Read | Reason |
|------|---------|-------|-------------|--------|
| 28 | 12 | Kavanagh | Cavanaugh | To correct spelling error |
| 30 | 1 | immanence | imminent | To correct transcription error |
| 36 | 1 | Michelle | Michele | To correct spelling error |
| 36 | 7 | Shafbow | Schafbuch | To correct spelling error |
| 36 | 7 | Dooby | Dube | To correct spelling error |
| 36 | 7 | Tanya | Tonia | To correct spelling error |
| 38 | 5 | Michelle | Michele | To correct spelling error |
| 39 | 11 | Kenny | Kenney | To correct spelling error |
| 53 | 3 | P-h-i-l-l-i-p-i, I believe. | P-h-i-l-l-i-p-p-i, I believe. | To correct spelling error |
| 53 | 8 | Suiten | Sutin | To correct spelling error |
| 60 | 22 | back sell | back fill | To correct transcription error |
| 65 | 11 | Nike values perspective | Nike VALUES band perspective | To clarify testimony |
| 67 | 7 | Birch | Burch | To correct spelling error |
| 68 | 2 | Birch | Burch | To correct spelling error |
| 74 | 8 | My role was to - - to oversight | My role was to – provide oversight | To clarify testimony |
| 77 | 12 | Haightman | Hapeman | To correct transcription error |
| 83 | 19 | Yes | Yes, I was involved in the decision. | To clarify testimony |
| 93 | 3 | Kavanagh | Cavanaugh | To correct spelling error |
| 94 | 14 | Palo Polo | Paolo Polla | To correct spelling error |
| 97 | 23 | Piestrip | Peistrup | To correct spelling error |
| 100 | 11-12 | It was below the minimum. | I am 90% sure it was below the minimum. | To clarify testimony. |
| 101 | 19 | Palo Polo | Paolo Polla | To correct spelling error |
| 126 | 2 | No | No, I did not make hiring decisions, just recommendations | To provide complete answer to question |
| 126 | 5 | No | No, I did not make pay decisions, just recommendations | To provide complete answer to question |

796897.3

Davis Decl. Exhibit 62, Page 7 of 8

| 126 | 8 | No | No, I did not make CFE decisions, just recommendations | To provide complete answer to question |
|-----|-----|-----|-----|-----|
| 126 | 14 | No | No, I did not make promotion decisions | To provide complete answer to question |
| 126 | 19 | Ryan | Bryan | To correct transcription error |
| 126 | 22 | Binser | Binzer | To correct spelling error |
| 129 | 19 | Maggie Winkler | Maggie Winkel | To correct transcription error |
| 129 | 19 | Michelle | Michele | To correct spelling error |
| 132 | 17 | Kenny | Kenney | To correct spelling error |
| 136 | 3-4 | and include that was for his direct reports | that was for his direct reports and not include me | To correct transcription error |
| 160 | 4 | Scarmetto | Scarmato | To correct spelling error |
| 160 | 5 | Scarmetto | Scarmato | To correct spelling error |
| 166 | 4 | rule | role | To correct transcription error |
| 166 | 16 | Michelle | Michele | To correct spelling error |
| 171 | 9 | Yes, hiring recommendations, yes. | Not hiring decisions. Hiring recommendations, yes. | To clarify testimony |
| 181 | 12 | Michelle | Michele | To correct spelling error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on 3/4/2021_____ in Portland, OR _____.

Emily Tucker

796897.3

Davis Decl. Exhibit 62, Page 8 of 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                    )
individually and on behalf of            )
of others similarly situated,            )
                                         )
                Plaintiffs,              )
                                         )
        vs.                              )   No. 3:18cv-01477-JR
                                         )
NIKE, INC., an Oregon                    )
corporation,                             )
                                         )
                Defendant.               )

VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME I

DATE TAKEN:  December 17, 2020
TIME:        9:30 a.m.
PLACE:       Virtual

Walker, Shane - Vol. 1                    December 17, 2020

Page 48

1    I appreciate you telling me whether you have personal

2    knowledge or not, but I'm also asking you the question as

3    a Nike witness, sir.

4         A.   Okay.

5         Q.   Now, what is used at present rather than job

6    descriptions in making the market assessment?

7         A.   So we -- we will typically look at things like

8    job title.  We will look at -- we will do a benchmarking

9    exercise with our Total Rewards consulting team and some

10   HR-VP's to understand essentially pulling up the market

11   match from the profile from the market match and having

12   discussions with them about is this the job content, does

13   it match up with what we're seeing in the market, yes or

14   no, and then we match the job accordingly.

15        Q.   When you do this market assessment, is that --

16   is the market assessment written in any way?

17        A.   So the data that we assess is -- yes, it is.

18   They are numbers that are associated with this that we

19   look at and we do a summary of the findings for that

20   market assessment.

21        Q.   When you say summary of the findings, what do

22   you mean by that?

23        A.   So how our jobs are positioned against the

24   market.  So when we look at, for example, a compensation

25   analyst role and we look at the 50th percentile of the

Page 49

1   market, we look at it compared to Nike.  It allows us to

2   see how we are positioning that job within our pay ranges

3   and if we need to do anything different with our pay

4   ranges as a result of that.

5       Q.  Is the market assessment summaries written in

6   any fashion?

7       A.  At times, yes, they are.  I don't know if it

8   has been consistent across every year, but, yes, at times

9   they are written.

10      Q.  When you do a market assessment, do you send

11  your summary up to your -- to the vice president who you

12  report to?

13      A.  Again, it varies year by year.  This past year,

14  we did not.

15      Q.  The year prior to that, did you do it?

16      A.  Yes.

17      Q.  Where is that summary retained, sir?

18      A.  So we have -- it is on Box.

19      Q.  Was the answer on B-o-x?

20      A.  (Witness nods head affirmatively.)

21      Q.  What is Box?

22      A.  It is our company's file storage, file storage.

23      Q.  So if you wanted to find prior market

24  assessment and summaries, you could find it by going to

25  Box?

Walker, Shane - Vol. 1                               December 17, 2020

Page 60

1          MS. DAVIS:  The question is vague and
2    ambiguous.
3          THE WITNESS:  We're setting pay ranges and the
4    structures.  Managers are responsible for making pay
5    decisions for their employees.
6    BY MR. BARRY GOLDSTEIN:
7        Q.  Managers, as reviewed by vice presidents in
8    E7+?
9        A.  Not always.  So we typically are a manager plus
10   one in most cases.
11       Q.  Well, we'll talk about the review process
12   later.
13          Are the -- is the business-facing part of HR
14   working with the managers as far as setting pay?
15       A.  The HR business partners, on occasion, yes,
16   there would be times when they would be eventually
17   providing guidance or helping make a recommendation to
18   the manager.
19       Q.  In setting the pay ranges, are the surveys used
20   by these companies part of the process?
21       A.  Yes.
22       Q.  Now, before there were pay ranges, there were
23   market zones; is that correct?
24       A.  Yes.
25       Q.  In setting the market zones, were there surveys

Walker, Shane - Vol. 1                    December 17, 2020

Page 62

1      A.   No.

2      Q.   Now, agreement -- it looks like the first goal,

3  agreement on benchmark jobs and their matches, what does

4  this goal mean?

5      A.   So not all of Nike's jobs exist in the market,

6  so we are matching those jobs that had similar job

7  content at Nike and also had similar job content in the

8  market, which would be our survey vendors.

9           And so our intent of this was to agree on the

10  benchmark jobs across the team and make sure that we have

11  matched all the jobs at Nike to the appropriate salary

12  survey jobs.

13      Q.   So as I understand it, correct me if I'm wrong,

14  you take some jobs that you refer to as benchmark jobs

15  that are comparable to jobs that are -- generally exist

16  in the market with similar companies; is that correct?

17      A.   So we look at job content and we match our jobs

18  at Nike to the jobs that are in the market, and those are

19  what we consider to be our benchmark jobs.

20      Q.   When you say job content, what do you mean?

21      A.   Generally the nature of work of the job.  So a

22  finance job will have very different nature of work than,

23  for example, an HR job or a legal job, so it's the type

24  of work is what we are looking at.

25           And then the second piece is the level of work,

Walker, Shane - Vol. 1                    December 17, 2020

Page 86

1        Q.   On page 3244 of this document, towards the

2    bottom under job title, there's a reference to

3    compensation job description.

4             What is compensation job description refer to?

5        A.   Again, I don't believe -- again, I don't know

6    the specifics around job description.

7             What I can speak to is that we have job codes

8    that are tied to job titles, and then there is also a

9    position title that is tied to the person's specific

10   role.  And the position title is what shows up in our

11   employee-facing systems, like ~~hot lip~~ Outlook, for example, where

12   it is used as a more generic description or a specific

13   job role.

14             MS. DAVIS:  I'll make a belated objection, that

15   this document is related to CFEs, and Mr. Walker is not

16   designated.  It is not one of the designated topics

17   today.  He can give his opinion as a Nike employee, but

18   not as a 30(b)(6) witness on CFEs or any documents

19   related to CFE s.

20             MR. BARRY GOLDSTEIN:  We'll have to talk about

21   this, because this is intimately and interrelated with

22   compensation decision.

23             MS. DAVIS:  Well, then, why don't you -- then

24   you could ask him about how it's related to compensation,

25   but you're asking him about a document about how they're

```
 1                              CERTIFICATE

 2

 3    STATE OF OREGON       )

 4                          ) ss

 5    COUNTY OF MULTNOMAH   )

 6

 7

 8

 9         I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
      certify that said witness appeared before me via Zoom at
10    the time and place set forth in the caption hereof; that
      at said time and place I reported in stenotype all
11    testimony adduced and other oral proceedings had in the
      forgoing matter; that thereafter my notes were
12    transcribed through computer-aided transcription, under
      my direction; and that the foregoing pages constitute a
13    full, true and accurate record of all such testimony
      adduced and oral proceedings had, and the whole thereof.
14         I further certify review of the transcript was
      not requested
15         Witness my hand at Portland, Oregon, this 27th
      day of December 2020.
16

17

18

19

20

21                         Teresa L. Rider
                           Oregon CSR No. 12-0421
22                         Washington CCR No. 2119
                           Expires 12-03-23
23

24

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                    )
individually and on behalf of            )
of others similarly situated,            )
                                         )
                    Plaintiffs,          )
                                         )
          vs.                            )   No. 3:18cv-01477-JR
                                         )
NIKE, INC., an Oregon                    )
corporation,                             )
                                         )
                    Defendant.           )


VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME II


DATE TAKEN:  December 18, 2020
TIME:        9:30 a.m.
PLACE:       Virtual



COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR

Walker, Shane - Vol. 2                                December 18, 2020

Page 163

1       A.  They're the same.  We initially had talked
2   about it internally as active pay management.  Before
3   launching it to the rest of the company, we changed the
4   name to competitive pay management.
5       Q.  So the current name would be competitive pay
6   management?
7       A.  Yes.
8       Q.  And active pay management has slipped into the
9   historical bin file and is no longer used?
10      A.  Correct.  I would refer to as formerly known
11  as, also known as.
12      Q.  Well put.
13              Please continue.
14      A.  So in May of 2018, we also initiated a pay
15  equity analysis.  And then in June we continued APM and
16  CPM pay equity and GPR, and in that same time frame, we
17  moved from a share based stock program to volume based.
18              Moving for July, we continued APM and CPM,
19  continued pay equity and GPR and second email from Mo
20  Matheson.
21              And then in August, continued APM and CPM, pay
22  equity and GPR and Nike stock choice, which gives
23  employees the ability to choose or the vehicle they want
24  to receive their stock award in.
25              And then as we moved into November and

Walker, Shane - Vol. 2                                    December 18, 2020

Page 176

1    percent range.

2          Q.   Just to clarify that, if one was at the

3    midpoint of the range, it would be at 1.0 of the range or

4    100 percent of the range?

5          A.   Yes.

6          Q.   And if you were at the minimum, what is your

7    percentage?

8          A.   It's going to vary by pay range.

9               So our pay ranges have different range spreads,

10   as you move up, they broaden, so it would be -- it's

11   going to be different by each individual pay range.

12         Q.   I was asking about the percentage.

13         A.   That's -- yes.  So you would have to take the

14   minimum of the -- you'd have to take the minimum of the

15   pay range and divide it by the midpoint to determine what

16   the percentage is or what that percentage range is.

17         Q.   What is constant for all the pay ranges is that

18   the midpoint is 1.0?

19         A.   Yes.

20         Q.   Mr. Walker, I'm going to ask you about Topic

21   24.  If you wanted to look at Topic 24, you could look at

22   it on Exhibit 502.

23         A.   You said Topic 24?

24         Q.   Yes.

25         A.   Okay.

Walker, Shane - Vol. 2                         December 18, 2020

Page 276

1       Q.   I'm not sure you've testified, but what was the
2   purpose of the training program that is incorporated in
3   Exhibit 500?

4       A.   So the intent of this was to prepare managers
5   for their role in managing pay, ensure that our managers
6   understand, explain and can apply Nike's Total Rewards
7   program, that they know how to use Nike pay ranges and
8   that they are able to evaluate pay at key moments
9   throughout the year.

10      Q.   And so that is your answer to my question as to
11  what the purpose of training managers in pay and
12  compensation processes?

13      A.   Yes, this was the intent of training for the
14  annual pay review.

15      Q.   Okay.  Let's turn to slide 8 on Exhibit 521.

16      A.   Okay.

17      Q.   I think when you referred to HRBP, you referred
18  to their businesses.

19           What did you mean by that, if I recall your
20  testimony correctly?

21      A.   Yes.  So each HR business partner is lined up
22  against a various part of the business.  When I refer to
23  business-facing, they have different responsibilities
24  tied to different parts of the business, different
25  business leaders across Nike.

Walker, Shane - Vol. 2                                December 18, 2020

Page 313

1    BY MR. BARRY GOLDSTEIN:

2        Q.  Why don't you just tell me the way that you

3    were devolving base pay at this time.

4        A.  So I think I just answered that, but we were --

5    we were -- we were -- how do I want to explain this? --

6    we were putting emphasis on managers managing pay within

7    the pay range, and so with that, we implemented new

8    programs, redesigned programs to make it simpler and

9    easier for our managers to think about and manage pay for

10   their employees.

11           We looked at some of the our recognition

12   programs for employees and looked for ways to enhance and

13   optimize those.  We put new systems in place.  We

14   provided new guidance to managers to start thinking about

15   this in a slightly different way, so really with a focus

16   on how do you position someone in the pay range.  Why do

17   you position someone in the pay range.

18       Q.  Fair enough.

19           Why don't we look at some of the specifics of

20   these changes.  Could you go to page 1663?

21       A.  Okay.

22       Q.  Could you explain what is represented on this

23   page?

24       A.  Yes.

25       Q.  Please do.

Walker, Shane - Vol. 2                    December 18, 2020

Page 329

GPR
1   ~~practice~~ would have been partially based on CFE rating.

2        Q.  So as I understand what this chart shows is

3   that -- if someone got the same CFE rating, all other

4   things being equal, they would receive the same

5   percentage increase whether they were in the lower third,

6   the middle third or the upper third of the pay range; is

7   that correct?

8        A.  If the employee received the same rating, the

9   guidelines would have shown the same for each of those

10  employees.  The actual application of whether or not that

11  employee received an increase that was the same would

12  have been different.

13       Q.  I'm sorry.  I don't understand that.

14       A.  Can you ask the question again?

15       Q.  How is CFE, under the current practice as

16  defined here, which was GPR merit increase, if someone

17  got a CFE rating of successful, they would be entitled to

18  a certain percentage increase in their base pay pursuant

19  to the guidelines; is that correct?

20       A.  No.

21       Q.  Okay.  We haven't gone into the coaching for

22  excellence discussion yet, but in order to understand

23  this chart, could you explain the basis for merit

24  increases under GPR related to coaching for excellence?

25       A.  So merit guidelines -- this chart does not show

Walker, Shane - Vol. 2                                December 18, 2020

Page 330

1    the merit guidelines, so merit guidelines were based on
2    the country, the payroll country and the coaching for
3    excellence rating.   There was a range provided for each
4    performance rating, and those guidelines were loaded into
5    our system as a starting place for managers to make
6    decisions from.

7         Q.   Okay.   So -- and I'm only talking about Nike
8    World Headquarters, so we can leave out the country.
9         A.   No, I think it's important.   Country is a part
10   of how we establish guidelines.
11        Q.   No, I understand that, but I'm just looking how
12   it's applied at Nike World Headquarters.
13        MS. DAVIS:   Well, he's telling you that country
14   matters.
15   BY MR. BARRY GOLDSTEIN:
16        Q.   I'm sure it matters whether you're in, you
17   know, France or the United States, but all the class
18   members are in the United States, so for this case only,
19   the United States matters.
20        MS. DAVIS:   You can put it however you want to.
21   I think when we finish this line of questioning, we
22   should take a break.   I don't want to interrupt in the
23   middle if you have a few questions left.
24   BY MR. BARRY GOLDSTEIN:
25        Q.   Let's see what the answer is to the next

Walker, Shane - Vol. 2                    December 18, 2020

Page 331

1    question and we'll see how many questions I may have.
2    Let me try to simplify this, because I don't really want
3    to go into a discussion of CFE at this point.
4            If a manager had decided to give three
5    individuals under the current practice a 3 percent
6    increase and -- change the question.
7            Let's just say a manager determined that the
8    employees were worthy of the same merit increase.  It
9    wouldn't matter whether or not those employees were
10   located in the lower, middle or upper third of the pay
11   range; is that correct?
12       A.   The actual application of the increases is up
13   to the manager, and so they very well could have taken
14   into account where someone was positioned in the pay
15   range, but the guidance that we provided to the managers,
16   did not take into account where someone was positioned in
17   the pay range.
18       Q.   And explain how the new Compa-ratio is
19   different than the current practice.
20            MS. DAVIS:  Asked and answered.
21            You can answer again.
22            THE WITNESS:  The new Compa-ratio guidelines or
23   the new guidelines we provide as part of the annual pay
24   review, we provide based on country, budget and position
25   and range.  There are -- there is a default best and a

```
 1                          CERTIFICATE

 2

 3    STATE OF OREGON      )

 4                         ) ss

 5    COUNTY OF MULTNOMAH )

 6

 7

 8

 9           I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
      certify that said witness appeared before me via Zoom at
10    the time and place set forth in the caption hereof; that
      at said time and place I reported in stenotype all
11    testimony adduced and other oral proceedings had in the
      forgoing matter; that thereafter my notes were
12    transcribed through computer-aided transcription, under
      my direction; and that the foregoing pages constitute a
13    full, true and accurate record of all such testimony
      adduced and oral proceedings had, and the whole thereof.
14           I further certify review of the transcript was
      not requested.
15           Witness my hand at Portland, Oregon, this 29th
      day of December 2020.
16

17

18

19

20              Teresa L. Rider
                Teresa L. Rider
21              Oregon CSR No. 12-0421
                Washington CCR No. 2119
22              Expires 12-03-23

23

24

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                    )
individually and on behalf of            )
of others similarly situated,            )
                                         )
                    Plaintiffs,          )
                                         )
         vs.                             )   No. 3:18cv-01477-JR
                                         )
NIKE, INC., an Oregon                    )
corporation,                             )
                                         )
                    Defendant.           )


VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME III


DATE TAKEN:  December 21, 2020
TIME:        9:30 a.m.
PLACE:       Virtual



COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR

Page 352

1    who drafted it.  The document reads:  Nike provides

2    several opportunities for managers to recognize

3    employees' performance and contributions.  The basis for

4    these opportunities is Nike's philosophy to "pay for

5    performance."

6              Is one of the opportunities for awarding

7    increases to employees what was termed merit increases?

8         A.  I mean, yes, merit increases do take into

9    account performance as one of the factors.

10        Q.  And has this been true from 2015 to the

11   present?

12             MS. DAVIS:  The question is vague and

13   ambiguous.

14             Go ahead.

15             THE WITNESS:  Can you be more specific?

16   BY MR. BARRY GOLDSTEIN:

17        Q.  The merit increase awards based on performance

18   from 2015 to the present.

19        A.  There have been merit increase awards from 2015

20   to 2019, and in 2019, we implemented core pay increases.

21        Q.  Is core pay increases a change in terminology

22   from merit increase to core pay increase?

23        A.  It's not just a change in terminology.  I mean,

24   we changed guidelines and how we developed them, as well,

25   and how managers enter into the system.

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 63, Page 18 of 29

Page 354

1    accomplish, and so we take into account both the what and

2    the how when we are looking at performance.

3        Q.   And when you refer to leadership defined, is

4    that the name of the performance rating?

5        A.   No.

6        Q.   What is the name of the performance rating?

7        A.   The performance rating itself it's the CFE

8    rating.

9        Q.   Can you tell me what that acronym stands for?

10       A.   Coaching for excellence.

11       Q.   In addition to coaching for excellence, were

12   there any ratings that were -- are there any ratings

13   taken into account in 2019, other than coaching for

14   excellence?

15       A.   There are a number of things taken into account

16   for determining pay.  Coaching for excellence ratings is

17   one.  Talent segmentation, risk of loss, impact of loss,

18   those are just some examples.

19       Q.   Now, as I understand it, the performance rating

20   processes are not part of this 30(b)(6) deposition, just

21   how performance affects pay, so I won't go into the

22   details of talent segmentation or coaching for

23   excellence.

24            But is it accurate to say that talent

25   segmentation ratings just apply to bands E and S of the

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwreporters.com

Davis Decl. Exhibit 63, Page 19 of 29

Walker, Shane - Vol. 3                                        December 21, 2020

Page 359

1       A.   I don't know.

2       Q.   Is it infrequently done?

3       A.   I would say, yes, it's done infrequently.

4  Again, it's going to vary based on manager, based on

5  year.  I don't know the performance completion of the

6  company, so I can't speak to that.

7       Q.   The last bullet point is:  Awards are

8  differentiated based on performance as well as base

9  salary position in the market zone and the internal

10 equity range.

11          Do you see that, sir?

12      A.   Yes.

13      Q.   What does base salary position in the market

14 zone refer to?

15      A.   That would be the position and range or

16 Compa-ratio.

17      Q.   And we discussed Compa-ratio and position and

18 range on Friday with respect to the system that was put

19 into place in 2018.

20      A.   Yes.

21      Q.   So there's a position and range element to

22 determining pay that applied when the company used market

23 zones, just like there is a position and range that is

24 applied during the period when the company has used pay

25 ranges; is that correct?

Page 363

1  employee's performance rating?

2       A.  Performance rating is one factor that's taken

3  into account, but they do not drive the specific

4  guidelines.

5       Q.  Is there guidelines with respect to how

6  performance ratings should be taken into account by

7  managers and others in determining a core pay increase at

8  the present time?

9       A.  Not specifically.

10      Q.  What do you mean, not specifically?

11      A.  I mean, we do not from the center tell managers

12  how they should think about performance when determining

13  pay, but we do -- I mean, our expectation is that

14  managers know what great performance looks like and that

15  they are able to recognize their employees for that using

16  the programs that we have available.

17      Q.  And so as I understand it, there were

18  performance rating guidelines in effect up until the

19  implementation of core pay increases in 2019; is that

20  accurate?

21      A.  Yes.

22      Q.  Where are the current guidelines located for

23  managers and others to use in assessing core pay

24  increases?

25      A.  So there's an example in Exhibit 500 where we

Page 364

1    show managers how we establish the guidelines.  And then

2    the guidelines themselves are loaded into SuccessFactors

3    for use by the managers during the annual pay review

4    cycle.  Outside of that window, they are not available to

5    managers.

6         Q.  Could you look at Exhibit 500, please, and show

7    me where the guidance is located.

8         A.  So if you go to slide 51.

9         Q.  Okay.  Just give me a second, please.

10        Okay.  I'm there.

11        A.  Okay.  So slide 51 is an illustrative example

12   of how these guidelines are set up and loaded into

13   SuccessFactors.  So there is a matrix whereon the

14   left-hand column, we have max invest, invest and market

15   and zero.  And then the three columns to the right of

16   that show what an increase could be, and the lower

17   section of the pay range, the middle section of the pay

18   range or the upper section of the pay range.

19        In the system, every employee is defaulted to a

20   market increase, and then from there, managers can invest

21   or max invest in approximately 20 percent of their

22   employees.  They also have the ability to zero out an

23   increase for various reasons.

24        On slide 50, there is the specific guidance we

25   give around what factors managers should take into

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Davis Decl. Exhibit 63, Page 22 of 29

Page 365

1  account when managing pay.

2      Q.   Are the adjustments that managers make pursuant

3  to the guidance given on slide 51, are they then part of

4  the executive review process that we've discussed

5  previously?

6      A.   I mean, it is a data point that is available

7  during that process, but how each individual manager,

8  manager +1, uses that information will vary or if they

9  use it at all.

10     Q.   And then after the manager +1, the various pay

11 decisions proceed through the five phases of the

12 executive review process?

13         MS. DAVIS:  Misstates prior testimony.

14         Go ahead.

15         THE WITNESS:  Yeah, I don't know how many

16 specific phases there are right now, but there is an

17 executive review process where manager +1 and leaders

18 higher up in the organization are reviewing pay for their

19 organizations.  As it goes further up in the

20 organization, they are going to be looking at summary and

21 trend information.

22 BY MR. BARRY GOLDSTEIN:

23     Q.   We discussed the executive review process last

24 week.  I'm not going to go back through that.

25         With respect to the performance rating

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 63, Page 23 of 29

Walker, Shane - Vol. 3                                    December 21, 2020

Page 371

1    2020 when we implemented the annual pay review.

2         Q.   Now, prior to the annual pay review

3    implementation but after the implementation of pay ranges

4    on September 1st, 2016, would an accurate definition of

5    lump sum amount be portion of the merit increase that is

6    above the maximum of the pay range?

7         A.   So while that was the intent of lump sum

8    payment, that is not how they were always applied.

9    Managers could use discretion in how they allocated merit

10   increases, so they had the ability to give an increase to

11   base pay.  The system allowed them to give a lump sum

12   payment or in some cases the employee could have gotten

13   an increase and a lump sum award.

14        Q.   Now, under the annual pay review process, isn't

15   it possible that somebody could get a core pay increase

16   that would bring the employee up to the maximum of the

17   pay range and then also receive part of that core pay

18   increase as a lump sum?

19        A.   Yes.  It's more structured today.

20        Q.   With respect to the 2X program, and we

21   discussed the 2X program somewhat last week, what was the

22   purpose of the 2X program?

23        A.   So the 2X program was another opportunity for

24   managers to adjust employee's pay.  There were several

25   items that we looked at in that, one of them being

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 63, Page 24 of 29

Page 411

1      Q.   And how did the guidance change with respect to
2  promotion guidelines when Nike moved from -- moved into
3  APR?
4      A.   So we shifted from a percent increase approach
5  to a focus on position in range.
6      Q.   And that's what we discussed before, is that
7  correct, the Compa-ratio?
8      A.   Yes, the Compa-ratio.
9      Q.   And also with respect to slide 51 on Exhibit
10 500?
11     A.   Slide 51 was not in reference to new hires,
12 promotions or lateral moves, but the guidance is in
13 Exhibit 500.
14     Q.   Okay.  Could you show me where in Exhibit 500
15 the guidance is?
16     A.   So slide 41.
17     Q.   Okay.  It just takes me a second.  And what is
18 the guidance on 41?
19     A.   So for new hires, the guidance is to position
20 someone between 85 percent to the maximum of the pay
21 range.  For promotions is to position 85 percent to 95
22 percent in the pay range.  And for lateral moves it is
23 generally no increase.
24          But each individual situation needs to be
25 reviewed and may call for an increase, and our guidance

Page 412

1  is that managers are responsible for making pay

2  adjustments and that all newly hired or promoted

3  employees should always be above the minimum of the pay

4  range.

5        Q.  And I believe you testified that when we were

6  discussing Exhibit 549, that the factors for determining

7  when it was necessary to give a pay increase for a

8  lateral move, that those factors should remain constant

9  from the period prior to the annual pay review until

10 after the annual pay review; is that accurate?

11       A.  I would say that the general concept of no

12 increase for a lateral move has carried forward, but the

13 individual factors I would say are not something that --

14 I mean, not that they don't apply, but it's not something

15 that we directly communicate.

16       Q.  Mr. Walker, I'm going to show you a document

17 that's been marked as Exhibit 550 and it is entitled Job

18 Changes.  It's an August 2017 document, Bates No. 2321.

19            (Deposition Exhibit No. 550 was marked for

20 identification.)

21            THE WITNESS:  Okay.  I have it open.

22 BY MR. BARRY GOLDSTEIN:

23       Q.  Do you know who prepared this document, sir?

24       A.  No.

25       Q.  Would it have been prepared by the compensation

Walker, Shane - Vol. 3                                    December 21, 2020

Page 488

1                           CERTIFICATE

2

3    STATE OF OREGON      )

4                         ) ss

5    COUNTY OF MULTNOMAH  )

6

7

8

9         I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
     certify that said witness appeared before me via Zoom at
10   the time and place set forth in the caption hereof; that
     at said time and place I reported in stenotype all
11   testimony adduced and other oral proceedings had in the
     forgoing matter; that thereafter my notes were
12   transcribed through computer-aided transcription, under
     my direction; and that the foregoing pages constitute a
13   full, true and accurate record of all such testimony
     adduced and oral proceedings had, and the whole thereof.
14        I further certify review of the transcript was
     not requested.
15        Witness my hand at Portland, Oregon, this 29th
     day  of December 2020.
16

17

18

19

20

                              Teresa L. Rider
21                            Oregon CSR No. 12-0421
                              Washington CCR No. 2119
22                            Expires 12-03-23
23

24

25

DocuSign Envelope ID: A4479852-EAF8-4369-9599-88298971A09C

*Cahill, et al v. Nike*

**Shane Walker Deposition Errata**

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 8:1 | "Mr. Benton" | "Mr. Vinton" | To correct a transcription error |
| 9:3 | "community resource officer" | "Chief Human Resource Officer" | To correct a transcription error |
| 11:20 | "I lead our enroll programs" | "I lead our annual programs" | To correct a transcription error |
| 21:7 | "Mr. Benton" | "Mr. Vinton" | To correct a transcription error |
| 25:12 | "OSA" | "FLSA" | To correct a transcription error |
| 25:16 | "OSA" | "FLSA" | To correct a transcription error |
| 29:23 | "footwear, a partial" | "footwear, apparel" | To correct a transcription error |
| 52:21-22 | "cover things like spoken impact, communication influence and knowledge and experience" | "cover things like scope and impact, communication, influence, and knowledge and experience" | To correct a transcription error |
| 71:20 | "Bradford" | "Radford" | To correct a transcription error |
| 86:11 | "hot lip" | "Outlook" | To correct a transcription error |
| 124:18 | "shows the new from market zones" | "shows the move from market zones" | To correct a transcription error |
| 137:14 | "Deloit" | "Deloitte" | To correct a transcription error |
| 140:20 | "Anybody of a direct report | "Anybody with a direct report" | To correct a transcription error |
| 144:12 | | Add:  Note that during the second day of the deposition I identified a number of documents using the term "decisions." | To account for later testimony |
| 162:14-15 | "when we hold the RS pay review that is to provide pay adjustments at employees" | "when we hold the 2X pay review that is to provide pay adjustments for employees" | To correct a transcription error |
| 167:22 | "David Eric" | "David Ayre" | To correct a transcription error |
| 175:2-3 | "they would need an increase to get into that pay range" | "they would not need an increase to get into that pay range" | To correct a transcription error |
| 198:18 | "Mr. Benton | "Mr. Vinton" | To correct a transcription error |

| 227:14 | "refers to four stock awards" | "refers to our stock awards" | To correct a transcription error |
| 229:12 | "additional words" | "additional awards" | To correct a transcription error |
| 275:6 | "for the role-out" | "for the rollout" | To correct a transcription error |
| 322:19 | "in 20719" | "in 2019" | To correct a transcription error |
| 325:25-326:1 | "And it did mean that somebody couldn't exceed" | "And it did not mean that somebody couldn't exceed" | To correct a transcription error |
| 328:21 | "Yes, merit increase guidelines is part of GPR." | "Merit increase guidelines were a part of GPR, but GPR is not current practice." | To conform to the facts, consistent with other testimony |
| 328:25-329:1 | "So the merit increase guidelines in current practice would have been partially based on CFE rating." | "So the merit increase guidelines in GPR would have been partially based on CFE ratings." | To conform to the facts, consistent with other testimony |
| 410:11-12 | "As stated on the slide, 2 percent. That was not always the rule." | "As stated on the slide, the guidance for VALUES band was 5 to 20 percent. That was not always the rule." | To conform to the facts, consistent with other testimony |
| 421:20 | "looking at the low" | "looking at below" | To correct a transcription error |
| 447:9 | "composition experts" | "compensation experts" | To correct a transcription error |
| 472:6-7 | "we made other results public" | "we made our results public" | To correct a transcription error |

I attest that the above-referenced changes are true and correct.

Date: February 11, 2021

DocuSigned by:

*Shane Walker*

5B97C30509694BB...

Shane Walker

2

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF OREGON

 3                   PORTLAND DIVISION

 4

 5   KELLY CAHILL, SARA JOHNSTON,    Case No.: 3:18-cv-01477-JR

     LINDSAY ELIZABETH, and HEATHER

 6   HENDER, individually and on

     behalf of others similarly

 7   situated,

 8           Plaintiffs,

 9        v.

10   NIKE, INC., an Oregon Corporation,

11           Defendant.

     _____

12

13

14

15      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

16              JESSICA L. WESTERHOF

17              Ann Arbor, Michigan

18           Wednesday, April 21, 2021

19                   Volume 1

20

21

22   Reported by:

     LESLIE JOHNSON

23   RPR, CCRR, CSR No. 11451

24   Job No.: 4514710

25   PAGES 1 - 282
```

                                                    Page 1

Davis Decl. Exhibit 64, Page 1 of 7

```
 1        Q    Sorry about that.  Okay.                   05:04:38

 2        A    But, yes, I see that.

 3        Q    Okay.  Great.

 4             And is January 8, 2016 the approximate

 5   date when you started as a Nike employee?           05:04:59

 6        A    Yes.  As a full-time Nike employee.

 7        Q    Okay.  When you were hired by Nike,

 8   correct?

 9        A    Well, it looks like it says my start date

10   is January 25th for that role.  But I was notified  05:05:13

11   actually about that role in December of 2015, but it

12   didn't get -- I guess, like, go through the

13   paperwork and actualized until I got this letter on

14   January 8th letting me know that my start date would

15   be the 25th.                                        05:05:35

16        Q    Okay.  And let's see.  So the second

17   sentence on Exhibit 212, it states, "We're pleased

18   to confirm your acceptance of Nike's offer for the

19   position of assistant buyer - FBTL."

20             Do you see that?                           05:06:01

21        A    Yes.

22        Q    Okay.  And is assistant buyer FBTL the

23   position that you actually started in when you were

24   hired at Nike as a full-time employee in or around

25   January 2016?                                        05:06:20
```

Page 118

Davis Decl. Exhibit 64, Page 2 of 7

```
 1        A    Yes.                                    05:06:29

 2        Q    And was this a role that you had applied

 3   for?

 4        A    No.  I actually believe I did apply for

 5   it -- sorry -- formally.  Sorry.  I like -- I did    05:06:39

 6   formally and legally apply for the position.  I know

 7   I did that.  I was -- the position was created, and

 8   I was selected for that -- this new open position of

 9   an assistant buyer.  Assistant buyer roles didn't

10   exist prior to -- in the reorg or prior to this,    05:07:01

11   yeah, reorg.

12             And I -- sorry.  And the question was, was

13   this the -- sorry.  What was -- I know I'm getting

14   somewhere with this, but I forgot what the exact

15   question was.                                       05:07:20

16        Q    So I just asked if you had applied for

17   this role of assistant buyer --

18        A    Oh, right.

19        Q    -- FBTL.

20        A    I know I did legally apply for it.  I was  05:07:26

21   offered it when it became available.  And then once

22   it actually was posted online, I was notified that

23   it was so that I could, like, formally and properly

24   apply for it through the website.

25        Q    So you submitted an online application for  05:07:47
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 64, Page 3 of 7

```
 1   this role --                                      05:07:49

 2        A    Correct.

 3        Q    -- to the best of your recollection?

 4             Okay.  And then were you interviewed for

 5   the role before --                                05:07:54

 6        A    No.

 7        Q    -- you received this offer?

 8             Okay.  And let's see.  So the title that's

 9   reflected there in that second sentence, FBTL, does

10   that stand for football --                        05:08:10

11        A    It actually stands for --

12        Q    -- or what does it stand for?

13        A    At the time -- because it changed a lot

14   when I was there.  So I believe it stood for

15   football, baseball, team and licensed.            05:08:22

16        Q    Okay.  And do you know who made the

17   decision to offer you the position?

18        A    No.

19        Q    Okay.  So, if you look at the third

20   paragraph on Exhibit 212, it says "As an exempt    05:09:02

21   employee not eligible for overtime, we are offering

22   you an analyzed salary of $46,000."

23             Do you see that?

24        A    Yes.

25        Q    And was $46,000 your actual starting     05:09:15
```

```
1                    REPORTER'S CERTIFICATION

2          I, Leslie Johnson, a Certified Shorthand

3     Reporter of the State of California, do hereby certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth; that

6     any witnesses in the foregoing proceedings, prior to

7     testifying, were administered an oath; that a record of

8     the proceedings was made by me using machine shorthand

9     which was thereafter transcribed under my direction;

10    that the foregoing transcript is a true record of the

11    testimony given.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [ ] was [ ] was not requested.

16    I further certify I am neither financially interested in

17    the action nor a relative or employee of any attorney or

18    any party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21    Dated:  May 11, 2021

22

23

24         LESLIE JOHNSON

25         CSR No. 11451, RPR, CCRR
```

Page 282

Davis Decl. Exhibit 64, Page 5 of 7

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: April 21, 2021

Deponent: Jessica Westerhof

| Page | Line(s) | Reads | Should Read | Reason |
|---|---|---|---|---|
| 25 | 25 | I don't know approximately, | I don't know exactly, | To correct an inadvertent error |
| 28 | 15 | I don't know approximately, | I don't know exactly, | To correct an inadvertent error |
| 49 | 15 | Not approximately, | Not exactly, | To correct an inadvertent error |
| 56 | 5 | ultimatum for my future employment | ultimatum and threat to my future employment | To clarify and provide additional details |
| 59 | 21 | Yes. | Ms. Haas worked at Nike's European Headquarters when I had this conversation with her. | To correct an inadvertent error |
| 81 | 21 | comparison | comparable | To correct an inadvertent error |
| 100 | 7-9 | I don't know, actually, if he did – if they knew that he did that. He called them that, sorry. | I don't know whether those three knew that Jeremy called them that. | To clarify and provide additional details |
| 102 | 10 | Cascarelli | Cafarelli | To correct a transcription error |
| 126 | 3 | John Cusick | Sean Cusick | To correct a transcription error |
| 128 | 8 | assistant buyer associate merchant | associate merchant from assistant buyer | To clarify and provide additional details |
| 129 | 3 | Williams | Whaling | To correct a transcription error |
| 140 | 2 | Kyla Curatolo | I believe that Kyla Curatolo was offered an assistant buyer position, but she instead took a digital coordinator position. | To clarify and provide additional details |
| 140 | 6 | I forgot about Cynthia | I forgot about Cynthia, and Debby Plenert also became an assistant buyer from previously being a buying coordinator. | To clarify and provide additional details |
| 147 | 24 | got move involved | got more involved | To correct a transcription error |
| 172 | 21 | Pavin | Pawan | To correct a transcription error |
| 173 | 14 | Molly | Mollie | To correct a transcription error |
| 189 | 25 | Yeah. The other assistant buyers. | Yeah, except Kyla Curatolo, since she instead took a digital coordinator position. So | To clarify and provide additional details |

|     |       |                                                                             | the peers I'm referring to are the other assistant buyers.                                                      |                                              |
| --- | ----- | --------------------------------------------------------------------------- | --------------------------------------------------------------------------------------------------------------- | -------------------------------------------- |
| 190 | 8     | not worthy                                                                  | less prestigious                                                                                                | To clarify and provide additional details   |
| 190 | 8-9   | but they were worth more,                                                   | but they were more prestigious,                                                                                 | To clarify and provide additional details   |
| 209 | 18-20 | anyone who was an associate merchant or who would be a buying coordinator as well. | anyone who was an associate merchant, digital site coordinator, or who would be a buying coordinator as well. | To clarify and provide additional details   |
| 210 | 13    | Molly                                                                       | Mollie                                                                                                          | To correct a transcription error             |
| 212 | 7     | Molly                                                                       | Mollie                                                                                                          | To correct a transcription error             |
| 214 | 9     | Molly                                                                       | Mollie                                                                                                          | To correct a transcription error             |
| 221 | 7-8   | I don't feel like I was getting not only paid fairly,                       | I not only felt I was not getting paid fairly,                                                                  | To correct an inadvertent error and clarify  |
| 257 | 13    | Tanya Harding [sic]                                                         | Tanya Morning                                                                                                   | To correct a transcription error             |
| 261 | 15    | that it did it appear that I was getting paid a                             | that it did appear I was getting paid a                                                                         | To correct a transcription error and clarify |
| 262 | 21    | stood me apart from them. So . . .                                          | made me stand out from others who were doing the same work as me but getting paid more than me.                | To clarify and provide additional details   |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on ___June 8, 2021___ in ___Washtenaw County, Ann Arbor, Michigan___

DocuSigned by:

*Jessica Westerhof*

A4F0BC493E34462...

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,    No.

      Plaintiffs,          3:18-cv-01477-JR

    v.

NIKE INC., an Oregon

Corporation,

      Defendant.

REMOTE VIDEOCONFERENCE 30(b)(6) DEPOSITION OF

SHELLI WHITE

Taken in behalf of Plaintiffs

January 29, 2021

White, Shelli - 30(b)(6)                                    January 29, 2021

Page 15

1  A.   Yes.  That was, I was a senior compensation
2       consultant.
3  Q.   Were you in the L band?
4  A.   No.  That was a U band position.
5  Q.   When you went from compensation -- So you went
6       from senior compensation consultant to senior
7       executive compensation consultant?
8  A.   Yes.
9  Q.   Okay.  Is that your complete job history at
10      Nike?
11 A.   Yes.
12 Q.   All right.  Thank you.  Can you just briefly
13      tell me your education history, you know,
14      what -- Did you go to college, postgraduate
15      school, any degrees you have?
16 A.   I have a bachelor's degree in business.
17 Q.   In business.  Okay.  So you helpfully already
18      did some of what I wanted to get into first,
19      which was get an overview of all the various
20      incentive pay programs at Nike.  You made quick
21      work of that in the beginning, but just to
22      confirm, there's an annual cash bonus at Nike
23      that is called the Performance Sharing Plan; is
24      that right?
25 A.   Yes.

Beovich Walter & Friend
1-800-541-4452            503-228-7201            www.bwfreporters.com

Davis Decl. Exhibit 65, Page 2 of 22

White, Shelli - 30(b)(6)                                January 29, 2021

Page 17

1   Q.   And that's, that reminds me.  It's another
2        admonition, which is because we have a court
3        reporter, we have to say "yes" or "no."  You
4        know, often we're just nodding our heads in
5        normal conversation, but here we have to say
6        "yes" or "no" to answers (sic).  Is that okay?
7   A.   Yes.  I understand.
8   Q.   Okay.  What is the eligibility currently for the
9        Performance Sharing Plan?
10  A.   The current eligibility through the Performance
11       Sharing Plan is employees who are in bands V all
12       the way through the CEO.  So V, A, L to U, E, S
13       and all of our executive population, E7 and
14       above.  They cannot have a performance rating of
15       unsatisfactory.  They need to be employed on
16       May 31st.  That's the last day of the annual
17       performance period.  They cannot be terminated
18       for a performance issue or a violation of
19       company rules prior to the payout, which is, the
20       payout is in August, and they can't be
21       participating in another bonus plan.  So we have
22       retail bonus plans.  So if they're participating
23       in one of those, they're not eligible for PSP.
24  Q.   Other than the Performance Sharing Plan, are
25       there any other annual cash bonuses for

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwreporters.com

Davis Decl. Exhibit 65, Page 3 of 22

Page 68

```
 1          is, how do you know what it rolls up to next for
 2          the PSP budget during GPR?
 3     A.   Employees who are in the same group generally
 4          are in the same cost center, report to the same
 5          leader.  And so I don't know the back end
 6          workings of the mePortal, but employees are
 7          grouped together for a manager to make their
 8          recommendations and that goes to the manager
 9          plus one.  So it follows the reporting
10          relationship.  And so that budget would roll up
11          to the manager plus one.  Do you know what I
12          mean when I say "manager plus one"?
13     Q.   Yes.  The next level; right?
14     A.   Yes.
15     Q.   Okay.  Now, so after manager plus one there was
16          additional business leader review of PSP awards
17          during fiscal years 2015, 2016 and 2017.  Is
18          that right?
19     A.   There was -- I don't know how every business
20          unit managed that.  I know in the mePortal that
21          the manager entered the recommendation.  The
22          manager plus one had to approve that
23          recommendation and the expectation was that each
24          business unit would stay within their PSP
25          budget.  So it was the responsibility of the
```

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwreporters.com

Davis Decl. Exhibit 65, Page 4 of 22

Page 69

```
 1      business unit leaders to stay within their
 2      budget.
 3  Q.  Okay.  So let's say it's an E band who has an S
 4      band direct supervisor.  That S band direct
 5      supervisor would make a recommendation about the
 6      E band; is that right?
 7  A.  Yes.
 8  Q.  And this is during GPR.  Then that would go up
 9      to let's say that that S band has a direct
10      reporting line to an E7 band.  That would, the
11      recommendation about the E band would go to the
12      E7; is that correct?
13  A.  Yes.  For approval.
14  Q.  Okay.  And it would then roll up to higher
15      levels of the organization; isn't that right?
16  A.  They would have visibility into the
17      recommendations that had been made and approved.
18  Q.  Yes.  And they can make changes; right?  Each --
19      So after E, the E7 made, either did or did not
20      make a change, then people above E7 who that E7
21      reported to could make changes if they wanted
22      to; is that right?
23  A.  I don't recall system wise.  I know at, there
24      was a period of time where if a higher level
25      leader didn't approve of the, you know, after it
```

Beovich Walter & Friend
1-800-541-4452            503-228-7201            www.bwfreporters.com

Davis Decl. Exhibit 65, Page 5 of 22

Page 104

1           Under -- Near the top where it says, do you
2       see where it says "Nike's Performance Sharing
3       Plan PSP is," and then the first bullet point
4       is, "an important part of your Total Rewards
5       package at Nike."  Is that an accurate
6       statement?
7   A.  Yes.  I see it.  And yes, that's accurate.
8   Q.  If you turn to the second page, 19412, do you
9       see where it says "How PSP Works"?
10  A.  Yes.
11  Q.  And you see where next to that it says, "Getting
12      to the award"?
13  A.  Yes.
14  Q.  And it looks like there's two things that create
15      the PSP award pool.  Those two things are Nike
16      performance measures and team performance
17      measures; is that accurate?
18  A.  Yes.
19  Q.  And it's also accurate that the PSP award pool
20      is split into two shares that are each
21      50 percent, one is called the team share, one is
22      called the discretionary share.  Is that
23      accurate?  And then combining those two shares,
24      you get to the final PSP award.
25  A.  Yes.  And this would describe how the plan

Beovich Walter & Friend
1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 65, Page 6 of 22

White, Shelli - 30(b)(6)                                    January 29, 2021

Page 105

 1          worked from the period of 2015 through 2017.
 2   Q.     Thank you.  And as we talked about before, the
 3          target share per band shown at the top of this
 4          page was the same for fiscal years '15 through
 5          fiscal year '17?
 6   A.     Yes.  I believe these, yeah.  Yes, these were.
 7   Q.     I'm going to introduce two exhibits that I think
 8          will help us get through the calculation of PSP
 9          more quickly, and those are exhibits, those will
10          be Exhibit 599 and 600.  And those are -- Sorry.
11          One moment, Shelli.
12              So 599 will be NIKE_00015413.  And strike
13          that.  I'll just do Exhibit 599 because I think
14          we can get through it with just that.
15          Exhibit 600 will be something else later.
16              (Exhibit 599 marked for identification.)
17   Q.     BY MR. BYRON GOLDSTEIN:  So let me know when you
18          have that open.
19   A.     I have it open.
20   Q.     Okay.  Thanks.  Can you turn to the second page.
21          And you see this is titled "Personal pay
22          statement."  And under where it says "Rewards"
23          you see, "Your performance awards for FY17."
24          Based on the format and personal pay statement
25          and the year, does this, do you believe this

Beovich Walter & Friend
1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 65, Page 7 of 22

Page 106

1         document is a personal pay statement for a Nike
2         employee of fiscal year '17?
3    A.   Yes.  It looks to be that.  Yes.
4    Q.   And then if you go to the bottom of it, do you
5         see where it says "PSP calculation"?
6    A.   Yes.
7    Q.   And see the team award is on the left and on the
8         right is discretionary award?  Do you see that?
9    A.   I do.
10   Q.   And you also see that the five factors under the
11        team award are also included under the
12        discretionary award?
13   A.   Yes.
14   Q.   It says the five factors are "Plan," one; the
15        second one is "Time and Plan."  The third one is
16        "Weighted Achievement."  The fourth one is
17        "Fiscal Earnings."  The fifth one is "One-Half
18        Band Target."  Do you see that?
19   A.   Yes.
20   Q.   Okay.  And all five of those are in the
21        discretionary award.  And the discretionary
22        award has a sixth factor, which is called
23        performance modifier.  Do you see that?
24   A.   Yes.
25   Q.   Okay.  Now, is this formula for PSP calculation,

Page 107

1    this is the same formula that Nike used for
2    employees in bands L through S from fiscal year
3    '15 through fiscal year '18?
4  A.  It's the calculation that was used for the
5      awards in 2015, 2016 and 2017.  I just want to
6      make sure we're talking about the same time
7      periods.  And in 2000 -- I want to make sure.
8  Q.  Shelli, why don't we do this, why don't we --
9      So, why don't we do this:  I'll make it so you
10     don't have to -- We'll get to that in a second.
11     So, but for now you can confirm that this is the
12     same PSP calculation that was used for employees
13     in band L through S at Nike World Headquarters
14     for fiscal years 2015, 2016 and 2017?
15 A.  Yes, and 2018.
16 Q.  And 2018.
17 A.  Yes.
18 Q.  Okay.  Thank you.  So the first factor is
19     called -- is plan.  And in this particular pay
20     statement it says, INC.  Can you tell me what
21     the factor plan means in this, in PSP
22     calculations?
23 A.  This identifies the plan that an employee was
24     on.  So INC or I N C, we would call that the INC
25     Plan or the Nike INC plan.

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 65, Page 9 of 22

White, Shelli - 30(b)(6)                                    January 29, 2021

Page 108

```
 1   Q.   And was there more than one plan for employees
 2        at Nike World Headquarters in band L through S
 3        at any point in fiscal years 15 through 2018?
 4   A.   Yes.
 5   Q.   Approximately how many different plans were,
 6        existed for employees at Nike World Headquarters
 7        in band L through S in, say, fiscal year 2017?
 8   A.   In 2017 I believe we had about 18 plans.
 9   Q.   And how does the particular plan impact the PSP
10        calculation?
11   A.   The individuals -- Sorry.  I lost the exhibit.
12   Q.   That's okay.  Take your time.
13   A.   Will you ask your question again, please?
14   Q.   ████████  ████████████████████████  ████████████
     ██        ██████████████████████████████████████████████
     ██        ███████████████████████████████████████
     ██        ████████████████████████████████████████████
     ██    ██  ██████
     ██    ██  ██████████████████████████████████████
     ██        ███████████████████████████████████
     ██        ██████████████████
     ██    ██  ██████
     ██    ██  ██████████████████████████████████████
     ██        ██████████████
     ██    ██  ██████████████████████████████
```

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Davis Decl. Exhibit 65, Page 10 of 22

White, Shelli - 30(b)(6)                                          January 29, 2021

Page 109



Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Davis Decl. Exhibit 65, Page 11 of 22

White, Shelli - 30(b)(6)                              January 29, 2021

Page 110

1    ████████████████████████████████████████

     ████████████████████████████████████████

     █████████████████████████████████

     ██    ███████████████████████

5    Q.   Okay.  Before we get off of this Exhibit 599,
6         you see below Performance Sharing Plan there's
7         something called the Profit Sharing Plan?  Do
8         you see that?
9    A.   I do.
10   Q.   What is the Profit Sharing Plan?
11   A.   The Profit Sharing Plan is part of our
12        retirement program.  So that falls under the
13        purview of our benefits team.  And it's a -- I'm
14        not an expert on that plan, but it's a
15        contribution that Nike sometimes makes on an
16        annual basis to employees' retirement accounts.
17   Q.   Okay.  Thank you.  Do you know how they
18        calculate Profit Sharing Plan in any --
19   A.   Not enough to speak about it.
20   Q.   Okay.  Thank you.  And thank you for letting me
21        know that you're not sure.
22             The next exhibit will be Exhibit 600, and
23        that will be NIKE_1900019405.
24             (Exhibit 600 marked for identification.)
25   Q.   BY MR. BYRON GOLDSTEIN:  Just let me know when

Beovich Walter & Friend
1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 65, Page 12 of 22

White, Shelli - 30(b)(6)                              January 29, 2021

Page 114

1        cash annual bonuses.  Is that fair to say?
2             MS. DAVIS:  Objection; misstates the
3        testimony, asked and answered.
4   Q.   BY MR. BYRON GOLDSTEIN:  I'm sorry, Shelli.  Are
5        you waiting for me?
6   A.   I'm looking through this document so I can be
7        clear about what the difference is here, and
8        I -- This...
9   Q.   Why don't we move on and we'll try it with some
10       other documents.  Okay?
11  A.   Okay.
12  Q.   Going back to Exhibit 599, and the plan says INC
13       here.  So how were employees placed in one plan
14       versus another plan from the PSP calculation
15       during fiscal years '15 through 2018?
16            MS. DAVIS:  Asked and answered.
17            Go ahead.
18            THE WITNESS:  It was based on their cost
19       center.
20  Q.   BY MR. BYRON GOLDSTEIN:  Okay.  In fiscal year
21       2017, approximately how many cost centers were
22       there at Nike World Headquarters?
23  A.   I, I don't know.
24  Q.   Is it fair to say there was a lot --
25  A.   Yes.

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 65, Page 13 of 22

White, Shelli - 30(b)(6)                                    January 29, 2021

Page 115

1    Q.    -- of cost centers?

2    A.    Yes.

3    Q.    So there was, I believe you said there was 18

4          plans in fiscal year '17.  So those ultimately

5          associated with 18 different cost centers; would

6          that be accurate?

7    A.    There were 18 plans.  There -- When we talk

8          about a lot of cost centers, I don't know --

9          There are at least hundreds of cost centers.  I

10         don't know if it, if it exceeds into the

11         thousands.  I don't.  But it's at least hundreds

12         of cost centers.  Those different cost centers

13         roll into the different plans.

14   Q.    Is there -- So to make these calculations, Nike

15         must have a document that says which cost

16         centers were included in which PSP plan --

17   A.    We would have had that at the time to know who,

18         which cost centers were part of which plans or

19         we would have -- the cost centers, the cost

20         center is the -- at the most granular level, and

21         that rolls up into different groupings.  As I

22         mentioned the example I'm in global

23         compensation, which rolls up into Total Rewards,

24         which rolls up into human resources.  And I

25         don't remember how many layers there are for me

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Davis Decl. Exhibit 65, Page 14 of 22

White, Shelli - 30(b)(6)                                  January 29, 2021

Page 120

1    A.    Yes.

2    Q.    And so there might have been plans or there were

3          plans that had a higher weighted achievement in

4          fiscal year 2017, for example, than the INC

5          Plan; right?

6    A.    It's possible.  I don't remember how each plan

7          achieved, but the other plans would have had

8          different achievement percentages.

9    Q.    Well, let's say, for example, a plan had a

10         hundred percent weighted achievement in fiscal

11         year 2017, a different plan than the main plan.

12         That would have had a significant impact on the

13         PSP calculations?

14   A.    It would have been 100 instead of 58.29 in this

15         calculation if a plan had achieved at a hundred

16         percent.

17   Q.    So it would have been higher than the

18         calculation shown here if this employee was in a

19         different plan?

20   A.    If that plan achieved higher than this, yes.

21   Q.    And each of those plans' weighted achievement is

22         calculated pursuant to a specific formula?

23   A.    It's based on the EBIT target set at the

24         beginning of the plan year.

25   Q.    So the next factor is "Time in Plan."  Can you

*Beovich Walter & Friend*

1-800-541-4452                 503-228-7201                 www.bwreporters.com

Davis Decl. Exhibit 65, Page 15 of 22

Page 124

1    Q.    So fiscal earnings, the amount, if you were a

2          salaried employee of your base pay for the

3          fiscal year, that has been a factor in the PSP

4          calculations since at least 2015 through the

5          present?

6    A.    Yes.

7    Q.    Same question for band target.  That's been a

8          factor in the PSP calculation from at least 2015

9          through the present?

10   A.    Yes.

11   Q.    And as you, I believe you testified before, but

12         please correct me if I get it wrong, the targets

13         by band have remained the same from 2015 to the

14         present?

15   A.    Yes.

16   Q.    Okay.  And so the remaining factor, we've talked

17         about five factors in the team award and the

18         five factors, five out of six factors in the

19         discretionary award, the remaining factor is

20         "Performance Modifier"?

21   A.    Yes.

22   Q.    What is the "Performance Modifier"?

23   A.    The performance modifier is the discretionary

24         amount that a manager from 2015, in 2015, 2016,

25         2017 and 2018, the manager could apply or choose

Davis Decl. Exhibit 65, Page 16 of 22

White, Shelli - 30(b)(6)                                    January 29, 2021

Page 125

1        a performance modifier.

2   Q.   When we've been using the word "Manager" today,

3        manager could be any employee who has at least

4        one direct report?

5   A.   What I'm referring to in this case, it's the

6        employee's direct manager who's making the

7        initial recommendation for the individual

8        modifier.

9   Q.   And so, and if you look at Exhibit 598, fiscal

10       year '17 brochure, PSP brochure, you see CFE

11       discretionary modifier guidelines?

12  A.   Yes.

13  Q.   Okay.  I'm going to introduce Exhibit 601 as

14       NIKE_00013312.

15            (Exhibit 601 marked for identification.)

16            MR. BYRON GOLDSTEIN:  Exhibit 602 will be

17       NIKE_00030254.

18            (Exhibit 602 marked for identification.)

19  Q.   BY MR. BYRON GOLDSTEIN:  Let me know when you

20       have -- We can look at 601 first.

21  A.   I have 601 open.

22  Q.   Okay.  Nike metadata says this is titled, (02)

23       FY18 PSP brochure, created on August 29, 2017,

24       last modified August 16, 2018.  Do you recognize

25       this as the fiscal year '18 PSP brochure?

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwreporters.com

Davis Decl. Exhibit 65, Page 17 of 22

White, Shelli - 30(b)(6)                                    January 29, 2021

Page 126

1    A.    Yes.

2    Q.    And then 602 at Nike Bates number 00030254, the

3          file name PSP Brochure, created and last

4          modified October 27, 2015.  Do you recognize

5          this as the fiscal year 2016 PSP brochure?

6    A.    Yes.

7    Q.    And if you look at all three of these brochures,

8          fiscal years '16, '17 and '18, so Exhibit 602,

9          601 and 598, do you see that each has a table

10         listing CFE discretionary modifier guidelines?

11   A.    Yes.  And that was 601, 602 and I'm sorry.  The

12         other exhibit was?  I have got a lot open.

13   Q.    It's okay.  598.

14   A.    Yes.  Yes.  I see that all three have that

15         section.

16   Q.    And all three have the same CFE ratings

17         beginning at the highest as "Exceptional,"

18         "Highly Successful," "Successful,"

19         "Inconsistent," "Unsatisfactory," and then at

20         the bottom "Too New to Rate"?

21   A.    Yes.

22   Q.    And all three of them for fiscal years '16, '17

23         and '18 have the same exact ranges for

24         performance modifier corresponding to each of

25         those ratings?

White, Shelli - 30(b)(6)                    January 29, 2021

Page 127

1    A.    Yes.

2    Q.    Thank you.  And the CFE ratings, those have been

3          done on an annual basis from at least fiscal

4          year 2015 to the present?

5    A.    Yes.

6    Q.    And the definition of each of those ratings has

7          been the same from at least fiscal year 2015 to

8          the present?

9          MS. DAVIS:  May call for speculation,

10         outside the scope of the witness's deposition --

11         Sorry -- Outside the scope of the topics on

12         which the witness was designated to testify.

13         If you know, you can answer.

14         THE WITNESS:  I don't know if the

15         definitions have changed.  I'm...

16   Q.    BY MR. BYRON GOLDSTEIN:  Exhibit 603 is

17         NIKE_0002617.  And the Nike metadata says this

18         is titled "CFE collection FAQ-EN-April 2016,"

19         created and last modified as April 25th, 2016.

20         (Exhibit 603 marked for identification.)

21   Q.    BY MR. BYRON GOLDSTEIN:  Do you recognize this

22         as a Nike HR document?

23   A.    Yes.

24   Q.    And you see there's definitions of the ratings

25         for fiscal year 2016?

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 65, Page 19 of 22

White, Shelli - 30(b)(6)                           January 29, 2021

Page 128

1    A.    Yes.

2    Q.    And based on the performance modifier input in

3          the PSP calculation, that was there from fiscal

4          year 2015 to fiscal year, through fiscal year

5          2018, your CFE rating impacted the size of your

6          PSP award?

7    A.    It was a, there were guidelines given to

8          managers in making that discretionary decision.

9          So the guidelines were associated with the CFE

10         rating.  So based on the CFE rating, there was a

11         suggested guideline.

12   Q.    The higher your rating, the higher the range for

13         your PSP modifier; right?

14   A.    The higher the ~~range~~ rating, the higher the guideline.

15   Q.    One moment.  So I'm going to introduce as

16         Exhibit 604, NIKE_00030271.

17             (Exhibit 604 marked for identification.)

18             THE WITNESS:  I have the document open.

19   Q.    BY MR. BYRON GOLDSTEIN:  Okay.  So on the three

20         of three page NIKE_30273, do you see the last

21         question, "How do I determine the appropriate

22         discretionary share performance modifier?"

23   A.    Yes.  I see that question.

24   Q.    And answer, "Use the guidelines provided for

25         performance modifiers.  Within these guidelines

*Beovich Walter & Friend*

1-800-541-4452              503-228-7201              www.bwfreporters.com

Davis Decl. Exhibit 65, Page 20 of 22

White, Shelli - 30(b)(6)                                    January 29, 2021

Page 236

1                C E R T I F I C A T E

2

3        I, Aleshia K. Macom, Oregon CSR No. 94-0296,

4    Washington CCR No. 2095, California CSR

5    No. 7955, RMR, CRR, RPR, do hereby certify that

6    SHELLI WHITE remotely appeared before me at the

7    time and place mentioned in the caption herein;

8    that the witness was by me first duly sworn on

9    oath, and examined upon oral interrogatories

10   propounded by counsel; that said examination,

11   together with the testimony of said witness, was

12   taken down by me in stenotype and thereafter

13   reduced to typewriting; and that the foregoing

14   transcript, pages 1 to 235, both inclusive,

15   constitutes a full, true and accurate record of

16   said examination of and testimony given by said

17   witness, and of all other proceedings had during

18   the taking of said deposition, and of the whole

19   thereof, to the best of my ability.

20        Witness my hand at Portland, Oregon, this

21   11th day of February, 2021.

22

23   _____

     Aleshia K. Macom

24   OR CSR No. 94-0296, Expires 9-30-2023

     WA CCR No. 2095, Expires 7-7-2021

25   CA CSR No. 7955, Expires 7-7-2021

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Davis Decl. Exhibit 65, Page 21 of 22

*Cahill, et al v. Nike*

**Shelli White Deposition Errata**

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 12:23 | "Yes.  Approximately June 2020." | "Yes.  Approximately June 2019." | To conform to the facts |
| 97:4 | "I don't know." | "I don't know, other than the names I have already provided." | To reflect prior consistent testimony mischaracterized by counsel |
| 101:6 | "Then I don't know." | "Then I don't know, other than the names I have already provided." | To reflect prior consistent testimony mischaracterized by counsel |
| 128:14 | "The higher the range, the higher the guideline." | "The higher the rating, the higher the guideline." | To correct a transcription error |

I attest that the above-referenced changes are true and correct.

Date: March 22, 2021

DocuSigned by:

*Shelli White*

F8DEB74ECF524EA...    Shelli White

1