**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Counsel for Plaintiffs, Opt-in Plaintiffs and Putative Class

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, Ph.D.**<br><br>**Title VII of the Civil Rights Act of 1964; Federal Equal Pay Act; Oregon Equal Pay Act; Oregon Equality Act**<br><br>**DEMAND FOR JURY TRIAL** |

PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.

854090.17

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.    NIKE FAILS TO REFUTE PLAINTIFFS' ARGUMENT THAT DR.
HANVEY'S "JOB ANALYSIS" IS NOT RELEVANT SINCE NIKE
MISCHARACTERIZES PLAINTIFFS' CLAIMS AND MAKES IRRELEVANT
AND ERRONEOUS ARGUMENTS ABOUT PLAINTIFFS' EXPERT ...................... 5

    A.    Nike's Criticism of Plaintiffs' Expert, Dr. Lundquist, Does Not Support
the Admissibility of Dr. Hanvey's Testimony ...................................................... 5

    B.    Dr. Hanvey's Job Analysis Concerning Sample 1 Is Irrelevant Since It
Addresses Neither Issues Before the Court nor Any Relevant Dispute
Among the Experts ................................................................................................ 6

    C.    Dr. Hanvey's Job Analysis Concerning Sample 2 Is Irrelevant Since It
Addresses Work Performed by Employees in Only Five or .36% of the Job
Codes and Neither Nike's Corrections to Dr. Hanvey's Report Nor Legal
Arguments Establish Relevancy ............................................................................ 7

        1.    Nike's Corrections to Dr. Hanvey's Report Only Serve to
Underscore that the Job Analysis Is Limited and Irrelevant .................... 7

        2.    Nike's Argument that Plaintiffs' Burden in an Equal Pay Claim
Renders Dr. Hanvey's Job Analysis Relevant Mischaracterizes
Plaintiffs' Compensation Claims Pursuant to Title VII and the
Oregon Equality Act and Fails to Apply Properly Plaintiffs'
Burden to Meet the Rule 23 Standards for the Oregon Equal Pay
Act ........................................................................................................... 9

III.    NIKE'S ASSERTIONS ABOUT JOB ANALYSES AND REFERENCE TO
KASSMAN V. KPMG DO NOT SUPPORT THE RELIABILITY OF THE
METHODOLOGY USED BY DR. HANVEY ............................................................ 11

    A.    Dr. Hanvey Did Not Employ a Reliable Methodology for Conducting the
Job Analysis .......................................................................................................... 11

    B.    Contrary To Nike's Argument, Kassman v. KPMG Provides No Support
for a Conclusion that Dr. Hanvey Utilized a Reliable Methodology ................. 16

IV.    PLAINTIFFS' ARGUMENT THAT DR. HANVEY'S OPINIONS ARE
INADMISSIBLE DUE TO THE UNRELIABILITY CAUSED BY
METHODOLOGICAL FLAWS, CONCLUSIONS REACHED WITHOUT
SUFFICIENT FACTS AND CARELESS ERRORS WAS NOT
SUCCESSFULLY REBUTTED BY NIKE .................................................................. 21

A.    Dr. Hanvey's Process for Selecting Survey Participants Was Unreliable Due to an Inadequate Method for Determining the Sample Size, Selection Bias Caused by the Exclusion of Male Employees, Nonresponse Bias and Inclusion of Employees without Sufficient Knowledge. ................................... 21

1.    Dr. Hanvey Failed to Follow an Appropriate Process for Determining Sample Size. .................................................................... 21

2.    Dr. Hanvey Biased the Sample by Excluding Male Employees ............ 23

3.    Dr. Hanvey Failed to Consider Bias that May Have Resulted from the Substantial Nonresponse Rate .......................................... 25

4.    Dr. Hanvey Included Employees in the Sample Who Did Not Possess Adequate Knowledge of the Job Requirements ........................ 27

B.    Nike Failed to Rebut Plaintiffs' Showing that Dr. Hanvey's Opinions Are Unreliable Because He Reached Conclusions without Sufficient Facts and Committed Errors that Demonstrate a Failure to Exercise Proper Care. ............ 29

V.    CONCLUSION ............................................................................................. 34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Cullen v. Indiana Univ. Bd. of Trs.*,
  338 F.3d 693 (7th Cir. 2003) ...............................................................................16

*Ebbert v. Nassau County*,
  No. 1:05-cv-05445-AKT, 2008 WL 8086382 (E.D.N.Y. 2008)................................28

*Hangarter v. Provident Life & Accident Ins. Co.*,
  373 F. 3d 998 (9th Cir. 2004) ...............................................................................20

*Hein v. Or. Coll. of Educ.*,
  718 F.2d 910 (9th Cir. 1983) ..........................................................................10, 16

*Kassman v. KPMG, LLC*,
  416 F. Supp. 3d 252 (S.D.N.Y. 2018).............................................................. *passim*

*Morales v. Kraft Foods Corp.*,
  No. 2:14-cv-04387-JAK-PJW, 2017 WL 2598556 (C.D. Cal. June 9, 2017) ........................24

**Federal Statutes**

29 U.S.C. § 216(b) ...............................................................................................11, 18

Federal Equal Pay Act ......................................................................................2, 10, 15

**State Statutes**

Or. Rev. Stat. § 652.210(16) ..............................................................................10, 15

Oregon Equal Pay Act ........................................................................................ *passim*

Oregon Equality Act ....................................................................................1, 9, 10, 29

**Rules**

Federal Rule of Civ. P. 23...........................................................................2, 10, 11, 18

Federal Rule of Evidence 702 ..................................................................................20

**Regulations**

29 C.F.R. § 1620.15(a)..............................................................................................16

29 C.F.R. § 1607.1 *et. seq.*........................................................................................12

Pls.' Reply Brief in Sup. of Mot. to Rule as Inadmissible Part of the Expert Report of Chester Hanvey, Ph.D.

Page iii

854090.17

**Other Authorities**

Reference Manual on Scientific Evidence 384, 2011 WL 7724258 (Fed. Judicial
  Ctr. 3d ed. 2011) ........................................................................................................25, 26

SIOP Principles ....................................................................................................12, 14, 27

## I.    INTRODUCTION

Nike makes a single argument to try to show the relevance of Dr. Hanvey's conclusion based upon Sample 1: Dr. Hanvey's conclusion that there is "high variability" among the more than 1,000 jobs at issue will assist the Court in determining whether the "aggregated" multiple regression analysis presented by Plaintiffs' expert, Dr. Neumark, is appropriate.  Neither Plaintiffs nor Dr. Neumark dispute that there is variability among the jobs.  Accordingly, as is standard for the use of multiple regression analyses in discrimination cases, Dr. Neumark controls for comparable jobs and other factors.  The only pertinent issues of Dr. Neumark's analysis relate to whether the controls are adequate.  But Dr. Hanvey's analysis is not relevant since it only speaks to the need for controls, which is obvious and undisputed.

In its Opposition, Nike confirms that Dr. Hanvey's job analysis based upon Sample 2 only leads to conclusions about the variability in 5, or 0.36%, of the approximately 1,200 Job Codes included in the Covered Positions.  Even if accurate, conclusions concerning such a minuscule number of jobs does not provide relevant information about whether the class action requirements have been met.  Furthermore, at most, Dr. Hanvey's analysis only applies to the equal pay claims under the Oregon Equal Pay Act ("OEPA") since it only purports to study whether the jobs are comparable.  Plaintiffs' claims under Title VII and the Oregon Equality Act ("OEA") are based upon allegations that Nike's <u>practices</u> are unlawful.  Dr. Hanvey offers no opinions about Nike's challenged practices.  Finally, Nike's description of Dr. Hanvey's job analysis confirms that, in fact, the analysis is not relevant to the claims under the Oregon Equal Pay Act.  The equal pay claims are based upon whether the <u>job requirements</u> are "comparable."  Dr. Hanvey studied the "differences" or "variability" among employees.  Given that a violation

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 1**

854090.17

of OEPA turns on what the jobs <u>require</u>, not whether all employees <u>possess</u> the same skills, education, and experience, Dr. Hanvey's job analysis is not relevant.

Nike fails to rebut Plaintiffs' contention that Dr. Hanvey's job analysis is unreliable and inadmissible due to a failure to use a reliable methodology.  In an attempt to demonstrate that Dr. Hanvey's methodology is supported by professional literature, Nike refers to a single article.  However, that article neither refers to Dr. Hanvey's methodology, "individualized job analysis," nor to the processes that he used.  Dr. Hanvey admitted that no "article" would describe his methodology, and he did not claim that the "authoritative sources" for the relevant discipline supported his methodology.

Nike argues that a decision, *Kassman v. KPMG, LLC*, 416 F. Supp. 3d 252 (S.D.N.Y. 2018) approved a "virtually identical" methodology to that used by Dr. Hanvey.  In fact, *Kassman* illustrates the unreliability and irrelevance of Dr. Hanvey's job analysis.  The expert in *Kassman*, Dr. Christina Banks, <u>only</u> applied her methodology to the "similarly situated" standard for a collective action pursuant to the Federal Equal Pay Act, which looks at whether the collective action members are similarly situated to one another.  Accordingly, the court ignored Dr. Banks' opinions when deciding whether the Title VII claims could proceed as a class action and <u>only</u> relied upon Dr. Banks' opinions when considering whether the collective action could proceed.  Like *Kassman*, the Court should ignore Dr. Hanvey's job analysis when considering the pending Rule 23 class action issues.  Since the Plaintiffs do not pursue a collective action, even if Dr. Hanvey's methodology was identical to that used by Dr. Banks in *Kassman*, which it is not, the methodology would be irrelevant to the issues pending in this action.

In addition, even though Dr. Hanvey participated in preparing Dr. Banks' reports, he failed to follow a critical aspect of the methodology used by Dr. Banks in recruiting and

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 2**

854090.17

communicating with survey participants.  Dr. Banks informed the survey participants about the *Kassman* litigation and that the survey would be used in the litigation.  Dr. Banks's report states that "[p]sychometric principles require" such a communication plan, it was necessary to produce "honest reporting," and "was not a threat to the validity of … responses."  Dr. Hanvey's decision to hide the purpose of this work underscores the unreliability of his methodology.

Nike provided no legitimate response to Plaintiffs' demonstration that Dr. Hanvey applied an unreliable methodology to the implementation of the job analysis by means of a survey of a sample of employees.  Four interrelated problems when taken together compel the conclusion that the methodology is unreliable and inadmissible.  First, using a "rule of thumb" and ignoring applicable scientific principles, Dr. Hanvey selected an extremely small sample without considering the "problems," as he described in an expert report in another litigation, that a small sample may cause.  Second, Dr. Hanvey created a biased sample by excluding male employees.  Dr. Hanvey decided to exclude male employees based on a false premise that the pending issues concern an evaluation of the "differences" or "variability" among the putative class members.  But the OEPA concerns whether the requirements of jobs are "comparable."

Third, Dr. Hanvey failed to follow applicable scientific principles that required an analysis of the determinants for the significant nonresponse rate and whether that rate biased the results.  Moreover, there was an obvious determinant for the nonresponse rate, the role played by the Nike Legal Department in soliciting the employees for the survey.  Fourth, Dr. Hanvey did not even consider  the employees who participated in the survey to have a thorough knowledge of the jobs to meet the qualifications for "Subject Matter Experts."  Indeed, a substantial number of these survey participants responded that they did not have a "clear" understanding of the expectations of the jobs.  Employees who do not have an adequate knowledge or understanding

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 3**

854090.17

of the expectations of jobs are incapable of providing reliable information concerning the

<u>required</u> knowledges, skills and abilities for the jobs.

Plaintiffs described numerous opinions or representations offered by Dr. Hanvey that were based upon insufficient facts or were the result of careless errors.  Nike's attempts to explain or defend Dr. Hanvey's slipshod approach only underscores the flaws and unreliability of his methodology.  For example, Dr. Hanvey opined that Nike's job architecture included so-called management and individual contributor "tracks" and about how employees supposedly advance within the tracks, but, during his deposition, Dr. Hanvey testified that this was "just a general statement" and were not based upon an analysis of Nike practices.  Dr. Hanvey also opined that there were 17,000 Position Titles that "more accurately reflect work" than Job Codes.  Dr. Hanvey then testified that he considered any difference between a position title in the data, such as a missing comma, to be a unique Position Title, and Dr. Hanvey testified that this did not "reflect" work.  Finally, Dr. Hanvey relied upon a declaration from a Nike employee that was presented to him by a Nike attorney three days before he completed his Report.  Without any understanding as to the reason that the Nike attorney provided the declaration and without bothering to understand the basis for the declarant's representations, Dr. Hanvey adopted opinions presented in the declaration.  After being shown how the declarant reached one of her conclusions, Dr. Hanvey admitted he did not know if it were "possible" to reach that conclusion.

Because Dr. Hanvey's job analysis is neither relevant nor reliably executed, the Court should rule those opinions inadmissible.

II.    **NIKE FAILS TO REFUTE PLAINTIFFS' ARGUMENT THAT DR. HANVEY'S "JOB ANALYSIS" IS NOT RELEVANT SINCE NIKE MISCHARACTERIZES PLAINTIFFS' CLAIMS AND MAKES IRRELEVANT AND ERRONEOUS ARGUMENTS ABOUT PLAINTIFFS' EXPERT**

A.    **Nike's Criticism of Plaintiffs' Expert, Dr. Lundquist, Does Not Support the Admissibility of Dr. Hanvey's Testimony.**

Nike asserts that Plaintiffs criticize the job analysis of Dr. Hanvey "even though their I/O expert [Dr. Lundquist] performed **no job analysis at all**" and that Plaintiffs' criticisms "only magnify the deficiencies in their own expert evidence." Def.'s Opp'n to Mot. to Rule as Inadmissible Part of the Expert Report of Chester Hanvey Ph.D., ("Hanvey Opp'n") 4, ECF No. 216 (emphasis in original). Initially, it is important to consider the relative experience and qualifications of the experts offering testimony on behalf of the Plaintiffs and Nike. Plaintiffs' expert, Dr. Lundquist, has extensive experience and has been elected to prestigious positions by organizations of psychologists whereas Nike's expert, Dr. Hanvey, has limited experience, has been elected to no positions in psychological organizations and is not even a licensed psychologist. Pls.' Opp'n to Mot. to Exclude Ops. of Dr. Kathleen Lundquist ("Lundquist Opp'n") 4-7, ECF No. 211.

Moreover, as a result of the insurmountable obstacles for a Plaintiffs' expert to perform a job analysis where the expert has no access to an appropriate range of supervisors and employees of a defendant, Dr. Lundquist described that in her over 30 years of experience, which includes serving as a plaintiffs' or defendant's expert in numerous cases and as a court-appointed expert in 16 cases, she has never seen a plaintiffs' expert conduct a job analysis consistent with professional principles. Lundquist Opp'n 17-18. Nike's assertions that Dr. Lundquist has not performed a job analysis, *see, e.g.,* Hanvey Opp'n 1, 3-4, 9, are irrelevant to whether Dr. Hanvey's opinions are admissible. Nor are they even good faith assertions since Dr. Hanvey

testified that he could not recall a single case cited in a book that he co-edited on employment litigation in which a plaintiffs' expert had conducted a job analysis, that he could only name a single case where he thought a plaintiffs' expert may have conducted a job analysis, and that it was "probably debatable" if the work in that single case complied with professional principles. Lundquist Opp'n 18.

**B.    Dr. Hanvey's Job Analysis Concerning Sample 1 Is Irrelevant Since It Addresses Neither Issues Before the Court Nor Any Relevant Dispute Among the Experts.**

Based on Sample 1, Dr. Hanvey concluded that all the jobs in the Covered Positions "are not the same or substantially equal."  Dr. Chester Hanvey's Expert Report ("Hanvey Report") ¶ 2, ECF No. 185-1.  The short response is "so what;" no one, neither the Plaintiffs nor Plaintiffs' experts, Dr. Lundquist or Dr. Neumark, dispute this obvious and unremarkable conclusion.  Pls. Motion to Exclude Hanvey Testimony ("Hanvey Mot.") 8-10, ECF No. 192.

In its opposition, Nike makes a single argument concerning the relevancy of Dr. Hanvey's opinions based upon Sample 1: "Dr. Hanvey's Sample 1 testimony will help the Court properly weigh Dr. Neumark's decision to aggregate all Covered Positions in one regression model."  Hanvey Opp'n 5-6.  As described by Nike, the only conclusion resulting from the job analysis related to Sample 1 is that there is a "high degree of variability" among employees "in the work they perform" and "Nike employees are not sufficiently similar to be examined as a single group."  *Id.* at 5.  However, Dr. Neumark did not produce, and Plaintiffs do not rely upon, any statistical analyses for all the Covered Positions without controlling for jobs at different Job Levels, Bands, Functions, Families or Subfamilies.

Although Nike's Opposition asserts that the controls Dr. Neumark used are not adequate (Hanvey Opp'n 5), Dr. Hanvey's conclusion from Sample 1 is only that there is variation in the Covered Positions.  Plaintiffs do not dispute that controls are needed for the type and level of

work.  The issue in dispute is whether the controls are adequate and whether an aggregated analysis is permissible or not.  Dr. Hanvey's job analysis based upon Sample 1 only indicates that controls for job positions are needed in the multiple regression, and there is no dispute that such controls are needed.

C.    **Dr. Hanvey's Job Analysis Concerning Sample 2 Is Irrelevant Since It Addresses Work Performed by Employees in Only Five or 0.36% of the Job Codes and Neither Nike's Corrections to Dr. Hanvey's Report Nor Legal Arguments Establish Relevancy.**

   1.    **Nike's Corrections to Dr. Hanvey's Report Only Serve to Underscore that the Job Analysis Is Limited and Irrelevant.**

Plaintiffs argue that Dr. Hanvey's conclusions and analyses based on Sample 2 are irrelevant to Plaintiffs' Motion for Class Certification because Sample 2 only looked at 5, or 0.36%, of the Job Codes within the Covered Positions and Dr. Hanvey testified he did not "generalize" those conclusions to the remaining 99.64% of Job Codes at issue.  Hanvey Mot. at 10.

Although Nike's Opposition suggests that Dr. Hanvey was making conclusions as to all the Job Codes (*see* Hanvey Opp'n 6 (Nike argues Sample 2 "clearly shows" Plaintiffs cannot "establish an essential element of their equal pay claims … on a class-wide basis")), Nike's Opposition concedes that Dr. Hanvey did not generalize beyond the 5 Job Codes he looked at (*see id.* at 6-7 (Nike nowhere states that Dr. Hanvey was generalizing beyond the "handful of at-issue jobs" he looked at)).  As such, there is no dispute that Dr. Hanvey was not and could not make any conclusions to the 99.64% of Job Codes he did not look at.  Dr. Hanvey could not have opined that: "*Nike's roles whether looking* across Function and Job Code, or *within Job Code, are not all the same or substantially equal or comparable*" (Hanvey Report ¶ 3 (emphasis added)).  Nor could he have concluded that it is necessary to do "a full assessment" for the

99.64% of Job Codes he did not look at.  Thus, results from 0.36% of job codes is not relevant to understanding anything about the remaining 96.64% of job codes at issue here.

In its Opposition, Nike asserted that there was an inadvertent error in Dr. Hanvey's Report and, accordingly, corrected the representation in the Report that Sample 2 was based upon employees "within randomly selected Job Codes" to "randomly selected employees within Job Codes."  Hanvey Opp'n 34.  Given that the small number of Job Codes that were the subject of Sample 2 were not even randomly selected, there was no possible basis for Dr. Hanvey to generalize or, that is, draw conclusions, from this non-random sample to the vast number of Job Codes.

Next, Nike reinterprets the plain meaning of Dr. Hanvey's expressed conclusions.  Dr. Hanvey stated that "Nike roles whether looking across Function and Job Code, or within Job Code, are not all the same or substantially equal or comparable."  Hanvey Report at 3.  Nike explains that what Dr. Hanvey "actually means is that **not all Job Codes** encompass substantially similar roles, as evidenced by Dr. Hanvey's analysis of Sample 2."  Hanvey Opp'n 10, n.7 (emphasis in original).  The problem with Nike's explanation of Dr. Hanvey's overstatement of the purpose and findings of Sample 2 is that Dr. Hanvey repeated statement on several other occasions in his Report.  Hanvey Mot. 13 (quoting Hanvey Report).  Nevertheless, Nike has now acknowledged that, at most, Dr. Hanvey's job analysis only found variability in the jobs performed by employees within 0.36% of the job codes.  Given that Dr. Hanvey acknowledged during his deposition that he did not "generalize" his conclusions to the overall population of Job Codes in the Covered Positions, Nike had no choice but to concede that Dr. Hanvey's conclusions applied to only 5 Job Codes.

**2.     Nike's Argument that Plaintiffs' Burden in an Equal Pay Claim Renders Dr. Hanvey's Job Analysis Relevant Mischaracterizes Plaintiffs' Claims Pursuant to Title VII and the Oregon Equality Act and Fails to Properly Apply Plaintiffs' Burden to Meet the Rule 23 Standards for the Oregon Equal Pay Act.**

Nike argues that the "purpose" of Dr. Hanvey's Report was to "determine whether Plaintiffs can establish an essential element of their equal pay claims – that women were paid less than men for *comparable* or *substantially equal* work – on a class-wide basis."  Hanvey Opp'n 6.[1]  Plaintiffs base their Title VII and OEA disparate impact compensation claims upon demonstrating that Nike's starting pay practice, including the collection and use of prior pay information for new hires, adversely impacts the compensation of female employees, and that Nike's practice of basing merit increases and bonuses on the base compensation of employees by using a percentage calculation, perpetuates and/or exacerbates the gender disparity.  Pls.' Mot. for Class Certification ("Class Cert. Mot.") 4-7, 38-43, ECF No. 146.[2]  Plaintiffs base their Title VII/OEA disparate treatment claim on the adverse impact caused by Nike's challenged practices, that Nike was aware of the gender disparity caused by the practices but continued the practices, that Nike did not alleviate the adverse consequences of the practices, and testimonial evidence concerning discrimination complaints and admissions by Nike executives or representatives.  *Id.* The evaluation of the variability of work performed by employees in 0.36% of Job Codes is

---

[1] Nike asserts, wrongly, that "Plaintiffs theory" for showing a Title VII compensation violation is based upon showing that female workers are paid less than male workers for performing "substantially equal" work.  Hanvey Opp'n 3.  As described above, "Plaintiffs theory" for establishing a Title VII compensation violation is premised upon Nike's unlawful <u>practices</u> for setting compensation.

[2] It has always been clear that Dr. Hanvey has offered <u>no</u> opinions about Plaintiffs' claims that Nike unlawfully discriminated against female employees in promotion and initial assignment. Deposition of Chester Hanvey, ("Dep.") 59:7-10  Suppl. Sun Decl. Ex. 1.  Report did not discuss the manner by which Nike made personnel decisions) and 60:2-8 (referring specifically that there is no discussion of "hiring and promotion" practices), Suppl. Sun Decl. Ex 1., filed herewith.

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 9**

854090.17

simply not relevant to a determination of whether the Plaintiffs have satisfied the requirements

for class certification for the claims that Nike's challenged practices violated Title VII and the

OEA.

Plaintiffs' claim under the OEPA turns on whether Nike paid women less than men for

jobs that require comparable work.[3]  But the methodology Dr. Hanvey sought to use, an

"individualized job analysis," is designed for and relevant, if at all, to determining whether

collective action members are "similarly situated" to the named plaintiffs in a collective action

brought pursuant to the Federal Equal Pay Act, III.B, *infra*, not to whether the claims made

pursuant to the OEPA meet the requirements for a Rule 23 class action proceeding.  *Id.*  Dr.

Hanvey's analysis fails to address the critical inquiry for OEPA claims regarding the

identification of jobs that *require* comparable work because, as Nike's Opposition concedes, Dr.

Hanvey's analysis only goes to "the determination of which employees *perform* comparable or

substantially equal work …."  Hanvey Opp'n 7 (emphasis added).  Thus, Dr. Hanvey's Sample 2

is irrelevant because it looked at the wrong legal standard.  *See Hein v. Or. Coll. of Educ.*, 718

F.2d 910 (9th Cir. 1983) (reversing judgment for plaintiff in an action under the federal EPA

because the district court focused on how a plaintiff's "skills are equal to or greater than those of

[the male comparator]," which is reversible error because the "statute explicitly applies to jobs

that require equal skills, and not to employees that possess equal skills").

Moreover, Nike erroneously claims that the Sample 2 job analysis is based upon an

"empirical[]" analysis.  Hanvey Opp'n 7.  Dr. Hanvey produced <u>no</u> "empirical" demonstration or

---

[3] The OEPA provides that "'Work of comparable characters' means work that <u>requires</u>
substantially similar knowledge, skill, effort, responsibility and working conditions in the
performance of work, regardless of job description or job title."  Or. Rev. Stat. § 652.210(16)
(emphasis added).

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT
REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 10**

854090.17

analysis related to Sample 2.  Dr. Hanvey acknowledged that the interview responses that he used for the job analysis are "qualitative."  Dep. 228:5-10.  Dr. Hanvey also confirmed that anything "non-numeric" is "qualitative."  *Id.* 101:16-21.  There is no "empirical" evaluation of qualitative, non-numeric, interview responses that comprise the job analysis related to Sample 2. Hanvey Report ¶¶ 157-234.  As Dr. Lundquist described: "Dr. Hanvey was not actually analyzing the job – he simply reported what individuals said they were doing and made no attempt to define what the job entails based on those responses."  Hanvey Mot. 11.

Dr. Hanvey's descriptive reporting of interview responses does not provide any assistance to the Court in evaluating "comparable" work or, more importantly, determining whether Rule 23 is met.  Hanvey Mot. 11.  Nike relies upon *Kassman* in an attempt to rebut this argument.  Hanvey Opp'n 7-8.  But, as described in III.B, *infra.*, the expert testimony in *Kassman* was only relied upon by the court to determine whether employees were sufficiently "similarly situated" so as to meet the standard for proceeding as a collective action pursuant to 29 U.S.C. § 216(b), which is not present in this case.  The description of interview responses focused upon evaluating the variability among employees may be relevant for determining whether employees are "similarly situated" so as to meet the requirement to proceed in a collective action but it has no relevance to addressing the Rule 23 requirements or evaluating "comparable work."  III.B, *infra.*

## III. NIKE'S ASSERTIONS ABOUT JOB ANALYSES AND REFERENCE TO *KASSMAN V. KPMG* DO NOT SUPPORT THE RELIABILITY OF THE METHODOLOGY USED BY DR. HANVEY

### A. Dr. Hanvey Did Not Employ a Reliable Methodology for Conducting the Job Analysis.

In response to Plaintiffs' arguments that Dr. Hanvey's methodology for conducting his job analysis was unreliable and inadmissible, Hanvey Mot. 19-21, Nike argues that conducting a

"job analysis" is a methodology that IO Psychologists "commonly rely on," that Dr. Lundquist used a job analysis in another case, that "relevant literature" is supportive and that the methodology is necessary to look at the "differences between people." Hanvey Opp'n 15-19 & n.13.

First, the fact that IO Psychologists, including Dr. Lundquist, conduct job analyses does not support the particular methodology that Dr. Hanvey used.

Second, Dr. Hanvey did not even claim to follow "authoritative sources" guiding the work of IO Psychologists.  As Dr. Lundquist explained, a job analysis is central to developing and evaluating employment practices.  Lundquist Report 10-14.[4]  The principle sources setting standards, including those related to job analyses, for IO Psychologists are the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.1 et. seq. ("Uniform Guidelines") and the Principles for the Use of Employee Selection Procedures authored by the Society for Industrial and Organizational Psychology ("SIOP Principles") (available at https://www.apa.org/ed/accreditation/about/policies/personnel-selection-procedures.pdf). Lundquist Report 10.  Dr. Hanvey acknowledged that the "[U]niform Guidelines [and] SIOP [P]rinciples are authoritative sources in the field of personnel selection."  Dep. 92:13:15.[5] However, neither Nike nor Dr. Hanvey have claimed that these "authoritative sources" supported the methodology that he used for his job analysis.

Third, the one source that Nike cited to support Dr. Hanvey's methodology, Hanvey Opp'n at 18-19, does not pertain to the methodology used by Dr. Hanvey.  Nike simply quotes a

---

[4] Expert Report of Kathleen Lundquist ("Lundquist Report"), July 15, 2021, ECF No. 148-1.

[5] *See* Lundquist Opp'n 13-14 (describing the application of the Uniform Guidelines and professional standards in fair employment litigation) and Class Cert. Mot. 46-47 (Uniform Guidelines are "entitled to great deference" by the courts).

single sentence from this lengthy, complex article and provides neither a description of the article nor any context for the quoted sentence.[6]  This article simply does not discuss the methodology used by Dr. Hanvey.  In fact, Dr. Hanvey, acknowledged that the article did not discuss "specific interview" approaches "or anything like that."  Dep. 108:9-17.  Dr. Lundquist explained that the article "focuses almost exclusively on how to analyze the quantitative data that's been collected …"  Lundquist Rebuttal Report 21.[7]  Given that the article "focuses" on the analysis of "quantitative" data whereas Dr. Hanvey collected "qualitative" data from interviews, *see* II.C.2, *supra*, and the article did not discuss "interview" methods or "anything like that," the article does not provide any support for Dr. Hanvey's methodology.  At the least, Nike's citation to a single sentence out of a detailed 45-page article without any explanation does not demonstrate that there is support for Dr. Hanvey's methodology among "relevant" professional literature.

While stating that Dr. Hanvey cited "many articles" in his Report, Nike identifies no other article that supports his methodology.  Hanvey Opp'n 18-19.  In fact, Dr. Hanvey admitted that there was no "article that details the exact approach that [he] followed …."  Dep. 113:3-5.

Fourth, Dr. Lundquist's job analysis in another case on behalf of an employer does not support Dr. Hanvey's methodology, and Nike's contention that Dr. Hanvey's methodology was

---

[6] *See* Nicole Strah, Deborah E. Rupp and Scott Morris, "Job Analysis and Job Classifications for Addressing Pay Inequality in Organizations: Adjusting Our Methods Within a Shifting Legal Landscape" p. 25, Davis Decl. Ex. B, ECF 217-1.  At the time, September 30, 2021, when Nike submitted Dr. Hanvey's Report, which cited this article, and when Plaintiffs took Dr. Hanvey's deposition, the article was unpublished.  The unpublished version is not complete.  The article has now been published, 15 Industrial and Organizational Psychology 1, Suppl. Sun Decl. Ex. 2, filed herewith.  The sentence quoted by Nike is located on page 31 of the published article.

[7] *See* Rebuttal Expert Report of Dr. Kathleen K. Lundquist ("Lundquist Rebuttal Report"), November 29, 2021, ECF No. 148-2.

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 13**

854090.17

geared to examining the "differences between" people only underscores the unreliability and irrelevance of the methodology.

Nike refers to an expert report prepared by Dr. Lundquist in another litigation where she served as expert on behalf of defendant Oracle. Hanvey Opp'n 16.[8] Initially, it should be noted that, as Dr. Lundquist repeatedly explained, the job and organizational structure at Nike and Oracle are completely different. Lundquist Opp'n 17-20.

More to the point, there is nothing in the Lundquist *Oracle* Report that endorses or even mentions the "individualized job analysis" that Dr. Hanvey applied. As an example, on the two pages that Nike cites specifically, Lundquist *Oracle* Report 12-13, Dr. Lundquist refers to the SIOP <u>Principles</u> as providing guidance for the job analysis. Dr. Hanvey never states that the SIOP <u>Principles</u> provided guidance for his job analysis. Further, Nike asserts that Dr. Lundquist agrees with Dr. Hanvey because her report includes the following quote: "[T]he determination of whether work is 'substantially similar' is to be based on examining the actual work performed in the job, not on a common job title [or] classification." Hanvey Opp'n 9 (emphasis in original). However, the first part of the sentence and the citation that Nike omitted make clear that Dr. Lundquist is quoting a statement from the California Pay Equity Task Force. Lundquist *Oracle* Report 10, Davis Decl. Ex. D p. 15 ("the Task Force stated that" is immediately before the excerpt Nike quoted and the omitted citation is a url to the Task Force). Further, immediately after this statement, Dr. Lundquist, in her own words, states, the purpose of a work analysis, which is another name for job analysis, is to "reach a conclusion about the content and requirements of the job." *Id.* (emphasis added). (citations omitted). By contrast, Dr. Hanvey

---

[8] "Expert Report of Dr. Kathleen K. Lundquist in *Jewett, et al. v. Oracle* (Superior Court of the State of California, County of San Mateo, Case. No: 17CIV02669)," June 9, 2021 ("Lundquist *Oracle* Report"), Davis Decl. Ex. D, ECF No. 217-1.

focused not on the requirements of the job but on the "variability between people" and work performed.  Dep. 109:25-110:11, quoted in Hanvey Opp'n 18.[9]

Fifth, Dr. Hanvey repeatedly examined the "differences" between or "variability" among employees as exemplified by the charts that he presents showing that the 60 interviewees in Sample 1 had worked in jobs with over 200 job titles before coming to Nike, that they had over 40 different educational backgrounds and about 60 different licenses or certifications.  Hanvey Report Tables 6-8 & ¶¶ 89-94.  Dr. Hanvey makes similar evaluations of the differences among the employees in Sample 2.  Hanvey Report Tables 10 -13, 15 & ¶¶ 167-68, 171-72, 180-81, 185-86, 211-14.  Accordingly, Dr. Hanvey's "job analysis" was not focused upon the knowledges, skills and abilities required for jobs at Nike but rather upon the "variability" of the knowledges, qualifications and educational attainments of the employees whom he interviewed.

Sixth, given Dr. Hanvey's methodology, his job analysis is unreliable and irrelevant to the equal pay claim under the OEPA since "comparable work" is defined as "work that requires substantially similar knowledge, skill, effort, responsibility …."  Or. Rev. Stat. section 652.210(16) (emphasis added).  Nowhere does Dr. Hanvey reach any conclusions about what is required by the jobs at issue.  As Dr. Lundquist observed, Dr. Hanvey did no "synthesis" of the qualitative data that he obtained from the interviews in order to actually analyze the requirements of Nike jobs.  Lundquist Rebuttal Report 22.  Decisions under the federal Equal Pay Act, which provide guidance for the application of OEPA, emphasize the distinction between examining the

---

[9] Nike referred to Dr. Hanvey as finding a "**high degree of variability** between employees," Hanvey Opp'n 5 (emphasis in original) (quoting Hanvey Report); "Dr. Hanvey conducted an analysis to determine the degree of variability between Nike employees," *id*. at 8; "point[ing] to myriad differences between people," *id*. at 11; "looking at differences between people," *id*. at 18 n.13 (quoting Dr. Hanvey's testimony); and "Dr. Hanvey's studies … are used to show **variability** among interview respondents," *id*. at 26 (emphasis in original).

PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.

PAGE 15

854090.17

differences between the knowledges and skills of employees and examining the differences in the knowledges and skills <u>required</u> by the jobs at issue.  The EPA focuses on whether <u>jobs require</u> equal skills, not whether <u>employees possess</u> equal skills.  *Hein*, 718 F. 2d at 918 (affirming district court's finding of substantial equality based upon an analysis of whether jobs required equal skills and explicitly discounting what skills and experience employees possessed); *Cullen v. Indiana Univ. Bd. of Trs.*, 338 F.3d 693, 699 (7th Cir. 2003) (relevant comparison "is between positions, not individuals").[10]

## B.    Contrary To Nike's Argument, *Kassman v. KPMG* Provides No Support for a Conclusion that Dr. Hanvey Utilized a Reliable Methodology.

Plaintiffs argued that Dr. Hanvey's "individualized job analysis" should be excluded because the methodology was not "widely accepted," not "peer reviewed" and that there was no "article that details" the approach used by Dr. Hanvey.  Hanvey Mot. 19-21.  Among other sources supporting Plaintiffs' position were explicit admissions by Dr. Hanvey.  *Id.* at 19.  In rebuttal, Nike relies upon a claim that another district court, *Kassman*, had determined that a "virtually identical" methodology implemented by a Dr. Banks was "reliable and admissible."  Hanvey Opp'n 19-21.

Nike's argument that Dr. Hanvey's methodology was "widely accepted" commences in an incoherent manner.  Hanvey Opp'n 18.  Nike states that the term, "individualized job analysis," was "never used" by Dr. Hanvey and that "Plaintiffs' counsel coined it during Dr. Hanvey's deposition."  *Id.*  But, on the next page, Nike states that KPMG's expert, Dr. Banks, "performed an 'individualized job analysis' ...."  *Id.* at 19 (quoting *Kassman*, 416 F. Supp. 3d at

---

[10] The regulations adopted by the enforcement agency, Equal Employment Opportunity Commission, make the same point about the interpretation of equal skill. 29 C.F.R. § 1620.15(a) ("Possession of a skill not needed to meet the requirements of the job cannot be considered in making a determination regarding equality of skill").

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 16**

854090.17

262).  Moreover, earlier in its Opposition, Nike asserted, "like in *Kassman*, "[c]ommon sense also suggests that [Dr. Hanvey] performed an analysis when conducting [his] 'individualized job analysis.'"  Hanvey Opp'n 7 (citation omitted).  Dr. Banks specifically explained that she conducted an "individualized job analysis."  Rebuttal to Rebuttal Reports of Paul J. Hanges and John McGowan, Expert Witnesses for the Plaintiffs, Cristina G. Banks, Ph.D., November 22, 2017" ("Banks Rebuttal Report") 6, Suppl. Sun. Decl. Ex. 3 p. 7.  Nike's reference to the term "individualized job analysis" as merely "Plaintiffs' fixation on their chosen nomenclature," Hanvey Opp'n 18, makes no sense because it was the "nomenclature" attributed by Dr. Banks to the type of analysis that she undertook in *Kassman* that, according to Nike, was "virtually identical" to the analysis done by Dr. Hanvey.[11]

The designation "individualized job analysis" is important in that it identifies a specific type of "job analysis" that is designed, as Dr. Banks represented that she was retained to do, to examine issues related to a collective action or a "conditionally certified collective."  Banks Rebuttal Report at 6.  In *Kassman*, the plaintiffs sought to certify a class of "more than 10,000 female KPMG employees" with respect to Title VII claims and also sought "second stage collective action certification of the Equal Pay Act claims of the 1,112 Opt-In Plaintiffs."  416 F. Supp. 3d at 257.  In her analysis, Dr. Banks opined about issues related to the "conditionally certified collective" under the Equal Pay Act, not to any issues related to whether the Title VII claims might be brought as a class action.  Accordingly, the court in *Kassman* does not rely upon any opinion offered by Dr. Banks or even mention Dr. Banks when ruling upon whether the plaintiffs have met the standards for class certification.  *Id*. at 273-86 (ruling upon "Title VII

---

[11] In his Report at pages 7-8, Dr. Hanvey refers to "individualized analysis."  When asked if he conducted "an individualized job analysis," Dr. Hanvey responded, "Yeah, I suppose."  Dep. 107:20-108:8.

PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.

PAGE 17

854090.17

Class Certification"). The court only referenced Dr. Banks' opinion when evaluating the "similarly situated" requirement for the final certification of the EPA collective. *Id.* at 288 (relying upon Dr. Banks' report as "suggest[ing]" that "Proposed Collective … members are not similarly situated.") The court observed that a collective action may proceed if the "plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Id.* (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010)).[12]

Nike's reliance upon Dr. Banks' analysis in *Kassman* does not support the relevance or reliability of Dr. Hanvey's job analysis since the analysis undertaken by Dr. Banks was directed solely to the "similarly situated" issue raised by the EPA collective action. In this action, the Plaintiffs do not seek any affirmation of a collective action under the "similarly situated" standard pursuant to 29 U.S.C. § 216(b), but rather the certification of a class pursuant to Rule 23. Dr. Banks did not direct her analysis towards the Rule 23 standards and, accordingly, in *Kassman*, 416 F. Supp. 3d at 273-86, the court ignored her analysis when deciding whether to certify the class pursuant to the Rule 23. Similarly, in this action, the Court should ignore Dr. Hanvey's analysis, which Nike claims is "virtually identical" to Dr. Bank's analysis, when determining the motion for class certification.

There is also a fundamental difference between the methodologies followed by Dr. Hanvey and Dr. Banks that further undermines the reliability of Dr. Hanvey's work. Dr. Hanvey failed to adhere to the process by which Dr. Banks recruited and communicated to the survey participants even though Dr. Banks described that her process was designed "to encourage

---

[12] The EPA is part of the Fair Labor Standards Act, 29 U.S.C. § 216(b), that provides that an action may be maintained "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." (Emphasis added.) Among the many differences between a collective proceeding and a class action proceeding is that in order for an employee to be part of a collective action an employee must affirmatively "opt-in."

honest responding" and was consistent with "Psychometric principles" for conducting surveys.

Dr. Banks explained:

> "I developed and implemented a detailed communication plan to ensure that participants in the study sample received a standardized and accurate message about the study and about the *Kassman et al.* litigation *before* agreeing to participate."

"Expert Report of Cristina Banks, Ph.D., submitted in the matter of *Donna Kassman, et al. v. KPMG*, August 4, 2017," ("Banks Report") ¶ 41, Suppl. Sun Decl. Ex. 4, p. 2 (emphasis in original).  Dr. Banks explained that the purpose of the instructions, including that the "study might be used in connection with the *Kassman*" litigation, was "to encourage honest reporting …."  *Id*. at 20-21.  Dr. Banks further explained that "Psychometric principles require administrators of assessments to tell study participants the purpose of the study" and, accordingly, "[w]e informed selected employees regarding the issues of case [*Kassman*]." Banks Rebuttal Report 19-20, Suppl. Sun Decl. Ex. 3 pp. 20-21.  Dr. Banks opined that given the nature of the structured interviews "telling participants the facts of the litigation … was not a threat to the validity of the interview responses [and] had no consequences on the study results."  *Id*.

Dr. Hanvey did not inform the survey participants that he had been retained for the *Cahill v. Nike* litigation, Dep. 254:21-23, and did not inform the survey participants about the litigation or that the survey results might be used in the litigation.  *See* Hanvey Report ¶¶ 28-29 (communication plan asserting that it was an "accurate" description but not informing participants about litigation).  When asked about the fact that he did not follow the communication plan established by Dr. Banks, Dr. Hanvey responded that "I believe [that in *Kassman*] the attorneys felt strongly that they need to tell employees about the litigation …." Dep. 252:23-253:1.  In her Reports, Dr. Banks did not state that she was following the instructions of the attorneys representing KPMG; in any event, the fact that the attorneys

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 19**

854090.17

representing Nike may not have "felt strongly" about informing the survey participants about the purpose of the survey could not justify an expert's departure from an appropriate communication plan that Dr. Banks concluded was compelled by the goal of obtaining "honest reporting" and complying with "Psychometric principles."  Moreover, the problems created by Dr. Hanvey's failure to inform fully the survey participants about the purpose of the survey were compounded by Dr. Hanvey's failure to even understand that the "interest" of putative class member, who were participants in the survey, "might be contrary to that" of Nike, *id*. 247:25-248:17, and that the Nike Legal Department informed Nike employees about the survey and requested their participation.  Hanvey Mot. 26; § IV.A.3, *infra*.

In a further attempt to bolster the reliability of the methodology applied by Dr. Hanvey, Nike states that "Plaintiffs do not dispute Dr. Hanvey's credentials as an I/O psychologist …." Hanvey Opp'n 21.  Plaintiffs did not do so in recognition of the minimal standard for meeting the qualification requirement under Federal Rule of Evidence 702. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F. 3d 998, 1015-16 (9th Cir. 2004) (only a "minimal foundation of knowledge, skill and experience" is required) (emphasis in original) (internal citation omitted). However, Nike overstates Dr. Hanvey's so-called "extensive experience," Hanvey Opp'n 21, which, in fact, is limited.  Since Dr. Hanvey is not a licensed psychologist he tries to avoid calling himself a "psychologist."  Dep. 202:15-18.  Of the 13 American civil actions in which he has served as an expert, he was only retained by a plaintiff on a single occasion.  Dep. 55:9-13. Of particular relevance for his "experience" for this civil action, Dr. Hanvey did not know if any one of these 13 cases involved a class claim of gender discrimination or pay discrimination. Dep. 38:11-39:8.

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 20**

854090.17

IV.    PLAINTIFFS' ARGUMENT THAT DR. HANVEY'S OPINIONS ARE
INADMISSIBLE DUE TO THE UNRELIABILITY CAUSED BY
METHODOLOGICAL FLAWS, CONCLUSIONS REACHED WITHOUT
SUFFICIENT FACTS AND CARELESS ERRORS WAS NOT SUCCESSFULLY
REBUTTED BY NIKE

A.    **Dr. Hanvey's Process for Selecting Survey Participants Was Unreliable Due to an Inadequate Method for Determining the Sample Size, Selection Bias Caused by the Exclusion of Male Employees, Nonresponse Bias and Inclusion of Employees without Sufficient Knowledge.**

Four problems rendered unreliable Dr. Hanvey's methodology for selecting the employees whom he used for implementing his job analysis.  Hanvey Mot. 22-27.  Nike mischaracterizes these problems and inaccurately describes the applicable record in an unsuccessful attempt to defend the methodology used by Dr. Hanvey.

1.    **Dr. Hanvey Failed to Follow an Appropriate Process for Determining Sample Size.**

Dr. Hanvey used a "rule of thumb" in order to determine that 60 job incumbents was the appropriate size for Sample 1, which Dr. Lundquist described as a "dismiss[al] of scientific methods for determining sample size …."  Hanvey Mot. 22.  Unsuccessfully, Nike makes several arguments in an attempt to rebut the criticism of Dr. Hanvey's methodology.

First, Nike asserts that Plaintiffs "mischaracterize" Dr. Hanvey's report in another case, *Davenport v. Charter Commc'ns, LLC*.  Hanvey Opp'n 21-22.  In *Davenport*, Dr. Hanvey was retained to evaluate the report of a plaintiffs' expert who used a survey based upon a sample of 6.6% of the general population.  Dep. 74:17-75:1 (identifying deposition Exhibit 752, "Expert Report of Chester Hanvey, Ph.D.," *Davenport v. Charter Communications, LLC*, No. 4:12-cv-00007-AGF, 2016 WL 9308250 (E.D. Mo. June 27, 2016) ("Hanvey *Davenport* Report"), Sun Decl. Ex. 4, ECF No. 193-4).  Plaintiffs quoted the Hanvey *Davenport* Report that generalizing to a large population from a "small sample is problematic" for a number of reasons.  Hanvey

Mot. 24-25.  Dr. Hanvey affirmed that generalizing from a small sample is problematic.  Dep. 236:17-21.  When asked if he criticized the plaintiffs' expert "for using a sample of only 6.6% of the population," Dr. Hanvey replied, "[n]ot specifically.  I criticized him from extrapolating results with <u>potential</u> errors to a large population."  Dep. 236:22-237:2 (emphasis added).  This is precisely the situation in this action given that Dr. Hanvey generalized from a small sample, 0.6% of the population, where there was significant "potential" for errors in light of other problems with the sampling methodology.  *See* § IV.A.2-4, *infra*.

Second, Nike claims wrongly that Dr. Hanvey "does <u>not</u> generalize to the overall population" as the expert did in *Davenport* and that "sample size critiques are irrelevant when a sample is not used to extrapolate results to a broader data set."  Hanvey Opp'n 24.  Dr. Hanvey generalized from the 60 incumbents in his Sample 1 to all the employees in the Covered Positions.  *See, e.g.*, Hanvey Report ¶ 65.  (The "data from Sample 1 reveals a degree of variability between employees in the Covered Positions …..")  Accordingly, the "problematic" issues related to generalizing from a small sample where there is a "potential" for error apply to the job analysis based upon Sample 1.[13]

Third, Nike misinterprets Plaintiffs' criticism of Dr. Hanvey's methodology by describing that it focuses upon Dr. Hanvey's failure to identify an "error rate."  Hanvey Opp'n 24.  Dr. Hanvey admitted that when the job analysis is based on qualitative data, that is, interview responses, it is important to be sure that the "data [is] of sufficient quality but it's not

---

[13] Nike has now acknowledged that, as a result of the job analysis related to Sample 2, Dr. Hanvey only reached a conclusion about the 5 Job Codes studied and did not reach any conclusions about the more than 1,000 other Job Codes at issue.  III.C.1, *supra*.  Accordingly, the issue of whether the sample size was adequate for Sample 2 is no longer relevant.  However, the remaining problems concerning Dr. Hanvey's methodology are still important because they pertain to the accuracy of the data obtained.  *See* IV.A.2-4.

something that you can analyze numerically." Dep. 228:5-17. When selecting a sample size, as the source referenced in Dr. Hanvey's Report directs, it is important to assess the "level of error that is tolerable." Hanvey Mot. 22-23. There is no limitation that the assessment of a tolerable level of error need only be done when it is possible to do so numerically; it would make no sense not to apply such a limitation since, as Dr. Hanvey testified, both quantitative and qualitive data need be sufficiently accurate. Dr. Hanvey does not describe the manner by which he assessed the "tolerable level of error" when determining the sample size. Nike adds that Plaintiffs and their expert do not "state what sample size they would consider appropriate." Hanvey Opp'n 25. However, as represented in the Hanvey *Davenport* Report at paragraph 32, and acknowledged by Dr. Hanvey, "it is the responsibility of the person presenting the data to provide a detailed explanation for why the sample design was appropriate." Dep. 237:10 -238:1.

## 2.    Dr. Hanvey Biased the Sample by Excluding Male Employees.

Dr. Hanvey excluded more than one-half of the employees in the Covered Positions – all male employees – from selection as interviewees who supplied the data that he used for his job analysis. Nike attempts to justify this gender-based exclusion by asserting that the "purpose of the study was to look at the putative class members and the work that they were performing." Hanvey Opp'n 29-30 (emphasis in original). Dr. Hanvey further explained that he just included women in the sample because "one of the issues is the degree of similarity between the class members," Dep. 210:14-21, and that his focus was upon the "variability between" members of the class, Dep. 109:25-110:11. But, Dr. Hanvey based his gender-based selection methodology upon a faulty premise since he ignored that the relevant issue for an equal pay claim under OEPA is whether the relevant jobs require equal skills and qualifications not whether employees possess equal skills and qualifications. *See* §§ II.C.2 and III.B, *supra*.

Dr. Hanvey's fundamental error is further illustrated by Nike's citation to *Kassman v. KPMG* in support of Dr. Hanvey's inclusion of only women in the samples.  Hanvey Opp'n 29. Nike describes the *Kassman* decision as "admitting opinions of an expert based on 'structured interviews with 81 <u>female</u> employees.'"  *Id*. (emphasis in original).  But, the opinions of the expert in *Kassman* were directed at whether the employees who opted into a collective action proceeding were "similarly situated" to the named plaintiffs.  There is no "collective" proceeding in this case and the "similarly situated" standard is not relevant.  *See* § III.B, *supra*.[14]

Finally, Nike argues that "Plaintiffs fail to explain why or how Dr. Hanvey's opinions would have changed had his analysis included male employees."  Hanvey Opp'n 29.  Nike's statement is in error since Dr. Lundquist described a significant problem with Dr. Hanvey's women-only job analysis:

> "Determining whether jobs are substantially similar is not a gender-based conclusion but rather depends on the characteristics and requirements of work.  To the extent that there was any difference in the work performed by men and women within a job code …, Dr. Hanvey's sampling of only women would prevent him from detecting this information."

Lundquist Rebuttal Report 27.  Moreover, the burden for justifying such a severe restriction in the selection process or the demonstration that the severe restriction did not have any impact on the results must fall on Dr. Hanvey and Nike.

---

[14] Nike cites to *Morales v. Kraft Foods Corp.*, No. 2:14-cv-04387-JAK-PJW, 2017 WL 2598556, at *12 (C.D. Cal. June 9, 2017) (quoting *Icon Enters. Int'l. Inc. v. Am Prod. Co.*, No. 2:04-cv-01240-SVW-PLA, 2004 WL 5644805, at *26 (C.D. Cal. Oct. 7 2004)) for the proposition that "[a]s a general rule, 'courts within the Ninth Circuit are reluctant to exclude survey evidence on the basis of an overinclusive or underinclusive population.'"  Hanvey Opp'n.at 29.  This proposition was developed and applied in a vastly different context than presented in this action. *Morales* concerned false advertising claims and the survey at issue was attempting to gauge the impact of the alleged misrepresentation concerning "natural foods."  The issue of the appropriate "target population" was a matter of legitimate debate among experts.

3. **Dr. Hanvey Failed to Consider Bias that May Have Resulted from the Substantial Nonresponse Rate.**

Plaintiffs explained that the substantial nonresponse rate, 30% for Sample 1 and 53% for Sample 2, to the request to participate in the job analysis survey that was sent by the Nike Legal Department might bias the results. Hanvey Mot. 25-26. Dr. Hanvey's failure to evaluate the determinant(s) for the substantial nonresponse rate and to consider whether bias was caused by the nonresponse rate rendered the job analysis results unreliable. *Id.*

Nike correctly states that Plaintiffs cited to the second edition of the <u>Reference Manual for Scientific Evidence</u> published by the Judicial Center even though there is a third edition. Hanvey Opp'n 28. Plaintiffs apologize for doing so. However, the third edition underscores, as did the second edition, the seriousness of nonresponse bias and the need for researchers to examine the determinants of the nonresponse rate in order to consider whether that rate biased the results of the survey.

The second edition of the <u>Reference Manual</u>, as quoted by Plaintiffs, provided that "[p]otential bias should receive greater scrutiny when the rate dops below 75%," Hanvey Mot. at 26. The third edition essentially provides the same instruction: "high response rates (i.e., 80% or higher) … eliminate the need to address the issue of potential bias from nonresponse …." Reference Manual on Scientific Evidence 384, 2011 WL 7724258, at *16 (Fed. Judicial Ctr. 3d ed. 2011) ("Reference Manual").

If the response rate is below 80%, and it was substantially below that level in Dr. Hanvey's survey, it is incumbent on the researcher to "evaluate[] the effect of nonresponse in a survey …," *id.* In order to do so, it "generally requires an analysis of the determinants of the nonresponse." *Id.* at *17. Dr. Hanvey made no attempt to examine the impact of the nonresponse rate. Furthermore, there was an obvious potential "determinant" for the

nonresponse rate, the critical role of the Nike Legal Department in inviting employees to participate in the survey.  *See* § III.B, *supra*; Hanvey Mot. 26.  Moreover, a researcher may "anticipate systematic patterns of nonresponse."  Reference Manual, 2011 WL 7724258 at *16.  Dr. Hanvey's lack of attention to the potential impact of the involvement of the Nike Legal Department is extraordinary given that there was significant press coverage and public knowledge of this litigation.  Dr. Hanvey apparently gave no consideration to the role of the Legal Department.  When asked the reason that the Legal Department extended the invitations to participate in the study, Dr. Hanvey had to "<u>guess</u> that it was a collaborative decision."  Dep. 247:2-6 (emphasis added).  Dr. Hanvey did not know who suggested that the Legal Department extend the requests to participate in the survey, Dep. 247:7-11, and he did not know how frequently employees received emails from the Legal Department, Dep. 247:12-18.

Dr. Hanvey's lack of concern for the involvement of the Legal Department on the nonresponse rate and the related failure to inform the putative class members about the litigation defense purpose of his survey is even more inexplicable given the communication plan in the *Kassman* litigation.  *See* III.B, *supra*.  Nike describes that "Dr. Hanvey worked on the *Kassman* project and thus had firsthand knowledge of it."  Hanvey Opp'n 20.  The expert in *Kassman* "implemented a detailed communication plan" informing the survey invitees <u>before</u> they agreed to participate about the litigation in order "to encourage honest reporting" and to follow the dictates of "Psychometric principles."  III.B, *supra*.  But Dr. Hanvey did not follow the communication plan in *Kassman*, and did not inform the invitees to the study that it would be used in this litigation.  *Id*.

Dr. Lundquist opined that "[s]uch a high rate of fallout from the intended sample could indicate a potential systematic bias in the individuals who were willing to participate in the study

…," Lundquist Rebuttal Report 32, and that "[i]t is entirely possible that the invitation to participate in the study which was sent by Nike's Legal Department could have depressed participation …," *id*. at 32 n.18.  Given Dr. Hanvey's complete disregard of the possibility of bias caused by the nonresponse rate, his failures to follow professional guidance as described in the Reference Manual to "anticipate" a "systematic" pattern of nonresponse and to examine the possible "determinants" of nonresponse, his survey methodology was unreliable.

> **4.    Dr. Hanvey Included Employees in the Sample Who Did Not Possess Adequate Knowledge of the Job Requirements.**

Plaintiffs argued that Dr. Hanvey wrongly and unreliably based his entire job analysis upon interviews with incumbents whom he did not consider to be Subject Matter Experts ("SMEs"), that is, individuals with a "thorough knowledge of the work behavior" of a relevant job, and who admittedly were not clear about the "expectations" of the relevant jobs.  Hanvey Mot.at 28-29.

Nike's description of the term, SME, as referring to a "broad range of people in a broad range of areas" and implying that Dr. Hanvey merely used SME as a "label," Nike's Opp. to Hanvey Mot. 30-31, is untethered from the actual meaning of the term in IO Psychology, as acknowledged by Dr. Hanvey, as well as from the evidence.  Dr. Hanvey was asked to read the definition for SMEs contained in the SIOP Principles, which Dr. Hanvey had acknowledged is an "authoritative source" for IO Psychology.  *See* § III.A.1, *supra*:

> "Individuals who have thorough knowledge of the work behaviors, activities, or responsibilities of job incumbents and the KSAOs needed for effective performance of the job."

Dep. 174:25-175:8 (quoting SIOP Principles).  Dr. Hanvey agreed that this is the definition for SMEs, and that he used the term in a manner consistent with this definition when in paragraphs 28-29 of his Report he referred to the persons in "leadership roles" with whom he conducted

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 27**

854090.17

initial interviews.  Dep. 175:9-18.  Dr. Hanvey emphasized that "they were people

knowledgeable about the different work performed and the KSAOs required to perform the job."

Dep. 175:11-18. Dr. Hanvey explained that "KSAOs" refers to "knowledges, skills, abilities, or

other characteristics."  Dep. 175:21-24.

When Dr. Hanvey was asked if he would consider the employees to be SMEs whose

interview responses provided the data which formed the basis for the job analysis, Dr. Hanvey

replied that he "wouldn't really call [the interviewees in Sample 1 and Sample 2] subject matter

experts; I would just refer to them as incumbents."  Dep. 241:13-22. Thus, unlike the persons in

"leadership roles," whom he referred to as SMEs, the interviewees, in Dr. Hanvey's estimation,

did not meet the definition for SMEs, that is, "[i]ndividuals who have thorough knowledge of the

work behaviors … needed for effective performance of the job."[15]

Plaintiffs further described that Dr. Hanvey's own data drawn from the responses of the

interviewees demonstrate that a substantial number of employees were unclear about the

requirements of their jobs.  Hanvey Mot. 29.  Nike attempts, unsuccessfully, to rebut this

description.  Hanvey Opp'n 31 n. 21.  Dr. Hanvey acknowledged that a number of interviewees

indicated that their "role [job] at Nike [was not] clearly defined" and they did not "understand

what is expected."  Dep. 241:3 -243:7.  Dr. Hanvey added that even though they are unclear how

their job "fits into the organization" they are "still capable of describing what they do every day

---

[15] Nike's reference to the testimony of Dr. Lundquist in another case, *Ebbert v. Nassau County*,
No. 1:05-cv-05445-AKT, 2008 WL 8086382 (E.D.N.Y. 2008), is inapposite. Hanvey Opp'n 31.
In *Ebbert*, Dr. Lundquist offered expert opinions on behalf of the plaintiffs and, like in this
litigation, the defendants sought to exclude her testimony because Dr. Lundquist "relied upon
only those documents supplied by the defendant and her personal observation' but did not
'engage[] in an independent fact based analysis.'"  2008 WL 8086382, at *4.  Some of those
documents included interviews of "'incumbents and supervisors."  Dr. Lundquist did not opine
nor was it relevant for her to opine about whether job analyses should be based upon interviews
with SMEs.  As a plaintiffs' witness, Dr. Lundquist did not perform a job analysis and was not
attempting to opine about the requirements for a proper job analysis.  *See* § II.A, *supra*.

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT
REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 28**

854090.17

…." Dep. 243:3-14.  But, a mere description of what employees do every day is not sufficient for the evaluation of "comparable work,' which turns on the "requirements" of the job.  *See* § II.C.2, III.A, *supra*.  Employees who are "unclear" about the expectations or definition of a job are not able to provide reliable information concerning job requirements.

**B.**      **Nike Failed to Rebut Plaintiffs' Showing that Dr. Hanvey's Opinions Are Unreliable Because He Reached Conclusions without Sufficient Facts and Committed Errors that Demonstrate a Failure to Exercise Proper Care.**

Dr. Hanvey includes numerous opinions or representations in his Report that have no sufficient factual basis or result from careless error.  Hanvey Mot. 11-18, 28-31.  Nike's attempts to explain away Dr. Hanvey's misstatements only underscore the seriousness of the flaws in the Report.  Plaintiffs describe below Nike's failed attempts with respect to Dr. Hanvey's erroneous assertions related to Nike's job architecture, Position Titles and Job Codes.

Before reviewing Dr. Hanvey's misstatements, it is important to underscore an important matter that Dr. Hanvey did not analyze.  Plaintiffs had argued that Dr. Hanvey had no basis for opining with respect to Nike's compensation practices that his job analysis showed employees "varied substantially on factors that commonly impact pay."  Hanvey Mot. 13-14 (quoting Hanvey Report).  In response, Nike unequivocally acknowledges that "Dr. Hanvey never claims to opine on Nike's pay practices."  Hanvey Opp'n 11.  Accordingly, Dr. Hanvey's opinions are not relevant to the Plaintiffs claims that Nike violated Title VII and the OEA by implementing pay practices that unlawfully discriminated against female employees.  *See* § II.C.2, *supra*.

In a section purporting to describe Nike's "Job Architecture," Dr. Hanvey represents that "employees are further subdivided into a 'Level' which is based in part on whether the employee is on a 'Management' or 'Individual Contributor' track."  Hanvey Report ¶ 16.  Dr. Hanvey continues by representing that "[t]hose lacking the skillset or desire to advance to a management

role can continue to progress in their career through the Individual Contributor Track." *Id*. Plaintiffs described that Dr. Hanvey had no basis for these representations and opinions about Nike's job architecture. Hanvey Mot. 17-18. Nike responds that Dr. Hanvey never "purports to analyze" the issue of movement between Management and Individual Contributor job and that it is "irrelevant to his opinions." Hanvey Opp'n 12. Nike does not deny that Dr. Hanvey had <u>no</u> basis for describing these separate "tracks" and opining about employees continuing to promote within one track or another depending upon "skillset" and "desire." Nike did not do so for the simple reason that Dr. Hanvey did not know about any Nike document or corporate witness who identified "tracks" for Management and Individual Contributor jobs. Dep. 155:10-156:1. Moreover, Dr. Hanvey acknowledged that the statement that employees "lacking the skillset or desire to move into management" may advance "through the Individual Contributor track" was not based upon any information or knowledge related to Nike but was "[j]ust a general statement." Dep. 159:8-160:5. In essence, these statements in the Hanvey Report purportedly describing and opining about Nike's "job architecture," did not apply to Nike but were "just a general statement" that Dr. Hanvey applied to Nike.

Similarly, Dr. Hanvey renders opinions about "Position Titles" without sufficient facts and in a manner that is best described as fictitious. Plaintiffs describe that Dr. Hanvey had no basis for concluding that "Position Titles are even more specific than Job Codes and more accurately reflect the work that employees perform." Hanvey Mot. 14 (quoting Hanvey Report ¶ 247). Nike responded by asserting that Dr. Hanvey relied upon "his review of the data" and his "interviews with" the senior leaders. Hanvey Opp'n 14. Neither support the statement that Position Titles "more accurately reflect the work that employees perform" than Job Codes. Dr. Hanvey explicitly admitted that the "database" does not "show that the position titles more

accurately reflect the work employees perform." Dep. 142:25-143:2. All that the "**folks … in the leadership interviews** said [was] that employees tend to associate with their position titles …." Hanvey Opp'n 13 (emphasis in original). Of course, this statement makes no reference to anything approaching Dr. Hanvey's opinion that "Position Titles … more accurately reflect work that employees perform."

Given the manner by which Dr. Hanvey determined "Position Titles," it is absurd to consider that those Titles "reflect the work that employees perform." Dr. Hanvey determined that there were 17,000 unique Position Titles in the database. *See* Hanvey Report ¶ 14 (database shows that from September 2015 to September 2019 employees worked in "more than 17,000 unique Position Titles"). If there was any difference between Titles, even just a "comma," Dr. Hanvey would define the Titles as "unique." Dep. 146:2-147:9; 147:10-14 ("any change whatsoever in the" entry in the database would "result in a different position title.") Moreover, Dr. Hanvey acknowledged that Nike did not look at Position Titles when making compensation decisions and he did not know if Nike did so when determining promotions or salary increases. Hanvey Mot. 14. It makes no sense to assert that a Position Title, which could be identified by a "comma" and for which, as far as Dr. Hanvey knows, is not used by Nike to make any employment decision, defines or reflects the work performed.

The third example of the unprofessional way that Dr. Hanvey offered opinions without sufficient factual support or through a failure to consider evidence carefully was his reliance on a declaration from Jessica Stuckey, a Nike manager. Stuckey Decl., Sept. 28, 2021, Davis Decl. in Opp'n to Mot. Class Cert. Ex. 41, ECF NO. 187-1. Dr. Hanvey relied upon the Stuckey Declaration when he opined that "Job Codes … are broad in many cases." Hanvey Report ¶ 247, n.62; Dep. 125:25-126:10. After being shown the manner by which Ms. Stuckey relied upon job

descriptions, Dr. Hanvey conceded that he could not agree with Ms. Stuckey.  Hanvey Mot. 14-15.  Nike attempted to rebut Plaintiffs' conclusion.  Hanvey Opp'n 11-12.  By showing the error in Nike's rebuttal, Dr. Hanvey's slipshod methodology becomes clear.

    An initial observation is that Dr. Hanvey relied upon the opinions contained in the Stuckey Declaration without understanding the manner by which the Declaration was created or undertaking an examination of the validity of the opinions offered by Ms. Stuckey.  The Declaration was signed a mere three days prior to the date that Dr. Hanvey completed his Report.  Hanvey Mot. 14-15.  Although Ms. Stuckey was a corporate witness, Dr. Hanvey only "read bits" of her deposition and did not compare her deposition testimony with the assertions in her Declaration.  *Id*. at 15.  Dr. Hanvey did not know the reason that the Declaration was prepared and made no inquiry about its preparation even though the declaration was provided to him by an attorney representing Nike.  *Id*.  Dr. Hanvey did not even know whether an attorney for Nike had drafted the declaration.  Dep. 127:5-7.

    Dr. Hanvey based his conclusion regarding Job Codes on paragraph 4 of the Stuckey Declaration.  Dep. 125:25-126:10.  In paragraph 4, Ms. Stuckey explains that various job descriptions provide "examples" demonstrating her opinion that, contrary to the opinion of Plaintiffs' expert, "job codes that share the same Job Subfamily and Job Level … are readily distinguishable …."  Stuckey Declaration ¶ 4.  During the deposition, Dr. Hanvey was asked to review one of the examples relied upon by Ms. Stuckey, which is described in the Stuckey Declaration at paragraphs 8-9, and which involves a comparison of three job descriptions.  Dep. 131:17-25.  In order to facilitate Dr. Hanvey's review of the three job descriptions,[16] Plaintiffs

---

[16] The three job descriptions are for Job Codes, A1341, A1343 and A1773.  Stuckey Decl. ¶¶ 8-9.  The job descriptions are attached to the Stuckey Declaration at NIKE_HANVEY _000000019-24, Davis Decl. in Opp'n to Mot. Class Cert. Ex. 41, pp. 19-21, ECF NO. 187-1.

provided a chart that indicated in red printing any differences in language contained in the job descriptions.  Dep. Ex. 760, Suppl. Sun Decl. Ex. 5.  After reviewing the job descriptions, Dr. Hanvey agreed that the only differences among the three job descriptions were identified in red printing on Exhibit 760.  Dep. 138:4-139:1.

After identifying the only differences in the job descriptions, Dr Hanvey was asked whether he agreed with Ms. Stuckey's opinion in paragraph 9 that "the job description for each of these three job codes demonstrate differences in the skills required for each."  Dr. Hanvey answered that he doesn't know whether "it's possible" to reach that conclusion "just by looking at the job description[s]."  Dep. 140:3-16.  Before relying upon the Stuckey Declaration, Dr. Hanvey had simply not made the effort to review whether, in fact,  the examples provided by Ms. Stuckey supported her opinions.

Nike argues that during the deposition, Dr. Hanvey was "told to ignore differences in work experience" included on the three job descriptions.  Hanvey Opp'n 14.  To the contrary: during the deposition Dr. Hanvey was specifically directed to examine the descriptions of "work experience" and directed to refer to Hanvey Deposition Exhibit 760, which identified in red the differences in "work experience."  Dep. 137:11-24.  After examining those differences, Dr. Hanvey testified that he did not know whether it was "possible" to draw the opinion from these job descriptions that was drawn by Ms. Stuckey.  Dep. 140:3-16.[17]

---

[17] Nike asserts that Dr. Hanvey verified Ms. Stuckey's opinion by reference to the "data set" and with 'what folks said in the leadership interviews." Hanvey Opp'n ¶¶ 13-14.  Most importantly, these references do not explain Dr. Hanvey's careless and unprofessional reliance upon the opinions offered by Ms. Stuckey.  Moreover, the database does not describe work performed. *See* Dep. 142:25-143:2 (the listing of Position Titles in database does not provide information about work performed).  Dr. Hanvey does not explain in his Report that the database provides information about work performed or any detail about what "folks … said in the leadership interviews" concerning Job Codes.  *See* Hanvey Report ¶ 31.

## V.    CONCLUSION

For the reasons set forth in Plaintiffs' motion and set forth above, Plaintiffs request that

the sections of Dr. Hanvey's Report concerning Nike's jobs and job analysis, paragraphs 3, 5-8,

16, 19-34, 247-48, and 251-52, be excluded.

Dated:  April 27, 2022                  Respectfully submitted,

                                        GOLDSTEIN, BORGEN, DARDARIAN & HO


                                        *s/Byron Goldstein*
                                        Laura L. Ho (admitted *pro hac vice*)
                                        Barry Goldstein, Of Counsel (admitted *pro hac vice*)
                                        James Kan (admitted *pro hac vice*)
                                        Byron Goldstein (admitted *pro hac vice*)
                                        Katharine L. Fisher (admitted *pro hac vice*)
                                        Mengfei Sun (admitted *pro hac vice*)

                                        MARKOWITZ HERBOLD PC
                                        Laura Salerno Owens, OSB #076230
                                        David B. Markowitz, OSB #742046
                                        Harry B. Wilson, OSB #077214
                                        Kathryn P. Roberts, OSB #064854

                                        ACKERMANN & TILAJEF PC
                                        Craig Ackerman (admitted *pro hac vice*)
                                        cja@ackermanntilajef.com
                                        1180 S Beverly Drive, Suite 610
                                        Los Angeles, CA 90035
                                        Tel:  (310) 277-0614
                                        Fax:  (310) 277-0635

                                        INDIA LIN BODIEN LAW
                                        India Lin Bodien (admitted *pro hac vice*)
                                        india@indialinbodienlaw.com
                                        2522 North Proctor Street, #387
                                        Tacoma, WA 98406-5338
                                        Tel:  (253) 503-1672
                                        Fax:  (253) 276-0081

                                        Of Attorneys for Plaintiffs and Opt-In Plaintiffs

**PLS.' REPLY BRIEF IN SUP. OF MOT. TO RULE AS INADMISSIBLE PART OF THE EXPERT REPORT OF CHESTER HANVEY, PH.D.**
**PAGE 34**

854090.17