**From:** HireRight Applicant Care <customerservice@hireright.com>
**Sent:** Friday, March 6, 2015 12:23 AM
**To:** Heather Hender
**Subject:** Information required for NIKE background report



178878673

Dear Heather,

We are contacting you to help complete your background report that you authorized NIKE to obtain.

We need the information/documentation listed below to complete your background report. Please submit the information to HireRight as soon as possible via one of the three methods described below.

- Documentation that verifies your starting and ending dates of employment for PECO Energy Company. Acceptable forms of documentation may include W-2 forms, pay stubs and/or 1099 forms. If this is your current employer, provide a copy of your most recent paycheck stub along with a document verifying your start date.

For faster processing, please include your Request ID, TL-030515-UT3DN, in all of your communication. Documents must include your name, Company /Educational Institution name, dates, signature (if applicable). You may receive a follow up email if we have not received the requested information from you within two days.

For your convenience, HireRight offers three ways for you to send this documentation or respond to our inquiries:

1. *(Preferred Method)* Log-in to HireRight's Applicant Center and upload the requested documents or information using the link below; use your original log-in credentials. If you forgot your password, please use the "Forgot Password" feature on the login page to retrieve it.
https://ows01.hireright.com/ac.html?key=D79149ED3541EE2A61D81369A872D880
*If you are unable to access this link by clicking it, please copy and paste the entire link into a web browser.*

2. Your document(s) can be sent by email directly to documentation@hireright.com
*You may take a photo or scan the document to submit in pdf, jpeg, tiff or a doc format.*

3. Attach your document(s) along with this letter as a cover sheet and fax to: (877) 797-3441 (inside US and Canada) or (+1) 949-224-6064

If you have any questions or concerns, please feel free to email customerservice@hireright.com or call (877) 553-0346 to speak with a representative. If you are unable to provide any documentation, please inform us as soon as possible.

We've also included some frequently asked questions, which provide additional information about HireRight's background check process.

Sincerely,
The HireRight Team

***This message has been sent from an automated system - please do not reply to this email address; please email customerservice@hireright.com or call (877) 553-0346 directly with questions. ***

**Frequently Asked Questions**

Q: What is the relationship between HireRight and NIKE? Does this additional contact mean I am hired?
A: NIKE has partnered with HireRight - a global provider of employment screening services - to conduct its background screenings. To learn more about HireRight, please visit http://www.hireright.com. Please note that HireRight does not make the hiring decision. For the status of your employment, we recommend that you contact NIKE

Q: Why hasn't HireRight been able to verify this information without me?
A: We make every effort to verify your information directly with the source provided. Unfortunately, there are times when we either need specific assistance from you, or the source simply is not responding to our inquiries. We will continue to contact the source while reaching out to you so that we can complete your background check in the timeliest manner possible.

Q: Is my information secure?
A: All information sent to us, whether via email or by fax, or uploaded online, is stored electronically and password-protected, and is ONLY accessible by authorized personnel. For additional information about HireRight's data security, please visit http://www.hireright.com/Data-Security.aspx

Q: Are there any file/size limitations for documents being sent to HireRight?
A: Yes, our system does have some limitations. HireRight cannot convert or open "zip" files; convert or open "password protected" documents/files; convert or open corrupted files/documents; convert or open unknown file extensions; convert or open any document utilizing a "link"; retrieve documents/files over 20 MB When sending documentation, please ensure the document does not exceed 20 MB. .If documentation exceeds this size, the documents may need to be split into two or more transactions.

Q: What happens next? How long does this process take?
A: HireRight will continue processing the background check and submit the final report to NIKE once it has been completed. We may need to contact you again if we require additional information, but we will do our very best to minimize the impact to you. In order to expedite our clients' hiring processes, we strive to complete high-quality background checks in the fastest time possible. We ask for you to respond, if possible, within 24 hours to help complete your background report in a timely manner. Should you require more time, please feel free to contact us.

↩ Reply    ➡ Forward

PLF_002885

Suppl. Sun Decl. Ex. 84, Page 1 of 1

## Subject

**Previous rate of pay**

### Contact Information

- Email Address: ████████████████
- First Name: Sara
- Last Name: Johnston
- EE ID: 136656

### Question Reference # 120719-000545

- Assigned: Crystal Barlow
- Date Created: Jul 19, 2012 10:30 AM
- Date Last Updated: Jul 19, 2012 10:30 AM
- Status: Resolved

Note By (Crystal Barlow) (Jul 19, 2012 10:30 AM)
adv ee of rate of pay for prev position
forwarded ee link to look up old pay statements
Customer By Phone (Crystal Barlow) (Jul 19, 2012 10:30 AM)
ee called to get her rate of pay from a prev job at Nike
ee adv that she needed for a background check for another job she applied
for at Nike
ee also wanted an old pay statement from her previous position

Visit the NIKE HR Website for the latest information about HR tools, policies, benefits and more.

NIKE_00012821
Suppl. Sun Decl. Ex. 85, Page 1 of 1

## Subject

**US+Pay History+Contact**

Contact Information

- Email Address: ████████████
- First Name: Sara
- Last Name: Johnston
- EE ID: 136656

Question Reference # 120718-000862

- Assigned: Andrea Lassett-Hankins
- Date Created: Jul 18, 2012 02:55 PM
- Date Last Updated: Jul 19, 2012 10:13 AM
- Status: Resolved

Response By Email (Andrea Lassett-Hankins (ETW)) (Jul 19, 2012 10:13 AM)
Hi Sara,

Please obtain this information by looking at your paystub history. I am unable to provide you with this information.

Thank you,

Andrea Lassett-Hankins
HR Direct-Americas
503-532.3402

Auto-Response By (Administrator) (Jul 18, 2012 02:55 PM)
Sara,

Thank you for contacting HR Direct.

We have received your inquiry. Our next available HR Direct Advisor will review your request and will respond accordingly with a resolution or a

NIKE_00012846
Suppl. Sun Decl. Ex. 86, Page 1 of 2

request for more details.

Question Reference #: 120718-000862
Data Created: Jul. 18, 2012 02:55 PM
Summary: US+Pay History+Contact

Thank you,
HR Direct
Customer By Email (Sara Johnston) (Jul 18, 2012 02:55 PM)
Employee Id: 136656

Hi, I applied for a new position and am filling out the background check form through hire right. I need to know my ending base hourly amount for my aquatics position. Thank you, Sara Johnston 136656

Visit the NIKE HR Website for the latest information about HR tools, policies, benefits and more.

Confidential

# APPLICATION FOR EMPLOYMENT



**NIKE**

**HUMAN RESOURCES SERVICE CENTER**

*GRAY OAKS*

NIKE_00019174

Suppl. Sun Decl. Ex. 87, Page 1 of 4



# APPLICATION FOR EMPLOYMENT
## NIKE EEO/AFFIRMATIVE ACTION APPLICANT TRACKING

STEP #1 - FOLD DOWN HERE ↓

This application is being sent to you because we have determined from your resume that a match between your skills and experience and an open position within NIKE may exist. Please bring this COMPLETED application with you for your scheduled appointment.

On an ongoing basis, NIKE evaluates the effectiveness of its recruiting efforts. The following questions are completely voluntary and will not impact your consideration in the employment process. Federal regulations require the collection of this voluntary equal employment opportunity data for statistical analysis and program purposes. This information will be detached from the application and processed separately. All responses will be kept strictly confidential.

We appreciate your assistance in ensuring the success of NIKE's employment process.

| APPLICANT NAME | PHONE NUMBER |
| --- | --- |
| | |

## 1. GENDER

☐ Male     ☐ Female

## 2. RACE/ETHNIC HERITAGE

☐ Asian/Pacific Islander — All persons having origins in any of the original peoples of the Far East, southeast Asia, the Indian Subcontinent, or the Pacific Islands. This area includes, for example: China, Japan, Korea, the Philippine Islands, and Samoa.

☐ Black/African American — (Not of Hispanic origin) • All persons having origins in any of the Black racial groups of Africa.

☐ Hispanic — All persons of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race.

☐ American Indian/ Alaskan Native — All persons having origins in any of the original peoples of North America, and who maintain cultural identification through tribal affiliations or community recognition.

☐ White — (Not of Hispanic origin) • All persons having origins in any of the original peoples of Europe, North Africa, or the Middle East.

STEP #2 - FOLD UP HERE

*Recruiter, please remove this portion of the application, fold on lines as indicated, tape or staple to seal, and send to H.R.S.C.*

2155 MAY97

NIKE_00019175

Suppl. Sun Decl. Ex. 87, Page 2 of 4

 **NIKE, INC.**
An Equal Opportunity Employer

## APPLICATION FOR EMPLOYMENT

This application is being sent to you because we have determined from your resume that a match between your skills and experience and an open position within NIKE may exist. Please bring this COMPLETED application with you for your scheduled appointment.

### GENERAL INFORMATION

| FIRST, LAST NAME EMILY TUCKER | TELEPHONE NUMBER (HOME) ▮ |
|---|---|
| STREET ADDRESS ▮ | TELEPHONE NUMBER (WORK) ▮ |
| CITY - STATE - ZIP ▮ | SOCIAL SECURITY NUMBER ▮ |

**INDICATE AREA OF INTEREST** (Optional, but would assist us in matching your skills and qualifications with NIKE employment opportunities)

### EDUCATION    LIST DEGREE/CERTIFICATES COMPLETED OR IN PROGRESS

| DEGREE, MAJORING IN | SCHOOL NAME |
|---|---|
| BA MASS Comm/JOURNALISM | FRANKLIN PIERCE COLLEGE |
| | |
| | |

### COMPLETE EMPLOYMENT HISTORY    BEGIN WITH CURRENT OR MOST RECENT POSITION  (Attach additional sheets if necessary.)

| DATES EMPLOYED 5/99 TO 12/99 | TITLE APPAREL SPECIAL SALES REP | COMPANY NAME ADECCO INC. | |
|---|---|---|---|
| COMPANY ADDRESS PORTLAND, OR | | | GROSS MONTHLY SALARY $2,450 |
| SUPERVISOR'S NAME TARA CONWAY | | | SUPERVISOR'S PHONE NO. |

IDENTIFY MAJOR RESPONSIBILITIES; ACCOMPLISHMENTS; SKILLS/KNOWLEDGE GAINED
IBM SYSTEM, INVENTORY - CLOSE'OUT APPAREL DEVELOPING RELATIONSHIPS W/ CLOSE-OUT ONLY ACCOUNTS.

REASON FOR LEAVING
HIRED FULL-TIME BY NIKE

| DATES EMPLOYED 7/98 TO 5/99 | TITLE ADMIN ASSO. | COMPANY NAME PINNACLE REALTY Mgmt. | |
|---|---|---|---|
| COMPANY ADDRESS PORTLAND, OR | | | GROSS MONTHLY SALARY $2,450 |
| SUPERVISOR'S NAME ROGER STONE | | | SUPERVISOR'S PHONE NO. |

IDENTIFY MAJOR RESPONSIBILITIES; ACCOMPLISHMENTS; SKILLS/KNOWLEDGE GAINED
COMMUNICATION LIAISON

REASON FOR LEAVING
NO GROWTH

2155 MAY97

NIKE  00019176

**COMPLETE EMPLOYMENT HISTORY** *Continued*

| DATES EMPLOYED 1992 to 1995 | TITLE PROJECT SECRETARY | COMPANY NAME LEHRER MCGOVEN BOVIS |
|---|---|---|
| COMPANY ADDRESS PRINCETON NEW JERSEY | | GROSS MONTHLY SALARY $3000 |

| SUPERVISOR'S NAME ERIC NORDBERG | SUPERVISOR'S PHONE NO. |
|---|---|

IDENTIFY MAJOR RESPONSIBILITIES; ACCOMPLISHMENTS; SKILLS/KNOWLEDGE GAINED
ACCOUNTING, COORDINATION, PROJECT SPECS + PLANS. ADMINISTRATIVE

REASON FOR LEAVING WENT TO FINISH COLLEGE FULL-TIME

HAVE YOU EVER BEEN EMPLOYED BY NIKE, INC? ☑ NO ☐ YES    IF YES, DATES

POSITION/LOCATION

**ADDITIONAL SKILLS**   (List relevant additional skills to include; specific equipment, foreign languages, computer applications, etc.)

COMMUNICATION, COMPUTER, QUICK LEARNER, IBM SYSTEM, BRIO REPORTING.

IN THE PAST SEVEN (7) YEARS, HAVE YOU EVER BEEN CONVICTED OF A CRIME, OTHER THEN A TRAFFIC VIOLATION? ☑ NO ☐ YES   IF YES, PLEASE DESCRIBE.
(A CONVICTION WILL NOT NECESSARILY BAR YOU FROM EMPLOYMENT)

**USE THIS SPACE TO ACCOUNT FOR ANY GAPS IN YOUR EMPLOYMENT HISTORY**

| DATES 1995 to 1998 | ACTIVITY FINISHING COLLEGE @ FRANKLIN PIERCE COLLEGE, RINDGE, NH |
|---|---|
| TO | |

**REFERRAL SOURCE**

I authorize NIKE, Inc. to conduct an investigation of my application. I further authorize all contacted persons and former employees to provide information concerning this application, my background and suitability for employment and I release each such person and former employer from liability for providing such information. I certify that the information contained in this application in correct to the best of my knowledge and I understand that any false or misleading information furnished by me on this application or in connection with my application for employment may result in rejection of my application or, if employed, in termination of my employment.

I further understand that this employment application is not a contract of employment and that if hired, I may voluntarily leave employment and that NIKE, Inc. may terminate my employment at any time for any reason. Any oral or written statements made to the contrary are not to be construed as contracts of employment and are not recognized or authorized by NIKE, Inc., unless in writing and specifically approved by NIKE's Chairman, President or Vice President.

The Immigration Reform Act requires evidence of identity and employment eligibility. I understand that continued employment is contingent upon receipt of appropriate documents.

SIGNATURE

NIKE_00019177

Suppl. Sun Decl. Ex. 87, Page 4 of 4

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented to: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | X  BOLI<br>X  EEOC | 659a.030<br><br>**AMENDED** |

EEOC and Oregon Bureau of Labor & Industries
*State or local Agency, if any*

| Name *(indicate Mr. Ms. Mrs.)* | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Heather Hender | ███  ███ | ███ |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| ███  ███ | ███  ███  ███ | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| Nike, Inc. | 75,000+ | (503) 671-6453 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| One Bowerman Drive, Beaverton, OR 97006 | | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| | | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

__ RACE  __ COLOR  _X_ SEX __ RELIGION __ NATIONAL ORIGIN

_X_ RETALIATION __ AGE __ DISABILITY __ OTHER (Specify below.)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest          Latest

Continuing Action, April 6, 2015 to the present

THE PARTICULARS ARE *(If additional paper is needed, attached extra sheet(s))*:

**See attached statement.**

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY -*When necessary for State and Local Agency Requirements*

I declare under penalty of perjury that the above is true and correct.

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINT

14 APR 2020
Date

*Charging Party Signature*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
*(month, day, year)*

Heather Hender
Amended Charge of Discrimination

The Particulars are:

## I. OVERVIEW OF ALLEGATIONS

1. Nike has and continues to unlawfully retaliate against me in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, as well as the Oregon State Law Against Discrimination, ORS 659A.001, *et seq.* Specifically, Nike has denied me work assignments and has sought to "freeze" me out of my job because I asserted claims – both by filing a charge of discrimination and participating as a named plaintiff in a putative class action lawsuit – that the company systemically discriminates against its female employees.

2. The particulars set forth herein are offered as an amendment to the charge of discrimination that I filed on November 9, 2018, a copy of which is attached as Exhibit 1.

## II. EDUCATION AND WORK HISTORY

3. I have worked at Nike since April 6, 2015, when Nike hired me to the position of Manufacturing Engineer II, a title which was later changed to Process Engineer II.

4. I had nearly 20 years of engineering experience before I joined Nike. I have extensive experience in the area of robotics and automation, and, until recently, was the acknowledged technical expert for the robotic cells and vision software featured in the technology systems used for Nike's "Agile" lines.

5. During my tenure at Nike, I have consistently achieved and exceeded my performance goals and made significant contributions to Nike's business. For example, I was rated "Highly Successful" in both my mid-year FY2018 and final FY2018 written performance evaluation – which is known as a "CFE." My mid-year FY 2018 CFE states that "Ms. Hender is the most knowledgeable engineer about the Agile systems which are quickly becoming the new standard in Zoom," and her "colleagues rely heavily on this expertise." That review also recognized my contributions to the team and my work ethic, stating: "I have seen Heather excel in her leadership of the qualifications of C8014 on Agiles for the Peg35 program;" "[w]hen given ownership of a task or line Heather steps up to the challenge and I can count on her to make things work;" that she should keep "[b]ringing her hard work ethic (and helping set the tone for others …);" and, "Heather is always tactful and considerate of her peers."

6. Yet, despite my experience and performance, I was repeatedly passed over for promotional opportunities that matched my qualifications and that were provided to men with similar or less experience. I was also paid less than similarly situated male employees.

7. In the summer of 2018 after months of requesting a promotion on the grounds that I was performing duties at a senior engineer level, my manager, Deni Ponganis, told me that she was "socializing" the idea of a promotion for me, which was being received well by others she spoke to.

2

8.    In September 2018, I was promoted to Senior Process Engineer I based on evidence that I had been performing at that level. This promotion was significantly delayed compared to the rate at which male employees are promoted at Nike.

9.    On or about November 1, 2018, Ms. Ponganis floated the possibility of assigning me to serve as the Automation / Process specialist on a new "continuous improvement program" ("CIP") team – known as Tiger Team – which she told me would provide continuous opportunities to work on next-generation problem solving in the area of robotics and automation.

## III. PROTECTED CONDUCT

10.    On November 9, 2018, I filed a charge with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging that Nike had discriminated against me and other female employees on the basis of sex in terms of compensation and promotional opportunities.

11.    On November 15, 2018, the EEOC terminated its processing of my charge of discrimination and issued me a "Notice of Right to Sue."

12.    On November 18, 2018, I became a named plaintiff in the putative class action lawsuit *Cahill, et al. v. Nike*, Case No. 3:18-cv-01477-PK (D. Or.), which alleges that Nike systemically discriminates against a class of female employees.

## IV. RETALIATION

### Withholding of Work Assignments

13.    Since I filed the sex discrimination claims described above, Nike has consistently withheld work assignments from me. Nike asserted that it was withholding work from me to keep me available to take on projects for the new CIP team. However, it has been about seventeen months and Nike continues to withhold work assignments from me.

14.    My last big project assignment was completed in late September 2018 or early October 2018.

15.    Over the next several months, I received sparse and conflicting information from Nike concerning the status of the CIP team. Nike, however, continued to deny me substantive work assignments, leaving my role at the company in limbo.

16.    Over the past seventeen months, I have had almost no work assignments. My only project during this time was assigned to me near the end of 2019. This lack of work is a significant contrast from the preceding three-plus years that I have worked at Nike because I had never had so little work assigned to me.

17.    Nike has denied me work assignments during this period of time even though my attorneys first notified Nike's counsel in January 2019 – more than one year ago – of my concern that I was being sidelined

3

18.    In the absence of substantive work assignments, I was often forced to ask colleagues – many of whom are lower-level employees whom I have trained – for work assignments, which I found to be humiliating and demeaning.  To the extent I could, I filled time doing work for other teammates for which I receive little or no credit.

19.    In or about October 2019 – about a year after my work assignments started being withheld – I was transferred to a new CIP "Airspeed" team.  As part of this transition, I was abruptly transferred to a different manager and removed from my normal email distribution lists.

20.    Although I had been told that the new CIP team would tackle challenging technical issues and that I would serve as the Automation / Process technical lead, this was not the case.  Indeed, since transferring to the CIP Airspeed team, my work assignments focus on environment, health and safety issues, and have largely consisted of administrative and other non-technical work.

21.    My performance evaluations have suffered due to the lack of substantive work assignments.  For example, in contrast to my mid-year and final FY2018 Highly Successful rating, my mid-year FY2019 written CFE, which was done on December 20, 2018, states that my currently proposed rating is "Successful."  In addition to being demoralizing, this lower rating impacts my income as it is associated with smaller raises and bonuses.

**Denial of Arc Flash Training**

22.    Since filing my sex discrimination claims, Nike has also ignored my requests for critical "arc flash" safety training, which is needed to accomplish the few work assignments I have been given.  Arc flash training is required by Nike for maintenance and engineering personnel who may need to open electrical cabinets during the course of their work.  Both my former and current roles contain work that requires that I be able to open electrical cabinet doors for troubleshooting and to access certain technical components.  To do so, I must ask someone with arc flash training to open electrical cabinet doors for me and supervise my work while the door is open.

23.    Although I have requested arc flash training on multiple occasions since December 2018, my requests have largely been ignored, even though other engineers doing work with robotic and vision systems have this training.

24.    All maintenance technicians are given arc flash training.  There are currently 36 maintenance technicians at Nike AIR MI, all but one of whom are male.  As such, I am forced to routinely ask male colleagues for assistance with basic tasks, such as opening and closing the doors to electrical panels.  I find this very demeaning as a senior engineer having to ask a male colleague to open these cabinets for me.

**Patent Process Retaliation**

4

25.     In 2017, I worked with Nike's intellectual property ("IP") department to submit an application to the USPTO to patent a new process that I invented to achieve airbag inflation. Although Nike assisted me in the early stages of this process, it has repeatedly ignored my communications relating to the application after I asserted my sex discrimination claims.

26.     Since filing my sex discrimination claims, I have had to frequently pester Nike IP to take required action to keep the key aspects of the application from being rejected, which has been an unpleasant and nerve-wracking experience for me.

27.     My experience with Nike IP has been markedly different than that of my colleagues. One male colleague who obtained a patent through Nike has told me that Nike IP assisted him throughout the process and kept him informed of how the application was progressing.

I swear under penalty of perjury that I have read the above charge and that it is true and correct to the best of my knowledge, information, and belief. This charge is not intended to be exhaustive, but representative of the treatment to which Nike has subjected me.

Date: __14 APR 2020__

__Heather Hender__
Charging Party

5

Suppl. Sun Decl. Ex. 88, Page 5 of 5

| Log Entry No. | Starting Bates Number | Date | From / Author | To / Recipient | CC | Redaction Description | Privilege Asserted |
|---|---|---|---|---|---|---|---|
| 1. | N/A | 7/1/2018 | Nicholas Van Osdol (Mercer) | Relevant Nike HRBPs (Kori Vyse, Alycia Gonzalez, Karen Weisz, Rolien Hoogers, Samantha Halverson, Steve Conroy, Regina Perata, Christie Mao, Andrew Kilshaw, Elvira Corey, Tellisa Amos, Jennifer Falor, Omar Douglas, Treasure Heinle, Genevieve Long, Stuart Teale, Beth Herinckx, Mahvish Zaman, Steve Manthe, Marc Price, Stacy Strauss, Julie Marquard, Tyler Allen, Elizabeth Brouwer, Kimbrough Elstad, Gillian Harrison, | Relevant members of Nike's compensation team (Jessica Stuckey, Frankie Long, Vanessa Tollefsen, Zack Wells, Nick Rettenmyer, Emily Denney, Danielle van Dijk, Rebecca Liu, Beth Rosenberger, Zack Vinton, Grace Wang, Nathalie Fournel, Tom Gulka, Kim Lupo, Amy Janke-Godfrey, Shane Walker) | 24 confidential documents prepared at the direction of counsel and reflecting attorney-client communications and reflecting attorney thoughts and mental impressions. | Attorney-client communication; attorney work product |

| | | | | Maris Pauk, Rosie Rock Rogers, Mindy Davis, Derek Lachman, Kathy Mao, Jodi Montalbano, Erin Cochell, Colleen Olson | Relevant members of Nike legal (Lauren Thibodeaux*) | | |
|---|---|---|---|---|---|---|---|
| 2. | N/A | 9/16/2020 | Steven Nelson | Brendan O'Connor, Genevieve Krietemeyer, Dominic Mara, Omar Douglas, Bernard Bedon, Corey Smith, Alex de Guzman, Mandy Collins, Ronan McCann, Kelsey Yuzon, Lauren Thibodeaux*, Joren Ross, Steven Nelson, Jessica Baumann*, Kamili Talley, John Rowe, Nick Vollman, Jason VanNimwegen, Tammy Summers, Jon Kellerman, Leslie Golay, | | Confidential document prepared for the purposes of providing legal advice | Attorney-client communication; attorney work product |

| | | | | Katrina Boshuizen, Luke Peoples | | | |
|---|---|---|---|---|---|---|---|
| 3. | N/A | 2/15/2018 | Mo Matheson | Hilary Krane* | | Confidential notes from attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | Attorney-client communication; Attorney work product |
| 4. | N/A | 2/23/2018 | Mo Matheson | Hilary Krane* | | Confidential notes from attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | Attorney-client communication; Attorney work product |
| 5. | N/A | 2/26/2018 | Mo Matheson | Hilary Krane* | | Confidential notes from attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | Attorney-client communication; Attorney work product |
| 6. | N/A | 3/1/2018 | Mo Matheson | Hilary Krane* | | Confidential notes from attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | Attorney-client communication; Attorney work product |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7. | N/A | 3/2/2018 | Mo Matheson | Hilary Krane* | | Confidential notes from attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | Attorney-client communication; Attorney work product |
| 8. | N/A | 3/5/2018 | Mo Matheson | Hilary Krane* | | Confidential notes from attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | Attorney-client communication; Attorney work product |
| 9. | N/A | 3/3/2018 | Hilary Krane* | Mark Parker | Monique Matheson | Confidential memorandum regarding attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | Attorney-client communication; attorney work product |
| 10. | N/A | Week of February 11, 2018 | Monqiue Matheson, Hilary Krane* | Mark Parker | | Confidential document reflecting legal advice from in-house counsel regarding legal investigation matters. | Attorney-client communication; attorney work product |
| 11. | N/A | 4/25/2018 | David Baffa** | Robert Leinwand*, Lauren Thibodeaux*, Alison Daugherty | Myra Villamor** | Confidential communication from outside counsel regarding attorney-directed and led investigation, conducted for purposes of providing legal advice, and | Attorney-client communication; attorney work product |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | reflecting attorney thoughts and mental impressions. | |
| 12. | N/A | 4/25/2018 | David Baffa** | Robert Leinwand*, Lauren Thibodeaux*, Alison Daugherty | Myra Villamor** | Confidential memorandum prepared by outside counsel regarding attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. (Attachment to No. 11) | Attorney-client communication; attorney work product |
| 13. | N/A | February 2018 | Mo Matheson | N/A | | Confidential notes from attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | Attorney-client communication; attorney work product |
| 14. | N/A | 3/12/2018 | Robert Leinwand*, Lauren Thibodeaux* | Hilary Krane*, Monique Matheson, Michael Spillane | | Confidential memorandum reflecting legal advice from in-house counsel regading legal investigation matters. | Attorney-client communication |
| 15. | N/A | 3/14/2018 | Robert Leinwand* | Lauren Thibodeaux*, Hilary Krane*, Monique Matheson, Michael Spillane | | Confidential communication reflecting legal advice from in-house counsel regading legal investigation matters. | Attorney-client communication |
| 16. | N/A | 3/14/2018 | Lauren Thibodeaux* | Monique Matheson | Robert Leinwand* | Confidential communication reflecting legal advice from in-house counsel regarding legal investigation matters. | Attorney-client communication |

| 17. | N/A | 3/10/2018 | Alison Daugherty | Monique Matheson, Kellie Leonard | | Confidential communication transmitting legal advice from in-house counsel regarding legal investigation matters. | Attorney-client communication |
|---|---|---|---|---|---|---|---|
| 18. | N/A | 3/10/2018 | Hilary Krane* and Mo Matheson | N/A | | Confidential communication prepared by in-house counsel regarding attorney-directed and led investigation, conducted for purposes of providing legal advice. (Attachment to No. 17) | Attorney-client communication |
| 19. | N/A | 3/10/2018 | Hilary Krane* and Mo Matheson | N/A | | Confidential communication prepared by in-house counsel regarding attorney-directed and led investigation, conducted for purposes of providing legal advice. (Attachment to No. 17) | Attorney-client communication |
| 20. | N/A | 6/1/2018 | David Baffa** | Hilary Krane*, Rob Leinwand* | | Confidential memorandum reflecting legal advice regarding legal investigation matters. | Attorney-client communication; attorney work product |
| 21. | N/A | 3/12/2018 | Hilary Krane* | Executive Leadership Team | | Confidential communication prepared by in-house counsel regarding attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | Attorney-client communication; attorney work product |
| 22. | N/A | 3/8/2018 | Hilary Krane* | Mark Parker | Monique Matheson | Confidential communication prepared by in-house counsel | Attorney-client communication; |

| | | | | | | regarding attorney-directed and led investigation, conducted for purposes of providing legal advice, and reflecting attorney thoughts and mental impressions. | attorney work product |
|---|---|---|---|---|---|---|---|

\* – Where symbol follows a name, it designates Nike's in-house legal counsel or member of Nike's in-house legal department.

\*\* - Where symbol follows a name, it designates Nike's outside legal counsel.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


KELLY CAHILL, et al.,                    )

                    Plaintiffs,     )

        VS.                              ) NO. 3:18-CV-01477-JR

NIKE, INC., an Oregon                    )

Corporation,                             )

                    Defendants.     )

_____)




VIDEOCONFERENCE DEPOSITION OF:

                KELLY CAHILL

                WEDNESDAY, NOVEMBER 18, 2020

                12:10 P.M.





REPORTED BY:

                Sari M. Knudsen

                CSR No. 13109



                                                    Page 1

Suppl. Sun Decl. Ex. 90, Page 1 of 17

Videoconference deposition of KELLY CAHILL, taken on behalf of the DEFENDANT, at West Newton, Massachusetts, on WEDNESDAY, NOVEMBER 18, 2020, before Sari M. Knudsen, CSR No. 13109.

APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:

        GOLDSTEIN, BORGEN, DARDARIAN & HO

        BY:  BYRON GOLDSTEIN, ESQ.

        AND JAMES KAN, ESQ.

        AND MENGFEI SUN, ESQ.

        300 Lakeside Drive

        Oakland, California  94612

        510-763-9800

        (VIA VIDEOCONFERENCE)

Page 2

Suppl. Sun Decl. Ex. 90, Page 2 of 17

APPEARANCES OF COUNSEL:    (CONTINUED)

FOR THE DEFENDANT:

PAUL HASTINGS LLP

BY:  FELICIA DAVIS, ESQ.

AND DANIEL PRINCE, ESQ.

AND LAURA ZABALE, ESQ.

515 South Flower Street, 25th Floor

Los Angeles, California  90071

213-683-6000

(VIA VIDEOCONFERENCE)

ALSO PRESENT:

JILL WARREN, VIDEOGRAPHER

ALYSON SMITH, IN-HOUSE COUNSEL FOR

NIKE, INC.

Page 3

Suppl. Sun Decl. Ex. 90, Page 3 of 17

Q    Other than the administrative charge you    00:25:48
filed against Nike with the -- with BOLI, B-O-L-I,    00:25:55
have you ever filed another administrative or agency    00:25:59
charge of discrimination against an employer?    00:26:03

A    No.    00:26:06

Q    Have you ever accused another employer of    00:26:09
discrimination?    00:26:10

A    No.    00:26:13

MR. GOLDSTEIN:  Objection.    00:26:14

BY MS. DAVIS:    00:26:14

Q    Have you ever made any internal complaints    00:26:17
of discrimination at any employer other than Nike?    00:26:21

A    No.    00:26:24

Q    Have you ever made any internal complaints    00:26:27
of harassment against any employer other than Nike?    00:26:30

A    No.    00:26:40

Q    Again, I don't want you to tell me what you    00:26:42
discussed.  But when did you first engage counsel    00:26:45
for any matters related to your employment with    00:26:48
Nike?    00:26:51

A    Oh, gosh.  Don't recall clearly.  But it    00:26:56
would have been in 2018.    00:27:00

Q    Okay.  Well, you filed your -- a charge of    00:27:11
discrimination with the Oregon Bureau of Labor &    00:27:17
Industry in July of 2018.    00:27:20

Page 23

Suppl. Sun Decl. Ex. 90, Page 4 of 17

THE VIDEOGRAPHER:  We are back on the record at 01:40:04 1:40 P.M.  This is the beginning of media No. 2. 01:40:09

BY MS. DAVIS: 01:40:09

Q    Ms. Cahill, did you look at any documents 01:40:14 to refresh your recollection during the break? 01:40:17

A    No. 01:40:19

Q    Okay.  I just want to make sure.  You don't 01:40:21 have your phone out during the deposition, do you? 01:40:24

A    No. 01:40:25

Q    Okay.  I thought I maybe saw or heard it 01:40:28 before.  I just wanted to double-check.  Thanks. 01:40:31

A    No.  You might -- you might hear -- my 01:40:35 husband works in the room next door.  So you might 01:40:38 hear a ding or something. 01:40:41

Q    Okay.  You don't have a phone on your desk 01:40:43 or anything? 01:40:44

A    No.  Not around me, no. 01:40:46

Q    Okay.  All right. 01:40:49

So before the break, you were telling me 01:40:52 about the new position within digital at Nike that 01:40:58 you left The Swift Collective to accept.  So I 01:41:04 wanted to talk a little bit about that job. 01:41:06

Approximately when did you first start 01:41:09 talking to Nike or anyone at Nike about joining the 01:41:11 company? 01:41:14

Page 57

Suppl. Sun Decl. Ex. 90, Page 5 of 17

A    To the best of my recollection, it would have been in October -- early October -- late September or early October of 2012.

MR. GOLDSTEIN:  Are there any documents that could refresh your recollection?

MS. DAVIS:  Wait, Byron.  That's not an appropriate objection.  I'm asking the question.

MR. GOLDSTEIN:  Objection.  Lack of foundation.

BY MS. DAVIS:

Q    And with whom did you have these initial conversations with about joining Nike?

A    Dorinda Ross.

Q    Did she approach you, or did you approach her?

A    She approached me.

Q    What did she tell you?

A    She asked if I -- to my recollection, asked if I would ever be interested in working at Nike and that she had, you know, an opportunity or position coming.

Q    Okay.  And did she explain what the opportunity or the position was?

A    Over time, yes.

Q    Okay.  And what did you tell her when you -- when she asked if you were -- have -- were

Page 58

interested in working at Nike?    01:42:45

A    "Oh, yes.  I'm definitely interested in    01:42:47
working at Nike."    01:42:49

Q    Okay.  And was there a position that you    01:42:52
applied to?    01:42:56

A    There was a contractor position that she    01:42:58
was referring to that I would have applied to.    01:43:02

Q    Okay.  Did the position have a title?    01:43:06

MR. GOLDSTEIN:  Objection.  Lack of foundation.    01:43:08
If there is documents, this could be a little more    01:43:11
efficient and not a quiz.    01:43:13

MS. DAVIS:  Byron, stop speaking objections.    01:43:15
You can state your objection.  I'm asking her the    01:43:17
job she held.  She can tell me if she knows the    01:43:20
title or not.    01:43:21

Q    Go ahead.    01:43:22

A    I do not remember the exact title.    01:43:24

Q    Okay.  Does the title "Digital Brand Senior    01:43:28
Producer" ring a bell?    01:43:31

A    That sounds familiar.    01:43:34

Q    Okay.  And you said it was a contractor    01:43:49
position.  That was through a contract company    01:43:53
called EPW or Flex.  Is that correct?    01:43:57

MR. GOLDSTEIN:  Objection.  Misstates testimony.    01:44:01

///    01:44:01

Page 59

Suppl. Sun Decl. Ex. 90, Page 7 of 17

(Whereupon a recess was taken)                  02:53:20

THE VIDEOGRAPHER:  We are back on the record at    03:02:16
3:02 P.M.  This is the beginning of media No. 4.    03:02:19

BY MS. DAVIS:                                       03:02:19

Q    Did you review any documents during the       03:02:24
break, Ms. Cahill?                                  03:02:25

A    No.                                            03:02:30

Q    So going back to the beginning of your time    03:02:34
as a Nike employee -- I'd like to show you          03:02:42
Exhibit 6.  Exhibit 6, for the record, is a one-page    03:02:52
document bates stamped PLF 020484.  It appears to be    03:03:01
an automated e-mail response from Human Resources to    03:03:03
Ms. Cahill.  The subject is Nike.com Global Digital    03:03:09
Cross-Category Director.  And then it has some      03:03:17
numbers.                                            03:03:18

Do you recognize Exhibit 6?                   03:03:21

A    It looks familiar, yes.                        03:03:24

(Whereupon Defendant's Exhibit 6              03:03:24
was marked for identification)                03:03:24

BY MS. DAVIS:                                       03:03:24

Q    Exhibit 6 suggests that you applied for the    03:03:29
job Nike.com Global Digital Cross-Category Director    03:03:30
on or about October 8, 2013.                        03:03:37

Does that seem accurate to you?               03:03:41

MR. GOLDSTEIN:  Objection.                    03:03:42

Page 104

Suppl. Sun Decl. Ex. 90, Page 8 of 17

THE WITNESS:  To my knowledge, yes.    03:03:44

BY MS. DAVIS:    03:03:44

Q    And you specifically applied for that    03:03:48
director position.  Correct?    03:03:51

A    I did at the -- at the request of Nike to    03:03:56
apply -- directly apply.    03:03:59

Q    Okay.  Yeah.  Let's talk about that, how    03:04:02
that changed.    03:04:03

So you had been working for Nike -- you had    03:04:08
been working for Nike as a contractor for about a    03:04:11
year at this point.  Correct?    03:04:12

A    Correct.    03:04:13

Q    And how did it come about that you decided    03:04:15
or you applied for a job with Nike?    03:04:21

A    To clarify, as in this -- this current job    03:04:24
you are referring to, the director position?    03:04:27

Q    Yeah.  The global -- the Nike.com Global    03:04:30
Digital Cross-Category Director.    03:04:35

A    There -- so in this context.    03:04:38

So prior to this role and the Nike.com    03:04:43
global organization, there wasn't one.  And I was    03:04:46
tasked, along with my boss at the time, Dorinda, as    03:04:53
part of a committee to help formulate what a global    03:04:57
Nike.com function would look like and how it would    03:05:01
operate.  So I was part of that committee.    03:05:06

Page 105

Suppl. Sun Decl. Ex. 90, Page 9 of 17

Q    Okay.  What do you recall discussing with H.R.?    03:14:31 03:14:32

A    I recall discussing formal application -- to submit a formal application where I could do that.  I remember discussing salary and pay.  They asked me what I had made prior or what I currently made as a Flex contractor.    03:14:38 03:14:41 03:14:47 03:14:51 03:14:57

We discussed what the role -- like what the benefits were of this role moving forward and what that looked like.    03:15:01 03:15:07 03:15:12

Q    Anything else?    03:15:15

MR. GOLDSTEIN:  Objection.    03:15:16

THE WITNESS:  Yeah.  Not that I can -- not that I can clearly recall.    03:15:18 03:15:20

BY MS. DAVIS:    03:15:20

Q    Do you have any notes or any other documents that would refresh your recollection?    03:15:23 03:15:26

A    I don't personally have unless there is, you know, a calendar date with that H.R. person that could help refresh.    03:15:28 03:15:34 03:15:36

Q    Okay.  You said that you discussed salary and pay and that they asked you what you made at Flex.  What did you tell them that you made at Flex?    03:15:38 03:15:43 03:15:45

A    $90,000 as a salary.    03:15:48

Q    And that's what you told the H.R. person?    03:15:55

Page 112

Suppl. Sun Decl. Ex. 90, Page 10 of 17

2014?

A    I -- I do not know.

Q    Okay.  And do you know who made any recommendations regarding the amount of equity that you received in July of 2014?

MR. GOLDSTEIN:  Objection.

THE WITNESS:  I do not.  I can only assume.

BY MS. DAVIS:

Q    Do you know who -- well, who do you assume made recommendations about your equity grant?

A    I would --

MR. GOLDSTEIN:  Objection.  If you are calling for speculation, you have to say that.

BY MS. DAVIS:

Q    Go ahead.

A    I would assume it's someone who was in H.R. makes those recommendations.

Q    Do you believe that Pam, your supervisor, has any influence on the amount of equity you receive?

A    I do not know on -- I would assume she would have influence, yes.

Q    Do you -- who do you assume made recommendations about the amount of your PSP award?

A    I would assume Pamela as well.  H.R.

Page 139

Suppl. Sun Decl. Ex. 90, Page 11 of 17

Q    Anyone else?    03:52:18

A    H.R.    03:52:18

Q    Okay.  What makes you believe that H.R.    03:52:30
influenced or had any influence over the amount of    03:52:34
equity you received in 2014?    03:52:37

A    I think it's based on distribution, and it    03:52:44
all has to add up to a certain company number.  So    03:52:47
they have influence or recommend those numbers    03:52:54
within each function so that the company stays    03:53:01
neutral.    03:53:05

Q    And what is the basis for your saying that    03:53:07
H.R. weighs in on those decisions?    03:53:10

A    Because every -- everything is submitted    03:53:12
into H.R. and up the chain.    03:53:17

Q    Okay.  Any other reason that you believe    03:53:19
H.R. has influence?    03:53:24

A    They have -- just that they have influence    03:53:25
over everything.    03:53:28

Q    But any -- do they specifically have    03:53:31
influence over equity grants?    03:53:35

A    As part of the -- I would just assume as    03:53:38
part of overall distribution recommendations and    03:53:40
decisions, that they have a hand in it -- in    03:53:43
anything that's awarded to an employee.    03:53:46

Q    Okay.  Any other basis for that assumption    03:53:49

Page 140

Suppl. Sun Decl. Ex. 90, Page 12 of 17

Q    Anything else?    05:32:22

A    Specifically to my knowledge at this time, I cannot recall.    05:32:23 05:32:29

Q    Are there any documents that would help you refresh your recollection?    05:32:30 05:32:33

A    If there were any media invites to H.R. to talk about these things, that would be helpful.  Any other communication between him and I that would be on Nike's system could refresh.    05:32:39 05:32:46 05:32:51 05:32:57

Q    Anything else?    05:33:01

MR. GOLDSTEIN:  Objection.    05:33:02

THE WITNESS:  Text messages.  But I don't know where those are.  Those would be helpful.    05:33:05 05:33:09

BY MS. DAVIS:    05:33:09

Q    Anything else?    05:33:11

A    No.    05:33:15

Q    Do you still have any text messages between yourself and Mr. Tawiah?    05:33:16 05:33:18

A    I do not.    05:33:21

Q    What happened to them?    05:33:24

A    They are -- when I left and switched jobs, I deleted all communication.    05:33:26 05:33:37

Q    Approximately when did you delete the communications between yourself and Mr. Tawiah?    05:33:42 05:33:45

A    That probably would have been when I left    05:33:47

Page 174

Suppl. Sun Decl. Ex. 90, Page 13 of 17

in July of 2017.                                           05:33:48

Q    All right.  I'm going to mark two          05:35:00
documents.  One is Exhibit 9.  Exhibit 9 is a            05:35:10
one-page document.  It's bates stamped NIKE 23837.       05:35:16

(Whereupon Defendant's Exhibit 9        05:35:16

was marked for identification)          05:35:16

MS. DAVIS:  And then I'm going to mark       05:35:19
Exhibit 10.  Exhibit 10 is a multipage document that     05:35:24
is bates stamped Nike 23838 through 23842.  Right.       05:35:45

(Whereupon Defendant's Exhibit 10       05:35:45

was marked for identification)          05:35:45

BY MS. DAVIS:                                              05:35:45

Q    Do you recognize Exhibit 10 as your CFE     05:35:49
goal-setting document?                                   05:35:52

A    Let me pull that up.  This looks like a      05:36:01
goal-setting document, yes.                              05:36:05

Q    Okay.  And Exhibit 9 is an e-mail from you  05:36:09
to Ms. Inglesby dated February 6, 2015.  So,             05:36:22

"Attached is my goal-setting          05:36:24

document."                            05:36:30

Does that refresh your recollection about       05:36:33
whether Exhibit 10 was your goal-setting document        05:36:35
for 2015?                                                05:36:38

A    If -- yes.  If that's actually the document  05:36:43
that was attached.  Yes.                                 05:36:47

Page 175

Suppl. Sun Decl. Ex. 90, Page 14 of 17

specifically, it's hard to tell.  I mean, they look 06:00:07

rather identical except for a few output numbers 06:00:12

because of the modifier. 06:00:19

BY MS. DAVIS: 06:00:19

Q    Did you ever recommend PSP awards for your 06:00:24

employees? 06:00:25

A    Yes, I did make recommendations. 06:00:27

Q    Okay.  Do you remember -- what would you 06:00:33

base those recommendations on? 06:00:35

A    Based on their overall -- a calculation 06:00:41

based on their overall CFE evaluation and what those 06:00:47

were.  And then it was calculated automatically like 06:00:50

this.  So the input was really around their CFE 06:00:56

performance. 06:00:58

Q    Okay.  So is it your testimony that if 06:01:01

someone receives, for example, a highly successful 06:01:03

rating, then their PSP output would just be one 06:01:08

number, and there was no ability for you as a 06:01:10

manager to change that number or exercise any 06:01:13

discretion? 06:01:14

MR. GOLDSTEIN:  Objection.  Facts not in 06:01:15

evidence.  No foundation. 06:01:17

THE WITNESS:  We would make recommendations.  We 06:01:20

never got to make the final -- the final decision on 06:01:23

any PSP calculation. 06:01:26

Page 189

Suppl. Sun Decl. Ex. 90, Page 15 of 17

BY MS. DAVIS:    06:01:26

Q    Sometimes were your recommendations    06:01:28
followed?    06:01:29

A    I can't remember.  But yes.  Sometimes they    06:01:37
had to have been followed, and sometimes they    06:01:38
weren't.    06:01:39

Q    Okay.  Do you have any reason to believe    06:01:54
that the $35,000 -- $35,610 PSP bonus was -- had    06:02:05
anything to do with your gender?    06:02:08

MR. GOLDSTEIN:  Objection.    06:02:09

THE WITNESS:  Yes.  Sorry.    06:02:10

Yes.  Based on the compounding effect of    06:02:19
the salary.    06:02:20

BY MS. DAVIS:    06:02:20

Q    Other than the fact that it's based on your    06:02:25
salary, do you have any other reason to believe that    06:02:28
it has anything to do with your gender?    06:02:33

MR. GOLDSTEIN:  Objection.    06:02:35

THE WITNESS:  No.  It's a straight -- a straight    06:02:37
calculation.    06:02:38

MS. DAVIS:  All right.  Would now be a good time    06:02:46
to take a break?    06:02:49

THE REPORTER:  Yes.    06:02:51

THE WITNESS:  Sure.    06:02:52

MR. GOLDSTEIN:  How long do you want to do,    06:02:54

Page 190

Suppl. Sun Decl. Ex. 90, Page 16 of 17

I, SARI M. KNUDSEN, CSR NO. 13109, in and for the State of California, do hereby certify:

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition;

Prior to being examined, the deponent was first duly sworn by me;

The foregoing transcript is a true record of the testimony given;

Before completion of the deposition, review of the transcript was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed are appended hereto.

Dated the 9th day of December, 2020.

SARI M. KNUDSEN, CSR NO. 13109

Page 313

Suppl. Sun Decl. Ex. 90, Page 17 of 17

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,

      Plaintiffs,

  v.                    No. 3:18-cv-01477-JR

NIKE INC., an Oregon

corporation,

      Defendant.

DEPOSITION OF CHESTER HANVEY, Ph.D.

FRIDAY, OCTOBER 29, 2021

SAN DIEGO, CALIFORNIA

Reported by:   Marilynn Hoover, RPR

Oregon CSR No. 04-0387

Page 1

Suppl. Sun Decl. Ex. 91, Page 1 of 16

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the Zoom video deposition of CHESTER HANVEY, Ph.D., was taken before Marilynn Hoover, Oregon CSR No. 04-0387; on Friday, October 29, 2021, at the hour of 9:05 a.m.; the witness testifying from San Diego, California.

APPEARANCES

GOLDSTEIN BORGEN DARDARIAN & HO

BY MR. BARRY GOLDSTEIN

MR. BYRON GOLDSTEIN

MR. JAMES KAN

MS. MENGFEI SUN

155 Grand Avenue, Suite 900

Oakland, California 94612

Telephone:  510-763-9800

E-mail:  BGoldstein@gbdhlegal.com

BRGoldstein@gbdhlegal.com

JKan@gbdhlegal.com

MSun@gbdhlegal.com

On behalf of Plaintiffs

Page 2

Suppl. Sun Decl. Ex. 91, Page 2 of 16

APPEARANCES (CONT.)

PAUL HASTINGS

BY MS. FELICIA DAVIS

MS. LAURA ZABELE

MR. DANIEL PRINCE

515 South Flower Street, 25th Floor

Los Angeles, California 90071

Telephone:  213-683-6169

E-mail:  FeliciaDavis@paulhastings.com

LauraZabele@paulhastings.com

DanielPrince@paulhastings.com

On behalf of Defendant


ALSO PRESENT:  Kathleen Lundquist

Elizabeth Arnold

Katey Foster

Page 3

Chester Hanvey , Ph.D. - October 29, 2021

Q.    So I'm going to ask you about those job descriptions.  And so if you could turn to job --

A.    I don't see --

Q.    Excuse me?

A.    Oh, I was going to say, I don't see job descriptions in paragraph 8 or 9.

Q.    Well, they're attached to the declaration.

A.    Oh.

Q.    And she's referring to the job descriptions that she describes in the declaration; isn't that correct?

A.    Okay.  In paragraph 9, yes, she does reference job descriptions.

Q.    Right.  And I'm looking at that -- So, for that particular example, she's referring to three job descriptions there located at -- And I'm not -- I don't know if you're familiar with that, but the parties have labeled documents that have been produced by what we call Bates numbers, and they're at the bottom right.

So if you look at pages 19 to 24, you'll see there the relevant --

A.    Okay.  So I see --

Q.    -- job descriptions.

A.    So page 19 starts -- is the job -- for job

Page 132

Suppl. Sun Decl. Ex. 91, Page 4 of 16

Chester Hanvey , Ph.D. - October 29, 2021

code A1341?

Q. Correct.

A. Okay.

Q. And 21/22 is for 1343, and 23/24 is 1773.

A. Okay.

Q. Now, you're familiar with the job descriptions at Nike, are you not?

A. Yes, I've seen -- I've seen a lot of job descriptions.

Q. Okay. And you understand that -- Well, what do you understand about the shaded parts of the job descriptions?

A. Can you be more specific. I'm not sure what you're asking.

Q. Well, take a look at the job description at 19 and 20.

A. Okay.

Q. Do you see that that's shaded? If you compare it to page 20, there's also some shaded parts and then there are two unshaded parts.

Do you see that?

A. Kind of. I mean, it's -- the headings are shaded, and then the some of the text is partially shaded and partially not shaded. I see what you're talking about. Everything -- Well, I think I should

Page 133

Suppl. Sun Decl. Ex. 91, Page 5 of 16

just ask:   What are you referring to?

Q.   Well, at the bottom of the job description, it says:  "Gray fields are common across the company."

Do you understand those gray fields refer to the leveling criteria that Nike has?

MS. DAVIS:  Objection.  Misstates the evidence.  Assumes facts not in evidence.  Go ahead.

THE WITNESS:  I'm not sure if they come from leveling criteria or somewhere else.  I just don't know.

(Reporter request.)

THE WITNESS:  Sure.  I'm not sure if they come from the leveling criteria or somewhere else. I just don't know.

THE REPORTER:  Thank you.

Q.   BY MR. BARRY GOLDSTEIN:  Now, the shaded areas on these three job descriptions that have been Ms. Stuckey's example in paragraph 8, they're the same for all three job descriptions, are they not?

A.   I can compare them if you'd like me to.

Q.   Well, I don't -- we have a limited amount of time.

A.   Yeah.

MR. BARRY GOLDSTEIN:  I'm going to

Page 134

Suppl. Sun Decl. Ex. 91, Page 6 of 16

Chester Hanvey , Ph.D. - October 29, 2021

represent to you that they are the same.

And I'm going to upload an exhibit that is marked 760.

(Exhibit 760 marked.)

THE WITNESS:  Okay.  I see them.

Q.  BY MR. BARRY GOLDSTEIN:  Okay.  This is a descriptive exhibit that we prepared to kind of facilitate the comparison of these three job descriptions.

And, now, if you'd look at the bottom box, which is referred to as "the capabilities."

Do you see that?

A.  Are you talking about Exhibit 760?

Q.  No, no.  I'm back on the job description.

A.  Oh.

Q.  All 760 is -- Can you put both those exhibits -- Can you look at both exhibits at the same time?

THE WITNESS:  Does anybody know if I can do that?

MS. DAVIS:  Dr. Hanvey, yeah, you can download -- when you click on the document, you can download it and it will download a PDF.

So if you'd do that with both exhibits, you should be able to have them both up.  You'll

Page 135

Suppl. Sun Decl. Ex. 91, Page 7 of 16

have to obviously put them over Exhibit Share.

THE WITNESS:  Okay.  So this was 760 and 759; is that right?

MR. BARRY GOLDSTEIN:  Yes.

THE WITNESS:  Okay.  Okay.  I'm going to block you guys out, but I can -- I can see both -- both documents.

Q.   BY MR. BARRY GOLDSTEIN:  Okay.  Now, are you set, Dr. Hanvey, for me to ask you a question?

A.   Yes.  Yeah, I can see Exhibit 759 and 760 at the same time.

Q.   Thank you.  Isn't it true that the unshaded sections under "key capabilities," titled "physical requirements," "travel," "irregular work hours," and "certifications," are the same for all three job codes?

A.   I can compare them.  So this started on page 19 of 759, I think you said?

Q.   That's correct.

A.   Okay.

Q.   The job codes are in 719 to -- excuse me -- from 19 to 24.

A.   Okay.  And then can you repeat which three sections you wanted to compare.

Q.   The bottom sections under "key

Page 136

Suppl. Sun Decl. Ex. 91, Page 8 of 16

capabilities": "Physical requirements," "travel," "irregular work hours," and "certifications."

A. Got it. Okay. Okay. Okay. I've looked at them.

Q. And are they the same?

A. No, they're not.

Q. What's not?

A. The specific work experience is different.

Q. I didn't ask you about specific work experience.

A. Oh, I misunderstood you.

Q. Physical requirements, travel, irregular work hours, and certifications.

A. Oh, okay. Yeah, those -- those four that you mentioned appear to be the same.

Q. Okay. Now, let's turn to specific work experience. And, here, Exhibit 760 may be of assistance to you.

Is the only difference among the three job descriptions what is in red on Exhibit 760? That is, on one it says "apparel," on another it says "footwear or product," and the third it says "apparel or product"?

A. Yes, that appears to be the case.

Q. Now, we're going to move up to the next

Page 137

Suppl. Sun Decl. Ex. 91, Page 9 of 16

unshaded part, which is under "job accountability."
Okay, sir?

A.    Okay.

Q.    Now, with respect to -- Well, let's make it easy:  Are the only differences between the job descriptions the words that are in red on Exhibit 760?

A.    That might take a few minutes to confirm that.

Okay.  I'm finished reviewing it.  Can you restate your question.

Q.    Are the only differences between the three job descriptions those statements or words that are indicated in red on Exhibit 760?

A.    No.

Q.    And what do you -- What else do you see that's different between the three job descriptions?

A.    Well, the job codes and the titles are different.

Q.    Okay.  Obviously the job codes and job titles are different; but, apart from the job codes and job titles, is the job description the same on the three job descriptions, except for those words or statements that are indicated in red on Exhibit 760?

Page 138

Suppl. Sun Decl. Ex. 91, Page 10 of 16

A.    Yes, I believe so.

Q.    Now, on Exhibit-- Excuse me.

On job description A1773, there's an added fifth paragraph that's not included on the other two job descriptions, that indicates:  "Responsible for an equipment category team that creates 100 million product annually."

Do you see that?

A.    I do.

Q.    Do you know if the directors in job codes A1341 and A1343 are also responsible for teams?

A.    Do you mean -- Are you asking whether that statement is true for the other -- the other job codes?

Q.    Yes.

A.    I don't know.

Q.    Now, do you know who prepares the shaded areas of Nike's job descriptions?

A.    I do not.

Q.    Do you know if that's prepared by the compensation department within the HR function?

A.    I don't know.

Q.    Do you know who prepares the parts of the job descriptions on key accountabilities and -- let's see -- well, in the unshaded portions of the

Page 139

Suppl. Sun Decl. Ex. 91, Page 11 of 16

Chester Hanvey , Ph.D. - October 29, 2021

job description?

A.    I don't know specifically who does that.

Q.    Now, in paragraph 9 of her declaration, Ms. Stuckey states -- well, she attests that "the job descriptions for each of these three job codes demonstrate differences in the skills required for each."

Do you see that?

A.    Yes, I do.

Q.    As an industrial organizational psychologist, is it your professional opinion that the three job descriptions demonstrate that there are differences in the skills required for each of the three jobs?

A.    I don't know that it's possible to tell just by looking at the job description.

Q.    The sentence after the one that's footnoted 62 in paragraph 247 of your report, there's the statement:  "In addition, position titles are even more specific than job codes and more accurately reflect the work employees performed."

Do you see that?

A.    No.  I'm switching back to my report now. Can you say which paragraph that is?

Page 140

Suppl. Sun Decl. Ex. 91, Page 12 of 16

notes, typing, while conducting the interview.

Is that correct?

A.    That's correct.

Q.    Now, in the job analyses that you've done, have you recorded the interviews?

A.    I can't think of any examples where I've audio- or video-recorded interviews.  It tends to make people pretty uncomfortable.

Q.    Now, turning to "sample selection" that begins on page 23 of your report.

You only sampled the women who were in the covered positions; is that correct?

A.    That's correct.

Q.    Why did you decide only to interview women?

A.    It's based on the structure of the litigation.  So at the pre class certification stage, one of the issues is the degree of similarity between putative class members; and so asking questions to male employees would not be relevant to that inquiry.

Q.    Are you referring to an EPA analysis that looks at whether opt-ins, that is, persons who opted in to an EPA action, are sufficiently similarly situated?

Page 210

Chester Hanvey , Ph.D. - October 29, 2021

A.    The interviews were completed.

Q.    I see.  Now, there are four bands in which covered positions are located; is that correct?

A.    I think there's actually five, because I think there were a couple in A, based on how it was defined; but, generally speaking, the bulk are in the other four, yeah.

Q.    L, U, E, and S; is that correct?

A.    That's right.

Q.    And you didn't look for any job codes in S.  Why is that?

A.    The other three that we used were the ones that had the highest number of employees.  So, you know, we're somewhat limited in terms of -- you know, we can't select every job code, so we prioritize the ones that have the most people.

Q.    So you were trying -- you were generalizing to all job codes; right?

A.    No, I don't think that's right.

Q.    You don't conclude that there's variability within -- What do you conclude as a result of your analysis of sample 2?

A.    That there's variability within job codes.

Q.    Which job codes?

A.    The ones that I cited.

Page 232

Suppl. Sun Decl. Ex. 91, Page 14 of 16

says in paragraph 179:  "Managing others, such as communication, listening, the ability to give honest and timely feedback, as well as the ability to work with computers."

Q.   That's the description of the knowledge, skills, and abilities that meets the standard of the SIOP principles?

A.   That's the summary of the knowledge, skills, and abilities that these five employees reported.

Q.   In your professional opinion, is that an adequate description of knowledge, skills, and abilities for a job analysis as required by the SIOP principles?

A.   You know, again, like every job analysis, it depends on the purpose.

So the purpose of this was to determine the degree of variability between employees.  They didn't provide a lot of KSAs, which is fine. There's -- We didn't find much variability there, so we looked at other factors as well.

Q.   Did you describe the knowledge, skills, and abilities for each of these -- each of the jobs in sample 2?

A.   I'm pretty sure there was at least a

Page 257

Suppl. Sun Decl. Ex. 91, Page 15 of 16

STATE OF CALIFORNIA    )

                       )  SS.

COUNTY OF SAN DIEGO    )

      I, MARILYNN HOOVER, CSR No. 04-0387 for the State of Oregon, do hereby certify:

      That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify the truth, the whole truth, and nothing but the truth;

      That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced by me to typewritten form; and that the same is a true, correct, and complete transcript of the said proceedings.

      Before completion of the deposition, review of the transcript [X] was [ ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed shall be appended hereto.

      I further certify that I am not interested in the outcome of the action.

      Witness my hand this 31st day of October 2021.

                       Marilynn Hoover, RPR

                       CSR No. 04-0387; Exp. 03/31/2023

                                            Page 264

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

_____

KELLY CAHILL, SARA JOHNSTON,  )
LINDSAY ELIZABETH, and HEATHER)
HENDER, individually and on   )
behalf of others similarly    )
situated,                     )
                              )
                Plaintiffs,   )
                              )
vs.                           ) No. 3:18-cv-01477-JR
                              )
NIKE, INC., an Oregon         )
Corporation,                  )
                              )
                Defendant.    )
_____

VIDEO-RECORDED REMOTE COUNSEL ZOOM DEPOSITION

UPON ORAL EXAMINATION OF

HEATHER HENDER

_____

9:10 A.M.

THURSDAY, JANUARY 14, 2021

(ALL PARTICIPANTS AT THEIR RESPECTIVE LOCATIONS)

WITNESS LOCATION:  REDMOND, WASHINGTON

Reported by:  Tami Lynn Vondran, CRR, RMR, CCR
Washington CCR No. 2157, Oregon CSR No. 20-0477

Page 1

Suppl. Sun Decl. Ex. 92, Page 1 of 6

A P P E A R A N C E S

(ALL PARTIES APPEARING REMOTELY)

FOR THE PLAINTIFFS:

CRAIG ACKERMANN

BRIAN DENLINGER

Ackermann & Tilajef

1180 South Beverly Drive, Suite 610

Los Angeles, California 90035

310.277.0614

cja@ackermanntilajef.com

bd@ackermanntilajef.com

FOR THE DEFENDANT:

DANIEL PRINCE

ANNA SKAGGS

Paul Hastings LLP

515 South Flower Street, 25th Floor

Los Angeles, California 90071

213.683.6000

danielprince@paulhastings.com

annaskaggs@paulhastings.com

ALSO PRESENT:

CASSIE ENGLISH, Nike in-house counsel

MICHAEL HEHENKAMP, Videographer

Page 2

Suppl. Sun Decl. Ex. 92, Page 2 of 6

Q.    And your response was that you wanted to continue to work under Mr. Stowell's leadership; right?

A.    My response was there needed to be a position for me to move back into, and I made a compliment to James saying, "Can I take my manager with me," which was just a compliment sideways to James.  It was intended to be lighthearted, and it was that.

Q.    What did you prefer about Mr. Stowell's leadership style?

A.    I don't recall saying I preferred it, but what James -- just -- I don't think James was extremely popular or part of the boys' club.  I think Deni was.  And James seemed to be a straight shooter, plain talker.

Q.    Did you like working under Mr. Stowell?

A.    Except for the circumstances outlined in the retaliation complaint, he was an okay manager.

Q.    For your position as a Manufacturing Engineer II, how did you hear about that position?

A.    It may have been a recruiter.  There were several recruiters that reached out to me in that time frame.  It may have either been a recruiter submitted me.  I -- I do not remember if the recruiter submitted me or if I applied directly.  I think it was the recruiter.

Q.    This was an external recruiter; right?

Page 167

Suppl. Sun Decl. Ex. 92, Page 3 of 6

A.    Yes.

Q.    What about that Manufacturing Engineering II position interested you?

A.    Well, it talked about the production.  I was also interested, at the time, in working for Nike, a prominent Beaverton employer with a lot of history, a lot of -- what's word I'm looking for?  A lot of stature in Oregon and the Portland area.

Q.    I'm going to upload the next exhibit in order.

A.    I have it now, 136.

Q.    You have it, great.  It's Exhibit 136.

        (Exhibit No. 136 was marked remotely for

                identification.)

A.    I have it open now.

Q.    (BY MR. PRINCE)  Is this the -- it's a letter dated March 5, 2015.

        Is this the offer letter that you received from Nike in connection with the Manufacturing Engineer II position?

A.    It appears to be, yes.

Q.    This was the same position that you had applied for; correct?

A.    I believe so.

Q.    And it states that the annual salary is 78,600 for that position; right?

Page 168

Suppl. Sun Decl. Ex. 92, Page 4 of 6

experience prior to my arriving at the company.  The team had been formed for more than a year before I got there.

Q.    Before you accepted the Manufacturing Engineering II position, had you applied for other positions at Nike?

A.    Yes.

Q.    Do you recall how many?

A.    I applied for some, and the recruiters applied for many.

Q.    Do you know the outcome of any of those positions?

A.    I believe a recruiter put me in for a -- more of a coding position, and I do have some limited coding background.  I was not chosen for that position.  And I think I did only a phone screen for it.  And I was hired into the Manufacturing II position in April of 2015.

Q.    Let's talk about your promotion to the Senior Process Engineer I position.

That was a U-Band position; correct?

A.    Yes.

Q.    And you were again working under Ms. Ponganis; is that right?

A.    Yes.

Q.    Do you believe Ms. Ponganis helped you get

Page 180

Suppl. Sun Decl. Ex. 92, Page 5 of 6

REPORTER'S CERTIFICATE

I, TAMI LYNN VONDRAN, the undersigned Certified Court Reporter, pursuant to RCW 5.28.010, authorized to administer oaths and affirmations in and for the State of Washington, do hereby certify that the sworn testimony and/or proceedings, a transcript of which is attached, was given before me at the time and place stated therein; that any and/or all witness(es) were duly sworn to testify to the truth; that the sworn testimony and/or proceedings were by me stenographically recorded and transcribed under my supervision, to the best of my ability; that the foregoing transcript contains a full, true, and accurate record of all the sworn testimony and/or proceedings given and occurring at the time and place stated in the transcript; that a review of which was not requested; that I am in no way related to any party to the matter, nor to any counsel, nor do I have any financial interest in the event of the cause.

WITNESS MY HAND AND DIGITAL SIGNATURE THIS 26th day of January, 2021.

TAMI LYNN VONDRAN, CRR, RMR, CCR

Washington CCR No. 2157, Oregon CSR No. 20-0477

Page 265

Suppl. Sun Decl. Ex. 92, Page 6 of 6

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, SARA JOHNSTON,     Case No.: 3:18-cv-01477-JR
LINDSAY ELIZABETH, and HEATHER
HENDER, individually and on
behalf of others similarly
situated,

        Plaintiffs,

    v.

NIKE, INC., an Oregon Corporation,

        Defendant.

_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

SARA JOHNSTON

Beaverton, Oregon

Tuesday, November 24, 2020

Volume 1

Reported by:
LESLIE JOHNSON
RPR, CCRR, CSR No. 11451
Job No.: 4347395
PAGES 1 - 312

Page 1

Suppl. Sun Decl. Ex. 93, Page 1 of 12

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, SARA JOHNSTON,    Case No.: 3:18-cv-01477-JR

LINDSAY ELIZABETH, and HEATHER

HENDER, individually and on

behalf of others similarly

situated,

        Plaintiffs,

    v.

NIKE, INC., an Oregon Corporation,

        Defendant.

_____

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF SARA JOHNSTON, Volume 1, taken on behalf of Defendant, at Beaverton, Oregon, beginning at 10:03 a.m. and ending at 8:38 p.m., on Tuesday, November 24, 2020, before LESLIE JOHNSON, Certified Shorthand Reporter No. 11451.

Page 2

Suppl. Sun Decl. Ex. 93, Page 2 of 12

APPEARANCES:


For Plaintiffs:

GOLDSTEIN, BORGEN, DARDARIAN & HO

BY: JAMES KAN, ESQ.

MENGFEI SUN, ESQ.

155 Grand Avenue, Suite 900

Oakland, California 94612-3536

(510)763-9800

jkan@gbdhlegal.com

msun@gbdhlegal.com

-and-

MARKOWITZ HERBOLD PC

BY: ANTHONY BLAKE, ESQ.

1455 SW Broadway, Suite 1900

Portland, Oregon 97201

(503)295-3085

anthonyblack@markowitzherbold.com

Page 3

Suppl. Sun Decl. Ex. 93, Page 3 of 12

APPEARANCES (Cont.):


For Defendant:

    PAUL HASTINGS LLP

    BY: DANIEL PRINCE, ESQ.

         LINDSEY C. JACKSON, ESQ.

    515 South Flower Street, 25th Floor

    Los Angeles, California 90071

    (213)683-6000

    danielprince@paulhastings.com

    lindseyjackson@paulhastings.com


Also Present:

    DUSTIN BROWN, Videographer

    CASSIE ENGLISH, Nike

Page 4

Suppl. Sun Decl. Ex. 93, Page 4 of 12

said I'd like to help all the other women be treated  11:44:21
equally.

Q   Do you recall who placed that ad?

A   No.  I don't think I have any visibility
into that.  11:44:34

Q   Did -- well, did you -- let me make sure I
understand you.

Was this an ad that was placed by an
attorney that you responded to?

A   It looked like an ad for a law firm, yes.  11:44:48

Q   And you contacted the counsel that placed
that ad; is that fair?

A   Yes.  And said I would like to help the
women.

Q   Do you recall when you first engaged  11:45:11
counsel, which is to say when you retained the
services of an attorney?

A   Can you define "retained"?

Q   When you hired an attorney.

A   For this lawsuit?  11:45:29

Q   Yes, for this lawsuit.

A   I don't know the exact date, no.  I would
need to look at paperwork to see when I signed
paperwork.

Q   Did you sign a retainer letter with your  11:45:50

Page 64

THE WITNESS: I felt pressured to give a photo. I don't -- I mean, I'm a woman. I don't feel comfortable with my body. I don't really want to take any photos ever. And he put a lot of pressure on me to send photos. I think it's a very bottom of the chain before the messages.

There's -- there is content that shows that he was pressuring for photos, so a comment I made. But that specific text message or Facebook message I believe was my attempt to flirt because I considered having a relationship with him. I knew him for three years. He was a coworker. He mentored me in a lot of ways. He was someone I went on the coast with through Nike.

You know, we spent a lot of time together. But I did consider at some point dating him, and I would characterize that as flirting.

BY MR. PRINCE:

Q    Is there a reason that you deleted the photo that you sent but kept the nude photos that Mr. Carlson sent?

A    I had deleted a lot of chats as well. I didn't want his on my phone record. I didn't want Facebook -- for it to, like, appear, looking at his messages. I didn't know who was looking at it.

Page 229

Suppl. Sun Decl. Ex. 93, Page 6 of 12

On, you know, the Valentine's Day text where he sent a dick pic, it actually was sent when I was at a coworker's house having a glass of wine, and the coworker saw it.  So I deleted -- I thought I had deleted all of the photos a long time ago before I even left Nike.

Q    The question I have is, you preserved the nude photographs that Mr. Carlson sent you and indeed turned them over to Nike HR.  However, your photos that you sent you deleted; is that correct?

MR. KAN:  Objection.  Misstates her testimony.

THE WITNESS:  There was a time that I considered dating Chad.  I viewed everything up to that point as consensual.  Even the stuff that wasn't consensual at the beginning, in my complaint to HR, it wasn't necessarily that that had -- that we had a consensual relationship.

For me, the issue was he was retaliating. I had stopped responding, and he refused to come to meetings -- to two meetings that I held that were necessary to get my job done.  He was effectively preventing me from doing my job, and he started denigrating my work to other coworkers.

If I needed to meet with him, he was

05:25:47
05:26:03
05:26:30
05:26:44
05:27:05
05:27:22

Page 230

Suppl. Sun Decl. Ex. 93, Page 7 of 12

punishing me because I wasn't responding, and he absolutely required that a male or a different coworker set the meeting.  He wouldn't go to it if I set it.  He didn't show up.

I then needed to get my work done.  He was retaliating against me and refusing to help me with my work because I stopped responding after -- so there was a period -- I will say at the very beginning, it was nonconsensual.  There was a period that was consensual.  And I didn't turn any of the material over to HR between either of us because it was consensual.

And then the period of nonconsensual activity, I handed that over because I felt like that was when the boundaries were broken between what we agreed to, and I was being retaliated against because I wouldn't respond sexually to him anymore or however.

BY MR. PRINCE:

Q    In Exhibit 40, where does Mr. Carlson ask for nude photo of you?

MR. KAN:  Objection.  The document speaks for itself.

THE WITNESS:  On December 14th.  I can't see which one, since I -- yeah.  I don't know which

Page 231

Suppl. Sun Decl. Ex. 93, Page 8 of 12

time stamp belongs to me versus Facebook user, but 05:29:01
between 6:21 and 6:22 I made a comment.  At 6:21 --
I believe that's the time stamp, if I'm reading this
correctly.  "I know I'm good about keeping it under
wraps.  I'm surprised I didn't send you a dirty pic 05:29:18
or something being that drunk."

        And then I respond "or that you didn't
request one."  That implies that he requested them
before.  Because he requested several and pressured
me. 05:29:33

        I don't have -- I accidentally deleted
part of our conversation at some point.  So all of
the beginning text messages I don't have.

BY MR. PRINCE:

    Q    You accidentally deleted them or did you 05:29:55
delete them intentionally?

    A    I think I tried to -- I thought that if I
did something to them it would put it in a folder or
somehow archive it, and I accidentally deleted it
instead of archiving it.  So I don't know what I did 05:30:20
or how I did it.  I have spent hours trying to get
it back from Facebook for my lawyers.  I've
requested -- I've spent time trying to undo that.

    Q    Did you ever communicate to Nike HR that
there were consensual text messages as well as 05:30:42

Page 232

Suppl. Sun Decl. Ex. 93, Page 9 of 12

But . . .                                                    07:57:21

BY MR. PRINCE:

    Q   And so, would the -- sorry.  Let me start over.

        Do you know whether women make hiring or    07:57:40
promotions decisions at Nike?

    A   I would assume that some do.

    Q   Do you know whether women make compensation decisions at Nike?

    A   I would assume that some do that as well.    07:58:00

    Q   Do you know whether women investigate complaints of gender discrimination at Nike?

    A   I would assume that they would if it were part of their job.

    Q   Any reason to believe that women would not    07:58:21
participate in any of these processes?

        MR. KAN:  Objection.  Vague and ambiguous.

        THE WITNESS:  I wouldn't see why they wouldn't.

BY MR. PRINCE:                                               07:58:40

    Q   In your lawsuit, what's the remedy that you're seeking?

    A   I don't understand the question.  What do you mean "remedy"?

    Q   What ultimate relief are you seeking in    07:59:00

Veritext Legal Solutions
866 299-5127

connection with being a member of this class action 07:59:04

lawsuit?

    A    Me personally?

    Q    Yes.

    A    I would like all women to be treated 07:59:15
fairly, to be treated equitably, to have their
complaints taken seriously.  I don't want any woman
to ever experience what Juanita or I or Laura did.

    I would really like to see a comprehensive
training rolled out.  I believe that some of the 07:59:37
same issues still exist today, and they're not
addressed.  So I'd like to see, you know,
comprehensive reform.

    Q    Anything else?

    A    Specifically, that's all I really ever 08:00:05
wanted.  That's why I went to HR.

    Q    Any other --

    A    I mean, I'd also like women to be paid
fairly and equitably and promoted fairly and
equitably.  I would like my job back at a fair and 08:00:25
equitable wage.  And I would like my benefits
reinstated.  I really did enjoy that six weeks of
vacation.

    I left with five weeks before my
sabbatical.  That would have been six weeks 08:00:39

Page 298

Suppl. Sun Decl. Ex. 93, Page 11 of 12

REPORTER'S CERTIFICATION


I, Leslie Johnson, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested. I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  December 15, 2020


*Leslie Johnson*


LESLIE JOHNSON

CSR No. 11451, RPR, CCRR


Page 312

Suppl. Sun Decl. Ex. 93, Page 12 of 12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,

      Plaintiffs,

  v.                    No. 3:18-cv-01477-JR

NIKE INC., an Oregon

corporation,

      Defendant.

DEPOSITION OF JULIAN MILLER

PURSUANT TO FRCP 30(B)(6)

THURSDAY, JUNE 3, 2021

Reported by:  Marilynn Hoover, RPR

               Oregon CSR No. 04-0387

Miller, Julian                                          June 3, 2021

Page 2

BE IT REMEMBERED THAT, pursuant to Rule
30(b)(6) of the Federal Rules of Civil Procedure,
the Zoom video deposition of JULIAN MILLER was taken
before Marilynn Hoover, Oregon CSR No. 04-0387; on
Thursday, June 3, 2021, at the hour of 9:34 a.m.;
the witness testifying from Portland, Oregon.

                         APPEARANCES
GOLDSTEIN BORGEN DARDARIAN & HO
    BY MR. JAMES KAN
        MR. BARRY GOLDSTEIN
        MR. BYRON GOLDSTEIN
        MS. MENGFEI SUN
    155 Grand Avenue, Suite 900
    Oakland, California 94612
    Telephone:  510-763-9800
    E-mail:  JKan@gbdhlegal.com
             BGoldstein@gbdhlegal.com
             BRGoldstein@gbdhlegal.com
             MSun@gbdhlegal.com
    On behalf of Plaintiffs

Suppl. Sun Decl. Ex. 94, Page 2 of 15

APPEARANCES (CONT.)

PAUL HASTINGS

   BY MS. FELICIA DAVIS

   515 South Flower Street, 25th Floor

   Los Angeles, California 90071

   Telephone:  213-683-6169

   E-mail:  FeliciaDavis@paulhastings.com

   On behalf of Defendant


ALSO PRESENT:  Ms. Cassie English

                Ms. Rakhi Kumar

Suppl. Sun Decl. Ex. 94, Page 3 of 15

Miller, Julian                                          June 3, 2021

Page 68

Q.   Okay.  Is it -- Is it possible for a recruiter, once they are aware of a candidate who applies for, say, job A, and they have job B that's similar, that they could look at that candidate's profile and say, "I think you might be a good fit for job B," and extend them an invitation to apply for that other open position?

A.   It's possible.  That would be up to the individual recruiter for that requisition.

Q.   On the slide ending in 2160, there's a box that says "job submission" in the middle.

Do you see that?

A.   Yes.

Q.   Okay.  And this is -- it says: "Information submitted by the candidate for the specific position includes answers to screening questions."

Is that right?

A.   Yes.

Q.   Okay.  And so that's basically describing when a candidate -- they specifically fill out a job application for a specific open requisition position?

A.   Yes.

Q.   Okay.  Right below that is a box that says

Page 69

"passive candidate correspondence."

Do you see that?

A.    Yes.

Q.    Okay.  And it says:  "Recruiters can invite candidates to apply to the specific requisition."

Is that true?

A.    Yes.

Q.    Okay.  And what guidelines, if any, are given to recruiters about when it's appropriate to invite candidates to apply for specific requisitions?

A.    That's up to the discretion of the individual recruiter for that requisition.

THE REPORTER:  I didn't catch your objection, counsel.

MS. DAVIS:  Sorry, I was muted.

My objection was just that it's outside the scope of the deposition topic.

Q.    BY MR. KAN:  Are there -- Are there any parameters within Taleo that limit or cabin what types of invites recruiters can send to candidates to encourage them to apply for a specific requisition?

A.    No.

Suppl. Sun Decl. Ex. 94, Page 5 of 15

Miller, Julian                                              June 3, 2021

Page 70

Q.    What records are kept by Taleo in the event that a recruiter does invite a candidate to apply to a specific requisition?

A.    All communication sent from Taleo is logged in Taleo; so if a candidate were sent -- you sent that message directly through the system, there'd be a record of it.  You can also see how an applicant applied to the job, and that can be a record of how they came to it.

Q.    When it comes to this passive candidate correspondence, are these invitations only manually generated, or can Taleo automatically generate them for candidates that meet specific criteria relevant to a specific open requisition?

A.    Only manually generated.

Q.    So I wanted to jump down to a slide a little further down.  It's ending in Bates number 2172, it's also slide 101, and it has the title of "Avature integration."

A.    Okay.  I have the slide in front of me.

Q.    Okay.  So in the first box, it says: "Recruiters can export" -- or the first bullet says: "Recruiters can export pre-qualified passive candidates from Avature to a requisition in Taleo."

Do you see that?

Suppl. Sun Decl. Ex. 94, Page 6 of 15

Miller, Julian                                    June 3, 2021

Page 79

only time that a recruiter will actively identify passive candidates for an open requisition is if they have some information in Avature that identifies them or pre-qualifies them as a candidate?

MS. DAVIS:  Objection.  Compound. Misstates the testimony.  Outside the scope of the deposition topic.

If you know based on your personal knowledge, you can testify; but this is not rule 30(b)(6) testimony.

THE WITNESS:  All recruiting done for an active requisition is done in Taleo.

Q.   BY MR. KAN:  Okay.  So, to the extent that an invitation is sent or a passive correspondence is sent, that is recorded in Taleo; correct?

A.   If it was sent from Taleo, yes.

Q.   Okay.  Can it be sent outside of Taleo?

A.   Yes.  You could copy a link and send it via e-mail or other means.

Q.   Okay.  And does Nike do anything to -- To the extent that passive correspondence with a candidate by a recruiter occurs outside of Taleo, does Nike do anything to make sure that that information is later on reflected in Taleo, or does

Suppl. Sun Decl. Ex. 94, Page 7 of 15

Miller, Julian                                                    June 3, 2021

Page 80

it just exist outside of Taleo?

A.    If a -- If a candidate was sent a link to apply outside of Taleo, there would be no record of that communication within Taleo; however, you would see based on how the candidate applied and you could make an assumption.

Q.    Okay.  What would you be able to see in terms of how that applicant applied, and what assumptions do you think could be drawn from that?

A.    If they were sent a passive link to apply, it would show they applied via a passive link.

Q.    Okay.  And if somebody applied via a passive link -- Well, what is a passive link, first?

A.    It's a link to apply to a requisition.

Q.    Okay.  And are those -- are those URLs unique in terms of identifying that it's something that only a recruiter would have been able to generate?  Or can they also be sent, say, a publicly facing job posting?

A.    Only a recruiter can generate and send a passive link, based on system access.

Q.    Can a recruiter also send a public link to a publicly posted job posting for, say, a WHQ position externally?

A.    Yes.

Suppl. Sun Decl. Ex. 94, Page 8 of 15

Miller, Julian                                                 June 3, 2021

Page 81

Q. Okay. And to the extent that a recruiter sends a passive candidate an invitation via a public link to the job posting, would the Taleo information regarding that application submission necessarily indicate that that person was invited by a recruiter to apply?

A. I'll state it again: If the communication was not sent via Taleo, there's no record in Taleo of communication being sent. So to determine -- It's dependent on how that candidate was invited to apply.

Q. So the only way we can know for sure if a candidate potentially was invited by a recruiter is if they -- if they applied via a passive link generated by a recruiter with permission to do so?

A. Yes.

Q. Are you familiar with Taleo's ability to do something called automatic candidate pooling?

A. Could you define that for me, please.

Q. Sure. The idea behind this would be allowing Nike to add auto-pooling criteria to a requisition in order to find candidates in a database who are available and qualified for a job.

Does that help?

A. Are you saying that this is functionality

Suppl. Sun Decl. Ex. 94, Page 9 of 15

Miller, Julian                                      June 3, 2021

Page 100

recruiter from matching a candidate to a different requisition based on, you know, preset limits or parameters.

Is that right?

A.   That's correct.

Q.   Okay.  Now, when it comes to the guidelines that Nike provides recruiters about when they should match a candidate to a different open job, what are those guidelines?

A.   The guidelines are very specific.  It has to be a job that meets the same band level.  Right? It's the same seniority, the same job code.  We're recruiting within those roles within a similar time frame, so it's still a valid application.  And the screening criteria, as we mentioned, those pre-screening questions are the same amongst those requisitions.  Those are -- Those are the guidelines that we educate them on.  Right?  So we can show in the system that -- that those roles use the same criteria, that recruiters screen candidates based on the same criteria based on -- across multiple requisitions.

Q.   Okay.  Are there any other guidelines that Nike provides?

A.   No, not to my knowledge.

Suppl. Sun Decl. Ex. 94, Page 10 of 15

Miller, Julian                                                    June 3, 2021

Page 101

Q.   Are these guidelines that you just described, are they written down anywhere in a policy, in a policy document, in a training document, anywhere else?

A.   Yes.

Q.   Okay.  And where -- where are those kept or written?

A.   Within our talent acquisition playbook; so I believe I mentioned that before.

Q.   And has the talent -- has the talent acquisition playbook contained guidelines about when and under what circumstances a recruiter should match a candidate to a job?  Has that been true since 2015?

A.   I cannot speak to that entire time frame. I know that that is true today, but I don't -- I can't speak to back in 2015.

Q.   Prior to current use, can you tell -- can you testify about whether the TA playbook included these guidelines on when to match a candidate to a job at any time prior to 2021?

A.   The TA playbook was created, I think, sometime in 2016; so that would -- that would predate that system.

Q.   And is it your contention that the TA

Miller, Julian                                                    June 3, 2021

Page 111

There's no other information, I don't think, that they could enter.

Q.   Okay.

A.   But this is all done individually by a recruiter, right, based on their discrepancy. Candidates are not matched automatically based on any other criteria; it's always performed individually by a recruiter.

Q.   If someone were interested in identifying within Taleo all the times a recruiter matched a candidate to a job, could Taleo -- could you generate a report to identify those situations or those events based on the relevant histories of requisitions for a certain time period in a certain geography?

A.   I can't say for certain.  I'm not an expert in reporting out of Taleo, unfortunately. Like Taleo's a very large system and it requires a lot of experts; so my expertise is not in data extraction of reporting from Taleo, unfortunately, so I couldn't say for certain.

Q.   Okay.  The flip side of that is, for any requisitions that a recruiter matched a candidate to that job, there would be at least some Taleo entries that would reflect that event occurring; correct?

Suppl. Sun Decl. Ex. 94, Page 12 of 15

Miller, Julian                                    June 3, 2021

Page 112

A.   Correct.   Yeah, we're looking at one.
Absolutely.

Q.   Right.   Okay.   Backing up for a second, and I probably should have asked this at the very beginning:   What kind of -- What type of data system is Taleo?   Can you describe it in terms of like what kind of -- is it a SQL database?   Is it -- Is there a way to describe it?

A.   I'm -- I'm not familiar with that term, "SQL database."   Could you define that for me?

Q.   Sadly, I can't.   What I do know is that there are various types of databases:   There are relational databases.   I think a SQL database, generally, if I'm using it -- if I'm doing it correctly, is a relational database that connects multiple different data sets to kind of help you understand how things -- to make additional connections if you need to.

I'm just curious kind of if you have an understanding of the type of data system that Taleo Enterprise is.

A.   I'm not.

MR. KAN:   Okay.

(Reporter request.)

MR. KAN:   Yeah, why don't we go ahead --

Suppl. Sun Decl. Ex. 94, Page 13 of 15

Miller, Julian                                        June 3, 2021

Page 139

Does -- Do the fields reflected here on Exhibit 732 identify or show all of the available data fields in the job application data that Taleo contains?

A.    Again, that's a very difficult question for me to answer off the top of my head.  Like there are -- those are large -- they can be large applications that can differ between groups at Nike, so I would be guessing.  I can't say for certain off the top of my head.  Those are large -- The fields that make up applications have many different components, so it's difficult for me to say on the spot if that's -- that's true or not.

Q.    Looking at the fields reflected in Exhibit 732, can you, sitting here today, identify or are you aware of any fields that you know exist within the applications data of Taleo but is not reflected here?

A.    Yes.

Q.    Okay.  Roughly speaking, do you have a sense of how many different fields exist within the app -- related to job application data within Taleo?

A.    I wouldn't feel comfortable speculating.

Q.    Okay.  Did you have any role in determining which fields within the larger job

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Suppl. Sun Decl. Ex. 94, Page 14 of 15

Miller, Julian                                                    June 3, 2021

Page 170

STATE OF OREGON            )
                          )  SS.
COUNTY OF MULTNOMAH        )

        I, MARILYNN HOOVER, CSR No. 04-0387 for the
State of Oregon, do hereby certify:

        That prior to being examined, the witness named
in the foregoing deposition was duly sworn to
testify the truth, the whole truth, and nothing but
the truth;

        That said deposition was taken down by me in
shorthand at the time and place therein named, and
thereafter reduced by me to typewritten form; and
that the same is a true, correct, and complete
transcript of the said proceedings.

        Before completion of the deposition, review of
the transcript [ ] was [X] was not requested.  If
requested, any changes made by the deponent (and
provided to the reporter) during the period allowed
shall be appended hereto.

        I further certify that I am not interested in
the outcome of the action.

        Witness my hand this 7th day of June 20__.


                        _____
                        Marilynn Hoover, RPR
                        CSR No. 04-0387; Exp. 03/31/2023

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

_____

                                  )

KELLY CAHILL, SARA JOHNSTON,   )

LINDSAY ELIZABETH, and HEATHER)

HENDER, individually and on    )

behalf of others similarly     )

situated,                      )

                               )

          Plaintiffs,          )

                               )

vs.                            ) No.  3:18-CV-01477-JR

                               )

NIKE, INC., an Oregon          )

Corporation,                   )

                               )

          Defendant.           )

_____)

VIDEOTAPED REMOTE DEPOSITION OF DAVID NEUMARK, Ph.D.

San Francisco, California

Tuesday, August 31, 2021

Volume I

Reported by:

CATHERINE A. RYAN, RMR, CRR

CSR No. 8239

Job No. 4778006

PAGES 1 - 299

Page 1

Suppl. Sun Decl. Ex. 95, Page 1 of 6

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

_____

)

KELLY CAHILL, SARA JOHNSTON, )

LINDSAY ELIZABETH, and HEATHER)

HENDER, individually and on )

behalf of others similarly )

situated, )

)

         Plaintiffs, )

)

vs. ) No. 3:18-CV-01477-JR

)

NIKE, INC., an Oregon )

Corporation, )

)

         Defendant. )

_____)

Videotaped remote deposition of DAVID NEUMARK, Ph.D., Volume I, taken on behalf of Defendant, by way of video-telecommunication with the Witness appearing in San Francisco, California, beginning at 9:12 a.m. and ending at 5:30 p.m., on Tuesday, August 31, 2021, before CATHERINE A. RYAN, Certified Shorthand Reporter No. 8239.

Page 2

Suppl. Sun Decl. Ex. 95, Page 2 of 6

APPEARANCES VIA VIDEO-TELECONFERENCE:

For Plaintiffs and the Witness:
        GOLDSTEIN BORGEN DARDARIAN & HO
        BY:   JAMES KAN
              BARRY GOLDSTEIN
              BYRON R. GOLDSTEIN
        Attorneys at Law
        155 Grand Avenue, Suite 900
        Oakland, California  94612
        (510) 763-9800
        jkan@gbdhlegal.com
        (Mr. Byron Goldstein was not present at the
        commencement of the deposition proceedings.)

For Defendant:
        PAUL HASTINGS LLP
        BY:   FELICIA A. DAVIS
              LAURA E. ZABELE
              DANIEL PRINCE
        Attorneys at Law
        515 South Flower Street, 25th Floor
        Los Angeles, California  90071-2228
        (213) 683-6120 (Ms. Davis)
        (213) 683-6127 (Ms. Zabele)
        (213) 683-6169 (Mr. Prince)
        (213) 996-3127 Fax
        feliciadavis@paulhastings.com
        laurazabele@paulhastings.com
        danielprince@paulhastings.com

ALSO PRESENT VIA VIDEO-TELECONFERENCE:
LAUREN D. THIBODEAUX, Nike, Inc.
ELAINE REARDON, Resolution Economics
JENNIFER WILLIAMS, Videographer, Veritext
CARISSA NARCISO, Technical Concierge

Page  3

Suppl. Sun Decl. Ex. 95, Page 3 of 6

period, correct?                                    09:32:20

A    Well, I mean, I -- I think I've answered the question, but I'll -- I'll say it slightly differently, perhaps, and you can tell me if it's unsatisfactory to you.                    09:32:31

An average is -- is meaningful.  An averaging you get out of an aggregated model is meaningful, but as I said, as I -- as I acknowledged, there is -- there is no estimate for that job code nor any other one in isolation,        09:32:42 ignoring data on all other job codes.

Q    Okay.  Got it.

So you don't know whether women in job code A1046 were paid statistically significantly less or statistically significantly more than men in    09:33:03 job code A1046 during the class period, correct?

A    I've produced an estimate which is representative of the people in the data.  It's obviously -- all the variation associated with gender, or anything else, for that matter, is        09:33:26 identified from within job code differences.  I'm not comparing a CEO and a -- oh, I don't know, some other -- some other job that's far away from CEO, but, again, there is no -- there is no specific estimate of a single job code, the one you mentioned    09:33:43

Page 21

Suppl. Sun Decl. Ex. 95, Page 4 of 6

or any other one, in isolation.                    09:33:46

Q    Okay.  And you say that you've produced an estimate which is representative of the people and the data, but it doesn't mean it's the same estimate -- it's not the same answer for every job in the    09:33:59 data, correct?

A    Well, that's what an average means.  I mean, an average or any estimate is -- is representative, and how -- how much variation there is in the data about -- about or around, I should    09:34:15 say, that estimate is reflected in -- well, what -- what -- what econometricians call the "standard error," what attorneys tend to think of more in terms of the standard deviations.

So a strongly significant result says it's    09:34:30 pretty strongly representative.  A much weak- -- a much more weaker -- weakly significant result would say there's a lot more variation about that estimate.

Q    Right.                                      09:34:40

But there is going to be variation for every job code, correct?

A    That's --

MR. KAN:  Objection.

THE WITNESS:  -- the nature that --        09:34:48

Page 22

Suppl. Sun Decl. Ex. 95, Page 5 of 6

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ X ] was [  ] was not requested.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 09/07/2021

*Catherine A. Ryan*

Catherine A. Ryan, RMR, CRR

CSR No. 8239

Page 299

Suppl. Sun Decl. Ex. 95, Page 6 of 6

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON, PORTLAND DIVISION

_____

KELLY CAHILL, SARA JOHNSTON,

LINDSAY ELIZABETH, and HEATHER

HENDER, individually and on

behalf of others similarly

situated,

        Plaintiffs,

    vs.                  Case No.:

                         3:18-cv-01477-JR

NIKE, INC., an Oregon

corporation,

        Defendant.

_____

VIDEO-RECORDED ZOOM VIDEOCONFERENCE DEPOSITION OF

DONNA OLSON

Friday, December 11, 2020

Volume I

Reported by:

MICHELLE BULKLEY

CSR #13658

Job #4347602

PAGES 1 - 265

Page 1

Suppl. Sun Decl. Ex. 96, Page 1 of 5

Video-Recorded Zoom Videoconference Deposition of DONNA OLSON, Volume I, taken on behalf of Defendant, beginning at 9:59 a.m. and ending at 6:44 p.m. on Friday, December 11, 2020, before Michelle Bulkley, Certified Shorthand Reporter Number 13658.

Page 2

Suppl. Sun Decl. Ex. 96, Page 2 of 5

APPEARANCES (All via Zoom videoconference):


    For Plaintiff:
        GOLDSTEIN, BORGEN, DARDARIAN & HO
        James Kan, Esq.
        Mengfei Sun, Esq.
        155 Grand Avenue, Suite 900
        Oakland, California 94612
        Telephone:  510-763-9800
        jkan@gbdhlegal.com


    For Defendant:
        PAUL HASTINGS LLP
        Ms. Laura Zabele, Esq.
        Ms. Felicia Davis, Esq.
        515 South Flower Street, 25th Floor
        Los Angeles, California 90071
        laurazabele@paulhastings.com
        feliciadavis@paulhastings.com


    Also Present:
        Ron Lazo, Videographer
        Lauren Thibodeaux, in-house counsel for Nike

                                            Page 3

Suppl. Sun Decl. Ex. 96, Page 3 of 5

Q   Who?                                                    03:11

A   I -- I don't remember.  Again, it was just referring to the two-times pay that happened twice a year.

Q   Okay.  And when you made that                          03:11
recommendation to give someone more, you were told no?

A   I was told that we would deal with it at two-times pay.

Q   Do you remember specifically who told you              03:11
that?

A   The talent acquisition people, that's all they could put in, is 15 percent, period.  And then when I would bring it up saying, you know, this person is, you know, with -- I don't know.  It could   03:12
have been Deb.  It could have -- it happened on more than one occasion.

I mean, if I would -- I would say, "Hey, listen, if we're promoting this person, but we're not able to get them where they need to be," the     03:12
answer was always, "We'll do it in two-times pay."

Q   Okay.  And in the instances that you're thinking of specifically, was it dealt with at two-times pay?

A   As much as we could.  Sometimes even the               03:12

Page 152

Suppl. Sun Decl. Ex. 96, Page 4 of 5

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:   12/28/2020

_Michelle Bulkley_

MICHELLE BULKLEY, CSR No. 13658

The dismantling of transcript will void Reporter's certificate.

Page 265

Veritext Legal Solutions
866 299-5127

Suppl. Sun Decl. Ex. 96, Page 5 of 5

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, SARA JOHNSTON,        )    Case No.
LINDSAY ELIZABETH, and HEATHER      )    3:18-cv-01477-JR
HENDER, individually and on         )
behalf of others similarly          )
situated,                           )
                                    )
          Plaintiff,                )
                                    )
vs.                                 )
                                    )
NIKE, INC., an Oregon               )
Corporation,                        )
                                    )
          Defendants.               )
_____)

VIDEO-RECORDED VIDEOCONFERENCE

DEPOSITION OF SAMANTHA PHILLIPS

Tuesday, December 1, 2020

Volume I

Reported by:
ROCHELLE HOLMES
CSR No. 9482
Job No. 4347573
PAGES 1 - 235

Page 1

Suppl. Sun Decl. Ex. 97, Page 1 of 10

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, SARA JOHNSTON,    )    Case No.
LINDSAY ELIZABETH, and HEATHER   )    3:18-cv-01477-JR
HENDER, individually and on      )
behalf of others similarly       )
situated,                        )
                                 )
            Plaintiff,           )
                                 )
vs.                              )
                                 )
NIKE, INC., an Oregon            )
Corporation,                     )
                                 )
            Defendants.          )
                                 )
_____)

    Deposition of SAMANTHA PHILLIPS, taken on behalf of
Defendants, via videoconference, beginning at 10:04 a.m.
and ending at 7:05 p.m. on Tuesday, December 1, 2020,
before ROCHELLE HOLMES, Certified Shorthand Reporter No.
9482, Certified Realtime Reporter No. 0123.

Page 2

Suppl. Sun Decl. Ex. 97, Page 2 of 10

APPEARANCES:

For Plaintiff:


    GOLDSTEIN BORGEN DARDARIAN & HO

    BY:  MENGFEI SUN, ATTORNEY

         JAMES KAN, ATTORNEY

    155 Grand Avenue, Suite 900

    Oakland, California 94612-3767

    (510) 763-9800

    Msun@gbdhlegal.com

    Jkan@gbdhlegal.com

         --and--

    MARKOWITZ HERBOLD PC

    BY:  ANTHONY BLAKE, ATTORNEY

    1455 Broadway, Suite 1900

    Portland, Oregon  97201

    (503) 295-3085

    AnthonyBlake@markowitzHerbold.com

         --and--

    INDIA BODIEN, ATTORNEY

    2522 North Proctor Street, No. 387

    Tacoma, Washington  98406

    (253) 212-7913

    India@indialinbodienlaw.com

    (All Appearing via videoconference.)

                                   Page 3

Suppl. Sun Decl. Ex. 97, Page 3 of 10

APPEARANCES (CONTINUED):

For Defendants:

    PAUL HASTINGS LLP

    BY:   LINDSEY JACKSON, ATTORNEY

         FELICIA A. DAVIS, ATTORNEY

    515 South Flower Street , 25th Floor

    Los Angeles, California 90071

    (213) 683-6103

    Lindseyjackson@paulhastings.com

    Feliciadavis@paulhastings.com

    (Appearing via videoconference.)

ALSO PRESENT:

    ALYSON SMITH, IN-HOUSE COUNSEL, NIKE INC.

    (Appearing via videoconference.)

VIDEOGRAPHER:   SHAWNA HYNES

            (Appearing via videoconference.)

                               Page 4

Suppl. Sun Decl. Ex. 97, Page 4 of 10

Q    What about LJ Johnson, what was her role?

A    LJ, her role was fairly new.  There -- there's a very large organization, I think it's DTC, and they had their own information security team.  And so she led that team there.                                      02:08PM

Q    Sorry.  What was the acronym that you said she was heading up?

A    D -- well, DTC is the division in Nike.

Q    And what does DTC stand for?

A    I don't know.  Digital technology something.     02:08PM
Basically, her team was ensuring information security was embedded in the development aspects of all the E Commerce development that was going on, all of the applications.

Q    When you attended the panel interview, did you   02:08PM
have an understanding as to what role you would be filling at Nike?

A    Not exactly.

Q    Who from Nike did you hear from next after the panel interview?                                          02:09PM

A    Sheryl Coulter.

Q    And what did Sheryl tell you?

A    I don't remember.

Q    Did she offer you a job?

A    Yeah.  I was offered a job.                       02:09PM

Page 101

Q    Do you know who made the hiring decision?

A    I don't know.

Q    What job did Ms. Coulter offer you?

A    The role of director of risk management.

Q    What division was it in?                    02:10PM

A    Information security.

Q    Do you recall anything else about the
conversation that you had with Ms. Coulter when she
offered you the director of risk -- director, risk
management role?                                   02:10PM

A    That the pay was lower than what I was making
currently.

Q    What was the -- what was the pay, the starting
salary as the director of risk management role that you
were offered?                                      02:10PM

A    So the -- the pay was lower than what I was
making at eBay.

Q    What -- what was the -- what was the offer for
pay that -- that Nike gave you?

A    I believe it was 200,000.                     02:10PM

Q    And what were you making at eBay?

A    205.

Q    Did you attempt to negotiate your salary?

A    I did.

Q    With whom?                                    02:11PM

Page 102

Suppl. Sun Decl. Ex. 97, Page 6 of 10

A    With Sheryl.  With Ryan.

Q    Can you tell me about the conversation that you had with Sheryl about trying to negotiate your pay?

A    Well, she had asked what I was making at eBay before she even presented me with an offer.  And the term that was used is it's the ten percent factor for Portland.                                                          02:11PM

Q    What do you mean by that?

A    It means it's cheaper -- it's believed that the cost of living is cheaper in Portland than it is in the Bay Area.                                                           02:11PM

Q    So when she offered you 200,000 -- the $200,000 salary -- starting salary, how did you respond?

A    I asked for additional information and why it was lower.                                                              02:12PM

Q    Is that when she told you about the -- the ten percent factor?

A    Yeah.

Q    Did you ask for a higher salary after that?

A    Yeah.                                                             02:12PM

Q    With Sheryl?

A    And -- and with Ryan.

Q    So I want to stick with Sheryl first and then we'll go to Ryan.

How much did you ask for in an increase from                         02:12PM

Page 103

Sheryl?

A    It wasn't a specific number.  It's just that look, you're asking me to take a pay cut.  So, you know, her response, you know, she had already shared with me the bands.  She said that I was capped out in the E   02:13PM
bands and they'd have a really hard time justifying me on getting me into the F band.

Q    What do you mean when she said she -- what do you mean when she said you were capped out in the E band?                                              02:13PM

A    I believe that there's salary ranges within the bands.

Q    And you had this conversation -- did you have this conversation before or after she had given you -- you had -- let me rephrase.                         02:13PM

Did you have this conversation after she gave you the offer?

A    Yes.

Q    And did you -- did she offer you a signing bonus?                                                    02:13PM

A    I don't remember.

Q    Do you remember negotiating a signing bonus?

A    I don't remember.

Q    Did you speak to Ryan about your salary after you spoke with Sheryl?                                   02:14PM

Page 104

Suppl. Sun Decl. Ex. 97, Page 8 of 10

A    I believe so.

Q    And what was your conversation with Ryan?

A    You know, "Can we increase this, you know, match it to where I was with eBay?"

He said, "Well, Portland's a ten percent    02:14PM
factor and everybody gets discounted ten percent."

Q    Do you recall discussing a signing bonus with Ryan?

A    I don't remember.

Q    Was it your understanding that the 200K offer    02:14PM
was at the top of the range for the job that you were offered, the director of information risk management?

A    That is my understanding.

Q    I want to try and get a sense of the organization that you were working in and make sure I'm    02:15PM
using the proper terminology.

So you said that your division was information security; is that correct?

A    So division or department?  What -- what do you mean?    02:16PM

Q    I guess I'll ask you both.  What -- what division did you work in?

A    So I worked in information security under GRC as the director of risk management.

Q    So I guess I'm just trying to understand like    02:16PM

Page 105

Suppl. Sun Decl. Ex. 97, Page 9 of 10

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

I, Rochelle Holmes, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me via videoconference; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated:  December 18, 2020

_Rochelle Holmes_

Rochelle Holmes

CSR No. 9482, CCRR No. 0123

Page 235

Suppl. Sun Decl. Ex. 97, Page 10 of 10

Ali Saad , Ph.D. - October 27, 2021

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, et al.,                )
individually and on behalf of    )
others similarly situated,       )
                                 )
                 Plaintiffs,     )
                                 )
       vs.                       ) No. 3:18-cv-01477-JR
                                 )
NIKE, INC., an Oregon            )
corporation,                     )
                                 )
                Defendant.       )


VIDEOCONFERENCE DEPOSITION

OF

ALI SAAD, Ph.D

DATE TAKEN:  October 27, 2021
TIME:        9:00 a.m.
PLACE:       Virtual



   COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR


                                              Page 1

Suppl. Sun Decl. Ex. 98, Page 1 of 7

Ali Saad , Ph.D. - October 27, 2021

APPEARANCES


FOR THE PLAINTIFFS:    MR. JAMES KAN

MR. BYRON GOLDSTEIN

MR. BARRY GOLDSTEIN

Goldstein Borgen Dardarian & Ho

155 Grand Ave., Ste. 900

Oakland, CA  94612

Jkan@gbdhlegal.com


FOR THE DEFENDANT:    MS. FELICIA A. DAVIS

MS. LAURA ZABELE

MR. DANIEL PRINCE

Paul Hasting, LLP

515 S. Flower St., 25th Floor

Los Angeles, CA  90071

Feliciadavis@paulhastings.com



ALSO PRESENT:  Mr. David Neumark and Ms. Elaine Reardon

Page  2

Suppl. Sun Decl. Ex. 98, Page 2 of 7

Ali Saad , Ph.D. - October 27, 2021

dimension?

A. Which dimension?

Q. On the pay ranges that might have applied to job codes within the same interaction.

A. No. As I said, I wasn't looking at the pay ranges. I'm not sure I have the data on pay ranges.

Q. What is your understanding of how skill, effort, responsibility and working conditions factor into a decision about whether jobs are performing substantially similar work?

MS. DAVIS: Objection. This is a pure legal question or a question for an I-O psychologist, not for a labor economist.

If you want to answer, you can, but this is, again, just a waste of time. Go ahead.

THE WITNESS: My answer was going to be exactly that. You're asking me a legal question. But delving into those specific components is typically what an I-O psychologist would do. The labor economist would look at the outcome of that and that's measured in pay, typically.

But that's really a legal question or -- and/or a question for somebody studying work content or performing job analysis, which would tend to be an I-O psychologist, not a labor economist.

Page 96

Suppl. Sun Decl. Ex. 98, Page 3 of 7

Ali Saad , Ph.D. - October 27, 2021

mischaracterizes his testimony.  I'll also just object that it's really irrelevant to his testimony.

But go ahead.

THE WITNESS:  I didn't say that I hadn't reviewed.  I've reviewed a wide variety of things, whether or not they were applicable to the assignment I was asked to do is a different matter.  Much of what I reviewed was not specifically applicable.

I reviewed information that allowed me to conclude that manager + 1 was a reasonable approach to segmenting employees for purposes of analyzing certain pay practices, and I enumerated what those are.  So I'm looking, for example, at incumbent pay based on the manager + 1 cuts of the data.

BY MR. KAN:

Q.  Do you contend that the manager + 1 level of decision-maker applies to starting pay -- deciding starting pay for new hires in bands L through S at Nike headquarters?

A.  Obviously not.

MS. DAVIS:  Objection.  I'll object that it's outside -- this is a factual question to Nike, not a contention to an expert who is analyzing pay.  It calls for speculation.

If you can answer, go ahead.

Page 191

Suppl. Sun Decl. Ex. 98, Page 4 of 7

THE WITNESS:  I'm not contending that.  That's the point.  That's what I'm saying obviously not to, I am not contending.  The managers + 1 are involved in starting pay, whether they are or not is not something I understand or know, but I'm not contending that.

BY MR. KAN:

Q.  How about initial job assignments?

MS. DAVIS:  Objection, same objection.  This is not about an expert's contention.  Those are factual questions for Nike.  You should ask him about the analyses he prepared.  It calls for speculation.

BY MR. KAN:

Q.  It's not speculation because, Dr. Saad, you make representations about what you believe.  You assert what is factually happening and who are the decision-makers at Nike for certain decisions.

What I'm trying to understand is the basis for those opinions, and if there was any evidence that you didn't consider or didn't credit, I want to understand that, too.

A.  Just to be clear, I did not make assertions, to use your phrase, regarding practices that I did not discuss at all in my report.  I don't discuss anything in my report regarding mangers + 1's in relation to starting pay, managers + 1's with respect to any other practice,

Page 192

Suppl. Sun Decl. Ex. 98, Page 5 of 7

other than the ones that I actually analyzed with respect to the incorporation of managers + 1's.  So I'm not sure that I understand what your last question was getting at.

BY MR. KAN:

Q.  I think that's helpful.

It is accurate to say, then, that you're manager + 1 regression analysis only applies to certain pay practices at Nike, correct?

A.  It applies to the practices that I say it applies to and, in particular, looking at incumbent pay and elements of incumbent pay.

Q.  Are you aware of whether or not it is possible for a manager above the manager + 1 to make changes or cause changes to be made?

MS. DAVIS:  Objection, calls for speculation.

THE WITNESS:  I don't know if that's the case or not.  It's not my understanding and I didn't see any materials that would lead me to believe that that was a systematic practice.

BY MR. KAN:

Q.  Are you familiar with the executive review process for annual pay decisions at Nike?

A.  Not specifically.  I think I have an understanding that there is such a thing.

Q.  Are you aware that business-facing HR employees

Page 193

Suppl. Sun Decl. Ex. 98, Page 6 of 7

CERTIFICATE

STATE OF OREGON        )

                       ) ss

COUNTY OF MULTNOMAH )

        I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby certify that said witness appeared before me via Zoom at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the forgoing matter; that thereafter my notes were transcribed through computer-aided transcription, under my direction; and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and the whole thereof.

        I further certify review of the transcript was not requested.

        Witness my hand at Portland, Oregon, this 29th of October 2021.

                        Teresa L. Rider

                        Oregon CSR No. 12-0421

                        Expires 5-31-23

Page 288

Suppl. Sun Decl. Ex. 98, Page 7 of 7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,    No.

      Plaintiffs,           3:18-cv-01477-JR

    v.

NIKE INC., an Oregon

Corporation,

      Defendant.


REMOTE 30(b)(6) VIDEOCONFERENCE DEPOSITION OF

SHINE THOMAS

Taken in behalf of Plaintiffs

March 26, 2021

Page 2

BE IT REMEMBERED THAT, the remote 30(b)(6) videoconference deposition of SHINE THOMAS was reported by Aleshia K. Macom, Oregon CSR No. 94-0296, Washington CCR No. 2095, California CSR No. 7955, RMR, CRR, RPR, on Friday, March 26, 2021, commencing at the hour of 9:32 a.m., the witness appearing at Portland, Oregon.

APPEARANCES (Via Zoom videoconference)

GOLDSTEIN, BORGEN, DARDARIAN & HO
   By Byron Goldstein
       Barry Goldstein
       James Kan
       Mengfei Sun
   155 Grand Avenue, Suite 900
   Oakland, California 94612
   510-763-9800
   brgoldstein@gbdhlegal.com
   bgoldstein@gbdhlegal.com
   jkan@gbdhlegal.com
   msun@gbdhlegal.com
   Appearing for Plaintiffs

Suppl. Sun Decl. Ex. 99, Page 2 of 23

Page 3

PAUL HASTINGS

By Felicia Davis

515 South Flower Street, 25th Floor

Los Angeles, California 90071

213-683-6169

feliciadavis@paulhastings.com

Appearing for Defendant


Also Present:  Alyson Smith - Nike

                        *    *    *

Suppl. Sun Decl. Ex. 99, Page 3 of 23

Page 14

Q.  Do you remember if those were current practices or prior practices?

A.  Can you clarify what you mean by "current"?

Q.  Are they in effect now?

A.  I think our guidelines are always evolving and I don't know what date those documents were pulled from.

Q.  Okay.  Did you get those documents yourself?

A.  I did not.

Q.  Where did you get the documents from?

A.  My outside counsel.

Q.  Did you gather any documents yourself in preparation for this deposition?

A.  I did not.

Q.  Did you talk to anyone else at, either a current or former employee at Nike in preparation for this deposition?

A.  I did not.

Q.  Shine, one other thing I wanted to mention.  I'm sure Felicia mentioned it to you, too, but I just wanted to confirm if you're hearing this for the first time, if you ever want to take a break, don't hesitate, for any reason.  But just if there's a question pending, I would like if we could finish the answer before we go on

Page 18

Q.   Either or both.  Sorry.  Do you remember the names of who sent both of the e-mails?

A.   I recall one specific name on one e-mail.

Q.   Okay.  What was that name?

A.   Dan Laboe.

Q.   And was that before or after 2019 that the e-mail had Dan Laboe on it?

A.   I don't recall looking at the date.

Q.   Okay.  Thank you.  In your preparation for this deposition, did you learn any facts that you, about Nike, that you did not know before your preparation for this deposition?

A.   Can you clarify what you mean by "facts"?

Q.   Yeah.  Trying to figure out the, the preparation for the deposition today.  You know, you, so I believe you met with Ms. Davis a few times and you looked at some documents.  Was there anything in those meetings or those documents that you did not know before those meetings or reviewing those documents?

A.   I don't, I don't think so.

Q.   And other than those documents that you reviewed with Ms. Davis within the last week and the meetings you had with Ms. Davis within the last few weeks, there was nothing else that you did

Suppl. Sun Decl. Ex. 99, Page 5 of 23

Page 19

to prepare for this deposition; is that correct?

A.   That's correct.

Q.   So I'm going to -- Do you have the chat function open, Shine?

A.   I do.

Q.   Okay.  So the way that I do -- The way that we do, in here that we do the exhibits is I'll load it into the chat function.  And so the first exhibit -- Actually before I do this, this is an exhibit we've already entered.  I'm going to upload the exhibit.  This is Exhibit 636.  It's been previously entered.  And the Bates number is NIKE_00003255, noncompetitive change, process summary document for managers.

          Let me know, Shine, when you have it open.

          Shine, do you have that document open?

A.   I do.

Q.   Do you see where it says, "Other types of changes"?

A.   Yes.

Q.   Do you see that it states, "The following changes would not be considered a noncompetitive job change:  A job change resulting from the employee applying for and being selected for a posted position.  Competitive job changes are

Page 49

question that's there, after it says "No," it says, "All decisions related to" -- "relating to hiring should be approved by talent acquisition."  Is this an accurate statement by Nike's code of conduct Inside the Lines?")

THE WITNESS:  I think it depends because -- It really depends.  Every, every situation is different, and it depends on the role and the position.

Q.  BY MR. BYRON GOLDSTEIN:  So the statement in Inside the Lines, it says "All decisions relating to hiring."  That is not accurate; is that what you're saying?

A.  I think it depends on the type of position, the type of division.  There are multiple people involved in hiring positions.

Q.  So you would disagree with the statement that all decisions relating to hiring should be approved by talent acquisition?

A.  I would, I would tell you that all decisions around hiring are approved by multiple people.  And I don't know if there is other information in this document that refers to that.

Q.  Fair enough, Shine.  So would it be accurate to

Page 50

say that all decisions related to hiring should be approved by talent acquisition but not necessarily only talent acquisition?  Would that be an accurate statement?

          MS. DAVIS:  Objection; vague.

          THE WITNESS:  I would say that is a fair assessment.

Q.   BY MR. BYRON GOLDSTEIN:  Okay.  Thank you.  I just uploaded an Exhibit 503.  Can you open it and tell me whether you've ever seen it before?

A.   I've not seen this before.

Q.   Okay.  Were you provided any instructions or asked any questions confirming that any of the bullet points in here would take place today during the deposition?

A.   Oh, you want me to read the whole document?

Q.   You know what, Shine, no.  Let me ask --

A.   Yeah.

Q.   Where are you taking -- Where are you currently?  Are you at home or at Nike's office?

A.   I am working remotely from my home.

Q.   Okay.  Yeah.  And I don't need to know exactly where that is.  Do you see the second two bullet points on the second page?

A.   Yes.

Page 83

you been involved in decisions concerning whether to do, fill a job competitively or noncompetitively in meeting the fill strategy?

A.  The fill strategy decision is made by the hiring manager.  Every single situation is unique and niche.  So there may have been situations where the hiring manager may wish to understand various topics such as the candidate pool.  However, every single situation, every single position at Nike is unique when that vacancy opens up.

Q.  Have you, Shine Thomas, been involved in any determinations regarding fill strategy, whether a position will be filled competitively or noncompetitively?

A.  Talent acquisition is involved when we're informed that a position is to be filled competitively.  That is when talent acquisition enters the process.

Q.  So is it accurate to state that you, Shine Thomas, has not been involved in any determinations regarding fill strategy and whether or not to fill it competitively or noncompetitively?

A.  I would say that I'm not involved in the

Page 84

decision making around whether or not a role should be filled internally or competitively or externally. I may, as a recruiter, provide consultative advice, but I am not involved in the decision making around that situation.

Q. And when you provided consultative advice, what was that advice?

A. Every single situation is different. There is no -- I cannot say the advice was exact. It would depend on the open role and vacancy that existed.

Q. Can you recall any advice that you have ever given while at Nike concerning whether or not a job should be filled competitively or noncompetitively?

A. Yes.

Q. Okay. And what did you say in those situations when you -- that you can recall?

A. The advice that I would give them, I will give you an example, would be in the hiring of a position, for example, a data science position where we don't have an internal talent pool in this group.

So my advice would be we should post the role internally and externally, but we

Page 104

Nike metadata they produced is PSD training job architecture V4, date created January 8, 2013, last modified August 10th, 2016.

A.   This is a large document, so it will take some time to download and open.

Q.   Thank you for the heads-up.  Is it still --

A.   It's halfway there.  This document is over, about twice as large as the last large document. So it does take some time.

Q.   Maybe while that's uploading, I'll just continue on Exhibit 663.  Is that okay?

A.   That's okay.

Q.   Okay.  So under page 1, under the business facing HR, the second bullet point says, "If approving the request, facilitate creation of a position number with position management.  Do you see that?

A.   Yes.

Q.   So the business facing HR has to approve the request for a new position?

A.   I think that refers to more a process in creating a requisition.  So they're involved in a process for creating the requisition.

Q.   So for whatever they're approving there, what, what is, what are the policies, guidelines or

Page 105

other documents that apply to making that approval?

A.   There are not documents for this.  It's our way of working.  So, for example, again it varies from position to position.  If, for example, if a business is opening, has an investment to open X number of roles, that will be approved through a specific different type of process and the HR manager will create the roles.  There are other times when the HR manager may facilitate understanding the financial implications or other, other positions being open, et cetera. There are so many complexities around the decision making.

So the HR manager is, I believe that that refers to that step of the process.  But there are multiple people involved in this way of working up until this stage, if not --

Q.   Yeah.  In this first phase of the hiring process we've seen that it says, "Receive approvals from leadership and finance to open position."  And here it says, "for business facing HR if approving the request."  So those are two of the approvals required in this part of the hiring process?

Thomas, Shine - 30(b)(6)                                    March 26, 2021

Page 106

A.   Yeah.  And I believe what this means by "approval" is the decision's been made to open a position and then the HR manager may have to click something in some tool to say create the requisition because the role has been approved.  It's not a straightforward process.  Nothing is linear.  You know, it really depends on the situation.  But the HR manager or the HR coordinator, I think that refers to that as well, someone may click on a button to say open requisition.

Q.   Have you, Shine Thomas, ever been involved in phase one of the hiring process and specifically with regards to the bullet points about receiving approvals from leadership in finance or HR business facing approving the request?

A.   I have not been involved in the decision making in phase one.  I have been involved in being informed that the process is happening, but I'm not involved in the decision making of approving positions.

Q.   The next bullet -- I'm sorry.  Go ahead, Shine.

A.   I have the document open if you just...

Q.   Let me just finish the next bullet point and then we'll go to the document.  The next bullet

Suppl. Sun Decl. Ex. 99, Page 13 of 23

Page 107

point says, "Recommend position leveling if needed."  Do you see that?

A.  Yes.

Q.  What does that refer to?

A.  I believe that refers to what is the right position for that hiring manager's team at that point.  Again, it's a consultative process.  The hiring manager at times may have a specific knowledge of what level that they would like to create an open position.  There are times when the creation of a position, for example, if someone exits the team, may create in some changes around what capabilities are needed.  And so the hiring manager will partner with the HR manager around what is the best approach.  Then the hiring manager will make the decision because it is their team and their business around what the open position should be.

Q.  How does the business facing HR know if position leveling is needed?

A.  Every single scenario is different.  So every single HR manager operates differently with their business.  They, because of the process of approvals, the HR manager is involved in, in that as a central point for coordination,

Suppl. Sun Decl. Ex. 99, Page 14 of 23

Page 204

Q.   And does compensation maintain the offer intake form?

          MS. DAVIS:  Objection; calls for speculation.

          THE WITNESS:  I don't -- First of all, the offer intake form is not used with every single offer.  It's another tool that a recruiter can use.  It's not a standard part of the process by any means.  If the recruiter uses it, they will, if they e-mail it to the compensation partner, I don't know if they keep records of it or not.

Q.   BY MR. BYRON GOLDSTEIN:  What policies or guidelines discuss the offer intake form?

A.   I think -- I don't know of the documents you've already shown me, but again it's a guideline.  It's a tool.  It's not a rule that recruiters have to use this.  It depends on the offer.

Q.   Is the Talent Acquisition Playbook the main source of policies and guidelines for members of the talent acquisition team?

A.   I would say yes.  It's mainly guidelines around the recruiting.

Q.   Would there be guidelines or policies in there about the offer intake form?

A.   There probably would be.  I haven't been into

Page 205

that document in a while.  So I don't know.  But I would not be surprised if there was the guideline around the offer intake form.

Q.  This might be helpful to do this now.  The next paragraph, the first sentence says, "Please review the resources on the TA Playbook."

A.  Yeah.

Q.  So does that confirm for you that there were policies or guidelines concerning the offer intake form on the TA playbook?

A.  Yeah.  I would say all these tools that are available are typically housed in the TA playbook and there are always guidelines and tools.

Q.  And the TA playbook, is that a folder on the box site?

A.  I think it's on the share point site actually.

Q.  And had that been where the TA playbook has been maintained since 2015?

A.  I believe so.

Q.  I apologize if I asked you this earlier, but who is responsible for maintaining the TA playbook?

A.  I believe it's the operations function within talent acquisition that is the team that is responsible.  I don't know a sole person.

Suppl. Sun Decl. Ex. 99, Page 16 of 23

Page 206

Q.  When they update the TA playbook, do they maintain prior versions of what was in the TA playbook or do they delete it?

A.  I do not know.

        MS. DAVIS:  Objection.

Q.  BY MR. BYRON GOLDSTEIN:  Do you know what the retention policy or schedule is with respect to documents maintained by human resources?

        MS. DAVIS:  Objection; outside the scope.

        THE WITNESS:  I do not know.

Q.  BY MR. BYRON GOLDSTEIN:  Sorry, Shine.  I didn't know if you answered.  I wasn't --

A.  That's okay.

Q.  So in the paragraph that talks about the Total Rewards partners having created an update offer intake form, do you see the last sentence of that paragraph that says, "Please use this form as you work with Total Rewards to construct offers for your roles."  Do you see that?

A.  Yes.

Q.  So talent acquisitions was told to use the offer intake form when they are constructing offers for starting pay at Nike World Headquarters; is that correct?

A.  I would say that e-mail says please use this

previously been introduced as Exhibit 513.  And that is NIKE_00002070.

A.  I have the document.

Q.  Thank you, Shine.  And the file name in the metadata Nike produced is TA comp history policy change, two-pager, August 24, 2017, and there's also a title of the document listed that says TA policy change one-pager final.  Even though the title of this document, according to Nike's metadata produced is TA policy change, one-pager final, is this the document referenced in 673 TA comp history practice one-pager?

A.  I assume so.  It has the same title.

Q.  At the bottom of the first page it says, "This policy only applies to external applicants, which includes all ETW's."  Do you see that?

A.  I see that.

Q.  This document is thus announcing a change in Nike policy; correct?

A.  Yes.  So some elements of this is a change in policy and some elements of this is a change in guideline.

Q.  Is one of the change in policies, do you see where it says "Nike employees may no longer"?

A.  I do.

Beovich Walter & Friend
1-800-541-4452       503-228-7201       www.bwfreporters.com

Suppl. Sun Decl. Ex. 99, Page 18 of 23

Page 215

Q. Under that it says, "ask candidates or their employers questions about their compensation history." Is that one of the policy changes?

A. That would be a policy change.

Q. And it says, "ask their employers." How did Nike previously ask their employers about their compensation history?

A. I have never asked an employer about someone's previous compensation history. So I'm not actually sure why it says that. It's not a standard part of our recruiting process. We would ask, a follow-on change, we would ask a compensation history of a candidate. I can't think of a single scenario where the question went to their previous employer because of confidentiality. And currently we ask the candidate expectations, but we also do not contact the candidate's previous employer around compensation.

Q. You were saying that you, in your role as a recruiter, did not yourself ask employers those questions. Is that what you're saying or are you speaking for all of Nike?

A. I would say our guideline is to only ask the candidate about their compensation and that is a

Page 216

Nike guideline.

Q. And it also says under "Nike employees may no longer," it says, "Record salary history information in the ATS/CRM." So this was telling -- Well, strike that. Is that a policy change, too?

A. That would, recording salary history, that would be a salary change because the law changed.

Q. And ATS refers to Taleo?

A. Correct.

Q. CRM refers to, does that refer to Avature?

A. Correct.

Q. Did Nike maintain the salary history information in the ATS, I mean, has Nike maintained that data to the present?

A. Can you clarify what you mean by that question?

Q. Does Taleo currently have information concerning salary history of candidates, external candidates for positions at Nike World Headquarters bands L through S?

A. It should not. Taleo is not used for that and we don't, since the law changed, we don't record compensation. So I don't -- I would be -- Taleo is not used to house that information. Whether it has or not, I don't know.

Page 271

C E R T I F I C A T E

I, Aleshia K. Macom, Oregon CSR No. 94-0296, Washington CCR No. 2095, California CSR No. 7955, RMR, CRR, RPR, do hereby certify that SHINE THOMAS remotely appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and that the foregoing transcript, pages 1 to 270, both inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other proceedings had during the taking of said deposition, and of the whole thereof, to the best of my ability.

Witness my hand at Portland, Oregon, this 8th day of April, 2021.

_____
Aleshia K. Macom
OR CSR No. 94-0296, Expires 9-30-2023
WA CCR No. 2095, Expires 7-7-2021
CA CSR No. 7955, Expires 7-7-2021

DocuSign Envelope ID: E5C3E18B-79D1-4FE2-92A7-C7ABDF9B226F

*Cahill, et al v. Nike*

**Shine Thomas Deposition Errata**

| Page: Line | Reads | Should Read | Reason |
|---|---|---|---|
| 25:6-8 | "a requisition was created and open to hire against, a recruiter would be managing that requisition." | "a requisition was created and open to hire against, a recruiter would be managing the administrative process of that requisition." | To clarify the record as reflected in other testimony |
| 29:4 | "involves the hiring and talent acquisition." | "involves the hiring manager and talent acquisition." | To correct a transcription error |
| 50:6-7 | "I would say that is a fair assessment." | "I would say that is a fair assessment but Talent Acquisition does not approve whether a candidate is hired or not." | To clarify the record as reflected in other testimony |
| 67:11 | "might take someone in a specific position." | "might place someone in a specific position." | To correct a transcription error |
| 85:6 | "opinion, externally or internally." | "opinion, externally and internally." | To correct a transcription error |
| 85:15 | "to post it internally or externally." | "to post it internally and externally." | To correct a transcription error |
| 121:6-7 | "I cannot, but I will reiterate this is not a rule that recruiters have to follow." | "I cannot, other than the New Hire Approval Matrix (Exhibit 672), but I will reiterate this is not a rule that recruiters have to follow." | To conform to the facts |
| 123:6 | "I cannot point to documents." | "I cannot point to documents other than the New Hire Approval Matrix (Exhibit 672)." | To conform to the facts |
| 132:15 | "Correct." | "I assume so, but as I said many times, non-competitive promotions are not my area of expertise." | To clarify the record as reflected in other testimony |
| 171:5-6 | "one of multiple data points that we would look at." | "one of multiple data points that we could look at." | To correct a transcription error |
| 180:11-19 | [This question is recorded in the form of an answer.] | | To correct a transcription error |
| 182:21-23 | "I don't know outside of not competitive hiring who uses this tool and for what." | "I don't know outside of competitive hiring who uses this tool and for what." | To correct a transcription error |
| 185:11 | "It's not a lineal process" | "It's not a linear process" | To correct a transcription error |
| 187:17 | "I did not." | "I did not look at specific offers.  I know how offers are made." | To conform to the facts |

1

Suppl. Sun Decl. Ex. 99, Page 22 of 23

DocuSign Envelope ID: E5C3E18B-79D1-4FE2-92A7-C7ABDF9B226F

| 195:12-13 | "There are no written documents that I can think of." | "There are no written documents that I can think of other than the New Hire Approval Matrix." | To conform to the facts |
|---|---|---|---|
| 197:16 | "It's one of the data points that we look at." | "Equity walkaway is one of the data points that we look at." | To clarify the record as reflected in other testimony |
| 215:11-13 | "We would ask, a follow-on change, we would ask a compensation history of a candidate." | "We would ask, before the change, we would ask the compensation history of a candidate." | To correct a transcription error |
| <u>216:7-8</u> | "<u>That would, recording salary history, that would be a salary change because the law changed.</u>" | "<u>That would, recording salary history, that would be a policy change because the law changed.</u>" | <u>To correct a transcription error</u> |
| 251:6 | "screen to see we can hire the candidate." | "screen to see if we can hire the candidate." | To correct a transcription error |

I attest that the above-referenced changes are true and correct.


Date: May 21, 2021

DocuSigned by:

_Shine Thomas_____
5E235634EA0241F...Shine Thomas

2

Suppl. Sun Decl. Ex. 99, Page 23 of 23

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, SARA                )
JOHNSTON, LINDSAY                 )
ELIZABETH, and HEATHER            )
HENDER, individually and          )
on behalf of others               )
similarly situated,               )
                                  )
            Plaintiffs,           )
                                  )
    vs.                           )   Case No. 3:18-cv-01477-JR
                                  )
NIKE, INC., an Oregon             )
Corporation,                      )
                                  )
            Defendant.            )
_____)

REMOTE VIDEOTAPED DEPOSITION OF EMILY TUCKER
Portland, Oregon
Friday, January 22, 2021


REPORTED BY:  Dayna Michelle Glaysher
              CSR No. 13079;
              RPR, CRR No. 28081

Page 1

Suppl. Sun Decl. Ex. 100, Page 1 of 6

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, SARA                )
JOHNSTON, LINDSAY                 )
ELIZABETH, and HEATHER            )
HENDER, individually and          )
on behalf of others               )
similarly situated,               )
                                  )
          Plaintiffs,             )
                                  )
     vs.                          )  Case No. 3:18-cv-01477-JR
                                  )
NIKE, INC., an Oregon             )
Corporation,                      )
                                  )
          Defendant.              )
_____)

     Remote Videotaped Deposition of EMILY TUCKER, taken before Dayna Michelle Glaysher, a Certified Shorthand Reporter for the State of California, with principal office in the County of Los Angeles, commencing at 8:57 AM, Friday, January 22, 2021. Witness location:  Portland, Oregon.

                                              Page  2

Suppl. Sun Decl. Ex. 100, Page 2 of 6

APPEARANCES (REMOTE):

For Plaintiffs:

GOLDSTEIN BORGEN DARDARIAN & HO
BY:  MENGFEI SUN, Esq.
155 Grand Avenue, Suite 900
Oakland, California 94510
TEL:  510.763.9800
EMAIL: Msun@gbdhlegal.com

For Defendant:

PAUL HASTINGS LLP
BY:  FELICIA A. DAVIS, Esq.
BY:  NICOLE LUEDDEKE, Esq.
515 South Flower Street, 25th Floor
Los Angeles, California  90071
TEL:  213.683.6000
EMAIL: Feliciadavis@paulhastings.com

Also Present:

Lauren Thibodeaux,
Nike Client Representative
Ron Lazo,
Videographer

Page 3

Suppl. Sun Decl. Ex. 100, Page 3 of 6

reports.  And each of those managers had between eight and ten -- eight and ten or eight to twelve, depending, account service reps reporting to them.

Q.  Okay.  Got it.  So maybe around 40 people in your group, give or take?   11:52:53

A.  40 to 50, in that zone.

Q.  Okay.  Okay.  Great.  And while you were footwear/equipment, inventory planning director, were you responsible for evaluating performance of people on your team?   11:53:09

A.  Yes.

Q.  Were you responsible for completing CFE evaluations and giving CFE ratings for the people on your team?

A.  Yes.   11:53:21

Q.  Were you responsible for any compensation decisions for the people on your team?

A.  Just recommendations.

Q.  Okay.  Do you remember any compensation recommendations that you made that were not followed?   11:53:31

A.  Yes.

Q.  Tell me about those.

A.  Specifically Adam Piestrip.  When I hired him into this role, his management role, I made a recommendation that put him where I thought at the time   11:53:56

Page 97

Suppl. Sun Decl. Ex. 100, Page 4 of 6

that he fell within that -- you know, the salary -- what do you call it -- guidelines or parameters.  And in particular he had someone on his team who made more than he did.

So my recommendation was to put him on that -- my   11:54:22 recommendation was to ensure that he was being paid according to where I felt his experience lie on that spectrum for the role.  And that included having him making more than one of the people on his team.  And my recommendation was not accepted.   11:54:51

Q.   Okay.  Any other times you can remember making a compensation recommendation that was not followed while you were footwear/equipment inventory planning director?

A.   Hold on.  Got to think about that a second.  Not that I can specifically recall.   11:55:19

Q.   Okay.  And you said that you wanted to ensure he was being paid according to where you felt his experience lied on the spectrum of -- for the role.

What about his experience were you considering?

A.   His operations demand planning and deep system   11:55:37 knowledge.

Q.   Why was that important?

A.   So at the time Nike was making a huge investment into their supply chain software.  And it was a project called planning transformation.  And the long and the   11:56:02

Page 98

Suppl. Sun Decl. Ex. 100, Page 5 of 6

CERTIFICATE

OF

CERTIFIED SHORTHAND REPORTER

The undersigned certified shorthand reporter of the State of California does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me.

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and thereafter transcribed, said transcript being a true copy of my shorthand notes thereof.

In witness whereof, I have subscribed my name this date: February 4, 2021

CSR Number 13079

RPR, CRR Number 28081

Page 186

Suppl. Sun Decl. Ex. 100, Page 6 of 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, et al.,
individually and on behalf
of others similarly situated,    No.

      Plaintiffs,          3:18-cv-01477-JR

    v.

NIKE INC., an Oregon
Corporation,

      Defendant.

REMOTE 30(b)(6) VIDEOCONFERENCE DEPOSITION OF

ELIZABETH VALES

Taken in behalf of Plaintiffs

May 27, 2021

Suppl. Sun Decl. Ex. 101, Page 1 of 6

Vales, Elizabeth - 30(b)(6)                                      May 27, 2021

Page 2

BE IT REMEMBERED THAT, the remote 30(b)(6) videoconference deposition of ELIZABETH VALES was reported by Aleshia K. Macom, Oregon CSR No. 94-0296, Washington CCR No. 2095, California CSR No. 7955, RMR, CRR, RPR, on Thursday, May 27, 2021, commencing at the hour of 11:10 a.m., the witness appearing at Lake Oswego, Oregon.

APPEARANCES (Via Zoom videoconference)

GOLDSTEIN, BORGEN, DARDARIAN & HO
   By Byron Goldstein
       Barry Goldstein
       James Kan
       Mengfei Sun
   155 Grand Avenue, Suite 900
   Oakland, California 94612
   510-763-9800
   brgoldstein@gbdhlegal.com
   bgoldstein@gbdhlegal.com
   jkan@gbdhlegal.com
   msun@gbdhlegal.com
   Appearing for Plaintiffs

Suppl. Sun Decl. Ex. 101, Page 2 of 6

Page 3

PAUL HASTINGS

    By Felicia Davis

        Laura E. Zabele

    515 South Flower Street, 25th Floor

    Los Angeles, California 90071

    213-683-6169

    feliciadavis@paulhastings.com

    laurazabele@paulhastings.com

    Appearing for Defendant


Also Present:  Aly Smith - Nike

                          *    *    *

Vales, Elizabeth - 30(b)(6)                                    May 27, 2021

Page 100

send us that org view?  You said the org view and then -- Do you want to put the date on the record or just send us an e-mail?

MS. DAVIS:  I can send you an e-mail.

MR. BYRON GOLDSTEIN:  All right.  Thanks.

MS. DAVIS:  Uh-huh.

Q.  BY MR. BYRON GOLDSTEIN:  Liz, so do you see the second bullet point in the e-mail that Nike's counsel sent to plaintiffs' counsel, the second bullet point states, "High-level changes that were made as a result of the two major reorganizations that occurred during the relevant time period (2015 to the present.)" Liz, what were the major two reorganizations that occurred?

A.  The two major reorganizations that I'm aware of in this time period were one that happened in 2017, commonly known as CDO, and one that happened in 2017 -- 2020, referred to as CDA.

Q.  I didn't catch the something A.

A.  CDA.

Q.  Can you tell us what CDO and CDA, what those are acronyms for?

A.  Yes.  CDO is consumer direct offense.  CDA, consumer direct acceleration.

Suppl. Sun Decl. Ex. 101, Page 4 of 6

Page 102

as, due to that work happened in August of 2017.

Q. And then the same question with regards to the 2020 reorganization. When did the work start?

A. So 2020 reorganization was an operating model realignment connected to our strategy and that work started at the end of 2018. And the work around the structure reorganization started in June of 2020.

Q. Sorry. Did you say June 2020?

A. June of 2020.

Q. I'm going to introduce a Nike news story about the 2017 reorganization. This will be Exhibit 705 (sic). And this is from the, at Nike news website and it's got a date of June 15, 2017, and the title of it is "Nike, Inc., announces new consumer direct offense, a faster pipeline to serve consumers personally at scale."

Can you read this Nike news article and let me know if it's an accurate, maybe, you know, an accurate description of the 2017 reorganization, you know, at least to some degree. It probably doesn't contain everything that occurred, but the high-level parts of it?

A. I'm sorry. Did you say Exhibit 705?

Page 187

C E R T I F I C A T E

I, Aleshia K. Macom, Oregon CSR No. 94-0296, Washington CCR No. 2095, California CSR No. 7955, RMR, CRR, RPR, do hereby certify that ELIZABETH VALES remotely appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and that the foregoing transcript, pages 1 to 186, both inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other proceedings had during the taking of said deposition, and of the whole thereof, to the best of my ability.

Witness my hand at Portland, Oregon, this 10th day of June, 2021.

_____

Aleshia K. Macom
OR CSR No. 94-0296, Expires 9-30-2023
WA CCR No. 2095, Expires 7-7-2021
CA CSR No. 7955, Expires 7-7-2021

Suppl. Sun Decl. Ex. 101, Page 6 of 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

KELLY CAHILL, et al.,     )
individually and on behalf of  )
of others similarly situated,  )
              )
      Plaintiffs,  )
              )
   vs.         )  No. 3:18cv-01477-JR
              )
NIKE, INC., an Oregon     )
corporation,         )
              )
      Defendant.   )

VIDEOCONFERENCE DEPOSITION

OF

SHANE WALKER

VOLUME II

DATE TAKEN:  December 18, 2020

TIME:        9:30 a.m.

PLACE:       Virtual

COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR

Suppl. Sun Decl. Ex. 102, Page 1 of 7

Walker, Shane - Vol. 2                        December 18, 2020

Page 150

APPEARANCES

FOR THE PLAINTIFFS:    MR. BARRY GOLDSTEIN

MR. BYRON GOLDSTEIN

MR. JAMES KAN

MR. MENGFEI SUN

Goldstein, Borgen, Dardarian,

Ho

300 Lakeside Drive, Ste. 1000

Oakland, CA  94612

FOR THE DEFENDANT:    MS. FELICIA DAVIS

MS. LAURA ZABELE

MS. LAUREN THIBODEAUX

Paul Hastings, LLP

515 South Flower Street

25th Floor

Los Angeles, CA  90071

Suppl. Sun Decl. Ex. 102, Page 2 of 7

Page 210

bands will have the responsibility for making compensation decisions or reviewing compensation decisions or reviewing pay recommendations with respect to this subfamily and how would you know that?

MS. DAVIS:  Asked and answered.

Go ahead.

THE WITNESS:  No.  We would not be able to find one person that has the responsibility for this particular subfamily.

BY MR. BARRY GOLDSTEIN:

Q.  I'm not asking one person.  I'm asking all the persons who have responsibility.

A.  Yes.  And the way I mentioned it was we would be able to run a report of these job codes and provide a list of who all of those people report to, and that would show you who is responsible for the employees in those job codes.

Q.  So this would be a report that could be run that would show the reporting lines from one level to another with respect to making pay decisions or approving pay recommendations from one level to another; is that correct?

A.  No, no.

Q.  How would we be able to tell who would review the pay decisions that were made with respect to the

Page 211

employees in this external communication subfamily?

A.   I'm sorry.   I feel like I'm answering the question, that we would look at the specific job code, see who was in those job codes, see who their managers were, and then we would -- that's how we would look to see who was making pay decisions for this.   And then if you wanted to find the hierarchy, follow the chain up to see who these people -- who these people report to.   But you're asking whether or not those people reviewed pay decisions or not, and my answer is, no, I would have no way of knowing who reviewed the pay decisions for the employees.

Q.   Is that because, I think you testified, that pay changes that were made in 2019 through the APR have not been retained; is that correct?

A.   What I'm saying --

MS. DAVIS:   Go ahead.

THE WITNESS:   What I'm saying is during the process, we have a system where entries are made and that managers make an entry.   It's reviewed.   And there are times when they are changed and the expectation is that managers and their leaders are having conversations about any changes that may occur.

BY MR. BARRY GOLDSTEIN:

Q.   And I believe you testified those changes have

Suppl. Sun Decl. Ex. 102, Page 4 of 7

Page 291

it.  And see how it goes.  And I'm going to try to be cognizant of that distinction, although I'm not sure I fully understand the distinction.

MS. DAVIS:  Okay.  Well, Mr. Walker can tell you what he's prepared to talk about, and if there is a question that is outside of what he's prepared to talk about, then he can just tell you.  I think the intent was that he could talk about, as I said, the development and the implementation of the starting pay guidelines, but not necessarily the process that the company uses when it actually sets starting pay for a specific individual employee.  That's how I was kind of making a distinction in my mind.  But ask the question and he can tell you if it's outside the scope.

MR. BARRY GOLDSTEIN:  Okay.  We'll give it a try.

(Pause in proceedings.)

BY MR. BARRY GOLDSTEIN:

Q.  Mr. Walker, we're going to return to Exhibit 514, which is the email from HR communications to Amy Janke.

A.  I have that up.

Q.  Now, in the middle of the page 23659, do you see a reference to a new policy?

A.  Yes.

Suppl. Sun Decl. Ex. 102, Page 5 of 7

Walker, Shane - Vol. 2                                   December 18, 2020

Page 292

Q.  And among other things, it is a new policy that states that Nike may no longer record salary history in ATS or CRM systems.  We discussed that yesterday.

A.  Okay.

Q.  Does this new policy mean that there was a change from an old policy?

MS. DAVIS:  Again, I think that's outside the scope of Mr. Walker's deposition topics.

If you know, based on your knowledge, you can answer.

BY MR. BARRY GOLDSTEIN:

Q.  I just thought the policy and guidelines were more or less the same.

MS. DAVIS:  Yeah, he's really intended to talk about the starting pay -- yeah, starting pay guidelines. That's something specific.

But go ahead.

THE WITNESS:  Yeah, so I don't know if there was a prior policy in place before this was implemented.

BY MR. BARRY GOLDSTEIN:

Q.  If you go down a couple of paragraphs, it says: Talent acquisition operations is currently working with HR COE partners to align their processes to this new policy.

Do you see that?

Suppl. Sun Decl. Ex. 102, Page 6 of 7

338

CERTIFICATE

STATE OF OREGON        )

                       ) ss

COUNTY OF MULTNOMAH )

        I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby certify that said witness appeared before me via Zoom at the time and place set forth in the caption hereof; that at said time and place I reported in stenotype all testimony adduced and other oral proceedings had in the forgoing matter; that thereafter my notes were transcribed through computer-aided transcription, under my direction; and that the foregoing pages constitute a full, true and accurate record of all such testimony adduced and oral proceedings had, and the whole thereof.
        I further certify review of the transcript was not requested.
        Witness my hand at Portland, Oregon, this 29th day of December 2020.

Teresa L. Rider
Oregon CSR No. 12-0421
Washington CCR No. 2119
Expires 12-03-23



Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

June 15, 2021

**Via E-Mail Only**

Daniel Prince                          danielprince@paulhastings.com
Felicia A. Davis                        feliciadavis@paulhastings.com
Laura Zabele                          laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 S. Flower Street, 25th Floor
Los Angeles, CA 90071

　　　　*Cahill, et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel,

　　　　Although Rule 26(e) "creates an ongoing duty to supplement or correct prior disclosures or discovery responses without the need for a request from another party," *Brown v. Wal-Mart Store, Inc.*, 2018 WL 2011935, at *2 (N.D. Cal. Apr. 27, 2018) (citation and internal quotations omitted), Plaintiffs must again write to remind Nike it has failed to produce documents that should have been produced prior to the close of the discovery period.

　　　　Please promptly produce the below documents.  These documents are responsive to RFPs served over two years ago, covered by discovery orders, and Nike knows these documents existed.  Yet, Nike neither produced these documents nor informed Plaintiffs that it was withholding these documents.  Please thus explain why Nike failed to produce this discovery so that the Parties can meet and confer about what additional steps should be taken.  If Nike no longer has any of these documents, please promptly let us know when the documents were deleted or otherwise became inaccessible, by whom, and why.

　　　　1.　　Pre-2018 versions of the Offer Intake Form.  Thomas 202:12-203:18; Exhibit 673.

　　　　2.　　Pre-2018 Versions of Manager Playbook, Hiring. Thomas 210:10-23; Exhibit 673.

　　　　3.　　Pre-2018 Versions of Hiring Process. Thomas 210:10-23; Exhibit 673.

　　　　4.　　Pre-December 2018 Hiring Philosophy and Guidelines.  Thomas 55:5-17.  Exhibit 660.

　　　　5.　　Complete versions of the Talent Acquisition Playbook.  Thomas 204:12-206:10 (Talent Acquisition playbook is the main source of guidelines and policies for TA members, and "[a]ll these tools that are available are typically housed in the TA playbook and there are always guidelines and tools."); *see also id.* at 157:16-160:12; Exhibits 669, 670, 671, 673.

823242.9

Suppl. Sun Decl. Ex. 103, Page 1 of 4

*Cahill, et al. v. Nike, Inc.*                    -2-                    June 15, 2021

6.    Compensation Guidelines for External Hires and Total Compensation Hiring Tool. Thomas 167:6-69:17 ("assume [the Compensation guidelines for external hires and the Total Compensation Hiring Tool] provide guidelines around compensation as a data point in making the final offer recommendations."); Exhibit 670.

7.    Taleo Question Library with Answers.  Thomas 161:24-162:3; Exhibit 670.

8.    FPT Access Form. Thomas 167:6-19, 174:7-20; Exhibit 669.

9.    Manager Excellence and Manager Manifesto.  Heinle 114:11-22, 115:17-21.

10.    Employees chosen for Xcelerate.  This data may show that Nike's top management and HR disproportionately selected men for Xcelerate.  Nike does not assert this data is non-existent and does not provide any basis for withholding other than saying that Nike has unilaterally determined that the discovery is irrelevant.  Further, Nike failed to even respond to the meet and confer on the unproduced Xcelerate data for ten months, almost two months after the discovery deadline it sought, and more than six weeks after it represented to the Court it would respond, ECF No. 114 at 20.

11.    Talent Move form and any other documents filled out for talent planned / noncompetitive promotions.  Heinle 47:6, 48:10-50:4.  Ms. Heinle testified that Nike fills out forms and spreadsheets concerning noncompetitive promotions. Heinle 198:12-199:7.  Ms. Heinle, however, did not know the name of the form, what information is in the form, or where the data was entered (though she assumed SAP).  Id. at 198:24-199:7 (Ms. Heinle believes this form is "submitted to our HR operations group that would then enter the data," and Ms. Heinle was not sure where the data was entered into but assumes SAP).

12.    Online Assessments for Leadership Potential Assessment ("LPA") and Talent Segmentation.  Heinle 207:13-19 (To assess potential for LPA, from at least 2015 until LPA ended, there was an online assessment that consisted of various questions, part of which is shown in the image in the top right on slide 20 of Exhibit 647); *id*. at 207:23-208:14 (online assessment that is part of the talent segmentation process).  The screenshot on slide 20 of Exhibit 647 does not show all the questions for the LPA assessment, and the witness did not know what the other questions were.  *Id*. at 207:20-22.

13.    Risk of Loss and Impact of Loss data from the period when Nike did the Leadership Potential Assessment, 2018 and before.  Ms. Heinle testified that Nike collected this data.  Heinle 37:17-23.  Exhibit 500 at slide 40 states that these two factors were used prior to 2019 when making pay recommendations and determinations, so Nike must have collected the data on these two factors.

14.    Criteria to Recruit.  Thomas 260:3-261:7

823242.9

Suppl. Sun Decl. Ex. 103, Page 2 of 4

*Cahill, et al. v. Nike, Inc.*                    -3-                    June 15, 2021

15.  Fill Strategy guidelines, which means a determination about how a position is going to be filled.  Heinle 124:13-125:2.  Ms. Heinle believes there are guidelines regarding fill strategy, but she did not know the names of those guidelines.  Heinle 133:6-11.[1]

16.  Documents and communications showing what, how, and the substance of Succession Management Systems or Related Systems.  Nike's Rule 30(b)(6) witness testified that she believed Nike's Succession Management System and "SMS SumTotal" are succession planning systems.  Heinle 239:13-240:21[2]

17.  Documents showing how Nike used Taleo, Avature, SAP, and other systems for sourcing candidates who were hired into Covered Positions, related to noncompetitive promotions, matching, or initial job assignments, and what data was collected regarding same.  Nike has possession, custody, or control of such documents, which are responsive to RFPs 2-3.  The importance of this discovery is underscored by the fact that Nike choose to not prepare its Rule 30(b)(6) witnesses for Topics noticed on October 28, 2020 concerning this information.[3]  Nike also failed to appear for parts of these Topics; for example, Nike failed to appear with respect to the data collected and systems it used to source candidates,

---

[1] Ms. Heinle was otherwise unprepared to testify about policies, practices, guidelines, or trainings concerning noncompetitive promotions.  When asked whether there were guidelines or policies regarding noncompetitive promotions and approvals, Ms. Heinle answered, "I don't know."  Heinle 70:20-71:1.  Ms. Heinle also did not know if there were trainings about noncompetitive promotions.  *Id.* at 132:24-133:5.

[2] SumTotal "can develop talent pools … to drive decision-making," "identify top talent," "build bench strength," "cultivate new leaders," "improve internal career mobility," and "create dynamic talent pools."  https://www.sumtotalsystems.com/solutions/talent-development/succession (SumTotal's homepage).

[3] For example, when asked about systems Nike maintains data related to noncompetitive promotions and/or job transfers from 2015 to the present, Ms. Heinle answered: "I believe most of our data is housed in SAP. I do not know what data is included – I don't know all our other systems or where it would be."  Heinle 75:17-76:6.  After identifying the employees who would have information to answer this question, the witness testified she did not talk to them in preparation for the deposition, Ms. Heinle did not do anything to prepare with respect to the data concerning noncompetitive promotions or job changes, and Ms. Heinle also testified that she did "nothing" to prepare for this deposition regarding anything about impact of loss or risk of loss with respect to LPA.  *Id.* at 76:7-23, 172:23-173:11, Heinle 230:22-231:16.  Ms. Thomas testified she did not do anything to prepare for topic 11, which concerns systems Nike used, other than speak to outside counsel, who provided no new facts.  Thomas 173:11-22.  Ms. Thomas did not learn anything new during preparation for the deposition, did not look for any documents on her own, or talk to anyone other than counsel during preparation for the deposition.  *Id.* at 14:12-18, 18:17-19:2.  She did not review any transcripts from prior depositions.  *Id.* at 29:25-30:3.

823242.9

Suppl. Sun Decl. Ex. 103, Page 3 of 4

*Cahill, et al. v. Nike, Inc.*                    -4-                    June 15, 2021

which caused women to disproportionally apply to lower-level jobs than men. Nike also made other efforts to prevent Plaintiffs from obtaining this discovery.[4]

Sincerely,

Byron Goldstein

Enclosures

cc:    James Kan
       Barry Goldstein
       Mengfei Sun
       Laura Salerno Owens
       Kathryn A. Roberts

---

[4] For example, Nike's November 22, 2020 letter stated Nike "produced all of the fields available in [SAP], even those that are not consistently used" (Nike's Nov. 22, 2020 letter at 3), but Nike was then forced to admit for the first time on March 14, 2021 that that it had not produced all data fields in SAP (Nike's Mar. 14, 2021 letter at 3).

823242.9

Suppl. Sun Decl. Ex. 103, Page 4 of 4