AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA E. ZABELE, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No.:  3:18-cv-01477-JR |
| Plaintiffs, | DEFENDANT NIKE, INC.'S SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |
| v. | REQUEST FOR ORAL ARGUMENT |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | FILED UNDER SEAL |

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION .................................................................................................................... 2

ARGUMENT ........................................................................................................................... 2

I.     Plaintiffs' Newly-Introduced Arguments And Evidence Cannot Save Plaintiffs' Class Certification Motion. ......................................................... 2

     A.     Plaintiffs Do Not Present Evidence That Nike Regularly Collected Prior Pay Data For Candidates From Previous Employers Or Public Sources. ................................................................................. 3

     B.     Plaintiffs' General Attacks On The Use Of Declarations Are Meaningless. ................................................................................... 7

     C.     Plaintiffs' Introduction Of Individualized Evidence Regarding Putative Class Member Chelsea Leenhouts Further Weighs Against Class Certification. .................................................................. 10

     D.     Plaintiffs' Mischaracterization Of The Evidence Show Why Their Claims Fail. .............................................................................. 11

     E.     Plaintiffs Cannot Ignore The Significant Evidence That Individual Issues Predominate ............................................................ 17

II.     The Newly-Decided Case Cited By Plaintiffs Does Not Cure The Deficiencies In Plaintiffs' Case. .................................................................. 18

III.     Plaintiffs' Attempt To Sandbag Nike And The Court With An Untimely Expanded Class Definition Should Be Rejected. ......................................... 21

     A.     Plaintiffs' Untimely Proposed Class Definition Is Broader Than The Original. .............................................................................. 22

     B.     Plaintiffs' Untimely Rewriting Of The Class Definition Prejudices Nike. ............................................................................................. 23

CONCLUSION ...................................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Ctr. for Env't v. U.S. Forest Serv.*,
   189 F.3d 851 (9th Cir. 1999) ................................................................22

*Alonzo v. Maximus, Inc.*,
   275 F.R.D. 513 (C.D. Cal. 2011) .............................................................8

*Berlowitz v. Nob Hill Masonic Mgmt.*,
   1996 WL 724776 (N.D. Cal. Dec. 6, 1996) ...............................................21

*Cancino Castellar v. Mayorkas*,
   2021 WL 4081559 (S.D. Cal. Sept. 8, 2021) .........................................22, 25

*Casida v. Sears Holdings Corp.*,
   2012 WL 3260423 (E.D. Cal. Aug. 8, 2012) ...............................................8

*Coleman v. Quaker Oats Co.*,
   232 F.3d 1271 (9th Cir. 2000) ...............................................................22

*Costelo v. Chertoff*,
   258 F.R.D. 600 (C.D. Cal. 2009) ...........................................................21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014) ..........................................................................17

*In re High-Tech Emp. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ..................................................8, 9

*In re Wal-Mart Wage Hour Emp. Pracs. Litig.*,
   2008 WL 3179315 (D. Nev. Jun. 20, 2008) .........................................22, 23, 24

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
   527 F. Supp. 2d 1053 (N.D. Cal. 2007) .....................................................8

*Jordan v. Paul Fin., LLC*,
   2009 WL 192888 (N.D. Cal. Jan. 27, 2009) ...............................................21

*Kassman v. KPMG LLP*,
   416 F. Supp. 3d 252 (S.D.N.Y. 2018) .......................................................8

*Naylor Farms v. Anadarko OGC Co.*,
   2009 WL 8572026 (W.D. Okla. Aug. 26, 2009), *order clarified sub nom.*,
   *Naylor Farms, Inc. v. Anadarko OGC Co.*,
   2011 WL 7267850 (W.D. Okla. June 15, 2011) .......................................22, 23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
    31 F.4th 651 (9th Cir. 2022) (*en banc*) .............................................................. *passim*

*Polo v. Goodings Supermarkets, Inc.,*
    232 F.R.D. 399 (M.D. Fla. 2004) ............................................................................22

*Tyson Foods, Inc. v. Bouaphakeo,*
    577 U.S. 442 (2016) ..................................................................................................20

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ............................................................................................8, 17

*Willis v. Ironwood Commc'ns, Inc.,*
    2008 WL 2167175 (D. Or. May 22, 2008) ............................................................8

RULES

FED. R. CIV. P. 23 ....................................................................................................2, 8, 17

FED. R. CIV. P. 23(b)(3) ..................................................................................................19

**INTRODUCTION**

Plaintiffs claim that Nike is living in a "fantasy," but it is Plaintiffs who conjure an alternate reality. Based on a misleading and incomplete recitation of facts, and an erroneous belief that they are entitled to discard and ignore evidence simply because it does not fit their theory—sworn testimony under oath from the same women they seek to represent—Plaintiffs attempt to lead the Court astray on both the factual record and the law. Faced with mountains of deposition testimony, documentary evidence, and declarations from more than 40 Nike employees, Plaintiffs have no choice but to try to convince the Court that it too should gloss over the significant and undisputed evidence that Nike managers retain discretion to make the thousands of hiring, pay, promotion, and performance decisions at issue in this case. The Court should not be so persuaded. Plaintiffs also try to save their improper aggregated statistical analysis with a newly decided case, *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (*en banc*). This too fails. Despite two bites at the apple, Plaintiffs *still* have not met their burden to establish that any company policy or practice uniformly applied to, and consistently harmed, the entire putative class. Instead, Plaintiffs make an improper and delinquent effort to amend the class definition and twist evidence to confuse the record. Despite these antics, the record is clear: this putative class of over 5,200 female employees working in more than 1,200 different job codes should not be certified.

**ARGUMENT**

I.  **Plaintiffs' Newly-Introduced Arguments And Evidence Cannot Save Plaintiffs' Class Certification Motion.**

Because Plaintiffs cannot carry their Rule 23 burden, they resort in their reply to twisting facts and disparaging the declarations of their own putative class members. None of their tactics move the needle.

A.      **Plaintiffs Do Not Present Evidence That Nike Regularly Collected Prior Pay Data For Candidates From Previous Employers Or Public Sources.**

As set forth in Nike's Opposition, and supported by substantial evidence, Nike did not collect, let alone use, prior pay to set starting pay consistently throughout the class. Oppo. at 9-11. For example, putative class members testified:

- "Nobody at Nike asked me about my prior salary or salary expectations before making the offer [to me to join Nike]." Louder Decl. ¶ 6, Davis Decl. Ex. 12.

- "Nike does not ask new graduate hires for prior salary information and it plays no role in the compensation for new graduate hires." Dockter Decl. ¶ 10, Davis Decl. Ex. 29.

- "I do not recall if anyone asked me about my current salary or salary expectations during the hiring process, but I would not have answered the question if asked. So I am confident that I did not provide any information about my prior salary or salary expectations before I was hired." Lore Decl. ¶ 6, Davis Decl. Ex. 11.

- "I do not believe anyone asked me about my prior salary or my salary expectations before I received an offer." Hansen Decl. ¶ 6, Davis Decl. Ex. 6.

- "I do not recall anyone asking me about my current salary or discussing my salary during the hiring process. I was not working when I received a job offer for Nike, so I would not have had a current salary to discuss." Worboys Decl. ¶ 5, Davis Decl. Ex. 24.

- "Throughout the hiring process, no one asked me about my current salary or salary expectations." Thornton Decl. ¶ 5, Davis Decl. Ex. 23.

- "I do not recall being asked for my current salary during the interview or hiring process. I recall discussing salary generally and the hiring manager was open about the salary range for the position, so I knew the salary range during the interview process. My starting salary at Nike was higher than my salary at PGE at the time." Saxton Decl. ¶ 5, Davis Decl. Ex. 19.

- "I do not believe anyone at Nike asked about my prior salary or salary expectations before offering me the job. I recall that the salary offered to me was slightly lower than what I had made in my previous job. However, I was fine with that and didn't negotiate because the cost of living in Oregon was much lower than it had been in California, plus the country was still in a recession." Spencer Decl. ¶ 4, Davis Decl. Ex. 21.

- "No one asked me about my current salary during the recruitment process at Nike. The hiring manager gave me an offer with a salary that I accepted. I did not negotiate

salary because I was willing to take a pay cut to join Nike. I knew that I would take a pay cut to move into an industry job from consulting. Generally, consultants take a pay cut when they leave consulting in exchange for better hours and less stress. I wanted to work for Nike and knew that joining the business would entail a pay cut. . . . I [also] left two years of tuition reimbursement on the table with my former employer. For all of these reasons, I don't believe that my starting pay at Nike was, or could have been, based on my prior salary." Peale Decl. ¶ 5, Davis Decl. Ex. 16.

- "No one asked me about my current salary or my salary expectations before I received my offer." Stallard Decl. ¶ 5, Davis Decl. Ex. 22.

Faced with this evidence—from putative class members themselves—that belies any common policy, practice, or experience, and directly undercuts the basis for their class certification motion, Plaintiffs respond by arguing, for the first time on reply, that Nike actually collected prior pay information from employers and public sources to set starting salary. *See* Reply at 3 ("Nike didn't just collect prior pay information from candidates, it also collected this information from employers and public records."). That assertion is flat wrong and unsupported even by the evidence Plaintiffs cite in support of this claim.

First, Plaintiffs claim that Nike collected salary information from Plaintiff Heather Hender's previous employers via an email sent from background check vendor HireRight titled "Information required for NIKE background Report," dated March 8, 2015. Reply at 3 fn. 2, Suppl. Sun Decl. 84. Plaintiffs omit, however, that Nike extended an offer to Plaintiff Hender with a starting salary of $78,600 three days *before* sending this background check email. Hender Tr. 168:11-171:9, Suppl. Davis Decl. Ex. 4 (confirming that Plaintiff Hender did not negotiate the starting salary that was offered in March 5, 2015); Suppl. Davis Decl. ¶ 3, Ex. 2 (Hender Exhibit 136) (offer letter).[1] Employers routinely request compensation-related information from

---

[1] Plaintiffs also conclude that Nike collected prior pay information via a background check performed on Sara Johnston. *See* Suppl. Sun Decl. Exs. 85, 86. This evidence faces the same issue—it does not demonstrate that Nike used prior pay data to set Ms. Johnston's salary. The document shows that Ms. Johnston asked Nike to provide her with the rate she was paid during an earlier employment spell as a part-time swim instructor and lifeguard. Suppl. Sun Decl. Exs.

a new hire's prior employers to confirm employment history as part of a reference check. But it is illogical to conclude that Nike would seek Ms. Hender's pay data from her prior employer and use it to set her starting pay at Nike *after* her offer was already extended. Moreover, Plaintiffs' argument that Nike somehow obtained Ms. Hender's prior pay data and retroactively used it to set pay for an offer that had already occurred only highlights the individualized nature of this inquiry. If Plaintiffs' theory were true, for each putative class member, now we need to know: (1) Did the applicant provide their prior salary data?; (2) Did Nike solicit the applicant's prior salary data from a prior employer or public source?; (3) Did the applicant's prior employer respond to Nike's inquiry and provide the prior pay data?; (4) If so, was it before or after Nike made the initial offer?; (5) Was the applicant's prior pay data available from a public source?; (6) Did the hiring manager use the applicant's prior pay to set their starting pay?; and finally (7) Did the applicant negotiate their starting salary, and at which part in the process? This seven-part, individual inquiry simply is not possible for the more than 5,200 putative class members. Not to mention the myriad individual facts and circumstances that might explain any pay differential, which are affirmative defenses that Nike has an important due process right to assert. Such claims are inappropriate for class treatment.

Plaintiffs' new argument is nothing more than attempted subterfuge to distract from the fact that Nike recruiters and hiring managers (many of whom are putative class members themselves), confirm that they did not consistently request or use candidates' prior pay to make

---

85, 86. At the same time she was a part-time swim instructor and lifeguard, Ms. Johnston worked in human resources with an annual salary of approximately $35,000. Johnston Tr. 77:9-78:3, Suppl. Davis Decl. Ex. 5. Nike subsequently offered Ms. Johnston a position titled "Business Systems Analyst I - Integrated Planning Solutions" at an annual salary of $57,000.00. Suppl. Davis Decl. Ex. 3 (NIKE_00014659). It is absurd for Plaintiffs, without evidence, to assume that these prior salaries were related in any way to the Nike offer.

starting pay decisions. Oppo. at 11. For example:

- "The pay I selected [for a new hire] was not based on the candidate's prior salary or salary expectations." Nopper Decl. ¶ 9, Davis Decl. Ex. 14.

- "[N]either salary history nor salary expectations has ever influenced my decision on a candidate's starting pay. Instead, I consider why a candidate is the right person for the role and decide their starting salary based on that." Louder Decl. ¶ 19, Davis Decl. Ex. 12.

- "I do not have any conversations with candidates about salary during the interview stage because I do not want pay to influence my decision about which candidate is the best for the role. Once I decide I want to make a job offer to a candidate, I will set the starting pay. I tend to set starting pay at the higher end of the pay range and I have even set starting salaries above the suggested pay range. I evaluate a variety of factors when setting starting pay, including the candidate's experience, any unique qualities the candidate could bring to the role, and how the pay compares to the overall team." Worboys Decl. ¶ 16, Davis Decl. Ex. 24.

- "Before 2017, a candidate's prior salary would sometimes come up in my discussions of starting pay. But I never treated prior salary as the sole input to use in setting the starting salary. Rather, it was just one of the many considerations, and my focus in setting the starting salary has always been the actual position that is being filled, the candidate's experience, and their skillset, vs just how much they may have earned at their prior job or even their salary expectations. Neither salary history nor salary expectations has been a primary factor that I considered in setting the starting salary. To the contrary, in order to ensure we get the right people for the role and pay equitably, I have always tried very hard to look more holistically." Hunter Decl. ¶ 16, Davis Decl. Ex. 8.

At best, the question of whether Nike obtained prior pay data on candidates, the source and accuracy of that data, and whether that data was used to set a candidate's starting pay, is a highly-individualized one, not capable of supporting class treatment.

Plaintiffs also misleadingly quote a change reflected in "Nike's TA Comp History Policy" to suggest a common practice previously existed. Reply at 3-4 (quoting Mot. at 13 (quoting Sun Decl. 30 (email explaining policy); citing Sun Decl. Ex. 6 ("Nike's TA Comp History Policy")). That 2017 Nike email states, "Nike may no longer . . . [u]se salary as a tool to disqualify candidates, or as a screening criteria . . . . [r]equire candidates to satisfy a minimum/maximum salary for a position. . . . [r]ecord salary history . . . . [or s]earch public

records for candidates' compensation history." Sun Decl. Ex. 30; *see also* Sun Decl. Ex. 6. This updated policy merely informs Nike's Talent Acquisition team what is no longer permissible (*e.g.*, they are no longer permitted to search public records for candidates' compensation history). But evidence of a policy prohibiting Talent Acquisition team members from searching public records for compensation data going forward is not evidence that Nike had a policy or practice of searching public records for pay data in the past, let alone that it consistently used this data to set starting pay. Employers frequently issue policies asking employees to cease certain behavior. That does not mean that the behavior was common practice before the policy change. For example, a policy telling employees that they are no longer allowed to wear sneakers to work does not establish a common practice of wearing sneakers to work before the prohibition. By contrast, sworn testimony about whether an employee actually wore sneakers would be probative. So would company representative testimony on the topic. Here, there is no testimony that Nike consistently used public data or information from employers to set pay at all. To the contrary, the only evidence of whether Nike actually used prior pay to set starting pay comes in the form of Nike's employee declarations, which, at best, show an inconsistent—*i.e.*, not common—practice. *See* Oppo. at 9-11. Certification does not follow on these facts.

### B.  Plaintiffs' General Attacks On The Use Of Declarations Are Meaningless.

In response to Nike's substantial deposition testimony and sworn declarations demonstrating that the "classwide" policies alleged by Plaintiffs were not, in fact, "classwide" or consistently used (if at all), Plaintiffs argue that this Court should disregard sworn statements from the very putative class members Plaintiffs seek to represent. Reply at 1, *see also* Reply at 5-6. Plaintiffs are wrong on the substance; equally important, the criticisms they offer call into question whether Plaintiffs and counsel can adequately represent the class. To suggest that the declarants are not being honest or do not understand what they have signed—without a shred of

evidence supporting such accusations—is not only inappropriate, but demeaning to the **same putative class members** they seek to represent.

It is well-established that courts regularly rely on putative class member declarations when considering class certification. *Willis v. Ironwood Commc'ns, Inc.*, 2008 WL 2167175, at *3 (D. Or. May 22, 2008); *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1061 (N.D. Cal. 2007) ("Though selectively chosen, defendants' declarations indicate a certain degree of variability from one [job type] to the next that the court must take into account when determining whether class certification or collective action certification is appropriate."); *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 520 (C.D. Cal. 2011) ("district courts have regularly relied on declarations from a defendant's employees when considering a class certification motion under Rule 23"), *abrogated on other grounds by Dukes*, 564 U.S. at 349; *Casida v. Sears Holdings Corp.*, 2012 WL 3260423, at *16 (E.D. Cal. Aug. 8, 2012) (describing declarations of proposed class members "regarding their individual experiences" put forth by both class plaintiffs and defendant); *see also Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 265-66 (S.D.N.Y. 2018) (describing declarations of putative class members submitted by defendants). Declarations from putative class members are some of the most probative evidence available, as they are on the front-lines, implementing on a daily basis in real-time the alleged practices challenged by Plaintiffs. Their testimony is far more probative than selectively pulling single lines of text from a 2017 email, as Plaintiffs do.

Plaintiffs also rely on *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1216 (N.D. Cal. 2013) to argue that "declarations created for opposing class certification and contradicted by the employer's policies and other documents contemporaneously created are entitled to little, if any, weight." Reply at 6. That case is inapposite. First, the declarations

submitted by Nike do not contradict Nike's policies or other documents. It is only through Plaintiffs' significant mischaracterizations of the evidence that such alleged contradictions are manufactured. Second, the declarations at issue in the *High-Tech* case did not come from putative class members; they were declarations from "top management in [defendants'] human resources, recruitment, compensation, and benefits departments" that the court concluded *directly contradicted* documents and, at times, the witness' own deposition testimony. *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1216 (declining to rely on a declaration because the declarant "took the diametrically opposite position" in deposition testimony). That is not the case here. The declarations filed by Nike come directly from putative class members. They explain how Nike policies are actually implemented and experienced in reality, not how Plaintiffs' counsel, who have never worked at Nike, mischaracterize a few words on a piece of paper. The Court can and should rely on these sworn declarations by putative class members, which confirm that apparent "classwide" policies were not, in fact, "classwide." *See* Oppo. at 7-12 (discussing the variety within starting pay), 12-17 (discussing variation within annual base pay increases and bonuses), 17 (discussing individual managers making individual promotion decisions), 19-21 (discussing managers discretion in deciding appropriate level for job postings to which candidates then apply), 35 (evidence by potential class member declarations that upper-level managers do not revisit or second-guess lower-level managers' decisions).

      Plaintiffs also argue that the declarants were not subject to cross-examination or provided relevant documents or data to review in advance of the declarations—but make no showing that either is required. Reply at 6. And it is *Plaintiffs* who did not notice depositions of any of the declarants, so complaining now that they were not subject to cross-examination simply reflects Plaintiffs' own lack of diligence.

Plaintiffs' challenges to the putative class member declarations are nothing but a thinly veiled attempt to deflect from the fact that although they have been litigating this case for nearly four years, the case has been widely publicized in the press, and Plaintiffs' counsel have a list containing the names of more than five thousand putative class members, they did not submit a single putative class member declaration in support of their motion, and still cannot provide sufficient evidence to support class certification. As set forth in Nike's Opposition, this paltry factual record is insufficient to meet Plaintiffs' burden. *See e.g.*, Oppo. at 40-44.

### C.   Plaintiffs' Introduction Of Individualized Evidence Regarding Putative Class Member Chelsea Leenhouts Further Weighs Against Class Certification.

Plaintiffs' claim that an investigation of one of the 24 putative class member declarations submitted by Nike contains one statement they factually dispute is meaningless, except to the extent it highlights the individual nature of this case.

Specifically, Plaintiffs challenge one statement in the declaration of Putative Class Member Chelsea Leenhouts which states, when discussing her early Nike salary, "Nike had recently hired a male peer who was in the same role and level with the same salary." Leenhouts Decl. ¶ 5, Davis Decl. Ex. 9. Plaintiffs contend that this statement is false, because "three men hired into the same role as Ms. Leenhouts in the year before she was hired in June 2016 all received substantially higher salaries." Reply at 6 fn. 7 (citing Suppl. Sun Decl. ¶ 22). The problem with Plaintiffs' assertion is that they have no idea who Ms. Leenhouts was referring to when she identified a "male peer who was in the same role and level with the same salary." Plaintiffs assume she was talking about one of the three men ***they*** identified as her comparators based on job code. But each of those men had significantly more prior experience than Ms. Leenhouts, and worked in different parts of Nike's business. Instead, Ms. Leenhouts may have been referencing a fourth male employee, who also was hired into the same job code around the

same time, who was paid less than she was. Or she could have been comparing herself to a peer in a different job code altogether. The data does not tell us which male employees performed work substantially equal or similar to Ms. Leenhouts at the time of her hire (or at any time thereafter). And that is the point. If this kind of detailed factual analysis is needed to identify the appropriate comparator(s) for Ms. Leenhouts, imagine the time and effort needed to identify the appropriate comparators for each of the other more than 5,200 putative class members. Those analyses will quickly "devolve into a quagmire of individualized inquiries" including the determination of each class member's comparators (if any) in each job, a "fact-intensive inquiry involving diverse areas of specialty, education, past experience, certifications, and more." Oppo. at 55. Plaintiffs' attack on Ms. Leenhouts' declaration makes clear that such individual issues predominate. Class certification is not appropriate.

### D.    Plaintiffs' Mischaracterization Of The Evidence Show Why Their Claims Fail.

Plaintiffs repeatedly assert that their Motion for Class Certification presents common evidence showing that Nike discriminated against women through four classwide policies. However, mere assertions are not common evidence. In an attempt to save their claims, Plaintiffs resort to misquoting deposition testimony and declarations. A review of just some of this evidence shows why Plaintiffs' claims fail.

For example, faced with clear evidence that each manager at Nike is responsible for making merit and bonus decisions, and that, at most, the manager's manager ("Manager +1") approves these adjustments (Oppo. at 14-16), Plaintiffs rely on misleading testimony from one named Plaintiff that merit increases and bonus plans are "subject to final approval by HRBPs and business leaders." Reply at 9 & fn. 15.[2] Plaintiffs' Reply asserts that "Plaintiffs and Opt-ins also

---

[2] Notably, the other two cites are to deposition testimony regarding starting salary and salary

consistently testified at deposition that they made recommendations and that HR and executives made the decisions. *See, e.g.*, Cahill Dep. 139:3-140-14; 189:5-190:6." Reply at 9 fn. 15. Putting aside the fact that they actually only cite the testimony of one Plaintiff in support of this claim (not "Plaintiffs and Opt-ins" as they claim), that one Plaintiff, Ms. Cahill, *actually* said she "can't remember" whether her recommendations for bonuses were followed (Cahill Tr. 189:5-190:6, Suppl. Sun Decl. Ex. 90), and that she *assumed* someone in HR made recommendations about bonus and stock awards based on the fact that the awards were submitted through an HR portal, but did not know for certain. Cahill Tr. 139:3-141:25, Suppl. Davis Decl. Ex. 7.

Plaintiffs also mischaracterize Nike's evidence that managers have discretion to provide merit increases and bonuses. First, Plaintiffs assert that "[Mr.] Walker admitted that he did not and could not know which executives reviewed pay decisions." Reply at 10 fn. 16 (citing Walker Tr. 210:24-211:12). Mr. Walker *actually* testified that he would need to review the specific employees at issue to see who was making the pay decisions because there are so many different managers involved in the process. Walker Tr. 210:24-211:12, Suppl. Sun Decl. Ex. 102. Next, Plaintiffs claim that the Vice President declarants "could not speak to review conducted by higher executives or HRBPs." Reply at 10 fn. 16. Not true. Declarant Vice President Kimberly Mack stated, "I have never seen a base pay or ratings decision changed by anyone in a higher level." Mack Decl. ¶ 14, Davis Decl. Ex. 13. Similarly, Putative Class Members also describe

---

increase for a promotion, not merit increase and bonus pay. *See* Reply at 9 fn. 15 ("Tucker Dep. 97:19-98:10, Suppl. Sun Decl. Ex. 100 (recommendation for starting salary not accepted); Olson Dep. 152:5-21, Suppl. Sun Decl. Ex. 96 (recommendation of higher than 15% salary increase for promoted employee rejected by TA).") The description of this evidence is misleading. Ms. Tucker actually testified that when she hired a male employee at Nike for a role on her team, her recommendation for a salary for this lateral hire was not accepted. Tucker Dep. 97:4-100:12, Suppl. Davis Decl. Ex. 6. Ms. Olson testified that Talent Acquisition limited a recommended increase in pay for a promoted employee to 15% and explained that the manager could increase that employees pay in subsequent merit increases.

that the discretionary salary adjustments and bonus decisions they made for their direct reports were not changed or rejected by executives or HRBPs. *See* Levison Decl. ¶ 12, Davis Decl. Ex. 10 ("When making base pay salary adjustments, I consider where an employee falls in their job's salary range, their specific performance on the job, feedback from their peers, and their CFEs. I have never had my base pay salary adjustment decision rejected."); Harris Decl. ¶ 15, Davis Decl. Ex. 7 ("I do not recall ever having my base pay adjustment or PSP bonus recommendation changed or rejected."); Oda Decl. ¶¶ 17, 18, Davis Decl. Ex. 15 ("There are criteria or guidelines I used when making merit pay decisions that all managers use, but it is up to me how I apply them and what weight to give to each category . . . . I cannot recall any instances in which my merit pay or CFE decisions were changed or rejected.).

Further, to the extent Plaintiffs attempt to use the declaration of Rebecca Edington to suggest that some common practice exists, Plaintiffs selectively misquote it:

| What Plaintiffs Argue: | What The Actual Evidence Is: |
| --- | --- |
| "Edington's declaration confirms that before managers make these 'decisions,' she meets with them to 'make sure we are aligned philosophically,' and that she 'make[s] sure that managers are adhering to the budget and guidelines provided.' Edington Decl. ¶¶ 11, 12[, Davis Decl. Ex. 4]." Reply at 10 fn. 16 (alterations in original). | 11. Lower-level managers are the ones who make decisions on base pay increases for their direct reports. They are given a budget with defined parameters, and once their decisions are inputted into the system, I spot-check the system and make sure that we have stayed within the budget provided for my group. **I only make base pay decisions for my own direct reports.** In advance of lower-level managers making these decisions, however, I do conduct meetings with my direct reports and make sure we are all aligned philosophically on how we are approaching pay increase decisions. **Otherwise, it is completely up to managers to make these decisions for their direct reports. Rather than reviewing and approving every single pay decision, I simply make sure that managers are adhering to the budget and guidelines provided.** |

|  | 12. Similarly, **lower-level managers are the ones who make PSP bonus decisions for their direct reports.** While I spot-check some of these outcomes, **I do not review or approve all of them,** but ensure that guidelines and budgets are adhered to. |
|  | (Emphasis added.) |

Finally, Plaintiffs incorrectly assert that Nike "concedes that it actively recruits applicants to apply for specific job openings through multiple channels and through its 'matched to job' process, will apply for a position on behalf [of] a potential candidate." Reply at 15. There is no evidence to support this claim. Nike has consistently explained that candidates—not recruiters—decide which jobs to apply for. Oppo. at 20. Furthermore, the evidence is that any alleged "matching" rarely occurs and, even then, only when there are multiple job requisitions for the **exact same job** at the same time. Oppo. at 20-21. Sworn testimony from recruiters, Nike witnesses, and even Plaintiffs' own experiences confirm that each candidate had to affirmatively apply to a job at Nike to be considered for the role. Oppo. at 21.

Plaintiffs *still* present no evidence that Nike "channels" or "matches" any candidates. Plaintiffs cite to Nike's explanation that recruiters "use various tools to find candidate[s] they believe are qualified for open positions" to support this claim (Reply at 15), but sourcing candidates for roles and encouraging them to apply to open positions is hardly channeling or matching candidates. Nor is there any evidence of a common practice or policy. For example, putative class members report a number of varied ways through which they identified their initial Nike role:

- "A friend who worked at Nike recommended me to the hiring manager for the position. The hiring manager contacted me to encourage me to apply to the role if I was interested in the position." Worboys Decl. ¶ 4, Davis Decl. Ex. 24.

- "In September 2016, I applied to a full time position as a Service Delivery Manager, and I was selected for the job. Because I was working as a contractor at Nike up until

that point, the people on my team suggested that I look out for any positions that opened up on the team, so that I could apply to one. That is exactly what I did. I did not apply to any other job at that time." Peele Decl. ¶ 3, Davis Decl. Ex. 17.

- "I grew up running and loved the Nike brand and product. I wanted to work for Nike based on my admiration for the company so I networked with Nike employees and applied to a few positions online. I went through the interview process and was offered one of the positions I applied for." Peale Decl. ¶ 4, Davis Decl. Ex. 16.

- "I was unemployed at the time and actively searching for jobs at local companies. I saw the posting for my first job at Nike on an external job site." Spencer Decl. ¶ 4, Davis Decl. Ex. 21.

- "I learned about the role at Nike from a relative whose contact had an open position. I was not referred or directed to the role by a recruiter." Harris Decl. ¶ 4, Davis Decl. Ex. 7.

- "One of these fellow military veterans who had left PGE sometime prior encouraged me to apply for a role at Nike. . . . I applied for the role, went through the interview process, and was offered a role in the IT Security team in January 2015." Saxton Decl. ¶ 4, Davis Decl. Ex. 19.

- "I enjoyed the work I was doing as an Assistant Planner [a temporary position at Nike], so I was eager to pursue a full time position in this same capacity because of Nike's competitive benefits package, the culture and the people. The Nike manager with whom I worked during this time told me that he expected a Reporting Analyst position was going to open up and he recommended that I apply for it. I applied for the Reporting Analyst role through Nike's website. No one from Talent Acquisition told me which role to apply to. I actually turned down a competitive full time offer at another company while I was waiting to hear if I was selected for the Reporting Analyst role because I did not want to pass up the opportunity to become a Nike employee." Stallard Decl. ¶ 4, Davis Decl. Ex. 22.

- "No recruiter contacted me about the role – I found it myself when I was looking at CareerBuilder and saw the posting." Slaughter-Beveridge Decl. ¶ 4, Davis Decl. Ex. 20.

- "I learned of this role when a Nike employee reached out to me about this specific role through LinkedIn." Bond Decl. ¶ 4, Davis Decl. Ex. 3.

- "I found out about this role because a former colleague of mine made me aware of the job posting, which stated that Nike was looking for a chemical policy expert regarding consumer products. . . . I applied through the Nike website, and did not apply to any other Nike positions at that time. No Nike recruiter encouraged me to apply for this opening." Hackenmiller-Paradis Decl. ¶ 5, Davis Decl. Ex. 5.

And sworn testimony from recruiters confirms that recruiters **could not** apply for roles on a

candidate's behalf except in extremely narrow circumstances. *See* Oppo. at 20-21 (citing Snashall Decl. ¶ 12, Davis Decl. Ex. 38 ("Whether a candidate is internal or external, the candidates have to apply for the jobs themselves. I do not apply for them."); Morton Decl. ¶ 12, Davis Decl. Ex. 35 ("I have never applied for a job on behalf of a candidate. It was always a candidate's choice to apply, regardless of my suggestion."); Collins Decl. ¶ 9, Davis Decl. Ex. 27 ("These passive candidates still have to apply for the job; I do not apply for them . . . I can invite an internal candidate to apply for an open position, but they still need to apply through the portal if they actually want to be considered for the role."); Mangan Decl. ¶ 12, Davis Decl. Ex. 34 ("Regardless of which system I use (Taleo or Avature), candidates still have to apply for jobs themselves."); *see also* Yoon Decl. ¶¶ 12-13, Davis Decl. Ex. 39; Scire Decl. ¶ 17, Davis Decl. Ex. 37; Caputo Decl. ¶ 14, Davis Decl. Ex. 26; Bowman Decl. ¶¶ 13-14, Davis Decl. Ex. 25; Flores-Sandoval Decl. ¶¶ 7, 10, Davis Decl. Ex. 31; Hopkins Decl. ¶ 12, Davis Decl. Ex. 32; Lozito Decl. ¶ 7, Davis Decl. Ex. 33). Plaintiffs cannot establish by a preponderance of the evidence a common practice of "channeling" when so many candidates and recruiters confirm that *candidates choose* the roles to which they apply. *See* Oppo. 20-21.[3]

Plaintiffs attempt to support their allegations by claiming that Plaintiff Cahill was "channeled" into a contractor position before her hire. Reply at 16 (citing Cahill Tr. 57:23-59:20). Putting aside the fact that Plaintiff Cahill admitted in that cited deposition testimony that she actually applied for that role (Cahill Tr. 57:23-59:20, Suppl. Sun Decl., Ex. 90), contractors are not a part of this case, and her route to working as a contractor—rather than an employee—is totally irrelevant. Moreover, it is—yet again—more evidence of the individualized nature of

---

[3] Notably, Plaintiffs cite to deposition testimony that confirms that recruiters could only *invite* applicants to apply for roles at Nike. Reply at 15 fn. 20 (citing Miller Tr. 68:25-70:15; 79:14-81:16)

Plaintiffs' claims. Even the named and Opt-In Plaintiffs lack a common story:

- Plaintiff Cahill claims she was "channeled" to a contractor position before hire.

- Opt-in Plaintiff Anderson learned of a role at Nike, and subsequently applied to that role through the external Nike website. Anderson Tr. Vol. I, 113: 8-18, Davis Decl. Ex. 44.

- Opt-in Plaintiff Olson learned of a role at Nike through the "Help Wanted" section of the newspaper and applied for the position through the mail. Olson Tr. 74: 9-19, Davis Decl. Ex. 58.

These are not the facts on which class certification should be granted.

### E.    Plaintiffs Cannot Ignore The Significant Evidence That Individual Issues Predominate.

Faced with this avalanche of evidence, Plaintiffs bury their heads in the sand. They claim that the Court can ignore the declarations, ignore the statistical evidence, and ignore *Dukes*[4]—which all support denial of certification—because they only challenge "classwide practices and not the subjective decision-making of lower-level managers." Reply at 1. They have the standard wrong.

"[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis in original). They must do so "by a preponderance of the evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (*en banc*). That means Plaintiffs must show that it is more likely than not that the practices challenged by Plaintiffs were common across all putative class members throughout the class period, and had a common harm on all women. Plaintiffs cannot ignore this standard by claiming—as they do repeatedly throughout their reply—that they are only challenging the "classwide" policy, not the subjective decisionmaking. That is the entire

---

[4] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

question before the court: Is it more likely than not that the practices challenged by Plaintiffs were common across all putative class members and had a common harm on all women? Or is it more likely than not that managers exercised their own independent judgment and discretion in making decisions like setting starting pay, awarding promotions, evaluating performance, and making ongoing compensation decisions? Nike submits that Plaintiffs have failed to prove their theory is the truth.

Nor may the Court defer the question of whether classwide policies exist to the jury, as Plaintiffs suggest. For example, Plaintiffs argue that "whether Nike had a starting pay policy that considered prior pay and then salary expectations presents a common question that a factfinder can resolve based on Plaintiffs' common evidence." Reply at 7. But it is not up to the jury to decide whether classwide issues predominate. As the Ninth Circuit recently recognized in *Olean*:

> A district court must also resolve disputes about historical facts if necessary to determine whether the plaintiffs' evidence is capable of resolving a common issue central to the plaintiffs' claims. For instance, in a case in which a nationwide class of plaintiff employees alleged nationwide discrimination by their employer, we held that a district court had to resolve factual disputes at certification regarding whether decisions regarding promotions were made at the local level or by upper management.

*Olean*, 31 F.4th at 667 (footnote omitted). Thus it is critical that the Court examine all of the evidence and make this key threshold finding.

## II.    The Newly-Decided Case Cited By Plaintiffs Does Not Cure The Deficiencies In Plaintiffs' Case.

Plaintiffs reply heavily cites a new case decided after Nike filed its Opposition: *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022). Plaintiffs cite *Olean* for the proposition that aggregated analyses can be used to show commonality. *See, e.g.*, Reply at p. 2, 7-8, 17, 19, 32-33. It does not cure the deficiencies in Plaintiffs' case.

For background, *Olean* is an antitrust case, brought by a putative class of individuals purchasing one type of fish—tuna. *Olean*, 31 F.4th at 661-62. After a three-day evidentiary hearing, the trial court granted certification of three antitrust subclasses, based in part on aggregated statistical analyses which the trial court concluded showed "class-wide antitrust impact." *Id.* at 662. On appeal, the Ninth Circuit held that the district court did not abuse its discretion in finding "the [tuna] purchasers' statistical regression model, along with other expert evidence, [wa]s capable of showing that a price-fixing conspiracy caused class-wide antitrust impact, thus satisfying one of the prerequisites for bringing a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure." *Id.* at 661.

Plaintiffs argue that *Olean* endorses the use of aggregated models in all scenarios. They are mistaken. First, the aggregated statistics in *Olean* analyzed the impact of the defendant companies' alleged price-fixing scheme on the price of one type of fish—tuna. Were Plaintiffs using an aggregated analysis in this case to review the pay or promotion rates of employees in just one job at Nike, such aggregation may be appropriate. They are not. Contrary to Plaintiffs' assertions, *Olean* does not stand for the proposition that aggregation is appropriate to analyze the impact of price-fixing on 1,200 different types of fish, the like the 1,200 different jobs Plaintiffs seek to certify here. Second, importantly, in *Olean*, many of the defendant companies had already pled guilty to, or been convicted of, conspiracy to fix pricing. *Id.* at 661. Conspiracy to fix prices is the definition of a "common practice," rendering the application of a common, aggregated model more appropriate. In contrast, there is significant evidence in this case that the challenged practices are not common or classwide at Nike.

As the *Olean* court explained, "the Supreme Court has made clear that the permissibility of statistical evidence 'turns not on the form a proceeding takes—be it a class or individual

action—but on the degree to which the evidence is reliable in proving or disproving the elements

of the relevant cause of action.'" *Id.* at 685 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S.

442, 455 (2016)). Further quoting *Tyson Foods*, the *Olean* court continued that aggregated

statistics could be used to support certification "if 'each class member could have relied on [the

plaintiffs' evidence] to establish liability if he or she had brought an individual action.'" *Olean,*

31 F.4th at 667. Plaintiffs' aggregated analysis cannot serve this purpose.

As set forth in Nike's Motion to Exclude the Opinions of Plaintiffs' Expert, David

Neumark, Ph.D., aggregated analyses do not provide the kind of evidence that "each class

member could have relied on to establish liability if he or she had brought an individual action."

That is because aggregated analyses do not answer whether a specific woman is paid less than

men for substantially equal or comparable work. The following hypothetical, also contained in

Nike's briefing in support of its Motion to Exclude Dr. Neumark's opinions, demonstrates this

issue. Assume three job codes: Senior Designer, Lead Designer, and Junior Designer, populated

and paid as follows:

- Senior Designer – 10 men each paid $200,000 per year, and 10 women each paid
  $200,000 per year.

- Lead Designer – 10 men each paid $175,000 per year, and 10 women each paid
  $180,000 per year.

- Junior Designer – 10 men each paid $150,000 per year, and 10 women each paid
  $140,000 per year.

Assume further that all Senior Designers, all Lead Designers, and all Junior Designers are

similar in all material respects to the other employees in the same job, regardless of gender. On

this fact pattern, it is clear that not one of the women in the Senior Designer or Lead Designer

roles has a pay discrimination claim; men and women in the Senior Designer role are paid

identically, while women in the Lead Designer role are paid more than men in the same role. But

an aggregated model, where Senior, Lead, and Junior Designers are combined into a single

model—like Dr. Neumark's analysis—suggests that all female Designers are paid, on average,

$1,667 less than all male Designers ($173,333 average pay for women vs. $175,000 average pay

for men). This outcome—while "common"—does not reflect reality. It suggests a pay shortfall

for female Senior and Lead Designers where none exists. It also underestimates the pay

difference for Junior Designers (which is actually $5,000 per female employee), an equally

problematic outcome. None of these putative class members could have accurately "relied on

[Dr. Neumark's aggregated analysis] to establish liability if she had brought an individual

action." The analysis produced the wrong result in all cases. As a result, even according to

Plaintiffs' new case *Olean*, class certification does not follow.

### III.    Plaintiffs' Attempt To Sandbag Nike And The Court With An Untimely Expanded Class Definition Should Be Rejected.

It is well established that, barring unusual circumstances, plaintiffs are limited at

certification to the class definition contained in the operative complaint, and cannot offer another

one *sua sponte* on a motion for class certification. *See Jordan v. Paul Fin., LLC*, 2009 WL

192888, at *6 (N.D. Cal. Jan. 27, 2009) (holding plaintiff must seek leave to file an amended

complaint before redefining the class definition); *Costelo v. Chertoff*, 258 F.R.D. 600, 604-05

(C.D. Cal. 2009) ("The Court is bound to class definitions provided in the complaint and, absent

an amended complaint, will not consider certification beyond it."); *Berlowitz v. Nob Hill*

*Masonic Mgmt.*, 1996 WL 724776, at *2 (N.D. Cal. Dec. 6, 1996) ("[T]he court will not consider

certification of the class beyond the definition provided in the complaint unless plaintiffs choose

to amend it."). In the limited circumstances when amendment is permitted at the class

certification stage, the putative class definition may diverge from that set forth in the operative complaint only if "the new class definition is narrower than the original, . . . or the proposed change is minor and non-prejudicial to the defendant." *Cancino Castellar v. Mayorkas*, 2021 WL 4081559, at *8-10 (S.D. Cal. Sept. 8, 2021) (excluding a class definition revision that was not minor and non-prejudicial) (internal citations omitted).

Plaintiffs not only disregard this basic tenet of class certification, but have waited until their ***reply brief*** to make this significant change. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1289 n.4 (9th Cir. 2000) (citing *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 858 n.4 (9th Cir. 1999). Plaintiffs' amendment comes at the last possible moment, nearly four years after filing the operative complaint, and after completion of close to four years of fact discovery, six expert reports and expert depositions, and hundreds of pages of briefing, all of which relied on Plaintiffs' original definition. Plaintiffs offer no explanation or excuse to even attempt to justify this dilatory change. The Court should deny their request. *See Polo v. Goodings Supermarkets, Inc.*, 232 F.R.D. 399, 409 (M.D. Fla. 2004) (refusing plaintiff's request to revise class definition on reply in support of motion for class certification nearly seven months after discovery opened).

A.    **Plaintiffs' Untimely Proposed Class Definition Is Broader Than The Original.**

Courts regularly reject delinquent class definition changes, particularly where, as here, they are used to expand the size or scope of the putative class. *See Naylor Farms v. Anadarko OGC Co.*, 2009 WL 8572026, at *3 (W.D. Okla. Aug. 26, 2009), *order clarified sub nom.*, *Naylor Farms, Inc. v. Anadarko OGC Co.*, 2011 WL 7267850 (W.D. Okla. June 15, 2011) (striking third amended class definition increasing the scope of the class, where, *inter alia*, the court concluded it would be unfair to defendants who had been defending the case based on the prior definition for more than four years); *In re Wal-Mart Wage Hour Emp. Pracs. Litig.*, 2008

WL 3179315, at *6 (D. Nev. Jun. 20, 2008) (rejecting plaintiffs' motion for class certification to the extent it seeks to expand the class time period and class definition beyond the parameters contained in plaintiffs' complaint). The *Naylor* court in particular highlighted the case's extensive litigation history, including extensive discovery and evidentiary hearings based on the previous class definition, when denying the plaintiff's request. *Naylor Farms*, 2009 WL 8572026, at *3. Just like in *Naylor*, the parties here have been litigating the case for years based on Plaintiffs' original definition, including significant discovery hearings and disputes. Nike has spent significant resources on experts who provided opinions based on Plaintiffs' original definition. As in *Naylor*, Plaintiffs' attempt to expand the definition of the class at this late stage "must fail" because "[t]he time for expanding the class and presenting evidence in support of the certification thereof passed." *Id.*

B.     **Plaintiffs' Untimely Rewriting Of The Class Definition Prejudices Nike.**

Make no mistake. While Plaintiffs attempt to downplay their class definition change by describing the "only change" as amending the OEA period to "begin[] 15 days earlier" (Reply at 2 & fn. 1), this is a significant change. First, under Plaintiffs' original class definition, *their lead plaintiff*, Kelly Cahill, *was not even a putative class member*. Oppo. at 48 fn. 41. It was Plaintiffs' counsel, not Nike, who pleaded, litigated, and moved to certify a class that did not include their own lead plaintiff. And the only justification Plaintiffs offer for the change is invalid on its face. They argue the change was made "[t]o conform to the evidence of the earliest filed class charge by Plaintiff Cahill." Reply at 2. But the date of the filed administrative charge filed by Plaintiff Cahill is not recently discovered evidence. Ms. Cahill has been represented by Plaintiffs' counsel since 2018. Reply at 30 fn. 37. Her charge was filed in 2018 (probably by Plaintiffs' counsel). Suppl. Davis Decl. Ex. 1. This unjustifiable and material change is improper. *See In re Wal-Mart Wage Hour Emp. Pracs. Litig.*, 2008 WL 3179315, at *6 (denying plaintiffs'

motion for class certification to the extent it seeks to expand the class period when plaintiffs "cite no new facts uncovered during certification discovery which would warrant expanding the class period in this case").

Second, the change is material because it changes the statutory period for the parties' statistical analyses. Nike's expert, Dr. Ali Saad, based his 298-page report on Plaintiffs' original class definition. He identified relevant putative class members, selected their data, and analyzed Plaintiffs' claims based on *their* stated class definition. These efforts stretched over many months, at a significant cost to Nike. If the definition on which Dr. Saad relied—as provided by Plaintiffs—will now change, Dr. Saad must re-run his analysis and amend his report to reflect the newly-articulated statutory period. Anything less would deprive Nike of the opportunity to defend against Plaintiffs' claims. Yet starting over again would force Nike to expend significant additional resources to correct an issue entirely of Plaintiffs' own making. Fairness and equity do not permit such an outcome.

Plaintiffs may argue in response that their expert, Dr. Neumark, does not need to amend his analysis. Such argument only serves to highlight the significant flaws in Dr. Neumark's original work. As Nike argues in its Motion to Strike, Dr. Neumark's analysis was never limited to any class definition—his analyses went far beyond even Plaintiffs' new proposal. *See* Mot. to Strike Neumark, Dkt. 181 at 13-15. So, while it is correct that Dr. Neumark's analysis does not match any proposed definition of the class, old or new, this merely underscores that his opinions fail *Daubert*'s fit test and are otherwise unhelpful to the Court. *See id.*

Class definitions matter. They define the scope of fact and expert discovery. They tell us who is a putative class member and who is not. They inform the data used in complex statistical analyses. The parties have been litigating this case for almost four years using Plaintiffs' existing

class definition. In short, Plaintiffs made both a strategic and tactical decision about how to litigate this case, and there is no new fact or law that could justify the change they made—one that would require Nike to expend countless resources in response. The Court should not reward this type of gamesmanship. *See Cancino Castellar*, 2021 WL 4081559, at *9 (finding expanded class definition impermissible when Plaintiffs "do[] not address the administrative burden Defendants allege they would face" as a result of the expanded definition). The new class definition should be rejected and stricken.

## CONCLUSION

Nike respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.

Dated:  June 10, 2022                Respectfully submitted,

/s/ Felicia A. Davis
Daniel Prince, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
Felicia A. Davis, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
Laura E. Zabele, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Amy Joseph Pedersen, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  (503) 294-9408
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, INC