AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA E. ZABELE, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>   Defendant. | Case No.: 3:18-cv-01477-JR<br><br>SUPPLEMENTAL DECLARATION OF FELICIA A. DAVIS IN SUPPORT OF DEFENDANT NIKE, INC.'S SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION<br><br>FILED UNDER SEAL |

## SUPPLEMENTAL DECLARATION OF FELICIA A. DAVIS

I, Felicia A. Davis, declare and state as follows:

1.      I am an attorney duly licensed to practice law in the State of California, and am admitted *pro hac vice* to the District Court of Oregon.  I am a partner at the law firm of Paul Hastings LLP, counsel of record for Nike, Inc. in the above-captioned lawsuit.  I have personal knowledge of the facts contained herein, or know of such facts by my review of the files maintained by Paul Hastings LLP in the normal course of its business, and if called upon to do so, could and would competently testify thereto.

2.      I submit this Declaration in Support of Defendant Nike, Inc.'s Sur-Reply in Opposition to Plaintiffs' Motion for Class Certification.

3.      Attached hereto as **Exhibit 1** is a true and correct copy Kelly Cahill's Charge of Discrimination filed against Nike, Inc. on July 25, 2018, Bates numbered PLF_000749-56, also produced as Exhibit 32 in the Deposition of Kelly Cahill.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of Nike, Inc.'s March 5, 2015 offer letter for Heather Hender, Bates numbered NIKE_00014416, also produced as Exhibit 136 in the Deposition of Heather Hender.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of Nike, Inc.'s July 20, 2012 letter confirming Sara Johnston's acceptance for the Business Systems Analyst I - Integrated Planning Solutions position, Bates numbered NIKE_00014659.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of a relevant excerpt from the Deposition of Plaintiff Heather Hender, taken on January 14, 2021.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of a relevant excerpt from the Deposition of Plaintiff Sara Johnston, taken on November 24, 2020.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of a relevant excerpt from the Deposition of Opt-in Emily Tucker, taken on January 22, 2021.

9.     Attached hereto as **Exhibit 7** is a true and correct copy of a relevant excerpt from the Deposition of Plaintiff Kelly Cahill, taken on November 18, 2020.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 and the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 10th day of June 2022, at Los Angeles, California.

/s/ *Felicia A. Davis*

_____
Felicia A. Davis

ORIGINAL

**BUREAU OF LABOR AND INDUSTRIES**
Civil Rights Division Complaint of Unlawful Practice

| | |
|---|---|
| COMPLAINANT: | Case #: STEMSX180725-11114 |
| Kelly Cahill REDACTED | |
| RESPONDENT: | Contact: (503) 671-6453 |
| Nike, Inc. One Bowerman Drive Beaverton, OR 97006 | |
| County: Washington | # of Employees: 75,000+ |
| ORS 659A.030 | |

See attached statement for the particulars and the signature of the Complainant.

RECEIVED

JUL 25 2018

CIVIL RIGHTS DIVISION
PORTLAND OFFICE

1

762905

Davis Decl. Exhibit 1, Page 1 of 8

**EXHIBIT**

0032

PLF_000749

The Particulars are:

## I. OVERVIEW OF ALLEGATIONS

1.      This sex discrimination charge is filed on behalf of myself, Kelly Cahill, and all other similarly situated female corporate employees of Nike, Inc. ("Nike"), who worked at Nike's headquarters in Oregon at Nike's Corporate Division ("Oregon Corporate Employees"). Like other female Oregon Corporate Employees at Nike, I have been harmed by Nike's continuing policy, pattern, and practice of sex discrimination with respect to performance evaluations, pay, promotions, and other terms and conditions of employment in violation of the Oregon State Law Against Discrimination, ORS 659A.001, *et seq.*

2.      Nike has continued these policies and practices despite knowing that they have a disparate impact on female Oregon Corporate Employees. Nike's Oregon headquarters has a pervasive culture of gender discrimination and harassment that reinforces and exacerbates the discriminatory effects of Nike's policies and practices. On information and belief, Nike has retaliated against female Oregon Corporate Employees who complained about gender discrimination.

## II. NIKE HEADQUARTERS

3.      Nike's worldwide headquarters consists of campuses in and around Beaverton, Oregon. All of Nike's most senior executives are based at Nike's headquarters.

4.      Nike is divided into "Organizations" and "Teams." There is an executive, either a President or a Vice-President, in charge of each Organization. Within each Organization, there are "Teams." Typically, the most senior member of each Team is a Senior Director. I worked within the Direct to Consumer ("DTC") Organization on the Nike.com Team. The DTC Organization was within the Nike Brand Organization.

5.      Below Senior Directors, there are Directors, then Managers, and then a variety of lower-level titles, including lead, project coordinator, analyst, specialist, and assistant.

6.      In addition, Nike has thousands of workers that Nike has classified as independent contractors ("Contractors"). As both an employee and a manager, I observed that Nike full-time employees ("FTEs") were the primary people who directed the hiring of Contractors and conducted the interview process, dictated Contractors' pay, set Contractors' job duties, assigned work to Contractors, determined whether Contractors would receive pay increases, determined whether Contractors were promoted to FTEs, and made the decision to terminate a Contractor. On information and belief, the hiring was done through Nike's internal staffing agency, "Flex," which was located at Nike headquarters.

2

762905

Davis Decl. Exhibit 1, Page 2 of 8

PLF_000750

## III.  EDUCATION AND WORK HISTORY

7.      I graduated from the University of Oregon in 2004 with a Bachelor of Science in Sports Marketing.  I received a Project Management Certification from the University of Washington in 2011.  Before starting at Nike, I worked in marketing, business development, and digital advertising and marketing.

8.      I worked at Nike from November 2012 through July 2017.  I began as a Senior Producer on the Global Digital Brand Team, and Nike classified me as a Contractor while I held that position.  In October 2013, I was hired as a full-time employee at the Director level, as Global Cross-Category Director for Nike.com from October 2013 to November 2014 and then as Brand Marketing Director for Nike.com, North America until I left on July 26, 2017.

9.      Although Nike is divided into Organizations and Teams, there are many connections and similarities across Organizations and Teams.  Nike Oregon Corporate Employees often had more than one direct or indirect line of reporting, and there were overlapping responsibilities among employees in different Organizations and/or different Teams. In addition, Nike Oregon Corporate Employees were transferred and/or promoted from one Team and/or Organization to another.  Other Nike employees worked as Directors on different Teams and Organizations, and, on information and belief, they had similar responsibilities as I did.

10.     During my tenure at Nike, I consistently achieved and exceeded my performance goals and made significant contributions to Nike's business.  I also took on additional responsibilities, including, for example, after a reorganization around fall of 2016, I became responsible for all the duties previously held by Paige Azavedo, including ten additional direct reports.

## IV.  DISCRIMINATION

Performance Evaluations

11.     On information and belief, Nike has a uniform rating system for annually evaluating employee performance.  One part of the performance evaluation process is supposed to be a substantive, written evaluation, called "Coaching for Excellence" ("CFE").  Oregon Corporate Employees are supposed to discuss their CFE with their managers one-on-one during a mid-year review, which occurs around January, and a final review, which occurs around June.

12.     The critical part of the performance evaluation process is the rating of employees by their managers.  On information and belief, all employees with a Senior Director, Director, Manager, or lower-level title are given a rating.  There are five possible ratings: exceptional, highly successful, successful, inconsistent, and needs improvement.  Nike has a policy and practice of limiting the number of Oregon Corporate Employees who can receive a highly successful rating as well as to limit the number of Oregon Corporate Employees who can receive an exceptional rating.  I was told that I could only propose that two of my direct reports could receive highly successful ratings, and I was told that I could not propose that any of my direct reports receive a rating of exceptional.

3

762905

Davis Decl. Exhibit 1, Page 3 of 8

PLF_000751

13. Each employee is initially given a suggested rating by their direct manager. There is then a series of "calibration" meetings, where each Corporate employee's rating is discussed, and the participants in the calibration meetings are, on information and belief, mostly men.

14. For employees who are in Manager and lower positions, the initial calibration meeting is among the Senior Director and Directors on that employee's Team. Subsequently, the head of the Organization and Senior Directors hold another calibration meeting for all the Manager and other positions below Senior Director. If the employee is a Director, then the calibration meetings are done by Senior Directors and Vice-Presidents. On information and belief, the calibration meetings for Senior Directors' ratings are done by Vice-Presidents. The head of each Organization determines the rating for each employee within that Organization according to the rating system. This means that, ultimately, on information and belief, a small group of mostly male Vice-Presidents and other executives determine the ratings.

15. The ratings are finalized before the end of the fiscal year, which is on May 31, because the ratings impact compensation. This means the ratings must be and are finalized before the final reviews of Nike Oregon Corporate Employees in June.

16. On information and belief, female Oregon Corporate Employees regularly got lower scores than their male peers despite having equal or better work performance. On information and belief, I received lower ratings than my male peers.

17. On information and belief, the rating system is a common policy and practice utilized by Nike to rate Nike Oregon Corporate Employees. Women are routinely rated lower than similarly situated men, and this causes a disparate impact in pay and promotion, amongst other employment conditions, because the rating system has a direct, substantial impact on compensation and promotions.

<u>Compensation</u>

18. Oregon Corporate Employees' compensation is a result of, first, Nike's "Band" system, a specific range of salary or hourly pay and other compensation such as bonuses and equity compensation. There are six Bands, each identified by a letter that spells the word "VALUES." The S-Band is the highest level, and the L-Band and higher are salaried employees. The employees in the V-Band and A-Band are paid by the hour. Within each Band, there is a range of salaries. On information and belief, the high-end of each Band overlaps with the low-end of the next highest Band. On information and belief, Managers were in either the U-Band or E-Band, Directors were in either the E-Band or S-Band, and Senior Directors were in the S-Band. Within the E-Band and S-Band, there are also sub-Bands. I was in the E-Band for the four years I was a full-time employee at Nike.

19. Compensation within each Band is also affected by the ratings. The ratings are a critical component of the performance evaluation system because it, and not the written CFE, is used to determine annual salary or hourly raises, bonuses under the Performance Sharing Plan ("PSP"), and the amount, if any, of equity compensation awarded.

4

Davis Decl. Exhibit 1, Page 4 of 8

PLF_000752

20.     Each rating entitles employees receiving that rating to, for example, a percent increase in salary within a certain range. The higher the rating, the higher the range at both the low-end and high-end. For example, the range of potential pay increases is higher for employees who receive a "highly successful" rating than those who receive a "successful rating." Likewise, the "highly successful" employee is entitled to a higher range of annual bonus than the employee who receives a "successful" rating. Nike determines a target percentage for bonus for each Band level, and the bonus is then increased or decreased based on the rating.

21.     Oregon Corporate Employees' senior managers are, within certain parameters, the ultimate arbiters of the ratings as well the specific percent increase in annual pay, the annual bonus payment, and the amount of equity compensation awarded, if any. Senior managers' decisions are cabined in several systematic ways, including, for example, the specific range tied to each rating. In addition, Nike provides the head of each Organization with a set pool of money to distribute among the employees in the Organization as pay increases and other compensation. Like the rating system, the set pool of money means that not all employees in the Organization will get the largest percent increase for salary or bonus within the range tied to their rating. On information and belief, compared to similarly situated male Oregon Corporate Employees who receive the same rating as female Oregon Corporate Employees, women are awarded annual pay increases and annual bonuses that are on the lower end of the range assigned to the rating.

22.     Stock options are also awarded annually along with pay increases and annual bonuses, but not all Oregon Corporate Employees are awarded equity compensation. On information and belief, Oregon Corporate Employees are not eligible to be awarded equity compensation unless they are at a certain Band and/or are paid at least a certain amount in salary. Because female Oregon Corporate Employees are paid less than similarly situated male Oregon Corporate Employees and receive smaller annual pay increases than similarly situated male Oregon Corporate Employees, the threshold requirement for the award of equity compensation further compounds the gender discrimination caused by Nike's compensation and promotion policies and practices.

23.     The compensation range tied to each rating is less value to women because female Oregon Corporate Employees are in lower Band levels than male peers and receive lower salary increases than their male peers. Male Oregon Corporate Employees, by contrast, received larger percent increases to their larger salaries.

24.     During Nike's recently-initiated internal review of gender discrimination issues, Nike recognized that it needs to change its compensation system.

25.     On information and belief, Nike's compensation system also discriminates against female Oregon Corporate Employees who qualify for Nike's severance plan benefit. Nike's standard severance plan determines the severance amount by looking at the number of years worked at Nike, the Band level, and compensation. Since Nike's compensation and promotion policies and practices had a disparate impact on female Oregon Corporate Employees, female

762905

Davis Decl. Exhibit 1, Page 5 of 8

PLF_000753

Oregon Corporate Employees were again discriminated against when Nike paid the severance benefit.

26.     On information and belief, Nike paid me less than similarly situated males with respect to salary, bonuses, and equity compensation. When I was hired as a full-time employee, I was asked what my salary was as a contractor. I started at $110,000 and when I left I had a salary of about $127,000. On information and belief, a male Director on my Team, Tim Ramirez, had a salary that was approximately $20,000 higher than my salary.

27.     On information and belief, compared to similarly situated male Oregon Corporate Employees, female Oregon Corporate Employees' starting salary was lower and they were in lower Band levels.

Promotions

28.     The ratings also impact promotion decisions. On information and belief, for example, if an employee receives a rating below successful, then the employee is automatically barred from applying to any internal openings.

29.     Although I consistently met and exceeded my performance goals and gained significant, relevant experience prior to Nike, I was never promoted to Senior Director.

30.     I sought a Senior Director position on my Team around July 2017, but that position was given to a male Director who I had worked with and observed was not performing as well as I was performing.

31.     After I left Nike, on information and belief, my position was filled by a man who was awarded the title of Senior Director and placed in the E-Band.

32.     On information and belief, although Nike has an approximately equal number of men and women in Corporate, the senior level positions at Nike Headquarters are overwhelmingly held by men. Only about 29% of Nike's Vice-Presidents are women, and only about 38% of Directors and Senior Directors are women. On information and belief, women make up significantly less than 38% of Senior Directors.

33.     On information and belief, women make up significantly less than 50% of Oregon Corporate Employees in the E-Band (2nd highest Band) or the S-Band (highest Band) and significantly more than 50% of the Oregon Corporate Employees who are L-Band (4th highest Band) or U-Band (3rd highest Band).

34.     Nike's current Vice-President of human resources stated, in April 2018, that the makeup of Nike's Vice-Presidents "demonstrate[s] that we need to accelerate representation of women . . . at leadership levels within the company." Nike's current Vice-President of human resources also recently wrote, "[w]hile we've spoken about this many times, and tried different ways to achieve change, we have failed to gain traction—and our hiring and promotion decisions are not changing senior-level representation as quickly as we have wanted."

6

762905

Davis Decl. Exhibit 1, Page 6 of 8

PLF_000754

<u>Job Assignments</u>

35.     As an employee and manager, I observed that Nike Oregon Corporate Employees who had a better connection or visibility to certain senior executives received higher compensation and more promotions than those Nike Oregon Corporate Employees who lacked those connections or visibility.

36.     I also observed that women worked in roles where they were disproportionately promoted less and, on information and belief, paid less than other roles.

<u>Nike's Awareness of the Discrimination and Nike's Culture and Retaliation</u>

37.     On information and belief, Nike's Vice-President of human resources from 2007 through mid-2017, David Ayre, fostered a hostile work environment and was subject to numerous complaints of inappropriate workplace behavior. Nike conducted at least two internal investigations of Mr. Ayre for creating a hostile work environment.

38.     Numerous Nike employees have reported that they found Nike human resources unhelpful and sometimes disrespectful. On or about April 28, 2018, Nike admitted that its Human Resources department failed to consistently work well.

39.     There was a survey of female corporate employees about gender discrimination within Nike. The results of this survey were shared with Nike's CEO on March 5, 2018. Within three weeks of receiving the results of this survey, the CEO announced that Trevor Edwards, the widely-recognized next CEO of Nike, was leaving Nike.

40.     Nike has been conducting an internal review of gender discrimination since March 2018. During this review, Nike has announced that at least nine senior level executives are leaving the company in addition to Mr. Edwards.

41.     Approximately one year ago, Mr. Ayre sent an email to all Oregon Corporate Employees stating that Nike was going to examine whether there was a pay disparity between men and women. Approximately one month after this email, Mr. Ayre sent another company-wide email stating that Nike reviewed whether there was gender discrimination at Nike, any issues that were identified were corrected, and that there were no remaining gender discrimination issues. However, his email did not provide any data or analysis supporting those assertions.

42.     I was subjected to and witnessed a former Vice-President at Nike, Daniel Tawaih, devalue women. For example, in my presence, he referred to certain women as "dykes" on several occasions. Around April 2016, Mr. Tawaih, several other Oregon Corporate Employees, including a male Director on my Team, and I were eating dinner at a restaurant. During the dinner, Mr. Tawaih said that they were hiring a new Director. I asked Mr. Tawaih about the status of the hiring process and who was being considered because the new Director would impact Cahill's work. In response, Mr. Tawaih told me that I did not need to know the status and

PLF_000755

that my opinion did not matter. At the same time, on information and belief, the male Director on my Team was included in the hiring process.

43. I also witnessed Mr. Tawaih, then a Senior Director, berate a fellow female Oregon Corporate Employee. In approximately May 2016, Mr. Tawaih yelled at this female employee in front of me and several other Oregon Corporate Employees. Then, around July 2016, Mr. Tawaih again yelled at this female Oregon Corporate Employee about the same issue; this time it was in front of employees of an advertising agency that Nike hired for a project, as well as me and several other Oregon Corporate Employees. On that occasion, Mr. Tawaih yelled at this female Oregon Corporate Employee something along the lines of that she was a failure and that the failure of a project was all her fault even though it was mostly Mr. Tawaih's fault that the project was not completed in a certain timeframe.

44. I complained to Nike Human Resources on four separate occasions, including about the above-described incidents. None of those complaints resulted in any meaningful consequences or corrective actions.

## V. CLASS CLAIMS

45. It is my understanding and belief that Nike has engaged in a continuing pattern or practice of discrimination based on sex against female Oregon Corporate Employees throughout the United States with respect to performance evaluations, compensation, promotions, and other terms and conditions of employment at Nike.

46. Among other means, Nike: has implemented this pattern and practice of discrimination through a rating system that systematically underrates female Oregon Corporate Employees as compared to their male peers, denies them fair compensation, denies them promotions, and increases the likelihood of termination. On information and belief, Nike also condones disparities in pay and promotion as well as retaliation against female employees who complain about discrimination.

47. Nike's performance review, compensation, and promotion systems have an adverse impact on female Oregon Corporate Employees throughout the United States. On information and belief, although Nike has known about the adverse impact of their practices on women's compensation and promotional opportunities, Nike failed to take steps to address the adverse impact.

I swear under penalty of perjury that I have read the above charge and that it is true and correct to the best of my knowledge, information, and belief. This charge is not intended to be exhaustive, but representative of the treatment to which Nike has subjected me.

Date: 7/25/18

Kelly Cahill
Charging Party

8

762905

Davis Decl. Exhibit 1, Page 8 of 8

PLF_000756



March 5, 2015

Heather Hender
9549 NW Elva Ave
Portland Oregon 97231
hdhender@hotmail.com

Dear Heather,

Welcome! We are pleased to present Nike's offer for the position of Manufacturing Engineer II. We feel that your experience and talents are valuable to Nike, and we are excited that you will be joining the team. As discussed, your start date will be April 6, 2015.

This offer is contingent upon the successful completion of a background investigation.

As an exempt employee not eligible for overtime, we are offering you an annualized salary of $78,600.00, which will be paid on a biweekly basis.

This offer is contingent upon the successful completion of a drug screen. As mentioned during your verbal offer, you have 48 hours from the time of that offer to complete the drug screen.

As a Nike Inc. employee, you are eligible to participate in the Performance Sharing Plan (PSP). PSP is a discretionary bonus program based upon a percentage of your eligible paid fiscal year earnings (June 1 - May 31), and is distributed in August if we achieve our financial goals for the year. The target PSP percentage for this position is 10%. This incentive bonus will vary based upon company performance and your individual performance as determined at Nike's discretion. You must be employed by Nike on the last day of the fiscal year to be eligible to receive a PSP bonus. Further details on this Plan, including performance scales and other eligibility requirements will be provided to you. The terms and conditions of this Plan may be amended or varied at Nike's discretion and such amendment or variation shall be valid upon notification to you.

You will be eligible for most corporate benefits on your first day. If you haven't already, be sure to check out the overview of what Nike Benefits has to offer at http://www.nikeinc.com/pages/benefits. Nike is committed to family-friendly benefits and resources. If you require child care for children between ages 0-5, the Family Resource Coordinator in the Nike Child Development Program can help you identify options, including information about Nike's onsite childcare facilities. Call 503-671-6416 or email Melissa.McReynolds@nike.com.

You will be attending New Hire Orientation at Nike World Headquarters in Steve Prefontaine Hall, Eugene Auditorium (see attached map), on April 6, 2015 scheduled 8:00 am - 4:30 pm. The day will be spent getting you on-board, and touring the campus (bring comfortable shoes for the walking tour). You'll learn more about your resources, benefits, and NIKE's history. Please bring documentation to confirm your eligibility to work in the United States (see the attached form for guidance on acceptable documents). You must provide legal documentation to start working on your first day.

This offer, and your acceptance thereof, is contingent upon your agreement to the terms of the Covenant Not to Compete and Non-Disclosure Agreement which will be sent to your email to review and eSign the document through the *NIKE Contract Management* system.

Finally, this letter constitutes your offer with Nike and supersedes all prior oral or written communications between you and Nike on the subject matter of your employment. You understand and acknowledge that this is an offer for "at will" employment at Nike. This means that you may resign from Nike or Nike may end the employment relationship at any time, with or without cause, and with or without notice.

Heather, we feel that you have a great deal to contribute to our team and we hope that you will find opportunity, challenge, and satisfaction in your association with Nike.

Regards,

Michael Pfluger
DIRECTOR IHM ENG -VISI-ZOOM/TOOLING
Nike



EXHIBIT
136



July 20, 2012

Dear Sara,

Congratulations! We are pleased to confirm your acceptance of NIKE's offer for the position of Business Systems Analyst I - Integrated Planning Solutions, reporting to {HMGR_NAME}. We feel that your experience and talents are valuable to NIKE. As discussed, your start date will be August 13, 2012.

This offer is contingent upon the successful completion of a background investigation.

As an exempt employee not eligible for overtime, we are offering you an annualized salary of $57,000.00, which will be paid on a biweekly basis.

You will remain eligible to participate in the Nike Inc. Performance Sharing Plan (PSP). PSP is a bonus program based upon a percentage of your eligible paid fiscal year earnings (June 1 - May 31) and is distributed in August if we achieve our Pre Tax Income goals for the year. The target PSP percentage for this position is 10%. This incentive bonus will vary based upon company performance and your individual performance.

Finally, this letter constitutes your offer with NIKE and supersedes all prior oral or written communications between you and NIKE on the subject matter of your employment. You understand and acknowledge that this is an offer for "at will" employment at NIKE . This means that you may resign from NIKE or NIKE may end the employment relationship at any time, with or without cause, and with or without notice.

Sara, we feel that you have a great deal to contribute to our team and we hope that you will continue to find opportunity, challenge, and satisfaction in your association with Nike Inc. If you have any questions, please feel free to contact {NAME} at [PHONE_NUMBER]. To accept this offer, please sign below and return a copy of this letter to {HMGR_NAME}.
Regards,

Rahul Sanghoi
SR. IT Manager
[Brand]

I accept and agree to the terms of the above offer of employment.

Employee's Signature:_____
Date:_____

Davis Decl. Exhibit 3, Page 1 of 2

Confidential                                                                    NIKE_00014659

Confidential

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF OREGON
 2                 PORTLAND DIVISION
   _____

 3

   KELLY CAHILL, SARA JOHNSTON,  )
 4 LINDSAY ELIZABETH, and HEATHER)
   HENDER, individually and on   )
 5 behalf of others similarly    )
   situated,                     )
 6                               )
                 Plaintiffs,     )
 7                               )
   vs.                           ) No. 3:18-cv-01477-JR
 8                               )
   NIKE, INC., an Oregon         )
 9 Corporation,                  )
                                 )
10               Defendant.      )
   _____

11

12    VIDEO-RECORDED REMOTE COUNSEL ZOOM DEPOSITION

13              UPON ORAL EXAMINATION OF

14                   HEATHER HENDER

15 _____

16

17                   9:10 A.M.

18             THURSDAY, JANUARY 14, 2021

19     (ALL PARTICIPANTS AT THEIR RESPECTIVE LOCATIONS)

20         WITNESS LOCATION:  REDMOND, WASHINGTON

21

22

23

24 Reported by:  Tami Lynn Vondran, CRR, RMR, CCR
   Washington CCR No. 2157, Oregon CSR No. 20-0477

25

                                         Page 1
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 4, Page 1 of 7

1      A.   Yes.

2      Q.   What about that Manufacturing Engineering II

3  position interested you?

4      A.   Well, it talked about the production.  I was

5  also interested, at the time, in working for Nike, a

6  prominent Beaverton employer with a lot of history, a

7  lot of -- what's word I'm looking for?  A lot of stature

8  in Oregon and the Portland area.

9      Q.   I'm going to upload the next exhibit in order.

10     A.   I have it now, 136.

11     Q.   You have it, great.  It's Exhibit 136.

12          (Exhibit No. 136 was marked remotely for

13               identification.)

14     A.   I have it open now.

15     Q.   (BY MR. PRINCE)  Is this the -- it's a letter

16  dated March 5, 2015.

17          Is this the offer letter that you received

18  from Nike in connection with the Manufacturing

19  Engineer II position?

20     A.   It appears to be, yes.

21     Q.   This was the same position that you had

22  applied for; correct?

23     A.   I believe so.

24     Q.   And it states that the annual salary is 78,600

25  for that position; right?

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 4, Page 2 of 7

```
 1       A.   It says so, yes.

 2       Q.   And you -- you knew that the Manufacturing

 3  Engineer II position was an L-Band position; is that

 4  correct?

 5       A.   I'm not sure I understood the Band system at

 6  Nike at this stage -- at that stage.

 7       Q.   When you applied or subsequently?

 8       A.   When this offer letter was -- was given to me,

 9  or made to me.

10       Q.   When you applied for the position, did you

11  understand that you were applying for an L-Band

12  position?

13       A.   I do not -- I do not believe I had knowledge

14  of the Band system or what an L-Band was at that time.

15       Q.   Did you have an understanding of what the pay

16  range might be for the manufacturing engineering

17  position when you applied?

18       A.   I don't recall that I had a pay range for

19  that -- I don't know if -- I do not remember knowing

20  what Nike paid its Engineer IIs at that time.

21       Q.   So when you submitted for the position, you

22  did not have any understanding as to what the pay range

23  might be?

24       A.   I do not recall that I did.

25       Q.   You never attempted to negotiate that starting
```

Page 169

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 4, Page 3 of 7

```
 1   salary of $78,600; is that correct?
 2        A.   I did not know that negotiation was an option.
 3        Q.   Did you inquire?
 4        A.   I did not know it was an option.
 5        Q.   So you never made the inquiry?
 6        A.   I didn't know inquiring was an option.  I
 7   thought the offers -- the offer was what it was.
 8        Q.   Did you believe that -- that the
 9   $78,600 salary was appropriate at the time that you
10   accepted the offer?
11             MR. DENLINGER:  Objection.  Vague and
12   ambiguous as to the word "appropriate."
13             You can answer, Heather.
14        A.   I believe it was the offer made at the time.
15        Q.   (BY MR. PRINCE)  Did you tell anyone that you
16   thought the salary was too low?
17        A.   That implies that I thought the salary was too
18   low.  I did not discuss it with anyone other than my
19   spouse.
20        Q.   Other than your spouse, did you tell anyone
21   whether or not you believed the salary was too high or
22   too low?
23        A.   I did not, other than with my spouse, tell
24   anyone whether or not I believed the salary was too high
25   or too low.
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 4, Page 4 of 7

1     Q.   The offer letter that's in front of you as

2   Exhibit 136 also references a PSP bonus, a target bonus.

3        Do you see that, a 10 percent target bonus?

4     A.   I see that.

5     Q.   Did you have a conversation with anyone about

6   whether or not you thought that was an appropriate

7   target bonus?

8     A.   Other than my spouse, I did not have a

9   conversation about that with anyone.

10     Q.   What were your job responsibilities as a

11   Manufacturing Engineer II?

12     A.   I quickly became the robotics and vision

13   system specialist for one of the older lines and then

14   incoming new line, which were new technology being

15   brought on site.  So one of my first major projects was

16   the placement of a robotic controller in 2015, a complex

17   technical job which involved the ABB, which is the robot

18   manufacturer technology team, and orchestrating that

19   project.

20     Q.   Did you have any other responsibilities?

21     A.   There were responsibilities around new product

22   introduction.  And, again, I quickly became the expert

23   at teaching vision system patterns for new product

24   introduction on robotic cell.  Also improving yield and

25   throughput for the robotic and vision cell.

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 4, Page 5 of 7

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, TAMI LYNN VONDRAN, the undersigned Certified

 4    Court Reporter, pursuant to RCW 5.28.010, authorized to

 5    administer oaths and affirmations in and for the State

 6    of Washington, do hereby certify that the sworn

 7    testimony and/or proceedings, a transcript of which is

 8    attached, was given before me at the time and place

 9    stated therein; that any and/or all witness(es) were

10    duly sworn to testify to the truth; that the sworn

11    testimony and/or proceedings were by me stenographically

12    recorded and transcribed under my supervision, to the

13    best of my ability; that the foregoing transcript

14    contains a full, true, and accurate record of all the

15    sworn testimony and/or proceedings given and occurring

16    at the time and place stated in the transcript; that a

17    review of which was not requested; that I am in no way

18    related to any party to the matter, nor to any counsel,

19    nor do I have any financial interest in the event of the

20    cause.

21          WITNESS MY HAND AND DIGITAL SIGNATURE THIS 26th

22    day of January, 2021.

23

24

      TAMI LYNN VONDRAN, CRR, RMR, CCR

25    Washington CCR No. 2157, Oregon CSR No. 20-0477

                                         Page 265
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 4, Page 6 of 7

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Dates: January 14, 2021 and March 17, 2021

Deponent: Heather Hender

| Page | Line(s) | Reads | Should Read | Reason |
|---|---|---|---|---|
| 17 | 21 | practices and pay, performance and | practices in pay, promotions and | To correct an inadvertent error |
| 18 | 4 | pay, performance and | pay, promotions and | To correct an inadvertent error |
| 24 | 9 | performance and evaluations | promotions and evaluations | To correct an inadvertent error |
| 25 | 1 | performance and evaluations | promotions and evaluations | To correct an inadvertent error |
| 26 | 14 | pay, performance and | pay, promotion and | To correct an inadvertent error |
| 49 | 4 | pay, performance and | pay, promotions and | To correct an inadvertent error |
| 227 | 4 | what she [sic] was | what he was | To correct an inadvertent error |
| 274 | 1 | it's where I achieved the pen | it's where I achieved the patent | To correct a transcription error |
| 275 | 3 | there are a few similarities in that | there are few similarities in that | To correct a transcription error |
| 275 | 6 | There are few similarities, so I won't say | There are few similarities, so I would say | To correct a transcription error |
| 276 | 5-6 | and a 50-percent target bonus. | and a 15-percent target bonus. | To correct a transcription error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on April 21, 2021 in King County, WA.

DocuSigned by:
Heather Hender
72E5D0E6364F46D...

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF OREGON |
| 3 | PORTLAND DIVISION |
| 4 | |
| 5 | KELLY CAHILL, SARA JOHNSTON,     Case No.: 3:18-cv-01477-JR |
| | LINDSAY ELIZABETH, and HEATHER |
| 6 | HENDER, individually and on |
| | behalf of others similarly |
| 7 | situated, |
| 8 |        Plaintiffs, |
| 9 |    v. |
| 10 | NIKE, INC., an Oregon Corporation, |
| 11 |        Defendant. |
| | _____ |
| 12 | |
| 13 | |
| 14 | |
| 15 | VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF |
| 16 | SARA JOHNSTON |
| 17 | Beaverton, Oregon |
| 18 | Tuesday, November 24, 2020 |
| 19 | Volume 1 |
| 20 | |
| 21 | |
| 22 | Reported by: |
| | LESLIE JOHNSON |
| 23 | RPR, CCRR, CSR No. 11451 |
| 24 | Job No.: 4347395 |
| 25 | PAGES 1 - 312 |

Page 1

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 5, Page 1 of 10

```
 1    12:06 p.m.                                          12:06:40

 2    BY MR. PRINCE:

 3        Q    So we just went off the record for a

 4    moment.  But, Ms. Johnston, I just want to be clear.

 5    Are you going to decline to respond to the last       12:06:52

 6    question?

 7        A    Yes.  I'm going to follow the advice of my

 8    lawyer.

 9        Q    Okay.  After you departed Standard TV,

10    what was your next position?                          12:07:06

11        A    I worked in human resources at Lifeworks

12    Northwest.  Additionally, part-time as a swim

13    instructor at Nike.

14        Q    Do you recall your starting pay when you

15    were with Lifeworks Northwest?                        12:07:26

16        A    I do not recall.

17        Q    Do you recall your ending pay?

18        A    I believe it was $35,000, approximately.

19    After I left Lifeworks, I also received an on-call.

20    I continued on to help advise through their           12:07:50

21    transition.  And they do pay a differential for --

22    they changed it to hourly from salary and added a

23    differential for on-call work.

24        Q    So while you were at Lifeworks, you were

25    hourly?                                               12:08:08
```

Page 77

Davis Decl. Exhibit 5, Page 2 of 10

```
 1        A     I was salary.                              12:08:09

 2        Q     You were salary?

 3        A     I was an exempt employee.

 4        Q     And what was your title there?

 5        A     To the best of my knowledge, I believe    12:08:21

 6   human resource specialist.

 7        Q     What were your duties?

 8        A     My duties over time were similar.  There

 9   are six areas of expertise inside human resources;

10   benefits administration, recruitment, employee        12:08:43

11   relations, training and development, compensation.

12   And I'm forgetting one.  But I believe that I did

13   several of those while I was employed.

14             My primary focus was on recruitment and

15   benefits administration.  And then I additionally     12:09:11

16   did a lot of work with IT in that space.  I acted

17   similar to the role of a business analyst and helped

18   them bring all of their job applications online

19   and -- as well as their training development for

20   recredentialing their providers.                      12:09:38

21             And then, additionally, I helped out in

22   the -- the provider space.

23        Q     You mentioned that HR has a number of

24   different disciplines.  I'm presuming that was the

25   case at Lifeworks, or are you contending that every   12:10:05
```

Page 78

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 5, Page 3 of 10

```
 1              REPORTER'S CERTIFICATION

 2

 3          I, Leslie Johnson, a Certified Shorthand

 4    Reporter of the State of California, do hereby certify:

 5          That the foregoing proceedings were taken

 6    before me at the time and place herein set forth; that

 7    any witnesses in the foregoing proceedings, prior to

 8    testifying, were administered an oath; that a record of

 9    the proceedings was made by me using machine shorthand

10    which was thereafter transcribed under my direction;

11    that the foregoing transcript is a true record of the

12    testimony given.

13          Further, that if the foregoing pertains to

14    the original transcript of a deposition in a Federal

15    Case, before completion of the proceedings, review

16    of the transcript [ ] was [ ] was not requested.

17    I further certify I am neither financially interested in

18    the action nor a relative or employee of any attorney or

19    any party to this action.

20          IN WITNESS WHEREOF, I have this date

21    subscribed my name.

              Dated:  December 15, 2020

22

23                   Leslie Johnson

24

               LESLIE JOHNSON

25          CSR No. 11451, RPR, CCRR

                                        Page 312
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 5, Page 4 of 10

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: November 24, 2020

Deponent: Sara Johnston

| Page | Line(s) | Reads | Should Read | Reason |
|------|---------|-------|-------------|--------|
| 7 | 11 | Menfei | Mengfei | To correct a transcription error |
| 7 | 25 | Renée | Renee | To correct a transcription error |
| 30 | 5 | Yes. | Not when I was interviewed, but when I was interviewing other people. | Misheard the question |
| 32 | 5 | what | where | To correct a transcription error |
| 33 | 9 | Fallgamwalla | Balgamwalla | To correct a transcription error |
| 33 | 10 | David – I don't remember | David Klasner | To correct spelling |
| 37 | 23 | Maybe the lawyer | Maybe at the lawyers' office | To correct a transcription error |
| 39 | 1 | Acevedo | Azavedo | To correct a transcription error |
| 39 | 6 | Acevedo | Azavedo | To correct a transcription error |
| 39 | 9 | Acevedo | Azavedo | To correct inadvertent error in year |
| 39 | 11 | Acevedo's | Azavedo's | To correct a transcription error |
| 39 | 14 | Acevedo's | Azavedo's | To correct a transcription error |
| 39 | 19 | Acevedo's | Azavedo's | To correct a transcription error |
| 39 | 25 | Acevedo | Azavedo | To correct a transcription error |
| 40 | 5 | Acevedo | Azavedo | To correct a transcription error |
| 40 | 8 | Acevedo | Azavedo | To correct a transcription error |
| 40 | 11 | Acevedo | Azavedo | To correct a transcription error |
| 49 | 2 | To my knowledge, no. | Other than Nike, to my knowledge, no. | Misheard the question. |
| 49 | 22 | recognized the same rate as men | recognized at the same rate as men | To correct a transcription error |
| 49 | 23-24 | individuals who started with | individuals who I started with | To correct a transcription error |
| 53 | 11 | to | Too | To correct a transcription error |
| 55 | 1 | skills. In that more junior ASR, I did not realize | skills in that more junior, Sr. ASR role. I did not realize | To correct a transcription error |
| 55 | 2-3 | To my knowledge, I don't think I | To my knowledge, I don't think I viewed it that way. | To correct a transcription error |

| | | viewed it that way until then. | | |
|---|---|---|---|---|
| 55 | 18 | When I qualified | Which means to me that I was qualified | To correct a transcription error |
| 71 | 20 | after the same graduate school of management | Atkinson Graduate School of Management | To correct a transcription error |
| 77 | 19 | I also received an on-call. | I transitioned to an on-call role. | To correct a transcription error |
| 80 | 23 | Taleo is an application, a system application | Taleo is an application, an online job application tracking system | Full response to question asked |
| 86 | 16 | SaaS skills that come with that. | Social skills that come with that | To correct a transcription error |
| 88 | 21 | Colton | Colten | To correct a transcription error |
| 89 | 7-8 | I have suggested that two other people apply for the role | I encouraged two other people to apply for the role | To correct a transcription error |
| 90 | 14 | Colton | Colten | To correct a transcription error |
| 90 | 17 | Colton | Colten | To correct a transcription error |
| 91 | 16 | Colton | Colten | To correct a transcription error |
| 92 | 5 | Colton | Colten | To correct a transcription error |
| 92 | 7 | Colton | Colten | To correct a transcription error |
| 92 | 12 | Colton | Colten | To correct a transcription error |
| 93 | 4 | Colton | Colten | To correct a transcription error |
| 99 | 18 | Senior HR position | Senior ASR position | To correct a transcription error |
| 106 | 25 | Colton's | Colten's | To correct a transcription error |
| 107 | 7 | Colton | Colten | To correct a transcription error |
| 107 | 7 | Colton's | Colten's | To correct a transcription error |
| 107 | 11 | Colton | Colten | To correct a transcription error |
| 107 | 13 | Colton | Colten | To correct a transcription error |
| 107 | 16-17 | And Rick said "I'm not going to reveal, but I did negotiate." | And Rick said I'm not going to reveal, but I did negotiate, more than what you make | Full response to the question asked |
| 107 | 23 | Colton | Colten | To correct a transcription error |
| 108 | 3 | Colton | Colten | To correct a transcription error |
| 108 | 6 | Colton | Colten | To correct a transcription error |
| 108 | 10 | Colton | Colten | To correct a transcription error |

794333.6

Davis Decl. Exhibit 5, Page 6 of 10

| 108 | 16 | Colton | Colten | To correct a transcription error |
|---|---|---|---|---|
| 109 | 16 | Marty. I don't remember her last name. Jenny Rhoten. Emily James. And there was another woman on our team, and she passed away. I'm – I don't remember her name. | Marty. I don't remember her last name. Jenny Rhoten. Emily James. And there was another woman on our team, and she passed away. I'm – I don't remember her name. Also Lori Nearhood | Full response to the question asked |
| 111 | 16 | Colton | Colten | To correct a transcription error |
| 122 | 2 | To get the chain of permission. | To go up the chain to get permission. | To correct a transcription error |
| 123 | 24 | Value structure | VALUES structure | To correct a transcription error |
| 124 | 5 | B | V | To correct a transcription error |
| 124 | 7 | B | V | To correct a transcription error |
| 129 | 21 | Colton | Colten | To correct a transcription error |
| 131 | 1 | Colton | Colten | To correct a transcription error |
| 134 | 1 | OAT | OIT | To correct a transcription error |
| 136 | 18-19 | It's my belief.  I don't have a solid knowledge. | It's my belief based on my experience.  I don't have solid knowledge beyond that. | To correct a transcript error and provide full response to the question asked |
| 140 | 6 | And the nonapplication track | And the application track | To correct a transcription error |
| 154 | 24 | NCS | in CS | To correct a transcription error |
| 155 | 17 | BSA | ASR | To correct a transcription error |
| 162 | 25 | HPs | pieces | To correct a transcription error |
| 167 | 14 | Sladebo | Fladebo | To correct a spelling error |
| 167 | 18 | Yes | Yes, she was also a BSA. | Misheard the question. |
| 170 | 20-23 | They restructured the way we did work, and they promoted Lynn, and they moved her to a different – they changed how our teams were structured. | They restructured the way we did work, and they promoted Lynn, and they moved her to a different team, which was an off-cycle event that enabled | Complete answer to question |

| | | | managers to promote people like Lynn and Mrudula – they changed how our teams were structured. | |
|---|---|---|---|---|
| 171 | 25 | She was a BSA1. | She was a BSA 1? | To correct a transcription error |
| 173 | 6 | Has ever trained on a task | Has ever trained me on a task | To correct a transcription error |
| 173 | 22 | Grant and Jim Sherwin | Leon Fabricki and Jim Sherwin | To correct name |
| 174 | 24 | I would say yeah. I mean I don't - | I would say yeah. But I mean I don't know why that should affect his performance assessment. | Full response to the question asked |
| 175 | 14 | I didn't have the same deliverables as Grant | I didn't work on the same deliverables with Noah like I did with Grant | To correct a transcription error |
| 177 | 24 | I made rec- | I made recommendations to my manager when I was involved in phone screens and interviews. | To correct a transcription error |
| 181 | 11 | I didn't know that I could. | No, I didn't know that I could. | Full response to the question asked |
| 181 | 12 | That I acted | That it acted | To correct a transcription error |
| 186 | 7 | I think it would have been | No, I think it would have been | Full response to the question asked |
| 189 | 3 | Lindsay | Lynn Fladebo | To correct a transcription error |
| 192 | 4 | I'm sorry. I'm sorry. | I'm sorry. But as I testified earlier, senior BSAs performed the same general duties as junior and intermediate BSAs. | Full response to the question asked |

794333.6

Davis Decl. Exhibit 5, Page 8 of 10

| 192 | 8 | I don't have visibility, to my knowledge. | I don't have visibility, to my knowledge. But as I testified earlier, senior BSAs performed the same general duties as junior and intermediate BSAs. | Full response to the question asked |
| 194 | 7-8 | I did not know that at the time I was made an intermediate BSA, no. | I did not know the salary range at the time I was made an intermediate BSA, no. | Full response to the question asked. |
| 196 | 22 | E band | U band | To correct a transcription error. |
| 199 | 14 | Intermediate 1 | BSA 1 | To correct a transcription error |
| 199 | 24 | initial | Initial phone screen | Full responses to question asked |
| 201 | 15 | And we discussed advanced -- | And discussed the questions we wanted to ask in advance | Full responses to question asked |
| 202 | 18 | If they are not promoted at the same | If they are not promoted at the same rate | To correct a transcription error |
| 220 | 22 | Justin reached out to all of the Cs | Justin reached out to all of the SMEs | To correct a transcription error. |
| 229 | 14 | I went on the coast with | I did Hood to Coast with | To correct a transcription error |
| 230 | 14-15 | I viewed everything up to that point as consensual. | I viewed everything during that period as consensual. | Fully response to the question asked |
| 244 | 22 | Carsecken | Carspecken | To correct a transcription error |
| 254 | 12-13 | Justin Larsen told Juanita Danielson, "You talk to me about her issues with Chad" | Justin Larsen told Juanita Danielson that she should talk to me about her issues with Chad | To correct a transcription error |
| 257-258 | 25-1 | Against because she was let go and severance. They offered her | Against because she was let go and I suspect was severance. I believe they | Full response to the question asked. |

794333.6

Davis Decl. Exhibit 5, Page 9 of 10

| | | severance, and they let her go. | offered her severance, and they let her go. | |
|---|---|---|---|---|
| 276 | 24 | And I said "Wow, that's – okay." | And I said "Wow, that's shocking, okay." | Full response to the question asked |
| 277 | 2 | OTE | OTP | To correct a transcription error |
| 300 | 10-11 | an intermediate | a junior BSA | To conform to facts |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on ___1/13/2021___ in ___Beaverton,___
OR

Sara Johnston

794333.6

Davis Decl. Exhibit 5, Page 10 of 10

```
1
2                 UNITED STATES DISTRICT COURT
3                     DISTRICT OF OREGON
4                     PORTLAND DIVISION
5
6    KELLY CAHILL, SARA          )
     JOHNSTON, LINDSAY           )
7    ELIZABETH, and HEATHER      )
     HENDER, individually and    )
8    on behalf of others         )
     similarly situated,         )
9                                 )
                Plaintiffs,       )
10                                )
        vs.                       )  Case No. 3:18-cv-01477-JR
11                                )
     NIKE, INC., an Oregon        )
12   Corporation,                 )
                                  )
13              Defendant.        )
     _____   )
14
15       REMOTE VIDEOTAPED DEPOSITION OF EMILY TUCKER
16                    Portland, Oregon
17               Friday, January 22, 2021
18
19
               REPORTED BY:  Dayna Michelle Glaysher
20                           CSR No. 13079;
                             RPR, CRR No. 28081
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

```
 1    reports.  And each of those managers had between eight

 2    and ten -- eight and ten or eight to twelve, depending,

 3    account service reps reporting to them.

 4        Q.  Okay.  Got it.  So maybe around 40 people in your

 5    group, give or take?                                    11:52:53

 6        A.  40 to 50, in that zone.

 7        Q.  Okay.  Okay.  Great.  And while you were

 8    footwear/equipment, inventory planning director, were

 9    you responsible for evaluating performance of people on

10    your team?                                              11:53:09

11        A.  Yes.

12        Q.  Were you responsible for completing CFE

13    evaluations and giving CFE ratings for the people on

14    your team?

15        A.  Yes.                                            11:53:21

16        Q.  Were you responsible for any compensation

17    decisions for the people on your team?

18        A.  Just recommendations.

19        Q.  Okay.  Do you remember any compensation

20    recommendations that you made that were not followed?   11:53:31

21        A.  Yes.

22        Q.  Tell me about those.

23        A.  Specifically Adam Piestrip.  When I hired him

24    into this role, his management role, I made a

25    recommendation that put him where I thought at the time 11:53:56
```

```
1    that he fell within that -- you know, the salary -- what
2    do you call it -- guidelines or parameters.  And in
3    particular he had someone on his team who made more than
4    he did.
5         So my recommendation was to put him on that -- my    11:54:22
6    recommendation was to ensure that he was being paid
7    according to where I felt his experience lie on that
8    spectrum for the role.  And that included having him
9    making more than one of the people on his team.  And my
10   recommendation was not accepted.                          11:54:51
11      Q.  Okay.  Any other times you can remember making a
12   compensation recommendation that was not followed while
13   you were footwear/equipment inventory planning director?
14      A.  Hold on.  Got to think about that a second.  Not
15   that I can specifically recall.                           11:55:19
16      Q.  Okay.  And you said that you wanted to ensure
17   he was being paid according to where you felt his
18   experience lied on the spectrum of -- for the role.
19         What about his experience were you considering?
20      A.  His operations demand planning and deep system     11:55:37
21   knowledge.
22      Q.  Why was that important?
23      A.  So at the time Nike was making a huge investment
24   into their supply chain software.  And it was a project
25   called planning transformation.  And the long and the     11:56:02
```

Page 98

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 6, Page 3 of 8

```
 1    short of it is that Nike's capacity for footwear,

 2    footwear capacity has never been -- had never been in

 3    the system.

 4         And the upgrade, if you will, to -- to the supply

 5    chain was to put that factory capacity into the system      11:56:28

 6    so that when we make a buy we're not -- they were not

 7    purchasing what couldn't be produced.

 8    Q.   Okay.  And so why would Mr. Piestrip's experience

 9    be particularly relevant?

10    A.   Having been -- he himself been in the demand          11:56:53

11    planning inventory management organization for North

12    America for many years, he -- he brought that deep

13    understanding of how the system worked, which was

14    valuable as we were endeavoring to -- to change that.

15    Q.   Got it.  So he was an internal hire?                  11:57:19

16    A.   Yes.

17    Q.   Got it.  But did he go through the application,

18    interview process, the whole thing?

19    A.   Oh, yes.

20    Q.   Okay.  Got it.  And what was the final decision       11:57:30

21    on his compensation?

22         Was it lower than you recommended or higher than

23    you recommended?

24    A.   Oh, lower.

25    Q.   Okay.  And were you told why?                         11:57:46
```

Veritext Legal Solutions
866 299-5127

1     A.  Not to my satisfaction.

2     Q.  Okay.  What were you told?

3     A.  I'll be honest, I don't remember correct -- like

4   the exact words or the -- I don't recall the reasoning.

5   I recall that I was frustrated that we would endeavor to    11:58:18

6   bring someone in below the minimum for a required

7   position.  It didn't -- did not compute.

8     Q.  Oh, was he below the minimum?

9         I thought you said before he was just below

10  someone who would be reporting to him.                       11:58:37

11    A.  No, I believe it was below the minimum.  It was

12  below the minimum.

13    Q.  Got it.  Okay.  Okay.  Any other compensation

14  recommendation -- sorry.  I already asked you that.

15        You also -- so in addition to making               11:58:53

16  recommendations about starting salary, you would also

17  make recommendations about like annual increases for

18  employees, correct?

19    A.  Yes.

20    Q.  Okay.  What kind of factors would you consider    11:59:04

21  when you were making a recommendation about an annual

22  increase for an employee?

23        Let's say on the footwear/equipment inventory

24  planning director role.

25    A.  You know what, strike what I just said.  Not       11:59:17

Page 100

Davis Decl. Exhibit 6, Page 5 of 8

```
1                        CERTIFICATE

2                            OF

3              CERTIFIED SHORTHAND REPORTER

4

5

6              The undersigned certified shorthand reporter

7    of the State of California does hereby certify:

8              That the foregoing deposition was taken

9    before me at the time and place therein set forth, at

10   which time the witness was duly sworn by me.

11             That the testimony of the witness and all

12   objections made at the time of the deposition were

13   recorded stenographically by me and thereafter

14   transcribed, said transcript being a true copy of my

15   shorthand notes thereof.

16             In witness whereof, I have subscribed my

17   name this date: February 4, 2021

18

19

20

21

22             CSR Number 13079

23             RPR, CRR Number 28081

24

25

                                           Page 186
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 6, Page 6 of 8

DocuSign Envelope ID: 3EA699B7-28FA-44FD-B20B-426B98800D23

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: January 22, 2021

Deponent: Emily Tucker

| Page | Line(s) | Reads | Should Read | Reason |
|------|---------|-------|-------------|--------|
| 28 | 12 | Kavanagh | Cavanaugh | To correct spelling error |
| 30 | 1 | immanence | imminent | To correct transcription error |
| 36 | 1 | Michelle | Michele | To correct spelling error |
| 36 | 7 | Shafbow | Schafbuch | To correct spelling error |
| 36 | 7 | Dooby | Dube | To correct spelling error |
| 36 | 7 | Tanya | Tonia | To correct spelling error |
| 38 | 5 | Michelle | Michele | To correct spelling error |
| 39 | 11 | Kenny | Kenney | To correct spelling error |
| 53 | 3 | P-h-i-l-l-i-p-i, I believe. | P-h-i-l-l-i-p-p-i, I believe. | To correct spelling error |
| 53 | 8 | Suiten | Sutin | To correct spelling error |
| 60 | 22 | back sell | back fill | To correct transcription error |
| 65 | 11 | Nike values perspective | Nike VALUES band perspective | To clarify testimony |
| 67 | 7 | Birch | Burch | To correct spelling error |
| 68 | 2 | Birch | Burch | To correct spelling error |
| 74 | 8 | My role was to - - to oversight | My role was to – provide oversight | To clarify testimony |
| 77 | 12 | Haightman | Hapeman | To correct transcription error |
| 83 | 19 | Yes | Yes, I was involved in the decision. | To clarify testimony |
| 93 | 3 | Kavanagh | Cavanaugh | To correct spelling error |
| 94 | 14 | Palo Polo | Paolo Polla | To correct spelling error |
| 97 | 23 | Piestrip | Peistrup | To correct spelling error |
| 100 | 11-12 | It was below the minimum. | I am 90% sure it was below the minimum. | To clarify testimony. |
| 101 | 19 | Palo Polo | Paolo Polla | To correct spelling error |
| 126 | 2 | No | No, I did not make hiring decisions, just recommendations | To provide complete answer to question |
| 126 | 5 | No | No, I did not make pay decisions, just recommendations | To provide complete answer to question |

796897.3

Davis Decl. Exhibit 6, Page 7 of 8

| 126 | 8 | No | No, I did not make CFE decisions, just recommendations | To provide complete answer to question |
|-----|-----|-----|-----|-----|
| 126 | 14 | No | No, I did not make promotion decisions | To provide complete answer to question |
| 126 | 19 | Ryan | Bryan | To correct transcription error |
| 126 | 22 | Binser | Binzer | To correct spelling error |
| 129 | 19 | Maggie Winkler | Maggie Winkel | To correct transcription error |
| 129 | 19 | Michelle | Michele | To correct spelling error |
| 132 | 17 | Kenny | Kenney | To correct spelling error |
| 136 | 3-4 | and include that was for his direct reports | that was for his direct reports and not include me | To correct transcription error |
| 160 | 4 | Scarmetto | Scarmato | To correct spelling error |
| 160 | 5 | Scarmetto | Scarmato | To correct spelling error |
| 166 | 4 | rule | role | To correct transcription error |
| 166 | 16 | Michelle | Michele | To correct spelling error |
| 171 | 9 | Yes, hiring recommendations, yes. | Not hiring decisions. Hiring recommendations, yes. | To clarify testimony |
| 181 | 12 | Michelle | Michele | To correct spelling error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on __3/4/2021_____ in _Portland, OR_____.

Emily Tucker

796897.3

Davis Decl. Exhibit 6, Page 8 of 8

```
1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF OREGON

3                  PORTLAND DIVISION

4

5

6    KELLY CAHILL, et al.,          )

7                   Plaintiffs,     )

8         VS.                       ) NO. 3:18-CV-01477-JR

9    NIKE, INC., an Oregon          )

10   Corporation,                   )

11                  Defendants.     )

12   _____)

13

14

15   VIDEOCONFERENCE DEPOSITION OF:

16              KELLY CAHILL

17              WEDNESDAY, NOVEMBER 18, 2020

18              12:10 P.M.

19

20

21

22   REPORTED BY:

23              Sari M. Knudsen

24              CSR No. 13109

25
```

                                                Page 1

Davis Decl. Exhibit 7, Page 1 of 7

```
 1   2014?                                              03:51:10

 2       A    I -- I do not know.                       03:51:14

 3       Q    Okay.  And do you know who made any       03:51:16

 4   recommendations regarding the amount of equity that  03:51:18

 5   you received in July of 2014?                     03:51:20

 6       MR. GOLDSTEIN:  Objection.                     03:51:22

 7       THE WITNESS:  I do not.  I can only assume.    03:51:25

 8   BY MS. DAVIS:                                      03:51:25

 9       Q    Do you know who -- well, who do you assume  03:51:29

10   made recommendations about your equity grant?      03:51:34

11       A    I would --                                03:51:35

12       MR. GOLDSTEIN:  Objection.  If you are calling  03:51:36

13   for speculation, you have to say that.            03:51:41

14   BY MS. DAVIS:                                      03:51:41

15       Q    Go ahead.                                 03:51:42

16       A    I would assume it's someone who was in H.R.  03:51:44

17   makes those recommendations.                      03:51:53

18       Q    Do you believe that Pam, your supervisor,  03:51:54

19   has any influence on the amount of equity you     03:51:56

20   receive?                                          03:51:57

21       A    I do not know on -- I would assume she    03:52:01

22   would have influence, yes.                        03:52:05

23       Q    Do you -- who do you assume made          03:52:08

24   recommendations about the amount of your PSP award?  03:52:12

25       A    I would assume Pamela as well.  H.R.      03:52:16
```

Page 139

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 7, Page 2 of 7

|   |   |   |
|---|---|---|
| 1 | Q    Anyone else? | 03:52:18 |
| 2 | A    H.R. | 03:52:18 |
| 3 | Q    Okay.  What makes you believe that H.R. | 03:52:30 |
| 4 | influenced or had any influence over the amount of | 03:52:34 |
| 5 | equity you received in 2014? | 03:52:37 |
| 6 | A    I think it's based on distribution, and it | 03:52:44 |
| 7 | all has to add up to a certain company number.  So | 03:52:47 |
| 8 | they have influence or recommend those numbers | 03:52:54 |
| 9 | within each function so that the company stays | 03:53:01 |
| 10 | neutral. | 03:53:05 |
| 11 | Q    And what is the basis for your saying that | 03:53:07 |
| 12 | H.R. weighs in on those decisions? | 03:53:10 |
| 13 | A    Because every -- everything is submitted | 03:53:12 |
| 14 | into H.R. and up the chain. | 03:53:17 |
| 15 | Q    Okay.  Any other reason that you believe | 03:53:19 |
| 16 | H.R. has influence? | 03:53:24 |
| 17 | A    They have -- just that they have influence | 03:53:25 |
| 18 | over everything. | 03:53:28 |
| 19 | Q    But any -- do they specifically have | 03:53:31 |
| 20 | influence over equity grants? | 03:53:35 |
| 21 | A    As part of the -- I would just assume as | 03:53:38 |
| 22 | part of overall distribution recommendations and | 03:53:40 |
| 23 | decisions, that they have a hand in it -- in | 03:53:43 |
| 24 | anything that's awarded to an employee. | 03:53:46 |
| 25 | Q    Okay.  Any other basis for that assumption | 03:53:49 |

Page 140

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 7, Page 3 of 7

```
 1    that you haven't already shared with me?          03:53:54

 2        A    No.  Except it's -- I mean, it's all      03:53:57

 3    submitted into an H.R. portal.                    03:53:59

 4        MR. GOLDSTEIN:  Objection.  Calling for        03:54:01

 5    speculation.                                      03:54:02

 6    BY MS. DAVIS:                                     03:54:02

 7        Q    And you said you believe H.R. also weighs 03:54:06

 8    in on PSP awards.  What is the basis for your     03:54:08

 9    assumption that H.R. weighs in on the amount of   03:54:11

10    individual PSP awards?                            03:54:12

11        A    Based on -- just based on the submission,  03:54:15

12    that it's all submitted into H.R.                 03:54:17

13        Q    Any other reason?                         03:54:22

14        A    Not that I can recall.                    03:54:27

15        Q    Do you have any reason to believe that H.R. 03:54:29

16    weighs in on the amount of merit increase?        03:54:33

17        A    I do.                                     03:54:35

18        Q    And what is the basis for that?           03:54:37

19        A    It's submitted into an H -- an H.R. portal. 03:54:41

20        Q    Any other reason supporting your statement? 03:54:48

21        A    Conversations that I've personally had with 03:54:50

22    H.R. when I've had to go through that process with 03:54:53

23    people that directly reported to me.              03:54:56

24        Q    Anything else?                            03:54:59

25        A    No.                                       03:55:10
```

Veritext Legal Solutions
866 299-5127

```
 1            I, SARI M. KNUDSEN, CSR NO. 13109, in and

 2   for the State of California, do hereby certify:

 3            I am the deposition officer that

 4   stenographically recorded the testimony in the

 5   foregoing deposition;

 6            Prior to being examined, the deponent was

 7   first duly sworn by me;

 8            The foregoing transcript is a true record of

 9   the testimony given;

10             Before completion of the deposition, review

11   of the transcript was not requested.  If requested,

12   any changes made by the deponent (and provided to

13   the reporter) during the period allowed are appended

14   hereto.

15

16   Dated the 9th day of December, 2020.

17

18

19

20

21            SARI M. KNUDSEN, CSR NO. 13109

22

23

24

25

                                           Page 313
```

Veritext Legal Solutions
866 299-5127

Davis Decl. Exhibit 7, Page 5 of 7

*Cahill v. Nike*
No. 3:18-cv-01477-JR (D. Or.)

Deposition Date: November 18, 2020

Deponent: Kelly Cahill

| Page | Line(s) | Reads | Should Read | Reason |
|------|---------|-------|-------------|--------|
| 25 | 13 | payee quality | pay equality | To correct a transcription error |
| 25 | 17 | payee quality | pay equality | To correct a transcription error |
| 38 | 9 | selling in new products | selling new products | To correct a transcription error |
| 40 | 8 | then ex-husband | then husband | To correct a transcription error |
| 43 | 20 | Gem Soda | Jones Soda | To correct a transcription error |
| 48 | 23 | 2011 | 2012 | To correct inadvertent error in year |
| 59 | 23 | EPW | ETW | To correct a transcription error |
| 123 | 6 | Insures | Ensures | To correct a transcription error |
| 142 | 3 | CFE's | CFEs | To correct a transcription error |
| 163 | 4 | participants | participates | To correct a transcription error |
| 163 | 18 | participants | participates | To correct a transcription error |
| 173 | 9-10 | Was rated during CFE one year what I saw everyone was getting. Not necessarily the case. | Was rated Successful during CFE one year when I was told everyone was getting Successful. But then I saw that was not necessarily the case. | To correct a transcription error |
| 174 | 6 | media | meeting | To correct a transcription error |
| 177 | 2 | Nike.com right | Nike.com that are right | To correct a transcription error |
| 179 | 5 | manager CFE | manager's CFE | To correct a transcription error |
| 179 | 11 | managing CFE | manager's CFE | To correct a transcription error |
| 180 | 1 | CFE's | CFEs | To correct a transcription error |
| 185 | 22 | Kasatani. | Fisanotti | To correct a transcription error |
| 186 | 4 | up levels from me | a higher level than mine | To correct a transcription error |
| 186 | 7 | It | He | To correct a transcription error |
| 196 | 19 | June 11 | June 1 | To correct a transcription error |
| 196 | 23 | CFE's | CFEs | To correct a transcription error |
| 222 | 2 | dikes | dykes | To correct a transcription error |
| 222 | 8 | dike | dyke | To correct a transcription error |

| 223 | 5 | dikes | dykes | To correct a transcription error |
|-----|-----|-------|-------|----------------------------------|
| 251 | 24 | CFAE's | CFEs | To correct a transcription error |
| 254 | 13 | CFE's | CFEs | To correct a transcription error |
| 263 | 7 | D banding | debanding | To correct a transcription error |
| 263 | 17 | D banding | debanding | To correct a transcription error |
| 284 | 19 | Communication's | Communications | To correct a transcription error |
| 297 | 10 | July 27 | July 25 | To correct a transcription error |
| 309 | 14 | opportunity proactively | opportunity to proactively | To correct a transcription error |

Subject to the above changes, I declare under the penalties of perjury of the laws of the United States that my deposition transcript is true and correct.

Executed on <u>1/6/2021</u> in <u>West Newton, MA</u>.

Kelly Cahill

794325.3

Davis Decl. Exhibit 7, Page 7 of 7