**REBUTTAL EXPERT REPORT OF DR. KATHLEEN K. LUNDQUIST**

**in**

*Cahill, et al. v. Nike*

**November 29, 2021**

**APT*Metrics***

**320 Post Road West**

**Westport, CT 06880**

**(203) 655-7779**

Lundquist Decl. Ex. B, Page 1 of 69

**REBUTTAL EXPERT REPORT OF DR. KATHLEEN K. LUNDQUIST**
**in**
*Cahill, et al. v. Nike*

I was retained by counsel for Plaintiffs to analyze and provide expert opinion in the matter of *Cahill, et al. v. Nike.*  I previously provided an expert report in this matter dated July 15, 2021. This rebuttal report addresses the opinions expressed by Dr. Chester Hanvey, Nike's IO psychology expert, in his report dated October 1, 2021 and his subsequent deposition dated October 29, 2021.  I also reviewed the report of Dr. Ali Saad, Nike's Labor Economics expert, dated October 1, 2021 and his deposition dated October 27, 2021.

**EXECUTIVE SUMMARY**

At issue in this case is whether Nike pays and promotes women less than men, and assigns women to lower level positions than men.  In my previous report I concluded that Nike's job architecture groups its jobs into substantially similar job groups and that Nike applies a consistent set of policies and practices for employees in these groups related to compensation, promotion and hiring.  I also concluded that some of these Human Resources (HR) practices were known to exacerbate gender differences in compensation (for example, use of percent of salary to make merit increase and bonus decisions, collection of prior pay information to set starting salary) and that Nike's HR practices in these areas had not been substantiated as job-related according to professional and legal guidelines (Lundquist report, 7/15/21, p. 47).  I also reviewed the available information about the role of HR, much of it from communications admitting the failures of HR by Nike's CEO and Nike's Chief Human Resources Officer (CHRO) and found a lack of internal controls at the company to monitor and correct poor and/or discriminatory practices.

2

***Limited Scope of Opinions Offered by Nike's Experts***

In their reports and depositions, both Dr. Hanvey and Dr. Saad described the scope of the opinions that they offered about Nike's compensation, promotion and hiring practices.  Neither expert addresses nor rebuts my previous conclusions about these HR practices in their reports.

- In his deposition, Dr. Hanvey testified that he had not directly analyzed Nike's HR practices (Hanvey deposition, 10/29/21, p. 66), and was only dealing "indirectly" with compensation issues (Hanvey deposition, 10/29/21, p. 60).

- Dr. Saad testified in his deposition that he is not offering opinions concerning job content (Saad deposition, 10/27/21, p. 82) and that determinations of substantially similar work is the role of an IO psychologist (Saad deposition, 10/27/21, p. 96).  Dr. Saad stated that he "was certainly not asked to respond to Dr. Lundquist's opinions" (Saad deposition, 10/27/21, p. 269).

While both Dr. Hanvey and Dr. Saad criticized my conclusion about substantially similar work based on Nike's leveling criteria for jobs, neither offered his own opinion on the appropriate level of analysis.  Dr. Hanvey did not offer an alternative grouping of substantially similar jobs, concluding instead that a job analysis would have to be conducted for each of the 1,400 job codes in the covered positions (Hanvey report, 10/1/21, p. 2)[1].  Dr. Saad testified that he was not opining that job code was the correct level of analysis and admitted he had not studied the matter (Saad deposition, 10/27/21, p. 34).

---

[1] It remains my professional opinion that Nike's leveling criteria specify the appropriate groupings of substantially similar work at the interaction of subfamily and job level.  Although Nike's experts used job codes (or even position titles) rather than interaction for their analyses, I discuss job codes in commenting on their reports since that is how they defined their analyses.

3

***Dr. Hanvey Purports to Conduct a "Scientific Analysis"***

Dr. Hanvey claims to be using "widely recognized and accepted 'scientific' methods" in his data gathering (Hanvey report, 10/1/21, p. 11) and that "… certain methodological standards must be met for an approach to be considered 'scientific'" (Hanvey report, 10/1/21, p. 133). In actuality, Dr. Hanvey's studies do not provide useful information on substantial similarity of work performed by the putative class, did not follow a recognized methodology, were flawed in execution and failed to adequately analyze the data he obtained. Some of the most significant concerns are listed below.

***Dr. Hanvey's Studies were Flawed in Design and Execution***

Dr. Hanvey gathered data from two samples: one to examine the variability across job codes (Sample 1) and the other to examine variability within job codes (Sample 2).

- Dr. Hanvey's "scientific analysis" of a sample of 60 incumbents (Sample 1) reached the unsurprising conclusion that not all jobs at Nike perform the same work. He reached this conclusion by comparing the interview responses of current incumbents in 59 job codes, across 16 different functions, 41 job families, and 9 job levels. As a result, he was able to show that an Office Supervisor, a Lab Technician and a Director of IT Security do not all perform the same work. This study is not a serious or meaningful contribution to defining substantially similar jobs at Nike.

- Dr. Hanvey's second sample was intended to examine the similarity of work within the same job code, but he focused on only less than half a percent of Nike job codes at issue, did not sample 50% of the job levels or any job codes in Band S, sampled only women, and only interviewed a small number of incumbents in the selected job codes. Moreover,

4

in his deposition, Dr. Hanvey testified that he was not generalizing from the 5 job codes he studied to the remainder of the approximately 1,400 job codes at issue in the case (Hanvey deposition, 10/29/21, p. 232), making the limited scope of this second study meaningless for determining substantial similarity for the 1,400 job codes.

### Dr. Hanvey's Methodology is Not Widely Recognized or Accepted

Dr. Hanvey uses the term "individualized analysis" to describe his methodology, a term which he concedes is not "really a term that's widely accepted…" (Hanvey deposition, 10/29/21, pp. 107-108).  At deposition, he was unable to cite a professional source for this methodology (Hanvey deposition, 10/29/21, pp. 112-113).  Dr. Hanvey does not refer to professional or legal standards in his "analysis" of the information he obtained and made little attempt to quantify or "analyze" the results, but instead just repeated many of the interview responses verbatim in his report.

### Problems with Dr. Hanvey's Samples

Dr. Hanvey gathered data from senior leaders, as well as from two samples of incumbents. In each case, the samples were small and not representative.

- Senior leader interviews failed to cover 7 of the 20 functions (over a third) at Nike.

- Sample 1 included 60 incumbents who accounted for less than 5% of the roughly 1,400 job codes and less than 1% of the employees in the covered positions.

- Sample 2 included 29 incumbents who accounted for less than half a percent of the 1,400 job codes, did not include any jobs in one of the four bands, and only 50% of

5

the job levels.  Sample 2 represented only 0.3% of the total employees in the covered positions.

- Dr. Hanvey chose to restrict his samples to only women.  As such, Dr. Hanvey made the incomprehensible choice to shift the focus from determining whether the work performed in various jobs at Nike was substantially similar to looking at whether women at Nike were performing similar work to other women.  In essence, Dr. Hanvey is not analyzing the jobs, but rather analyzing women's work at Nike.

- Of great concern in terms of potential bias in his results was a very high non-response or refusal rate for selected participants (30% for Sample 1 and 53% for Sample 2).

***Problems with Dr. Hanvey's Methodology***

Dr. Hanvey's use of structured interviews is not typically recommended as the only source of job analysis information as they tend to limit sample size, are susceptible to distortion without verification, and in this case were performed under time pressure.

- Dr. Hanvey "analyzed" unreliable data from incumbents who indicated that they were unclear about their job responsibilities, a flaw affecting 13% of Sample 1 and 20% of Sample 2.

- Dr. Hanvey relied on incumbents as his only source for the data he "analyzed".  He did not gather interview responses from supervisors who are a more reliable source of information about job expectations, such as skill, effort, responsibility and working conditions.

- Dr. Hanvey did not appear to critically evaluate the responses from the incumbents or to challenge them to confirm understanding of their responses.  For example, he

6

simply reports implausible responses about the "helpfulness" of previous education and experience to performing the jobs.

***Problems with Dr. Hanvey's "Analysis" of the Information Collected***

- Dr. Hanvey gathered data on over 100 interview questions, only coded 23 of the questions, only coded responses from one of the two samples and did very little to synthesize the information or draw conclusions.

- His coding scheme did not produce an evaluation for each of the areas he examined: work performed, skill, effort, responsibility and working conditions.

- Because of the subjective nature of the data, the responses can be difficult to evaluate consistently when two respondents may say the same thing in different words and when respondents may not always understand the question in the same way.

- Dr. Hanvey considered the senior leaders to be subject matter experts (SMEs) but did not consider the incumbents in Samples 1 and 2 to be SMEs (Hanvey deposition, 10/29/21, p. 241). Yet his primary analysis concerning the requirements of the job was based on the responses from the incumbents in Samples 1 and 2 – individuals not knowledgeable enough about Nike jobs to be considered SMEs.

- His carelessness with data is demonstrated by a table which purports to show the number of employees for each subfamily (Hanvey report, Exhibit 2). When totaled, the data show 429,000 employees, a figure more than 20 times the actual number of employees at Nike in covered positions. His response at deposition was, "I believe

7

the numbers are correct. It's just what the number represents, is the part I'm not sure about (Hanvey deposition, 10/29/21, p. 155).

***Dr. Hanvey's Criticism that I "did not follow a scientific method to formulate [my] opinions" (Hanvey report, 10/1/21, p. 133) is Without Substance***

Not all opinions about HR practices require a "scientific experiment"; some evaluations can appropriately be based on the accumulated research literature and extensive experience applying that research in the workplace. Further, this criticism is inconsistent with his acknowledgement during his deposition that IO psychologists, as a result of training, education and experience, are competent to evaluate HR practices (Hanvey deposition, 10/29/21, p. 57). My specialized professional experience in evaluating HR practices over the past 30+ years (described later in this report) both as a consultant and as a court-appointed expert in the settlement of class actions has required me to review, design, and/or modify where necessary human resources practices, including selection, promotion and compensation processes such as those at issue in this case.

***Dr. Saad Lacked a Full Understanding of Nike HR Policies and Practices***

Given that Nike retained Dr. Saad as a Labor Economics expert, it is unsurprising that his report is primarily focused on the analysis of pay data. However, there are several HR practices which he discussed in his report and used as the basis for his analysis. His understanding of the decision maker for compensation decisions is inconsistent with my review of Nike's policies, training and 30(b)6 witness testimony. Specifically, I understand that executive level reviews of compensation recommendations are part of Nike's compensation process and that Nike does not finalize merit and bonus recommendations made by the immediate manager of employees and

8

approved by the manager + 1 until *several* levels of leadership successively review and approve the initial recommendation.  Regarding Nike's prior pay policy, the documentation and testimony indicate that a new hire's prior pay was a factor considered in setting starting salary.  Finally, although Dr. Saad concluded that women are not disadvantaged in initial placement into a job based on his modeling of controls for "job applied for", neither Dr. Saad nor Dr. Hanvey addressed the evidence I described in my report indicating that Nike policies or practices could have injected bias into the application process where recruiters had the ability to "match" women to a lower-level job or encourage women candidates to apply to lower-level jobs compared to men.

In sum, the reports and testimony of Drs. Hanvey and Saad do not alter my previous conclusions.

**BACKGROUND & INVESTIGATION**

*Professional Background*

I am an Industrial/Organizational Psychologist currently employed as President and CEO of APT*Metrics*, Inc., in Westport, Connecticut.  I described my professional background in my previous expert report in this matter (Lundquist Expert Report, July 15, 2021).  My specialized knowledge and experience for evaluating HR practices are described in a later section of this report.

I am currently an elected Fellow of the American Psychological Association (APA) and the Society for Industrial and Organizational Psychology (SIOP).  I am licensed as a psychologist in the State of Connecticut.

9

My qualifications and prior testimony are set forth in my curriculum vitae, which is contained in Attachment A to my prior expert report (Lundquist report, July 15, 2021).

I have been assisted in this work by Dr. Katey Foster, an Industrial Psychologist employed by APT*Metrics*.  APT Masters-degreed staff who assisted us include Nikki Carusone, Sean Wright, Tyler Slezak, David Cassell and Kathya Garcia. For my work on this case, I am being paid $600 per hour, and my assistants are being paid between $75 to $350 per hour.

### *Investigation*

The data and documents I used to form my previous opinions in this case are listed in Attachment B to my previous report dated July 15, 2021.  Additional documents reviewed for this rebuttal report are contained in Attachment A to this report.  I reviewed the reports and depositions of Nike's experts, as well as the data produced by Dr. Hanvey relevant to his report and deposition testimony. I also analyzed the data produced by Dr. Hanvey concerning his studies of job content.  Professional and scientific literature cited in this report relevant to my opinions are listed in Attachment B to this report.

### SPECIALIZED EXPERIENCE IN EVALUATING HUMAN RESOURCE PROCESSES & PRACTICES

Over the course of my more than 30 years as an Industrial/Organizational Psychologist, I have reviewed and evaluated Human Resources (HR) processes and practices (including those for hiring, compensation and promotion) at a wide variety of organizations both in the role of a consultant designing such processes and as an expert in class action litigation or settlement.

The evaluation of HR practices has been particularly central to my work as a court-appointed expert in the settlement of employment class actions.  I have served or am currently

10

serving as a court-appointed expert to help carry out the settlement provisions of class actions involving Abercrombie & Fitch, Bank of America, Bass Pro, Coca-Cola, Dell, Farmers Insurance, the FBI, Ford, Kodak, Merrill Lynch, Morgan Stanley, Qualcomm, Sodexo, Target, Uber and the U.S. Census Bureau.  In addition to conducting job analyses, grouping substantially similar jobs, validating HR processes, and analyzing statistical data, my role in these settlements has required me to review, design, and/or modify where necessary the organization's HR practices, including selection, promotion and compensation processes such as those at issue in this case.

Dr. Hanvey's criticism that I "did not follow a scientific method to formulate [my] opinions" (Hanvey report, 10/1/21, p. 133) is misplaced and inconsistent with his acknowledgement during his deposition that IO psychologists, as a result of training, education and experience, are competent to evaluate HR practices (Hanvey deposition, 10/29/21, p. 57). Not all opinions about HR practices require a "scientific experiment"; some evaluations can appropriately be based on the accumulated research literature and extensive experience applying that research in the workplace.

I relied on this specialized professional experience in evaluating the adequacy of Nike's processes, policies and practices concerning pay and promotion.  In my previous report I detailed an extensive review and analysis of the testimony of Nike's 30(b)(6) witnesses and associated training, policy and internal communication documents (Lundquist report, 7/15/21, pp. 30-36 concerning the evaluation of Nike's compensation practices, pp. 38-41 concerning Nike's promotion practices and pp. 42-47 concerning the role of HR at Nike) and documented the basis

11

for my conclusions by referencing the pertinent documents and deposition testimony[2].  I concluded from this review that:

- Nike groups its jobs into substantially similar job groups based on the Job Function, Job Family, Job Subfamily, Band and Job Level architecture into which all jobs at Nike are categorized (Lundquist report, 7/15/21, p. 47).  Specifically, it is my opinion that the interaction of Job Subfamily and Job Level defines substantially similar work.

- Nike uses this job architecture to apply a consistent set of policies and practices for employees within these groups for compensation, talent acquisition, talent management and performance management (Lundquist report, 7/15/21, p. 47).

- Some of Nike's policies are known to perpetuate or exacerbate gender differences in compensation, such as basing merit increases and bonuses on a percentage of base pay and using prior pay as a factor in setting starting salary (Lundquist report, 7/15/21, pp. 3-4).

- Nike's policies and practices for compensation, promotion and initial job assignment have not been substantiated as job related according to professional and legal guidelines (Lundquist report, 7/15/21, p. 47).

Finally, I reviewed the available information about the dysfunctional role of HR, much of it from communications admitting the failures of HR by Nike's CEO and CHRO, and found a lack of internal controls at the company to monitor and correct bad practices.

---

[2] This is consistent with Dr. Hanvey's acknowledgement during his deposition that documentation is part of the "scientific process" (Hanvey deposition, 10/29/21, p. 58).

12

A "scientific experiment" at Nike was not necessary to recognize that gender differences in pay at Nike would "tend to be perpetuated, and sometimes exacerbated, over time when [merit] increases are based on a percentage of base pay (Baker, 2003, pp. 221-222)" (Lundquist report, 7/15/21, p. 32).  This finding is consistent with the accumulated literature on percent increases in pay and borne out by Dr. Neumark's statistical analyses of Nike's pay data.  Similarly, my analysis of the differences in the level of structure imposed on competitive vs. non-competitive promotions (i.e., formal job postings and interviews) is consistent with the SIOP *Principles* which indicate the risk for predictor contamination when selection procedures are not sufficiently structured and consistent (SIOP, 2018, p. 12).

In some cases the absence of documentation by Nike was the basis for evaluation.  Job analyses and validation studies are required by professional principles and legal standards to support the use of selection procedures when adverse impact is found.  In my previous report I noted:

> Nike's witnesses have testified that Nike has conducted no job analysis to inform its job architecture and leveling decisions, compensation policies and practices, or performance management rating process.  Nike has also produced no evidence regarding any adverse impact analysis consistent with the professional and legal standards, nor is it clear whether Nike even maintained records and data to determine whether adverse impact exists within its practices (Lundquist report, 7/15/21, p. 4).

Dr. Hanvey testified at deposition that he was unaware of any job analysis or validation study conducted by Nike nor any adverse impact study undertaken by Nike (Hanvey deposition, 10/29/21, pp. 96-97).  Nike also did not produce relevant information to evaluate some of its practices.  For example, Nike did not provide the policies, guidelines and training materials associated with the hiring process, initial job assignment, pay equity adjustments and/or the

13

results of investigations of Starfish survey complaints concerning inadequate or inconsistent performance by HR.  As a result, these practices could not be fully evaluated and potential sources of information could not be examined.

Finally, Dr. Hanvey repeatedly criticized me for not conducting a job analysis of the covered jobs.  Conducting a job analysis requires access to individuals within the company who are knowledgeable about job requirements.  Plaintiffs' experts typically do not have access to a representative or appropriate sample of such individuals.  Gathering information from informal samples of plaintiffs in a case would not qualify as an unbiased, representative or professionally-acceptable job analysis.  In fact, in my over 30 years of experience in this field I have never submitted a job analysis as a plaintiffs' expert, nor am I aware of any other plaintiffs' expert who has conducted such a job analysis[3].  It is, however, possible for a plaintiffs' expert to evaluate job analysis data that has been produced by the company in previously conducted job analyses (none were produced by Nike) or when collected as part of litigation, as was done in Dr. Hanvey's report.  Analyses of the data collected by Dr. Hanvey are contained later in this report.

**THE LIMITED SCOPE OF OPINIONS OFFERED BY NIKE'S EXPERTS**

***Dr. Hanvey did not Provide Opinions Concerning Any of Nike's HR Practices***

Dr. Hanvey did not examine, analyze or offer opinions concerning any of Nike's HR practices at issue in this case.  In his deposition, Dr. Hanvey testified that he had not directly

---

[3] Dr. Hanvey was unable to cite any job analyses that would meet the SIOP professional standards conducted by a plaintiffs' expert in any cases in which he had previously testified.  Similarly, he was unable to cite any such job analyses by plaintiffs' experts from his own book entitled, "A Practitioner's Guide to Legal Issues in Organizations".  The single case where he thought an expert for plaintiffs might have conducted a job analysis was in *EEOC v. BMW Manufacturing*, and in that case he stated that it was "debatable" if the job analysis met the SIOP standards.

14

analyzed Nike's HR practices (Hanvey deposition, 10/29/21, p. 66), including the hiring, promotion and compensation practices.  Further, he stated that although he asked background questions about compensation practices, he was only dealing "indirectly" with compensation issues, and that his conclusions weren't based specifically on Nike's compensation practices (Hanvey deposition, 10/29/21, p. 60)[4].  Dr. Hanvey testified in his deposition that he did not analyze policies or practices for:

- Leveling jobs (pp. 117-118),

- Assigning job codes (pp. 115-117),

- Preparing job descriptions (pp. 139-140),

- Assigning position titles (p. 141),

- Benchmarking jobs to the market (pp. 163-164),

- Setting starting pay (p. 62),

- Determining pay raises for job changes (pp. 113-114),

- Making promotional decisions (p. 115),

- Making initial job assignments to new hires (pp. 62-63), or

- Evaluating the role of HR (p. 66).

**_Dr. Saad did not Provide Opinions on Key Issues in this Case_**

Dr. Saad, Nike's Labor Economics expert, testified in his deposition that he is not offering opinions concerning job content (Saad deposition, 10/27/21, p. 82) and that determinations of

---

[4] In fact, Dr. Hanvey was only able to identify 3 places in his report that address Nike's compensation practices:  in a footnote on page 4 referencing compa ratios and in comments on pages 4 and 79 in relation to differential pay for shift work (Hanvey deposition, 10/29/21, pp. 61-62).  From the snapshot data I was only able to identify approximately 44 employees who worked the night shift out of over 13,400 employees (0.3%) in the 2015 to 2019 timeframe.

15

substantially similar work is the role of the IO psychologist (Saad deposition, 10/27/21, p. 96). Dr. Saad stated that he "was certainly not asked to respond to Dr. Lundquist's opinions. There's another expert whose responsibility it was to do that, so I did not look at the specific issues of Dr. Lundquist. And as I said, it's not relevant to the analysis that I performed" (Saad deposition, 10/27/21, p. 269).

Nonetheless, Dr. Saad discusses HR policies and practices in his report. In his deposition, however, he clarified that these passages were intended to be descriptive, rather than articulating an opinion about the HR practice. For example, he testified that his discussion of the "prior pay" policy was "purely descriptive" and that he was not relying on it for his analysis (Saad deposition, 10/27/21, pp. 197-199). Similarly, he acknowledged that while Nike relied on job code for certain program eligibility, that alone does not define substantially equal or comparable work. He stated that he was just observing a fact – not making a conclusion (Saad deposition, 10/27/21, p. 99). Finally, Dr. Saad testified that he did not have an understanding of several aspects of the HR practices, including the executive review process for pay decisions and 2x pay (Saad deposition, 10/27/21, pp. 193-194), the "match to job" process or the way Nike recruiters could influence which candidates applied for jobs at Nike (Saad deposition, 10/27/21, pp. 266-270), the role of the business-facing Human Resources Business Partners (HRBPs) (Saad deposition, 10/27/21, p. 194) and whether an individual can receive a competitive and a non-competitive promotion in the same year (Saad deposition, 10/27/21, p. 244). These statements are consistent with his testimony that he is not offering opinions about the HR practices at Nike.

Neither Dr. Hanvey nor Dr Saad addressed the concerns I raised about initial job assignment and offered no opinion as to whether those concerns were valid. Neither did they

16

offer counter information about how HR had "underserved the organization" which necessitated the types of changes implemented by Nike since 2018.

In short, it is my understanding that neither Dr. Hanvey nor Dr. Saad are providing opinions concerning the HR practices at Nike and my previous opinions about those HR processes and practices remain unaddressed and unrebutted by their reports.

**SUBSTANTIALLY SIMILAR WORK BASED ON NIKE'S LEVELING CRITERIA**

My examination of the jobs at issue in this litigation led me to examine Nike's job architecture and the criteria used by Nike to group and level its jobs, i.e., the leveling criteria. In my previous report I observed:

> According to Nike's job architecture, Subfamily (within Job Function and Job Family) is the most differentiated *type of work* variable and Job Level within Band is the most differentiated *level of work* variable. Jobs at the same Job Level within a Subfamily have been categorized by Nike as similar in job content or type of work and require a similar level of knowledge, experience, scope, effort and responsibility based on the leveling criteria. (Lundquist report, 7/15/21, p. 2)

At the interaction of subfamily and job level are Nike's job codes. Typically, there is only a single job code for each interaction (Hanvey deposition, 10/29/21, p. 117; Saad deposition, 10/27/21, p. 76). In fact, 88% of the interactions had only a single job code for the 1,107 unique subfamily interactions across the 2015 to 2019 time period[5]. When an interaction had multiple job codes associated with it, the differences sometimes reflected no more than the same work in different product lines. In fact, Jessica Stuckey, Nike's 30(b)6 witness on job descriptions, cited the

---

[5] This count is based on the most recent iteration of an interaction over the time period. For example, if an interaction had one job code in 2015, then three job codes in 2017 and then 1 job code again in 2019, it would be considered to be an interaction with one job code. This reflects Nike's ongoing efforts to maintain or clean up its job codes over time. By 2021, 91% of the interactions had a single job code.

17

following example of three job codes for the same interaction (Product Category Management, Director) in her declaration dated September 28, 2021. Reproduced below in Figure 1 is a comparison of the Key Job Accountabilities for the three job codes Ms. Stuckey cited. The information that varies across the job codes is shown in red. Clearly the same accountabilities are repeated for all three job codes, varying as to whether the work relates to apparel, footwear or equipment, with one additional responsibility for the equipment job. In fact, after being shown Exhibit 760 and virtually the same accountabilities for all three jobs, Dr. Hanvey conceded that, contrary to the assertion made by Ms. Stuckey in her declaration, it was not possible to conclude that different skills were required for these jobs based on the job descriptions (Hanvey deposition, 10/29/21, p. 140).

**Figure 1. Comparison of Key Job Accountabilities for 3 Job Codes in Product Category Management Subfamily and Director Level (from Exhibit 760)**

| A1341 DIR: PROD CATG BUS – APP | A1343 DIR: PROD CATG BUS – FTW | A1773 DIR: PROD CATG BUS - EQUIP |
|---|---|---|
| *[Includes managerial responsibilities that are shared across level]* | *[Includes managerial responsibilities that are shared across level]* | *[Includes managerial responsibilities that are shared across level]* |
| Leads all aspects of product creation for Apparel for a global category. Creates and directs the implementation of long term business plans to meet category goals. Creates and communications [sic] business initiatives, direction, and vision. | Leads all aspects of product creation for Footwear for a global category. Creates and directs the implementation of long term business plans to meet category goals. Creates and communications [sic] business initiatives, direction, and vision. | Leads all aspects of product creation for Equipment for a global category. Creates and directs the implementation of long term business plans to meet category goals. Creates and communications [sic] business initiatives, direction, and vision. |
| Directs the development of product strategies to enhance the brand and meet the needs of the customer and consumer. Ensures partnership with the category team to ensure an integrated approach towards the market. | Directs the development of product strategies to enhance the brand and meet the needs of the customer and consumer. Ensures partnership with the category team to ensure an integrated approach towards the market. | Directs the development of product strategies to enhance the brand and meet the needs of the customer and consumer. Ensures partnership with the category team to ensure an integrated approach towards the market. |

18

| A1341 DIR: PROD CATG BUS – APP | A1343 DIR: PROD CATG BUS – FTW | A1773 DIR: PROD CATG BUS - EQUIP |
|---|---|---|
| Member of the category leadership team. | Member of the category leadership team. | Member of the category leadership team. |
| Provides leadership (direct or indirect) to all members of the category product creation team to champion innovation and excellence. | Provides leadership (direct or indirect) to all members of the category product creation team to champion innovation and excellence. | Provides leadership (direct or indirect) to all members of the category product creation team to champion innovation and excellence. |
| | | Responsible for an Equipment category team that creates <$100M product annually. |
| *Specific Work Experience:* Apparel Merchandising / General Management experience in high image/profile brand. | *Specific Work Experience:* Footwear or Product Merchandising / General Management experience in high image/profile brand. | *Specific Work Experience:* Apparel/Product Merchandising / General Management experience in high image/profile brand. |

While both Dr. Hanvey and Dr. Saad criticized my conclusion that the interaction of subfamily and job level should be used to define substantially similar work based on Nike's leveling criteria for jobs, neither offered their own opinion on the appropriate level of analysis. Dr. Hanvey did not offer an alternative grouping of substantially similar jobs, concluding instead that a job analysis would have to be conducted for each of the 1,400 job codes in the covered positions (Hanvey report, 10/1/21, p. 2), notwithstanding the fact that many of the job codes had so few incumbents as to make such a job analysis meaningless[6].  Dr. Saad testified that he was not opining that job code was the correct level of analysis, but that he assumed "job code constitutes substantially similar work" based on the declaration of Ms. Stuckey, Nike's 30(b)6 witness concerning SAP job descriptions (Saad deposition, 10/27/21, p. 34).

---

[6] Dr. Hanvey does not stop at 1,400 job codes. He also claims that the 17,000 position titles are more accurate than the 1,400 job codes, thereby suggesting that Nike has far more than 1,400 substantially similar jobs in the covered positions.

19

**RESPONSES TO THE REPORT OF DR. HANVEY**

***Dr. Hanvey's "Studies" Do Not Provide Useful Information on Substantial Similarity***

Dr. Hanvey gathered data from two samples: one to examine the variability across job codes (Sample 1) and the other to examine variability within job codes (Sample 2).

Dr. Hanvey's "scientific analysis" of Sample 1 reached the unsurprising conclusion that not all jobs at Nike perform the same work. He reached this conclusion by comparing the interview responses of current incumbents in 59 job codes, across 16 different functions, 41 job families, and 9 job levels. As a result, he was able to show that an Office Supervisor, a Lab Technician and a Director of IT Security do not all perform the same work. This finding is not a serious or meaningful contribution to defining substantially similar jobs at Nike. In fact, Dr. Hanvey admits as much in his own report.

> The difference in pay between a janitor and the CEO is irrelevant to a pay discrimination claim – the only question is the difference in pay between individuals performing substantially equal or comparable or similar work (Hanvey report, 10/1/21, p. 135).

Dr. Hanvey's Sample 2 study attempted to examine the similarity of work within the same job code, but he focused on only less than half a percent of the job codes at issue, did not sample 50% of the job levels or any job codes in Band S, sampled only women, and only interviewed a small number of incumbents in the selected job codes. Moreover, he made little attempt to quantify or "analyze" the results, but instead just repeated many of the interview responses verbatim in his report. In his deposition, Dr. Hanvey testified that he was not generalizing from the 5 job codes to the remainder of the approximately 1,400 job codes at issue in the case

20

(Hanvey deposition, 10/29/21, p. 232), making the limited scope of this study meaningless for determining substantial similarity for the 1,400 job codes.

***Dr. Hanvey Does Not Use a Recognized Job Analysis Methodology***

Dr. Hanvey states that his work was conducted using widely recognized and accepted scientific methods ("We followed widely recognized and accepted scientific methods to conduct a job analysis of employees for purposes of gathering data that are relevant to this case" (Hanvey report, 10/1/21, p. 11)).  He cites to a chapter by Banks and Cohen (2005) titled "Wage and Hour Litigation: I-O Psychology's New Frontier" for the proposition that job analysis data may be used to evaluate variability among employees for class certification purposes.  This chapter does discuss the use of a job analysis to evaluate the variability of the work done by employees who have "opted in" to a wage and hour claim under FLSA in order to assess whether a collective action is appropriate. However, the chapter does not discuss the use of a job analysis for determining whether jobs are substantially similar for a pay equity analysis or whether an action brought under the fair employment laws may proceed as a class action. Although he cited the chapter, Dr. Hanvey did not know whether the chapter even mentions discrimination class actions (Hanvey deposition, 10/29/21, pp. 104-05).  In fact, I reviewed the chapter and found no mention of discrimination class actions.  He also cites Strah, Rupp and Morris (in press) to justify his methodology, but this article's discussion of methodologies has much less to do with how to collect the data and instead focuses almost exclusively on how to analyze the quantitative data that's been collected (for the most part, Dr. Hanvey's data would be considered qualitative rather than quantitative data).  In fact, during his deposition, he stated, "I don't think there's going to

21

be any one single article that details the exact approach that I followed, though" (Hanvey deposition, 10/29/21, pp. 112-113).

Dr. Hanvey uses the term "individualized analysis"[7] in his report to describe the need to examine an individual's background and qualifications against the requirements of the job when examining issues of pay equity.  However, he seems to conflate this individualized analysis of employee pay with job analysis, or the study of the actual work that employees perform in the job and the requirements needed to perform that work.  His lack of synthesis of any of the individual interview responses demonstrates this point further.  Dr. Hanvey was not actually analyzing the job – he simply repeated what individuals said they are doing and made no attempt to define what the job entails based on those responses.

Dr. Hanvey acknowledges the federal *Uniform Guidelines on Employee Selection Procedures* (1978) and the *Principles for the Validation of Employee Selection Procedures* (SIOP, 2018) "as authoritative sources for professional and legal standards in the field of personnel selection" (Hanvey report in *Williams v. Jeld – Wen*, 2021, Exhibit 754, pp. 91-93).  Dr. Hanvey criticized me (Hanvey report, 10/1/21, p. 134) for not describing how I applied the *Uniform Guidelines* and the *Principles.*  In doing so, he completely ignored my findings criticizing Nike's failure to conduct or produce job analyses, validation studies or adverse impact analyses consistent with the professional and legal standards.

Other than mentioning them in his criticism of me, Dr. Hanvey only cites to the SIOP *Principles* in his report a total of two times, both very generally, and nowhere in his report does

---

[7] Dr. Hanvey concedes that an "individualized job analysis" is not "really a term that's widely accepted …" (Hanvey deposition, 10/29/21, pp. 107-108).

22

he cite the *Uniform Guidelines*.  In response to a question as to how he applied the *Uniform Guidelines* and the *Principles*, he testified, "I did not analyze policies or procedures, outside of kind of … indirectly looking at compensation.  I didn't analyze promotions, so I wasn't validating any promotional decisions" and he did not "directly" make any determinations whether Nike's compensation practices complied with the requirements of the SIOP *Principles* (Hanvey deposition, 10/29/21, pp. 98-99).

***Dr. Hanvey's Lack of Understanding about How Nike Defines its Jobs***

Although Dr. Hanvey states that his interviews were designed to gather information about the work performed by employees in specific job codes (Hanvey report, 10/1/21, p. 1), he has very limited knowledge about the job codes, job descriptions and the position titles he examines in his studies[8].

**Leveling and job codes.**  Dr. Hanvey did not analyze the process by which Nike leveled its jobs (Hanvey deposition, 10/29/21, p. 118) and assigned job codes.  He testified that he has no direct knowledge of how job codes are assigned at Nike (Hanvey deposition, 10/29/21, pp. 115-117).  In response to a question regarding who at Nike would assign a job code to a job, Dr. Hanvey replied "Yeah, I'm not a hundred percent sure. I was – From the interviews, people talked

---

[8] Dr. Hanvey indicated in his report that he reviewed "thousands of pages of company documents … including approximately 1,300 job descriptions, HR training documents, performance management materials, compensation documents, employee work history data, employee compensation data, legal documents, and Subject Matter Expert (SME) work history reports, among others… also reviewed 31 deposition transcripts… and the Expert Reports and deposition testimony of Dr. Lundquist and Dr. Neumark" (Hanvey report, 10/1/21, p. 12).  Despite all of this document review, Dr. Hanvey cites only 3 case documents in his report.  During his deposition, Dr. Hanvey indicated that "…generally, I relied on the data as opposed to documents, but cited documents when appropriate" (p. 171).

23

about different processes that may be used, but it sounded like the manager and possibly HR would be involved in that" (Hanvey deposition, 10/29/21, p. 142).

**Job descriptions.** Despite saying he's "seen a lot of job descriptions" (Hanvey deposition, 10/29/21, p. 133), Dr. Hanvey is not familiar with the way Nike's job descriptions are set up – specifically that shaded, common areas of the job description are pre-populated for all jobs based on Nike's leveling criteria (Hanvey deposition, 10/29/21, pp. 133-134), nor does he know who prepares the only unique parts of the job description for a job code, i.e., Key Job Accountabilities and Key Capabilities (Hanvey deposition, 10/29/21, pp. 139-140).

This is particularly surprising given the "systematic analysis" of the content of 1,311 job descriptions that he describes conducting in his report (Hanvey report, 10/1/21, pp. 12-13, paragraphs 26-27). Dr. Hanvey stated that he used machine learning tools and the statistical analysis program R to analyze the text in the job descriptions and "…identify the specific terms used frequently and infrequently across the multiple documents" (Hanvey report, 10/1/21, p. 13). The result of Dr. Hanvey's "systematic analysis" is contained in paragraph 27 to his report:

> Examples of frequent terms identified include "processes", "system", and "calibration." Examples of infrequent terms used include, "chemistry", "trademark", "childcare" and "inflight" and "mannequins." We manually reviewed many of the job descriptions containing infrequent terms to understand the range of jobs that Nike employees perform (Hanvey report, 10/1/21, p. 13).

Dr. Hanvey doesn't provide any context for these terms, nor does he provide any analysis or conclusion on what he found in this review. In reviewing Dr. Hanvey's output files in his backup production, he provides the text extracted from the job descriptions, what we assume to be the most frequently occurring words (or pairs/combinations of words), and categorizations of words as nouns, verbs, or unknown for each job description. I saw no synthesis of this information. Dr.

24

Hanvey confirmed in his deposition that the two paragraphs in his report (i.e., paragraphs 26 and 27) were all he wrote on this topic (Hanvey deposition, 10/29/21, pp. 161-162). Again, although this initially appears to be a "scientific" endeavor, Dr. Hanvey fails to analyze the results or to provide an opinion concerning his findings.

**Position titles.** In his report, Dr. Hanvey indicates that "Position Titles are even more specific than Job Codes and more accurately reflect the work employees perform" (Hanvey report, 10/1/21, p. 139). However, Dr. Hanvey testified that he doesn't know how position titles are created nor could he identify any Nike documents to support the assertion that position titles are more specific (Hanvey deposition, 10/29/21, pp. 142-143).

> Well, it sounded to me like they are – I don't know if it's the manager or the employee has any input, but someone who's knowledgeable about the job will try to figure out what's the best description of the work that an employee's performing (Hanvey deposition, 10/29/21, p. 141).

Dr. Hanvey ultimately admitted in his deposition that he has no data that shows that position title more accurately reflects the work that employees do (Hanvey deposition, 10/29/21, pp. 141-143). He further testified that he doesn't know if Nike maintains job content information by position title (Hanvey deposition, 10/29/21, pp. 151-152), but that the leveling process stops at job code (Hanvey deposition, 10/29/21, p. 148).

Dr. Hanvey states in his report that the covered positions include "more than 1,400 unique Job Codes and more than 17,000 unique Position Titles" (Hanvey report, 10/1/21, p. 6)[9]. That is a little more than 12 times as many position titles as job codes and roughly 25% more

---

[9] Dr. Hanvey also didn't know why approximately 4,000 position titles that were present from 2015 to 2017 no longer appear in the data covering 2017 through 2019 (Hanvey deposition, 10/29/21, pp. 145-146).

25

position titles than employees over the 2015-2019 time period[10].  What Dr. Hanvey does not mention in his report is that even minor variations in the way a position title is entered into Nike's SAP system (e.g., two titles that are exactly the same, where one has a comma and the other does not) result in an additional "unique" position title in Dr. Hanvey's counts.  Dr. Hanvey conceded this in his deposition (Hanvey deposition, 10/29/21, pp. 146-147).  In my review of the data, in addition to the typographical differences above, I also found many instances of almost identical position titles that were simply worded differently (e.g., "SW Engineering Manager" vs. "Manager, Software Engineering").

Dr. Hanvey indicated that he did not think Nike used position title in determining compensation, but was unaware of whether it was used to make promotion or merit increase decisions (Hanvey deposition, 10/29/21, pp. 147-148).

### Problems with Dr. Hanvey's Sampling

**Dr. Hanvey restricted his samples to only women.**  Both men and women populate most of the covered jobs at Nike[11].  By restricting his samples to only women, Dr. Hanvey made the incomprehensible choice to shift the focus from determining whether the work performed in various jobs at Nike was substantially similar to whether women at Nike were performing similar work.  In essence, Dr. Hanvey is not analyzing the jobs, but rather analyzing women's work at Nike.

---

[10] There are approximately 13,400 unique employees in covered positions from 2015 to 2019.  There are approximately 20,000 employees when individual changes to subfamilies are considered during that time.

[11] Of the 65 jobs Dr. Hanvey examined, only 4 of the jobs were performed by women only, and those four jobs had 2, 3, or 4 employees in them. The remaining 61 jobs (94%) were unsurprisingly performed by both male and female employees.

26

Determining whether jobs are substantially similar is not a gender-based conclusion but rather depends on the characteristics and requirements of the work.  To the extent that there was any difference in the work performed by men and women within a job code or between the 5 women he sampled for each job code and a group of 5 other men and women within the job code, Dr. Hanvey's sampling of only women would prevent him from detecting this information. When asked in deposition, Dr. Hanvey defended this practice by indicating that the potential class members are women, so he needed to evaluate the similarity between putative class members, and therefore "…asking questions to male employees would not be relevant…" (Hanvey deposition, 10/29/21, pp. 210-211).  This rationale is inconsistent with his charge as outlined on p. 1 of his report, "Specifically, I was asked to analyze the **jobs** performed **by Nike employees in Covered Positions** and provide an opinion on the degree of variability in the work performed and the skill, effort, responsibility, and working conditions associated with their jobs" (Hanvey report, 10/1/21, p. 1, **emphasis** added).

**Dr. Hanvey's samples of employees are small and not representative.**   Dr. Hanvey gathered data from Subject Matter Experts (SMEs), as well as from Samples 1 and 2.  In each case the samples were small and not representative[12].

- *Senior leader interviews.* Dr. Hanvey stated that he interviewed senior leaders to learn:

    > … how employees' work might be structured and what outcomes were required for successful performance. The information also helped me to understand why the different functions, families, and

---

[12] Dr. Hanvey analyzed information from about 1.4% of *female* employees (60 of 4,240) in Sample 1 and less than 0.5% of job codes (5 of 1,376) in Sample 2.  Dr. Hanvey has previously criticized an opposing expert for sampling only 6.6% of a population in another case (Hanvey report in *Davenport et al. v. Charter Communications*, 2016, p. 6).

27

> subfamilies existed and how they interacted with each other, if at all (Hanvey report, 10/1/21, p. 13).

> The SME interviews were an important first step in conducting the job analysis study because they helped determine which data collection method was most appropriate for obtaining a full and unbiased picture of the jobs at issue (Hanvey report, 10/1/21, p. 16).

Given the important role of the SMEs, it is surprising that Dr. Hanvey only spoke with SMEs from 13 of the 20 covered functions. Dr. Hanvey does not explain why one function (Product Creation) was interviewed twice (Hanvey report, 10/1/21, p. 13, footnote 21) and 7 functions were not interviewed at all.

The SIOP *Principles* define SMEs as "[i]ndividuals who have thorough knowledge of the work behaviors, activities, or responsibilities of job incumbents and the KSAOs needed for effective performance on the job" (SIOP, 2018, p. 50). Quite surprisingly, Dr. Hanvey was willing to consider the senior leaders to be subject matter experts but he did not consider the women currently performing the jobs in Samples 1 and 2 whose data he was using to examine job requirements to be SMEs (Hanvey deposition, 10/29/21, p. 241). He thus based his entire job analysis on the substantive responses of individuals he did not consider to be knowledgeable enough to be called SMEs.

- *Sample 1 interviews.* Dr. Hanvey interviewed 60 female incumbents in Sample 1, a sample that was both small and unrepresentative of the population it was seeking to describe. Sample 1 included less than 5% of the 1,376 unique job codes in the 2015-2019 snapshot data. These job codes were randomly selected by stratifying the

28

sample on job function only[13]. The resulting sample included only 80% of the 20 covered job functions, approximately only 40% of the 102 job families that contained women and only 7% of the 855 Subfamily x Level combinations in the 2021 time period. Of the population of "eligible" employees from which Dr. Hanvey sampled[14] the 60 female incumbents covered only 1.4% of the eligible females (N = 4,240), and only 0.6% of all male and female employees (N = 9,475) in those same covered positions.

- ***Sample 2 interviews.*** Dr. Hanvey interviewed 29 additional incumbents for Sample 2 chosen from the covered job codes with the greatest number of female incumbents. Dr. Hanvey selected job codes based on the number of women in each job code. We examined these numbers in comparison to the most populous job codes including both male and female employees. If Dr. Hanvey had sampled based on both male and female incumbents, he would have examined three alternative job codes (i.e., 3 out of the 5 job codes in Sample 2 would have been different).

  Even though these were the most populous jobs, Dr. Hanvey chose to interview only 5 incumbents in each of the 6 job codes he selected for Sample 2. These 6 job codes account for less than half a percent of the roughly 1,400 job codes

---

[13] Dr. Hanvey testified that he did not stratify the sample for any other variable, such as job level, because "[t]here's just way too many combinations" of functions by level and this would lead to "extremely small percentages" in each cell given the already limited sample size of 60 (Hanvey deposition, 10/29/21, pp. 220-221). While Dr. Hanvey admitted that he could have expanded his sample size to account for this, the study would have become "unfeasible" to analyze at a certain point (p. 221). Nonetheless, even had he increased the sample size, the comparison of such diverse jobs would have led to the same meaningless result – not all jobs at Nike perform the same work.

[14] Dr. Hanvey defined the population as "current female employees [as of March 2021] in Job Codes within the Covered Positions" (Hanvey report, 10/1/21, p. 23).

29

at issue (6/1,376 or 0.44%); ultimately Dr. Hanvey only "analyzed" responses for 5 of the 6 job codes (0.36%)[15].  Not only does this constitute a small percentage of the 1,400 job codes at issue, the sample also fails to include any jobs in the S band and only includes job codes in half of the 10 job levels (Hanvey report, 10/1/21, pp. 26-27).  Sample 2 included only 25% of the 20 covered job functions, only 5% of the 102 job families and less than 0.6% of the 855 Subfamily x Level combinations in the 2021 time period. Of the population of "eligible" employees from which Dr. Hanvey sampled, the 29 female incumbents in Sample 2 covered only 0.7% of the eligible females (N = 4,240), and only 0.3% of male and female employees combined (N = 9,475) in those same covered positions.

- ***Appropriate sample sizes.***  In his report, Dr. Hanvey states that "There are not widely agreed-upon standards for [identifying] the proper sample size (*see, e.g.,* Kaye & Freedman, 2011) so professional judgment is typically required to determine whether a sample is sufficiently large." (p. 24, footnote 28).  Yet the Kaye and Freedman article he cites discusses many statistical techniques for determining appropriate sample size and concludes that increasing the sample size will reduce the level of error, particularly if the sample is heterogeneous, as it is here (Kaye & Freedman, 2011, p. 246).   Dr. Hanvey claims that he is not estimating a population parameter or

---

[15] Dr. Hanvey declined to analyze the sixth job code (i.e., A2542 – PROF ENTRY: PROD CREATION OPS) because 2 of the 5 employees sampled in the job code had recently "moved into a different job code prior to the interview" (Hanvey report, 10/1/21, p. 26, footnote 33).  In fact, these women had been in the job until March of 2021 when the new role (presumably Intermediate Professional level in PROD CREATION OPS) was created (Hanvey report, 10/1/21, PDF pp. 797, 859, 863, 868); the women were interviewed in September of 2021. It would be reasonable to assume that they could have described the entry-level job they had held until 5 to 6 months prior, particularly as one of the women indicated she had not been able to "fully step into the more senior role" until "now" due to commitments through mid-July (Hanvey report, 10/1/21, PDF p. 868).

30

generalizing his data beyond the 89 people he sampled[16] and therefore the statistical approaches to determining sample size do not apply to his study.

Thus, dismissing the scientific methods for determining sample size, Dr. Hanvey used his own "rule of thumb" of 30 for determining sample size, but since Nike had a wide range of jobs, he increased the sample size to 60 (Hanvey deposition, 10/29/21, pp. 222-223). He goes on to testify that, given that the responses are qualitative, "…I think you'd want to make sure your - - data are of sufficient quality, but it's not something that you can analyze numerically" (Hanvey deposition, 10/29/21, p. 228).

- *Random sampling.* Despite his frequent references to the scientific method and his elaborate description of his methods for "random sampling", Dr. Hanvey's sampling methods produced unusual results and were poorly executed. He selected 89 women to interview from a total of 4,240 women in the covered jobs as of March 2021. In doing so, he managed to select one woman for both Sample 1 and Sample 2 – the probability of doing so by chance is less than 2 in a million (0.0000018)[17]. Her responses about the Supervisor, Manufacturing job code were analyzed in both Sample 1 and Sample 2. By contrast, one of the jobs "analyzed" in Sample 2 was also

---

[16] At his deposition Dr. Hanvey opined about the likelihood of variability in the remaining job codes at issue:
Q. So all -- -- You only made a conclusion that there's a variability within five job codes out of the 1,300 job codes that are at issue in this case. Is that what you're saying?
A. Yeah, I think that's stated in the intro, that in order to determine similar variabilities in other job codes, you would have to do a job analysis in every single job code. But based on the evidence we have, there's very clear variability within each of the job codes that we selected; so it's highly likely that we would expect to see some variability elsewhere (Hanvey deposition, 10/29/21, p. 233).
[17] Dr. Hanvey also calls these "independent samples" even though 1 of the 60 women from Sample 1 was also selected to be 1 of the 30 women in Sample 2.

31

represented in Sample 1 by a sixth interviewee.  Dr. Hanvey could have looked at the responses for 6 interviewees in examining the Director, IT Management job, but he chose not to do so for this job code.  In another example of Dr. Hanvey's "random sampling", four out of the five (80%) Supervisors, Manufacturing selected were on the night shift.

- ***Dr. Hanvey's samples suffered from high non-response rate.***  Of even greater concern than the small samples is the non-response rate or refusal to participate of individuals selected randomly.  In Sample 1, 30% of the original 60 selected did not participate and had to be replaced (2 declined, 9 did not respond, and 7 indicated no availability; Hanvey report, 10/1/21, p. 28, footnote 36).  In Sample 2, 53% of the original 30 selected did not participate and had to be replaced (1 declined, 12 did not respond, 1 was out of the office during the interview and 2 were unavailable; Hanvey report, 10/1/21, p. 28, footnote 36)[18].  Such a high rate of fallout from the intended samples could indicate a potential systematic bias in the individuals who were willing to participate in the study (Rogelberg & Stanton, 2007; Fowler, 2013).

***Problems with Dr. Hanvey's "Methodology"***

**Dr. Hanvey "analyzed" unreliable data from people unclear about their jobs**.  Dr. Hanvey asked each interviewee the following question: "To what degree is your role at Nike clearly defined? **In other words, do you understand what is expected of you?** Please explain." (Hanvey Exhibit 5, p. 10, question #39, **emphasis** added).  Dr. Hanvey and his team coded the responses

---

[18] It is entirely possible that the invitation to participate in the study which was sent by Nike's Legal Department could have depressed participation (Hanvey report, 10/1/21, Exhibit 8; NIKE_HANVEY_00000960-0961).

32

to this question and found that 13% of the 60 respondents in Sample 1 indicated their role was not clear (see comments coded by Dr. Hanvey's team as "not clear" in Table 1 below).  Yet, despite the employees' lack of clarity and understanding about their role, Dr. Hanvey chose to include these 8 individuals' data in his results (Hanvey deposition, 10/29/21, pp. 241-242).

**Table 1. Responses of Sample 1 Participants who were Unclear about their Jobs**

| ID | Response to Question 39 – *To what degree is your role at Nike clearly defined? In other words, do you understand what is expected of you? Please explain.* |
|---|---|
| 6 | Not particularly, the role was new, it was created just before I took it. No one had this role in the past. I came into it and its sort of my role to shape. I have an overarching goal of keeping the lab running and making sure everyone has what they need, but there is not a clearly defined list of subtasks or way to make that happen. |
| 8 | I understand that I support Nike Direct analytics and I know the role profile.  When I started, I listened to the needs and started trying to solve for those needs.  there isn't any guidance on what I'm supposed to do.  I cover for a lot of people who are on sabbatical or maternity/paternity leave so I'm often working multiple jobs. |
| 16 | I would say my work is not clearly defined. I have decided what my job is, so that is what I do and I hold myself up to my standards. I think everyone has a different definition of what a product manager does, and I don't think there is much consistency for that anywhere. |
| 23 | Post CDA (Consumer Direct Acceleration) I did not receive a job description so I have had to almost create that with my manager who also did not receive a job description. For that reason, it almost feels like we made up the role. This makes it hard to know what is actually expected of me. |
| 29 | It is not clearly defined. This role is new and I think our group is trying to build a team and team structure, so there is a lot to change and a lot more to come. |
| 32 | It is not defined, right now I am filling in a temporary backfill at the current time and do not have a defined role, CFE (Coaching for Excellence our standard measurement of employee performance), or deliverables. This is not uncommon, because right now it is the beginning of our fiscal year so this is the time to define roles in relation to our vision and mission. |
| 62 | It is not. I always have a moving target, depending on who else is in role and what the priority of the season is. |
| 79 | There is not a clear definition for my role. I have been in this position for 2.5 years and it is constantly being evolved and reshaped based on either what the market needs or changes within our team. |

Dr. Hanvey also asked this same question of the Sample 2 participants but did not actually code their responses.  I applied Dr. Hanvey's coding scheme for this question to the 25 responses

33

in Sample 2[19] and found that 5 of the respondents (20%) indicated that their role was not clearly defined (see comments in Table 2 below).  Interestingly, 3 of these 5 individuals were in the same job code – Professional Expert, Brand-Category Marketing (A1044).  Yet again, Dr. Hanvey included these five individuals in his analysis despite their lack of understanding of their job.

**Table 2. Responses of Sample 2 Participants who were Unclear about their Jobs**

| ID | Response to Question 39 – *To what degree is your role at Nike clearly defined? In other words, do you understand what is expected of you? Please explain.* |
|---|---|
| 69 | It is not clearly defined, especially in this current environment (post organizational restructure). This makes it hard to understand my own role and how I am supposed to interact with others in the organization. I would say that there is an unhappy culture at Nike where there are streams of people turning over and resigning--this means that there is constant change in leadership and roles (for ex: I have had 6 bosses in two years). With each change, our roles/responsibilities become different or are changed. |
| 85 | My role is not clearly defined. General understanding of role, but lack detailed clarity on key responsibilities, deliverables, and scope. |
| 87 | No, its not clearly defined. I've never seen a job description. I've been told from my CFE what I am supposed to get after, but I can't obtain that without shifting the way we work. We have roles that the organization is not aligned to support. We thus have created our job description based on the needs that we see coming up out of the reorg and the big gaps in knowledge and capability that are not addressed by certain roles. |
| 57 | I feel like it is fairly well defined. However, there appears to be a lot of variations across against different groups. So what might be expected of me may not match what is expected of an Engineering Manager in a different part of the organization. Having said that I guess it isn't really well defined. While I have an Engineering Manager title and 2 others in my group have a Senior Engineering Manager title, it appears as though our responsibilities are the same. So maybe not well defined. I understand what is expected of me from my boss but that doesn't necessarily mean that the expectations of Engineering managers across different groups are the same or that there is clarity between Engineering Manager v. Senior Engineering Manager. |
| 53 | Roles are not clearly defined and its a trial by error to discover your full role. Equivalent roles don't necessarily align to other companies. |

**Dr. Hanvey relied on incumbents as his only source for the "data" he "analyzed".**  As noted earlier, Dr. Hanvey collected interview responses from incumbents to "provide an opinion

---

[19] Consultants on my team reviewed the responses for each job code in Sample 2 and applied Dr. Hanvey's coding scheme to the responses for Question 39.  Dr. Foster also coded each response and came to consensus with the other coder on the final code represented here.

Lundquist Decl. Ex. B, Page 34 of 69

on the degree of variability in the work performed and the skill, effort, responsibility, and working conditions associated with their jobs" (Hanvey report, 10/1/21, p. 1). By restricting his data to incumbents, he chose participants who were not responsible for articulating the requirements of the job, particularly in the areas of skill, effort and responsibility. Incumbents are typically a reliable source of information for the work performed, but supervisors are considered the best source of information for establishing job expectations.

> Supervisors who directly observe the work being analyzed can be a valuable source of information about the KSAOs [knowledges, skills, abilities or other characteristics] required for the incumbent to perform the work successfully (Gatewood & Feild, 1994; Goldstein, Zedeck, & Schneider, 1993). ***Because supervisors typically have observed a number of individuals performing the work, they may have insight regarding the KSAOs that enable some incumbents to perform the work effectively, whereas others are less successful.*** (Guder, 2012, p. 35, ***emphasis*** added).

Supervisors are preferred survey respondents when job expectations such as skill, effort, responsibility and working conditions are being evaluated. Research summarizing results across studies has found that supervisors provide more accurate, more reliable and less inflated job analysis ratings than do incumbents (DuVernet, Dierdorff & Wilson, 2015; Morgeson, Delaney-Klinger, Mayfield, Ferrara & Campion, 2004; Dierdorff & Wilson, 2003). In his deposition, Dr. Hanvey conceded that "sometimes" supervisors of targeted jobs in job analysis may be better suited to discuss what characteristics make employees successful on the job (Hanvey deposition, 10/29/21, p. 246).

As noted earlier, Dr. Hanvey did not consider the incumbents to be subject matter experts (Hanvey deposition, 10/29/21, p. 241). Given this evaluation of the incumbent sample, it is incomprehensible that he is relying on incumbent data to provide exactly the type of information that the SIOP *Principles* define as the role of a subject matter expert in job analysis.

35

**Dr. Hanvey did not critically evaluate the quality of the data obtained.**  The unreliability of incumbent data to identify job requirements is further illustrated by the data Dr. Hanvey obtained from his samples.  Dr. Hanvey did not appear to critically evaluate the quality of the data he collected, or to challenge the respondents to confirm understanding of their responses during the interview.  I have compiled several examples below where the respondent indicated that her education (Hanvey report, 10/1/21, p. 55, Table 7) or experience (Hanvey report, 10/1/21, pp. 51-52, Table 6) was helpful to her job, but the actual response indicates some level of implausibility.

- *Education claimed as helpful to performing job.*  Dr. Hanvey uncritically accepted and tabled the education data for the following respondents:

  o ID #6 indicated that her Bachelor's degree in Film and Television Production was helpful for her Lab Tech job because she "majored in how to run a three-ring circus" (Hanvey report, 10/1/21, PDF p. 312).

  o ID #52 cited a Bachelor's degree in Political Science as helpful for the Senior Director, Brand Category Management (NA Marketing League & Athletes) job because "Political science is… the study of people and what they want, and that directly applies to marketing" (Hanvey report, 10/1/21, PDF p. 731).

  o ID# 4 had a Bachelor's degree in Music.  Dr. Hanvey cites the Music degree in Table 7, but the respondent actually does not indicate that her Music degree helps her in her job at Nike.  Instead, she indicates that she is currently working toward her Master's degree in Organizational Leadership which is what is helpful to her job (Hanvey report, 10/1/21, PDF p. 283).

36

- ***Past experience claimed as helpful to performing job.*** Dr. Hanvey also reviewed respondents' past job experience. He stated,

> Prior jobs held by incumbents are typically related to the KSAs [knowledge, skills and abilities] possessed by these workers when they join Nike. In addition, prior work experience is commonly a factor that influences pay. However, an inherent assumption is that an employee's prior work experience relates to the employee's current job by providing them with higher levels of KSAs that are related to their current job. Therefore, we investigated not only employee's prior jobs but also the degree to which that prior experience was helpful in performing their current job" (Hanvey report, 10/1/21, pp. 51-52).

Again, I have pulled several examples of instances that do not make sense, all of which are included in Dr. Hanvey's Table 6 (Hanvey report, 10/1/21, pp. 52-53).

- o ID #24 was apparently a Barista at a drive-thru coffee shop and had previous work experience at a preschool providing family counseling (Hanvey report, 10/1/21, PDF p. 469). She stated that this experience was helpful for her job as a Social Media Support Manager. She had originally been hired by Nike as a Store Athlete several jobs prior to her current job.

- o ID #10 had been a front desk clerk at a hotel, a night shift manager and baker, and a Digital Imagery Analyst, all of which she found helpful for her job as Manager, Merchandising Fraud (Hanvey report, 10/1/21, PDF p. 339). She was originally hired into Nike as a contact center representative several jobs prior to her current job.

- o ID #65 had been a project manager at a sign company and case worker for a non-profit for people who had minor misdemeanors and parking tickets. She found this experience helpful for her job as Director of Digital Production

37

(Hanvey report, 10/1/21, PDF p. 910).  She was originally hired into Nike as a Product Presentation Specialist several jobs prior to her current job.

Although all of these women may believe that their education or prior work experience were "helpful" to them in performing their job, this information does not provide a "scientific" basis for establishing the education and experience required to perform the job.

**Dr. Hanvey's analysis of the structured interviews occurred under time pressure.**  While research and best practices indicate that structured interviews are an effective and commonly used method to collect job analysis information, they are not typically the only source of information obtained.  Often, job analysis interviews are conducted so that the researcher can efficiently get information on the jobs in question, but then that information is synthesized into inventories or surveys or subjected to evaluation by a focus group as the basis for analysis.

It is also commonly accepted that the analysis of open-ended, qualitative data collected in this type of interview is time-consuming.  In his report, Dr. Hanvey cites to a textbook authored by Gatewood and Feild (2001) for the proposition that structured interviews are a commonly used job analysis method (Hanvey report, 10/1/21, p. 10).  He does not cite to the most recent version of the text (Gatewood, Feild & Barrick, 2016) which also states the limitations of relying on interviews for collecting job analysis information.  Specifically, Gatewood et al. state that the use of interviews for job analysis makes it challenging to gain input from a large number of respondents and both difficult and expensive to evaluate the subjective data obtained. They further cautioned that using interviews as the sole job analysis technique can be susceptible to a distortion of information if relying on incumbents only, and distorted information can be hard to

38

identify unless verified by a supervisor[20].  As such, Gatewood and colleagues recommend not relying solely on interviews for job analysis; rather, they recommend that interviews be used as a supplementary source to identify "content for other job analysis methods, such as the development of task analysis inventories or the clarification of responses to other methods" (Gatewood, et al., 2016, p. 61).  Dr. Hanvey also cites Van De Voort and Whelen (2012), who similarly recommend that data from interviews "be combined with job information obtained through other job analytic techniques" (p. 43).

Dr. Hanvey himself co-authored a blog entry with Elizabeth Arnold entitled "Tools for Studying Your Employees' Duties" (Exhibit 756).  In discussing methodologies for collecting job analysis data, Dr. Hanvey and Ms. Arnold wrote about structured interviews:

> Depending on the resources available, the number of employees which can be included in the study may be limited because of the time required to conduct each interview. In addition, because the responses are qualitative and often quite lengthy, a significant amount effort [sic] and time may be required to analyze the data" (p. 2).

Of note, Dr. Hanvey conducted 36 of his 89 interviews with employees within a month of filing his report; 9 of those 36 were conducted between September 20 and September 24 and two follow-up interviews occurred 3 days before (Vales) and on the actual day (October 1) the report was due (Johansson).  The compressed time period for analysis of the interview data apparently did not provide sufficient time to thoroughly analyze and evaluate the data in a manner that would be scientifically precise.

---

[20] When presented with the Gatewood et al. text, Dr. Hanvey admitted at deposition that, "I suppose, in some cases [distortion of information] could occur" (Hanvey deposition, 10/29/21, p. 260).

39

**Dr. Hanvey's studies were conducted following a major reorganization of Nike**. Dr. Hanvey indicated that he conducted the senior leader interviews "[t]o learn more about Nike's functions and job architecture" (Hanvey report, 10/1/21, p. 13). He further testified that part of the reason for these interviews was to "help design the interview protocol..." (Hanvey deposition, 10/29/21, p. 193). However, two of the functions discussed in the senior leader interviews had recently undergone reorganizations (Sports Marketing and Design). In fact, in his report Dr. Hanvey wrote that the Sports Marketing reorganization was "part of a company-wide re-organization ...." (Hanvey report, 10/1/21, p. 15). Dr. Hanvey testified that, while he was aware of the reorganizations, he knew little about the impact of these reorganizations on the jobs within these two functions (Hanvey deposition, 10/29/21, pp. 183-187) and had not asked to see any new job descriptions that may have been developed as part of the reorganization (Hanvey deposition, 10/29/21, pp. 183-187).

A further limitation of the senior leader interviews was a mix of timeframes. Dr. Hanvey showed the senior leaders the job architecture for their function based on snapshot data, presumably covering the period through September 2019. His interviews of the leaders took place in April through June of 2021. It is not clear how or if reorganizations or changes to jobs in the intervening time period might have impacted the results of the senior leader interviews. Further, his interviews of incumbents took place in July through September of 2021. The interviewees were instructed to respond to the jobs as they currently performed them in 2021. Again, it is not clear how or if reorganizations or changes to jobs in the intervening time period might have impacted the results of the incumbent interviews.

40

***Problems with Dr. Hanvey's "Analysis" of the Interview Data***

**Dr. Hanvey's structured interview questions were not easily amenable to analysis.** Dr. Hanvey asked over 100 open-ended questions of 89 participants and transcribed their responses. He did very little to synthesize this information or draw conclusions. While Dr. Hanvey stated that he developed interview topics in alignment with the factors in Table 1 of his report (Hanvey report, 10/1/21, p. 21), I found that his questions did not always align cleanly with those factors and in some cases the factors themselves were questionable. Some topics were addressed directly with a close-ended format question (e.g., creativity needed, physical exertion, travel requirements), while other topics required synthesis across several open-ended questions (e.g., decision-making authority, working conditions), resulting in unclear standards for how to determine the degree of similarity.

In addition, questions concerning the "work performed outside of normal job duties" would seem to be the definition of work that should not be considered in an analysis of "substantially similar jobs". By definition, this work is not part of normal job requirements. Here are a few examples:

- ID23: While working at Nike, I used to run a "fun" committee. It was like a culture committee that focused on physical activities, mentoring opportunities, and educational opportunities. (Hanvey report, 10/1/21, PDF p. 460)

- ID64: Yes - I am part of our employee networks. I have a pillar meeting every two weeks and I am part of the leadership team for one of the networks, and they meet about every two weeks, as well. I mentor (but consider that part of day-to-day). (Hanvey report, 10/1/21, PDF p. 848)

41

- ID48: Mentorship... I took this on myself. I am mentoring others. I am currently mentoring someone from the business and I am a mentor guide to a group of 7 women. We had a team giving committee that I have volunteered for, as well. These are volunteer things. (Hanvey report, 10/1/21, PDF p. 694)

- ID4: I am a Nike storyteller. Tour guides who have gone through certification to give Nike tours to other businesses that are visiting campus. (Hanvey report, 10/1/21, PDF p. 284)

Dr. Hanvey reports this information without analysis or interpretation as to how it is useful to define job requirements.

**Dr. Hanvey's coding and "analysis" were incomplete and unreliable.** Dr. Hanvey describes that "[m]any employee responses to the Nike Job Study open-ended interview questions were detailed and lengthy. To facilitate the communication of this detailed information, we used a 'content analysis' approach" (Hanvey report, 10/1/21, p. 33). Dr. Hanvey describes the process he and his team used to "…maximize the reliability of the data" (pp. 33-34), which generally followed common, professional best practices. However, as with Dr. Hanvey's other analyses, a closer examination of the specifics of his analysis in his backup production revealed that it was not complete.

- Dr. Hanvey only coded 23 of the 100+ questions he asked of employees in these interviews. Dr. Hanvey references conducting the "Content Analysis" for these responses but doesn't report overall findings in a table or summarize overall findings.

- Dr. Hanvey describes in great detail that his interview questions were designed to collect information on relevant factors identified in the federal Equal Pay Act, the

42

Oregon Equal Pay Act and Title VII of the Civil Rights Act (Hanvey report, 10/1/21, pp. 16-21). He specifically states:

> To formulate interview questions that would generate information most helpful to the court or jury, I designed them to collect detailed data on the topics specified in the above-referenced statutes and regulations (Hanvey report, 10/1/21, p. 20).

He specifies these factors in Table 1 of his report (p. 21) as Work Performed, Skill/Knowledge, Effort, Responsibility and Working Conditions. Yet, surprisingly, Dr. Hanvey's coding scheme did not produce an evaluation for these factors individually nor does his report reach a conclusion about each of these categories. This would appear to have been the whole purpose of the study and yet Dr. Hanvey's "job analysis" fails to actually analyze the job on the key factors used to establish substantial similarity.

- Dr. Hanvey analyzed responses for Sample 1 on responsibility within level (Hanvey report, 10/1/21, pp. 72-78). Despite the fact that Nike's leveling criteria were intended to categorize jobs such that "each job within a certain level would have generally the same level of responsibility" based on the leveling criteria (Walker deposition, 12/17/20, p. 54), Dr. Hanvey reported that when he analyzed the data from Sample 1 by level, he "found that even within the same Level, employees varied with respect to the amount and type of responsibility associated with their jobs" (Hanvey report, 10/1/21, p. 69).

    I examined Dr. Hanvey's analysis of the responsibility data for Director as he said it was the level with the largest number of participants (N = 13). Dr. Hanvey doesn't mention that he also collected information from five respondents in Sample

43

2 at the Director level which he did not analyze for this purpose.  I examined the responses of all 18 Directors interviewed by Dr. Hanvey in Samples 1 and 2.  These data are shown in Table 3 below. In his report, Dr. Hanvey describes the responses as follows,

> Ten Directors stated that both they and their manager determine their work assignments.  Two Directors reported that they receive work assignments from their managers, with one clarifying that she is 'assigned a portfolio and I make decisions regarding my work within it' (ID36) and the other stating, 'I determine my own assignments and I review with my direct leader." (ID 17).  One Director stated that she receives work assignments from her manager and leadership (ID 56).  (Hanvey report, 10/1/21, p. 73).

This example illustrates the problem with Dr. Hanvey's lack of analysis.  When the responses are reviewed carefully, it is apparent that they are all saying the same thing, i.e., both the individual employee and her manager have some input on the work the participant is doing.  Most of these Directors are determining their own priorities, but that appears to be consistently happening within the broader purview of their manager, leadership, assigned initiatives, etc.  Not one participant says she works completely independently of her manager's purview.

**Table 3. Directors' Responses to the Question "Are you assigned work by your manager/leadership or do you determine your own assignments?"**

| Sample | ID | Response |
|---|---|---|
| Sample 1 | 1 | Its a little bit of both.  I more or less determine my own assignment but sometimes there are projects or other things that I am assigned to or volunteer for. |
| Sample 1 | 5 | I determine my own assignments dependent upon where we are in the SEC program. |
| Sample 1 | 9 | Both. |

44

| Sample | ID | Response |
|---|---|---|
| Sample 1 | 11 | A bit of both. I think in terms of day to day, I self managed - but I would never take on additional workload or assignments without providing visibility and getting alignment from my manager. |
| Sample 1 | 14 | Both. My manager may assign me to an area or an area of work, but then I determine my own assignments within that area of ownership. |
| Sample 1 | 17 | I determine my own assignments and I review with my direct leader. |
| Sample 1 | 28 | Both. Primarily I determine my own assignments though. |
| Sample 1 | 35 | It's a mix of the two. My leadership assigns me areas of focus, but within the areas I determine what type of work needs to happen. |
| Sample 1 | 37 | Both, it depends. It is more on the big picture elements (asking what will be done about something, figuring out if something is a problem, figuring out how to put the analysis together to solve well defined and not well defined issues that are coming up). Sometimes I have visibility on these issues, others I don't. Now that we have lose employees who haven't been replaced, leadership will have to ask for certain responsibilities to be done by others. |
| Sample 1 | 41 | Both. |
| Sample 1 | 58 | Both. Mostly I determine my own, but sometimes my manager has something for me to do. |
| Sample 1 | 65 | I am assigned work by my manager and I determine my own assignments, so both. |
| Sample 1 | 70 | A mixture of both. |
| Sample 2 | 48 | I think it is a collaboration. In a lot of cases, I would present the opportunities (here is the problem, then they tell me to go solve it). In other cases, they mention a body of work they'd like me to work on. It is a collaboration and depends on the need. |
| Sample 2 | 49 | Both. |
| Sample 2 | 53 | Mostly determine my own. |
| Sample 2 | 72 | Probably both. I think there is some work that my leader gives to me, but for the most part, I know my area and I manage my work within my scope. |
| Sample 2 | 89 | 90% determine my own, 10% leadership assigned. |

- Dr. Hanvey only coded responses from Sample 1. Even though he asked the same questions of Sample 2, he did not code the Sample 2 data. To illustrate how Dr. Hanvey could have examined similarity in responses for incumbents within a job code in Sample 2, I applied his coding scheme to the responses for job code A0971. I chose

45

this job code because one survey respondent's data was included in both Samples 1 and 2 (Interview ID 3) so Dr. Hanvey had coded her response in Sample 1.

I analyzed the responses for the question, "To what degree does your work require a high level of precision in how you perform it? In other words, what work must be completed in an exact and accurate manner? What could the consequences be if you did not perform your work to a high degree of precision?"  Table 4 below contains the responses (with **emphasis** added), along with Dr. Hanvey's coding (ID 3) or my application of his codes to the remaining responses.  As is shown in Table 4, there is a high degree of similarity in responses to this question – 80% of respondents indicated that they must be precise or highly precise in their jobs.  Additionally, the similarity occurred not only with the amount of precision required, but also specifically in relation to which task/activity must be accurate (i.e., timecards).

**Table 4. Responses of Interviewees in Job Code A0971 concerning Work Precision**

| ID | Response | Code |
|---|---|---|
| 3 | The number one thing is **time card accuracy**.  If employees' timecards are incorrect they don't get paid accurately - that is a real morale hit for the line employees. | *2: Must be Precise* (actual code provided by Dr. Hanvey's coders) |
| 68 | The typical example is the **time cards**.  if you don't make sure the employees **time cards** are on time before the end of the pay period, it will reflect on their paycheck which means they wont be paid.  If this happens, you have to go back into the system to correct it. | *2: Must be Precise* (expected code) |
| 76 | I have to make sure people's **time cards are accurate**, if they are not and people don't get their pay checks, that's a big deal. Make sure that safety equipment is in good condition, that much be accurate. You can't have people in an unsafe working environment. Part of our job is look for and encourage people to speak up. The consequences can be someone getting hurt and changing their life or not getting paid. | *2: Must be Precise* (expected code) |
| 80 | The tasks I do don't need to be done in a very exact manner, as long as they get done at some point in the shift. | *1: Minimal Precision Required* (expected code) |

46

| ID | Response | Code |
|----|----------|------|
| 88 | **Time cards need to have a high level of precision** and the consequences would be not properly compensating employees, this can have a big impact on their paychecks. | *3: High Level of Precision* (expected code) |

Similarly, I used Dr. Hanvey's coding scheme to analyze responses for this job code concerning the question, "Do you have any involvement in developing policies or procedures for Nike employees? If yes, how do you contribute?". The responses are shown in Table 5 below.  As can be seen in Table 5, 80% of the respondents in this job code provided the same response.

**Table 5. Responses of Interviewees in Job Code A0971 concerning Involvement in Policy**

| ID | Response | Code |
|----|----------|------|
| 3 | No. | *3: No* (actual code provided by Dr. Hanvey's coders) |
| 68 | No. | *3: No* (expected code) |
| 76 | Yes, we developed a one-pager for a electrode guard safety. | *1: Yes* (expected code) |
| 80 | Not developing. | *3: No* (expected code) |
| 88 | No. | *3: No* (expected code) |

Responses to other questions illustrate the issues in Dr. Hanvey's interview and coding process. For instance, the question, "Do you have any involvement in strategy development or strategic planning within Nike? If yes, how do you contribute?" does not specify what is meant by strategy. Responses to this question demonstrate that employees may not have understood what was meant by the question. For instance, Interview ID 3 responded, "Its minimal.  I share labor between other platforms." This vague response makes it hard to determine if this employee is involved in strategy development or not. Despite this vague response, Dr. Hanvey coded the response as "*Limited (Contribute)*". Interview ID 76 also had a vague

47

response of, "Not necessarily." Vague or short responses like these can typically be clarified with probing questions. Dr. Hanvey notes in his report that, "interviewers were instructed to use specific follow-up questions ("probing questions") as needed to ensure that the employees' responses were clear and provided sufficient detail to answer the question" (Hanvey report, 10/1/21, p. 27). However, responses such as the ones provided by Interview ID 3 and ID 76 call into question whether probing questions were used at appropriate times or at all. Full responses to the questions on strategy development can be seen in Table 6.

**Table 6. Responses of Interviewees in Job Code A0971 concerning Strategy Development**

| ID | Response | Code |
|----|----------|------|
| 3 | Its minimal.  I share labor between other platforms. | *2: Limited (Contribute)* (actual code provided by Dr. Hanvey's coders) |
| 68 | Yes.  We communicate with our managers about how we can do better in our employee development.  We ask for opportunities for them. | *2: Limited (Contribute)* (expected code) |
| 76 | Not necessarily. | *3: No (No Involvement)* (expected code) |
| 80 | No | *3: No (No Involvement)* (expected code) |
| 88 | No. | *3: No (No Involvement)* (expected code) |

### Dr. Hanvey's Sloppiness in Dealing with Data

Dr. Hanvey in a previous expert report noted the importance of errors when analyzing small samples.

> When extrapolating data from a small sample to a large population, accuracy of results from the sample is extremely important.  Small errors in the sample data or analyses are magnified and can result in massive errors when extrapolated to a large population (Hanvey expert report. *Davenport et al. v. Charter Communications*, 2016, p. 6)

48

He confirmed in his deposition that the accuracy of results is extremely important when small samples are used (Hanvey deposition, 10/29/21, p. 236). Dr. Hanvey's conclusions in this case are based on small samples, even if he is not extrapolating a population value. Hence, the accuracy with which he analyzes the data is extremely important.

In his report, Dr. Hanvey includes an exhibit which lists the job families and subfamilies within each function along with the number of employees in each subfamily (Hanvey report, 10/1/21, Exhibit 2). When totaled, the exhibit indicates that Nike had almost 430,000 employees during the relevant time period, a number more than 20 times the actual number of covered employees (N = 13,400) during this time period. Apparently, the table mistakenly counted each month a person was employed from the snapshots data as if he or she were a separate employee (i.e., if a person was employed for 3 years, then he or she was counted 36 times). In his deposition, Dr. Hanvey first defends the 429,000 number saying "… So as someone progresses or changes jobs or anything, if there's a reorganization, all those people would appear in two places" (Hanvey deposition, 10/29/21, p. 154) and then concedes it is possible that there was overcounting. He goes on to state:

> Q. If that's how it was done, does that make any sense?
> A. Well, the point of this is to show the different combinations. So the total employees is not really very relevant to the point I was making in the report. So whether it makes sense or not, I don't know. It is what it is. I think the numbers are correct.
> Q. What did you say about the numbers being correct?
> A. **I believe the numbers are correct. It's just what the number represents, is the part I'm not sure about**. (pp. 154-155, **emphasis** added)

There are several other minor misstatements or errors in his report, a few of which are catalogued below.

49

- Table 12 on p. 97 of his report is mislabeled – the job code is incorrect.  The label refers to A2543, PROF ENTRY: PROD CREATION OPS, i.e., the sixth job code which Dr. Hanvey chose not to analyze.  The data in the table actually reflects information from job A0971, SUPV: MFG.

- Dr. Hanvey continued to represent that his Sample 2 consisted of 30 interviewees when he chose to not analyze the data from the Product Information Analyst job code (A2543) and actually only interviewed 29 individuals for Sample 2.

- In Exhibit 4 of his report, Dr. Hanvey neglects to include 3 individuals who he interviewed: missing Kristopher Johansson, Shane Walker, and Liz Vales.

- Dr. Hanvey's report is missing a Table 14.  It goes from Table 13 on page 99 to Table 15 on page 118.

- Dr. Hanvey's backup data includes a list of interviewees along with what is labeled as company tenure.  In fact, the tenure variable he lists appears to be time in job level, rather than time in company.

**RESPONSES TO THE REPORT OF DR. SAAD**

As Nike's Labor Economics expert, Dr. Saad's report is primarily focused on the analysis of pay data.  However, there are several HR practices which he discussed in his report and used as the basis for his analysis.

*Manager and Manager + 1 as Decision Makers*

In his report, Dr. Saad conducts analyses based on manager + 1 as the decision maker for merit increases, bonus and stock (Saad report, 10/1/21, p. 52).  He testified in his deposition that

50

he was directed to do the manager + 1 analyses by counsel and that he believes it to be a "reasonable approach" based on the documents he was provided (Saad deposition, 10/27/21, pp. 186-187; 191).  However, he did concede that he did not study who made the final decisions regarding certain pay practices at Nike and had no understanding of either Nike's executive review process or the role of others in making final pay decisions (Saad deposition, 10/27/21, pp. 193-194.)  As I noted in my previous report (Lundquist report, 7/15/21, p. 28), Nike's training documents and deposition testimony concerning merit increases and bonuses show that Nike does not finalize merit award recommendations made by the immediate manager of employees and approved by the manager + 1 until *several* levels of leadership successively review and approve the initial recommendation (White deposition, pp. 196-198; Exhibit 596, NIKE_00026514, slide 13; Exhibit 522, NIKE_00024770, slide 30).  This executive level review provides the opportunity for more senior managers and executives to alter pay recommendations and for HRBPs to play a role in reviewing the recommendations with senior leadership (Walker deposition, 12/18/20, p. 155)[21].  Below is a timeline outlining this review in one of Nike's training documents on managing pay (Exhibit 500, NIKE_00003191, slide 46).

---

[21] Although Dr. Saad does not address the 2x pay practices, the 2x pay recommendations made by managers are also reviewed and approved by the "highest leadership level" (Exhibit 526, NIKE_00030360, p. -30360; Stuckey deposition, pp. 205-206).

51



### Nike's Prior Pay Policy

Dr. Saad devotes several pages of his report to describing his understanding of Nike's use of prior pay information to set starting salary (Saad report, 10/1/21, pp. 89-91).   He acknowledged (citing Nike documents (Exhibit 512 - NIKE_00002233) and deposition testimony (Thomas deposition, 3/26/21, pp. 219-220; Walker deposition, 12/17/20, p. 107)) that Nike has in the past considered prior pay in making salary offers but that it was only one of several factors considered.  This is consistent with my understanding of how Nike made salary offers prior to the change in Oregon law prohibiting such practices.  It is also my understanding that many, if not all, of the remaining factors are still in use to set salary offers.  Dr. Neumark's analysis of starting salary before and after the change in the law is a reasonable analysis of the impact of the change in collecting prior pay information as part of making salary offers.

52

*Initial Job Assignment*

In my previous report, I questioned whether processes used by Nike's recruiters (such as Avature or Taleo's passive candidate correspondence function) could have helped to channel women into lower job levels, either by recruiting women with the same education and experience into lower jobs or by using the "match to job" process to consider women for positions other than the ones to which they had applied (Lundquist report, 7/15/21, pp. 41-42). Dr. Saad testified in his deposition that he did not investigate whether and how recruiters used Avature to solicit potential candidates to apply for positions, nor does he have an understanding of the Taleo passive candidate correspondence function or the "match to job" process (Saad deposition, 10/27/21, pp. 266-269). Further, although Dr. Saad concluded that women are not disadvantaged based on his modeling of controls for "job applied for", it is unclear to me whether these analyses eliminated the potential impact of the recruiter encouraging or "matching" a woman to a lower-level job, thereby having that data reflect that she had chosen to apply for that job.

**CONCLUSION**

Notwithstanding the reports and testimony of Drs. Hanvey and Saad, my previous conclusions in this matter remain unchanged. It remains my professional opinion that Nike groups its jobs into substantially similar job groups based on the Job Function, Job Family, Job Subfamily, Band and Job Level architecture into which all jobs at Nike are categorized. Nike uses this job architecture to apply a consistent set of policies and practices for employees within these groups for compensation, talent acquisition, talent management and performance management.

53

Despite a common architecture for classifying jobs, Nike's policies and practices for compensation, promotion and initial job assignment have not been substantiated as job related according to professional and legal guidelines.

54

I make this declaration under penalty of perjury, this 29th day of November 2021.


Kathleen K. Lundquist, Ph.D.

**ATTACHMENTS**

Lundquist Decl. Ex. B, Page 56 of 69

**ATTACHMENT A**

Lundquist Decl. Ex. B, Page 57 of 69

**DOCUMENTS REVIEWED**

| File Name | Document Name or Description | # Pages | Bates # |
|---|---|---|---|
| ChesterHanveyPhD_PDFTran.pdf | Deposition of Chester Hanvey, Ph.D. in Cahill et al., v. Nike, Inc. (10/29/21) with exhibits | 318 | N/A |
| AliSaadPhD_PDFTran.pdf | Deposition of Ali Saad, Ph.D. in Cahill et al., v. Nike, Inc. (10/27/21) with exhibits | 354 | N/A |
| Nike_Cahill - 2021-10-01 - Letter re Nike's Expert Disclosures.pdf | Cahill, et al. v. Nike, Inc., Case No. 3:18-cv-01477-JR - Nike's FRCP 26(a)(2)(B) Expert Disclosures/Reports Felicia A. Davis 10/1/2021 | 2 | N/A |
| Nike - Saad Report 2021_10_01.pdf | Expert Report of Ali Saad, Ph.D. 10/1/2021 | 298 | N/A |
| Nike-Hanvey_Report_10-01-21_with_Exhibits.pdf | Expert Report of Chester Hanvey, Ph.D. 10/1/2021 | 1,073 | N/A |
| WHQ_Air MI Oregon S band &amp; Below Snapshot 17MAR2021.xlsx | Nike Snapshot data from March 17, 2021 | N/A | N/A |
| NIKE_HANVEY_00000960-00000961.pdf | Email from Jessica Baumann - Invitation for Nike Job Study Interview September 17, 2021 | 2 | NIKE_HANVEY_00000960-_0961 |
| Nike Questions & Analyses Notes 20201116.xlsx | NIKE - Employee Study Distinct Analysis of Field: "Overall" Quick Analysis of Overall | N/A | N/A |
| Nike Questions & Analyses Notes 20201116.xlsx | Nike Questions & Analyses Notes 20201116 | N/A | N/A |
| Memo - AWS Text Scraping Overview.docx | PDF Text Scraping Using AWS | 2 | N/A |
| Memo - AWS Text Scraping Overview.docx | PDF Text Scraping Using AWS | 2 | N/A |
| 01 - AWS Textract - Start Analyzing Documents.R | 01 - AWS Textract - Start Analyzing Documents.R | N/A | N/A |
| 01 - AWS Textract - Start Analyzing Documents.R | 01 - AWS Textract - Start Analyzing Documentsv2.R | N/A | N/A |
| 01 - AWS Textract - Start Analyzing Documentsv2.R | 02 - AWS Textract Pull & Scrape Results.R | N/A | N/A |
| 02 - AWS Textract Pull & Scrape Resultsv2.R | 02 - AWS Textract Pull & Scrape Resultsv2.R | N/A | N/A |
| 03 - Stack Results.R | 03 - Stack Results.R | N/A | N/A |
| 03 - Stack Resultsv2.R | 03 - Stack Resultsv2.R | N/A | N/A |
| 04 - Working File.R | 04 - Working File.R | N/A | N/A |
| 01 - AWS Textract.R | 01 - AWS Textract.R | N/A | N/A |

58

| File Name | Document Name or Description | # Pages | Bates # |
|---|---|---|---|
| All PDF Contracts - BRG.pdf | All PDF Contracts - BRG.pdf | 2,622 | NIKE_00003352-_5973 |
| Analysis 1.RDS | ANALYSIS 1.RDS | N/A | N/A |
| First 10 PDF Text.RDS | FIRST 10 PDF TEXT.RDS | N/A | N/A |
| Job IDs - Batch 1.RDS | JOB IDS - BATCH 1.RDS | N/A | N/A |
| Job IDs - Batch 2.RDS | JOB IDS - BATCH 2.RDS | N/A | N/A |
| Job IDs - Batch 3.RDS | JOB IDS - BATCH 3.RDS | N/A | N/A |
| Job IDs - Batch 4.RDS | JOB IDS - BATCH 4.RDS | N/A | N/A |
| Job IDs - Batch 5.RDS | JOB IDS - BATCH 5.RDS | N/A | N/A |
| Job IDs - Batch 6.RDS | JOB IDS - BATCH 6.RDS | N/A | N/A |
| PDF Name Index - Step 1.txt | PDF NAME INDEX - STEP 1.TXT | N/A | N/A |
| Results List - Batch 1.RDS | RESULTS LIST - BATCH 1.RDS | N/A | N/A |
| Results List - Batch 1.RDS | Results List - Batch 1.RDS | N/A | N/A |
| Results List - Batch 2.RDS | RESULTS LIST - BATCH 2.RDS | N/A | N/A |
| Results List - Batch 2.RDS | Results List - Batch 2.RDS | N/A | N/A |
| Results List - Batch 3.RDS | RESULTS LIST - BATCH 3.RDS | N/A | N/A |
| Results List - Batch 3.RDS | Results List - Batch 3.RDS | N/A | N/A |
| times - Batch 2.RDS | TIMES - BATCH 2.RDS | N/A | N/A |
| Results List - Batch 1RDS | Results List - Batch 1RDS | N/A | N/A |
| Batch 1 - 1 to 50.txt | Text file - Batch 1 - 1 to 50.txt | N/A | N/A |
| Batch 1 - 1 to 50.txt | Text file - Batch 1 - 1 to 50.txt | N/A | N/A |
| Batch 2 Parsed Data Rows - Raw.txt | Text file - Batch 2 Parsed Data Rows - Raw.txt | N/A | N/A |
| Batch 3 Parsed Data Rows - Raw.txt | Text file - Batch 3 Parsed Data Rows - Raw.txt | N/A | N/A |
| Batch 4 Parsed Data Rows - Raw.txt | Text file - Batch 4 Parsed Data Rows - Raw.txt | N/A | N/A |
| Batch 5 Parsed Data Rows - Raw.txt | Text file - Batch 5 Parsed Data Rows - Raw.txt | N/A | N/A |
| Batch 6 Parsed Data Rows - Raw.txt | Text file - Batch 6 Parsed Data Rows - Raw.txt | N/A | N/A |
| Results List - Batch 4.RDS | Results List - Batch 4.RDS | N/A | N/A |
| Results List - Batch 5.RDS | Results List - Batch 5.RDS | N/A | N/A |
| Results List - Batch 6.RDS | Results List - Batch 5.RDS | N/A | N/A |
| NIKE_00003352.tif | Nike, Inc Job Description Prof Entry: Ext Comm | N/A | N/A |
| NIKE_00003353.tif | Nike, Inc Job Description Prof Entry: EXT COMM | N/A | N/A |
| NIKE_00003354.tif | Nike, Inc Job Description Prof Entry: EXT COMM | N/A | N/A |
| NIKE_00003355.tif | Nike, Inc Job Description Prof Entry: EXT COMM | N/A | N/A |

| File Name | Document Name or Description | # Pages | Bates # |
|---|---|---|---|
| NIKE_00003356.tif | Nike, Inc Job Description Prof Entry: EXT COMM | N/A | N/A |
| NIKE_00003357.tif | Nike, Inc Job Description Prof Entry: EXT COMM | N/A | N/A |
| NIKE Job Descriptions - Processed Output - All Jobs.xlsx | Nike - Employee Study Job Descriptions All 1,311 PDFs | N/A | N/A |
| NIKE Job Descriptions - Misc Analyses - 20201120.xlsx | Nike - Employee Study Subset of Job Descriptions 1 NGRAM | N/A | N/A |
| NIKE Job Descriptions - Misc Analyses - 20201120_Active.xlsx | Nike - Employee Study Subset of Job Descriptions 1 NGRAM | N/A | N/A |
| NIKE Job Descriptions - Unprocessed Output - All Jobs (RAW).xlsx | NIKE Job Descriptions - Unprocessed Output - All Jobs (RAW) | N/A | N/A |
| NIKE Job Descriptions - Processed Output - All Jobs (RAW).xlsx | Nike - Employee Study Job Descriptions All 1,311 PDFs | N/A | N/A |
| NIKE Job Descriptions - Unprocessed Output.xlsx | NIKE Job Descriptions - Unprocessed Output | N/A | N/A |
| NIKE Job Descriptions - Unprocessed Output (RAW).xlsx | NIKE Job Descriptions - Unprocessed Output (RAW) | N/A | N/A |
| NIKE Job Descriptions - Working.xlsx | NIKE Job Descriptions - Working | N/A | N/A |
| Nike-Content_Analysis_Coding_Calibration_Meeting_Info_Sheet.docx | Nike-Content Analysis Coding Calibration Meeting | N/A | N/A |
| Nike-Sample_ID_with_Details.xlsx | Nike-Sample_ID_with_Details | N/A | N/A |
| Nike-Structured_Interview_Data_Content_Analysis_Coding.xlsx | Nike-Structured_Interview_Data_Content_Analysis_Coding | N/A | N/A |
| Nike-Structured_Interview_Data_Select_5_Random_responses.xlsx | Nike-Structured_Interview_Data_Select_5_Random_responses | N/A | N/A |
| 20210927120426-SurveyExport.csv | 20210927120426-SurveyExport | N/A | N/A |
| 20210927120426-SurveyExport.csv | Survey Export | N/A | N/A |

60

| File Name | Document Name or Description | # Pages | Bates # |
|---|---|---|---|
| 20210916205805-SurveyExport.csv | 20210916205805-SurveyExport | N/A | N/A |
| 20210916205805-SurveyExport.csv | Pilot Survey Export | N/A | N/A |
| Nike-SAS_Code_Interview_Data.xlsx | Nike-SAS_Code_Interview_Data | N/A | N/A |
| Nike-SAS_Code_Interview_Data.xlsx | Nike-SAS_Code_Interview_Data | N/A | N/A |
| interviewdata_a0727.sas7bdat | SAS Dataset - interviewdata_a0727 | N/A | N/A |
| interviewdata_a0971.sas7bdat | SAS Dataset - interviewdata_a0971 | N/A | N/A |
| interviewdata_a1044.sas7bdat | SAS Dataset - interviewdata_a1044 | N/A | N/A |
| interviewdata_a2543.sas7bdat | SAS Dataset - interviewdata_a2543 | N/A | N/A |
| interviewdata_a2662.sas7bdat | SAS Dataset - interviewdata_a2662 | N/A | N/A |
| interviewdata_a3118.sas7bdat | SAS Dataset - interviewdata_a3118 | N/A | N/A |
| interviewdata_all.sas7bdat | SAS Dataset - interviewdata_all | N/A | N/A |
| interviewdata_sample1.sas7bdat | SAS Dataset - interviewdata_sample1 | N/A | N/A |
| interviewdata_sample2.sas7bdat | SAS Dataset - interviewdata_sample2 | N/A | N/A |
| Nike-Interview_Data_Frequencies_Job_Cd_A2662.pdf | Frequencies from All Multiple Choice - A2662 | 3 | N/A |
| Nike-Interview_Data_Frequencies_Job_Cd_A0727.pdf | Frequencies from All Multiple Choice - Job Code A0727 | 3 | N/A |
| Nike-Interview_Data_Frequencies_Job_Cd_A0971.pdf | Frequencies from All Multiple Choice - Job Code A0971 | 4 | N/A |
| Nike-Interview_Data_Frequencies_Job_Cd_A1044.pdf | Frequencies from All Multiple Choice - Job Code A1044 | 4 | N/A |
| Nike-Interview_Data_Frequencies_Job_Cd_A2543.pdf | Frequencies from All Multiple Choice - Job code A2543 | 4 | N/A |

61

| File Name | Document Name or Description | # Pages | Bates # |
|---|---|---|---|
| Nike-Interview_Data_Frequencies_09-17-21.pdf | Frequencies from All Multiple Choice - Sample of 60 | 5 | N/A |
| Nike-Interview_Data_Job_Cd_A2662.xlsx | Frequencies from All Multiple Choice Questions - JOB CODE A0727 | N/A | N/A |
| Nike-Interview_Data_Job_Cd_A2543.xlsx | Frequencies from All Multiple Choice Questions - JOB CODE A0971 | N/A | N/A |
| Nike-Interview_Data_Job_Cd_A1044.xlsx | Frequencies from All Multiple Choice Questions - JOB CODE A1044 | N/A | N/A |
| Nike-Interview_Data_Job_Cd_A0971.xlsx | Frequencies from All Multiple Choice Questions - JOB CODE A2543 | N/A | N/A |
| Nike-Interview_Data_Job_Cd_A0727.xlsx | Frequencies from All Multiple Choice Questions - JOB CODE A2662 | N/A | N/A |
| Nike-Interview_Data_Frequencies_Job_Cd_A3118.pdf | Frequencies from All Multiple Choice Questions - JOB CODE A3118 | 4 | N/A |
| Nike-Interview_Data_Job_Cd_A3118.xlsx | Frequencies from All Multiple Choice Questions - Sample of 60 | N/A | N/A |
| Nike-Interview_Data_Frequencies 09-17-21.xlsx | Nike-Interview_Data_Frequencies 09-17-21 | N/A | N/A |
| Nike-1.0_Import_Survey_Data.sas | Nike-1.0_Import_Survey_Data | N/A | N/A |
| Nike-2.0_Split_Data_by_Sample_Add_Details.sas | Nike-2.0_Split_Data_by_Sample_Add_Details | N/A | N/A |
| Nike-3.0_Export_Responses_Sample.sas | Nike-3.0_Export_Responses_Sample | N/A | N/A |
| Nike-3.1_Export_Responses_Sample_Supplemental.sas | Nike-3.1_Export_Responses_Sample_Supplemental | N/A | N/A |
| Nike - List of Interviewees by Sample.xlsx | Nike - List of Interviewees by Sample | N/A | N/A |
| Nike-SAS_Code_Sampling.xlsx | Nike-SAS_Code_Sampling | N/A | N/A |

62

Lundquist Decl. Ex. B, Page 62 of 69

| File Name | Document Name or Description | # Pages | Bates # |
|---|---|---|---|
| Nike-SAS_Code_Sampling.xlsx | Nike-SAS_Code_Sampling | N/A | N/A |
| Nike-SAS_Code_Sampling.xlsx | Nike-SAS_Code_Sampling | N/A | N/A |
| Nike-SAS_Code_Sampling.xlsx | Nike-SAS_Code_Sampling | N/A | N/A |
| compchngequity2019.sas7bdat | SAS Dataset - compchngequity2019 | N/A | N/A |
| compchngmerit2019.sas7bdat | SAS Dataset - compchngmerit2019 | N/A | N/A |
| compchngpsp2019.sas7bdat | SAS Dataset - compchngpsp2019 | N/A | N/A |
| compchngthru20190531.sas7bdat | SAS Dataset - compchngthru20190531 | N/A | N/A |
| eepopulation.sas7bdat | SAS Dataset - eepopulation | N/A | N/A |
| eepopulation_cleaned.sas7bdat | SAS Dataset - eepopulation_cleaned | N/A | N/A |
| potappraisal_13_19.sas7bdat | SAS Dataset - potappraisal_13_19 | N/A | N/A |
| sample.sas7bdat | SAS Dataset - sample | N/A | N/A |
| sample_count_by_function.sas7bdat | SAS Dataset - sample_count_by_function | N/A | N/A |
| sample_supplemental.sas7bdat | SAS Dataset - sample_supplemental | N/A | N/A |
| segmentation.sas7bdat | SAS Dataset - segmentation | N/A | N/A |
| snapshots.sas7bdat | SAS Dataset - snapshots | N/A | N/A |
| snapshots_cleaned.sas7bdat | SAS Dataset - snapshots_cleaned | N/A | N/A |
| snapshots_gender.sas7bdat | SAS Dataset - snapshots_gender | N/A | N/A |
| static_table.sas7bdat | SAS Dataset - static_table | N/A | N/A |
| Nike-Current_Population_Profile_Tables.xlsx | Nike Current Population Profile Tables | N/A | N/A |
| Nike-Current_Population_Varlist.xlsx | Nike Current Population Varlist | N/A | N/A |
| Nike-1.1_Import_Company_Data.sas | Nike-1.1_Import_Company_Data | N/A | N/A |
| Nike-1.2_Add_Gender_to_Snapshot.sas | Nike-1.2_Add_Gender_to_Snapshot | N/A | N/A |

63

| File Name | Document Name or Description | # Pages | Bates # |
|---|---|---|---|
| Nike-1.3_Clean_Snapshot_Data.sas | Nike-1.3_Clean_Snapshot_Data | N/A | N/A |
| Nike-1.4_Create_Snapshot_Profile.sas | Nike-1.4_Create_Snapshot_Profile | N/A | N/A |
| Nike-1.5_Create_Snapshot_Profile_2017.sas | Nike-1.5_Create_Snapshot_Profile_2017 | N/A | N/A |
| Nike-2.1_Import_Current_Population.sas | Nike-2.1_Import_Current_Population | N/A | N/A |
| Nike-2.2_Clean_Current_Population_Data.sas | Nike-2.2_Clean_Current_Population_Data | N/A | N/A |
| Nike-2.3_Create_Current_Population_Profile.sas | Nike-2.3_Create_Current_Population_Profile | N/A | N/A |
| Nike-3.1_Sample_Selection.sas | Nike-3.1_Sample_Selection | N/A | N/A |
| Nike-3.2_Sample_Selection_Supplemental.sas | Nike-3.2_Sample_Selection_Supplemental | N/A | N/A |
| Nike-Sample_Selection_by_Function.xlsx | Nike-Sample_Selection_by_Function | N/A | N/A |
| Nike-Sample_Selection_by_Function_Calculation_Sheet.xlsx | Nike-Sample_Selection_by_Function_Calculation_Sheet | N/A | N/A |
| Nike-Sample_Selection_Replaced.xlsx | Nike-Sample_Selection_Replaced | N/A | N/A |
| Nike-Sample_Selection_Supplemental_Replaced.xlsx | Nike-Sample_Selection_Supplemental_Replaced | N/A | N/A |
| Nike-Snapshot_Profile_Tables_2015.xlsx | Nike-Snapshot_Profile_Tables_2015 | N/A | N/A |
| Nike-Snapshot_Profile_Tables_2017.xlsx | Nike-Snapshot_Profile_Tables_2017 | N/A | N/A |

64

| File Name | Document Name or Description | # Pages | Bates # |
|---|---|---|---|
| Nike-Supplemental_Sample_Selection.xlsx | Nike-Supplemental_Sample_Selection | N/A | N/A |
| Comp_Change_2019_Equity_Attorneys_Eyes_Only.xlsx | Comp Change 2019 Equity Attorneys Eyes Only | N/A | N/A |
| Comp_Change_2019_Merit_Attorneys_Eyes_Only.xlsx | Comp Change 2019 Merit  Attorneys Eyes Only | N/A | N/A |
| Comp_Change_2019_PSP_Attorneys_Eyes_Only.xlsx | Comp_Change_2019_PSP_Attorneys_Eyes_Only | N/A | N/A |
| Comp_Change_thru_20190531_Attorneys_Eyes_Only.xlsx | Comp_Change_thru_20190531_Attorneys_Eyes_Only | N/A | N/A |
| NIKE_HANVEY_001 | Hanvey backup data production (10/15/21). Includes document range NIKE_HANVEY_00000001-NIKE_HANVEY_00000185 | N/A | NIKE_HANVEY_00000001-NIKE_HANVEY_00000185 |
| NIKE_HANVEY_002 | Hanvey backup data production 002 (10/18/21). Includes document range NIKE_HANVEY_00000186-NIKE_HANVEY_00000680 | N/A | NIKE_HANVEY_00000186-NIKE_HANVEY_00000680 |
| NIKE_HANVEY_003 | Hanvey backup data production 003 (10/20/21). Includes document range NIKE_HANVEY_00000681-NIKE_HANVEY_00000959 | N/A | NIKE_HANVEY_00000681-NIKE_HANVEY_00000959 |
| Pot_Appraisal_FY13_FY18_Attorneys_Eyes_Only.xlsx | Pot_Appraisal_FY13_FY18_Attorneys_Eyes_Only | N/A | N/A |
| Segmentation_FY18_FY20_Attorneys_Eyes_Only.xlsx | Segmentation_FY18_FY20_Attorneys_Eyes_Only | N/A | N/A |
| Snapshots_201207_201909_Attorneys_Eyes_Only.xlsx | Snapshots_201207_201909_Attorneys_Eyes_Only | N/A | N/A |
| Snapshots_201207_201909_Attorneys_Eyes_Only_GENDER_ADDED.xlsx | Snapshots_201207_201909_Attorneys_Eyes_Only_GENDER_ADDED | N/A | N/A |
| Snapshots_201207_201909_Attorneys_Eyes_Only_SAMPLE_1000.xlsx | Snapshots_201207_201909_Attorneys_Eyes_Only_SAMPLE_1000 | N/A | N/A |
| Static_Table_20190831_Attorneys_Eyes_Only.xlsx | Static Table 20190831  Attorneys Eyes Only | N/A | N/A |

65

| File Name | Document Name or Description | # Pages | Bates # |
|---|---|---|---|
| Stuckey Declaration.pdf | Declaration of Jessica Stuckey in Cahill v. Nike, dated 9/28/21 | 32 | NIKE_HANVEY_000 00001-_0032 |
| RE Backup data and documents for Nike's expert reports.msg | Email from L. Zabele regarding Nike expert backup data (10/14/21) | N/A | N/A |
| Cahill v. Nike - Errata for Deposition of Ali Saad, Ph.D.pdf | Errata Sheet for the Deposition of Ali Saad, Ph.D. | 9 | N/A |
| Cahill v. Nike - Errata for Deposition of Chester Hanvey, Ph.D.pdf | Errata Sheet for the Deposition of Chester Hanvey, Ph.D. | 2 | N/A |
| NIKE_00003352.txt through NIKE_00005972.txt | Extracted text from Nike PDF Job Descriptions in Batches 1 through 6 of Dr. Hanvey's data production | N/A | N/A |
| NIKE_00003352.pdf through NIKE_00005972.pdf | Nike PDF Job Descriptions in Batches 1 through 6 of Dr. Hanvey's data production | N/A | NIKE_00003352-_5972 |

66

**ATTACHMENT B**

## References

Banks, C. G., & Cohen, L. (2005). Wage and hour litigation: I-O psychology's new frontier. In F.J. Landy (Ed.), *Employment discrimination litigation* (pp. 336-370). Jossey-Bass/Pfeiffer.

Dierdorff, E. C., & Wilson, M. A. (2003). A meta-analysis of job analysis reliability. *Journal of Applied Psychology, 88*(4), pp. 635–646.

DuVernet, A. M., Dierdorff, E. C., & Wilson, M. A. (2015). Exploring factors that influence work analysis data: A meta-analysis of design choices, purposes, and organizational context. *Journal of Applied Psychology, 100*(5), pp. 1603-1631.

Fowler Jr., F. J. (2013). *Survey research methods*. Sage publications.

Gatewood R. D., & Feild, H. (1994). *Human resource selection* (3rd ed.). Fort Worth, TX: Harcourt Brace.

Gatewood, R. D., & Feild, H. S. (2001). *Human resource selection* (5th ed.). Mason, OH: South-Western.

Gatewood, R. D., Feild, H. S., & Barrick, M. R. (2016). *Human resource selection* (8th ed.). Boston, MA: Cengage Learning.

Goldstein, I. L., Zedeck, S., & Schneider, B. (1993). An exploration of the job analysis-content validity process. In N. Schmitt, W. Borman, & Associates (Eds.), *Personnel selection in organizations* (pp. 3–34). San Francisco: Jossey-Bass.

Guder, E. J. (2012). Identifying appropriate sources of work information. In M. A. Wilson, Jr., W. Bennett, S. G. Gibson & G. M. Alliger (Orgs.), *The handbook of work analysis. Methods, systems, applications and science of work measurement in organizations* (pp. 31-40). New York, NY: Routledge.

Kaye, D. H. & Freedman, D. A. (2011). Reference guide on statistics. In *Reference Manual of Scientific Evidence* (3rd ed.) (pp. 211-302). Washington, DC: National Academies Press.

Morgeson, F. P., Delaney-Klinger, K., Mayfield, M. S., Ferrara, P., & Campion, M. A. (2004). Self-presentation processes in job analysis: A field experiment investigating inflation in abilities, tasks, and competencies. *Journal of Applied Psychology, 89*, pp. 674-686.

Rogelberg, S. G., & Stanton, J. M. (2007). Introduction: Understanding and dealing with organizational survey nonresponse. *Organizational Research Methods, 10*, pp. 195–209.

68

Society of Industrial and Organizational Psychology. (2018). *Principles for the Validation and Use of Personnel Selection Procedures* (5th ed.). Bowling Green, OH: Society of Industrial and Organizational Psychology.

Strah, N., Rupp, D. E., & Morris, S. (in press). Job analysis and job classification for addressing pay inequality in organizations: Adjusting our methods within a shifting legal landscape. *Industrial and Organizational Psychology: Perspectives on Science and Practice*.

U.S. Equal Employment Opportunity Commission, Civil Service Commission, Department of Justice, & Department of Labor (1978).  Uniform guidelines on employee selection procedures.  *Federal Register*, 43(166), 38290-38315.

Van De Voort, D. M., & Whelan, T. J. (2012). Work analysis questionnaires and app interviews. In M. A. Wilson, W. Bennett, S. G. Gibson, & G. M. Alliger (Eds.), *The handbook of work analysis: Methods, systems, applications and sciences of work measurement in organizations* (pp. 41-80). New York, NY: Routledge.