Expert Report (Rebuttal) of

David Neumark, Ph.D.

in the matter of

*Cahill et al. v. Nike, Inc.*

(November 29, 2021)

Neumark Decl. Ex. B, Page 1 of 99

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ...................................................................................1

II.     SUMMARY ............................................................................................1

III.    ORGANIZATION OF THIS REPORT.......................................................4

IV.     DR. SAAD'S APPARENTLY LEGAL OPINIONS NOTWITHSTANDING, MY AGGREGATED ANALYSIS PROVIDES ROBUST STATISTICAL PROOF OF PAY DISCRIMINATION AT NIKE. ............................................................7

V.      DR. SAAD'S "MECHANICAL" CRITICISMS DO NOT REDUCE THE VALIDITY OF MY ROBUST FINDINGS THAT WOMEN RECEIVE LOWER PAY THAN MEN....................................................................................10

        A.    Correcting the Class Definition Does Not Alter the Findings of Statistically Significant Female Pay Shortfalls.................................13

        B.    Dr. Saad Incorrectly Argues That the Analysis Period for Liability Should Be Shortened to Discard Two Years of Data....................................14

        C.    Dr. Saad Argues, Without Justification, That Job Codes, Rather Than Job Cells (Job Subfamily/Level Interactions), Define Jobs with Substantially Similar Work..........................................................16

        D.    Adding Equity to Total Compensation Does Not Change the Conclusion That Women Are Paid Less Than Comparable Men Doing Substantially Similar Work..........................................................................18

        E.    What Dr. Saad Describes as Necessary Corrections to My Regression Model (A) Are Not All Necessary, and (B) *Confirm* a Statistically Significant Female Pay Shortfall for Women Doing Substantially Similar Work to Men. ..............................................................20

VI.     DR. SAAD'S CRITICISMS OF MY CONCLUSION THAT NIKE USED PRIOR PAY TO HELP DETERMINE STARTING PAY ARE CONTRADICTED BY UNDISPUTED FACTS AND ACTUALLY PRESENT EVIDENCE THAT IS *FULLY SUPPORTIVE* OF MY CONCLUSION. ...................22

VII.    DR. SAAD'S CLAIMS THAT A PROPER RE-EVALUATION OF THE EVIDENCE ON PROMOTIONS REVEALS NO EVIDENCE CONSISTENT WITH DISCRIMINATION AGAINST WOMEN IN PROMOTIONS, AND HIS CRITIQUES OF MY ANALYSIS ARE INCORRECT. THE EVIDENCE CONTINUES TO SHOW LOWER PROMOTIONS FOR WOMEN THAN FOR COMPARABLE MEN. ..............................................................29

A.     Women Continue to be Less Likely to Receive a Non-Competitive Promotion Than Similar Men. ..............................................................29

B.     Women Continue Have a Lower Likelihood to Be Promoted By Two or More Levels Than Similar Men. ....................................................35

VIII.    DR. SAAD ARGUES THAT MY EDUCATION AND PRIOR WORK EXPERIENCE CONTROLS USED IN THE LIMITED SET OF MY STARTING PAY ANALYSES ARE FLAWED; HE OFFERS NO ALTERNATIVE ANALYSES SUGGESTING THAT MY CONCLUSIONS ARE INCORRECT, AND ADDITIONAL EVIDENCE REINFORCES THAT MY CONCLUSIONS ARE CORRECT. ...................................................................................39

A.     Education Controls.....................................................................41

B.     Experience Controls...................................................................45

IX.     DR. SAAD'S ANALYSIS OF INITIAL JOB ASSIGNMENT RELIES ON USING POTENTIALLY TAINTED INFORMATION ON JOB LEVELS APPLIED TO, WHICH WOULD BIAS RESULTS TOWARDS FINDING NO GENDER SHORTFALL. .............................................................60

X.      THERE IS NO DISPUTE OVER THE FACT THAT WOMEN RECEIVE LOWER MERIT PAY INCREASES BECAUSE THEY ARE IN LOWER JOB LEVELS, WHICH CAUSES THE FEMALE PAY GAP TO PERSIST. ...................63

XI.     A DISAGGREGATED ANALYSIS, WHILE MUCH LESS INFORMATIVE, STILL SUPPORTS THE CONCLUSION OF A PATTERN OF PAYING WOMEN LESS THAN MEN DOING SUBSTANTIALLY SIMILAR WORK. .......63

XII.    DR. SAAD MAKES MANY OTHER SPECIOUS STATISTICAL ARGUMENTS TO TRY TO POKE HOLES IN THE EVIDENCE PRESENTED IN MY REPORT. THESE ARE MISLEADING AND DO NOT UNDERMINE MY CONCLUSIONS. ............................................................75

XIII.   CONCLUSION.................................................................................79

Appendix A: Materials...................................................................80

Appendix B: Results Incorporating Additional Cleaning of Job Titles........................84

Appendix C: Why Equity Should Be Counted as Earned When it Vests.....................88

Appendix D: Supplemental Tables ........................................................92

## I.    INTRODUCTION

1.    I am David Neumark, Distinguished Professor of Economics at the University of California—Irvine. I submitted a report in the matter of *Cahill et al. v. Nike, Inc.*, on July 15, 2021, with a corrected version on August 5, 2021.[1] In this Rebuttal, I refer to my corrected report as my "Report." On October 1, 2021, Dr. Ali Saad submitted a report in this case.[2] This Rebuttal presents my responses to Dr. Saad's report. I have included any materials used, beyond those in my Report, in Appendix A. While this Rebuttal presents my findings to data, additional analysis of the data may occur in the future as I learn more about the data.

## II.    SUMMARY

2.    In my Report, I concluded that:

a.    Women come to Nike with similar or better human capital (education, experience) compared to men, and, according to Nike's performance ratings, women perform their jobs once hired as well or better than men.

b.    Despite coming to Nike with similar or superior human capital, at the time of hire Nike has paid women less than men for positions that involve substantially similar work. This starting pay gap for women directly tracks Nike's policy of using prior pay as a factor in setting starting pay at Nike as well as its cessation of that policy in late 2017.

c.    This starting pay gap persists into the class period, during which women are paid less than men who are doing substantially similar work and have similar qualifications and performance. This happens because, after being hired, merit pay increases and bonuses for

---

[1] *Expert Report of David Neumark, Ph.D. in the matter of Cahill et al. v. Nike, Inc.*, August 5, 2021.

[2] *Expert Report of Ali Saad, Ph.D. In the Matter of Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender, individually and on behalf of others similarly situated, Plaintiffs, v. NIKE, Inc., an Oregon Corporation, Defendant, October 1, 2021*.

1

women and men with similar performance are based on the same percentage pay increase relative to their base pay, which perpetuates the starting pay gap.

    d.  In addition, Nike hires women into lower Job Levels than men who come to Nike with similar human capital. Once hired, Nike promotes women more slowly than men; this is driven by non-competitive promotions. The combination of lower Job Levels at hire, and slower promotions to higher Job Levels after hire, creates an even larger pay shortfall for women at Nike in the class period.

  These conclusions remain unchanged despite the numerous arguments and critiques raised by Dr. Saad.

  3.  In reaching these conclusions, my analysis uses an aggregated model that includes detailed controls for differences across women and men in the jobs they are in (or "Job Cells" defined by the interactions of Job Subfamilies and Levels), and their bona fide qualifications. This provides precise estimates of potential gender differences in pay and other outcomes. Dr. Saad insists, instead, that a disaggregated model must be used; this means that there has to be a separate model for each job (which he incorrectly insists should be based on Job Code rather than Job Cells). However, Dr. Saad's proposed disaggregation reduces statistical precision, which predictably often eliminates statistical significance, and masks common mechanisms that, as my evidence shows, cause discrimination.

  4.  Aside from this very important issue of statistical precision, the aggregated approach is strongly justified here because the evidence establishes that the relevant policies and practices were common across jobs at Nike, which I am informed by Plaintiffs' counsel has been confirmed by Dr. Lundquist. Dr. Saad did not offer any opinion contradicting the use of common

2

policies at Nike that underlies my aggregate-level analysis.[3] Nor did he report any empirical analyses that undermine the notion that there are common policies and practices at play.

5.      With regard to Dr. Saad's insistence that one is required to estimate separate models (that is, do a disaggregated analysis) for each Job Code (as opposed to Job Cells, which I use) for the Equal Pay claim or for each manager+1 unit for the Title VII and Oregon anti-discrimination laws, he is incorrect because: (a) he appears to be offering a legal opinion, which even he acknowledges is not the role of a statistical expert; (b) there is no labor economics research that supports either proposition and, in fact, there are studies that have endorsed aggregated regression analyses to understand Equal Pay Act violations; (c) his arguments are based on an incorrect and incomplete understanding of the relevant facts, which show that Nike categorizes jobs with substantially similar work based on Job Subfamily-Job Level pairs (not Job Codes) and Nike executives (not managers+1) make the final decisions about pay; and (d) even if one adopted a disaggregated model, which I strongly reject, its results – properly done – present a clear pattern indicating that a disproportionately high share of women are in jobs in which they are paid less than otherwise similar men.

6.      Dr. Saad produces a litany of critiques of my Report. Much of his report is devoted to raising hypothetical objections to elements of my analysis, of the flavor "there is a potential issue with Dr. Neumark's analysis, which arguably could have been handled better/differently." But in each of these cases, Dr. Saad presents *no* evidence that if one addresses his criticisms the results would change.[4] Moreover, in most cases I am able to present evidence

---

[3] Saad Dep. 69:14-17, Oct. 27, 2021.

[4] As he stated in his deposition, he was only "retained to respond to Dr. Neumark's report in this case in connection with the process of class certification…" (Saad Dep. 20:12-14.) (See also, Saad Dep. 21:14-21, 39:15-17, and 213:25-214-4.)

3

that Dr. Saad's criticisms are without merit; that is, there are data available with which to address his criticisms, even though he did not do so. In these cases, I show that the criticisms are unfounded in that addressing them does not alter my conclusions. In a much more limited number of cases, Dr. Saad does present some alternative analyses. In my view, either the basis for these alternative analyses, or the specifics of how he does them and the conclusions that he draws, are flawed.

7.    Thus, in combination, Dr. Saad's criticisms and analyses do nothing to undermine the conclusions of my report that confirm statistically significant evidence of female disparities in pay, promotions, and initial job assignment at Nike, which is strongly consistent with sex discrimination.

### III.    ORGANIZATION OF THIS REPORT

8.    This Rebuttal organizes my responses to Dr. Saad's criticisms as described below.

9.    First, in **Section IV**, I discuss Dr. Saad's core criticism that my statistical approach does not address the underlying questions presented by Plaintiffs' EPA and Title VII/Oregon anti-discrimination law claims. I explain why Dr. Saad's unqualified legal opinions are incorrect, at odds with decades of labor economics research, and otherwise contradicted by the factual record and Dr. Lundquist's unrebutted expert opinions.

10.    Second, I respond to issues Dr. Saad raises about my core evidence that is consistent with Nike engaging in pay discrimination against women – analyses reported in Tables 2, 3, 4, and 5 of my Report (pp. 54-57). I show, in **Sections V(A)-(E)**, that Dr. Saad's challenge to this conclusion is invalid, and that my conclusion remains valid and robust.

11.    Third, I respond to issues Dr. Saad raises that pertain to my conclusion that Nike used prior pay to help determine starting pay, and that this disadvantaged women. This conclusion is based on a statistically significant within-Job Cell shortfall in female pay for

women with similar qualifications to men and doing substantially similar work to men, during the period when Nike was using prior pay to help determine starting pay – coupled with the finding that once Nike stopped using prior pay in this manner, the within-Job Cell female pay shortfall in starting pay shrunk considerably and was no longer statistically significant. This analysis was presented in Table 6 of my Report (p. 58). I show in **Section VI** that Dr. Saad's challenges to this conclusion are invalid and, in fact, reaffirm my conclusions.

12.     Fourth, I respond to issues Dr. Saad raises that pertain to my conclusion that Nike promoted women more slowly than otherwise similar men, a result driven by non-competitive promotions – which are the much more common type of promotion at Nike. This evidence was reported in Tables 10 and 11 of my Report (p. 62-63). I explain in **Section VII** why many criticisms Dr. Saad offers of my promotions analysis are invalid, and that additional analysis responding to Dr. Saad's criticisms show that my conclusions are robust and unchanged.

13.     Fifth, I respond to issues Dr. Saad raises about a subset of analyses from my Report that used detailed data on education and prior work experience – data that Nike only provided for a subset of those who worked in Covered Positions during the Class Period. These analyses include: (i) analysis of the within-Job Cell female shortfall in starting pay incorporating this more-detailed data for the subset of observations for which these data were provided (Tables 7 and B5 of my Report, pp. 59, 77); and (ii) analysis of the within-Job Cell female shortfall in pay during the Class Period incorporating this more-detailed data for the subset of observations for which these data were provided (Table 8 of my Report, p. 60). In **Section VIII**, I show that Dr. Saad's criticisms of these prior analyses are misguided or invalid, and do not change my conclusions.

5

14.    Sixth, I discuss issues that Dr. Saad raises regarding my analysis of starting Job Level. I explain that he fails to account for possible biases "tainting" the data he uses on the jobs to which people apply, and thus why his criticisms of my conclusion that women at Nike started at lower Job Levels than otherwise similar men are unfounded. This is covered in **Section IX**.

15.    Seventh, I note that Dr. Saad does not offer any direct evidence to dispute my findings that women receive lower merit pay increases because they both start at lower Job Levels, and are promoted to higher Job Levels at a lower rate. He does not offer compelling evidence that discrimination does not account for women starting at lower Job Levels, and as indicated above, my conclusions about discrimination against women regarding promotions are robust to his criticisms. Moreover, Dr. Saad does not dispute that the female pay gap persists despite how Nike awards annual base pay merit increases. This is discussed in **Section X**.

16.    Eighth, I respond to the analysis Dr. Saad presents – although I believe it to be an uninformative and inappropriate approach – using a disaggregated analyses of the gender gap in pay between women and men doing substantially similar work. Although in no way endorsing Dr. Saad's approach, I show that his disaggregated analyses were done incorrectly, and using the data appropriately shows a clear pattern indicating that a disproportionately high share of women are in jobs in which they are paid less than otherwise similar men. This evidence, discussed in **Section XI**, reinforces the conclusion that Nike paid women less than men doing substantially similar work, and that the gender differences in pay are not explained by other potentially bona fide factors. Likewise, in **Section XI**, I address Dr. Saad's "manager+1" disaggregated pay analysis and explain why it is based on an apparently unqualified legal opinion, is contradicted by the factual record, presents a flawed statistical model, but nonetheless demonstrates that a disproportionate share of women at Nike were paid less than men.

6

17.    Finally, **Section XII** responds to a number of smaller points or criticisms Dr. Saad offers. I show that these are misleading and do not in any way offer evidence that my conclusions were wrong, and hence in no way alter my conclusions.

**IV.    DR. SAAD'S APPARENTLY LEGAL OPINIONS NOTWITHSTANDING, MY AGGREGATED ANALYSIS PROVIDES ROBUST STATISTICAL PROOF OF PAY DISCRIMINATION AT NIKE.**

18.    As stated in my Report, I apply widely accepted "regression models to estimate the gender gap in pay once I adjust for the possible differences between female and male employees that could potentially account for this pay gap." (My Report, para. 20.) In doing so, I have controlled for a number of factors that could possibly explain a female pay gap, including controlling for job classifications that capture substantially similar work at Nike (the interaction between Job Subfamily and Job Level – or "Job Cell").[5] I also apply controls for various measures related to productivity (such as tenure and performance ratings) as well as worker characteristics (such as education and prior work experience where available). In other words, I compare the pay of Nike employees with similar productivity measures and worker characteristics and who perform the same or substantially similar work. These aggregated regression models report statistically significant pay disparities disfavoring women consistent with pay discrimination.

19.    One of Dr. Saad's core critiques is that my analysis does not answer the purportedly correct questions to present relevant statistical evidence for Plaintiffs' Equal Pay or Title VII/Oregon Anti-Discrimination claims. My understanding is that he is incorrect on both accounts.

---

[5] Henceforth, I will generally use the phrase "Job Cells" to refer to the interactions of Job Subfamilies and Job Levels (or, equivalently, unique Job Subfamily-Job Level pairs), as a convenient short-hand.

7

20.    As to Plaintiffs' Equal Pay claims, Dr. Saad argues that one must estimate individual and isolated statistical models for each job classification that defines substantially similar work. I have five responses to Dr. Saad's argument.

a.    First, Dr. Saad appears to offer a legal opinion on this issue, which to my understanding is not the proper role of a statistical expert. In his report, he states: "The specific construction of the federal and Oregon Equal Pay Act determines at what level the analysis should be conducted and who is a relevant comparator." (Saad Report, p. 47.) Further, as he said, "[m]y understanding is that in an EPA context, pay outcomes among claimants and comparators in Job A are irrelevant for the analysis of pay outcomes in Job B. The issue is not whether there is a pattern when averaged across jobs but rather whether *in any given job*, men and women are paid the same." (Saad Report, para. 68.) This appears to be a statement of a legal opinion. Despite his report, Dr. Saad appears to agree with me that statistical experts should not offer legal opinions. In his deposition, he admitted that "all of the legal implications are not for [him] to opine on." (Saad Dep. 51:5-6.)

b.    Second, Dr. Saad does not and cannot cite to any labor economics research to support his bold assertion that, as a labor economist, an aggregated analysis cannot address an Equal Pay claim. (Saad Dep. 60:19-61:13.) In fact, there is well-established labor economics research that uses aggregate models to assess evidence of Equal Pay violations.[6] The bottom line is that Dr. Saad's argument that one must use a disaggregated approach to evaluate Equal Pay claims rests solely on a legal argument and not on any labor economics research.

---

[6] See: Groshen, Erica. 1991. "The Structure of the Female/Male Wage Differential: Is It Who You Are, What You Do, or Where You Work?" *Journal of Human Resources*, Vol. 26, pp. 457-472; Bayard, Kimberley, Judith Hellerstein, and David Neumark. 2003. "New Evidence on Sex Segregation and Sex Differences in Wages from Matched Employer-Employee Data." *Journal of Labor Economics*, Vol. 203, pp. 887-922.

8

c.    Third, as I show in this Rebuttal, nothing in Dr. Saad's Report alters the conclusion that an aggregated model shows statistically significant evidence of lower pay for women than for men doing substantially similar work at Nike, including after I account for potentially bona fide factors.

d.    Fourth, an aggregated model is the appropriate way to analyze Nike's pay, promotion, and initial job assignment policies and practices because Dr. Saad's disaggregated approach leads to very imprecise results. His disaggregated model cuts the data into small cells, which, in turn, make it hard to determine, statistically, what is happening. See Section XVI.

e.    Finally, even examining a disaggregated approach that Dr. Saad contends is the only legitimate way to evaluate an Equal Pay claim, I find that the evidence is broadly consistent with Nike paying women less than men doing substantially similar work, and that the within-Job Cell female pay shortfall is not explained by other bona fide factors. See Section XI.

21.    As to Plaintiffs' Title VII and Oregon Anti-Discrimination claims, Dr. Saad contends that one must use a disaggregated model, based on his "understanding" of the legal decision in *Dukes v. Wal-Mart*. In addition to the reasons against a disaggregated model discussed above, this disaggregation argument regarding Plaintiffs' Title VII and Oregon Anti-Discrimination claims is wrong for two other reasons.

a.    First, Dr. Saad's argument again appears to be predicated on a legal opinion. In his report, he asserts without qualification that "to the extent that the Court must decide issues of commonality regarding Plaintiffs' disparate impact or treatment claims under Title VII or the Oregon Equality Act, Dr. Neumark presents no analyses at the level of decision-makers as I understand is required by *Wal-Mart Stores, Inc. v. Dukes*." (Saad Report, para 7, footnote 4.) Later, citing the U.S. Supreme Court decision in *Wal-Mart v. Dukes*, Dr. Saad

9

opines "that to be relevant for analyzing Plaintiffs' Title VII or the Oregon Equality Act claims at the class certification stage, statistical studies should examine the data at the level of decision-making for the challenged practices in order for the Court to gain an understanding regarding the consistency, or lack thereof, in gender pay outcomes." (Saad Report, para. 18, footnote 11.) Yet, at his deposition, Dr. Saad again acknowledges it is not his role (nor is it mine) to offer legal opinions. For example, he concedes that he is "not in a position to support whether or not [his manager +1 analysis was] relevant [to *Dukes*]," but rather he was "informed by Counsel that might be the case," and he was not offering a legal opinion as to what type of statistical analysis is required by the *Wal-Mart v. Dukes* Supreme Court decision. (Saad Dep. 186:12-187:21.)

b.    Second, I am informed by Plaintiffs' counsel that Dr. Saad's apparent legal opinions about the *Wal-Mart v. Dukes* case do not apply here for several reasons, including because the facts there involved unfettered discretion at the manager level to make certain employment decisions, which Dr. Lundquist opines is not the case here. I am informed by Plaintiffs' counsel that Dr. Lundquist, in fact, opined that Nike's compensation policies were common and that the decision-makers for final pay decisions were above the "manager+1" level.

## V.    DR. SAAD'S "MECHANICAL" CRITICISMS DO NOT REDUCE THE VALIDITY OF MY ROBUST FINDINGS THAT WOMEN RECEIVE LOWER PAY THAN MEN

22.    My core Class Period results on gender disparities in pay were provided in Table 2 of my Report. There, I reported that in regressions for the sum of base pay and bonuses – looking within the Job Cells defined by the interactions of Job Subfamilies and Levels to compare women and men doing substantially similar work, and controlling for other potentially bona fide factors – women were paid 2.03% less than men. This difference was strongly

10

statistically significant (9.55 standard deviations).[7] This evidence is strongly consistent with pay discrimination against women doing substantially similar work to men – which as I understand it speaks to Equal Pay violations. I also reported that in regressions that did not control for Job Level, women were paid 7.35% less than men. This difference was strongly statistically significant (12.25 standard deviations).[8]

23.    Dr. Saad asserts that four "technical" or "mechanical corrections" must be applied to my statistical analysis of compensation of women and men doing substantially similar work, which have the effect of reducing the within-Job Cell gender shortfall from 2.03% for women doing substantially similar work to men to fall to 1.33%. (Saad Report, para. 6.) These "corrections" include: (1) applying a slightly different class definition for covered positions (Saad Report, Appendix C at paras. 2-6); (2) discarding two years of data, where Nike indisputably used prior pay as a factor in setting starting pay, from the statistical analysis (Saad Report, Appendix C at para. 1); (3) replacing Job Subfamily-Level interactions with Job Codes (Saad Report, para. 78); and (4) including equity as a component of the compensation analysis (Saad Report, para. 82.)

24.    Although Dr. Saad never notes this in his report, even if we take his 1.33% female pay within-Job Code shortfall at face value, his results still indicate a statistically significant pay shortfall for women doing substantially similar work to men. While his report never provides a regression table showing this estimate, Table R1, below, does and reveals that his 1.33% estimate – while still too low – is strongly statistically significant. That is, Dr. Saad – like me – found that there was a statistically significant pay shortfall for women when he included all of

---

[7] See Table 2, column (4) of my Report, p. 54.

[8] See Table 2, column (2) of my Report, p. 54.

11

his criticisms (except for disaggregation). Indeed Dr. Saad confirmed this at his deposition.[9] I

say more about some details of these estimates below.

**Table R1**
**Nike Incumbent Pay Analysis Sensitivity to Dr. Saad's Class and Timing Change**
**Responses to Dr. Saad's Criticisms of Table 2 from my Report**

|  | Class Definition used in Neumark August 5, 2021 Report | Saad's Class Definition Excluding pre-August 2017 |
|---|---|---|
| *Dependent Variable* | Log of Base Pay and PSP Bonuses | Log of Base Pay, PSP Bonuses and Equity Granted |
| *Job Controls* | Job Cells | Job Codes |
|  | (1) | (2) |
| Female Shortfall | **-2.03%** | **-1.33%** |
| Std. Deviations | 9.55 | 5.62 |
| Observations | 39,691 | 27,207 |
| Total Observations | 39,766 | 27,325 |
| R-squared | 0.93 | 0.95 |

Notes:
I use the phrase "Job Cells" to refer to the interactions of Job Subfamilies and Job Levels. Model specification is the same as Table 2, Column 4 in Neumark Report, Aug 5, 2021, other than dependent variable and job controls, which are as indicated in column headers. *Independent variables:* Female Indicator, Year Fixed Effects, Tenure, Tenure Squared, Age, Age Squared, Time in Job Code, Time in Job Code Squared, Job Performance Rating (6 categories), Full Time/Part Time Status, and Job controls as indicated in column headers. The estimated female shortfalls are based on regressions for the log of pay, and hence are approximate percentage differences. The standard deviations for all regression estimates are computed clustering at the individual level. Base Pay, PSP Bonuses and Equity granted are all converted to December 2019 dollars. Observations with missing base pay or PSP bonuses are excluded. The data consist of annual snapshots and cover the time period from 2015 to 2019. For the time period from 2015 to 2018, the snapshots are as of December 1 of each year. For 2019, the snapshots are as of September 1. Regressions include a dummy variable for each performance rating category (including a dummy for missing performance rating). Job Performance Rating has six categories: Consistent Rating, Successful Rating, Highly Successful Rating, Exceptional Rating, Unsatisfactory Rating, and the combined category of Not Rated, Too New To Rate, and missing rating. Col. (1) includes person-year observations for covered positions as identified in Neumark August 5, 2021 Report and Col (2) includes person-year observations for covered positions as identified in Saad Report, October 1, 2021. Col. (2) dependent variable includes value of unvested equity granted as calculated in Saad Report, October 1, 2021. Reported number of observations are those retained by the high-dimension fixed effects estimation procedure. Full regression samples are as indicated by 'Total Observations.'
Dr. Saad's class definition is as defined in "Add RE Variable to Neumark Incumbent Data.sas."

25.     Dr. Saad's attempt to diminish the gender gap for women and men doing

substantially similar work with these purported corrections ultimately fails. As detailed in the

sections that follow, Dr. Saad's purported "corrections" either confirm my findings of

---

[9] "Q. How many standard deviations did you find were associated with the 1.33 percent female shortfall? A. I believe it's between five and six standard deviations." (Saad Dep. 35:17-20.)

12

statistically significant pay disparities that disadvantage women or should be rejected. In the end, I continue to find strong statistical evidence consistent with sex discrimination in pay, even when incorporating the appropriate "corrections" raised by Dr. Saad.

**A.     Correcting the Class Definition Does Not Alter the Findings of Statistically Significant Female Pay Shortfalls.**

26.     Dr. Saad notes that the precise class definition used in my Report had slight differences from those specified in a letter Nike drafted, 12-30-19 *Letter Transmitting Data Production.pdf.* (Saad Report, Appendix C at para. 2.) Making appropriate corrections to the class definition, to respond to Dr. Saad's note, has no material impact on the results.[10]  I illustrate this in Table R2, below, simply comparing the estimates from Table 2, columns 2 and 4, Panel C, of my Report with and without this correction. I adopt this correction in all analyses in this Rebuttal.[11]

---

[10] While I adopt all of the data parameters specified in Nike's 12-30-19 letter, I have been instructed by Plaintiffs' counsel to maintain my exclusion of employees in either Band V or A. I have been informed that these individuals were not intended to be covered by the proposed class definition in this action, which is focused on Bands L, U, E, and S at Nike World Headquarters.

[11] Note that the data set used in Tables 7, 8, 12, and B5 (my Report, pp. 59, 60, 64, 77) changes for some other reasons, including responses to other criticisms in Dr. Saad's report, discussed below. In contrast, the data used in Table 2 (and other tables for class period pay) are not affected by these responses. Thus, when I document the robustness of the findings to various issues Dr. Saad raises, I mainly restrict attention to the core class period pay estimates in Table 2. The reader will see later, though, that addressing all of Dr. Saad's criticisms of my data, including the data used in Tables 7, 8, 12, and B5, does not alter the conclusions.

**Table R2**

**Nike Incumbent Pay Analysis Sensitivity to Correcting the Class Definition**

**Responses to Dr. Saad's Criticisms of Table 2 from my Report**

*Dependent Variable:* Log of Base Pay and PSP Bonuses

| Job Controls | Class Definition used in Neumark August 5, 2021 Report | | Corrected Class Definition | |
|---|---|---|---|---|
| | Job Sub-Family | Job Cells | Job Sub-Family | Job Cells |
| | (1) | (2) | (3) | (4) |
| Female Shortfall | **-7.35%** | **-2.03%** | **-7.45%** | **-1.95%** |
| Std. Deviations | 12.25 | 9.55 | 12.73 | 9.47 |
| Observations | 39,764 | 39,691 | 42,321 | 42,245 |
| Total Observations | 39,766 | 39,766 | 42,323 | 42,323 |
| R-squared | 0.54 | 0.93 | 0.53 | 0.93 |

Notes: "Corrected Class Definition" makes Saad's class definition correction and excludes bands V and A.
See notes to Table R1.

27.     Based on this updated class definition, paragraph 16 of my Report should be modified to read: "Based on the data I was provided in the Static File, there are approximately 4,913 class members who were employed at Nike Headquarters in Oregon in a salaried, corporate position that was a lower-level position than Vice-President between October 11, 2017 and August 31, 2019. (There are 6,451 males who otherwise meet the same criteria.) The hypothetical maximum of women who could have met the Equal Pay Act collective action definition, between August 9, 2015 and August 31, 2019, totals approximately 5,731. (There are 7,469 males who otherwise meet the same criteria.)."

**B.     Dr. Saad Incorrectly Argues That the Analysis Period for Liability Should Be Shortened to Discard Two Years of Data.**

28.     Although Dr. Saad limited the data he used to August 4, 2017 to September 1, 2019, Dr. Saad never provided the basis for discarding a significant amount of data in his report. At his deposition, Dr. Saad stated that he discarded the other data because Nike's counsel told

14

him to.[12]  However, I am advised by Plaintiffs' counsel that this is incorrect for the purposes of this case, because, among other reasons, Title VII plaintiffs can seek backpay up to two years prior to the earliest filed class charge of discrimination and courts permit the inclusion of pre-liability data in statistical analyses where the challenged policy or practice remained the same, as I am informed they did here and which Dr. Saad does not dispute. I therefore do not make this change.

29.     Nonetheless, it is important to point out throwing out the data as Dr. Saad does is not immaterial. It is the case, as we would expect, that the smaller sample size resulting from what Dr. Saad does reduces the statistical significance of the results. Moreover, it happens to also reduce the estimated gender gap in pay that disadvantages women in the class period. I illustrate this with two examples, in Table R3 (the same models covered in Table R2), which shows that just changing the sample period to exclude the two years that Dr. Saad throws away leads to a somewhat smaller female pay penalty, and fewer standard deviations. This effect of throwing out the first two years of data is not surprising, given evidence in my Report – reinforced in this Rebuttal – which indicates that during the two discarded years, Nike was using prior pay to partly set starting pay, to the disadvantage of women.[13]  This incorrect discarding of two years of data, and the weaker evidence it generates, permeates other analyses Dr. Saad reports, in general weakening evidence of lower pay for women at Nike. This is important to keep in mind in comparing later results in this Rebuttal to those in Dr. Saad's Report. At the same time, note that

---

[12] "So it's not – that's not my opinion. That is something that I have been asked to assume. I'm not a lawyer, so I cannot determine that separate and apart from the input of Counsel." (Saad deposition, 37:9-17)

[13] By throwing out the data for August 5, 2016 to August 4, 2017, I am informed by Plaintiffs' counsel that this throws out a year of data covering the liability period for Title VII.

even when Dr. Saad incorrectly discards two years of data, there is a negative and statistically significant pay shortfall for women doing substantially similar work to men.

**Table R3**
**Nike Incumbent Pay Analysis Sensitivity to Excluding Pre-August 2017 Data**
**Responses to Dr. Saad's Criticisms of Table 2 from my Report**

*Dependent Variable:* Log of Base Pay and PSP Bonuses

| Job Controls | Corrected Class Definition | | Corrected Class Definition Excluding pre-August 2017 | |
|---|---|---|---|---|
| | Job Sub-Family | Job Cells | Job Sub-Family | Job Cells |
| | (1) | (2) | (3) | (4) |
| Female Shortfall | **-7.45%** | **-1.95%** | **-6.78%** | **-1.76%** |
| Std. Deviations | 12.73 | 9.47 | 11.15 | 8.16 |
| Observations | 42,321 | 42,245 | 27,041 | 26,961 |
| Total Observations | 42,323 | 42,323 | 27,046 | 27,046 |
| R-squared | 0.53 | 0.93 | 0.53 | 0.94 |

Notes: See notes to Tables R1 and R2.

**C.**     **Dr. Saad Argues, Without Justification, That Job Codes, Rather Than Job Cells (Job Subfamily/Level Interactions), Define Jobs with Substantially Similar Work.**

30.     Dr. Saad argues that Job Codes, and not the Job Cells I use, provide the appropriate controls so that the gender pay gap is estimated for employees doing substantially similar work (Saad Report, para. 78). Yet, Dr. Saad admits, in his report and his deposition, that he has "not studied nor do[es] [he] opine on what constitutes 'similar' work and what variables should be used to represent that in a regression model." (Saad Report, para 67.)[14]  When asked about his understanding of how skill, effort, responsibility, and working conditions factor into whether jobs perform substantially similar work, Dr. Saad acknowledged he did not know because "that's really a legal question or -- and/or a question for somebody studying work

---

[14] Similarly, in his deposition: "Q: And your report does not opine on what constitutes similar work at Nike, correct? A: That's correct. Q: And you haven't studied what constitutes similar work at Nike, correct? A: That's correct." (Saad Dep. 79:6-11.)

16

content or performing job analysis, which would tend to be an I-O psychologist, not a labor economist." (Saad Dep. 96:7-25.) Notably, Dr. Lundquist, who is an I-O psychologist and studied work content at Nike, has opined that Job Cells (Job Subfamily-Job Level interactions), not Job Codes, are most differentiated level of work at Nike and have been categorized by Nike as having similar job content.[15] I am informed by Plaintiffs' counsel that Dr. Saad cannot rely on another expert opinion to counter Dr. Lundquist's conclusions, as Dr. Hanvey – Nike's IO/Psychology expert in this case – did not opine on this issue.[16] I therefore continue to use Job Cells in this Rebuttal.

31.    Dr. Saad also agrees with me that this issue has only minor implications for the results.[17] Still, it is the case that using Job Codes instead of Job Cells tends to weaken slightly the evidence of a female shortfall in pay. I illustrate this in Table R4 below, again for the same model covered in Table R2. Thus, again, this must be kept in mind in comparing the evidence I present later that continues to use Job Cells to define jobs with substantially similar work, to what is reported by Dr. Saad.

---

[15] *Expert Report of Dr. Kathleen K. Lundquist in Cahill, et al. v. Nike, Inc.*, July 15, 2021 (p. 21), as cited in my Report (para. 38).

[16] Dr. Saad did not cite Dr. Hanvey's report. (Saad Report, Appendix B.)

[17] "I also made a relatively small change of going from the intersection of job subfamily and level to using job code, which as Dr. Neumark states is very similar, virtually the same thing, so I made that small change, as well." (Saad Dep. 34:16-22.)

17

**Table R4**
## Nike Incumbent Pay Analysis Sensitivity to Job Code Controls
### Responses to Dr. Saad's Criticisms of Table 2 from my Report

*Dependent Variable:* Log of Base Pay and PSP Bonuses

| *Job Controls* | Job Cells | Job Codes |
|---|---|---|
| | (1) | (2) |
| Female Shortfall | **-1.95%** | **-1.85%** |
| Std. Deviations | 9.47 | 8.90 |
| Observations | 42,245 | 42,230 |
| Total Observations | 42,323 | 42,323 |
| R-squared | 0.93 | 0.93 |

Notes: See notes to Tables R1 and R2.

**D.    Adding Equity to Total Compensation Does Not Change the Conclusion That Women Are Paid Less Than Comparable Men Doing Substantially Similar Work.**

32.     Dr. Saad notes that my Report did not include equity – either analyzed separately as one component of pay, or combined with base pay and bonuses to construct a total compensation measure. I explained in my Report why I did not include equity; because equity was based on a number of factors including job performance and future potential, and not a percentage of pay, equity awards would not be expected to contribute to the female shortfall in compensation within the same job. Dr. Saad concurs with this point, and acknowledged that, in contrast, merit pay and bonuses are based on a percentage of base pay. (Saad Dep. 160:16-161:3.) My analysis confirms this point: the within-Job Cell female pay shortfall increases a little bit when equity compensation is added, but the substantive conclusion is unchanged.

33.     However, I also previously noted that because equity is used at higher levels and bands, the lower starting Job Levels of women and their lower promotions to higher Job Levels, would disadvantage them in equity compensation across Job Levels (i.e., in regression models

18

that did not include the Job Subfamily-Job Level interactions).[18] Note that Dr. Saad ignores these disparities because he reports results on equity compensation only for those who received equity. (Saad Report, para. 86.) Given that the source of the gender gap in equity compensation is women being over-represented in Job Levels (and Bands) where equity is not paid, this analysis of Dr. Saad's is irrelevant and completely misses this point from my Report.

34.    While analysis without equity is appropriate for the claims in this case, I have added equity in response to Dr. Saad's critique and find that the addition of equity actually increases the within-Job Cell female pay shortfall. Table R5 reports the results. (Table R5 contrasts with Table 2 of my Report by adding a column for total compensation that combines base pay, bonuses, and equity, instead of just the first two.)

35.    In creating Table R5, I follow Dr. Saad's treatment of equity in his backup production, using the Black-Scholes model to value equities. I do not represent that this is the correct or the only way to value equities.[19] The only difference is that I treat equity as earned when it vests, rather than when it is granted. I discuss the rationale for this Appendix C.[20]

---

[18] My Report, footnote 25.

[19] Dr. Saad also uses a second method, based on reporting in Nike's 10-K filings (Saad Report, footnote 74), and says the results are similar (which I confirmed).

[20] In particular, I created additional variables to represent values of vested stock options (Stock Options and Equity Choice) and values of vested Restricted Stock Units in each year. For stock options, a 25% vesting (in values) begins at the end of the next calendar year with another 25% vested over three subsequent calendar years. For RSUs, a vesting schedule of 1/3 over three years is used. In any given year, employees receive a sum of vested values from prior years. (NIKE_00030274, NIKE_00033429, NIKE_00033457, NIKE_00033463, NIKE_00033421, NIKE_00015689.)

Also, because the amount of vested equity credited in a year can differ substantially during the earliest years of tenure, I add dummy variables for the early tenure differences when I study vested equity; and because I can be missing data on earlier equity grants for those working in 2015 hired 2011 or earlier, I include a dummy variable for them.

19

36.    Column 1 of Table R5 reports the estimated within-Job Cell female shortfall in pay defined as the log of base pay plus bonuses. The estimated shortfall is 1.95%, significant at the 5% level (9.54 standard deviations). When I add equity, as shown in column 2, the estimated within-Job Cell female shortfall is 2.06%, significant at the 5% level (9.7 standard deviations). Thus, adding equity makes the within-Job Cell female pay shortfall slightly larger.[21]

## Table R5
## Nike Incumbent Pay Analysis Sensitivity to Including Vested Equity
### Responses to Dr. Saad's Criticisms of Table 2 from my Report

| Dependent Variable | Log of Base Pay and PSP Bonuses | Log of Base Pay, PSP Bonuses and Vested Equity |
|---|---|---|
| | (1) | (2) |
| Female Shortfall | **-1.95%** | **-2.06%** |
| Std. Deviations | 9.47 | 9.74 |
| Observations | 42,245 | 42,245 |
| Total Observations | 42,323 | 42,323 |
| R-squared | 0.93 | 0.93 |

Notes: See notes to Tables R1 and R2. Regressions include controls for Job Cells.
Col. (2) includes additional independent variables 'Missing Vesting Data' and dummies for 'Tenure Group'.
'Missing Vesting Data' is a dummy that takes value 1 in year 2015 for employees hired in 2011 or earlier.
'Tenure Group' includes dummies for tenure<1 year, 1-2 years, 2-3 years, 3-4 years, and 4+ years.

**E.    What Dr. Saad Describes as Necessary Corrections to My Regression Model (A) Are Not All Necessary, and (B) *Confirm* a Statistically Significant Female Pay Shortfall for Women Doing Substantially Similar Work to Men.**

37.    As Sections V(A) through V(D) indicate, two of Dr. Saad's "corrections" – discarding the first two years of data used for this estimation, and using Job Codes rather than

---

[21] If I treat equity as earned when it is granted, rather than when it vests – although I view this treatment as incorrect – I still find a statistically significant female pay shortfall of 1.72% (8.0 standard deviations).

Job Cells (interactions between Job Subfamilies and Levels) should not be made because there is no basis for these changes. These two inappropriate changes serve to reduce the estimated female pay shortfall, as I show in Tables R3 and R4, above. The third "correction" – using equity – is not needed because it was appropriately excluded, but even if it is included, it increases the estimated within-Job Cell female shortfall when properly done to account for vesting (Table R5). The final "correction" – refining the covered positions of the class definition (while maintaining the exclusion of V and A Bands) – can and has been done with no material change to the results (Table R2).

38.     In my ensuing analyses responding to Dr. Saad, I use the modified class definition described in Section V(A). But I neither change to using Job Codes nor do I discard the first two years of data for the class period analysis. Table R6 below shows revised estimates for Table 2 from my Report, incorporating the response to Dr. Saad's Report regarding the changes in the class that should be made.

39.     The estimates in Panels A and C of Table R6, which cover the same outcomes and models as in Table 2 of my Report, are not materially different from the estimates in my Report.

21

**Table R6**
**Original Table 2 Updated with Corrected Class Definition**
Responses to Dr. Saad's Criticisms of Table 2 from my Report

| | Table 2-Col 1 Individual Controls | Table 2-Col 2 (1) Plus Job Subfamily | Table 2-Col 3 (2) Plus Job Levels | Table 2-Col 4 (1) Plus Job Cells |
|---|---|---|---|---|
| | (1) | (2) | (3) | (4) |
| **Panel A. Log of Base Pay** | | | | |
| Female Shortfall | **-10.76%** | **-6.54%** | **-1.79%** | **-1.74%** |
| Std. Deviations | 18.09 | 12.68 | 8.74 | 9.04 |
| Observations | 46,199 | 46,197 | 46,197 | 46,124 |
| Total Observations | 46,199 | 46,199 | 46,199 | 46,199 |
| R-squared | 0.30 | 0.53 | 0.91 | 0.92 |
| **Panel B. Log of PSP Bonuses** | | | | |
| Female Shortfall | **-19.41%** | **-12.64%** | **-3.11%** | **-2.95%** |
| Std. Deviations | 15.87 | 11.61 | 5.64 | 5.41 |
| Observations | 42,323 | 42,321 | 42,321 | 42,245 |
| Total Observations | 42,323 | 42,323 | 42,323 | 42,323 |
| R-squared | 0.50 | 0.60 | 0.79 | 0.80 |
| **Panel C. Log of Base Pay and PSP Bonuses** | | | | |
| Female Shortfall | **-11.84%** | **-7.45%** | **-2.01%** | **-1.95%** |
| Std. Deviations | 17.54 | 12.73 | 9.21 | 9.47 |
| Observations | 42,323 | 42,321 | 42,321 | 42,245 |
| Total Observations | 42,323 | 42,323 | 42,323 | 42,323 |
| R-squared | 0.31 | 0.53 | 0.92 | 0.93 |

Notes: "Corrected Class Definition" makes Saad's class definition correction and excludes bands V and A.
See notes to Tables R1 and R2. Panel A excludes observations with missing base pay and panels B and C also exclude observations missing PSP bonuses. Dependent variable as listed for each panel.

## VI.    DR. SAAD'S CRITICISMS OF MY CONCLUSION THAT NIKE USED PRIOR PAY TO HELP DETERMINE STARTING PAY ARE CONTRADICTED BY UNDISPUTED FACTS AND ACTUALLY PRESENT EVIDENCE THAT IS *FULLY SUPPORTIVE* OF MY CONCLUSION.

40.    In Table 6 of my report, I present an analysis that begins with data restricted to those who were hired between January 1, 2012 and September 1, 2019, although Plaintiffs' counsel requested starting pay data for all employees who worked in covered positions during the class period. (My Report, paras 56-59.) In columns 5 and 6 of Table 6 of my Report, I

22

contrasted starting pay regressions before September 2017, and for September 2017 and after. This analysis was motivated by Nike's assertion that it stopped using prior pay to help determine starting pay in September 2017. (My Report, paras. 52 and footnote 56.) If prior pay reflects gender discrimination in pay in the labor market in general, then basing starting pay in part on prior pay would be expected to replicate that general labor market discrimination in starting pay at Nike. The estimates in columns 5 and 6 of Table 6 were consistent with that hypothesis, as the estimated within-Job Cell female starting pay shortfall was 1.06% (2.39 SDs, $1,231 per woman) in the period before September 2017, but fell by more than half (to 0.48%) and was not statistically significantly different from zero (1.00 SDs, a shortfall of $557 per woman), for the period September 2017 and after. I concluded that this evidence was "consistent with" the hypothesis that Nike used prior pay to help determine starting pay. (My Report, para. 59.)

41.    Dr. Saad attempts to diminish my analysis by claiming the evidence of Nike's use of prior pay is only "circumstantial." (Saad Report, para. 21.) Dr. Saad's position that circumstantial evidence (as I understand it) is not informative about policy is incorrect. There are hundreds if not thousands of labor economics research papers where we infer the effect of a policy by asking how the outcome potentially influenced by that policy changed when the policy changed, even though we do not have evidence that the policy directly affected any particular individual. As one example, there are hundreds of papers on the employment effects of minimum wages, where a minimum wage changes and the effects of that change are inferred from changes in the employment of low-skilled workers more likely to be affected by the minimum wage.[22] And there are numerous papers that infer the effects of anti-discrimination laws from changes in

[22] See, e.g., the extensive survey in: Neumark, David, and William Wascher. 2008. Minimum Wages. Cambridge, MA: MIT Press.

23

outcomes for protected groups when the discrimination laws changed.[23]  Thus, it is well accepted in labor economics that the evidence that Dr. Saad calls "circumstantial" is an appropriate basis to make inferences.

42.    Indeed, Dr. Saad appears to recognize this, as he recently wrote in a supplemental expert report in another case: "Discrimination cannot be observed directly – one cannot 'prove' that discrimination did or did not occur. As such, the analyst must consider the available data, and make a determination as to whether or not those data are consistent with a finding of discrimination." Supp. Expert Rpt. Of Ali Saad, *Antoine v. The School Board of Colliert Cnty.*, FL, 2019 WL 3239837 (M.D. Fla, Apr. 12, 2019).

43.    Even if Dr. Saad is somehow correct that "circumstantial" evidence is not appropriate, my understanding, from Plaintiffs' counsel, is that this evidence is not circumstantial, because – from Nike documents and testimony – I know the policy changed, and I know how the policy was used to influence starting pay.

44.    Relatedly, note also that Dr. Saad grossly misrepresents the documentary and testimonial evidence regarding Nike's prior pay policy. Dr. Saad did not address most of the supporting evidence I cited in my Report. (My Report, para. 29 footnote 56.) In addition, in the

---

[23] See, e.g.: Neumark, David, and Wendy Stock, 2006, "The Labor Market Effects of Race and Sex Discrimination Laws," Economic Inquiry, pp. 385-419; Neumark, David, and Wendy Stock, 1999, "Age Discrimination Laws and Labor Market Efficiency," Journal of Political Economy, pp. 1081-125; Beller, Andrea H. 1979. "The Impact of Equal Employment Opportunity Laws on the Male-Female Earnings Differential." In Women in the Labor Market, edited by C. Lloyd, E. Andrews, and C. Gilroy. New York: Columbia University Press, pp. 203-30; Brown, Charles. 1982. "The Federal Attack on Labor Market Discrimination: The Mouse That Roared?" *Research in Labor Economics*, Vol. 5, pp. 33-68; Chay, Kenneth Y. 1998. "The Impact of Federal Civil Rights Policy on Black Economic Progress: Evidence from the Equal Employment Opportunity Act of 1972." *Industrial and Labor Relations Review*, Vol. 51, pp. 608-32; Zabalza, A., and Z. Tzannatos. 1985. "The Effect of Britain's Anti-Discriminatory Legislation on Relative Pay and Employment." *Economic Journal*, Vol. 95, pp. 679-99.

heading section of his report (Saad Report, p. 88), he inexplicably misconstrues my statement that "Nike used prior pay to 'set' starting pay" to somehow mean that I contend that prior pay was the sole factor determining starting pay. As just quoted above, I said that prior pay helped determine starting pay. This is also consistent with the question I said I was asked to address: "Did the consideration of prior pay of a new hire or the increase in pay that a new hire would receive when setting starting pay disadvantage female employees?" (My Report, para. 7.c.)

45.    As a result, the only question here is whether prior pay was a factor in setting starting pay. The available evidence, expert testimony, and even Dr. Saad's testimony confirm that the answer is yes. In my Report, I cite several Nike documents and Nike witness testimony that demonstrate that Nike collected and used prior pay information as a factor when setting starting pay. (My Report, para. 52, footnote 56.) Notably, Dr. Lundquist also concluded that "prior to September 2017 Nike had a practice of collecting and using prior salary to set new employees' starting pay." (Lundquist Report, p. 27.) At his deposition, Dr. Saad did not dispute the evidence and testimony relied upon by Dr. Lundquist or me regarding Nike's prior pay policy. He further confirmed the misleading nature of his report by agreeing that Nike does not deny that it "sometimes obtained prior pay data on candidates as part of the hiring process," "that it stopped obtaining such data after the law changed," and Nike witnesses testified that "prior salary was a data point we looked at" when determining starting pay. (Saad Dep. 197:6-198:16.)[24]

---

[24] At his deposition, Dr. Saad further acknowledged that his statements about Nike's prior pay policy were "purely descriptive," he didn't know what the actual policy was, he did not rely upon the referenced materials in his report, and he made no attempt to investigate Nike's prior pay policy. (Saad Dep. 198:17-199:19.)

46.    In response to my Table 6 results, Dr. Saad presents one counter analysis. (Saad Report, Para. 135.) He splits the data into before September 2016, and September 2016 and after (rather than using the September 2017 cutoff that I used). He then reports that "female coefficient prior to September 2016 is statistically significantly negative and in the "September 2016 and after" regression is equal to −0.75% and is not statistically significant (t = −1.83)." He then concludes: "In other words, Dr. Neumark's conclusions based on his September 2017 cutoff would have been the same had he examined starting pay before and after September 2016, a date that has nothing to do with Nike's prior pay data collection" (Saad Report, para. 136.)

47.    Dr. Saad's argument is badly confused. The evidence he presents is in fact *exactly* what one would expect if Nike was using prior pay as a factor to determine starting pay prior to September 2017, but not from September 2017 and after – precisely my conclusion. Note that Dr. Saad does not report the results for before September 2016, but in his deposition said that the estimate was similar to my estimate of −1.06%. (Saad Dep. 203:7-17.) Based on his backup production, the estimate was −1.14%.[25]  So what do we know?

    a.    Whether we end the first period in August 2016 or August 2017, the estimated within-Job Cell gender gap in starting pay is about −1% disfavoring women.

    b.    For the period September 2017 and after, the estimated within-Job Cell gender gap in starting pay is −.48%.

    c.    If we take the 12-month period from September 2016 to August 2017, and add it to the latter period (September 2017 and after), the estimate falls to −.75%.

48.    In other words, all Dr. Saad has shown is that if we average my two estimates from before and after Nike stopped using prior pay, by placing one year of data when Nike *was*

---

[25] *Uncorrected Starting Pay Analyses.xlsx* (Saad backup production).

26

using prior pay – September 2016 to August 2017 – into the period when Nike *had stopped* using prior pay, the estimated within-Job Cell gender pay shortfall in starting pay becomes larger, and roughly at an average of the periods when Nike was and was not using prior pay (the average of −.48% and −1% is −.74%). This is exactly what is predicted my evidence, *and by my interpretation of my evidence*, and hence does absolutely nothing to undermine my conclusion that prior pay played a role in generating the within-Job Cell gender gap in starting pay at Nike, up to September 2017 when Nike stopped using prior pay as a factor in determining starting pay.

49.      Indeed, this is confirmed by estimating the model only for September 2016 to August 2017 – i.e., for the period when Dr. Saad seems to argue this represents a decline in the within-Job Cell gender gap in starting pay even though Nike continued to use prior pay. I show this in Table R7.[26]  The difference is that I *omit* the data from September 2017 and after, when Nike *in fact* stopped using prior pay. For the period September 2016 to August 2017, the estimated within-Job Cell female shortfall in starting pay is 1.99% (significant at the 10% level, 1.65 standard deviations). What is noteworthy is that in contrast to what Dr. Saad's confused reasoning might try to suggest, the estimated within-Job Cell female shortfall in starting pay did not shrink until September 2017 and after, when Nike stopped using prior pay to help set starting pay.[27]

---

[26] I also show, in Appendix D, Table D1, that my original Table 6 results are unchanged after dropping additional hourly employees identified by Dr. Saad in addition to the exclusion of Bands V and A I was doing previously.

[27] It is not surprising that with only one year of data the estimate is less strongly statistically significant.

27

**Table R7**
**Estimated Gender Differences in Starting Pay**
**Comparison of Female Coefficients**
**Responses to Dr. Saad's Criticisms of Table 6 from my Report**

*Dependent Variable:* Log of Starting Pay

| | Neumark Table 6 | | Periods Modified by Saad | | Period Modified by Neumark | |
|---|---|---|---|---|---|---|
| | Column 5 "Before September 2017" | Column 6 "September 2017 and after" | "Before September 2016" | "September 2016 and after" | "Sept 2016 - Aug 2017" Before Correction | "Sept 2016 - Aug 2017" After Correction |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| Female Shortfall | **-1.06%** | **-0.48%** | **-1.14%** | **-0.75%** | **-1.95%** | **-1.99%** |
| Std. Deviations | 2.39 | 1.00 | 1.76 | 2.50 | 1.66 | 1.66 |
| Observations | 4,382 | 1,922 | | | 621 | 604 |
| Total Observations | 4,610 | 2,103 | 3,853 | 2,860 | 757 | 739 |
| R-squared | 0.91 | 0.95 | 0.92 | 0.95 | 0.94 | 0.94 |

Notes:
*Independent variables:* Female Indicator, Year Fixed Effects, Age, Age Squared, Full Time/Part Time Status, Job Cell (job subfamily-level interaction) controls. The analysis includes starting pay for employees initially hired on or after January 1, 2012, who were class members at some point during the class period and excludes employees who started in the V and A bands as their starting pay was mostly hourly. Col. (6) also excludes hourly employees identified by Dr. Saad. Starting pay is converted to December 2019 dollars. Reported number of observations are those retained by the high-dimension fixed effects estimation procedure. Full regression samples are as indicated by 'Total Observations.'

Sources:
Cols. (1)-(2): Neumark August 5, 2021 Report, Table 6;
Cols. (3)-(4): Saad backup "Uncorrected Starting Pay Analyses.xlsx", "Uncorrected Starting Pay Analyses - OUTPUT.pdf";
Col. (5): Uses data from Neumark August 5, 2021 Report;
Col. (6): Uses updated data which excludes hourly employees as identified by Dr. Saad.

50.    In other words, we know that Nike used prior pay through August 2017. Thus, if prior pay influenced starting pay, we would expect a statistically significant within-Job Cell female shortfall in starting pay for periods through that date. That is what I showed originally (the statistically significant 1.06% shortfall through August 2017), what Dr. Saad reports (the statistically significant 1.14% shortfall through August 2016), and what I report for September 2016 through August 2017 (the statistically significant 1.97% shortfall).[28] Thus, not only does Dr. Saad's analysis fail to undermine my conclusions; it strengthens my conclusions.

_____

[28] The most reliable evidence comes from using the full data through August 2017 – a within-Job Cell female pay shortfall of 1.06% (2.39 standard deviations).

**VII.    DR. SAAD'S CLAIMS THAT A PROPER RE-EVALUATION OF THE EVIDENCE ON PROMOTIONS REVEALS NO EVIDENCE CONSISTENT WITH DISCRIMINATION AGAINST WOMEN IN PROMOTIONS, AND HIS CRITIQUES OF MY ANALYSIS ARE INCORRECT. THE EVIDENCE CONTINUES TO SHOW LOWER PROMOTIONS FOR WOMEN THAN FOR COMPARABLE MEN.**

51.    In my Report, I presented two promotion analyses – one focused on the rate of promotions for both competitive and non-competitive promotions and the other focused on the likelihood of receiving promotions of two or more levels. As detailed below, none of Dr. Saad's criticisms alter my conclusions for either promotion analysis.

**A.    Women Continue to be Less Likely to Receive a Non-Competitive Promotion Than Similar Men.**

52.    My promotions analysis first analyzed the rate of promotions both for competitive and non-competitive promotions. As reported in Table 10 of my Report, I found that women were less likely to be promoted than otherwise similar men in the same Job Cell, and that this difference was driven by lower rates of non-competitive promotions – which are more numerous than competitive promotions – for women. Dr. Saad raises a number of criticisms of my promotions analysis. None of these criticisms overturn my conclusion that women receive fewer promotions, than comparable men. I discuss each of these in turn.

53.    This rate of promotion analysis focused on identifying promotions based on year-end snapshots and classified promotions as competitive if there was a match found for a person receiving the promotion in the requisition data. This had the result of assigning those who received competitive promotion as not receiving the non-competitive promotion in the same year. Dr. Saad criticized this approach because in this manner I treat "employees who received non-competitive promotions … as though they were eligible for a competitive promotion but received no promotion at all." (Saad Report, para. 205.) A simple check of the data shows that employees can receive both types of promotions in a year, so my treatment is in fact consistent

29

with the data.[29]  However, to address Dr. Saad's concern about eligibility for both types of promotions, I have gone back to the data to incorporate into my analysis all promotions that occur during a year, to capture the cases when both types of promotions occur, and below I show that this does not impact the results.[30]

54.    The evidence that employees could receive either one or both kinds of promotions in a year completely undermines an alternative analysis Dr. Saad presents. Specifically, based on his false assumption that Nike employees can receive only one kind of promotion or the other in a year, Dr. Saad uses my data to estimate a multinomial logit model for promotions. He argues that this is a "commonly used statistical model developed for situations like this in which the dependent variable has three outcomes (no promotion, competitive promotion and non-competitive promotion)." (Saad Report, para. 206.) His analysis using the multinomial logit model is flawed because this model requires that one and only one of each of the outcomes can occur. As I noted above, this is not the case, as Nike employees can receive both types of promotions in a year (now accounted for in my data and the analysis below). Though he could

---

[29] 7,469 person-year observations had one promotion type only (5,659 only non-competitive, 1,810 only competitive) while 73 observations had both types of promotion in a year.

[30] Specifically, I look at all promotions that occur in the year, classified as either competitive or non-competitive. I construct a dummy variable for whether any promotion occurred, and whether a promotion of either type occurred. I also construct levels moved up from promotions and promotions of either type. The only complication is that there are sometimes moves down a job level or more (which one might label a demotion). (Of 49,300 person-year observations for which job levels can be observed in one year to the next, 1,619 observations had a net annual demotion.)  In my computations, I always offset these against non-competitive promotions, treating the "demotions" as a similar personnel decision to a non-competitive promotion. I only consider a non-competitive promotion to occur if the net number of levels up is positive, and define the number of non-competitive promotions similarly. In revisiting my promotions data, I address Dr. Saad's criticisms by also changing my promotion definition to define a promotion based on Job Levels from one year to the next, not to the Job Level in subsequent years when intervening years were missing and to not treat a person as eligible for promotion if they were terminated.

30

have checked the data on this point, Dr. Saad conceded he did not. (Saad Dep. 244:1-21.) The model is simply inapplicable when an individual can receive both types of promotions in some instances.

55.    In addition, even in the absence of this problem (hypothetically), the application of the multinomial model to the promotions data would be inappropriate because this model requires a technical assumption called "independence of irrelevant alternatives," which is almost certainly violated in this case.[31] Put simply, this assumption requires that for any individual, the ratio of probabilities of choosing two alternatives is independent of the availability or attributes of any other alternatives. That would mean that, if there were no competitive promotions, the relative probability of no promotion vs. non-competitive promotion would be the same. At his deposition, Dr. Saad could not point to any evidence that showed this same relative probability required for his multinomial model. (Saad Dep. 246:1-22.) This is unsurprising since it seems extraordinarily unlikely to hold, because if there were only one kind of promotion – say non-competitive – then it seems likely that many of those who received competitive promotions would instead have received non-competitive promotions.[32]  As a result, the analysis presented by Dr. Saad in Exhibit 27 to his Report should be ignored.

56.    Dr. Saad also levels a number of other criticisms at my rate of promotion analysis. First, he contends that my coding of the job level of Senior Manager between Mangers and Expert Professional was in error. Based on the variable Job_Lvl_Cd, I agree that Senior Manager

---

[31] See: Hausman, Jerry, and Daniel McFadden. 1984. "Specification Tests for the Multinomial Logit Model." *Econometrica*, Vol. 52, pp. 1219-1240. This is a well-known paper cited thousands of times on Google Scholar.

[32] One can test the assumption of independence of irrelevant alternatives, as described in the Hausman and McFadden paper cited in the previous footnote, and estimate alternative models if it does not hold. However, Dr. Saad did not do this (not that it would make sense, anyway, given that individuals can receive both kinds of promotions).

31

should have been placed above Expert Professional.[33]  However, making this correction has no

material impact on the results (of either of my promotion analyses), which is not surprising since

there were very few records coded as Senior Manager.[34]  The estimates are reported below.

57.    Second, Dr. Saad argues that I incorrectly treated promotions as non-competitive

in cases where I did not observe promotions to non-covered positions at the E7 and higher Bands

in the Taleo data. (Saad Report, para. 207.) However, I am informed by Plaintiffs' counsel that

Nike's counsel confirmed in writing that promotions to Vice-President positions and above,

which are E7+ positions, are not posted and therefore are, in fact, non-competitive promotions.[35]

Hence, my treatment of the data is correct based on what Nike provided and stipulated.

58.    Third, Dr. Saad argues that my analysis is flawed because I do not have data on

workers who worked in Covered Positions but left Nike before the beginning of the Class Period

in August 2015. There is nothing either Dr. Saad or I can do about this since data on these

individuals were not provided. But Dr. Saad does not even offer a hypothetical argument about

why this might bias my findings towards lower promotion rates for women. I think it is most

likely that the exclusion of these data actually biases the findings *against* evidence of a female

shortfall in promotions. If there is discrimination against women in promotions, then we would

expect that, all else the same, women who should have expected promotions under a gender-

neutral policy and did not get them would have left the company, thus removing non-promoted

---

[33] Dr. Saad says that he put Senior Managers and Directors at the same level, and I follow that
here. However, the variable *Job_Lvl_Cd* actually shows Director at two different levels – 120
(the same as Senior Manager), and 140.

[34] Only two employees held a Senior Manager position in 2013 in the Snapshot data, and the
analysis excluded 2012.

[35] March 14, 2021 Letter from Felicia Davis, p. 4

women from the sample who, if added back in, would lower relative promotions rates for women. That is, my evidence of lower promotion rates for women is understated.

59. Based on the preceding discussion and to respond to Dr. Saad's criticisms, I have redone my promotions analysis changing the level of the Senior Manager position and using data on all promotions that occur within a year. The results are reported in Table R8. The results in Table R8 cover the same analyses as in Table 10 (columns (3)-(5)) of my Report.[36] I continue to find statistically significant evidence of lower probabilities of non-competitive promotions for women, once I add Job Cells (the interactions of Job Level with Job Subfamily) in column (3), Panel C, and that this difference was present prior to April 2018, after which time Nike's policies changed in a manner that eliminated the female shortfall in non-competitive promotions. The table also reports the baseline promotion rates (for men), which emphasize that competitive promotions are far more common – which implies that the female shortfall in these types of promotions is relatively more harmful to women.

---

[36] As my Report (para. 96) explained, the estimates from columns (1) and (2) of Table 10, which did not account for Job Level, were not informative about gender differences in promotions of employees at the same Level.

33

**Table R8**
**Estimated Gender Differences in Promotions**
**Responses to Dr. Saad's Criticisms of Table 10 from my Report**

| | Table 10-Col 3 Individual Controls Plus Job Cells | Table 10-Col 4 Same as (3): Pre-April 2018 | Table 10-Col 5 Same as (3): April 2018 and Later |
|---|---|---|---|
| | (1) | (2) | (3) |
| **Panel A. Promotion Rate: All Promotions** | | | |
| Estimated Female Coefficient | **-0.0039** | **-0.0046** | **0.0015** |
| Std. Deviations | 1.19 | 1.22 | 0.23 |
| Observations | 49,196 | 39,275 | 9,705 |
| Total Observations | 49,298 | 39,384 | 9,914 |
| Baseline Promotion Rate | 14.83% | 16.07% | 9.98% |
| Implied % Change | -2.63% | -2.86% | 1.50% |
| **Panel B. Promotion Rate: Only Competitive Promotions** | | | |
| Estimated Female Coefficient | **0.0037** | **0.0050** | **-0.0012** |
| Std. Deviations | 1.94 | 2.25 | 0.30 |
| Observations | 49,196 | 39,275 | 9,705 |
| Total Observations | 49,298 | 39,384 | 9,914 |
| Baseline Promotion Rate | 3.34% | 3.42% | 3.06% |
| Implied % Change | 11.08% | 14.62% | -3.92% |
| **Panel C. Promotion Rate: Only Non-Competitive Promotions** | | | |
| Estimated Female Coefficient | **-0.0073** | **-0.0092** | **0.0035** |
| Std. Deviations | 2.43 | 2.64 | 0.63 |
| Observations | 49,196 | 39,275 | 9,705 |
| Total Observations | 49,298 | 39,384 | 9,914 |
| Baseline Promotion Rate | 11.65% | 12.84% | 6.99% |
| Implied % Change | -6.27% | -7.17% | 5.01% |

Notes: A promotion is a job change to a higher job level from one year to the next. A competitive promotion is a job change to a higher job level that can be matched with job openings in the Hire Data in the same month or adjacent months. A non-competitive promotion is a job change to a higher level that cannot be matched with job openings in the Hire Data. I use the phrase "Job Cells" to refer to the interactions of Job Subfamilies and Job Levels. Dependent variable as listed for each panel. Independent variables: Female Indicator, Year Fixed Effects, Tenure, Tenure Squared, Age, Age Squared, Time in Job Code, Time in Job Code Squared, Job Performance Rating (6 categories), and Job Cell controls. The standard deviations for all regression estimates are computed clustering at the individual level. Reported number of observations are those retained by the high-dimension fixed effects estimation procedure. Full regression samples are as indicated by 'Total Observations.' Implied % change for women are estimated based on the mean promotion rate for males in the relevant sample. The analysis excludes 2012 because many job codes got assigned to different job levels in April 2013. Some job codes got assigned to different job levels in 2014, 2017, and 2018 but those instances were not excluded. Employees in bands V and A and hourly employees are excluded from the analysis. Job levels were adjusted following Saad's correction to Senior Manager job level per "Build Promotions Corrected.sas."

Sources: Snapshot Data, Static File, and Hire Data.

Neumark Decl. Ex. B, Page 37 of 99

**B.      Women Continue Have a Lower Likelihood to Be Promoted By Two or More Levels Than Similar Men.**

60.      The other promotions analysis in my Report analyzed the incidence of promotions by more than one level. As reported in Table 11 of my Report, I found that women were less likely to be promoted by two or more levels, with the evidence particularly strong for non-competitive promotions than otherwise similar men in the same Job Cell, and that this difference was driven by lower rates of non-competitive promotions – which are more numerous than competitive promotions – for women. Dr. Saad raises two primary criticisms against this analysis, but both are without merit.

61.      First, Dr. Saad argues that my analysis in Table 11 should be limited only to those who received a promotion and exclude those who never received a promotion. He argues that this is a "logical first step." (Saad Report, para. 209.) I do not know what he means by "logical," but I do know that this is a flawed statistical strategy. If we select a subsample based on who received a promotion, and then study only that sample, this generates an "endogenously selected sample." If there is discrimination regarding whether women get any promotion, then those who do get promotions are positively selected – that is, with discrimination against women in promotions, only the more exceptional (relative to men) women get ahead. Then when one looks at some other promotion decision for "representative" men and "better" women, the promotion penalty for women is understated.[37]  Here is a simple explanation:

---

[37] For a parallel example, later (in footnote 61), I discuss the example of comparing the effect of college degrees for white-collar versus blue-collar workers. Because fewer blue-collar workers get a college degree, those who do may be quite exceptional. This could lead to overstatement of the effect of college degrees for blue-collar versus white-collar workers, because the sample of blue-collar workers with college degrees is endogenously selected on positive characteristics that we do not measure. See: Angrist, Joshua, and Jörn-Steffen Pischke. 2008. Mostly Harmless Econometrics: An Empiricist's Companion. Princeton, NJ: Princeton University Press.

a.    Suppose 5% of women get promoted at all, and of these 10% get promoted 2 levels. So if there are 1000 women, 50 get promoted at all, and 5 get promoted 2 levels.

b.    Suppose that for men the percentages are 10% and 10%. So, if there are 1000 men, 100 get promoted at all, and 10 get promoted 2 levels.

c.    So, more men than women are promoted 2 levels (10 vs. 5, and there are 1000 of each). But among those promoted at all (50 women, and 100 men), equal percentages get promoted two levels (10% of the 50 women, or 5 women, and 10% of the 100 men, or 10 men).

d.    Thus, men have a higher probability of a promotion of two levels – consistent with the evidence from Table 11 of my Report – but if we condition on a promotion – as Dr. Saad advocates – then men and women have equal probabilities of a promotion of two levels. So his conditioning on a promotion masks the gender shortfall in promotions of more than one level.[38]

62.    In addition, Dr. Saad also acknowledged that by limiting his Table 11 analysis to those who received promotions, the sample size was reduced by almost 80%, which also, of course, make it much less likely to find statistically significant results. He also concedes that his analysis led to larger negative coefficients – indicating larger female shortfalls in multi-level promotions – but without statistically significant results. (Saad Dep. 256:7-257:9.)

63.    The second issue Dr. Saad raises regarding my analysis of multi-level promotions is my interpretation of a promotion of more than one level as necessarily a better outcome than a

---

[38] Dr. Saad's response to a question about this in his deposition indicates to me that he does not understand this issue. (Saad Dep. 252:20-254:12.) The only rationale he can offer is that the decision to promote two, three, or four levels is a separate practice. I am informed by Plaintiffs' counsel that these multi-level promotion decisions are not a distinct practice, but rather part of a common promotion policy that applies to covered employees. Note, Dr. Saad does not cite any evidence that indicates decisions to promote multiple levels are separate practices.

promotion of one level, because a promotion along a track (Individual Contributor, or IC; and Management, or M) may require a promotion up two levels. He argues: "Sometimes the next 'single step' up the IC track is one level and sometimes it is two levels. These 'two level' moves are inherently only that – you cannot make one level moves for certain promotions…." (Saad Report, para. 211; see also Saad Dep. 256:20-258:21.) This is contradicted by the data, as shown in Table B7 of my report.[39] To make it clearer, Figure R1 color codes the IC and M tracks, but otherwise shows the same information – the number of promotions from each Job Level to the higher Job Levels for which promotions are observed, using the updated promotions data. We can see that there are promotions up levels both across and between tracks. For example, if we look in the row for Senior Prof., we can see a large number of promotions of from one to four levels, both within the same track (e.g., to Lead Prof.) and across tracks (e.g., to Manager). Thus, I maintain that this criticism is without merit.

---

[39] Note, Dr. Saad confirmed, at his deposition, that he did not dispute or otherwise opine about Table B7 of my report. (Saad Dep. 259:8-15.)

**Figure R1**
**Updated Promotion Transition Matrix**

| Level Promoted from | Bands | Level Promoted to | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ENTRY PROF. | INTER. PROF. | SUPER-VISOR | SENIOR PROF. | LEAD PROF. | MGR | EXPERT PROF. | DIR / SR MGR | CONSUL-TANT | SR DIR | VICE PRES |
| | | L | L | L | U | U | U | E | E | S | S | E7+ |
| ENTRY PROF. | L | | 586 | 19 | 279 | 21 | 11 | 1 | | | | |
| INTER. PROF. | L | | | 30 | 1185 | 97 | 68 | 6 | | | | |
| SUPERVISOR | L | | | | 20 | 6 | 34 | | | | | |
| SENIOR PROF. | U | | | | | 1057 | 436 | 575 | 258 | | | |
| LEAD PROF. | U | | | | | | 260 | 312 | 176 | | | |
| MANAGER | U | | | | | | | 84 | 309 | | | |
| EXPERT PROF. | E | | | | | | | | 882 | 17 | 192 | |
| DIRECTOR / SR MGR | E | | | | | | | | | 11 | 467 | 3 |
| CONSULTANT | S | | | | | | | | | | 23 | 1 |
| SENIOR DIRECTOR | S | | | | | | | | | | | 94 |

Individual Contributor Track     Management Track

Notes: A promotion is a job change to a higher job level from one year to the next. The analysis excludes 2012 because many job codes got assigned to different job levels in April 2013. Some job codes got assigned to different job levels in 2014, 2017, and 2018 but those instances were not excluded. Employees in bands V and A and hourly employees are excluded from the analysis. Job levels were adjusted following Saad's correction to Senior Manager job level per "Build Promotions Corrected.sas." Individual Contributor and Management tracks are based on Saad Report, Exhibit 29. See sources to Table R8.

64.    Like with my other promotions analysis above, I have updated my Table 11 analysis by changing the level of the Senior Manager position and using data on all promotions that occur within a year to address Dr. Saad's critiques. Table R9 shows the revised results for the probability of getting promoted two or more levels, three or more levels, or four or more levels. I continue to find evidence that women overall are less likely to be promoted multiple levels (Panel A, columns (1) and (2) – with female shortfalls significant at the 5% level), and that women are less likely to experience competitive promotions over multiple levels (Panel C, columns (1)-(3) – with female shortfalls significant at the 5% or 10% level).

38

**Table R9**
**Estimated Gender Differences in Promotions by More than One Level**
**Responses to Dr. Saad's Criticisms of Table 11 from my Report**

| | Table 11-Col 1 Two or More Levels: Individual Controls Plus Job Cells | Table 11-Col 2 Three or More Levels: Individual Controls Plus Job Cells | Table 11-Col 3 Four or More Level: Individual Controls Plus Job Cells |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Panel A. Promotion Rate: All Promotions* | | | |
| Estimated Female Coefficient | **-0.0062** | **-0.0038** | **-0.0009** |
| Std. Deviations | 2.36 | 2.16 | 1.01 |
| Observations | 49,196 | 49,196 | 49,196 |
| Total Observations | 49,298 | 49,298 | 49,298 |
| Baseline Promotion Rate | 8.65% | 3.34% | 0.65% |
| Implied % Change | -7.17% | -11.38% | -13.85% |
| | | | |
| *Panel B. Promotion Rate: Only Competitive Promotions* | | | |
| Estimated Female Coefficient | **0.0010** | **-0.0009** | **0.0002** |
| Std. Deviations | 0.65 | 0.87 | 0.42 |
| Observations | 49,196 | 49,196 | 49,196 |
| Total Observations | 49,298 | 49,298 | 49,298 |
| Baseline Promotion Rate | 2.22% | 0.92% | 0.17% |
| Implied % Change | 4.50% | -9.78% | 11.76% |
| | | | |
| *Panel C. Promotion Rate: Only Non-Competitive Promotions* | | | |
| Estimated Female Coefficient | **-0.0072** | **-0.0028** | **-0.0012** |
| Std. Deviations | 3.15 | 1.91 | 1.65 |
| Observations | 49,196 | 49,196 | 49,196 |
| Total Observations | 49,298 | 49,298 | 49,298 |
| Baseline Promotion Rate | 6.45% | 2.39% | 0.46% |
| Implied % Change | -11.16% | -11.72% | -26.09% |

Notes: See notes and sources to Table R8.

## VIII.   DR. SAAD ARGUES THAT MY EDUCATION AND PRIOR WORK EXPERIENCE CONTROLS USED IN THE LIMITED SET OF MY STARTING PAY ANALYSES ARE FLAWED; HE OFFERS NO ALTERNATIVE ANALYSES SUGGESTING THAT MY CONCLUSIONS ARE INCORRECT, AND ADDITIONAL EVIDENCE REINFORCES THAT MY CONCLUSIONS ARE CORRECT.

65.    Having found a within-Job Cell female pay gap in class period pay and in starting

pay using all of the data available, my Report took the additional step of checking, for a smaller

39

universe of employees with available and matched data, whether prior education or work experience explained the observed within-Job Cell female pay gap at Nike. I found that education and prior work experience did not eliminate the within-Job Cell female pay gap in either starting pay or class period pay at Nike.

66.    I used the education and experience data in two ways. First, I use the data in a parsimonious way. In particular, I used the education data to determine the university of the highest degree attained and included controls for the ranking of this university. And I created clusters of related job titles and constructed experience measures corresponding to each of these clusters. As reported in Tables 7 and 8 of my Report, even with those controls applied, my analysis found statistically significant female pay disparities in base and starting pay, which were consistent with my pay disparity findings using the entire data set. Second, for the analysis of starting pay, I created a large set of unique school indicators (dummy variables) for the university of the highest degree, and a large set of separate prior experience measures based on unique job titles. As reported in Appendix Table B5 of my Report, this approach similarly led to a statistically significant female pay disparity in starting pay.

67.    Dr. Saad levels some criticisms at both the education controls and the prior experience controls – in particular, the education controls used in Tables 7 and 8 (but not Appendix Table B5), and the experience controls used in all three tables. I address the issues with respect to the education controls and then the prior experience controls, in turn. In general, though, it is important to point out that the criticisms he raises are issues that can be addressed with the available data, but Dr. Saad did not consider evidence on whether his criticisms affect my conclusions. They do not. Also, it is important to point out that the education and prior

40

experience controls that Dr. Saad criticizes affect only a subset of my analyses that use information from job applications (for the subsample for which these are available).

68.     Moreover, the starting pay and class period pay analyses using the detailed education and prior experience variables are not my core analyses. Rather, they are intended as checks on my analysis of class period pay in Table 2 of my Report, and my analysis of starting pay in Table 6 of my Report. My intention was to explore whether the conclusions in Tables 2 and 6 are robust once I included the detailed education and prior experience controls for a subset of the data for which this detailed information is available. This is useful because the full data set provided by Nike did not have education data or experience data, so that I was limited to including controls for age and its square (as a proxy for experience). I confirmed that these conclusions are robust.

A.     **Education Controls**

69.     I first discuss Dr. Saad's criticisms of my detailed education controls used in Tables 7 and 8. Dr. Saad's first criticism is that my coding of the school of the highest degree earned chose the wrong school, but as he acknowledges, in only 6% of cases (Saad Report, para. 147). This is an easy coding fix that I have made an include in my new analyses reported below. There, I show that my new analyses incorporating this are the same, so this criticism is inconsequential. Dr. Saad did not present any other evidence indicating that this coding issue affected the results.

70.     Dr. Saad's second criticism of the education data is that my data cleaning on degrees and schools did not capture every possible item that could have been cleaned (Saad Report, para. 149). This is of course not surprising. There is a huge number of degrees and especially schools listed, and consistency checks have to be largely done by hand. I have made all the additional corrections that Dr. Saad flags (Saad Report, paras. 150 and 151, and footnote

41

135); I have also done additional cleaning along these lines, although this is not to say that one could not potentially find more cases in which further cleaning would lead to additional modifications. I use this education coding with this additional cleaning in the analyses reported below, and given that my new analyses below show the same results as my Report (as reported below), it is clear that this is inconsequential. Again, Dr. Saad did not present any other evidence that this data issue affected the results in any way.

71.     Dr. Saad's third criticism of the education controls used in a limited set of my analyses is that my coding of schools ignores the potentially high value that Nike places on education in design (Saad Report, para. 144). He notes that a number of art or design schools are absent from the rankings of schools I use in some of my specifications in Tables 7, 8, and 12. However, it would have been easy to identify individuals with degrees from these schools; indeed Dr. Saad *does* this in Paragraph 144. It would then have been a simple matter to include separate dummy variables for these schools, which would let them have their own controls in my models – which is even more flexible than controlling for these schools with rankings (which are unavailable). If he had done this, he would have found that this has no impact on the results.[40] Again, Dr. Saad did not present any other evidence that this data issue affected the results in any way.

72.     To show this, I re-estimated models using the school rankings data, adding in separate dummy variables for each design school I identified in the data, rather than including

---

[40] In his deposition, Dr. Saad incorrectly claims that he is not sure how one would incorporate this information, since these schools do not show up in the rankings that I use. (Saad Dep. 218:6-14.) But of course simply including separate dummy variables for these schools controls for the value Nike places on degrees from these schools even more flexibly than just including rankings.

42

them with the other schools for which I do not have rankings.[41] I also, at the same time, address

the issue of identifying the school of the highest degree, and other cleaning of university data.

The results, shown in Panels A-C, columns (1)-(2) of Table R10, indicate clearly that the results

are unaffected.[42] (Note that this analysis includes the changes to the prior experience controls

discussed below.)

---

[41] Design schools are identified using search terms such as 'ART,' 'DESIGN,' and 'FASHION' in the cleaned school name. If a design school was part of a larger ranked or unranked university, it was not identified separately. For example, Tisch School of Arts is a part of New York University. It gets the cleaned school name 'New York University' and does not get flagged as a design school. Therefore, separate design school dummies are created only for schools that can be identified with design, art, and fashion related search terms, and that are not part of a larger university.

[42] The specifications shown in this table refer to from Table 7, column (4), Table 8, column (4), and Table 12, column (2), from my Report.

43

**Table R10**

**Starting Pay and Base Pay Analysis Robustness to Additional Cleaning and Design Schools Controls**

Responses to Dr. Saad's Criticisms of Tables 7, 8, and B5 from my Report

| | Table 7-Col 4 | Table 8-Col 4 | Table B5-Col 2 |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Panel A* | | | |
| *With Additional Cleaning for Job Titles and University Names; Correction of Highest Degree School* | | | |
| Female Shortfall | **-1.15%** | **-0.99%** | **-1.39%** |
| Std. Deviations | 3.23 | 3.18 | 3.66 |
| Observations | 4,646 | 14,876 | 4,646 |
| Total Observations | 4,880 | 14,965 | 4,880 |
| | | | |
| *Panel B* | | | |
| *Panel A with a Combined Indicator for Design Schools* | | | |
| Female Shortfall | **-1.18%** | **-1.01%** | **-1.40%** |
| Std. Deviations | 3.29 | 3.26 | 3.66 |
| Observations | 4,646 | 14,876 | 4,646 |
| Total Observations | 4,880 | 14,965 | 4,880 |
| | | | |
| *Panel C* | | | |
| *Panel A with Separate Dummies for Design Schools* | | | |
| Female Shortfall | **-1.19%** | **-1.04%** | **-1.39%** |
| Std. Deviations | 3.31 | 3.36 | 3.62 |
| Observations | 4,623 | 14,875 | 4,623 |
| Total Observations | 4,880 | 14,965 | 4,880 |

Notes: Incorporates additional job title and university name cleaning in response to Dr. Saad's criticisms. Excludes bands V&A and hourly employees. Also combines Senior Manager with Director level. Design schools are identified using search terms such as "DESIGN," "FASHION," and "ART." Regression specifications are the same as in original Table 7 Col. 4, Table 8 Col. 4, and Table B5 Col. 2. Reported number of observations are those retained by the high-dimension fixed effects estimation procedure. Full regression samples are as indicated by 'Total Observations.'

73.     As noted earlier, Dr. Saad's criticisms of my education controls do not pertain to the unique school indicators approach taken in Appendix Table B5 of my Report, which uses dummy variables, or indicators, for unique schools, rather than the ranking method. (Saad Dep. 221:18-222:12.) This is significant for two reasons. First, Dr. Saad does not rebut or otherwise dispute my findings that differences in education, when controlled using the unique school

44

indicators approach (reflected in Table B5), do not explain the within-Job Cell pay gap at Nike. Second, my analysis in Table B5 includes many design and local schools – including all those he specifically flags in Paragraphs 143 through 145 of his report – because they are actually captured in the unique school indicators I included.[43] Thus, that analysis, reported in my Table B5, already incorporated the detailed data on education (and prior experience) and confirms Dr. Saad's specific criticisms of my education controls are without merit. Nonetheless, I have also re-run these models including individual variables for all the design schools I identified, and alternatively simply including a single variable for all of these design schools. The results confirm that additional accounting for design school has no bearing on the conclusions, as shown in the last column of Panels A-C in Table R10.[44]

74.    Dr. Saad's final criticism is that I did not account for major or field of study in my educational controls. (Saad Report, para. 152.) Yet, in elsewhere in his report and at his deposition, Dr. Saad admits that Nike failed to produce any data related to major or field of study.[45]  Dr. Saad also does not show or attempt to show that the inclusion of this missing data would change the results. (Saad Dep. 213:13-19.)

**B.    Experience Controls**

75.    Dr. Saad also criticizes how I use the prior experience controls in the subset of my analyses that use these (along with the detailed education controls just discussed).

---

[43] Note that Dr. Saad also mentions five schools in the Portland area for which Nike has many hires.  (Saad Report, para. 145.) Indeed, all of these schools are represented sufficiently that they were assigned their own individual variables in Table B5 from my Report.

[44] Note that this analysis includes all of the changes to the education and prior experience controls discussed in this section.

[45] On page 22 of the Saad Report, Dr. Saad acknowledges that "the available data does not record college major." At his deposition, confirmed "that the available data does not record college major or otherwise field of study in Nike's produced Taleo data." (Saad Dep. 211:14-17.)

45

76.     It is important to first understand the problem I am trying to address in order to be able to have a tractable approach to controlling for prior job experience – in particular: How do we shrink the dimensionality of the data down to a size where we can engage in statistical analysis? Here, Nike's Taleo data production included only job title information for the prior jobs held by a subset of employees, which totaled over 14,000 unique job titles. That is, with, say, 5,000 observations, even if I want to construct detailed prior experience controls, I need to define this prior experience over a set of jobs much, much smaller than the number of observations. This is exactly what I do, in two different ways.

77.     One approach I take, in Tables 7 and 8 of my Report, is to use the detailed prior job histories for the subsample for which they are available to construct detailed controls for prior experience by type of job, using language processing techniques to turn over 14,000 job titles corresponding to these prior jobs into a narrower set job clusters based on the relatedness (semantic similarity) of the job titles.[46]  The second approach I take, in Table B5 of my Report, was to assign separate variables for the most common prior job titles, and then to construct detailed controls for prior experience for each of these jobs, plus a catch-all category of the less common jobs.[47]  In the first approach, as explained in my Report, I use 20 different job clusters, measuring prior experience in each one of them. In the second approach, as also explained in my Report, I have over 200 different job titles in which I measure experience. The first approach uses fewer variables to capture prior experience, although all prior jobs are classified into one of

---

[46] Nike did not provide any other descriptions of these jobs other than the job titles.

[47] For the sake of completeness, my Tables 2-5 use a third approach of including age and age squared to control for prior experience. This is the best I can do for the full data sample for which Nike did not include any information on work history nor any information on schooling (with which labor economists will sometimes construct a measure of potential experience).

46

the 20 clusters. The second approach uses more variables, jobs, but has a large catch-all category of all the jobs that appear very infrequently in the data.

78.    It is critical to emphasize that there is simply no alternative to taking some approach like this, unless you want to argue that data simply cannot be used to test for gender discrimination in pay. Clearly any data shrinkage – by which I mean collapsing the job titles from peoples' job applications to a smaller number for statistical analysis – will lead to some job titles that are not the same being grouped together. If that were not the case, the data shrinkage would not be needed in the first place. To emphasize this point, 85% of the job titles have only one observation (i.e., one person with that job title) across the clusters I use in my analysis in this Rebuttal.

79.    Indeed, Dr. Saad does not object to the general approach of using language that describes jobs to find common themes to group them into a smaller set of jobs in order to make empirical analysis tractable. He recognizes that machine learning techniques to shrink data are not new and have had a "solid" 20 years or longer of "history with the application of these methods." (Saad Dep. 228:1-18.) For example, in his Report, he describes a version of my approach: "the techniques are essentially "content analysis" methods, which take longer sections of descriptive text and subject them to specialized "big-data" analytical methods designed to reduce the complexity and dimensionality of such descriptive material to cognizable and useable metrics or measures. In other words, these methods when applied correctly take multiple bodies of highly heterogeneous text fields and find natural groupings within these text fields that are more homogeneous, such that analysis can utilize the more homogeneous sub-groupings and create variables for further analysis. It is what is sometimes referred to as converting text to data." (Saad Report, para. 23.)

47

80.     Instead, Dr. Saad's criticism is with the details of how I do this. An essential core of his criticism is that I use the relatively brief job titles to do my clustering (and to create my larger number of separate prior experience variables in Table B5). He says: "job title alone is not enough grist for the mill of clustering techniques," (Saad Report, para. 24), and "[i]n my work in this area I have never seen clustering techniques applied to simple labels of anything." (Saad Report, para. 23.) Note that I could only use job titles because of Nike's limited production of Taleo data, which only included job titles and no other work experience information for certain individuals. Setting aside Nike's self-imposed data limitations, I cannot speak for what research Dr. Saad has seen. But he mischaracterizes research he does cite in support of his position and is unaware of research that undermines his position.

81.     In his report, Dr. Saad cites an article that he claims demonstrates that job titles are insufficient to classify jobs. The quotes he cites read: "substantial limits to using machine learning to create discrete occupational categories" which includes the fact that "job titles have insufficient consistency or detail across institutions necessary for robust supervised machine learning."[48] He has, in fact, excluded text to distort the meaning of the article he cites. In fact, the full sentence states: "*While our results suggest that occupations can be assigned from job titles*, they also point to real challenges. In particular, our analysis suggests that there are substantial limits to using machine learning to create discrete occupational categories, even with rich data sources." (Ikudo et al., p. 59.) At his deposition, Dr. Saad conceded that the Ikudo article, in fact, concluded that machine learning techniques could be used to classify people based on job title even if those results were not better than manual classification techniques. (Saad Dep. 236:4-14.)

---

[48] These quotes are from: Ikudo, Akina, Julia I. Lane, Joseph Staudt, and Bruce A. Weinberg. 2019. "Occupational Classifications: A Machine Learning Approach." *Journal of Economic and Social Measurement*, Vol. 44, pp. 57-87.

48

82.     It may well be accurate that Dr. Saad has never "seen clustering techniques applied to simple labels of anything," but Dr. Saad acknowledges his research only identified the Ikudo article for any articles or studies that used job titles as text sources for machine learning techniques while the rest of his cited studies "were actually on the descriptive content." (Saad Dep. 232:7-17.) My review of the applicable literature on this topic confirms that Dr. Saad's cited studies are not applicable and that a number of studies, missed by Dr. Saad, support my methodology and reject his criticisms.

a.     First, Dr. Saad cites a number of other studies in support of his claim that "I have never seen any analysis that used such simple labels as source material for these techniques." (Saad Report, para. 157, and footnotes 140 and 141.) I have examined each of the studies he cites. Not a single one of them pertains to using text data to classify jobs, and most have to do with using text data to try to understand more complex issues, which for obvious reasons could not be captured in phrases of a few words.[49]  In particular: Baker et al. (2016)

_____

[49] The studies are: Baker, Scott R., Nicholas Bloom and Steven J. Davis. 2016. "Measuring Economic Policy Uncertainty." *Quarterly Journal of Economics*, Vol. 131, pp. 1593-1636; Born, Benjamin, Michael Ehrmann and Marcel Fratzscher. 2013. "Central Bank Communication on Financial Stability." *The Economic Journal*, Vol. 124, pp. 701-734; Chae D.H., Clouston S., Hatzenbuehler M.L., et al. 2015. "Association between an Internet-Based Measure of Area Racism and Black Mortality." *PloS ONE*, Vol. 10: e0122963; Gentzkow, Matthew, Bryan Kelly, and Matt Taddy. 2019. "Text as Data." *Journal of Economic Literature*, Vol. 57, pp. 535-574; Gentzkow, Matthew, Jesse M. Shapiro, and Michael Sinkinson. 2014. "Competition and Ideological Diversity: Historical Evidence from US Newspapers." *American Economic Review*, Vol. 104, pp. 3073-3114; Gentzkow, Matthew, and Jesse M. Shapiro. 2010. "What Drives Media Slant? Evidence from U.S. Daily Newspapers." *Econometrica*, Vol. 78, pp. 35-71; Groseclose, Tim, and Jeffrey Milyo. 2005. " A Measure of Media Bias." *Quarterly Journal of Economics*, Vol. 120, pp. 1191-1237; Litecky, Chuck, et al. 2010. "Mining for Computing Jobs." *IEEE Software*, January/February; Romer, Christina D., and David H. Romer. 2017. "New Evidence on the Aftermath of Financial Crises in Advanced Countries." *American Economic Review*, Vol. 107, pp. 3072-3118; Saiz, Albert and Uri Simonsohn. 2013. "Proxying for Unobserved Variables with Internet Document-Frequency." *Journal of the European Economic Association*, Vol. 11, pp. 137-165; Woweczko, Izabella A. 2015. "Skills and Vacancy Analysis with Data Mining Techniques." *Informatics*, Vol. 2, pp. 31-49; and Taddy, Matt. 2013. "Measuring Political

49

study policy uncertainty; Born et al. (2013) study Central Bank policy; Gentzkow and Shapiro (2010) study media "slant"; Romer and Romer (2017) study the health of financial systems; and Tatty (2013) studies political sentiment.[50]

b.    Second, although Dr. Saad may not have seen clustering techniques applied to job titles, there is in fact research on this. A 2020 study published in the *Journal of Labor Economics* (one of two leading journals in the field) that uses *job titles* (generally of a few words at most) to study jobs, categorize them by skill, etc.[51]  This is a highly-cited paper already (129 cites on Google Scholar as of Nov. 11, 2021).[52]  It also would not have been hard to find. On my first attempt at locating related articles in Google Scholar, I entered "labor economics" and "job titles" – which seem like obvious search terms – and this showed up as the third paper on the first page.[53]

c.    Finally, I have identified a number of other studies that use job titles to classify jobs.

---

Sentiment on Twitter: Factor Optimal Design for Multinomial Inverse Regression." *Technometrics* Vol. 55, pp. 415-425.

[50] Other studies in this list also completely fail to make the point Dr. Saad seems to think they do. In particular: Gentzkow et al. (2014) study ideological diversity in newspapers, but do not actually use text analysis; Saiz and Simonsohn (2013) pursue a different task – documenting the potential use of document-frequency methods, and this is based on searches for *keywords* (i.e., very short phrases); Groseclose and Milyo (2005) study media bias, and just uses short phrases – in this case names of think tanks and policy groups; Litecky et al. (2010) uses job ads, and extracts many definitions of skills from them – interestingly, using cluster analysis to arrive at 20 job types; and Chae et al. (2015) study racism – and this is based on just single words.

[51] See: Marinescu, Ioana, and Ronald Wolthoff. 2020. "Opening the Black Box of the Matching Function: The Power of Words." *Journal of Labor Economics*, Vol. 38, pp. 535-568.

[52] In his deposition, Dr. Saad confirmed that he was not aware of this paper, even though he claims to have searched the labor economics literature: "If I didn't cite it, I'd be surprised that I didn't. I tried to find articles that related in any way to these techniques in labor economics." (Saad Dep. 232:23-25.)

[53] This was on November 20, 2021.

50

   i.   Li et al. (2021) use job titles to create clusters to track careers.[54]

   ii.   Ahuja et al. (2017) uses semantic similarity to identify similar job titles. To quote from the paper: "In this paper, we described an approach to find similarity between job titles based on the observation that each job title consists of three components – domain, function, and attribute…As we observed via the intra vs inter job title similarity scores, the approach gives fairly accurate results." (p. 17.) The authors discuss how job titles, despite brevity, can indicate information about job domain, function, and attribute (p. 4). They use WordNet – "a large lexical database of the English language" (p. 12) – for its corpus, like I use GoogleNews.

   iii.   Bao et al. (forthcoming) code occupations based on job titles (and industry). Their goal is to facilitate automated coding occupations based on job titles and then supplemented by industry information (p. 5), and conclude that the method they explore is a "robust algorithm for automatically coding to the Canadian National Occupational Classification system, and has been evaluated using real work data. It allows researchers to codify data by occupation in a timely and cost-efficient manner…" (p. 6).[55]

83. In other words, I pointed out before that Dr. Saad acknowledges the validity of trying to use language that describes jobs to engage in some kind of data shrinkage to get a more manageable classification of jobs. He tries to argue that one simply cannot use job titles, but must use richer language (although he never proposes an alternative and shows that it changes the results). However, I have shown that his claims that one cannot use simple job titles are

---

[54] See: Li, Lei, Svetlana Peltsverger, Jack Zheng, and Linh Le. 2021. "Retrieving and Classifying LinkedIn Job Titles for Alumni Career Analysis." SIGITE, pp. 85-90.

[55] See: Bao Hongchang, Christopher Baker, and Anil Adisesh. "Development of the ASOC (Automated Semantic Occupation Coding) Algorithm." Forthcoming in *JMIR Formative Research*.

51

unfounded, based on mischaracterization of some research, and ignorance of other research, and that labor economics research *has* used job titles. Thus, if there is an argument, it is an even narrower one – over exactly how to use job titles.

84.    With that in mind, I now turn to some of the specifics of Dr. Saad's criticisms and why they do not undermine my conclusions. I start with some of his general critiques before turning to some point-by-point responses to specific criticisms.

85.    First, what I am doing by adding detailed controls for prior experience by job is *far* beyond what labor economists typically do when controlling for the effect of prior labor market experience on pay. Nearly all studies simply control for an aggregate prior job experience measure (and its square). The research paper I am aware of that constructs the most detailed controls for prior experience – and this is in the context of understanding gender wage differentials – focuses on the timing of prior experience without reference to the specific job in which one worked.[56] Other research focuses on the difference between experience in the current industry or occupation and any other industry or occupation, occupation, without further differentiating the prior experience by industry and occupation.[57] I am controlling for either 20 or more than 200 different types of prior experience.

86.    Yet despite what labor economics research typically does, and the fact that I go way beyond that in constructing detailed prior experience controls, Dr. Saad believes this is not *nearly* enough, and that we need to control for experience in every possible prior job *distinguished by the employer for that prior job*. For example, he writes: "Dr. Neumark's

---

[56] See: Light, Audrey, and Manuelita Ureta. 1995. "Early-Career Work Experience and Gender Wage Differentials." *Journal of Labor Economics*, Vol. 13, pp. 121-54.

[57] See: Sullivan, Paul. 2010. "Empirical Evidence on Occupation and Industry Specific Human Capital." *Labour Economics*, Vol. 17, pp. 567-580.

analysis does not consider the company where an applicant's prior experience occurred. A new hire with five years of footwear design experience working for a direct competitor, such as Adidas, may have more advanced skills than a new hire with the same years of design experience working for a smaller label, or for another large company but in a different industry, such as interior or video game design. The job titles here may be close or even identical; the experience may not." (Saad Report, para. 165.)

87.    The position Dr. Saad takes is simply at odds with how labor economists study the effects of prior experience on pay. Moreover, the position Dr. Saad takes has the direct implication of *ruling out* statistical analysis of the effects of prior job experience on starting pay. The reason is simple. There is one starting pay observation per person (ignoring rehires). In Table 7 of my Report, this implies about 5,000 observations. But there are over 14,000 different prior job titles in the data for these 5,000 observations. Moreover, that figure of over 14,000 does not include separate counts for the different companies at which they worked. Thus, Dr. Saad's position would require separate control variables for prior experience in many tens of thousands of different job titles. But one cannot estimate a regression with more variables than the number of observations. Dr. Saad surely knows this, but refuses to acknowledge that what he is arguing is that statistical analysis of pay disparities generally, or starting pay disparities specifically, is impossible. Literally thousands of labor economics papers by hundreds of labor economists, with wage regressions including prior experience controls, would disagree.

88.    Second, although Dr. Saad criticizes what I do, he presents no alternative analyses that use the data on prior job titles in a different way, and thus presents no evidence that undermines my conclusions.

53

89.     I now address Dr. Saad's specific criticisms. First, Dr. Saad makes the completely obvious point that having grouped over 14,000 job titles into a small number of clusters, some job titles do not look like good matches, whether because the job title appears quite different (Saad Report, para. 154), or because jobs with different adjectives (like with and without "senior") are grouped together. (Saad Report, para. 156.) It is clear from my Report that this method will put together jobs that are not identical, which is necessary as part of the data shrinkage. The question is not simply "Are some job titles in a cluster different," but rather "Do job titles in the same cluster share some similarities, and are they generally more like each other and different from job titles in other clusters?" Indeed, the empirical methods used to create the clusters, described in my Report, impose exactly the latter condition on the data – grouping together more similar clusters. Dr. Saad cherry picks some job titles that do not match well, but he does not acknowledge in any way that job titles within clusters are more similar than job titles across clusters. And that is the whole point of the method – to group similar jobs, but in a feasible approach that captures some richness of differences in prior jobs, while still allowing a meaningful statistical analysis of the discrimination claims. It is easy to see that Dr. Saad completely ignores the effects of the clustering method in grouping together job titles with some similarities. For example, consider his Exhibit 22, and the three clusters he presents there as evidence that "clustering methodology does not produce groupings of even remotely similar job titles." (Saad Report, para. 154.) In fact:

a.     Cluster 0 includes: Application Support Specialist, Information Technology Technician, Information Systems Technician, Computer Support Technician, Global Network Architect, Org Digital Activation Specialist, Systems Integration Specialist, among others. These job titles have computer and network applications common to them, and other job

54

titles in this cluster may also share similar technical skills (e.g., Sales Operations Reverse Logistics).

b.    Cluster 9 includes: Social Marketing Practice Intern, Digital Senior Account Executive, Social Media Sports Marketing Chair, Social Media Customer Experience Associate, Social Media Specialist Nike Store, Social Media Intern, and Social Media Copy Editor. These job titles share social media commonalities, and other job titles in this cluster may also share similar skills or roles (e.g., MBA Marketing Intern, Marketing Public Relations Intern, and PR Image Management Intern).

c.    Cluster 19 includes: Comp Artist Graphic Designer, Associated Designer, Assistant Technical Designer Panties and Sex Sleepwear, Brand Design Producer, Retail Store Design Intern, Designer Retail, Sponsored Senior Design on D Printing Bras, EQ Material Designer and Developer, Designer Intern, Intern Graphic Designer, Senior Designer Brand Design, Lead Computer Graphics Artist, Design Assistant, Graphic Designer Copywriter, Nike NA Retail Design D Designer Visualizer, Tech Design Intern, Graphic Designer Contract Logo Identity, VP Design Merchandising, Lead Senior Designer, Graphics Apps Planner, Contract Visual Interaction Designer, Senior Designer Developer Apparel Soft Goods, Production Designer, Founder Designer Reluctant Entrepreneur, Brand Design Intern, and Workplace Designer. These job titles all share design elements that support my clustering strategy.

d.    To be sure, one can also see another set of related job titles in this cluster related to different kinds of specialists. But just because sometimes there is more than one type of job in a cluster, does not imply, as Dr. Saad argues, that my "'control' for prior experience is worthless, and serves only to inject statistical noise…" (Saad Report, para. 156.) At worst, having two or three types of jobs grouped into one cluster could lead to some error in estimating

55

the different effects of experience in these types of jobs. But many different jobs may in fact have similar effects of prior experience. And Dr. Saad has not presented *any* evidence to back up his assertion that my prior experience controls do not help explain variation in starting pay and instead simply inject noise. In fact, in my estimates of the effects of prior experience in these clusters are usually statistically significant predictors of variation in starting pay, with the positive effects of experience predicted by human capital theory.

90.    Going beyond the three clusters Dr. Saad highlights and based on the data as I now use them, I list 30 sampled jobs from all 20 clusters that I use. Looking across all of the clusters, I find a good deal of clustering of related job titles, although of course, by the nature of the exercise, there will be some job titles that do not fit well in the clusters. I show this in the set of panels in Table D2:a-d in Appendix D of this Report.[58] In the panels of Table D2, I list the

---

[58] To construct these panels, like Dr. Saad, I sampled 30 job titles from each cluster. However, whereas Dr. Saad did simple random sampling, I drew representative samples of job titles from each cluster based on the number of observations on a job title in the cluster. To clarify what this means, note that Dr. Saad claims that his "Exhibit 22 … shows 30 scientifically randomly selected prior job titles in three of Dr. Neumark's aggregated clusters." (Saad Report, para. 154.) He does not define what he means by "scientific," but his method is anything but scientific. The goal here is to assess how much job titles within clusters are similar. To do this, one would clearly want to look at a *representative* set of job titles in each cluster. A "representative" sample means the sample reflects the proportions of people (or other objects studied), and people of different types, in the data. In other words, if Job Title A shows up for 100 observations in a cluster, and Job Titles B, C, D, E, and F each shows up 1 time, we would want to sample from the 105 job titles made of 100 A's, 1 B, 1 C, 1 D, 1 E, and 1 F. Dr. Saad, instead, samples from 6 job titles made up of 1 A, 1 B, 1 C, 1 D, 1 E, and 1 F. This non-representative sampling will necessarily put too much weight, or emphasis, on job titles that show up very rarely – and indeed a huge percentage (85%) of job titles show up only *one* time. Thus, I instead sample job titles from each cluster based on the actual sample of job titles, which reflects how many times they appear in the data. I performed this exercise on the updated list of clusters, in which I included a frequency variable for the titles. These clusters are not identical to the ones in my Report or the ones Dr. Saad sampled from, but they are created using the same machine learning process.

56

sampled job titles based on randomly sampling 30 job titles in each cluster.[59]  I have also assigned, in the first row of each column, what I regard as the common theme tying together the job titles. In my view, for most of the 20 clusters there is a theme tying together most of the sampled jobs. Moreover, in most cases there are clear differences in these themes *across* the job cluster. Recall that, above, I described as the correct question to ask about the clustering of job titles as: "Do job titles in the same cluster share some similarities, and are they generally more like each other and different from job titles in other clusters?" In my view, the answer is yes. I am confident that any reasonable labor economist with experience doing peer-reviewed research on gender and pay would regard this as a sensible and reliable approach that captures a good deal of richness in prior job experience; I am similarly confident they would reject Dr. Saad's assessment, as do I.

91.     Dr. Saad also notes a few cases where my extensive cleaning of the job titles did not catch every possible anomaly. (Saad Report, para. 163.) I have done additional cleaning, although one must understand that with over 14,000 job titles it is always possible that two apparently different job titles should be the same. As reported in Panel A of Table R10 (above), which is repeated as Panel A of Table R11 (below), this additional data cleaning, coupled with the additional cleaning of university names discussed above, has no material impact on the results, and do not change my results. The conclusion can be stated very succinctly: None of these considerations change the conclusions from my report.[60]

---

[59] Note that for some clusters there are fewer than 30 job titles. That is precisely a reflection of the representative random sampling that I do, as sometimes more common clusters are repeated in the sample of 30.

[60] The results with these cleaned job titles, as already noted, can be compared to Tables 7, 8, 12, and B5 of my Report. There was some additional work to clean the job title data addressing issues explained in *Plaintiffs_Written Response to Nike_s 7-29-21 Email.pdf*. See Appendix B.

92.     Finally, Dr. Saad unsuccessfully attempts to minimize the fact that I present results using prior job titles with a different method, in Table B5, and those results are qualitatively the same as my cluster analysis. In particular, I define prior experience across a large number of unique job titles rather than use clustering of many job titles based on machine learning techniques. Table B5 shows that, when I do this, women receive lower starting pay than men who come to Nike with similar human capital. In my Report, I define prior experience (and its square) across 239 unique job titles. The remaining job titles, which appear in the data fewer than 10 times (and most commonly, as noted above, *once*), get grouped into a catchall category. But note what I am doing compared to the standard labor economics literature, which – as explained above – uses only a single prior experience measure, or not much more detail. I am defining prior experience in over 200 unique types of jobs – a remarkably rich approach, even though Dr. Saad insists that there is no satisfactory approach, advocating instead the completely unrealistic position that we need to measure experience in each different job at each prior employer. That is a prescription to undermine statistical analysis in discrimination cases, not a prescription to get reliable evidence on whether or not discrimination occurred.

93.     Using the unique job title approach, it is true that I have a large catchall category – 70% in my original analysis. Dr. Saad criticizes the size of this "other" category (Saad Report, Para. 25), although he also, at one point in the report, exhibits a misunderstanding of what I have done – claiming that my "most common jobs" approach "is only able to cover 30% of the prior job observations…[t]hat means 70% of applicants' prior job observations are omitted from the analysis. (Saad Report, para. 166.) This is incorrect; all prior job experience is counted. The prior jobs assigned an individual variable each count as the same work experience for employees who held that prior job while jobs in the catchall category are counted as reflecting equivalent prior

58

job experience. Note, that with a "unique job title" approach, there is no established cutoff for how large or small the catchall category must be to provide reliable results for statistical analysis. I maintain that my results remain reliable because they are based a rich approach that applies unique controls for over 200 different jobs most commonly held by Nike hires; they return consistent findings with my other work experience approaches. Nevertheless, to respond to Dr. Saad's argument that the catchall is too large, I re-estimate this "unique job title" model with a lower cutoff for the most common job titles of 7 instead of 10 (see Panel B of Table R11). This re-estimated model assigned indicators for 405 unique job titles – 150 more than the original approach (the catchall category drops to 65%). Even with the large increase in the number unique job titles used, this re-estimated model continues to confirm that prior job experience does not explain the within-Job Cell starting pay gap experienced by women at Nike. Dr. Saad, however, refuses to propose any alternative model because he takes the extreme position that no statistical analysis is possible.

59

**Table R11**

**Starting Pay and Base Pay Analysis Robustness to Lower Cutoff for**
**Prior Experience by Job Title**

Responses to Dr. Saad's Criticisms of Tables 7, 8, and B5 from my Report

|  | Table 7-Col 4 | Table 8-Col 4 | Table B5-Col 2 |
|---|---|---|---|
|  | (1) | (2) | (3) |
| *Panel A* |  |  |  |
| *With Additional Cleaning for Job Titles and University Names; Correction of Highest Degree School* |  |  |  |
| Female Shortfall | **-1.15%** | **-0.99%** | **-1.39%** |
| Std. Deviations | 3.23 | 3.18 | 3.66 |
| Observations | 4,646 | 14,876 | 4,646 |
| Total Observations | 4,880 | 14,965 | 4,880 |
|  |  |  |  |
| *Panel B* |  |  |  |
| *Panel A with Lower Cutoff for Experience by Job Title* |  |  |  |
| Female Shortfall |  |  | **-1.39%** |
| Std. Deviations |  |  | 3.44 |
| Observations |  |  | 4,646 |
| Total Observations |  |  | 4,880 |

Notes: Incorporates additional job title and university name cleaning in response to Dr. Saad's criticisms. Excludes bands V&A and hourly employees. Also combines Senior Manager with Director level. 'Lower Cutoff' version in Panel B defines separate experience variables for each job title with 7 or more observations (405 job titles); the remainder are combined. The 405 job titles capture 35% of all observations. Regression specifications are the same as in original Table 7 Col. 4, Table 8 Col. 4, and Table B5 Col. 2. Reported number of observations are those retained by the high-dimension fixed effects estimation procedure. Full regression samples are as indicated by 'Total Observations.'

## IX. DR. SAAD'S ANALYSIS OF INITIAL JOB ASSIGNMENT RELIES ON USING POTENTIALLY TAINTED INFORMATION ON JOB LEVELS APPLIED TO, WHICH WOULD BIAS RESULTS TOWARDS FINDING NO GENDER SHORTFALL.

94. My Report showed that women start at lower Job Levels at Nike, even when they come to Nike with similar human capital and are hired in the same Job Family (Table 12 of my Report). This hiring of women at lower Job Levels, as well as their lower promotion rates, generate an initial and widening gap in the Job Levels at which women at Nike work relative to otherwise similar men. As my Report noted, this is why the female pay shortfall is larger in

60

models that control for Job Subfamily but not Job Level (via the inclusion of Job Subfamily-Job Level interactions); compare the estimates in columns (2) and (4) of Table 2 in my Report.

95.    Dr. Saad in no way disputes the conclusions of my analysis showing that women are hired into lower Job Levels within the same Subfamily, compared to men with similar human capital. He also confirmed this in his deposition. (Saad Dep. 277:10-14.) However, Dr. Saad tries to explain this fact away by claiming that women chose to apply to lower level jobs than did men with similar human capital, and that this explains why women were *hired* at lower level jobs. But the jobs to which women and men applied were influenced by Nike's recruiting procedures, and hence could generate a bias toward finding no gender shortfall in job level at hiring. In other words, the variable that captures the levels to which women and men may have applied, which suggests women apply to lower Job Levels, could well be tainted.[61]

---

[61] The tainted variables problem is well known in econometrics; it is often called the problem of "bad controls." As explained by Angrist and Pischke (2009), "Bad controls are variables that are themselves outcome variables in the notional experiment at hand. That is, bad controls might just as well be dependent variables too." The "notional experiment" – in the present case – is whether the worker is female or male, and how this affects outcomes at Nike. To illustrate, I quote the example they use in full: "[S]uppose we are interested in the effects of a college degree on earnings and that people can work in one of two occupations, white collar and blue collar. A college degree clearly opens the door to higher-paying white collar jobs. Should occupation therefore be seen as an omitted variable in a regression of wages on schooling? After all, occupation is highly correlated with both education and pay. Perhaps it's best to look at the effect of college on wages for those within an occupation, say white collar only. The problem with this argument is that once we acknowledge the fact that college affects occupation, comparisons of wages by college degree status within an occupation are no longer apples-to-apples comparisons, *even* if college degree completion is randomly assigned." See: Angrist, Joshua, and Jörn-Steffen Pischke. 2008. Mostly Harmless Econometrics: An Empiricist's Companion. Princeton, NJ: Princeton University Press.

This problem is common in the analysis of discrimination, whether looking at starting Job Levels or at other outcomes. For example, in the present case, my evidence indicates gender discrimination in the Job Levels at which women are hired, and to which they are promoted. The implication would be that a pay discrimination regression that controls for Job Levels (via interactions with Job Level, in my case) faces the problem of "bad controls" leading to an estimate of the contribution of discrimination to the female pay shortfall that is too small.

96.     Dr. Saad understands the potential problem from including as a control variable a variable that is itself potentially influenced by discrimination:

> "Q. And why is it important to exclude tainted variables when you're analyzing data related to discrimination?
>
> A. If, to take your hypothetical, if a particular explanatory factor is itself determined by some sort of adverse treatment or adverse impact, or what have you, if you want to use the word discrimination, I believe that's a legal word, but that explanatory factor is itself influenced in some way according to gender, then using it to explain another outcome may, in fact, simply – it would be relying upon a variable that is not neutrally determined with respect to the ultimate question, which is whether there are gender differences."

(Saad Dep. 262:12-24.)

97.     Yet, despite reviewing both my report and Dr. Lundquist's report where both discussed these potential sources of bias in the recruiting process, Dr. Saad was uninterested in Nike's procedures that could make job level applied to a tainted variable. He even said: "… I didn't want to understand the application process generally." (Saad Dep. 264: 20-21.)[62] Because Dr. Saad does not present any evidence disputing the possible injection of bias into Nike's application process due to various ways Nike recruiters affirmatively affected who applied for jobs, including in some situations applying on behalf of the candidate (Lundquist Report, p. 41-42), I reject Dr. Saad's attempt to apply a control for level applied for and continue to stand by my initial job assignment analysis and its findings of statistically significant female disparities in starting job level.

---

[62] As further evidence, he denied the importance of understanding these procedures: Q: … Dr. Lundquist makes a representation that there's a software system called Avature that recruiters can use to solicit potential candidates to apply for a position. Did you do anything to verify if that statement was true or false? A. Of course not. I'm looking – all I am looking at is the level of a job present in the data in the application materials that applicants would be – have access to." (Saad Dep. 266:24-267:8.)

62

## X.    THERE IS NO DISPUTE OVER THE FACT THAT WOMEN RECEIVE LOWER MERIT PAY INCREASES BECAUSE THEY ARE IN LOWER JOB LEVELS, WHICH CAUSES THE FEMALE PAY GAP TO PERSIST.

98.    In my Report, I make a very simple conclusion about merit pay increases – that women in the same Job Subfamily and Job Level as men do not receive lower merit pay increases, but that women receive lower merit pay increases *because* they are in lower Job Levels on average. Thus, the evidence I documented regarding lower promotions and lower starting Job Levels for women imply that these latter effects imply they receive lower merit pay increases. Dr. Saad may disagree with me about whether discrimination plays a role in the lower starting Job Levels of women, and whether they receive promotions at a lower rate than men and thus promotions discrimination contributes to lower merit pay increases for women. As I have shown, however, my promotion results and conclusions are robust to Dr. Saad's criticisms, and he has not provided any compelling evidence that discrimination does not play a role in the lower Job Levels at which women start at Nike.

99.    Although Dr. Saad notes that my merit pay regressions for the log of merit pay in the models accounting for Job Level point to larger merit pay increases for women (Saad Report, para. 35), he fails to note that this clearly does not materially reduce the overall pay gap for women given my findings of on the female pay shortfall in class period pay. In other words, the overall female pay gap persists despite how Nike awards annual base pay merit increases.

## XI.    A DISAGGREGATED ANALYSIS, WHILE MUCH LESS INFORMATIVE, STILL SUPPORTS THE CONCLUSION OF A PATTERN OF PAYING WOMEN LESS THAN MEN DOING SUBSTANTIALLY SIMILAR WORK.

100.    As discussed above, Dr. Saad argues – without basis – that an Equal Pay claim requires an isolated job by job analysis. I in no way endorse that view. An aggregated model is appropriate when an analysis that cuts the data into small cells leads to inaccurate results. In general, disaggregating the data will make it hard to determine, statistically, what the data tell us.

63

Of course, my aggregated model controls for Job Cells (interactions between Job Subfamilies and Job Levels), which implies that the gender pay gap is identified, in the data, based only on earnings differences between women and men in the same Job Cell.

101.    The argument against a disaggregated approach is that when we divide the data into small samples of observations, there is a very high probability that the data will generate the opposite sign from the truth. That is exactly the reason why with very small numbers of observations in a job cell, there is a low likelihood of finding statistically significant evidence, and a fairly high chance of getting the wrong sign. Thus, it is no surprise that when Dr. Saad considers very small job cells he often finds no pay disparity against women: many of these Job Codes are so sparsely populated that they would not show a negative pay shortfall for women even if Nike discriminates against women.

102.    Here is an example that illustrates this point, and demonstrates the value of aggregating the data. Suppose I have a coin that has a 0.55 probability (55%) of coming up heads rather than tails. I want to construct a sample of coin tosses to test whether the coin is fair (50-50 probability of coming up heads), or "unfair," e.g., biased toward heads.

      a.    I first do this with one sample of 1,000 coin tosses. The probability of getting more coin tosses that come up heads than tails is > 0.999, given that the true probability of heads for this coin is 0.55. That is, it is virtually certain that the unfair coin that is *biased* to come up heads *will* come up heads more often in the data.

      b.    Suppose now I split the sample of 1,000 tosses into 10 subsamples of 100 coin tosses in each, and then evaluate the data for each subsample. For each sample of 100 coin tosses, the probability of getting more coin tosses that come up heads than tails is 0.817. That is,

64

it is still very likely that the unfair coin that is *biased* to come up heads *will* come up heads more often.

c.      Suppose now I instead split the sample into 100 subsamples of 10 coin tosses in each. For each sample of 10 coin tosses, the probability of getting more coin tosses that come up heads than tails is only 0.504. In other words, in *nearly half* of the subsamples I will fail to find more heads than tails, even though we *know* the coin is unfair. The numbers are summarized in the table below:

**Examples of Loss of Precision from Excessive Disaggregation of Data**

| Number of samples | Number of observations in sample | Probability that, in each sample, coin with P("heads") = 0.55 comes up "heads" more than "tails" |
|---|---|---|
| 1 | 1,000 | >0.999 |
| 10 | 100 | 0.817 |
| 100 | 10 | 0.504 |

d.      This is a vivid illustration of how disaggregating the data, and then evaluating the data separately for each small sample into which the data are disaggregated, can hide evidence of a systematic difference in behavior – whether an unfair coin in my example that is rigged to come up heads more than tails, or an unfair pay process at Nike that pays women less than men.

e.      Dr. Saad argues that this kind of coin toss example is "completely off point" because in an example like this, the coin has the same underlying probability of coming up heads in every sample. (Saad Report, footnote 42.) But he misses the point. He advocates using a disaggregated model to see if the aggregated model provides misleading evidence. My coin toss example pertains to this directly, because it illustrates how when the true effect is the same in each sample, disaggregated results can still give evidence suggesting that it is not the same.

65

103.    Note that the problem is particularly severe in the case of Nike, because the number of Job Cells is so high (nearly 1,000), so that many of these cells have a very small number of observations.[63] Dr. Saad fully recognizes that a disaggregated analysis cannot be informative about many job cells. In his analysis, using Job Codes, he imposes a rule that takes him from an aggregated model using all the data on over 1,000 Job Codes, to Job Code by Job Code models estimated for 138 Job Codes.

104.    I thus maintain that my aggregated multiple regression analysis is the appropriate method to analyze the available data and those results are reliable and robust. However, to respond to Dr. Saad's disaggregated analysis, I show below that a disaggregated model can still generate results that confirm my aggregated model's conclusion that Nike pays women less than men for doing similar work.

105.    In my analysis, described below, I conduct a disaggregated multiple regression analysis, but make several corrections to Dr. Saad's approach.

106.    First, like I did for my aggregated multiple regression analysis above, I use my corrected class definition data (but maintaining my exclusion of Bands V and A), the full set of data from August 2015 to August 2019. I also estimate my model for each unique Job Subfamily-Job Level pair, corresponding precisely to the Job Cells in my aggregate model.[64] Unlike Dr. Saad, I do not include unvested equity in this analysis and instead focus on base pay.

---

[63] For example, 83% of Job Cells have 30 or fewer observations, 73% have 20 or fewer, 60% have 10 or fewer, and 45% have 5 or fewer.

[64] I have to exclude two types of these pairs, or Job Cells. First, there are some of the job cells for which there are only women or only men. I obviously cannot estimate a gender gap for these cells. There are also job cells for which I cannot estimate gender differential because there are so few observations that other control variables in the model completely account for the difference between women and men. For example, suppose I had an education control indicating whether or not a person had a college degree. And suppose that, as could happen in a cell with few

66

107.    Second, for the job cells for which I can estimate a gender gap, I focus attention on those that provide a reasonably precise estimate. In particular, I focus only on Job Cells for which the 95% confidence interval is sufficiently small that it would identify as statistically significant, at the 5% level, a gender pay gap of +/−4%. (In other words, an estimate of 4% or larger, in either direction, would represent a difference of 2 or more standard deviations.) Given that the actual estimated gender gap is in the 2% range, this restriction excludes Job Cells for which an estimated gender gap up to about twice as large as the aggregate estimate could not be detected as statistically significant.

108.    The criterion I use takes account of two things: what effect size we would like to be able to detect as statistically significant; and the precision of the data regarding such an effect size. For example, suppose an estimate for a particular Job Cell could only find a female pay shortfall of 10% or more to be statistically significant at the 5% level, because the precision of the estimate was low.[65] Such a Job Cell would be uninformative about the kinds of magnitudes of interest in this case. Specifically, if my aggregate model estimates a female pay shortfall of, say, 2% (and some of my estimates are smaller), there is no way we can get reliable information on whether this result holds up in a disaggregated model for Job Cell with precision this low. This is standard statistical knowledge covered in any undergraduate statistics course. And Dr. Saad recognized this point explicitly in his deposition.[66]

---

observations, all women have a college degree and no men have a college degree. Then once I control for college degree there is no remaining variation by gender.

[65] In particular, the standard error of the estimate for the coefficient on female in the log pay equation was 0.051 (for a Job Cell with enough observations to use the normal distribution).

[66] When asked about an appropriate sample size to use for analysis, he said one would look at "the amount of variation" and "what is the size of the difference you are trying to estimate and is it meaningful." (Saad Dep. 93:5-19.) Regarding the second point, he goes on to say that he is not sure it is meaningful because one is just comparing two means; but that is in fact irrelevant and

67

109.    Dr. Saad, when reporting regression results by Job Code (which is what he uses) in Exhibit 10, instead uses a rule, which as best I can tell he simply made up, of only estimating a pay regression for Job Codes (which is what he uses) with at least 30 observations, and at least 5 men and 5 women across all the years of the data. There is, in fact, absolutely *no* basis for this rule. In his deposition, Dr. Saad asserted that "30-5-5 is not an atypical approach in terms of rules of thumb in statistics." (Saad Dep. 123:20-21.) Yet he could not cite any specific source for this rule, particularly any labor economics peer-reviewed literature. (Saad Dep. 124:19-125:17.) All he could say was "there are, in statistics, not in labor economics, per se, sample sizes or what's called population sizes, because they're not samples, they are actually populations of all people and all people of years in these Job Codes, that a population size or an analytical number of observations of 30 is sufficient to allow one to do reasonable statistical inference. Having fewer observations than that may cause you to violate some of these assumptions underlying types of statistical tests performed to draw inferences on such a sample." (Saad Dep. 124:25-125:9.) Here, Dr. Saad acknowledges his own confusion and the incorrect application of his "30-5-5" rule to how large a sample one needs to estimate a regression. The "30" rule he is referring to is the general rule that for many statistical tests (including for the statistical significance of a regression coefficient), one has to use a t-distribution for samples less than 30, whereas for samples larger than 30 the normal distribution provides a near perfect approximation.[67] This 30

---

these considerations apply to what sample size one would like – when one has a choice – for any statistical test.

[67] Beals writes: "[T]hey are so close for samples of more than 30 that the differences can be ignored." And: "[T]he *t*-distribution is seldom tabled for more than 30 degrees of freedom because it is so close to the normal when samples are larger than 30." (See: Beals, Ralph E. 1972. Statistics for Economists: An Introduction. Chicago: Rand McNally and Co., p. 192.)

68

rule has nothing to do with how large a sample has to be to reliably estimate regression.[68] Finally, I noted earlier that I used a rule based on a meaningful effect size as well as sufficient precision to detect that effect size. In his deposition, Dr. Saad acknowledged that his "30-5-5" rule did not consider either a minimum level of precision or the effect size in question." (Saad Dep. 126:5-24.)

110.    Moreover, in Exhibits 11 and 12, in which he reports his key claim that only a slight majority of women are in Job Codes where women earn less than men, he also includes Job Codes where he cannot run a regression but only computes a Wilcoxon Rank-Sum test (which tests for whether the overall distribution of observations for women is below that of men).[69] Including these Job Codes makes no sense, as for these Job Codes there are no control variables for other differences between women and men, despite these controls being in the aggregate model, and the disaggregated regression models.[70] Because of the lack of controls, Dr. Saad's report acknowledges that one cannot accept on face value any results with statistically significant coefficients and instead, must examine the job cells further to eliminate a job-related reason for the result (Saad Report, Para. 99). Yet, in his deposition, Dr. Saad concedes he did not

---

[68] Note, also, that there is no connection between the 30 rule of thumb Dr. Saad tries to invoke here and the 30 job titles Dr. Saad samples from different clusters, discussed in Section VIII of this Rebuttal. The latter was simply a number he chose from the much larger number of possible job titles, to examine a smaller set.

[69] This a large number of the total Job Codes covered in Exhibits 11 and 12. His Report says that he uses the results of the Rank-Sum test for 500 Job Codes (para. 99), and the results of regression analyses for only 138 Job Codes (para. 100).

[70] Dr. Saad acknowledges that very many Job Codes in his analysis for which he uses the Rank-Sum test in Exhibits 11 and 12 have no control variables. (Saad Dep. 136:21-25.)

69

perform these investigations and made no conclusions about these Wilcoxon test results other than "categorizing the nature of the outcome" (Saad Dep. 143:1-144:18.)[71]

111.    Figure R2 below shows the estimated gender gaps for the Job Cells for which I estimate a separate pay regression, of which there are 62, looking at base pay. Each bar in these graphs can be measured relative to 0. A negative estimate (below 0) indicates a female pay shortfall. The bars are color coded. Red bars are negative (i.e., women are paid less) and green bars are positive. In addition, I shade the estimates more darkly if they are statistically significant at the 5% level (greater than 2 SDs). Finally, the widths of the bars are proportional to the number of observations on women in the Job Code; these numbers range from 4 to 499. A wider bar indicates more observations on women. This is important, because we can learn the most about the estimates that cover many women.

---

[71] Note that Dr. Saad includes his Wilcoxon Rank-Sum results in Exhibits 11 and 12, but fails to separately report those results from his disaggregated regression analysis, leaving the reader to guess which results pertain to which analysis. This is particularly problematic given Dr. Saad's admission that he draws no conclusions from the Wilcoxon test results.



112.	Figure R2 shows that far more of the estimated gender pay gaps by Job Cell are negative. In addition, the negative job cells are generally wider, representing more women. And finally, there are almost no positive and significant estimates, but quite a few negative and significant estimates.

113.	Figure R3 makes this point another way, providing a pie chart that shows the percentages of observations on women in each type of Job Code: negative (i.e., women are paid less) and statistically significant at the 5% level (greater than 2 SDs); negative, but fewer than two SDs; positive, but fewer than two SDs; and positive and statistically significant at the 5% level (greater than 2 SDs). The figure shows that 62.5% of women are in job cells where women are paid less than men (taking into account legitimate job-related factors). Moreover, 17.7% of women are in job cells where the estimated female pay shortfall is negative and statistically

71

significant (2 or more SDs), despite doing a highly disaggregated analysis by its very nature kills

off statistical significance. In contrast, virtually no job cells (representing only 42 observations

on women across the years), had a statistically significant result in the opposite direction.[72]  Note

that this latter result is important. Only if an estimated pay difference for women in a Job Cell is

statistically significant at the 5% level and *positive* can we rule out with 95% confidence a

negative pay difference (i.e., a female pay shortfall) for a Job Code. And this virtually never

happens.[73]

---

[72] Dr. Saad's Exhibits 11 and 12 give a quite different impression. But these Exhibits are based on model that has all of the other flaws this Report identified: discarding the first two years of the data; using unvested equity; using Job Codes instead of Job Cells (Job Subfamily x Job Level interactions); including some workers in V and A bands; including Job Codes for which he only computes the Wilcoxon Rank-Sum test, etc.

[73] That is, if a particular value is *not* contained within the 95% confidence interval, then the estimate is statistically significantly different from that value at the 5% level or less. Thus, only when an estimated female pay gap for a Job Cell is *positive* and statistically significant can we rule out the hypothesis (at the 5% significance level) that women in that Job Cell are paid less than men.

Neumark Decl. Ex. B, Page 75 of 99



Figure R3
Base Pay Regression by Job Cell
Weighted by Female Employee Years

Note: Based on regression of log base pay by job cell.
Restricted to job cells for which a gender gap of +/-4% would be significant.
Uses corrected class definition. See notes to Tables R1 and R2.

114.    Compounding his error in advocating for a disaggregated analysis related to Plaintiffs' EPA claims, Dr. Saad also criticizes my statistical analysis for not conducting a disaggregated pay analysis based on Nike "decision-makers," which he contends is required to prove Plaintiffs' alleged Title VII and Oregon anti-discrimination claims. (Saad Report, paras. 7, 18, 110.)

115.    As discussed above (Section IV), Dr. Saad bases this alternative "manager+1" analysis on apparently a legal opinion of what is required by the Supreme Court's decision in *Wal-Mart v. Dukes*. This counter-analysis likely lacks a legal basis based on understanding shared with me by Plaintiffs' counsel. It also lacks a factual basis as the available evidence and expert opinion about "decision-makers" on merit increases and bonuses indicates Nike executives and not "manager+1" make those final pay decisions, which Dr. Saad acknowledges

73

he did not fully study.[74] While Dr. Saad accuses me of assuming commonality and then applying a model to confirm that assumption, it is Dr. Saad who actually assumes a dimension of variation ("manager+1") and then constructs a flawed statistical model to confirm that assumption.

116.    Dr. Saad's "manager+1" analysis also suffers from the same methodological errors (i.e., improperly disaggregating, using the wrong data set, using erroneous sampling criteria, and using uninformative/flawed Wilcoxon rank sum and averaged pay difference analyses) that render his other disaggregated statistical analysis unsound as outlined above. Even with these significant errors, note that Dr. Saad still finds (in his Exhibit 17) that almost two-thirds of putative class members report a female pay gap compared to men doing substantially similar work, which is consistent with my aggregate findings of statistically significant within-Job Cell pay gap. Moreover, Dr. Saad's approach minimizes the estimated gender pay gaps relevant to the Title VII and Oregon anti-discrimination law claims, by improperly including controls for Job Code. As my Report showed and this Rebuttal confirms, there are gender disparities in promotions and starting Job Level that greatly increase the female pay shortfall (see Table R6, columns (2) and (4)).

117.    Because Dr. Saad's disaggregated "manager+1" analysis is both flawed and unhelpful, I maintain that my aggregated model presents relevant and strong evidence that Nike discriminates against women in pay based on sex.

---

[74] Note, Dr. Saad admits at his deposition that his "manager+1" analysis/critique only applies to Nike's decisions about base pay, merit increases, bonuses, and equity. Dr. Saad does not contend that a "manager+1" analysis is required for Plaintiffs' other Title VII or Oregon anti-discrimination law claims regarding promotions, starting pay or initial job assignments. (Saad Dep. 191:16-193:11.)

**XII.    DR. SAAD MAKES MANY OTHER SPECIOUS STATISTICAL ARGUMENTS TO TRY TO POKE HOLES IN THE EVIDENCE PRESENTED IN MY REPORT. THESE ARE MISLEADING AND DO NOT UNDERMINE MY CONCLUSIONS.**

118.    Dr. Saad uses Exhibit 5 to try to argue that Job Cells (Job Subfamily-Job Level interactions) do not constitute substantially similar work. One piece of evidence he cites is different pay for people in different Job Codes but the same Job Subfamily-Job Level cell (in the bottom two rows of the exhibit). But there is no reason to think that different pay implies the work is not substantially similar (and the pay difference is not very large). In fact, my regression models including controls for other factors that can explain pay differences within Job Subfamily-Job Level cells. Moreover, Dr. Saad did not bother to check whether the reported pay for various positions in Exhibit 5 or any other of his illustrative comparisons were within the uniform pay ranges Nike itself used to identify appropriate pay for similar work.[75] Second, Dr. Saad claims that "Data Scientist" is a very different job from "Business Data Analytics." He says, specifically: "For Job Code A2898 (Data Scientist), an advanced quantitative degree in statistics, mathematics, or computer science up to a Ph.D. is required with strong technical skills in Python, R, or other data science languages. In Job Code A2908 (Business Data Analytics), an MBA or unspecified advanced degree is preferred with experience in market research and business intelligence. These differences in job prerequisites suggest non-interchangeable job duties even though those Job Codes share the same Job Subfamily-Level." (Saad Report, para. 81.) I do not know the basis of this assertion, but it clearly is not generally true. To name but three examples I was able to find with two minutes of research: the MIT Sloan School of Management advertises a "Master of Business Analytics: A 12-month program focused on

---

[75] Saad Dep. 89:9-19.

75

applying the tools of modern data science…;"[76] UNC Charlotte offers a "Master of Data Science and Business Analytics;"[77] and Michigan State University's Broad College of Business offers a "Master's in Business Data Science and Analytics."[78] Thus, neither piece of evidence Dr. Saad offers in Exhibit 5 do anything to establish that we need to go beyond Job Cells (Job Subfamily-Job Level interactions), and rather use Job Codes, to capture substantially similar work.

119.    Dr. Saad uses Exhibit 24 to try to argue that men under-report their prior job experience more than women do. (Saad Report, para. 188.) This argument is flawed for several reasons. First, the sole study upon which Dr. Saad relies for the proposition that men under-report prior job experience, in fact, concluded the opposite – that women under-report their prior job experience (not men).[79] Second, Dr. Saad cites to the larger gap between age and prior experience for men than for women (although it is only 0.52 years) for his argument; this proves nothing about under-reporting, however, because it does nothing to compare actual experience worked with what people report. He purports to address this problem by comparing prior experience reported in the Nike applications (Taleo data) to prior experience from employees' LinkedIn pages (for 87 employees out of 100 chosen randomly, for whom he could find LinkedIn profiles). All he shows here, in Exhibit 24, is that the gap between LinkedIn and Taleo prior experience grows with age. He then says that since men are older, this gap must be larger for men than for women. This begs the obvious question: with the Taleo and LinkedIn data in hand, why not just estimate the gender gap in this difference? Because he did not to this, Exhibit

---

[76] See: https://mitsloan.mit.edu/master-of-business-analytics.

[77] See: https://dsba.charlotte.edu/.

[78] See: https://broad.msu.edu/masters/business-data-science-analytics/.

[79] See: Jovanovic, Boyan. 1979. "Job-Matching and the Theory of Turnover." *Journal of Political Economy*, Vol. 87, p. 973.

24 offers no evidence on whether women under-report their experience relative to men.[80] (Of course, it is not clear we would want to conclude anything from 87 observations anyway.)

120.    Dr. Saad tries to raise doubts about the analysis for the subset of the data with matched information on applications. (Saad Report, para.'s 193-198.) He claims that because there are some differences in average characteristics of women and men in the full sample and this matched sample, my estimates are not representative of the larger class and hence are unreliable; in other words, he insists that his analysis implies that my estimates for the matched subsample are biased. Dr. Saad fails to understand the issue selection of a sample and whether this generates bias in regression estimates. In particular, differences in characteristics between a subsample and the larger sample do not imply bias, because the same characteristics he examines are included as control variables in my models. This is the issue of "selection on observables," and it is well-known that non-random sample on a variable or set of variables on which one conditions (i.e., controls for) in a regression does not create bias.[81] Thus, Dr. Saad's analysis does nothing to establish that estimated gender gaps for the subsample of the data with matched applications are biased.

121.    Dr. Saad presents a statistically invalid argument, based on Exhibit 8, to try to argue that my aggregated regression model fails to establish a negative pay shortfall for women. In Exhibit 8, he uses his model and sample (the ones that generate the −1.33% shortfall in Table R2-1, column 5) – putting aside the fact that his model and sample choices lead to an understated female pay shortfall. He then re-estimates the model excluding the female dummy variable, and

---

[80] Moreover, one would want to do this comparison controlling for all of the other variables in the model for which prior experience is used, since if these other controls account for the reporting difference, there would be no bias from this alleged under-reporting.

[81] See: Goldberger, Arthur S. 1991. A Course in Econometrics, Cambridge, MA: Harvard University Press, pp. 146-7.

77

plots a point for each woman's pay relative to the value predicted by the regression model. (Saad Report, Para. 90.) He concludes: "If adverse outcomes were more common for women, a disproportionate amount of the weight of the scatter of dots would be below the line rather than above it. Visually that does not seem to be the case." (Saad Report, para. 91.) This is an absurd and uninformative conclusion, for a number of reasons.

a.      First, and most obviously, *we already know* that the underlying regression model with the female dummy variable included indicates a statistically significant, at the 5% level, −1.33% pay shortfall for women. So what could Saad's purported "visual test" possibly add to this?

b.      Second, Dr. Saad seems to be suggesting that because there is variation in data points around the regression line, the regression is somehow uninformative or misleading. But anyone who understands regression also understands that we are fitting a line to data points, and the regression model will not exactly predict every point; if it did, the R2 would equal 1, which it never does, and usually falls well short of 1 with individual pay data. In addition, the test of statistical significance already accounts for how much unexplained variation there is; if there were too much variation to be sure that the estimated −1.33% shortfall were different from zero, the estimate would not be statistically significant.

c.      Third, since we already know – as acknowledge by Dr. Saad's estimates – that the female dummy variable belongs in the regression equation, the estimates without this variable are biased (omitted variable bias).

d.      Fourth, note that Dr. Saad's plotting symbols are quite thick. Pick a vertical line on the graph – say through $200,000. Given that, on that vertical line, there is just a

78

sea of blue both above and below the regression line, we cannot possibly even "see" whether there are more points above or below the line.

122. In short, Dr. Saad is offering confusion, not illumination. The only meaningful figure would be the one based on the actual regression model. This figure would plot actual vs. predicted compensation, and show the gender difference implied by the regression model, in the form of a lower predicted line for women than for men. How much lower? By exactly the 1.33% shortfall estimated by the regression.

### XIII.    CONCLUSION

123. Despite Dr. Saad's numerous critiques and handful of alternative analyses, I find his arguments unpersuasive or invalid. Accordingly, I stand by my Report's conclusions that there is compelling statistically significant evidence of female disparities relating to pay, promotions, and initial job assignments at Nike, and that this evidence is strongly consistent with sex discrimination.

The Rebuttal is submitted on November 29, 2021.

_David Neumark_

79

**Appendix A: Materials**

**Nike Related Data/Documents**

*12-30-19 Letter Transmitting Data Production.pdf*

*Letter from F. Davis to B. Goldstein* dated March 14, 2021

NIKE_00030274

NIKE_00033429

NIKE_00033457

NIKE_00033463

NIKE_00033421

NIKE_00015689

Exhibit 626, PLF000010-63

*Deposition of Shelli White*


**Expert Related Documents and Data**

*Expert Report and Backup Materials of David Neumark, Ph.D. in the matter of Cahill et al. v. Nike, Inc.*, August 5, 2021

*Expert Report and Backup Materials of Ali Saad, Ph.D. In the Matter of Kelly Cahill,* Sara Johnston, Lindsay Elizabeth, and Heather Hender, individually and on behalf of others similarly situated, Plaintiffs, v. NIKE, Inc., an Oregon Corporation, Defendant, October 1, 2021

*Plaintiffs_Written Response to Nike_s 7-29-21 Email.pdf*

*Expert Report of Dr. Kathleen K. Lundquist in Cahill, et al. v. Nike, Inc.*, July 15, 2021.

*Deposition of Dr. Ali Saad*, October 27, 2021 and Errata Sheet dated November 19, 2021

Supplemental Expert Report of Ali Saad, *Antoine v. The School Board of Colliert Cnty., FL*, 2019 WL 3239837 (M.D. Fla, Apr. 12, 2019)

*Uncorrected Starting Pay Analyses.xlsx* (Saad backup production)

*Uncorrected Starting Pay Analyses - OUTPUT.pdf* (Saad backup production)

80

*Build Equity.sas* (Saad backup production)

*equity.sas7bdat* (Saad backup production)

*nikepspcombined_all.sas7bdat* (Saad backup production)

*snapshots_201207_201909.sas7bdat* (Saad backup production)

*Add RE Variable to Neumark Incumbent Data.sas* (Saad backup production)

*school_name_mismatch.do* (Saad backup production)

*Starting Pay Analyses.sas* (Saad backup production)

*Build Promotions Corrected.sas* (Saad backup production)

*Build Promotions Corrected - OUTPUT.pdf* (Saad backup production)

## Labor Economics and Econometrics Research

Ahuja, Sarthak, Joydeep Mondal, Sudhanshu Shekhar Singh, and David Glenn George. 2017. "Similarity Computation Exploiting the Semantic and Syntactic Inherent Structure Among Job Titles." *International Conference on Service-Oriented Computing*, pp. 3-18.

Angrist, Joshua, and Jörn-Steffen Pischke. 2008. Mostly Harmless Econometrics: An Empiricist's Companion. Princeton, NJ: Princeton University Press.

Baker, Scott R., Nicholas Bloom and Steven J. Davis. 2016. "Measuring Economic Policy Uncertainty." *Quarterly Journal of Economics*, Vol. 131, pp. 1593-1636.

Bao Hongchang, Christopher Baker, and Anil Adisesh. "Development of the ASOC (Automated Semantic Occupation Coding) Algorithm." Forthcoming in *JMIR Formative Research*.

Bayard, Kimberley, Judith Hellerstein, and David Neumark. 2003. "New Evidence on Sex Segregation and Sex Differences in Wages from Matched Employer-Employee Data." *Journal of Labor Economics*, Vol. 203, pp. 887-922.

Beals, Ralph E. 1972. Statistics for Economists: An Introduction. Chicago: Rand McNally and Co.

Beller, Andrea H. 1979. "The Impact of Equal Employment Opportunity Laws on the Male-Female Earnings Differential." In Women in the Labor Market, edited by C. Lloyd, E. Andrews, and C. Gilroy. New York: Columbia University Press, pp. 203-30.

Born, Benjamin, Michael Ehrmann and Marcel Fratzscher. 2013. "Central Bank Communication on Financial Stability." *The Economic Journal*, Vol. 124, pp. 701-734.

Brown, Charles. 1982. "The Federal Attack on Labor Market Discrimination: The Mouse That Roared?" *Research in Labor Economics*, Vol. 5, pp. 33-68.

Burn, Ian, Patrick Button, Luis Felipe Munguia Corella, and David Neumark. "Does Ageist Language in Job Ads Predict Age Discrimination in Hiring?" Forthcoming in *Journal of Labor Economics*.

Chae D.H., Clouston S., Hatzenbuehler M.L., et al. 2015. "Association between an Internet-Based Measure of Area Racism and Black Mortality." *PloS ONE*, Vol. 10: e0122963.

Chay, Kenneth Y. 1998. "The Impact of Federal Civil Rights Policy on Black Economic Progress: Evidence from the Equal Employment Opportunity Act of 1972." *Industrial and Labor Relations Review*, Vol. 51, pp. 608-32;

Erkens, David H. 2011. "Do Firms Use Time-Vested Stock-Based Pay to Keep Research and Development Investments Secret?" *Journal of Accounting Research*, Vol. 49, pp. 861-894.

Gentzkow, Matthew, Bryan Kelly, and Matt Taddy. 2019. "Text as Data." *Journal of Economic Literature*, Vol. 57, pp. 535-574.

Gentzkow, Matthew, Jesse M. Shapiro, and Michael Sinkinson. 2014. "Competition and Ideological Diversity: Historical Evidence from US Newspapers." *American Economic Review*, Vol. 104, pp. 3073-3114.

Gentzkow, Matthew, and Jesse M. Shapiro. 2010. "What Drives Media Slant? Evidence from U.S. Daily Newspapers." *Econometrica*, Vol. 78, pp. 35-71.

Goldberger, Arthur S. 1991. A Course in Econometrics, Cambridge, MA: Harvard University Press.

Groseclose, Tim, and Jeffrey Milyo. 2005. " A Measure of Media Bias." *Quarterly Journal of Economics*, Vol. 120, pp. 1191-1237.

Groshen, Erica. 1991. "The Structure of the Female/Male Wage Differential: Is It Who You Are, What You Do, or Where You Work?" *Journal of Human Resources*, Vol. 26, pp. 457-472.

Hausman, Jerry, and Daniel McFadden. 1984. "Specification Tests for the Multinomial Logit Model." *Econometrica*, Vol. 52, pp. 1219-1240.

Ikudo, Akina, Julia I. Lane, Joseph Staudt, and Bruce A. Weinberg. 2019. "Occupational Classifications: A Machine Learning Approach." *Journal of Economic and Social Measurement*, Vol. 44, pp. 57-87.

Jochem, Torsten, Tomislav Ladika, and Zacharias Sautner. 2018. "The Retention Effects of Unvested Equity: Evidence from Accelerated Option Vesting." *Review of Financial Studies*, Vol. 31, pp. 4142-4186.

Jovanovic, Boyan. 1979. "Job-Matching and the Theory of Turnover." *Journal of Political Economy*, Vol. 87, pp. 972-990.

Li, Lei, Svetlana Peltsverger, Jack Zheng, and Linh Le. 2021. "Retrieving and Classifying LinkedIn Job Titles for Alumni Career Analysis." SIGITE, pp. 85-90.

Light, Audrey, and Manuelita Ureta. 1995. "Early-Career Work Experience and Gender Wage Differentials." *Journal of Labor Economics*, Vol. 13, pp. 121-54.

Litecky, Chuck, et al. 2010. "Mining for Computing Jobs." *IEEE Software*. January/February.

Marinescu, Ioana, and Ronald Wolthoff. 2020. "Opening the Black Box of the Matching Function: The Power of Words." *Journal of Labor Economics*, Vol. 38, pp. 535-568.

Neumark, David, and Wendy Stock, 2006, "The Labor Market Effects of Race and Sex Discrimination Laws," Economic Inquiry, pp. 385-419.

Neumark, David, and Wendy Stock, 1999, "Age Discrimination Laws and Labor Market Efficiency," Journal of Political Economy, pp. 1081-125.

Neumark, David, and William Wascher. 2008. Minimum Wages. Cambridge, MA: MIT Press.

Oyer, Paul, and Scott Schaefer. 2005. "Why Do Some Firms Give Stock Options to All Employees? An Empirical Examination of Alternative Theories." *Journal of Financial Economics*, Vol. 76, pp. 99-133.

Romer, Christina D., and David H. Romer. 2017. "New Evidence on the Aftermath of Financial Crises in Advanced Countries." *American Economic Review*, Vol. 107, pp. 3072-3118.

Saiz, Albert and Uri Simonsohn. 2013. "Proxying for Unobserved Variables with Internet Document-Frequency." *Journal of the European Economic Association*, Vol. 11, pp. 137-165.

Sullivan, Paul. 2010. "Empirical Evidence on Occupation and Industry Specific Human Capital." *Labour Economics*, Vol. 17, pp. 567-580.

Taddy, Matt. 2013. "Measuring Political Sentiment on Twitter: Factor Optimal Design for Multinomial Inverse Regression." *Technometrics* Vol. 55, pp. 415-425.

Woweczko, Izabella A. 2015. "Skills and Vacancy Analysis with Data Mining Techniques." *Informatics*, Vol. 2, pp. 31-49.

Zabalza, A., and Z. Tzannatos. 1985. "The Effect of Britain's Anti-Discriminatory Legislation on Relative Pay and Employment." *Economic Journal*, Vol. 95, pp. 679-99.

Neumark Decl. Ex. B, Page 86 of 99

84

**Appendix B: Results Incorporating Additional Cleaning of Job Titles**

1.        There was some additional cleaning of job titles used in the analyses in my Report, in Tables 7, 8, 12, and B5, as described in *Plaintiffs_Written Response to Nike_s 7-29-21 Email.pdf*. The tables that follow show the original results and the updated results. Inspection of these tables shows that changes are immaterial and no conclusions are affected.

2.        To provide more detail on the changes made, I provide the following elaborations or explanations.

        a.        First, I ran the python program with the updated set of job titles, to construct the sematic similar scores and form clusters. Some titles create errors in the python clustering, so additional cleaning of these job titles was done, and the python program re-run. This iterative process is repeated, by doing an additional round of cleaning of job titles, making the more obvious correction. This led to a shorter error list with 244 words for which corrections were not obvious. These remaining titles are dropped, and the python program is run a final time to produce the clusters used in the tables in this appendix. The corrections include: (i) removing errors that appear redundant or immaterial; (ii) removing error words that represent a company, organization, or brand name (but we retain "Nike" when it appears); and (iii) replacing error words with non-abbreviated words, split words, or a correctly spelled word. The table below shows some examples.

84

85

| JOB TITLE | JOB TITLE (CLEANED) |
|---|---|
| GLOBAL LEADERSHIP DEVELOPMENT PROGRAM GLDP | GLOBAL LEADERSHIP DEVELOPMENT PROGRAM |
| CONSULTANT AT NIKE WHQ | CONSULTANT AT NIKE |
| PRODUCT DEVELOPMENT ASSISTANT BCBGENERATION | PRODUCT DEVELOPMENT ASSISTANT |
| SNAPCHAT PROJECT ASSOCIATE EDITOR | PROJECT ASSOCIATE EDITOR |
| SQA MANAGER | SOFTWARE QUALITY ASSURANCE MANAGER |
| QUALITY CONTROLL DEVELOPER IN ASIA | QUALITY CONTROL DEVELOPER IN ASIA |
| COLOR MATERIALS FINISHE DESIGNER FOR NOKIA GEAR | COLOR MATERIALS FINISH DESIGNER FOR NOKIA GEAR |
| BIGDATA ENGINEER | BIG DATA ENGINEER |
| SR WEBOPS ENGINEER | SR WEB OPS ENGINEER |

b.      The new job titles also required a reclassification of job titles that are most common (10 or more observations), prior to the accumulation of prior experience in each of these jobs. This led to 244 job titles with 10+ observations.

3.      The results are reported in the tables that follow, and show no material changes relative to my initial Report filed August 5, 2021.

**Appendix B1**
**Table 7 Robustness to Changes in Job Clusters & Experience Accumulation**

|  | Table 7-Col 3 | Table 7-Col 4 | Table 7-Col 5 | Table 7-Col 6 |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| *Original as Reported in 8-5-21 Report* |  |  |  |  |
| Female Shortfall | **-3.32%** | **-1.18%** | **-1.33%** | **-0.56%** |
| Std. Deviations | 3.84 | 3.31 | 2.70 | 1.00 |
| Observations | 4,859 | 4,657 | 2,889 | 1,622 |
| Total Observations | 4,896 | 4,896 | 3,107 | 1,789 |
|  |  |  |  |  |
| *Updated Clusters and Experience Accumulation* |  |  |  |  |
| Female Shortfall | **-3.38%** | **-1.18%** | **-1.30%** | **-0.52%** |
| Std. Deviations | 3.91 | 3.33 | 2.67 | 0.95 |
| Observations | 4,859 | 4,657 | 2,889 | 1,622 |
| Total Observations | 4,896 | 4,896 | 3,107 | 1,789 |

Notes: Incorporates corrections to job titles as described in "Plaintiffs_Written Response to Nike_s 7-29-21 Email.pdf" and additional cleaning of job titles to address error words generated by clustering program 4. process_words.py. Independent variables same as in Neumark August 5, 2021 Report. Reported number of observations are those retained by the high-dimension fixed effects estimation procedure. Full regression samples are as indicated by 'Total Observations.'

**Appendix B2**
**Table B5 Robustness to Changes in Job Clusters & Experience Accumulation**

|  | Table B5-Col 1 | Table B5-Col 2 | Table B5-Col 3 | Table B5-Col 4 |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| *Original as Reported in 8-5-21 Report* |  |  |  |  |
| Female Shortfall | **-1.99%** | **-1.38%** | **-1.32%** | **-0.67%** |
| Std. Deviations | 2.21 | 4.05 | 2.42 | 0.87 |
| Observations | 4,859 | 4,657 | 2,886 | 1,613 |
| Total Observations | 4,896 | 4,896 | 3,107 | 1,789 |
|  |  |  |  |  |
| *Updated Clusters and Experience Accumulation* |  |  |  |  |
| Female Shortfall | **-1.83%** | **-1.41%** | **-1.43%** | **-0.80%** |
| Std. Deviations | 2.04 | 3.75 | 2.61 | 1.04 |
| Observations | 4,859 | 4,657 | 2,886 | 1,613 |
| Total Observations | 4,896 | 4,896 | 3,107 | 1,789 |

Notes: See notes to Table Appendix B1.

86

**Appendix B3**

**Table 8 Robustness to Changes in Job Clusters & Experience Accumulation**

|  | Table 8-Col 2 | Table 8-Col 4 | Table 8-Col 5 | Table 8-Col 6 |
|---|---|---|---|---|
|  | (1) | (2) | (3) | (4) |
| *Original as Reported in 8-5-21 Report* | | | | |
| Female Shortfall | **-4.52%** | **-1.03%** | **-1.07%** | **-0.59%** |
| Std. Deviations | 5.16 | 3.29 | 2.83 | 1.13 |
| Observations | 14,563 | 14,494 | 11,649 | 2,757 |
| Total Observations | 14,572 | 14,572 | 11,725 | 2,847 |
| *Updated Clusters and Experience Accumulation* | | | | |
| Female Shortfall | **-4.47%** | **-1.08%** | **-1.12%** | **-0.54%** |
| Std. Deviations | 5.13 | 3.46 | 2.98 | 1.06 |
| Observations | 14,563 | 14,494 | 11,649 | 2,757 |
| Total Observations | 14,572 | 14,572 | 11,725 | 2,847 |

Notes: See notes to Table Appendix B1.

**Appendix B4**

**Table 12 Robustness to Changes in Job Clusters & Experience Accumulation**

|  | Table 12-Col 2 | Table 12-Col 3 | Table 12-Col 4 |
|---|---|---|---|
|  | (1) | (2) | (3) |
| *Original as Reported in 8-5-21 Report* | | | |
| Female Coefficient | **-0.1861** | **-0.2680** | **-0.0579** |
| Std. Deviations | 2.94 | 3.39 | 0.53 |
| Observations | 4,873 | 3,082 | 1,770 |
| Total Observations | 4,909 | 3,119 | 1,790 |
| *Updated Clusters and Experience Accumulation* | | | |
| Female Coefficient | **-0.1886** | **-0.2577** | **-0.0907** |
| Std. Deviations | 2.97 | 3.26 | 0.83 |
| Observations | 4,873 | 3,082 | 1,770 |
| Total Observations | 4,909 | 3,119 | 1,790 |

Notes: See notes to Table Appendix B1.

87

Neumark Decl. Ex. B, Page 90 of 99

### Appendix C: Why Equity Should Be Counted as Earned When it Vests

1.      I believe there is both good reason and scientific evidence to count equity as compensation when it vests. Treating equity grants in the year they vest parallels the usual treatment of base pay: it counts compensation as compensation when it is actually paid, not just promised. That is, when I use equity vesting, I treat pay in each year as what a person gets paid in each year. In contrast, treating equity as compensation when it is granted ends up treating equity very differently from base pay, with base pay viewed as pay when it is actually paid, but not equity, so that when equity and base pay are added together in total compensation, one ends up treating pay in each year as a mix of what you get paid in each year plus what you have been promised as pay in the future and do not in fact receive if you are no longer employed by the company.

2.      To see this in an example, suppose that an employee's pay evolves according to Scenario A in Table 1 below. The employee gets a 10% raise at the end of 2016 (effective beginning the next year), and no raise in the subsequent three years with the company. The total value of the raise "granted" in 2016 is $30,000 – $10,000 in each year 2017, 2018, and 2019.[82] But we measure pay in each year as indicated in the "Base pay" row of the table – with the additional $10,000 being attributed to each of these three future years, as shown in the bolded row. That is, the 10% raise in 2016 adds to the compensation the employee will earn in the future, but we do not credit the higher future earnings to the year of the raise: the 10% raise in 2016 adds nothing to 2016 pay. Now suppose instead that the employee gets an equity grant of

---

[82] I ignore the issue of future money being worth less in the current years, or what economists call "present discounted value."

$30,000 in 2016, but one-third of it vests in each of the next three years. Then the person's

compensation evolves as in Scenario B in Table C1 below.

**Table C1: Parallel Treatment of Stock Grant Vesting Base Pay**

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| *Scenario A* | | | | | |
| Base pay | $100,000 | $110,000 | $110,000 | $110,000 | NA (left company) |
| Raise | 10% | 0% | 0% | 0% | |
| **Total compensation** | **$100,000** | **$110,000** | **$110,000** | **$110,000** | |
| | | | | | |
| *Scenario B* | | | | | |
| Base pay | $100,000 | $110,000 | $110,000 | $110,000 | NA (left company) |
| Stock grant | $30,000 | | | | |
| Vested stock grant | | $10,000 | $10,000 | $10,000 | |
| **Total compensation** | **$100,000** | **$110,000** | **$110,000** | **$110,000** | |
| | | | | | |
| **Total compensation for Scenario B according to Dr. Saad** | **$130,000** | **$100,000** | **$100,000** | **$100,000** | |

3.      Note the key result – total compensation in each year is identical under these two

scenarios. The point is that there is an exact equivalence between a stock grant that vests in the

future, and a raise that goes into base pay that is paid in the future. No one would argue that we

should regard compensation in Scenario A as $130,000 in 2016 and $100,000 in 2017, 2018, and

2019 – i.e., putting the future value of the raise in 2016; this, however, is exactly what Dr. Saad

does with equity, when treating it as earned when it is granted, as shown in the last row of Table

1. This example provides a good argument for why equity should be "counted" when it vests in

order to parallel the treatment of raises to base pay. In either case, the employee has been

promised higher pay in the future, and the employee only earns that pay in the future as long as

she stays with the company (and forfeits it if she leaves the company).[83]

---

[83] In Table 1, I assume the person leaves the company in 2020; but of course they could leave the company earlier, with some probability. In my A and B scenarios, if the employee left the company at the end of 2018, her total compensation for 2016 through 2018 would equal

4.　　To make the point even more starkly, suppose that Nike pays a man a salary of $150,000 per year, and pays a woman a salary of $100,000 year, but promises the woman that if she is still employed at Nike the following year, she will receive an additional $50,000. Would anyone regard these two compensation packages as equal? Of course not – and most simply because there is some probability the woman will not be employed at Nike the following year. Suppose the probability that an employee at Nike is employed at the company the next year is 0.9 (a 90% chance). Viewed this way, the "expected value" of the $50,000 promised for next year is $45,000 ($50,000 multiplied by 0.9), and the woman's compensation is clearly worth less than the man's – but not according to Dr. Saad's calculation. And if we think about vesting over multiple years instead of one year, the expected value of the future compensation is even lower, because the probability that the woman will be employed is lower still.[84]

5.　　In addition, economic research on stock options (which are different from stock grants, but similar in that they typically vest over time) indicates that an important reason companies provide some compensation in this form is to encourage employees to remain with the company in the future.[85] Other research looking explicitly at unvested equity pay finds that deferred payment achieved through vesting of equity pay increases retention.[86]  In other words,

---

$320,000 ($100,000 in 2016; $110,000 in 2017 and 2018). By contrast, although Dr. Saad would treat the employee in scenario A as earning $320,000 for 2016 through 2018, he would treat the employee in scenario B as earning $330,000 ($130,000 in 2016 and $100,000 in 2017 and 2018).

[84] If we assume the retention probability of 0.9 is the same in every year, then the probability of being employed at Google four years later is 0.9 to the fourth power, or 0.66.

[85] See: Oyer, Paul, and Scott Schaefer. 2005. "Why Do Some Firms Give Stock Options to All Employees? An Empirical Examination of Alternative Theories." *Journal of Financial Economics*, Vol. 76, pp. 99-133.

[86] See: Jochem, Torsten, Tomislav Ladika, and Zacharias Sautner. 2018. "The Retention Effects of Unvested Equity: Evidence from Accelerated Option Vesting." *Review of Financial Studies*, Vol. 31, pp. 4142-4186; Erkens, David H. 2011. "Do Firms Use Time-Vested Stock-Based Pay

the essence (or at least an important part) of equity payments that vest in the future is to affect compensation in the future in order to retain employees, which is a compelling argument to treat equity as compensation when it vests.

6.      Nike uses the vesting schedule of its stock awards and options for these very same retention purposes. Nike documents filed with the Securities Exchange Commission confirm that Nike "[v]est[s] equity awards over time to promote retention with a minimum of one year vesting." Exhibit 626 at PLF000028. Specifically, "[t]o promote executive retention, unvested [stock] options generally are forfeited if the employee leaves the Company before the vesting occurs." Exhibit 626 at PLF0000034. Restricted Stock Awards and Restricted Stock Units "vest based on continued services within the Company through a future service date, for the specific purpose of further promoting retention." Exhibit 626 at PLF000034-35. One "of the main purposes of [Nike's] stock option awards is retention of employees." (White Dep. 155:17-19.)

---

to Keep Research and Development Investments Secret?" *Journal of Accounting Research*, Vol. 49, pp. 861-894.

# Appendix D: Supplemental Tables

### Table D1
### Original Table 6 with Updated Data
### (Excludes Bands V & A and Hourly Employees Identified by Dr. Saad)

*Dependent Variable:* Log of Starting Pay

| | Table 6-Col 1 Individual Controls | Table 6-Col 2 (1) Plus Job Subfamily | Table 6-Col 3 (2) Plus Job Levels | Table 6-Col 4 (1) Plus Job Cells | Table 6-Col 5 Same as (4): Before September 2017 | Table 6-Col 6 Same as (4): September 2017 or Later |
|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) |
| **_Panel A. Log of Base Pay_** | | | | | | |
| Female Shortfall | **-7.61%** | **-2.30%** | **-0.88%** | **-1.04%** | **-1.16%** | **-0.49%** |
| Std. Deviations | 9.87 | 3.30 | 2.77 | 3.38 | 2.89 | 1.00 |
| Observations | 6,587 | 6,560 | 6,559 | 6,334 | 4,273 | 1,911 |
| Total Observations | 6,587 | 6,587 | 6,587 | 6,587 | 4,499 | 2,088 |
| R-squared | 0.35 | 0.59 | 0.91 | 0.93 | 0.92 | 0.94 |

Notes: Uses updated data which excludes hourly employees as identified by Dr. Saad. See notes to Tables R1 and R2. See notes to Table R7 for explanation and a list of regression controls and data description.

92

**Table D2:a**

| "Engineers" | "Miscellaneous—1" | "Product Marketing and Management" | "Analytics, Data, and Information" | "Miscellaneous—2" |
|---|---|---|---|---|
| Cluster 0 | Cluster 1 | Cluster 2 | Cluster 3 | Cluster 4 |
| SOFTWARE ENGINEER | STRATEGIC PLANNING | SENIOR PRODUCT MANAGER | PRODUCT CREATION DEVELOPMENT MANAGEMENT | ATHLETE |
| SENIOR SOFTWARE ENGINEER | SOCIAL MEDIA SPECIALIST | INFORMATION TECHNOLOGY MANAGER | TECHNICAL CONSULTANT | PRESIDENT |
| QUALITY ASSURANCE ENGINEER | TECHNICAL LEAD | PRODUCT DEVELOPMENT MANAGER | SENIOR ACCOUNT SERVICE REPRESENTATIVE | CAPTAIN |
| PRODUCT DEVELOPER | TECHNOLOGY LEAD | SOFTWARE DEVELOPMENT MANAGER | DIRECTOR OF INFORMATION TECHNOLOGY | TELLER |
| PROJECT ENGINEER | INVENTORY PLANNER | DIRECTOR OF BUSINESS DEVELOPMENT | INFORMATION TECHNOLOGY DIRECTOR | TUTOR |
| TECHNICAL ARCHITECT | MANAGEMENT TRAINEE | ACCOUNT EXECUTIVE STRATEGIC PLANNER CREATIVE | CORPORATE COMMUNICATIONS DIRECTOR | WAITRESS |
| DEVELOPMENT ENGINEER | COLOR SPECIALIST | ASSOCIATE DIRECTOR MANAGER PERFORMANCE IMPROVEMENT DATA ANALYTICS | ORGANIZATIONAL EFFECTIVENESS CONSULTANT | KEY HOLDER |
| SENIOR DATABASE DEVELOPER | PROGRAM MANAGEMENT | CONTROLS ENGINEER VIBRATION ANALYSIS PRODUCT MANAGER | EXECUTIVE TEAM LEADER OPERATIONS | COLOR KEY |
| PRODUCTION ENGINEER | SAP SECURITY CONSULTANT | DIRECTOR MARKETING BUSINESS INTELLIGENCE BI ANALYTICS | IMPLEMENTATION SPECIALIST | HOST |
| SENIOR JAVA APPLICATION ENGINEER | APPLICATION SUPPORT TEAM LEAD | GROUP PRODUCT PROGRAM MANAGER | PROJECT CONSULTANT | SALESMAN |
| APPLICATION SECURITY ARCHITECT | CUSTOMER SERVICE AGENT | MANAGER INFORMATION TECHNOLOGY INFRASTRUCTURE | ALLOCATION ANALYST WOMENS TRAINING APPAREL | ALLOCATIONS |
| NETWORK SECURITY ENGINEER | RETURNS SPECIALIST | MANAGER MARKETING BUSINESS DEVELOPMENT | BUSINESS ANALYTICS MANAGER ANALYTICS | ASM FOR MIDWEST REGION |
| COMPUTER ENGINEER | CONSULTANT SUNRISE SYSTEMS | MARKETING PERFORMANCE MANAGER | DATA GOVERNANCE MANAGER | BOS |
| LEAD SOFTWARE DEVELOPMENT ENGINEER | DESKTOP TECHNICIAN | MATERIALS DEVELOPMENT ASSISTANT PURCHASING SPECIALIST | DIRECTOR OF DATABASE SERVICES | BROADCASTER |
| PROJECT ENGINEER INTERN | ENGAGEMENT STRATEGIST | PRODUCT PROJECT MANAGER ANALYST | ENGINEERING CHANGE COORDINATOR ELECTRONICS | CIA |
| QUALITY SYSTEMS ENGINEER | INDEPENDENT RESEARCH CONTRACTOR NOV CONTRACTOR TRAINEE | QUALITY ASSURANCE CUSTOMER SUPPORT ENGINEER RELEASE MANAGER QUALITY ASSURANCE MANAGER | FINANCE STRATEGY SPECIALIST | CLOTHE TAILORING |
| SERVICE VIRTUALIZATION ENGINEER | INTERNAL INFORMATION SECURITY AUDITOR | SENIOR BUSINESS SYSTEMS ANALYST PRODUCT OWNER | FOUNDER DIRECTOR OF RESEARCH AND STRATEGY | EKIN RUNNING |
| SOFTWARE ENGINEER INTEGRATION | OFFICE ADMINISTRATORS SALES SUPPORT | SENIOR DESIGN DIRECTOR | INFORMATION TECHNOLOGY SYSTEMS ARCHITECTURE MANAGER | GUEST SPEAKER |
| AUTOMATION LEAD ENGINEER SAP | OPERATIONS INVENTORY CONTROL | SENIOR ENGINEERING MANAGER CORE PERF INNOVATION | PROCUREMENT CARD ADMIN CUSTOMER SERVICE FINANCE ADMIN SUPPORT | GYM TECH |
| CONSULTANT SOFTWARE DEVELOPER | PEER EDUCATION SPECIALIST | SENIOR MANAGER DISTRIBUTION SERVICES | PRODUCT PRESENTATION SPECIALIST | KOREAN AUGMENTATION TO THE US ARMY |
| FACILITIES ENGINEER | PRODUCTION GROUP LEADER | SENIOR MANAGER MARKETING ANALYTICS LOYALTY PROGRAMS | SALES OPERATIONS A INVENTORY MANAGEMENT | POLICE DETECTIVE |
| SENIOR SOFTWARE TEST ENGINEER PROGRAMMER | RESEARCH ASSISTANT COGNITIVE LAB | SENIOR MANAGER STRATEGY AND ANALYTICS | SENIOR PROCUREMENT SPECIALIST | SISTER COMPANY |
| SENIOR SUPPLY PLANNER | SCRUM MASTER SENIOR QUALITY ASSURANCE LEAD | SENIOR PRODUCT MANAGER ECONOMIC ORDERING VENDOR MANAGEMENT | SENIOR SECURITY AND COMPLIANCE CONSULTANT FORENSIC INVESTIGATOR | |
| SENIOR TEST ENGINEER SOFTWARE QUALITY ASSURANCE | SENIOR AIRCRAFT TECHNICIAN | SENIOR PRODUCT MARKETING MANAGER TELECOMMUNICATIONS | SOCIAL MEDIA GOVERNANCE MANAGER | |
| SOFTWARE DEVELOPMENT ENGINEER IN TEST LEAD | SOCIAL MEDIA SPECIALIST RUNNING HERC | SENIOR TECHNICAL DELIVERY MANAGER | SOLUTION CONSULTANT | |
| STAFF RESEARCH DEVELOPMENT ENGINEER | SYSTEM DATA COORDINATOR | SENIOR TECHNICAL SUPPORT MANAGER | SUSTAINABILITY COMMUNICATIONS DIRECTOR | |
| | UNIT CHIEF CRISIS MANAGEMENT UNIT | STRATEGIC PLANNING AND ASSET MANAGER | TECHNOLOGY PROJECT MANANGER | |
| | VICE PRESIDENT INFORMATION TECHNOLOGY ANALYTICS | STRATEGIC PLANNING SALES INTERN | USER EXPERIENCE PROJECT ASSISTANT | |
| | VIDEO CONTENT STRATEGIST | STRATEGY CONSULTANT PRODUCT AND BRAND | | |

93

Table D2:b

| "Consultants and Analysts" | "Managers" | "Sales and Marketing" | "Design" | "Support Services" |
|---|---|---|---|---|
| Cluster 5 | Cluster 6 | Cluster 7 | Cluster 8 | Cluster 9 |
| SENIOR CONSULTANT | MANAGER | SALES ASSOCIATE | GRAPHIC DESIGNER | ADMINISTRATIVE ASSISTANT |
| BUSINESS SYSTEMS ANALYST | GENERAL MANAGER | MARKETING | DESIGNER | ASSOCIATE |
| SENIOR BUSINESS ANALYST | STORE MANAGER | PRODUCT OWNER | FREELANCE DESIGNER | ASSISTANT BUYER |
| SENIOR BUSINESS SYSTEMS ANALYST | OFFICE MANAGER | DIGITAL PRODUCER | DESIGN | PRODUCER |
| SENIOR TECHNICAL CONSULTANT | DEPARTMENT MANAGER | INTERACTIVE PRODUCER | FREELANCE GRAPHIC DESIGNER | TEACHING ASSISTANT |
| BUSINESS PROCESS ANALYST | SUPPLY CHAIN MANAGER | INSIDE SALES REPRESENTATIVE | COPYWRITER | SUPERVISOR |
| SENIOR PROGRAMMER ANALYST | RELEASE MANAGER | SALES ASSISTANT | PRODUCTION ARTIST | PRODUCTION SUPERVISOR |
| BUSINESS ANALYST INTERN | MERCHANDISE MANAGER | PURCHASING AGENT | GRAPHIC DESIGN | ASSISTANT COACH |
| SENIOR OPERATIONS ANALYST | RETAIL STORE MANAGER | SALES OPERATIONS | ARCHITECTURAL DESIGNER | SECURITY OFFICER |
| LEAD SENIOR CONSULTANT | SOCIAL MEDIA MANAGER | DIGITAL BRAND SPECIALIST | STUDIO DESIGNER | ACCOUNTING ASSISTANT |
| PRODUCT OWNER BUSINESS ANALYST | OPERATIONS SUPERVISOR | APPAREL COORDINATOR | APPAREL TRIM DEVELOPER | CHIEF OPERATING OFFICER |
| PRODUCTION SUPPORT ANALYST | MANAGER ANALYTICS | APPAREL MANAGER EXPRESS LANE INNOVATION | BRAND DESIGNER ASICS | GUEST SERVICE REPRESENTATIVE |
| STORE OPERATIONS ANALYST | OWNER CONSULTANT | AREA SALES REPRESENTATIVE | COSTUME SHOP WORKER DRESSER | EDI ANALYST |
| ADVANCED ANALYTICS CONSULTANT INTERN | RETAIL BRAND MANAGER RUNNING | ASSOCIATE BUYER AND MERCHANDISER | FOOTWEAR MATERIALS INTERN | SERVICE REPRESENTATIVE |
| APLA INVENTORY OPERATIONS PERFORMANCE MANAGEMENT ANALYST | AGILE PROGRAM MANAGER SCRUM MASTER | BRAND COMMUNICATIONS AND DIGITAL MARKETING | GRAPHIC DESIGN ART DIRECTION | SHIFT SUPERVISOR |
| BI PRODUCT OWNER BUSINESS ANALYST | ATHLETE MANAGER | DIGITAL PRODUCT OWNER | MENS KNITS BUYER | IAM CONSULTANT |
| BUSINESS SYSTEMS ANALYST AT NIKE | DIGITAL MERCHANDISE MANAGER | HEAD OF TRADE MARKETING | WOMENS RUNNING APPAREL DESIGNER | STAFF MEMBER |
| DIGITAL CUSTOMER ANALYST | FOOTBALL BRAND MANAGER | MEDIA PLANNER BUYER AMAZON | | WHOLESALE REPRESENTATIVE |
| LOGISTICS AND PLANNING ANALYST INTERN | LOGISTICS WAREHOUSE MANAGER | MERCHANDISING ASSOCIATE | | ADMIN CLERK |
| MARKET ANALYST INTERN | MANAGER CONSOLIDATION DECONSOLIDATION SOLUTIONS | PRODUCER NIKE ACCOUNT | | ARCHAEOLOGIST CREW CHIEF |
| PRODUCT IMPLEMENTATION ANALYST | MANAGER GIT CHANGE MANAGEMENT | PRODUCT OWNER NIKE | | ASSISTANT BUYER DOMESTICS |
| RETAIL ANALYTICS CONSULTANT | MONTRAIL SALES MANAGER | SALES AND MERCHANDISING INTERN | | ASSISTANT LACROSSE COACH |
| SCRUM MASTER SENIOR INFORMATION TECHNOLOGY ANALYST | REGIONAL MERCHANDISE MANAGER | SENIOR PRODUCER TRAVEL | | CAMP COUNSELOR COACH |
| SENIOR BUSINESS DATA ANALYST | SALES SUPERVISOR | SKATE SHOP MANAGER | | CLINIC COORDINATOR |
| SENIOR BUSINESS SYSTEM ANALYST AT NIKE | WHOLESALE EXPORT DISTRIBUTION MANAGER | SPORTS AGENT ASSOCIATE | | CREATOR EDITOR IN CHIEF |
| SENIOR CLIENT SERVICE REPRESENTATIVE ANALYST | | SPORTSWEAR FOOTWEAR MERCHANDISING OPERATIONS SPECIALIST | | EMERGENCY COORDINATOR |
| SUPPLY CHAIN PLANNING LEAD BUSINESS ANALYST | | TEAM MANAGER NIKE DIGITAL SPORT | | FOUNDER ADMINISTRATORS OWNER |
| | | VICE PRESIDENT CREATIVE DIRECTION | | GENERAL COUNSEL |
| | | | | VICE PRESIDENT OF OPERATIONS ACQUIRED BY HELLO ALFRED |

94

**Table D2:c**

| "Design II" | "Interns and Assistants" | "Miscellaneous—3" | "Account Management and Service" | "Human Resources and Analytics" |
|---|---|---|---|---|
| Cluster 10 | Cluster 11 | Cluster 12 | Cluster 13 | Cluster 14 |
| TECHNICAL DESIGNER | INTERN | SCRUM MASTER | CONSULTANT | ADMINISTRATIVE SUPPORT |
| GRAPHIC DESIGN INTERN | SENIOR ASSOCIATE | OWNER | RESEARCH ASSISTANT | TECHNOLOGY |
| ASSISTANT DESIGNER | SUMMER INTERN | BUYER | ART DIRECTOR | FINANCE ACCOUNTING |
| ASSOCIATE DESIGNER | INSTRUCTOR | CO FOUNDER | ACCOUNT EXECUTIVE | DATA SCIENTIST |
| PRODUCT DESIGNER | SENIOR DATA SCIENTIST | INTERNSHIP | SENIOR ADMINISTRATIVE ASSISTANT | SALESPERSON |
| CONTRACT GRAPHIC DESIGNER | COMMUNICATIONS INTERN | RETAIL STORES | CREATIVE DIRECTOR | RESEARCH SCIENTIST |
| MENSWEAR DESIGN INTERN | LAB TECHNICIAN | COACH | EXECUTIVE ASSISTANT | DATA MODELER |
| SENIOR VISUAL DESIGNER | LEGAL INTERN | PRINCIPAL | GRADUATE RESEARCH ASSISTANT | PRODUCTION OPERATOR |
| TEXTILE DESIGN INTERN | ARCHITECTURAL LIBRARY ASSISTANT | PERSONAL BANKER | ACCOUNT SERVICE REPRESENTATIVE | STITCHING SPECIALIST |
| SENIOR PRODUCTION DESIGNER | ASSOCIATE INTERN | SERVER | PRINCIPAL CONSULTANT | BILINGUAL HUMAN RESOURCES ADVISOR SPANISH ENGLISH |
| TECHNICAL DESIGN | ATHLETIC DEPARTMENT INTERN SPECIAL ASSISTANT TO THE ATHLETIC DIRECTORS | SENIOR | PROGRAM COORDINATOR | COMPETE AT THE HIGHEST LEVEL CREATE VISIBILITY FOR NIKE RUNNING SPONSOR |
| APP DESIGN INTERN | BIOMEDICAL INFORMATICS SUMMER INTERNSHIP SUMMERS | FREELANCE WRITER | ASSOCIATE CONSULTANT | DIGITAL CONTENT |
| ASSISTANT BRA TECHNICAL DESIGNER | CHALLENGE COURSE CLERICAL ASSISTANT | VOLUNTEER | ASSISTANT DEPARTMENT MANAGER | FINANCIAL AFFAIRS WORK STUDY |
| DESIGN STUDIO MANAGER BRAND DESIGN NIKE | CHILD AND ADOLESCENT TREATMENT SPECIALIST | SPORTS REPORTER | MERCHANDISE COORDINATOR | HUMAN RESOURCES TALENT ACQUISITION |
| DESIGNER FABRICATOR | ENTREPRENEURSHIP TEACHING ASSISTANT | SUBSTITUTE TEACHER | ASSISTANT ACCOUNT EXECUTIVE | LABOR OPTIMIZATION TEAM |
| DESIGNER GOLF EQUIPMENT | GRAPHIC ARTIST PARENT VOLUNTEER | ACADEMIC TUTOR | ASSOCIATE EDITOR | MODULE LEADER |
| DESIGNER PRODUCTION ASSISTANT | INTERN INDEX GROUP | TENNIS COACH | DIRECTOR DIGITAL COMMERCE | OFF SITE SEASONAL WORKER |
| EXPERIENCE DESIGN LEAD | LEGISLATIVE INTERN | CHEF | ACCOUNT COORDINATOR ACCOUNT EXECUTIVE | SCRUM MASTER AND AGILE COACH |
| FABRIC DEVELOPER WOMENS COLLECTION | MATERIALS SCIENCE RESEARCHER | UNIVERSITY RESIDENCE LIFE | ASSISTANT DIRECTOR WEB APPLICATIONS | SEARCH ENGINE EVALUATOR |
| GRAPHIC DESIGNER CONTENT WRITER | NIKE SPORTS RESEARCH LAB INTERN | CIVIL RECORDS CLERK | DIRECTOR CS EXPERIENCE ENABLEMENT | |
| GRAPHIC DESIGNER FRONT DESK | PEER INSTRUCTOR | GOLF PROFESSIONAL HEAD GOLF PROFESSIONAL BANDON DUNES BANDON TRAILS PACIFIC DUNES OLD MACDONALD | EXECUTIVE ASSISTANT TO THE CHIEF EXECUTIVE OFFICER CLARA SHIH CHIEF OPERATIONS OFFICER | |
| LEAD CREATIVE PRODUCER ON NIKE SPORTSWEAR BRAND DESIGN | RESEARCH ASSOCIATE POST DOCTORAL FELLOW | INTRODUCED AGENT | INTERNATIONAL COMMERCIAL DIRECTOR | |
| PRINCIPAL USER INTERFACE DESIGNER | SENIOR COMMUNITY ASSISTANT | KANSAS CITY TERRITORY TECH REPRESENTATIVE | PROGRAMS COORDINATOR | |
| PRODUCTION GRAPHIC DESIGNER | STUDIO INSTRUCTOR ID | NIKE GOLF BRAND AMBASSADOR | RESEARCH AND TEACHING ASSISTANT | |
| SENIOR DESIGNER DEVELOPER APPAREL SOFT GOODS | TELEVISION PRODUCTION INTERN | OWNER DJ MC | SPEECHWRITER TO THE DIRECTOR | |
| TECHNICAL DEVELOPER DESIGNER | TRANSLATOR FACILITATOR | PART TIME UNDER WOMENS ATHLETE | VICE PRESIDENT DIGITAL STRATEGY | |
| WEB DEVELOPER PHOTOGRAPHER AND DYNO RUN ARCHIVIST | | PROFESSIONAL GOLFER | VICE PRESIDENT PRODUCT DEVELOPMENT | |
| | | SPEC WRITER | VIDEO COORDINATOR | |
| | | VOLUNTEER MISSIONARY | | |

95

Neumark Decl. Ex. B, Page 98 of 99

Table D2:d

| "Developers and Programmers" | "Account and Project Managers" | "Analysts" | "Marketing Management" | "Interns—2" |
|---|---|---|---|---|
| Cluster 15 | Cluster 16 | Cluster 17 | Cluster 18 | Cluster 19 |
| SOFTWARE DEVELOPER | PROJECT MANAGER | DATA ANALYST | MARKETING ASSOCIATE | MARKETING INTERN |
| WEB DEVELOPER | SENIOR PROJECT MANAGER | PROGRAMMER ANALYST | DESIGN CONSULTANT | BRAND MARKETING INTERN |
| ENGINEER | PRODUCT MANAGER | SENIOR ANALYST | APPAREL DEVELOPMENT MANAGER | PRODUCT DESIGN INTERN |
| SENIOR SOFTWARE DEVELOPER | PROGRAM MANAGER | SYSTEMS ANALYST | MATERIAL DESIGN MANAGER | SOFTWARE DEVELOPMENT INTERN |
| MECHANICAL ENGINEER | SENIOR MANAGER | RESEARCH ANALYST | MERCHANDISING AND PRODUCT MANAGEMENT | MECHANICAL ENGINEERING INTERN |
| TECHNICAL DEVELOPER | ASSOCIATE PRODUCT MANAGER | INVENTORY ANALYST | OWNER CREATIVE DIRECTOR | BUSINESS DEVELOPMENT INTERN |
| PROGRAMMER | ENGINEERING MANAGER | WEB ANALYST | RETAIL BRAND DIRECTOR | DIGITAL MARKETING INTERN |
| TEST ENGINEER | OPERATIONS SPECIALIST | INVENTORY SALES ANALYST | SENIOR PROJECT MANAGER AT NIKE | INTERN ARCHITECT |
| SOLUTIONS ARCHITECT | SALES OPERATIONS MANAGER | FORECASTING ANALYST | ASSOCIATE PRODUCT MANAGER ESPN APP | RESEARCH AND DEVELOPMENT INTERN |
| SENIOR WEB DEVELOPER | AREA SALES MANAGER | MERCHANDISE ANALYST | COMMS PLANNING MANAGER TEAM NIKE | BRAND DEVELOPMENT TRAINEE |
| COMPUTER PROGRAMMER | DIRECTOR BUSINESS DEVELOPMENT | PLANNING ANALYST | DIGITAL MARKETING MANAGER UNIVERSAL EASE | CONTENT STRATEGIST WRITER CONTRACT |
| EVERGREEN OPEN ILS SOFTWARE ENGINEER | NATIONAL ACCOUNT MANAGER | APPLICATION ANALYST | DIRECTOR OF RETAIL SALES | CREATIVE LEAD EMPLOYEE COMMUNICATIONS |
| LEAD APPLICATION DEVELOPER | MARKETING OPERATIONS MANAGER | APPLICATIONS ANALYST | FOOTWEAR MATERIALS MANAGER | D APPAREL DEVELOPMENT INTERN |
| MATERIAL PLANNER | ACCOUNT MARKETING MANAGER | INVESTMENT ANALYST | GOLF BRAND DESIGN PROJECT MANAGER | DIGITAL PRINT COLOR MANAGEMENT TECHNICIAN |
| SOFTWARE ENGINEERING | CLIENT SERVICE DIRECTOR | ACCOUNTANT ANALYST | HEAD OF PRODUCT DEVELOPMENT | DISTRIBUTION LOGISTICS INTERN |
| WEB DEVELOPER DESIGNER | DIRECTOR PROFESSIONAL SERVICES | ANALYST VIDEO ANALYTICS | MANAGEMENT INTERN SALES PERSON | GRADUATE RESEARCH ASSISTANT MATERIALS SCIENCE AND ENGINEERING |
| AVIATION STRUCTURAL HYDRAULIC MECHANIC SUPERVISOR | DISTRIBUTION CHANNEL MARKETING MANAGER | ASSOCIATE RESEARCH ANALYST | MANAGER FABRIC RESEARCH DEVELOPMENT INTIMATES PERFORMANCE SWIM SEAMLESS | INVENTORY MANAGEMENT INTERN |
| CONTRACT SOFTWARE DEVELOPER | FOUNDER PRODUCT MANAGER | FINANCIAL ANALYST REJUVENATION BRAND | MANAGER PRODUCT IDEATION DIGITAL MEASUREMENT | MANUFACTURING ENGINEERING SPECIAL PROJECTS |
| DEVELOPER SCRUM MASTER AGILE COACH | PROGRAM SENIOR PROJECT MANAGER | HELPDESK SUPPORT ANALYST | MERCHANDISING CONSULTANT | MARKETING ADMINISTRATION INTERN |
| PATTERN ENGINEER | SENIOR DIRECTOR INTEGRATED PLANNING | INVENTORY PLANNING ANALYST EM | NIKE MARKETPLACE OPERATIONS PROCESS SPECIALIST | MATERIALS MANAGEMENT RESEARCH INTERN |
| PLATFORM ARCHITECT NDE | STUDIO COORDINATOR PROJECT MANAGER | INVESTMENT BANKING SUMMER ANALYST | PRIVATE LABEL PRODUCTION MANAGER | MBA INTERN STRATEGIC PLANNING JORDAN BRAND |
| SENIOR DEVELOPER IOS | | SENIOR E COMMERCE RESEARCH ANALYST | RETAIL CORPORATE INTERIM PLANNER | MBA INTERN UTILITY SALES |
| SENIOR MOBILE WEB DEVELOPER | | SENIOR INTELLIGENCE ANALYST FOR NIKE | SCRUM MASTER PRODUCT MANAGER | QUALITY ASSURANCE ENGINEERING INTERN |
| SENIOR SW ENGINEER NDE EDA | | SENIOR REGIONAL PLANNING ANALYST US REGION | SEARCH ENGINE MARKETING ACCOUNT MANAGER | SALES AND SOCIAL MEDIA INTERN |
| SOLUTION DEVELOPER | | STRATEGIC PLAN ANALYST | SENIOR BUYER VENDOR MANAGER | SALES BRAND INTERN |
| WINDOWS PLATFORM CLIENT ENGINEER | | TABLEAU REPORTING ANALYST | SENIOR INTERACTIVE DESIGNER DIGITAL ART DIRECTOR | |
| | | TEST ANALYST | SENIOR SOURCING MANAGER HOME DECOR AND HARD GOODS | |
| | | TREND ANALYST | SPORTSWEAR BRAND MARKETING PRODUCT SPECIALIST | |
| | | WAREHOUSE INVENTORY ANALYST | TRANSITION MANAGER APPAREL PLANNING | |
| | | | VISUAL SPECIALIST AND SALES SUPPORT ASSOCIATE | |

96

Neumark Decl. Ex. B, Page 99 of 99