IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,   No.

      Plaintiffs,        3:18-cv-01477-JR

   v.

NIKE INC., an Oregon

Corporation,

      Defendant.




REMOTE VIDEOCONFERENCE DEPOSITION OF

MONIQUE MATHESON

Taken in behalf of Plaintiffs

February 22, 2021

Matheson, Monique                                    February 22, 2021

Page 2

1          BE IT REMEMBERED THAT, the remote

2     videoconference deposition of MONIQUE MATHESON

3     was reported by Aleshia K. Macom, Oregon CSR

4     No. 94-0296, Washington CCR No. 2095, California

5     CSR No. 7955, RMR, CRR, RPR, on Monday,

6     February 22, 2021, commencing at the hour of

7     9:02 a.m., the witness appearing at Beaverton,

8     Oregon.

9

10          APPEARANCES (Via Zoom videoconference)

11

12    GOLDSTEIN, BORGEN, DARDARIAN & HO

13       By Barry Goldstein

14          James Kan

15          Byron Goldstein

16          Mengfei Sun

17       155 Grand Avenue, Suite 900

18       Oakland, California 94612

19       510-763-9800

20       bgoldstein@gbdhlegal.com

21       jkan@gbdhlegal.com

22       brgoldstein@gbdhlegal.com

23       msun@gbdhlegal.com

24       Appearing for Plaintiffs

25

Page 3

```
 1      PAUL HASTINGS
 2      By Daniel Prince
 3      515 South Flower Street, 25th Floor
 4      Los Angeles, California 90071
 5      213-683-6169
 6      danielprince@paulhastings.com
 7      Appearing for Defendant
 8
 9      Also Present:  Felicia Davis - Nike
10                     Lauren Thibodeaux - Nike
11                          *    *    *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Sun Decl. Ex. 74, Page 3 of 28

Page 29

```
 1        not Nike received a complaint that Mr. Ayre had
 2        created a hostile work environment.
 3             MR. PRINCE:  Same objection.
 4             THE WITNESS:  I don't know.
 5   Q.   BY MR. BARRY GOLDSTEIN:  You don't know one way
 6        or the other whether Nike had received a
 7        complaint that Mr. Ayre was creating a hostile
 8        work environment?
 9             MR. PRINCE:  Asked and answered.
10             THE WITNESS:  I'm not aware whether Nike
11        received a complaint regarding Mr. Ayre and a
12        hostile work environment.
13   Q.   BY MR. BARRY GOLDSTEIN:  Who at Nike would know
14        whether Nike had received a complaint that
15        Mr. Ayre had created a hostile work environment?
16   A.   I'm not sure who would know that.
17   Q.   I'm going to read another couple sentences from
18        this article from the same page.  "In July
19        Mr. Parker held an annual leadership team
20        meeting at a resort in Oregon's Willamette
21        Valley where he informed Mr. Ayre he could no
22        longer stay, one person said.  The next day Nike
23        announced Mr. Ayre's retirement and the
24        promotion of Monique Matheson."
25             Do you see those sentences?
```

Matheson, Monique                                    February 22, 2021

Page 30

1    A.    I do see those sentences.

2    Q.    Was your promotion announced on the same day as

3          the announcement of Mr. Ayre's retirement?

4    A.    I don't recall the exact announcement of either

5          his departure or my promotion.

6    Q.    We're uploading a document that is marked as

7          Exhibit 631 from Nike News, dated July 18, 2017,

8          heading, "Nike, Inc., announces Monique Matheson

9          as New EVP Global Human Resources."  Let me know

10         when you've downloaded Exhibit 631, please.

11   A.    I have that document open.

12   Q.    Can you identify this document, please?

13   A.    It's, I mean, it's, it's entitled "Nike News."

14         I don't, I don't understand the question.

15   Q.    What is Nike News?

16   A.    I, I don't know.  I don't know.  I don't know

17         where this came from.

18   Q.    Does Nike make announcements in documents

19         referred to as Nike News?

20   A.    I'm not sure.

21   Q.    As you see down at the bottom, it came from the

22         internet.

23             Is this a document that would have been

24         posted to Nike's website?

25             MR. PRINCE:  Objection; speculation.

Matheson, Monique                                February 22, 2021

Page 31

1              THE WITNESS:  I haven't seen this document.

2         I'm not sure where it came from.

3    Q.   BY MR. BARRY GOLDSTEIN:  Does it refresh your

4         recollection that you're, you were announced as

5         the new EVP on July 18, 2017?

6    A.   I don't recall the specific date.  And this date

7         is, is in the, is in the ballpark of when I

8         would have been announced.

9    Q.   Do you know if the announcement of your

10        appointment as the new EVP was made on the same

11        day that Mr. Ayre's retirement was announced?

12             MR. PRINCE:  Asked and answered.

13             THE WITNESS:  I don't recall specifically,

14        although it makes sense that I would not be

15        announced into a job unless it had already been

16        announced that David was not in the job.

17   Q.   BY MR. BARRY GOLDSTEIN:  By "David" you're

18        referring to David Ayre?

19   A.   I'm referring to David Ayre.

20   Q.   Do you know if Mr. Parker informed Mr. Ayre at

21        the 2017 leadership conference in the Willamette

22        Valley that he had to leave the conference?

23             MR. PRINCE:  Objection; vague, speculation.

24             THE WITNESS:  I don't know what

25        conversations occurred between Mr. Parker and

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 74, Page 6 of 28

Matheson, Monique                          February 22, 2021

Page 75

```
 1              MR. BYRON GOLDSTEIN:  Ms. Matheson, we can
 2        either do it for you or you can right click on
 3        the screen and then do you see where it says
 4        rotate clockwise?
 5              THE WITNESS:  Yes.
 6              MR. BYRON GOLDSTEIN:  So whichever you
 7        prefer.  It's just how the court reporter saved
 8        them last time.  But we're happy to do it on our
 9        end if you prefer.
10              THE WITNESS:  I've got it.  Just take a
11        second.
12              I believe that I would have seen -- Well,
13        let me back up.  When the survey --
14   Q.   BY MR. BARRY GOLDSTEIN:  Pardon?
15   A.   When the survey is provided to Nike, I did a
16        initial review of the surveys.  I don't recall
17        all the pages or the contents of the surveys.
18        So the format looks familiar, but I don't recall
19        if I saw all of these pages when I did that
20        review.
21   Q.   Let me ask you about the format.  Do you recall
22        that the format of the survey was at the first
23        page, was the same for the survey and it's the
24        first page of Exhibit 587, which is
25        NIKE_00033338?  Do you recall that this being
```

Matheson, Monique                                February 22, 2021

Page 76

 1        the first page for the survey responses that you
 2        saw?
 3    A.  My recollection is that this was the first page
 4        of most of the surveys.
 5    Q.  And it had two general areas, discrimination or
 6        other harassment and sexual harassment; is that
 7        correct?
 8    A.  I -- This first page has those two, those two
 9        areas.  So I believe this page was the first
10        page of the survey.
11    Q.  Okay.  Now, some of the survey responses were
12        anonymous.  This one was not.  It's listed as
13        ██████████.  Do you know ███████████?
14    A.  I do.
15    Q.  How do you know ████████████
16    A.  She was a Nike employee.
17    Q.  What was her position?
18    A.  She held a number of positions at Nike.  I
19        believe her most recent position was the GM of
20        New York City.
21    Q.  And that's a vice president level position, is
22        it not?
23    A.  She was a vice president.
24    Q.  Is ████████████ still with Nike?
25    A.  ████████████ is no longer an employee at Nike.

Page 81

```
 1        concerns of an employee, to take notes of any
 2        interview you had with an employee?
 3    A.  It is my general practice to take notes when I'm
 4        talking to employees who've brought a concern
 5        forward.
 6            MR. BARRY GOLDSTEIN:  Why don't we take a
 7        ten-minute -- You'd like to take a recess now?
 8            THE WITNESS:  Yes, please.
 9            MR. BARRY GOLDSTEIN:  Okay.  So it's noon.
10        12:10?  Is ten minutes enough time,
11        Ms. Matheson?
12            THE WITNESS:  I think it's okay.
13            MR. BARRY GOLDSTEIN:  Okay.  12:10.
14            (Break taken from 11:59 to 12:15.)
15    Q.  BY MR. BARRY GOLDSTEIN:  Ms. Matheson, did you
16        write up a summary or a report of your
17        conversation with _____ regarding the
18        concerns that she raised in the survey document?
19            MR. PRINCE:  Asked and answered.
20            THE WITNESS:  I don't have a specific
21        recollection of writing up notes from my meeting
22        with _____.  But as I stated earlier, it
23        would have been my practice to write notes.
24    Q.  BY MR. BARRY GOLDSTEIN:  You did give that
25        testimony about notes, but I asked about a
```

Matheson, Monique                           February 22, 2021

Page 83

```
 1              THE WITNESS:  Could you repeat that
 2       question?
 3              MR. BARRY GOLDSTEIN:  Aleshia, please.
 4              (Record read as follows:
 5              "Q    Would there be a record of the
 6              conclusions reached with respect to the
 7              investigation of ██████████ complaint?")
 8              THE WITNESS:  There was an investigation
 9       into every concern that was brought forward,
10       including ██████████.  I believe there would
11       be a report associated with the investigation.
12       I don't recall seeing it.
13  Q.   BY MR. BARRY GOLDSTEIN:  Did you recall -- Do
14       you -- Have you seen the investigation report
15       with respect to any of the complaints that were
16       filed in the Starfish survey?
17              MR. PRINCE:  Vague as well as foundation.
18              THE WITNESS:  As I said earlier, every
19       concern that was raised was followed up on.  I'm
20       not sure the status of the reports.  I recall
21       seeing some reports.  I do not recall which
22       specific reports I reviewed.
23  Q.   BY MR. BARRY GOLDSTEIN:  Do you recall, were
24       there conclusions with respect to the validity
25       of the complaints made in the survey included in
```

Matheson, Monique                                    February 22, 2021

Page 84

```
 1          the reports that you saw?
 2              MR. PRINCE:  Same objection.
 3              THE WITNESS:  The reports, I don't recall
 4          the specific reports.  The reports would have
 5          provided an overview of what the investigation
 6          found as part of a followup.
 7    Q.    BY MR. BARRY GOLDSTEIN:  Where are those reports
 8          retained?
 9    A.    I don't know where they're retained.
10    Q.    Do you know if the reports related to the
11          complaints made in the Starfish survey have been
12          retained by Nike?
13    A.    All of the concerns, all of the employee
14          concerns that were brought forward in a
15          followup.  And our outside counsel took the full
16          set of surveys and ensured that everyone had a
17          followup.  I don't know where the reports are
18          kept right now.  I do believe that Nike would
19          have maintained a copy of the reports.  I don't
20          know where they are or who has them.
21    Q.    You testified that it was your usual practice to
22          take notes with respect to conversations that
23          you had with employees who raised concerns.
24          Where would the notes that you would take of
25          those interviews be retained?
```

Beovich Walter & Friend

1-800-541-4452              503-228-7201          www.bwfreporters.com

Sun Decl. Ex. 74, Page 11 of 28

Matheson, Monique                                    February 22, 2021

```
 1        would have been shared for the relevant followup
 2        investigation.
 3   Q.   When you interviewed vice president ████, was
 4        there anyone else on that conversation that you
 5        had with ████████?
 6   A.   Yes.
 7   Q.   Is it a telephone conversation?
 8   A.   I believe it was an in-person conversation.
 9   Q.   Where did that in-person conversation take
10        place?
11   A.   I believe it happened, I believe it occurred in
12        a conference room on the first floor of the Dan
13        Fouts or the Salazar building, one of the --
14   Q.   This is at Nike World -- Excuse me.  This is at
15        Nike World Headquarters?
16   A.   Yes.  In a conference room in one of the Nike
17        buildings here on campus.
18   Q.   Who else was present when you had this in-person
19        conversation with ████████?
20   A.   Our chief administrative officer, Hilary Krane.
21   Q.   Did you talk to other employees who responded to
22        the Starfish survey about their complaints?
23   A.   I spoke with a number of employees who brought
24        concerns forward.  Not all of whom completed a
25        survey.
```

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Sun Decl. Ex. 74, Page 12 of 28

Matheson, Monique                                February 22, 2021

Page 89

```
 1      survey.
 2  Q.  Was your conversation with ████████ in person?
 3  A.  Yes.
 4  Q.  Was it -- Excuse me.
 5  A.  Yes.  I had an in-person conversation with ███
 6      ██████.
 7  Q.  Is ██████████ still employed at Nike?
 8  A.  She is no longer a Nike employee.
 9  Q.  What was ████████████ last position at Nike?
10  A.  I don't recall her title.
11  Q.  Was she a vice president?
12  A.  She was.
13  Q.  Was anyone else present when you met with ████
14      ██████?
15  A.  Yes.
16  Q.  Who was present?
17  A.  Hilary Krane, I believe.
18  Q.  Did you take notes of your meeting with █████
19      ██████?
20  A.  Yes.  I believe I would have taken notes at the
21      advice of counsel and consistent with my
22      practice.  I very likely took notes during that
23      conversation.
24  Q.  Would your notes reflect whether or not Hilary
25      Krane was present?
```

Matheson, Monique                          February 22, 2021

Page 91

```
 1   Q.   Did you take notes during that meeting?
 2   A.   I don't have specific recollection of taking
 3        notes.  And it would have been my practice to
 4        take notes, and likely on the advice of counsel,
 5        I would have taken notes.
 6   Q.   You also met with          , and I'm sorry I don't
 7        have her last name.  But you know who I'm
 8        referring to?
 9   A.   I believe you're referring to                    .
10   Q.   Right.  Did you meet with her in person?
11   A.   I did.
12   Q.   Was Ms. Krane present at that meeting as well?
13   A.   I don't recall if Hilary was present for that
14        meeting.
15   Q.   Do you recall if anybody else was present at
16        that meeting?
17   A.   No one else would have been present in that
18        meeting.
19   Q.   Is, is          still an employee with the
20        company?
21   A.            is not an employee of Nike.
22   Q.   What was her position at the time that she made
23        a complaint with the Starfish survey?
24   A.   I believe          was a vice president in our
25        design organization.
```

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 74, Page 14 of 28

Matheson, Monique                              February 22, 2021

Page 100

```
 1            MR. BARRY GOLDSTEIN:  Why don't we take a
 2       lunch period.
 3            (Break taken from 12:57 to 1:47.)
 4  Q.   BY MR. BARRY GOLDSTEIN:  Okay.  We've uploaded
 5       an exhibit marked as 506, Uniform Guidelines on
 6       Employee Selection Procedures.  Ms. Matheson,
 7       let me know when you have this document up,
 8       please.
 9  A.   Okay.  I have the Code of Federal Regulations
10       up.  Hang on one minute.  I'm not able to --
11       Okay.
12  Q.   If you look down it says "Part 1607, Uniform
13       Guidelines and Employee Selection Procedures."
14       Are you familiar with the uniform guidelines?
15  A.   I am not.
16  Q.   I'll just ask you a couple of questions with
17       respect to these guidelines.  I'm going to ask
18       you a question on page 19 of the guidelines.
19       It's section 1607.16X.  And I will read that,
20       Ms. Matheson.
21  A.   Give me a minute.
22  Q.   Do you have it?
23  A.   I'm not quite there.  Page 17, you said?
24  Q.   19.
25  A.   Okay.  I'm on page 19.
```

Matheson, Monique                                    February 22, 2021

Page 101

1    Q.    And I want to read to you section X.

2    A.    Okay.

3    Q.    "Validated in accordance with these guidelines

4          or properly validated.  A demonstration that one

5          or more validity study or studies meeting the

6          standards of these guidelines has been

7          conducted, including investigation and, where

8          appropriate, use of suitable alternative

9          selection procedures as contemplated by section

10         3B and has produced evidence of validity

11         sufficient to warrant use of the procedure for

12         the intended purpose under the standards of

13         these guidelines."

14              My question, Ms. Matheson, is do you know if

15         any validity study has been conducted by Nike

16         with respect to promotion practices?

17              MR. PRINCE:  Vague and ambiguous.

18              THE WITNESS:  I'm not sure whether any

19         validation studies have been completed.

20   Q.    BY MR. BARRY GOLDSTEIN:  Do you know of any such

21         validity studies as defined by what I just read

22         from the uniform guidelines?

23   A.    I'm not aware.

24              MR. PRINCE:  Vague.  Hang on.  Vague and

25         also to the extent it would call for an expert

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 74, Page 16 of 28

Matheson, Monique                              February 22, 2021

Page 102

 1       opinion or a legal conclusion.
 2             THE WITNESS:  I'm not aware of any
 3       validation studies have been completed.
 4    Q.  BY MR. BARRY GOLDSTEIN:  Is that true with
 5       respect to proponents evaluation practices as
 6       well?
 7             MR. PRINCE:  Same objections.
 8             THE WITNESS:  Yes.  I'm not aware of
 9       validation studies being conducted regarding
10       performance evaluation process.
11    Q.  BY MR. BARRY GOLDSTEIN:  Would the same be true
12       with respect to compensation practices?
13             MR. PRINCE:  Same objections.
14             THE WITNESS:  I'm not aware of validation
15       studies pursuant to these guidelines being
16       conducted --
17    Q.  BY MR. BARRY GOLDSTEIN:  Do you know what a
18       lease -- Excuse me.  Had you finished,
19       Ms. Matheson?
20    A.  Yes.  Go ahead.
21    Q.  Do you know a Lisa Lewen, L E W E N?
22    A.  That name does not -- I recognize the name.  I
23       don't...  I don't know more than that.
24    Q.  Do you know if she's in the talent practices
25       department at Nike?

Beovich Walter & Friend

1-800-541-4452              503-228-7201            www.bwfreporters.com

Sun Decl. Ex. 74, Page 17 of 28

Page 103

```
 1    A.    I'm not sure.
 2    Q.    Does talent practices report to you?
 3    A.    Yes.  The talent organization reports up to me.
 4    Q.    We're uploading an exhibit marked as 615.  It's
 5          a LinkedIn profile for Lisa Lewen, has her
 6          picture on it.  I'm going to ask you whether or
 7          not this profile with her picture refreshes your
 8          recollection about Ms. Lewen.  Do you have that
 9          exhibit before you?
10    A.    I see.  I do.  I do.
11    Q.    Does this exhibit refresh your recollection
12          about Ms. Lewen?
13               MR. PRINCE:  Vague.
14               THE WITNESS:  It does not.
15    Q.    BY MR. BARRY GOLDSTEIN:  Returning back to
16          Exhibit 506, which is the uniform guidelines,
17          and looking on page 18, there is a definition of
18          job analysis.  In section K it reads "A detailed
19          statement of work behaviors and other
20          information relevant to the job."
21    A.    I see that.
22    Q.    Do you know of any job analysis that Nike has
23          performed with respect to this definition for
24          any job at Nike World Headquarters in bands L
25          through S?
```

Matheson, Monique                              February 22, 2021

Page 104

1          MR. PRINCE:  Vague, compound, calls for
2     expert opinion or legal conclusion.
3          THE WITNESS:  I do not know if any job
4     analysis pursuant to this federal standard has
5     been conducted for Nike.
6  Q.  BY MR. BARRY GOLDSTEIN:  Turning to page 12 in
7     section 1607.15.
8  A.  I'm at that section.
9  Q.  And I'll just read it, "Required information.
10    Users of selection procedures other than those
11    users complying with Section 15A(1) below,
12    should maintain and have available for each job
13    information on adverse impact of the selection
14    process for that job and, where it is determined
15    a selection practice has an adverse impact,
16    evidence of validity as set forth below."
17         Does Nike have available any information on
18    adverse impact as provided for in this section
19    with respect to any selection practices used for
20    jobs in bands L through S at Nike World
21    Headquarters on female employees?
22         MR. PRINCE:  Vague, compound, calls for
23    expert opinion or legal conclusion.
24         THE WITNESS:  I'm going to need you to
25    repeat that question.

Beovich Walter & Friend

1-800-541-4452           503-228-7201       www.bwfreporters.com

Sun Decl. Ex. 74, Page 19 of 28

Matheson, Monique                    February 22, 2021

Page 111

```
 1        you're withholding any information based on
 2        privilege, please let me know whether you are
 3        doing so.  Obviously don't reveal that
 4        information that you're withholding because of
 5        privilege, but let me know if you are
 6        withholding any information.
 7             THE WITNESS:  I am not clear on the question
 8        that you're asking.
 9   Q.   BY MR. BARRY GOLDSTEIN:  Mr. Parker says there's
10        going to be a comprehensive review of HR
11        practices.  My question is during that
12        comprehensive review, was there any
13        investigation of whether or not there were
14        allegations of misconduct that had been raised
15        with respect to Mr. Ayre?
16             MR. PRINCE:  Same objections here.
17             THE WITNESS:  The review of our HR systems
18        and practices was, I'm not trying to be
19        difficult, I'm not quite understanding your
20        question.  The HR systems and practices that
21        were reviewed included systems and practices
22        that were in place when David Ayre was the CHRO
23        as well as the systems and practices that were
24        in place at the time.
25   Q.   BY MR. BARRY GOLDSTEIN:  Is it fair to say that
```

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Sun Decl. Ex. 74, Page 20 of 28

Matheson, Monique                    February 22, 2021

Page 112

1       you don't know of any investigation involved in

2       this comprehensive review that examined whether

3       there are allegations of misconduct by ███████?

4            MR. PRINCE:  Same objections here as well as

5       asked and answered and argumentative.  With

6       respect to the scope of the review, as I've

7       stated probably three times now, the instruction

8       is not to answer to the extent that it would

9       reveal attorney-client privileged

10      communications.

11           THE WITNESS:  If there was a concern

12      involving ██████████, it would have been, it

13      would have been handed over to our third-party

14      legal firm Seyfarth, who would have determined

15      what fact finding and followup should occur.

16  Q.  BY MR. BARRY GOLDSTEIN:  Do you know if the

17      attorneys at Seyfarth Shaw did any investigation

18      with respect to misconduct by ██████████

19           MR. PRINCE:  Same objection, Barry;

20      privilege.

21           MR. BARRY GOLDSTEIN:  Well, if you direct

22      Ms. Matheson not to answer that question, we'll

23      move on.

24           MR. PRINCE:  That's the instruction.

25           MR. BARRY GOLDSTEIN:  Okay.  We'll move on.

Matheson, Monique                                February 22, 2021

Page 181

```
1         organization.
2    Q.   Does that, does that refer to the value bands?
3    A.   Yes.  The bands are represented in the letters
4         of the word "value."
5    Q.   And --
6    A.   Value --
7    Q.   Does it also refer to the E7 plus bands?
8    A.   Yes.  It also includes our vice president
9         levels.
10   Q.   And when you say "vice president levels," the
11        vice presidents are in the bands E7 to E1; is
12        that correct?
13   A.   Vice presidents are E7 to E1.  Yes.
14   Q.   Right.  And that's what is generally referred to
15        as E7 plus; right?
16   A.   I guess it could be referred to as E7 plus.
17   Q.   Okay.  Now, within bands there are also levels,
18        are there not?
19   A.   Some bands, some jobs have a band and a job
20        level, but I don't believe every job has a band
21        and a job level.  I'm not, I'm not familiar with
22        the full level and banding information for Nike.
23   Q.   When you were referring here to banding, were
24        you also referring to levels within bands?
25   A.   For me banding is more the levels of the values
```

Beovich Walter & Friend

1-800-541-4452              503-228-7201          www.bwfreporters.com

Sun Decl. Ex. 74, Page 22 of 28

Matheson, Monique                                    February 22, 2021

1   A.   She did report to me.

2   Q.   Did she report to you in 2018?

3   A.   She began to report to me in the spring of 2018.

4   Q.   Do you know if she was on the team that was to

5        undertake the time and place and promotion

6        study?

7   A.   I don't recall specifically.

8   Q.   Does Julie Fuller report to you?

9   A.   Julie Fuller did report to me.

10  Q.   Did she report to you in 2018?

11  A.   Julie Fuller did report to me in the spring of

12       2018.

13  Q.   Do you know if she was on the team that was to

14       undertake the time in place and pace of

15       promotion pay study?

16  A.   I don't recall specifically.

17  Q.   Do you recall if Ms. Lauren Thibodeaux was on

18       the team that was to undertake the pace of

19       promotion and time in place study?

20  A.   I don't recall specifically.

21  Q.   Isn't it true that the team in the study began

22       to do its work in June of 2018?

23  A.   I don't recall when the work was initiated.

24  Q.   Has the work stopped at some point?

25  A.   On the advice of counsel we paused the work.

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 74, Page 23 of 28

Matheson, Monique                          February 22, 2021

Page 186

1    Q.    Do you recall when it was paused?

2    A.    I do not recall when it was paused.

3    Q.    You say "pause."   That means it may start up

4          again, in my view.   Is that what you mean by

5          "pause"?

6    A.    Yes.   I believe we may, we very well may start

7          this up again at some point in the future.

8    Q.    But you haven't started it up again, have you?

9    A.    We have not started it up again.   No.

10   Q.    Do you know if the study was conducted for

11         several months?

12   A.    I'm not aware.

13   Q.    Do you know the reason that the study was

14         stopped on advice of counsel?

15               MR. PRINCE:   Objection; privilege, Court's,

16         also The Court's 2020 order.

17               MR. BARRY GOLDSTEIN:   Just asking if she

18         knows.

19               MR. PRINCE:   Objection remains on the basis

20         of privilege and The Court's October 2020 order.

21   Q.    BY MR. BARRY GOLDSTEIN:   Was there an answer?

22   A.    I'm sorry.   What was the question again?

23   Q.    Do you know why the study was stopped on advice

24         of counsel?

25   A.    I do not recall why the study was stopped on the

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 74, Page 24 of 28

Matheson, Monique                           February 22, 2021

Page 187

1          advice of counsel.

2    Q.    In your e-mail there is a section "Driving

3          Toward Change."  And there's a bullet point

4          "Hold Leaders Accountable."  What do you mean by

5          "leaders"?

6    A.    As I mentioned earlier, when we think about

7          increasing representation, we think about

8          increasing representation of women and U.S.

9          people of color.  And we do that by looking at

10         promotions, retention and hiring.  And the

11         leaders who we started with were the top

12         leadership team, the direct reports to the CEO.

13   Q.    How are leaders held accountable?

14   A.    We provided each leader with visibility to the

15         diverse representation data for their business

16         unit and we showed them what the data showed on

17         promotion, retention and hiring and we worked

18         with them to use this data to inform talent

19         plans and strategies designed to increase

20         representation.

21   Q.    When you say "we," who are you referring to?

22   A.    My team and I provided visibility to the

23         information and we looked at this information

24         with Mark Parker.

25   Q.    I'm sorry.  I missed, I missed the name.

Matheson, Monique                                    February 22, 2021

 1       these documents.

 2   Q.  Who on the legal team?

 3   A.  Our in-house employment counsel.

 4   Q.  Can you tell me specifically who?

 5   A.  During this period I believe it was a

 6       combination of Lauren Thibodeaux and Rob

 7       Leinwand.

 8   Q.  Okay.  Let's return to Exhibit 512 under

 9       "Inclusive Hiring."  And towards the end of that

10       bullet point there's a statement, "Remove bias

11       from critical moments of the hiring process by

12       creating more inclusive job descriptions,

13       enabling blind resume reviews, eliminating the

14       collection of candidate salary history and using

15       data to inform hiring decisions."

16           Do you see that?

17   A.  I do.

18   Q.  What is meant by "inclusive job descriptions"?

19   A.  Inclusive job descriptions are intended to

20       remove the types of things that can create

21       unnecessary or artificial barriers to access to

22       the jobs.

23   Q.  We're uploading a document that is marked as

24       Exhibit 510.  It's a job description for

25       professional entry and the job code is A0054.

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Sun Decl. Ex. 74, Page 26 of 28

Matheson, Monique                                February 22, 2021

Page 198

1          This is just an example of a Nike job

2          description.  Is this what you mean by "job

3          description"?

4     A.   I don't recognize this document.

5     Q.   What are you referring to as a "job description"

6          in this sentence?

7     A.   Our Talent Acquisition team, when they are

8          posting roles, whether it's internally, for

9          internal or external candidates, they use a job

10         description that we explicitly edit to remove

11         anything that might create an artificial barrier

12         to applicants who are otherwise qualified to the

13         role.

14    Q.   Who would be responsible in talent acquisitions

15         for carrying out the goal of creating more

16         inclusive job descriptions?

17    A.   I don't know.  I don't know who's responsible

18         for that specific task.

19    Q.   And talent acquisitions does report to you, does

20         it not?

21    A.   Talent acquisitions does report to me.

22    Q.   We're uploading two documents, Exhibit 552 and

23         555.  Exhibit 552 is a e-mail dated July 23rd,

24         2018, subject, "Upcoming Pay and Reward Changes"

25         from yourself to Nike employees.

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 74, Page 27 of 28

Matheson, Monique                                February 22, 2021

Page 214

```
 1              C E R T I F I C A T E

 2

 3        I, Aleshia K. Macom, Oregon CSR No. 94-0296,

 4    Washington CCR No. 2095, California CSR

 5    No. 7955, RMR, CRR, RPR, do hereby certify that

 6    MONIQUE MATHESON appeared before me remotely at

 7    the time and place mentioned in the caption

 8    herein; that the witness was by me first duly

 9    sworn on oath, and examined upon oral

10    interrogatories propounded by counsel; that said

11    examination, together with the testimony of said

12    witness, was taken down by me in stenotype and

13    thereafter reduced to typewriting; and that the

14    foregoing transcript, pages 1 to 213, both

15    inclusive, constitutes a full, true and accurate

16    record of said examination of and testimony

17    given by said witness, and of all other

18    proceedings had during the taking of said

19    deposition, and of the whole thereof, to the

20    best of my ability.

21        Witness my hand at Portland, Oregon, this

22    3rd day of March, 2021.

23

      _____

24    Aleshia K. Macom

      OR CSR No. 94-0296, Expires 9-30-2023

25    WA CCR No. 2095, Expires 7-7-2021
```

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Sun Decl. Ex. 74, Page 28 of 28