IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                    )
individually and on behalf of            )
of others similarly situated,            )
                                         )
                    Plaintiffs,          )
                                         )
        vs.                              )   No. 3:18cv-01477-JR
                                         )
NIKE, INC., an Oregon                    )
corporation,                             )
                                         )
                    Defendant.           )


VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME I


DATE TAKEN:  December 17, 2020
TIME:        9:30 a.m.
PLACE:       Virtual

Walker, Shane - Vol. 1                    December 17, 2020

```
 1                         APPEARANCES

 2    FOR THE PLAINTIFFS:    MR. BARRY GOLDSTEIN

 3                           MR. BYRON GOLDSTEIN

 4                           MR. JAMES KAN

 5                           MR. MENGFEI SUN

 6                           Goldstein, Borgen, Dardarian,

 7                           Ho

 8                           300 Lakeside Drive, Ste. 1000

 9                           Oakland, CA  94612

10

11    FOR THE DEFENDANT:    MS. FELICIA DAVIS

12                           MS. LAURA ZABELE

13                           MS. ALYSON SMITH

14                           MS. LAUREN THIBODEAUX

15                           Paul Hastings, LLP

16                           515 South Flower Street

17                           25th Floor

18                           Los Angeles, CA  90071

19

20

21

22

23

24

25
```

Beovich Walter & Friend

1-800-541-4452            503-228-7201            www.bwfreporters.com

Sun Decl. Ex. 81, Page 2 of 38

Page 43

1    BY MR. BARRY GOLDSTEIN:

2         Q.   Do you understand the term validation?

3         A.   Can you define that, please?

4         Q.   Are you familiar with the guidelines of

5    employee selection procedures?

6         A.   I am not.   Can you define that, as well?

7         Q.   I'll show you a copy and ask you if you've ever

8    seen it.

9              Can you see the --

10        A.   Okay.   I have the document up.

11        Q.   Have you ever seen this document before, sir?

12        A.   No.

13             (Deposition Exhibit No. 506 was marked for

14   identification.)

15   BY MR. BARRY GOLDSTEIN:

16        Q.   So you wouldn't be able to testify as to

17   whether or not these requirements have been validated in

18   accordance with the requirements set forth in the uniform

19   guidelines which I've just had marked as Exhibit 506.

20        A.   I would --

21             MS. DAVIS:   The question is vague and

22   ambiguous, and it assumes that the guidelines apply to

23   the compensation programs that Mr. Walker is here to

24   testify about, calls for a legal or expert opinion.

25             Go ahead.   Sorry, Mr. Walker.

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Sun Decl. Ex. 81, Page 3 of 38

Page 45

```
 1        Q.   Do you have it, Mr. Walker?
 2        A.   I'm downloading it now.  Okay.  I have the
 3   document up.
 4        Q.   Would you know who prepared this document?
 5        A.   No, I do not.
 6        Q.   Can you turn to slide 11, please.
 7        A.   Okay.
 8        Q.   These are the pipelines that I was referring to
 9   earlier.
10             Does this refresh your recollection that Nike
11   has 20 pipelines?
12        A.   At one point in time, yes, we would have had 20
13   pipelines.  I would also refer to this as job function.
14        Q.   So pipelines and functions are interchangeable?
15        A.   Pipeline and function I would not say are
16   interchangeable, but pipeline and job function are
17   interchangeable.
18        Q.   So we could say that -- I see one of the
19   pipelines here is human resources, and you would be in
20   the human resources pipeline; is that correct?
21        A.   Yes.
22        Q.   And you would also call that, you'd be in the
23   human resources job function?
24        A.   Yes.
25        Q.   If you could turn to slide 20.
```

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 4 of 38

Page 52

1    determine job levels in leveling criteria.

2            Do you see that?

3        A.  Yes.

4        Q.  Now, when we're talking about levels, we're

5    talking about the 10 levels that -- that are related to

6    the four bands, L through S?

7        A.  Yes, more than ten, but, yes.  They are the job

8    levels associated with each of the programs.

9        Q.  But there are ten, aren't there?

10       A.  Yes, there are ten.  Sorry.

11       Q.  I just want to be sure we're on the same page.

12           MS. DAVIS:  I'll object.  That misstates the

13   document.

14           MR. BARRY GOLDSTEIN:  I'm not referring to the

15   document.  I'm referring to whether there were ten levels

16   in the four bands, L through S.

17   BY MR. BARRY GOLDSTEIN:

18       Q.  There's leveling criteria.  What are the

19   leveling criteria?

20       A.  So they describe the level of work for each job

21   level and they cover things like spoken impact,

22   communication influence and knowledge and experience.

23       Q.  Are criteria what are used to establish what

24   level a job is placed within?

25       A.  There is leveling criteria describes a level of

Page 53

1    work for each job, and within each job family, there is

2    going to be a full set of levels that are linked to each

3    of the criteria.

4        Q.  But these -- the leveling criteria are used to

5    place jobs that are similar with respect to these three

6    criteria within levels?

7            MS. DAVIS:  The question is vague and

8    ambiguous.

9            If you understand it, you can answer.

10           THE WITNESS:  Again, the leveling criteria

11   describes the level of work that is tied to each job

12   level.  It would not describe anything related to the job

13   itself.

14   BY MR. BARRY GOLDSTEIN:

15       Q.  I'm confused, because if we just take scope and

16   impact, it describes the scope and impact of the job

17   within Nike, including the degree to which the job

18   identifies solutions to problems, makes autonomous

19   decisions and is responsible for managing talent,

20   performance and pay.

21           Isn't that related to the job?

22       A.  So every job at Nike has a job level, so in the

23   way that it relates to the job is the level of work.

24       Q.  Okay.  And in using these leveling criteria, is

25   it fair to say that the level of work is comparable for

Walker, Shane - Vol. 1                              December 17, 2020

Page 54

1    all the jobs that are in a particular level?

2         A.   So it is the guidance we provide, so it's the

3    framework we use, so each job within a certain level

4    would have generally the same level of responsibility

5    across those criteria.

6         Q.   When you say it is the guidance we provide, is

7    that -- are you referring to the compensation team?

8         A.   Yes.

9         Q.   And you're providing that guidance to other

10   parts of HR?

11        A.   So we provide it to our HR business-facing

12   roles as well as managers.

13        Q.   How were these three leveling criteria

14   developed?

15        A.   Similar to the document we looked at earlier

16   that had criteria listed around where we talked about the

17   requirements, we look at the market to help us define

18   what is -- what is the job level that we're seeing in the

19   market.  They typically have descriptions of what is

20   required for each of those job levels, and then we use

21   that to kind of a baseline for building our criteria for

22   Nike.

23        Q.   Turning to Exhibit 507.  Has that been

24   downloaded?  Could you look at Exhibit 507, please, Mr.

25   Walker?

Walker, Shane - Vol. 1                                    December 17, 2020

1      A.  No.

2      Q.  Now, agreement -- it looks like the first goal,

3  agreement on benchmark jobs and their matches, what does

4  this goal mean?

5      A.  So not all of Nike's jobs exist in the market,

6  so we are matching those jobs that had similar job

7  content at Nike and also had similar job content in the

8  market, which would be our survey vendors.

9          And so our intent of this was to agree on the

10  benchmark jobs across the team and make sure that we have

11  matched all the jobs at Nike to the appropriate salary

12  survey jobs.

13      Q.  So as I understand it, correct me if I'm wrong,

14  you take some jobs that you refer to as benchmark jobs

15  that are comparable to jobs that are -- generally exist

16  in the market with similar companies; is that correct?

17      A.  So we look at job content and we match our jobs

18  at Nike to the jobs that are in the market, and those are

19  what we consider to be our benchmark jobs.

20      Q.  When you say job content, what do you mean?

21      A.  Generally the nature of work of the job.  So a

22  finance job will have very different nature of work than,

23  for example, an HR job or a legal job, so it's the type

24  of work is what we are looking at.

25          And then the second piece is the level of work,

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Sun Decl. Ex. 81, Page 8 of 38

Walker, Shane - Vol. 1                    December 17, 2020

Page 63

1    which is tied to the criteria.

2        Q.   When you say -- are you matching in content or

3    are you thinking of the skills, abilities, knowledge and

4    experiences required for specific jobs?

5        A.   No.   I mean, not necessarily.

6             So we are -- when we are setting the jobs, we

7    are using the criteria that we just discussed and we're

8    looking at the job content, which I described as type of

9    work.   Those two things combined are what get us to the

10   ability to match to a job in the market.

11            For example, we discussed the requirements

12   section that we have, that is not something we would

13   necessarily use when we are benchmarking our jobs to the

14   market.

15       Q.   When you say the criteria, you're referring to

16   the three leveling criteria that we just discussed?

17       A.   Yes, the three leveling criteria or the other

18   exhibits that had the criteria listed by bands and level.

19       Q.   I just want to be sure, the other exhibit, I

20   think, that you're referring to is the Nike VALUES band

21   overview, which was Exhibit No. 505?

22       A.   Correct.

23       Q.   So you're looking go at the description of the

24   jobs or the content of the jobs in 505 along with the

25   three leveling criteria that we looked at?

Page 64

1      A.  I am using what you just -- 505 and leveling

2  criteria interchangeably.  They are both the same thing.

3      Q.  Who makes the determination as to which are the

4  benchmark jobs?

5      A.  So the compensation team.  In this particular

6  case, we had a group working session, and so it was a

7  collective, I would call it, consensus decision-making to

8  get to those benchmark jobs.

9      Q.  The second goal is agreement on senior manager

10  level and cleanup of job codes/families.

11          What is senior manager level?

12      A.  So that is a level that we see in the markets,

13  but we do not currently have at Nike.



Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 10 of 38

Walker, Shane - Vol. 1                     December 17, 2020

Page 90

1      A.   Yes.

2      Q.   -- Exhibit 505?

3      A.   Yes.   And we have gone through a transition to

4   talking about those in different terms over the past

5   several years.

6      Q.   And what do you mean you've gone through

7   talking about it in different terms?

8      A.   So I'm referring to slide 26 in Exhibit 500, we

9   talk about it in terms of scope and impact, communication

10  and influence and knowledge and experience, whereas on

11  the leveling guides, there were more granular views of

12  what each, I guess, bucket of criteria would be.   So

13  essentially what we've been trying to do is simplify the

14  way we talk about that criteria.

15     Q.   Thank you for the clarification.   Let me just

16  be sure that I understand it.

17          You indicated that the three leveling criteria

18  were the same as the more granular descriptions that were

19  on Exhibit 505 presented in a more simplified form; is

20  that accurate?

21          MS. DAVIS:   Misstates the testimony that

22  they're the same.

23          Go ahead.

24          THE WITNESS:   Yes, I was just going to say they

25  are not exactly the same, but they serve the same

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 11 of 38

Walker, Shane - Vol. 1                      December 17, 2020

Page 102

1              (Deposition Exhibit No. 515 was marked for

2       identification.)

3       BY MR. BARRY GOLDSTEIN:

4           Q.   We've downloaded another PowerPoint.   This is

5       Exhibit 515, fiscal year '20 Total Rewards Updates.   It

6       has a date of May 24, 2019.

7              What does Total Rewards refer to?

8           A.   So at Nike Total Rewards are our pay and

9       benefit programs.

10          Q.   And that would -- Total Rewards would fall

11      under the responsibility of the compensation team?

12          A.   The pay side of that would fall under the

13      compensation team.   We have a separate team responsible

14      for benefits.

15          Q.   Are stock awards part of benefits or part of

16      pay?

17          A.   So annual stock awards and discretionary stock

18      awards are considered part of pay.   Employee stock

19      purchase plans would be considered a benefit.   And some

20      of this information is also in Exhibit 500, on slides 10

21      through, I believe, 20.   10 through 20 has the definition

22      of what Total Rewards are at Nike.

23          Q.   If you turn to -- do you know who prepared --

24      is this a training presentation, this PowerPoint?

25          A.   So I felt like there were two questions in

Beovich Walter & Friend

1-800-541-4452            503-228-7201            www.bwfreporters.com

Sun Decl. Ex. 81, Page 12 of 38

Page 103

1    there.  I don't know who prepared this document.

2          And from just looking over the content of it,

3    yes, it does look like a training document of some kind.

4          Q.  Would it be prepared by the compensation team,

5    someone on the compensation team?

6          A.  It's possible.  What I can see in here is that

7    there are slides that were pulled from Exhibit 500, which

8    is our Nike training, so there likely was some

9    involvement from the compensation team.  My guess would

10   be it was a combination of compensation and talent

11   acquisition in partnership.

12         Q.  I did notice that somebody was stealing your

13   work.

14         A.  It should be all over now.

15         Q.  The first bullet point:  We recognize that it's

16   helpful to have guidelines to follow when making pay

17   decisions.

18         Does that apply for pay decisions at Nike that

19   there are guidelines for managers and executives to

20   follow in making pay decisions?

21         A.  I'm sorry.  What part are you referencing?

22         Q.  6 in the notes.

23         A.  Got it.

24         Can you please repeat the question?

25         Q.  The bullet point says:  We also recognize that

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 13 of 38

Walker, Shane - Vol. 1                     December 17, 2020

Page 113

1    efficient way of managing pay across the company.

2            With market zones, we had approximately 100,000

3    market zones that we were having to manage within the

4    compensation team and as a company.  And managers, also,

5    managers, HR, talent acquisition were also having to

6    refer to each of those data points to make pay decisions

7    when they were in various processes.  And so we moved to

8    pay ranges, which just simplified the way that we managed

9    pay for employees.

10       Q.  And you devised the pay ranges with the

11   benchmarking and market assessment that we've discussed?

12       A.  Yes.

13       Q.  If you turn to slide 5.

14       A.  Okay.

15       Q.  What does this slide indicate?

16       A.  So the documents essentially shows how our pay

17   structures are spread out across each of the job levels

18   and bands at Nike, so if you're looking at the rows,

19   those are tied to each of the job levels.  And then the

20   columns under the pay range represent essentially what

21   turns into a pay grade and the pay range tied to that.

22            If you're looking at the entry level, there are

23   five pay grades within --

24       Q.  Excuse me.  Let's look at this --

25            MS. DAVIS:  Can you just -- can you just let

Page 123

1    things consistent in terms of what our pay structures

2    might show up in the U.S. are versus another location, or

3    if they show up in a similar way from one job function

4    versus another job function.  <u>We wouldn't want to build</u>

5    <u>pay ranges, for example, that are drastically different</u>

6    <u>for one of our job functions in pipeline versus another,</u>

7    <u>so we do aim to be consistent in our approach in how we</u>

8    <u>do pay ranges.</u>

9    BY MR. GOLDSTEIN:

10        Q.  Focusing on Nike World Headquarters, is there a

11   goal to have a consistent compensation practices at Nike

12   World Headquarters?

13            MS. DAVIS:  Objection, vague and ambiguous.

14            Go ahead.

15            THE WITNESS:  We provide the frameworks for our

16   managers to use, and so we do aim to provide consistent

17   frameworks and guidelines for our managers, but how those

18   are applied by our managers, anyone that's involved in a

19   pay decision, will be different.

20            (Deposition Exhibit No. 517 was marked for

21   identification.)

22   BY MR. BARRY GOLDSTEIN:

23        Q.  Again, as we move on with this deposition,

24   we'll talk about the role of E7+ in the pay decisions.

25   I'm not following up on the questions of managers and

Beovich Walter & Friend

1-800-541-4452            503-228-7201            www.bwfreporters.com

Sun Decl. Ex. 81, Page 15 of 38

1

CERTIFICATE

2

3    STATE OF OREGON        )

4                          ) ss

5    COUNTY OF MULTNOMAH )

6

7

8

9        I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
certify that said witness appeared before me via Zoom at
10   the time and place set forth in the caption hereof; that
at said time and place I reported in stenotype all
11   testimony adduced and other oral proceedings had in the
forgoing matter; that thereafter my notes were
12   transcribed through computer-aided transcription, under
my direction; and that the foregoing pages constitute a
13   full, true and accurate record of all such testimony
adduced and oral proceedings had, and the whole thereof.
14        I further certify review of the transcript was
not requested
15        Witness my hand at Portland, Oregon, this 27th
day of December 2020.

16

17

18

19

20

21

22                  Teresa L. Rider
                    Oregon CSR No. 12-0421
23                  Washington CCR No. 2119
                    Expires 12-03-23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                )
individually and on behalf of        )
of others similarly situated,        )
                                     )
                Plaintiffs,          )
                                     )
        vs.                          )    No. 3:18cv-01477-JR
                                     )
NIKE, INC., an Oregon                )
corporation,                         )
                                     )
                Defendant.           )


VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME II


DATE TAKEN:  December 18, 2020
TIME:        9:30 a.m.
PLACE:       Virtual


COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR

Page 150

```
 1                         APPEARANCES
 2    FOR THE PLAINTIFFS:    MR. BARRY GOLDSTEIN
 3                          MR. BYRON GOLDSTEIN
 4                          MR. JAMES KAN
 5                          MR. MENGFEI SUN
 6                          Goldstein, Borgen, Dardarian,
 7                          Ho
 8                          300 Lakeside Drive, Ste. 1000
 9                          Oakland, CA  94612
10
11    FOR THE DEFENDANT:    MS. FELICIA DAVIS
12                          MS. LAURA ZABELE
13                          MS. LAUREN THIBODEAUX
14                          Paul Hastings, LLP
15                          515 South Flower Street
16                          25th Floor
17                          Los Angeles, CA  90071
18
19
20
21
22
23
24
25
```

Page 178

1   validation?

2        A.   In this particular setting, no.  I think there

3   are many ways that validation can occur within

4   compensation, so I'm having a hard time understanding

5   what specifically this is relating to.

6        Q.   Now, the definition that we would use for

7   validation would be the one that's provided in the

8   Uniform Guidelines.

9             And could you look at Exhibit 506?

10       A.   Okay.  I have 506 open.

11       Q.   Okay.  And I'm going to read the definition of

12  validation, which is at Section 1607.16X.  It's near the

13  back of the document, sir.

14       A.   I just have to get there.

15            Okay.  I am at that section.

16       Q.   And the definition is:  Validated in accord

17  with these guidelines or properly validated.  Validated.

18  A demonstration that one or more validity study or

19  studies meeting the standards of these guidelines has

20  been conducted, including investigation and, where

21  appropriate, use of suitable alternative selection

22  practices as contemplated by Section 3B, and has produced

23  evidence of validity sufficient to warrant use of the

24  procedure for the intended purpose under the standards of

25  these guidelines.

Beovich Walter & Friend

1-800-541-4452                503-228-7201            www.bwfreporters.com
Sun Decl. Ex. 81, Page 19 of 38

Page 179

1              Do you see that?

2      A.  I do.

3              MS. DAVIS:  I'll just object.  I'll object.

4  You misread one word.  It said selection procedures.

5              MR. BARRY GOLDSTEIN:  I copied it wrong.  Where

6  is that, Felicia?

7              MS. DAVIS:  I'm just reading the paragraph, but

8  you didn't read it accurately.

9              MR. BARRY GOLDSTEIN:  Suitable alternative

10  selection procedures is what I said.

11             MS. DAVIS:  You said suitable alternative

12  selection practices.

13             MR. BARRY GOLDSTEIN:  Oh, okay.  I should have

14  said procedures.  Is that correct, Felicia?

15             MS. DAVIS:  Yes.  That's what the document

16  says, yes.

17             MR. BARRY GOLDSTEIN:  Okay.  Thank you.

18  BY MR. BARRY GOLDSTEIN:

19      Q.  Mr. Walker, does that help you understand what

20  validation means?

21      A.  Generally, yes.

22      Q.  Have you ever seen validation evidence or study

23  at Nike?

24      A.  I have not.

25      Q.  I'm going to read you one other definition of

Page 184

1    If you want to use terminology --

2            MR. BARRY GOLDSTEIN:  I just asked him a

3    question, Felicia.  I just asked him a question.

4            MS. DAVIS:  It misstates his testimony.

5            MR. BARRY GOLDSTEIN:  I was asking him a

6    question.

7    BY MR. BARRY GOLDSTEIN:

8        Q.  Are you qualified to testify about Topic No.

9    24, Mr. Walker?

10       A.  Can you define what you mean by qualified to

11   testify on this topic?

12       Q.  Can you tell me what Nike understands the term

13   validation to mean?

14       A.  I cannot.

15           MS. DAVIS:  Let's take a break.

16           MR. BARRY GOLDSTEIN:  Okay.  Ten minutes?

17           MS. DAVIS:  That works.

18           (Off the record.)

19   BY MR. BARRY GOLDSTEIN:

20       Q.  Mr. Walker, I want to turn you to Topic 27.

21   Again, you can look at Topic 27 on Exhibit 502.

22       A.  Okay.

23       Q.  Topic 27 is Nike's use of job analyses in

24   establishing, modifying or implementing compensation,

25   policies or practices or establishing job codes, job

Walker, Shane - Vol. 2                           December 18, 2020

Page 185

1   levels, bands, subfamilies, families or functions, 2016

2   to the present.

3              Do you know of any use by Nike of job analyses

4   for the purposes listed in this topic?

5       A.   I am not aware that has occurred.

6       Q.   Turning to Topic 25.  I'll read it:  Compliance

7   with the Uniform Guidelines with respect to compensation,

8   policies or practices, as Nike understands that term and

9   to the extent it applies to compensation, policies or

10  practice, 2016 to the present.

11             You've already testified that you haven't seen

12  -- didn't see the Uniform Guidelines or you never

13  reviewed the Uniform Guidelines prior to this deposition,

14  but I want to focus my question on as Nike understands

15  this term.

16             Do you know how Nike understands the term

17  compliance with the Uniform Guidelines?

18      A.   I do not.

19      Q.   Mr. Walker, I want to turn your attention back

20  to Exhibit 522, which is the Annual Pay Review Deep Dive

21  Total Rewards, March 12, 2019.

22      A.   Okay.  I have it opened.

23      Q.   I have to bring it up on my screen.

24             Did this presentation occur on March 12, 2019?

25      A.   Yes, I believe so.

Beovich Walter & Friend

1-800-541-4452                503-228-7201              www.bwreporters.com

Sun Decl. Ex. 81, Page 22 of 38

Walker, Shane - Vol. 2                          December 18, 2020

Page 287

1       A.   Bernard Bedon, I think is how you say his last

2    name.

3            (Deposition Exhibit No. 524 was marked for

4    identification.)

5    BY MR. BARRY GOLDSTEIN:

6       Q.   If we could return to Exhibit 524.

7       A.   Okay.  I have the document open.

8       Q.   And again, if we could look at slide 15.  I'm

9    sorry.  I meant Exhibit 522.

10      A.   Okay.  Give me just a second.  Okay.  I have

11   that one open.

12      Q.   There's some overlap with the roles and

13   responsibilities that we discussed in the other

14   presentation that you did that was Exhibit 521, but I

15   think there's one or two additional ones for the HRBP:

16   Utilize reporting to ensure pay recommendations and

17   outcomes align with talent perspectives.  I think that

18   was listed with TRC in the prior presentation.

19           What is referenced by utilizing reporting to

20   ensure pay recommendations and outcomes align with talent

21   perspectives?

22      A.   Yeah.  Counsel just clarified something you

23   just said.  This document, 521, is from March -- 522 is

24   from March.  521 is from May.  They were intended to

25   serve the same purpose, and so we keep jumping around

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Sun Decl. Ex. 81, Page 23 of 38

Page 288

1  back and forth between the two, but we're referring to

2  older language in this particular document.

3      Q.   Okay.   In this document, is it a role, a

4  current role of HRBP to utilize reporting to ensure pay

5  recommendations and outcomes align with talent

6  perspectives?

7      A.   It is something that we do expect our HRBP and

8  TRCs to be looking at.

9      Q.   What's the reporting that is referenced?

10      A.   So the reporting in dashboards -- dashboard

11  tiles that are available in SuccessFactors.

12      Q.   And what specific tiles?

13      A.   Not necessarily one single tile.

14      Q.   Would those be the tiles that reflected

15  performance evaluations, such as CFE and talent

16  segmentation?

17      A.   Generally, they're going to have to be a

18  combination of the data that's available through the

19  dashboard to be able to make some of these assessments.

20  There's not one self-service view that's going to tell

21  them an answer on how that looks.

22      Q.   Would they be looking at the tile that

23  reflected CFE ratings?

24      A.   They may.   Each TRC goes about that process or

25  each HRBP goes about that process in a different way.

Walker, Shane - Vol. 2                         December 18, 2020

Page 301

1            MS. DAVIS:  I'll just object, briefly, that it

2     calls for a legal opinion and Mr. Walker is not an

3     attorney, but he can testify about his understanding.

4            Go ahead.

5            THE WITNESS:  Yes, so my understanding is in

6     this first year, it was -- it was protected, because

7     there are now two separate bodies of work that we do, the

8     below minimum piece is not protected.

9     BY MR. BARRY GOLDSTEIN:

10        Q.  Now, in the below minimum piece, it's not a

11    merit increase, but it would be an increase in salary

12    that would result; is that correct?

13        A.  Yes, we would make a pay adjustment for an

14    employee.

15    ██     ████████████████████████████████████████████████

16    ███████████████████████████████████████████████████████

17    ██████████████████████████████████

18    ██     ██████████████████████████████████████████████

19    ████████████████████████████████

20        Q.  If you determined that somebody wasn't being

21    paid equitably, was there any payment of back wages for

22    the period of time when the person was not being paid

23    equitably?

24            MS. DAVIS:  I'll object and instruct you not to

25    answer.  This is getting into our attorney work product

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 25 of 38

Page 302

1    and he's not going to answer questions about it.

2    BY MR. BARRY GOLDSTEIN:

3        Q.  In the first year, what were the documents that

4    were created for active pay management?  I guess you said

5    it was spreadsheets.  Is there anything created other

6    than spreadsheets?

7            MS. DAVIS:  I'm going to object and instruct

8    you not to answer on the grounds it invades the

9    attorney-client privilege and goes into attorney work

10   product, what other documents were prepared.

11           MR. BARRY GOLDSTEIN:  I'm not asking about

12   content.  I'm just asking if there were documents that

13   were prepared.

14           MS. DAVIS:  I'm going to instruct you not to

15   answer at this point.  If we take a break, he and I can

16   chat and I can decide if I'll change my objection.

17           MR. BARRY GOLDSTEIN:  That's fair enough.

18           MR. BYRON GOLDSTEIN:  Do you want to take a

19   break?

20           MS. DAVIS:  We can take it now or we can do it

21   later.

22           MR. BARRY GOLDSTEIN:  We can continue.  And

23   there may be more things for you to consult with,

24   Felicia.

25           MS. DAVIS:  That would be more efficient, then.

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 26 of 38

```
1                            CERTIFICATE

2

3    STATE OF OREGON        )

4                           ) ss

5    COUNTY OF MULTNOMAH    )

6

7

8

9         I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
     certify that said witness appeared before me via Zoom at
10   the time and place set forth in the caption hereof; that
     at said time and place I reported in stenotype all
11   testimony adduced and other oral proceedings had in the
     forgoing matter; that thereafter my notes were
12   transcribed through computer-aided transcription, under
     my direction; and that the foregoing pages constitute a
13   full, true and accurate record of all such testimony
     adduced and oral proceedings had, and the whole thereof.
14        I further certify review of the transcript was
     not requested.
15        Witness my hand at Portland, Oregon, this 29th
     day of December 2020.
16

17

18

19

20                            Teresa L. Rider
                              Oregon CSR No. 12-0421
21                            Washington CCR No. 2119
                              Expires 12-03-23
22

23

24

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                )
individually and on behalf of        )
of others similarly situated,        )
                                     )
                Plaintiffs,          )
                                     )
        vs.                          )    No. 3:18cv-01477-JR
                                     )
NIKE, INC., an Oregon                )
corporation,                         )
                                     )
                Defendant.           )

VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME III

DATE TAKEN:  December 21, 2020
TIME:        9:30 a.m.
PLACE:       Virtual


COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR

Page 340

```
 1                        APPEARANCES
 2    FOR THE PLAINTIFFS:     MR. BARRY GOLDSTEIN
 3                            MR. BYRON GOLDSTEIN
 4                            MR. JAMES KAN
 5                            MR. MENGFEI SUN
 6                            Goldstein, Borgen, Dardarian,
 7                            Ho
 8                            300 Lakeside Drive, Ste. 1000
 9                            Oakland, CA  94612
10
11    FOR THE DEFENDANT:      MS. FELICIA DAVIS
12                            Paul Hastings, LLP
13                            515 South Flower Street
14                            25th Floor
15                            Los Angeles, CA  90071
16
17    Also Present:  Ms. Cassie English
18
19
20
21
22
23
24
25
```

Sun Decl. Ex. 81, Page 29 of 38

Page 349

1    as outside the scope of the topics under which Mr. Walker

2    has been designated to testify.  He's not here to talk

3    about hiring.

4    BY MR. BARRY GOLDSTEIN:

5         Q.  Would these consistent guidelines apply to the

6    policy for setting starting pay?

7              MS. DAVIS:  Objection.  Vague and ambiguous.

8              If you understand, you can answer.

9              THE WITNESS:  I don't know what is being

10   referred to, but we do have guidelines that are provided

11   to our managers on the acquisition team around

12   positioning people in the pay range when they join it.

13   BY MR. BARRY GOLDSTEIN:

14        Q.  Do those consistent guidelines apply to the

15   setting of starting pay from 2015 to the present?

16        A.  We put the guidelines in place in 2018.

17        Q.  When you refer to the guidelines in place in

18   2018, which guidelines are you referring to, sir?

19        A.  The position of range guidance that we've

20   discussed prior.

21        Q.  Prior to putting in -- prior to implementing

22   the position and range guidelines in 2018, were there

23   guidelines for hiring managers and talent acquisition

24   with respect to setting starting pay before 2018?

25        A.  Yes, there were guidelines.

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 30 of 38

Page 350

1        Q.   What were those guidelines, sir?

2        A.   I don't know specifically.

3        Q.   How would those guidelines have been

4   communicated to the talent acquisition and hiring

5   managers?

6        A.   Again, I don't know.

7        Q.   Who would have been responsible for setting the

8   guidelines for setting starting pay prior to 2018 that

9   were communicated to talent acquisition and hiring

10  managers?

11       A.   I can't say for a fact.   I don't know.

12           MR. BARRY GOLDSTEIN:   Felicia, I assume that

13  when you designate somebody for setting starting pay that

14  there will be somebody prepared to answer these

15  questions.

16  BY MR. BARRY GOLDSTEIN:

17       Q.   Mr. Walker, I'm showing you a document that is

18  Exhibit No. 540, Candidate Summary.   It's a phone screen

19  date, I believe, of December 2014 for Heather Hender.

20           (Deposition Exhibit No. 540 was marked for

21  identification.)

22  BY MR. BARRY GOLDSTEIN:

23       Q.   Do you see this document, Candidate Summary for

24  Ms. Heather Hender?

25       A.   I do, yes.

Page 357

1      Q.   So as I understand your testimony, you do have

2  lump sum merit or core pay increases today; is that

3  correct?

4      A.   Yes.

5      Q.   And how are those lump sum awards calculated?

6      A.   Today?

7      Q.   Yes, sir.

8      A.   So it is calculated as a percentage of the

9  employee's base pay, and it would be calculated as the

10  percentage above the maximum of the pay range.

11      Q.   Now, during this time period from 2015 until

12  the change to core awards in 2019, would merit awards be

13  calculated on the basis of a percentage increase to base

14  salary?

15      A.   The award an employee would have received would

16  have been based on a percentage of base pay, yes.

17      Q.   Turning to the second bullet:  Performance

18  appraisal must be done before an award is processed.

19           Is that accurate in 2015 and is it accurate

20  from 2015 to the present?

21      A.   It was accurate in 2015.  In order to have

22  guidelines appear for pay, you have to have a CFE rating.

23  There's no rating your guidelines don't appear.  So in

24  that sense, in terms of exactly what happened with the

25  CFE performance appraisal, I can't speak to that, and

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 32 of 38

Walker, Shane - Vol. 3                    December 21, 2020

Page 360

1         A.   Yes.

2         Q.   And what does internal equity range refer to?

3         A.   So internal equity is pay relative to peers,

4    and that can look many different ways for an individual

5    team or manager.  In 2015, this would have referred --

6    one data point in that would have been the internal pay

7    range.

8         Q.   And I believe you testified about that on

9    Friday, is that correct, you referred to those external

10   pay range and an internal pay range?

11        A.   Yes, I did testify to that.  I don't know what

12   day it was on, but, yes, we did cover that.

13        Q.   Let's move up to the directions that are under

14   the category, how it works.  There's the statement:

15   Performance rating guidelines used for merit awards vary

16   from year to year and country to country.

17             Are there performance rating guidelines for

18   establishing merit awards?

19        A.   So from 2015 to 2018, yes.  The way we

20   established merit rating guidelines was using performance

21   rating.  There was a minimum and maximum percentage for

22   each rating, and then managers used discretion to

23   determine what increase the employee would receive,

24   whether that was within or outside of the guideline

25   depended on each manager.

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Sun Decl. Ex. 81, Page 33 of 38

Page 366

1    guidelines, I think you said the guidelines would provide

2    a percentage range for potential increases for merit pay

3    increase; is that correct?

4         A.  Yes, each performance rating would have had a

5    range for the guideline.

6         Q.  Would it be a higher range for highly

7    successful as opposed to, for example, successful rating?

8         A.  The possibility for a larger increase would

9    have been reflected in the guidelines, yes.  I don't know

10   what specifically is meant by higher guideline.  The

11   range spread would have been the same and there would

12   likely have been some overlap between ratings.

13        Q.  When you say overlap between ratings, what do

14   you mean by that, sir?

15        A.  So for example, for a successful -- an employee

16   rated successful, the guideline would have potentially

17   shown this up, but 3 to 5 percent.  I'm making this up --

18        Q.  Excuse me.  I'm sorry.  I just missed what you

19   said.  What was the example you're giving?  And I

20   understand you don't know exactly what the guidelines

21   were and you're giving an example, and that's helpful, so

22   please go ahead, sir.

23        A.  So for an employee rated successful, the

24   guideline that would have shown could have been 3 percent

25   to 5 percent.  For an employee that was highly

Page 367

1    successful, the guideline could have shown 4 percent to 6

2    percent.  And for someone whose rated exceptional, the

3    guideline could have shown 5 percent to 7 percent.

4         Q.   And, again, this is a hypothetical that you're

5    giving.  You don't know exactly what the guidelines

6    showed for each of the years from 2015 to 2018, do you?

7         A.   I do not.

8         Q.   Now, also turning to Exhibit 541 and under How

9    It Works, could you read the first sentence under the

10   title How It Works?

11        A.   The first sentence says:  Merit awards

12   recognize the annual coaching for excellence, CFE,

13   assessment of results achieved, the budget available and

14   other relevant factors such as market data and internal

15   equity.

16        Q.   How does budget availability impact merit

17   increases during the period from 2015 until the core pay

18   increases implemented in 2019?

19        A.   So budgets are established at the country

20   level, so we use market data from our survey vendors

21   along with information about our range movement or our

22   pay range movement to determine what is the appropriate

23   budget for each country, and then that budget is applied

24   to each individual employees pay.  It is summed together

25   and for each manager, and that is the budget that they

Beovich Walter & Friend

1-800-541-4452                    503-228-7201                    www.bwreporters.com

Sun Decl. Ex. 81, Page 35 of 38

Walker, Shane - Vol. 3                    December 21, 2020

Page 395

1    expanded definition of market pricing that I want to ask

2    you about.

3          A.   Okay.

4          Q.   And I'll read it into the record this time:

5    Market pricing is the process of determining the market

6    rates for representative sample of jobs in a specific

7    talent market, based on data for jobs with similar

8    functions and comparable scope of responsibility.

9                Do you see that, sir?

10         A.   Yes.

11         Q.   Do you agree with that definition of market

12   pricing, as well?

13         A.   Yes.

14         Q.   Is the data referred to in this definition the

15   data that is supplied through the survey companies?

16         A.   Yes.

17         Q.   And is jobs with similar functions and

18   comparable scope of responsibility, would that be --

19   those jobs be determined in the same way that you've

20   described job content being determined when we discussed

21   the last exhibit?

22         A.   Yes.  Where it says similar functions and

23   comparable scope of responsibility, I would define that

24   as type of work and level of work.

25         Q.   So the job levels within the value bands would

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 36 of 38

Walker, Shane - Vol. 3                    December 21, 2020

Page 396

1    be the scope of responsibility?

2        A.   It's one factor in determining a job level,

3    yes.

4        Q.   And similar functions, that would be the job

5    functions, job families, job subfamilies?

6        A.   Yes.

7        Q.   Turn to slide 12, please.

8        A.   Which slide?

9        Q.   12.

10       A.   Okay.

11       Q.   Now, on the left-hand part of this slide,

12   there's V - S.  I'm assuming that is referring to the

13   values bands?

14       A.   Yes.

15       Q.   And remind me again what CLT refers to?

16       A.   CLT is defined as the corporate leadership

17   team, and that would be E7+ bands.

18       Q.   Now, under V - S, it says:  CompAnalyst uses a

19   regression line to market competitions to determine the

20   number of job grades.

21           Job grades, does that refer to pay grades?

22           MS. DAVIS:  The document actually says market

23   composites.

24   BY MR. BARRY GOLDSTEIN:

25       Q.   Market composites.  Let me see if I can get it

Page 488

                              CERTIFICATE
1

2

3   STATE OF OREGON      )
4                        ) ss
5   COUNTY OF MULTNOMAH )

6

7

8

9        I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
    certify that said witness appeared before me via Zoom at
10  the time and place set forth in the caption hereof; that
    at said time and place I reported in stenotype all
11  testimony adduced and other oral proceedings had in the
    forgoing matter; that thereafter my notes were
12  transcribed through computer-aided transcription, under
    my direction; and that the foregoing pages constitute a
13  full, true and accurate record of all such testimony
    adduced and oral proceedings had, and the whole thereof.
14       I further certify review of the transcript was
    not requested.
15       Witness my hand at Portland, Oregon, this 29th
    day  of December 2020.
16

17

18

19

20
                              Teresa L. Rider
21                            Oregon CSR No. 12-0421
                              Washington CCR No. 2119
22                            Expires 12-03-23
23

24

25

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Sun Decl. Ex. 81, Page 38 of 38