

Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

August 7, 2020

<u>**Via E-Mail Only**</u>

Hon. Jolie A. Russo                               Gary_Magnuson@ord.uscourts.gov
Mark O. Hatfield United States Courthouse
Room 1027
1000 S.W. Third Avenue
Portland, OR 97204

      Re:    *Kelly Cahill, et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR
             Plaintiffs' Request for an Order to Compel Nike to Produce Documents and Data
             From Internal Pay Equity and Promotion Analyses

Dear Judge Russo:

      Plaintiffs request the Court to compel three types of pay equity and promotion analyses performed by Nike that are central and highly relevant to the claims and defenses in this action and proportional to the needs of the class/collective action.

      Nike is hard pressed to deny the material relevance of the requested documents.  These analyses are direct evidence that Plaintiffs' compensation and promotion claims can be ascertained and evaluated on a class wide basis.  For a class action alleging systemic and widespread pay and promotion inequity, it's difficult to imagine more relevant evidence than the pay and promotion studies conducted by Nike on its own workforce that were then used to create the very same policies challenged by this lawsuit – both to see if disparities based on sex were found and how Nike determined comparable jobs for purposes of analysis.  Yet, Nike seeks to shield these documents from discovery by raising unsubstantiated and inapplicable claims of privilege.  Well-established case law, however, demonstrates that one cannot launder admissible evidence contained in publicly touted business records by handing them to an attorney.

      Accordingly, Plaintiffs move to compel the production of three types of pay equity and promotion analyses performed by Nike:

      1.    <u>"Global" pay equity analyses.</u>  Since at least 2016, Nike has conducted "global" pay equity analyses on an annual basis comparing compensation of male and female employees.

      2.    <u>Supplemental pay equity analyses.</u>  At least since 2018, Nike has represented that it has conducted supplemental pay equity analyses, with the assistance of a HR consulting company Mercer, evaluating whether it has paid employees equitably in comparison to their peers.

300 Lakeside Drive, Suite 1000, Oakland, CA 94612-3534    Tel 510.763.9800    Fax 510.835.1417    www.gbdhlegal.com

787475.15                                               Goldstein Decl. Ex. 12, Page 1 of 297

*Cahill, et al. v. Nike, Inc.*                    -2-                    August 7, 2020

    3.   <u>Studies or analyses related to time-in-job and pace of promotions</u>.  At least since 2018, Nike has publicly represented that it has conducted studies or analyses related to time-in-job and pace of promotions to address the lack of female representation in management.

    Plaintiffs seek these pay equity and promotion analyses documents related to putative class members and male salaried employees at Nike World Headquarters levels below the Vice-President level, including the organizational structure used to analyze comparable jobs, and documents related to the scope of Mercer's retention and consulting duties.

    Nike's asserted privileges and protections fail because (1) they constitute improper boilerplate privilege objections (Section II.A.1); (2) Nike has produced facially deficient and incomplete privilege logs that preclude it from establishing work product or attorney-client protection over these studies (Section II.A.2-4); (3) Nike's extended and continued delay in producing a complete log waives any associated privileges (Section II.A.5); (4) even if Nike's logs were not facially deficient, the evidence demonstrates these analyses and studies, which are business documents Nike used to create and formulate policies challenged by Plaintiffs as discriminatory, are not privileged or protected (Section II.B); and (5) Nike impliedly waived any privilege by using the studies and analyses as both a sword and shield (Section II.C).

    As such, the Court should compel Nike to produce the requested discovery.

# I.   Factual Background

## A.  Plaintiffs Requested These Documents on March 22, 2019.

    This letter seeks documents responsive to Request for Production ("RFP") 16, which Plaintiffs served on March 22, 2019.  Plaintiffs' RFP No. 16 sought, among other documents, "studies, reviews, analyses, surveys, compilations or audits related to the effect or impact of any of the following Nike policies or practices that apply to HQ employees has had on female HQ employees: (a) compensation … (g) promotions …."

## B.  Relevance of Pay Equity and Promotion Analyses to Nike's Compensation Policies and Practices.

### 1.  Nike's Compensation Policies and Practices

    Nike's Total Rewards program, comprised of Nike's pay and benefits programs, strives to "meet the diverse needs of our employees, deliver differentiated, competitive pay and benefits, and support a culture in which employees feel included and empowered."  NIKE_00019436.  In 2018, Nike announced changes to the "Total Rewards" program that led to the establishment of the practice titled "Competitive Pay Management (CPM)" as part of Nike's "commit[ment] to evaluating pay every year to ensure … equitable pay for all employees."  NIKE_00003281 ("Annual Pay Review, Manager Toolkit//April 2019").  Competitive pay adjustments were implemented as part of Nike's Total Rewards Program and its annual assessment of this business process.  *See id.*  Nike planned changes to Total Rewards over many months and years. NIKE_00019624.  These compensation and promotion policies are at the core of Plaintiffs'

*Cahill, et al. v. Nike, Inc.*                    -3-                    August 7, 2020

allegations that Nike continues to discrimination against women at Nike HQ on the basis of sex. Pls.' 1st Am. Compl. 26-31, ECF No. 42.

### 2. "Global" Pay Equity Analyses

Nike has conducted annual pay analyses as part of its Total Rewards strategy. NIKE_00019624 ("As part of our Total Rewards strategy, we analyze pay every year, and this year, we opted to perform a deeper analysis across all roles in the organization, globally."). These annual "pay competitive analyses" occurred as early as August 2016, as part of the White House Equal Pay Pledge, years before Plaintiffs either filed their respective EEOC charges or filed their complaint in this action. NIKE_00002052 (FY16/FY17 Sustainability Business Report publicly declaring "global" pay equity analyses).

Since at least 2017, Nike has publicly published the results of these annual "global" pay equity analyses and has relied upon them as purported proof that it does not have a pay gap due to sex. *See* FY17 Representation in Leadership, available at https://purpose.nike.com/fy17-representation-pay (showing pay equity data of 99.6 cents for women versus $1 for men globally in FY16 and 99.9 cents for women versus $1 for men globally in FY17). Nike continued to conduct annual pay analyses in FY 18 and FY 19 that it reported to both its workforce and the wider public. *See* PLF_020794 (FY18 Nike Inc. Impact Report) ("1:1 Pay ratio for men to women (globally)"); PLF_020655, (FY19 Nike Inc. Impact Report) ("1:1 pay equity maintained for women globally").

The statistical comparison of the compensation paid to female and male employees and Nike's use of those results in making compensation decisions for its Nike HQ employees is highly relevant discovery. "Statistical disparities in the treatment of women alone may be sufficient to establish a prima facie case" of disparate treatment discrimination. Findings and Recommendations 9, ECF No. 64. The pay equity analyses that Nike has represented to its employees and to the public are directly related to this evidence. The documents requested would describe the approach that Nike used to determine "pay equity." *See* NIKE_00003193 (Nike explaining that its "[p]ay equity is informed by several inputs (for example, performance, pay, function, job code and location) to determine the expected range of pay for each employee"). The production of these documents is relevant to and will facilitate the development of statistical evidence by Plaintiffs. In addition, actions Nike took or refused to take once it had the results of these pay competitive analyses is relevant to its discriminatory intent if it continued to pay women less than men despite knowing about the pay gap.

The pay equity analyses also implicate Nike's affirmative defenses, including its Tenth Affirmative Defense that any relevant action with respect to Plaintiffs' employment was for legitimate business reasons unrelated to Plaintiffs' sex, Eleventh Affirmative Defense that alleged differences in compensation are based on permitted factors other than sex, Fifteenth Affirmative Defense that Nike would have taken the same employment action for legitimate, non-discriminatory, non-retaliatory, and non-pretextual reasons unrelated to Plaintiffs' sex, and Twenty-First Affirmative Defense that Nike's policies and good faith efforts preclude punitive damages. *See* Def.'s Answer & Affirmative Defenses to Pls.' 1st Am. Compl., ECF No. 75.

### 3. Supplemental Pay Equity Analysis

Through its Human Resources team, Nike engaged in the supplemental pay equity analyses as part of its normal business functions to update pay and benefits policies. *See* NIKE_00015705 ("As part of Nike's commitment to competitive pay – and taking into consideration both the constant movement of internal talent and the demands of a dynamic market – the HR team implemented an analysis to ensure our programs and individual pay rates are strongly competitive across the board."). This supplemental pay equity analysis has been performed by Mercer since the summer of 2018.

Nike has made and continues to make competitive pay adjustments using the supplemental pay equity analyses. *See id.* ("As part of our commitment to competitive pay, Nike, Inc. conducted additional pay analyses this year to make sure we're strongly competitive."); PLF_020794 (10% of employees received "an adjusted base salary as part of ongoing competitive pay management").

Nike began work on this "supplemental analysis" months if not years prior to first sharing its FY17 "global" pay equity analyses with its employees on April 2018. NIKE_00019624 ("When we shared our FY17 Pay and Representation data with employees in early April [2018], we had already begun additional pay competitive analyses …. I think there's an inference by many media that the pay analysis and bump were related to the issues in March [2018]. But the truth is that this was in the works for some time and for something this sweeping, it doesn't happen in three or four months."). Significantly, this work predated the filing of this complaint.

The "supplemental analysis" is relevant to the claims and defenses for the same reasons that the "global" pay equity analyses are relevant. *See* Sec. II(B)(2), *supra*. Furthermore, the "supplemental analyses" are relevant since the analyses are part of Nike's compensation practices that are challenged in this civil action. Finally, these supplemental analyses are relevant since they may indicate, in part, employees who may not have received equal pay and the manner by which Nike began in 2018 evaluating whether specific employees were receiving equal pay.[1]

### 4. Studies or Analyses Related to Time-In-Job and Pace of Promotions

In her April 4, 2018, "Message" and email to Nike employees, Nike's Chief Human Resources Officer Monique Matheson wrote that Nike was "focused on the deeper issues of driving changes in representation, banding and promotions. We will be **studying time-in-job and the pace of promotions** across our employee base – with a strong focus on women … to understand how this impacts women" after recognizing Nike's failure to change senior-level representation of women. *See* NIKE_00002235 (emphasis added).

The studies or analyses evaluating promotions and the pace of promotions "with a strong focus on women" are directly relevant to the promotion claims and the defenses to those claims in this class action. Moreover, these studies or analyses are interrelated with the approaches and

---

[1] The supplemental pay equity analyses also implicate Nike's affirmative defenses, as detailed above. *See* ECF No. 75.

*Cahill, et al. v. Nike, Inc.*                    -5-                    August 7, 2020

operations of Nike's promotion practices challenged here. The time-in-job and pace of promotion studies and analyses also implicate Nike's affirmative defenses, as discussed above. *See* ECF No. 75.[2]

### C. Summary of Meet and Confer Process

Since requesting the pay equity and promotion studies and analyses in March 2019, Plaintiffs have made numerous efforts to meet and confer with Nike, including correspondence on May 31, 2019, July 15, 2019, August 2, 2019, November 4, 2019, December 20, 2019, January 8, 2020, May 15, 2020, and July 10, 2020, that requested the bases for Nike's alleged burden, and/or requested complete privilege logs. Nike did not produce its first privilege log until February 2, 2020 and produced subsequent logs on March 13, 2020 and July 24, 2020. *See* Exhibit 1, attached to this letter. Nike's produced logs are deficient and incomplete for numerous reasons as set forth below.

## II. Legal Argument

### A. Nike's Facially Deficient Privilege Logs Cannot Carry Nike's Burden of Establishing Attorney-client Privilege or Attorney Work Product Protection for Pay Equity and Promotion Analyses.

Federal Rule of Civil Procedure 26(b)(5) requires that when a party withholds otherwise discoverable information as privileged or work product, that party must "describe[s] the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim," typically in a privilege log, and "a proper assertion of privilege must be more specific than a generalized, boilerplate objection." *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1147 (9th Cir. 2005). The party asserting the privilege, here Nike, bears the burden of proving each essential element. *United States v. Ruehle*, 583 F.3d 600, 608 (9th. Cir. 2009). Likewise, "the burden of proof [for work product] rests with the party asserting the privilege." *Amy's Kitchen, Inc. v. Stukel Mt. Organics LLC*, No. 1:16-cv-00071-CL, 2016 U.S. Dist. LEXIS 192179, *5 (D. Or. Sept. 28, 2016) (citations omitted).

Given their relevance, Nike's failure to produce adequate privilege and redaction logs for the requested pay equity and promotion analyses is fatal to any asserted privilege. Nike has only provided boilerplate privilege assertions, failed to identify which privilege and redaction log entries relate to these analyses, and failed to supplement its logs despite confirming that its logs are still missing documents related to these analyses.

---

[2] The production of these highly relevant documents is proportional to the needs of the case pursuant to Federal Rule of Civil Procedure 26(b)(1). *See* Section B of Plaintiffs' June 5, 2020 letter to the Court for analysis and argument regarding the application of the proportionality standard to this civil action.

**1.  Nike Relies Upon Improper Boilerplate Objections of Privilege.**

In response to Plaintiffs' RFP No. 16, Nike asserted boilerplate objections of privilege claiming "it seeks private, privileged, and confidential commercial, financial, and/or proprietary business information."  *See* Defendant Nike, Inc.'s Objections and Responses to Plaintiffs' First Set of RFPs.  The Ninth Circuit has explained that such boilerplate objections are improper and insufficient to assert a privilege.  *See Burlington N.*, 408 F.3d at 1149.

**2.  Nike's Privilege Logs Either Fail to Identify Which Entries Correspond to the Requested Analyses or Fail to Include Them at All.**

Nike's privilege logs do not include any entries related to Nike's time-in-job and pace of promotion analyses.  By their May 15 letter, Plaintiffs confirmed that the log entries referencing "compensation" only related to pay equity analyses and did not include studies or communications related to promotions, which Nike has not disputed.

Nike's logs also lack basic information to allow the Court to identify the entries related to "global" or supplemental pay analyses.  Most entries vaguely state someone is "requesting and providing legal advice" or "providing legal advice in this lawsuit" without indicating the subject matter of the communication.  These entries contravene the requirements of Rule 26(b)(5).

For the only entries that could conceivably relate to the "global" or supplemental pay analyses, ones where Nike refers generically to compensation or Competitive Pay Management,[3] Nike still fails to specific which, if any, are documents related to its "global" or supplemental pay analyses.  Further, these entries have dates starting in 2017, so they cannot cover "global" pay equity studies conducted in 2016.  These deficiencies are further compounded by Nike's refusal to clarify which of its log entries related to the requested analyses.

**3.  Nike's Privilege Logs Fail to Establish the Basic Elements Required for Work Product Protection.**

To prove work product protection for documents, "(1) they must be prepared in anticipation of litigation or for trial, and (2) they must be prepared by or for another party or by or for that other party's representative."  *United States v. Torf (In re Grand Jury Subpoena)*, 357 F.3d 900, 907 (9th Cir. 2003) (quotation and citations omitted).  The party asserting work product protection must prove that "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation."  *See id.* (quotation omitted).

Nike's log entries are facially deficient as to work product protection for two simple reasons.  First, none of Nike's work product entries state that the document was prepared in anticipation of litigation.  Instead, Nike's log entries related to compensation[4] or Competitive

---

[3] *See* Exhibit 1, Nike Privilege Log #2, Entries 26-37, 39-79.

[4] *See* Exhibit 1, Nike Privilege Log #2, Entries 36-37, 41-48, 51, 53-55, 57-59, 61-63, 65-67, 69-71, 73-75, 77-79.

*Cahill, et al. v. Nike, Inc.* -7- August 7, 2020

Pay Management[5] state that these withheld documents are "Reports requested by, and created at the direction of, inhouse counsel … for use in providing legal advice" or "Presentation created by outside counsel regarding employee compensation for the purpose of providing legal advice."[6] It is well settled that documents created for the purpose of providing legal advice alone do not qualify for work product protection. *See Coltec Indus., Inc. v. Am. Motorists Ins. Co.*, 197 F.R.D. 368, 373 (N.D. Ill. 2000) ("describing a document as 'legal advice' or 'work product' is not the same as *establishing* that the documents are immune from discovery ... [and] are insufficient to carry [the] burden of establishing attorney-client privilege or work product") (emphasis in original).

Second, many of Nike's work product entries[7] are missing both the sender and recipient information, which prevents Nike from showing that the documents were created in anticipation of litigation if they were not ultimately received or reviewed by counsel. *See Visa U.S.A., Inc. v. First Data Corp.*, No. C-02-1786, 2004 U.S. Dist. LEXIS 17117, at *32 n.6 (N.D. Cal. Aug. 23, 2004) (finding document not protected by work product doctrine in part because "[n]otably, there is no confirmation that the drafts were actually reviewed by counsel.").

When confronted by Plaintiffs with these facial deficiencies, Nike refused to supplement its work product entries. Accordingly, Nike has failed to carry its burden to establish work product protection over the pay equity and promotion studies.

### 4. Nike's Privilege Logs Fail to Establish the Basic Information Required for Attorney-Client Privilege.

Rule 26 requires Nike to identify the position of the senders, recipients, and authors of the documents and communications so that Plaintiffs and the Court can properly assess the privilege. *See Rawcar Grp., LLC v. Grace Med., Inc.*, No. 13cv1105-H, 2013 U.S. Dist. LEXIS 201729, at *18 (S.D. Cal. Dec. 16. 2013) (noting that courts have interpreted Rule 26(b)(5) to "require the withholding party to provide information identifying by name and position the author …"). For attorney-client communications between a corporate attorney and corporate employees, the privilege only applies: (1) when a communication is made to the corporation's counsel that is acting in their capacity as counsel (and not as business consultants, for example); (2) at the direction of corporate management for the purpose of securing legal advice from counsel; (3) concerning a subject within the scope of employment; and (4) when the employee knows that the purpose of the communication is for the corporation to procure legal advice. *See Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981); *see also Gregorio v. Clorox Co.*, No. 17-cv-03824-PJH, 2019 U.S. Dist. LEXIS 108955, (N.D. Cal. June 28, 2019) (requiring the privilege log include the identity and position of its author and all addressees and recipients of the communication).

---

[5] *Id.* at Entries 26-33, 52, 56, 60, 64, 68, 72, 76.

[6] *See* Exhibit 1, Nike Privilege Log #2, Entries 34-35, 39-40, 50.

[7] *See* Exhibit 1, Nike Privilege Log #2, Entries 26-33, 36-37, 41-48, 51-79.

For the only possible entry related to pay equity analyses that Nike claims attorney-client privilege, Entry 49,[8] it lacks the requisite information required to assert attorney-client privilege. For the listed recipient of Nike Pay Review Project Team, Nike failed to identify the persons on this team or their corporate positions. This undermines Nike's asserted privilege because Nike cannot establish and the Court cannot assess whether any Nike recipients of purported legal advice were upper-echelon management or non-management personnel for purposes of *Upjohn* and, if non-management, whether they were directed by corporate superiors to secure legal advice from counsel. *See United States v. Chen*, 99 F.3d 1495, 1502 (9th Cir. 1996) ("The attorney-client privilege applies to communications between corporate employees and counsel, made at the direction of corporate superiors in order to secure legal advice."). In addition, Nike has not established and the Court cannot assess whether the pay equity analyses were within the scope of employment for corporate employees listed on the logs, and whether each employee knew the purpose of the communication was for the corporation to procure legal advice. Notably, Nike has not established that the Pay Review Project Team was created for legal and not business purposes.

Nike also failed to maintain the confidentiality of documents and communications regarding the pay equity analyses because Nike has publicly discussed these studies, their results, and relied upon them to show Nike's progress on compensation and promotion issues, undermining any claim of privilege or protection. *See, e.g., SEC v. Chesnoff*, No. 4:05-MC-043-Y, 2006 U.S. Dist. LEXIS 49090, at *11 (N.D. Tex. July 18, 2006) ("By putting his offer in the public arena and by putting at issue the details of his offer, he could not reasonably believe that those same details could be kept confidential."). Nike claims it has not disclosed the details of the analyses with the public or anyone who does not "need to know" but without identifying the job positions of the corporate employees involved or the individuals to whom Nike disclosed parts or all of these analyses, neither Plaintiffs nor the Court can assess Nike's claim.[9]

Accordingly, Nike has failed to carry its burden to establish attorney-client privilege over the pay equity and promotion studies.

### 5. Nike Has Long Waived Its Privilege Assertions by Failing to Timely Produce an Adequate Log.

Nike waived its attorney-client and work product objections for pay equity and promotion analyses by failing to timely produce an adequate privilege log. *See Burlington N.*, 408 F.3d at 1147, 1149. In *Burlington Northern*, the Ninth Circuit affirmed the district court's finding of waiver where the party asserting privilege provided a privilege log that was "not filed during the Rule 34 time limit, but was filed *five months* later." *Id.* (emphasis in original). The Ninth Circuit ruled that "in the absence of mitigating considerations, this fact alone would immunize the district court's ruling …." *Id.* This finding of waiver is consistent with Local Rule 26-5(b) which expressly requires that the specific bases showing attorney-client privilege or work

---

[8] *See* Exhibit 1, Nike Privilege Log #2.

[9] It is unclear whether Nike's logs reflect all the people who were disclosed the details of the pay equity analyses. Plaintiffs requested that Nike clarify in their July 10 letter, but Nike refused to do so in its July 24 letter.

*Cahill, et al. v. Nike, Inc.*                            -9-                            August 7, 2020

product "must be provided within a reasonable time after service of timely objections to a discovery request."

The facts here present a stronger case for waiver than the conduct in *Burlington Northern*. Despite at least ten written requests from Plaintiffs over a one-year period, Nike has failed to submit an adequate privilege log and assert objections that comply with the requirements of Rule 26(b)(5) and Local Rule 26-5(b). Nike waited until February 2020 to serve its first privilege log, and neither that log nor its March 2020 or July 2020 logs are clear about which entries relate to the pay equity and promotion analyses. Nike concedes, as it must, that its privilege logs remain incomplete because they do not include all the pay equity and promotion analyses documents – over a year after it should have produced these relevant documents. Even for the entries that arguably relate to the pay equity analyses, Nike fails to provide basic information necessary to establish work product or attorney-client protection. Section III.B.3-4, *supra*. Nike thus never met its burden to prove attorney-client privilege or work product protection in the 16 months since the RFP was served, almost thrice the amount of time in *Burlington Northern*.[10]

Nike's refusal to produce the documents or provide an adequate privilege log has obstructed Plaintiffs' opportunity to either review or challenge Nike's privilege assertions for this important discovery. Given Nike's recent attempt to set a document discovery deadline of August 28, 2020 (ECF No. 107 at 22), it appears that Nike is trying to run out the clock. Although "[p]rejudice to the party requesting production of documents or information is not expressly listed as a factor in *Burlington*," it is "arguably implicit in the court's direction that the factors 'be applied in the context of a holistic reasonableness analysis.'" *Fid. & Deposit Co. v, Travelers Cas. & Sur. Co. of Am.*, No. 2:13-cv-00380-JAD-QWF, 2017 U.S. Dist. LEXIS 84070, at *15 (D. Nev. May 3, 2017) (quoting *Burlington N.*, 408 F.3d at 1149).[11]

**B.  Nike Cannot Carry Its Burden to Prove that Either Attorney-Client Privilege or Attorney Work Product Protection Apply to these Business Documents.**

While the facial deficiencies of Nike's logs alone preclude any asserted privilege, Nike's documents also confirm that there is no basis for asserting privilege over its pay equity analyses

---

[10] Nike may attempt to argue that Plaintiffs' production of phased privilege logs excused its delayed and incomplete logs. This is a false equivalency because (1) Plaintiffs have served privilege and redaction logs for their productions before Nike requested them, whereas Plaintiffs have been requesting privilege logs from Nike since early 2019; (2) Plaintiffs have included sufficient detail in their privilege logs unlike Nike; and (3) most critically, Nike has not raised any disputes or questions about Plaintiffs' assertions of privilege while Plaintiffs have challenged Nike's asserted privileges/protections.

[11] Here, there are no mitigating considerations because: (1) Nike has not provided specifics supporting any associated burden during the last 16 months despite Plaintiffs' repeated requests; (2) Nike has not asked the Court or Plaintiffs to continue any Court-imposed deadlines; (3) Nike has sought to close class certification document discovery by August 28, 2020; and (4) Nike's document production has been deficient in light of the various motions to compel filed by Plaintiffs to date.

*Cahill, et al. v. Nike, Inc.*                    -10-                    August 7, 2020

and promotion studies because they constitute business documents that Nike used to create and implement compensation and pay policies directly challenged by Plaintiffs as discriminatory.

    **1.  Nike cannot establish work product protection because the analyses were not performed in anticipation of litigation.**

      **a.  Supplemental pay equity analyses are not protected work product**

As discussed above, Nike's March 2020 privilege log entries are the only ones that possibly relate to the supplemental pay equity analyses. However, these work product entries only refer to "legal advice" and fail to assert that the documents were created in anticipation of litigation and the available evidence further confirms Nike would be unable to prove such a claim. Work product protection only applies if the document can be fairly said to have been prepared or obtained "because of" the prospect of litigation. *See Torf*, 357 F.3d at 907. The "because of" standard for work product protection does not consider whether litigation was a primary or secondary motive behind the creation of a document. Rather, it considers the totality of the circumstances and affords protection when it can fairly be said that the "document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation[.]" *Id.* at 908 (citation omitted).

Here, work product protection does not apply because Nike has not and cannot make a showing that its supplemental pay equity analyses were "because of" litigation when its documents indicate that "the HR team implemented an analysis to ensure our programs and individual pay rates are strongly competitive across the board" as part of Nike's business commitment to competitive pay and considerations of constant movement of internal talent and the demands of a dynamic market. *Torf*, 357 F.3d at 908. Nike has made no showing that it would not have conducted these supplemental pay equity analyses in substantially similar form irrespective of whether Plaintiffs filed their lawsuit.[12] Inconsistent with a purported confidential legal defense, Nike has conceded that it publicly "acknowledged the existence of such analyses" and has "taken action as a result of the outcome of such analyses." These concessions reinforce evidence that Nike used these analyses for business reasons, including to try to improve its compensation and promotion practices in an effort to retain workers, improve, morale, and bolster Nike's competitive position in the marketplace. Accordingly, these supplemental pay equity study documents are thus not subject to work product protection because any purported litigation purpose was incidental to the independent business purposes. *See Torf*, 357 F.3d at 910 (documents are entitled to work product protection when their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole). It is particularly curious that Nike would attempt to invoke work product protections around documents Nike admittedly used to create the very policies that Plaintiffs challenge as causing sex discrimination in this lawsuit. By Nike's logic, employers could shield discovery into any policies challenged under Title VII or other anti-discrimination laws simply by involving attorneys in the development of said policies.

---

[12] Nor has Nike identified any other lawsuit that these analyses were "in anticipation of."

The timing and context of the supplemental pay equity analyses further indicate that they were not created in anticipation of litigation.  *See Cung Le v. Zuffa, LLC*, 321 F.R.D. 636, 651 (D. Nev. 2017) (finding that the timing and context of the creation of disputed Mercer documents indicated that they were not created in anticipation of litigation).  Nike clarified that the 2018 supplemental pay equity analyses and resulting bumps to employee pay were not related to the sex discrimination issues raised in March 2018 but instead were in the works for some time.  These analyses were thus in the works for many months before public sex discrimination complaints and thus, could not have been created in anticipation of this litigation.

Furthermore, Nike's attempts to shield the results of Mercer's supplemental pay equity analyses from discovery fall short.[13]  First, Nike documents indicate that the Mercer analyses will be conducted every year for routine compensation and benefits program design, which courts recognize constitute a typical business function performed by companies.[14]  Notably, Mercer bills itself as a human resources consulting company that offers HR solutions for companies including "compensation data to benchmark your organization against others ...."  *Cung Le*, 321 F.R.D. at 640.

Second, Nike failed to show that the disputed Mercer documents were prepared because of reasonably foreseeable litigation.  In *Cung Le*, the court rejected the employer's attempt to shield a similar Mercer pay study under the guise of attorney-work product.  Because Mercer's role focused on business functions such analyzing the defendant's compensation information and assessing its current compensation model to compare fighter compensation with athletes in other sports, the defendant failed to show that those Mercer documents were prepared in anticipation of litigation. 321 F.R.D. at 640, 651.  The same conclusion applies here because Nike also relied upon Mercer to provide business advice (i.e., setting competitive employee pay as part of Nike's Total Rewards program and responding to employee concerns about equitable pay cited in Matheson's message) and not to prepare against this litigation (Mercer's analyses began many months before public complaints of sex discrimination).  *See id.* at 648.

Third, Nike's supplemental pay equity analyses had readily separable business purposes of setting corporate policy that do not warrant work product protection.  Nike used the Mercer analyses to set its corporate policy on pay and benefits, creating the Competitive Pay Management program within its Total Rewards policy.  "Drafting corporate policies, even if performed by an attorney, is part of a company's ordinary course of business.  *See Dewitt v. Walgreen Co.*, No. 1:11-cv-00263-BLW, 2012 U.S. Dist. LEXIS 125493, at *14-15 (D. Idaho

---

[13] Nike has refused to produce documents that reveal the reason for Nike's engagement of Mercer, including the retention contract and communications regarding the scope of its work.  Critically, Plaintiffs requested these documents in March 2019 and they cannot be privileged because they go to foundational facts Nike has expressly relied upon to justify its asserted protections.

[14] *See, e.g.*, *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 618 (E.D. Mich. 2012) (describing how Henry Ford Health System has "Total Rewards Committee" that relies in part on a "Competitive Pay Analysis" prepared each year by Henry Ford's compensation department); *In re High-Tech Emps. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 110064, at *55 (N.D. Cal. Aug. 8, 2014) (describing Adobe's practice of competitive pay analysis).

Sept. 4, 2012).  Even if Mercer's work involved attorneys, the attorney-client relationship was merely tangential to the independent business purposes and Mercer's work is thus not properly protected under work product doctrine.  *See Resnick v ADA*, 95 F.R.D. 372, 375 (N.D. Ill. 1982).

Because Nike cannot establish work product protection over the supplemental pay equity analyses, even if it submits an adequate privilege log, the Court should order Nike to produce data and documents related to its supplemental pay equity analyses.

### b.   "Global" Pay Equity Analyses and Promotion Studies Are Not Protected Work Product

The available evidence also shows that Nike cannot prove work product protection for either its "global" pay equity analyses or its promotion studies.  The timing and context of both of these analyses confirm that they were not conducted in anticipation of litigation and would have been created in substantially the same format even without litigation.  For example, Nike committed to conducting its yearly "global" pay equity analyses in August 2016, as part of the White House Equal Pay Pledge, years before Plaintiffs either filed their respective EEOC charges or filed their complaint in this action.  Likewise, regarding the promotion studies, Ms. Matheson announced the intent to conduct the studies in April 2018, months before the EEOC charges and complaints were filed in this case.  By highlighting Nike's focus "on the deeper issues of driving changes in representation, banding and promotions," Ms. Matheson's communication confirm that Nike would have conducted these studies even without litigation.

### 2.   Nike Cannot Establish Attorney-Client Privilege Because the Analyses Were Business Advice, Not Legal Advice.

It is unclear whether any of the attorney-client entries from Nike's February and March 2020 logs relate to the "global" pay equity analyses, supplemental pay equity analyses, and promotion studies that Plaintiffs seek in this letter.  Even if they did, the evidence shows that Nike cannot establish attorney-client privilege over the business advice provided by the analyses.

The eight elements for attorney-client privilege are: (1) where legal advice of any kind is sought, (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected, (7) from disclosure by himself or by the legal adviser, and (8) unless the protection be waived.  *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (citation omitted).

### a.   Supplemental Pay Equity Analyses Are Not Privileged Communications

Nike has failed to establish that any communications between Mercer and Nike counsel were for the purpose of legal advice.  The fact that Nike's outside counsel retained Mercer does not prove that Mercer's analysis is protected by attorney-client privilege.  *See Becker v. Willamette Cmty. Bank*, No. 6:12-cv-01427-TC, 2014 U.S. Dist. LEXIS 88616, at *11 (D. Or. June 30, 2014).  Furthermore, Nike must prove that Mercer is a "functional employee" to maintain any purported attorney-client communication privilege in its presence.  *See United States v. Graf*, 610 F.3d 1148, 1159 (9th Cir. 2010) (adopting *Bieter* test from Eighth Circuit);

*Cahill, et al. v. Nike, Inc.*                    -13-                    August 7, 2020

*NECA-IBEW Pension Trust Fund (The Decatur Plan) v. Precision Castparts Corp.*, 2019 U.S. Dist. LEXIS 168088, *16 (D. Or. Sept. 27, 2019) (listing factors for determining whether outside firm was functional employee under *Bieter*). Yet, it has not. Nike has not provided declarations, documents, or other evidence regarding its engagement of Mercer for the supplemental pay equity analyses, other than unverified representations by counsel. This is insufficient to prove Mercer was a functional employee or that its work was for the purpose of legal advice as opposed to business purposes to establish attorney-client privilege. Nike represents that the scope of Mercer's duties was "to design, conduct, and facilitate compensation and promotion analyses;" however, those facts indicate a business, not legal purpose for its work.

Moreover, assessing the competitiveness of employee pay is a typical human resources function that does not implicate privilege even if it involves legal considerations. *See Koumoulis v. Indep. Fin. Mktg. Grp.*, 295 F.R.D. 28, 45 (E.D.N.Y. 2013) ("Despite its legal content, human resources work, like other business activities with a regulatory flavor, is part of the day-to-day operation of a business; it is not a privileged legal activity."). Just as how Ms. Bradley's status as an attorney did not "transform what would otherwise be human resources and business communications into legal communications" in *Koumoulis*, here, the fact that Nike's outside counsel Seyfarth Shaw communicated with Mercer did not transform what would otherwise be human resources and business communications into legal communications. *See id.* As discussed above, the purpose of the Mercer analyses was to inform the new competitive pay policy being developed by HR, which is an ordinary business activity, even if attorneys are involved.

### b. "Global" Pay Equity Analyses and Time-In-Place and Pace of Promotion Studies Are Not Privilege Communications

For the same reasons these analyses and studies cannot be protected as work product, the available evidence confirms that Nike also cannot prove attorney-client privilege because Nike conducted its "global" pay equity analyses and promotion studies for business, not legal purposes. *See supra* Section III.B.1.b.

## C. Nike Implicitly Waived Privilege Over the Pay Equity and Promotion Analyses by Using Analyses as Both A Sword and A Shield

Finally, Nike's attorney-client and work product assertions over the pay equity analyses and promotion studies do not justify withholding documents because it is well-established that using privilege as a sword and shield impliedly waives privilege. *See e.g., Dulcich, Inc. v. USI Ins. Servs. Nat'l, Inc.*, No. 3:18-cv-01089-YY, 2019 U.S. Dist. LEXIS 58888, *5-6, *11 (D. Or. Apr. 5, 2019) (finding that plaintiff impliedly waived attorney-client privilege where plaintiff affirmatively brought suit, plaintiff put at issue the privileged information, and allowing plaintiff to assert privilege would deny defendant information vital to its defense) (quoting *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)).

Here, Nike has done just that by refusing to produce responsive pay equity documents while also relying on these same analyses for its affirmative defenses. Nike claims it had legitimate business reason for its decisions and that there were non-discriminatory reasons it would have made same decisions. Allowing Nike to shield its pay equity studies under work product would deny plaintiffs the ability to challenge Nike's assertion that its business reasons

*Cahill, et al. v. Nike, Inc.*                    -14-                    August 7, 2020

were non-discriminatory.  Courts are clear that such improper usage of privilege as both a sword and a shield impliedly waives the privilege.  *See, e.g., United States v. Ortland*, 109 F.3d 539, 543 (9th Cir. 1997) ("The privilege which protects attorney-client communications may not be used both as a sword and a shield.") (citation omitted).

## CONCLUSION

For all the above reasons, Plaintiffs request an order compelling Nike to produce highly relevant documents and data relating to its (1) "global" pay equity analyses since 2016, (2) supplemental pay equity analyses since 2018, and (3) pace of promotion and time-in-job studies since 2018.

Respectfully submitted,

 */s/ James Kan*
James Kan

Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Anna M. Joyce, OSB #013112
Chad A. Naso, OSB #150310
chadnaso@markowitzherbold.com
MARKOWITZ HERBOLD PC
Tel.: (503) 295-3085

Laura L. Ho (admitted pro hac vice)
Barry Goldstein, Of Counsel (admitted pro hac vice)
James Kan (admitted pro hac vice)
Byron Goldstein (admitted pro hac vice)
Katharine L. Fisher (admitted pro hac vice)
Mengfei Sun (admitted pro hac vice)
msun@gbdhlegal.com
GOLDSTEIN BORGEN DARDARIAN & HO
Tel.: (510) 763-9800

Craig Ackerman (SBN 229832)
ACKERMANN & TILAJEF PC
Tel: (310) 277-0614

India Lin Bodien (SBN 44898)
INDIA LIN BODIEN LAW
Tel: (253) 503-1672

Attorneys for Plaintiffs

cc: Daniel Prince (danielprince@paulhastings.com)
    Zach P. Hutton (zachhutton@paulhastings.com)
    Felicia A. Davis (feliciadavis@paulhastings.com)
    Amy Joseph Pedersen (amy.joseph.pedersen@stoel.com)
    Kennon Scott (kennon.scott@stoel.com)

# EXHIBIT 1

**Exhibit A**
Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #1 (2020-02-02)

| Log Entry No. | Starting Bates Number | Date | From / Author | To / Recipient | CC / Recipient | Document Description / Reason for Redaction or Withholding | Privilege Asserted |
|---|---|---|---|---|---|---|---|
| 1. | NIKE_0 0006022 | 1/30/2019 | Mylissa Hoffman | Donna Vanderschoot* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 2. | NIKE_0 0006491 | 10/30/2018 | Mylissa Hoffman | Donna Vanderschoot* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 3. | NIKE_0 0008564 | 8/8/2018 | Carla Lowe | Jessica Baumann* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 4. | NIKE_0 0008567 | 8/8/2018 | Carla Lowe | Jessica Baumann* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |

\* – Where symbol follows a name, it designates Nike's in-house legal counsel or member of Nike's in-house legal department.
\*\* – Where symbol follows a name, it designates Nike's outside legal counsel.

1

**Exhibit A**
Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #1 (2020-02-02)

| 5. | NIKE_0 0008568 | 8/8/2018 | Carla Lowe | Jessica Baumann* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
|---|---|---|---|---|---|---|---|
| 6. | NIKE_0 0008635 | 9/7/2018 | Carla Lowe | Jessica Baumann* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 7. | NIKE_0 0001277 9 | 10/12/2018 | Carla Lowe | Jessica Baumann* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 8. | NIKE_0 0012781 | 10/10/2018 | Carla Lowe | Jessica Baumann* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 9. | NIKE_0 0012915 | 3/20/2019 | Mylissa Hoffman | Donna Vanderschoot* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of | Attorney-client communication |

\* – Where symbol follows a name, it designates Nike's in-house legal counsel or member of Nike's in-house legal department.
\*\* – Where symbol follows a name, it designates Nike's outside legal counsel.

2

**Exhibit A**
Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #1 (2020-02-02)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | providing legal advice in this lawsuit. | |
| 10. | NIKE_0 0012930 | 3/20/2019 | Mylissa Hoffman | Donna Vanderschoot* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 11. | NIKE_0 0013159 | 12/6/2018 | Mylissa Hoffman | Donna Vanderschoot* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. <br><br> Redacted names of complainant and witnesses for privacy. | Attorney-client communication |
| 12. | NIKE_0 0013174 | 12/6/2018 | Mylissa Hoffman | Donna Vanderschoot* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. <br><br> Redacted names of complainant and witnesses for privacy. | Attorney-client communication |
| 13. | NIKE_0 0013176 | 12/6/2018 | Mylissa Hoffman | Donna Vanderschoot* | | Communication with Nike Legal Department transmitting | Attorney-client communication |

\* – Where symbol follows a name, it designates Nike's in-house legal counsel or member of Nike's in-house legal department.
\*\* – Where symbol follows a name, it designates Nike's outside legal counsel.

**Exhibit A**
Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #1 (2020-02-02)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | information requested by counsel for the purpose of providing legal advice in this lawsuit. Redacted name of complainant for privacy. | |
| 14. | NIKE_0 0013183 | 12/6/2018 | Mylissa Hoffman | Donna Vanderschoot* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. Redacted name of subject of investigation for privacy. | Attorney-client communication |
| 15. | NIKE_0 0013206 | 8/8/2018 | Carla Lowe | Jessica Baumann* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 16. | NIKE_0 0013208 | 8/8/2018 | Carla Lowe | Jessica Baumann* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |

\* – Where symbol follows a name, it designates Nike's in-house legal counsel or member of Nike's in-house legal department.
\*\* – Where symbol follows a name, it designates Nike's outside legal counsel.

Goldstein Decl. Ex. 12, Page 19 of 297

**Exhibit A**
Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #1 (2020-02-02)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 17. | NIKE_0 0013251 | 7/28/2016 | Chris Jones | Anton Litchfield | | Contains advice of legal counsel to business leaders. | Attorney-client communication |
| 18. | NIKE_0 0013294 | 8/5/2015 | Karin Bidberg | Stuart Teale | | Contains advice of legal counsel to business leaders. | Attorney-client communication |
| 19. | NIKE_0 0013307 | 8/10/2016 | Mona-Lisa Pinkney | Lauren Thibodeaux* | Brittany Miller; Stuart Teale | Communication with Nike in-house legal counsel requesting and providing legal advice. | Attorney-client communication |
| 20. | NIKE_0 0014593 | 8/8/2018 | Carla Lowe | Jessica Baumann* | | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |

\* – Where symbol follows a name, it designates Nike's in-house legal counsel or member of Nike's in-house legal department.
\*\* – Where symbol follows a name, it designates Nike's outside legal counsel.

5

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| Log Entry No. | Starting Bates Number | Date | From / Author | To / Recipient | CC | Redaction Description | Privilege Asserted |
|---|---|---|---|---|---|---|---|
| 1. | NIKE_00 015875 | 9/10/2019 | Mylissa Hoffman | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 2. | NIKE_00 015954 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 3. | NIKE_00 015996 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 4. | NIKE_00 015999 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal | Attorney-client communication |

1

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | |
|---|---|---|---|---|---|---|---|
| 5. | NIKE_00016004 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 6. | NIKE_00016007 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 7. | NIKE_00016019 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing | Attorney-client communication |

2

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | legal advice in this lawsuit. | |
| 8. | NIKE_00016019 | 9/21/2018 | Cory Gillespie | Alison Daugherty, Lauren Thibodeaux*, Tanya Morning | N/A | Communication with Nike in-house legal counsel requesting and providing legal advice. | Attorney-client communication |
| 9. | NIKE_00016063 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 10. | NIKE_00016076 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 11. | NIKE_00016092 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the | Attorney-client communication |

Goldstein Decl. Ex. 12, Page 23 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | purpose of providing legal advice in this lawsuit. | |
|---|---|---|---|---|---|---|---|
| 12. | NIKE_00 016104 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 13. | NIKE_00 016217 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 14. | NIKE_00 016425 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 15. | NIKE_00 016428 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal | Attorney-client communication |

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | |
|---|---|---|---|---|---|---|---|
| 16. | NIKE_00 016529 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 17. | NIKE_00 016606 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 18. | NIKE_00 016731 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing | Attorney-client communication |

Goldstein Decl. Ex. 12, Page 25 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | legal advice in this lawsuit. | |
| 19. | NIKE_00 016735 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 20. | NIKE_00 016753 | 12/18/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 21. | NIKE_00 016797 | 12/19/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 22. | NIKE_00 016807 | 12/19/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department | Attorney-client communication |

Goldstein Decl. Ex. 12, Page 26 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | |
|---|---|---|---|---|---|---|---|
| 23. | NIKE_00 016810 | 12/19/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 24. | NIKE_00 016883 | 12/19/2019 | Mercedez Corner | Jessica Baumann* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 25. | N/A | 3/19/2018 | David Baffa** | Alison Daugherty | Lauren Thibodeaux*, Robert Leinwand* | Communication with Nike in-house and outside legal counsel requesting and providing legal advice. | Attorney-client communication |
| 26. | N/A | 2018 | Shane Walker | N/A | N/A | Reports requested by, and created at the | Attorney work product doctrine |

Goldstein Decl. Ex. 12, Page 27 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | direction of, in-house counsel regarding Competitive Pay Management adjustments for use in providing legal advice. | |
|---|---|---|---|---|---|---|---|
| 27. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of, in-house counsel regarding Competitive Pay Management adjustments for use in providing legal advice. | Attorney work product doctrine |
| 28. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of, in-house counsel regarding Competitive Pay Management adjustments for use in providing legal advice. | Attorney work product doctrine |
| 29. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of, in-house counsel regarding Competitive Pay Management adjustments for use in | Attorney work product doctrine |

Goldstein Decl. Ex. 12, Page 28 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | providing legal advice. | |
| 30. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of, in-house counsel regarding Competitive Pay Management adjustments for use in providing legal advice. | Attorney work product doctrine |
| 31. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of, in-house counsel regarding Competitive Pay Management adjustments for use in providing legal advice. | Attorney work product doctrine |
| 32. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of, in-house counsel regarding Competitive Pay Management adjustments for use in providing legal advice. | Attorney work product doctrine |
| 33. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of, in-house | Attorney work product doctrine |

Goldstein Decl. Ex. 12, Page 29 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | counsel regarding Competitive Pay Management adjustments for use in providing legal advice. | |
| 34. | N/A | 2018 | Mercer; Seyfarth Shaw LLP** | Nike | N/A | Presentation created by outside counsel regarding employee compensation for the purpose of providing legal advice. | Attorney work product doctrine |
| 35. | N/A | 2018 | Mercer; Seyfarth Shaw LLP** | Nike | N/A | Presentation created by outside counsel regarding employee compensation for the purpose of providing legal advice. | Attorney work product doctrine |
| 36. | N/A | 2018 | Steven Nelson | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine |
| 37. | N/A | 2018 | Casey North | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use | Attorney work product doctrine |

Goldstein Decl. Ex. 12, Page 30 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | in providing legal advice. | |
|---|---|---|---|---|---|---|---|
| 38. | N/A | 8/9/2019 | Casey North | Meaghan Wheeler, David Buckmaster | Lauren Thibodeaux*, Cassie English*, Alyson Smith*, Dave Baffa**, Christine Hendrickson** | Communication with Nike in-house and outside legal counsel requesting and providing legal advice. | Attorney-client communication |
| 39. | N/A | 2019 | Mercer; Seyfarth Shaw LLP** | Nike | N/A | Presentation created by outside counsel regarding employee compensation for the purpose of providing legal advice. | Attorney work product doctrine |
| 40. | N/A | 2019 | Mercer; Seyfarth Shaw LLP** | Nike | N/A | Presentation created by outside counsel regarding employee compensation for the purpose of providing legal advice. | Attorney work product doctrine. |
| 41. | N/A | 2017 | Amy Janke | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |

Goldstein Decl. Ex. 12, Page 31 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| 42. | N/A | 2017 | Amy Janke | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
|---|---|---|---|---|---|---|---|
| 43. | N/A | 2017 | Amy Janke | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 44. | N/A | 2017 | Amy Janke | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 45. | N/A | 2017 | Amy Janke | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |

Goldstein Decl. Ex. 12, Page 32 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| 46. | N/A | 2017 | Amy Janke | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 47. | N/A | 2018 | Shane Walker | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 48. | N/A | 2018 | Amy Janke | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 49. | N/A | 5/14/2018 | David Baffa** | Nike Pay Review Project Team | N/A | Memorandum regarding employee compensation created by outside counsel for purpose of providing legal advice. | Attorney-client communication; attorney work product doctrine. |

Goldstein Decl. Ex. 12, Page 33 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| 50. | N/A | 6/20/2018 | Mercer; Seyfarth Shaw LLP** | Nike | N/A | Presentation created by outside counsel regarding employee compensation for the purpose of providing legal advice. | Attorney work product doctrine. |
|---|---|---|---|---|---|---|---|
| 51. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 52. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 53. | N/A | 2018 | David Buckmaster | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 54. | N/A | 2018 | Jeff Baker | N/A | N/A | Reports requested by, and created at the | Attorney work product doctrine. |

14

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | direction of in-house counsel regarding employee compensation for use in providing legal advice. | |
| 55. | N/A | 2018 | Emily Denney | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 56. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 57. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 58. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the | Attorney work product doctrine. |

Goldstein Decl. Ex. 12, Page 35 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

|  |  |  |  |  |  | direction of in-house counsel regarding employee compensation for use in providing legal advice. |  |
|---|---|---|---|---|---|---|---|
| 59. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 60. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 61. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 62. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the | Attorney work product doctrine. |

Goldstein Decl. Ex. 12, Page 36 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | direction of in-house counsel regarding employee compensation for use in providing legal advice. | |
|---|---|---|---|---|---|---|---|
| 63. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 64. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 65. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 66. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the | Attorney work product doctrine. |

Goldstein Decl. Ex. 12, Page 37 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | direction of in-house counsel regarding employee compensation for use in providing legal advice. | |
| 67. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 68. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 69. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 70. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the | Attorney work product doctrine. |

Goldstein Decl. Ex. 12, Page 38 of 297

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | direction of in-house counsel regarding employee compensation for use in providing legal advice. | |
| 71. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 72. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 73. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 74. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the | Attorney work product doctrine. |

19

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | direction of in-house counsel regarding employee compensation for use in providing legal advice. | |
| 75. | N/A | 2018 | Chijioke Orjiakor | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 76. | N/A | 2018 | Shane Walker | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 77. | N/A | 2018 | Nicolas Van Odsol | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |
| 78. | N/A | 2018 | Chijioke Orjiakor | N/A | N/A | Reports requested by, and created at the | Attorney work product doctrine. |

20

Cahill, et al. v. Nike, Inc.
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #2 (2020-03-13)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | direction of in-house counsel regarding employee compensation for use in providing legal advice. | |
| 79. | N/A | 2018 | Amy Janke-Godfrey | N/A | N/A | Reports requested by, and created at the direction of in-house counsel regarding employee compensation for use in providing legal advice. | Attorney work product doctrine. |

* – Where symbol follows a name, it designates Nike's in-house legal counsel or member of Nike's in-house legal department.
** – Where symbol follows a name, it designates Nike's outside legal counsel.

Goldstein Decl. Ex. 12, Page 41 of 297

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| Log Entry No. | Starting Bates Number | Date | From / Author | To / Recipient | CC | Redaction Description | Privilege Asserted |
|---|---|---|---|---|---|---|---|
| 1. | NIKE_000 23242 | 1/30/2019 | Hoffman, Mylissa | Vanderschoot, Donna* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 2. | NIKE_000 23244 | 10/30/2018 | Hoffman, Mylissa | Vanderschoot, Donna* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 3. | NIKE_000 23258 | 8/8/2018 | Lowe, Carla | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 4. | NIKE_000 23261 | 8/8/2018 | Lowe, Carla | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 5. | NIKE_000 23262 | 8/8/2018 | Lowe, Carla | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the | Attorney-client communication. |

1

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| | | | | | | purpose of providing legal advice in this lawsuit. | |
|---|---|---|---|---|---|---|---|
| 6. | NIKE_000 23271 | 9/7/2018 | Lowe, Carla | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 7. | NIKE_000 23276 | 10/12/2018 | Lowe, Carla | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 8. | NIKE_000 23278 | 10/10/2018 | Lowe, Carla | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 9. | NIKE_000 23282 | 3/20/2019 | Hoffman, Mylissa | Vanderschoot, Donna* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 10. | NIKE_000 23297 | 3/20/2019 | Hoffman, Mylissa | Vanderschoot, Donna* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |

Goldstein Decl. Ex. 12, Page 43 of 297

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 11. | NIKE_000 23298 | 12/6/2018 | Hoffman, Mylissa | Vanderschoot, Donna* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 12. | NIKE_000 23313 | 12/6/2018 | Hoffman, Mylissa | Vanderschoot, Donna* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 13. | NIKE_000 23315 | 12/6/2018 | Hoffman, Mylissa | Vanderschoot, Donna* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 14. | NIKE_000 23321 | 12/6/2018 | Hoffman, Mylissa | Vanderschoot, Donna* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 15. | NIKE_000 23324 | 8/7/2018 | Lowe, Carla | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |

Goldstein Decl. Ex. 12, Page 44 of 297

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| 16. | NIKE_000 23326 | 8/8/2018 | Lowe, Carla | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
|---|---|---|---|---|---|---|---|
| 17. | NIKE_000 23332 | 7/28/2016 | Jones, Chris | Kat Robison*, Robert Ciochon, Rob Geurtsen | Gregory Fowler, Mona-Lisa Pinkney, Sam Taylor | Communication with Nike in-house counsel requesting legal advice. | Attorney-client communication. |
| 18. | NIKE_000 23370 | 8/5/2016 | Blidberg, Karin | Teale, Stuart | Dorr, Chris | Confidential communication regaring communication with Nike in-house counsel providing legal advice. | Attorney-client communication. |
| 19. | NIKE_000 23383 | 8/10/2016 | Pinkney, Mona-Lisa | Thibodeaux, Lauren* | Miller, Brittany; Teale, Stuart | Communication with Nike in-house counsel requesting and providing legal advice. | Attorney-client communication. |
| 20. | NIKE_000 23388 | 8/8/2018 | Lowe, Carla | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 21. | NIKE_000 19663 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the | Attorney-client communication. |

4

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| | | | | | | purpose of providing legal advice in this lawsuit. | |
|---|---|---|---|---|---|---|---|
| 22. | NIKE_000 21529 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 23. | NIKE_000 19667 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 24. | NIKE_000 19857 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 25. | NIKE_000 20047 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 26. | NIKE_000 20245 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |

Goldstein Decl. Ex. 12, Page 46 of 297

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 27. | NIKE_000 20473 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 28. | NIKE_000 20703 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 29. | NIKE_000 20970 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 30. | NIKE_000 21250 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 31. | NIKE_000 21375 | 12/6/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |

Goldstein Decl. Ex. 12, Page 47 of 297

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| 32. | NIKE_000 23392 | 9/10/2019 | Hoffman, Mylissa | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
|---|---|---|---|---|---|---|---|
| 33. | NIKE_000 21464 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 34. | NIKE_000 21506 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 35. | NIKE_000 21509 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication |
| 36. | NIKE_000 21513 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |

Goldstein Decl. Ex. 12, Page 48 of 297

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| 37. | NIKE_000 21517 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
|---|---|---|---|---|---|---|---|
| 38. | NIKE_000 21573 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 39. | NIKE_000 21586 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 40. | NIKE_000 21602 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 41. | NIKE_000 21614 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |

Goldstein Decl. Ex. 12, Page 49 of 297

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 42. | NIKE_000 21727 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 43. | NIKE_000 21935 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 44. | NIKE_000 21938 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 45. | NIKE_000 22039 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 46. | NIKE_000 22116 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |

9

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| 47. | NIKE_000 22153 | 6/1/2017 | Brennon Stewart | Phoebe Diaz, Steve Michaelsen, Lee Noble, JC Garay, Olga Kislinska, Dave Kirk, Angelique Okeke*, Michael Benno | Nike Data ProteXon Security Exhibit (DPSE), Inforisk, Abid Ansari. | Communication with Nike in-house legal counsel requesting and providing legal advice. | Attorney-client communication. |
|---|---|---|---|---|---|---|---|
| 48. | NIKE_000 22189 | 10/22/2018 | Phoebe Diaz | Rosalie Siler | N/A | Description of communication with Nike in-house counsel providing legal advice. | Attorney-client communication. |
| 49. | NIKE_000 22193 | 10/22/2018 | Phoebe Diaz | Rosalie Siler | N/A | Description of communication with Nike in-house counsel providing legal advice. | Attorney-client communication. |
| 50. | NIKE_000 22241 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 51. | NIKE_000 22245 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 52. | NIKE_000 22263 | 12/18/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information | Attorney-client communication. |

10

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | requested by counsel for the purpose of providing legal advice in this lawsuit. | |
| 53. | NIKE_000 22307 | 12/19/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 54. | NIKE_000 22369 | 12/19/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 55. | NIKE_000 22379 | 12/19/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 56. | NIKE_000 22382 | 12/19/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit. | Attorney-client communication. |
| 57. | NIKE_000 22455 | 12/19/2019 | Corner, Mercedez | Baumann, Jessica* | N/A | Communication with Nike Legal Department transmitting information requested by counsel for the | Attorney-client communication. |

11

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #3 (July 24, 2020)

|  |  |  |  |  |  | purpose of providing legal advice in this lawsuit. |  |
|--|--|--|--|--|--|---------------------------------------------------|--|

\* – Where symbol follows a name, it designates Nike's in-house legal counsel or member of Nike's in-house legal department.

12



1(213) 683-6169
danielprince@paulhastings.com


September 8, 2020

**VIA EMAIL**                                                    **ATTORNEYS' EYES ONLY**

Hon. Jolie A. Russo
United States Magistrate Judge
Mark O. Hatfield United States Courthouse
Room 1027
1000 S.W. Third Avenue
Portland, Oregon  97204
Gary_Magnuson@ord.uscourts.gov

Re:      *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Judge Russo:

Defendant Nike, Inc. ("Nike") submits this opposition to Plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender's (collectively, "Plaintiffs") August 7, 2020 motion to compel the production of privileged and confidential compensation and/or promotions analyses, each of which was designed, conducted, and executed at the direction of counsel, beginning in 2016 through 2020.[1]

I.      **INTRODUCTION**

Plaintiffs seek to obtain what they know they are not entitled to receive—confidential compensation and/or promotions analyses that are squarely protected by the attorney-client privilege and/or the attorney work product doctrine.  Plaintiffs' motion should be denied for several reasons, including the following:

*First*, each of the analyses at issue was conducted at the direction of Nike's Legal Department and its outside counsel, Seyfarth Shaw LLP ("Seyfarth").  Seyfarth's employment law partners were retained by Nike for their expertise in, *inter alia*, collecting compensation-related data, developing and refining statistical models to analyze compensation, identifying outliers or variables that may explain differences in pay practices, assessing legal risk exposure arising out of or relating to pay and/or promotions discrepancies for members of protected classes, and counseling regarding pay practices. Seyfarth provided these legal services and its legal advice and judgment to Nike Legal.  In turn, Nike Legal provided legal advice and legal risk assessments to its own clients, Nike's corporate functions such as Total Rewards, Operations & Services ("Total Rewards").[2]

*Second*, contrary to Plaintiffs' argument that the compensation and/or promotions analyses here *solely* are the province of business functions, like Total Rewards or Human Resources, the facts demonstrate otherwise.  With respect to compensation and/or promotions matters at Nike, the legal purposes of the compensation analyses are not mutually exclusive from the needs of Nike's corporate

---

[1] Like Plaintiffs' motion, this opposition brief exceeds the page limits provided under LR 26-3(b), however, Nike respectfully submits that the additional pages are necessary to respond to the issues raised by Plaintiffs concerning Nike's privileged and confidential compensation and/or promotions analyses.
[2] Total Rewards handles compensation and benefits for Nike employees.



**Attorneys' Eyes Only**

functions.  Seyfarth's specific legal advice regarding data collection, the specific analyses used, the legal import of the results, the job groupings and sub-groupings used, and the methods to identify any outliers was "baked into" the statistical models that were used to analyze compensation and/or promotions.  Nike Legal, Seyfarth, and the labor economists and statisticians that helped to carry out these analyses *all* are in accord on this point.  Seyfarth's legal advice, therefore, cannot be untangled from any of these analyses, and no authority supports compelling production on this factual record.

*Third*, as set forth in this opposition, every pay study here was performed with the objective of preserving the attorney-client privilege.  For *every* study:  (i) Nike Legal and Seyfarth identified a narrowly-defined group of legal personnel and subject matter experts to drive the workflows; (ii) Nike Legal directed Seyfarth to prepare a "Privilege Protocol" that set forth clear guidelines on preserving privilege; (iii) Seyfarth prepared a separate Protocol for each compensation project, and that Protocol was distributed to every project team member; (iv) under each Protocol, project team members were instructed not to disclose information about their work or documents to anyone outside of the core project team; and (v) each Protocol mandated that documents be identified as "Privileged and Confidential/Prepared at the Direction of Counsel," including drafts and emails.  Significantly, for *every* study, *each* witness from Nike Legal, Seyfarth, Willis Towers Watson ("WTW") and Mercer[3] attested, under penalty of perjury, that members of *each and every* project team faithfully adhered to the instructions provided in *each and every* Privilege Protocol.

*Fourth*, each pay study was nuanced, with different input variables, different data, and different segmentation protocols.  The record therefore shows that Seyfarth's legal advice continued for each study at issue, in 2016 and from 2018 to 2020.  The objective of Seyfarth's continued counsel was to provide legal advice to Nike Legal so that Nike Legal could assess legal risk, and to assist Nike Legal in providing legal advice to its corporate functions regarding various compensation-related matters.

*Finally*, each of the analyses was conducted in anticipation of litigation and at the direction of counsel.  Plaintiffs' reliance on aspirational public relations statements by non-attorneys about "pay equity" does not change the outcome.  Nor do Plaintiffs' supposed waiver arguments, which have no basis in law or fact.  Nike's privilege logs contain sufficient detail, consistent with the case law.  And no case law supports a waiver of privilege where, as here, Plaintiffs complain that Nike did not provide a correlation between the entries on its privilege logs and the compensation studies at issue.  Nike has no obligation to spoon-feed Plaintiffs, and despite Plaintiffs' "do as I say, not as I do" mantra, Nike has timely produced privilege logs on a rolling basis—just like Plaintiffs.

In summary, there are attorney-client privilege and attorney work product bases for each compensation and/or promotions analyses, and Plaintiffs are not entitled to the same under any legal theory or misstatement of fact.  The motion should be denied.  Further, if it would be helpful to the Court, Nike requests oral argument in connection with the motion.

---

[3] Willis Towers Watson ("WTW") and Mercer are the consulting firms retained to carry out the analyses.



## II.    FACTUAL BACKGROUND ON NIKE'S PAY AND PROMOTIONS STUDIES

### A.    Nike Engaged Outside Counsel and Consultants to Conduct Compensation Analyses in Early 2016.

In or around November 2015, Nike received an EEOC Charge of Discrimination brought by a Black female employee alleging that she had been discriminated against under Title VII because she had been paid less than her White male counterpart.  *See* Declaration of Holly Hearn ("Hearn Decl.") at ¶ 4.  Then, in February 2016, counsel for a former Nike executive sent a demand letter to Nike Legal, threatening an age discrimination claim.  *See id.*  In handling these matters, Holly Hearn, Nike's then-Global Employment Counsel, decided that ███████████████████████████████████████████████████████████████████████████████████████████████████  *See id.*  Also around that time, Ms. Hearn had several conversations with Kim Lupo, Vice President of Total Rewards, during which Ms. Lupo sought legal advice regarding ████████████████████████████████████████████████████████████████████████████████████████  *See id.* at ¶ 5; Declaration of Kim Lupo ("Lupo Decl.") at ¶ 3.

In early 2016, Ms. Hearn engaged David Baffa and Christine Hendrickson, both Partners with the Seyfarth law firm and experts in designing and conducting privileged compensation analyses.  Mr. Baffa leads Seyfarth's national counseling practice and routinely guides companies in structuring and executing privileged pay and promotions analyses.  *See* Declaration of David Baffa ("Baffa Decl.") at ¶ 1.  Likewise, Ms. Hendrickson co-chairs Seyfarth's Pay Equity group and has authored reference guides on structuring and conducting privileged pay analyses.  *See* Declaration of Christine Hendrickson ("Hendrickson Decl.") at ¶ 1.  Both Mr. Baffa and Ms. Hendrickson regularly lead teams of attorneys, subject matter experts, labor economists, and data analysts in compensation and promotions studies, which include legal advice on data collection, segmenting and cleaning data, identifying outliers and other variables that may explain differences in pay, and legal advice on pay adjustments and remediation.  *See* Baffa Decl. at ¶ 1; Hendrickson Decl. at ¶ 1.

Given their relevant legal training and expertise, Nike Legal engaged Seyfarth to provide legal advice to Nike Legal in connection with, for example, ████████████████████████████████████████████████████████████████████████████████████████████████  *See* Hearn Decl. at ¶ 5; Baffa Decl. at ¶ 4; Hendrickson Decl. at ¶ 4.  In March 2016, Nike retained labor economists and consultants from WTW to carry out the analyses, at the direction of Nike Legal and Seyfarth.  *See* Hearn Decl. at ¶ 6; Baffa Decl. at ¶ 6; Hendrickson Decl. at ¶ 5.



Hon. Jolie A. Russo                                              **Attorneys' Eyes Only**
September 8, 2020
Page 4


     **B.**     **In 2016-2017, Nike Legal and Seyfarth Worked with Willis Towers Watson to Conduct Global Compensation Analyses.**

Despite the fact that the scope of Plaintiffs' lawsuit is limited to pay practices at Nike's World Headquarters in Oregon, Plaintiffs now seek production of global pay analyses that were conducted, at the direction of counsel, with WTW in 2016-17.[4]

In April 2016, Nike Legal and Seyfarth assembled a project team to conduct compensation analyses to provide legal advice to Nike Legal.  *See* Hearn Decl. at ¶ 8; Baffa Decl. at ¶ 6.  At the direction of Nike Legal, Mr. Baffa circulated a Privilege Protocol to the Pay Compliance Team ("PACT"), a narrowly-defined group of legal and subject matter experts that would be working on the 2016-2017 pay equity analyses.  *See* Hearn Decl. at ¶ 9; Declaration of Lindsay Wiggins ("Wiggins Decl.") at ¶ 4; Baffa Decl. at ¶ 7.  The PACT had approximately 20 members.  *See* Hearn Decl. at ¶ 9; Wiggins Decl. at ¶ 5; Baffa Decl. at ¶ 7.

The Privilege Protocol implemented guidelines to maintain the attorney-client privilege, and every witness confirms that these guidelines were followed.  *See* Hearn Decl. at ¶ 10; Baffa Decl. at ¶ 11; Wiggins Decl. at ¶ 6.  The Protocol established a limited distribution list, consisting of legal and subject matter experts from Seyfarth (including Mr. Baffa and Ms. Hendrickson), WTW (including Lindsay Wiggins, a Senior Consultant, and Richard Luss, a Senior Economist), Nike Legal (Ms. Hearn), and various Nike corporate functions, like Total Rewards (including Kim Lupo), Diversity & Inclusion (Antoine Andrews, then-Vice President, Diversity and Inclusion), and Talent (Courtney Watts, then-Talent Managing Director, Innovation, Product, Design).  *See* Hearn Decl. at ¶ 9; Wiggins Decl. at ¶ 5; Baffa Decl. at ¶ 7.

Nike Legal relied on Seyfarth to provide legal advice regarding, for example, ███████████

███████  *See* Hearn Decl. at ¶ 11; Baffa Decl. at ¶ 9.  Indeed, Mr. Baffa was heavily involved in this work and drove the methodology; and, Mr. Baffa's advice was built into the statistical models themselves.  *See* Baffa Decl. at ¶ 9; Wiggins Decl at ¶ 7; Hearn Decl. at ¶ 11.  Seyfarth continued to provide legal advice throughout the course of the analyses on these (and other) issues; in fact, even after executing the analyses, Seyfarth provided legal advice to Nike Legal regarding ██████████████.  *See* Baffa Decl. at ¶ 9; Hearn Decl. at ¶ 11.

---

[4] All of the pay equity analyses referenced in Plaintiffs' motion were done on a global scale (not just across the United States or even Nike Headquarters).  Setting aside, *arguendo*, the privilege and work product protections over these documents, Plaintiffs are not entitled to these analyses because they are beyond the scope of relevance in this case.  This lawsuit is limited to certain employees *at Nike's World Headquarters* in Beaverton, Oregon.  Compensation analyses for employees in other work locations, in other states, and in other countries, are not relevant here.  *See* Fed. R. Civ. Proc. R. 26, Notes of Advisory Committee on Rules – 1970 Amendment, Subdivision (b)(3) – Basic Standard ("With respect to documents not obtained or prepared with an eye to litigation, the decisions, while not uniform, reflect a strong and increasing tendency to relate 'good cause' to a showing that the documents are relevant to the subject matter of the action.") (internal citations omitted).


Hon. Jolie A. Russo                                                **Attorneys' Eyes Only**
September 8, 2020
Page 5

The subject matter experts from WTW were instrumental in carrying out the PACT's compensation analyses. *See* Hearn Decl. at ¶ 12; Baffa Decl. at ¶ 9; Wiggins Decl. at ¶ 8. These labor economists and consultants were integrated into the PACT. *See* Wiggins Decl. at ¶ 8; Baffa Decl. at ¶ 10. They received and generated PACT-related communications; they attended meetings and phone calls with Seyfarth, Nike Legal, and Nike's subject matters experts; they carried out analyses; and, they helped prepare deliverables. *See* Hearn Decl. at ¶ 12; Baffa Decl. at ¶ 10; Wiggins Decl. at ¶ 8. Any work product prepared by the PACT belonged to Nike and was regarded as highly confidential and privileged. *See* Hearn Decl. at ¶ 12; Wiggins Decl. at ¶ 8; Baffa Decl. at ¶ 10.

### C.    Public Relations Statements Regarding "Pay Equity" by Non-PACT Members and Non-Attorneys Do Not Change the Fact That the Studies Here are Privileged.

In a slight of hand, Plaintiffs conflate statements by non-PACT members and non-attorneys about "pay equity" with the conduct of the studies themselves. Aside from the fact that the term "pay equity" has a different meaning colloquially and for legal professionals, *see* Hearn Decl. at ¶ 3, Baffa Decl. at ¶ 3, and Hendrickson Decl. at ¶ 3, Plaintiffs rely on statements by David Ayre, Nike's former Vice President of Human Resources, and Monique Matheson, Nike's current Vice President of Human Resources, to suggest that the compensation analyses were not performed at the direction of counsel. That is in error. Disclosing the fact of compensation analyses does ***not*** mean that there was a waiver of the methodologies used to conduct those analyses, the analyses themselves, or pay adjustments flowing from those analyses, all of which solidly incorporate and reflect legal advice. *See* Hearn Decl. at ¶ 13; Baffa Decl. at ¶ 8.

### D.    In Early 2018, Nike Again Decided to Undertake Compensation Analyses, as well as Promotions and Turnover Analyses.

In or about December 2017, Nike Legal learned about an informal and unofficial gender survey being conducted at Nike, which contained a compilation of complaints made by unidentified current and former employees. *See* Declaration of Lauren Thibodeaux ("Thibodeaux Decl.") at ¶ 4. Nike's then-Senior Director, Global Employment Counsel, Lauren Thibodeaux, reviewed those complaints in or around February 2018. *See id.* Some of the complaints raised in the survey, *inter alia*, alleged bias in compensation and promotion decisions on the basis of gender. *See id.* ████████████████

██████████  [5] *See id.*

Nike again engaged Seyfarth's pay equity experts, Mr. Baffa and Ms. Hendrickson, to lead global pay equity analyses, and promotion and turnover analyses, which related to ████████████ ██████████████████████  *See* Thibodeaux Decl. at ¶ 5. Nike also retained Mercer, a global human resources consulting firm that specializes in statistical analyses of pay, performance, and promotions decisions. Thibodeaux Decl. at ¶ 6; Hendrickson Decl. at ¶ 7; Declaration of Casey North ("North Decl.") at ¶ 3. For both projects, Mr. Baffa and Ms. Hendrickson provided legal advice to Nike Legal in

---

[5] Indeed, approximately five months later, this lawsuit was filed.



connection with ███████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ *See* Thibodeaux Decl. at
¶ 5; Hendrickson Decl. at ¶ 6; North Decl. at ¶ 8.

     ***First***, a discrete project team was created for the Promotion and Turnover Analysis Project – the
PTAP Team.  *See* Thibodeaux Decl. at ¶ 7; Hendrickson Decl. at ¶ 8; North Decl. at ¶ 5.  The PTAP
Team consisted of 17 individuals, including legal and subject matter experts from Seyfarth (including Mr.
Baffa and Ms. Hendrickson), Mercer (including Casey North, a Principal in Mercer's Workforce Strategy &
Analytics group), Nike Legal (Ms. Thibodeaux), and various Nike corporate functions, like Total Rewards
(including Kim Lupo), Diversity & Inclusion (Kellie Leonard, then-Chief Diversity & Inclusion Officer), and
Talent & Organizational Effectiveness (including Julie Fuller, Vice President).  *See* Thibodeaux Decl. at ¶
8; Hendrickson Decl. at ¶ 9; North Decl. at ¶ 6.

     At the direction of Nike Legal, Seyfarth developed a Privilege Protocol, and in May 2018, that
Privilege Protocol was circulated to the PTAP Team.  *See* Thibodeaux Decl. at ¶ 8; Hendrickson Decl. at
¶ 9; North Decl. at ¶ 5.  The Privilege Protocol advised PTAP Team members ███████████████
████████████████████████  *See* Thibodeaux Decl. at ¶ 8; Hendrickson Decl. at ¶ 9; North Decl. at ¶ 6.  PTAP Team
members also were instructed not to discuss or disclose communications related to the PTAP Team's
work outside of the PTAP Team.  *See* Thibodeaux Decl. at ¶ 8; Hendrickson Decl. at ¶ 10; North Decl. at
¶ 7.  The Protocol mandated that ███████████████████████████████████████████
█████████████  *See* Thibodeaux Decl. at ¶ 8; Hendrickson Decl. at ¶ 10; North Decl. at ¶ 7.
Moreover, the Protocol required that ████████████████████████████████████████
███████████████████████████  *See* Thibodeaux Decl. at ¶ 8; Hendrickson Decl. at ¶
10; North Decl. at ¶ 7.  The provisions of the Privilege Protocol were followed by PTAP Team members.
*See* Thibodeaux Decl. at ¶ 8; Hendrickson Decl. at ¶ 9; North Decl. at ¶ 7.

     As stated above and like the other studies, Seyfarth provided legal advice related to, for example,
██████████████████████████████  *See* Hendrickson Decl. at ¶¶ 8-11.  However, the work of the PTAP
Team was not completed; this project concluded, per the direction of counsel, in or about August 2018.
*See* Thibodeaux Decl. at ¶ 10; Hendrickson Decl. at ¶ 9.

     ***Second***, Nike Legal and Seyfarth established a separate, discrete project team to conduct
compensation analyses, also in 2018, named the Pay Review Project ("PRP") Team.  *See* Thibodeaux
Decl. at ¶ 12; Hendrickson Decl. at ¶ 13; North Decl. at ¶ 5.  At Nike Legal's direction, Seyfarth prepared
a separate Privilege Protocol for the PRP Team.  *See* Thibodeaux Decl. at ¶ 13; Hendrickson Decl. at ¶
14; North Decl. at ¶ 5.  This Protocol again identified specific guidelines to preserve privilege, as set forth
above, and all of the witnesses here attest that those guidelines were followed.  *See* Thibodeaux Decl. at
¶ 13; Hendrickson Decl. at ¶ 14; North Decl. at ¶ 7.

     The PRP Team consisted of 15 legal and subject matter experts from Seyfarth (including Mr.
Baffa and Ms. Hendrickson), Mercer (including Ms. North), Nike Legal (Ms. Thibodeaux), and various
Nike corporate functions, like Total Rewards (including Ms. Lupo, Shane Walker, Senior Director of



Global Compensation, and Zach Vinton, Vice President of Compensation, Mobility, and Rewards) and Human Resources (including Amy Janke, Director of Human Resources Enterprise Advanced Analytics, and Bethany Dohleman, then-Director of Workforce Intelligence). *See* Thibodeaux Decl. at ¶ 13; Hendrickson Decl. at ¶ 14; North Decl. at ¶ 6. Further, Ms. Lupo frequently sought legal advice in connection with ███████████████████████████████████████████████████████████
██████████████████████████. *See* Lupo Decl. at ¶ 4.

The PRP Team's work began in earnest in or about June 2018. Coordinating with Nike Legal, Seyfarth's pay equity experts drove this analysis and critical workflows to develop the statistical models. *See* Thibodeaux Decl. at ¶ 13; Hendrickson Decl. at ¶ 14; North Decl. at ¶ 8. Seyfarth provided legal advice regarding, for example, █████████████████████████████████████████████████
█████████████. *See* Thibodeaux Decl. at ¶ 13; Hendrickson Decl. at ¶ 14; North Decl. at ¶ 8. Seyfarth's advice was built into the statistical models, and counsel continued to provide legal advice throughout the course of the analyses. *See* Thibodeaux Decl. at ¶ 13; Hendrickson Decl. at ¶ 14; North Decl. at ¶ 8. Even after executing the analyses, Seyfarth provided legal advice to Nike Legal regarding ██████████████
██████████████. *See* Thibodeaux Decl. at ¶ 13; Hendrickson Decl. at ¶ 14.

In both the PTAP and PRP projects, Mercer's subject matter experts were instrumental in carrying out the team's analyses. *See* Thibodeaux Decl. at ¶ 16; Hendrickson Decl. at ¶ 17; North Decl. at ¶ 9. Mercer's labor economists and consultants were integrated into the teams, and these consultants received and generated PRP/PTAP-related communications, attended meetings and phone calls with Seyfarth, Nike Legal, and Nike's subject matters experts, carried out analyses, and helped prepare deliverables. *See* Thibodeaux Decl. at ¶ 16; Hendrickson Decl. at ¶ 17; North Decl. at ¶ 9.

**E.      In June 2018, Nike Received an EEOC Charge From a Former Female Employee Alleging Gender Discrimination and Pay Equity Claims and in August 2018, the Present Lawsuit Was Filed; and, Nike Continued to Direct Pay Equity Studies in 2019 and 2020.**

In June 2018, Nike received an EEOC charge from a former employee alleging violations of the Federal Equal Pay Act, as well as Title VII and the Age Discrimination in Employment Act. *See* Thibodeaux Decl. at ¶ 17. Plaintiffs filed this case in August 2018. *See id.* Throughout this time, Nike Legal also continued to receive requests from the business functions, like Total Rewards, for compensation-related legal advice. *See* Lupo Decl. at ¶ 4. Nike Legal therefore continued to request compensation analyses to render legal advice to Nike's corporate functions in connection with the lawsuits and to continue to assess ongoing legal risk. *See* Thibodeaux Decl. at ¶ 17.

Nike Legal again engaged Seyfarth to conduct compensation analyses in 2019 and 2020. *See* Thibodeaux Decl. at ¶ 18; Hendrickson Decl. at ¶¶ 18, 24. Mercer also was engaged with respect to the same. *See* Thibodeaux Decl. at ¶ 19; Hendrickson Decl. at ¶¶ 23, 29; North Decl. at ¶ 9. As was (is) the custom, Nike Legal and Seyfarth established discrete project teams for the analyses, such as the 2019 Pay Review Project Team ("2019 PRP Team") and the 2020 Pay Review Project Team ("2020 PRP Team"). *See* Thibodeaux Decl. at ¶¶ 20, 25; Hendrickson Decl. at ¶ 19, 25; North Decl. at ¶ 4.



Each project began with the circulation of a Privilege Protocol that was prepared by Seyfarth (at Nike Legal's direction); Privilege Protocols were circulated to the 2019 PRP Team in or about March 2019 and in or about February 2020 to the 2020 PRP Team.  *See* Thibodeaux Decl. at ¶¶ 21, 26; Hendrickson Decl. at ¶¶ 20, 26; North Decl. at ¶ 5.  The Privilege Protocols contained specific instructions to maintain the attorney-client privilege, such as a ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████  *See* Thibodeaux Decl. at ¶¶ 22, 27; Hendrickson Decl. at ¶¶ 21, 27; North Decl. at ¶ 7.  These instructions were followed by the project team members.  *See* Thibodeaux Decl. at ¶¶ 22, 27; Hendrickson Decl. at ¶¶ 21, 27; North Decl. at ¶ 7.

In addition, while the 2019 PRP Team and the 2020 PRP Team work was completed at different times, each project was directed by Seyfarth and Nike Legal.  *See* Thibodeaux Decl. at ¶ 30; Hendrickson Decl. at ¶¶ 18, 24 ; North Decl. at ¶ 8.  For instance, Seyfarth provided advice on ██████████████

████████████████████████████  *See* Thibodeaux Decl. at ¶¶ 23, 28, 30; Hendrickson Decl. at ¶¶ 22, 24, 28; North Decl. at ¶ 8.  Seyfarth's advice was built into the statistical models for these projects, each of which presented different challenges and was an iterative process.  *See* Thibodeaux Decl. at ¶ 30; Hendrickson Decl. at ¶¶ 22, 28; North Decl. at ¶ 8.

Finally, the Mercer team was an integral part of each of the projects in 2019 and 2020.  They were integrated into the project teams, attended meetings and phone calls, received and generated communications, and prepared deliverables to carry out the analyses.  *See* Thibodeaux Decl. at ¶¶ 24, 29; Hendrickson Decl. at ¶¶ 23, 29; North Decl. at ¶ 9.  Likewise, Mercer understood that any work product prepared by a project team belonged to Nike and was regarded as highly confidential and privileged.  North Decl. at ¶ 9.

III.    **FACTUAL BACKGROUND REGARDING PRODUCTION OF PRIVILEGE LOGS**

Plaintiffs issued 83 requests for production of documents in three sets.  *See* Declaration of Daniel Prince ("Prince Decl.") at ¶ 2.  Those requests are wide-ranging, including, for instance, documents relating to the pay ranges for jobs in which putative class members worked or have worked during the liability period; (legacy) policies regarding categories such as overall job architecture, calculating and determining equity awards, performance rating guidelines used to make salary increase determinations, promotional guidelines, and the creation, review and modification of market zones and internal pay ranges; and all complaints, allegations, reports, investigations, recommended responses to complaints, and enacted responses to complaints relating to sex discrimination at Nike HQ as it relates to pay, promotions and performance review.  *See id.*

Nike served objections to these requests that comply with Rule 34(b)(2)(B)'s requirement that a responding party "state with specificity the grounds for objecting to the request, including the reasons." *See id.* at ¶ 3.  Nevertheless, Plaintiffs assert that Nike's objections are "boilerplate" without further explanation or development, particularly because Nike's objections (and privilege logs) comply with the Rules.  *See id.*  These assertions are meritless and conclusory, and Nike has sent letters to Plaintiffs detailing the bases of Nike's objections (and inviting Plaintiffs to meet and confer regarding the same).



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 8, 2020
Page 9

*See id.* Nike has diligently collected, reviewed, and produced more than 23,000 pages of documents (and continue to do so)—all during this pre-class certification phase of the matter. *See id*

Nike's privilege logs have included available information regarding creation dates, authors and recipients that it has been able to extrapolate through review of the documents and their metadata. *See id.* Additionally, Paul Hastings has interviewed dozens of individuals at Nike in an effort to locate responsive documents, and to understand their context, the authors, recipients, and approximate dates of creation. *See id.* That information is reflected in Nike's privilege logs. *See id.*

Plaintiffs make several misstatements in their motion because they want information to which they are not entitled and which long established and bona fide legal doctrines do not permit them to obtain. Instead of accepting this reality, Plaintiffs make baseless allegations of untimely and insufficient privilege logs. But Plaintiffs omit from the record that any purported "delays" in production of privilege logs are Plaintiffs' own doing. From the outset, Plaintiffs have refused to prioritize or phase certain discovery items over others. *See id.* at ¶ 4; Joint Fed. R. Civ. R. 26(f) Report and Proposed Discovery Plan (Dkt. No. 70) (Apr. 26, 2019) ("…Plaintiffs do not believe that discovery should be phased at this time because of the overlap between certification and merits issues[.] … Nike contends that the parties should work together to phase or prioritize discovery in a manner that is proportional to the needs and stage of the case, particularly given that this is a class and collective action."); Prince Decl. at Exh. A (Nike's February 12, 2020 Meet and Confer Letter) ("Plaintiffs' conduct, compounded with their refusal to prioritize or phase certain discovery items over others, has drawn out the discovery process and caused Nike to expend time and resources unnecessarily.").

Also, Plaintiffs' references to their own correspondence are hypocritical and misleading. Plaintiffs made their first production in June 2019, but did not serve their first privilege log until January 2020 (seven months later). *See* Prince Decl. at ¶ 5. The fact is that both Plaintiffs and Nike have served privilege logs on a rolling basis. *See id.* at ¶ 7. Nike has served privilege logs on February 2, 2020, March 13, 2020, July 24, 2020, August 31, 2020, and September 8, 2020. *See id.* Plaintiffs served their privilege logs on January 10, 2020, April 21, 2020 and August 5, 2020. *See id.* Nike's document descriptions adequately describe what has been redacted or withheld in sufficient detail, consistent with applicable law. *See id.*

Finally, Nike's document production (and privilege log) process has required significant time and expense, in part, because it required the identification and collection of documents from individuals responsible for driving the relevant work streams, some of whom are no longer employed by Nike. *See id.* at ¶ 8. That the work had to be done in phases, given available resources, does not change the fact that this lawsuit is and always has been an important lawsuit for Nike Legal and the entire company. Notwithstanding, there are four employees in Nike Legal who are responsible for managing this large-scale litigation. *See* Thibodeaux Decl. at ¶¶ 31-33. Those four people also are responsible for overseeing document collection and case management in other ongoing legal matters and providing advice and counsel to over 40,000 Nike employees in the United States. *See id.* This same team has helped to guide Nike through significant challenges (in addition to this litigation), including lay-offs, the closure of domestic retail stores, and transitioning tens of thousands of employees to working-from-home during the COVID-19 pandemic.



## IV.    PLAINTIFFS ARE NOT ENTITLED TO NIKE'S PAY AND/OR PROMOTION STUDIES, WHICH ARE SHIELDED FROM DISCLOSURE BY THE ATTORNEY-CLIENT PRIVILEGE.

Both the pay equity analyses and promotion & turnover analyses (as well as the communications and documents generated in connection with such analyses) are protected by the attorney-client privilege.  Communications "made in confidence" are "permanently protected" "from disclosure" by the attorney-client privilege "where legal advice of any kind is sought . . . from a professional legal adviser in his/her capacity as such."  *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (affirming judgment denying motion for *in camera* review of allegedly privileged documents where defendant made a *prima facie* showing, through privilege log and affidavits, that the privilege applied). These requirements are satisfied here.

### A.    Every Study at Issue was Conducted at the Direction of Counsel for the Purpose of Providing Legal Advice; Each is Privileged.

As set forth above, each of the analyses at issue was conducted at the direction of Nike's in-house legal counsel (either Ms. Hearn or Ms. Thibodeaux), performed by external consultants under the guidance of outside legal counsel at Seyfarth Shaw LLP (Mr. Baffa and Ms. Hendrickson), and performed for the purpose of providing legal advice to Nike and its corporate functions.  In fact, Nike retained Mr. Baffa and Ms. Hendrickson specifically because they wanted experts skilled in overseeing and conducting privileged pay analyses to provide their legal advice and to bring their legal expertise to bear on these analyses.  Nike relied on Seyfarth's expertise in, among other things, building statistical models, validating those models and identifying outliers that might explain differences in pay and promotion practices, and providing legal advice and guidance regarding the same.  *See* Baffa Decl. at ¶ 4; Hendrickson Decl. at ¶ 4; Hearn Decl. at ¶ 5; Thibodeaux Decl. at ¶ 5.  Significantly, the legal advice of counsel was built into each of the models at issue in each study, and that advice cannot be extracted. *See* Baffa Decl. at ¶ 9; Hendrickson Decl. at ¶¶ 14, 22, 28; Hearn Decl. at ¶ 11; Thibodeaux Decl. at ¶¶ 13, 30.  WTW and Mercer performed their work at the direction of counsel, who drove these projects. *See* Wiggins Decl. at ¶¶ 3, 7; North Decl. at ¶¶ 3, 8.  *See also Viacom, Inc. v. Sumitomo Corp. (In re Copper Mkt. Antitrust Litig.)*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001) (confidential communications between in-house counsel and the consultant, or between the consultant and the client, or among the consult, in-house counsel, and outside counsel that were made for the purpose of facilitating the rendition of legal advice to the client can be protected from disclosure by the attorney-client privilege).  There is no serious argument that the analyses—along with the communications necessary to conduct and discuss the analyses both among attorneys and with the business leaders (*i.e.*, the client)—are privileged.

Plaintiffs' claim that no privilege applies because the analysis was conducted for "business purposes" is without merit, completely speculative, and does not comport with the factual record.  *See King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 721 (5th Cir. 2011) (upholding district court's rejection of privilege challenges because plaintiff "offered only speculation that the e-mails are not covered by privilege because they were made for a purpose other than obtaining legal advice").

*First*, the purpose of each study was to provide legal advice to Nike Legal regarding ███████. *See* Hearn Decl. at ¶ 11; Thibodeaux Decl. at ¶¶ 4, 5; Baffa Decl. at ¶ 4; Hendrickson Decl. at ¶ 4.  The studies, in turn, ████████████████████ *See* Hearn Decl. at ¶¶ 5, 7; Thibodeaux Decl. at ¶ 30;



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 8, 2020
Page 11

Lupo Decl. at ¶¶ 3-4.  In fact, even after designing the models and kicking-off each project, Seyfarth continued to provide legal advice on an ongoing basis.  *See* Hendrickson Decl. at ¶¶ 6, 16, 22, 28; Baffa Decl. at ¶ 9.  Put simply, both legal teams (outside counsel and in-house attorneys) played material roles during the entire lifespan of each analysis.

**Second**, there is no dispute that WTW and Mercer were engaged by counsel to carry out the analyses, at counsel's direction.  Attorney-client privilege extends to a "consultant [ ] working directly with the attorneys for purposes of assisting them in providing the soundest legal advice to their client, . . . ." *Stardock Sys. v. Reiche*, No. 4:17-cv-07025-SBA (KAW), 2018 U.S. Dist. LEXIS 204438, at *17-21 (N.D. Cal. Nov. 30, 2018).  *See also In re Bieter Co.*, 16 F.3d 929, 939 (8th Cir. 1994); *In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321, 331 (S.D.N.Y. 2003); *McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D. Cal. 1990) (under *Upjohn*, there is no principled basis for distinguishing a consultant's communications with attorneys and a corporate employee's communications with attorneys when each acted in the scope of their employment).

In this case, Mercer and WTW were tasked with carrying out the analyses, subject to counsel's direction.  Wiggins Decl. at ¶¶ 2, 3; North Decl. at ¶ 8; Hendrickson Decl. at ¶ 5, Baffa Decl. at ¶ 5, Hearn Decl. at ¶ 6; Thibodeaux Decl. at ¶¶ 6, 12, 19.  The consultants' work was supervised by counsel throughout the course of each project; indeed, counsel provided legal advice regarding ███████████ ██████████████████████████████████████████████████████████████████████  *See* Baffa Decl. at ¶¶ 4, 9; Hendrickson Decl. at ¶¶ 4, 6, 11, 16, 22, 24, 28.  The Seyfarth attorneys were heavily involved in this work and drove its methodology.  *See* Baffa Decl. at ¶ 9 (Mr. Baffa advised on ████████████████████████████████████████ ███████████████  and other matters for the 2016-17 work with WTW); Hendrickson Decl. at ¶¶ 11, 16, 22, 28 (in conjunction with the 2018, 2019, and 2020 work with Mercer, Seyfarth also provided legal advice in connection with, for example, ██████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ████████████████████  The consultants work is privileged.

**Third**, Mercer's and WTW's communications with Nike and its counsel also fall within the attorney-client privilege because the communications were "made for the purpose of seeking legal advice."  *United States v. Kovel*, 296 F.2d 918, 938 (2d Cir. 1961).  The privilege protects communications with experts when the expert "is necessary, or at least highly useful, for the effective consultation between the client and the lawyer."  *United States v. Judson*, 322 F. 2d 460, 462 (9th Cir. 1963) (assistance of expert privileged when hired "to facilitate an accurate and complete consultation between the client and the attorney about the former's financial picture").  The consulting firms here were key—indeed they were imperative—to conducting the statistical analyses.  Neither Nike nor Seyfarth could have performed the analyses without them.  *See Kovel*, 296 F. 2d at 922; *see also* Baffa Decl. at ¶ 10; Hendrickson Decl. at ¶¶ 12, 17, 23, 29; Hearn Decl. at ¶ 12; Thibodeaux Decl. at ¶¶ 11, 16, 24, 29; North Decl. at ¶ 9; Wiggins Decl. at ¶ 8.[6]

---

[6] "[T]he privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981).  In fact, even those communications that reflect the information an attorney asked to be analyzed is privileged.  *See Suboh v. Bellsouth Bus. Sys. Inc.*, 2004



**Fourth**, that Nike's corporate functions may have derived benefit from the legal advice from counsel does not waive privilege.  *See* Lupo Decl. ¶ 4 ("[T]he legal objectives are weaved together with the business objectives.  For the Total Rewards organization, the two are not mutually exclusive."); s*ee also Portland Wine & Iron Works v. Barrier Corp.*, 1980 U.S. Dist. LEXIS 17898 at *4 (D. Or. May 30, 1980) ("if the communication is made primarily for the purpose of securing legal advice, an incidental request for business advice will not vitiate the privilege").  In addition, each of the attorneys from Nike Legal and Seyfarth have stated that the legal issues here have been (and are) the driving concern for Nike.  *See* Hearn Decl. at ¶¶ 3-5; Thibodeaux Decl. at ¶¶ 3-5, 17; Baffa Decl. at ¶¶ 3-5; Hendrickson Decl. at ¶¶ 3-7.

In summary, each of the studies is protected from disclosure by the attorney-client privilege.

**B.      Each of Plaintiffs' Waiver Arguments Fail.**

        1.      <u>Nike's communications with WTW and Mercer—the functional equivalent of Nike employees—do not waive the privilege.</u>

        "[W]hen applying the attorney-client privilege to a corporation or partnership, it is inappropriate to distinguish between those on the client's payroll and those who are instead . . . employed as independent contractors."  *Bieter*, 16. F.3d at 947 (a contrary construction would "lead to attorneys not being able to confer confidentially with nonemployees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing most freely").  A third party is a functional employee when the facts and circumstances demonstrate that the third party works with the company to such an extent that the third party "[is] in all relevant respects the functional equivalent of an employee."  *Id.* at 938 (consultant that was "involved on a daily basis with the principals of [the partnership] and on [the partnership's] behalf in the unsuccessful development that serve[d] as the basis for th[e] litigation," was a functional employee).  When the communications in question fall within the scope of the third party's duties, were made at the behest of his superior, and were made for the purpose of seeking legal advice, the communications are protected by privilege.  *See id.*

        The project team members from WTW and Mercer are the functional equivalent of Nike employees.  They are labor economists and consultants, who worked side-by-side with Nike Legal and outside counsel to carry out counsel's direction.  *See* Wiggins Decl. ¶ 8; North Decl. ¶ 9; Hendrickson Decl. ¶¶ 17, 23, 29; Baffa Decl. ¶ 10; Hearn Decl. ¶ 12; Thibodeaux Decl. ¶¶ 11, 16, 24, 29.  Their inclusion in the analysis and privileged communications does not waive the privilege.  *See United States v. Graf*, 610 F.3d 1148, 1158 (9th Cir. 2010) (citing *In re Bieter Co.*, 16 F. 3d 929, 937 (8th Cir. 1994)).

        Mercer and WTW also acted on Nike's behalf in conjunction with the pay equity analyses and promotions and turnover analysis, rendering them just the type of entity with which Nike's counsel would wish to confer confidentially.  *See Graf*, 610 F.3d at 1159; *see also Bieter*, 16 F.3d at 939.  They were integral team members assigned to deal with issues that were completely intertwined with litigation and legal strategies.  *See* Hendrickson Decl. ¶¶ 17, 23, 29; Baffa Decl. ¶ 10; Hearn Decl. ¶ 12; Thibodeaux

_____

U.S. Dist. LEXIS 31422 at *21-22 (N.D. Ga. Nov. 17, 2004) (communications that reflect "what specific information [an attorney asked to be] . . . compile[d] for [a] report, how that information was organized in the report, or what conclusions . . . may have [been] reached and communicated . . . regarding the information contained in the report" were privileged).



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 8, 2020
Page 13

Decl. ¶¶ 11, 16, 24, 29.  *See FTC v. GlaxoSmithKline,* 294 F.3d 141, 148, 352 U.S. App. D.C. 343 (D.C. Cir. 2002) (extending privilege to communications between corporate employees and corporation's public relations and government affairs consultants; "the consultants became integral members of the team assigned to deal with issues that were completely intertwined with [the corporation's] litigation and legal strategies.") (internal alterations and quotations omitted).

Plaintiffs' cited cases do not change this analysis.  First, in *Becker v. Willamette Cmty. Bank*, No. 6:12-cv-01427-TC, 2014 U.S. Dist. LEXIS 88616, at *11 (D. Or. June 30, 2014), the client hired an attorney, not to provide legal advice, but to act as an independent fact-finder.  Nike's analyses are inextricably intertwined with a legal purpose and the consultants were hired to help advance that purpose. There is no similarity.

Next, in *NECA-IBEW Pension Trust Fund (The Decatur Plan) v. Precision Castparts Corp.*, 2019 U.S. Dist. LEXIS 16808, at *17 (D. Or. Sept. 27, 2019), cited in Plaintiffs' letter brief, the court found that the PR firm in question **was** the functional equivalent of an employee (just as WTW and Mercer are here). In reaching its conclusion, the Court considered the following:  (1) the PR firm took its instruction from the hiring company and consulted with members of the company's management team and legal and financial advisors as necessary; (2) the work product the PR firm created belonged to the company; and (3) the PR firm was required to maintain the confidentiality of non-public documents it received from the company's attorneys and financial advisors.  *See id.* at *18.

The same is true here.  The WTW and Mercer consultants communicated with Nike at the direction of their superior—Nike Legal—in regards to legal advice.  *See* Wiggins Decl. ¶ 3; North Decl. ¶¶ 3, 4.  *See Bieter,* 16 F.3d at 939.  Mercer's and WTW's privileged communications with Nike were "within the scope of [its] duties" to design, conduct and facilitate compensation and promotion analyses.  *Id.*  The communications followed the Privilege Protocol and were not "disseminated beyond those persons who, because of the structure of the client's operations, need[ed] to know its contents."  *Id.  See* also Hendrickson Decl. at ¶¶ 10, 15, 21, 27; Baffa Decl. at ¶¶ 8, 11.  The protocols were followed by the team members.  *See* Hendrickson Decl. ¶¶ 10, 15, 21; Baffa Decl. ¶¶ 8, 11; Hearn Decl. ¶ 10; Thibodeaux Decl. ¶¶ 9, 14, 22, 27; Wiggins Decl. ¶ 6; North Decl. ¶ 7.

Nike has demonstrated the privileged nature of the documents and communications on its privilege logs as they relate to WTW and Mercer's consulting work for the company.[7]

        2.     <u>Communications by non-attorneys about forward-looking aspirational goals do not constitute waiver.</u>

Plaintiffs argue that the fact that Nike discussed "pay equity" somehow waived privileged over the studies themselves, as well as the privileged advice and analysis that necessarily are intertwined.  Of course, this is not the law.

---

[7] At this pre-certification phase in particular, Nike has not undertaken the obligation of logging every potential email relating to the compensation and/or promotions analyses over a five-year period.  The logs identify analyses, slide decks, etc. establishing the bases for the assertions of privilege and work product protection.



Hon. Jolie A. Russo
September 8, 2020
Page 14

**Attorneys' Eyes Only**

Disclosure of the ultimate outcome of a privileged legal process does not waive privilege with respect to the entire process. Such a result would be ludicrous. Imagine the millions of business decisions that are made every day based on legal advice. Consider, for instance, a CEO announces a new parental leave policy after months of discussing the company's legal obligations, legal risks, and the legal pros and cons of the change with its in-house or outside counsel. Surely the announcement of the ultimate decision—which is not privileged—does not waive the privilege with respect to all of the legal analysis and advice that preceded it. The same argument holds true for privileged investigations. Reference to the ultimate conclusion of an attorney does not waive attorney-client privilege, so long as the actual content of the attorney's confidential communication is not disclosed. *See Rauh v. Coyne,* 744 F. Supp. 1181, 1185 (D.D.C. 1990) ("The privilege was not waived merely because defendants' [sic] disclosed counsel's conclusion that the investigation could not determine the truth of Bottalico's allegations."); *Bose Corp. v. Linear Design Labs, Inc.,* No. 71 Civ. 3103, 1975 U.S. Dist. LEXIS 13454, 1975 WL 21399, at *1 (S.D.N.Y. Mar. 10, 1975) (agreeing that client's "letter contain[ing] nothing more than the ultimate conclusion that the action brought by plaintiff was without merit" did not constitute a waiver).[8]

Mr. Ayre (who worked in HR, not Legal) made aspirational statements about the desire to get to a "1:1" ratio on "pay equity." That statement does not mean anyone ever waived privilege over the analyses themselves, nor is the aspirational statement itself a waiver. Mr. Ayre was not involved in the execution of the analyses, and Nike Legal specifically took steps to limit any disclosure and to avoid waiver. *See* Hearn Decl. at ¶ 13; Baffa Decl. at ¶¶ 6-10. Similarly, Plaintiffs' argument regarding the timing of Mo Matheson's statements (as they relate to the purpose of the pay equity studies) also prove nothing.[9] Announcing Nike's interest in pay equity (at a time when every major company is doing the same) is not the same as announcing how the studies are conducted, what data is collected, how that data is culled, and the steps taken to make pay adjustments—just like announcing that Nike is selling a new shoe is radically different than disclosing how Nike manufactures the air sole for that shoe or the legal analysis performed to determine whether the air sole design is the subject of a trade secret or patent.[10]

---

[8] *See also In re Commercial Fin. Servs., Inc.,* 247 B.R. 828, 852-53 (Bankr. N.D. Okla. 2000) (mere disclosure of an investigative report did not waive protection of counsel's interview notes, memos, research, selection and arrangement of documents, investigation strategies, and personal recollections); *Kraemer v. Franklin & Marshall Coll.,* Civ. A. No. 95-0020, 1995 WL 447634, at *3 (E.D. Pa. July 27, 1995) (notes of counsel's interviews with employees in connection with Title VII case were not waived by the disclosure of the substance of the interviews by the interviewees); *Chamberlain Mfg. Corp. v. Maremont Corp,* No. 90 C 7127, 1993 WL 11885, at *2-3 (N.D. Ill Jan. 19, 1993) (disclosure of report prepared by attorney following investigation of fraud allegations did not waive work-product claim protection for attorney's interview memoranda and summaries underlying the report); *Shaheen v. WellPoint Cos., Inc.,* 490 F. App'x 552, 557 (4th Cir. 2012) (holding that even where client relied on non-privileged aspects of internal investigation, client did not put privileged information at issue in defamation case because it did not assert advice of counsel as an affirmative defense, nor defend its decision to terminate the employee or the alleged defamatory statements on the basis that it relied on the advice of counsel).

[9] Furthermore, the timeline demonstrates that Legal was working on pay equity issues well before the announcements flowing from the White House Pledge. *See* Hearn Decl. at ¶ 4; Thibodeaux Decl. ¶ 4.

[10] Plaintiffs' reliance on *SEC v. Chesnoff,* 2006 U.S. Dist. LEXIS 49090, at *11 (N.D. Tex. July 18, 2006) is misplaced. In *Chesnoff,* an individual disclosed to the press the amount he had offered to acquire a



**Attorneys' Eyes Only**

      3.      <u>Plaintiffs' contrived arguments on the completeness of the privilege logs lack merit.</u>

Plaintiffs' arguments regarding Nike's privilege logs all fail, and there is no basis to find waiver given the factual record.

      a.     *Nike's privilege logs are sufficiently detailed.*

***First***, Nike provided sufficient detail, including, for example, the bases for privilege, sender and recipient information, date, and a description of the communication/document.  In fact, all available information was provided to Plaintiffs (save information that Nike has no legal obligation to provide).  *See* Prince Decl. at ¶ 8.  But Plaintiffs believe the court should find waiver because Nike did not correlate the specific entries on its log with the specific pay or promotions analyses.  No authority supports this finding.

Privilege logs are sufficient where they identify "(a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated."  *In re Grand Jury Investig.*, 974 F.2d 1068, 1071 (9th Cir. 1992) (citing *Dole v. Milonas*, 889 F.2d 885, 888 n.3 (9th Cir. 1989)) (holding that the producing party "met its burden in satisfying the applicability of the attorney-client privilege").  While the description of privilege must be more than a "generalized, boilerplate objection," it need not be overly detailed.  *Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for the Dist. of Mont.*, 408 F.3d 1142, 1147 (9th Cir. 2005).  Indeed, "the creation of an adequate privilege log requires a delicate balancing act—on the one hand, the withholding party must not supply too little or indecipherable information, and on the other, the withholding party must not reveal too much detail for fear that the privileged information itself may seep into the log."  *Johnson v. Ford Motor C*o., 2016 U.S. Dist. LEXIS 44267, at *69 (S.D. W. Va. Mar. 28, 2016).

***Second***, Nike's objections were and are well-founded.  Nike provided a detailed privilege log indicating, to the extent the information was available, the bates number; date of creation; the author; the recipients; whether those authors and recipients were a member of Nike's in-house legal department or Nike's outside legal counsel; a description of the document and reason for withholding; and the asserted privilege.  *See Melgoza v. Rush Univ. Med. Ctr.*, No. 17 C 6819, 2019 U.S. Dist. LEXIS 100458, at *24 (N.D. Ill. June 14, 2019) (description such as "report, prepared at the direction of [defendant's] counsel, providing counsel with a pay equity analysis within [defendant] for the purpose of assisting counsel's provision of legal advice to [defendant] on pay equity issues" may have sufficed).

Nike has thus surpassed its burden in establishing a *prima facie* showing of privilege as to documents and communications relating to the analyses at issue.  *See In re Grand Jury Investig.*, 974 F.2d at 1071.  Any claimed questions left open by Nike's privilege log are answered by the declarations submitted concurrently with this Opposition.  *See id.* ("Whatever questions the Corporation's log might leave open with regard to whom the documents were shown or were intended to be shown are answered to our satisfaction by the affidavits of the attorneys responsible for preparing the documents. Therefore, the Corporation has met its burden in demonstrating the applicability of the attorney-client privilege.").

---

company.  Nike has not disclosed the details of its analyses with the public or anyone who does not "need to know."



Hon. Jolie A. Russo
September 8, 2020
Page 16

**Attorneys' Eyes Only**

Plaintiffs conclusorily assert that Nike's privilege logs contravene the requirements of Rule 26(b)(5), arguing that Nike's entries fail to indicate "the subject matter of the communication." *See* Motion at p. 6. Plaintiffs do not cite any legal support for this proposition because there is none. Rather, the law in the Ninth Circuit is clear that Rule 26(b)(5) "merely requires 'the nature of the documents,'" not the subject or description. *Nat.-Immunogenics Corp. v. Newport Trial Grp.,* 2017 U.S. Dist. LEXIS 224063, at *26-27 (C.D. Cal. Mar. 9, 2017); *W. Mortg. & Realty Co. v. KeyBank Nat'l Ass'n,* 2015 U.S. Dist. LEXIS 195124, at *6 (D. Idaho Apr. 15, 2015) ("While a privilege log may certainly include the subject matter of the document, a party is not required to include such subject matter information. It is sufficient, in our circuit, for the privilege log to include, among other things, 'the nature of the document'") (citing *Dole,* 889 F.2d at 888 n.3, 890); *Khasin v. Hershey Co.,* 2014 U.S. Dist. LEXIS 23886, at *16 (N.D. Cal. Feb. 21, 2014) ("Although the [Ninth] Circuit does require the log to indicate the nature of the document, it has never required a privilege log to specifically note the titular subject of each document, and the court will not now create such a requirement.").

Nike's descriptions are sufficient. For example, the withheld items on Nike's March 13, 2020 Privilege Log (entries 25-79) specifically identify that the attorney-client communication and/or work product relates to (1) compensation, or (2) Competitive Pay Management adjustments. The content of the privileged reports, including, for example, the types of compensation analyzed is privileged. Nike does not have an obligation to explain the legal advice sought or the questions asked regarding such advice. Plaintiffs are not entitled to know the substance of the privileged communications between the Nike Legal Department and its clients to obtain information related to this lawsuit.

A privilege log need only establish a *prima facie* case of privilege based on the factors set forth above.[11] *See In re Grand Jury Investig.,* 974 F.2d at 1071 (privilege log should detail (a) attorney and client involved, (b) nature of the document, (c) authors and recipients, (d) persons who have been informed of the document's substance, and (d) the date of the document.").

Plaintiffs' assertion that Nike's privilege log must essentially argue its positions regarding privilege and work product protection as it would in this Opposition is nonsensical and unsupported by any case law. Tellingly, Plaintiffs rely on *Torf* and *Upjohn* for their privilege log analysis, but such cases do not even discuss the sufficiency of asserting work product or attorney-client privilege in a privilege log. Moreover, while *Coltec Indus., Inc. v. Am. Motorists Ins. Co.,* 197 F.R.D. 368, 373 (N.D. Ill. 2000) does evaluate a privilege log, Plaintiffs misconstrue its holding, claiming that a document that provides legal advice is non-privileged. This is misleading (and obviously wrong). *Coltec* held that a conclusory assertion in a privilege log that the document is "legal advice" (without any other supporting factors) is

---

[11] Plaintiffs' Letter addresses attorney-client privilege and work product assertions in Nike's privilege log as though they present different analyses, but this is misleading. The analysis is the same regardless of the privilege asserted. *See Hellmann-Blumberg v. University of the Pacific,* 2013 U.S. Dist. LEXIS 116574, at *3-4 (E.D. Cal. Aug. 15, 2013) (privilege log should include "(a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities *known* to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated.") (emphasis added).



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 8, 2020
Page 17

insufficient.[12]  *See* Motion at p.7 ("It is well settled that documents created for the purpose of providing legal advice alone do not qualify for work protection.").

While Plaintiffs would like the Court to evaluate each piece of Nike's privilege log in isolation, the Court cannot ignore that Nike has provided an eight-column privilege log that provides "the nature of the documents, communications, [and] things not produced or disclosed in a manner, that without revealing information itself privileged or protect, will enable the other parties to assess the applicability of the privilege or protection." *Coltec Indus.*, 197 F.R.D. at 373.  Further, Plaintiffs' reliance on *Visa U.S.A., Inc. v. First Data Corp.*, No. C-02-1786, 2004 U.S. Dist. LEXIS 17117, at *32 n.6 (N.D. Cal. Aug. 23, 2004) and *Gregorio v. Clorox Co.*, No. 17-cv-03824-PJH, 2019 U.S. Dist. LEXIS 108955, (N.D. Cal. June 28, 2019) is thus misplaced.  While some of Nike's privilege log entries do not contain recipient information, Nike clearly indicates in the description of those documents that, for example, the "[r]eports [were] requested by and created at the direction of, in-house counsel . . . for use in providing legal advice." *See e.g.*, *Stardock Sys. v. Reiche*, No. 4:17-cv-07025-SBA (KAW), 2018 U.S. Dist. LEXIS 204438, at *17-21 (N.D. Cal. Nov. 30, 2018) (PR firm that was hired by defendant's counsel to assist in legal advice and litigation strategy fell within privilege); *Williams v. Sprint/United Mgmt.* Co., 238 F.R.D. 633, 639 (D. Kan. 2006) ("communications between non-attorneys could nonetheless be privileged so long as the communications were made in confidence for the purpose of obtaining legal advice from counsel").

Although the names of specific recipients is not listed in certain instances, as this Opposition demonstrates, there is a clear order to the timing of the various pay equity and promotion and turnover analyses.  Similarly, Nike and Paul Hastings have interviewed several Nike employees in an attempt to try to determine exactly who wrote or received particular documents.  *See* Prince Decl. ¶ 8.  In certain instances, this information was simply not feasible to be ascertained due to the passage of time and employee turnover.  *See* Thibodeaux Decl. ¶ 33.  There can be no question that the items on Nike's privilege log, where indicated, fall under the privilege and work product protections.

Notably, Plaintiffs seem to admit that this is sufficient, as they assert that documents protected by work product can "be prepared by or for another party or by or for that other party's representative."  *See* Motion at p. 7.  To the extent that there are questions as to whether Nike only shared the documents detailed in its privilege log to "upper-echelon management or non-management personnel," as Plaintiffs suggest (*see* Motion at p. 8), these questions are not only a misstatement of the law, *see Upjohn*, 682 F.2d at 538 n.8 ("communications from lower echelon employees [are] within the privilege as long as the communications were made to the attorney to assist him in giving legal advice to the client corporation"), but they are also adequately addressed by Nike's declarations and fifth privilege log.  *See In re Grand Jury Investig.*, 974 F.2d at 1071; Hearn Decl. ¶ 9 (a protocol was prepared for the pay equity analyses, which established a distribution list to maintain confidentiality); Thibodeaux Decl. ¶ 9 (a team of 17

---

[12] The Court in *Coltec* explained that the privilege log at issue only asserted vague, two-word descriptions of the nature of the document and failed to provide any information regarding the document's author, "making it a matter of speculation as to whether they were authored by individuals that could be expected to be involved in preparation for litigation, or whether there was any degree of attorney involvement that might suggest they contain legal advice."  *Coltec Indus.*, 197 F.R.D. at 374.  In stark contrast, Nike's privilege log includes, among other identifiers, detailed descriptions of the documents, what privilege is asserted, the author and recipient, and whether the author or recipient is an in-house attorney or outside counsel.  *See Rawcar Grp., LLC v. Grace Med., Inc.*, No. 13cv1105-H, 2013 U.S. Dist. LEXIS 201729, at *18 (S.D. Cal. Dec. 16. 2013) (privilege log was insufficient when there was no indication of an author or recipient's position).  This undoubtedly supports Nike's conclusion that such documents are privileged.



Hon. Jolie A. Russo                                                              **Attorneys' Eyes Only**
September 8, 2020
Page 18

individuals were involved with the promotion and turnover analysis and were instructed not to discuss matters related to the analysis outside of the team).

> b.    Nike's privilege logs are timely.

Nike has timely produced privilege logs on a rolling basis, like Plaintiffs. Plaintiffs' "do as I say, not as I do" approach overlooks the work Nike devoted to handle discovery in this case, including with respect to privilege issues. A finding of waiver would be inequitable under the circumstances. *See Angelone v. Xerox Corp.*, No. 09-CV-6019-CJS, 2012 U.S. Dist. LEXIS 20482, at *11 (W.D.N.Y. Feb. 17, 2012) (internal citation omitted) ("Waiver of privilege based on an insufficient privilege log is an extreme sanction that a court should only impose for 'flagrant' violations of these rules."). As detailed above, Nike and its counsel have been diligently working to address and respond to Plaintiffs' document requests. *See* Prince Decl. ¶ 2. Nike's counsel has collected and reviewed tens of thousands of documents and has made numerous supplemental productions. *See id.* ¶ 6.

Plaintiffs' citation to *Burlington Northern*, 408 F.3d at 1147 (9th Cir. 2005) inaccurately conveys the court's holding and its applicability to the privilege issues here. Notably, *Burlington Northern* expressly rejected a *per se* waiver rule (which Plaintiffs seem to endorse) and, instead, invoked a "case-by-case determination, taking into account: the degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged (where providing particulars typically contained in a privilege log is presumptively sufficient and boilerplate objections are presumptively insufficient); the timeliness of the objection and accompanying information about the withheld documents (where service within 30 days, as a default guideline, is sufficient); the magnitude of the document production; and other particular circumstances of the litigation that make responding to discovery unusually easy (such as, here, the fact that many of the same documents were the subject of discovery in an earlier action) or unusually hard." *See id.* at 1149.

Plaintiffs attempt to argue that they will be prejudiced if waiver is not found by citing to *Fid. & Deposit Co. v, Travelers Cas. & Sur. Co. of Am.*, No. 2:13-CV-00380-JAD-QWF, 2017 U.S. Dist. LEXIS 84070, at *14-15 (D. Nev. May 3, 2017), but that case involved egregious circumstances not present here. The court in *Travelers* found waiver after the defendant (1) served privilege logs **two to three years** after the date of production, and (2) failed to provide any evidence that defendant's counsel began preparing a privilege log, or even intended to prepare one, before becoming sidetracked by other tasks in the case. *See id.* The defendant in *Travelers* also failed to address letters from the plaintiff indicating that it had not yet produced privilege logs. *See id.* Here, the extenuating circumstances, including the sheer volume of documents involved in this matter, in conjunction with the COVID-19 pandemic and its impact on Nike's business and workforce, weigh heavily against finding waiver. *See id.* at *13; *see also Khasin v. Hershey Co.*, No. 5:12-cv-01862-EJD-PSG, 2014 U.S. Dist. LEXIS 23886, at *19 (N.D. Cal. Feb. 21, 2014) (seven month delay did not justify waiver where discovery was in flux and the production was ongoing); *Marx v. Kelly, Hart & Hallman, P.C.*, 929 F.2d 8, 9-11 (1st Cir. 1991) (waiver is appropriate where the responding party's conduct evinces a "deliberate pattern of delay" and is "egregious"); Thibodeaux Decl. ¶ 32. Nike has not engaged in the type of flagrant violations required to find waiver.

Ironically, Plaintiffs complain about Nike's alleged delay in producing privilege logs while simultaneously engaging in delay of their own. Waiver based on failure to timely serve a privilege log "would not be appropriate here, where both parties have engaged in some delay." *Berry Plastics Corp. v. Intertape Polymer Corp.*, No. 3:10-cv-76-RLY-WGH, 2014 U.S. Dist. LEXIS 187296, at *17 (S.D. Ind. July



**Attorneys' Eyes Only**

18, 2014).  Nike has produced privilege logs five times thus far, including in February, March, July, August, and September of 2020.  *See* Prince Decl. ¶ 7.  Plaintiffs served privilege logs three times—in January, April, and August of 2020.  *See id.*  Nike produced its first privilege log six months after its first production, while Plaintiffs delayed their privilege log by seven months.

Finally, despite Nike's efforts to prioritize certain discovery items to more efficiently address Plaintiffs' requests, Plaintiffs have flatly refused to do so.  *See* Joint Fed. R. Civ. R. 26(f) Report and Proposed Discovery Plan.  As a result, Nike has worked on collecting and reviewing documents potentially responsive to over 80 requests for production simultaneously.  In the case of the pay equity analyses, Nike was working to track down documents and individuals (some of whom may no longer be employees) to provide on a rolling basis.  *See* Thibodeaux Decl. ¶ 31-33.  Nike Legal has done this all while helping to guide the company through significant challenges, including lay-offs, the closure of domestic retail stores, and transitioning tens of thousands of employees to working-from-home during the COVID-19 pandemic.  *See id.*  These are not the circumstances that warrant a waiver finding.

## V.    PLAINTIFFS ARE NOT ENTITLED TO NIKE'S PAY AND/OR PROMOTION STUDIES, WHICH ARE PROTECTED BY THE ATTORNEY-WORK PRODUCT DOCTRINE.

The pay studies here also are protectable attorney work product because they were conducted by Nike's counsel in anticipation of potential litigation.

***First***, the 2016 and 2018 pay equity analyses were initiated by Nike Legal in view of internal complaints and the potential for litigation.  *See* Hearn Decl. ¶ 4; Thibodeaux Decl. at ¶ 4.  The promotion and turnover analysis was undertaken in view the informal and unofficial gender survey, and all of these analyses were intended to provide legal advice.  *See id.* ¶ 5.  During the middle of the 2018 pay equity analysis, this lawsuit was filed.  *See* Thibodeaux Decl. at ¶ 4.  The 2019 and 2020 pay equity analyses were undertaken during the pendency of this litigation.  *See* Thibodeaux Decl. at ¶¶ 21, 26.

"Work-product privilege protects from discovery in litigation 'mental impressions, conclusions, opinions, or legal theories of a party's attorney' that were 'prepared in anticipation of litigation or for trial." *See ACLU of N. Cal. v. United States DOJ*, 880 F.3d 473, 483 (9th Cir. 2018) (citing Fed. R. Civ. Proc. 26(b)(3)).  Where a document has a dual purpose, it too is covered if the document was "prepared or obtained because of the prospect of litigation."  *United States v. Torf (In Re Grand Jury Subpoena)*, 357 F.3d 900, 907 (9th Cir. 2003).  The Ninth Circuit has adopted the "because of" standard, holding that a document is deemed prepared in anticipation of litigation and eligible for work product protection if "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation."  *See id.*  In making that determination, "courts do[] not consider whether litigation was a primary or secondary motive behind the creation of" a document, but rather consider "the totality of the circumstances."  *Id.* at 908.  Protection is afforded when it can fairly be said that the "document was created because of anticipated litigation and would not have been created in substantially similar form but for the prospect of that litigation."  *Id.* (internal citation omitted).  However, a dual purpose for the documents does not preclude work product protection.  *See id.* at 909.

Here, throughout the relevant time period, Nike was subject to pending, threatened or actual litigation alleging discrimination.  *See* Hearn Decl. ¶ 4; Thibodeaux Decl. ¶¶ 4, 5, 21, 26.  The 2016-2017 pay equity analysis was initiated following Nike's receipt of a demand letter claiming age discrimination



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 8, 2020
Page 20

and an EEOC Charge of Discrimination alleging unequal pay on the basis of sex and gender. *See* Hearn Decl. ¶ 4. In February 2018, after Nike learned of an informal and unofficial gender survey, which contained some employee complaints, ██████████████████████████████████████████ ████████████████████████████████████ *See* Thibodeaux at ¶¶ 4-5. Likewise, Nike continued to conduct pay analyses in the wake of an EEOC charge in 2018 ████████████████████████████ ██████████████████████████████████████████████████████████████ *See id.* ¶¶ 17-18. These matters are more than sufficient to demonstrate that Nike anticipated litigation. *See ACLU v. DOJ*, 70 F. Supp. 3d 1018, 1034 (N.D. Cal. 2014) (memoranda "created to assist . . . with recurring litigation . . . are protected as work product").

     *Second*, Ms. Matheson's communication regarding the business advantage inherent in conducting such analyses does not mean that the analyses were not also prepared in anticipation of reasonably foreseeable litigation. Plaintiffs' citation to *Cung Le v. Zuffa, LLC*, 321 F.R.D. 636, 650 (D. Nev. 2017) is misplaced. The responding party in *Cung Le* failed to argue a dual purpose for the documents and instead argued that they were prepared for the sole use of litigation. *See id.* at 648. Such an argument failed because the responding party did not point to a single threat of litigation, and it was clear that the documents' purpose was to align pay with the market and identify potential areas for change. *See id.* Here, Nike's declarations establish that each of the analyses were prepared in connection with alleged discrimination and threats of litigation, including an EEOC charge and an informal and unofficial survey containing gender-based discrimination complaints in regard to pay and promotions. *See* Hearn Decl. at ¶¶ 4-5; Thibodeaux Decl. at ¶¶ 4, 5, 17-18.

     Plaintiffs assert that "courts recognize [that pay equity analyses] constitute a typical business function performed by companies" and thus cannot be protected by work product. *See* Motion at 11. This is false, and Plaintiffs' position is not even supported by their own case law. Indeed, not only do the cases Plaintiffs cite not involve questions of privilege or work product, but the only reason the courts "recognized" that the relevant pay analyses were routine business practices were because the declarations and evidence submitted supported that conclusion. *See Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 618 (E.D. Mich. 2012); *High-Tech Emps. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 110064, at *55 (N.D. Cal. Aug. 8, 2014). There is absolutely no authority for the proposition that pay equity analyses, conducted after receipt of an administrative charge and internal complaints, and during litigation specifically related to pay equity cannot be work product.

     In this case, Nike hired Seyfarth to provide legal advice concerning employment issues. *See* Hendrickson Decl. at ¶ 4. Seyfarth worked with the consultants to prepare analyses to assist with providing advice regarding ████████████████████████████████████████████████████████████ ████████████. *See e.g.*, Hearn Decl. at ¶ 5, Thibodeaux Decl. at ¶¶ 5, 10. Importantly, in contrast to the analyses in *Cason-Merenda* and *High-Tech*, which were annual reports that were designed to adhere to competitive salaries in the market, the pay equity analyses are ██████████████████████████ ████████████ *See* Hearn Decl. ¶ 3. Such documents are privileged.

     Plaintiffs also rely on *Torf* to argue that the analyses cannot be protected from disclosure because they serve a business purpose, but *Torf* actually **ruled in favor of work product protection** and possesses many similarities to the matter at issue. *See id.* at 906-910. Plaintiffs argue that Nike's public acknowledgement of the existence of the pay equity analyses, and actions taken as a result, somehow negates any work product protection, but *Torf* explicitly holds that a dual business purpose for the documents does not preclude work product privilege. *See* Motion at p. 10; *Torf*, 357 F.3d. at 909; *see also* Lupo Decl. at ¶ 4 (the legal purposes and business purposes for conducting pay studies are not



**Attorneys' Eyes Only**

mutually exclusive).  As in *Torf*, where the consultant worked in conjunction with attorneys to address legal issues, WTW and Mercer were hired at the direction of counsel and worked alongside Nike Legal and Seyfarth in response to impending threats of litigation as Seyfarth provided legal advice to Nike in connection with these matters.  *See id.* at 908.[13]

In sum, Plaintiffs have failed to show why these analyses are not protected by work product and their motion should be denied.

## VI.    PLAINTIFFS' "SWORD AND SHIELD" ARGUMENT IS UNAVAILING.

Plaintiffs' sword-and-shield argument has no merit because Nike has not put its attorneys' performance at issue during the course of this litigation.  *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).  The sword-and-shield argument prevents parties in litigation from abusing the privilege by asserting claims the opposing party cannot adequately dispute unless it has access to the privileged material.  *See id.*  Implied waiver is, thus, found where (1) there has been some affirmative act, such as filing suit, (2) through the affirmative act, the party asserting privilege puts the privileged information at issue, and (3) allowing the privilege would deny the opposing party access to information vital to its defense.  *Dulcich, Inc. v. USI Ins. Servs. Nat'l, Inc.*, 2019 U.S. Dist. LEXIS 58888, at *7 (D. Or. Apr. 5, 2019).

As the cases cited by Plaintiffs indicate, implied waiver under this argument requires the claimed privileged material to be the primary form of direct evidence that goes to the heart of the issues of litigation.  This generally arises when the party relies on the advice of counsel to assert its claims, rather than on objective facts.  *Dulcich*, 2019 U.S. Dist. LEXIS 58888, at *7; *see also United States v. Ortland*, 109 F.3d 539, 543 (9th Cir. 1997).  In *Dulcich*, the Court held that a plaintiff who initiated a suit to obtain attorneys' fees as damages put a billing statement directly at issue and, thus, waived privilege because the defendant could not accurately calculate the reasonableness of attorneys' fees without access to the hours and fees on the billing statements.

Here, Plaintiffs have all of the underlying data necessary to conduct any analysis they want themselves.  They do not need Nike's privileged work product to tell them what they already know—that Nike pays and promotes female employees equally to their similarly-situated male colleagues.

---

[13] Plaintiffs muddle attorney-client and work product privilege, citing cases that are irrelevant to the work product analysis.  *See* Motion at pp. 11, 12 (citing *Dewitt v. Walgreen Co.*, 2012 U.S. Dist. LEXIS 125493, at *9 (D. Idaho Sep. 4, 2012) and *Resnick v ADA*, 95 F.R.D. 372, 375 (N.D. Ill. 1982).  Even so, unlike in either *Dewitt* or *Resnick*, in which there were no legal reasons for the documents and communications, Nike's pay equity analyses were undoubtedly connected to the ███████████████████████████████ ████████████████████████████.  Both in-house and outside counsel worked simultaneously with consultants and employees to gather evidence and data related to these issues to support efforts to provide legal advice to Nike.



Hon. Jolie A. Russo                                          **Attorneys' Eyes Only**
September 8, 2020
Page 22


## VII.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny Plaintiffs' motion to compel in its entirety.

Respectfully submitted,

_____
Daniel Prince

Daniel Prince (*pro hac vice*)
danielprince@paulhastings.com
Zach P. Hutton (*pro hac vice*)
zachhutton@paulhastings.com
Felicia A. Davis (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Amy Joseph Pedersen, OSB No. 853958
amy.joseph.pedersen@stoel.com
Kennon Scott, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Defendant Nike, Inc.

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel:  (503) 224-3380
Fax:  (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel:  (213) 683-6000
Fax:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-JR |
| Plaintiffs, | **DECLARATION OF CHRISTINE HENDRICKSON** |
| vs. | **ATTORNEYS' EYES ONLY** |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

I, Christine Hendrickson, hereby declare as follows:

1.      I am a Partner with Seyfarth Shaw LLP ("Seyfarth"), based in the firm's Chicago office. I am co-chair of Seyfarth's Pay Equity group and a member of the firm's Labor & Employment People Analytics and OFCCP & Affirmative Action compliance teams.  I co-authored the law firm's 50-State Pay Equity Desktop Reference, and have extensive experience conducting, structuring, and executing pay equity and compensation analyses.  Given my background, I regularly lead teams of attorneys, subject matter experts, labor economists, and data analysts in compensation analyses, including to segment data, clean data, and to identify outliers or other variables that may explain differences in pay.  Further, I provide legal advice to clients on pay practices, policy enhancements, and pay adjustment philosophy and remediation.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify thereto.

2.      I submit this declaration in support of Nike's opposition to Plaintiffs' motion to compel production of certain analyses, including "'global' pay equity analyses" from 2016, "supplemental pay analyses" since at least 2018, and "studies or analyses related to time-in-job and pace of promotions" since at least 2018.

3.      The term "pay equity" may have different meanings depending on context and/or the audience.  For instance, pay equity could be interpreted differently by different corporate functions and/or different employees within those functions.  In a colloquial sense, the term can be used to refer to the aggregate gender pay gap (*e.g.,* the average difference between the salaries of men and women).  But, in a legal sense, pay equity refers to the elimination of discriminatory differences in compensation.  Still, there are varying standards for determining when pay equity

1

is achieved, whether under Title VII, the federal Equal Pay Act, the Oregon Equal Pay Act, or other statutes regarding equal pay.

**Background**

4.      I began working Nike on compensation matters in 2016.  Then, Nike engaged our firm (including me and my Partner, David S. Baffa) to provide legal advice in connection with, for example, ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

5.      Subsequently, in or about March 2016, labor economists and consultants from Willis Towers Watson ("WTW") were retained, at the direction of counsel, to carry out the compensation analyses.  I was involved in the 2016-17 compensation analyses with WTW, however, that work largely was driven by Mr. Baffa.  My work on the compensation analyses intensified beginning in 2018 and I have been involved in the conduct, execution, and structuring of these analyses since that time.

**Background of the 2018 Compensation and Promotion & Turnover Analyses with Mercer**

6.      Nike Legal engaged us to provide legal advice on two projects in 2018—a Promotion and Turnover Analysis, relating to decisions made around promotions and employee turnover, and a Pay Review Project, relating to compensation across the organization.  For both projects, we provided legal advice regarding ████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

2

███████████████████████████████████████████ Our

objective was to help Nike Legal assess potential legal risk and to provide legal advice for Nike

Legal to counsel its corporate functions ███████████████████████████

████████████████████████████████████████

7.      Moreover, in or about March – April 2018, Mercer was retained to carry out the analyses.

The analyses were conducted at the direction of Nike Legal and Seyfarth.

**2018 Promotion and Turnover Analyses with Mercer**

8.      I worked with Nike Legal to form a discrete project team—called the Promotion and

Turnover Analysis Project ("PTAP") Review Team (the "PTAP Team")—to perform the

promotion and turnover analyses.  We were intentional about the composition of this team (and

the other teams), so that we only included subject matters experts and attorneys who were

necessary for the analyses.

9.      At the direction of Nike Legal, we prepared a "Privilege Protocol" for the analyses.  The

Protocol, dated May 16, 2018, was circulated to the PTAP Team.  The Protocol implemented

guidelines to maintain the attorney-client privilege.  For instance, the Protocol established a

distribution list, consisting of legal and subject matter experts from my law firm (including me

and Mr. Baffa), Mercer (including Casey North, a Principal in Mercer's Workforce Strategy &

Analytics group), Nike Legal (Lauren Thibodeaux), and various Nike corporate functions, like

Total Rewards (including Kim Lupo, Vice President of Total Rewards, Operations & Services),

Diversity & Inclusion (Kellie Leonard, then-Chief Diversity & Inclusion Officer), and Talent &

Organizational Effectiveness (including Julie Fuller, Vice President).  There were 17 members of

the PTAP Team, including me.

Goldstein Decl. Ex. 12, Page 79 of 297

10.     Further, the Protocol advised PTAP Team members ██████████████████████

████████████████████████████████████████████████

PTAP Team members also were instructed ████████████████████████████████████

████████████████████████████████ and to my knowledge, members of the PTAP

Team followed that instruction.  The Protocol mandated that ████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████. Moreover, the Protocol

required that ████████████████████████████████████

████████████████████████████████████████

11.     The PTAP Team's work began in earnest in or around June 2018.  Along with Nike

Legal, I provided legal advice on ██████████████████████████████████████

████████ I also provided legal advice regarding, for example, ███████████████████

████████████████████████████████████████████████

████████████████████████████ My legal advice was incorporated into

the models.  I was involved in these matters until the PTAP Team's work concluded in or about

2018, at the direction of Nike Legal.

12.     Before this work stopped, the subject matter experts from Mercer were instrumental in

the PTAP Team's analyses.  Mercer's labor economists and consultants were integrated into the

PTAP Team.  They received and generated PTAP-related communications, they attended

meetings and phone calls with us, Nike Legal, and Nike's subject matters experts, they carried

out analyses, and they helped prepare deliverables.  I understood that any work product prepared

by the PTAP Team belonged to Nike and was regarded as highly confidential and privileged.

Goldstein Decl. Ex. 12, Page 80 of 297

**2018 Compensation Analyses with Mercer**

13.     I also directed another project with Mercer in 2018 called the Pay Review Project

("PRP").  Again, Mr. Baffa and I worked with Nike Legal to form a discrete project team—

called the "PRP Team"—of legal and subject matters experts to perform the compensation

analyses.

14.     At the direction of Nike Legal, Seyfarth prepared a "Privilege Protocol" for the analyses.

The Protocol, dated May 16, 2018, was circulated to the PRP Team.  The Protocol implemented

guidelines to maintain the attorney-client privilege.  The Protocol established a distribution list,

consisting of legal and subject matter experts from my law firm (including me and Mr. Baffa),

Mercer (including Ms. North), Nike Legal (Ms. Thibodeaux), and various Nike corporate

functions, like Total Rewards (including Ms. Lupo, Shane Walker, Senior Director of Global

Compensation, and Zach Vinton, Vice President of Compensation, Mobility, and Rewards) and

Human Resources (including Amy Janke, Director of Human Resources Enterprise Advanced

Analytics, and Bethany Dohleman, then-Director of Workforce Intelligence).  There were 15

members of the PRP Team, including me.

15.     Further, the Protocol advised PRP Team members that ███████████████████████

███████████████████████████████████████████████████.  PRP

Team members also were instructed ████████████████████████████████

██████████████████████, and to my knowledge, members of the PRP Team

followed that instruction.  The Protocol mandated that ████████████████████████

████████████████████████████████████████████████

████████████████████████████.  Moreover, the Protocol required

that ███████████████████████████████████████████████████

██████████████████████████████████████████████████ .

16.    The PRP Team's work began in earnest in or about June 2018.  Coordinating with Nike

Legal and Mr. Baffa, I drove this analysis and critical workflows to develop the statistical

models.  These pay analyses were ███████████████████████████████████

███████████████████ .  We provided legal advice regarding, for example, ████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████  Our advice was built into the statistical

models, and we continued to provide legal advice throughout the course of the analyses on these

(and other) issues.  And after executing the analyses, I provided legal advice to Nike Legal

regarding pay adjustment philosophy, remediation, and other items.

17.    Mercer's subject matter experts were instrumental in carrying out the PRP Team's

compensation analyses.  Its labor economists and consultants were integrated into the PRP Team.

They received and generated PRP-related communications, they attended meetings and phone

calls with Seyfarth, Nike Legal, and Nike's subject matters experts, they carried out analyses,

and they helped prepare deliverables.  I understood that any work product prepared by the PRP

Team belonged to Nike and was regarded as highly confidential and privileged.

**2019 Compensation Analyses with Mercer**

18.    In or about February – March 2019, Nike Legal engaged us to provide legal advice with

respect to ████████████████████████████████████████████ , again working

with Mercer to carry out the analyses, the objective of which was to continue our work of

advising Nike Legal on ███████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████

19.     We again coordinated with Nike Legal to form a narrowly-tailored project team—called the 2019 Pay Review Project Team ("2019 PRP Team")—to carry out the compensation analyses.

20.     Per Nike Legal, we prepared a "Privilege Protocol" for the analyses.  The Protocol, dated March 20, 2019, was circulated to the 2019 PRP Team.  The Protocol implemented guidelines to maintain the attorney-client privilege.  The Protocol established a customized and narrowly-tailored distribution list, consisting of legal and subject matter experts from my firm (me and Mr. Baffa), Mercer (including Ms. North), Nike Legal (Ms. Thibodeaux, along with Alyson Smith and Cassie English, each an Assistant General Counsel, Employment – Americas), and Nike corporate functions, like Total Rewards (including Mr. Walker, Mr. Vinton, and David Buckmaster, Director of Global Compensation).  There were 14 members of the 2019 PRP Team, including me.

21.     The Protocol advised the 2019 PRP Team members that ██████████████████████ ███████████████████████████████████████████████.  The 2019 PRP Team members also were instructed ███████████████████████████ ██████████████████████████████ and to my knowledge, members of the 2019 PRP Team followed that instruction.  The Protocol mandated that ████████████ █████████████████████████████████████████████████ █████████████████████████████████████████ Moreover, the Protocol required that ████████████████████████████ ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

22.     The 2019 PRP Team's work began in earnest in or about February – March 2019.  In

close coordination with Nike Legal, we worked with the 2019 PRP Team to develop the

statistical models to analyze compensation.  The analyses were performed by gender globally,

meaning they were not separated by region.  We provided legal advice regarding, for example,

█████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████ Our advice was

built into the models, and we continued to provide legal advice throughout the course of the

analyses on these (and other) issues.  And after executing the same, we provided legal advice to

Nike Legal regarding pay adjustment philosophy, remediation, and other items.

23.     Mercer's subject matter experts were instrumental in carrying out the 2019 PRP Team's

compensation analyses.  Its labor economists and consultants were integrated into the 2019 PRP

Team.  They received and generated 2019 PRP-related communications, they attended meetings

and phone calls with Seyfarth, Nike Legal, and Nike's subject matters experts, they carried out

analyses, and they helped prepare deliverables.  I understood that any work product prepared by

the 2019 PRP Team belonged to Nike and was regarded as highly confidential and privileged.

**2020 Compensation Analyses with Mercer**

24.     In or about January – February 2020, Nike Legal engaged us again to provide legal

advice with regard to compensation analyses.  While we had served in this capacity for previous

analyses, each of these analyses is different and involve different variables, data, segmentation

protocols, outliers, and remediation efforts.  Yet, the purpose of our work remained constant—to

provide legal advice to Nike Legal to ███████████████████████████████

███████████████████████████████████████████

25.     For this project, we again coordinated with Nike Legal to assemble a discrete project

team—called the 2020 Pay Review Project Team ("2020 PRP Team").

26.     Per Nike Legal, we prepared a "Privilege Protocol" for the analyses.  The Protocol, dated

February 24, 2020, was circulated to the 2020 PRP Team.  The Protocol implemented guidelines

to maintain the attorney-client privilege.  The Protocol established a customized and narrowly-

tailored distribution list, consisting of legal and subject matter experts from my firm (me and Mr.

Baffa), Mercer (including Ms. North), Nike Legal (Ms. Thibodeaux, Ms. Smith, and Ms.

English), and Nike corporate functions, like Total Rewards (including Mr. Walker, Mr. Vinton,

and Mr. Buckmaster).  There were 14 members of the 2020 PRP Team, including me.

27.     The Protocol advised the 2020 PRP Team members that ███████████████████

███████████████████████████████████████████.  The

2020 PRP Team members also were instructed ███████████████████████

███████████████████████, and to my knowledge, members of

the 2020 PRP Team faithfully adhered to that instruction.  The Protocol mandated that

███████████████████████████████████████████

███████████████████████████████████████████

███████████     Moreover, the Protocol required that ███████████████████

███████████████████████████████████████████

███████████████████████████████████████

Goldstein Decl. Ex. 12, Page 85 of 297

28.    The 2020 PRP Team's work began in earnest in or about January – February 2020.

These analyses were ███████████████████████████████████████████.

Working with Nike Legal and Mercer, we were responsible for advising on the design and

development of statistical models for this work and our advice was built into the models.  We

also provided legal advice regarding, for example, ████████████████████████

██████████████████████████████████████████████

████████████████████████████.  We continued to provide

legal advice throughout the course of the analyses on these (and other) issues.  Subsequently, we

provided legal advice to Nike Legal regarding pay adjustment philosophy, remediation, and other

items.

29.    Mercer's subject matter experts were instrumental in carrying out the 2020 PRP Team's

compensation analyses.  Its labor economists and consultants were integrated into the 2020 PRP

Team.  They received and generated 2020 PRP-related communications, they attended meetings

and phone calls with Seyfarth, Nike Legal, and Nike's subject matters experts, they carried out

analyses, and they helped prepare deliverables.  Any work product prepared by the 2020 PRP

Team belonged to Nike and was regarded as highly confidential and privileged.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on this 8th day of September, 2020, at Sioux Falls, SD.



_____

Christine F.  Hendrickson

10

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-JR |
| Plaintiffs, | **DECLARATION OF CASEY NORTH** |
| vs. | **ATTORNEYS' EYES ONLY** |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

I, Casey North, hereby declare as follows:

1.        I am a Principal in the Workforce Strategy & Analytics group of Mercer LLC

("Mercer"), a global human resources consulting firm.  I began my career with Mercer in

January 2013, and have experience consulting businesses on the collection and use of data and

analytics to evaluate compensation, promotions, or other variables.  As a Principal, I frequently

consult companies on the structure and development of statistical models to evaluate

compensation and promotions within an organization, and I often work at the direction of in-

house attorneys and/or outside counsel to conduct those analyses.  That includes working with

counsel to develop methodologies to structure and conduct analyses, to validate the data, and to

identify outliers.  I have personal knowledge of the facts set forth in this declaration, and if called

as a witness, I could and would competently testify thereto.

2.        I submit this declaration in support of Nike's opposition to Plaintiffs' motion to compel

production of certain analyses that were carried out by Mercer, at the direction of counsel, from

2018 to 2020.

**Background of the 2018, 2019, and 2020 Analyses**

3.        In or about March – April 2018, we were retained to carry out two separate privileged

and confidential analyses for Nike:  first, a Promotion and Turnover Analysis Project ("PTAP");[1]

and, second, a Pay Review Project ("PRP").  I was the primary Mercer contact on both projects

for Nike Legal, and for its outside counsel, Seyfarth Shaw LLP ("Seyfarth").  At Seyfarth, my

main contact was and is Christine Hendrickson, whom has provided direction to me and the

Mercer team on each of the analyses discussed in this declaration.  Mercer's work in 2018 for

Nike Legal was performed at the direction of Ms. Hendrickson and Nike Legal.

---

[1] At the direction of Nike Legal, our work on this matter stopped in or about August 2018.

Goldstein Decl. Ex. 12, Page 88 of 297

4.      Further, we were retained in or about February – March 2019 and in or about January –

February 2020 to carry out privileged and confidential compensation analyses as part of the 2019

Pay Review Project Team ("2019 PRP Team") and the 2020 Pay Review Project Team ("2020

PRP Team"), respectively.  I served as the primary Mercer contact for Nike Legal and Ms.

Hendrickson with respect to these analyses, which also were conducted at the direction of Ms.

Hendrickson and Nike Legal.

**Privilege Protocols for Each Project**

5.      Each project began with the circulation of a "Privilege Protocol" that was prepared by

Seyfarth.  For instance, Protocols were circulated to the PTAP Team and the PRP Team in or

about May 2018; a Protocol was circulated to the 2019 PRP Team in or about March 2019; and a

Protocol was circulated to the 2020 PRP Team in or about February 2020.

6.      We agreed to follow the rules established by the Protocols as part of our engagement.

They contained specific instructions to maintain the attorney-client privilege.  Each Protocol

established a distribution list (consisting of subject matter and legal experts from Seyfarth,

Mercer, Nike Legal, and Nike's corporation functions, such as Total Rewards, Human

Resources, and Diversity & Inclusion).  And, while there were modest changes to the distribution

list from project to project (due to changes in staffing, etc.), Seyfarth's specific guidelines to

preserve privilege have remained constant throughout our work with them.

7.      For example, each Protocol mandated:  ██████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████

████████████████. To my knowledge, these instructions were followed by Mercer and the remaining project team members.

**Direction of Legal Counsel**

8.      Each of the above-referenced projects started at different times, but they all featured direct instruction from Ms. Hendrickson and the Seyfarth team, as well as direction from Nike Legal.  In particular, for each project, Ms. Hendrickson advised us on ████████████

████████████████████████████████████████

████████████████████ She attended meetings and calls with us, and her advice was built into the statistical models and remediation proposals for these projects, each of which presented different challenges and was an iterative process.

9.      Finally, the Mercer team was an integral part of each of the projects in 2018, 2019, and 2020.  We were integrated into the project teams, attended meetings and phone calls, received and generated communications, and prepared deliverables to carry out the analyses.  I understood that any work product prepared by a project team belonged to Nike and was regarded as highly confidential and privileged.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 8th day of September, 2020, at San Francisco, California.


*Casey North*

_____

Casey North

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br><br>**DECLARATION OF DAVID S. BAFFA**<br><br>**ATTORNEYS' EYES ONLY** |

I, David S. Baffa, hereby declare as follows:

1.  I am a Partner with Seyfarth Shaw LLP ("Seyfarth"), based in the firm's Chicago office. I lead Seyfarth's national counseling practice and regularly advise clients in conducting, structuring, and executing pay and promotion equity analyses (and other diversity analyses). I also advise clients on remediation efforts flowing from those analyses. In this regard, I routinely lead teams of attorneys, subject matter experts, labor economists, and data analysts in designing statistical analyses of compensation (including to segment data, clean data, and to identify outliers or other variables that may explain differences in pay) to provide legal advice to clients on pay practices, policy enhancements, and pay adjustment philosophy. I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify thereto.

2.  I submit this declaration in support of Nike's opposition to Plaintiffs' motion to compel production of certain analyses, including "'global' pay equity analyses" from 2016, "supplemental pay analyses" since at least 2018, and "studies or analyses related to time-in-job and pace of promotions" since at least 2018.

3.  The term "pay equity" may have different meanings depending on context and/or the audience. For instance, pay equity could be interpreted differently by different corporate functions and/or different employees within those functions. In a colloquial sense, the term can be used to refer to the aggregate gender pay gap (*e.g.,* the average difference between the salaries of men and women). But, in a legal sense, pay equity refers to the elimination of discriminatory differences in compensation. Still, there are varying standards for determining when pay equity is achieved, whether under Title VII, the federal Equal Pay Act, the Oregon Equal Pay Act, or other statutes regarding equal pay.

**Background**

4.    I manage my law firm's relationship with Nike.  In or about February 2016, Nike Legal engaged my firm, including me and my Partner, Christine Hendrickson, to provide legal advice to Nike to analyze compensation.  That included, for example, legal advice relating to █████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

5.    With these objectives in mind, in or about March 2016, Willis Towers Watson ("WTW") was retained, at the direction of counsel, to carry out the compensation analyses.

**2016-17 Global Compensation Analyses with Willis Towers Watson**

6.    After we were engaged and WTW was retained, I worked with Nike Legal to form a discrete project team—called the Pay Compliance Team or "PACT"—to perform the compensation analyses.  These analyses were performed at the direction of my law firm and Nike Legal.

7.    At the direction of Nike Legal, I prepared a "Privilege Protocol" for the analyses.  I also distributed the Protocol, dated April 13, 2016, to the PACT.  The Protocol implemented guidelines to maintain the attorney-client privilege.  For instance, the Protocol established a distribution list, consisting of legal and subject matter experts from my law firm (me and Ms. Hendrickson), WTW (including Lindsay Wiggins, a Senior Consultant, and Richard Luss, a Senior Economist), Nike Legal (Holly Hearn, the then-Global Employment Counsel), and various Nike corporate functions, like Total Rewards (including Kim Lupo, Vice President of

Goldstein Decl. Ex. 12, Page 93 of 297

Total Rewards, Operations & Services), Diversity & Inclusion (Antoine Andrews, then-Vice President, Diversity & Inclusion), and Talent (Courtney Watts, then-Talent Managing Director, Innovation, Product, Design).  There were about 20 members of the PACT, including me.

8.      Further, the Protocol advised PACT members that ███████████████████ ██████████████████████████████████████████████.  PACT members also were instructed ██████████████████████████████████████, and to my knowledge, members of the PACT followed that instruction.  In addition, the Protocol mandated that ████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████

9.      The PACT's work began in earnest in or about April 2016.  With my legal advice and the advice of Nike Legal, the PACT developed statistical models to analyze compensation.  I was heavily involved in this work and driving the methodology, including the number of standard deviations, averages, and the approach for multiple regressions.  I also provided legal advice regarding, for example, ███████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████  My advice and counsel was built into the models, and I continued to provide legal advice throughout the course of the analyses on these (and other) issues; and, even after executing the analyses, I provided legal advice to Nike Legal regarding pay adjustment philosophy, remediation, and other items.

10.     The subject matter experts from WTW were instrumental in carrying out the PACT's compensation analyses.  These labor economists and consultants were integrated into the PACT. They received and generated PACT-related communications, they attended meetings and phone

3

calls with us, Nike Legal, and Nike's subject matters experts, they carried out analyses, and they helped prepare deliverables.  I understood that any work product prepared by the PACT belonged to Nike and was regarded as highly confidential and privileged.

**Additional Analyses**

11.     Since the 2016-17 project, Nike Legal and my team have continued to conduct, structure, and execute compensation analyses.  Each of these analyses is different and involve different variables, data, segmentation protocols, outliers, and remediation efforts.  In addition, for each, we prepared a Privilege Protocol that was distributed to each project team member.  These Protocols established guidelines for maintaining the attorney-client privilege with regard to any documents, communications, or analyses generated by the project team (*e.g.*, ███████

████████████████████████████████████████████

███████████████████████, etc.).  To my knowledge, the Protocol was followed by the respective members of each project team.

12.     In addition, the purpose of my work on each of the subsequent projects—in 2018, 2019, and 2020—continued to be to provide legal advice to Nike Legal to ████████████

████████████████████████████████████████████

███████████████████████

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 8th day of September, 2020, at Chicago, Illinois.

David S. Baffa

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br><br>**DECLARATION OF DANIEL PRINCE** |

I, Daniel Prince, hereby declare as follows:

1.      I am an attorney licensed by the Bar of the State of California, and am admitted *pro hac vice* to the District Court of Oregon.  I am a Partner with the law firm of Paul Hastings LLP, counsel of record for Nike, Inc. ("Nike") in the above-captioned matter.  I have personal knowledge of the facts set forth in this Declaration, and if called to testify under oath, I could and would testify competently thereto.

2.      On March 22, 2019, June 7, 2019 and November 26, 2019, Plaintiffs issued 83 requests for production of documents in three sets.  Those requests are wide-ranging, including, for instance, documents relating to the pay ranges for jobs in which putative class members worked or have worked during the liability period; (legacy) policies regarding categories such as overall job architecture, calculating and determining equity awards, performance rating guidelines used to make salary increase determinations, promotional guidelines, and the creation, review and modification of market zones and internal pay ranges; and all complaints, allegations, reports, investigations, recommended responses to complaints, and enacted responses to complaints relating to sex discrimination at Nike HQ as it relates to pay, promotions and performance review.

3.      Nike served objections to these requests that comply with Fed. R. Civ. P. 34(b)(2)(B)'s requirement that a responding party "state with specificity the grounds for objecting to the request, including the reasons."  Nevertheless, Plaintiffs' frequently assert that Nike's objections are "boilerplate" without further explanation or development.  These assertions are meritless and conclusory, and we have directed letters to Plaintiffs detailing the bases of Nike's objections (and inviting Plaintiffs to meet and confer regarding the same).

4.      From the outset, Plaintiffs have refused to prioritize or phase certain discovery items over

others, which means we have been working with Nike to respond to a wide range of requests including for the compensation (and promotion) analyses that are the subject of Plaintiffs' motion to compel.  *See*, *e.g.,* April 26, 2019 Joint Fed. R. Civ. R. 26(f) Report and Proposed Discovery Plan ("…Plaintiffs do not believe that discovery should be phased at this time because of the overlap between certification and merits issues[.] … Nike contends that the parties should work together to phase or prioritize discovery in a manner that is proportional to the needs and stage of the case, particularly given that this is a class and collective action."); Nike's February 12, 2020 Meet and Confer Letter ("Plaintiffs' conduct, compounded with their refusal to prioritize or phase certain discovery items over others, has drawn out the discovery process and caused Nike to expend time and resources unnecessarily.").  A true and correct copy of Nike's February 12, 2020 Meet and Confer Letter is attached hereto as **Exhibit A**.

5.      Plaintiffs served their first document production in June 2019, but did not serve their first privilege log until January 2020 (seven months later).  Yet, before Plaintiffs had even served their own privilege log, they demanded that Nike produce its privilege log.

6.      Paul Hastings has been diligently collecting and reviewing documents for responsiveness to Plaintiffs' document requests.  We have collected, reviewed, and produced more than 23,000 pages of documents (and we continue to do so)—all during this pre-class certification phase of the matter.

7.      Similarly, both Plaintiffs and Nike have sent out rolling privilege logs.  Nike has served privilege logs on February 2, 2020, March 13, 2020, July 24, 2020, August 31, 2020, and September 8, 2020.  Plaintiffs served their privilege logs on January 10, 2020, April 21, 2020 and August 5, 2020.  The document descriptions adequately describe what has been redacted or withheld in sufficient detail, consistent with applicable law.

Goldstein Decl. Ex. 12, Page 98 of 297

8.      The document production (and privilege log) process has required significant time and expense, in part, because it requires the identification and collection of documents from individuals responsible for driving the relevant work streams, some of whom are no longer employed by Nike.  Nike's privilege logs have included all available information regarding creation dates, authors and recipients that it has been able to extrapolate through review of the documents and their metadata.  Additionally, Paul Hastings has interviewed dozens of individuals at Nike in an effort to not only locate responsive documents, but to understand their context, the authors, recipients, and approximate dates of creation.  That information is reflected in Nike's privilege logs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 8th day of September, 2020, at Los Angeles, California.

_____

Daniel Prince

# Exhibit A



1(213) 683-6120
feliciadavis@paulhastings.com

**VIA E-MAIL AND U.S. MAIL**                                                                 98484.00003

February 12, 2020

Byron Goldstein (brgoldstein@gbdhlegal.com)
James Kan (jkan@gbdhlegal.com)
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Drive, Suite 1000
Oakland, CA 94612

*Re:*     *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel:

We write in response to Plaintiffs' January 8, 2020 letter ("MCL") concerning Nike's objections and responses to Plaintiffs' Requests for Production ("RFP"), Set Three (RFP Nos. 80-83).  We address each of Plaintiffs' arguments in turn.

First, Plaintiffs mischaracterize the nature of Nike's responses to their third set of RFPs.  (MCL pp. 1-2.) Nike is not "refus[ing] to confirm" whether it will produce documents; rather, Nike is still investigating whether any responsive documents to Plaintiffs' RFPs exist (let alone relevance and privilege considerations as applied to those hypothetical documents).  As Plaintiffs are well-aware from the parties' numerous meet and confer communications regarding Plaintiffs' first set of RFPs — of which Plaintiffs' third set is largely duplicative — Nike has been unable to identify, for example, job analyses/analyses of job groupings or historical copies of job descriptions.  Of course, Rules 26 and 34 only require Nike to conduct a reasonable inquiry and produce documents that are within its possession, custody, or control. S*ee, e.g., McMaster v. Spearman*, No. 1:10-cv-01407-AWI-SKO (PC), 2014 U.S. Dist. LEXIS 81621, at *29 (E.D. Cal. June 16, 2014) ("Defendants searched and were unable to locate any responsive [documents].  Plaintiff is required to accept that answer."); *see also Boston v. Clubcorp USA, Inc.*, No. CV 18-3746 PSG (SS), 2019 U.S. Dist. LEXIS 72975, at *21 (C.D. Cal. Mar. 11, 2019) ("It is axiomatic . . . that a court cannot order a party to produce documents that do not exist.").  Nike's investigation no doubt exceeds its obligations as far as conducting a reasonable inquiry, especially where Plaintiffs' RFPs seek documents from over thirteen years ago.  Nevertheless, Nike has continued its investigation in a good faith effort to respond to Plaintiffs' discovery.  To the extent Plaintiffs continue to insist that Nike "promptly" serve supplemental responses, Nike can agree to cease further investigation by a date certain.  Otherwise, Plaintiffs' demands in this respect are premature.

Second, from a general standpoint, Plaintiffs' criticisms regarding Nike's alleged "boilerplate" objections are unfounded.  (MCL pp. 2-3.)  As a preliminary matter, and as Nike has already noted in previous correspondence, Plaintiffs have engaged in the exact same conduct regarding boilerplate objections for which they have repeatedly criticized Nike (which, in Nike's case, is unsubstantiated).  (*See* Nike's Jan. 23, 2020 MCLs.)  Moreover, Plaintiffs' claims that they "set forth how the scope of discovery applies to this action" or "set forth a detailed explanation justifying pre-liability discovery"[1] misapprehend their

---

[1] For Plaintiffs to complain about this is particularly disingenuous where Nike has, for example, produced data starting from August 2012 — well before the start of the earliest applicable statutory period.

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
t: +1.213.683.6000  |  www.paulhastings.com

Goldstein Decl. Ex. 12, Page 101 of 297



Byron Goldstein
James Kan
February 12, 2020
Page 2

(lack of) ability to dictate discovery.  Those parameters are set by the Federal Rules and the Court — not Plaintiffs.

In any event, Nike's objections comply with Rule 34.  For example, Nike specifically objected that Plaintiffs' RFPs were unduly burdensome, overly broad, and oppressive *because* they sought documents from outside of the applicable statutory period(s).  Since the RFPs plainly seek documents from over eight years before the start of the earliest applicable statutory period in this case, Plaintiffs cannot truly claim confusion about Nike's objections in that respect.  Likewise, Nike objected that Plaintiffs' RFPs were duplicative by specifically identifying the prior RFP(s) that sought the same documents and information. Plaintiffs cannot credibly take issue with this when they have already acknowledged such overlap in prior meet and confer correspondence.  (*See, e.g.,* Dec. 26, 2019 E-mail from B. Goldstein.)  And minor differences between the RFPs — such as a change in the time period — do not prevent Nike from objecting that the RFPs are duplicative.  Similarly, Nike's objections regarding relevance, proportionality, privacy, and other reasons specifically explain their bases.  Nike declines to address them further individually, especially where Plaintiffs' objections to Nike's objections are boilerplate themselves.

Third, Plaintiffs' demand that Nike "promptly describe how the data produced in response to RFP 1 shows [categories of information]" is essentially an interrogatory and therefore improperly included in their MCL. It is also cumulative of questions that Plaintiffs raised in their January 24, 2020 letter to Nike regarding its data production.  Nevertheless, Nike directs Plaintiffs to the "Mgr_Pos" field, which identifies direct reporting lines, as well as the job family, subfamily, functional area, organizational unit, and cost center fields.  Plaintiffs can use all of this to see how individuals relate to one another in Nike's data.

Finally, Nike notes that the meet and confer process is meant to resolve legitimate discovery disputes, not to manufacture incessant, frivolous, or trivial issues.  By constantly sending lengthy, repetitive letters and then demanding "prompt" responses from Nike, Plaintiffs are undermining that process.  This is especially the case where, as here, the parties have extensively met and conferred regarding the issues (which Plaintiffs implicitly acknowledge in their MCL by citing to prior correspondence).  Plaintiffs' conduct, compounded with their refusal to prioritize or phase certain discovery items over others, has drawn out the discovery process and caused Nike to expend time and resources unnecessarily.  Nike hopes that Plaintiffs will approach the process more constructively going forward.

We remain available to discuss any of the above by phone.

Sincerely,

Felicia A. Davis
of PAUL HASTINGS LLP

FAD

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>                              Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>                              Defendant. | Case No. 3:18-cv-01477-JR<br><br><br>**DECLARATION OF HOLLY HEARN**<br><br>**ATTORNEYS' EYES ONLY** |

I, Holly Hearn, hereby declare as follows:

1.       I am employed by Nike, Inc. ("Nike") as a Senior Human Resources Business Partner for the Europe, Middle East, and Africa ("EMEA") region, and am based in the Netherlands.  I have served in this role since March 2018.  I am currently the HR business partner assigned to implementing Nike's "Consumer Direct Acceleration" strategy and reorganization in EMEA. Immediately prior to this, until August of this year, I was primarily responsible for managing Nike's human resources strategy and operations in EMEA for corporate functions, like Finance, Strategic Planning, Procurement, and Government & Public Affairs, which includes more than 4,000 employees.  Prior to transitioning to the human resources side of the business, I was Nike's Global Employment Counsel based at Nike's World Headquarters in Oregon.  I served in this capacity from May 2015 to March 2018.  As Global Employment Counsel, I, for example, (i) managed Nike's global employment team, (ii) counseled internal clients in functions like Total Rewards (which handles employee compensation and benefits), Human Resources, and Employee Relations, and (iii) led hundreds of privileged investigations and analyses in partnership with corporate functions, including providing legal advice and guidance to those functions on key initiatives, investigations, and analyses.  As Global Employment Counsel, I also provided legal advice to members of Nike's Communications team, and the Diversity & Inclusion team, on various initiatives, programs, and public-facing messaging related to key projects.  Prior to being Global Employment Counsel, I was Assistant General Counsel, Employment – Americas, from January 2011 to April 2015.  Before joining Nike, I was a Partner at Davis Wright Tremaine LLP, where I practiced employment law for more than 14 years.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify thereto.

1

2.      I submit this declaration in support of Nike's opposition to Plaintiffs' motion to compel production of certain analyses, including "'global' pay equity analyses" from 2016, "supplemental pay analyses" since at least 2018, and "studies or analyses related to time-in-job and pace of promotions" since at least 2018.

3.      The term "pay equity" may have different meanings depending on context and/or the audience.  For instance, pay equity could be interpreted differently by different corporate functions and/or different employees within those functions.  In a colloquial sense, the term can be used to refer to the aggregate gender pay gap (*e.g.,* the average difference between the salaries of men and women).  But, in a legal sense, pay equity refers to the elimination of discriminatory differences in compensation.  And even then, there are varying standards for determining when pay equity is achieved, whether under Title VII, the federal Equal Pay Act, the Oregon Equal Pay Act, or other statutes regarding equal pay.  Thus, as Global Employment Counsel, I viewed pay equity through a certain lens, which framed the legal advice I provided to Nike's corporate functions, such as Total Rewards, Human Resources, Communications, and others.

**Background**

4.      In or around November 2015, I learned that a Black female employee filed a Charge of Discrimination with the EEOC alleging that she had been discriminated against under Title VII because she had been paid less than her White male counterpart.  A couple of months later, in February 2016, I received a separate demand letter from a former Nike executive alleging, *inter alia*, age discrimination.  In handling these claims, I believed in late 2015/early 2016 that Nike Legal ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

As Global Employment Counsel, I believed this analysis to be necessary so that ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

5.      Around this time, I had several conversations with Kim Lupo, the Vice President of Total

Rewards, to provide legal advice regarding ███████████████████████████████

██████████████████████    As Global Employment Counsel, I routinely provided legal

advice to Ms. Lupo on these matters, and in regards ██████████████████████████

██████████    In fact, in or about February 2016, I engaged David Baffa and Christine

Hendrickson, both Partners with the law firm of Seyfarth Shaw LLP ("Seyfarth") and experts in

designing and conducting compensation analyses.  I retained Seyfarth to provide legal advice to

Nike Legal in connection with, for example, ███████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████. Obtaining legal advice in

these areas (and others) was critical to Nike Legal's assessment of potential legal risk and

providing legal advice to Nike's corporate functions to ████████████████████████████

███████████████████████████████████████████████

6.      Moreover, in or about March 2016, we retained Willis Towers Watson ("WTW") to carry

out the analyses.  The analyses were carried out at the direction of Nike Legal and Seyfarth.

7.      In or about June 2016, the White House launched the Equal Pay Pledge and Nike became

a signatory onto the Pledge, which encouraged companies to take action to advance equal pay.

Becoming a signatory onto the Pledge resonated with some of Nike's corporate functions, like

3

Total Rewards, although Nike Legal and Seyfarth already had begun driving work streams to assess compensation with the purpose of providing legal advice to the corporate functions and to assess legal risk exposure.

**2016-17 Global Compensation Analyses with Willis Towers Watson**

8.      After Seyfarth and WTW were retained, we formed a discrete project team—called the Pay Compliance Team or "PACT"—to perform the compensation analyses.

9.      At my direction, Seyfarth prepared a "Privilege Protocol" for the analyses.  Seyfarth distributed the Protocol, dated April 13, 2016, to the PACT.  The Protocol implemented guidelines to maintain the attorney-client privilege.  For instance, the Protocol established a distribution list, consisting of legal and subject matter experts from Seyfarth (including Mr. Baffa and Ms. Hendrickson), WTW (including Lindsay Wiggins, a Senior Consultant, and Richard Luss, a Senior Economist), Nike Legal (myself), and various Nike corporate functions, like Total Rewards (including Kim Lupo, Vice President of Total Rewards, Operations & Services), Diversity & Inclusion (Antoine Andrews, then-Vice President, Diversity & Inclusion), and Talent (Courtney Watts, then-Talent Managing Director, Innovation, Product, Design). There were about 20 members of the PACT, including me.

10.     Further, the Protocol advised PACT members that ███████████████████ ████████████████████████████████████████████ PACT members also were instructed ████████████████████████████ ████████████████, and to my knowledge, members of the PACT faithfully adhered to that instruction.  In addition, the Protocol mandated █████████████████ ███████████████████████████████████████████ ███████████████████████████████████

4

11.      The PACT's work began in earnest in or about April 2016.  With the advice of Nike Legal and Seyfarth, the PACT developed statistical models to analyze compensation.  These pay analyses were ███████████████████████████████████████████████████████ Specifically, I relied on Seyfarth to provide legal advice regarding, for example, ████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ Seyfarth's advice was built into the models that were developed, and Seyfarth continued to provide legal advice throughout the course of the analyses on these (and other) issues.  And, even after executing the analyses, Seyfarth continued to provide legal advice to Nike Legal regarding pay adjustment philosophy, remediation, and other items.

12.      The subject matter experts from WTW were instrumental in carrying out the PACT's compensation analyses.  These labor economists and consultants were integrated into the PACT.  They received and generated PACT-related communications, they attended meetings and phone calls with Seyfarth, Nike Legal, and Nike's subject matters experts, they carried out analyses, and they helped prepare deliverables.  Any work product prepared by the PACT belonged to Nike and was regarded as highly confidential and privileged.

**Communications Related to Compensation Analyses**

13.     In late 2017, David Ayre, Nike's former Vice President of Human Resources, released a public statement related to the results of the 2016-17 compensation analyses and certain aspirational goals in regards to "pay equity."  Mr. Ayre was not a member of the PACT.  He did not participate in the development of any methodology for conducting the analyses.


        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 8th day of September, 2020, at Hilversum, North Holland Province, Netherlands.



_____

Holly Hearn

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**DECLARATION OF KIMBERLY LUPO**<br><br>**ATTORNEYS' EYES ONLY** |

I, Kimberly ("Kim") Lupo, hereby declare as follows:

1.       I am Nike, Inc.'s ("Nike") Vice President of Total Rewards, Operations & Services ("Total Rewards"), and I have had responsibility for overseeing the Total Rewards function since 2015.  Total Rewards is responsible for compensation and benefits for Nike employees.  I have nearly 25-years of experience managing compensation and benefits programs for major enterprises.  I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify thereto.

2.       I submit this declaration in support of Nike's opposition to Plaintiffs' motion to compel production of certain compensation analyses that were carried out by Willis Towers Watson ("WTW") and Mercer, at the direction of counsel, from 2016 to 2020.

3.       I understand that Plaintiffs argue that the compensation analyses that were carried out by WTW in 2016-17, and by Mercer from 2018 to 2020, were driven by corporate functions, like Total Rewards, and not by Nike Legal.  That is incorrect.  Dating back to at least early 2016, I had several conversations with Nike's then-Global Employment Counsel, Holly Hearn, to seek legal advice regarding, for example, █████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████

4.       I sought further legal advice from Ms. Hearn in 2016 and 2017, and I have continued to seek legal advice from her successor, Lauren Thibodeaux, in connection with the compensation analyses regarding, among other things, ███████████████████████████ ████████████████████████████████████████ ██████████  I sought, and continue to seek, legal advice on these topics ████████████████████

███████████████████████████████████████████████████

████████  In this regard, the legal objectives are weaved together with the business objectives.

For the Total Rewards organization, the two are not mutually exclusive.


I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on this 8th day of September, 2020, at Portland, Oregon.


_____

Kimberly Lupo

2    Goldstein Decl. Ex. 12, Page 112 of 297

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br><br>**DECLARATION OF LAUREN THIBODEAUX**<br><br>**ATTORNEYS' EYES ONLY** |

I, Lauren Thibodeaux, hereby declare as follows:

1.      I have been employed by Nike, Inc. ("Nike") for nearly five years, and am Nike's Vice

President, Global Employment Counsel.  I have been a Vice President since August 2019, but

have served as Global Employment Counsel since March 2018, when I succeeded Holly Hearn

in this role.  I manage a team of lawyers around the world that support various Nike corporate

functions, including Total Rewards, Operations & Services (which handles employee

compensation and benefits) ("Total Rewards"), Human Resources, Employee Relations,

Diversity & Inclusion, Communications, and Talent.  In my current capacity, I have counseled

and regularly counsel internal clients across the organization in a range of confidential and

sensitive matters, and I have led and continue to lead privileged investigations and analyses in

partnership with corporate functions.  Prior to being Global Employment Counsel, I was Nike's

Assistant General Counsel – Employment, Americas, from January 2016 to March 2018, and

Assistant General Counsel for DirecTV, from October 2013 to January 2016.  Before I joined

DirecTV, I practiced labor and employment law for approximately eight years at Sheppard

Mullin Richter & Hampton LLP.  I have personal knowledge of the fact set forth in this

declaration, and if called as a witness, I could and would competently testify thereto.

2.      I submit this declaration in support of Nike's opposition to Plaintiffs' motion to compel

production of certain analyses, including "'global' pay equity analyses" from 2016,

"supplemental pay analyses" since at least 2018, and "studies or analyses related to time-in-job

and pace of promotions" since at least 2018.

3.      The term "pay equity" may have different meanings depending on context and/or the

audience.  For instance, pay equity could be interpreted differently by different corporate

functions and/or different employees within those functions.  In a colloquial sense, the term can

1

be used to refer to the aggregate gender pay gap (*e.g.,* the average difference between the salaries of men and women). But, in a legal sense, pay equity refers to the elimination of discriminatory differences in compensation. And even then, there are varying standards for determining when pay equity is achieved, whether under Title VII, the federal Equal Pay Act, the Oregon Equal Pay Act, or other statutes regarding equal pay. As Vice President, Global Employment Counsel, I view pay equity through a certain lens, which frames the legal advice I provide to internal clients in Nike's corporate functions. This includes, for example, providing legal advice to Kim Lupo, the Vice President of Total Rewards, ███████████████████████████████ ████████████████████████████████████████. The compensation analyses are a key element of my legal advice to Ms. Lupo and others.

**Background of the 2018 Compensation and Promotion & Turnover Analyses with Mercer**

4.      In or about December 2017, I began to hear about an informal and unofficial gender survey being circulated by employees at Nike, and I received a copy of this compilation of complaints—made by mostly unidentified employees—in or about February 2018. Some of the complaints raised in the survey, *inter alia*, were claims purporting to allege discrimination in compensation and promotions on the basis of gender. Given these surveys and other claims in early 2018,[1] I believed that ██████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████

5.      Nike Legal engaged David Baffa and Christine Hendrickson, both Partners with the law

---

[1] Plaintiffs filed this lawsuit only months after these complaints surfaced.

firm of Seyfarth Shaw LLP ("Seyfarth") and experts in designing and conducting compensation and promotions analyses.  We retained Seyfarth in connection with two projects in 2018—a Promotion and Turnover Analysis, which related to "promotion equity" or decisions made around promotions and employee turnover, and a Pay Review Project, which related to compensation across the organization.  Specifically, Nike Legal retained Seyfarth to provide legal advice to Nike Legal in connection with, for example, ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Obtaining legal advice in these areas (and others) was critical to Nike Legal's assessment of potential legal risk and providing legal advice to Nike's corporate functions to ███████

████████████████████████████████████████

███████████████

6.      Moreover, in or about March – April 2018, labor economists and consultants from Mercer were retained—at the direction of counsel—to carry out the analyses.

**2018 Promotion and Turnover Analyses with Mercer**

7.      After Seyfarth and Mercer were retained, we formed a discrete project team—called the Promotion and Turnover Analysis Project ("PTAP") Review Team (the "PTAP Team")—to perform the promotion and turnover analyses.  These analyses were conducted at the direction of Nike Legal and Seyfarth.

8.      At my direction, Seyfarth prepared a "Privilege Protocol" for the analyses.  The Protocol, dated May 16, 2018, was circulated to the PTAP Team.  The Protocol implemented guidelines to maintain the attorney-client privilege.  For instance, the Protocol established a distribution list,

3

consisting of legal and subject matter experts from Seyfarth (including Mr. Baffa and Ms. Hendrickson), Mercer (including Casey North, a Principal in Mercer's Workforce Strategy & Analytics group), Nike Legal (myself), and various Nike corporate functions, like Total Rewards (including Ms. Lupo), Diversity & Inclusion (Kellie Leonard, then-Chief Diversity & Inclusion Officer), and Talent & Organizational Effectiveness (including Julie Fuller, Vice President). There were 17 members of the PTAP Team, including me.

9.      Further, the Protocol advised PTAP Team members ███████████████████████████████████████████████████████████████████████. PTAP Team members also were instructed ███████████████████████████████████████████████████, and to my knowledge, members of the PTAP Team faithfully adhered to that instruction.  The Protocol mandated that ██████████████████████████████████████████████████████████████████████████████████████████████. Moreover, the Protocol required that ██████████████████████████████████████████████████████████████████████████████.

10.     The PTAP Team's work began in earnest in or around June 2018.  With the advice of Nike Legal and Seyfarth, the PTAP Team began to develop statistical models to analyze promotion and turnover.  Specifically, I relied on Seyfarth to provide legal advice regarding, for example, ████████████████████████████████████████████████████████████. Seyfarth's advice was incorporated into the models that were developed, and Seyfarth continued to provide legal advice during the course of the analyses

on these (and other) issues, until the PTAP Team's work concluded in or about August 2018 at my direction.

11.     Before this work stopped, the subject matter experts from Mercer were instrumental in the PTAP Team's analyses.  Mercer's labor economists and consultants were integrated into the PTAP Team.  They received and generated PTAP-related communications, they attended meetings and phone calls with Seyfarth, Nike Legal, and Nike's subject matters experts, they carried out analyses, and they helped prepare deliverables.  Any work product prepared by the PTAP Team belonged to Nike and was regarded as highly confidential and privileged.

**2018 Compensation Analyses with Mercer**

12.     As stated above, the other project in 2018 that Mercer had been retained to carry out, at the direction of Nike Legal and Seyfarth, was called the Pay Review Project ("PRP").  Again, we formed a discrete project team—called the "PRP Team"—and that team performed the compensation analyses.

13.     At my direction, Seyfarth prepared a "Privilege Protocol" for the analyses.  The Protocol, dated May 16, 2018, was circulated to the PRP Team.  The Protocol implemented guidelines to maintain the attorney-client privilege.  For instance, the Protocol established a distribution list, consisting of legal and subject matter experts from Seyfarth (including Mr. Baffa and Ms. Hendrickson), Mercer (including Ms. North), Nike Legal (myself), and various Nike corporate functions, like Total Rewards (including Ms. Lupo, Shane Walker, Senior Director of Global Compensation, and Zach Vinton, Vice President of Compensation, Mobility, and Rewards) and Human Resources (including Amy Janke, then-Director of Human Resources Enterprise Advanced Analytics, and Bethany Dohleman, then-Director of Workforce Intelligence).  There were 15 members of the PRP Team, including me.

14.     Further, the Protocol advised PRP Team members ███████████████████████

████████████████████████████████████████████████████. PRP

Team members also were instructed ████████████████████████████████████████

███████████████████████████████, and to my knowledge, members of the PRP Team

faithfully adhered to that instruction.  The Protocol mandated ███████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

Moreover, the Protocol required that ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

15.     The PRP Team's work began in earnest in or about June 2018.  With the advice of Nike

Legal and Seyfarth, the PRP Team developed statistical models to analyze compensation.  These

pay analyses were ███████████████████████████████████████████████████

Specifically, I relied on Seyfarth to provide legal advice regarding, for example, ████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████.  Seyfarth's advice was incorporated into the models that were developed,

and Seyfarth continued to provide legal advice throughout the course of the analyses on these

(and other) issues.  And, even after executing the analyses, Seyfarth continued to provide legal

advice to Nike Legal regarding pay adjustment philosophy and other items.

16.     Mercer's subject matter experts were instrumental in carrying out the PRP Team's

compensation analyses.  Its labor economists and consultants were integrated into the PRP Team.

They received and generated PRP-related communications, they attended meetings and phone

6    Goldstein Decl. Ex. 12, Page 119 of 297

calls with Seyfarth, Nike Legal, and Nike's subject matters experts, they carried out analyses, and they helped prepare deliverables.  Any work product prepared by the PRP Team belonged to Nike and was regarded as highly confidential and privileged.

**Background of the 2019 and 2020 Compensation Analyses with Mercer**

17.     As stated above, I became aware of complaints alleging discrimination in compensation and promotions on the basis of gender in or about February 2018.  Nike Legal then received an EEOC charge in or about June 2018, filed by a former female employee, alleging violations of the federal Equal Pay Act, as well as Title VII of the Civil Rights Act and the Age Discrimination in Employment Act.  Further, the instant class and collective action lawsuit, filed by Plaintiffs in or about August 2018, challenges Nike's pay and promotion practices as they relate to women at Nike's World Headquarters in Oregon.  Taken together and given the pending litigation, Nike Legal continued to order and direct compensation analyses to render legal advice to Nike's corporate functions in connection with the lawsuits, and on pay adjustment philosophy (including remediation), and to continue to assess potential vulnerabilities with the company's compensation practices.

18.     To that end, Nike Legal engaged Mr. Baffa and Ms. Hendrickson of Seyfarth to facilitate the design and execution of the compensation analyses, in 2019 and again in 2020.  Specifically, I retained Seyfarth to provide legal advice to Nike Legal in connection with, for example, ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

These items were and are critical to Nike Legal's assessment of ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

19.     Accordingly, Mercer was again retained in or about February – March 2019 and January – February 2020, at the direction of counsel, to carry out the compensation analyses.

**2019 Compensation Analyses with Mercer**

20.     For this project, as is our custom, Nike Legal and Seyfarth formed a discrete project team—called the 2019 Pay Review Project Team ("2019 PRP Team")—and that team performed the compensation analyses.

21.     At my direction, Seyfarth prepared a "Privilege Protocol" for the analyses.  The Protocol, dated March 20, 2019, was circulated to the 2019 PRP Team.  The Protocol implemented guidelines to maintain the attorney-client privilege.  The Protocol established a customized and narrowly-tailored distribution list, consisting of legal and subject matter experts from Seyfarth (including Mr. Baffa and Ms. Hendrickson), Mercer (including Ms. North), Nike Legal (myself, along with Alyson Smith and Cassie English, both Assistant General Counsel, Employment – Americas), and Nike corporate functions, like Total Rewards (including Mr. Walker, Mr. Vinton, and David Buckmaster, Director of Global Compensation).  There were 14 members of the 2019 PRP Team, including me.

22.     Further, the Protocol advised the 2019 PRP Team members ████████████████

█████████████████████████████████████████████████████████

████████     The 2019 PRP Team members also were instructed ███████████████

████████████████████████████████████████████████, and to my knowledge, members of the 2019 PRP Team faithfully adhered to that instruction.  The Protocol mandated that ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████. Moreover, the Protocol required that ██████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

23.     The 2019 PRP Team's work began in earnest in or about February – March 2019.  With the advice of Nike Legal and Seyfarth, the 2019 PRP Team developed statistical models to analyze compensation.  These pay analyses were ██████████████████████████

███████████████████ Specifically, I relied on Seyfarth to provide legal advice regarding, for example, ████████████████████████████████████

████████████████████████████████████████

████████████████████████. Seyfarth's guidance was built into the models that were developed, and Seyfarth continued to provide legal advice throughout the course of the analyses on these (and other) issues.  And, even after executing the analyses, Seyfarth continued to provide legal advice to Nike Legal regarding pay adjustment philosophy, remediation, and other items.

24.     Mercer's subject matter experts were instrumental in carrying out the 2019 PRP Team's compensation analyses.  Its labor economists and consultants were integrated into the 2019 PRP Team.  They received and generated 2019 PRP-related communications, they attended meetings and phone calls with Seyfarth, Nike Legal, and Nike's subject matters experts, they carried out analyses, and they helped prepare deliverables.  Any work product prepared by the 2019 PRP Team belonged to Nike and was regarded as highly confidential and privileged.

## 2020 Compensation Analyses with Mercer

25.     For the 2020 project, Nike Legal and Seyfarth again formed a discrete project team—

called the 2020 Pay Review Project Team ("2020 PRP Team")—and that team performed the compensation analyses.

26.     At my direction, Seyfarth prepared a "Privilege Protocol" for the analyses.  The Protocol, dated February 24, 2020, was circulated to the 2020 PRP Team.  The Protocol implemented guidelines to maintain the attorney-client privilege.  The Protocol established a customized and narrowly-tailored distribution list, consisting of legal and subject matter experts from Seyfarth (including Mr. Baffa and Ms. Hendrickson), Mercer (including Ms. North), Nike Legal (myself, Ms. Smith, and Ms. English), and Nike corporate functions, like Total Rewards (including Mr. Walker, Mr. Vinton, and Mr. Buckmaster).  There were 14 members of the 2020 PRP Team, including me.

27.     Further, the Protocol advised the 2020 PRP Team members ████████████████

████████████████████████████████████████████████████████████

████████     The 2020 PRP Team members also were instructed ████████████████

████████████████████████████████████████████████, and to my knowledge, members of the 2020 PRP Team faithfully adhered to that instruction.  The Protocol mandated ████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████.  Moreover, the Protocol required that ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

28.     The 2020 PRP Team's work began in earnest in or about January – February 2020.  With the advice of Nike Legal and Seyfarth, the 2020 PRP Team developed statistical models to

analyze compensation.  These pay analyses were ██████████████████████████
████████████████████.  Specifically, I relied on Seyfarth to provide legal advice
regarding, for example, ███████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
████████████████████████████████.  Seyfarth's guidance was built into the
models, and Seyfarth continued to provide legal advice throughout the course of the analyses on
these (and other) issues.  And, even after executing the analyses, Seyfarth continued to provide
legal advice to Nike Legal regarding pay adjustment philosophy, remediation, and other items.

29.     Further, Mercer's subject matter experts were instrumental in carrying out the 2020 PRP
Team's compensation analyses.  Its labor economists and consultants were integrated into the
2020 PRP Team.  They received and generated 2020 PRP-related communications, they attended
meetings and phone calls with Seyfarth, Nike Legal, and Nike's subject matters experts, they
carried out analyses, and they helped prepare deliverables.  Any work product prepared by the
2020 PRP Team belonged to Nike and was regarded as highly confidential and privileged.

30.     In summary, Nike Legal, in concert with Seyfarth, has directed several compensation
(and promotion) analyses for the purposes of providing legal advice to Nike's corporate
functions and assessing potential exposure.  Each of these analyses is different and there is no
one-size-fits-all approach to conducting the analyses.  We retained Seyfarth to provide legal
advice to Nike Legal ████████████████████████████████████████████████
███████████████████████████████████████████████████████

**Document Collection Matters**

31.     This is an important lawsuit for Nike Legal and the entire organization.  My team, which is responsible for managing this large-scale litigation consists only of four people in the United States, whom also are responsible for overseeing document collection and case management in other ongoing legal matters and providing advice and counsel related to over 40,000 Nike employees in the United States.

32.     During the pendency of this matter, my team has worked diligently to collect documents, including the compensation and promotions analyses that are the subject of Plaintiffs' motion to compel.  We did so while helping to guide the company through significant challenges, including lay-offs, the closure of domestic retail stores, and transitioning tens of thousands of employees to working-from-home during the COVID-19 pandemic.

33.     Likewise, identifying and collecting the compensation and promotions analyses required significant time and expense.  This work had to be performed in phases, given available resources.  It also required the identification and collection of documents from individuals responsible for driving those work streams (some of whom are no longer employed by Nike), while managing a multitude of obligations to other legal matters and to the business at large.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 8th day of September, 2020, at Portland, Oregon.

Lauren Thibodeaux

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br><br>**DECLARATION OF LINDSAY WIGGINS**<br><br>**ATTORNEYS' EYES ONLY** |

I, Lindsay Wiggins, hereby declare as follows:

1.      I am a Senior Consultant in the Talent and Rewards line of business of Willis Towers

Watson ("WTW"), a leading global advisory and solutions company.  I have approximately 30

years of experience consulting companies regarding a range of solutions for their businesses,

including Total Rewards Strategy, Job Architecture and Job Leveling, and more than 15 years

consulting on Fair Pay.  Among other things, I consult on the structure and development of

statistical models to evaluate compensation within an organization, and I commonly work at the

direction of in-house attorneys and/or outside counsel to conduct those analyses.  In fact, I work

closely with counsel to develop methodologies to execute compensation analyses, which may

include validation, identifying variables that may impact the analysis, and regression analysis.  I

have personal knowledge of the facts set forth in this declaration, and if called as a witness, I

could and would competently testify thereto.

2.      I submit this declaration in support of Nike's opposition to Plaintiffs' motion to compel

production of certain analyses that were carried out by WTW, at the direction of counsel, in

2016-17.

3.      In or about March 2016, we were retained to carry out a privileged and confidential

analyses of compensation for Nike employees worldwide.  I was the engagement leader for the

project, with other WTW personnel contributing to the effort, including Richard Luss, a Senior

Economist, who has expertise in statistical modeling.  Our work was performed at the direction

of Holly Hearn, Nike's Global Employment Counsel, and David S. Baffa of Seyfarth Shaw LLP

("Seyfarth").

4.      To carry out the work, Nike Legal and Seyfarth developed a core project team called the

Pay Compliance Team or "PACT."  Mr. Baffa prepared a "Privilege Protocol" to govern the

analyses and we agreed to follow that Protocol.  In fact, our engagement contemplated that WTW's work would be done in conformity with the Protocol and at the direction of Nike's legal counsel for the purpose of rendering legal advice to Nike.

5.    The Protocol, dated April 13, 2016, was distributed to me and the rest of the PACT members.  It established guidelines to maintain the attorney-client privilege.  For instance, the Protocol created a distribution list, consisting of legal and subject matter experts from Seyfarth (including Mr. Baffa), WTW (including me and Mr. Luss), Nike Legal (Ms. Hearn), and various Nike corporate functions, like Total Rewards (including Kim Lupo, Vice President of Total Rewards, Operations & Services), Diversity & Inclusion (Antoine Andrews, then-Vice President, Diversity & Inclusion), and Talent (Courtney Watts, then-Talent Managing Director, Innovation, Product, Design).  There were about 20 members of the PACT, including me.

6.    The Protocol advised PACT members ███████████████████████████████████ ████████████████████████████████████████.  PACT members also were instructed ████████████████████████████████████████ ██████████, and to my knowledge, members of the PACT followed that instruction.  In addition, the Protocol mandated that ████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████

7.      The PACT's work kicked-off in or about April 2016.  Mr. Baffa was involved at the outset of the project.  He attended the kick-off meeting, during which he advised on, for example, the data to request from Nike, the variables to include in the analyses, and the analytics that should be run.  Mr. Baffa was heavily involved in the project, including on the development of statistical models, and his advice was built into those models.  Mr. Baffa's involvement continued during the course of WTW's work, which continued into early 2017.  During that time, Mr. Baffa and I interacted and he provided advice on a number of other key matters, including statistical methodology, additional variables for testing, and identifying outliers.

8.      Both Mr. Luss and I also contributed to the PACT's work.  We were integrated into the PACT, attended a number of PACT meetings and phone calls, received and generated PACT-related communications, and prepared deliverables to carry out the analyses.  I understood that any work product prepared by the PACT belonged to Nike (or was licensed to Nike to use to the extent that any WTW intellectual property was incorporated therein) and was regarded as highly confidential and privileged.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 8th day of September, 2020, at Los Angeles, California.


_____

Lindsay Wiggins

Goldstein Decl. Ex. 12, Page 129 of 297



Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

**Goldstein, Borgen,
Dardarian & Ho**

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

September 15, 2020

<u>**Via E-Mail Only**</u>

Hon. Jolie A. Russo                                    Gary_Magnuson@ord.uscourts.gov
Mark O. Hatfield United States Courthouse
Room 1027
1000 S.W. Third Avenue
Portland, OR 97204

> Re:   *Kelly Cahill, et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR
>       Plaintiffs' Reply in Support of Their Request for an Order to Compel Nike to
>       Produce Documents and Data from Internal Pay Equity and Promotion Analyses

Dear Judge Russo:

Plaintiffs submit this reply in support of their request that the Court order Nike to produce certain pay equity and promotion analyses, Plaintiffs' Motion to Compel Letter, August 7, 2020 ("MTC").

**A.    Introduction and Summary**

In its Opposition, Nike does not deny that the pay and promotion studies are highly relevant for class certification, proportional, and responsive to a Request for Production ("RFP") served 18 months ago.[1]  MTC at 1-3, 5 n.2.  Yet, Nike concedes that it never identified its 2016 pay equity analysis, its 2018 promotion study, and many other documents withheld until, at the earliest, its September 8, 2020 privilege log, which includes at least 60 new entries.[2]  Nike also concedes that it has never asserted "in anticipation of litigation" in any of its logs.

Instead, Nike submitted declarations with its Opposition that were created one month after Plaintiffs submitted their MTC.[3]  These declarations attempt, for the first time to address some, but not all, of the deficiencies with its privilege assertions that Plaintiffs have been raising with Nike for over a year.  Nike's Opposition, also for the first time, claims that a seemingly

---

[1] The applicable RFP is RFP No. 16.  MTC at 2.  The Opposition mischaracterizes Plaintiffs' request because Plaintiffs request only the part of the pay analyses that are relevant to "putative class members and male salaried employees at Nike World Headquarters levels below the Vice-President level."  *Id.*

[2] Nike's September 8, 2020 privilege log (Privilege Log #5) is attached as Exhibit 2 to Byron Goldstein's Declaration in support of this Reply Letter ("Goldstein Decl."); Nike did not provide the Court this log with its September 8, 2020 Opposition.

[3] Each of the declarations Nike submitted is signed on September 8, 2020.

300 Lakeside Drive, Suite 1000, Oakland, CA  94612-3534    Tel 510. 763. 9800    Fax 510. 835. 1417    www.gbdhlegal.com

789638.18                                                                  Goldstein Decl. Ex. 12, Page 130 of 297

*Cahill, et al. v. Nike, Inc.* -2- September 15, 2020

individual 2015 EEOC charge and a 2016 demand letter about age discrimination show that Nike did its pay analyses in anticipation of litigation, identifies project teams, privilege protocols, and job titles for Nike employees and provides declarations on the work of third parties Mercer and Willis Towers Watson ("WTW") – none of which appeared in Nike's privilege logs.

Nike's Opposition only confirms that Nike has unjustifiably withheld documents concerning pay and promotion studies.

First, Nike's submission of eight declarations and a privilege log on September 8, 2020 is an implicit admission that, over the last seventeen months, it failed to log many withheld documents and otherwise failed to justify withholding documents concerning its pay and promotion studies. *See e.g.*, *Burch v. Regents of the Univ. of Cal.*, No. Civ. S-04-0038 WBS GGH, 2005 U.S. Dist. LEXIS 46998, at *8 (E.D. Cal. Aug. 30, 2005) (where defendants provided a privilege log five months after the Rule 34 time limit and then filed declarations about thirteen months after the Rule 34 time limit, the Court held defendant had waived privilege objections because, inter alia, the declarations are "an implicit admission that, without them, the privilege log was insufficient ….") (citation omitted).

Second, even if Nike's September 8, 2020 log and declarations are considered timely, credible, and complete, Nike still fails to establish that any of the analyses were "created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation." *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 296 F. Supp. 3d 1230, 1239 (D. Or. 2017). For example, Nike "launched" its "Equal Pay Pledge" in about June 2016, Hearn Decl. ¶ 7, "publicly declaring [its] commitment to review pay and promotion practices annually, and to ensure that women and men who undertake the same work at the same level are equitably compensated." Goldstein Decl. ¶ 11(a) (quoting NIKE_00002052). Nowhere does Nike show that its pay or promotion studies were done differently because of litigation.

Third, Nike has not met its burden to establish all the elements for attorney-client privilege, as it has not shown that the primary purpose of conducting the pay equity and promotion analyses was to secure legal advice. Instead, the factual record indicates the primary purpose was for routine human resources functions.

Fourth, given Nike's affirmative defenses, including that it acted in "good faith," it has impliedly waived and cannot use attorney client privilege and work product protection as a shield to protect from discovery pay and promotion analyses that contain evidence that is highly relevant to those affirmative defenses. *See, e.g., Brown v. Barnes & Noble, Inc.*, No. 1:16-cv-07333 (RA) (KHP), 2019 U.S. Dist. LEXIS 220625, at *28 (S.D.N.Y. Dec. 23, 2019) (finding defendant "impliedly waived" attorney client privilege and work product protection because it had asserted a good faith defense to a claim brought under the Fair Labor Standards Act (FLSA) – the same good faith defense as the one applicable to Plaintiffs' Equal Pay Act claims here.)

*Cahill, et al. v. Nike, Inc.*                    -3-                    September 15, 2020

**B.      Nike's September 8, 2020 Privilege Log and Declarations Support the Conclusion
         That Nike's Failure to Timely Comply with the Requirements of the Federal Rules
         Should Result in Waiver.**

Nike's failure to comply with Rule 26(b)(5) and Local Rule 26-5(b) by describing the
documents withheld in a manner that would enable Plaintiffs to assess Nike's claims occurred
despite several confirmations from Nike, beginning in September 2019, that it was withholding
its pay and promotion studies based on privilege.  Goldstein Decl. ¶¶ 6(e), 7(a), 7(c).  Between
March 2019 (when the applicable RFP was served) and August 2020, Plaintiffs asked Nike at
least thirteen times for a privilege log and specifically raised Nike's pay and promotion studies at
least ten times.  *Id.* ¶¶ 6(a)-(d), (f)-(g), (i), 7(d), (f), (h)-(j).

Nike's untimeliness is more than three times longer than the five-month delay that
occurred in *Burlington Northern*, where the Ninth Circuit affirmed a waiver finding.  *Burlington
N. & Santa Fe Ry. v. U.S. Dist. Court*, 408 F.3d 1142, 1149 (9th Cir. 2005) (the fact of a five-
month delay was sufficient on its own to justify finding of waiver "[i]n the absence of mitigating
considerations ….").  Given Nike's more than 16-month delay, Nike's privilege assertions for
the pay and promotion studies are waived unless there are significant "mitigating
considerations."

However, as described below, Nike's discovery collection and production have been
deficient and paltry, including before March 2020 when stay home orders were issued, it has
long known of the centrality of the pay and promotion studies, and it long ago confirmed that it
was withholding these studies.  Thus, Nike's delay of more than three times as long as in
*Burlington Northern* is not justified under the four factors the Ninth Circuit instructs courts to
consider "in the context of a holistic reasonableness analysis, intended to forestall needless waste
of time and resources, as well as tactical manipulation of the rules and the discovery process."[4]
*Burlington N.*, 408 F.3d at 1149.

**1.      Nike's Boilerplate Privilege Objection and Inadequate Privilege Log Did Not
         Enable Plaintiffs or the Court to Evaluate Nike's Assertions**

Nike provided only a boilerplate objection in response to RFP 16 in April 2019.  *See*
Goldstein Decl. Ex. 1 ("Nike further objects to this Request to the extent that it seeks information
protected by the attorney-client privilege and/or attorney work product doctrine.").  Plaintiffs
asked Nike for a privilege log in their May 31, 2019 letter to Nike, which also noted that Nike
used the same exact language for its privilege and work product objection to 59 of the 63 RFPs
in Plaintiffs' First Set.  *See* Goldstein Decl. ¶ 6(a).  Over the next ten months, Plaintiffs made

---

[4] The four factors are: (1) the degree to which the objection or assertion of privilege enables the
litigant seeking discovery and the court to evaluate whether each of the withheld documents is
privileged (where providing particulars typically contained in a privilege log is presumptively
sufficient and boilerplate objections are presumptively insufficient); (2) the timeliness of the
objection and accompanying information about the withheld documents (where service within 30
days, as a default guideline, is sufficient); (3) the magnitude of the document production; (4)
other particular circumstances of the litigation that make responding to discovery unusually easy
or unusually hard.  *Burlington N.*, 408 F.3d at 1149.

*Cahill, et al. v. Nike, Inc.*                    -4-                    September 15, 2020

numerous requests for Nike to produce the bases for their privilege assertions. *See* Goldstein Decl. ¶ 6.

Before the submission of its Opposition, the only privilege log that Nike produced related to the pay equity analyses was its March 13, 2020 log, which contains the only privilege log entries Nike cites in either its Opposition or its declarations, *see* Opp'n 16.[5]  Nike has not disputed that Plaintiffs were unable to assess Nike's privilege assertions based on that privilege log because Nike failed to provide: (1) any foundation for why work product was in anticipation of litigation; (2) any foundation for claiming privilege over work by Mercer; (3) job titles for Nike employees to assess if they were clients of Nike counsel; or (4) evidence that the analyses were only disclosed to people who need to know to maintain confidentiality.[6]  Rather, Nike submitted a new privilege log on September 8, 2020, with declarations addressing many of these points, showing the deficiency of its March 13, 2020 log. *See e.g.*, *Burch*, 2005 U.S. Dist. LEXIS 46998, at *8 (E.D. Cal. Aug. 30, 2005) (where defendants provided a privilege log five months after the Rule 34 time limit and then filed declarations about testimony thirteen months after the Rule 34 time limit, the Court held defendant had waived privilege objections because, inter alia, the declarations are "an implicit admission that, without them, the privilege log was insufficient ….") (citation omitted).

### 2.    Nike's Assertions Are Far from Timely, Especially Given that Particulars Were Not Provided Until More than 16 Months After the Rule 34 Deadline, and the Written Discovery Period Will Soon Close.

Nike waited more than 16 months after the Rule 34 time limit and one month after Plaintiffs' MTC to provide most of the particulars it now seeks to use to justify its privilege and work product assertions, such as why Nike anticipated litigation, some details on the project teams involved in the analyses, and privilege protocols implemented for confidentiality.  The September 8, 2020 log and declarations were also not provided until almost 13 months after Plaintiffs wrote Nike about the high relevance and centrality of the pay and promotion studies, about 12 months after Nike confirmed that it was withholding the studies, at least 13 requests from Plaintiffs to Nike for a privilege log, at least 10 times when Plaintiffs specifically raised Nike's pay and promotion studies, and several times when Plaintiffs explained to Nike why its privilege logs were inadequate.  *See* Goldstein Decl. ¶¶ 6-7.

---

[5] In addition, Nike's February 2, 2020 privilege log did not include the pay equity and promotion studies.  *See e.g.,* Goldstein Decl. ¶ 7(a) (quoting Nike's February 21, 2020 letter to Plaintiffs: Nike's pay equity analyses and promotion analyses "*will be* identified on Nike's privilege log" (emphasis added).  Nike's July 24, 2020 and August 31, 2020 privilege logs also did not include entries related to the analyses sought here; they concern redactions Nike made in the documents that Nike produced.  *Id*. at ¶ 7(k).

[6] Compounding the uninformative logs provided, Nike then created confusion on whether its March log addressed the analyses sought here by stating in the March 18, 2020 CMC statement that the internal pay equity and market analyses and time in place and promotion studies "documents are privileged and *will be* denoted on Nike's privilege log (*if they are not already*)."  *See* Goldstein Decl. ¶ 7(c), quoting Jt. CMC Stmt. 4, ECF No. 97 (emphasis added).

*Cahill, et al. v. Nike, Inc.*                           -5-                           September 15, 2020

Although Nike still has not met its burden of establishing attorney-client or work product protection, *see* Sections C.2, D.1, *infra*, even assuming that the privilege and work protection assertions were adequate, the timeliness of the declarations and log – over 16 months after the Rule 34 time limit – weighs in favor of waiver.

### 3.    Nike Cannot Claim the Magnitude of the Document Production Justifies Its Failure Because Nike's Document Collection Efforts and Production Has Been Deficient.

Nike's argument that its more than 16-month delay is justified by Plaintiffs' "83 requests for production in three sets" that are "wide-ranging," is meritless. The pay and promotion studies are responsive to RFP 16 from Plaintiffs' First Set of RFPs, served on March 22, 2019. Plaintiffs' other two sets of RFPs were also served in 2019.[7]  Nike has only had to focus on producing responsive documents because Plaintiffs have not served interrogatories, requests for admissions, or deposition notices.  Goldstein Decl. ¶ 3.  Moreover, all of the examples Nike provides in its Opposition of Plaintiffs' "wide-ranging" requests are for categories of documents that the Court ordered Nike to produce.[8]

Nike's Opposition also seeks to justify its untimeliness because it has "produced more than 23,000 pages of documents," and "has collected and reviewed tens of thousands of documents."  Opp'n. at 9, 18.  However, that is hardly an extensive amount of discovery given the type of complex litigation this Title VII case presents. For example, the defendant in a putative sex discrimination class action that had been pending for about 26 months, filed a status report stating that it had "produced well over 100,000 pages of documents, including organizational charts, policy documents, training materials, job descriptions, and review forms …."  *See* Letter and Order at 4, *Chen-Oster, et al. v. Goldman, Sachs & Co.,* 10 Civ. 6950, (S.D.N.Y., Nov. 9, 2012) (also stating that defendant's production was ongoing), ECF No. 166, attached to Goldstein Decl. as Ex. 5.  Moreover, in contrast to here, while Goldman was producing these documents, they had also six witnesses deposed by Plaintiffs.  *Id.*

---

[7] Nike, by contrast, has served 1,097 RFPs, including 759 RFPs on July 28, 2020.  Goldstein Decl. ¶ 4.  Nike has served thirteen times more RFPs even though its access to relevant information is far greater than Plaintiffs' access.

[8] Nike's examples, which are covered by the October 31, 2019 and August 10, 2020 Orders, are documents relating to: (a) the pay ranges for jobs in which putative class members worked or have worked during the liability period; (b) policies regarding categories such as overall job architecture; (c) calculating and determining equity awards; (d) performance rating guidelines used to make salary increase determinations; (e) promotional guidelines; (f) the creation, review and modification of market zones and internal pay ranges; and (g) all complaints, allegations, reports, investigations, recommended responses to complaints, and enacted responses to complaints relating to sex discrimination at Nike HQ as it relates to pay, promotions and performance review.

Further, as one of Nike's designated ESI liaisons – Tom Barnett[9] – attested, even the equivalent of 60,000,000 to 120,000,000 pages of document review would not be burdensome. An affidavit from Mr. Barnett filed in another case states that he is "an expert in electronic discovery," who was retained to "opine on … assertions" about a claim of undue burden and cost to respond to a subpoena.  Affidavit of Thomas I. Barnett at ¶¶ 1-2, *Chevron Corp. v. Donzinger, et al.*, 11-Civ-0691, (S.D.N.Y. Jan. 7, 2013), ECF No. 716, attached to Goldstein Decl. as Ex. 4. Mr. Barnett's affidavit states, "[i]n my expert opinion, [1,200 gigabytes of electronically stored information] is not unduly large or burdensome in comparison to similar complex civil litigations," and, "based on my experience, I estimate that 1,200 gigabytes of ESI, if printed, would total between 60,000,000 and 120,000,000 pages." *Id.* at ¶¶ 2, 9.  Mr. Barnett further attested that "cases commonly involve the collection, processing, and review of large quantities of data," "[i]t is common for [Barnett's] clients … to require the processing of data greater than [60,000,000 to 120,000,000 pages]," and that he has "personally have been involved in dozens of cases with larger data sets than [60,000,000 to 120,000,000 pages]." *Id.* at ¶ 19.

Given these sworn statements from one of Nike's ESI liaisons, Nike should get no credit for collecting and reviewing "tens of thousands of pages."  Moreover, Nike's implication that "23,000 pages" signifies the appropriateness and magnitude of its production is incorrect; indeed, Nike was forced to admit this: "Nike does not contend—and has never contended—that the volume of pages produced by Nike signals the completeness of its production."  Jt. CMC Stmt. 12 n.11, June 29, 2020, ECF No. 107.

### 4.    The Record Contradicts Nike's Other Claimed Justifications.

As Plaintiffs anticipated, Nike attempts to justify its delays in providing sufficiently detailed privilege logs and evidence by arguing that both Parties have delayed in providing privilege logs.  However, as Plaintiffs explained in their MTC, which Nike did not dispute in Opposition:

> This is a false equivalency because (1) Plaintiffs have served privilege and redaction logs for their productions before Nike requested them, whereas Plaintiffs have been requesting privilege logs from Nike since early 2019; (2) Plaintiffs have included sufficient detail in their privilege logs unlike Nike; and (3) most critically, Nike has not raised any disputes or questions about Plaintiffs' assertions of privilege while Plaintiffs have challenged Nike's asserted privileges/protections.

MTC at 9 n.10.[10]

---

[9] *See* Jt. Stip. & Order Re: E-Discovery 2, ECF No. 72 (Nike designated Mr. Barnett as an ESI Liaison).

[10] For example, after Plaintiffs provided their first privilege log on December 31, 2019, Nike's January 10, 2020 letter to Plaintiff stated: "we are in receipt of Plaintiffs' privilege log," and "[w]e are still reviewing this document and, if necessary, will circle back with any questions or concerns regarding Plaintiffs' privilege designations."  Goldstein Decl. ¶ 6(h).  (Nike omitted

Even if Nike's criticisms of Plaintiffs' production of privilege logs were accurate, Nike cannot excuse its failure to comply with the discovery rules because of any alleged failures by Plaintiffs to comply with the rules.  Pointing to another party's discovery violations does not provide "justification" for a party's "own discovery violations" nor even render a "sanctions award unjust."  *Infanzon v. Allstate Ins. Co.*, No. 2:19-cv-06483-JAK (SKx), 2020 U.S. Dist. LEXIS 88023 at *16 (C.D. Cal. 2020).  The court added that "[c]ounsel should need no reminding of the tenet that 'wrongful conduct by one party, perceived or real, does not justify wrongful conduct by the other party and is not a defense.'"  *Id.* at *17 (quoting, *MGA Entm't Inc. v Nat'l Prod Ltd.*, 2012 WL 12883974 at *6 n.5 (C.D. Cal. Jan 19, 2012)); *Gropper v. David Ellis Real Estate, L.P.*, No. 13 Civ. 2068 (ALC) (JCF), 2014 U.S. Dist. LEXIS 16849 at *8 (S.D.N.Y. 2014) ("Discovery is not equity: one party's noncompliance with discovery requirements does not excuse the other's failure to comply. Each party's obligation is independent, and any motion to compel will be determined on its own merits.").

Nike also states that COVID-19, "in conjunction" with "the sheer volume of documents involved in this matter," helps justify its untimely provision of its attorney-client and work product bases.  Yet, Nike had long failed to provide a privilege log for the pay and promotion studies before the stay home order was issued in Oregon.[11]  *See e.g.,* Goldstein Decl. ¶¶ 6-7 (well before the stay home order, Nike confirmed it was withholding pay and promotion studies, Plaintiffs had made at least ten requests for a privilege log, Plaintiffs had made numerous attempts to describe the relevance of and the lack of privilege or work product protection for these studies to Nike, and Nike conceded that it did not include all the studies in a privilege log).

Likewise, Nike's document production had long been deficient before the stay home order, as shown by this Court's Orders compelling Nike to produce discovery (ECF Nos. 89 and 99).  Nike had produced only about 2,388 unique documents before the stay home order (*see* Goldstein Decl. ¶ 5), and Nike has yet to produce numerous categories of documents responsive to the Court's October 31, 2019 Order (*see* August 10, 2020 Order).

## C.    Nike Failed to Establish Work Product Protection Given It Would Have Conducted the Analyses in Substantially Similar Form for Business Purposes Even Without Litigation.

Work product protection only applies if the document can be fairly said to have been prepared or obtained "because of" the prospect of litigation.  *See United States v. Torf (In re Grand Jury Subpoena)*, 357 F.3d 900, 907 (9th Cir. 2003).  The "because of" standard for work product protection does not consider whether litigation was a primary or secondary motive behind the creation of a document.  *Id.* at 908.  Rather, it considers the totality of the circumstances and affords protection when it can fairly be said that the "document was created

---

Plaintiffs' December 31, 2019 privilege log in their Opposition).  Nike never circled back with any questions or concerns regarding Plaintiffs' privilege designations.  *Id.*

[11] The Governor of Oregon issued the stay home order on March 23, 2020.  *See* https://www.oregon.gov/gov/Documents/executive_orders/eo_20-12.pdf.

*Cahill, et al. v. Nike, Inc.*                    -8-                    September 15, 2020

because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation[.]" *Id.* (citation omitted).

Here, Nike tries to minimize the evidence cited in Plaintiffs' MTC – all of which are Nike documents or statements that were created prior to litigation – with declarations created one month after Plaintiffs filed their MTC. But Nike neither denies nor shows that the pay and promotion studies were not used for business purposes or that the analyses would not have been in substantially similar form without litigation. Thus, Nike does not meet its burden of showing work product, and the totality of the circumstances show that Nike would have conducted the pay equity and promotion analyses in substantially similar form for business purposes even without litigation.

1.    **Nike Would Have Conducted the Pay Equity and Promotion Analyses in Substantially Similar Form for Business Purposes.**

(a)    **Nike Publicly Committed to Annual Reviews of Pay and Promotion Practices by 2016.**

Nike "launched" its "Equal Pay Pledge" in about June 2016, Hearn Decl. ¶ 7, "publicly declaring [its] commitment to review pay and promotion practices annually, and to ensure that women and men who undertake the same work at the same level are equitably compensated." *See* Goldstein Decl. ¶ 11(a) (quoting NIKE_00002052). In addition, it appears that, by May 31, 2015, according to a public Nike statement, Nike had "developed a thoughtful plan to increase the diversity of our workforce and leadership … with an initial focus on women …," which included "[e]valuating our promotion, pay and benefit practices." *See* Goldstein Decl. ¶ 10 (quoting Nike's FY14/15 Sustainable Business Report).

Nike would have conducted its pay equity and promotion analyses in line with this public commitment, even if it did not receive the EEOC charges in November 2015 and June 2018 or the Starfish survey in February 2018, so it cannot fairly be said that the pay equity analyses and promotion analyses were conducted "because of" anticipated litigation. *See Torf*, 357 F.3d at 908.

(b)    **Pay Equity is Part of Nike's Routine Total Rewards Human Resources Function.**

Through its Human Resources team, Nike engaged in the pay equity analyses as part of its routine human resources functions to update pay and benefits policies through its Total Rewards approach. *See* Goldstein Decl. Ex. 9,[12] NIKE_00015705 ("As part of Nike's commitment to competitive pay – and taking into consideration both the constant movement of

---

[12] Exhibits 6-20 to the Goldstein Declaration contain documents Nike marked as "Confidential" but, pursuant to paragraphs 7(e) and 8 of the Protective Order (ECF No. 82), the Court and its staff can review the documents. However, if the Court intends to put this document on the docket, please seal Exhibits 6-20 pursuant to paragraph 4 of the Protective Order. Exhibits 17-20 were cited only in the initial MTC.

internal talent and the demands of a dynamic market – the HR team implemented an analysis to ensure our programs and individual pay rates are strongly competitive across the board.").  Nike has a "commitment" to "competitive, equitable pay" that committed to conducting annual pay equity analyses to identify employees whose pay is not aligned with what Nike would expect and make pay adjustments to address those gaps, so Nike would have conducted these analyses even without the prospect of litigation.  *See* Goldstein Decl. Ex. 10, NIKE_00015707; *see also* Goldstein Decl. Ex. 9, NIKE_00015705 (Nike "conducted additional analyses this year, and will continue to analyze and adjust our own programs to make sure we're strongly competitive"); Goldstein Decl. Ex. 6, NIKE_00001645 ("About 10% of our population will receive a Competitive Pay adjustment").  Nike stated its intent to employees to be "more competitive to market, strengthening our position across the board" and to "perform [competitive pay] reviews for all employees annually (in addition to merit reviews) to ensure we are delivering on our commitments."  *See* Goldstein Decl. Ex. 6, NIKE_00001645; Goldstein Decl. Ex. 11, NIKE_00015722 ("We are committed to competitive pay, and after deeper analyses, we are making specific pay adjustments to ensure that Nike is more competitive to market … This will impact employees at all bands .…  We will perform these reviews for all employees annually … to ensure we are delivering on our commitments.").

Nike's addition of competitive pay to its Total Rewards approach is an ordinary business activity, even if attorneys are involved.  Nike states that the legal purposes of the compensation analyses are not mutually exclusive from the needs of Nike's corporate functions, which is precisely the point made in *Koumoulis*; human resources work can have legal content, but is still part of the day-to-day of a business and not privileged legal activity.  *See Koumoulis v. Indep. Fin. Mktg. Grp.*, 295 F.R.D. 28, 45 (E.D.N.Y. 2013) ("Despite its legal content, human resources work, like other business activities with a regulatory flavor, is part of the day-to-day operation of a business; it is not a privileged legal activity.").  Further, Nike's references to making policy enhancements, *see* Opp'n  3, 5, 6, 11, is part of a company's ordinary course of business, even if performed by an attorney.  S*ee Dewitt v. Walgreen Co.*, No. 1:11-cv-00263-BLW, 2012 U.S. Dist. LEXIS 125493, at *14-15 (D. Idaho Sep. 4, 2012).

Nike's use of the pay equity analyses for its Total Rewards approach and commitment to employees of competitive, equitable pay indicate it would have performed the pay equity analyses in substantially similar form even if it did not receive the EEOC charges or Starfish survey, just like the drafts were prepared to assist Visa in reaching a business decision and the analysis would have been undertaken even if no lawyers were to be involved.  *See Visa U.S.A., Inc. v. First Data Corp.*, No. C-02-1786 JSW (EMC), 2004 U.S. Dist. LEXIS 17117, *27 (N.D. Cal. Aug. 23, 2004).  The "independent business purpose" of the pay equity analyses for Nike's public and internal commitments to equitable pay is such that it "cannot be fairly said that the [analyses] were created in the first place because of the need to obtain legal advice or because of anticipation of litigation."  *See id.* at *28-29.

### (c)     Nike Would Have Conducted the Pay Equity and Promotion Analyses to be Competitive in the Marketplace and Attract and Retain Talent

As Nike points out in its Opposition, every major company is announcing an interest in pay equity, so Nike would have had to conduct its pay equity analyses to be competitive in the marketplace regardless of the prospect of litigation.  *See* Opp'n 14.  Nike's Total Rewards

approach reflects that pay and rewards are critical parts of how it attracts and retains the best talent, which fuels its business growth and sets it apart.  *See* Goldstein Decl. Ex. 6, NIKE_00001645.  With constant movement of internal talent, and the demands of a dynamic market, Nike conducted additional analyses and will continue to analyze and adjust its programs to make sure its strongly competitive.  *Id.*  Further, Nike used its pay equity analyses to construct pay ranges to ensure external competitiveness and internal equity within job codes.  *See* Goldstein Decl. Ex. 16, NIKE_00023551 at 8.  Every year, Nike reviews pay structures for all countries globally to make adjustments based on market movement for that year, so Nike would have had to conduct the pay analyses regardless of the prospect of litigation.  *See* Goldstein Decl. Ex. 15, NIKE_00023549 at 6.  Based on the totality of the circumstances, the pay equity studies would have been created in substantially similar form even without litigation, so they should not be afforded work product protection.

> **(d)** **Nike Has Not Established that the Dual Purpose Pay Equity and Promotion Analyses Are Entitled to Work Product Protection.**

Nike's pay equity and promotion analyses were and continue to be used for business purposes and may have also had a legal purpose, just like the documents prepared by third-party vendors hired by outside counsel in *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 296 F. Supp. 3d at 1242, 1244.  Nike cannot claim work product over the pay equity analyses simply by delegating oversight of the analyses to Seyfarth.  *See id.* at 1244 ("delegating business functions to counsel to oversee does not provide work-product protection to the materials created for those business functions").  If Nike "can show that a particular document was prepared specifically in anticipation of litigation, contains the mental impressions of counsel, and would not have been prepared in substantially the same form but for the prospect of litigation," then it may assert work-product protection for that specific document.  *See id.*

But Nike does not make this showing.  Rather, the same pay equity and promotion analyses were conducted for business purposes and possibly legal purposes, suggesting the analyses would have been created in substantially similar form even without litigation, unlike when separate investigations are conducted by the company and counsel, and the company's investigation was produced while the attorneys' separate investigation was protected.  *See In re Dominion Dental Servs. U.S.*, 429 F. Supp. 3d 190, 193 (E.D. Va. 2019)

> **2.** **Nike's Assertion That the Analyses Were in Anticipation of Litigation Is Unpersuasive.**

> > **(a)** **Anticipation of Litigation Must Be More Than the Mere Possibility of Litigation.**

Anticipation of litigation "certainly must be more than the mere possibility of litigation." *Wenzel v. Klamath Cty. Fire Dist. No. 1*, No. 1:15-cv-01371-CL, 2016 U.S. Dist. LEXIS 198529, *10 (D. Or. Sept. 14, 2016).  Nike asserts that it anticipated litigation prior to the 2016 global pay equity analyses after in-house counsel "learned that a Black female employee filed [an EEOC charge] alleging that she had been discriminated against … because she had been paid less than her White male counterpart" and a "demand letter from a former Nike executive

*Cahill, et al. v. Nike, Inc.*                    -11-                    September 15, 2020

alleging, inter alia, age discrimination." Hearn Decl. ¶ 4. Before September 8, 2020, Nike had never mentioned either the EEOC charge or the demand letter in any of its privilege logs.

After receiving Nike's Opposition, Plaintiffs asked Nike to produce the 2015 charge so that Plaintiffs could evaluate Nike's anticipation of litigation assertion. Nike refused to produce the charge because the charging individual was not employed at Nike World Headquarters. *See* Goldstein Decl. Ex. 3. Nike's Opposition does not provide sufficient information because Nike does not state whether the employee was an hourly or salaried employee, in the United States, whether the charge alleged racial discrimination, gender discrimination, both types of discrimination, or any other details that would support Nike's claim that this seemingly individual charge from a non-Headquarters employee would cause Nike to do a systematic compensation analysis in both 2016 and 2017.[13] Thus, Plaintiffs and the Court cannot assess whether the charge constituted more than a mere possibility of litigation, or was, at most, only "generalized fear" of litigation. *See Wenzel*, 2016 U.S. Dist. LEXIS 198529 at *11.

Given Nike's vague assertion made one month after Plaintiffs' MTC, it is more likely that the 2016 and 2017 pay equity analyses, which Nike documents state were used for making pay adjustments and other business purposes, flowed from Nike's course of business and public relations interests.

Further, Nike's cited concerns with ██████████████████ do not qualify as in anticipation of litigation. *See id.* at *10-11, citing *Lewis v. Wells Fargo & Co.*, 266 F.R.D. 433, 440 (N.D. Cal. 2010) (finding that FLSA audits conducted to ensure compliance with the law were not created in anticipation of litigation even though there was litigation on-going regarding the subject of the audits). Nike conducted the pay equity analyses with complying with the changing equal pay laws in mind, so it was a compliance audit of compensation, and "generalized fear of litigation does not turn a compliance audit into attorney work product." *See id.*

     **(b)**     **Nike Has Publicly Stated Its Pay Equity Analyses Were Not in Response to the Starfish Survey.**

Before this action was filed, a reporter asked Nike whether its competitive pay analysis was undertaken at least in part because of the allegations of poor conditions for women at the company, and Nike answered "No," it "had already begun additional … analyses" and "[a]s part of our Total Rewards strategy, we analyze pay every year …." *See* Goldstein Decl. Ex. 12, NIKE_00019490; *see also* Goldstein Decl. Ex. 14, NIKE_00019624 ("When we shared our FY17 Pay and Representation data with employees in early April [2018], we had already begun additional pay competitive analyses …. I think there's an inference by many media that the pay analysis and bump were related to the issues in March [2018]. But the truth is that this was in the

---

[13] Nike also references an age discrimination demand letter from a former Nike executive but provides no information, including no assertion that pay or promotion claims were involved. Thus, Nike cannot assert the pay equity and promotion analyses were in anticipation of litigation based on this demand letter.

*Cahill, et al. v. Nike, Inc.*                    -12-                    September 15, 2020

works for some time and for something this sweeping, it doesn't happen in three or four months.").

After this action was filed but before Plaintiffs filed their MTC, Nike asserted that any documents "related to gender discrimination complaints (if any) and Nike's responses to such complaints (if any)" are not relevant to "Plaintiffs' allegations or the issues in the case …" unless related to a Named Plaintiff.  Jt. CMC Stmt. 6, Sept. 13, 2019, ECF No. 85.  Now, after Plaintiffs' MTC, Nike asserts that gender discrimination complaints from women who are not Named Plaintiffs led Nike to undertake systematic analyses of its pay and promotions in anticipation of litigation.[14]  Nike has thus failed to carry its burden that the 2018 pay equity analyses were in anticipation of litigation due to the Starfish survey because its own statements, made prior to litigation, show that its analyses were not due to the Starfish survey.

> **(c)     "Legal Advice" Does Not Equate to Anticipation of Litigation.**

Nike muddles the analysis for attorney-client privilege and work product doctrine.  *See* Opp'n 20.  Even if Seyfarth provided legal advice and assessed legal risk concerning employment issues, that is not sufficient to establish that the pay equity and promotion analyses were conducted in anticipation of litigation.  As discussed above, an internal investigation or compliance audit undoubtedly involve legal advice and assessment of legal risk, but neither is considered to be "in anticipation of litigation."  *See Wenzel*, 2016 U.S. Dist. LEXIS 198529 at *10-11.  Neither the Seyfarth attorneys (Baffa and Hendrickson) nor Nike in-house counsel, (Hearn and Thibodeaux) explain in their declarations how the pay equity and promotion analyses were conducted in anticipation of litigation.  Hearn states she handled the EEOC charge and age discrimination demand letter, but as explained above, neither qualify as in anticipation of litigation.  *See* Hearn Decl. ¶ 4, Section C.2(a), *supra*.  In their declarations, Baffa, Hendrickson and Thibodeaux do not even mention either the charge or the demand letter.

**D.     Nike Failed to Establish Attorney Client Privilege Given the Primary Purpose of the Analyses Was Business, Not Legal**

> **1.     The Attorney-Client Privilege is Strictly Construed, and Nike Has Not Met its Burden to Establish All Elements of the Attorney Client Privilege.**

The fact that a person is a lawyer does not make all communications with that person privileged.  *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (citations omitted).  "Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed."  *Id.* (citations omitted)  "[T]he privilege stands in derogation of the public's 'right to every man's evidence' and as 'an obstacle to the investigation of the truth,' [and] thus, ... '[i]t ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.'"  *Id.* (citations omitted).  The party asserting the privilege bears the burden of proving each essential element:

---

[14] Nike also refers to "other claims in early 2018" without providing further information or documents.  Thibodeaux Decl. ¶ 4.

*Cahill, et al. v. Nike, Inc.* -13- September 15, 2020

> (1) Where legal advice of any kind is sought (2) from a professional legal
> adviser in his capacity as such, (3) the communications relating to that
> purpose, (4) made in confidence (5) by the client, (6) are at his instance
> permanently protected (7) from disclosure by himself or by the legal
> adviser, (8) unless the protection be waived.

*Id.* at 607-08 (citation omitted). The party asserting the privilege is also obliged, if necessary, to segregate the privileged information from the non-privileged information. *Id.* at 609.

Nike must prove for each communication that legal advice was sought and the communication related to seeking legal advice. "The claim of privilege must be made and sustained on a question-by-question or document-by-document basis; a blanket claim of privilege is unacceptable," and the "scope of the privilege should be strictly confined within the narrowest possible limits." *United States v. Christensen*, 828 F.3d 763, 803 (9th Cir. 2016) (citations and internal quotations omitted).

Here, Nike has not logged every communication relating to the compensation and/or promotion analyses over a five-year period, instead claiming privilege over every communication related to the compensation and promotion analyses. *See* Opp'n 13 n.7. For example, there is not a single log entry on Nike's September 8, 2020 log showing that any communication was sent to or from a Seyfarth lawyer for all of 2017. *See* Goldstein Decl. Ex. 2. Nike's assertion of privilege over every document sent to counsel and every email on which counsel is copied does not establish that every communication sought legal advice. *See Royal Surplus Lines Ins. v. Sofamor Danek Group*, 190 F.R.D. 463, 475 (W.D. Tenn. 1998) ("Simply sending a carbon copy to in house counsel does not cloak a routine business communication with attorney client privilege. The communication must have been for the purpose of securing legal advice.")

Nike claims that it engaged Seyfarth for their relevant legal training and expertise to provide legal advice to Nike Legal, but the topics for which Seyfarth provided counsel do not require legal training and expertise: ███████████████████████████████ ████████████████████████████████████████████████████ ██████████. Lawyers can of course provide counsel on these topics, but business advice does not become legal advice simply because it is rendered by counsel. *See Becker v. Willamette Cmty. Bank*, No. 6:12-cv-01427-TC, 2014 U.S. Dist. LEXIS 88616, at *9 (D. Or. June 30, 2014).[15] Nike must clearly demonstrate that the communication in question was made for the express purpose of securing legal not business advice, and Nike has not carried that burden in this case, where many of the topics for which Seyfarth provided advice were not legal in nature. *See Wenzel*, 2016 U.S. Dist. LEXIS 198529 at *14 ("Business communications are not protected

---

[15] Nike's attempt to distinguish *Becker* is unavailing. *See* Opp'n 13. Just as the client hired an attorney to act as an independent fact-finder in *Becker*, here Nike is relying on Seyfarth to provide guidance on pay equity analyses that labor economists or industrial organization psychologists could provide, showing an independent non-legal purpose for hiring the attorney.

*Cahill, et al. v. Nike, Inc.*                    -14-                    September 15, 2020

merely because they are directed to an attorney, and communications at meetings attended or directed by attorneys are not automatically privileged as a result of the attorney's presence.").

### 2.    Nike Would Have Conducted the Pay Equity and Promotion Analyses Even Without Additional Interest in Securing Legal Advice.

Nike has not established that the primary purpose of conducting its pay equity and promotion analyses was to secure legal advice because the factual record indicates the primary purpose was for routine human resources functions. "There is general agreement that the protection of the privilege applies only if the primary or [predominant] purpose of the attorney-client consultations is to seek legal advice or assistance." *NECA-IBEW Pension Trust Fund (The Decatur Plan) v. Precision Castparts Corp.*, No. 3:15-cv-01756-YY, 2019 U.S. Dist. LEXIS 168088, at *5 (D. Or. Sept. 27, 2019) (citation omitted); *see also FTC v. Adept Mgmt.*, No. 1:16-cv-00720-CL, 2018 U.S. Dist. LEXIS 111673, at *8-9 (D. Or. July 3, 2018) ("The attorney client privilege protects confidential communications between attorneys and clients that are made for the primary purpose of giving or receiving legal advice"). Here, Nike conducted its internal pay equity analyses primarily for business purposes, with legal advice only incidental to those business purposes. *See* Section C.1 *supra.*

In a setting where there is a clear business purpose in the environment in which the communications occurred, the Court should sustain an assertion of privilege only when there is a clear evidentiary predicate for concluding that each communication in question was made primarily for the purpose of generating legal advice. *See McCaugherty v. Siffermann*, 132 F.R.D. 234, 238 (N.D. Cal. 1990) ("No privilege can attach to any communication as to which a business purpose would have served as a sufficient cause …."). Nike would have worked with outside experts to complete a comprehensive study of *all* aspects of pay across all jobs and all levels globally in keeping with industry best practices and in line with its commitment to the White House Equal Pay Pledge, for example, even without any perceived additional interest in securing legal advice. *See* Goldstein Decl. Ex. 8, NIKE_00015428.

Nike's desire to approach pay equity in a way that mirrors that of other leading companies is a business purpose that would have served as a sufficient cause for any communications with WTW and Mercer, so no privilege can attach to any of Nike's communications with WTW and Mercer. *See McCaugherty*, 132 F.R.D. at 238. Nike's annual pay equity analyses was used to further its commitment to maintaining its reported pay equity ratios, make pay adjustments when needed, and regularly evaluate its pay programs and practices, indicating the primary business purpose for these analyses. *See* Goldstein Decl. Ex. 7, NIKE_00014009. Further, Nike used its supplemental analyses to gain greater insight in local areas[16] to help it make speedier progress in pay equity, in recognition that a global approach can obscure anomalies in pockets of the organization. *See* Goldstein Decl. Ex. 13, NIKE_00019519. Similarly, Nike used the time-in-job and pace of promotion studies for the primary business purpose of diversity and representation, evaluating promotion, pay, and performance impacts on all employees, with a strong focus on women and URM. *See* Goldstein Decl. ¶ 11(a), quoting

---

[16] Plaintiffs' request for data for putative class members and male salaried employees at Nike World Headquarters levels below the Vice-President level can be separated from the overall global analyses based on these supplemental analyses into local areas.

*Cahill, et al. v. Nike, Inc.*                    -15-                    September 15, 2020

NIKE_00002052.  The primary business purposes, for which Nike would have performed the pay equity and promotion analyses even without the need for legal advice, show that attorney-client privilege should not apply to communications related to these analyses.

**E.    Nike's Arguments Confirm That It Has Waived Privilege and Protection by Using the Analyses as Both a Sword and a Shield.**

Nike misstates the law regarding an implied waiver of attorney client privilege and work product protection caused by a party using the privilege or protection as both a shield and sword. Moreover, Nike misapplies the standard for this waiver to the facts and issues in this civil action.

Nike asserts that the "implied waiver … requires the claimed privileged material to be the primary form of direct evidence that goes to the heart of the issues of litigation.  This generally arises when the party relies on the advice of counsel rather than on objective facts."  Opp'n 21. Apart from the lack of clarity in this proposed standard – what are "objective facts" and a "primary form of direct evidence" – it is a standard that finds no authority in case law.

The waiver standard is based upon "fairness," not, as Nike asserts, a rigid requirement that the asserted privilege cover some "primary form of direct evidence."  "The privilege which protects attorney-client communication may not be used as both a sword and a shield.  Where a party raises a claim which *in fairness* requires disclosure of the protected communication, the privilege may be implicitly waived."  *United States v. Ortland*, 109 F.3d 539, 543 (9th Cir. 1997) (quoting, *Chevron Corp. v. Penzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)) (emphasis in original).  Accordingly, the implicit waiver standard is not limited, as Nike asserts, to those instances where the opposing party "cannot adequately dispute" a claim or defense without access to the asserted privileged material.  Opp'n  21.  It is manifestly "unfair" to deprive a party of access to more relevant and convincing evidence by application of the attorney client privilege or work product protection simply because the opposing party may have access to "adequate" evidence that is less persuasive than the protected evidence.

The fairness factor informing the implied waiver standard is illustrated in a decision that is particularly relevant to the affirmative defenses asserted by Nike in this action, *Brown v. Barnes & Noble, Inc.*, No. 1:16-cv-07333 (RA) (KHP), 2019 U.S. Dist. LEXIS 220625 (S.D.N.Y. Dec. 23, 2019).  The court initiated its analysis by observing that "[c]ourts have found that 'advice of counsel may be placed in issue where, for example, a party's state of mind, such as a good faith belief in the lawfulness of the conduct, is relied upon in support of a claim or defense.'"  *Brown*, 2019 U.S. Dist. LEXIS 220625 at * 22 (quoting *Leviton Mfg. Co. v. Greenberg Traurig LLP*, No. 09 Civ. 8083(GBD)(THK), 2010 U.S. Dist. LEXIS 128849 (S.D.N.Y. Dec. 6, 2010)).  Applying this principle, the court held that the defendant had "impliedly waived" attorney client privilege and work product protection because it had asserted a good faith defense to a claim brought under the Fair Labor Standards Act (FLSA).  *Brown*, 2019 U.S. Dist. LEXIS 220625 at *28.  The court observed that if the defendant established that it acted in "good faith" then the defendant would avoid an award of liquidated damages and shorten the statute of limitations from three to two years.  *Id.* at *29.  In its twenty-fifth affirmative defense, Nike claims that it acted in "good faith" under the FLSA, as did the defendant in *Brown* (the same good faith defense applies to overtime misclassification and Equal

*Cahill, et al. v. Nike, Inc.*                    -16-                    September 15, 2020

Pay Act claims).[17]  As the court explained in *Brown,* 2019 U.S. Dist. LEXIS 220625 at *29, the assertion of a good faith defense by Nike serves as an implied waiver because the Plaintiffs are "entitled to explore whether the defendant acted contrary to legal advice …. Such evidence would undermine the defense of good faith."

Finally, Nike argues that implied waiver should not apply because the "Plaintiffs have all underlying data necessary to conduct any analysis they want themselves." Opp'n 21.  Of course, raw personnel data does not provide evidence relevant to the "good faith defense," such as, whether Nike acted contrary to legal advice, whether Nike did or did not remedy any disparities in compensation and promotional opportunities that Nike's analyses revealed, whether the analyses were prepared in a manner designed to detect gender disparities and/or discrimination or whether the analyses were designed to serve an internal or external public relations purpose. It is possible that statistical disparities alone might lead a fact finder to determine by inference that Nike had not established its "good faith" defense.  But, simply because this "data" might be "adequate" for Plaintiffs to prevail does not justify not finding an "implied waiver" because Nike is attempting to use its assertions of  attorney client privilege and work product protection as a shield so as not to produce relevant evidence while at the same time using its "good faith" and other affirmative defenses as a sword to defeat Plaintiffs claims.

## CONCLUSION

Based on the foregoing and Plaintiffs' MTC, Plaintiffs request an order compelling Nike to produce the documents and data related to putative class members and male salaried employees at Nike World Headquarters levels below the Vice-President level for its internal (1) global pay equity analyses from 2016 onward, (2) supplemental pay equity analyses from 2018 onward, and (3) time-in job and pace of promotion analyses from 2018 onward.

Respectfully submitted,

Byron Goldstein

---

[17] "An employer has the burden of showing that the violation of the Equal Pay Act was in good faith and that the employer had reasonable grounds for believing no violation took place. Absent such a showing, liquidated damages are mandatory." *EEOC v. Citizens Bank*, 758 F.2d 397, 403 (9th Cir. 1985) (internal citations omitted).  Since the Equal Pay Act was enacted as Section 6(d) of the FLSA, *see* 29 U.S.C. Section 206(d), the remedial section of the FLSA, 29 U.S.C. Section 216, applies.  Accordingly, the FLSA standard for determining liquidated damages, which is set forth in 29 U.S.C. Section 216 (b), applies to EPA claims.

Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Anna M. Joyce, OSB #013112
Chad A. Naso, OSB #150310
chadnaso@markowitzherbold.com
MARKOWITZ HERBOLD PC
Tel: (503) 295-3085

Laura L. Ho (admitted pro hac vice)
Barry Goldstein, Of Counsel (admitted pro hac vice)
James Kan (admitted pro hac vice)
Byron Goldstein (admitted pro hac vice)
Katharine L. Fisher (admitted pro hac vice)
Mengfei Sun (admitted pro hac vice)
msun@gbdhlegal.com
Tel: (510) 763-9800

Craig Ackerman (SBN 229832)
ACKERMANN & TILAJEF PC
Tel: (310) 277-0614

India Lin Bodien (SBN 44898)
INDIA LIN BODIEN LAW
Tel: (253) 503-1672

Attorneys for Plaintiffs


cc: Daniel Prince (danielprince@paulhastings.com)
     Zach P. Hutton (zachhutton@paulhastings.com)
     Felicia A. Davis (feliciadavis@paulhastings.com)
     Amy Joseph Pedersen (amy.joseph.pedersen@stoel.com)
     Kennon Scott (kennon.scott@stoel.com)

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
**Chad A. Naso, OSB #150310**
ChadNaso@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone:  (503) 295-3085 ǀ Fax:  (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Telephone:  (510) 763-9800 ǀ Fax:  (510) 835-1417

Attorneys for Plaintiffs and Opt-In Plaintiffs
[Additional Counsel of Record listed on following page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**DECLARATION OF BYRON GOLDSTEIN ISO PLAINTIFFS' REPLY LETTER REQUESTING ORDER COMPELLING NIKE TO PRODUCE DOCUMENTS AND DATA FROM INTERNAL PAY EQUITY AND PROMOTION ANALYSES** |

GOLDSTEIN DECL. IN SUPP. OF PLS.' REPLY LETTER TO THE COURT REQUESTING ORDER
COMPELLING NIKE TO PRODUCE DOCUMENTS

**Craig Ackerman** (admitted *pro hac vice*)
cja@ackermanntilajef.com
ACKERMANN & TILAJEF PC
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Telephone: (310) 277-0614

**India Lin Bodien** (admitted *pro hac vice*)
india@indialinbodienlaw.com
INDIA LIN BODIEN LAW
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Telephone: (253) 212-7913

**GOLDSTEIN DECL. IN SUPP. OF PLS.' REPLY LETTER TO THE COURT REQUESTING ORDER COMPELLING NIKE TO PRODUCE DOCUMENTS**

I, Byron Goldstein, declare as follows:

1.      I am a member in good standing of the Bar of the State of California and a partner at the law firm of Goldstein Borgen Dardarian & Ho ("GBDH"), in Oakland, California.  I am counsel for Plaintiffs, Opt-in Plaintiffs, and the proposed Class and Collective Action.  I am providing this declaration of counsel in support of Plaintiffs' Reply Letter to the Court Compelling Nike to Produce Documents and Data From Internal Pay Equity and Promotion Analyses.  I have personal knowledge of the facts set forth in this declaration and could and would testify competently to them.

**Request for Production No. 16 and Overview of the Parties' Discovery Requests**

2.      Plaintiffs served Request for Production ("RFP") No. 16 with their First Set of RFPs on March 22, 2019.  Nike served its objections to RFP 16 and the other RFPs in Plaintiffs' First Set of RFPs on April 25, 2019.  Nike's privilege objection to RFP 16 is the exact same language it used to object to 59 of the 63 RFPs in Plaintiffs' First Set of RFPs: "Nike further objects to this Request to the extent that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine."  *See* Exhibit 1, attached herewith.  Nike's response to RFP 16 neither states it is producing responsive documents nor whether any responsive materials are being withheld based on an objection.

3.      Plaintiffs have not served interrogatories, requests for admissions, or deposition notices.

4.      Nike has served 1,097 RFPs, including 759 RFPs on July 28, 2020.

5.      At the time of Oregon's stay at home order on March 23, 2020, Nike had produced, at most, 2,388 unique documents.  This is likely an overcount of the number of unique documents that Nike produced by March 23 because duplicate documents are identified by looking at the MD5Hash values that are included in the metadata for documents Nike produced and Nike has produced 1,334 documents that do not have an MD5Hash.  A hash value is:

> A unique numerical identifier that can be assigned to a file, a group
> of files, or a portion of a file, based on a standard mathematical
> algorithm applied to the characteristics of the data set. The most

**GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER COMPELLING NIKE TO PRODUCE DOCUMENTS PAGE 1**

789702.10

Goldstein Decl. Ex. 12, Page 149 of 297

> commonly used algorithms, known as MD5 and SHA, will
> generate numerical values so distinctive that the chance that any
> two data sets will have the same hash value, no matter how similar
> they appear, is less than one in one billion. "Hashing" is used to
> guarantee the authenticity of an original data set and can be used as
> a digital equivalent of the Bates stamp used in paper document
> production.

*United States v. Kendall*, No. 0:18-CR-19-DLB, No. 0:18-CR-19-DLB, 2019 U.S. Dist. LEXIS

192821, at *10 (E.D. Ky. Aug. 30, 2019) (quoting Barbara J. Rothstein et al., Managing

Discovery of Electronic Information: A Pocket Guide for Judges 24 (Federal Judicial Center

2007)).  Courts "have found hash values to be highly reliable—akin to the reliability of DNA.

*Id.* (citing *United States v. Wellman*, 663 F.3d 224, 226 n.2 (4th Cir. 2011) (a "'hash value' is an

alphanumeric string that serves to identify an individual digital file as a kind of 'digital

fingerprint,'" and "the district court found that files with the same hash value have a 99.99

percent probability of being identical.")) (additional citations omitted).

### Nike's Withholding of Responsive Documents and Summary of Plaintiffs' Efforts To Get The Bases for Nike's Privilege and Work Product Objections.

6.     Summary of Plaintiffs' efforts to get the bases for Nike's privilege and work

product objections from March 2019 until Nike provided its first privilege log on February 2,

2020:

a.     Plaintiffs' May 31, 2019 meet and confer letter to Nike identified the 59

RFPs, including RFP 16, where Nike responded with the exact same "attorney-client privilege

and/or attorney work product" objection.  This letter asked Nike for a privilege log.  Nike's July

1, 2019 response does not state it will provide a privilege log, does not mention "privilege log,"

and states that "Nike will produce non-privileged documents that demonstrate its policies are

job-related and consistent with business necessity."

b.     Plaintiffs then explained, in a July 15, 2019 letter, that RFP 16 and other

RFPs "seek documents and communications regarding Nike's review of pay and promotion

disparities, validation studies of identified policies and practices, job analyses, steps considered

or taken by Nike to address disparities, and internal pay equity policies and processes."

GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER
COMPELLING NIKE TO PRODUCE DOCUMENTS
PAGE 2

789702.10

Goldstein Decl. Ex. 12, Page 150 of 297

Plaintiffs also stated that the requested discovery "includes, at a minimum," the underlying facts, and Plaintiffs identified the data underlying Nike's analyses, documents showing how Nike identified employees doing the same work at the same level, experience and performance, and which employees were identified as doing the same work at the same level, experience and performance.  Plaintiffs further explained that this discovery goes to "the central issues of adverse impact, monitoring of adverse impact by Nike, steps taken to remove the adverse impact, if any, job relatedness, business necessity, and Nike's affirmative defenses of job related and consistent with business necessity.

c.       After the Parties agreed that they were at an impasse with respect to certain documents, Jt. Case Mgmt. Conf. Stmt. 3-6, ECF No. 85, Plaintiffs' September 27, 2019 letter to the Court requested an Order compelling these documents and it noted that Nike has not provided a privilege log for the requested documents.[1]  Although Nike had not provided a privilege log for documents requested in Plaintiffs' September 27 letter, Nike's October 4, 2019 opposition letter to the Court stated that "much of [the documents concerning a category of documents Plaintiffs sought] would be protected under the attorney work product doctrine and/or attorney client privilege."  Nike's letter neither identified any documents withheld, attached a privilege log, nor otherwise provided information that would enable Plaintiffs or the Court to assess Nike's claim of "attorney work product … and/or attorney client privilege."

d.       Plaintiffs again wrote Nike, on November 4, 2019, about their requests for pay analyses.  Plaintiffs identified numerous pay equity analyses that, according to Nike documents cited in this letter, Nike conducted.  Plaintiffs also, for the fourth time, asked Nike to produce a privilege log including with respect to the pay equity analysis Nike had stated was withheld based on privilege.

e.       Nike's November 13, 2019 response letter stated: "[a]s mentioned in our previous meet and confer calls, Nike's pay equity analyses were undertaken at the direction of

---

[1] The Court decided Plaintiffs' requests in the October 31, 2019 Order, ECF No. 89.

GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER
COMPELLING NIKE TO PRODUCE DOCUMENTS
PAGE 3

789702.10

Goldstein Decl. Ex. 12, Page 151 of 297

counsel," and "documents responsive to these requests are privileged and will be identified as such on Nike's privilege log, which Nike anticipates providing to Plaintiffs by the end of December."

      f.     After Nike did not provide a privilege log for the requested documents by the December CMC statement, Plaintiffs stated, in the CMC statement, that "Nike should immediately provide Plaintiffs with a privilege log because Nike states it is withholding responsive discovery based on privilege" and noted six occasions when Plaintiffs had asked Nike for a privilege log. Jt. Case Mgmt. Conf. Stmt. 2-3, ECF No. 90. In this CMC statement, Nike stated that Plaintiffs' requests for a privilege log are "premature" and that Nike "would consider producing a phased privilege log, but that counsel needed to confer with Nike and analyze potential privilege issues concerning categories of documents/information before providing a date certain for the production of a privilege log." *Id*. at 3.

      g.     On December 20, 2019, Plaintiffs again wrote Nike to follow-up about analyses concerning pay equity and promotions. Plaintiffs cited Nike documents showing these documents exist and stated that they doubted that the pay equity analyses were privileged. Nike did not provide a privilege log by the end of December as it "anticipate[d]" in its November 13, 2019 letter.

      h.     After Plaintiffs provided their first privilege log on December 31, 2019, Nike's January 10, 2020 letter to Plaintiff stated: "we are in receipt of Plaintiffs' privilege log," and "[w]e are still reviewing this document and, if necessary, will circle back with any questions or concerns regarding Plaintiffs' privilege designations." Nike never circled back with any questions or concerns regarding Plaintiffs' privilege designations.

      i.     On January 8, January 17, and January 24, 2020 Plaintiffs wrote Nike to follow-up about providing a privilege log for documents withheld based on privilege. Plaintiffs' January 17 and January 24 correspondence stated, respectively, that the "privilege log must include Nike's internal pay equity analyses and studies, which have been confirmed to exist and are being withheld" and that Nike's first log should include the "documents Nike has confirmed

**GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER COMPELLING NIKE TO PRODUCE DOCUMENTS PAGE 4**

789702.10

Goldstein Decl. Ex. 12, Page 152 of 297

it is withholding due to privilege."

7.     Summary of Plaintiffs' efforts to get the bases for Nike's privilege and work product objections after Nike provided its first privilege log on February 2, 2020, through the date of this declaration:

a.     Nike's first privilege log – provided on February 2, 2020 and containing 20 entries – did not include the requested documents.[2]  Nike's February 21, 2020 letter to Plaintiffs asserted that the "global" and "supplemental" pay equity analyses and studies or analyses related to time-in-job and pace of promotions "were undertaken at the direction of counsel and *will be* identified on Nike's privilege log" (emphasis added).

b.     Nike's second privilege log – provided on March 13, 2020 and containing 79 entries – contains boilerplate descriptions that indicate that Nike did not include all or most of the requested documents on the privilege logs.  If Nike did include any of the requested documents, the log lacked sufficient information to evaluate Nike's assertions.

c.     Compounding the uninformative logs provided, Nike then stated in the March 18, 2020 CMC statement that with respect to the "'internal pay equity and market analyses' and 'time in place and promotion studies,'" the "documents are privileged and *will be* denoted on Nike's privilege log (*if they are not already*)."  Jt. Case Mgmt. Conf. Stmt. 4, ECF No. 97 (emphasis added).  In this CMC statement, Plaintiffs noted that the pay equity and promotion analyses are responsive to RFPs served in March 2019, that Nike confirmed it was withholding these documents in September 2019, Nike had yet to provide a log with the requested documents, Plaintiffs anticipated a dispute regarding Nike's assertions for the requested documents, and that Nike's privilege objections were waived.  *Id*. at 10-11.

---

[2] The log asserts attorney-client for each entry and it lacks sufficient information to evaluate the basis for Nike's privilege assertions.  For example, there are no job titles for any of the people listed on the log.  Nike claims that a communication was "providing legal advice" even though the author is not a lawyer.  The descriptions are also boilerplate; for example, of the 20 entries, 16 provide the exact same description: "Communication with Nike Legal Department transmitting information requested by counsel for the purpose of providing legal advice in this lawsuit."  *See* Nike's Privilege Log #1 (Entries 1-12, 14-16, 20), Ex. 1 to Pls.' Mot. to Compel, Aug. 7, 2020.

**GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER
COMPELLING NIKE TO PRODUCE DOCUMENTS
PAGE 5**

789702.10

Goldstein Decl. Ex. 12, Page 153 of 297

d.      In an April 7, 2020 email, Plaintiffs again followed up about a privilege log containing pay equity and promotion analyses, noting that Nike confirmed that its first two privilege logs do not include all such documents, and that the parties remained at an impasse regarding the validity of any such objections.

e.      Plaintiffs' May 15, 2020 letter to Nike described why Nike's privilege objections for the requested documents did not apply: (i) Nike waived their objections by asserting boilerplate objections and failing to timely provide a privilege log containing the withheld documents for over a year; (ii) the privilege logs Nike provided were incomplete and lacked the necessary information; and (iii) Nike's privilege and work product objections do not apply to the requested documents.

f.      Regarding Nike's logs, Plaintiffs' May 15, 2020 letter identified numerous deficiencies, including that numerous entries: (a) failed to identify the individuals who were parties to the communication; (b) failed to describe the nature of the documents or communications; (c) incorrectly assert that communications were sent for the purpose of providing legal advice in this lawsuit but the communications predated, in some instances by years, the filing this action; (d) omitted documents concerning Nike's pay equity and promotion analyses; (e) lacked specific dates, instead only including a year (*e.g.*, "2019"); (f) lacked information showing that the primary purpose of the alleged attorney-client communications was for legal advice; (g) lacked information that third-parties, such as consultants, were "functional employees;" and (h) there was no information showing that the documents were made in anticipation of litigation.  Plaintiffs asked for corrected and complete privilege logs.

g.      When Nike responded on June 12, 2020 to Plaintiffs' May 15 letter, it stated that it "disagree[d] with [Plaintiffs'] characterization of [Nike's] privilege … logs."  Nike stated that it does not believe "Plaintiffs are entitled to additional information" regarding the identities of parties to the communications in the logs or regarding the nature or substance of the documents in the logs, and it "believe[s] that [its] attorney work product designations are appropriate."  Nike did not provide further information concerning which, if any, entries

**GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER COMPELLING NIKE TO PRODUCE DOCUMENTS**
**PAGE 6**

789702.10

Goldstein Decl. Ex. 12, Page 154 of 297

concerned the requested documents and Nike did not commit to providing supplemental privilege logs.

h.    When Nike had not provided an updated and complete log by the June 29, 2020 CMC statement, Plaintiffs again stated that Nike has failed to produce a complete privilege log for the pay equity and promotion studies.

i.    Plaintiffs then responded to Nike's June 12, 2020 letter on July 10, 2020, describing why Nike's privilege logs are inadequate regarding its pay and promotion studies. Plaintiffs noted that Nike had not "disputed that its logs do not include (1) any global pay analyses from 2016 and 2017 despite asserting privilege as to them in late 2019; or (2) any entries related to the time-in-place and pace of promotion studies." Plaintiffs reiterated that they "still cannot confirm which privilege log entries relate to these three categories of requested documents …."

j.    For those entries that potentially could refer to pay equity studies, Plaintiffs further reiterated the deficiencies that were identified in their May 15 letter and that remained, including the boilerplate descriptions and missing information.[3]  For example, Nike's June 12 letter did not dispute that the entries do not establish that they were prepared in anticipation of litigation.  Nike would be unable to show that the documents were obtained "because of" the prospect of litigation because Nike has not provided information showing it would not have conducted these pay equity analyses in substantially similar form irrespective of whether Plaintiffs filed their lawsuit and Nike documents show the business purposes of these analyses.  Plaintiffs requested that Nike provide sufficient information that would allow Plaintiffs to know what, if any, documents concerning the requested documents were in the logs and to evaluate Nike's privilege and work product assertions.

---

[3] Plaintiffs' identified entries 26-37 and 39-79 from Nike's March 13, 2020 privilege log.  In Nike's only reference in its 9/8 opposition to specific entries on any of its privilege logs, Nike states: "the withheld items on Nike's March 13, 2020 Privilege Log (entries 25-79) specifically identify that the attorney-client communication and/or work product relates to (1) compensation, or (2) Competitive Pay Management adjustments."  Opposition at 16.

**GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER COMPELLING NIKE TO PRODUCE DOCUMENTS**
**PAGE 7**

789702.10

Goldstein Decl. Ex. 12, Page 155 of 297

k.      Nike responded with a letter on July 24, 2020 that purported to respond to Plaintiffs' July 10 letter but failed to substantively address any of the points made in Plaintiffs' July 10 letter. Nike produced additional privilege and redaction logs on July 24, 2020, but none of the entries related to the pay equity and promotion analyses sought here, nor did they address the deficiencies Plaintiffs identified in their July 10 letter. Nike provided another privilege log on August 31, 2020, but the two entries were unrelated to the analyses sought here. The July 24 and August 31 logs concern redactions that Nike made in the documents it produced.

l.      Due to this impasse, Plaintiffs filed a letter to the Court to compel the data and documents from the internal pay equity and promotion analyses on August 7, 2020. Nike submitted its Opposition on September 8, 2020, along with 8 supporting declarations and a fifth privilege log. Nike's Privilege Log #5 is attached as Exhibit 2.

m.      In the Opposition, for the first time, Nike provides some foundational facts for elements of the attorney client-privilege, such as the project teams involved in the analyses, confidentiality protocols in place, and job titles for some of the Nike employees included on the privilege logs. Nike also articulates its basis for work product for the first time. As explained in the reply brief, even with this delayed, additional information, Nike still has not met its burden to establish attorney client privilege or work product protection over the pay equity and promotion analyses.

n.      On September 10, 2020, Plaintiffs requested that Nike produce the 2015 EEOC charge that it relies on in its Opposition for its work product argument. Nike responded by letter on September 11, 2020, refusing to produce the charge because it was not brought by an employee at Nike World Headquarters. *See* Ex. 3, hereto.

**Documents Attached for the Court's Convenience**

8.      Attached as Exhibit 4, is a true and correct copy of an affidavit signed by Thomas I. Barnett downloaded from PACER filed in *Chevron Corp. v. Donzinger, et al.*, 11-Civ-0691, ECF No. 716, (S.D.N.Y., Jan. 7, 2013).

9.      Attached as Exhibit 5, is a true and correct copy of Goldman Sachs' November 9,

**GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER COMPELLING NIKE TO PRODUCE DOCUMENTS**
**PAGE 8**

789702.10

Goldstein Decl. Ex. 12, Page 156 of 297

2012 status report downloaded from Pacer filed in *Chen-Oster, et al. v. Goldman, Sachs & Co.,* 10 Civ. 6950, ECF No. 166 at 4 (S.D.N.Y., Nov. 9, 2012).

**Documents Published or Produced by Nike**

10.     The following document was published by Nike:

In its FY14/15 Sustainable Business Report, Nike reported that it "developed a thoughtful plan to increase the diversity of our workforce and leadership teams.  We will accomplish this through recruitment, development and retention of diverse talent, with an initial focus on women and people of color and the goal of reflecting the diversity of the consumers we serve and the communities where we live and work.  Our strategy includes … Evaluating our promotion, pay and benefit practices."  *See* FY14/15 Nike, Inc. Sustainable Business Report, page 71, https://purpose-cms-production01.s3.amazonaws.com/wp-content/uploads/2018/05/14214951/NIKE_FY14-15_Sustainable_Business_Report.pdf.

11.     The following documents were produced by Nike in response to Plaintiffs' requests for production:

a.     In its FY16/17 Sustainable Business Report, Nike reported that: "In August 2016, NIKE signed the White House Equal Pay Pledge, publicly declaring our commitment to review pay and promotion practices annually, and to ensure that women and men who undertake the same work at the same level are equitably compensated."[4]  Nike will "[c]ontinue to evaluate our promotion, pay, and performance results to assess the impact on all employees with a specific focus on diverse talent and representation.  We will be studying time-in-job and the pace of promotions across our employee base - with a strong focus on women and URM - to understand how this impacts representation."

b.     Email from Monique Matheson, "For Managers: Upcoming Pay & Reward Changes," dated July 13, 2018, NIKE_00001645-46, attached as Exhibit 6.

[4] The bates number of this document is Nike_00002052.

**GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER COMPELLING NIKE TO PRODUCE DOCUMENTS PAGE 9**

789702.10

Goldstein Decl. Ex. 12, Page 157 of 297

c. Letter from Monique Matheson, dated April 2, 2019, NIKE_00014009, attached as Exhibit 7.

d. Email from David Ayre, "Lst-Nike General," dated April 4, 2017, NIKE_00015428, attached as Exhibit 8.

e. "Competitive Pay Conversations," dated October 4, 2018, NIKE_00015705, attached as Exhibit 9.

f. "Competitive, Equitable Pay: Our Commitment," dated July 2, 2018, NIKE_00015706-07 (cover page and page 2), attached as Exhibit 10.

g. "FY19 Total Rewards Changes," dated July 12, 2018, NIKE_00015717, -15722-23 (cover page and pages 6-7 of document), attached as Exhibit 11.

h. Email "Re: <External> media inquiry: pay raises," dated July 24, 2018, NIKE_00019490-91, attached as Exhibit 12.

i. "Nike Additional Information," dated March 21, 2018, NIKE_00019519, attached as Exhibit 13.

j. Email "Statement for Clarification," dated July 24, 2018, NIKE_00019624, attached as Exhibit 14.

k. "Market Pricing," dated July 31, 2016, NIKE_00023549 (cover page and page 6), attached as Exhibit 15.

l. "Range Positioning," dated July 31, 2016, NIKE_00023551 (cover page and page 8), attached as Exhibit 16.

m. Email, from Monique Matheson, to Nike employees, "Lst-Nike Global," dated April 4, 2018, NIKE_00002233-36, attached as Exhibit 17.

n. "Pay Equity and Gender Gap," dated April 2, 2018, NIKE_00003193, attached as Exhibit 18.

o. "Annual Pay Review: Manager Toolkit//April 2019," NIKE_00003279, -3281 (cover page and page 3 of document), attached as Exhibit 19.

p. "Nike Total Rewards Program Overview," dated July 22, 2018,

GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER
COMPELLING NIKE TO PRODUCE DOCUMENTS
PAGE 10

789702.10

Goldstein Decl. Ex. 12, Page 158 of 297

NIKE_00019436, attached as Exhibit 20.

 I declare under penalty of perjury under the laws of the State of California and of the

United States that the foregoing is true and correct, and that this Declaration was executed this

15th day of September 2020, in Oakland, California.

        _____

        Byron Goldstein

        *Attorneys for Plaintiffs, Opt-In Plaintiffs, and*
        *Putative Class and Collective Action Members*

**GOLDSTEIN DECL. IN SUPP. OF PLS.' LETTER TO THE COURT REQUESTING ORDER
COMPELLING NIKE TO PRODUCE DOCUMENTS
PAGE 11**

789702.10

Goldstein Decl. Ex. 12, Page 159 of 297

# EXHIBIT 1

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL *et al.*, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br><br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant(s). | Case No. 3:18-cv-01477-JR<br><br><br>**DEFENDANT NIKE, INC.'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION** |

"HQ employee."  Nike further objects to this Request on the grounds that it is unduly

burdensome, oppressive, and seeks information that is not relevant to the subject matter of this

litigation, is not proportional to the needs of the case, and/or seeks ESI that is not reasonably

accessible because of undue burden or cost.  Specifically, it is entirely unclear how "standard

forms" for job descriptions, if any, are at all relevant to Plaintiffs' class and collective claims of

unfair pay, promotion, and job channeling on the basis of sex.  Nike further objects to this

Request to the extent that it seeks information protected by the attorney-client privilege and/or

attorney work product doctrine.  Nike further objects to this Request on the grounds that it seeks

private, privileged, and confidential commercial, financial, and/or proprietary business

information.


**DOCUMENT REQUEST NO. 16:**

All documents and communications containing or referring to any allocation, distribution,

comparison or analysis of men and women at Nike HQ within or across any job grouping.  This

request includes all documents and underlying data relating to studies, reviews, analyses,

surveys, compilations, or audits related to the effect or impact that any of the following Nike

policies or practices that apply to HQ employees has had on female HQ employees: (a)

compensation; (b) job assignment; (c) job applications and decisions on job applications for new

hires, lateral moves, and promotions, including collection and use of prior compensation and

work experience; (d) performance evaluations; (e) CFE ratings; (f) Potential Appraisal; and/or

(g) promotions.  This request also includes the document or communication issued on or about

April 2017 by David Ayre or HR referring to pay equity, or any review, analysis, or summary of

pay equity.  This request also includes any analyses, studies, reports, or other documents related

to the evaluation of, pursuant to the provisions of the Uniform Guidelines, whether any

employment or selection practice had an adverse impact on female employees.  This request also

includes any annual reviews of pay and promotion practices conducted as part of Nike's

commitment to and signing of the White Equal Pay Pledge as described in Nike's FY16/17 Sustainable Business Report (page 56).  The time-period for this request is January 1, 2010 to the present.

**OBJECTIONS AND RESPONSE TO DOCUMENT REQUEST NO. 16:**

Nike refers to its objections to Plaintiffs' Definitions and incorporates them by reference as though fully set forth herein.  Nike objects to this Request on the grounds that it is vague and ambiguous as to "containing or referring to," "allocation, distribution, comparison, or analysis," "within or across" "job grouping," "relating to," "studies, reviews, analyses, surveys, compilations, or audits," "related to," "effect or impact," "policies or practices," "apply to," "HQ employees," "has had," "job applications," "decisions," "lateral moves," "promotions," "Potential Appraisal," "collection and use of," "prior compensation," "work experience," "issued," "HR," "pay equity," "review, analysis, or summary," "analyses, studies, reports," "evaluation of," "pursuant to," "provisions," "Uniform Guidelines," "selection practice," "adverse impact," "annual reviews" "conducted," "commitment to," and "signing."  Nike further objects to this Request on the grounds that it is compound and appears to squeeze multiple, distinct requests into a single Request.  Nike further objects to this Request on the grounds that it is unduly burdensome, oppressive, and overly broad as to time and scope because it seeks documents outside of the applicable statutory period(s).  Nike further objects to this Request on the grounds that it seeks ESI that is not reasonably accessible because of undue burden or cost. Nike further objects to this Request to the extent that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine.  Nike further objects to this Request on the grounds that it seeks private, privileged, and confidential commercial, financial, and/or proprietary business information.

DEFENDANT NIKE, INC.'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION

**OBJECTIONS AND RESPONSE TO DOCUMENT REQUEST NO. 63:**

Nike refers to its objections to Plaintiffs' Definitions and incorporates them by reference as though fully set forth herein. Nike objects to this Request on the grounds that it is overly broad, vague, and ambiguous as to "related to," "job assignments," "this action," "job performance," "evaluation," "compensation," and "promotion." Nike further objects to this Request on the grounds that it seeks ESI that is not reasonably accessible because of undue burden or cost. Nike further objects to this Request to the extent that it seeks information protected by the attorney-client privilege and/or attorney work product doctrine.


Dated: April 25, 2019                    /s/ Felicia A. Davis

Daniel Prince (*pro hac vice*)
danielprince@paulhastings.com
Zach P. Hutton (*pro hac vice*)
zachhutton@paulhastings.com
Felicia A. Davis (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Amy Joseph Pedersen, OSB No. 853958
amy.joseph.pedersen@stoel.com
Kennon Scott, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Attorneys for Defendant NIKE, INC.

# EXHIBIT 2

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| 1. | 3/7/2016 | Lindsay Wiggins | Holly Hearn*, Kim Lupo | N/A | Executed statement of work for confidential pay equity analysis prepared at the direction of counsel | Attorney-client; attorney work product |
| 2. | 4/14/2016 | David Baffa** | Emily Albers, Antoine Andrews, Lucia Carrera, Katherine Chan, Carrie Tarbell, Emily Denney, Bethany Dohleman, Larry Helmke, Christine Hendrickson**, Valeria Hoffman, Michael Leith, Kim Lupo, Richard Luss, Brenda Parrett, Paul Smith, Jessica Stuckey, Nick Vollman, Courtney Watts, Lindsay Wiggins | Holly Hearn* | Attorney-client communication providing legal advice regarding privilege protocol for confidential pay equity analysis | Attorney-client; attorney work product |
| 3. | 4/13/2016 | David Baffa** | Emily Albers, Antoine Andrews, Lucia Carrera, Katherine Chan, Carrie Tarbell, Emily Denney, Bethany Dohleman, Larry Helmke, Christine Hendrickson**, Valeria Hoffman, Michael Leith, Kim Lupo, Richard Luss, Brenda Parrett, Paul Smith, Jessica Stuckey, Nick Vollman, Courtney Watts, | N/A | Attachment to Document No. 2 (confidential privilege protocol prepared by outside counsel at Seyfarth Shaw regarding confidential pay equity analysis) | Attorney-client; attorney work product |

1

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| | | | Lindsay Wiggins; Holly Hearn* | | | |
| 4. | 4/26/2016 | Lindsay Wiggins | Holly Hearn*, David Baffa**, Kim Lupo, Richard Luss | Larry Helmke | Attorney-client communication transmitting presentation prepared at the direction of counsel and seeking legal advice regarding confidential pay equity analysis kickoff | Attorney-client; attorney work product |
| 5. | 4/26/2016 | Willis Towers Watson | Holly Hearn*, David Baffa**, Kim Lupo, Richard Luss | Larry Helmke | Attachment to Document No. 4 (confidential pay equity analysis kickoff presentation prepared at the direction of counsel) | Attorney-client; attorney work product |
| 6. | 4/26/2016 | David Baffa** | Holly Hearn* | N/A | Attorney-client communication providing legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 7. | 8/5/2016 | Lindsay Wiggins | David Baffa**, Bethany Dohleman | N/A | Attorney-client communication seeking legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 8. | 8/5/2016 | Lindsay Wiggins | David Baffa**, Bethany Dohleman | N/A | Attachment to Document No. 7 (notes regarding confidential pay equity analysis methodology) | Attorney-client; attorney work product |

2

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| 9. | 8/19/2016 | David Baffa** | Bethany Dohleman | Holly Hearn*, Kim Lupo, Mike DuMond | Attorney-client communication seeking/providing legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 10. | 8/19/2016 | Mike DuMond | Bethany Dohleman | Holly Hearn*, Kim Lupo | Attachment to Document No. 9 (Attorney-client communication seeking/providing legal advice regarding confidential pay equity analysis) | Attorney-client; attorney work product |
| 11. | 8/15/2016 | Willis Towers Watson | Bethany Dohleman, Holly Hearn*, Kim Lupo, Mike DuMond David Baffa** | N/A | Attachment to Document No. 9 (confidential pay equity analysis materials presentation prepared at the direction of counsel) | Attorney-client; attorney work product |
| 12. | 8/19/2016 | Willis Towers Watson | Emily Albers, Antoine Andrews, Lucia Carrera, Katherine Chan, Carrie Tarbell, Emily Denney, Bethany Dohleman, Larry Helmke, Christine Hendrickson**, Valeria Hoffman, Michael Leith, Kim Lupo, Richard Luss, Brenda Parrett, Paul Smith, Jessica Stuckey, Nick | N/A | Confidential pay equity anlaysis materials prepared at the direction of counsel | Attorney-client; attorney work product |

3

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| | | | Vollman, Courtney Watts, Lindsay Wiggins; Holly Hearn* | | | |
| 13. | 9/16/2016 | Willis Towers Watson | Emily Albers, Antoine Andrews, Lucia Carrera, Katherine Chan, Carrie Tarbell, Emily Denney, Bethany Dohleman, Larry Helmke, Christine Hendrickson**, Valeria Hoffman, Michael Leith, Kim Lupo, Richard Luss, Brenda Parrett, Paul Smith, Jessica Stuckey, Nick Vollman, Courtney Watts, Lindsay Wiggins; Holly Hearn* | N/A | Confidential performance evaluation analysis materials conducted as part of the confidential pay equity analysis, conducted at the direction of counsel | Attorney-client; attorney work product |
| 14. | 10/11/2016 | Willis Towers Watson | Kim Lupo, Bethany Dohleman | N/A | Confidential promotions analysis materials conducted and prepared at the direction of counsel | Attorney-client; attorney work product |
| 15. | 4/10/2017 | Holly Hearn* | David Ayre, Monique Matheson, Antoine Andrews, Kellie Leonard, Kim Lupo, Marc Bohn | Katie Meyers, Judy McFarland | Attorney-client communication providing legal advice regarding communications related to confidential pay equity analysis | Attorney-client; attorney work product |

4

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| 16. | 4/10/2017 | Holly Hearn* | David Ayre, Monique Matheson, Antoine Andrews, Kellie Leonard, Kim Lupo, Marc Bohn | Katie Meyers, Judy McFarland | Attachment to Document No. 15 (confidential internal memo prepared by in-house counsel providing legal advice regarding communications related to confidetial pay equity analysis) | Attorney-client; attorney work product |
| 17. | 11/17/2017 | Annabel Reeves | Kim Lupo, Manny Espinoza, Zack Vinton, Beth Rosenberger, Amy Janke, Antoine Andrews, Holly Hearn* | Julie Fuller, Chris Susen, Kayla Spencer | Attorney-client communication seeking legal advice regarding communications related to confidential pay equity anaylsis | Attorney-client; attorney work product |
| 18. | 11/17/2017 | Annabel Reeves | Kim Lupo, Manny Espinoza, Zack Vinton, Beth Rosenberger, Amy Janke, Antoine Andrews, Holly Hearn* | Julie Fuller, Chris Susen, Kayla Spencer | Attachment to Document No. 17 (confidential internal memorandum seeking legal advice regarding communications related to confidential pay equity analysis) | Attorney-client; attorney work product |
| 19. | 2/20/2018 | Kim Lupo | Lauren Thibodeaux* | Amy Janke, Bethany Dohleman, Zack Vinton, Jaynee Riordan | Attorney-client communication seeking legal advice regarding pay equity anaylsis communications | Attorney-client; attorney work product |
| 20. | 2/20/2018 | Amy Janke, Bethany Dohleman, | Lauren Thibodeaux*, Kim Lupo, Amy Janke, Bethany | N/A | Attachment to Document No. 19 (confidential internal memorandum provding | Attorney-client; attorney work product |

5

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| | | Lauren Thibodeaux* | Dohleman, Zack Vinton, Jaynee Riordan | | legal advice regarding confidential pay equity analysis) | |
| 21. | 3/30/2018 | Min Park | Kim Lupo | Will Ferguson, Michael Nikunen | Confidential statement of work detailing confidential promotions and turnover analysis undertaken at the direction of counsel | Attorney-client; attorney work product |
| 22. | 4/24/2018 | Casey North | Kim Lupo, Zack Vinton, Shane Walker, Bethany Dohleman, Amy Janke, Lauren Thibodeaux*, Min Park, Will Ferguson | N/A | Attorney-client communication transmitting materials prepared at the direction of counsel and seeking legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 23. | 4/24/2018 | Mercer | Kim Lupo, Zack Vinton, Shane Walker, Bethany Dohleman, Amy Janke, Lauren Thibodeaux*, Min Park, Will Ferguson | N/A | Attachment to Document No. 22 (confidential pay equity analysis materials prepared at the direction of counsel) | Attorney-client; attorney work product |
| 24. | 4/24/2018 | Mercer | Kim Lupo, Zack Vinton, Shane Walker, Bethany Dohleman, Amy Janke, Lauren Thibodeaux*, Min Park, Will Ferguson | N/A | Attachment to Document No. 22 (confidential pay equity analysis materials prepared at the direction of counsel) | Attorney-client; attorney work product |
| 25. | 5/17/2018 | Casey North | Kim Lupo, Zack Vinton, Shane Walker, Bethany Dohleman, Amy Janke, Haig | Lauren Thibodeaux*, David Baffa**, | Attorney-client communication providing legal advice regarding | Attorney-client; attorney work product |

6

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| | | | Nalbantian, Will Ferguson, Kevin Quinn, Alan Xu, Kanishka Ray, Michael Mikunen | Christine Hendrickson** | privilege protocol for confidential pay equity analysis | |
| 26. | 5/14/2018 | David Baffa** | Kim Lupo, Zack Vinton, Shane Walker, Bethany Dohleman, Amy Janke, Haig Nalbantian, Will Ferguson, Kevin Quinn, Alan Xu, Kanishka Ray, Michael Mikunen, Lauren Thibodeaux*, David Baffa**, Christine Hendrickson** | N/A | Attachment to Document No. 25 (confidential privilege protocol prepared by outside counsel at Seyfarth Shaw regarding confidential pay equity analysis) | Attorney-client; attorney work product |
| 27. | 5/17/2018 | Casey North | Kim Lupo, Julie Fuller, Melissa Huntley, Kellie Leonard, Behtany Dohleman, Amy Janke, Zack Vinton, Haig Nalbantian, Will Ferguson, Kevin Quinn, Alan Xu, Kanishka Ray, Michael Nikunen | Lauren Thibodeaux*, David Baffa**, Christine Hendrickson** | Attorney-client communication providing legal advice regarding privilege protocol for confidential promotion and turnover analysis | Attorney-client; attorney work product |
| 28. | 5/16/2018 | David Baffa** | Kim Lupo, Julie Fuller, Melissa Huntley, Kellie Leonard, Behtany Dohleman, Amy Janke, Zack Vinton, Haig Nalbantian, Will Ferguson, Kevin Quinn, Alan Xu, Kanishka Ray, Michael | N/A | Attachment to Document No. 27 (confidential privilege protocol prepared by outside counsel at Seyfarth Shaw regarding confidential promotion and turnover analysis) | Attorney-client; attorney work product |

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| | | | Nikunen, Lauren Thibodeaux*, David Baffa**, Christine Hendrickson** | | | |
| 29. | 6/6/2018 | Casey North | David Baffa**, Christine Hendrickson** | Lauren Thibodeaux* | Attorney-client communication seeking/reflecting legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 30. | 6/6/2018 | Will Ferguson, Haig Nalbantian, Casey North, Alan Xu | David Baffa**, Christine Hendrickson** | Lauren Thibodeaux* | Attachment to Document No. 29 (confidential memo regarding confidential pay equity analysis prepared at the direction of counsel) | Attorney-client; attorney work product |
| 31. | 6/6/2018 | Lauren Thibodeaux* | Casey North, Zack Vinton, Bethany Dohleman, David Baffa**, Haig Nalbantian, Amy Janke-Godfrey, Shane Walker, Will Ferguson, Kevin Quinn, Kim Lupo | Christine Hendrickson** | Attorney-client communication seeking/reflecting legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 32. | 6/6/2018 | Will Ferguson, Haig Nalbantian, Casey North, Alan Xu | Kim Lupo, Zack Vinton, Shane Walker, Bethany Dohleman, Amy Janke, Haig Nalbantian, Will Ferguson, Kevin Quinn, Alan Xu, Kanishka Ray, Michael Mikunen, Lauren | N/A | Attachment to Document No. 31 (confidential memo regarding confidential pay equity analysis prepared at the direction of counsel) | Attorney-client; attorney work product |

8

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| | | | Thibodeaux*, David Baffa**, Christine Hendrickson** | | | |
| 33. | 6/23/2018 | Casey North | Christine Hendrickson**, David Baffa**, Lauren Thibodeaux* | N/A | Attorney-client communication seeking/reflecting legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 34. | 6/23/2018 | Will Ferguson, Haig Nalbantian, Casey North, Alan Xu | Christine Hendrickson**, David Baffa**, Lauren Thibodeaux* | N/A | Attachment to Document No. 33 (confidential memo regarding confidenial pay equity analysis prepared at the direction of counsel) | Attorney-client; attorney work product |
| 35. | 6/25/2018 | Lauren Thibodeaux* | Casey North, Kim Lupo, Zack Vinton, Shane Walker, Bethany Dohleman, Amy Janke, Haig Nalbantian, Will Ferguson, Kevin Quinn, David Baffa** | N/A | Attorney-client communication seeking/reflecting legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 36. | 6/25/2018 | Will Ferguson, Haig Nalbantian, Casey North, Alan Xu | Casey North, Kim Lupo, Zack Vinton, Shane Walker, Bethany Dohleman, Amy Janke, Haig Nalbantian, Will Ferguson, Kevin Quinn, David Baffa**, Lauren Thibodeaux* | N/A | Attachment to Document No. 35 (confidential memo regarding confidential pay equity analysis prepared at the direction of counsel) | Attorney-client; attorney work product |

9

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| 37. | 7/9/2018 | Casey North | David Baffa**, Christine Hendrickson**, Lauren Thibodeaux* | N/A | Attorney-client communication seeking/reflecting legal advice regarding confidential promotion and turnover analysis | Attorney-client; attorney work product |
| 38. | 7/9/2018 | Will Ferguson, Haig Nalbantian, Casey North, Alan Xu | David Baffa**, Christine Hendrickson**, Lauren Thibodeaux* | N/A | Attachment to Document No. 37 (confidential memo regarding confidential promotion and turnover analysis prepared at the direction of counsel) | Attorney-client; attorney work product |
| 39. | 8/13/2018 | Casey North | Christine Hendrickson**, David Baffa**, Lauren Thibodeaux* | Alan Xu, Haig Nalbantian, Will Ferguson | Attorney-client communication seeking legal advice regarding promotion and turnover analysis | Attorney-client; attorney work product |
| 40. | 8/13/2018 | Will Ferguson, Haig Nalbantian, Casey North, Alan Xu | Christine Hendrickson**, David Baffa**, Lauren Thibodeaux* | N/A | Attachment to Document No. 39 (confidential memo regarding confidential promotion and turnover analysis prepared at the direction of counsel) | Attorney-client; attorney work product |
| 41. | 3/8/2019 | Casey North, Matt Reiser, Will Ferguson, Haig Nalbantian | David Buckmaster, Meaghan Wheeler, Lauren Thibodeaux*, Alyson Smith*, Shane Walker, Zack Vinton, Frankie Long, Cassie Enlgish*, Christine | N/A | Confidential pay equity analysis kickoff materials prepared at the direction of counsel | Attorney-client; attorney work product |

10

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| | | | Hendrickson**, David Baffa** | | | |
| 42. | 3/11/2019 | Casey North | David Buckmaster, Shane Walker, Meaghan Wheeler, Zack Vinton, Lauren Thibodeaux*, Frankie Long, Will Ferguson, Haig Nalbantian, Alyson Smith*, Matt Reiser, David Baffa** | N/A | Attorney-client communication seeking legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 43. | 3/8/2019 | Mercer | David Buckmaster, Shane Walker, Meaghan Wheeler, Zack Vinton, Lauren Thibodeaux*, Frankie Long, Alyson Smith*, David Baffa** | N/A | Attachment to Document No. 42 (confidential pay equity analysis kickoff materials prepared at the direction of counsel) | Attorney-client; attorney work product |
| 44. | 3/20/2019 | David Baffa** | David Buckmaster, Meaghan Wheeler, Lauren Thibodeaux*, Alyson Smith*, Shane Walker, Zack Vinton, Frankie Long, Cassie English*, Christine Hendrickson**, Casey North, Matt Reiser, Will Ferguson, Haig Nalbantian | N/A | Confidential privilege protocol prepared by outside counsel at Seyfarth Shaw regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 45. | 4/17/2019 | Casey North | Lauren Thibodeaux*, Cassie English*, Alyson Smith*, David Baffa**, Christine Hendrickson** | Will Ferguson, Haig Nalbantian, Matt Reiser | Attorney-client communication seeking legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |

11

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| 46. | 4/17/2019 | Casey North, Will Ferguson, Haig Nalbantian, Matt Reiser | Lauren Thibodeaux*, Cassie English*, Alyson Smith*, David Baffa**, Christine Hendrickson** | N/A | Attachment to Document No. 45 (confidential pay equity analysis presentation materials prepared at the direction of counsel and seeking legal advice related to analysis) | Attorney-client; attorney work product |
| 47. | 5/14/2019 | Casey North | Christine Hendrickson**, David Baffa** | Will Ferguson, Haig Nalbantian, Matt Reiser | Attorney-client communication seeking legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 48. | 5/14/2019 | Will Ferguson, Haig Nalbantian, Casey North, Matt Reiser | Christine Hendrickson**, David Baffa** | N/A | Attachment to Document No. 47 (confidential pay equity analysis presentation materials prepared at the direction of counsel and seeking legal advice related to analysis) | Attorney-client; attorney work product |
| 49. | 5/14/2019 | Casey North | Lauren Thibodeaux*, Cassie English*, Alyson Smith*, David Baffa**, Christine Hendrickson** | Will Ferguson, Haig Nalbantian, Matt Reiser | Attorney-client communication seeking legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 50. | 5/14/2019 | Will Ferguson, Haig Nalbantian, | Lauren Thibodeaux*, Cassie English*, Alyson Smith*, David Baffa**, Christine Hendrickson** | N/A | Attachment to Document No. 49 (confidential pay equity analysis presentation materials prepared at the direction of counsel and | Attorney-client; attorney work product |

12

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| | | Casey North, Alan Xu | | | seeking legal advice related to analysis) | |
| 51. | 8/9/2019 | Casey North | Meaghan Wheeler, David Buckmaster | Lauren Thibodeaux*, Cassie English*, Alyson Smith*, David Baffa**, Christine Hendrickson** | Attorney-client communication seeking legal advice regarding confidential pay equity analysis | Attorney-client; attorney work product |
| 52. | 8/9/2019 | Mercer | Meaghan Wheeler, David Buckmaster | Lauren Thibodeaux*, Cassie English*, Alyson Smith*, David Baffa**, Christine Hendrickson** | Attachment to Document No. 51 (confidential pay equity analysis draft presentation materials prepared at the direction of counsel and seeking legal advice related to analysis) | Attorney-client; attorney work product |
| 53. | 2/24/2020 | David Baffa** | David Baffa**, Christine Hendrickson**, David Buckmaster, Cassie English*, Alyson Smith*, Lauren Thibodeaux*, Zack Vinton, Shane Walker, Meaghan Wheeler, Janki Shanmugasundaram, Will | N/A | Confidential privilege protocol prepared by outside counsel at Seyfarth Shaw regarding confidential pay equity analysis | Attorney-client; attorney work product |

13

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| | | | Ferguson, Haig Nalbantian, Casey North, Poulomi Sen | | | |
| 54. | 2/24/2020 | Will Ferguson, Haig Nalbantian, Casey North, Poulomi Sen | David Baffa**, Christine Hendrickson**, David Buckmaster, Cassie English*, Alyson Smith*, Lauren Thibodeaux*, Zack Vinton, Shane Walker, Meaghan Wheeler | N/A | Confidential pay equity analysis kickoff presentation materials prepared at the direction of counsel | Attorney-client; attorney work product |
| 55. | 10/24/2018 | Makayla Lopez** | N/A | N/A | Prepared by outside counsel regarding attorney-directed investigation | Attorney-client; attorney work product |
| 56. | 08/15/2018 | Monica Rodriguez** | N/A | N/A | Prepared by outside counsel regarding attorney-directed investigation | Attorney-client; attorney work product |
| 57. | 03/29/2018 | Kristen M. Peters** | N/A | N/A | Prepared by outside counsel regarding attorney-directed investigation | Attorney-client; attorney work product |
| 58. | 01/30/2019 | Kristen M. Peters** | N/A | N/A | Prepared by outside counsel regarding attorney-directed investigation | Attorney-client; attorney work product |
| 59. | 01/30/2019 | Myra Villamor** | N/A | N/A | Prepared by outside counsel regarding attorney-directed investigation | Attorney-client; attorney work product |

14

*Cahill et al. v. Nike, Inc.*
Case No. 3:18-cv-01477-JR
Nike's Privilege Log #5 (September 8, 2020)

| Log Entry No. | Date | From / Author | To / Recipient | CC | Document Description | Privilege Asserted |
|---|---|---|---|---|---|---|
| 60. | 01/30/2019 | Jennifer Nunez** | N/A | N/A | Prepared by outside counsel regarding attorney-directed investigation | Attorney-client; attorney work product |
| 61. | 07/11/2018 | Sara Eber Fowler** | Sara Eber Fowler** | N/A | Prepared by outside counsel regarding attorney-directed investigation | Attorney-client; attorney work product |
| 62. | 07/11/2018 | Sara Eber Fowler** | Sara Eber Fowler** | N/A | Prepared by outside counsel regarding attorney-directed investigation | Attorney-client; attorney work product |
| 63. | 03/19/2018 | David Baffa** | Alison Daugherty | Lauren Thibodeaux*; Robert Leinwand* | Attorney-client communication providing legal advice regarding attorney-directed investigation | Attorney-client; attorney work product |

\* – Where symbol follows a name, it designates Nike's in-house legal counsel or member of Nike's in-house legal department.

\*\* – Where symbol follows a name, it designates Nike's outside legal counsel.

15

# EXHIBIT 3



1(213) 683-6169
danielprince@paulhastings.com

**VIA E-MAIL**                                                                              98484.00003

September 11, 2020

Barry Goldstein
bgoldstein@gbdhlegal.com
Byron Goldstein
brgoldstein@gbdhlegal.com
James Kan
jkan@gbdhlegal.com
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Dr., Suite 1000
Oakland, CA  94612

*Re:*     *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel:

I write in response to your September 10, 2020 letter regarding documents referenced in Nike's
opposition to Plaintiffs' motion to compel letter brief.

The 2015 EEOC Charge referenced in Nike's opposition is not responsive to any of Plaintiffs' RFPs.  The
employee who brought the Charge did not work at Nike Headquarters, and is thus not covered by the
scope of Plaintiffs' lawsuit.  For that reason, Nike will not produce the EEOC Charge in question.

Nike has already produced the complaints raised in the informal and unofficial "gender survey" entries
that alleged bias in compensation and promotion decisions on the basis of gender.  *See, e.g.*,
NIKE_00019389-00019392, NIKE_00022566-00022577, NIKE_00023464, NIKE_00019421-00019422.

Sincerely,

**/s/ Daniel Prince**

Daniel Prince
of Paul Hastings LLP

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
t: +1.213.683.6000  |  www.paulhastings.com

Goldstein Decl. Ex. 12, Page 182 of 297

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                            :

CHEVRON CORPORATION,           :

         Plaintiff,             :

                         :      11 Civ. 0691 (LAK)

       v.                  :

STEVEN DONZIGER, et al.,      :

        Defendants.         :

                         :
---------------------------------------------------------x

## AFFIDAVIT OF THOMAS I. BARNETT

    I, Thomas I. Barnett, state under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

following is true and correct.

    1.    I am an expert in electronic discovery. Chevron Corporation ("Chevron") has

requested that I submit this affidavit and opine on the assertions contained in the

Affidavit of Adam Seskis, dated December 12, 2012, and the Supplemental Declaration

of Ari Perlstein, dated December 12, 2012, submitted in support of the "Renewed

Submission Regarding Undue Burden Imposed by Chevron Corporation's Modified

Subpoena and for Other Relief," dated December 12, 2012 and filed by non-party Patton

Boggs LLP ("Patton Boggs"). I also have been asked to opine on the average number of

printed pages represented by 1,200 gigabytes of electronically stored information

("ESI").

    2.    In my expert opinion, the facts asserted by Mr. Seskis and Mr. Perlstein in their

sworn statements do not present a sufficient basis to support Patton Boggs's arguments

regarding the cost and burden of responding to Chevron's subpoena. Rather, the review

process they describe is not unduly large or burdensome in comparison to similar

complex civil litigations. In addition, Mr. Seskis and Mr. Perlstein do not adequately

consider technology-assisted review methods that could significantly reduce the burden,

time, and expense of producing responsive documents.

### PROFESSIONAL BACKGROUND

3.     I am a Managing Director at Stroz Friedberg, LLC ("Stroz Friedberg"), where I

serve as the firm's eDiscovery Practice Leader. Stroz Friedberg is a digital risk

management firm specializing in, among other things, electronic discovery. My firm and

I have routinely advised corporations, law firms, government agencies, and courts

throughout the country on electronic discovery and document production matters. In my

role at Stroz Friedberg, I am responsible for guiding the firm's strategic direction in

electronic discovery technology and processes. I also am responsible for serving as a

consultant to Stroz Friedberg's clients on electronic discovery, records and information

management, and data analytics in civil, criminal, and regulatory matters.

4.     Prior to joining Stroz Friedberg, I created and led the Electronic Discovery &

Compliance group at Sullivan & Cromwell LLP, where I oversaw all aspects of the

firm's matters involving electronic discovery. I also served as a Vice President at

Stratify/Iron Mountain, where I led the global consulting practice and advised clients on

electronic discovery issues and the management of digital data.

2

5.    I am an original co-author and editor of the Sedona Conference treatise, Principles on Electronic Document Production. I also am an original member of the Electronic Discovery Reference Model (EDRM) Project and continue to serve on its Board of Editors.

6.    I attach as Exhibit A to this affidavit my Curriculum Vitae, which contains descriptions of some of my significant engagements.

7.    My firm is being compensated at its standard hourly rates for this retention.

**OPINIONS**

8.    I have reviewed the Affidavit of Adam Seskis, dated December 12, 2012, and the Supplemental Declaration of Ari Perlstein, dated December 12, 2012, filed in support of Patton Boggs's submission regarding the undue burden imposed by Chevron's subpoena. Unless otherwise noted, the statements set forth in this affidavit are based on my personal knowledge and experience, information I have obtained from counsel, and my involvement in and supervision of electronic discovery matters at Stroz Friedberg and elsewhere.

9.    It is my opinion that Mr. Seskis and Mr. Perlstein: (a) do not provide sufficient detail to support or test Patton Boggs's undue burden claim; (b) describe an electronic discovery process that is not unusually burdensome in comparison to other similarly complex civil litigations; and (c) do not adequately consider the use of technology-assisted review methods that could dramatically decrease the time and cost associated

3

with responding to Chevron's subpoena. In addition, based on my experience, I estimate that 1,200 gigabytes of ESI, if printed, would total between 60,000,000 and 120,000,000 pages.

**A.     Mr. Seskis and Mr. Perlstein provide insufficient information to support or test Patton Boggs's undue burden claim.**

10.     In his affidavit, Mr. Seskis provides lump sum estimates for the cost of "data processing, data hosting, and producing data." (Seskis Aff. at ¶¶ 2, 3.) According to Mr. Seskis, the estimated processing, hosting, and production costs for the 58 custodians using Patton Boggs search terms would total $92,747.00, while the estimated processing, hosting, and production costs for the 58 custodians using the Chevron search terms would total $240,400.16. (Seskis Aff. at ¶¶ 2, 3.) However, there is little indication of how Mr. Seskis arrived at these estimates, beyond his statement that the fees are composed of "per gigabyte charges for data processing, per gigabyte charges for data hosting, per gigabyte charges for review accelerators, per page charges for production services, and per hour charges for project management." (Seskis Aff. at ¶¶ 2, 3.) This is insufficient detail to fully evaluate Mr. Seskis's estimates.

11.     As an initial matter, Mr. Seskis does not break down the charges by service offering, making it impossible to determine what portions of the total costs are attributable to each service listed: data processing; data hosting; review accelerator charges; production services; and project management. In addition, Mr. Seskis is silent as to the actual rates used to generate these estimates, making it impossible to determine

4

what the per gigabyte costs are for data processing, data hosting, and review accelerators, what the per page charges are for production services, and what the per hour charges are for project management. Without knowing the total charges for each service performed and the actual rates for each service, one cannot properly evaluate Patton Boggs's undue burden claim.

12.    Mr. Seskis's affidavit also is silent as to several critical questions, such as what criteria were used to identify the data to be searched and what analytical tools and processes were used to cull that data prior to subjecting the data to the search terms. Without this information, it is impossible to evaluate whether the number of documents and the volume of data to be reviewed accurately reflect the amount of data that would actually have to be reviewed, or whether those numbers have been inflated by choosing an unnecessarily large data set for searching.

13.    Patton Boggs's argument also ignores the critical question: Are the additional documents identified by Gibson Dunn's broader search term list relevant to the issues in this litigation? Patton Boggs's expert, Epiq eDiscovery Solutions, Inc. ("Epiq"), has already searched the data using Gibson Dunn's proposed search terms, and the responsive data set could have been evaluated by choosing a sample of documents to determine whether Gibson Dunn's keyword list is overbroad. In my experience, such sampling techniques are common when evaluating the effectiveness of a search term list, and Patton Boggs's failure to conduct sampling here leaves a critical question unanswered

5

and unaddressed. If a search term list like Gibson Dunn's is necessary to identify relevant and important documents, then Patton Boggs's attempt to limit that list would be difficult to defend.

14.    Mr. Perlstein's supplemental declaration also provides insufficient information to support or test Patton Boggs's burden claim. Mr. Perlstein appears to apply assumptions about the rate of review (the average number of documents an attorney reviews in an hour) in other cases to Mr. Seskis's calculations, without providing any information regarding the bases for those assumptions or even specifying what the assumptions are.

**B.    The review described by Mr. Seskis and Mr. Perlstein is not atypically large for complex and high-stakes civil litigation.**

15.    For purposes of this section, a basic understanding of how electronic information is measured is useful. The smallest unit of measure for digital of information is called a "bit" which is a contraction of "binary digit." A "byte" is typically comprised of eight bits and is the unit commonly used by computers to represent an English language character such as a number, letter or typographical symbol. Bytes typically are represented in groups of increasing orders of magnitude.

16.    In the context of computer science, a kilobyte (KB) consists of 1,024 bytes, a megabyte (MB) consists of 1,024 kilobytes, a gigabyte (GB) consists of 1,024 megabytes

6

and a terabyte (TB) consists of 1,024 gigabytes.[1] By way of illustration, I estimate that one gigabyte (GB) of ESI would total between 50,000 and 100,000 pages if printed.

17.    As the amount of data has grown, increasingly larger units have been created to represent them.  For example, a petabyte (PB) consists of 1,024 terabytes, an exabyte (XB) consists of 1,024 petabytes, and a zettabyte (ZB) consists of 1,024 exabytes.

18.    In recent years there has been an explosion in the amount of ESI that is created and stored. A 2011 study by International Data Corporation ("IDC") estimates that the amount of electronic data that exists worldwide has reached 1.8 ZB (the equivalent of 1.8 trillion gigabytes). This amount is approximately twice as large as it was in 2009.  I believe it is reasonable to expect the amount of electronic data worldwide to double every two years for the foreseeable future.  The IDC study estimates that 85% of the total electronic data worldwide (1.8 ZB) is owned or controlled by companies, institutions, and governments.

19.    Due to the large volume of ESI created and exchanged, cases commonly involve the collection, processing, and review of large quantities of data.  It is common for clients of

---

[1] It has become a conventional practice in the data-storage industry to round these numbers down for ease of reference.  In the context of the data-storage industry, a kilobyte (KB) consists of 1,000 bytes, a megabyte (MB) consists of 1,000 kilobytes, a gigabyte (GB) consists of 1,000 megabytes and a terabyte (TB) consists of 1,000 gigabytes.

7

Goldstein Decl. Ex. 12, Page 190 of 297

Stroz Friedberg to require the processing of data greater than the volume of data that is at issue here. I personally have been involved in dozens of cases with larger data sets than are at issue here, including several cases that involved multiple terabytes of ESI.

**C.      Mr. Seskis and Mr. Perlstein do not adequately consider the potential cost savings that could be achieved through the use of technology-assisted review methods.**

20.      In my experience, the majority of the cost involved in the processing, review, and production of ESI is attributable to attorney review, which is commonly performed at an hourly rate. There are many forms of technology-assisted review that can be used to significantly reduce the overall cost of the electronic discovery process by dramatically decreasing the cost associated with attorney review.

21.      One method that can be used to increase the efficiency and decrease the cost of a document review is predictive coding, which is a term used to describe a supervised machine learning process applied to document review. Typically, predictive coding involves:

- Conducting attorney review of a sample set of documents for a specific criteria (e.g., responsiveness);

- Creating a statistical model based on the determinations made by the reviewers as to the target criteria;

- Testing the statistical model against the data set and revising the model as necessary; and

8

- Applying the model to the entire data set to rank the documents according to the probability that a given document matches the target criteria.

22. While attorney review of documents generally has been uncritically accepted as the most effective and accurate means of analyzing and coding documents in discovery, a growing number of studies going back several decades suggest that human accuracy in coding documents for specific issues is far lower than commonly believed. (*See* Nicholas M. Pace & Laura Zakaras, "Where the Money Goes: Understanding Litigant Expenditures for Producing Electronic Discovery," RAND Institute for Civil Justice, at pp. 55-58 (reviewing studies regarding the limitations of human review).) In recent years, with the advent of predictive coding, studies have shown that the use of predictive coding supported by knowledgeable attorney review can result in significantly more accurate results than unassisted human review alone. (*See* Maura R. Grossman & Gordon V. Cormack, "Technology-Assisted Review in E-Discovery Can Be More Effective and Efficient Than Exhaustive Manual Review," Rich. J.L. & Tech., Spring 2011, at 48; Thomas I. Barnett & Svetlana Godjevac, "Faster, better, cheaper legal document review, pipe dream or reality?," ICAIL 2011/DESI: Workshop for Setting Standards for Searching Electronically Stored Information in Discovery Proceedings, at 14, *available at* http://www.umiacs.umd.edu/~oard/desi4/proceedings.pdf).

23. Epiq, Mr. Seskis's own firm, recognizes the potential of predictive coding. According to its website, Epiq's predictive coding offering, called IQ Review, "solves the

9

challenge of rapidly locating the documents that are actually responsive to the matter –
typically less than 20% of a collection." Among other things, Epiq states that its IQ
Review solution can "[r]educe time and money spent reviewing documents
inconsequential to a case."

24.     Both Mr. Seskis and Mr. Perlstein fail to adequately consider the potential cost
savings that could be achieved through the use of predictive coding. According to Mr.
Seskis, Epiq has not attempted to quantify the cost savings that would be achieved by the
use of IQ Review because the search term list has not yet been agreed upon. However, it
is not clear why the lack of agreement on a search term list precludes Mr. Seskis from
estimating the potential cost savings from the use of IQ Review.

25.     The failure to consider such potential cost savings is particularly glaring in Mr.
Perlstein's supplemental declaration, in which Mr. Perlstein appears to calculate the
attorney review costs based on a document-by-document review without the use or
assistance of any advanced technologies. If IQ Review is as effective as Epiq claims, it
could substantially decrease the cost of Patton Boggs's attorney review, a fact that would
be central to evaluating its undue burden claim.

26.     Another form of technology-assisted review that frequently is used in large-scale,
complex, civil litigations is privilege analytics, which uses automated processes to
identify documents that likely are subject to attorney-client privilege. Such technology
goes beyond simple keywords and uses rules-based inferential reasoning to determine the

10

likelihood that a given document is privileged. While this does not render manual review unnecessary, it can significantly increase the speed and efficiency of the review process, and thereby lower the cost, by ranking and prioritizing potentially privileged documents. This is another useful technology-assisted review method that is not considered by Mr. Seskis or Mr. Perlstein.

27. Concept clustering, which is an automated means of organizing data by grouping related documents, is another commonly used and effective approach that can increase the speed and efficiency of the attorney review process. By grouping documents based on the co-occurrence and frequency of common words in a set of documents, concept clustering allows reviewers to rapidly cull out non-relevant information and reduce the amount of data that needs to be subjected to full-scale attorney review.

28. In certain types of cases, the use of concept clustering may be more effective than traditional keywords. One of the challenges in identifying documents potentially responsive to an alleged fraud is that individuals engaged in fraudulent activities often consciously attempt to hide their actions. As a result, code words, indirect references, nicknames, and other means of obfuscating communications frequently are employed. While ordinary keywords may miss these documents, concept clustering may identify them, or even suggest the code words themselves as possible new keywords, based on the frequency that those terms appear in relevant documents or in the same documents as other keywords. Concept clustering, which may be very useful here, is another

11

technology-assisted review methodology that is not considered by either Mr. Seskis or Mr. Perlstein.

29.   Beyond stating that the data has undergone a global de-duplication process, neither Mr. Seskis nor Mr. Perlstein account for the potentially dramatic cost savings that could come from technology-assisted review methods. Instead, the review costs are calculated assuming a manual, file-by-file document review. This assumption, and the failure to consider possible cost savings from alternative review methods, likely results in Patton Boggs overstating the overall cost of the electronic discovery process.

**D.    1,200 gigabytes of ESI, if printed, could total as much as 60,000,000 to 120,000,000 printed pages.**

30.   The number of printed pages in a gigabyte of ESI varies greatly depending on the file types that make up the gigabyte. Some documents, like Excel spreadsheets, may not take up a large amount of disk space but may result in a large number of printed pages, while other file types, like graphic files, may take up a larger amount of disk space but result in relatively few printed pages.

31.   However, based on my experience, it is possible to estimate the number of printed pages that would result on average from one gigabyte of ESI. Based on industry standards, I estimate that the average gigabyte of ESI would total between 50,000 and 100,000 pages if printed.

32.   Using those estimates, 1,200 gigabytes of ESI, if printed, likely would total between 60,000,000 and 120,000,000 pages.  Assuming an average document size of 4 to eight

12

pages, a conservative estimate of the resulting number of documents would be 7,500,000 to 30,000,000 million, subject to the types of documents in the data set (emails, spreadsheets, Word files, etc.).

## CONCLUSION

For the above reasons, I conclude that Mr. Seskis and Mr. Perlstein: (a) do not provide sufficient detail to support or test Patton Boggs's undue burden claim; (b) describe an electronic discovery process that is not unusually burdensome in comparison to other similarly complex civil litigations; and (c) do not adequately consider the use of technology-assisted review methods that could dramatically decrease the time and cost associated with responding to Chevron's subpoena.

Dated: January 3, 2013

Thomas I. Barnett

13

Goldstein Decl. Ex. 12, Page 196 of 297

# EXHIBIT 5

# PAUL
# HASTINGS



1(202) 551-1717
barbarabrown@paulhastings.com

November 5, 2012

21166.00050

### VIA EMAIL (FURMAN_NYSDCHAMBERS@NYSD.USCOURTS.GOV)
### CONFIDENTIAL

Hon. Jesse M. Furman
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007-1312

Re:     *Chen-Oster et al. v. Goldman, Sachs & Co. and The Goldman Sachs Group, Inc.,*
        No. 10 Civ. 6950 (LBS) (JCF)

Dear Judge Furman:

Paul Hastings LLP, together with Sullivan & Cromwell LLP, represent Defendants Goldman, Sachs & Co. and The Goldman Sachs Group, Inc. (collectively, "Goldman Sachs") in this matter.  We write pursuant to the Court's October 22, 2012 Order, to provide information concerning the status of the case.  Because of the confidential nature of the "Status of Settlement Negotiations" section below, we respectfully request that the Court treat this letter as confidential, including by not posting it on the Court's CM/ECF system.

### 1.     Corrections to Names and Contact Information of Counsel

The docket contains correct information concerning the individuals at Paul Hastings LLP and Sullivan & Cromwell LLP, except for the following updates:  C. Geoffrey Weirich's address recently changed to the following:  1170 Peachtree Street, N.E., Suite 100, Atlanta, GA 30309.  Additionally, John Francis Fullerton, III and Margaret Elizabeth Bartlett filed notices of withdrawal as counsel; their names are still on the docket as counsel for Goldman Sachs, and we would appreciate their being removed.

### 2.     Statement of the Case and Principal Defenses

This putative class action alleging sex discrimination was brought by three named plaintiffs, all of whom are former employees of Goldman Sachs.  Two worked their entire time at the firm in its Securities Division, and the other worked exclusively within the firm's Investment Management Division.  Plaintiffs purport to represent all current and former female Associates, Vice Presidents, and Extended Managing Directors ("EMDs") in all four of the firm's revenue generating divisions – Securities, Investment Banking, Investment Management, and Merchant Banking (the "four revenue divisions"), from 2002 on.  They allege sex discrimination with respect to compensation, promotions, and performance evaluations, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New York City Human Rights Law ("NYCHRL").

The specifics of the named plaintiffs' experience at Goldman Sachs are as follows.  Plaintiff Cristina Chen-Oster joined the firm in 1997 and resigned in March 2005.  She worked as a sales person in the Convertible Sales Department in the Equities unit of the Securities Division throughout almost all of her employment with Goldman Sachs; she worked briefly in another related area of Equities.  Shanna Orlich worked as a summer intern at the firm in 2006 and then as an entry-level Associate in the Capital Structure Franchise Trading Department, within the Fixed Income, Currencies, and Commodities ("FICC") unit of the Securities Division, from mid-2007 until November 2008, when her employment was terminated in connection with workforce reductions resulting from the economic crisis.  Lisa Parisi worked in the

Paul Hastings LLP  |  875 15th Street, N.W.  |  Washington, DC 20005
t: +1.202.551.1700  |  www.paulhastings.com

Goldstein Decl. Ex. 12, Page 198 of 297



Hon. Jesse M. Furman
November 5, 2012
Page 2

Investment Management Division. She joined the firm in 2003 as a Vice President and was subsequently promoted to EMD. Her employment was terminated on the recommendation of her female superior, in 2008.

Goldman Sachs has asserted in its defenses that Plaintiffs' claims are not suitable for class treatment, as Plaintiffs cannot satisfy the commonality and typicality requirements of Fed. R. Civ. P. Rule 23(a) or 23(b)(3) or the other prerequisites to class certification. Among other reasons, there are significant differences within and among the four revenue divisions with respect to the skills, duties, and job functions that employees perform and thus a trial would not yield a common answer to the question "why was I disfavored," as the Supreme Court's recent decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) makes clear is required.[1] There is no evidence of intentional bias against women so as to warrant certifying a disparate treatment class claim; on the contrary the firm has a strong record of embracing equal employment opportunity for women. Also, the firm's primary level managers exercise significant discretion in making decisions related to compensation, promotions, and performance evaluations, a fact which makes class treatment inappropriate under *Dukes*. Nor can Plaintiffs prove that class certification of a disparate impact claim is appropriate with respect to the personnel processes at issue in this case. Moreover, and as set forth in the Answer, Goldman Sachs will prevail on the merits of any claims that survive after determination of the motion for class certification.

### 3. Existing Deadlines, Due Dates, and Cut-off Dates

On December 23, 2010, Judge Sand entered the Joint Discovery Plan proposed by the parties. *See* Joint Discovery Plan entered on December 23, 2010 (ECF No. 38). Due to the motion practice to date, including interim dispositive motions by Goldman Sachs (which are described below), as well as a motion to compel data and documents filed by Plaintiffs, the dates set forth in the Joint Discovery Plan are in need of revision. These motions have now been decided by this Court and the time is ripe for entry of a revised Scheduling Order. The parties are now discussing a proposed updated schedule, which we will present to the Court pursuant to Magistrate Judge Francis's direction (see below).

### 4. Previously Scheduled Conference Dates with the Court

At Magistrate Judge Francis's request,[2] a telephone conference with the parties took place today, November 5. Magistrate Judge Francis has requested that the parties confer regarding scheduling and present a revised proposed Scheduling Order to him by Friday, November 9, 2012. There are no other scheduled conference dates.

### 5. Motions Made to Date

To date, the parties have made the following motions:

a. On November 22, 2010, Goldman Sachs filed a Motion to Stay Plaintiff Parisi's Claims and Compel Individual Arbitration, on the ground that when she was promoted to Managing Director of the

---

[1] The four revenue divisions are as different from one another as are wholly separate companies. Within each division, there are many stand-alone financial services businesses exclusively performing functions that are different from one another. As a result, the jobs performed by Vice Presidents and Associates in these divisions, and in each business in each division, are numerous and diverse – and inappropriate for class treatment.

[2] Judge Sand referred the case to Magistrate Judge Francis for general pretrial matters (including scheduling, discovery, non-dispositive pretrial motions, and settlement) and dispositive motions. (ECF Nos. 35, 71, & 129.)

PAUL
HASTINGS

Hon. Jesse M. Furman
November 5, 2012
Page 3

firm, Plaintiff Parisi signed an agreement to arbitrate any claims she might have against Goldman Sachs.[3] (ECF Nos. 23 & 24.) Magistrate Judge Francis denied the motion by decision dated April 28, 2011 and denied Goldman Sachs' motion for reconsideration on July 7, 2011. (ECF Nos. 59 & 73.) (Goldman Sachs moved for reconsideration in light of the Supreme Court's ruling in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), which was issued the day before Magistrate Judge Francis' original decision. (ECF Nos. 62 & 63.)) Defendants appealed those decisions to Judge Sand, who denied the motion to compel arbitration without an opinion on November 15, 2011. (ECF No. 120.) Oral argument on Defendants' appeal of this ruling to the Second Circuit is scheduled for November 7, 2012.

b.      On January 21, 2011, Plaintiffs filed a Motion to Compel Discovery seeking documents Plaintiffs claimed were related to Goldman Sachs' motion to compel arbitration. (ECF Nos. 41 & 42.) On March 1, 2011, Magistrate Judge Francis denied the motion. (ECF No. 46.)

c.      On June 13, 2011, Defendants filed a Motion to Strike Plaintiff Cristina Chen-Oster's Class Allegations, on the grounds that her EEOC charge did not exhaust class claims, let alone the expansive class she seeks to certify. (ECF No. 66-70.) On September 29, 2011, Magistrate Judge Francis issued his Report and Recommendation that the motion be denied. (ECF No. 105.) Defendants objected on October 17, 2011 (ECF No. 114), and Judge Sand affirmed the Report and Recommendation on January 10, 2012. (ECF No. 133.)

d.      On July 22, 2011, Defendants filed a Motion to Strike All Class Allegations and for Partial Summary Judgment as to Plaintiffs' Disparate Impact Claim Under Title VII, based on the ground that Plaintiffs' class allegations were essentially identical to those that the Supreme Court rejected in *Dukes*, 131 S. Ct. at 2541. (ECF Nos. 82 & 88.) Plaintiffs then notified Defendants of their intention to amend their Complaint. The parties filed a Joint Stipulation Regarding First Amended Complaint on August 16, 2011, which provided for Plaintiffs to file their Amended Complaint and for Defendants to withdraw their pending motion and file a new Motion to Strike and for Partial Summary Judgment, which Defendants did on September 8, 2011. (ECF Nos. 96, 98, & 101.) On January 19, 2012, Magistrate Judge Francis issued a Report and Recommendation that the motion be denied. (ECF No. 134.) Defendants filed an objection on February 2, 2012. (ECF No. 135.) On July 17, 2012, Judge Sand partially granted Defendants' motion, striking Plaintiffs' class claims under Federal Rule of Civil Procedure 23(b)(2), on the grounds that under *Dukes*, Plaintiffs, as former employees of Goldman Sachs, did not have standing to seek class-wide injunctive relief. The remainder of the relief Goldman Sachs requested with respect to striking the class allegations was denied as premature. (ECF No. 158.)

e.      On May 2, 2012, Plaintiffs filed a Motion to Compel data and documents. (ECF No. 145 & 146.) Until that time, pursuant to Magistrate Judge Francis' order of October 4, 2011, discovery (other than with respect to the named Plaintiffs) had been limited to the Securities Division back to 2007. (ECF No. 109.) On September 10, 2012, Magistrate Judge Francis granted Plantiffs' motion, in part, with respect to certain data related to the revenue-generating divisions and denied the motion to compel documents as premature and "abstract," given that Plaintiffs did not identify specifically any documents that Goldman Sachs had failed to produce. (ECF No. 159.)

Currently, there are no outstanding motions pending before this Court.

---

[3] Additionally, on March 25, 2011, Plaintiffs filed a Motion for Leave to File Surreply in Opposition to Defendants' Motion to Compel Arbitration; Magistrate Judge Francis granted the motion on March 30, 2011. (ECF Nos. 55 & 57.)

PAUL
HASTINGS

Hon. Jesse M. Furman
November 5, 2012
Page 4

#### 6.    Pending Appeals

As noted above, Defendants have appealed to the Second Circuit the denial of their Motion to Stay Plaintiff Parisi's Claims and Compel Individual Arbitration. Oral argument is scheduled for November 7, 2012. Both Magistrate Judge Francis and Judge Sand recognized that Plaintiff Parisi's arbitration agreement encompasses her individual Title VII and NYCHRL claims and that the arbitration agreement did not authorize class arbitration. Magistrate Judge Francis and Judge Sand ruled, however, that Plaintiff Parisi need not arbitrate based on their conclusion that there is a "substantive" statutory right under Title VII to pursue disparate treatment claims through the "pattern or practice" method of proof and that because the "pattern or practice" method of proof is only available in class actions, the arbitration agreement could not be enforced.

On appeal, Goldman Sachs argues that there is nothing in Title VII that gives a statutory right to pursue the pattern or practice method of proof, that the Second Circuit in July 2012 has affirmed that pattern or practice allegations are not statutory claims but rather simply one means of proving a Title VII claim and that the decision conflicts with recent Supreme Court precedent, including *CompuCredit v. Greenwood*, 132 S. Ct. 665, 669 (2012) (affirming that the Federal Arbitration Act ("FAA") "requires courts to enforce agreements to arbitrate according to their terms. . . . unless the FAA's mandate has been 'overridden by a contrary congressional command'") (citation omitted).

#### 7.    Discovery Undertaken to Date[4]

*General:* The parties agreed that there was no reason to bifurcate discovery strictly into "class" and "merits" phases but instead agreed to engage in discovery relevant to the Court's resolution of Plaintiffs' anticipated motion for class certification. On March 18, 2011, Magistrate Judge Francis signed the parties' stipulated Protective Order and Confidentiality Agreement. (ECF No. 51.)

*Depositions:* Defendants have deposed Plaintiffs Chen-Oster and Orlich. Plaintiffs have taken three Rule 30(b)(6) depositions of Goldman Sachs employees, on the organizational structure of the firm overall and for two of the four revenue divisions; they have not requested dates for the other two divisions' witnesses. Nor have they pursued dates for depositions on the other 30(b)(6) topics, on the understanding that the organizational structure depositions logically came first. Plaintiffs also deposed two Goldman Sachs employees and a third-party vendor regarding certain databases that Goldman Sachs uses. Both parties intend to take further depositions.

*Document Discovery:* Plaintiffs have requested a wide range of documents, in many cases going back to 2000, concerning the personnel processes at issue in the lawsuit, demographic data and other information. To date, Goldman Sachs has produced well over 100,000 pages of documents, including organizational charts, policy documents, training materials, job descriptions, and review forms, in addition to personnel documents and emails related to Plaintiffs Chen-Oster and Orlich. Now that the Court has ruled on motions related to the scope of this case, Goldman Sachs has begun producing documents for all four divisions back to 2000, and will continue to produce such documents on a rolling basis. Additionally, Plaintiffs have said that they will provide Goldman Sachs with a list of custodians (beyond Plaintiffs Chen-Oster and Orlich) whose emails they would like to have searched. Goldman Sachs has not yet received that list from Plaintiffs.

---

[4] The parties have agreed to stay discovery with respect to the Managing Director position until the issue of the scope of Plaintiff Parisi's arbitration commitment with the firm is resolved by the Second Circuit. Nonetheless, Goldman Sachs has agreed that it will provide discovery related to the process for promotions from Vice President to EMD in the four revenue divisions – and indeed already has produced numerous documents related to this process.


# PAUL
# HASTINGS

Hon. Jesse M. Furman
November 5, 2012
Page 5

*Data Discovery:* The parties have approached data discovery in two phases. First, Goldman Sachs provided Plaintiffs with samples of the sorts of data it maintains on personnel. Second, the time period and divisional scope of the data production was decided by Magistrate Judge Francis on September 10, 2012. Thereafter the parties negotiated a data handling agreement that was signed on November 3, 2012, and Goldman Sachs now plans to produce promptly extensive data from its PeopleSoft database, consistent with the Magistrate's order. Plaintiffs have recently demanded production of data fields that Defendants believe go beyond what was previously agreed and represented to Magistrate Judge Francis. Goldman Sachs is working with Plaintiffs to try to resolve this change in their position about the fields to be produced.

*Expert Discovery:* The parties intend to exchange expert reports and conduct expert depositions. We will include a schedule for expert discovery in our proposal for a revised scheduling order.

*Additional Discovery for Purposes of Settlement:* The extensive amount of documents and some statistical data analyses that Goldman Sachs have already provided to Plaintiffs has allowed for the parties to begin engaging in meaningful settlement negotiations (as discussed below). The upcoming database productions likely will be important to those discussions as well.

### 8.     Status of Settlement Negotiations
Throughout 2012, the parties have had several in-person and telephonic meetings to discuss possible settlement. While the parties are not close to a resolution, we intend to continue these discussions, including by participation in mediation, as ordered by the Court on October 10, 2012. (*See* ECF 162.)

### 9.     Estimated Length of Trial
The length of a trial would depend on whether Plaintiffs' motion for class certification is granted or denied. If the motion is denied, we estimate a trial in this case would take approximately 5 to 10 trial days. If a class along the lines sought by Plaintiffs were certified, we estimate trial would take 10 to 12 weeks.

### 10.    Additional Information
Goldman Sachs is available to answer any questions the Court may have or to provide any additional information to the Court.

Respectfully,

Barbara Berish Brown
of PAUL HASTINGS LLP

Theodore O. Rogers, Jr.
SULLIVAN & CROMWELL LLP

cc:     Adam T. Klein, Esq.
        Kelly M. Dermody, Esq.

In light of the common law right of access to judicial documents, Defendants' request to keep this letter confidential is DENIED, as there is nothing confidential or sensitive about the information disclosed herein.

LEGAL_US_E # 100984395

SO ORDERED.

November 9, 2012

# EXHIBIT 6

**From:** MMatheson
**Sent:** Friday, July 13, 2018 10:11 AM
**To:** MMatheson <MMatheson@Nike.com>
**Subject:** For Managers: Upcoming Pay & Rewards Changes

Managers,

To follow up on my <u>message</u> in April, this month I'll be sharing some changes to pay and rewards at NIKE, Inc. – and I want to begin by sharing them with you.

Our Total Rewards approach is grounded in the philosophy that our practices must reflect our company values, meet the diverse needs of our employees and deliver differentiated, competitive pay and benefits. Pay and rewards are also critical parts of how we attract and retain the best talent, which fuels our business growth and sets us apart. With constant movement of internal talent, and the demands of a dynamic market, we have conducted additional analyses this year, and will continue to analyze and adjust our own programs to make sure we're strongly competitive.

As part of this approach and commitment – and to meet our goal of evolving our culture to one in which employees feel included and empowered – we have made several recent changes to pay and rewards. Most of them are company-led and don't require action from you; if they do, we'll be explicit. Still, please take some time to understand what's changing – to <u>educate yourselves</u> as leaders at this company.

Beginning July 25, you'll be having year-end rewards conversations with your teams, and I want you to feel prepared to speak to these changes (I also anticipate sharing them with all employees directly on July 24). This is launching quickly because our desire for action and progress supersedes our need for perfection. These changes are important, and we ask for your partnership to roll them out to employees together. You don't need to have all of the answers; HR Direct can help you and your team members.

Here's a summary:

- **Competitive Pay Adjustments:** We are committed to competitive pay, and after deeper analyses, this year we are making specific pay adjustments to ensure that NIKE is more competitive to market – strengthening our position across the board. This will impact employees in all bands, geos, functions and brands, though not all employees will receive adjustments. We will perform these reviews for all employees annually (in addition to merit reviews) to ensure we are delivering on our commitments. *About 10% of our population will receive a Competitive Pay adjustment; managers will be notified directly next week if their employee is receiving one, along with additional resources to have the conversation.*
- **One PSP:** FY19 moves us into One Performance Sharing Plan (PSP) for all eligible employees. Previously, bonus payouts were determined by a combination of company, team and individual performance. One PSP measures success based on company performance.
- **Stock Choice:** For stock-eligible employees (bands E-E6), a new feature will let them choose how to receive their annual stock award – as either 100% Stock Options, 100% Restricted Stock Units (RSUs), or 50/50 Stock Options and RSUs.
- **Total Rewards Portal:** On August 6, we will launch a new platform for employees to view their pay information – in more detail, on their own. Every year during awards conversations with your employees, you print out their Personal Pay Statements (PPS); after this year's PPS, we will be going digital through the portal.

**Page 1 of 2**

Goldstein Decl. Ex. 12, Page 204 of 297

NIKE_00001645

Please do take the time to read through the **manager toolkit** with in-depth descriptions, talking points, FAQs and more.

Thank you for being in this with us; these are important steps forward – for employees, for teams and for NIKE.

Until next time,

**Monique Matheson**
Chief Human Resources Officer



FOR INTERNAL USE ONLY. © 2018 ALL RIGHTS RESERVED

Goldstein Decl. Ex. 12, Page 205 of 297

CONFIDENTIAL

NIKE_00001646

# EXHIBIT 7

Team,

It's been one year since I last shared NIKE, Inc.'s Pay Equity data, so I'd like to update you again on where we are now. As a reminder, Pay Equity means equal pay for those who undertake the same work at the same location, level, experience and performance.

Our FY18 Pay Equity data show that globally, for every $1 earned by men, women earned $1; and in the U.S., for every $1 earned by white employees, people of color earned $1.

We're committed to maintaining these ratios — and we'll continue to perform annual data analyses, make pay adjustments when needed and regularly evaluate our pay programs and practices.

When we reported Pay Equity ratios last year, we also shared NIKE's diversity representation data. We will continue to report on representation annually, and you can expect a progress update in our Sustainable Business Report, which will be published soon.

I'm proud of the work our teams are doing across the company to continue to put our people first and innovate more. In the Total Rewards space — our pay and benefits programs — we do this by staying grounded in NIKE's values, integrating insights from teammates and benchmarking externally.

We shared a number of Total Rewards enhancements with you last July, including Competitive Pay Adjustments, One PSP and Nike Stock Choice — and you can expect more improvements over the next few quarters. More to come on that. In the meantime, you can learn about NIKE's Total Rewards philosophy and approach here, or find more on Pay Equity here. For questions, including those about your own pay, please speak with your manager or contact HR Direct.

Until next time,

**Monique Matheson**
Chief Human Resources Officer



FOR INTERNAL USE ONLY. © 2019 ALL RIGHTS RESERVED

For more information visit: Z E R O

Goldstein Decl. Ex. 12, Page 207 of 297

Confidential

NIKE_00014009

# EXHIBIT 8

| | |
|---|---|
| **From:** | DAyre |
| **To:** | Lst-Nike.Global |
| **Sent:** | 4/4/2017 7:20:00 PM |
| **Subject:** | Equal Pay Day: Nike has Pay Equity |

http://extassets.ni

Team,

Today, on Equal Pay Day, we are pleased to share that NIKE, Inc. has pay equity globally across all team members in all brands, inclusive of our wholesale and retail employees. This means that women, men and all races/ethnicities who undertake the same work at the same level, experience and performance are equitably compensated.

You may recall that several months ago Mark Parker communicated our commitment to pay equity as part of the White House Equal Pay Pledge. At that time, we shared that we would review pay practices across the company. In keeping with industry best practices, we worked in partnership with outside experts to complete a comprehensive study of all aspects of our pay across all jobs and all levels globally.

████████████████████████████████████████
████████████████████████████████████████. This confirms that there are essentially no differences in pay and that we have pay equity, highlighting the strengths of our Total Rewards programs and our continued focus on market competitiveness and pay for performance.

As Mark stated, "we are proud of our leadership and efforts to create a level playing field where all team members can perform at their best." We'll continue to focus on maintaining and reporting on pay equity across Nike. However, to truly unleash our full potential, we recognize that we must increase our efforts to create an inclusive culture where all of our diverse employees thrive, with supporting policies and practices, and — most importantly — where diverse individuals are represented at every level of leadership.

Regards,

id_ayre_david_only

**David Ayre**
EVP, Human Resources

Goldstein Decl. Ex. 12, Page 209 of 297

Confidential

NIKE_00015428

# EXHIBIT 9



# COMPETITIVE PAY CONVERSATIONS

OUR TOTAL REWARDS APPROACH IS GROUNDED IN THE PHILOSOPHY THAT OUR PRACTICES MUST REFLECT OUR VALUES, MEET THE DIVERSE NEEDS OF OUR EMPLOYEES AND DELIVER DIFFERENTIATED, COMPETITIVE PAY.

AS PART OF OUR COMMITMENT TO COMPETITIVE PAY, NIKE, INC. CONDUCTED ADDITIONAL PAY ANALYSES THIS YEAR TO MAKE SURE WE'RE STRONGLY COMPETITIVE.

THIS GUIDE WILL HELP PREPARE YOU FOR CONVERSATIONS WITH EMPLOYEES RECEIVING AN ADJUSTMENT AS A RESULT OF THIS ANALYSIS, OR WHO HAVE QUESTIONS ABOUT IT.

## COMMUNICATING AN ADJUSTMENT

- As part of NIKE's commitment to competitive pay – and taking into consideration both the constant movement of internal talent and the demands of a dynamic market – the HR team implemented an analysis to ensure our programs and individual pay rates are strongly competitive across the board.

- Recognizing the unique value that you bring to NIKE, and as result of this analysis, you will be receiving a pay adjustment.

- The increase includes both the value of your merit – reflecting your performance and contributions over the past year – and this incremental competitive pay adjustment.

- We don't expect adjustments like this to happen often, or for large portions of the employee population. However, we are committed to a regular annual review, and will make adjustments like this when we feel we have an opportunity to improve our position against market or internal pay rates.

- The increase is retroactive to the 2018 GPR Merit increase effective date. Current ESPP and 401(k) elections will apply to the retroactive amount.

## RESPONDING TO AN EMPLOYEE WHO DIDN'T RECEIVE AN INCREASE

- You did not receive a competitive adjustment because your pay is already considered competitive. While we examined and analyzed each role, not everyone received an adjustment; only about 10% of employees globally did.

- As the external market and internal pay rates are constantly changing, our Competitive Pay program will be conducted annually. There are also other opportunities for pay increases during the year including Mid-Year Talent & Pay Review and at promotion.

- Close with reinforcing key performance and pay messages around merit, PSP and stock if applicable.

## RELAX, YOU'VE GOT THIS!

These conversations are complex, as pay is a very personal topic. You may not have all the answers, or be able to make every person feel good immediately. What you do have is an opportunity to be clear on what is happening, connect with your employee and acknowledge how they are feeling at this time.

- Your goal is not to make every member of your team "happy" – this moment is about listening to their concerns and questions, building trust through open dialogue and partnering to move forward.

- It is tempting to feel like you need to have all the answers. You don't. That said, it's your responsibility to listen and lead in this moment and play back what you're hearing. Don't interrupt to offer unsolicited advice or solutions.

- This moment should not prompt you to apologize, place blame on another decision-maker or commit to any future rewards or financial incentives.

- You should not feel inclined or required to share details about who was given adjustments and why, or to compare your employee with others.

- If you need additional support, you or your employee can contact HR Direct.



Goldstein Decl. Ex. 12, Page 211 of 297

Confidential

NIKE_00015705

# EXHIBIT 10

# COMPETITIVE, EQUITABLE PAY:
## OUR COMMITMENT

Confidential

# COMPETITIVE, EQUITABLE PAY

## OUR COMMITMENT

THE PURSUIT OF COMPETITIVE, EQUITABLE PAY IS AN ONGOING DISCIPLINE. IN RECOGNITION OF THIS, WE HAVE PUT IN  PLACE A CENTER-DRIVEN ANALYSIS FOCUSED ON DELIVERING AGAINST OUR COMMITMENTS.

THIS ANNUAL, GLOBAL PROCESS WILL FOCUS ON MAKING COMPETITIVE PAY ADJUSTMENTS TO EMPLOYEES WHO ARE PAID BELOW OUR MARKET COMPETITIVE RANGES AND TO BETTER ALIGN PAY OF PEERS DOING SIMILAR WORK WITH SIMILAR EXPERIENCE AND PERFORMANCE.

### SUMMER 2018 ANALYSIS INCLUDES:

| UNDER MINIMUM | PAY EQUITY | KEY TALENT INTERNAL EQUITY |
|---|---|---|
| We will review employees who are paid under the pay range, making adjustments where necessary to ensure their pay is in the expected range for their job. | We will conduct an annual pay equity analysis to identify employees whose pay is not aligned with what we would expect based on our review. Where appropriate, we will make competitive pay adjustments to address those gaps. | We will centrally identify key talent using talent assessment results and other criteria, like: performance, length in job/band, and compa-ratio to surface competitive pay adjustments. |

© 2018 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.

I 2

Goldstein Decl. Ex. 12, Page 214 of 297

Confidential

NIKE_00015707

# EXHIBIT 11

# FY19 TOTAL REWARDS CHANGES

© 2018 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.

11

Goldstein Decl. Ex. 12, Page 216 of 297

Confidential

NIKE_00015717

# CHANGE 1:
# COMPETITIVE PAY – WHAT IT IS

We are committed to competitive pay, and after deeper analyses, we are making specific pay adjustments to ensure that NIKE is more competitive to market – strengthening our position across the board. This will impact employees at all bands, though not all employees will receive adjustments. We will perform these reviews for all employees annually (in addition to merit reviews) to ensure we are delivering on our commitments.

MANAGERS OF IMPACTED EMPLOYEES WILL BE NOTIFIED DIRECTLY, AND GIVEN RESOURCES TO COMMUNICATE THE PAY ADJUSTMENT TO EMPLOYEES.

© 2018 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.

16

Goldstein Decl. Ex. 12, Page 217 of 297

Confidential

NIKE_00015722

# COMPETITIVE PAY – WHAT YOU NEED TO KNOW

**Sustainable competitive, equitable pay is the result of thoughtfully designed hiring, promotion, lateral movement and performance pay practices, along with annually reviewing and adjusting pay. It is a system of complementary practices and habits, and is ongoing.**

- Our annual Competitive Pay program is a data-driven review of salary rates globally, for all employees, in all jobs.

- This year, NIKE ran its Competitive Pay program at the same time as our annual Global Performance Rewards (GPR) process. Going forward, the Competitive Pay program will run in the spring on its own.

- This year, for those who receive a competitive pay adjustment, it will be combined with merit, and paid out in the employee's first August paycheck. Adjustments won't be communicated to the employee as a separate increase. Managers whose employees are receiving an adjustment will receive additional information for those conversations.

- Most employees (~90%) will not receive an adjustment in their pay.

- Appreciate these conversations can be complex, as pay is a very personal topic.

© 2018 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.

17

Goldstein Decl. Ex. 12, Page 218 of 297

Confidential

NIKE_00015723

# EXHIBIT 12

| | |
|---|---|
| **From:** | Finley, Ilana (Converse) |
| **To:** | Bill Chappell |
| **Sent:** | 7/24/2018 5:00:21 PM |
| **Subject:** | Re: <External>media inquiry: pay raises |

Hi Bill,

No problem.  Follow up to your additional questions below.

- No. When we shared our FY17 Pay and Representation data with employees in early April, we had already begun additional pay competitive analyses. As part of our Total Rewards strategy, we analyze pay every year, and this year, we opted to perform a deeper analysis across all roles in the organization, globally. And key shifts in some of our rewards systems like Stock Choice and the new Fidelity portal require long-term planning and have been on the roadmap for several years.
- Through NIKE's Total Rewards program, we strive to meet the diverse needs of our employees, deliver differentiated, competitive pay and benefits, and support a culture in which employees feel included and empowered. We will perform these reviews annually, in addition to our standard merit reviews, to ensure NIKE remains competitive.
- Adjustments were made across all bands, geography, functions and brands. We're not speaking to specific percentages.

Best,
Ilana


**From:** Bill Chappell <BChappell@npr.org>
**Date:** Tuesday, July 24, 2018 at 12:36 PM
**To:** Ilana Finley <Ilana.Finley@nike.com>
**Subject:** RE: <External>media inquiry: pay raises

Thank you, Ilana – that is helpful. Can you confirm whether the company undertook this "deeper analysis" at least in part because of the allegations of poor conditions for women at the company that led to the departure of nearly a dozen executives?
Is this part of a broader plan to change Nike's culture, or is it common to see pay hikes for thousands of employees based solely on a competitiveness adjustment?
Can you tell me what is the average pay increase, in percentage?


**From:** Finley, Ilana <Ilana.Finley@nike.com>
**Sent:** Tuesday, July 24, 2018 9:36 AM
**To:** Bill Chappell <BChappell@npr.org>
**Subject:** Re: <External>media inquiry: pay raises

Hi Bill,

Here's more on what was communicated yesterday:

This month, NIKE, Inc. will make updates to employee pay and awards. Through NIKE's Total Rewards program, we strive to meet the diverse needs of our employees, deliver differentiated, competitive pay and benefits, and support a culture in which employees feel included and empowered. As part of this approach and commitment we have made the following changes to pay and rewards.

•       Competitive Pay Adjustments: We are committed to competitive pay.  With movement of internal talent, and the demands of a dynamic market, we analyze pay each year. This year we have conducted a deeper analysis of all

Goldstein Decl. Ex. 12, Page 220 of 297

Confidential

NIKE_00019490

roles, at all levels globally. As a result, we are making adjustments to some employee pay to ensure that NIKE, Inc. is more competitive to market. About 10% of our population will receive an adjustment, across all levels, geographies, functions and brands.

•        One PSP: FY19 moves us into a One Performance Sharing Plan (PSP) for all eligible employees. Previously, bonus payouts were determined by a combination of company, team and individual performance. Going forward, One PSP will measure success based primarily on company-wide performance.

•        Stock Choice: Stock-eligible employees, will now be able to choose how to receive annual stock awards – as either 100% Stock Options, 100% Restricted Stock Units (RSUs), or 50/50 Stock Options and RSUs.

I think this should cover most of the below, but please let me know if you still have questions.

Best,
Ilana


---
**Ilana Finley**
Senior Director, North America Communications
**Nike, Inc.**


**From:** Media Relations <Media.Relations@nike.com>
**Date:** Tuesday, July 24, 2018 at 9:28 AM
**To:** Ilana Finley <Ilana.Finley@nike.com>, KeJuan Wilkins <KeJuan.Wilkins@nike.com>
**Subject:** FW: <External>media inquiry: pay raises


**From:** Bill Chappell <BChappell@npr.org>
**Date:** Tuesday, July 24, 2018 at 8:35 AM
**To:** Media Relations <Media.Relations@nike.com>
**Subject:** <External>media inquiry: pay raises

Hi,
I'm looking at writing a quick story on Nike raising pay, for NPR's website.

Can you tell me the thinking behind the pay raises? Was it done to even out the wage gap?

Did the pay raises affect any countries/regions?

How about any specific pay bands – like, those in the bottom half of the pay range?

Trying to get a sense of who this pay raise went to, essentially.

Thank you for any help,
Bill

Bill Chappell
NPR
202-513-3624

Goldstein Decl. Ex. 12, Page 221 of 297

NIKE_00019491

# EXHIBIT 13

**Nike Additional Information**
**3/21/18**

**When we became aware of behavioral issues in some areas of the company, we acted swiftly. We take these issues very seriously and we were disturbed and saddened to hear of them. We are committed to a culture that reflects our values and are taking steps so that all our employees have a positive experience built on respect, inclusivity and empowerment.**

**Nike is committed to pay equity across all roles and we measure pay equity by looking at whether individuals, regardless of their gender or race/ethnicity, are paid equitably taking into consideration relevant factors such as job, job level, performance ratings over time, tenure at Nike, time in role, and experience.  Nike's approach to pay equity mirrors that of other leading companies. We recognize that a global approach can sometimes obscure anomalies in pockets of the organization. As a result, we are using supplemental analyses to gain greater insight in local areas that will help us make speedier progress.**

**We plan to continue to make progress, update and publish this figure annually.  We will be updating this year's results soon.**

**For our most recent results in FY15, the overall ratio of female to male people managers is 59% male and 41% female and the overall ratio of female to male leadership/management is 64% male and 36% female, versus the total global employee ratios of 51% male and 48% female. For more information go to our Sustainable Business Report:** <u>**https://about.nike.com/pages/sustainable-innovation**</u>

**We are focused on attracting, developing and retaining more women and people of color. We remain strongly committed to accelerating these numbers and increasing the number of women and people of color we have in leadership levels.**

Goldstein Decl. Ex. 12, Page 223 of 297

# EXHIBIT 14

| From: | Carreon-John, Sandra |
|-------|----------------------|
| To: | Cowley, Stacy |
| Sent: | 7/24/2018 3:03:24 PM |
| Subject: | Statement for clarification |

Stacy --

Thanks so much for taking my call and for your consideration.

Below is a statement on record for clarification vis-a-vis pay analyses:

*When we shared our FY17 Pay and Representation data with employees in early April, we had already begun additional pay competitive analyses. As part of our Total Rewards strategy, we analyze pay every year, and this year, we opted to perform a deeper analysis across all roles in the organization, globally. And key shifts in some of our rewards systems like Stock Choice and the new Fidelity portal require long-term planning and have been on the roadmap for several years.*

**Sandra Carreon-John**
Nike, Inc. | Global Corporate Communications Director
Mobile: 212-518-7642

**From:** "Cowley, Stacy" <stacy.cowley@nytimes.com>
**Date:** Tuesday, July 24, 2018 at 10:21 AM
**To:** "Carreon-John, Sandra" <Sandra.Carreonjohn@nike.com>
**Subject:** <External>Re: Quick call...

Hey there -- you can get me at 212-556-4620. The story is pretty carefully worded, though, to avoid drawing a direct line between the internal unrest and the compensation changes. My editors went over it all quite carefully, so I don't think they're going to be willing to make changes to the text.

--
**Stacy Cowley**
**reporter @ new york times**
**620 eighth ave., new york, ny 10018**
**phone: 212-556-4620**

On Tue, Jul 24, 2018 at 9:34 AM, Carreon-John, Sandra <Sandra.Carreonjohn@nike.com> wrote:
Hi Stacy....

Do you have time for a quick call... wanted to chat about the piece you wrote cuz I wanted to provide clarity on something. I think there's an inference by many media that the pay analysis and bump were related to the issues in March.

But the truth is that this was in the works for some time and for something this sweeping, it doesn't happen in three or four months... I'm not sure how long it had been taking place (the research and analysis) but it didn't begin in March. Is there any way to clarify?

**Sandra Carreon-John**
Nike, Inc. | Global Corporate Communications Director
Mobile: 212-518-7642

Goldstein Decl. Ex. 12, Page 225 of 297

# EXHIBIT 15



# MARKET PRICING



Every year, all structures are reviewed for all countries, globally.  Adjustments to the structures are made, based on the market movement for that year.

# EXHIBIT 16



RANGE
POSITIONING

 Goldstein Decl. Ex. 12, Page 230 of 297    1

# PAY CONSIDERATIONS

**EXTERNAL COMPETITIVENESS**

External Pay Range

Employee pay compared to external market

**INTERNAL EQUITY**

Internal Pay Range

Pay compared to other Nike employees in same job code

In making pay decisions, you should consider where an employee is paid relative to others within Nike as well as how they're paid compared to the external market.

Assessing **External Competitiveness**
- External Pay Range
  - Pay range for jobs in a particular market based on external data
- Assess an employee's pay position by reviewing how their pay compares to the pay range

Reviewing **Internal Equity**
- Internal Pay Range – used for information purposes – not to be only data points used for pay decisions.
  - All employees within a specific job code (e.g. A0374 Prof Inter: Fin Planning)
  - Same Currency & same Market
  - Ranges in tool represent 10th to 90th percentile of actual employee pay

Both of these ranges are available to managers & HR in HRD

 Goldstein Decl. Ex. 12, Page 231 of 297

# EXHIBIT 17

Message

| | |
|---|---|
| **From**: | MMatheson [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6FBEEAB93A734FB3939CC8B7F8EDCCA8-M.MMATHESON] |
| **Sent**: | 4/4/2018 4:00:23 PM |
| **To**: | Lst-Nike.Global [lst-nike.global@nike.com] |
| **BCC**: | Powell, Nigel [nigel.powell@nike.com]; Leonard, Kellie [kellie.leonard@nike.com]; Remuzzi, Mary [mary.remuzzi@nike.com]; Oei, Sabrina [sabrina.oei@nike.com]; Freinquel, Mihal [mihal.freinquel@nike.com]; Favret, Emily [emily.favret@nike.com]; Communications, Internal [internal.communications@nike.com]; Wade, Marcus [marcus.wade@nike.com]; Krane, Hilary [hilary.krane@nike.com]; Matheson, Monique [monique.matheson@nike.com]; Jones, Hannah [hannah.jones@nike.com]; Andrews, Antoine [antoine.andrews@nike.com]; Fuller, Julie [julie.fuller@nike.com]; Leinwand, Robert [robert.leinwand@nike.com]; Thibodeaux, Lauren [lauren.thibodeaux@nike.com]; Lupo, Kim [kimberly.lupo@nike.com]; Simpson, Patrick [patrick.simpson@nike.com]; Smiddy, Alex [alex.smiddy@nike.com]; Small, Carolyn [carolyn.small@nike.com]; Bassett, Lynn [lynn.bassett@nike.com] |
| **Subject**: | Representation & Pay Equity Commitments |
| **Flag**: | Follow Up |

Team –

We are committed to evolving our culture and making NIKE, Inc. an environment focused on respect, equality, inclusion and empowerment. For NIKE to grow and evolve, we need to create meaningful change and put a sharper focus on how we lead our teams and work together.

We're a growth company committed to employing the best and brightest to serve consumers globally. Employees with the necessary skillsets, expertise and diversity are critical to drive our business forward. Diversity allows for a breadth of perspectives and experiences to develop thoughtful and original ideas; it's a key component of innovation.

We also want to create a culture of true inclusion. As part of our plan, we need to improve representation of women and people of color (POC). While we're focused on these two areas in the near term, we will continue to expand representation across other dimensions of diversity over the long term.

While we've spoken about this many times, and tried different ways to achieve change, we have failed to gain traction – and our hiring and promotion decisions are not changing senior-level representation as quickly as we have wanted. We need to accelerate our progress and are committed to being transparent.

I want to walk you through a few elements of this – including where we are now and how we plan to improve. Also, I'd like to help explain some recent pay-related data. It's a lot. Please take some time to get through it.

**OUR CURRENT REPRESENTATION**

Our efforts to improve will begin at the Vice President (VP) level, because representation at this level provides a foundation for us to grow representation at all levels. As a group, these leaders manage broad teams, recognize and promote our internal talent, hire in larger volume, and are charged with leading the business direction for our company and tone for our culture. They also serve as role models and advocates for talent in the organization.

Our FY17 data show that at the VP level, representation is currently at 29% women globally, and 16% POC in the U.S. The U.S. is the only country in which NIKE captures employee race/ethnicity information. Many countries restrict the collection of personal demographic information so we are unable to capture it consistently. Even so, we will continue to make progress against diverse representation globally.

We're also committed to increasing diverse representation across all levels of the company, because we know that our manager and director-level employees will be part of the future senior leadership teams for NIKE. See the FY17 data

CONFIDENTIAL

NIKE_00002233

for all employees, Directors+ and VPs here:

CONFIDENTIAL

NIKE_00002234

**PAY EQUITY IS ONE PART OF THE SOLUTION**

Not to be confused with the UK Gender Pay Gap Report, we also want to provide our most recent data on Global Pay Equity, which we reported last year for the first time. Pay Equity is defined as equal compensation for women, men and all races/ethnicities who undertake the same work at the same level, experience and performance. It's different from the UK Pay Gap analysis because it looks at pay for jobs, rather than average of all pay.

Our approach mirrors that of other leading companies, and allows us to compare across companies and evaluate progress. We've also heard from some of you that this result does not reflect your personal experience, so we have begun supplemental analysis to help us to learn more about specific parts of the company and make speedier progress.

We are monitoring these data, and adjusting where appropriate, driving with 1:1 as our goal for both groups, every year. And while Pay Equity is an important measure, we are also focused on the deeper issue of driving changes in representation, banding and promotions. We will be studying time-in-job and the pace of promotions across our employee base – with a strong focus on women and POC – to understand how this impacts representation.

**DRIVING TOWARD CHANGE**

We are committed to driving change to move us forward. We've done some work overall already, but need to move faster. Here is where we will start:

- **Hold leaders accountable:** There are three ways to increase representation – promotion, retention and hiring – and we're working through strategic initiatives and action plans to enable each of them. Leaders will be held accountable for representation growth within their teams (women globally, and POC in the U.S.).
- **Develop diverse talent:** A multi-faceted approach to investing in our diverse talent. This includes evolving our current development offerings, creating new programs that accelerate emerging diverse leaders, and expanding our employee networks – showcasing our commitment to engaging the diverse talent of the future.
- **Inclusive hiring:** Invest in a dedicated diversity sourcing team to be immersed in the marketplace; increase visibility and accountability to ensure slates of diverse candidates when hiring; and remove bias from critical moments of the hiring process by creating more inclusive job descriptions, enabling blind resume reviews, eliminating the collection of candidate salary history, and using data to inform hiring decisions.
- **Accelerated training:** Focused manager training, beginning in May, to ensure all managers are clear on expectations – when and how they are compelled to act – and have resources to lead in a manner consistent with our values and behaviors. Mandatory Unconscious Bias Awareness training for all employees aimed at creating a stronger, more inclusive culture. Unconscious Bias Awareness training will launch to employees located in the U.S. and Canada in August, with a global launch to all employees in mid-FY19.

Our executive leadership team is committed to action and change. We begin with representation – which we know requires sharp and sustained attention. We will be talking a lot more about our culture, redefining what great leadership looks like and how we model a culture where all leaders are focused on empowering our employees.

We look forward to having a full, open dialogue with everyone. We will also provide opportunities to continue this

CONFIDENTIAL

conversation, and for our communities around the world to share and connect. Over the next couple of weeks and continuing in the months ahead, there will be opportunities to speak directly with leaders face-to-face in small group sessions, 1:1s and D&I-sponsored forums about what this means.

I know you probably have questions, and we've tried to answer some of them here. I believe we are moving in the right direction, and as an Executive Leadership Team, we're encouraged by the passion and voices we hear. We're listening and we'll keep this dialogue going.

We need everyone's help to drive this change, and our leadership team is accountable for making progress against this vision.

I'll connect again soon.

**Mo Matheson**
Chief Human Resources Officer

FOR INTERNAL USE ONLY. © 2018 ALL RIGHTS RESERVED

For more information visit:

CONFIDENTIAL

NIKE_00002236

# EXHIBIT 18

Goldstein Decl. Ex. 12, Page 237 of 297



# PAY EQUITY AND GENDER PAY GAP

**PAY EQUITY & GENDER PAY GAP**

FAQS

PAY EQUITY DATA

GENDER PAY GAP DATA

English

NIKE, Inc. is committed to competitive and equitable pay — and with constant movement of internal talent, and the demands of a dynamic labor market, we analyze pay each year. Two of the many data points we continue to measure are Pay Equity and, in certain countries where required by law, the Gender Pay Gap.

## PAY EQUITY

NIKE measures Pay Equity as equal pay for women, men and all races and ethnicities who undertake the same work at the same level, location, experience and performance – this approach aligns with top-tier global companies. Pay Equity is informed by several inputs (for example performance, pay, function, job code and location) to determine the expected range of pay for each employee. Find historical Pay Equity data here.

## GENDER PAY GAP

Companies in certain countries (currently the U.K. and France) are required to calculate the Gender Pay Gap by aggregating all men's pay versus all women's pay — across all bands, levels and jobs — and taking the average of each. Because it is an aggregated number, results are primarily driven by the ratio of men to women in higher paid positions. In contrast with Pay Equity inputs, the Gender Pay Gap measurement places greater emphasis on the importance of hiring, promoting and retaining diverse talent. Find historical Gender Pay Gap data here.

2019/04/02 - 1:38pm

Global

Website Help    Contact HR

Confidential

NIKE_00003193

# EXHIBIT 19



ANNUAL PAY REVIEW

MANAGER TOOLKIT  //  APRIL 2019

Goldstein Decl. Ex. 12, Page 240 of 297

# ANNUAL PAY REVIEW: WHAT'S CHANGING

## COMPETITIVE PAY MANAGEMENT (CPM)

We are committed to evaluating pay every year to ensure competitive and equitable pay for all employees — and in 2018, we introduced CPM.

We don't anticipate that most employees will receive a CPM adjustment, however, there are times when one is recommended.

FROM: In 2018, this process (analysis and adjustments) was done entirely through Excel spreadsheets.

TO: Moving forward, **all adjustments will be loaded into SuccessFactors** for review.

## CORE PAY INVESTMENTS

Base Pay is made up of Core Pay + CPM Adjustments.

FROM: Base pay increases were driven by the CFE rating.

TO: Managers are equipped with pre-populated recommendations for market competitive base pay increases. This is done in SuccessFactors and is based on the employee's country and position in range.

Managers can further invest by selecting from a dropdown list or can remove the increase entirely.

**CFE ratings no longer drive the default Core Pay increase,** but performance continues to be an important factor when determining pay. Other inputs include current position in range, future potential, impact of loss, risk of loss, time in role and pay relative to peers.

## STOCK AWARDS

FROM: Managed through Excel spreadsheets with minimal visibility for managers throughout the process.

TO: **Market competitive stock awards are pre-populated** in SuccessFactors based on the employee's country and band.

Managers can further invest by selecting from fixed increments from a dropdown list, or can decrease or remove the award.

Throughout the Executive Review process, managers will **maintain visibility** into award adjustments.

## DASHBOARDS & REPORTING

FROM: Limited, static and disparate reporting available to managers throughout all pay processes.

TO: **Standardized reporting** available in SuccessFactors to provide leaders and managers with **greater visibility** into pay adjustments throughout the process.

## PAY STATEMENTS

FROM: Managers print out pay statement, with employee-level details only, to support pay conversations.

TO: **Enhanced statement** available in SuccessFactors to print with employee details, additional program details and enhanced formatting to enable managers to have **a richer, more informed conversation.**

NIKE, Inc. reserves the right to amend, modify, terminate or suspend the plans and programs described in this document at any time, for any reason and without prior notice. In addition, NIKE reserves the right to impact pay adjustments, short-term incentive payments and long-term incentive payments if, during the performance period, an employee receives an Unsatisfactory CFE rating, a performance action plan, corrective action or it is determined the employee engaged in behavior that violates policies. NIKE is not obligated to grant any future awards to any employee and participation in NIKE's compensation plans does not constitute a guarantee of employment.

©2019 NIKE, Inc. All rights reserved. For internal use only.

3

Confidential

# EXHIBIT 20

**Nike Total Rewards Program Overview**

This month, NIKE, Inc. will make updates to employee pay and awards.

Through NIKE's Total Rewards program, we strive to meet the diverse needs of our employees, deliver differentiated, competitive pay and benefits, and support a culture in which employees feel included and empowered.

As part of this approach and commitment we have made the following changes to pay and rewards.

- **Competitive Pay Adjustments:** We are committed to competitive pay. With movement of internal talent, and the demands of a dynamic market, we analyze pay each year. This year we have conducted a deeper analysis of all roles, at all levels globally.

  As a result, we are making adjustments to some employee pay to ensure that NIKE, Inc. is more competitive to market. About 10% of our population will receive an adjustment, across all levels, geographies, functions and brands.

  **One PSP:** FY19 moves us into a One Performance Sharing Plan (PSP) for all eligible employees. Previously, bonus payouts were determined by a combination of company, team and individual performance. Going forward, One PSP will measure success based primarily on company-wide performance.

- **Stock Choice:** Stock-eligible employees, will now be able to choose how to receive annual stock awards – as either 100% Stock Options, 100% Restricted Stock Units (RSUs), or 50/50 Stock Options and RSUs.

Confidential



1(213) 683-6169
danielprince@paulhastings.com

September 22, 2020

**VIA EMAIL**                                                    **ATTORNEYS' EYES ONLY**

Hon. Jolie A. Russo
United States Magistrate Judge
Mark O. Hatfield United States Courthouse
Room 1027
1000 S.W. Third Avenue
Portland, Oregon  97204
Gary_Magnuson@ord.uscourts.gov

Re:      *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Judge Russo:

        Defendant Nike, Inc. ("Nike") submits this Sur-Reply in connection with Plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender's (collectively, "Plaintiffs") August 7, 2020 Motion to Compel the production of privileged compensation and promotions analyses, each of which was designed, conducted, and executed at the direction of counsel, beginning in 2016 through 2020.[1]

I.      **INTRODUCTION**

        Plaintiffs ask this Court to grant the ultimate sanction—compelling the production of analyses that the record evidence establishes to be privileged and protected attorney work-product—without any objective measure or legal standard, or the necessary factual predicate.  Nike requested this Sur-Reply to clarify the misstatements of fact and law contained in Plaintiffs' Reply.  As set forth in Nike's Opposition and below, the Court should deny Plaintiffs' motion to compel for at least the following reasons:

        ***First***, there is no prohibition on the submission of declarations in opposition to a party's challenge to privilege designations.  To the contrary, declarations routinely are submitted and accepted by courts to substantiate privilege designations.  *See In re Grand Jury Investig.*, 974 F.2d 1068, 1071 (9th Cir. 1992).  Nor does submitting declarations constitute evidence of a deficient privilege log in the first instance.  Plaintiffs are intentionally seeking to blur the distinction between the legal requirements for a privilege log to assert a claim of privilege with the legal standard of proof when an assertion of privilege is challenged in court.  *See Apple Inc. v. Samsung Elecs. Co.*, 306 F.R.D. 234, 237 (N.D. Cal. 2015); *Kiobel v. Royal Dutch Petroleum Co.*, 2005 U.S. Dist. LEXIS 16514, at *13 (S.D.N.Y. Aug. 3, 2005).  Regardless, Nike has established that its privilege logs contained the requisite detail and Nike has carried the burden of substantiating those assertions of privilege.

        ***Second***, Plaintiffs dared Nike to "provide[] declarations" to lay foundation for its privilege claims. Mot. at 13.  Nike did it.  Those declarations unequivocally show that the compensation and promotions analyses are protected by the attorney-client privilege and the attorney work-product doctrine, and

---

[1] Like Plaintiffs' Reply, this Sur-Reply brief exceeds the page limits provided under LR 26-3(b), however, Nike respectfully submits that the additional pages are necessary to respond to the issues raised by Plaintiffs concerning Nike's privileged and confidential compensation and promotions analyses.



Hon. Jolie A. Russo                                    **Attorneys' Eyes Only**
September 22, 2020
Page 2

therefore are shielded from disclosure, even considering Plaintiffs' attempt to make an end-run around sacrosanct legal doctrines.  *See, e.g.,* Hearn Decl. at ¶¶ 6, 8-12; Thibodeaux Decl. at ¶¶ 6-30; Baffa Decl. at ¶¶ 5-11; Hendrickson Decl. at ¶¶ 5-29; Wiggins Decl. at ¶¶ 3-8; North Decl. at ¶¶ 3-9.[2]

> *Third*, Plaintiffs' "timeliness" narrative is not supported law or fact.  As this Court has recognized, Plaintiffs filed an "extensive case," Dkt. # 111, a collective and class action challenging Nike's pay and promotion decisions for virtually every woman at Nike's world headquarters and their alleged male counterparts.  Plaintiffs argue that Nike was obligated to produce privilege logs within a 30-day "time limit" and that the Court should find waiver of privilege because Nike did not produce its privilege logs for this "extensive case" within 30-days of Plaintiffs' demand.  Plaintiffs are wrong.  Even the case Plaintiffs cite rejects a *per se* application of a rigid "time limit" and waiver, opting instead to avoid litigation "gamesmanship" by focusing on the circumstances of each case.  *See, e.g., Burlington N. & Santa Fe Ry. v. United States Dist. Court*, 408 F.3d 1142, 1149 (9th Cir. 2005).

> The record evidence establishes that a 30-day "time limit" is not workable in this "extensive case" and Plaintiffs apparently agree.  They took more than seven months to produce a "phase one" privilege log and they produced a supplemental privilege log only a month ago.  That Plaintiffs contend they can avoid the claimed "time limit" but that Nike cannot—and worse, that Nike must be sanctioned for it—is pure gamesmanship and double-talk.  As set forth in Nike's Opposition and the supporting declarations, identifying and collecting documents related to work that began almost five years ago is not as simple as typing "search" into a computer and then all of the records magically appear for entry on a privilege log.  Rather, the breadth and scope of the RFPs, the relevant time periods of the analyses, Plaintiffs' refusal to prioritize discovery, tracking down work and documents for former employees, identifying the universe of privileged documents, interviewing more than a dozen witnesses on privilege issues, scouring metadata to populate fields in privilege logs, employee lay-offs, nationwide retails store closures, limited staffing and the need for in-house counsel to transition thousands of employees to working-from-home during the COVID-19 pandemic all have made document collection, production, and privilege logging more challenging in this case and not susceptible to the claimed "time limit."  *See, e.g.,* Thibodeaux Decl. at ¶¶ 31-33; Prince Decl. at ¶¶ 6-8.

> Indeed, Plaintiffs neglect to advise the Court of the true dispute over privilege logs.  That is, whether privilege logs reasonably can be provided immediately, as Plaintiffs contend, or whether they should be provided at or near the close of discovery, as Nike proposed.  While Nike always believed in the merits of its proposal, it agreed to a compromise.  To accommodate Plaintiffs, Nike agreed to produce its privilege logs, including in connection with the analyses, on a phased basis.  And Nike has done just that.  But now, Plaintiffs insist that even phased privilege logs are not good enough.  At least for Nike they are not.  It is acceptable, according to Plaintiffs, for them to produce phased logs, but for Nike to be sanctioned for doing the same thing.  The gamesmanship continues.

> *Fourth*, Nike has not impliedly waived protection over the analyses by virtue of its affirmative defenses in this lawsuit.  Plaintiffs again misstate the law and facts.

> The motion should be denied in its entirety.

---

[2] Except where indicated, this Sur-Reply cites to and incorporates by reference declarations that were filed in support of Nike's Opposition, dated September 8, 2020.



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 22, 2020
Page 3

II.      **PLAINTIFFS IGNORE THE FACTS SET FORTH BY EVERY DECLARANT; AND, THOSE FACTS ESTABLISH THAT THE ANALYSES ARE PROTECTED FROM DISCLOSURE BY THE ATTORNEY-CLIENT PRIVILEGE.**

         A.      **The Facts Establish That the Analyses Are Privileged.**

                 1.      Plaintiffs' 16-page Reply brief fails to grapple with the undisputed facts.

         The undisputed facts establish that the analyses are privileged.  This conclusion is based on the declarations of:

- Nike's former Global Employment Counsel;
- Nike's current Vice President, Global Employment Counsel;
- Two attorneys with Nike's outside counsel, Seyfarth Shaw LLP (including the co-chair of the firm's Pay Equity Practice Group and the head of the firm's National Counseling Practice);
- The consultants retained by counsel to carry out the privileged analyses, at the direction of counsel (including a Senior Consultant from Willis Towers Watson ("WTW") for the 2016 compensation analyses, and a Principal from Mercer for the 2018 – 20 compensation and promotions analyses); and
- Nike's Vice President of Total Rewards, Operations & Services, the corporate function responsible for compensation and benefits ("Total Rewards").

         To counter this avalanche of facts from *all* of the relevant witnesses, Plaintiffs offer pure speculation that (i) Seyfarth's pay equity attorneys did not, in fact, practice law when they were retained by Nike to provide legal advice on the structure and conduct of the studies and to remediate potential legal exposure, Reply at 13, and (ii) in Plaintiffs' expert opinion (although no declaration was filed), the corporate functions at Nike were driving the analyses, not Nike Legal or outside counsel.  Reply at 14.  Both arguments fail.  At least the following facts are fatal to Plaintiffs' position:

         *First*, Nike retained pay equity experts at Seyfarth with specific expertise in conducting, structuring, and executing compensation and promotions analyses.  Nike engaged Seyfarth to provide legal advice regarding, for example, ███████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████.  These attorneys did, in fact, provide legal advice to Nike on these matters for each of the analyses.  Hearn Decl. at ¶¶ 4-7; Thibodeaux Decl. at ¶¶ 4-5; Baffa Decl. at ¶¶ 1-4, 11-12; Hendrickson Decl. at ¶¶ 4-5.

         Plaintiffs baldly assert that these matters "do not require legal training or skill," but that ignores reality.  Reply at 13.  Seyfarth has a dedicated Pay Equity practice group, and those attorneys counsel clients based on their specialized knowledge and training.  Baffa Decl. at ¶ 1; Hendrickson Decl. at ¶ 1. In fact, Ms. Hendrickson co-authored a manual on pay equity developments in all 50-states, and she and her partner, Mr. Baffa, conduct pay studies with a view towards assessing legal risk exposure and eliminating discriminatory differences in pay.  Baffa Decl. at ¶¶ 4-5, 11-12; Hendrickson Decl. at ¶¶ 1, 4-5. *See also Ozgur v. Daimler Trucks N. Am. LLC*, No. 3:19-cv-00432-JR, 2020 U.S. Dist. LEXIS 86894, at *3 (D. Or. May 18, 2020) ("[Attorney-client] privilege 'applies to communications between lawyers and their



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 22, 2020
Page 4

clients when the lawyers act in a counseling and planning role, as well as when lawyers represent their clients in litigation.'  And when an attorney is hired to give advice, there is a rebuttable presumption that the lawyer is hired to give 'legal advice.'") (quoting *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir. 1996)).

**Second**, the term pay equity has different meanings for different people.  While non-attorney, lay personnel generally refer to a gender pay gap (*e.g.,* average salary difference), in a legal sense, pay equity refers to the elimination of discriminatory differences in compensation.  The latter was (and is) a primary driver of the compensation and promotions analyses.[3]  Lupo Decl. at ¶¶ 3-4; Hearn Decl. at ¶¶ 3-5; Thibodeaux Decl. at ¶¶ 3-5; Baffa Decl. at ¶¶ 3-4; Hendrickson Decl. at ¶¶ 3-5.

**Third**, Nike Legal and Seyfarth's discussions and work on compensation analyses began nearly six months prior to the June 2016 Equal Pay Pledge initiative launched by the White House.  In addition, public statements by Nike's current or former Human Resources or Media professionals—or other non-attorney, lay personnel—regarding "pay equity" or gender "pay gap" studies do not waive privilege over the formulation or execution of the analyses here, much like the announcement that Nike is selling a new shoe would not waive privilege over the legal analysis performed to determine if the air sole design is subject to trade secret or patent protection.  Hearn Decl. at ¶¶ 3-7, 13; *see also* Reply at 14-15.  Plaintiffs never responded to this hypothetical.

That Nike may have acknowledged the existence of such analyses, taken action as a result of the outcome of such analyses, or relied upon such analyses in making and/or acting upon legal advice does not waive their privileged and confidential status.

**Fourth**, dating back to at least early 2016, Kim Lupo, the Vice President of Total Rewards, specifically consulted Nike Legal regarding the need to ███████████████████████████████████ ██████████████████████████████████████████.  Lupo Decl. at ¶ 3.  Ms. Lupo has continued to seek legal advice from Nike Legal in regards █████████████████████████████████████████ ████████████████████████████████████ .  *Id.* at ¶¶ 3-4.

Contrary to Plaintiffs' assertion that the studies primarily were business-oriented, Ms. Lupo responded:  "the legal objectives [of the analyses] are weaved together with the business objectives … [and that for] the Total Rewards organization, the two are not mutually exclusive."  Lupo Decl. at ¶¶ 3-4; *see also* Hearn Decl. at ¶¶ 4-5 and Thibodeaux Decl. at ¶¶ 3-5.

---

[3] Plaintiffs rely on *NECA-IBEW Pension Trust Fund (The Decatur Plan) v. Precision Castparts Corp.*, 2019 U.S. Dist. LEXIS 168088 at *12 (D. Or. Sept. 27, 2019), but there, the Court found that defendants carried their burden that the documents, like those at issue here, concerned legal advice.  Plaintiffs' reliance on *FTC v. Adept Mgmt.*, 2018 U.S. Dist. LEXIS 111673 at *9 (D. Or. July 3, 2018), similarly is misplaced because that case deals with the crime-fraud exception to the attorney-client privilege, which is analyzed under its own test and is not at issue in this matter.  Similarly, in *McCaugherty v. Sifferman*, 132 F.R.D. 234 (N.D. Cal. 1990), the court found that the ultimate goal of the relevant work was a business goal, namely selling a company.  Here, even though there are benefits to other corporate functions, that does not diminish the primary function of providing legal advice.



**Fifth**, for every study performed, Nike Legal and Seyfarth formed a discrete project team of attorneys, consultants, and subject matter experts to carry out the work.  For every study performed, Nike Legal directed Seyfarth to prepare a Privilege Protocol.  In every case, the Protocol provided clear guidance to project team members on the need to keep the materials confidential, including limiting the distribution of documents to project team members.  Every witness stated that he or she faithfully followed the Protocol, as did other team members.  Hearn Decl. at ¶¶ 8-12; Thibodeaux Decl. at ¶¶ 7-30; Baffa Decl. at ¶¶ 6-10; Hendrickson Decl. at ¶¶ 6-29; Wiggins Decl. at ¶¶ 4-8; North Decl. at ¶¶ 3-7.

**Sixth**, WTW and Mercer were retained at the direction of counsel, to carry out the analyses at the direction of counsel.  And these consultants did, in fact, carry out their work at the direction of counsel.  Hearn Decl. at ¶¶ 6, 8-12; Thibodeaux Decl. at ¶¶ 6-30; Baffa Decl. at ¶¶ 5-11; Hendrickson Decl. at ¶¶ 5-29; Wiggins Decl. at ¶¶ 3-8; North Decl. at ¶¶ 3-9.

Indeed, Seyfarth provided legal advice on the methodology of the studies (*e.g.,* ██████████ ████.  That legal advice was baked-into each and every study and the legal risk analysis prepared and provided to Nike Legal in connection with each and every study.  Hearn Decl. at ¶¶ 6, 8-12; Thibodeaux Decl. at ¶¶ 6-30; Baffa Decl. at ¶¶ 5-11; Hendrickson Decl. at ¶¶ 5-29; Wiggins Decl. at ¶¶ 3-8; North Decl. at ¶¶ 3-9.

Thus, Plaintiffs' continued reliance on *Becker v. Willamette Cmty. Bank*, 2014 U.S. Dist. LEXIS 88616 (D. Or. June 30, 2014), is unavailing.  In Becker, the context and chronology of the plaintiff's supervisor's communications with outside counsel demonstrated "that she was not seeking legal advice of any kind, but a factual evaluation of [plaintiff's] performance."  *Id.* at *9.  Per above, the analyses here would have been substantively and substantially different without Seyfarth's involvement because Seyfarth provided legal advice on key methodology issues that were baked-into the studies themselves.  Hearn Decl. at ¶¶ 6, 8-12; Thibodeaux Decl. at ¶¶ 6-30; Baffa Decl. at ¶¶ 5-11; Hendrickson Decl. at ¶¶ 5-29; Wiggins Decl. at ¶¶ 3-8; North Decl. at ¶¶ 3-9

**Seventh**, Plaintiffs concede that the labor economists and consultants from Mercer and WTW constitute functional employees for purposes of this inquiry.  Plaintiffs initially criticized Nike (before Nike had a chance to respond) for failing to "provide[] declarations" regarding "its engagement of Mercer for the supplemental pay equity analyses."  Mot. at 13. But when Nike complied, Plaintiffs had no response.  Mercer and WTW were retained as part of privileged studies, their work was directed by counsel, and they were integrated onto the project teams to provide legal advice to Nike Legal.  Their work, along with the communications shared between Mercer, WTW, and other members of the project teams are privileged.[4]  Hearn Decl. at ¶¶ 6, 8-12; Thibodeaux Decl. at ¶¶ 6-30; Baffa Decl. at ¶¶ 5-11; Hendrickson Decl. at ¶¶ 5-29; Wiggins Decl. at ¶¶ 3-8; North Decl. at ¶¶ 3-9.

---

[4] This concession is fatal to Plaintiffs' claim that Nike must log every communication for the last five years related to the studies.  By acknowledging that the consultants at WTW and Mercer are functional employees and that the project team communications were part of the privileged studies, there would be no need to log every communication shared between WTW, Mercer, Nike Legal, and Nike's subject matter experts.  Moreover, there is no support for Plaintiffs' position, particularly at the pre-certification phase.  And, *Royal Surplus Lines Ins. v. Sofamor Danek Group*, 190 F.R.D. 463 (W.D. Tenn. 1998), is



**Attorneys' Eyes Only**

***Eighth***, while each of the analyses at issue is different and involved different variables, Seyfarth's involvement to provide legal advice has been a constant.  At all times, the purpose of the studies has been to provide legal advice to Nike Legal ██████████████████████████████████ ████████████████████████████████████████████████████████ Lupo Decl. at ¶¶ 3-4; Hearn Decl. at ¶¶ 3-5; Thibodeaux Decl. at ¶¶ 3-5; Baffa Decl. at ¶¶ 4, 11-12; Hendrickson Decl. at ¶¶ 4-5; Wiggins Decl. at ¶ 3; North Decl. at ¶¶ 3-4, 8-9.

The analyses are privileged.

2.    Plaintiffs' complaint about Nike's submission of declarations rings hollow.

Plaintiffs' Motion challenged Nike's assertions of privilege, but when Nike responded with evidence substantiating its assertions, Plaintiffs' cried foul.  Reply at 2.  Courts routinely accept supporting declarations to establish foundation for assertions of privilege, especially when a party challenges entries on a privilege log.  *See In re Grand Jury Investig.*, 974 F.2d at 1071 ("Whatever questions the Corporation's log might leave open with regard to whom the documents were shown or were intended to be shown are answered to our satisfaction by the affidavits of the attorneys responsible for preparing the documents."); *Moore v. Garnand*, No. CV-19-00290-TUC-RM (LAB), 2020 U.S. Dist. LEXIS 50565, at *15 (D. Ariz. Mar. 24, 2020) (privilege log and declaration were sufficient); *Apple*, 306 F.R.D. at 237 (briefs and declarations can establish privilege).  There is little other way to establish privilege other than declarations from those who were involved in the privileged analysis.

Nike's reliance on supporting declarations does not concede that its privilege logs are deficient.[5] To the contrary, Nike properly submitted declarations because Plaintiffs challenged those privilege designations.[6]  *Kiobel*, 2005 U.S. Dist. LEXIS 16514, at *13 (declarations are sufficient to establish privilege after the privilege assertions have been challenged).  This is standard practice.

**B.    Plaintiffs' "Timeliness" Narrative Lacks Factual and Legal Support.**

Plaintiffs contend that a "30-day time limit" should govern the production of privilege logs here, even though:

- Plaintiffs did ***not*** produce their own privilege logs within the same "time limit" and also risk waiver under this standard; Plaintiffs' "do as I say, not as I do" approach should be rejected;[7]

---

inapposite.  There, case documents were copied and sent to a broker in a failed attempt to assert privilege, whereas here, the analyses were created for the purpose of seeking or providing legal advice.
[5] Nike's privilege logs explicitly state that the relevant communications and documents were sent or created for the purpose of seeking or providing legal advice.  Plaintiffs' reliance on *United States v. Christensen*, 828 F. 3d 763 (9th Cir. 2016), is misplaced.  *Christensen* is a criminal case dealing with whether recordings of conversations between one defendant and a private investigator were privileged.  It bears no resemblance to the instant case.
[6] Plaintiffs' reliance on *Burch v. Regents of the Univ. of Cal.*, No. Civ. S-04-0038 WBS GGH, 2005 U.S. Dist. LEXIS 46998, at *8 (E.D. Cal. Aug. 30, 2005), therefore, is misplaced.
[7] Plaintiffs produced their first privilege log more than seven months after Nike served its first set of RFPs, and Plaintiffs have continued to supplement their privilege logs—just like Nike—where appropriate.



Hon. Jolie A. Russo                                          **Attorneys' Eyes Only**
September 22, 2020
Page 7

- As this Court has acknowledged, "[P]laintiffs have brought an extensive case"—that is, a class and collective action challenging Nike's pay and promotions decisions for virtually every woman employee at Nike's world headquarters and their alleged male counterparts—which makes a 30-day "time limit" unworkable, *see* August 10, 2020 Order, Dkt. # 111;

- The case law Plaintiffs cite rejects Plaintiffs' rigid construction of a "time limit" for producing privilege logs. *See Burlington*, 408 F.3d at 1149 ("However, we also reject a per se waiver rule that deems a privilege waived if a privilege log is not produced within Rule 34's 30-day time limit."); and

- As the timeline below illustrates, the Parties' course of dealing establishes that privilege logs have been, and continue to be, produced on a rolling basis.

Despite Plaintiffs' table-pounding, the core dispute here is this:  On the one hand, Nike proposed that privilege logs be produced at or near the close of discovery so that the Parties could complete (or substantially complete) their document productions, after which, the Parties would produce a fulsome privilege log reflecting the totality of those productions.  The Parties therefore would be able to review the privilege designations and challenge them, as appropriate, before discovery closed.  Nike believed that this proposal made sense because this is an "extensive case," Dkt. # 111, and because Plaintiffs' refused to prioritize their discovery requests.

On the other hand, Plaintiffs argue that Nike immediately must have produced all of its privilege logs simply because Plaintiffs demanded it.  Plaintiffs refused any alternative no matter how reasonable, given the complex nature of the case and scope of the RFPs.  In any event, the case law simply does not support waiver here.  ***Plaintiffs have shown no evidence of prejudice***, nor did they attempt to do so in their 16-page brief (because they cannot).  No depositions have been taken.  Expert discovery has not commenced.  Class certification briefing is more than six months out.  Plaintiffs have not been harmed.

Nike, however, would suffer ***extreme prejudice*** if compelled to produce privileged analyses.  *See USW v. Ivaco, Inc.*, No. 1:01-CV-0426-CAP, 2003 U.S. Dist. LEXIS 10008, at *13 (N.D. Ga. Jan. 13, 2003) ("courts have recognized that waiver of the attorney-client privilege is an ***extreme sanction*** and that it therefore should be reserved for cases of unjustifiable delay, inexcusable conduct, or bad faith in responding to discovery requests") (emphasis added); Bess v. Cate, 2008 WL 5100203, 4 (E.D. Cal. 2008) ("Finding that a party has waived its right to assert a privilege objection due to its conduct (or lack thereof) is a harsh sanction utilized where that party has unjustifiably delayed discovery. . . ."); *Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC*, No. 08CV1559 BTM (WMC), 2009 WL 3857425, at *4 (S.D. Cal. Nov. 16, 2009) ("While an inadequate privilege log may be the basis for disallowing a privilege, such a finding resembles a sanction and should be weighed in terms of the intent of the party producing the defective log and against the harm caused by the disclosure of what otherwise might be privileged documents.") (citing Evergreen Trading, LLC v. United States, 80 Fed. Cl. 122, 126 (2007)); *E.E.O.C. v. Safeway Store, Inc.*, No. C-00-3155 TEH(EMC), 2002 WL 31947153 (N.D. Cal. Sept. 16, 2002) (declining to impose waiver sanction on party that was six months late in providing privilege log because "[f]inding that a party has waived its right to assert a privilege objection due to its conduct (or lack thereof) is a harsh sanction utilized where that party has unjustifiably delayed discovery").



Hon. Jolie A. Russo                                                              **Attorneys' Eyes Only**
September 22, 2020
Page 8

> 1.    <u>The factual record makes clear that Nike engaged Plaintiffs in a meaningful dialogue about privilege logs and acceded to Plaintiffs' demand for phased logs.</u>

Plaintiffs have launched a desperate campaign to argue that Nike has been radio silent on privilege matters for 16-months.  Nonsense.  The timeline proves the point.  It also shows that, despite Nike's objections and its strong preference to produce a fulsome privilege log at or near the close of discovery, Nike ultimately produced phased privilege logs—just as Plaintiffs requested.

- March 22, 2019:  Plaintiffs served more than 60 RFPs, including RFP No. 16 that seeks compensation and/or promotions analyses.

- April 25, 2019:  Nike served timely objections and responses to Plaintiffs' RFPs.  The next day, the parties filed a Joint Rule 26(f) Report and Proposed Discovery Plan, in which Nike stated that discovery should be "phase[d] or prioritize[d] … in a manner that is proportional to the needs and stage of the case, particularly that this is a class and collective action."  Dkt. # 70.  Plaintiffs refused to do so on every topic of discovery, including compensation and promotions analyses.

- May 30, 2019:  Neither party had produced documents or privilege logs at this point; Nike filed its Answer to the First Amended Complaint ("FAC") after the District Court adopted the Magistrate's Findings and Recommendations regarding Nike's Partial Motion to Dismiss the FAC.  Dkt. # 75.

- June 14, 2019:  The parties filed a Supplemental Joint Rule 26(f) Report because Plaintiffs objected to a two-tier Protective Order with an Attorney's Eyes Only provision.  Nike repeated its position that discovery should be "phase[d] or prioritize[d]" to minimize burden and focus efforts on critical issues.  Dkt. # 77.  Plaintiffs refused.

- July 1, 2019:  Nike sent Plaintiffs a letter confirming that it was working to identify analyses in response to RFP No. 16, but that the process of collecting, reviewing, producing, and/or logging responsive documents would "several months to complete, ***at the earliest***."  Nike also proposed that the Parties "meet and confer to narrow the scope of Plaintiffs' RFPs and to identify priorities for the same."  *See* Supplemental Declaration of Daniel Prince in support of Nike's Sur-Reply ("Prince Supp. Decl."), ¶ 2, Ex. A.  Plaintiffs refused.

- November 13, 2019:  Nike's investigation continued, including meet and confer calls, during which Nike expressed that privilege logs should be produced at or near the close of discovery.  Nike also communicated:  "As mentioned in our previous meet and confer calls, Nike's pay equity analyses were undertaken at the direction of counsel."  Prince Supp. Decl., ¶ 3, Ex. B.

- December 16, 2019:  The Parties had a status conference with the Court, during which Nike's counsel represented to the Court that Nike was continuing to collect potentially privileged communications (including compensation analyses) and that counsel was considering Plaintiffs' proposal of providing phased privilege logs, although Nike believed a fulsome privilege log at or near the close of discovery to be appropriate in this complex case.  *See* Joint Case Management Conference Statement, Dkt. # 90.

- December 31, 2019:  Plaintiffs produced their "phase one" privilege log.



Hon. Jolie A. Russo                                    **Attorneys' Eyes Only**
September 22, 2020
Page 9

- January 10, 2020:  Nike wrote to Plaintiffs explaining that "a singular, comprehensive privilege log is more efficient and therefore preferential, and that the appropriate juncture for producing [a privilege log] is at or near the close of discovery."  Notwithstanding this objection, Nike stated that it anticipated producing an "initial 'phase one'" privilege log in January 2020.  That log was produced on February 2, 2020, about a month after Plaintiffs produced their "phase one" log on New Year's Eve.  Prince Supp. Decl., ¶ 4, Ex. C.

- February 21, 2020:  Nike again advised Plaintiffs that its "'global' and 'supplemental' pay equity analyses," "time-in-job and pace of promotions" analyses, and "analysis done in partnership with Mercer" were undertaken at the direction of counsel and documents relating to those studies would be identified on Nike's forthcoming privilege log(s).  Prince Supp. Decl., ¶ 5, Ex. D.

- March 5, 2020:  Nike reminded Plaintiffs that "(i) Pay Equity Analyses; (ii) Studies or Analyses Related to Time-in-Job and Pace of Promotions; and (iii) Analyses Done in Partnership with Mercer to Identify Outliers and Employees Who May Receive Pay Adjustments" are privileged and that Nike would produce a supplemental privilege log the following week.  Prince Supp. Decl., ¶ 6, Ex. E.

- March 13, 2020:  Nike produced a supplemental, phased privilege log.  That log was not intended to be the last and final log (as stated earlier).  In fact, Nike was attempting to accommodate Plaintiffs' request for phased privilege logs.  Dkt. # 90.  Plaintiffs now complain that they got exactly what they asked for—a phased privilege log.  This privilege log contained several entries related to the compensation and promotions analyses, as Plaintiffs admit.  Reply at 4.  Nike did not "spoon-feed" Plaintiffs by telling them which entries applied to certain analyses, and no case law provides that Nike had an obligation to do so.

- March 18, 2020:  In the Joint Case Management Conference Statement, Nike again explained that the "internal pay equity and market analyses" and "time in place and promotion studies" were privileged, that Nike had denoted documents related to the same on its privilege log, and that Nike's work continued in connection with the analyses.  Dkt. # 97.

- April 21, 2020:  Plaintiffs produced a supplemental, phased privilege log.

- June 12, 2020:  Nike sent Plaintiffs another letter stating:  "First, as we have explained several times, Nike's original objections to Plaintiffs' discovery requests were neither generalized nor boilerplate.  Second, Nike has not failed to timely produced privilege logs.  We note that Nike produced privilege logs in February and March 2020.  Plaintiffs produced privilege logs in January and April 2020.  It is thus bizarre to suggest that Nike's privilege logs are untimely."  Nike continued:  "[T]his work was requested by Nike's in-house and outside counsel for the purpose of providing legal advice to the company.  The fact that Nike may have acknowledged the existence of such analyses, taken action as a result of the outcome of such analyses, or relied upon such analyses in making and/or acting upon legal advice does not waive their privileged and confidential status."  Prince Supp. Decl., ¶ 7, Ex. F.

- June 29, 2020:  In the Joint Case Management Conference Statement, Nike repeated that its compensation and promotions analyses are privileged, that it had denoted entries for same on its



Hon. Jolie A. Russo                                                          **Attorneys' Eyes Only**
September 22, 2020
Page 10

privilege log, and that Nike would continue to supplement those logs as it identified more documents.  Dkt. # 107.

- July 24, 2020:  Nike produced another supplemental, phased privilege log.

- August 5, 2020:  Plaintiffs produced a supplemental, phased privilege log.

- August 19, 2020:  Acknowledging the Parties' pattern and practice of producing supplemental, phased privilege logs, as well as the pending Motion to Compel, Nike advised Plaintiffs that it would produce a supplemental privilege log on or before September 8, 2020.  Prince Supp. Decl., ¶ 8, Ex. G.

- August 28, 2020:  Nike again communicated to Plaintiffs that it intended to supplement its privilege logs on or before September 8, 2020, and that Nike would continue to roll-out supplemental, phased privilege logs on a going-forward basis per its discovery obligations.  Prince Supp. Decl., ¶ 9, Ex. H.

- August 31, 2020:  Nike produced another supplemental, phased privilege log.

- September 8, 2020:  In conjunction with its opposition to Plaintiffs' Motion to Compel, Nike produced another supplemental, phased privilege log.  This log identified additional documents that Nike had identified as part of its ongoing work related to the compensation and promotions analyses.  Some of the entries on Nike's September 8, 2020 privilege log mirrored entries on Nike's March 13, 2020 privilege log, as Nike continued to conduct witness interviews, parse metadata, and identify documents and communications relating to the analyses.  *See* Prince Decl. at ¶¶ 6-8; Thibodeaux Decl. at ¶¶ 31-33.

- September 22, 2020:  In the Joint Submission Regarding Revised Case Management Schedule, Nike said that it would produce another supplemental, phased privilege log on or before October 2, 2020 to coincide with a further document production.  Dkt. # 114.

In summary and notwithstanding its objection to the piecemeal production of privilege logs, Nike has attempted to accommodate Plaintiffs by producing phased logs.[8]  Indeed, the Parties' course of dealing has been to produce supplemental, phased privilege logs based on the development of certain work streams or the production of certain documents.  That cadence is indisputable.  Nike should not be sanctioned for following the Parties' cadence.  Likewise, Plaintiffs have not articulated any prejudice and are foreclosed from doing so.  As of the date of this filing, no fact or expert depositions have been taken, and no class certification briefing has commenced.  The only Party subject to potential harm is Nike if it is compelled to produce privileged analyses.

        2.     <u>Plaintiffs' request for waiver on "timeliness" grounds is an extreme sanction that is unsupported by case law and, in any event, unwarranted here.</u>

    ***First***, Plaintiffs have not explained, and cannot explain, why they believe a 30-day "time limit" to

---

[8] Nike still believes it would have been more efficient to produce privilege logs at or near the close of discovery, but it attempted to accommodate Plaintiffs' requests.



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 22, 2020
Page 11

produce privilege logs would be appropriate in this "extensive case" involving pay and promotions for virtually every female employee at Nike's world headquarters (as well as their alleged male counterparts). *See* Dkt. # 111.  Indeed, Plaintiffs' actions tell a different story.  They waited more than seven months to produce their own "phase one" privilege log, yet seek sanctions against Nike for similar conduct.

**Second**, given Plaintiffs' apparent admission that 30-days is an insufficient "time limit," there is no objective standard pursuant to which sanctions should be issued.  Nike has consistently stated that privilege logs should be produced at or near the close of discovery, and sanctions are not appropriate simply because Plaintiffs disagreed with that approach.  Nor are sanctions appropriate where, as here, Nike acceded to Plaintiffs demands and produced phased privilege logs on a range of subject matters, including compensation and promotions analyses.

**Third**, as stated above, Plaintiffs' reliance on *Burlington* is misplaced.  408 F.3d at 1149.  There, the court rejected a *per se* waiver rule and articulated an approach guided by the circumstances of the case, while observing that "gamesmanship" is an animating concern in the context of waiver arguments. *See id.* at 1150.  So too is the case here.  Plaintiffs claim Nike waived privilege due to delay, while Plaintiffs engaged in the same conduct.  *See Berry Plastics Corp. v. Intertape Polymer Corp.*, No. 3:10-cv-76-RLY-WGH, 2014 U.S. Dist. LEXIS 187296, at *17 (S.D. Ind. July 18, 2014) (waiver "would not be appropriate here, where both parties have engaged in some delay").[9]  It is Plaintiffs' gamesmanship that must cease.

**Fourth**, Plaintiffs have not demonstrated how they have been prejudiced by any alleged delay in the production of privilege logs, nor can they.  *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2003 U.S. Dist. LEXIS 71, at *12 (S.D.N.Y. Jan. 3, 2003) (one-year delay in serving privilege log did not waive privilege where there was no evidence of prejudice).  Here, no depositions have been taken, discovery remains open, and Plaintiffs have not shown any harm flowing from the purported delay.  This is instead a transparent attempt by Plaintiffs to make an end-run around the most sacrosanct of legal doctrines.  The Court should not aid Plaintiffs' scheme.

Nike has produced phased privilege logs regarding the analyses (and other matters) on a rolling basis and will continue to do so, as necessary.  It therefore is unclear why Plaintiffs cite *Chen-Oster, et al. v. Goldman, Sachs & Co.,* 10 Civ. 6950 (S.D.N.Y. Nov. 9, 2012), for the proposition that the volume of document production does not present a "mitigating circumstance" for finding against waiver.  Reply at 5-6.  Plaintiffs miss the point.  The complexity of the case, breadth and scope of the RFPs, relevant time periods of the analyses, Plaintiffs' refusal to prioritize discovery, tracking down work and documents for former employees, identifying the universe of privileged documents, interviewing more than a dozen witnesses on privilege issues, scouring metadata to populate fields in privilege logs, employee lay-offs, nationwide retail store closures, limited staffing and the need for in-house counsel to transition thousands of employees to working-from-home during the COVID-19 pandemic all have made document collection,

---

[9] Plaintiffs attempt to defend their "do as I say, not as I do" arguments.  Their cases are inapposite. *Infanzon v. Allstate Ins. Co.*, No. 2:19-cv-06483-JAK (SKx), 2020 U.S. Dist. LEXIS 88023, at *15 (C.D. Cal. May 15, 2020), involved a party that did not respond to discovery requests at all, which is not the case here.  Nike has produced several privilege logs and will continue to supplement the same.  Further, *Gropper v. David Ellis Real Estate, L.P.*, No. 13 Civ. 068 (ALC) (JCF), 2014 U.S. Dist. LEXIS 16849 at *8 (S.D.N.Y. 2014), involved a defendant that did not provide a privilege log.  That is not an analogous fact pattern, as evidenced by the timeline presented herein.



Hon. Jolie A. Russo
September 22, 2020
Page 12

**Attorneys' Eyes Only**

production, and privilege logging more challenging in this case and not susceptible to the claimed "time limit." *See* Thibodeaux Decl. at ¶¶ 31-33; Prince Decl. at ¶¶ 6-8.

Courts have declined to find waiver on far less. *See, e.g., Yith v. Nielsen*, No. 1:14-cv-01875-LJO-SKO, 2019 U.S. Dist. LEXIS 104514, at *12 (E.D. Cal. June 21, 2019); *McKeen-Chaplin v. Provident Sav. Bank, FSB*, No. 2:12-cv-03035 GEB AC, 2015 U.S. Dist. LEXIS 14143, at *28 (E.D. Cal. Jan. 4, 2015); *Jumping Turtle Bar & Grill v. City of San Marcos*, No. 10-CV-270-IEG (BGS), 2010 U.S. Dist. LEXIS 119390, at *11 (S.D. Cal. Nov. 10, 2010); *see also Sempra Energy v. Marsh United States, Inc.*, No. CV 07-5431 SJO (SSx), 2008 U.S. Dist. LEXIS 126738, at *11 (C.D. Cal. July 25, 2008) (defendant not entitled to documents where it contributed to delay).

The waiver argument is properly denied.

### C. Nike's Privilege Logs Met the Legal Standard and Its Objections Were On Point.

*First*, Plaintiffs assert that Nike's objections to RFP No. 16 were boilerplate because Nike properly objected on the grounds of attorney-client privilege and attorney work product. Reply at 3-4. This circular makes no sense. Nike had good cause to assert its objections and it did so. That is why Nike told Plaintiffs—repeatedly—in correspondence that its analyses were privileged and not subject to disclosure. *See* Section II.B.1. It also is why Nike is defending its objections in the instant briefing.

*Second*, in another "sleight of hand," Plaintiffs (without authority) argue that Nike's March 2020 privilege log did not contain sufficient detail because it did not include, for example, employee job titles and foundation for the work performed by Mercer. Reply at 4. Plaintiffs again conflate the standard for information listed on a privilege log with the standard for defending a privilege designation challenged in court. Importantly, the prior only requires "(a) the attorney and client involved, (b) the nature of the document, (c) all persons or entities shown on the document to have received or sent the document, (d) all persons or entities known to have been furnished the document or informed of its substance, and (e) the date the document was generated, prepared, or dated." *In re Grand Jury Investig.*, 974 F.2d at 1071 (citing *Dole v. Milonas*, 889 F.2d 885, 888 n.3 (9th Cir. 1989)) (holding that the producing party "met its burden in satisfying the applicability of the attorney-client privilege").

Here, Nike's March 13, 2020 privilege log satisfies this standard. It provided the bates number, date of creation, author, recipients, whether those authors and recipients were a member of Nike's in-house legal department or outside counsel, a description of the document, and the nature of the privilege asserted. *See* Opp. at 15-18. That is sufficient under the law.

In addition, Nike made a prima facie showing in its Opposition that the privilege designations set forth in its March 2020 log were just and proper. *See, e.g.,* Opp. at 3-9 (identifying job titles for consultants, legal personnel, and other subject matter experts, while also laying out the foundation for the work performed by Mercer and WTW). Plaintiffs' argument fails.

### III. THE ATTORNEY WORK PRODUCT DOCTRINE SHIELDS THE PAY EQUITY AND PROMOTIONS ANALYSES FROM DISCLOSURE.

As an initial matter, and as argued above, the compensation and promotions analyses are shielded from disclosure pursuant to the attorney-client privilege, irrespective of whether the analyses



Hon. Jolie A. Russo                                                        **Attorneys' Eyes Only**
September 22, 2020
Page 13

constitute attorney work-product.  That said, the facts and law demonstrate that the analyses qualify for protection under the attorney work-product doctrine too.

Plaintiffs continue to rely on *United States v. Torf*, 357 F. 3d 900, 908 (9th Cir. 2003), apparently forgetting that the *Torf* court held that the attorney work product doctrine applied.[10]  *Id.* at 906-10.  Like in *Torf*, the consultants here—WTW and Mercer—worked at the direction of counsel to conduct analyses in connection with anticipated litigation.[11]  *Id.* at 908.

**A.    Nike's Compensation Analysis in 2016 with Willis Towers Watson Was Commenced in View of Anticipated Litigation.**

As provided in Nike's Opposition and the supporting declarations, *see* Opp. at 3-5, this work was initiated in view of an EEOC charge filed in or about November 2015 by a Black female employee alleging discrimination under Title VII because she was paid less than her White male counterpart.  Hearn Decl. at ¶ 4.  Then, in or about February 2016, Nike received a demand letter in another matter in which a former Nike executive alleged age discrimination.  *See id.*  In turn, Nike's then-Global Employment Counsel believed that ███████████████████████████████████████████████████████████████████████████████████████████████  *See id.*  Nike's counsel, Ms. Hearn, also had contemporaneous discussions with Ms. Lupo, the VP of Total Rewards, who believed that ████████████████████████████████████████████ ███████████████  Lupo Decl. at ¶ 3.

Plaintiffs' response to this uncontroverted evidence is essentially, "we do not believe the sworn declarations submitted by counsel."  Plaintiffs claim that Nike must produce the EEOC charge and the demand letter to establish the anticipation of litigation.  Reply at 10-11.  Not true.  Sworn declarations, including one submitted by an officer of the court, are sufficient to support Nike's work product assertion. Nike need not provide supplemental documentary support outside the scope of this case to "prove up" its position.  Prince Supp. Decl. at ¶ 10, Ex. I.

Next, Plaintiffs contend that the possibility of litigation here was too remote, citing *Wenzel v. Klamath City, Fire Department*, No.1, 2016 U.S. Dist. LEXIS 198529 at *11 (D. Or. Sept. 14, 2016). *Wenzel* does not support Plaintiff's position.  In *Wenzel*, there was no threatened litigation by an employee, but rather an internal investigation into an employee and discussions of his future employment. Here, there was no "generalized fear" of future litigation; there was certain evidence of imminent litigation.

Finally, Plaintiffs rely on generalized statements by non-attorney, lay personnel indicating a desire to "focus on women," to "improve diversity," or to evaluate "our practices" to suggest that the pay studies were developed and executed in mid-late 2016 (and, therefore that they could not be in "anticipation of litigation").  Reply at 8.  The factual record shows otherwise.  Hearn Decl. at ¶¶ 4-7.  Further, even if

---

[10] Plaintiffs' reliance on *Dewitt v. Walgreen Co.*, 2012 U.S. Dist. LEXIS 125493 at *14 (D. Id. Sept.4, 2012), is misplaced.  There, preliminary drafts of a policy were prepared "in an effort . . .  to formulate a corporate policy."  Nike's analyses were undertaken in view of anticipated litigation.
[11] Plaintiffs contend that Nike never asserted on its privilege logs that the analyses were prepared "in anticipation of litigation," but that argument makes no sense.  Nike asserted attorney work product, which, by definition under the federal rules, means that the analyses were prepared "in anticipation of litigation."



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 22, 2020
Page 14


Nike's corporate functions may have been thinking about compensation issues in mid-late 2016, that does not mean that Nike Legal was not driving compensation analyses in anticipation of litigation.[12]

**B.      Nike's 2018 Compensation and Promotions Analyses with Mercer Were Commenced in View of Anticipated Litigation.**

In its Opposition, Nike explained that these analyses were initiated in view of the informal and unofficial gender "survey" circulated at Nike in or about December 2017.  Some of these complaints (which have been produced to Plaintiffs in discovery) alleged bias in compensation and promotions on the basis of gender.  Nike's then-Senior Director, Global Employment Counsel reviewed those complaints in or about February 2018; she believed ████████████████████████████████████ ████████████████████████████████████████████████.  Thibodeaux Decl. at ¶ 4.  The promotions analysis followed, beginning in or about May 2018.  Thibodeaux Decl. at ¶ 8; Hendrickson Decl. at ¶ 8; North Decl. at ¶ 5.

The promotions work was not completed, but Nike kicked-off a separate compensation analysis with Mercer in or about June 2018.  Thibodeaux Decl. at ¶ 13; Hendrickson Decl. at ¶ 14; North Decl. at ¶ 8.  Per the above, these projects were initiated by counsel in view of the internal complaints, for which litigation was reasonably anticipated (and while this is not the legal standard, litigation indeed followed).

Plaintiffs again argue:  "we do not believe the sworn declarations submitted by counsel."  Reply at 11.  But this time, Plaintiffs have the complaints showing the anticipated litigation.  Apparently, that *still* is not good enough.  For Plaintiffs, it never is.  And never will be.

So Plaintiffs moved the target.  Again.  Instead of arguing that they do not have documents showing the anticipation of litigation, Plaintiffs now rely on a Q&A sequence between media professionals to "show" that the informal and unofficial gender survey could not have established the "anticipation of litigation."  But these generalized statements by or to the media are not dispositive, particularly where, as here, Nike has submitted sworn declarations by attorneys.  Those media statements cannot and do not reflect the internal strategy discussions in Nike Legal regarding anticipated litigation, nor would you expect Nike to release public statements regarding anticipated litigation for fear of privilege waiver.

**C.      Plaintiffs Concede That Nike's Compensation Analyses with Mercer in 2019 and 2020 are Attorney Work Product.**

Plaintiffs' Reply fails to address the 2019 or 2020 analyses.  Plaintiffs therefore concede, as they must, that these studies were conducted in anticipation of litigation, namely (i) the June 2018 filing of an EEOC charge by a former female employee alleging violations of the federal Equal Pay Act, Title VII, and the Age Discrimination in Employment Act, and (ii) the filing of the instant lawsuit in August 2018.  Thibodeaux Decl. at ¶¶ 17-18.

---

[12] Statements by non-legal personnel whom do not comprehend the distinction between a gender pay gap (used in common parlance to refer to differences in average salary) and pay equity (the legal definition of which involves eliminating discriminatory differences in pay) do not nullify the claim of work product in this case.  Lupo Decl. at ¶¶ 3-4; Hearn Decl. at ¶¶ 3-5; Thibodeaux Decl. at ¶¶ 3-5; Baffa Decl. at ¶¶ 3-4; Hendrickson Decl. at ¶¶ 3-5.



### D.    That the Compensation and Promotions Analyses Assist Nike's Corporate Functions Does Not Negate the Primacy of Their Legal Purpose.

Plaintiffs' unsupported assertion that the compensation and promotions analyses here were "routine human resources functions" is belied by the record evidence.  Seyfarth—including the head of its National Counseling Practice and the co-chair of its Pay Equity Practice group—was indispensable to the analyses.  Mr. Baffa and Ms. Hendrickson provided legal advice regarding ███████████████.  Baffa Decl. at ¶¶ 4, 9; Hendrickson Decl. at ¶¶ 4, 6, 11, 16, 22, 24, 28.  The lawyers' investments in the creation and conducting of the analyses was integral because of their expertise in legal advice and data collection, segmenting and cleaning data, identifying variables that may explain differences in pay, pay adjustments, and remediation.  Baffa Decl. at ¶ 1; Hendrickson Decl. at ¶ 1.

This stands in stark contrast to the Human Resources employee, who also happened to be a lawyer, in *Koumoulis v. Indep. Fin. Mktg. Group*, 295 F.R.D. 28, 45-46 (E.D.N.Y. 2013).  There, the employee simply sent scheduling emails, investigation summaries, and draft documents.  The employee performed remedial tasks, unlike Mr. Baffa and Ms. Hendrickson, whose legal advice (regarding, for instance, ████████████████████████████████) was built into the studies at issue and who used their specialized training to conduct the analyses here, with a view towards assessing legal risk exposure.  The studies themselves include Seyfarth's thoughts, strategies, and mental impressions.  Baffa Decl. at ¶¶ 4-5, 11-12; Hendrickson Decl. at ¶¶ 1, 4-5.  *See also* Hearn Decl. at ¶¶ 6, 8-12; Thibodeaux Decl. at ¶¶ 6-30; Baffa Decl. at ¶¶ 5-11; Hendrickson Decl. at ¶¶ 5-29; Wiggins Decl. at ¶¶ 3-8; North Decl. at ¶¶ 3-9.

Likewise, Plaintiffs' reliance on *Visa U.S.A., Inc. v. First Data Corp.*, 2004 U.S. Dist. LEXIS 17117 at *27 (N.D. Cal. Aug 23, 2004), is misplaced.  There, the court found that drafts of a private arrangement analysis were created to assist Visa in making a business decision and thus were not protected by the work product protection.  However, the same court found that three reports "prepared under the direction of counsel . . . were created in the first instance for the purpose of rendering legal advice by counsel in anticipation of litigation" and were protected by the work product doctrine even if they "may have informed the business analysis as well."  *Id.* at *33.

Here, the compensation and promotions analyses were prepared under the direction of counsel for the purpose of rendering legal advice in anticipation of litigation, even though the same work also may inform some business decisions surrounding pay outcomes.  But that does not mean the underlying analyses cannot be shielded from disclosure.  Lupo Decl. at ¶¶ 3-4 ("the legal objectives [of the analyses] are weaved together with the business objectives … [and that for] the Total Rewards organization, the two are not mutually exclusive."); *see also* Hearn Decl. at ¶¶ 4-5 and Thibodeaux Decl. at ¶¶ 3-5 (primary driver of the compensation and promotions analyses ████████████████████████ ████████).

Finally, Plaintiffs cite *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, 296 F. Supp. 3d 1230, 1241 (D. Or. 2017) for their proposition that Nike cannot delegate "routine" business functions to outside counsel.  That is not what occurred here.  The case, relying on Washington state law, found that the defendant had withheld draft press releases and notices to be sent to its customers that were not reviewed by attorneys.



Hon. Jolie A. Russo                                                    **Attorneys' Eyes Only**
September 22, 2020
Page 16


Here, the analyses were prepared at the direction of and in conjunction with Nike's counsel for the purpose of providing legal advice in connection with real threats of litigation. *Blue Cross* also notes that if certain of the documents at issue were prepared in anticipation of litigation, meant to advise counsel of underlying facts to help with counsel's representation, or meant to communicate with counsel for the purpose of receiving legal advice, such documents warranted protection. *See id.* at 1242. The facts of this case fit more squarely with the documents that were protected in *Blue Cross.*

## IV.    PLAINTIFFS' "SWORD AND SHIELD" ARGUMENT ENTIRELY MISSES THE MARK.

Plaintiffs wrongly assert that Nike impliedly waived privilege because Nike has set forth a "good faith" defense to the Fair Labor Standards Act ("FLSA"). For this proposition, Plaintiffs solely on *Brown v. Barnes & Noble, Inc.*, No. 1:16-cv-07333 (RA) (KHP), 2019 U.S. Dist. LEXIS 220625, at *16 (S.D.N.Y. Dec. 23, 2019); but, *Barnes & Noble* does not state the law of this Circuit.[13]

Rather, district courts in the Ninth Circuit "have declined to find implied waiver of the attorney-client privilege simply because a defendant asserted a good faith affirmative defense to a plaintiff's claims, specifically in the context of implied waiver arguments and good faith affirmative defenses to claims under the FLSA . . ." *Goro v. Flowers Foods, Inc.*, No. 17-cv-02580-JLS-JLB, 2019 U.S. Dist. LEXIS 203568, at *47-49 (S.D. Cal. Nov. 22, 2019) (collecting cases). Waiver **only** applies if the defendant affirmatively relies on and asserts the advice of counsel or communications with counsel in support of its defense. *Id.; see also Sorensen v. Black & Decker Corp.*, No. 06cv1572-BTM (CAB), 2007 U.S. Dist. LEXIS 26335, 2007 WL 1976652, at *2 (S.D. Cal. Apr. 9, 2007) ("The privilege is waived only when a party chooses to utilize the [privileged] information to advance a claim or defense."); *Phelps v. MC Comm., Inc.* No. 2:11-cv-00423-PMP—VCF, 2013 U.S. Dist. LEXIS 101965, 2013 WL 3944268, at *19 (D. Nev. July 22, 2013) (finding waiver of attorney-client communications that "could arguabl[y] form the basis for defendants' 'reasonable belief' that they were acting in 'good faith' and did not intentionally violate the FLSA").

Nowhere in Nike's Answer and Affirmative Defenses does Nike claim to rely on advice by its attorneys in propounding its defenses, and such reliance cannot be presumed. *See* Dkt. # 75; *see also Abbe v. City of San Diego*, Nos. 05cv1629 DMS (JMA), 06cv0538 DMS (JMA), 2007 U.S. Dist. LEXIS 87501, at *69 (S.D. Cal. Nov. 9, 2007) ("Defendant's answer does not reveal reliance upon a defense of advice of counsel, nor may such be presumed. Accordingly, the Court declines to rule that Defendant has implicitly waived the attorney-client privilege in its Answer."); *Columbia Cmty. Credit Union v. Chi. Title Ins. Co.*, No. C09-5290RJB, 2009 U.S. Dist. LEXIS 141078, at *8 (W.D. Wash. Dec. 22, 2009) (merely

---

[13] Notably, *Barnes & Noble* cites *Leviton Mfg. Co. v. Greenberg Traurig LLP*, No. 09 Civ. 8083(GBD)(THK), 2010 U.S. Dist. LEXIS 128849 (S.D.N.Y. Dec. 6, 2010), which lays out the standard for implied waiver and notes that determinations of fairness must be decided on a case-by-case basis, in the specific context in which the privilege has been asserted, rather than on the basis of generalization. The standard set forth in *Leviton* is the same standard that Nike set forth in its Opposition—*i.e.,* waiver is generally only found where "(1) assertion of the privilege was a result of some affirmative act, such as filing suit by the asserting party; (2) through the affirmative act, the asserting party has put the protected information at issue by making it relevant to the case; and (3) the application of the privilege would have denied the opposing party access to information vital to the defense." *Id.*; Opp. at 21. Simply because privileged information is relevant to a claim or defense is not enough to give rise to implied waiver. Rather, to forfeit privilege "the party must <u>rely</u> on privileged advice from his counsel to make his claim or defense." *Id.* (internal citation omitted).



**Attorneys' Eyes Only**

asserting that actions were in good faith does not waive privilege); *SmithKline Beecham Corp. v. Apotex Corp.*, 2005 U.S. Dist. LEXIS 22228, 2005 WL 2436662, *3 (E.D. Pa. 2005) (assertion of affirmative defense of good faith does not automatically place advice of counsel at issue).

Nike's Answer only states that Nike will base its good faith defense upon "reliance on a written opinion and/or interpretation by the EEOC, BOLI, and/or FLSA." *See* Dkt. # 75 at ¶ 25; *Goro,* 2019 U.S. Dist. LEXIS 203568, at *49 (good faith defense based on third party administrative decisions did not result in implicit waiver of privilege). This affirmative defense is significantly different than "advice of counsel," internal investigation," or similar defenses that courts have found impliedly waive the attorney-client privilege. *See e.g.*, *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1163 (9th Cir. 1992) (privilege was waived where defendant claimed its tax position was reasonable because it was based on advice of counsel); *Walker v. Cty. of Contra Costa*, 227 F.R.D. 529, 534 (N.D. Cal. 2005) (waiver was found where defendant explicitly stated in its affirmative defenses that it would rely on an internal investigation and steps it took to prevent and correct wrongdoing). Nor does Nike intend to rely on counsel's advice in supporting its defenses in this litigation. *See Goro*, 2019 U.S. Dist. LEXIS 203568, at *47-49 (defendant did not put attorney-client communications "at issue" because defendants represented that the factual bases of their good faith affirmative defense are not and will not be based on the advice of counsel).

In the absence of affirmative reliance on, and assertion of, a defense based on the advice of counsel, fairness does not dictate waiver; it dictates protection. *United States v. Ortland*, 109 F.3d 539, 543 (9th Cir. 1997).[14]

//

//

//

//

//

//

//

//

//

//

---

[14] Plaintiffs also cite *Orland*, but the Court only found implicit waiver in that case because the defendant attempted to deflect from any wrongdoing by *explicitly* telling the government attorneys that he had relied on his attorney's advice and counsel. *Ortland*, 109 F.3d 539, 543. Similar facts are not found here.



Hon. Jolie A. Russo                                          **Attorneys' Eyes Only**
September 22, 2020
Page 18


V.      <u>**CONCLUSION**</u>

        For the foregoing reasons, and as set forth in Nike's Opposition and in the Declarations filed in support of the Opposition and this Sur-Reply, the Court should deny Plaintiffs' motion to compel in its entirety.


Respectfully submitted,


_____
Daniel Prince

Daniel Prince (*pro hac vice*)
danielprince@paulhastings.com
Zach P. Hutton (*pro hac vice*)
zachhutton@paulhastings.com
Felicia A. Davis (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Amy Joseph Pedersen, OSB No. 853958
amy.joseph.pedersen@stoel.com
Kennon Scott, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Defendant Nike, Inc.

AMY JOSEPH PEDERSEN, OSB No. 853958
amy.joseph.pedersen@stoel.com
KENNON SCOTT, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Tel:  (503) 224-3380
Fax:  (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
ZACH P. HUTTON (*pro hac vice*)
zachhutton@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Tel:  (213) 683-6000
Fax:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-JR<br><br><br>**SUPPLEMENTAL DECLARATION OF DANIEL PRINCE** |

I, Daniel Prince, hereby declare as follows:

1.      I am an attorney licensed by the Bar of the State of California, and am admitted *pro hac vice* to the District Court of Oregon.  I am a Partner with the law firm of Paul Hastings LLP, counsel of record for Nike, Inc. ("Nike") in the above-captioned matter.  I have personal knowledge of the facts set forth in this Declaration, and if called to testify under oath, I could and would testify competently thereto.

2.      On July 1, 2019, my co-counsel, Felicia Davis, sent a letter to Byron Goldstein and James Kan, Plaintiffs' counsel, on which I was copied, confirming that Nike was working to identify analyses in response to RFP No. 16, but that the process of collecting, reviewing, producing, and/or logging responsive documents would take "several months to complete, at the earliest." In that letter, Nike also proposed that the Parties "meet and confer to narrow the scope of Plaintiffs' RFPs and to identify priorities for the same."  A true and correct copy of this letter is attached hereto as **Exhibit A**.

3.      On November 13, 2019, Ms. Davis sent a letter to Mr. Goldstein and Mr. Kan, on which I was copied.  The letter said, in part, "As mentioned in our previous meet and confer calls, Nike's pay equity analyses were undertaken at the direction of counsel.  Accordingly, documents responsive to these requests are privileged and will be identified as such on Nike's privilege log, which Nike anticipates providing to Plaintiffs by the end of December."  A true and correct copy of this letter is attached hereto as **Exhibit B**.

4.      On January 10, 2020, I wrote a letter to Mr. Goldstein and Mr. Kan explaining that "a singular, comprehensive privilege log is more efficient and therefore preferential, and that the appropriate junction for producing [a privilege log] is at or near the close of discovery." Notwithstanding this objection, I wrote that Nike anticipated producing an "initial 'phase one'"

privilege log in January 2020.  A true and correct copy of this letter is attached hereto as **Exhibit C**.

5.      On February 21, 2020, Ms. Davis wrote a letter to Mr. Goldstein and Mr. Kan, on which I was copied advising Plaintiffs that Nike's "'global' and 'supplemental' pay equity analyses," "time-in-job and pace of promotions" analyses, and "analyses done in partnership with Mercer" were undertaken at the direction of counsel and documents relating to those studies would be identified on Nike's forthcoming privilege log(s).  A true and correct copy of this letter is attached hereto as **Exhibit D**.

6.      On March 5, 2020, Ms. Davis wrote a letter to Mr. Goldstein and Mr. Kan, on which I was copied, reminding Plaintiffs that "(i) Pay Equity Analyses; (ii) Studies or Analyses Related to Time-in-Job and Pace of Promotions; and (iii) Analyses Done in Partnership with Mercer to Identify Outliers and Employees Who May Receive Pay Adjustments" are privileged and that Nike would produce a supplemental privilege log the following week.  A true and correct copy of this letter is attached hereto as **Exhibit E**.

7.      On June 12, 2020, Ms. Davis wrote a letter to Mr. Goldstein and Mr. Kan, on which I was copied, regarding Nike's previously produced privilege logs.  A true and correct copy of this letter is attached hereto as **Exhibit F**.

8.      On August 19, 2020, I wrote a letter to Mr. Goldstein and Mr. Kan advising Plaintiffs that it would produce a supplemental privilege log on or before September 8, 2020.  A true and correct copy of this letter is attached hereto as **Exhibit G**.

9.      On August 28, 2020, I wrote a letter to Mr. Goldstein and Mr. Kan again communicating Nike's intent to supplement its privilege logs on or before September 8, 2020, and that Nike would continue to roll-out supplemental, phased privilege logs on a going-forward basis per its

discovery obligations.  A true and correct copy of this letter is attached hereto as **Exhibit H**.

10.    On September 11, 2020, I sent a letter to Mr. Goldstein, Mr. Kan and Mr. Barry Goldstein explaining why Nike had no obligation to produce the 2016 age discrimination demand letter or the 2015 EEOC Charge of Discrimination.  A true and correct copy of this letter is attached hereto as **Exhibit I**.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 22nd day of September, 2020, at Los Angeles, California.

_____
Daniel Prince

# Exhibit A



1(213) 683-6120
feliciadavis@paulhastings.com

July 1, 2019                                                                                                     98484.00003

**VIA E-MAIL AND U.S. MAIL**

James Kan
Byron Goldstein
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Drive, Suite 1000
Oakland, CA 94612-2354

Re:    *Cahill et al v. Nike, Inc.* – Response to Plaintiffs' Meet and Confer Letter Regarding Nike's
       Objections and Responses to RFP Set One

Dear Counsel:

We write in response to your meet and confer letter dated May 31, 2019 (which was sent to us after midnight on Saturday, June 1, 2019). As stated in our response to your supplemental Rule 26(f) submission (which is incorporated herein by reference), we believe that your letter was premature — especially when considering that this is a class/collective action lawsuit and we are still in the initial stages of discovery. In the future, we hope that you will first reach out to us via email or telephone to discuss these issues to avoid unnecessary work and so the parties can work cooperatively to resolve issues, where possible.

Before we address our proposed discovery plan below, we want to reiterate that — contrary to the assertion in your meet and confer letter — Nike does *not* refuse, and has never refused, to produce documents in response to Plaintiffs' Requests for Production ("RFP"). Rather, as we have articulated from the outset, due to the sensitive, confidential, proprietary and/or personal nature of the discovery that Plaintiffs seek, Nike believed that it first would be appropriate for the Parties to stipulate to and/or for the Court to enter a Protective Order and a Data Handling Agreement. Although the Court entered Nike's proposed two-tier Protective Order, the Parties still need to finalize the Data Handling Agreement, and we have corresponded with you regarding the same. Indeed, we sent our proposed data handling provisions to Plaintiffs several months ago during the Parties' negotiations of an ESI protocol and we await Plaintiffs' mark-up of the document.

Furthermore, Nike has proposed and continues to believe that the Parties should meet and confer to narrow the scope of Plaintiffs' RFPs and to identify priorities for the same. As you might expect, we are continuing to work with Nike to collect, review, and produce responsive information, but that is an ongoing process that likely will take several months to complete, at the earliest.

In addition, we note that a number of Plaintiffs' RFPs seek documents from time periods that extend well beyond the relevant statutory period. The statutory period for Plaintiffs' collective claims only extends to August 9, 2015. The Parties need to meet and confer to narrow the temporal scope of these RFPs. After conducting a fulsome meet and confer with Plaintiffs, Nike may supplement its responses as necessary.

Notwithstanding the above, for purposes of responding to Plaintiffs' initial meet and confer letter, Nike has broken down Plaintiffs' RFPs into various categories, which we discuss below in turn. We also note that discovery is ongoing, and that Nike is still investigating Plaintiffs' claims and its defenses.

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
t: +1.213.683.6000  |  www.paulhastings.com

Goldstein Decl. Ex. 12, Page 267 of 297



James Kan
Byron Goldstein
July 1, 2019
Page 2

## I.      DATA – RFP NO. 1

RFP No. 1, as written, is overly broad, and Plaintiffs should narrow it.  For example, it asks Nike to produce data indicating the race and ethnicity of each HQ employee, notwithstanding the fact that Plaintiffs have not alleged claims based on race or ethnicity.  Plaintiffs also ask Nike to include employees' names with its data production, which would link individual employees to highly sensitive and confidential personnel data, such as compensation, performance, evaluation, work experience, and leave information, for the duration of their employment at Nike.  Individual employee names are not relevant to the litigation in its current status and infringe on important privacy interests of the putative class/collective and their thousands of male counterparts.  Nevertheless, Nike is in the process of determining what other data requested by Plaintiffs is available, whether it is reliable, and the burden involved in its collection and production.  When Nike has more information, the Parties should meet and confer to reach a resolution without court intervention.

## II.     SYSTEMS / OPERATIONS / RECORDS – RFP NOS. 2 AND 3

RFP No. 2 – Plaintiffs seek "documents that identify all systems used by Nike to track, store, access information, or generate reports . . . relating to HQ employees . . . ."  This Request is irrelevant and completely overbroad.  It would be nearly impossible for Nike to identify each and every place that it stores/has stored and collected data, and it should not be Nike's burden to do so.  Nike invites Plaintiffs to meet and confer on this Request.

RFP No. 3 – RFP No. 3 requests "data and content dictionaries, glossaries, reference guides, field and code definitions, training materials, and schema documents."  Nike invites Plaintiff to meet and confer on this Request once the relevant data (requested in RFP No. 1) has been identified and produced.

## III.    POLICIES AND TRAININGS – RFP NOS. 4-10, 18, 22, 26, 30, 31, AND 43

Nike will produce copies of current policies and trainings related to compensation, performance reviews and ratings, complaint processes, bands and levels, Employee Relations, sexual harassment, unconscious bias, discrimination, retaliation, promotion, and lateral transfers, identified after a reasonable search and diligent inquiry.  Furthermore, Nike will produce non-privileged documents that demonstrate that its current policies are job-related and consistent with business necessity.

## IV.     PERFORMANCE REVIEWS AND RATINGS – RFP NOS. 11 AND 21

RFP No. 11 – RFP No. 11 seeks documents relating to "HQ executives' involvement in the setting or review of" various Nike policies.  It is unclear to Nike what documents and information Plaintiffs seek with this Request.  Nike invites Plaintiffs to meet and confer on the scope of this Request and to provide insight into what types of documents this Request seeks.

RFP No. 21 – As written, this Request is entirely overbroad, as it seeks "**all** documents and communications related to **any** HQ executive's involvement with, decision about or review of **any** HQ employee's" performance review, or "CFE rating-related compensation."  As written, this Request asks Nike to review, for example, every document that may be related to any CFE rating for every putative class/collective member during their employment at Nike — which is particularly burdensome because



James Kan
Byron Goldstein
July 1, 2019
Page 3

CFE ratings and compensation decisions related to those ratings are conducted on an individualized basis.  Again, Nike invites Plaintiffs to meet and confer to narrow this Request.

**V.      JOB ASSIGNMENTS / DUTIES / DESCRIPTIONS / CODES – RFP NOS. 12, 14, AND 15**

RFP No. 12 – Plaintiffs seek "all descriptions or analyses of job groupings."  It is unclear to Nike what documents Plaintiffs seek with this Request, and Nike invites Plaintiffs to meet and confer to provide more insight.

RFP Nos. 14 and 15 – Nike will produce current job descriptions for positions that are covered by Plaintiffs' class/collective claims ("Covered Positions").  However, to do so, the Parties need to first meet and confer to determine exactly which job positions are Covered Positions for purposes of this lawsuit.

**VI.      ORGANIZATIONAL CHARTS / MAPS – RFP NOS. 13 AND 33**

Nike will produce a map of Nike HQ.  To the extent Plaintiffs request current and historical organizational charts covering every employee in every job throughout the entirety of Nike's organization, the Parties will need to meet and confer once Nike has an opportunity to determine whether and in what format such information may be available, if it is available at all.

**VII.      JOB STUDIES / ANALYSES – RFP NOS. 16, 17, 19, 20, AND 48**

Nike will produce non-privileged documents that demonstrate its policies are job-related and consistent with business necessity.  Nike denies that there are gender disparities or potential disparities that need to be addressed.  Nevertheless, Nike will produce documents relating to diversity and inclusion initiatives during the statutory period.

RFP Nos. 16 and 17 reference the Uniform Guidelines within the Code of Federal Regulations.  First, this is not a hiring case; to the extent Plaintiffs seek information about applicants and/or Nike's hiring rates, such requests are outside the scope of this litigation and irrelevant to this action.  Second, to the extent Plaintiffs seek relevant information (such as gender, compensation, performance, etc.) about employees who *were* hired, Nike is working to identify what data is available (*see* Section I, above).  To the extent Plaintiffs seek "validation studies" related to any relevant business practices, Nike also is working to determine whether any validation studies or similar analyses exist.

**VIII.      COMPENSATION / PROMOTIONS – RFP NOS. 23-25**

RFP Nos. 23 and 24 – Nike will produce copies of policies regarding Two Times Pay, CFE ratings, and merit increases.

RFP No. 25 – This Request seeks "all documents and communications concerning . . . proposed promotion[s] or application[s] for promotion[s] . . . that [were] provided to any HQ executive."  As written, this Request asks Nike to review, for example, every document that may be related to any promotion that every putative class/collective member may have applied for during their employment at Nike. This is particularly burdensome because it would require Nike to collect and review each individual employee's emails and records one-by-one.



James Kan
Byron Goldstein
July 1, 2019
Page 4

### IX.  COMPLAINTS / CHARGES / INVESTIGATIONS – RFP NOS. 27, 29 AND 46

RFP Nos. 27, 29 and 46 – Nike will produce documents relating to any complaints of gender discrimination by or relating to the Named Plaintiffs.  Nike disagrees that complaints outside of the issues in this case (namely, compensation) and complaints made by individuals outside of the Covered Positions are relevant.  Nike invites Plaintiffs to meet and confer on this issue.

### X.  INTERNAL COMMUNICATIONS – RFP NOS. 39, 41-43, AND 45

Nike will produce relevant company-wide communications from Mo Matheson and Mark Parker, as well as Nike's Fiscal Year 2016-2017 Sustainable Business Report.

### XI.  EXTERNAL COMMUNICATIONS – RFP NOS. 40, 44 AND 47

Nike does not see the relevance of these communications generally, but invites Plaintiffs to meet and confer on these topics.

### XII.  INDIVIDUAL PLAINTIFFS – RFP NOS. 52-63

Nike has already informally produced documents responsive to RFP Nos. 52, 55, 56, 58-60, and 63, to the extent they exist.  Nike will formally re-produce these documents, and will continue to review and produce any responsive, non-privileged documents on a rolling basis.

In response to RFP No. 62, at this time, Nike does not intend to produce documents regarding Sean Hoy or Shawn Cahill.  As the Parties have already discussed and as set forth in Nike's correspondence to counsel on this subject, Mr. Hoy was not a Nike employee, and neither Mr. Hoy nor Mr. Cahill are parties to this action or represented by Plaintiffs' counsel.  Nike will not turn over third parties' confidential personnel records and information.

### XIII.  SENIOR MANAGERS AND OFFICIALS – RFP NOS. 34-38

These RFPs, which relate to Nike's senior managers, appear solely intended to harass Nike.  Namely, Plaintiffs seek confidential personnel records and data for more than a dozen Nike senior managers, including information regarding any discipline, resignation, separation, discharge and/or promotions that may have impacted those senior managers.  These Requests call for an inappropriate and unnecessary intrusion into employment data for these individuals – none of whom is a putative class/collective member or alleged comparator – and bear no relevance to the claims or defenses in this case.

***



James Kan
Byron Goldstein
July 1, 2019
Page 5


Nike continues to gather and review documents for production.  We hope that, in the interim, the Parties can meet and confer telephonically about narrowing Plaintiffs' various RFPs so as to ensure a productive discovery process.  Nike reserves all rights, including to supplement its responses, where necessary and appropriate.


Sincerely,

Felicia A. Davis
of PAUL HASTINGS LLP

# Exhibit B



1(213) 683-6120
feliciadavis@paulhastings.com

**VIA E-MAIL AND U.S. MAIL**                                                98484.00003

November 13, 2019

Byron Goldstein
brgoldstein@gbdhlegal.com
James Kan
jkan@gbdhlegal.com
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Dr.
Suite 1000
Oakland, CA 94612

*Re:*    *Cahill et. al. v. Nike, Inc.*, U.S. District Court, D. Oregon, Case No. 3:18-cv-01477-JR

Dear Counsel:

We write in response to your November 4, 2019 letter and address the issues you raised in turn.

**1.        RFP 1 and The Court's October 31, 2019 Discovery Order**

With respect to RFP 1, as mentioned on our last meet and confer call, Nike is in the process of addressing a few remaining issues with respect to the data production.  Assuming that those issues can be resolved within the next few weeks — and recognizing the impact of the upcoming holidays — Nike anticipates that it will be able to produce the data to Plaintiffs at the end of December. Nike will also make best efforts to produce documents in response to the Court's October 31, 2019 Discovery Order (to the extent it has not already done so) by the end of December as well.

**2.        Job Groupings/Descriptions/Studies/Analyses (RFPs 12, 14, 16-20, 48, 70-71, and 79)**

RFPs 12-14, 17, and 19 seek job analyses and validation studies from the time period "January 1, 2010 to the present."  To the best of Nike's knowledge, information, and belief after a reasonable inquiry, Nike is not aware of any documents responsive to these requests.

RFPs 16, 20, and 48 seek pay equity analyses and communications related thereto.  As mentioned in our previous meet and confer calls, Nike's pay equity analyses were undertaken at the direction of counsel. Accordingly, documents responsive to these requests are privileged and will be identified as such on Nike's privilege log, which Nike anticipates providing to Plaintiffs by the end of December.

RFPs 18, 70, 71, and 79 relate to Nike's affirmative defenses.  As also mentioned on our last meet and confer call, Nike has agreed to produce relevant, non-privileged documents that support its affirmative defenses and will continue to do so on a rolling basis.

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
t: +1.213.683.6000  |  www.paulhastings.com

Goldstein Decl. Ex. 12, Page 273 of 297



Byron Goldstein
James Kan
Page 2


3.    **Documents Related To Plaintiff Heather Hender (RFPs 52-58, 61, and 63)**

For RFPs 52-56 and 63, Nike has produced and will continue to produce relevant, non-privileged documents that are responsive to these requests, including Plaintiff Hender's background/onboarding documents, personnel file, CFEs, applications for promotion, job descriptions for positions held during the statutory period, and documents sufficient to show Plaintiff Hender's annual salary at Nike during the statutory period.

As to RFP 57, Plaintiffs will receive the information sought by this request through Nike's data production in response to RFP 1.  For RFP 58, to the extent that Plaintiff Hender made any internal complaints to Nike, Nike will produce all relevant, non-privileged documents in accordance with the Court's October 31, 2019 Discovery Order.

Last, as to RFP 61, documents concerning Plaintiff Hender's EEOC Charge are equally in her possession custody or control.  And pursuant to Plaintiffs' stated position, such documents are also "publicly available" and obtainable through a FOIA request to the EEOC.  Finally, as you know, Plaintiff Hender filed her EEOC Charge on or around November 9, 2018 — several months after this lawsuit had already commenced — and immediately requested a Notice of Right to Sue letter, which the EEOC issued to her November 15, 2018.  As a result, Nike did not have the opportunity to prepare and file a position statement in response to her Charge, and communications regarding said Charge are post-litigation among counsel and privileged.


Sincerely,

Felicia Davis
of PAUL HASTINGS LLP


FAD

# Exhibit C



1(213) 683-6169
danielprince@paulhastings.com

**VIA E-MAIL AND U.S. MAIL**                                          98484.00003

January 10, 2020

Byron Goldstein
James Kan
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Dr., Suite 1000
Oakland, CA 94612

*Re:*    *Cahill et. al. v. Nike, Inc.*, U.S. District Court, D. Oregon, Case No. 3:18-cv-01477-JR

Dear Counsel:

We write as a follow up to the parties' January 3, 2020 discussion regarding Nike's anticipated privilege
log, as well as to acknowledge Nike's receipt of Plaintiffs' privilege log, produced on December 31, 2019.

During the parties' January 3, 2020 meet and confer call, Plaintiffs requested that Nike deliver rolling
productions of a "phased" privilege log.  As we discussed, Nike's position is that a singular,
comprehensive privilege log is more efficient and therefore preferential, and that the appropriate juncture
for producing such a record is at or near the close of discovery.  We are continuing to speak with our
client regarding the various categories of potentially privileged communications (and we will continue to
do so), but notwithstanding the above objections, we anticipate production of Nike's initial "phase one"
privilege log sometime in January.

Additionally, we are in receipt of Plaintiffs' privilege log.  We are still reviewing this document and, if
necessary, will circle back with any questions or concerns regarding Plaintiffs' privilege designations.
Nike reserves all rights in connection with the same.

Best regards,

**/s/ Daniel Prince**

Daniel Prince
of Paul Hastings LLP

cc:    Felicia A. Davis
        Paul Hastings LLP

Goldstein Decl. Ex. 12, Page 276 of 297

# Exhibit D



**PAUL HASTINGS**

1(213) 683-6120
feliciadavis@paulhastings.com

February 21, 2020                                                                                              98484.00003

**VIA EMAIL AND U.S. MAIL**

Bryon Goldstein (brgoldstein@gbdhlegal.com)
James Kan (jkan@gbdhlegal.com)
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Drive, Suite 1000
Oakland, CA 94612

*Re:*  *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel:

We write in response to Plaintiffs' December 20, 2020, 15-page meet and confer letter ("MCL").

As a threshold matter, many of the questions that Plaintiffs raise (e.g., what documents do HRBPs rely on; identify individuals involved in Nike's Competitive Pay Management process) are interrogatories guised as document requests and, in any event, improperly included in their MCL. In most instances, Plaintiffs failed to even tie their questions to the original RFP. Nevertheless, Nike has investigated and continues to investigate whether documents that Plaintiffs inquired about in their MCL exist (in addition to assessing relevance, privilege, and burdensomeness considerations as applied to any such documents). To the extent Nike is able to respond at this time, it does so below.

- **A.1. "Job Descriptions and Related Discovery":**  Nike previously indicated to Plaintiffs that it does not maintain historical copies of job descriptions. The "compensation job descriptions identified in the MePortal," which Plaintiffs inquired about, are the same as the job descriptions that Nike already produced. Further, in its January 31, 2020 production, Nike has produced data points related to metadata for those job descriptions. To the extent that Nike uncovers additional data points in its investigation, it will supplement its production. And of course, the parties have separately and more recently met and conferred on this topic via e-mail (which does not warrant further repeating here).

- **A.2. "Job Groupings and Related Discovery":**  First, Plaintiffs mischaracterize Nike's communications regarding what documents it has and has not found. Specifically, Nike informed Plaintiffs that it was not aware of documents responsive to certain RFPs to the extent they sought job analyses or validation studies during the period **January 1, 2010 to present**. We have not made representations regarding the existence of documents that precede this time period, more than a decade ago. Second, Nike has produced documents that show or describe various ways jobs may be "grouped," as Nike understands you are using this term, although Nike disputes that any alleged "job groupings" are appropriate. For example, Nike has produced its "Job Codes" and "Grade Mapping/Job Code Master" spreadsheets; *see* NIKE_00015398 and NIKE_00015611. Nike has produced its VALUES Bands Overview; *see* NIKE_00000026. Nike's data contains band, level, job family, subfamily, functional area, and organizational unit. Finally, with respect to "leveling criteria" and "surveys," Nike is still investigating what responsive documents may exist.



Bryon Goldstein
James Kan
February 21, 2020
Page 2

- **A.3. "Organization Structure and Reporting Lines":** Nike has previously indicated to Plaintiffs that it does not maintain organizational charts (current or historical) in any manageable format. Nike has, however, produced direct reporting lines through its data (*see* the "Mgr_Pos" field). Plaintiffs can use this, as well as the job family, subfamily, functional area, organizational unit, and cost center fields to see how individuals relate to one another in Nike's data. And, although the same information may be accessible to managers through Nike's MePortal system, running reports for each manager would be unduly burdensome, oppressive, and cumulative of information that Nike has already produced (in additionally to creating documents solely for use in this litigation).

- **B. "Pay Equity Analyses":** Nike's "global" and "supplemental" pay equity analyses were undertaken at the direction of counsel and will be identified on Nike's privilege log. To clarify, the "supplemental analysis" is the same as the "Summer 2018" analysis referred to on page 22 of Nike's "Total Rewards Deep Dive Rewards Conversations" PowerPoint. It is also the same as the "analysis done in partnership with Mercer," which Plaintiffs inquired about in Category P, below. Finally, with respect to Nike's Competitive Pay Management ("CPM") process, Nike has produced the corresponding instructions/guidelines for that process in the Total Rewards PowerPoints that Plaintiffs cite throughout their MCL. Additionally, Nike's data production reflects compensation increases, which would include any CPM adjustments. Thus, Plaintiffs are seeking information that is cumulative of what Nike has already produced. Nevertheless, Nike is still investigating what additional relevant, non-privileged documents regarding its CPM process may exist.

- **F. "Guidelines and/or Standards for Determining the Amount of an Employee's Cash Bonus Under the Performance Sharing Plan (PSP)":** Nike has collected its PSP Brochure for FY16, FY17, and FY19, and will include those documents in its next production. As to the remainder, Nike is still investigating what responsive documents may exist.

- **J. "Preferred Candidate, Potential Appraisal, and Enhanced Segmentation":** Nike does not maintain a separate "Enhanced Segmentation" policy. The slide in question refers to Nike's Talent Segmentation process, for which Nike has already produced documents. *See, e.g.,* NIKE_00013811; NIKE_00013815. With respect to "Potential Appraisal," Nike has already produced documents that reference or explain that framework. *See, e.g.,* NIKE_000158769, NIKE_000158770, NIKE_000158773, NIKE_000158774. Nike continues to investigate your remaining requests.

- **K. "Studies or Analyses Related to Time-in-Job and Pace of Promotions":** These analyses were undertaken at the direction of counsel and will be identified on Nike's privilege log.

- **M. "Instructions for Determining Whether an Employee is in the Correct 'Job Code, Salary, and Band'":** The "instructions" that Plaintiffs reference are for Nike's CPM process and are contained in the Total Rewards PowerPoints that Plaintiffs cite. Nike refers Plaintiffs to its response to Category B, above.

- **N. "Active Pay Management (APM) Analyses and Implementation":** "Active Pay Management (APM)" is the previous name for Nike's CPM process. Nike refers Plaintiffs to its response to Category B, above.



Bryon Goldstein
James Kan
February 21, 2020
Page 3

- **P. "Analysis Done in Partnership with Mercer to Identify Outliers and Employees Who May Receive Pay Adjustments":** This analysis was undertaken at the direction of counsel and will be identified on Nike's privilege log. Nike refers Plaintiffs to its response to Category B, above.

- **Q. "Overall 2018 Review of Nike's HR Systems and Practices":** This review was undertaken by counsel and will be identified on Nike's privilege log.

- **R.1. "Equal Opportunity is the Law":** Nike produced this document on January 31, 2020.

- **R.2. "Manager Playbook":** Nike produced these documents on January 31, 2020.

- **R.7. "Stock Award Data Available to Managers":** Nike refers Plaintiffs to its data, which contains equity awards from the time period of August 2012 – September 2019.

- **R.8. "Performance Ratings Summary Template and CFE Ratings Distribution Summary Template Job Aid":** Nike produced this document on January 31, 2020.

- **R.9. "CFE Ratings Report Detail Job Aid":** Nike produced this document on January 31, 2020.

- **R.11. "Leveling Criteria, Benchmark Surveys, and Identification of Job Functions":** These documents are duplicative of Category A.2. As noted above, with respect to "leveling criteria" and "surveys," Nike is still investigating what responsive documents may exist.

As a final note, Nike again reiterates that the meet and confer process is meant to resolve legitimate discovery disputes, and Nike does not believe that Plaintiffs' to-date approach of sending multiple, lengthy, repetitive letters and then demanding "prompt" responses from Nike is in line with the spirit of that process. Again, Nike hopes that Plaintiffs will approach things more constructively going forward, particularly where Nike continues to investigate Plaintiffs' questions and has provided updates to Plaintiffs when possible. And if Plaintiffs have suggestions for streamlining the discovery process, Nike welcomes that discussion.

We remain available to discuss any of the above by phone.

Sincerely,

Felicia Davis
of PAUL HASTINGS LLP


FAD

# Exhibit E



1(213) 683-6120
feliciadavis@paulhastings.com

March 5, 2020                                                                                    98484.00003

**VIA EMAIL**

Bryon Goldstein (brgoldstein@gbdhlegal.com)
James Kan (jkan@gbdhlegal.com)
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Drive, Suite 1000
Oakland, CA 94612

Re:      *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel:

We write in response your March 5, 2020 letter regarding a motion to compel three categories of documents:  (i) Pay Equity Analyses; (ii) Studies or Analyses Related to Time-in-Job and Pace of Promotions; and (iii) Analyses Done in Partnership with Mercer to Identify Outliers and Employees Who May Receive Pay Adjustments.  As we have communicated, to the extent responsive documents exist, they are privileged.  We will produce our next wave of privilege logs next week.  As a result, we believe any motion to compel is premature.

If I am misunderstanding the issue, please let me know.  As always, we are happy to discuss this further if that would be productive, rather than taking up the Court's time.

Sincerely,

/s/ Felicia A. Davis

Felicia A. Davis
of PAUL HASTINGS LLP

# Exhibit F



1(213) 683-6120
feliciadavis@paulhastings.com


June 12, 2020

**VIA E-MAIL**

Bryon Goldstein
brgoldstein@gbdhlegal.com
James Kan
jkan@gbdhlegal.com
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Drive
Suite 1000
Oakland, CA 94612


Re:    Cahill et al v. Nike, Inc., Case No. 3:18-cv-01477-JR

Dear Counsel:

We write in response to your May 15, 2020 letter regarding Nike's privilege and redactions logs.  We disagree with your characterization of our privilege and redaction logs, but in the spirit of cooperation, we seek to address your concerns to avoid unnecessary discovery disputes going forward.

I.    **NIKE HAS NOT WAIVED ANY OF ITS PRIVILEGE OBJECTIONS**

As a preliminary matter, Nike has not waived its privilege objections.  First, as we have explained several times, Nike's original objections to Plaintiffs' discovery requests were neither generalized nor boilerplate.  Second, Nike has not failed to timely produce privilege logs.  We note that Nike produced privilege logs in February and March 2020.  Plaintiffs produced privilege logs in January and April 2020.  It is thus bizarre to suggest that Nike's privilege logs are untimely.  Nike has and will continue to provide privilege and redaction logs on a rolling basis as discovery proceeds.

II.    **IDENTIFYING PARTIES TO COMMUNICATIONS**

Contrary to your assertion, each of the entries in the February 2, 2020 privilege log identifies the individuals who are parties to the communication.  Not only has Nike listed the names of the individuals, Nike has also identified which individuals are Nike's in-house legal counsel or members of Nike's in-house legal department, and which are Nike's outside counsel.  We do not believe Plaintiffs are entitled to additional information, such as employee job titles, but if you have authority for such a position, please let us know, and we will consider it.

To the extent Redaction Logs contain entries without an author or recipient, this is because the redaction occurs in a document without a clear author or recipient, such as a personnel file or other employment-related document.  Since these documents have been produced to Plaintiffs, you should have all of the information you need in this regard.

To the extent that the names of specific authors or recipients are not listed for every document contained on Nike's March 13, 2020 privilege log, we were attempting to respond to Plaintiffs' request that the

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
+1 213.683.6000  |  www.paulhastings.com

Goldstein Decl. Ex. 12, Page 284 of 297



June 12, 2020
Page 2

privilege log be produced by a date you requested.  Nike is continuing to work to provide specific names of authors and recipients of various documents, and will supplement its privilege log accordingly, to the extent that information is available.

## III.    PRIVILEGE AND REDACTION DESCRIPTIONS

The documents listed on Nike's February 20, 2020 Privilege Log reflect communications between Nike's attorneys (or members of Nike's legal department) and various document custodians, for the purpose of collecting documents or other information directly related to this case.  The "underlying facts," as you call them (i.e., the documents forwarded to Nike's Legal Department) were all produced.  This is evident from the log because each entry contains a bates number, corresponding to a produced document.  The text of any communications between the document custodian and Nike's Legal Department made for the purpose of identifying or collecting these documents, however, is privileged attorney-client communication, and is not discoverable.  Plaintiffs are not entitled to any additional information regarding the substance or nature of the communications beyond that which we have provided.  We feel that the descriptions adequately describe what has been redacted, but if you have specific questions, please let us know.  We are happy to discuss.

Nike's redaction descriptions listed on the March 13, 2020 Privilege Log likewise are sufficient.  We do not believe that Plaintiffs are entitled to know the substance of the privileged communications between the Nike Legal Department and its clients to obtain information related to this lawsuit.  If you have authority to the contrary, please let us know, and we certainly will consider it.

With respect to those documents withheld in their entirety on the basis of privilege (entries 25–79 on Nike's March 13, 2020 Privilege Log), we disagree that the descriptions do not contains sufficient detail.  Here, we have specifically identified that the attorney-client communication and/or work product relates to 1) compensation or 2) Competitive Pay Management adjustments.  The content of the privileged reports, including, for example, the types of compensation analyzed, is privileged.  Nike does not have an obligation to explain the legal advice sought or the questions asked regarding such advice.

## IV.    COMMUNICATIONS SENT FOR THE PURPOSE OF PROVIDING LEGAL ADVICE

Plaintiffs argue that several entries in the February 2, 2020 Privilege Log "incorrectly assert that communications were sent 'for the purpose of providing legal advice in this lawsuit,' but these communications predated, in some instance by years, the filing of the complaint in this action."  This is not correct.  This lawsuit was filed on August 9, 2018.  Nike received notice of Plaintiff Cahill's BOLI complaint shortly before that date.  None of the entries that reflect advice given "in this lawsuit" predate these two events.

Moreover, the March 13, 2020 Privilege Log demonstrates that the primary purpose of each entry was to provide legal advice.  For Plaintiffs to suggest that the communications or documents relate to routine HR issues is complete speculation, and is contradicted by Nike's privilege descriptions and the job functions of the authors and recipients.  *See King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 721 (5th Cir. 2011) (upholding district court's rejection of privilege challenges because plaintiff "offered only speculation that the e-mails are not covered by privilege because they were made for a purpose other than obtaining legal advice").  That Nike may have derived other benefits from the advice, such as providing business advice (which again, is pure speculation by Plaintiffs), does not waive the privilege.  *See Portland Wire & Iron*



June 12, 2020
Page 3

*Works v. Barrier Corp.*, 1980 U.S. Dist. LEXIS 17898 at *4 (D. Or. May 30, 1980) ("if the communication is made primarily for the purpose of securing legal advice, an incidental request for business advice will not vitiate the privilege").

In any event, Plaintiffs' reliance on *Pitkin v. Corizon Health, Inc.*, 2017 U.S. Dist. LEXIS 208058 (D. Or. Dec. 18, 2017) is misleading.  The *Pitkin* court found that the primary purpose test applied in the Ninth Circuit "falls short in circumstances where a communication serves many overlapping purposes, and none of them can reasonably be considered 'primary' over any other."  *Id.* at *8.  For that reason, the Court adopted the D.C. Circuit Court of Appeal's analysis.  *See id.* at *10.  "Trying to find *the* one primary purpose for a communication motivated by two sometimes overlapping purposes (one legal and one business, for example) can be an inherently impossible test."  *Id.* at *9 (*quoting In re Kellogg Brown & Root, Inc.*, 756 F. 3d 754, 759 (D.C. Cir. 2014) (emphasis in original).

## V.    COMMUNICATION AND DOCUMENTS WITHOUT AN ATTORNEY AUTHOR OR RECIPIENT

As you know, an attorney need not be an author or recipient of a communication where a corporate client invokes the attorney-client privilege.  A document may be privileged if it reflects legal advice or information provided to an attorney for the purpose of obtaining legal advice.  *See, e.g., Cuno, Inc. v. Pall Corp.*, 121 F.R.D. 198, 203 (E.D.N.Y. 1988) (*citing Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)).  Thus, privileged communications may be shared among non-attorney employees for various legitimate reasons and still retain their privileged nature, such as when executives discuss legal advice or when information is sent to responsible employees to inform of the fact that legal advice was sought or obtained.  *See, e.g., United States v. Schwimmer*, 892 F. 2d 237, 244 (2d Cir. 1989) (communications from client to accountant hired to assist in preparing a defense strategy were privileged); *Weber v. FujiFilm Med. Sys. USA, Inc.*, 2011 U.S. Dist. LEXIS 6199 at *11 (D. Conn. Jan. 24, 2011) (communications among corporate employees to or from corporate counsel can be privileged if those communications are made among employees who need to know the content and share the common interest); *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 453 (N.D. Ill. 2006) (privilege is not lost when management discusses legal advice with one another); *QST Energy Inc. v. Meryn's*, 2001 U.S. Dist. LEXIS 25927 at *8 (N.D. Cal. May 14, 2001) ("since these disclosures of the confidential communications to third persons were reasonably necessary to accomplish the purpose for which Defendants' counsel was consulted, they did not waive the privilege"); *Baxter Travenol Labs, Inc. v. Abbott Labs.*, 1987 WL 12919, at *5 (N.D. Ill. June 19, 1987) (documents communicating legal advice to non-legal personnel and documents reflecting executives' discussion of legal advice are privileged).

## VI.    PAY EQUITY ANALYSES, STUDIES OF ANALYZES RELATED TO TIME-IN-JOB AND PACE OF PROMOTIONS OR ANALYSES

As we have discussed, Nike's pay equity analyses, as well as any studies or analyses related to time-in-job and/or pace of promotions, are conducted at the direction of counsel and are privileged.  Specifically, this work was requested by Nike's in-house and outside counsel for the purpose of providing legal advice to the company.  The fact that Nike may have acknowledged the existence of such analyses, taken action as a result of the outcome of such analyses, or relied upon such analyses in making and/or acting upon legal advice does not waive their privileged and confidential status.  Plaintiffs' reliance on *SEC v. Chesnoff*, 2006 U.S. Dist. LEXIS 49090 (N.D. Tex. July 18, 2006) does not support its contention that these analyses are not confidential.  In *Chesnoff*, an individual disclosed to the press the amount he had



June 12, 2020
Page 4

offered to acquire a company.  Nike has not disclosed the details of its analyses with the public or anyone who does not "need to know."

Nike's legal department certainly can engage an external consultant on a privileged basis.  *See In re Syngenta AG MIR 162 Corn. Litig.*, 2017 U.S. Dist. LEXIS 92606, at *294-95 (D. Kan. June 13, 2017) (finding no reason to question company's representation that it had hired third-party employees as consultants "to provide … scientific assistance sought by [Company's] legal department regarding regulatory requirements") (*quoting High Point SARL v. Sprint Nextrel Corp.*, 2012 U.S. Dist. LEXIS 8435, at *13 (D. Kan. Jan. 25, 2012), *A.H. ex rel. Hadjih v. Evenflo Co.*, 2012 U.S. Dist. LEXIS 76100, at *2 (D. Colo. May 31, 2012).  And to the extent Plaintiffs argue that any external consultants must be considered "functional employees" to retain the privilege, which Nike does not concede, the Mercer team working on behalf of Nike legal were just that.  "'Functional employees' are agents of a corporation that fall within the privilege's scope under *Upjohn*."  *Schaeffer v. Gregory Vill. Partners L.P.*, 78 F. Supp. 3d 1198, 1202 (N.D. Cal. 2015).  The Ninth Circuit has adopted the Eighth Circuit's reasoning in *In re Bieter Co.*, which "applied *Upjohn* to cover communications between corporate counsel and outside consultants."  *United States v. Graf*, 610 F. 3d 1148, 1158 (9th Cir. 2010).  Mercer's communications with Nike meet all of the requirements for them to fall under the attorney-client privilege.  Mercer's communications with Nike were "made for the purpose of seeking legal advice."  *In re Bieter Co.*, 16 F. 3d 929, 938 (8th Cir. 1994).  The individuals at Mercer made these communications at the direction of their superior—Nike Legal—as it sought to secure legal advice.  *See id.* at 939.  Mercer's privileged communications with Nike were "within the scope of [its] duties" to design, conduct, and facilitate compensation and promotion analyses.  *Id.* Finally, these communications were "not disseminated beyond those persons who, because of the structure of the client's operations, need[ed] to know its contents."  *Id.*

In *NECA-IBEW Pension Trust Fund (The Decatur Plan) v. Precision Castparts Corp.*, 2019 U.S. Dist. LEXIS 16808, at *17 (D. Or. Sept. 27, 2019), cited in Plaintiffs' letter, the Court found that the PR firm in question also was the functional equivalent of an employee.  In reaching its conclusion, the Court considered the following:  1) the PR firm took its instruction from the hiring company and consulted with members of the company's management team and legal and financial advisors as necessary; 2) the work product the PR firm created belonged to the company, and 3) the PR firm was required to maintain the confidentiality of non-public documents it received from the company's attorneys and financial advisors. *See id.* at *18.  The same is true here.  Nike has demonstrated the privileged nature of the documents and communications on its privilege log as they relate to Mercer's consulting work for the company. Please let us know if you have any questions, but we hope this resolves your concerns.

## VII.    REDACTIONS FOR RELEVANCE

The February 20, 2020 redaction log includes three documents that have been redacted for relevance. The redacted material is clearly irrelevant to any party's claims or defenses because it relates to employees who are not members of the putative class or their alleged comparators (i.e., employees working outside of the United States and retail store employees).  Nike has not unilaterally made any other assessment regarding redactions for relevance.  These redactions are a far cry from the ad hoc redactions for relevance that some courts have disapproved; they are categorical lines clearly drawn to exclude information about groups who are not relevant, based on the allegations contained in Plaintiffs' Complaint.



June 12, 2020
Page 5

**VIII.    DOCUMENT CREATION / RECEIPT DATES**

We are working with Nike to provide document creation dates for documents listed on the privilege log, where available.  Per the ESI Order, we are not obligated to create metadata which does not exist.  In an effort to provide you with a rolling privilege log as soon as possible (at your request) we have provided date approximations where we had them.  Nike will update its privilege logs with updated creation date information to the extent it is available.

**IX.    ATTORNEY WORK PRODUCT**

We believe that our attorney work product designations are appropriate but will review and update them if necessary.

**X.    DISCOVERY IS ONGOING**

Nike continues to review and analyze documents for production.  As Nike locates such documents, we will supplement privilege and redaction logs accordingly.

In addition, Nike will review its previously provided privilege and redaction logs in light of the above and determine whether any additional information should be provided in order to respond to your inquiries without the need to bother the Court.  We remain optimistic that the parties can resolve this matter cooperatively and look forward to doing so.

Sincerely,

/s/ Felicia A. Davis

Felicia A. Davis
of PAUL HASTINGS LLP

FAD

# Exhibit G



1(213) 683-6169
danielprince@paulhastings.com

**VIA E-MAIL**                                                                          98484.00003

August 19, 2020

Byron Goldstein
brgoldstein@gbdhlegal.com
James Kan
jkan@gbdhlegal.com
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Dr., Suite 1000
Oakland, CA  94612

*Re:*    *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel:

We write in response to your August 14, 2020 letter regarding the Court's August 10, 2020 Order
(Dkt. # 111) (the "Order").

First, we are working with Nike to locate, collect, and produce additional responsive documents (if any),
consistent with the Order.  We note, however, that the Order compels production where, for example:  "if
such records exist" (section A(1)); "to the extent Nike has not [already] produced" them (section A(2)); "to
the extent Nike has responsive documents" (section B(1)); "if they exist" (section B(2)); "to the extent Nike
has [responsive] documents . . ." (sections B(3-4)); "to the extent Nike has any" (section F(3)); and, "to the
extent Nike has any further responsive documents" (section G).

In any event, we are actively engaged in this effort and Nike will continue its work so that any additional
materials may be produced ASAP.  We are mindful of the September 28, 2020 document discovery
deadline, and are amenable to discussions regarding a production timeframe (including rolling
productions) once we complete our due diligence under the Order.

Second, you asked about "any privilege or work product clams" and a "date certain by which Nike will
provide a privilege log listing all documents that: (a) Nike withheld based on attorney-client or work
product, and (b) are covered by Sections I-III of Plaintiffs' June 30, 2020 letter to the Court."  Notably, the
Court "decline[d] to rule on any attorney-client or work product privileges at this time" to "allow the parties
further opportunity to meet and confer on this issue."  As you know, Nike has produced privilege logs and
supplemental logs, and at intervals that are consistent with Plaintiffs' production of privilege logs.  As you
further know, Plaintiffs filed a motion to compel in connection with privilege matters and Nike currently is
preparing its response to the same.  Nike's response to that motion is due on September 8, 2020, and we
anticipate that a supplemental log(s) will be produced on or before that date.

Third, we appreciate your proposals with respect to the "Neuburger-related documents," but we do not
believe that any authority supports the production of documents (even under an AEO designation) with
Plaintiffs electing to decide if such documents are responsive or not.  That said, it might be helpful for the
parties to meet and confer telephonically as a first step (consistent with the Order) regarding this issue.

Goldstein Decl. Ex. 12, Page 290 of 297



Byron Goldstein
James Kan
August 19, 2020
Page 2


Please let us know when you are available to discuss these matters, as well as Plaintiffs' responses to Nike's RFPs, as provided in my letter dated August 17, 2020.

Further to this point, we have suggested numerous times that the parties meet and confer via phone on the various discovery issues that have been raised, but Plaintiffs have not responded to Nike's requests, which fails to comply with Local Rule 7-1 (requiring a certification that the parties have made "a good faith effort *through personal or telephone conferences* to resolve the dispute") (emphasis added).  Thus, please let us know when you are free to discuss during the week of August 31, 2020 (as you may know, Felicia is in arbitration during the week of August 24, 2020).

Sincerely,

**/s/ Daniel Prince**

Daniel Prince
of Paul Hastings LLP

# Exhibit H



1(213) 683-6169
danielprince@paulhastings.com

August 28, 2020                                                                                      98484.00003

**VIA E-MAIL**

Byron Goldstein
brgoldstein@gbdhlegal.com
James Kan
jkan@gbdhlegal.com
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Dr., Suite 1000
Oakland, CA  94612

Re:      *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel:

We write in response and to follow-up on the parties' correspondence, including, without limitation, your letters dated August 7, 14, 19, 20, and 21, and Nike's letters dated August 17, 19, and 21.

At the outset, we note that this is not a letter-writing contest; instead, as we have maintained, the Local Rules and the FRCP require the parties to meet and confer in good faith—telephonically—to resolve discovery disputes.  We have extended several invitations to do so, many of which have been, and continue to be, ignored.  That said, we propose to meet and confer next week, so please let us know if you have any available timeslots on September 2 or 3 (and if these days do not work, we can offer some options during the week of September 7).  In turn, we will coordinate our schedules internally, confirm a time with you, and circulate a dial-in to facilitate the meeting.  In that vein, we hope that our meeting would not be a "cram down" session in which the matters Nike has raised, and the facts it sets forth (or has set forth) are disregarded because they do not fit a pre-determined narrative.

We likewise submit this letter without prejudice and with a full reservation of rights.  Put simply, we disagree with Plaintiffs' characterizations of the record, as we have expressed, but we prefer to focus on solutions so the parties can move forward with the litigation.  We address the various issues below in turn, subject to the above.

Privilege/Redaction Log(s)

As we have stated *ad nauseam*, Nike continues to work diligently to supplement its privilege and/or redaction logs.  Simultaneously, we are preparing the opposition to Plaintiffs' motion to compel in regards to the same.  That work is ongoing.  We intend to supplement those logs by September 8, which is the due date for Nike's opposition.  Our objective is for any supplementation to complete Nike's production of privilege and/or redaction logs; but, we note that Plaintiffs continue to seek additional discovery, so if it becomes necessary to supplement those logs for purposes of completeness, Nike will do so consistent with its discovery obligations.

Likewise, we have not heard from Plaintiffs whether they have completed their production of privilege and/or redaction logs, or when that will occur.  Please confirm.

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
t: +1.213.683.6000  |  www.paulhastings.com

Goldstein Decl. Ex. 12, Page 293 of 297



Byron Goldstein
James Kan
August 28, 2020
Page 2


Supplemental Production

Per our prior correspondence, Nike has been working to identify additional, responsive documents—or to confirm that no such documents exist—pursuant to the Court's order.  We had expected to make a production this week, but due to some vendor-related challenges, I understand that we instead will produce documents early next week and continue to process/produce documents on a rolling basis, as noted in your correspondence, until we have completed the same.

Further, in Nike's August 17 letter, we noted certain issues with respect to Plaintiffs' production, including documents related to Plaintiffs' education, work experience, and damages.  I understand that Plaintiffs responded to the August 17 letter just today, and we will review the same and revert, as necessary, at a later date.  In the meantime, we understand that Plaintiffs have agreed to produce any delinquent documents by September 30.

On a related note, our working understanding was that the parties would complete document discovery by September 28.  We now understand, based on Plaintiffs' recent correspondence, that Plaintiffs may disagree (and, instead, believe an October 30 deadline to be appropriate).  That may be workable for Nike, and we proposed to address the same during our meeting of counsel next week.

Data

We have been working on extracting data, per our prior correspondence, and will address the specific issues you raised in a separate letter (by early next week).

Neuberger Documents

As explained in our August 19 letter, we would prefer to meet and confer regarding the Neuburger-related documents.  Plaintiffs insist that if Nike produces these documents under an AEO designation and then meet and confer with Plaintiffs as to their responsiveness, Plaintiffs would not be deciding whether such documents are, in fact, responsive.  That is incorrect.  Nor does the non-binding case you cite support the same.

Right now, our preliminary view is that counsel may conduct a thorough and complete review of the documents and produce responsive documents in the ordinary course.  But, we are happy to listen to the merits of Plaintiffs' proposal during our meeting of counsel and to discuss other alternatives.

Case Management Schedule

We appreciate your August 7 proposal in regards to case management matters.  We again believe that a schedule to complete fact and expert discovery, as well as class certification briefing, should be the subject of our meeting of counsel, particularly given that the Court asked the parties to consider a proposal in connection with the same.

That said, we are considering (without limitation) certain issues with Plaintiffs' proposal:  first, the sequencing of document discovery, depositions, and expert discovery, and Plaintiffs' proposed time allocation for the same; and, second, the proposed timing of opposition and reply briefs for class certification.



Byron Goldstein
James Kan
August 28, 2020
Page 3


We look forward to a productive meeting of counsel.

Best regards,

**/s/ Daniel Prince**

Daniel Prince
of PAUL HASTINGS LLP

# Exhibit I



1(213) 683-6169
danielprince@paulhastings.com

**VIA E-MAIL**                                                                           98484.00003

September 11, 2020

Barry Goldstein
bgoldstein@gbdhlegal.com
Byron Goldstein
brgoldstein@gbdhlegal.com
James Kan
jkan@gbdhlegal.com
Goldstein, Borgen, Dardarian & Ho
300 Lakeside Dr., Suite 1000
Oakland, CA  94612

Re:    *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel:

I write in response to your September 10, 2020 letter regarding documents referenced in Nike's opposition to Plaintiffs' motion to compel letter brief.

The 2015 EEOC Charge referenced in Nike's opposition is not responsive to any of Plaintiffs' RFPs.  The employee who brought the Charge did not work at Nike Headquarters, and is thus not covered by the scope of Plaintiffs' lawsuit.  For that reason, Nike will not produce the EEOC Charge in question.

Nike has already produced the complaints raised in the informal and unofficial "gender survey" entries that alleged bias in compensation and promotion decisions on the basis of gender.  *See, e.g.*, NIKE_00019389-00019392, NIKE_00022566-00022577, NIKE_00023464, NIKE_00019421-00019422.

Sincerely,

**/s/ Daniel Prince**

Daniel Prince
of Paul Hastings LLP

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
+1.213.683.6000  |  www.paulhastings.com

Goldstein Decl. Ex. 12, Page 297 of 297