

Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

**Goldstein, Borgen, Dardarian & Ho**

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

March 23, 2021

<u>**Via Email Only**</u>
Gary_Magnuson@ord.uscourts.gov

Hon. Jolie A. Russo
Mark O. Hatfield United States Courthouse
Room 1027
1000 S.W. Third Avenue
Portland, OR 97204

     Re:    *Cahill, et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Judge Russo:

     Plaintiffs respectfully request that the Court compel Nike to designate corporate witnesses pursuant to Federal Rule of Civil Procedure 30(b)(6) regarding the subject areas related to (1) job descriptions of Covered Positions, (2) organizational structure of Nike headquarters, (3) 2X pay policies prior to 2015, (4) validation studies and the Uniform Guidelines, and (5) personnel data issues. Each of these subject areas were included in Plaintiffs' Notice of Remote Deposition of a Nike Corporate Witness, served October 28, 2020, ("Corporate Witness Notice"), Exhibit A, and are relevant and important to the issues presented in this action. Despite Plaintiffs' meet and confer efforts, Nike has refused to produce corporate witnesses for these subject areas.

     Also, in order to provide sufficient time to complete the taking of the corporate witness depositions, Plaintiffs respectfully request that the deadline for the taking of fact witness depositions be extended for forty-five days from the entry of an Order pursuant to this motion and to extend by a similar period each of the other deadlines listed in the Court's February 12, 2021, Order, ECF No 134. Plaintiffs further request that the Court compel Nike to begin to produce the witnesses for deposition within fifteen days of the commencement of the extension

155 Grand Avenue, Suite 900, Oakland, CA 94612    Tel 510.763.9800    Fax 510.835.1417    www.gbdhlegal.com

821691.7

Goldstein Decl. Ex. 17, Page 1 of 120

period and to complete the production of the witnesses within thirty-five days from the commencement of the extension period.  It is important to set this schedule in order to avoid the situation that has occurred after the Court approved a 42-day extension of the deposition period where Nike failed to schedule a witness for the initial four weeks and scheduled two of the three witnesses on the last two days of the extended period.

In support of this request, Plaintiffs briefly describe the pertinent procedural history, the applicable law and Nike's contravention of it, the necessity of the designation of corporate witnesses who are prepared to testify about the five subject areas, and the requisite 45-day extension of the deposition discovery period.

**A.    Procedural History**

The Court entered an Order, ECF No. 116, providing for the "[c]lose of document discovery on class issues (without prejudice to reopen if necessary)" for October 30, 2020, and setting the "[f]act witness deposition discovery period" for November 2, 2020, to February 12, 2021.  In serving their Corporate Witness Notice on October 28, 2020 and scheduling the deposition for November 12, 2020, Plaintiffs sought to maximize the likelihood of completing the depositions of Nike's witnesses by February 12, 2021.  On the evening of November 11, 2020 Nike filed a motion for a protective order.  In their Opposition at 4-9, filed November 25, 2020, Plaintiffs described in detail the procedural history related to their repeated attempts to commence the taking of the corporate witness depositions.

While Nike's motion was pending, Plaintiffs sought to move forward with deposition discovery by sending a meet and confer letter, dated November 25, 2020, seeking to take a percipient witness deposition pursuant to Rule 30(b)(1) of Alison Daugherty, an employee of the HR department, on December 8, 2020 and offering nine alternative dates in December.

*Cahill, et al. v. Nike, Inc.*                    -3-                    March 23, 2021

Similarly, in a meet and confer letter, dated November 30, 2020, Plaintiffs sought to take a

percipient witness deposition pursuant to Rule 30(b)(1) of Shane Walker, an employee in the

compensation department, on December 15, 2020 and offering alternative dates in December.

Nike proposed that it would designate Ms. Daugherty and Mr. Walker as corporate witnesses

pursuant to Rule 30(b)(6), and Plaintiffs agreed but retained the right, if necessary, to depose Ms.

Daugherty and Mr. Walker as percipient witnesses.

On December 17, 2020, the Court declined to enter the protective order requested by

Nike and directed the parties to meet and confer about the issues related to the Rule 30(b)(6)

deposition.  ECF No. 131.  Consistent with the Court's Order, Plaintiffs adopted a pragmatic

approach because Nike asserted that it should determine the topics about which its designees

would testify.  This practical approach allowed Nike to designate the witnesses it would propose,

present the topics for the testimony and schedule the depositions.  The approach afforded Nike

flexibility and avoided *ex ante* arguments about the expected testimony.  But, as Plaintiffs told

Nike, this practical approach required that after Nike completed providing 30(b)(6) testimony on

topics that it had drafted, Plaintiffs would have the opportunity to review the testimony against

the applicable discovery standard.  If there were issues regarding the scope of the outstanding

testimony, the Parties would have an opportunity to meet and confer and, if necessary, seek

guidance from the Court.

Plaintiffs repeatedly requested that Nike present witnesses in a timely manner in order

that the Parties would be able to meet the February 12, 2021 deadline.  An email chain between

counsel from January 13, 2021 through January 20, 2021 is an example.  Ex. B.  On January 13,

2021, Plaintiffs' counsel wrote that "we have repeatedly requested that Nike present corporate

witnesses … in order that we may complete the deposition … by February 12 ….  On several

occasions, we have declared that we were available to take the 30(b)(6) deposition on just about every business day in January." *Id.* Plaintiffs' counsel further explained that "we are concerned that Nike is not going to present corporate witnesses in a manner that will permit the completion of deposition discovery by February 12, 2021. In order to complete the 30(b)(6) depositions, there must be time available for the parties to meet and confer about the adequacy of the scope of the testimony presented by the Nike corporate witnesses." *Id.* Nike's responses and further emails concerning the scheduling of the deposition are included in Exhibit B.

Despite Plaintiffs' multiple requests for Nike to produce corporate witnesses for deposition, Nike only scheduled three days of deposition in December, two days in January and two days in February prior to the February 12, 2021 deadline. Ex. C (chart of days and time of the depositions of Nike witnesses and of Plaintiffs and opt-in Plaintiffs). Mostly due to Nike's failure to produce corporate witnesses for deposition, the Parties were unable to meet the February 12 deadline. Accordingly, the Parties stipulated to an extension of forty-two days to the deposition period until March 26, 2021 (along with related extensions of other litigation deadlines), which the Court approved. It is noteworthy that, in contrast to Nike, Plaintiffs offered the four named Plaintiffs and nine opt-in plaintiffs for deposition in a timely fashion so that their deposition could be completed or started by the February 12 deadline. Ex. C. Plaintiffs have scheduled significantly more days of deposition and for longer periods than Nike has scheduled for its corporate witnesses and sole (b)(1) witness, Ms. Matheson. The imbalance and unfairness of this process is magnified by the fact that, like most employment discrimination actions, there is significant "information asymmetry" where the overwhelming amount of relevant evidence is controlled by the employer.

Shortly after the start of the extension, Plaintiffs wrote a meet and confer letter, dated February 17, 2021, emphasizing that in order to complete the deposition the parties would need to schedule corporate witnesses depositions expeditiously.  Ex. D.  In order to facilitate the deposition, Plaintiffs listed the outstanding subject areas and topics for corporate witness testimony and the relevance of the testimony.  Nike responded two weeks later, on March 2, 2021.  Ex. E.  Nike stated that it would produce corporate witness testimony concerning four subject areas but refused to produce such testimony for many other areas.  *Id.*  In a last attempt to resolve the matter, Plaintiffs responded, March 9, 2021, by describing the difficulty caused by Nike's failure "to schedule any depositions for the … first half of the extension period," and requesting prompt action.  Ex. F.  Since Nike did not respond to the Plaintiffs' March 9 letter, Plaintiffs sent a letter, dated March 12, 2021, notifying the Court that an impasse had been reached, identifying outstanding subject areas for which Nike had refused to provide corporate witness testimony, and seeking guidance from the Court about an appropriate procedure for resolving the dispute including a possible discovery conference.  Nike replied by letter on the same date accusing Plaintiffs of unspecified misrepresentations, stating that is "amenable to a discovery conference," but not responding to the substance of Plaintiffs' letter.

During the 42-day extension period Nike has scheduled corporate witness depositions on the thirty-second day, the forty-first and forty-second days of the period.

**B.    Nike's Second Attempt to Improperly Refuse to Appear for a Properly Noticed Deposition Violates the Settled Law and The Court's Prior Order.**

It is well settled that "it is for the court not the deponent or his counsel to relieve him of his duty to appear" for a properly noticed deposition.  *Pioche Mines Control, Inc. v. Dolman*, 333

F.2d 257, 269 (9th Cir. 1964).[1]  In denying a late-filed motion for a protective order concerning a Rule 30(b)(6) deposition, another district court relied upon the principle "long made clear" by the Ninth Circuit, citing *Pioche Mines Control*, that a party may not engage in self-help and refuse to appear for a noticed deposition.  *Twin Falls NSC, LLC v. S. Idaho Ambulatory Surgery, Ctr*, No: 1:19-cv-00009-DCN, 2020 U.S. Dist. LEXIS 168764, at *40 (D. Idaho 2020).  The mere filing of a motion for a protective order "is not self-executing – the relief under the rule depends on obtaining a court to that effect."  Fed. R. Civ. P. 37(d) advisory committee notes to 1993 amendment.

This is a particularly extreme situation.  Nike filed a motion for a protective order covering the topics listed in the Corporate Witness Notice: the Court "declin[ed] to enter the protective order as requested by Defendant in its letter to the Court dated November 11, 2020." ECF No. 131.  Nike has not filed a motion for reconsideration or even a subsequent motion for a protective order.  Because it had the obligation to file and prevail on a motion for a protective order before refusing to present witnesses to testify to long ago noticed topics, Nike's failure to do so is a clear contravention of the Federal Rules of Civil Procedure, controlling Ninth Circuit authority, and this Court's prior order.  On this basis alone, the Court should order Nike to present witnesses for the duly noticed topics set forth in Plaintiffs' Corporate Witness Notice. While Plaintiffs do not carry the burden of proof here, they had no choice but to file this motion in order to prevent Nike from "running out the discovery clock" and thereby avoid its obligations under the discovery rules.

---

[1] In their Opposition to Nike's Motion for Protective Order, filed November 25, 2020, Plaintiffs presented additional discussion of the applicable legal standard for a party's compliance with a Notice for a Rule 30(b)(6) deposition, which they incorporate by reference here.  Opp'n 9-10, 25-31.

**C.      Subject Areas for Additional Corporate Witness Testimony that Must Be Ordered to Proceed.**

While Nike's actions warrant an order compelling witness testimony irrespective of the topics sought, the relevance and importance of five categories of testimony specifically sought here underscore the need for the Court's intervention.

**1.      Job Descriptions.**

The third topic in the Corporate Witness Notice is "Job Descriptions for Any Covered Position, Including formation, uses review, Related Policies and Practices, and use, if Any, of a Job Analysis." Ex. A. Nike has produced over 1,800 job descriptions. As shown on one of these documents for a professional entry position, the job description shows job duties, requirements for the job, and classification by job group among other matters. Ex. G (job description for "Prof. entry EXT Comm," NIKE_00003352-53).[2] Issues related to the job descriptions, such as the manner by which Nike creates the job descriptions, designates job requirements, describes job duties and classifies jobs, are critical to questions raised by the fair employment allegations in this action. *See*, *Hodgson v. Corning Glass Works*, 474 F.2d 226, 234 n. 10 (2d Cir 1973) (While job descriptions may not be dispositive by themselves of the comparability or similarity of jobs, a company's own evaluation as reflected in job descriptions "is nonetheless evidence, and often exceedingly good evidence …."), *aff'd sub nom.*, *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974). In addition, evaluation of the job descriptions may be relevant to the determination of whether aggregation of similar or comparable jobs is proper for defining variables for inclusion in statistical analyses. *See*, *Bazemore v. Friday*, 478

---

[2] Exhibit G and portions of Exhibit K (216:19-217:4; 371:23-24; 372-373; 483:3-11) attached to this letter have been marked "Confidential" by Nike, but, pursuant to paragraph 7(e) of the Protective Order (ECF No. 82), the Court and its staff can review the documents. However, if the Court intends to put this document on the docket, please seal it pursuant to paragraph 4 of the Protective Order.

U.S. 385, 399 (1986) (importance of variables, including use of job title as a variable, in a Title VII pay discrimination action).

In addition, in a public report, <u>FY16/17 Sustainable Business Report</u>, Exhibit H (pages 2 and 56, NIKE_00001998, NIKE_00002052), Nike underscores another aspect of the importance of job descriptions by stating that "[w]e will … remove bias from critical moments of the hiring process by creating more inclusive job descriptions …."

Nike does not appear to contest the relevance of a corporate witness prepared to testify about its job descriptions.  In Plaintiffs' meet and confer letter, dated February 17, 2021, sent shortly after the commencement of the extended deposition discovery period, they requested that Nike designate a witness to testify about job descriptions.  Ex. D.  In its response, on March 2, Nike stated, "[w]e … are working to identify a deponent on job descriptions (if any)."  Ex. E.  However, to date, Nike has failed to designate a corporate witness to testify about job descriptions as requested in the third topic in the Corporate Witness Notice.[3]

### 2.    Organizational Structure of WHQ.

The first topic in the Corporate Witness Notice is "Organizational structure of HQ, Including HR.  This topic Includes the identities of HQ Executives, Who reported to each HQ Executive, And Who each HQ Executive reported to.  This topic Includes how reporting lines function, their meanings And Impacts, And roles, responsibilities, And authority Related to

---

[3] In a March 11, 2021 email, Nike represented that it will provide a witness to testify about limited parts of topic 3: Nike drafted the limited part of topic 3 to read: "the use of job descriptions in non-competitive promotions and/or job transfers, for the time period 2015 to the present."  In a March 16, 2021 email, Nike represented that it would produce a witness on the same topic with respect to competitive promotions and/or job transfers.  Nike's designation of a witness to testify about limited aspects of the use of job descriptions in its practices only reinforces the relevance and criticality of the testimony of a corporate witness, as Plaintiffs have requested, concerning the use, creation, etc., of job descriptions.

reporting lines ….." Ex. A. Plaintiffs seek corporate witness testimony about the organizational

structure of the large proportion of Covered Positions for which Nike has refused to designate a

corporate witness.[4] Organizational structure is critical to an understanding the manner by which

Nike makes decisions concerning promotion, compensation and other employment decisions and

the manner by which policies and practices are monitored and implemented.

Furthermore, this testimony concerning organizational structure and reporting lines is

directly related to class certification issues. In *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 356

(2011), the Supreme Court stressed that in assessing whether practices were implemented in a

"common way," it was necessary to examine whether there was "some common direction"

regarding that implementation. Organizational structure and reporting lines are certainly relevant

to the evaluation of whether Nike's policies and practices are implemented with a "common

direction."

The testimony regarding organizational structure is particularly critical since Nike has

refused to produce organizational charts and, in fact, claims that it cannot reasonably do so. *See*,

Plaintiffs' Sixth Motion to Compel, filed March 1, 2021, Nike's Opposition, filed March 15,

2021, and Sur-reply, filed March 19, 2021. Furthermore, Nike argues that Plaintiffs possess

"information" about organizational structure "through Nike's data production" and should

"create [organizational] charts themselves …." Nike's Sur-reply at 10-11. As Plaintiffs have

---

[4] Nike has designated corporate witnesses to testify about the organizational structure applicable
to a limited number of departments – namely human resources department, including
compensation, and parts of the legal department, namely Global Investigations. But, Nike has
failed to designate a corporate witness to testify about the vast majority of Covered Positions in
which the putative class members work or have worked. Nike has provided no basis, as it could
not, for refusing to provide a corporate witness to testify about the organizational structure for
this vast majority of Covered Positions. *Compare* Ex. E at 2 (Nike's March 2 letter) *with* Ex. F
at 6-7 (Plaintiffs' March 9 letter).

*Cahill, et al. v. Nike, Inc.*                     -10-                     March 23, 2021

previously explained, it is not possible to create a complete organizational structure from the data

produced by Nike since that data does not include necessary information about Nike executives

at all levels.[5]  Incredibly, Nike recently conceded this fact in a letter clarifying its data:

> We understand that you are looking for full "chain of command" information for each
> employee at each snapshot date. That means not just the employee's direct supervisor,
> but the full sequence of supervisors all the way up to the CEO, on each Monthly
> Snapshot, since 2012. We are informed that this information is not maintained in a
> "historied" format, meaning Nike does not maintain full chain of command information
> historically. So we are not able to pull each employee's full chain of command 2 months
> ago or 2 years ago.

Ex. I (Nike March 14, 2021 Letter at p. 3) (emphasis added).

However, even if Plaintiffs were able to create an organizational chart from the data,

which they cannot, Plaintiffs would need make assumptions and guesses about the reporting

lines, responsibilities of various executives and similar issues.  Nike, no doubt, would seek to

criticize and undercut those assumptions during the class certification presentations or in the

reports submitted by Plaintiffs' experts.  Nike should not be allowed to refuse to prepare and

present a corporate witness regarding organizational structure and reporting lines; particularly

where it simultaneously seeks to prevent the production of any organizational charts.

**3.       2X Pay Policies and Practices Prior to 2015.**

The tenth topic in the Corporate Witness Notice is "Setting and modifying salaries … for

Covered Positions.  This topic Includes Policies and Practices Related to recommendations And

determinations concerning … core pay, base pay increases … And Who makes determinations

concerning each form of Compensation and how."  Ex. A.  The time period for which Plaintiffs

---

[5] *See*, Plaintiffs' motion to compel letter, filed March 1, 2021, at 8-9, n.8.  In brief, it is
impossible to attempt to construct Nike's organizational structure and reporting lines from the
personnel data produced by Nike since that data does not include any reporting lines for the vice
president level and above or even any information regarding the majority of vice presidents.

sought this testimony was from July 1, 2012, to the present; Nike produced personnel data

starting from this date. Ex. A at 6, ¶ 26. Nike designated Mr. Walker as a corporate witness to

testify about pertinent parts of this topic but only from 2015 to the present. Exhibit J (Email

from Nike's counsel, dated December 8, 2020). Nike has refused to produce a corporate witness

to testify about the operation of the 2X pay process from July 1, 2012 to the end of 2014.

The purpose of the 2X pay program was to provide "another opportunity for managers to

adjust an employee's pay." Walker Dep. 371:21-24, Ex. K. Employees who were paid a salary

below the minimum for a pay range or who were at a level below 95% of the mid-point of the

range for a number of years and who had received sufficiently high performance evaluations

were eligible to receive a 2X pay adjustment (or pay raise). Walker Dep. 372-73, Ex. K. Not all

employees who are eligible receive pay adjustments under the 2X pay process. "Pay

recommendations" under the 2X program "are approved through the highest leadership level"

depending upon "budget availability and priorities." Walker Dep. 216:19-217:22, Ex. K. The

creation, review, and determinations concerning the 2X pay policy are relevant for the

compensation claims in this action and for assessing the common questions related to those

claims for class certification.

Mr. Walker was neither prepared to testify about implementation of the 2X pay process

for the period from July 1, 2012 through the end of 2014, nor did he testify about this period. In

fact, Mr. Walker was not sure how the system concerning the 2X pay process was "configured

back in 2015." Walker Dep. 483:2-21; *see*, Walker Dep. 485:20- 25, Ex. K (testifying that he

"can't speak to" whether certain information was available for the 2X pay program "off the top

of my head for 2015"). Testimony regarding 2X pay, an important compensation program, is

relevant from July 1, 2012, even if it is prior to the commencement of the liability period. *Ellis*

*v. Costco Wholesale Corp.*, 285 F.R.D. 492, 528 (N.D. Cal. 2012) ("[P]re-statute of limitations data is generally both relevant and frequently used … as evidence of the alleged discriminatory practice, even when a plaintiff may not directly recover as to events occurring outside the applicable time period."); *Butler v. Home Depot*, No. C-94-4335 SI, 1997 U.S. Dist. LEXIS 24913, at *7 (N.D. Cal. 1997) ("Supreme Court has held that a time-barred discriminatory act may constitute relevant background evidence in a proceeding in which a current practice is at issue," citing *United Airlines v. Evans*, 431 U.S. 553, 558 (1977) and *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 309 n. 15 (1977)).

Importantly, pre-liability conduct, such as that related to 2X pay decisions, that impacts the compensation of class members who worked during the liability period is relevant and may constitute evidence of unlawful discrimination because of the Lilly Ledbetter Fair Pay Act ("FPA") which amended Title VII of the Civil Rights Act of 1964.  The FPA provides that a "discriminatory compensation decision or other practice" that occurred prior to a liability period has an unlawful actionable consequence "each time" during the liability period that "wages, benefits, or other compensation is paid [which] result[ed] in whole or part from such a decision or other practice."  42 U.S.C. section 2000e-5(e)(3)(A).  Thus, as modified by the FPA, under Title VII, "each paycheck resulting from the original 'discriminatory compensation decision or other practice' triggers a new filing period, in effect reviving a claim that otherwise would have been time-barred."  *Johnson v. District of Columbia*, 632 F. Supp. 2d 20, 22 (D.D.C. 2009).

**4.    Validation Studies and Compliance with the Uniform Guidelines.**

The twenty-fourth topic in the Corporate Witness Notice is "Nike's efforts, if Any, Relating to the Validation of Or attempts to Validate Any Policy Or Practice concerning Compensation, promotions, Or evaluation of employees in Covered Positions, And Any

*Cahill, et al. v. Nike, Inc.*                    -13-                    March 23, 2021

Validation studies Or materials Related to Any Policy Or Practice concerning the Compensation, promotion, Or evaluation of employees in Covered Positions." Ex. A. The twenty-fifth topic in the Corporate Witness Notice is "Nike's efforts, if Any, Policies, Or Practices Relating to compliance with the Uniform Guidelines with respect to Compensation, promotion, Or evaluation Policies And Practices …." Ex. A. Except to a limited and inadequate extent, Nike has refused to produce a corporate witness prepared to testify and topics 24 and 25.[6]

The Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. Sections 1607 *et seq.* ("Uniform Guidelines") and issues related to validation have a central and often determinative role in fair employment actions as made apparent by seminal Supreme Court decisions. *Griggs v. Duke Power Co.*, 401 U.S. 424, 433-34 (1971) (predecessor to the Uniform Guidelines entitled to "great deference"); *Albemarle Paper Co.*, 422 U.S. 405, 431 (1975) (same); *Contreras v. Los Angeles*, 656 F.2d 1267, 1281 (9th Cir. 1981) (The Uniform Guidelines while "not mandatory … are 'entitled to great deference'''' in determining whether an employer has met the Title VII affirmative defense standard, quoting *Griggs v. Duke Power*, *supra*.) Furthermore, the Supreme Court has emphasized the importance of the record-keeping

---

[6] Nike designated Mr. Walker to testify as a corporate witness with respect to topics 24 and 25, "validation" and the Uniform Guidelines, but limited that testimony "to the extent it applies to compensation polices or practices" and "as Nike understands" validation and Uniform Guidelines. Ex. J (Dec. 8, 2020 email from Nike counsel). Nike provides no explanation as to why it would designate a corporate witness to testify about validation and the Uniform Guidelines with respect to compensation policies and practices but not with respect to other policies or practices, such as promotion, job assignment or performance evaluation. Furthermore, Mr. Walker was neither prepared nor sufficiently knowledgeable to testify about these subjects as a corporate witness. Mr. Walker admitted that he was not familiar with the Uniform Guidelines, Walker Dep. 43:4-6, and, after he was shown a copy of the Guidelines, he conceded that he had never previously seen the document, Walker Dep. 43:7-12, Ex.K. He added that he was not able to testify about whether Nike's requirements met the standards set forth in the Guidelines. Walker Dep. 43:16-44:1, Ex.K. Furthermore, Mr. Walker testified that he did not understand the way that Nike defines the term "validation." Walker Dep. 182:20-23, 184:8-14, Ex. K.

provisions of the Uniform Guidelines.  Employers, like Nike, "falling within the scope of the

Uniform Guidelines … are required 'to maintain … records or other information …'" such as the

adverse impact of its practices on female employees and other groups.  *Wards Cove Packing v.*

*Atonio*, 490 U.S. 642, 657-58 (1989).  The Court emphasized and directed that that "[p]laintiffs

as a general matter will have the benefit of" these documents and records in order to establish

their claims.  *Id.* at 658.

      The Second Circuit has described the central role of the Uniform Guidelines and the

validation standard included in the Guidelines with respect to the affirmative Title VII defense of

"job related for the position in question and consistent with business necessity."  *Gulino v. N.Y.*

*State Dep't of Educ.*, 460 F.3d 361, 386 (2d Cir. 2006) (the court is "bound by the validation

requirements expressed in earlier Supreme Court precedent, namely *Albemarle Paper* and *Griggs*

….").  In applying the "job related" standard as required by "Title VII and related statutes," the

Second Circuit underscored that courts require "clearly established guideposts" since the

standard is "not primarily a legal subject."  *Gulino*, 460 F.3d at 383.  The "most important source

of guidance" is the Uniform Guidelines.  *Id*.  The Uniform Guidelines are premised upon the

principle that "the use of any selection procedure which has an adverse impact … will be

considered to be discriminatory and inconsistent with these Guidelines unless the procedure has

been <u>validated</u>."  29 C.F.R. section 1607.3(A) (emphasis added).

      Nike refuses to produce a corporate witness to testify about the topics related to

validation and the Uniform Guidelines because "Nike has repeatedly informed Plaintiffs that it

does not have validation studies" and it would be "illogical to designate a Rule 30(b)(6) witness

on studies that do not exist or events that did not happen."  Ex. E (March 2 letter at 3).  Nike's

position provides no justification for a refusal to produce a corporate witness to testify.  First, the

incomplete representations of Nike's counsel are not evidence.  Second, it is not "illogical" for Plaintiffs to have an opportunity to examine a Nike corporate witness about whether Nike made any attempt to comply with the provisions of the Uniform Guidelines to validate its practices or to comply with any of the other provisions of the Guidelines.  Third, it is similarly not "illogical" for Plaintiffs to have an opportunity to examine a Nike corporate witness about whether Nike has maintained the records required by the Uniform Guidelines with respect to adverse impact as well as other matters as specifically emphasized in *Wards Cove Packing Co*.  Fourth, the limited, non-evidentiary, representations by Nike's counsel about "validation studies" are an apparent attempt to avoid the examination of a corporate witness about critical matters relevant to the claims of discrimination that would reflect unfavorably upon Nike.  Fifth, Nike's representations are inadequate and incomplete since, among other matters, Nike fails to represent that it has not complied with the record-keeping and other provisions of the Uniform Guidelines.

### 5.    Data Issues

The thirty-second and thirty-third topics in the Corporate Witness Notice seek testimony explaining the meaning, completeness, and use of data already produced by Nike relating to "Compensation, promotions, Performance And Potential Evaluations, demographics, education, Or job experience."  Ex. A.  It is axiomatic that Plaintiffs must have a clear understanding about any data produced by Nike to facilitate accurate analysis of this data whether by Plaintiffs' counsel or their retained experts; this includes the meaning of data fields and entries, whether any relevant fields were omitted or excluded, and how Nike used this data.  Neither Plaintiffs nor their experts should be left to guess about the meaning or application of Nike data where Nike will undoubtedly seek to undercut class certification presentations or reports submitted by Plaintiffs' experts for any incorrect assumptions.

In an effort to obviate the need for a 30(b)(6) witness on produced data, Plaintiffs have repeatedly asked Nike, through years' long meet and confer exchanges, to clarify questions about the produced data and to agree to informal alternatives to a 30(b)(6) deposition, such as a joint expert call with Nike data persons followed by a memorialization of information confirmed, but data questions remain and Nike has not yet committed to any workable alternatives to a 30(b)(6) deposition on data.  While Plaintiffs continue to meet and confer in good faith in the hopes that a suitable alternative can be agreed upon by the Parties, the impending close of the deposition period requires Plaintiffs to preserve their ability to obtain 30(b)(6) testimony about data if those efforts fail.

**D.    45-Day Extension of Discovery for Fact Witness Depositions.**

The deadline for the conclusion of deposition discovery of fact witnesses is currently March 26.  In order to provide an opportunity for the taking of the corporate witness depositions requested in section C, it is necessary to extend that deadline.  Plaintiffs believe that forty-five days is a reasonable period by which to extend the deadline.

In order to make it unlikely that any further extension is required, Plaintiffs request that the Court order Nike to begin to produce the corporate witnesses for deposition within fifteen days of the commencement of the extension period and that Nike shall complete the production of witnesses within thirty-five days of the commencement of the extension period.  This specific timetable is appropriate given the experience with Nike's scheduling of corporate witness depositions during the 42-day extension ordered by the Court from February 12 until March 26, 2021.  Nike failed to schedule a deposition until the 32nd day of the extension period, March 16, and scheduled the second and third days of deposition on the last two days of the extension period, March 25 and 26.  By delaying the scheduling of the depositions, Nike made it

*Cahill, et al. v. Nike, Inc.*                    -17-                    March 23, 2021

impossible for the parties to have any opportunity to engage in effective meet and confer efforts with respect to any disputes regarding scope of the deposition.[7]

Finally, Plaintiffs request that the Court extend the other litigation deadlines, such as those for the submission of expert reports and briefing of the motion for class certification, by forty-five days. Much of the outstanding 30(b)(6) testimony sought by this letter brief, such as data explanations and Nike's organizational structure, will directly impact the reports of both Parties' respective experts and class certification submissions. Thus, any extension of the deposition period will necessitate a concomitant extension of other litigation deadlines.

Sincerely,

Barry Goldstein
Of Counsel

BG/kbm

cc:    Daniel Prince (danielprince@paulhastings.com)
       Zach P.  Hutton (zachhutton@paulhastings.com)
       Felicia A. Davis (feliciadavis@paulhastings.com)
       Amy Joseph Pedersen (amy.joseph.pedersen@stoel.com)
       Kennon Scott (kennon.scott@stoel.com)

---

[7] Plaintiffs filed a motion to compel by letter dated, March 1, 2021. As set forth in that letter, Nike's corporate witnesses identified documents that were covered by Plaintiffs' Requests to Produce Documents, that were relevant to the issues in the action and that Nike had failed to produce. Nike's witnesses have continued to identify such documents and Plaintiffs expect that one or both of the witnesses whom Nike scheduled for the last two days of the deposition period, March 25 and 26, will identify such documents. Accordingly, Plaintiffs may need to file additional motions to compel these documents if Nike fails to produce the documents voluntarily through the meet and confer process.

# EXHIBIT A

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Anna M. Joyce, OSB #013112**
AnnaJoyce@MarkowitzHerbold.com
**Chad A. Naso, OSB #150310**
ChadNaso@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
PortlAnd, Or 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
OaklAnd, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Attorneys for Plaintiffs and Opt-In Plaintiffs
[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**PLAINTIFFS' NOTICE OF REMOTE DEPOSITION OF A NIKE CORPORATE WITNESS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(b)(6)**<br><br>**Title VII of the Civil Rights Act of 1964; Federal Equal Pay Act; Oregon Equal Pay Act; Oregon Equality Act**<br><br>**DEMAND FOR JURY TRIAL** |

**PLAINTIFFS' NOTICE OF DEPOSITION OF NIKE CORPORATE WITNESS**

PLEASE TAKE NOTICE that pursuant to Rule of Civil procedure 30(b)(6) Plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth and Heather Hender (collectively, "Plaintiffs") will take the oral deposition of Defendant Nike, Inc.'s corporate witness regarding the following topics starting on November 12, 2020 at the offices of Markowitz Hebold, 1455 SW Broadway, Suite 1900, Portland, Oregon, at 9:30 am.

NOTICE IS FURTHER GIVEN that we reserve the right to conduct this deposition utilizing a secure web-based video teleconferencing service to provide remote/virtual access for those parties wishing to participate in the deposition via the internet and/or telephone.

Also take notice that we reserve the right to record the deposition either by stenographic means by a court reporter certified to record depositions or a digital reporter utilizing state-of-the-art digital recording equipment.  Both the court reporter and digital reporter are authorized to administer the oath and serve as the deposition officer in the State of Oregon.  Take note that the deposition officer may also be remote and out of the presence of the deponent for the purposes of providing the oath/affirmation to the deponent and capturing the proceeding.

The parties are advised that in lieu of a paper set of exhibits they may be provided and displayed digitally to the deposition officer, deponent, parties and counsel.  The exhibits will be compiled by the deposition officer for the purposes of exhibit stamping, and ultimate production of the final certified transcript.  Please contact the noticing attorney at least five (5) calendar days prior to the deposition to advise that it is your desire to appear via this remote participating means so that the necessary credentials, call-in numbers, firm name, email address, services, testing and information, if necessary, can be arranged and provided to you prior to the proceeding(s).

PLAINTIFFS' NOTICE OF DEPOSITION OF NIKE CORPORATE WITNESS
PAGE 1

788081.13

Goldstein Decl. Ex. 17, Page 20 of 120

We further reserve the right to utilize the following: (1) Recording of the deposition utilizing audio or video technology; (2) Instant visual display such that the reporter's writing of the proceeding will be available to all who are a party to this proceeding to request and receive it in Realtime; (3) Exhibit Capture (picture-in-picture) technology in which any exhibit reviewed by the deponent during the deposition can be captured visually; and (4) To conduct this deposition utilizing a paperless exhibit display process or platform.

 The deposition will continue from day to day excepting Saturdays, Sundays, and holidays until completed unless Plaintiffs agree to continue until a later date (*e.g.*, Nike needs to complete its document and data productions).  As required by Fed. R. Civ. P. 30(b)(6) Nike is requested to produce that person or those persons knowledgeable about the topics listed below. Defendant is requested to provide to counsel for Plaintiffs in writing, in advance of the deposition, the name And job title of the person or persons, if more than one person will be produced by Nike, Who will testify on behalf of Nike on each topic.

## DEFINITIONS

1.      "And" And "Or" shall be construed either disjunctively Or conjunctively as necessary to bring within the scope of the discovery notice all responses that might otherwise be construed to be outside the scope.

2.      "Any" shall be construed to include "all," And "All" should be understood to include "Any."

3.      "CFE" means Coaching for Excellence Or other annual performance evaluation process, Including Any Related ratings.

4.      "Communication" refers to the transmittal of information Or opinion (in the form of facts, ideas, inquiries Or otherwise) whether oral, written Or electronic, Including SMS messages, MMS messages, slack messages, instant messenger, And e-mails.

**PLAINTIFFS' NOTICE OF DEPOSITION OF NIKE CORPORATE WITNESS**
**PAGE 2**

Goldtstein Decl. Ex. 17, Page 21 of 120

5.      "Compensation" means all money And other things of value received by an employee for labor Or services performed Including hourly pay, salary, Milestone awards, bonuses, Performance Sharing Plan ("PSP"), Two Times ("2X") Pay, lump sum, equity, options, Or Related to an annual review, mid-year review, Or Long-Term Incentive Plan.

6.      "Covered Employee" means Any employee Who worked in a Covered Position at Any time during the Covered Period Or the Data Period as indicated below.

7.      "Covered Position" means all job positions Or job codes located at HQ in which a salaried employee worked that is below the Vice President level, except those job positions Or job codes for employees Who worked inside in a Nike retail store, in HR, Or in Nike's Legal Or Finance departments.

8.      "Data Period" means the time period from July 1, 2012 to the present.

9.      "Defendant," "Nike," "You" And "Your" mean Defendant Nike, Inc., Including Any officer, director, agent, employee, representative, accountant, investigator, consultant, advisor, manager, Or attorney of Any of the above, And Any other person, agent Or entity acting Or purporting to act on behalf of Any of the above.

10.      "Document" means all written, graphic, recorded, Or illustrated matter, data, data structure, software Or Any other tangible thing by which information is contained, stored, Or displayed by every kind of description, however produced Or reproduced, whether draft Or final, original Or reproduction, partial Or complete, And regardless of whether approved, signed, sent, received, redrafted Or executed, And containing all attachments, Including Communications.

11.      "HQ" means all buildings in Washington County, Oregon, Or Multnomah County, Oregon where four Or more Nike employees have an office Or work.

Goldtstein Decl. Ex. 17, Page 22 of 120

12.    "HQ Executive" means Any Nike employee Who is in bands E1 through E7 ("E7+"), is an officer of Nike, Or has a Vice-President title, President title, members of the Board of Directors, other job title that indicates a job position is similar, equal, more senior, Or superior to Vice President.

13.    "HR" means Nike's Human Resources business unit, department Or organization Including Human Resource Business Partners, Employee Relations, Talent Acquisition, Talent And Org Effectiveness, And Total Rewards business units, Any other business unit Or group that reports to the Vice President And/Or Chief Human Resources Officer in charge of Nike's Human Resources business unit, Matter of Respect, And Alertline.

14.    "Identify," "Identity," "Identities," "Who," Or "Whom" mean:

a.    When referring to a Person, to give, to the extent known, the Person's full name, title, present Or last known address, And places of employment, and when the Person is Or was a Nike employee, All job positions And Job Groupings.

b.    When referring to an act, transaction, relationship, thing Or occurrence, giving a detailed description, Including complete reference to date, place, persons involved, And means employed.

c.    When referring to a System, the control of, operation of, schema, fields, definitions of fields that are not clear on their face, available functions Or reports, brand, name, version, changes Or updates, And the categories of data that are utilized Or accessible by the System.

15.    "Including" Or "Includes" means "Including," "Including but not limited to," And "Including without limitation."

Goldstein Decl. Ex. 17, Page 23 of 120

16.     "Job Analysis" means the same as "analysis of work" as defined in the "Principles for the Validation And Use of Personnel Selection Procedures," (5th edition 2018, American Psychological Association), which is, "Any method used to gain an understanding of the work behaviors And activities required, Or the worker requirements (e.g., knowledge, skills, abilities, And other personal characteristics), And the context Or environment in which an organization And individual may operate.  This term subsumes what has earlier And variously been referred to as work And Job Analysis, And competency modeling."

17.     "Job Grouping" means Any Nike created grouping Or organization of jobs, Including pipeline, function, business unit, organization, cost center, work center, category, job family, job sub-family, band, level, job title, grade, benchmarking, And job code.

18.     "Performance And Potential Evaluations" means Any evaluation of Covered Employees' performance Or potential, annual review, CFE, CFE ratings, nine box, potential appraisal, talent segmentation, Organizational Talent Planning, And OTPR.

19.     "Person" Or "People" means a natural person, firm, association, organization, partnership, business, trust, corporation Or public entity.

20.     "Policies" mean all Nike Policies, rules, directives, protocols, And procedures, regardless of whether shown in a Document, Communication, Or other format, Including manuals, trainings, memoranda, handbooks, FAQs, Or similar Documents.

21.     "Practices" mean all Systemic processes Or established, recognized, habitual, customary, usual, regular, Or prescribed Practices for achieving certain ends.

22.     "Related to," "Relates to," And "Relating to" mean concerning, referring to, Relating to, describing, evidencing, constituting, comprising, containing, consisting of, setting

forth, proposing, showing, disclosing, embodying, explaining, reflecting, authorizing, recording, memorializing, Or mentioning (directly Or indirectly) Or in Any way pertaining to.

23.    "System" And "Systems" mean software, applications, databases, computer processes, email Systems, And Any other Communications' Systems.

24.    "Uniform Guidelines" means the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. Sections 1607 *et seq.*

25.    "Validation" means the definition in the Uniform Guidelines, 29 C.F.R. Section 1607.16X, which is "Validation in accord with these guidelines Or properly validated.  A demonstration that one Or more validity studies meeting the standards of these guidelines have been conducted, Including investigation And, where appropriate use of suitable alternative selection procedures as contemplated by section 3B, And has produced evidence of validity sufficient to warrant use of the procedure for the intended purpose under the standards of the guidelines."

26.    Unless otherwise stated Or necessarily implied from the context, the topic for examination encompasses the entire Data Period, that is from July 1, 2012, through the date of the deposition.

27.    Interpretation:

a.    Words in the singular include their plural meaning, And vice versa.

b.    The past tense Includes the present tense, And words used in the masculine gender shall include the feminine gender.

## **TOPICS FOR EXAMINATION**

1.    Organizational structure at HQ, Including HR.  This topic Includes the identities of HQ Executives, Who reported to each HQ Executive, And Who each HQ Executive reported to.  This topic Includes how reporting lines function, their meanings And impacts, And roles,

**PLAINTIFFS' NOTICE OF DEPOSITION OF NIKE CORPORATE WITNESS**
**PAGE 6**

788081.13

Goldtstein Decl. Ex. 17, Page 25 of 120

responsibilities, And authority Related to reporting lines.  This topic Includes the organizational structure between And among HQ Executives, HR, And Nike's Global Investigations.  This topic includes reports, surveys, Or analyses Related to organizational structure at HQ.

2.      Job Groupings at HQ with at least one Covered Position Or Related to HR Or Nike's Global Investigations, Including Any such Job Groupings' formation, modifications, composition, meaning, use, And Policies And Practices Related to the foregoing.  This topic Includes Who developed, formed, Or modified Job Groupings Or Policies And Practices Related to Job Groupings, and how the foregoing were developed, formed, Or modified.  This topic also Includes Any surveys, reports, Or Analyses Relating to the formation, modification, Or composition of Job Groupings.

3.      Job Codes at HQ, Including job codes' formation, review, modification, use, And Policies And Practices Related to the foregoing.  This topic Includes the three largest consolidations of job codes since 2007 measured by the quantity of Covered Positions job codes consolidated.  This topic also Includes Who developed, consolidated, Or organized job codes.

4.      Job descriptions for Any Covered Position, Including formation, uses, review, Related Policies And Practices, And use, if Any, of a Job Analysis.

5.      HQ Executives' involvement, knowledge, And responsibilities Relating to Covered Employees, Compensation, promotions, workplace complaints, potential disparities between women and men in Compensation or Promotion, Or Performance And Potential Evaluations at HQ, Including Policies And Practices Relating to such involvement, knowledge, And responsibilities.  This topic Includes determinations, review, Or other involvement Or responsibilities Related to Performance And Potential Evaluation, Compensation, workplace complaints, Or promotions.  This topic also Includes HQ Executives' involvement, knowledge,

Goldstein Decl. Ex. 17, Page 26 of 120

And responsibilities Related to workplace complaints by a Covered Employee Or against an HQ Executive. This topic also Includes HQ Executives' involvement, knowledge, And responsibilities concerning the formation, review, Or changing of Policies And Practices Related to Compensation, workplace complaints, Performance And Potential Evaluation, Or promotions.

6.      Pay ranges Relating to Covered Positions, Including "internal" And "external" ranges, market zones, market surveys, And how pay ranges are formed, reviewed, changed, And used. This topic Includes Policies And Practices Relating to pay ranges' formation, review, changes, And use, And changes to such Policies And Practices. This topic also Includes Who was involved with the formation, review, Or modification of pay ranges Or pay ranges' Policies And Practices.

7.      Hiring for Covered Positions, Including starting pay, qualifications evaluated, And starting Job Groupings. This topic Includes the collection Or use of Any Compensation history, placement into a pay range, assignment of a salary within a pay range, And evaluation of education, job experience, Or other background characteristics of the persons hired. This topic also Includes Policies And Practices Relating to collection Or use of prior Compensation history, starting pay determinations, starting Job Grouping assignments, application Or use of pay ranges, And evaluation of education, job experience And other background characteristics. This topic also Includes Who was involved in forming, changing, Or implementing such Policies And Practices.

8.      Performance And Potential Evaluations, Including recommendations, determinations, and use of such evaluations, who was involved in determinations and how they were involved, Any Related curves or percentages, effect on Or relationship to budgets, Compensation, promotions, Or workplace complaints, And Policies And Practices Related to the

Goldstein Decl. Ex. 17, Page 27 of 120

foregoing.  This topic also Includes Who formed, reviewed, changed, Or supervised Policies And

Practices Related to Performance And Potential Evaluations, and how these Policies and

Practices were formed, reviewed, changed Or supervised.  This topic also Includes calibration

meetings, preparation for, Related documentation, how conducted, Who attended, And how

calibration meetings are used and by Whom.

      9.     Total rewards, Including all forms of potential Compensation to employees in

Covered Positions Or in E7+, total rewards' philosophy, And the uses Or interactions between

total rewards And total rewards' philosophy, Performance And Potential Evaluations,

Compensation, budgets, workplace complaints, equitable pay, promotions, And Job Groupings.

This topic also Includes all Systems used for Compensation determinations, Including Offer

Modeling Tool And Fair Pay Tool.

      10.    Setting And modifying of salaries And lump sum payments for Covered

Positions.  This topic Includes Policies And Practices Related to recommendations And

determinations concerning merit, core pay, base pay increases, lump sum payments, And Who

made determinations concerning each form of Compensation and how.

      11.    Systems Nike used for, to track, to analyze, Or containing Documents Related to

Compensation, promotions, Performance And Potential Evaluations, hiring, workplace

complaints, job assignments, Job Groupings, Or organizational structure.  This topic Includes the

Identities, uses, And Documents stored Or accessed by such Systems, Including MePortal,

SuccessFactors, Box, SharePoint, ATS, CRM, Any email System, SMS messages, Global

Investigations Case Management System, Slack, And Any other System Nike used for storing Or

using Documents Or data for, communicating about, training for, Or recommendations, Or

**PLAINTIFFS' NOTICE OF DEPOSITION OF NIKE CORPORATE WITNESS**
**PAGE 9**

788081.13

Goldstein Decl. Ex. 17, Page 28 of 120

determinations concerning Compensation, promotions, Performance And Potential Evaluations, hiring, job assignments, Job Groupings, Or organizational structure.

12. Calculations, factors, recommendations, supervision, responsibilities, authority, And determinations concerning the amount of, factors impacting, Or eligibility for Performance Sharing Plan ("PSP") payments for employees in Covered Positions during the Data Period, Including Policies And Practices Related to the foregoing. This topic Includes Who formed, reviewed, Or changed such Policies And Practices, and how these Policies and Practices were formed, reviewed, Or changed.

13. Competitive Pay Management ("CPM") And Active Pay Management ("APM") for Covered Positions, Including CPM's and APM's formation, components, uses, Related processes, changes, And Related Policies and Practices. This topic Includes Who was involved in the formation, use, changes, implementation, Or supervision of CPM, APM, Compa-Ratio, Or Related Policies and Practices. This topic also Includes recommendations and determinations Related to CPM and APM for Covered Positions, recommendations And determinations of competitive, equitable, Or other adjustments for Covered Positions, And the use of pay ranges, market analyses, surveys, Or Any other analyses Or surveys.

14. Equity awards Or awards Related to the Long Term Incentive Plan ("LTIP"), Including calculations, factors, recommendations, supervision, responsibilities, authority, determinations, And Related Policies And Practices concerning the amount of Or eligibility for such awards for employees in Covered Positions. This topic Includes Who made recommendations And determinations regarding awards of equity Or Relating to LTIP. This topic Includes Who formed, reviewed, Or changed such Policies And Practices, and how these Policies and Practices were formed, reviewed, Or changed.

Goldtstein Decl. Ex. 17, Page 29 of 120

15.     Promotions And lateral job transfers by employees in Covered Positions to a Covered Position Or a position in the E7+ bands, how determinations are made and by Whom, And Including the Policies And Practices Related to the foregoing.  This topic Includes Any application process, Any posting of jobs in machine readable Or other form, And the impact of performance evaluations, potential evaluations, interviews, And Xcelerate, Amplify, And other programs, Policies, Or Practices.  This topic Includes the Policy, Practice, Or process that Nike has referred to as "Preferred Candidate."  This topic Includes Who formed, reviewed, Or changed such Policies And Practices, and how these Policies And Practices were formed, reviewed, Or changed.

16.     Compensation And Job Grouping determinations And reviews Related to a promotion Or lateral job transfer, Who made such determinations and how, And Including the Policies And Practices Related to the foregoing.  This topic Includes Who formed, reviewed, Or changed such Policies And Practices and how the Policies and Practices were formed, reviewed, Or changed.

17.     The organizational structure, responsibilities, And authority of HR at HQ Related to Performance And Potential Evaluations, Compensation, promotions, And workplace complaints.

18.     Complaints of discrimination Relating to an HQ Executive discriminating Or condoning discrimination, investigations, recommendations, And decisions Related to such complaints, And Policies And Practices Relating to the foregoing.  This topic Includes Who is involved with these investigations, recommendations, And determinations, and how these investigations, recommendations, And determinations occurred.  This topic also Includes the

Goldstein Decl. Ex. 17, Page 30 of 120

Identity of Systems used to store, access, Or generate Documents And the retention of such Documents.

19.     Pay equity analyses, studies, Or reports containing Covered Positions and concerning the Compensation paid to female And male employees at HQ, Including Policies And Practices Related to the foregoing.  This topic Includes Who was involved in these analyses, each person's role, And the facts And Documents involved.  This topic also Includes, with respect to Covered Positions, how jobs And employees were grouped together for the analyses, the results of the analyses, Who received information Related to the results of these analyses, And what the results of these analyses were used for.

20.     Analyses, surveys, Or reports Relating to promotions Or time-in-job and containing Covered Positions, Including Policies And Practices Related to the foregoing. This topic Includes Who was involved in these analyses, each person's role, And the facts And Documents involved.  This topic also Includes, with respect to Covered Positions, how jobs And employees were grouped together for the analyses, the results of the analyses, Who received information Related to the results of these analyses, And what the results of these analyses were used for.

21.     Policies And Practices concerning anti-discrimination And Policies And Practices Related to reviewing Compensation And promotion Policies And Practices for compliance with the federal And state fair employment laws that were pled in the First Amended Complaint in this civil action: Title VII, Equal Pay Act, Oregon Equal Pay Act, And Oregon Equality Act.

22.     Reviews, analyses, reports, Policies, Or Practices Relating to the comparison of employees in Covered Positions for determining whether employees are being paid equitably Or competitively compared to other HQ employees Or Any external market.  This topic Includes

**PLAINTIFFS' NOTICE OF DEPOSITION OF NIKE CORPORATE WITNESS**
**PAGE 12**

788081.13

Goldstein Decl. Ex. 17, Page 31 of 120

Who was involved in these analyses, each person's role, And the facts And Documents involved. This topic also Includes, with respect to Covered Positions, how jobs And employees were grouped together for the analyses, the results of the analyses, Who received information Related to the results of these analyses, And what the results of these analyses were used for.

23.    Reviews, analyses, reports, Policies, Or Practices Relating to the comparison of employees in Covered Positions with other HQ employees Relating to promotions.  This topic Includes Who was involved in these analyses, each person's role, And the facts And Documents involved.  This topic also Includes how jobs And employees were grouped together for the analyses, the results of the analyses, Who received information Related to the results of these analyses, And what the results of these analyses were used for.

24.    Nike's efforts, if Any, Relating to the Validation of Or attempts to Validate Any Policy Or Practice concerning Compensation, promotions, Or evaluation of employees in Covered Positions, And Any Validation studies Or materials Related to Any Policy Or Practice concerning the Compensation, promotion, Or evaluation of employees in Covered Positions.

25.    Nike's efforts, if Any, Policies, Or Practices Relating to compliance with the Uniform Guidelines with respect to Compensation, promotion, Or evaluation Policies And Practices, And Any reports, surveys, documentation, analyses, Or other Documents Related to the Uniform Guidelines And compliance with the Uniform Guidelines.

26.    Your Policies And Practices Relating to the training of managers, directors, vice presidents And other employees with respect to making performance evaluation, Compensation And promotion decisions And implementing Nike's Policies And Practices Related to performance evaluation, Compensation And promotion decisions.

PLAINTIFFS' NOTICE OF DEPOSITION OF NIKE CORPORATE WITNESS
PAGE 13

788081.13

Goldstein Decl. Ex. 17, Page 32 of 120

27.     Nike's use, if Any, of Job Analyses in establishing, modifying Or implementing Compensation, performance evaluation, Or promotion Policies And Practices, Or the establishment of minimum job requirements Or Job Groupings such as job codes, levels, bands, sub-families, families, function Or pipelines.

28.     Nike's efforts, reviews, investigations, analyses, Or determinations Related to the Starfish Survey, Including with respect to Policies Or Practices, HQ Executives, HR, And personnel decisions.  This topic includes workplace complaints made in or around the same time. This topic Includes Who was involved in such efforts, reviews, investigations, analyses, Or determinations.

29.     Reviews, reports, investigations, Documents, Or events Relating to: the discharge, resignation, Or termination of David Ayre; harassment, discrimination, condoning discrimination, or fostering of a hostile work environment by Mr. Ayre; the conduct Or operation of HR; And the selection of Monique Matheson as head of HR.

30.     Reviews, reports, investigations, Documents, Or events Relating to the discharge, resignation, Or termination of Trevor Edwards, Daniel Tawiah, or Any other Person Who, between February 2018 to the present, was discharged, resigned, or terminated and was alleged to have, in a workplace complaint, Starfish Survey, investigations, Or Related documents, discriminated or condoned discrimination.

31.     Existence, location, collection, And production of Documents potentially responsive to Plaintiffs' Requests for Production, Including Who was involved, how conducted, And when Nike searched, collected, Or produced Documents.  This topic Includes the Identities of Systems with, reports Related to, And preservation, retention, And custodians of potentially responsive Documents.

Goldstein Decl. Ex. 17, Page 33 of 120

32.    Nike's initial data production, which occurred on December 30, 2019, And Any other data productions by Nike Related to the initial data production.  This topic Includes how And why data was included Or excluded in the data productions, identities of the Systems that Nike retrieved the data from, with, Or otherwise used for its data productions.  This topic also Includes the meanings of words Or phrases in the data productions.

33.    Data that Nike has not produced Related to Compensation, promotions, Performance And Potential Evaluations, demographics, education, Or job experience.  This topic Includes: data Related to Talent Segmentation And Nine-Box; demographic data, inclusive of education, job experience prior to hire at Nike, And pre-Nike salary history, collected by Nike before making decisions about starting pay And job assignment for HQ employees; And data And Documents relating to job changes And promotions, inclusive of job postings, job applications, minimum And required qualifications, applicants, candidates considered, And the person ultimately selected, used by Nike to assess And select internal And external candidates for job openings at HQ.

Dated:  October 28, 2020                    Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

_____

Laura L. Ho (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (*pro hac vice*
application forthcoming)
James Kan (*pro hac vice* application forthcoming)
Byron Goldstein (admitted *pro hac vice*)
Katharine L. Fisher (admitted *pro hac vice*)
Mengfei Sun (admitted *pro hac vice*)

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Anna M. Joyce, OSB #013112

**PLAINTIFFS' NOTICE OF DEPOSITION OF NIKE CORPORATE WITNESS**
**PAGE 15**

ACKERMANN & TILAJEF PC
Craig Ackerman (admitted *pro hac vice*)
cja@ackermanntilajef.com
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Tel:  (310) 277-0614
Fax:  (310) 277-0635

INDIA LIN BODIEN LAW
India Lin Bodien (admitted *pro hac vice*)
india@indialinbodienlaw.com
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Tel:  (253) 503-1672
Fax:  (253) 276-0081

Of Attorneys for Plaintiffs And Opt-In Plaintiffs

PLAINTIFFS' NOTICE OF DEPOSITION OF NIKE CORPORATE WITNESS
PAGE 16

788081.13

Goldtstein Decl. Ex. 17, Page 35 of 120

# EXHIBIT B

**From:** Davis, Felicia A. <feliciadavis@paulhastings.com>
**Sent:** Wednesday, January 20, 2021 10:11 AM
**To:** Barry Goldstein
**Cc:** Prince, Daniel; Zabele, Laura; James Kan; Byron Goldstein; Mengfei Sun
**Subject:** RE: Rule 30(b)(6) deposition

Thanks.  Will do.

Felicia

**From:** Barry Goldstein <bgoldstein@gbdhlegal.com>
**Sent:** Wednesday, January 20, 2021 8:27 AM
**To:** Davis, Felicia A. <feliciadavis@paulhastings.com>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Zabele, Laura <laurazabele@paulhastings.com>; James Kan <jkan@gbdhlegal.com>; Byron Goldstein <brgoldstein@gbdhlegal.com>; Mengfei Sun <msun@gbdhlegal.com>
**Subject:** [EXT] RE: Rule 30(b)(6) deposition

Felicia, 4:00 is fine for a call on Thursday.

Let's use call-in #, 800-768-2983, access code 7639800.

Thanks, Barry

**From:** Davis, Felicia A. <feliciadavis@paulhastings.com>
**Sent:** Tuesday, January 19, 2021 8:34 PM
**To:** Barry Goldstein <bgoldstein@gbdhlegal.com>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Zabele, Laura <laurazabele@paulhastings.com>; James Kan <jkan@gbdhlegal.com>; Byron Goldstein <brgoldstein@gbdhlegal.com>; Mengfei Sun <msun@gbdhlegal.com>
**Subject:** RE: Rule 30(b)(6) deposition

Barry,

Unfortunately, I am booked during both of those times on Thursday.  Are you free from 4-4:30 pm?

Thanks,
Felicia

**From:** Barry Goldstein <bgoldstein@gbdhlegal.com>
**Sent:** Tuesday, January 19, 2021 11:39 AM
**To:** Davis, Felicia A. <feliciadavis@paulhastings.com>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Zabele, Laura <laurazabele@paulhastings.com>; James Kan <jkan@gbdhlegal.com>; Byron Goldstein <brgoldstein@gbdhlegal.com>; Mengfei Sun <msun@gbdhlegal.com>; Barry Goldstein <bgoldstein@gbdhlegal.com>
**Subject:** [EXT] Rule 30(b)(6) deposition

Goldstein Decl. Ex. 17, Page 37 of 120

Felicia, it has been my experience that emails or letters  setting forth the position of a party in a clear manner may usually (or almost always) save time when done in conjunction with or even, at times,  instead of calls with multiple attorneys. In any event, we have tried to set forth carefully the reasons that we think that an extension of the deposition discovery period is almost certainly necessary and thus we have commenced the meet and confer process.  We would have been pleased to have received Nike's written response. But, if you prefer to explain Nike's position in a phone call on Thursday, we are available at 11:00 or 3:00. Let us know if one of these times is convenient for you; if not, please provide another time or times and we will try to make ourselves available.

Best, Barry

---

**From:** Davis, Felicia A. <feliciadavis@paulhastings.com>
**Sent:** Monday, January 18, 2021 4:37 PM
**To:** Barry Goldstein <bgoldstein@gbdhlegal.com>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Zabele, Laura <laurazabele@paulhastings.com>; James Kan <jkan@gbdhlegal.com>; Byron Goldstein <brgoldstein@gbdhlegal.com>; Mengfei Sun <msun@gbdhlegal.com>
**Subject:** RE: Rule 30(b)(6) deposition

Barry,

Thanks for your email.  We have communicated to you many times that we are working on deposition dates, so these very long emails recounting your perspective on the back and forth to date really are not necessary or productive.  Luckily, I don't feel the need to have the last word, nor do I want to spend my client's money writing long emails that do not advance the conversation.  I am interviewing prospective associates all day Tuesday and have back-to-back meetings on Wednesday.  I can talk Thursday if you would like to propose some times.

Thanks,
Felicia

---

**From:** Barry Goldstein <bgoldstein@gbdhlegal.com>
**Sent:** Friday, January 15, 2021 11:30 AM
**To:** Davis, Felicia A. <feliciadavis@paulhastings.com>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Zabele, Laura <laurazabele@paulhastings.com>; James Kan <jkan@gbdhlegal.com>; Byron Goldstein <brgoldstein@gbdhlegal.com>; Mengfei Sun <msun@gbdhlegal.com>; Barry Goldstein <bgoldstein@gbdhlegal.com>
**Subject:** [EXT] Rule 30(b)(6) deposition

Felicia, thank you for your email. We understand that it takes time to prepare 30(b)(6) witnesses. In my view, it takes substantially more time to prepare properly and thoroughly for taking 30(b)(6) depositions. For these reasons, we have been pushing hard to take the 30(b)(6) depositions from even before the start of the deposition discovery period in November.

We appreciate that there have been 4 days of the deposition and that two more have been scheduled but there are many outstanding topics that are not covered by the depositions taken or planned. I doubt whether half of the topics have yet been

Goldstein Decl. Ex. 17, Page 38 of 120

adequately covered by the depositions taken or planned. In any event, there is a good amount remaining.

In comparison, we have to-date provided Nike with an opportunity to take 9 full days of depositions of the Plaintiffs and Opt-in Plaintiffs. Moreover, Nike will have an opportunity to take full day depositions of the 13 Plaintiffs and Opt-in Plaintiffs before the end of January. Also, the depositions of the Plaintiffs have had had about a one-third longer deposition running time, 8 hours, compared to the four days of deposition that we have taken pursuant to 30(b)(6), which, on average, have run about 6 hours. The disparity between the time for depositions that Plaintiffs have provided Nike compared to the time provided by Nike for the Plaintiffs to take depositions of Nike corporate witnesses is all the more consequential given the information asymmetry between the parties where Nike controls almost all of the information and evidence relevant for the determination of class certification.

We also appreciate that the situation has been made more difficult with the challenges caused by COVID-19 and the unfortunate spike that we are all dealing with this winter. Of course, we are dealing with such difficulties as well and accordingly would appreciate as much advance notice as possible of Nike's plans to present 30(b)(6) witnesses. Furthermore, Plaintiffs' experts are limited in the preparation of their reports until the corporate witnesses depositions are completed. Given the limited time for the experts to prepare their reports after the close of deposition discovery period and the fact that the experts, as you describe with respect to Nike, are dealing with COVID-19 issues, we would appreciate knowing promptly Nike's plans for complying with the Notice that Plaintiffs' served on October 28th.

We understand that Nike is making efforts to present witnesses. However, we would like to have a realistic plan for completing the deposition. In that regard, we note that despite our requests, Nike does not appear to be prepared to propose any further days in January for the taking of the 30(b)(6) deposition. This would leave 10 business days in February prior to the conclusion of deposition discovery. Three of those days are already taken: (b)(6) deposition of Ms. Daugherty on February 5, potential (b)(1) deposition of Ms. Daugherty on February 9, and an unscheduled date for the deposition of Ms. Matheson that Nike has stated may only occur in February. While we will try to accommodate whatever Nike may propose for the remaining 7 days, we can not be sure that we will be able to do so.

We do not see a possible path for finishing the 30(b)(6) deposition within the current discovery period for the reasons set forth in this and other emails. Please consider this email as part of meet and confer process for the parties to agree upon an appropriate extension of the deposition discovery period. If that period is extended we would propose and expect that all of the remaining time periods would be extended by a similar period. We hope that we will be able to reach an agreement. We look forward to discussing this matter with you next week. Perhaps, we can discuss this matter on the call that Daniel and I scheduled on Tuesday to discuss the Daugherty deposition. If you are available to do so, please let us know as we would want to have others join the call. If Tuesday does not work for you, please let us know another day and time that would be convenient for you next week in order to discuss a possible extension.

Best, Barry

**From:** Davis, Felicia A. <feliciadavis@paulhastings.com>
**Sent:** Thursday, January 14, 2021 12:24 PM
**To:** Barry Goldstein <bgoldstein@gbdhlegal.com>; Prince, Daniel
<danielprince@paulhastings.com>; Zabele, Laura <laurazabele@paulhastings.com>
**Cc:** James Kan <jkan@gbdhlegal.com>; Byron Goldstein <brgoldstein@gbdhlegal.com>;
Mengfei Sun <msun@gbdhlegal.com>
**Subject:** RE: Rule 30(b)(6) deposition

Barry,

Thank you for your emails yesterday.  We have been diligently working to identify
witnesses for the litany of 30(b)(6) topics you have proposed.  As we discussed last
week, it takes time to identify the appropriate witnesses on these topics, but rest
assured, we are working on it.  To date, you have conducted four full days of Rule
30(b)(6) deposition testimony, and there are two additional days scheduled.  We are
engaged in ongoing meetings with our clients to identify and schedule additional
individuals and will send you those dates as soon as we are able.  All of this has occurred
during the major holidays and in the midst of a spike in Covid-19 cases and related
closures.  Rest assured that it is not our intention to prejudice plaintiffs.  If we need to
schedule a few of the Rule 30(b)(6) witnesses to sit for deposition outside of the
discovery period in order to accommodate everyone's schedules, we certainly can
discuss that.  We are not yet at that point, but we are happy to meet and confer in good
faith should that be necessary.

Regarding the January 29, 2021 Rule 30(b)(6) deposition, we will send you the specifics
on the topics soon.  As you know, that witness will be prepared to testify regarding PSP,
stock and LTIP, but I will send the specific parameters.

Best,
Felicia

**From:** Barry Goldstein <bgoldstein@gbdhlegal.com>
**Sent:** Wednesday, January 13, 2021 6:16 PM
**To:** Prince, Daniel <danielprince@paulhastings.com>; Davis, Felicia A.
<feliciadavis@paulhastings.com>; Zabele, Laura <laurazabele@paulhastings.com>
**Cc:** James Kan <jkan@gbdhlegal.com>; Byron Goldstein <brgoldstein@gbdhlegal.com>;
Mengfei Sun <msun@gbdhlegal.com>; Barry Goldstein <bgoldstein@gbdhlegal.com>
**Subject:** [EXT] Rule 30(b)(6) deposition

> Counsel, we have repeatedly requested that Nike present corporate
> witnesses pursuant to Rule 30(b)(6) in order that we may complete the
> deposition that  we noticed on  October 28 by February 12, which is the
> current close of the deposition discovery period. We agreed to follow a
> pragmatic approach whereby Nike would designate witnesses and
> propose topics about which the corporate witnesses would be prepared
> to testify. After Nike presented such witnesses and the Plaintiffs
> reviewed whether the scope of testimony of  Nike's corporate witnesses
> met the applicable and appropriate discovery standard, the parties
> might need to meet and confer about the scope of the testimony. If the
> parties were not able to resolve any dispute, the Plaintiffs might need to

Goldtstein Decl. Ex. 17, Page 40 of 120

seek guidance from the Magistrate Judge based upon the actual scope of the questions asked and testimony presented as directed by the Minute Order, dated, December 17, 2020.

On several occasions, we have declared that we were available to take the 30(b)(6) deposition on just about every business day in January. There are numerous topics for which Nike has not yet designated a corporate witness. Yet, in January there is currently only a single date scheduled for the 30(b)(6) deposition, January 29 and a number of topics remaining that are   completely or partially outstanding.. We reiterate that we are available to take the 30(b)(6) deposition on other days in January. Please let us know as soon as possible if Nike proposes that the deposition may continue on any other day in January, as well as the topics about which the corporate witness or witnesses will testify, so that we can make arrangements, if at all possible, to take the deposition on days proposed by Nike.  Please also let us know who is the designee  for January 29 and the specific topics about which that individual will testify.

At this point, we are concerned that Nike is not going to present corporate witnesses in a manner that will permit the completion of deposition discovery by February 12. In order to complete the 30(b)(6) depositions, there must be time available for the parties to meet and confer about the adequacy of the scope of the testimony presented by the Nike corporate witnesses. Moreover, we do not think that it would be appropriate and fair for Nike to not designate corporate witnesses until the very end of the discovery period.

We urge Nike to tell us as soon as possible when it will produce corporate witnesses and the topics about which those witnesses will testify.

If Nike maintains that it cannot produce corporate witnesses who may testify about the requisite topics prior to the close of the discovery period then Nike should so inform Plaintiffs. If that is the case, then Nike should also indicate by which date it will designate the corporate witnesses so that the parties may inform the Court about the need for and proposed length of an  extension of the deposition discovery period.

Best, Barry


**We've moved!  Please take note of our new address, below.**

Barry Goldstein, Of Counsel
Goldstein, Borgen, Dardarian & Ho
155 Grand Avenue, Suite 900
Oakland, CA  94612
(510) 763-9800
(510) 835-1417 fax

www.gbdhlegal.com

Please Note:

The information in this E-mail message is legally privileged and confidential information intended only for the use of the addressee(s) named above.  If you, the reader of this message, are not the intended recipient, you are hereby notified that you should not further disseminate, distribute, or forward this E-mail message.  If you have received this E-mail in error, please notify the sender as soon as possible.  In addition, please delete the erroneously received message from any device/media where the message is stored.

Thank you.

*************************************************************************************
*******
This message is sent by a law firm and may contain information that is privileged or confidential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
If you reply to this message, Paul Hastings may collect personal information including your name, business name
and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy
and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

*************************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
If you reply to this message, Paul Hastings may collect personal information including your name, business name
and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy
and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

*************************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
If you reply to this message, Paul Hastings may collect personal information including your name, business name
and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy
and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

*************************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received
this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.
If you reply to this message, Paul Hastings may collect personal information including your name, business name
and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy
and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

Goldstein Decl. Ex. 17, Page 42 of 120

# EXHIBIT C

*Cahill, et al. v. Nike*

## DEPOSITIONS OF PLAINTIFFS AND OPT-IN PLAINTIFFS

| Deponent | Deposition Date | Record Time |
|---|---|---|
| Kelly Cahill | 11/18/2020 | 7 hours, 44 minutes |
| Sara Johnston | 11/24/2020 | 8 hours, 3 minutes |
| Samantha Phillips | 12/1/2020 | 6 hours, 48 minutes |
| Tracee Cheng | 12/2/2020 | 5 hours, 58 minutes |
| Donna Olson | 12/11/2020; 12/22/2020 | 7 hours, 55 minutes |
| Jessica Junkins | 12/16/2020 | 7 hours, 56 minutes |
| Cindy Linebaugh | 12/21/2020 | 7 hours, 57 minutes |
| Lindsay Elizabeth | 1/11/2021 | 7 hours, 27 minutes |
| Heather Hender | 1/12/2021; 3/17/2021 | 7 hours, 45 minutes |
| Emily Tucker | 1/22/2021 | 5 hours, 24 minutes |
| Christina Baumel | 1/26/2021 | 8 hours, 9 minutes |
| Lauren Anderson | 1/21/2021; 2/5/2021 | 9 hours, 44 minutes |
| Paige Azavedo | 1/29/2021 | 6 hours, 23 minutes |
| **Total** | | **97 hours, 13 minutes** |

## DEPOSITIONS OF NIKE CORPORATE WITNESSES AND MS. MATHESON

| Deponent | Deposition Date | Record Time |
|---|---|---|
| Shane Walker | 12/17/2020; 12/18/2020; 12/21/2020 | 17 hours, 46 minutes |
| Alison Daugherty | 1/8/2021; 2/5/2021 | 13 hours, 3 minutes |
| Shelli White | 1/29/2021 | 7 hours, 21 minutes |
| Kendra Pryce | 2/11/2021 | 3 hours, 25 minutes |
| Monique Matheson | 2/22/2021 | 7 hours, 54 minutes |
| Treasure Heinle | 3/16/2021 | 8 hours |
| **Total** | | **57 hours, 29 minutes** |

# EXHIBIT D



Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

**Goldstein, Borgen,
Dardarian & Ho**

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

February 17, 2021

<u>**Via E-Mail Only**</u>

Felicia A. Davis                    feliciadavis@paulhastings.com
Daniel Prince                       danielprince@paulhastings.com
Laura Zabele                        laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 S. Flower Street, 25th Floor
Los Angeles, CA 90071

  Re: *Cahill, et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Felicia, Daniel and Laura:

  We are writing to discuss the Rule 30(b)(6) deposition that should be completed by March 26, 2021.  The Plaintiffs agreed to stipulate to Nike's proposed 42-extension of the period for the taking of fact witness depositions.  In doing so, Plaintiffs expressed misgivings since they considered that it would be very difficult for the parties to complete the corporate witness deposition within this period given the pace and scope of the testimony presented thus far.  In fact, the Plaintiffs thought that it would be a challenge to complete the deposition within the 60-day extension that they had proposed.  However, Plaintiffs will work diligently to complete the deposition within the 42-day period.

  To that end, this letter seeks to facilitate the process for completing the deposition by describing, in general, the subject matters that remain to be addressed by a corporate witness.  In order to further identify the remaining subject matters we list the Topics set forth in Plaintiffs' Notice for the 30(b)(6) deposition, served October 28, that further describe the scope of the testimony requested (topics with an asterisk are discussed further below the table).

| General Subject Matters | Topics |
|---|---|
| Promotions | 5, 11, 15, 16 (prior to 2017), 26 |
| Setting Staring Pay and Related Hiring | 7, 9, 10, 11, 13, 26 |
| Performance and Potential Evaluations | 5, 8, 11, 17, 26 |
| Job Descriptions | 4 |

155 Grand Avenue, Suite 900, Oakland, CA  94612  Tel 510. 763. 9800  Fax 510. 835. 1417  www.gbdhlegal.com

797366.6

Goldstein Decl. Ex. 17, Page 46 of 120

*Cahill, et al. v. Nike, Inc.*                    -2-                    February 17, 2021

| General Subject Matters | Topics |
|---|---|
| Validation, Uniform Guidelines, and Job Analyses (other than to the extent Mr. Walker testified with respect to compensation) | 24, 25, 27 |
| Organizational Structure of WHQ (other than testimony related to HR and the Compensation Team) | 1 |
| Job groupings and job codes, including assignment of employees to job codes (other than what was included in Mr. Walker's testimony and testimony related to HR and Global Investigations) | 2, 3 |
| Anti-discrimination policies and practices | 21 (prior to 2017) |
| 2X Pay* | 5 (prior to 2015) 9 (prior to 2017) 10 (prior to 2015) 26 (prior to 2017) |
| Compensation, pay equity, and promotion analyses* | 19, 20, 22, 23 |
| Nike's data productions and unproduced documents* | 31, 32, 33 |
| Workplace complaints, investigations, and results* | 5, 11, 18, 28, 29, 30 |

In addition, there are several other subjects for which we believe testimony of a corporate witness is required but for which some further explanation may be helpful.

Compensation, pay equity, and promotion analyses - Topics 19, 20, 22, and 23 request testimony about analyses concerning compensation, pay equity, promotions, and related matters. We acknowledge and will adhere to the Court's Order, October 9, 2020, ECF No. 117, concerning the application of attorney client privilege and the work product doctrine. The testimony that we seek regarding these analyses would not include attorney client communication or infringe upon the work product doctrine as set forth in the Order. Rather, the Plaintiffs would seek non-privileged testimony such as underlying facts or non-privileged analyses of compensation related to past re-organizations.

Nike's data productions and unproduced documents - Topics 31, 32 and 33 concern generally the production and description of data and documents. The appropriate testimony related to these topics is guided by the Order, August 10, 2020, ECF No. 111. The Court recognized that there were some problems with Nike's response to discovery: "Defendant has demonstrated a certain lack of transparency so far in the discovery process and certainly some

*Cahill, et al. v. Nike, Inc.*                    -3-                    February 17, 2021

deficient production." Order at 9. However, the Court refused to enter an order requiring additional discovery regarding Nike's response to Plaintiffs' RFPs because such additional discovery may be "premature and may ultimately be unnecessary." *Id.* Plaintiffs have sent four letters requesting that Nike produce documents and data and/or provide additional information about documents and data: October 8, 2020 (documents); December 30, 2020 (data);[1] January 29, 2021 (documents identified in the deposition of Mr. Walker); and February 16, 2021 (documents identified in the deposition of Ms. Daugherty). To the extent that Nike produces documents and information requested in these letters, the scope of testimony necessary for these Topics will be reduced.

        <u>Workplace complaints, investigations, and results</u> - Plaintiffs continue to evaluate Nike's limited submission of the testimony of corporate witnesses for certain topics. For example, Nike presented Ms. Daugherty as a corporate witness with respect to "… Nike's Human Resources Department at Nike WHQ related to workplace complaints (March 2017-present)."[2] Plaintiffs are unsure whether Nike will present a corporate witness for the period prior to March 2017. If Nike fails to do so, then Nike may appropriately be limited in the evidence that it may present in opposition to Plaintiffs' Motion for Class Certification. Ms. Daugherty was also presented as a corporate witness "[t]o the extent not privileged, Nike's response to the anonymous … survey circulated at Nike WHQ …." Topic 22.[3] But, Ms. Daugherty was not able to testify about various "responses" by Nike to the survey.[4] If Nike produces no further corporate witness regarding its "responses" to the survey, Nike may appropriately be limited with respect to the evidence and argument that it may make. Plaintiffs must evaluate whether such a limitation would suffice or whether they need take further steps to seek a corporate witness about Nike's response to the survey.

        <u>2x Pay</u> - We note that Mr. Walker was designated as a corporate witness for several compensation-related practices but that designation was limited by time periods ranging from 2015, 2016 or 2017 to the present. See, for example, topics 5, 9-10 and 26 presented by Nike for Mr. Walker's testimony. Plaintiffs have limited their request for testimony regarding these compensation-related practices from a corporate witness covering the periods prior to those testified to by Mr. Walker to 2X pay.

        Since the deposition of Mr. Walker in December the parties have adopted a practical approach to Rule 30(b)(6) deposition. Plaintiffs set forth the scope of testimony requested in the

---

[1] In an email, January 19, 2021, from Byron Goldstein, Plaintiffs prioritized some of the data issues.

[2] This same time limit "March 2017-present" was applied by Nike with respect to Topics 29-30 concerning certain "[w]orkplace complaints of sexual harassment/discrimination …."

[3] As explained in the email from Barry Goldstein, February 2, 2021, Nike erroneously listed this definition as corresponding to Plaintiffs' Topic 22 when it actually corresponds to Plaintiffs' Topic 28.

[4] After receiving and having an opportunity to review the transcript of the second day of Ms. Daugherty's deposition, if Nike so requests we will provide examples of Ms. Daugherty's inability to provide testimony concerning Nike's responses to the survey.

*Cahill, et al. v. Nike, Inc.*                    -4-                    February 17, 2021

October 28 Notice and Nike has designated witnesses and drafted topics in response.  The parties will need to meet and confer about Nike's presentation of designated witnesses and the scope of their testimony if Plaintiffs conclude that the scope was insufficient, the parties will need to meet and confer regarding the scope of the testimony.  We intend that this letter serve to further this practical approach.

        In conclusion, it is clear that there is a substantial portion of the corporate witness deposition that remains.  If this deposition is to be completed by March 26, 2021, it is necessary for the parties to proceed expeditiously.

                            Sincerely,

                            Barry Goldstein

BG/kbm

# EXHIBIT E



1(213) 683-6169
danielprince@paulhastings.com

**VIA E-MAIL**                                                                                    98484.00003

March 2, 2021

Barry Goldstein (bgoldstein@gbdhlegal.com)
Byron Goldstein (brgoldstein@gbdhlegal.com)
James Kan (jkan@gbdhlegal.com)
Mengfei Sun (msun@gbdhlegal.com)
Goldstein, Borgen, Dardarian & Ho
155 Grand Avenue, Suite 900
Oakland, CA  94612

*Re:*    *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel:

We write in response to your February 17, 2021 letter in connection with Nike's Rule 30(b)(6) deposition. As you know, Plaintiffs served nearly three dozen proposed deposition topics, many of which were improper and overly broad.  Nike therefore endeavored to revise such topics, as appropriate, and to present witnesses for testimony on the same.  Nike has been more than flexible in scheduling these depositions and in providing Plaintiffs with multiple hours/days of deposition testimony, including in many instances where the questioning was largely irrelevant and immaterial.  Plaintiffs are not entitled to an unlimited corporate deposition of Nike; but even so, Plaintiffs already have deposed Rule 30(b)(6) witnesses on:  (1) Nike's compensation programs (three days); (2) Nike's bonus, equity and long-term incentive programs (one day); (3) Nike's Employee Relations function (two days); and (4) Nike's Global Investigations function (one day).[1]  Plaintiffs also deposed Nike's Chief Human Resources Officer for a full eight-hour deposition.

That said and subject to the below, Nike intends to provide this week proposed dates for its Rule 30(b)(6) deposition on the following topics:  (1) performance and potential evaluations; (2) starting pay; (3) promotions; and (4) Employee Relations (specifically, the same substantive topics for which Ms. Daugherty was designated), from August 2015 to March 2017.  We also are working to identify a deponent on job descriptions (if any).

Regarding your other proposed topics, please see below.

### 1.    Compensation, Pay Equity and Promotion Analyses

We will not be providing another deponent on this topic.  As an initial matter, Plaintiffs' request seeks privileged information that the Court has already determined Plaintiffs are not entitled to obtain.  *See* Dkt. 117.  The Court reiterated this conclusion in its December 17, 2020 order, in which Plaintiffs were warned, "the Court has made clear . . . which topics are privileged matters in its Order dated October 8, 2020."  Dkt. 131.  Although Plaintiffs claim to seek testimony concerning just the "underlying facts," Plaintiffs make no attempt (or are unable) to explain what "underlying facts" they allegedly (only) will seek.

---

[1] Ultimately, the parties agreed to an extension of the deposition period, given the scope and breadth of the topics and to accommodate scheduling.

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
t: +1.213.683.6000  |  www.paulhastings.com

Goldtstein Decl. Ex. 17, Page 51 of 120



March 2, 2021
Page 2

This is likely because the "underlying facts" are already in Plaintiffs' possession through the wealth of data that Nike has produced in this case.

Further, Plaintiffs questioned Shane Walker regarding the privileged analyses.  He provided testimony on this topic based on his role as a member of the Compensation Department, to the extent the information sought was not privileged.  Plaintiffs also questioned Chief Human Resources Officer Monique Matheson about, for example, Nike's promotion and "time-in-level" analyses.  She testified that these analyses were not conducted on the advice of counsel; thus, there is no testimony to elicit.  Finally, Plaintiffs have nine sworn declarations from Nike employees, in-house and outside counsel, and outside consulting firms regarding the "underlying facts" supporting Nike's privileged pay equity analyses.  There is nothing left to discover.

## 2.   Nike's Data Production and "Unproduced Documents"

Nike is currently working on a response to Plaintiffs' letter regarding its data production.  We believe that the parties should be able to resolve any outstanding data questions without the need for a Rule 30(b)(6) deposition.

Moreover, Plaintiffs' request for a Rule 30(b)(6) deposition on "unproduced documents" is essentially a request for a corporate witness on Nike's document collection efforts (*i.e.*, discovery on discovery).  As you acknowledge, the Court's August 10, 2020 Order denied Plaintiffs' request on this same topic.  In that Order, the Court stated, "[w]hen the discovery sought is collateral to the relevant issues (*i.e.*, discovery on discovery), the party seeking the discovery must provide an 'adequate factual basis' to justify the discovery, and the Court must closely scrutinize the request in light of the danger of extending the already costly and time-consuming discovery process ad infinitum. . . .  The Court therefore declines to order Nike to provide further declarations of its efforts at this time."  Dkt. 111 at 8-9 (internal citation omitted); *see also* Dkt. 131 ("the Court has made clear . . . which topics are prohibited 'discovery on discovery.'").

Furthermore, any testimony about what steps Nike's in-house and outside counsel have taken to search for and/or collect documents would invade the attorney work product doctrine.

Finally, Plaintiffs' request is unreasonable, burdensome, and not proportional to the needs of this case, consistent with the Federal Rules of Civil Procedure.  Plaintiffs essentially request that Nike prove a negative by offering a witness to testify about non-existent and/or non-responsive documents.  That is not supported by law; nor does it make sense.

## 3.   Workplace Complaints, Investigations and Results

There is no need for further testimony on this topic, nor do we agree that Nike somehow is precluded from offering information or evidence here based on your mischaracterization of the Rule 30(b)(6) testimony.  Alison Daugherty sufficiently answered Plaintiffs' questions regarding Nike's "response" to the anonymous survey.  As Ms. Daugherty explained, for example, Nike had already begun undertaking various actions when the anonymous surveys were revealed, and Nike continued to implement those actions after the survey was received.  Monique Matheson also provided testimony here,[2] as did Kendra

---

[2] To the extent Plaintiffs chose not to question the Chief Human Resources Officer about this topic in greater detail, that was Plaintiffs' decision.



March 2, 2021
Page 3

Pryce.  That the deposition testimony may not fit squarely into Plaintiffs' pre-determined narrative does not mean that Nike's witnesses did not provide adequate testimony in the first instance.

Furthermore, to the extent Plaintiffs believe that a corporate designee (or anyone) must provide specific testimony on Nike's response to each separate survey complaint, that again is unreasonable and not supported by fact or law.  As Ms. Daugherty explained several times, the majority of the survey complaints were anonymous, contained few details, and/or were about individuals who were no longer employed by Nike.  That said, Nike retained outside counsel to investigate each complaint and continued its journey of refining its processes and practices, and implementing actions, to make its workplace more inclusive and responsive to employee concerns.  You should review both days of Ms. Daugherty's testimony, Ms. Pryce's testimony, and Ms. Matheson's testimony in connection with the same.

4.  **2X Pay**

Shane Walker was designated for, among other topics, "setting and modifying salaries and lump sum payments for Covered Positions (excluding the setting of starting salary); policies and practices related to recommendations and determinations concerning merit, base pay, increases, lump sum payments (excluding the setting of starting salary); the individuals who make determinations regarding merit, base pay, increases, lump sum payments, and how, for the time period 2015 to present."  That category encompasses 2x Pay.  Indeed, Mr. Walker testified about 2x Pay to the extent Plaintiffs asked him questions about it.  Plaintiffs do not now get a second bite at the apple because they are unsatisfied with the questions on 2x Pay that they asked, particularly where, as here, Mr. Walker was deposed for three days and Plaintiffs had plenty of time to make such inquiries but failed to do so.

5.  **Job Groupings and Job Codes**

Shane Walker was designated on topics related to job groupings and job codes, specifically:  (1) "the establishing of job codes, job levels, bands, sub-families, families, and/or functions for the Covered Positions for the time period 2016 to present"; and (2) "the formation, review, modification and use of job codes for the Covered Positions; related policies and procedures; the individuals who developed, consolidated and/or organized job codes, for the time period 2016 to present."

Plaintiffs' February 17 letter also carves out the deposition testimony related to HR and Global Investigations on this topic.  It is unclear what additional testimony Plaintiffs could seek here.

To the extent Plaintiffs seek testimony regarding job groupings and job codes at the time of hire, this is not a hiring case, and thus such testimony is irrelevant and not proportional to the needs of the instant case.  To the extent Plaintiffs seek testimony on job groupings and job codes in relation to promotions, this will be covered by Nike's Rule 30(b)(6) promotions designee.

6.  **Validation Studies, Uniform Guidelines and Job Analyses**

Nike has repeatedly informed Plaintiffs that it does not have validation studies from January 1, 2010 to the present, nor has Nike made representations regarding the existence of documents that precede this time period.  Similarly, as Nike has communicated, it is unaware of any job analyses.  For that reason, it would be illogical to designate a Rule 30(b)(6) witness on studies that do not exist or events that did not happen.



March 2, 2021
Page 4

### 7.  <u>Organizational Structure of WHQ</u>

Nike provided several Rule 30(b)(6) designees on organizational structure topics, including Ms. Daugherty (organizational structure of HR, ER, and Global Investigations); Ms. Pryce (organizational structure of Global Investigations); and Mr. Walker (organizational structure of Compensation).  Plaintiffs also deposed Ms. Matheson, the Chief Human Resources Officer.  There is no dispute that these are the relevant functions for purposes of the allegations contained in Plaintiffs' lawsuit.  Nor is there a dispute that Nike has produced available information on the organization of various business units through its data production.

It is unclear what additional information Plaintiffs seek here, but again, neither fact nor law support the production—assuming this is even possible in the first instance—of dozens of potential designees regarding other, unrelated business units.

Sincerely,

**/s/ Daniel Prince**

Daniel Prince
of Paul Hastings LLP

# EXHIBIT F



**G B D H**

**Goldstein, Borgen,
Dardarian & Ho**

Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

March 9, 2021

<u>**Via E-Mail Only**</u>

Felicia A. Davis                                    feliciadavis@paulhastings.com
Daniel Prince                                       danielprince@paulhastings.com
Laura Zabele                                       laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 S. Flower Street, 25th Floor
Los Angeles, CA 90071

  *Cahill, et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Felicia, Daniel, and Laura:

  Thank you for the response, dated, March 2, 2021, to our letter dated, February 17, 2021. As we stated in our February 17 letter, it will be difficult for the parties to complete the 30(b)(6) deposition within the 42-day extension period. The task has become even more difficult since Nike has failed to schedule any depositions for the corporate witnesses for the first half of the extension period. We will work diligently to attempt to complete the deposition within the remaining period although we have serious doubts as to whether this can be accomplished.[1]

  Nike has taken the position that it will not produce corporate witnesses to testify about seven subject areas covered by the topics set forth in Plaintiffs' October 28 Notice and that Plaintiffs described in their February 17 letter. Plaintiffs hereby respond to Nike's failure, as of this date, to commit to produce a corporate witness to testify about job descriptions and Nike's refusal to produce a corporate witness to testify about the seven subject areas.

  As a general matter, counsel for a deponent may not determine whether the deponent will appear or about which topics the deponent will testify. It is for the Court to relieve a deponent of the obligation to appear. Here, the Court has spoken by denying Nike's motion for a protective order. The Court directed the parties to meet and confer about the corporate witness deposition but the Court did not provide any basis for Nike to simply determine the topics for which it would designate a witness. As we have done over the past several months, we will take a practical approach.

---

[1] As to the depositions recently scheduled, Nike has offered three days of depositions covering four subject areas: performance and potential evaluations; starting pay; promotions and Employee Relations for the period from August 2015 to March 2017. We have agreed to the days offered but have stressed that the two days of deposition offered for the areas of evaluations, starting pay and promotions is likely to prove insufficient. We have urged Nike to set aside an additional two days. In addition, Nike has stated that it is "working to identify" a corporate witness for the subject of job descriptions but Nike has not yet committed to produce a witness for this subject matter.

155 Grand Avenue, Suite 900, Oakland, CA 94612  Tel 510.763.9800  Fax 510.835.1417  www.gbdhlegal.com

798332.4

*Cahill, et al. v. Nike, Inc.*                    -2-                    March 9, 2021

     1.    <u>Job Descriptions</u>. Nike represents that it is "<u>working to identify a deponent on job descriptions (if any)."</u>  We appreciate that Nike is working to produce this witness but Plaintiffs maintain that Nike must commit to designate a witness to testify about job descriptions.  If Nike fails to commit to designate such a witness the Plaintiffs will need to move to compel.  Job descriptions are relevant to the issues in the action including appropriate job requirements and the comparability or similarity of jobs.

     2.    <u>Compensation, Pay Equity and Promotion Analyses</u>.  Nike refuses to produce a witness regarding these subject areas due to arguments based upon attorney client privilege, work product and the Court's Order, ECF No. 117.  Contrary to Nike's assertions, the Court's Order does not preclude deposition testimony on these topics.

     First, Mr. Walker's testimony made clear that several types of documents that Nike have failed to produce are not protected by attorney client privilege or work product.  (a) As set forth in Plaintiffs' Motion to Compel, filed March 1, 2021, documents related to Nike's market assessments and benchmark jobs have no protection since the documents were prepared by Nike's compensation team without any input from attorneys.  (b) In the meet and confer letter, dated January 29, 2021, based upon testimony from Mr. Walker, Plaintiffs requested that Nike produce lists of employees receiving a competitive pay adjustment because they are below the minimum of a pay range.  In addition, to the testimony referenced in that letter, we add that Mr. Walker testified that, at least after the list prepared for FY19, there was no basis for protection. According to Mr. Walker, during the first year of its implementation, the two parts of the Competitive Pay Management process, evaluation of employees who were paid below the minimum of the pay range and evaluation of pay equity, did not have much separation.  Walker Dep at 300.  Thereafter, the two parts were "separated" and the "below minimum part is not protected."  Walker Dep at 300-01.  Nike should produce these documents and eliminate the need for the Court to rule.

     Second, Nike mischaracterizes the Court's Order, ECF No. 131, denying the motion for a protective order.  There, the Court rejected Nike's request to bar *ex ante* testimony about these topics.  Importantly, with respect to the three Orders, the Court concluded that "it will not entertain objections to these topics without knowledge of specific questions."  Accordingly, the Court did not authorize a blanket refusal to provide a corporate witness regarding a topic since such a blanket refusal would preclude the Court from having questions upon which to make rulings.

     Third, Plaintiffs provided a legal and factual explanation concerning underlying facts over three months ago.  *See* Pls.' Nov. 25, 2020 Opp. to Nike's Mot. For a Protective Order at 11-13.  Nike thus misstates the record when it states Plaintiffs have made no showing for why this testimony is warranted.  In addition, Plaintiffs' Notice of a 30(b)(6) deposition provides reasonable notice of the testimony sought.  *See* Topics 19-20, and 21-22.

     Fourth, Nike cannot, as it asserts, avoid discovery depositions because it submitted declarations in support of a brief where neither those declarants nor any other Nike corporate witnesses were subject to examination.

Finally, Nike states since Ms. Matheson testified that the promotion analyses "were not conducted on the advice of counsel" there is "no testimony to elicit." While Ms. Matheson so testified, she subsequently contradicted herself by testifying that she could not recall when the work on the promotional analysis was "initiated," that the work was "paused" on the advice of counsel, and that she was not "aware' whether the analyses were conducted over several months. Matheson Dep. at 185-86. Moreover, Ms. Matheson's assertion that the analyses were not conducted is flatly contradicted by the Declaration of Lauren Thibodeaux, an in-house Nike attorney. Ms. Thibodeaux attested that work on the promotional analyses began in "earnest" in June 2018 and did not "conclude[]" until August. Thibodeaux Declaration, dated, September 8, 2020. The contradictions between the testimony of Ms. Matheson and Ms. Thibodeaux underscore the need and appropriateness for a corporate witness who is prepared to testify about the subject.

As described in the February 17 letter, Plaintiffs continue to request that Nike produce a corporate witness to testify about the underlying facts related to pay, promotion, and time-in job analyses. If Nike continues to hide these analyses behind the shield of privilege, is Nike agreeing that it cannot in anyway use these analyses as a sword in any argument or as evidence in this action?

    3.    <u>Nike's Data and Document Production</u>. Nike represents that it is "currently working on a response to Plaintiffs' letter regarding data production." Nike further represents that it "believe[s] that the parties should be able to resolve any outstanding data questions without the need for a 30(b)(6) deposition." We appreciate Nike's representations. It has been Plaintiffs' goal, as expressed in several communication spanning more than a year, to resolve data questions without the need for a 30(b)(6) deposition or, at least, only a limited deposition. Plaintiffs have suggested that it would facilitate the resolution of these issues if the parties would arrange a conference call with their respective experts. While Plaintiffs look forward to attempting to resolve data issues informally, obviously the issue of whether a corporate witness deposition is necessary depends upon whether the parties are able to resolve successfully these issues and do so in a timely manner. Unfortunately, these issues have remained unresolved until close to the end of the deposition discovery period; accordingly, at present, we need to assume the data deposition will proceed until the Parties can confirm it is mooted by other arrangements.

Nike continues to mischaracterize the Court's discovery order, ECF No. 111, regarding discovery about data and document production issues. As set forth in Plaintiffs' February 17 letter, the Court criticized Nike's discovery efforts and denied Plaintiffs' request without prejudice because it was "premature and may ultimately be unnecessary." Plaintiffs are continuing to attempt to resolve the document production disputes through the meet and confer process and where necessary by seeking resolution by the Court.

    4.    <u>Workplace Complaints, Investigations, and Determinations</u>. After Plaintiffs' February 17 letter, Nike agreed to produce a witness to testify about complaints and related matters for a period preceding March 2017.

Nike retained an outside law firm to investigate the complaints and responses included in the Starfish Survey, which was submitted to Nike in February 2018, as well as complaints that were filed around this period. Nike has produced some complaints but it has withheld documents

it says are related to the investigation of these complaints by the outside counsel. Nike's corporate witness was unable to testify about the investigations and decisions related to those investigations; nor did Nike make adequate efforts to prepare the witnesses. Unless Nike produces the documents related to these investigations and prepares a corporate witness to testify about the investigations and conclusions reached as a result of the investigations, there is no practical way for Plaintiffs to take a corporate witness deposition regarding these complaints, investigations and determinations. Plaintiffs continue to request that Nike produce these documents and designate an adequately prepared corporate witness. If Nike fails to do so, then Nike will be prevented from making any assertions through arguments or evidentiary submissions related to these investigations and determinations that it has hidden behind the shield of privilege.

While Nike disagrees that "it might be precluded" from offering arguments and evidence based upon the investigations conducted and determinations made by outside counsel, in its letter, Nike articulates the type of argument and evidence that must be precluded: "Nike retained outside counsel to investigate each complaint and continued its journey of refining processes and practices, and implementing actions, to make its workplace more inclusive and responsive to employee concerns." As a result of Nike's refusal to provide documents and testimony regarding the work of outside counsel, there is no evidence, among other matters, concerning whether outside counsel investigated "each complaint," investigations, if any, were adequate, and to what extent outside counsel made determinations regarding the complaints. Accordingly, since there is no such evidence concerning the work of outside counsel, there is no evidence, among other matters, concerning whether Nike took "implementing actions" as a result of the investigations, followed any recommended remedies or addressed any "concerns" validated by the investigations.

Nike argues that Nike's designated corporate witness, Ms. Daugherty, "sufficiently answered" Plaintiffs questions, and that Ms. Matheson and Ms. Pryce also "provided testimony." In fact, the testimony of Nike's corporate witness proves the contrary. Ms. Daugherty neither reviewed any documents related to the investigations conducted by outside nor any documents containing the findings or determinations made by outside counsel. Daugherty Dep at 323, 325 and 427-28. Ms. Daugherty testified that there were complaints of pay equity discrimination but acknowledged that she did not know about any investigation that was undertaken regarding these pay discrimination complaints. Daugherty Dep at 398-400. Furthermore, Nike's counsel directed Ms. Daugherty not to answer questions related to the process used by investigators for "looking into" and to "gather" information about complaints filed in the survey, Dep at 216-18. Additional Nike counsel directed Ms. Daugherty not to answer questions regarding the "results and the information that would have been handled with outside and inside counsel." Dep at 173-75. Given Ms. Daugherty's lack of information about the investigation and directions not to answer about the process used by the investigators and information and results related to the investigation, it is obvious that the corporate witness, Ms. Daugherty, provided inadequate information.

Since Ms. Matheson testified as a percipient witness pursuant to Rule 30(b)(1), her testimony cannot substitute for the testimony of a witness designated pursuant to Rule 30(b)(6) by Nike to testify on behalf of Nike. In any event, Ms. Matheson's testimony simply reinforces

*Cahill, et al. v. Nike, Inc.*                               -5-                               March 9, 2021

the conclusion that Nike has failed to produce essential information related to the investigation of the complaints included in the survey.  For example, Ms. Matheson testified she had discussions with a number of employees who filed complaints but she could not remember all of the names of those employees.  Matheson Dep at 88.  She did name three Nike vice presidents, █████ ████████████████████████████████████, with whom she had discussions.  Dep at 88. However, she did not recall much about those discussions including, critically, whether or not, those vice presidents had complained about sex discrimination.  Dep at 92-93.  Matheson took notes regarding these discussions which she provided to outside counsel.  Dep at 89-90.  But Nike has not produced these notes apparently because Nike is withholding the notes pursuant to its claim of privilege as it is withholding all materials related to the investigation of the complaints by outside counsel.  If that is the case, please confirm the basis for withholding the production of these responsive notes and provide a timely privilege log if Nike asserts a privilege.  Furthermore, Nike's counsel directed Ms. Matheson not to answer questions concerning discussions about the survey complaints that she had with Nike's CEO because counsel was present.  Dep at 69-70.  Similarly, Nike's counsel directed Ms. Matheson not to answer questions concerning whether the investigations by outside counsel examined whether █████████ had engaged in misconduct.  Dep at 111-12.  We do not understand the reason that Nike mentioned the deposition of Ms. Pryce because, like Ms. Daugherty, Nike declared she was not a witness on Starfish, related complaints, and resulting investigations.

5.      <u>2X Pay</u>.  Nike refuses to provide a corporate witness to testify about 2X pay for the period expressly not covered by the testimony of Mr. Walker.  Plaintiffs are surprised by this position given that Nike explicitly limited Mr. Walker's testimony from 2015 to the present.  In their Notice, the Plaintiffs sought testimony during the "data period" or from July 1, 2012 to the present.  (Nike provided personnel data, including compensation data, commencing as of July 1, 2012).  In its Motion for a Protective Order at 17, Nike argued that Plaintiffs' Notice sought "unduly burdensome" discovery not proportional to the needs of case because Plaintiffs sought testimony from July 1,2012, "well outside the statutory periods in this case."  In their Opposition at 30, Plaintiffs pointed out that Nike's position was contrary to the Lilly Ledbetter Act and established Ninth Circuit precedent.  The Court denied Nike's motion. Any issue concerning the temporal scope of the corporate witness deposition has been resolved.

Given the temporal restriction that Nike placed upon the testimony of Mr. Walker, Plaintiffs did not inquire about the pre-2015 development and implementation of 2X pay. Furthermore, Mr. Walker had difficulty addressing important aspects of 2X pay in 2015.  He did not know how the system was "configured" with respect to 2X pay in 2015 and thus could not testify about "what information would have been available" as it "rolled up the system" from the manager to the higher levels of review.  Walker Dep at 483.  Walker admitted that he "can't speak to" another issue in 2015 "off the top of my head."  Walker Dep at 485.

Therefore, Nike must designate a corporate witness to testify about 2X pay prior to 2015.

6.      <u>Job Grouping and Job Codes</u>.  Nike correctly makes the point that the issue of job grouping and related matters, *see* Topics 2-3 in Plaintiffs' Notice, are pertinent to the corporate witness testimony concerning promotions. Moreover, the issues related to job grouping and related matters are also pertinent to the corporate witness testimony concerning starting pay. While this is not a "hiring case," the job, level, job code, and family into which a new hire is

*Cahill, et al. v. Nike, Inc.*                    -6-                    March 9, 2021

placed impacts starting pay. Accordingly, "channeling," as Nike has stated in several filings, is a relevant issue. *See also*, Findings and Recommendations, ECF No. 64 at 3 (quoting allegation of Nike "channeling" women into less valuable positions). At this point, Plaintiffs will wait to see the scope of the depositions related to the promotion and starting pay subject areas before making a practical determination as to whether a further corporate witness deposition regarding this subject matter is required.

   7. <u>Validation Studies, Uniform Guidelines and Job Analyses</u>. Nike refuses to designate a witness to testify about Nike's compliance or lack of compliance with the Uniform Guidelines, evidence or lack of evidence of validity and use or lack of use of job analyses and related matters. Nike relies upon its representations, including in the March 2 letter, that Nike does not have "validation studies" and is "unaware" of any job analyses. Nike concludes that it would be "illogical" to designate a witness "on studies that do not exist or events that did not occur." This is not a proper basis to refuse to present a corporate designee on these topics.

   First, Nike has made no explicit statement about the Uniform Guidelines in the March 2 letter. Nike has not represented that it neither has any evidence that it followed or implemented the standards in the Guidelines nor maintained the documentation of adverse impact and other matters required by the Uniform Guidelines.

   Second, the representations of counsel are not evidence and it is unclear how the courts may consider those representations. Such representations are not the same as a corporate witness testifying, for example, that Nike has no evidence that it has complied with the requirements of the Uniform Guidelines and has not conducted any job analyses or validity studies.

   Third, contrary to it being "illogical" to have a corporate witness testify about "studies that do not exist and events that do not occur," such evidence is relevant and critical, even determinative, in fair employment actions. As a legal matter, Nike may argue to the contrary, but Nike cannot prevent the Plaintiffs from establishing an evidentiary record regarding Nike's lack of compliance with the Uniform Guidelines, failure to conduct any validity study and failure to rely upon any job analyses.

   Finally, as a practical matter, as required by Rule 30(b)(6), it would be straightforward for Nike to prepare a corporate witness about these matters since, as Nike apparently maintains, it has no evidence of compliance with the Uniform Guidelines and its recordkeeping requirements, no evidence of validation and no job analyses. Indeed, Nike designated Mr. Walker to testify about these topics as it related to some of Nike's compensation policies and practices. Thus, Nike must produce a corporate witness regarding these matters. As an alternative, Plaintiffs would consider a stipulation of fact that is provided by Nike that is suitable for submission into the evidentiary record that comprehensively provides that Nike has no evidence that it has complied with the Uniform Guidelines and its recordkeeping requirements, has no validity study or evidence of validity, and has not conducted or used any job analysis.

   8. <u>Organizational Structure of WHQ</u>. Nike refuses to produce a corporate witness regarding the organizational structure for the jobs covered by this class action. ("Covered Positions"). Nike bases this refusal on its designation of corporate witnesses to testify about the organizational structure of Human Resources and the compensation department, its production of

*Cahill, et al. v. Nike, Inc.*                    -7-                    March 9, 2021

data and Plaintiffs' deposition of the Chief of Human Resources as a percipient not corporate witness. Nike's arguments are without merit for several reasons.

First, by its own admission, Nike has failed to produce a corporate witness to testify about the organizational structure for the vast majority of Covered Positions located in the business units or Pipelines. These organizational structures are pertinent to the manner by which employment decisions, such as compensation and promotion are made, reviewed and implemented among other matters.

Second, as Plaintiffs have described in numerous communications, the data that Nike produced is far from sufficient and that Nike has data and documents showing organizational structure. *See e.g.,* Pls. Oct. 8, 2021 Letter to Nike. Furthermore, even if an organizational structure could be created from the data, which it cannot, this would not eliminate Plaintiffs entitlement to testimony from a corporate witness explaining the structure. Third, Nike does not explain why the deposition of Ms. Matheson under Rule 30(b)(1) provides Nike with a legitimate basis to refuse to provide testimony on organizational structure.

Fourth, Nike's refusal to designate a corporate witness prepared to testify about organizational structure is made even more indefensible by Nike's failure to produce documents describing the organizational structure for the Covered Positions. *See*, Plaintiffs' Motion to Compel, filed March 1, 2021. Thus, for these reasons and the Court's denial of Nike's request for a protective order, Nike must designate a corporate witness prepared to testify about the organizational structure.

********

While there are good number of issues presented by the exchange of meet and confer letters, we would appreciate a prompt response by the close of business on Thursday, March 11, 2021, because of the approaching conclusion of the extension period and the possible need to seek guidance from the Court.

Sincerely,

Barry Goldstein

BG/kbm

# EXHIBIT G

## NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A0054 | PROF ENTRY: EXT COMM | |
| **Band** | **Level** | **FLSA Status** |
| L | ENTRY PROFESSIONAL | Exempt |

| Pipeline | COMMUNICATIONS |
|---|---|
| The nature of the work is focused on understanding and conveying company and product information to internal and external stakeholders through appropriate and effective channels. | |
| **Family** | **COMMUNICATIONS** |
| Responsible for understanding and conveying company and product information to internal and external stakeholders through appropriate and effective channels. | |
| **Sub Family** | **EXTERNAL COMMUNICATIONS** |
| Responsible for understanding and conveying company and product information to external stakeholders and consumers through appropriate and effective channels. | |

| Band Level Criteria & Minimum Requirements for: | L  Band / ENTRY PROFESSIONAL |
|---|---|
| Overall | - Performs routine assignments in entry-level to professional role |
| | - Typically requires a Bachelors Degree or equivalent work experience that provides knowledge and exposure to fundamental theories, principals and concepts |
| | - Develops competence by performing structured work assignments |
| | - Uses existing procedures to solve routine or standard problems |
| | - Receives instruction, guidance and direction from others |
| Business Expertise | - Applies general knowledge of business developed through education or past experience |
| | - Has conceptual knowledge of theories, practices and procedures in a discipline |
| Delivering Solutions | - Uses existing procedures to solve routine or standard problems; applies limited judgment and discretion |
| | - Responds to standard requests from internal and/or external customers |
| Impact | - Communicates information, asks questions and checks for understanding |
| | - Has limited decision-making authority; works within technical guidelines and direction to achieve objectives and meet deadlines |
| Resource Management | - Has no formal role in managing projects |
| | - Builds awareness of costs related to own work |
| Brand Protection/Promo | - Performs work in support of brand plans; links daily work with company mission; participates in initiatives, program or products with low visibility |
| | - Ensures actions protect company image and limits risks |
| | - Actions impacting company image require management oversight and are constrained by policies |
| Leadership | |
| Minimum Requirements | - Typically requires a Bachelors Degree and minimum of 0-1 years directly relevant work experience |
| | Note: One of the following alternatives may be accepted: PhD or Law + 1 yr; Masters + 0-3 yrs; Associates degree + 1-3 yrs; High School + 3-5 yrs |



EXHIBIT
510
Shane Walker
12/17/2020
Teresa Rider - CSR

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

COMMUNICATIONS

NIKE_00003352
Goldtstein Decl. Ex. 17, Page 64 of 120

## NIKE, Inc. Job Description

| Job Code | Title | |
|---|---|---|
| A0054 | PROF ENTRY: EXT COMM | |
| **Band** | **Level** | **FLSA Status** |
| L | ENTRY PROFESSIONAL | Exempt |

**Key Job Accountabilities**

Foster and cultivate relationships with key media, and keep up to date on Nike happenings. Not to be quoted as a spokesperson on the record unless authorized and trained by a manager.

Organize and manage assigned projects and events. Participate in communications team idea generation. Follow up with Nike employees and partners, answer questions and supply PR information. Work with manager to provide assistance to media on-site at special events, photo shoots, interviews and press conferences.

Research, write and edit press releases, fact sheets, video packages and speaking points. Create and write PR plans; work with PR agencies and freelancers. Research media groups.

Work with Communications manager / director to administer allocated budget. This includes invoicing; producing reports, working with finance and updating team on a regular basis.

| Key Capabilities (beyond minimum requirements for L Band / ENTRY PROFESSIONAL) | |
|---|---|
| Specific Work Experience | Bachelor's degree in public relations, journalism, communications, business, marketing or related field preferred. Previous PR experience preferred. |
| Physical Requirements | Typical Office: This is a typical office job, with no special physical requirements or unusual work environment. |
| Travel | 10-20% |
| Irregular Work Hours | No |
| Certifications | |

**NIKE CONFIDENTIAL**
Note: Gray fields are common across the company
Date Created: 12/05/2018

Confidential

COMMUNICATIONS

NIKE_00003353

# EXHIBIT H



FY16/17 Sustainable Business Report
NIKE, Inc.

EXHIBIT
509
Shane Walker
12/17/2020
Teresa Rider - CSR

MAXIMUM
PERFORMANCE
MINIMUM
IMPACT

NIKE_00001996

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | Appendix

# ABOUT THIS REPORT

This report covers NIKE's fiscal years 2016 and 2017 (June 1, 2015 through May 31, 2017). We will refer to these as FY16 and FY17 for the rest of the report.

The content found in this report is focused on progress toward our 2020 targets and key priority issues.[1] Targets and measures represent the full suite of NIKE's public corporate sustainability commitments, and are an aggregated view of functionally set long-term goals and additional corporate commitments to meet stakeholder expectations. Unless otherwise stated, the baseline for the majority of our targets is fiscal year 2015.

NIKE's 2020 targets encompass a broader scope than NIKE's previous targets in many areas of the value chain. For example, while 2015 targets for corporate offices included NIKE's World Headquarters, 2020 targets also include Converse HQ, Hurley HQ, European HQ, and Greater China HQ. Other targets go deeper into our supply chain, like expanding energy and emissions commitments to material dyeing and finishing for the first time, and broadening logistics goals to include outbound transportation. As a result of the expanded scope, certain 2015 performance metrics originally reported in NIKE's FY14/15 Sustainable Business Report are restated in this report to reflect the expansion and enable comparability.

This report reflects an evolution in our approach to reporting, allowing us to focus on performance. To enable this change, we have enhanced our website to share additional stories and provide additional context to our work. For more detail about our efforts and progress over more than 20 years of work in sustainability as well as our more current initiatives, please see our updated website at sustainability.nike.com.

This report has been prepared in accordance with the **GRI STANDARDS: CORE** option.

## DATA INTEGRITY

Sustainability data is shaped by a landscape of evolving methodologies, advancing standards and expansions in data accessibility over time. Adapting to these changes while maintaining comparability in our data is critical to instilling integrity and confidence in the validity of the insights the data provides. We understand that we must adapt and be nimble to keep pace with broadening data sets and emerging standards. To that end, we've been focused on designing more flexibility with tighter controls into our sustainability data processes and systems.

Based upon a thorough review by NIKE's internal audit function, considerable progress has been made to NIKE's sustainability data processes over the past several fiscal years, including but not limited to: a performance management data system overhaul, development of standard operating procedures, and an improved data governance model. The review also identified opportunities to further improve systems and controls around sustainability reporting. NIKE will continue to evolve and address information systems in light of this goal.

In cases where shifts in scope, methodology, and/or data quality have led to changes in previously reported performance results, we've restated historically reported results and provided context on the changes.

The data presented in this report has been collected, reviewed, and internally validated to ensure completeness and accuracy and represents the most complete and accurate information at the time of publication. NIKE will continue to be transparent on revisions to reported data in the future.

## REFERENCE

We will cross-reference the following frameworks throughout the report:

**PRIORITY ISSUE** – An issue deemed to be material to the company through our sustainability issue prioritization process.

**GLOBAL REPORTING INITIATIVE (GRI)** – The GRI Sustainability Reporting Standards are the first and most widely adopted global standards for sustainability reporting.

**SUSTAINABILITY ACCOUNTING STANDARDS BOARD (SASB)** – SASB is an independent, private sector standards-setting organization dedicated to enhancing the efficiency of the capital markets by fostering high-quality disclosure of material sustainability information that meets investor needs.

**UN GLOBAL COMPACT (UNGC)** – The UNGC is a voluntary initiative based on CEO commitments to implement universal sustainability principles and to undertake partnerships in support of UN goals.

**SUSTAINABLE DEVELOPMENT GOALS (SDGs)** – The SDGs are a universal call to action to end poverty, protect the planet, and ensure that all people enjoy peace and prosperity.

[1] Priority issues are described in the Issue Prioritization.



NIKE_00001998
Goldtstein Decl. Ex. 17, Page 68 of 120

# EMPLOYEES



We continue to provide reward programs tailored to the needs of our workforce, including:

* Competitive health care benefits, with multiple plan design options to suit various family types
* Retirement benefits
* Incentives based on company and individual performance for eligible employees
* Opportunity to enroll in the Employee Stock Purchase Plan in most locations
* Employee discounts on NIKE products

In August 2016, NIKE signed the White House Equal Pay Pledge, publicly declaring our commitment to review pay and promotion practices annually, and to ensure that women and men who undertake the same work at the same level are equitably compensated. At NIKE, we define pay equity as equal compensation for women, men, and all races/ethnicities who undertake the same work at the same level, experience, and performance – and this methodology aligns with top tier global companies. NIKE's FY17 data show that for every $1 earned by men, women globally earned 99.9 cents, and for every $1 earned by white employees in the U.S., URM also earned $1. We will maintain focus, driving with 100 percent as our goal for both ratios every year, and will continue to monitor this data.

## FY17 GLOBAL PAY EQUITY

| 99.9¢ TO $1 | $1 TO $1 |
|---|---|
| WOMEN VS. MEN (GLOBAL) | URM VS. WHITE (U.S.) |

LEARN MORE: Global Pay Equity

## FY17 GENDER PAY AND BONUS GAP (U.K.)

| DIFFERENCE BETWEEN MEN/WOMEN | MEAN | MEDIAN |
|---|---|---|
| WHOLESALE (ALL OF NIKE U.K. MINUS RETAIL) | | |
| Hourly Pay Gap | 10% | 8% |
| Bonus Pay Gap[1] | 37% | 52% |
| RETAIL | | |
| Hourly Pay Gap | 3% | 3% |
| Bonus Pay Gap[1] | 15% | 18% |

1 Bonus includes bonus payouts, stock options exercised and/or ESPP issuances during the one-year time frame.

LEARN MORE: U.K. Gender Pay Gap Report

## NIKE, INC. TOTALS BY GENDER (GLOBAL)

| | ALL EMPLOYEES | | | DIRECTORS+ | | | VPs | | | BOD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 |
| Female | 48% | 48% | 48% | 35% | 36% | 38% | 26% | 28% | 29% | 21% | 25% | 25% |
| Male | 51% | 52% | 52% | 64% | 64% | 62% | 74% | 72% | 71% | 79% | 75% | 75% |
| No gender reported | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |

1 On initial hire data, chose not to self-identify.

## NIKE, INC EMPLOYEE TOTALS[1] BY ETHNICITY (U.S.)

| RACE/ETHNICITY | ALL EMPLOYEES | | | DIRECTORS+ | | | VPs | | | BOD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 |
| American Indian or Alaskan Native | 134 | 142 | 129 | 5 | 12 | 12 | – | – | – | – | – | – |
| | <1% | <1% | <1% | <1% | <1% | <1% | | | | | | |
| Asian | 2,379 | 2,761 | 2,955 | 272 | 361 | 409 | 7 | 12 | 16 | 1 | 1 | 1 |
| | 7% | 8% | 8% | 8% | 9% | 10% | 2% | 4% | 5% | 7% | 8% | 8% |
| Black or African American | 6,733 | 7,634 | 8,561 | 167 | 191 | 188 | 28 | 29 | 29 | 2 | 2 | 2 |
| | 21% | 22% | 23% | 5% | 5% | 5% | 9% | 9% | 8% | 14% | 17% | 17% |
| Hispanic/Latino | 5,732 | 6,210 | 6,961 | 149 | 190 | 209 | 10 | 9 | 9 | – | – | – |
| | 18% | 18% | 19% | 4% | 5% | 5% | 3% | 3% | 3% | | | |
| Native Hawaiian or Other Pacific Islander | 251 | 250 | 277 | 2 | 5 | 5 | – | – | – | – | – | – |
| | <1% | <1% | <1% | <1% | <1% | <1% | | | | | | |
| Two or More Races | 1,307 | 1,606 | 1,812 | 72 | 92 | 106 | 3 | 5 | 4 | – | – | – |
| | 4% | 5% | 5% | 2% | 2% | 3% | 1% | 2% | 1% | | | |
| Unknown | 115 | 17 | 71 | 10 | 2 | 22 | 2 | – | 2 | – | – | – |
| | <1% | <1% | <1% | <1% | <1% | <1% | <1% | – | <1% | | | |
| White[2] | 15,326 | 16,355 | 16,374 | 2,457 | 2,993 | 3,159 | 253 | 271 | 293 | 11 | 9 | 9 |
| | 48% | 47% | 44% | 80% | 78% | 77% | 84% | 83% | 83% | 79% | 75% | 75% |
| TOTAL | 31,977 | 34,985 | 37,140 | 3,333 | 3,846 | 4,110 | 303 | 326 | 353 | 14 | 12 | 12 |

1 Numbers may not add up to 100% due to rounding. Not included in the data above are U.S. NIKE employees working outside the U.S. URM represented 52% (FY15), 52% (FY16) and 27% (FY17) of this population.
2 These are the URM codes for a breakdown between White and underrepresented minorities (URM).

### Goals, Resources, and Accountability

In FY16/17, we increased our resources within the Global Diversity & Inclusion team to provide strategic leadership for the function, and drive consistency for our eight Employee Networks. These resources strengthened our impact, but were insufficient. Now we are focused on creating a systemic approach to our diversity efforts in service of our business, people strategy, and employee experience in order to transform our culture.

In 2018, we elevated the Diversity team to sit at the heart of NIKE's People and Culture Strategy. We also created a new, elevated role of Chief Diversity and Inclusion Officer who reports directly to our Chief Human Resources Officer, and allocated additional funding into all of our employee networks for mentoring, training, and development.

We also have a set of initiatives designed to further accelerate our culture and prioritize our people that will roll out in the remainder of FY18 and FY19. They include:

* FY18/19: Promotion-Pay-Performance Evaluation: Continue to evaluate our promotion, pay, and performance results to assess the impact on all employees with a specific focus on diverse talent and representation. We will be studying time-in-job and the pace of promotions across our employee base – with a strong focus on women and URM – to understand how this impacts representation.
* FY18/19: Dedicated Talent Sourcing: We will invest in a dedicated diversity sourcing team to be immersed in the marketplace; increase visibility and accountability to ensure slates of diverse candidates when hiring; and remove bias from critical moments of the hiring process by creating more inclusive job descriptions, enabling blind resume reviews, eliminating the collection of candidate salary history, and using data to inform hiring decisions.
* FY19: Global Pay Equity: Our aim is a 1:1 pay ratio for both women (globally) and URM (U.S.). We will monitor our results annually and make adjustments where necessary.



NIKE_00002052
Goldstein Decl. Ex. 17, Page 69 of 120

# EXHIBIT I



1(213) 683-6120
feliciadavis@paulhastings.com

**VIA E-MAIL**                                                                                                  98484.00003

March 14, 2021

Barry Goldstein (bgoldstein@gbdhlegal.com)
Byron Goldstein (brgoldstein@gbdhlegal.com)
James Kan (jkan@gbdhlegal.com)
Mengfei Sun (msun@gbdhlegal.com)
Goldstein, Borgen, Dardarian & Ho
155 Grand Avenue, Suite 900
Oakland, CA  94612

*Re:     Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Counsel:

We write in response to your follow-up letter regarding Nike's data productions.  We note, as we have throughout this litigation, that your requests remain disproportionate to the needs of the case.  For example, in some cases you have asked us to run to ground questions about data which, based on your own analysis, appear in just 5% of the observations.  Nevertheless, we have endeavored to respond to your inquiries to the best of our ability, as set forth below.

   A.   <u>The Meaning of Names and Values in Nike's Data Files</u>

Responses to your remaining questions regarding Equity, Merit and PSP Tables are attached to my email.  With respect to your other data-related questions:

SNAPSHOTS TABLE

• Job_Key – As we stated, Job_Key is almost universally linked to Job Code.  We previously told you, "**Nike does not use Job Key and it should not be relied upon.**"  Because we don't use it, we cannot provide an answer regarding its meaning.

• Job_Name – We are concurrently providing a historical look-up table.  As you can see, the job name associated with a job code does not change frequently.  Moreover, this information was available in the data we previously provided to you (as we told you last year).  Accordingly, the time spent running this to ground was disproportionate to the needs of the case.  But in order to cooperate in the discovery process, we did so anyway.  If the job name has an end date of 12/31/9999, that means the job name is currently being used.  You can determine whether a job name changed by looking to see if there are multiple entries for the same job code.  If the job code has multiple entries, that indicates a name change on the date indicated in the end date column.

• Org_Unit – Org_Unit is a label to describe a single report-to organizational unit.  For example, Golf Operations is an Org_Unit.

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
t: +1.213.683.6000  |  www.paulhastings.com



March 14, 2021
Page 2

- Org_Unit_Chief_Ind – We feel our answer is clear.  The "Org_Unit_Chief_Ind" indicator indicates that the employee is the manager of the Org Unit.

- Territory – As we stated, Territory was originally designed to describe which Nike territory the employee supported.  It is no longer used or maintained.  "**It should not be relied upon because it is not accurate.**"  This is why Territory is blank for 95% of the entries, as you note.

- Geography – As we stated, Geography was originally deigned to describe which Nike Geography the employee supported.  It is no longer used or maintained.  "It should not be relied upon because it is not accurate."  That is why Geography is blank for 78% of the entries, as you note.

- Cost-Ctr – Cost Centers are owned by Finance and represent a defined location of cost occurrence within the business. A Cost Center is only established when the business need will continue for two or more fiscal years. It essentially is the organization that pays for the individual's employment.

STATIC TABLE

- Max_Sel_End_Dt – This does not limit the data pulled.  For most of the records, the date is 8/31/2019, which represents the end of the period of time for which we pulled the data.  For approximately 2,600 records, the date corresponds to the end of the individual's employment.  For a handful of other records, the date appears to correspond to the date the person moved out of a litigation-relevant position (e.g., moving into a retail job, transferred abroad, etc.).  But, again, this is irrelevant.  As we have told you before, the Monthly Snapshots are the relevant source of information for data such as Band and Position.  The Static Table's purpose is to provide data on employee gender, date of birth, employee IDs, and hire and termination dates.  It is not useful for following the evolution of jobs or pay for an employee at Nike.  The Monthly Snapshot data should be relied on for employee job history and compensation information.

- Empl_Bnd_Cd – Thanks for clarifying your question.  The Static Table is a one record per person table that contains only the most current information as of the date value in the Max_Sel_End_Dt field for each current and former Nike employee that meets the mutually agreed upon litigation relevant definition.  Band changes are not reflected in this table.  You should rely on the Monthly Snapshots for this data.

- Pstn_Long_Nm – As set forth above, the Static Table is a one record per person table that contains only the most current information as of the date value in the Max_Sel_End_Dt field for each current and former Nike employee that meets the mutually agreed upon litigation relevant definition.  Position name changes are not reflected in this table.  You should rely on the Monthly Snapshots for this data.

**B.  File Linking Names and Employee IDs with Anonymized Numbers**

Plaintiffs made numerous representations to the Court that they were unable to analyze Nike's data using the anonymous identifiers.  It seems disingenuous now to ask Nike to provide a file linking employee names to the anonymous identifiers when you claimed that the data was not usable.



March 14, 2021
Page 3

 

**C.  Potentially Relevant, Unproduced Data Fields**

We do not believe there are any relevant, unproduced data fields in SAP.  We did exclude fields such as race / ethnicity from our production, as this is a putative gender class action.  We also excluded fields that contained employee contact information and social security numbers.  If there are specific data fields you feel you are missing, you can let us know, and we will inquire.  But we decline to provide a printout of every single field possibly available – many of which may not be used or updated – at this time.

**D.  Question Concerning Band Level Values in Snapshots**

It is not reasonable or proportionate to the needs of the case to ask Nike to go back and verify details with respect to individual employees in a class action such as this one.

**E.  Question Concerning "In Planning" Status**

When reviewing the Comp Review File, we believe that only the payments with Status = "Active" were actually made.  That said, there appear to be two odd exceptions.  First, none of the "Stock Option 2012" awards moved from "Approved" to "Active."  Second, none of the "Equity Choice" awards moved from "Approved" to "Active."  We believe this is just an idiosyncratic difference in how the awards for these programs were recorded and that these awards were actually made.  We are working to confirm this with our client.

**F.  Snapshot and Comp Change File**

As we stated previously, it is not correct that all compensation changes or payments to employees in the Snapshot files are contained in the Comp Change Thru file.  For example, the Comp Change Thru file does not appear to include compensation changes related to job changes, such as promotional increases.  This information is contained in the Monthly Snapshots.

**G.  Organizational Structure and Reporting Lines**

The Monthly Snapshots contain each employee's direct supervisor as reflected in Nike's HRIS data as of the effective snapshot date.  We understand that you are looking for full "chain of command" information for each employee at each snapshot date.  That means not just the employee's direct supervisor, but the full sequence of supervisors all the way up to the CEO, on each Monthly Snapshot, since 2012.  We are informed that this information is not maintained in a "historied" format, meaning Nike does not maintain full chain of command information historically.  So we are not able to pull each employee's full chain of command 2 months ago or 2 years ago.  That said, because you have data for such a large percentage of Nike's employee population, you could create reporting line tables using the supervisor data in your possession.

I have not seen the Organizational Unit 2 Text, Organizational Unit 3 Text, etc., data that you reference in your letter, but I am continuing to research to determine whether it exists in a way that can be extracted.

**H.  Education and Pre-Nike Work History**

I think we may be talking past each other.  Perhaps I am not understanding your question, or you are not understanding our responses.  Nike's only source of education and pre-Nike employment history is in the



March 14, 2021
Page 4

Taleo database, which only contains information on people who applied for a Nike position in Taleo after the database was implemented. Many employees never did so (they were hired before Taleo was implemented and did not submit a subsequent application). Nike did not artificially "limit its collection and production to [the Taleo] applications database," as Plaintiffs suggest. This is the database in which this data exists.

Regarding your question about why Nike used "requisition" as a criteria, we did so to capture as many relevant pieces of data as possible. If we pulled Taleo applications only for those individuals who were hired within the Taleo database, we would have excluded education and pre-Nike employment history for incumbent employees who applied for jobs in Taleo but were not selected. For example, if an employee was hired in 2010, and applied for an internal job in 2017 but was not selected, your method of collection would have excluded that individual's data. Our method included that individual's data. We were attempting to cast as wide of a net as possible to collect as much education and pre-Nike employment experience as possible, per your request. I am happy to discuss this via telephone if either my answer is unclear or if I am not understanding your question.

Regarding your question about promotions, promotions will only be reflected in Taleo when the job opening was posted and filled through Taleo. Employees can receive a promotion from one level to the next without the opening being posted and applicants applying in Taleo. So those promotions and job changes will not be reflected in the Taleo data. You also asked the following question: "for any promotion, lateral, or other job change that is not in the Taleo data that was produced, does that mean no requisition was created for that promotion or other job change?" This is an impossible question to answer. You have chosen to file a putative class action implicating more than 5,000 putative class members, more than 10,000 total employees, and more than 1,000 different job codes. There are thousands of promotions, lateral and other job changes in the data. There is no way we could possibly answer this question with respect to every job change.

Regarding the E7+ promotions, as a preliminary matter, employees in E7+ roles are outside the scope of this lawsuit based on Plaintiffs' definition of the putative class. Nevertheless, as we have communicated previously, jobs in levels E7+ generally are not posted, so there are no postings, applications, etc. to produce. I cannot say for certain that no E7+ jobs have ever been posted, which is why I use the term "generally." However, I understand that the process for moving into an E7+ role is very different than the process for moving into roles at lower band levels. These jobs typically are talent planned, which means that people are considered based on their skills, background, expertise, and performance, but there is not an application and selection process that is documented in Taleo. And other than going to each hiring manager and collecting documents that may have been relevant to the decision-making process, I do not believe records exist in a consolidated or uniform format.

I.  **Potential Appraisal and Talent Segmentation**

I believe you will learn during the relevant Rule 30(b)(6) depositions that the data you are asking about is not centrally maintained. More importantly, you have the final data related to these evaluations. We do not believe Nike is obligated to run-to-ground every document that may or may not contain information about how these decisions are made. Doing so would be akin to producing every document upon which a manager relied to evaluate an employee's performance. If the Rule 30(b)(6) deposition reveals information that is inconsistent with our understanding, we are happy to meet and confer with you about this.



March 14, 2021
Page 5

**J.   Preferred Candidates**

There is no data to produce because Nike does not have a preferred candidate process.  I do not know how to be any clearer on this.

**K.   Other Inquiries**

With respect to the remaining topics:

- Amplify and Xcelerate:  These are small employee engagement programs with limited populations.  The rosters of individuals who participate in them are irrelevant to the pre-class certification stage of this case.

- PSP Award Pool and PSP Award Pool Factors; Share-Based Guidelines for Stock Awards; Pre-Set Award Targets by Band for Stock Awards:  Shelli White testified on these topics at length during her Rule 30(b)(6) deposition.  Although most of these documents are irrelevant to the litigation as they only impact employees at the level Vice President and above (which are not included in the putative class definition), we have identified the available Stock Award Templates, Equity Award Guides, and Stock Award Guides during the relevant period available after a reasonable search and will produce them.

- CPM Data:  Nike has already produced data that shows whether an employee received a CPM adjustment.

- 2X Pay Factors:  As Mr. Walker testified, managers were able to use whatever criteria they chose to determine whether and how to make 2X pay decisions.  There are no "factors" to produce because these were individualized decisions based on manager discretion.

- Sign-On Bonuses and Relocation Payments:  As we have previously stated, these rewards are ad hoc and not consistently provided throughout all Nike roles.  We do not believe they are relevant to this litigation.

Finally, your letter suggesting Nike has spoliated data is not well taken.

- Compa-Ratio and Compa-Ratio Factors:  As you know, compa-ratio is a calculation that changes over time when ever (a) an employee's salary changes, and/or (b) the salary range for a job changes.  These are always fluid calculations, not fixed data.  You can certainly calculate compa-ratio for any employee at any time you wish using the compensation and salary range data we have produced.

- Incorrect Job Code, Corrected Job Code, and Corrected Band:  In its regular course of business, Nike does not retain data when it corrects an erroneous job code for an employee.  Nor is Nike under any obligation to do so.

- Documented Performance Plan:  We struggle to understand how this is possibly relevant to the putative class action you seek to certify.  But putting that aside, Nike does not maintain this



March 14, 2021
Page 6

information in a database format.  It is not the case that Nike failed to preserve it – it is never retained in a database to begin with.

We hope this information helps put these data-related inquiries to rest.  If you would like to discuss any of the foregoing, please let me know.

Sincerely,

**/s/ Felicia A. Davis**

Felicia A. Davis
of Paul Hastings LLP

# EXHIBIT J

**From:** Davis, Felicia A. <feliciadavis@paulhastings.com>
**Sent:** Tuesday, December 8, 2020 7:26 PM
**To:** Byron Goldstein; Barry Goldstein; James Kan; Mengfei Sun
**Cc:** Prince, Daniel; Zabele, Laura
**Subject:** Cahill v. Nike - Shane Walker and Alison Daugherty Depositions

Counsel,

Mr. Walker can sit for a virtual deposition on December 17, 2020.  Mr. Walker will be designated as Nike's 30(b)(6) deponent on the following topics, as defined below.  The time period for which Mr. Walker will be prepared to testify with respect to each topic is set forth in parenthesis following each topic:

- **Topic 1**:  The organizational structure of Nike's compensation department (2015 to present).
- **Topic 2**:  The establishing of job codes, job levels, bands, sub-families, families, and/or functions for the Covered Positions (2016 to present).
- **Topic 3**:  The formation, review, modification, and use of job codes for the Covered Positions; related policies and procedures; the individuals who developed, consolidated, and/or organized job codes (2016 to present).  This does not include the assignment of employees to job codes.
- **Topic 5**:  Nike HQ executives' involvement, knowledge and responsibilities related to employee compensation; executives' knowledge regarding potential disparities between men and women in compensation; executives' involvement, knowledge, and responsibilities concerning the formation, review, and/or changing of policies and practices related to compensation (2015 to present).
- **Topic 6**:  Pay ranges relating to the Covered Positions, including "internal" and "external" ranges, market zones, market surveys, and how pay ranges are formed, review, changed and used; related policies and practices; the individuals who were involved in the formation, review and/or modification of pay ranges or related policies (2015 to present).
- **Topic 7**:  Development and implementation of starting pay guidelines; the individuals who were involved in the formation, changing and implementation of starting pay guidelines (2017 to present).
- **Topic 8**:  Effect of performance evaluations and potential appraisal ratings on employee compensation; related policies and procedures (2015 to present).
- **Topic 9**:  "Total rewards philosophy and interactions between philosophy and compensation," as Nike understands this phrase (2017 to present); offer modeling tool (2016 to present).
- **Topic 10**:  Setting and modifying salaries and lump sum payments for Covered Positions (excluding the setting of starting salary); policies and practices related to recommendations and determinations concerning merit, base pay, increases, lump sum payments (excluding the setting of starting salary); the individuals who make determinations regarding merit, base pay, increases, lump sum payments, and how (2015 to present).
- **Topic 11**:  General systems used to maintain employee compensation data; systems used to communicate recommendations or determinations concerning compensation (2015 to present.)
- **Topic 13**:  To the extent not privileged, recommendations and determinations of Competitive Pay Management ("CPM") and Active Pay Management ("APM") for Covered Positions; formation, components, uses, processes, and changes related to CPM and APM; related policies and practices; the individuals who are involved in the formation, use, changes, implementation, and/or supervision of CPM and APM; compa-ratios; the use of pay ranges, market analyses, and/or surveys in the CPM and APM process (2017 to present).
- **Topic 16**:  Guidance regarding compensation at promotion or lateral job transfer; the individuals who make such decisions and how; related policies and procedures; the individuals involved in forming and/or changing the policies and procedures; how the policies and practices were formed, reviewed and/or changed (2017 to present).

- **Topic 17**: Responsibilities and authority of Human Resources at Nike HQ related to compensation processes (2016 to present).
- **Topic 21**: To the extent not privileged, policies and practices regarding anti-discrimination in compensation (2017 to present).
- **Topic 24**: "Validation" of any compensation policy or practice, as Nike understands this term, and to the extent it applies to compensation policies or practices (2016 to present).
- **Topic 25**: "Compliance with the Uniform Guidelines" with respect to compensation policies or practices, as Nike understands this term, and to the extent it applies to compensation policies or practices (2016 to present).
- **Topic 26**: Policies and practices relating to the training of managers, directors, VPs and other employees with respect to making compensation decisions and implementing Nike's policies and practices related to compensation decisions (2017 to present).
- **Topic 27**: Nike's use of job analyses in establishing, modifying, or implementing compensation policies and practices, or establishing job codes, job levels, bands, sub-families, families, or functions (2016 to present).

We plan to submit formal objections to the 30(b)(6) deposition notice as well, but wanted to get you the topics as soon as possible so you have time to prepare.  In providing this list of topics, Nike does not consent to or agree with the scope or breadth of the topics noticed by Plaintiffs (i.e., Nike reserves its rights with respect to objections, and as provided in its Motion for Protective Order), nor does Nike consent to the defined terms contained in Plaintiffs' deposition notice.  Use of terms above does not necessarily mean that Nike's definition and Plaintiffs' definition are the same.

As set forth above, the term "compensation" is given its typical meaning, except that Mr. Walker will not be Nike's 30(b)(6) witness on the following compensation-related topics:  PSP awards, equity, stock options, or other long-term incentive payments.

***

Separately, Ms. Daugherty is available for deposition on January 7, 2021.  Ms. Daugherty likely will be designated as Nike's witness for certain 30(b)(6) deposition topics.  We are working through those now and will provide them in advance of the deposition.

Best,
Felicia

---



**Felicia Davis** | **Partner, Employment Law Department**
Paul Hastings LLP | 515 South Flower Street, Twenty-Fifth Floor, Los Angeles, CA 90071
Direct: +1.213.683.6120 | Main: +1.213.683.6000 | Fax: +1.213.996.3120 |
feliciadavis@paulhastings.com | www.paulhastings.com

*********************************************************************************
This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments. If you reply to this message, Paul Hastings may collect personal information including your name, business name and other contact details, and IP address. For more information about Paul Hastings' information collection, privacy and security principles please click HERE. If you have any questions, please contact Privacy@paulhastings.com.

Goldstein Decl. Ex. 17, Page 79 of 120

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                    )
individually and on behalf of            )
of others similarly situated,            )
                                         )
                Plaintiffs,              )
                                         )
        vs.                              )    No. 3:18cv-01477-JR
                                         )
NIKE, INC., an Oregon                    )
corporation,                             )
                                         )
                Defendant.               )

VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME I

DATE TAKEN:   December 17, 2020
TIME:         9:30 a.m.
PLACE:        Virtual

Walker, Shane - Vol. 1                    December 17, 2020

Page 2

```
 1                         APPEARANCES
 2    FOR THE PLAINTIFFS:    MR. BARRY GOLDSTEIN
 3                           MR. BYRON GOLDSTEIN
 4                           MR. JAMES KAN
 5                           MR. MENGFEI SUN
 6                           Goldstein, Borgen, Dardarian,
 7                           Ho
 8                           300 Lakeside Drive, Ste. 1000
 9                           Oakland, CA  94612
10
11    FOR THE DEFENDANT:     MS. FELICIA DAVIS
12                           MS. LAURA ZABELE
13                           MS. ALYSON SMITH
14                           MS. LAUREN THIBODEAUX
15                           Paul Hastings, LLP
16                           515 South Flower Street
17                           25th Floor
18                           Los Angeles, CA  90071
19
20
21
22
23
24
25
```

Beovich Walter & Friend

1-800-541-4452          503-228-7201          www.bwfreporters.com

Goldtstein Decl. Ex. 17, Page 82 of 120

Walker, Shane - Vol. 1                    December 17, 2020

Page 43

1  BY MR. BARRY GOLDSTEIN:

2       Q.  Do you understand the term validation?

3       A.  Can you define that, please?

4       Q.  Are you familiar with the guidelines of

5  employee selection procedures?

6       A.  I am not.  Can you define that, as well?

7       Q.  I'll show you a copy and ask you if you've ever

8  seen it.

9           Can you see the --

10      A.  Okay.  I have the document up.

11      Q.  Have you ever seen this document before, sir?

12      A.  No.

13          (Deposition Exhibit No. 506 was marked for

14  identification.)

15  BY MR. BARRY GOLDSTEIN:

16      Q.  So you wouldn't be able to testify as to

17  whether or not these requirements have been validated in

18  accordance with the requirements set forth in the uniform

19  guidelines which I've just had marked as Exhibit 506.

20      A.  I would --

21          MS. DAVIS:  The question is vague and

22  ambiguous, and it assumes that the guidelines apply to

23  the compensation programs that Mr. Walker is here to

24  testify about, calls for a legal or expert opinion.

25          Go ahead.  Sorry, Mr. Walker.

Walker, Shane - Vol. 1                    December 17, 2020

Page 44

1              THE WITNESS:  I would not be able to.

2              (Deposition Exhibit No. 507 was marked for

3      identification.)

4      BY MR. BARRY GOLDSTEIN:

5         Q.  Exhibit 507 is Nike job architecture.  I'm

6      going to ask you to turn to slide 20.

7              MR. BYRON GOLDSTEIN:  It's loading.

8              MS. DAVIS:  I think what it is is the

9      PowerPoints are very large, and that's what seems to be

10     taking a long time.  The PDFs seem to work pretty well.

11             MR. BYRON GOLDSTEIN:  Felicia, maybe at the

12     next break, I wonder if it's worth trying to turn the

13     PowerPoints into PDFs on my end.

14             MR. BARRY GOLDSTEIN:  Then you can't read the

15     notes.

16             MR. BYRON GOLDSTEIN:  You can put the notes in

17     the PDF.

18             MR. BARRY GOLDSTEIN:  Maybe what we can do is

19     we can download them during the next break.  We can

20     download some of the PowerPoints.

21             MR. BYRON GOLDSTEIN:  It's the uploading.

22             MR. BARRY GOLDSTEIN:  Are we off the record?

23             MR. BYRON GOLDSTEIN:  There's not too many

24     PowerPoints.  We're almost done.

25     BY MR. BARRY GOLDSTEIN:

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Goldtstein Decl. Ex. 17, Page 84 of 120

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                    )
individually and on behalf of            )
of others similarly situated,            )
                                         )
                Plaintiffs,              )
                                         )
        vs.                              )    No. 3:18cv-01477-JR
                                         )
NIKE, INC., an Oregon                    )
corporation,                             )
                                         )
                Defendant.               )

VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME II

DATE TAKEN:  December 18, 2020
TIME:         9:30 a.m.
PLACE:        Virtual


COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR

Page 150

```
 1                        APPEARANCES
 2    FOR THE PLAINTIFFS:     MR. BARRY GOLDSTEIN
 3                            MR. BYRON GOLDSTEIN
 4                            MR. JAMES KAN
 5                            MR. MENGFEI SUN
 6                            Goldstein, Borgen, Dardarian,
 7                            Ho
 8                            300 Lakeside Drive, Ste. 1000
 9                            Oakland, CA   94612
10
11    FOR THE DEFENDANT:      MS. FELICIA DAVIS
12                            MS. LAURA ZABELE
13                            MS. LAUREN THIBODEAUX
14                            Paul Hastings, LLP
15                            515 South Flower Street
16                            25th Floor
17                            Los Angeles, CA   90071
18
19
20
21
22
23
24
25
```

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Goldtstein Decl. Ex. 17, Page 86 of 120

Walker, Shane - Vol. 2                         December 18, 2020

Page 182

1      Q.  Have you ever seen any evidence of validation

2   consistent with this definition with respect to

3   compensation?

4      A.  Not that I'm aware of.

5      Q.  When you say not that you're aware of, is that

6   a no?

7      A.  For the time 2016 to 2020, I would say no.

8      Q.  Do you have any knowledge of any validation

9   evidence prior to 2015?

10         MS. DAVIS:  Again, it exceeds the scope of the

11   topic upon which Mr. Walker is designated to testify, but

12   he can answer based on his own personal knowledge not as

13   a 30(b)(6).

14         Go ahead.

15         THE WITNESS:  No, I do not have any personal

16   knowledge.

17   BY MR. BARRY GOLDSTEIN:

18      Q.  Turning back to Topic 24, can you testify as to

19   the way that Nike understands the term validation?

20      A.  So as the company itself understands the

21   definition, no.

22         As myself understands the definition or a

23   definition of what validation is, yes.

24      Q.  Okay.  You're testifying as a company witness,

25   and so I just want the record to be clear that as a

Beovich Walter & Friend
1-800-541-4452          503-228-7201          www.bwfreporters.com

Goldstein Decl. Ex. 17, Page 87 of 120

Page 184

1    If you want to use terminology --

2              MR. BARRY GOLDSTEIN:  I just asked him a

3    question, Felicia.  I just asked him a question.

4              MS. DAVIS:  It misstates his testimony.

5              MR. BARRY GOLDSTEIN:  I was asking him a

6    question.

7    BY MR. BARRY GOLDSTEIN:

8         Q.  Are you qualified to testify about Topic No.

9    24, Mr. Walker?

10        A.  Can you define what you mean by qualified to

11   testify on this topic?

12        Q.  Can you tell me what Nike understands the term

13   validation to mean?

14        A.  I cannot.

15             MS. DAVIS:  Let's take a break.

16             MR. BARRY GOLDSTEIN:  Okay.  Ten minutes?

17             MS. DAVIS:  That works.

18             (Off the record.)

19   BY MR. BARRY GOLDSTEIN:

20        Q.  Mr. Walker, I want to turn you to Topic 27.

21   Again, you can look at Topic 27 on Exhibit 502.

22        A.  Okay.

23        Q.  Topic 27 is Nike's use of job analyses in

24   establishing, modifying or implementing compensation,

25   policies or practices or establishing job codes, job

Page 216

1    recommendations and leaders reviewed and approved those

2    recommendations.  Would you agree with that?

3              MS. DAVIS:  The question has been asked and

4    answered.

5              You can answer it again.

6              THE WITNESS:  So again, managers enter pay

7    decisions and manager +1 review and approve.

8              MR. BARRY GOLDSTEIN:  Okay.  Why don't we take

9    a look at a few documents pertaining to the period before

10   APR.

11             (Deposition Exhibit No. 526 was marked for

12   identification.)

13   BY MR. BARRY GOLDSTEIN:

14        Q.  This is Exhibit 526, 2X pay review, Nike

15   30360-65.  It's a May, 2018 document.

16             Do you see it, sir?

17        A.  Yes, it's opening now.

18             Okay.  I have it open.

19        Q.  And I'm going to ask you about the third

20   paragraph:  2X pay changes, as with merit or job change

21   related pay adjustments, are funded from your current

22   budget.  There is no separate funding source.  Before the

23   start of each 2X pay cycle, you should receive direction

24   from your leadership on budgeting and priorities.  Pay

25   recommendations are approved through the highest

Page 217

1   leadership level, in order to assess global alignment --
2   let me finish -- budget availability and priorities.
3   Managers must review all of his or her employees and make
4   pay adjustment recommendations appropriate.
5          Do you see that, sir?
6      A.  Yes.
7      Q.  Now, who is this document directed to?
8      A.  So it's resources available to managers.
9      Q.  And is this document produced by human
10  resources?
11     A.  Yes.
12     Q.  And is it the Total Rewards part of human
13  resources?
14     A.  Yes.
15     Q.  When it says that you should receive direction
16  from your leadership on budgeting and priorities, what
17  leadership is being referenced?
18     A.  That varies across the organization.  So there
19  are different leaders that are managing their P&L, and
20  based on the way that your budgets are set from a P&L
21  perspective, they either would or would not have funds
22  available for the 2X pay process.
23     Q.  Mr. Walker, you used -- you used some letters
24  there.  What were you referring to?
25     A.  I said the 2X pay process.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                    )
individually and on behalf of            )
of others similarly situated,            )
                                         )
                Plaintiffs,              )
                                         )
        vs.                              )   No. 3:18cv-01477-JR
                                         )
NIKE, INC., an Oregon                    )
corporation,                             )
                                         )
                Defendant.               )


VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME III

DATE TAKEN:  December 21, 2020
TIME:        9:30 a.m.
PLACE:       Virtual


COURT REPORTER:  Teresa L. Rider, CRR, RPR, CCR, CSR

Walker, Shane - Vol. 3                    December 21, 2020

```
 1                          APPEARANCES
 2   FOR THE PLAINTIFFS:     MR. BARRY GOLDSTEIN
 3                           MR. BYRON GOLDSTEIN
 4                           MR. JAMES KAN
 5                           MR. MENGFEI SUN
 6                           Goldstein, Borgen, Dardarian,
 7                           Ho
 8                           300 Lakeside Drive, Ste. 1000
 9                           Oakland, CA  94612
10
11   FOR THE DEFENDANT:      MS. FELICIA DAVIS
12                           Paul Hastings, LLP
13                           515 South Flower Street
14                           25th Floor
15                           Los Angeles, CA  90071
16
17   Also Present:  Ms. Cassie English
18
19
20
21
22
23
24
25
```

Page 371

1  2020 when we implemented the annual pay review.

2        Q.   Now, prior to the annual pay review

3  implementation but after the implementation of pay ranges

4  on September 1st, 2016, would an accurate definition of

5  lump sum amount be portion of the merit increase that is

6  above the maximum of the pay range?

7        A.   So while that was the intent of lump sum

8  payment, that is not how they were always applied.

9  Managers could use discretion in how they allocated merit

10  increases, so they had the ability to give an increase to

11  base pay.  The system allowed them to give a lump sum

12  payment or in some cases the employee could have gotten

13  an increase and a lump sum award.

14        Q.   Now, under the annual pay review process, isn't

15  it possible that somebody could get a core pay increase

16  that would bring the employee up to the maximum of the

17  pay range and then also receive part of that core pay

18  increase as a lump sum?

19        A.   Yes.  It's more structured today.

20        Q.   With respect to the 2X program, and we

21  discussed the 2X program somewhat last week, what was the

22  purpose of the 2X program?

23        A.   So the 2X program was another opportunity for

24  managers to adjust employee's pay.  There were several

25  items that we looked at in that, one of them being

Walker, Shane - Vol. 3                    December 21, 2020

Page 372

1    employees that were below min were flagged.  One of them
2    was employees that were below 95 percent position in
3    range that had been -- that had had a year-over-year
4    rating.  I don't know the specific ratings.  And then the
5    third was a factor of time in role.
6         Q.  When you said below min, you meant below the
7    minimum for the particular pay range; is that correct?
8         A.  Yes, below the minimum of the pay range or the
9    market zone.
10        Q.  When you said time in role, by role you mean
11   job; is that correct?
12        A.  I don't know how specifically we were defining
13   time in job, but, yes.
14        Q.  Well, I'm just referring to the term role.  By
15   role, you mean job; is that correct?
16        A.  Again, so when I say role, I probably am being
17   not so specific to job.  But if you show me kind of what
18   guidance was provided, I can speak to specifically what
19   the program was.
20        Q.  Well, I'm just trying to get a clarification of
21   the term that you used.
22             You had mentioned the factors that would be
23   considered during 2X review, below minimum of the pay
24   range or the market zone, below .95 of the range in
25   position and then I believe you said time in role, and I

Beovich Walter & Friend
1-800-541-4452            503-228-7201            www.bwfreporters.com

Goldtstein Decl. Ex. 17, Page 94 of 120

Walker, Shane - Vol. 3                          December 21, 2020

Page 373

1    just wanted to know what you meant by role.

2         A.   Yes.   Again, I am defining this off the top of

3    my head.   So I know there are documents that show the

4    specific guidance and criteria for 2X, so when I'm saying

5    time in role, I'm referring to how long someone was in

6    their job, their current job level, et cetera.

7         Q.   During the review of the 2X pay, was

8    performance evaluation taken into account?

9         A.   So we did -- there was one of the criteria for

10   flagging an employee for 2X was performance rating over a

11   two- to three-year period, so, yes, there were pieces of

12   performance that were taken into account for 2X.

13        Q.   And when we're talking about performance

14   evaluation with the 2X program, are we talking about

15   coaching for excellence ratings?

16        A.   Yes.

17             (Deposition Exhibit No. 544 was marked for

18   identification.)

19   BY MR. BARRY GOLDSTEIN:

20        Q.   We're uploading a document that is 544 and it's

21   a series of emails in 2016.   Some of these emails were

22   included in an Exhibit 527 that we discussed last week.

23   I just want to bring your attention to that.   There were

24   some additional related emails in Exhibit 544.

25        A.   Okay.   I have the document up.

Beovich Walter & Friend

1-800-541-4452                503-228-7201                www.bwfreporters.com

Goldstein Decl. Ex. 17, Page 95 of 120

Walker, Shane - Vol. 3                    December 21, 2020

Page 483

1        A.   Yes.

2        Q.   And I think you've testified that those are the
3   types of situations that were examined during the 2X
4   period?

5        A.   So, yes, the system would flag employees that
6   were in this -- in one of those two buckets.  But it
7   didn't mean that a manager couldn't make a pay
8   recommendations for any employee that they had
9   responsibility for.  These were just the ones that I
10  guess were highlighted in the system for a manager to
11  look at.

12       Q.   I'm calling this a report in that it reports
13  all the employees below the minimum of the external
14  market zone.  So would it be possible for vice presidents
15  in E7+ to examine these reports and evaluate the number
16  of employees who are below the minimum of the market
17  zone?

18       A.   I don't fully know how the system was
19  configured back in 2015, so I don't know what information
20  would have been available as the information rolled up in
21  the system.

22       Q.   Did these types of reports continue through the
23  time period when 2X pay was in existence?

24       A.   Can you repeat the question?  I'm sorry.

25            (Last question read by reporter.)

Beovich Walter & Friend
1-800-541-4452                    503-228-7201                    www.bwfreporters.com

Goldstein Decl. Ex. 17, Page 96 of 120

Walker, Shane - Vol. 3                    December 21, 2020

Page 484

1          THE WITNESS:  So, again, these aren't reports.

2    It is a system.  So the system is configured -- it's

3    live.  Data feeds back and forth during the process.  So,

4    yes, the process is designed more or less the same from

5    2015 to when it ended.

6    BY MR. BARRY GOLDSTEIN:

7        Q.  Was 2X -- are these spreadsheets?  How do they

8    -- how were they made available to the managers?

9        A.  So managers --

10          MS. DAVIS:  Asked and answered.

11          Go ahead.

12          THE WITNESS:  So managers would go into the

13   MEportal and through that would access SAP where this

14   process was managed.  And within the functionality of the

15   system, there were certain features or buttons that would

16   allow a manager to export data to Excel, if you wanted to

17   look at it in that way.  But all entries would need to be

18   made back into SAP.

19   BY MR. BARRY GOLDSTEIN:

20       Q.  So if someone in E7+ band with direct reports

21   would receive a showing of their direct reports that were

22   flagged and not flagged for the criteria in the 2X

23   system?

24       A.  All managers would be able to see their direct

25   reports, and based on what this email says, they would be

Beovich Walter & Friend

1-800-541-4452                    503-228-7201                    www.bwfreporters.com

Goldstein Decl. Ex. 17, Page 97 of 120

Walker, Shane - Vol. 3                    December 21, 2020

Page 485

1  able to see employees in their org using the 2X report.

2       Q.  Would they be able to see, that is someone in

3  E7+ band, would they be able to see the reports

4  concerning not only their direct reports but the

5  employees who were lower down in the system?

6       A.  We would provide guidance, but manager +1 would

7  need to review and approve the recommendation.

8       Q.  Well, these reports were provided, though, for

9  the entire organization to E7+ vice presidents, were they

10 not?

11      A.  So, again, as I've mentioned, every leader

12 managed this process slightly differently.  So in some

13 cases, they potentially would have seen the details for

14 their whole organization.  In other cases, the

15 information they would have seen would have been in

16 summary or trends format.

17      Q.  A vice president in the E7+ could have seen

18 their reports for everyone in their organization; is that

19 accurate?

20      A.  What I can say is that they have the ability to

21 see their direct report -- if they are a manager +1, they

22 have the ability to see their direct reports and their

23 manager's direct reports.  Whether or not they were able

24 to see the entire organization, I can't speak to off the

25 top of my head for 2015.

Beovich Walter & Friend

1-800-541-4452              503-228-7201              www.bwfreporters.com

Goldtstein Decl. Ex. 17, Page 98 of 120



1(213) 683-6169
danielprince@paulhastings.com

March 30, 2021

**VIA E-MAIL**

Hon. Jolie A. Russo
United States Magistrate Judge
Mark O. Hatfield United States Courthouse
Room 1027
1000 S.W. Third Avenue
Portland, Oregon  97204
(gary_magnuson@ord.uscourts.gov)

Re:    *Cahill et al. v. Nike, Inc.*, Case No. 3:18-cv-01477-JR

Dear Judge Russo:

Defendant Nike, Inc. ("Nike") submits this letter in response to Plaintiffs' March 23,

2021 letter seeking to compel Nike to produce witnesses on certain Rule 30(b)(6) deposition

topics.

## I.    INTRODUCTION

Nike has worked diligently throughout the deposition period to identify, prepare, and

designate witnesses to testify on Plaintiffs' dozens of topics and numerous subtopics, affording

Plaintiffs with nearly **80 hours of testimony**.  Plaintiffs' protests to the contrary are specious.

Plaintiffs appear to suggest that Nike is at fault for failing to show up for Rule 30(b)(6)

depositions on certain topics.  But Plaintiffs' suggestion ignores Nike's "substantial

responsibilities and burdens" under Rule 30(b)(6) to identify and designate witnesses, and "more

importantly, prepare them so that they may give complete, knowledgeable and binding answers

on behalf of the corporation."  *Memory Integrity, LLC v. Intel Corp.*, 308 F.R.D. 656, 661 (D.

Paul Hastings LLP  |  515 South Flower Street  |  Twenty-Fifth Floor  |  Los Angeles, CA 90071
t: +1.213.683.6000  |  www.paulhastings.com



Hon. Jolie A. Russo
March 30, 2021
Page 2

Or. 2015). As discussed below, Plaintiffs' noticed Topics are not amenable to (or appropriate for) Rule 30(b)(6) testimony because they are unduly burdensome and overly broad in scope. For example, in response to Plaintiffs' demand for a corporate designee on Nike's organizational structures, Nike cannot possibly identify and prepare a witness or witnesses to testify as to all reporting lines for the approximately 1,300 Covered Positions (as Plaintiffs have defined their proposed class and collective) since July 2012. It is not possible for a human to memorize this type of information. As such, Plaintiffs' demand that Nike simply produce a witness to testify on the topic, only for the witness to inevitably respond "I don't know" to Plaintiffs' questions, puts Nike in an impossible position of trying to prepare a Rule 30(b)(6) witness on a topic no person could know.

To this end, Plaintiffs' attempt to equate their individual depositions under Rule 30(b)(1) with the depositions of Nike's corporate representatives under Rule 30(b)(6) is an apples to oranges comparison that misses the mark. Specifically, for Plaintiffs' individual depositions, they were only called to testify about their personal knowledge which should have required little, if any, preparation. By contrast, Rule 30(b)(6) depositions are necessarily a much more involved process, requiring Nike to identify and prepare (and as appropriate, educate) witnesses to testify on *Nike's* behalf. Plaintiffs' insistence that Nike should have accepted their Topics without consideration of how their Topics practically apply to witnesses' testimony misapprehends the requirements of the Rule. In other words, producing a Rule 30(b)(6) witness is not simply a matter of picking a date on a calendar, as Plaintiffs appear to suggest.



Hon. Jolie A. Russo
March 30, 2021
Page 3

With this in mind, Nike addresses the substantive portions of Plaintiffs' Letter below.

II.    **PLAINTIFFS' REQUEST FOR A CORPORATE WITNESS ON NIKE'S ORGANIZATIONAL STRUCTURES IS NOT AN APPROPRIATE RULE 30(b)(6) TOPIC NOR RELEVANT AND PROPORTIONAL TO CLASS CERTIFICATION**

First, the Court should deny Plaintiffs' request for an ***additional*** Rule 30(b)(6) witness on Nike's "organizational structure" (Letter pp. 8-10) for several key reasons.

As a threshold matter, and as Plaintiffs admit in Footnote 4 of their Letter, Nike's witnesses have already testified on (or, to the extent Plaintiffs failed to ask them relevant questions, were available to testify on) Nike's organizational structure in its Total Rewards (Compensation), Human Resources, Employee Relations, and Global Investigations departments for approximately **60 hours** of Rule 30(b)(6) depositions (out of **80 total hours** of deposition time) that Plaintiffs have conducted to date.  The below chart shows each relevant witness with their corresponding topics and deposition times:

| Witness | Designation Regarding Organizational Structure | Total Deposition Time |
|---|---|---|
| Shane Walker | "The organizational structure of Nike's compensation department, for the time period 2015 to present." | **18 hours and 46 minutes** (3 days)<br><br>December 17, 18, and 21, 2020 |
| Alison Daugherty | "With respect to Nike WHQ, the organizational structure of Nike's Human Resources, Employee Relations, and Global Investigations departments (March 2017 – present)."<br><br>"The organizational structure, responsibilities, and authority of Nike's | **13 hours and 3 minutes** (2 days)<br><br>January 8 and February 5, 2021 |



Hon. Jolie A. Russo
March 30, 2021
Page 4

| | | |
|---|---|---|
| | Human Resources Department at Nike WHQ related to workplace complaints (March 2017 – present)." | |
| Kendra Pryce | "With respect to Nike WHQ, the organizational structure of Nike's Global Investigations department (July 2015 – present)." | **3 hours and 25 minutes** (1 day)<br><br>February 11, 2021 |
| Treasure Heinle | "The organizational structure, responsibilities, and authority of Nike's Human Resources Department at Nike WHQ related to performance evaluations, potential appraisals, and non-competitive promotions and/or job transfers, for the time period 2015 to present." | **7 hours and 59 minutes** (1 day)<br><br>March 16, 2021 |
| Cory Gillespie | "With respect to Nike WHQ, the organizational structure of Nike's Employee Relations department (July 2015 – February 2017)."<br><br>"The organizational structure, responsibilities, and authority of Nike's Employee Relations Department at Nike WHQ related to workplace complaints (July 2015 – February 2017)." | **7 hours 30 minutes** (1 day)[1]<br><br>March 25, 2021 |
| Shine Thomas | "The organizational structure, responsibilities, and authority of Nike's Human Resources Department at Nike WHQ related to competitive promotions and/or job transfers, for the time period 2015 to present." | **8 hours** (1 day)<br><br>March 26, 2021 |

---

[1] With respect to the total deposition time of Mss. Gillespie and Thomas, Nike has estimated the total time based on their rough deposition transcripts because the final versions have not yet been circulated by Plaintiffs' court reporter.



Hon. Jolie A. Russo
March 30, 2021
Page 5

Additionally, on February 22, 2021, Plaintiffs deposed Nike's Chief Human Resources Officer in her personal capacity for **7 hours and 44 minutes**.  In sum, Plaintiffs have deposed Nike witnesses who were designated/available to testify on organizational structure for relevant departments at Nike WHQ for the **nearly 70 hours**.[2]  In two instances, Nike made their witnesses (Mr. Walker and Ms. Daugherty) available for additional days of deposition in excess of the one-day, seven-hour time limit set forth in the Federal Rules.  *See* Fed. R. Civ. P. 30(d)(1); *see also* Fed. R. Civ. P. 30, Advisory Committee Note (2000 Amendments) ("For purposes of this durational limit, the deposition of each person designated under Rule 30(b)(6) should be considered a separate deposition").[3]  And, as Plaintiffs cannot refute, Nike's Total Rewards, Human Resources, Employee Relations, and Global Investigations departments are those "critical to an [sic] understanding the manner by which Nike makes decisions concerning promotion, compensation and other employment decisions and the manner by which policies and practices are monitored and implemented" — the key policies and practices at issue in this case. (Letter p. 9.)  Thus, Plaintiffs have obtained discovery on the organizational structures for the departments at Nike WHQ that are relevant and proportional to their anticipated motion for class certification.  Nothing further is warranted.

---

[2] This calculation does not include Nike's Rule 30(b)(6) witness Shelli White, who was not designated on organizational structure but whom Plaintiffs deposed on various compensation-related topics for **7 hours and 21 minutes** on January 29, 2021.

[3] The Parties agreed to extend the Rule 30(d)(1) time period to eight hours per day to account for potential technological issues with virtual depositions.



Hon. Jolie A. Russo
March 30, 2021
Page 6

Despite this, Plaintiffs assert that Nike should designate, prepare, and produce a Rule

30(b)(6) witness to testify on "organizational structure and reporting lines" for — evidently —

each and every "Covered Position" in their putative class and collective (as Plaintiffs have

defined them), including the identities of all individuals in every reporting line at any given time

since July 2012.  (Letter pp. 8-9.)[4]  This is an impossible task and wholly unsupported by the

Federal Rules.  There are more than **1,300 job codes, 100 job families, and 200 sub-families**

that are possibly relevant in this litigation.  Within those job codes, job families, and sub-

families, there are approximately **13,400 current and former employees** (including putative

class/collective members and their alleged comparators).  Added to this, Nike WHQ is composed

of dozens of business units and hundreds of teams, and their organizational structures change

regularly through the ordinary course of employee hiring, promotion, and departure, in addition

to periodic reorganizations based on business needs.  And, because every Nike business unit

operates differently, each unit and team within those units have unique organizational structures.

Nike could not possibly designate and prepare a witness — or multiple witnesses, even ones with

strong memories — that could satisfy Nike's "substantial responsibility" to "identify and prepare

---

[4] Plaintiffs' Topic 1, which they quote in their Letter, purports to seek testimony on the "meanings" and "Impacts" of reporting lines.  (Letter p. 8.)  It is unclear what Plaintiffs mean by these terms, and Plaintiffs have offered no clarification in their Letter.  For this and other reasons, Plaintiffs' Topic 1 fails to comply with Rule 30(b)(6) in that it fails to "describe with reasonable particularity the matters for examination."  *See, e.g., Memory Integrity, LLC v. Intel Corp.*, 308 F.R.D. 656, 661 (D. Or. 2015) (noting that, under Rule 30(b)(6), "the requesting party must take care to designate, ***with painstaking specificity***, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute") (emphasis in original and added).



Hon. Jolie A. Russo
March 30, 2021
Page 7

its witnesses 'so that they may give complete, knowledgeable and binding answers on behalf of the corporation.'" *United States v. HVI Cat Canyon, Inc.*, No. CV 11-5097 FMO (SSx), 2016 U.S. Dist. LEXIS 200353, at *18-19 (C.D. Cal. Oct. 26, 2016) (further explaining that "[t]opics should be drafted in accordance with the widely-recognized understanding that Rule 30(b)(6) is not designed to be a memory contest") (quoting *Sprint Communs. Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006)); *see also Dealer Comput. Servs. v. Curry*, 2013 U.S. Dist. LEXIS 18315, at *7-8 (S.D.N.Y. Feb. 7, 2013) (agreeing that plaintiff's Rule 30(b)(6) topic calling for testimony on the "identity, position, and title of each officer, director, and employee of all corporate defendants over a seven-year period" was inappropriate, explaining "[a] deposition is not a quiz"); *Apple Inc. v. Samsung Elecs. Co.*, No. C 11-1846 LHK (PSG), 2012 U.S. Dist. LEXIS 9921, at *13-14 (N.D. Cal. Jan. 27, 2012) (explaining that Rule 30(b)(6) does not permit "burdening the responding party with production and preparation of a witness on every facet of the litigation. . . . This would render unworkable the obligation of the responding party"). As a result, Plaintiffs' request for further testimony on Nike's "organizational structure" is an inappropriate topic for a Rule 30(b)(6) deposition, and on that basis alone, the Court should deny it.

Further, if it were even possible for Nike to prepare a witness or witnesses to testify on "organizational structures" at WHQ since July 2012 (which it is not), it would be unduly burdensome for Nike to do so, and the resulting deposition would be inefficient and unproductive for the reasons described above. *See* Fed. R. Civ. P. 1 (requiring the court and the



Hon. Jolie A. Russo
March 30, 2021
Page 8

parties to construe and administer the Federal Rules "to secure the just, speedy, and inexpensive

determination of every action and proceeding").  Plaintiffs fail to explain what benefit, if any,

would outweigh the immerse burden that their request would impose.  Nor do Plaintiffs

specifically explain — besides conclusory assertions about "commonality" — how testimony on

the identities of all individuals in every reporting line at WHQ at any given time since July 2012

is relevant and necessary for their anticipated class certification motion.  *See, e.g., Makaneole v.*

*SolarWorld Indus. Am., Inc.*, No. 3:14-CV-1528-PK, 2016 U.S. Dist. LEXIS 182243, at *52 (D.

Or. Sep. 2, 2016) ("At the pre-class certification stage, discovery in a putative class action is

generally limited to certification issues: e.g., the number of class members, the existence of

common questions, the typicality of claims, and the representative's ability to represent the

class.") (quoting *Dysthe v. Basic Research, L.L.C.*, 273 F.R.D. 625 (C.D. Cal. 2011) and citing

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978)); *see also Walker v. Alta Colls., Inc.*,

No. A-09-CV-894-LY, 2010 U.S. Dist. LEXIS 67153, at *24 (W.D. Tex. July 6, 2010) (denying

motion to compel "[b]ecause this discovery does not go to the question of whether a class can be

certified").  And here, Nike has provided Plaintiffs with substantial discovery on organizational

structure and reporting lines already.[5]

---

[5] In addition to the nearly **80 hours** of depositions that Plaintiffs have taken so far, Nike has also produced reporting lines through its data, as well as a high-level organizational chart of its Human Resources department, which it especially prepared for Ms. Daugherty to use during her deposition if she needed it.  *See* Nike's March 15, 2021 opposition and March 19, 2021 sur-reply to Plaintiffs' March 1, 2021 letter motion to compel.



Hon. Jolie A. Russo
March 30, 2021
Page 9

For all of these reasons, Plaintiffs' request is not proportional to the pre-certification
needs of this case, placing it firmly outside the bounds of Rule 26. *See* Fed. R. Civ. P. 26(b)(1);
*see also* Fed. R. Civ. P. 26, Advisory Committee Note (2015 Amendments) ("The parties and the
court have a collective responsibility to consider the proportionality of all discovery and consider
it in resolving discovery disputes."); *HVI Cat Canyon*, 2016 U.S. Dist. LEXIS 200353, at *12
("The revisions to Rule 26 make clear that the right to discovery, even plainly relevant
discovery, is not limitless."); *City of N.Y. v. FedEx Ground Package Sys.*, 2016 U.S. Dist. LEXIS
56553, at *15 (S.D.N.Y. Apr. 27, 2016) ("A Rule 30(b)(6) deposition notice, like other forms of
discovery, is subject to the limitations under Rule 26."). As a result, in accordance with Rule 26,
the Court should deny Plaintiffs' request.

### III.    PLAINTIFFS FAIL TO DEMONSTRATE WHY TESTIMONY ON 2X PAY REVIEW OUTSIDE OF THE STATUTORY PERIOD IS RELEVANT AND PROPORTIONAL TO CLASS CERTIFICATION

Next, Plaintiffs ask Nike to produce a Rule 30(b)(6) designee on "2X Pay Policies and
Practices Prior to 2015." (Letter pp. 10-12.) Plaintiffs have failed to demonstrate why testimony
on Nike's 2X Pay Review during the time period 2012-2014 is relevant and proportional to class
certification issues here, as is their burden. *Makaneole*, 2016 U.S. Dist. LEXIS 182243, at *52.
The Court should deny their request.

Briefly, as background, Nike's 2X Pay Review was one part of its base pay management
process, which occurred on a yearly cycle. Specifically, 2X Pay Review gave managers the
opportunity to review their employees' base pay at certain points during the fiscal year and apply



Hon. Jolie A. Russo
March 30, 2021
Page 10

targeted pay increases where appropriate based on a number of different factors, which could

include an employee's position to market, sustained performance, time in job, and available

budget.  Nike employees who received a 2X Pay "award" as part of the Review received a one-

time lump increase to their base salaries.[6]  Not all employees were eligible for such awards when

the 2X Pay Review occurred, and not all employees who were eligible for such awards received

them — as Plaintiffs describe in their Letter.  (Letter p. 11.)  Nike designated Mr. Walker to

testify on 2X Pay Review during the time period **2015-present**, and Mr. Walker testified on the

topic during the **18 hours and 46 minutes** in which Plaintiffs deposed him.  (*Id.* at pp. 10-11.)

Despite this, Plaintiffs now demand a Rule 30(b)(6) deponent on 2x Pay Review from

2012-2014 — *before* the statutory period at issue in this case.[7]  Plaintiffs provide no specific,

colorable reason why such testimony is relevant and proportional to class certification issues,

other than asserting on a conclusory basis that 2X Pay Review is "relevant."  (*Id.* at p. 11.)  Nike

also has not identified a witness with knowledge of 2X Pay Review during the 2012-2014 time

period, and it would be unduly burdensome for Nike to even attempt to educate a Rule 30(b)(6)

---

[6] For the avoidance of doubt, Plaintiffs have this information through Nike's data production.
[7] Again, the earliest statutory period for Plaintiffs Cahill and Johnston's (and opt-in Plaintiffs
Phillips and Cheng's) EPA claims only is **August 9, 2015**: three years from the date when Cahill
and Johnston filed the original complaint in this case and when Cahill, Johnston, Phillips, and
Cheng filed their consents to join the collective. Dkt. # 1 3.  For all other named Plaintiffs and
opt-in Plaintiffs, the maximum statutory period for their EPA claim will be three years from the
date that they file their consent to join the collective which, in any event, will be after August 9,
2015.  As to Plaintiffs' Title VII and Oregon state law claims, the statutory period is much
shorter.  As Plaintiffs acknowledge in their FAC; the class period for their proposed Title VII
class begins, at the earliest, October 11, 2017, and the class period for their proposed ORS class
begins, again at the earliest, **August 9, 2017**.  FAC ¶ 176.



Hon. Jolie A. Russo
March 30, 2021
Page 11

based solely on the documentation from that time period — especially given that there is limited, if any, benefit that such testimony would provide at this stage.  In such case, courts have limited Rule 30(b)(6) testimony to the applicable statutory period, and the Court should do so here.  *See, e.g., Uschold v. Carriage Servs*., No. 17-cv-04424-JSW (EDL), 2019 U.S. Dist. LEXIS 230037, at *4 (N.D. Cal. Jan. 22, 2019) (in employment class action, agreeing that Rule 30(b)(6) topics "should be limited at the very least to the class period and [defendant's] California locations and employees"); *see also Arenas v. Unified Sch. Dist. No. 223*, No. 15-CV-9359-JWL-TJJ, 2016 U.S. Dist. LEXIS 143338, at *18 (D. Kan. Oct. 17, 2016) (holding that "to avoid unnecessary burden and expense," a witness's testimony should be limited to the applicable statute of limitations); *Greene v. Sears Prot. Co.*, No. 15 C 2546, 2017 U.S. Dist. LEXIS 43810, at *14 (N.D. Ill. Mar. 27, 2017) ("This Court agrees . . . that plaintiffs have provided no compelling argument that discovery going back earlier than [the applicable statute of limitations] is warranted."); *Wilson v. MRO Corp.*, No. 2:16-CV-05279, 2017 U.S. Dist. LEXIS 18967, at *5 (S.D. W.Va. Feb. 10, 2017) ("In view of the applicable limitations period for Plaintiffs' claims, and considering that the scope of discovery must be proportional to the needs of the case," the court limited the timeframe for discovery.).

Plaintiffs' cited cases are inapposite.  In *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012), the court addressed whether the plaintiffs' expert could use pre-statute of limitations ***data*** to demonstrate a disparity in promotions, and observed that "statistical studies



Hon. Jolie A. Russo
March 30, 2021
Page 12

*may* include *data* from outside the statute of limitations." *Id*. at 528 (emphasis added).[8]  Further,

*Ellis* is distinguishable because it only concerned a class of 700 members holding "two closely-

related" positions sharing "a uniform job description across the class."  *Id.* at 509; *see Kassman*

*v. KPMG LLP*, No. 11 Civ. 3743 (LGS), 2018 U.S. Dist. LEXIS 203561, at *53-54 (S.D.N.Y.

Nov. 30, 2018) (discussing the limited applicability of *Ellis* to a 10,000-person class action

"cover[ing] a myriad of job descriptions"); *Moussouris v. Microsoft Corp.*, No. C15-1483JLR,

2018 U.S. Dist. LEXIS 112792, at *57-58 (W.D. Wash. June 25, 2018) (distinguishing *Ellis*

from an 8,600-person class action that "covers a myriad of positions").  Likewise, *Butler v.*

*Home Depot, Inc.*, No. C-94-4335 SI, 1997 U.S. Dist. LEXIS 24913 (N.D. Cal. Apr. 23, 1997)

only concerned a motion to exclude limited "sexual harassment" evidence from trial (*i.e.*, well

after a class had been certified).  *Id.* at *9.  The court found it was premature to rule "without

knowing if or in what context plaintiffs intend to introduce such evidence," since the court could

not "properly apply the factors articulated in [FRE] 403." *Id.* at *10 n.3.

Finally, Plaintiffs' (continued) reliance on the Fair Pay Act ("FPA") is unavailing and

appears to be based on a misapprehension of that law.  *See, e.g., Holloway v. Best Buy Co.*, 2009

U.S. Dist. LEXIS 50994, at *24-25 (N.D. Cal. May 28, 2009) (rejecting plaintiff's proposal that

the FPA allowed the court to consider claims outside of Title VII statute of limitations period).

As the *Holloway* court explained, the FPA simply alleviated the need to look to starting salary as

the basis for a Title VII gender discrimination claim based on pay (which was oftentimes outside

---

[8] As discussed in prior briefing, Nike has produced data from July 2012 (three years prior to the start of the earliest statutory period for certain Plaintiffs' EPA claims).



Hon. Jolie A. Russo
March 30, 2021
Page 13

the limitations period and therefore time-barred; *see Ledbetter v. Goodyear Tire Rubber Co.*, 550

U.S. 618 (2007)).  The FPA did not extend the statutory period for fair pay claims, nor did it

bring employment decisions made outside of the statutory period within it:

> The FPA establishes that the unlawful employment practice is the payment of a
> discriminatory salary, not necessarily the original setting of the pay level
> (although that can be discriminatory as well).  While the FPA [did] change the
> definition of when an "unlawful employment practice occurs, with respect to
> discrimination in compensation;" and also permits a victim of discrimination who
> files a timely EEOC charge as to at least one instance of pay discrimination to
> recover back pay for pay discrimination that occurred during the two years
> preceding the filing of the charge, if such preceding discrimination is "similar or
> related to" the practice that is the subject of the timely-filed charge, nothing in the
> FPA otherwise modifies the limitation period during which a charge must be
> filed.

*Holloway*, 2009 U.S. Dist. LEXIS 50994, at *24-25.  Thus, compensation decisions that occurred

outside of the class and collective period are irrelevant to Plaintiffs' pay claims; what matters is

how employees are paid **during** the liability period, and Plaintiffs have all of that information —

and more — at their disposal.  *See Peterson v. Alaska Communs. Sys. Grp., Inc.*, 2020 U.S. Dist.

LEXIS 218352, at *6 (D. Ala. Nov. 22, 2020) ("The court has an obligation to prevent a party

from using a Rule 30(b)(6) deposition to harass the opposing party or to subject the opposing

party to unreasonably burdensome or cumulative discovery.").  For all of these reasons, the

Court should deny Plaintiffs' request.



Hon. Jolie A. Russo
March 30, 2021
Page 14

**IV.    PLAINTIFFS' REQUEST FOR A CORPORATE WITNESS ON NIKE'S COMPLIANCE WITH THE UNIFORM GUIDELINES IS NOT AN APPROPRIATE RULE 30(b)(6) TOPIC AND PREMATURE AT THIS STAGE OF THE LITIGATION, IN ANY EVENT**

Plaintiffs also seek a Rule 30(b)(6) designee about "Nike's compliance or lack of compliance with the Uniform Guidelines," — referring to the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.1 *et seq.* (1978).  (Letter pp. 4-5.)  The Court should foreclose testimony on this topic as well.

"The primary purpose of the Guidelines is to indicate the standards that various Federal agencies, such as the EEOC, the Civil Service Commission, and the Department of Justice are to use in enforcing Title VII and related statutes." *Guardians Asso. of N.Y.C. Police Dep't, Inc. v. Civil Serv. Com.*, 630 F.2d 79, 91 (2d Cir. 1980).  "But the fact that an agency or group of agencies has announced the standards they will use does not convert those standards into mandatory legal rules".[9] *Id.*  As Plaintiffs readily admit, the Guidelines are "not mandatory" — they are not law.  *Contreras v. Los Angeles*, 656 F.2d 1267, 1281 (9th Cir. 1981); *see also Clady v. Cty. of L.A.*, 770 F.2d 1421, 1428 (9th Cir. 1985) ("The Uniform Guidelines are not legally binding.  They have not been promulgated as regulations and do not have the force of law.").

---

[9] *See also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 449 (1975) (Blackmun, J., concurring) (noting that the Guidelines "have never been subjected to the test of adversary comment.  Nor are the theories on which the Guidelines are based beyond dispute"); *EEOC v. Freeman*, 288 F.R.D. 92, 97 (D. Md. 2012) (EEOC deponent described how the Guidelines "provide[] guidance as to the Commission's views of how it will enforce the law in these particular circumstances should the employer be subject to a charge involving these circumstances").



Hon. Jolie A. Russo
March 30, 2021
Page 15

Assuming, *arguendo*, that the Guidelines are relevant and applicable here, the question of whether Nike's employment selection procedures comply with the Guidelines calls for legal analysis and/or conclusions, rendering it an inappropriate topic for a Rule 30(b)(6) deposition. *See, e.g.*, *Zeleny v. Newsom*, No. 17-cv-07357-RS (TSH), 2020 U.S. Dist. LEXIS 100944, at *6-7 (N.D. Cal. June 9, 2020) (explaining that a "[Rule] 30(b)(6) deposition is not an appropriate vehicle for taking discovery into legal contentions"); *Lenz v. Universal Music Corp*, No. C 07-03783 JF (PVT), 2010 U.S. Dist. LEXIS 47873, at *7 (N.D. Cal. Apr. 20, 2010) (denying plaintiff's motion to compel Rule 30(b)(6) designee, explaining "[t]he court agrees with defendant and finds that topic no. 8 seeks testimony regarding [defendant's] legal conclusions. Plaintiff is asking for testimony that forms the basis of defendant's 'belief' regarding infringement and fair use.  The facts that form those 'beliefs' are legal conclusions and an improper topic for a Rule 30(b)(6) deposition").

In the same vein, Plaintiffs' assertion that the Guidelines are relevant "in determining whether an employer has met the Title VII affirmative defense standard" for a disparate impact claim (Letter p. 13) underscores why the topic is disproportional to the pre-certification needs of this case.  *See Makaneole*, 2016 U.S. Dist. LEXIS 182243, at *52.  Namely, whether Nike can establish any affirmative defenses to disparate impact liability (assuming Plaintiffs can even sustain their *prima facie* burden) is a merits question and, therefore, premature at this stage of the litigation.  *See, e.g.*, *Ingersoll v. Farmland Foods, Inc.*, No. 10-6046-CV-SJ-FJG, 2011 U.S. Dist. LEXIS 31872, at *16-18 (W.D. Mo. Mar. 28, 2011) (granting defendant's motion for



Hon. Jolie A. Russo
March 30, 2021
Page 16

protective order, agreeing that Rule 30(b)(6) topics "ask[ed] for prohibited legal conclusions

[and] relate[d] to potential defenses" which were "irrelevant to class certification issues"); *see*

*also Cooper v. Charter Communs., Inc.*, No. 3:12-cv-10530-MGM, 2016 U.S. Dist. LEXIS

3651, at *7 (D. Mass. Jan. 12, 2016) ("[A] lay witness should not be expected to testify as to how

any such facts form the basis of a legal affirmative defense.  [D]epositions, including 30(b)(6)

depositions, are designed to discover facts . . . not legal theories[.]") (alteration in original).

    Finally, to the extent Plaintiffs assert they seek underlying "facts" as to Nike's

compliance with the Guidelines, Nike has produced documents regarding its compensation,

promotion, and performance evaluation policies, and has designated Rule 30(b)(6) witnesses on

the topics as well (which Plaintiffs do not and cannot refute).  *See, e.g., In re Independent Serv.*

*Org. Antitrust Litig.*, 168 F.R.D. 651, 654 (D. Kan. 1996) (granting protective order where

plaintiff's attempt to discover facts underlying defendant's defenses and counterclaims through

a Rule 30(b)(6) deposition was "overbroad, burdensome, and a highly inefficient method through

which to obtain otherwise discoverable information").  And in addition, as Nike has informed

Plaintiffs numerous times, it is unaware of any "validation studies" from January 2010-present

— making it impossible for a Nike corporate witness to testify in this regard.  *See, e.g., Bigsby v.*

*Barclays Capital Real Estate, Inc.*, 329 F.R.D. 78, 81 (S.D.N.Y. 2019) ("If [defendant] does not

possess knowledge of the matters listed in the deposition notice, then its obligations under Rule

30(b)(6) obviously cease, since the rule requires testimony only as to matters known or

reasonably available to the organization.") (internal quotation marks omitted); *Mitchell v. Atkins*,



Hon. Jolie A. Russo
March 30, 2021
Page 17

No. 3:19-cv-5106-RBL, 2019 U.S. Dist. LEXIS 203464, at *4 (W.D. Wash. Nov. 22, 2019*)*

("[A]n organization has no obligation under Rule 30(b)(6) to testify as to matters it cannot

reasonably gain knowledge of.").[10]   The Court should deny Plaintiffs' request.

## V.    NIKE HAS DESIGNATED WITNESSES TO TESTIFY ABOUT JOB DESCRIPTIONS; IT IS UNCLEAR WHAT FURTHER TESTIMONY PLAINTIFFS SEEK

Plaintiffs also ask the Court to compel a Rule 30(b)(6) witness on "job descriptions."

(Letter pp. 7-8.)  But as Plaintiffs admit in Footnote 3 of their Letter, Nike *has* designated Rule

30(b)(6) witnesses to testify on job descriptions, and those witnesses testified for approximately

**8 hours each** on March 16 and March 26, 2021, respectively.  As Plaintiffs further admit, Nike

has informed them that it was working to identify a deponent on any remaining aspects of "job

descriptions" — for which Plaintiffs continue to press Nike without any clarification or

explanation as to what specific testimony they believe is outstanding.  This has made it difficult

for Nike to identify and prepare (or educate, as appropriate), a corporate witness on the

extremely broad topic of "job descriptions."  Plaintiffs point to Topic 4[11] in the Rule 30(b)(6)

deposition notice, which calls for testimony on "Job Descriptions for ***Any Covered Position***,

Including formation, uses, review, Related Policies and Practices, And use, if Any, of a Job

Analysis."  (*Id.* at Ex. A (emphasis added)).  Again, there are 1,300 job codes at issue in this

litigation, and Nike has produced over 1,800 job descriptions — as Plaintiffs note.  Nike has also

produced job descriptions as set forth in requisitions through the 1.1 million Taleo data records

---

[10] As Nike has similarly communicated to Plaintiffs, it is unaware of any job analyses.
[11] Plaintiffs incorrectly identify this as the "third topic" in their Notice.  (*Id.* at p. 7.)



Hon. Jolie A. Russo
March 30, 2021
Page 18

produced to Plaintiffs.  It would be unduly burdensome, and frankly impossible, for Nike to

prepare a witness or multiple witnesses to speak to the "formation, uses, [and] review" of each

one of them since 2012, as contemplated by Plaintiffs' Topic 4.  Perhaps Plaintiffs only seek a

corporate deponent on the formation and use of job descriptions in general.  But for purposes of

preparing and producing a Rule 30(b)(6) designee, Nike cannot just assume that is the case.  As

such, Nike proposes that the Parties meet and confer about what specific testimony Plaintiffs

believe they need, and Nike will work to identify and prepare an appropriate deponent in that

regard, if Plaintiffs will agree on a reasonable subset of information requested.

## VI. CONTINUED MEET AND CONFER CORRESPONDENCE IS THE APPROPRIATE METHOD TO RESOLVE ANY OUTSTANDING QUESTIONS PLAINTIFFS OR THEIR EXPERT HAVE ABOUT NIKE'S DATA

At the end of their Letter, Plaintiffs note that they "continue to meet and confer in good

faith in hopes that a suitable alternative can be agreed upon by the Parties" regarding Plaintiffs'

alleged outstanding questions regarding Nike's data.  (Letter p. 16.)  Plaintiffs further note that

they raise the issue to "preserve their ability to obtain 30(b)(6) testimony about data if those

efforts fail."  (*Id.*)[12]  Nike agrees that continuing to meet and confer via letter is the best, most

conducive method to resolve outstanding questions Plaintiffs or their experts may have about

Nike's data.  A Rule 30(b)(6) deposition would prove inefficient and unproductive.

---

[12] By Plaintiffs' statements in their Letter, Nike understands that Plaintiffs are seeking a dialogue on this issue as opposed to affirmative relief from the Court.  To the extent Plaintiffs change their position in any subsequent briefing, Nike reserves the right to submit a fulsome response in kind, including but not limited to the fact that Plaintiffs' Topics 32 and 33 do not comply with the specificity requirements of Rule 30(b)(6) and seek impermissible "discovery on discovery."



Hon. Jolie A. Russo
March 30, 2021
Page 19

To date, many of Plaintiffs' plentiful questions about Nike's data have centered on complex, hyper-technical minutiae and required Nike to spend considerable time and effort running to ground issues that, in many cases, appear in just 5% of the observations (and nevertheless, Nike has endeavored to respond to Plaintiffs' inquiries to the best of its ability).  In the context of a Rule 30(b)(6) deposition, Nike could not adequately prepare a witness or witnesses to answer to such questions in real time.  To even attempt to do so, Nike would bear the burden of preparing multiple witnesses for multiple days of testimony, and those witnesses will likely need to research or consult among several persons to ensure accurate testimony in responding to Plaintiffs' questions, which are collateral to Nike's data production.  Again, a Rule 30(b)(6) deposition is not designed to be a memory contest, and Rule 26(b)(1) requires discovery to be proportional to the needs of the case considering, among other factors, "whether the burden or expense of the proposed discovery outweighs its likely benefit."  In light of these standards and Rule 1, which counsels for "the just, speedy, and inexpensive determination of every action and proceeding," a Rule 30(b)(6) deposition on Nike's data production is not the answer.

Nor would an informal "joint expert" call, as Plaintiffs have proposed, be an economical way of resolving Plaintiffs' remaining questions about Nike's data.  To the contrary, this approach would similarly be unproductive, inefficient, and create more problems than solutions. In effect, it would be a deposition without the formalities and, for Nike, the protections.  The Parties would need to agree on any number of issues ahead of time, such as how long the call would last and how many/what types of questions Plaintiffs would ask (assuming Plaintiffs



Hon. Jolie A. Russo
March 30, 2021
Page 20

would adhere to the scope of those questions, which they have failed to do in every single one of

the Rule 30(b)(6) depositions).  This will likely lead to impasse.  Even if the "call" occurred,

Nike's internal database person(s) in attendance would need to consult with others and research

answers to Plaintiffs' complex, hyper-technical questions before responding.  This would result

in an inordinate amount of downtime between question and response, and waste of the Parties'

resources.  And as Plaintiffs accurately note, that the call would need to be "followed by a

memorialization of information confirmed," which would no doubt lead to disagreements about

what Nike's data persons did or did not say, and how they said it.  Overall, an "informal joint

expert call" would prove unworkable in this case.

      For these reasons, Nike believes that the most efficient solution is to continue the Parties'

current course: Nike will respond to remaining questions from Plaintiffs or their experts, which

are reasonable and proportional in scope and number, via letter.

## VII.    PLAINTIFFS FAILED TO MEET AND CONFER WITH NIKE ABOUT THEIR REQUEST FOR AN EXTENSION, WHICH THE COURT SHOULD DENY

      Finally, the Court should deny Plaintiffs' request for a 45-day extension of discovery for

fact witness depositions and adjustments of corresponding deadlines.  (Letter p. 16.)  As Nike

noted in its March 23, 2021 email to the Court responding to Plaintiffs' Letter, Plaintiffs failed to

meet and confer with Nike about their request *at all* before submitting it to the Court.  *See* Fed.

R. Civ. P. 37(a)(1); L.R. 7-1(a)(1)(A).  This is not the first time that Plaintiffs have disregarded

the Rules in this respect.  *See, e.g.,* Nike's March 19, 2021 sur-reply to Plaintiffs' March 1, 2021

letter motion to compel.  The Ninth Circuit instructs that "[t]he district court has considerable



Hon. Jolie A. Russo
March 30, 2021
Page 21

latitude in managing the parties' motion practice and enforcing local rules that place parameters

on briefing." *Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002); *see, e.g., Alpha*

*Floors, Inc. v. Dyno Exch.*, No. 8:16-cv-932-JLS-JCGx, 2016 U.S. Dist. LEXIS 188940, at *3

(C.D. Cal. Dec. 12, 2016) (striking motion where party failed to follow local rules by

appropriately meeting and conferring with the opposing party before submitting brief to the

court). On this basis, the Court should deny Plaintiffs' request outright.

But even if the Court considers Plaintiffs' request, it should deny it because there are few,

if any, outstanding Rule 30(b)(6) topics for which Nike can appropriately designate a witness.

Alternatively, to the extent the Court grants Plaintiffs' request in any respect, Nike submits that

the extension should be solely for purposes of scheduling remaining depositions that Plaintiffs

have already noticed. The extension should not be carte blanche for Plaintiffs to pursue any new

depositions that they failed to notice since the deposition period commenced on November 2,

2020, which Plaintiffs knew about since at least September 25, 2020. (Dkt. # 116.)

## VIII.   CONCLUSION

For all of the foregoing reasons, Nike respectfully requests that the Court deny Plaintiffs'

March 23, 2021 letter motion in its entirety.

Respectfully submitted,

/s/ Daniel Prince
Daniel Prince (*pro hac vice*)
danielprince@paulhastings.com
Zach P. Hutton (*pro hac vice*)
zachhutton@paulhastings.com
Felicia A. Davis (*pro hac vice*)



Hon. Jolie A. Russo
March 30, 2021
Page 22


feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, California 90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Amy Joseph Pedersen, OSB No. 853958
amy.joseph.pedersen@stoel.com
Kennon Scott, OSB No. 144280
kennon.scott@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, Oregon 97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, INC.