UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

KELLY CAHILL, SARA JOHNSTON,                           3:18-cv-1477-JR
LINDSAY ELIZABETH, and HEATHER
HENDER, individually and on behalf of others
similarly situated,                                    FINDINGS & RECOMMENDATION

                             Plaintiffs,

            v.

    NIKE, INC., an Oregon Corporation,

_____ Defendant.

RUSSO, Magistrate Judge:

        Named plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender bring

this putative class and collective action alleging that defendant Nike systematically discriminates

against them and other similarly situated women at Nike headquarters regarding salary and

promotions.   Plaintiffs move to certify this case as a class action.   Related to the motion to certify,

the parties raise challenges to each other's experts and evidentiary objections.   For the reasons

stated below, plaintiffs' motion to certify should be denied.

Page 1 - FINDINGS & RECOMMENDATION

## ALLEGATIONS

Named plaintiffs bring this action on behalf of the following collective/class members:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed by Nike at any time from three years prior to opting-in through the resolution of this action, in a salaried, corporate position that was or is a lower-level position than Vice-President.

First Amended Complaint (ECF 42) at ¶ 165. Plaintiffs exclude Nike retail store employees, lawyers within Nike's legal department, and employees in Nike's finance and human resources departments. Id. at ¶ 166.

Plaintiffs allege defendant has engaged in systemic sex discrimination against the collective/class members by paying them less than male employees with substantially equal job duties requiring substantially similar skill, effort, and responsibility performed under similar working conditions. Id. at ¶ 167. Plaintiffs also allege defendant has contributed to, and perpetuated, sex-based pay disparities through common policies, patterns, or practices, including, but not limited to, those relating to starting salary and "band level," annual ratings, promotions, performance management policies or practices, centralized decision-making, and a work environment hostile to women. Id. at ¶ 168.

Plaintiffs assert defendant pays lower salaries and promotes women with less frequency than defendant's male employees. Plaintiffs allege those disparities occur because a small group of primarily male decision-makers implement the policies below, patterns, or practices which have an adverse impact on and otherwise discriminate against Class/Collective Members based on their sex:

> First, Nike sets starting pay and other compensation-related terms based, in part, on prior compensation. Around May 2018, Nike stated that it will "remove bias from critical moments of the hiring process by . . . eliminating the collection of candidate

salary history . . . ." The collection of prior compensation history causes women to receive lower starting salaries and other less favorable compensation-related terms.

Second, as part of its annual performance evaluation process, Nike rates each of its corporate employees. The ratings are assigned according to a forced ranking system. Nike utilizes a curve that limits the number of employees at Nike headquarters who can receive ratings in the top two levels. This system causes Class/Collective Members to receive lower ratings than their male colleagues. Lower ratings cause women to receive less compensation, including smaller annual salary increases, lower annual bonuses, and smaller equity distributions. Ratings also affect promotions. Lower ratings preclude promotions whereas higher ratings can lead to promotions.

Third, Nike's budgeting system for finalizing annual salary increases and annual bonuses adversely impacts and otherwise discriminates against women. Each year, Nike creates a set pool of money for each of its organizations that is then used to provide annual salary increases and bonuses. A disproportionately low amount of these budgets is distributed towards women's annual salary increases and bonuses.

Fourth, Nike's Organizational Talent Planning system identifies a disproportionately low number of women for promotional opportunities.

Fifth, Nike has a pattern or practice of channeling women into positions and job assignments that Nike views as less valuable and that are less likely to lead to promotions or increased compensation.

Nike has neither validated nor established the job relatedness of its policies or practices for its systems that determine starting pay, ratings, pay raises, bonuses, equity distributions, and promotions.

Nike has intentionally and willfully discriminated against Class/Collective Members with respect to pay, promotions, and conditions of employment. Two of Nike's most-senior executives – Trevor Edwards (Nike Brand President and the second most senior executive after the CEO from July 2013 to August 2018) and David Ayre (Vice-President in charge of HR from 2007 through July 2017) – caused and reinforced a workplace that was, and continues to be, hostile towards women and that devalues women. The above-described policies or practices reflect Nike's discriminatory intent. In addition, since before the class and collective action periods, Nike has been aware that Class/Collective Members are paid and promoted less than male employees at Nike headquarters. Nike has known that the above-described policies or practices caused women to receive less pay and fewer promotions. Nike has likewise long known that Nike headquarters' workplace is hostile towards and devalues women. For years, women have reported hostility, sexual harassment, and inequality in pay and promotions to Nike's Employee

Relations department, which is the department within Nike Human Resources that is primarily tasked with addressing workplace complaints, and to Nike's Human Resources department ("HR"). Instead of addressing these complaints, HR has reinforced and exacerbated the hostile work environment. Regardless of the evidence, HR has regularly found such complaints unsubstantiated, avoided taking any meaningful corrective or preventive actions, and otherwise failed to act to end either the inequality in pay and promotions or the hostility towards women in the workplace.

Id. at ¶¶ 4, 5-12 (footnotes and parentheticals omitted).

The named plaintiffs are as follows:

- Heather Hender, who had nearly 20 years of engineering experience and a B.S. in Manufacturing Engineering when she started working at Nike in April 2015. She was hired initially as a process engineer II until September 2018 when she was promoted to senior process engineer. Hender filed a sex discrimination charge with the EEOC on November 9, 2018, alleging harm due to defendant's alleged pattern and practice of discrimination with respect to pay and promotions, and received a right to sue notice on November 15, 2018.

- Sara Johnston, who had four years of experience in human resources and analytics along with an M.B.A. when she started working at Nike as a part-time employee in June 2008 in the employee services department. Johnston began working full-time in February 2010 when she was hired as a senior account service representative. In August 2012, Johnston became a junior business systems analyst and then promoted in 2014 to an intermediate business system analyst. In November 2017, Johnston resigned asserting she had fewer promotions than her male counterparts and due to a hostile work environment that defendant refused to cure.

- Kelly Cahill, who had nearly eight years of work experience in marketing, business

development, and advertising, and a B.S. in Sports Marketing, when Nike hired her in November 2012 as an independent contractor in a senior producer position. Nike then hired Cahill as a full-time director in October 2013. On July 26, 2017, Cahill resigned asserting Nike refused to address her complaints of a hostile work environment and discriminatory promotional practices.

- Lindsay Elizabeth, who had nearly four years of experience in product design and a B.F.A. in apparel design when Nike hired her as an independent contractor in March 2015 in a design position. In January 2017, Nike hired Elizabeth as a full-time apparel designer. On August 23, 2018, Elizabeth filed a sex discrimination charge against Nike with the EEOC alleging harm due to defendant's alleged pattern and practice of discrimination with respect to pay and promotions. Elizabeth received a right to sue notice on September 28, 2018. Elizabeth left Nike's employment in October 2018.

Id. at ¶¶ 13-40.

Plaintiffs allege defendant has a disproportionately low number of women in higher level positions. Specifically, plaintiffs allege 71% of Nike's vice presidents are men, 62% of its directors and senior directors are men, with significantly more men making up senior directors. Also, Nike's "band level" ranks influence employees' salaries and bonuses. Plaintiffs assert that, as the band level increases, the percentage of women within that band level decreases. Id. at ¶¶ 53-56.

Plaintiffs allege that despite many and long-standing complaints about male supervisors subjecting women to a hostile work environment and sexual harassment, defendant did not conduct

sexual harassment training for its headquarter employees until March 2018.  Id. at ¶¶ 64-65.

Plaintiffs relate their personal experiences with sexual harassment and hostile working conditions

as well as their formal complaints, and assert the male perpetrators were promoted while they

suffered retaliation.  Id. at ¶¶ 72-90.

Plaintiffs allege that defendant acknowledged in May 2018 that it has a policy or practice

of setting employees' starting pay and band levels based on past compensation which

disproportionately places women in lower pay and band levels.  Id. at ¶¶ 97-103.  Plaintiffs also

allege employee ratings are decided by a majority of male managers based on criteria that are not

job-related causing women to receive smaller salaries, bonuses, and fewer promotions.  Id. at ¶¶

104-17.

Plaintiffs assert defendant has a pattern or practice of channeling women into positions that

are less likely to lead to promotions by, for example, providing smaller budgets to teams with

higher percentages of women.  Id. at ¶¶ 118-24.  Plaintiffs allege defendant acknowledges it has

failed to implement changes in hiring and promotion decisions to eliminate discriminatory impact

on women and that it needs to change its hiring, compensation, and promotion systems.  Id. at ¶¶

126, 129.

Cahill alleges when she left defendant, she was replaced with a male who received a higher

title and band level resulting in a higher salary and bonuses than she received despite having

substantially the same job responsibilities.  Id. at ¶¶ 132-36.

Johnston alleges that two months after she was hired, defendant hired a male employee to

perform substantially the same work in the same conditions, at a higher rate of pay even though

Johnston had to train him, and he had a lower level of education and less experience.  Id. at ¶ 137.

Johnston further alleges she received fewer and slower promotional opportunities than her less qualified or equally qualified male counterparts.  Id. at ¶ 140-43.  Johnston asserts that when she left, defendant hired two men to fill her position at higher pay.  Id. at ¶ 144.

Elizabeth and Hender also allege they were paid and promoted less than their similarly situated male counterparts.  Id. at ¶¶ 145-55.

Plaintiffs allege six claims for relief: (1) violation of the Equal Pay Act, 29 U.S.C. § 206(d); (2) violation of the Civil Rights Act via disparate impact, 42 U.S.C. §§ 2000e *et seq*; (3)  violation of the Civil Rights Act via disparate treatment, 42 U.S.C. §§ 2000e *et seq*; (4) violation of the Oregon Equal Pay Act, Or. Rev. Stat. § 652.220; (5) violation of the Oregon Equality Act via disparate impact, Or. Rev. Stat. § 659A.030; and (6) violation of the Oregon Equality Act via intentional discrimination, Or. Rev. Stat. § 659A.030.  Defendant moves to dismiss or strike the class and collective claims in the first, third, fourth, and sixth causes of action.

## BACKGROUND

The putative class includes at least 5,200 current and former female employees at Nike's World Headquarters (WHQ) in salaried corporate positions in Bands L, U, E, or S.[1]  Report of Ali Saad at ¶ 43 (ECF 186-1 at p. 30).  As result, the proposed class includes employees in 1249 different job codes.  Id. at ¶ 44.[2]

Nike's WHQ consists of a broad array of employees including, but not limited to, shoe and apparel designers, manufacturing and software engineers, event planners, sports marketers,

---

[1] Nike places employees under the executive level in six bands known as VALUES.  Declaration of Mengfei Sun at Ex. 27 at p. 6 (ECF 157-7 at p. 6).  The L Band includes supervisors, intermediate professional, and entry professional. The U Band includes managers, lead professionals and senior professionals.  The E Band includes directors and expert professionals.  The S Band includes senior directors and professional consultants.  Id.

[2] In addition, there are over 13,000 position titles for the putative class.  Report of Chester Hanvey at ¶ 14, fn. 6 (ECF 185-1 at p. 9).

information and technology security professionals, security professionals, supply chain experts, and airplane pilots and mechanics.   See id. at Appx. D (ECF 186-1 at pp. 185-266).   The WHQ jobs are organized within a uniform hierarchy according to "type of work" and "level of work." Declaration of Mengfei Sun at Ex. 27 (ECF 156-2 at p. 24) (defining job code via "type of work" such as finance and "level of work" such as intermediate professional).   "Type of Work" includes job functions and job family.   Job functions are broad categories of work that can be logically grouped together based on having similar characteristics or prerequisite skills.   Nike has identified about 20 job functions that categorizes the work it does.   Job families are the unique roles within a job function that can be performed at various levels based on Nike's leveling criteria. The number of job families varies with each job function. Id. at p. 25 (description from Nike "2019 Job Training Program").

"Level of work" provides a common framework used to determine the scope and complexity of various roles.   "Level of work" consists of bands and job levels.   Id.   The combination of "level of work" and "type of work" results in a job code.   Id. at p. 27.

A.      Starting Pay

The putative class's positions span 21 different job functions which are then divided across 109 different job families and 198 different job subfamilies.   Report of Ali Saad at ¶¶ 44-45 (ECF 186-1 at p. 31).   As noted, within this proposed class there over 1200 different job codes and each job code has its own pay range which managers use to place new hires and determine their compensation.   ECF 187-3 at 41 (importance of job code and its relation to pay range); Deposition of Shane Walker at p. 60 (ECF 187-2 at p. 334) (managers are responsible for making pay decisions); p. 86 (ECF 187-2 at p. 336) (job codes tied to job titles and there is a position title

which provides the generic description of job role); p. 411-12 (ECF 187-2 at pp. 355-56) (managers are responsible for making pay adjustments); ECF 187-3 at p. 47 (sections of pay range); Deposition of Jessica Elizabeth Stuckey at p. 67-68 (ECF 187-2 at pp. 270-71) (job code and title drives pay range and without link to job code, there is no driver for pay range).

Nike uses global jobs and global job descriptions "to level jobs across the organization, regardless of the location of the role, and facilitates career pathing, talent planning, and organizational design."  ECF 160-8 at p. 1.   The pay ranges are "developed from market pay data and used to guide pay decisions and provide a common span of pay for people in similarly valued jobs," but "[i]ndividual pay within that range can be influenced by performance/potential, experience, length of time in job, previous pay rate or strategic talent focus."   ECF 155-2 at p. 10. Nike specifically denotes that, "[w]hile individual pay may vary, there should not be systematic differences based on gender or race."   Id.

Despite the leveling of jobs across the organization, Nike's Senior Director of Global Retail Compensation confirms

> Nike's job codes are the most differentiated type of work and level of work within our corporate architecture (but even then, individuals working in the same job code do not necessarily perform similar work). Job codes that share the same Job Subfamily and Job Level may not be the same from a compensation survey or actual day-to-day perspective at Nike – it depends on the job. In fact, there are a number of job codes that share the same Job Subfamily and Job Level but are readily distinguishable, involving the application of differing skillsets.

Declaration of Jessica Stuckey at ¶ 4 (ECF 187-1 at pp. 270-71).

> Managers determine base salaries by considering the experience and sustained performance of the employee while also recognizing pay levels in the external market.

> Although employees' backgrounds vary widely, each should be paid within the portion of the market zone* that reflects their level of experience and performance.

Employees with less experience and lower performance will generally be lower in NIKE's relevant market zone for that job, while employees with more experience and/or higher sustained performance in that job will generally be paid higher (at or above the median**) in the market zone.

ECF 159-5 at p. 1.

When beginning a new job, whether new to Nike or moving into a new role at Nike, managers could consider these factors when offering base salary:

- External market zone for the job
- Internal peer base salaries
- Relevant work experience, education, and skills
- Total rewards package
- Historical salary progression
- Business financial conditions
- Past NIKE job performance (for internal employees changing jobs)

Id. Managers are also free to consider and weigh whatever factors they deem relevant to the position being hired. E.g., Declaration of Cynthia Peele (Service Delivery Manager) at ¶ 9 (ECF 187-1 at p 126):

I have also been involved in the hiring process in my roles at Nike. No one has to approve my decision to post a job. I am typically posting jobs that existed on my team previously, but now are vacant. Accordingly, the band level and job title are pre-set and cannot change based on the candidate or any other factor. I also am involved in setting starting salary. To make this decision, I look at the candidate's experience, whether they have any certifications, and sometimes, what company they are coming from. For example, I know that candidates from Microsoft have a lot of technical experience, so I would likely give someone from Microsoft a higher salary than someone from a smaller, less technical company. Certifications are also very important for roles on my team because it shows whether candidates are keeping up with their technical skills. In IT and Tech Ops, it is easy to fall behind, so it is imperative that candidates actively seek to develop and refine their skills.[3]

---

[3] See also, e.g., Declaration of Alyssa Levison (Director Digital Design Operations) at ¶¶ 14-15 (ECF 187-1 at pp. 72-73) (have ultimate responsibility for setting starting pay, consult HR and Nike's salary range but then consider education, experience, room for growth, mastery of soft skills — may have to consult manager one level above to offer staring salary above pay range); Declaration of Mac Caputo (Former Recruiter-Global HR) at ¶¶ 9-11 (ECF 187-1 at pp. 187-88) ("Ultimately, while I typically do provide a recommendation to the hiring manger, the hiring manager is responsible for making the final decision on the starting salary" and they consider factors such as years of experience, related progressive experience to the job, education, complexity of the applicant's prior organization, level of prior influence and responsibility, and communication style, among many other possible factors).

In May 2019, Nike internal documents indicate that, "[i]n the past, we often focused on the new hire's prior salary and/or the size of the increase the new hire would receive," but that it did not "want to carry over poor pay practices from a prior company or start a candidate from a disadvantage—we want to create an equal playing field from day one." ECF 158-2 at p. 8.

In September 2019, Nike issued a directive that recruiters, hiring managers, etc. may no longer ask external applicants or their employers questions about their compensation history. ECF 155-6 at p. 1. After that, Nike policy permitted asking a candidate about salary expectations. Id.

As noted above, Shane Walker, Senior Director of Global Compensation, indicates the hiring managers receive pay ranges for a job and are responsible for making the pay decision within that range. Deposition of Shane Walker at pp. 48-49, 60 (ECF 187-2 at pp. 332-33, 344):

> So for new hires, the guidance is to position someone between 85 percent to the maximum of the pay range. For promotions is to position 85 percent to 95 percent in the pay range. And for lateral moves it is generally no increase.

> But each individual situation needs to be reviewed and may call for an increase, and our guidance is that managers are responsible for making pay adjustments and that all newly hired or promoted employees should always be above the minimum of the pay range.

Id. at pp. 411-12 (ECF 187-2 at pp. 355-56).

According to Shine Thomas (Senior Director for Talent Acquisition, Innovation, Enterprise Data Science, and Analytics, Consumer Creation), decisions related to hiring, in some cases, should be approved by Talent Acquisition, but that hiring decisions are approved by multiple people. Deposition of Shine Thomas at pp. 49-50 (ECF 162-9 at pp. 9-10).[4] That said, "[t]he

---

[4] Thomas made this statement in the context of a situation in which a manager is asked to hire a relative of a friend for a summer internship whom they know is not qualified and whether that is considered a form of bribery. See ECF

onus of the decision making for the offer rests on the hiring manager. The recruiter is involved in facilitating that process, but the decision is made by the hiring manager." Id. at p. 123 (ECF 187-2 at p. 299).

Thomas states that before September 2017:

> [P]rior salary was a data point that we looked at, but it was always, our guideline has always been that is a data point. The position and the range is also a data point. Every single offer is unique, and every single offer has different nuances associated with the candidate and their experiences and qualifications.

Id. at p. 220 (ECF 187-2 at p. 307).

B.      Pay Increases and Bonuses

From 2015 until 2019, lump-sum merit awards and pay increases were based on a percentage of employees' base pay.   Deposition of Shane Walker at p. 357 (ECF 162-11 at p. 32). In March 2019, Nike adjusted its annual salary increase policy (core pay) such that it is not purely percentage based and would account for an employee's position within Nike's pay range.   ECF 158-5 at pp. 34-35.   Even so, using the new competitive pay management (CPM) system still has a percent increase to base pay component.   ECF 156-6 at pp. 2-4.   The pay adjustment also includes consideration of the employee's current position in pay range, prior year performance, future potential, impact of loss, risk of loss, time in role and pay relative to peers.   Id. at pp. 3-4.

Nike's performance review process  - i.e., Coaching for Excellence (CFE) - assigns a rating of exceptional, highly successful, successful, inconsistent, or unsatisfactory.   ECF 187-3 at p. 85.   Prior to 2019, Nike assigned a minimum and maximum percentage for each rating and then managers used discretion to determine what increase the employee would receive, but whether that was within or outside the guideline depended on each manager.   Deposition of Shane Walker at

---

159-2 at p. 18.

p. 360 (ECF 162-11 at p. 33). Beginning in 2019, managers select among four options (max invest, invest, market, and zero) which then presents a percent increase based on where the employee is in the pay range. ECF 158-5 at p. 35.

Nike does not have a forced CFE distribution. ECF 187-3 at p. 139. Individual CFE ratings seldom need to be approved by higher level managers. E.g., Declaration of Rebecca Edington (Vice President of Footwear Technical Development) at ¶ 13 (ECF 187-1 at p. 24) ("Lower-level managers are also the ones who made decisions on their direct reports' CFE ratings. While I do run calibration sessions to review the CFE ratings for the higher-level managers in my organization to ensure we are aligned and consistent in how we are rating employees, lower-level employees are reviewed through separate calibration sessions. I do not rate or review ratings for every single employee in my organization. I have never encountered a situation where I have over-ridden any manager's rating for his or her direct report."); Declaration of Kimberly Mack (Vice President for Men's Sport Performance Apparel) at ¶ 14 (ECF 187-1 at p. 97) ("During the annual pay and performance review cycles, I provide a performance rating for each of my direct reports. I then select a base pay increase for each direct report based on their performance rating. Each manager on my team rates and reviews each of their direct reports and selects a base pay increase accordingly. It is the manager's responsibility to select the employee's rating and base pay increase, not mine. If a manager cannot decide on a rating or base pay increase, that manager and I may have a conversation about ratings and pay, and I may provide input or guidance, but it ultimately is the direct manager's decision. In fact, I rarely question a manager's perspective on their direct report's performance or pay. I have never seen a base pay or ratings decision changed by anyone in a higher level."); but see ECF 158-6 at p. 13 (executive review does include using

reporting to ensure pay outcomes align with talent perspective and ability to make any necessary changes); ECF 159-3 at p. 3 ("[S]ystem requires 'manger+1' approvals for merits and PSP awards.").

Despite the Nike guidelines, managers had discretion regarding pay increases and even employees with the same CFE ratings could receive different percent merit increases. E.g., Declaration of Ronni Worboys (Director of Retail Operations) at ¶ 12 (ECF 187-1 at p. 173) ("As a manager, I have the discretion to set base pay increases within this budget. I allocate this budget based on each employee's performance rating and each employee's compensation within a competitive salary range. I try to be as equitable as possible in providing base pay increases for each of the employees I supervise, but I do not always provide the same base pay increases to employees with the same ratings. For example, if two employees both received the same performance rating, but one employee's base pay is further from the midpoint of the salary range, I would give that employee a higher base pay increase. My goal is to try to increase pay so that all my employees are situated equitably within the same percentage of the pay range for the job."); see also ECF 187-3 at p. 141:

> Merit awards are discretionary and merit award guidelines vary within each performance rating category. When determining the size of increase, managers should consider a variety of factors:
>
>> o Performance: employee's performance for the entire fiscal year, and the most important factor in merit pay decisions.
>> o Position to Market: employee's pay relative to external market zone
>> o Internal Equity: employee's pay relative to peers in similar jobs within NIKE
>> o Employee's experience, skill levels, etc.
>> o Available Budget

The same is true after the 2019 introduction of the CPM system. See ECF 187-3 at p. 65

(managers have the ability to further invest using a dropdown list); Deposition of Shane Walker at p. 365 (ECF 187-2 at p. 353) (The core pay investment table "is a data point that is available during that process, but how each individual manager, manager +1, uses that information will vary or if they use it at all.").

Nike uses a Performance Sharing Plan (PSP) to award annual cash bonuses to employees who receive a CFE rating above unsatisfactory. See, e.g., ECF 187-3 p. 78 (fiscal year 2017 CFE modifier guidelines: exceptional = 75-150%; highly successful = 50-125%; successful = 25-110%; inconsistent = 0-75%; and unsatisfactory = 0%). Prior to 2019, the award consisted of team and discretionary shares; the latter was determined by the manager based on the CFE rating. Id. Both shares consider an employee's job band and fiscal year earnings (i.e., base pay for salaried employees). Id.; Deposition of Shelli White at p. 122 (ECF 162-13 at p. 9). Starting in 2019, the performance modifier was set at 100% for all employees. ECF 158-5 at p. 11. The manager+1 approves the PSP award. Deposition of Shelli White at pp. 68-69 (ECF 187-2 at pp. 370-71).

C.      Promotions

At Nike, Talent Acquisition helps manage the process for competitive promotions or other job changes but does not manage the process independent of hiring managers. Deposition of Shine Thomas at pp. 28-29 (ECF 162-9 at pp. 6-7). Nike has a fill strategy which allows a job role to be posted internally, externally, or the hiring manager can promote someone within the company into a position. Deposition of Shine Thomas at pp. 80-81 (ECF 180-10 at pp. 2-3). Fill strategy and promotions do not require approval from Human Resources but may require a manager's direct supervisor (manager+1). See, e.g., Deposition of Treasure Heinle at pp. 62-63 (ECF 187-2 at pp. 144-45 (manager needs to get her direct manager's approval for noncompetitive

job change); ECF 156-5 (noncompetitive job changes described as when an employee moves into a different role without formal interview process and requires approval of manager+1 or Human Resources partner).

Until 2018, employees in Bands L though S could receive a noncompetitive promotion, but it was really up to the manager.   Deposition of Treasure Heinle at pp. 211-12 (ECF 161-10 at pp. 25-26).   In December 2018, Nike required all E Band positions and below to be posted for a competitive hiring process.   ECF 156-10 at pp. 1-3.   Nike noted the changes in response to, among other things, recent employee surveys revealing that employees feel excluded from career opportunities due to perceived lack of transparency and visibility into open roles.   ECF 157-1 at p. 5.   Plaintiff's expert, Dr. David Neumark, found that, during the period from January 1, 2013, to September 1, 2019, promotions among entry level professionals to senior director consisted of 5,688 non-competitive promotions and 1,974 competitive promotions.   Expert Report of David Neumark, Ph.D. at p. 78 (ECF 149-1 at p. 79).

This case is distinguishable from Ellis v. Costco Wholesale Corp., 285 F.R.D. 492 (N.D. Cal. 2012) where the court acknowledged that (1) the derivative effects of a companywide policy could themselves present issues common to the class; and (2) a "common mode of exercising discretion that pervades the entire company" (recruiting internally and without necessarily making employees aware of openings) – coupled with evidence of working culture that reinforces stereotypes was enough to establish commonality regarding Title VII claims brought by woman surrounding the defendant's allegedly promotion practices. There, however, the class was much narrower (nationwide but concerning only two "closely related management-level" positions), and significantly, there were upper level managers that had direct oversight in the selection process.

D.    Initial Job Assignments

As noted above, in the context of bribery and corruption practices by third parties seeking employment, all decisions related to hiring should be approved by Talent Acquisition.   ECF 159-2 at p. 18.   Talent Acquisition's role is to ensure compliance and provide guidance throughout the competitive hiring process, ensure a diverse slate when hiring for E-band+ open roles, and regularly communicate with hiring managers.   ECF 157-1 at p. 7.   Human Resources Business Partners associate with Talent Acquisition to ensure all E-band and below open roles are posted competitively.   Id.   Hiring managers attend regular manger training on the hiring process.   Id. In December 2018, Nike instituted these policy guidelines to prioritize inclusion, transparency, and equal opportunity throughout the hiring process.   Id. at p. 4.   To that end, Nike asked all employees, managers, and Talent Acquisition to follow consistent guidelines during each stage of the hiring process.   Id.

Maggie Baird, who has held positions ranging from Category Sales Director for Men's Training to Senior Director for Jordan North America, describes the initial hiring process she has used:

> We typically post an open position both internally and externally. There was one occasion that we posted the job internally only because we had an immediate business need for a position that managed a category, which comprised 65-70% of the business. We needed someone who understood the business to come in and pick up the work quickly. Prior to posting a job, I determine the band level based on what I think the scope of the work is in the current state and what I think the scope will be in the future. I also look at the work structure of my team, including each employee's band level, and figure out what our needs are. For example, when we hired the Retail Concepts Director, we knew that position would not have a team at the time of hiring, but we wanted a candidate that had leadership skills because we knew we would build out a team of direct reports into that role eventually.

Declaration of Maggie Baird at ¶¶ 4, 8, 13 (ECF 187-1 at pp. 7, 9, 11).

Although a hiring manager may partner with the Human Resources manager around the best approach for an open position, "the hiring manager will make the decision because it is their team and their business around what the open position should be." Deposition of Shine Thomas at p. 107 (ECF 187-2 at p. 295).

A hiring manager may work with Human Resources and their manager to set the level for the job posting. "The level is set for each role when the job is approved for headcount and cannot be changed once the job is approved." Declaration of Ronni Worboys at ¶ 15 (ECF 187-1 at p. 174); see also Declaration of Cynthia Peele at ¶ 9 (ECF 187-1 at p. 126) ("the band level and job title are pre-set and cannot change").

Recruiters may extend invitations to applicants for one job to apply for another open job. Deposition of Julian Miller at pp. 68-69 (ECF 187-2 at pp. 203-04) (a recruiter might extend an invitation to another job—they can invite candidates to apply to the specific requisition and it is up to the discretion of the recruiter). As for the guidelines provided recruiters:

> The guidelines are very specific. It has to be a job that meets the same band level. Right? It's the same seniority, the same job code. We're recruiting within those roles within a similar time frame, so it's still a valid application. And the screening criteria, as we mentioned, those pre-screening questions are the same amongst those requisitions. Those are -- Those are the guidelines that we educate them on. Right? So we can show in the system that -- that those roles use the same criteria, that recruiters screen candidates based on the same criteria based on -- across multiple requisitions.

Id. at p. 100 (ECF 187-2 at p. 205).

For example, Cahill notes that she planned to apply for a senior manager position, but the Vice President of Global Digital Brand wanted her to be at the higher level of Director instead. Deposition of Kelly Cahill at p. 106 (ECF 182 at p. 104). The record demonstrates that none of the named plaintiffs were channeled into a lower position than the one for which they had planned

to apply.  See Defendant's Opposition (ECF 183) at p. 21, n. 25 (collecting transcript entries noting plaintiffs were hired into the positions for which they applied).

E.      Complaints of Harassment and Discrimination

In 2018, several Nike employees made complaints about discrimination and harassment referenced as the Starfish Survey.  See, e.g., Declaration of Mengfei Sun at Ex. 46 (ECF 159-6 at pp. 1-3)[5]; at Ex. 48 (ECF 159-8 at pp. 1-6)[6]; at Ex. 24 (ECF 157-4 at pp. 1-2);[7] at Ex. 50 (ECF 159-10 at pp. 1-4).[8]  Plaintiff identifies approximately 22 Nike executives who were alleged to have discriminated or condoned discrimination and approximately 30 complaints.[9]  Declaration of Byron Goldstein at ¶ 16 (ECF 163 at pp. 9-10).  Some complainants noted that Human Resources refused to act or apparently condoned the discriminatory and harassing behavior.  See,

---

[5] Gender bias and leadership complaint summarized as:
    • Was completely disrespected by []. No problems until he came on board. Almost left NIKE because of him. Terrorized her. He wouldn't stop. Boys club attitude. Knows he can get away with it. Sad to say, [] turned a blind eye.
• Gender bias. On team with other men. They had no issues. They didn't get demeaned. She was top performer but was not set up for career advancement. Her male colleague moved up, doesn't understand how. Biggest concern is that she already reported this situation to HR and nothing was done except she was moved to another role deeper in the organization, with no track for development. []
    • Fails or refuses to communicate with his team regarding key facts (e.g., new hires, project details and assignments, promotion of new boss); displays lack of interest in developing careers of his reports; in his current role, has never called a group meeting of his direct reports on any issues, including recent MOR-related events and []'s termination; indignantly refused team member request for huddle to discuss []'s promotion and impact on team.

[6] Describing a broken culture of pay inequities, diminished female talent, old-school lack of modern approach, male oriented supervision, disparaging behavior, "[b]oys club, biased selection process," and lack of HR action.

[7] Responses by Nike to the New York Times regarding complaints of harassment and discrimination.

[8] Female vice president alleges a more senior male denied her request for consideration of three females for a position and was told, "no, you need a man in that role."

[9] Plaintiff refers to the 2018 complaints as the Starfish survey.  While there is evidence in the record that refers to "Nike Project Starfish" (ECF 159-6 at p. 2), the record does not demonstrate who created the survey, how it was distributed, how recipients were selected, the sample size, or the response rate.  See Deposition of Kathleen Lundquist at pp. 275-80 (ECF 187-2 at pp. 184-89).  Nike's Human Resources Chief doesn't know who created the survey or who completed it but did receive a hard copy of the complaints.  Deposition of Monique Matheson at p. 93 (ECF 187-2 at p. 196).

e.g., Declaration of Mengfei Sun at Ex. 49 (ECF 159-9 at p. 2) (unable to do anything about being called a "bitch" by a manger who "is protected by the European Boys Club" and nothing happened after reported to HR); at Ex. 47 (ECF 159-7 at p. 3) ("ER and HR at this company are a joke… [former Head of Human Resources] himself was a well-known sexual harasser").[10]

Nike's internal portals provide avenues to raise complaints (anonymously or otherwise). See, e.g., ECF 187-3 at pp. 83-84 (anti-harassment and antidiscrimination policy with definitions and directing: "Anyone who experiences, witnesses, or learns of harassment in the workplace must immediately report the incident by contacting their manager, HR Direct or Matter of Respect" and providing phone numbers, web links, and email address); id. at p. 86 (providing a link to provide feedback to HR); id. at pp. 87-90 (portal to "speak up," provided by an external issue reporting firm, to report concerns related to "harassment, retaliation, [and] discrimination" and if reporter chooses to remain anonymous, no identifying information is passed on to Nike); id. at pp. 92-99 (speak-up portal overview and instructions on reporting).

Monique Matheson, Nike's Chief Human Resources Officer since July 2017, notes that Nike shared the Starfish complaints with third-party counsel. Deposition of Monique Matheson at pp. 86, 93 (ECF 187-2 at pp. 195-96). Third-party counsel led an investigation and follow-up for the concerns raised. Id. at pp. 86, 97-98 (ECF 187-2 at pp. 197-98). Opt-in plaintiff Lauren Anderson states that after third-party counsel investigated her complaint of sexual harassment, the subject of the complaint was no longer with Nike and her complaint was taken seriously. Deposition of Lauren Anderson at pp. 220-21 (ECF 187-2 at pp. 40-41).

---

[10] This complainant reported "bullying" to HR which also included bullying by female managers but did not report sexual harassment because "it has not happened to me personally." Declaration of Mengfei Sun at Ex. 47 (ECF 159-7 at p. 3).

Near the conclusion of the investigation conducted in response to the Starfish complaints, Nike CEO Mark Parker stated:

> … the main set of complaints that gave rise to this process have been acted on … and employee exits from this larger investigation will be behind us after this next week.
>
> It's also important to remember that not all employment action is visible. Just because someone didn't leave, does not necessarily mean that they've not had consequences. People have the potential to change and grow … we have to believe in that as well.
>
> And as I said in my email, people leave and join Nike every day. With a workforce of 74,000 people, not everyone who leaves during this time is being exited.
>
> It's clear that people have raised broader concerns. Please remember that system changes, compensation reviews, and changes to organizations take time.
>
> There is no finish line here. We continue to review our HR processes from top to bottom so we can take our learnings from this experience.

ECF 155-4 at pp. 6-7.

Nike confirmed to the New York Times that, "[b]esides the resignations of Trevor Edwards and Jayme Martin, Nike has also confirmed the departures of Antoine Andrews; Vikrant Singh, a senior brand director for basketball; Daniel Tawiah, a VP for global brand innovation; and Greg Thompson, the VP for footwear."  ECF 157-3 at p. 2.  Nike also stated: "There was conduct where an insular group of high-level managers, in pockets of the organization, protected each other and looked the other way. This is something Nike will not tolerate."  Id. at p. 3.

DISCUSSION

A.      Defendant's Motion to Exclude the Opinions of Plaintiffs' Expert, Kathleen Lundquist, Ph.D.

Nike seeks to exclude the expert reports and testimony of Dr. Lundquist, an

Industrial/Organizational (I/O) psychologist, pursuant to Fed. R. Evid. 702.

Dr. Lundquist opines that:

Nike groups its jobs into substantially similar job groups based on the Job Function, Job Family, Job Subfamily, Band and Job Level architecture into which all jobs at Nike are categorized. Nike uses this job architecture to apply a consistent set of policies and practices for employees within these groups for compensation, talent acquisition, talent management and performance management. Despite a common architecture for classifying jobs, Nike's policies and practices for compensation and promotion have not been substantiated as job related according to professional and legal guidelines.

ECF 148-1 at p. 48.

Nike asserts Dr. Lundquist's report is not based on any reliable methodology. Specifically, Nike contends she failed to describe any objective principles, standards, definitions, or other methodologies she applied to support her finding.

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This court must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts at issue. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 (1993). The court's task is to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Id. at 597.

Although Daubert listed specific factors for assessing scientific testimony, the test for

reliability is a flexible one and not all factors[11] necessarily apply in every case.   Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010).

> When considering the applicability of Daubert criteria to the particular case before the court, the inquiry must be flexible. Peer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature. Lack of certainty is not, for a qualified expert, the same thing as guesswork. Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline. [T]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible.

Id. at 565 (internal citations omitted).

"Daubert's general holding--setting forth the trial judge's general 'gatekeeping' obligation--applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999).   This Court has broad latitude when it decides how to determine reliability.   Id.   In the end, an opinion is admissible if it is reliable and will assist the trier of fact in understanding the evidence at issue.

Certainly, Dr. Lundquist qualifies as an expert and her knowledge is connected to facts in issue, e.g., the relationship of Nike's Human Resources in developing and monitoring implementation of Nike's employment practices.   It is true that Dr. Lundquist provides scant analysis of, for example, whether certain job groupings actually perform similar work.   However, the Court is able to weigh the evidence adduced regarding Nike's Human Resources policies and determine what weight to give expert opinion, if any, for purposes of class certification.   See

---

[11]  The Court listed criteria such as testability, publication, peer review, and general acceptance.

[Primiano](#) 598 F.3d at 564–65 ("Under Daubert, the district judge is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by [Rule 702](#) as explained in Daubert, the expert may testify and the jury decides how much weight to give that testimony.").[12]   When and if this action proceeds to a merits decision, the parties may wish to revisit the relevance of this opinion. Yet, as noted below, given the evidence regarding Nike's employment policies and discretion afforded individual managers, plaintiffs' experts provide little useful information for determining the core issue of whether commonality exits.[13]   Accordingly, the motion to exclude the opinions of Dr. Lundquist should be denied at this time.

B.      Defendant's Motion to Exclude the Opinions of Plaintiffs' Expert, David Neumark, Ph.D.

Nike also seeks to exclude the expert reports and testimony of statistical expert Dr. Neumark pursuant to Fed. R. Evid. 702.

Dr. Neumark opines that:

a. Women and men come to Nike with similar human capital (education, experience), and women get performance ratings as high or higher than men.
b. Women are hired at lower Job Levels than are men who come to Nike with similar human capital.
c. Once hired, women are promoted more slowly than men; this is driven by non-competitive promotions.
d. The lower Job Levels at hire, and the slower progress to higher Job Levels, creates a large pay shortfall for women in the class period.
    i. A simple estimate of this pay shortfall is $11,363 lower pay (in December 2019 dollars) per woman per year. [footnote omitted]
e. In addition, women doing substantially similar work to men, and with similar qualifications to men and similar performance to men, are paid less at hire. This

_____

[12]  For purposes of this motion, the Court itself has the discretion to determine whether a class should be certified and conducts a rigorous analysis to consider whether a claim meets Rule 23's requirements.   Thus, the Court, for certification purposes, decides how much weight to give the expert testimony.

[13]  The core issue of commonality is generally capable of resolution without resort to expert analysis as the Court can review the evidence of whether Nike mandates an applicable policy that results in disparate treatment or impact. While a statistical analysis has some bearing on this issue, it becomes more useful in understanding an issue once the policy is or standard operating procedure is identified.   In addition, Dr. Lundquist's opinion regarding the job relatedness of Nike's policies becomes important once an actual company-wide policy has been identified.

starting pay gap persists into the class period, during which women are paid less than men who are doing substantially similar work and have similar qualifications and performance. This happens because, after being hired, subsequent pay increases for women and men with similar performance are based on the same percentage pay increase, perpetuating the starting pay gap.

> i. The pay gap within the same job creates a large pay shortfall for women in the class period. A simple estimate of this pay shortfall is $3,138 lower pay (in December 2019 dollars) per woman per year. Note that these amounts, while sizable, are smaller than the amounts in paragraph 8.d.i. above, because they do not reflect the female pay shortfall attributable to women being hired at lower Job Levels and being promoted more slowly.

ECF 149-1 at pp. 4-5

Dr. Neumark further opines:

> In reaching these conclusions, my analysis uses an aggregated model that includes detailed controls for differences across women and men in the jobs they are in (or "Job Cells" defined by the interactions of Job Subfamilies and Levels), and their bona fide qualifications. This provides precise estimates of potential gender differences in pay and other outcomes. Dr. Saad insists, instead, that a disaggregated model must be used; this means that there has to be a separate model for each job (which he incorrectly insists should be based on Job Code rather than Job Cells). However, Dr. Saad's proposed disaggregation reduces statistical precision, which predictably often eliminates statistical significance, and masks common mechanisms that, as my evidence shows, cause discrimination.

ECF 149-2 at p. 5.

Nike asserts Dr. Neumark's opinions and/or analyses: (1) are based on the kind of aggregated analyses that the United States Supreme Court found were insufficient to establish whether pay discrimination claims can be proved on a class-wide basis; (2) do not show whether women are paid less than men for performing comparable or substantially equal work; (3) fail to consider the effect that different decision-makers have on the pay and promotion decisions challenged by plaintiffs; (4) incorporate data from outside the relevant claims periods, which leads to misleading and irrelevant results; (5) fail to account for fundamental variables and rely on unsubstantiated assumptions; (6) are based on a purported disparity that is not statistically

significant or derives from the misapplication of his own models and standards; (7) are based on scientifically unsound and unreliable analyses of work experience and education background that fail to apply the facts here, and lack support within the scientific community; and (8) accepted the reliability of the opinions of Dr. Lundquist without question, despite admitting that he never analyzed her report.

Dr. Neumark, like Dr. Lundquist, is qualified and offers an opinion that is relevant to the facts at issue. However, as addressed below, the weight afforded this opinion is limited given the failure of the evidence to demonstrate a common policy or a standard operating procedure. Nonetheless, the motion should be denied at this time.

C.     Plaintiffs' Motion to Rule as Inadmissible Part of the Expert Report of Chester Hanvey, Ph.D.

Plaintiffs seek to exclude paragraphs 3, 5-8, 19-234, 247-48, and 251-52 of Dr. Hanvey, an I/O psychologist, pursuant to Fed. R. Evid. 702.

Dr. Hanvey opines that Nike employees are not sufficiently similar to be examined as a single group. ECF 185-1 at p. 5, ¶ 3. After analyzing the jobs performed by certain individuals in covered positions, Dr. Hanvey concluded:

> I designed and conducted an extensive job analysis involving over 200 hours of interviews with Nike employees to gather systematic data about the work performed by Nike employees and skill, effort, responsibility, and working conditions associated with that work. I selected two random samples of employee to evaluate the degree of variability across Job Codes and within Job Codes and conducted detailed interviews with each individual in the samples regarding various aspects of their work that relate to the factors specified in equal pay statutes and regulations.
>
> I found that employees in both samples varied substantially on factors that commonly impact pay, such as: work performed; KSAs required to perform that work; prior work experience; education; decision-making authority; supervisory

responsibility; level of stress in the job; work hours; travel; and exposure to physical hazards. Many of these differences are also present when I examined responses from multiple Nike employees with the same Job Code, Level, Function, Family, and Subfamily. I also found that certain factors that impact pay such as prior experience and education are not uniformly applicable to all Job Codes. In order to determine which roles do perform substantially equal or similar work, it would be necessary to conduct a full assessment of actual job content for each of the more than 1,400 Job Codes.

Finally, I found that rather than conducting a job analysis, Dr. Lundquist relied entirely on existing documents to reach her conclusions, which directly contradicts professional standards and her own statements in a prior case. She did not employ any scientific methods to support her conclusions about Nike employees and did not perform any analysis to determine whether employees are "substantially similar" for evaluating pay. As a result, there is no scientific basis to support her position that Nike employees in the same Subfamily/level are substantially similar.

ECF 185-1 at pp. 144-45, ¶¶ 251-53.

Plaintiffs assert they do not seek to establish that all jobs at Nike are comparable. They also argue Dr. Hanvey's conclusions are not based on sufficient facts, and he did not understand Nike's policies or plaintiffs' challenge to those policies. Plaintiffs also contend Dr. Hanvey did not use generally recognized methodologies and his sample sizes were too small to be reliable.

As with the other experts discussed above, Dr. Hanvey's qualifications are not in question. As for the merits of plaintiffs' claims, the opinion is relevant, and the weaknesses identified are more appropriately confined to the weight of the opinion, at least at this stage of the proceedings. As noted above, the Court can resolve the core issue of class certification without much resort to expert opinion. The parties disagree regarding how to demonstrate the important issue of whether there is a pay differential based on gender. Plaintiffs believe they can establish that difference by showing generally, regardless of job variability, that men as a whole earn more than women as a whole even when controlling for experiential differences. Nike, on the other hand, asserts the question must be answered by comparing similar work performed in a similar manner to determine

whether any differences in pay exist. But at this stage, the Court is more concerned whether plaintiffs can point to any common company-wide policy or standard operating procedure that impacted the pay of all class members. It is unclear, at this stage, to what extent the various expert opinions may assist the trier of fact, but the Court can determine the existence of the policy or procedure by examining the underlying facts generally with or without the aid of the expert opinions. Accordingly, the motion should be denied at this time.

D.      Plaintiffs' Motion to Rule as Inadmissible Parts of the Expert Report of Ali Saad, Ph.D.

Plaintiffs seek to exclude portions of the opinion of statistical expert Dr. Saad pursuant to Fed. R. Evid. 702.

Dr. Saad reviewed Dr. Neumark's report and opined:

a. **Incumbent Pay**: There is no common pay shortfall for women across the Covered Positions. When I examine pay outcomes on a job-by-job basis, I find that for 97.1% of job codes, in which 92.4% of all women in the Covered Positions worked, there are no statistically significant adverse outcomes for women. Moreover, only 35 of the 1,204 job codes show a statistically significant adverse outcome for women, and those 35 job codes include just 7.6% of women in the Covered Positions. When I examine female pay outcomes by manager, I find that just 5.7% of managers have teams in which women earn statistically significantly less than men. The relatively small number of statistically significant disparities that the analyses do yield (for incumbent pay only) are sporadic and isolated, linked to a relatively small number of job codes and a small percentage of decision-makers, and do not appropriately account for legitimate, business-related factors that explain pay.
b. **Prior Pay**: There is no statistical evidence of sex-based disparities in prior pay because this data is not available to analyze. Nor is there any statistical evidence using the approach of Dr. Neumark that Nike consistently used prior pay to set starting pay at Nike, or that any such practice disparately impacted women.
c. **Starting Pay**: There is no consistent statistical evidence of sex-based disparities in starting pay when proper analysis groups are constructed. I estimated Dr. Neumark's starting pay model separately by Job Family in order to compare employees with prior education and work experience backgrounds one would expect to be similar. I find that 48% of Job Families analyzed show that female new hires are paid more than men on average (covering 39% of female new hires), even without suitable controls for prior experience and education. Only four Job Families

show that women earn statistically significantly less than men. One Job Family shows that women earn statistically significantly more than men. Using Dr. Neumark's approach there is no common starting pay shortfall for women.

d. **Starting Level**: There is no statistical evidence of sex-based disparities in starting level once I correct Dr. Neumark's analysis to account for a critical variable — the job level a candidate applied to — which is essential for any analysis of whether "under-leveling" occurred.

e. **Prior Relevant Experience**: Dr. Neumark's methodology for measuring and comparing prior relevant experience among new hires is completely unscientific and full of obvious errors. Indeed, the clusters of purportedly similar prior jobs generated by Dr. Neumark's methodology are preposterous on their face. One cluster, for example, contains as supposedly similar prior jobs: Library Page; Deckhand; Spanish-English GED Tutor; Nanny; CEO; Handyman; Armory Chief; Journeymen; Bank Teller; Sign Painter; Penetration Tester; Tennis Captain; Model; Master Black Belt; and Caregiver.[footnote omitted] Dr. Neumark claims this is irrelevant because his alternative method of calculating prior experience returns the same results, but his alternative method omits 70% of the data used in the analysis. Neither method produces scientifically reliable results. Both should be disregarded.

f. **Relevant Education**: Dr. Neumark's attempts to control for education are equally deficient. Rather than control for college major, or degrees from schools that are valued by Nike, he controls for schools' rank based on three publicly-available "top 500"-type lists, which do not contain a single art or design school. Considering that Nike is a footwear and athletic apparel design company, the fact that not a single art or design school appears on those lists should have given Dr. Neumark pause as to their relevance for hiring at Nike (and his methodology as a whole).

g. **Merit Increases**: There is no statistical evidence of sex-based disparities in merit increases. In fact, Dr. Neumark finds that women actually receive larger merit increases than men. It is only by omitting job level – which is a key factor in determining the amount of merit pay awarded, regardless of gender – that Dr. Neumark manufacturers an issue where none exists.

h. **Promotions**: Finally, there is no statistical evidence of sex-based disparities in promotions. Again, Dr. Neumark's own analysis confirms this is true. And once again, only by contorting the data does Dr. Neumark manufacture an issue where there is none.

Not only is the analysis flawed, but the Neumark Corrected Report fails to address the legal claims at issue in this case. I understand that for claims under the federal Equal Pay Act ("federal EPA") and the Oregon Equal Pay Act ("Oregon EPA"), the jury must decide whether women are paid less than men for substantially equal or comparable work, respectively. [footnote omitted] In order to answer this question, the statistical analysis must present results at the level of the question presented – substantially equal or comparable work. Yet none of Dr. Neumark's analyses do so. Nowhere in Dr. Neumark's report can one find the answer to the

question of whether women in job code A1046 (like named Plaintiff Cahill) are paid less than men in job code A1046. Nor does he answer the question whether women in job code A0692 (like named Plaintiff Johnston) are paid less than men in job code A0692. Instead, he combines all employees in the over 1,200 different Covered Positions [footnote omitted] in a single analysis, and presents one singular alleged female pay difference. In other words, he purports to find a 2.03% average shortfall across all of these disparate jobs (from his Table 2, column 4, panel C (which, when technical errors of timing and other mechanical issues are corrected, actually reveals itself to be 1.33%)). Yet even Dr. Neumark testified that this alleged shortfall does not apply to all of the Covered Positions, and is not likely to be the shortfall for any one Covered Position. In fact, I show that the overwhelming majority of within-job analyses show no statistically significant sex disparity in pay. Dr. Neumark's analysis, on the other hand, does not identify jobs in which women are paid more than men performing substantially equal or comparable work, jobs where women and men are paid the same, and jobs where women are paid less than men. Thus he cannot answer the question presented by the federal and Oregon EPAs: are women are paid less than men for substantially equal or comparable work? The alleged "average" provided by Dr. Neumark is not the correct metric to employ for a statistical analysis in an EPA setting.

Furthermore, to the extent that the Court must decide issues of commonality regarding Plaintiffs' disparate impact or treatment claims under Title VII or the Oregon Equality Act, Dr. Neumark presents no analyses at the level of decision-makers as I understand is required by Wal- Mart Stores, Inc. v. Dukes. [footnote omitted] In fact, Dr. Neumark never mentions decision-makers at all. Thus, none of Dr. Neumark's aggregated incumbent pay analyses speak to the issues in this case, or to the statistical issues relevant to class certification.

To summarize, Dr. Neumark conducts the wrong analysis to address Plaintiffs' federal and Oregon EPA claims, and he fails to show statistical commonality supporting certification of Plaintiffs' Title VII or Oregon Equality Act claims. His aggregated analyses of incumbent pay do not identify a single job in which men and women are paid differently. Using his model but correcting for flaws in timing and various technical errors demonstrates that the vast majority of the putative class did not experience a statistically significant pay shortfall. In addition, none of the various other employment outcomes studied by Dr. Neumark (for which he claims women share an adverse experience) are found to show any adverse outcomes, once errors are corrected.

ECF 186-1 at pp. 5-10.

Plaintiffs assert portions of the report are inadmissible because they contain legal

conclusions, Dr. Saad lacks a reliable basis in knowledge and experience in the relevant discipline,

and portions of the report are not relevant.   Again, the Court should decline to grant the motion at

this time as the report, while useful as to certain merits issues, is not entirely necessary to resolve

a core issue regarding class certification. To the extent Dr. Saad offers his own legal analysis and

conclusions on issues related to class certification,[14] the Court should not consider those opinions.

See, e.g., Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1016 (9th Cir. 2004) (an

expert witness cannot give an opinion as to their legal conclusion, i.e., an opinion on an ultimate

issue of law).

E.        Evidentiary Objections

Nike argues the Declaration of Byron Goldstein improperly raises discovery disputes

despite the close of pre-certification discovery.   Defendant also raises specific hearsay objections

and objections to conclusions of law offered by a witness.

Plaintiffs object to: (1) the declaration of Jessica Stuckey as inadmissible lay testimony

about scientific matters; (2) statements relying on privileged pay equity studies and investigation

of Starfish complaints because Nike uses both as a shield and sword; and (3) evidence based on

the Talent Acquisition playbook regarding "Match to Job" because Nike failed to produce the

playbook.

In evaluating a motion for class certification, the Court may consider all material evidence

submitted by the parties to determine whether the Rule 23 requirements are satisfied. Blackie v.

Barrack, 524 F.2d 891, 901 (9th Cir. 1975). Strict adherence to the Federal Rules of Evidence is

not required. Gonzalez v. Millard Mall Servs., Inc., 281 F.R.D. 455, 459 (S.D. Cal. 2012).   In

considering the background facts applicable to class certification, the Court has endeavored to

---

[14] In addition to paragraphs   6 through 7 of the report quoted above, Dr. Saad concludes that Dr. Neumark's analysis
provides no "glue" holding together plaintiffs' claims.   ECF 186-1 at p. 151.

consider only evidence upon which both parties had access. To the extent that the Court discusses

any attorney-client privileged material, it is merely to provide historical background information

leading up this litigation.[15]

F.      Class Certification

Initially, plaintiffs filed their class certification motion seeking to certify a class of:

> All female current and former Nike employees at Nike Headquarters in Oregon,
> who were employed at any time from October 11, 2017 through the resolution of
> this action for claims under Title VII, and for the period from August 9, 2017
> through the resolution of this action for claims under ORS 652.220 and ORS
> 659A.030, in a salaried, corporate position in Bands L, U,
> E, or S2 ("Putative Class")

Motion For Class Certification (ECF 146) at p. 1.

Nike asserted this definition precluded Cahill's inclusion in the putative class given that

she resigned from Nike on July 26, 2017.  Thus, in their reply brief, plaintiffs modified their

proposed class as follows:

> All female current and former Nike employees at Nike Headquarters in Oregon,
> who were employed at any time from October 11, 2017 through the resolution of
> this action for claims under Title VII, for the period from July 25, 2017 through the
> resolution of this action for claims under ORS 659A.030, and for the period from
> August 9, 2017 through the resolution of this action for claims under ORS 652.220,
> in a salaried, corporate position in Bands L, U, E, or S ("Putative Class").

Reply (ECF 240) at p. 2.

The proposed change expands the claims under the Oregon Equality Act to begin 15 days

earlier.  Defendant objects contending the amendment to the class definition causes it to suffer

prejudice.

---

[15] The Court does consider Stuckey's declaration regarding job codes given her position as Senior Director of
Global Retail Compensation.   The declaration is based on her personal knowledge and qualifies as lay testimony.
See United States v. Flores, 536 F. App'x 709, 711 (9th Cir. 2013) (testimony rationally based on personal
knowledge offering observation that is common and requires limited expertise is admissible).

Generally, the Court is bound by the class definitions provided in the complaint and, absent an amendment to the operative complaint, will not consider certification beyond that definition. See Berlowitz v. Nob Hill Masonic Mgmt., Inc., 1996 WL 724776, at *2 (N.D. Cal. Dec. 6, 1996) (rejecting plaintiff's attempt to certify a class different from that alleged in the complaint, because the "court is bound by the class definition provided in the complaint ... and will not consider certification of the class beyond the definition provided in the complaint unless plaintiffs choose to amend it"); see also Ortiz v. McNeil–PPC, Inc., 2009 WL 1322962, at *2 (S.D. Cal. May 8, 2009); Stuart v. Radioshack Corp., 2009 WL 281941, at *2 (N.D. Cal. Feb. 5, 2009).

Plaintiffs assert they are willing to amend if the Court prefers. Thus, in the Court is not prohibited from considering certification of a class as modified in a reply brief. See Garcia v. Schlumberger Lift Sols., 2021 WL 1259737, at *18 (E.D. Cal. Apr. 6), report and recommendation adopted, 2021 WL 5321669 (E.D. Cal. Nov. 16, 2021) ("As an initial matter, the Court may consider class definitions first raised in a plaintiff's reply brief."). As noted in Garcia, "the Court has the authority to redefine a class, and as such there is no reason the Court should not consider the amended definitions proposed." Id. Nonetheless, the modification should be permitted only if it is minor and non-prejudicial. Cancino Castellar v. Mayorkas, 2021 WL 4081559, at *8 (S.D. Cal. Sept. 8, 2021).

Defining the class is critical because it identifies the persons (1) entitled to relief, (2) bound by a final judgment, and (3) entitled under Rule 23(b)(2) to the "best notice practicable" in a Rule 23(b)(3) action. Naylor Farms v. Anadarko OGC Co., 2009 WL 8572026, at *3 (W.D. Okla. Aug. 26, 2009). In this case, the parties engaged in a rancorous discovery process related to class certification over a nearly four-year period including extensive expert analysis based on the

definition asserted in the First Amended Complaint which did not include dates but included all current and former female employees employed by Nike at any time from three years prior to opting-in through resolution of this action. First Am. Compl. ¶ 165 (ECF 42). The complaint alleged Cahill was a full-time employee from October 2013 to July 26, 2017. Cahill filed a BOLI complaint on July 25, 2018, which was withdrawn due to the filing of the initial complaint on August 9, 2018. Id. at ¶¶ 28, 32. Cahill filed the BOLI complaint on behalf of herself and all other similarly situated female Nike employees. Id. at ¶ 33. Further, Cahill filed her consent to be a party in the EPA collective action on August 9, 2018. Id. at ¶ 31. Accordingly, the First Amended Complaint made clear that the proposed class included claims up to one year before the filing of the BOLI charge which includes claims of former female employees, such as Cahill, as far back as July 25, 2017. See Or. Rev. Stat. § 659A.875; Or. Admin. R. § 839-003-020(3).

The inclusion of modified specific dates within the time frame alluded to in the First Amended Complaint is a minor adjustment to the class definition. Moreover, Nike does not demonstrate a need to conduct further discovery, only a potential need to have their expert re-run his analysis to reflect the 15-day change to the class definition. However, pre-liability data is relevant and thus Nike already had incentive to conduct such analysis. See, e.g., Ellis v. Costco Wholesale Corp., 285 F.R.D. 492, 528 (N.D. Cal. 2012) (pre-statute of limitations data is generally both relevant and frequently used in such matters as evidence of the alleged discriminatory practice, even when a plaintiff may not directly recover as to events occurring outside the applicable period). In addition, Nike's primary dispute about expert analysis revolves around whether that analysis should be aggregated or disaggregated and the 15-day difference in the modified class does not impact this argument. Accordingly, the Court should consider class

certification based on the modified definition asserted in plaintiffs' reply brief.

Besides certifying the above modified class, plaintiffs also ask the Court to appoint the four named plaintiffs, Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender, as class representatives and appoint named plaintiffs' counsel as class counsel.

Plaintiffs challenge four purported class-wide polices that allegedly resulted in the putative class receiving lower pay than their male counterparts: (1) using prior pay or salary expectations when setting starting salary; (2) using a percentage of current salary when awarding annual merit increases and bonuses; (3) determining whether to fill promotions non-competitively or competitively; and (4) using hiring policies or practices that place women into lower job-levels based on initial job assignments.

Defendant asserts plaintiffs fail to provide sufficient evidence of a company policy or practice that both uniformly applies and harmed the entire putative class of 5,200 female employees. Defendant thus asserts plaintiffs fail to establish commonality, typicality, and predominance for purposes of Fed. R. Civ. P. 23. Defendant also argues certain putative class members themselves exercised discretion in their jobs and made the allegedly discriminatory decisions having a disparate impact, thus raising issues as to the adequacy of representation by the named plaintiffs. Defendant also contends plaintiffs lack standing for injunctive relieve on behalf of the class given that they are former employees. Finally, defendant argues plaintiffs fail to show a class action is superior to other methods of adjudication.

Rule 23 imbues "district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings." Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1176 (9th Cir. 2007). The party seeking certification bears the burden

of showing the proposed class meets the requirements of Federal Rule of Civil Procedure 23(a) and (b). See id. Although a court should accept the substantive allegations of the complaint as true, a court must also consider the nature and range of proof necessary to establish those allegations and conduct a "rigorous analysis" to determine whether the claim satisfies the Rule 23(a) requirements. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160-61 (1982); see also Zinser v. Accuflx Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001). Thus, this Court may look to supplemental information to "allow an informed judgment." Id. Although it may be necessary to inquire into the substance of a case to ascertain satisfaction of the Rule 23 requirements, the Court should not "advance a decision on the merits to the class certification stage." Staton v. Boeing Co., 327 F.3d 938, 954 (9th Cir. 2003).

To meet plaintiffs' burden, they must satisfy the requirements of Fed. R. Civ. P. 23(a) and 23(b). Rule 23(a) provides that plaintiffs may represent a class of similarly situated persons in a class action lawsuit only where:

(1) the class is so numerous that joinder of all members is impracticable,
(2) there are questions of law or fact common to the class,
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs seek Rule 23 certification for three class claims: (1) disparate impact under Title VII, 42 U.S.C.§ 2000e et seq. and the Oregon Equality Act (OEA), Or. Rev. Stat. 659A.001 et seq.; (2) disparate treatment under Title VII and the OEA; and (3) pay discrimination under the Oregon Equal Pay Act (OEPA).

1.    Numerosity

There are at least 4,913 potential class members who were employed at Nike Headquarters in Oregon in a salaried, corporate position that was a lower-level position than Vice-President between October 11, 2017, and August 31, 2019.[16]   Rebuttal Expert Report of David Neumark at ¶ 27 (ECF 149-2 at p. 17).   Accordingly, this requirement for certification is met.   See Harrison v. Harry & David Operations, Inc., 2020 WL 8367533, at *6 (D. Or. Oct. 21, 2020), report and recommendation adopted, 2021 WL 1135022 (D. Or. Mar. 24, 2021) (numerosity is met when the proposed class size in excess of 2000 is so large that joinder would be impractical).

### 2.     Commonality

A class has sufficient commonality "if there are questions of fact and law which are common to the class." Fed. R. Civ. P. 23(a)(2). The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). Indeed, Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

The class members' claims "must depend on a common contention ... that is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

Plaintiffs assert that all three of the of the claims upon which they seek certification are capable of class-wide resolution.   Plaintiffs contend the four challenged practices (using prior pay when setting starting salary, using a percentage of current salary when awarding annual merit increases and bonuses, filling promotions non-competitively, and placing women into lower job-

---

[16] As noted, discovery and expert reporting were completed before plaintiffs' modification of the class period.

levels based on initial job assignments) result in disparate impact and disparate treatment. In other words, plaintiffs contend that resolution of whether these policies result in lower pay for women will decide a common question impacting the whole class. Plaintiffs also contend resolution of Nike's affirmative defense that any pay gap is due to a factor other than sex will resolve a common question related to the OEPA claim. At the core of this argument is whether the purported policies are in fact company-wide policies applied to all employees regardless of job or at least all employees within the 1200+ different jobs plaintiffs occupy.

     a.  Disparate Impact Claims

   To establish a prima facie case of disparate impact under Title VII, the plaintiffs must: (1) show a significant disparate impact on a protected class or group; (2) identify the specific employment practices or selection criteria at issue; and (3) show a causal relationship between the challenged practices or criteria and the disparate impact. Atonio v. Wards Cove Packing Co., Inc., 810 F.2d 1477, 1482 (9th Cir. 1987).[17] If plaintiffs establish a prima facie case, the burden shifts to the employer to show that its challenged practices are consistent with business necessity and that there was no less discriminatory alternative. Moussouris v. Microsoft Corp., 2018 WL 3328418, at *14 (W.D. Wash. June 25, 2018), aff'd, 799 F. App'x 459 (9th Cir. 2019).

   For purposes of plaintiff's disparate impact claims, proof of commonality overlaps with the merits because both look at the reason for a particular employment decision. See, e.g., Cooper v. Fed. Rsrv. Bank of Richmond, 467 U.S. 867, 876 (1984). Thus, in order to demonstrate commonality, it is not enough for plaintiffs to show they disproportionately are paid less than men, they must show that the reason behind that discrimination is the same for all class members.

---

[17] The parties agree that the OEA claims are analyzed similarly to the Title VII claims.

However, by using an aggregate statistical analysis as their primary evidence of disparate impact, plaintiffs put the cart before the horse and essentially argue the impact provides the common thread as to the reason for the discrimination. The four purported company-wide policies to which plaintiffs' point are the ostensive class-wide glue that binds their claims together permitting resolution at one fell swoop. The question thus becomes whether the policies are in essence mandatory principles upon which hiring managers must adhere together with whether those policies caused the disparate pay shown by the statistical analysis.

### 1.    Starting Pay

As noted above, before September 2017, Nike hiring managers were free to consider and weigh whatever factors they deemed relevant to the position being hired including historical salary progression. In September 2017, Nike issued a directive that recruiters, hiring managers, etc. may no longer ask external applicants or their employers questions about their compensation history. ECF 155-6 at p. 1. After that, Nike policy permitted asking a candidate only about salary expectations. Id. Nike internal documents specifically indicated that, "[i]n the past, we often focused on the new hire's prior salary and/or the size of the increase the new hire would receive," but it did not "want to carry over poor pay practices from a prior company or start a candidate from a disadvantage—we want to create an equal playing field from day one." ECF 158-2 at p. 8.

Plaintiffs assert Nike had a class-wide policy of using prior pay when setting starting salaries and uniformly implemented this policy via active involvement of Human Resources including final decision-making by Human Resources and high-level executives. However, the evidence presented does not tip the scales in favor of a class-wide policy, rather it demonstrates that hiring managers possessed significant discretion.

Hiring managers receive pay ranges for a posted job but then make an independent decision within that range. While hiring decisions may involve multiple people providing approval, the onus for the offer decision rests on the hiring manager. In that respect, the prior salary (before September 2017) was merely a data point the manager could consider. The record does not demonstrate a centralized decisionmaker(s) inserting themself into the hiring decision to adjust the offer to align with prior pay. Indeed, there appear to be many times a hiring manager did not inquire into prior pay. See e.g., Declaration of Kimberly Louder at ¶ 6 (ECF 187-2 at p. 84) ("After the hiring manager offered me the job, I asked for a higher starting salary, which she approved. Nobody at Nike asked me about my prior salary or salary expectations before making the offer."); Declaration of Amber Dockter at ¶ 10 (ECF 187-1 at p. 203) ("Nike does not ask new graduate hires for prior salary information and it plays no role in the compensation for new graduate hires."); Declaration of Adrienne Lore at ¶ 6 (ECF 187-1 at p. 77) ("I do not recall if anyone asked me about my current salary or salary expectations during the hiring process, but I would not have answered the question if asked."); Declaration of Julia Hansen at ¶ 6 (ECF 187-1 at p. 39) ("I do not believe anyone asked me about my prior salary or my salary expectations before I received an offer, nor did anyone communicate to me what my starting salary was based on."); Declaration of Taya Saxton at ¶ 5 (ECF 187-1 at p. 136) ("I do not recall being asked for my current salary during the interview or hiring process. I recall discussing salary generally and the hiring manager was open about the salary range for the position, so I knew the salary range during the interview process. My starting salary at Nike was higher than my salary at PGE at the time.").[18]

---

[18] There were candidates who did recall being asked about prior pay. See, e.g., Deposition of Kelly Cahill at p. 112 (ECF 241-1 at p. 30) ("I remember discussing salary and pay. They asked me what I had made prior or what I currently made as a Flex contractor."); Deposition of Samantha Phillips at p. 103-05 (ECF 241-1 at pp. 104-06) (candidate noted that the offer was lower than prior pay and was told it was because cost of living is lower in Portland).

Plaintiffs assert Nike not only collected prior pay information from candidates, it also collected such information from employers and public records. See ECF 157-10 at p. 2 (in response to legislation prohibiting gathering compensation, Nike notes under new policy it may no longer search public records for compensation history); ECF 241-1 at p. 1 (HireRight background check seeking, from Hender, documentation verifying previous employment which may include W-2 forms, pay stubs and/or 1099 forms).[19]

The Senior Director for Talent Acquisition, Shine Thomas, specifically notes that she has:

> never asked an employer about someone's previous compensation history. … It's not a standard part of our recruiting process. We would ask, a follow-on change, we would ask a compensation history of a candidate. I can't think of a single scenario where the question went to their previous employer because of confidentiality. And currently we ask the candidate expectations, but we also do not contact the candidate's previous employer around compensation.

Deposition of Shine Thomas at p. 215 (ECF 162-9- at p. 21). Nike also asserts it is routine to confirm employment history. Moreover, there is insufficient evidence that Nike had a company-wide policy of collecting prior pay data from other sources. As with directly asking about prior pay either in the interview process or via public records search/background checks, some hiring managers inquired about it and some did not. The evidence does not demonstrate a centralized decision-making process that collected prior pay data used to make starting pay decisions.

Plaintiffs suggest the statistical analysis showing little variability among the class demonstrating women overall received lower pay than men at a statistically significant level is strong evidence of commonality. However, when using an aggregated statistical analysis, plaintiffs

---

[19] Plaintiffs similarly contend background checks sought prior pay information from plaintiffs Sara Johnston and Emily Tucker (ECF 241-1 at pp. 3-4, 7-8).

must first demonstrate a class-wide policy that is the alleged cause of the pay gap.   The evidence here more likely suggests an individual analysis of whether a particular hiring manager gathered prior pay history and used that information to set the starting pay with respect to individual hires.

In Wal-Mart Stores, Inc., 564 U.S. 338, the Supreme Court recognized the difficulty of maintaining a class action for disparate impact claims where hiring managers have discretion to make employment decisions such as setting starting pay.   As noted above, while Nike permitted consideration of historical salary progression, mangers were free to consider and weigh whatever factors they deemed relevant to the position.   While prior salary may have been a permissible data point, every offer was unique.   In other words, hiring managers were given discretion to set starting pay, within a guideline range, using whatever factors they deemed relevant which may or may not include prior pay history.   Use of such a discretionary system requires an individualized assessment as to whether the consideration of prior pay resulted in a disparate impact on the starting pay for women.   As the Supreme Court noted:

> recognition that this type of Title VII claim "can" exist does not lead to the conclusion that every employee in a company using a system of discretion has such a claim in common. To the contrary, left to their own devices most managers in any corporation—and surely most managers in a corporation that forbids sex discrimination—would select sex-neutral, performance-based criteria for hiring and promotion that produce no actionable disparity at all. Others may choose to reward various attributes that produce disparate impact…. And still other managers may be guilty of intentional discrimination that produces a sex-based disparity. In such a company, demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's. A party seeking to certify a nationwide class will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions.

Id. at 355–56.

Certainly, plaintiffs have shown that, in the aggregate, there is a statistically significant disparity among pay for women compared to pay for men at Nike.   Plaintiffs have not, however,

provided a statistical analysis demonstrating on a class-wide basis that starting pay is lower for women and higher for men where prior pay was a data point used by hiring managers in determining starting pay. Plaintiffs merely offer a broad analysis of starting pay at Nike headquarters showing a significant statistical disparity and assume the gathering of prior pay history is to blame without showing that the gathering of such information was common class-wide regardless of the job applied for, the department in which the job was located, or the educational, experiential, and other requirements for the job. Plaintiffs simply point to one document showing managers may consider historical salary progression (which is not defined in the document)[20] and assumed Nike did not permit managers to exercise discretion in implementing factors for setting starting pay. The evidence demonstrates otherwise. At best, plaintiffs demonstrate that some hiring managers considered prior pay. Nike similarly demonstrates that some hiring managers did not. The evidence squarely supports that an individualized inquiry will be necessary for each plaintiff to determine whether the imposition of the factor (or lack of imposition of that factor) had a disparate impact on pay.

Plaintiffs assert their multiple regression analysis demonstrates common impact. See Olean Wholesale Grocery Coop., 31 F.4th at 679 (finding well-developed expert testimony and regression modeling support common impact). The Court does not disagree that there is a

_____

[20] The seven factors listed apply to "beginning a new job," but do not necessarily mean starting fresh with Nike. For example, one factor is past Nike job performance for internal employees changing jobs. Thus, it is not clear that historical salary progression applies to pay before coming to Nike. The evidence does, however, demonstrate that prior salary was a factor that may have been considered, but it does not demonstrate that it was a required factor class-wide. Plaintiffs argue that such an issue is itself a common question, but the Court must resolve the question of commonality at this stage of the litigation. See, e.g., Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 667 (9th Cir. 2022) ("A district court must also resolve disputes about historical facts if necessary to determine whether the plaintiffs' evidence is capable of resolving a common issue central to the plaintiffs' claims. For instance … a district court [must] resolve factual disputes at certification regarding whether decisions regarding promotions were made at the local level or by upper management").

statistically significant difference in pay even when controlling for factors such as education and experience. However, the issue in this case is whether the common impact results from a common policy.

As noted above, Dr. Neumark opines that generally women came to Nike with similar or better education and/or experience than men but the starting pay for women was lower because of the purported company-wide policy of using prior pay as a factor in setting starting pay. (ECF 149-2 at p. 4). In reaching this conclusion, Dr. Neumark used an aggregate model controlling for differences in job families and subfamilies rather than for each job. Dr. Neumark justifies this level of statistical analysis asserting the prior pay policy was common across all jobs at Nike. Id. at p. 5. While it is true that for a short period encompassed within the proposed class period prior salary was a permissible data point at Nike, the evidence does not establish hiring managers were required to or even did actually use such data uniformly across all jobs. An aggregated statistical analysis is only appropriate in analyzing practices that are uniform across a company because it would conform to the level of decision for the challenged practice. Ellis, 285 F.R.D. at 523. "[I]n the absence of a common policy or procedure, mere statistics could not 'produce a common answer to the crucial question why was I disfavored.'" Jones v. Nat'l Council of Young Men's Christian Assocs. of the U.S. of Am., 34 F. Supp. 3d 896, 909 (N.D. Ill. 2014) (quoting Wal-Mart Stores, Inc., 564 U.S. at 352).[21] The evidence supports a finding that hiring managers exercised discretion and determined what factors to apply in setting starting pay. The existence of a factor that may or may not be used is not "common direction" and there is no evidence that Nike

---

[21] Additionally, prior pay data for either men or women employed at Nike was unavailable for the analysis. This reinforces that plaintiffs' experts presumed prior pay must be the reason behind the aggregated lower starting pay.

executives directed their hiring managers to use that factor. Generalized statistics notwithstanding, "it is quite unbelievable that all managers would exercise their discretion in a common way without some common direction." Wal-Mart Stores, Inc. 564 U.S. at 356. That an intervening change in the law required Nike to issue directives not to use the factor is not evidence of a prior directive requiring its use.[22]

In Olean, plaintiff sought class certification for price fixing where the common practice was already established via a conspiracy and thus the use of a common aggregated model to show class-wide impact was appropriate. See Olean Wholesale Grocery Coop., 31 F.4th at 661 (DOJ investigation uncovered a price-fixing scheme among tuna suppliers and Bumble Bee and StarKist, and three tuna industry executives pleaded guilty to the conspiracy); id. at 685 (statistical evidence capable of providing class-wide proof, sufficient to sustain a jury verdict on antitrust impact for the entire class).

While plaintiffs offer evidence of impact, they fail to establish a common mode of exercising discretion applied to virtually all hiring decisions made at Nike headquarters. Plaintiffs' theory is that use of prior pay or obtaining pay history resulted in women receiving disproportionately lower pay than men despite similar qualifications. However, because of the discretion afforded hiring managers, during the brief period in which such data could have been

---

[22] Plaintiffs assert they need not prove the existence of the challenged practice at this stage, merely that their evidence is capable of proving a key element on a class-wide basis. See Maney v. State, 2022 WL 986580, at *18 (D. Or. Apr. 1, 2022) ("based on Plaintiffs' theory of the case, they will be able to rely on same evidence of centralized policies, practices, and decisions to attempt to prove that Defendants' alleged deliberate indifference and negligence caused the class members' injuries. Whether or not Plaintiffs can so prove is a merits question for trial, but these common questions predominate over individual questions for the purpose of class certification."). However, the Court must resolve factual disputes at the certification stage regarding whether starting pay decisions were at the hiring manager level or at the highest level of Nike management. Plaintiffs' theory is that differences in starting pay resulted in the disparate impact but resolving that question will require individualized inquiries as to whether each hiring manager utilized prior pay to set that pay. Plaintiffs would not just place the issue of determining the merits of its case to the jury but leave to the jury whether plaintiffs establish commonality. That is an issue the Court must decide before certifying the class.

used, for each putative class member it will be necessary to determine did the applicant provide the salary data or did the hiring manager obtain it from another source and did the hiring manager use such data to set pay. The evidence already shows that some hiring managers did not use such data in the hiring process, while also showing some managers had the data. Accordingly, it is necessary to resolve not just whether the use of such data had a disparate impact (plaintiffs' theory) but whether each plaintiff was subject to such treatment. Simply resolving the issue of whether the data caused the disparate impact will not resolve a common question, it will instead turn on individualized inquiries. The resolution of those individualized inquires will then present the added complication of whether there is some other reason for the disparate pay, in the aggregate. Of course, offering a different reason for the pay differential (presumably one that is legitimate and nondiscriminatory) could itself present a common question. Nonetheless, in this case, it is first necessary to delve into each plaintiff's hiring process to determine what happened that may have caused any disparate impact. The failure to point to a common and required policy in the hiring process precludes a common analysis.

Plaintiffs attempt to certify a class of over 5,200 women in widely varying job positions with myriad qualifications from entry professionals to senior directors. There is insufficient evidence that starting pay was a required factor in making starting pay decisions throughout all these varied jobs. Plaintiffs fail to establish a common question of law or fact capable of class-wide resolution for starting pay and their disparate impact claims.

### 2.    Pay Increases and Bonuses

Plaintiffs assert that Nike had a policy of calculating merit awards and pay increases based on a percentage of base pay and that this policy exacerbates the starting pay gap based on the

purported policy of using prior pay to set starting pay.

The evidence again establishes considerable discretion on the part of managers and manager+1, with some managers providing a higher percentage increase to an employee with the same CFE rating as another employee if one of the employee's base pay is further from the midpoint.

Dr. Neumark opines:

This starting pay gap persists into the class period, during which women are paid less than men who are doing substantially similar work and have similar qualifications and performance. This happens because, after being hired, merit pay increases and bonuses for women and men with similar performance are based on the same percentage pay increase relative to their base pay, which perpetuates the starting pay gap.

ECF 149-2 at p. 4.[23]

Dr. Lundquist opines:

In addition to the problem of setting starting pay based on prior pay, Nike awarded merit increases using a percentage increase approach based on performance ratings from 2015 to 2018 ….   This approach is problematic because gender differences in starting salary tend to be perpetuated, and sometimes exacerbated, over time when increases are based on a percentage of base pay ….   These differences can be exacerbated both within the current job and magnified in promotional increase decisions which typically also are based on a percentage of pay . . . The issues with percentage increases in merit decisions discussed above are also applicable to Nike's annual bonus plan, or PSP, which determined payouts based on percentage of base pay….   As with merit increases, a reward based on a percentage of the employee's base pay will continue to exacerbate existing gender differences in pay.

ECF 148-1 at pp. 33-35.

Plaintiffs point to a company-wide policy of using percentages of base pay for increases, but to the extent that this policy results in a disparate impact it requires Nike to also have a

---

[23] Dr. Neumark also opines that the purported policy of hiring women into lower job levels and promoting them more slowly further exacerbates the disparate impact of the use of a percentage of base pay to calculate increases and bonuses.   ECF 149-2 at p. 5.   The placement and fill strategy is addressed in the next sections.

company-wide policy of using prior pay to set starting salaries. As noted above, the evidence fails to demonstrate that Nike had such a policy. Moreover, managers had considerable discretion and could adjust the pay percentage to accommodate different employees with lower base pay in the same CFE rating. They had discretion to account for lower base pay, and upper-level management involvement was generally limited to manager+1. As noted above, the absence of a common mode of exercising discretion that pervades throughout Nike headquarters prevents a finding of commonality. See, e.g., Moussouris v. Microsoft Corp., 2018 WL 3328418, at *19-21 (W.D. Wash. June 25, 2018), aff'd, 799 F. App'x 459 (9th Cir. 2019) (use of common criteria for pay determinations insufficient where the class was large involving myriad positions along with discretion of managers to make decisions within the framework).

### 3.        Promotions

Until 2018, employees in Bands L through S could receive promotions noncompetitively. Dr. Neumark opines women at Nike experience a 6.26% lower rate of promotion, despite similar qualifications and performance ratings, when promotions are made noncompetitively. ECF 149-2 at pp. 36-38, ¶ 59 and Table R8.

However, the evidence again demonstrates managers exercise discretion in determining whether to promote noncompetitively. In addition, beyond a manager+1, upper-level Nike executives played no role in that decision.[24] When upper-level executives did get involved in response to employee surveys, it was to require all E Band and below jobs to be posted for a competitive hiring process. As with the other purported company-wide policies above, the

---

[24] Plaintiffs did present an instance in which Talent Acquisition posted competitively for a U Band position in 2016. ECF 159-1 at p. 1. However, the record does not support a broad HR policy enforced upon hiring managers to post non-competitive positions.

discretion afforded managers with little upper management involvement is insufficient to present a common question that will resolve an issue relative to the entire class.

4.  Initial Job Assignments

Plaintiffs assert Nike has a policy of hiring women into lower job levels than men despite more education and work experience. Expert Report of Dr. David Neumark at ¶ 102 (ECF 149-1 at p. 50). Plaintiffs primarily assert the policy is company-wide based on a Nike document which stated: "All decisions related to hiring should be approved by Talent Acquisition." ECF 159-2 at p. 18. As noted previously, this statement is made in the very specific context of bribery and corruption. The full context is as follows, which appears in a code of conduct document under the heading "BRIBERY AND CORRUPTION":

> The rule is simple:
> Don 't bribe anybody, anytime, for any reason.
>
> We do not offer, promise, give or accept money or anything of value to or from third parties to get an improper business advantage. Any of these actions constitutes a bribe. Anti-bribery laws apply in every country where Nike does business. Criminal penalties to you and Nike for violating these laws are severe. There is no monetary threshold, so even a small or minor improper gift or donation could be construed as a bribe. Maintain accurate and transparent books and records, so all payments can be honestly described and documented. We take particular care when working with or evaluating prospective third parties, including agents who may interact with government officials or business partners on behalf of Nike. We don't use them to do anything that is prohibited by law, our Code or Nike policies.
>
> WHAT I F. . .?
> I know someone who works in the Department of Customs. This person asked if I would be willing to hire their relative as an intern for the summer even though I know they aren't qualified. Would it be OK if I offer the relative a position or recommend them to another department for a position?
> **No. All decisions relating to hiring should be approved by Talent Acquisition.** Offering the official's relative a position or ensuring they receive special consideration in the hiring process could be considered a form of bribery. Please direct all requests for employment or internships to Talent Acquisition or reach out to Human Resources or the Ethics & Compliance Office for help.

> We are in the middle of negotiating a big contract with a potential vendor. The vendor just gave me NBA courtside tickets. Is it OK to accept the tickets ? Probably not . Accepting anything of value - including event tickets, gifts, excessive meals or hospitality - from a vendor while negotiating a contract with them creates a potential conflict of interest and could also violate our policy on gifts, hospitality and other payments. Discuss with your manager to determine the best course of action to take.

ECF 159-2 at p. 18 (emphasis added).

This does not support a conclusion that all hiring decisions must be approved by Talent Acquisition.   Indeed, the record supports a finding that, while hiring managers attend training sessions to understand guidelines, those managers make the decision on posting open positions. Even though a hiring manager may work with Human Resources to set the level for the posting, it cannot be changed once approved and the record does not support an effort to channel women into applying for postings at a lower level once an application is received.   To the extent that hiring managers tend to deny applications from women for the higher-level jobs in favor of men, that is again a function of discretion that does not involve the application of any required company policy or upper management.   The presence of centralized guidelines along with discretion is insufficient to present a common question — the resolution of which will apply to all putative class members. Whether any given candidate was channeled into a lower paying job requires an individualized assessment.   See Moussouris, 2018 WL 3328418, at *19-21 (use of common criteria for pay determinations insufficient where managers exercise discretion within that framework).

Plaintiffs fail to establish the requirement of commonality for the disparate impact claims.

### b.      Disparate Treatment Claims

To demonstrate commonality in a disparate treatment claim, plaintiffs need not identify a specific company-wide employment practice, rather they must provide evidence of a "systemwide

pattern or practice" of pervasive discrimination against the class, such that the discrimination is "the regular rather than the unusual practice." Kassman v. KPMG LLP, 416 F. Supp. 3d 252, 281 (S.D. N.Y. 2018) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977)). Plaintiffs may satisfy their burden of showing a pattern or practice of discrimination through statistics alone. Teamsters, 431 U.S. at 339–40.[25]  Still, plaintiffs must show discrimination was the company's standard operating procedure.  Wal-Mart Stores, Inc., 564 U.S. at 352 n.7.

As in the Wal-Mart case, Nike's announced policy forbids discrimination.  In addition, as in Wal-Mart, plaintiffs presented significant statistical evidence of disparities between men and women.  Nonetheless, Wal-Mart concluded:

> Even if they are taken at face value, these studies are insufficient to establish that respondents' theory can be proved on a classwide basis. In Falcon, we held that one named plaintiff's experience of discrimination was insufficient to infer that "discriminatory treatment is typical of [the employer's employment] practices." 457 U.S., at 158, 102 S.Ct. 2364. A similar failure of inference arises here. As Judge Ikuta observed in her dissent, "[i]nformation about disparities at the regional and national level does not establish the existence of disparities at individual stores, let alone raise the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." 603 F.3d, at 637. A regional pay disparity, for example, may be attributable to only a small set of Wal–Mart stores, and cannot by itself establish the uniform, store-by-store disparity upon which the plaintiffs' theory of commonality depends.
>
> There is another, more fundamental, respect in which respondents' statistical proof fails. Even if it established (as it does not) a pay or promotion pattern that differs from the nationwide figures or the regional figures in all of Wal–Mart's 3,400

---

[25] In a case involving discretion among many decisionmakers, use of statistics to demonstrate common answers to the question of whether discrimination occurred requires something more to show a pattern and practice of discrimination.  In Wal-Mart Stores, the Supreme Court found that, despite statistical evidence, plaintiffs could not establish commonality for purposes of their disparate treatment claims because the discretion afforded managers prevented finding a uniform corporate culture of bias against women.  Wal-Mart Stores, Inc., 564 U.S. at 345, 352 (resolving a Title VII claim focuses on the reason for a particular employment decision that must have a uniform answer to permit class action status); see also Stephanie S. Silk, More Decentralization, Less Liability: The Future of Systemic Disparate Treatment Claims in the Wake of Wal-Mart v. Dukes, 67 U. Miami L. Rev. 637, 656 (2013) (after the Supreme Court's rejection of this evidence in Dukes, it seems increasingly unlikely that plaintiffs asserting systemic employment discrimination claims will be able to meet the evidentiary threshold necessary to prove a pattern or practice of discrimination especially when dealing with large corporations).

stores, that would still not demonstrate that commonality of issue exists. Some managers will claim that the availability of women, or qualified women, or interested women, in their stores' area does not mirror the national or regional statistics. And almost all of them will claim to have been applying some sex-neutral, performance-based criteria—whose nature and effects will differ from store to store. In the landmark case of ours which held that giving discretion to lower-level supervisors can be the basis of Title VII liability under a disparate-impact theory, the plurality opinion conditioned that holding on the corollary that merely proving that the discretionary system has produced a racial or sexual disparity is not enough. "The plaintiff must begin by identifying the specific employment practice that is challenged." … That is all the more necessary when a class of plaintiffs is sought to be certified. Other than the bare existence of delegated discretion, respondents have identified no "specific employment practice"—much less one that ties all their 1.5 million claims together. Merely showing that Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice.

Wal-Mart Stores, Inc., 564 U.S. at 356–57.

While this case does not involve 1.5 million putative class members, it does involve over 5200 women employed in a vast array of positions from apparel designers to pilots and mechanics in many separate departments at Nike's sprawling world headquarters.   And as noted above, Nike has delegated substantial authority for hiring and promotion within each of those departments. Plaintiffs' statistical analysis, while accounting for certain human capital, does not account for the differences from department to department and job to job.   Plaintiffs' experts merely pooled data across all 1,200 jobs and reported a single percentage in difference between men and women in all jobs combined.   See ECF 149-1 at p. 6.   The disparities might be attributable to only a small set of Nike managers, rather than a standard Nike operating procedure.   See Deposition of Deposition of David Neumark, Ph.D. at p. 297 (ECF 182 at p. 91) (it is possible that there are a couple or a handful of large job subfamily and level groupings that are driving the negative results).   As noted above, the aggregated data presume commonality, however, it does not present a common mode of proving it.

Plaintiffs also allege a standard operating procedure exists at Nike based on anecdotal evidence. Plaintiffs present approximately 30 complaints from the Starfish Survey and no declarations from opt-in plaintiffs. Given the size of the putative class, this is insufficient to demonstrate a standard operating procedure of discrimination. Courts generally require a significant amount of anecdotal evidence to demonstrate commonality and even accepting the 30 complaints, that amount is insignificant. Compare Teamsters, 431 U.S. at 331, 338 (1 complaint per 8 class members), Brown. Nucor Corp., 785 F.3d 895, 913 (4th Cir. 2015) (1 for every 6.25 class members); Rollins v. Traylor Bros., 2016 WL 258523, at *5, 7-8 (W.D. Wash Jan. 21, 2016) (about 1 for every 4 class members). Here, by contrast, there is 1 complaint per 173 class members. Plaintiffs' assessment of Nike's response to the Starfish Survey otherwise fails to show Nike had a standard operating procedure of failing to address discrimination. Plaintiffs fail to establish commonality sufficient to maintain a class action with respect to their disparate treatment claims.

### c. Oregon Equal Pay Act Claim

To establish a claim under OEPA, plaintiffs must show they were performing work comparable to that of men and were paid less than the male comparators. Smith v. Bull Run Sch. Dist. No. 45, 80 Or. App. 226, 229, 722 P.2d 27, 29 (1986). "Work of comparable character" means work that requires substantially similar knowledge, skill, effort, responsibility and working conditions in the performance of work, regardless of job description or title. Or. Rev. Stat. § 652.210(16).

Plaintiffs assert the expert opinions of Drs. Neumark and Lundquist demonstrate that, for a given set of job requirements men were paid more than women even with the same level of

knowledge, experience, scope, effort, and responsibility.   However, the reports do not adequately address job-to-job work and are too generalized to demonstrate work of comparable character. Nor do plaintiffs even identify specific job comparators for the named plaintiffs.   And, as noted above, plaintiffs do not present a common thread as to the reason for the purported discrimination. Accordingly, plaintiffs fail to establish the requirement of commonality sufficient to support a class action with respect to their OEPA claim.

### 3. and 4.       Typicality and Adequacy of Representation

The typicality prerequisite of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Under the Rule's permissive standards, representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical. Hanlon, 150 F.3d at 1020.   In determining typicality, the court asks, "whether other members have the same or similar injury, whether the action is based on conduct, which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks omitted) (quoting Hanon v. Dataprods. Corp., 976 F.2d 497, 508 (9th Cir. 1992)). Individualized defenses applicable to class representatives do not preclude a finding of typicality unless there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it. Hanon, 976 F.2d at 508.

> To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them. See Hansberry v. Lee, 311 U.S. 32, 42-43, 85 L. Ed. 22, 61 S. Ct. 115 (1940). Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the

class? See Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978).

Hanlon, 150 F.3d at 1020.

Because the evidence establishes discretion on the part of hiring managers in setting pay, promoting, and granting pay increases and bonuses, the inquiry will be fact intensive and individualized for all putative plaintiffs. Commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether, under the particular circumstances, maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. Those requirements therefore also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest. Wal-Mart Stores, Inc.,564 U.S. at 338 n.5. Accordingly, plaintiffs fail to meet these requirements sufficient to support a class action.

5.        Predominance and Superiority

A class action may be maintained only if one of three factors noted in Fed. R. Civ. P. 23(b) is present. Plaintiffs rely primarily on Rule 23(b)(3) requiring that:

> questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> > (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).[26]

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."   Amchem Prods. v. Windsor, 521 U.S. 591, 623 (1997).

> Rule 23(b)(3) focuses on the relationship between the common and individual issues.  When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.  …[T]the examination must rest on legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement.

Hanlon, 150 F.3d at 1022.

The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case.   Id. at 1023. This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution.   Id.

The predominance standard is even more stringent than commonality.   As noted above, common questions do not predominate and thus pursuit of individual claims is the better method to litigate claims of discrimination.   Accordingly, plaintiffs' motion to certify the class should be denied.

<u>CONCLUSION</u>

---

[26] Plaintiffs also assert Rule 23(b)(2) is satisfied because they seek injunctive relief to halt the purported company-wide polices that result in discrimination.  However, as noted, the evidence does not support a finding of common issues about the purported policies.   Thus, plaintiffs would necessarily seek to enjoin individual hiring managers from engaging in the allegedly discriminatory conduct.   Accordingly, plaintiffs fail to present a class action that may be maintained for injunctive relief.

Plaintiffs' motion to certify the class (ECF 146) should be denied.   Defendant's motions to exclude the opinions of Kathleen Lundquist and David Neumark (ECF 179, 181) should be denied.   Plaintiffs' motions to rule as inadmissible parts of Chester Hanvey's and Ali Saad's expert reports (ECF 192, 221) should be denied.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.   The parties have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the court. Thereafter, the parties shall have fourteen (14) days within which to file a response to the objections. Failure to timely file objections to any factual determination of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will waive a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to this recommendation.

DATED this 22nd day of November, 2022.


 /s/ Jolie A. Russo                                    
JOLIE A. RUSSO
United States Magistrate Judge