**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Counsel for Plaintiffs, Opt-in Plaintiffs and Putative Class
[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br>Defendant. | Case No. 3:18-cv-01477-JR<br><br>**CLASS ACTION ALLEGATIONS [Fed. R. Civ. P. 23]**<br><br>**PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATIONS**<br><br>Title VII of the Civil Rights Act of 1964; Oregon Equal Pay Act; Oregon Equality Act<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

OBJECTIONS ..................................................................................................... 3

STATEMENT OF FACTS ................................................................................... 8

STANDARD OF REVIEW .................................................................................. 8

ARGUMENT ...................................................................................................... 9

I.    THE COURT SHOULD CERTIFY THE PUTATIVE CLASS AS TO ALL
      CLAIMS PURSUANT TO RULES 23(A) AND 23(B). .................................. 9

      A.    Rule 23 Requirements ......................................................................... 9

      B.    Plaintiffs Satisfy the Rule 23(a) Requirements .................................... 9

            1.    Because Plaintiffs' Classwide Evidence Presents Common
                  Questions Capable of Classwide Resolution, Commonality Is Met. ........ 9

                  a.    Each of Plaintiffs' Four Disparate Impact Claims Satisfy
                        Commonality…………….............................................. 10

                        (1)    Classwide Evidence Can Resolve Whether Nike's
                               Starting Pay Policy Disparately Impacted Women's
                               Compensation. ......................................................... 10

                               i.     The FR's Commonality Analysis Did Not
                                      Correctly Apply the Disparate Impact
                                      Elements. ........................................................... 10

                               ii.    Instead of Determining Whether Common
                                      Questions Are Capable of Class Resolution,
                                      the FR Required Plaintiffs to Prove They
                                      Would Succeed At Trial Based on Nike's
                                      Legal Theory. ..................................................... 11

                               iii.   The FR Incorrectly Disregarded Plaintiffs'
                                      Legal Theory. ..................................................... 13

                               iv.    Plaintiffs' Classwide Evidence Is Capable of
                                      Proving Nike's Classwide Prior Pay Policy
                                      Caused a Disparate Impact. ................................ 14

v.    Although the Statistical Evidence Is Capable of Proving Plaintiffs' Prima Facie Disparate Impact Case, the FR Gave It No Weight. ........... 17

vi.    The FR Improperly Relied on Litigation-Driven Declarations and Limited Corporate Witness Testimony............................................... 20

(2)    Classwide Evidence Can Resolve Whether Nike's Policy of Giving Raises and Bonuses As A Percentage of Base Pay Disparately Impacted Women's Compensation. ................................................. 21

(3)    Classwide Evidence Can Resolve Whether Nike's Fill Strategy for Making Noncompetitive Promotions Disparately Impacted Women. .................... 24

(4)    Classwide Evidence Can Resolve Whether Nike's Policy and Practice of Assigning New Hires Disparately Impacted Women........................................... 26

(5)    Nike's Affirmative Defense of Business Necessity Is Susceptible to Classwide Resolution. ......................... 28

b.    Plaintiffs' Disparate Treatment Claims Satisfy Commonality…………............................................................... 29

(1)    The FR Misapplied *Wal-Mart* to Preclude the Use of Statistical Evidence Regardless of Plaintiffs' Theory of Liability.......................................................... 30

(2)    The FR Erroneously Disregarded Plaintiffs' Statistical Evidence on Additional Improper Bases........ 31

(3)    The FR Erred in Disregarding Admissions and Anecdotal Evidence in Evaluating Disparate Treatment Discrimination. ................................................ 34

c.    Plaintiffs' OEPA Claims Satisfy Commonality......................... 36

(1)    The FR Erred in Rejecting Plaintiffs' Evidence As To "Work of Comparable Character." ............................ 37

(2)    The FR Erroneously Disregarded Statistical Evidence that Nike Violated the OEPA......................... 40

2.    Plaintiffs' Claims Are Typical of the Class. ........................................... 41

3.    Plaintiffs Meet the Adequacy Requirement. ........................................... 42

C.    Plaintiffs Satisfy Requirements of Rule 23(b)(2) and (b)(3). ........................... 42

    1.    Plaintiffs' Claims Present Common Issues for Which Classwide Injunctive Relief Under Rule 23(b)(2) Is Appropriate. ........................ 42

    2.    Common Issues Predominate and A Class Trial is Superior Such That Certification Under Rule 23(b)(3) Is Appropriate. ........................ 44

        a.    Predominance Is Met. ................................................................. 44

            (1)    Plaintiffs Satisfy Predominance for Their Disparate Impact Claims. ................................................................. 45

            (2)    Plaintiffs Satisfy Predominance for Their Disparate Treatment Claims. ............................................................. 47

            (3)    Plaintiffs Satisfy Predominance for Their OEPA Claims.         ................................................................. 47

        b.    A Class Proceeding Is Manageable and Superior to Thousands of Individual Cases. ................................................. 48

            (1)    A Class Trial Is Manageable. .......................................... 48

            (2)    A Class Trial Is Superior to Thousands of Individual Cases. ............................................................. 49

D.    In the Alternative, the Court May Certify Issues Under Rule 23(c)(4). ............. 50

E.    Conclusion…………. ...................................................................... 50

# **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)............................................................................................11

*Bazemore v. Friday*,
    478 U.S. 385 (1986) .......................................................................................14, 33

*Becks-Wilson v. Principi*,
    441 F.3d 353 (6th Cir. 2006) ..............................................................................41

*Bell v. PNC Bank, National Ass'n*,
    800 F.3d 360 (7th Cir. 2015) ..............................................................................46

*Buchanan v. Tata Consultancy Servs., Ltd.*,
    No. 4:15-cv-01696-YGR, 2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) ................................33

*Chen-Oster v. Goldman, Sachs & Co.*,
    325 F.R.D. 55 (S.D.N.Y. Mar. 30, 2018).............................................................8, 29

*Chen-Oster v. Goldman Sachs & Co.*,
    No. 1:10-cv-06950-AT-RWL, 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022).........................40

*Cooper v. Fed. Rsrv. Bank of Richmond*,
    467 U.S. 867 (1984)............................................................................................31

*E.E.O.C. v. Gen. Tel. Co. of Nw., Inc.*,
    885 F.2d 575 (9th Cir. 1989) ..............................................................................36

*Ellis v. Costco Wholesale Corp.*,
    285 F.R.D. 492 (N.D. Cal. 2012).....................................................................12, 50

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ..............................................................................12

*Franks v. Bowman Transp. Co.*,
    424 U.S. 747 (1976)............................................................................................43

*Freyd v. Univ. of Or.*,
    990 F.3d 1211 (9th Cir. 2021) ............................................................................18

*Griggs v. Duke Power Co.*,
    401 U.S. 424 (1971)............................................................................................29

*Hazelwood Sch. Dist. v. United States*,
    433 U.S. at 307 (1977).....................................................................................31, 35

*Hein v. Or. Coll. of Educ.*,
  718 F.2d 910 (9th Cir. 1983) .............................................................................41, 49

*Hemmings v. Tidyman's Inc.*,
  285 F.3d 1174 (9th Cir. 2002) ...............................................................................5, 17

*In re High-Tech Employee Antitrust Litigation*,
  985 F. Supp. 2d 1167 (N.D. Cal. 2013) ........................................................................20

*Int'l Bhd. of Teamsters v. United States*,
  431 U.S. 324 (1977).................................................................................10, 29, 48

*Johnson v. District of Columbia*,
  632 F. Supp. 2d 20 (D.D.C. 2009) ..............................................................................14

*Lavin-McEleney v. Marist Coll.*,
  239 F.3d 476 (2d Cir. 2001)...........................................................................40, 41, 49

*Maney v. State*,
  No. 6:20-cv-00570-SB, 2022 WL 986580 (D. Or. Apr. 1, 2022).................................45, 49

*McClain v. Lufkin Indus., Inc.*,
  519 F.3d 264 (5th Cir. 2008) .................................................................................26

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  672 F.3d 482 (7th Cir. 2012) ...............................................................................23, 43

*Moore v. Int'l Cosms. & Perfumes, Inc.*,
  No. 5:14-cv-01179-DMG-DTB, 2016 WL 7644849 (C.D. Cal. Mar. 17, 2016) ...................47

*Obrey v. Johnson*,
  400 F.3d 691 (9th Cir. 2005) .................................................................................29

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) ................................................................................. *passim*

*Palmer v. Shultz*,
  815 F.2d 84 (D.C. Cir. 1987) ..................................................................................18

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) ...............................................................................3, 9, 10

*Rizo v. Yovino*,
  950 F.3d 1217 (9th Cir. 2020) ...........................................................................17, 48, 50

*Segar v. Smith*,
  738 F.2d 1249 (D.D.C. 1984) .................................................................................35

*Senne v. Kansas City Royals Baseball Corp.*,
  934 F.3d 918 (9th Cir. 2019) .................................................................................43

*Smith v. L.A. Unified Sch. Dist.*,
    830 F.3d 843 (9th Cir. 2016) ........................................................................50

*Stockwell v. City & County of San Francisco*,
    749 F.3d 1107 (9th Cir. 2014) ........................................................................11

*Thiessen v. Gen. Elec. Cap. Corp.*,
    267 F.3d 1095 (10th Cir. 2001) ........................................................................31

*B.K. ex rel. Tinsley v. Snyder*,
    922 F.3d 957 (9th Cir. 2019) ........................................................................12

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ........................................................................4, 32, 44, 45

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. &*
    *Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*,
    593 F.3d 802 (9th Cir. 2010) ........................................................................3, 13

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................ *passim*

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
    594 F.3d 1087 (9th Cir. 2010) ........................................................................46

**Federal Statutes**

42 U.S.C.
    § 2000e-2(k)(1)(A)(i) ........................................................................28
    § 2000e-2(k)(1)(B)(i) ........................................................................26

Equal Pay Act ........................................................................41

Lilly Ledbetter Fair Pay Act ........................................................................14

**State Statutes**

Or. Rev. Stat.
    § 652.220 ........................................................................3, 36
    § 659A.030 ........................................................................3
    § 659A.885 ........................................................................44

Oregon Equal Pay Act ........................................................................ *passim*

**Rules**

Fed. R. Civ. P.

    23 ........................................................................................................................9, 11
    23(a) .....................................................................................................................8, 9
    23(a)(2) ....................................................................................................................9
    23(b) ...................................................................................................................9, 42
    23(b)(2) ...............................................................................................8, 42, 43, 50
    23(b)(3) ..........................................................................................................*passim*
    23(c)(4) ..............................................................................................................8, 50
    30(b)(6) .............................................................................................................2, 27
    42(b) .......................................................................................................................49
    72(b)(2) .................................................................................................................3, 8
    72(b)(3) .....................................................................................................................8

**Regulations**

29 C.F.R.

    § 1607.1 *et seq.* ....................................................................................................29

**Other Authorities**

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*
    (Fed. Judicial Ctr. 3d ed. 2011)............................................................................32

Manual for Complex Litigation (Fourth) (2004) ......................................................48

**INTRODUCTION**

Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender ("Plaintiffs") request class certification for their disparate impact, pattern-or-practice disparate treatment, and Oregon Equal Pay Act ("OEPA") claims. Each of these claims alleges that Nike pays women less than men. The disparate impact claims challenge the four Nike policies Plaintiffs contend have an adverse impact on women. The disparate treatment claims allege Nike discriminated against women regularly, rather than unusually. And the OEPA claim, which does not require identifying a practice or a pattern-or-practice of discrimination, alleges Nike paid women less for jobs requiring comparable work.

The Findings and Recommendation ("FR"), ECF No. 310, recognized that extensive gender pay disparities have existed for years at Nike, but denied class certification based on commonality. It found commonality was not met because it erroneously found that Plaintiffs have not presented common evidence that a factfinder could use to conclude that Nike's policies and practices caused those disparities. The FR's conclusion, however, was based on a misunderstanding of Plaintiffs' legal theories, the evidentiary record, and misapplication of controlling case law.

The Ninth Circuit and Supreme Court have held statistical evidence alone can establish Plaintiffs' *prima facie* elements for disparate impact and disparate treatment claims. The FR found, "in the aggregate, there is a statistically significant disparity among pay for women compared to pay for men at Nike." FR 42. And, in fact, Plaintiffs' statistical evidence tells a straightforward story of systemic sex discrimination with Nike underpaying women, on average, across all class positions by almost $11,000 per woman per year. There is less than a 1 in 1 billion chance that these disparities occurred due to random chance, creating a strong inference

866714.35

of sex discrimination.  But the FR gave little to no weight to this classwide evidence of discriminatory disparities.

Misapplying *Wal-Mart v. Dukes* and other controlling legal standards, the FR recast Plaintiffs' legal theory as challenging discretionary decision-making while it disregarded evidence capable of resolving classwide questions of pay discrimination.  Unlike *Wal-Mart*, Plaintiffs' disparate impact and treatment claims can provide a common answer for why women have been disfavored at Nike.  For their disparate impact claims, women are disfavored because four centralized policies adversely impacted women.  For their disparate treatment claims, women are disfavored because systemic sex discrimination was the regular rather than unusual practice at Nike.  In addition to the acknowledged evidence of statistically significant disparities, Plaintiff offered, but the FR erroneously disregarded common evidence of classwide policies and the bias they caused, including contemporaneous Nike policy and training documents, Nike Federal Rule of Civil Procedure ("Rule") 30(b)(6) testimony, and expert witness testimony. Furthermore, this case contains key admissions by Nike executives that it engaged in systematic discrimination.  These include Nike's CEO admitting that HR process had "underserved us in recent years" while acknowledging behavior at Nike that did "not reflect our core values" as well as admissions that Nike's past collection of prior pay information created "bias" in its "hiring process" by both Nike's Chief Human Resources Officer and its FY 16/17 Sustainable Business Report.  Regarding their OEPA claims, Plaintiffs also presented classwide evidence capable of establishing both of their elements – namely expert opinions confirming that, in jobs requiring comparable work, Nike paid women less than men based on sex and not a job-related factor.

The FR should have considered whether Plaintiffs, under their theory, have provided sufficient evidence showing a common question central to their claims is capable of classwide

resolution.  Respectfully, Plaintiffs contend the answer to the question is yes.  Based on common evidence presented, Plaintiffs hereby object to the FR, seek the Court's *de novo* review, and request certification of the following class:

> All female current and former Nike employees at Nike Headquarters in Oregon, who were employed at any time from October 11, 2017 through the resolution of this action for claims under Title VII, for the period from July 25, 2017 through the resolution of this action for claims under ORS 659A.030, and for the period from August 9, 2017 through the resolution of this action for claims under ORS 652.220, in a salaried, corporate position in Bands L, U, E, or S ("Putative Class").

> Excluded from the putative class are Nike retail store employees and employees in Nike's Finance, Human resources, and Legal Job Functions.

## <u>OBJECTIONS</u>

Pursuant to Rule 72(b)(2), Plaintiffs object as follows:

**1.  There are three foundational legal errors in the FR's commonality analysis.**

1.a.    Although commonality must begin with the elements of the claim, the FR's analysis was not based on the elements of the claims.  *See Parsons v. Ryan*, 754 F.3d 657, 676 (9th Cir. 2014) (Commonality requires "a precise understanding of the nature of the underlying claims" and to "identify the elements of the class members' case-in-chief.") (citations omitted). *See* Sections I.B.1.a(1)(i), I.B.1.b, I.B.1.c, *infra*.

1.b.    A district court abuses its discretion when it fails to consider whether plaintiffs' legal theory provides common questions capable of classwide resolution.  *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) (holding, where a "district court treated plaintiffs' actual legal theory as all but beside the point, … the district court ignored Ninth Circuit precedent and ultimately abused its discretion.").  Instead of analyzing whether Plaintiffs' legal theory presents common questions capable of classwide resolution, the FR's commonality analysis proceeded under Nike's preferred theories for Plaintiffs' claims.  By focusing on the

defendant's theory and evidence, the FR did not consider whether there are common questions under Plaintiffs' legal theory and the classwide evidence they presented.

1.c.    A "district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022) (*en banc*), *cert. denied*, 2022 WL 16909174 (2022) (emphasis in original).  Yet the FR repeatedly decided whether Plaintiffs would succeed at trial based on Nike's theory and evidence.

## 2.   The FR found Plaintiffs' experts' testimony admissible but not entitled to any weight, which is contrary to the record and binding precedent.

2.a.    Contrary to binding precedent, the FR categorically rejected Dr. Neumark's multiple regression analysis because it found, without analysis, that the analysis could not control for differences among class members.  *See e.g.,* FR 52 (disregarding Dr. Neumark's multiple regression analysis because it "does not account for the differences from department to department and job to job.").

This finding is contrary to both the record and *Olean*.  Based on Dr. Lundquist's testimony concerning how Nike designated comparable jobs, Dr. Neumark used a well-established statistical method, multiple regression analysis, that controlled for different jobs, as well as other factors that potentially can impact compensation.  *See* Sections I.B.1.a(1)v, I.B.1.b(2), *infra*.  The Ninth Circuit and Supreme Court are clear: multiple regression analyses can control for individualized differences among class members.  *See Olean*, 31 F.4th at 677 (based on *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 459-60 (2016), "any categorical argument that a pooled regression model cannot control for variables relating to the individualized differences among class members must be rejected.").

2.b.    Contrary to binding precedent, the FR gave no weight to Dr. Neumark's multiple regression analysis for any of the claims.

The FR gave little or no weight to Plaintiffs' statistical evidence for their disparate impact claims even though the Ninth Circuit holds statistical evidence can prove a prima facie disparate impact case.  *See e.g., Hemmings v. Tidyman's Inc.,* 285 F.3d 1174, 1184 (9th Cir. 2002) ("Courts have long recognized that statistical evidence may be used to establish a prima facie case of disparate impact discrimination.") (citation omitted).

The FR gave little or no weight to Plaintiffs' statistical evidence for their disparate treatment claims even though, as the FR recognized, the Supreme Court held "statistics alone" can prove a *prima facie* pattern-or-practice case.  FR 51 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 at 339-40 (1977)).

2.c.    The FR incorrectly disregarded the testimony of Dr. Kathleen Lundquist, Plaintiffs' Industrial Organizational Psychology expert.  Dr. Lundquist's testimony is capable of proving that Nike designates comparable jobs consistently based on its uniform job architecture, which consists of "type of work" and "level of work."  *See* Section I.B.1.c(1), *infra*.

**3.   For Plaintiffs' challenge to Nike's use of prior pay as causing a disparate impact on women, the FR's commonality findings were based upon several errors.**

3.a.    The FR did not consider whether Plaintiffs' theory and classwide evidence presents common questions capable of classwide resolution concerning whether Nike had a policy of using prior pay when setting starting salary and that this caused a disparate impact.

3.b.    Despite acknowledging Nike's admission that it "often focused on a hire's prior salary," the FR disregarded this admission, and many other Nike business documents acknowledging Nike's prior pay policy.  The FR also ignored Nike admissions that in order to "remove bias" it was "eliminating the collection of candidate salary history."

3.c.    The FR incorrectly gave no weight to Plaintiffs' statistical evidence even though it showed statistically significant disparities for women in starting pay when controlling for comparable jobs, education, experience, and other legitimate factors that may impact compensation.

**4.  For Plaintiffs' challenge to Nike's policy of using a percentage of current salary when calculating annual salary increases and bonuses as causing a disparate impact on women, the FR's commonality findings were based on several errors.**

4.a.    Although the FR found that Nike used a percentage of current salary to determine annual raises and bonuses (FR 12-15), the FR denied commonality because it incorrectly relied on Nike's theory, which asserted that Plaintiffs were challenging discretionary decision-making.

4.b.    Plaintiffs' challenge to annual salary increases and bonuses does not require first proving that Nike's prior pay policy caused a disparate impact.  *See, e.g.*, ECF No. 240 at 17. The FR, however, denied commonality because it found Plaintiffs' challenge to the use of a percentage of current salary requires Plaintiffs to first prove a prior pay policy.  FR 46-47.

**5.  For Plaintiffs' challenge to Nike's centralized fill strategy as causing a disparate impact on women, the FR's commonality findings are incorrect.**

5.a.    Plaintiffs challenge Nike's fill strategy practice, which is the decision Nike makes of whether to fill a job opening through either a noncompetitive process or a competitive one. Plaintiffs' classwide evidence can show Nike makes its fill strategy determinations through centralized processes run by Nike HR and involving executives.  But the FR's analysis focused on Nike's preferred theory that Plaintiffs must challenge discretionary decision-making.

**6.  For Plaintiffs' challenge to Nike's hiring process as incapable of separation for analysis and its disparate impact on women, the FR's commonality findings were based on several errors.**

6.a.    The FR erroneously ignored statistical evidence showing that Nike assigned women to lower job assignments than comparably qualified men.

6b.    Under Title VII, a plaintiff can challenge a decision-making process if it is incapable of separation for analysis.  Plaintiffs provided classwide evidence capable of showing that Nike's hiring process could not be separated for purposes of analysis.  But the FR neither analyzed nor mentioned this theory.

7.  **The FR's commonality findings for Plaintiffs' pattern-or-practice disparate treatment claims were based on several errors**.

7.a.    For Plaintiffs' prima facie pattern-or-practice claim, the FR stated it "focuse[d] on the reason for a particular employment decision that must have a uniform answer to permit class action status." FR 51 n.25.  The Supreme Court, however, holds Plaintiffs are not required to offer evidence that each person for whom they will ultimately seek relief was a victim of the discriminatory policy; rather, Plaintiffs must show discrimination was the employer's "standard operating procedure," which means "the regular rather than the unusual practice."  *See* Section I.B.1.b, *infra*.

7.b.    Although the FR recognized that "statistics alone" can prove Plaintiffs' *prima facie* case, the FR disregarded Plaintiffs' statistical evidence showing that the likelihood of the gender disparity occurring by random chance instead of discrimination is more than 1 in 1 billion.  The FR disregarded Plaintiffs' theory and other evidence, including admissions by Nike's CEO that HR practices had "underserved" Nike, which a jury could credit, while uncritically accepting Nike's evidence.

8.  **The FR's commonality findings for Plaintiffs' OEPA claims were based on several errors.**

The OEPA's two elements are work of comparable character and lower pay.  The FR did not consider Plaintiffs' expert testimony showing comparable work.  Also, the FR's finding that "plaintiffs do not present a common thread as to the reason for the purported discrimination" imposed a requirement not found in the statute.  FR 54.

8.a.    The FR disregarded Plaintiffs' expert testimony showing that female employees received lower pay.

**9.   Relying on its erroneous commonality findings, the FR also erred in concluding that Plaintiffs did not satisfy the remaining elements of Rule 23(a), 23(b)(2), or 23(b)(3).**

9.a.    The FR's denial of typicality, adequacy, Rule 23(b)(2), and Rule 23(b)(3) were based on its legal and factual errors in its commonality analysis and other errors.  The record shows Plaintiffs meet each of these requirements.  *See* Sections I.B.2, I.B.3, I.C.1, I.C.2, *infra*.

**10. In the alternative to Rule 23(b)(2) or (b)(3) certification, the Court should grant certification pursuant to Rule 23(c)(4) or to classwide issues or defenses.**

10.a.    Even if the Court finds individual issues predominate under Rule 23(b)(3), it should certify all issues, such as the lawfulness of a prior pay policy or availability of punitive damages for the class, which can be efficiently resolved on a classwide basis.

## STATEMENT OF FACTS

The facts underlying the motion for class certification have been extensively briefed in Plaintiffs' Motion for Class Certification, ECF No. 146, Plaintiffs' Reply Brief, ECF No. 240, and Plaintiffs' Sur-Sur-Reply, ECF No. 268.  For purposes of brevity, Plaintiffs incorporate the facts in these submissions by reference.  Certain specific facts are described below.

## STANDARD OF REVIEW

As set forth in this filing, Plaintiffs object to the FR.  Fed. R. Civ. P. 72(b)(2).  The district judge must make a *de novo* determination.  Fed. R. Civ. P. 72(b)(3); *see*, *e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 62 (S.D.N.Y. Mar. 30, 2018) (*de novo* review of magistrate judge's order denying class certification, sustaining objections in part, and granting class certification in part).  The "district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions."  Fed. R. Civ. P. 72(b)(3).

Given the number of issues presented, Plaintiffs believe that oral argument will assist the court and hereby request it.

## ARGUMENT

### I.    THE COURT SHOULD CERTIFY THE PUTATIVE CLASS AS TO ALL CLAIMS PURSUANT TO RULES 23(A) AND 23(B).

**A.    Rule 23 Requirements**

Class certification requires meeting the four Rule 23(a) prerequisites (numerosity, commonality, typicality and adequacy) and at least one of the Rule 23(b) standards.  Fed. R. Civ. P. 23(a), (b).  Plaintiffs have a preponderance burden to meet these requirements.  *Olean*, 31 F.4th at 664.

Before certifying a class, a district court must be "satisfied, after a rigorous analysis," that Rule 23(a) and (b) are met.  *Olean*, 31 F.4th at 664 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161(1982)).  The Ninth Circuit also states, "[w]hen reviewing a grant of class certification, we accord the district court noticeably more deference than when we review a denial of class certification."  *Parsons v. Ryan*, 754 F.3d 657, 673 (9th Cir. 2014) (citations omitted).

**B.    Plaintiffs Satisfy the Rule 23(a) Requirements.**[1]

**1.    Because Plaintiffs' Classwide Evidence Presents Common Questions Capable of Classwide Resolution, Commonality Is Met.**

The commonality standard requires "questions of law or fact common to the class."  Rule 23(a)(2).  A single common question central to the determination of the claim is sufficient to establish commonality.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

---

[1] The FR correctly found numerosity met with "at least 4,913 class members."  FR 36-37.

### a.    Each of Plaintiffs' Four Disparate Impact Claims Satisfy Commonality.

Disparate impact claims concern "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters*, 431 U.S. at 335 n.15. "Proof of discriminatory motive ... is not required ...." *Id.*

### (1)    Classwide Evidence Can Resolve Whether Nike's Starting Pay Policy Disparately Impacted Women's Compensation.

Classwide evidence is capable of establishing that Nike's policy of using candidates' prior pay to set their starting pay adversely affected the compensation received by female employees, thereby satisfying the commonality requirement. The FR failed to so find because it applied the wrong standard, failed to consider or misinterpreted evidence, incorrectly evaluated statistical evidence, and wrongly relied upon litigation-driven declarations submitted by Nike.

### i.    The FR's Commonality Analysis Did Not Correctly Apply the Disparate Impact Elements.

Commonality requires "a precise understanding of the nature of the underlying claims" and to "identify the elements of the class members' case-in-chief." *Parsons*, 754 F.3d at 676 (citations omitted).

The FR correctly identified the elements for a *prima facie* case of disparate impact discrimination: (1) show a significant disparate impact *on a protected class or group*; (2) identify a specific employment practice; and (3) show a causal relationship between the challenged practice and the disparate impact. FR 38 (emphasis added). The Ninth Circuit thus states a *prima facie* case requires plaintiff to show "a group-based disparity" that requires "statistical evidence" because "discriminatory consequences are perceptible only in the *aggregate* ...."

*Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1115 & n.4 (9th Cir. 2014) (citation and quotation omitted) (emphasis added).[2]

In contrast, the FR required Plaintiffs to show a disparate impact on each individual class member.  FR 38 ("it is not enough for plaintiffs to show they disproportionately are paid less than men, they must show that 'reason behind the discrimination must be the *same* for all class members.'") (emphasis added, quotation omitted); 43 (asserting that "individualized inquiry will be necessary for each plaintiff to determine whether the imposition of the factor (or lack of imposition of that factor) had a disparate impact on pay.").

> ### ii.     Instead of Determining Whether Common Questions Are Capable of Class Resolution, the FR Required Plaintiffs to Prove They Would Succeed At Trial Based on Nike's Legal Theory.

The "district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 667 (emphasis in original).  While commonality may require consideration of the merits, *Wal-Mart*, 564 U.S. at 351, the Supreme Court made clear: "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites … are satisfied," *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) (citations omitted); *see also id.* ("Rule 23 grants courts no license to engage in free-ranging merits inquires at the certification stage.").

Merits issues, the Ninth Circuit explained, "while not irrelevant to the class certification inquiry,

---

[2] Nor is there any requirement in commonality that individual questions be absent.  That position is contrary to the structure of Rule 23 which requires an evaluation of the "predominance" of common questions compared to individual questions pursuant to Rule 23(b)(3). The "individualized" issues identified by the FR concern questions of whether individual class members were harmed by Nike's prior pay policy or the presence of limited exceptions to its centralized policy, but neither defeat commonality or predominance as discussed below in Section I.C.2.a(1), *infra*.

do not preclude certification as a matter of law unless proving the answer to a common question or crafting uniform injunctive relief will be impossible." *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 973 (9th Cir. 2019).

The FR, by contrast, decided Plaintiffs would not win at trial based on Nike's theory of the case. *See e.g.*, FR 39 ("before September 2017, Nike hiring managers were free to consider and weigh whatever factors they deemed relevant to the position being hired including historical salary progression."). These determinations are based, in part, on an overreading of a Ninth Circuit's reference to "historical facts." FR 43 n.20 (based on language from *Olean*, finding the court must decide if prior pay was "a required factor class-wide" before certifying the class); *see also id.* 45 n.22. But this misapplied the holding and language from *Olean* because the Ninth Circuit's holding is clear, including in the passage the FR quoted, that the determination is limited to whether plaintiffs' evidence is capable of resolving a common issue. *Id.* ("A district court must also resolve disputes about historical facts *if necessary to determine whether the plaintiffs' evidence is capable of resolving a common issue* ….") (quoting *Olean*, 31 F.4th at 667) (emphasis added).[3] The question here is thus, as *Olean* states, whether plaintiffs' evidence is capable of resolving a common issue.

---

[3] The FR also misapplied the quoted language from *Olean*. 31 F.4th at 667 (citing *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 983-84 & n.7 (9th Cir. 2011)). Because the example identified in *Olean* and *Ellis* concerned a class disparate treatment claim that challenged discretionary promotion decisions, inquiry into the level of decision-making, absent a challenged centralized policy, would be appropriate to determine if the decisionmaking process affected the class as a whole. In contrast, Plaintiffs here raise a disparate impact claim challenging Nike policies centrally created and applicable to the entire class, which makes concerns of decentralized and discretionary decisions of individual managers "less of a hurdle to certification." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 531 (N.D. Cal. 2012).

### iii.    The FR Incorrectly Disregarded Plaintiffs' Legal Theory.

Commonality requires considering how plaintiffs propose to prove their case.  *See Olean,*
*31 F.4th at 665* ("the court must make a rigorous assessment of the available evidence and the
method or methods by which plaintiffs propose to use the class-wide evidence to prove the
common question in one stroke.") (citation, brackets, and internal quotations omitted).  The
Ninth Circuit thus held, where a "district court treated plaintiffs' actual legal theory as all but
beside the point, … the district court ignored Ninth Circuit precedent and ultimately abused its
discretion." *United Steel Workers*, 593 F.3d at 808.

Here, the FR disregarded Plaintiffs' theory and proposed method for proving their claims
in two distinct ways.  First, the FR disregarded Plaintiffs' legal theory that Nike's classwide
policy of using prior pay to set starting pay caused a disparate impact on women.  ECF No. 146
at 47-54.[4]  Instead, the FR described Plaintiffs' claim as premised on the assumption that Nike
managers did not exercise discretion.  FR 43.  And the FR finds, "[a]t best, plaintiffs demonstrate
that some hiring managers considered prior pay." *Id.*  But Plaintiffs are not seeking to prove that
managers made decisions based on discretion.  Instead, Plaintiffs are seeking to prove Nike's
centrally-created policy for using prior pay when setting starting salary.  They seek to prove,
based on documents Nike created for business purposes and other classwide evidence, that Nike
designed a standard process to consistently use prior pay when setting starting pay.  Nor do
Plaintiffs just assume other factors may not have caused the disparities.  Rather, their expert's
regression analysis controls for legitimate factors that could impact starting pay, such as
education, experience, and comparable jobs.

---

[4] Citations for ECF documents are to the page numbers stamped at the header of each page.

Second, the FR incorrectly stated that Title VII liability applied only to the "brief period" prior to Nike's policy change. FR 44-46. Yet the Lilly Ledbetter Fair Pay Act, which amended Title VII, provides, "each paycheck resulting from the original 'discriminatory compensation decision or other practice' triggers a new filing period, in effect reviving a claim that otherwise would have been time-barred ….". *Johnson v. District of Columbia*, 632 F. Supp. 2d 20, 22 (D.D.C. 2009).[5] Accordingly, all members of the Putative Class hired prior to September 2017 were subject to this discriminatory policy – not just those hired during the early part of the liability period.

iv.      **Plaintiffs' Classwide Evidence Is Capable of Proving Nike's Classwide Prior Pay Policy Caused a Disparate Impact.**

Internal Nike documents demonstrate its centralized policy regarding the collection and use of prior pay to set starting compensation. Yet the FR did not mention, Nike's repeated admissions it had used prior pay when setting starting salary and that this policy caused "bias." Nike's FY16/17 Sustainable Business Report states it will "remove bias from critical moments of the hiring process by … eliminating the collection of candidate salary history." ECF No. 155-5 at 57. Nike's Chief Human Resources Officer ("CHRO") then made this same admission in a 2018 email to all Nike employees. ECF No. 155-7 at 3.

The FR referenced Nike documents but failed to credit them as evidence of Nike's policy. In a 2019 training document, Nike wrote, "in the past, *we often* focused on the new hires prior salary and/or the size of the increase the new hire would receive." FR 39 (citing ECF No.

---

[5] *See also* *Bazemore v. Friday*, 478 U.S. 385, 395 (1986) (Brennan, J., concurring in part) ("The error of the Court of Appeals with respect to salary disparities created prior to [the start of liability] and perpetuated thereafter is too obvious to warrant extended discussion: that the [employer] discriminated with respect to salaries *prior* to the time it was covered by Title VII does not excuse perpetuating that discrimination *after* the [employer] became covered by Title VII.").

158-2 at 8) (emphasis added).  This same document also contains evidence of the adverse impact caused by this challenged policy because Nike recognized the need to stop using prior pay because "we don't want to carry over poor pay practices from a prior company …."  ECF No. 158-2 at 8.  The FR also referred to a Nike directive announcing its prior pay policy change (FR 39 citing ECF No. 155-6 at 1), which states, "Nike employees may no longer ask candidates or their employers questions about their compensation history … [or] record salary information …."  ECF No. 155-6 at 1.[6]  These two documents alone establish a common question capable of classwide resolution regarding whether Nike used prior pay to set starting compensation.

There are numerous additional Nike documents, unmentioned by the FR that show Plaintiffs can prove their claim.  For example, in another 2019 training, Nike states, "we no longer ask new hires their prior salary or focus on the size of the increase the new hire would receive."  ECF No. 156-2 at 41.  There is also Nike's September 2017 email to all its Human Resources Business Partners ("HRBPs") telling them they "can no longer ask candidates to provide actual compensation figures" and "Nike may no longer … record salary history."  ECF No. 157-10 at 2.  Nike then instructed their HRBPs, "[i]nstead, our conversations with candidates must focus on their compensation expectations" and worked to "prepare HRBPs and Business Leadership for *this policy change*."  *Id.* (emphasis added).

Likewise, Nike sent an October 2017 email to all its Talent Acquisition ("TA") employees instructing them, "we will no longer ask candidates about their compensation history."  ECF No. 164-2.  Nike told all its TA employees, "our Total Rewards partners," which means HR's compensation unit, "created an updated Offer Intake Form to collect this information from candidates *… Please use this form as you work with Total Rewards to*

---

[6] This document's name includes "policy change."  Kan Decl. ¶ 2, filed herewith.

*construct offers for your roles*." *Id.* (emphasis added). This Offer Intake Form shows that the

pre-September 2017 version of this standard form has a field near the top of the form for an

external candidate's current salary. *See* Kan Decl. in Supp. of Pls.' Objs., filed herewith, Ex. 1

(NIKE_00024726) (compare tab for "Intake Form – Current" (p.3) and "Intake Form Example"

(p. 5) show "Annual Base Salary" versus "Annual Base Salary Expectation" on the "New Intake

Form") (p.1-2).[7]

Despite all the evidence Plaintiffs provided, including the statistical evidence described

below, the FR stated "Plaintiffs simply point to one document showing managers may consider

historical salary progression (which is not defined in the document) and assumed that Nike did

not permit managers to exercise discretion in implementing factors for setting starting pay." FR

43. It is clear that "historical salary progression" means prior pay because Nike repeatedly

referred to its use of prior pay in other documents and its witness admitted "historical salary

progression" means prior pay.[8]

In addition, the FR did not consider the unrebutted expert opinion of Plaintiffs' industrial-

organizational psychologist expert, Dr. Lundquist, who testified that "Nike's practice of setting

starting pay based on prior pay only worked to perpetuate the ongoing pay gap consistently cited

in the United States (Blau & Kahn, 2017)." ECF No. 148-1 at 33-34. The Ninth Circuit also

---

[7] In addition, the Form shows Nike's standard process was for hiring managers to just provide a "viewpoint" on starting offers. In both versions of this standard Form, there is a field titled, "Hiring Manager Viewpoint," which asks, "Does the hiring manager have compensation recommendations in mind for salary, sign-on, stock, etc.?" *Id.* Consistent with this Nike-designed process is another Nike document, titled "Hiring Process." ECF No. 156-1. It is a "guide to educate key players on their roles and responsibilities when looking to hire great talent at Nike." *Id.* For making an offer, Nike instructs TA employees to "review compensation information with Hiring Manager;" in contrast, the TA employees are told to "contact HRBP and business leaders for offer approval." *Id.*

[8] Kan Decl., Ex. 2, (Thomas Dep.) tr. 234:9-23 (corporate designee confirming "historical salary progression" more accurately refers to "prior salary to Nike").

found that the "history of pervasive wage discrimination in the American workforce prevents

prior pay from satisfying the employer's burden to show that sex played no role in wage

disparities between employees of the opposite sex." *Rizo v. Yovino*, 950 F.3d 1217, 1228 (9th

Cir. 2020) (*en banc*).  Plaintiffs' evidence thus shows they can prove Nike's prior pay policy

caused a disparate impact on women.

>    **v.    Although the Statistical Evidence Is Capable of Proving Plaintiffs' Prima Facie Disparate Impact Case, the FR Gave It No Weight.**

Based on multiple regression analysis from Plaintiffs' expert, Dr. Neumark, the FR found

"plaintiffs have shown that in the aggregate, there is a statistically significant disparity among

pay for women compared to pay for men at Nike."  *See* FR 42 ("there is a statistically significant

disparity among pay for women compared to pay for men at Nike."); 43-44 ("The Court does not

disagree that there is a statistically significant difference in pay even when controlling for factors

such as education and experience.").  Nevertheless, the FR concluded this evidence did not

support commonality.  FR 41-46.

The FR's finding, however, is contrary to the record and binding precedent.  The Ninth

Circuit recently explained that a multiple regression analysis can isolate the impact of an

independent variable such as gender, on a dependent variable such as starting pay, by controlling

for differences in other potentially relevant factors, such as tenure, performance ratings,

education, experience, and comparable jobs.  *Olean*, 31 F.4th at 671.  Further, the Ninth Circuit

has repeatedly found statistical evidence can meet Plaintiffs' disparate impact *prima facie* case.

*See e.g., Hemmings*, 285 F.3d at 1184 ("Courts have long recognized that statistical evidence

may be used to establish a *prima facie* case of disparate impact discrimination.").[9]  A pay

disparity is sufficient to establish disparate impact based on sex if it is statistically significant at

the 5% level or at least 1.96 standard deviations ("SDs").  *Palmer v. Shultz*, 815 F.2d 84, 96

(D.C. Cir. 1987).

Here, Dr. Neumark used a multiple regression analysis to control for non-discriminatory

factors.  Controlling for age, tenure, time in position, performance ratings, and comparable jobs,

Dr. Neumark first determined that the pay disparity at Nike was attributable to sex, thereby

raising an inference of discrimination.  Dr. Neumark established that Nike paid women

approximately $3,000 (or 2.03%) less per year in base pay and bonuses compared to men doing

comparable work.  ECF No. 149-1 at 29 ¶¶ 46-47, 31 ¶ 53.  This disparity is statistically

significant at 9.55 SDs, meaning the probability this result occurred by random chance less than

1 in 1 billion.  *See id*. at 16 ¶ 27 (chart indicates that an SD value of 6.12 or higher would result

in a probability of 1 in 1 billion or more).  This pay disparity far exceeds the requirement to show

disparate impact.

Further, the FR did not consider the evidence of a statistically significant disparity in

starting pay.  Dr. Neumark found the starting pay drove a substantial amount of the classwide

pay gap since Nike paid women roughly $1,300 less per year (or 1.18% less) in starting pay

compared to men hired into comparable jobs, again a statistically significant difference of 3.31

SDs.[10]  Further, differences in work experience or education do not explain this disparity because

---

[9] *See also Freyd v. Univ. of Or.*, 990 F.3d 1211, 1226 (9th Cir. 2021) (reversing grant of
summary judgment to the employer on a disparate impact claim, finding a dispute about the
statistical evidence "a matter for the experts to debate and the jury to resolve," and "[w]e think
that a reasonable jury could find that Freyd's statistical analysis shows a prima facie case of
disparate impact.").

[10] *See* ECF No. 149-1 at 36, ¶ 63 (discussing Table 7, Col. 4 results that show starting pay gap of
1.18% or $1,368 at 3.31 SDs when controlling for Job-Subfamily and Job Level interactions as
well as education, and work experience) & 60 (Table 7, col. 4).

"on balance … women have more of the education and types of experience that is valued by Nike."  ECF No. 149-1 at 36 ¶ 63.

Plaintiffs' statistical evidence also shows a substantial drop in the starting pay disparity after Nike's centrally-directed change to its prior pay policy.  ECF No. 149-1 at 34 ¶ 59 (after Nike ended the use of prior pay, the disparity dropped by nearly half).  This change "directly tracks Nike's policy of using prior pay as a factor in setting starting pay as well as its cessation of that policy in late 2017."  ECF No. 149-2 at 4 ¶ 2b.  This statistical evidence is significant evidence that Nike had a classwide prior pay policy that caused a disparity in starting pay for women, which the FR did not consider.

Finally, the FR also misdescribed that statistical evidence "Dr. Neumark used an aggregate model controlling for differences in job families and subfamilies rather than for each job."  FR 44.  Dr. Neumark, however, controlled not only for education and experience, as the FR recognized, but also for *comparable jobs*.  He did this by controlling for individuals in the same Job Subfamily and Job Level.  *See*, Section I.B.1.c(1), *infra*.  This is significant because, according to classwide evidence from Dr. Lundquist and Nike documents created for business purposes, Nike's job architecture designates jobs in the same subfamily and level to require comparable work.  Dr. Neumark's multiple regression analyses are thus classwide evidence of a common question capable of resolving a central issue, whether the prior pay policy caused a disparate impact on women.[11]

---

[11] Intentional discrimination may have also contributed to the statistically lower compensation that female employees received than male employees.  But, since Nike did not retain records concerning its collection and use of prior pay to set starting salary, the fact that it is not possible to separate those discriminatory causes does not preclude a demonstration of adverse impact.  *See* Section I.B.1.a(4), *infra*.

vi.     **The FR Improperly Relied on Litigation-Driven Declarations and Limited Corporate Witness Testimony.**

The FR incorrectly and uncritically relied on Nike's declarations, which were created for, and shortly before, Nike's opposition to class certification.  FR 9-10 & n.7, 40.  These declarations are also inconsistent with Nike's documents created for business purposes.  As Judge Koh found, in *In re High-Tech Employee Antitrust Litigation*, 985 F. Supp. 2d 1167, 1216 (N.D. Cal. 2013), declarations drafted for the specific purpose of opposing Plaintiffs' class certification motion that "are inconsistent with discovery Plaintiffs obtained from Defendants" are of "diminished probative value."  *Id.* (citations omitted); *see also* ECF No. 268 at 18-21.[12]

The FR also did not consider evidence from other Nike declarations showing Nike had a prior pay policy.[13]  Recruiters stated they regularly asked for prior salary before the policy changed in September 2017 and that admitted prior pay was a factor considered for setting starting pay.[14]  Recruiters also stated they were trained to be consistent across applicants in

---

[12] The FR acknowledged that there were "candidates who did recall being asked about prior pay."  FR 40 n.18.  These "candidates" not only recalled being asked about prior pay but also produced documents demonstrating that Nike systematically asked about prior pay.  *See* ECF No. 240 at 13 & n.6 (listing testimony and evidence of prior pay policy, including standard job applications and internal Nike forms).  Furthermore, Nike had the opportunity to depose these Plaintiffs or opt-in Plaintiffs.  In contrast, Nike did not appear to provide its declarants with any documents to review and since Nike presented these declarations after the close of deposition discovery for non-experts, these declarants were not subject to cross-examination.

[13] Certainly, the declarations do not overcome Plaintiffs' classwide evidence or show it is impossible for Plaintiffs to prove their claims. For example, in the Peele declaration, which is the most extensively quoted declaration of the FR's starting pay section, Peele merely states she is "involved in setting starting salary" (FR 10), but also notes that she has never been responsible for pay decisions, ECF No. 187-1 at 124-125, ¶¶ 5, 7-8 (stating she became a Director in November 2021, the "biggest change" with this promotion is, "I now will be responsible for pay decisions;" yet even the later claim is speculation because she states "[a]lthough I will eventually make pay decisions for my team, I have not done so yet.").  *See also* ECF No. 268 at 22-24 (explaining other inconsistencies in Nike's submitted declarations).

[14] *See, e.g.*, ECF No. 187-1 at 226 (Lozito Decl. ¶ 6) (prior salary is indicative of experience, which is important factor for setting starting pay); 187 (Caputo Decl. ¶ 9); 182-83 (Bowman Decl. ¶ 12); 199-200 (Croll Decl. ¶ 12); 212 (Fagan Decl. ¶ 18).

making salary recommendations, and prior to September 2017, prior pay data influenced their recommendations.[15]

The FR uncritically accepted Nike's cherry-picked deposition testimony from two of Nike's witnesses, Shane Walker (FR 8) and Shine Thomas (FR 11-12, 41).  But Nike repeatedly emphasized Mr. Walker was neither designated nor prepared to offer testimony on starting salary.  *See e.g.*, ECF No. 165-1 at 1 (Nike specifically excepting "setting of starting salary" from Walker's designated topics).[16]  And Ms. Thomas' testimony can support Plaintiffs' theory because she admitted that prior pay was a "data point" used to set starting pay and that Nike made a "policy change" when it stopped using and recording prior pay.  *See* ECF No. 241-1 at 132-33, tr. 214:4-215:4 (no longer requesting prior salary was policy change); 134, 137, tr. (Errata) 216:2-12 (no longer recording prior salary in ATS/CRM systems was policy change).

### (2)   Classwide Evidence Can Resolve Whether Nike's Policy of Giving Raises and Bonuses As A Percentage of Base Pay Disparately Impacted Women's Compensation.

Plaintiffs challenge Nike's classwide policy using a percentage of current salary when calculating annual salary increases and bonuses ("PSP bonuses").  The FR found Nike had this classwide policy for annual salary increases.  FR 12 (finding "pay increases were based on a percentage of employees' base pay" between 2015 and 2019, and since then, "still has percent increase to base pay component.")  The FR also found Nike uses current salary for PSP bonuses. FR 15 (PSP Bonus consider "fiscal year earnings (i.e., base pay for salaried employees))."  Since 2019, there is zero discretion for any factor in Nike's classwide formula for calculating PSP bonuses, which continues to use a percentage of current salary.  ECF No. 162-13 at 7-10, tr.

---

[15] ECF No. 187-1 at 185-87 (Caputo Decl. ¶¶ 5, 9).

[16] *See also e.g.,* ECF No. 241-1 at 155, tr. 292:1-8 (Nike's counsel stating questions about Nike's prior pay policy are outside the scope of Walker's topics).

108:14-109:11, 122:3-8, 122:22-123:5; ECF No. 158-5 at 11.  In addition, Nike does not dispute that it used employees' base pay as a factor when calculating annual salary increases and PSP bonuses for all employees at Nike WHQ.  *See* ECF No. 240 at 15-16.  There is thus ample and undisputed evidence of the challenged policy.

First, the FR required, without explanation, Plaintiffs to first prove that Nike also had a "company-wide policy of using prior pay to set starting salaries."  FR 47-48.  Not so.  Nike's use of salary as a factor compounds pay disparities between women and men, whatever the reason or cause, because it "essentially locks in the pay disadvantage of women at Nike."  ECF No. 149-1 at 43 ¶ 82.

Second, the FR ignored common evidence that can show this use of current salary has negative consequences and can perpetuate existing gender differences in pay.  Nike's own documents, not mentioned in the FR, acknowledge that a percentage-based approach "leads to an array of pay position outcomes with often undesirable long-term consequences."  ECF No. 155-2 at 14; *see also* ECF No. 157-9 at 9 (Nike recognizing underpayment at hire means that "[e]ven with a full merit increase, the employee is still below the minimum.").

The FR also discounted Plaintiffs' unrebutted expert testimony confirming the same.  FR 47, citing ECF No. 148-1 at 33-35 (Dr. Lundquist confirming that "This approach is problematic because gender differences in starting salary tend to be perpetuated, and sometimes exacerbated, over time when increases are based on a percentage of base pay…").  And despite citing Dr. Neumark approvingly, the FR failed to credit the common statistical evidence supporting Plaintiffs' challenge to Nike's raise and bonus policy.  FR 47, citing ECF No. 149-2 at 4 ("*This starting pay gap persists* … because, after being hired, merit pay increases and bonuses for women and men with similar performance are based on the same percentage pay increase

relative to their base pay, *which perpetuates the starting pay gap*.") (emphasis added).  The FR also erroneously ignored the results of Dr. Neumark's multiple regression analysis, which confirmed that Nike's use of existing salary increased the pay gap for women by paying them lower bonuses by roughly $600 per year.  He also found this policy continued the existing pay gap for women in annual salaries because, even though women received annual merit increases a few percentage points higher than comparable men, they were far from enough to eliminate existing salary disparities.[17]

Third, the FR found no commonality because there is some discretion with respect to other factors used for annual salary and PSP bonuses.  FR 48.  But Plaintiffs challenge Nike's undisputed classwide practice of using existing salary as a factor when determining annual salary increases and PSP bonuses.  And just because there may be discretion exercised elsewhere in the decision-making process does not preclude Plaintiffs' challenge.  *See McReynolds*, 672 F.3d at 488-90 (certifying challenge to employer's policy allowing brokers in the same office to form teams even though discretion involved with the subsequent forming of teams because it was a classwide policy that local managers could not ignore "at their whim").  While Nike's classwide use of the challenged policy satisfies commonality, the FR also ignored undisputed evidence that the annual bonus formula has *zero* discretion since 2019.  ECF No. 162-13 at 7-10, tr. 108:14-109:11, 122:3-8, 122:22-123:5; ECF No. 158-5 at 11.

---

[17] ECF No. 149-1 at 44 ¶ 86 (reporting bonus shortfall in Table 2 Column 4), 28 ¶¶ 42-43, 41-42 ¶¶ 81-82 (referencing results from Table 9, Column 2).

**(3)      Classwide Evidence Can Resolve Whether Nike's Fill Strategy for Making Noncompetitive Promotions Disparately Impacted Women.**

Plaintiffs allege that Nike's classwide fill strategy, which determines whether to fill job openings non-competitively rather than competitively, adversely impacted the promotion of women.  ECF No. 146 at 52.  Unlike competitive promotions, non-competitive promotions were neither posted nor were applications solicited.  ECF No. 161-10 at 2-3, tr. 45:2-6, 56:20-25; ECF No. 148-1 at 40.  Instead of considering whether Plaintiffs' evidence is capable of proving their claim, the FR focused on purported discretion of individual managers.

The FR did not consider the classwide evidence that can show Nike's fill strategy was centrally determined at the time of the job opening either during Nike's workforce planning process or its annual Talent Planning Cadence ("TPC").  *See* ECF No. 158-9 at 16 (illustrating annual TPC); ECF No. 161-10 at 17-22, tr. 177:17-182:11 (confirming Nike's workforce planning process occurred centrally); 23-24, tr. 200:13-201:2 (TPC could include determining whether to fill a position noncompetitively or competitively).

During workforce planning sessions, Nike documents state that it seeks "consistency in position management" by, among other things, updating its "fill strategy" for open positions. ECF No. 155-3 at 11; ECF No. 161-10 at 12, tr. 129:2-8 (confirming that Nike will "determine at times that a position would be a noncompetitive position" as part of workforce planning); 13-14, tr. 131:5-132:14 (confirming Nike would have a "discussion on how to approach the fill strategy for, for a job").  In handling promotion decisions, Nike's Talent Planning team takes a

"consistent" approach using the same company-wide tools to identify high potential talent.  ECF No. 158-10 at 2.[18]

Emblematic of its centralized approach to fill strategy, Nike announced a company-wide policy change in 2018.  Prior to 2018, Nike's fill strategy permitted employees in Bands L through S to receive either a competitive or noncompetitive promotion.  FR 16.  In December 2018, Nike modified its policy to require all openings for E-Band positions and below to go through the competitive promotion process.  FR 16.

The FR also overlooked Nike admissions and statistical evidence that Nike's fill strategy policy had been a poor employment practice and disfavored women.  For example, Nike admitted that it changed its policy to "[e]nsure an inclusive approach to hiring" in response to a company-wide survey revealing that "employees feel excluded from career opportunities due to a perceived lack of transparency and visibility into open roles." FR 16; ECF No. 157-1 at 5.  The FR further ignored Dr. Lundquist's expert testimony that a non-transparent process, such as non-competitive promotions, is more likely to produce a discriminatory impact.  ECF No. 148-1 at 5-6, 38-40.  The FR likewise ignored Nike's admissions by its CHRO that women were still underrepresented at its higher levels and that "[w]hile we've spoken about this many times, … we have failed to gain traction." ECF No. 156-3 at 1.

---

[18] The FR summarily concluded that "[f]ill strategy and promotions do not require approval from Human Resources but may require a manager's direct supervisor (manager+1)." FR 15. But the FR failed to consider evidence that Nike's fill strategy decisions are made centrally.

The FR also credits a passing comment by Ms. Heinle that noncompetitive job changes "really ends up being dependent on the manager" when confirming that all positions in the E Band and lower could have been filled noncompetitively prior to Nike's 2018 fill strategy policy change. FR 16 (citing ECF No. 161-10 at 25-26, tr. 211:8-212:14).  But the FR acknowledged without crediting contrary evidence that Talent Acquisition, in fact, approves noncompetitive promotions with an example where Talent Acquisition required an E-Band Director to fill a promotion competitively instead of noncompetitively.  FR 48, fn 24; *see* ECF No. 159-1 at 1-2 (HR stating "I was mistaken about being able to Talent Plan Jennifer into the U Band role and you will need to post and competitively hire through TA for both U Band positions.").

Despite describing Dr. Neumark's findings that noncompetitive promotions at Nike disadvantaged women compared to similarly situated men, FR 48, the FR disregarded this statistically significant evidence of commonality.  When Nike chose its non-competitive process, Dr. Neumark found statistically significant disparities for women even when controlling for legitimate factors, such as the fact that women received as high or higher performance ratings than comparable men (ECF No. 149-1 at 63 (Table 10, panel C, column (3); *id*. at 20 ¶ 33b); in contrast, there was no statistically significant gender disparity when Nike chose its competitive process.  ECF No. 149-1 at 63 (Table 10, panel B, column (3).

Contrary the FR's conclusion, Plaintiffs have established commonality because their common evidence is capable of resolving that Nike's fill strategy adversely impacted the promotional opportunities of women.

### (4)   Classwide Evidence Can Resolve Whether Nike's Policy and Practice of Assigning New Hires Disparately Impacted Women.

Plaintiffs challenge Nike's hiring process for assigning women to lower positions than comparable men.  Under Title VII, an employer's "decisionmaking process may be analyzed as one employment practice" if its elements "are not capable of separation for analysis …."  42 U.S.C. § 2000e-2(k)(1)(B)(i); *see also McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 276 (5th Cir. 2008) (affirming class certification of a disparate impact claim for non-separable promotion process).  Pursuant to this exception, "Plaintiffs challenge the hiring process as one employment practice because Nike's hiring process is not capable of separation for analysis." ECF No. 240 at 21; ECF No. 146 at 54; ECF No. 268 at 28.

The FR, however, did not consider or even mention the legal basis for Plaintiffs' challenge.  Instead, the FR characterized Plaintiffs' challenge as based on a single line in a single

document.[19]  FR 49.  The FR thus neither considered whether Plaintiffs' classwide evidence can

prove Nike's hiring process is incapable of separation for analysis nor the disparate impact it had

on women.  Also the FR did not consider the evidence that shows Nike's hiring process had

negative effects on Plaintiffs, ECF No. 240 at 23, before finding that the "record demonstrates"

Plaintiffs were not channeled, FR 18-19.

      To support their theory, Plaintiffs provided classwide evidence showing Nike's hiring

process is not separable for analysis due to Nike's own policies and recordkeeping practices.

Although the Court's October 2019 Order required Nike to produce policies regarding its hiring,

pay, and compensation systems, ECF No. 89, Nike was unable to produce discovery that could

allow Plaintiffs or the Court to separate the elements of Nike's hiring process for analysis.  ECF

No. 146 at 54 & n.49; ECF No. 240 at 21.  Nike was unable to produce any documents showing

the steps, policies, procedures, or guidelines governing initial job assignments for the period

prior to November 2018.  ECF No. 163 at 4 ¶ 4.[20]  Nor was Nike able to provide relevant data or

Rule 30(b)(6) testimony for those topics concerning initial job assignment.  *Id.* at 6-8 ¶¶ 5-8.  Dr.

---

[19] With respect to this one document, the FR's analysis shows how it made determinations that
should be left for the jury.  This document states, "All decisions related to hiring should be
approved by Talent Acquisition."  FR 49.  While this document is in a bribery and corruption
section of the code of conduct, a reasonable juror could determine that this statement was not just
instructing Nike employees who were engaging in bribery or corruption.  Further, Nike's Rule
30(b)(6) witness confirmed that TA, along with other stakeholders, approves all hiring
decisions."  ECF No. 162-9 at 9-10, tr. 49:11-50:7.

[20] For example, even where highly relevant documents existed, Nike was either unable or refused
to produce the discovery.  For example, Nike has a "Hiring Process" document, which states it
"is a quick guide to educate key players on their roles and responsibilities when looking to hire
great talent at NIKE, inc." and instructs the key players to "[u]se this resource to learn about
your role – as well as when to rely on other stakeholders – throughout the hiring process."  ECF
No. 163 at 4-5 ¶ 4(a).  Although Nike documents show Nike had a pre-December 13, 2018
version of this document, Nike was unable or refused to produce this highly relevant document
describing the "roles and responsibilities" of key players "throughout the hiring process."  *Id.*;
*see also id.* at 5-6 ¶ 4(b)-(c).

Lundquist's testimony further confirms the absence of the necessary documentation to analyze Nike's process.  ECF No. 148-1 at 42-43.

In addition, Dr. Neumark's regression analysis shows statistically significant disparities in starting job level for women even though women having have equal or better education and work experience than men.  ECF No. 146 at 37.[21]  In opposing certification, Nike did not produce any statistical analysis to rebut this showing.  *See* ECF No. 183 at 28-30.[22]  Plaintiffs have thus provided undisputed classwide evidence capable of proving the elements of this disparate impact claim.

### (5)    Nike's Affirmative Defense of Business Necessity Is Susceptible to Classwide Resolution.

Nike has alleged that, even if its policies have a disparate impact on female employees, those policies are justified by their business necessity and job relatedness.  The validity of this affirmative defense is a question common to the class that can resolved by using classwide evidence, including Nike admissions and Dr. Lundquist's expert opinions.  *See* ECF No. 146 at 46-47, 51; ECF No. 240 at 20, 27.

Under Title VII, once Plaintiffs have established a *prima facie* disparate impact case, the employer must "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i).  Having wrongly concluded that Plaintiffs failed to establish a *prima case*, the FR did not address whether Nike's affirmative defenses supported commonality.  They do.

---

[21] *See also* ECF No. 149-1 at 3-5 (lower job levels at hire and slower progress in promotions leads to a gender shortfall of pay of roughly $11,000); ECF No. 149-1 at 54 (Table 2, col. 2).

[22] Although Plaintiffs' Reply identified Nike's failure to rebut the statistical disparities, Nike's Sur-Reply likewise did not try to rebut Dr. Neumark's findings with any statistical analysis.  *Id.*

In applying the "job related" and "business necessity" defense courts give "great deference" to the standards established by the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.1 *et seq.; see Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 433-34 (1971). Under the Uniform Guidelines, a practice causing an adverse impact must be "validated in accordance with these guidelines," which are intended to be "consistent with professional standards." ECF No. 146 at 55-56; ECF No. 148-1 at 11-15 (as explained by Dr. Lundquist). Nike did not, however, provide any evidence to validate its policies under the Uniform Guidelines. ECF No. 146 at 56-57. By contrast, Dr. Lundquist's expert testimony that Nike's practices were not "job related" pursuant to professional standards is common evidence applicable to all class members. ECF No. 148-1 at 48, ECF No. 148-2 at 12-13. Accordingly, the record contains unrebutted classwide evidence that is capable of resolving whether Nike has a viable affirmative defense to the disparate impact claims. *See*, *e.g.*, *Chen-Oster*, 325 F.R.D. at 82 ("[w]hether the challenged processes are job related or consistent with business necessity is a question of generalized proof").

> **b.    Plaintiffs' Disparate Treatment Claims Satisfy Commonality.**

Disparate treatment claims require a showing that "discrimination was the company's standard operating procedure the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336. As the FR observed, "Plaintiffs may satisfy their burden of showing a pattern or practice of discrimination through statistics alone." FR 51 (citing *Teamsters* at 339-40) (footnote omitted). Statistical evidence "is often a telltale sign of purposeful discrimination …." *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005) (quoting *Teamsters*, 431 U.S. at 339-40 n.20). Other evidence, including "anecdotal evidence," may be used "to establish a general discriminatory pattern in an employer's hiring or promotion practices." *Id.* at 698. As shown below, classwide evidence, including statistically significant expert conclusions, anecdotal evidence, and

admissions by Nike executives present common questions capable of establishing a *prima facie* case of disparate treatment.

> **(1)** **The FR Misapplied *Wal-Mart* to Preclude the Use of Statistical Evidence Regardless of Plaintiffs' Theory of Liability.**

The FR relied on *Wal-Mart* for the proposition that in a case based solely upon the unguided exercise of discretion among many decisionmakers, statistics cannot establish commonality for a pattern and practice claim. FR 51 n.25 (citing *Wal-Mart*, 564 U.S. at 345, 352). Based on this and Nike's preferred theory, the FR found that Nike delegated "substantial authority for hiring and promotion within each of those departments," which precluded commonality for Plaintiffs' disparate treatment claims. FR 52.

This, however, was an overreading of *Wal-Mart* because plaintiffs there advanced a fundamentally different theory than Plaintiffs' here. In *Wal-Mart*, plaintiffs' "*theory of their case* alleged was that a "culture permits bias against women to infect … the discretionary decisionmaking of each one of Wal-Mart's thousands of managers …." 564 U.S. at 345 (emphasis added). Based on the *Wal-Mart* plaintiffs' theory, the Court found their statistics "*insufficient to establish that respondents' theory* can be proved on a classwide basis." *Id.* at 356 (emphasis added); *see also, e.g., id.* at 352 ("In this case, proof of commonality necessarily overlaps with … merits" since plaintiffs "wish to sue about literally millions of employment decisions at once.").

Here, in contrast to *Wal-Mart*, Plaintiffs do not allege that individual managers have discretionary decisionmaking and that this is the cause of the discrimination. Rather, Plaintiffs identify four Nike-imposed policies through which Nike pays women less than men for comparable work, despite women having the same or better performance ratings, education, and prior work experience. *See* Sections I.B.1.a(1)-(4), *supra*. In this context, the statistical proof

that women were disadvantaged in initial assignment, compensation, and promotion, which the FR acknowledged, is compelling classwide evidence capable of establishing a *prima facie* case of disparate treatment. *See* FR 42.

In fact, this pattern of statistical disparities can alone prove Plaintiffs' *prima facie* case of disparate treatment.  *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.").  In addition, contrary to the FR's interpretation of *Wal-Mart*, FR  51 n.25, plaintiffs asserting a pattern-or-practice claim "are not required to offer evidence that each person for whom they will ultimately seek relief was a victim of the employer's discriminatory policy."  *Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001) (quoting *Teamsters*, 431 U.S. at 360) (brackets omitted); *see also Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 876 (1984) (during the initial liability stage, "the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking.").

> **(2)** **The FR Erroneously Disregarded Plaintiffs' Statistical Evidence on Additional Improper Bases.**

The FR erroneously disregarded Plaintiffs' statistical evidence on two additional grounds. First, the FR discounted Dr. Neumark's analysis, claiming "it does not account for the differences from department to department and job to job" and "merely pooled data across all 1,200 jobs and reported a single percentage difference between men and women in all jobs combined."  FR 52 (citing ECF No. 149-1 at 6).  This is incorrect.  As described above in Section I.1.a(1)v , *supra*, Dr. Neumark controlled for comparable jobs based upon the conclusions of Dr. Lundquist and evidence of Nike's own job architecture that it uses to determine comparable jobs.  It is thus not the case that Dr. Neumark "merely pooled data."  Dr.

Neumark's regression analysis also controlled for other legitimate factors that might impact compensation, including education, experience, performance rating and tenure.  *See* Section I.B.1.a(1)(v), *supra*.

In reaching this conclusion, the FR referenced a single source.  FR 52, citing ECF No. 149-1 at 6.  Specifically, it cited a "Summary Table: Key Findings" contained in Dr. Neumark's expert report.  Contrary to the FR, this table not only reports "percentages" but also the level of statistical significance as reflected in the SDs for each finding.  *Id.*  The table also shows that Dr. Neumark controlled for comparable jobs.  This is precisely the type of evidence that courts have regularly relied upon to conclude that statistical analyses are probative of discrimination.

Furthermore, the table cited in the FR is indeed a summary that refers to the more specific, substantive tables showing all the controls used by Dr. Neumark.  This evidence makes clear that Dr. Neumark did not "merely pool data" but rather engaged in a rigorous analysis that controlled for other relevant factors.  And Ninth Circuit and Supreme Court precedent are also clear: multiple regression analyses can control for individualized differences among class members.  *See Olean*, 31 F.4th at 677 (pursuant to *Tyson Foods*, 577 U.S. at 459-60, "any categorical argument that a pooled regression model cannot control for variables relating to the individualized differences among class members must be rejected.").  In addition, multiple regression analysis is a well-accepted form of evidence regularly used in discrimination and other cases.  *See e.g.,* Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, 306 n.5 (Fed. Judicial Ctr. 3d ed. 2011); ("Discrimination cases using multiple regression analysis are legion.") (collecting cases); *see also Olean*, 31 F.4th at 685 (discussing the probative value of statistical evidence in a range of litigation contexts).

Second, the FR disregarded the multiple regression analyses on the ground that the "disparities might be attributable to only a small set of Nike managers, rather than a standard Nike operating procedure." FR 52 (citing ECF No. 182 at 91). This finding relied on Dr. Neumark's deposition testimony that the disparity could be attributable to a nondiscriminatory cause was "in the realm of is anything possible or almost anything possible, yes." ECF No. 182 at 91, tr. 297:7-8. Critically, the FR failed to consider that Dr. Neumark, in fact, confirmed this was not the case. ECF No. 241-1 at 91, tr. 22:2-19 (explaining that the strongly significant results indicate little variation within the class sample); ECF No. 149-2 at 74-75 ¶¶ 112-113 (further confirming the accuracy of his multiple regression analysis after conducting a disaggregated analysis by job cell).

Regardless, courts have long rejected these speculative attacks on statistical analyses. *See e.g., Buchanan v. Tata Consultancy Servs., Ltd.*, No. 4:15-cv-01696-YGR, 2017 WL 6611653, at *9 (N.D. Cal. Dec. 27, 2017) (the employer "cannot simply identify non-discriminatory variables and assert that controlling for such variables would cure the observed statistical disparities. Rather, defendant must 'produce credible evidence that curing the alleged flaws must also cure the statistical disparity.'") (quoting *E.E.O.C. v. Gen. Tel. Co. of Nw., Inc.*, 885 F.2d 575, 583 (9th Cir. 1989)). Further, an explanation that may otherwise account for the disparity does not invalidate Plaintiffs' statistical evidence supporting their *prima face* case: "A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence." *Bazemore*, 478 U.S. at 400 (Brennan, J., concurring in part) (holding that multiple regression analyses do not need include all measurable variables thought to have an impact on salary to be admissible).

Thus, it was error to disregard Plaintiffs' compelling statistical evidence in denying certification of Plaintiffs' disparate treatment claim. Here, Plaintiffs' statistical evidence tells a straightforward story of systemic sex discrimination. It begins with Nike underpaying at hire by almost $1,300 per women per year despite their equivalent or better educational and professional credentials compared to men hired into comparable positions. *See* ECF No. 149-1 at 36 ¶ 63 & 60 (Table 7, col. 4). Then, Nike perpetuates this disparity throughout the tenure of female employees by calculating annual salary increases and bonuses as a percentage of existing salary. This practice "essentially locks in the pay disadvantage of women at Nike." ECF No. 149-1 at 46 ¶ 82. These disparities amount to a shortfall of $600 per year in annual bonuses and $3,000 per year in annual salary. ECF No. 149-1 at 44 ¶ 86; ECF No. 149-2 at 24-25 ¶ 39 & Table R6 (reporting an extraordinary statistically significant disparity of 9.47 SDs). These numbers get even worse when accounting for the discriminatory effects of Nike's initial job assignment and promotion practices, which start women in lower positions and promote them more slowly than comparable men. In sum, Nike pays women roughly $11,000 (or 7.45% less to 12.73 SDs) per year less than comparable men. ECF No. 149-1 at 4-5 ¶ 8.d.i & 6 (Summary Table Key Findings, Row A "Combined" results). The probability that these disparities are the result of random chance is less than a 1 in 1 billion.

### (3) The FR Erred in Disregarding Admissions and Anecdotal Evidence in Evaluating Disparate Treatment Discrimination.

The FR disregarded competent evidence of discrimination at Nike, while giving Nike's written anti-discrimination policy outsized weight in evaluating Plaintiffs' disparate treatment claims. For example, in 2018, Nike employees submitted a document known as the "Starfish Survey." This survey was comprised of complaints about gender discrimination and harassment

at Nike and contended that Human Resources "refused to act or apparently condoned the discriminatory and harassing behavior." FR 19-20; *see* ECF No. 146 at 37-38.[23]

The FR disregarded the evidence in the Starfish Survey on the ground that "1 complaint per 173 class members" is "insignificant." FR 53. In making this evaluation, the FR asserted that Plaintiffs submitted "no declarations from opt-in plaintiffs" (FR 53), but, in fact, Plaintiffs submitted deposition testimony from a dozen named and opt-in Plaintiffs, describing gender discrimination and harassment similar to that described in the Starfish Survey. ECF No. 146 at 30 & n.36. In any event, neither *Wal-Mart* nor any other authority requires a certain number or even any declarations to meet commonality requirement for disparate treatment claims where sufficient evidence otherwise exists. *See Segar v. Smith*, 738 F.2d 1249, 1278 (D.D.C. 1984) ("[n]either *Hazelwood* nor any other Supreme Court precedent supports a rule that statistical proof of the kind presented in this case is insufficient absent anecdotal evidence.").

The FR further failed to consider that Nike's own actions and related admissions corroborated plaintiffs' anecdotal evidence in this case. For example, shortly after receiving the Starfish Survey in March 2018, CEO Mark Parker sent an email stating that "we've heard from strong and courageous employees" and "we've become aware of behavior occurring within our organization that do (sic) not reflect our core values …." ECF No. 155-8. And as Nike's corporate designee admitted at deposition, the survey led to the forced exit of several employees alleged to have committed the discrimination and harassment. ECF No. 161-7 at 6-9, tr. 172:5-173:2, 175:20-176:8. In a May 2018 speech, Nike's CEO made a critical admission: "[w]e

---

[23] Nike claimed attorney-client privilege over all investigations conducted by outside counsel of complaints, including those in the Starfish Survey. Because of this, the record fails to show whether Nike either conducted an adequate investigation or took appropriate remedial steps. *See* ECF No. 161-7 at 15, tr. 331:8-12 (Nike counsel asserting attorney-client privilege over all investigations conducted by outside counsel, including the Starfish Survey.)

continue to review our HR processes from top to bottom … to improve processes that *underserved us in recent years* … and to restore trust in places where it has eroded."  ECF No. 155-4 at 7 (emphasis added).  Despite referencing other parts of this speech, the FR did not mention or consider this critical admission when evaluating whether Plaintiffs have offered sufficient evidence to establish commonality for their disparate treatment claim.  FR 50-53.

Moreover, the FR gave significant weight to "Nike's announced policy [that] forbids discrimination" and observed that such a policy was recognized in *Wal-Mart*.  FR 51.  But, unlike *Wal-Mart*, the Nike CEO admitted that HR processes had "underserved [Nike] in recent years" and had not prevented conduct inconsistent with Nike's core values.  Although Nike's written policies are relevant to this analysis, they cannot outweigh the overwhelming evidence of disparate treatment, including Nike's own admissions that its written anti-discrimination policies were not followed or enforced in practice.  Finally, it was error to uncritically accept Nike's written anti-discrimination policies when Nike refused to produce any "self-critical materials" such as its pay equity and promotion analyses.  ECF No. 89; *see Gen. Tel.*, 885 F.2d at 578 (finding the district court erred in admitting employer's "equal opportunity evidence" but precluded the EEOC from discovering relevant self-critical materials, thus "facilitating one-sided presentation" and "precluding the plaintiff from enjoying a fair opportunity to challenge" it).

### c.    Plaintiffs' OEPA Claims Satisfy Commonality.

The OEPA is violated if an employer pays women less "for work of comparable character."  Or. Rev. Stat. § 652.220.  The definition of work of comparable character is: "work that requires substantially similar knowledge, skill, effort, responsibility and working conditions in the performance of work, regardless of job descriptions or title."  FR 53 (citing Or. Rev. Stat. § 652.210(16)).  It does not require the identification of a practice or the reason for the disparities.  *See* Or. Rev. Stat. § 652.220.  Nevertheless in denying commonality, the FR

incorrectly relied upon a finding that, "plaintiffs do not present a common thread as to the reason for the purported discrimination."  FR 54.

Plaintiffs, however, submitted classwide evidence that can prove the two OEPA elements, that they were paid less than men for work of comparable character.

### (1)    The FR Erred in Rejecting Plaintiffs' Evidence As To "Work of Comparable Character."

The FR concluded that Plaintiffs' evidence was insufficient to demonstrate a discrepancy between positions of comparable character.[24]

But the FR erroneously discounted the testimony of Dr. Lundquist, who based her analysis upon Nike's own "job architecture," *i.e.* its system of evaluating and grouping jobs. Initially, the FR observed that Nike "uses this job architecture to apply a consistent set of policies and practices for employees within these groups to compensation, talent acquisition, talent management and performance management."  FR 22 (quoting ECF No. 148-1 at 48).  But, the FR nonetheless failed to evaluate or credit Dr. Lundquist's detailed analysis showing the manner by which Nike's own job architecture and the consistent manner in which it applied that job architecture.  This analysis provided the foundation for her conclusion that "[j]obs within the same job level within Subfamily have been *designated by Nike* as similar in job content or type

---

[24] Also, the FR rendered the erroneous conclusion that Plaintiffs do not "even identify specific job comparators for the named Plaintiffs," FR 54, despite recognizing earlier in the FR and in another earlier order that all four named Plaintiffs alleged that they were paid and promoted less than their similarly situated male counterparts, FR 6-7; ECF No. 64 at 11 (finding that "each named plaintiff has identified male counterparts who were paid more or received greater advancement opportunities despite having similar or lesser qualifications for similar work."). Further, each named plaintiff asserted in their consent to join that they were paid less than male counterparts doing substantially similar work.  *See* ECF No. 1-1 at 1 ¶ 3 (Johnston); ECF No. 1-2 at 1 ¶ 3 (Cahill); ECF No. 20 at 1 ¶ 3 (Elizabeth); ECF No. 43 at 2 ¶ 5 (Hender).  Finally, each named plaintiff identified specific male comparators in their deposition testimony.

of work and require a *similar level of knowledge, experience, scope, effort and responsibility* based on the leveling criteria."  ECF No. 148-1 at 22-23 (emphasis added).

Dr. Lundquist did a detailed analysis based on Nike documents created for business purposes and Nike's deposition testimony.  ECF No. 148-1 at 16-26.  Dr. Lundquist pointed out that a "2018 Nike HR document entitled 'Total Rewards Deep-Dive' stated as a core belief that, 'We believe that all employees, at the *same level*, and in similar jobs with similar performance, should be equitably compensated."  ECF No. 148-1 at 23 (citing ECF No. 155-2 at 8) (emphasis added).  Dr. Lundquist also explained that Nike defined jobs by "Type of Work," which "refers to the essential responsibilities of a particular role," and is comprised of Job Function, Job Family and Job Subfamily; and "Level of Work," which "refers to the scope and complexity of a particular role" and is comprised of Band and Job Level.  *Id.* at 17 (quoting ECF No. 157-7 at 10).  Nike describes this detailed structure as "very much like a Dewey decimal system at a library …."  *Id.* at 18.

Similarly, the FR found that Nike's jobs were "organized within a uniform hierarchy according to 'type of work' and 'level of work,'" and that "[j]ob families are the unique roles within a job function that can be performed at various levels based on Nike's leveling criteria."  FR 8.  But the FR failed to consider how this "uniform hierarchy" and "leveling criteria," which established requirements for placing jobs in various levels, resulted in Nike classifying jobs, as Dr. Lundquist explained, requiring similar work.  *See* ECF No. 148-1 at 22 (Nike's leveling criteria establish requirements for placing jobs in various levels).[25]  Also, Dr. Lundquist relied upon Ex. 500 to the deposition of Walker, ECF No. 156-2 at 26, which describes the 2019

---

[25] This 2013 Nike document, which describes the leveling criteria in detail, is Ex. 505 to the deposition of Walker, ECF No. 155-1, and is so identified by Dr. Lundquist.

modification of the leveling criteria, and the testimony of Shane Walker.  Kan Decl. Ex. 3 at 2-3, tr. 90:8-91:9 (the 2019 adoption of "three leveling criteria" serve the "same purpose" as the "more granular descriptions" in the prior leveling criteria).

The FR seemingly ignored Dr. Lundquist's other conclusions.  After reviewing Nike's job architecture and leveling criteria, Dr. Lundquist concluded, "[w]hen used to describe the work performed within a Job Function, Family Subfamily, the leveling criteria serve to identify a similar level of work in terms of skill, effort and responsibility, a structure which parallels the equal pay legislation's focus on the factors of Skill, Effort, Responsibility and Working Conditions."  ECF No. 148-1 at 24-25.  Dr. Lundquist also observed, "Nike's compensation policies further support the comparability of work within levels" since Nike's compensation guidelines dictate that compensation should not change when an employee makes a lateral transfer between jobs in the same level.  ECF No. 148-1 at 26 & n. 13.  Thus, Dr. Lundquist concluded that "Nike views jobs within the same level as comparable in terms of the compensation factors of skill, effort, responsibility and working conditions," *id.* at 26, and "that the interaction of Job Subfamily and Job Level defines substantially similar work," ECF No. 148-2 at 12.

Although the FR concluded that Dr. Lundquist was qualified as an expert, FR 23, it failed to credit her exceptional qualifications, including her frequent appointment as an expert by federal judges who rely on her expertise.  To wit, Dr. Lundquist has served as a court-appointed expert to effectuate the settlement provisions of discrimination class actions in cases involving over a dozen companies or governmental agencies.  ECF No. 148-2 at 10-11.

Ample evidence exists that Nike paid women less for work of comparable character, a violation of the OEPA.  In failing to credit expert testimony that Nike did just that, and other

record evidence, including Nike's Job Architecture, leveling criteria, and job classifications, the FR failed to recognize that Plaintiffs presented more than sufficient evidence to raise a common question "capable of class-wide resolution" under the OEPA.[26]

### (2) The FR Erroneously Disregarded Statistical Evidence that Nike Violated the OEPA.

By means of a multiple regression analysis specifically controlling for comparable work, Dr. Neumark concluded that the "female base pay shortfall is 1.78% (8.975 SDs), and 2.03% (9.55 SDs) for base pay plus bonuses," and the "implied shortfalls," respectively, "per woman per year, are $2,371 and $3,138." ECF No. 149-1 at 29 ¶ 46. Dr. Neumark explained that this disparity "persists even when we compare women and men in the same Job Subfamily and Job Level, with the same age, job tenure, time in job and performance. The female pay shortfall is consistent with pay discrimination against women doing substantially similar work with similar skills, qualifications and performance to men." *Id.* at 29 ¶ 47.

The extent of the gender disparity, 9.00 SDs, means that the likelihood that this disparity occurred by random chance is more than 1 in one billion. ECF No. 149-1 at 16 ¶ 27. This is more than sufficient to establish a *prima facie* claim under the OEPA which requires only that Plaintiffs show they are paid "less" than men.

As above, a multiple regression analysis with appropriate controls may establish a *prima facie* violation. *See Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 481-82 (2d Cir. 2001) (regression analysis showing "plaintiff is receiving lower wages than the average wages paid to

---

[26] Nike's expert criticized Dr. Lundquist for failing to perform a job analysis. This is a meaningless charge because no plaintiff's expert has ever conducted a job analysis that would meet professional standards due to the insurmountable hurdles to doing so, including lack of access to employees. ECF No. 148-2 at 14; *see also e.g.*, *Chen-Oster v. Goldman Sachs & Co.*, No. 1:10-cv-06950-AT-RWL, 2022 WL 814074, at *7 (S.D.N.Y. Mar. 17, 2022) ("There is no requirement that an expert run a specific analysis, so long as they have a methodological explanation for the analysis they chose.").

all employees of the opposite sex performing substantially equal work" can establish a *prima facie* case) (internal citation omitted); *Becks-Wilson v. Principi*, 441 F.3d 353, 363-64 (6th Cir. 2006) (regression analysis used to establish disparities in wages).[27]

Here, Plaintiffs' evidence shows a statistically significant disparity between male and female employees in comparable jobs, and is classwide evidence capable of resolving a common question as to Plaintiffs' OEPA claim: whether Plaintiffs receive less pay than male employees performing comparable work. Accordingly, the FR incorrectly ruled that Plaintiffs had not established commonality for their OEPA claim.

### 2.    Plaintiffs' Claims Are Typical of the Class.

As the FR stated, typicality requirement is met if the claims of the representatives are "typical," *i.e.*, "reasonably co-extensive," of the claims of the class members. FR 54. Also, the FR correctly noted that the commonality and typicality requirements "tend to merge" since they both serve as "guideposts" assuring that the class action will proceed in an economical fashion with the interests of all adequately and fairly represented. FR 55.

The FR erred, however, in concluding that Plaintiffs did not satisfy the typicality requirement on the same grounds that it rejected the commonality of the class claim. *See* FR 55. As set forth above, Section I.B.1.a(1)-(4), this conclusion is incorrect because Plaintiffs challenge specific Nike policies as opposed to alleged managerial discretion. Plaintiffs thus meet

---

[27] Courts have recognized that multiple regression and other aggregated analyses can present superior evidence of pay disparities amongst comparable jobs versus the identification of a single male comparator. *Lavin-McEleney*, 239 F.3d at 481 (approving of use of multiple regression analysis because individual comparators "may create the impression of an Equal Pay Act violation where no widespread gender discrimination exists … [and] may either grant … a windfall … or improperly limit [the] recovery" of a plaintiff); *Hein v. Or. Coll. of Educ.*, 718 F.2d 910, 916 (9th Cir. 1983) (the "proper test for establishing a prima facie case [under the federal Equal Pay Act] … is whether the plaintiff is receiving lower wages than the average wages paid to all employees of the opposite sex performing substantially equal work ….").

the typicality requirement because they, like the class members, were subject to the same discriminatory policies, thereby assuring that the interests of the class members will be adequately and fairly protected.

### 3.    Plaintiffs Meet the Adequacy Requirement.

The FR incorrectly concluded that the named Plaintiffs and Plaintiffs' counsel were inadequate based solely on its erroneous findings against commonality.  FR 55.  Because Plaintiffs satisfy commonality and typicality, its finding regarding adequacy is also erroneous. *See* Sections I.B.1, I.B.2, *supra*.  Moreover, while the FR correctly noted that the adequacy analysis must determine whether there are conflicts of interest between the named plaintiffs and the class, and whether class counsel is competent, FR 55, it made no such findings.  Plaintiffs presented clear evidence that no intra-class conflicts exist and that class counsel, who have significant experience and a proven track record covering several decades in representing classes of workers and others in complex litigation, are competent to represent the class.  ECF No. 146 at 61-62.  Adequacy is clearly met here.

### C.    Plaintiffs Satisfy Requirements of Rule 23(b)(2) and (b)(3).

"A Class action may be maintained only if one of three factors noted in Fed. R. Civ. P. 23(b) is present."  FR 55.  Contrary to the FR, Plaintiffs satisfy both Rule 23(b)(2) and (b)(3).

### 1.    Plaintiffs' Claims Present Common Issues for Which Classwide Injunctive Relief Under Rule 23(b)(2) Is Appropriate.

Rule 23(b)(2) is satisfied if "the party opposing the class has acted or refused to act on a grounds that apply generally to the class so that final injunctive relief ... is appropriate respecting the class as a whole ...."  The FR concluded that Plaintiffs failed to satisfy Rule 23(b)(2) because the "evidence does not support a finding of common issues about the purported policies."  FR 56 n.26.  As shown in section I.B.1, *supra*, Plaintiffs have established commonality as to their

disparate impact, disparate treatment, and OEPA claims, and thus a Rule 23(b)(2) class should be

certified. *See*, *e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482,

491-92 (7th Cir. 2012), *abrogated on other grounds by Phillip v. Sheriff of Cook Cnty.*, 828 F.3d

541 (7th Cir. 2016) (it is appropriate in a pay discrimination case alleging disparate impact to

certify a Rule 23(b)(2) class).

      The FR incorrectly concluded that "plaintiffs would necessarily seek to enjoin individual

hiring managers from engaging in the allegedly discriminatory conduct." FR 56 n.26. To the

contrary, if successful, Plaintiffs would be entitled to injunctive relief from Nike's discriminatory

policies of general application. This relief could include: (a) adjustment of compensation to

correct discriminatory consequences of the prior pay policy and to assure equal pay; (b) a

prohibition on using a percentage of base pay to calculate merit increases and bonuses that

perpetuate or exacerbate pay discrimination; and (c) modification of the "fill" policy whereby

Nike's choice of non-competitive promotions causes a disadvantage to women. Moreover, if the

common issues related to disparate treatment were resolved in Plaintiffs' favor, other injunctive

relief, such as a general injunction against intentional discrimination, as well as training and

monitoring provisions might be appropriate pursuant to the Court's equitable powers.

      Unlike under Rule 23(b)(3), there is no "cohesiveness" or "predominance" requirement

for a Rule 23(b)(2) class. *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 937-38

(9th Cir. 2019), *cert. denied*, 141 S. Ct. 248 (2020). Most importantly, Plaintiffs emphasized the

importance of injunctive relief given the role of the "injunction [section] 706(g)" in Title VII.

*See Franks v. Bowman Transp. Co.*, 424 U.S. 747, 770-71 (1976) (where discrimination "is

concerned, 'the (district) court has not merely the power but the duty to render a decree which

will so far as possible eliminate the discriminatory effects of the past as well as bar like

discrimination in the future'") (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)); *see also* Or. Rev. Stat. § 659A.885 (providing that a court "may order injunctive relief" if there is a violation of OEPA).

**2.      Common Issues Predominate and A Class Trial is Superior Such That Certification Under Rule 23(b)(3) Is Appropriate.**

Under Rule 23(b)(3), Plaintiffs must establish that common questions "predominate over any questions affecting only individual class members" and a class resolution will be "superior to other available methods for the fair and efficient adjudication of the controversy."

The FR erred in concluding the elements of predominance and superiority from Rule 23(b)(3) were not met based solely on its findings regarding commonality.  FR 56.  As above, Plaintiffs have satisfied commonality as to the disparate impact, disparate treatment and OEPA claims.  *See* Sections I.B.1.a-c, *supra*.  To the extent that the FR improperly considered potential individualized issues in its commonality analysis, those concerns do not defeat a finding of predominance.  The central issues of this case, namely the elements of Plaintiffs' claims and Nike's statutory defenses, are capable of resolution on a classwide basis.

**a.      Predominance Is Met.**

"The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453 (internal quotation marks & citation omitted); *Olean*, 31 F.4th at 664.  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Olean*, 31 F.4th at 668 (quoting *Tyson Foods*, 577 U.S. at 453) (internal quotation marks omitted).

Critically, "a district court cannot decline certification merely because it considers plaintiffs' evidence relating to the common question to be unpersuasive and unlikely to succeed in carrying the plaintiffs' burden of proof on that issue." *Olean*, 31 F.4th at 667 (citing *Tyson Foods*, 577 U.S. at 459-60). Rather, "*Tyson* established the rule that if 'each class member could have relied on [the plaintiffs' evidence] to establish liability if he or she had brought an individual action,' and the evidence 'could have sustained a reasonable jury finding' on the merits of a common question, *Tyson Foods*, 577 U.S. at 455, then a district court may conclude that the plaintiffs have carried their burden of satisfying the Rule 23(b)(3) requirements as to that common question of law or fact." *Id.* Here, Plaintiffs have, in fact, satisfied the requirements of Rule 23(b)(3).

### (1)    Plaintiffs Satisfy Predominance for Their Disparate Impact Claims.

Plaintiffs have presented common evidence to prove the elements of their disparate impact claims that challenge four classwide employment practices. Based on evidence including contemporaneous Nike documents, Nike admissions, statistical analyses, and expert opinions, a factfinder could conclude that Plaintiffs established a *prima facie* showing for all three elements of their disparate impact claims. *Olean*, 31 F.4th at 668; *Maney v. State*, No. 6:20-cv-00570-SB, 2022 WL 986580, at *18 (D. Or. Apr. 1, 2022) (finding "that based on Plaintiffs' theory of the case, they will be able to rely on the same evidence of centralized policies, practices, and decisions to attempt to prove [their claims].").

Plaintiffs also have established that Nike's affirmative defenses of job relatedness and business necessity are capable of being resolved using classwide evidence. *See* Section I.B.1.a(5), *infra*.

Disregarding this common proof of central issues, the FR found that each challenged policy will require individualized inquiries into whether those policies, in fact, applied to and harmed all class members.  FR 46-50.  But this conclusion is based on the FR's premature merits determination that, in its view, Plaintiffs' evidence was unpersuasive.  Instead, the FR should have analyzed whether Plaintiffs' classwide evidence could be used by individual class members if they pursued an individual action.  Here, for example, an individual class member could rely upon Dr. Neumark's multiple regression analysis to prove the adverse impact of Nike's centralized prior pay policy or Dr. Lundquist's explanation for why Nike's use of existing salary to calculate annual merit increases and bonuses can exacerbate existing pay disparities.  Because central issues of liability are *capable* of classwide resolution, predominance is met.

As to the concern that some class members were not harmed by the challenged policies, Ninth Circuit precedent is clear that individualized damages issues are readily managed in certified cases through damages proceedings after class liability is established.  *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010) ("In this circuit ... damage calculations alone cannot defeat certification."); *Olean*, 31 F.4th at 681-82 ("there is no per se rule that a district court is precluded from certifying a class if plaintiffs may have to prove individualized damages at trial.").

Moreover, courts regularly find predominance met where centralized policies are challenged even if some or many class members are not damaged by the unlawful policy.  As the Seventh Circuit in *Bell v. PNC Bank, National Ass'n*, explained, in a case challenging an unofficial policy of requiring unpaid overtime work, "[a] class will often include persons who have not been injured by the defendant's conduct, but this possibility or, indeed inevitability, does not preclude class certification."  800 F.3d 360, 380 (7th Cir. 2015); *see also id.* (holding

that individualized questions regarding relief (i.e., which class members were harmed and what loss they sustained) did not defeat predominance because "[a]t least it will not be necessary in each of those trials to determine whether PNC had an illegal policy of denying pay for off-the-clock work."); *Moore v. Int'l Cosms. & Perfumes, Inc.*, No. 5:14-cv-01179-DMG-DTB, 2016 WL 7644849, at *13 (C.D. Cal. Mar. 17, 2016) (for meal and rest break class claim, "[t]he fact that some employees did take breaks is not fatal to the claim that there was a common policy, uniformly applied, which subjects ICP to liability."). By improperly conflating the possibility of individualized relief issues with Plaintiffs' ability to prove classwide liability, the FR erred in finding predominance not met.

> ### (2) Plaintiffs Satisfy Predominance for Their Disparate Treatment Claims.

The FR erred in concluding that predominance was not met for Plaintiffs' disparate treatment claims based solely on a purported failure to establish commonality. But, as stated above, Plaintiffs have demonstrated that the *prima facie* showing of their disparate treatment claim, that discrimination was Nike's regular practice, can be establishing using common, classwide evidence. *See* Section I.B.1.b, *infra.* Because a factfinder could plausibly find that discrimination is Nike's standard operating procedure based upon Plaintiffs' statistical evidence of systemic pay, promotion, and job assignment disparities disfavoring women coupled with anecdotal complaints of sex discrimination underscored by Nike admissions and classwide responses to these serious discrimination complaints, the FR erred in finding a lack of predominance.

> ### (3) Plaintiffs Satisfy Predominance for Their OEPA Claims.

The FR erred in finding that Plaintiffs could not satisfy predominance for their OEPA claims based on its erroneous commonality findings. *See* Section I.B.1.c, *infra.* As they have

demonstrated, Plaintiffs will establish all elements of their OEPA claim using common proof, including Dr. Lundquist's conclusions about comparable work at Nike and Dr. Neumark's classwide statistical evidence of pay disparities based on sex even after controlling for potential job-related reasons.

To the extent the FR was concerned that Nike may present counter evidence that comparable work was performed at the job code level, not job cell level, this would not defeat predominance.  This dispute would be resolved on a classwide basis using the parties' common proof, including the testimony of their respective experts.  Thus, even if Nike presents evidence regarding whether job codes or job cells best reflect comparable work at Nike, the factfinder will ultimately make a single classwide determination whether they find Plaintiffs' or Nike's evidence of comparable work persuasive.

In addition, the resolution of Nike's affirmative defense to the OEPA claims will be subject to common proof since reliance on prior pay is not a bona fide factor other than sex. *Rizo*, 950 F.3d at 1222, 1229 (holding that a wage disparity "associated with an employee's prior job does not qualify as a factor other than sex").

The FR erred by finding that predominance was not satisfied.

      **b.**      **A Class Proceeding Is Manageable and Superior to Thousands of Individual Cases.**

         **(1)**      **A Class Trial Is Manageable.**

The FR erred in failing to analyze the manageability of a class trial or Plaintiffs' proposed bifurcated trial plan.  Courts typically bifurcate class claims of employment discrimination into liability and remedial phases. *See Wal-Mart*, 564 U.S. at 352 n.7 (reaffirming the bifurcated, burden-shifting trial approach to disparate treatment claims initially set forth in *Teamsters*); Manual for Complex Litigation (Fourth) § 32.45 (2004) ("Employment

discrimination class actions have commonly been tried in separate stages under Rule 42(b)."). In the first phase, plaintiffs seek to establish the employer's liability; if they do, then there is a second remedial phase. *Wal-Mart*, 564 U.S. at 352 n.7.

Plaintiffs' trial plan proposes this same two-stage approach with Phase I focusing on classwide liability and classwide affirmative defenses. Phase I can also resolve whether the class is entitled to injunctive relief and declaratory relief to end the unlawful practices, as well as punitive damages (based solely on an employer's state of mind). If Phase I results in findings of liability or relief, then Phase II would address the scope of injunctive relief and the amount of monetary relief owed to the class. The amount of punitive damages owed will be a classwide determination. Likewise, any lost earnings that are due to class members will be calculated using multiple regression analyses.[28] During Phase II, Nike will have the opportunity to raise defenses related to the class' or an individual class member's entitlement to relief, which could be effectively managed by a variety of tools, including the use of a special master or claims administrator and a notice and claim process. *See Maney*, 2022 WL 986580, at *24 (recent District of Oregon decision deeming bifurcation, similar to Plaintiffs' proposal, was appropriate).

### (2)    A Class Trial Is Superior to Thousands of Individual Cases.

The FR erred in summarily concluding that "pursuit of individual claims is the better method to litigate claims of discrimination." FR 56. Given the issues raised in this action, "classwide adjudication is far more manageable than the alternative individual proceedings on all issues, because it has the potential to resolve multiple issues in one proceeding before proceeding

---

[28] *See, e.g., Lavin-McEleney*, 239 F.3d at 482 (multiple regression analysis based on a pool of male comparators with appropriate controls "properly supported plaintiff's [EPA] case and was appropriately employed to calculate damages"); *Hein*, 718 F. 2d at 916 (EPA wage disparity calculations in professional settings should compare plaintiff's wages against "the average wages paid to all employees of the opposite sex performing substantially equal work and similarly situated with respect to any other factors").

to individual hearings on relief." *Ellis*, 285 F.R.D. at 540. To the extent that a single action can determine classwide issues, it makes little sense to litigate those same claims in thousands of proceedings. Moreover, a class procedure is the only feasible way to marshal sufficient resources, including the retention of experts and processing of complicated data files, to present issues related to the disparate impact and treatment claims. *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 863 (9th Cir. 2016) ("Class actions are used to 'vindicate … the rights of groups of people who individually would be without effective strength to bring their opponents into court at all'") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997)).

**D.    In the Alternative, the Court May Certify Issues Under Rule 23(c)(4).**

Even if individualized issues are found to predominate under Rule 23(b)(3), the Court may use Rule 23(c)(4) to "adjudicate those issues capable of classwide resolution separately." *Ellis*, 285 F.R.D. at 544. For example, in conjunction with Rule 23(b)(2), the Court could certify classwide liability issues, such as whether any use of prior pay by Nike has a disparate impact on women or whether Nike can assert a defense in light of *Rizo* and its use of prior pay. Such certification would resolve issues that can be efficiently determined on a classwide basis.

**E.    Conclusion**

Based on the foregoing, Plaintiffs respectfully request that the Court decline to adopt the FR. The Court instead should grant Plaintiffs' motion for class certification, certify the proposed class, appoint Plaintiffs as Class Representatives, and appoint Class Counsel.

Dated: December 22, 2022              Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

Laura L. Ho (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
James Kan (admitted *pro hac vice*)

Byron Goldstein (admitted *pro hac vice*)
Mengfei Sun (admitted *pro hac vice*)

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Kathryn P. Roberts, OSB #064854

ACKERMANN & TILAJEF PC
Craig Ackerman (admitted *pro hac vice*)
cja@ackermanntilajef.com
1180 S Beverly Drive, Suite 610
Los Angeles, CA 90035
Tel:  (310) 277-0614
Fax:  (310) 277-0635

INDIA LIN BODIEN LAW
India Lin Bodien (admitted *pro hac vice*)
india@indialinbodienlaw.com
2522 North Proctor Street, #387
Tacoma, WA 98406-5338
Tel:  (253) 503-1672
Fax:  (253) 276-0081

Of Attorneys for Plaintiffs and Opt-In Plaintiffs