LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LAURA E. ZABELE, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, SARA JOHNSTON, LINDSAY ELIZABETH, and HEATHER HENDER, individually and on behalf of others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>NIKE, INC., an Oregon Corporation,<br><br> Defendant. | Case No.:  3:18-cv-01477-JR<br><br>DEFENDANT NIKE, INC.'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO MAGISTRATE JUDGE'S FINDINGS AND RECOMMENDATION DENYING CLASS CERTIFICATION<br><br>ORAL ARGUMENT REQUESTED |

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.   THIS COURT SHOULD ADOPT JUDGE RUSSO'S FINDINGS AND
      RECOMMENDATIONS AND DENY CLASS CERTIFICATION ............................... 4

      A.    Plaintiffs Fail To Identify A Common Policy Or Practice That Applied To
            The Entire Putative Class. ................................................................... 4

            1.    Plaintiffs Failed To Establish That A Common Policy Or Practice
                  Adversely Affected Women. ....................................................... 5

                  a.    Plaintiffs Failed To Establish That Nike Had A Common
                        Policy Or Practice Of Using Prior Pay To Set Starting Pay. ......... 7

                        (i)     Starting Pay Decisions Were Made By Thousands
                                Of Individual Nike Managers Using A Variety Of
                                Criteria. .............................................................. 7

                        (ii)    Plaintiffs Presented No Evidence Of A Common Or
                                Uniform Practice Regarding Use Of Prior Pay. ............. 8

                        (iii)   Nike's Later Guidance To Conform To A New
                                Oregon Law Does Not Establish A Prior Common
                                Policy. ................................................................. 11

                  b.    Plaintiffs Failed To Establish That Nike Had A Common
                        Policy Or Practice Regarding Merit Increases And Bonus
                        Awards. .................................................................... 11

                        (i)     The Evidence Shows That Managers Had, And
                                Exercised, Discretion In Awarding Merit Increases
                                And Bonuses. ........................................................ 11

                        (ii)    Plaintiffs' Objections Are Without Merit. ................... 15

                  c.    Plaintiffs Failed To Establish That Nike Had A Common
                        Policy Or Practice Regarding Noncompetitive Promotions. ....... 17

                        (i)     Individual Managers Made Discretionary Decisions
                                About Noncompetitive Promotions. ........................... 17

                        (ii)    Plaintiffs' Contentions To The Contrary Do Not
                                Establish A Common Practice. ................................. 18

                  d.    Plaintiffs Failed To Establish That Nike Had A Common
                        Policy Or Practice Regarding Initial Job Level
                        Assignments. ............................................................... 20

                        (i)     Open Roles Are Assigned To A Level Before
                                Posting And Candidates Decide On Which Roles
                                To Seek. .............................................................. 20

                        (ii)    Plaintiffs' Objections Do Not Establish
                                Commonality ......................................................... 21

|  |  | e. | Plaintiffs' Statistical Evidence Does Not Establish Commonality................................................. | 23 |

|  |  | f. | Judge Russo's Findings And Recommendations Did Not Ignore Plaintiffs' Legal Theory Or Evidence. ............................ | 25 |

|  | 2. | Plaintiffs Failed To Establish Commonality With Respect To Their Disparate Treatment Claims. .............................................. | 28 |

|  |  | a. | Plaintiffs' Statistical Evidence Fell Short. .................................. | 28 |

|  |  | b. | *Dukes* Applies To Plaintiffs' Claims. ......................................... | 30 |

|  |  | c. | Plaintiffs' Anecdotal Evidence Also Falls Well Short Of Their Burden. .................................................. | 31 |

|  | 3. | Plaintiffs Failed To Establish Commonality For Their OEPA Claim.................................................... | 34 |

|  |  | a. | Dr. Lundquist Offered No Common Way To Identify Which Jobs Perform Comparable Work. ................................. | 35 |

|  |  | b. | Dr. Neumark's Analysis Did Not Establish Commonality. ......... | 38 |

|  |  | c. | Plaintiffs' Remaining Objections Do Not Establish Error........... | 41 |

| B. |  | Judge Russo Correctly Found That Plaintiffs Failed To Satisfy The Typicality And Adequacy Requirements Of Rules 23(a)(3) And (a)(4). ........... | 42 |

| C. |  | Judge Russo Correctly Found That Plaintiffs Failed To Satisfy The Predominance And Superiority Requirements Of Rule 23(b)(3). ...................... | 43 |

|  | 1. | Plaintiffs Failed To Prove Predominance. ................................................. | 43 |

|  | 2. | A Class Trial Would Be Inefficient And Would Not Be Superior To Individual Trials. .................................................... | 45 |

|  | 3. | Judge Russo Correctly Found That Certification Of Plaintiffs' Claim For Injunctive Relief Is Inappropriate Under Rule 23(b)(2). ........ | 46 |

| D. |  | Plaintiffs Incorrectly Suggest That The Court Should Reserve The Class Certification Question For The Jury. ................................................... | 48 |

| E. |  | Plaintiffs Belatedly And Improperly Seek Certification Under Rule 23(c)(4)................................................... | 49 |

| III. |  | CONCLUSION................................................................. | 50 |

-    DEFENDANT NIKE, INC.'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO FINDINGS AND RECOMMENDATION DENYING CLASS CERTIFICATION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Aguilera v. Att'y Gen. of Arizona,*
2021 WL 1751442 (D. Ariz. May 4, 2021) ............................................................3

*Alonzo v. Maximus, Inc.,*
275 F.R.D. 513 (C.D. Cal. 2011), *abrogated on other grounds by*
*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) ............................................................................................10

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ............................................................................................44

*Arrendondo v. Delano Farms Co.,*
2011 WL 1486612 (E.D. Cal. Apr. 19, 2011) ......................................................9

*Betancourt v. Ace Ins. Co. of Puerto Rico,*
313 F. Supp. 2d 32 (D.P.R. 2004) .......................................................................3

*Bolden v. Walsh Const. Co.,*
688 F.3d 893 (7th Cir. 2012) ...........................................................17, 23, 29, 40

*Casida v. Sears Holdings Corp.,*
2012 WL 3260423 (E.D. Cal. Aug. 8, 2012),
*report and recommendation adopted,*
2012 WL 3763621 (E.D. Cal. Aug. 29, 2013) ....................................................27

*Christian v. Generation Mortg. Co.,*
2014 WL 4494860 (N.D. Ill. Sept. 12, 2014) ....................................................23

*Cooper v. Fed. Rsrv. Bank of Richmond,*
467 U.S. 867 (1984) .............................................................................................5

*Cuevas v. Citizens Fin. Grp., Inc.,*
526 F. App'x 19 (2d Cir. 2013) .........................................................................26

*Donaldson v. Microsoft Corp.,*
205 F.R.D. 558 (W.D. Wash. 2001) ...................................................................43

*Dukes v. Wal-Mart, Inc.,*
509 F.3d 1168 (9th Cir. 2007) ............................................................................4

*Dukes v. Wal-Mart Stores, Inc.,*
964 F. Supp. 2d 1115 (N.D. Cal. 2013) ..........................................................6, 16

*Ellis v. Costco Wholesale Corp.,*
285 F.R.D. 492 (N.D. Cal. 2012) ..................................................................19, 29

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) ....................................................................... *passim*

*Freitag v. Ayers,*
  468 F.3d 528 (9th Cir. 2006) ................................................46

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ................................................35

*Gen. Tel. Co. of the Sw. v. Falcon,*
  457 U.S. 147 (1982)................................................4, 32, 42

*Gonzalez v. Millard Mall Servs., Inc.,*
  281 F.R.D. 455 (S.D. Cal. 2012) ................................................28

*Gordon v. Kaleida Health,*
  299 F.R.D. 380 (W.D.N.Y. 2014)................................................34

*Handloser v. HCL Techs. Ltd.,*
  2021 WL 879802 (N.D. Cal. Mar. 9, 2021)................................................50

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) ................................................45

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ................................................4

*Harris v. Initial Sec., Inc.,*
  2007 WL 703868 (S.D.N.Y. Mar. 7, 2007)................................................32

*Howard v. Sec'y of Health and Human Servs.,*
  932 F.2d 505 (6th Cir. 1991) ................................................2

*In re Countrywide Fin. Corp. Mortg. Lending Pracs. Litig.,*
  708 F.3d 704 (6th Cir. 2013) ................................................17, 23

*In re Wells Fargo Home Mortg. Overtime Pay Litig.,*
  527 F. Supp. 2d 1053 (N.D. Cal. 2007)................................................10

*Jones v. Nat'l Council of Young Men's Christian*
*Ass'ns of the United States of Am.,*
  34 F. Supp. 3d 896 (N.D. Ill. 2014)................................................6, 23, 24, 29

*Kassman v. KPMG LLP,*
  416 F. Supp. 3d 252 (S.D.N.Y. 2018)................................................ *passim*

*Lott v. Vial Fotheringham, LLP,*
  2020 WL 1890539 (D. Or. Apr. 15, 2020) ................................................44

*McCullock v. Tharratt,*
  2017 WL 6398611 (S.D. Cal. Dec. 15, 2017)................................................3

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  672 F.3d 482 (7th Cir. 2012) ................................................16, 17

*Meacham v. Knolls Atomic Power Lab'y,*
  554 U.S. 84 (2008)................................................22

*Moore v. Publicis Grp. SA,*
  2014 WL 11199094 (S.D.N.Y. May 15, 2004) ................................................38

*Moussouris v. Microsoft Corp.,*
   2018 WL 3328418 (W.D. Wash. June 25, 2018), *aff'd,*
   799 F. App'x 459 (9th Cir. 2019) ................................................................. *passim*

*Moussouris v Microsoft Corp.,*
   799 F. App'x 459 (9th Cir. 2019) ............................................................. 5, 15

*Nance v. May Trucking Co.,*
   2013 WL 10229756 (D. Or. June 10, 2013), *aff'd,*
   685 F. App'x 602 (9th Cir. 2017) ............................................................. 4, 25

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC,*
   31 F.4th 651 (9th Cir. 2022), *cert. denied,*
   143 S. Ct. 424 (2022) ................................................................. 24, 25, 48

*P.J.E.S. by & through Escobar Francisco v. Wolf,*
   502 F. Supp. 3d 492 (D.D.C. 2020) .................................................................. 3

*Perry-Roman v. AIG Ret. Servs., Inc.,*
   2010 WL 8697061 (C.D. Cal. Feb. 24, 2010) .......................................................... 37

*Puffer v. Allstate Ins. Co.,*
   255 F.R.D. 450 (N.D. Ill. 2009), *aff'd,*
   675 F.3d 709 (7th Cir. 2012) ......................................................... 33, 37, 38

*Reyes v. Netdeposit, LLC,*
   802 F.3d 469 (3d Cir. 2015) .................................................................. 27

*Serrano v. Cintas Corp.,*
   2009 WL 910702 (E.D. Mich. Mar. 31, 2009), *aff'd sub nom.*
   *Davis v. Cintas Corp.,*
   717 F.3d 476 (6th Cir. 2013) .................................................................. 32

*Smith v. Bull Run Sch. Dist. No. 45,*
   80 Or. App. 226 (1986) ...................................................................... 34

*Soto v. Castlerock Farming & Transp., Inc.,*
   2013 WL 6844377 (E.D. Cal. Dec. 23, 2013),
   *report and recommendation adopted,*
   2014 WL 200706 (E.D. Cal. Jan. 16, 2014) ....................................................... 27

*Stanley v. Ylst,*
   2007 WL 2121845 (E.D. Cal. July 24, 2007) ...................................................... 49

*Stringham v. Bick,*
   2007 WL 806619 (E.D. Cal. Mar. 15, 2007) ....................................................... 49

*Taison Commc'ns, Inc. v. Ubiquiti Networks, Inc.,*
   308 F.R.D. 630 (N.D. Cal. 2015) ................................................................ 49

*Tyson Foods, Inc. v. Bouaphakeo,*
   577 U.S. 442 (2016) .......................................................................... 45

*United States v. Howell,*
   231 F.3d 615 (9th Cir. 2000) .................................................................. 49

*United States v. Oregon State Med. Soc'y,*
    343 U.S. 326 (1952) ...........................................................................47

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv.*
    *Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.,*
    593 F.3d 802 (9th Cir. 2010) ............................................................26

*Wal-Mart Stores, Inc. v. Dukes,*
    564 U.S. 338 (2011) ..................................................................... *passim*

*Wallin v. Holbrook,*
    2012 WL 4792923 (W.D. Wash. Oct. 9, 2012) .................................2, 3

*Walsh v. Nevada Dep't of Hum. Res.,*
    471 F.3d 1033 (9th Cir. 2006) ...........................................................46

STATUTES

28 U.S.C. § 631 (MAGISTRATES ACT) ...........................................................3

42 U.S.C. § 2000e-2 (TITLE VII) .......................................................6, 8, 10

OR. REV. STAT. § 652.210(16)........................................................................34

OR. REV. STAT. § 652.220 (OREGON EQUAL PAY ACT (OEPA))................. *passim*

OR. REV. STAT. § 652.220(2) ..........................................................................38

RULES

FED. R. CIV. P. 23 .......................................................................... *passim*

FED. R. CIV. P. 65(d)......................................................................................47

FED. R. CIV. P. 72(b)....................................................................................2, 3

REGULATIONS

29 C.F.R. § 1607.1(B)....................................................................................38

I.    __INTRODUCTION__

Sensational accusations bolstered by attorney commentary may grab headlines, but Magistrate Judge Russo's Findings & Recommendations ("F&R") recognize that more is required to certify a class action.  Put simply, Plaintiffs failed to show that tens of thousands of Nike's pay, promotion, and job leveling decisions can be tried in one action with the uniform proof a class action requires.  Even lead plaintiff Cahill's testimony shows why Judge Russo correctly denied class certification.  When asked how *she* made hiring and starting pay decisions, Cahill explained that, as a manager, she based her decisions on the pay range for the role and the candidate's "overall work experience," *not gender*.  ECF 187-2 at 104-113, Cahill Tr. 236:18-245:13.  Cahill denied the very discriminatory practices she alleges (without proof) to operate class and company-wide.

This is just a snippet of the extensive record demonstrating that Plaintiffs failed to meet the rigorous standard required to certify a class action.  They failed to show a company-wide policy or practice of discrimination that applied to the putative class of nearly 5,200 women performing more than 1,200 different jobs.  Likewise, the record established, consistent with Judge Russo's findings, that there is no typicality or adequacy because Nike's managers exercised wide-ranging discretion in setting pay, promotions, and job level, and for awarding bonuses.  Cahill's testimony, the testimony of other named and opt-in plaintiffs, and dozens of class member declarations make this point.  Further, individualized issues predominate in resolving the employment circumstances of each class member because thousands of different managers (including putative class members) exercised discretion when making the pay, promotion and leveling decisions challenged here, based upon the managers' personal assessments of employees' performance, expertise, skills, experience, and a host of other factors.

Judge Russo has overseen these proceedings for 4½ years, including a motion to dismiss and years of discovery involving Nike's production of nearly 50,000 pages of documents and data for more than 10,000 putative class members and their alleged comparators, and 30 separate depositions.  ECF 136 at 2.[1]  Judge Russo and the court staff spent more than four months carefully reviewing and analyzing more than 200 pages of class certification briefing, two dozen putative class member declarations, close to 2,000 pages of expert reports and supporting documents, and another 400 pages of dueling *Daubert* briefing.

After all of this, Judge Russo correctly concluded that Plaintiffs' motion for class certification should be denied.  F&R at 1, 56.  Specifically, Judge Russo found that Plaintiffs: (1) failed to establish the commonality required to certify their adverse impact, disparate treatment, and Oregon Equal Pay Act (OEPA) claims (*id.* at 50, 53, 54); (2) failed to show the typicality and adequacy required for certification (*id.* at 55); (3) failed to establish that common questions predominate over individual ones, and that a class action is the superior method for adjudicating their claims (*id.* at 56); and (4) failed to show the existence of common policies sufficient to maintain a class action for injunctive relief (*id.*).

Plaintiffs now reprise the same arguments that Judge Russo rejected.  Their purported "objections" offend Federal Rule of Civil Procedure 72(b) and ignore established law.

*First*, Rule 72(b) demands *specific* objections to Judge Russo's findings, not generalized restatements of arguments that already were presented and rejected.  "[G]eneral objections, or summaries of arguments previously presented, have the same effect as no objection at all, since the Court's attention is not focused on any specific issues for review."  *Wallin v. Holbrook*, 2012 WL 4792923, at *2 (W.D. Wash. Oct. 9, 2012) (citing *Howard v. Sec'y of Health and Human*

---

[1] Page citations are to ECF pagination, not a document's internal pagination.

*Servs.*, 932 F.2d 505, 509 (6th Cir. 1991)).  The consideration of such broad and generalized "'objections' would entail *de novo* review of the entire report, rendering the referral to the magistrate judge useless and causing a duplication of time and effort that wastes judicial resources and contradicts the purposes of the Magistrates Act."  *Wallin*, 2012 WL 4792923, at *2 (citation omitted); *see also McCullock v. Tharratt*, 2017 WL 6398611, at *1 (S.D. Cal. Dec. 15, 2017) ("[G]eneralized or blanket objections do not trigger the *de novo* review requirement."). "Objections . . . are not to 'be construed as a second opportunity to present the arguments already considered by the Magistrate Judge.'"  *Aguilera v. Att'y Gen. of Arizona*, 2021 WL 1751442, at *2 (D. Ariz. May 4, 2021) (quoting *Betancourt v. Ace Ins. Co. of Puerto Rico*, 313 F. Supp. 2d 32, 34 (D.P.R. 2004).  That is precisely what Plaintiffs do here.  Because Plaintiffs have failed to file proper objections, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  Fed. R. Civ. P. 72(b), Adv. Cmte. Note to 1983 Amendment; *see also P.J.E.S. by & through Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 507 (D.D.C. 2020) ("If, however, the party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the [F&R] only for clear error. . . . Under the clearly erroneous standard, the magistrate judge's decision is entitled to great deference and is clearly erroneous only if on the entire evidence the court is left with the definite and firm conviction that a mistake has been committed.") (internal citations and quotation marks omitted).[2]

    *Second*, even if the Court were to review the F&R *de novo*, it should find no error.  "The party seeking certification bears the burden of showing the proposed class meets the requirements of Federal Rule of Civil Procedure 23(a) and (b)."  *See* ECF 310 ("F&R") at 35-36

---

[2] Nike has identified in footnotes the numbered objections to which it is responding.

(citing *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1176 (9th Cir. 2007)); *see also Nance v. May Trucking Co.*, 2013 WL 10229756, at *4 (D. Or. June 10, 2013) (Hernández, J.), *aff'd*, 685 F. App'x 602 (9th Cir. 2017) ("Plaintiffs bear the burden of demonstrating that each element of Rule 23 is satisfied.") (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). A court considering class certification must conduct a "rigorous analysis" and find, by a preponderance of the evidence, that the requirements of Rule 23 are met.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("actual, not presumed, conformance with Rule 23(a) remains . . . indispensable")) (alterations in original).  Such rigorous analysis requires "judging the persuasiveness of the evidence presented" for and against certification and "resolv[ing] any factual disputes necessary to determine whether" the requirements of Rule 23 have been satisfied.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982-83 (9th Cir. 2011).

As demonstrated by the record and the well-reasoned F&R, Judge Russo correctly concluded that Plaintiffs failed to meet their burden to withstand the "rigorous analysis" the Supreme Court requires for certification.

## II.    THIS COURT SHOULD ADOPT JUDGE RUSSO'S FINDINGS AND RECOMMENDATIONS AND DENY CLASS CERTIFICATION

### A.    Plaintiffs Fail To Identify A Common Policy Or Practice That Applied To The Entire Putative Class.

"What matters to class certification . . . is not the raising of common 'questions' — even in droves — but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350 (citation omitted) (emphasis in original).  To generate common answers, Plaintiffs must show that "the *reason behind*" adverse employment decisions was "the same for all class members."  *See* F&R at 38 (emphasis added); *accord Dukes*, 564 U.S. at 352 ("Without some glue holding the alleged *reasons* for all those

decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*") (emphasis in original).  As Judge Russo correctly explained, Plaintiffs must show that the class members' claims "'depend upon a common contention . . . which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'"  F&R at 37 (quoting *Dukes*, 564 U.S. at 350).

"If there is no evidence that the entire class was subject to the same allegedly discriminatory practice, there is no question common to the class.  In other words, the district court must determine whether there was 'significant proof that [the employer] operated under a general policy of discrimination.'"  *Ellis*, 657 F.3d at 983 (quoting *Dukes*, 564 U.S. at 353).  As Judge Russo noted, "the purported policies [challenged by Plaintiffs must be] in fact company-wide policies applied to all employees regardless of job or at least all employees within the 1200+ different jobs plaintiffs occupy" to certify Plaintiffs' proposed class.  *See* F&R at 38.

Based on the record, Judge Russo properly concluded that the individualized pay, promotion, and leveling decisions at issue here cannot be evaluated with common proof.

## 1.    <u>Plaintiffs Failed To Establish That A Common Policy Or Practice Adversely Affected Women.</u>

The commonality inquiry for certification of an adverse impact claim "overlaps with the merits because both look at the reason for a particular employment decision."  F&R at 38 (citing *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 876 (1984)); *see also Moussouris v. Microsoft Corp.*, 2018 WL 3328418, at *13 n.10 (W.D. Wash. June 25, 2018), aff'd, 799 F. App'x 459, 462 (9th Cir. 2019) ("the distinction between a disparate impact claim and a disparate treatment claim, for commonality purposes, is often illusory because the 'actual argument in support of class certification ultimately makes little distinction between the two'")

(quoting *Dukes v. Wal-Mart Stores, Inc.*, 964 F. Supp. 2d 1115, 1119 (N.D. Cal. 2013) ("*Dukes II*")). Indeed, *Dukes* teaches that proof of commonality "necessarily overlaps" with the merits of a plaintiff's discrimination allegations "because, in resolving an individual's Title VII claim, the crux of the inquiry is 'the *reason* for a particular employment decision[.]'" 564 U.S. at 352 (emphasis added) (citation omitted).[3]

While an adverse impact claim does not require proof of discriminatory intent, "the plaintiff must still establish that the practice is the common cause of conduct for which the defendant is alleged to be liable." *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the United States of Am.*, 34 F. Supp. 3d 896, 909 (N.D. Ill. 2014) (for certification, "there must be a common cause for the injuries claimed").

Judge Russo correctly concluded that Plaintiffs failed to identify a "common cause" for any alleged shortfalls in their four areas of challenge: starting pay, merit increases and bonus awards, promotion decisions, and job leveling. Instead, as in *Dukes*, the evidence showed that individual Nike managers exercised significant discretion with respect to these decisions, and thus no "glue" holds employees' claims together. *See Dukes*, 564 U.S. at 355 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal-Mart's 'policy' of *allowing discretion* by local supervisors over employment matters.") (emphasis in original).

Plaintiffs repeatedly "object" that Judge Russo "ignored" their theory of the case.[4] Judge Russo correctly found that manager discretion, exercised person by person, defeated commonality.

---

[3] *See* Plaintiffs' Objection 1.a. ECF 320 at 11.
[4] *See* Plaintiffs' Objections 1.b., 3.a., 4.a., 5.a., 7.b. ECF 320 at 11, 13-15.

a.    **Plaintiffs Failed To Establish That Nike Had A Common**
**Policy Or Practice Of Using Prior Pay To Set Starting Pay.**

Plaintiffs claimed that Nike had a common and class-wide policy of using candidates'

prior pay to set starting salaries.  ECF 146 at 21.  Judge Russo correctly concluded, however, that

the evidence did not reveal "a class-wide policy, rather it demonstrates that hiring managers

possessed significant discretion" with respect to starting pay.  F&R at 39.

(i)    **Starting Pay Decisions Were Made By Thousands Of**
**Individual Nike Managers Using A Variety Of Criteria.**

Starting salary decisions at Nike were made by thousands of different hiring managers

based on a variety of factors that varied depending on the role, the candidate, and the manager.

*See* ECF 183 at 17.  After selecting a candidate, hiring managers receive a salary range for the

role, and then decide where to place each new hire, normally within that range, though they may

exceed the range at their discretion.  ECF 187-1 at 199, Croll Decl. ¶ 11 (hiring manager may set

starting salary "within the pay range" or "above the range, with additional approval").

As the F&R found, Nike documents and sworn testimony confirmed that managers may

consider factors such as external market rates, internal equity, the applicant's relevant work

experience, education and skills, and the business' financial conditions in setting starting pay.

ECF 159-5; *see also* ECF 187-2 at 316-19, Thomas Tr. 232:21-235:5 (explaining factors

managers may consider when setting starting pay); ECF 187-1 at 302-04, Thomas Decl. ¶¶ 4-7

("[m]any different factors go into hiring decisions and can lead to higher starting pay for

different roles").  Managers have discretion to consider and weigh the particular factors that they

deem relevant to the specific position.  *See, e.g.,* ECF 187-1 at 126, Peele Decl. ¶ 9 ("I know that

candidates from Microsoft have a lot of technical experience, so I would likely give someone

from Microsoft a higher salary than someone from a smaller, less technical company."); at 187-

88, Caputo Decl. ¶¶ 9-11 ("What differentiates an excellent candidate, and can lead to a higher

Page 7    -    DEFENDANT NIKE, INC.'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO
FINDINGS AND RECOMMENDATION DENYING CLASS CERTIFICATION

starting salary, will be nuanced and vary based on the particular business unit, the role, and the functions they support.").[5]

### (ii)  Plaintiffs Presented No Evidence Of A Common Or Uniform Practice Regarding Use Of Prior Pay.

Plaintiffs claim that Judge Russo erroneously concluded that Nike did not consistently use prior pay to set starting pay, but the evidence the Court was *required* to rigorously analyze disproved that theory.[6]  There is no dispute that, effective September 2017, in anticipation of a new Oregon state law, Nike instructed recruiters and hiring managers never to ask candidates about prior salary or salary history going forward.  *See* ECF 155-6 at 1-2.  No one hired after this date was subject to the alleged "common" policy.[7]  Before September 2017, managers were allowed to consider a candidate's salary history in setting starting pay, but they were not asked or required to do so and they also could consider any number of additional factors.  F&R at 10 (citing declarations); *see also* ECF 159-5 at 1.  Moreover, "[w]hile hiring decisions may involve multiple people providing approval, the onus for the offer decision rests on the hiring manager[,]" and prior salary "was merely a data point the manager could consider."  F&R at 40.

---

[5] *See also* ECF 187-1 at 174-75, Worboys Decl. ¶¶ 16-17 ("I evaluate a variety of factors when setting starting pay, including the candidate's experience, any unique qualities the candidate could bring to the role, and how the pay compares to the overall team."); at 34, Hackenmiller-Paradis Decl. ¶ 22 ("Factors I considered about what starting pay to offer included a combination of what the internal pay scale currently is and what the competitive pay range is externally for the role, whether technical skillsets are required, years of relevant experience of the candidate, whether the candidate is in his or her career, and whether and how long the candidate previously worked with Nike as a contractor (if applicable).  Factors can vary based on the role itself . . . ."); at 46-66, Azavedo Tr. 54:25-72:7; 80:14-20; 103:1-14 (opt-in plaintiff considered factors like passion, fit, existing relationships, internal recommendations, communication skills, education, prior relevant experience, and prior employers to make hiring decisions; made or approved salary decisions for all individuals she hired; never made any hiring or pay decisions based on gender).
[6] *See* Plaintiffs' Objection 3.b.  ECF 320 at 13.
[7] Although Plaintiffs criticize Judge Russo's reference to the "brief period" during which salary could have been used as a data point, Judge Russo did not address the Title VII liability period, but merely stated this undisputed fact.  *See* ECF 320 at 22 (citing F&R 44-46).

Nike's Senior Director, Talent Acquisition, Shine Thomas, testified that prior salary was "a data point," but that "[e]very single offer is unique … and [reflects] different nuances associated with the candidate and their experiences and qualifications." ECF 187-2 at 307-09, Thomas Tr. 220:7-21; *see also id.* 221:22-222:1.

Judge Russo also cited evidence showing that even when such inquiries were permitted, hiring managers often did not ask about candidates' prior pay, or candidates chose not to provide it, such that prior pay could not have been a factor in each pay decision. *Id.* Such evidence included the sworn testimony of putative class members hired when the inquiry was allowed but who were not asked to provide their salary histories, or who were recent college graduates with no salary history to report.[8] *See, e.g.,* ECF 187-1 at 157, Stallard Decl. ¶ 5 ("No one asked me about my current salary or salary expectations before I received my offer."); at 116-17, Peale Decl. ¶ 5 ("No one asked me about my current salary during the recruitment process at Nike."); at 170-71,Worboys Decl. ¶ 5 ("I was not working when I received a job offer from Nike, so I would not have had a current salary to discuss."); at 203, Dockter Decl. ¶ 10 ("Nike does not ask new graduate hires for prior salary information and it plays no role in the compensation for new graduate hires.").[9] Judge Russo also correctly concluded that the record does not support

---

[8] Judge Russo acknowledged that Plaintiffs submitted deposition testimony from two putative class members who did recall being asked about prior pay. F&R at 40 n.18. But two statements from a class exceeding 5,200 are insufficient to find a *uniform, class-wide policy*, particularly in light of the contrary evidence reviewed by Judge Russo. For example, in addition to the five declarations that Judge Russo cited, Nike submitted declarations from at least seven putative class members, hired before 2017, who also were not asked about their prior pay, recruiters who reported that they typically did not ask candidates about prior pay, even when doing so was permitted, and hiring managers who said that, to the extent they knew a candidate's salary history, it did not influence their decisions on starting pay. *See generally,* ECF 187-01 at 1-258. Such conflicting evidence defeats any claim of a uniform practice. *See, e.g.*, *Arrendondo v. Delano Farms Co.*, 2011 WL 1486612, at *9 (E.D. Cal. Apr. 19, 2011) (collecting cases).
[9] Plaintiffs disparage the numerous class-member declarations Nike proffered (ECF 320 at 28-29), but failed to present any of their own, despite full access to members of the putative class.

Plaintiffs' assertion that Nike had a company-wide policy of collecting prior pay information from other employers or public sources.  F&R at 41.

Judge Russo therefore was correct in finding that the "evidence supports a finding that hiring managers exercised discretion and determined what factors to apply in setting starting pay."  *See* F&R at 44.  Thus, "[t]he evidence squarely supports that an individualized inquiry will be necessary for each plaintiff to determine whether the imposition of the factor (or lack of imposition of that factor) had a disparate impact on pay."  F&R at 43.  Judge Russo properly relied on *Dukes* to conclude that individualized inquiries like these defeat class certification:

> Use of such a discretionary system requires an individualized assessment as to whether the consideration of prior pay resulted in a disparate impact on the starting pay for women.  As the Supreme Court noted:  ". . .  In [a company where managers are given discretion to make employment decisions], demonstrating the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's.  A party seeking to certify a nationwide class will be unable to show that all the employees' Title VII claims will in fact depend on the answers to common questions."

F&R at 42 (quoting *Dukes*, 564 U.S. at 355-56).  A policy of discretion is "just the opposite of a uniform employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices."  *Dukes*, 564 U.S. at 355 (emphasis in original).

---

Declarations like these are highly probative.  *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1061 (N.D. Cal. 2007) (declarations show, for example, variability in job type, which should be evaluated in determining whether certification is appropriate); *Alonzo v. Maximus, Inc.*, 275 F.R.D. 513, 520 (C.D. Cal. 2011) ("district courts have regularly relied on declarations from a defendant's employees when considering a class certification motion under Rule 23"), *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

(iii)    **Nike's Later Guidance To Conform To A New Oregon Law Does Not Establish A Prior Common Policy.**

Nike's September 2017 instruction to recruiters and hiring managers not to ask candidates about prior salary or salary history, and Nike's subsequent communications related to its starting pay practices, do not demonstrate that Nike had a common policy regarding the use of prior pay before the change.[10]   As Judge Russo correctly explained, "[t]hat an intervening change in the law required Nike to issue directives not to use the factor is not evidence of a prior directive requiring its use."  F&R at 45.

b.    **Plaintiffs Failed To Establish That Nike Had A Common Policy Or Practice Regarding Merit Increases And Bonus Awards.**

Plaintiffs also claimed that Nike had a common and class-wide policy of calculating merit increases and bonuses as a percentage of base pay, supposedly exacerbating alleged gaps in starting pay.  ECF 146 at 24-28.  Judge Russo correctly found "[t]he evidence again establishes considerable discretion on the part of managers," precluding commonality.  F&R at 47.

(i)    **The Evidence Shows That Managers Had, And Exercised, Discretion In Awarding Merit Increases And Bonuses.**

Plaintiffs do not challenge Nike's performance review process (known as Coaching for Excellence, or CFE), by which managers annually award one of five ratings to their direct reports.  ECF 187-3 at 85.  These ratings are based on criteria that managers interpret and apply to their teams' roles and each employee's individual goals.  *See, e.g.,* ECF 187-1 at 88-89, Louder Decl. ¶ 17 ("look[s] holistically at each person's individualized efforts" and considers several factors when deciding on CFE ratings, including performance on projects, 360 feedback and feedback from peers, and whether the employee is in a "learning" or "driving" phase in their

---

[10] *See* Plaintiffs' Objection 3.b.  ECF 320 at 13, 22-23.

role).  Individual CFE ratings need not be approved by higher-level managers, and Nike does not

impose a forced distribution of ratings.  ECF 187-1 at 24, Edington Decl. ¶ 13 (Vice President

confirming she does "not rate or review ratings for every single employee in [her] organization"

and "[l]ower-level managers are also the ones who made decisions on their direct reports' CFE

ratings."); ECF 187-3 at 139 ("NIKE does not have a forced CFE Distribution.").

CFE ratings can be used by managers as a factor in awarding annual pay increases, a

process that changed during the putative class period.  Before 2019, Nike referred to its annual

salary increase process as Merit Pay.  ECF 187-2 at 348.  As part of Merit Pay, Nike provided

managers with "Merit Guidelines," ranges of suggested salary increases for managers to consider

based on CFE ratings.  *Id.* at 344.[11]  However, the Merit Guidelines were just "a starting place

for managers to make decisions" (*id.*); "[t]he actual application of the increases is up to the

manager."  *Id.* at 345.  Thus, at the manager's discretion, even employees with the same CFE

rating could receive different merit increases.  *Id.* at 343; ECF 187-1 at 173, Worboys Decl. ¶ 12

("I do not always provide the same base pay increase to employees with the same ratings.").

Nike's written guidelines expressly state that such increases are "discretionary":

> Merit awards are discretionary and merit award guidelines vary within each
> performance rating category.  When determining the size of increase, managers
> should consider a variety of factors:
>
> o **Performance:** employee's performance for the entire fiscal year, and the most
>    important factor in merit pay decisions.
> o **Position to Market:** employee's pay relative to external market zone
> o **Internal Equity:** employee's pay relative to peers in similar jobs within NIKE
> o **Employee's experience, skill levels, etc.**
> o Available Budget
>
> Employee performance is the primary driver of merit pay decisions.  Merit awards are
> intended to reward performance over the entire fiscal year and differentiate pay for
> better performers.

ECF 187-3 at 141.

---

[11] The specific Merit Guideline ranges during the putative class period were:  Exceptional = 4.5-6.5%; Highly Successful = 3.0-5.0%; Successful = 2.5-3.5%; Inconsistent = 0.0-1.5%; Unsuccessful = 0.0%; "Too New to Rate" = 0.0-3.5%.  ECF 187-1 at 307-308.

In 2019, Nike's annual salary planning changed to "Core Pay."  ECF 187-2 at 348.  Core Pay identified for each employee a possible "Market" increase; individual managers then exercised discretion to adjust the "Market" increase to "Invest," "Max Invest," or "Zero."  *Id.* at 351-53; ECF 187-3 at 65.  Nike guidelines list subjective criteria managers may consider for Core Pay adjustments; CFE ratings were just one data point.  ECF 187-3 at 85 ("Performance is an important factor for determining pay.  *Other inputs include current position in range, future potential, impact of loss, risk of loss, time in role and pay relative to peers*.") (emphasis added).  *See also* ECF 187-2 at 349-50, Walker Tr. 354:11-18; 359:4-5 (Core Pay decisions "vary based on [the] manager, based on [the] year").  The amount of each merit award also depended in part on the employee's position in their pay range.  *Id.*



ECF 187-3 at 65.  Under both Merit and Core Pay, the evidence (including the Nike guidelines shown above) demonstrates that each manager had discretion to make merit decisions; at most, the manager's manager (referred to as "Manager+1") approved these adjustments.  ECF 187-2 at 334, Walker Tr. 60:3-10 (pay decisions are only reviewed at the "Manager +1" level and are not reviewed at higher levels in the organization); ECF 187-1 at 24, Edington Decl. ¶ 11 ("[l]ower-level managers are the ones who make decisions on base pay increases for their direct reports"; denying "reviewing [or] approving every single pay decision").  Putative class

members also attested that managers have discretion to make merit decisions based on a variety

of factors, and that the decisions are not subject to executive review.[12]

     Bonus awards (called Performance Sharing Plan (PSP)) similarly were subject to

manager discretion, and the practices for awarding them changed significantly during the

putative class period.  For example, in 2017 and 2018, Nike had 18 and 11 different PSP plans,

respectively; each employee's PSP depended on their cost center (of which Nike has

"hundreds").  ECF 187-2 at 375-77, 389-80.  The plans identified a target bonus, but managers



could award employees a PSP higher or lower than their targets

based on their performance, using a "Performance Modifier" (*see*

figure to the left).  *Id.* at 372-75, 382-86.[13]  Since 2019, Nike has

used one PSP plan.  *Id*. at 377-78.  As with Merit and Core Pay,

individual managers determined the amount of the PSP award, and

then the Manager+1 approves.  *Id.* at 370-71 (denying "additional business leader review" of

PSP awards).  There is no evidence that executives override the pay decisions of lower-level

managers.  *See, e.g.,* ECF 187-1 at 97, Mack Decl. ¶ 14 (managers rate their direct reports and

---

[12] ECF 187-1 at 71, Levison Decl. ¶ 12 ("When making base pay salary adjustments, I consider where an employee falls in their job's salary range, their specific performance on the job, feedback from their peers, and their CFEs.  I have never had my base pay salary adjustment decision rejected."); at 53-54, Hunter Decl. ¶ 8 ("[I]n making pay increase decisions for my team, I look to a variety of factors and information, including surveys and team member feedback, how the employee has progressed towards his or her goals this year, and whether the employee made any notable achievements, among other factors . . . .").

[13] *See, e.g.*, ECF 187-1 at 32-33, Hackenmiller-Paradis Decl. ¶¶ 16-17 (describing factors she considers in making bonus decisions, including "work performance, CFE ratings, overall contributions to specific department goals, and overall contributions to Nike goals"); at 54, Hunter Decl. ¶ 10 (describing factors she considers in making bonus decisions, including performance rating, as well as individualized considerations, such as experience and growth).

Page 14    -    DEFENDANT NIKE, INC.'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO
                        FINDINGS AND RECOMMENDATION DENYING CLASS CERTIFICATION

select base pay increases; "I have never seen a base pay or ratings decision changed by anyone in a higher level.").

As such, Judge Russo concluded that "managers had considerable discretion" over merit and bonus decisions, and that "upper-level management involvement was generally limited to manager+1" and did not involve executives.  F&R at 48.  Applying Ninth Circuit cases, Judge Russo properly concluded that "the absence of a common mode of exercising discretion that pervades throughout Nike headquarters prevents a finding of commonality" with respect to merit and bonus awards.  *Id.* (citing *Moussouris*, 2018 WL 3328418, at *19-21 (use of common criteria for pay decisions was insufficient to certify large class comprising myriad positions where managers had discretion to make decisions within a common framework); *Moussouris v Microsoft Corp.*, 799 F. App'x 459, 462 (9th Cir. 2019) (finding district court "correctly recognized that, where the plaintiffs and the proposed class challenge a discretionary system for pay raises and promotions, they must 'identif[y] a common mode of exercising discretion that pervades the entire company'") (alteration in original) (quoting *Dukes*, 564 U.S. at 356).

### (ii)    Plaintiffs' Objections Are Without Merit.

Plaintiffs object that, to certify a class based on merit and bonus awards, Judge Russo improperly required that they show "a company-wide policy of using prior pay to set starting salaries."[14]  But that was Plaintiffs' own theory of the case; they argued that "Nike's continuing policy or practice of awarding annual merit increases and bonuses calculated as a percentage of current salary perpetuates or exacerbates *the starting pay disparities* . . . ."  ECF 146 at 11 (emphasis added).  Plaintiffs linked starting pay with merit and bonus awards, not Judge Russo.

---

[14] *See* Plaintiffs' Objection 4.b.  ECF 320 at 14, 30.

Regardless, the evidence demonstrates that both the merit increase and bonus processes at Nike rely on individual manager discretion.  *See* section II.A.1.b.(i).  And, Nike's guidance to managers regarding merit increase and bonus awards changed over time.  *See Dukes II*, 964 F. Supp. 2d at 1126 ("Practices that do not apply during the entire class period across the class cannot provide a common question tying the class together.").  The evidence disproves commonality.

Second, Plaintiffs object that Judge Russo "ignored common evidence" that the use of percentage-based pay decisions can exacerbate existing pay differences.  ECF 320 at 30-31.  This misses the point.  While a pay practice that awards each employee exactly the same percentage increase could expand a prior pay differential, that is not Nike's practice.  *See* section II.A.1.b.(i).  Merit and PSP awards are based on individual manager discretion, not formulaic percentages.  Judge Russo correctly found that there was no "common" evidence of a uniform percentage-based pay practice.

Finally, Plaintiffs argue that they only challenge the use of "existing salary as a factor when determining annual salary increases and PSP bonus," and that the court should ignore the fact that there is "discretion exercised elsewhere in the decision-making process."  ECF 320 at 31.  Plaintiffs cite *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012), for this proposition, but that case is inapposite.  The *McReynolds* plaintiffs sought class certification based on two discrete, company-wide policies:  one afforded individual stockbrokers discretion in forming their own teams, and the other prescribed specific, formulaic criteria for account distributions that favored successful teams.  *Id.* at 488.  Specifically, the account distribution policy used "company establishe[d] criteria for deciding who will win the competition" for new accounts, which was based on "records of revenue generated for the

company and of the number and investments of clients retained." *Id.* at 488-89.  Plaintiffs

alleged that the two company-wide policies combined to adversely affect African-American

brokers, and certification was granted.  *Id.* at 488, 492.  "Essential to *McReynolds*, and missing

from the instant litigation, were companywide policies that contributed to the alleged disparate

impact that arose from the delegation of discretion to individual brokers."  *In re Countrywide*

*Fin. Corp. Mortg. Lending Pracs. Litig.*, 708 F.3d 704, 709 (6th Cir. 2013) (citing *Bolden v.*

*Walsh Const. Co.*, 688 F.3d 893, 898 (7th Cir. 2012) ("This single national policy [in

*McReynolds*] was the missing ingredient in [*Dukes*].")).  Unlike *McReynolds*, Nike had no

company-wide, formulaic policy dictating how managers awarded merit or PSP consistently

throughout the class period.  Certification does not follow.

> ### c.     Plaintiffs Failed To Establish That Nike Had A Common Policy Or Practice Regarding Noncompetitive Promotions.

Plaintiffs also asserted that Nike's practices regarding "noncompetitive" promotions

adversely affected women.  ECF 320 at 32.  However, "the evidence again demonstrates

managers exercise discretion in determining whether to promote noncompetitively."  F&R at 48;

*see also id.* at 16 (whether employees could receive noncompetitive promotions "was really up to

the manager") (citing ECF 161-10).  The discretion defeats class adjudication.

> ### (i)     Individual Managers Made Discretionary Decisions About Noncompetitive Promotions.

Plaintiffs assail Nike's process of "noncompetitive promotions," which are promotions

made without job postings.  ECF 146 at 31-35.  Plaintiffs do not challenge "competitive"

promotions (those made through job postings) because, according to their own expert, women

obtain competitive promotions at a significantly higher rate than men.  ECF 149-1, Neumark R.

at 63 (Table 10, Panel A); ECF 187-2 at 217-19, Neumark Tr. 261:16-262:4, 263:1-21.

"Noncompetitive promotions" typically occur when a role has expanded in scope, and the person holding the role at the time is judged capable of growing with it.  Once it is determined that a role should expand, the direct manager decides whether the employee currently in the role has the potential to assume the expanded role.  If so, the employee generally will be selected for the "noncompetitive" promotion.  If not, the role generally will be posted for others to apply.

Nike did not have a common, consistent, or centralized process for determining whether a promotion should be filled competitively or noncompetitively (referred to as "fill strategy").  Individual hiring managers determined fill strategy for their own team.  *See* ECF 187-1 at 97, Mack Decl. ¶ 15 ("I trust my managers so I defer to them and support their decision on fill strategy."); ECF 187-2 at 144-45, Heinle Tr. 62:9-63:14 (the direct manager is responsible to making the decision regarding a "noncompetitive job change").  Putative class members confirmed that individual hiring managers made promotion decisions based on a range of factors that vary by role and manager.  *See, e.g.,* ECF 187-1 at 57, Hunter Decl. ¶ 17 ("The particular factors I consider in recommending someone for a promotion varies from job to job, but there is focus on work results.").  The "fill strategy" decision and selection process was highly individualized, varied by job, and was based on the discretion of the direct manager.  "Noncompetitive" promotions exemplify individual manager discretion; there is no common practice susceptible to class-wide litigation.

### (ii)  Plaintiffs' Contentions To The Contrary Do Not Establish A Common Practice.

Plaintiffs highlight the term "fill strategy," and allege the involvement in the process of individuals in Nike's Talent Acquisition or HR functions.[15]  As outlined above, however, individual hiring managers determine the "fill strategy" for roles that they directly supervise, and

---

[15] *See* Plaintiffs' Objection 5.a.  ECF 320 at 14.

promotion decisions (whether competitive or noncompetitive) do not require approval from HR or anyone else (beyond possibly the hiring manager's direct supervisor). *See*, *e.g.*, ECF 187-2 at 144-45, 148; ECF 187-1 at 25, Edington Decl. ¶ 16 (Vice President: "[T]he hiring manager is typically the one who makes the final decision on hiring decisions, and I do not get involved."). At best, Plaintiffs' evidence suggests that Talent Acquisition may assist with managing promotion processes, or that from time to time, a decision could be made by someone other than the hiring manager that a certain position would be filled noncompetitively. ECF 320 at 32-33. There is no evidence that Talent Acquisition or anyone else consistently usurped the decisionmaking authority of hiring managers. ECF 187-2 at 279-80, 295, Thomas Tr. 28:17-29:6, 107:10-18 (individual hiring managers determine "fill strategy" for their teams' needs).

Plaintiffs also cite a company-wide email from Nike's Chief Human Resources Officer discussing Nike's desire to increase representation of women and persons of color at the Vice President level as evidence that Nike had a "common" promotion practice. ECF 320 at 33. Aspirational statements about diversity do not show discrimination against women. Further, nothing in the email deprived individual managers of their promotion discretion, or assigned to HR or Talent Acquisition responsibility for fill strategy or promotion decisions.

In rejecting Plaintiffs' claims, Judge Russo correctly explained that at least two facts differentiate this case from *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492 (N.D. Cal. 2012) ("*Ellis II*"), on which Plaintiffs relied. *See generally* ECF 240; *see also* F&R at 16. First, the *Ellis II* plaintiffs proposed a class covering "only two 'closely related management-level' positions"; Judge Russo correctly concluded it "was much narrower" than the class Plaintiffs proposed here. *Id.* Second, "and significantly," in *Ellis II* "there were upper level managers that had direct oversight in the selection process." F&R at 16. Here, by contrast, the evidence

showed that, beyond the potential involvement of a Manager+1, "upper-level Nike executives played no role" in hiring managers' decisions on fill strategy. *Id.* at 48-49.[16]

Judge Russo correctly found "managers exercise discretion in determining whether to promote noncompetitively. . . . [T]he discretion afforded managers with little upper management involvement is insufficient to present a common question that will resolve an issue relative to the entire class." F&R at 48-49.

### d. Plaintiffs Failed To Establish That Nike Had A Common Policy Or Practice Regarding Initial Job Level Assignments.

Plaintiffs alleged a class-wide policy of hiring women into lower-level jobs than men, despite comparable education and work experience. F&R at 49. There is no such thing.

### (i) Open Roles Are Assigned To A Level Before Posting And Candidates Decide On Which Roles To Seek.

At Nike, before a position is posted, individual hiring managers determine the level and job code for the role, an assessment that turns on the unique needs of that team. *See, e.g.,* ECF 187-1 at 11, Baird Decl. ¶ 13 (hiring manager sets level based on role and team needs). The hiring manager may consult with an HR representative about the best approach, but "*the hiring manager* will make the decision because it is their team[.]" ECF 187-2 at 295, Thomas Tr. 107:14-18 (emphasis added). Once the job is posted, the level and job code cannot be changed once candidates are identified.[17] No one at Nike "levels" candidates or "assigns" them to jobs at hire; candidates apply to open roles *where the job level and job code are pre-determined*.

---

[16] As Judge Russo noted, although Plaintiffs identified one instance in which Talent Acquisition posted one role that plaintiff Cahill intended to fill noncompetitively, "the record does not support a broad HR policy enforced upon hiring managers to post non-competitive positions." F&R at 48 n.24 (citing ECF 159-1 at 1).

[17] *See, e.g.*, ECF 187-1 at 174, Worboys Decl. ¶ 15 ("The level for each role is set when the job is approved for headcount and cannot be changed once the job is approved.").

In addition, *candidates* — not Nike recruiters — decide whether to apply, and to what job.  Plaintiffs contend (citing no evidence) that Nike recruiters apply or match candidates to jobs, but that is not true.  While recruiters may, in their discretion, use tools to identify potential candidates to apply for open positions, candidates must decide for themselves whether to apply to those jobs or not, and then compete against other applicants.  ECF 187-2 at 281-85, Thomas Tr. 42:20-46:1; *see also* ECF 187-2 at 203-4, Miller Tr. 68:1-69:14.  Recruiters do not "match" applicants to jobs.

The named and opt-in plaintiffs' own experiences confirm they were not "channeled" or "matched" to lower-level roles.  *See* F&R 18-19.  In fact, named plaintiff Cahill testified that she was encouraged to apply to a position *higher* (Director) than she originally sought (Manager), and that she was hired into the Director role.  ECF 187-2 at 86-92, Cahill Tr. 105:13-111:2.  Not one named plaintiff said she was "assigned" into a lower-level job at hire by a recruiter or anyone else at Nike; to the contrary, opt-in plaintiffs and putative class members confirmed that they were hired for the specific roles to which they applied, and that they learned about the open positions through the newspaper, career websites, Nike.com, or word-of-mouth (*i.e.,* they were not directed by Nike to apply for certain roles).  *See, e.g.,* ECF 187-2 at 2-3, Anderson Tr., 112:25-113:18 (heard about positions at Nike through Nike.com, networking, and word-of-mouth, and hired into the role she applied to); at 236, 240, Olson Tr. 74:9-19, 78:6-9 (learned about the security supervisor position at Nike through the newspaper and was hired into that role after applying).  There is *zero evidence*, much less common evidence, that women are channeled into lower-level jobs at Nike.

### (ii)    Plaintiffs' Objections Do Not Establish Commonality.

Plaintiffs try to establish that a "common" hiring practice exists by contending that Talent Acquisition "approves" all hiring decisions.  Even if that were true, it says nothing about whether

applicants were "channeled" into the roles for which they eventually were hired.  But it is also false.  Judge Russo correctly noted that Plaintiffs' only evidence that Talent Acquisition "approves" hiring decisions was one sentence Plaintiffs' misleadingly wrenched from the "very specific context" of a bribery and corruption policy, which "does not support a conclusion that all hiring decisions must be approved by Talent Acquisition."  F&R at 49-50.  Rather, the record supported a finding that "[hiring] managers make the decision on posting open positions[,]" and their decisions are "a function of discretion that does not involve the application of any required company policy or [consultation with] upper management."  *Id.* at 50; *see, e.g.*, ECF 187-1 at 11, Baird Decl. ¶ 13 ("Prior to posting a job, I determine the band level based on what I think the scope of the work is in the current state and what I think the scope will be in the future.").  Because the question of "[w]hether any given candidate was channeled into a lower paying job" would "require[] an individualized assessment[,]" Judge Russo concluded that Plaintiffs again failed to establish commonality.  F&R at 50 (citing *Moussouris*, 2018 WL 3328418, at *19-21 (use of common framework insufficient where managers exercise discretion within that framework)).

Tacitly conceding this failure, Plaintiffs now argue that they instead challenge the entire hiring process and that the evidence allegedly demonstrates that "Nike's hiring process had negative effects on Plaintiffs."  ECF 320 at 34-35.[18]  But that conclusory assertion cannot substitute for the identification of a specific policy susceptible to certification.  *See Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 100-101 (2008) ("[A] plaintiff falls short by merely alleging a disparate impact, or 'pointing to a generalized policy that leads to such an impact.'  . . .  The plaintiff is obliged to do more:  to 'isolate and identify the *specific* employment practices

---

[18] *See* Plaintiffs' Objection 6.b.  ECF 320 at 15.

that are allegedly responsible for any observed statistical disparities.'") (emphasis in original) (brackets, quotation marks, and internal citations omitted).  Plaintiffs identify no common policy that Nike hires women into lower level jobs compared to men.

e.    **Plaintiffs' Statistical Evidence Does Not Establish Commonality.**

Plaintiffs repeatedly "object" that Judge Russo "rejected" and "disregarded" their statistical evidence.[19]  Not so; she referred to Plaintiffs' statistical evidence throughout the F&R.  *See, e.g.,* F&R at 37-38, 52.  However, as Judge Russo explained, at the class certification stage, "the issue in this case is whether the common impact results from a *common policy*."  F&R at 44 (emphasis added).  Plaintiffs failed to meet the burden of showing such a policy.

Even if Plaintiffs' statistical evidence demonstrated a "common *effect*" (which Nike disputes), Plaintiffs fail to establish the "common *cause* for that effect" as required for certification.  *See Christian v. Generation Mortg. Co.*, 2014 WL 4494860, at *2 (N.D. Ill. Sept. 12, 2014) ("A common *effect* does not establish a common *cause* for that effect, even in a disparate impact case.  That is the Supreme Court's teaching in [*Dukes*]; which 'reiterates that statistical correlation, no matter how robust, cannot substitute for a specific finding of class-action commonality.'") (quoting *In re Countrywide*, 708 F.3d at 709 (citing *Dukes*, 564 U.S. at 357*, and affirming the denial of certification because plaintiffs' statistical evidence was insufficient to establish that the alleged disparity was the product of a single cause)).  This is because "statistical evidence of a disparity simply 'begs the question' of the cause of the disparity." *Jones*, 34 F. Supp. 3d at 909 (citing *Bolden*, 688 F.3d at 896).  "A well done multiple regression analysis may go a long way to establishing that there *is* a [gender]-based disparity, ruling out the possibility that an observed disparity is simply the product of chance.  But ruling

---

[19] *See* Plaintiffs' Objections 2.a., 2.b., 3.c., 6.a., 7.b.  ECF 320 at 12-15.

out chance says only that *something*, or *some combination of things*, other than chance, is causing the disparity; it does not identify what that thing, or those things, actually may be." *Id.* (emphasis in original). Accordingly, plaintiffs' statistical evidence "adds nothing to the proof of the existence of a common policy that is the common cause of injury to the [putative] class members[.]" *Id.*

Plaintiffs' motion and "objections" here suffer from the same infirmities. As Judge Russo concluded, "the aggregated data presume[s] commonality, however, it does not present a common mode of proving it." F&R at 52. Thus, "when using an aggregated statistical analysis, plaintiffs must first demonstrate a class-wide policy that is the alleged cause of the pay gap." F&R at 41-42. "[I]n the absence of a common policy or procedure, mere statistics could not 'produce a common answer to the crucial question [of] why was I disfavored.'" F&R at 44 (quoting *Jones*, 34 F. Supp. 3d at 909).

Plaintiffs' repeated arguments that statistical evidence can establish their *prima facie* case (*see* ECF 320 at 18-19) do not save their motion. As Judge Russo noted, such argument "put[s] the cart before the horse," essentially bypassing certification altogether. F&R at 39. Rule 23 commonality requires more than different outcomes between groups. Plaintiffs must show that "the *reason behind*" the alleged discrimination was "the same for all class members." *Id.* (emphasis added); *see also Dukes*, 564 U.S. at 352. Plaintiffs' statistics do not make this showing.

Plaintiffs claim that *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 424 (2022), supports their use of multiple regression analysis to establish commonality. *See* ECF 320 at 12, 40, 53. It does not. First, the aggregated statistics in *Olean* analyzed the impact of the defendant companies' alleged price-

fixing scheme on the price of one type of fish — tuna.  Were Plaintiffs using an aggregated analysis in this case to review the pay or promotion rates of employees in just one job at Nike, such aggregation may be appropriate.  They are not.  *Olean* does not hold that aggregation is appropriate to analyze the impact of price-fixing on 1,200 different types of fish, like the 1,200 different jobs Plaintiffs seek to certify here.  Second, importantly, in *Olean*, many of the defendant companies had already pled guilty to, or been convicted of, conspiracy to fix pricing. *Id.* at 661.  Conspiracy to fix prices is the definition of a "common practice," rendering the application of a common, aggregated model more appropriate.  In contrast, there is significant evidence in this case that the challenged practices are not common or classwide at Nike.

### f. Judge Russo's Findings And Recommendations Did Not Ignore Plaintiffs' Legal Theory Or Evidence.

Plaintiffs also repeatedly accuse Judge Russo of ignoring their theory of the case.[20]  Not so.  Plaintiffs' theories are that Nike had class-wide and common practices related to starting pay, merit and bonus awards, promotions and leveling.  Over 57 pages, Judge Russo explained that she considered all of these theories, examined the evidence presented by both sides, and found that opt-in plaintiff testimony, putative class member and recruiter declarations, and Nike documents showed that the only "common practice" was that individual managers exercised their independent judgment and discretion to make the tens of thousands of employment decisions at issue.  F&R at 39, 47-48, 50.  This manager discretion precludes commonality.  *See* F&R at 43. *See also* Nance, 2013 WL 10229756, at *9 (finding the "commonality prerequisite ha[d] not been met" because, contrary to plaintiffs' theory regarding an alleged common policy, the evidence demonstrated that individualized analysis would be required, and, as such, plaintiffs' "claim does not present a common issue for all class members") (Hernández, J.).

---

[20] *See* Plaintiffs' Objections 1.b., 3.a., 4.a., 5.a., 7.b.  ECF 320 at 11, 13-15.

Plaintiffs repeatedly argue that they do not challenge manager discretion, and that Judge Russo was compelled to credit their theories and ignore the evidence that Nike's decisionmaking rested on that discretion. But this is not a motion to dismiss, where Plaintiffs' theories and evidence are assumed true and immune from rebuttal. At class certification, a court may not ignore the significant evidence that shows that plaintiffs cannot prevail on their theory using common proof. Indeed, the Court is obligated to resolve factual disputes; it cannot ignore them.[21]

Plaintiffs attempt to equate Judge Russo's F&R with the district court's analysis in *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co.*, 593 F.3d 802 (9th Cir. 2010). It is not persuasive. In *United Steel*, the plaintiffs claimed that the employer's policy of requiring workers to remain at their work stations during meal breaks rendered the meal periods "on duty" and thus must be paid. *Id.* at 804. In denying class certification, the district court stated that, while "it appeared that 'the existence of a uniform policy as to the availability of a meal period *could be proved* on a classwide basis . . . ,'" certification was denied because "'there c[ould] be no *assurances* that [plaintiffs] w[ould] prevail on [their 'on duty'] theory.'" *Id.* at 807-08 (alterations in original) (emphasis added). The Ninth Circuit reversed, finding that the district court skipped the question of whether common issues of law or fact predominate and held the plaintiffs to a "nearly insurmountable standard" that certification follows only where plaintiffs can "assure" the court they will prevail. *Id.* at 808-09. Judge Russo made no such finding, and states no opinion on whether Plaintiffs or Nike are likely to prevail on the merits.[22] Instead, she conducts the

---

[21] *See, e.g., Cuevas v. Citizens Fin. Grp., Inc.*, 526 F. App'x 19, 20-22 (2d Cir. 2013) (the court "committed legal error in failing to resolve factual disputes").
[22] *See* Plaintiffs' Objection 1.c. ECF 320 at 12.

"rigorous analysis" required to determine whether Plaintiffs' motion satisfies Rule 23.  She

correctly concludes it does not.

Plaintiffs also incorrectly argue that Judge Russo ignored evidence supporting their

claims.  *See* ECF 320 at 30-32.  A court "[is] not required . . . to cite specifically to the

declarations of every expert or every other piece of evidence relevant to class certification

merely to prove that they were considered in its rigorous analysis of the Rule 23 requirements."

*Reyes v. Netdeposit, LLC*, 802 F.3d 469, 495 (3d Cir. 2015).  That is particularly true in cases

like this, where the parties submitted 17 briefs on certification issues, including close to 2,000

pages of expert reports and supporting documents, nearly 3,500 pages of evidence, and nearly

600 pages of legal briefing, that Judge Russo and court personnel reviewed over more than four

months before issuing the 57-page F&R.  *See Casida v. Sears Holdings Corp.*, 2012 WL

3260423, at *2 n.2 (E.D. Cal. Aug. 8, 2012), *report and recommendation adopted*, 2012 WL

3763621 (E.D. Cal. Aug. 29, 2013) ("Due to the volume of evidence submitted by the parties, the

Court declines to identify every declaration relied upon but rather, cites representative

samples.").

Judge Russo did, in fact, extensively cite and credit Plaintiffs' evidence, including the

testimony of named and opt-in plaintiffs, in addition to Nike's evidence.  As Judge Russo noted,

however, this conflicting evidence merely demonstrated the lack of a common practice.  For

example, with respect to starting pay, the combined evidence from Plaintiffs and Nike shows that

some decisionmakers knew about and relied upon prior salary; others knew about it but did not

rely upon it; and some did not know about prior salary at all.  "Some did, some didn't" is not

the stuff of a company-wide class action.  *See, e.g., Soto v. Castlerock Farming & Transp., Inc.*,

2013 WL 6844377, at *19 (E.D. Cal. Dec. 23, 2013), *report and recommendation adopted*, 2014

WL 200706 (E.D. Cal. Jan. 16, 2014) ("In light of the dissimilarities and conflicting testimony of putative class members, the Court is unable to find a contention 'capable of classwide resolution.'") (quoting *Dukes*, 564 U.S. at 350).[23]

### 2. Plaintiffs Failed To Establish Commonality With Respect To Their Disparate Treatment Claims.

To establish commonality for their disparate treatment claims, Plaintiffs needed to "provide evidence of a 'systemwide pattern or practice' of pervasive discrimination against the class, such that the discrimination is 'the regular rather than the unusual practice.'" F&R at 50-51 (quoting *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 281 (S.D.N.Y. 2018)). Plaintiffs also needed to show that Nike directed and approved discrimination as its "standard operating procedure." *Dukes*, 564 U.S. at 352 n.7 (citation omitted). Here, Plaintiffs attempted to meet their burden through statistical and anecdotal evidence, but Judge Russo correctly concluded they failed on both fronts.[24]

### a. Plaintiffs' Statistical Evidence Fell Short.

Plaintiffs' aggregated analyses are insufficient to establish a company-wide practice of discrimination. The *Dukes* plaintiffs offered a similarly aggregated statistical study, in which regression analyses purportedly showed statistically significant disparities in pay between men and women that "can be explained only by gender discrimination." 564 U.S. at 356 (citation omitted). The Supreme Court explained the flaw in aggregated analyses, which, by their very nature, mask potential disparities within individual units, and therefore cannot prove "a company-wide policy of discrimination" where "discretionary decisions [are made] at the store

---

[23] *See also Gonzalez v. Millard Mall Servs., Inc.*, 281 F.R.D. 455, 463-64 (S.D. Cal. 2012) ("Because of the varying declarations and conflicting facts of the putative class members, Plaintiffs have failed to show that Defendants had a common policy . . . under Rule 23(a)(2).").
[24] *See* Plaintiffs' Objections 7.a., 7.b. ECF 320 at 15.

and district level." *Id.* at 356-57 (citation omitted).  For example, as Judge Russo noted, any "disparities might be attributable to only a small set of Nike managers, rather than a standard Nike operating procedure."  F&R at 52 (citing ECF 182 at 91) (Plaintiffs' own expert admitted that it is possible that there are a handful of large job groupings that are driving the negative results.).  Aggregated analyses mask such differences, and they thus do not inform whether a "uniform, store-by-store" or unit-by-unit disparity exists.  *Dukes*, 564 U.S. at 357.

Post-*Dukes*, statistical studies must "conform[] to the level of decision [where] the challenged practices" are made.  *Ellis II*, 285 F.R.D. at 523; *accord Kassman*, 416 F. Supp. 3d at 282; *Moussouris*, 2018 WL 3328418, at *24.  Where decisions are made at the discretion of individual managers, courts find aggregated statistics inadequate because they are "derived from hundreds of employment decisions made by myriad decision makers, at different times, under mutable procedures and guidelines, in different departments, and in different office locations, concerning employees at varying levels of experience, responsibilities, and education."  *Jones*, 34 F. Supp. 3d at 909; *accord Kassman*, 416 F. Supp. 3d at 282-83 (finding plaintiffs' aggregated statistical evidence "has the same problem as the statistical evidence in [*Dukes*]") (quoting *Bolden*, 688 F.3d at 896); *accord Moussouris*, 2018 WL 3328418, at *24.

As in *Dukes*, Plaintiffs here presented no statistical studies analyzed by decision-maker.  The *Moussouris* court illustrated the dangers of relying on aggregated models in such situations: "if Microsoft had 25 managers, 5 of whom discriminated in making pay and promotion decisions, aggregate data would show that female employees fared worse than male employees.  But 'that result would not imply that all 25 [managers] behaved similarly, so it would not demonstrate commonality.'"  *Moussouris*, 2018 WL 3328418, at *24 n.20 (quoting *Bolden*, 688 F.3d at 896) (alterations in original).  As Judge Russo explained, "Plaintiffs' experts merely

pooled data across all 1,200 jobs and reported a single percentage in difference between men and women in all jobs combined." F&R at 52 (citing ECF 149-1 at 6). Plaintiffs' "aggregated data presume commonality, however, it does not present a common mode of proving it." *Id.*

### b.    *Dukes* Applies To Plaintiffs' Claims.

Plaintiffs claim, however, that the *Dukes* plaintiffs alleged a policy of discretion, whereas the Nike Plaintiffs do not. ECF 320 at 38. This is a distinction without a difference. Whether Plaintiffs allege a policy of discretion or not, class certification is based on evidence of how decisions are actually made; a plaintiff cannot wish away that evidence, as Plaintiffs do here. And the evidence amply supports Judge Russo's conclusion that substantial discretion abounds.

The case is similar to *Dukes*. In *Dukes*, managers contended that they exercised their discretion independently and made employment decisions based on "sex-neutral, performance-based criteria[,]" the nature and effects of which would "differ from store to store." F&R at 52 (quoting *Dukes*, 564 U.S. at 357). Here, similarly, the evidence established that "Nike's announced policy forbids discrimination" and "Nike has delegated [to managers] substantial authority for hiring and promotion within each of those departments." *See* F&R at 51-52; *see also* sections II.A.1.a.(i), b.(i), c.(i) *supra*. While Plaintiffs' proposed class is smaller than *Dukes*, it does "involve over 5200 women employed in a vast array of positions from apparel designers to pilots and mechanics in many separate departments at Nike's sprawling world headquarters." *See id.* at 52; *see also* ECF 186-1 at 30. As in *Dukes*, the aggregated statistical analysis fails to establish commonality, because "in a case involving discretion among decisionmakers, use of statistics to demonstrate common answers to the question of whether discrimination occurred requires something more to show a pattern and practice of discrimination." F&R at 51 n.25 (citing *Dukes*, 564 U.S. at 345, 352). As in *Dukes*, without some common direction, it is "quite unbelievable" that all Nike managers supervising over 5,200

putative class members "would exercise their discretion in a common way." *Dukes*, 564 U.S. at 356. Plaintiffs' aggregated analyses thus could not tie together the claims of all putative class members. F&R at 51-52 & n.25. They do not support certification.

c.    **Plaintiffs' Anecdotal Evidence Also Falls Well Short Of Their Burden.**

Plaintiffs also rely on a handful of employee complaints from the so-called "Starfish Survey" as alleged anecdotal evidence of commonality. ECF 146 at 38-39. Judge Russo correctly concluded these limited complaints are "insufficient to demonstrate a standard operating procedure of discrimination" as "[c]ourts generally require a significant amount of anecdotal evidence to demonstrate commonality[.]" F&R at 53 (citations omitted). For example, in *Moussouris*, evidence that female employees had lodged 238 internal complaints of discrimination and harassment (roughly one complaint for every 33 putative class members) "[did] not satisfy the 'significant proof' needed at [the class certification] stage." 2018 WL 3328418, at *6, *26 (plaintiffs offered no evidence showing the number of complaints was unusual for a large company). Similarly, in *Kassman*, evidence of 150 internal complaints of sexual harassment, unprofessional behavior and gender discrimination (roughly one complaint for every 66 putative class members) "fail[ed] to raise any inference that KPMG engaged in a systemwide pattern or practice of discrimination." *Kassman*, 416 F. Supp. 3d at 284.

Here, Judge Russo credited Plaintiffs with submitting 30 "Starfish" complaints to support their motion — even though they actually submitted only six (and four were anonymous),[25] and even though "the record does not demonstrate who created the ["Starfish"] survey, how it was distributed, how recipients were selected, the sample size, or the response rate." F&R at 19 n.9 (citing testimony of Plaintiffs' expert, Dr. Lundquist). Judge Russo correctly concluded that

---

[25] ECF 146 at 37-39, 58; ECF 159-6 through 10, 160-1, 160-2.

even 30 complaints for a proposed class of 5,200 employees — less than one complaint for every

173 putative class members — "is insignificant."  F&R at 53.[26]

Plaintiffs also proffered deposition testimony "from a dozen named and opt-in Plaintiffs"

(ECF 320 at 43), but that proffer is no more persuasive.  While no particular number of

declarants is required to find commonality on disparate treatment claims, "when the claim is that

a company operates under a general policy of discrimination, a few anecdotes selected from

literally millions of employment decisions prove nothing at all."  *Dukes*, 564 U.S. at 358 n.9.

Plaintiffs' own accounts — which span many years, involve different facts, decisionmakers and

business groups, and describe the alleged experiences of *less than 0.25%* of the proposed class

— are "insufficient to bridge the wide gap between Plaintiffs' own allegations that they were

subjected to discrimination and the existence of a class of . . . employees who have suffered the

same alleged injury[.]"  *Harris v. Initial Sec., Inc.*, 2007 WL 703868, at *5 (S.D.N.Y. Mar. 7,

2007) (citing *Gen. Tel. Co.*, 457 U.S. at 157-58).

The record shows that Plaintiffs' evidence, even if competent and fully credited, showed

isolated anecdotes only.  Nike presented declarations from 22 putative class members who

testified to their belief that gender has *not* adversely affected their Nike careers.  For example,

Diana Stallard, a Director who joined Nike in 2008, attested:

---

[26] Contrary to Plaintiffs' assertion (ECF 320 at 42-43), Judge Russo also considered — but
simply found unpersuasive — evidence of Nike's response to the "Starfish" complaints.  *See*
F&R at 19-21.  Plaintiffs attempted to spin Nike's response into an "admission" of widespread
bias, but Judge Russo concluded that an "assessment of Nike's response to the Starfish Survey
. . . fails to show Nike had a standard operating procedure of failing to address discrimination."
F&R at 53; *see also, e.g., Serrano v. Cintas Corp.*, 2009 WL 910702, at *7 (E.D. Mich. Mar. 31,
2009) (internal memoranda and statements by CEO "demonstrate[d] endeavors to target women
and racial minorities in the interests of increasing diversity[,]" and "Plaintiffs' attempt to turn
these examples . . . into evidence that Cintas has a problematic culture of discrimination . . . is
entirely unpersuasive."), *aff'd sub nom. Davis v. Cintas Corp.*, 717 F.3d 476 (6th Cir. 2013).

> I understand that the Plaintiffs in this case have asserted that they were paid less than male colleagues, were promoted less frequently than male colleagues, and were channeled into lower level jobs compared to male colleagues. That has not been my experience at Nike. I do not believe that gender has impacted my pay, performance ratings or promotional opportunities during my Nike employment. I do not believe that any of my managers at Nike have treated me differently because of my gender.

ECF 187-1 at 161, Stallard Decl. ¶ 14. Other putative class members similarly described their positive experiences at Nike.[27]

In *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450 (N.D. Ill. 2009), *aff'd*, 675 F.3d 709 (7th Cir. 2012), the plaintiff submitted declarations from 49 female employees "purporting to show that discrimination occurred uniformly across [the proposed class]." *Id*. at 466-67. The defendant responded with declarations by 35 putative class members who "describe[d] promotions, advancement, and pay increases they received in accordance with their personal choices and qualifications, leading them to believe that they were *not* discriminated against on the basis of gender." *Id.* (emphasis added). "Taken together, these declarations underscore[d] the lack of commonality in plaintiff's proposed class[,]" because "the Court [could] only presume that the remaining possible 1,615 class members would have their own unique stories as well." *Id.* at 467. *Accord Kassman*, 416 F. Supp. 3d at 285 ("Anecdotal evidence, by definition, raises individual rather than common questions."). The same is true here. At most, the evidence shows that some women had negative experiences working at Nike, and other women had positive experiences. This is not the kind of overwhelming anecdotal evidence necessary to

---

[27] *See* ECF 187-1 at 4, Amann Decl. ¶ 13 ("[S]ince 2016, I have not sought a promotion I did not receive. I believe I have had a good progression of success at Nike over the years, and have never personally felt discriminated against as a woman."); at 11, Baird Decl., ¶ 14 ("I do not feel like my gender has ever impacted my pay, performance ratings, or promotional opportunities at Nike, and I do not think I have been treated any differently by my managers because of my gender."); at 40-41, Hansen Decl. ¶ 14 ("[M]y personal experience is that I do not feel gender has ever affected my pay, performance ratings, or promotional activities. In fact, I feel that my salary is quite competitive.").

Page 33    -    DEFENDANT NIKE, INC.'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO
                FINDINGS AND RECOMMENDATION DENYING CLASS CERTIFICATION

show a company-wide practice. *See, e.g., Moussouris*, 2018 WL 3328418, at *26 ("Plaintiffs'

evidence offer[s], at most, a glimpse into individual incidents that are not sufficiently

representative of the entire culture across Microsoft.").

Plaintiffs accuse Judge Russo of deferring to Nike's written policy prohibiting

discrimination. ECF 320 at 44. She did not. In fact, Judge Russo's only acknowledgment of

Nike's written policy reads, in full: "As in the [*Dukes*] case, Nike's announced policy forbids

discrimination." F&R at 51. In light of this prohibition, Plaintiffs "were required to offer

'significant proof' that [Nike] actually operated under a general policy to the contrary." *Gordon*

*v. Kaleida Health*, 299 F.R.D. 380, 401 (W.D.N.Y. 2014) (discussing *Dukes*, 564 U.S. 338).

Judge Russo's conclusion that Plaintiffs failed to establish commonality for their disparate

treatment claim rested not on Nike's written policy, but on Plaintiffs' failure of adequate proof.

### 3.    Plaintiffs Failed To Establish Commonality For Their OEPA Claim.

An Oregon Equal Pay Act claim requires a plaintiff to show she was paid less than a male

comparator who was performing "work of a comparable character," meaning work requiring

"substantially similar knowledge, skill, effort, responsibility and working conditions[.]" F&R at

53 (citing *Smith v. Bull Run Sch. Dist. No. 45*, 80 Or. App. 226, 228-29 (1986); Or. Rev. Stat.

§ 652.210(16)). Thus, to establish commonality for their proposed OEPA class, Plaintiffs

needed to show that these elements can be established with common proof: for example, that

common proof can resolve whether employees within given job groupings performed

comparable work and were paid differently for it. Plaintiffs attempted to do this through the

expert reports of Dr. Lundquist (who opined that Nike groups together employees performing

comparable work) and Dr. Neumark (who relied uncritically on Dr. Lundquist's report in

performing an aggregated regression analysis). F&R at 53-54. Judge Russo correctly concluded

that the reports of Plaintiffs' experts "do not adequately address job-to-job work and are too generalized to demonstrate work of comparable character." *Id.* at 54; *see also id.* at 52.[28]

Plaintiffs contend that, by requiring common proof, Judge Russo "imposed a requirement not found in the [OEPA]." ECF 320 at 15 (citing F&R at 54).[29] Plaintiffs sought certification of their OEPA claim in federal court. That means Judge Russo was required to examine whether they satisfied the procedural requirements of Rule 23 — including commonality. As shown below, Plaintiffs' evidentiary proffer fell well short of what the law requires.

### a. Dr. Lundquist Offered No Common Way To Identify Which Jobs Perform Comparable Work.

Dr. Lundquist opined that "Nike groups its jobs into substantially similar job groups based on the Job Function, Job Family, Job Subfamily, Band and Job Level architecture into which all jobs at Nike are categorized." ECF 148-1 at 48 (Lundquist R.). But as Judge Russo observed, in fact "Dr. Lundquist provides scant analysis of . . . whether certain job groupings actually perform similar work." F&R at 23.[30] In fact, Dr. Lundquist provided no analysis at all of whether certain Nike job groupings actually perform similar work; she made assumptions based on Nike's broad job architecture. That architecture says nothing about whether the actual work performed by diverse persons is "comparable" under the law.

---

[28] Plaintiffs also contend that Judge Russo failed to consider the testimony of their experts Lundquist and Neumark. *See* Plaintiffs' Objections 2.c., 8.a. ECF 320 at 13, 16, 45. Judge Russo did consider their experts' testimony; she simply found it inadequate to demonstrate that the question of whether women are paid less than men for comparable work can be tried on a class basis in this case. F&R at 54. Nike's *Daubert* briefing sets forth fully why Plaintiffs' expert evidence is flawed. *See generally* ECF 179, 181.

[29] *See* Plaintiffs' Objection 8. ECF 320 at 15-16.

[30] Contrary to Plaintiffs' assertion (ECF 320 at 47), Judge Russo found that, "[c]ertainly, Dr. Lundquist qualifies as an expert" (F&R at 23). But Dr. Lundquist's resume is no substitute for a reliable, testable methodology. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts may exclude opinions that are "connected to existing data only by the *ipse dixit* of the expert[.]").

*Even Dr. Lundquist agrees.*  In another equal pay case in which Dr. Lundquist is retained as an expert, she recently testified that in her professional opinion, "[t]he determination of whether work is 'substantially similar' requires an evaluation of the skill, effort, responsibility and working conditions required of individuals performing the work" and that this evaluation (known as a "job analysis") "*is more than just reviewing a job description or a categorization scheme such as a job code*."  ECF 180-1 at 90-91 (emphasis added).  In that case, Dr. Lundquist designed and executed a systematic job analysis that included extensive sampling, interviews, and surveys.  *See id.* at 109-116.  Based on her analysis, Dr. Lundquist opined that "to determine which roles are the same or substantially similar, *an assessment of actual job content that goes beyond reliance on job code would be required*."  *Id.* at 136 (emphasis added).  Here, by contrast, Dr. Lundquist omitted the job analysis she deemed essential in that other case and opined that certain Nike jobs are "comparable" based solely on her review of documents and deposition testimony.  *See* ECF 179 at 17.  She did not perform *any* job analysis, and did not even interview the named and opt-in plaintiffs (let alone any other Nike employees) to learn about their jobs and supposed comparators.  *See* ECF 179 at 22; *see also* ECF 180-1 at 4-5, 13-18, 22-26, 29, 33, Lundquist Tr. (repeatedly admitting that she performed no job analysis and did not interview a single Nike employee in forming her opinions).  Indeed, Dr. Lundquist admitted that she has no idea whether employees *actually* perform comparable work; she only concluded that Nike's "job architecture" — the boxes on an organizational chart — *appears* to group similar employees into the same "job subfamily" and level.  *See* ECF 179 at 18-19; ECF 180-1 at 2-5, 10-11.

Nike's expert Dr. Hanvey, on the other hand, *did* perform a job analysis.  Based on his analysis (which involved hundreds of hours of interviews with nearly 100 randomly selected

putative class members), Dr. Hanvey concluded that, "[i]n order to determine which roles do perform substantially equal or similar work, *it would be necessary to conduct a full assessment of actual job content for each of the more than 1,400 Job Codes*."  ECF 185-1 at 144, Hanvey R. ¶ 252 (emphasis added).  In other words, the determination of whether work is comparable among jobs stretched across nearly every job function, family and level would require a fact-based, job-by-job analysis; it is not susceptible to common proof.  *See Puffer*, 255 F.R.D. at 460 (plaintiffs' attempt to show commonality was undermined by, inter alia, "the diversity of . . . the proposed class members in terms of their job duties").[31]

Plaintiffs suggest they and Dr. Lundquist should be held to a lower standard because, according to them, plaintiffs' experts do not have access to employees for purposes of conducting job analyses.  ECF 320 at 48 n.26.  False.  Plaintiffs had a full list of putative class members (ECF 99, 128); Dr. Lundquist could have contacted them to learn about their jobs.  At minimum, she could have interviewed the named and opt-in Plaintiffs.  Dr. Lundquist did none of that.  After years of discovery and thousands of pages of certification briefing, neither Plaintiffs nor Dr. Lundquist have suggested how a jury can find, using common proof, which employees in the 1,200 jobs at issue perform comparable work, an essential element of an OEPA claim.

In *Kassman*, the court rejected an approach similar to Plaintiffs here:

> Plaintiffs ignore what [they] will eventually need to prove — and the impossibility of practically adjudicating that proof in a single action.  The EPA requires equal pay for — emphatically — *equal* work. . . .  [This] requires a focus on job content, in which courts assess the congruity and equality of actual job content between the plaintiff and comparator. . . .  To satisfy this standard, a plaintiff must establish that the jobs compared entail

---

[31] *See also Perry-Roman v. AIG Ret. Servs., Inc.*, 2010 WL 8697061, at *5 n.5 (C.D. Cal. Feb. 24, 2010) ("[T]he mere fact that a company has a number of workers with co-equal titles and similar responsibilities does not render class treatment proper[.]") (citation omitted).

common duties or content, and do not simply overlap in titles or classifications.

*Kassman*, 416 F. Supp. 3d at 288-89 (internal quotation marks and citations omitted, emphasis in original). Here, if Plaintiffs' OEPA claim were certified, a jury would need to decide whether employees in 1,200 widely disparate jobs actually performed comparable work. Even if Dr. Lundquist had proposed a way for the jury to resolve that question on a class-wide basis (she did not), Nike would be entitled to present rebuttal evidence showing differences in the knowledge, skill, effort, responsibility, and working conditions required for each job, as well as evidence that any difference in pay was attributed to "a bona fide factor that is related to the position in question."[32] OR. REV. STAT. § 652.220(2). Even if one hour of testimony per job would suffice (it would not), this issue alone would require 150 eight-hour days of testimony.[33]

> **b.    Dr. Neumark's Analysis Did Not Establish Commonality.**

Dr. Neumark's aggregated statistical analysis also provides no evidence of commonality for OEPA purposes. Dr. Neumark simply assumed that Dr. Lundquist had established the comparability of work — which, as shown above, Dr. Lundquist did not.

There are more than 1,200 job codes among the putative class and more than 900 job subfamily-level groupings (which is the level at which Plaintiffs contend "comparable" or "substantially equal" work exists). Thus, to answer the relevant question based on Plaintiffs'

---

[32] Contrary to Plaintiffs' contention, Nike's affirmative defenses would not be limited to application of the EEOC Uniform Guidelines on Employee Selection Procedures, which merely provide an optional "framework for determining the proper use of tests and other selection procedures." *See* ECF 320 at 36-37; 29 C.F.R. § 1607.1(B).

[33] That this case would devolve into countless mini-trials also defeats predominance, superiority and manageability. *See, e.g., Puffer*, 255 F.R.D. at 458, 471 (in pay discrimination case, no predominance where determining liability and damages would require inquiry into individual circumstances of 1,700 putative class members); *Moore v. Publicis Grp. SA*, 2014 WL 11199094, at *8 (S.D.N.Y. May 15, 2004) (in pay discrimination case, no superiority where court would need to conduct mini-trials for 150 putative class members).

theory of the case — are women paid less than men in the same subfamily-level group — we would expect Dr. Neumark's report to tell us, for each of the 900+ employee groupings, whether women were underpaid compared to men, overpaid compared to men, or paid equitably to men. Yet neither of Dr. Neumark's reports even attempt to make that demonstration.

In fact, Dr. Neumark conceded that his aggregated analysis *cannot* tell the jury whether women are paid less than men within any specific subfamily-level grouping. For example, according to Plaintiffs' theory of the case, Plaintiff Sara Johnston was paid less than men in the "Business Systems Analyst-Lead Professionals" group. Thus, for the jury to determine whether Ms. Johnston and other women in her comparator group were paid less than their male peers, the jury would need evidence of the pay of women in the "Business Systems Analyst-Lead Professionals" group compared to men in the same group. Dr. Neumark admits his report does not provide this result; in fact, his report does not tell us whether women are paid less than men in *any* group of alleged peers:

> Q.   Is there a page I can look at in your report that will tell me whether women in the business operations, lead professionals grouping are paid statistically significantly less than men in the business operations, lead professionals grouping during the relevant class period? . . .
> A.   . . . There are no pages or tables . . . which study the data for that subfamily level pair in isolation, i.e., discarding all of the other data.
> Q.   And I assume if I grabbed any one of the other 900 groupings and asked you the same question, you would not be able to point to a page or tell me where in your report I could find a result for that specific job subfamily level grouping; is that correct?
> A.   I would give you the exact same answer, yes.

ECF 187-2 at 214-15, Neumark Tr. 52:18-53:15.

Instead, Dr. Neumark pooled data across *all* 1,200 different jobs (shoe designers, software engineers, airplane pilots, etc.), in all compensation levels, and reported a single, alleged percentage difference in pay between all female and all male employees in all jobs combined. *See e.g.,* ECF 149-1, Neumark R. at 6 ("Summary Table:  Key Findings"); ECF 182

at 5, 13-17,  Neumark Tr. 20:9-20, 65:19-69:1.  According to Dr. Neumark, this one average shortfall applies to all women, including those who were paid more than all of the men in their Job Subfamily-Level group (ECF 182 at 89-91, Neumark Tr. 295:19-297:11) and who worked in Job Subfamily-Level groups that never contained a single male peer (*Id.* at 18-19, Tr. 71:2-72:14).  But this average result does not answer whether any group of women, or even a single woman, was paid less than men performing comparable work.  *See, e.g., Bolden*, 688 F.3d at 896-97 (data from multiple work sites with multiple working conditions should not be pooled).

Although Plaintiffs contend that Dr. Neumark's aggregated models "control" for job, the use of prior experience and education variables demonstrates why merely "controlling" for job is not enough.  Take the following example:  one Nike new hire has a Master's Degree in Computer Science from MIT, while another has a Master's Degree in French Literature from a non-technical state school.  If both employees were hired into IT roles, one would expect that the new hire with the Computer Science degree would earn more, and potentially work at a higher level, than the new hire with a French Literature degree.  But that may not hold true for all jobs.  If the job was copy editor for a French language website, perhaps the inverse would be true.  If the job was lifeguard or sales representative, the two degrees may have equivalent value.  The point is that the value of certain types and levels of education — in addition to the school attended — varies by job.  The same is true of relevant prior experience.  "Relevant" experience is highly job specific; experience that is relevant for one job may have little relevance for another.  Aggregated analyses do not account for these nuances, even when they "control" for job, because a regression estimates the impact of a Master's Degree for employees within each job, and then averages that estimated impact across all employees in the regression.  Aggregation

means that the estimated effect of a Master's Degree has the same value for every one of the 1,200 jobs at issue.  Common sense tells us this is false.  *See* ECF 186-1 at 63-72.

The OEPA requires the comparison of comparable jobs, but Dr. Neumark's analysis presents a single supposed disparity that he says exists across all roles.  This is particularly problematic given the breadth and scope of the roles Plaintiffs seek to try as one.  This is not a case like *Ellis*, where plaintiffs' proposed class contained only two "closely related management-level" positions.  Nor does the case involve only software engineers, or only nurses, or any other grouping of employees who could plausibly be argued perform "comparable" work.  As Judge Russo notes, this case involves nearly every female worker in Oregon "employed in a vast array of positions from apparel designers to pilots and mechanics in many separate departments at Nike's sprawling world headquarters."  F&R at 52.  On these facts, certification is improper.

### c.    Plaintiffs' Remaining Objections Do Not Establish Error.

Judge Russo did not fail to consider whether Nike's job architecture grouped similar jobs together.  *See* ECF 320 at 46.  She acknowledged Plaintiffs' evidence that Nike says its job architecture organizes jobs according to "type of work" and "level of work" and that "[j]ob families are the unique roles within a job function that can be performed at various levels based on Nike's leveling criteria."  F&R at 8.[34]  Judge Russo also recognized, however, that the putative class spans an enormous and disparate group:  "at least 5,200 current and former female employees" who worked in 21 different job functions, 109 different job families, 198 different job subfamilies, 1,249 different job codes, and a "broad array" of positions "including, but not

---

[34] Contrary to Plaintiffs' characterization, Judge Russo did not "observe" that Nike uses its job architecture to apply "a consistent set of policies and practices" within job groupings.  *See* ECF 320 at 45 (citing F&R at 22).  Judge Russo simply quoted *Dr. Lundquist's opinion* (based on the methodology discredited above) to contextualize Nike's evidentiary objections.  F&R at 22.

Page 41    -    DEFENDANT NIKE, INC.'S RESPONSE TO PLAINTIFFS' OBJECTIONS TO
FINDINGS AND RECOMMENDATION DENYING CLASS CERTIFICATION

limited to, shoe and apparel designers, manufacturing and software engineers, event planners, sports marketers, information and technology security professionals, security professionals, supply chain experts, and airplane pilots and mechanics." *Id.* at 7-8 (citations omitted). Further, the evidence confirms that even within a given job code — *i.e.*, "the most differentiated type of work and level of work within [Nike's] corporate architecture" — employees "do not necessarily perform similar work[.]" *Id.* at 9. "In fact, there are a number of job codes that share the same Job Subfamily and Job Level but are readily distinguishable, involving the application of differing skillsets." *Id.* (citation omitted).

Plaintiffs also incorrectly criticize Judge Russo's statement that they failed to identify specific male comparators. ECF 320 at 45 n.24. Even assuming the named and opt-in plaintiffs did identify individuals they believed to be their alleged comparators, for this case to proceed as a class, Plaintiffs must demonstrate that the appropriate comparators can be identified with common proof. Judge Russo properly concluded that they cannot, because Plaintiffs' expert reports "are too generalized to demonstrate work of comparable character." Certification properly was denied.

### B. Judge Russo Correctly Found That Plaintiffs Failed To Satisfy The Typicality And Adequacy Requirements Of Rules 23(a)(3) And (a)(4).

Plaintiffs agree that the typicality and adequacy requirements of Rule 23(a) "tend to merge" with the commonality requirement. ECF 320 at 49-50; F&R at 55.[35] Indeed, courts in the Ninth Circuit regularly find that plaintiffs cannot satisfy typicality and adequacy for the same reasons they cannot satisfy commonality: The putative class includes individuals who had

---

[35] *See Dukes*, 564 U.S. at 349, n.5 (noting that "it is unnecessary to resolve whether respondents have satisfied the typicality and adequate-representation requirements of Rule 23(a)" in light of its disposition of the commonality question because, just like commonality and typicality requirements tend to merge, so does the adequacy-of-representation requirement) (citing *Gen. Tel. Co.*, 457 U.S. at 157-58, n.13).

different experiences, for different reasons, including individuals who made the same decisions challenged in this case.[36]  Here, too, Judge Russo aptly concluded that Plaintiffs could not establish typicality or adequacy because, as with commonality, "the evidence establishes discretion on the part of hiring managers in setting pay, promoting, and granting pay increases and bonuses[,]" and thus "the inquiry will be fact intensive and individualized for all putative plaintiffs."  F&R at 55.  Plaintiffs contend that Judge Russo's conclusion was erroneous because, in their view, so was her finding on commonality.  ECF 320 at 49-50.  Plaintiffs' objections on typicality mirror their commonality objections, which are addressed in full above.

With respect to adequacy, Plaintiffs claim Judge Russo made no findings with respect to whether there are conflicts of interest between the named plaintiffs and the class, and whether class counsel is competent.  Because she properly concluded that the class lacks both commonality and typicality, additional findings were not necessary.[37]  Had she reached the question, however, she would have found that intra-class conflicts, including those specific to the named plaintiffs, doom certification.  *See* ECF 183 at 58-60.

### C.    **Judge Russo Correctly Found That Plaintiffs Failed To Satisfy The Predominance And Superiority Requirements Of Rule 23(b)(3).**

#### 1.    **Plaintiffs Failed To Prove Predominance.**

In addition to the prerequisites of Rule 23(a), plaintiffs seeking class certification must satisfy one of the three factors under Rule 23(b).  F&R at 55.  Plaintiffs here primarily relied on Rule 23(b)(3), which required them to show that "questions of law or fact common to class

---

[36] *See, e.g.*, *Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D. Wash. 2001) (adequacy was lacking where two named plaintiffs and a significant number of putative class members were employed as supervisors and "implement[ed] the very supervisory system" they challenged as discriminatory).

[37] *See Dukes*, 564 U.S. at 349, n.5 ("In light of our disposition of the commonality question, however, it is unnecessary to resolve whether respondents have satisfied the typicality and adequate-representation requirements of Rule 23(a).").

members predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  *Id.*; Fed. R. Civ. P. 23(b)(3).

       The predominance inquiry "'tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation.'"  *Id.* at 56 (quoting *Amchem Prods., Inc. v. Windsor*,

521 U.S. 591, 623 (1997)).  As Judge Russo observed, "[t]he predominance standard is even

more stringent than commonality."  F&R at 56; *see also Amchem Prods.*, 521 U.S. at 623-24

("Even if Rule 23(a)'s commonality requirement may be satisfied by [a] shared experience, the

predominance criterion is far more demanding.").  Indeed, this Court recently declined to certify

a class even though plaintiffs satisfied Rule 23(a)'s commonality requirement, because

"individual inquiries . . . would predominate."  *Lott v. Vial Fotheringham, LLP*, 2020 WL

1890539, at *6 (D. Or. Apr. 15, 2020) (Hernández, J.) (noting, among other things, that the Court

would be required to separately examine 71 contractual clauses).

       Here, Plaintiffs failed to establish predominance.  As shown above, myriad individualized

factual issues contributed to each hiring, pay, promotion, and leveling decision made by

thousands of decisionmakers, each involving significant individual managerial discretion.  Hiring

managers set starting pay by considering a wide range of factors, including, but not limited to, a

candidate's prior relevant experience, education, expectations for the role, and caliber of prior

employers.  *See, e.g.*, ECF 187-2 at 302, 310-19, Thomas Tr. 197:8-18, 226:15-235:5 ("We have

so many jobs and so many types of jobs, you know, what's relevant, it varies with every single

job.").  Merit and PSP awards are determined by individual managers based on their perception

of the employee's performance.  *See, e.g.*, ECF 187-1 at 113, Oda Decl. ¶¶ 16-18 ("For the

employees I have supervised, I had discretion as to the amount of merit pay increase to award.

In making those decisions, I would consider performance, CFE ratings, and ability to meet goals and deliverables."). Thousands of individual managers make decisions on whether to post job vacancies or to promote without posting, and then select candidates based on criteria that vary depending upon the role. *See, e.g.*, ECF 187-1 at 71-72, Levison Decl. ¶ 13 ("When making a promotion recommendation, I consider the designer's performance, output and passion, how motivated they are, and how easy it is to work with them."). Furthermore, litigating Plaintiffs' Oregon EPA claim will require a fact-intensive inquiry to determine each putative class member's "comparators" (if any). *See* section II.A.3. *supra*. Nike also is entitled by statute to introduce evidence to explain any alleged pay disparities between supposed comparators, including information regarding relevant prior experience, education, expertise, and other factors, the importance of which will vary by role.

Plaintiffs contend that because Judge Russo found that Plaintiffs did not satisfy the commonality requirement (by considering individualized issues), her finding that common questions do not predominate is incorrect.[38] This contention is flawed. If there are no common policies the case necessarily flunks the predominance test; any common issue cannot be "more prevalent or important than . . . individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). But even where commonality exists, predominance requires much more.

### 2.    A Class Trial Would Be Inefficient And Would Not Be Superior To Individual Trials.

The superiority inquiry "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case[,]" which "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." F&R at 56 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998)). A class action would be

---

[38] *See* Plaintiffs' Objection 9.a. ECF 320 at 16.

inefficient and unmanageable here and would require over 5,200 mini-trials — each requiring proof of the reasons for each decision as to each class member — and far more than have defeated superiority in other similar cases.  Plaintiffs' proposed trial plan (bifurcation of liability and damages) fails to solve these issues.  Instead, any former or current Nike employee who feels aggrieved can pursue her claims individually, as is common.  Judge Russo was correct:  in this case, presentation of "individual claims is the better method to litigate" allegations by any persons claiming to be aggrieved.  F&R at 56.

Given the individual issues here, a class trial would simply devolve into thousands of individual mini-trials.  Because individual issues predominate, a class trial is not superior to individual cases.

### 3.    Judge Russo Correctly Found That Certification Of Plaintiffs' Claim For Injunctive Relief Is Inappropriate Under Rule 23(b)(2).

Class certification under Rule 23(b)(2) can only occur if Plaintiffs established common issues.  *See* ECF 146 at 63.  They did not, as shown above.

Even laying that aside, Plaintiffs lack standing to pursue an injunctive relief class under Rule 23(b)(2) because they are all former employees of Nike.  In *Dukes*, the Supreme Court confirmed that "plaintiffs no longer employed by [a defendant] lack standing to seek injunctive or declaratory relief against its employment practices."  *Dukes*, 564 U.S. at 364; *accord Ellis, 657 F.3d at 988* ("As the Supreme Court explained, only current employees have standing to seek injunctive relief.").  Ninth Circuit cases hold that a "non-employee may have standing to sue for injunctive relief against an employer" only when "those non-employees were in the process of seeking reinstatement to their former positions, or seeking work from that employer."  *Walsh v. Nevada Dep't of Hum. Res., 471 F.3d 1033, 1037 (9th Cir. 2006)* (citing *Freitag v. Ayers, 468 F.3d 528, 547-48 (9th Cir. 2006)*).  That is not the case here; the only evidence that

any Plaintiff seeks Nike work is Plaintiff Johnston's conclusory statement: "I would like my job back at a fair and equitable wage." ECF 162-2 at 32 (Johnston Tr. 298:18-23). No plaintiff, including Johnston, has ever applied to be rehired at Nike.

Finally, Nike has already banned consideration of prior pay in setting starting pay; there is nothing to enjoin. *See* ECF 155-6 at 1-2 (prohibiting Nike employees from basing offer on current or previous compensation, even if volunteered by candidate); *see United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952) (noting that "[t]he sole function of an action for injunction is to forestall future violations"; requiring "a real threat of future violation or a contemporary violation of a nature likely to continue or recur").

Moreover, the injunctive relief that Plaintiffs suggest is so vague that it would offend due process. For example, Plaintiffs say they want to adjust compensation to "correct discriminatory consequences of the prior pay policy." ECF 322 at 51. As explained in the F&R and here, there was no "prior pay policy"; the alleged "discriminatory consequences" also are indeterminate. So it is unclear what Plaintiff is proposing and how it would be executed. Plaintiffs also propose prohibiting using a percentage of base pay to determine merit increases. But Nike's current "Core Pay" process already invites managers to award higher pay increases to high-performing employees, and requires that employees lower in the pay range receive larger increases than those higher in the range, assuming equivalent performance and contributions. Thus, it is unclear what Plaintiffs' proposed injunction would require managers to do that they cannot already do. Plaintiffs' proposed injunctions do not satisfy Federal Rule of Civil Procedure 65(d) because they do not state with specificity what an injunction in this case would look like or how it would be accomplished.

### D.    Plaintiffs Incorrectly Suggest That The Court Should Reserve The Class Certification Question For The Jury.

Faced with their failure to establish the class certification requirements, Plaintiffs repeatedly argue that Judge Russo should have left many of her determinations for the jury.  *See, e.g.*, ECF 320 at 55.  Class certification is a question for the court; it does not turn on a summary judgment-like standard, in which every doubt is resolved in a plaintiff's favor.  Judge Russo correctly explained:

> [T]he Court must resolve factual disputes at the certification stage regarding whether starting pay decisions were at the hiring manager level or at the highest level of Nike management.  Plaintiffs' theory is that differences in starting pay resulted in the disparate impact but resolving that question will require individualized inquiries as to whether each hiring manager utilized prior pay to set that pay.  *Plaintiffs would not just place the issue of determining the merits of its case to the jury but leave to the jury whether plaintiffs establish commonality*.  That is an issue the Court must decide *before* certifying the class.

F&R at 45 n.22 (emphasis added); *see also* F&R at 43 n.20 ("The evidence does, however, demonstrate that prior salary was a factor that may have been considered, but it does not demonstrate that it was a required factor class-wide.  Plaintiffs argue that such an issue is itself a common question, but the Court must resolve the question of commonality at this stage of the litigation.") (citing *Olean*, 31 F.4th at 667 ("A district court must also resolve disputes about historical facts if necessary to determine whether the plaintiffs' evidence is capable of resolving a common issue central to the plaintiffs' claims.  For instance . . . a district court [must] resolve factual disputes at certification regarding whether decisions regarding promotions were made at the local level or by upper management.")).  Failure to do so would have constituted legal error, and, as such, Plaintiffs' objections have no merit.  *See Ellis*, 657 F.3d at 983 ("[T]he district court was required to resolve any factual disputes necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*.") (emphasis in original).

E.    **Plaintiffs Belatedly And Improperly Seek Certification Under Rule 23(c)(4).**

Plaintiffs' Objections, for the first time, argue that the Court should have certified issues classes pursuant to Rule 23(c)(4).[39]  Plaintiffs' request is not an objection, but a new request for certification that they never presented to Judge Russo.  This Court should reject at the threshold Plaintiffs' attempt to introduce now a new basis for certification.  *See United States v. Howell*, 231 F.3d 615, 622 (9th Cir. 2000) ("[I]t would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and — having received an unfavorable recommendation — shift gears before the district judge.") (quotation marks and citation omitted); *see also Stanley v. Ylst*, 2007 WL 2121845, at *2 (E.D. Cal. July 24, 2007) (refusing to consider new arguments in reviewing a magistrate judge's findings; "these arguments are not properly considered by the undersigned as they were not raised in the exhaustive proceedings before the magistrate judge").[40]

Plaintiffs in any event have not demonstrated that certification pursuant to Rule 23(c)(4) would have been warranted.  Rule 23(c)(4) provides that, "*when appropriate*, an action may be brought or maintained as a class action with respect to particular issues."  Fed. R. Civ. P. 23(c)(4) (emphasis added).  However, "a Rule 23(c)(4) issues class must still meet the requirements of Rule 23(a) and (b) (except for the predominance requirement of Rule 23(b)(3))." *Taison Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 633 (N.D. Cal. 2015) (collecting cases).  Here, as Judge Russo correctly found, Plaintiffs failed to meet the commonality and typicality requirements, and, as such, certification pursuant to Rule 23(c)(4) is

---

[39] *See* Plaintiffs' Objection 10.a.  ECF 320 at 16.

[40] Plaintiffs also improperly submitted new evidence (new deposition testimony and an exhibit) in support of their objections to Judge Russo's F&R, which the Court should reject.  ECF 323-1, 323-2, 323-3.  *See Stringham v. Bick*, 2007 WL 806619, at *1 (E.D. Cal. Mar. 15, 2007) (refusing to consider new evidence submitted by defendants in objections to magistrate judge's rulings).

similarly inappropriate.  *See Handloser v. HCL Techs. Ltd.*, 2021 WL 879802, at *12 (N.D. Cal. Mar. 9, 2021) (finding Rule 23(c)(4) certification improper because "[p]laintiffs have not met the commonality and typicality requirements of Rule 23(a)(2) and 23(a)(3)").

Finally, Plaintiffs' Rule 23(c)(4) argument is a conclusory single paragraph bereft of explanation.  *See* ECF 320 at 58.  Thus, "Plaintiffs' perfunctory justification for certification itself requires the Court to deny certification of a Rule 23(c)(4) class."  *Handloser*, 2021 WL 879802, at *12.

## III.    **CONCLUSION**

In her 57-page Findings & Recommendation, Judge Russo conducted a rigorous examination of both parties' submissions and the class certification elements, and her reasoned analysis aptly demonstrates that Plaintiffs failed to meet their class certification burden on their adverse impact, disparate treatment, and OEPA claims.  Because Plaintiffs identify no error in Judge Russo's findings, this Court should adopt her recommendation and deny class certification.

Dated:  January 26, 2023                    Respectfully submitted,

/s/ Felicia A. Davis

Daniel Prince, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
Felicia A. Davis, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
Laura E. Zabele, Cal. SB# 330847 (*pro hac vice*)
laurazabele@paulhastings.com

PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA  90071-2228
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Laura E. Rosenbaum, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  (503) 294-9408
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, INC.