JOHN A. BERG, OSB# 120018
jberg@littler.com
PAUL E. CIRNER, OSB# 191471
pcirner@littler.com
LITTLER MENDELSON P.C.
1300 SW Fifth Avenue
Wells Fargo Tower, Suite 2050
Portland, OR 97201
Telephone:  (503) 221-0309
Facsimile:  (503) 242-2457

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

Attorneys for Defendant NIKE, INC.


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


KELLY CAHILL, et al,

    Plaintiffs,

    v.

NIKE, INC., an Oregon Corporation,

    Defendant.

Case No.:  3:18-cv-01477-JR

**DEFENDANT NIKE, INC.'S RESPONSE TO ADVANCE LOCAL MEDIA LLC, D/B/A OREGONIAN MEDIA GROUP'S (THE OREGONIAN) ARGUMENTS IN SUPPORT OF ITS EMERGENCY MOTION TO VACATE THE MAGISTRATE JUDGE'S ORDER, OR IN THE ALTERNATIVE, STAY PROCEEDINGS PRIOR TO JANUARY 31, 2024, FRCP 72**

**ORAL ARGUMENT REQUESTED**

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ............................................................................................. 1

II.     RELEVANT BACKGROUND .......................................................................... 3

III.    ARGUMENT ................................................................................................... 7

        A.      The Court Should Re-Instate The Magistrate's Order Because the
                Oregonian Is Subject To This Court's And The Ninth Circuit's Orders .............. 7

        B.      The Court's Order Does Not Violate The First Amendment .............................. 11

        C.      The Non-Party Individuals Would Suffer Irreparable Harm Should the
                Oregonian Not Be Ordered To Return the Alleged Complaints .......................... 15

        D.      The Court Should Issue An Order To Show Cause ............................................ 17

IV.     CONCLUSION ................................................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*CBS v. Davis,*
510 U.S. 1315 (1994)............................................................................................14

*Chavis v. Whitcomb,*
305 F. Supp. 1359 (S.D. Ind. 1969)........................................................................8

*Cohen v. Cowles Media Co.,*
501 U.S. 663 (1991)........................................................................................ 13-14

*Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz,*
793 F. Supp. 2d 311 (D.D.C. 2011).......................................................................15

*Culinary Foods v. Raychem Corp.,*
151 F.R.D. 297 (N.D. Ill. 1993)............................................................................13

*Eli Lilly & Co. v. Gottstein,*
617 F.3d 186 (2d Cir. 2010)...............................................................................2, 9

*Galbreath v. Metropolitan Trust Co. of Cal.,*
134 F.2d 569 (10th Cir.1943).................................................................................8

*Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy,*
860 F.3d 1244 (9th Cir. 2017) ................................................................. 2-3, 12, 13

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.,*
No. 2672 CRB (JSC), 2017 U.S. Dist. LEXIS 171321 (N.D. Cal. Oct. 14, 2017)........... 15-16

*In re Zyprexa Injunction,*
474 F. Supp. 2d 385 (E.D.N.Y. 2007) ...............................................................7, 15

*N.Y. Times Co. v. United States,*
403 U.S. 713 (1971)..............................................................................................14

*Near v. Minnesota ex rel. Olson,*
283 U.S. 697 (1931)..............................................................................................14

*Org. for a Better Austin v. Keefe,*
402 U.S. 415 (1971)..............................................................................................14

*Pansy v. Borough of Stroudsburg,*
23 F.3d 772 (3d Cir. 1994)....................................................................................14

*Ramsey v. NYP Holdings, Inc.,*
No. 00 Civ.3478(VM)(MHD), 2002 WL 1402055 (S.D.N.Y. June 27, 2002)..........................7

*Redapt Inc. v. Parker,*
No. 2:20-cv-00862-JRC, 2020 WL 3128859 (W.D. Wash. June 11, 2020)..........................11

*Robert Ito Farm, Inc. v. Cnty. of Maui,*
842 F.3d 681 (9th Cir. 2016) ...........................................................................................8

*Seattle Times Co. v. Rhinehart,*
467 U.S. 20 (1984)...................................................................................... *passim*

*Smith v. Daily Mail Publ'g Co.,*
443 U.S. 97 (1979).....................................................................................................14

*State ex rel. Sports Mgmt. News v. Nachtigal,*
324 Or. 80 (1996).....................................................................................................15

*The Fla. Star v. BJF,*
491 U.S. 524 (1989)..................................................................................................14

*United States v. Brown,*
250 F.3d 907 (5th Cir. 2001) ....................................................................................11

*United States v. United Fruit Co.,*
410 F.2d 553 (5th Cir. 1969) ......................................................................................8

*Wachner v. Aramark Educ. Servs., Inc.,*
No. CV 02-528-BR, 2003 WL 23538037 (D. Or. Dec. 12, 2003)...............................7

*Walker v. City of Birmingham,*
388 U.S. 307 (1967)..................................................................................................16

*Widjaja v. YUM! Brands, Inc.,*
No. CV-F-09-1074 OWW/DLB, 2009 WL 3462040 (E.D. Cal. Oct. 22, 2009).....................8

**RULES**

FED. R. CIV. P. 26(b)(1)..................................................................................................14

**TREATISES**

Wright & Miller, *7C Fed. Prac. & Proc. Civ.* § 1920 (3d ed.).....................................8

**CONSTITUTIONAL PROVISIONS**

U.S. CONST., amend. I ............................................................................. *passim*

## OTHER AUTHORITIES

Jeff Manning, *Class-action lawsuit on Nike: 'where women are devalued and demeaned'*, The Oregonian, August 10, 2018, https://www.oregonlive.com/business/2018/08/class-action_lawsuit_on_nike_w.html (last visited February 6, 2024) ...............................................................................................10

Matthew Kish, *Deposition shakes up Nike pay discrimination lawsuit; Nike wants it barred*, Business Insider, Oct. 5, 2023, https://www.oregonlive.com/business/2023/10/deposition-shakes-up-nike-pay-discrimination-lawsuit-nike-wants-it-barred.html (last visited February 6, 2024).................10

Matthew Kish, *Nike says it has made changes to improve its work culture. But employees are still making new discrimination complaints amid an ongoing lawsuit, lawyer says*, Business Insider, Sept. 21, 2022, https://www.businessinsider.com/nike-employees-continue-to-make-new-discrimination-claims-lawyer-says-2022-9 (last visited February 6, 2024).....................................................................................................10

Sara Germano and Joann S. Lublin, *Inside Nike, a Boys-Club Culture and Flawed HR*, The Wall Street Journal, last updated Mar. 31, 2018, https://www.wsj.com/articles/inside-nike-a-boys-club-culture-and-flawed-hr-1522509975 (last visited February 6, 2024) ..........................................................10

Shoshy Ciment, *Judge Sides With Nike in Recent Development Gender Discrimination Suit*, FOOTWEAR NEWS, March 22, 2023, https://footwearnews.com/business/legal-news/judge-nike-discrimination-suit-development-1203374861/ (last visited February 6, 2024) ....................................................10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

A review of the facts surrounding this motion would leave both journalism and legal ethics professors sobbing in their soup.  The Oregonian, a party to this case, possesses confidential discovery that it was prohibited from accessing by the Protective Order here and a Ninth Circuit stay order.[1]  What's more, the Oregonian's reporter knew that the newspaper should ***not*** have access to the files at issue, much like Plaintiffs' counsel knew that she should ***not*** have shared those same documents with the reporter.  Yet, counsel and the reporter decided to meet in-person so that counsel could use her iPad to preview documents for the reporter that she should have known should ***not*** have been previewed, including documents that were not part of the record on class certification.  Counsel then used her iPhone to email the reporter copies of the documents they had been reviewing in secret.  All of this violates ***two court orders***.  Yet, the Oregonian now argues its violations have no remedy, insisting that this case is about a prior restraint on speech.  It is not.  The issue is whether the Court has authority to enforce orders— ***two of them***—that are binding on the parties and their counsel.  The answer must be "yes."

The Oregonian attempts to invoke judicial processes while at the same time defying judicial orders.  On the one hand, the Oregonian willingly availed itself of this Court's powers to challenge the sealing/redaction of the documents at issue and vindicate their claim of First Amendment rights.  Once it obtained documents in violation of ***two court orders*** (and the Oregonian was aware of both), however, the Oregonian changed its tune.  It now contends that the Protective Order's provisions regarding access or use are optional and can be ignored.  The Oregonian cannot invoke the equity of the court while shielding itself from the enforcement of

---

[1] The stay order was issued as an ECF notice from the Ninth Circuit, and that order also was circulated to the counsel in the district court action, via ECF, on the same day.

the very order that it sought to modify.  The Court has the inherent authority to enforce (and

punish) violators of its orders, including those who knowingly participate in such violation.  *See*

*Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195 (2d Cir. 2010).

The First Amendment also does not entitle the Oregonian to keep and publish documents

that it should have never received but for a breach of court orders.  Indeed, the Oregonian

attempts to argue that its acquisition of these documents was independent from the litigation and

lawful.  The facts tell a different story.  The Plaintiffs filed this litigation in 2018, referring to a

group of unverified complaints (though unrelated to any claims in the case) (the "Alleged

Complaints"); the Court ordered NIKE to produce the Alleged Complaints after Plaintiffs moved

to compel the same; NIKE produced those documents with limited redactions (*i.e.,* names of

witnesses, subjects, and complainants); the Media Intervenors sought relief under the Protective

Order to unredact/unseal certain names identified in the Alleged Complaints; and, the

redaction/sealing issues have been the subject of extensive briefing in the District Court, an

appeal to the Ninth Circuit, and a stay order. [2]  This issue has touched every facet of the litigation

and under these facts, the First Amendment does ***not*** safeguard the press from enforcement of a

protective order.  *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33-34 (1984) (a party "may

disseminate the identical information covered by the protective order as long as the information

*is gained through means independent of the court's processes*.") (emphasis added); *Ground Zero*

*Ctr. for Non-Violent Action v. United States Dep't of Navy*, 860 F.3d 1244, 1258 (9th Cir. 2017)

("By independent source, we mean what the district court implied:  Ground Zero may discuss

and distribute the documents in question *so long as it acquires the documents from a source not*

---

[2] The Media Intervenors are Media Organizations Insider Inc. *d/b/a Business Insider*, Advance
Local Media LLC *d/b/a Oregonian Media Group*, and American Business Journals, Inc., *d/b/a
Portland Business Journal*.

*involved in this litigation*[.]") (emphasis added).  Put simply, there is no "coffee meeting" exception for litigants exchanging documents in violation of court orders.

Allowing the Oregonian to keep and publish the documents threatens NIKE's appeal, casts doubt on this Court's powers to enforce its orders, and rewards the Oregonian for acquiring the very documents it was prohibited from accessing.  This is not the law and cannot be the outcome.  Accordingly, NIKE respectfully requests that the Court reinstate its order requiring return of the documents, preventing dissemination, and destroying all copies.  At minimum, the Court should preserve the status quo until NIKE can conduct discovery into the disclosure and supplement its briefing with the Court.

## II.    **RELEVANT BACKGROUND**

Since this litigation was filed, through irrelevant to their actual legal claims, Plaintiffs have built their case around the Alleged Complaints.  Dkt. No. 1 ¶ 54.  Those documents were produced to Plaintiffs (upon a Court order, following extensive briefing) under the Protective Order, and the Media Intervenors intervened in this action with the specific purpose of unsealing those records.  Dkt. No. 111; Dkt. No. 205.  Since April 2022, the Media Intervenors have been fighting to gain unfettered access to non-party individuals' names connected to unverified complaints that were submitted in connection with—though unrelated to the merits of— Plaintiffs' class certification motion.  *Id*.  NIKE has vigorously opposed such attempts to intrude upon the inherent privacy rights of third party complainants, witnesses, and subjects of sensitive, unsubstantiated allegations.  *E.g.*, Dkt. Nos. 345, 376, 406.  This Court entered a temporary 7-day stay on January 5, 2024 to allow NIKE to seek a stay of the Court's October 11, 2023 order to unseal the records.  Dkt. No. 363; Dkt. No. 404.  Shortly thereafter, NIKE sought and obtained a temporary stay from the Ninth Circuit, which went into effect on January 11, 2024 and remained in effect until the Ninth Circuit could rule on NIKE's motion to stay pending appeal.

Dkt. No. 407.  On January 19, 2024, the Ninth Circuit Court of Appeals stayed this Court's order

pending NIKE's appeal of that order (the "Stay Order").  Dkt. No. 408.  The Stay Order was

entered and recognized in this case on the same day.  *Id*.

     ***Hours after the Stay Order was entered***, Plaintiffs' counsel, Ms. Laura Salerno Owens of

Markowitz Herbold PC, met with Matthew Kish, a business reporter for the Oregonian at a

coffee shop to discuss allegations raised by a current or former NIKE employee, purportedly

unconnected to this litigation.  Dkt. No. 416 ¶ 2.   Even before the entry of the full Stay Order, an

interim stay was in place and known.  Dkt. No. 407.   According to the Oregonian, Ms. Salerno

Owens provided a comment and sent three emails to Mr. Kish from two different devices during

their meeting—one of which included the Alleged Complaints.  *Id*. ¶ 3.  Specifically, Ms.

Salerno Owens forwarded a PDF—over half of which contained material that (1) NIKE

produced to Plaintiffs subject to the Protective Order and has not been filed in this case or (2) is

subject to the Ninth Circuit's Stay Order.  Dkt. No. 411 ¶ 9.  Ms. Salerno Owens now claims that

this disclosure of protected material was "inadvertent".  *Id*. ¶ 14.

     The circumstances surrounding this disclosure raise questions that have thus far been

unanswered.  As an initial matter, Plaintiffs chose not to notify NIKE regarding the blatant

violation of the Protective Order and Stay Order ***until six days later***, on January 25, 2024, after it

was clear that Plaintiffs could not alleviate the issue on their own.  Declaration of Daniel Prince

("Prince Decl.") ¶¶ 3-4; Dkt. No. 416 ¶ 7; Dkt. No. 411 ¶ 19.  NIKE has been kept largely in the

dark regarding this serious issue concerning its own protected material and, despite numerous

requests to Plaintiffs' counsel, has received very little information regarding this purported

"inadvertent" disclosure.  Prince Decl. ¶¶ 7-11.  NIKE's knowledge is, thus, currently limited to

the facts set forth in Markowitz Herbold's and the Oregonian's filings.[3]

Ms. Salerno Owens met with Mr. Kish on January 19, 2024 to discuss allegations raised by Mr. Kish.  Dkt. No. 411 ¶ 2.  Again, at this time, Ms. Salerno Owens, at minimum, knew that a temporary stay was in effect, Dkt. No. 407, and several lawyers in her firm had been notified of the full Stay Order.  Prince Decl. ¶ 5, Exs. A & B.  Nevertheless, Ms. Salerno Owens appeared eager to provide a comment to the reporter.  Dkt. No. 411 ¶ 5.  At 1:58 p.m., while still at the coffee shop, Ms. Salerno Owens emailed a comment to Mr. Kish.  Dkt. No. 411 ¶ 5; Dkt. No. 416 ¶ 3.  Ms. Salerno Owens claims that Mr. Kish "noticed [she] referenced the [the Alleged Complaints]" and "asked [ ] which [Alleged Complaints] supported the comment."  Dkt. No. 411 ¶ 6.  However, nowhere in the email referenced by Ms. Salerno Owens does she reference the Alleged Complaints.  Dkt. No. 411-1.  Within *four minutes* of the email providing the comment, Mr. Kish purportedly read the email, deduced that it referred to the Alleged Complaints, and requested Ms. Salerno Owens to identify the specific Alleged Complaints; Ms. Salerno Owens, in turn, had enough time to type an index with page numbers and allegations, which she emailed to Mr. Kish at 2:02 p.m.  Dkt. Nos. 411 ¶ 7, 411-2.  Thereafter, Mr. Kish purportedly told Ms. Salerno Owens that the index did not reference ECF numbers to the public record.  Dkt. No. 411 ¶ 8.  Eight minutes later, at 2:10 p.m., Ms. Salerno Owens forwarded the PDF (containing significantly more pages than what has been filed in this case).  *Id*. ¶ 9.

At some point, Ms. Salerno Owens realized that she and Mr. Kish had gone too far. Rather than immediately notify NIKE, Ms. Salerno Owens tried to convince Mr. Kish to return the documents.  Dkt. No. 411 ¶¶ 13-19.  Mr. Kish refused.  Dkt. No. 416 ¶¶ 4, 7.  It was only

---

[3] NIKE has propounded discovery requests on the Oregonian and Markowitz Herbold concerning these events.  Prince Decl. ¶ 11.

days later, when Ms. Salerno Owens realized she could not solve their breach, that Plaintiffs

informed NIKE.  Prince Decl. ¶ 4.

The same day that Plaintiffs notified NIKE of their violation, Markowitz Herbold filed a

Motion to Request Return of Inadvertently Disclosed Materials.  Dkt. No. 410.  Reserving its

rights, NIKE emailed the Court joining the request to secure relief from this Court.  Prince Decl.

¶ 6.  Despite the fact that the motion directly affected the Oregonian, Markowitz Herbold

apparently did not serve the Oregonian with the motion, or otherwise notify the Oregonian of its

filing.  Dkt. No. 414 at 10.  The Magistrate granted the motion on January 26, 2024, noting that

the Oregonian is an intervenor in this action for the purposes of obtaining disclosure of the very

documents in its possession and is a party to the appeal in which the Stay Order was issued.  Dkt.

No. 412.  The order required the Oregonian to (1) return the documents by January 31, 2024; (2)

agree not to disseminate that information; and (3) destroy any copies in its possession.  *Id*.  On

January 29, 2024, the Oregonian filed its Motion to Vacate the order.  Dkt. No. 414.  On January

30, 2024, this Court granted the Motion to Vacate and vacated its order, but ordered the status

quo remain in effect until the issues set forth in the motion were resolved.  Dkt. No. 417.  The

Magistrate then directed the parties to respond to the arguments made in the Motion to Vacate.

Dkt. No. 418.  The Oregonian published "unbiased" articles decrying the Court's order as

unconstitutional, unsurprisingly written by the very reporter that knew he should not be in

possession of the documents at issue but took them anyway and refuses to return the same.[4]

---

[4] *See, e.g.,* Matthew Kish, *The Oregonian/OregonLive wins decision overturning order in Nike documents ease - oregonlivecom,* THE OREGONIAN, Jan. 30, 2024, https://www.oregonlive.com/business/2024/01/federal-judge-orders-review-of-ruling-in-dispute-over-nike-documents-after-the-oregonianoregonlive-appeals.html.

## III.    ARGUMENT

### A.    The Court Should Re-Instate The Magistrate's Order Because the Oregonian Is Subject To This Court's And The Ninth Circuit's Orders

The Oregonian approached this Court dressed *as a litigant*.  It sought and was granted the right to intervene to contest the Protective Order.  It invoked the authority of the Court and made itself subject to that same authority.  Indeed, it *is a party to the appeal* about these very documents.  The Oregonian's position that its powers of the press trump any obligation it may assume as a litigant is wrong.  The press does not get to pick and choose what Court rules it follows.  "[W]hen a member of the press is a litigant, he has no right to demand that the court processes triggered by his conduct will be made available to him for journalistic endeavors irrespective of the legitimate privacy interests of his adversary."  *Ramsey v. NYP Holdings, Inc.,* No. 00 Civ.3478(VM)(MHD), 2002 WL 1402055, at *13, n.11 (S.D.N.Y. June 27, 2002). Despite the Oregonian's protestations otherwise, there is no "coffee meeting" exemption to protective orders, when two litigants exchange documents (in violation of court orders).

Having, instead, made itself subject to the Court's jurisdiction, the Oregonian is subject to the Court's orders.  And, "[t]he Court has inherent authority to enforce [those] orders[,]" *Wachner v. Aramark Educ. Servs., Inc.*, No. CV 02-528-BR, 2003 WL 23538037, at *3 (D. Or. Dec. 12, 2003), a power that "carries with it the equal power to punish for a disobedience[.]" *In re Zyprexa Injunction,* 474 F. Supp. 2d 385, 417-18 (E.D.N.Y. 2007) (citation omitted).  As a litigant before the Court, the Oregonian knew (and was told) the documents it received were documents *it was not supposed to have under the Court's orders.*

The Oregonian argues that the Protective Order does not apply.  Dkt. No. 414 at 5.  Not so.  By intervening in this action, the Oregonian bound itself to this Court's orders and authority. As an intervenor, the Oregonian "join[ed the litigation] subject to the proceedings that have

occurred prior to his intervention[.]"  Wright & Miller, *7C Fed. Prac. & Proc. Civ.* § 1920 (3d ed.).  "[O]ne who intervenes in a suit in equity thereby becomes a party to the suit, *and is bound by all prior orders* and adjudications of fact and law as though he had been a party from the commencement of the suit."  *Galbreath v. Metropolitan Trust Co. of Cal*., 134 F.2d 569, 570 (10th Cir.1943) (emphasis added); *see also Widjaja v. YUM! Brands, Inc*., No. CV-F-09-1074 OWW/DLB, 2009 WL 3462040, at *3, 8 (E.D. Cal. Oct. 22, 2009) (intervenors, which intervened for the "limited purpose of striking the class action allegations or for stay of overlapping claims" were "treated as if the intervenor[s] were an original party and has equal standing with the original parties").  This is hardly new law.  "It is a general principle that intervening defendants enter the case as they find it, *bound by all orders and proceedings* prior to the date of intervention."  *Chavis v. Whitcomb*, 305 F. Supp. 1359, 1363 (S.D. Ind. 1969) (emphasis added).[5]

Pursuant to the Protective Order, the Oregonian was prohibited (1) from seeing the documents in the first place, Dkt. No. 82 ¶¶ 7-8, and (2) using the Alleged Complaints for a commercial or business purpose.  Dkt. No. 82 ¶ 2.  This is exactly what the Oregonian intends to do.  *See* Dkt. No. 414.  A clawback order is, thus, necessary and within this Court's inherent authority.  Dkt. No. 82 ¶ 17; *United States v. United Fruit Co.,* 410 F.2d 553, 554 (5th Cir. 1969) (trial court "did not abuse its discretion in enforcing [a protective] order").

Here, the Plaintiffs and the Oregonian are doubly bound.  As a party to the appeal, the Ninth Circuit's Stay Order undoubtedly binds the Oregonian.  Tellingly, the Oregonian does not

---

[5] The Oregonian's invocation of *Robert Ito Farm, Inc. v. Cnty. of Maui*, 842 F.3d 681, 687 (9th Cir. 2016) misses the mark.  That case is about the power of Magistrate Judges and *prospective* intervenors.  Here, by contrast, The Oregonian *has* intervened.  Dkt. No. 205.  And, *Maui* says nothing by way of displacing the settled law that says an intervenor is bound by prior orders.

address its obligations under the Stay Order, only mentioning in a footnote that the Alleged

Complaints "include at least some of the sealed documents subject to the [Stay Order.]" Dkt.

No. 414 at 2. ***But in the same order that confirmed the Oregonian was a party to the appeal,***

***the Ninth Circuit entered an order staying production of the Alleged Complaints pending***

***appeal.*** Dkt. No. 408. The Oregonian ignores all of that, wrongly suggesting that this Court and

the Ninth Circuit are powerless to remedy a breach of their orders.

Indeed, the Court's power extends even beyond litigants, including the authority to issue

orders barring dissemination and require return of confidential documents from parties who

improperly obtained the materials from a party to the litigation—*i.e.*, "third parties who aid and

abet the violation of their protective orders." *Eli Lilly*, 617 F.3d at 195.

*Eli Lilly* is instructive. There, the plaintiff's expert witness received documents pursuant

to a protective order from Eli Lilly. *Eli Lilly*, 617 F.3d at 189. The expert hoped to distribute

them to the media. *Id.* Not wanting to violate the protective order overtly, the expert instead

conspired with third parties to construct a "lawful" and "independent" means of publicizing the

documents. *Id.* at 193. The expert reached out to a reporter, who put him in touch with an

attorney, who, in turn, intervened in an unrelated case and subpoenaed the expert to produce the

confidential documents. *Id.* at 189. The Court held that an order to return the documents was a

"perfectly appropriate device to foreclose further dissemination of the confidential documents

produced under the protective order." *Id.* at 196. The Second Circuit reasoned:

> If courts cannot bind third parties who aid and abet the violation of their protective
> orders, then any party, agent, attorney or expert who comes into possession of
> material he wanted to use against the producing party could simply disseminate the
> information quickly, then deal with the damages issue after the fact. We understand
> the threat of a sizable damages award may deter this action in some cases, but [the]
> proposed rule would eviscerate [the] courts' ability to manage discovery and,
> hence, litigation.

*Id.* at 195.

So too here.  While much is still unknown and must be discovered, the little information that is known confirms a breach and suggests impropriety.  At minimum, both Plaintiffs' counsel and the Oregonian knew the Alleged Complaints were ***not*** supposed to be distributed to the Oregonian pending the Ninth Circuit appeal.  Dkt. No. 411 ¶ 13; Dkt. No. 407.  Yet, those Alleged Complaints were shared in person via two *different* devices (an iPhone and an iPad), which suggests that there was conscious and *active* searching for and sharing of the information (in violation of Court orders).  Dkt. No. 411-2; Dkt. No. 416 ¶ 3.  It was shared the same day, and importantly, *after* the Ninth Circuit said it could not be, and Ms. Salerno Owens was aware of such fact because she receives this Court's ECF notifications.  Dkt. No. 407; Dkt. No. 408; Dkt. No. 411 ¶ 2.  Add to that the following:

- Ms. Salerno Owens is at the forefront of the publicity surrounding this litigation and appears to have a working relationship with the Oregonian and Mr. Kish;[6]

- Ms. Salerno Owens apparently asked her team *prior to meeting Mr. Kish* to compile the PDF that she would later send to Mr. Kish (*see* Dkt. No. 411 ¶ 4);

---

[6] *See, e.g.*, Matthew Kish, *Nike executives subjects of sex discrimination, harassment complaints, plaintiffs claim*, THE OREGONIAN, Nov. 14, 2023, https://www.oregonlive.com/business/2023/11/nike-executives-subjects-of-sex-discrimination-harassment-complaints-plaintiffs-claim.html (last visited February 6, 2024); Jeff Manning, *Unsealed Nike documents reveal widespread complaints of harassment, pay disparities,* THE OREGONIAN, Jan. 18, 2023, https://www.oregonlive.com/business/2023/01/unsealed-nike-documents-reveal-widespread-complaints-of-harassment-pay-disparities.html (last visited on February 6, 2024); Jeff Manning, *Class-action lawsuit on Nike: 'where women are devalued and demeaned'*, THE OREGONIAN, Aug. 10, 2018, https://www.oregonlive.com/business/2018/08/class-action_lawsuit_on_nike_w.html (last visited February 6, 2024); Matthew Kish, *Nike says it has made changes to improve its work culture. But employees are still making new discrimination complaints amid an ongoing lawsuit, lawyer says*, BUSINESS INSIDER, Sept. 21, 2022, https://www.businessinsider.com/nike-employees-continue-to-make-new-discrimination-claims-lawyer-says-2022-9; Matthew Kish, *Deposition shakes up Nike pay discrimination lawsuit; Nike wants it barred*, BUSINESS INSIDER, Oct. 5, 2023, https://www.oregonlive.com/business/2023/10/deposition-shakes-up-nike-pay-discrimination-lawsuit-nike-wants-it-barred.html  (last visited February 6, 2024).

- The PDF contained significantly more pages than what is available publicly, but purportedly did not sound alarm bells (*compare* Dkt. No. 411 ¶ 9 *with* Dkt. No. 284-6 (Ex. 50), 285-1 (Ex. 52), 290 (Ex. 9)); and

- Both Plaintiffs' counsel and the Oregonian then kept the news of their breach from NIKE and *two different* Courts (this one and the Ninth Circuit) for *six* days.

Whether there was an *intentional* violation of court orders *may* not be clear (yet), but what is clear is that the Oregonian knew that obtaining the Alleged Complaints constituted a breach of Court orders. In the face of that breach, this Court may issue equitable orders against the breaching party and all "other persons who may be in active concert or participating with [them]." *See Redapt Inc. v. Parker,* No. 2:20-cv-00862-JRC, 2020 WL 3128859, at \*1, 6 (W.D. Wash. June 11, 2020) (granting an order barring the use of stolen confidential information "binding on any such person who has or may have access to the information, devices, or materials that are the subject of this order and who received actual notice of this Order").

### B.    The Court's Order Does Not Violate The First Amendment

The First Amendment does not stand as a bar to the Court remedying breaches of its orders. The Oregonian invokes the First Amendment in its refusal to return the Alleged Complaints. But this resistance is grounded in a fundamental misinterpretation of the law and a *mischaracterization* of its acquisition of the Alleged Complaints.

"While the news media are entitled to receive, investigate and report on all *public* proceedings involved in a trial, the right to gather news, much like other first amendment rights, is not absolute." *United States v. Brown,* 250 F.3d 907, 914-15 (5th Cir. 2001) (emphasis in original). The First Amendment does not "guarantee journalists access to sources of information not available to the public generally." *Id.* at 914 (citation omitted). This Court may refuse to

allow the press to inspect non-public documents, including individuals' identities; "such orders are distinct from prior restraints." *Id.* Thus, the Oregonian's argument that there must be a showing that the clawback serves a governmental interest of a "highest order" is incorrect. Dkt. No. 414 at 6. Courts have considerable discretion to constrain litigants from disseminating information obtained through litigation and apply "relaxed First Amendment scrutiny" when determining whether restrictions intrude upon free speech. *Ground Zero Ctr.*, 860 F.3d at 1258. Consistent with these principles, this Court has authority to remedy the Oregonian's misconduct.

The Oregonian's invocation of *Seattle Times Co. v. Rinehart*, 467 U.S. 20 (1984) is unfounded. While the *Seattle Times* Court addressed whether a litigant could seek a protective order that prohibited the petitioner from disseminating information gathered through discovery, the focus of its analysis was on this latter part—*i.e.*, whether the information was obtained through court processes. The Court held that a party "may disseminate the identical information covered by the protective order as long as the information *is gained through means independent of the court's processes*." *Id*. at 33-34 (emphasis added).

The Oregonian argues that its acquisition of the Alleged Complaints was lawful and outside of court processes. Dkt. No. 414 at 7. But even in the face of sparse and incomplete evidence, it is apparent that the acquisition was intertwined with this Court's processes. Simply because the Oregonian did not propound the Requests for Production ("RFPs") that resulted in these documents does not then mean that its acquisition was independent. This litigation touched every aspect of the Oregonian's receipt of the documents. NIKE produced the documents to Plaintiffs in response to RFPs and upon a motion to compel. The documents were subject to the Protective Order, and these Alleged Complaints have been the subject of hundreds of pages of briefing in this Court (and the Ninth Circuit). Plaintiffs then gave those documents to the

Oregonian, an intervenor.  To allow the Oregonian to keep and publish confidential records in violation of clear court orders would create a loophole to judicial processes that are enacted to safeguard the integrity of discovery and litigation as a whole.  *Seattle Times*, 467 U.S. at 32.  The Oregonian asks this court to create the "coffee meeting" exception, wherein litigants are free to ignore protective orders under the shield provided by a coffee shop.  This absurd result is not and cannot be the law.[7]  The Ninth Circuit has said so.

In *Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*, 860 F.3d 1244 (9th Cir. 2017), the Ninth Circuit explained that the law *permitted* a District Court from barring the press from using *litigation* documents, so long as it did not bar the press from using "independent sources" to gather the information.  *Id.* at 1257-58.  The Ninth Circuit clarified what this meant:  "By independent source, we mean what the district court implied:  Ground Zero may discuss and distribute the documents in question *so long as it acquires the documents from a source not involved in this litigation*[.]"  *Id.* at 1258 (emphasis added).

The Ninth Circuit, in other words, has already interpreted *Seattle Times* as affording this Court authority to curtail use of litigation documents.  *Id.*  And, courts likewise recognize that as between parties involved in litigation, solicitation and discovery are effectively the same thing:  "Where [a party] has solicited information from other parties who are subject to protective orders, we believe that [party's] solicitation is part of this case's pretrial discovery" and thus can be prohibited under a protective order.  *Culinary Foods v. Raychem Corp.*, 151 F.R.D. 297, 302-03 (N.D. Ill. 1993).[8]

_____

[7] Even Plaintiffs' counsel agrees that the Oregonian's acquisition of these materials was through this litigation. Dkt. No. 421 ("Stated another way, absent normal discovery process, the Oregonian would have never obtained these documents[.]").

[8] The other authority the Oregonian cites is inapposite because, there, the press received information outside of litigation and unconnected to a protective order.  In *Cohen v. Cowles*

The limits on the "independent source" rule make sense. Parties to litigation are generally subject to protective orders, which as the *Seattle Times* court explained, are crucial—and therefore, must be enforced—because of the liberality of pretrial discovery permitted by Rule 26(b)(1) and the corresponding potential for abuse. What the Oregonian received here are not only publicly-filed documents sealed by the Stay Order, but also ***documents that have never been filed—period***. The Oregonian does not have the right to (nor would it have had access to) this information (or even known of its existence) had NIKE not produced it to Plaintiffs, who in turn gave it to Mr. Kish. *See e.g.*, *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 782 (3d Cir. 1994) ("[W]hen a court enters an order of protection over documents exchanged during discovery, and these documents have not been filed with the court, such documents are not, by reason of the protective order alone, deemed judicial records to which the right of access attaches."). Receipt of discovery materials from a party subject to a protective order certainly does not fall within the category of "traditionally public source[s]" safeguarded from enforcement orders. *Seattle Times*, 467 U.S. at 33-35.

---

*Media Co.*, 501 U.S. 663 (1991), Cowles Media, received information from Cohen prior to, and completely disconnected from, any litigation. *Id.* at 663. In *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979), the newspaper defendants were sued for publishing the name of a minor, which they acquired through independent means unrelated to any litigation. *Id.* at 103; *The Fla. Star v. BJF*, 491 U.S. 524, 524 (1989) (newspaper was sued for publishing the name of a rape victim, which it obtained after entering into the police's pressroom); *see also Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931) (the newspaper challenged a pre-existing law that prohibited them from printing its newspaper based on claims that it was malicious, lewd, and defamatory); *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (government sought injunction against the newspaper for publication of the contents of a classified study obtained independently from litigation); *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 415 (1971) (an organization sought review of an injunction to stop distribution of pamphlets, unconnected to any litigation); *CBS v. Davis*, 510 U.S. 1315, 1315 (1994) (broadcaster and news program sought review of a preliminary injunction prohibiting them from broadcasting footage obtained via undercover footage, not from a party to a litigation). Those cases are not this one. The Oregonian has invoked litigation tools and now seeks to ignore litigation rules.

This is why a clawback order would not violate First Amendment rights.  It invokes the Court's inherent authority to enforce orders and remedy unlawful acquisition of documents; it does **not** limit a type of speech.  *In re Zyprexa Injunction,* 474 F. Supp. 2d at 423 (enjoining individuals who had received documents covered in violation of a protective order from further dissemination of the documents); *Council on Am.-Islamic Rels. Action Network, Inc. v. Gaubatz,* 793 F. Supp. 2d 311, 330 (D.D.C. 2011) ("[T]he protections afforded by the First Amendment, far reaching as they may be, do not place the unlawful acquisition of information beyond the reach of judicial review.").  Nothing in the order would prevent the Oregonian from publishing a certain topic or expressing an opinion.  Rather, it would only seek to unravel a potentially damaging violation of important court protections.[9]  *Id.*

## C.    The Non-Party Individuals Would Suffer Irreparable Harm Should the Oregonian Not Be Ordered To Return the Alleged Complaints

As the Oregonian has made clear, it has no intention of complying with the Protective Order or the Stay Order.  It will immediately publicize not only the individuals protected by the stay—which the Ninth Circuit has already confirmed will suffer irreparable harm, Dkt. No. 408—but also contents of the Alleged Complaints that have never been filed in this action because they are irrelevant.  Publication of this information will impact the privacy interests and livelihood of non-parties with no connection to the remaining Plaintiffs' claims.  *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, No. 2672 CRB (JSC),

---

[9] For this reason, the Oregonian's reliance on *State ex rel. Sports Mgmt. News v. Nachtigal,* 324 Or. 80, 90 (1996) is misplaced.  There, the court was tasked with determining whether an Oregon statute, which required court approval to disclose an alleged trade secret, violated the Oregon Constitution. *Id.*  Because the statute focused on the content of the speech, the statute would be invalid on its face unless it fit into "some historical exception."  *Id.* at 89.  There was no indication that the acquisition of the trade secret information was unlawful because the source of the leak was unknown.  *Id.*; Dkt. No. 414 at 9.  Here, of course, an order to return documents is not focused on the content of any publication, and the source of the leak is not unknown.

2017 U.S. Dist. LEXIS 171321 (N.D. Cal. Oct. 14, 2017) ("disclosure of the non-party employees' names . . . would infringe on those individuals' privacy rights").  Once the information is published, the damage will be done, and the non-parties will have no recourse.

Even more fundamentally, publication may moot NIKE's appeal and deprive it of its opportunity to seek review of this important issue.  Whether purposeful or not, the Oregonian's conduct in concert with Plaintiffs' counsel has threatened NIKE's legal rights and undermines the efficacy of court orders.  Allowing the Oregonian to profit from documents to which it should not have had access pursuant to Court orders, under the guise of First Amendment concerns, would serve to reward them for their unlawful acquisition.  This is not what the First Amendment protects.  Holding otherwise sets a dangerous precedent.

On the other hand, the harm imposed on the Oregonian if it was ordered to return the documents would be minimal, at best.  The Oregonian was supposed to be barred from obtaining these documents in the first place.  It has no property rights in the Alleged Complaints, and it would suffer no injury to its constitutional rights.  *See supra* Section III.B.  Nor is the Oregonian's impatience in waiting for the outcome on appeal a harm that warrants disregarding the judicial process (particularly where, as here, the Media Intervenors—including the Oregonian—filed their initial motion relating to unsealing in April 2022).  "One may sympathize with the petitioners' impatient commitment to their cause.  But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom."  *Walker v. City of Birmingham,* 388 U.S. 307, 321 (1967).  If the Oregonian can convince the Ninth Circuit that it has a right to access the unredacted documents, it will have lawful access in due course.  And if the Oregonian is not ultimately entitled to these documents (which NIKE believes will be established on appeal), the Oregonian will suffer no

harm.  In fact, returning the documents is the only way to ensure that *no one* is harmed.[10]

**D.      The Court Should Issue An Order To Show Cause**

Plaintiffs' counsel has admitted that there has been a breach.  Yet, the circumstances surrounding that breach between lawyer and reporter are not fully known and Plaintiffs and the Oregonian have been coy regarding the real story.  (*E.g.*, Why were they meeting that day?  How many times had they met before?  Why was the lawyer volunteering information from her files?  Why was the PDF prepared ***prior*** to the meeting?  Why was information sent on two different devices?  What did they specifically talk about?  Who else has the reporter shared the protected information with?)  These are questions that NIKE ***and the Court*** have every reason to ask in the face of the admitted breach.  If the Court is any way inclined to consider allowing this breach to benefit the Oregonian, NIKE asks that this Court allow it limited discovery before it does so.  NIKE has served discovery and believes that the process should be completed within 45 days (including depositions).  Once completed, NIKE can supplement its briefing in this Court.

To be clear, the Court has every ability to order the clawback now, as argued above.  And what's more, the breach needs to be redressed.  NIKE suggests that an OSC issue as to both Plaintiffs' counsel (Ms. Salerno Owens and her firm) and the Oregonian explaining why some form of sanction should not issue.

**IV.      CONCLUSION**

For the foregoing reasons, NIKE respectfully requests that this Court reinstate the Order to Return Documents and require the Oregonian to (1) return the documents immediately; (2) agree not to disseminate or publish that information in any way; and (3) destroy any copies or derivatives in its possession.  NIKE also asks that an OSC issue as discussed above.

---

[10] NIKE does not address the Oregonian's due process argument or its request for a stay, as those issues are now moot given its Motion to Vacate and the corresponding Court order.

Date:  February 6, 2024                    /S/ Daniel Prince

                                    DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
                                    danielprince@paulhastings.com
                                    FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
                                    feliciadavis@paulhastings.com
                                    PAUL HASTINGS LLP
                                    515 South Flower Street, 25th Floor
                                    Los Angeles, CA 90071
                                    Telephone:  (213) 683-6000
                                    Facsimile:  (213) 627-0705

                                    JOHN A. BERG, OSB# 120018
                                    jberg@littler.com
                                    PAUL E. CIRNER, OSB# 191471
                                    pcirner@littler.com
                                    LITTLER MENDELSON P.C.
                                    1300 SW Fifth Avenue
                                    Wells Fargo Tower, Suite 2050
                                    Portland, OR 97201
                                    Telephone:  (503) 221-0309
                                    Facsimile:  (503) 242-2457

                                    Attorneys for Defendant NIKE, INC.