**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Attorneys for Plaintiffs

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>                                        Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>                                        Defendant. | Case No. 3:18-cv-01477-AB<br><br>**[PROPOSED] PRETRIAL ORDER** |

**[PROPOSED] PRETRIAL ORDER**

The following Pretrial Order is filed with the Court pursuant to L.R. 16-5.

## I.    CONCISE STATEMENT OF THE NATURE OF THE ACTION

In this employment discrimination action, Plaintiffs Kelly Cahill, Sara Johnston, Heather Hender, and Lindsay Elizabeth allege sex discrimination claims against NIKE. Plaintiff Hender also brings a retaliation claim.

**First**, Plaintiffs bring disparate impact claims. All Plaintiffs bring this claim under the Oregon Equality Act, ORS 659A.030, and Johnston, Elizabeth, and Hender also bring this claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. Plaintiffs' allegations are that NIKE used each of the following two practices and each had a disproportionately adverse impact on women at NIKE World Headquarters: (1) NIKE's use of prior pay when setting starting salaries prior to October 2017; and (2) NIKE's use of its annual bonus formula for calculating annual bonuses. These disparate impact claims are tried to the Court.

**Second**, Johnston, Hender, and Elizabeth bring disparate treatment claims. All Plaintiffs bring a disparate treatment claim under the Oregon Equality Act, and Johnston, Elizabeth, and Hender also bring this claim under Title VII. Cahill, Elizabeth, and Hender allege that NIKE underpaid them because of sex. Cahill, Johnston, and Hender allege that NIKE failed to promote them because of sex. These claims are tried to a jury.

**Third**, Cahill, Elizabeth and Hender allege that, in violation of the Federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and the Oregon Equal Pay Act, ORS 652.220, NIKE paid them less than the average compensation of men in substantially equal or comparable jobs. NIKE alleges the disparity is the result of job-related factors other than sex. These claims are tried to a jury.

**Fourth**, Hender brings retaliation claims under Title VII and the Oregon Equality Act.

Hender alleges NIKE retaliated against her because she filed an administrative charge against NIKE and she joined this lawsuit. These claims are tried to a jury.

The Parties do not consent to trial by a magistrate judge.

## II.    BASES FOR FEDERAL JURISDICTION

The Parties agree that this Court has subject matter jurisdiction over the federal statutory claims under Title VII and the Federal Equal Pay Act. *See* 28 U.S.C. §§ 1331 and 1343. The Parties also agree that this Court has supplemental jurisdiction over the Oregon Equality Act and Oregon Equal Pay Act claims because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

## III.    AGREED FACTS (WITH AN ASTERISK (*) BY THOSE WHERE RELEVANCE IS DISPUTED).

### A.    The Parties

#### 1.    Hender

1.    NIKE employed Heather Hender at NIKE World Headquarters from April 6, 2015 through October 12, 2020.

2.    The name of Hender's first job was Professional Intermediate: Manufacturing Engineering. The job code was A0945. This job was in the L-Band. It was in the Intermediate Professional Job Level. It was in the Manufacturing Engineering Job Subfamily. Hender was in this job from April 6, 2015 through September 5, 2018.

3.    The name of Hender's second job was Professional Senior: Quality Assurance. The Job Code was A1013. This job was in the U-Band. It was in the Senior Professional Job Level. It was in the Quality Assurance Job Subfamily. Hender was in this job from September 5, 2018 through February 16, 2019.

4.    The name of Hender's third job was Professional Senior: Manufacturing. The Job Code was A0946. This job was in the U-Band. It was in the Senior Professional Job Level. It was in the Manufacturing Engineering Job Subfamily. Hender was in this job from February 17, 2019 through October 12, 2020.

5.    Hender resigned her employment with NIKE effective October 12, 2020.

6. Hender filed an EEOC Charge on November 9, 2018, a revised EEOC Charge on April 14, 2020, and received a Right to Sue Letter prior to joining this case.

7. Hender filed a Consent to Become Party Plaintiff in Collective Action under 29 U.S.C. § 216(b) on November 19, 2018.

### 2. **Johnston**

8. NIKE employed Sara Johnston at NIKE World Headquarters from February 21, 2010 through October 26, 2017.

9. The name of Johnston's first job was Support Senior: Customer Service. The job code was A0815. This job was in the A-Band. It was in the Senior Support Job Level. It was in the Customer Service Job Subfamily. Johnston was in this job from February 21, 2010 through August 13, 2012.

10. The name of Johnston's second job was Professional Entry: Applications Engineering. The Job Code was A0665. This job was in the L-Band. It was in the Entry Professional Job Level. It was in the Applications Engineering Job Subfamily. Johnston was in this job from August 13, 2012 through July 29, 2014.

11. The name of Johnston's third job was Professional Intermediate: Business Systems Analysis. The Job Code was A0692. This job was in the L-Band. It was in the Intermediate Professional Job Level. It was in the Business Systems Analysis Subfamily. Johnston was in this job from July 29, 2014 through October 26, 2017.

12. Johnston resigned her employment with NIKE effective October 26, 2017.

13. Johnston filed an EEOC Charge on August 7, 2018 and received a Right to Sue letter prior to joining this case.

14. Johnston filed a Consent to Become Party Plaintiff in Collective Action under 29 U.S.C. § 216(b) on August 9, 2018.

### 3. **Cahill**

15. From October 2012 to October 2013, Kelly Cahill worked at NIKE World Headquarters in a position that NIKE classified as an independent contractor.

16. NIKE employed Kelly Cahill at NIKE World Headquarters from October 21, 2013 through July 25, 2017.

17. The name of Cahill's first job as a NIKE employee was Director: Product Presentation. The job code was A1591. This job was in the E-Band. It was in the Director Job Level. It was in the Product Presentation Job Subfamily. Cahill was in this job from October 21, 2013 through December 1, 2014.

18. The name of Cahill's second job was Director: Brand/Category Marketing. The Job Code was A1046. This job was in the E-Band. It was in the Director Job Level. It was in

the Brand/Category Marketing Job Subfamily.  Cahill was in this job from December 1, 2014 through July 25, 2017.

19.     Cahill resigned her employment with NIKE effective July 25, 2017.

20.     Cahill filed a charge with BOLI on July 25, 2018, and received a Notice of Right to File Suit prior to joining this case.

21.     Cahill filed a Consent to Become Party Plaintiff in Collective Action under 29 U.S.C. § 216(b) on August 9, 2018.

### 4.   **Elizabeth**

22.     From March 2015 to January 2017, Lindsay Elizabeth (formerly Lindsay Gates) worked at NIKE World Headquarters in a position that NIKE classified as an independent contractor.

23.     NIKE employed Lindsay Elizabeth at NIKE World Headquarters from January 17, 2017 through October 5, 2018.

24.     The name of Elizabeth's job as a NIKE employee was Professional Intermediate: Product Design - Apparel.  The job code was A0246.  This job was in the L-Band.  It was in the Intermediate Professional Job Level.  It was in the Product Design Job Subfamily.  Elizabeth was in this job from January 17, 2017 through October 5, 2018.

25.      Elizabeth resigned her employment with NIKE effective October 5, 2018.

26.     Elizabeth filed an EEOC Charge on August 23, 2018, and received a Right to Sue letter prior to joining this case.

27.     Elizabeth filed a Consent to Become Party Plaintiff in Collective Action under 29 U.S.C. § 216(b) on August 24, 2018.

### 5.   **NIKE**

28.     NIKE is a corporation formed under the laws of Oregon.

29.     NIKE World Headquarters is located near Beaverton, Oregon.

30.     NIKE's principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories and services.

31.     "ETW" is a commonly-used acronym at NIKE WHQ that refers to external temporary workers.

**B.**     Pay Structure and Employee Evaluations

32.     NIKE's fiscal year is from June 1 to May 31.  For example, the fiscal year ending on May 31, 2018 is referred to as Fiscal Year 2018.*

33.     Since at least 2015 through at least 2020, NIKE referred to its performance management process as Coaching For Excellence ("CFE"), which awarded employees one of five ratings based on manager discretion.

34.     Promotions at NIKE could occur through a competitive process or a non-competitive process.

35.     Competitive promotions are promotions that occurred after a job posting, which could be applied to.  Noncompetitive promotions occurred without a job posting.

**C.**     Plaintiffs' Evaluations, Pay, and Promotions

**1.**     Cahill

36.     On October 21, 2013, Cahill was hired as a full-time NIKE employee with a starting salary of $110,000.

37.     Cahill received "Highly Successful" CFE ratings in fiscal years 2014,* 2015, and 2017.  She received a "Successful" CFE rating in fiscal year 2016.

**2.**     Johnston

38.     In February 2010, Johnston was hired as a full-time NIKE employee with an annualized starting salary of $33,000.

39.     Johnston was promoted to the Intermediate level in or around July 2014.*

40.     Johnston never received a promotion to a Senior Level Business Systems Analyst or the Product Owner role.  Johnston resigned from NIKE thereafter.

41.     Johnston received "Successful" CFE ratings in fiscal years 2009*, 2010*, 2011*, 2012*, 2015, and 2016.  She received a "Highly Successful" CFE rating in fiscal years 2013* and 2014*.

**3.**     Elizabeth

42.     In January 2017, when NIKE hired Elizabeth as a full-time employee, NIKE offered her a starting salary of $67,000.

43.     Elizabeth received "Successful" CFE ratings both years she was employed by NIKE.

4.     **Hender**

44.     When NIKE hired Hender as an employee in April 2015, it offered her a starting salary of $78,600.

45.     Hender applied for a position in job code A0946 in October 2016, which she did not receive.

46.     Hender was promoted to a U-band level role on September 2, 2018.

47.     Hender received a "Highly Successful" rating in fiscal year 2018, and she received "Successful" ratings every other year.

D.     **Statutes of Limitations for Hender's Retaliation Claims**

48.     The Parties agree the statute of limitations for the Plaintiffs' claims are as follows:

a.     Retaliation claim under Title VII, the damages period begins on June 19, 2019.

b.     Retaliation claim under the Oregon Equality Act, the damages period begins on April 14, 2019.

## IV.     CLAIMS AND DEFENSES

### CLAIM ONE
**(Disparate Impact Violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Oregon Equality Act ORS 659A.030)**

A.     **Plaintiffs contend**

1.     Plaintiffs' prima facie disparate impact burden is met if they show NIKE used a facially neutral employment practice that had a significantly discriminatory impact upon women. Once they do so, NIKE is liable unless it can establish its affirmative defense, which requires NIKE "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."

2.     Plaintiffs assert NIKE used the following two practices that each had an adverse impact on the compensation of women at NIKE World Headquarters: (1) NIKE's use of prior pay when setting starting salaries prior to October 2017; and (2) NIKE's use of its standardized Performance Sharing Plan formula for calculating annual bonuses.

3.      NIKE's practice of using prior pay when setting starting salaries prior to October 2017 for salaried positions at NIKE World Headquarters below the level of Vice President had a significantly disparate impact on women.

4.      NIKE admitted that it "often focused on the new hires prior salary and/or the size of the increase the new hire would receive." NIKE admitted that it sought to "remove bias from critical moments of the hiring process" by "eliminating the collection of candidate salary history." NIKE stated that its elimination of the use of prior pay in October 2017 was a "policy change." NIKE admitted that candidates' prior pay was "requisite information" for setting starting salaries before October 2017. NIKE created a standard form to collect this and other "requisite information" to streamline its processes and store information in a more organized way.

5.      The statistical analyses using multiple regression show NIKE paid similarly situated men more than women, and, after NIKE stopped using prior pay, the starting pay disparity for women dropped by more than 50%. These regressions use the data that NIKE made available, and they control for potentially non-discriminatory factors. NIKE also failed to maintain, preserve, or deleted most records showing its practice of using prior pay when setting starting salary.

6.      NIKE had one business unit, which was part of Human Resources, that was responsible for pay practices, including for starting pay, throughout NIKE World Headquarters. This business unit was called Total Rewards or Compensation. NIKE also had one business unit in Human Resources that was involved in every hire throughout NIKE World Headquarters. This business unit was called Talent Acquisition. Both business units reported to the head of

NIKE Human Resources, David Ayre, until July 2017, and then to Monique Matheson until January 2025.

7.      NIKE's practice of using prior pay when setting starting pay had a disparate impact on the starting salary of women.  It also had a disparate impact on the annual bonuses of women since one of the factors in NIKE's standardized Performance Sharing Plan ("PSP") formula was current salary.

8.      NIKE's practice of using the same formula for calculating PSP annual through at least 2022 had a significantly disparate impact on women.  From 2015 through 2022, NIKE used the exact same formula, which consisted of six factors, to calculate the annual bonus for every employee at NIKE World Headquarters in salaried positions below the level of Vice President.  These factors included the amount of salary NIKE paid the employees in the fiscal year and which Band their job was in. The higher an employee's salary or the higher their Band, the higher the PSP annual bonus.  From Fiscal Year 2019 through at least Fiscal Year 2022, the value of every factor in this formula was automatically and centrally-determined in the same way, and no employees could modify the value of any factor or the formula.  Before Fiscal Year 2019, only one of the six factors in this formula was not automatically and centrally set, the "performance modifier;" the basis for setting the performance modifier percentage was performance ratings (i.e., CFE ratings), and women received as high or higher performance ratings than men.

9.      NIKE cannot meet its affirmative defense with respect to either of the two challenged practices.  NIKE did not do a validation study, impact study, job analysis, or other work in compliance with the EEOC Uniform Guidelines.  It also cannot show its practice of using prior pay when setting starting salary is job-related or consistent with business necessity

because, in this litigation, NIKE refuses to acknowledge it had this practice, which, in turn, precludes an argument that its practice meets disparate impact's affirmative defense.  NIKE admitted that these were problematic pay practices.  NIKE was unable to and did not produce evidence that could meet its burden of proving its affirmative defense.

10.    There is a presumption that each Plaintiff is entitled to back pay once Plaintiffs prove their prima facie case and NIKE fails to meet its burden of proving its affirmative defense.

11.    NIKE used each Plaintiff's prior pay when setting their starting salaries.  In addition to the above evidence showing NIKE's practice, NIKE collected pre-NIKE compensation for each Plaintiff.  Each Plaintiff was hired prior to October 2017.  NIKE was unable to and did not produce evidence showing all factors used for setting each Plaintiff's and similarly situated men's starting salaries.

12.    Even if such systems or policies could be justified by business necessity, less discriminatory alternatives exist that are consistent with business necessity. For example, NIKE stopped using prior pay after October 2017.

13.    Plaintiffs are thus entitled to back pay, interest, attorneys' fees and costs, and injunctive relief.

## B.    <u>NIKE contends</u>

1.    NIKE denies Plaintiffs' contentions except to the extent agreed in the Agreed Facts section.  NIKE also objects to Plaintiffs' contentions to the extent they "recite the evidence to be offered at trial."  Local Rule 16-5(b)(4).

2.    NIKE contends that each of the Plaintiffs were paid equitably for the work they performed, considering their performance, experience, expertise, education, training, and other legitimate factors.

3.      NIKE further contends that NIKE did not have a policy or practice of using prior pay to set starting salary for its employees prior to October 2017.  Starting salary decisions at NIKE are made by thousands of different individual hiring managers based on a variety of factors that vary depending on the role, the candidate, and the manager.  For starting salaries, managers could consider, in their discretion, factors like the external market and internal equity, the applicant's relevant work experience, education and skills, and the business's financial conditions when setting an employee's starting pay.  NIKE did not instruct managers to ask about or use prior salaries when setting starting pay.

4.      In 2017, Oregon passed a law that prohibited employers from inquiring into prior salaries when setting starting salaries.  In accordance with that law, NIKE enacted a policy that prohibited its employees and hiring managers from asking about candidate's prior salary or salary history during the interview process.  But even before this policy was enacted, NIKE never required candidates to provide prior salary during the hiring process.  Nor were candidates asked about prior salary in every instance or as a matter of policy or practice.

5.      Plaintiffs' expert's statistical analysis demonstrates that there is no consistent pattern of women being paid less than men at hire.  Indeed, in some years, women received slightly more in starting pay and in other years, slightly less.  There was no statistically significant difference in pay between men and women.  Plaintiffs' expert's analyses are so flawed that they are not reliable to establish that NIKE paid women less than men.

6.      Any pay differential that may exist is explained by permissible factors other than sex.

7.      Nor can Plaintiffs prove that NIKE's annual bonuses had a disparate impact on women.  NIKE's annual bonuses are called the Performance Sharing Plan ("PSP") awards.

916628.2

**[PROPOSED] PRETRIAL ORDER**
**PAGE 10**

NIKE's PSP awards were comprised of both "Team" and "Discretionary" components. The "Discretionary" component was determined in part by the individual employee's manager through assignment of a "Performance Modifier." While the "Performance Modifier" involved a percentage of salary range based on the employee's CFE, managers had discretion to choose which percentage within that range, or to even exceed the range, when awarding a PSP to their employees.

8.    Plaintiffs' theory is that because they believe NIKE had a practice of using prior pay, which disparately impacted women, and because a factor in NIKE's PSP awards was the employee's salary, the PSP awards perpetuated the disparate impact on pay. Plaintiffs cannot prove that NIKE had such a practice and even if such practice existed, that it disparately impacted women. Moreover, while employee salary was a factor in the PSP calculation, the performance modifier percentage was based on manager discretion.

9.    Even if Plaintiffs can establish that NIKE had a policy or practice that disparately impacted women, Plaintiffs cannot demonstrate that they are entitled to damages. Plaintiffs cannot prove that they were asked about their prior salaries during the interview process or that, even if asked, those prior salaries were *used* to set starting pay. Plaintiffs cannot rely on a blanket statement that "[e]ach Plaintiff was hired prior to October 2017," because they cannot prove that NIKE always asked about prior pay before October 2017 or that prior pay was used to set starting salary in every instance. Nor is it NIKE's burden to demonstrate the factors used for setting each Plaintiff's starting salaries. Plaintiffs must prove that they were harmed from the practice of using starting pay, which necessarily involves proving that their prior pay was not only asked about, but also used to set their starting salaries, and that their salaries would have

been higher had they not been asked about their prior pay (if indeed they were).  They cannot do so.

10.     Likewise, for the same reason, Plaintiffs cannot demonstrate that they were harmed by NIKE's PSP awards.  To the extent that Plaintiffs received PSP awards lower than their peers, such awards were given pursuant to the discretion of their managers based on their performance and qualifications.

**CLAIM TWO**
**(Disparate Treatment Violations of Title VII of the Civil Rights Act of 1964,**
**42 U.S.C. §§ 2000e *et seq.*, and the Oregon Equality Act ORS 659A.030)**

**C.     Plaintiffs contend:**

1.     Plaintiffs can meet their prima facie disparate treatment burden if they prove that discrimination against women at NIKE World Headquarters was NIKE's regular practice, rather than something unusual.

2.     If Plaintiffs prove discrimination against women was NIKE's regular practice, rather than something unusual, than NIKE must prove that discrimination was not a reason for Plaintiffs' lower pay or NIKE's failure to promote.

3.     Plaintiffs can also meet their prima facie burden if they show that: (1) they were paid less or NIKE failed to promote them because of their sex, (2) Plaintiffs were qualified to be paid more or promoted, and (3) at least one similarly situated man was treated more favorably.

4.     Under either method, Plaintiffs are not required to provide direct evidence of discrimination, because disparate treatment can be, and most often is, inferred from the existence of other facts.

5.     Discrimination against women was NIKE's regular practice, rather than something unusual.  The statistical evidence shows that NIKE paid women less and the chance of this occurring without discrimination is less than one in one billion.  This statistical evidence

uses a multiple regression analysis, a well-established method in discrimination actions, and used

the data NIKE provided. Multiple regression analysis controls for non-discriminatory factors,

thus showing the impact of other variables, such as sex, on compensation.

6.    NIKE had a culture of discrimination against women.  NIKE executives

discriminated against women and condoned discrimination against women.  Those charged with

preventing discrimination, NIKE human resources, instead had a pattern of disregarding

complaints and condoning discrimination against women.

7.    At least seven of the most powerful women at NIKE created what they referred to

as "Starfish."  They created Starfish to try to change NIKE's pattern of discrimination against

women and Human Resources' pattern of disregarding or condoning discrimination against

women.  Based on both the complaints they collected and their own experiences over many years

at NIKE, Melanie Strong, Nicole Hubbard Graham, Jamie Jeffries, and the other women

involved determined that women at NIKE faced, among other common themes: (1) "sexual

harassment and discrimination;" (2) "fear of retaliation;" and (3) "no trust in [Nike HR] if you

report things."  This was listed in a document titled "Project Starfish," and was provided to

Monique Matheson, Nike's Chief Human Relations Officer at the time, and Hilary Krane, Nike's

General Counsel, in around February 2018.

8.    After receiving written complaints, verbal complaints, and other information

resulting from Starfish, NIKE had no choice but to acknowledge its pattern of discrimination.  In

a March 2018 email and May 2018 speech, NIKE's CEO admitted that the "courageous

employees" who led or came forward as part of Starfish had described "behavior" contrary to

NIKE's stated values, that Human Resources "processes underserved [NIKE and its employees]

in recent years," and that NIKE needed "to restore trust in places where it has eroded."  The CEO

confirmed that the "main set of complaints that gave rise to this process have been acted on and employee exits from this larger investigation will be behind us after this week." (ellipses in original omitted).

9.      NIKE acknowledged its pattern of discrimination because the Starfish effort caused NIKE to force its second-highest executive and the heir apparent to the CEO role, Trevor Edwards, to leave NIKE.  The Starfish effort and its results showing a pattern of discrimination at NIKE also forced NIKE to discharge many other executives, including Simon Pestridge, Greg Thompson, Jayme Martin, and Daniel Tawiah.  For example, there were many complaints about Daniel Tawiah's discriminatory treatment of women prior to Starfish. Before Starfish, NIKE had disregarded complaints against Mr. Tawiah, including four complaints from Cahill.  NIKE, instead, promoted Mr. Tawiah even though a Senior Director in Human Resources, Genevieve Long, raised concerns to three executives before his promotion about his discriminatory treatment of women.  Following the release of Starfish, NIKE discharged Mr. Tawiah along with many other executives.  NIKE also recognized it had to do a comprehensive review of its Human Resources systems and practices.  And NIKE was forced to recognize that it had to do pay equity and promotion analyses to identify and remediate discrimination, but NIKE failed to do or complete such analyses.

10.     NIKE's culture of sex discrimination was modeled by those at the highest levels of NIKE, including Trevor Edwards, David Ayre, Jayme Martin, and Monique Matheson.  David Ayre, the head of Human Resources immediately prior to Ms. Matheson, discriminated against or condoned discrimination against women and presided over a Human Resources system that underserved women at NIKE.  After NIKE discharged Mr. Ayre, NIKE replaced him with Ms. Matheson.  Ms. Matheson condoned discrimination.  After Ms. Matheson and NIKE's general

counsel, Hilary Krane, received a report of serious sex discrimination by a then NIKE employee, they chose to not investigate the report for over a year. In January 2025, NIKE replaced Ms. Matheson with Treasure Heinle. NIKE chose to promote Ms. Heinle to the head of Human Resources even though it knew that Ms. Heinle has disregarded complaints of discrimination. Many NIKE executives, including numerous executives involved in Starfish or who otherwise reported complaints as a result of Starfish, admitted, recognized, or described NIKE's pattern of discrimination against women, culture of discrimination against women, and Human Resources' pattern of disregarding, condoning, and otherwise failing to address discrimination.

11.    NIKE knew before Starfish that women were paid less and otherwise discriminated against, but NIKE chose not to address the discrimination. It knew that it needed to do pay equity and promotion analyses to identify and remediate discrimination, but it failed to do so.

12.    NIKE has demonstrated its consciousness of guilt with its numerous attempts to suppress evidence concerning Starfish's creation, implementation, and NIKE's responses to Starfish. NIKE's head of Human Resources, Monique Matheson, provided misleading testimony related to Starfish when she was deposed in 2021. NIKE's Rule 30(b)(6) witness, Allison Daugherty, provided misleading testimony related to Starfish when she was deposed in 2021. NIKE deleted or suppressed evidence, including evidence responsive to discovery requests as well as evidence responsive to Court Orders. NIKE collected and produced clearly responsive discovery in another matter during this litigation in 2019 but withheld it from Plaintiffs here. NIKE intentionally deleted communications and documents related to Starfish, including communications or documents sent or received by those involved in either organizing, leading,

or responding to Starfish, including Jamie Jeffries, Nicole Graham, Melanie Strong, Hannah Jones, Mark Parker, Hilary Krane, and Monique Matheson.

13.    Plaintiffs suffered from NIKE's pattern of discrimination. Each complained of discrimination. In response, NIKE disregarded their complaints, otherwise discouraged reports of discrimination, and failed to address the complained-of discrimination.

14.    Cahill was subjected to demeaning, attacking, degrading, and condescending treatment from Daniel Tawiah, she reported this discrimination to NIKE, but NIKE failed to address the discrimination. Cahill witnessed and was aware of Mr. Tawiah's discriminatory behavior toward other women, including how Mr. Tawiah (1) called female employees dykes; (2) degraded and berated women, making them cry; (3) spoke to women, including Cahill, in a demeaning, attacking, degrading, and condescending manner; and (4) put his crotch in coworker Lauren Anderson's face and made a sexually inappropriate comment.

15.    NIKE HR told Mr. Tawiah about complaints against him while failing to address these complaints. Cahill went to HR in the spring of 2016 and told Tyler Allen about the language Mr. Tawiah used against two women, about being assigned more responsibility without recognition, and overall lack of leadership; Mr. Allen said it was being documented but no next steps were taken, and NIKE deleted or suppressed these records.

16.    Hender experienced NIKE's boys club atmosphere. She experienced a greater underrepresentation of women in NIKE's engineering areas than in other businesses with engineers. And she was retaliated against for complaining about discrimination.

17.    Johnston experienced several incidents where a Senior Director, Jim Sherwin, treated her differently based on her gender: (1) at a golf tournament that Johnston assisted in setting up to be able to network, Mr. Sherwin told a male employee that he was lucky Johnston

was there because if not, "when a male doesn't hit the ball past the women's pin, they have to pull their dick out and walk to the next pin with it out of their pants"; (2) Mr. Sherwin stroked Johnston's hair when she had a pixie cut and told her she should grow out her hair; and (3) Mr. Sherwin discounted Johnston's achievements because she was a woman while advocating for the promotions of men, including Grant Small and Noah Nwokoma.

18.    Johnston was also sexually harassed by her former mentor, Chad Carlson, who sexually harassed other women before and after he began sexually harassing Johnston.

19.    Johnston repeatedly complained to her managers and HR about the discrimination she was subjected to, but NIKE failed to appropriately address her complaints.

20.    Elizabeth was singled out to clean up after everyone, even though male employees were not asked to clean up, and it happened so many times that a male coworker, Taylor Sieg, spoke up and pointed out that Elizabeth was being targeted even though the mess belonged to everyone.

21.    During Elizabeth's employment, a NIKE executive, Phil Hodgson, subjected Elizabeth and other employees to several blatantly sexist incidents, including in March 2017, when a manager, Michelle Walter Baerncopf, asked the team to play basketball together, and Mr. Hodgson responded, "Even girls?"

22.    Plaintiffs each received performance ratings that were "Successful" or higher every year they worked at NIKE.  None of the Plaintiffs were ever placed on a performance information plan, terminated for cause, or found to have violated NIKE's Matter of Respect Policy.

23.    Despite being equally or more qualified, Cahill was paid less than similarly situated men, Graham Neuburger and Carter Truong.

24.     NIKE had paid Cahill less than similarly situated men since she started working at NIKE.  NIKE knew this, but it failed to address it.

25.     Despite being equally or more qualified, Elizabeth was paid less than similarly situated men, Jamell Harris, Paul Kim, and Dustin Mangan.

26.     NIKE had paid Elizabeth less than similarly situated men since she started working at NIKE.  NIKE knew this, but it failed to address it.

27.     Despite being equally or more qualified, Hender was paid less than similarly situated men, Geoffrey Weston and Trent Waddell.

28.     NIKE had paid Hender less than similarly situated men since she started working at NIKE.  NIKE knew this, but it failed to address it.

29.     NIKE failed to promote Cahill despite her being qualified for a promotion.  When Cahill resigned, NIKE replaced her with a similarly situated man, John Gordon, who it noncompetitively promoted to the S-Band where he was paid more than Cahill.

30.     NIKE had previously failed to promote Cahill despite her being qualified for a promotion and it promoted similarly situated men.  NIKE knew this, but it failed to address it.

31.     NIKE failed to promote Johnston despite her being qualified for a promotion.  NIKE promoted a similarly situated man who had no prior experience at NIKE, Aaron Peters, who was paid more than Johnston.

32.     NIKE had previously failed to promote Johnston despite her being qualified for a promotion and it promoted similarly situated men.  NIKE knew this, but it failed to address it.

33.     NIKE failed to promote Hender despite her being qualified for a promotion.  NIKE noncompetitively promoted a similarly situated man, Trent Waddell, before Hender.

34.     NIKE has been unable to and did not produce evidence that could justify Plaintiffs' lower pay or NIKE's failure to promote them.

35.     Even if NIKE alleges any such justifications, they are pretext.  NIKE had a pattern of discrimination against women.  It had a culture of discrimination against women.

36.     Plaintiffs are thus entitled to back pay, interest, attorneys' fees and costs, injunctive relief, and punitive damages.

**D.    <u>Defendant contends</u>**

1.     NIKE denies Plaintiffs' contentions except to the extent agreed to in the Agreed Facts section. NIKE also objects to Plaintiffs' contentions to the extent they "recite the evidence to be offered at trial."  Local Rule 16-5(b)(4).

2.     NIKE reincorporates contentions asserted in its defense to the first claim for relief.

3.     NIKE does not have a regular practice of discriminating against women.  In fact, the statistical evidence demonstrates that there are no statistically significant adverse pay or promotion outcomes for women.  Nor can Plaintiffs establish that any of the Plaintiffs experienced unlawful discrimination, as most of the allegations set forth in Plaintiffs' section above do not relate to any of the four Plaintiffs.

4.     NIKE had, and continues to have, anti-discrimination and anti-harassment policies in place to ensure an inclusive and diverse culture. For example, NIKE's Matter of Respect policy instructs its employees and managers that harassment and discrimination would not be tolerated.  It emphasizes that diversity and inclusion were NIKE's strengths and encouraged employees to report any behavior that appeared to be contrary to its policies. Likewise, NIKE instructs its employees regarding the law surrounding equal employment and Title VII.

5.      NIKE further denies and objects to the allegations in paragraphs 6-12 of

Plaintiffs' contentions.  The allegations in paragraphs 6-12 will be the subject of motions *in*

*limine* due to their lack of relevance to this trial regarding pay and promotions discrimination.

6.      For example, NIKE disputes and objects to the relevance of the Starfish

questionnaires to this trial.  None of the four named Plaintiffs filled out or otherwise participated

in the creation, distribution, or collection of the Starfish questionnaires.  Johnston and Cahill

were not even employed by NIKE at the time that they were circulated.  Plaintiffs cannot

demonstrate that the Starfish questionnaires have any connection to the Plaintiffs' claims that

they were "paid less or NIKE failed to promote them because of their sex."  Me too evidence is

only relevant if Plaintiffs can prove that the individual complainants in the Starfish

questionnaires worked at the same job site, worked for the same department or supervisor, had

similar experiences that were close in time, were in the same protected group, and experienced

the same kind of discrimination, harassment, or retaliation.  Plaintiffs attempt to prove their

claims based on evidence related to other women, who are not related.  This is improper and

does not prove that the four Plaintiffs experienced discrimination in pay and promotions

decisions on the basis of sex.

7.      The Starfish questionnaires were an informal effort led by a small group of female

employees at NIKE.  They were passed from hand-to-hand between employees and asked only

whether an employee had experienced harassment or discrimination.  In or around February or

March 2018, one of the individuals involved in the Starfish questionnaires, Nicole Hubbard

Graham, compiled the questionnaires that had been collected by the small group of female

employees and hand delivered them to Mo Matheson, NIKE's former Chief Human Resources

Officer, and Hilary Krane, NIKE's former General Counsel.  Ms. Hubbard Graham delivered

around 30 or so questionnaires total. Ms. Matheson and Ms. Krane made themselves available to employees for meetings. Moreover, NIKE properly investigated the allegations set forth in the questionnaires and took appropriate actions as necessary.

8.      Likewise, NIKE denies and objects to the allegations regarding spoliation and misleading testimony in paragraphs 12 and 15 as not relevant to the litigation, prejudicial, and lacking foundation. Plaintiffs have no evidence to support their unfounded allegations. Testimony confirms that only around 30 or so Starfish questionnaires were provided to NIKE, and NIKE produced them. NIKE likewise produced all complaints against Danny Tawiah.

9.      Cahill cannot prove that Danny Tawiah discriminated against her in any pay or promotions decisions. While Mr. Tawiah eventually left NIKE, Plaintiffs are unable to show that he discriminated against any of the Plaintiffs here, including that he made any discriminatory employment decisions against Cahill.

10.     NIKE also denies and objects to the allegations in paragraph 17. Jim Sherwin was not Sara Johnston's direct manager, and NIKE denies the events as described by Plaintiffs' Counsel in this document.

11.     Johnston began a consensual relationship with Chad Carlson. After Johnston and other women reported Mr. Carlson to Human Resources, NIKE investigated the complaint and fired Mr. Carlson.

12.     NIKE denies and objects to the allegations in paragraph 20 as outside the statute of limitations / damages period for a disparate treatment claim under Title VII. Elizabeth's allegations occurred in 2015, when she was an ETW, which is outside the damages period.

13.     NIKE denies and objects to the allegations in paragraph 21 as irrelevant to pay and promotions discrimination claims. Mr. Hodgson did not make any employment decisions

for Elizabeth.  Appropriate actions were taken by HR following Elizabeth's complaint about the email.

14.     Cahill cannot prove that similarly situated men were paid more.  The men that Cahill identified, Graham Neuburger and Carter Truong, were not similarly situated for many reasons.  For example, they started at NIKE before Cahill and were promoted into a Director role, while Cahill was hired into a Director role.  Moreover, they were in different departments, which required different skills and involved different responsibilities and managers, and had different education, experience, and contributions to NIKE.

15.      Nor can Cahill prove that she was equally or more qualified than Mr. Neuburger or Mr. Truong.

16.     Elizabeth cannot prove that similarly situated men were paid more.  The male employees that Elizabeth identified, Jamell Harris, Paul Kim, and Dustin Mangan, were not similarly situated.  Mr. Harris, Mr. Kim, and Mr. Mangan were in different categories, performed different job duties, had different qualifications, and/or were better performers in their role.

17.     Nor can Elizabeth prove that she was equally or more qualified than Mr. Mangan, Mr. Kim, or Mr. Harris.

18.     Hender cannot prove that similarly situated men were paid more.  Geoffrey Weston and Trent Waddell, the identified alleged comparators, were not similarly situated for several reasons. For example, while Hender was a Process Engineer, Mr. Weston was an Innovation Engineer.  Mr. Waddell was an Automation Engineer.  They also had different education, experience, and contributions to NIKE.

19.     Nor can Hender prove that she was equally or more qualified than Mr. Weston or Mr. Waddell.

20.     Hender cannot prove that NIKE failed to promote her despite being qualified for a promotion or that a similarly situated male employee received the role.  Mr. Waddell had a different job with different responsibilities and a different manager.

21.     Cahill also cannot prove that NIKE failed to promote her despite being qualified for a promotion or that a similarly situated male employee received the role.  The role John Gordon received was in the Brand Design function, which Mr. Gordon had previously worked in. Cahill was in the Marketing function.

22.     Johnston cannot prove that NIKE failed to promote her despite being qualified for a promotion.  While an Intermediate BSA, Johnston was given the opportunity to try a stretch role as a Product Owner, which was typically a Senior BSA position.  After six months in the role, Johnston's managers received negative feedback from stakeholders and team members about her communication style.  Johnston did not perform well in this position, so she did not receive the promotion. Johnston thereafter resigned from NIKE, and Aaron Peters, an outside candidate who had prior experience as a Product Owner, was hired into the role.

23.     In sum, NIKE will demonstrate that the Plaintiffs' alleged comparators were not similarly situated.  NIKE will demonstrate that any pay differentials are explained by legitimate factors.  And NIKE will demonstrate that any promotion decisions were made based on bona fide reasons other than sex, such as, but not limited to, poor performance or lesser skill or qualifications.

24.     Plaintiffs cannot prove that NIKE intentionally and willfully retaliated against Plaintiffs in the face of a perceived risk that its actions would violate Title VII.  Thus, Plaintiffs cannot meet their burden for punitive damages.

25.     Because the alleged actions were not taken by senior management and because NIKE implemented good faith anti-discrimination and anti-harassment policies, punitive damages are precluded.

**CLAIM THREE**
**(Violations of the Federal Equal Pay Act, 29 U.S.C. §§ 206, *et seq.*)**

E.     **Plaintiffs Cahill, Elizabeth, and Hender contend**

1.     Plaintiffs' *prima facie* burden is met if they prove NIKE paid them less than the average base pay, or the average annual bonuses, of men in substantially equal jobs.

2.     At NIKE, jobs NIKE placed in the same NIKE job code are substantially equal. NIKE's use of its common job evaluation system that NIKE used to classify jobs (NIKE refers to this classification system as its "job architecture") shows which jobs were substantially equal to each Plaintiff's jobs. Jobs in the same job code, according to NIKE, require the same minimum skills, responsibilities, and experience. They are also performed under similar working conditions. NIKE used job codes to compare employee pay.

3.     NIKE paid Cahill a lower salary than the average salary for men in the same job code as her in Fiscal Year 2016, in Fiscal Year 2017, and in Fiscal Year 2018.

4.     NIKE paid Cahill lower annual bonuses than the average annual bonuses for men in the same job code as her in Fiscal Year 2016, in Fiscal Year 2017, and in Fiscal Year 2018.

5.     NIKE paid Elizabeth a lower salary than the average salary for men in the same job code as her in Fiscal Year 2017 and in Fiscal Year 2018.

6.     NIKE paid Elizabeth lower annual bonuses than the average annual bonuses for men in the same job code as her in Fiscal Year 2017 and in Fiscal Year 2018.

7.     NIKE paid Hender a lower salary than the average salary for men in the same job code as her in Fiscal Year 2019 and in Fiscal Year 2020.

8.    NIKE paid Hender lower annual bonuses than the average annual bonuses for men in the same job code as her in Fiscal Year 2019 and in Fiscal Year 2020.

9.    Once Plaintiffs meet their *prima facie* burden, NIKE is liable unless it can prove its statutory affirmative defense justifies 100% of the disparity.  To do so, NIKE must prove not simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the entire wage disparity.  And NIKE must show the reasons were job-related.

10.    NIKE cannot prove its affirmative defenses.  NIKE has been unable to and did not produce evidence showing the reasons that were in fact used to make the compensation decisions or that can explain 100% of the disparities.  NIKE cannot show any purported reasons are job-related.  NIKE failed to maintain records concerning compensation and its practices.  NIKE must show that its practice of using prior pay did not cause any amount of the pay disparity because prior pay cannot contribute to any disparity under the EPA.  In addition, the evidence described above concerning Nike's pattern or culture of discrimination show any alleged reasons NIKE provides lack credibility.  This includes the evidence describe above related to Starfish, why it was created, by whom, what they found, and NIKE's responses to Starfish-related complaints and investigations.

11.    If NIKE disregarded the very possibility that it violated the EPA, then it willfully violated the EPA and thus the statute of limitations is three-years, rather than two years.

12.    Plaintiffs will show NIKE disregarded the very possibility that it violated the EPA because it knew that women were potentially paid less than men but failed to appropriately examine, remedy, or otherwise address.  Instead, complaints of discrimination against women were disregarded or condoned.

13.     Since at least 2012, NIKE HR and executives received reports for "Two Times" pay showing women were paid less but NIKE did not take steps to appropriately determine and address whether it was underpaying women.  NIKE looked at the pay of each Plaintiff in comparison to men in the same job code.  NIKE knew each Plaintiff was being underpaid compared to men in substantially equal jobs, but NIKE failed to appropriately investigate and address these underpayments.  NIKE knew it should conduct pay equity analyses to identify and correct pay disparities, but NIKE never conducted and/or completed such analyses.  NIKE knew women were discriminated against, but NIKE did not take reasonable steps to address or prevent the discrimination.  Even though NIKE knew that its standardized PSP formula for calculating annual bonuses had a disproportionately negative impact on women, NIKE continued to use this formula, including the use of current salary when calculating annual bonuses.  NIKE also was unable to and did not produce evidence showing that it took appropriate steps to determine or address the very possibility it was violating the EPA.

14.     In addition, the evidence described above concerning Nike's pattern or culture of discrimination show NIKE's willfulness. This includes the evidence described above related to Starfish, why it was created, by whom, what they found, and NIKE's responses to Starfish-related complaints and investigations.

15.     Plaintiffs are thus entitled to back pay, interest, liquidated damages, and attorneys' fees and costs.

**F.    Defendant contends**

1.     NIKE denies Plaintiffs' contentions except to the extent agreed to in the Agreed Facts section.  NIKE also objects to Plaintiffs' contentions to the extent they "recite the evidence to be offered at trial."  Local Rule 16-5(b)(4).

2.    Plaintiffs cannot prove that they are paid less than males performing substantially equal work.

3.    Individuals in the same job code do not necessarily perform the same work.  In fact, the responsibilities and job requirements involved in a particular job code can, and often do, involve widely varied work.  Indeed, while the general title of a job in a particular job code may be similar, the job itself may be in a completely different function, performing completely different work.  Thus, Plaintiffs cannot meet their burden simply by asserting that all jobs within a job code are substantially equal.

4.    Plaintiffs have not proven which jobs, if any, within a job code are substantially equal and, thus, their calculation of the average salary for men in the same job code as each Plaintiff does not support their Equal Pay Act claims.  Their calculation does not control for easily measured differences in jobs within a job code associated with differences in skill, effort, responsibilities, working conditions, etc...

5.    NIKE will demonstrate that Plaintiffs' expert analysis is flawed and does not demonstrate that women were paid less than men at NIKE.  Nor does Plaintiffs' expert analysis show that the four Plaintiffs were paid less than male employees.

6.    NIKE will demonstrate that any pay differential is explained by factors other than sex, such as education, experience, skill, and performance.

7.    The allegations in paragraph 13 are unfounded.  NIKE denies and Plaintiffs cannot prove that any discrepancy in pay was willful.

## CLAIM FOUR
## (Violations of the Oregon Equal Pay Act, ORS 652.220)

**G.** **Plaintiffs Cahill, Elizabeth, and Hender contend**

8.      Each Plaintiff can meet their prima facie burden if they prove they were paid less than the average base pay, or the average annual bonuses, of men in comparable jobs.

9.      Jobs in the same job code are comparable.  NIKE's use of its common job evaluation system (which it refers to as its "job architecture") shows which jobs were comparable to each Plaintiff's job.  Jobs in the same job code, according to NIKE, require the same minimum skills, responsibilities, and experience. They are also required to be performed under substantially similar working conditions.

10.      NIKE paid Cahill a lower salary than the average salary for men in the same job code as her in Fiscal Year 2017 and in Fiscal Year 2018.

11.      NIKE paid Cahill lower annual bonuses than the average annual bonuses for men in the same job code as her in in Fiscal Year 2017 and in Fiscal Year 2018.

12.      NIKE paid Elizabeth a lower salary than the average salary for men in the same job code as her in Fiscal Year 2017 and in Fiscal Year 2018.

13.      NIKE paid Elizabeth lower annual bonuses than the average annual bonuses for men in the same job code as her in Fiscal Year 2017 and in Fiscal Year 2018.

14.      NIKE paid Hender a lower salary than the average salary for men in the same job code as her in Fiscal Year 2019 and in Fiscal Year 2020.

15.      NIKE paid Hender lower annual bonuses than the average annual bonuses for men in the same job code as her in Fiscal Year 2019 and in Fiscal Year 2020.

16.      Once Plaintiffs meet their *prima facie* burden, NIKE is liable unless it can prove its statutory affirmative defense justifies 100% of the disparity.  To do so, NIKE must prove not

916628.2

simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the entire wage disparity. And NIKE must show the reasons were job-related.

17.    NIKE cannot prove its affirmative defenses. NIKE has been unable to and did not produce evidence showing the reasons that were in fact used to make the compensation decisions or that can explain 100% of the disparities. NIKE cannot show any purported reasons are job-related. NIKE failed to maintain records concerning compensation and its practices. NIKE must show that its practice of using prior pay did not cause any amount of the pay disparity because prior pay cannot contribute to any disparity under the EPA. In addition, the evidence described above related to Starfish, why it was created, by whom, what they found, and NIKE's responses to Starfish-related complaints and investigations show any alleged reasons NIKE provides lack credibility.

18.    Plaintiffs are thus entitled to back pay, interest, liquidated damages, attorneys' fees and costs, and punitive damages.

**H.    <u>Defendant contends</u>**

1.    NIKE denies Plaintiffs' contentions except to the extent agreed to in the Agreed Facts section. NIKE also objects to Plaintiffs' contentions to the extent they "recite the evidence to be offered at trial." Local Rule 16-5(b)(4).

2.    NIKE reincorporates contentions asserted in its defense to the third claim for relief.

3.    Individuals in the same job code do not necessarily perform the same work. In fact, the responsibilities and job requirements involved in a particular job code can, and often do, involve widely varied work. Indeed, while the general title of a job in a particular job code may

be similar, the job itself may be in a completely different function and/or may be performing completely different work.

4.      Plaintiffs have not proven which jobs, if any, within a job code are comparable and, thus, their calculation of the average salary for men in the same job code as each Plaintiff does not support their Equal Pay Act claims.  Their calculation does not control for easily measured differences in jobs within a job code associated with differences in skill, effort, responsibilities, working conditions, etc.

5.      NIKE will demonstrate that Plaintiffs' expert analysis is flawed and does not demonstrate that women were paid less than men at NIKE.  Nor does Plaintiffs' expert analysis show that the four Plaintiffs were paid less than male employees.

NIKE will demonstrate that Plaintiffs' salary was based on factors other than sex, such as education, experience, skill, and performance.

### CLAIM FIVE
### (Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a))

**I.      Hender contends**

1.      Hender meets her prima facie burden if she shows: (1) she participated in an activity protected under federal law, (2) NIKE subjected her to an action that a reasonable employee would have found materially adverse, which means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination complaint, and (3) Hender was subjected to the adverse employment action because she filed a discrimination complaint against NIKE.

2.      Hender filed a charge of discrimination with the EEOC on November 9, 2018, and she became a plaintiff in this case on November 19, 2018.

3.      After Hender filed her EEOC charge and joined the instant action, NIKE: (a) withheld work assignments and engineering roles from Plaintiff, (b) ignored Hender's communications during her patent application approval process, and/or (c) denied Hender Arc Flash training that male engineers received.  NIKE subjected Hender to these adverse employment actions because she filed a charge of discrimination and a discrimination complaint against NIKE.

4.      After Hender filed her EEOC charge and joined the instant action,  NIKE retaliated against Hender by isolating her from important work groups, denying her critical training opportunities, withholding work assignments from her, and denying her support for her patent application to the United States Patent and Trademark Office.

5.      NIKE's failure to provide Hender with Arc Flash training shortly after she engaged in protected activities, and after she made multiple good-faith requests for such training, coupled with the fact such training was provided to a number of other similarly-situated male engineers, constitutes a separate materially adverse action that would dissuade a reasonable worker from making a charge of discrimination. Based on these particular circumstances, and especially when considered in conjunction with NIKE's withholding of engineering work assignments from Hender, her re-assignment to the AirSpeed Team to work on administrative, low-tech projects, and NIKE's unreasonable denial of Arc Flash training—all of which began shortly after Hender engaged in protected activities—a reasonable person would find NIKE has unlawfully retaliated against Hender.

6.      Due to NIKE's retaliatory conduct, Hender's work performance was negatively impacted and her performance evaluations suffered, which resulted in NIKE denying her pay increases and promotion opportunities.

7.      Any alleged reasons NIKE provides to justify its actions are pretext.  The evidence described above concerning Nike's pattern or culture of discrimination show any alleged reasons NIKE provides lack credibility.  This includes the evidence describe above related to Starfish, why it was created, by whom, what they found, and NIKE's responses to Starfish-related complaints and investigations.

8.      Due to NIKE's retaliatory conduct, Hender suffered emotional distress, and is therefore entitled to garden-variety emotional distress damages.

9.      She is also entitled to attorneys' fees and costs.

10.     NIKE's conduct that harmed Hender was in reckless disregard of Hender's rights, oppressive, or malicious. Accordingly, to punish NIKE and deter similar conduct in the future, Hender is entitled to punitive damages.

## J.      **Defendant contends**

1.      NIKE denies Plaintiffs' contentions except to the extent agreed to in the Agreed Facts section. NIKE also objects to Plaintiffs' contentions to the extent they "recite the evidence to be offered at trial."  Local Rule 16-5(b)(4).

2.      Plaintiffs cannot prove that NIKE (a) withheld work assignments and engineering roles for Hender, (b) ignored Hender's communications during her patent application approval process, and/or (c) denied Hender Arc Flash training because Hender filed a charge of discrimination and joined the lawsuit against NIKE.

3.      Hender was not denied Arc Flash training because of her gender or because she filed a charge of discrimination.  Plaintiff Hender did not have a need for Arc Flash training because her job as a Process Engineer did not involve accessing high voltage electrical cabinets. Arc Flash training is limited to maintenance technicians and equipment engineers because it is a very dangerous activity.

4.      Hender also cannot prove that NIKE ignored her communications during her patent application approval process due to the filing of her complaint.  In fact, NIKE worked with Hender to address the patent office's non-final rejections of her application.

5.      Moreover, Hender cannot prove that her work performance was negatively impacted or her performance evaluations suffered.  Hender received a "Highly Successful" in 2018, which was after she filed her complaint.  She also received a promotion.

6.      Accordingly, NIKE did not retaliate against Hender for filing her complaint, and she suffered no damages.

7.      Hender cannot prove that NIKE intentionally and willfully retaliated against Hender in the face of a perceived risk that its actions would violate Title VII.  Thus, Hender cannot meet her burden for punitive damages.

8.      Because the alleged actions were not taken by senior management and because NIKE implemented good faith anti-retaliation and anti-discrimination policies, punitive damages are precluded.

## CLAIM EIGHT
### (Retaliation in Violation of Oregon State Law Against Discrimination, ORS 659A.001, *et seq.*)

**K.**    **Hender contends:**

1.      "To establish [a] retaliation claim [under Oregon law], [a] plaintiff [must] prove three elements: (1) [s]he engaged in an activity protected by law, that is, [s]he opposed or reported discrimination or harassment, (2) defendant subjected [her] to an adverse employment action, and (3) defendant subjected [her] to the adverse employment action because of plaintiff's opposition to or report of [gender] discrimination or [sexual] harassment." *Summerfield v. Or Liquor Control Comm'n*, 366 Ore 763, 782 (2020).

2.    NIKE retaliated against Hender as a result of her filing her Charge of Discrimination with the EEOC on November 9, 2018, and after she became a named plaintiff in this Action on November 19, 2018.

3.    Specifically, NIKE retaliated against Hender by isolating her from important work groups, denying her critical training opportunities, withholding work assignments from her, and denying her support for her patent application to the USPTO.

4.    NIKE's failure to provide Hender with Arc Flash training shortly after she engaged in protected activities, and after she made multiple, good-faith requests for such training, coupled with the fact such training was provided to a number of other similarly-situated male engineers, constitutes a materially adverse action that would dissuade a reasonable worker from making a charge of discrimination. Based on these particular circumstances, and especially when considered in conjunction with NIKE's withholding of engineering work assignments from Hender, her re-assignment to the AirSpeed Team to work on administrative, low-tech projects, and NIKE's unreasonable denial of Arc Flash training—all of which began shortly after Hender engaged in protected activities—a reasonable person would find NIKE has unlawfully retaliated against Hender.

5.    Any alleged reasons NIKE provides to justify its actions are pretext.  The evidence described above concerning Nike's pattern or culture of discrimination show any alleged reasons NIKE provides lack credibility.  This includes the evidence describe above related to Starfish, why it was created, by whom, what they found, and NIKE's responses to Starfish-related complaints and investigations.

6.       Due to NIKE's retaliatory conduct, Hender's work performance was negatively impacted and her performance evaluations suffered, which resulted in NIKE denying her pay increases and promotion opportunities.

7.       Due to NIKE's retaliatory conduct, Hender suffered emotional distress, and is therefore entitled to garden-variety emotional distress damages.

8.       She is also entitled to attorneys' fees and costs.

9.       NIKE's conduct that harmed Hender was in reckless disregard of Hender's rights, oppressive, or malicious. Accordingly, to punish NIKE and deter similar conduct in the future, Hender is entitled to punitive damages.

## L.    **Defendant contends:**

1.       NIKE denies Plaintiffs' contentions except to the extent agreed to in the Agreed Facts section. NIKE also objects to Plaintiffs' contentions to the extent they "recite the evidence to be offered at trial."  Local Rule 16-5(b)(4).

2.       Plaintiffs cannot prove that NIKE (a) withheld work assignments and engineering roles for Hender, (b) ignored Hender's communications during her patent application approval process, and/or (c) denied Hender Arc Flash training because Hender filed a charge of discrimination and joined the lawsuit against NIKE.

3.       Hender was not denied Arc Flash training because of her gender or because she filed a charge of discrimination.  Plaintiff Hender did not have a need for Arc Flash training because her job as a Process Engineer did not involve accessing high voltage electrical cabinets. Arc Flash training is limited to maintenance technicians and equipment engineers because it is a very dangerous activity.

4.      Hender also cannot prove that NIKE ignored her communications during her patent application approval process due to the filing of her complaint.  In fact, NIKE worked with Hender to address the patent office's non-final rejections of her application.

5.      Moreover, Hender cannot prove that her work performance was negatively impacted or her performance evaluations suffered.  Hender received a "Highly Successful" in 2018, which was after she filed her complaint.  She also received a promotion.

6.      Accordingly, NIKE did not retaliate against Hender for filing her complaint, and she suffered no damages.

7.      Hender cannot prove that NIKE retaliated against her with malice or that NIKE has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others.  Thus, Hender cannot meet her burden for punitive damages.

8.      Because the alleged actions were not taken by senior management and because NIKE implemented good faith anti-retaliation and anti-discrimination policies, punitive damages are precluded.

## V.      OTHER LEGAL ISSUES

### A.      Disparate impact claims

1.      To prove their prima facie disparate impact claims alleging NIKE's practice of using prior pay when setting starting salaries prior to October 2017 had a disparate impact on women, are Plaintiffs required to prove, as NIKE asserts for purposes of damages only, that prior pay was used to set starting salary in every instance?

2.      If Plaintiffs meet their prima facie burden and NIKE does not prove the practice is job-related and consistent with business necessity, its affirmative defenses, are Plaintiffs, as Plaintiffs contend, presumptively entitled to back pay?  Or, as NIKE contends, must Plaintiffs

then submit additional evidence that proves the following before receiving damages: (i) that prior pay was used to set starting pay in every instance or (ii) their prior pay was not only asked about, but also used to set their starting salaries, and that their salaries would have been higher had they not been asked about their prior pay?

**B.    Equal Pay Act claims**

1.    To prove the element of paid less for their prima facie equal pay act claims, are Plaintiffs required to show they were paid less than men when "control[ling] for easily measured differences in jobs within a job code associated with differences in skill, effort, responsibilities, working conditions, etc.?

2.    If Plaintiffs prove that they are paid less than males in substantially similar or comparable jobs, does NIKE need to prove, as Plaintiffs contend, that 100% of the disparity is due to job-related factors?

**C.    Statute of Limitations Questions**

**1.**    For the Oregon Equal Pay Act claim, is the damages period for each Plaintiff calculated from each Plaintiff's filed administrative charge or the earliest filed administrative charge?

**2.**    For the Title VII claims, is the damages period for each Plaintiff calculated from each Plaintiff's filed administrative charge or the earliest filed administrative charge?

**3.**    For the disparate treatment and disparate impact claims under Oregon law, is the damages period for each Plaintiff calculated from each Plaintiff's filed administrative charge or

the earliest filed charge?

## VI.    <u>AMENDMENTS TO PLEADINGS</u>

A.    <u>None.</u>


DATED: January 27, 2025                    GOLDSTEIN, BORGEN, DARDARIAN & HO


                                           */s/ Bryon Goldstein*
                                           Barry Goldstein, Of Counsel (admitted *pro hac vice*)
                                           Laura L. Ho (admitted *pro hac vice*)
                                           James Kan (admitted *pro hac vice*)
                                           Byron Goldstein (admitted *pro hac vice*)
                                           Katharine L. Fisher (admitted *pro hac vice*)

                                           MARKOWITZ HERBOLD PC
                                           Laura Salerno Owens, OSB #076230
                                           LauraSalerno@MarkowitzHerbold.com
                                           David B. Markowitz, OSB #742046
                                           DavidMarkowitz@MarkowitzHerbold.com
                                           Harry B. Wilson, OSB #077214
                                           HarryWilson@MarkowitzHerbold.com
                                           Kathryn P. Roberts, OSB #064854
                                           KathrynRoberts@MarkowitzHerbold.com

                                           INDIA LIN BODIEN, ATTORNEY AT LAW
                                           India Lin Bodien (admitted *pro hac vice*)
                                           india@indialinbodienlaw.com
                                           2522 North Proctor Street, #387
                                           Tacoma, WA  98406-5338
                                           Tel: (253) 503-1672
                                           Fax: (253) 276-0081

                                           ACKERMANN & TILAJEF, P.C.
                                           Craig J. Ackermann (admitted *pro hac vice*)
                                           cja@ackermanntilajef.com
                                           Brian W. Denlinger (admitted *pro hac vice*)
                                           bd@ackermanntilajef.com
                                           Erika Smolyar (admitted *pro hac vice*)
                                           es@ackermanntilajef.com
                                           315 South Beverly Drive, Suite 504
                                           Beverly Hills, CA  90212
                                           Tel: (310) 277-0614
                                           Fax: (310) 277-0635

                                           *Attorneys for Plaintiffs*

Dated: January 27, 2025                    PAUL HASTINGS LLP


_/s/ Alyssa K. Tapper (as authorized on 1/27/2025)_    /
Daniel Prince (admitted _pro hac vice_)
danielprince@paulhastings.com
Felicia A. Davis (admitted _pro hac vice_)
feliciadavis@paulhastings.com
Lindsey C. Jackson (admitted _pro hac vice_)
lindseyjackson@paulhastings.com
Alyssa K. Tapper (admitted _pro hac vice_)
alyssatapper@paulhastings.com
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, CA 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Laura E. Rosenbaum, OSB No. 110061
Laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 300
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Attorneys for Defendant NIKE, Inc.

The foregoing Pretrial Order is:

_____ Approved

SO Ordered this ___ day of _____, 2025.

_____

AMY M. BAGGIO

United States District Judge