LAURA E. ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

DANIEL PRINCE (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS (*pro hac vice*)
feliciadavis@paulhastings.com
LINDSEY C. JACKSON (*pro hac vice*)
lindseyjackson@paulhastings.com
ALYSSA K. TAPPER (*pro hac vice*)
alyssatapper@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street
Twenty-Fifth Floor
Los Angeles, California 90071-2228
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Attorneys for Defendant NIKE, Inc.


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| KELLY CAHILL et. al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-AB<br><br>**DECLARATION OF DANIEL PRINCE IN SUPPORT OF NIKE, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE A RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>**ORAL ARGUMENT REQUESTED** |

## DECLARATION OF DANIEL PRINCE

I, Daniel Prince, hereby declare as follows:

1.     I am an attorney duly licensed to practice law in the State of California and the United States District Court for the Central District of California.  I am admitted *pro hac vice* in the United States District Court for the District Court of Oregon.  I am a partner with the law firm of Paul Hastings LLP, counsel of record for Defendant NIKE, Inc. ("NIKE") in the above-captioned matter.  I have personal knowledge of the facts herein, and if called upon to do so, could and would competently testify thereto.

2.     I submit this Declaration in Support of NIKE's Opposition to Plaintiffs' Motion for Leave to File A Renewed Motion for Class Certification.

3.     Attached hereto as **Exhibit A** are true and correct excerpts of Nicole Hubbard Graham's June 20, 2024 deposition transcript.

4.     Attached hereto as **Exhibit B** are true and correct excerpts of Melanie Strong's March 1, 2024 deposition transcript.

5.     Attached hereto as **Exhibit C** are true and correct excerpts of Alison Daugherty's February 5, 2021 deposition transcript.

6.     Attached hereto as **Exhibit D** are true and correct excerpts of Shane Walker's December 17, 2020 deposition transcript.

7.     Attached hereto as **Exhibit E** is a true and correct copy of ECF No. 350, the Declaration of Byron Goldstein in Support of Plaintiffs' Motion to Compel Production of Documents ("Goldstein Decl."), ECF No. 350 at 1-5, and Exhibit G to the Goldstein Decl. ("Offer Intake Form").  ECF No. 350 at 116-122.  As confirmed in paragraph 8 of the Goldstein Decl., "Exhibit G ['Offer Intake Form'] is a true and correct copy of NIKE_000024726, produced by

NIKE in this ligation.  NIKE produced this document with its fourteenth volume of production on October 12, 2020."  Goldstein Decl. at 3.  The native version of this Offer Intake Form is a single Excel spreadsheet with several tabs.  Goldstein Decl. at 116-120, Ex. G.

8.      Attached hereto as **Exhibit F** is a true and correct copy of ECF No. 386, the Court's Order Denying Defendant's Motion for a Protective Order (ECF No. 347) and Plaintiffs' Motion to Compel (ECF No. 349).

9.      I am familiar with the discovery process (including Plaintiffs' requests, court orders, and document collection and production) in this case.  The document that Plaintiff refers to as the "Project Starfish" presentation document was not included with the Starfish questionnaires delivered to Ms. Matheson and Ms. Krane.  Plaintiffs received this document from Ms. Strong in advance of her deposition.  Plaintiffs did not produce this document to NIKE.

10.      In response to Plaintiff's instant Motion, attorneys on my team, under my supervision, have reviewed the Starfish questionnaires and, again, confirmed that at least 21 of the Starfish questionnaires were anonymous.  Notably, Plaintiffs did not depose (and in fact, did not even seek to depose) any complainant or person-of-interest identified on the Starfish questionnaires produced to Plaintiffs.  At that time, Plaintiffs had at least fifteen (complainant, person-of-interest, or witness) names on the questionnaires that they could have investigated, yet made no attempt at further discovery.

11.      I have also reviewed the discovery that has been propounded and provided in this case.  Plaintiffs have long had the names of executives identified in connection with the Starfish questionnaires, as they were referenced throughout class discovery, including in Requests for Production ("RFP") 34, 35, and 37.  *See* Plaintiffs' First Set of RFPs, which Plaintiffs' served on NIKE on March 22, 2019.

12.     Plaintiffs' RFP 134 confusingly sought "[a]ll documents and communications related to any testimony from a deposition or declaration that NIKE has (a) relied on in a court filing." Plaintiffs' Fifth Set of RFPs, which Plaintiffs served on NIKE on December 4, 2023. After conferrals to understand the breadth of the request revealed that the request included documents and communications concerning 43 witnesses' individual experiences that had nothing to do with Plaintiffs' claims, NIKE stated it would not produce the documents.

13.     In response to Plaintiffs' Seventh Set of RFPs, NIKE found, through its detailed ESI search, documents consisting of meeting invitations mentioning "Starfish" in the subject line; discussions between Ms. Graham, Ms. Strong, and others involved in the Starfish questionnaires; and a handful of questionnaires (most of which were dated after the packet of questionnaires were given to Ms. Matheson and Ms. Krane).

14.     Of the 38 exhibits attached to the Declaration of Byron Goldstein in support of Plaintiff's instant Motion, 20 are documents (or exact duplicates of documents that were produced) prior to class certification. *See* **Appendix 3** (showing when documents were previously used by Plaintiffs prior to class certification). The "new" documents that Plaintiff relies on for her Motion were produced in January 2024 after Plaintiffs, for the first time, sought *communications* relating to the Offer Intake Form. *See* Plaintiffs' Fourth Set of RFPs, which Plaintiffs served on NIKE on October 6, 2023. Specifically, Plaintiffs' RFP 85 sought "All Documents and Communications from November 2012 through November 1, 2017 Relating To or containing the following Boolean search terms and/or connectors:  offer! /5; intake!; form!; model!." NIKE originally objected, noting the improper form of the request, but eventually came to an agreement after conferrals with Plaintiffs and produced *email communications* hitting on those searches. *Id*.

15.     NIKE performed a diligent search for any attachment(s) to the October 2016 email, ECF No. 653, Ex. 21 (NIKE_00060779-81), on which Plaintiff's Motion relies.  NIKE could not locate any such potential attachments, likely due the fact that the document is nearly *ten years old* and predated NIKE's preservation obligations.  Nor does the October 2016 email appear to attach anything, as there is no "Attachment" heading under the "Subject" heading.

16.     I have confirmed with my client that, since the Court's denial of the class certification motion in November 2022, no Plaintiffs have filed suit against NIKE for individual pay equity claims.

17.     On behalf of NIKE, and in support of its Opposition to Plaintiff's Motion for Leave to File a Renewed Motion for Class Certification, attached are three Appendices to this declaration. **Appendix 1** plots key "Starfish"-related events cited in NIKE's Opposition to Plaintiffs' Motion for Leave to File a Renewed Motion for Class Certification over time.  A more detailed chart follows on the subsequent page describing each event plotted.  **Appendix 2** plots key events related to prior pay, as cited in NIKE's Opposition to Plaintiffs' Motion for Leave to File a Renewed Motion for Class Certification, over time.  A more detailed chart follows on the subsequent page describing each event plotted.  **Appendix 3**, as mentioned earlier, is a summary of the exhibits cited by Plaintiff in Support of her Motion for Leave to File a Renewed Motion for Class

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Certification and which notes production dates and details, including Plaintiffs' use of such documents prior to class certification.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 28th day of October 2025 at Los Angeles, California.


Date:  October 28, 2025                          _____ */s/ Daniel Prince*_____
                                                            DANIEL PRINCE

# APPENDICES

## APPENDIX 1:  "STARFISH" TIMELINE AND CHART



*Appendix 1 plots key "Starfish"-related events cited in NIKE's Opposition to Plaintiffs' Motion for Leave to File a Renewed Motion for Class Certification over time.  A more detailed chart follows on the subsequent page describing each event plotted.*

Page 1 APPENDIX 1:  "STARFISH" TIMELINE AND CHART

| Date | Description of Event |
|------|---------------------|
| **February 2018** | The "Starfish" questionnaires are hand-delivered to NIKE.  (ECF 517.) |
| **August 2018** | Plaintiffs initiated this matter, seeking to bring pay and promotion discrimination claims on behalf of themselves and women who are similarly situated.  (ECF 1.) |
| **June 2019** | Class discovery begins.  (ECF 80.) |
| **October 2019** | NIKE produces all "[discrimination] complaints made by any named plaintiff or [ ] putative plaintiffs who have already consented to join [the action.]"  The Court orders that complaints from other non-Plaintiff complainants should only be produced as they relate to "compensation, promotion, or performance reviews and specific complaints that male colleagues received favorable treatment."  (ECF 89.) |
| **April 2020** | Plaintiffs first produce documents containing Melanie Strong's name. |
| **August 2020** | The Court orders NIKE to produce all "complete[d]" Starfish questionnaires.  (ECF 111.) |
| **February 2021** | Plaintiffs depose Monique Matheson and specifically ask about Melanie Strong.  (ECF 654, Ex. G at 94:19-95:6.) |
| **May 2021** | Class discovery ends.  (ECF 140.) |
| **January 2022** | Plaintiffs file **only** *six* "Starfish" questionnaires as attachments to declarations in support of Plaintiffs' motion for class certification.  (ECF 146.) |
| **November 2022** | Magistrate Judge Russo denies Plaintiffs' motion for class certification.  (ECF 310.) |
| **March 2023** | District Judge Hernandez affirms Magistrate Judge Russo's denial of Plaintiffs' motion for class certification.  (ECF 335.) |
| **June 2023** | The Ninth Circuit Panel denies Plaintiffs' Federal Rule of Civil Procedure 23(f) Petition.  (Appeal 23-80027.) |
| **March 2024** | Plaintiffs depose Melanie Strong. |
| **March 2024** | Plaintiffs propound their seventh set of Requests for Production to NIKE. |
| **August 2024** | The Court denies additional Starfish discovery.  "It is time to put this search expedition to rest."  (ECF 521.) |

## APPENDIX 2:  "PRIOR PAY" TIMELINE AND CHART



*Appendix 2 plots key events related to prior pay, cited in NIKE's Opposition to Plaintiffs' Motion for Leave to File a Renewed Motion for Class Certification over time.  A more detailed chart follows on the subsequent page describing each event plotted.*

| Date | Description of Event |
|------|----------------------|
| **June 2019** | Class discovery begins.  (ECF 80.) |
| **August 2019** | NIKE produces Exhibits 2-3, 20, & 33 to Byron Goldstein's Declaration in support of Plaintiffs' Motion for Leave. |
| **October 2019** | The Court orders NIKE to produce "any uniform policies."  (ECF 89.) |
| **April 2020** | NIKE produces Exhibits 13-14 of Byron Goldstein's Declaration in support of Plaintiffs' Motion for Leave. |
| **October 2020** | NIKE produces offer intake forms, NIKE_00024726 (Copy of NIKE_00060776, Exhibit 22, of Byron Goldstein's Declaration in support of Plaintiffs' Motion for Leave). |
| **May 2021** | Class discovery ends.  (ECF 140.) |
| **January 2022** | Plaintiffs file motion for class certification.  (ECF 146.) |
| **November 2022** | Magistrate Judge Russo denies class certification.  (ECF 310.) |
| **March 2023** | District Judge Hernandez affirms Magistrate Judge Russo's denial of class certification.  (ECF 335.) |
| **June 2023** | The Ninth Circuit Panel denies Plaintiffs' Federal Rule of Civil Procedure 23(f) Petition.  (Appeal 23-80027.) |
| **January 2024** | NIKE produces Exhibit 21 to Byron Goldstein's Declaration in support of Plaintiffs' Motion for Leave. |
| **March 2024** | Plaintiffs propound their seventh set of Requests for Production to NIKE. |

Page 2 APPENDIX 2:  "PRIOR PAY" TIMELINE AND CHART

## APPENDIX 3:  PRODUCTION CHART

| Decl. Ex.[1] | Produced Before or After Class Cert. and When Used if Produced Prior | Description | Bates Number(s) | Production Date |
|---|---|---|---|---|
| 1 | Produced After Class Cert. | Project Starfish PowerPoint | JEFFRIES_ 00000001-05 | 6/12/2024 |
| 2 | Dep. Ex. 561 (Walker Dep., 12/17/2020); Expert Report of Neumark (7/15/2021); Expert Report of Lundquist (7/15/2021) | Parker speech, dated May 2018 | NIKE_00001960-79 | 8/16/2019 |
| 3 | Dep. Ex. 560 (Walker Dep., 12/17/2020); Cited in Class Cert. Goldstein Decl., Ex. 11 (1/10/2022) | Email Mark Parker to Nike Employees re A note from Mark, dated March 15, 2018 | NIKE_00002237-38 | 8/16/2019 |
| 4 | Expert Report of David Neumark (7/15/2021) | Annual Pay Review July 2019, dated July 1, 2019 | NIKE_00033960-81 | 4/13/2021 |
| 5 | Produced After Class Cert. | Letter re:  Starfish, dated February 13, 2018 | PLF_028040-41 | 6/17/2024 |
| 6 | Produced After Class Cert. | WhatsApp message thread, dated June 3, 2019 | PLF_027992-01; PLF_028039-42 | 6/17/2024 |
| 7 | Produced After Class Cert. | Project Starfish metadata, dated February 23, 2018 | N/A | 6/14/2024 |
| 8 | Produced After Class Cert. | Meeting invitation re:  2:30-3:30PM Starfish, dated February 14, 2018 | NIKE_00062321 | 5/29/2024 |

---

[1] This column refers to the Declaration of Byron Goldstein in support of Plaintiffs' Motion for Leave to File a Renewed Motion for Class Certification, ECF No. 653.

| Decl. Ex.[1] | Produced Before or After Class Cert. and When Used if Produced Prior | Description | Bates Number(s) | Production Date |
|---|---|---|---|---|
| 9 | Produced After Class Cert. | Meeting invitation re: 5:00-6:00PM Starfish, dated February 26, 2018 | NIKE_00062442 | 5/29/2024 |
| 10 | Produced After Class Cert. | Meeting invitation re: Quick Update from HJ re: Starfish follow up phone calls, dated February 16, 2018 | NIKE_00062517 | 5/29/2024 |
| 11 | Produced After Class Cert. | Email re: FW: PERSONAL AND CONFIDENTIAL TO BE OPENED BY RECIPIENT ONLY, dated March 30, 2018 | NIKE_00062347 | 5/29/2024 |
| 12 | Produced After Class Cert. | Email re: FW: PERSONAL AND CONFIDENTIAL - TO BE OPENED BY RECIPIENT ONLY, dated March 30, 2018 | NIKE_00062350 | 5/29/2024 |
| 13 | Dep. Ex. 585 (Daugherty, Vol. 1, 1/8/2021); Expert Report of Lundquist (7/15/2021) | Email re: "NYT Q&A and MP Quote," with attachments, dated April 24, 2018 | NIKE_00019537 -47 | 4/24/2020 |
| 14 | Expert Report of Lundquist (7/15/2021) | Email re: <External>URGENT: Confirming Departures, dated May 8, 2018 | NIKE_00019430 | 4/24/2020 |
| 15 | Expert Report of Lundquist (7/15/2021) | NIKE HR4HR ONBOARDINGAPRIL2020-org charts | NIKE_00036736 | 5/17/2021 |
| 16 | Ex. 6 to Plaintiffs' Reply ISO Motion to Compel, ECF 365 | Organizational chart, dated March 19, 2018 | NIKE_00046432 | 5/21/2021 |

| Decl. Ex.[1] | Produced Before or After Class Cert. and When Used if Produced Prior | Description | Bates Number(s) | Production Date |
|---|---|---|---|---|
| 17 | Dep. Ex. 696 (Vales Dep., 5/27/2021); Expert Report of Lundquist (7/15/2021); Ex. 7 to Plaintiffs' Reply ISO Motion to Compel, ECF 365 | Organizational chart, dated March 19, 2018 | NIKE_00046439 | 5/21/2021 |
| 18 | Ex. 8 to Plaintiffs' Reply ISO Motion to Compel, ECF No. 365 | Organizational chart, dated March 19, 2018 | NIKE_00046443 | 5/21/2021 |
| 19 | Dep. Ex. 626 (Daugherty, Vol. 2, 2/5/2021) | SCHEDULE 14A INFORMATION, dated July 24, 2018 | PLF_000010-63 | 6/14/2019 |
| 20 | Dep. Ex. 512 (Walker Dep., 12/17/2020) (Vales Dep., 5/27/2021) (Stuckey Dep., 5/14/2021); Expert Report of Neumark (7/15/2021); Expert Report of Lundquist (7/15/2021) | Email from Monique Matheson to Nike Employees ("Lst-Nike Global"), dated April 4, 2018 | NIKE_00002233-36 | 8/16/2019 |
| 21 | Produced After Class Cert. | Email re: FW: Talent Acquisition Offer Intake Form - Internal Template, dated October 24, 2016 | NIKE_00060779-81 | 1/31/2024 |
| 22 | Copy (NIKE_00024726) used in Expert Report of Lundquist (7/15/2021) | Offer Intake Forms (Copy of NIKE_00024726, first produced on 10/12/2020) | NIKE_00060776 | 1/31/2024 |
| 23 | Produced After Class Cert. | Email re: Facilitator Signup for Managing Pay at Nike, dated April 6, 2019 | NIKE_00060254 | 1/31/2024 |

| Decl. Ex.[1] | Produced Before or After Class Cert. and When Used if Produced Prior | Description | Bates Number(s) | Production Date |
|---|---|---|---|---|
| 24 | Produced After Class Cert. | Email re:  PSD Training - Your module!, dated July 31, 2016 | NIKE_00060285 | 1/31/2024 |
| 25 | Produced After Class Cert. | Email re:  FW:  Final Taping Schedule, dated August 9, 2016 | NIKE_00060294 -95 | 1/31/2024 |
| 26 | Produced After Class Cert. | Email re:  Training Website - Pay Structure Design, dated August 12, 2016 | NIKE_00060298 | 1/31/2024 |
| 27 | Produced After Class Cert. | Training video chart | NIKE_00060299 | 1/31/2024 |
| 28 | Produced After Class Cert. | Email re:  Total Rewards Deck from 6/27 Training, dated July 10, 2019 | NIKE_00060340 | 1/31/2024 |
| 29 | Produced After Class Cert. | Email re:  FW:  Readiness Update, dated April 10, 2019 | NIKE_00060354 -55 | 1/31/2024 |
| 30 | Produced After Class Cert. | FY20 Total Rewards Updates, dated May 24, 2019 | NIKE_00060339 | 1/31/2024 |
| 31 | Produced After Class Cert. | Email re:  Training Video, dated April 9, 2019 | NIKE_00060370 | 1/31/2024 |
| 32 | Dep. Ex. 522 (Walker Dep. 12/17/2020) (White Dep. 1/29/2021); Expert Report of Neumark (7/15/2021); Expert Report of Lundquist (7/15/2021) | Annual Pay Review Deep Dive, dated March 12, 2019 | NIKE_00024770 | 10/12/2020 |

| Decl. Ex.[1] | Produced Before or After Class Cert. and When Used if Produced Prior | Description | Bates Number(s) | Production Date |
|---|---|---|---|---|
| 33 | Dep. Ex. 500 (Walker Dep. 12/17/2020); Expert Report of Neumark (7/15/2021); Expert Report of Lundquist (7/15/2021); Cited in Class Cert. Goldstein Decl., Ex. 11 (1/10/2022) | Managing Pay at NIKE with Script (Updated Apr 24) | NIKE_00003191 | 8/30/2019 |
| 34 | Dep. Ex. 509 (Walker Dep. 12/17/2020) (Thomas Dep. 3/26/2021); Expert Report of Neumark (7/15/2021); Expert Report of Lundquist (7/15/2021); Class Cert. Sun Decl., Ex. 5 (1/10/2022); Cited in Class Cert. Goldstein Decl., Ex. 11 (1/10/2022) | Fy16/17 Sustainable Business Report | NIKE_00001996 -2069 | 8/16/2019 |
| 35 | Dep. Ex. 514 (Walker Dep. 12/17/2020); Expert Report of Lundquist (7/15/2021) | Email re: HRBP Update: September 14, 2017, dated September 14, 2017 | NIKE_00023658 -59 | 8/31/2020 |
| 36 | Produced After Class Cert. | Email re: Pay Equity Legislation Update, dated May 8, 2018 | NIKE_00060745 -56 | 1/31/2024 |
| 37 | Produced After Class Cert. | Comp History Policy Change | NIKE_00060770 -74 | 1/31/2024 |
| 38 | Dep. Ex. 673 (Thomas Dep. 3/26/2021); Expert Report of Neumark (7/15/2021); Expert Report of Lundquist (7/15/2021) | Email re: Commitment to Pay Equity, dated October 12, 2017 | NIKE_00024727 | 10/12/2020 |

# Deposition Transcript

Case Number: 3:18-cv-01477-JR
Date: June 20, 2024

In the matter of:

# CAHILL, et al. v NIKE, INC.

# Nicole Hubbard Graham

**CERTIFIED COPY**

Reported by:
Mary Jacks



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

| | | |
|---|---|---|
| 09:44:44 | 1 | A.   I do. |
| 09:44:44 | 2 | Q.   And how do you know that? |
| 09:44:47 | 3 | A.   Because I brought approximately 30 of these |
| 09:44:50 | 4 | paper surveys into Monique Matheson and Hilary Krane. |
| 09:44:57 | 5 | Q.   And when did you bring those surveys to |
| 09:45:03 | 6 | Ms. Krane and Ms. Matheson? |
| 09:45:06 | 7 | A.   I believe it was approximately March, February |
| 09:45:15 | 8 | March of 2018. |
| 09:45:16 | 9 | Q.   Do you know if that's something referred to as |
| 09:45:33 | 10 | the Starfish Survey? |
| 09:45:36 | 11 | A.   I do. |
| 09:45:36 | 12 | Q.   Okay.  And do you know about something referred |
| 09:45:37 | 13 | to as Project Starfish? |
| 09:45:39 | 14 | MR. PRINCE:  Vague. |
| 09:45:44 | 15 | BY MR. GOLDSTEIN: |
| 09:45:45 | 16 | Q.   So Mr. Prince can correct me if I'm wrong, but |
| 09:45:49 | 17 | if he does not instruct you not to answer, then |
| 09:45:53 | 18 | you're supposed to answer.  He will have these |
| 09:45:57 | 19 | objections but -- and he can correct me if I'm wrong. |
| 09:46:01 | 20 | But do you want me to repeat the question? |
| 09:46:01 | 21 | A.   Sure. |
| 09:46:03 | 22 | Q.   Do you know about something referred to as |
| 09:46:05 | 23 | Project Starfish? |
| 09:46:06 | 24 | A.   There was an overall effort called Starfish. |
| 09:46:11 | 25 | Q.   Okay.  And do you know about Starfish because |

NICOLE HUBBARD GRAHAM
JUNE 20, 2024

JOB NO. 1025103

| | | |
|---|---|---|
| 09:50:12 | 1 | Q.  -- did I get that sort of correct? |
| 09:50:13 | 2 | A.  In the ballpark. |
| 09:50:15 | 3 | Q.  Okay.  So when you distributed these Starfish |
| 09:50:19 | 4 | questionnaires, did you only distribute them to |
| 09:50:22 | 5 | current Nike employees? |
| 09:50:23 | 6 | A.  I personally did. |
| 09:50:26 | 7 | Q.  Okay.  And everyone that you distributed this |
| 09:50:30 | 8 | Starfish questionnaire to is -- was someone that you |
| 09:50:33 | 9 | knew? |
| 09:50:34 | 10 | A.  To the best of my recollection, yes. |
| 09:50:44 | 11 | Q.  Do you remember approximately how many Starfish |
| 09:50:47 | 12 | questionnaires you distributed? |
| 09:50:49 | 13 | A.  To the best of my recollection, I would say |
| 09:50:59 | 14 | five. |
| 09:51:01 | 15 | Q.  And did you collect any Starfish questionnaires |
| 09:51:23 | 16 | that had been filled in? |
| 09:51:26 | 17 | A.  I did. |
| 09:51:26 | 18 | Q.  And do you remember approximately how many |
| 09:51:36 | 19 | filled-in Starfish questionnaires were provided to |
| 09:51:43 | 20 | you by people who filled them in? |
| 09:51:45 | 21 | A.  Can you provide a little more detail to that |
| 09:51:48 | 22 | question? |
| 09:51:48 | 23 | Q.  Sure.  So -- so you -- so you said that you |
| 09:51:57 | 24 | distributed about five questionnaires that looked |
| 09:52:03 | 25 | like Exhibit G. |

Prince Decl., Exhibit A Page 3 of 13

NICOLE HUBBARD GRAHAM                                    JOB NO. 1025103
JUNE 20, 2024

```
            1        (The court reporter read back as

            2    requested.)

10:05:28    3    BY MR. GOLDSTEIN:

10:05:28    4      Q.  Do you believe that your lawyer just instructed

10:05:31    5    you not to answer?

10:05:37    6      A.  No, I don't believe my lawyer instructed me not

10:05:42    7    to answer.

10:05:42    8      Q.  Okay.  So can you please answer the question?

10:05:44    9           MR. PRINCE:  Objection.  The witness is

10:05:44   10    not -- I instruct the witness not to answer on the

10:05:47   11    basis of privilege.

10:05:48   12           MR. GOLDSTEIN:  Thank you.

10:05:49   13    BY MR. GOLDSTEIN:

10:05:54   14      Q.  So this -- the -- the filled-in questionnaires

10:05:57   15    that you provided to Nike recently, those are

10:06:00   16    Starfish questionnaires that you currently have in

10:06:04   17    your possession?

10:06:07   18      A.  No.

10:06:09   19      Q.  That you currently had in your possession

10:06:13   20    before you provided it to Nike's attorneys; is that

10:06:16   21    correct?

10:06:16   22      A.  That is correct.

10:06:17   23      Q.  Do you remember approximately how many pages

10:06:24   24    you provided to Nike's attorneys?

10:06:27   25      A.  I don't know exactly how many pages.  If I
```

Prince Decl., Exhibit A Page 4 of 13

| | | |
|---|---|---|
| 10:06:37 | 1 | recall, there were around 30 filled-out surveys. |
| 10:06:41 | 2 | Q.  When you provided those Starfish questionnaires |
| 10:07:05 | 3 | to -- to Ms. Krane and Ms. Matheson, was that in |
| 10:07:07 | 4 | person when you provided it to them? |
| 10:07:09 | 5 | A.  Are you asking about in 2018? |
| 10:07:12 | 6 | Q.  Yeah.  I'm sorry. |
| 10:07:13 | 7 | A.  That's okay. |
| 10:07:14 | 8 | Q.  That was confusing. |
| 10:07:16 | 9 | Okay.  So going back to the -- the -- so you |
| 10:07:18 | 10 | recently provided Nike's attorneys with hardcopies of |
| 10:07:22 | 11 | Starfish questionnaires; correct? |
| 10:07:23 | 12 | A.  That is correct. |
| 10:07:24 | 13 | Q.  Okay.  And you had -- I think you mentioned |
| 10:07:28 | 14 | earlier you had previously provided Nike with |
| 10:07:31 | 15 | filled-in Starfish questionnaires; is that correct? |
| 10:07:33 | 16 | A.  That is correct. |
| 10:07:34 | 17 | Q.  And when you -- when you provided Nike with |
| 10:07:37 | 18 | those filled-in Starfish questionnaires, that was -- |
| 10:07:41 | 19 | you meant you provided them to Ms. Krane and |
| 10:07:44 | 20 | Ms. Matheson; is that correct? |
| 10:07:45 | 21 | A.  That is correct. |
| 10:07:46 | 22 | Q.  Okay.  And so that was in 2018? |
| 10:07:49 | 23 | A.  That is correct. |
| 10:07:51 | 24 | Q.  Okay.  Other than 2018, when you provided |
| 10:07:58 | 25 | filled-in Starfish questionnaires to Ms. Matheson and |

NICOLE HUBBARD GRAHAM
JUNE 20, 2024

JOB NO. 1025103

| | | |
|---|---|---|
| 10:31:59 | 1 | MR. PRINCE:  Same objection. |
| 10:32:03 | 2 | MS. GRAHAM:  Do you want to provide a |
| 10:32:05 | 3 | little more clarity on that? |
| 10:32:06 | 4 | BY MR. GOLDSTEIN: |
| 10:32:07 | 5 | Q.  Sure.  Do you know who put together this |
| 10:32:09 | 6 | document, Project Starfish? |
| 10:32:10 | 7 | A.  I don't know who put together this document. |
| 10:32:13 | 8 | Q.  Okay.  Do you remember reviewing this document |
| 10:32:14 | 9 | in 2018? |
| 10:32:18 | 10 | MR. PRINCE:  Lacks foundation. |
| 10:32:20 | 11 | BY MR. GOLDSTEIN: |
| 10:32:20 | 12 | Q.  Let me start with this:  Did you review this |
| 10:32:23 | 13 | document in 2018? |
| 10:32:24 | 14 | A.  I don't recall reviewing this document in 2018. |
| 10:32:27 | 15 | Q.  Is it possible that you reviewed this document |
| 10:32:30 | 16 | in 2018? |
| 10:32:32 | 17 | A.  There are things in this document that I don't |
| 10:32:46 | 18 | know what they mean and so that's what is making me |
| 10:32:49 | 19 | feel like I didn't review this document. |
| 10:32:51 | 20 | Q.  What -- what in here don't you -- you're not |
| 10:32:56 | 21 | sure what it is? |
| 10:32:56 | 22 | A.  On the immediate next steps it says, "Reach out |
| 10:33:01 | 23 | to CAA team for blueprint on how they created |
| 10:33:05 | 24 | internal change, what we can learn," I don't -- I |
| 10:33:09 | 25 | don't remember what that is. |

Prince Decl., Exhibit A Page 6 of 13

NICOLE HUBBARD GRAHAM
JUNE 20, 2024

JOB NO. 1025103

| | | |
|---|---|---|
| 11:14:31 | 1 | Q. Did all five of those filled-in Starfish |
| 11:14:37 | 2 | questionnaires have the name of the person who filled |
| 11:14:41 | 3 | it in? |
| 11:14:42 | 4 | A. I don't remember. |
| 11:14:43 | 5 | Q. You said a lot of the communications earlier |
| 11:14:50 | 6 | was done face-to-face. Why were -- why was that as |
| 11:14:58 | 7 | opposed to over e-mail? |
| 11:15:04 | 8 | A. I think at first we were trying to keep it to a |
| 11:15:12 | 9 | small group of people. And I think we were -- I |
| 11:15:27 | 10 | mean, we were just trying to organize ourselves a |
| 11:15:29 | 11 | little bit so it was -- it felt best to do it |
| 11:15:32 | 12 | face-to-face when we were -- when we were talking |
| 11:15:36 | 13 | about this. |
| 11:15:36 | 14 | Q. Okay. Ms. Strong testified that kind of the |
| 11:15:40 | 15 | original thought or hypothesis was that you get a few |
| 11:15:45 | 16 | stories and you take them to Mark who -- and it's |
| 11:15:50 | 17 | because stories are able to reach him well or show |
| 11:15:56 | 18 | him what's going on. |
| 11:15:57 | 19 | Do you remember that thought, that the original |
| 11:15:59 | 20 | idea was to gather a few stories to bring to Mark |
| 11:16:05 | 21 | Parker? |
| 11:16:05 | 22 | MR. PRINCE: Lacks foundation. Calls for |
| 11:16:15 | 23 | speculation. |
| 11:16:22 | 24 | MS. GRAHAM: I'm pausing -- I'm pausing |
| 11:16:24 | 25 | because I -- yes, I believe that we thought that |

NICOLE HUBBARD GRAHAM
JUNE 20, 2024

JOB NO. 1025103

| | | |
|---|---|---|
| 11:19:39 | 1 | Foundation.  Mischaracterizes. |
| 11:19:46 | 2 | MS. GRAHAM:  I really want to -- I really |
| 11:19:47 | 3 | want to answer your question. |
| 11:19:50 | 4 | BY MR. GOLDSTEIN: |
| 11:19:50 | 5 | Q.  Sure. |
| 11:19:48 | 6 | A.  I'm just not following your question.  Sorry. |
| 11:19:50 | 7 | Q.  I'm going to try to make this as -- |
| 11:19:50 | 8 | A.  Yeah. |
| 11:19:53 | 9 | Q.  -- efficient and straightforward as possible. |
| 11:19:55 | 10 | And I know it's hard with objections to every |
| 11:19:58 | 11 | question -- |
| 11:19:58 | 12 | A.  Yeah. |
| 11:19:58 | 13 | Q.  -- that are long.  I know it makes it harder, |
| 11:20:03 | 14 | but -- |
| 11:20:03 | 15 | MR. PRINCE:  Or there could be better |
| 11:20:04 | 16 | questions. |
| 11:20:04 | 17 | BY MR. GOLDSTEIN: |
| 11:20:09 | 18 | Q.  You said you wanted to keep Starfish small |
| 11:20:12 | 19 | initially; was that fair? |
| 11:20:16 | 20 | A.  We didn't even have the word "Starfish" at the |
| 11:20:20 | 21 | very beginning.  We wanted to keep a small group of |
| 11:20:24 | 22 | people together to understand were there hotspots in |
| 11:20:30 | 23 | our organization. |
| 11:20:31 | 24 | Q.  Okay.  And you -- the number of Starfish |
| 11:20:36 | 25 | questionnaires that were filled in that were |

Prince Decl., Exhibit A Page 8 of 13

NICOLE HUBBARD GRAHAM                                    JOB NO. 1025103
JUNE 20, 2024

| | | |
|---|---|---|
| 11:20:40 | 1 | collected was more than you initially planned; |
| 11:20:44 | 2 | correct? |
| 11:20:47 | 3 | MR. PRINCE:  Objection.  Vague and |
| 11:20:47 | 4 | ambiguous. |
| 11:20:47 | 5 | MS. GRAHAM:  Yeah, I need you -- I'm |
| 11:20:54 | 6 | sorry.  I need you to read the question. |
| 11:20:56 | 7 | BY MR. GOLDSTEIN: |
| 11:21:02 | 8 | Q.  When you say in the -- in the beginning you |
| 11:21:05 | 9 | said we were trying to keep it small.  What do you |
| 11:21:08 | 10 | mean by "small"? |
| 11:21:10 | 11 | A.  We were trying to keep it to a group of women |
| 11:21:13 | 12 | that we trusted and knew one another and could be |
| 11:21:17 | 13 | asking ourselves do we feel like there is -- do we |
| 11:21:24 | 14 | feel like women are having a challenged experience at |
| 11:21:30 | 15 | Nike. |
| 11:21:30 | 16 | Q.  Okay.  And so is Melanie Strong someone that |
| 11:21:37 | 17 | you trusted? |
| 11:21:39 | 18 | A.  I'm sorry.  Did I trust Mel? |
| 11:21:41 | 19 | Q.  Yes. |
| 11:21:41 | 20 | A.  Was that your question? |
| 11:21:41 | 21 | Q.  Yes. |
| 11:21:43 | 22 | A.  Do I trust Mel? |
| 11:21:44 | 23 | Q.  Yes. |
| 11:21:45 | 24 | A.  I do trust Melanie. |
| 11:21:46 | 25 | Q.  Okay.  How long have you known Melanie? |

Prince Decl., Exhibit A Page 9 of 13

| | | |
|---|---|---|
| 13:48:08 | 1 | Q.  I'm not asking about what you told them, the |
| 13:48:11 | 2 | content of it.  I'm just asking about you had your |
| 13:48:15 | 3 | own experiences concerning discrimination or |
| 13:48:19 | 4 | harassment that you reported to Ms. Matheson and |
| 13:48:24 | 5 | Ms. Krane around March 2nd, 2018 in the meeting that |
| 13:48:31 | 6 | is labeled Starfish meeting in that e-mail.  Isn't |
| 13:48:34 | 7 | that correct? |
| 13:48:34 | 8 | MR. PRINCE:  Same objections.  Scope of |
| 13:48:36 | 9 | the court's order 486.  No response.  Instruction not |
| 13:48:40 | 10 | to respond. |
| 13:48:40 | 11 | BY MR. GOLDSTEIN: |
| 13:48:55 | 12 | Q.  How many filled-in Starfish survey responses |
| 13:49:02 | 13 | were there in 2018? |
| 13:49:09 | 14 | A.  To the best of my recollection, it was the |
| 13:49:16 | 15 | surveys that we pulled together at Jamie's house, |
| 13:49:20 | 16 | which then were in my possession which I took to |
| 13:49:23 | 17 | Monique and Hilary which was approximately 30-ish. |
| 13:49:28 | 18 | Q.  Okay.  And so that -- you're saying so 30, and |
| 13:49:33 | 19 | there's 30 Starfish questionnaire responses that are |
| 13:49:37 | 20 | in the documents you provided counsel last week, last |
| 13:49:41 | 21 | Friday? |
| 13:49:42 | 22 | A.  Correct. |
| 13:49:42 | 23 | Q.  Okay.  So, but you can see from Exhibit 587 and |
| 13:49:47 | 24 | 570 and Exhibit T that there's other Starfish |
| 13:49:52 | 25 | questions and responses; correct? |

| | | |
|---|---|---|
| 14:33:49 | 1 | house when we came was that we looked through the |
| 14:33:52 | 2 | surveys and we started to -- we started to just kind |
| 14:33:58 | 3 | of identify different themes, if you will, of the |
| 14:34:04 | 4 | surveys.  I then -- I then took those surveys and |
| 14:34:07 | 5 | that's what I delivered to my meeting with Monique |
| 14:34:10 | 6 | and Hilary. |
| 14:34:11 | 7 | BY MR. GOLDSTEIN: |
| 14:34:11 | 8 |    Q.  And was there anything in that clip we played |
| 14:34:14 | 9 | of Ms. Strong's testimony that you know is incorrect? |
| 14:34:17 | 10 |        MR. PRINCE:  Objection.  Vague and |
| 14:34:19 | 11 | ambiguous.  It was a long clip that ran several pages |
| 14:34:23 | 12 | in the transcript.  Vague as to anything in there |
| 14:34:29 | 13 | that may be incorrect so -- |
| 14:34:34 | 14 |        MS. GRAHAM:  I was never at a meeting |
| 14:34:35 | 15 | where we sorted through 300 surveys. |
| 14:34:39 | 16 | BY MR. GOLDSTEIN: |
| 14:34:39 | 17 |    Q.  Okay.  But there could have -- you do not deny |
| 14:34:42 | 18 | that Ms. Strong could have been at -- was -- |
| 14:34:45 | 19 |        Do you deny that Ms. Strong was at a meeting |
| 14:34:49 | 20 | where 300 Starfish surveys were sorted through? |
| 14:34:52 | 21 |    A.  That would be total speculation on my part. |
| 14:34:55 | 22 |    Q.  So it's -- it's -- you do not deny that there |
| 14:35:04 | 23 | was a meeting with Ms. Strong at where there was 300 |
| 14:35:09 | 24 | Starfish questionnaires that were filled in. |
| 14:35:12 | 25 |        MR. PRINCE:  Objection.  Lacks foundation. |

NICOLE HUBBARD GRAHAM
JUNE 20, 2024

JOB NO. 1025103

| | | |
|---|---|---|
| 14:36:39 | 1 | were reviewed? |
| 14:36:40 | 2 | MR. PRINCE:  Objection.  Asked and |
| 14:36:42 | 3 | answered.  Lacks foundation.  And still assumes facts |
| 14:36:46 | 4 | that the alleged 300 surveys ever existed and the |
| 14:36:49 | 5 | witness has testified about it. |
| 14:36:52 | 6 | MS. GRAHAM:  I would be really surprised |
| 14:36:54 | 7 | if Mel was at a meeting that I wasn't at where there |
| 14:36:58 | 8 | was 300 surveys. |
| 14:37:00 | 9 | We were at a meeting where we got these |
| 14:37:03 | 10 | surveys and then lines of communication were open to |
| 14:37:07 | 11 | Monique and Hilary where you could then personally |
| 14:37:10 | 12 | talk to them.  So I would find it hard to believe |
| 14:37:14 | 13 | that I wasn't at a meeting with Mel where 300 more |
| 14:37:20 | 14 | were sorted through. |
| 14:37:21 | 15 | BY MR. GOLDSTEIN: |
| 14:37:23 | 16 | Q.  And you don't remember whether you were |
| 14:37:26 | 17 | provided any copies of Project Starfish, Exhibit A; |
| 14:37:30 | 18 | is that -- is that correct? |
| 14:37:31 | 19 | MR. PRINCE:  Objection.  Asked and |
| 14:37:32 | 20 | answered. |
| 14:37:32 | 21 | BY MR. GOLDSTEIN: |
| 14:37:34 | 22 | Q.  That Ms. Strong was -- Ms. Strong was |
| 14:37:35 | 23 | testifying in that Exhibit A -- |
| 14:37:37 | 24 | A.  Yeah. |
| 14:37:37 | 25 | Q.  -- and they were identifying the themes based |

```
 1              REPORTER'S CERTIFICATE

 2

 3        I, Mary Jacks, a professional court reporter,

 4   do hereby certify:  That the foregoing proceedings

 5   were taken before me at the time and place herein set

 6   forth; that any witnesses in the foregoing

 7   proceedings, prior to testifying were placed under

 8   oath; that a verbatim record of the proceedings was

 9   made by me using machine shorthand which was

10   thereafter transcribed under my direction; further,

11   that the foregoing is a transcription thereof.

12        I further certify that I am neither financially

13   interested in the action nor a relative or employee

14   of any attorney of any of the parties.

15        IN WITNESS HEREOF, I have hereunto subscribed

16   my name this 26th day of June, 2024.

17

18        _____

19        Mary Jacks

20        Oregon Commission No. 1027581

21        Expires 09/13/2026

22

23

24

25
```

# Deposition Transcript

Case Number: 3:18-cv-01477-JR
Date: March 1, 2024

In the matter of:

# CAHILL, et al. v NIKE, INC.

# MELANIE STRONG

**CERTIFIED COPY**

**Reported by:**

Mary Jacks

Oregon Commission No. 1027581

CONFIDENTIAL ATTORNEYS' EYES ONLY



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

| | | |
|---|---|---|
| 10:07:01 | 1 | THE COURT REPORTER:  Do you know what |
| 10:07:01 | 2 | number you're on? |
| 10:07:01 | 3 | MR. GOLDSTEIN:  Can we do A? |
| 10:08:09 | 4 | Thank you. |
| 10:08:09 | 5 | (Exhibit No. A, a Project Starfish |
| 10:08:09 | 6 | summary, was marked for identification.) |
| 10:08:09 | 7 | BY MR. GOLDSTEIN: |
| 10:08:11 | 8 | Q.  So this will be Exhibit A, a document titled |
| 10:08:15 | 9 | Project Starfish. |
| 10:08:21 | 10 | MS. DAVIS:  Counsel, is there a Bates |
| 10:08:23 | 11 | number on this document so I can look it up? |
| 10:08:26 | 12 | MR. GOLDSTEIN:  There's not a Bates |
| 10:08:28 | 13 | number.  Your co-counsel, who's -- has a copy of it. |
| 10:08:33 | 14 | It's not been produced. |
| 10:08:34 | 15 | MS. DAVIS:  Okay.  It hasn't -- it hasn't |
| 10:08:36 | 16 | been produced? |
| 10:08:37 | 17 | MR. GOLDSTEIN:  Yes, it has not been |
| 10:08:38 | 18 | produced. |
| 10:08:41 | 19 | MS. ROSENBAUM:  If it's not been produced, |
| 10:08:42 | 20 | you need to make a copy available to the folks on the |
| 10:08:46 | 21 | Zoom call so that they can have access. |
| 10:08:51 | 22 | MR. GOLDSTEIN:  Well, yes, of course.  I'm |
| 10:08:55 | 23 | going to ask questions of the witness first.  Do you |
| 10:08:58 | 24 | have a copy?  It's a document that we will establish |
| 10:09:02 | 25 | Nike already has.  So when -- we can take a break and |

MELANIE STRONG - CONFIDENTIAL - ATTORNEYS' EYES ONLY                JOB NO. 875525
MARCH 01, 2024

| | | |
|---|---|---|
| 11:06:49 | 1 | A.  I believe so. |
| 11:06:50 | 2 | Q.  During the meeting when you handed about 300 |
| 11:07:00 | 3 | Starfish Survey complaints to Ms. Matheson and |
| 11:07:04 | 4 | Ms. Krane, were those provided in -- in hardcopy to |
| 11:07:11 | 5 | Ms. Matheson and Ms. Krane? |
| 11:07:13 | 6 | A.  Not initially. |
| 11:07:14 | 7 | Q.  Do you remember how they were provided to |
| 11:07:20 | 8 | Ms. Matheson and Ms. Krane? |
| 11:07:23 | 9 | A.  Nicole Hubbard Graham had the hardcopies.  Our |
| 11:07:32 | 10 | initial desire was to use the document titled Project |
| 11:07:37 | 11 | Starfish as a way to address the themes of those |
| 11:07:42 | 12 | 300-ish surveys.  Eventually, I do believe that the |
| 11:07:50 | 13 | hardcopies were delivered to Monique and Hilary, but |
| 11:07:54 | 14 | I'm unclear on the details. |
| 11:07:57 | 15 | Q.  But to be clear, you saw Ms. Matheson and |
| 11:08:13 | 16 | Ms. Krane receive about 300 Starfish Survey |
| 11:08:19 | 17 | complaints? |
| 11:08:19 | 18 | A.  I did not. |
| 11:08:20 | 19 | MS. DAVIS:  Objection. |
| 11:08:22 | 20 | MS. STRONG:  I did not.  I saw them |
| 11:08:25 | 21 | receive our Project Starfish summary document and I |
| 11:08:31 | 22 | was told that they received the 300 hardcopies. |
| 11:08:36 | 23 | BY MR. GOLDSTEIN: |
| 11:08:36 | 24 | Q.  And who told you that Ms. Matheson and |
| 11:08:40 | 25 | Ms. Krane received the 300 Starfish Survey |

**Prince Decl., Exhibit B Page 3 of 7**

| | | |
|---|---|---|
| 11:08:44 | 1 | hardcopies? |
| 11:08:45 | 2 | A.  Nicole Hubbard Graham. |
| 11:08:48 | 3 | Q.  And in the meeting with Ms. Matheson and |
| 11:08:52 | 4 | Ms. Krane that you were in, do you remember whether |
| 11:09:01 | 5 | you or Ms. Graham communicated to Ms. Matheson and |
| 11:09:05 | 6 | Ms. Krane that there was about 300 Starfish Survey |
| 11:09:10 | 7 | complaints? |
| 11:09:10 | 8 | A.  Yes. |
| 11:09:11 | 9 | Q.  Do you have a copy of all the Starfish Survey |
| 11:09:21 | 10 | complaints? |
| 11:09:22 | 11 | A.  No. |
| 11:09:22 | 12 | Q.  You said the hardcopies had been with |
| 11:09:26 | 13 | Ms. Graham? |
| 11:09:27 | 14 | A.  Correct. |
| 11:09:28 | 15 | Q.  This has been previously marked as Exhibit 58. |
| 11:10:04 | 16 | MS. SULLIVAN:  Thank you. |
| 11:10:04 | 17 | (Previously marked Exhibit 58, an e-mail |
| 11:10:04 | 18 | in re NYT responses, was introduced for |
| 11:10:04 | 19 | examination.) |
| 11:10:04 | 20 | BY MR. GOLDSTEIN: |
| 11:10:18 | 21 | Q.  This is a document Nike produced with a Bates |
| 11:10:19 | 22 | number Nike_00019526. |
| 11:10:25 | 23 | Do you see on the first page this is from |
| 11:10:40 | 24 | someone named KeJuan Wilkins? |
| 11:10:46 | 25 | A.  Yes, KeJuan. |

MELANIE STRONG - CONFIDENTIAL - ATTORNEYS' EYES ONLY    JOB NO. 875525
MARCH 01, 2024

| | | |
|---|---|---|
| 12:02:15 | 1 | kind of survey form, I would have had to ask someone |
| 12:02:19 | 2 | for it; is that true? |
| 12:02:21 | 3 | A.  I don't actually recall.  I'm not sure. |
| 12:02:24 | 4 | Q.  Did you send it to the entire company? |
| 12:02:30 | 5 | A.  No. |
| 12:02:31 | 6 | Q.  Did you send it to all women? |
| 12:02:36 | 7 | A.  No. |
| 12:02:36 | 8 | Q.  Did you send it to former employees? |
| 12:02:47 | 9 | A.  I don't recall. |
| 12:02:52 | 10 | Q.  And you -- I'm assuming the answer is no, but |
| 12:03:13 | 11 | did you send it to all former employees? |
| 12:03:16 | 12 | A.  No. |
| 12:03:17 | 13 | Q.  So would you agree that the Starfish Survey is |
| 12:03:30 | 14 | not a survey of Nike's entire workforce? |
| 12:03:34 | 15 | A.  It was not a formally run survey by Nike, no. |
| 12:03:46 | 16 | We tried -- |
| 12:03:46 | 17 | Q.  It -- sorry. |
| 12:03:47 | 18 | A.  Yeah, it's okay.  We tried to make it as |
| 12:03:51 | 19 | accessible as we could. |
| 12:03:54 | 20 | Q.  And did you ask anyone to let you know if they |
| 12:04:03 | 21 | had not experienced harassment or discrimination to |
| 12:04:07 | 22 | also fill out a survey? |
| 12:04:09 | 23 | A.  I'm not sure. |
| 12:04:18 | 24 | Q.  And would you agree that the individuals who |
| 12:04:31 | 25 | received the survey were not selected at random? |

Prince Decl., Exhibit B Page 5 of 7

| | | |
|---|---|---|
| 13:39:58 | 1 | Q.  Okay.  Got it.  So if somebody was hired on |
| 13:40:05 | 2 | your team as a director or lower, you would not be |
| 13:40:09 | 3 | involved in, kind of, their starting pay decision -- |
| 13:40:12 | 4 | decisions about their starting pay; is that correct? |
| 13:40:15 | 5 | A.  No.  Yeah.  That would have been handled by the |
| 13:40:18 | 6 | function -- the HR partner in the function, sales, |
| 13:40:22 | 7 | marketing, product, et cetera. |
| 13:40:25 | 8 | Q.  Okay.  And they would have worked with the -- |
| 13:40:27 | 9 | the, kind of, leader -- the business side leader on |
| 13:40:31 | 10 | making those decisions? |
| 13:40:33 | 11 | A.  As -- yeah.  Theoretically, yes. |
| 13:40:38 | 12 | Q.  Okay. |
| 13:40:39 | 13 | A.  I only know marketing. |
| 13:40:39 | 14 | Q.  How about -- |
| 13:40:41 | 15 | A.  That's -- |
| 13:40:41 | 16 | Q.  Fair enough. |
| 13:40:42 | 17 | A.  Yeah. |
| 13:40:42 | 18 | Q.  Fair enough.  And how about for your -- your |
| 13:40:47 | 19 | directs in that -- when you were in this role, what |
| 13:40:51 | 20 | level were the directs reporting to you? |
| 13:40:56 | 21 | A.  My directs would have ranged from an admin at |
| 13:41:02 | 22 | the U level to mostly ENS folks. |
| 13:41:19 | 23 | Q.  And for people who reported directly to you, |
| 13:41:24 | 24 | did you -- were you involved in deciding what their |
| 13:41:27 | 25 | starting pay would be? |

```
 1              REPORTER'S CERTIFICATE

 2

 3        I, Mary Jacks, a professional court reporter,

 4   do hereby certify:

 5        That the foregoing proceedings were taken

 6   before me at the time and place herein set forth;

 7   that any witnesses in the foregoing proceedings,

 8   prior to testifying were placed under oath; that a

 9   verbatim record of the proceedings was made by me

10   using machine shorthand which was thereafter

11   transcribed under my direction; further, that the

12   foregoing is a transcription thereof.

13        I further certify that I am neither financially

14   interested in the action nor a relative or employee

15   of any attorney of any of the parties.

16        IN WITNESS HEREOF, I have hereunto subscribed

17   my name this 3rd day of March, 2024.

18

19

20

21   Mary Jacks

22   Oregon Commission No. 1027581

23   Expires 09/13/2026

24

25
```

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


KELLY CAHILL, et al.,

individually and on behalf

of others similarly situated,    No.

      Plaintiffs,          3:18-cv-01477-JR

   v.

NIKE INC., an Oregon

Corporation,

      Defendant.



VOLUME II


REMOTE VIDEOCONFERENCE 30(b)(6) AND PERSONAL

DEPOSITION OF ALISON DAUGHERTY

Taken in behalf of Plaintiffs

February 5, 2021

Page 377

```
 1    where he talked about behaviors that saddened
 2    him and that were contrary to the values that he
 3    thought should be espoused at Nike?
 4        MR. PRINCE:  Objection; compound, improper
 5    characterization, calls for speculation and
 6    foundation.
 7        THE WITNESS:  I once again don't want to
 8    speculate about Mark Parker's choice of words,
 9    but my understanding is that, going back to what
10    we saw in that exhibit referencing KeJuan's
11    conversation with the reporter, again, there
12    were many different types of complaints coming
13    forward.  And the overriding behavior was the in
14    crowd/out crowd and people feeling like they
15    were, people who were in, you know, feeling like
16    they were in an out crowd, that their careers
17    were different than people who were in the in
18    crowd.  And it was not gender based.  It was not
19    predominantly, you know, discrimination, as you
20    said earlier.  It was, there was behavior that
21    was poor leadership within the company that
22    wasn't allowing us to, you know, to be where we
23    wanted to be in the future.  I think, you know,
24    again, I'm speculating, but I think that was
25    what was making Mark sad.
```

Daugherty, Alison - Vol. 2                                    February 5, 2021

Page 430

1                    C E R T I F I C A T E

2

3              I, Aleshia K. Macom, Oregon CSR No. 94-0296,

4        Washington CCR No. 2095, California CSR

5        No. 7955, RMR, CRR, RPR, do hereby certify that

6        ALISON DAUGHERTY remotely appeared before me at

7        the time and place mentioned in the caption

8        herein; that the witness was by me first duly

9        sworn on oath, and examined upon oral

10       interrogatories propounded by counsel; that said

11       examination, together with the testimony of said

12       witness, was taken down by me in stenotype and

13       thereafter reduced to typewriting; and that the

14       foregoing transcript, pages 222 to 429, both

15       inclusive, constitutes a full, true and accurate

16       record of said examination of and testimony

17       given by said witness, and of all other

18       proceedings had during the taking of said

19       deposition, and of the whole thereof, to the

20       best of my ability.

21            Witness my hand at Portland, Oregon, this

22       16th day of February, 2021.

23

         _____

24       Aleshia K. Macom

         OR CSR No. 94-0296, Expires 9-30-2023

25       WA CCR No. 2095, Expires 7-7-2021

Prince Decl., Exhibit C Page 3 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

KELLY CAHILL, et al.,                )
individually and on behalf of        )
of others similarly situated,        )
                                     )
                Plaintiffs,          )
                                     )
        vs.                          )   No. 3:18cv-01477-JR
                                     )
NIKE, INC., an Oregon                )
corporation,                         )
                                     )
                Defendant.           )


VIDEOCONFERENCE DEPOSITION
OF
SHANE WALKER
VOLUME I


DATE TAKEN:  December 17, 2020
TIME:        9:30 a.m.
PLACE:       Virtual

Page 31

1          Q.   Yeah, the reason I'm asking that is that
2    there's been some issue as to what a proper definition of
3    human resources is, and I just want to have an accurate
4    one and what are the -- what's included within human
5    resources at Nike.
6              MS. DAVIS:  I'll object that this is outside
7    the scope of the 30(b)(6) topics that Mr. Walker is
8    designated on.  He can certainly testify based on his own
9    knowledge, but he's not designated as the person most
10   knowledgeable about all HR functions.
11             But go ahead, Mr. Walker, to the extent you
12   know.
13             THE WITNESS:  Okay.  So my understanding of HR
14   is that we are responsible for our -- we have an HR
15   business-facing organization which provides support to
16   our managers and leaders on things related to people.  We
17   have a Total Rewards and HR operations organization,
18   rewards is for our pay and benefit programs.  And our
19   operations function is responsible for ensuring that we
20   administer all of our programs appropriately for our
21   employees.
22             And then we also have a talent, diversity and
23   culture organization, which is responsible for our talent
24   practices, talent acquisition and diversity and
25   inclusion.

Walker, Shane - Vol. 1                           December 17, 2020

1              And then the final one is org effectiveness,

2    and that is responsible for the organizational design of

3    the company.

4    BY MR. BARRY GOLDSTEIN:

5        Q.   We'll be referring to HR as we already have and

6    we now have a general definition of HR, and I appreciate

7    you providing that.

8              On this document on the upper right corner

9    under documents, there's a reference to a Nike VALUES

10   band overview.

11             Do you see that?

12       A.   Yes.

13       Q.   And when -- there's a reference to another

14   document.  What's the connection?  Why would there be a

15   reference to another document on this particular document

16   labeled bands and levels, Exhibit 504?

17       A.   Typically when we have documents posted to our

18   Nike HR site, which is where this document is from, it

19   provides additional information to other managers,

20   employees or HR organization.

21       Q.   So this document, what's referenced there, Nike

22   VALUES band overview would provide additional information

23   related to what is included in Exhibit 504 labeled bands

24   and levels?

25       A.   I mean, possibly.  I don't know what's in that

Prince Decl., Exhibit D Page 3 of 4

```
 1                          CERTIFICATE
 2
 3   STATE OF OREGON      )
 4                        ) ss
 5   COUNTY OF MULTNOMAH )
 6
 7
 8
 9        I, Teresa L. Rider, CRR, RPR, CCR, CSR, hereby
     certify that said witness appeared before me via Zoom at
10   the time and place set forth in the caption hereof; that
     at said time and place I reported in stenotype all
11   testimony adduced and other oral proceedings had in the
     forgoing matter; that thereafter my notes were
12   transcribed through computer-aided transcription, under
     my direction; and that the foregoing pages constitute a
13   full, true and accurate record of all such testimony
     adduced and oral proceedings had, and the whole thereof.
14        I further certify review of the transcript was
     not requested
15        Witness my hand at Portland, Oregon, this 27th
     day of December 2020.
16
17
18
19
20
21
22
23
24
25
```

_Teresa L. Rider_

Teresa L. Rider
Oregon CSR No. 12-0421
Washington CCR No. 2119
Expires 12-03-23

**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@gbdhlegal.com
**Barry Goldstein, Of Counsel** (admitted *pro hac vice*)
bgoldstein@gbdhlegal.com
**James Kan** (admitted *pro hac vice*)
jkan@gbdhlegal.com
**Byron Goldstein** (admitted *pro hac vice*)
brgoldstein@gbdhlegal.com
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@gbdhlegal.com
**Mengfei Sun** (admitted *pro hac vice*)
msun@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Counsel for Plaintiffs

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> NIKE, INC., an Oregon Corporation, <br><br> Defendant. | Case No. 3:18-cv-01477-JR <br><br> **DECLARATION OF BYRON GOLDSTEIN IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS** <br><br><br> **ORAL ARGUMENT REQUESTED** |

**DECL. OF BYRON GOLDSTEIN IN SUPP. OF PLS.' MOT. TO COMPEL PRODUCTION OF DOCS.**

I, Byron Goldstein, declare as follows:

1.      I am a member in good standing of the Bar of the State of California and a Partner at the law firm of Goldstein Borgen Dardarian & Ho ("GBDH") in Oakland, California.  I was admitted *pro hac vice* to this Court for this action on August 16, 2018.  I and co-counsel Markowitz Herbold PC, Ackermann & Tilajef PC, and India Lin Bodien Law represent the Plaintiffs.  I am providing this declaration in support of Plaintiffs' Motion to Compel Production of Documents.  I have personal knowledge of the facts set forth in this declaration and could and would testify competently to them if called upon to do so.

2.      Plaintiffs served their First Set of Requests for Production ("RFP") on March 22, 2019.  A true and correct copy is attached as Exhibit A.

3.      Nike served its Objections and Responses to Plaintiffs' First Set of RFPs on April, 25, 2019.  A true and correct copy is attached as Exhibit B.

4.      Attached as Exhibit C is a true and correct copy of NIKE_00024727, produced by Nike in this litigation.  Nike produced this document with its fourteenth volume of production on October 12, 2020.

5.      Attached as Exhibit D is a true and correct excerpt from the deposition of Shine Thomas at 213:21-214:13.

6.      Attached as Exhibit E is a true and correct copy of Nike's September 21, 2020 letter to Plaintiffs.

7.      Based on the following reasons, Plaintiffs believe Nike produced thousands of organizational charts that existed as of Nike's March 15, 2021 submission opposing Plaintiffs' request for an Order compelling production of organizational charts, ECF No. 166-5.  First, Nike's June 2, 2021 letter to Plaintiffs states, "we have produced more than 5,000 organizational

charts ….."  Attached as Exhibit F is a true and correct copy of Nike's June 2, 2021 letter.

Second, after the Court's March 30, 2021 Order requiring Nike to produce existing

organizational charts (ECF No. 135), Nike produced organizational charts in documents

produced between May 17, 2021 and May 26, 2021 (Nike Volumes of Production 36-39).

Plaintiffs' counsel reviewed the discovery in Volumes 36-39 that Nike produced and the

metadata Nike produced along with this discovery.  According to Nike's metadata, in Volumes

36-39, Nike produced over 17,000 pages in documents last modified before March 15, 2021.

8.      Attached as Exhibit G is a true and correct copy of NIKE_000024726, produced

by Nike in this litigation.  Nike produced this document with its fourteenth volume of production

on October 12, 2020.

9.      Attached as Exhibit H is a true and correct excerpt from the deposition of Shine

Thomas at 202:12-203:18.

10.     Attached as Exhibit I is a true and correct copy of Plaintiffs' June 15, 2021 letter

to Nike.  Nike did not respond to this letter.  Based on the lack of a response and Plaintiffs'

counsel's review of all discovery Nike produced, after Plaintiffs' June 15, 2021 letter, Nike did

not produce any additional versions of its "Offer Intake Form" or "Hiring Process."

11.     Attached as Exhibit J is a true and correct copy of NIKE_00003185, produced by

Nike in this litigation.

12.     Attached as Exhibit K is a true and correct excerpt from the deposition of Shine

Thomas at 199:5-16 and 210:7-212:19.

13.     Attached as Exhibit L is a true and correct copy of NIKE_00023658, produced by

Nike in this litigation.  Nike produced this document with its twelfth volume of production on

August 31, 2020.

14.    Based on the following reasons, Plaintiffs believe Nike has not produced any policies, guidelines, trainings, descriptions, or forms that it used for determining the amount of starting pay before October 2017.

a.    First, Plaintiffs' counsel reviewed all discovery Nike produced.

b.    Second, Nike did not rely on any such documents in its Opposition to Class Certification even though Nike had known of Plaintiffs' starting pay allegation since 2018. *See* ECF No. 183 at 16-21.

c.    Third, when Plaintiffs sought to meet and confer about pre-October 2017 starting pay practices, Plaintiffs told Nike that one of the reasons why this was necessary was because Nike had failed to produce any policies, guidelines, trainings, descriptions, or forms it used when determining the amount of starting pay before October 2017. While Nike stated that it disputed this, it could not identify a single such document in several communications, including an August 28, 2023 meet and confer call. Attached as Exhibit M are true and correct copies of this correspondence, which includes Plaintiffs' July 11, 2023 letter, Nike's July 17, 2023 letter, Plaintiffs' July 20, 2023 letter, Plaintiffs' July 27, 2023 letter, Nike's July 31, 2023 letter, and Nike's August 2, 2023.

15.    In July 2023, Plaintiffs again sought to engage Nike in a transparent and cooperative discovery process. For discovery related to determining starting pay before October 2017, Plaintiffs, on July 11, 2023, asked Nike what discovery it was withholding, where it looked for discovery, and where it did not look for discovery. *See* Ex. M at 1. Nike did not provide this information in its July 17, 2023 response. *See id.* at 2-3. Plaintiffs again sought this information in their July 20, July 27, and August 6 communications. *See id.* at 4-7, 12, 14. Nike's responses to these communications again did not provide this information. *See id.* at 8-

**DECL. OF BYRON GOLDSTEIN IN SUPP. OF PLS.' MOT. TO COMPEL PRODUCTION OF DOCS.**
**Page 3**

12, 14.  Nor did Nike provide this information during an August 28, 2023 call that Plaintiffs requested to meet and confer about pre-October 2017 discovery related to determining starting pay, whether and what discovery Nike was withholding, where it looked for discovery, and where it did not look for discovery.

16.     Plaintiffs made numerous efforts to meet and confer about whether and what discovery Nike was withholding, the bases for Nike's objections to their First Set of RFPs, including burden, how it searched for and collected discovery, and where potentially responsive discovery was located.  This includes numerous written and phone communications over the last four years, including, for example, a May 31, 2019 written communication, a June 11, 2019 call, a July 15, 2019 written communication, a March 9, 2020 written communication, a December 20, 2019 written communication, an October 8, 2020 written communication, and an August 28, 2023 call.

I declare under penalty of perjury under that the foregoing is true and correct, and that this Declaration was executed this 15th day of September, 2023 in Oakland, California.

 *s/ Byron Goldstein*
Byron Goldstein

**DECL. OF BYRON GOLDSTEIN IN SUPP. OF PLS.' MOT. TO COMPEL PRODUCTION OF DOCS.**
**Page 4**

New Intake Form - Mid-Tier Exec

## OFFER INTAKE FORM

| Date Submitted: | | Desired Delivery Date: | | |
|---|---|---|---|---|
| Submitted By: | | HRBP Associated with Hire: | | |

| **CURRENT CANDIDATE INFORMATION** | | | | <--- USE FOR EXTERNAL OFFERS |
|---|---|---|---|---|
| Candidate Name: | | Current Company: | | |
| Location (City, State): | | Company Stock Symbol: | | |
| Company Fiscal Year End: | < Select > | | | |
| Job Title: | | | | |

**BASE PAY EXPECTATIONS**

| Annual Base Salary Expectations: | |
|---|---|

**BONUS EXPECTATIONS**

| Annual Bonus Target % Expectations: | | |
|---|---|---|
| Annual Bonus Target Amt Expectations: | | |

**EQUITY EXPECTATIONS - UNVESTED EQUITY OR DEFERRED COMPENSATION THAT CANDIDATE WOULD FORFEIT OR HAVE CANCELLED BY VIRTUE OF THE CANDIDATE'S RESIGNATION FROM THEIR CURRENT EMPLOYER IN NEXT 24 MONTHS**

| Vehicle Type 1: | < Select > | Vesting Schedule: | < Select > |
|---|---|---|---|
| Equity Target: | <Select> | Is Award Size Based on Perf: | < Select > |
| Vehicle Type 2: | < Select > | Vesting Schedule: | |
| Equity Target: | <Select> | Is Award Size Based on Perf: | < Select > |
| Vehicle Type 3: | < Select > | Vesting Schedule: | |
| Equity Target: | <Select> | Is Award Size Based on Perf: | < Select > |

**LONG-TERM CASH EXPECTATIONS**

| Long-Term Cash Target: | |
|---|---|

**ADDITIONAL COMPENSATION EXPECTATIONS**

Does the candidate have any additional compensation expectations that should be considered (e.g. requests for allowances, additional bonuses, etc.)? Please explain and provide award type/size expectations.

| **NIKE JOB INFORMATION** | | | | <--- USE FOR EXTERNAL OFFERS ONLY |
|---|---|---|---|---|
| Hiring Manager Name: | | Proposed Start Date: | | |
| Position Title: | | Job Location: | < Select > | |
| Position Number: | | Cost Center: | | |
| Job Code: | | Job Band: | | |
| Job Title: | | Pay Range Minimum: | | |
| Job Pipeline: | | Pay Range Median: | | |
| Job Family: | | Pay Range Maximum: | | |

| **MOBILITY/IMMIGRATION** | | | | <--- USE FOR EXTERNAL OFFERS ONLY |
|---|---|---|---|---|
| Has Pre-Offer Immigration Assessment been initiated? | < Select > | Has Pre-Offer Relocation Consultation been initiated? | < Select > | |
| Visa or Sponsorship Required: | < Select > | Homeowner or Renter: | < Select > | |
| Type: | | Potential Loss on Sale: | < Select > | |
| Explanation: | | Explanation: | | |

Are there any unique relocation issues? Is the candidate being localized? If so, please provide context.

| **CONTEXT & TALENT STORY** | <--- USE FOR EXTERNAL OFFERS ONLY |
|---|---|

BUSINESS/HIRING MANAGER VIEWPOINT: Does the hiring manager have compensation recommendations in mind for salary, sign-on, stock, etc.?

TALENT STORY: What will the candidate bring to Nike? Why is this the best candidate for the job? Is this candidate a "unicorn" or the best available?

ADDITIONAL INFO: Is there any additional information that should be considered in developing this offer?

| **ATTACHMENTS** | | | | | | <--- USE FOR EXTERNAL OFFERS ONLY |
|---|---|---|---|---|---|---|
| Candidate Resume: | < Select > | | | Documentation Supporting Localization: | < Select > | Additional Attachments: < Select > |

Goldstein Decl. Ex. G, Page 1 of 7

Prince Decl., Exhibit E Page 6 of 12

New Intake Form - Below Mid Exe

## OFFER INTAKE FORM

| | | | |
|---|---|---|---|
| Date Submitted: | | Desired Delivery Date: | |
| Submitted By: | | HRBP Associated with Hire: | |

### CURRENT CANDIDATE INFORMATION  <---  USE FOR EXTERNAL OFFERS

| | | | |
|---|---|---|---|
| Candidate Name: | | Current Company: | |
| Location (City, State): | | Company Stock Symbol: | |
| Company Fiscal Year End: | < Select > | | |
| Job Title: | | | |

### BASE PAY EXPECTATIONS
| | |
|---|---|
| Annual Base Salary Expectations: | |

### BONUS EXPECTATIONS
| | | |
|---|---|---|
| Annual Bonus Target % Expectations: | | |
| Annual Bonus Target Amt Expectations: | | |

### ADDITIONAL COMPENSATION EXPECTATIONS
Does the candidate have any additional compensation expectations that should be considered (e.g. requests for allowances, additional bonuses, equity, etc.)? Please explain and provide award type/size expectations.

### NIKE JOB INFORMATION  <---  USE FOR EXTERNAL OFFERS

| | | | |
|---|---|---|---|
| Hiring Manager Name: | | Proposed Start Date: | |
| Position Title: | | Job Location: | < Select > |
| Position Number: | | Cost Center: | |
| Job Code: | | Job Band: | |
| Job Title: | | Pay Range Minimum: | |
| Job Pipeline: | | Pay Range Median: | |
| Job Family: | | Pay Range Maximum: | |

### MOBILITY/IMMIGRATION  <---  USE FOR  EXTERNAL OFFERS ONLY

| | | | |
|---|---|---|---|
| Has Pre-Offer Immigration Assessment been initiated: | < Select > | Has Pre-Offer Relocation Consultation been initiated? | < Select > |
| Visa or Sponsorship Required: | < Select > | | |
| Type: | | | |
| Explanation: | | Explanation: | |

Are there any unique relocation issues? Is the candidate being localized? If so, please provide context.

### CONTEXT & TALENT STORY  <---  USE FOR EXTERNAL OFFERS ONLY

BUSINESS/HIRING MANAGER VIEWPOINT: Does the hiring manager have compensation recommendations in mind for salary, sign-on, stock, etc.?

TALENT STORY: What will the candidate bring to Nike? Why is this the best candidate for the job? Is this candidate a "unicorn" or the best available?

ADDITIONAL INFO: Is there any additional information that should be considered in developing this offer?

### ATTACHMENTS  <---  USE FOR EXTERNAL OFFERS ONLY

| | | | | | |
|---|---|---|---|---|---|
| Candidate Resume: | < Select > | | Documentation Supporting Localization: | < Select > | Additional Attachments: | < Select > |

Goldstein Decl. Ex. G, Page 2 of 7

**Prince Decl., Exhibit E Page 7 of 12**

Intake Form - Current

## OFFER INTAKE FORM

| | |
|---|---|
| Date Submitted: | Desired Delivery Date: |
| Submitted By: | HRBP Associated with Hire: |

### CURRENT CANDIDATE INFORMATION

| | | | |
|---|---|---|---|
| Candidate Name: | | EE ID: | Internal Offers Only |
| Location (City, State): | | Current Company: | |
| Company Fiscal Year End: | < Select > | Company Stock Symbol: | |
| Job Title: | | | |

### BASE PAY

| | |
|---|---|
| Annual Base Salary: | |

### BONUS

| | | | |
|---|---|---|---|
| Annual Bonus Target %: | | Previous Bonus Amount Paid: | |
| Annual Bonus Target Amt: | | Anticipated Bonus Amount: | |
| Bonus Payout Frequency: | | Bonus Payout Date: | |
| Does the candidate need to be employed on a certain date to receive the bonus? If so, what date? | | | |
| If the candidate leaves their current company, what amount will they receive in prorated bonus? | | | |

### EQUITY

| | | | |
|---|---|---|---|
| Vehicle Type 1: | < Select > | Vesting Schedule: | |
| Equity Target: | <Select> | Is Award Size Based on Perf: | < Select > |
| Vehicle Type 2: | < Select > | Vesting Schedule: | |
| Equity Target: | <Select> | Is Award Size Based on Perf: | < Select > |
| Vehicle Type 3: | < Select > | Vesting Schedule: | |
| Equity Target: | <Select> | Is Award Size Based on Perf: | < Select > |

### LONG-TERM CASH

| | | | |
|---|---|---|---|
| Long-Term Cash Target: | | Performance Period: | |

### ADDITIONAL COMPENSATION

| |
|---|
| Is there any additional compensation that should be considered (e.g. allowances, additional bonuses, etc.)? Please explain and provide award type/size. |
| |

### NIKE JOB INFORMATION

| | | | |
|---|---|---|---|
| Hiring Manager Name: | | Proposed Start Date: | |
| Position Title: | | Job Location: | < Select > |
| Position Number: | | Cost Center: | |
| Job Code: | | Job Band: | |
| Job Title: | | Pay Range Minimum: | |
| Job Pipeline: | | Pay Range Median: | |
| Job Family: | | Pay Range Maximum: | |

### MOBILITY/IMMIGRATION

| | | | |
|---|---|---|---|
| Has Pre-Offer Immigration Assessment been initiated? | < Select > | Has Pre-Offer Relocation Consultation been initiated? | < Select > |
| Visa or Sponsorship Required: | < Select > | Homeowner or Renter: | < Select > |
| Type: | | Potential Loss on Sale: | < Select > |
| Explanation: | | Explanation: | |
| Are there any unique relocation issues? Is the candidate being localized? If so, please provide context. | | | |

Goldstein Decl. Ex. G, Page 3 of 7

**Prince Decl., Exhibit E Page 8 of 12**

Intake Form - Current

## OFFER INTAKE FORM

✓ Nike    CONVERSE    Hurley )(    Jordan

### CONTEXT & TALENT STORY

**CANDIDATE EXPECTATIONS: Please provide information related to any discussions related candidate expectations around salary, sign-on, etc.**

**BUSINESS/HIRING MANAGER VIEWPOINT: Does the hiring manager have compensation recommendations in mind for salary, sign-on, stock, etc.?**

**TALENT STORY: What will the candidate bring to Nike? Why is this the best candidate for the job? Is this candidate a "unicorn" or the best available?**

**ADDITIONAL INFO: Is there any additional information that should be considered in developing this offer?**

### ATTACHMENTS

| Candidate Resume: | < Select > | Equity Award Summary or Statement: | < Select > | Documentation Supporting Localization: | < Select > | Additional Attachments: | < Select > |
|---|---|---|---|---|---|---|---|

Goldstein Decl. Ex. G, Page 4 of 7

**Prince Decl., Exhibit E Page 9 of 12**

Intake Form Example

## OFFER INTAKE FORM EXAMPLE    ✔ NIKE  CONVERSE  Hurley )(  ⛷

| Date Submitted: | 3/2/2017 | Desired Delivery Date: | 3/9/2017 |
|---|---|---|---|
| Submitted By: | Daffy Duck | HRBP Associated with Hire: | Bugs Bunny |

### CURRENT CANDIDATE INFORMATION

| Candidate Name: | Stan Podolak | EE ID: | Internal Offers Only |
|---|---|---|---|
| Location (City, State): | Birmingham, AL | Current Company: | Birmingham Barons |
| Company Fiscal Year End: | June | Company Stock Symbol: | MLBB |
| Job Title: | Publicist and Personal Assistant | | |

**BASE PAY**

| Annual Base Salary: | $100,000 | | |
|---|---|---|---|

**BONUS**

| Annual Bonus Target %: | 15% | Previous Bonus Amount Paid: | $20,000 |
|---|---|---|---|
| Annual Bonus Target Amt: | $15,000 | Anticipated Bonus Amount: | $17,500 |
| Bonus Payout Frequency: | Annual | Bonus Payout Date: | 7/1/2017 |
| Does the candidate need to be employed on a certain date to receive the bonus? If so, what date? | | | 6/1/2017 |
| If the candidate leaves their current company, what amount will they receive in prorated bonus? | | | $2,500 |

**EQUITY**

| Vehicle Type 1: | RSUs | | Vesting Schedule: | 3 Year Cliff Vest |
|---|---|---|---|---|
| Equity Target: | 50,000 | Dollars | Is Award Size Based on Perf: | No |
| Vehicle Type 2: | Stock Options | | Vesting Schedule: | 4 Year Annual Vest |
| Equity Target: | 15,000 | Shares | Is Award Size Based on Perf: | Yes |
| Vehicle Type 3: | < Select > | | Vesting Schedule: | n/a |
| Equity Target: | n/a | <Select> | Is Award Size Based on Perf: | < Select > |

**LONG-TERM CASH**

| Long-Term Cash Target: | $10,000 | Performance Period: | 2 Year Cliff Vest |
|---|---|---|---|

**ADDITIONAL COMPENSATION**

**Is there any additional compensation that should be considered (e.g. allowances, additional bonuses, etc.)? Please explain and provide award type/size.**

No special circumstances.

### NIKE JOB INFORMATION

| Hiring Manager Name: | Lola Bunny | Proposed Start Date: | 4/1/2017 |
|---|---|---|---|
| Position Title: | Operations Director | Job Location: | Beaverton, OR |
| Position Number: | 2596648 | Cost Center: | 109987 |
| Job Code: | A0937 | Job Band: | E |
| Job Title: | DIR: LOGISTICS | Pay Range Minimum: | $125,000 |
| Job Pipeline: | LOGISTICS & SERVICES | Pay Range Median: | $150,000 |
| Job Family: | PRODUCT DELIVERY | Pay Range Maximum: | $175,000 |

### MOBILITY/IMMIGRATION

| Has Pre-Offer Immigration Assessment been initiated? | Yes | Has Pre-Offer Relocation Consultation been initiated? | Yes |
|---|---|---|---|
| Visa or Sponsorship Required: | Yes | Homeowner or Renter: | Homeowner |
| Type: | H1-B Visa | Potential Loss on Sale: | Yes |
| Explanation: | Hoping to relocate this candidate from the Center of the Earth to Beaverton. Will require an H1-B Visa. | Explanation: | Candidate owns a house. Loss on sale assistance will likely be required, pending assessment by Cartus. |

**Are there any unique relocation issues? Is the candidate being localized? If so, please provide context.**

Candidate will need 3 months temporary housing.

Goldstein Decl. Ex. G, Page 5 of 7

**Prince Decl., Exhibit E Page 10 of 12**

Intake Form Example

## OFFER INTAKE FORM EXAMPLE

**CONTEXT & TALENT STORY**

**CANDIDATE EXPECTATIONS: Please provide information related to any discussions related candidate expectations around salary, sign-on, etc.**

Candidate is expecting sign-on of at least $100K

**BUSINESS/HIRING MANAGER VIEWPOINT: Does the hiring manager have compensation recommendations in mind for salary, sign-on, stock, etc.?**

Hiring manager believes this is the best candidate possible and is ok with the $500K sign-on.

**TALENT STORY: What will the candidate bring to Nike? Why is this the best candidate for the job? Is this candidate a "unicorn" or the best available?**

Candidate is has potential to save struggling business unit based on skills and experience. Brings assets to Nike that we don't currently have on the bench.

**ADDITIONAL INFO: Is there any additional information that should be considered in developing this offer?**

Candidate has 2 additional offers on the table at this time.

**ATTACHMENTS**

| Candidate Resume: | Yes | Equity Award Summary or Statement: | Yes | Documentation Supporting Localization: | Yes | Additional Attachments: | No |
|---|---|---|---|---|---|---|---|

Goldstein Decl. Ex. G, Page 6 of 7

**Prince Decl., Exhibit E Page 11 of 12**

Equity Statement Examples



| IDEAL! | OKAY | NOT ENOUGH DETAIL |
|---|---|---|
| Annual awards listed separately with award type, vesting details including # of shares, vesting dates & number of shares already vested.  If this were for options, it should also show award strike price. | This isn't ideal since it doesn't show any details about the original award size, or vesting timing.  But with vesting schedule details, we can still determine walkaway value | This summary looks nice but doesn't have the level of detail that we need.  Are these awards in the format of options or RSUs?  How many shares/options have been awarded and when do they vest? |

NIKE_00024726_Confidential.xlsx                                    1 of 1

Goldstein Decl. Ex. G, Page 7 of 7

**Prince Decl., Exhibit E Page 12 of 12**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KELLY CAHILL, SARA JOHNSTON,
LINDSAY ELIZABETH, and HEATHER
HENDER, individually and on behalf of
others similarly situated,

Case No. 3:18-cv-01477-JR

ORDER

              Plaintiffs,

    v.

NIKE, INC., an Oregon Corporation,

              Defendant.

_____

RUSSO, Magistrate Judge:

      Plaintiffs Kelly Cahill, Sara Johnston, Lindsay Elizabeth, and Heather Hender brought this

action seeking class action status alleging that defendant Nike systematically discriminates against

them and other similarly situated women regarding salary and promotions. Several additional

plaintiffs filed consents to join this action.

      After the Court denied plaintiffs' motion for class certification, the parties proceeded to

"merits" discovery on plaintiffs' claims.  Currently, defendant moves for a protective order barring

Page 1 – ORDER

Prince Decl., Exhibit F Page 1 of 6

or quashing plaintiffs' deposition of third-party individual Genevieve Long,[1] and plaintiffs' move

for an order compelling defendant to:

> (1) produce discovery related to the setting of starting pay prior to October 2017
> that is responsive to Plaintiffs' Request for Production ("RFP") No. 4, RFP No. 8,
> or the Court's October 31, 2019 Order (ECF No. 89); (2) produce retention policies
> responsive to RFP No. 32; and (3) provide a declaration setting forth (a) what
> discovery responsive to RFP Nos. 4 or 8 it withheld and why, (b) how and who
> searched for and collected potentially responsive discovery related to setting
> starting pay before October 2017, and (c) if any of this responsive discovery was
> deleted, what, when, and why.

Motion to Compel (ECF 349) at p. 2.

A.      Deposition of Genevieve Long

In 2018, several Nike employees complained about gender discrimination and harassment

referenced as the Starfish Survey.  Genevieve Long served as defendant's global senior director

and human resources business partner from September 2008 until November 2018. Long received

a copy of the Survey.  Defendant asserts none of the named plaintiffs submitted complaints as part

of the Survey and that Long has no information related to plaintiffs' claims.

A party generally has no standing to object to a subpoena issued to a third party. See

Langford v. Chrysler Motors Corp., 513 F.2d 1121, 1126 (2d Cir.1975) ("In the absence of a claim

of privilege a party usually does not have standing to object to a subpoena directed to a non-party

witness.").  Moreover, as noted the deposition has already taken place and, thus, to the extent the

motion seeks to quash the subpoena pursuant to Fed. R. Civ. P. 45, the motion is denied as moot.

---

[1] On August 25, 2023, plaintiffs noticed Long's deposition for September 7, 2023.  On August 28, 2023, defendant asked to reschedule the deposition. Plaintiffs accommodated that request and rescheduled the deposition to September 27, 2023, after confirming with Long's counsel that date was acceptable.  On September 12, 2023, defendant moved for a protective order to bar the deposition but did not seek expedited consideration. The motion did not go under advisement until October 2, 2023, after the deposition took place.  Third-party Long, who previously served as a Nike human resources business partner, did not object to the deposition.  Counsel for Nike did not attend the deposition and now informs the Court the deposition was "improper" and seeks to strike the testimony.

Page 2 – ORDER

Pursuant to Fed. R. Civ. P. 26(c), a court may, for "good cause," issue a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Nike asserts the deposition seeks irrelevant testimony because none of the plaintiffs submitted Starfish complaints, and any relevant testimony Long might provide would be unreasonably cumulative and duplicative.  Nike also asserts that because Nike shared the Starfish complaints with outside counsel, any testimony Long could provide about the Starfish complaints is covered by attorney-client privilege.

Nike's general arguments fail to meet its burden to show good cause for issuance of a protective order.  The case is now in the merits discovery phase and any evidence of discrimination by Nike executives may be relevant to plaintiffs' specific allegations of discrimination and pay inequality.  See, e.g., Obrey v. Johnson, 400 F.3d 691, 698 (9th Cir. 2005) (A plaintiff attempting to establish a pattern or practice of discriminatory employment will present some anecdotal testimony regarding past discriminatory acts.); E.E.O.C. v. Farmer Bros. Co., 31 F.3d 891, 898 (9th Cir. 1994) ("Because hostility against women underlies decisions to discharge or to refuse to hire women because of their gender, evidence of sexual harassment often will be relevant to claims of gender-based employment discrimination.").  In addition, speculation regarding whether the testimony will come within any privilege is insufficient to issue a protective order.

However, given that counsel for Nike did not appear at the deposition, it did not have an opportunity to object to testimony that may have come within the attorney-client privilege. Nonetheless, it is unclear why Nike contends the deposition itself was improper as it did not seek expedited relief and the Court did not issue an order preventing the deposition from going forward. As far as third-party Long was concerned, she was obligated to appear for the properly noticed deposition.  When the Court scheduled the motion on the under-advisement calendar, it did so

Prince Decl., Exhibit F Page 3 of 6

based on Nike's failure to seek expedited consideration and did not intend the scheduling order to

stay the deposition.  Nike was properly noticed regarding the deposition and indeed plaintiffs

accommodated Nike's counsel in rescheduling the deposition.  The deponent was properly noticed

and represented by counsel at the deposition.  To the extent the Court could strike a deposition that

is not in the record before the Court, the Court declines to do so simply because Nike took the risk

to not appear at the deposition.  However, to the extent plaintiffs, may in the future, submit the

deposition or portions thereof into the record that contain inadmissible or privileged evidence,

defendant may, if appropriate move to strike.[2]  At this stage, defendant's motion to quash, for

issuance of a protective order, or to strike is denied.

B.      Plaintiffs' Motion to Compel

Plaintiffs' latest motion to compel documents that have been the subject of numerous

discovery conflicts going back more than four years again involves disputes over whether Nike

has documents responsive to the request to which Nike has repeatedly asserted it has produced "all

documents within its control and kept in the ordinary course of business."  Of particular importance

to plaintiffs are purported pre-October 2017 starting pay polices involving the collection of prior

pay information.  The Court cannot order a party to produce documents that do not exist. Plaintiffs'

mere suspicion that additional documents "must exist" is an insufficient basis to grant a motion to

compel. See Bethea v. Comcast, 218 F.R.D. 328, 329 (D. D.C. 2003). Rather, the moving party

must have a colorable basis for its belief that relevant, responsive documents exist and are being

improperly withheld. See Carter v. Dawson, 2010 WL 4483814, at *5 (E.D. Cal. Nov. 1, 2010)

(defendants' representation that they are unable to locate responsive documents precludes the grant

of a motion to compel "unless Plaintiff can identify a specific document that Defendants have

---

[2] As noted below, plaintiffs do submit a small portion of the deposition for purposes of their own discovery motion and the Court declines to strike it from the record.

Page 4 – ORDER

withheld"); Ayala v. Tapia, 1991 WL 241873, at *2 (D.D.C. Nov. 1, 1991) (denying motion to compel where moving party could not identify withheld documents).

Plaintiffs present an offer intake form suggesting collection of current pay information to construct offers to candidates for hire. Although the form is not a written policy of the purported practice itself, plaintiffs assert the form suggests there are indeed documents responsive to its request for prior pay policies in existence before October 2017. Plaintiffs also rely on Long's deposition to argue that Nike did have a policy or practice of using prior pay to determine the starting pay for new hires. Deposition of Genevieve Long at 18 (ECF 361 at p. 8-9).

Nike calls Long's credibility into question and notes her testimony is unclear as to whether Nike had an actual policy directing managers to rely on prior pay to determine starting pay for new hires, or whether there was simply an informal practice of using prior pay by some managers. This is significant as the evidence presented in support of the certification of a class motion demonstrated individual hiring managers did indeed use such a practice while other managers did not. The evidence, however, failed to show a company-wide policy. Although Nike's own actions resulted in its failure to cross examine Long on such issues, plaintiffs did not pursue the inquiry beyond a simple open-ended question. Some four plus years after plaintiffs initially sought discovery into this issue and have utilized numerous opportunities to seek the Court's intervention, the Court declines to find that the deposition provides a colorable basis to again compel Nike to make another effort to locate responsive documents.

Moreover, the intake form does not present a colorable basis for yet another search for responsive documents as it does not suggest the existence of a company-wide policy given the evidence produced through previous discovery including depositions of a Senior Director for Talent Acquisition and a Senior Director of Global Compensation among others. As noted in the

Page 5 – ORDER

==Court's ruling on class certification, the evidence suggests only that individual hiring managers had discretion to use such data==.  Accordingly, plaintiffs' motion to compel is denied.  In addition, the Court declines to order "discovery on discovery" into Nike's methods for searching for responsive documents especially in light of the lengthy and exhaustive discovery process thus far, and the expense and burden of this further duty in proportion to the individual claims in this case.

<u>CONCLUSION</u>

For the reasons stated above, defendant's motion for a protective order or to quash (ECF <u>347</u>) and plaintiffs' motion to compel (ECF <u>349</u>) are denied.

DATED this 22nd day of November, 2023.

_____
Jolie A. Russo
United States Magistrate Judge