IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br>Defendant. | Case No. 3:18-cv-01477-AB<br><br>**[PROPOSED] PRETRIAL ORDER** |

**[PROPOSED] PRETRIAL ORDER**

The following Pretrial Order is filed with the Court pursuant to L.R. 16-5.

## I.     CONCISE STATEMENT OF THE NATURE OF THE ACTION

In this employment discrimination action, Plaintiff Heather Hender alleges sex discrimination claims related to pay and promotions against NIKE.

**First**, Plaintiff brings disparate impact claims under the Oregon Equality Act, ORS 659A.030 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*.  Plaintiff alleges that NIKE used each of the following two practices and that each had a disproportionately adverse impact on women at NIKE World Headquarters: (1) NIKE's use of prior pay when setting starting salaries before October 2017; and (2) NIKE's use of its annual bonus formula for calculating annual bonuses. These disparate impact claims are tried to the Court.

**Second**, Plaintiff brings disparate treatment claims under the Oregon Equality Act and Title VII.  Hender alleges that NIKE underpaid her because of sex.  Hender also alleges that NIKE failed to promote her because of sex.  These claims are tried to a jury.

**Third**, Plaintiff alleges that, in violation of the Federal Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and the Oregon Equal Pay Act, ORS 652.220, NIKE paid her less than the average compensation of men in substantially equal or comparable jobs.  NIKE alleges that if there is a disparity, it is the result of job-related factors other than sex.  These claims are tried to a jury.

The Parties do not consent to trial by a magistrate judge.

## II.     BASES FOR FEDERAL JURISDICTION

The Parties agree that this Court has subject matter jurisdiction over the federal statutory claims under Title VII and the Federal Equal Pay Act.  *See* 28 U.S.C. §§ 1331 and 1343.  The

Parties also agree that this Court has supplemental jurisdiction over the Oregon Equality Act and Oregon Equal Pay Act claims because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

## III.    AGREED FACTS (WITH AN ASTERISK (*) BY THOSE WHERE RELEVANCE IS DISPUTED).

### A.    The Parties

**Hender**

1.    NIKE employed Heather Hender at NIKE World Headquarters from April 6, 2015 through October 12, 2020.

2.    The name of Hender's first job was Professional Intermediate: Manufacturing Engineering.  The job code was A0945.  This job was in the L-Band.  It was in the Intermediate Professional Job Level.  It was in the Manufacturing Engineering Job Subfamily.  Hender was in this job from April 6, 2015 through September 5, 2018.

3.    The name of Hender's second job was Professional Senior: Quality Assurance. The Job Code was A1013.  This job was in the U-Band.  It was in the Senior Professional Job Level.  It was in the Quality Assurance Job Subfamily.  Hender was in this job from September 5, 2018 through February 16, 2019.

4.    The name of Hender's third job was Professional Senior: Manufacturing.  The Job Code was A0946.  This job was in the U-Band.  It was in the Senior Professional Job Level.  It was in the Manufacturing Engineering Job Subfamily.  Hender was in this job from February 17, 2019 through October 12, 2020.

5.    Hender resigned her employment with NIKE effective October 12, 2020.

6.      Hender filed an EEOC Charge on November 9, 2018, a revised EEOC Charge on April 14, 2020, and received a Right to Sue Letter prior to joining this case.

7.      A former Plaintiff in this case, Kelly Cahill, filed a charge with BOLI on July 25, 2018, stating that she was making allegations on behalf of herself and "all other similarly situated female corporate employees of Nike, Inc.," and received a Notice of Right to File Suit prior to joining this case.*

8.      Hender filed a Consent to Become Party Plaintiff in Collective Action under 29 U.S.C. § 216(b) on November 19, 2018.

**NIKE**

1.      NIKE is a corporation formed under the laws of Oregon.

2.      NIKE World Headquarters is located near Beaverton, Oregon.

3.      NIKE's principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories and services.

4.      "ETW" is a commonly-used acronym at NIKE WHQ that refers to external temporary workers.

**B.      Pay Structure and Employee Evaluations**

1.      NIKE's fiscal year is from June 1 to May 31.  For example, the fiscal year ending on May 31, 2018 is referred to as Fiscal Year 2018.*

2.      Since at least 2015 through at least 2020, NIKE referred to its performance management process as Coaching For Excellence ("CFE"), which awarded employees one of five ratings based on manager discretion.

3.      Promotions at NIKE could occur through a competitive process or a non-competitive process.

4.      Competitive promotions are promotions that occurred after a job posting, which could be applied to.  Noncompetitive promotions occurred without a job posting.

**C.    Plaintiff's Evaluations, Pay, and Promotions**

1.      When NIKE hired Hender as an employee in April 2015, it offered her a starting salary of $78,600.

2.      Hender applied for a position in job code A0946 in October 2016, which she did not receive.

3.      Hender was promoted to a U-band level role on September 2, 2018.

4.      Hender received a "Highly Successful" rating in fiscal year 2018, and she received "Successful" ratings every other year.

## IV.    CLAIMS AND DEFENSES

### CLAIM ONE
**(Disparate Impact Violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Oregon Equality Act ORS 659A.030)**

**A.    Plaintiff contends**

1.      Plaintiff's prima facie disparate impact burden is met if they show NIKE used a facially neutral employment practice that had a significantly discriminatory impact upon women. Once they do so, NIKE is liable unless it can establish its affirmative defense, which requires NIKE "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity."

2.      Plaintiff asserts NIKE used the following two practices that each had an adverse impact on the compensation of women at NIKE World Headquarters: (1) NIKE's use of prior pay when setting starting salaries prior to October 2017; and (2) NIKE's use of its standardized Performance Sharing Plan formula for calculating annual bonuses.

3.      NIKE's practice of using prior pay when setting starting salaries prior to October 2017 for salaried positions at NIKE World Headquarters below the level of Vice President had a significantly disparate impact on women.

4.      NIKE admitted that it "often focused on the new hires prior salary and/or the size of the increase the new hire would receive." NIKE admitted that it sought to "remove bias from critical moments of the hiring process" by "eliminating the collection of candidate salary history." NIKE stated that its elimination of the use of prior pay in October 2017 was a "policy change." NIKE admitted that candidates' prior pay was "requisite information" for setting starting salaries before October 2017. NIKE created a standard form to collect this and other "requisite information" to streamline its processes and store information in a more organized way.

5.      The statistical analyses using multiple regression show NIKE paid similarly situated men more than women, and, after NIKE stopped using prior pay, the starting pay disparity for women dropped by more than 50%. These regressions use the data that NIKE made available, and they control for potentially non-discriminatory factors. NIKE also failed to maintain, preserve, or deleted most records showing its practice of using prior pay when setting starting salary.

6.      NIKE had one business unit, which was part of Human Resources, that was responsible for pay practices, including for starting pay, throughout NIKE World Headquarters. This business unit was called Total Rewards or Compensation. NIKE also had one business unit in Human Resources that was involved in every hire throughout NIKE World Headquarters. This business unit was called Talent Acquisition. Both business units reported to the head of

NIKE Human Resources, David Ayre, until July 2017, and then to Monique Matheson until January 2025.

7.    NIKE's practice of using prior pay when setting starting pay had a disparate impact on the starting salary of women.  It also had a disparate impact on the annual bonuses of women since one of the factors in NIKE's standardized Performance Sharing Plan ("PSP") formula was current salary.

8.    NIKE's practice of using the same formula for calculating PSP annual through at least 2022 had a significantly disparate impact on women.  From 2015 through 2022, NIKE used the exact same formula, which consisted of six factors, to calculate the annual bonus for every employee at NIKE World Headquarters in salaried positions below the level of Vice President. These factors included the amount of salary NIKE paid the employees in the fiscal year and which Band their job was in. The higher an employee's salary or the higher their Band, the higher the PSP annual bonus.  From Fiscal Year 2019 through at least Fiscal Year 2022, the value of every factor in this formula was automatically and centrally-determined in the same way, and no employees could modify the value of any factor or the formula.  Before Fiscal Year 2019, only one of the six factors in this formula was not automatically and centrally set, the "performance modifier;" the basis for setting the performance modifier percentage was performance ratings (i.e., CFE ratings), and women received as high or higher performance ratings than men.

9.    NIKE cannot meet its affirmative defense with respect to either of the two challenged practices.  NIKE did not do a validation study, impact study, job analysis, or other work in compliance with the EEOC Uniform Guidelines.  It also cannot show its practice of using prior pay when setting starting salary is job-related or consistent with business necessity

because, in this litigation, NIKE refuses to acknowledge it had this practice, which, in turn, precludes an argument that its practice meets disparate impact's affirmative defense.  NIKE admitted that these were problematic pay practices.  NIKE was unable to and did not produce evidence that could meet its burden of proving its affirmative defense.

10.    There is a presumption that Plaintiff is entitled to back pay once Plaintiff proves her prima facie case and NIKE fails to meet its burden of proving its affirmative defense.

11.    And NIKE used Plaintiff's prior pay when setting their starting salary. Nike set her starting salary before October 2017.  NIKE was unable to and did not produce evidence showing all factors used for setting Plaintiff's and similarly situated men's starting salaries.

12.    Even if such systems or policies could be justified by business necessity, less discriminatory alternatives exist that are consistent with business necessity. For example, NIKE stopped using prior pay after October 2017.

13.    Plaintiff is thus entitled to back pay, interest, attorneys' fees and costs, and injunctive relief.

### B.    **NIKE contends**

1.    NIKE denies Plaintiff's contentions except to the extent agreed in the Agreed Facts section.  NIKE also objects to Plaintiff's contentions to the extent they "recite the evidence to be offered at trial."  Local Rule 16-5(b)(4).

2.    NIKE contends that Plaintiff was paid equitably for the work she performed, considering her performance, experience, expertise, education, training, and other legitimate factors.

3.    NIKE further contends that NIKE did not have a policy or practice of using prior pay to set starting salary for its employees prior to October 2017.  Starting salary decisions at

NIKE are made by thousands of different individual hiring managers based on a variety of factors that vary depending on the role, the candidate, and the manager. For starting salaries, managers could consider, in their discretion, factors like the external market and internal equity, the applicant's relevant work experience, education and skills, and the business's financial conditions when setting an employee's starting pay. NIKE did not instruct managers to ask about or use prior salaries when setting starting pay.

4.      In 2017, Oregon passed a law that prohibited employers from inquiring into prior salaries when setting starting salaries. In accordance with that law, NIKE enacted a policy that prohibited its employees and hiring managers from asking about candidate's prior salary or salary history during the interview process. But even before this policy was enacted, NIKE never required candidates to provide prior salary during the hiring process. Nor were candidates asked about prior salary in every instance or as a matter of policy or practice.

5.      Plaintiff's expert's statistical analysis demonstrates that there is no consistent pattern of women being paid less than men at hire. Indeed, in some years, women received slightly more in starting pay and in other years, slightly less. There was no statistically significant difference in pay between men and women. Plaintiff's expert's analyses are so flawed that they are not reliable to establish that NIKE paid women less than men.

6.      Any pay differential that may exist is explained by permissible factors other than sex.

7.      Nor can Plaintiff prove that NIKE's annual bonuses had a disparate impact on women. NIKE's annual bonuses are called the Performance Sharing Plan ("PSP") awards. NIKE's PSP awards were comprised of both "Team" and "Discretionary" components. The "Discretionary" component was determined in part by the individual employee's manager

through assignment of a "Performance Modifier."  While the "Performance Modifier" involved a percentage of salary range based on the employee's CFE, managers had discretion to choose which percentage within that range, or to even exceed the range, when awarding a PSP to their employees.

8.      Plaintiff's theory is that because she believes NIKE had a practice of using prior pay, which she claims disparately impacted women, and because a factor in NIKE's PSP awards was the employee's salary, the PSP awards perpetuated the alleged disparity in pay.  Plaintiff cannot prove that NIKE had such a practice and even if such practice existed, that it disparately impacted women.  Moreover, while employee salary was a factor in the PSP calculation, the performance modifier percentage was based on manager discretion.

9.      Even if Plaintiff can establish that NIKE had a policy or practice that disparately impacted women, Plaintiff cannot demonstrate that she is entitled to damages.  Plaintiff cannot prove that she was asked about her prior salaries during the interview process or that, even if asked, those prior salaries were *used* to set starting pay.  Plaintiff cannot rely on a blanket statement that "Nike set Plaintiff's starting salary before October 2017.," because she cannot prove that NIKE always asked about prior pay before October 2017 or that prior pay was used to set starting salary in every instance.  Nor is it NIKE's burden to demonstrate the factors used for setting Plaintiff's starting salary.  Plaintiff must prove that she was harmed from the alleged practice of using prior pay, which necessarily involves proving that her prior pay was not only asked about, but also used to set her starting salary, and that her salary would have been higher had she not been asked about her prior pay (if indeed she was).  She cannot do so.

10.     Likewise, for the same reason, Plaintiff cannot demonstrate that she was harmed by NIKE's PSP awards.  To the extent that Plaintiff received PSP awards lower than her peers,

such awards were given pursuant to the discretion of their managers based on her performance and qualifications.

## CLAIM TWO
### (Disparate Treatment Violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Oregon Equality Act ORS 659A.030)

**C.**    **Plaintiff contends:**

1.      Plaintiff can meet their prima facie disparate treatment burden if they prove that discrimination against women at NIKE World Headquarters was NIKE's regular practice, rather than something unusual.

2.      If Plaintiff proves discrimination against women was NIKE's regular practice, rather than something unusual, than NIKE must prove that discrimination was not a reason for Plaintiff's lower pay or NIKE's failure to promote.

3.      Plaintiff can also meet their prima facie burden if they show that: (1) they were paid less or NIKE failed to promote them because of their sex, (2) Plaintiffs were qualified to be paid more or promoted, and (3) at least one similarly situated man was treated more favorably.

4.      Under either method, Plaintiff is not required to provide direct evidence of discrimination, because disparate treatment can be, and most often is, inferred from the existence of other facts.

5.      Discrimination against women was NIKE's regular practice, rather than something unusual.  The statistical evidence shows that NIKE paid women less and the chance of this occurring without discrimination is less than one in one billion.  This statistical evidence uses a multiple regression analysis, a well-established method in discrimination actions, and used the data NIKE provided. Multiple regression analysis controls for non-discriminatory factors, thus showing the impact of other variables, such as sex, on compensation.

6.    NIKE had a culture of discrimination against women.  NIKE executives discriminated against women and condoned discrimination against women.  Those charged with preventing discrimination, NIKE human resources, instead had a pattern of disregarding complaints and condoning discrimination against women.

7.    At least seven of the most powerful women at NIKE created what they referred to as "Starfish."  They created Starfish to try to change NIKE's pattern of discrimination against women and Human Resources' pattern of disregarding or condoning discrimination against women.  Based on both the complaints they collected and their own experiences over many years at NIKE, Melanie Strong, Nicole Hubbard Graham, Jamie Jeffries, and the other women involved determined that women at NIKE faced, among other common themes: (1) "sexual harassment and discrimination;" (2) "fear of retaliation;" and (3) "no trust in [Nike HR] if you report things."  This was listed in a document titled "Project Starfish," and was provided to Monique Matheson, Nike's Chief Human Relations Officer at the time, and Hilary Krane, Nike's General Counsel, in around February 2018.

8.    After receiving written complaints, verbal complaints, and other information resulting from Starfish, NIKE had no choice but to acknowledge its pattern of discrimination.  In a March 2018 email and May 2018 speech, NIKE's CEO admitted that the "courageous employees" who led or came forward as part of Starfish had described "behavior" contrary to NIKE's stated values, that Human Resources "processes underserved [NIKE and its employees] in recent years," and that NIKE needed "to restore trust in places where it has eroded."  The CEO confirmed that the "main set of complaints that gave rise to this process have been acted on and employee exits from this larger investigation will be behind us after this week." (ellipses in original omitted).

9.     NIKE acknowledged its pattern of discrimination because the Starfish effort caused NIKE to force its second-highest executive and the heir apparent to the CEO role, Trevor Edwards, to leave NIKE.  The Starfish effort and its results showing a pattern of discrimination at NIKE also forced NIKE to discharge many other executives, including Simon Pestridge, Greg Thompson, Jayme Martin, and Daniel Tawiah.  For example, there were many complaints about Daniel Tawiah's discriminatory treatment of women prior to Starfish. Before Starfish, NIKE had disregarded complaints against Mr. Tawiah, including four complaints from Kelly Cahill.  NIKE, instead, promoted Mr. Tawiah even though a Senior Director in Human Resources, Genevieve Long, raised concerns to three executives before his promotion about his discriminatory treatment of women.  Following the release of Starfish, NIKE discharged Mr. Tawiah along with many other executives.  NIKE also recognized it had to do a comprehensive review of its Human Resources systems and practices.  And NIKE was forced to recognize that it had to do pay equity and promotion analyses to identify and remediate discrimination, but NIKE failed to do or complete such analyses.

10.     NIKE's culture of sex discrimination was modeled by those at the highest levels of NIKE, including Trevor Edwards, David Ayre, Jayme Martin, and Monique Matheson.  David Ayre, the head of Human Resources immediately prior to Ms. Matheson, discriminated against or condoned discrimination against women and presided over a Human Resources system that underserved women at NIKE.  After NIKE discharged Mr. Ayre, NIKE replaced him with Ms. Matheson.  Ms. Matheson condoned discrimination.  After Ms. Matheson and NIKE's general counsel, Hilary Krane, received a report of serious sex discrimination by a then NIKE employee, they chose to not investigate the report for over a year.  In January 2025, NIKE replaced Ms. Matheson with Treasure Heinle.  NIKE chose to promote Ms. Heinle to the head of Human

Resources even though it knew that Ms. Heinle has disregarded complaints of discrimination. Many NIKE executives, including numerous executives involved in Starfish or who otherwise reported complaints as a result of Starfish, admitted, recognized, or described NIKE's pattern of discrimination against women, culture of discrimination against women, and Human Resources' pattern of disregarding, condoning, and otherwise failing to address discrimination.

11.     NIKE knew before Starfish that women were paid less and otherwise discriminated against, but NIKE chose not to address the discrimination.  It knew that it needed to do pay equity and promotion analyses to identify and remediate discrimination, but it failed to do so.

12.     NIKE has demonstrated its consciousness of guilt with its numerous attempts to suppress evidence concerning Starfish's creation, implementation, and NIKE's responses to Starfish.  NIKE's head of Human Resources, Monique Matheson, provided misleading testimony related to Starfish when she was deposed in 2021.  NIKE's Rule 30(b)(6) witness, Allison Daugherty, provided misleading testimony related to Starfish when she was deposed in 2021. NIKE deleted or suppressed evidence, including evidence responsive to discovery requests as well as evidence responsive to Court Orders.  NIKE collected and produced clearly responsive discovery in another matter during this litigation in 2019 but withheld it from Plaintiffs here. NIKE intentionally deleted communications and documents related to Starfish, including communications or documents sent or received by those involved in either organizing, leading, or responding to Starfish, including Jamie Jeffries, Nicole Graham, Melanie Strong, Hannah Jones, Mark Parker, Hilary Krane, and Monique Matheson.

13.     Other examples include Nike subjecting Kelly Cahill to demeaning, attacking, degrading, and condescending treatment from Daniel Tawiah, she reported this discrimination to

NIKE, but NIKE failed to address the discrimination.  Cahill witnessed and was aware of Mr. Tawiah's discriminatory behavior toward other women, including how Mr. Tawiah (1) called female employees dykes; (2) degraded and berated women, making them cry; (3) spoke to women, including Cahill, in a demeaning, attacking, degrading, and condescending manner; and (4) put his crotch in coworker Lauren Anderson's face and made a sexually inappropriate comment.

14.     NIKE HR told Mr. Tawiah about complaints against him while failing to address these complaints. Cahill went to HR in the spring of 2016 and told Tyler Allen about the language Mr. Tawiah used against two women, about being assigned more responsibility without recognition, and overall lack of leadership; Mr. Allen said it was being documented but no next steps were taken, and NIKE deleted or suppressed these records.

15.     Plaintiff suffered from NIKE's pattern of discrimination.

16.     Plaintiff received performance ratings that were "Successful" or higher every year they worked at NIKE.  Plaintiff was never placed on a performance information plan, terminated for cause, or found to have violated NIKE's Matter of Respect Policy.

17.     Despite being equally or more qualified, Hender was paid less than similarly situated men, Geoffrey Weston and Trent Waddell.

18.     NIKE had paid Hender less than similarly situated men since she started working at NIKE.  NIKE knew this, but it failed to address it.

19.     NIKE failed to promote Hender despite her being qualified for a promotion. NIKE noncompetitively promoted a similarly situated men, including Trent Waddell, before Hender.

20.     Hender experienced NIKE's boys club atmosphere.  She experienced a greater underrepresentation of women in NIKE's engineering areas than in other businesses with engineers.

21.     NIKE has been unable to and did not produce evidence that could justify Plaintiff's lower pay or NIKE's failure to promote them.

22.     Even if NIKE alleges any such justifications, they are pretext.  NIKE had a pattern of discrimination against women.  It had a culture of discrimination against women.

23.     Plaintiff is thus entitled to back pay, interest, attorneys' fees and costs, injunctive relief, and punitive damages.

**D.     Defendant contends**

1.     NIKE denies Plaintiff's contentions except to the extent agreed to in the Agreed Facts section. NIKE also objects to Plaintiff's contentions to the extent they "recite the evidence to be offered at trial."  Local Rule 16-5(b)(4).

2.     NIKE reincorporates contentions asserted in its defense to the first claim for relief.

3.     NIKE does not have a regular practice of discriminating against women.  In fact, the statistical evidence demonstrates that there are no statistically significant adverse pay or promotion outcomes for women.  Nor can Plaintiff establish that she experienced unlawful discrimination, as most of the allegations set forth in Plaintiff's section above do not relate to her.

4.     NIKE had, and continues to have, anti-discrimination and anti-harassment policies in place to ensure an inclusive and diverse culture. For example, NIKE's Matter of Respect policy instructs its employees and managers that harassment and discrimination would not be tolerated.  It emphasizes that diversity and inclusion are NIKE's strengths and encourages

employees to report any behavior that appears to be contrary to its policies.  Likewise, NIKE instructs its employees regarding the law surrounding equal employment and Title VII.

5.      NIKE further denies and objects to the allegations in paragraphs 7-14 of Plaintiff's contentions.  The allegations in paragraphs 7-14 will be the subject of motions *in limine* due to their lack of relevance to this trial regarding pay and promotions discrimination.

6.      For example, NIKE disputes and objects to the relevance of the Starfish questionnaires to this trial.  Plaintiff did not fill out or otherwise participate in the creation, distribution, or collection of the Starfish questionnaires.  Plaintiff cannot demonstrate that the Starfish questionnaires have any connection to her claims that she was "paid less or NIKE failed to promote her because of her sex."  Me too evidence is only relevant if Plaintiff can prove that the individual complainants in the Starfish questionnaires worked at the same job site, worked for the same department or supervisor, had similar experiences that were close in time, were in the same protected group, and experienced the same kind of discrimination, harassment, or retaliation.  Plaintiff attempts to prove her claim based on evidence related to other women, who are not related.  This is improper and does not prove that Plaintiff experienced discrimination in pay and promotion decisions on the basis of sex.

7.      The Starfish questionnaires were an informal effort led by a small group of female employees at NIKE.  They were passed from hand-to-hand between employees and asked only whether an employee had experienced harassment or discrimination.  In or around February or March 2018, one of the individuals involved in the Starfish questionnaires, Nicole Hubbard Graham, compiled the questionnaires that had been collected by the small group of female employees and hand delivered them to Mo Matheson, NIKE's former Chief Human Resources Officer, and Hilary Krane, NIKE's former General Counsel.  Ms. Hubbard Graham delivered

around 30 or so questionnaires total.  Ms. Matheson and Ms. Krane made themselves available to employees for meetings.  Moreover, NIKE properly investigated the allegations set forth in the questionnaires and took appropriate actions as necessary.

8.    Likewise, NIKE denies and objects to the allegations regarding spoliation and misleading testimony in paragraphs 12 and 14 as not relevant to the litigation, prejudicial, and lacking foundation.  Plaintiff has no evidence to support these unfounded allegations.  Testimony confirms that only around 30 or so Starfish questionnaires were provided to NIKE, and NIKE produced them.  NIKE likewise produced all complaints against Danny Tawiah, although it is unclear why any evidence about Mr. Tawiah is relevant to this case, since he had no interaction with Plaintiff, nor did he have the ability to influence any pay or promotion decisions related to her employment.  Plaintiff's attempt to introduce evidence regarding Mr. Tawiah, and any other alleged wrongdoers who had nothing to do with Ms. Hender's employment, will be the subject of one of NIKE's upcoming motions *in limine*.

9.    Plaintiff cannot prove that similarly situated men were paid more than she was paid.  Geoffrey Weston and Trent Waddell, the identified alleged comparators, were not similarly situated for several reasons. For example, while Plaintiff was a Process Engineer, Mr. Weston was an Innovation Engineer.  Mr. Waddell was an Automation Engineer.  They also had different education, experience, and contributions to NIKE.

10.    Nor can Plaintiff prove that she was equally or more qualified than Mr. Weston or Mr. Waddell.

11.    Plaintiff cannot prove that NIKE failed to promote her despite being qualified for a promotion or that a similarly situated male employee received the role.  Mr. Waddell had a different job with different responsibilities and a different manager.

12.     In sum, NIKE will demonstrate that the Plaintiff's alleged comparators were not similarly situated.  NIKE will demonstrate that any pay differentials are explained by legitimate factors.  And NIKE will demonstrate that any promotion decisions were made based on bona fide reasons other than sex, such as, but not limited to, poorer performance or lesser skill or qualifications.

13.     Plaintiff cannot prove that NIKE intentionally and willfully retaliated against her in the face of a perceived risk that its actions would violate Title VII.  Thus, Plaintiff cannot meet her burden for punitive damages.

14.     Because the alleged actions were not taken by senior management and because NIKE implemented good faith anti-discrimination and anti-harassment policies, punitive damages are precluded.

## CLAIM THREE
### (Violations of the Federal Equal Pay Act, 29 U.S.C. §§ 206, *et seq.*)

**E.**     **Plaintiff contends**

1.     Plaintiff's *prima facie* burden is met if they prove NIKE paid them less than the average base pay, or the average annual bonuses, of men in substantially equal jobs.

2.     At NIKE, jobs NIKE placed in the same NIKE job code are substantially equal. NIKE's use of its common job evaluation system that NIKE used to classify jobs (NIKE refers to this classification system as its "job architecture") shows which jobs were substantially equal to each Plaintiff's jobs.  Jobs in the same job code, according to NIKE, require the same minimum skills, responsibilities, and experience.  They are also performed under similar working conditions. NIKE used job codes to compare employee pay.

3.     NIKE paid Hender a lower salary than the average salary for men in the same job code as her in Fiscal Year 2019 and in Fiscal Year 2020.

4.      NIKE paid Hender lower annual bonuses than the average annual bonuses for men in the same job code as her in Fiscal Year 2019 and in Fiscal Year 2020.

5.      Once Plaintiff meets their *prima facie* burden, NIKE is liable unless it can prove its statutory affirmative defense justifies 100% of the disparity.  To do so, NIKE must prove not simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the entire wage disparity.  And NIKE must show the reasons were job-related.

6.      NIKE cannot prove its affirmative defenses.  NIKE has been unable to and did not produce evidence showing the reasons that were in fact used to make the compensation decisions or that can explain 100% of the disparities.  NIKE cannot show any purported reasons are job-related.  NIKE failed to maintain records concerning compensation and its practices.  NIKE must show that its practice of using prior pay did not cause any amount of the pay disparity because prior pay cannot contribute to any disparity under the EPA.  In addition, the evidence described above concerning Nike's pattern or culture of discrimination show any alleged reasons NIKE provides lack credibility.  This includes the evidence describe above related to Starfish, why it was created, by whom, what they found, and NIKE's responses to Starfish-related complaints and investigations.

7.      If NIKE disregarded the very possibility that it violated the EPA, then it willfully violated the EPA and thus the statute of limitations is three-years, rather than two years.

8.      Plaintiff will show that NIKE disregarded the very possibility that it violated the EPA because it knew that women were potentially paid less than men but failed to appropriately examine, remedy, or otherwise address.  Instead, complaints of discrimination against women were disregarded or condoned.

9.       Since at least 2012, NIKE HR and executives received reports for "Two Times" pay showing women were paid less but NIKE did not take steps to appropriately determine and address whether it was underpaying women.  NIKE looked at the pay of women, including Plaintiff, in comparison to men in the same job code.  NIKE knew Plaintiff was being underpaid compared to men in substantially equal jobs, but NIKE failed to appropriately investigate and address these underpayments.  NIKE knew it should conduct pay equity analyses to identify and correct pay disparities, but NIKE never conducted and/or completed such analyses.  NIKE knew women were discriminated against, but NIKE did not take reasonable steps to address or prevent the discrimination.  Even though NIKE knew that its standardized PSP formula for calculating annual bonuses had a disproportionately negative impact on women, NIKE continued to use this formula, including the use of current salary when calculating annual bonuses.  NIKE also was unable to and did not produce evidence showing that it took appropriate steps to determine or address the very possibility it was violating the EPA.

10.      In addition, the evidence described above concerning Nike's pattern or culture of discrimination show NIKE's willfulness. This includes the evidence described above related to Starfish, why it was created, by whom, what they found, and NIKE's responses to Starfish-related complaints and investigations.

11.      Plaintiff is thus entitled to back pay, interest, liquidated damages, and attorneys' fees and costs.

**F.       Defendant contends**

1.       NIKE denies Plaintiff's contentions except to the extent agreed to in the Agreed Facts section.  NIKE also objects to Plaintiff's contentions to the extent they "recite the evidence to be offered at trial."  Local Rule 16-5(b)(4).

2.     Plaintiff cannot prove that she was paid less than males performing substantially equal work.

3.     Individuals in the same job code do not necessarily perform the same work.  In fact, the responsibilities and job requirements involved in a particular job code can, and often do, involve widely varied work.  Indeed, while the general title of a job in a particular job code may be similar, the job itself may be in a completely different function, performing completely different work.  Thus, Plaintiff cannot meet her burden simply by asserting that all jobs within a job code are substantially equal.

4.     Plaintiff has not proven which jobs, if any, within a job code are substantially equal and, thus, her calculation of the average salary for men in the same job code does not support her Equal Pay Act claims.  Her calculation does not control for easily measured differences in jobs within a job code associated with differences in skill, effort, responsibilities, working conditions, etc.

5.     NIKE will demonstrate that Plaintiff's expert analysis is flawed and does not demonstrate that women were paid less than men at NIKE.  Nor does Plaintiff's expert analysis show that Plaintiff was paid less than male employees.

6.     NIKE will demonstrate that any pay differential is explained by factors other than sex, such as education, experience, skill, and performance.

7.     The allegations in paragraph 9 are unfounded.  NIKE denies and Plaintiff cannot prove that any discrepancy in pay was willful.

**CLAIM FOUR**
**(Violations of the Oregon Equal Pay Act, ORS 652.220)**

G.    **Plaintiff contends**

1.    Plaintiff can meet their prima facie burden if they prove they were paid less than the average base pay, or the average annual bonuses, of men in comparable jobs.

2.    Jobs in the same job code are comparable. NIKE's use of its common job evaluation system (which it refers to as its "job architecture") shows which jobs were comparable to each Plaintiff's job. Jobs in the same job code, according to NIKE, require the same minimum skills, responsibilities, and experience. They are also required to be performed under substantially similar working conditions.

3.    NIKE paid Hender a lower salary than the average salary for men in the same job code as her in Fiscal Year 2019 and in Fiscal Year 2020.

4.    NIKE paid Hender lower annual bonuses than the average annual bonuses for men in the same job code as her in Fiscal Year 2019 and in Fiscal Year 2020.

5.    Once Plaintiff meets their *prima facie* burden, NIKE is liable unless it can prove its statutory affirmative defense justifies 100% of the disparity. To do so, NIKE must prove not simply that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the entire wage disparity. And NIKE must show the reasons were job-related.

6.    NIKE cannot prove its affirmative defenses. NIKE has been unable to and did not produce evidence showing the reasons that were in fact used to make the compensation decisions or that can explain 100% of the disparities. NIKE cannot show any purported reasons are job-related. NIKE failed to maintain records concerning compensation and its practices. NIKE must show that its practice of using prior pay did not cause any amount of the pay disparity because

prior pay cannot contribute to any disparity under the EPA. In addition, the evidence described above related to Starfish, why it was created, by whom, what they found, and NIKE's responses to Starfish-related complaints and investigations show any alleged reasons NIKE provides lack credibility.

7.    Plaintiff is thus entitled to back pay, interest, liquidated damages, attorneys' fees and costs, and punitive damages.

## H.    **Defendant contends**

1.    NIKE denies Plaintiff's contentions except to the extent agreed to in the Agreed Facts section. NIKE also objects to Plaintiff's contentions to the extent they "recite the evidence to be offered at trial." Local Rule 16-5(b)(4).

2.    NIKE reincorporates contentions asserted in its defense to the third claim for relief.

3.    Individuals in the same job code do not necessarily perform the same work. In fact, the responsibilities and job requirements involved in a particular job code can, and often do, involve widely varied work. Indeed, while the general title of a job in a particular job code may be similar, the job itself may be in a completely different function and/or may be performing completely different work.

4.    Plaintiff has not proven which jobs, if any, within a job code are comparable and, thus, her calculation of the average salary for men in the same job code does not support her Equal Pay Act claim. Her calculation does not control for easily measured differences in jobs within a job code associated with differences in skill, effort, responsibilities, working conditions, etc.

5.      NIKE will demonstrate that Plaintiff's expert analysis is flawed and does not demonstrate that women were paid less than men at NIKE.  Nor does Plaintiff's expert analysis show that Plaintiff was paid less than male employees.

6.      NIKE will demonstrate that Plaintiff's salary was based on factors other than sex, such as education, experience, skill, and performance.

## V.      OTHER LEGAL ISSUES

### A.      Disparate impact claims

1.      To prove her prima facie disparate impact claims alleging NIKE's practice of using prior pay when setting starting salaries prior to October 2017 had a disparate impact on women, is Plaintiff required to prove, as NIKE asserts, that prior pay was used to set starting salary in every instance?

2.      If Plaintiff meets her prima facie burden and NIKE does not prove the practice is job-related and consistent with business necessity, its affirmative defenses, is Plaintiff, as Plaintiff contends, presumptively entitled to back pay? Or, as NIKE contends, must Plaintiff then submit additional evidence that proves the following before receiving damages: (i) that prior pay was used to set starting pay in every instance or (ii) her prior pay was not only asked about, but also used to set her starting salary, and that her salary would have been higher had she not been asked about her prior pay?

### B.      Equal Pay Act claims

1.      To prove the element of "paid less than" for her prima facie equal pay act claims, is Plaintiff required to show she was paid less than men when "control[ling] for easily measured differences in jobs within a job code associated with differences in skill, effort, responsibilities, working conditions, etc."?

2.      If Plaintiff proves that she was paid less than males in substantially similar or comparable jobs, does NIKE need to prove, as Plaintiff contends, that 100% of the disparity is due to job-related factors?

**C.      Statute of Limitations Questions**

1.      For the Oregon Equal Pay Act claim, is the damages period for Plaintiff calculated from the date of filing of Plaintiff's administrative charge, or the earliest filed administrative charge by her former co-plaintiffs?

2.      For the Title VII claim, is the damages period for Plaintiff calculated from the date of filing of Plaintiff's administrative charge, or the earliest filed administrative charge by her former co-plaintiffs?

3.      For the disparate treatment and disparate impact claims under Oregon law, is the damages period for Plaintiff calculated from the date of filing of Plaintiff's administrative charge, or the earliest filed charge by her former co-plaintiffs?

## VI.      AMENDMENTS TO PLEADINGS

**A.      None.**

DATED: January 26, 2026

/s/ Byron Goldstein

Byron Goldstein (admitted *pro hac vice*)
byron@goldsteinbrowne.com
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
barry@goldsteinbrowne.com
GOLDSTEIN BROWNE, PC
1111 Broadway, Office 04-117
Oakland, CA 94607
Tel: 510-584-9020

Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com
David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Kathryn P. Roberts, OSB #064854
KathrynRoberts@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085

Craig J. Ackermann (admitted pro hac vice)
cja@ackermanntilajef.com
Brian Denlinger (admitted pro hac vice)
bd@ackermanntilajef.com
Erika Smolyar (admitted pro hac vice)
es@ackermanntilajef.com
ACKERMANN & TILAJEF, P.C
315 South Beverly Drive, Suite 504
Beverly Hills, CA 90212
Tel: (310) 277-0614
Fax: (310) 277-0635

Laura L. Ho (admitted pro hac vice)
lho@dhkl.law
James Kan (admitted pro hac vice)
jkan@dhkl.law
Katharine L. Fisher (admitted pro hac vice)
kfisher@dhkl.law
DARDARIAN, HO, KAN & LEE
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800
Fax: (510) 835-1417

DATED: January 26, 2026

/s/ Felicia A. Davis

Daniel Prince (admitted *pro hac vice*)
danielprince@paulhastings.com
Felicia A. Davis (admitted *pro hac vice*)
feliciadavis@paulhastings.com
Lindsey C. Jackson (admitted *pro hac vice*)
lindseyjackson@paulhastings.com
Alyssa K. Tapper (admitted *pro hac vice*)
alyssatapper@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, CA 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Laura E. Rosenbaum, OSB No. 110061
Laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

*Attorneys for Defendant NIKE, Inc.*

916628.2

The foregoing Pretrial Order is:

_____ Approved

SO Ordered this ___ day of _____, 2026.

_____

AMY M. BAGGIO

United States District Judge