**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
**Kelsie G. Crippen, OSB #193454**
KelsieCrippen@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@dhkl.law
**James Kan** (admitted *pro hac vice*)
jkan@dhkl.law
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@dhkl.law
DARDARIAN HO KAN & LEE
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Counsel for Plaintiffs
[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-AB<br><br>**PLAINTIFF'S MOTION FOR LEAVE TO FILE A RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>**FILED UNDER SEAL**<br><br>**ORAL ARGUMENT REQUESTED** |

**Byron Goldstein** (admitted *pro hac vice*)
byron@goldsteinbrowne.com
**Barry Goldstein**, Of Counsel (admitted *pro hac vice*)
barry@goldsteinbrowne.com
GOLDSTEIN BROWNE, PC
1111 Broadway 3rd Floor, Office 04-117
Oakland, CA 94607
Telephone: (510) 584-9020
Email: team@goldsteinbrowne.com


**Craig Ackerman** (admitted *pro hac vice*)
cja@ackermanntilajef.com
**Brian Denlinger** (admitted *pro hac vice*)
bd@ackermanntilajef.com
**Erika Smolyar** (admitted *pro hac vice*)
es@ ackermanntilajef.com
ACKERMANN & TILAJEF PC
315 S Beverly Drive, Suite 504
Beverly Hills, CA 90212
Telephone: (310) 277-0614 | Fax: (310) 277-0635

## <u>TABLE OF CONTENTS</u>

**Page**

LR 7-1(A) CERTIFICATION ....................................................................................................1

MOTION.....................................................................................................................................1

MEMORANDUM OF LAW ......................................................................................................2

I.     INTRODUCTION .............................................................................................................2

II.    ARGUMENT .....................................................................................................................5

        A.     Rule 23 and Binding Precedent Authorize Renewed Class Certification Motions at Any Time Before Final Judgment. ........................................5

        B.     New Evidence that Nike Withheld for Years Requires Leave to File a Renewed Class Certification Motion. .......................................................8

               1.     The Court's Initial Commonality Ruling was Based on a Misleading Record Curated by Nike to Exclude Key Evidence.................8

               2.     Discovery Resumes, Nike Continues Denying the Existence of Evidence, But New Evidence is Obtained Demonstrating the 2022 Record was Materially Misleading. ...........................................................14

                        a.     The Transformed Record Concerning Starfish Makes for a Potent Classwide Record in Support of the Pattern or Practice Claim. ................................................................17

                        b.     On the Disparate Impact Claim, Nike's Late-Produced Evidence Shows Nike Required the Use of Prior Pay. .................25

               3.     Even Nike Now Admits Commonality is Met. .........................................31

                4.     The New Evidence and Other Developments Warrant Leave to File a Renewed Motion for Class Certification................................................31

III.    CONCLUSION................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)............................................................................................................4, 31

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)...............................................................................................................2

*Andren v. Alere, Inc.*,
    No. 16CV1255-GPC (AGS), 2018 WL 1920179 (S.D. Cal. Apr. 24, 2018)............................6

*Bostock v. Clayton Cnty., Ga.*,
    590 U.S. 644 (2020)..............................................................................................................29

*Bouman v. Block*,
    940 F.2d 1211 (9th Cir. 1991) .............................................................................................29

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ...............................................................................................6

*Buchanan v. Tata Consultancy Servs., Ltd.*,
    2017 WL 6611653 (N.D. Cal. Dec. 27, 2017)......................................................................33

*Cahill v. Non-Party Media Organizations Insider Inc.*,
    No. 24-165, 2025 WL 841196 (9th Cir. Mar. 18, 2025)...............................................3, 9, 32

*Chamberlan v. Ford Motor Co.*,
    402 F.3d 952 (9th Cir. 2005) ...............................................................................................14

*Chen-Oster v. Goldman, Sachs & Co.*,
    325 F.R.D. 55 (S.D.N.Y. 2018) ...........................................................................................25

*Cody v. City of St. Louis ex rel. Medium Sec. Inst.*,
    103 F.4th 523 (8th Cir. 2024) ...............................................................................................5

*Computer Task Grp., Inc. v. Brotby*,
    364 F.3d 1112 (9th Cir. 2004) .............................................................................................32

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
    482 F.3d 1091 (9th Cir. 2007) ........................................................................................7, 33

*Cooper v. Fed. Reserve Bank of Richmond*,
    467 U.S. 867 (1984)...............................................................................................................8

*Davidson v. O'Reilly Auto Enters., LLC,*
    968 F.3d 955 (9th Cir. 2020) ................................................................5, 6

*Edwards v. First Am. Corp.*,
    385 F. App'x 629 (9th Cir. 2010) .............................................................7

*Emami v. Mayorkas,*
    725 F. Supp. 3d 1046 (N.D. Cal. 2024) .....................................................4

*Fair Hous. of Marin v. Combs,*
    285 F.3d 899 (9th Cir. 2002) .................................................................32

*Freyd v. Univ. of Or.*,
    990 F.3d 1211 (9th Cir. 2021) ...............................................................18

*Hargrove v. Sleepy's LLC,*
    974 F.3d 467 (3d Cir. 2020)....................................................................5

*Hartman v. United Bank Card, Inc.,*
    291 F.R.D. 591 (W.D. Wash. 2013) .........................................................6

*Lewis v. City of Chi.*,
    560 U.S. 205 (2010)................................................................................8

*Little v. Windermere Relocation, Inc.,*
    301 F.3d 958 (9th Cir. 2002) .................................................................21

*Microsoft Corp. v. Baker,*
    582 U.S. 23 (2017)..................................................................................5

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005) ....................................................8, 18, 25

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ....................................................2, 25, 29

*Parra v. Bashas', Inc.*,
    291 F.R.D. 360 (D. Ariz. 2013) ...............................................................7

*Perez v. Safelite Grp., Inc.*,
    553 F. App'x 667 (9th Cir. 2014) .............................................................7

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)..............................................................................21

*Ricci v. DeStefano*,
    557 U.S. 557 (2009)................................................................................8

*Romero v. Securus Techs., Inc.*,
    331 F.R.D. 391 (S.D. Cal. 2018) .............................................................6

*Sali v. Corona Reg'l Med. Ctr.*,
    909 F.3d 996 (9th Cir. 2018) ................................................................7

*Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*,
    5 F.3d 1255 (9th Cir. 1993) ................................................................6

*Segar v. Smith*,
    738 F.2d 1249 (D.C. Cir. 1984) ..........................................................18

*Slack v. Swift Transp. Co. of Arizona, LLC*,
    No. C11-5843 BHS, 2018 WL 3344790 (W.D. Wash. July 9, 2018)......................7

*Stender v. Lucky Stores, Inc.*,
    803 F. Supp. 259 (N.D. Cal. 1992) ................................................18, 25

*Stockwell v. City & Cnty. of San Francisco*,
    749 F.3d 1107 (9th Cir. 2014) ..........................................................2, 8

*Terrill v. Electrolux Home Prods., Inc.*,
    274 F.R.D. 698 (S.D. Ga. 2011) ..........................................................7

*United States v. Castillo*,
    615 F.2d 878 (9th Cir. 1980) ............................................................21

*Williams v. Big Picture Loans, LLC*,
    339 F.R.D. 46 (E.D. Va. 2021) ............................................................7

**State Statutes**

Oregon Equal Pay Act ............................................................................8

**Rules**

Fed. R. Civ. P.
    16........................................................................................16
    23..............................................................................5, 6, 7, 14
    23(a).....................................................................................5
    23(b).....................................................................................5
    23(c).....................................................................................5
    23(c)(1)(C)............................................................................2, 5
    30(b)....................................................................................19
    30(b)(6) ............................................................................ *passim*

**Other Authorities**

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in Reference
    Manual on Scientific Evidence* 303 (Fed. Jud. Ctr. 3d ed., 2011) ..........................18

Manual for Complex Litig., § 32.43 ................................................................31

## LR 7-1(A) CERTIFICATION

Pursuant to Local Rule 7-1(a), counsel for Plaintiff certifies that they made a good faith effort through telephone conferences regarding certification of the putative class and the evidentiary issues related to this motion to resolve the issues but the parties could not reach a resolution.

## MOTION

Pursuant to Dkt. 647 and Rule 23, Plaintiff moves for leave to file a renewed motion for class certification. This Motion is based on the memorandum of law, declarations of Byron Goldstein and Erika Smolyar, evidence submitted therewith, and the record in this litigation.

## MEMORANDUM OF LAW

## I.     INTRODUCTION

This Court has clear authority to afford Plaintiff the opportunity to use the new evidence in support of a motion for class certification. Rule 23(c)(1)(C) explicitly empowers courts to "alter or amend" an order that "denies class certification" at any time before final judgment. The Supreme Court confirms it is appropriate to do so "based on circumstances developing as the case unfolds."[1]

Here, the 2023 decision declined to certify based on its commonality findings from the record at the time, but the new evidence provides a materially stronger record that will demonstrate that Rule 23's elements are satisfied.[2] A plaintiff satisfied commonality if they show, by a preponderance of the evidence, that one significant common question, such as an element for liability, "is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."[3] After weighing the evidence to make factual findings, the 2023 decision determined these findings meant that this standard was not satisfied. Crucial to the Court's factual findings were: (1) its determination that Plaintiff's evidence was insufficient, and (2) its reliance on assertions from Nike's declarations submitted with its opposition. Both bases have since materially changed.  And even Nike now contends that commonality is satisfied as to the class.

First, the law is clear that new evidence warrants a renewed class certification motion, especially where, like here, it is crucial to meeting Rule 23's requirements. The new evidence, according to this Court's and the Ninth Circuit's decisions in this case, concerns "crucial" evidentiary support for class certification. New evidence for the pattern or practice claim relates

---

[1] *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 479, n.9 (2013).

[2] The Magistrate Judge issued Findings and Recommendations on November 22, 2022 (Dkt. 310), which the District Court Judge adopted on March 21, 2023. Dkt. 335.

[3] *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664, 667 (9th Cir. 2022) (en banc) (emphasis in original); *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1111-12 (9th Cir. 2014).

to Project Starfish, evidence of which the Ninth Circuit found "formed a crucial part of Plaintiffs' class certification motion."[4] Under the 2022 record Nike curated to exclude documents and witnesses, Nike could claim Starfish was meaningless because Nike represented that it was created by unknown people, mostly anonymous, otherwise unworthy of a response, and thus none of Nike's actions or admissions in 2018 were in response to Starfish-related complaints or investigations. But the new evidence demonstrates the opposite, including that nine of the most powerful women at Nike determined they needed to take extraordinary actions to address Nike's pattern of discrimination and condoning discrimination against women. There is also new evidence for the disparate impact claim alleging Nike had a practice, until October 2017, of using prior pay when setting starting salary: After the Court denied commonality because it found the evidence "insufficient" to prove that Nike "required" the use of prior pay, Nike produced evidence in 2024 demonstrating that Nike did require the use of prior pay. All this evidence is new even though Plaintiff requested it in 2019 and made repeated efforts to obtain it because Nike withheld it, and its Rule 30(b)(6) and Chief Human Resources Officer provided misleading testimony in 2021.

Second, while assertions from Nike's declarations submitted with its initial opposition to class certification provided crucial support for the 2023 decision's findings, these declarants are now excluded or should be afforded little weight. After discovery resumed later in 2023, Nike was unable to produce evidence substantiating these assertions. Because the record is now final and complete, with all potential trial witnesses and exhibits identified, their testimony was excluded when Nike chose not to identify them as potential trial witnesses.[5]

Third, Nike now agrees the 2023 commonality finding should be altered since it contends

---

[4] *Cahill v. Non-Party Media Organizations Insider Inc.*, No. 24-165, 2025 WL 841196, at *1 (9th Cir. Mar. 18, 2025) (internal quotation omitted).

[5] *See* Dkt. 557 at 6 ("**No exhibits or testimony will be received into evidence at trial … unless presented in accordance with this Order.**") (emphasis in original).

All evidence cited herein is thus limited to what is available for trial – exhibits and witnesses identified for trial.

this Court should find commonality satisfied. This is a clear and necessary conclusion from Nike's assertion that this Court can approve a class action settlement because such approval requires, the Supreme Court held, the district court to find commonality satisfied.[6]

Meanwhile, there is no decision on the merits, the alleged harm to women at Nike is too widespread, and the conduct is too egregious to justify adherence to the 2023 decision because it is based on the incomplete, misleading record that Nike created. Nike withheld responsive evidence, benefitting from it while prejudicing Plaintiff. Nike's approach to discovery—described by this Court as "recalcitrant" and "lacking transparency"—should not be rewarded by the Court declining to consider the new evidence once it is uncovered. Doing so not only deprives the class from having the class discrimination claims fairly considered but also rewards and encourages gamesmanship in discovery.[7]

Plaintiff's motion will further inform the Court, prior to scheduling the trial and based on the current record, as to Rule 23's "overall goal," which is "to select the method best suited to adjudication of the controversy fairly and efficiently." *Emami v. Mayorkas*, 725 F. Supp. 3d 1046, 1055 (N.D. Cal. 2024) (quoting *Amgen,* 568 U.S. at 460) (internal quotations omitted). This includes, for example, whether it is more efficient to preside over one trial that resolves the liability questions for the whole class or over thousands of individual trials with the same evidence. Plaintiff should thus have the opportunity to file a renewed motion requesting class certification for the pattern and practice and disparate impact prior pay claims.

---

[6] *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (vacating district court's class action settlement approval since commonality requires "undiluted, even heightened, attention in the settlement context" and the record did not prove "the requirements of common issue predominance …."); Dkt. 644 at 2.

[7] The timing of this motion is not from a lack of diligence on Plaintiff's part. As Nike admitted to this Court, "Plaintiffs took every approach to drilling down on the Starfish survey issue, asking individual witnesses, NIKE itself, experts, and NIKE HR professionals." Dkt. 347 at 8 (internal quotations omitted). The new evidence is responsive to discovery requests Plaintiff propounded years before the class certification decision. Plaintiff repeatedly sought Court intervention to obtain this discovery, but Nike told the Court that it "did not exist." It was only through Plaintiff's continued diligence that she discovered crucial new witnesses and documents. *See* Sec. II(B), *infra*.

## II.     ARGUMENT

### A.     Rule 23 and Binding Precedent Authorize Renewed Class Certification Motions at Any Time Before Final Judgment.

It is well established that Rule 23 authorizes district courts to consider a renewed request for class certification at any time before final judgment. That comes from the text of Rule 23: "An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). As the Rules Committee explained in enacting this text, "the cut-off point" is "final judgment," Fed. R. Civ. P. 23(c) cmt. 1. Class certification motions are not denied forever; they are denied "until [Rule 23's requirements] have been met." *Id.* The Supreme Court thus emphasizes that where a district court initially denies class certification, it may "later reverse course and certify the proposed class." *Microsoft Corp. v. Baker*, 582 U.S. 23, 34 (2017) (citing Rule 23).

The Ninth Circuit likewise underscores: "the denial of a motion for class certification is inherently tentative." *Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 964 n.7 (9th Cir. 2020) (citation and internal quotations omitted). At "*any time* before final judgment," Plaintiff is thus "free to renew the motion after obtaining further evidence in pre-trial discovery." *Id.* at 964-65, 964 n.7 (citing Rule 23(c)(1)(C)). Indeed, unreasonably denying a party the opportunity to renew a class certification motion is an abuse of discretion. *See id.* at 963.

The text of Rule 23 makes clear that all class certification motions (initial and renewed) are subject to the same standard: the requirements of Rule 23(a) and (b). The rule makes no distinction between initial and renewed class certification motions: A "class action may be maintained if Rule 23(a) is satisfied and if [one of subsection (b)'s provisions is satisfied]." *Id.*; *see, e.g.*, *Cody v. City of St. Louis ex rel. Medium Sec. Inst.*, 103 F.4th 523, 529 (8th Cir. 2024); *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 476-77 (3d Cir. 2020). As the Third Circuit explained, the plain "language of Rule 23(c)(1)(C) … allows for multiple bites at the apple throughout the litigation," but the requirements remain the same every time. *Id.* at 476.  Many district courts in this circuit follow the plain text of the rule, applying the same standard to all class certification

motions. *See, e.g.*, *Andren v. Alere, Inc.*, No. 16CV1255-GPC (AGS), 2018 WL 1920179, at *2 (S.D. Cal. Apr. 24, 2018) (holding, pursuant to subsection (c)(1)(C), "because the Court has discretion to modify an order on class certification prior to judgment, the Court considers Plaintiffs' motion under Rule 23 and not under the parameters of a motion for reconsideration.") (citations omitted); *Romero v. Securus Techs., Inc.*, 331 F.R.D. 391, 409 (S.D. Cal. 2018).

Some district courts, however, have imported the heightened motion for reconsideration standard into the Rule 23 context. This approach is difficult to square with Rule 23's text. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017) (declining "to interpose an additional hurdle into the class certification process delineated in [Rule 23]" because the Supreme Court "counsels in favor of hewing closely to the text of Rule 23."). This approach is also contrary to binding precedent: "the denial of a motion for class certification is inherently tentative." *Davidson*, 968 F.3d at 964 n.7 (9th Cir. 2020). This Court should thus not "interpose an additional hurdle." But this Court need not decide the issue here because even if the heightened reconsideration standard applies, new evidence justifies reconsideration. *See Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) ("Reconsideration is appropriate if the district court … is presented with newly discovered evidence ….") (citation omitted).

Under either standard, therefore, courts hold that a renewed class certification motion is warranted when there is new evidence or other materially changed circumstances. *See, e.g.*, *Davidson*, 968 F.3d at 964-65 (plaintiff is "free to renew the motion after obtaining further evidence in pre-trial discovery."); *Romero*, 331 F.R.D. at 413 (rejecting defendant's timeliness argument against a renewed motion for class certification because defendant "did not produce some documents relied upon in the instant motion until … after Plaintiffs' initial motion for class certification was filed."); *Hartman v. United Bank Card, Inc.*, 291 F.R.D. 591, 597 (W.D. Wash. 2013) ("it is not uncommon for district courts to permit renewed certification motions that set out a narrower class definition or that rely upon different evidence or legal theories.") (citations omitted); *Terrill v. Electrolux Home Prods., Inc.*, 274 F.R.D. 698, 701 (S.D. Ga. 2011) (granting

motion for leave to file a renewed motion for class certification where plaintiff offered new evidence "belatedly" produced by the defendant); *see also generally Parra v. Bashas', Inc.*, 291 F.R.D. 360 (D. Ariz. 2013) (certifying disparate impact and pattern or practice claims eight years after the court declined to certify these claims and over 10 years after the complaint was filed).[8]

And renewed class certification motions are particularly appropriate where a defendant withheld documents or misled the court—or, as here, both—in the initial class certification proceedings. *See, e.g.*, *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 54 (E.D. Va. 2021) (granting renewed motion for class certification where defendant made material misrepresentations of fact to the court). After all, defendants should not benefit from their own misconduct. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1097 (9th Cir. 2007) (finding a purpose of the Federal Rules of Civil Procedure is to prevent a party from gaining an "advantage" through "contumacious refusal to produce required discovery or comply with orders compelling discovery ….").

---

[8] Not only is new evidence a sufficient ground to renew *any* motion, it makes particular sense for class certification. Class certification is not and cannot be a decision on the merits. *See, e.g.*, *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) ("For practical reasons, we have never equated a district court's 'rigorous analysis' at the class certification stage with conducting a mini-trial."). Rule 23 explicitly allows courts to revisit class certification decisions, and the Ninth Circuit emphasizes the importance of allowing the plaintiff to obtain a sufficient record before deciding class certification. *See Perez v. Safelite Grp., Inc.*, 553 F. App'x 667, 669 (9th Cir. 2014), *as amended on denial of reh'g and reh'g en banc* (Mar. 7, 2014) (vacating certification denial because plaintiff was not permitted to obtain and submit certain evidence that was "necessary to determine the existence of a class"); *Edwards v. First Am. Corp.*, 385 F. App'x 629, 631 (9th Cir. 2010) (same and after obtaining this discovery, "Plaintiff may renew her motion for certification of a nationwide class.").

A "decision to certify or not to certify a class may therefore require revisiting upon completion of full discovery." *Slack v. Swift Transp. Co. of Arizona, LLC*, No. C11-5843 BHS, 2018 WL 3344790, at *4 (W.D. Wash. July 9, 2018) (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005)).

**B.**    **New Evidence that Nike Withheld for Years Requires Leave to File a Renewed Class Certification Motion.**

   **1.**    **The Court's Initial Commonality Ruling was Based on a Misleading Record Curated by Nike to Exclude Key Evidence.**

Plaintiff's 2022 motion for class certification requested certification of a pattern or practice claim alleging Nike's discrimination against women at Nike World Headquarters was its "regular rather than the unusual practice," and a disparate impact claim alleging Nike had a practice until October 2017 of using prior pay when setting starting salaries that had a disproportionately adverse impact on women.[9]

The question for liability on a pattern or practice claim is whether the employer's discrimination against women was "the regular rather than the unusual practice." *Obrey v. Johnson*, 400 F.3d 691, 694 (9th Cir. 2005) (citation omitted). The focus will "not be on individual … decisions, but on a pattern of discriminatory decisionmaking." *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984). Plaintiffs typically prove this through a combination of statistical and anecdotal evidence. *See, e.g.*, *Obrey*, 400 F.3d at 698 ("in a case involving a claim of discriminatory pattern or practice 'the combination of convincing anecdotal and statistical evidence is potent.'") (citation omitted).

Disparate impact prohibits "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities …." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). A "plaintiff wins simply by showing [Title VII's] stated elements," which are that "an employer 'uses' an 'employment practice' that 'causes a disparate impact ….'" *Lewis v. City of Chi.*, 560 U.S. 205, 213 (2010) (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)). Disparate impact requires a "group-based disparity … in the aggregate" from the challenged practice (*i.e.*, women), as opposed to each woman individually. *Stockwell*, 749 F.3d at 1115 and n.4.

---

[9] The November 2022 decision declined to certify claims not raised in this motion – three disparate impact claims and an Oregon Equal Pay Act claim. While Plaintiff contends the denial for each claim was based on errors of law, Plaintiff's proposed renewed motion for class certification will be limited to the two claims on which Plaintiff was able to discover significant new evidence.

***The Pattern or Practice Claim***

As the Ninth Circuit recognized in 2025, "crucial" to Plaintiff's commonality argument on the pattern or practice claim was Starfish-related evidence. *Cahill*, 2025 WL 841196, at *1 (internal quotation omitted). The record now shows that Starfish was an "initiative led by executive women at Nike related to gender discrimination within the company." Dkt. 542 at 2 (citation omitted). These women determined that, to address longstanding discrimination at Nike, they needed to band together, collect complaints from other women, and otherwise proceed outside of Nike's centralized, designated human resources ("HR") process because HR condoned discrimination. *See, e.g.*, Ex. 8 at 3 (these women determined "no trust in HR/ER if you report"); Strong Dep. 18:14-20, 28:18-30:12, 35:18-36:6, 39:5-40:12, 80:4-25, 133:9-16; Graham Dep. 10:16-21, 14:3-11, 120:14-20.[10]

The new evidence further shows that the women who led Starfish were nine of the most powerful women at Nike, eight of whom were executives and all longtime employees.[11] They and many other women provided evidence showing a pattern of discrimination against women,

---

[10] All Exhibits ("Ex.") cited herein are attached to the Declaration of Byron Goldstein ("Goldstein Decl.").

All deposition testimony cited herein is attached to the Declaration of Erika Smoylar ("Smoylar Dec."), filed herewith. The exhibit numbers for these deponents are:

| Deposition | Ex. number from Smoylar Dec. |
|---|---|
| Deposition of Melanie Strong ("Strong Dep.") | Exhibit A |
| Deposition of Nicole Hubbard Graham ("Graham Dep.") | Exhibit B |
| Deposition of Genevieve Long ("Long Dep.") | Exhibit C |
| Deposition of Shane Walker ("Walker Dep.") | Exhibit D |
| Deposition of Jessica Stuckey ("Stuckey Dep.") | Exhibit E |
| Deposition of Alison Daugherty ("Daugherty Dep.") | Exhibit F |
| Deposition of Monique Matheson ("Matheson Dep.") | Exhibit G |

[11] Two of the leaders of Starfish, Strong and Graham, identified these nine women. *See* Strong Dep. 22:8-14, 26:20-27:7, 35:16-37:21, 150:15-24; Graham Dep. 14:3-11, 17:18-21. All were executives except one, who was a Senior Director, and their average Nike tenure was over 17 years as of 2018, with starting Nike employment dates between 1990 and 2008. *See* Dkt. 511-2 at 4-5, ¶ 26.

including HR's pattern of condoning discrimination, to Nike's Chief Human Resources Officer (Matheson), General Counsel (Hilary Krane), and CEO (Mark Parker). Given that this group of women provided this evidence, Nike could not continue to ignore its pattern of discrimination. Nike was forced to take some steps to address this pattern of discrimination: Nike discharged its second-highest level executive and "heir apparent to the CEO role;" Nike discharged numerous other high-level executives; Nike admitted that its HR processes underserved employees and that it had "to review our HR processes from top to bottom so we can take our learnings from this experience;" and Nike had to make "significant investments" to address "problematic pay practices." *See, e.g.,* Strong Dep. 32:19-35:7, 52:12-53:7, 135:15-20; Long Dep. 49:9-50:1, 57:6-18; Ex. 3 at 1-2; Ex. 2 at 6-7; Ex. 4 at 2.

All discovery concerning Starfish was requested in March 2019. This included all documents and communications titled or referring to "Starfish," relating to sex discrimination complaints, investigations of such complaints, and any such materials provided to or by an executive. Dkt. 164-1 at 19-20, 26 (RFP Nos. 27, 29, 46). Even Nike recognized Plaintiff's extensive efforts to obtain Starfish-related evidence: "Plaintiffs took every approach to drilling down on the Starfish issue, asking individual witnesses, NIKE itself, experts, and NIKE HR professionals." Dkt. 347 at 8 (internal quotations omitted). Yet Nike withheld evidence, including through misleading testimony from its Chief Human Resources Officer and Rule 30(b)(6) witness. *See* Sec. II(B)(2)(a), *infra*.

Plaintiff's January 2022 motion for class certification argued that Starfish-related complaints and Nike's responses satisfied commonality because this evidence, in combination with Plaintiff's classwide statistical evidence, was capable of proving the liability question for a pattern or practice claim on a classwide basis. Dkt. 146 at 57-59.

Nike, by contrast, described the Starfish-related record as follows in its March 2022 opposition to class certification:

- Unknown people created Starfish. *See* Dkt. 183 at 32 (Nike disputing Plaintiff's evidence for "believ[ing] (without facts) that … a female employee [created Starfish]").

- It was unknown whether Starfish-related complaints were from women or men. *Id.* (Nike disputing Plaintiff's assertion that Starfish "was completed by females" because Nike claimed Plaintiff did so "again without facts").

- Plaintiff wrongly claimed Starfish involved "higher-level women." *Id.* at 32-33 (Nike disputing Plaintiff's evidence that Starfish involved "mostly higher-level women" because Nike claimed Plaintiff did so "without facts, a common theme").

- Starfish was "mostly anonymous," limited to "about 30 complaints," and Plaintiff invented the term "Starfish," *id.* at 32 ("which Plaintiffs refer to as the 'Starfish' survey").

- Nike had a "deep commitment to equity," including because it has had a "dedicated" team responsible for investigating discrimination complaints, Nike "listens" to employees' discrimination complaints, and it responds "seriously." *See id.* at 30-31, 33.

Based on this portrayal, Nike assured the Court that its 2018 statements, executive changes, and practice changes were unrelated to Starfish or an alleged pattern of discrimination. *See, e.g.*, *id.* at 32 ("refuting Plaintiffs' suggestion that Nike changed practices in response to complaints of discrimination by female employees."); *see also id.* at 52-53.

In November 2022, the Magistrate Judge recommended that certification be denied because commonality was not satisfied. This was because she determined, from her factual findings based on the record before her, that Plaintiff's evidence was insufficient to prove discrimination was Nike's "standard operating procedure." Dkt. 310 at 50-53. Relying on testimony from Monique Matheson, "Nike's Human Resources Chief," that she "doesn't know who created [Starfish] or who completed it," the Court found that "the record does not demonstrate who created the survey." *Id.* at 19 n.9 (quoting Matheson deposition). The 2023 decision otherwise found little reason to give the Starfish-related evidence any weight. It determined that Starfish was from just "several Nike employees," totaled "approximately 30 complaints," and it is "Plaintiff [who] refers to the 2018 complaints as the Starfish survey." *Id.* at 19 and n.9. The Court credited Nike with having sufficient structures for and responses to complaints of discrimination. *See id.* at 20 ("Nike's internal portals provide avenues to raise

complaints (anonymously or otherwise)"). The Court thus concluded, "Plaintiffs' assessment of Nike's response to the Starfish Survey otherwise fails to show Nike had a standard operating procedure of failing to address discrimination." *Id.* at 53. As a result, the Court found the evidence insufficient to meet the commonality standard.

### The Disparate Impact Claim

Plaintiff's disparate impact arguments suffered a similar fate. In March 2019, Plaintiff requested all discovery concerning Nike's starting pay practices. This included documents and communications showing Nike's starting pay practices, with respect to the collection or use of prior pay, and Nike's statement that it would be "eliminating the collection of candidate salary history." Dkt. 164-1 at 11-13, 23-25 (RFP Nos. 4, 8, 43). Plaintiff made extensive additional efforts to obtain evidence concerning Nike's starting pay practices. *See, e.g.*, Dkt. 85 at 2-4; Dkt. 97 at 2-3, 5-10; Dkt. 107 at 2-3, 7-9; Dkt. 114 at 5-8; Dkt. 165-2 at 1-3; Dkt. 166-1 at 1-3; Dkt. 386 at 4 (finding discovery concerning Nike's pre-October 2017 starting pay practices was "the subject of numerous discovery conflicts going back more than four years ….").[12]

Despite these efforts, Nike refused, prior to the October 30, 2020 discovery deadline before class certification, to produce any policies, guidelines, trainings, or descriptions it used for determining the amount of starting pay before October 2017. *See* Dkt. 350 at 4, ¶14; Dkt. 366 at 3. On October 31, 2019, the Court ordered Nike to produce discovery showing its policies regarding "hiring," "pay," and "compensation systems." Dkt. 89. After Plaintiff requested court intervention in June 2020 to enforce this Order, Nike responded that it had not located discovery. *See* Dkt. 166-1 at 1-3, 62-63. The resulting August 2020 Order directed Nike to "make one final

---

[12] Plaintiff also made numerous meet and confer attempts about all this outstanding discovery, including about the scope of Nike's Electronically Stored Information ("ESI") collection pursuant to the ESI Order so that the parties could efficiently complete discovery. *See, e.g.*, Dkt.166-1 at 20-21 ¶ 3 and 27 ¶¶ 26-28; Dkt. 350 at 4-5 ¶¶ 14-16. Plaintiff was forced to repeatedly seek the Court's assistance regarding Starfish-related, starting pay, and other outstanding discovery. *See, e.g.*, Dkt. 165-2 (Sept. 27, 2019); 165-3 (Mar. 4, 2020); 165-4 (May 7, 2020); 165-5 (June 6, 2020); 166-1 (June 30, 2020); 166-2 (Aug. 7, 2020); 114 (Sept. 21, 2020); 166-3 (Oct. 15, 2020).

attempt at locating any such policies and if such records exist produce them to plaintiffs. If Nike reports that no such records exist, the Court will accept Nike's representation on this issue." Dkt. 111 at 3. Nike then represented: "Nike has not located, nor is it aware of, any written policies regarding the collection or use of prior compensation history beyond the documents previously produced." Dkt. 350 at 112.

The initial motion for class certification argued that common questions were capable of classwide resolution based on a combination of statistical evidence and admissions Nike made shortly after it ended this alleged practice. Dkt. 146 at 21-24, 47-49. For example, Plaintiff contended that this statement in a Nike training admitted that Nike had a practice of using prior pay when setting starting salary: "In the past, we often focused on the new hires (sic) prior salary and/or the size of the increase the new hire would receive." *Id.* at 22.

In opposition, Nike urged the Court to deny certification for the disparate impact prior pay claim because, Nike assured the Court that it "never required" the use of prior pay when setting starting salaries. Dkt. 183 at 18. Based primarily on its declarations created for and submitted with its opposition to class certification, Nike instead asserted that its lower-level managers decided starting pay and were "free to, and do, consider and weigh whatever factors they deem relevant …." *Id.* at 17-21.

The Court determined commonality was not satisfied because it found "insufficient evidence that starting pay was a required factor in making starting pay decisions…." Dkt. 310 at 46; *see also e.g.*, *id.* ("The failure to point to a common and required policy in the hiring process precludes a common analysis."). Relying primarily on three declarations from current employees that Nike submitted with its opposition to certification, the Court found that Nike's lower-level managers decided starting pay and were "free to consider and weigh whatever factors they deem relevant…." *See id.* at 10 and n.3.[13]

---

[13] Each of these three declarations, as well as the other declarations cited in the 2023 decision for the prior pay findings, was created after the following: (a) the October 30, 2020 deadline for document production; (b) the May 31, 2021 deadline for deposing fact witnesses; and (c) the January 10, 2022 deadline for Plaintiff's class certification motion. *See* 187-1 at 41, 73, 80, 90,

For both the disparate impact and pattern or practice claims, based on its conclusion that Plaintiff had not satisfied commonality, the Court determined that other Rule 23 factors were not met. *See* Dkt. 310 at 54-55 (finding typicality and adequacy not met based on the Court's commonality findings because these Rule 23 elements "tend to merge"); *id.* at 55-56 (finding predominance not met because it requires commonality to be met and the Court had found commonality not met).[14]

2. <u>**Discovery Resumes, Nike Continues Denying the Existence of Evidence, But New Evidence is Obtained Demonstrating the 2022 Record was Materially Misleading.**</u>

After discovery resumed on June 14, 2023 (Dkt. 340), Nike continued to deny the existence of discovery related to Starfish and its pre-October 2017 starting pay practices. Plaintiff's September 2023 motion to compel requested an order directing Nike to produce discovery concerning its pre-October 2017 starting pay practices that was responsive to RFP Nos. 4 or 8 (from March 2019) or the October 31, 2019 Order requiring production of policies concerning hiring, pay, or compensation systems. Dkt. 349 at 12; Dkt. 350 at 4-5, ¶¶ 14-16. Nike's opposition represented that Plaintiff "falsely" contended that "Nike has failed to produce all pre-October 2017 versions of an Offer Intake Form and communications relating thereto." Dkt. 354 at 5.[15] As it did before the 2023 decision, Nike assured the Court that it "has not

---

126, 137, 190, 205 (all cited declarations obtained more than a month after Plaintiff filed their motion).

[14] The Court also denied Nike's motion to exclude the testimony of Plaintiff's expert, Dr. David Neumark, an expert in labor economics who provided statistical evidence. Dkt. 310 at 26. Nike did not object to the recommendation denying its motion to exclude Dr. Neumark's testimony. Plaintiff objected to the class certification findings and recommendation. Dkt. 320. The District Court Judge adopted the Findings and Recommendation; and, under its "unfettered discretion" standard, the Ninth Circuit declined to proceed with an interlocutory appeal. Dkt. 335; Dkt. 341 at 2; *see Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005) (citation omitted). These later two orders did not contain case-specific reasoning.

Dr. Neumark's testimony is unquestionably admissible at trial and applies to each class member. After Nike deposed Dr. Neumark for a second time, it chose not to file a second motion to exclude before the January 28, 2025 pretrial deadline. *See* Dkt. 590.

[15] Four months later, on January 31, 2024, Nike disclosed 2016 communications with the subject

withheld non-privileged, responsive documents." *Id*. The Magistrate Judge denied Plaintiff's motion since "Nike has repeatedly asserted it has produced 'all documents'" and the "Court cannot order a party to produce documents that do not exist." Dkt. 386 at 4.

Meanwhile, Plaintiff served a deposition subpoena on Genevieve Long, a former "Global Senior Director and HR Business Partner [at Nike World Headquarters] from September 2008 until November 2018," Dkt. 347 at 7. In response, Nike moved for a protective order because, it argued, Plaintiff sought Starfish-related testimony, Nike's witnesses already provided "comprehensive deposition testimony" related to Starfish, and this meant any further testimony was "duplicative." *Id.* at 10, 12-13. Nike thus sought "to prevent Plaintiffs from" what it called a "blatant abuse of the discovery rules and employing a fishing expedition for no legitimate purpose." *Id.* at 6.

Nike continued to echo these representations throughout the merits discovery period. For example, in August and September 2023, Nike assured the Court that Starfish was "unsubstantiated," "uncorroborated," "mostly anonymous," and from "a small group." Dkt. 345 at 6, 14; Dkt. 347 at 5, 7. In March 2024, Nike accused Plaintiff of seeking discovery concerning "the unofficial, unsubstantiated, and unverified issues raised in certain documents that Plaintiffs refer to as 'Starfish.'" Dkt. 443-1, ¶ 3.

Eventually, Plaintiff began uncovering the truth. During Long's September 27, 2023 deposition, she testified that a Nike executive reported that there were "over 100" Starfish complaints, which is far more than the 30 Starfish-related complaints Nike had disclosed prior to the 2023 decision. *See* Long Dep. 45:1-12; Dkt. 357 at 2. Her testimony revealed that Melanie Strong, a former Nike executive who was "trustworthy" and "very highly regarded," was involved in Starfish. Long Dep. at 50:25-51:13, 52:17-21. And her testimony supported the existence of Nike's practice of using prior pay. *Id.* at 18:22-19:1 ("until about October 2017 … Nike [had] a policy or practice of using prior pay when determining the amount of starting pay

---

line "Offer Intake Form" from the business unit in charge of pay practices across Nike World Headquarters admitting that prior pay was "requisite information." *See* Sec. II(B)(2)(b), *infra*.

for new hires.").[16] This evidence should have been obtained in 2019 because it was responsive to Plaintiff's March 2019 RFPs, and it should have been disclosed during the 2021 depositions of Nike's corporate designees and Matheson (Nike's Chief Human Resources Officer).

Because Long identified Strong as an important witness, Plaintiff proceeded to obtain Strong's testimony. Since Strong was then on a month-long trip, she stated she needed to retain an attorney before the deposition, and Nike sought to reschedule the deposition, the deposition occurred on March 1, 2024. Dkt. 449 at 12. After Strong's testimony revealed significant new evidence and identified long-outstanding discovery, as described below, Plaintiff immediately commenced further meet and confer with Nike. *See* Dkt. 450-7; Dkt. 450-8; Dkt. 450-9. Because this was unsuccessful and given the March 29, 2024 discovery deadline, Plaintiff immediately sought Court intervention and discovery, filing an emergency Rule 16 request on March 11, 2024, serving RFPs, and noticing depositions. *See* Dkt. 432; Dkt.443-3; Dkt. 443-4; Dkt.443-5; Dkt. 443-6. Nike did not appear for the noticed depositions and filed a motion for a protective order. *See* Dkt. 449 at 13.

Nike continued to resist disclosure of Starfish-related evidence, representing to the Court on March 18, 2024 that Plaintiff sought "phantom documents" and was engaging in "abusive discovery tactics." Dkt. 439 at 2-3. But Nike produced some of these "phantom documents" because the Court's May 2024 order directed Nike "to complete its production of non-privileged documents responsive to Plaintiffs' RFP Set 7," which sought all evidence related to Starfish. *See* Dkt. 485 at 8; Dkt. 486; Dkt. 509 at 4. Specifically, in May-June 2024, Nike produced hundreds of documents referring to "Starfish" over 500 times along with a 342-entry privilege log of Starfish-related documents. Dkt. 519 at 3 ¶ 2.

Further delay occurred because Nike chose not to produce all discovery responsive to the May 2024 order. *See* Dkt. 509 at 2-4, 8-9; Dkt. 518 at 12-20; Dkt. 540 at 35:25-36:19 (this Court observing that Plaintiffs' RFPs in Set 7 are broader than Nike's production). Given that Nike did

---

[16] The Court denied Nike's motion for a protective order. Dkt. 386 at 4.

not complete the production required by the May 2024 order and Nike's years-long recalcitrance regarding Starfish-related discovery, Plaintiff filed motions to compel discovery and for appointment of a special master to ensure an efficient completion of discovery. Dkt. 509, 511-1.[17] The Magistrate denied these requests on August 26, 2024. Dkt. 521. After Plaintiff objected to this Order, the Court adopted the Magistrate Judge's Recommendation on October 22, 2024. Dkt. 542. It was thus not until October 22, 2024 that Plaintiff's efforts to complete discovery were ended.

### a.    The Transformed Record Concerning Starfish Makes for a Potent Classwide Record in Support of the Pattern or Practice Claim.

Starfish-related evidence is crucial for proving the pattern or practice claim on a classwide basis. But, under the 2022 record Nike curated, Nike was able to claim that Starfish was meaningless since Nike assured the Court that it was created by unknown people, mostly anonymous, otherwise unworthy of a response, and thus none of Nike's actions or admissions in 2018 were in response to Starfish-related complaints or investigations. *See* Sec. II(B)(1), *supra*. The new evidence shows these representations were misleading.

The Starfish-related evidence is, in fact, more compelling than the Court or Plaintiff knew in 2022. The renewed motion for class certification will show that their classwide anecdotal evidence, in combination with their classwide statistical evidence, demonstrates that *the* liability question for a pattern or practice claim is capable of classwide resolution.[18]

---

[17] The Magistrate Judge sua sponte raised the possibility of appointing a special master for handling all discovery. *See* Dkt. 481 at 60:2-7 ("I have looked into the appointment of a special master. I have a couple of individuals that have expressed an interest. And this would be for the purposes of handling all discovery issues.").

[18] The 2023 decision found it "does not disagree that there is a statistically significant difference in pay even when controlling for factors such as education and experience." Dkt. 310 at 43-44; *id.* at 42 ("Certainly, plaintiffs have shown that, in the aggregate, there is a statistically significant disparity among pay for women compared to pay for men at Nike."). This statistical evidence is from multiple regression analyses, a common, well-established statistical method for isolating the influence of a specific factor, like sex, on an outcome, like salary, by controlling for potentially non-discriminatory factors, like performance. *See, e.g., Freyd v. Univ. of Or.,* 990 F.3d 1211, 1217 n.3 (9th Cir. 2021); Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in Reference Manual on Scientific Evidence* 303, 306 n.5 (Fed. Jud. Ctr. 3d ed.,

Because pattern or practice claims typically require plaintiffs to present anecdotal evidence, in combination with statistical evidence, to meet their prima facie burden, sufficient anecdotal evidence is often necessary for the jury to answer the liability question—whether the discrimination was the "regular rather than the unusual practice"—on a classwide basis. *See, e.g.*, *Segar v. Smith*, 738 F.2d 1249, 1277-78 (D.C. Cir. 1984) ("The presence of anecdotal testimony bolsters a plaintiff's case, and may become crucial when the statistical evidence does not adequately account for the diverse and specialized qualifications necessary for the positions in question.") (cleaned up and citations omitted).

The Ninth Circuit and Supreme Court thus find that anecdotal evidence, such as the new evidence described below, in combination with statistical evidence, provides the strongest showing in support of liability for a pattern or practice claim. *See, e.g.*, *Obrey*, 400 F.3d at 698 ("in a case involving a claim of discriminatory pattern or practice 'the combination of convincing anecdotal and statistical evidence is potent.'") (citation omitted); *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 319 (N.D. Cal. 1992) ("Inferences drawn from statistical proof are strongest when they are substantiated by other evidence in the case which brings 'the cold numbers convincingly to life.'") (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977)).

First, in contrast to Nike's 2022 contentions, the new evidence demonstrates that Starfish provided evidence of a pattern of discrimination that even Nike could not ignore. The new evidence reveals the importance of who created Starfish, why they created it, what they found, and what they communicated to Nike. After Nike claimed in its opposition to the 2022 motion for class certification that it was unknown who created Starfish and whether Starfish-related complaints were from women or men (Dkt. 183 at 32), and its Rule 30(b) witness testified that Starfish "wasn't complaints of discrimination" (Daugherty Dep. 366:1-24), new documents and testimony show the opposite. The women who created Starfish explicitly found, based on both

---

2011) ("Discrimination cases using multiple regression analysis are legion.") (collecting cases).

the complaints these executives collected and their own experiences over many years at Nike, in a presentation titled "Project Starfish" that they created for Nike, that "women" faced discrimination. Ex. 1 at 3. This presentation, excerpts of which are shown below, further shows that these executives determined that the Nike "actions required to create meaningful change" included "equality in pay and promotions." *Id.* at 4. This "Project Starfish" presentation should have been produced in response to Plaintiff's RFP seeking all documents containing "Starfish" in 2019, but Nike did not produce it until June 2024. Dkt. 164-1 at 26, RFP 46; Dkt. 511-2 at 4, ¶¶ 23-24.

**THEMES WE HAVE HEARD ON CHALLENGES WOMEN FACE**

| | | |
|---|---|---|
| SEXUAL HARASSMENT & DISCRIMINATION | FEAR OF RETALIATION OR BEING "LABLED" (EMOTIONAL, ANGRY BLACK WOMAN) | NO TRUST IN HR / ER IF YOU REPORT THINGS |
| FEW ROLE MODELS AT TOP "YOU CAN'T BE WHAT YOU CAN'T SEE" | WOMEN NOT PROGRESSING AS FAST AS MEN REGARDLESS OF OUTPUT | NIKE HASN'T MOVED ON FROM THE "BOYS CLUB" CULTURE |
| ONE ARCHETYPE OF SUCCESSFUL LEADER AT NIKE | NIKE FORCES WOMEN INTO "FIXER, PROBLEM SOLVER" ROLES | FEEL UNDERMINED CONSTANTLY BY MALE LEADERS (REGARDLESS OF BAND OR SENORITY) |
| DON'T FEEL INVESTED IN UNLESS IDENTIFIED AS HI-PO TALENT | WOMEN COMPETING WITH ONE ANOTHER, VERSUS SUPPORTING | WOULD LIKE TO SEE TOP FEMALE LEADERS BE MORE VULNERABLE AND ACCESSIBLE |

**ACTIONS REQUIRED TO CREATE MEANINGFUL CHANGE**

WE MUST DRIVE ACCOUNTABILITY
- ACCOUNTABILITY FOR ACTIONS / ZERO TOLERANCE
- SEE SOMETHING, SAY SOMETHING (IT IS EVERYONE'S RESPONSIBILITY)

WE MUST DRIVE DIVERSITY
- EQUALITY ON THE BOARD
- EQUALITY ON NLT
- EQUALITY ON LEADERSHIP TEAMS ACROSS THE ORGANIZATION (BRAND LT, SALES LT, FW LT, FW DESIGN LT, INNOVATION LT, COUNTRY GM'S)
- EQUALITY IN PAY AND PROMOTION

WE MUST DRIVE TRANSPARENCY
- ASSESS ALL SEXUAL HARASSMENT & DISCRIMINATION COMPLAINT RECORDS, REPORT QUARTERLY
- PROGRESS IN HIRING & PROMOTING, REPORT QUARTERLY
- OUTWARD COMMUNICATION OF WHAT WE ARE DOING TO MOVE DIVERSITY FORWARD

**PROJECT STARFISH**

Ex. 1 at 3-4 (emphasis added); Strong Dep. 28:18-30:12; Graham Dep. 94:11-14, 108:4-18. These executives discussed these problems at Nike "for years." Graham Dep. 138:5-19.[19] Thus, while Nike convinced the Court in 2022 that Starfish was meaningless, insufficient to support classwide resolution of the liability question, and thus commonality was not satisfied, it should not be able to do so under the current record.

Second, in contrast to Nike's initial opposition to class certification representing that it actively and responsibly addressed discrimination against women, new evidence shows the two executives in charge of addressing discrimination—its Chief Human Resources Officer (Matheson) and General Counsel (Hillary Krane)—instead condoned discrimination. Nike's

---

[19] The metadata from a version of the "Project Starfish" presentation states a current, longtime Nike executive, Jamie Jeffries, modified the tenth version of this presentation. *See* Ex. 7 at 2.

opposition argued that Plaintiff's evidence could not prove that Nike knew but failed to address discrimination; rather, Nike assured the Court that the evidence Plaintiff identified, including communications from Matheson, "shows that Nike is self-reflective, constantly strives to improve its culture, and takes seriously the experiences of … women." Dkt. 183 at 52.

But new evidence shows otherwise. For example, after a Nike employee, ███████████, reported an especially serious incident of sex discrimination to Matheson and Krane in 2018, Matheson and Krane did not do anything about it for at least a year and until ████████ persistence forced them to take some action. *See* Ex. 5; Ex. 6 at 2-3; Dkt. 601-1 at 10-11; Strong Dep. 45:14-48:23, 49:12-50:1, 55:6-10, 58:23-60:11.[20] This new evidence shows that Nike is not a place with effective internal reporting procedures, as the Court found based on Nike's previous representations. Rather, Nike is a place where the two people who are ultimately responsible for preventing and remediating discrimination instead condoned discrimination. *See Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967-68 (9th Cir. 2002) (finding employer's "failure to take immediate corrective action" in response to an employee's complaint of a sexual assault is a violation of Title VII because it "effectively condoned a rape … and its effect."); Dkt. 64 at 15 n.5 ("specific instances of defendant's knowledge of sex discrimination and protection of discriminatory practices by high-level managers . . . [are] facts from which the court can infer a discriminatory motive.") (citing *E.E.O.C. v. Inland Marine Indus.*, 729 F.2d 1229, 1235 (9th Cir.

---

[20] This evidence was uncovered after Strong testified in March 2024 that ████████ was a potentially relevant witness. *See* Strong Dep. 58:6-60:11. Plaintiff's counsel then contacted ████████, who provided discovery that was produced by Nike and her in another matter in 2019—evidence never produced by Nike in this litigation—that explicitly refers to "Starfish." Dkt. 511-2 at 6, ¶ 32; Dkt. 519 at 3, ¶ 2. This discovery was obtained in mid-2024, five years after it was produced by and to Nike in another matter but not to Plaintiff even though it is responsive to Plaintiff's 2019 RFPs. *See* Dkt. 511-2 at 6, ¶ 32; Dkt. 164-1 at 19-20, 26 (RFPs 27, 29, 46).

In the email ████████ drafted for "Hilary [Krane], Mo [Matheson], ████████ and Mark Parker" after Nike did not address her reported discrimination for a year, ████████ wrote: "he has [] assaulted another woman … A year ago I sat across from you and relived the worst night of my life… I was not followed up with after our conversation… I plan to go public with my experience and escalate this to ensure the truth is heard." Ex. 6 at 1-3.

1984)).

Similarly, in Long's late-2023 testimony, she described how, despite reporting concerns about Daniel Tawiah's treatment of women to numerous executives while his promotion to VP was being considered, Nike executives decided to promote Tawiah to VP. Long Dep. 40:7-42:23. Long also testified that Nike knew about pay disparities for years from regularly generated reports concerning all employees in class jobs since 2010 that showed many more women were underpaid than men. *See id.* 26:20-29:13; *see also* Walker Dep. 482:2-9; Stuckey Dep. 177:19-181:2.

Third, the evidentiary developments revealed Nike's consciousness of guilt. The Supreme Court held that in disparate treatment actions, "the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (citations omitted). This principle means attempts "to suppress evidence [are] probative of consciousness of guilt and admissible on that basis." *United States v. Castillo*, 615 F.2d 878, 885 (9th Cir. 1980). Here, Nike suppressed documents, witnesses, and facts for years.

Nike's Rule 30(b)(6) witness for workplace complaints, Alison Daugherty, testified in 2021 that Starfish "wasn't complaints of discrimination. It was complaints of in crowd, out crowd, you know." Daugherty Dep. 366:1-24.[21] Daugherty also testified that Nike did not know who was involved in Starfish. *See id.* 381:11-15 (testifying they were "not aware of who was involved in organizing the survey"). But the evidence that Nike had since 2018 shows that it knew who was involved with Starfish and that it provided evidence of a pattern of discrimination and condoning discrimination against women.

Nike's Chief Human Resources Officer, Matheson, testified, also in 2021, "I know Melanie Strong … she was a vice president at Nike … I'm not familiar with, with what role she may or may not have had with the survey." Matheson Dep. 94:19-95:6. But the new evidence

---

[21] A Rule 30(b)(6) witness must "must testify about information known or reasonably available to the organization."

demonstrates she, in fact, knew. Among the evidence produced in May-June 2024 are calendar

invitations showing Matheson and Nike's General Counsel, Krane, had numerous meetings that

they explicitly titled "Starfish," including, as the following example shows, with Strong.

| | |
|---|---|
| **From:** | Krane, Hilary </O=EXCHANGELABS/OU=EXCI (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1 KRANE, HILA> |
| **Sent:** | 2/14/2018 8:44:14 PM |
| **To:** | Krane, Hilary <hilary.krane@nike.com>; Strong Monique <monique.matheson@nike.com> |
| **Subject:** | 2:30-3:30PM Starfish |
| **Location:** | SebCoe, 5th Floor (Ace Conference Room) |
| **Start:** | 2/20/2018 10:30:00 PM |
| **End:** | 2/20/2018 11:30:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Accepted |
| **Required Attendees:** | Strong, Melanie; Matheson, Monique |

| | |
|---|---|
| **From:** | </O=EXCHANGELABS/OU=EX( (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6AC9861 on behalf of Krane, Hilar |
| **Sent:** | 2/16/2018 6:28:49 AM |
| **To:** | |
| **Subject:** | Quick Update from HJ re: Starfish follow up phone calls |
| **Location:** | SebCo - Ace Conference Room |
| **Start:** | 2/16/2018 7:00:00 PM |
| **End:** | 2/16/2018 7:20:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Meeting organized |
| **Required Attendees:** | Krane, Hilary |
| **Categories:** | Nike Executive Meeting |

Ex. 8; Ex. 9; *see also e.g.*, Ex. 10 (same as Ex. 8, invite from Krane and Matheson to Graham for

a meeting titled "Starfish"). Strong, likewise, testified in 2024 that she met with Matheson about

Starfish; described the substance of Starfish to Matheson; Strong "engaged many, many times"

with Matheson and Krane regarding Starfish; and Strong had "lots of correspondence" with

Matheson and Krane, including over e-mail and text, regarding Starfish. Strong Dep. 21:1-22:4,

30:3-12, 37:22-38:9, 51:3-8, 58:12-20, 97:15-24, 149:15-150:11. Strong, other executives, and

other women described discrimination against women to Matheson and Krane, as confirmed, for

example, in the following email from a Nike-retained attorney that Nike produced in June 2024.

**From:** "Tran, Tiffany (ETW)" <Tiffany.Tran@nike.com>
**Date:** March 30, 2018 at 10:26:24 AM PDT
**To:** "Strong, Melanie" <Melanie.Strong@nike.com>
**Subject: PERSONAL AND CONFIDENTIAL - TO BE OPENED BY RECIPIENT ONLY**

**PERSONAL AND CONFIDENTIAL - TO BE OPENED BY RECIPIENT ONLY**

Hi Melanie,

My name is Tiffany Tran and I am the member of the Matter of Respect Team who will look into the
concerns you raised to Mo and Hilary. Although I have a Nike email and dedicated phone number,
which is (971) 294-9519, I am with an outside firm that Nike has retained to assist in this matter.

We are going through the information you provided and gathering more to look into the issues. As a
part of our process, we may reach out to you and to others to ask questions. If you have any
concerns about this, please let me know as soon as you can.

*See, e.g.*, Ex. 11; Ex. 12 (same email to Nike's current Chief Marketing Officer, Nicole Hubbard

Graham, about the "concerns" Graham described to "Mo [Matheson] and Hilary."); *see also e.g.*,

Strong Dep. Dep. 96:9-23.

Nike also suppressed, at a minimum, hundreds of documents that referred to "Starfish" over 500 times, which were requested in 2019 but not produced until May-June 2024. *See* Dkt. 511-2 at 6, ¶¶ 31-32. Nike knowingly withheld this and other Starfish-related evidence and witnesses because new evidence shows Matheson possessed far more knowledge than her 2021 testimony stated, and documents explicitly referring to "Starfish" were produced by and to Nike in another matter in 2019 but not to Plaintiff in this case. *See id.*; Ex. 5 (█████ email, with "Starfish" in the subject line, scheduling a meeting with Matheson and Krane). Further, for example, on March 18, 2024, which was two months before Nike produced hundreds of documents mentioning "Starfish" over 500 times, Nike urged the Court to stop further Starfish-related discovery because Nike was "not withholding any Starfish complaint documents" and Plaintiff was seeking "phantom documents." Dkt. 439 at 2-4. Nike insisted no further discovery was appropriate because Plaintiff was engaging in "abusive discovery tactics" (*id*. at 3); and Plaintiff's "sole purpose," Nike continued, was to "harass" Nike (Dkt. 443 at 7).

Fourth, the evidentiary record now more clearly connects Nike's admissions and actions to what the high-level women leading Starfish and others reported. In opposition to the initial class certification motion, Nike assured the Court that its actions and admissions after receiving Starfish were not in response to discrimination complaints. But the new evidence shows that Nike recognized that Starfish was important because Nike itself recognized it showed a pattern of discrimination that required a response. New evidence includes testimony connecting Nike's receipt of Starfish-related evidence to Nike's actions and admissions shortly after receiving this evidence. *See, e.g.,* Strong Dep. 32:19-34:8, 135:21-136:10 (testifying that she read an email from Edwards to the CEO that recognized Nike was forcing him out because of Starfish).[22] The current

---

[22] After this email was identified for the first time to Plaintiff during Strong's deposition, Nike refused to produce it in response to either Plaintiff's meet and confer attempts or the Court's May Order directing Nike to produce the complete record related to Starfish. *See* Dkt. 511-2 at 5, ¶ 28.

record thus more clearly connects these Nike admissions and actions to the *pattern of discrimination against women* that Nike was forced to confront:

- Nike discharged its longtime second-highest level executive and "heir apparent to the CEO role," Trevor Edwards. *See* Strong Dep. 32:19-34:8, 52:12-53:7, 135:15-20; Long Dep. 49:9-50:1; Ex. 3 at 1-2.[23]

- Nike discharged numerous other high-level executives. *See, e.g.*, Strong Dep. 34:9-35:7; Long Dep. 57:6-18, 58:4-7. For example, ██████████, one of the highest-level Nike executives, was discharged a few weeks after Nike's CEO was informed of Starfish, which contained at least two complaints of sexual assault against ██████. *See* Strong Dep. 34:9-35:7; Long Dep. 57:6-18; Ex. 13 at 3; Ex. 2 at 6 (CEO's all-employee speech in response to Starfish stating that the "main set of complaints that gave rise to this process have been acted on and employee exits from this larger investigation will be behind us after this week.") (cleaned up). Testimony from mid-2024 also shows Nike discharged a senior executive, ████████ ██████, shortly after Strong and Graham reported discrimination by him. *See* Strong Dep. 96:9-23, 132:2-23; Ex. 14.[24]

- Nike's CEO admitted that Nike needed "a comprehensive review of [its] HR systems and practices." Ex. 3 at 1; *see also e.g.*, Daugherty Dep. 161:3-16 (CEO's speech concerned Starfish). Nike had to review its "HR processes from top to bottom" because Nike's HR "processes [] underserved [its employees] in recent years and [Nike needed] to restore trust in places where it has eroded." Ex. 2 at 7; *see also id.* at 17 ("I am hopeful we will seize this time that exposed our need to improve diversity, our HR systems, and to create a culture that serves every person.").

- Reports of a pattern of discrimination against women forced Nike to recognize that it must conduct systematic reviews of pay and promotions for women and make "significant investments" to address "problematic pay practices." *See* Dkt. 166-2 at 73 (Nike admitting, after Starfish in "February 2018," Nike determined that it "was necessary to analyze Nike's compensation and promotion practices ....") (citation omitted); Ex. 4 at 2.

---

[23] Nike organizes its executives into levels, which range from E7 to E1, with E1 being the highest level, the CEO. Matheson Dep. 181:7-16. The second-highest level executive at Nike is at level E2, which was Edwards until March 2018. *E.g.,* Strong Dep. 135:15-20; Ex. 15 at 12; Exs. 16-18; Ex. 19 at 19.

[24] As Nike's CHRO admitted, Nike executives "are charged with leading the ... tone for our culture," they "serve as role models," and they "recognize and promote our internal talent [and] hire in large volume." Ex. 20 at 1. Nike's executives, those at the Vice President level and higher, are referred to as Nike's "Corporate Leadership Team." Ex. 15 at 13.

The new evidence also substantiates and strengthens the statistical evidence. As the Supreme Court and Ninth Circuit recognize, "inferences drawn from statistical proof are strongest when they are substantiated by other evidence in the case which brings 'the cold numbers convincingly to life.'" *Stender*, 803 F. Supp. at 319 (quoting *Teamsters,* 431 U.S. at 339); *Obrey*, 400 F.3d at 698 ("in a case involving a claim of discriminatory pattern or practice 'the combination of convincing anecdotal and statistical evidence is potent.'") (citation omitted); *see also e.g.*, *Chen-Oster v. Goldman, Sachs & Co.,* 325 F.R.D. 55, 76-77 (S.D.N.Y. 2018) (finding common questions for the pattern or practice claim based on anecdotal evidence, in combination with the statistical evidence, that included complaints of "sexualization," public and private "verbal abuse," "slander and libel," "denial of employment opportunities," "retaliation," and failure to address known discrimination). This means that Plaintiff's renewed motion for class certification can provide sufficient evidence from the current record to show that the liability question for a pattern or practice claim is capable of classwide resolution and thus commonality is satisfied. *See Olean*, 31 F.4th at 665-66 (determining commonality requires the district court to identify the elements of the claim and then consider whether "the available evidence and the method or methods by which plaintiffs propose to use the class-wide evidence [can] prove the common question in one stroke.") (citations omitted and cleaned up).

### b. On the Disparate Impact Claim, Nike's Late-Produced Evidence Shows Nike Required the Use of Prior Pay.

The Court denied certification on Plaintiff's disparate impact claim because the Court found there was "insufficient" evidence that Nike "required" the use of prior pay. Dkt. 310 at 46. After Plaintiff's persistent efforts to obtain this evidence for five years, Nike produced evidence proving that the Nike-curated record on which the 2023 decision relied was wrong. And, like the pattern or practice evidence, the new evidence also strengthens the existing record, including as to the classwide statistical evidence.

Communications from the business unit in charge of pay practices across Nike World Headquarters were produced in 2024 admitting that Nike required prior pay's use. *See* Ex. 21.

Nike produced these communications two years after it assured the Court in its 2022 opposition to class certification that it never required the use of prior pay, *see* Dkt. 183 at 18. These communications discuss Nike's "Offer Intake Form," and were produced four months after Nike convinced the Court to deny Plaintiff's Motion to Compel by representing it had not withheld "communications relating" to its "Offer Intake Form." *See* Dkt. 354 at 5.

An email Nike produced—and the form that it attached—demonstrate that the "requisite information" for Nike to extend a job offer included the candidate's prior pay. The business unit responsible for creating and implementing pay practices across Nike World Headquarters, "Total Rewards," sought to institute a more efficient process for setting starting pay in 2016. Ex. 21 at 2-3. To accomplish this, Total Rewards created an "Offer Intake Form." *Id.* This "Offer Intake Form" was "attached" to the following email amongst Total Rewards employees.

**From:** Dickson, Kevin
**Sent:** Monday, October 10, 2016 5:39 PM
**To:** Marlin, Meredith <Meredith.Marlin@nike.com>; Vinton, Zack <Zack.Vinton@nike.com>; Rettenmyer, Nick <Nick.Rettenmyer@nike.com>; Abisror, Lance <Lance.Abisror@nike.com>
**Subject:** Talent Acquisition Offer Intake Form - Internal Template

Good Afternoon Everyone,

Attached you will find two separate excel templates I have put together for Talent Acquisition to use when requesting offer recommendations – one for external offers and the other for internal offers.

These intake forms will achieve the following:
?     Receive all of the requisite information in one email communication
?     Minimize the back-and-forth between TA/HRBP/TRC/Comp
?     Help us store information in a more organized manner
?     Drastically reduce turnaround times for offers

Ex. 21 at 2-3 (highlighting added). Total Rewards thus created its Offer Intake Form to "receive all the requisite information in one email communication." *Id.*

This is Nike's "Offer Intake Form" listing the "requisite information," including "example" answers.

| OFFER INTAKE FORM EXAMPLE | | | NIKE   CONVERSE |
|---|---|---|---|
| Date Submitted: | 3/2/2017 | Desired Delivery Date: | 3/9/2017 |
| Submitted By: | Daffy Duck | HRBP Associated with Hire: | Bugs Bunny |
| **CURRENT CANDIDATE INFORMATION** | | | |
| Candidate Name: | Stan Podolak | EE ID: | Internal Offers Only |
| Location (City, State): | Birmingham, AL | Current Company: | Birmingham Barons |
| Company Fiscal Year End: | June | Company Stock Symbol: | MLBB |
| Job Title: | Publicist and Personal Assistant | | |
| **BASE PAY** | | | |
| Annual Base Salary: | $100,000 | | |
| **BONUS** | | | |
| Annual Bonus Target %: | 15% | Previous Bonus Amount Paid: | $20,000 |
| Annual Bonus Target Amt: | $15,000 | Anticipated Bonus Amount: | $17,500 |
| Bonus Payout Frequency: | Annual | Bonus Payout Date: | 7/1/2017 |

Ex. 22 at 6 (emphasis added). Contrary to Nike's repeated assertions to the Court, this "requisite information" included "annual base salary" for candidates' then current—i.e. pre-Nike—job. *Id.* at 6-7 (under "current candidate information," it lists their pre-Nike job; their location for that job; their "base pay" for their current, pre-Nike job; and later in the form is a separate section for "Nike job information"); Ex. 21 at 2 (Offer Intake Form to gather "requisite information" for creating starting salary offers).[25]

Further, Long testified in her deposition after the 2023 decision that Nike had a practice of using prior pay. Long Dep. 8:2-9:25, 10:9-18, 11:3-12:8, 18:22-19:4. Long's deposition and documents Nike produced in 2024 further revealed that Total Rewards was responsible for creating and implementing pay practices across Nike World Headquarters. *See* Long Dep. 8:2-9:25, 10:9-18, 11:3-12:8, 17:12-18:4; Ex. 23 (Total Rewards creating and providing training on compensation practices); Ex. 24 (same as to Pay Structure Design); Ex. 25 (same as to compensation and job architecture); Exs. 26-27 (same); Exs. 28-29 (same as to changes to compensation practices).

---

[25] Although the October 2016 Total Rewards communication about Nike's "Offer Intake Form" "attached" this form to that email (Ex. 21 at 2), Nike refused to produce the specific form that was attached to this email. *See* Goldstein Decl. at ¶ 42. But Nike produced a version from five months later, March 2017, which is what is displayed above. *See id.;* Ex. 22 at 6.

In addition to the "requisite information" admission, new evidence revealed that Total Rewards was the source of another key Nike admission about having and implementing its prior pay practice—"we often focused on the new hires prior salary and/or the size of the increase the new hire would receive." Ex. 30 at 8, Exs. 28-29, 31; Long Dep. 18:15-19:4. Plaintiff also did not have this evidence because when Nike's Rule 30(b)(6) witness from Total Rewards was asked in 2021 who created the presentation containing this admission he testified, "I don't know who prepared this document." Walker Dep. 102:4-103:1. The new evidence showing prior pay was "requisite information" is thus confirmed by Nike's admission from the business unit in charge of pay practices that Nike "often focused on the new hires prior salary and/or the size of the increase the new hire would receive."

The cumulative effect of the new evidence and the existing record is potent because it is all consistent and shows these admissions were not some stray comments; Nike repeatedly admitted to a practice of using prior pay for starting salary. *See* Ex. 30 at 8; Ex. 32 at 7 (Nike admitting its "*pay practices*" included being "primarily focused on 'percent increase'" to determine pay at "hiring," and that it planned "to move past *this practice*") (emphasis added); Ex. 33 at 57 ("we no longer ask new hires their prior salary or focus on the size of the increase the new hire would receive."); Ex. 34 at 57 (Nike admitting it was "eliminating the collection of candidate salary history"); Ex. 20 at 3 (same).[26]

Further confirming the new evidence are Nike's admissions showing that even it recognizes that using prior pay when setting starting salaries has a biased impact. Its Chief Human Resources Officer and a centrally created Nike report both admitted that Nike would "remove bias from critical moments of the hiring process" by "eliminating the collection of

---

[26] In addition, as Nike ended its prior pay practice, it repeatedly admitted that this was a "policy change."  Ex. 35 at 2; Ex. 36 at 2, 6; Ex. 37 at 1. In doing so, Nike told all its Talent Acquisition and HR Business Partners, "**we will no longer ask candidates about their compensation history**" (Ex. 38 (emphasis in original); and because Nike would "no longer … record salary history," Nike instructed them to, "instead," seek a candidate's "compensation expectations," Ex. 35 at 2.

candidate salary history….” Ex. 34 at 57; Ex. 20 at 3 (same); *see also e.g.*, Ex. 30 at 8 (Nike admitting to eliminating its prior pay practice because “[w]e don’t want to carry over poor pay practices from a prior company ….”); Ex. 4 at 2 (Nike admitting that, after ending the alleged prior pay practice, its “problematic pay practices” required “significant investments”).

Third, because the statistics must be considered in light of all the evidence and the other evidence corroborating the statistics is stronger, the statistical evidence is more persuasive because the other evidence is stronger. *See Bouman v. Block*, 940 F.2d 1211, 1225 (9th Cir. 1991) (instructing that, for a disparate impact claim, “the trier of fact must consider the statistics in light of all the evidence.”) (citations omitted). Here, consistent with Nike’s admissions, Dr. Neumark’s multiple regression analysis found statistically significant disparities for women in starting pay for the period that Nike used this practice. *See* Dkt. 149-1 at 34 ¶ 59; *id.* at 59, cols. 5 and 6. He further found that, after Nike stopped using prior pay, this starting-pay disparity for women dropped by over 50%. *Id.*

This is a textbook example of but-for causation, Title VII’s standard for causation. *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020). Such causation is shown if “the outcome changes” after a “change [to] one thing.” *Id.* Here, the statistical evidence can prove, for the whole class, that Nike’s practice of using prior pay when setting starting salary was a but-for cause because after Nike stopped using this practice (a “change to one thing”), the starting pay disparity for women substantially dropped (“the outcome changes”).[27]

Further, the Nike declarants who provided crucial support for the 2023 decision’s factual findings are now excluded or entitled to little weight. A critical reason why the 2023 decision determined Plaintiff’s evidence was “insufficient” to show Nike sought to require prior pay’s use was the decision’s finding that, “as noted above [in the decision],” Nike’s lower-level managers

---

[27] Given that Dr. Neumark’s testimony is unquestionably admissible (*see supra* note 14), it is for the factfinder to decide the persuasiveness of this common evidence. *See Olean*, 31 F.4th at 678 (holding, if expert evidence “is admissible and, after rigorous review, determined to be capable of establishing [an element] on a class-wide basis, it is for the jury, not the court, to decide the persuasiveness of [this evidence] ….”).

made the starting pay decisions and "were free to consider and weigh whatever factors they deemed relevant …." Dkt. 310 at 39. To make this finding, the 2023 decision relied on assertions from three declarations of current employees Nike submitted with its opposition. *See id.* at 10 and n.3.

After discovery resumed, Plaintiff served RFPs seeking any documents concerning these declarants' representations. *See* Dkt. 452-2 at 2 (RFP 134). For example, the Court cited the Levison declaration for the proposition that managers "have ultimate responsibility for setting starting pay…." Dkt. 310 at 10 n.3. Yet Nike was unable to produce any documents showing Levison having *any* responsibility, let alone ultimate responsibility, for setting starting pay. *See, e.g.*, Dkt. 451 at 4 (Nike refused to produce discovery responsive to RFP 134); Dkt. 468 at 7-8 (Nike refusing to produce this requested discovery). Nor could Nike produce any documents supporting the specific assertions of any of its declarants. *See id.* When Nike was then forced to decide whether to make these declarants available for testimony before this Court, it chose not to identify any of them as potential trial witnesses, thus confirming the exclusion of their testimony. *See* Dkt. 557 at 6 ("**No exhibits or testimony will be received into evidence at trial … unless presented in accordance with this Order.**") (emphasis in original); Dkt. 607 at 25-61 (Nike's identified potential trial witnesses).[28]

---

[28] Shortly after the Civil Jury Trial Management Order was issued, Plaintiff promptly sought to obtain an agreement with Nike to exchange their potential witnesses in December 2024 but Nike repeatedly refused. *See* Ex. 39.

On February 10, 2025, the Parties informed the Court that three of the four Plaintiffs agreed to settle all their claims, Hender agreed to settle her non-class claims, and the Parties were negotiating a potential class settlement. *See* Ex. 40. The litigation remained paused while the parties attempted to negotiate a potential class settlement, during which they informed the Court they continued to negotiate but material issues remained. *See e.g.,* Dkt. 637, 641. In the August 20, 2025 report, Plaintiff reported that the Parties were unable to reach agreement on a proposed class settlement under the current circumstances while Nike reported a class settlement was enforceable and that this Court should approve it. *See* Dkt. 644. The Court promptly scheduled a conference with the Parties and then set a schedule for simultaneous filings of this motion and Nike's motion to enforce an alleged proposed class settlement. *See* Dkt. 647, 651.

### 3.   Even Nike Now Admits Commonality is Met.

In contrast to the 2023 decision, Nike now contends this Court can find commonality satisfied. Nike recently asserted that this Court should approve an alleged proposed class action settlement "so that participating individuals can receive the benefits of that settlement." Dkt. 644 at 2. To do so, as is well-established, the Court must find commonality satisfied. *See Amchem*, 521 U.S. at 620 (explaining that a class must be certified for settlement, just as it must for trial except for one of the superiority factors, and commonality requires "undiluted, even heightened, attention in the settlement context"). This is yet another factual development as to why the Court should grant leave for plaintiff to renew her motion for class certification.

### 4.   The New Evidence and Other Developments Warrant Leave to File a Renewed Motion for Class Certification.

Under any standard, the new evidence and litigation developments undermining the factual record on which the 2023 decision relied warrant a renewed class certification motion. This is especially true because Nike's discovery misconduct and misleading testimony created that incorrect factual record. Plaintiff is entitled to an opportunity to demonstrate that the facts warrant class certification.

While Plaintiff has the burden to prove, by a preponderance of the evidence, Rule 23's prerequisites, Nike had access to most of the relevant discovery. *See, e.g.*, Manual for Complex Litig., § 32.43, at 586 (in "employment discrimination litigation … most of the information will be within the control of the employer …."); Dkt. 542 at 7 ("the Court is sympathetic to the information asymmetry that exists in civil discovery."). Plaintiff served RFPs in 2019, repeatedly engaged in meet and confer efforts, and, after Nike remained recalcitrant, Plaintiff repeatedly sought court intervention. *See* Sec. II(B), *supra*. Nike, however, did not produce the new evidence before the 2023 decision. Its witnesses provided misleading testimony. *See* Sec. II(B)(2)(b), *supra*. The record before the Court in 2023 was thus incomplete and misleading. *See* Sec. II(B), *supra*.[29]

---

[29] The Court recognized Nike's inappropriate discovery tactics throughout the litigation. The

The new evidence addresses what the Court and the Ninth Circuit found were necessary or "crucial" parts of the evidence in support of class certification. Certification was denied for the disparate impact claim because the evidence was "insufficient" to prove that Nike "required" the use of prior pay, but Nike finally produced evidence demonstrating Nike did require its use. *See* Sec. II(B)(2)(b), *supra*. The Ninth Circuit, likewise, found Starfish-related evidence "formed a crucial part of Plaintiffs' class certification motion." *Cahill*, 2025 WL 841196, at *1 (internal quotation omitted). The changed record thus contains necessary or crucial evidence that should be considered by the Court for class certification.

Because Nike withheld this evidence, Plaintiff was prejudiced. It was not available for the initial motion for class certification, for key depositions, or for otherwise incorporating into litigation strategy. *See, e.g.*, *Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1116 (9th Cir. 2004) (finding that production of discovery "two years after it was requested … seriously prejudiced [plaintiff], as key depositions had already been taken."); *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905–06 (9th Cir. 2002) (finding defendant's misrepresentations about and failure to produce discovery "depriv[ed] [plaintiff] of any meaningful opportunity to follow up … or to incorporate it into litigation strategy.").

If Plaintiff is not permitted to file a renewed class certification motion, then Nike's suppression of discovery means it avoids a decision on the merits as to the class for its alleged pattern of discrimination against women and discriminatory prior pay practice. No party should be so rewarded, especially at the expense of women who have long been treated worse by Nike because they are women. *See Conn. Gen. Life Ins. Co.*, 482 F.3d at 1097 (finding a purpose of

---

Magistrate Judge found: (a) Nike "demonstrated a certain lack of transparency so far in the discovery process;" (b) Nike "*certainly* [had] some deficient production," (c) Nike failed to produce "documents ordered some nine months ago;" and (d) that Nike has "been recalcitrant in responding to discovery requests." Dkt. 111 at 8-9 (emphasis added) and Dkt. 521 at 15.  These findings are well-justified. *See* Sec. II(B)(2), *supra*; *see also e.g.*, Dkt. 511-1 at 10-14 (describing Nike's false and misleading testimony, its failure to disclose this discovery, and its misrepresentations to the Court and Plaintiff regarding the existence of this discovery); Dkt. 518 at 7-20 (similar).

the Federal Rules of Civil Procedure is to prevent a party from gaining an "advantage" through "contumacious refusal to produce required discovery or comply with orders compelling discovery ….").

As shown in Plaintiff's Opposition to Nike's Motion to Sever and the Joint Proposed Pretrial Order, the evidence here will be the same regardless of whether the Court presides over a class trial or thousands of individual trials. *See* Dkt. 555 at 12-19, Dkt. 594 at 7-10, 13-17. This Court should not proceed with an individual trial without considering the more efficient course under the current record. Further, a class trial is the only realistic or available method of addressing this controversy. The "substantial upfront costs of litigating a complex discrimination case against a multi-national corporate defendant" means "few potential class members could afford to undertake individual litigation." *Buchanan v. Tata Consultancy Servs., Ltd.*, 2017 WL 6611653, at *22 (N.D. Cal. Dec. 27, 2017) (citation and internal quotations omitted). As a result, here, the alternatives—either thousands of individual proceedings on the same subject inefficiently using court resources or (given the fear of Nike retaliating) few cases challenging these systemic problems at all—are neither appropriate nor "available" alternatives at all. Plaintiff's renewed motion for class certification will thus show the most efficient and only available method for resolving this controversy is as a class.

### III.     <u>CONCLUSION</u>

For the foregoing reasons, this Court should grant Plaintiff's motion for leave to file a renewed motion for class certification.

Dated: October 7, 2025                    Respectfully submitted,

                                          GOLDSTEIN BROWNE, PC


                                          */s/ Byron Goldstein*
                                          Byron Goldstein (admitted *pro hac vice*)
                                          Barry Goldstein (admitted *pro hac vice*)
                                          1111 Broadway 3rd Floor, 04-117
                                          Oakland, CA 94607
                                          Telephone: (510) 584-9020

                                          ACKERMANN & TILAJEF, P.C.
                                          Craig Ackerman (admitted *pro hac vice*)
                                          cja@ackermanntilajef.com
                                          Brian Denlinger (admitted *pro hac vice*)
                                          bd@ackermanntilajef.com
                                          Erika Smolyar (admitted *pro hac vice*)
                                          es@ackermanntilajef.com
                                          315 S Beverly Drive, Suite 504
                                          Beverly Hills, CA 90212
                                          Tel: (310) 277-0614 Fax: (310) 277-0635

                                          MARKOWITZ HERBOLD PC
                                          Laura Salerno Owens, OSB #076230
                                          David B. Markowitz, OSB #742046
                                          Harry B. Wilson, OSB #077214
                                          Kathryn P. Roberts, OSB #064854
                                          Kelsie G. Crippen, OSB #193454

                                          DARDARIAN HO KAN & LEE
                                          Laura L. Ho (admitted *pro hac vice*)
                                          James Kan (admitted *pro hac vice*)
                                          Katharine L. Fisher (admitted *pro hac vice*)

                                          Of Attorneys for Plaintiffs

**EXHIBIT A**

**People Identified in This Memorandum and Their Roles.**

| Name | Role |
|---|---|
| ███████████ | Former Nike Senior Director. |
| Alison Daugherty | Current Nike executive and Rule 30(b)(6) witness in this litigation. |
| Trevor Edwards | Nike's second-highest executive from July 2013 through March 15, 2018. He worked for Nike since 1992. |
| Nicole Hubbard Graham | Nike's current Chief Marketing Officer. She began working for Nike in 2002. |
| Heather Hender | Former Nike employee and proposed class representative. |
| Jamie Jeffries | Current Nike executive. She has worked for Nike since 1990. |
| Hilary Krane | Nike's general counsel from 2010 through February 2022. |
| Genevieve Long | Nike Senior Director in HR from September 2008 until November 2018. |
| ███████████ | Nike executive until about March 29, 2018. He worked for Nike since 1997. |
| Monique "Mo" Matheson | Nike's Chief Human Resources Officer from July 2017 through January 2025. She worked for Nike since 1998. |
| Mark Parker | Nike's CEO from 2006 through January 2020. |
| ███████████ | Nike executive until about April 2018. He worked for Nike since 2010. |
| Melanie Strong | Nike executive until about June 2019. She worked for Nike since 2002. |
| Daniel Tawiah | Nike executive until around April 2018. He worked for Nike since 2006. |