**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
**Kelsie G. Crippen, OSB #193454**
KelsieCrippen@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Laura L. Ho** (admitted *pro hac vice*)
lho@dhkl.law
**James Kan** (admitted *pro hac vice*)
jkan@dhkl.law
**Katharine L. Fisher** (admitted *pro hac vice*)
kfisher@dhkl.law
DARDARIAN HO KAN & LEE
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417

Counsel for Plaintiffs

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-AB<br><br>**DECLARATION OF BYRON GOLDSTEIN IN SUPPORT OF MOTION FOR LEAVE TO FILE A RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>**FILED UNDER SEAL**<br><br>**Oral Argument Requested** |

**Byron Goldstein** (admitted *pro hac vice*)
byron@goldsteinbrowne.com
**Barry Goldstein**, Of Counsel (admitted *pro hac vice*)
barry@goldsteinbrowne.com
GOLDSTEIN BROWNE, PC
1111 Broadway 3rd Floor, Office 04-117
Oakland, CA 94607
Telephone: (510) 584-9020
Email: team@goldsteinbrowne.com


**Craig Ackermann** (admitted *pro hac vice*)
cja@ackermanntilajef.com
**Brian Denlinger** (admitted *pro hac vice*)
bd@ackermanntilajef.com
**Erika Smolyar** (admitted *pro hac vice*)
es@ackermanntilajef.com
ACKERMANN & TILAJEF PC
315 S Beverly Drive, Suite 504
Beverly Hills, CA 90212

I, Byron Goldstein, declare as follows:

1.      I am a member in good standing of the Bar of the State of California and a partner at Goldstein Browne, PC in Oakland, California. I am counsel for Plaintiffs, along with Markowitz Herbold, Ackerman & Tilajef, India Lin Bodien Law, and Dardarian, Ho, Kan & Lee. I am providing this declaration in support of Plaintiffs' Motion for Leave to File a Renewed Motion for Class Certification. I have personal knowledge of the facts set forth in this declaration and could and would testify competently to them if called upon to do so.

2.      Attached hereto as Exhibit 1 is a true and correct copy of Plaintiff's Trial Exhibit No. P428. Nike produced this document in this litigation on June 12, 2024.

3.      Attached hereto as Exhibit 2 is a true and correct copy of Plaintiff's Trial Exhibit No. P015. Nike produced this document in this litigation on August 16, 2019.

4.      Attached hereto as Exhibit 3 is a true and correct copy of Plaintiff's Trial Exhibit No. P019. Nike produced this document in this litigation on August 16, 2019.

5.      Attached hereto as Exhibit 4 is a true and correct copy of Plaintiff's Trial Exhibit No. P207. Nike produced this document in this litigation on April 13, 2021.

6.      Attached hereto as Exhibit 5 is a true and correct copy of Plaintiff's Trial Exhibit No. P401. Plaintiff produced this document in this litigation on June 17, 2024.

7.      Attached hereto as Exhibit 6 is a true and correct copy of Plaintiff's Trial Exhibit No. P397. Plaintiff produced this document in this litigation on June 17, 2024.

8.      Attached hereto as Exhibit 7 is a true and correct copy of Plaintiff's Trial Exhibit No. P434. Plaintiff entered this document as Exhibit C during the June 14, 2024 deposition of Jamie Jeffries. Nike never produced a version of the Project Starfish presentation containing metadata or otherwise produced metadata from the Project Starfish presentation pursuant to the

E-Discovery Order (Dkt. 72 at 4-5, 12) or otherwise.

9.      Attached hereto as Exhibit 8 is a true and correct copy of Plaintiff's Trial Exhibit No. P308. Nike produced this document in this litigation on May 29, 2024.

10.      Attached hereto as Exhibit 9 is a true and correct copy of Plaintiff's Trial Exhibit No. P312. Nike produced this document in this litigation on May 29, 2024.

11.      Attached hereto as Exhibit 10 is a true and correct copy of Plaintiff's Trial Exhibit No. P313. Nike produced this document in this litigation on May 29, 2024.

12.      Attached hereto as Exhibit 11 is a true and correct copy of Plaintiff's Trial Exhibit No. P310. Nike produced this document in this litigation on May 29, 2024.

13.      Attached hereto as Exhibit 12 is a true and correct copy of Plaintiff's Trial Exhibit No. P311. Nike produced this document in this litigation on May 29, 2024.

14.      Attached hereto as Exhibit 13 is a true and correct copy of Plaintiff's Trial Exhibit No. P117. Nike produced this document in this litigation on April 24, 2020.

15.      Attached hereto as Exhibit 14 is a true and correct copy of Plaintiff's Trial Exhibit No. P113. Nike produced this document in this litigation on April 24, 2020.

16.      Attached hereto as Exhibit 15 is a true and correct copy of Plaintiff's Trial Exhibit No. P215. Nike produced this document in this litigation on May 17, 2021.

17.      Attached hereto as Exhibit 16 is a true and correct copy of Plaintiff's Trial Exhibit No. P218. Nike produced this document in this litigation on May 21, 2021.

18.      Attached hereto as Exhibit 17 is a true and correct copy of Plaintiff's Trial Exhibit No. P219. Nike produced this document in this litigation on May 21, 2021.

19.      Attached hereto as Exhibit 18 is a true and correct copy of Plaintiff's Trial Exhibit No. P220. Nike produced this document in this litigation on May 21, 2021.

20.    Attached hereto as Exhibit 19 is a true and correct copy of Plaintiff's Trial Exhibit No. P336. Plaintiff produced this document in this litigation on June 14, 2019.

21.    Attached hereto as Exhibit 20 is a true and correct copy of Plaintiff's Trial Exhibit No. P018. Nike produced this document in this litigation on August 16, 2019.

22.    Attached hereto as Exhibit 21 is a true and correct copy of Plaintiff's Trial Exhibit No. P307. Nike produced this document in this litigation on January 31, 2024.

23.    Attached hereto as Exhibit 22 is a true and correct copy of Plaintiff's Trial Exhibit No. P305. Nike produced this document in this litigation on January 31, 2024. This document is a copy of a document that Nike produced on October 12, 2020, NIKE_00024726.

24.    Attached hereto as Exhibit 23 is a true and correct copy of Plaintiff's Trial Exhibit No. P280. Nike produced this document in this litigation on January 31, 2024.

25.    Attached hereto as Exhibit 24 is a true and correct copy of Plaintiff's Trial Exhibit No. P285. Nike produced this document in this litigation on January 31, 2024.

26.    Attached hereto as Exhibit 25 is a true and correct copy of Plaintiff's Trial Exhibit No. P288. Nike produced this document in this litigation on January 31, 2024.

27.    Attached hereto as Exhibit 26 is a true and correct copy of Plaintiff's Trial Exhibit No. P290. Nike produced this document in this litigation on January 31, 2024.

28.    Attached hereto as Exhibit 27 is a true and correct copy of Plaintiff's Trial Exhibit No. P291. Nike produced this document in this litigation on January 31, 2024.

29.    Attached hereto as Exhibit 28 is a true and correct copy of Plaintiff's Trial Exhibit No. P296. Nike produced this document in this litigation on January 31, 2024.

30.    Attached hereto as Exhibit 29 is a true and correct copy of Plaintiff's Trial Exhibit No. P297. Nike produced this document in this litigation on January 31, 2024.

31.     Attached hereto as Exhibit 30 is a true and correct copy of Plaintiff's Trial Exhibit No. P295. Nike produced this document in this litigation on January 31, 2024.

32.     Attached hereto as Exhibit 31 is a true and correct copy of Plaintiff's Trial Exhibit No. P298. Nike produced this document in this litigation on January 31, 2024.

33.     Attached hereto as Exhibit 32 is a true and correct copy of Plaintiff's Trial Exhibit No. P158. Nike produced this document in this litigation on October 12, 2020.

34.     Attached hereto as Exhibit 33 is a true and correct copy of Plaintiff's Trial Exhibit No. P035. Nike produced this document in this litigation on August 30, 2019.

35.     Attached hereto as Exhibit 34 is a true and correct copy of Plaintiff's Trial Exhibit No. P016. Nike produced this document in this litigation on August 16, 2019.

36.     Attached hereto as Exhibit 35 is a true and correct copy of Plaintiff's Trial Exhibit No. P133. Nike produced this document in this litigation on August 31, 2020.

37.     Attached hereto as Exhibit 36 is a true and correct copy of Plaintiff's Trial Exhibit No. P301. Nike produced this document in this litigation on January 31, 2024.

38.     Attached hereto as Exhibit 37 is a true and correct copy of Plaintiff's Trial Exhibit No. P303. Nike produced this document in this litigation on January 31, 2024.

39.     Attached hereto as Exhibit 38 is a true and correct copy of Plaintiff's Trial Exhibit No. P153. Nike produced this document in this litigation on October 12, 2020.

40.     Attached hereto as Exhibit 39 are true and correct copies of Plaintiff's meet and confer efforts (from November 26, 2024, December 26, 2024, and December 30, 2024) to obtain an agreement with Nike for the parties to exchange their potential witnesses in December 2024 or as early as possible, but Nike repeatedly refused to do so earlier than February 3, 2025.

41.     Attached hereto as Exhibit 40 is a true and correct copy of a February 10, 2025

communication from the Parties to the Court.

42.     Nike did not produce any attachments to the email that is Exhibit 21. Nike produced an Offer Intake Form that states, "Rev. 3/2/2017." Ex. 22. Within Exhibit 22, the "Intake Form Example" tab of the excel file states, "Rev. 3/2/2017." This date was difficult to locate because the metadata Nike produced for this document did not include its creation date or modified date, as set forth in the E-Discovery Order (Dkt. 72 at 21-25), and it required several steps to find this date within Exhibit 22 itself: after clicking on the "Intake Form Example" tab of the excel file, the "Page Setup" button needs to be located and clicked; then, in the Page Setup window, the "Header/Footer" button must be clicked; and then "Rev. 3/2/2017" is displayed.

I declare under penalty of perjury under the laws of the State of California and of the United States that the foregoing is true and correct, and that this Declaration was executed this 7th day of October, 2025 in Oakland, California.

*/s/ Byron Goldstein*
Byron Goldstein

# EXHIBIT 1

# PROJECT STARFISH

Confidential



EXHIBIT
H
JEFFRIES
6/14/24

JEFFRIES_00000001

**WHAT WE WANT**

TO UTILIZE OUR <u>COLLECTIVE POWER</u> TO
PRODUCE MEANINGFUL CHANGE SO THAT BOTH
GENDERS CAN THRIVE WITH THE GOAL OF
MAKING NIKE ONE OF THE BEST COMPANIES IN
THE WORLD
(FOR EMPLOYEES & CONSUMERS)

**PROJECT STARFISH**

Confidential

JEFFRIES_00000002

# THEMES WE HAVE HEARD ON CHALLENGES WOMEN FACE

**SEXUAL HARASSMENT & DISCRIMINATION**

**FEAR OF RETALIATION OR BEING "LABLED"**
(EMOTIONAL, ANGRY BLACK WOMAN)

**NO TRUST IN HR / ER IF YOU REPORT THINGS**

**FEW ROLE MODELS AT TOP "YOU CAN'T BE WHAT YOU CAN'T SEE"**

**WOMEN NOT PROGRESSING AS FAST AS MEN REGARDLESS OF OUTPUT**

**NIKE HASN'T MOVED ON FROM THE "BOYS CLUB" CULTURE**

**ONE ARCHETYPE OF SUCCESSFUL LEADER AT NIKE**

**NIKE FORCES WOMEN INTO "FIXER, PROBLEM SOLVER" ROLES**

**FEEL UNDERMINED CONSTANTLY BY MALE LEADERS**
(REGARDLESS OF BAND OR SENORITY)

**DON'T FEEL INVESTED IN UNLESS IDENTIFIED AS HI-PO TALENT**

**WOMEN COMPETING WITH ONE ANOTHER, VERSUS SUPPORTING**

**WOULD LIKE TO SEE TOP FEMALE LEADERS BE MORE VULNERABLE AND ACCESSIBLE**

**PROJECT STARFISH**

Confidential

JEFFRIES_00000003

# ACTIONS REQUIRED TO CREATE MEANINGFUL CHANGE

**WE MUST DRIVE ACCOUNTABILITY**
- ACCOUNTABILITY FOR ACTIONS / ZERO TOLERANCE
- SEE SOMETHING, SAY SOMETHING (IT IS EVERYONE'S RESPONSIBILITY)

**WE MUST DRIVE DIVERSITY**
- EQUALITY ON THE BOARD
- EQUALITY ON NLT
- EQUALITY ON LEADERSHIP TEAMS ACROSS THE ORGANIZATION (BRAND LT, SALES LT, FW LT, FW DESIGN LT, INNOVATION LT, COUNTRY GM'S)
- EQUALITY IN PAY AND PROMOTION

**WE MUST DRIVE TRANSPARANCY**
- ASSESS ALL SEXUAL HARASSMENT & DISCRIMINATION COMPLAINT RECORDS, REPORT QUARTERLY
- PROGRESS IN HIRING & PROMOTING, REPORT QUARTERLY
- OUTWARD COMMUNICATION OF WHAT WE ARE DOING TO MOVE DIVERSITY FORWARD

**WE MUST DRIVE TRAINING & SUPPORT**
- 3RD PARTY TRAINING
- ALL LEVELS OF THE ORGANIZATION
- GENDER SPECIFIC?
- SPECIFIC SUPPORT PLANS FOR NEWLY PROMOTED LEADERS

**PROJECT STARFISH**

Confidential

JEFFRIES_00000004

# IMMEDIATE NEXT STEPS

- INTERVIEWS CONTINUE (ENCOURAGE WOMEN TO PARTICIPATE, INCLUDING OURSELVES)

- QUESTIONAIRS COPIED & GIVEN TO STARFISH NEXT WEEK

- EMAIL J LOTH FOR MEETING WITH STARFIST TEAM (WHOMEVER WOULD LIKE TO PARTICIPATE FROM MEETING ON 2/23)

- MEET AGAIN TO PREPARE FOR GROUP STARFISH MEETING (DATE AND LOCATION NEEDS TO BE DETERMINED)

- MEET WITH STARFISH TO HEAR WHAT WAS LEARNED AND WHAT STEPS ARE GOING TO BE TAKEN

- REACH OUT TO CAA TEAM FOR BLUEPRINT ON HOW THEY HAVE CREATED INTERNAL CHANGE, WHAT CAN WE LEARN (BOTH CAA AND NIKE ARE INDUSTRY LEADERS)

**PROJECT STARFISH**

Confidential

JEFFRIES_00000005

# EXHIBIT 2

FINAL

Welcome everybody and hello to all those people watching from closed circuit and around the world.   I'm really glad to be here with all of you…more than you might imagine.

I think we can all feel that this is an especially important time for us to connect.    This has been a <u>painful moment for me</u>, personally…and <u>painful for many of you</u> who I've spoken with.

I'd like to <u>thank</u> all of you…for the care you've shown one another over the last several weeks.

(PAUSE)

I'm going to share some thoughts on where we are now…and how we're going to move forward.   But I would like to start with a story from my past.   I'm coming on 40 years with Nike next year…

I can assure you when Jeff Johnson asked me to work in product development right out of college in Exeter, New Hampshire, I certainly never envisioned I'd be standing in front of you today.

Surrounded by buildings like the new Seb Coe and the Coach K. Joined by so many talented people, from so many backgrounds and experiences.

1

EXHIBIT
561
Shane Walker
12/21/2020
Teresa Rider - CSR

CONFIDENTIAL
NIKE_00001960

I remember my first day…walking up to the old, L-Shaped brick building on Front Street.   I had about five jobs early on – I was a designer, a developer and I led the weartesting program with about 70 athletes from the area.

As I dug into the role, it became clear we needed to form one, connected R & D team in Exeter.   So we put together the right people…and the only question left was what to name the team.  We approached it like any of our big marketing decisions at the time – we held a contest in the office.

I proudly entered the name: "Nike Sports Research Lab"…and it won.   My reward…a gift certificate to our favorite restaurant in town.

(PAUSE)

In those days, Bill Bowerman would mail us sketches from the West Coast based on x-rays of his runners' feet…to show us exactly where the track spikes should be.   That was Bill.   He was a purist and the conscience of the athlete.

It was our job to come together as a team…and figure out how to give his runners an edge.

We'd debate to get to the best possible place, but we knew – for the most part – when to make a decision and move forward.

2

Success was bigger than any one person.   The "collective" win was always the most impactful.

Sometimes, we <u>just</u> had to have faith in one another. When you were given a bigger job, it was assumed you could do it.

Bob Woodell tells a wonderful story of when Phil Knight asked him to move to Exeter to oversee our footwear research and development.   Bob, who is a paraplegic, has been quoted as saying, "I couldn't run, I couldn't even feel a shoe on my foot.   And yet Phil never assumed I couldn't do it.   So, consequently, I didn't assume I couldn't either."

Now, to be clear, this isn't a story about how "I wish it were the old days."   It's not about living in the past.   Like all companies, we've faced challenging dynamics throughout our history.

But these are some of the qualities I've always looked for in strong teams.   And they're some of the same values and relationships I see all over Nike every day.

But if you asked me then, what does Nike stand for? It was clear: we were there to serve the athlete.

(PAUSE)

3

CONFIDENTIAL

NIKE_00001962

So the question becomes what does Nike stand for today?
What are we learning about ourselves?    Who are we
now?

We have to start with the mission.   This is our north star.
And I personally believe it's one of the most noble
company missions there is.

But as Nike's place in the world has become larger and
more important, we've learned that it isn't enough to just
create amazing products and experiences for the athlete.
Our purpose has become greater.

I believe…we have an incredible power.   We can use
sport in ways that move the world…

…bringing physical activity back into kids' lives…

…tearing down inequalities on and off the playing field…

…or innovating a new business model that delivers a fair
and sustainable supply chain and sustainable products.

This bigger purpose and sense of mission has taken us on
a journey of innovation, revolutionizing factory floors and
forming new partnerships.   It's radically transformed how
we engage with the outside world.

(PAUSE)

4

Plaintiff's Trial Exhibit 15
Page 4 of 20

And as we've grown, we've also had to change how we work within our own culture.   This year we added a new challenge – we laid out a new strategic direction and redefined what it means to be consumer-obsessed.

We set new priorities with the Triple Double – and restructured our teams with the Consumer Direct Offense. We're moving faster, working closer with our geographies, and undergoing a digital revolution.

These aren't minor tweaks.   These are massive moves and they're exactly what we need to make us more competitive.   I know none of its easy.

(PAUSE)

Throughout all of this change, we -- and I -- missed something. While many of us feel like we're treated with respect at Nike, that wasn't the case in all teams.   And if all of our teammates don't see the same opportunities, we just can't accept that.

I am responsible for all of Nike and it's my job, supported by all of you, to help Nike be a place for everyone – both as an empowering place to work and as a brand for all athletes…with a special emphasis on the asterisk.

That's what we mean when we say, "Until we all win" in the Equality Campaign.   It's more than a message that moves people, it has to be the values we live up to, every day.

5

CONFIDENTIAL                                                                                      NIKE_00001964

So, we're taking action.   It's taken considerable time and effort to do it right, respecting everyone's confidentiality…and being thorough and fair.

With the size of our Company, it is normal, sadly, to have workplace concerns raised every day and we are determined to treat each of them seriously.

So, if you contacted the Matter of Respect hotline or email, you can be assured, we will handle your issue with the care and professionalism it deserves.

If you raised an issue, there will be a process of getting back to you personally – we're looking into every concern.

It took incredible bravery from everyone who stepped up to make their voice heard.   So thank you for your courage.

I can tell you that the main set of complaints that gave rise to this process have been acted on…and employee exits from this larger investigation will be behind us after this next week.

(PAUSE)

6

CONFIDENTIAL

NIKE_00001965

It's also important to remember that not all employment action is visible.    Just because someone didn't leave, does not necessarily mean that they've not had consequences.    People have the potential to change and grow…we have to believe in that as well.

And as I said in my email, people leave and join Nike every day. With a workforce of 74,000 people, not everyone who leaves during this time is being exited.

It's clear that people have raised broader concerns.    Please remember that system changes, compensation reviews, and changes to organizations take time.

There is <u>no finish line</u> here.    We continue to review our HR processes from top to bottom so we can take our learnings from this experience.

The goal is to improve our sensing function in the organization…to improve processes that underserved us in recent years…and to restore trust in places where it has eroded.

We'll never be done trying to improve both our teams and our process.    And as hard as it is, I ask you all to focus on your work and making your current environment great.

Please don't spend too much energy on what you think may have happened – it's counterproductive to our ability to move forward.

7

CONFIDENTIAL

NIKE_00001966

Remember, Nike is a big place.   This room is filled with people who are proud to be here…and some feel that they have everything they need.

And there are also people who need MORE from us…and want to us to be better.   Both are true.

(PAUSE)

Let's be clear about why we're all here.   Success is more than just innovative products…emotional ads…and quarterly financial results.   We come to Nike to be part of something bigger – to experience the joy and pride of working on a team that can transcend what we could ever accomplish on our own.

To do that, we all have an obligation – and it's non-negotiable – to create and cultivate an environment of respect and inclusion.   And that starts with me.

I apologize to the people on our team who were excluded. And I apologize that some of those same people felt they had no one to turn to.

I want everyone at Nike to know that their voices do matter ... and your bravery is making us better.

We'll start with a process that protects our people when they need support.   And we'll be more intentional in how we get people to connect and share how they're feeling.

8

CONFIDENTIAL
NIKE_00001967

Because we need those insights more consistently.   We want that transparency.

If you remember, we sent out an all employee survey in March. And over 40,000 of you responded. That's impressive. And we've learned a lot.

| Formatted: Underline |
|---|

(PAUSE)

Some of the things we're doing right are…

…you know what's expected of you at work.

…your manager holds you accountable for your performance

…and your manager treats you with respect.

That's great to hear.   Being clear on your role is no small task in such a complex organization.   And it's encouraging that many of us feel respected.   But "many of us" is not enough.

(PAUSE)

Among the areas where we can be better are…

…effective communication between teams

…you feel you can achieve your goals here

9

CONFIDENTIAL

NIKE_00001968

…and senior leaders are clearly communicating the reasons for business decisions.

This is telling.   We need to be better at collaborating with one another…empowering our people…and explaining how everybody's role can contribute to our overall success.

We'll all hear more about the specific results of the survey from managers next week.

(PAUSE)

So we need to make some deeper changes. And it's already happening.

I'll use a "FROM-TO" to describe where we are now as a culture…and more importantly where we're going.   What is our vision? And what are the behaviors we expect to see?

So the first From…

We're going to move from a place where the "Loudest voices carry the conversation", to "Every voice is heard."

In other words, we're evolving how we define great leadership.

10

CONFIDENTIAL                                                                NIKE_00001969

We want great leaders to be great coaches – spending time building teams, mentoring and growing people.   We need clear direction, but also an openness to feedback. Sometimes asking questions…is as important as giving answers.

One request I've heard a lot…is for <u>more straight talk</u> and <u>real collaboration</u>.   We're going to move beyond our silos and deliberately seek out divergent thinkers…truly listen to their expertise…and create solutions together.

People may think collaboration slows things down.   <u>It can</u>. But if <u>done right</u>, it's about <u>speed</u> and <u>results</u>.

<u>(PAUSE)</u>

Which brings me to the second "from"…

From "We all have to Agree"…to "Simplify and Go."   I think we all know the difference between bringing in different perspectives to add to a plan…versus too much process…pre-meetings…and check-points.

I think a lot of that process has been created out of a desire to avoid having dissenting views in a meeting.   But if we can be <u>honest without being negative</u>, we can dispense with that, be <u>more direct</u> and <u>move faster</u>.   I want us to focus on getting our best ideas into the world as quickly as possible.

11

CONFIDENTIAL

NIKE_00001970

Sometimes we won't all agree.   And that's ok.   None of us can expect that our views will win-out 100% of the time…but we should all feel heard and respected.   Listen to the voices, get in a room, decide…then go.

(PAUSE)

This next one is at the heart of our widest, systemic change.

From a place where "I sometimes question whether I belong here" to "I feel included and I have an opportunity to succeed." Someone told me recently that they didn't feel like they fit the Nike profile.   It hurt me to hear that. There is no Nike profile.
There are many ways to succeed here.

I was reminded of that last week, when Secretary Madeleine Albright, visited campus.   And I'll say for those of who were lucky enough to speak with her…her energy and her drive were~~as~~ amazing.

She was outspoken on a number of issues, but the insight that resonated most with me – as we move towards our goal of a more inclusive culture – was "The best way to use people's talents is to have them <u>comfortable in who they are</u>."

12

CONFIDENTIAL
NIKE_00001971

At Nike, we want every person -- irrespective of how long we've been here…which department we work in…our gender…the color of our skin…or who we love...to feel a part of our team and to fully realize their potential.

It's up to all of us to engage in a dialogue more often and strive for more than just tolerance.   Secretary Albright also had this to say about her approach to working with all people.

She said, "I don't like the word tolerance, because it comes from 'tolerate,' which means to put up with.   What we really need to do is respect each other's views."

That kind of compassion is critical in leading, innovating and driving meaningful change.

(PAUSE)

We're also going to create a fair playing field.   That's why we're being more transparent about where we are on our representation and equal pay goals, beginning with women and people of color. We want our actions to better match our values.

I've really valued the partnership and engagement with our Employee Networks throughout this process.   They have great perspectives on what our teams need, and I'm certain they will be ~~will be~~ an even more powerful source of insights, energy and change, moving forward.

13

Across the organization, we also have a number of programs we're activating…

… from a focus on our future leaders with executive training programs and a new expanded mentor program…

... to training across the company for 10,000 managers to ensure that people who lead teams are clear on expectations, which behaviors to model and what resources are available to them.

... to unconscious-bias training for all employees, which has already started.

Now, let me add here that I don't believe that Training Programs are any kind of simple and quick fix, in and of themselves.   But they are an important piece of a bigger plan.

(PAUSE)

Moving to the last From/To…

Is from a "culture where great work is assumed"…to a culture "where great work is recognized and celebrated."

We have an incredible standard at Nike.   That will never change.

14

CONFIDENTIAL                                                                          NIKE_00001973

But we can have more fun…and not take ourselves too seriously.   I want us to find informal moments to thank each other for how hard we're working, more consistently. Recognition, should become second nature to us all.

We've also created more platforms for our people to be recognized formally.   Our Maxims, as you know, have been reimagined.

They are now more aspirational, inclusive and grounded in our values.   They are now coupled with daily behaviors… which we want our teams to model.   We'll host the Maxim awards in September – which celebrates team wins.

And we've added new individual awards, up to 50 a year from around the world – called the Just Do It awards. Winners of the JDI award are all considered for the Founders Award – which selects one Nike employee that represents the best of Knight and Bowerman.

One final announcement on recognition.   It should be obvious by now that "Win as a team" is the way forward. That collective win I spoke about earlier, has to be real. With that in mind, we are changing our PSP structure.

Starting next fiscal year, PSP will be awarded against one set of objectives.   There will be one plan, with one reward system.    We are One Nike – we win and lose as a team.

(PAUSE)

15

As you can see, and will continue to see, we're making changes where we need them.   And we're strengthening what already makes us great.

I want us all to see this moment in time as an opportunity to lead Nike in a different way.   Having more open conversations…giving our teams more opportunity to grow within their jobs…being more empathetic…coaching our people.   These are not add-ons to the work you're already doing.

This is the work that we must all commit to.

(PAUSE)

In the last several weeks, many of you have sent supportive notes to one another.   And I appreciate those of you who reached out to me directly.

The tone of your notes and calls have ranged from deep concern…to encouragement and appreciation.   All of them have been inspiring and helpful.

I'd like to read an excerpt from one email that was shared with me after some of the more recent media reports.

"I've been with Nike about 18 years so it comes as no surprise that I have a strong bond with the company.

I love that we exist to serve human potential.   I love the passion so many of us bring to the work and to our outside

16

CONFIDENTIAL

pursuits.   I also love that we're self-critical and always striving to improve.

Reading the article reminded me of when I first started at Nike.   At that time, whenever Nike was mentioned in the news it was synonymous with the working conditions in our contract factories.

We were doing tons of work to improve conditions and there was so much more work that needed to be done.

We didn't do the minimum.   We put a significant, sustained effort against these very complex issues.

And while conditions in our contract factories require continuous improvement and focus, we are a recognized leader in our industry in terms of how we address these issues.

And, so, I am hopeful we will seize this time that exposed our need to improve diversity, our HR systems, and to create a culture that serves <u>every person</u>.

I have seen that when we really commit to complex change, we can genuinely improve.   For change to be real, it's not quick or easy or linear.

In the process, there may be more public criticism.   And, even after real change, the results will not be nirvana for all.

17

But when we stay on this, we will be recognized as leaders -- who continue to be self-critical and always striving to improve."

(PAUSE)

I hope we can take thoughtful and optimistic messages like this one…and build on all the good things we are doing as a company.

Momentum for Nike is happening everywhere…

..the consumer is voting for our new innovation platforms

…our brand is connecting through both locally-driven campaigns and big global moments

…we're shrinking product timelines and getting our hottest styles to market faster

…and we're reinventing the retail experience as we reshape the marketplace

(PAUSE)

Nike's future…is bright.

If Jeff Johnson told me on that first day in Exeter that the company I was entering would be one of the world's most powerful influences on sport and popular culture…I wouldn't have believed him.

18

CONFIDENTIAL
NIKE_00001977

Plaintiff's Trial Exhibit 15
Page 18 of 20

The same goes if he had told me we would be a leading innovation company, that's on the front edge of digital design and printing footwear.

Or that we would have the ability to connect what we did for Bill's athletes, to hundreds of millions of people around the world,
1-to-1.

Or that we would create a legacy of Nike employees that have changed our industry and in some cases the world. That many, as I have, would stay here for decades and build their careers…grow their families…and form life-long friendships.

I might not have believed him…but I would've said that sounds like a pretty good future to me.

(PAUSE)

I'm hopeful ~~about~~ today because we're responding to such a tough situation…together.

That's important, because I can help lead this change, but I can't do it alone.   It's going to take all of us.   If you have suggestions on how to do it better, I want to hear from you.

Support each other.   Bring energy to those around you.

19

Be engaged, constructive and passionate…yet respectful, open and humble.   Let's move towards that future.

I'm in 100%, and I'm counting on you to be all-in too.

Thank you, everybody.

20

NIKE_00001979

Plaintiff's Trial Exhibit 15
Page 20 of 20

# EXHIBIT 3

Message

| | |
|---|---|
| **From:** | MParker [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C71CBB2F68E5478B9A922D1623D4857C-MPARKER] |
| **Sent:** | 3/15/2018 9:40:21 PM |
| **To:** | Lst-Nike.Global [lst-nike.global@nike.com] |
| **BCC:** | Powell, Nigel [nigel.powell@nike.com]; Leonard, Kellie [kellie.leonard@nike.com]; Wade, Marcus [marcus.wade@nike.com]; Miller, Ann [ann.miller@nike.com]; Leinwand, Robert [robert.leinwand@nike.com]; Krane, Hilary [hilary.krane@nike.com]; Matheson, Monique [monique.matheson@nike.com]; Parker, Mark [mark.parker@nike.com]; Favret, Emily [emily.favret@nike.com]; Communications, Internal [internal.communications@nike.com] |
| **Subject:** | A note from Mark |



Team,

Over the past few weeks, we've become aware of reports of behavior occurring within our organization that do not reflect our core values of inclusivity, respect and empowerment at a time when we are accelerating our transition to the next stage of growth and advancing our culture. This disturbs and saddens me.

We've heard from strong and courageous employees. This has been a very difficult time and we are still talking to team members to better understand what we need to change. Our culture is one based on mutual respect, inclusion and teamwork and we want Nike to be a place where everyone has an opportunity to play an important role and succeed. Behavior that is inconsistent with our values has no place at Nike and we will continue to look into matters and take appropriate action where we find behavior against our code of conduct.

We are going to be doing a comprehensive review of our HR systems and practices along with elevating our complaint process for matter of respect issues. We will increase and invest more heavily in our diversity and inclusion teams and networks and additionally will immediately put in place an enhanced process to encourage our employees to speak up and make their voices heard. We will also create a mandatory manager training program so that everyone understands what we expect and what they need to do to reinforce our core values. Any employees who wish to request a confidential meeting can send an email to matterofrespect@nike.com. Additionally, employees can access our Matter of Respect hotline at +1 503-532-4444 or 324444 from an internal Nike phone. You can also call our 24-hour, global hotline to reach a representative connected with our Inside the Lines Alertline.

**Restructured Leadership Team**

Further, I want to share with you that in light of my desire to accelerate change, I've made the decision to restructure my leadership team into a different alignment that will allow for closer management and a sharper focus on our culture. Elliott Hill is taking on



EXHIBIT
560
Shane Walker
12/21/2020
Teresa Rider - CSR

CONFIDENTIAL

NIKE_00002237

Plaintiff's Trial Exhibit 19
Page 1 of 2

the new role of President of Consumer and Marketplace. He will be responsible for Marketing, Geographies, Nike Direct, Global Sales and Jordan Brand. Michael Spillane will continue to lead all Categories, Design, Product and Merchandising. Both Elliott and Michael will report to me. I also want to communicate that I am committed to serve as Chairman, President and CEO for Nike beyond 2020. Trevor Edwards has decided to resign as Nike Brand President and will retire in August. He will serve as an advisor to me until his retirement as we transition the organization.

I'd like to thank Trevor for his significant contributions to Nike over the last 25 years. He has helped us grow and strengthen our brand on a global scale. Elliott and Michael are both highly accomplished leaders at Nike with strong experience and, along with our leadership team, are ideally suited to steward our culture and help lead our teams forward.

I am determined to make the necessary changes so that our culture and our company can evolve and grow. We all want to create an environment where everyone can thrive and contribute to our shared success.

Sincerely,

**Mark Parker**
Chairman, President and CEO, NIKE Inc.

FOR INTERNAL USE ONLY. © 2018 ALL RIGHTS RESERVED

CONFIDENTIAL

NIKE_00002238

# EXHIBIT 4

**YEAR-END PROCESS**

# ANNUAL PAY REVIEW

JULY 2019

Highly Confidential - Attorneys' Eyes Only

NIKE_00033960

# EXECUTIVE OVERVIEW

**At this meeting we will review the results of our Annual Pay Review (APR) and <u>request approval</u> of the <u>annual stock awards</u> for employees in bands E to E4. Business leaders have completed their planning – an overview of this year's APR is provided on the following pages.**

- We are on a multi-year journey to transform Total Rewards at NIKE…we are assessing our programs, practices, and policies – from design to administration – to ensure alignment with our culture, strategy, and Total Rewards Principles. This requires investment to evolve outdated pay practices, maintain market competitiveness, and create capacity for future enhancements to ensure a healthy rewards ecosystem.

- Between FY18 and FY20, we made significant investments to address problematic pay practices and gaps to market … enabling us to deliver competitive and equitable rewards for all employees, while continuing to drive pay for performance and impact.

- Throughout FY19 we implemented a number of enhancements:
  - One Team PSP
  - Competitive Pay Management
  - Stock Choice

  - Total Rewards Portal
  - Flexible Time Off (Netherlands)
  - Stock Plan Administrator Change

  - Revised New Hire & Promotion Guidance
  - Updated International Stock Guidelines
  - Introduction of New Hire Stock Guidelines

- The evolution of our Annual Pay Review sharpens NIKE's focus on competitive and equitable pay, while providing managers the opportunity to evaluate pay for their employees at a key moment in the year, investing in talent based on performance and impact. As an outcome of this program and other investments:

  - We've delivered a comprehensive Total Rewards training for managers (over 200 sessions), building manager capability in our pay programs

  - █████████████████████████████████████████████

  - ~30% of eligible employees (critical talent) received above market pay increases and ~50% above market annual stock awards

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

# APR PROCESS OVERVIEW

In 2019, NIKE, Inc. introduced an updated Annual Pay Review (APR) process, which evolves and consolidates previous annual reward processes like Global Performance Rewards (GPR), 2X/Mid-Year Talent & Pay Review, Competitive Pay Management, and the Annual Stock Award process. APR sharpens NIKE's focus on competitive and equitable pay, while providing managers the opportunity to evaluate pay for their employees at a key moment in the year. SuccessFactors, available on the MEportal, is a single digital tool that will enable managers to enter pay recommendations in one place, with real-time relevant information to aid them throughout the process.



**PROGRAMS, PRACTICES, AND SOLUTIONS MAXIMIZE IMPACT AND EFFICIENCY**

COACHING FOR EXCELLENCE
CFE Ratings entered by managers in SAP

**MANAGED THROUGH ONE TECHNOLOGY PLATFORM: SUCCESSFACTORS**

| ALL REWARDS | BASE PAY | | | BONUS | STOCK | ALL REWARDS |
|---|---|---|---|---|---|---|
| **GLOBAL MARKET ASSESSMENT** | **COMPETITIVE PAY ADJUSTMENT** | **CORE PAY ADJUSTMENT** | **MANAGER INVESTMENT** | **PSP** | **STOCK** | **COMMUNICATE** |
| Develop reward budgets, adjust pay ranges, and assess pay competitiveness | Increases to base pay resulting from centrally driven analysis | Default, fixed base pay increase based on country and position in range: Market Increase | Optional additional increase to reward performance, impact, key talent, or address internal equity: Invest or Max Invest Increase | Shared Nike Inc. performance metric and 100% individual modifier for all employees | Recognize and retain eligible talent with stock awards: Lower, Market, Invest Award Levels | Enhanced pay statement to communicate awards |

**COMPETITIVE AND EQUITABLE REWARDS ARE OUR BASELINE**                **WE PAY FOR PERFORMANCE AND IMPACT**

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

3

NIKE_00033962

# PROGRAM OUTCOMES

## CORE PAY ADJUSTMENTS

**2019 APR INVESTMENT**


$127M

| | | |
|---|---|---|
| BUDGET | | 130.3 |
| SPEND | 127.0 | |

Our annual core pay budget to actual was consistent with prior years. The total includes **$113.3M for manager-driven decisions and $14.0M for prescriptive increase programs**. $2M is reserved for NA Retail increases that will take effect in February 2020.

### DISTRIBUTION OF CORE PAY

The distribution of core pay increases was generally consistent across all bands and aligned to enterprise wide distribution. The enterprise wide distribution by investment category:

- **7%** for Max Invest
- **22%** for Invest
- **66%** for Market
- **5%** for Zero

### IMPACT OF INVESTMENT

Our annual base pay investment (core pay plus competitive pay management) across the enterprise increased our average position in range from **97% before APR to 101% after APR**.

## COMPETITIVE PAY MANAGEMENT



## CASH INCENTIVE PLANS

**2019 PSP PAYOUT**


$586M

FY19 was the first year our **~36,000 eligible employees** were rewarded as "One Team" under the Nike PSP, with plan achievement at **122%**. PSP is designed to recognize and reward Company performance. One team PSP creates the opportunity for global teammates to share in NIKE's collective success.

**2019 LTIP PAYOUT**


$31M

FY17-19 LTIP achievement was **0%.** Management confirmed that a **discretionary adjustment** to the payout from 0% to **50% for 418 Non-Executive Officers** was appropriate to drive sustained engagement, retention, and motivation across the leadership team. No adjustment was made to the payout for Nike's 7 Executive Officers.

## STOCK INCENTIVE PLANS

**2019 ANNUAL AWARD INVESTMENT**


$507M

| | | |
|---|---|---|
| BUDGET | | 522.0 |
| SPEND | 507.0 | |

Annual award recommendations total **$507M for ~6,300 employees**, which is **$15M (3%) below** the $522M Pool.

The enterprise wide distribution by investment category, generally aligned with prior year:

- **49%** for Invest
- **47%** for Market
- **3%** for Lower
- **1%** for Zero

### NIKE STOCK CHOICE

A total of **$449M (89% of annual award value)** will be awarded through the **Nike Stock Choice** program for eligible E - E6 employees.

Employees will be able to choose 100% Stock Options, 100% RSUs, or a 50/50 mix of both Stock Options & RSUs. The election period is August 6-23. The grant date for these awards is September 1.

E5+ Employees will have their total stock award granted in 60% Stock Options and 40% RSUs and the grant date for these awards is August 1.

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

4

NIKE_00033963

# ANNUAL STOCK AWARD APPROVAL

At this meeting, we will seek CEO approval of **annual stock awards for Bands E – E4**

- **Annual Stock Awards** reflect a total award value of $475M for ~6,300 employees

  - **Band E to E6** employees are eligible for **Nike Stock Choice** and will have the opportunity to choose how they receive their annual stock award (100% stock options, 100% RSUs, or 50/50 mix)

    - The grant date will be **September 1**, following the Nike Stock Choice election period (Aug 6-22)

  - **Band E5 & Above** employees will receive their stock award as **60% stock options and 40% RSUs**

    - The grant date will be **August 1**

The **Total Annual Stock Award** investment reflects $507M, which is $15M (3%) below the $522M pool – this represents the $32M (approved by the Compensation Committee) and the $475M (to be approved by Mark Parker at this meeting)

- We will reserve the remaining pool to support further discretionary awards throughout the fiscal year, as needed

Resolutions in support of the annual stock awards are provided at the end of your materials

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

# APPENDIX

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL

Highly Confidential - Attorneys' Eyes Only

6

NIKE_00033965

# COMPETITIVE PAY MANAGEMENT (CPM)



CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

NIKE_00033966

# CORE PAY

## PROGRAM OVERVIEW

Core Pay is the new term we are using in place of Merit. Increases are pre-populated based on country and position in range to ensure consistency in approach across NIKE and employee movement through their pay range. Managers can further invest in their employees by selecting from a predefined dropdown list and taking into account current position in pay range, prior year performance, future potential, impact of loss, risk of loss, time in role, and pay relative to peers.

## 2019 INVESTMENTS

Investment in **37,380** employees through manager-driven core pay increases total **$113.3M**, which is **$0.6M (0.5%) below budget**. Spend was evenly distributed across bands relative to budget.



## LUMP SUM AWARDS

Overall, **3,166 (8%)** of employees are **above the maximum** of the pay range. This resulted in **1,688 lump sum awards** in lieu of a core pay increase. At manager discretion, the remaining employees received either no increase or a core pay increase in lieu of a lump sum award.

## DISTRIBUTION OF CORE PAY BY CFE RATING (ALL BANDS)



## DISTRIBUTION OF CORE PAY BY TALENT SEGMENT (E-BAND AND ABOVE)



## POSITION IN RANGE MOVEMENT



## HIGHLIGHTS

Approximately **28%** of our population were selected by managers for a **further investment** in Core Pay above the pre-populated market rate.

The distribution of employees with further investments was consistent across all Employee Bands. Maintaining this distribution ensures competitive and equitable pay for all employees.

Core Pay increases for nearly **28,000** employees in Retail Stores and Distribution Centers were managed through separate and prescriptive increase programs tied to either CFE rating or location and years of experience. These annual Core Pay increases and Lump Sum awards total an incremental **$14.0M** not shown in the other sections of this slide.

Overall, Core Pay increases were given to over **~67,000** employees through our various programs.

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

8

NIKE_00033967

# CASH INCENTIVE PLANS¹

## Performance Sharing Plan (PSP) AND Long Term Incentive Plan (LTIP)

Nike's cash incentive plans (PSP & LTIP) provide employees the opportunity to share in the Company's success. The **annual target investment in cash incentives is $570M** – PSP represents $500M for ~36K employees; LTIP represents $70M for ~425 employees.

For PSP, success is measured annually by a company-wide financial goal based on growing Nike, Inc. Earnings Before Interest & Tax (EBIT). LTIP rewards employees in bands E1-E7 for delivering revenue growth and earnings per share (EPS) growth over a three-year period.

**FY19** cash incentive plan payouts resulted in a **total $617M investment** or **108% of our target investment**.

### CASH INCENTIVE PLAN INVESTMENTS



**$570M**
TARGET FY19 INVESTMENT
@100% ACHIEVEMENT

LTIP
$31M

PSP
$586M

$617M

**ACTUAL FY19 INVESTMENT**

PERFORMANCE SHARING PLAN (PSP)
- FY19 Plan Achievement: 122%

LONG-TERM INCENTIVE PLAN (LTIP)
- FY17-19 Plan Payout: 50%
- FY17-19 Plan Achievement: 0%

## PSP ACHIEVEMENT

Aligned to our one-team culture, beginning in FY19 all eligible employees were on **One Shared PSP** measured by Nike, Inc EBIT, and the individual performance modifier was removed. FY19 PSP delivered **122%** of target to **~36K employees**, rewarding One Nike Team for achieving our Company goals and delivering equitable payouts to all participants.

The 5 and 10-year average payouts for the NIKE, Inc. EBIT plan are 95% and 106%, respectively, with payouts ranging from 58% to 150% (maximum) over the past 10 years.

### 10-YEAR NIKE INC EBIT PLAN ACHIEVEMENT HISTORY



## PSP IN FY20

To further emphasize the goal to deliver sustainable, profitable growth by focusing on underlying operating results, **FY20 EBIT** results will be adjusted to **exclude the impact of foreign exchange** vs. budgeted EBIT. This change ensures that our short-term incentive target is not subject to external, uncontrollable currency fluctuations, and prevents payout windfalls and shortfalls not aligned with operating performance.

## LTIP ACHIEVEMENT

The FY17-19 LTIP fell short of target goals, resulting in achievement of 0%. Management confirmed that a **discretionary adjustment** to the payout **from 0% to 50%** was appropriate for **418 Non-Executive Officers** to drive sustained engagement, retention, and motivation across the leadership team. The payout for **Executive Officers** was **not adjusted**. The 5 and 10-year average LTIP payouts are 109% and 102%, respectively, with payouts ranging from 0% to 200% over the past 10 years.

### 10-YEAR LTIP ACHIEVEMENT HISTORY



## LTIP IN FY20

To normalize the performance impact across the 3-year performance period, **FY20-22 LTIP** Revenue and EPS targets reflect ending results as of Year 3, with the Compound Annual Growth Rate (**CAGR**) **based on final achievements**. Nike's other active LTI cash plans (FY18-20 and FY19-21) will be the last to use a Cumulative CAGR calculation—a measurement that places greater emphasis on Year 1 performance.

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

¹Currently excludes Retail cash incentives—to be incorporated at a later date    9

NIKE_00033968

# STOCK INCENTIVES

## PROGRAM OVERVIEW

Stock awards are pre-populated based on the employee's country and band. Managers can further invest by selecting from a predefined dropdown list and taking into account prior year performance, future potential, impact of loss, and risk of loss. Nike Stock Choice provides eligible employees the opportunity to choose how they receive their Annual Stock Award: 100% stock options, 100% restricted stock units (also known as RSUs), or a 50/50 mix of both stock options and RSUs.

## 2019 INVESTMENTS

Investment in **6,279 employees** through annual stock awards total **$507M, which is $15M (3%) below** budget. Spend was evenly distributed across bands relative to budget.



**INVEST** **MARKET** **LOWER** **ZERO**

| E & S BAND | E7 & E6 BAND | E5 & E4 BAND |
|---|---|---|
| • $361M in value | • $89M in value | • $26M in value |
| • 5,947 employees | • 384 employees | • 26 employees |
| • 48% Invest | • 59% Invest | • 46% Invest |
| • 48% Market | • 37% Market | • 46% Market |
| • 3% Lower | • 0% Lower | • 4% Lower |
| • 1% Zero | • 4% Zero | • 4% Zero |

## KEY TALENT DIFFERENTIATION

Approximately **49%** of our population were selected by managers for a **further investment** in Stock Awards, above the pre-populated market rate. Key talent is also eligible for Mid-Year awards, providing further opportunity to reward and retain.

### DISTRIBUTION OF STOCK AWARDS CFE RATING (E-BAND AND ABOVE)



## HIGHLIGHTS

### Meaningful Differentiation
Top talent is recognized through a higher distribution of Invest level stock awards.

### Alignment of Practice
We have a more consistent stock award process with the E4 & E5 population now part of APR in Success Factors along with the E-E6 population and using the same investment decision choices of "Invest", "Market", and "Lower".

### Competitive Pay as our Baseline
Expanded stock Tiers for E-S employees in our regions. We now have 3 stock tiers with guideline values increased from prior years.

### DISTRIBUTION OF STOCK AWARDS BY TALENT SEGMENT (E-BAND AND ABOVE)



CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

10

NIKE_00033969

# FISCAL 2020 STOCK POOL SUMMARY

- **The following table provides a summary of YTD Stock Awards compared to Pool. The amounts below reflect:**

| FY20 YTD STOCK AWARDS VS POOL | | | | |
|---|---|---|---|---|
| **AWARD TYPE** | **POOL** | **FY20 TOTAL AWARD VALUE** | **REMAINING POOL $ / %** | **# of RECIPIENTS** |
| **DISCRETIONARY AWARDS** | | | | |
| New Hire | $27M | $6.2M | $20.8M / 77% | 50 |
| Select Retention / Promotion | $20M | $4.7M | $15.3M / 77% | 6 |
| Mid-Year | $40M | $0.0M | $40M / 100% | 0 |
| **ANNUAL AWARDS** | | | | |
| Annual Grant [1] | $522M | $507M | $15M / 3% | 6,279 |
| **SUMMARY TOTALS** | **$609M** | **$517.9M** | **$91.1M / 15%** | **6,335** |

[1] Reflects awards granted to Section 16 officers ($28.5M), E5 & Above Non-Section 16 officers ($29M), and employees at levels E-E6 ($449M).
NOTE: Pool and Spend exclude BOD stock awards

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

Plaintiff's Trial Exhibit 207
Page 11 of 22

# BACKUP (KIM ONLY)

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

# TOTAL REWARDS PHILOSOPHY

WE EXIST TO CREATE "UNIQUELY NIKE" TOTAL REWARDS THAT ENABLE NIKE TO ATTRACT, RETAIN, & ENGAGE THE WORLD'S BEST TALENT

Aligned with our culture (what we stand for), what our people value, and the competitive market

**1** ENSURE COMPETITIVE & EQUITABLE REWARDS

**2** WE PAY FOR PERFORMANCE & IMPACT

**3** INVEST IN POSITIVE EXPERIENCES



CULTURE & VALUES
WHAT NIKE STANDS FOR

PEOPLE FIRST

EMPLOYEE INSIGHTS
WHAT EMPLOYEES VALUE

MARKET INSIGHTS
EXTERNAL CONTENT TO INFORM PRACTICE

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

13

NIKE_00033972

# WE'RE ON A JOURNEY TO TRANSFORM TOTAL REWARDS

We are on a multi-year journey to transform Total Rewards at Nike…we are assessing our programs, practices, and policies – from design to administration – to ensure alignment with our culture, strategy, and Total Rewards principles.

A healthy rewards ecosystem requires investment to adapt outdated pay practices, maintain market competitiveness, and create capacity for future enhancements.

### FY19 - WHAT WE'VE DONE:

- One PSP
- Competitive Pay Management
- Shift from share-based to value-based stock awards
- Stock Choice
- Total Rewards Portal
- Flexible Time Off (Netherlands)
- Military Leave (U.S.)

### WHAT'S AHEAD:

- Pay Equity Update
- Stock Plan Administrator Change
  - *Blackout period: May 10 – June 3*
- Introduction of Annual Pay Review
- Revised New Hire & Promotion Guidance
- Updated International Stock Guidelines
- Introduction of New Hire Stock Guidelines

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

# ANNUAL PAY REVIEW OVERVIEW

In 2019, NIKE, Inc. introduced an updated Annual Pay Review (APR) process, which evolves and consolidates previous annual reward processes like Global Performance Rewards (GPR), 2X/Mid-Year Talent & Pay Review, Competitive Pay Management, and the Annual Stock Award process. SuccessFactors, available on the MEportal, is a single digital tool that will enable managers to enter pay recommendations in one place, with real-time relevant information to aid them throughout the process.

The Annual Pay Review process runs June 5-July 7. During the planning period (June 5-18) all people managers, regardless of level, will gain access to SuccessFactors via the MEportal to review their employees' information and make all applicable pay recommendations. After the initial planning period, pay recommendations move through the Executive Review process (June 19-July 7). Each stage of the Executive Review process allows 3-4 days for leaders to review recommendations. At the end of each review stage, the ability to edit information will close for that particular group. Managers will have visibility throughout the Executive Review process.

| Competitive Pay Management | Core Pay | Lump Sum | Annual Bonus – PSP | Stock Awards | Long-Term Incentive Plan (LTIP) |
|---|---|---|---|---|---|
| • CPM Adjustments pre-populate for select employees<br>• Managers determine whether to Apply CPM Adjustments – default is '**Yes**'<br>• Manager may select '**No**' if:<br> • Incorrect job code is listed<br> • There is a documented performance action plan<br> • The employee is a future termination<br> • You require HR Business Partner assistance | • Core Pay Adjustments pre-populate for all employees with a 'Market' default<br>• Managers determine whether to further invest in their employees by:<br> • Increasing the investment by selecting '**Invest**' or '**Max Invest**'<br> • Decreasing the investment by selecting '**Zero**'<br> • *Note: We expect that overall approximately 20% of employees will receive 'Invest' or 'Max Invest', although this will vary by manager* | • Lump Sum awards pre-populate when pay exceeds the pay range maximum (whereas amounts that reach pay range maximum result in pay increase)<br>• Managers determine whether to Apply Lump Sum Amount – default is '**Yes**'<br>• Manager may select '**No**' but must provide justification | • No action required<br> • All individual modifiers are set at 100%<br> • Final bonus payout is based on achievement of one company-wide metric – Earnings Before Interest and Taxes (EBIT) – and is approved by NIKE's Board of Directors at the end of the fiscal year | • Stock award recommendations pre-populate for eligible employees with a 'Market' default<br>• Managers determine whether to further invest in their employees by:<br> • Increasing the investment by selecting '**Invest**'<br> • Decreasing the investment by selecting '**Lower**' or '**Zero**'<br> • *Note: We expect that overall approximately 20% of employees will receive 'Invest', although this will vary by manager* | • No action required<br> • LTIP payout is based on achievement of revenue and Earnings Per Share (EPS) metrics over a three-year period and is approved by NIKE's Board of Directors at the end of the fiscal year |

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

# KEY CHANGES
## BASE PAY

| WHAT'S NEW | | WHY |
|---|---|---|
| **COMPETITIVE PAY** | Recommended adjustments pre-populated in SuccessFactors | Supports ongoing commitment to equitable and competitive pay while maximizing impact and efficiency |
| **BASE PAY GUIDANCE** | Prepopulated default increase based on country and position in range | Ensures consistency in approach, employee movement through ranges and competitive increases |
| **DIFFERENTIATION** | Ability to make additional predetermined investment recommendations | Balances competitive pay with differentiation based on performance and provides flexibility to address other talent-related pay needs |
| **LUMP SUM** | Default for employees above the maximum of the pay range with ability for managers to apply to base pay as needed | Ensures consistent usage of lump sum payments and requires greater visibility into pay recommendations for employees above the maximum of the pay range |

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

16

NIKE_00033975

# KEY CHANGES
## SHORT TERM & LONG TERM INCENTIVES

| WHAT'S NEW | | WHY |
|---|---|---|
| **PSP** | Based on a single, shared NIKE performance metric, individual modifiers are 100% | Aligns to One Team, One Metric |
| **STOCK PROCESS** | Managers will have visibility in SuccessFactors and be able to recommend stock | Streamlined process with manager ability to influence awards |
| **STOCK GUIDELINES** | Three stock guideline tiers for E & S bands and one tier for E7+ bands | Aligns target values to desired market position and supports ongoing commitment to competitive, equitable pay |
| **PROMOTIONS INTO STOCK ELIGIBLE BANDS** | Default approach to stock awards for employees promoted in June, July, and August | Equitable treatment for both internal employees and external candidates moving into and out of the program |
| **LTIP ELIGIBLITY DATES** | LTIP eligibility based on employee band as of May 31 | Equitable treatment for both internal employees and external candidates moving into and out of the program |

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

17
NIKE_00033976

# KEY CHANGES
## REPORTING & PAY STATEMENTS

| WHAT'S NEW | | WHY |
|---|---|---|
| **STANDARDIZED REPORTING** | Real-time dashboards and reports via SuccessFactors | Provides HR, Leaders and Managers with greater visibility into pay recommendations occurring in the system for their organizations |
| **COST CENTER REPORTING** | In addition to 'Reports To' views, data can be filtered using Cost Center Levels 3 through 9 | Enables real-time reporting on a cost-center basis, reducing manual effort required to piece together data from various sources |
| **PAY STATEMENTS** | Enhanced pay statement generated via SuccessFactors | Increases understanding and supports pay conversations through enhanced formatting and content |
| **PAY STATEMENT TRANSLATIONS** | Varies by country with 14 languages available for V-U bands; English only for E+ bands | Provides a better employee experience and meets regulatory and compliance requirements |

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

18
NIKE_00033977

# KEY CHANGES
## TIMELINE & ADMINISTRATION

| WHAT'S NEW | | WHY |
| --- | --- | --- |
| **TIMELINE & ROUTE MAP** | SuccessFactors open from June 5 to July 7 with set timeframes for planning and review by Band | Standardizes process across company, ensuring appropriate time allocated for leadership review and approval |
| **E4 & E5 ADMINISTRATION** | Pay recommendations administered via SuccessFactors | Streamlines the process increases consistency and efficiency while reducing risk of errors |
| **NO PROXY** | Managers enter recommendations in SuccessFactors – no edit access for HR | Reinforces manager accountability for making pay recommendations for their teams |
| **ACCESS FOR ALL** | HR access to all data in system (excluding our own function) | Provides greater visibility to recommendations across Nike to support matrixed environment |

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

19
NIKE_00033978

# ANNUAL STOCK AWARDS – PROGRAM CHANGES & GUIDELINES

| FROM | TO | WHY |
|---|---|---|
| **INTERNATIONAL GUIDEINES** | | |
| 2-Tier Approach<br>Tier 1: 100% US Market   All US & Global E6+<br>Tier 2: ~55% US Market   All Non-US (E7 & below) | 3-Tier Approach<br>Tier 1: 100% US Market   NA Geo & All CLT<br>Tier 2: ~80% US Market   EMEA<br>Tier 3: ~70% US Market   APLA & GC | Strengthens competitiveness & further aligns with global market practice & levels. Aligns with our business & talent strategies. Balances simplicity/ease of communication |
| **CLT GUIDELINES** | | |
| E5+ VPs: Two sets of broad guidelines for stock options (share-based) and restricted stock (value-based) by level | One set of guidelines by level (value-based) providing default award level at target market value with optionality to adjust (Invest – Market – Lower) | Supports our shift to value-based stock for E5+. Provides a consistent approach across all levels |
| **ELIGIBILITY** | | |
| Active stock-eligible employees on May 31 | Active stock-eligible employees on June 1<br>New Hires & E-Band Promotions in Q1<br>Eligible for annual grant in September<br>Award at market level by band; deliver in RSUs | Appropriately award stock to 1st-time stock eligible employees who become eligible (hire/promo) in Q1. Strengthens retention by delivering RSUs |

| | NA & All CLT (Bands E7-E4) | | | | EMEA Geo | | | | Greater China & APLA Geos | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budgeted Amount | Invest | Market | Lower | Budgeted Amount | Invest | Market | Lower | Budgeted Amount | Invest | Market | Lower |
| **E4** | $1.55M | $1.70M | $1.40M | $1.10M | - | - | - | - | - | - | - | - |
| **E5** | $900K | $1.0M | $825K | $700K | - | - | - | - | - | - | - | - |
| **E6** | $363K | $400K | $325K | $275K | - | - | - | - | - | - | - | - |
| **E7** | $180K | $200K | $160K | $140K | - | - | - | - | - | - | - | - |
| **S** | $125K | $140K | $110K | $90K | $100K | $110K | $90K | $70K | $90K | $100K | $80K | $60K |
| **E** | $50K | $55K | $45K | $40K | $40K | $45K | $35K | $30K | $35K | $40K | $30K | $25K |

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL<br>Highly Confidential - Attorneys' Eyes Only

20

NIKE_00033979

# FY20 CORE PAY & STOCK GUIDELINES
## USA

### MANAGER INPUT

**APPLIES TO:** All wholesale employees.

**HOW IT WORKS:** The 'Market' increase will pre-populate in SuccessFactors based on country and position in range. Managers can then select Invest or 'Max Invest' for ~20% of employees. The final increase will be based on investment level and the employee's position in the pay range.

| CORE PAY INCREASE % | LOWER SECTION OF PAY RANGE | MIDDLE SECTION OF PAY RANGE | UPPER SECTION OF PAY RANGE |
|---|---|---|---|
| Max Invest | 6.5% | 5.5% | 4.5% |
| Invest | 5.0% | 4.5% | 4.0% |
| **Market** | **3.5%** | **3.0%** | **2.5%** |
| Zero | 0.0% | 0.0% | 0.0% |

*Default*

| STOCK (USD) | E-BAND | S-BAND | E7-BAND | E6-BAND |
|---|---|---|---|---|
| Invest | $55,000 | $140,000 | $200,000 | $400,000 |
| **Market** | **$45,000** | **$110,000** | **$160,000** | **$325,000** |
| Lower | $40,000 | $90,000 | $140,000 | $275,000 |
| Zero | $0 | $0 | $0 | $0 |

*Default*

### CENTRALLY PLANNED

**APPLIES TO:** Distribution Centers (V+A Bands), Hursley Retail V & A

**NOTE:** Retail employees in NK/CV V & A bands managed through separate program.

**HOW IT WORKS:** No action required by managers. Increase will populate based on CFE rating according to the table below.

| CFE RATING | INCREASE % |
|---|---|
| Exceptional | 5.5% |
| Highly Successful | 4.5% |
| Successful | 3.0% |
| Inconsistent | 1.5% |
| Unsatisfactory | 0.0% |
| Too New to Rate | 0.0% |
| No Rating | 0.0% |

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

# FISCAL 2019 PLANNED PEOPLE RELATED INVESTMENTS

## GLOBAL COMPENSATION +$75M

| | INCREMENTAL | TOTAL | % COMMITTED |
|---|---|---|---|
| RSU program | 87M | 123M | 43% |
| Stock option program | (38M) | 122M | 86% |
| ESPP | 8M | 43M | 100% |
| LTIP | 8M | 42M | 48% |
| Profit share | 6M | 74M | 100% |
| 401k | 4M | 78M | 100% |
| **TOTAL** | **$75M** | **$482M** | **77%** |

## COMPENSATION REDESIGN +$53M

| | INCREMENTAL |
|---|---|
| Mid-year talent review | 11M |
| Legacy 2x pay elimination | (8M) |
| ████████████████ | |
| Europe sabbatical | 0.2M |
| North America Retail Pay | 23M |
| **TOTAL** | **$53M** |

## CULTURE & DIGITAL EXPERIENCE +$34M / $20M INCREMENTAL

### CULTURE

- Global Recruitment Platform
- D&I Strategic Initiatives + HC + EE Network Inv
- Performance Development
- Executive & Mgr Capability (incl. mandatory training)
- High-Potential + Targeted Development (WON/POC)
- Employee Survey / Mgr. 90
- Compensation Redesign Implementation
- Global Leave Strategy
- 12 HC (10 HR + 2 Int Comms)

### DIGITAL EMPLOYEE EXPERIENCE

- Integrated Digital Employee Experience (HR, Tech, Internal Comms, WD&C & Direct)
- Access for all Employees + Mobile/Own Device Strategy
- Enterprise Knowledge & Content Mgmt Platform
- Employee/User Experience Strategy & Solution (e.g., App Development, Portal)
- People & Way Finding

NOTE: Total FY19 investment $34M includes $14M in FY18 base spent on employee and culture related projects. ~$6M of baseline estimated to be invested in headcount related to continuing culture related initiatives. All incremental spend assumed in non-wage spend (primarily third party professional services).

CONFIDENTIAL AND PRIVILEGED/PREPARED AT THE DIRECTION OF COUNSEL
Highly Confidential - Attorneys' Eyes Only

# EXHIBIT 5

Message

From:
Sent:
To:                              [/o=ExchangeLabs/ou=Exchange Administrative Group
                                 PDLT)/cn=Recipients/cn=dcbe5eda092a4bd394a491b60052c8bd
Subject:        Re: Starfish


2pm Thursday works perfectly.

Sent from my iPhone

> On Feb 13, 2018, at 8:31 AM,                                    wrote:
>
>       , would you be able to meet on Thursday anytime after 2pm?
>
>
>
>
> On 12/02/2018, 22:43,                                    wrote:
>    Sounds good. Thanks
>
>    On 2/12/18, 10:27 PM,                                    wrote:
>
>           thank you
>           figure out times w Hilary and Mo tomorrow ASAP and get back w suggestions
>       you
>
>           Sent from my iPhone
>
>> On Feb 12, 2018, at 5:55 PM,                                    wrote:
>>
>> Hi
>>
>> I'm happy to meet you all at once so I don't have to repeat it multiple times if that's ok? It's
not a story I enjoy telling.
>> What time might work for you? I have an appointment off campus in the morning but I can prioritize any
time post 10am.
>>
>>       you,
>>
>>
>> Sent from my iPhone
>>
>>> On Feb 12, 2018, at 4:26 PM,                                    wrote:
>>>
>>> Absolutely.
>>>
>>> Do you want to meet me alone first, or with Hilary or Mo?
>>>
>>> I can make time tomorrow if that works for you.
>>>
>>> Thank you for reaching out.
>>>
>>>
>>>
>>> You can also call my cell              if you prefer to talk it over.
>>>
>>>
>>>
>>> On 12/02/2018, 15:58,                                    wrote:
>>>
>>> Hi        ,
>>>
>>>         mentioned to email this word to schedule time to chat.
>>>

EXHIBIT
6.20.24
Graham

PLF_028040

```
>>>        you,
>>>   ████
>>>
>>>   Sent from my iPhone
>>>
>>>
>
>
>
>
```

PLF_028041

# EXHIBIT 6



(owner)

> I spoke to a lawyer this morning. No one believes that girl and I am sick to my stomach about this.
>
> Attach  Group photo state : Intact Path :
> humb
>
> 2019-06-03 18:05:26Z

> I should have done more back then and I didn't and now someone else is hurt.
>
> Attach  Group photo state : Intact Path :
> humb
>
> 2019-06-03 18:05:50Z

Can you chat?

Attach  Group photo state : Intact Path
humb

2019-06-03 19:00:43Z

> I can on here. I'm on my airplane.
>
> Attach  Group photo state : Intact Path :
> humb
>
> 2019-06-03 19:02:35Z

> Drafting an email to Hilary, Mo,          and Mark Parker.
>
> Attach  Group photo state : Intact Path :
> thumb
>
> 2019-06-03 19:02:53Z

I am sure you can also ask NIKE for legal support. Ask Hilary for her opinion.

Attach  Group photo state : Intact Path
thumb

CAPONE000000013
PLF_027992



2019-06-03 19:04:13Z

And let me know what I can to do support you.

Attach  Group photo state : Intact Path ██████
██████ thumb

██████████████████████

2019-06-03 19:04:24Z

Brave girl.

Attach  Group photo state : Intact Path ██████
██████ thumb

██████████████████████

2019-06-03 19:04:29Z

I know I'm super emotional right now but I feel so sick about this

Attach  Group photo state : Intact Path ██████
██████ thumb

██████████████████████

2019-06-03 19:04:39Z

Something has to be done

Attach  Group photo state : Intact Path ██████
██████ thumb

██████████████████████

2019-06-03 19:04:48Z

Xx

Attach  Group photo state : Intact Path ██████
██████ thumb

██████████████████████

2019-06-03 19:05:17Z

Keep me updated.

Attach  Group photo state : Intact Path ██████
██████ thumb

██████████████████████

2019-06-03 19:05:35Z

Email A few years ago I had to fight to have one female professional athlete included in our global marketing football campaign. She was featured for 6 seconds. Total.

CAPONE000000014
PLF_027993

And. Fought for months to make that a reality. I had to fight for her to be imaged in an authentic way (wearing a suit) as the men wanted her in a ball gown to fit their comfort level of how a woman should present herself. I had to fight to ensure the woman standing next to her as the award presenter had her dress re-sewn on set as the crew wanted her breasts to be the focal point of that outfit. I fought so hard for those 6 seconds and that felt like such a win to me at the time. I was the only one that could see these missteps and I was elevating them. I was seen as a nuisance in all our planning meetings and on set - but that's why I was on that team. As the sole woman in Global Brand Marketing for Football. I was there to make a difference because I could see things the men couldn't and it was my responsibility to fight for those things and to help them understand because how we image women matters - it is a huge privilege and responsibility. The entire world watches us and takes cues from us. I led the marketing plans and strategy for our two top athletes and ███████ yet was never the face of any of my work when it was presented to them. My brain was good enough to do the work, but my gender not enough to be the face of it. I was vocal about that and you can imagine my excitement when I was the one leading ███████ collaboration with ███████ I would be the sole Brand person on the ground in NYC for the launch - the brains and the face of my work for the first time. I planned every second of his first visit to NYC across teams, functions and projects. My strategy for and execution of that week was best in class. A highlight of my career. Fast forward to this weekend. I was so proud to see our World Cup add that premiered knowing that the steps I took back then helped pave the way for a moment like this. I cried. The women featured in all their glory imaged as the champions they are - inspiring youth all around the world. That feeling only lasted a moment as the athlete that I reported was also featured in that campaign. Then I wake up the next morning to the news that he has not only assaulted another woman, but that the assault was far worse than what had happened to me. ███████ has no respect for women. You knew that and yet he was still featured alongside our top female athletes as an ally only to show his true colors less than 24hours later. A year ago I sat across from you and re lived the worst night of my life. It was the last night of the NYC launch and I was so proud of myself to see all the hard work execute so well. That moment has been stolen from me and will forever be remembered as a trauma. I confided in you with the hope that steps would be taken to ensure no one else would have to experience what I did not once that night, but twice. First with the father and then with his son. And now I am reliving not only that day, but watching a woman go through exactly what I was afraid of. She is being humiliated, exposed, dragged through the mud, character questioned - all because she is brave enough to do the right thing and try to hold someone accountable for actions that are beyond reprehensible. Something you convinced me I didn't need to do publicly because I came to you - my Nike "family". I was not followed up with after our conversation. When I expressed frustration with the lack of communication back to me, after I had been completely truthful and vulnerable, I was assured steps were being taken but that no further information could be provided to me based on legal concerns. A patronizing and effective strategy to get me to fall back in line and silence my voice. I feel betrayed by you. My entire career feels like a naïve waste of time. I can see who we are now clearly based on the events that have unfolded over the past few years. We support women when we are backed into a corner and desperate to come our looking like we care. When it's in the best interest of the stock price. This company does not support women. It does not support persons of color. It does not make space to story-tell and image Queer and Trans identified persons. It does not serve all athletes as we claim. It is run by men for men to protect men and make them rich. I am ashamed and embarrassed to have spent over a decade of my life here. I plan to go public with my experience and escalate this to ensure the truth is heard.

CAPONE000000015
PLF_027994



CAPONE000000016
PLF_027995



I want to talk to the lawyer again Friday

Attach   Group photo state : Intact Path :
thumb

2019-06-03 19:51:43Z

*first, Not Friday.

Attach   Group photo state : Intact Path :
thumb

2019-06-03 19:51:48Z

He said we would talk again today when I land

Attach   Group photo state : Intact Path :
thumb

2019-06-03 19:52:02Z

Ok so...I think an opportunity for you to make a huge difference.

Attach   Group photo state : Intact Path :
thumb

2019-06-03 19:59:13Z

I can tell that you are really pissed and you need to capture that emotion alongside an ask.

Attach   Group photo state : Intact Path :
thumb

2019-06-03 19:59:43Z

I know this is going to ruin my life for a while

Attach   Group photo state : Intact Path :
thumb

2019-06-03 20:00:50Z

But it's so much bigger than me

Attach   Group photo state : Intact Path :
thumb

CAPONE000000017
PLF_027996



2019-06-03 20:00:56Z

Any lawyer will be rubbing their hands with glee so DO NOT RUSH into something without giving it 24 hours.

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:01:33Z

Ok. Thank god I have you.

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:01:52Z

My brother and I had a 24 hour rule when dealing with my dads fraud and it was helpful.

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:02:17Z

It allowed us to keep the essence and emotion, but be much more strategic.

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:02:34Z

I know you want something from this, but I would challenge to define WHAT YOU WANT.

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:02:58Z

Don't just share information and let it ruin your life. Have a strategy.

Attach  Group photo state : Intact Path :
thumb

Attach  Photo of participant :

CAPONE000000018
PLF_027997



2019-06-03 20:03:39Z

You are right. I don't know how to map that out.

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:04:04Z

I'll make sure I do before anything happens

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:04:12Z

Simply ask yourself what you would like to happen in exchange for sharing your story

Attach  Group photo state : Intact Path
thumb

2019-06-03 20:06:01Z

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:06:22Z

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:06:42Z

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:07:22Z

CAPONE000000019
PLF_027998



Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:07:51Z

Attach  Group photo state : Intact Path :
thumb

2019-06-03 20:53:19Z

Great - when you have it send me the list. Then take a look at your note and re write as needed.

Attach  Group photo state : Intact Path :
thumb

2019-06-03 21:03:05Z

Oh! There you go!

Attach  Group photo state : Intact Path :
thumb

2019-06-03 21:03:12Z

Good list.

Attach  Group photo state : Intact Path :
thumb

2019-06-03 21:03:28Z

Attach  Group photo state : Intact Path :
thumb

2019-06-03 21:03:37Z

CAPONE000000020
PLF_027999



Attach  Group photo state : Intact Path :
thumb

2019-06-03 21:04:03Z

Because I don't feel like I can do anything here to help anyone. I keep trying with HR and nothing good has happened.

Attach   Group photo state : Intact Path :
thumb

2019-06-03 21:04:15Z

If this is my one shot to help I want to make sure I do it.

Attach   Group photo state : Intact Path
thumb

2019-06-03 21:04:29Z

You have my utmost support at any and all times

Attach   Group photo state : Intact Path :
humb

2019-06-03 21:04:54Z

I watch how they treat you and Melanie and the other women early in my career who I respect more than you will ever know. If they don't listen to you they aren't going to listen to me. But with this they can't ignore me.

Attach   Group photo state : Intact Path
humb

2019-06-03 21:05:30Z

That is true.

Attach   Group photo state : Intact Path :
humb

2019-06-03 21:05:47Z

Now, take another look at your note and lift the most important parts that support your goals.

CAPONE000000021
PLF_028000



CAPONE000000022
PLF_028001

# EXHIBIT 7



# EXHIBIT 8

----------------------------------------------------------------------------------------------------

| | |
|---|---|
| **From:** | Krane, Hilary </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1BF9AEF4D1CC463797F09787E91CDA6C-KRANE, HILA> |
| **Sent:** | 2/14/2018 8:44:14 PM |
| **To:** | Krane, Hilary <hilary.krane@nike.com>; Strong, Melanie <melanie.strong@nike.com>; Matheson, Monique <monique.matheson@nike.com> |
| **Subject:** | 2:30-3:30PM Starfish |
| **Location:** | SebCoe, 5th Floor (Ace Conference Room) |
| **Start:** | 2/20/2018 10:30:00 PM |
| **End:** | 2/20/2018 11:30:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Accepted |
| | |
| **Required Attendees:** | Strong, Melanie; Matheson, Monique |

Confidential

NIKE_00062321

Plaintiff's Trial Exhibit 308
Page 1 of 1

# EXHIBIT 9

| | |
|---|---|
| **From:** | ▮ </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=37AE7384AAB8478FBF4CF13347E3AF21-▮, ▮ > on behalf of Krane, Hilary |
| **Sent:** | 2/26/2018 5:53:38 PM |
| **To:** | Matheson, Monique <monique.matheson@nike.com>; Hubbard Graham, Nicole <nicole.hubbard@nike.com> |
| **Subject:** | 5:00-6:00PM Starfish |
| **Start:** | 3/2/2018 1:00:00 AM |
| **End:** | 3/2/2018 2:00:00 AM |
| **Show Time As:** | Free |
| | |
| **Recurrence:** | (none) |
| **Required Attendees:** | Matheson, Monique; Hubbard Graham, Nicole |
| **Attachments:** | SecCoe 5th Floor Map.jpg |



Attached is a map to SebCoe 5 which is a secure floor.  Upon arrival, please pick up a guest badge at reception, and they will direct you to the elevators.  The 5th floor can be accessed via Elevator 5 or 6 in the West Wing.



3:18-cv-01477
PLAINTIFF'S
TRIAL EXHIBIT
**P312**

# EXHIBIT 10

**From:**          ████████████ </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
                   (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6AC986113D124560ADD6676CED5BB6D5-
                   ████████████ on behalf of ████████████
**Sent:**          2/16/2018 6:28:49 AM
**To:**            ████████████ Krane, Hilary <hilary.krane@nike.com>
**Subject:**       Quick Update from ██ re: Starfish follow up phone calls
**Location:**      SebCo - Ace Conference Room
**Start:**         2/16/2018 7:00:00 PM
**End:**           2/16/2018 7:20:00 PM
**Recurrence:**    (none)
**Meeting Status:** Meeting organized

**Required Attendees:**    ████████████ ; Krane, Hilary
**Categories:**            Nike Executive Meeting



3:18-cv-01477
**PLAINTIFF'S
TRIAL EXHIBIT
P313**

Confidential                                                                                    NIKE_00062517

Plaintiff's Trial Exhibit 313
Page 1 of 1

# EXHIBIT 11

Message

---

**From**:     Melanie.Strong@nike.com [Melanie.Strong@nike.com]
**Sent**:     3/30/2018 5:56:31 PM
**To**:       Hubbard Graham, Nicole [Nicole.Hubbard@nike.com]
**Subject**:  Fwd: PERSONAL AND CONFIDENTIAL - TO BE OPENED BY RECIPIENT ONLY

Yes!

Begin forwarded message:

**From:** "Tran, Tiffany (ETW)" <Tiffany.Tran@nike.com>
**Date:** March 30, 2018 at 10:26:26 AM PDT
**To:** "Strong, Melanie" <Melanie.Strong@nike.com>
**Subject: PERSONAL AND CONFIDENTIAL - TO BE OPENED BY RECIPIENT ONLY**

**PERSONAL AND CONFIDENTIAL - TO BE OPENED BY RECIPIENT ONLY**

Hi Melanie,

My name is Tiffany Tran and I am the member of the Matter of Respect Team who will look into the concerns you raised to Mo and Hilary. Although I have a Nike email and dedicated phone number, which is (971) 294-9519, I am with an outside firm that Nike has retained to assist in this matter.

We are going through the information you provided and gathering more to look into the issues. As a part of our process, we may reach out to you and to others to ask questions. If you have any concerns about this, please let me know as soon as you can.

Going forward, please send any other questions directly to me. Nike encourages all individuals to *Do The Right Thing* by reporting misconduct and takes reports seriously. Finally, I want to remind you that Nike has a no Retaliation Policy. If you feel you are being impacted for reporting something, please contact me immediately via this email address.

Regards,

Tiffany

NIKE_00062347

# EXHIBIT 12

Message

---

**From:**      Hubbard Graham, Nicole [Nicole.Hubbard@nike.com]
**Sent:**       3/30/2018 5:44:49 PM
**To:**          Strong, Melanie [Melanie.Strong@nike.com]
**Subject:**    FW: PERSONAL AND CONFIDENTIAL - TO BE OPENED BY RECIPIENT ONLY


Did you get this too?

---

**From:** "Launey, Kristina (ETW)" <Kristina.Launey@nike.com>
**Date:** Friday, March 30, 2018 at 10:28 AM
**To:** "Hubbard Graham, Nicole" <Nicole.Hubbard@nike.com>
**Subject:** PERSONAL AND CONFIDENTIAL - TO BE OPENED BY RECIPIENT ONLY

PERSONAL AND CONFIDENTIAL

Hi Nicole,

My name is Kristina Launey and I am the member of the Matter of Respect Team who will look into the concerns you raised to Mo and Hilary.  Although I have a Nike email and dedicated phone number, which is (971) 294-9503, I am with an outside firm that Nike has retained to assist in this matter.

We are going through the information you provided and gathering more to look into the issues.  As a part of our process, we may reach out to you and to others to ask questions.  If you have any concerns about this, please let me know as soon as you can.

Going forward, please send any other questions directly to me.  Nike encourages all individuals to *Do The Right Thing* by reporting misconduct and takes reports seriously. Finally, I want to remind you that Nike has a no Retaliation Policy.  If you feel you are being impacted for reporting something, please contact me immediately via this email address.

Regards,
Kristina

Confidential

# EXHIBIT 13

**From:**          Wilkins, KeJuan
**To:**            Finley, Ilana (Converse)
**Sent:**          4/24/2018 9:04:47 PM
**Subject:**       NYT Q&A and MP quote
**Attachments:**   MP NYT statement.docx; NYT responses.docx; NYT follow up responses.docx

Here's everything that I spoke to the NY Times about.

NIKE_00019537

*I care deeply about our company and our people – the vast majority of whom live by our values and do amazing work to inspire and serve athletes throughout the world every day. It has pained me to hear that there are pockets of our company where behaviors inconsistent with our values have prevented some employees from feeling respected and doing their best work. As these reports have come to light we have taken action. I am confident that we will learn from this. I am personally committed to making Nike a place where all our team can speak up, be heard, and where everyone can thrive in an environment of respect, empathy  and equal opportunity for all.*

Confidential

Responses

**Q: Is Nike is in the midst of an internal investigation into various sexual harassment and discrimination complaints?**

A: First, it is important to note that the actions we are taking will make Nike better. We are committed to our core values of inclusion, respect and empowerment and we are looking into employee concerns about behavior inconsistent with those values.  We do not limit the type of concerns that employees can bring to our attention.

**Q: Our reporting shows that that dozens, perhaps hundreds, of women have come forward in recent weeks, making allegations involving discrimination and harassment. Is that correct?**

A: The complaints are from women and men and cover behavior inconsistent with our core values of inclusion, respect and empowerment.

**Q: Besides the resignations of Trevor Edwards and ▮▮▮▮▮▮▮▮ Nike has also confirmed the departures of Antoine Andrews; Vikrant Singh, a senior brand director for basketball; Daniel Tawiah, a VP for global brand innovation; and ▮▮▮▮▮▮▮▮ the ▮▮▮▮▮▮▮ correct?**

A: That is correct.

**Q: In our reporting, we have been told of a number of other recent or planned departures, including:**
  **-Eric Sprunk, the COO**
  **-Adam Sussman, chief digital officer**
  
  **-Lynn Merritt**
  **Can Nike confirm their departures or planned departures?**

A: This is incorrect. There are no planned departures of the names referenced as a result of the investigation.

**Q: In our reporting, a theme that continuously comes up is that, in recent years, Nike had become a boy's club, where individuals - mostly men - who were so-called FOT's, or "Friends of Trevor," were fast-tracked for promotions and received little or no repurcussions for complaints against them made to human resources. How does Nike respond to that characterization?**

        **-In mid-March, the chief executive, Mark Parker, sent a memo alluding to behavior that did not reflect "our core values of inclusivity, respect and empowerment." Was Mr. Parker referring to**

the boys-club culture and the discomfort it caused for women? Can Nike elaborate on his comments?

A: There was conduct where an insular group of high level managers, in pockets of the organization, protected each other and looked the other way. This is something Nike will not tolerate.

Mr. Parker was referring to an in / out club mentality that wasn't gender specific.

**Q: Our reporting shows that a number of high-level executives inside Nike were having sexual relationships with individuals who reported directly to them. Does Nike have a policy in place about workplace relationships and if so, was it applied to these cases?**

A: We are not aware of any incidents where a high-level executive has had a relationship with an individual reporting directly to them.

Background: We consider a high-level executive a reference to our corporate leadership team. [Clarify ELT]. We have approximately 375 VP's in a company of over 74,000 employees.

**Q; A number of individuals have said it was common for managers to attend or even lead staff outings at the end of the night at strip clubs. Was Nike aware of that behavior and were there any policies in place around it?**

A: Absolutely not. This is not a common behavior at Nike. We have become aware that over the years this has happened in isolated instances.

**Q: In our reporting, many employees spoke about a culture of alcohol use, inside and outside the workplace, where executive assistants were ordered to have beer and wine available for almost all meetings that occurred after noon, and where, in some areas of the finance department, employees did shots of alcohol and blared loud music around noon on Fridays. Can you explain Nike's culture, its approach and rules around alcohol in the workplace?**

A: There is not a culture of alcohol abuse and Nike has a no drug, no alcohol abuse policy. Like many companies, celebrations occur in the office where drinks are served.

**Q: Another theme that repeatedly emerged in our reporting involved female employees saying they could not gain a foothold in certain critical segments of Nike's business, including basketball and football, because those areas were viewed internally as "men's sports?" What does Nike say about that characterization?**

A: We have been very clear that we believe we have work to in this area and we committed to broadening representation across the company.  It's also important to note that we do now, and have traditionally had women holding senior positions in these areas.

**Q: Another theme that emerged in our reporting involved females who felt that they were bullied and marginalized by senior men in meetings, that their compensation levels were below those of**

NIKE_00019540

their male peers and that, in many cases, they left the company because they felt their careers were dead-ended. Does Nike have a response to those characterizations?

A: We are committed to addressing of all types of harassment, discrimination or other inappropriate conduct does not occur at Nike and to increasing representation across all areas.

Our FY17 Pay Equity data shows that for every $1 earned by men, women globally earned 99.9 cents.   We are focused on attracting, developing and retaining more women and people of color.  For our most recent results in FY17, the overall ratio of female to male people managers was 62% male and 38% female and the overall ratio of female to male leadership/management was 71% male and 29% female, versus the total global employee ratios of 52% male and 48% female.

**Q: Among the senior female departures that have occurred in the past year are Patty Ross, █████████ and Nikki Neuburger, correct?**

A: Yes, those individuals left the company for either retirement or to pursue other opportunities.

**Q: Our reporting shows that when Nikki Neuburger left, she wrote a fiery letter to Mr. Parker that was shared with some members of her team, in which she laid out her frustrations about management, along with allegations of discrimination and harassment. Is that accurate? When did Mr. Parker receive the letter and did he speak with Ms. Neuburger about it?**

A: Nikki did write a letter, that was thoughtful and professional. Mark took the letter very seriously.

Mark did meet with Nikki.

**Q: And we understand a number of other women, including Jill Rankin and Melanie Strong, threatened to quit, but were, in some cases, given sabbaticals and, upon their return, new jobs, reporting to different managers, is that correct?**

A: Both individuals left their existing roles and came back into new roles. In one of those instances, the individual felt they should be recognized with a more senior role, which Nike supported.

**Q: We understand the results of the informal survey that asked whether women had been discriminated or harassed and whether they believed compensation levels were unequal between male and female peers, led by Ms. Strong, was presented to Mr. Parker in February. Is that correct? What was Mr. Parker's reaction to the survey and what surprised him about the results?**

A: We do not know who led the survey, nor is that our concern. We encourage all employees to speak up and will take action where action is needed. That is the focus of our response to the survey.  Ms. Strong has never presented herself as being the person who was leading any effort whatsoever.

**Q: In our reporting, about a third of the individuals we spoke to said they reported specific incidents to human resources, but that nothing seemed to happen after doing so. Does Nike believe it had a robust set of procedures to investigate complaints or issues raised with human resources?**

A: We believed we had a set of procedures including a global alert line, an employee relations line, a HR direct line, along with a Anit harassment and discrimination policy and code of conduct. As Mark has said, we are conducting a top to bottom review of our procedures to guard against this happening in the future.

**Q: In our reporting, we were told about specific incidents that were reported to human resources including:**

**-a supervisor who threw his car keys at a female and called her a "stupid bitch." The female who reported the incident said nothing happened to the boss.**

**-A senior manager who referenced a female employee's breasts in an email to her was not terminated or suspended, but rather, given a warning.**

**-a woman reported her manager bragging about the condoms he always carried and the copies of GQ he kept on his desk, despite being told not to because of the bikini-clad women on the covers. The manager's behavior did not change, we were told. Was this manager reprimanded in any way?**

**-a woman who said she wanted to speak with human resources to discuss complaints of bullying and harassment was told to meet her H.R. representative in the Mia Hamm cafe - a very public space.**

**-When** ▮▮▮▮▮▮ **went to human resources to complain about boss, she said she was told that she was the problem, not her boss.**

**-When Paige Azavedo, who had complained about her manager, Daniel Tawiah, to human resources, went for her exit interview, the H.R. representative failed to show up for the meeting.**

**Is Nike aware of these complaints or incidents and does it have any comment about how these and other women were treated by human resources?**

A: As a company of over 74,000 employees it is very difficult to look up specific instances without detail and that research would take some time. In addition, in each case people need to be interviewed and credibility assessed. We will not comment on individual cases other than to note that oftentimes cases are more complicated than just listening to one side of the story. That you list only a small handful of incidents across a number of years is interesting.

Hey, I don't all the details but I just wanted to have context. You should be aware you may be talking to some disgruntled employees who may not be provided the full story.

**Q: We are told in our reporting that at least two complaints involving hostile behavior were lodged against David Ayre, the head of human resources for a number of years before his retirement last year. Can Nike confirm those complaints and explain how it handled them and what if any action was taken against Mr. Ayre?**

A: As you're aware, Mr. Ayre is no longer with the company. As I told you earlier, we're undertaking a comprehensive review of our HR systems and practices.

NIKE_00019542

We will not comment on individual cases.

**Q: Mr. Ayre reported directly to Mark Parker. What was Mr. Parker told about complaints to human resources, etc. Was he aware about the numbers of types of complaints involving top managers? And if not, why not? Does that speak to a larger issue of communication and transparency within the organization?**

A: In a Company of over 74000 employees across the world, day-to-day HR matters are not typically brought to the attention of the CEO and he would rely on his senior management teams to manage these situations. What we have discovered here was an insular group of high level managers, in pockets of the organization, protecting each other and looking the other way. I imagine the reason you were prompted to look into this is because you are seeing the actions Mark has taken when he was made aware.

**Q: In our reporting, we have spoken to six women who worked for Daniel Tawiah between 2014 and 2016. Of those, three said they reported Mr. Tawiah to human resources for badgering and belitting them or other females in meetings, sometimes to the point where the female was in tears. The women said nothing seemed to come of their complaints and, in 2017, Mr. Tawiah received a promotion to Vice President.**
          **Was Mr. Parker aware of the complaints made against  Mr. Tawiah? If so, why did Mr. Tawiah receive a promotion and, if not, should he have been made aware as Mr. Tawiah was given more authority?**

A:. Mr. Tawiah is no longer with the company. The CEO would not be aware of day to day HR matters and would rely on his senior management teams to manage these situations. Mr. Tawiah's position was not one that the CEO would typically engage with. We are not going to discuss the specifics of any employee situation.


**Q: In our reporting, we were told that at the 2014 Super Bowl in New York, a group of top executives were in a VIP area of the 40/40 Club late one night along with scantily clad women who were not Nike employees. Can Nike confirm, and did this violate company policy?**

A: It does not violate policy for employees to go to a sports bar.

**Q: Our reporting shows that** ▮▮▮▮▮▮▮▮ **wife sent screenshots of personal messages** ▮▮▮▮▮▮ **had exchanged with another Nike employee** ▮▮▮▮▮▮▮▮▮ **to dozens of Nike employees, and that Nike instructed employees not to open the email.** ▮▮▮▮▮ **and** ▮▮▮▮▮▮▮ **were subsequently fired. Can Nike explain why they were fired?**

A: Nike did instruct employees not to open the mail as it contained highly personal, information regarding two employees. Both employees were ultimately terminated.

**Q: Through our reporting, we understand that in the summer of 2016, when Nike decided to stop making golf equipment, employees of the division were summoned to a meeting at the Clubhouse, the nickname for one of Nike's off-campus buildings.**

There, in a powerpoint presentation led by Daric Ashford, employees watched their names appear on slides that directed them to different rooms to meet with HR reps, a clear signal of who was getting laid off.

Did Nike typically lay off its employees in a public powerpoint? If not, why did it do so in this case?

A: Employees were directed through PowerPoint to the rooms where conversations would take place. This is absolutely not normal process. In layoff situations we make great efforts to treat employees respectfully and they are provided an appropriate severance package.

**Q: Does Nike still believe it can execute on the plan laid out by Mr. Parker in 2015 to reach $50 billion in revenues by 2020?**

A: As Mark mentioned in our 2017 analyst day, we are confident that Nike will pass the $50B milepost within the next 5-years.

**Q: One of the primary focus of the plan was to expand its focus in the women's market, growing revenues from $5.7 billion in 2015 to $11 billion in 2020. Does Nike feel it is still on track to achieve that goal?**

A: As we shared at our analyst day in 2017, we reevaluated the timing of our goals. We remain bullish on the potential of our women's business and see great momentum in the marketplace around the world.

**Q: In our reporting, many women said it was ironic that Nike was making a big push into the women's market when it was so difficult for women inside the company to have their ideas heard. Does Nike believe women had a voice at the table when it came to creating, designing and marketing footwear and apparel to women?**

A: Of course. You may have not historically followed Nike and may not be aware that Amy M leads our multi-billion-dollar business and has a highly diverse and talented team. Just recently Nike launched a collection of product for women designed entirely by a large female team. Having said that, we recognize that we still have opportunities to improve. You may have seen that Monique Matheson sent a note to all employees stating we need to, and are committed to doing more to increase diverse representation.

**Q: Another theme that has come up in our reporting is Nike's struggle to evolve from its core culture of selling shoes and clothing to athletes to selling goods to women or more of a leisure category. Several individuals said marketing campaigns involving model Bella Hadid and singer FKA Twigs were hotly debated with even Phil Knight weighing in that he disliked the campaigns. Was that true? What are the challenges of transforming Nike as its target audience evolves?**

A: Nike strives to be a creative culture where all voices are heard. One of the reasons Nike is able to deliver work that athletes and consumers love is that we obsess and debate the creation of every product and campaign.

Talk about the CDO strategy and our confidence behind it.

Confidential

**Q: In our reporting, some have criticized the management style of Mr. Edwards, claiming that he and his team would often override individuals or Nike's own research in favor of their own, personal preferences about trends. Multiple employees described Mr. Edwards as an extreme micromanager, often delaying the process and causing employees to wait for his approval of even trivial items. Does Nike or Mr. Edwards have a response to this?**

‑**In 2015, Mr. Edwards and his team was told that the head-to-toe fashion trend of teens wearing all of their favorite team from their hat to their shoes was quickly ending at retailers. But Mr. Edwards and his team disagreed and continued with the trend, resulting in clothing being discounted and, in some cases, sent back to Nike.**

**-Mr. Edwards had to approve all communications with consumers through its website, according to employees.**

**-In another instance, Mr. Edwards sent at least ten emails about a mannequin and product display in Nike's Soho store that he didn't like.**

A: As you may expect, the Brand President would and should have a strong point of view on many areas of our business. I can't talk to the specifics here but it would normal for any executive accountable for brand representation to have a point of view on any major investment or project. NYC is a premier city and huge investment for the brand.

Confidential

**1. Our timeline. Are we right? And am I describing the women's business details, etc. correctly?**

**-Patty Ross departs in March. She was a vice president of global operations who had started working at Nike when she was 16 years old.**

**-Nikki Neuburger departs? Ms. Neuburger was part of the team behind the Nike+ app.**

**-████████████ departs in early 2018, either January or February?**

**-January/February of 2018 - the off-the-books survey occurs.**

Answer: We will not comment on the timelines of employment departures.

**When and how does Mr. Parker find out about the survey?**

Answer: Mark Parker was provided the employee led survey on March 5.

2. Ms. Neuburger's letter. As I indicated, I was told by someone that the letter contained frustrations and/or concerns about leadership, harassment and discrimination. Others have indicated it was quite frank about ████████████ If there is a way to provide more color/clarity around that, that would be helpful so that we are accurate.

Answer: As stated before, Nikki wrote a letter that was thoughtful and respectful. We are not going to talk about individual details of employee conversations as we want to be respectful of their privacy.

And again, Mr. Parker met with Ms. Neuburger to discuss the letter, did he try to convince her to stay, offer her a move to another area, as other women had done?

Answer: We are not going to talk about individual details of employee conversations as we want to be respectful of their privacy.

3. The survey. Does our timeframe and understanding make sense?

Again, we have been told it was initially handed out (seemed to be paper originally, perhaps to protect anonymity) to around 150 fairly senior females inside the company shortly after the holidays in January. But others said they were receiving the survey via email in late February.
Again, the questions I understand were fairly open-ended: Have you ever experienced harassment? Have you ever been discriminated against? Pay inequities. Possible inappropriate activities that happened in offsites or while traveling?

-When and how was the survey brought to Mr. Parker's attention?

Answer: To our knowledge, there was one survey which was employee led.

A packet of completed employee led surveys was delivered to our general counsel at the end of February.

Mark Parker was provided the employee led survey on March 5.

Was this the first time Mr. Parker became aware of the circle of highly ranked individuals who were protecting each other, and that's what led to the resignations of Mr. Edwards and ███████

Answer: In mid-February, our general counsel and head of HR became aware of concerns from the employee base about behaviors inconsistent with our values. It is at that point they began fact-finding. Mark was provided a packet of completed, employee-led surveys on March 5.

# EXHIBIT 14

| | |
|---|---|
| **From:** | Finley, Ilana (Converse) |
| **To:** | Sheena Butler |
| **Sent:** | 5/8/2018 9:42:36 PM |
| **Subject:** | Re: <External>URGENT: Confirming Departures |

Hi Sheena,

I can confirm that the 4 mentioned are no longer with the company. We don't have anything to add beyond that.

Best,
Ilana

**From:** Sheena Butler <SButler@footwearnews.com>
**Date:** Tuesday, May 8, 2018 at 2:44 PM
**To:** Ilana Finley <Ilana.Finley@nike.com>
**Subject:** <External>URGENT: Confirming Departures

Hi Ilana,

Can you please confirm the following, as reported here? *Four additional people have either left the company already or will depart soon, Nike confirmed on Tuesday: Steve Lesnard, the head of running in North America; Helen Kim, who oversaw Eastern North America;* ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ *; and Tommy Kain, Nike's director of sports marketing.*

Also, can you confirm whether CEO Mark Parker *gave companywide address last week stating that departures related to the company's broad investigation into workplace behavior would be completed by this week.*

We would like to post a story ASAP. Thanks for your help!

Best,

**Sheena Butler-Young**
*Senior Business Editor*
Footwear News
Fairchild Media, PMC

475 5th Ave. 16th Fl.
New York, NY 10017
Sbutler@footwearnews.com
o: 646.356.4777
m: 660-229-0293

**FN70**

WWD | Beauty Inc | FN | Menswear | M |Fairchild Summits

Plaintiff's Trial Exhibit 113
Page 1 of 1

# EXHIBIT 15



ORG
CHARTS
**FY20**

Plaintiff's Trial Exhibit 215
Page 1 of 14

# ORG CHART

## HUMAN RESOURCES LEADERSHIP TEAM (HRLT)



**MO MATHESON**

EVP, GLOBAL HR



**BERNARD BEDON**

VP, HR GLOBAL OPERATIONS & TECHNOLOGY + CORPORATE FUNCTIONS



**TREASURE HEINLE**

VP, HR CONSUMER MARKETPLACE



**FELICIA MAYO**

VP, HR INNOVATION, CATEGORIES, DESIGN, PRODUCT & MERCHANDISING



**DAVID KIM**

SR. DIRECTOR, HR STRATEGY & PLANNING



**KELLIE LEONARD**

VP, DIVERSITY & INCLUSION



**ALISON DAUGHERTY**

VP, EMPLOYEEE RELATIONS



**PAULA RADLOFF**

VP, TALENT ACQUISITION

No Photo

**JULIE FULLER**

VP, TALENT & ORG EFFECTIVENESS



**KIM LUPO**

VP, HR INNOVATION, CATEGORIES, DESIGN, PRODUCT & MERCHANDISING

© 2020 NIKE, Inc. Human Resources. All rights reserved. For internal use only.

2

# ORG CHART

**TALENT ACQUISITION
LEADERSHIP TEAM (TALT)**



**PAULA RADLOFF**

VP, GLOBAL TALENT
ACQUISITION



**DENISE
NOVOSEL**

VP, GLOBAL
OPERATAIONS &
TECHOLOGY +
CORPORATE
FUNCTIONS



**BEN
O'REILLY**

SR. DIR, CONSUMER
MARKETPLACE &
GEOGRAPHIES



**RYAN
OWEN**

SR. DIR, INNOVATION,
CATEGORIES, DESIGN,
PRODUCT &
MERCHANDISING



**KIZMET
MILLS**

SR. DIR, UNIVERSITY
RELATIONS



**JARVIS
SAM**

SR. DIR, DIVERSITY
RECRUITING &
TALENT EXPEREINCE



**EMILY
HOFFMAN**

SR. DIR, TA STRATEGY
& PLANNING

**BUSINESS FACING**          **EXPERT FUNCTIONS**

© 2020 NIKE, Inc. Human Resources. All rights reserved. For internal use only.          3

# ORG CHART

**TALENT ACQUISITION
GLOBAL OPERATIONS &
TECHNOLOGY / CORPORATE
FUNCTIONS**



**DENISE NOVOSEL**

VP, TALENT ACQUISITION



**KYLIE
PENN**

**DIR, DSM +
TECHNOLOGY**



**WADDELL
SHEPPARD**

**DIR, SUPPLY CHAIN**



**MATTHEW
BOWMAN**

**DIR, AIR
MANUFACTURING**



**KEVIN
SERVINO**

**DIR, AD-HOC**



**DUSTIN
WILSHIRE**

**DIR, SOURCING &
MANUFACTURING,
SUSTAINABILITY +
PROCUREMENT**



**STEFANIE
JACQUEMIN**

**DIR, INTERNAL
RECRUITING**



**BROOK
RUSHING**

**DIR, CORPORATE
FUNCTIONS**

© 2020 NIKE, Inc. Human Resources. All rights reserved. For internal use only.

4

# ORG CHART

## TALENT ACQUISITION CORPORATE FUNCTIONS



**BROOK RUSHING**

DIR, CORPORATE FUNCTIONS



**DORI DURHAM**

SR. RECRUITER, WORKPLACE DESIGN & CONNECTIVITY + FINANCE



**SHANNON BAYON**

RECRUITER, FINANCE (ETW)



**JAMIE GORE**

RECRUITER, PRIVACY + LEGAL (ETW)



**AMBER SELLERS**

SR. RECRUITER, CHIEF ADMINISTRATION OFFICE (REMOTE)



**SARAH RESER**

SR. RECRUITER, HR



**PAMELA FLORES-SANDOVAL**

RECRUITER, AUDIT + HR



**TYLER CHO**

RECRUITER, STRATEGY (ETW)

**MARC CAPUTO**

SR. RECRUITER, STRATEGY + HR (STRETCH)

© 2020 NIKE, Inc. Human Resources. All rights reserved. For internal use Only.

5

# APPENDICES

# KEY ONBOARDING CONTACTS



## Recommended Contacts /1:1's during your first 90 Days

| Name(s) | Title | Location | Recommended Timing |
|---|---|---|---|
| Brook Rushing | TA Director – CF & WD&C | Mike Schmidt | First week |
| Denise Novosel | VP TA- GOT, CF, Internal | Seb Coe | First 60 Days |
| Kim Veasey Callahan | HRBP- Consumer Marketplace (Treasure), Talent Acquisition (Paula), Total Rewards (Kim L.), D&I (Kellie), ER (Alison) and Strategy (David) | Seb Coe | First 30 Days |
| Stuart Teale | HRBP- HR Ops and Services (Courtney), Talent +OE (Julie F), GOT+CF (Bernard) and ICDPM (Felicia) | Seb Coe | First 30 Days |
| Julie Marquard | Sr. HRBP, HR4HR | Seb Coe | First 60 Days |
| Jennifer Scales | HR Coordinator (HR4HR) | Seb Coe | First 30 Days |
| Amber Sellers | Sr. Recruiter CAO | Memphis | First 30 Days |
| Dori Durham | Sr. Recruiter Finance, Accounting, WD&C | Mike Schmidt | First 30 Days |
| Sarah Reser | Sr. Recruiter HR4HR | Mike Schmidt | First 30 Days |
| Marc Caputo | Sr. Recruiter HR4HR, Strategy | Mike Schmidt | First 30 Days |
| Pam Flores | Recruiter HR4HR, Audit | Mike Schmidt | First 30 Days |
| Francisco Estrada | D&I Sourcing Manager- Corp. Functions | Remote | First 30 Days |
| Dre Reed | Sr. D&I Talent Sourcer – Corp. Functions | Remote | First 30 Days |
| Heather Gatto | Sr. Internal Recruiter | Remote | First 30 Days |

© 2020 NIKE, Inc. Human Resources. All rights reserved. For internal use only.

7

7

# KEY ONBOARDING CONTACTS



### Recommended Contacts /1:1's during your first 90 Days

| Name(s) | Title | Location | Recommended Timing |
|---|---|---|---|
| Marcy McCoun | Internal  - Corp Functions Manager | Remote | First 30 Days |
| Omar Garcia | Recruiting Services Manager | Alpha Force | First 30 Days |
| Alex Garcia | Coordination Lead  - Corp. Functions | Mike Schmidt | First 30 Days |
| Jenny Gong | TA Coordinator | Mike Schmidt | First 30 Days |
| Zack Wells | Total Rewards Sr Director | Seb Coe | First 60 Days |
| Jessica McCoy | HRDO Specialist – HR/CF | Seb Coe | First 30 Days |

© 2020 NIKE, Inc. Human Resources. All rights reserved. For internal use only.

8



# NIKE GEOGRAPHIES

High-Level

| GEOGRAPHY | HQ LOCATION | KEY CITIES | HIRING OWNERSHIP |
|---|---|---|---|
| **GLOBAL** | Beaverton, OR | | All roles: USA team |
| **NORTH AMERICA (NA)** | Beaverton, OR | Los Angeles, New York | All roles: USA team |
| **ASIA-PACIFIC, LATIN AMERICA (APLA)** | Beaverton, OR | Mexico City, Seoul. Tokyo | USA-based roles: USA team<br>Territory roles: Territory team |
| **EUROPE, MIDDLE EAST, AFRICA (EMEA)** | Hilversum, Netherlands | Barcelona, Berlin, London, Milan, Paris | All roles: Territory team |
| **GREATER CHINA (GC)** | Shanghai, China | Beijing, Shanghai | All roles: Territory team |

9

# NIKE GEOGRAPHIES

Deep Dive



**NORTH AMERICA**

There are four Nike locations in the United States where you will place HR talent. They are:

**World Headquarters (WHQ)** in
Beaverton, OR.

**West Headquarters (LAHQ)** in
Los Angeles, CA.

**East Headquarters (NYHQ)** in
New York, NY.

**North Central Headquarters (CHQ)** in
Chicago, IL.

**Distribution Network (DC)** in
Greater Memphis, TN.

10

# RECRUITING PROCESS HIGHLIGHTS

**LEGEND**  ■ Recruiter  ■ Hiring Manager (HM)  ■ TA Coordination Team  ■ TA Recruiting Services  ■ Candidate

Recruiter(s) and Hiring Manager (HM) to: Review Hiring at Nike (one-pager) with HM, confirm Requisition/Position details, confirm Posting & Sourcing Strategy, and level set expectations

Recruiter to send Job Posting Request to TA Recruiting Services

SLA: 1 BUSINESS DAY

Recruiter sources the most qualified candidates

Recruiter requests interview coordination via: TA Coordination Team

SEE INTERVIEW COORDINATION SLAS HERE

Recruiter to ensure all Interview Participants are prepared to ensure we uphold Nike Candidate Promise, follow Interview Guidelines, and Interview Debrief Guidelines accordingly

Recruiter requests applicable Recruiting Services, **PRIOR TO OFFER**:

Employee Relations Review
Rehire Verification
Cartus (Relocation) Assessment
Immigration Assessment
Commuter Assessment
Non-Compete Agreement

Requests can be sent to TA Recruiting Services

Recruiter provides Verbal Offer to candidate.

Once accepted, disposition other candidates.

Recruiter submits Offer Letter Request to TA Recruiting Services

SLA: 2-3 BUSINESS DAYS

Candidate completes Background Check, Drug Screen, Relocation, VISA, etc. requirements as requested

Candidate Moved to Hired.

| STRATEGY MEETING & JOB POSTING | SOURCING | INTERVIEW | PRE-OFFER REQUIREMENTS* | OFFER** & PRE-EMPLOYMENT | HIRED*** |

**COMPLIANCE CHECK POINT**

Is the candidate an ACE candidate?
Does this position require a Diversity Slate?
More on Nike Screening & Qualifying here

Are those participating in Interviews & Hiring aware of Nike Interview Guidelines?

* SLAs vary depending on service(s) requested, **some as long as 10 business days.**

Plan & communicate start date timelines to HM and Finalist Candidate accordingly.

** Does the start date allow for required internal and external processing (as found through previous step's assessments/review)?

*** Candidates pending VISA/Relocation may experience changes in start dates. Recruiter to continue to touch point with Candidate/Mobility for updates.

© 2020 NIKE, Inc. Human Resources. All rights reserved. For internal use only.

11

# BAND LEVELS



All Nike roles fit into our "Job Bands", which are the levels of role-types within the company.

The primary band levels spell out VALUES, and have the following titles associated with them. Executive level roles are categorized as E7 and above.

| V – BAND<br>A – BAND | L – BAND<br>U – BAND | E – BAND<br>S – BAND |
| --- | --- | --- |

E1- CEO
E2-President/GM/Chief
E3-President/GM/Chief
E4- EVP
E5- EVP
E6- VP
E7- VP
S- SR Director
E- Director | Principal Specialist
U- Manager | SR Specialist
L- Supervisor | Lead | Specialist
A- Coordinator | Admin
V- Receptionist

© 2020 NIKE, Inc. Human Resources. All rights reserved. For internal use only.

# NIKE ACRONYMS



**Leadership**
ELT = Executive Leadership Team (led by John Donahoe)
CMLT = Consumer & Marketplace Leadership Team (led by Heidi O'Neill)
ICDPM = I Innovation, Categories, Design, Product and Merchandising Team (led by Michael Spillane)
GOT = Global Operations Team (led by Andy Campion)
CLT= Corporate Leadership Team (VP and above)
BOD = Board of Directors

**Corporate Planning**
SPKO= Strategic Planning Kickoff
CSR= Corporate Strategy Review
AOP = Annual Operating Plan
QBR = Quarterly Business Review
MBR = Monthly Business Review
"i"CSR/QBR/AOP= Brand Leadership meeting
"c"CSR/QBR/AOP= Executive Leadership meeting
MOFO = Monthly Operating & Financial Overview

**Seasonal Planning**
SL= Strategic Launch
PR= Product Review
BAM= Business Alignment Meeting
PRO= Product Read-out
ISR= Integrated Seasonal Readiness
SIM= Seasonal Integration Meeting
KAPM= Key Account Planning Meeting
GTM= Go-to-Market Meeting

**Channels**
NFS = Nike Factory Store
NSO = Nike Store Only
NSP= Nike Store Partnered
SNKRS= Nike-owed App
W/S= Wholesale
3PW= Third-party Wholesale; 1PW= First-party Wholesale
IMP = Integrated Marketplace (usually includes Direct & Wholesale)

**Geographies**
EMEA = Europe, Middle East, Africa
GC= Greater China
NA= North America
APLA = Asia Pacific Latin America

**Functions**
GSP = Global Strategic Planning
GBP = Global Brand Planning (part of Finance)
GMI = Global Market Intelligence
IRM = Integrated Retail Marketing
DSM= Demand & Supply Management
DP = Demand Planning
GSM= Global Sourcing & Manufacturing
DC= Demand Creation (i.e., marketing spend)
IAT = Integrated Account Team

**Categories**
NSW= Nike Sportswear
Nike Kids
R/T= Running & Training
NBB= Nike Basketball
MT= Men's Training
WT= Women's Training
JDN= Jordan
JSW= Jordan Sportswear

**Product Engine**
FW= Footwear
APP= Apparel
EQ = Equipment
GEL = Geo Express Lane
NXT = Nike Innovation Team
NSRL= Nike Sports Research Lab
SP/SU/FA/HO= Retail Seasons:  Spring (Jan-Mar), Summer (Apr-June), Fall (July-Sept), Holiday (Oct-Dec)

**Retail**
ADPT = Average dollar per transaction
ASP= Average sales price
B&M vs. .com= Brick & Mortar vs. online sales
APPU = Average Price Per Unit
AGSP = Average Gross Selling Price
MSRP = Manufacturers Suggested Retail Price
EPR = Early Price Reduction (Markdowns before the product is liquidated)
C/O= Close-out (aka liquidation)
C/O= Carryover (for SKU or inventory)
S/T= Sell-thru

**Operations**
DSI = Day Sales Inventory
DFC = Days Forward Coverage
FOB= Free on Board (aka Freight on Board) This is the cost of a shoe when loaded on the vessel @ the port of origin.
BOM = Bill of materials.  This itemizes the cost of each and every component used in a product based on the consumption by a single unit.
LOH = Labor and Overhead (is usually spread across or amortized to a particular model)
IBP= Integrated Business Planning
DC= Distribution Centers

**HR**
COE = Centers of Excellence
ER = Employee Relations
MOR = Matter of Respect
TM = Talent Management
TR = Total Rewards
OE = Organizational Effectiveness
HRM = HR Manager
HRBP = HR Business Partner
HRDO = HR Delivery Operations
TA = Talent Acquisition
D&I = Diversity & Inclusion

**Other**
CDO = Consumer Direct Offense
Triple/Double = 2x Innovation; 2x Direct; 2x Speed
BSM= Brand strength monitor
NPD= External market reporting (size, growth, share)
G2N= Gross Margin to Net Margin (Tie-out of how you get there)
OTP= Organizational Talent Planning
CFE = Coaching For Excellence
TIs= Transformational Initiatives
SES = Strategic Enterprise Scorecard (tracking TI's for leadership)
T2T= Team-to-Team/Top-to-Top Leadership meetings
DNA= Department of Nike Archives
KCA= Key City Activation

© 2020 NIKE, Inc. Human Resources. All rights reserved. For internal use only.

13

# WELCOME TO NIKE TALENT ACQUISITION

NIKE, Inc. Human Resources

# EXHIBIT 16



Organizational charts found on this site are proprietary to Nike, Inc. - do not copy, disclose or disseminate to anyone who is not authorized to see such information or in any manner external to Nike, Inc. and/or its affiliates.

Data source: SAP Refreshed 3/19/2018

Confidential

NIKE_00046432

# EXHIBIT 17



**Mark Parker**
*CHAIRMAN, PRESIDENT AND CEO*
Job Code: A0523
Employee Band: E1

**Trevor Edwards**
*PRESIDENT OF NIKE BRAND*
Job Code: A0522
Employee Band: E2

**Michael Spillane**
*PRESIDENT OF CATEGORIES AND PRODUCT*
Job Code: A2546
Employee Band: E3

███████████
*VP/GM GLOBAL CATEGORIES*
Job Code: A2449
Employee Band: E4

**Steve Lesnard**
*VP/GM RUNNING, GLOBAL*
Job Code: A2358
Employee Band: E6

**Nicole Patokoski**
*EXECUTIVE ASSISTANT*
Job Code: A0088
Employee Band: A

**Jason Babkes**
*DIRECTOR RUNNING STRAT PLANNING, GLOBAL*
Job Code: A1707
Employee Band: E

**Charles Gatchell**
*VP/GM OLYMPICS & ATHLETES, GLOBAL*
Job Code: A0459
Employee Band: E7



EXHIBIT
**696**
Elizabeth Vales
5/27/2021
Aleshia Macom - CSR

Organizational charts found on this site are proprietary to Nike, Inc. - do not copy, disclose or disseminate to anyone who is not authorized to see such information or in any manner external to Nike, Inc. and/or its affiliates.

Data source: SAP Refreshed 3/19/2018

Confidential

NIKE_00046439

Plaintiff's Trial Exhibit 219
Page 1 of 1

# EXHIBIT 18



Organizational charts found on this site are proprietary to Nike, Inc. - do not copy, disclose or disseminate to anyone who is not authorized to see such information or in any manner external to Nike, Inc. and/or its affiliates.

Data source: SAP Refreshed 3/19/2018

Confidential

NIKE_00046443

# EXHIBIT 19

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 14A INFORMATION

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934
### (Amendment No.    )



Filed by the Registrant  ☒          Filed by a Party other than the Registrant  ☐

Check the appropriate box:

    ☐   Preliminary Proxy Statement

    ☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

    ☒   Definitive Proxy Statement

    ☐   Definitive Additional Materials

    ☐   Soliciting Material under §240.14a-12

# NIKE, INC.

**(Name of registrant as specified in its charter)**

**(Name of person(s) filing proxy statement, if other than the registrant)**

Payment of Filing Fee (Check the appropriate box):

☒   No fee required

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11

    (1)   Title of each class of securities to which transaction applies:

    (2)   Aggregate number of securities to which transaction applies:

    (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)   Proposed maximum aggregate value of transaction:

    (5)   Total fee paid:

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)   Amount Previously Paid:

    (2)   Form, Schedule or Registration Statement No.:

    (3)   Filing Party:

    (4)   Date Filed:

PLF_000010

Sun Decl. Ex. 56, Page 1 of 54

Plaintiff's Trial Exhibit 336
Page 1 of 54



**To Our Shareholders:**

You are cordially invited to attend the annual meeting of shareholders of NIKE, Inc. to be held at the Tiger Woods Conference Center, One Bowerman Drive, Beaverton, Oregon 97005-6453, on Thursday, September 20, 2018, at 10:00 A.M. Pacific Time. Registration will begin at 9:00 A.M.

The meeting will consist of a brief presentation followed by the business items listed on the included notice.

Whether or not you plan to attend, the prompt execution and return of your proxy card will both assure that your shares are represented at the meeting and minimize the cost of proxy solicitation.

Sincerely,

**Mark G. Parker**
*Chairman of the Board*
July 24, 2018

PLF_000011

Sun Decl. Ex. 56, Page 2 of 54

Plaintiff's Trial Exhibit 336
Page 2 of 54



# Notice of Annual Meeting of Shareholders

## September 20, 2018

**To the Shareholders of NIKE, Inc.**

**The Annual Meeting of Shareholders of NIKE, Inc., an Oregon corporation, will be held at the Tiger Woods Conference Center, One Bowerman Drive, Beaverton, Oregon 97005-6453, on Thursday, September 20, 2018, at 10:00 A.M. Pacific Time, for the following purposes:**

1. To elect the 12 directors named in the accompanying proxy statement for the ensuing year.

2. To approve executive compensation by an advisory vote.

3. To consider a shareholder proposal regarding political contributions disclosure as described in the accompanying proxy statement, if properly presented at the meeting.

4. To ratify the appointment of PricewaterhouseCoopers LLP as our independent registered public accounting firm.

5. To transact such other business as may properly come before the meeting.

All shareholders are invited to attend the meeting. Shareholders of record at the close of business on July 20, 2018, the record date fixed by the Board of Directors, are entitled to notice of and to vote at the meeting. You must present your proxy, voter instruction card, or meeting notice for admission.

By Order of the Board of Directors,

**Ann M. Miller**
*Vice President, Corporate Secretary & Chief Compliance Officer*

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Shareholders To Be Held on September 20, 2018. The proxy statement and NIKE, Inc.'s 2018 Annual Report to Shareholders are available online at www.investorvote.com or www.proxyvote.com, for registered and beneficial owners, respectively.**

*Whether or not you plan to attend the meeting, please sign and date the enclosed proxy card and return it in the enclosed envelope, or vote online or by telephone following the instructions on the proxy card.*

PLF_000012

Sun Decl. Ex. 56, Page 3 of 54

Plaintiff's Trial Exhibit 336
Page 3 of 54

# Proxy Statement

We are furnishing proxy materials to our shareholders primarily via the Internet by mailing a Notice of Internet Availability of Proxy Materials, or "Notice", instead of mailing printed copies of those materials to each shareholder. The Notice directs shareholders to a website where they can access our proxy materials, including our proxy statement and our annual report, and view instructions on how to vote online or by telephone. If you would prefer to receive a paper copy of our proxy materials, please follow the instructions included in the Notice. If you have previously elected to receive our proxy materials electronically, you will continue to receive access to these materials electronically unless you elect otherwise.

The enclosed proxy is solicited by the Board of Directors (the "Board") of NIKE, Inc. ("NIKE" or the "Company") for use at the annual meeting of shareholders to be held on September 20, 2018, and at any adjournment thereof (the "Annual Meeting"). Our principal executive offices are located at One Bowerman Drive, Beaverton, Oregon 97005-6453. This proxy statement is first being made available to shareholders on or about August 8, 2018. Shareholders may submit a proxy to vote at the Annual Meeting by following the instructions on the Notice, online or by telephone, or (if they have received paper copies of the proxy materials) by returning a proxy card.

The Company will bear the cost of soliciting proxies. In addition to soliciting proxies by mail, certain officers and employees of the Company, without extra compensation, may also solicit proxies personally or by telephone. Copies of proxy solicitation materials will be furnished to fiduciaries, custodians, and brokerage houses for forwarding to the beneficial owners of shares held in their names.

Shares that are properly voted online or by telephone or for which proxy cards are properly executed and received by the Company prior to the Annual Meeting will be voted in accordance with the instructions specified in such proxies. Where no instructions are given, shares will be voted "FOR" the election of each of the named nominees for director (Proposal 1), "FOR" the proposal regarding an advisory vote to approve executive compensation (Proposal 2), "AGAINST" the shareholder proposal regarding political contributions (Proposal 3), and "FOR" the ratification of the appointment of PricewaterhouseCoopers LLP as independent registered public accounting firm (Proposal 4).

A shareholder giving the enclosed proxy has the power to revoke it at any time before it is exercised by affirmatively electing to vote in person at the meeting or by delivering to Ann M. Miller, Vice President, Corporate Secretary & Chief Compliance Officer of NIKE, Inc., either an instrument of revocation or an executed proxy bearing a later date.

# Voting Securities and Vote Required

Holders of record of NIKE's Class A Common Stock ("Class A Stock") and holders of record of NIKE's Class B Common Stock ("Class B Stock") at the close of business on July 20, 2018 will be entitled to vote at the Annual Meeting. On that date, 320,065,752 shares of Class A Stock and 1,280,488,786 shares of Class B Stock were issued and outstanding. Neither class of Common Stock has cumulative voting rights.

Each share of Class A Stock and each share of Class B Stock is entitled to one vote on every matter submitted to the shareholders at the Annual Meeting.

A majority of the votes entitled to be cast on Proposal 1, the election of directors, by each of the Class A Stock and Class B Stock separately constitutes a quorum of Class A Stock and Class B Stock, respectively, for action on Proposal 1. The holders of Class A Stock and the holders of Class B Stock will vote separately on Proposal 1. Holders of Class B Stock are currently entitled to elect 25 percent of the Board, rounded up to the next whole number. Holders of Class A Stock are currently entitled to elect the remaining directors. Under this formula, holders of Class B Stock, voting separately, will elect three directors, and holders of Class A Stock, voting separately, will elect nine directors. Under our Bylaws, if a quorum of each class of Common Stock is present at the meeting, the three director nominees who receive the greatest number of votes cast by holders of Class B Stock and the nine director nominees who receive the greatest number of votes cast by holders of Class A Stock will be elected directors.

A majority of the votes entitled to be cast on Proposals 2, 3, and 4 by both Class A Stock and Class B Stock together constitutes a quorum for action on those proposals. Holders of Class A Stock and holders of Class B Stock will vote together as one class on Proposals 2, 3, and 4. If a quorum is present at the meeting, Proposals 2, 3, and 4 will be approved if the votes cast in favor of the proposal exceeds the votes cast against the proposal.

Abstentions and broker non-votes are counted for purposes of determining whether a quorum exists. Abstentions and broker non-votes are not included as votes cast and will not affect the outcome of any of the proposals. Broker non-votes occur when a person holding shares in street name, such as through a brokerage firm, does not provide instructions as to how to vote those shares and the broker does not then vote those shares on the shareholder's behalf.

PLF_000013

Sun Decl. Ex. 56, Page 4 of 54

Plaintiff's Trial Exhibit 336
Page 4 of 54

CORPORATE GOVERNANCE
Board of Directors

# CORPORATE GOVERNANCE

# Board of Directors

The Board is currently composed of ten independent directors and three directors who are not independent under the New York Stock Exchange (the "NYSE") listing rules. During fiscal 2018, there were five meetings of the Board and all of our then serving directors attended at least 75 percent of the total number of meetings of the Board and committees on which he or she served. The Company encourages all directors to attend each annual meeting of shareholders and, with the exception of Travis A. Knight, all directors serving at the time of the 2017 annual meeting attended the 2017 annual meeting.

## Board Committees

On November 16, 2017, to allow for flexibility to implement evolving governance best practices, the Board elected to restructure from six to four committees. As a result, the Board's current standing committees are an Audit & Finance Committee; a Compensation Committee; a Corporate Responsibility, Sustainability & Governance Committee; and an Executive Committee. The Board may appoint other committees from time to time. Each standing committee has a written charter; all such charters, as well as the Company's corporate governance guidelines, are available at the Company's corporate website: *http://investors.nike.com* and will be provided in print to any shareholder who submits a request in writing to NIKE Investor Relations, One Bowerman Drive, Beaverton, Oregon 97005-6453.

The Audit & Finance Committee consolidated the prior Audit Committee and Finance Committee. The Audit & Finance Committee provides assistance to the Board in fulfilling its legal and fiduciary obligations with respect to matters involving the Company's accounting, auditing, financial reporting, internal controls, information security (including those risks related to cyber security), data protection, and oversees the financial policies and activities of the Company that may have a material impact on the results of operations or the financial position of the Company. The Audit & Finance Committee is also responsible for overseeing the integrity of the Company's financial statements, the compliance with legal and regulatory requirements, the independent auditor's qualifications and independence, and the performance of the Company's internal audit function and independent auditor. The Audit & Finance Committee also considers long-term financing options, long-range tax, financial regulatory and foreign currency issues facing the Company, and management's recommendations concerning capital deployment strategy, major capital expenditures, and material acquisitions or divestitures. The Board has determined that each member of the Audit & Finance Committee meets all independence and financial literacy requirements applicable to audit committees under the NYSE listing standards and applicable regulations adopted by the U.S. Securities and Exchange Commission (the "SEC"). The Board has also determined that Mr. Alan B. Graf, Jr. is an "audit committee financial expert" as defined in regulations adopted by the SEC.

The Compensation Committee evaluates the performance of the Chief Executive Officer ("CEO"), reviews the performance evaluations of our other Named Executive Officers, and recommends their compensation for approval by the independent members of the Board (other than the incentive compensation approved solely by the Compensation Committee as described below). The Compensation Committee also grants equity incentive awards under the NIKE, Inc. Stock Incentive Plan, and determines targets and awards under the NIKE, Inc. Executive Performance Sharing Plan and the NIKE, Inc. Long-Term Incentive Plan. The Compensation Committee also makes recommendations to the Board regarding other executive incentive compensation arrangements and profit sharing plan contributions. The Board has determined that each member of the Compensation Committee meets all independence requirements applicable to compensation committees under the NYSE listing standards.

The Corporate Responsibility, Sustainability & Governance Committee consolidated the prior Nominating & Corporate Governance Committee and the Corporate Responsibility & Sustainability Committee. The Corporate Responsibility, Sustainability & Governance Committee identifies individuals qualified to become Board members, recommends director nominees for election at each annual shareholder meeting, and develops and recommends corporate governance guidelines and standards for business conduct and ethics. The Corporate Responsibility, Sustainability & Governance Committee also reviews significant strategies, activities and policies regarding sustainability (including labor practices), community impact and charitable activities, and makes recommendations regarding the same to the Board. The Corporate Responsibility, Sustainability & Governance Committee also oversees the annual self-evaluations of the Board and its committees and makes recommendations to the Board concerning the structure and membership of the other Board committees. The Board has determined that each member of the Corporate Responsibility, Sustainability & Governance Committee meets all independence requirements applicable to nominating/corporate governance committees under the NYSE listing standards.

The Executive Committee is authorized to act on behalf of the Board on all corporate actions for which applicable law does not require participation by the full Board. In practice, the Executive Committee acts in place of the full Board only when emergency issues or scheduling conflicts make it difficult or impracticable to assemble the full Board. All actions taken by the Executive Committee must be reported at the next Board meeting, or as soon thereafter as practicable. The Executive Committee held no formal meetings during fiscal 2018, but took action by unanimous written consent.

**NIKE, INC. ·** *2018 Notice of Annual Meeting* **2**

PLF_000014

Sun Decl. Ex. 56, Page 5 of 54

Plaintiff's Trial Exhibit 336
Page 5 of 54

**CORPORATE GOVERNANCE**
Board of Directors

The table below provides information regarding the current membership of each standing Board committee and denotes the number of standing Board committee meetings held during fiscal 2018:

| Director Name | Audit & Finance* | Compensation | Corporate Responsibility, Sustainability & Governance* | Executive |
|---|---|---|---|---|
| Cathleen A. Benko** | | | | |
| Elizabeth J. Comstock | | ✓ | | |
| John G. Connors | ✓ | | | ✓ |
| Timothy D. Cook | | Chair | | |
| John J. Donahoe II | ✓ | | | ✓ |
| Alan B. Graf, Jr. | Chair | | | |
| Peter B. Henry*** | | | ✓ | |
| Travis A. Knight | | | | ✓ |
| John C. Lechleiter | | | Chair | |
| Mark G. Parker | | | | Chair |
| Michelle A. Peluso | | | ✓ | |
| Johnathan A. Rodgers | | ✓ | | |
| John R. Thompson, Jr. | | | | |
| Phyllis M. Wise**** | | | | |
| Meetings in Fiscal 2018 | 15 | 5 | 7 | - |

\* Represents total meetings of restructured committees inclusive of predecessor committees.
\*\* Ms. Benko was elected to the Board of Directors effective July 12, 2018.
\*\*\* Mr. Henry was elected to the Board of Directors effective February 14, 2018.
\*\*\*\* Effective September 21, 2017, Dr. Wise retired from the Board.

## Director Independence

Pursuant to NYSE rules, in order for a director to qualify as "independent", the Board of Directors must affirmatively determine that the director has no material relationship with the Company that would impair the director's independence. The Board affirmatively determined that commercial or charitable relationships below the following thresholds will not be considered material relationships that impair a director's independence: (i) if a NIKE director or immediate family member is an executive officer of another company that does business with NIKE and the annual sales to, or purchases from, NIKE are less than one percent of the annual revenues of the other company; and (ii) if a NIKE director or immediate family member serves as an officer, director or trustee of a charitable organization, and NIKE's contributions to the organization are less than one percent of that organization's total annual charitable receipts. After applying this categorical standard, the Board has determined that the following directors who served during fiscal 2018 — Elizabeth J. Comstock, John G. Connors, Timothy D. Cook, John J. Donahoe II, Alan B. Graf, Jr., Peter B. Henry, John C. Lechleiter, Michelle A. Peluso, Johnathan A. Rodgers, and Phyllis M. Wise — have no material relationship with the Company and, therefore, are independent. Ms. Benko did not serve in fiscal 2018 but has been determined independent by the Board. Messrs. Travis A. Knight, Mark G. Parker, and John R. Thompson, Jr. were not independent pursuant to NYSE rules. Mr. Parker was not independent pursuant to NYSE rules because he was an executive officer of the Company during fiscal 2018. Mr. Knight was not independent pursuant to NYSE rules because he is the son of NIKE's co-founder and former Chairman of the Board, Mr. Philip Knight, who received compensation in excess of the threshold set forth in applicable NYSE rules (the "NYSE threshold") for his position as Chairman Emeritus. Mr. Thompson was not independent pursuant to NYSE rules because the Company had a, now terminated, contract with his son, John Thompson III, former head basketball coach at Georgetown University, to provide endorsement and consulting services to the Company with compensation in excess of the NYSE threshold. The compensation paid to Mr. Philip Knight is described under "Transactions with Related Persons" below.

## Director Nominations

The Corporate Responsibility, Sustainability & Governance Committee identifies potential director candidates through a variety of means, including recommendations from members of the Corporate Responsibility, Sustainability & Governance Committee or the Board, suggestions from Company management, and shareholder recommendations. The Committee also may, in its discretion, engage director search firms to identify candidates. Shareholders may recommend director candidates for consideration by the Corporate Responsibility, Sustainability & Governance Committee by submitting a written recommendation to the Committee, c/o Ann M. Miller, Vice President, Corporate Secretary & Chief Compliance Officer, NIKE, Inc., One Bowerman Drive, Beaverton, Oregon 97005-6453. The recommendation should include the candidate's name, age, qualifications (including principal occupation and employment history), and written consent to be named as a nominee in the Company's proxy statement and to serve as a director, if elected.

The Board of Directors has adopted qualification standards for the selection of non-management nominees for director, which can be found at our corporate website: *http://investors.nike.com* . As provided in these standards and the Company's corporate governance guidelines, nominees for director are selected on the basis of, among other things, distinguished business experience or other non-business achievements; education; significant knowledge of international business, finance, marketing, technology, human resources, diversity & inclusion, law, or other fields which are complementary to, and balance the knowledge of, other Board members; a desire to represent the interests of all shareholders; independence; character; ethics; good judgment; diversity; and ability to devote substantial time to discharge Board responsibilities.

**NIKE, INC.** • *2018 Notice of Annual Meeting* **3**

PLF_000015

Sun Decl. Ex. 56, Page 6 of 54

Plaintiff's Trial Exhibit 336
Page 6 of 54

## CORPORATE GOVERNANCE
**Board of Directors**

The Corporate Responsibility, Sustainability & Governance Committee identifies qualified potential candidates without regard to their age, gender, race, national origin, sexual orientation, or religion. While the Board has no policy regarding Board member diversity, the Corporate Responsibility, Sustainability & Governance Committee considers and discusses diversity in selecting nominees for director and in the re-nomination of an incumbent director. The Committee views diversity broadly, including gender, ethnicity, differences of viewpoint, geographic location, skills, education, and professional and industry experience, among others. The Board believes that a variety and balance of perspectives on the Board results in more thoughtful and robust deliberations.

In considering the re-nomination of an incumbent director, the Corporate Responsibility, Sustainability & Governance Committee reviews the director's overall service to the Company during his or her term, including the number of meetings attended, level of participation and quality of performance, as well as any special skills, experience or diversity that such director brings to the Board. All potential new director candidates, whether recommended by shareholders or identified by other means, are initially screened by the Chair of the Corporate Responsibility, Sustainability & Governance Committee, who may seek additional information about the background and qualifications of the candidate, and who may determine that a candidate does not have qualifications that merit further consideration by the full Committee. With respect to new director candidates who pass the initial screening, the Corporate Responsibility, Sustainability & Governance Committee meets to discuss and consider each candidate's qualifications and potential contributions to the Board, and determines by majority vote whether to recommend such candidates to the Board. The final decision to either appoint a candidate to fill a vacancy between annual meetings or include a candidate on the slate of nominees proposed at an annual meeting is made by the Board.

It is the general policy of the Board that directors first elected after the fiscal year ended May 31, 1993 will not stand for re-election after reaching the age of 72. Mr. Rodgers, who has served on the Board since 2006, has announced his retirement and will not stand for re-election to the Board at the 2018 Annual Meeting.

## Shareholder Communications with Directors

Shareholders or interested parties desiring to communicate directly with the Board, with the non-management directors or with any individual director may do so in writing addressed to the intended recipient or recipients, c/o Ann M. Miller, Vice President, Corporate Secretary & Chief Compliance Officer, NIKE, Inc., One Bowerman Drive, Beaverton, Oregon 97005-6453. All such communications will be reviewed, compiled as necessary, and then forwarded to the designated recipient or recipients in a timely manner.

## Board Leadership Structure

NIKE's governing documents provide the Board with flexibility to select the appropriate leadership structure of the Company. In determining the leadership structure, the Board considers many factors, including the specific needs of the business, fulfilling the duties of the Board, and the best interests of the Company's shareholders. Mr. Parker, the Company's President and CEO since 2006, also serves as the Chairman of the Board, a position he has held since 2016. As Chairman, Mr. Parker presides over meetings of the Board and shareholders. As President and CEO, Mr. Parker is in charge of the general supervision, direction, and control of the business and affairs of the Company, subject to the overall direction and supervision of the Board and its committees.

The Board believes this leadership structure is appropriate for the Company due to Mr. Parker's intimate knowledge of the Company's business, his unique experience, talent, tenure, and effective leadership. The structure permits Mr. Parker, by serving as both Chairman and CEO, to draw on his knowledge of the operations of the business, industry developments, customers, shareholders, and employees in providing leadership on the broad strategic issues considered by the Board.

The Corporate Responsibility, Sustainability & Governance Committee determined that given Mr. Parker's position as Chairman, President and CEO, a lead independent director would ensure strong independent leadership of the Board and simultaneous with Mr. Parker's appointment as Chairman in 2016, the Board appointed Tim Cook as Lead Independent Director to serve for a term of three years. As Lead Independent Director, Mr. Cook executes the following functions:

- serves as a liaison between the Chairman/CEO and the independent directors;

- approves the meeting agendas for the Board;

- advises the Chairman/CEO regarding the sufficiency, quality, quantity, and timeliness of information provided to the Board;

- ensures that meeting schedules permit sufficient time for discussion of all agenda items;

- provides consultation and direct communication with major shareholders, if requested;

- presides at meetings of the Board at which the Chairman/CEO is not present, including executive sessions; and

- performs other duties specified in the Lead Independent Director Charter.

The chairs of Board committees also play an active role in the leadership structure of the Board. The Corporate Responsibility, Sustainability & Governance Committee and the Board endeavor to select independent committee chairs who will provide strong leadership to guide the important work of the Board committees. Committee chairs work with the Company's senior executives to ensure the committees are discussing the key strategic risks and opportunities of the Company. In the absence of the lead independent director, a presiding director is appointed to chair executive sessions of non-management directors (consisting of all directors other than Mr. Parker). The position of presiding director is rotated among the chairs of the various Board committees, other than the Executive Committee. Executive sessions are regularly scheduled and held at least once each year.

Mr. Philip Knight, co-founder and former Chairman of the Company, serves as Chairman Emeritus, with a standing invitation to attend meetings of the Board and its committees as a non-voting observer. The Board believes that it benefits from the valuable experience and insights of the Company's co-founder and former Chairman of the Board.

For all of these reasons, the Board believes this leadership structure is optimal.

**NIKE, INC.** •    *2018 Notice of Annual Meeting* **4**

PLF_000016

Sun Decl. Ex. 56, Page 7 of 54

Plaintiff's Trial Exhibit 336
Page 7 of 54

**CORPORATE GOVERNANCE**
**Board of Directors**

## The Board's Role in Risk Oversight

While the Company's management is responsible for day-to-day management of the various risks facing the Company, the Board takes an active role in the oversight of the management of critical business risks. The Board does not view risk in isolation. Risks are considered in virtually every business decision and as part of NIKE's business strategy. The Board recognizes it is neither possible nor prudent to eliminate all risk. Purposeful and appropriate risk-taking is essential for the Company to be competitive on a global basis and to achieve its strategic objectives.

The Board implements its risk oversight function both as a whole and through committees, which play a significant role in carrying out risk oversight. While the Audit & Finance Committee is responsible for oversight of management's risk management policies, oversight responsibility for particular areas of risk is allocated among the Board committees according to the committee's area of responsibility as reflected in the committee charters. In particular:

- The Audit & Finance Committee oversees risks related to the Company's financial statements, the financial reporting process, accounting, legal matters, investments, access to capital and capital deployment, currency risk and hedging programs, information security (including those risks related to cyber security), and data protection. The Committee oversees the internal audit function, reviews a risk-based plan of internal audits, and reviews a risk-based integrated audit of internal controls over financial reporting. The Committee meets separately with the Vice President of Corporate Audit and Chief Risk Officer, representatives of the independent registered public accountants, and senior management.

- The Compensation Committee oversees risks and rewards associated with the Company's compensation philosophy and programs, management succession plans, and executive development.

- The Corporate Responsibility, Sustainability & Governance Committee oversees risks associated with company governance, including NIKE's code of business conduct and its ethics, compliance programs, and the structure and performance of the Board and its committees. The Committee also oversees issues that involve reputational risk to the Company, including community engagement, and sustainability innovation relating to the Company's products, its supply chain (including labor practices), and the environment.

Each committee chair works with one or more senior executives assigned to assist the committee in: developing agendas for the year and for each meeting, paying particular attention to areas of business risk identified by management, Board members, internal and external auditors, and in their committee charter; and scheduling agenda topics, presentations, and discussions regarding business risks within their area of responsibility. At meetings, the committees discuss areas of business risk, the potential impact, and management's initiatives to manage business risk, often within the context of important business decisions. Through this process key business risk areas are reviewed at appropriate times, with some topics reviewed on several occasions throughout the year. At every Board meeting each committee chair provides a report to the full Board outlining its discussions and actions, including those affecting the oversight of various risks.

The Company believes its leadership structure, discussed in detail above, supports the risk oversight function of the Board. Strong directors chair the various committees involved in risk oversight, there is open communication between management and directors, and all directors are involved in the risk oversight function.

## Code of Business Conduct and Ethics

The NIKE Code of Ethics ("Ethics Code") is available at the Company's corporate website: *http://investors.nike.com* and will be provided in print without charge to any shareholder who submits a request in writing to NIKE Investor Relations, One Bowerman Drive, Beaverton, Oregon 97005-6453. The Ethics Code applies to all of the Company's employees and directors, including our CEO and all other executive officers. The Ethics Code provides that any waiver of the Ethics Code may be made only by the Board. Any such waiver in favor of a director or executive officer will be publicly disclosed. The Company plans to disclose amendments to, and waivers from, the Ethics Code on the Company's corporate website: *http://investors.nike.com*.

**NIKE, INC.** • *2018 Notice of Annual Meeting* **5**

PLF_000017

Sun Decl. Ex. 56, Page 8 of 54

Plaintiff's Trial Exhibit 336
Page 8 of 54

CORPORATE GOVERNANCE
PROPOSAL 1

# Proposal 1    Election of Directors

A Board of 12 directors will be elected at the Annual Meeting. All of the nominees other than Ms. Cathleen A. Benko and Mr. Peter B. Henry were elected at the 2017 annual meeting of shareholders. Directors will hold office until the next annual meeting of shareholders or until their successors are elected and qualified.

Mr. Alan B. Graf, Jr., Dr. John C. Lechleiter, and Ms. Michelle A. Peluso are nominated by the Board of Directors for election by the holders of Class B Stock. The other nine nominees are nominated by the Board for election by the holders of Class A Stock.

Under Oregon law and our Bylaws, if a quorum of each class of shareholders is present at the Annual Meeting, the nine director nominees who receive the greatest number of votes cast by holders of Class A Stock and the three director nominees who receive the greatest number of votes cast by holders of Class B Stock will be elected directors. Abstentions and broker non-votes will have no effect on the results of the vote. Unless otherwise instructed, proxy holders will vote the proxies they receive for the nominees listed below. If any nominee becomes unable to serve, the holders of the proxies may, in their discretion, vote the shares for a substitute nominee or nominees designated by the Board.

The Bylaws and the Corporate Governance Guidelines of the Company provide that any nominee for director in an uncontested election who receives a greater number of votes "withheld" from his or her election than votes "for" such election shall tender his or her resignation for consideration by the Corporate Responsibility, Sustainability & Governance Committee. The Committee will recommend to the Board the action to be taken with respect to the resignation. The Board will publicly disclose its decision within 90 days of the certification of the election results.

Background information on the nominees as of July 20, 2018, including some of the attributes that led to their selection, appear below. The Corporate Responsibility, Sustainability & Governance Committee has determined that each director meets the qualification standards described in the section entitled "Director Nominations" above. In addition, the Board firmly believes that the experience, attributes, and skills of any single director nominee should not be viewed in isolation, but rather in the context of the experience, attributes, and skills that all director nominees bring to the Board as a whole, each of which contributes to the function of an effective Board.

## Nominees for Election by Class A Shareholders



**Cathleen A. Benko**

Ms. Benko, 59, a director since July 2018, is Vice Chairman and Managing Principal of Deloitte LLP ("Deloitte"), an organization that, through its subsidiaries and as part of a network of member firms, provides audit, consulting, tax, and advisory services to clients throughout the world. During her nearly 30-year career with Deloitte, Ms. Benko held many leadership roles, some concurrent with her most recent position as Vice Chairman and Managing Principal, a position she has held since 2011. From 2015 to 2018 she served as Senior Partner working with digital giants where she was the lead advisory partner for several digital-native companies. From 2010 to 2014, Ms. Benko served as Chief Digital, Brand, and Communications Officer. Previous to this role as Chief Digital, Brand, and Communications Officer she held multiple technology and talent management roles including serving as the company's first Vice Chairman and Chief Talent Officer from 2006 to 2010, its Chief Inclusion Officer from 2008 to 2010, and as Managing Principal, Initiative for the Retention and Advancement of Women, from 2003 to 2009. Ms. Benko led Deloitte's technology sector from 2003 to 2007 and was previously Deloitte's first Global e-Business Leader, a position she held from 1998 to 2002. Ms. Benko serves as a member of Catalyst's Board of Advisors and is chair of the Harvard Business School Advisory Council. Ms. Benko was selected to serve on the Board because her experience developing digital platforms, and working in the technology industry, and expertise in talent management and development, specifically within diversity and inclusion, make her a valuable addition to the Board.



**Elizabeth J. Comstock**

Ms. Comstock, 57, a director since 2011, is the former Vice Chair of General Electric Company ("GE"). Ms. Comstock led GE's efforts to accelerate new growth and operated GE Business Innovations, which included Current, GE Lighting, GE Ventures & Licensing and GE sales, marketing and communications. At GE, she was appointed Vice President, Communications, NBC News Communications in 1994, Senior Vice President, NBC Corporate Communications in 1996, Vice President of Corporate Communications in 1998, Corporate Vice President and Chief Marketing Officer

**NIKE, INC.** • *2018 Notice of Annual Meeting* **6**

PLF_000018

Sun Decl. Ex. 56, Page 9 of 54

Plaintiff's Trial Exhibit 336
Page 9 of 54

**CORPORATE GOVERNANCE**
PROPOSAL 1

in 2003, President, NBC Universal Integrated Media in 2006, and Senior Vice President, Chief Marketing and Commercial Officer in 2008. Prior to joining GE in 1994, Ms. Comstock held a succession of positions at NBC, CBS, and Turner Broadcasting. Ms. Comstock is a trustee of The National Geographic Society. Ms. Comstock was selected to serve on the Board because her broad experience in, and understanding of, media, marketing, and innovation aligns well with the Company's business model, which involves a great deal of each.



**John G. Connors**

Mr. Connors, 59, a director since 2005, is a partner in Ignition Partners LLC, a Seattle-area venture capital firm. Mr. Connors served as Senior Vice President and Chief Financial Officer of Microsoft Corporation ("Microsoft") from December 1999 to May 2005. He joined Microsoft in 1989 and held various management positions, including Corporate Controller from 1994 to 1996, Chief Information Officer from 1996 to 1999, and Vice President, Worldwide Enterprise Group in 1999. Mr. Connors is currently a member of the board of directors of Splunk, Inc. and privately held companies Chef, Inc., Motif Investing, Inc., FiREapps, Inc., ICERTIS, Inc., Tempered Networks Inc., Azuqua, Inc., LiveStories Inc., and KenSci Inc., and is on the Board of the Washington Policy Center and the University of Washington Tyee Club. Mr. Connors was selected to serve on the Board because his experience and skills in accounting, financial management, venture capital, technology, and international operations enable him to make valuable contributions to the Board.



**Timothy D. Cook**

Mr. Cook, 57, a director since 2005, is the Company's Lead Independent Director and is the Chief Executive Officer of Apple, Inc. ("Apple"). Mr. Cook joined Apple in March 1998 as Senior Vice President of Worldwide Operations and also served as its Executive Vice President, Worldwide Sales and Operations and Chief Operating Officer. Mr. Cook was Vice President, Corporate Materials for Compaq Computer Corporation from 1997 to 1998. Previous to his work at Compaq, Mr. Cook served in the positions of Senior Vice President Fulfillment and Chief Operating Officer of the Reseller Division at Intelligent Electronics from 1994 to 1997. Mr. Cook also worked for International Business Machines Corporation from 1983 to 1994, most recently as Director of North American Fulfillment. Mr. Cook is currently a member of the Board of Directors of the National Football Foundation and Apple. Mr. Cook also currently serves on the Board of Trustees for Duke University. Mr. Cook was selected to serve on the Board because his operational executive experience and his knowledge of technology, cyber security, marketing, and international business allow him to provide the Board with valuable perspectives and insights.



**John J. Donahoe II**

Mr. Donahoe, 58, a director since 2014, is President and Chief Executive Officer of ServiceNow, Inc. and also serves on its Board of Directors. Mr. Donahoe also serves as Chairman of PayPal Holdings, Inc. From 2008 through 2015, Mr. Donahoe served as President and Chief Executive Officer of eBay, Inc. ("eBay"), provider of the global eBay.com online marketplace and PayPal digital payments platform. Mr. Donahoe joined eBay in 2005 as President of eBay Marketplaces, responsible for eBay's global e-Commerce businesses, and was appointed President and Chief Executive Officer in 2008. Prior to joining eBay, Mr. Donahoe was the Chief Executive Officer and Worldwide Managing Director of Bain & Company from 1999 to 2005, and a Managing Director from 1992 to 1999. Mr. Donahoe currently serves on the Board of Trustees for The Bridgespan Group. He served on the Board of Directors of Intel Corporation from March 2009 until May 2017. Mr. Donahoe was selected to serve on the Board because his experience in executive and financial management, strategic planning, branding, technology, cyber security, and digital commerce allow him to provide valued perspectives on each of these areas of the Company's business.

**NIKE, INC.** °   *2018 Notice of Annual Meeting* **7**

PLF_000019

Sun Decl. Ex. 56, Page 10 of 54

Plaintiff's Trial Exhibit 336
Page 10 of 54

**CORPORATE GOVERNANCE**
PROPOSAL 1



**Peter B. Henry**

Mr. Henry, 48, a director since February 2018, is Dean Emeritus of New York University's Leonard N. Stern School of Business and William R. Berkley Professor of Economics and Finance. Mr. Henry assumed the Deanship of the Stern School of Business in January 2010 and served through December 2017. Prior to joining Stern, he was the Konosuke Matsushita Professor of International Economics at the Stanford University Graduate School of Business. In 2008, he led Barack Obama's Presidential Transition Team in its review of international lending agencies such as the IMF and the World Bank. In June 2009, President Obama appointed Mr. Henry to the President's Commission on White House Fellowships. Mr. Henry also serves on the Board of Directors of Citigroup, the National Bureau of Economic Research, and the Economic Club of New York and served on the Board of Directors of General Electric from July 2016 until April 2018. He is also a member of the Council on Foreign Relations and the Economic Advisory Panel of the Federal Reserve Bank of New York. Mr. Henry was selected to serve on the Board because of his extensive experience in economics, international finance and emerging markets, academia and governance, which allow him to provide valued perspectives on each of these areas of the Company's business.



**Travis A. Knight**

Mr. Knight, 44, a director since 2015, is the President and Chief Executive Officer of the animation studio, LAIKA, LLC ("LAIKA"), which specializes in feature-length films. He has been involved in all principal creative and business decisions at LAIKA since its founding in 2003, serving in successive management positions as Lead Animator, Vice President of Animation, and then as President and Chief Executive Officer in 2009. Mr. Knight was Producer and Director of the feature film Kubo and the Two Strings (2017) which was nominated for an Academy Award and winner of the BAFTA award for Best Animated Film. Mr. Knight has served as Producer and Lead Animator on Academy Award-nominated feature-length films The Boxtrolls (2014) and ParaNorman (2012, for which he won an Annie Award for Outstanding Achievement in Character Animation), and Lead Animator for Coraline (2009). Prior to his work at LAIKA, Mr. Knight held various animation positions at Will Vinton Studios from 1998 to 2002, as a stop-motion animator for television series, commercials, and network promotions. He has been recognized for his work on the Emmy Award-winning stop-motion animated television series The PJs. Mr. Knight serves on the Board of Directors of LAIKA. He is the son of NIKE's co-founder, Mr. Philip Knight, who currently serves as Chairman Emeritus. Mr. Travis Knight was selected to serve on the Board because of his creative and management experience, and because he has a significant role in the management of the Class A Stock owned by Swoosh, LLC, strengthening the alignment of the Board with the interests of NIKE shareholders.



**Mark G. Parker**

Mr. Parker, 62, is Chairman of the Board of Directors of the Company, and has served as President and CEO, and a director since 2006. He was named Chairman of the Board on June 30, 2016. Mr. Parker has been employed by NIKE since 1979 with primary responsibilities in product research, design and development, marketing, and brand management. He was appointed divisional Vice President in charge of product development in 1987, corporate Vice President in 1989, General Manager in 1993, Vice President of Global Footwear in 1998, and President of the NIKE Brand in 2001. Mr. Parker is currently a member of the Board of Directors of The Walt Disney Company. Mr. Parker was selected to serve on the Board because he has extensive knowledge and experience regarding Company operations, sports marketing, manufacturing, research, design, development, and management, and is an effective leader of NIKE. His position as CEO makes his position as Chairman of the Board critical.

**NIKE, INC.** ®    *2018 Notice of Annual Meeting* **8**

PLF_000020

Sun Decl. Ex. 56, Page 11 of 54

Plaintiff's Trial Exhibit 336
Page 11 of 54

**CORPORATE GOVERNANCE**
PROPOSAL 1



*John R. Thompson, Jr.*

Mr. Thompson, 76, a director since 1991, was head coach of the Georgetown University men's basketball team from 1972 until 1998. Mr. Thompson was head coach of the 1988 United States Olympic basketball team. He hosted a sports radio talk show in Washington, D.C. for 13 years, and is a nationally broadcast sports analyst for Turner Network Television (TNT) and Dial Global, Inc. He serves as Assistant to the President of Georgetown University for Urban Affairs and he is a past President of the National Association of Basketball Coaches and presently serves on its Board of Governors. Mr. Thompson has honorary doctorate degrees from Wheeling Jesuit University, Georgetown University, University of the District of Columbia, and St. Peter's College. Mr. Thompson was selected to serve on the Board because his extensive experience and knowledge of education, college and professional sports, media, broadcasting, and knowledge of urban issues allow him to provide valuable insights to the Board regarding sports marketing, corporate responsibility and diversity.

## Board Recommendation

**The Board of Directors recommends that the Class A Shareholders vote FOR the election of nominees above to the Board of Directors.**

NIKE, INC. ◦  *2018 Notice of Annual Meeting* **9**

PLF_000021

Sun Decl. Ex. 56, Page 12 of 54

Plaintiff's Trial Exhibit 336
Page 12 of 54

**CORPORATE GOVERNANCE**
PROPOSAL 1

## Nominees for Election by Class B Shareholders



**Alan B. Graf, Jr.**

Mr. Graf, 64, a director since 2002, is the Executive Vice President and Chief Financial Officer of FedEx Corporation ("FedEx"), a position he has held since 1998, and is a member of FedEx's Executive Committee. Mr. Graf joined FedEx in 1980 and was Senior Vice President and Chief Financial Officer for FedEx Express, FedEx's predecessor, from 1991 to 1998. He previously served on the board of directors of Kimball International Inc., Storage USA, Inc., and Arkwright Mutual Insurance Co., and he is currently a director of Mid-America Apartment Communities, Inc., Methodist Le Bonheur Healthcare, and the Indiana University Foundation. In March 2017, Mr. Graf was selected as the Chairman of the University of Memphis Board of Trustees. Mr. Graf was selected to serve on the Board because his experience and skills in auditing, accounting, financial management, executive leadership, and international operations enable him to effectively provide the Board with valuable perspectives and insights.



**John C. Lechleiter**

Dr. Lechleiter, 64, a director since 2009, is the Chairman Emeritus of Eli Lilly and Company ("Lilly"). He served as President and Chief Executive Officer of Lilly from 2008 until his retirement in December 2016. He also served as a member of Lilly's board from 2005 to May 2017 and as Chairman of Lilly's board from January 2009 to May 2017. Dr. Lechleiter began work at Lilly as a senior organic chemist in Lilly's process research and development division in 1979 and became head of that department in 1982. He later held roles in project management, regulatory affairs, product development, and pharmaceutical operations. In 2005, he was named President and Chief Operating Officer and joined the Lilly board of directors. He became President and Chief Executive Officer in 2008 and became Chairman of the Board in 2009. He is a member of the American Chemical Society. He is a member emeritus of the board of the Central Indiana Corporate Partnership. He also serves on the boards of Ford Motor Company, the Indiana Economic Development Corporation and United Way Worldwide. Dr. Lechleiter was selected to serve on the Board because his operational executive experience and his knowledge of science, marketing, management, and international business allow him to provide the Board with significant contributions in those strategic areas.



**Michelle A. Peluso**

Ms. Peluso, 46, a director since 2014, is Senior Vice President and Chief Marketing Officer at IBM. She served as Chief Executive Officer of online shopping destination Gilt Groupe, Inc. ("Gilt") from 2013 until its sale to Hudson's Bay Company in February 2016, and was on Gilt's board of directors from 2009 to 2016. Prior to joining Gilt in 2013, she served as Global Consumer Chief Marketing and Internet Officer of Citigroup Inc. from 2009 to 2013, and from 2002 to 2009, Ms. Peluso held senior management positions at Travelocity.com LP, being appointed Chief Operating Officer in 2003, and President and Chief Executive Officer in December 2003. Prior to joining Travelocity, in 1999 she founded Site59, an online travel site, serving as its Chief Executive Officer until its acquisition by Travelocity in 2002. Ms. Peluso was a director of OpenTable, Inc. from 2008 to 2012 and is a director of the nonprofit TechnoServe and Tech:NYC. She also is a Strategic Advisor at Technology Crossover Ventures. Ms. Peluso was selected to serve on the Board because of her extensive experience in and, understanding of, online retail, marketing, branding, and digital connections with consumers, which are integral components of the Company's growth strategy.

## Board Recommendation

**The Board of Directors recommends that the Class B Shareholders vote FOR the election of nominees above to the Board of Directors.**

**NIKE, INC.** • *2018 Notice of Annual Meeting* **10**

PLF_000022

Sun Decl. Ex. 56, Page 13 of 54

Plaintiff's Trial Exhibit 336
Page 13 of 54

**CORPORATE GOVERNANCE**

# Director Compensation for Fiscal 2018

| Name | Fees Earned or Paid in Cash ($) | Stock Awards [1][2] ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Other Compensation [3] ($) | Total ($) |
|---|---|---|---|---|---|
| Elizabeth J. Comstock | 90,000 | 165,049 | — | — | 255,049 |
| John G. Connors | 101,882 | 165,049 | — | 20,000 | 286,931 |
| Timothy D. Cook | 130,000 | 165,049 | — | 20,000 | 315,049 |
| John J. Donahoe II | 95,000 | 165,049 | — | — | 260,049 |
| Alan B. Graf, Jr. | 115,000 | 165,049 | — | — | 280,049 |
| Peter B. Henry | 26,250 [4] | 165,013 | — | — | 191,263 |
| Travis A. Knight | 90,000 | 165,049 | — | — | 255,049 |
| John C. Lechleiter | 105,000 | 165,049 | — | 20,000 | 290,049 |
| Michelle A. Peluso | 92,294 | 165,049 | — | 14,285 | 271,628 |
| Johnathan A. Rodgers | 90,000 | 165,049 | — | — | 255,049 |
| John R. Thompson, Jr. | 72,000 | 165,049 | — | 41,984 | 279,033 |
| Phyllis M. Wise | 32,308 [5] | — | — | — | 52,308 |

(1) *Represents the grant date fair value of restricted stock awards granted in fiscal 2018 computed in accordance with accounting guidance applicable to stock-based compensation. The grant date fair value is based on the closing market price of our Class B Stock on the grant date. As of May 31, 2018, non-employee directors held the following number of outstanding shares of unvested restricted stock: Ms. Comstock, 3,103; Mr. Connors, 3,103; Mr. Cook, 3,103; Mr. Donahoe, 3,103; Mr. Graf, 3,103; Mr. Henry, 2,416; Mr. Knight, 3,103; Dr. Lechleiter, 3,103; Ms. Peluso, 3,103; Mr. Rodgers, 3,103; and Mr. Thompson, 3,103.*

(2) *As of May 31, 2018, non-employee directors held outstanding options for the following number of shares of our Class B Stock: Ms. Comstock, 90,000; Mr. Connors, 90,000; Mr. Cook, 90,000; Dr. Lechleiter, 126,000; and Mr. Thompson, 90,000.*

(3) *Includes matched contributions to charities in the following amounts: Mr. Connors, $20,000; Mr. Cook, $20,000; Dr. Lechleiter, $20,000; Ms. Peluso, $14,285; Mr. Thompson, $20,000; and Dr. Wise, $20,000. Also includes medical and life insurance premiums paid by the Company of $21,984 for Mr. Thompson.*

(4) *Mr. Henry was appointed to the Board of Directors on February 14, 2018 (includes prorated annual retainer payments).*

(5) *Dr. Wise did not stand for re-election at our 2017 annual meeting of shareholders and retired effective September 21, 2017 (includes prorated annual retainer payments).*

## Director Fees and Arrangements

Under our standard director compensation program in effect for fiscal 2018, non-employee directors received:

- An annual retainer of $90,000, paid in quarterly installments.
- Upon appointment, a one-time, sign-on restricted stock award valued at $165,000 on the date of grant, generally, the date of appointment. The one-time, sign-on restricted stock award is subject to forfeiture in the event that service as a director terminates prior to anniversary of the date of grant.
- An annual restricted stock award valued at $165,000 on the date of grant, generally, the date of each annual meeting of shareholders. The annual restricted stock award is subject to forfeiture in the event that service as a director terminates prior to the next annual meeting.
- For the Lead Independent Director, an annual retainer of $25,000, paid in quarterly installments.
- For chairs of board committees (other than the Executive Committee), an annual retainer of $15,000 for each committee chaired ($20,000 for the chair of the Audit & Finance Committee), paid in quarterly installments.
- For Audit & Finance Committee members, an additional annual retainer of $5,000, paid in quarterly installments.
- Payment or reimbursement of travel and other expenses incurred in attending Board meetings.
- Matching charitable contributions under the NIKE Matching Gift Program, under which directors are eligible to contribute to qualified charitable organizations and the Company provides a matching contribution to the charities in an equal amount, up to $20,000 in the aggregate, for each director annually.

In fiscal 2018, Mses. Comstock and Peluso, Messrs. Connors, Cook, Donahoe, Graf, Henry, Knight, and Rodgers, and Dr. Lechleiter participated in our standard director compensation program as described above, and Dr. Wise participated in our standard director compensation program prior to her retirement. Mr. Parker does not receive any compensation for his Board service or his position as Chairman of the Board.

Mr. Thompson does not participate in our standard director compensation program. In fiscal 2018, pursuant to his election made in fiscal 2000, Mr. Thompson received an annual retainer of $72,000 (instead of the $90,000 annual retainer fee paid under our standard program), medical insurance, and $500,000 of life insurance coverage paid for by the Company. Additionally, on September 21, 2017, the date of the 2017 annual meeting of shareholders, Mr. Thompson received an annual restricted stock award valued at $165,000 on the same terms as apply to the restricted stock awards granted pursuant to our standard program. He is also eligible for payment or reimbursement of board-related expenses, and participation in the NIKE Matching Gift Program on the same basis as other directors.

**NIKE, INC.** ▪ *2018 Notice of Annual Meeting* **11**

PLF_000023

Sun Decl. Ex. 56, Page 14 of 54

Plaintiff's Trial Exhibit 336
Page 14 of 54

**CORPORATE GOVERNANCE**

Effective June 1, 2018, the Company changed the standard director compensation program by increasing the annual retainer to $100,000 per year, increasing the value of the annual restricted stock award to $175,000 on the date of grant, increasing the value of the one-time, sign-on restricted stock award to $175,000 on the date of grant for newly appointed non-employee directors, and increasing the annual leadership retainers for the Lead Independent Director and the chairs of Board committees (other than the chair of the Executive Committee) by $5,000, resulting in the following annual leadership retainers: Lead Independent Director, $30,000; Audit & Finance Committee Chair, $25,000; Compensation Committee Chair, $20,000; and Corporate Responsibility, Sustainability & Governance Committee Chair, $20,000. The Company made these changes to the director compensation program to maintain the competitiveness of the Company's director compensation program and to reinforce our directors' ability to meet the stock ownership guidelines described below.

Effective June 1, 2018, and in connection with the changes to the standard director compensation program described above, Mr. Thompson's annual retainer increased to $82,000 and the value of his annual restricted stock award increased to $175,000 on the date of the grant. His other compensation, including medical and life insurance, payment or reimbursement of board-related expenses, and participation in the NIKE Matching Gift Program remain unchanged.

## Stock Ownership Guidelines for Directors

NIKE maintains stock ownership guidelines for all non-employee directors. Under these guidelines, directors are required to hold NIKE stock valued at five times their annual cash retainer. New directors are required to attain these ownership levels within five years of their election to the Board. Each of our directors has met or is on track to meet the specified ownership level.

## Director Participation in Deferred Compensation Plan

Under our Deferred Compensation Plan, non-employee directors may elect in advance to defer up to 100 percent of the director fees paid by the Company. For a description of the plan, see "Non-Qualified Deferred Compensation in Fiscal 2018" below. In addition, in fiscal 2000, Mr. Thompson received credits to a fully vested NIKE stock account under the Deferred Compensation Plan in exchange for his waiver of rights to future payments under a former non-employee director retirement program. The Class B Stock credited to Mr. Thompson's account is distributed to him upon his retirement from the Board and the account is credited with quarterly dividends until distributed.

**NIKE, INC.**   *2018 Notice of Annual Meeting* **12**

PLF_000024

Sun Decl. Ex. 56, Page 15 of 54

Plaintiff's Trial Exhibit 336
Page 15 of 54

**CORPORATE GOVERNANCE**

# Stock Holdings of Certain Owners and Management

The following table sets forth the number of shares of the classes of NIKE securities beneficially owned, as of June 30, 2018, after giving effect to any transactions that occurred on such date, by (i) each person known to the Company to be the beneficial owner of more than 5 percent of any class of the Company's securities, (ii) each of the directors and nominees for director, (iii) each executive officer listed in the Summary Compensation Table ("Named Executive Officers"), and (iv) all nominees, Named Executive Officers, and other executive officers as a group. Because Class A Stock is convertible into Class B Stock on a share-for-share basis, each beneficial owner of Class A Stock is deemed by the SEC to be a beneficial owner of the same number of shares of Class B Stock. Therefore, in indicating a person's beneficial ownership of shares of Class B Stock in the table, it has been assumed that such person has converted into Class B Stock all shares of Class A Stock of which such person is a beneficial owner. For these reasons the table contains substantial duplications in the numbers of shares and percentages of Class A and Class B Stock shown for Swoosh, LLC, Philip H. Knight, the Travis A. Knight 2009 Irrevocable Trust II, and Travis A. Knight in his capacity as the Trustee of such Trusts. In addition, unless otherwise indicated, all persons named below can be reached c/o Ann M. Miller, Vice President, Corporate Secretary & Chief Compliance Officer, NIKE, Inc., One Bowerman Drive, Beaverton, Oregon 97005-6453.

| | Title of Class | Shares Beneficially Owned [1] | Percent of Class [2] |
|---|---|---|---|
| Cathleen A. Benko | Class B | — [3] | — |
| Elizabeth J. Comstock | Class B | 102,763 [4] | — |
| John G. Connors | Class B | 128,603 [4] | — |
| Timothy D. Cook | Class B | 108,763 [4] | — |
| John J. Donahoe II | Class B | 16,995 | — |
| Alan B. Graf, Jr. | Class B | 195,715 | — |
| Peter B. Henry | Class B | 2,416 | — |
| Travis A. Knight | Class A | 38,856,369 [6] | 11.8% |
| | Class B | 38,874,592 [6] | 3.0% |
| John C. Lechleiter | Class B | 157,763 [4] | — |
| Mark G. Parker [7] | Class B | 4,927,444 [4][8] | 0.4% |
| Michelle A. Peluso | Class B | 17,099 | — |
| Johnathan A. Rodgers | Class B | 134,763 [4] | — |
| John R. Thompson, Jr. | Class B | 77,946 [5] | — |
| Andrew Campion [7] | Class B | 437,191 | — |
| Eric D. Sprunk [7] | Class B | 384,187 [4] | — |
| Hilary K. Krane [7] | Class B | 492,390 [4][3] | — |
| John F. Slusher [7] | Class B | 899,067 [4][8] | — |
| Trevor A. Edwards [7] | Class B | 1,796,180 [4][8] | 0.1% |
| **Sojitz Corporation of America** | | | |
| 1211 S.W. 5th Ave, Pacwest Center, Ste. 2220, Portland, OR 97204 | Preferred [8] | 300,000 | 100.0% |
| **Philip H. Knight** | Class A | 26,054,487 | 7.9% |
| One Bowerman Drive, Beaverton, OR 97005 | Class B | 45,065,174 [10] | 3.5% |
| **Swoosh, LLC** | Class A | 255,000,000 [11] | 77.5% |
| 22990 NW Bennett Street, Hillsboro, OR 97124 | Class B | 255,000,000 | 16.7% |
| **Travis A. Knight 2009 Irrevocable Trust II** | Class A | 38,856,369 [6] | 11.8% |
| 22990 NW Bennett Street, Hillsboro, OR 97124 | Class B | 38,856,369 [6] | 3.0% |
| **The Vanguard Group** | | | |
| 100 Vanguard Blvd., Malvern, PA 19355 | Class B | 101,511,950 [12] | 7.8% |
| **BlackRock, Inc.** | | | |
| 40 East 57th Street, New York, NY 10022 | Class B | 79,221,723 [13] | 6.1% |
| **All directors and executive officers as a group (21 persons)** | Class A | 38,856,369 [6][14] | 11.8% |
| | Class B | 49,430,605 [4][6][14] | 3.9% |

(1)  A person is considered to beneficially own any shares: (a) over which the person exercises sole or shared voting or investment power, or (b) of which the person has the right to acquire beneficial ownership at any time within 60 days (such as through conversion of securities or exercise of stock options). Unless otherwise indicated, voting and investment power relating to the above shares is exercised solely by the beneficial owner or shared by the owner and the owner's spouse or children.

(2)  Omitted if less than 0.1 percent.

(3)  Ms. Benko received a one-time, sign-on restricted stock award valued at $175,000 effective July 12, 2018, the date of her appointment to the Board. This award is consistent with the Company's standard director compensation program in effect for fiscal 2019.

PLF_000025

Sun Decl. Ex. 56, Page 16 of 54

Plaintiff's Trial Exhibit 336
Page 16 of 54

## CORPORATE GOVERNANCE

(4) *These amounts include the right to acquire, pursuant to the exercise of stock options, within 60 days after June 30, 2018, the following numbers of shares: 90,000 shares for Ms. Comstock, 90,000 shares for Mr. Connors, 90,000 shares for Mr. Cook, 126,000 shares for Dr. Lechleiter, 3,611,250 shares for Mr. Parker, 122,000 shares for Mr. Rodgers, 406,250 shares for Mr. Campion, 343,750 shares for Mr. Sprunk, 370,000 shares for Ms. Krane, 785,000 shares for Mr. Slusher, 1,335,000 shares for Mr. Edwards, and 7,394,250 shares for the executive officer and director group.*

(5) *Includes 33,183 shares credited to Mr. Thompson's account under the NIKE, Inc. Deferred Compensation Plan.*

(6) *Includes 19,713,989 shares of Class A Stock held directly by the Travis A. Knight 2009 Irrevocable Trust II (the "Trust"), of which Mr. Travis Knight is the Trustee, and 19,142,380 shares of Class A Stock held by an indirect subsidiary of the Trust. Mr. Knight and members of his immediate family are among the beneficiaries of the Trust. Mr. Knight disclaims beneficial ownership of the Company's securities held directly and indirectly by the Trust, except to the extent of his pecuniary interest therein. On June 30, 2016, a wholly owned subsidiary of the Trust acquired all of the voting units in Swoosh, LLC. Mr. Knight disclaims beneficial ownership of all securities held by Swoosh, LLC.*

(7) *Named Executive Officer listed in the Summary Compensation Table.*

(8) *Includes shares held in accounts under the NIKE, Inc. 401(k) and Profit Sharing Plan for Messrs. Parker, Slusher, Edwards, and Ms. Krane in the amounts of 35,640, 2,747, 18,840, and 116, respectively.*

(9) *Preferred Stock does not have general voting rights except as provided by law, and under certain circumstances as provided in the Company's Restated Articles of Incorporation, as amended.*

(10) *Does not include: (a) 521,792 shares of Class A Stock that are owned by Mr. Philip Knight's spouse, and (b) 2,836,056 shares of Class B Stock held by the Knight Foundation, a charitable foundation in which Mr. Philip Knight and his spouse are directors. Mr. Philip Knight has disclaimed ownership of all such shares. Mr. Philip Knight holds the position Chairman Emeritus, and has a standing invitation to attend all meetings of the Board as a non-voting observer.*

(11) *Information provided as of July 7, 2017 in the Form 4 filed by the shareholder.*

(12) *Information provided as of February 9, 2018 in Schedule 13G filed by the shareholder.*

(13) *Information provided as of February 8, 2018 in Schedule 13G filed by the shareholder.*

(14) *These amounts do not include shares owned by Mr. Philip Knight who retired from the Board in 2016.*

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires the Company's directors and executive officers, and persons who own more than 10 percent of a registered class of the Company's equity securities, to file with the SEC and the NYSE, initial reports of ownership and reports of changes in ownership of Common Stock and other equity securities of the Company. Officers, directors, and greater than 10 percent shareholders are required by the regulations of the SEC to furnish the Company with copies of all Section 16(a) forms they file. To the Company's knowledge, based solely on review of the copies of such reports furnished to the Company and written representations that no other reports were required, during fiscal 2018 all Section 16(a) filing requirements applicable to its officers, directors, and greater than 10 percent beneficial owners were complied with.

## Transactions with Related Persons

In fiscal 2018, two of Mr. Parker's siblings, each with over 25 years of service to the Company, were employed by the Company in non-executive roles. Ann Parker was a Design Talent Scout, and Stephen Parker held a Vice President role with Converse. During fiscal 2018, the Company paid aggregate compensation to Stephen Parker in the amount of $486,535, comprised of salary, bonuses, the value of stock awards granted during the fiscal year, a valued service award and associated tax reimbursement, profit sharing and matching contributions to Company-sponsored retirement plan. Additionally, the Company paid aggregate compensation to Ann Parker in the amount of approximately $487,367, comprised of approximately $306,037 paid in connection with her termination of service as well as the compensation components listed above. The compensation and benefits received by each of Mr. Parker's siblings, including the separation benefits received by Ann Parker and the 30th anniversary service award received by Stephen Parker, were consistent with compensation paid to other similarly situated employees.

Eric Sprunk's daughter, Nicole Sprunk, was employed by the Company in a non-executive role in fiscal 2018 as a Brand Director. During fiscal 2018, the Company paid aggregate compensation to Nicole Sprunk of $196,748, comprised of salary, bonus, the value of stock granted, profit sharing and matching contributions to the Company-sponsored retirement plan. The compensation and benefits received by Nicole Sprunk were consistent with compensation paid to other employees holding similar positions.

Philip H. Knight, the father of NIKE director Travis A. Knight, serves as Chairman Emeritus, which provides a standing invitation for Philip H. Knight to attend meetings of the Board and its committees as a non-voting observer. As Chairman Emeritus, Mr. Knight receives an annual salary of $500,000, and medical and dental insurance coverage generally available to employees. In fiscal 2018, Philip H. Knight received $516,819, comprised of salary, profit sharing and matching contributions to Company-sponsored retirement plans.

The Company's written policy requires the Corporate Responsibility, Sustainability & Governance Committee to review any transaction or proposed transaction with a related person that would be required to be reported under Item 404(a) of Regulation S-K, and to determine whether to ratify or approve the transaction, with ratification or approval to occur only if the Committee determines that the transaction is fair to the Company or that approval or ratification of the transaction is in the interest of the Company.

PLF_000026

Sun Decl. Ex. 56, Page 17 of 54

Plaintiff's Trial Exhibit 336

Page 17 of 54

**CORPORATE GOVERNANCE**

## Compensation Committee Interlocks and Insider Participation

The members of the Compensation Committee of the Board of Directors during fiscal 2018 were Timothy D. Cook, Elizabeth J. Comstock, John C. Lechleiter, and Johnathan A. Rodgers. The Committee is composed solely of independent, non-employee directors. No member of the Compensation Committee has been an executive officer of the Company, and no member of the Compensation Committee had any relationships requiring disclosure by the Company under the SEC's rules requiring disclosure of certain relationships and related-party transactions. None of the Company's executive officers served as a director or member of a compensation committee (or other committee serving an equivalent function) of any other entity, the executive officers of which served as a director or member of the Compensation Committee of the Company during fiscal 2018.

**NIKE, INC.** ®   *2018 Notice of Annual Meeting* **15**

PLF_000027

Sun Decl. Ex. 56, Page 18 of 54

Plaintiff's Trial Exhibit 336
Page 18 of 54

COMPENSATION DISCUSSION AND ANALYSIS

COMPENSATION DISCUSSION AND ANALYSIS

# Executive Summary

This Compensation Discussion and Analysis explains our compensation philosophy, summarizes our compensation programs, and reviews compensation decisions for our Chief Executive Officer, our Chief Financial Officer, and our next three most highly compensated executive officers who were serving as executive officers on May 31, 2018 (collectively, the "Continuing Officers"), and one former executive officer who would have been one of the three most highly compensated executive officers if he was serving as an executive officer on May 31, 2018. These individuals are referred to throughout this proxy statement as the "Named Executive Officers". The Named Executive Officers for fiscal 2018 were:

- Mark G. Parker, Chairman, President and Chief Executive Officer

- Andrew Campion, Executive Vice President and Chief Financial Officer

- Eric D. Sprunk, Chief Operating Officer

- Hilary K. Krane, Executive Vice President, Chief Administrative Officer and General Counsel

- John F. Slusher, Executive Vice President, Global Sports Marketing

- Trevor A. Edwards, Former President, NIKE Brand

Mr. Edwards resigned as President, NIKE Brand, effective March 15, 2018, and will retire from the Company in August 2018.

Our executive compensation program, similar to our non-executive compensation programs, is aligned with our business strategy and our culture and is designed to attract and retain top talent, reward business results and performance, viewed holistically, and most importantly, maximize shareholder value. Our total compensation program for the Named Executive Officers is highly incentive-based and competitive in the marketplace, with Company performance determining a significant portion of total compensation.

## Executive Compensation Governance Practices

To achieve the objectives of our executive compensation program and emphasize pay-for-performance principles, the Compensation Committee of the Board of Directors (the "Committee") employs strong governance practices as outlined in the table below.

| We Do | We Don't Do |
|---|---|
| ✓ Base a majority of total compensation on performance and retention incentives | ✗ Retirement acceleration for restricted stock or restricted stock units ("RSUs") |
| ✓ Set annual and long-term incentive targets based on clearly disclosed, objective performance measures | ✗ Payments of accumulated dividends on unearned RSUs until and unless shares are earned |
| ✓ Mitigate undue risk associated with compensation by using multiple performance targets, caps on potential incentive payments, and a clawback policy | ✗ Repricing of options without shareholder approval |
| | ✗ Permit hedging transactions or short sales by executive officers |
| ✓ Require executive officers to hold NIKE stock through stock ownership guidelines | ✗ Significant perquisites |
| | ✗ Tax gross-ups for perquisites |
| ✓ Vest equity awards over time to promote retention with a minimum of one year vesting | ✗ Pension or supplemental executive retirement plan |
| | ✗ Employment contracts |
| ✓ Provide double-trigger change-in-control equity acceleration | ✗ Cash-based change-in-control benefits |
| ✓ Conduct annual "say-on-pay" advisory votes | ✗ Excise tax gross-ups upon change of control |

## Consideration of Say-on-Pay Vote Results

The non-binding advisory proposal regarding compensation of the Named Executive Officers submitted to shareholders at our 2017 annual meeting was approved by 94% of the votes cast. The Committee believes this favorable outcome conveyed our shareholders' support of our executive compensation program and the Committee's decisions. After considering the shareholder vote and other factors in its annual review of our total executive compensation programs, the Committee made no material changes in the structure of our compensation programs. The Committee will continue to consider the outcome of the Company's say-on-pay votes when conducting its regular practice of evaluating the executive compensation program and making future compensation decisions for the Named Executive Officers.

**NIKE, INC.** ▪ *2018 Notice of Annual Meeting* **16**

PLF_000028

Sun Decl. Ex. 56, Page 19 of 54

Plaintiff's Trial Exhibit 336
Page 19 of 54

**COMPENSATION DISCUSSION AND ANALYSIS**

## Financial Highlights

NIKE delivered solid performance in fiscal 2018. Earnings per share, however, was impacted by the Tax Cuts and Jobs Act. The charts below set forth certain key financial results that were used in connection with determining payouts for our Named Executive Officers under our incentive compensation plans for fiscal 2018. The measures below are based on NIKE's comparable publicly reported financial results.



[1] Excluded from the 2018 result was the income tax benefit ($0.14 per share) from adoption of a stock compensation accounting change in the first quarter of fiscal 2018 (Financial Accounting Standards Board ("FASB") Accounting Standard Update 2016-09).

## Executive Compensation Highlights

The total compensation for each of the Named Executive Officers is shown in the Summary Compensation Table on page 28. While we describe executive compensation in greater detail throughout this Compensation Discussion and Analysis, key actions the Committee took in fiscal 2018 are highlighted below:

- **Base Salary.** Based on the recommendation by the Committee, which was approved by the independent members of the Board in June 2017, Mr. Parker's base salary remained the same at $1,550,000. Base salaries for Messrs. Campion and Sprunk increased to $975,000 and $1,100,000, respectively. Base salaries for Ms. Krane and Mr. Slusher were each set at $900,000. Mr. Edwards' base salary increased to $1,200,000.

- **Performance-Based Annual Incentive Plan.** Target awards for Messrs. Parker, Campion, and Sprunk remained the same. Target awards for Ms. Krane and Mr. Slusher were each set at 90%. Mr. Edwards' target remained the same. Based on financial performance goals set by the Committee in June 2017 and actual performance results, no Named Executive Officer was paid an annual cash incentive award for fiscal 2018.

- **Performance-Based Long-Term Incentive Plan.** The target awards for the fiscal 2018-2020 performance period were set in June 2017. The target award for Mr. Parker remained the same at $3,500,000, and target awards for Messrs. Campion and Sprunk each increased to $1,000,000. Target awards for Ms. Krane and Mr. Slusher were each set at $700,000. Mr. Edward's target award increased to $1,500,000. Based on long-term financial performance goals set by the Committee in June 2015 and actual performance results, each Named Executive Officer received a payout for the fiscal 2016-2018 performance period of 37% of target. In addition, each Continuing Officer received a discretionary cash bonus equal to 37% of his or her performance-based LTIP target, as further described in "Elements of Our Compensation Program - Performance-Based Long Term Cash Incentive".

- **Stock Options.** The annual awards for Messrs. Parker, Campion, and Sprunk remained the same 165,000, 75,000, and 85,000 option shares, respectively. Ms. Krane and Mr. Slusher were each awarded 70,000 option shares. Each award vests in equal annual installments over four years. Mr. Edwards' annual award remained the same at 100,000 option shares and will be eligible for continued vesting upon Mr. Edwards' retirement in August 2018, based on his age and years of service, as further described in "Stock Options".

- **Restricted Stock.** The annual award value for Mr. Parker remained the same, and award values for Messrs. Campion and Sprunk increased to $1,000,000. Ms. Krane's award value was set at $850,000. Mr. Slusher's award value was set at $750,000. Mr. Edwards' annual award value increased to $1,200,000. Each award vests in equal annual installments over three years. This award will not fully vest for Mr. Edwards given his retirement in August 2018.

- **Restricted Stock Unit Retention Awards.** In July 2017, Messrs. Campion and Sprunk each received a retention award of restricted stock units ("RSUs") in the amount of $6,000,000. Ms. Krane and Mr. Slusher each received a retention award of RSUs in the amount of $4,000,000. Mr. Edwards received a retention award of RSUs in the amount of $6,000,000. Mr. Parker did not receive any retention award. These awards are intended to further promote retention of key leaders while simultaneously providing incentives consistent with driving shareholder value. They are scheduled to vest in full on the third anniversary of the grant date. The awards have no value to the recipients unless they remain employed with the Company for the full vesting period. Mr. Edwards' retention award will be forfeited in full as his retirement in August 2018 will precede the vesting date.

**NIKE, INC.** • *2018 Notice of Annual Meeting* **17**

PLF_000029

Sun Decl. Ex. 56, Page 20 of 54

Plaintiff's Trial Exhibit 336

Page 20 of 54

**COMPENSATION DISCUSSION AND ANALYSIS**

# Operation of the Compensation Committee

The Committee evaluates the performance of the CEO against goals and objectives reviewed and approved by the Committee. Based on the evaluation, the Committee Chair discusses the CEO's performance and recommended compensation with the independent members of the Board. The CEO's base salary and the base salaries of the other Named Executive Officers are approved by the independent members of the Board based on the Committee's recommendation. The Committee has sole responsibility for all other elements of Named Executive Officer compensation. The Committee also reviews the performance evaluation of each Named Executive Officer and oversees the administration of our executive compensation programs. The Committee receives recommendations from the CEO as to compensation of other Named Executive Officers, and the CEO participates in Committee discussions regarding the compensation of those officers. The Committee meets in executive session without the CEO to determine his compensation. The Committee is currently comprised of Timothy D. Cook (Chairman), Elizabeth J. Comstock, and Johnathan A. Rodgers, each of whom is an independent director under applicable NYSE listing standards. The Committee operates pursuant to a written charter that is available on our website at: *http://investors.nike.com* .

Each year, the Committee reviews our executive compensation program to ensure it continues to reflect the Committee's commitment to align the objectives and rewards of our executive officers with the creation of value for our shareholders. Similar to our non-executive compensation programs, the program has been designed to reinforce our pay-for-performance philosophy by delivering total compensation that motivates and rewards short- and long-term financial performance to maximize shareholder value, and to be externally competitive to attract and retain outstanding and diverse executive talent. This is done much in the same way our human resources staff designs our non-executive compensation programs, to ensure they are market competitive, offer performance-based financial incentives, and provide opportunities to share in total Company success through competitive benefits, employee stock purchase programs, and broad-based profit sharing. In conducting its annual review, the Committee considers information provided by our human resources staff. Our human resources staff retains independent compensation consulting firms to provide surveys and reports containing competitive market data. These consultants do not formulate executive compensation strategies for NIKE or recommend individual executive compensation. The human resources staff uses the surveys and reports to make recommendations to the Committee concerning executive compensation. The Committee relies on its collective experience and judgment along with the recommendations prepared by our human resources staff to set executive compensation. The Committee has the authority, in its sole discretion, to retain compensation consultants to assist the Committee in evaluating the compensation of executive officers, but chose to not retain any such consultants in fiscal 2018.

## Use of Market Survey Data

To help establish competitive ranges of base salary, incentive compensation opportunities, and target total compensation for the purpose of making recommendations to the Committee, our human resources staff uses competitive market data from surveys and reports prepared by Aon Hewitt and Willis Towers Watson. We consider market survey data from a peer group of companies that have similar revenue size, market capitalization, brand value, products, or markets, or with which we compete for executive talent. For purposes of setting executive compensation for fiscal 2018, the companies in our peer group were unchanged from fiscal 2017 and consisted of the following:

| | | |
|---|---|---|
| Alphabet Inc. | Kellogg Company | Procter & Gamble Company |
| The Coca-Cola Company | Kimberly-Clark Corporation | Starbucks Corporation |
| Colgate-Palmolive Company | Macy's, Inc. | Target Corporation |
| eBay Inc. | McDonald's Corporation | Time Warner Inc. |
| FedEx Corporation | Mondelez International, Inc. | TJX Companies |
| The Gap, Inc. | Pepsico, Inc. | The Walt Disney Company |

The surveys that our human resources staff reviews show percentile compensation levels for various executive positions with comparable job responsibilities. The staff also analyzes market data regarding compensation mix among base salary, annual incentive and long-term incentives such as performance-based cash awards, stock options, restricted stock and restricted stock unit awards. The Committee reviews this mix analysis when evaluating the separate compensation elements for each executive. The Committee does not endeavor to set executive compensation at or near any particular percentile, and it considers target total compensation to be competitive if it is generally within a reasonable range of the market median. Market data is one of many factors that the Committee considers in the determination of executive compensation levels. Other factors include internal pay equity, level of responsibility, the individual's performance viewed holistically, expectations regarding the individual's future potential contributions, ability to drive the Company's culture and ethics with integrity, succession planning and retention strategies, budget considerations, and the Company's performance.

In November 2017, we conducted our regular periodic review of our peer group. Based on the criteria described above, we determined that for purposes of setting executive compensation for fiscal 2019, the peer group above should be refined to include Microsoft Corporation and Comcast Corporation, and to remove Alphabet Inc. and eBay Inc.

**NIKE, INC.** ®    *2018 Notice of Annual Meeting* **18**

PLF_000030

Sun Decl. Ex. 56, Page 21 of 54

Plaintiff's Trial Exhibit 336
Page 21 of 54

COMPENSATION DISCUSSION AND ANALYSIS

# Objectives and Elements of Our Compensation Program

As noted in the Executive Summary, our executive compensation program is aligned with our business strategy and our culture and is designed to attract and retain top talent, reward business results and performance, viewed holistically, and most importantly, maximize shareholder value. Our holistic view of performance considers the individual's ability to deliver business results, engage and motivate our employees, their leadership capacity, ability to drive the Company's culture and ethics with integrity, and commitment to diversity and inclusion. Our total compensation program for the Named Executive Officers is highly incentive-based and competitive in the marketplace, with Company performance determining a significant portion of total compensation. The key elements of our program consist of the following:

- Base salary that reflects the executive's accountabilities, skills, experience, performance, and future potential
- Performance-based annual cash incentive based on Company financial results under our Executive Performance Sharing Plan
- A portfolio approach to long-term incentive compensation to provide a balanced mix of performance-based cash incentives and equity, including:
    - Performance-based long-term cash incentive based on Company financial results to encourage attainment of long-term Company financial objectives
    - Stock options to align the interests of executives with those of shareholders
    - Restricted stock awards and restricted stock unit retention awards to provide incentives consistent with driving shareholder value, and to provide strong retention incentives
- Benefits
    - Executives are generally eligible for the same competitive benefits as other employees in the United States, including medical, dental, and vision insurance, paid time off, 401(k) plan, and Company-provided life and disability insurance; employees outside of the United States are offered locally competitive benefits
    - Profit sharing contributions to defined contribution retirement plans
    - Employee Stock Purchase Plan
    - Post-termination payments under non-competition agreements

In determining the award levels for each of the elements in our total compensation program, our philosophy is to "pay for performance". As a result, we place relatively greater emphasis on the performance incentive components of compensation (performance-based annual cash incentive award, performance-based long-term cash incentive award, and stock options) to align the interests of our executives with shareholders, and motivate them to maximize shareholder value. This is balanced with retention incentives provided by base salary, restricted stock awards, and RSU awards.

We look to the experience and judgment of the Committee to determine what it believes to be the appropriate target compensation mix for each Named Executive Officer. We do not apply fixed ratios or formulas, or rely solely on market data or quantitative measures. In allocating compensation among the various elements, the Committee considers market data, Company performance and budget, the impact of the executive's position in the Company, past performance, viewed holistically, expectations for future performance, experience in the position, any recent or anticipated changes in the individual's responsibilities, internal pay equity for comparable positions, and retention incentives for succession planning. As shown in the charts below, incentive components accounted for nearly 90% of the CEO's target compensation and approximately 80% of the other Named Executive Officers' target compensation in fiscal 2018. For purposes of this analysis, RSU retention awards, which were granted to Mr. Campion, Mr. Sprunk, Ms. Krane, Mr. Slusher, and Mr. Edwards in fiscal 2018, are excluded to reflect the compensation mix targeted by the Committee on an annual basis.



### CEO
#### 2018 Total Direct Compensation Mix
89%    19%    70%

### Other NEOs
#### 2018 Total Direct Compensation Mix
80%    19%    61%

■ Base Salary
■ Performance-Based Annual Incentive Plan
■ Long-Term Incentive Compensation
(Performance-Based Long-Term Incentive Plan,
Stock Options and Restricted Stock Awards)

NIKE, INC. •  *2018 Notice of Annual Meeting* 19

PLF_000031

Sun Decl. Ex. 56, Page 22 of 54

Plaintiff's Trial Exhibit 336
Page 22 of 54

COMPENSATION DISCUSSION AND ANALYSIS

# Elements of Our Compensation Program

## Base Salary

When making recommendations to the Committee concerning base salary levels for our Named Executive Officers, our human resources staff follows a similar process to how they evaluate non-executive base salary levels. We consider the individual's performance in the prior year, expectations regarding the individual's future performance, experience in the position, any recent or anticipated changes in the individual's responsibilities, internal pay equity for comparable positions, succession planning strategies, our annual salary budget, other elements of the individual's compensation, and the market data described in "Use of Market Survey Data". The Committee reviews these factors each year and adjusts base salary levels to ensure that we are appropriately rewarding performance, viewed holistically.

The Committee generally reviews base salaries of the Named Executive Officers annually based on a review of individual performance at a meeting in June, with salary adjustments becoming effective for the first pay period ending in August. During the salary review in June 2017, the Committee recommended, based on the factors described above, and the independent members of the Board approved, the following base salaries for the Named Executive Officers.

| Named Executive Officer | Fiscal 2018 Base Salary | % Change |
|---|---|---|
| Mark G. Parker | $1,550,000 | 0.0% |
| Andrew Campion | $975,000 | 8.3% |
| Eric D. Sprunk | $1,100,000 | 4.8% |
| Hilary K. Krane | $900,000 | N/A |
| John F. Slusher | $900,000 | N/A |
| Trevor A. Edwards | $1,200,000 | 14.3% |

In setting a Named Executive Officer's overall compensation package, the Committee places a relatively greater emphasis on the incentive components of compensation described below.

## Performance-Based Annual Cash Incentive

Annual awards are paid to the Named Executive Officers under our Executive Performance Sharing Plan ("PSP"). Our "pay for performance" philosophy for such awards is simple and applies to all global employees who are eligible to share in the Company's success through incentive bonuses: if we exceed our financial objectives, we will pay more; if we fail to reach them, we will pay less or nothing at all. The PSP for all executives is based 100% on overall corporate performance each year against a target based on the Company's annual financial objective, as measured by income before income taxes ("PTI"), excluding the effect of any acquisitions, divestitures, accounting changes, restructurings or other extraordinary, unusual or infrequently occurring items in accordance with the PSP terms and conditions. The Committee selected PTI as the performance measure as it aligns with the Company's operational financial targets for the individual fiscal year. By focusing on driving strong operational performance each year, the plan supports our goal of delivering sustainable, profitable growth. In support of our culture, the Committee retains the discretion to reduce or eliminate PSP award payouts based on individual or Company performance. Basing our annual cash incentive award program for all executives on overall corporate performance is intended to foster teamwork and send the message to each executive that his or her role is to help ensure overall organizational success and maximize shareholder value.

Each year the Committee establishes a PSP target award for each Named Executive Officer based on its judgment of the impact of the position in the Company and what it believes to be competitive against market data as described in "Use of Market Survey Data", while considering internal pay equity for comparable positions. For fiscal 2018, the Committee maintained Messrs. Parker, Campion, and Sprunk's target awards. Ms. Krane's and Mr. Slusher's target awards were set at 90%. Mr. Edwards' target award remained the same. The fiscal 2018 PSP target awards were:

| Named Executive Officer | Fiscal 2018 PSP Target Award (% of base salary) |
|---|---|
| Mark G. Parker | 180% |
| Andrew Campion | 100% |
| Eric D. Sprunk | 100% |
| Hilary K. Krane | 90% |
| John F. Slusher | 90% |
| Trevor A. Edwards | 110% |

**NIKE, INC.**  *  *2018 Notice of Annual Meeting* **20**

PLF_000032

Sun Decl. Ex. 56, Page 23 of 54

Plaintiff's Trial Exhibit 336
Page 23 of 54

**COMPENSATION DISCUSSION AND ANALYSIS**

In June 2017, the Committee established performance goals for the fiscal 2018 PSP awards based on its evaluation of our business plan and prospects for the year. When setting these goals, the Committee considered evolving business dynamics, achievability to support engagement, and appropriate stretch to drive growth consistent with NIKE's long-term financial model. The target for fiscal 2018 was set at $4,717 million. The table below summarizes the fiscal 2018 PSP performance goals established by the Committee. For fiscal 2018, NIKE achieved a PTI of $4,325 million, which was below the threshold performance goal established by the Committee. As a result, no executive officer was paid an annual cash incentive award for fiscal 2018.

*(Dollars in millions)*

| Fiscal 2018 PSP Performance Goal | Threshold Performance | Threshold % Payout | Target Performance | Target % Payout | Maximum Performance | Maximum % Payout | Actual Performance | Actual % Payout |
|---|---|---|---|---|---|---|---|---|
| PTI | $4,528 | 50% | $4,717 | 100% | $5,094 | 150% | $4,325 | 0% |

## Performance-Based Long-Term Cash Incentive

The first component in our long-term portfolio mix is performance-based awards payable in cash under our Long-Term Incentive Plan ("LTIP"). As with the performance-based annual cash incentive, the LTIP follows our "pay for performance" philosophy. If we exceed our targets, we will pay more; if we fall short, we will pay less or nothing at all. This program focuses executives on overall, long-term financial performance, and is intended to reward them for delivering revenue growth and diluted earnings per share ("EPS") growth over a three-year performance period. At the beginning of each fiscal year, the Committee establishes performance goals and potential cash payouts for the next three fiscal years for all executives under the LTIP. LTIP performance measures for all executives are based 50% on cumulative revenues and 50% on cumulative EPS for the three-year performance period, in each case excluding generally the effect of acquisitions, divestitures, accounting changes and other extraordinary, unusual or infrequently occurring items. The Committee selected revenue and EPS as LTIP performance measures to encourage executives to focus on delivering profitable, sustainable growth. Strong revenue growth is the foundation of the Company's financial strategy, requiring investments in key business drivers to sustain growth. EPS growth is essential to delivering value for our shareholders, requiring investments be targeted to those areas with the highest potential for return. By balancing revenue growth and EPS growth, the plan supports the Company's objective of delivering long-term shareholder value. In support of our culture, the Committee retains the discretion to reduce or eliminate LTIP award payouts based on individual or Company performance.

During the compensation review in June 2017, the Committee approved LTIP target awards for all Named Executive Officers for the fiscal 2018-2020 performance period. The Committee set these targets based on its judgment of what it believes to be a desirable mix of long-term compensation, the impact of the position in the Company, and what it finds to be competitive against market data as described in "Use of Market Survey Data", while maintaining internal pay equity for comparable positions. For the fiscal 2018-2020 performance period, the Committee maintained the target for Mr. Parker and increased the targets for each of Messrs. Campion and Sprunk to $1,000,000. Ms. Krane's and Mr. Slusher's targets were set at $700,000. Mr. Edwards' target increased to $1,500,000. The target awards for the fiscal 2018-2020 performance period are as follows:

| Named Executive Officer | Fiscal 2018-2020 LTIP Award Target ($) |
|---|---|
| Mark G. Parker | 3,500,000 |
| Andrew Campion | 1,000,000 |
| Eric D. Sprunk | 1,000,000 |
| Hilary K. Krane | 700,000 |
| John F. Slusher | 700,000 |
| Trevor A. Edwards | 1,500,000 |

In June 2017, the Committee established performance goals for the fiscal 2018-2020 LTIP. The Committee considered our long-term financial goals of high single-digit revenue growth and continued EPS growth in setting performance goals for the target award payout level. Additionally, goals were set to provide appropriate stretch to drive growth while balancing sustained engagement over the performance period. The total payout percentage will be the average of the payout percentages determined for cumulative revenues and cumulative EPS, respectively. Payout below the threshold payout level may occur if either the revenue or EPS related percentage achievement is less than 50%. If both revenue and EPS fall below the threshold level, there is no payout. The table below summarizes the fiscal 2018-2020 LTIP performance goals.

*(Dollars in millions, except per share data)*

| Fiscal 2018-2020 Performance Goals | Threshold Performance | Threshold % Payout | Target Performance | Target % Payout | Maximum Performance | Maximum % Payout |
|---|---|---|---|---|---|---|
| Revenue | $113,703 | 50% | $118,162 | 100% | $127,430 | 200% |
| EPS | $7.53 | 50% | $8.15 | 100% | $9.49 | 200% |

For fiscal 2018, executive officers were eligible to receive LTIP award payouts based on performance targets set in June 2015 covering the fiscal 2016-18 performance period. In June 2018, the Committee determined a payout of 37% under these awards was earned based on the average of the payout percentages for cumulative revenues and cumulative EPS for the performance period shown in the table below. For non-executive officers, the Committee adjusted the payout to 74% primarily to offset the impact of the Tax Cuts and Jobs Act, which negatively impacted EPS.

*NIKE, INC. • 2018 Notice of Annual Meeting* **21**

PLF_000033

Sun Decl. Ex. 56, Page 24 of 54

Plaintiff's Trial Exhibit 336
Page 24 of 54

## COMPENSATION DISCUSSION AND ANALYSIS

*(Dollars in millions, except per share data)*

| Fiscal 2016-2018 Performance Goals | Threshold Performance | Threshold % Payout | Target Performance | Target % Payout | Maximum Performance | Maximum % Payout | Actual Performance | Actual % Payout |
|---|---|---|---|---|---|---|---|---|
| Revenue [1] | $101,293 | 50% | $105,266 | 100% | $113,521 | 200% | $103,123 | 73% |
| EPS [2] | $6.61 | 50% | $7.12 | 100% | $8.23 | 200% | $5.70 | 0% |
| | | | | | | | Total Payout | 37% |

[1] Cumulative revenues for fiscal 2016, fiscal 2017, and fiscal 2018.

[2] Cumulative EPS for fiscal 2016, fiscal 2017, and fiscal 2018 adjusted for adoption of stock compensation accounting change in the first quarter of fiscal 2018 (FASB Accounting Standard Update 2016-09).

In July of 2018, in connection with the determination of the payout for the fiscal 2016-2018 LTIP, the Committee elected to normalize the payouts for the non-executive officers and the Continuing Officers by awarding a discretionary cash bonus to each of the Continuing Officers equal to 37% of their individual award target. The adjustment for the Continuing Officers was structured in the form of a discretionary cash bonus rather than a LTIP adjustment as the terms of the Company's LTIP, as applicable to the Named Executive Officers, did not contemplate the impact of the Tax Cuts and Jobs Act. The Committee viewed these awards as integral to its efforts to drive sustained performance, viewed holistically, engagement, retention, and motivation of the Continuing Officers.

## Stock Options

The second component in our long-term portfolio mix is stock options. Stock options are designed to align the interests of the Company's executives with those of shareholders by encouraging executives to enhance the value of the Company and, hence, the price of the Class B Stock. This is true "pay for performance", executives are rewarded only if the market price of our stock rises, and they get nothing if the price does not rise or goes down. When determining the grants, the Committee generally focuses on the number of shares, while considering the value for accounting purposes. Our approach is designed to carefully avoid fluctuations in grant levels due to share price changes and control annual share usage. The Committee awards stock options to each executive based on its judgment. The Committee considers a number of factors including performance, viewed holistically, management succession, competitive market data as described in "Use of Market Survey Data", internal pay equity for comparable positions, and a desirable mix of long-term incentives. Our human resources staff periodically tests the reasonableness of our stock option grants against competitive market data and may make recommendations to the Committee. Options are generally granted annually to selected employees, including the Named Executive Officers, in July under our shareholder-approved Stock Incentive Plan. Stock options for fiscal 2018 were granted by the Committee on July 20, 2017 with an exercise price equal to the closing market price of our stock on that date.

In July 2017, the Committee granted Messrs. Parker, Campion, and Sprunk 165,000, 75,000, and 85,000 option shares, respectively, the same number of stock options granted in July 2016. Ms. Krane and Mr. Slusher each received 70,000 option shares. Mr. Edwards received 100,000 option shares, the same number of stock options granted in July 2016. As described below and pursuant to the terms of the stock option agreement generally applicable to all stock option recipients, this award is eligible for continued vesting upon Mr. Edwards' retirement in August 2018, based on his age and years of service. The Committee, in its judgment, set these award levels based on the factors described above.

Options granted by the Company generally vest in equal annual installments over a four-year period. To promote executive retention, unvested options generally are forfeited if the employee leaves the Company before vesting occurs and vested options must be exercised within three months after termination of employment. Options provide for a limited retirement provision designed to encourage employees to delay retirement, thus enhancing retention. Only those employees with a minimum of five years of service who are age 55 and above at the time of termination of employment are eligible for the provision. Under the provision, for employees between the ages of 55 to 59 at the time of termination of employment, unvested stock options that were granted at least one full year prior to termination will continue to vest, and vested options may be exercised for up to four years after termination. If an employee is age 60 or older and has at least five years of service at termination, unvested stock options that were granted at least one full year prior to termination will receive accelerated vesting, and vested options may be exercised for up to four years after termination. The features related to accelerated vesting are described in "Potential Payments upon Termination or Change-in-Control". Based on their ages and years of service, as of May 31, 2018, Mr. Parker was eligible for accelerated vesting and Mr. Edwards was eligible for continued vesting of their options in July 2014, 2015, and 2016. Upon Mr. Edwards' retirement in August 2018, he will be eligible for continued vesting of his options granted in July 2017.

## Restricted Stock Awards

The third component in our long-term portfolio mix is restricted stock awards. Stock ownership and stock-based incentive awards align the interests of our Named Executive Officers with the interests of our shareholders, as the value of this incentive rises and falls with the stock price. Restricted stock awards are generally granted annually to selected employees, including the Named Executive Officers, in July at the same meeting at which stock options are granted under our shareholder-approved Stock Incentive Plan. Awards generally vest in three equal installments on each of the first three anniversaries of the grant date. The awards promote executive retention, as unvested shares held at the time the executive's employment is terminated are forfeited. Award recipients receive dividends on the full number of restricted shares awarded at the same time dividends are paid to other shareholders.

The Committee, in its judgment, sets restricted stock award levels based on several factors, including what the Committee believes to be a desirable mix of long-term compensation, their determination of an appropriate weighing of potential future contribution to the Company, retention incentives, and competitive market data as described in "Use of Market Survey Data". In July 2017, the Committee granted a restricted stock award to Mr. Parker valued at $3,500,000, representing 59,222 shares of our Class B Stock based on the closing price on the grant date. This was the same value of restricted stock granted to Mr. Parker in July 2016. Messrs. Campion and Sprunk received awards valued at $1,000,000, representing 16,921 shares of our Class B Stock based on the closing price on the grant date. This was an increase of $250,000 for each of Messrs. Campion and Sprunk. Ms. Krane received an award valued at $850,000, representing 14,383 of our Class B Stock based on the closing price on the grant date. Mr. Slusher received an award valued at $750,000, representing 12,691 of our Class B Stock based on the closing price on the grant date. Mr. Edwards received

**NIKE, INC.** ▪ *2018 Notice of Annual Meeting* **22**

PLF_000034

Sun Decl. Ex. 56, Page 25 of 54

Plaintiff's Trial Exhibit 336

Page 25 of 54

**COMPENSATION DISCUSSION AND ANALYSIS**

an award valued at $1,200,000, representing 20,305 shares of our Class B Stock based on the closing price on the grant date. This was an increase of $325,000 for Mr. Edwards. This award will not fully vest for Mr. Edwards given his retirement in August 2018.

**Restricted Stock Unit (RSU) Retention Awards**

From time to time, the Committee also grants RSUs that vest based on continued service with the Company through a future service date, for the specific purpose of further promoting retention. These RSU awards accumulate dividend equivalents that are only paid in cash upon full vesting. The awards have no value to the executive unless the executive remains employed with the Company for the full vesting period, and will be forfeited if the executive terminates or retires within the vesting period. While RSU awards are intended as a retention incentive, as equity-based awards they have the additional benefit of further aligning the interests of our Named Executive Officers with the interests of our shareholders, as the value of these awards rises and falls with the stock price.

On July 20, 2017, the Committee approved grants of RSUs to Messrs. Campion and Sprunk each valued at $6,000,000, and grants of RSUs to Ms. Krane and Mr. Slusher each valued at $4,000,000. Mr. Edwards received a grant valued at $6,000,000. Based on the closing price of our Class B Stock on the grant date, this represented 101,523 RSUs for each of Messrs. Campion and Sprunk; 67,682 RSUs for each of Ms. Krane and Mr. Slusher; and 101,523 RSUs for Mr. Edwards. The RSUs are scheduled to vest in full on the third anniversary of the grant date. Mr. Edwards' retention award will be forfeited in full as his retirement in August 2018 will precede the vesting date. In determining the award amounts, the Committee considered business continuity during a period of transformational change to support the Consumer Direct Offense. The Committee utilized its business judgment and experience as it reviewed the Company's succession and retention strategy, accumulated vested and unvested awards, and individual performance, viewed holistically. As these awards are intended as a retention incentive they were viewed by the Committee as compensation over the vesting period and not solely as compensation for fiscal 2018.

PLF_000035

Sun Decl. Ex. 56, Page 26 of 54

Plaintiff's Trial Exhibit 336
Page 26 of 54

**COMPENSATION DISCUSSION AND ANALYSIS**

## Profit Sharing and Retirement Plans

Our 401(k) Savings and Profit Sharing Plan is a U.S. tax qualified retirement savings plan pursuant to which all eligible U.S. employees, including the Named Executive Officers, are able to make pre-tax contributions and after-tax contributions from their cash compensation. We make matching contributions for all participants each year equal to 100% of their pre-tax contributions up to 5% of their total eligible compensation. We also make annual profit sharing contributions to the accounts of eligible U.S. employees under the 401(k) Savings and Profit Sharing Plan. The contributions are allocated among eligible employees based on a percentage of their total salary and annual cash incentive award for the year. The total profit sharing contribution and the percentage of salary and annual cash incentive award contributed for each employee is determined each year by the Board of Directors. For fiscal 2018, the Board of Directors approved a profit sharing contribution for each eligible employee equal to 3.4% of the employee's total eligible salary and annual cash incentive award.

The Internal Revenue Code limits the amount of compensation that can be deferred under our 401(k) Savings and Profit Sharing Plan, and also limits the amount of salary and annual cash incentive award ($270,000 for fiscal 2018) that may be taken into account when determining contributions under that plan. Accordingly, we provide our Named Executive Officers and other highly compensated employees with the opportunity to defer their compensation, including amounts in excess of the tax law limit, under our nonqualified Deferred Compensation Plan. We also make profit sharing contributions under the Deferred Compensation Plan with respect to salary and annual cash incentive award of any eligible employee that exceeds the tax law limit, and for fiscal 2018 these contributions were equal to 3.4% of the total salary and annual cash incentive award of each Named Executive Officer in excess of $270,000. These contributions under the Deferred Compensation Plan allow our Named Executive Officers and other highly compensated employees to receive profit sharing contributions in the same percentage as our other employees. We do not match deferrals to the Deferred Compensation Plan. Balances in the Deferred Compensation Plan, including the balances of the Named Executive Officers, are unsecured and at-risk, meaning the balances may be forfeited in the event of the Company's financial distress such as bankruptcy. Our matching and profit sharing contributions for fiscal 2018 to the accounts of the Named Executive Officers under the qualified and nonqualified plans are included in the All Other Compensation column in the Summary Compensation Table on page 28.

## Employee Stock Purchase Plan

Our Employee Stock Purchase Plan allows all employees who work at least 20 hours per week in the United States and in many countries outside of the United States to purchase NIKE Class B Stock, through payroll deductions, at a 15% discount to the market price on the first or last trading day of the six-month purchase period, depending on which day the stock price was lower. No plan participant is allowed to purchase more than $25,000 in market value of our stock under the plan in any calendar year or more than 500 shares in any six-month offering period. In fiscal 2018, all Named Executive Officers participated in our Employee Stock Purchase Plan, with the exception of Messrs. Parker and Campion.

**NIKE, INC.** ▪ *2018 Notice of Annual Meeting* **24**

PLF_000036

Sun Decl. Ex. 56, Page 27 of 54

Plaintiff's Trial Exhibit 336
Page 27 of 54

**COMPENSATION DISCUSSION AND ANALYSIS**

### Post-termination Payments under Non-competition Agreements

In exchange for non-competition agreements from all of our Named Executive Officers, we have agreed to provide, during the non-competition period, the monthly payments described in "Potential Payments upon Termination or Change-in-Control", some of which are at the election of the Company. We believe that it is appropriate to compensate individuals to refrain from working with competitors following termination, and that compensation enhances the enforceability of such agreements.

## Stock Ownership Guidelines

NIKE maintains the following stock ownership guidelines for executive officers. These guidelines are designed to further align the long-term interests of our executive officers with those of our shareholders. Under the guidelines, the CEO and other executive officers are required to hold NIKE stock valued at the following multiple of their annual base salary:

| Position | Ownership Level |
|---|---|
| Chief Executive Officer | 6X Base Salary |
| Other Named Executive Officers | 3X Base Salary |
| Other Executive Officers | 2X Base Salary |

New officers are required to attain these ownership levels within five years of their appointment. As of May 31, 2018, each of our executive officers has met or is on track to meet the applicable ownership guideline within the requisite period.

## Hedging and Pledging

The Company's Blackout and Pre-clearance Policy (which supplements our Insider Trading Policy) prohibits directors, executive officers, and other designated insiders from engaging in transactions involving hedging, monetization or short sales of NIKE stock, including zero-cost collars and forward sale contracts. The policy also requires directors, executive officers, and designated insiders to obtain pre-approval from the Company's Clearance Director before pledging NIKE stock. Before granting approval of any pledge, the Clearance Director considers the size of the pledge relative to the individual's other holdings, both direct and indirect, and NIKE's shares outstanding; the risk of foreclosure given the nature of the associated transaction; protections against the appearance of insider trading, including prohibitions on sales during trading black-outs; and the ability to timely report sales on Form 4.

## Change-in-Control Provisions

LTIP awards are not subject to accelerated change-in-control vesting. All unvested stock option, restricted stock, and restricted stock unit awards are subject to accelerated change-in-control vesting only when two events (a "double-trigger") occur. Vesting of grants is generally accelerated only if there is a change-in-control of the Company and either the acquiring entity fails to assume the awards or the employee's employment is terminated by the acquirer without cause or by the employee for good reason within two years following a change-in-control. This double-trigger was adopted to encourage executive retention through a period of uncertainty and a subsequent integration with an acquirer. The Committee believes that this approach will enhance shareholder value in the context of an acquisition, and align executives with the interests of investors. The effects of change-in-control transactions on stock option, restricted stock, and restricted stock unit awards are described further in "Potential Payments Upon Termination or Change-in-Control".

## Clawback Policy

Since June 2010, the Company has had a policy for recoupment of incentive compensation (the "clawback policy"). In June 2015, the Committee and Board of Directors approved amendments to our incentive compensation plans to cover additional circumstances in which the Company may clawback awards. Under the clawback policy, an executive officer who is involved in wrongful conduct that results in a restatement of the Company's financial statements must repay to the Company up to the full amount of any incentive compensation based on the financial statements that were subsequently restated. The clawback policy covers the annual cash incentive award, long-term cash incentive award, profit sharing contributions to the Deferred Compensation Plan, and excess proceeds from sales of stock acquired under stock option, restricted stock, and RSU awards that occurred prior to the restatement. The 2015 amendments to our Executive Performance Sharing Plan, Long-Term Incentive Plan and Stock Incentive Plan clarify that for all participants in those plans the Committee may apply additional clawback policies to awards, or add clawback terms to award agreements or notices, and that any clawback requirements of applicable law and regulation will apply to the plans.

## Risk Assessment

At the Committee's request, in fiscal 2018 management prepared and discussed with the Committee an assessment of potential risk associated with the Company's compensation programs, including any risk that would be reasonably likely to have a material adverse effect on the Company. This included an assessment of risks associated with each element of employee compensation. The assessment considered certain design features of the compensation programs that reduce the likelihood of excessive risk taking, such as reasonable performance targets, capped payouts of

PLF_000037

Sun Decl. Ex. 56, Page 28 of 54

Plaintiff's Trial Exhibit 336
Page 28 of 54

**COMPENSATION DISCUSSION AND ANALYSIS**

incentive compensation, a balance of short- and long-term incentives, a balance of cash and equity incentives, vesting of awards over time, and the potential for clawback of incentive compensation. In addition, for equity compensation, the Committee and the Board have adopted stock ownership guidelines, limited accelerated vesting of stock options upon termination of employment, and implemented double-trigger accelerated vesting for all equity awards upon change-in-control (each as described above).

# Tax Deductibility of Executive Compensation

Section 162(m) of the Internal Revenue Code generally disallows a tax deduction to public companies for annual compensation over $1 million paid to "covered employees". Prior to the Tax Cuts and Jobs Act of December 2017, the Internal Revenue Code provided an exception that generally excluded from the calculation of the $1 million cap compensation that was based on the attainment of pre-established, objective performance goals established under a shareholder-approved plan. Historically, the Committee has considered, among other things, the impact of this exclusion for performance-based compensation when developing and implementing our executive compensation programs. Annual cash incentive awards under our Executive Performance Sharing Plan, long-term cash incentive awards under our Long-Term Incentive Plan, and stock options under our Stock Incentive Plan have generally been designed in a manner intended to meet the requirements under the exclusion, although we could not guarantee such treatment given the complex nature of the performance-based compensation requirements.

The new tax legislation removed the exception for performance-based compensation (unless the compensation qualifies for certain transition relief, the scope of which is currently uncertain) for taxable years beginning after December 31, 2017. The definition of "covered employees" was also expanded to include a company's chief financial officer (in addition to the chief executive officer and three other most highly paid executive officers), plus any individual who has been a "covered employee" in any taxable year beginning after December 31, 2016.

While the Committee seeks to preserve tax deductibility in developing and implementing our compensation program, the Committee also believes that it is important to maintain flexibility in administering compensation programs in a manner designed to promote varying corporate goals. Accordingly, we have not adopted a policy that all compensation must qualify as deductible for tax purposes and retain the ability to provide compensation that may not qualify as deductible under Section 162(m).

PLF_000038

Sun Decl. Ex. 56, Page 29 of 54

Plaintiff's Trial Exhibit 336
Page 29 of 54

# COMPENSATION COMMITTEE REPORT

The Compensation Committee of the Board of Directors (the "Committee") has reviewed and discussed with management the Compensation Discussion and Analysis required by Item 402(b) of Regulation S-K. Based on the review and discussions, the Committee recommended to the Board that the Compensation Discussion and Analysis be included in this proxy statement.

Members of the Compensation Committee:

' Timothy D. Cook, Chair

' Elizabeth J. Comstock

' Johnathan A. Rodgers

**NIKE, INC.** •   *2018 Notice of Annual Meeting* **27**

PLF_000039

Sun Decl. Ex. 56, Page 30 of 54

Plaintiff's Trial Exhibit 336

Page 30 of 54

EXECUTIVE COMPENSATION

EXECUTIVE COMPENSATION

## Summary Compensation Table

The following table sets forth information concerning compensation for fiscal 2016-2018 paid to or earned by our Named Executive Officers.

| Name and Principal Position | Year | Salary ($) | Bonus (1) ($) | Stock Awards (2) ($) | Option Awards (3) ($) | Non-Equity Incentive Plan Compensation (4) ($) | All Other Compensation (5) ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Mark G. Parker Chairman, President and Chief Executive Officer | 2018 | 1,550,000 | 1,295,000 | 3,500,020 | 1,618,650 | 1,295,000 | 208,790 | 9,467,460 |
| | 2017 | 1,550,000 | | 3,500,035 | 1,542,750 | 6,261,144 | 997,570 | 13,851,499 |
| | 2016 | 1,550,000 | | 33,500,142 | 4,179,450 | 7,305,902 | 1,079,808 | 47,615,302 |
| Andrew Campion Executive Vice President and Chief Financial Officer | 2018 | 963,462 | 277,500 | 7,000,040 | 735,750 | 277,500 | 63,514 | 9,317,766 |
| | 2017 | 889,231 | | 750,053 | 701,250 | 1,513,176 | 92,546 | 3,946,256 |
| | 2016 | 822,306 | | 625,025 | 1,519,800 | 1,772,897 | 105,479 | 4,845,507 |
| Eric D. Sprunk Chief Operating Officer | 2018 | 1,092,308 | 277,500 | 7,000,040 | 833,850 | 277,500 | 80,560 | 9,561,758 |
| | 2017 | 1,042,308 | | 750,053 | 794,750 | 1,603,277 | 253,713 | 4,444,101 |
| | 2016 | 990,000 | | 750,007 | 2,026,400 | 1,927,813 | 335,126 | 6,029,346 |
| Hilary K. Krane (5) Executive Vice President, Chief Administrative Officer & General Counsel | 2018 | 892,308 | 185,000 | 4,850,042 | 686,700 | 185,000 | 58,524 | 6,857,574 |
| John F. Slusher (6) Executive Vice President, Global Sports Marketing | 2018 | 900,000 | 185,000 | 4,750,044 | 686,700 | 185,000 | 59,715 | 6,766,459 |
| Trevor A. Edwards (7) Former President, NIKE Brand | 2018 | 1,176,923 | | 7,200,035 | 981,000 | 370,000 | 101,075 | 9,829,033 |
| | 2017 | 1,042,308 | | 875,052 | 935,000 | 1,862,583 | 271,389 | 4,986,332 |
| | 2016 | 990,000 | | 875,102 | 2,279,700 | 2,221,919 | 270,440 | 6,637,161 |

(1) In July of 2018, the Committee elected to award a discretionary cash bonus equal to 37% of the 2016-2018 LTIP target award to each of the Continuing Officers. In connection with the determination of the payout for the fiscal 2016-2018 LTIP, the Committee elected to adjust the LTIP payout for non-executive officers primarily to offset the impact of the Tax Cuts and Jobs Act (which negatively impacted EPS), one of the two Performance Goals which determine the LTIP payout). The LTIP terms, as applicable to the Named Executive Officers, did not contemplate the impact of the Tax Cuts and Jobs Act. The Committee viewed these special cash bonuses as integral to its efforts to drive sustained performance, viewed holistically, engagement, retention and motivation of the Continuing Officers.

(2) Represents the grant date fair value of restricted stock and restricted stock unit awards granted in the applicable fiscal year computed in accordance with accounting guidance applicable to stock-based compensation. The grant date fair value is based on the closing market price of our Class B Stock on the grant date.

(3) Represents the grant date fair value of options granted in the applicable fiscal year computed in accordance with accounting guidance applicable to stock-based compensation. The grant date fair value of the options was estimated using the Black-Scholes option pricing model. The assumptions made in determining the grant date fair values of options under applicable accounting guidance are disclosed in Note 11 of Notes to Consolidated Financial Statements in our Annual Report on Form 10-K for the year ended May 31, 2018.

(4) Non-Equity Incentive Plan Compensation consists of the following:

**NIKE, INC. ·** *2018 Notice of Annual Meeting* **28**

PLF_000040

Sun Decl. Ex. 56, Page 31 of 54

Plaintiff's Trial Exhibit 336
Page 31 of 54

**EXECUTIVE COMPENSATION**

| Name | Fiscal Year | Annual Incentive Compensation (a) ($) | Long-Term Incentive Compensation (b) ($) | Total ($) |
|---|---|---|---|---|
| Mark G. Parker | 2018 | — | 1,295,000 | 1,295,000 |
| | 2017 | 1,642,194 | 4,618,950 | 6,261,144 |
| | 2016 | 2,577,402 | 4,728,500 | 7,305,902 |
| Andrew Campion | 2018 | — | 277,500 | 277,500 |
| | 2017 | 523,401 | 989,775 | 1,513,176 |
| | 2016 | 759,647 | 1,013,250 | 1,772,897 |
| Eric D. Sprunk | 2018 | — | 277,500 | 277,500 |
| | 2017 | 613,502 | 989,775 | 1,603,277 |
| | 2016 | 914,563 | 1,013,250 | 1,927,813 |
| Hilary Krane | 2018 | — | 185,000 | 185,000 |
| John Slusher | 2018 | — | 185,000 | 185,000 |
| Trevor A. Edwards | 2018 | — | 370,000 | 370,000 |
| | 2017 | 674,853 | 1,187,730 | 1,862,583 |
| | 2016 | 1,006,019 | 1,215,900 | 2,221,919 |

(a)   Amounts shown were earned for performance in the applicable fiscal year under our Executive Performance Sharing Plan.

(b)   Amounts shown were earned for performance during the three-year period ending with the applicable fiscal year under our Long-Term Incentive Plan.

(5)   For fiscal 2018 for each of the Named Executive Officers, this includes (a) profit-sharing contributions by us to the 401(k) Savings and Profit Sharing Plan in the amount of $9,082; (b) matching contributions by us to the 401(k) Savings and Profit Sharing Plan in the amount of $13,500, and (c) profit-sharing contributions by us to the Deferred Compensation Plan in the following amounts: $98,296 for Mr. Parker, $40,932 for Mr. Campion, $48,297 for Mr. Sprunk, $35,942 for Ms. Krane, $37,133 for Mr. Slusher, and $53,207 for Mr. Edwards. For Messrs. Sprunk and Edwards, also includes $5,000 in compensation in recognition of 25 years of service with the Company, and associated tax reimbursement in the amount of $4,681 and $5,194, respectively, pursuant to our Valued Service Award Program, under which all employees receive cash awards and associated tax reimbursements in recognition of their significant service anniversaries with the Company. Includes the cost of daily residential security, including monitoring, patrols, and installation at primary residences provided by the Company of $18,948 for Mr. Parker and $8,488 for Mr. Edwards. For Mr. Parker, includes a nominal gift card and Company-related merchandise. For Mr. Edwards, includes a nominal gift card and attire for a Company-related function. For Mr. Parker, this amount includes $68,831 in aggregate incremental cost to the Company for his personal use of the Company's aircraft and actual cost of chartered flights for travel to and from the board and shareholder meetings of an outside company for which Mr. Parker serves as a director. The aggregate incremental cost is determined based on the variable operating cost to the Company including the cost of fuel, maintenance, crew travel expenses, landing fees, parking fees, in-flight food and beverage, and other smaller variable costs associated with each flight. This amount excludes the aggregate incremental cost to the Company for Mr. Parker's personal use of the Company's aircraft for which Mr. Parker reimbursed the Company in accordance with a time sharing agreement and as allowed under Federal Aviation Regulation 91.501(c) and (d).

(6)   Because Ms. Krane and Mr. Slusher were only Named Executive Officers for fiscal 2018, no disclosure is included as to Ms. Krane and Mr. Slusher for fiscal 2017 and 2016.

(7)   Upon his retirement in August 2018, Mr. Edwards will forfeit the RSU Retention Award of $6,000,000 granted July 2017 in full as his retirement will precede the vesting date. Mr. Edwards will also forfeit two-thirds of the $1,200,000 restricted stock award granted July 2017, and one-third of the $875,000 restricted stock award granted in July 2016 in connection with his retirement. Excluding the awards granted in July 2017 subject to forfeiture upon his retirement, Mr. Edwards' total compensation for fiscal 2018 was $3,029,046.

**NIKE, INC.** ˒   *2018 Notice of Annual Meeting* **29**

PLF_000041

Sun Decl. Ex. 56, Page 32 of 54

Plaintiff's Trial Exhibit 336
Page 32 of 54

EXECUTIVE COMPENSATION

## Grants of Plan-Based Awards in Fiscal 2018

The following table sets forth information concerning the performance-based annual cash incentive opportunities, performance-based long-term cash incentive opportunities, restricted stock and restricted stock unit awards, and stock options granted to the Named Executive Officers in fiscal 2018.

| Name | Grant Date | Estimated Future Payouts Under Non-Equity Incentive Plan Awards | | | All Other Stock Awards: Number of Shares of Stock or Units | All Other Option Awards: Number of Securities Underlying Options [5] | Exercise or Base Price of Option Awards | Grant Date Fair Value of Stock and Option Awards [6] |
|---|---|---|---|---|---|---|---|---|
| | | Threshold ($) | Target ($) | Maximum ($) | (#) | (#) | ($/Sh) | ($) |
| Mark G. Parker | 6/21/2017 | 1,395,000 [1] | 2,790,000 [1] | 4,185,000 [1] | | | | |
| | 6/21/2017 | 1,750,000 [2] | 3,500,000 [2] | 7,000,000 [2] | | | | |
| | 7/20/2017 | | | | 59,222 [3] | | | 3,500,020 |
| | 7/20/2017 | | | | | 165,000 | 59.10 | 1,618,650 |
| Andrew Campion | 6/21/2017 | 487,500 [1] | 975,000 [1] | 1,462,500 [1] | | | | |
| | 6/21/2017 | 500,000 [2] | 1,000,000 [2] | 2,000,000 [2] | | | | |
| | 7/20/2017 | | | | 16,921 [3] | | | 1,000,031 |
| | 7/20/2017 | | | | 101,523 [4] | | | 6,000,009 |
| | 7/20/2017 | | | | | 75,000 | 59.10 | 735,750 |
| Eric D. Sprunk | 6/21/2017 | 550,000 [1] | 1,100,000 [1] | 1,650,000 [1] | | | | |
| | 6/21/2017 | 500,000 [2] | 1,000,000 [2] | 2,000,000 [2] | | | | |
| | 7/20/2017 | | | | 16,921 [3] | | | 1,000,031 |
| | 7/20/2017 | | | | 101,523 [4] | | | 6,000,009 |
| | 7/20/2017 | | | | | 85,000 | 59.10 | 833,850 |
| Hilary K. Krane | 6/21/2017 | 405,000 [1] | 810,000 [1] | 1,215,000 [1] | | | | |
| | 6/21/2017 | 350,000 [2] | 700,000 [2] | 1,400,000 [2] | | | | |
| | 7/20/2017 | | | | 14,383 [3] | | | 850,035 |
| | 7/20/2017 | | | | 67,682 [4] | | | 4,000,006 |
| | 7/20/2017 | | | | | 70,000 | 59.10 | 686,700 |
| John F. Slusher | 6/21/2017 | 405,000 [1] | 810,000 [1] | 1,215,000 [1] | | | | |
| | 6/21/2017 | 350,000 [2] | 700,000 [2] | 1,400,000 [2] | | | | |
| | 7/20/2017 | | | | 12,691 [3] | | | 750,038 |
| | 7/20/2017 | | | | 67,682 [4] | | | 4,000,006 |
| | 7/20/2017 | | | | | 70,000 | 59.10 | 686,700 |
| Trevor A. Edwards [7] | 6/21/2017 | 660,000 [1] | 1,320,000 [1] | 1,980,000 [1] | | | | |
| | 6/21/2017 | 750,000 [2] | 1,500,000 [2] | 3,000,000 [2] | | | | |
| | 7/20/2017 | | | | 20,305 [3] | | | 1,200,026 |
| | 7/20/2017 | | | | 101,523 [4] | | | 6,000,009 |
| | 7/20/2017 | | | | | 100,000 | 59.10 | 981,000 |

(1) *These amounts represent the potential performance-based annual cash incentive awards payable for performance during fiscal 2018 under our Executive Performance Sharing Plan. Under this plan, the Compensation Committee approved target awards for fiscal 2018 based on a percentage of the executive's base salary paid during fiscal 2018 as follows: Mr. Parker, 180%; Mr. Campion, 100%; Mr. Sprunk, 100%; Ms. Krane, 90%; Mr. Slusher, 90%, and Mr. Edwards, 110%. The Committee also established a series of performance targets based on our income before income taxes ("PTI") for fiscal 2018 (excluding the effect of acquisitions, divestitures, accounting changes not reflected in our business plan at the time of approval of the target awards) corresponding to award payouts ranging from 50% to 150% of the target awards. The PTI for fiscal 2018 required to earn the target award payout was $4,717 million. The PTI for fiscal 2018 required to earn the 150% maximum payout was $5,094 million. The PTI for fiscal 2018 required to earn the 50% threshold payout was $4,528 million. Participants receive a payout at the percentage level at which the performance target is met, subject to the Committee's discretion to reduce or eliminate any award based on Company or individual performance, viewed holistically. Actual award payouts earned in fiscal 2018 and paid in fiscal 2019 are shown in footnote 4 to the Non-Equity Incentive Plan Compensation column in the Summary Compensation Table.*

**NIKE, INC.** ▪ *2018 Notice of Annual Meeting* 30

PLF_000042

Sun Decl. Ex. 56, Page 33 of 54

Plaintiff's Trial Exhibit 336
Page 33 of 54

**EXECUTIVE COMPENSATION**

(2)  These amounts represent the potential performance-based long-term cash incentive awards payable for performance during the three-year period consisting of fiscal 2018-2020 under our Long-Term Incentive Plan. Under this plan, the Compensation Committee approved target awards for the performance period and also established a series of performance targets based on our cumulative revenues and cumulative diluted earnings per common share ("EPS") for the performance period (excluding the effect of acquisitions, divestitures, and accounting changes not reflected in our business plan at the time of approval of the target awards) corresponding to award payouts ranging from 50% to 200% of the target awards. Participants will receive a payout at the average of the percentage levels at which the two performance targets are met, subject to the Committee's discretion to reduce or eliminate any award based on Company or individual performance, viewed holistically. For cumulative revenues over the performance period, the target payout requires revenues of $118,162 million, the 50% threshold payout requires revenues of $113,703 million, and the 200% maximum payout requires revenues of $127,430 million. For cumulative EPS over the performance period, the target payout requires EPS of $8.15, the 50% threshold payout requires EPS of $7.53, and the 200% maximum payout requires EPS of $9.49. Under the terms of the awards, on the first payroll period ending in August 2020 we will issue the award payout to each participant, provided that the participant is employed by us on the last day of the performance period.

(3)  These amounts represent grants of restricted stock under our Stock Incentive Plan which vest in three equal installments on the first three anniversaries of the grant date. Vesting will be accelerated in certain circumstances as described below under "Potential Payments Upon Termination or Change-in-Control". Dividends are payable on restricted stock at the same rate paid on all other outstanding shares of our Class B Stock.

(4)  These amounts represent grants of restricted stock units under the Stock Incentive Plan which vest in full on the third anniversary of the grant date. Vesting will be accelerated in certain circumstances as described in the section "Potential Payments Upon Termination or Change-in-Control". The restricted stock units accumulate cash dividend equivalents that are only paid upon vesting.

(5)  All amounts reported in this column represent options granted under our Stock Incentive Plan which become exercisable for option shares in four equal installments on the first four anniversaries of the grant date. Options will become fully exercisable in certain circumstances as described below under "Potential Payments Upon Termination or Change-in-Control". Each option has a maximum term of 10 years, subject to earlier termination in the event of the optionee's termination of employment.

(6)  For stock awards, represents the value of restricted stock granted based on the closing market price of our Class B Stock on the grant date. For option awards, represents the grant date fair value of options granted based on a value of $9.81 per share calculated using the Black-Scholes option pricing model. These are the same values for these equity awards used under accounting guidance applicable to stock-based compensation. The assumptions made in determining option values are disclosed in Note 11 of Notes to Consolidated Financial Statements in our Annual Report on Form 10-K for the year ended May 31, 2018.

(7)  Mr. Edwards resigned as President, NIKE Brand, effective March 15, 2018, and will retire from the Company in August 2018. As a result of Mr. Edwards' retirement, he will not fully vest in his restricted stock grant and will forfeit the restricted stock unit retention award. Pursuant to the form of stock option agreement generally applicable to stock options awards, Mr. Edwards will be eligible for continued vesting of his stock option grant based on his age and years of service. The features related to continued vesting are described in "Stock Options".

**NIKE, INC.** *   *2018 Notice of Annual Meeting* **31**

PLF_000043

Sun Decl. Ex. 56, Page 34 of 54

Plaintiff's Trial Exhibit 336
Page 34 of 54

**EXECUTIVE COMPENSATION**

## Outstanding Equity Awards at May 31, 2018

The following table sets forth information concerning outstanding stock options and unvested restricted stock and restricted stock units held by the Named Executive Officers at May 31, 2018.

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercisable Options (#) [1] | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) |
| Mark G. Parker | 135,000 | — | 14.5500 | 7/18/2018 | | | | |
| | 600,000 | — | 13.1100 | 7/17/2019 | | | | |
| | 660,000 | — | 17.2400 | 7/16/2020 | | | | |
| | 660,000 | — | 22.9250 | 7/15/2021 | | | | |
| | 660,000 | — | 23.2700 | 7/20/2022 | | | | |
| | 330,000 | — | 31.6750 | 7/19/2023 | | | | |
| | 247,500 | 82,500 (2) | 38.7600 | 7/18/2024 | | | | |
| | 165,000 | 165,000 (3) | 56.4000 | 7/17/2025 | | | | |
| | 41,250 | 123,750 (4) | 57.8700 | 7/15/2026 | | | | |
| | — | 165,000 (5) | 59.1000 | 7/20/2027 | 342,410 (6) | 24,585,038 | 166,636 (12) | 11,964,465 |
| Andrew Campion | 103,000 | — | 22.9250 | 7/15/2021 | | | | |
| | 120,000 | — | 23.2700 | 7/20/2022 | | | | |
| | 60,000 | — | 31.6750 | 7/19/2023 | | | | |
| | 60,000 | 20,000 (2) | 38.7600 | 7/18/2024 | | | | |
| | 60,000 | 60,000 (3) | 56.4000 | 7/17/2025 | | | | |
| | 18,750 | 56,250 (4) | 57.8700 | 7/15/2026 | | | | |
| | — | 75,000 (5) | 59.1000 | 7/20/2027 | 130,778 (7) | 9,389,860 | | |
| Eric D. Sprunk | 45,000 | — | 23.2700 | 7/20/2022 | | | | |
| | 150,000 | — | 31.6750 | 7/19/2023 | | | | |
| | 120,000 | 40,000 (2) | 38.7600 | 7/18/2024 | | | | |
| | 80,000 | 80,000 (3) | 56.4000 | 7/17/2025 | | | | |
| | 21,250 | 63,750 (4) | 57.8700 | 7/15/2026 | | | | |
| | — | 85,000 (5) | 59.1000 | 7/20/2027 | 131,516 (8) | 9,442,849 | | |
| Hilary K. Krane | 110,000 | — | 31.6750 | 7/19/2023 | | | | |
| | 82,500 | 27,500 (2) | 38.7600 | 7/18/2024 | | | | |
| | 65,000 | 65,000 (3) | 56.4000 | 7/17/2025 | | | | |
| | 17,500 | 52,500 (4) | 57.8700 | 7/15/2026 | | | | |
| | — | 70,000 (5) | 59.1000 | 7/20/2027 | 91,651 (9) | 6,580,542 | | |
| John F. Slusher | 200,000 | — | 22.925 | 7/15/2021 | | | | |
| | 220,000 | — | 23.2700 | 7/20/2022 | | | | |
| | 110,000 | — | 31.6750 | 7/19/2023 | | | | |
| | 86,250 | 28,750 (2) | 38.7600 | 7/18/2024 | | | | |
| | 60,000 | 60,000 (3) | 56.4000 | 7/17/2025 | | | | |
| | 16,250 | 48,750 (4) | 57.8700 | 7/15/2026 | | | | |
| | — | 70,000 (5) | 59.1000 | 7/20/2027 | 89,959 (10) | 6,459,056 | | |
| Trevor A. Edwards | 200,000 | — | 13.1100 | 7/17/2019 | | | | |
| | 200,000 | — | 17.2400 | 7/16/2020 | | | | |
| | 200,000 | — | 22.9250 | 7/15/2021 | | | | |
| | 240,000 | — | 23.2700 | 7/20/2022 | | | | |
| | 150,000 | — | 31.6750 | 7/19/2023 | | | | |
| | 120,000 | 40,000 (2) | 38.7600 | 7/18/2024 | | | | |

PLF_000044

Sun Decl. Ex. 56, Page 35 of 54

Plaintiff's Trial Exhibit 336
Page 35 of 54

| | 90,000 | | 90,000 | (3) | 56.4000 | 7/17/2025 | | | |
| | 25,000 | | 75,000 | (4) | 57.8700 | 7/15/2026 | | | |
| | — | | 100,000 | (5) | 59.1000 | 7/20/2027 | 137,080 [1] | 9,842,344 | |

(1) Stock options generally become exercisable for option shares in four equal installments on each of the first four anniversaries of the grant date.

(2) 100% of these options vested on July 18, 2018.

**NIKE, INC.** • *2018 Notice of Annual Meeting* **32**

PLF_000045

Sun Decl. Ex. 56, Page 36 of 54

Plaintiff's Trial Exhibit 336
Page 36 of 54

**EXECUTIVE COMPENSATION**

(3)  50% of these options vested on July 17, 2018 and 50% will vest on July 17, 2019.

(4)  33.3% of these options vested on July 15, 2018, 33.3% will vest on July 15, 2019, and 33.3% will vest on July 15, 2020.

(5)  25% of these options vested on July 20, 2018, 25% will vest on July 20, 2019, 25% will vest on July 20, 2020, and 25% will vest on July 20, 2021.

(6)  20,160 of these restricted shares vested on July 15, 2018, and 20,160 of these restricted shares will vest on July 15, 2019. 20,686 of these restricted shares vested on July 17, 2018. 19,741 of these restricted shares vested on July 20, 2018, 19,741 of these restricted shares will vest on July 20, 2019, and 19,740 of these restricted shares will vest on July 20, 2020. 222,182 of these RSUs will vest on June 30,2020.

(7)  4,320 of these restricted shares vested on July 15, 2018, and 4,320 of these restricted shares will vest on July 15, 2019. 3,694 of these restricted shares vested on July 17, 2018. 5,641 of these restricted shares vested on July 20, 2017, 5,640 of these restricted shares will vest on July 20, 2019, and 5,640 of these shares will vest on July 20, 2020. 101,523 of these RSUs will vest on July 20, 2020.

(8)  4,320 of these restricted shares vested on July 15, 2018, and 4,320 of these restricted shares will vest on July 15, 2019. 4,432 of these restricted shares vested on July 17, 2018. 5,641 of these restricted shares vested on July 20, 2018, 5,640 of these restricted shares will vest on July 20, 2019, and 5,640 of these shares will vest on July 20, 2020. 101,523 of these RSUs will vest on July 20, 2020.

(9)  3,168 of these restricted shares vested on July 15, 2018, and 3,168 of these restricted shares will vest on July 15, 2019. 3,250 of these restricted shares vested on July 17, 2018. 4,795 of these restricted shares vested on July 20, 2018, 4,794 of these restricted shares will vest on July 20, 2019, and 4,794 of these restricted shares will vest on July 20, 2020. 67,682 of these RSUs vested on July 20, 2020.

(10)  3,168 of these restricted shares vested on July 15, 2018, and 3,168 of these restricted shares will vest on July 15, 2019. 3,250 of these restricted shares vested on July 17, 2018. 4,231 of these restricted shares vested on July 20, 2018, 4,230 of these restricted shares will vest on July 20, 2019, and 4,230 of these shares will vest on July 20, 2020. 67,682 of these RSUs vested on July 20, 2020.

(11)  5,040 of these restricted shares vested on July 15, 2018, and 5,040 of these restricted shares shall be forfeited to the Company upon the expected retirement in August 2018. 5,172 of these restricted shares vested on July 17, 2018. 6,769 of these restricted shares vested on July 20, 2018, and 13,536 of these restricted shares shall be forfeited to the Company upon the expected retirement in August 2018. 101,523 of these RSUs shall be forfeited to the Company upon the expected retirement in August 2018.

(12)  This figure represents performance at threshold, 50% of target. These RSUs may vest on June 30, 2020, subject to performance vesting based on cumulative revenue growth and cumulative EPS growth over a five-year performance period. Actual payout will depend on actual performance, which could range from 0 to 100%.

## Option Exercises and Stock Vested During Fiscal 2018

The following table sets forth information concerning stock option exercises and vesting of restricted stock during fiscal 2018 for each of the Named Executive Officers on an aggregated basis.

| | Option Awards | | Stock Awards | |
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) |
|---|---|---|---|---|
| Mark G. Parker | 474,300 | 22,411,144 | 70,947 | 4,108,605 |
| Andrew Campion | 90,000 | 3,625,000 | 11,670 | 676,092 |
| Eric D. Sprunk | 471,040 | 20,284,387 | 229,001 | 13,517,288 |
| Hilary K. Krane | — | — | 140,074 | 8,265,115 |
| John F. Slusher | 200,000 | 9,249,153 | 140,074 | 8,265,115 |
| Trevor A. Edwards | 400,000 | 19,488,995 | 231,535 | 13,664,035 |

**NIKE, INC.** *   *2018 Notice of Annual Meeting* **33**

PLF_000046

Sun Decl. Ex. 56, Page 37 of 54

Plaintiff's Trial Exhibit 336
Page 37 of 54

**EXECUTIVE COMPENSATION**

## Equity Compensation Plan Information

The following table summarizes information regarding outstanding options and shares available for future issuance under equity compensation plans approved by shareholders and equity compensation plans that were not approved by shareholders as of May 31, 2018. The table does not reflect issuances made during fiscal 2019.

| Plan Category | (a)<br>Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | (b)<br>Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights [1] | (c)<br>Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in Column(a)) |
|---|---|---|---|
| Equity compensation plans approved by shareholders | 95,482,201 [2] | $40.7351 | 96,790,885 [3] |
| Equity compensation plans not approved by shareholders | — | — | 6,728,713 [4] |
| **Total** | 95,482,201 | **$40.7351** | 103,519,598 |

(1) *Weighted-average exercise prices do not reflect the shares that will be used upon the payment of outstanding awards of restricted stock units.*

(2) *Includes 95,482,201 shares subject to awards of options, restricted stock units, and stock appreciation rights outstanding under the Stock Incentive Plan (including the maximum number of Performance-Based RSUs granted to Mr. Parker).*

(3) *Includes 85,555,568 shares available for future issuance under the Stock Incentive Plan and 11,235,317 shares available for future issuance under the Employee Stock Purchase Plan.*

(4) *Includes 6,728,713 shares available for future issuance under the Foreign Subsidiary Employee Stock Purchase Plan, pursuant to which shares are offered and sold to employees of selected non-U.S. subsidiaries of the Company on substantially the same terms as those offered to U.S. employees under the shareholder-approved Employee Stock Purchase Plan as described above under "Employee Stock Purchase Plan" on page 24.*

## Non-Qualified Deferred Compensation in Fiscal 2018

| Name | Plan Name | Executive Contributions in Fiscal 2018 [1] | NIKE Contributions in Fiscal 2018 [1] | Aggregate Earnings in Fiscal 2018 | Aggregate Withdrawals/ Distributions in Fiscal 2018 | Aggregate Balance at 5/31/2018 [1] |
|---|---|---|---|---|---|---|
| Mark G. Parker | DCP | $1,639,729 | $148,636 | $614,151 | — | $17,733,270 |
| Andrew Campion | DCP | $213,317 | $53,256 | $84,504 | — | $1,365,036 |
| Eric D. Sprunk | DCP | $801,639 | $65,108 | $1,356,969 | — | $12,091,730 |
| Hilary K. Krane | DCP | $399,672 | $47,567 | $495,756 | — | $4,453,111 |
| John F. Slusher | DCP | $1,075,323 | $51,733 | $1,623,651 | — | $10,030,443 |
| Trevor A. Edwards | DCP | $1,345,376 | $68,628 | $2,303,967 | — | $22,869,300 |

(1) *All amounts reported in the Executive Contributions column are also included in amounts reported in the Summary Compensation Table. The amounts reported in the NIKE Contributions column represent profit sharing contributions made by us in early fiscal 2018 based on fiscal 2017 results; these amounts are also included in amounts reported for fiscal 2017 in the All Other Compensation column of the Summary Compensation Table. Of the amounts reported in the Aggregate Balance column, the following amounts have been reported in the Summary Compensation Tables in this proxy statement or in prior year proxy statements: Mr. Parker, $15,520,705; Mr. Campion, $710,278; Mr. Sprunk, $4,744,865; Ms. Krane, $447,239; Mr. Slusher, $1,127,056; and Mr. Edwards, $11,000,685.*

### Non-Qualified Deferred Compensation Plans

The Named Executive Officers are eligible to participate in our Deferred Compensation Plan (the "DCP"). Participants in the DCP may elect in advance to defer up to 100 percent of their annual base salary, bonus, and long-term incentive payments.

Each year, we share profits with our employees in the form of profit sharing contributions to defined contribution retirement plans. The contributions are allocated among eligible employees based on a percentage of their total salary and bonus for the year. To the fullest extent permitted under Internal Revenue Code limitations, these contributions are made to employees' accounts under our qualified 401(k) Savings and Profit Sharing Plan. Contributions based on salary and bonus in excess of the tax law limit ($270,000 for fiscal 2018) are made as NIKE contributions under the DCP.

Amounts deferred under the DCP are credited to a participant's account under the DCP. Each participant may allocate his or her account among any combination of the investment funds available under the DCP. Participants' accounts are adjusted to reflect the investment performance of the funds selected by the participants. Participants can change the allocation of their account balances daily. The funds available under the DCP consist of 18 mutual funds with a variety of investment objectives. The investment funds had annual returns in fiscal 2018 ranging from -.68% to 23.66%.

NIKE, INC. ＊ *2018 Notice of Annual Meeting* **34**

PLF_000047

Sun Decl. Ex. 56, Page 38 of 54

Plaintiff's Trial Exhibit 336
Page 38 of 54

Amounts credited to participants' accounts are invested by us in actual investments matching the investment options selected by the participants to ensure that we do not bear any investment risk related to participants' investment choices.

The portion of a participant's account attributable to elective deferrals, including investment returns, is fully vested at all times. The portion of a participant's account attributable to NIKE contributions, including investment returns, is fully vested after the participant has been employed by us for five years. All of the Named Executive Officers are fully vested in their NIKE contributions.

Each time they elect to defer compensation, participants make an election regarding distribution of the compensation deferred under the election (as adjusted to reflect investment performance). A participant may elect for distribution to be made in a lump sum at the beginning of a predetermined year while the participant is still employed or in service (but no sooner than the fourth year after the year in which the distribution election is submitted). Alternatively, a participant may elect for distribution to be made in a lump sum or in quarterly installments over five, ten or fifteen years after termination of employment or service. Participants have limited rights to change their distribution elections. Participants may make a hardship withdrawal under certain circumstances. Subject to certain limitations, a participant may also at any time request to withdraw amounts from his or her account balance that were vested as of December 31, 2004 (and any subsequent investment returns on such amount). If such request is approved, the participant may withdraw 90% of the amount requested, and the remaining 10% will be permanently forfeited.

## Potential Payments Upon Termination or Change-in-Control

### Change-in-Control Compensation — Acceleration of Equity Awards

All unvested stock option, restricted stock, and restricted stock unit ("RSU") awards are subject to accelerated vesting upon the occurrence of two events (a "double-trigger"): there is a "change-in-control" and the Named Executive Officer's employment is terminated by us without "cause" or by the Named Executive Officer for "good reason", in each case on or before the second anniversary of the change in control. Double-trigger accelerated vesting of all awards will also occur if the Named Executive Officer's employment is terminated without "cause" or for "good reason" between shareholder approval of the change-in-control and the occurrence of the change-in-control (and, for restricted stock and RSUs, the change-in-control occurs within one year following the termination). In addition, for stock options granted since July 2010, the standard period for exercising options following termination of employment is extended from three months to four years, but not beyond each option's original 10-year term. Accelerated vesting of stock options and RSUs will also occur if we are acquired and the acquiring company does not assume the outstanding options or RSUs. In our agreements, "change-in-control" is generally defined to include:

- the acquisition by any person of 50% or more of our outstanding Class A Stock or, if the Class A Stock no longer elects a majority of directors, the acquisition by any person of 30% or more of our total outstanding Common Stock,

- the nomination (and subsequent election) in a two-year period of a majority of our directors by persons other than the incumbent directors,

- a sale of all or substantially all of our assets, and

- an acquisition of NIKE through a merger, consolidation or share exchange.

In our agreements, "cause" generally includes willful and continued failure to substantially perform assigned duties and willful engagement in illegal conduct materially injurious to us. In our agreements, "good reason" generally includes a material diminution in position or duties, a salary reduction or material reduction in other benefits, and a home office relocation of over 50 miles.

The following table shows the estimated benefits that would have been received by the Named Executive Officers if double-trigger accelerated vesting had occurred on May 31, 2018, when the closing price of our Class B Stock was $71.80 per share.

| Name | Stock Award Acceleration [1] | | Stock Option Acceleration [2] | | Total | |
|------|---|---|---|---|---|---|
| Mark G. Parker | $ | 48,513,968 | $ | 9,086,138 | $ | 57,600,106 |
| Andrew Campion | $ | 9,389,860 | $ | 3,320,863 | $ | 12,710,723 |
| Eric D. Sprunk | $ | 9,442,849 | $ | 4,521,138 | $ | 13,963,987 |
| Hilary K. Krane | $ | 6,580,542 | $ | 3,529,925 | $ | 10,110,467 |
| John F. Slusher | $ | 6,459,056 | $ | 3,441,988 | $ | 9,901,044 |
| Trevor A. Edwards | $ | 9,842,344 | $ | 5,022,350 | $ | 14,864,694 |

(1) Information regarding unvested restricted stock and restricted stock units held by each Named Executive Officer is set forth in the Outstanding Equity Awards table above. The award agreements provide for full double-trigger accelerated vesting as described above (for Performance-Based RSUs granted to Mr. Parker, assuming such awards are earned at 100%). The amounts in the table above represent the number of unvested restricted shares and RSUs multiplied by the closing price of our Class B Stock on May 31, 2018.

(2) Information regarding outstanding unvested options held by each Named Executive Officer is set forth in the Outstanding Equity Awards table above. The agreements governing unvested stock options provide for full double-trigger accelerated vesting and an extended post-termination exercise period as described above. Amounts in the table above represent the aggregate value as of May 31, 2018 of those options using the excess of the per share closing price of our Class B Stock on May 31, 2018 over the per share exercise price, multiplied by the number of unvested option shares for each Named Executive Officer.

### Benefits Triggered on Certain Employment Terminations

### Stock Option Acceleration and Extension

As of May 31, 2018, each Named Executive Officer held options to purchase Class B Stock as listed in the Outstanding Equity Awards table above. Under the terms of the stock options granted to each Named Executive Officer before July 2010, upon the death or disability of the officer, the standard three-month period for exercising options following termination of employment is extended to 12 months, but not beyond each option's original 10-year term. Under the terms of the stock options granted to each Named Executive Officer since July 2010, upon the death or disability

**NIKE, INC. •** *2018 Notice of Annual Meeting* **35**

PLF_000048

Sun Decl. Ex. 56, Page 39 of 54

Plaintiff's Trial Exhibit 336
Page 39 of 54

## EXECUTIVE COMPENSATION

of the officer, all unvested options become fully exercisable and the standard three-month period for exercising options following termination of employment is extended to four years, but not beyond each option's original 10-year term. If death or disability of a Named Executive Officer had occurred on May 31, 2018, the aggregate value of those options would have been $9,086,138 for Mr. Parker, $3,320,863 for Mr. Campion, $4,521,138 for Mr. Sprunk, $3,529,925 for Ms. Krane, $3,441,988 for Mr. Slusher, and $5,022,350 for Mr. Edwards.

Under the terms of the unvested stock options granted to Named Executive Officers since July 2010, vesting of options that have been outstanding for at least one year will be accelerated if the holder retires after reaching age 60 with at least 5 years of service, and vesting of options that have been outstanding for at least one year will continue notwithstanding termination of employment if the holder retires after reaching age 55 with at least 5 years of service. In addition, for any holder who retires after reaching age 55 (but before reaching age 60) with at least 5 years of service, the standard three-month period for exercising these options following termination of employment will be extended to four years, but not beyond the option's original ten-year term. If termination of employment of a Named Executive Officer (other than due to death or disability) had occurred on May 31, 2018, the aggregate value of those options would have been $6,990,638 for Mr. Parker and $3,752,350 for Mr. Edwards. The value for Mr. Sprunk, Mr. Campion, Ms. Krane, and Mr. Slusher is zero because they have not reached age 55.

## Stock Award Acceleration

As of May 31, 2018, each Named Executive Officer held unvested restricted stock and/or restricted stock units as set forth in the Outstanding Equity Awards table above. Under the terms of their award agreements, all unvested restricted shares and restricted stock units will immediately vest fully upon the death or disability of the holder, except that Performance-Based RSUs held by Mr. Parker will vest at the threshold amount. The value of the unvested restricted shares and restricted stock units held by each Named Executive Officer as of May 31, 2018 that would have become vested if death or disability had occurred on that date is as set forth in the "Stock Award Acceleration" column of the Change-in-Control Compensation — Acceleration of Equity Awards table above, except that the amount for Mr. Parker would be $36,549,503.

## Payments Under Noncompetition Agreements

We have an agreement with Mr. Parker that contains a covenant not to compete that extends for two years following the termination of his employment with us. The agreement provides that if Mr. Parker's employment is terminated by us, we will make monthly payments to him during the two-year noncompetition period in an amount equal to one-twelfth of his then current annual salary and target Executive Performance Sharing Plan bonus ("Annual NIKE Income"). The agreement provides further that if Mr. Parker voluntarily resigns, we will make monthly payments to him during the two-year noncompetition period in an amount equal to one-twenty-fourth of his then current Annual NIKE Income. However, commencement of the above-described monthly payments will be delayed until after the six-month period following Mr. Parker's separation from service, and all payments that he would otherwise have received during that period will be paid in a lump sum promptly following the end of the period, together with interest at the prime rate. If employment is terminated without "cause", the parties may mutually agree to waive the covenant not to compete, and if employment is terminated for "cause", we may unilaterally waive the covenant. Under Mr. Parker's noncompetition agreement, "cause" means continual and repeated neglect of duties or acts of dishonesty. If the covenant is waived, we will not be required to make the payments described above for the months as to which the waiver applies. If the employment of Mr. Parker had been terminated by us on May 31, 2018, and assuming the covenant is not waived, we would have been required to pay Mr. Parker $361,667 per month for the 24-month period ending May 31, 2020. If Mr. Parker had voluntarily resigned on May 31, 2018, and assuming the covenant is not waived, we would have been required to pay Mr. Parker $180,833 per month for the 24-month period ending May 31, 2020.

We have noncompetition agreements with Mr. Campion, Mr. Sprunk, Ms. Krane, Mr. Slusher, and Mr. Edwards on the same terms, except that the noncompetition period is one year instead of two years, payments may commence on termination, and we may unilaterally waive the covenant in all cases including termination without cause (in which case payments would cease). In addition, for Mr. Campion, Mr. Sprunk, Ms. Krane, Mr. Slusher, and Mr. Edwards, the monthly payments are one-twelfth or one-twenty-fourth of their then current annual salaries, instead of their Annual NIKE Income. If the employment of these officers had been terminated by us on May 31, 2018, and assuming the covenant is not waived, we would have been required to pay Mr. Campion $81,250, Mr. Sprunk $91,667, Ms. Krane $75,000, Mr. Slusher $75,000, and Mr. Edwards $100,000 each on monthly basis for the 12-month period ending May 31, 2019. If these officers had voluntarily resigned on May 31, 2018 and assuming the covenant is not waived, we would have been required to pay Mr. Campion $40,625, Mr. Sprunk $45,833, Ms. Krane $37,500, Mr. Slusher $37,500, and Mr. Edwards $50,000 each on a monthly basis for the 12-month period ending May 31, 2019.

Mr. Edwards resigned as President, NIKE Brand, effective March 15, 2018, and will retire from the Company in August 2018. In accordance with the noncompetition agreement described above, we will pay him $50,000 per month for the 12-month period ending August 2019.

**NIKE, INC.** *   *2018 Notice of Annual Meeting* **36**

PLF_000049

Sun Decl. Ex. 56, Page 40 of 54

Plaintiff's Trial Exhibit 336

Page 40 of 54

## EXECUTIVE COMPENSATION

## CEO Pay Ratio

NIKE strives to provide competitive base pay, market-leading benefits, and an exceptional work environment that collectively create a premium employee experience. Our pay and benefit programs are designed to attract and engage talent, and reward performance, viewed holistically across individual, team, and business results. Our programs are administered to be equitable relative to employees' performance, experience, and level within the Company.

The executive compensation program is highly incentive-based with Company performance determining a significant portion of total compensation. It is designed to motivate and maximize shareholder value by achieving both short- and long-term goals.

In accordance with the Dodd-Frank Act, the SEC adopted a rule that requires companies to disclose the ratio of CEO compensation to that of the median employee's.

This section discloses our CEO Pay Ratio and provides information on how the ratio was derived.

For fiscal 2018, our last completed fiscal year:

* The employee identified at the median of all NIKE employees (other than our CEO) was a retail store employee in the United States;

* The annual total compensation of the median employee was $24,955;

* The annual total compensation of our CEO, Mr. Parker, was $9,467,460; and

* The estimated ratio of the annual total compensation of our CEO to the median annual total compensation of all NIKE employees was 379 to 1.

This pay ratio is a reasonable estimate calculated in a manner consistent with SEC rules based on our payroll and employment records and the methodology described below. The SEC rules for identifying the median compensated employee and calculating the pay ratio based on that employee's annual total compensation allow companies to adopt a variety of methodologies, to apply certain exclusions, and to make reasonable estimates and assumptions that reflect their compensation practices. As such, the pay ratio reported by other companies may not be comparable to the pay ratio reported above, as other companies may have different employment and compensation practices and may utilize different methodologies, exclusions, estimates, and assumptions in calculating their own pay ratios.

## Methodology

To allow sufficient time to collect data across our global operations, we selected May 1, 2018 as the date to determine the "median employee". At that time, we had approximately 72,997 employees globally. We applied the "de minimis exemption" under SEC rules, which permits us to exclude non-U.S. employees accounting for 5% or less of our total employee population. After applying the de minimis exemption to exclude the 3,606 employees in the jurisdictions identified below, our employee population consisted of approximately 69,391 employees.

| Country | | Country | | Country | |
|---|---|---|---|---|---|
| Finland | 1 | New Zealand | 71 | Portugal | 166 |
| Slovenia | 3 | Norway | 73 | Israel | 168 |
| United Arab Emirates | 4 | Sweden | 78 | Thailand | 177 |
| Sri Lanka | 12 | Denmark | 89 | Austria | 182 |
| Slovakia | 14 | India | 89 | Greece | 185 |
| Philippines | 24 | Czech Republic | 96 | Vietnam | 188 |
| Macao | 33 | Switzerland | 102 | South Africa | 216 |
| Croatia | 45 | Indonesia | 115 | Poland | 235 |
| Hungary | 60 | Ireland | 118 | Hong Kong | 408 |
| Uruguay | 64 | Malaysia | 151 | Singapore | 439 |

Of the 69,391 employees included in the CEO Pay Ratio calculation, approximately 66% were full-time, 57% were in retail jobs, and 54% were located in the United States.

To identify our "median employee" we calculated target annual compensation for fiscal 2018 based on base salary or hourly wages, as applicable. For the majority of our employees, base salary or hourly wages comprise the majority of their compensation. To determine wages for hourly employees, we used each individual's pay rate and estimated scheduled hours in the applicable Human Resources system of record.

After determining the target annual compensation for our employee population as described above, we identified a subset of approximately 100 individuals representing the potential median employee population. For this subset, we calculated each employee's annual total compensation in U.S dollars for the fiscal year based on the Summary Compensation Table rules used for our Named Executive Officers (in accordance with Item 402(c)(2)(x) of Regulation S-K). Compensation for permanent employees hired during the fiscal year was annualized and the median employee was then selected from the subset to determine the CEO Pay Ratio.

PLF_000050

Sun Decl. Ex. 56, Page 41 of 54

Plaintiff's Trial Exhibit 336
Page 41 of 54

PROPOSAL 2

# Proposal 2      Shareholder Advisory Vote to Approve Executive Compensation

In accordance with the requirements of Section 14A of the Securities Exchange Act of 1934, we are submitting to shareholders our annual "say-on-pay proposal", an advisory vote to approve the compensation of our Named Executive Officers as described in this proxy statement.

At the Company's 2017 annual meeting of shareholders, we provided shareholders with an advisory vote with respect to how often we should hold a say-on-pay proposal vote, and shareholders voted in favor of holding such a vote annually. Consistent with the voting results, we will hold an advisory vote each year.

At the Company's 2017 annual meeting of shareholders, 94% of the votes cast on the say-on-pay proposal were voted in favor of the proposal. The Compensation Committee believes this affirms shareholders' support of the Company's approach to executive compensation.

As discussed in the Compensation Discussion and Analysis, our compensation philosophy is designed to attract and retain top talent, reward business results and performance, viewed holistically, and motivate executives to maximize long-term shareholder value. The program is competitive in the marketplace, highly incentive-based to align interests of executives with those of shareholders, and balanced across incentives to appropriately mitigate risk.

To achieve the objectives of our executive compensation program and emphasize pay-for-performance principles, the Compensation Committee has continued to employ the strong governance practices described in "Executive Compensation Governance Practices" on page 16, including:

- basing a majority of total compensation on performance and retention incentives;

- setting annual and long-term incentive targets based on clearly disclosed, objective performance measures;

- mitigating undue risk associated with compensation by using multiple performance targets, caps on potential incentive payments, and a clawback policy; and

- requiring executive officers to hold NIKE stock through published stock ownership guidelines.

Because your vote is advisory, it will not be binding on the Board. However, the Board values shareholder opinions, and the Compensation Committee will take into account the outcome of the vote when considering future executive compensation arrangements.

## Board Recommendation

**The Board of Directors recommends that shareholders vote FOR approval of the following resolution:**

**RESOLVED, that the shareholders approve the fiscal 2018 compensation paid to the Named Executive Officers as disclosed in this proxy statement pursuant to the SEC's compensation disclosure rules (which disclosure includes the Compensation Discussion and Analysis, the compensation tables, and the narrative disclosures that accompany the compensation tables).**

NIKE, INC. •   *2018 Notice of Annual Meeting* **38**

PLF_000051

Sun Decl. Ex. 56, Page 42 of 54

Plaintiff's Trial Exhibit 336
Page 42 of 54

PROPOSAL 3

# Proposal 3     Shareholder Proposal Regarding Political Contributions Disclosure

The following shareholder proposal (the "Proposal") will be voted on at the Annual Meeting only if properly presented by or on behalf of the shareholder proponent. Mercy A. Rome, c/o Investor Voice, SPC, 111 Queen Anne Ave N, Suite 500, Seattle, WA 98109, a holder of 76 shares of Class B Stock submitted the Proposal. The Board of Directors recommends a vote AGAINST the Proposal and asks shareholders to read through NIKE's response which follows the Proposal.

**BE IT RESOLVED** : The shareholders of NIKE, Inc. ("NIKE" or "Company") hereby request that the Company provide a report, updated semiannually, to disclose the Company's :

1.  Policies and procedures for making, with corporate funds or assets, direct or indirect contributions and expenditures to:
    a. participate or intervene in any campaign on behalf of (or in opposition to) any candidate for public office, or
    b. influence the general public, or any segment thereof, with respect to an election or referendum.

2.  Monetary and non-monetary contributions and expenditures (direct and indirect) used in the manner described in section 1 above, including:
    a. the identity of the recipient as well as the amount paid to each; and
    b. the title(s) of the person(s) in the Company responsible for oversight and decision-making.

The report shall be presented to the Board of Directors or relevant board committee and posted on the Company's website within 12 months from the date of the annual meeting. This Proposal is not to encompass lobbying spending.

## Supporting Statement

As long-term shareholders of NIKE, we support transparency and accountability in corporate electoral spending. This includes any activity considered intervention in a political campaign under the Internal Revenue Code, such as direct and indirect contributions to political candidates, parties, or organizations, along with independent expenditures and electioneering communications on behalf of Federal, State, or local candidates.

Disclosure is in the best interest of the Company and its shareholders. The U.S. Supreme Court recognized this in its 2010 Citizens United decision, which said: "[D]isclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."

Public records show NIKE has contributed at least $2,106,738 in corporate funds since the 2010 election cycle (CQMoneyLine: http://moneyline.cq.com; National Institute on Money in State Politics: http://www.followthemoney.org).

However, relying on publicly available data does not provide a complete picture of the Company's electoral spending. For example: undisclosed and unknown are any Company payments to trade associations that are used for election-related activities.

Concerned shareholders ask the Company to disclose all of its electoral spending – including payments to trade associations and other tax-exempt organizations – which may be used for electoral purposes. This would bring our Company in line with a growing number of leading companies in the consumer discretionary sector – including Ralph Lauren Corp. and Tiffany & Co. – which present this information on their public websites.

The Company's Board and shareholders need comprehensive disclosure to fully assess and regulate the use of corporate assets in elections.

**THEREFORE:** We urge your vote FOR this critical governance enhancement.

## The Company's Statement in Opposition to Proposal 3

The Board of Directors recommends that shareholders vote AGAINST this Proposal because:

*   Our current policies and public disclosures already address many of the items requested by the Proposal;

*   In the Board's judgment, more disclosure than we already provide would not be in the best interests of shareholders; and

*   NIKE received virtually identical proposals for its Annual Meetings in 2012, 2013, 2015, 2016, and 2017, and the proposals were rejected by approximately 78%, 82%, 73%, 71%, and 70%, respectively, of shares voted.

Frankly, we agree with our shareholders.

NIKE is committed to the highest ethical standards when engaging in political activities. We have strong governance practices and accountability in corporate spending on political activities, and maintain a level of transparency that we believe allows shareholders to have the information they need to make informed decisions. This Proposal is unnecessary to achieve these objectives and the proponent offers no new compelling evidence or arguments in support of the Proposal.

NIKE's Political Contributions Policy (the "Policy") is designed to give shareholders confidence that there is proper oversight of political activity and to allow shareholders to assess any risks associated with significant contributions. All of our political contributions and expenditures are made in accordance with the Policy and our objective is to strictly comply with all public reporting laws. Our Policy ensures that political

**NIKE, INC.** ◦   *2018 Notice of Annual Meeting* **39**

PLF_000052

Sun Decl. Ex. 56, Page 43 of 54

Plaintiff's Trial Exhibit 336
Page 43 of 54

**PROPOSAL 3**

contributions, trade group memberships, and policy statements are made in a manner consistent with NIKE's core values to protect or enhance shareholder value, without regard to the private political preferences of our corporate officers. Our Policy describes the policies and procedures for making corporate political contributions, how they are approved, who must approve them, and how they are reported to the Board's Corporate Responsibility, Sustainability & Governance Committee. Our Policy is available on our website at http://investors.nike.com/investors/corporate-governance.

Consistent with our Policy, we also annually disclose on our website all direct political contributions to any candidate, political party, or ballot initiative in any year that exceed $100,000, and all political contributions in any U.S. state where we make more than 50% of our political contributions in any year. We believe these disclosures provide shareholders meaningful information to assess any risks posed by significant political contributions. Our disclosures are simple, accurate, and clear and we have published them for every year since 2012.

Our Policy also requires that management annually report on compliance with our Policy to the Board's Corporate Responsibility, Sustainability & Governance Committee, and review the strategic priorities for political contributions and trade association affiliations, to ensure they align with the long-term business objectives of the Company.

The additional disclosure requested in this Proposal could place NIKE at a competitive disadvantage by revealing strategies and priorities designed to protect the economic future of NIKE, its employees and its shareholders. Given that parties with interests adverse to NIKE also participate in the political process for their business advantage, any unilateral expanded disclosure could benefit them, while harming the interests of NIKE and its shareholders.

In summary, the Board of Directors believes the Proposal is unnecessary because NIKE has followed a comprehensive policy for oversight and disclosure of political contributions for many years. If adopted, the Proposal would cause NIKE to incur undue cost and administrative burden, as well as competitive harm, without commensurate benefit to our shareholders. Our shareholders have understandably rejected this Proposal five times before.

## Board Recommendation

**The Board of Directors recommends a vote AGAINST the shareholder proposal.**

**NIKE, INC.** ▪ *2018 Notice of Annual Meeting* **40**

PLF_000053

Sun Decl. Ex. 56, Page 44 of 54

Plaintiff's Trial Exhibit 336
Page 44 of 54

PROPOSAL 4

# Proposal 4    Ratification of Appointment of Independent Registered Public Accounting Firm

The Audit & Finance Committee of the Board of Directors has sole authority to retain, with shareholder ratification, the Company's independent registered public accounting firm. The Audit & Finance Committee directly oversees the firm's work with respect to the annual audit of the Company's consolidated financial statements and internal control over financial reporting and approves all audit engagement fees and terms. At least annually, the Audit & Finance Committee evaluates the independent registered public accounting firm's qualifications, performance, and independence, including a review and evaluation of its lead partner. The Audit & Finance Committee is also involved in the selection of the new lead engagement partner following mandated rotation of the firm's lead partner, and is responsible for considering the benefits of rotation of the Company's independent registered public accounting firm.

The Audit & Finance Committee has appointed PricewaterhouseCoopers LLP to audit the Company's consolidated financial statements and internal control over financial reporting for the fiscal year ending May 31, 2019 and to render other professional services as required.

PricewaterhouseCoopers LLP has served as the Company's independent registered public accounting firm for many years. The Audit & Finance Committee and the Board of Directors believe that the continued retention of PricewaterhouseCoopers LLP as the independent registered public accounting firm is in the best interests of the Company and its shareholders.

Accordingly, the Audit & Finance Committee is submitting the appointment of PricewaterhouseCoopers LLP to shareholders for ratification. If the appointment is not ratified by our shareholders, the Audit & Finance Committee may reconsider whether it should appoint another independent registered public accounting firm.

Representatives of PricewaterhouseCoopers LLP will be present at the Annual Meeting, will have the opportunity to make a statement if they desire to do so, and are expected to be available to respond to questions.

Aggregate fees billed by the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP, for audit services related to the most recent two fiscal years, and for other professional services incurred in the most recent two fiscal years, were as follows:

| Type of Service | | 2018 | | | 2017 | |
|---|---|---|---|---|---|---|
| Audit Fees [(1)] | $ | 20.3 | million | $ | 20.1 | million |
| Audit-Related Fees [(2)] | | — | million | | — | million |
| Tax Fees [(3)] | | 1.3 | million | | 1.6 | million |
| All Other Fees [(4)] | | 0.1 | million | | 0.1 | million |
| Total | $ | 21.7 | million | $ | 21.8 | million |

(1) Comprises the audits of the Company's annual financial statements and internal controls over financial reporting, and reviews of the Company's quarterly financial statements, as well as statutory audits of Company subsidiaries, attest services and consents to SEC filings.

(2) Comprises services including consultations regarding financial accounting and reporting.

(3) Comprises services for tax compliance, tax planning and tax advice. Tax compliance includes services for compliance related tax advice, as well as the preparation and review of both original and amended tax returns for the Company and its consolidated subsidiaries. Tax compliance related fees represented $0.1 million and $0.3 million of the tax fees for fiscal 2018 and 2017, respectively. The remaining tax fees primarily include tax advice.

(4) Comprises other miscellaneous services.

In accordance with the Sarbanes-Oxley Act of 2002, the Audit & Finance Committee established policies and procedures under which all audit and non-audit services performed by the Company's independent registered public accounting firm must be approved in advance by the Audit & Finance Committee. During fiscal 2018, all such services performed by, and fees paid to, PricewaterhouseCoopers LLP were approved in advance. During fiscal 2017, fees totaling $4,080, or less than 0.1% of total fees, were paid to PricewaterhouseCoopers LLP for two engagements that were not pre-approved. All such services were approved by the Audit & Finance Committee promptly after their inadvertent omission from pre-approval was noticed.

## Board Recommendation

**The Board of Directors recommends that shareholders vote FOR ratification of the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ending May 31, 2019.**

NIKE, INC. ‧ *2018 Notice of Annual Meeting* 41

PLF_000054

Sun Decl. Ex. 56, Page 45 of 54

Plaintiff's Trial Exhibit 336

Page 45 of 54

**PROPOSAL 4**

## Report of the Audit & Finance Committee

The Audit & Finance Committee has:

- Reviewed and discussed the audited financial statements with management.

- Discussed with the independent auditors the matters required to be discussed by Public Company Accounting Oversight Board ("PCAOB") Statement on Auditing Standards No. 16 *Communications with Audit Committees.*

- Received the written disclosures and the letter from the independent accountants required by applicable requirements of the PCAOB regarding the independent accountants' communications concerning independence, and has discussed with the independent accountant the independent accountant's independence.

- Based on the review and discussions above, recommended to the Board of Directors that the audited financial statements be included in the Company's Annual Report on Form 10-K for the last fiscal year for filing with the Securities and Exchange Commission.

Members of the Audit & Finance Committee:
- Alan B. Graf, Jr., Chairman
- John G. Connors
- John J. Donahoe II

**NIKE, INC.** • *2018 Notice of Annual Meeting* **42**

PLF_000055

Sun Decl. Ex. 56, Page 46 of 54

Plaintiff's Trial Exhibit 336

Page 46 of 54

**OTHER MATTERS / SHAREHOLDER PROPOSALS**

## Other Matters

As of the time this proxy statement was printed, management was unaware of any proposals to be presented for consideration at the Annual Meeting other than those set forth herein, but if other matters do properly come before the Annual Meeting, the persons named in the proxy will vote the shares represented by such proxy according to their best judgment.

## Shareholder Proposals

A proposal by a shareholder for inclusion in the Company's proxy statement and form of proxy for the 2019 annual meeting of shareholders must be received by Ann M. Miller, Vice President, Corporate Secretary & Chief Compliance Officer of NIKE, Inc. at One Bowerman Drive, Beaverton, Oregon 97005-6453, on or before April 4, 2019 to be eligible for inclusion. Rules under the Securities Exchange Act of 1934, as amended, describe standards as to the submission of shareholder proposals. In addition, the Company's Bylaws require that any shareholder wishing to make a nomination for director, or wishing to introduce a proposal or other business at a shareholder meeting must give the Company at least 60 days' advance written notice, which for the 2019 annual meeting of shareholders is July 21, 2019, and that notice must meet certain other requirements described in the Bylaws.

For the Board of Directors,

**Ann M. Miller**

*Vice President, Corporate Secretary & Chief Compliance Officer*

**NIKE, INC.** •  *2018 Notice of Annual Meeting* **43**

PLF_000056

Sun Decl. Ex. 56, Page 47 of 54

Plaintiff's Trial Exhibit 336

Page 47 of 54

**ANNUAL**
**MEETING**
**AND**
**PROXY STATEMENT**

# September 20, 2018
# Beaverton, Oregon



*Whether or not you plan to attend the meeting, please sign and date the enclosed proxy card and return it in the enclosed envelope, or vote online or by telephone following the instructions on the proxy card.*

PLF_000057

Sun Decl. Ex. 56, Page 48 of 54

Plaintiff's Trial Exhibit 336
Page 48 of 54



**IMPORTANT ANNUAL MEETING INFORMATION**

0:10004



**Admission Ticket**

### Electronic Voting Instructions

**Available 24 hours a day, 7 days a week!**

Instead of mailing your proxy, you may choose one of the voting methods outlined below to vote your proxy.

VALIDATION DETAILS ARE LOCATED IN THE TITLE BAR BELOW.

**Proxies submitted online or by telephone must be received by 1:00 a.m., Central Time, on September 20, 2018.**



**Vote Online**

- Go to **www.investorvote.com**
- Or scan the QR code with your smartphone
- Follow the steps outlined on the secure website

**Vote by telephone**

- Call toll free 1-800-652-VOTE (8683) within the USA, US territories & Canada on a touch tone telephone
- Follow the instructions provided by the recorded message

Using a **black ink** pen, mark your votes with an **X** as shown in this example. Please do not write outside the designated areas.

☒

---

**Annual Meeting Proxy Card**　　　　　　　　　　　　　1234  5678  9012  345

↳ IF YOU HAVE NOT VOTED ONLINE OR BY TELEPHONE, FOLD ALONG THE PERFORATION, DETACH AND RETURN THE BOTTOM PORTION IN THE ENCLOSED ENVELOPE. ↳

---

**A** **Proposals — The Board of Directors recommends a vote FOR all the nominees listed in Proposal 1, a vote FOR Proposals 2 and 4, and a vote AGAINST Proposal 3.**

**1. Class A director nominees:** To elect a Board of Directors for the ensuing year.　　　　　　　　　»

| | For | Withhold | | For | Withhold | | For | Withhold |
|---|---|---|---|---|---|---|---|---|
| 01 - Cathleen A. Benko | ☐ | ☐ | 02 - Elizabeth J. Comstock | ☐ | ☐ | 03 - John G. Connors | ☐ | ☐ |
| 04 - Timothy D. Cook | ☐ | ☐ | 05 - John J. Donahoe II | ☐ | ☐ | 06 - Peter B. Henry | ☐ | ☐ |
| 07 - Travis A. Knight | ☐ | ☐ | 08 - Mark G. Parker | ☐ | ☐ | 09 - John R. Thompson, Jr. | ☐ | ☐ |

| | For | Against | Abstain | | | For | Against | Abstain |
|---|---|---|---|---|---|---|---|---|
| 2. To approve executive compensation by an advisory vote. | ☐ | ☐ | ☐ | 3. Shareholder proposal regarding political contributions disclosure. | | ☐ | ☐ | ☐ |
| 4. To ratify the appointment of PricewaterhouseCoopers LLP as independent registered public accounting firm. | ☐ | ☐ | ☐ | 5. To transact such other business as may properly come before the meeting. | | | | |

PLF_000058

Sun Decl. Ex. 56, Page 49 of 54

Plaintiff's Trial Exhibit 336
Page 49 of 54

**B**     **Non-Voting Items**

**Change of Address** — Please print new address below.

**C**     **Authorized Signatures — This section must be completed for your vote to be counted. — Date and Sign Below**

Please sign exactly as name(s) appears hereon. Joint owners should each sign. When signing as attorney, executor, administrator, corporate officer, trustee, guardian, or custodian, please give full title.

| Date (mm/dd/yyyy) — Please print date below. | Signature 1 — Please keep signature within the box. | Signature 2 — Please keep signature within the box. |
| --- | --- | --- |
| / / | | |

C 1234567890     J N T

1 U P X     1 4 1 8 6 0 2

PLF_000059

Sun Decl. Ex. 56, Page 50 of 54

Plaintiff's Trial Exhibit 336

Page 50 of 54

**Meeting Information**

**2018 Annual Meeting of Shareholders**
**for Shareholders as of July 20, 2018**
**September 20, 2018**
**10:00 A.M. PDT**

**Meeting Location:**

**Tiger Woods Conference Center**
**One Bowerman Drive**
**Beaverton, OR 97005**

**Meeting Directions:**

| | |
|---|---|
| **From I-5 South of Portland:** | I-5 North to 217 North. Follow to Hwy 26 West. |
| **From I-5 North of Portland:** | I-5 South to I-405 South. Follow to Hwy 26 West. |
| **From I-84 East of Portland:** | I-84 West to I-5 South to I-405 North. Follow to Hwy 26 West. |

Exit Hwy 26 at Murray Blvd, turn left, and drive one mile. Turn right on SW Bowerman Drive into the NIKE World Headquarters (WHQ). Keep right at the entry and go directly to the parking structure. Follow posted signs to The Tiger Woods Conference Center, which is located directly ahead of the parking structure. **Please note that the NIKE Campus is a non-smoking location and smoking is not permitted on NIKE property.**

Ç   **IF YOU HAVE NOT VOTED ONLINE OR BY TELEPHONE, FOLD ALONG THE PERFORATION, DETACH AND RETURN THE BOTTOM PORTION IN THE ENCLOSED ENVELOPE.** Ç



## NIKE, INC.

CLASS A COMMON STOCK PROXY

**SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**
FOR THE 2018 ANNUAL MEETING OF SHAREHOLDERS
SEPTEMBER 20, 2018

The undersigned hereby appoints Mark G. Parker, Travis A. Knight and John C. Lechleiter, and each of them, proxies with full power of substitution, to vote, as designated on the reverse side, on behalf of the undersigned, all shares of Class A Common Stock which the undersigned may be entitled to vote at the Annual Meeting of Shareholders of NIKE, Inc. on September 20, 2018, and any adjournments thereof, with all powers that the undersigned would possess if personally present. A majority of the proxies or substitutes present at the meeting may exercise all powers granted hereby.

**THE SHARES REPRESENTED BY THIS PROXY WILL BE VOTED AS SPECIFIED, BUT IF NO SPECIFICATION IS MADE, THIS PROXY WILL BE VOTED FOR THE ELECTION OF THE NOMINEES FOR DIRECTOR FOR PROPOSAL 1, FOR PROPOSALS 2 AND 4, AND AGAINST PROPOSAL 3. THE PROXIES MAY VOTE IN THEIR DISCRETION AS TO OTHER MATTERS WHICH MAY COME BEFORE THE MEETING.**

YOU ARE ENCOURAGED TO SPECIFY YOUR CHOICES BY MARKING THE APPROPRIATE BOXES, BUT YOU NEED NOT MARK ANY BOXES IF YOU WISH TO VOTE IN ACCORDANCE WITH THE BOARD OF DIRECTORS' RECOMMENDATIONS. THE PROXIES CANNOT VOTE THESE SHARES UNLESS YOU SIGN AND RETURN THIS CARD OR PROPERLY VOTE ONLINE OR BY TELEPHONE.

PLF_000060

Sun Decl. Ex. 56, Page 51 of 54

Plaintiff's Trial Exhibit 336
Page 51 of 54



### Admission Ticket

### Electronic Voting Instructions

**Available 24 hours a day, 7 days a week!**

Instead of mailing your proxy, you may choose one of the voting methods outlined below to vote your proxy.

VALIDATION DETAILS ARE LOCATED IN THE TITLE BAR BELOW.

**Proxies submitted online or by telephone must be received by 1:00 a.m., Central Time, on September 20, 2018.**

**Vote Online**
- Go to **www.investorvote.com**
- Or scan the QR code with your smartphone
- Follow the steps outlined on the secure website

**Vote by telephone**
- Call toll free 1-800-652-VOTE (8683) within the USA, US territories & Canada on a touch tone telephone
- Follow the instructions provided by the recorded message

Using a **black ink** pen, mark your votes with an **X** as shown in this example. Please do not write outside the designated areas.

**Annual Meeting Proxy Card**    1234  5678  9012  345

q **IF YOU HAVE NOT VOTED ONLINE OR BY TELEPHONE, FOLD ALONG THE PERFORATION, DETACH AND RETURN THE BOTTOM PORTION IN THE ENCLOSED ENVELOPE.** q

**A** **Proposals — The Board of Directors recommends a vote FOR all the nominees listed in Proposal 1, a vote FOR Proposals 2 and 4, and a vote AGAINST Proposal 3.**

1. **Class B director nominees:** To elect a Board of Directors for the ensuing year.

| | For | Withhold | | For | Withhold | | For | Withhold |
|---|---|---|---|---|---|---|---|---|
| 01 - Alan B. Graf, Jr. | ☐ | ☐ | 02 - John C. Lechleiter | ☐ | ☐ | 03 - Michelle A. Peluso | ☐ | ☐ |

| | | For | Against | Abstain | | | For | Against | Abstain |
|---|---|---|---|---|---|---|---|---|---|
| 2. | To approve executive compensation by an advisory vote. | ☐ | ☐ | ☐ | 3. | Shareholder proposal regarding political contributions disclosure. | ☐ | ☐ | ☐ |
| 4. | To ratify the appointment of PricewaterhouseCoopers LLP as independent registered public accounting firm. | ☐ | ☐ | ☐ | 5. | To transact such other business as may properly come before the meeting. | | | |

PLF_000061

Sun Decl. Ex. 56, Page 52 of 54

Plaintiff's Trial Exhibit 336
Page 52 of 54

**B**    **Non-Voting Items**

**Change of Address** — Please print new address below.

**C**    **Authorized Signatures — This section must be completed for your vote to be counted. — Date and Sign Below**

Please sign exactly as name(s) appears hereon. Joint owners should each sign. When signing as attorney, executor, administrator, corporate officer, trustee, guardian, or custodian, please give full title.

Date (mm/dd/yyyy) — Please print date below.     Signature 1 — Please keep signature within the box.     Signature 2 — Please keep signature within the box.

    /     /

C 1234567890    J N T

1 U P X    1 4 1 8 6 0 2

+

PLF_000062

Sun Decl. Ex. 56, Page 53 of 54

Plaintiff's Trial Exhibit 336

Page 53 of 54

**Meeting Information**

**2018 Annual Meeting of Shareholders**
**for Shareholders as of July 20, 2018**
**September 20, 2018**
**10:00 A.M. PDT**

**Meeting Location:**

**Tiger Woods Conference Center**
**One Bowerman Drive**
**Beaverton, OR 97005**

**Meeting Directions:**

| | |
|---|---|
| **From I-5 South of Portland:** | I-5 North to 217 North. Follow to Hwy 26 West. |
| **From I-5 North of Portland:** | I-5 South to I-405 South. Follow to Hwy 26 West. |
| **From I-84 East of Portland:** | I-84 West to I-5 South to I-405 North. Follow to Hwy 26 West. |

Exit Hwy 26 at Murray Blvd, turn left, and drive one mile. Turn right on SW Bowerman Drive into the NIKE World Headquarters (WHQ). Keep right at the entry and go directly to the parking structure. Follow posted signs to The Tiger Woods Conference Center, which is located directly ahead of the parking structure. **Please note that the NIKE Campus is a non-smoking location and smoking is not permitted on NIKE property.**

---

Ç   IF YOU HAVE NOT VOTED ONLINE OR BY TELEPHONE, FOLD ALONG THE PERFORATION, DETACH AND RETURN THE BOTTOM PORTION IN THE ENCLOSED ENVELOPE.   Ç



## NIKE, INC.

---

CLASS B COMMON STOCK PROXY

**SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS**
FOR THE 2018 ANNUAL MEETING OF SHAREHOLDERS
SEPTEMBER 20, 2018

The undersigned hereby appoints Mark G. Parker, Travis A. Knight and John C. Lechleiter, and each of them, proxies with full power of substitution, to vote, as designated on the reverse side, on behalf of the undersigned, all shares of Class B Common Stock which the undersigned may be entitled to vote at the Annual Meeting of Shareholders of NIKE, Inc. on September 20, 2018, and any adjournments thereof, with all powers that the undersigned would possess if personally present. A majority of the proxies or substitutes present at the meeting may exercise all powers granted hereby.

**THE SHARES REPRESENTED BY THIS PROXY WILL BE VOTED AS SPECIFIED, BUT IF NO SPECIFICATION IS MADE, THIS PROXY WILL BE VOTED FOR THE ELECTION OF THE NOMINEES FOR DIRECTOR FOR PROPOSAL 1, FOR PROPOSALS 2 AND 4, AND AGAINST PROPOSAL 3. THE PROXIES MAY VOTE IN THEIR DISCRETION AS TO OTHER MATTERS WHICH MAY COME BEFORE THE MEETING.**

YOU ARE ENCOURAGED TO SPECIFY YOUR CHOICES BY MARKING THE APPROPRIATE BOXES, BUT YOU NEED NOT MARK ANY BOXES IF YOU WISH TO VOTE IN ACCORDANCE WITH THE BOARD OF DIRECTORS' RECOMMENDATIONS. THE PROXIES CANNOT VOTE THESE SHARES UNLESS YOU SIGN AND RETURN THIS CARD OR PROPERLY VOTE ONLINE OR BY TELEPHONE.

PLF_000063

Sun Decl. Ex. 56, Page 54 of 54

Plaintiff's Trial Exhibit 336
Page 54 of 54

# EXHIBIT 20

---

Message

| | |
|---|---|
| **From:** | MMatheson [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6FBEEAB93A734FB3939CC8B7F8EDCCA8-M.MMATHESON] |
| **Sent:** | 4/4/2018 4:00:23 PM |
| **To:** | Lst-Nike.Global [lst-nike.global@nike.com] |
| **BCC:** | Powell, Nigel [nigel.powell@nike.com]; Leonard, Kellie [kellie.leonard@nike.com]; Remuzzi, Mary [mary.remuzzi@nike.com]; Oei, Sabrina [sabrina.oei@nike.com]; Freinquel, Mihal [mihal.freinquel@nike.com]; Favret, Emily [emily.favret@nike.com]; Communications, Internal [internal.communications@nike.com]; Wade, Marcus [marcus.wade@nike.com]; Krane, Hilary [hilary.krane@nike.com]; Matheson, Monique [monique.matheson@nike.com]; ███████████████████ Andrews, Antoine [antoine.andrews@nike.com]; Fuller, Julie [julie.fuller@nike.com]; Leinwand, Robert [robert.leinwand@nike.com]; Thibodeaux, Lauren [lauren.thibodeaux@nike.com]; Lupo, Kim [kimberly.lupo@nike.com]; Simpson, Patrick [patrick.simpson@nike.com]; Smiddy, Alex [alex.smiddy@nike.com]; Small, Carolyn [carolyn.small@nike.com]; Bassett, Lynn [lynn.bassett@nike.com] |
| **Subject:** | Representation & Pay Equity Commitments |
| **Flag:** | Follow Up |



Team –

We are committed to evolving our culture and making NIKE, Inc. an environment focused on respect, equality, inclusion and empowerment. For NIKE to grow and evolve, we need to create meaningful change and put a sharper focus on how we lead our teams and work together.

We're a growth company committed to employing the best and brightest to serve consumers globally. Employees with the necessary skillset, expertise and diversity are critical to drive our business forward. Diversity allows for a breadth of perspectives and experiences to develop thoughtful and original ideas; it's a key component of innovation.

We also want to create a culture of true inclusion. As part of our plan, we need to improve representation of women and people of color (POC). While we're focused on these two areas in the near term, we will continue to expand representation across other dimensions of diversity over the long term.

While we've spoken about this many times, and tried different ways to achieve change, we have failed to gain traction – and our hiring and promotion decisions are not changing senior-level representation as quickly as we have wanted. We need to accelerate our progress and are committed to being transparent.

I want to walk you through a few elements of this – including where we are now and how we plan to improve. Also, I'd like to help explain some recent pay-related data. It's a lot. Please take some time to get through it.

**OUR CURRENT REPRESENTATION**

Our efforts to improve will begin at the Vice President (VP) level, because representation at this level provides a foundation for us to grow representation at all levels. As a group, these leaders manage broad teams, recognize and promote our internal talent, hire in larger volume, and are charged with leading the business direction for our company and tone for our culture. They also serve as role models and advocates for talent in the organization.

Our FY17 data show that at the VP level, representation is currently at 29% women globally, and 16% POC in the U.S. The U.S. is the only country in which NIKE captures employee race/ethnicity information. Many countries restrict the collection of personal demographic information so we are unable to capture it consistently. Even so, we will continue to make progress against diverse representation globally.

We're also committed to increasing diverse representation across all levels of the company, because we know that our manager and director-level employees will be part of the future senior leadership teams for NIKE. See the FY17 data

for all employees, Directors+ and VPs here:

**THE UK GENDER PAY GAP REPORT DETAILS**

I also wanted to share that today, the Nike Brand filed a legally-required government report that measures the

Plaintiff's Trial Exhibit 18
Page 2 of 4

difference in average pay for UK women and men at Nike.

The UK Gender Pay Gap is calculated by aggregating all men's pay versus all women's pay – across all bands, levels and jobs – and taking the average of each. The difference in average pay is caused by having fewer UK women in senior-level, higher-paying positions.

Applying the formula, the calculations show that on average, UK men earned 10% more in hourly pay than women in Wholesale (comprised of all Nike employees in the UK minus Retail) and 3% more in Retail. The bonus pay difference between UK men and women was 37% in Wholesale and 15% in Retail. You can learn more about this methodology and data here.

We are working on an action plan to address these results locally in the UK.

**PAY EQUITY IS ONE PART OF THE SOLUTION**

Not to be confused with the UK Gender Pay Gap Report, we also want to provide our most recent data on Global Pay Equity, which we reported last year for the first time. Pay Equity is defined as equal compensation for women, men and all races/ethnicities who undertake the same work at the same level, experience and performance. It's different from the UK Pay Gap analysis because it looks at pay for jobs, rather than average of all pay.

Our FY17 Pay Equity data show that for every $1 earned by men, women globally earned 99.9 cents, and for every $1 earned by white employees in the U.S., POC earned $1.

Our approach mirrors that of other leading companies, and allows us to compare across companies and evaluate progress. We've also heard from some of you that this result does not reflect your personal experience, so we have begun supplemental analysis to help us to learn more about specific parts of the company and make speedier progress.

We are monitoring these data, and adjusting where appropriate, driving with 1:1 as our goal for both groups, every year. And while Pay Equity is an important measure, we are also focused on the deeper issue of driving changes in representation, banding and promotions. We will be studying time-in-job and the pace of promotions across our employee base – with a strong focus on women and POC – to understand how this impacts representation.

**DRIVING TOWARD CHANGE**

We are committed to driving change to move us forward. We've done some work overall already, but need to move faster. Here is where we will start:

- **Hold leaders accountable:** There are three ways to increase representation – promotion, retention and hiring – and we're working through strategic initiatives and action plans to enable each of them. Leaders will be held accountable for representation growth within their teams (women globally, and POC in the U.S.).
- **Develop diverse talent:** A multi-faceted approach to investing in our diverse talent. This includes evolving our current development offerings, creating new programs that accelerate emerging diverse leaders, and expanding our employee networks – showcasing our commitment to engaging the diverse talent of the future.
- **Inclusive hiring:** Invest in a dedicated diversity sourcing team to be immersed in the marketplace; increase visibility and accountability to ensure slates of diverse candidates when hiring; and remove bias from critical moments of the hiring process by creating more inclusive job descriptions, enabling blind resume reviews, eliminating the collection of candidate salary history, and using data to inform hiring decisions.
- **Accelerated training:** Focused manager training, beginning in May, to ensure all managers are clear on expectations – when and how they are compelled to act – and have resources to lead in a manner consistent with our values and behaviors. Mandatory Unconscious Bias Awareness training for all employees aimed at creating a stronger, more inclusive culture. Unconscious Bias Awareness training will launch to employees located in the U.S. and Canada in August, with a global launch to all employees in mid-FY19.

Our executive leadership team is committed to action and change. We begin with representation – which we know requires sharp and sustained attention. We will be talking a lot more about our culture, redefining what great leadership looks like and how we model a culture where all leaders are focused on empowering our employees.

We look forward to having a full, open dialogue with everyone. We will also provide opportunities to continue this

conversation, and for our communities around the world to share and connect. Over the next couple of weeks and continuing in the months ahead, there will be opportunities to speak directly with leaders face-to-face in small group sessions, 1:1s and D&I-sponsored forums about what this means.

I know you probably have questions, and we've tried to answer some of them here. I believe we are moving in the right direction, and as an Executive Leadership Team, we're encouraged by the passion and voices we hear. We're listening and we'll keep this dialogue going.

We need everyone's help to drive this change, and our leadership team is accountable for making progress against this vision.

I'll connect again soon.

**Mo Matheson**
Chief Human Resources Officer

FOR INTERNAL USE ONLY. © 2018 ALL RIGHTS RESERVED

For more information visit:

# EXHIBIT 21

Message

---

**From:** Abisror, Lance [Lance.Abisror@nike.com]
**Sent:** 10/24/2016 5:08:48 PM
**To:** Radloff, Paula [Paula.Radloff@nike.com]
**CC:** Laboe, Daniel [Daniel.Laboe@nike.com]
**Subject:** FW: Talent Acquisition Offer Intake Form - Internal Template

Just an FYI as this was originally sent to me but more appropriate for broader BF TA teams.

Lance Abisror
Executive Talent Scout | Nike, Inc. | Office: ☎954.370.6872 | Mobile: ☎954.558.4330|

 

---

**From:** Lance Abisror <Lance.Abisror@nike.com>
**Date:** Monday, October 24, 2016 at 11:53 AM
**To:** "Marlin, Meredith" <Meredith.Marlin@nike.com>
**Cc:** "Dickson, Kevin" <Kevin.Dickson@nike.com>, "Vinton, Zack" <Zack.Vinton@nike.com>, "Rettenmyer, Nick" <Nick.Rettenmyer@nike.com>
**Subject:** Re: Talent Acquisition Offer Intake Form - Internal Template

That's great context Meredith. No disagreement here. Was just calling out as 99% of reqs don't come form my team so biggest impact/change would be to get buy in from TA handling vast majority reqs is all. Glad to know Stef and Denise are on board.

Lance Abisror
Executive Talent Scout | Nike, Inc. | Office: ☎954.370.6872 | Mobile: ☎954.558.4330|

 

---

**From:** "Marlin, Meredith" <Meredith.Marlin@nike.com>
**Date:** Monday, October 24, 2016 at 11:49 AM
**To:** Lance Abisror <Lance.Abisror@nike.com>
**Cc:** "Dickson, Kevin" <Kevin.Dickson@nike.com>, "Vinton, Zack" <Zack.Vinton@nike.com>, "Rettenmyer, Nick" <Nick.Rettenmyer@nike.com>
**Subject:** Re: Talent Acquisition Offer Intake Form - Internal Template

As I mentioned below, I shared with my TA partners. They are Stefanie and Denise. I am not sure of others' plans or if they are experiencing the same issues that I am, but I have a need to reduce cycle time on offers, and I need to fix it sooner vs later. I see TR's job as being clear on what we need (hence the form) and TA's expertise is knowing when in the process is the right time to engage the candidate in the discussion.

I haven't discussed or shared with Paula but would be happy to be part of the discussion if this was added to her next LT meeting, which I am attending for a related but different purpose.

Sent from my iPhone

On Oct 23, 2016, at 8:36 PM, Abisror, Lance <Lance.Abisror@nike.com> wrote:

Hi all,
Curious if this was sent to any of the TA LT or Paula? As you know, I only focus on 10-12 CLT searches a year and the candidate conversation at that level is much different than E/S or other bands. There's nuance around what we ask for

Confidential

and when we do it (i.e. getting high level cash comp vs. an equity statement vs. a realtor drive by and home visit to understand potential LOS – all happen at different stages of candidacy and engagement).

I agree we can button up the form and format we use currently (incorporating what Kevin has put together) but I'd recommend sharing with TA Biz Facing Sr. Directors on Paula's team (Ben, Stefanie, Jessica, Denise) to understand it's implications at scale.


Lance Abisror
Executive Talent Scout | Nike, Inc. | Office: ☎954.370.6872 | Mobile: ☎954.558.4330|
<image001.png>

---

**From:** "Marlin, Meredith" <Meredith.Marlin@nike.com>
**Date:** Friday, October 21, 2016 at 4:43 PM
**To:** "Dickson, Kevin" <Kevin.Dickson@nike.com>, "Vinton, Zack" <Zack.Vinton@nike.com>, "Rettenmyer, Nick" <Nick.Rettenmyer@nike.com>, Lance Abisror <Lance.Abisror@nike.com>
**Subject:** RE: Talent Acquisition Offer Intake Form - Internal Template

Hi Kevin,
I provided this to my TA pod partners for their feedback, too. Now that E and S band offers have come to the TRCs we are experiencing the same pain. I hate to mandate formats and forms, but this level of discipline not only helps our internal processes, it helps TA be buttoned up on the candidate side so they only have to go to the candidate once or twice asking for information. I've been in the situation more than once where we had to go with what we know (which wasn't the full picture) because there had been so much back and forth with the candidate already, we made the call to not go back again. This avoids that.


Will let you know what I hear from my partners,
M

---

**From:** Dickson, Kevin
**Sent:** Monday, October 10, 2016 5:39 PM
**To:** Marlin, Meredith <Meredith.Marlin@nike.com>; Vinton, Zack <Zack.Vinton@nike.com>; Rettenmyer, Nick <Nick.Rettenmyer@nike.com>; Abisror, Lance <Lance.Abisror@nike.com>
**Subject:** Talent Acquisition Offer Intake Form - Internal Template

Good Afternoon Everyone,

Attached you will find two separate excel templates I have put together for Talent Acquisition to use when requesting offer recommendations – one for external offers and the other for internal offers.

These intake forms will achieve the following:
| ? | Receive all of the requisite information in one email communication |
| ? | Minimize the back-and-forth between TA/HRBP/TRC/Comp |
| ? | Help us store information in a more organized manner |
| ? | Drastically reduce turnaround times for offers |

The problem we have been having is the way in which we receive employee/candidate information as well as sometimes not having the complete picture in order the most informed recommendation. For example, sometimes we will receive internal offer requests from TA that just have a candidate's first and last name and a position number with the ask to promote them. Then we have to go back and ask them for an employee ID, job code, and a hiring manager to ensure internal equity within the org.

Confidential

When receiving requests for external offers, sometimes we will receive an email with the candidate name and a comp summary, but won't have the resume attached to do research on the company, stock price, fiscal year end, etc. Or even if we do receive all of the pertinent candidate information, we may spend time putting together what we feel is an attractive offer, but then we will find out that the business had a certain number they didn't want to exceed, or the candidate doesn't care about base salary and wants a huge sign-on because s/he has always wanted to open a brewery and they will move to NIKE from New York for a tiny base salary as long as we can give them $150,000 cash sign-on to start their awesome brewery in Portland.

Can you please take a look at both of these excel files and let me know any thoughts you have? Are there any key pieces of information needed in making an offer that I have not taken into account? Do you like/dislike the font? Is it simple enough to comprehend and complete?

Thanks,
KD

**Kevin Dickson** | Lead Executive Compensation Consultant | NIKE Global Compensation
Office: 503.532.7061 | mobile: 971.250.1412 | fax: 503.863.3214

Confidential

NIKE_00060781

# EXHIBIT 22

## OFFER INTAKE FORM

| | |
|---|---|
| Date Submitted: | Desired Delivery Date: |
| Submitted By: | HRBP Associated with Hire: |

**CURRENT CANDIDATE INFORMATION**     <--- USE FOR EXTERNAL OFFERS

| | |
|---|---|
| Candidate Name: | Current Company: |
| Location (City, State): | Company Stock Symbol: |
| Company Fiscal Year End: | < Select > |
| Job Title: | |

**BASE PAY EXPECTATIONS**

| | |
|---|---|
| Annual Base Salary Expectations: | |

**BONUS EXPECTATIONS**

| | |
|---|---|
| Annual Bonus Target % Expectations: | |
| Annual Bonus Target Amt Expectations: | |

**EQUITY EXPECTATIONS - UNVESTED EQUITY OR DEFERRED COMPENSATION THAT CANDIDATE WOULD FORFEIT OR HAVE CANCELLED BY VIRTUE OF THE CANDIDATE'S RESIGNATION FROM THEIR CURRENT EMPLOYER IN NEXT 24 MONTHS**

| | | | |
|---|---|---|---|
| Vehicle Type 1: | < Select > | Vesting Schedule: | |
| Equity Target: | <Select> | Is Award Size Based on Perf: | < Select > |
| Vehicle Type 2: | < Select > | Vesting Schedule: | |
| Equity Target: | <Select> | Is Award Size Based on Perf: | < Select > |
| Vehicle Type 3: | < Select > | Vesting Schedule: | |
| Equity Target: | <Select> | Is Award Size Based on Perf: | < Select > |

**LONG-TERM CASH EXPECTATIONS**

| | |
|---|---|
| Long-Term Cash Target: | |

**ADDITIONAL COMPENSATION EXPECTATIONS**

Does the candidate have any additional compensation expectations that should be considered (e.g. requests for allowances, additional bonuses, etc.)? Please explain and provide award type/size expectations.

**NIKE JOB INFORMATION**     <--- USE FOR EXTERNAL OFFERS ONLY

| | | |
|---|---|---|
| Hiring Manager Name: | Proposed Start Date: | |
| Position Title: | Job Location: | < Select > |
| Position Number: | Cost Center: | |
| Job Code: | Job Band: | |
| Job Title: | Pay Range Minimum: | |
| Job Pipeline: | Pay Range Median: | |
| Job Family: | Pay Range Maximum: | |

**MOBILITY/IMMIGRATION**     <--- USE FOR EXTERNAL OFFERS ONLY

| | | | |
|---|---|---|---|
| Has Pre-Offer Immigration Assessment been initiated? | < Select > | Has Pre-Offer Relocation Consultation been initiated? | < Select > |
| Visa or Sponsorship Required: | < Select > | Homeowner or Renter: | < Select > |
| Type: | | Potential Loss on Sale: | < Select > |
| Explanation: | | Explanation: | |

Are there any unique relocation issues? Is the candidate being localized? If so, please provide context.

**CONTEXT & TALENT STORY**     <--- USE FOR EXTERNAL OFFERS ONLY

**BUSINESS/HIRING MANAGER VIEWPOINT:** Does the hiring manager have compensation recommendations in mind for salary, sign-on, stock, etc.?

**TALENT STORY:** What will the candidate bring to Nike? Why is this the best candidate for the job? Is this candidate a "unicorn" or the best available?

**ADDITIONAL INFO:** Is there any additional information that should be considered in developing this offer?

**ATTACHMENTS**     <--- USE FOR EXTERNAL OFFERS ONLY

| | | | | | |
|---|---|---|---|---|---|
| Candidate Resume: | < Select > | | Documentation Supporting Localization: | < Select > | Additional Attachments: | < Select > |

## OFFER INTAKE FORM

| Date Submitted: | | Desired Delivery Date: | |
|---|---|---|---|
| Submitted By: | | HRBP Associated with Hire: | |

**CURRENT CANDIDATE INFORMATION**  <-- USE FOR EXTERNAL OFFERS

| Candidate Name: | | Current Company: | |
|---|---|---|---|
| Location (City, State): | | Company Stock Symbol: | |
| Company Fiscal Year End: | < Select > | | |
| Job Title: | | | |

**BASE PAY EXPECTATIONS**

| Annual Base Salary Expectations: | |
|---|---|

**BONUS EXPECTATIONS**

| Annual Bonus Target % Expectations: | | | |
|---|---|---|---|
| Annual Bonus Target Amt Expectations: | | | |

**ADDITIONAL COMPENSATION EXPECTATIONS**

Does the candidate have any additional compensation expectations that should be considered (e.g. requests for allowances, additional bonuses, equity, etc.)? Please explain and provide award type/size expectations.

**NIKE JOB INFORMATION**  <-- USE FOR EXTERNAL OFFERS

| Hiring Manager Name: | | Proposed Start Date: | |
|---|---|---|---|
| Position Title: | | Job Location: | < Select > |
| Position Number: | | Cost Center: | |
| Job Code: | | Job Band: | |
| Job Title: | | Pay Range Minimum: | |
| Job Pipeline: | | Pay Range Median: | |
| Job Family: | | Pay Range Maximum: | |

**MOBILITY/IMMIGRATION**  <-- USE FOR  EXTERNAL OFFERS ONLY

| Has Pre-Offer Immigration Assessment been initiated? | < Select > | Has Pre-Offer Relocation Consultation been initiated? | < Select > |
|---|---|---|---|
| Visa or Sponsorship Required: | < Select > | | |
| Type: | | | |
| Explanation: | | Explanation: | |

Are there any unique relocation issues? Is the candidate being localized? If so, please provide context.

**CONTEXT & TALENT STORY**  <-- USE FOR EXTERNAL OFFERS ONLY

**BUSINESS/HIRING MANAGER VIEWPOINT: Does the hiring manager have compensation recommendations in mind for salary, sign-on, stock, etc.?**

**TALENT STORY: What will the candidate bring to Nike? Why is this the best candidate for the job? Is this candidate a "unicorn" or the best available?**

**ADDITIONAL INFO: Is there any additional information that should be considered in developing this offer?**

**ATTACHMENTS**  <-- USE FOR EXTERNAL OFFERS ONLY

| Candidate Resume: | < Select > | | Documentation Supporting Localization: | < Select > | Additional Attachments: | < Select > |
|---|---|---|---|---|---|---|

# OFFER INTAKE FORM

| Date Submitted: | | Desired Delivery Date: | |
|---|---|---|---|
| Submitted By: | | HRBP Associated with Hire: | |

## CURRENT CANDIDATE INFORMATION

| Candidate Name: | | EE ID: | Internal Offers Only |
|---|---|---|---|
| Location (City, State): | | Current Company: | |
| Company Fiscal Year End: | < Select > | Company Stock Symbol: | |
| Job Title: | | | |

### BASE PAY

| Annual Base Salary: | |
|---|---|

### BONUS

| Annual Bonus Target %: | | Previous Bonus Amount Paid: | |
|---|---|---|---|
| Annual Bonus Target Amt: | | Anticipated Bonus Amount: | |
| Bonus Payout Frequency: | | Bonus Payout Date: | |
| Does the candidate need to be employed on a certain date to receive the bonus? If so, what date? | | | |
| If the candidate leaves their current company, what amount will they receive in prorated bonus? | | | |

### EQUITY

| Vehicle Type 1: | < Select > | | Vesting Schedule: | |
|---|---|---|---|---|
| Equity Target: | | <Select> | Is Award Size Based on Perf: | < Select > |
| Vehicle Type 2: | < Select > | | Vesting Schedule: | |
| Equity Target: | | <Select> | Is Award Size Based on Perf: | < Select > |
| Vehicle Type 3: | < Select > | | Vesting Schedule: | |
| Equity Target: | | <Select> | Is Award Size Based on Perf: | < Select > |

### LONG-TERM CASH

| Long-Term Cash Target: | | Performance Period: | |
|---|---|---|---|

### ADDITIONAL COMPENSATION

| Is there any additional compensation that should be considered (e.g. allowances, additional bonuses, etc.)? Please explain and provide award type/size. |
|---|
| |

Plaintiff's Trial Exhibit 305

# OFFER INTAKE FORM

## NIKE JOB INFORMATION

| | | | |
|---|---|---|---|
| **Hiring Manager Name:** | | **Proposed Start Date:** | |
| **Position Title:** | | **Job Location:** | < Select > |
| **Position Number:** | | **Cost Center:** | |
| **Job Code:** | | **Job Band:** | |
| **Job Title:** | | **Pay Range Minimum:** | |
| **Job Pipeline:** | | **Pay Range Median:** | |
| **Job Family:** | | **Pay Range Maximum:** | |

## MOBILITY/IMMIGRATION

| | | | |
|---|---|---|---|
| **Has Pre-Offer Immigration Assessment been initiated?** | < Select > | **Has Pre-Offer Relocation Consultation been initiated?** | < Select > |
| **Visa or Sponsorship Required:** | < Select > | **Homeowner or Renter:** | < Select > |
| **Type:** | | **Potential Loss on Sale:** | < Select > |
| **Explanation:** | | **Explanation:** | |

**Are there any unique relocation issues? Is the candidate being localized? If so, please provide context.**

| |
|---|
| |

Rev. 3/2/2017

NIKE CONFIDENTIAL

Plaintiff's Trial Exhibit 305



# OFFER INTAKE FORM

## CONTEXT & TALENT STORY

**CANDIDATE EXPECTATIONS:** Please provide information related to any discussions related candidate expectations around salary, sign-on, etc.

**BUSINESS/HIRING MANAGER VIEWPOINT:** Does the hiring manager have compensation recommendations in mind for salary, sign-on, stock, etc.?

**TALENT STORY:** What will the candidate bring to Nike? Why is this the best candidate for the job? Is this candidate a "unicorn" or the best available?

**ADDITIONAL INFO:** Is there any additional information that should be considered in developing this offer?

## ATTACHMENTS

| Candidate Resume: | < Select > | Equity Award Summary or Statement: | < Select > | Documentation Supporting Localization: | < Select > | Additional Attachments: | < Select > |
|---|---|---|---|---|---|---|---|

Plaintiff's Trial Exhibit 305

## OFFER INTAKE FORM EXAMPLE

| | | | |
|---|---|---|---|
| Date Submitted: | 3/2/2017 | Desired Delivery Date: | 3/9/2017 |
| Submitted By: | Daffy Duck | HRBP Associated with Hire: | Bugs Bunny |

### CURRENT CANDIDATE INFORMATION

| | | | |
|---|---|---|---|
| Candidate Name: | Stan Podolak | EE ID: | Internal Offers Only |
| Location (City, State): | Birmingham, AL | Current Company: | Birmingham Barons |
| Company Fiscal Year End: | June | Company Stock Symbol: | MLBB |
| Job Title: | Publicist and Personal Assistant | | |

### BASE PAY

| | |
|---|---|
| Annual Base Salary: | $100,000 |

### BONUS

| | | | |
|---|---|---|---|
| Annual Bonus Target %: | 15% | Previous Bonus Amount Paid: | $20,000 |
| Annual Bonus Target Amt: | $15,000 | Anticipated Bonus Amount: | $17,500 |
| Bonus Payout Frequency: | Annual | Bonus Payout Date: | 7/1/2017 |
| Does the candidate need to be employed on a certain date to receive the bonus? If so, what date? | | | 6/1/2017 |
| If the candidate leaves their current company, what amount will they receive in prorated bonus? | | | $2,500 |

### EQUITY

| | | | | |
|---|---|---|---|---|
| Vehicle Type 1: | RSUs | | Vesting Schedule: | 3 Year Cliff Vest |
| Equity Target: | 50,000 | Dollars | Is Award Size Based on Perf: | No |
| Vehicle Type 2: | Stock Options | | Vesting Schedule: | 4 Year Annual Vest |
| Equity Target: | 15,000 | Shares | Is Award Size Based on Perf: | Yes |
| Vehicle Type 3: | < Select > | | Vesting Schedule: | n/a |
| Equity Target: | n/a | <Select> | Is Award Size Based on Perf: | < Select > |

### LONG-TERM CASH

| | | | |
|---|---|---|---|
| Long-Term Cash Target: | $10,000 | Performance Period: | 2 Year Cliff Vest |

### ADDITIONAL COMPENSATION

| |
|---|
| Is there any additional compensation that should be considered (e.g. allowances, additional bonuses, etc.)? Please explain and provide award type/size. |
| No special circumstances. |

Plaintiff's Trial Exhibit 305
Page 6 of 11

# OFFER INTAKE FORM EXAMPLE

## NIKE JOB INFORMATION

| | | | |
|---|---|---|---|
| Hiring Manager Name: | Lola Bunny | Proposed Start Date: | 4/1/2017 |
| Position Title: | Operations Director | Job Location: | Beaverton, OR |
| Position Number: | 2596648 | Cost Center: | 109987 |
| Job Code: | A0937 | Job Band: | E |
| Job Title: | DIR: LOGISTICS | Pay Range Minimum: | $125,000 |
| Job Pipeline: | LOGISTICS & SERVICES | Pay Range Median: | $150,000 |
| Job Family: | PRODUCT DELIVERY | Pay Range Maximum: | $175,000 |

## MOBILITY/IMMIGRATION

| | | | |
|---|---|---|---|
| Has Pre-Offer Immigration Assessment been initiated? | Yes | Has Pre-Offer Relocation Consultation been initiated? | Yes |
| Visa or Sponsorship Required: | Yes | Homeowner or Renter: | Homeowner |
| Type: | H1-B Visa | Potential Loss on Sale: | Yes |
| Explanation: | Hoping to relocate this candidate from the Center of the Earth to Beaverton. Will require an H1-B Visa. | Explanation: | Candidate owns a house. Loss on sale assistance will likely be required, pending assessment by Cartus. |

**Are there any unique relocation issues? Is the candidate being localized? If so, please provide context.**

Candidate will need 3 months temporary housing.

Plaintiff's Trial Exhibit 305

# OFFER INTAKE FORM EXAMPLE

## CONTEXT & TALENT STORY

**CANDIDATE EXPECTATIONS: Please provide information related to any discussions related candidate expectations around salary, sign-on, etc.**

Candidate is expecting sign-on of at least $100K

**BUSINESS/HIRING MANAGER VIEWPOINT: Does the hiring manager have compensation recommendations in mind for salary, sign-on, stock, etc.?**

Hiring manager believes this is the best candidate possible and is ok with the $500K sign-on.

**TALENT STORY: What will the candidate bring to Nike? Why is this the best candidate for the job? Is this candidate a "unicorn" or the best available?**

Candidate is has potential to save struggling business unit based on skills and experience. Brings assets to Nike that we don't currently have on the bench.

**ADDITIONAL INFO: Is there any additional information that should be considered in developing this offer?**

Candidate has 2 additional offers on the table at this time.

## ATTACHMENTS

| Candidate Resume: | | Equity Award Summary or Statement: | | Documentation Supporting Localization: | | Additional Attachments: | |
|---|---|---|---|---|---|---|---|
| | Yes | | Yes | | Yes | | No |

Plaintiff's Trial Exhibit 305

# IDEAL!



**Restricted Stock Units (RSUs)**

| Award ID | Award Date | Type | Award Price | Granted | Unvested Market Value | Grant Agreement Status | Messages |
|---|---|---|---|---|---|---|---|
| ⊙ | 04/18/2016 | RSU | $0.00 | 492 | $24,555.72 | | N/A |

Symbol:
Vested: 0
Award Name: 63077
Unvested: 492
Shares issued: 0
Canceled: 0
Vesting schedule:

| Future Vest Date [1] | # of Shares [1] | Prior Vest Date [1] | # of Shares [1] |
|---|---|---|---|
| 04/18/2017 | 123 | | |
| 04/18/2018 | 123 | | |
| 04/18/2019 | 123 | | |
| 04/18/2020 | 123 | | |

[1] Subject to the terms and conditions of your grants.

| Award ID | Award Date | Type | Award Price | Granted | Unvested Market Value | Grant Agreement Status | Messages |
|---|---|---|---|---|---|---|---|
| ⊙ | 04/20/2015 | RSU | $0.00 | 392 | $14,673.54 | | N/A |

Symbol:
Vested: 98
Award Name: 62309
Unvested: 294
Shares issued: 98
Canceled: 0
Vesting schedule:

| Future Vest Date [1] | # of Shares [1] | Prior Vest Date [1] | # of Shares [1] |
|---|---|---|---|
| 04/20/2017 | 98 | | |
| 04/20/2018 | 98 | | |
| 04/20/2019 | 98 | | |

[1] Subject to the terms and conditions of your grants.

| Award ID | Award Date | Type | Award Price | Granted | Unvested Market Value | Grant Agreement Status | Messages |
|---|---|---|---|---|---|---|---|
| ⊙ | 04/22/2014 | RSU | $0.00 | 1086 | $27,101.13 | | N/A |

Symbol:
Vested: 543
Award Name: 61872
Unvested: 543
Shares issued: 543
Canceled: 0
Vesting sched

| Future Vest Date [1] | # of Shares [1] | Prior Vest Date [1] | # of Shares [1] |
|---|---|---|---|
| 04/22/2017 | 271 | | |
| 04/22/2018 | 272 | | |

**Annual awards listed separately with award type, vesting details including # of shares, vesting dates & number of shares already vested. If this were for options, it should also show award strike price.**

Plaintiff's Trial Exhibit 305
Page 9 of 11

## OKAY

### Grant Summary

<u>Print</u> View by    Classic    Chart

The amounts below show the total vested and unvested potential income and are based on a share price of Stock Symbol

**WMT $68.70** As of COB 10/07/2016

| All Grants | Restricted Units |
|---|---|
| $128,881 | $128,881 |

☑ Show Outstanding Grants

All dates are displayed in MM/DD/YYYY format

**All Grants**

Restricted Stock Units

| Grant Date | Restricted Stock Unit/Code | Units Balance | Units Vested | Potential Income Vested | Units Unvested | Potential Income Unvested | Final Vest Date | |
|---|---|---|---|---|---|---|---|---|
| 04/12/2016 | Restricted Stock Units | 509 | 0 | $0 | 509 | $34,968 | 03/16/2021 | Actions |
| 04/02/2015 | Restricted Stock Units | 434 | 0 | $0 | 434 | $29,816 | 03/17/2020 | Actions |
| 04/01/2014 | Restricted Stock Units | 456 | 0 | $0 | 456 | $31,327 | 03/19/2019 | Actions |
| 04/24/2013 | Restricted Stock Units | 225 | 0 | $0 | 225 | $15,458 | 03/13/2018 | Actions |
| 04/23/2012 | Restricted Stock Units | 252 | 0 | $0 | 252 | $17,312 | 03/15/2017 | Actions |
| Totals | | 1,876 | | $0 | | $128,881 | | |



> With info from candidate: "Stock vests 50% in year 2 and the remaining 50% in year 5"

**This isn't ideal since it doesn't show any details about the original award size, or vesting timing. But with vesting schedule details, we can still determine walkaway value**

Plaintiff's Trial Exhibit 305
Page 10 of 11

## NOT ENOUGH DETAIL



**This summary looks nice but doesn't have the level of detail that we need. Are these awards in the format of options or RSUs? How many shares/options have been awarded and when do they vest?**

Plaintiff's Trial Exhibit 305
Page 11 of 11

# EXHIBIT 23

---

| | |
|---|---|
| **From:** | Walker, Shane </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0ED06E8E4E9E4AA79DDACB90BE212AF3-WALKER, SHA> |
| **To:** | Lupo, Kim; Bynum, Jessica; Vinton, Zack; Martin, Leah; White, Shelli |
| **CC:** | Bierwagen, Cheryl; Buckmaster, David |
| **Sent:** | 4/6/2019 12:20:33 AM |
| **Subject:** | Facilitator Sign-up for Managing Pay at Nike |

Hi All,

We've landed the activation plan for the Total Rewards Fundamentals course which we're calling Managing Pay at Nike. We will be offering 69 sessions at WHQ and 24 Virtual Sessions via BlueJeans between April 23rd and June 14th. A majority of these sessions will be facilitated by the Total Rewards Consulting team, however, we'd love if you'd participate in facilitating some of these sessions as well. I wanted to give you first pick at dates and times before I open up the 'sign-up' to TRCs.

Below is a table with the number of sessions we're looking to have each of you facilitate (I was able to connect with David and Cheryl in person today).

- If you aren't able to sign-up for the number of sessions listed below, don't worry...just let me know and we can find other ways to resource.
- And, if you'd like to facilitate more sessions than what I have listed...feel free to sign-up for more directly in the file on Box.

| Name | # of Sessions | Sign-up Status |
|---|---|---|
| David Buckmaster | 8 | Complete |
| Shelli White | 8 | |
| Leah Martin | 8 | |
| Kim Lupo | 2 | |
| Jessica Bynum | 2 | |
| Zack Vinton | 2 | |
| Cheryl Bierwagen | 2 | Complete |

By **Monday morning** if you could go into the master file on Box and select your name under the TRC Facilitator column on the WHQ and/or Virtual Session tabs, I'd greatly appreciate it. à Click here to sign-up
- *Alternatively, if you don't have a preference, I'm happy to sign you up for sessions once the TRC's have made their way through the sign-up process.*

If you have any questions or trouble signing up, please don't hesitate to reach out.

**Shane Walker**
Sr. Director, Broad-based Compensation  |  **NIKE Total Rewards**
Mobile: 503.268.9623  |  Email: shane.walker@nike.com

Plaintiff's Trial Exhibit 280
Page 1 of 1

# EXHIBIT 24

| From: | Tieszen, Melissa </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=23A2EDD914554494B906B0AF5CA9F9D9-TIESZEN, ME> |
|---|---|
| To: | Quintas, Ana (Ana.Quintas@nike.com) |
| CC: | Janke, Amy (Amy.Janke@nike.com) |
| Sent: | 7/31/2016 12:18:05 AM |
| Subject: | PSD Training - Your module! |
| Attachments: | PSD TRAINING.MarketPricing.pptx |

Hi Ana,

Thanks so much for joining the Pay Structure Training Video cast!  J

In order to allow you as much time as possible to prepare for the shoot, attached is the module that you'll be recording.  Our recording day is on Wednesday the 10th and  I'll be sending over additional logistics following the "run-of-show" meeting with the video guys next week.  (Sounds so professional, right?!?!)

Each slide has some initial speaker's notes but you are welcome to add in additional commentary.  I understand that they have a teleprompter so if it would be helpful, feel free to prepare a list of reminders of what you would like to cover for each slide - according to the video guys, bullet points are better than full scripts.

If you have any questions about the intent or content of any of the slides, don't hesitate to reach out!

Thanks again!

Melissa Tieszen | **Global Compensation Consultant**
NIKE Global Compensation
( 503.671.5987 | * melissa.tieszen@nike.com

Plaintiff's Trial Exhibit 285
Page 1 of 1

# EXHIBIT 25

---

| From: | Tieszen, Melissa </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=23A2EDD914554494B906B0AF5CA9F9D9-TIESZEN, ME> |
|---|---|
| To: | Taylor, Michael (US); Franks, AJ |
| CC: | Janke, Amy (Amy.Janke@nike.com) |
| Sent: | 8/9/2016 9:10:49 PM |
| Subject: | FW: Final Taping Schedule |

Our schedule for tomorrow will be changing slightly, please see below.

Also, just want to confirm that we're still good to go…I'm hoping that AJ is feeling much better today!

M

---

**From:** Janke, Amy
**Sent:** Tuesday, August 09, 2016 2:03 PM
**To:** Beachy, Josh
**Cc:** Tieszen, Melissa; Albers, Emily
**Subject:** Final Taping Schedule

Hola, here's the final taping schedule:

| Wednesday, Aug. 10 | | |
|---|---|---|
| 8 - 8:45 a.m. | Emily Denney | Range Positioning |
| 8:45 - 9:30 a.m. | Emily Albers | Internal Movement |
| 9:30 - 10:15 a.m. | Barbara Fick | Talking About Rewards |
| 10:15 - 11 a.m. | Melissa Tieszen | Job Architecture |
| 11 - 11:45 a.m. | Amy Janke | HR - Pay Ranges |
| 11:45 - 12:30 p.m. | LUNCH | |
| 12:30 - 1:15 p.m. | Kate Gerhart | Manager.PSD |
| 1:15 - 2 p.m. | Meredith Marlin | TR Philosophy |
| 2 - 2:45 p.m. | Amy Janke | Europe Location Differential |
| 2:45 - 3:30 p.m. | Ana Quintas | Market Pricing |
| 3:30 - 4:14 p.m. | Zack Vinton | Intro (no deck) |
| 4:15 - 5 p.m. | Kevin Dickson | U.S. Location Differential |

**Amy Janke** | Lead Global Rewards Manager | NIKE Global Compensation | +1-503-532-6913 | Amy.Janke@nike.com

---

**From:** Janke, Amy
**Sent:** Tuesday, August 09, 2016 1:51 PM
**To:** Beachy, Josh
**Cc:** Tieszen, Melissa
**Subject:** RE: CANCELLED: VIDEO RECORDING - US Location Differential, Europe Location Differential & HR PSD

Not really, but I hunted them down. Here's the schedule. Zack can take my spot if he wants it earlier.

| Wednesday, Aug. 10 | | |
|---|---|---|
| 8 - 8:45 a.m. | Emily Denney | Range Positioning |
| 8:45 - 9:30 a.m. | Emily Albers | Internal Movement |
| 9:30 - 10:15 a.m. | Barbara Fick | Talking About Rewards |
| 10:15 - 11 a.m. | Melissa Tieszen | Job Architecture |
| 11 - 11:45 a.m. | Amy Janke | HR - Pay Ranges |
| 11:45 - 12:30 p.m. | LUNCH | |
| 12:30 - 1:15 p.m. | Kate Gerhart | Manager.PSD |
| 1:15 - 2 p.m. | Meredith Marlin | TR Philosophy |
| 2 - 2:45 p.m. | Zack Vinton | Intro (no deck) |

Confidential

NIKE_00060294

Plaintiff's Trial Exhibit 288
Page 1 of 2

| 2:45 - 3:30 p.m. | Ana Quintas | Market Pricing |
| 3:30 - 4:14 p.m. | Kevin Dickson | U.S. Location Differential |
| 4:15 - 5 p.m. | Amy Janke | Europe Location Differential |

**Amy Janke** | Lead Global Rewards Manager | NIKE Global Compensation | +1-503-532-6913 | Amy.Janke@nike.com

---

**From:** Beachy, Josh
**Sent:** Tuesday, August 09, 2016 1:48 PM
**To:** Janke, Amy
**Subject:** RE: CANCELLED: VIDEO RECORDING - US Location Differential, Europe Location Differential & HR PSD

Did anyone respond to this?

---

**From:** Janke, Amy
**Sent:** Monday, August 08, 2016 7:08 AM
**To:** Tieszen, Melissa; Gibb, David; Dickson, Kevin; Albers, Emily
**Cc:** Beachy, Josh
**Subject:** CANCELLED: VIDEO RECORDING - US Location Differential, Europe Location Differential & HR PSD

Hey guys,

Taping cancelled for today in case you didn't see the previous email.

Gibb, I think you're out for the rest of the week so I can take your module.

Kevin, let me know if you can do Wednesday. Your pick of times are:
11 – 11:45am
3:30 – 4:15pm
4:15 – 5:00pm

Melissa, I will take the other two open spots for mine and Gibb's.

Emily, I think you are already scheduled for Wednesday at 8:45 – 9:30. Let me know if this time is still OK for you.

Thanks!
Amy

**Amy Janke** | Lead Global Rewards Manager | NIKE Global Compensation | +1-503-532-6913 | Amy.Janke@nike.com

-----Original Appointment-----
**From:** Tieszen, Melissa
**Sent:** Tuesday, August 02, 2016 10:40 AM
**To:** Tieszen, Melissa; Gibb, David; Franks, AJ; Janke, Amy; Dickson, Kevin; Albers, Emily
**Subject:** VIDEO RECORDING - US Location Differential, Europe Location Differential & HR PSD
**When:** Monday, August 08, 2016 9:00 AM-11:00 AM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Alpha Force - Kersey

Updating the recording session timing to get in a few early videos –

- Kevin, could you be there at 9am?
- David, your session is still at 10am

Thanks all!
Melissa

Confidential

# EXHIBIT 26

| From: | Tieszen, Melissa </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=23A2EDD914554494B906B0AF5CA9F9D9-TIESZEN, ME> |
|---|---|
| To: | Taylor, Michael (US); Franks, AJ |
| CC: | Beachy, Josh; Janke, Amy (Amy.Janke@nike.com); Albers, Emily |
| Sent: | 8/12/2016 5:01:55 PM |
| Subject: | Training Website - Pay Structure Design |
| Attachments: | TR.TrainingBackground.png; Training Website.xlsx |

Hi Michael,

Thanks again for all of your help in getting our sessions recorded. I think they're going to be great!

Attached is our information for the website where the videos will be stored, including the order of videos, a few questions to use as the blurb about each video and links to other resources. We still owe you a few items (in red) but hopefully this info will help you get started.

I've also attached a photo that can be used as the background image for our training page – let me know if you need it saved in a different format.

We're aiming to have these training sessions available to HR by 8/24, in order to hit our comms dates. If that's not possible, please let us know. Also, for those comms & our website, we'll need the links to this training so that we can make sure that we're getting people to the right place.

Let us know if you have any questions or need additional details, and thanks again!
Melissa

**Melissa Tieszen | Global Compensation Consultant**
NIKE Global Compensation
( 503.671.5987 | ℅ melissa.tieszen@nike.com

Plaintiff's Trial Exhibit 290
Page 1 of 1

# EXHIBIT 27

| Order on page | Video | Title | Blurb | Other Resources |
|---|---|---|---|---|
| 1 | Intro (no deck) | Total Reward Training Introduction | Introduction to training modules by Zack Vinton - VP, Broad-based Total Rewards | Compensation Strategy & Overview (https://nikehr.nike.com/?q=page/compensation-strategy-and-overview-16524) |
| 2 | TR Philosophy | Total Rewards Philosophy | How does Nike position itself and its rewards programs in the marketplace? What are the elements of Total Rewards at Nike? | Compensation Strategy & Overview (https://nikehr.nike.com/?q=page/compensation-strategy-and-overview-16524) |
| 3 | Job Architecture | Nike Job Architecture | How are jobs organized at Nike? What are global jobs and how are they used? How do I pick the best job code for my employees? | Talk With me : Bands & Levels *(https://nikehr.nike.com/sites/default/files-public/legacy/attachments/twm-bands-and-levels.pdf)* *Choosing a Job Code (https://nikehr.nike.com/sites/default/files-public/legacy/attachments/choosing-* |
| 4 | Manager.PSD | NIKE'S Pay Ranges - VALUES Bands | What are pay structures and how are they different from the market zones that we've been using? | *FAQ document - link to be provided later* |
| 5 | U.S. Location Differential | USA Location Differential | What is a location differential & how will it be used in the US? | *FAQ document - link to be provided later* |
| 6 | Europe Location Differential | Europe Location Differential | What is a location differential & how will it be used in Europe? | *FAQ document - link to be provided later* |
| 7 | Range Positioning | Range Positioning | How do I use the new ranges to make sure that the employees on my team are all paid competitiv | Lateral Move Increase Considerations (https://nikehr.nike.com/sites/default/files-public/legacy/attachments/lateral-move-increase-considerations-Promotion Increase Considerations (https://nikehr.nike.com/sites/default/files-public/legacy/attachments/promotional-increase-considerations-en.pdf) |
| 8 | Internal Movement | Internal Movement | As a Nike manager, what opportunities do I have to adjust the base pay of individuals on my team? What are the guidelines for these pay changes | Talk With me: Lateral Moves (https://nikehr.nike.com/sites/default/files-public/legacy/attachments/twm-lateral-moves.pdf) Lateral Move Increase Considerations (https://nikehr.nike.com/sites/default/files-public/legacy/attachments/lateral-move-increase-considerations-en.pdf) Talk With me: Promotions (https://nikehr.nike.com/sites/default/files-public/legacy/attachments/twm-promotions.pdf) Promotion Increase Considerations (https://nikehr.nike.com/sites/default/files-public/legacy/attachments/promotional-increase-considerations-en.pdf) Reward Conversations, What to Cover (https://nikehr.nike.com/sites/default/files-public/primary-downloads/rewards-conversation-what-to-cover-en.pdf) |
| 9 | Market Pricing | Market Pricing | What is market pricing, and why do it? | *Amy will get you a new copy of this document* |
| 10 | Talking About Rewards | Talking About Rewards | How do I have the best pay conversations with my team? | Talking About Rewards (https://nikehr.nike.com/?q=page/talking-about-rewards-17074&p1=28202) Talk With me: Talking About Rewards (https://nikehr.nike.com/sites/default/files-public/primary-downloads/twm-talking-about-rewards-en.pdf) Reward Conversation Prep & Delivery (https://nikehr.nike.com/sites/default/files-public/primary-downloads/rewards-conversation-prep-delivery-en.pdf) |
| | | | | |
| Separate page (HR Training) | HR - Pay Ranges | HR Training - Pay Ranges | This training is specifically for HR regarding the new Pay Ranges. Please make sure that you also go to the manager specific training website to view the videos on that page as well. There, you will find additional Total Reward topics as well as the version of the Pay Range training that is targeted to managers. | Link to manager training decks |

CONFIDENTIAL

*ALL MODULES need links to new webpage - to be provided later*

NIKE_00060299

Plaintiff's Trial Exhibit 291

Page 1 of 1

# EXHIBIT 28

| | |
|---|---|
| **From:** | Wells, Zack </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=C7DC3EEB92B64E9AB06E6C97129BC50F-WELLS, ZACK> |
| **To:** | Ballagan, Carmen |
| **Sent:** | 7/10/2019 5:18:00 PM |
| **Subject:** | RE: Total Rewards Deck from 6/27 Training |
| **Attachments:** | Comp Program Changes for TA 6.27.19.pdf |

Here you go!

Thanks

**Zack Wells** | Sr. Director, Total Rewards Consulting – GOT & Corporate Functions
**Nike, Inc.** | Mobile: **503.616.6619** | Zack.Wells@nike.com
One Bowerman Drive
Beaverton, OR 97005

 CONVERSE  Hurley )(  

**From:** Ballagan, Carmen
**Sent:** Wednesday, July 10, 2019 9:07 AM
**To:** Wells, Zack <Zack.Wells@nike.com>
**Subject:** Total Rewards Deck from 6/27 Training

Good morning Zack,

Could you please send the updated total rewards deck that was used for the 6/27 recruiter training? I can go ahead and get that uploaded to the TA SharePoint site.

Thank you,
Carmen

NIKE, Inc. | Carmen Ballagan | Recruiting Services – Talent Acquisition Operations | 515.865.3721

 CONVERSE )  Hurley )(

Confidential

NIKE_00060340

# EXHIBIT 29

| From: | Perry, LeAnn </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=1AEC65D60C4A4D55BAC850BC72957F2A-PERRY, LEAN> |
|---|---|
| To: | Ballagan, Carmen |
| Sent: | 4/10/2019 8:23:00 PM |
| Subject: | FW: Readiness Update |
| Attachments: | Comp Program Changes for TA Final 4.9.19.pdf |

Carmen,
Can you please take down the old version of this and put this new one up on the playbook?
Thanks!

LeAnn Perry

---

**From:** "Paris, Anna" <Anna.Paris@nike.com>
**Date:** Tuesday, April 9, 2019 at 11:34 AM
**To:** "Junkin, Caitlin" <Caitlin.Junkin@nike.com>, "Stuckey, Jessica" <Jessica.Stuckey@nike.com>, "Wells, Zack" <Zack.Wells@nike.com>
**Cc:** LeAnn Perry <LeAnn.Perry@nike.com>, "Baker, Jeff (HR)" <Jeff.Baker2@nike.com>
**Subject:** FW: Readiness Update

Sorry, please use these versions, I hadn't removed all the 30% references. This deck has today's date.

**Anna Paris** | Lead Executive Comp Consultant | Executive Comp | 971.473.4661 |anna.paris@nike.com | NIKE, Inc. J

**From:** Paris, Anna
**Sent:** Tuesday, April 9, 2019 11:28 AM
**To:** Junkin, Caitlin <Caitlin.Junkin@nike.com>; Wells, Zack <Zack.Wells@nike.com>; Stuckey, Jessica <Jessica.Stuckey@nike.com>
**Cc:** Baker, Jeff (HR) <Jeff.Baker2@nike.com>; Perry, LeAnn <LeAnn.Perry@nike.com>
**Subject:** RE: Readiness Update
**Importance:** High

Hi,

Jessica, Jeff and I spoke quickly this morning and agreed that we should leave the Total Rewards Philosophy and Base Pay slides in the deck that we post in the Readiness update.

I've attached an updated training deck , as we did have one modification to the New Hire stock slide where we removed the "up to 30%" for new hire cash (top of slide 10), as that is still in discussion.

**Zack, Jessica and Jeff-** I changed the title of the readiness update to **Comp Program Changes for New Hires and Promos**, since the deck has more than just LTIP, STI in it and modified the wording slightly? Is that ok?
**Caitlin** is there still time to change to this updated version of the readiness verbiage that I attached?

Thanks,
Anna

**Anna Paris** | Lead Executive Comp Consultant | Executive Comp | 971.473.4661 |anna.paris@nike.com | NIKE, Inc. J

**From:** Paris, Anna
**Sent:** Monday, April 8, 2019 6:10 PM

Confidential

**To:** Junkin, Caitlin <Caitlin.Junkin@nike.com>
**Cc:** Wells, Zack <Zack.Wells@nike.com>; Baker, Jeff (HR) <Jeff.Baker2@nike.com>; Perry, LeAnn <LeAnn.Perry@nike.com>
**Subject:** Readiness Update
**Importance:** High

Hi Caitlin,

Attached is the Long and Short term Incentive updates for the Readiness email and the PowerPoint presentation that we did for TA. I know we were also going to have a link to the video that was coming from LeAnn.

Please let me know if you need anything else.

Thanks,
Anna

**Anna Paris** | Lead Executive Comp Consultant | Executive Comp | 971.473.4661 |anna.paris@nike.com | NIKE, Inc. J

Confidential

# EXHIBIT 30



Plaintiff's Trial Exhibit 295
Page 1 of 17



**SAY:**
- Our mission in the Total Rewards organization, is to create "uniquely Nike" Total Rewards that enable Nike to attract, retain, and engage the world's best talent.
- There are 3 principles that guide everything we do:
    - The first is to ensure competitive and equitable rewards are our baseline
        - While not all employees should be paid the same, we do believe that all employees, at the same level and in similar jobs with similar performance, should be equitably paid.
        - We are committed to conducting regular evaluations and taking action in service of competitive, equitable rewards – considering each component individually along with the full total rewards opportunity.
    - The second, is that we pay for performance and impact
        - We link pay and recognition to company performance, demonstrated and expected individual performance and impact over time, and to key talent critical to our long-term growth.
    - And third, is Invest in Positive experience
        - When rewarding employees and providing benefits, we focus investment of resources and time on events and practices that have the greatest positive impact on engagement, delivered with simplicity and clarity.

2

- When offering programs to employees, many companies are singularly focused on what's occurring in the market. While this is definitely important, we feel that it's just as important to be true to Nike.
- Our People First approach focuses on all employees, across all bands, functions, and geos also taking into consideration:
  - Our culture and values, which is what we stand for – rooted in our maxims and leadership model
  - Employee insights, which is what our employee's value – gathered through the employee engagement survey and a variety of focus groups
  - And market insights, which is what we see other companies doing – to provide context and inspiration for our programs and practices, aiming where possible to be globally consistent and locally relevant
- And depending on the program, the weight we put on each lens may vary – with culture and values playing a larger role than market insights and visa versa.

- So when we say, "Uniquely Nike" it means that our total rewards will meet the needs of our diverse employee population, in whatever stage of life they may be in.

**DO:**
- Use relevant examples for your local market as applicable. Nike Stock Choice may not resonate in all situations.
- For example: HMO in the US, FTO in Netherlands, etc.

**SAY:**
- A relevant example of how this comes to life can be seen with the Nike Stock Choice program that was introduced in 2018.
- While Nike had historically only provided Stock Options to eligible employees, we observed in the market that Restricted Stock Units were becoming more prevalent
- And, at the same time we heard from our employees that they desired more choices in the way they received their awards – to meet their unique financial needs
- Typically, companies don't offer choice when it comes to stock awards, however, we felt that this was the best path to be true to our culture and values, ensure the program met the needs of our employees, while also maintaining competitiveness with other companies like us.

2

Plaintiff's Trial Exhibit 295

# BASE PAY
# GUIDANCE

Plaintiff's Trial Exhibit 295
Page 4 of 17



**SAY:**

- Position in range is a way of describing where an individual's pay is relative to the midpoint of the pay range.
- It provides a consistent way to review and communicate pay, regardless of currency, location, or pay range.
- To calculate an employee's position in range, you simply take their current pay and divide it by the pay range midpoint.
  - Please note, that current pay is the employee's full-time equivalent or FTE salary meaning pay at 100%, regardless of hours worked or schedule.
- In this particular example, the employee has a current pay rate of $95,000 per year and the midpoint of the range is $100,000
- This results in a position in range of 95%.
- You might be asking yourself, so what?
- Let's take a deeper look at what 95% means and why an employee might be positioned in a particular section of the pay range.

Plaintiff's Trial Exhibit 295



**SAY:**

- Because our market competitive pay ranges are broad, it enables us to position employee's within the range based on a variety of factors.
- Here, we've divided the pay range into three sections to illustrate and provide guidance around why an employee might be positioned within a certain section.
- Each employee's pay will fall within different points in the pay range, as each employee brings different performance, skills, and experience to the table.
- If you recall from the previous slide, the employee's position in range was 95%.
- This means, the employee falls within the middle section of the pay range and likely has experience, knowledge and skills that are aligned with the expectations of the role and is fully functional in that role, contributing at expected levels.
- We would expect that a majority of our employees are paid within the middle section.
- However, there are reasons why we might position employees in the lower and upper sections of the pay range.
- The lower section is generally for employees that are building experience and/or developing skills for a particular role.
- While the upper section is generally for highly experienced employees with superior knowledge and skills relative to the role.
- These are employees that may be expert and/or progressing towards a promotion.
- As a manager, you should always use good judgement when making pay decisions.

Plaintiff's Trial Exhibit 295
Page 6 of 17

- It's also important to remember, that it takes effort to maintain a healthy pay ecosystem where pay is competitive and equitable.
- There is no finish line when it comes to positioning your employee's within the pay range.
- It will take time to influence pay for your employees to get to a place you feel is equitable AND once you arrive at that place, it takes focus to maintain that year over year.



**SAY:**
- We also recognize, that it's helpful to have guidelines to follow when making pay decision.
- In general, we expect that new hires will have a position in range of 85% up to the maximum of the pay range.
    - In the past, we often focused on the new hires prior salary and/or the size of the increase the new hire would receive.
    - Our recommendation is to shift to an approach where we make solid decision based on our pay ranges and the considerations we just covered on the previous slide.
    - We don't want to carry over poor pay practices from a prior company or start a candidate from at a disadvantage – we want to create an equal playing field from day one
- For promotions, we'd expect that employees are at an 85% to 95% position in range once they move into the new role.
    - We've historically had guidance that focused on the size of the increase, which at times was limiting.
    - As a result, we're shifting our focus to ensuring the employee is positioned appropriately regardless of the size of increase.
- And for lateral moves, we generally do not see pay increases occur.

- - However, with that said, there are cases where an increase may be needed to position the employee appropriately within the pay range.
  - Use the opportunity to review pay and make the appropriate decision.
- In all cases, managers are responsible for making pay recommendations that are competitive and equitable.
- Newly hired or promoted employees should always be above the minimum of the pay range.

6

# INCENTIVE DESIGN

7



**SAY:**

- NIKE Total Rewards is making several key changes to our short and long-term incentive programs, effective in FY19
- We'll walk through the changes you need to be aware of and take a deeper dive into how these impact offers going forward
- Let's start with the things you need to be aware of…
    - Stock Program Guidelines are changing to provide increased target awards in geos, consistent target awards for CLT roles globally, and standard ne hire stock awards for all E+ EXTERNAL hires
    - Additionally, we have new guidance for standard awards for Q1 external hires, U to E promotions as well as E to S band promos made during APR (the new process replacing GPR
    - We'll take a closer look at these in a minute
- Performance Sharing Plan – or PSP – changed at the beginning of the fiscal year to one plan
    - All employees will be on this plan globally
    - Managers will no longer make recommendations to increase or decrease the PSP award
- Long-Term Incentive Plan eligibility dates have been aligned with many of our other May 31, program eligibility dates



**STOCK PROGRAM GUIDELINES**

**FROM: 2-TIER APPROACH**
Market Segmentation
Tier 1: All U.S. & Global (E6+)
Tier 2: All Non-US (E7 & below)

**TO: 3-TIER APPROACH**
Market Segmentation
Tier 1: NA Geo & Global (E7+)
Tier 2: EMEA (E&S)
Tier 3: GC & APLA (E&S)

| NIKE FY20 COMPENSATION TARGETS | | |
|---|---|---|
| | **EMP BAND** | **ANNUAL STOCK TARGETS** |
| **GLOBAL** | E6 | $325K |
| | E7 | $160K |
| **NA REGION- TIER 1** | S | $110K |
| | E | $45K |
| **EMEA REGION-TIER 2** | S | $90K |
| | E | $35K |
| **APLA & GC REGIONS-TIER 3** | S | $80K |
| | E | $30K |

**Key policy changes:**
- Stock targets for the new Tier 2 & 3 are an increase from the FY19 Tier 2
- All External New Hires receive a default at 1X Annual stock award guidelines

For E & S band employees, we will be moving to a three tier approach for our stock guidelines and for E7+ we will have one tier.
- The tiers will be based on geo with guidelines reflecting the local market
- One tier for US, one for EMEA, and another for Greater China, and APLA.
- Stock targets for the new Tier 2 & 3 are an increase from the previous tier (outside of NA region)

9



External New Hires in bands E and up will receive a new hire stock grant based on 1X annual market level award and granted the month after hire.

There will be an audit to ensure all hires with start dates in May onward get stock awards at guideline levels.



S-E6 are already eligible for stock, so are already getting an award prior to Promotion.

Promoted E Bands are newly eligible for the program and wouldn't be receiving any stock award prior to promotion

11



Plaintiff's Trial Exhibit 295
Page 15 of 17



As we announced this past summer, we are moving to one PSP, based on a single, shared NIKE financial performance metric – EBIT- aligning us to our maxim of "Win as a Team"
- Managers will not see or make any recommendation to the PSP award
- We are referring to the PSP award program as "Annual Bonus" to align with standard practices and reflect how the award is actually perceived by employees

And finally, for LTIP, we are shifting the eligibility date from March 1st to May 31st.
- This means that employees will receive the payout if they are in an eligible band by the eligibility date.
- The aim of this change being to treat both internal employees and external candidates equitably as they move in and out of the program

# NEXT STEPS

Resources/Tools Coming:

• New Hire Stock/Cash Approval Matrix

• Offer Modeling Tool

• New Hire Stock Tracking

• Process for New Hire Stock in Offer Letters

Take Action on…

• Start offering E-S External New Hires, with a start date in May 2019 forward, sign-on stock based on the new guidelines

19-Oct-24    © 2019 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.                    14

# EXHIBIT 31

---

| From: | Hanson, Heidi </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=35C3661EB22348C18CA5E657E927AD49-HANSON, HEI> |
|---|---|
| To: | Perry, LeAnn |
| CC: | Ballagan, Carmen |
| Sent: | 4/9/2019 5:11:03 PM |
| Subject: | RE: Training Video |
| Attachments: | Comp Program Changes for TA Final 4.5.19.pdf |

So the files are so large that my computer cannot downloaded them.  I will have to go back to AV to see if they can help.  I've literally been trying to get them into box from bluejeans since 9:30.  I have an 11 o'clock meeting that I need to prep for.  In the meantime, I can share the link with you to watch the video and I have attached Zack's deck.

Hi Carmen – Can you please load the attached presentation into our SharePoint site?  It should be called New Hire Total Rewards Updates.

Please let me know if you have any questions.


Thank you,
Heidi
ǀ Heidi Hanson ǀ NIKE, Inc. ǀ Talent Acquisition – Senior Assistant ǀ M: 971.724.5175 ǀ O: 503.671.6006 ǀ



**From:** Perry, LeAnn
**Sent:** Monday, April 8, 2019 8:44 AM
**To:** Hanson, Heidi <Heidi.Hanson@nike.com>
**Subject:** FW: Training Video

Hi Heidi,
Please let me know when you get the video so I can send over to the team.
Thanks for all the great work in planning this!


LeAnn Perry

---

**From:** "Wells, Zack" <Zack.Wells@nike.com>
**Date:** Friday, April 5, 2019 at 3:20 PM
**To:** LeAnn Perry <LeAnn.Perry@nike.com>
**Cc:** "Baker, Jeff (HR)" <Jeff.Baker2@nike.com>, "Paris, Anna" <Anna.Paris@nike.com>, "Junkin, Caitlin" <Caitlin.Junkin@nike.com>
**Subject:** Training Video

Hey

LeAnn can you provide this group the link or video file of the training this morning when it's ready?

Thanks!

**Zack Wells** | Director, Total Rewards Consulting – GOT & Corporate Functions | **Nike, Inc.** | Mobile: **503.616.6619** | Zack.Wells@nike.com
One Bowerman Drive

Confidential

NIKE_00060370

# EXHIBIT 32

# ANNUAL PAY REVIEW DEEP DIVE

**TOTAL REWARDS // MARCH 12, 2019**



EXHIBIT
**522**
**Shane Walker**
**12/17/2020**
Julie Walter

1



**SAY:**
- Welcome everyone.
- This is the first of many conversations the Total Rewards team will be hosting as we roll out the new Annual Pay Review (APR) process.
- As a reminder, Kim Lupo and Zack Vinton previewed some of the expected changes to our pay review process at the last HR All-Hands Meeting. Today will be an overview of the new pay process and what to expect in the coming months before it launches.
- APR is an evolution and consolidation of our annual rewards events and will replace the current Global Performance Rewards (GPR) program. These changes support our commitment to competitive, equitable pay and aligns with two of our HR strategic priorities: to create an Unmistakably NIKE Experience where leaders, managers and employees clearly understand NIKE's pay process and how it embodies our values of equity, transparency, accountability and trust; and to build Great Leaders & Manager who are more active in the pay review process, making them more accountable and capable in the Total Rewards space.
- First, we are simplifying pay reviews with new technology that is more intuitive and easier to use.
- Second, we are shifting roles and responsibilities and giving managers more ownership of the review process. We are equipping our managers with the knowledge and tools they need to confidently make pay decisions and discuss pay with their employees. This will help ensure HR Partners – you – are able to play a more supportive role as trusted advisors.
- Third, you will have access to data for all employees in the system, along with enhanced reporting and dashboards to help you do your best work. I ask and trust that with this expanded access, you will use the data appropriately.
- The overarching goal is to ensure everyone – managers, HR and employees – clearly understand how pay is determined at NIKE.
- We are here to support you through this change. Throughout the coming months, the Total Rewards team will train you on the tools they've developed to properly prepare you as well as our leaders, managers and employees for the changes rolling out in June.
- I want to thank you all in advance for digging into this important work, for embracing this as a development opportunity for our function, and for leading our organization through this important transformation.
- I know you are eager to learn more about APR, so I'll hand it over to Shane Walker, Sr. Director, Broad-based Compensation to get us going!

Plaintiff's Trial Exhibit 158
Page 2 of 45



**SAY:**
- Thanks Mo.
- I appreciate you setting the stage for this important work and the transformational change we're driving as an HR organization.
- I am Shane Walker and I lead our broad-based compensation team with responsibility for program design across a few key areas, including:
    - Base Pay
    - Retail Pay
    - Market Insights for our pay programs
    - Global Recognition
    - And the Total Rewards Portal
- I also have the pleasure of serving as one of the initiative leads for the Annual Pay Review, alongside Kim Doyle who you'll hear from a bit later.

3

# TODAY

## GOALS OF TODAY'S SESSION

**1** Remind you of NIKE, Inc.'s Total Rewards strategy and core principles

**2** Provide details on this year's Annual Pay Review (APR) process and timeline

**3** Help you understand your role and what we'll be asking of your team(s)

## SESSION FLOW

- Total Rewards Philosophy
- Review Key Changes
- Roles + Responsibilities
- APR Timeline + Change Readiness Plan
- Managing Pay at NIKE Training
- SuccessFactors Pay Review Tool
- Resources + Next Steps
- Q&A

4

**SAY:**
- During our time together today, we'll cover a variety of topics with the goal of:
  - Reminding you of our Total Rewards strategy and core principles
  - Providing some additional details on this year's APR process
  - And begin sharing with you what we'll need from you and your teams in the coming months to successfully launch APR

4



**SAY:**

- Before we dive in, I wanted to quickly introduce Slido
- We'll be using this app throughout the session to gather questions and at the end we'll do a Q&A for those that are trending towards the top
- While we are logged into BlueJeans, Slido will be the primary way we gather questions for the Q&A
- We'll also be using this to source questions through the duration of APR (in other words now through August) in order to build out a comprehensive FAQ for HR, Leaders, and Managers
- The details for accessing Slido after today's session will be on the HR Readiness website

5

# TOTAL REWARDS CORE PRINCIPLES

**1**

COMPETITIVE
AND EQUITABLE REWARDS
ARE OUR BASELINE

**2**

WE PAY FOR
PERFORMANCE
AND IMPACT

**3**

OUR PROGRAMS, PRACTICES
AND SOLUTIONS MAXIMIZE
IMPACT AND EFFICIENCY

**SAY:**
- You may be familiar with our total rewards core principles
- These tenets serve as the foundation for how we think about and implement new programs, new policies, and new processes
- The first principle – competitive and equitable rewards are our baseline – ensures a healthy rewards ecosystem
  - We believe that all employees, at the same level and in similar jobs with similar performance, should be equitably paid.
  - We are committed to conducting regular evaluations and taking action in service of competitive, equitable rewards – considering each component individually along with the total rewards opportunity
- The second principle – we pay for performance and impact – acknowledges that individual, team, and company performance are foundational to our pay programs
  - We are broadening the definition of performance beyond purely individual to take into account team and company.
  - And it's also important to note that we are intentionally defining what type of performance we are driving through each program
  - For example, with one team PSP, we are laser focused on Nike, Inc performance as a company
- The third principle – programs, practices, and solutions maximize impact and efficiency – is a testament to our commitment to remove the inefficiencies in our programs and practices (and systems)
  - We want to eliminate unnecessary work for our managers that takes time/energy away from what matters most – running the business

## WE'RE ON A JOURNEY TO TRANSFORM TOTAL REWARDS

We are on a multi-year journey to transform Total Rewards at Nike…we are assessing our programs, practices, and policies – from design to administration – to ensure alignment with our culture, strategy, and Total Rewards principles.

A healthy rewards ecosystem requires investment to adapt outdated pay practices, maintain market competitiveness, and create capacity for future enhancements.

FY19 - WHAT WE'VE DONE:
- One PSP
- Competitive Pay Management
- Shift from share-based to value-based stock awards
- Stock Choice
- Total Rewards Portal
- Flexible Time Off (Netherlands)
- Military Leave (U.S.)

WHAT'S AHEAD:
- Pay Equity Update
- Stock Plan Administrator Change
  - Blackout period: May 10 – June 3
- Introduction of Annual Pay Review
- Revised New Hire & Promotion Guidance
- Updated International Stock Guidelines
- Introduction of New Hire Stock Guidelines

**SAY:**
- We are on a multi-year journey to transform Total Rewards at Nike.
- I've mentioned building a healthy reward ecosystem and would like to share a bit more about what that means and why it is a priority
- Let's talk first about pay practices:
    - Many companies, including Nike, have approached pay increases during key moments (like promotions or with hiring) primarily focused on "percent increase"
    - The challenge with this, is often the largest increase percent you can give doesn't get the talent at the right spot in the pay range
    - Because of this, we have played "catch up" – leveraging programs like 2X to capture basic pay hygiene activities (for example employees below the minimum of the pay range)
    - To move past this practice, we are now thinking about pay increases by focusing more on positioning employee appropriately in the pay range based on multiple factors (i.e. experience, talent segmentations, performance, etc)
- A healthy pay ecosystem at it's core necessitates that our program are competitive compared to market
    - We are in the midst of a deep assessment across all pay and benefit programs to ensure we live up to this commitment.
- We also recognize the need to proactively plan for future rewards enhancements that address our evolving business & talent landscape
    - Things like discretionary stock, ESPP expansion, etc
- Lastly, a healthy rewards ecosystems requires our managers to have increased capability in the total rewards space, specifically:
    - They must have a comprehensive understanding of pay,
    - Know how to make appropriate pay decisions
    - And are equipped to have meaningful conversations with their employees about pay

- I know you are well aware of the significant shifts we've made to date in FY19
    - We've evolved programs (PSP)
    - Introduced new offerings (Nike Stock Choice, FTO)
    - And enhanced the employee experience (Shift to value based stock awards, Launch of the Total Rewards Portal)

- We also have several other shifts that we'll be introducing in the next 3-6 months.
- While the focus of today is on the Annual Pay Review, we plan to follow-up through other channels in the coming weeks to provide updates on the other items listed under What's Ahead



**SAY:**
- So what is this new Annual Pay Review
- It's essentially an evolution and consolidation of our annual rewards events support by SuccessFactors
- Today, we manage GPR in SAP, while 2X, CPM, and the Annual Stock Process are all done in spreadsheets all on separate timelines
- Going forward, these will be in one system and on one timeline
- A few important things to note:
  - With the consolidation of GPR and 2X, we are also consolidating those budgets
  - This does not represent an incremental increase to the budgets, but does ensure managers utilize the funds for the intended purpose
  - Also, the discretionary stock process will continue to happen at mid-year as it has in the past

8



**SAY:**
- Before we jump into some of the key changes, I wanted to provide an end-to-end look at the APR process and how each step is linked to our Total Rewards Core Principles

- The first 3 "steps" are there to ensure our pay outcomes are competitive & equitable
- The remaining "steps" support our commitment to pay for performance & impact
- And across the board, we are aiming to implement a holistic solution that maximizes impact and efficiency (for our managers, but also for our HR organization)

- One thing to note is that the CFE Rating process will continue on the same timeframe as in past years with ratings entered in SAP – rating data will feed over from SAP into SuccessFactors to be used as a reference point during APR

9



## KEY CHANGES
### BASE PAY

| WHAT'S NEW | | WHY |
|---|---|---|
| COMPETITIVE PAY | Recommended adjustments pre-populated in SuccessFactors | Supports ongoing commitment to equitable and competitive pay while maximizing impact and efficiency |
| BASE PAY GUIDANCE | Prepopulated default increase based on country and position in range | Ensures consistency in approach, employee movement through ranges and competitive increases |
| DIFFERENTIATION | Ability to make additional predetermined investment recommendations | Balances competitive pay with differentiation based on performance and provides flexibility to address other talent-related pay needs |
| LUMP SUM | Default for employees above the maximum of the pay range with ability for managers to apply to base pay as needed | Ensures consistent usage of lump sum payments and requires greater visibility into pay recommendations for employees above the maximum of the pay range |

10

**SAY:**
- There are a several key changes that will be experienced during the upcoming APR process.
- From a base pay perspective, there are 4 I'd like to highlight:
- The first is around Competitive Pay Management, which we launched this past summer.
  - The analysis and review process was managed offline and was cumbersome for all involved.
  - Going forward, we will continue the analysis offline, however, any recommended pay adjustments will be loaded into SuccessFactors as part of APR for review by HR and Managers with increases effective in conjunction with APR.
- Historically, there was an inconsistent application and usage of guidelines provided during the GPR cycle.
  - Going forward, we will start each employee with a default increase based on their country and position in the pay range.
  - Employees low in the pay range will have a default that is larger, while employees high in the pay range will have a default that is lower – ensuring a consistent approach to pay increases, while enabling appropriate movement through the pay range.
- We also know that managers play a key role in differentiating rewards for their employees.
  - In the past, increases were almost entirely based on CFE performance rating.
  - As we move forward, managers will be able to select preset choices from a drop down to reward performance as well as a variety of other talent considerations.
- And finally, lump sum payments will only be available for employees that are above the maximum of the pay range.
  - Any amount up to the maximum will be applied as a core pay increase, while any amount above the maximum will be a lump sum payment.
  - Managers will have the ability to apply the entire amount as a base pay increase as needed

# KEY CHANGES
## SHORT TERM & LONG TERM INCENTIVES

| WHAT'S NEW | | WHY |
|---|---|---|
| PSP | Based on a single, shared NIKE performance metric, individual modifiers are 100% | Aligns to One Team, One Metric |
| STOCK PROCESS | Managers will have visibility in SuccessFactors and be able to recommend stock | Streamlined process with manager ability to influence awards |
| STOCK GUIDELINES | Three stock guideline tiers for E & S bands and one tier for E7+ bands | Aligns target values to desired market position and supports ongoing commitment to competitive, equitable pay |
| PROMOTIONS INTO STOCK ELIGIBLE BANDS | Default approach to stock awards for employees promoted in June, July, and August | Equitable treatment for both internal employees and external candidates moving into and out of the program |
| LTIP ELIGIBLITY DATES | LTIP eligibility based on employee band as of May 31 | Equitable treatment for both internal employees and external candidates moving into and out of the program |

11

**SAY:**
- We're also making enhancements to our incentive programs.
- As we announced this past summer, we are moving to one PSP, based on a single, shared NIKE financial performance metric AND all individual performance modifiers will be set at 100% - aligning us to our maxim of "Win as a Team"
- In the past, our stock program has been managed via spreadsheets with limited visibility for line managers with stock eligible employees.
  - This year, we will be moving the stock process into SuccessFactors so that HR and Managers have one place to go to make all award recommendations, as well as maintain visibility throughout the process.
- For E & S band employees, we will be moving to a three tier approach for our stock guidelines and for E7+ we will have one tier.
  - The tiers will be based on geo with guidelines reflecting the local market
  - One tier for US, one for EMEA, and another for Greater China, and APLA.
- Another enhancement is around eligibility – for the stock program:
  - Any employee newly promoted into an E-Band role will receive a default stock award for their geo location
  - The award will be delivered as 100% RSUs and granted on September 1
  - For promotions into S, E7, and E6 bands the data will update automatically in SuccessFactors so that recommendation can be made using the new band while planning is in progress
- And finally, for LTIP, we are shifting the eligibility date from March 1st to May 31st.
  - This means that employees will receive the payout if they are in an eligible band by the eligibility date.
  - For De-bands, they will maintain the previous award at the higher target and all future awards will be based on employee band as of June 1
  - The aim being to treat both internal employees and external candidates equitably as they move in and out of the program

Plaintiff's Trial Exhibit 158
Page 11 of 45

# KEY CHANGES
## REPORTING & PAY STATEMENTS

| WHAT'S NEW | | WHY |
|---|---|---|
| STANDARDIZED REPORTING | Real-time dashboards and reports via SuccessFactors | Provides HR, Leaders and Managers with greater visibility into pay recommendations occurring in the system for their organizations |
| COST CENTER REPORTING | In addition to 'Reports To' views, data can be filtered using Cost Center Levels 3 through 9 | Enables real-time reporting on a cost-center basis, reducing manual effort required to piece together data from various sources |
| PAY STATEMENTS | Enhanced pay statement generated via SuccessFactors | Increases understanding and supports pay conversations through enhanced formatting and content |
| PAY STATEMENT TRANSLATIONS | Varies by country with 14 languages available for V-U bands; English only for E+ bands | Provides a better employee experience and meets regulatory and compliance requirements |

12

**SAY:**
- One of the biggest pain points we've heard about our current processes is the lack of streamlined reporting – which was largely caused by multiple systems and timelines.
  - Going forward, we will have standardized, real-time reporting within SuccessFactors.
  - In addition, you will be able to view from both a Reports To perspective – while also having the ability to filter data using Cost Center levels 3 through 9
  - Hopefully reducing the manual effort required to access relevant data in our matrixed environment.
- At the end of each award cycle, one of the most impactful aspects is the pay conversation that occurs between a manager and employee.
  - With the shift to SuccessFactors, we will be enhancing the formatting and content of the pay statements that are generated through the system
  - Providing managers with direct access to relevant program information to help increase understanding, aid in making the conversation meaningful, and enhance the overall experience.
  - These statements can be printed and handed to the employee, in addition to pointing their employees to the Total Rewards Portal (for those that have access)
  - We're also standardizing the way we do translation for pay statements.
  - Going forward, we will have 14 languages for V-U bands with E+ bands being in English – this will improve the employee experience while meeting various regulatory and compliance requirements.

Plaintiff's Trial Exhibit 158
Page 12 of 45



**SAY:**
- For HR specifically, there are some additional changes.
- From a timeline perspective, we're increasing the timeline by approximately 2 weeks with set timeframes for both planning and review
  - We'll cover the specific timeline a little later, however, the goal is to standardize across the company ensuring appropriate time for executive review and approvals
- We'll also be including E5 & E4 employees in SuccessFactors.
  - Leaders will make pay recommendations for these employees just as managers do for the rest of the organization.
- Going forward, we will also hold managers accountable for entering recommendations in SuccessFactors, providing greater ownership in the process.
  - This means that HR will no longer have edit access in the system.
- However, we will be providing HR with view access to all data in the system (excluding our own function).
  - This will provide greater visibility to recommendations across Nike – particularly in organizations that are heavily matrixed.

Plaintiff's Trial Exhibit 158
Page 13 of 45

# ROLES & RESPONSIBILITIES

**LEADERS**

- ✓ Understand the new Annual Pay Review process and how pay recommendations will be made
- ✓ Actively champion the new Annual Pay Review process
- ✓ Cascade changes throughout your organization – supported by HR
- ✓ Review and approve pay recommendations

**MANAGERS**

- ✓ Understand the new Annual Pay Review process and how pay recommendations will be made
- ✓ Explain and apply NIKE's Total Rewards programs
- ✓ Influence pay recommendations during key moments, including:
  - ○ New Hires
  - ○ Pay Reviews
  - ○ Promotions
  - ○ Lateral Moves
- ✓ Differentiate pay for key talent
- ✓ Have meaningful pay conversations with your team members

14

**SAY:**

- With any change to a process like APR – there are also shifts to roles and responsibilities
- Across the board, we're looking for Leaders, Managers, HRBPs, TRCs, and HRDO to understand the new Annual pay Review process and how pay recommendations will be made.
- For leaders, we're looking for them to:
  - Actively champion the changes by cascading throughout their organizations
  - As well as review and approve pay recommendations during the designated timeframes
- For managers, the ultimate goal is for them to have meaningful pay conversations with their team members
  - To do this effectively, they must be able to explain and apply our Total Rewards programs
  - Influence pay during key moments, such as new hire, pay reviews, promotions, and lateral moves,
  - And differentiate pay for key talent

14

# ROLES & RESPONSIBILITIES

`HRBPS`

✓ Understand the new Annual Pay Review process and how pay recommendations will be made

✓ Reinforce, explain and apply NIKE's Total Rewards programs

✓ Hold Managers/Leaders accountable for completing pay recommendations in the system, reinforcing consistent practices

✓ Serve as trusted advisor to Managers/Leaders and consult on pay recommendations – including CPM, Core Pay, and Stock

✓ As needed, develop and send tailored geo/function communications

✓ Utilize reporting to ensure pay recommendations and outcomes align with talent perspective

✓ Partner with TRCs in Review and Roll-up of recommendations for target population Business Leaders and provide insights

✓ Ensure Core Pay and Stock recommendations are within budget at ELT level

15

**SAY:**
- I won't read this entire slide, but a few key callouts for HRBPs.
- We are looking for you to hold managers and leaders accountable for engaging in the APR process – they should know what's expected of them and when to take action
- You will also serve as trusted advisors to managers and leaders throughout the process.
- We also expect that you'll utilize the reporting within SuccessFactors to ensure pay recommendations and outcomes align from a talent perspective

15

## ROLES & RESPONSIBILITIES

### TOTAL REWARDS CONSULTANTS

✓ Understand the new Annual Pay Review process and how pay recommendations will be made

✓ Reinforce, explain and apply NIKE's Total Rewards programs

✓ Serve as trusted advisor to HRBP and HRDO teams on pay recommendations – including CPM, Core Pay, and Stock

✓ Educate HRBPs and Managers on relevant pay topics relating to the Annual Pay Review

✓ Utilize reporting to ensure pay recommendations and outcomes align with talent perspective

✓ Lead the Review and Roll-up of recommendations for target population Business Leaders

✓ Interpret data and provide insights into APR outcomes

### HR DELIVERY OPS

✓ Understand the new Annual Pay Review process and how pay recommendations will be made

✓ Reinforce, explain and apply NIKE's Total Rewards programs

✓ As needed, provide support to TRCs and HRBPs in review and roll-up recommendations for target population Business & HR Leaders

***Directors:***

✓ As needed, assist HRBPs with developing tailored function/geo specific calendars and communications

***Specialists:***

✓ Assist HRBPs in consolidating limited non-standard reports for unique geo/function situations

16

**SAY:**

- TRC's will serve as trusted advisors to HRBP and HRDO teams, while also providing education to HRBPS and Managers on relevant pay topics related to the Annual Pay Review.
    - This will come to life primarily through the Managing Pay at Nike Trainings
    - In addition, TRCs will lead the review and roll-up of recommendations for their target population business leaders in partnership with HRBPs and HRDO
- HRDO will provide support to TRCs and HRBPs as needed
    - With Directors leaning in on tailored calendars and communications as needed
    - And Specialists leaning in on limited non-standard reports for unique geo and/or function situations

16

IT'S MORE THAN JUST MANAGING
THE CHANGE EXPERIENCE.
IT'S ABOUT CREATING VALUE DURING
THE MOMENTS THAT MATTER MOST
TO IMPACTED AUDIENCES ALONG THEIR
UNIQUE JOURNEYS.

17



## MANAGER & EMPLOYEE FEEDBACK INFORMED THE CHANGE READINESS PLAN

KEY FINDINGS

**WHAT EMPLOYEES WANT**
- Better understanding of NIKE's pay philosophy
- Consistency between pay messages, actions and policies
- Pay that is competitive with internal and external peers
- Trust that managers act in their best interest

**WHAT MANAGERS WANT**
- Justification for individual pay recommendations
- Understanding of the fundamentals of pay
- Support in being able to talk to employees about pay at NIKE

18

# READINESS COVERS FOUR TOPIC AREAS









| BASE PAY FUNDAMENTALS | APR CHANGES | PAY PROCESS AND SYSTEM | PAY CONVERSATIONS |
|---|---|---|---|
| · Total Rewards philosophy<br>· Core elements of rewards<br>· Base pay (ranges, position in range, etc.)<br>· Considerations for Base Pay recommendations | · What's changing and why<br>· Key benefits of the change<br>· Timeline<br>· Roles and responsibilities | · Key processes and pay moments<br>· Making recommendations in SuccessFactors<br>· Executing review process in SuccessFactors<br>· Reporting in SuccessFactors | · Accessing comp statements<br>· Preparing for a rewards dialogue<br>· Facilitating a rewards dialogue<br>· Accessing the Total Rewards Portal |

| SUPPORTING RESOURCES | SUPPORTING RESOURCES | SUPPORTING RESOURCES | SUPPORTING RESOURCES |
|---|---|---|---|
| · Managing Pay at NIKE Training<br>  · In-Person<br>  · Virtual<br>  · E-learning | · Leader Toolkit<br>· Manager Toolkit<br>· FAQs | · Job Aids<br>· Key Terms List<br>· Dashboard and Reporting<br>· System Demo Videos<br>· HR Direct Support | · Pay Statements<br>· Manager Conversation Guide<br>· Employee Conversation Guide<br>· Meaningful Conversation Labs<br>· Total Rewards Portal |

19

Plaintiff's Trial Exhibit 158
Page 19 of 45



# HRBPs

HRBPs will be prepared via **monthly Readiness Updates**, three **Deep Dive** sessions, **Managing Pay at NIKE Training** and **system reporting** to support leaders and managers and provide accountability for making pay recommendations in the system.

**CONSIDERATIONS & ASSUMPTIONS**

- Provide clearly defined roles + responsibilities
- Deliver information in phases
- Communicate regularly and provide an open channel for questions and feedback
- Leverage existing Readiness channels (Readiness Update, Site, Deep Dives, Q&A sessions)
- Collect input early (e.g. reporting needs)

*Tools & Resources posted on the Readiness Site*

| FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST |

SUPPORT FROM TRCS

**FEB 13**
READINESS UPDATE
System Demos

**MAR 13**
READINESS UPDATE
Key Changes

**APR 10**
READINESS UPDATE
APR Kickoff

**MAY 8**
READINESS UPDATE
System + Process

**JUN 5**
READINESS UPDATE
APR Planning in SuccessFactors

**JUL 10**
READINESS UPDATE
Pay Conversations

**FEB 12-14**
TOOL PREVIEWS
System preview

**FEB 20-22**
REPORTING WORKSHOPS
Validate requirements

**MAR 12**
HR DEEP DIVE
Key changes, role of HR, timeline, Managing Pay at NIKE, SuccessFactors tool
- FAQs
- Timeline
- One-pager
- Comms previews

**MAR 12-27**
HR PREVIEW: MANAGING PAY AT NIKE
Review of pay fundamentals including NIKE's Total Rewards Philosophy, job architecture and pay ranges

**MAY 7**
HR DEEP DIVE
SuccessFactors system and process training
- HRBP Activation Kit
- Updated FAQs
- Job Aids
- System demo recording
- Comms previews
- Communication templates

**JUL 9**
HR DEEP DIVE
Accessing pay statements and having Rewards Conversations
- FAQs
- Sample pay statement
- Conversation Guides
- Comms previews

20

Plaintiff's Trial Exhibit 158
Page 20 of 45

# HR DIRECT

Tier 1 Advisor teams will be prepared via **three trainings**, **Managing Pay at NIKE Training** and **resources on KB** to answer manager and employee queries and offer support.





Plaintiff's Trial Exhibit 158
Page 22 of 45



# MANAGERS

Managers will receive **in-person training** and **self-serve resources** to better understand base pay, make pay recommendations in SuccessFactors, and engage in meaningful conversations with their teams.

**CONSIDERATIONS & ASSUMPTIONS**

- Begin to build foundational knowledge of base pay and continue to expand over time
- Ensure all managers are able to execute in the system
- Provide resources early for managers, while also linking to resources in the tool for 'just-in-time' support
- TRC-supported delivery of in-person training

*Tools & Resources (posted on HR site)*

| FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST |

HR BAR AND HR DIRECT SUPPORT

**APR 23**
ANNUAL PAY CHANGES EMAIL

Key pay moments at NIKE, what's changing, manager role + how to get ready
- FAQs
- Process timeline
- Manager Playbook
- HR Website content

**MAY – JUN**
PROCESS AND TOOL SUPPORT

Steps and considerations in making pay recommendations in SuccessFactors
- Job Aids
- System demo recording

**JUN 5**
LAUNCH OF ANNUAL PAY PROCESS EMAIL

System open, actions + deadlines and reminder of available resources
- Outage periods and submission deadlines

**JUL 15**
PAY CONVERSATION REMINDER EMAIL

How to access pay statements and prepare for meaningful conversations
- Updated FAQs
- Job aid
- Pay statements
- Conversation Guides

**JUL 15 – AUG 2**
MEANINGFUL CONVERSATION LABS

Optional lab experience to practice pay conversations

MANAGING PAY AT NIKE TRAINING

Review of pay fundamentals including NIKE's Total Rewards Philosophy, job architecture, and pay ranges
- In-person
- E-learning (late April)

23



# EMPLOYEES

Employees will understand how pay is determined at NIKE and the actions we take to support competitive and equitable pay.

**CONSIDERATIONS & ASSUMPTIONS**

- Focus on building understanding of Total Rewards Core Principles and Annual Pay Review process
- Provide a support resources outside of managers
- Prepare employees for pay conversations
- Make pay statements available during conversations with managers

*Tools & Resources (posted on HR Website)*

FEBRUARY | MARCH | APRIL | MAY | JUNE | JULY | AUGUST

HR BAR AND HR DIRECT SUPPORT

1:1 CONVERSATIONS

**APR 2**
**GLOBAL PAY EQUITY EMAIL**
Update on Pay Equity and NIKE's Total Rewards Philosophy
- FAQs
- Nike HR site content update

**JUL 15**
**PAY CONVERSATION REMINDER EMAIL**
Recap of manager pay process and expectation for pay conversations
- Updated FAQs
- Sample pay statement
- Conversation guide

**AUG 6**
**NIKE ZERO REMINDER TO ACCESS TR PORTAL**
Reminder that the Total Rewards Portal is updated + how to access pay statements
- Job aid

Plaintiff's Trial Exhibit 158
Page 24 of 45



Plaintiff's Trial Exhibit 158
Page 25 of 45



So what's this new Annual Pay Review……

It's a consolidation & evolution of our legacy GPR & 2X pay programs…. Brought to life through increased automation & and a simplified (more intuitive) technology platform

An important point here – with the consolidation of GRP and 2x we are also integrating the budgets…. While not representing an incremental budget increase, this ensures managers have access to all the funds intended for talent-related pay decisions

Some of the key outcomes we anticipate as a result of this new process are:
- Pay policies and practices aligned to business strategy and Total Rewards philosophy

- More informed manager decision-making through streamlined process and tools, using global standards that align to our core principles

- Support and invest in our employees to help build a culture of inclusion, where all employees feel valued

26

Plaintiff's Trial Exhibit 158
Page 26 of 45

# SETTING THE FOUNDATION

TRAINING WILL PREPARE MANAGERS TO:

- Prepare for their role in managing pay

- Explain and apply NIKE's Total Rewards programs

- Effectively use NIKE's job architecture and pay ranges

- Influence pay at key moments throughout the year



Plaintiff's Trial Exhibit 158
Page 27 of 45

# ACTIVATING TRAINING









**WHO WILL BE TRAINED**

**WHEN WILL TRAINING OCCUR**

**WHAT TRAINING WILL BE OFFERED**

**HOW WILL IT BE DELIVERED**

- Business-facing HR
- People managers across Geos and Business Units/Functions

- HR: March 12-27 (three in-person sessions at WHQ + five virtual sessions)
- Managers: April 3 - June 14

- A combination of in-person sessions (120 min), virtual sessions (90 min), and an e-learning or recording

- Total Rewards Team leads facilitation
- Manager registration through NikeU

28

28



Plaintiff's Trial Exhibit 158
Page 29 of 45



Thank you Shane.  As Shane mentioned, I lead our Total Reward Operations team, and we are responsible for administering the new program and processes going forward.  This section of our discussion is a click-down from Shane's earlier points and will hopefully show you in more detail how some of the pay changes will come to life in the new process and technology.  The process will be slightly different this year in that our new technology, SuccessFactors, enables greater visibility throughout each phase.

This year's Annual Pay Review cycle will run from June 5th through July 7th.
Manager Planning:  All managers, regardless of level are expected to enter the system, review their direct reports' information and make all applicable pay recommendations during this time.

After the initial planning period, we will move through the Executive Review Process. Each level will have approximately 3-4 days to review and make any changes to the planning manager's recommendations.  At the end of each week, the ability to edit information will close for that group, but unlike years' past, managers will be able to view any changes that are made during the executive review process.

Planning Managers will be encouraged to monitor their information for any changes that occur during the review period.  If there are questions or concerns, they should have a conversation with their manager.

Plaintiff's Trial Exhibit 158
Page 30 of 45



The expectation going forward is that all employees' pay will be planned in the system. We will no longer do planning in spreadsheets or any other form outside of a system.

We recognize that there are certain groups that operate differently and do not require managers to use discretion to make pay recommendations. The focus here is on right-sizing the effort with the pay practice.

Similar to past years, most employees will be planned by managers who will evaluate a number of factors including performance and talent segmentation (if applicable) and use discretion to potentially reward an employee above and beyond the market default. You can see those audiences in the Manager Input column. The focus during this process should be on roughly 20% of the population who should either be recognized for their achievements or have a different decision made based on performance.

Under the centrally planned model, managers will not enter pay recommendations individually. This process is driven by Total Rewards behind the scenes, and pay recommendations are based on a more formula-driven approach.

31



As Shane pointed out earlier, SuccessFactors is one consolidated tool that can be used to manage all aspects of pay planning.  All managers will be able to plan Competitive Pay, Core Pay, and Lump Sums, and E Band managers and above will be able to plan Annual Stock awards.  Since we've moved to one PSP plan, no action is required there nor is action required for LTIP.

We have been able to reduce the administrative burden by pre-populating values, providing greater visibility to all applicable decision points in one place, and providing a full suite of standardized reporting.

32



These next slides provide a very high level look at what managers will see when they enter the planning system.  I know many of you attended system demos in February, but for those of you haven't had a chance to see SuccessFactors yet in more detail, I would encourage you to view one of the recorded sessions located in the HR Readiness site.

Within the system, each component of pay is grouped into it's own section with the information needed to make an informed decision.  The first section a planning manager will see is Competitive Pay.

The Total Rewards team completes a centrally-driven analysis to identify any employees whose pay is below the minimum of the pay range or represents an outlier in our pay equity analysis. If an employee requires an adjustment to address one of those issues, that information is pre-populated in the SuccessFactors Tool. The planning manager has the ability to select a reason code of "NO" for various reasons…for example if there is an incorrect job code or the employee is on a documented performance plan.  If there is a question about the adjustment, the planning manager should request assistance from their HRBP.

Plaintiff's Trial Exhibit 158
Page 33 of 45

Core Pay:  Core pay is the new term we are using instead of Merit.  This section is where managers will spend the bulk of their time.  Their goal should be to focus on roughly 20% of their population who they may want to reward differently based on their achievements or performance.

There are a few things to pay attention to here:
The default for all employees will be set to "Market".  Managers can choose to reward an employee by selecting either the "Invest" or "Max Invest" options at their discretion based on performance, impact, talent segmentation (if applicable), etc.  Managers may also choose to decrease the investment in an employee by selecting "Zero" in the instance where performance is an issue.

# IMPACT OF POSITION-IN-RANGE

*ILLUSTRATIVE EXAMPLE OF CORE PAY INVESTMENT TABLE*

| | LOWER SECTION OF PAY RANGE | MIDDLE SECTION OF PAY RANGE | UPPER SECTION OF PAY RANGE |
|---|---|---|---|
| **MAX INVEST** (INCREASE) | 7.0% | 5.5% | 4.0% |
| **INVEST** (INCREASE) | 5.5% | 4.5% | 3.5% |
| **MARKET** (DEFAULT) | 4.0% | 3.0% | 2.5% |
| **ZERO** (DECREASE) | 0.0% | 0.0% | 0.0% |

MARKET WILL PREPOPULATE BASED ON COUNTRY AND POSITION IN RANGE

MANAGERS THEN HAVE THE ABILITY TO MAKE SELECT PREDETERMINED INVESTMENT
FOR ~20% OF EMPLOYEES

35

This is an example of the behind the scenes table that drives the default award recommendations in the system. Market will prepopulate based on an employee's country and where they are in the range. When a manager chooses either Invest or Max Invest, these are examples of the percentages that will be applied.

35



One additional thing to call out in the Core Pay section is that regardless of what's selected in core pay – any amount up to core pay maximum will show as a core pay increase. Any amounts over the maximum of the pay range will default to a lump sum amount. By selecting "NO", the lump sum amount will be put back into Core Pay. A manager may decide to do this if there is a high risk of loss or if the job code is incorrect. Otherwise the recommended practice is to pay a lump sum for employees who are above the maximum of the range.



Finally, the last section is for Stock Awards.  Like Core Pay, the focus in this section should be on roughly 20-30% of the population where differentiation makes sense.  Unlike Core Pay, there is an option for planning managers to select a "Lower" option.  We offer this option because Stock awards have a longer term impact on employees' pay.



Finally, SuccessFactors provides enhanced functionality for reports and dashboards as well as pay statements.  The system provides a number of tools to give managers visual information along the way.  Reports will be sortable based on multiple options, giving managers flexibility in how they see their data.  Pay statements, which bring the planning process to life in the conversations between managers and employees, will have robust language to support the conversation.  They will be translated into 14 languages for V-U Band employees and will be in English for E Bands and above.  Managers will also have the ability to print them either individually or in a bulk process.



As we discussed earlier, we will provide various tools and resources leading up to and throughout the process.  As you saw on the Change Readiness plan, we will provide…

39

# WHAT'S NEXT

**MAR 13:** APR resources available on Readiness Site:

- HR FAQs
- One-pager
- Timeline
- Managing Pay at NIKE for HR signup link (virtual sessions only)
- Slido page for questions

**MAR 12-27:** Managing Pay at NIKE Training for HR

**MAR 18-22:** HR Direct Training

**MAR - APR:** Comp Ops Training

**APR 10:** Readiness Site updated for APR kickoff

**APR 18:** APR Update for Talent Acquisition

**HRBPS**

- Attend a Managing Pay at NIKE session
- Share APR One-pager with your Business Leader(s)
- Share questions and feedback via Slido

**TRCS**

- Hold follow up conversations within your pods
- Share trending questions via Slido
- Activate Managing Pay at NIKE Training

Finally, here's what's next and how you can engage with the process...

40



Plaintiff's Trial Exhibit 158
Page 41 of 45

# SLI.DO Q&A

Throughout the session, use your mobile device or computer to ask questions or vote for others. We will answer the top questions in the room and provide an FAQ on the Readiness Site addressing the others.

1. GO TO: SLIDO.COM

(NO REGISTRATION OR ACCOUNT REQUIRED)

2. ENTER CODE: APR

3. SELECT THE QUESTIONS TAB

42



Plaintiff's Trial Exhibit 158
Page 43 of 45



44



Plaintiff's Trial Exhibit 158
Page 45 of 45

# EXHIBIT 33



**SAY:**
- Before we dive in, I wanted to quickly introduce Slido
- We'll be using this app throughout the session to gather questions and at the end we'll do a Q&A for those that are trending towards the top
- While we are logged into BlueJeans, Slido will be the primary way we gather questions for the Q&A
- We'll also be using this to source questions through the duration of APR (in other words now through August) in order to build out a comprehensive FAQ for HR, Leaders, and Managers
- The details for accessing Slido after today's session will be on the HR Readiness website

# FACILITATOR CHECKLIST

- Download fonts: https://nikehr.nike.com/?q=page/nike-hr-branding-17211&p1=1573
  - Double click on each font individually and click Install
- Save a copy of slides to your desktop
  - Any updates to materials will be communicated via email
- Have your script printed
- Turn off IM/Jabber/Teams and Close Outlook
- Turn off and/or silence your cell phone
- Grab water
- Legal Guidance
  - "Think about" vs. "Write down"
  - "Evaluate pay" vs. "Influence pay"
  - Further invest in ~20% of population, will vary by manager
  - Look for opportunities to differentiate based on performance and impact

6-Aug-24     © 2019 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.     2

Plaintiff's Trial Exhibit 35
Page 2 of 86

# TRAIN THE TRAINER Q&A

**Attendees:** Is it possible for TRCs to see the total number and individual names of enrollees prior to each session?

- Yes. The WHQ coordination team will create a roster a few days prior to the session and will email the TRC. If anyone enrolls in the last 2 days leading up to the session, there may be new names added.

**Confirmation:** Will TRC facilitators receive an Outlook or other invite / confirmation with the date, time and location of the session they are delivering?

- No. The system will not send a confirmation. TRCs will need to manually add each session to their calendars, including time to arrive early and prepare.

**Confirmation:** Will attendees receive an Outlook or other invite / confirmation with the date, time and location of the session they have enrolled in?

- Yes. Facilitators do not need to follow-up with enrolled attendees.

**AV Support at WHQ:** For the sessions scheduled at larger venues (e.g., TWC, Hayward Field, Edo), is AV support booked along with the room?

- Yes. AV partners will arrive prior to the session to ensure everything is connected and working.

**Clip-on Mics:** Where AV support is booked, will two clip-on mics be available?

- Yes. These are part of the AV orders.

**BlueJeans Kick-off One-Page:** Is a one-page best practices guide for kicking-off a BlueJeans session available?

- Yes. This will be available no later than April 25th and will be posted to the HUB Resource folder on Box.

**HRBPs for Co-Facilitation:** Will the HUB teams provide a list of HRBPs who have expressed interest in helping TRCs co-present the training session.

- Yes. These should be available by April 26th at which point we'll send out an email soliciting sign-ups for co-facilitators.

6-Aug-24     © 2019 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.     3

# YOUR ROLE AS A FACILITATOR

## LEAD FACILITATOR

- Deliver the training content and guide exercises/group activities

- Create conditions to foster individual learning and discoveries

- Create an environment that promotes opportunities to experiment, make mistakes, connect, and reflect.

- Model and reinforce behavior that is supportive. Make the space free of judgement (including your own self-judgement) and free of the need for approval.

- Create the conditions for each person to tap into and share their knowledge and experiences. Use others in the room as resources to gain new insights.

## CO-FACILITATOR

- Co-facilitation means supporting your partner and being present for them. Your job is to have each other's backs.

- Draw out discussion from the group and encourage participants to share their own experiences

- Monitor for confusion and check for common understanding

- Ensure the group begins and ends on time, maintaining the purpose of the training

- Helps respond to questions that err more to the grey zone

- Provide relevant examples and stories to help bring theory to life

6-Aug-24    © 2019 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.    4



- The engagement triangle is one way to remember the needs of your audience.
- It takes the pressure off of you as a facilitator to be "perfect".
- Facilitators have many responsibilities in addition to the participants' need to learn, such as: appearing credible, managing time, and communicating all of the content (of which there is seemingly no end).
- As a result of all these responsibilities, the needs of the audience can be ignored or considered a burden, even though they are the reason the session exists.
- Rather than focusing on being "prepared" as a facilitator with your own knowledge, ability and the perfect content, put emphasis on addressing the needs of your audience.
- The more you listen to your participants, the more you will understand what they need.
- That will help guide you on what to emphasize and where to take more or less time in each session.

5

Plaintiff's Trial Exhibit 35
Page 5 of 86

# REFLECT

A. WHAT WAYS HAVE YOU PUT YOUR AUDIENCE FIRST IN THE PAST?

B. HOW MIGHT YOU CONTINUE TO MAKE THIS A PRIORITY?

6-Aug-24     © 2019 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.                    6

**SAY:**
- Now that we've shared some foundational information, let's take a moment to reflect.
    - What did you learn?
    - You'll recall from the scenario at the beginning of this video that you were being asked what level role you'd need to add to your team.
    - Based on what you've learned, what factors would you take into account to determine whether the role is a lead professional or manager?
- Please pause the video and think about your answers to those questions.
- If you have additional questions or would like more information on the content covered in this video, please visit the HR website or contact HR Direct.

6



TOTAL REWARDS FUNDAMENTALS

# MANAGING PAY AT NIKE

**SAY:**
- Thank you for joining us for this Total Rewards Fundamentals course where we'll be discussing our Total Rewards Philosophy, programs and practices that you may or may not be familiar with, and also some shifts that will be coming over the next few months to the year-end process, now called the Annual Pay Review, or APR.
- You play a critical role in managing pay for your employees and this session has been designed to help set you up for success throughout the year.
- Over the course of the next several months, we'll be introducing some shifts to the way we manage pay at NIKE – impacting the way we approach offers for candidates AND how we evaluate pay during events like APR.
- The information we cover today will enable you to evaluate pay for your employees and make pay adjustments.

**DO:**
- Take a minute to introduce yourself and any co-facilitator that may be present (Name, Role, Where You Work From, Time at Nike)
  - E.g. My name is Sally Swoosh and I work on the Total Rewards team doing consulting. I'm based out of WHQ. I've been at Nike for 3 years.

**SAY:**

7

- As we begin this morning, at each of our tables let's take a minute to introduce ourselves – cover your Name, Role, and how long you've been at Nike.

**DO:**
- Provide 1-2 minutes for introductions at each table.

**SAY:**
- Now that we know a bit about who we're sitting with, I want you to take a moment to think about your current knowledge on the topic of pay.
- Where are you on a scale of 1 to 10 for each of the following questions, with 1 being the lowest score and 10 being the highest score.
    - I have the knowledge I need to make pay decisions for my employees.
    - I feel comfortable having pay conversations with my employees.

**DO:**
- Provide 10-20 seconds to complete, answering any clarifying questions

**SAY:**
- A recent study asked this same question of around 3,000 managers at different organizations of varying sizes and industries. The results? Approximately 1 in 2 managers feels prepared and comfortable discussing pay.
- What we know, is the more confidence you have around evaluating pay the more prepared and comfortable you will be in having pay conversations with your employees.

7



**SAY:**
- Many of us already have a reference point for how we manage pay. Perhaps it started when you received your first pay increase and had a conversation with your manager OR when you were making a difficult pay recommendation for one of your employees.
- Our goal for today is to orient those experiences to the way we manage pay at Nike.
- By the end of today's session you will be able to:
  - Prepare for your role in managing pay - which is directly tied to the next 3 objectives…
  - Understand, explain and apply Nike's Total Rewards Programs
  - Effectively use Nike's job architecture and pay ranges
  - Evaluate pay at key moments throughout the year



**SAY:**
- There are 4 primary sections we'll dive into today.
- In each section we'll provide a scenario for you to think about, dig into relevant information, and then provide an opportunity to reflect.
  - First we'll cover Nike's Reward Programs at a high-level
  - Then we'll move into Job Architecture and Pay Ranges
  - After that we'll cover the topic of evaluating pay, for example when hiring or promoting an employee
  - We'll then orient you to the new Annual Pay Review process which will kick off in June
- And to wrap up, we'll work through some common scenarios that you face day in and day out as a manager
- Feel free to ask questions throughout the session today, and we'll also aim to leave time at the end for Q & A

Plaintiff's Trial Exhibit 35
Page 10 of 86



**SAY:**
- Nike continues to transform.
- From the introduction of the Consumer Direct Offense to the execution of transformational initiatives across the business – we are striving to "Make Sport a Daily Habit."
- While we all have incredible passion for this vision and for the brand, we also want to be recognized and rewarded for the contributions we make day in and day out.
- We also have an opportunity to shift the way we engage in service of these changes – which means your role in Nike's Total Rewards Programs is also evolving.

10



**SAY:**
- As a leader of people, you are expected to:
    - Understand, explain and apply Nike's Total Rewards Programs – educating yourself on the programs that involve you and your team so you can answer questions as they arise.
    - You're also responsible for evaluating pay during key moments, such as New Hires, Pay Reviews, Promotions, and Lateral Moves – assessing key performance and talent considerations that inform pay adjustments and ensure your employees are competitively and equitably paid
    - It's also critical that you look for opportunities to differentiate pay based on performance and impact – this means focusing additional investment and resources – where appropriate – for those who drive the greatest impact, posses unique skills, or have potential to assume roles of increased scope and complexity.
    - Finally, just as you are engaging with your employees through Quarterly Check-ins to align on goals, celebrate wins, coach each other, and plan for the future. You should also be having meaningful pay conversations with your team members throughout the year as pay changes occur – inspiring confidence in the approach, as well as sharing the rationale you used to determine their pay.



**SAY:**

- Our mission in the Total Rewards organization, is to create "uniquely Nike" Total Rewards that enable Nike to attract, retain, and engage the world's best talent.
- There are 3 principles that guide everything we do:
    - The first is to ensure competitive and equitable rewards.
        - We believe that competitive and equitable rewards go hand in hand, and that employees at the same level, in similar jobs with similar performance should be equitably paid.
        - Achieving and maintaining this status is an ongoing discipline.
        - For benefits, we believe they should be comprehensive and inclusive.
        - We design our programs and practices to support NIKE's values and goals – considering each component individually along with the full Total Rewards opportunity
    - The second, is that we pay for performance and impact
        - We link pay to: company performance, demonstrated and expected individual performance, impact over time, and to talent key for NIKE's long-term growth.
        - Company performance plays a key role in our short-term and long-term incentives, while individual performance affects rewards like base pay, increases, milestone bonuses, as well as promotions into roles with

more scope and complexity.
- Impact is defined as the ability to create value for NIKE both now and in the future.
- And the third, is we invest in positive experiences – focusing on all employees, across all bands, functions and geos
    - We invest in programs and practices that have the greatest positive impact on the engagement and wellbeing of our employees.
    - These decisions are informed by:
        - NIKE's culture and values, which is what we stand for – rooted in our maxims and leadership model
        - Employee insights and feedback, which is what our employee's value – gathered through the employee engagement survey and a variety of focus groups
        - And market insights, which is what we see other companies doing – to provide context and inspiration for our programs and practices, aiming where possible to be globally consistent and locally relevant.
        - And depending on the program, the weight we put on each lens may vary – with culture and values playing a larger role than market insights and visa versa.
    - We're always asking ourselves whether our programs and practices are having the desired impact, are focused on the right things and whether they can be done better, easier, or more efficiently.

- When offering programs to employees, many companies are singularly focused on what's occurring in the market. While this is definitely important, we feel that it's just as important to be true to Nike.
- So when we say, "Uniquely Nike" it means that our total rewards will meet the needs of our diverse employee population, in whatever stage of life they may be in.

**DO:**
- Use relevant examples for your local market as applicable. Nike Stock Choice may not resonate in all situations.
- If you're traveling to do in-person training, research local example to use that will be relevant to participants.
- For example: HMO in the US, FTO in Netherlands, etc.

**SAY (GLOBAL EXAMPLE):**
- A relevant example of how this comes to life can be seen with the Nike Stock Choice program that was introduced in 2018.
- While Nike had historically only provided Stock Options to eligible employees, we observed in the market that Restricted Stock Units were becoming more prevalent
- And, at the same time we heard from our employees that they desired more choices in the way they received their awards – to meet their unique financial needs

12

- Typically, companies don't offer choice when it comes to stock awards, however, we felt that this was the best path to be true to our culture and values, ensure the program met the needs of our employees, while also maintaining competitiveness with other companies like us.

**SAY (EHQ EXAMPLE):**
- A relevant example of how this comes to life can be seen with the Flexible Time Off program that was introduced in the Netherlands this past year.

12



**SAY:**
- At the beginning of each section, we are going to introduce scenarios to guide our learning.
- The purpose of these scenarios is to connect to real-life situations you may find yourself in as a manager.
- At the end of each section, we'll spend some time reflecting, reviewing, and reporting out on these learnings.
- In this first scenario you are being asked about Nike's Total Rewards programs.
- Please take a moment to read through the scenario and consider a few key things you would cover with the candidate.
- We'll proceed in 2-3 minutes.

**DO:**
- Provide 2-3 minutes to complete, answering any clarifying questions

**SAY:**
- Has everyone had a chance to gather your initial thoughts? Any observations?
- Based on your knowledge today, what are some of the things you might mention to the candidate?

**DO:**
- Provide an opportunity for those that have an observation to share

13



**SAY:**
- Now that we've covered your role in Total Rewards and reviewed our Total Rewards philosophy, we are going to spend some time on the programs and practices that make up and drive Total Rewards.
- Each component plays a critical role in making Nike an employer of choice, where our employees feel empowered and valued.
- Before we take a look at each component in a little more detail, it's important to understand how they all fit together.

14



**SAY:**
- We aim to provide globally consistent, yet locally relevant Total Rewards programs.
- At the foundation is Career and Recognition, something offered to all of us regardless of role or level in the organization.
- In addition, a variety of locally relevant benefits are offered to employees – some are statutory, while others are chosen based on an employees unique needs.
- From a pay perspective, you'll see that we offer base pay, short-term incentives (like Annual Bonus – PSP), and long-term incentives (like Annual Stock Awards).
- In general, the pay mix is different based on the level an employee is at, which is informed by common market practice.
- For example, employees in V-U bands (typically individual contributor roles and supervisor/manager roles) have a greater proportion of their pay that is fixed and a smaller portion is variable – primarily through a cash bonus.
- For E and S bands (typically Director and Sr. Director roles) more pay becomes variable with the addition of long-term incentives - primarily stock awards.
- And for E7+ bands (which are Vice Presidents and above) an even greater portion becomes variable with the addition of long-term cash awards.
- The purpose of this is to ensure those in leadership roles are focused on both the short-term AND long-term success of the company in addition to their ability to influence results.



**SAY:**
- As we touch on each of the components that make up and drive Total Rewards, we'll provide a brief description of why it matters along with some examples of how this specifically shows up at Nike.
- In the Career and Recognition space, the focus is on engaging and developing our employees.
- Some examples of how this comes to life are through:
  - Coaching for Excellence or CFE – is NIKE"s performance management process. It helps you align each employee's work with business objectives and clarify expectations for the year, enables ongoing feedback and coaching, develops the capabilities of employees, and provides a consistent approach to evaluating and rewarding performance.
  - Promotion & Lateral Move Opportunities – ties into getting clear on what's important to you, what motivates you, and identifying what you want in your career and then putting plans in place to get where you want to go.
  - Recognition Programs – like Milestones, Service Awards, Maxims Awards (for teams), and JDI Awards (for individuals) provide an opportunity to reward employees' actions, efforts, behaviors, and performance.
  - And finally, Mobility Programs – supporting the career movement of our team members around the world through mobility assistance, tax support, and

Plaintiff's Trial Exhibit 35
Page 20 of 86

immigration programs.

**DO:**
- Provide locally relevant programs, where possible

16



**SAY:**
- In the Benefits space, the focus is on supporting the healthcare, financial and work/life needs of employees and their families.
- Some examples of this that are relevant across the globe are:
    - Health Insurance
    - Retirement Savings
    - Time Off Programs
    - And the Employee Assistance Program or EAP

**DO:**
- Mention locally relevant programs as needed

**SAY:**
- For those of you that manage global teams, your employees benefits will likely differ from yours – as you sit in different locations.
- For more information on benefits that are relevant for your location you can access the HR Website from Zero and then click Pay & Benefits from the menu bar at the top of the page

17



**SAY:**
- Base pay is the most foundational element of pay.
- It ensures that our employees are competitively and equitably paid for performing specific job responsibilities.
- Throughout the an employee's career at Nike there are several key moments where base pay is evaluated.
- New Hires, Pay Reviews, Promotions, and Lateral Moves are the primary moments where base pay is reviewed and has an opportunity to grow.



**SAY:**
- Short-term incentives are intended to provide eligible employees with an opportunity to share in Nike's success based on achievement of short-term financial objectives – typically 12 months or less.
- Eligibility for short-term incentives vary by plan.
- The Performance Sharing Plan (or PSP) is an annual cash bonus.
- There are several key things to know about PSP:
    - First, it is a single plan, based on one company-wide metric called EBIT or Earnings Before Interest and Taxes, which measures our profitability as a company.
    - All employees have a 100% individual modifier, that is not adjusted - ensuring we win as a team.
    - Bonus targets vary based on level, but are globally consistent.
    - And employees must be hired on or before May 31st in order to be eligible for the bonus payout.

- In addition, there are a number of Geo and Territory Store Incentives that are typically based on store performance (for example Revenue). These are generally paid monthly or quarterly, depending on location.



**SAY:**

- At Nike, long-term incentives are awarded to eligible employees at the Director and above levels, providing an opportunity to share in Nike's success based on the achievement of multi-year financial and stock price performance.
- Stock awards are communicated as a US Dollar amount and determined by managers during the annual pay review.
- With the introduction of the Nike Stock Choice program in 2018, employees have the opportunity to choose either 100% stock options, 100% restricted stock units (also known as RSUs), or a 50/50 mix of both stock options and RSUs.
- For employees at the Vice President level and above, we also provide cash awards based on achievement of financial goals over a 3-year period – what is referred to as the Long-Term Plan Incentive Plan or LTIP
- As we shared earlier, for E and S bands (typically Director and Sr. Director roles) more pay becomes variable with the addition of long-term incentives - primarily stock awards.
- And for E7+ bands (which are Vice Presidents and above) an even greater portion becomes variable with the addition of long-term cash awards.
- The purpose of this is to ensure those in leadership roles are focused on both the short-term AND long-term success of the company in addition to their ability to influence results.

Plaintiff's Trial Exhibit 35
Page 25 of 86



**SAY:**
- At the end of each section, we'll provide some space to reflect, review, and report out.
- During this we'll be looking for each group to assign three roles:
    - A Facilitator – who will be responsible for ensuring engagement from those in the group and encouraging all perspectives to be shared
    - A Spokesperson – who will report out to the larger team on common themes
    - A Time Keeper – to make sure you're on track to get through the conversation within the allocated time

- Now, please answer the following questions:
    - What did you learn?
    - If you'll recall, we started this section with a scenario where you were asked by a candidate about Nike's Total Rewards Programs…now, how would you talk to the candidate about these programs?
    - What are you curious to learn more about?

- I'll give you a couple minutes to reflect and then be prepared to share your answers.

**DO:**
- Provide 2-3 minutes to complete, answering any clarifying questions

Plaintiff's Trial Exhibit 35
Page 26 of 86

**SAY:**
- At your tables or in groups of 5-6, go ahead and discuss what's top of mind. We'll spend 5-10 minutes. Please be prepared to share out the common themes.

**DO:**
- Walk around and support as needed.
- Look for answers being discussed that might be off or misguided AND listen for any themes you notice across the room.
- Possibly mention themes you've heard and look for opportunities to clarify with the larger group.
- Clarify questions as they arise.

**SAY:**
- Let's bring everyone back together and talk through the themes that came out of your group conversations.

**DO:**
- Call on each table/group and ask them to share.
- Facilitate conversation as needed.

21



**SAY:**
- Now, with an understanding of the major components of Nike's Total Rewards programs, we will take a deeper dive into the topic of base pay.
- Every manager has a role in evaluating pay for their teams.
- To do this successfully you will need to effectively use our job architecture and pay ranges.

22



**SAY:**
- In this second scenario you are being asked which job level you'll need for a new position on your team.
- Please take a moment to read through the scenario and gauge a few key things you would take into consideration.
- We'll proceed in 2-3 minutes.

**DO:**
- Provide 2-3 minutes to complete, answering any clarifying questions
- If question comes up about difference between Lead and Manager: Lead = Individual Contributor role; Manager = Management role

**SAY:**
- Has everyone had a chance to gather your initial thoughts? Any observations?



**SAY:**

- Nike's job architecture is based on two elements: Type of Work and Level of Work
- These elements should be applied consistently across all geos, business units, and functions.
- Type of work refers to the essential responsibilities of a particular role.
- At Nike, there are two aspects that are key to Type of Work
    - Job Function and Job Family
- Level of work refers to the scope and complexity of a particular role taking into consideration a number of criteria.
- At Nike, there are two aspects that are key to Level of Work
    - Band and Job Level
- Once you have defined both the type of work and level of work, it results in a job code.
- It's important to note that you can enter the conversation from either side, however, you need both in order to end up with the right result.
- Let's take a closer look at Type of Work, Level of Work and the importance of Job Codes.

Plaintiff's Trial Exhibit 35
Page 30 of 86



**SAY:**
- Job Functions are broad categories of work that can be logically grouped together based on having similar characteristics or prerequisite skills.
- We have identified ~20 job functions across Nike that categorize the work we do as a company.
- An example includes Finance
- Job families are the unique roles within a job function that can be performed at various levels based on Nike's leveling criteria.
- The number of job families at Nike varies within each Job Function.
- Within the Finance job function some examples of job families include Accounting, Audit, Investor Relations, and Financial Analysis



**SAY:**

- Level of work provides a common framework used to determine the scope and complexity of various roles.
- There are two aspects of level of work that are important to understand: Bands and Job Levels
    - Bands (or the VALUES bands), are a uniquely Nike structure used to organize jobs throughout the company.
        - They are also one way we link pay and programs to individual employees.
        - Many of our short-term and long-term incentive programs have targets that are set for each band.
        - For example, the PSP target for eligible A-band employees is 5%, which means that if Nike achieves 100% of our financial performance metrics, employees at the A-band have the opportunity to receive an award of 5% on top of their base pay.
    - Job levels, align with surveys we use to benchmark Nike to other similar companies in the market, ensuring that our pay programs are both competitive, and equitable.
        - They also help provide a clear career path for employees as they progress to roles of increased scope and complexity.

Plaintiff's Trial Exhibit 35
Page 32 of 86

- A helpful tool we use to determine job levels is leveling criteria.
  - We use three primary criteria when assessing the level of work:
    - First is scope and impact, including the degree to which the job identifies solutions to problems, makes autonomous decisions, and is responsible for managing talent, performance, and pay.
    - Second is communication and influence, including the type of interaction and role in setting strategy.
    - And the third is knowledge and experience, which is typically defined by levels of education, related work experience, and capability required to fulfill job responsibilities.
- You'll see that we have both individual contributor and management roles at Nike.
  - This is one more way we further define roles.
- To help paint the picture a little more, let's walk through an analogy about "Rope" that's tied to each of the Professional Individual Contributor roles in bands L through S
  - An entry professional role would be learning about rope
  - An intermediate professional role would be expected to tie basic knots
  - A senior professional role would know a lot about knots and would be expected to calculate the ropes strength
  - A lead professional role would understand rope making
  - An expert professional role would know more about rope than you ever will
  - And a professional consultant role would be an expert in the field and invented nylon
- Because assessing the level of work can be complex, we encourage you to partner with your HR Business Partner when approaching this for jobs in your organization.

26



**SAY:**
- Combining the Type of Work with the Level of Work results in a job code.
- Job codes drive many aspects of Total Rewards.
- The one we'll focus on today are pay ranges.
- However, they also serve as a starting point to assess key talent, career paths, and org size and shape.
- As well as program eligibility and program targets, such as PSP, Stock, and LTIP
- As a manager, you are responsible for ensuring employees are in the right job code.
- However, we recommend that you partner with your HRBP if you have questions or need assistance when determining job codes.

27



**SAY:**
- Pay ranges are simply a structure for managing base pay.
- They are comprised of a minimum, midpoint, and maximum.
- In the illustration here, you can see that the minimum is $80,000, the midpoint is $100,000, and the maximum is $120,000.
- We develop pay ranges using country and location specific market data that we gather from third-party survey companies.
    - The market data is company reported and validated by our survey vendors.
    - There are some surveys and websites that provide self-reported market data, such as Glassdoor.com or Salary.com.
    - We do not use this data as a reference point, as it is often inaccurate and inconsistent.
    - Self-reported data is often based on job title alone, which varies greatly from company to company and between industries.
    - For example, everyone at a bank has the title of Vice President.
- Within a pay range, there are multiple, similarly paid jobs.
- The midpoint represents the approximate market rate for those jobs.

28

- Pay for individual employees can spread across the entire range and is influenced by a variety of factors (for example performance, potential, time in role, or pay relative to peers).
    - In general pay ranges for lower job levels have a smaller distance between the minimum and maximum.
    - While pay ranges at higher job levels have a larger distance between the minimum and maximum.
    - This is due to the fact that as employees progress through their career, they tend to stay in a particular job level for increasing lengths of time.

28



**SAY:**
- Again, please assign a Facilitator, Spokesperson, and Time Keeper within your group.

- Now, please answer the following questions:
    - What did you learn?
    - You'll recall from the scenario at the beginning of this section that you were being asked what level of role you'd need to add to your team for a new position. Based on what you've learned, what factors would you take into account to determine if this is a lead professional or manager role?

- I'll give you a couple minutes to reflect and then be prepared to share your answers.

**DO:**
- Provide 2-3 minutes to complete, answering any clarifying questions

**SAY:**
- At your tables or in groups of 5-6, go ahead and discuss what's top of mind. We'll spend 5-10 minutes. Please be prepared to share out the common themes.

**DO:**

- Walk around and support as needed.
- Look for answers being discussed that might be off or misguided AND listen for any themes you notice across the room.
- Clarify questions as they arise.

**SAY:**
- Let's bring everyone back together and talk through the themes that came out of your group conversations.

**DO:**
- Call on each table/group and ask them to share.
- Facilitate conversation as needed.

29



**SAY:**
- Now, with an understanding of the major components of Nike's Total Rewards programs and our job architecture and pay ranges, let's look at how you should approach evaluating pay for your team during key moments during an employee's career here at Nike.

30



**SAY:**
- In this third scenario you are being asked to explain this employee's position within the pay range.
- Please take a moment to read through the scenario and think about a few key things that may impact the employee's position in range.
- We'll proceed in 2-3 minutes.

**DO:**
- Provide 2-3 minutes to complete, answering any clarifying questions

**SAY:**
- Has everyone had a chance to gather your initial thoughts? Any observations?



**SAY:**
- Position in range is a way of describing where an individual's pay is relative to the midpoint of the pay range.
- It provides a consistent way to review and communicate pay, regardless of currency, location, or pay range.
- To calculate an employee's position in range, you simply take their current pay and divide it by the pay range midpoint.
  - Please note, that current pay is the employee's full-time equivalent or FTE salary meaning pay at 100%, regardless of hours worked or schedule.
- In this particular example, the employee has a current pay rate of $95,000 per year and the midpoint of the range is $100,000
- This results in a position in range of 95%.
- You might be asking yourself, so what?
- Let's take a deeper look at what 95% means and why an employee might be positioned in a particular section of the pay range.

**DO:**
- Be prepared for managers that may get focused on how they themselves are positioned in the range – redirect or parking lot conversation as needed

Plaintiff's Trial Exhibit 35
Page 41 of 86



**SAY:**
- Because our market competitive pay ranges are broad, it enables us to position employee's within the range based on a variety of factors.
- Here, we've divided the pay range into three sections to illustrate and provide guidance around why an employee might be positioned within a certain section.
- Each employee's pay will fall within different points in the pay range, as each employee brings different performance, skills, and experience to the table.
- If you recall from the previous slide, the employee's position in range was 95%.
- This means, the employee falls within the middle section of the pay range and likely has experience, knowledge and skills that are aligned with the expectations of the role and is fully functional in that role, contributing at expected levels.
- We would expect that a majority of our employees are paid within the middle section.
- However, there are reasons why we might position employees in the lower and upper sections of the pay range.
- The lower section is generally for employees that are building experience and/or developing skills for a particular role.
- While the upper section is generally for highly experienced employees with superior knowledge and skills relative to the role.
- These are employees that may be expert and/or progressing towards a promotion.
- As a manager, you should always use good judgement when making pay decisions.

33

Plaintiff's Trial Exhibit 35
Page 42 of 86

- It's also important to remember, that it takes effort to maintain a healthy pay ecosystem where pay is competitive and equitable.
- There is no finish line when it comes to positioning your employee's within the pay range.
- It will take time to adjust pay for your employees to get to a place you feel is equitable AND once you arrive at that place, it takes focus to maintain that year over year.

33



**SAY:**
- As we begin to focus more on appropriately positioning employee's pay within the pay range, we wanted to highlight several misconceptions that come up from time to time.
- For each statement, assess if it is true or false.
- The first, is "100% is the ideal position in range for an employee performing at their job level's expectations."

**DO:**

- Provide 10-15 seconds

Plaintiff's Trial Exhibit 35
Page 44 of 86

**SAY:**

- This first statement is: "FALSE"

- While 100% is a at the midpoint, pay in the middle section of the range - between 90% and 110% would generally be appropriate in this scenario.

- There are no rules, formulas, or policies regarding the "right" position in range because it is unique to each employee based on their performance, skills and experience, including their sustained performance over time and their rate of promotion.

34



**SAY:**
- Next, "if the employee is not at a 100% position in range they are not paid at market.
- I'll give a few seconds to think about your response.


**DO:**

- Provide 10-15 seconds


**SAY:**
- This second statement is also: "FALSE"

- The midpoint of the pay range represents the approximate market average, not the exact market rate. There is a wide range of salaries paid in the market place and our pay ranges reflect this.

35

**TRUE OR FALSE**

**STATEMENT #3...**

"IT'S BETTER TO BRING IN A NEW HIRE AT A HIGHER JOB LEVEL AND LOWER POSITION IN RANGE SO THEY HAVE ROOM TO GROW PAY"

6-Aug-24      © 2019 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.      36

**SAY:**

- Another one that comes into play when hiring new talent. "It's better to bring in a new hire at a higher job level and lower position in range so they have more room to grow pay."

- Think about your initial response – true or false?

**DO:**

- Provide 10-15 seconds

**SAY:**

36

- Statement number 3 is also: "FALSE"

- We do not recommend this approach.

- The job title and job level should represent the level of work the employee will be doing based on what is required for the role, not to manage pay to a specific position in range.

- Nike's wide ranges accommodate higher position in range when appropriate, based on an individual's knowledge, skills, and experience.

- We should be comfortable utilizing the full range starting at time of hire, as appropriate.

- Always hire at the appropriate band and level and pay appropriately for the individual's knowledge, skills, and experience.

- Artificially inflating the level or band to lower their position in range can create issues for pay relative to peers between employees actually performing work at the higher band or level.

36

**TRUE OR FALSE**

**STATEMENT #4...**

## "I SHOULDN'T HIRE SOMEONE AT A LOWER OR HIGHER POSITION IN RANGE THAN THEIR PEER GROUP"

6-Aug-24      © 2019 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.                                    37

**SAY:**

- "I shouldn't hire someone at a lower or higher position in range than their peer group."

- What do you think in this situation – true or false?

**DO:**

- Provide 10-15 seconds

**SAY:**

- This is also "FALSE"

- While this can be a challenging situation to face, we recommend that the focus be on positioning pay to reflect the individual employee's accumulated performance, skills, and experience over time.

- Each candidate and employee is different, therefore, we do not expect all pay to be the same.

- For example, the candidate may be highly experienced, have unique skills in the market place, and/or have been a top performer over their career.

- A higher position in range compared to some peers may be appropriate.

- Focus on calibrating pay based on experience, abilities, and expected contributions vs. NIKE tenure alone.

37

Plaintiff's Trial Exhibit 35
Page 50 of 86



**SAY:**

- And the finally, "it is appropriate to hire or promote an employee below the minimum of the pay range."

- True or false?

**DO:**

- Provide 10-15 seconds

**SAY:**

38

- This is "TRUE"

- Focusing on the size of the increase itself can hinder making solid pay decisions.

- Core to our beliefs is that competitive and equitable rewards are our baseline, and with base pay the minimum of the pay range is the threshold for competitiveness.

- Therefore base pay should be at or above the minimum of the range, including at hire and at promotion – regardless of the size of the increase.

38



**SAY:**
- With a better understanding of position in range, let's now turn our focus to key moments in an employee's career at NIKE that you have an opportunity to evaluate their pay.
- The first opportunity is when a new employee joins Nike by applying for a role and being selected after going through the competitive hiring process.
- Another common opportunity is through pay reviews.
    - We define pay reviews as moments where full teams or organizations are reviewed.
    - Some common examples include the Annual Pay Review that occurs each June and Org Changes.
- There are also situations where an employee is promoted or moved laterally
- A promotion occurs when an employee advances into a role with increased scope and complexity.
    - There are two ways a promotion can occur.
    - The first is advancing to a higher job level within the same job band.
    - For example, moving from a Sr. Professional role into a Lead Professional role with the U-band.
    - The second is advancing into a role within a higher job band
    - For example, moving from a Manager role at the U-band to a Director role at the

Plaintiff's Trial Exhibit 35
Page 53 of 86

E-band.
- A lateral move occurs when an employee moves into a new role with similar scope and responsibility.
  - A lateral move means there is no change to job level or the job band.

Plaintiff's Trial Exhibit 35
Page 54 of 86



**SAY:**
- Now that we've covered some of the fundamentals about position in range, we can focus our attention on the various considerations you will need to look at when evaluating pay at key moments in the employee's career at Nike.
- For New Hires, it's critically important to get the job code right when hiring.
    - As you'll recall, the job code is directly linked to the job level and band, and also will determine the pay range for the role.
    - This ensures that you are making pay decisions based on the appropriate pay range and are then able to asses pay relative to peers – that is employees in similar job codes and at the same level.
    - Remember, it may be appropriate to bring in a new hire at a position in range higher than the current team.
    - The focus should be on positioning pay appropriately and then managing the pay of your team over time.
- Pay reviews can either occur across the enterprise (an example is the Annual Pay Review) or might occur on a smaller scale in partnership with HR.
- During pay reviews, we also layer on some additional considerations including:
    - Assessing performance and impact over time – how they contribute to the team and Nike
    - Potential which is the ability and readiness to assume roles of increased scope

Plaintiff's Trial Exhibit 35
Page 55 of 86

and complexity (you can refer to Talent Segment for those in E+ band roles)

- As well as the impact of loss which refers to employees with capabilities, knowledge, and expertise that stand out when compared to peers.
- You may also consider someone's risk of loss; those employees who are likely considering the idea of leaving NIKE due to any number of engagement reasons
- Another lens that can also be helpful is to refer to the employees time in role.
- As we highlighted earlier, for those new in role it may be appropriate to position pay within the lower section of the pay range.
- While a more experienced employee's pay may fall into to the upper section of the pay range.
- Every team is unique, and as a result, it's important to use good judgement when making pay decisions.

- For both Promotions and Lateral Moves many of the same considerations come into play.
  - The two that are no longer applicable are impact of loss and risk of loss.
- We recognize that as a manager you have many responsibilities.
- And our hope is this checklist can be used as a starting place for you the next time you are looking to hire, promote, or laterally move an employee AND during any of our upcoming pay reviews.

40



**SAY:**
- We also recognize, that it's helpful to have guidelines to follow when making pay decision.
- Across the board, you should focus on positioning pay appropriately regardless of the size of the increase.
- In general, we expect that new hires will have a position in range of 85% up to the maximum of the pay range.
    - Laws and regulations continue to evolve in the area of pay.
    - As a result, we no longer ask new hires their prior salary or focus on the size of the increase the new hire would receive.
    - We want to ensure that newly hired employees receive competitive and equitable offers, so that from day one at Nike, they're setup for success
- For promotions, we'd expect that employees are at an 85% to 95% position in range once they move into the new role.
- And for lateral moves, we generally do not see pay increases occur.
    - However, with that said, there are cases where an increase may be needed to position the employee appropriately within the pay range.
    - Use the opportunity to evaluate pay and make the appropriate decision.
- In all cases, managers are responsible for making pay adjustments that are competitive and equitable.

41

- Newly hired or promoted employees should be above the minimum of the pay range.

41



**SAY:**
- Again, please assign a Facilitator, Spokesperson, and Time Keeper within your group.

- Now, please answer the following questions:
  - What did you learn?
  - How might you respond to your employees now if they asked you about their pay positioning?
  - What tools and resources are available to help prepare you?

- I'll give you a couple minutes to reflect and then be prepared to share your answers.

**DO:**
- Provide 2-3 minutes to complete, answering any clarifying questions

**SAY:**
- At your tables or in groups of 5-6, go ahead and discuss what's top of mind. We'll spend 5-10 minutes. Please be prepared to share out the common themes.

**DO:**
- Walk around and support as needed.

Plaintiff's Trial Exhibit 35
Page 59 of 86

- Look for answers being discussed that might be off or misguided AND listen for any themes you notice across the room.
- Clarify questions as they arise.

**SAY:**
- Let's bring everyone back together and talk through the themes that came out of your group conversations.

**DO:**
- Call on each table/group and ask them to share.
- Facilitate conversation as needed.

42



**SAY:**
- Now that we've covered our total rewards programs, the job architecture and pay ranges, and how to evaluate pay, we would like to shift our focus over to the primary opportunity you have as a manager to evaluate pay for your employees – the Annual Pay Review – which is part of our Year-End Process.

43



**SAY:**

- The Annual Pay Review or APR, is essentially an evolution and consolidation of our annual reward events supported by SuccessFactors
- Today, we manage GPR in SAP, while 2X, CPM, and the Annual Stock Process are all done in spreadsheets all on separate timelines
- Going forward, these will be in one system and on one timeline

44



**SAY:**
- APR is one half of the year-end process, which also includes Coaching for Excellence or CFE
- As we discussed earlier, CFE is NIKE's performance management process.
- It helps you align each employee's work with business objectives and clarify expectations for the year, enables ongoing feedback and coaching, develops the capabilities of employees, and provides a consistent approach to evaluating and rewarding performance.
- There are no changes to the Coaching for Excellence process this year.
  - The CFE Rating Collection Process will take place from May 8th through May 24th, followed by Year-End performance conversations in June.
- There are shifts taking place with the Annual Pay Review, which we'll be diving into.
  - The APR Process will take place from June 5th through July 7th, followed by Pay Conversations in July

Plaintiff's Trial Exhibit 35
Page 63 of 86



**SAY:**

- From June 5th through June 18th, all managers, regardless of level are expected to access SuccessFactors via the mePortal, review their direct reports' information and make all applicable pay recommendations.
- This is the Manager Planning window.
- After the initial planning period, we will move through the Executive Review Process, which is highlighted here in gray.
- Each level will have approximately 3-4 days to review and make any required changes to the recommendations that have been entered.
- At the end of each review period, the ability to edit information will close for that group.
  - Managers will be able to view any changes that are made during the executive review process.
  - For example, during the E+ Review…all E+ Managers will have edit access while V-U managers will only have view access.
- You are encouraged to monitor your team's information for any changes that may occur during the review period.
  - If there are questions or concerns, you should raise them for discussion with your manager prior to the end of APR.

Plaintiff's Trial Exhibit 35
Page 64 of 86



**SAY:**
- The expectation going forward is that all employees' pay will be planned in SuccessFactors.
    - We will no longer do planning in spreadsheets or any other form outside of SuccessFactors.
    - We recognize that there are certain groups that have unique requirements and/or pay strategies (for example due to Collective Labor Agreements) and do not require action from managers.
    - We are focused on right-sizing the effort from managers with the pay practice.

- Similar to past years, managers will input recommendations in SuccessFactors for most employees
    - Default values will be loaded for all components of pay where manager action is required
    - From there, managers will focus on further investing in their employees
    - We expect that overall approximately 20% of employee's will receive additional investment, although this will vary by manager

- Under the centrally planned model, there is no action required by manager
    - This process is formula driven based on either years of experience at NIKE or CFE

47

Rating, depending on location

Plaintiff's Trial Exhibit 35
Page 66 of 86

**SAY:**
- Before we jump into some of the key changes, I wanted to provide an end-to-end look at the APR process
- As in past years, the CFE Rating process will continue on the same timeframe with ratings entered in SAP – rating data will feed over from SAP into SuccessFactors to be used as a reference point throughout APR.
- For pay recommendations, managers will largely focus on Base Pay
- In addition, managers of E+ band employees will also make recommendations for Annual Stock Awards.
- With the shift to One PSP, you will no longer have to take any action related to our annual bonus.
- All employees are on the same plan, with a single shared performance metric, and individual modifiers will be set at 100% for all employees.
- Throughout the process you will also have access to centralized and standardized dashboards and reporting within SuccessFactors providing real-time and relevant information
- And, at the end of the process you will be able to generate a Pay Statement to use as a resource when having pay conversations with your employees.



**SAY:**

- These next slides provide a high-level overview of the actions you will be required to take within SuccessFactors
- Within the system, each component of pay is grouped into it's own section with the information needed to make an informed decision.
- The first section you will see is Competitive Pay Management or CPM, which we introduced at NIKE in 2018.
    - With the constant movement of internal talent and the demands of a dynamic labor market, we are committed to evaluating pay each year.
    - CPM is a centrally-driven annual, global pay review focused on ensuring competitive and equitable pay for all employees – in all bands, geos, functions, and brands.
- This process may be new to you, as we don't anticipate that most employees will receive a competitive pay adjustment, as they are competitively and equitably positioned in the pay range.
- However, there are times when an adjustment is recommended.
    - When this occurs, the recommended adjustment will be pre-populated in SuccessFactors
    - Managers then have the responsibility to determine whether or not to 'Apply the CPM Adjustment' to the employee's base pay

- The default response will be 'Yes', however, there are certain situations where a manager may select 'No'
- The four available reason codes for selecting 'No' include:
    - Incorrect job code – If you know that you've recently processed a job code change for your employee or don't believe their job code is correct
    - Documented performance action plan – If you have partnered with Employee Relations and the employee is on a documented performance action plan. These will be cross-referenced with Employee Relations and your HRBP at the end of the cycle.
    - Future Term – If you've received confirmation from an employee that they will be leaving Nike in the months of June, July, or August.
    - Request HRBP Assistance – This may be appropriate if you are unsure of whether to apply the adjustment or you would like to discuss before moving forward.
        - Your HRBP will reach out to you to discuss if you select this from the dropdown

49



**SAY:**

- The next section that all managers will see is Core Pay.
- Core pay is the new term we are using in place of Merit.
- You will likely spend a bulk of your time in this section.
- However, the focus should be on making base pay recommendations for ~20% of the population.
    - This is because a market default will be pre-populated in SuccessFactors based on the employees country and position in range (after any CPM adjustment).
    - In other words, all employees will have a default of 'Market'
- We also recognize that you, as a manage, play a critical role in differentiating rewards for your team.
- As a result, managers will have the ability to further invest in their employees by selecting either 'Invest' or 'Max Invest" from the dropdown list.
    - Depending on what country the employee is in and where the employee is positioned in the pay range the increase will adjust with the selection.
    - In addition, managers also have the ability to remove the increase by selecting 'Zero'
    - For any employee where 'Zero' is selected, please also provide justification in the notes section
- When determining how to invest in your employees, remember to take into account the

various factors discussed earlier.

- Things like: current position in range, prior year performance, future potential, impact of loss, risk of loss, time in role, and pay relative to peers are all important to consider when managing pay for your team.

50

**SAY:**
- This is an example of the behind the scenes table that drives the default 'Market' core pay recommendation in the system.
- Market' will pre-populate based on an employee's country and position in range.
- When you select either 'Invest' or 'Max Invest' the increase will adjust accordingly.
- As you can see, employees in the lower section of the pay range will have a default that is slightly larger, while employees in the upper section of the pay range will have a default that is slightly lower.
- Utilizing this matrix across the company ensures consistency in our approach, reinforces appropriate movement through the pay ranges, and provides employees with a competitive increase.



**SAY:**
- Because our pay ranges are broad, we would expect that most employee's pay would fall within this range.
- However, there are certain situations where an employee's pay may be above the maximum of the pay range.
- So, one additional thing we'd like to call out in the Core Pay section is the utilization of Lump Sum awards – which is a one-time payment in lieu of an increase to base pay
- Lump Sum awards will automatically populate for any employee where pay is above the maximum of the pay range.
- This means that regardless if you stay with the default of 'Market' or select 'Invest' or 'Max Invest' any amount up to the pay range maximum will result in a core pay increase and any amount over the pay range maximum will default to a Lump Sum award.
- Managers then have the responsibility to determine whether or not to 'Apply the Lump Sum Amount' as a one-time payment
    - The default response will be 'Yes', and we highly recommend this approach
    - However, there are certain situations where a manager may select 'No'
    - If a manager selects 'No' the lump sum award will zero out and the employee's base pay will increase above the maximum of the pay range by the same amount.
    - If 'No' is selected we also ask that you provide justification in the system to

52

further help us asses the utilization and effectiveness of these awards

52



**SAY:**

- The last section that will show is for Annual Stock Awards.
- This section will only be visible to E-band and above managers.
- Similar to Core Pay a market default stock award will be pre-populated in SuccessFactors based on the employee's country and band.
    - There are three tiers of guidelines for stock awards that reflect the local market – one tier for US, one for EMEA, and one for Greater China and APLA.
- As a result, the focus in this section should be on making stock award recommendations for approximately 20-30% of the population where additional differentiation is appropriate.
- Managers have the ability to further invest in their employees by selecting 'Invest' from the dropdown list.
    - Depending on what country the employee is in and the employees band the award amount will adjust with the selection.
    - In addition, managers also have the ability to decrease the investment by selecting 'Lower' (based on performance tracking below expectations) or remove the award by selecting 'Zero' (for planned terminations or unsatisfactory performance).
- As with Core Pay, when determining how to invest in your employees, remember to take into account the various factors discussed earlier to ensure meaningful differentiation.

Plaintiff's Trial Exhibit 35
Page 75 of 86

- Things like: prior year performance, future potential, impact of loss, and risk of loss all important to consider when managing pay for your team.

53

**SAY:**
- Finally, SuccessFactors provides enhanced functionality for dashboards and reporting, as well as pay statements.
- From a Dashboarding and Reporting perspective all reports will be centralized within SuccessFactors, providing real-time information to aid in making solid pay recommendations for your team.
    - You will also have the ability to filter and pivot the data to provide you with the most relevant information and views.
    - And from each tile, you also have the ability to drill down into the detailed employee information at the source of each tile.
- At the end of the cycle, you will be able to generate a comprehensive pay statement within SuccessFactors – either individually or in bulk for the entire team.
    - Pay statements can be used as an aid when having pay conversations with your employees and will have robust language to support the conversation.
    - For V-U band employees, pay statements will be translated into 12 languages, in addition to English.
    - For E+ band employees, pay statements will be in English only
- As we move into July, more information and resources will be provided to support you in having pay conversations with your employees.
- Including conversation guides for both managers and employees, as well as the

opportunity for you to practice with real-life scenarios through Meaningful Conversation Labs.

Plaintiff's Trial Exhibit 35
Page 78 of 86

**SAY:**
- As we've designed the APR process, our goal is to align each step to our Total Rewards Core Principles, that we discussed earlier today.
- As you can see, the first 2 "steps" under Base Pay are there to ensure our pay outcomes are competitive & equitable
- Manager Investment decisions, Bonus, and Stock support our commitment to pay for performance & impact
    - For example, individual performance will affect rewards like base pay and stock through manager investment decisions
    - While, company performance affects rewards like our annual bonus and stock, as both are based on achievement of financial objectives.
- And across the board, we are aiming to implement a holistic solution that maximizes impact and efficiency – so that this program has the greatest positive impact on the engagement and wellbeing of our employees.



**SAY:**
- Now that we've covered our total rewards programs, the job architecture and pay ranges, and how to evaluate pay, as well as the APR process - we would like to put them into practice through a series of four scenarios that we anticipate you'll face during a day in the life as a manager.
- We'll break you into 4 teams and provide 10 minutes to read through one of the scenarios and formulate your response.
- After 10 minutes, we'll circle back to do a pitch back of where you've landed as a team.

56

## PAY SIMULATION: NEW HIRE

Over the past month you've been working with Talent Acquisition to fill a Marketing Operations role on your team in Singapore. After a series of successful interviews you've decided to make an offer to your candidate of choice, Dre. Based on your interviews, you feel that Dre's experience will be a great asset to Nike and that within 2-3 months will be fully functioning in the new role.

A majority of your team is in the lower section of the pay range with an average position in range of 87%. Chai, one of your top performers and the most experienced member of the team is in the middle section of the pay range with a position in range of 105%.

Because this is an intermediate professional role at the L-band it results in the following pay range:

| Minimum | Midpoint | Maximum |
| --- | --- | --- |
| $43,000 | $50,000 | $57,000 |

**PRIOR TO POSTING THE ROLE, WHAT WOULD YOU NEED TO TAKE INTO CONSIDERATION WHEN SELECTING THE APPROPRIATE JOB CODE?**

**AFTER CONDUCTING INTERVIEWS, WHAT WOULD YOUR INITIAL BASE PAY RECOMMENDATION BE WHEN EXTENDING THE OFFER TO DRE?**

6-Aug-24     © 2019 NIKE, INC. ALL RIGHTS RESERVED. FOR INTERNAL USE ONLY.

57

**SAY:**
- Take 2-3 minutes to read through the scenario and think about your response.

**DO:**
- Provide 2-3 minutes to complete.

**ANSWERS**
**What do you need to take into consideration:**
- Type of Work - Key accountabilities of the role
- Level of Work
- Manger vs. Individual Contributor

**Base pay recommendation:**
- 90 – 110% of the median
- Rationale -

57



**SAY:**
- Take 2-3 minutes to read through the scenario and think about your response.

**DO:**
- Provide 2-3 minutes to complete.

**ANSWERS**
**Base pay recommendation:**
- Move closer to the median/median+ of the range

**Considerations:**
- CFE rating
- Impact of loss
- Position in Range
- Pay relative to peers
- Unique capability

58



**SAY:**
- This next scenario is around a promotion.
- Take a few minutes to read through the scenario and think about your responses.

**DO:**
- Provide 2-3 minutes to complete.

**ANSWERS**
**Section of the Pay Range:**
- Lower

**Base pay recommendation:**
- $102K/85% Position in Range

**Preparing for the conversation:**
- Know the pay range and position in range
- Rationale for positioning -



**SAY:**
- This final scenario is for a lateral move, and is linked to the promotion of Lee.
- Take a few minutes to read through the scenario and think about your responses.

**DO:**
- Provide 2-3 minutes to complete.

**ANSWERS**
**Base pay recommendation:**
- No increase

**How did you arrive at the recommendation:**
- Well positioned relative to the pay range and peers
- Pay range does not change
- Would expect to see someone fully functioning to be between 90%-110%
- Limited impact of loss
- Has been performing consistently, but not exceptionally
- Time in role is 4 years, so again would expect to be in the middle tier

60



**SAY:**
- Does everyone have their thoughts gathered?
- Let's talk through each pay simulation.



**SAY:**

# EXHIBIT 34

EXHIBIT
509
Shane Walker
12/17/2020
Teresa Rider - CSR



FY16/17 Sustainable Business Report
NIKE, Inc.

# MAXIMUM PERFORMANCE MINIMUM IMPACT

NIKE_00001996

# INTRODUCTION

4 Letter from Our CEO
5 Performance and Disclosure Committee
6 Business Overview

# OUR APPROACH

9 Sustainable Innovation
11 Our Environmental Moonshot
14 Target Performance Summary
16 Issue Prioritization

# MINIMIZE ENVIRONMENTAL FOOTPRINT

19 The World Around Us
20 FY16/17 Highlights
21 Product
23 Materials
25 Energy and Emissions
29 Waste
32 Water
34 Chemistry
37 Minimize Environmental Impact: by the Numbers

# TRANSFORM MANUFACTURING

39 The World Around Us
40 FY16/17 Highlights
41 Sustainable Sourcing
45 Engaged Workforce
47 Partnerships to Accelerate Industry Change
49 Additional Priority Issues
    Child Labor
    Freedom of Association
51 Transform Manufacturing: by the Numbers

# UNLEASH HUMAN POTENTIAL

53 The World Around Us
54 FY16/17 Highlights
55 Employees
58 Community Impact
61 Additional Priority Issues
    Occupational Health & Safety
63 Unleash Human Potential: by the Numbers

# APPENDIX

65 Global Reporting Initiative (GRI) Index



NIKE_00001997

Plaintiff's Trial Exhibit 16
Page 2 of 74

# ABOUT THIS REPORT

This report covers NIKE's fiscal years 2016 and 2017 (June 1, 2015 through May 31, 2017). We will refer to these as FY16 and FY17 for the rest of the report.

The content found in this report is focused on progress toward our 2020 targets and key priority issues.[1] Targets and measures represent the full suite of NIKE's public corporate sustainability commitments, and are an aggregated view of functionally set long-term goals and additional corporate commitments to meet stakeholder expectations. Unless otherwise stated, the baseline for the majority of our targets is fiscal year 2015.

NIKE's 2020 targets encompass a broader scope than NIKE's previous targets in many areas of the value chain. For example, while 2015 targets for corporate offices included NIKE's World Headquarters, 2020 targets also include Converse HQ, Hurley HQ, European HQ, and Greater China HQ. Other targets go deeper into our supply chain, like expanding energy and emissions commitments to material dyeing and finishing for the first time, and broadening logistics goals to include outbound transportation. As a result of the expanded scope, certain 2015 performance metrics originally reported in NIKE's FY14/15 Sustainable Business Report are restated in this report to reflect the expansion and enable comparability.

This report reflects an evolution in our approach to reporting, allowing us to focus on performance. To enable this change, we have enhanced our website to share additional stories and provide additional context to our work. For more detail about our efforts and progress over more than 20 years of work in sustainability as well as our more current initiatives, please see our updated website at sustainability.nike.com.

This report has been prepared in accordance with the **GRI STANDARDS: CORE** option.

## DATA INTEGRITY

Sustainability data is shaped by a landscape of evolving methodologies, advancing standards and expansions in data accessibility over time. Adapting to these changes while maintaining comparability in our data is critical to instilling integrity and confidence in the validity of the insights the data provides. We understand that we must adapt and be nimble to keep pace with broadening data sets and emerging standards. To that end, we've been focused on designing more flexibility with tighter controls into our sustainability data processes and systems.

Based upon a thorough review by NIKE's internal audit function, considerable progress has been made to NIKE's sustainability data processes over the past several fiscal years, including but not limited to: a performance management data system overhaul, development of standard operating procedures, and an improved data governance model. The review also identified opportunities to further improve systems and controls around sustainability reporting. NIKE will continue to evolve and address information systems in light of this goal.

In cases where shifts in scope, methodology, and/or data quality have led to changes in previously reported performance results, we've restated historically reported results and provided context on the changes.

The data presented in this report has been collected, reviewed, and internally validated to ensure completeness and accuracy and represents the most complete and accurate information at the time of publication. NIKE will continue to be transparent on revisions to reported data in the future.

## REFERENCE

We will cross-reference the following frameworks throughout the report:

**PRIORITY ISSUE** — An issue deemed to be material to the company through our sustainability issue prioritization process.

**GLOBAL REPORTING INITIATIVE (GRI)** — The GRI Sustainability Reporting Standards are the first and most widely adopted global standards for sustainability reporting.

**SUSTAINABILITY ACCOUNTING STANDARDS BOARD (SASB)** — SASB is an independent, private sector standards-setting organization dedicated to enhancing the efficiency of the capital markets by fostering high-quality disclosure of material sustainability information that meets investor needs.

**UN GLOBAL COMPACT (UNGC)** — The UNGC is a voluntary initiative based on CEO commitments to implement universal sustainability principles and to undertake partnerships in support of UN goals.

**SUSTAINABLE DEVELOPMENT GOALS (SDGs)** — The SDGs are a universal call to action to end poverty, protect the planet, and ensure that all people enjoy peace and prosperity.

---

1  Priority issues are defined in the Issue Prioritization



NIKE_00001998

Plaintiff's Trial Exhibit 16
Page 3 of 74



# INTRODUCTION

NIKE_00001999

# LETTER FROM OUR CEO

Throughout the process of pulling this report together, I've been thinking a great deal about what it means to lead in a time of such dramatic change. It's moments like these that offer the opportunity to hit the pause button and ask the big questions. Is it possible to grow the NIKE brand into new markets while leaving a smaller footprint? As we transform our business model to move faster and be more consumer-centric, how does that affect a sophisticated value chain that employs over a million workers and delivers over a billion units a year? And how can we challenge ourselves to cultivate a company culture that is more inclusive and empowering? What policies and practices will accelerate the pace of change within our own teams?

This report covers many of these complex challenges. It reveals our flaws and shines a light on our victories. Most importantly, it tells us where we need to work harder.

What keeps us going is this simple belief: when NIKE creates meaningful change within our own company and within the communities that we serve, we make a positive difference in the world. We expand our purpose as a company.

Next year will be my 40th with NIKE and I've seen our company's purpose evolve over the decades. When I started as a designer in our Exeter, New Hampshire research lab, that purpose was simple: innovate for the athlete. As we grew, we learned our purpose was greater. We realized we should serve all athletes, even those that don't consider themselves one and just want to move. We celebrated the benefits of sport, of fitness, of the joy of a run, the thrill of a goal, or the emotion of a gold. And we took a stand against discrimination because we believe everyone should have a right to sport and to a level playing field. After NIKE fought for Title IX and lobbied for the first Olympic women's marathon event in 1984, one of my proudest personal sport moments was hearing the roar of the crowd when Joan Benoit Samuelson emerged from the dark tunnel into the LA Colosseum to cross the finish line first.

As NIKE's place in the world became larger and more important, we learned that it wasn't enough to just create great product for the athlete. By the 1990s we were hit with allegations of poor working conditions in our supply chain. We vowed we'd disrupt ourselves, and the industry, and invent new ways to run supply chains, new ways to create products. We also heeded the science of climate change, seeing the threat it could pose to our athletes – without clean air, how do we run or play? With extreme weather, how do we compete? So, we set a moonshot – to double our business while halving our environmental impact. That sense of mission has taken us on a journey of innovation, revolutionizing factory floors, business models, materials, and processes. It's driven us to partner in unusual ways, and to lobby for change across the industry.

So what is NIKE's greater purpose in the world today – in an age of extreme polarization; of vanishing resources; of hyper-speed and digital disruption?

## "OUR PURPOSE IS TO USE THE POWER OF SPORT TO MOVE THE WORLD FORWARD."

Our purpose is to use the power of sport to move the world forward. We believe in a fair, sustainable future – one where everyone thrives on a healthy planet and a level playing field. We're advocating and investing in bringing sport back into kids' lives. We're innovating a new business model for the 21st century, in which supply chains are lean, green, equitable, and fair, and our materials and products are sustainable.

And now, with more determination than ever, we're creating a company culture where everyone has an opportunity to play an important role and be successful. We're measuring ourselves against three areas: diverse representation and an inclusive community that embraces it; comprehensive, equitable pay and benefits; and employee development and wellbeing.

This report is filled with detail on how far NIKE has come on all of these goals, and how far we have yet to go. Our focus will continue to be on the areas where we can use sport and our unique strengths to drive the highest impact. We'll stay open to unexpected partnerships that will move us closer to our goals, faster. And we'll continue to disrupt ourselves to evolve and reaffirm NIKE's greater purpose in the world.



Mark Parker
Chairman, President and CEO

NIKE_00002000

Plaintiff's Trial Exhibit 16
Page 5 of 74

# PERFORMANCE AND DISCLOSURE COMMITTEE

## SUSTAINABILITY IS A TEAM SPORT.

We aim to be a brand with purpose that moves the world forward. To achieve that, we need all parts of the business to understand and deliver on our goals – from our leaders to product designers, to the employees in our stores, to the workers in the contract factories who make our products. A strong governance structure, coupled with a sustainability-focused mindset, provides an essential foundation for driving collective decision-making and accountability across the company.

NIKE is embedding sustainability across all aspects of the organization. From our core Sustainable Business & Innovation (SB&I) team to our partners across the business, and from performance reviews that incorporate sustainability to indices that encourage more sustainable material and supplier choices, we are working to achieve our 2020 sustainability targets.

## GOVERNANCE IS VITAL TO ACCOUNTABILITY.

The Performance and Disclosure Committee provides direction for NIKE's sustainability work. We challenge our business to understand our sustainability impacts, set ambitious targets to address them, and overcome obstacles in meeting them. Established in 2012, the Committee provides oversight to our 2020 sustainability targets and guidance on efforts to improve data, transparency, and disclosure.

As a committee, we played a key role in evolving NIKE's approach to transparency and disclosure. We recognize that today's economic, political, environmental, and social context has shifted and corporations are playing larger roles in addressing major global challenges. To be nimbler, NIKE has updated our approach to communicating our sustainability efforts with different audiences, offering targeted communication and engagement approaches to consumers, employees, investors, and industry stakeholders. The FY16/17 Sustainable Business Report, with its increased focus on progress toward our 2020 sustainability targets and priority issues, is one example of that shift. The revamping of our website, with greater emphasis on storytelling, is another.

**LEARN MORE:** Governance

## THERE IS NO FINISH LINE.

We support an integrated and unified approach to sustainability across NIKE. We encourage strong attention to measuring sustainability, and champion efforts that allow cross-functional teams to collaborate on new solutions. Our Sustainable Business Report uses the lens of our 2020 targets as one way to view progress toward our vision. We have seen successes and we have identified areas where more work is needed. As NIKE's leadership, we commit to pushing the boundaries to unlock creative solutions for athletes, our business, and the world.

---

### PERFORMANCE AND DISCLOSURE COMMITTEE

NIKE has a Performance and Disclosure Committee that meets regularly to review sustainability targets, performance, and disclosures. This committee includes:

- Chief Administrative Officer & General Counsel **Hilary Krane**
- Chief Communications Officer **Nigel Powell**
- Chief Financial Officer **Andy Campion**
- Chief Operating Officer **Eric Sprunk**
- Chief Sustainability Officer & VP Innovation Accelerator **Hannah Jones**

---



NIKE_00002001

Plaintiff's Trial Exhibit 16
Page 6 of 74

# BUSINESS OVERVIEW

## NIKE, INC. DESIGNS, DEVELOPS, MARKETS AND SELLS ATHLETIC FOOTWEAR, APPAREL, EQUIPMENT, ACCESSORIES, AND SERVICES WORLDWIDE.

We are the largest seller of athletic footwear and apparel in the world. We sell our products to retail accounts, through NIKE-owned retail stores, factory stores, community stores, websites, and mobile applications (which we refer to collectively as our "NIKE Direct" operations), and through a mix of independent distributors, licensees, and sales representatives in virtually all countries around the world.

Announced at the beginning of FY18, NIKE's Consumer Direct Offense aims to serve athletes faster and more personally at scale. Core to our strategy is the "Triple Double": 2x Innovation, 2x Speed, and 2x Direct.

**2x Innovation**
We are moving from seeding to scaling faster. We will give consumers better choices to match their preferences. And we will set a new expectation for style, creating a new aesthetic to wear in all moments of consumers' lives.

**2x Speed**
We are investing in digital end-to-end to serve an insatiable consumer demand for new and fresh products. We are building new capabilities and analytics to deliver personalized products in real time, and we are engaging with more partners, companywide, to move faster against our goals.

**2x Direct**
We want as many NIKE touch points as possible to live up to consumer expectations. We are investing in our own channels and leading with digital.

## COMPANY PORTFOLIO

NIKE, Inc. portfolio brands include the NIKE Brand, Jordan Brand, Hurley, and Converse, each with a powerful connection to consumers:



**NIKE Brand** is focused on performance athletic footwear, apparel, equipment, accessories and services across a wide range of sport categories, amplified with sport-inspired sportswear products carrying the Swoosh trademark, as well as other NIKE Brand trademarks.



**Jordan Brand** designs, distributes, and licenses athletic and casual footwear, apparel, and accessories predominantly focused on basketball, using the Jumpman trademark.



**Hurley** designs and distributes a line of action sports and youth lifestyle apparel and accessories under the Hurley trademark.



**Converse** designs, distributes, and licenses casual sneakers, apparel, and accessories under the Converse, Chuck Taylor, All Star, One Star, Star Chevron, and Jack Purcell trademarks.

### REVENUE (IN MILLIONS)



| | |
|---|---|
| FY13 | $25,313 |
| FY14 | $27,799 |
| FY15 | $30,601 |
| FY16 | $32,376 |
| FY17 | $34,350 |

0  10  20  30

### DILUTED EARNINGS PER SHARE



| | |
|---|---|
| FY13 | $1.34 |
| FY14 | $1.49 |
| FY15 | $1.85 |
| FY16 | $2.16 |
| FY17 | $2.51 |

0  1  2  3

### RETURN ON INVESTED CAPITAL



| | |
|---|---|
| FY13 | 23.8% |
| FY14 | 24.5% |
| FY15 | 28.1% |
| FY16 | 29.7% |
| FY17 | 34.7% |

0  10  20  30

# OUR MISSION: BRING INSPIRATION AND INNOVATION TO EVERY ATHLETE* IN THE WORLD.

\* If you have a body, you are an athlete.

NIKE_00002002

# BUSINESS OVERVIEW

## NIKE, INC. VALUE CHAIN



CORPORATE SERVICES → RAW MATERIALS → MATERIALS MANUFACTURING & FINISHING → FINISHED GOODS MANUFACTURING → LOGISTICS → RETAIL → CONSUMERS → END OF LIFE

LEARN MORE: NIKE's Value Chain



### CORPORATE SERVICES

Activities and infrastructure that support the running and maintenance of our global business, including our people, offices, and brand.

Approximately

**67.5K**

EMPLOYEES* (as of end of FY17)

*Excludes temporary workers.

  

### MANUFACTURING

From the cultivation and extraction of raw materials, to the production and finishing of materials, to the finished assembly resulting in a product ready for public consumption.

NIKE product is manufactured at

**500+**

CONTRACT FACTORIES*

that employ

**1M+**
WORKERS

across

**42**
COUNTRIES

*Finished goods manufacture.



### LOGISTICS

The transportation and distribution of materials and products throughout our value chain.

**75**
DISTRIBUTION CENTERS





### RETAIL

The marketing and selling of products to consumers around the world through our retail stores, online, and through mobile applications, and through our wholesale partners.

 

**30K+**
RETAIL LOCATIONS²

**190+**
COUNTRIES

2  This number includes non-NIKE stores.



### CONSUMERS

Consumers' use, care, and maintenance of our products.

International business is now

**55%**
OF REVENUE

**#1**
MARKET SHARE in all markets and all major categories for footwear





### END OF LIFE

Activities associated with products at the end of their useful lives, which may include discarding, recycling, or reusing products or product parts.



**75%**
Some recycled materials were used in 75% of NIKE brand footwear and apparel products

NIKE_00002003

Plaintiff's Trial Exhibit 16
Page 8 of 74



OUR APPROACH

NIKE_00002004

# SUSTAINABLE INNOVATION

Sustainability must be the new normal to protect the environment where athletes live and play. So we're doing more than ever to tackle climate change and reduce our impact on the world around us – disrupting the status quo and innovating through the lens of sustainability to deliver for the athlete.

We also believe in a playing field where everyone can unleash their potential – one in which each person is treated with respect and equality, and where diversity is celebrated.

We don't compromise our values to achieve our goals. We use the power of our brand to stand up for what's right.

# AT NIKE, WE EXIST TO SERVE ATHLETES*. THIS PUSHES US TO DELIVER PERFORMANCE, PRODUCTS, AND SERVICES FOR ATHLETES WITH ZERO COMPROMISE.

NIKE_00002005

Case 3:18-cv-01477-AB     Document 693     Filed 02/06/26     Page 378 of 482

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | Appendix

# SUSTAINABLE INNOVATION



# OUR ENVIRONMENTAL MOONSHOT

## THE FUTURE OF SPORT

Sport brings us together, gives us the thrill of competition, and teaches us that we can always improve. But with the world shifting in dramatic ways, so is sport. Science has exposed that environmental degradation is occurring at a rapid pace. Carbon emissions, chemical usage, and water scarcity threaten our global population. Human activity is contributing to an array of challenges – from rising seas to intensifying droughts – that impact billions. At NIKE, we exist to serve athletes, to create

the future of sport. But if you can't run because of air pollution, or if it's too hot to play outside, or if your field is underwater, it becomes impossible for us to live out our mission.

## OUR MOONSHOT

That's why we're not sitting on the sidelines – we're taking action. For years, we've held this unshakeable belief that there is no opportunity with more possibility than sustainable innovation. And for the companies of the future, embedding sustainability in all aspects of a

business model isn't just a "nice-to-have" – it's a non-negotiable. In 2016, we announced our intention to put NIKE on a much steeper trajectory than in the past. We set an ambitious goal: double our business while halving our environmental impact – an environmental "moonshot." Drawing parallels to JFK's famous ambition, we set this goal not knowing if or how it could be achieved. What we did know was that the answers lay outside our four walls, in the creative minds yet to be tapped across our industry, supply chain, and adjacent sectors.

## GETTING TO HALF

A moonshot is nothing but words on paper if you can't bring it to life. Thus, our teams embarked on a robust scientific and analytic journey, studying our sourcing, manufacturing, and distribution channels and tracing products back through our value chain. Through this, we charted an actionable roadmap to radically reduce carbon, water, and controversial chemistry. We set milestones for ourselves, agreeing to check our progress bi-annually. Then, we got to work. We set out to fundamentally reinvent every part of our business with a zero-compromise, all-encompassing approach, maximizing the performance and minimizing the environmental impact of every product we create.

## OPPORTUNITY AREAS
Percentage of NIKE Footprint[1]



CARBON

WATER

| | NIKE RETAIL | END OF LIFE | CORPORATE SERVICES | SYNTHETIC LEATHER | OTHER TEXTILES | PACKAGING | OTHER PLASTICS | PRODUCT ASSEMBLY | COTTON | LOGISTICS | LEATHER | POLYESTER | COLOR & FINISHING | FOAM & RUBBER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carbon | 1% | 3% | 2% | 2% | 4% | 3% | 4% | 7% | 7% | 7% | 7% | 19% | 19% | 15% |
| Water | 2% | 0% | 0% | 0% | 2% | 1% | 3% | 7% | 52% | 0% | 5% | 5% | 18% | 4% |

"OUR TEAMS EMBARKED ON A ROBUST SCIENTIFIC AND ANALYTIC JOURNEY, STUDYING OUR SOURCING, MANUFACTURING, AND DISTRIBUTION CHANNELS AND TRACING PRODUCTS BACK THROUGH OUR VALUE CHAIN."

1   Chemistry is acknowledged as important but because there was no agreed upon method of assessing impact at the time of publication, its impact across the value chain is not modelled in this report.



NIKE_00002007

Plaintiff's Trial Exhibit 16
Page 12 of 74

# OUR ENVIRONMENTAL MOONSHOT

## DEFINING OUR MOONSHOT

Achieving our goal required a long-term, predictive understanding of our business inside a rapidly changing world. The science-based target we set for carbon reduction is aligned with the Paris Agreement's goal of stabilizing rising global temperatures to within 2°C during this century. We found that by cutting our carbon emissions in half, on a per unit basis, we would comply with the Agreement's temperature stabilization objectives. However, science-based approaches to setting targets for water and chemistry are less mature. In conjunction with the broader scientific community, we're working to move those areas forward with a focus on reducing water consumption in water-stressed geographies and designing controversial chemistries out of our production process entirely.

To track progress against our environmental moonshot, we are aiming to cut our environmental impact in half on a per unit basis.

Since the scope of this undertaking is vast, the potential ripple effects are massive. If NIKE were to hit its moonshot goal of half the impact, the greenhouse gas (GHG) emissions saved would be equivalent to taking 1.7 million passenger vehicles off the road for one year and the water saved annually would be equivalent to 103,000 Olympic-sized swimming pools.

## PROGRESS[1]



### CARBON

1/2 THE CARBON = 3.9 KG CO$_2$E PER UNIT[2]



↓1% end of FY17

2015 BASELINE
7.9 KG          3.9 KG

- We saw a positive impact linked to two main drivers: (1) the reduction in the amount of leather used in NIKE Brand footwear, with a move toward textile (with a lower carbon footprint) in our shoe uppers, and (2) energy efficiency initiatives in our supply chain.
- This progress was partially offset by an increase in the average weight of our apparel products, driven mainly by an increased proportion of fleece products.
- The innovation pipeline includes initiatives and innovations we have identified and hope to scale in the near future to reduce our carbon footprint. These can be material, operational, and process innovations in our supply chain, product design innovations, as well as renewable energy proliferation.



### WATER

1/2 THE WATER = 112 L PER UNIT



↑3% end of FY17

2015 BASELINE
224 L          112 L

- We saw an overall increase in water impact because the reductions achieved through water efficiency and recycling in our supply chain were more than offset by an increase in the average weight of cotton in our apparel products. This increase is driven by a higher proportion of fleece product in our sales, with cotton being a water-intensive crop.
- As with carbon, the innovation pipeline consists of initiatives and innovations in our supply chain that can reduce our water footprint, such as water efficiency measures, closed-loop water recycling, and scaling use of recycled cotton.



### CHEMISTRY

1/2 THE "CONTROVERSIAL CHEMISTRY" = 0.11 KG PER UNIT[3]



↓3% end of FY17

2015 BASELINE
0.22 KG          0.11 KG

- The 3 percent progress is linked to increased use of perfluorinated compound (PFC)-free water repellents.
- The innovation pipeline consists of initiatives and innovations to phase out priority chemicals in our supply chain, as well as to shift toward recycled material inputs to drive reduction in our chemistry footprint.

1    These performance indicators represent the best information and data at the time of publication.
2    A unit is a single packaged product. It could be a pair of shoes, a T-shirt, or an athletic bag.
3    The chemistry impact score is calculated by evaluating chemicals used throughout the entire manufacturing process of our materials and finished products. The score does not indicate the presence of controversial chemicals in the finished product.



NIKE_00002008

# OUR ENVIRONMENTAL MOONSHOT

## THE INNOVATION GAP

Nevertheless, simply hitting these targets or scaling proven technologies and best practices will not be enough to halve our environmental impact. Achieving our moonshot will require new technologies yet to be invented and partnerships yet to be forged.

Our focus on closing this innovation gap means we're doubling down on invention, design, and collaboration unlike ever before. We're challenging ourselves to imagine a different future, using our position at the forefront of manufacturing engineering and science to reimagine technologies and catalyze new processes. We're asking questions such as:

- How can cotton be grown without irrigation?
- How can the next generation of polyester be carbon-negative?
- How can water and oil be repelled without using harmful chemicals?
- How can newly developed textile recycling solutions be scaled?
- How can the carbon footprint of shipping be reduced?
- How can the availability of better chemistry information be accelerated?

Taking an unprecedented step for our company and our industry, we've moved from wondering "if" disruptive change is possible to "how" we'll take tangible action toward a better future. We can no longer just invent — we must invent with sustainability as our design constraint.

## WHAT WINNING LOOKS LIKE

Today's dream is bold — we see a path forward to hitting our goal while igniting sustainable, global growth. But tomorrow's dream is even more ambitious: to catalyze our entire industry to join us. Even if we hit our most ambitious targets, we are doing so in isolation — it won't be enough to solve the world's most pressing problems. To accelerate progress, it will take all of us — businesses, workers, civil society, and governments — working in collaboration. No one has all the answers, but all of us have a role to play.

If we dare to design the future, we must do it together. No matter our background, sustainability is the new frame through which to view any innovation. As engineers, we need to build better supply chains that minimize our footprint. As scientists, we need to create a new palette of low-impact materials. As coders, we

need to develop new open-source initiatives that will disrupt and change the game. And as storytellers, we need to re-brand sustainable innovation as a cause that anyone, anywhere, can take part in. This is our call to action, our rally cry. We need the brightest minds of today to rise up and join us to create a better tomorrow.

Don't sit on the sidelines. It's time to get in the game.

> "ACHIEVING OUR MOONSHOT WILL REQUIRE NEW TECHNOLOGIES YET TO BE INVENTED AND PARTNERSHIPS YET TO BE FORGED."

## INNOVATION GAP — WHERE TO ACCELERATE

Using carbon as an example, we explore the actions necessary to achieve our moonshot ambition.



**REDUCTION OF CARBON FOOTPRINT** (% OF KG $CO_2$e/unit)

**1/2 THE CARBON PER UNIT**

**INNOVATION GAP** — 26%
Additional reduction necessary to hit our moonshot target.

**PIPELINE** — 11%
Reduction based on projects we are currently reviewing/evaluating that leverage existing or known technologies.

**COMMITTED** — 13%
Reduction based on projects to which we have already committed.



NIKE_00002009

Plaintiff's Trial Exhibit 16
Page 14 of 74

# 2020 TARGET PERFORMANCE SUMMARY

| KEY | ▲ Increase | ▼ Decrease |
|---|---|---|
| Favorable | ▲ | ▼ |
| Unfavorable | ▲ | ▼ |

## MINIMIZE ENVIRONMENTAL FOOTPRINT

| Metric | Unit of Measurement | FY15 | FY16 | FY17 | FY17 Change vs. Baseline | FY20 Target |
|---|---|---|---|---|---|---|
| **PRODUCT** | | | | | | |
| Average Product Carbon Footprint[1] | kg CO₂e/unit | 7.33 | 7.19 | 7.15 | ▼ 2.5% | ▼ 10% |
| Product Scored on Sustainability Performance | % | 27% | 68% | 71% | ▲ 44 p.p.[2] | 80% |
| **MATERIALS** | | | | | | |
| Sustainable Materials[3] – Apparel (AP) | % | 19.0% | 20.2% | 29.6% | ▲ 10.6 p.p. | ▲ |
| Sustainable Materials[3] – Footwear (FW) | % | 30.6% | 31.3% | 32.5% | ▲ 1.9 p.p. | ▲ |
| Cotton Sourced More Sustainably[4] | % | 24.1% | 33.3% | 54.1% | ▲ 30 p.p. | 100% |
| **ENERGY & EMISSIONS** | | | | | | |
| Renewable Energy – Owned or Operated[5,6,7] | % | 14% | 20% | 22% | ▲ 8 p.p. | 100% |
| Energy Consumption Per Unit – Key Operations[8] | kWhe/unit | 4.70 | 4.25 | 4.70 | 0% | ▼ 25% |
| Carbon Emissions Per Unit – Key Operations[8] | kg CO₂e/unit | 1.74 | 1.61 | 1.74 | 0% | ▼ 25% |
| Energy Consumption Per Kg – Textile Dyeing and Finishing[9] | kWhe/kg | 15.86 | 15.46 | 14.95 | ▼ 5.8% | ▼ 35% |
| Carbon Emissions Per Kg – Textile Dyeing and Finishing[9] | kg CO₂e/kg | 4.78 | 4.68 | 4.55 | ▼ 4.8% | ▼ 35% |
| **WASTE** | | | | | | |
| Waste to Landfill[10] – Footwear Manufacturing | % | N/A (FY16 BL) | 6.6% | 4.0% | ▼ 2.6 p.p. | 0% |
| Waste Index[11] – Footwear Manufacturing, Distribution Centers (DCs), and Headquarters (HQs) | N/A | 100[12] | 98.2 | 100.8 | ▲ 0.8% | ▼ 10% |
| Landfill Diversion – DCs and HQs | % | 88.4% | 87.1% | 87.9% | ▼ 0.5 p.p. | ▲ |
| **WATER** | | | | | | |
| Freshwater Use Per Kg – Textile Dyeing and Finishing[9] | L/kg | N/A (FY16 BL) | 126.5 | 117.2 | ▼ 7.4% | ▼ 20% |
| **CHEMISTRY** | | | | | | |
| Tested Material in Compliance with NIKE Restricted Substance List (RSL)[13] | % | 95% | 99% | 98% | N/A[14] | 100% |
| Suppliers Meeting NIKE's Wastewater Quality Requirements – Textile Dyeing and Finishing[9] | % | N/A (FY16 BL) | 57.8% | 72.6% | ▲ 14.9 p.p. | 100% |



NIKE_00002010

Plaintiff's Trial Exhibit 16
Page 15 of 74

# 2020 TARGET PERFORMANCE SUMMARY

## TRANSFORM MANUFACTURING

| Metric | Unit of Measurement | FY15 | FY16 | FY17 | FY17 Change vs. Baseline | FY20 Target |
|---|---|---|---|---|---|---|
| **MANUFACTURING**[15] | | | | | | |
| Factories Rated Bronze or Better | % | 86.0% | 86.6% | 90.9% | ▲ 42.1 p.p. (vs. FY11 BL) | 100% |
| Factories with Excessive Overtime (EOT) | % | 3.3%[16] | 3.2% | 3.9% | ▲ 0.6 p.p. | 0% |

## UNLEASH HUMAN POTENTIAL

| Metric | Unit of Measurement | FY15 | FY16 | FY17 | FY17 Change vs. Baseline | FY20 Target |
|---|---|---|---|---|---|---|
| **COMMUNITY IMPACT** | | | | | | |
| Annual Investments as % of Pre-Tax Income (PTI) | % | 1.9% | 1.8% | 1.9% | N/A[17] | 1.5% |

FOOTNOTES
1  This target includes NIKE-designed/developed Nike Branded, Brand Jordan, and NIKE Golf Global apparel styles, and Nike Branded, Brand Jordan, and NIKE Golf Global footwear styles. We are using $CO_2e$ emissions as a proxy for other environmental impacts (e.g. energy, other air emissions).
2  p.p. = percentage points.
3  We define more sustainable materials as those that reduce the environmental impact of a product through better chemistry, lower resource intensity, less waste, and/or recyclability.
4  Certified organic, Better Cotton (cotton grown according to the Better Cotton Standard System), or recycled.
5  The target scope includes electricity only.
6  Where we make energy purchase decisions on strategic assets.
7  Equivalent to absolute reductions in Scope 1&2 $CO_2e$ emissions of at least 50 percent by FY25.
8  Key Operations = Finished goods manufacturing, inbound and outbound logistics, distribution centers, headquarter locations, and NIKE-owned retail.
9  Measure includes focus suppliers only. Focus suppliers represent key suppliers involved in the dyeing and/or finishing of materials which directly support finished product assembly.
10  Target covers waste to both landfill and incineration. Incineration does not include waste to energy recovery unless otherwise noted.
11  Our waste index replaces our previously stated waste measure, in order to better reflect our actual performance against our waste reduction goals, and avoid misleading trends due to shifts in the relative volumes of our apparel and equipment businesses. The waste index is a weighted average of our footwear manufacturing waste per unit, distribution centers waste per unit, and headquarters waste per occupant.
12  Baseline is FY15 except for Tier 1 FW Manufacturing and Converse HQ, which are FY16 and are included in INC-wide baseline for comparability across years.
13  Measurement of supplier adherence to NIKE's wastewater quality standards between FY16 and FY17 is based on a prior standard; progress from FY18 onward will be based on the higher standards of the ZDHC guideline.
14  As we add new chemicals and tighten the limits, we may see a small number of failures as the supply chain adapts to the more stringent requirements. Due to these changes, we do not recognize a baseline or change vs. the baseline.
15  Scope includes all finished goods manufacturing.
16  FY15 value previously reported in 14/15 SBR (96 percent of factories had no excessive overtime [EOT]) is restated due to data quality improvements.
17  This is an annual target. Baseline and change vs. baseline are not relevant to this target.



NIKE_00002011

Case 3:18-cv-01477-AB          Document 693          Filed 02/06/26          Page 384 of 482

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | Appendix

# ISSUE PRIORITIZATION

At NIKE, we look at sustainability throughout our value chain. This view is vital because most of our environmental and social impacts — as well as our opportunities — occur within our influence, but outside of our direct control.

For more than 20 years, we've been deepening our understanding of sustainability and the most significant issues that impact our people and our planet. We conduct regular assessments to add to this understanding and to keep our perspective fresh in an ever-evolving landscape.

### ADDING DEPTH TO OUR UNDERSTANDING

In FY14/15, we conducted an in-depth quantitative analysis to review and prioritize our key sustainability issues. First, we reviewed multiple ESG standards, frameworks, and rating systems. Next, we added current megatrends, stakeholder feedback, and the priorities of our key coalitions and partnerships to develop a complete universe of issues that would be relevant to NIKE's business model. This netted us upwards of approximately 100 potential topics. Then, we filtered for relevance by looking at location, risk, and other measures to determine 12 priority issues and mapped these against each stage in our value chain.

These results were key to internal strategy conversations and have supported our understanding that the two leading drivers of our environmental and social impacts are:

1. The materials we use in our products, and
2. The outsourced manufacturing of those products.

In FY17, we brought the voices of internal and external stakeholders into this analysis. We reached out to a wide range of stakeholders, including employees, NGOs, academics, investors, suppliers, and corporate peers.



**EXPLORE:** NIKE's Value Chain Impacts

Our survey was designed to identify the most relevant issues at each value chain stage and the impacts most directly linked to those issues.

By surveying our key stakeholders, we deepened our understanding of the most relevant issues in the value chain and then layered this new information into our quantitative analysis from FY14/15.

By combining the qualitative survey results with the quantitative analysis, we have been able to update our set of priority Corporate Responsibility & Sustainability (CR&S) issues. The quantitative data gave us a deep insight into what matters most, while the survey helped us to develop a more nuanced understanding of these issues.

**LEARN MORE:** Stakeholder Engagement

### ALIGNING WITH STAKEHOLDER EXPECTATIONS

The FY17 survey results showed us that we have an opportunity to better align the way we talk about CR&S issues with the expectations of stakeholders.

For example, in FY14/15 we embedded "Waste Generated" into the Water, Energy, and Chemical issues. This decision was made based on our analysis which showed that the real "impact" of waste is embodied in these areas. The unintended consequence was that stakeholders may have assumed that waste was a lower priority for NIKE, despite significant efforts made and the waste-related 2020 targets we had in place. As it is actually a top-rated issue for our stakeholders, this year we have reintroduced waste into our list of priority issues in an effort to align with our stakeholder understanding of these issues.

## FY16/17 PRIORITY ISSUES

| | Corporate Services | Raw Materials | Materials Manufacturing & Finishing | Finished Goods Manufacturing | Logistics | Retail | Consumers | End of Life |
|---|---|---|---|---|---|---|---|---|
| ACTIVE KIDS (Previously Community Impact) | | | | | | | | |
| CHEMISTRY | | | | | | | | |
| CHILD LABOR (Previously Labor Compliance) | | | | | | | | |
| EMPLOYMENT | | | | | | | | |
| ENERGY | | | | | | | | |
| EXCESSIVE OVERTIME | | | | | | | | |
| FREEDOM OF ASSOCIATION (Previously Labor Compliance) | | | | | | | | |
| GHG EMISSIONS | | | | | | | | |
| NON-RENEWABLE RESOURCE DEPLETION | | | | | | | | |
| MATERIAL WASTE (New Issue) | | | | | | | | |
| OCCUPATIONAL HEALTH & SAFETY | | | | | | | | |
| TOTAL COMPENSATION | | | | | | | | |
| WATER USE | | | | | | | | |
| WORKFORCE DEVELOPMENT | | | | | | | | |

**KEY**
- ● High
- ◐ Low
- ○ Not applicable

**FOOTNOTES**
- The results are based on a combination of the FY14/15 quantitative assessment with our new FY17 qualitative analysis. We only changed an issue score if the qualitative results were higher than the previous quantitative score.
- Material Waste is listed as a new issue (see discussion above). As such, the scoring is based solely on the qualitative findings from our FY16/17 survey.
- Labor Compliance used to combine two separate issues: Child Labor and Freedom of Association. This year, we divided the two issues and gave them separate scores.
- Community Impact previously combined two issues: Access to Sport and Obesity. Based on qualitative results, we separated these issues and focus only on Access to Sport, which was highly rated by our stakeholders. In comparison, Obesity was a much lower priority for stakeholders. We are also renaming the issue "Active Kids" to better reflect the current and future focus of our efforts.


NIKE_00002012

Plaintiff's Trial Exhibit 16
Page 17 of 74

Case 3:18-cv-01477-AB     Document 693     Filed 02/06/26     Page 385 of 482

Introduction  |  Our Approach  |  Minimize Environmental Footprint  |  Transform Manufacturing  |  Unleash Human Potential  |  Appendix

# ISSUE PRIORITIZATION

The chart below defines each priority issue and details where each issue can be found in the report.

## MINIMIZE ENVIRONMENTAL FOOTPRINT

| Priority Issue | Definition | Location | |
| --- | --- | --- | --- |
| CHEMISTRY | Chemicals used in making materials and products and substances released to the environment (air and water) that are toxic to humans and ecosystems | Chemistry | |
| ENERGY | Energy used for electricity, use of fossil fuels, and other energy sources | Energy and Emissions | |
| GHG EMISSIONS | Greenhouse gas emissions from energy, transportation, and NIKE's other business activities | Energy and Emissions | |
| NON-RENEWABLE RESOURCE DEPLETION | Non-renewable resources depleted, through materials and fuels used | Materials | |
| MATERIAL WASTE | Waste generated throughout NIKE's value chain and activities to reduce, reuse, or recycle | Waste | |
| WATER USE | Water consumed throughout our value chain, and monitoring our impacts in water-scarce regions | Water | |

## TRANSFORM MANUFACTURING

| Priority Issue | Definition | Location | |
| --- | --- | --- | --- |
| CHILD LABOR | Operations and suppliers identified as having significant risk for incidents of child labor | Child Labor | |
| EXCESSIVE OVERTIME | Workers in the value chain found to be working excessive hours | Sustainable Sourcing | |
| FREEDOM OF ASSOCIATION | Right to exercise freedom of association and collective bargaining for workers throughout the value chain | Freedom of Association | |

## UNLEASH HUMAN POTENTIAL

| Priority Issue | Definition | Location | |
| --- | --- | --- | --- |
| ACTIVE KIDS | Helping kids reach their full potential through play and sport and creating more equal playing fields for all | Community Impact | |
| EMPLOYMENT | Attracting and retaining talent, and ensuring a positive workplace culture, including healthy lifestyle opportunities and engagement initiatives | Employees | |
| OCCUPATIONAL HEALTH & SAFETY | Worker health and safety practices throughout the value chain | Occupational Health & Safety | |
| TOTAL COMPENSATION | Economic value generated for employees through wages and benefits | Employees | |
| WORKFORCE DEVELOPMENT | Training and development for workers to build capability and career opportunities | Employees | |

## GOING FORWARD

Our issue prioritization informs our approach to sustainability. We plan to review our priority issues on an annual basis, including conducting quantitative analysis every couple of years and regular stakeholder surveys in the interim years.



NIKE_00002013

Plaintiff's Trial Exhibit 16
Page 18 of 74

Case 3:18-cv-01477-AB     Document 693     Filed 02/06/26     Page 386 of 482

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | Appendix



MINIMIZE ENVIRONMENTAL FOOTPRINT

Sustainable Business Report FY16/17 **18**

NIKE_00002014

# THE WORLD AROUND US

Hurricanes battered the Caribbean and North America in 2017. We saw record ice loss at the poles, and heatwaves hit Europe and Australia. The effects of climate change were more apparent than ever, in part caused by record levels of carbon emissions.

To help reduce emissions, organizations – from the business community to local and state governments to NGOs – are aligning with the United Nations Sustainable Development Goals and the Paris Climate Agreement. Hundreds of corporations and cities have set science-based emission reduction targets to help keep the rise in global temperature below 2˚C. And they're more committed than ever to using renewable energy.

Another major battleground is the global war on waste. With concerns about plastic in our oceans and microfibers in our drinking water, combatting waste has never seemed so urgent an issue. But a move away from built-in obsolescence, toward circular design for recycling or reuse, is a challenge that the apparel and footwear industry is taking the lead on.

# OUR APPROACH

In 2016, we set an ambition to double our business while cutting our environmental impact in half on a per unit basis. We deliver performance products while obsessing about our impact on the environment – focusing on what we make, how we make it, and how we operate our business. We are investing in disruptive innovations and enterprise-wide strategies to cut our carbon emissions, water use, and controversial chemistries in half, while moving toward a circular future.

# "IF YOU CAN'T GO OUTSIDE TO RUN BECAUSE OF AIR POLLUTION, IF YOU DON'T HAVE CLEAN WATER TO DRINK, AND IF YOU DON'T HAVE A PLACE TO PLAY… YOU DON'T HAVE SPORT."

**Mark Parker,** Chairman, President and CEO of NIKE



NIKE_00002015

Plaintiff's Trial Exhibit 16
Page 20 of 74

# MINIMIZE ENVIRONMENTAL IMPACT: FY16/17 HIGHLIGHTS



## PRODUCT

   

- NIKE Free RN Flyknit shoe reduces waste by 60 percent compared to a traditional running shoe.

- Product teams now track the sustainability performance of 97 percent of our Nike-branded footwear and 96 percent of Nike-branded apparel.

- Footwear and apparel has seen a 2.5 percent decrease in average carbon footprint per unit since FY15.



## ENERGY AND EMISSIONS

  

- NIKE signed power purchase agreements that will allow us to source 100 percent renewable energy in North America in 2019, a major step on our path to reach 100 percent renewable energy in our owned or operated facilities globally by 2025.

- A majority of our footwear finished goods factories have eliminated outdated steam boiler systems, creating an average energy savings of between 15 to 20 percent at each location.



## WATER

 

- 40 percent of the suppliers making our primary materials are recycling treated wastewater back into their manufacturing processes.

- All finished goods factories and material suppliers in regions with high risk of water scarcity or flooding are evaluating their risks and preparing to develop mitigation and management plans.



## MATERIALS

 

- NIKE has been recognized as using the most recycled polyester in the industry for the fourth straight year by Textile Exchange's Annual Preferred Materials Market Report.

- We saved over 24 billion liters of water and 85,000 kg of pesticides by sourcing 54 percent cotton more sustainably.

- 75 percent of Nike-branded footwear and apparel products used some recycled materials in FY17.



## WASTE

 

- In FY17, 96 percent of NIKE footwear finished goods manufacturing waste was recycled or converted to energy.

- Our European Logistics Campus, Japan Distribution Center (DC), and Converse Ontario (California) DC hit 100 percent landfill diversion.

- NIKE diverted over 12.5M pounds of factory and postconsumer waste from landfills through Nike Grind in FY17 and revenues from the sale of Nike Grind sports and play surfaces funded sustainable innovations.



## CHEMISTRY

  

- NIKE formally adopted the AFIRM Group Restricted Substance List (RSL), which includes chemical limits based on legislation, best practices in industry, and voluntary reductions in hazardous chemicals.

- Global deployment of the ZDHC Wastewater Guideline has allowed NIKE to measure progress against our Manufacturing RSL (MRSL) compliance target by using a common industry tool.

- Our active collaboration within the ZDHC and the Sustainable Apparel Coalition (SAC) supported the development of the Higg FEM 3.0 Chemical Module, a tool for assessing chemicals management capability across the global supply chain.



**KEY**
Numbered icons above indicate relevant Sustainable Development Goals



NIKE_00002016

# PRODUCT



**TARGET**

## DELIVER PRODUCTS FOR MAXIMUM PERFORMANCE WITH MINIMUM IMPACT, WITH A 10 PERCENT REDUCTION IN THE AVERAGE ENVIRONMENTAL FOOTPRINT PER UNIT



**PERFORMANCE**

Average Product Carbon Footprint for Footwear and Apparel (kg $CO_2e$/unit)[1]



7.33    7.19    7.15

FY20 target ↓**10%**

FY15    FY16    FY17

[1] NIKE's FY20 product carbon footprint target differs in scope compared to our moonshot carbon ambition. While both commitments baseline in FY16, the FY20 product target is inclusive of NIKE brand footwear and apparel, from raw materials through finished goods manufacturing. The moonshot carbon ambition is broader in terms of product represented and emissions generated from corporate services to end of life (excluding consumer use).

Sustainability at NIKE is more than a single-product philosophy. It's a principle embedded in our product creation teams that we are scaling across our company to include every brand, every category, and every product.

During FY16 and FY17, we continued our effort to integrate sustainability into the product creation process, from the initial design brief to product reviews, ensuring product teams have the information they need to make informed decisions.

To define the environmental impact of a product, we look at the average carbon footprint of a unit of product and track this through our Material Sustainability Index (MSI), Apparel

Sustainability Index (ASI), and our Footwear Sustainability Index (FSI). These indices allow our product creation teams to measure the environmental profile of each product and make better choices in planning, designing, and development. While our Product target tracks the carbon footprint of the product, our efforts to integrate sustainability impact a wide range of environmental factors such as water, chemicals, and waste.

**LEARN MORE:** Product & Materials Sustainability Indices

In FY16, we developed a Sustainability Performance Dashboard to give our product teams timely sustainability metrics. Combining the ASI, FSI, and MSI with additional product and material data, the dashboard has helped our product category teams focus on the sustainability of their highest volume styles.

These additions have already produced improvements in apparel and footwear sustainability scores. For example, footwear has improved by using more water-based solvents (resulting in approximately 96 percent less petroleum-derived solvents since 1995) and better pattern efficiency, while apparel has improved by sourcing from better performing material suppliers and increased efficiency. The improvement in materials supplier performance can be attributed to, in part, engagement with our suppliers to improve sustainable practices at their facilities.

We improved our products' sustainability through a series of innovations in FY16. In footwear we drastically reduced waste with styles like the NIKE Free RN Flyknit shoe. This features an upper made with our low-waste Flyknit technology, and a Free midsole made with another low-waste technology where the midsole is made with pellets that are injected into a mold. The result is a shoe that reduces waste by an average of 60 percent compared to a traditional running shoe. In apparel, the fabric in the top-volume Women's Tempo Running Short was replaced with recycled polyester.

By the end of FY17, footwear and apparel teams had improved their internal index scores (FSI and ASI) resulting in a 2.5 percent decrease in average carbon footprint per unit compared to the baseline, or approximately 165M kg $CO_2e$. We're proud of the progress we've made on this, and we know there's more to be done.

Apparel scores continue to improve every year, but we're still behind on our overall 2020 product target. We've identified two areas for focus: decreasing waste and increasing our use of recycled materials. Footwear is on track to meet its 2020 product goals by focusing on more sustainable materials, improved pattern efficiency, and reduced solvent use. Overall, both apparel and footwear are proactively working toward their sustainability targets while meeting other key business metrics.



NIKE_00002017

Plaintiff's Trial Exhibit 16
Page 22 of 74

# PRODUCT



## CARBON FOOTPRINT BY FOOTWEAR STYLE (KG $CO_2E$/PAIR)

NIKE has measured the carbon footprint of all our shoes.



FREE RN FLYKNIT — 5.3

AIR MAX 90 — 8.3

**10.2** Equivalent to the GHG emissions from 25 miles driven in an average passenger vehicle

AIR FORCE 1 — 13.4

AIR VAPORMAX FLYKNIT — 6.2

PEGASUS 33 — 9.8

AIR JORDAN 31 — 12.4

Scale: 5 ... 10 ... 15

## MEASURE

**GREATER THAN 80 PERCENT OF ALL NIKE, INC. PRODUCTS WILL BE SCORED ON SUSTAINABILITY PERFORMANCE**

## PERFORMANCE

% Product Scored on Sustainability Performance

FY15 / **27%**

FY16 / **68%**

FY17 / **71%**

FY20 target **80%**

To connect our product creation process decisions to their impact on the environment, we've developed a system of scoring our products on sustainability performance. This allows us to increase awareness and establish a foundation for future improvement.

Creating such a foundation is no easy task. We face challenges with installing scoring systems across our diverse product ranges and IT systems, affiliate companies, and licensees. We also struggle to score products that are late additions, meaning they fall out of the normal production process.

Despite this, we made progress on this measure in FY16 and FY17. Product teams are now scoring 97 percent of our Nike-branded footwear and 96 percent of Nike-branded apparel.[3] For previously unscored product (i.e. equipment, socks, and Converse), product creation teams have created scoring processes and tools.

By the end of FY17, we were scoring most of our season-to-season basics, equipment, socks, headwear, and Converse products. In addition, we automated scoring for several outstanding high-volume product areas (including most T-shirts and versions with region-specific sizing) to improve accuracy and reduce workload. These efforts have helped us track toward our overall target of 80 percent product scored by the end of 2020.

### FURTHER READING

Approach to Sustainable Products



**S###** CN0501-03: Discussion of environmental and social risks associated with sourcing priority raw materials

---

3  These numbers pertain to Nike-branded footwear and apparel. The measure is more inclusive: all NIKE, Inc. products are in scope (footwear, apparel, equipment, promo/team, licensee, Converse, and Hurley).



NIKE_00002018

Case 3:18-cv-01477-AB      Document 693      Filed 02/06/26      Page 391 of 482

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | Appendix

# MATERIALS



## TARGET

### INCREASE USE OF MORE SUSTAINABLE MATERIALS IN FOOTWEAR AND APPAREL

## PERFORMANCE
% More Sustainable Materials

### APPAREL
FY15 / **19%**
FY16 / **20.2%**
FY17 / **29.6%**
FY20 target
**INCREASE**

### FOOTWEAR
FY15 / **31%**
FY16 / **31.7%**
FY17 / **32.5%**
FY20 target
**INCREASE**

The materials we use – from the crops grown to the finished fabrics and trims – have the greatest environmental impact in the entire product lifecycle. Reducing this impact is the strongest way we can improve our overall environmental performance.

The NIKE Materials Sustainability Index (MSI) encourages our teams to choose better materials from better vendors by comparing 57,000 different materials from more than 700 vendors.



Nike Air VaporMax Flyknit

## BETTER CHOICES

MATERIALS IN SCOPE: ○ Footwear  ○ Apparel


**POLYESTER**
Recycled


**COTTON**
Organic
Recycled
BCI Better
Cotton


**LEATHER**
Leather working
group certified
Environmentally
preferred leather

**SYNTHETIC
LEATHER**
Recycled


**EVA**
Recycled


**RUBBER**
Environmentally
preferred rubber
formulations
Grind


**THERMOPLASTIC
POLYURETHANE
(TPU)**
Recycled

Our materials teams incorporated the MSI into their standard tools. This allows them to make better decisions around which materials to use and which suppliers to work with to drive our use of sustainable materials.

In FY16 and FY17, apparel and footwear used more sustainable materials in the following ways:

1. **Sustainable cotton.** Apparel moved from conventional cotton to more sustainable cotton.[4] See our Measure for more information.

2. **Recycled rubber.** We are closing the loop on our rubber by using our own scraps as inputs into new shoes. NIKE has a long history of reducing the impact of rubber, including developing two environmentally preferred rubber base formulations suitable for performance footwear in the 1990s. In 2004, just 3 percent of Nike brand footwear designs used environmentally preferred rubber. By FY17, 98 percent of our products used environmentally preferred rubber. The increase is due to NIKE's continued proliferation of environmentally preferred compounds while slowly phasing out/retiring the less preferred compounds.

3. **Recycled polyester.** All core Flyknit yarns are 100% recycled polyester. We use recycled polyester in some of our most advanced apparel, such as global football team kits and elite track & field uniforms, classic items like our Tempo running shorts, as well as other key components used in the construction of a shoe. As of FY17, NIKE has transformed more than 4.6 billion plastic bottles into recycled polyester footwear and apparel. As a result, NIKE has been recognized as using the most recycled polyester in the industry for the fourth straight year by Textile Exchange's "2017 Preferred Fiber & Materials Market Report."

4   Sustainable cotton is defined as cotton that is either certified organic, BCI Better Cotton, or is recycled.



NIKE_00002019

Case 3:18-cv-01477-AB     Document 693     Filed 02/06/26     Page 392 of 482

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | Appendix

# MATERIALS





Nike Air Force One

## TOP FIVE MATERIALS BY VOLUME[1, 2, 3]

| | | FY15 | FY16 | FY17 |
|---|---|---|---|---|
| **COTTON** | | | | |
| Organic | kg | 4,123,000 | 4,613,000 | 5,304,000 |
| | % | 7% | 7% | 8% |
| Recycled | kg | 68,000 | 75,000 | 90,000 |
| | % | <1% | <1% | <1% |
| BCI | kg | 9,879,000 | 17,629,000 | 32,487,000 |
| | % | 24% | 26% | 46% |
| Total | kg | 58,348,000[4] | 67,102,000 | 70,065,000 |
| **POLYESTER** | | | | |
| Recycled | kg | 31,220,000 | 32,374,000 | 33,265,000 |
| | % | 14% | 14% | 14% |
| Total | kg | 218,149,000 | 228,056,000 | 237,830,000 |
| **CORRUGATE/PAPER** | | | | |
| Recycled | kg | 95,424,000 | 103,977,000 | 107,052,000 |
| | % | 84% | 84% | 84% |
| Total | kg | 113,568,000 | 123,622,000 | 127,236,000 |
| **RUBBER** | | | | |
| Environmentally Preferred | kg | 63,414,000[4] | 59,460,000 | 65,808,000 |
| | % | 89% | 91% | 98% |
| Total | kg | 71,380,000 | 65,382,000 | 67,382,000 |
| **ETHYLENE-VINYL ACETATE (EVA) FOAM** | | | | |
| Recycled | kg | 185,000 | 151,000 | 66,000 |
| | % | <1% | <1% | <1% |
| Total | kg | 81,221,000 | 97,214,000 | 103,182,000 |

1  The materials and scopes reported comprise about 60 percent of NIKE's total material usage.
2  Cotton and polyester volumes represent NIKE brand footwear, apparel, and equipment, and Converse footwear and apparel. Cotton also includes Hurley apparel.
3  Reported volumes have been rounded.
4  Total reported usage has increased due to business growth and data collection and quality improvements.
5  FY15 value has been restated due to data quality and calculation methodology improvements, previously reported as 76 percent in NIKE's FY14/15 SBR.

In FY17, some recycled materials were used in 75 percent of Nike brand footwear and apparel products. These materials include recycled PET bottles in our apparel textiles and Flyknit shoe uppers, apparel trims made from recycled Nike Airbag waste, and rubber outsole scraps recycled back into our footwear outsoles. Examples include the Nike Flyknit Free, Nike Air VaporMax Flyknit, Nike Air Zoom Wildhorse.

5  We updated this measure from calendar year to fiscal year to be consistent with the rest of the 2020 targets.

## MEASURE

SOURCE 100 PERCENT OF OUR COTTON MORE SUSTAINABLY (CERTIFIED ORGANIC, BCI BETTER COTTON, OR RECYCLED COTTON) ACROSS NIKE, INC. BY THE END OF FY20[5]

## PERFORMANCE

% Cotton Sourced More Sustainably
(Organic, BCI, or Recycled)

FY15 / 24.1%

FY16 / 33.3%

FY17 / 54.1%

FY20 target
**100%**

NIKE is a leader in advancing better approaches to cotton. Since 1998, we've been blending organic into our cotton products and in 2002 we co-founded Organic Exchange (now Textile Exchange).

As one of our top-volume materials, cotton represents more than one-half of our water footprint, mostly during the agricultural phase. We believe we can create the most positive impact on our overall environmental footprint by developing more sustainable cotton options that promote not only better water stewardship, but pesticide reduction and fairer labor practices.

We are working with our supply chain to move toward 100 percent sustainable cotton – certified organic, Better Cotton (BCI), or recycled cotton.

In FY16, we sourced one-third of our cotton more sustainably, which reduced our environmental footprint by more than 17 billion liters of water and more than 51,000 kilograms of pesticides. In FY17, we increased this to 54 percent, which reduced our impact by more than 24 billion liters of water and 85,000 kilograms of pesticides. In FY17, Nike-branded apparel continued to lead the company by sustainably sourcing 73 percent of its cotton.

We blend a minimum of 10 percent organic cotton into nearly every Nike-branded apparel cotton fabric, a strategy that has made us one of the top four buyers of certified organic cotton globally according to Textile Exchange's (TE) 2017 Preferred Fibers and Materials Report. We also ranked fourth in volume of recycled cotton (TE), and fourth in Better Cotton sourced (per BCI's report on 2016 calendar year).

Looking ahead, we believe that converting the final 20 percent of our cotton supply chain will be the most difficult. We also need to further address water risk by collaborating beyond the standards and our 2020 target. We strive to continuously innovate so we can scale our cotton recycling and close the loop.

We aim to be a leader by using our influence and reach to drive the cotton industry toward sustainability and helping others on their journeys.

### FURTHER READING



Approach to Sustainable Materials

Sustainable Materials Principles

**PRIORITY ISSUE**
Non-Renewable Resource Depletion

**GRI**
GRI 301: Materials
Disclosure 301-1: Materials used by weight

**SASB**
CN0501-03: Discussion of environmental and social risks associated with sourcing priority raw materials
CN0501-04: Percentage of raw materials third-party certified to an environmental or social sustainability standard, by standard


NIKE_00002020

Plaintiff's Trial Exhibit 16
Page 25 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 393 of 482

Introduction    |    Our Approach    |    Minimize Environmental Footprint    |    Transform Manufacturing    |    Unleash Human Potential    |    Appendix

# ENERGY AND EMISSIONS



## TARGET

REACH 100 PERCENT RENEWABLE ENERGY IN OWNED OR OPERATED FACILITIES BY THE END OF FY25 AND ENCOURAGE BROADER ADOPTION, AS PART OF OUR EFFORT TO CONTROL ABSOLUTE EMISSIONS



European Logistics Center, Laakdal, Belgium

## PERFORMANCE
% Renewable Energy

FY15 / **14%**

FY16 / **20%**

FY17 / **22%**

FY20 target
**100**%

NIKE exists to serve athletes. And climate issues, like pollution and extreme weather events, have a huge impact on how athletes perform.

As a global business, we're building resilience to climate uncertainty into our operations by reducing costs, innovating new operating models, and strengthening our supply chain.

While this target focuses specifically on renewable energy, we're reducing our carbon footprint in a variety of ways:

1. Innovating low-impact materials
2. Driving energy efficiency within our supply chain
3. Increasing renewable energy throughout our operations and supply chain, and

4. Collaborating with other organizations (i.e. corporate peers, government, NGOs) to scale impact and create better market conditions for clean energy.

**Renewable Energy in NIKE Owned and Operated Facilities**
In September 2015, we joined RE100, a coalition of businesses that have pledged to source 100 percent renewable energy in their operations. As a Fortune 100 company, we have an opportunity to drive increased production and accessibility of renewable energy globally.

Our strategy for achieving our RE100 commitment is to prioritize mature renewable energy markets with large NIKE-owned or operated consumption and strategically engage in projects that catalyze momentum toward broader adoption of renewable energy in our supply chain.

In the U.S., we have executed two projects which will produce roughly 460,000 mWh/year of wind energy. In Oregon, our off-site power purchase agreement (PPA) went live in January 2017. Today, it supplies our World Headquarters and other NIKE-owned or operated facilities in Oregon with 100 percent renewable energy. We also have a broader U.S. PPA which will support the development of a wind farm that will start operating commercially in mid-2019. Together, these contracts will cover our owned and operated consumption in the U.S. and Canada, and deliver on more than one-half of our global commitment for RE100.

Additionally, NIKE has reached 100 percent renewable energy at our European Logistics Campus in Laakdal, Belgium through five sources of energy (onsite wind, solar, geothermal, and locally produced biomass and hydro). We have also reached more than

35 percent renewable energy at our China Logistics Center in Taicang, China through a rooftop solar array.

PROCUREMENT
Procuring renewable energy for a diverse global operation is complex. So, like any team looking to win, we began by creating a game plan. First, we outlined our preferred sources of renewable energy, and then we developed principles to guide our procurement strategy.

We prefer to source electricity from wind, solar, geothermal, run-of-river hydro sources, and biomass, as we believe they pose the least harm for the environment.

Guided by the needs of our business, we developed these principles to assess opportunities. We look to optimize across these guiding principles when evaluating projects.

- **FINANCIAL IMPACT.** We seek cost-effective solutions, because we believe that in the long term, renewable energy is more cost effective than fossil fuel generation.
- **RISK DIVERSIFICATION.** Energy procurement and markets are dynamic and complex. Therefore, we look for solutions that won't result in unacceptable risk to our company.
- **ADDITIONALITY.** We strive for solutions that increase the amount and availability of renewable energy and benefit both the environment and the local communities where projects are located.
- **PROXIMITY.** Where feasible, we aim to procure renewable electricity close to our facilities so that the communities we are a part of share in the environmental, health, and economic benefits of renewable energy.

We look at different sourcing options in each geographic area we operate in and choose a solution that best optimizes these considerations.



NIKE_00002021

Plaintiff's Trial Exhibit 16
Page 26 of 74

Case 3:18-cv-01477-AB      Document 693      Filed 02/06/26      Page 394 of 482

Introduction    |    Our Approach    |    **Minimize Environmental Footprint**    |    Transform Manufacturing    |    Unleash Human Potential    |    Appendix

# ENERGY AND EMISSIONS



## CHALLENGES

We've already made significant progress, but the complexity of our operations and the nature of global renewable energy markets continue to present challenges for us.

Outside the U.S., we do not have sufficient owned or operated demand at any facility or in any individual country to enable utility-scale procurement. Utility-scale procurement options optimize our guiding principles, and without them we are limited to the less-preferred option of purchasing unbundled renewable energy credits from a market exchange.

To overcome this limitation, we will aggregate demand that aligns against our four geographies, with embedded sub-regions, and focus on projects in countries with attractive opportunities.

We've built a team of experts in renewable and global energy procurement. As we work toward the commitments we've made, our efforts can help accelerate a cleaner future for all.

**Factory Adoption of Renewables in the Supply Chain**
In addition to our efforts in NIKE-owned and operated facilities, we are convening supplier working groups to accelerate our manufacturing factories' adoption of renewable energy in multiple countries.

Our approach to accelerating renewable energy has three components:

1. Supporting factories in installing solar photovoltaic (solar PV) systems on factory rooftops to provide up to 45 percent of the electricity use of factory operations.
2. Engaging with governments and policymakers to advocate for policy that lets our manufacturing factories directly source renewable electricity from local power utilities.
3. Expanding our responsibly sourced biomass renewable energy program with a focus on our materials manufacturers.

At scale, this approach will eventually allow our manufacturing factories to use renewable energy to power their operations.

### TOTAL RENEWABLE ENERGY (MWH)

| | FY15 | FY16 | FY17 |
|---|---|---|---|
| **FW MANUFACTURING AND TEXTILE DYEING & FINISHING[1]** | | | |
| Total | 550,000 | 571,000 | 602,000 |
| % of total | 14% | 13% | 13% |
| **OWNED OR OPERATED** | | | |
| Total | 79,318 | 108,761 | 125,527 |
| % of total | 14% | 20% | 22% |
| **EMISSIONS AVOIDED FROM RENEWABLE ENERGY IN OWNED AND OPERATED** (Metric tonnes CO₂e) | 22,634 | 40,215 | 49,347 |

1  FW Manufacturing scope represents the majority of finished goods production for NIKE and Converse footwear. Textile dyeing and finishing scope includes focus suppliers only. Focus suppliers represent key suppliers involved in the dyeing and/or finishing of materials, which cannot support footwear and apparel finished product assembly.

## MEASURE

**DECREASE ENERGY AND CO2E EMISSIONS 25 PERCENT PER UNIT IN KEY OPERATIONS (INBOUND AND OUTBOUND LOGISTICS, DISTRIBUTION CENTERS, HEADQUARTER LOCATIONS, FINISHED GOODS MANUFACTURING, AND NIKE-OWNED RETAIL)**

## PERFORMANCE

Energy Consumption per unit – key operations (kWhe/unit)



| FY15 | FY16 | FY17 |
|---|---|---|
| 4.70 | 4.25 | 4.70 |

FY20 target ↓25%

Carbon Emissions per unit – key operations (kg CO2e/unit)



| FY15 | FY16 | FY17 |
|---|---|---|
| 1.74 | 1.61 | 1.74 |

FY20 target ↓25%

In FY17, our energy and carbon intensity in key operations was flat compared to baseline, as the reductions achieved in footwear manufacturing were offset by increased inbound air freight. Additional details on the root causes of these trends are provided below.

**Inbound Logistics**
The most significant driver of carbon emissions from logistics is shipping product from origin to destination by air. On the inbound leg (i.e. origin to destination geography), air freight is 25 times more carbon intensive than ocean freight. Air freight, however, allows us to deliver products more quickly to our consumers. The supply chain is complex and there are many reasons air freight is used, including manufacturing delays and responding to consumer demand.

To address air freight, going forward, we are working with key stakeholders to develop a cross-functional, internal strategy to optimize our use of air freight and ensure that we only use it when necessary.

In FY17, we introduced our Supply Chain Sustainability Index (SCSI) with our inbound ocean freight and air freight providers. The SCSI establishes clear minimum sustainability requirements for all logistics service providers and drives innovation discussions.

We are leveraging the SCSI to manage our providers to improve their sustainability performance through recognition, collaboration opportunities, and volume allocation. In FY18, we have begun implementing the SCSI for all other logistics services.

**Outbound Logistics**
Outbound logistics (i.e. transportation from a NIKE distribution center to point of sale or consumer) was challenged in FY16 and FY17 and will continue to be challenged as e-commerce sales continue to grow. E-commerce shipments are more carbon intensive than full truckload shipments to a wholesale partner, so we are working on minimizing their footprint by identifying less carbon-intensive delivery options (e.g. delivery by bike courier) and exploring regional fulfillment nodes.



NIKE_00002022

Plaintiff's Trial Exhibit 16
Page 27 of 74

# ENERGY AND EMISSIONS



**Distribution Centers**

Energy use in our distribution centers is trending higher than our target. One key reason is more extreme temperatures across seasons have required an increased use of air conditioning and heating. We have continued to implement energy efficiency measures like LED lighting and upgraded heating, ventilation, and air conditioning systems. We have also implemented energy, waste, water, and cross-metric requirements that all new and existing distribution centers must meet. For our facilities that do not currently meet minimum requirements, we are working on implementation plans and roadmaps.

At the end of FY16, our European Logistics Campus opened its newest building, WINGS (approximately 1.74M sq ft), which applied for LEED Gold certification for new construction. WINGS uses a racking structure (which reduces waste and materials used in construction), an abundance of natural light, and automated LED lighting. The facility is also designed to support biodiversity, with measures like sheep that naturally maintain the landscape and on-site beehives to pollinate flowers in the local area.

**Headquarters**

Energy use at World Headquarters (WHQ) in Beaverton, Oregon, was up 10 percent over the FY15 baseline, due in part to severe winter weather during FY17 and in part due to growth in site occupancy outpacing retrofits and efficiency improvements.

Our WHQ has developed a Roadmap to Smart Buildings, which includes a guide to equipment upgrades (where most of the reduction in energy comes from) and standardizes specifications for energy-efficient building systems. For example, daylight harvesting and flexible air conditioning add to the modular capabilities of NIKE's Freestyle work environment. Upgrading existing equipment makes up most of the energy reduction.

**Contract Manufacturer[6]: Footwear**

In FY08, we launched our Energy and Carbon program, which reduces the energy use, cost, and carbon footprint of footwear manufacturing. In nearly 10 years, we've made good progress, reducing energy use per pair by 60 percent with our Nike brand footwear finished goods manufacturing factories.

We work with our manufacturing partner locations to develop better energy efficiency.

6   Finished goods manufacturer.

We do this by building a management foundation geared at achieving energy savings through the NIKE Energy Minimum Program. This program brings organizational capabilities, data analytics, and energy activities to our contract manufacturers by concentrating on:

- Data-driven decision-making and performance management with energy and carbon baselines and ongoing data analysis
- Organization structure assessments to enable energy working teams to drive energy efficiency initiatives
- Sharing best practices for machine maintenance to reduce energy used in steam and compressed air systems

Additionally, we work with factories to scale key energy efficiency opportunities that have the greatest impact on their energy and carbon footprint; these opportunities include eliminating steam boiler systems and implementing electric motor management initiatives to improve efficiency in motor use.

In FY17, our biggest achievement was eliminating outdated steam boiler systems at a majority of footwear finished goods factories, which has given us energy savings between 15 to 20 percent at each location. Since the carbon emissions from manufacturing are a result of energy use, the effect on carbon emissions mirrors that of energy, decreasing carbon emissions per pair of footwear by 1.1 percent from the FY15 baseline.

As the energy program continues to mature, and energy efficiency opportunities are implemented, our focus is shifting to drive further adoption of renewable energy by our contract manufacturers.

**NIKE Direct Stores (NDS)**

In FY16 and FY17, we established a global electric energy baseline for over 1,000 retail locations. We also worked out a method to estimate energy use in areas where data is difficult to access.

Overall, we reduced energy used in retail locations per square foot due to our investments in LEED stores and energy efficiency projects, including HVAC and lighting upgrades. In our North America stores, we installed Energy Management Systems to provide centralized control and automation of HVAC and electrical systems, helping us spot opportunities for energy savings. We are now planning to bring these systems to new markets around the world.



European Logistics Center, Laakdal, Belgium

### ENERGY USE BY BUSINESS DIVISION (MWhe)

| | FY15[1] | FY16 | FY17 |
|---|---|---|---|
| **FUEL CONSUMPTION** | | | |
| Retail[2] | 7,559 | 6,055 | 7,135 |
| Distribution Centers | 39,853 | 45,396 | 58,230 |
| HQs | 22,171 | 28,257 | 33,738 |
| Other Office Facilities & WHQ Building Construction | 3,136 | 4,480 | 14,983[3] |
| Air Manufacturing Innovation (Air MI)[4] | 63 | 7[5] | 18 |
| Corporate Jets[6] | 12,411 | 16,972 | 13,105 |
| **TOTAL FUEL CONSUMPTION** | 85,193 | 101,167 | 127,208 |
| **ELECTRICITY CONSUMPTION** | | | |
| Retail | 185,281 | 199,552 | 209,300 |
| Distribution Centers | 130,047 | 155,138 | 168,533 |
| HQs | 77,519 | 86,007 | 89,127 |
| Other Office Facilities & WHQ Building Construction | 52,113 | 54,557 | 56,703 |
| Air MI | 39,121 | 40,647 | 50,210 |
| **TOTAL ELECTRICITY CONSUMPTION** | 484,081 | 535,701 | 573,873 |
| **ENERGY CONSUMPTION OUTSIDE OF THE ORGANIZATION** | | | |
| Inbound Logistics | 2,355,055 | 1,878,244 | 2,521,478 |
| Outbound Logistics | 250,606 | 273,722 | 275,661 |
| FW Manufacturing[7] | 2,154,045 | 2,209,104 | 2,226,619 |
| AP Manufacturing[8] (Estimated) | 283,000 | 292,000 | 311,000 |
| EQ Manufacturing[9] (Estimated) | 205,000 | 206,000 | 176,000 |
| Textile Dyeing & Finishing[9] | 1,800,730 | 2,100,084 | 2,313,869 |
| **TOTAL ENERGY CONSUMPTION OUTSIDE OF THE ORGANIZATION** | 7,048,436 | 6,959,154 | 7,824,627 |

1   FY15 values have been restated in alignment with expanded scope of FY20 targets
2   Due to global variance in patterns of energy consumption from direct fuel use, Retail fuel consumption represents North America actual data only, absent of global anthropocations.
3   The big increase in FY17 is due to construction at World Headquarters. Sites under construction will be incorporated into HQs data set once operational.
4   Air Manufacturing Innovation manufactures Air-Sole cushioning components at NIKE-owned facilities and one leased facility. Air Manufacturing Innovation also manufactures and sells small amounts of various other plastic products to other manufacturers
5   The drop in energy is due to a small leak in a natural gas meter that was addressed
6   Corporate jets aren't in scope of NIKE's targets but are part of NIKE's footprint.
7   Scope represents the majority of finished goods production for NIKE and Converse footwear
8   FY15 values have been restated due to improvements to data quality and estimation methodology.
9   Measure includes tissue suppliers only. Focus suppliers represent key suppliers involved in the dyeing and/or finishing of materials, which directly support footwear and apparel finished product assembly.



NIKE_00002023

Plaintiff's Trial Exhibit 16
Page 28 of 74

# ENERGY AND EMISSIONS



### GHG EMISSIONS BY BUSINESS DIVISION (METRIC TONNES CO₂E)

| | FY15[1] | FY16 | FY17 |
|---|---|---|---|
| **SCOPE 1** | | | |
| Retail[3] | 1,531 | 1,226 | 1,445 |
| Distribution Centers | 7,801 | 9,116 | 11,699 |
| HQs | 4,419 | 5,649 | 6,765 |
| Other Office Facilities & WHQ Building Construction | 635 | 908 | 3,035[3] |
| Air Ml | 13 | 2[4] | 4 |
| Corporate Jets[5] | 3,576 | 4,392 | 3,391 |
| **TOTAL SCOPE 1** | 17,975 | 21,293 | 26,339 |
| **SCOPE 2[1]** | | | |
| Retail | 98,154 | 99,959 | 103,393 |
| Distribution Centers | 58,152 | 67,752 | 61,084 |
| HQs | 27,038 | 15,935 | 14,799 |
| Other Office Facilities & WHQ Building Construction | 27,238 | 27,254 | 27,035 |
| Air Ml | 18,099 | 14,873 | 18,135 |
| **TOTAL SCOPE 2** | 228,681 | 225,773 | 224,446 |
| **SCOPE 3** | | | |
| Inbound Logistics | 599,788 | 478,475 | 642,287 |
| Outbound Logistics | 66,379 | 72,465 | 73,080 |
| FW Manufacturing[7] | 962,300 | 986,749 | 1,041,646 |
| AP Manufacturing (Estimated)[7] | 176,000 | 181,000 | 193,000 |
| Equipment (EQ) Manufacturing (Estimated)[8] | 114,000 | 114,000 | 98,000 |
| Textile Dyeing & Finishing[7] | 542,089 | 635,676 | 703,731 |
| **TOTAL SCOPE 3** | 2,460,556 | 2,468,365 | 2,751,744 |

1  FY15 values have been restated in alignment with expanded scope of FY20 targets.
2  Due to global variance in patterns of energy consumption from direct fuel use, Retail Scope 1 emissions represent North America actual data only, net of global extrapolations.
3  The big increase in FY17 is due to construction at World Headquarters. Sites under construction will be incorporated into HQs data set once operational.
4  The drop in emissions is due to a small leak in a natural gas meter that was addressed.
5  Emissions from corporate jets weren't in scope of NIKE's targets but are included in NIKE's Scope 1 emissions footprint.
6  Market-based Scope 2 emissions are reported in this table. Total NIKE, Inc. location-based Scope 2 emissions are reported in table below.
7  Scope represents the majority of emissions for finished goods production for NIKE and Converse footwear.
8  FY15 values have been restated due to improvements to data quality and calculation methodology.
9  Measure includes focus suppliers only. Focus suppliers represent key suppliers involved in the dyeing and/or finishing of materials, which directly support footwear and apparel finished product assembly.

### BIOMASS EMISSIONS (METRIC TONNES CO₂E)[1]

| | FY15 | FY16 | FY17 |
|---|---|---|---|
| Emissions from Biomass RECs | 4,785 | 4,335 | 3,109 |

1  Biomass emissions reported separately from scopes as per GHG Protocol.

### SCOPE 2 EMISSIONS (METRIC TONNES CO₂E)

| | FY15 | FY16 | FY17 |
|---|---|---|---|
| Location-Based | 250,493 | 262,354 | 289,556 |
| Market-Based | 228,681 | 225,773 | 224,446 |

1  As per the new GHG Protocol Scope 2 Emissions guidance, market-based emissions are reported alongside location-based emissions. Market-based emissions show the impact of NIKE's energy purchase decisions on emissions.

## MEASURE

### DECREASE ENERGY AND CO₂E EMISSIONS 35 PERCENT PER KG IN TEXTILE DYEING AND FINISHING PROCESSES[7]

## PERFORMANCE

Energy Consumption per kg – Textile Dyeing and Finishing (kWh/kg)



15.86    15.46    14.95

FY20 target ↓35%

FY15    FY16    FY17

Carbon Emissions per kg – Textile Dyeing and Finishing (kg CO₂e/kg)



4.78    4.68    4.55

FY20 target ↓35%

FY15    FY16    FY17

The dyeing and finishing of textiles is one of the most energy-intensive processes in our supply chain. To reduce this impact, we extended our Energy and Carbon Program to dyeing and finishing suppliers. Similar to our program in finished goods manufacturing, it's designed to drive energy efficiency by enabling organization capabilities, improving steam boiler systems, and implementing best practices for steam system maintenance.

We're currently on track to achieve our target, and a number of suppliers are ahead of schedule, including:

• Apparel suppliers in Taiwan, who have reduced energy by 12 percent from baseline
• Footwear suppliers in China, who have reduced energy by 24 percent from baseline

The primary focus of our work with dyeing and finishing suppliers is boiler system optimization projects. As an essential part of the dyeing and finishing process, boilers operate almost continuously and use 80 percent of the energy in a dyeing and finishing factory. Focusing efforts on these systems allows material suppliers to realize cost-effective, significant, short- and long-term gains in energy efficiency.

Washington State University is a key partner for NIKE's manufacturing global energy and carbon team. Through this collaboration, we're building capabilities, energy toolsets, and best practice guidelines to help our supply chain become more energy efficient in finished goods as well as dyeing and finishing.

### FURTHER READING

Approach to Energy & Emissions



| PRIORITY ISSUE | PRIORITY ISSUE |
|---|---|
| Energy | GHG Emissions |
| GRI | GRI |
| GRI 302: Energy | GRI 305: Emissions |
| Disclosure 302-1: Energy consumption within organization | Disclosure 305-1: Direct (Scope 1) GHG Emissions |

7  Measure includes focus suppliers only. Focus suppliers represent key suppliers involved in the dyeing and/or finishing of materials, which directly support footwear and apparel finished product assembly.



NIKE_00002024

Plaintiff's Trial Exhibit 16
Page 29 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 397 of 482

Introduction | Our Approach | **Minimize Environmental Footprint** | Transform Manufacturing | Unleash Human Potential | Appendix

# WASTE



## TARGET

## ELIMINATE FOOTWEAR MANUFACTURING WASTE TO LANDFILL OR INCINERATION, WHILE CONTINUING TO REDUCE OVERALL WASTE

## PERFORMANCE

% Waste to Landfill[1] – FW Manufacturing[2]



FY16 / **6.6%**

FY17 / **4.0%**

FY20 target

**0%**

1  FY16 is the baseline for this target.
2  Scope represents the majority of finished goods production for NIKE and Converse footwear.

*NIKE Grind integrated into recycled footwear.*

Our priority is zero waste. We aim to eliminate waste wherever we can, beginning by designing waste out of our products and optimizing manufacturing processes. Eliminating waste reduces material consumption and cost, and the upstream environmental impacts associated with making materials.

We're focused particularly on footwear, which accounts for nearly two-thirds of NIKE manufacturing waste. For us, manufacturing scraps and manufacturing byproducts are valuable resources. Every gram of materials sourced to make NIKE products should be put to good use, maximizing economic value and minimizing environmental impact.

We're strengthening our recycling capabilities and making it easier to responsibly convert unrecyclable waste into energy. In FY17, more than one-half of NIKE footwear finished goods manufacturing waste was recycled. We do this by segregating waste for recycling and using waste management centers that consolidate,

process, and market this material. The program increases the recycling demand for some materials through carefully targeted initiatives.

### Nike Grind

Nike Grind is a suite of premium, recycled, and regenerated materials we use to reduce waste and deliver performance products ranging from new NIKE footwear and apparel to sports and play surfaces made by our industry-leading partners. There are over 10,000 surfaces around the world made from our surplus manufacturing materials such as rubber, foam, fiber, leather, and textile blends.

NIKE has been supplying Nike Grind to premium surface manufacturers since 1992. In FY16 and FY17, revenues from the sale of Nike Grind sports and play surfaces funded additional sustainable innovations at NIKE.

### FOOTWEAR WASTE VOLUMES (LBS)[1]
### BY NIKE GRIND PROGRAM

|  | FY16 | FY17 |
|---|---|---|
| Factory Waste | 9,336,826 | 11,257,883 |
| Post-consumer[2] | 587,810 | 1,356,021 |

1  Measured in pounds of Nike Grind for use in sports and other flooring surfaces.
2  Post-consumer includes waste from distribution centers, Reuse-A-Shoe program, defective samples, and returns.

**LEARN MORE:** Nike Grind; Nike Grind Surfaces



NIKE_00002025

Plaintiff's Trial Exhibit 16
Page 30 of 74

# WASTE



## MEASURE

REDUCE WASTE INDEX BY
10 PERCENT, COVERING FOOTWEAR
MANUFACTURING, DISTRIBUTION
CENTERS, AND HEADQUARTER
LOCATIONS

## PERFORMANCE

Waste Index[1] – Footwear Manufacturing,
DCs, HQs



| | 100 | | 98.2 | | 100.8 |

FY20 target
FY15[2]        FY16        FY17        ↓10%



1  Our waste index replaces our previously stated waste measure, in order to better reflect our actual performance against our waste reduction goals, and avoid misleading trends due to shifts in the relative volumes of our apparel and equipment businesses. The waste index is a weighted average of our footwear manufacturing waste per unit, distribution centers waste per unit, and headquarters waste per occupant.
2  Baseline is FY15 except for Tier 1 FW Manufacturing and Converse HQ, which are FY16 and are included in 1NO-wide baseline for comparability across years.

Footwear factories are implementing NIKE's Waste Minimum Program, which sets expectations for:

1. Management commitment
2. A hierarchy of waste where disposal is a last resort
3. Separation and handling waste for recycling, and
4. Data collection and reporting for accountability.

We're also making good progress on our plan to eliminate waste to landfill or incineration.[8] At the beginning of FY16, 6.6 percent of footwear manufacturing waste was sent to landfill or incineration. By the end of FY17, this was down to 4.0 percent, with only six contract manufacturers still sending waste to landfill or incineration. Factories in China, Indonesia, and India no longer landfill manufacturing waste.

In Vietnam, we've identified and completed due diligence on additional waste-to-energy and logistics providers. This enables our contract manufacturers who are still sending waste to landfill or incineration to send it for responsible energy recovery instead.

The final push to zero waste in footwear manufacturing will be developing recycling and energy recovery channels for two remaining factories in Europe that landfill a small quantity of waste. A possible challenge in doing this is the current restrictions on shipping of waste materials between countries.

## FW MANUFACTURING WASTE, METRIC TONNES[1]

| | FY16 | FY17 |
|---|---|---|
| Reused & Recycled Waste | 49,020 | 47,579 |
| Energy Recovery Waste | 30,091 | 38,200 |
| Landfilled & Incinerated Waste | 5,567 | 3,550 |
| **TOTAL WASTE** | **84,678** | **89,329** |

1  Scope represents the majority of finished goods production for NIKE and Converse footwear.

In FY17, our waste index was up 0.8 percent over baseline. Early indicators based on FY18 first half data show a continued rise of our waste index, to ~2.5 percent over baseline. This rise in our waste index is due to:

1. Increasing waste per unit in footwear manufacturing, which represents 69 percent of the index (reflecting its contribution to our total waste)
2. Increasing waste per unit in our distribution centers, which represents 27 percent of our index
3. Finally, headquarter locations' waste per occupant is decreasing, but represents only 4 percent of our index.

We are evaluating options for how to reverse this trend but recognize our waste may continue to rise until we implement new functional strategies to curb this index back toward our target. Additional details on these trends are provided on the next page.

8  Incineration without energy recovery.



NIKE_00002026

Plaintiff's Trial Exhibit 16
Page 31 of 74

# WASTE





**Contract Manufacturers[9]: Footwear**

In FY16, we made progress to meet our footwear finished goods manufacturing reduction target by focusing on data, analytics, and cross-functional coordination.

Reducing manufacturing waste depends on how products are designed and how they are made. So, to achieve our target, we created a cross-functional material efficiency team. The team identifies key initiatives, from design through manufacturing, that address underlying drivers of waste generation. This includes reducing and standardizing the materials pallet, designing more efficient cutting patterns, replacing disposable materials packaging with more durable packaging that can be reused, improving cutting technologies to enable smaller gaps between cut parts, and designing more efficient tooling for making molded parts.

We are also improving waste data quality and the capacity of NIKE and our manufacturing factories to identify root causes of waste generation. In China, the factories decreased waste generation in four of the last eight quarters, ending 5.5 percent lower than the FY16 baseline. Globally, in FY17 waste generation in footwear factories was up 2.3 percent over the FY16 baseline, and up 3.7 percent as of the second quarter of FY18. While we aren't satisfied with these results to date, we are confident that our efforts are laying the foundation for better understanding and management of what drives waste generation.

**Corporate Headquarters**

By the end of FY17, our World Headquarters (WHQ) reduced one-time-use containers like bottles and cups by about 16,000 pounds per quarter through a reusable dishware program. Overall, average waste per occupant at our five headquarter locations was down 11.9 percent from baseline.

9　Finished goods manufacturer.

**Distribution Centers**

Corrugated cardboard cartons are the biggest source of waste at our distribution centers, and there was an increase in cardboard waste generation over FY16/17 because of changing customer order profiles. Today, our customers want more variety of product and/or smaller orders at any given time. This, in turn, means that our distribution centers must debox cartons delivered from our factories and repackage product into more customized orders, a process that inherently creates more waste. As a result, we have turned our focus to a long-standing initiative: our Re-Use-A-Box program, which reuses the corrugated cardboard carton waste on outbound shipments. We are analyzing the potential of increasing the reuse rate to get the most out of the program, and we are also piloting and evaluating alternative packaging such as reusable shipping totes.

### DISTRIBUTION CENTERS AND HQs (metric tonnes)

| | FY15 | FY16 | FY17 |
|---|---|---|---|
| **DISTRIBUTION CENTERS** | | | |
| Landfilled Waste | 2,719 | 3,117 | 3,270 |
| Recycled Waste | 29,391 | 29,593 | 32,687 |
| Composted Waste | 247 | 274 | 197 |
| Waste to Energy Incineration | 560 | 715 | 1,022 |
| **TOTAL WASTE** | 32,917 | 33,699 | 37,178 |
| **HQs** | | | |
| Landfilled Waste | 1,626 | 1,816 | 1,807 |
| Recycled Waste | 2,063 | 1,708 | 1,927 |
| Composted Waste | 707 | 1,042 | 1,157 |
| **TOTAL WASTE** | 4,396 | 4,566 | 4,891 |

## MEASURE

### INCREASE LANDFILL DIVERSION IN DISTRIBUTION CENTERS AND HEADQUARTER LOCATIONS

## PERFORMANCE

% Landfill Diversion

**FY15 / 88.4%**

**FY16 / 87.1%**

**FY17 / 87.9%**

FY20 target
**INCREASE**

**Distribution Centers**

Over the past few years, we have seen a steady 92 percent of our distribution centers' waste diverted from landfill. Our European Logistics Campus performed best in the NIKE network with 100 percent landfill diversion. Our Japan and Converse Ontario (California) distribution centers also hit 100 percent landfill diversion by the end of FY17. Meanwhile, landfill diversion decreased slightly at two key North America distribution centers due to challenges experienced while expanding capacity.

We are focusing on retraining our employees and working with local recycling providers to increase landfill diversion at each of our distribution centers.

**Corporate Headquarters**

Waste diversion at WHQ took a dip in FY17 when a food-only compost regulation was introduced by the municipality. As a result, items previously composted were sent to landfill.

In our European Headquarters, we've been evaluating waste streams to understand current volumes and behavioral trends with an eye to educating employees on their environmental impact.

At Converse's headquarters in Boston, we've been demonstrating the benefits of single-stream recycling, and we also began a compost program for catering leftovers and coffee grinds.

### FURTHER READING



Approach to Waste

**PRIORITY ISSUE**
Materials Waste

**GRI**
GRI 306: Effluents and Waste
Disclosure 306-2: Waste by type and disposal method

NIKE_00002027

Plaintiff's Trial Exhibit 16
Page 32 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 400 of 482

Introduction | Our Approach | **Minimize Environmental Footprint** | Transform Manufacturing | Unleash Human Potential | Appendix

# WATER



**TARGET**

## INNOVATE AND ADOPT NEW APPROACHES TO REDUCE WATER USE IN OUR SUPPLY CHAIN, WITH 20 PERCENT REDUCTION IN FRESHWATER USE IN TEXTILE DYEING AND FINISHING PER UNIT OF PRODUCTION



Factory water program check, Jakarta, Indonesia

**PERFORMANCE**

Freshwater Use Per Unit of Production[1] (L/kg) –
Textile Dyeing and Finishing[2, 3]



126.5

117.2

FY20 target ↓20%

FY16    FY17

1  FY16 is the baseline year for this target.
2  Target includes focus suppliers only. Focus suppliers represent key
   suppliers involved in the dyeing and/or finishing of materials, which directly
   support footwear and apparel finished product assembly.
3  NIKE's FY20 water target differs in scope compared to our moonshot water
   ambition. The moonshot water ambition is broader, inclusive of water
   consumed across the value chain, from corporate services to end of life
   (excluding consumer use).

At NIKE, we recognize the increasing risk of water availability to our business, and we've been working to reduce our water footprint for years. We are focused on reducing our water use through innovation, and improving wastewater quality to enable cost-effective water recycling.

We surpassed our water conservation target in FY15,[10] so we set a new target for 2020: reduce by 20 percent the amount of fresh water used by dyeing and finishing suppliers per unit of production in our supply chain. Taken together, the freshwater withdrawn by these vendors totaled 16 billion liters of water in FY16, which was about 126 liters of freshwater for every kilogram of fabric produced. Our focus is on dyeing and finishing facilities because they not only use the most industrial water, but they generate the most industrial wastewater in our manufacturing supply chain.

To achieve our target, we're teaching our suppliers to be aware, to be committed, and

to make meaningful improvements in water use, wastewater treatment, and recycling. In FY16, our team of water consultants set up the NIKE Water Minimum Program. Designed to spot opportunities for better efficiency, the program sets expectations for water stewardship, wastewater treatment data collection, and managers' understanding of the risks of water scarcity and flooding. It also helps factories develop structured approaches to maintaining their water and wastewater treatment equipment. The intent of the Water Minimum Program is to prepare our suppliers for closed-loop water recycling.

This resulted in a 7.4 percent drop in freshwater use from the previous year, a reduction to 117 liters of freshwater for every kilogram of fabric. By the end of FY17, 40 percent of the suppliers making our primary materials were recycling some treated wastewater back into their manufacturing processes.

10  FY15 Water Target: Improve water efficiency by 15 percent per unit in apparel materials dyeing and finishing, and in footwear manufacturing, from FY11 through FY15.



NIKE_00002028

Plaintiff's Trial Exhibit 16
Page 33 of 74

# WATER



We are making progress but there are challenges to reaching our 2020 target. Because our supply chain is diverse, the level of awareness, commitment, and capability varies between suppliers. We must build consistency across our supply chain to achieve our ambition of closed-loop water use to enable NIKE to achieve our moonshot of doubling our business while halving our environmental impact.

We also believe that to be successful, presence is influence. We are taking a proactive, lean-forward approach to assisting our material vendors in resolving their water and wastewater challenges. In addition, we have taken a leadership role in the development of the Sustainable Apparel Coalition's Higg 3.0 Facility Environment Module and the development and proliferation of the ZDHC Foundation's Wastewater Guidelines. These efforts aim to drive systemic change to water efficiency and wastewater treatment across our industry.

## MEASURE
### BUILD RESILIENCE THROUGH SUPPLIER WATER RISK MITIGATION PLANS WITH MATERIALS PROCESSORS

Water scarcity is real. To understand the risk of water scarcity – and in some regions, flooding – to our manufacturing factories and material suppliers we leveraged the Aqueduct Water Risk Atlas developed by the World Resources Institute (WRI) to assign a baseline water risk score at the facility level.

Through this exercise, we identified that 22 percent of footwear fabric and about 21 percent of apparel fabric from focus suppliers[11] is made in facilities classified by WRI as being at high risk of water scarcity. In China, India, Indonesia, and Taiwan, 12 finished goods factory locations are in regions with high risk of water scarcity or flooding.

To assist our suppliers with understanding, validating, and mitigating their water risk, we developed a Water Risk Mitigation Guideline, which provides a structured approach for our suppliers to better understand and manage risks from flooding and drought. We provided this guideline to finished goods factories and material suppliers in regions with high risk of water scarcity or flooding. At the end of FY17, all of these suppliers were evaluating their risks and preparing to develop mitigation and management plans. We are now planning to share the Water Risk Mitigation Guideline with our contract manufacturers and material suppliers in our supply chain.

### WATER (MILLION LITERS)

| | FY16 | FY17 |
|---|---|---|
| **DISTRIBUTION CENTERS** | | |
| TOTAL FRESHWATER USE[1] | 159.0 | 266.7 |
| **HQs** | | |
| TOTAL FRESHWATER USE | 597.8 | 604.2 |
| **AIR MI** | | |
| TOTAL FRESHWATER USE | 31.9 | 41.9 |
| **OTHER OFFICES** | | |
| TOTAL FRESHWATER USE[2] | 28.0 | 30.3 |
| **TEXTILE DYEING AND FINISHING[3]** | | |
| Municipal / City Water to Facility | 8,480.2 | 9,269.7 |
| Ground Water | 4,810.0 | 5,272.3 |
| Surface Water | 2,175.0 | 2,159.1 |
| Rain Water Collection | 44.2 | 13.0 |
| Condensate Use | 367.1 | 389.5 |
| **TOTAL FRESHWATER USE** | 15,876.4 | 17,103.6 |

1. Scope reflects 45 percent of shipped units reported.
2. Scope includes U.S. only.
3. Includes focus suppliers only. Focus suppliers represent key suppliers involved in the dyeing and/or finishing of materials, which directly support footwear and apparel finished product assembly.



### FURTHER READING



Approach to Water

**PRIORITY ISSUE**

Water Use

**GRI**

**GRI 303:** Water

**Disclosure 303-1:** Water withdrawal by source

11 Focus suppliers represent key suppliers involved in the dyeing and/or finishing of materials, which directly support finished product assembly.



NIKE_00002029

Plaintiff's Trial Exhibit 16
Page 34 of 74

# CHEMISTRY





The Nike AeroShield Jacket

**MEASURE**

100 PERCENT COMPLIANCE WITH NIKE RESTRICTED SUBSTANCE LIST (RSL)

**PERFORMANCE**

% of Tested Material in Compliance with NIKE RSL[1]

| | |
|---|---|
| FY15 / 95% | |
| FY16 / 99% | |
| FY17 / 98% | |

FY20 target
**100**%

1    All failures are resolved prior to product creation.

## TARGET

## ENABLE ZERO DISCHARGE OF HAZARDOUS CHEMICALS (ZDHC)

Chemistry plays an essential role in product innovation and manufacturing at NIKE. It can deeply influence and elevate product performance and design; yet the choice of chemistry can also affect sustainability of our overall product creation process.

With every chemistry choice our innovation teams make, we can unlock potential for the athlete. NIKE's Chemistry Center of Excellence works with teams across the business and supply chain to ensure we are simultaneously increasing the performance of our products while reducing our chemical footprint.

Achieving our goal of zero discharge of hazardous chemicals requires more than the implementation of our internal programs. It demands our continued commitment to collaborate with industry peers, aligning on how we manage chemicals across a shared supply chain.

Beyond our chemical compliance programs, further work is being advanced across three core areas to move us closer to our goal:

1. **Elevating Chemicals Management Capability:** We baselined performance at 121 strategic suppliers to help prioritize improvements and guide development of shared assessment tools.
2. **Assessing New Chemicals:** Going beyond compliance by strengthening our review of new chemicals through a robust toxicological screening process.
3. **Prioritizing Chemicals:** Ahead of compliance, identifying priority chemicals for phase-out based on an intensive review of the chemicals used throughout our supply chain's manufacturing processes.

Demonstrating our leadership and commitment to driving industry change through collective action, NIKE co-created and formally adopted the ZDHC Wastewater Guideline in FY17. The new guideline allows global suppliers and brands to align wastewater testing and reporting expectations to a testing schedule, laboratory methods, and reporting limits for hazardous chemicals. NIKE is deploying this robust tool across our supply chain to track progress toward our ZDHC target by measuring the performance of suppliers' ZDHC MRSL compliance and adherence to wastewater quality standards.[12]

By strengthening foundational programs, promoting responsible use of better chemistry, and advancing global alignment of chemical requirements, NIKE continues to make strong progress toward achieving the aspirational goal of the ZDHC.

In 2001, we shared our first RSL, a set of chemical requirements for materials that met or exceeded legal restrictions from around the world, including substances that we voluntarily restricted from products.

Our RSL has evolved since then, and other brands have created their own lists. This has led to confusion in the supply chain, where contract factories are stuck trying to deal with different requirements from different companies. So, to advance our RSL program and elevate supply chain performance, NIKE recognized the need for a common approach to RSL management. We invested significant effort co-creating a unified list of chemical restrictions with other key global brands through the Apparel & Footwear International RSL Management (AFIRM) Group.

In January 2017, NIKE formally adopted the AFIRM Group RSL, directly replacing the NIKE RSL list of chemical limits for all materials used in production of goods for NIKE. Just as the previous NIKE RSL was based on both legislated and voluntary commitments to creating safe products, the AFIRM RSL applies chemical limits based on legislation, best practices in industry, and voluntary reductions in hazardous chemicals.

12  Measurement of supplier adherence to NIKE's wastewater quality standards between FY16 and FY17 is based on a prior standard; progress from FY18 onward will be based on the higher standards of the ZDHC guideline.



NIKE_00002030

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 403 of 482

Introduction | Our Approach | **Minimize Environmental Footprint** | Transform Manufacturing | Unleash Human Potential | Appendix

# CHEMISTRY



We built on this industry success by focusing on implementation. Investing to strengthen our internal management of the program and improving capability across the supply chain is essential for reaching 100 percent compliance. For example, our RSL training program, launched in FY16, is a requirement for all suppliers. We have already trained 82 percent of our finished goods manufacturers and 72 percent of our raw material suppliers in our supply chain.

Right now, 98 percent of the materials we tested are compliant with the RSL. Though non-compliances are resolved before the creation of final product, it is important to recognize that the RSL is not static.

## MEASURE

### 100 PERCENT COMPLIANCE WITH THE ZDHC MANUFACTURING RESTRICTED SUBSTANCES LIST (MRSL)

## PERFORMANCE

Official performance monitoring began in FY18.

We believe that certain chemicals shouldn't be used in manufacturing, and we're always working to improve how suppliers in our supply chain select and use chemicals that meet our expectations. Our input management program supports this approach in two key areas:

1. Collaborating with the ZDHC Foundation to strengthen industry-wide MRSL compliance requirements for input chemistry, and
2. Advancing tools to enable our suppliers to scale procurement and use of chemicals that meet those requirements.

Having launched the first industry-aligned MRSL in 2014, we knew that this industry milestone was not the end of the journey; further work was needed to increase its applicability to our broader supply chain. In response, we worked extensively with other global brands and industry

stakeholders in FY16 to expand the scope of the MRSL. Successful collaboration led to the publication of an updated ZDHC MRSL in December 2015, which now includes additional guidance for controlling priority chemicals from possible use in natural leather production.

Though a robust MRSL is essential for defining the quality of input chemistry, this must be coupled with effective tools and training to help suppliers implement the MRSL and procure compliant chemicals. Recognizing this need, we actively supported the creation of the ZDHC Gateway "Chemical Module" – a database that supports procurement of MRSL compliant chemical formulations – and deployed a global training program to elevate understanding of MRSL implementation to our supply base. To further scale the use of MRSL compliant chemicals, we also continue to incentivize use of bluesign® approved chemistry within our textile supply chain by supporting access to the bluefinder database. The bluesign® system supports sustainable textile production by providing raw material suppliers with the tools and capability needed to successfully restrict and manage harmful substances.

Measuring progress against this target began in late FY17, when we rolled out the ZDHC Wastewater Guideline to dyeing and finishing suppliers. This enabled them to measure their compliance by testing wastewater for presence of MRSL chemistries. During the rollout, we trained facilities on the new guidelines and gave guidance on how to test wastewater for MRSL chemistries. Official performance monitoring to these new guidelines begins in FY18. In addition, we captured electronic chemical inventory data from 10 material vendors to quantify the use of compliant formulations; having contracted with a provider to expand this effort across the supply base, we plan to report on this progress when industry tools become sufficiently robust.

## MEASURE

### 100 PERCENT OF FOCUS SUPPLIERS MEETING NIKE'S WASTEWATER QUALITY REQUIREMENTS FOR TEXTILE DYEING AND FINISHING PROCESSES[13]

## PERFORMANCE

% of Focus Suppliers Meeting NIKE's Wastewater Quality Requirements[1] – Textile Dyeing and Finishing[2]

**FY16 / 57.8%**

**FY17 / 72.6%**

FY20 target
**100%**

1   FY16 is the baseline for this measure. Measurement of supplier adherence to NIKE's wastewater quality standards between FY16 and FY17 is based on a prior standard; progress from FY18 onward will be based on the higher standards of the ZDHC guideline.
2   Includes focus suppliers only. Focus suppliers represent key suppliers involved in the dyeing and/or finishing of materials, which directly support footwear and apparel finished product assembly.

As we use less and less freshwater in our manufacturing supply chain, we need to ensure that the water we do use can be cleaned and returned into the environment. Testing wastewater from our textile dyeing and finishing processes is a key measure to ensure we are on target for our zero discharge commitments. For wastewater, legal compliance is the bare minimum required of our suppliers. But legal compliance differs from country to country, and what's acceptable in some places does not necessarily match up to our expectations. That's why we, through collective action, developed and adopted tighter wastewater quality standards – the ZDHC Wastewater Guideline.

We also set up a global wastewater disclosure database to help suppliers optimize testing and disclosure of wastewater quality. Through the power of collective action, one wastewater test per the ZDHC Wastewater Guideline is valid for all member brands of the ZDHC.

By treating wastewater to ever-higher standards, suppliers can use less freshwater and reduce their risk of water scarcity by pursuing cost-effective water recycling and closed-loop

---

13   The target has not changed from our FY14/15 Sustainable Business Report, but the wording has changed to provide brevity and clarity to the original goal.



NIKE_00002031

Plaintiff's Trial Exhibit 16
Page 36 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 404 of 482

Introduction       |      Our Approach      |      Minimize Environmental Footprint      |      Transform Manufacturing      |      Unleash Human Potential      |      Appendix

# CHEMISTRY



water. Our vision is a supply chain with zero industrial wastewater discharge. We want to be so successful with closed-loop water that we make the need for wastewater quality guidelines obsolete. We're currently transitioning to the ZDHC Wastewater Guidelines, a more comprehensive set of guidelines designed specifically for our industry. Our progress between FY16 and FY17 is based on a prior standard, while our progress from FY18 onward will be based on the more comprehensive standards of the ZDHC guidelines.

By the end of FY17, 72.6 percent of suppliers met NIKE's wastewater quality requirements. We have been working with the remaining 27.4 percent to understand the opportunities that exist to allow them to discharge wastewater at a quality better than legal compliance. In many cases, the suppliers were challenged with conventional wastewater parameters such as chemical oxygen demand, biological oxygen demand, color, coliform, antimony, and total nitrogen. To help our suppliers master these fundamentals of wastewater treatment, we're encouraging them to incorporate the NIKE Minimum Water Program into their operations and examine the wastewater treatment equipment they're using and how they are operating, and requiring them to comply with the ZDHC Wastewater Guidelines.



## MEASURE
### ACHIEVE BETTER CHEMICAL INPUT MANAGEMENT THROUGH SCALING MORE SUSTAINABLE CHEMISTRIES

NIKE has created tools – for both in-house and supplier innovations – to make it easier to evaluate chemistry choices early in the development process. Utilizing these tools, which include a toxicological screening, we review new chemicals and formulations for human health and environmental hazards. This approach allows us to work directly with chemical suppliers to better understand which substances should be replaced to meet our sustainability goals. Our focus goes well beyond any regulated chemistries, seeking to identify those that are considered controversial by NIKE standards and reducing their use in the manufacturing of our products.

This toxicology review process is also utilized in our Validation of a Greening Effort program, where we work with material vendors to review the chemical formulations of specific materials. This review helps vendors choose better chemical inputs to create more sustainable materials, and those materials qualify for a higher score within the NIKE Materials Sustainability Index program.

The NIKE chemistry program routinely advises on which chemicals to eliminate from the supply chain well ahead of any enacted regulation and utilizes this information in our collaborative efforts across the industry.

## MEASURE
### LEAD INDUSTRY CHANGE THROUGH COLLECTIVE ACTION

We share an extensive and complex global supply base, so we need to be aligned with other brands when using tools and guidelines to significantly influence chemical compliance. These shared guidelines, built on sound science and an understanding of their technical validity, help us shape a better industry for everybody. Our commitment to collaborate across the industry continues to shape our chemicals management program and influences how we engage with our supply chain. Recent alignment on approaches to good chemical management highlight the critical importance of collaboration within our industry.

- **AFIRM Group:** Extensive collaboration resulted in the release of an industry-aligned RSL, which was adopted by NIKE in January 2017.
- **ZDHC Foundation:** In addition to NIKE's seat on the Board of Directors, our active leadership across a number of areas continues to strengthen the creation and implementation of MRSL & Wastewater guidance, improving use of chemicals throughout the global supply chain.
- **Sustainable Apparel Coalition (SAC):** Recognizing the value of measuring and elevating chemical management capability within a manufacturing facility, we actively engaged in the development of a converged chemical management assessment tool (integrated into the Higg Facility Environment Module 3.0).

### FURTHER READING

Approach to Chemistry
Chemistry Playbook & RSL

**PRIORITY ISSUE**
Chemistry

**SASB**
**CN0501-01:** Description of processes to maintain compliance with restricted substances regulation
**CN0501-02:** Description of processes to assess and manage risks associated with chemicals in products
**CN0501-08:** Percentage of (1) tier 1 supplier facilities and (2) supplier facilities beyond tier 1 with wastewater discharge meeting or exceeding legal requirements



NIKE_00002032

Plaintiff's Trial Exhibit 16
Page 37 of 74

# MINIMIZE ENVIRONMENTAL IMPACT: BY THE NUMBERS

## >96%
of Nike brand global apparel and footwear is **SCORED ON SUSTAINABILITY PERFORMANCE**



## 24B+
**LITERS OF WATER SAVED** by sourcing cotton more sustainably in FY17



## 100%
**RENEWABLE ENERGY** in North America by 2019



## 98%
of materials tested are **IN COMPLIANCE** with NIKE's restricted substance list



## 60%
**LESS WASTE GENERATED** in the Nike Free Run Flyknit compared to a traditional running shoe



## 100%
**LANDFILL DIVERSION** at NIKE's European Logistics Campus, Japan Distribution Center (DC), and Converse Ontario (California) DC



## 75%
of Nike brand global footwear and apparel **PRODUCTS USED SOME RECYCLED MATERIAL** in FY17



NIKE_00002033

Plaintiff's Trial Exhibit 16
Page 38 of 74



# TRANSFORM MANUFACTURING

NIKE_00002034

# THE WORLD AROUND US

Consumers increasingly demand ethical production and sustainable sourcing from business. The UN Guiding Principles on Human Rights makes human rights an integral part of how business is done and reported. Companies are expected to act responsibly, understand their human rights risks, report on them more consistently.

In the apparel sector, consumers are looking for brands to be more transparent. They want to see more eco-friendly fabrics used as fast fashion falls out of favor. Brands are focusing on the wellbeing of the contract factory worker and responding to public requests for more accountability. Retailers and manufacturers can only expect more pressure to be transparent about their production processes and their supply chains.

## OUR APPROACH

We are transforming manufacturing with world-class standards that ensure our products are made responsibly and sustainably. Everything we do puts workers at the center. We are respecting the environment and using cutting-edge technologies to create better, more personalized products for our customers.

# "IF WE ARE GOING TO CREATE THE FUTURE AND GROW NIKE, IT IS GOING TO BE IN A WORLD OF REDUCED RESOURCES. THAT MEANS WE HAVE TO THINK LONG AND HARD ABOUT WHAT OUR PRODUCTS ARE MADE OF AND HOW THEY ARE MADE."

**Tom Clarke,** President, NIKE Advanced Innovation

NIKE_00002035

# TRANSFORM MANUFACTURING: FY16/17 HIGHLIGHTS



## SUSTAINABLE SOURCING



- The number of factories achieving compliance with our Code of Conduct (Bronze status) increased from 50 percent in FY11 to 91 percent in FY17.

- We developed and rolled out a more detailed and robust audit protocol as part of our new Factory Compliance Ownership (FCO) program.

- We integrated a "Culture of Safety" program into our NIKE Lean management framework to ensure that health and safety strategies are embedded into business priorities.



## ENGAGED WORKFORCE



- In FY16, we launched a refined Engagement and Wellbeing (EWB) approach, including a survey that is statistically validated and correlated with key business metrics.

- In FY17, we completed a multi-year compensation and benefits pilot.

- We invested in human resource capability at supplier factories.



## PARTNERSHIPS TO ACCELERATE INDUSTRY CHANGE



- We continued to scale up the use of mobile platforms to support worker wellbeing.

- We strengthened external partnerships to find collaborative solutions.




**KEY**
Numbered icons above indicate relevant Sustainable Development Goals

NIKE_00002036

Plaintiff's Trial Exhibit 16
Page 41 of 74

# SUSTAINABLE SOURCING





Footwear on production line – Ho Chi Minh City, Vietnam

## TARGET

# SOURCE 100% FROM FACTORIES THAT MEET OUR DEFINITION OF SUSTAINABLE [14, 15]

## PERFORMANCE
% Factories Rated Bronze or Better

FY15 / **86.0%** (FY11 BL: 48.8%)

FY16 / **86.6%**

FY17 / **90.9%**

FY20 target
**100%**

A fundamental element of our relationship with factories is that that they provide fair and safe working conditions for employees, and share our commitment to protecting the environment. As a baseline for working with us, factories must comply with our Code of Conduct and Code Leadership Standards which are aligned with International Labour Organization (ILO) standards. Those standards are designed to protect the rights of workers, create a safe working environment, and safeguard the communities and areas where they operate.

**LEARN MORE:** Sourcing and Manufacturing Standards

In 2011, we established a 2020 target to source only from factories that meet our definition of sustainable, or rate Bronze on our Sustainable Manufacturing & Sourcing Index (SMSI). To assess progress, we regularly audit contract factories against our Code of Conduct and Code Leadership Standards, often with the support of independent third-party organizations such as Better Work (a joint program of the United Nations ILO and the International Finance Corporation, a member of the World Bank

Group) and the Fair Labor Association (FLA). Results of audits done by these third-party organizations are shared transparently through their sites.

**Compliance management**
When sourcing products, we incentivize suppliers that go beyond simple compliance and aim to make a real difference in terms of corporate responsibility and sustainability. Our Sustainable Manufacturing & Sourcing Index (SMSI) has become an important tool in factory engagement, encouraging improvements and eliminating underperformance by driving business to those that perform best. The SMSI is a critical piece of our overarching Manufacturing Index (MI), which also evaluates our suppliers' quality, cost, and delivery performance for sourcing decisions.

**LEARN MORE:** Product & Materials Sustainability Indices

14  NIKE removed the measure "Achieve 100% bronze or better on the Sustainable Manufacturing and Sourcing Index" because it was redundant with the sourcing target.
15  We define sustainable factories as those that rate bronze or better on the SMSI, demonstrating a beyond compliance approach that includes having effective management systems in place to meet and exceed baseline requirements in health, safety, and environmental management, and labor best practices that create a safe, empowered workplace that engages and values workers.



NIKE_00002037

Plaintiff's Trial Exhibit 16
Page 42 of 74

# SUSTAINABLE SOURCING



## SUSTAINABLE MANUFACTURING & SOURCING INDEX (SMSI)

**COMPLY** with NIKE Code of Conduct and Code Leadership Standards

**INNOVATE** by investing in and engaging workers to support business growth

| RED | YELLOW | BRONZE | SILVER | GOLD |
|---|---|---|---|---|
| UNSUCCESSFUL | INCONSISTENT | MEETS | EXCEEDS | GLOBAL LEADER |
| Under review for exit | Remediation plans in place to meet compliance | Compliance with our Code of Conduct and shows a commitment to lean manufacturing | Industry-leading manufacturing standards and innovation | World-leading manufacturing standards and innovation |

While 91 percent of our factories now achieving bronze status or higher represents real progress, 10 percent of our contract manufacturers did not meet our required standards for compliance at the end of FY17. When factories fall below compliance, they are given time to correct the issues. Those failing to remediate issues prior to their next audit are placed on probation and re-audited six months later. Failure to meet NIKE's bronze standard at that point will prompt consideration of a potential responsible exit. If critical issues are found, immediate remediation is required. We continue to review the most frequent areas of non-compliance, such as hours, wages, and benefits to identify ways we can work with our contract factories to strengthen compliance.

In addition to tracking non-compliance events, we continue to evolve our compliance expectations and monitoring program. This included transitioning in FY16 to a new system for managing factory compliance known as the Factory Compliance Ownership program, which has a more detailed and robust audit protocol. In early FY18, we updated our Code of Conduct and Code Leadership Standards to elevate key expectations around the environment, building and machine safety, women's rights, and chemical management, amongst others. The updated Code is a better representation of the breadth of our work with factories in sustainability and our requirements for continued partnership.

**LEARN MORE:** Building Supplier Capabilities

## FACTORY RATINGS

Year / Number of Factories



**NIKE INC.**

**FY16 / 663    FY17 / 591**

|  | FY16 | FY17 |
|---|---|---|
| | 0 | 0 |
| | 4 | 5 |
| | 570 | 532 |
| | 60 | 28 |
| | 27 | 23 |
| | 2 | 3 |

FY16   86%
FY17   91%

| | FY16 | FY17 |
|---|---|---|
| | <1% | <1% |
| | 9% | 5% |
| | 4% | 4% |
| | <1% | <1% |

Gold
Silver
Bronze
Yellow
Red
No rating

**FOOTWEAR**

**FY16 / 142    FY17 / 127**

| | |
|---|---|
| 0 | 0 |
| 4 | 5 |
| 123 | 111 |
| 10 | 4 |
| 5 | 6 |
| 0 | 1 |

**APPAREL**

**FY16 / 394    FY17 / 363**

| | |
|---|---|
| 0 | 0 |
| 0 | 0 |
| 335 | 331 |
| 42 | 18 |
| 15 | 14 |
| 2 | 0 |

**EQUIPMENT**

**FY16 / 127    FY17 / 101**

| | |
|---|---|
| 0 | 0 |
| 0 | 0 |
| 112 | 90 |
| 8 | 6 |
| 7 | 3 |
| 0 | 2 |

### AUDITS, NON-COMPLIANCE[1]

| | FY16 | FY17 |
|---|---|---|
| Working Hours | 39% | 43% |
| Wages & Benefits | 35% | 36% |
| Harassment & Abuse | 4% | 4% |
| Voluntary Labor | 0% | 6% |
| Regular Employment | 11% | 2% |
| Discrimination | 2% | 2% |
| Age Standards | 0% | 1% |
| Freedom of Association & Collective Bargaining | 0% | 0% |
| Other | 8% | 5% |

1   The top issues of non-compliance identified during audits in FY16 and FY17 remained similar with working hours and wages and benefits as the most common types of findings. For all findings, the factories were required to remediate the identified issues and the corrective actions were verified through another on-site audit.

**LEARN MORE:** Sourcing and Manufacturing Standards

NIKE_00002038

Plaintiff's Trial Exhibit 16
Page 43 of 74

# SUSTAINABLE SOURCING



## AUDIT COUNTS[1]

|  | FY16 | FY17 |
|---|---|---|
| NIKE | 538 | 390 |
| Fair Labor Association (FLA) | 7 | 1 |
| Better Work (BW) | 31 | 15 |
| **TOTAL** | **576** | **406** |

1  Audit counts were lower in FY17 primarily due to NIKE's introduction of the Factory Compliance Ownership (FCO) program. As the next step in evolving sustainability and compliance management, NIKE introduced the FCO program in early 2016. The program provides incentive opportunities for factories that maintain NIKE's compliance standards and move beyond minimum compliance. Included in the incentives is reduced audit frequency with self-assessments when a factory has met thresholds for maintaining compliance over a number of years.

## WORKER COUNT RESULTS[1]

|  | FY16 | FY17 |
|---|---|---|
| Americas | 71,904 | 77,833 |
| EMEA | 18,674 | 18,396 |
| N Asia | 233,561 | 198,877 |
| S Asia | 304,932 | 296,984 |
| SE Asia | 436,970 | 444,907 |
| **TOTAL** | **1,066,041** | **1,036,997** |

1  Count of workers in NIKE source base at fiscal year-end for period shown.

## TIER 1 SUPPLIERS AUDITED[1]

|  | FY16 | FY17 |
|---|---|---|
| % of Tier 1 Suppliers Audited to Code of Conduct | 100% | 100% |

1  All audits and self-assessments conducted are done to based on the NIKE Code of Conduct. For detail please see footnote for the "Audit Counts" table.

### Collaboration to drive industry changes

We also understand that certain systemic issues require an informed and collaborative approach. In our last report, we issued a call to action to increase the robustness of the compliance ecosystem in our industry by aligning codes of conduct, compliance protocols, and transparency around remediation. Implementing an industry-wide assessment will mean factories which supply to multiple brands can complete a single audit and have more time to invest in building strategic human resource management (HRM) and safety programs.

**LEARN MORE:** Collaboration with stakeholders

## MEASURE

### ELEVATE A CULTURE OF HEALTH AND SAFETY

At NIKE, we believe that protection of life and health in the workplace is a fundamental right. For us, safety is a core value, and we are dedicated to providing a safe, hygienic, and healthy workplace in all settings. Health and safety must be a strategic capability for our contract manufacturers. In FY17, we launched our "Culture of Safety" initiative which focuses on developing safety leadership behaviors and enabling workers to engage in their safety programs. To help achieve this objective, we integrated Culture of Safety into our NIKE Lean management framework, to ensure that health and safety strategies are embedded into business priorities.

**LEARN MORE:** NIKE Lean Management Framework

As part of our holistic approach to a Culture of Safety, we took the following actions in FY16/17:

- Introduced a Culture of Safety Maturity Assessment (CoSMA), which defines the foundational elements of a culture of safety and identifies steps for growth
- Held Culture of Safety trainings in English and local languages (Mandarin, Bahasa, and Vietnamese). There were six separate training sessions with an average of 12 factories participating
- Evolved machine safety standards to address risks associated with new modernized manufacturing equipment
- Improved quality of factory self-reported safety data.

We have faced challenges with the overall scalability of our program due to the depth of training and assessment necessary to effectively elevate a culture of safety. Subsequently, we are looking into additional scaling models, e-learning opportunities, and reliable third-party support to assist in accelerating strategic capability across our supply chain.

**LEARN MORE:** Occupational Health & Safety

## LONG-TERM RELATIONSHIPS WITH FEWER FACTORIES



PERCENTAGE CHANGE

OVERALL CHANGE

NIKE REVENUE
↑ **12.3**%

CONTRACT FACTORY PERFORMANCE RATINGS
↑ **4.9**%

CONTRACT FACTORY WORKERS
↑ **2.2**%

CONTRACT FACTORIES
↓ **14.6**%

— CONTRACT FACTORIES
— NIKE REVENUE (USD)
— CONTRACT FACTORY WORKERS
— CONTRACT FACTORY PERFORMANCE RATINGS (percentage of contract factories achieving bronze rating or above on the SMSI)

**LEARN MORE:** NIKE Manufacturing Map

NIKE_00002039

Plaintiff's Trial Exhibit 16
Page 44 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 412 of 482

Introduction | Our Approach | Minimize Environmental Footprint | **Transform Manufacturing** | Unleash Human Potential | Appendix

# SUSTAINABLE SOURCING





Global football jersey in production

EOT is a persistent challenge across industries in many of the countries where our suppliers operate. The biggest problems are underdeveloped management systems and a failure to enforce local law on working hours.

While the number of factories with incidents of EOT remains steady, this doesn't mean that the same factories are always responsible. In fact, a low rate of repeat findings is what makes it so challenging to predict and anticipate where EOT will occur. For example, of all factories with an EOT finding at the end of FY17, only three were repeat offenders. In fact, 11 of the 23 factories with EOT incidents during FY17 resolved the issues and went on to return a bronze rating by the end of the year.

We will continue to make this issue a priority in our compliance programs, as well as work to improve enforcement of shared standards throughout the industry.

## FURTHER READING
Making Product Responsibly
Learning from Our Past



**PRIORITY ISSUE**
Excessive Overtime

**SASB**

**CN0501-05:** Percentage of (1) tier 1 suppliers and (2) suppliers beyond tier 1 that have been audited to a labor code of conduct, percentage conducted by a third-party auditor

**CN0501-06:** Priority non-conformance rate and associated corrective action rate for suppliers' labor code of conduct audits

**CN0501-08:** Percentage of (1) tier 1 suppliers and (2) suppliers beyond tier 1 who have completed the Sustainable Apparel Coalition's Higg Index Facility Module assessment or equivalent environmental data collection

## MEASURE
**ELIMINATE EXCESSIVE OVERTIME**

## PERFORMANCE
% of Excessive Overtime Incidents in NIKE Factories

FY15 / **3.3%**

FY16 / **3.2%**

FY17 / **3.9%**

FY20 target
**0%**

Excessive Overtime (EOT) is a cross-sector issue which can have an impact on the health and quality of life of workers. It also can result in errors and rework, often making the additional hours unproductive. One of the requirements of the NIKE Code Leadership Standards is to eliminate excessive working hours and ensure that workers at our supplier factories do not work more than 60 hours a week, and have at least one full day off in every seven.

As we work toward our target of 100 percent of factories being bronze-rated, increased monitoring has shown that the facilities where EOT is most likely to occur tend to be factories that are multi-brand, where NIKE represents a small percent of their overall production.



NIKE_00002040

Plaintiff's Trial Exhibit 16
Page 45 of 74

# ENGAGED WORKFORCE



## TARGET
## ENSURE FACTORY WORKERS SHARE IN PRODUCTIVITY GAINS

As manufacturing processes become more sophisticated, the role of the contract factory worker is changing. We want to work with contract manufacturers that invest in the skills and capabilities of their employees and who promote collaboration among workers and between workers and managers. We know this is good for the businesses and the right thing for the people.

A firm's workforce is a key business asset that can perform to the best of its ability when supported, valued, and enabled correctly. We know that factories in our source base that use the tools of strategic compensation, safety, worker engagement, and overall human resource management will perform well from a business perspective, reduce risk, and ensure people are valued and treated properly.

**Fair compensation, meaningful benefits**
Every contract factory worker in our supply chain has the right to a standard of living that's adequate to support them and their families. We, like many other brands, have committed to work with our suppliers to progressively meet employees' basic needs, including some discretionary income. We believe that the wages can increase as overall factory operational efficiency improves.

A better run factory should be more profitable and should then be able to pay higher wages, in exchange for benefits such as lower turnover, higher productivity, and better quality product. Workers are key to delivering on the promise of high quality and high productivity, and need to be compensated accordingly.

Since FY15, we have partnered with a leading academic, factory management, workers, and third-party experts to see if we could increase the value created in a factory and see it shared between management and workers.



Factory workers packaging for NIKE product for shipment – Ho Chi Minh City, Vietnam

Our pilot tested three different approaches, each focusing on productivity improvements, shared value creation, and employee engagement.

After collecting baseline data, we spent a full year building the foundation of a better running factory, which included all key areas within our Lean 2.0 approach. These covered line operations, supervisory skills, leader standard work, relief teams, engagement and communication processes, social dialogue, stress resilience activities, and management skills. During the second year, we tested different ways to align compensation with Lean principles, make pay more transparent to workers, and empower workers to participate in decision-making and problem-solving.

**LEARN MORE:** NIKE Lean Management Framework

The results show that worker agency – their ability to voice their views and opinions – was important to good business performance. Collaborative problem solving between workers and supervisors increased, while self-reported levels of stress fell. Key business metrics, like turnover, productivity, and profitability, all improved. And, importantly, take-home pay went up.

**Building tools to measure and increase worker engagement**
We have set out to demonstrate to contract factories the importance of a valued and engaged workforce. Our future growth will increasingly rely on well-trained people learning new skills and using new technologies.



NIKE_00002041

Plaintiff's Trial Exhibit 16
Page 46 of 74

# ENGAGED WORKFORCE



**WORKER ENGAGEMENT**

Engaged workers are at the heart of our business model. However, most factories do not have a way of measuring that engagement. In 2014, we started developing an Engagement and Wellbeing Survey as a tool for managers to understand key impacts on workers' experience in the factory and to identify ways to make improvements. It enables workers to provide factory management with confidential, anonymous feedback on their experiences.

To refine the tool and methodology we conducted pilots from 2014 to 2017. The pilots involved more than 28,000 workers at 17 factories in Indonesia, Vietnam, Thailand, and China, and helped us design a standard protocol for measuring engagement, and reporting on and analyzing the data. The survey was deployed via technology-based solutions (mobile, tablets, and interactive voice recognition) focusing on key business metrics such as turnover, absenteeism, cost, and quality. Factory managers found the tool helpful in identifying tangible ways they could improve worker engagement, and factory workers reported positive feedback in having a mechanism to provide anonymous, confidential feedback to which factory management could respond.

In FY18, we are rolling out the revised survey to strategic manufacturing factories in nine countries, with the key aim of supplying managers with a reporting tool that they can use to take actions and invest in systems that deliver meaningful improvement in the workplace. We will continue to expand this deployment in FY19 and beyond.

**WHAT WE LEARNED**

We realized that there was a real need to understand how to engage workers on issues such as stress, compensation, safety, and management communication, and that there was great value both for us and factory line managers in the data that we are developing.

Other developments include:

- Introducing people-based Lean activities to further engage with workers
- Ensuring supervisors have the skills they need to manage lines
- Having a skilled relief team who can step in when people are absent
- Ensuring workers have the right skills relative to the products they are making
- Introducing ways in which workers can suggest ideas for changing or improving things

The pioneering work we have carried out in this area has also given us the opportunity to partner with other brands around developing an industry approach that drives worker engagement as a factory management-led model.

**Using data to improve worker experience and business outcomes**

Unplanned absenteeism and turnover don't just disrupt a business – they can often be signs of other problems within a factory. By collecting data from targeted suppliers around these issues, we have started to build human resources capabilities at factories to help bring about improvements in management, worker experience, and business outcomes.

In FY16, the team partnered closely with factory managers to clarify NIKE's expectations, improve data quality, and refine the reporting process. Every month, participating suppliers submit self-reported data on turnover and unplanned absenteeism. We set baselines specific to turnover and unplanned absenteeism against which we can now measure future performance and work with suppliers to uncover root causes.

Our internal team reviewed the data in FY17 to establish baselines and spot outliers – factories that have higher rates of unplanned absenteeism or turnover than their local peers.

**WHAT WE LEARNED**

We found that factories participating in the program perform better than their peers at a regional level. Going forward, our approach is to work with outliers to identify opportunities for improvement rather than create uniform improvement targets for all facilities. In FY18 and FY19, we'll continue work with those selected outlier suppliers to strengthen HR management systems aimed at improving rates for these key metrics at their facilities.

**Developing human resources**

As we continue to learn and evolve our approach, we have recognized having strong HRM is essential for contract factories to maintain compliance with our standards and to build an engaged workforce. We have teams in each of our regions with individuals dedicated to working with our partner factories to measure and develop their HRM capabilities. In FY16 and FY17, these engagements were part of an integrated approach to NIKE's Lean management framework and through that program the NIKE teams worked intensively with 16 factories. Those activities included:

- Developing systems and processes to capture accurate data and conduct data analysis on HRM-related metrics, both qualitative and quantitative
- Assessing supplier management strengths and weaknesses and identifying opportunities for development
- Providing coaching and consultation to strengthen supplier HRM systems with a particular focus on how to attract, develop, and engage their workers

As part of that work, we developed a tool to assess a factory's HRM capability and maturity. The tool evaluates aspects such as workforce planning, performance management, recruiting and hiring, employee development, and communication, as well as broader HR organizational structure and business integration issues. In FY16 and FY17, 30 factories were evaluated using the tool, which helped to identify areas of weakness as opportunities for potential investment.

## FURTHER READING



We Make Product Responsibly

Supply Chain Case Studies


NIKE_00002042

Plaintiff's Trial Exhibit 16
Page 47 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 415 of 482

Introduction    |    Our Approach    |    Minimize Environmental Footprint    |    **Transform Manufacturing**    |    Unleash Human Potential    |    Appendix

# PARTNERSHIPS TO ACCELERATE INDUSTRY CHANGE



**TARGET**

## ESTABLISH PARTNERSHIPS THAT SUPPORT THE NEEDS OF WORKERS BOTH INSIDE AND OUTSIDE THE FACTORIES

**MEASURE**

### SCALE SERVICES TO SUPPORT MANAGEMENT AND WORKERS FOR IMPROVED ENGAGEMENT AND WELLBEING

Many of the challenges we are seeking to address are complex and beyond the scope of one brand or company. We therefore need to work collaboratively with a wide range of stakeholders, to think creatively, and pool our skills in order to address risks and improve outcomes for our manufacturing factories, workers, and their communities. That includes identifying service providers who can work directly with our contract manufacturers on improving the workplace experience as well as service providers who are seeking to improve the broader ecosystem for sustainable supply chains.

**Harnessing technology to support wellbeing**
Workers face many challenges to delivering their best at work. Some are non-work-related, like transportation, health, and financial management, while others are work-related, such as information gaps on regulation and processes, pay slip accuracy, or understanding the business direction of the factory.

To address many of these challenges, NIKE is working to identify companies and organizations that can provide technology-based tools and services to meet the needs of our contract manufacturers and their workers.

In 2015, we completed factory pilots with technology providers, including MicroBenefits and Workplace Options, that provided engagement and wellbeing services to workers and managers using mobile technology. These included a pilot in China, where we worked with MicroBenefits to offer workers a smartphone-based platform for services ranging from factory communication tools to skills development. It also provided a new and direct channel of communication between workers and management. In Indonesia, Workplace Options provided a mobile platform with a large suite of wellness coaching programs and provided workers with direct access to the factory HR department, allowing them to confidentially ask questions, or report problems or concerns.

WHAT WE LEARNED
Analysis showed that the pilots have led to reduced turnover, less absenteeism, and better worker wellbeing and engagement, as well as cost savings for factory management. However, they also showed that in order for these types of solutions to create impact in the long term, they need to be driven by factory management. For that reason, in 2016 we developed a scaling strategy whereby we broker introductions between these technology providers and factory management, enabling factory management to determine the value.

By the end of FY17, six NIKE supplier facilities were using one of the two platforms (i.e. MicroBenefits or Workplace Options) for services to workers and a further two were using it to deploy the revised version of NIKE's Engagement and Wellbeing survey. In FY18, additional suppliers are working with MicroBenefits and Workplace Options to scale that survey.

The next step is to introduce the technology to more factories and we are also looking at ways of working with others in the industry to make it easier for suppliers to adopt these technologies.

**The importance of collaboration**
NIKE believes that we must raise the bar as an industry on standards, monitoring of working conditions, and sustained remediation, which cannot be achieved without increased collaboration with a wide range of stakeholders. That is why, in our last report, we issued a call to action to increase the robustness of the compliance ecosystem in our industry by aligning codes of conduct, compliance protocols, and transparency around remediation.

LEARN MORE: Collaboration with stakeholders



NIKE_00002043

Plaintiff's Trial Exhibit 16
Page 48 of 74

Case 3:18-cv-01477-AB          Document 693          Filed 02/06/26          Page 416 of 482

Introduction        |        Our Approach        |        Minimize Environmental Footprint        |        **Transform Manufacturing**        |        Unleash Human Potential        |        Appendix

# PARTNERSHIPS TO ACCELERATE INDUSTRY CHANGE 

Beyond compliance and our work with other brands and retailers, we are seeking opportunities for collaboration to develop management capabilities, measure social performance, and invest in working conditions across the industry. This includes work on joint standards, tools, programs, and advocacy.

For instance, our collaboration with the International Finance Corporation (IFC) offers financing on better terms to reflect lower risks of factories that comply with our Code of Conduct. Twenty-three factories are currently taking advantage of this due to their continued sustainable performance.

We also work with organizations such as the FLA and the ILO, through their Better Work Program, to find collaborative solutions to creating sustainable improvements in labor conditions.

In FY17, we joined 20 other apparel and footwear brands and organizations in a letter to the Turkish Government to adjust the work permit program to improve conditions for Syrians who are seeking work in Turkey. No one organization can solve all the societal and environmental challenges we face, and solutions require input and collaboration between government, business, consumers, and civil society. To this end, NIKE will continue to work with other businesses through trade associations and coalitions to help drive and shape sustainability policies.



**FURTHER READING**

Partnerships and
Collaborations




NIKE_00002044

Plaintiff's Trial Exhibit 16
Page 49 of 74

Case 3:18-cv-01477-AB          Document 693          Filed 02/06/26          Page 417 of 482

Introduction          |          Our Approach          |          Minimize Environmental Footprint          |          **Transform Manufacturing**          |          Unleash Human Potential          |          Appendix

---

# ADDITIONAL PRIORITY ISSUES



Our issue prioritization process identified a set of priority sustainability issues for NIKE and formed the baseline of required topics for this FY16/17 Sustainable Business Report. Most of these issues overlapped with our existing 2020 sustainability targets. For issues not specifically covered by a 2020 target, we have provided space in this report for a description of the issue and details of our progress against it. Both **Child Labor and Freedom of Association** fall into this category.

**LEARN MORE:** Issue Prioritization



## ADVANCING RESPECT FOR HUMAN RIGHTS

At NIKE, we have a responsibility to respect human rights in our operations and extended value chain, and to conduct business ethically and sustainably. We evaluate the impact of our business and set public targets to drive holistic, continuous improvements. We are continuously working to do better.

Our commitment to serving athletes everywhere has taught us that equality on the field is a powerful catalyst to driving equality off the field. NIKE supports human rights as defined by the Universal Declaration of Human Rights, which recognizes that "all human beings are born free and equal in dignity and rights." We work to elevate human potential through our products, partnerships, and operations, something that cannot be accomplished without a fundamental respect for human rights throughout NIKE's operations and our supplier's operations.

**LEARN MORE:** Human Rights

**LEARN MORE:** NIKE Manufacturing Map

**Respect for Human Rights in NIKE's Supply Chain**
NIKE does not own or operate the facilities that produce our products. However, we are prioritizing and growing relationships with suppliers who share our commitment to respect human rights and are investing in their workforces. NIKE's expectations for suppliers start with our Code of Conduct and Code Leadership Standards. NIKE's Code of Conduct is aligned with international standards and contains the foundational requirements all suppliers must meet in producing Nike-branded products. The Code Leadership Standards contain more detailed requirements on how the NIKE Code of Conduct must be

implemented. They also include specification on the development of robust management systems which are essential to consistently maintaining compliance with local law and our standards.

**LEARN MORE:** Code of Conduct

**LEARN MORE:** Code Leadership Standards

## CHILD LABOR

NIKE specifically and directly forbids the use of child labor in facilities contracted to make NIKE products. The NIKE Code of Conduct requires that workers must be at least 16 years of age, or past the national legal age of compulsory schooling and minimum working age, whichever is higher. The requirements also specify that workers between the ages of 16 and 18 cannot be employed in positions which may be hazardous, such as working with chemicals or heavy machinery,[16] nor can they work at night. Our Code of Conduct age requirements exceed those of the ILO (15 years of age, and 14 years of age in some developing countries).

NIKE's Code Leadership Standards include specific requirements on how suppliers must verify workers' age prior to starting employment. They also contain specific requirements for actions the facility must take to remediate a

situation where the supplier violates NIKE's standards, with the focus on protecting the rights and wellbeing of the worker. Those requirements include:

* Removing the underage employee from the workplace
* Providing support to enable the underage employee to attend and remain in school or vocational training until the age of 16 or the minimum legal working age, whichever is higher
* Agreement to rehire the underage employee when they reach the age of 16 or legal working age if the worker wishes

**Collaboration**
NIKE participates in multi-stakeholder initiatives, including the FLA, Better Work, and the Better Cotton Initiative (BCI), which are each focused on addressing critical human rights risks across different levels of the supply chain. For example, we joined a project facilitated by the FLA in partnership with İyi Pamuk Uygulamaları Derneği, as well as several other international brands, on improving employment practices in the Turkish cotton sector. The project focuses on preventing and addressing child labor risks and improving labor recruitment practices at the farm level.

---

16. Hazardous conditions are those defined as working with hazardous chemicals, working with dangerous machinery, night work, or as otherwise identified by country law.



NIKE_00002045

Plaintiff's Trial Exhibit 16
Page 50 of 74

Case 3:18-cv-01477-AB     Document 693     Filed 02/06/26     Page 418 of 482

Introduction | Our Approach | Minimize Environmental Footprint | **Transform Manufacturing** | Unleash Human Potential | Appendix

# ADDITIONAL PRIORITY ISSUES





Training at a Nike factory worker, 7zU Chi factory, Vietnam.

we joined the FLA, as well as other brands and retailers in advocating for legislative reforms in Mexico. The details of the most recent letter to the Secretary of Labor and Social Welfare of Mexico can be found here.

**Monitoring and Remediation**
NIKE monitors our suppliers' compliance with our Code of Conduct and Code Leadership Standards through regular announced and unannounced audits conducted by internal and external parties. This includes audits by the FLA and assessments by the Better Work Program, a partnership of the ILO and the International Finance Corporation. Our monitoring activities are conducted on a schedule determined based on each supplier's facility's prior performance.

When a supplier's facility is found to have serious violations of NIKE's standards, it is required to remediate all issues identified and have on-site verification of the remediation. If a concern is raised by a third party, NIKE promptly investigates and requires corrective actions for any issues identified. Should a supplier fail to remediate issues identified by an audit or allegation investigation according to NIKE's requirements it would be subject to review and sanctions, including potential termination of the relationship.

**LEARN MORE:** Sourcing and Manufacturing Standards

## FREEDOM OF ASSOCIATION
We believe all workers have the right to freely associate and collectively bargain. Where freedom of association and collective bargaining are restricted under law, NIKE requires suppliers to allow for parallel means for independent and free association and bargaining.

Our Code Leadership Standards contain detailed requirements on how suppliers must respect the rights of workers to freely associate. Those requirements include prohibitions on interference with workers seeking to organize or carry out union activities, as well as on any sort of activity which seeks to intimidate, harass, or retaliate against workers for participation in a union or other representative organization or for attempting to organize or form a union.

**Collaboration**
NIKE was an original signatory in 2011 to the Freedom of Association Protocol in Indonesia which was signed by unions, suppliers, and leading brands manufacturing in the country. The Protocol provides an implementation framework for suppliers to support union activities to fully respect the rights of workers to join unions of their choosing and to bargain collectively. We meet regularly with the National Committee to review progress and discuss further opportunities for improvement.

Beyond our own standards and programs, NIKE also advocates publicly for strengthening local laws protecting the rights of workers to fully realize their right to freedom of association and collective bargaining. For example, in 2017

## FURTHER READING
Human Rights



| PRIORITY ISSUE | PRIORITY ISSUE |
|---|---|
| Child Labor | Freedom of Association |
| **GRI** | **GRI** |
| **GRI 408:** Child Labor 2016 | **GRI 407:** Freedom of Association and Collective Bargaining |
| **Disclosure 408-1:** Operations and supplier at significant risk for incidents of child labor | **Disclosure 407-1:** Operations and supplier in which the right to freedom of association and collective bargaining may be at risk |

## CHILD LABOR AND FREEDOM OF ASSOCIATION FINDINGS[1]

| | FY16 | FY17 |
|---|---|---|
| Number of Child Labor Findings/Events[2] | 0 | 0 |
| Number of Other Age Standard Findings/ Events[3] | 0 | 1[4] |
| Number of FOA Findings/Events | 0 | 0 |

1   Based on factory audit findings during the period.
2   Includes events found where workers were under NIKE's minimum age requirement (age standard OLS).
3   Includes management policy/procedures for OLSs for proof of age, hazardous conditions and remedying underage employment.
4   The violation of NIKE's age standard related to one worker who was at least age 16, but under age 18, hired in a position which was deemed hazardous under local law. When a finding happens, the factory is required to remediate the issues and employ corrective actions.

NIKE_00002046

Plaintiff's Trial Exhibit 16
Page 51 of 74

# TRANSFORM MANUFACTURING:
# BY THE NUMBERS

## 91%
of our factories were rated **BRONZE OR BETTER,** our definition of sustainable

## 100%
of our Tier 1 Suppliers were **AUDITED TO NIKE'S CODE OF CONDUCT**

## 28K
**WORKERS** at

## 17
**FACTORIES** took part in our Engagement and Wellbeing Survey pilot between 2014–2017

## 0
the number of **FREEDOM OF ASSOCIATION FINDINGS** in FY17

## 0
the number of **CHILD LABOR** findings in FY17

Approximately
## 1M
**CONTRACT FACTORY** workers in NIKE's source base

NIKE_00002047

Plaintiff's Trial Exhibit 16
Page 52 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 420 of 482

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | Appendix



Sustainable Business Report FY16/17 52

NIKE_00002048

## THE WORLD AROUND US

Equality is a global issue. Perhaps more than ever, people are using their voice to call for change and to demand action, not just for them but for the intersectional cultures they represent.

More countries are likely to follow the U.K.'s lead in requiring mandatory disclosure of gender pay gap statistics. Radically changing expectations around the use of personal data, the neutrality of the internet, and freedom of information are putting greater pressure on companies.

Organizations that embrace diversity, transparency and accountability will thrive as a new model for the 21st century organization emerges.

## OUR APPROACH

We believe in harnessing the power of sport to unify and inspire the world toward action. We use the power of our brand to stand up for our values and create a level playing field. This starts with people: the people who make our products, the people who work in our offices, and the people in the communities where we live, work, and play.

# "NIKE IS ABOUT INNOVATION, ABOUT HONESTY AND INTEGRITY, AND ABOUT COMPETITIVENESS. THOSE ARE THE THINGS THAT WE STAND FOR AND WE WANT OUR PEOPLE TO BELIEVE IN."

**Phil Knight,** Co-Founder, NIKE, Inc.



NIKE_00002049

Plaintiff's Trial Exhibit 16
Page 54 of 74

# UNLEASH HUMAN POTENTIAL: FY16/17 HIGHLIGHTS



### EMPLOYEES



- Over 1,100 employees trained in Unconscious Bias Awareness in FY16/17.

- NIKE increased our resources within the Global Diversity & Inclusion team to provide strategic leadership for the function, and drive consistency for our eight Employee Networks.

- Over 1,800 employees utitlized the Family Care Benefit in FY17.



### COMMUNITY IMPACT



- Together with our community partners and employees, NIKE is getting millions of kids moving through Made to Play. Through FY17, we supported community partners around the world to get more than 14.5 million kids moving.

- Kids who move are the ones who move the needle – in the classroom, their careers, and in the community. NIKE works with partners around the world, including in Brazil, China, Europe, Russia, and the U.S., to get kids moving before, during, and after school.

- NIKE celebrated 45 Years of Giving in Oregon. In the six years from FY12 to FY17, we supported communities with more than $54 million in donations and nearly $5 million in product. And over 2,000 NIKE employees donated time and money in Oregon to support kids and their communities.

- NIKE and non-profit partner Marathon Kids are getting more than 350,000 kids running in the U.S. across all 50 states and in the U.K.



**KEY**
Numbered icons above indicate relevant Sustainable Development Goals



NIKE_00002050

# EMPLOYEES



## TARGET

## ATTRACT AND DEVELOP AN INCREASINGLY DIVERSE, ENGAGED AND HEALTHY WORKFORCE



Employees at Nike World Headquarters, Beaverton, Oregon

NIKE's mission is to bring inspiration and innovation to every athlete° in the world. We believe that sport has the power to unify and inspire the world toward action – and that starts with people.[17] From the people who make our products, to members of the NIKE team around the world and people in the communities where we live, work, and play, we're focused on helping everybody achieve their potential.

To attract and develop an increasingly diverse, engaged, and healthy workforce, we are measuring ourselves against three areas: diverse representation and a culture of inclusion; comprehensive, competitive, equitable pay and benefits; and employee growth, development, and wellbeing.

### TOTAL EMPLOYEES[1]

|  | FY15 | FY16 | FY17 |
|---|---|---|---|
| % Change | 10.4% | 11.7% | 6.8% |
| EE Count | 56,595 | 63,177 | 67,449 |

1  Excludes temporary workers.

## MEASURE

## PROVIDE VISIBILITY TO OUR INCLUSION PROGRESS AND DIVERSITY REPRESENTATION

In early 2018, we became aware of reports of behavior within our organization that did not reflect our core values of inclusivity, respect, and empowerment. We took swift action, committing to a wide-ranging approach to evolving our culture, transforming how we approach leadership, and investing in programs to unlock and accelerate us toward an environment that is more inclusive and empowering.

Specifically, we announced an overall review of our HR systems and practices, while elevating our confidential complaint process. We created a mandatory manager training that reinforces the role of respect, inclusion, and accountability that will roll out to people managers globally in 2018. We also increased our investment in leadership training and accountability, our diversity and inclusion teams and programs, and all-employee focused programming and training on our culture.

We also know that since our last report, our numbers around leadership representation for women globally and underrepresented minorities (URM)[18] in the U.S. have not evolved as fast as we would have liked. We are committed to making progress to increase URM globally, but can only track the U.S. at this point. While we are focused on increasing representation of women and URM in the near term, we will continue to expand representation across other dimensions over the long term.

We remain deeply committed to not only improving diversity across NIKE, particularly at the leadership level, but also evolving our culture and making NIKE an environment focused on respect, equality, inclusion, and empowerment. We want NIKE to be a place where everyone has the opportunity to be successful.

## MEASURE

## PROVIDE COMPREHENSIVE, COMPETITIVE AND EQUITABLE PAY AND BENEFITS

At NIKE, we strive to have a safe and inclusive workplace and continue to build diverse, high-performing teams. We engage and inspire our workforce by offering opportunities for career growth and development, in addition to providing equitable and competitive pay and benefits.

In FY16, we formally launched our U.S. Family Care benefit program, which provides up to eight weeks of paid time off for all eligible employees to care for a spouse, partner, or dependents. By the end of FY17, over 1,800 employees had already benefited from the program – from parents bonding with a newborn or adopted child, to those with a sick family member. This new benefit was also an opportunity for us to challenge gender norms where women typically assumed the role of primary caregiver. Of those who used the benefit over the past year, 57 percent (1,073) were men, compared to 43 percent (816) women.

### FAMILY CARE BENEFIT

|  | FY17 |
|---|---|
| Female | 816 |
| Male | 1,073 |
| No gender reported | 0 |

17  The targets in this section focus on NIKE, Inc. employees. For a discussion of our efforts to ensure that contract factory workers are treated equitably, please see the "Transform Manufacturing" section.
18  At NIKE, our working definition of an underrepresented minority (URM) is someone whose racial or ethnic makeup is from one of the following: American Indian or Alaskan Native, Asian, Black or African American, Hispanic/Latino, Native Hawaiian or Other Pacific Islander, or Two or More Races.



NIKE_00002051

Plaintiff's Trial Exhibit 16
Page 56 of 74

Case 3:18-cv-01477-AB        Document 693        Filed 02/06/26        Page 424 of 482

Introduction     |     Our Approach     |     Minimize Environmental Footprint     |     Transform Manufacturing     |     Unleash Human Potential     |     Appendix

# EMPLOYEES



We continue to provide reward programs tailored to the needs of our workforce, including:

- Competitive health care benefits, with multiple plan design options to suit various family types
- Retirement benefits
- Incentives based on company and individual performance for eligible employees
- Opportunity to enroll in the Employee Stock Purchase Plan in most locations
- Employee discounts on NIKE products

In August 2016, NIKE signed the White House Equal Pay Pledge, publicly declaring our commitment to review pay and promotion practices annually, and to ensure that women and men who undertake the same work at the same level are equitably compensated. At NIKE, we define pay equity as equal compensation for women, men, and all races/ethnicities who undertake the same work at the same level, experience, and performance – and this methodology aligns with top tier global companies. NIKE's FY17 data show that for every $1 earned by men, women globally earned 99.9 cents, and for every $1 earned by white employees in the U.S., URM also earned $1. We will maintain focus, driving with 100 percent as our goal for both ratios every year, and will continue to monitor this data.

## NIKE, INC. TOTALS BY GENDER (GLOBAL)

| | ALL EMPLOYEES | | | DIRECTORS+ | | | VPs | | | BOD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 |
| Female | 48% | 48% | 48% | 36% | 36% | 38% | 26% | 28% | 29% | 21% | 25% | 25% |
| Male | 51% | 52% | 52% | 64% | 64% | 62% | 74% | 72% | 71% | 79% | 75% | 75% |
| No gender reported[1] | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% |

1  On initial hire date, chose not to self-identify.

## NIKE, INC EMPLOYEE TOTALS[1] BY ETHNICITY (U.S.)

| RACE/ETHNICITY | ALL EMPLOYEES | | | DIRECTORS+ | | | VPs | | | BOD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 |
| American Indian or Alaskan Native | 134 | 142 | 129 | 9 | 12 | 12 | – | – | – | – | – | – |
| | <1% | <1% | <1% | <1% | <1% | <1% | | | | | | |
| Asian | 2,379 | 2,751 | 2,955 | 272 | 361 | 409 | 7 | 16 | 1 | 1 | 1 | 1 |
| | 7% | 8% | 8% | 8% | 9% | 10% | 2% | 4% | 5% | 7% | 8% | 8% |
| Black or African American | 6,733 | 7,634 | 8,561 | 167 | 191 | 188 | 28 | 29 | 29 | 2 | 2 | 2 |
| | 21% | 22% | 23% | 5% | 5% | 5% | 9% | 9% | 8% | 14% | 17% | 17% |
| Hispanic/Latino | 5,732 | 6,210 | 6,961 | 149 | 190 | 209 | 10 | 9 | 9 | – | – | – |
| | 18% | 18% | 19% | 4% | 5% | 5% | 3% | 3% | 3% | | | |
| Native Hawaiian or Other Pacific Islander | 251 | 250 | 277 | 2 | 5 | 5 | – | – | – | – | – | – |
| | <1% | <1% | <1% | <1% | <1% | <1% | | | | | | |
| Two or More Races | 1,307 | 1,606 | 1,812 | 72 | 92 | 106 | 3 | 5 | 4 | – | – | – |
| | 4% | 5% | 5% | 2% | 2% | 3% | 1% | 2% | 1% | | | |
| Unknown | 115 | 17 | 71 | 10 | 2 | 22 | – | – | 2 | – | – | – |
| | <1% | <1% | <1% | <1% | <1% | <1% | | | <1% | | | <1% |
| White[2] | 15,326 | 16,355 | 16,374 | 2,657 | 2,993 | 3,159 | 253 | 271 | 293 | 11 | 9 | 9 |
| | 48% | 47% | 44% | 80% | 78% | 77% | 84% | 83% | 83% | 79% | 75% | 75% |
| TOTAL | 31,977 | 34,965 | 37,140 | 3,338 | 3,846 | 4,110 | 303 | 326 | 353 | 14 | 12 | 12 |

1  Numbers may not add up to 100% due to rounding. Not included in the data above are U.S. NIKE employees working outside the U.S. URM represented 27% (FY15), 22%(FY16) and 25% (FY17) of this population.
2  Please see the CRII index for a breakdown between White and underrepresented minorities (URM).

**FY17 GLOBAL PAY EQUITY**

| 99.9¢ TO $1 | $1 TO $1 |
|---|---|
| WOMEN VS. MEN (GLOBAL) | URM vs. WHITE (U.S.) |

LEARN MORE: Global Pay Equity

**FY17 GENDER PAY AND BONUS GAP (U.K.)**

| DIFFERENCE BETWEEN MEN/WOMEN | MEAN | MEDIAN |
|---|---|---|
| WHOLESALE (ALL OF NIKE U.K. MINUS RETAIL) | | |
| Hourly Pay Gap | 10% | 8% |
| Bonus Pay Gap[1] | 37% | 52% |
| RETAIL | | |
| Hourly Pay Gap | 3% | 3% |
| Bonus Pay Gap[1] | 15% | 18% |

1  Bonus includes bonus received, stock options exercised and/or ESPP values during the one-year time frame.

LEARN MORE: U.K. Gender Pay Gap Report

### Goals, Resources, and Accountability

In FY16/17, we increased our resources within the Global Diversity & Inclusion team to provide strategic leadership for the function, and drive consistency for our eight Employee Networks. These resources strengthened our impact, but were insufficient. Now we are focused on creating a systemic approach to our diversity efforts in service of our business, people strategy, and employee experience in order to transform our culture.

In 2018, we elevated the Diversity team to sit at the heart of NIKE's People and Culture Strategy. We also created a new, elevated role of Chief Diversity and Inclusion Officer who reports directly to our Chief Human Resources Officer, and allocated additional funding into all of our employee networks for mentoring, training, and development.

We also have a set of initiatives designed to further accelerate our culture and prioritize our people that will roll out in the remainder of FY18 and FY19. They include:

- FY18/19: **Promotion-Pay-Performance Evaluation:** Continue to evaluate our promotion, pay, and performance results to assess the impact on all employees with a specific focus on diverse talent and representation. We will be studying time-in-job and the pace of promotions across our employee base – with a strong focus on women and URM – to understand how this impacts representation.
- FY18/19: **Dedicated Talent Sourcing:** We will invest in a dedicated diversity sourcing team to be immersed in the marketplace; increase visibility and accountability to ensure slates of diverse candidates when hiring; and remove bias from critical moments of the hiring process by creating more inclusive job descriptions, enabling blind resume reviews, eliminating the collection of candidate salary history, and using data to inform hiring decisions.
- FY19: **Global Pay Equity:** Our aim is a 1:1 pay ratio for both women (globally) and URM (U.S.). We will monitor our results annually and make adjustments where necessary.



NIKE_00002052

Plaintiff's Trial Exhibit 16
Page 57 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 425 of 482

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | Appendix

# EMPLOYEES



- **FY19: New Bonus Structure:** We will move to a new team-based PSP (Performance Sharing Plan) bonus award to accelerate our culture to reward behaviors that reinforce teamwork and collaboration.
- **FY19: Representation Accountability:** We will hold senior executives accountable to increasing representation, specifically within Leadership and Management. There are three ways to increase representation – promotion, retention, and hiring – and we're working through strategic initiatives and action plans to enable each of them.
- **FY19: Diverse Talent Investment:** We are creating a multi-faceted approach to investing in our diverse talent. This includes evolving our current development offerings, creating new programs that accelerate emerging diverse leaders, and expanding our employee networks – showcasing our commitment to engaging the diverse talent of the future. We will be investing in targeted leadership training – through best-in-class business schools and executive education institutions – for our diverse employees. And while NIKE holds a broad definition of diversity, we are beginning with women and URM. This new program will begin in June 2018.
- **FY19: New Mentoring Programs:** We will create new mentoring programs that will help accelerate career growth and development for women and URM. We plan to begin these programs with our employee networks and evaluate and scale where appropriate.
- **FY19: Unconscious Bias Awareness Training:** We will roll out Unconscious Bias Awareness training to the entire NIKE organization aimed at creating a stronger, more inclusive culture. Unconscious Bias Awareness training will launch to employees located in the U.S. and Canada in August of 2018, with a global launch to all 67,500 employees in mid-FY19. NIKE's Senior Executives went through this training in FY18.
- **FY19: Manager Training:** Manager Expectations: Living a culture of respect, inclusion, and accountability is a mandatory manager training for all people managers. It begins in May 2018 and ensures all managers are clear on expectations – when and how they are compelled to act – and that they have resources to lead in a manner consistent with our values and behaviors.

- **FY19: Immersive Executive Development:** A program for our most senior leaders where they'll re-connect to leadership expectations, receive direct feedback, and take accountability for their role in evolving NIKE's culture. This will become a core part of how we invest in, and develop, future leaders.

**Our Commitment**

For NIKE to grow and evolve, we need to create meaningful change and put a sharper focus on how we lead our teams and work together. We know we need to do more and accelerate our pace of change. We will hold ourselves and our leaders more accountable for driving measurable progress against representation and pay equity.

As a growth company, we're committed to employing the best and brightest to serve consumers globally. Employees with the necessary skillsets, expertise, and diversity are critical to drive our business forward. Diversity allows for a breadth of perspectives and experiences to develop thoughtful and original ideas; it's a key component of innovation.

For NIKE to deliver for every athlete completely, we need teams that truly reflect the diversity of our consumers, and a culture of inclusivity that reflects the communities we serve. This requires representation of diversity at all levels, and an inclusive community that embraces it.

## MEASURE

### BUILD STRONGER BODIES AND MINDS THROUGH DEVELOPMENT AND WELLNESS EFFORTS

We unleash human potential by creating growth and wellbeing opportunities for NIKE employees.

Our employees have access to more than 5,600 courses[19] taught by industry experts. We've worked to enhance our development tools, enabling employees to create personalized playlists of courses and resources that align to their development interests and areas of growth. We also made updates to our learning management system to make training more relevant, including:

- Continued expansion around the globe with translated materials, allowing every employee to access development where they live and work
- Targeted development tools aimed at building world-class managers and enhancing the manager-employee relationship
- A reimagined onboarding experience for new employees to drive inspiration and empowerment from day one, to successfully integrate into NIKE's culture

Encouraging people to live a healthy, active lifestyle is also core to who we are. It's reflected in the products we design and in the resources we offer. As a brand committed to sports and fitness, we encourage our workforce to engage in a healthy lifestyle to the best of their ability. In fact, we see health as imperative to a high-performing workplace.

To help our employees live healthy, active lifestyles, we provide fitness facility discounts, wellness services, and competitive healthcare benefits. We also offer an Employee Assistance Program that provides confidential, professional counselling, education, and referral services.

### FURTHER READING



Standing up for Equality
Approach to Diversity & Inclusion

| PRIORITY ISSUE | PRIORITY ISSUE |
|---|---|
| Employment | Workforce Development |
| **GRI** | **GRI** |
| GRI 401: Employment 2016 | GRI 404: Training and Education |
| **Disclosure 401-3:** Parental Leave | **Disclosure 404-3:** Percentage of employees receiving regular performance and career development reviews |
| PRIORITY ISSUE | |
| Total Compensation | |
| **GRI** | |
| GRI 405: Diversity and Equal Opportunity | |
| **Disclosure 405-2:** Ratio of basic salary and remuneration of women to men | |

19 These courses are offered to employees as part of a free membership to an online learning platform that helps anyone learn business, software, technology, and creative skills to achieve personal and professional goals.


NIKE_00002053

Plaintiff's Trial Exhibit 16
Page 58 of 74

# COMMUNITY IMPACT





Kids who move, move the needle – in the classroom, in their future careers, and in their communities. But never have kids been less active than they are today, a trend NIKE is committed to reversing. In FY16, we launched initiatives with partners around the world to transform the lives of kids through play and sport. We focused on where they spend most of their time – schools and their community centers – and worked with local leaders, community organizations, governments, and other partners to get kids active. Our efforts used early, fun, positive experiences with play and sport, inspiring a lifelong love of movement.

In FY17, we announced a partnership with China's Ministry of Education to get 2 million kids moving over three years, building on a successful pilot. This collaboration is helping to transform the culture and quality of the delivery of sport and physical activity in schools across China. The partnership is creating a forum to showcase innovation in physical education through establishing the <u>Active Schools Innovation Awards</u>. Also, as part of the partnership, NIKE is training up to 7,000 teachers to deliver engaging sports lessons, provide best-in-class coaching, and offer PE resources to more than 300 schools across China. We are also working with city school leagues to elevate locally relevant priority sports, such as basketball and soccer.

We support <u>Active Schools</u> in the U.S., an initiative supporting schools to get millions of kids active across the country. We also completed our Clinton Global Initiative Commitment, a three-year Active Schools and Active Communities pilot in Brazil that reached more than 60,000 kids and equipped schools and communities with ways to give young people early positive experiences with sport and physical activity.

The Rio 2016 Olympic Games were a huge opportunity to inspire Rio's youth and kids around the world to get active. Brazil's kids are the least active in Latin America. To help change this, we worked with the City of Rio, community leaders, and others on a five-year commitment to revitalize youth programming in the city's 22 Olympic Villages – local community sport and recreation hubs. Our goal is to increase access to sport and physical activity 25,000 kids to 50,000 kids at the Villages and to train 600 PE teachers and staff.

## TARGET
## INVEST A MINIMUM OF 1.5 PERCENT OF PTI TO DRIVE POSITIVE IMPACT IN OUR COMMUNITIES

Community isn't something we do, it's who we are. NIKE believes in the power of sport to move the world forward and unleash human potential for all athletes* and their communities everywhere. But, the world is moving less and less and today's kids are part of the least active generation ever. This is why NIKE is committed to Made to Play, its unifying brand and rallying call to bring sport and play to kids across the world, together with NIKE employees and partners. Through Made to Play, we've helped more than 14.5 million kids get moving, giving them an opportunity to live healthier, happier, and more successful lives. In FY16/17, we supported this work in communities around the world by investing more than 1.5 percent of pre-tax income (PTI) — meeting our target.

## PERFORMANCE
Annual Investment as % of PTI



FY15 / **1.9**%

FY16 / **1.8**%

FY17 / **1.9**%

FY20 target
**AT LEAST**
**1.5**%

## MEASURE
**THROUGH THE POWER OF OUR BRANDS AND PARTNERSHIPS, GET KIDS (AGES 7–12) MOVING THROUGH PLAY AND SPORT**[20]

20 The measure has not changed from our FY14/15 Sustainable Business Report, but the wording has changed to provide brevity and clarity to the original goal.



NIKE_00002054

Case 3:18-cv-01477-AB          Document 693          Filed 02/06/26          Page 427 of 482

Introduction        |        Our Approach        |        Minimize Environmental Footprint        |        Transform Manufacturing        |        **Unleash Human Potential**        |        Appendix

# COMMUNITY IMPACT



In FY17, NIKE employees engaged in this work with approximately 1,000 volunteer hours at the Villages and NIKE provided over 40,000 pieces of product and equipment. Four Villages (Encantado, Caju, Clara Nunes, and Mato Alto) have also been redesigned for play and sport with new, updated equipment and local art that honors each Village's unique culture.

Running is the foundation for play and movement: It's a gateway to other sports and a lifetime of physical activity. Each stride is a step toward improved health and wellbeing, and benefits that can last a lifetime. That's why NIKE teamed up with non-profit partner Marathon Kids to inspire half a million young people to start running with the program by 2020. By the end of FY17, the partnership had grown from three to all 50 states with more than 350,000 kids running in the program with their schools, families, or local community-based organizations. We've now begun to bring the Marathon Kids program to U.K. primary schools, through local partner Kids Run Free, helping to spread the joy of running even further.

We know that sport has the power to bring people together and build stronger communities. As part of its EQUALITY initiative in FY17, NIKE announced new partnerships with MENTOR and PeacePlayers International – two leading organizations who share NIKE's commitment to building more equal playing fields for all, on the field and in life. As part of EQUALITY's inspiration to take action in our local communities, these partnerships will empower youth leaders with mentorship and through sport experiences so they are equipped to be a force for change in their own lives and in their communities.

NIKE also became a founding donor of the Smithsonian's National Museum of African American History & Culture. NIKE's $2 million donation supports the museum's sports gallery which celebrates the contributions of athletes on and off the field, focusing on the role sports have had in empowering African Americans and the role of African American athletes in American culture.

## MEASURE
**INSPIRE A MAJORITY OF NIKE EMPLOYEES TO ENGAGE WITH THEIR COMMUNITIES AND SUPPORT THEIR GIVING OF EXPERTISE, TIME AND MONEY**

Our employees are talented, generous, passionate about sport, and enthusiastic about giving back to their communities. We want to fuel their efforts. So, in FY16 we launched "Give Your Best" (GYB) – an initiative inspired by Olympic runner Steve Prefontaine's challenge: "To give anything less than your best is to sacrifice the gift."

With the GYB giving platform, our employees can give their time and money to the causes they care about. The NIKE Foundation matches personal donations to charitable causes, dollar-for-dollar, up to $10,000 per year per employee. For causes supporting sport and play in the community, we give $2 for every $1 donated by employees. In FY17, our employees, supported by NIKE Foundation's match-giving, contributed $5.3 million to more than 1,400 charitable causes around the world.

We also give employees who volunteer $10 per hour to donate to the cause of their choice. In FY17, over 6,000 NIKE employees in 46 countries tracked more than 100,000 volunteer hours and generated nearly $1 million for charitable causes.

The NIKE Community Ambassador (NCA) program gives NIKE employees the opportunity to pass their love of sport on to the next generation. Through a train-the-trainer curriculum, local employees learn quality coaching skills and volunteer in schools and communities around the world. NCAs aren't just getting kids playing and moving today, they're inspiring them to be active for life. In FY17, over 3,200 of our employees regularly coached kids in their local community as part of the program.



NCA Kings Cross in London, U.K.

NIKE_00002055

Plaintiff's Trial Exhibit 16
Page 60 of 74

# COMMUNITY IMPACT



## MEASURE

### DRIVE SUSTAINED COMMUNITY IMPACT IN ALL OF OUR PRIMARY MARKETS AND SOURCING BACKYARDS

Together with our employees and organizational partners, we're excited about the future we're creating for kids and the communities where we live and work.

In FY17, we celebrated 45 years of community in Oregon, where NIKE was founded. Since the beginning, we've been working with our employees and community organizations to impact local communities across the state. From FY12 to FY17, we supported communities with more than $54 million in cash and nearly $5 million in product. And over 2,000 NIKE employees donated time and money in Oregon to support kids and their communities.

NIKE and Special Olympics Oregon (SOOR) marked the 10th anniversary of the SOOR Youth Games in FY17. This annual event brings more than 500 youth athletes with intellectual disabilities and over 400 volunteer employees to our World Headquarters for a day of play and sport – a first-time experience for many of the athletes. Since the Youth Games started in 2007, more than 3,400 of our employees have volunteered to inspire over 4,500 kids across the state, giving more than 17,000 hours (as of FY17). Reflecting our belief in the potential of every single kid, we've also contributed $400,000 to SOOR to develop Unified Champion Schools (UCS) in Oregon high schools across FY16–17, combining sports, education, and leadership training to equip young people with experiences and tools to create school cultures of acceptance and inclusion.

In FY16, we partnered with the City of Portland to bring the bike-share program BIKETOWN to Portland, which introduced 1,000 bikes and 100 bike stations across the city. Over five years, we're providing $10 million, contributing designs for BIKETOWN's stations and bicycles, and increasing accessibility through adaptable bikes for all people. We've also made an additional 400 BIKETOWN WHQ bikes available at our World Headquarters.

We bring the spirit of community that began in Oregon to all the places where we do business. For example, the NIKE Community Impact Fund (NCIF) is an innovative employee-led effort that



Special Olympics Oregon SOOR

leverages employees' local knowledge to fund grassroots organizations in their communities. In FY16, we expanded NCIF from our World Headquarters to all of NIKE's U.S. Community Stores, to our European Headquarters in the Netherlands, and to our Logistics facilities in Laakdal, Belgium. Since its launch, NCIF has awarded more than $4 million in grants to local community organizations and schools. During NCIF's inaugural year in Laakdal, NIKE employees helped power over 30 organizations through more than $220,000 in grants awarded to local non-profit organizations and schools creating more active communities through sport and play.

We're also doing work in our sourcing communities. For example, in FY16–17, we supported Active with Sports in Vietnam. Through our collaboration, Active with Sports

improved the quality of physical education in 10 schools in Ho Chi Minh City, helping teachers to get 4,800 students moving more each week. In China, we're bringing the benefits of sport to two schools serving 300 families and migrant children in Guangzhou through the Unlock School Gates after-school program.

### FURTHER READING



Inspiring Communities Through Sport

Community Impact

**PRIORITY ISSUE**

Active Kids



NIKE_00002056

# ADDITIONAL PRIORITY ISSUES





Our issue prioritization process identified a set of priority sustainability issues for NIKE and formed the baseline of required topics for this FY16/17 Sustainable Business Report. Most of these issues overlapped with our existing 2020 sustainability targets. For issues not specifically covered by a 2020 target, we have provided space in this report for a description of the issue and details of our progress against it. **Occupational Health & Safety** falls into this category.

**LEARN MORE:** Issue Prioritization

## OCCUPATIONAL HEALTH & SAFETY

NIKE believes that the protection of life and health in the workplace is a fundamental right. Our vision is to provide a safe, hygienic, and healthy workplace, develop safety management systems, and foster a strong culture of safety in NIKE facilities as well as the factories and facilities within NIKE's supply chain. Achieving this vision requires an active and engaged workforce that is properly informed and adequately trained on the hazards of their job and how to perform their work safely.

### Approach
At NIKE, we believe that although there is no finish line, there is a clear starting line for Occupational Health & Safety (OH&S). We have developed a Code of Conduct and Code Leadership Standards that lay out the minimum OH&S standards we expect each of NIKE's own facilities, our suppliers' facilities, and our supply chain partners to meet. These minimum standards are the foundation for the OH&S Management System we apply to our owned and operated facilities. We also factor these standards into our sourcing strategies in how we evaluate baseline factory performance, and how we determine the contract manufacturers and material suppliers with whom we will engage and grow our business.

The foundation of our safety management system is based on facility-appropriate implementation of the Code of Conduct, Code Leadership Standards, and local law. We monitor compliance to OH&S standards at NIKE owned and operated facilities and contract manufacturers through external audits and internal assessments. Establishing a culture

of safety is a continual journey and individual factories and facilities are at different levels of maturity. Gaps in implementation are treated as opportunities to develop management skills and tools to close gaps and improve performance.

Additionally, we work closely with Better Work – a joint initiative of the United Nations' ILO and the International Finance Corporation (IFC), a member of the World Bank Group – including its program in Cambodia, Better Factories Cambodia, to advance issues of health and safety in our factories. Our local team, along with Better Work, continue to work closely with our contract manufacturers to build management capabilities and to enhance the health and wellbeing of their workers.

### Contract Manufacturing: Areas of Focus
Fire safety, building safety, and occupational health issues are the highest risk issues in the footwear and apparel manufacturing industry. We require our suppliers to adopt fire prevention and emergency action plans to protect workers during normal working operations and emergency situations. To accelerate management capability, worker involvement, and understanding of fire safety issues and preventative measures, NIKE collaborated with the FLA and Institution of Occupational Safety and Health (IOSH) on a global initiative to develop and implement a portfolio of fire prevention and fire safety tools for factories. As of the end of FY17, the program has been implemented in over 16 factory locations, and more than 1,200 workers have been trained as safety leaders.

Buildings must be constructed or retrofitted according to the laws of the manufacturing country, international standards if local laws do not exist, or certified structural engineering construction standards.

Additionally, we require our suppliers to anticipate, recognize, evaluate, and control occupational health and hygiene hazards in the workplace, use routine monitoring and analytical methods to determine the potential health effects of hazards that are present in the workplace, and control worker exposure to these health hazards.

As we continue our journey to elevate a culture of safety, we actively seek opportunities to collaborate with others to resolve common occupational health and safety issues. Safe operation of boilers and pressure vessels is an emerging issue in our industry. NIKE

NIKE_00002057

Plaintiff's Trial Exhibit 16
Page 62 of 74

Case 3:18-cv-01477-AB     Document 693     Filed 02/06/26     Page 430 of 482

Introduction    |    Our Approach    |    Minimize Environmental Footprint    |    Transform Manufacturing    |    **Unleash Human Potential**    |    Appendix

# ADDITIONAL PRIORITY ISSUES



benchmarked Better Work's approach to boiler safety, and we have strengthened our program through our new Code Leadership Standard.

When we find issues of non-compliance in these high-risk areas, we respond immediately and work with factories to remediate. We divest from those factories that fail to elevate performance.

In FY17, we changed our compliance audit tool and methodology by including additional rating criteria and sophisticated risk and impact analysis. Based on the new tool, non-compliances were identified based on rating analysis, compared to the old tool provided rankings based on general performance of each category. The new tool allows audit teams to better identify non-compliances.

**LEARN MORE:** NIKE's audit process

**NIKE Facilities: Areas of Focus**
General OH&S compliance is a constant focus for NIKE owned and operated facilities, with individual business operations concentrating on the biggest risks to their operation. NIKE's global OH&S program is focused on developing and implementing a consistent management system to enable risk-based prioritization of OH&S concerns. Controlling hazardous energy and implementing comprehensive injury reporting requirements are examples of two such ongoing initiatives.

We believe that responsibility for OH&S issues must be shared by all stakeholders to create systemwide change. It is a collective effort that requires all companies contracting with factories as well as the factories themselves to share equally in raising the standards. One company cannot alone raise standards for an industry.

## OH&S DATA FOR NIKE EMPLOYEES AND TIER 1 FOCUS FACTORIES

| | | CY16 | CY17[1] |
|---|---|---|---|
| **NIKE EMPLOYEES**[1,2] | | | |
| **DISTRIBUTION (INDUSTRY CODE: 493110)** | | | |
| TCIR[4] | NIKE | 1.93 | 1.81 |
| | Industry[5] | 5.1 | 5.1 |
| LTIR[6] | NIKE | 1.08 | 1.24 |
| | Industry | 1.7 | 1.7 |
| **AIR MI (INDUSTRY CODE: 326100)** | | | |
| TCIR | NIKE | 2.8 | 3.7 |
| | Industry | 4.3 | 4.3 |
| LTIR | NIKE | 0.82 | 0.72 |
| | Industry | 1.1 | 1.1 |
| **OFFICES (INDUSTRY CODE: 561400)** | | | |
| TCIR | NIKE | 0.24 | 0.27 |
| | Industry | 0.8 | 0.8 |
| LTIR | NIKE | 0.08 | 0.07 |
| | Industry | 0.3 | 0.3 |
| **TIER 1 FOCUS FACTORIES**[7] | | | |
| **FOOTWEAR (INDUSTRY CODE: 3162)** | | | |
| TCIR | NIKE | 0.49 | 0.42 |
| | Industry | 6.7 | 6.7 |
| LTIR | NIKE | 0.30 | 0.25 |
| | Industry | 2.1 | 2.1 |
| **APPAREL (INDUSTRY CODE: 3152)** | | | |
| TCIR | NIKE | 0.94 | 0.60 |
| | Industry | 2.1 | 2.1 |
| LTIR | NIKE | 0.45 | 0.40 |
| | Industry | 0.6 | 0.6 |
| **EQUIPMENT** | | | |
| TCIR | NIKE | 1.68 | 0.78 |
| | Industry | N/A | N/A |
| LTIR | NIKE | 1.05 | 0.78 |
| | Industry | N/A | N/A |

1. Using CY16 BLS rates as BLS Rates for CY17 have not been published yet.
2. The reported injury rates reflect a combination of NIKE full-time and certain external temporary workers.
3. Data is collected based on U.S. legal reporting requirements, reporting on all NIKE operations except retail which is excluded from OSHA recordkeeping requirements. Retail will be included in future reports.
4. Total Case Incident Rate (TCIR).
5. The industry average comes from the United States Department of Labor, Bureau of Labor Statistics. Each industry classification (such as DC, Air MI, Offices, Footwear Manufacturing, Apparel Manufacturing) reports a separate average for recordable injuries and lost time rates (which are captured).
6. Lost Time Injury Rate (LTIR).
7. For Tier 1 focus factories by Product Engine for calendar year 2016. Self-reported by factories. The BLS does not calculate manufacturing rates for equipment.

## FURTHER READING
Health and Safety



**PRIORITY ISSUE**
Occupational Health & Safety

**GRI**
**GRI 403:** Occupational Health and Safety

**Disclosure 403-2:** Types of injury and rates of injury, occupational diseases, lost days, and absenteeism, and number of work-related fatalities.


NIKE_00002058

Plaintiff's Trial Exhibit 16
Page 63 of 74

# UNLEASH HUMAN POTENTIAL:
# BY THE NUMBERS

## $5.3M
**DONATED BY EMPLOYEES,**
supported by NIKE Foundation's
match-giving in FY17



## 14.5M
**KIDS MOVING**
through Made to Play



## 57
**PERCENTAGE OF MEN**
used our Family
Care Benefit



## 350K
**KIDS RUNNING**
through partnership with
Marathon Kids



## $54M
**DONATED BY NIKE**
to support communities
from FY12–FY17



## 8
**EMPLOYEE NETWORKS**
to support diversity



NIKE_00002059

Plaintiff's Trial Exhibit 16
Page 64 of 74



Plaintiff's Trial Exhibit 16
Page 65 of 74

# GLOBAL REPORTING INITIATIVE (GRI) INDEX

This report is aligned with the GRI Standards at the Core level. The Sustainable Development Goals (SDGs) and the United Nations Global Compact (UNGC) Principles are also referenced below.

## GENERAL DISCLOSURES

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| ORGANIZATION PROFILE | 102-1 | Name of the organization | NIKE, Inc. | | | |
| | 102-2 | Activities, brands, products, and services | Business Overview: *page 6*<br>FY17 10-K: Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations: *page 73* | | | |
| | 102-3 | Location of headquarters | One Bowerman Dr, Beaverton, OR 97005 | | | |
| | 102-4 | Location of operations | Business Overview: *page 7*<br>FY17 10-K: Item 1. Business: *pages 55–59* and Item 2. Properties: *page 68*<br>NIKE Manufacturing Map | | | |
| | 102-5 | Ownership and legal form | FY17 Proxy Statement<br>Company Bylaws<br>FY17 10-K: Item 1. Business: *page 55* | | | |
| | 102-6 | Markets served | FY17 10-K: Item 1. Business: *pages 55–59* | | | |
| | 102-7 | Scale of the organization | Business Overview: *pages 6–7*<br>FY17 10-K: Item 1. Business: *pages 55–59* | | | |
| | 102-8 | Information on employees and other workers | Business Overview: *pages 6–7*<br>Unleash Human Potential: Employees: *pages 55–57*<br>FY17 10-K: Item 1. Business: *page 57* and *59*<br>d. We do not have a significant portion of the organization's activities performed by people who are not employees.<br>e. No significant variations | 102-8a, b: We currently do not have temporary workers in our data sources. | | |

**Additional Information**

### TOTAL EMPLOYEES BY EMPLOYMENT TYPE AND GENDER[1] (102-8C)

| | FY17 | | | FY16 | | |
|---|---|---|---|---|---|---|
| | Male | Female | N/A | Male | Female | N/A |
| Regular Full-Time | 23,983 | 21,755 | 3 | 22,606 | 20,561 | 2 |
| Regular Part-Time | 11,017 | 10,691 | 0 | 10,090 | 9,918 | 0 |
| **TOTAL REGULAR** | 35,000 | 32,446 | 3 | 32,696 | 30,479 | 2 |
| **FULL-TIME** | 69% | 67% | 100% | 69% | 67% | 100% |

1   Temporary employees excluded.

### NIKE, INC EMPLOYEE TOTALS[1] BY ETHNICITY (U.S.)

| | ALL EMPLOYEES | | | DIRECTORS+ | | | VPs | | | BOD | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 | FY15 | FY16 | FY17 |
| White | 48% | 47% | 44% | 80% | 78% | 77% | 79% | 83% | 83% | 79% | 75% | 75% |
| Underrepresented Minority (URM) | 52% | 53% | 56% | 20% | 22% | 23% | 16% | 16% | 16% | 21% | 25% | 25% |
| No ethnicity reported | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | <1% | | | |

1   Numbers may not add up to 100% due to rounding. Not included in the data above are U.S. NIKE employees working outside the U.S. URM represented 27% (FY15), 22% (FY16) and 27% (FY17) of this population.

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| | 102-9 | Supply chain | Business Overview: *page 7*<br>Transform Manufacturing: Sustainable Sourcing: *pages 41–44*<br>FY17 10-K: Item 1. Business: *pages 57–58*<br>Stages of our Value Chain<br>Value Chain Footprint | | | |
| | 102-10 | Significant changes to the organization and its supply chain | FY17 10-K: Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations: *page 73*<br>FY17 10-K: Item 2. Properties: *page 68* | | | |
| | 102-11 | Precautionary Principle or approach | Our Approach: Sustainable Innovation: *pages 9–10*<br>Our Approach: Our Environmental Moonshot: *page 11*<br>Minimize Environmental Footprint: Our Approach: *page 19* | | | |
| | 102-12 | External initiatives | Sustainability Commitments<br>Industry Standards & Assessment Tools<br>We also mention external initiatives throughout the report. | | | |
| ORGANIZATION PROFILE | 102-13 | Membership of associations | Transform Manufacturing:<br>Partnerships to Accelerate Industry Change: *pages 47–48*<br>Partnerships and Collaborations<br>We also mention memberships throughout the report. | | | |
| STRATEGY | 102-14 | Statement from senior decision-maker | Letter from Our CEO: *page 4*<br>Performance and Disclosure Committee: *page 5* | | | |



NIKE_00002061

Plaintiff's Trial Exhibit 16
Page 66 of 74

# GLOBAL REPORTING INITIATIVE (GRI) INDEX

## GENERAL DISCLOSURES

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| ETHICS AND INTEGRITY | 102-16 | Values, principles, standards, and norms of behavior | Our Approach: Sustainable Innovation: *pages 9–10*<br>NIKE Code of Conduct<br>NIKE Code Leadership Standards<br>NIKE Code of Ethics<br>Sustainability Policies | | | 16 |
| GOVERNANCE | 102-18 | Governance structure | Performance and Disclosure Statement Executives<br>FY17 Proxy Statement: *page 7, 12*<br>Performance and Disclosure Committee: *page 5*<br>Governance | | | |

**Additional Information**

NIKE aims to be a brand with purpose that moves the world forward. To achieve that, we need all parts of our value chain to understand and deliver on our goals – from our leaders to product designers, to the employees in our stores, and workers in contracted factories who make our products. A strong governance structure, coupled with a sustainability mindset, provides the foundation for driving collective decision-making and accountability across the company.

**Corporate Responsibility, Sustainability and Governance Committee**

Our ability to succeed starts with leadership commitment at the highest level. The Corporate Responsibility, Sustainability and Governance (CRS&G) Committee of our Board of Directors is responsible for reviewing NIKE's significant strategies, activities, among other duties, and policies regarding sustainability, contract manufacturer labor practices, community impact, and charitable activities and make recommendations to the Board. The committee sets the tone and pace for sustainability within NIKE's business strategy. Learn more.

Responsibilities include:

• Review and provide guidance to management on sustainability issues and impacts, and the integration of sustainability into NIKE's business, including innovation, product design, manufacturing and sourcing, and operations.

• Review, provide guidance to management, and report to the Board on sustainability (including labor practices) within NIKE's supply chain, and review reports of NIKE's sustainability audits.

• Review and provide guidance to management regarding NIKE's work with industry organizations and non-governmental organizations concerning corporate responsibility.

• Annually review the activities of the NIKE Foundation and NIKE community impact initiatives.

• Review and make recommendations to management on reporting to shareholders and other communities regarding corporate responsibility activities.

• Review, provide guidance to management, and report to the Board regarding the involvement of significant corporate responsibility issues in major business decisions, to protect NIKE's valuable goodwill, and human and intellectual capital.

• Review and make recommendations to the Board with respect to any shareholder proposal that relates to the matters overseen by the Committee.

• Annually evaluate the performance of the Committee and report the results of the evaluation to the Board.

• Review and assess annually the adequacy of the Committee's charter.

• Perform such other duties and functions as may, from time to time, be assigned to the Committee by the Board.

**Performance and Disclosure Committee**

We established a Performance and Disclosure Committee – composed of NIKE's Chief Administrative Officer and General Counsel, Executive VP of Global Communications, Chief Financial Officer, Chief Operating Officer, and Chief Sustainability Officer – in 2012 to provide oversight and direction on NIKE public sustainability targets, reporting, and disclosures.

This body provides executive oversight of strategy, approach, and release of company reports, and the filters we use to participate in ratings, rankings, indices, and key public-facing agreements. The committee also provides executive oversight of development and performance of relevant sustainability targets and corporate sustainability policies. This oversight includes providing enterprise leadership for integrating sustainability into corporate and functional strategy to ensure that the efforts are resourced and supported to be successful.

**NIKE Teams Focused on Sustainability**

NIKE's core Sustainable Business & Innovation (SB&I) team is part of NIKE's Advanced Innovation function. The SB&I team links sustainability and leadership across our value chain, including innovation and product creation, sourcing and manufacturing, facilities, logistics, and retail. We have also connected teams across NIKE with a common sustainability vision. Specifically, we have sustainability-focused teams within Product Creation, NIKE Direct, Global Sourcing & Manufacturing, Supply Chain, and Brand. These teams report to the leaders of those areas and coordinate directly with SB&I through our Business Integration team.

**LEARN MORE:** Governance

| STAKEHOLDER ENGAGEMENT | 102-40 | List of stakeholder groups | Our Approach: Issue Prioritization: *page 16*<br>Partnerships & Collaborations | | | |
| | 102-41 | Collective bargaining agreements | FY17 10-K: Item 1. Business: *page 59* | | | 8 |
| | 102-42 | Identifying and selecting stakeholders | Partnerships & Collaborations | | | |
| | 102-43 | Approach to stakeholder engagement | See below | | | |
| | 102-44 | Key topics and concerns raised | Our Approach: Issue Prioritization: *page 16* | | | |

**Additional Information**

On our journey to be a brand with purpose that moves the world forward, we have benefited from constructive counsel from a variety of external stakeholders – civil society organizations, industry, government, investors, consumers, and others. Engaging stakeholders challenges us to better understand emerging issues and helps us identify opportunities for innovation.

For this year's report, we fundamentally altered our approach to sustainability disclosure, resulting in a Sustainable Business Report (SBR) that is more streamlined and focused on progress to our 2020 targets; and a website focused on topics important to our consumers, that also allows for deep dives on material issues.

To make sure our approach was sound, we worked with Ceres to convene an external stakeholder panel and conduct multiple dialogues to guide the development of NIKE's approach to reporting and communication. Ceres is a sustainability non-profit organization working with investors and companies to tackle the world's biggest sustainability challenges, including climate change, water scarcity and pollution, and human rights abuses. NIKE has worked with Ceres on many different sustainability projects since the late 90s.



NIKE_00002062

Plaintiff's Trial Exhibit 16
Page 67 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 435 of 482

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | **Appendix**

# GLOBAL REPORTING INITIATIVE (GRI) INDEX

## GENERAL DISCLOSURES

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| | | | Over the course of a year, we hosted three webinars with the stakeholder team to discuss our plans for the next SBR and updated sustainability website. | | | |
| | | | Stakeholder team: <br> • BSR, Tara Norton, Managing Director <br> • Calvert Investments, Mike Lombardo, Vice President <br> • Ceres, Amy Augustine, Senior Director <br> • Clean Production Action, Mark Rossi, Executive Director <br> • General Motors, Sharon Basel, Senior Manager Sustainability <br> • MIT Sloan School of Management, Jason Jay, Senior Lecturer and Director, Sustainability Initiative at MIT Sloan <br> • Solidaridad, Madhyama Subramanian, Program Manager <br> • WWF, Lindsay Bass, Manager, Water Stewardship <br> • WWF, Nicole Tanner, Senior Specialist, Water Stewardship <br> • NYC Comptroller's Office, Millicent Budhai Robinson, Assistant Comptroller | | | |
| | | | Engagement themes <br> Over the course of these engagements, the stakeholder team provided useful and relevant feedback for our disclosure strategy and planning. Here are just a few high-level themes we heard in those conversations. <br> • Integration: Communicate NIKE's commitment to sustainability as an important component of business strategy and decision-making. <br>   - Examples: Letter from Our CEO, Our Environmental Moonshot, Governance, Innovating Sustainably. <br> • External World: Acknowledge the external events and changing business context that are influencing and evolving expectations for companies. <br>   - Examples: Minimize Environmental Footprint: The World Around Us, Transform Manufacturing: The World Around Us, Unleash Human Potential: The World Around Us, Our Environmental Moonshot. <br> • Priority Issues: Clearly outline NIKE's approach to issue prioritization and strategic direction. <br>   - Examples: Letter from Our CEO, Issue Prioritization. <br> • Balance: Diversify the ways in which NIKE delivers relevant sustainability information to its interested stakeholders, ensuring the SBR, website and other supplementary communications present a consistent message and serve to complement one another. <br>   - Examples: Sustainable Business Report, Sustainability Website, Investor Relations. | | | |
| | | | Incorporating feedback <br> The feedback that resulted from these engagements provided NIKE's leadership with direct insights and perspectives about our approach to reporting and disclosure. It also allowed NIKE leadership to hear directly from stakeholders and understand the topics that are top of mind for them. <br><br> NIKE derives value from the stakeholder dialogue process, and we are committed to the integration of external feedback into our strategic planning and disclosure. We sincerely appreciate the time, expertise, and extensive input of the stakeholders for this report and our work more broadly. We believe that the net result of this stakeholder consultation is a stronger and more credible report. | | | |
| REPORTING PRACTICE | 102-45 | Entities included in the consolidated financial statements | About this Report: *page 2* <br> Business Overview: *pages 6–7* <br> FY17 1O-K: Item 1. Business: *page 55* | | | |
| | 102-46 | Defining report content and topic Boundaries | Our Approach: Issue Prioritization: *page 16* | | | |
| | 102-47 | List of material topics | Our Approach: Issue Prioritization: *page 16* | | | |
| | 102-48 | Restatements of information | All restatements are noted in this report. | | | |
| | 102-49 | Changes in reporting | Our Approach: Issue Prioritization: *page 16* <br> About this Report: *page 2* | | | |
| | | | **Additional information** <br> In FY14/15 we embedded "Waste Generated" into the Water, Energy, and Chemical issues. This decision was made based on our analysis which showed that the real "impact" of waste is embodied in these areas. The unintended consequence was that stakeholders may have assumed that waste was a lower priority for NIKE, despite significant efforts made and the waste-related 2020 target we had in place. As it is actually a top-rated issue for our stakeholders, this year we have reintroduced waste into our list of priority issues in an effort to align with our stakeholder understanding of these issues. <br><br> NIKE's FY14/15 SBR included reporting on FY11–15 performance targets. FY15 served as the target year for NIKE's previous targets and also is the baseline year for most of NIKE's FY20 targets. FY20 targets encompass a significantly expanded scope compared to FY11–15 targets. For example, previous targets only included WHQ for in scope office facilities. FY20 targets include five NIKE, Inc. global HQs. FY20 targets also include outbound logistics and get deeper into NIKE's supply chain. As a result, FY15 values have been restated where necessary to enable comparability considering this expanded scope. | | | |
| | 102-50 | Reporting period | About this Report: *page 2* | | | |
| | 102-51 | Date of most recent report | We published the FY14–15 Sustainable Business Report in May 2016. | | | |
| | 102-52 | Reporting cycle | NIKE reports on a biannual reporting cycle. | | | |
| | 102-53 | Contact point for questions regarding the report | sustainability@nike.com | | | |
| | 102-54 | Claims of reporting in accordance with the GRI Standards | About this Report: *page 2* | | | |
| | 102-55 | GRI content index | GRI Index: *pages 65–73* | | | |
| | 102-56 | External assurance | We do not externally assure any data in this report. <br> About this Report: *page 2* | | | |



NIKE_00002063

Plaintiff's Trial Exhibit 16
Page 68 of 74

# GLOBAL REPORTING INITIATIVE (GRI) INDEX

## ENVIRONMENT

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| **MATERIALS** | | | | | | |
| *MATERIAL ASPECTS: Non-Renewable Resource Depletion* | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16*<br>Minimize Environmental Footprint: Materials: *pages 23–24*<br>Energy & Emissions | | | |
| | 103-2 | The management approach and its components | Minimize Environmental Footprint: Materials: *pages 23–24*<br>Materials | | | |
| | 103-3 | Evaluation of the management approach | Minimize Environmental Footprint: Materials: *pages 23–24* | | | |
| GRI 301: MATERIALS | 301-1 | Materials used by weight or volume | Minimize Environmental Footprint: Materials: *pages 23–24* | | 8 | |

**Additional Information**
The top five material volumes reported include renewable materials: cotton and corrugate/paper; and non-renewable materials: polyester, rubber, and EVA foam.

All material types reported are purchased from external suppliers except for EVA foam, which is sourced internally. Data reported consists of both direct measurements and estimates.

While many materials are measured directly for a wide variety of products, total corrugate volumes are estimated using averaging packaging material used for each product group.

While the majority of cotton and polyester volume data is sourced using direct measurements, product creation data is used to estimate material volumes for certain parts of the business.

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| **ENERGY** | | | | | | |
| *MATERIAL ASPECTS: Energy* | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16*<br>Minimize Environmental Footprint: Energy and Emissions: *pages 25–28*<br>Energy & Emissions | | | |
| | 103-2 | The management approach and its components | Minimize Environmental Footprint: Energy and Emissions: *pages 25–28*<br>Energy & Emissions | | | |
| | 103-3 | Evaluation of the management approach | Minimize Environmental Footprint: Energy and Emissions: *pages 25–28* | | | |
| GRI 302: ENERGY | 302-1 | Energy consumption within the organization | Minimize Environmental Footprint: Energy and Emissions: *pages 25–28* | | 8 | |

| Additional Information | FY15 | FY16 | FY17 |
|---|---|---|---|
| OWNED OR OPERATED[1] | | | |
| Heat Consumed | 0 | 0 | 0 |
| Steam Consumed | 1,007 MWh | 614 MWh | 865 MWh |
| Cooling Consumed | 0 | 0 | 0 |

Fuel consumption represents natural gas and recycled oil.

1   NIKE converts all energy consumed to MWhs using net calorific value of the fuels consumed, including transportation fuels. Electricity data doesn't require conversion.

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| **WATER** | | | | | | |
| *MATERIAL ASPECTS: Water use* | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16*<br>Minimize Environmental Footprint: Water: *pages 32–33*<br>Water | | | |
| | 103-2 | The management approach and its components | Minimize Environmental Footprint: Water: *pages 32–33*<br>Water | | | |
| | 103-3 | Evaluation of the management approach | Minimize Environmental Footprint: Water: *pages 32–33* | | | |
| GRI 303: WATER | 303-1 | Water withdrawal by source | Minimize Environmental Footprint: Water: *pages 32–33* | | 8 | |

**Additional Information**
Contract manufacturers report their freshwater withdrawal volumes and source to NIKE in accordance with NIKE's Water Program, which outlines measurement practices and defines freshwater sources. The facility boundary is equivalent to the property boundary, and freshwater is inclusive of domestic and manufacturing uses.

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| **EMISSIONS** | | | | | | |
| *MATERIAL ASPECTS: GHG Emissions* | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16*<br>Minimize Environmental Footprint: Energy and Emissions: *pages 25–28*<br>Energy & Emissions | | | |
| | 103-2 | The management approach and its components | Minimize Environmental Footprint: Energy and Emissions: *pages 25–28*<br>Energy & Emissions | | | |
| GRI 305: EMISSIONS | 103-3 | Evaluation of the management approach | Minimize Environmental Footprint: Energy and Emissions: *pages 25–28* | | | |
| | 305-1<br>305-2<br>305-3 | Direct (Scope 1) GHG emissions | Minimize Environmental Footprint: Energy and Emissions: *pages 25–28* | | 8 | |

**Additional Information**
Scope 1 and 2 emissions have been calculated and reported in accordance with the Greenhouse Gas Protocol: A Corporate Accounting and Reporting Standard (Revised Edition). Scope 3 emissions in accordance with the Greenhouse Gas Protocol: Corporate Value Chain (Scope 3), Accounting and Reporting Standard. Emissions are reported in metric tonnes of carbon dioxide equivalent and include $CO_2$, $CH_4$, $N_2O$. Other GHGs have been assessed yet are not reported due to low materiality in NIKE's GHG emissions footprint. Global Warming Potentials (GWPs) are sourced from the Intergovernmental Panel on Climate Change Fifth Assessment Report (AR5 – 100 year). The operational control consolidation approach is used for emissions reporting. FY15 is used as the base year in alignment with FY20 energy and carbon targets.







NIKE_00002064

Plaintiff's Trial Exhibit 16
Page 69 of 74

# GLOBAL REPORTING INITIATIVE (GRI) INDEX

## ENVIRONMENT

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| Additional Information | | | | | | |

### SCOPE 1 AND 2 METHODOLOGY

Emissions data is calculated using primary activity data and extrapolations. Primary data is collected across the business via several internal processes and systems; extrapolation methodologies employ conservative assumptions to avoid understating NIKE's footprint. Emissions factors are updated according to a set cadence.

### SCOPE 1 AND 2 OPERATIONAL BOUNDARIES

**Distribution Centers**
Top 21 DCs globally as of the end of FY17, which represent more than 90% of shipped units and 90% of square footage.

**Retail**
Nike Brand, Converse, and Hurley stores globally.

**HQs**
World Headquarters, European HQ, Greater China HQ, Converse HQ, and Hurley HQ. New construction at HQ locations become in scope once buildings become operational.

**Other Office Facilities & WHQ Building Construction**
Includes non-HQ office facilities and new building construction at WHQ prior to newly constructed sites becoming operational.

**Air MI**
NIKE-owned manufacturing facilities that are the primary producers of NIKE air units.

### EMISSIONS FACTORS

| EMISSIONS | EMISSIONS FACTOR SOURCE |
|---|---|
| SCOPE 1 | GHG Protocol Emissions Factors from Cross-Sector Tools March 2017 |
| SCOPE 2 | U.S. – Contractual instruments (Power purchase agreement) |
| | U.S. & Canada – Supplier-specific emission factors |
| | U.S. – Green-e Energy US Residual Mix Emissions Rates |
| | U.S. – U.S. EPA Climate Leadership Emission Factors for GHG Inventories November 2015 |
| | U.S. – eGRID (location-based) |
| | E.U. – AIB European Residual Mixes |
| | Global – IEA World Electricity $CO_2$ Emissions Factors |
| | 2006 IPCC Guidelines for National Greenhouse Gas Inventories |
| | U.K. Department for Environment Food and Rural Affairs (DEFRA) and the Department of Energy and Climate Change (DECC) |
| SCOPE 3 | IEA World Electricity $CO_2$ Emissions Factors |
| | Network for Transport Measurement (NTM) |
| | Clean Cargo Working Group (CCWG) Nominal Trade Lane Average Port – Port |
| | U.K. Department for Environment Food and Rural Affairs (DEFRA) and the Department of Energy and Climate Change (DECC) |

### CARBON SCOPE MATRIX[1]

● IN SCOPE   ● OUT OF SCOPE

| NIKE VALUE CHAIN TERMINOLOGY | RE100 | 25% ENERGY & CARBON PER UNIT REDUCTION | 35% ENERGY & CARBON PER UNIT REDUCTION | MOONSHOT | FULL VALUE CHAIN IMPACTS |
|---|---|---|---|---|---|
| **CORPORATE SERVICES** | | | | | |
| HQs | ● | ● | ● | ● | ● |
| Other Office Facilities & WHQ Building Construction | ● | ● | ● | ● | ● |
| Air MI | ● | ● | ● | ● | ● |
| Corporate Jets | | | | ● | ● |
| Commercial Air Business Travel | | | | ● | ● |
| **RAW MATERIALS PRODUCTION** | | | | | |
| Raw Materials Production | | | | ● | ● |
| **MATERIALS MANUFACTURING** | | | | | |
| Materials Manufacturing | | | | ● | ● |
| **MATERIALS FINISHING** | | | | | |
| Textile Dyeing & Finishing | | | | ● | ● |
| **FINISHED GOODS MANUFACTURING** | | | | | |
| FW, AP, & EQ Manufacturing | | | | ● | ● |
| **LOGISTICS** | | | | | |
| Inbound Logistics | ● | ● | ● | ● | ● |
| Outbound Logistics | ● | ● | ● | ● | ● |
| Distribution Centers | ● | ● | ● | ● | ● |
| **RETAIL** | | | | | |
| NIKE Direct | ● | ● | ● | ● | ● |
| **CONSUMER USE** | | | | | |
| Consumer Use | | | | | ● |
| **END OF LIFE** | | | | | |
| End of Life | | | | | ● |

1 Only NIKE-owned Retail (NIKE Direct) and Logistics (Distribution Centers, Inbound & Outbound Logistics) are in scope for all of NIKE's commitments (RE100, FY20 targets, and the moonshot). Non-NIKE-owned Retail and Logistics are included in the Full Value Chain Impacts.

## SCOPE 3 EMISSIONS BY CATEGORY & OPERATIONAL BOUNDARIES

| SCOPE 3 EMISSIONS IN SCOPE OF MOONSHOT AMBITION | | | |
|---|---|---|---|
| EMISSIONS SOURCES | FY17 METRIC TONNES $CO_2e$ AND/OR EVALUATION STATUS | SCOPE OF REPORTED EMISSIONS | EMISSIONS CALCULATION METHODOLOGY |
| **UPSTREAM** | | | |
| 1 - PURCHASED GOODS & SERVICES | 9,179,754 | Includes emissions across NIKE brands and product engines, including from raw materials production, materials manufacturing, materials finishing, and finished goods manufacturing. | Emissions data is calculated using primary activity data and extrapolations. $CO_2e$ emissions include $CO_2$, $CH_4$, and $N_2O$. Nike Brand and Converse footwear finished goods manufacturing emissions data is derived from 100% primary data and represents nearly 90% of the emissions in finished goods manufacturing. For this subset, vendors provide monthly energy consumption: from the local utility grid, onsite generators, other fuels and purchased steam. For electricity: kWh values are multiplied by $CO_2e$ emissions factors for electricity purchased from the local utility grid by the country the factory resides in. For onsite generation and other fuels: $CO_2e$ emissions are calculated using the IPCC bottoms up calculation methodology. Extrapolation methodologies are used for emissions estimates outside of footwear finished goods manufacturing based on lifecycle analysis data and employ conservative assumptions to avoid understating NIKE's footprint. |



NIKE_00002065

Plaintiff's Trial Exhibit 16
Page 70 of 74

Case 3:18-cv-01477-AB    Document 693    Filed 02/06/26    Page 438 of 482

Introduction | Our Approach | Minimize Environmental Footprint | Transform Manufacturing | Unleash Human Potential | Appendix

# GLOBAL REPORTING INITIATIVE (GRI) INDEX

## ENVIRONMENT

### SCOPE 3 EMISSIONS IN SCOPE OF MOONSHOT AMBITION

| EMISSIONS SOURCES | FY17 METRIC TONNES $CO_2E$ AND/OR EVALUATION STATUS | SCOPE OF REPORTED EMISSIONS | EMISSIONS CALCULATION METHODOLOGY |
|---|---|---|---|
| **UPSTREAM** | | | |
| 4 - TRANSPORTATION & DISTRIBUTION (UPSTREAM) | 642,287 | Includes ~95% of global inbound transportation via the following modes of transportation: air, ocean, truck, and rail. | Transactional data is applied to a third-party transportation carbon calculator against industry standard emissions factors. For Air: Distance traveled (km) x cargo weight (kg) x emission factor [g of $CO_2$/ (TEU x km)]. For all other modes: Distance traveled (km) x cargo volume (TEU) x emission factor [g of $CO_2$/ (TEU x km)]. |
| 6 - BUSINESS TRAVEL | 81,913 | Includes emissions from commercial air travel. | Air $CO_2$ emissions are estimated based on number and distance of trips. Short-haul trips are less fuel efficient per mile flown. Longer haul flights become less efficient due to the need to carry more fuel. |
| **DOWNSTREAM** | | | |
| 9 - TRANSPORTATION & DISTRIBUTION (DOWNSTREAM) | 73,080 | Includes ~90% of global outbound transportation via the following modes of transportation: air, ocean, truck, and rail. Excludes non-NIKE paid freight. | Transactional data is applied to a third-party transportation carbon calculator against industry standard emissions factors. For Air: Distance traveled (km) x cargo weight (kg) x emission factor [g of $CO_2$/ (TEU x km)]. For all other modes: Distance traveled (km) x cargo volume (TEU) x emission factor [g of $CO_2$/ (TEU x km)]. |
| 12 - END-OF-LIFE TREATMENT OF SOLD PRODUCTS | 368,542 | These emissions are associated with the disposal of products including landfill, recycling, and incineration. | There is no primary emissions data available for end-of-life treatment of NIKE's products. To evaluate NIKE's value chain footprint, we identified and quantified $CO_2e$ emissions created at each stage of the value chain. The impact of each individual product differs considerably, based on its profile, materials used, size and weight, method of manufacture, and location of production, use, and disposal. Several internal and external tools were used to develop this estimation, including NIKE's Business and Environmental Scenario Tool (BEST), Enablon database, NIKE's Apparel Sustainability Index, NIKE's Footwear Sustainability Index, and NIKE's Materials Sustainability Index. End-of-life Stage: at the disposal stage we assumed the finished good is disposed of at the end of one year. |

### SCOPE 2 EMISSIONS OUT OF SCOPE OF MOONSHOT AMBITION

| EMISSIONS SOURCES | FY17 METRIC TONNES $CO_2E$ AND/OR EVALUATION STATUS | SCOPE OF REPORTED EMISSIONS | EMISSIONS CALCULATION METHODOLOGY |
|---|---|---|---|
| **DOWNSTREAM** | | | |
| 5 - WASTE GENERATED IN OPERATIONS | 2,030 | Emissions relative to the fate of the waste generated in our own operations including HQs and DCs. | Total HQ and DC waste not diverted from landfill multiplied by a lifecycle assessment-based emission factor for municipal waste sent to landfill. |
| 11 - USE OF SOLD PRODUCTS | 6,284,727 | These emissions are associated with washing and drying NIKE's sold apparel and socks. We assumed for the value chain footprint exercise that footwear and equipment were not washed. Based on our footprinting work, we estimate that about 36% of the emissions throughout our value chain are emitted during the use phase of NIKE products. These emissions are out of scope of NIKE's moonshot ambition. | There is no primary emissions data available from use of NIKE's products. To evaluate NIKE's value chain footprint, we identified and quantified $CO_2$ emissions created at each stage of the value chain. The impact of each individual product differs considerably, based on its profile, materials used, size and weight, method of manufacture, and location of production, use, and disposal. Several internal and external tools were used to develop this estimation, including NIKE's Business and Environmental Scenario Tool (BEST), Enablon database, NIKE's Apparel Sustainability Index, NIKE's Footwear Sustainability Index, and NIKE's Materials Sustainability Index. Consumer Usage: Water and Energy Usage was estimated based on the following assumptions – Only apparel units and socks were considered. Each item was assumed washed 52 times in one year. The washing assumptions were based on regional consumer washing practices and estimates of washing machine types by region. $CO_2e$ was based on regional conversion factors applied to the estimated energy usage. |

### SCOPE 3 EMISSIONS: NOT RELEVANT/NOT YET CALCULATED

| EMISSIONS SOURCES | FY17 METRIC TONNES $CO_2E$ AND/OR EVALUATION STATUS | SCOPE OF REPORTED EMISSIONS | EMISSIONS CALCULATION METHODOLOGY |
|---|---|---|---|
| **UPSTREAM** | | | |
| 2 - CAPITAL GOODS | Not relevant | NIKE does not have significant investment in capital goods as most manufacturing equipment is owned and operated by contracted factories. | N/A |
| 3 - FUEL & ENERGY-RELATED ACTIVITIES NOT INCLUDED IN SCOPE 1 OR 2 | Not relevant | NIKE does not have significant use of fuel and energy-related activities as our manufacturing is completed by contract factories. | N/A |
| 7 - EMPLOYEE COMMUTING | Relevant, not yet calculated | Employee commuting is a relevant metric for NIKE, Inc. as we had approximately 10,700 employees commuting just to our World Headquarters daily in FY17. We have not yet calculated the corresponding $CO_2$ emissions for employee commuting. | N/A |
| 8 - UPSTREAM LEASED ASSETS | Not relevant | NIKE does not have significant emissions from upstream leased assets. | N/A |



NIKE_00002066

Plaintiff's Trial Exhibit 16
Page 71 of 74

# GLOBAL REPORTING INITIATIVE (GRI) INDEX

## ENVIRONMENT

| SCOPE 3 EMISSIONS - NOT RELEVANT/NOT YET CALCULATED | | | |
|---|---|---|---|
| EMISSIONS SOURCES | FY17 METRIC TONNES CO₂E AND/OR EVALUATION STATUS | SCOPE OF REPORTED EMISSIONS | EMISSIONS CALCULATION METHODOLOGY |
| | | DOWNSTREAM | |
| 10 - PROCESSING OF SOLD PRODUCTS | Not relevant | NIKE's products are finished consumer goods and do not undergo any additional processing once sold. | N/A |
| 13 - DOWNSTREAM LEASED ASSETS | Not relevant | NIKE does not have significant emissions from downstream leased assets. | N/A |
| 14 - FRANCHISES | Not relevant | NIKE does not have significant emissions from franchises. | N/A |
| 15 - INVESTMENTS | Not relevant | NIKE does not have significant emissions from investments. | N/A |
| 8 - UPSTREAM LEASED ASSETS | Not relevant | NIKE does not have significant emissions from upstream leased assets. | N/A |

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| **EFFLUENTS AND WASTE** | | | | | | |
| **MATERIAL ASPECTS: Material Waste** | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: _page 16_ Minimize Environmental Footprint: Waste: _pages 29–31_ | | | |
| | 103-2 | The management approach and its components | Minimize Environmental Footprint: Waste: _pages 29–31_ Waste | | | |
| | 103-3 | Evaluation of the management approach | Minimize Environmental Footprint: Waste: _pages 29–31_ | | | |
| GRI 306: EFFLUENTS AND WASTE | 306-2 | Waste by type and disposal method | Minimize Environmental Footprint: Waste: _pages 29–31_ | | 8, 9 |  |

**Additional Information**

Distribution center and office waste disposal method has been determined by information provided by waste disposal contractors. In some facilities, NIKE directly contracts with disposal providers for material-specific streams or specific containers. In other facilities, NIKE uses one provider for all waste streams.

Contract manufacturers report their solid waste generation and disposal method to NIKE in accordance with NIKE's Waste Program, which outlines separation and handling practices for non-hazardous waste and defines waste items and management methods.

For hazardous waste, annual compliance audits verify that our partners are meeting the requirements in the NIKE Code Leadership Standards (CLS) for suppliers. Auditors confirm that partners have obtained all required permits and that hazardous waste vendors selected by the partners are properly qualified and licensed. The CLS also outlines storage requirements for any location that generates or stores 100 kg or more of hazardous waste each month.

**TOTAL WEIGHT OF HAZARDOUS WASTE (TONNES) GENERATED IN FOOTWEAR MANUFACTURING**[1,2]

| | FY16 | FY17 |
|---|---|---|
| Total Weight | 6,858 | 7,370 |

1   Best available data reported to NIKE by manufacturing partners of finished goods. Excludes from scope is any hazardous waste generated from non-manufacturing activities.
2   Annual compliance audits verify that our partners are meeting the requirements in the NIKE Code Leadership Standards (CLS) for suppliers. Auditors confirm that partners have obtained all required permits and that hazardous waste vendors selected by the partners are properly qualified and licensed. The CLS also outlines storage requirements for any location that generates or stores 100 kg or more of hazardous waste each month.

| | | | | | | |
|---|---|---|---|---|---|---|
| **EMPLOYMENT** | | | | | | |
| **MATERIAL ASPECTS: Employment Total Compensation** | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: _page 16_ Unleash Human Potential: Employees: _pages 55–57_ | | | |
| | 103-2 | The management approach and its components | Unleash Human Potential: Employees: _pages 55–57_ | | | |
| | 103-3 | Evaluation of the management approach | Unleash Human Potential: Employees: _pages 55–57_ | | | |
| GRI 401: EMPLOYMENT | 401-3 | Parental leave | Unleash Human Potential: Employees: _page 56_ | We report on the total number of employees that took parental leave, by gender. We currently are not able to track return to work and retention rates. | |  |



NIKE_00002067

Case 3:18-cv-01477-AB     Document 693     Filed 02/06/26     Page 440 of 482

Introduction  |  Our Approach  |  Minimize Environmental Footprint  |  Transform Manufacturing  |  Unleash Human Potential  |  Appendix

# GLOBAL REPORTING INITIATIVE (GRI) INDEX

## ENVIRONMENT

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| **OCCUPATIONAL HEALTH AND SAFETY** | | | | | | |
| *MATERIAL ASPECTS: Occupational Health & Safety* | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16* <br> Transform Manufacturing: Sustainable Sourcing: *page 41* <br> Unleash Human Potential: Additional Priority Issues: *pages 61–62* | | | |
| | 103-2 | The management approach and its components | Unleash Human Potential: Additional Priority Issues: *pages 61–62* <br> Culture of Health and Safety | | | |
| | 103-3 | Evaluation of the management approach | Unleash Human Potential: Additional Priority Issues: *pages 61–62* | | | |
| GRI 403: OCCUPATIONAL HEALTH AND SAFETY | 403-2 | Types of injury and rates of injury, occupational diseases, lost days, and absenteeism, and number of work-related fatalities | Unleash Human Potential: Additional Priority Issues: *pages 61–62* | We disclose Total Case Incident Rate (TCIR) and Lost Time Injury Rate (LTIR), which is considered industry standard. | |  |
| **TRAINING AND EDUCATION** | | | | | | |
| *MATERIAL ASPECTS: Workforce Development* | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16* <br> Unleash Human Potential: Employees: *pages 55–57* | | | |
| | 103-2 | The management approach and its components | Unleash Human Potential: Employees: *pages 55–57* <br> People at Nike | | | |
| | 103-3 | Evaluation of the management approach | Unleash Human Potential: Employees: *pages 55–57* | | | |
| GRI 404: TRAINING AND EDUCATION | 404-3 | Percentage of employees receiving regular performance and career development reviews | Unleash Human Potential: Employees: *page 55* | | | |

*Additional Information*

### EMPLOYEES WHO RECEIVE PERFORMANCE REVIEW (CFE RATING)[1]

| GENDER | | FY16 | FY17 | | EMPLOYMENT TYPE | | FY16 | FY17 |
|---|---|---|---|---|---|---|---|---|
| | | % | % | | | | % | % |
| Female | CFE Rating | 66% | 63% | | Full-time | CFE Rating | 76% | 73% |
| | No Rating | 34% | 37% | | | No Rating | 24% | 27% |
| Male | CFE Rating | 65% | 62% | | Part-time | CFE Rating | 42% | 39% |
| | No Rating | 35% | 38% | | | No Rating | 58% | 61% |
| GRAND TOTAL | CFE Rating | 65% | 62% | | | | | |
| | No Rating | 35% | 38% | | | | | |

[1] Excludes temporary workers.



| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| **DIVERSITY AND EQUAL OPPORTUNITY** | | | | | | |
| *MATERIAL ASPECTS: Total Compensation* | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16* <br> Unleash Human Potential: Employees: *pages 55–57* | | | |
| | 103-2 | The management approach and its components | Unleash Human Potential: Employees: *pages 55–57* <br> People at Nike | | | |
| | 103-3 | Evaluation of the management approach | Unleash Human Potential: Employees: *pages 55–57* | | | |
| GRI 405: DIVERSITY AND EQUAL OPPORTUNITY | 405-2 | Ratio of basic salary and remuneration of women to men | Unleash Human Potential: Employees: *pages 55–57* | | | |



NIKE_00002068

Plaintiff's Trial Exhibit 16
Page 73 of 74

# GLOBAL REPORTING INITIATIVE (GRI) INDEX

## SOCIAL

| GRI STANDARD | NUMBER | GRI DISCLOSURE | LOCATION AND NOTES | OMISSION | UNGC PRINCIPLE | SDG |
|---|---|---|---|---|---|---|
| **FREEDOM OF ASSOCIATION AND COLLECTIVE BARGAINING** | | | | | | |
| **MATERIAL ASPECTS: Freedom of Association** | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16*<br>Transform Manufacturing: Additional Priority Issues: *pages 49–50* | | | |
| | 103-2 | The management approach and its components | Transform Manufacturing: Additional Priority Issues: *pages 49–50*<br>Human Rights | | | |
| | 103-3 | Evaluation of the management approach | Transform Manufacturing: Additional Priority Issues: *pages 49–50* | | | |
| GRI 407: FREEDOM OF ASSOCIATION AND COLLECTIVE BARGAINING | 407-1 | Operations and suppliers in which the right to freedom of association and collective bargaining may be at risk | Transform Manufacturing: Additional Priority Issues: *pages 49–50* | | 1, 3 | |
| **CHILD LABOR** | | | | | | |
| **MATERIAL ASPECTS: Child Labor** | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16*<br>Transform Manufacturing: Additional Priority Issues: *pages 49–50*<br>Code of Conduct<br>Code Leadership Standards (CLS) | | | |
| | 103-2 | The management approach and its components | Unleash Human Potential: Additional Priority Issues: *pages 49–50*<br>Human Rights | | | |
| | 103-3 | Evaluation of the management approach | Transform Manufacturing: Additional Priority Issues: *pages 49–50* | | | |
| GRI 408: CHILD LABOR | 408-1 | Operations and suppliers at significant risk for incidents of child labor | Transform Manufacturing: Additional Priority Issues: *pages 49–50* | | 1, 5 | |
| **CHEMISTRY** | | | | | | |
| **MATERIAL ASPECTS: Chemistry** | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16*<br>Minimize Environmental Footprint: Chemistry: *pages 34–36* | | | |
| | 103-2 | The management approach and its components | Minimize Environmental Footprint: Chemistry: *pages 34–36*<br>Approach to Chemistry<br>Chemistry Playbook | | | |
| | 103-3 | Evaluation of the management approach | Performance and Disclosure Committee: *page 5*<br>Minimize Environmental Footprint: Chemistry: *pages 34–36* | | | |
| CHEMISTRY | N/A | | Minimize Environmental Footprint: Chemistry: *pages 34–36* | | | |
| **EXCESSIVE OVERTIME** | | | | | | |
| **MATERIAL ASPECTS: Excessive Overtime** | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16*<br>Transform Manufacturing: Sustainable Sourcing: *pages 41–44* | | | |
| | 103-2 | The management approach and its components | Transform Manufacturing: Sustainable Sourcing: *pages 41–44* | | | |
| | 103-3 | Evaluation of the management approach | Transform Manufacturing: Sustainable Sourcing: *pages 41–44* | | | |
| EXCESSIVE OVERTIME | N/A | | Transform Manufacturing: Sustainable Sourcing: *pages 41–44* | | | |
| **ACTIVE KIDS** | | | | | | |
| **MATERIAL ASPECTS: Active Kids** | | | | | | |
| GRI 103: MANAGEMENT APPROACH | 103-1 | Explanation of the material topic and its Boundaries | Our Approach: Issue Prioritization: *page 16*<br>Unleash Human Potential: Community Investment: *pages 58–60* | | | |
| | 103-2 | The management approach and its components | Unleash Human Potential: Community Investment: *pages 58–60*<br>Community Impact | | | |
| | 103-3 | Evaluation of the management approach | Performance and Disclosure Committee: *page 5*<br>Unleash Human Potential: Community Investment: *pages 58–60* | | | |
| ACTIVE KIDS | N/A | | Unleash Human Potential: Community Investment: *pages 58–60* | | | |



NIKE_00002069

Plaintiff's Trial Exhibit 16
Page 74 of 74

# EXHIBIT 35

| | |
|---|---|
| **From:** | HR Communications |
| **To:** | Janke, Amy |
| **Sent:** | 9/14/2017 7:00:13 PM |
| **Subject:** | HRBP Update: September 14, 2017 |





Having trouble viewing this email? View it in your browser.

**In This Issue:** *September 14, 2017*

- New U.S. Legislation Impacting Candidate Questions About Salary History

## Talent Acquisition Operations

### New U.S. legislation impacting candidate questions about salary history

*Relevance:* Any employee who interviews a candidate based in the U.S. or Puerto Rico.
*Requested Action:* Awareness of new legislation that affects what employers can ask

NIKE_00023658

*candidates about their compensation histories. Help TA build awareness & drive the change with your business teams.*

This October, cities and states across the U.S. will enact new laws that improve workers' abilities to earn competitive and equitable pay in the marketplace. In the spirit of Nike's culture & values, we support these new regulations, and are proactively adopting an internal policy to ensure we remain compliant.

**What you need to know:**

**Beginning October 1, interviewers can no longer ask candidates to share their current compensation or any compensation history**. Compensation questions now fall under non-discrimination legal statutes, and violations will incur fines and/or legal action.

This new policy also means that Nike may no longer:

- Use salary as a tool to disqualify candidates, or as a screening criteria.
- Require candidates to satisfy a minimum/maximum salary for a position.
- Record salary history in our ATS or CRM systems.
- Search public records for candidates' compensation history, even if the information is readily available.

**Instead, our conversations with candidates must focus on their compensation expectations**. Since we can no longer ask candidates to provide actual compensation figures, Nike will use the candidate's salary expectations—compiled with market information—to inform and create our offers.

Talent Acquisition Operations is currently working with HR COE partners to align their processes to this new policy. Training sessions and communications are planned throughout September to ensure recruiters, hiring managers & interviewers at corporate & retail adopt to this new policy. Hiring & interviewing resources on the HR Website, DTC Zero and other key internal websites will also be updated prior to October 1.

To drive awareness & adoption of this change in the business, recruiters are prepared with talking points to include in their ongoing conversations with hiring managers. The HR Business Planning & Delivery team is also equipped with this walking deck to prepare HRBPs and Business Leadership for this policy change.

**»» Questions?** Contact Marc Caputo, recruiter & project manager.

---

*About HRBP Update: The HRBP Update is a bi-weekly communication to business-facing HR with important HR information about current business priorities and what to expect in the future. For questions or comments, contact the HR Communications & Branding team.*

© 2017 NIKE, Inc. All rights reserved. For internal use only.

NIKE_00023659

# EXHIBIT 36

Message
_____

**Sent**: 5/8/2018 6:21:03 PM
**To**: Lupo, Kim [Kimberly.Lupo@nike.com]
**CC**: Westling, Daniel [Daniel.Westling@nike.com]; Caputo, Marc [Marc.Caputo@nike.com]
**Subject**: Pay Equity Legislation Update
**Attachments**: US salary history legistlation - comms package-updated-v4.docx; US Salary History Legislation - comms plan-updated-v2.docx

Hi Kim,
Here is the update below.  Let me know if you'd like any edits before we send out to Paula, Karen, Holly and Monica.


All,
HR Comms (Daniel Westling), TA (myself and Marc Caputo) and Legal (Lauren Thibodeaux & outside counsel) have worked on ███████████████████████████████████████████
███████████████████████████████████

What's new/changed:
- Clear communication to the HR community and to hiring managers that it is Talent Acquisition's responsibility to discuss compensation in all of its forms with candidates.  Hiring managers and other non-TA HR roles are not to discuss compensation with candidates.
- We will implement a 2 tier approach in how we engage and discuss with candidates about their compensation expectations, one for V-U bands and one for E and above roles.
  o The Total Rewards team has created new Offer intake forms for both tiers.  The Offer Intake form for E+ roles includes areas to capture candidate expectations for compensation outside of base pay.
- The TA team (several TA Recruiting Directors) is creating more in-depth training for recruiters including specific scripts for talking to candidates about their compensation expectations in order to provide the most complete information possible to create competitive and responsible offers.

What's next:
- Next Week: Send out updated communications to all affected populations (TR, HRBPs, HRBP Ops, TA & Hiring Managers)
- By end of October
- Also attached is the comms package of all communications that will be sent out to the various affected parties. What's new/changed is highlighted.


Daniel Laboe  /  Sr Director Talent Acquistion Operations & Innovation

     CONVERSE ✦✈     Hurley )(     

Confidential                                                                                   NIKE_00060745

Plaintiff's Trial Exhibit 301
Page 1 of 12

TALKING POINTS FOR RECRUITER CONVERSATIONS WITH HIRING MANAGERS
**Target Date:** *ongoing*

- Before you begin speaking with or interviewing candidates, it's important to make sure all members of your interview team are familiar with **Nike's list of Do Not Ask Questions**.

- These questions refer to the candidate's personal information – like their marital status, race, religion, disability and more.

- Updates were made on October 1, 2017 to include **salary history** on the Do Not Ask Questions list.

- As your recruiter, my role is to collect the candidate's salary expectations during initial conversations, so you can focus on assessing the candidate's qualifications and fit for the role. Once we pick our finalist(s), I will work with the HR Compensation team to make sure we form a competitive offer, based on the finalist's salary expectations. ***You don't need to worry about asking any candidates about their compensation histories or compensation expectations!***

- Please also make sure that **all members of your interview panels** are equipped with these new rules & resources. As hiring manager, **we are relying on you** to ensure all interviewers follow these rules – in order to protect Nike, and to create a positive & inclusive experience for all candidates.

- Thank you – please don't hesitate to reach out to me with any questions.

- *Additional resources:*

  - ***Lawful & Unlawful (Do Not Ask) Questions:*** [ HYPERLINK "http://hrcbi.nike.com:82/lawfulquestions.php" ]

  - ***TA Comp History Policy Change 2-Pager:*** [ HYPERLINK "https://nike.sharepoint.com/teams/na10/taplaybook/Recruiter%20Docs/TA%20Comp%20History%20Policy%20Change%202-Pager.pdf" ]

  - ***TA Comp History Policy Walking Deck:*** [ HYPERLINK "https://nike.ent.box.com/file/223884483305" ]

  - ***TA Salary History Policy_8.28.2017:*** [ HYPERLINK "https://nike.sharepoint.com/teams/na10/taplaybook/Recruiter%20Docs/TA%20Salary%20History%20Policy_8.28.2017.pdf" ]

  - ***Recent Updates on TA Playbook:*** [ HYPERLINK "https://nike.sharepoint.com/teams/na10/taplaybook" ]

**[PAGE  ]**

Plaintiff's Trial Exhibit 301
Page 2 of 12

EMAIL TO U.S. TA EMPLOYEES
From: Dan Laboe
Target Date: Wednesday, October 11, 2017

Global TA team-

In September, we shared our new U.S. policy around candidate questions about compensation history. Our TA Operations team has continued socializing this with HR Senior Leadership, HRBPs and other COE partners to further clarify roles and responsibilities so that Nike remains compliant with new U.S. regulations. And we have new decisions to share:

**Going forward, U.S. Talent Acquisition is solely responsible for discussing compensation expectations with candidates. All other hiring partners should not ask candidates about compensation.**

In addition, our Total Rewards partners have created an updated Offer Intake Form to collect this information from candidates. There are two versions of this form: one for offers that include equity compensation (E and S band candidates), and one for offers without equity (V through U band candidates). Please begin using this form as you work with Total Rewards to construct offers for your roles.

> **Commented [WD1]:** Add link to Offer Intake Form

All other details we've shared about this policy remain the same. Please review updated resources on the [ HYPERLINK "https://nike.sharepoint.com/teams/na10/taplaybook/SitePages/Home.aspx" ] including talking points for your conversations with hiring managers, FAQs, and the overview presentation (aka walking deck) we've shared with HRBPs and other COE partners.

Be aware that hiring & interviewing resources on the [ HYPERLINK "https://nikehr.nike.com/?q=page/hiring-process-15726&p1=27990" ], [ HYPERLINK "http://dtczero.nike.com/na/hiring-na" ] and other key internal websites have also been updated to reflect these policy updates. Our standard communications to hiring managers & interviewers will also prominently feature these updates—including interview invites from our coordinators, and system notifications from Taleo.

We will offer additional training opportunities later in October to review scenarios and best practices for applying this new policy to your conversations with hiring managers, interviewers and candidates. Until then, please direct any questions to me or Marc Caputo.

Thanks,
Dan

Daniel Laboe  /  Sr Director Talent Acquisition Operations & Innovation

**[PAGE  ]**

EMAIL TO TA FUNCTIONAL PARTNERS – *forward U.S. TA email, with additional context*
From: Dan Laboe
Target Date: Wednesday, October 11, 2017

TA partners- please be aware of additional updates we've made to TA's new policy regarding compensation history questions. You can find more details below.

We will also invite you to our training opportunities later this month.

If you have any questions, please direct them to me or Marc Caputo.

---

Global TA team-

In September, we shared our new U.S. policy around candidate questions about compensation history. Our TA Operations team has continued socializing this with HR Senior Leadership, HRBPs and other COE partners to further clarify roles and responsibilities so that Nike remains compliant with new U.S. regulations. And we have new decisions to share:

**Going forward, U.S. Talent Acquisition is solely responsible for discussing compensation expectations with candidates. All other hiring partners should not ask candidates about compensation.**

In addition, our Total Rewards partners have created an updated Offer Intake Form to collect this information from candidates. There are two versions of this form: one for offers that include equity compensation (E and S band candidates), and one for offers without equity (V through U band candidates). Please begin using this form as you work with Total Rewards to construct offers for your roles.

> Commented [WD2]: Add link to Offer Intake Form

All other details we've shared about this policy remain the same. Please review updated resources on the [ HYPERLINK "https://nike.sharepoint.com/teams/na10/taplaybook/SitePages/Home.aspx" ] including talking points for your conversations with hiring managers, FAQs, and the overview presentation (aka walking deck) we've shared with HRBPs and other COE partners.

Be aware that hiring & interviewing resources on the [ HYPERLINK "https://nikehr.nike.com/?q=page/hiring-process-15726&p1=27990" ], [ HYPERLINK "http://dtczero.nike.com/na/hiring-na" ] and other key internal websites have also been updated to reflect these policy updates. Our standard communications to hiring managers & interviewers will also prominently feature these updates—including interview invites from our coordinators, and system notifications from Taleo.

We will offer additional training opportunities later in October to review scenarios and best practices for applying this new policy to your conversations with hiring managers, interviewers and candidates. Until then, please direct any questions to me or Marc Caputo.

Thanks,
Dan

**[PAGE  ]**

NIKE_00060748

[PAGE  ]

Confidential

NIKE_00060749

HRBP UPDATE EMAIL NEWSLETTER
Target Date: Thursday, October 12, 2017

**Talent Acquisition Operations**
**Updates To How We Talk To Candidates About Compensation History**

*Relevance:* Any employee who interviews a candidate based in the U.S. or Puerto Rico.
*Requested Action:* Do not ask candidates about compensation. Share this guidance with your business teams. US Talent Acquisition has a new form and process (driven by Total Rewards) for collecting this information from candidates.

In September, [ HYPERLINK "http://nikeinc.createsend1.com/t/ViewEmail/r/47C79024CC1C17B32540EF23F30FEDED" ] new guidance around asking candidates questions about compensation history. The TA Operations team has continued socializing this policy with HR Senior Leadership, HRBPs and other COE partners to further clarify roles and responsibilities so that Nike remains compliant with new regulations.

**Going forward, US Talent Acquisition is solely responsible for discussing compensation expectations with candidates. All other hiring partners should not ask candidates about compensation.** Total Rewards has provided US Talent Acquisition with an updated Offer Intake Form to collect this information from candidates.

To drive awareness & adoption of this change in the business, recruiters will continue to include key talking points in their ongoing conversations with hiring managers. Hiring & interviewing resources on the [ HYPERLINK "https://nikehr.nike.com/?q=page/hiring-process-15726&p1=27990" ], [ HYPERLINK "http://dtczero.nike.com/na/hiring-na" ] and other key internal websites have been updated to reflect this minor change. Messages that hiring managers & interviewers receive directly from TA—including interview invites and Taleo system notifications—will also prominently feature these updates.

Talent Acquisition Operations will also share these updates directly with various stakeholders through upcoming meetings and communications. [ HYPERLINK "https://nike.box.com/s/1her6v4qzwbt6hjtxhhmkvpe6ctob2o6" ] has also been updated to reflect these changes, which you can use to update your Business Leadership about this policy change.

For complete details about this new policy, please review our update in the [ HYPERLINK "http://nikeinc.createsend1.com/t/ViewEmail/r/47C79024CC1C17B32540EF23F30FEDED" ] or refer to [ HYPERLINK "https://nike.box.com/s/1her6v4qzwbt6hjtxhhmkvpe6ctob2o6" ].

**»» Questions?** [ HYPERLINK "mailto:Marc.Caputo@nike.com?subject=Salary%20history%20legislation" ], recruiter & project manager.

---

**[PAGE  ]**

EMAIL TO MANAGERS WITH OPEN REQS
Target Date: Friday, October 13, 2017

**Heads up!** We recently made some important updates to the **questions you can & can't ask** during interviews and conversations with candidates.

[ HYPERLINK "http://hrcbi.nike.com:82/lawfulquestions.php" ] – and note new guidance on avoiding discussions about **salary history** with candidates.

**Your recruiter will collect salary expectations from candidates during initial conversations**, so you can focus on assessing the candidate's qualifications and fit for the role.

Please also make sure that **all members of your interview panels** thoroughly understand [ HYPERLINK "http://hrcbi.nike.com:82/lawfulquestions.php" ]. As the hiring manager, we are relying on you to ensure all interviewers follow these rules – in order to protect Nike, and to create a positive & inclusive experience for all candidates.

Thank you – please reach out to your recruiter or Talent Acquisition partner with any questions.

**[PAGE  ]**

Confidential

NIKE_00060751

NOTIFICATION ADDED TO CALENDAR INVITES FROM COORDINATORS TO HIRING MANAGERS / INTERVIEWERS
Launch Date: Friday, October 13, 2017

**Heads up!** *We recently made important updates to* [ HYPERLINK "http://hrcbi.nike.com:82/lawfulquestions.php" ]. *Note that* **salary history** *is now a Do Not Ask question. Before speaking with any candidates, it's important that you and all interviewers thoroughly understand Nike's Do Not Ask Questions and follow these rules – in order to protect our company, and to create a positive & inclusive experience for all candidates.*

Hello Everyone,

Hiring Manager Name has requested you be a part of the panel interview for the E Band Program Director - Capability Offense position in the _____ organization.  Please accept this interview proposal for Candidate Name

Candidate Name will be instructed to check in with reception upon arrival.  Please meet Candidate Name in the lobby and escort him to the conference room.  Following the interview, please escort Candidate Name to the Next Destination to meet with Panelist Name for his next interview.

Candidate Name's resume and conference room confirmation are attached:

(Insert resume and meeting room confirmation here)

Please reach out should you have any questions.

Thank you,
Coordinator Name

[PAGE  ]

Plaintiff's Trial Exhibit 301
Page 8 of 12

NOTIFICATION ADDED TO HIRING CONTENT PAGES ON HR WEBSITE
Launch Date: Friday, October 13, 2017

**Salary History added to Do Not Ask Questions list**

Important updates were recently made to Nike's Do Not Ask Questions list. [ HYPERLINK "http://hrcbi.nike.com:82/lawfulquestions.php" ] – and note that **salary history** is now a Do Not Ask question.

**Nike HR will collect salary expectations from candidates during initial conversations**, so hiring managers and other interviewers can focus on assessing the candidate's qualifications and fit for the role.

All employees who participate in interviews need to thoroughly understand the right way to request personal information from candidates – in order to protect Nike, and to create a positive & inclusive experience for all candidates.

**[PAGE  ]**

Confidential

NIKE_00060753

NOTIFICATION ADDED TO REQUISITION EMAIL TO HIRING MANAGERS
Launch Date: Friday, October 13, 2017

**From:** BTC_GBL_HR <[ HYPERLINK "mailto:HR.Batch_DoNotReply@nike.com" ]>
**Date:** June 28, 2017 at 11:11:04 PM PDT
**To:** [Hiring Manager]
**Subject: Talent Acquisition Notification**

Hi David,

This email is to confirm that the open position of SR FINANCE ANALYST with the position number of, 50729767, in your *me* portal meets the criteria to recruit. If you have already been in touch with your Recruiter or if this appears to be a duplicate notification, you can disregard this note. The goal of this email is to make sure you know how to get started with the recruitment process.

**Heads up!** We recently made important updates to [ HYPERLINK "http://hrcbi.nike.com:82/lawfulquestions.php" ]. Note that **salary history** is now a Do Not Ask question. Your recruiter will collect salary expectations from candidates during initial conversations, so you can focus on assessing the candidate's qualifications and fit for the role.

Before speaking with any candidates, it's important that you and all interviewers thoroughly understand Nike's Do Not Ask Questions and follow these rules – in order to protect our company, and to create a positive & inclusive experience for all candidates.

As the hiring manager, you own contacting Talent Acquisition when you are ready to get started. If your business group follows a special process to release positions (i.e. Hopper Process), **please make sure your position has received approval before contacting Talent Acquisition.**

**Ready Now?**
If you would like to initiate the recruiting process now, see below for next steps

**Not Ready Yet?**
We'll be waiting for your lead. Keep this email handy or jot down your Talent Acquisition contact information to use when you are ready. Make sure to give us at least 60 days advanced notice from the date you need to have your position filled. Design, Retail, and Nike Tech roles should give 90 days' notice. If you know the skill set you desire is unique or hard to find, please give a 90-day heads-up.

**Fill Strategy: Internal & External**
**Budget Status: Repurposed Budget**
**Budgeted Fill Date: September 25,2013**

This date is currently listed on your position as the date you plan to have someone start. Help us plan our resources. Change this date if your plans change. Each time you update this date on the position in your *me* portal, the requisition we have will automatically be updated.

**When you are ready...**
1. Please contact your assigned Talent Acquisition Resource. Click [ HYPERLINK "http://global-ta-contact-list" ]if you don't know your resource.

**[PAGE ]**

2. Provide your requisition # **00000000 (Only in US)**
3. Provide your job posting as outlined below
4. Based on your hiring needs, we'll assign a Recruiter
5. Your Recruiter will contact you to schedule an intake/strategy meeting within 48 hours.
6. Check-out the [ HYPERLINK "https://nikehr.nike.com/pages/manager-playbook/hiring-38" ] for our Simplified Hiring Process Guide.

**Job Postings:** Help us get your job posted quickly. Start with generic job description available for your job in the *me* portal. Using that as the base, add your unique requirements and desired skills. You can find an example and a template on the [ HYPERLINK "https://nikehr.nike.com/pages/manager-playbook/hiring-38" ]

Here is the ideal format to provide to your Recruiter:
- 1 paragraph describing the position and responsibilities associated with role.
- A bullet point list of the requirements to be considered for the role taken from generic job description (education, work experience, etc. - Please be specific and identify required vs preferred experience)

We look forward to partnering with you!
*Talent Acquisition*

Please note: This is a system generated email from an unmonitored mailbox. Please do not respond to this message.

**[PAGE  ]**

Confidential

NIKE_00060755

**October 9/10:**
- Review updated walking deck (including "tiered approach") with HR Business Planning & Delivery team (Tom Gulka / Chris Dorr)
- Review updated walking deck (including "tiered approach") with Total Rewards (Nick Rettenmeyer)

**October 11:**
- Email from Dan Laboe to Global TA employees:
  - Include best practices / script for candidates to use when asking for compensation & equity expectations
  - Include updated walking deck
  - Include updated recruiter talking points (for ongoing conversations with hiring managers)
- Email from Dan Laboe with updated approach + walking deck to:
  - AMS (Kate Thompson)
  - HR Business Planning & Delivery (Tom Gulka)
  - HR Direct (Carl Hoefer)
  - FLEX (Tina Roberts)
  - Sterling (Julian Miller)

**October 12:**
- Updated policy message to All HRBPs in bi-weekly HRBP Update email newsletter
  - Include updated walking deck
- Updated approach added to hiring & interviewing content on HR Website, NikeU, Taleo, DTC Zero, TA Playbook, etc.

**October 13:**
- Presentation of updated approach @ TA Managers/Directors meeting
- HRBPs + HR Business Planning & Delivery teams use updated walking deck to inform Sr. Leadership about new TA policy
- (postponed from original comms plan):
  - Email notification to managers with current open reqs
  - New notification included in interview calendar invitations from coordinators to hiring managers & interviewers
  - Taleo system notifications include reference to new policy

**October 18 (?)**
- Nike Direct TA shares updated approach with DOC's and Retail Leadership during their bi-weekly calls (including Converse & Hurley)

**Week of October 16:**
- Training sessions for U.S. TA employees + key stakeholders (include WebEx)

**End of October:**
- Sr. Recruiters share best practices for applying new policy @ TA Huddle

Plaintiff's Trial Exhibit 301
Page 12 of 12

# EXHIBIT 37



COMP HISTORY POLICY CHANGE

Confidential

NIKE_00060770

Plaintiff's Trial Exhibit 303
Page 1 of 5



# ONE
# OBJECTIVE

STARTING IN 10/2017, STATES / CITIES ENACTED LAWS REGARDING WHAT EMPLOYERS CAN/CAN'T ASK CANDIDATES. EMPLOYERS MAY NO LONGER ASK CANDIDATES FOR THEIR COMP HISTORY. IT IS THE HIRING MANAGER'S RESPONSIBILITY TO ENSURE THE INTERVIEW GROUP FOLLOWS THIS POLICY.

Confidential

NIKE_00060771



## HR POLICY

THE EMPLOYER MAY NOT INQUIRE ABOUT EXTERNAL CANDIDATES' COMPENSATION HISTORY. THE EMPLOYER MAY ASK FOR THE CANDIDATES' COMPENSATION EXPECTATIONS.

THIS POLICY CONSIDERS COMPENSATION TO INCLUDE WAGES, SALARY, BONUSES, BENEFITS, FRINGE BENEFITS AND EQUITY BASED COMPENSATION.

THE EMPLOYER MAY NO LONGER…

- ASK CANDIDATES OR THEIR EMPLOYERS QUESTIONS ABOUT THEIR COMPENSATION HISTORY
- USE SALARY AS A TOOL FOR DISQUALIFICATION OR AS SCREENING CRITERIA

YOUR RECRUITER WILL COLLECT COMPENSATION EXPECTATIONS FROM CANDIDATES. ALL OTHER HIRING PARTNERS SHOULD NOT ASK CANDIDATES ABOUT COMPENSATION.

Confidential

NIKE_00060772



# RESPONSIBILITIES

| HRBPs | HIRING TEAM | TA |
|---|---|---|
| POLICY COMMUNICATION | ADOPT NEW POLICY | GATHER COMP EXPECTATIONS |
| | ENSURE ALL EMPLOYEES WHO INTERACT WITH CANDIDATES ARE INFORMED | POLICY COMMUNICATION |

**THESE LAWS FALL UNDER NON-DISCRIMINATION STATUTES, AND VIOLATIONS WILL INCUR FINES AND/OR LEGAL ACTION.**

Confidential

NIKE_00060773

# WHAT IF…



**HR POLICY**

- A CANDIDATE VOLUNTARILY DISCLOSES HIS/HER CURRENT OR PREVIOUS COMPENSATION
  - ▷ **DO NOT RECORD THIS INFORMATION IN THE ATS/CRM. YOU MAY NOT BASE THE OFFER OFF THIS INFORMATION**
- A CANDIDATE IS A CURRENT NIKE, INC. ETW
  - ▷ **YOU MUST TREAT ETWS AS EXTERNAL APPLICANTS. YOU MAY NOT INQUIRE ABOUT THEIR CURRENT INFORMATION FROM FLEX NOR LOOK UP THEIR CURRENT INFORMATION**
- A CANDIDATE'S SALARY IS PUBLICLY AVAILABLE
  - ▷ **YOU MAY NOT SEARCH PUBLIC RECORDS FOR CANDIDATES' COMPENSATION HISTORY EVEN IF IT IS PUBLICLY AVAILABLE**
- YOU WOULD LIKE TO VERIFY A CANDIDATE'S CURRENT SALARY AFTER THEY DISCLOSE THE INFORMATION
  - ▷ **AFTER AN OFFER IS MADE, A CANDIDATE MAY AUTHORIZE THE RECRUITER TO VERIFY THEIR SALARY WITH THEIR CURRENT EMPLOYER**
- A CANDIDATE IS INTERNAL
  - ▷ **THIS POLICY ONLY APPLIES TO EXTERNAL CANDIDATES**

Confidential

NIKE_00060774

# EXHIBIT 38

| From: | Laboe, Daniel |
|---|---|
| To: | Lst-Talent.Acquisition.Americas |
| CC: | Lupo, Kim; Westling, Daniel; Lin-Meyer, Monica |
| Sent: | 10/12/2017 7:15:46 PM |
| Subject: | Commitment to Pay Equity |

U.S. TA team-

As part of NIKE, Inc.'s commitment to Diversity & Inclusion, we continually evolve our practices and programs with pay and hiring equity in mind. In support of our commitment, we recently shared that **we will no longer ask candidates about their compensation history.** This is one way we create a positive and inclusive experience for each candidate, while ensuring all candidates who are considered for the same work at the same level and experience are offered equitable compensation.

The U.S. Talent Acquisition team plays a critical role in implementing this practice. **Going forward, U.S. TA is solely responsible for discussing compensation expectations with candidates. All other hiring partners should not ask candidates about compensation.**

In addition, our Total Rewards partners have created an updated Offer Intake Form to collect this information from candidates. There are two versions of this form: one for offers that include equity compensation (E and S band candidates), and one for offers without equity (V through U band candidates). Please use this form as you work with Total Rewards to construct offers for your roles.

Please review the resources on the TA Playbook – which includes the one-pager we will be sharing with HRBPs and other COE partners — plus the following information:

- *Lawful & Unlawful Questions*
- *TA Comp History Practice one-pager*
- *Manager Playbook – Hiring*
- *Hiring Process*

Be aware that hiring & interviewing resources on the HR Website, NA DTC Zero and other key internal websites now reflect this practice, in support of our D&I commitment. Our standard communications to hiring managers & interviewers will also prominently feature these updates—including interview invites from our coordinators, and system notifications from Taleo.

We will offer additional training opportunities later in October to review scenarios and best practices for conversations with hiring managers, interviewers and candidates. Until then, please direct any questions to me.

Thanks,
Dan
Daniel Laboe / Sr Director Talent Acquistion Operations & Innovation

 



Confidential

NIKE_00024727

# EXHIBIT 39

# G B D H

## Goldstein, Borgen, Dardarian & Ho

Shareholders
Linda M. Dardarian
Laura L. Ho
James Kan
Andrew P. Lee

Of Counsel
Barry Goldstein
David Borgen
Morris J. Baller

November 26, 2024

**<u>Via E-Mail Only</u>**

Daniel Prince                                   danielprince@paulhastings.com
Felicia A. Davis                                feliciadavis@paulhastings.com
Laura Rosenbaum                         laura.rosenbaum@stoel.com

      Re:     Jury Trial Management Order – Meeting and Conferring

Dear Daniel, Felicia, and Laura:

      To meet the schedule set forth in the Jury Trial Management Order, the Parties need to promptly exchange information and engage in meet and confer discussions. As you know, joint proposed jury instructions and a joint proposed verdict form are due on January 27, 2025.  By February 3, 2025, the Parties must finalize and file their joint proposed exhibit list, joint proposed witness list, joint neutral statement of the case, and joint voir dire questions.

      Plaintiffs propose the following schedule for the Parties to exchange information and then meet and confer.

**<u>December 3, 2024</u>**: Parties exchange claims, defenses, and/or affirmative defenses that they will pursue at trial.

      Plaintiffs met this deadline in their Opposition to Nike's Motion to Sever.  They also state it here.  First, Plaintiffs' disparate treatment claims.  They seek to prove Nike's pattern or practice of discrimination against women at WHQ in bands L – S, or, in the alternative, liability can be proved based on Ninth Circuit pattern instruction 10.1, where the pattern evidence is also relevant.  Second, Plaintiffs' disparate impact claims challenge two alleged practices: Nike's practice of using prior pay for hires at WHQ before September 2017; and Nike's practice of calculating annual bonuses based on current salary had a disparate impact on women.  Third, Plaintiffs' EPA claims will identify comparable jobs based on Nike's job architecture.  Fourth, Hender will seek to prove her retaliation claim as described in the Second Amended Complaint.

      While Plaintiffs know Nike denies every claim, they currently do not know what Nike's defenses and affirmative defenses will be for each claim.  It is critical that the parties promptly complete this exchange because it is necessary for drafting a joint neutral statement of the case, identifying exhibits, describing the claims, identifying witnesses, and nearly everything else the parties must meet and confer about and then submit to the Court.  Can you please commit to providing plaintiffs with this information by December 3, 2024?

**<u>December 10, 2024</u>**: Parties to exchange proposed jury instructions and proposed verdict forms.

913913.5

*Cahill, et al. v. Nike, Inc.*                    -2-                    November 26, 2024

**December 23, 2024**: Parties to exchange their proposed list of exhibits, list of witnesses, and witness statements for each witness in their proposed list of witnesses.

**January 10, 2025**:

- Parties to exchange any proposed objections and alternative proposals regarding jury instructions and verdict forms.

- Parties to exchange any proposed objections regarding any of the opposing party's exhibits, witnesses, or witness testimony.

- Parties to exchange their lists of rebuttal witnesses and exhibits.

**January 15:**

- Parties to exchange proposed neutral statements.

- Parties to exchange proposed voir dire questions.

- Parties to exchange deposition testimony to be used instead of live testimony.

**January 13-22**: Parties to engage in multiple meet and confer discussions regarding jury instructions, verdict forms, exhibits, and witnesses.

**January 20**: Each party to provide written responses to neutral statement of the case and proposed voir dire questions proposed by opposing party.  Parties to exchange any objections to proposed deposition testimony to be used instead of live testimony.

Given the current schedule and the filings due under the JTMO, Plaintiffs seek to promptly finalize a schedule.  We are available to discuss on November 27 between 11-4:3, November 29 in the afternoon, or December 2 after 10:30am.  In the meantime, please let us know that Nike will meet the initial proposed deadlines because those are critical for the parties' preparation for and meeting of the remaining deadlines.

Sincerely,

Byron Goldstein

BG/kbm

913913.5

**Subject:** RE: Cahill pre-trial deadlines
**Date:** Monday, December 30, 2024 at 11:22:40 AM Pacific Standard Time
**From:** Byron Goldstein
**To:** Rosenbaum, Laura E., Davis, Felicia A., James Kan, Laura Salerno Owens
**CC:** Prince, Daniel, Tapper, Alyssa, Jackson, Lindsey C., Featherstun, Brian
**Attachments:** image001.png

Laura,

Thank you for the response. As we described below, Plaintiffs have made numerous accommodations to Nike. Nike, by contrast, has refused to likewise cooperate. After detailing this, Nike responds, again, without meaningful efforts to accommodate or compromise. While you state you would like to work with Plaintiffs, we need to see this in fact occurring.

It appears that Nike is trying to justify a lack of cooperation and as little transparency as possible by stating that it needs more time to do strategizing on the front-end. Over four months ago, however, Nike declared, to the Court that "It's time for trial." ECF No. 515 at 14. Now, Nike states it does not know what its exhibits will be, who its witnesses will be, or what they will testify about.

Plaintiffs are ready to promptly meet these deadlines and do not need the additional time Nike states it needs. Cooperation and transparency are two requirements for a productive meet and confer, pretrial process, and thus efficient and just trial. If Nike is unwilling to do so, then we need to discuss how the Parties will approach the Court for assistance because, unless both Parties are so committed, these processes cannot occur as they should.

Some responses to your comments in blue below.

1. Regarding language for witness statements, we propose the following, which is based Judge Hernandez's PTO and is designed to meet the goals witness statements are designed to meet, including making it possible for the parties and the Court to estimate how long witness testimony will take, allowing the parties to meet and confer on any objections to testimony prior to trial, and allowing the Court and the parties to resolve any objections to testimony prior to trial.

   "Include the name and occupation, the estimated length of direction examination, and the substance of the testimony. Do not say, 'The witness will testify about the accident.' Say, 'the witness will testify that the defendant ran the red light and was going an estimated 30 miles per hour.'"

We agree that we should try to reach agreement on the content of what we exchange in our witness statements. We went back and reviewed the Court's order and confirmed that Judge Baggio does not call for detailed witness statements, only a list of the witness names and occupations. We are willing to include, as you suggest above, the estimated length of examination and a general statement of the topics of testimony, because both are useful for the parties to plan the trial schedule and to identify potential objections to the witnesses proffered by the other side. However, we do not agree to providing the level of detail in Judge Hernandez's example above, as Judge Baggio's trial management order in this

case does not contemplate a similar level of detail.   Among other issues, Judge Hernandez's pre-trial order contemplates plaintiffs first providing their witness statements and then defendant providing witness statements in response; because that type of exchange (in which plaintiffs provide their statements first) is not contemplated by Judge Baggio's order, it is not reasonable to expect defendant to provide detailed witness statements of the type you contemplate above.

We suggest that in addition to name, occupation, and length of testimony, we exchange the general topics of testimony (e.g. "The witness will testify about the accident") but not the additional specifics in the example you provided above.

Nike has thus far been unwilling to make any compromise.  Plaintiffs have provided you transparency in their court filings and are eager to complete the exchanges providing information about how they plan to proceed at trial. There has always been a huge asymmetry of information in this case because Nike is the employer. And Nike's effort to withhold as much information as possible until the latest date possible is not conducive to effective meet and confer or the pretrial process.

Hernandez's JTMO calls for simultaneous exchange. That is especially necessary in this case because of the asymmetry in information and Nike's lack of transparency.

Nike's proposal means Plaintiffs will be unable to file MILs about Nike's general topics, it precludes the Parties from meeting and conferring about the time needed for trial and otherwise makes the pretrial process and pretrial conference less effective.

2.  Regarding when the Parties will exchange exhibits, witnesses, and witness statements, as we explained during the meet and confer discussion, 1/22 is not workable for several reasons. First, the Parties are going to be very busy from 1/22 through 1/27 on wrapping up PTO and jury instructions, two very big joint filings due on 1/27. That leaves four days four exhibits and witnesses.  Second, exhibits and witnesses are the two areas where there will be the biggest disputes.  Third, resolving as many disputes as possible ahead of the filing is critical because witnesses, the scope of their testimony, and the admissibility (and weight) of exhibits will have the biggest impact on both trial preparation and the amount of trial time needed.

   a.  In an effort to compromise, we propose 1/9 for these exchanges.  As noted above, we do not think exchanging witness and exhibit lists so far ahead of trial is beneficial, nor is it anticipated by the Court.  As we noted previously, most of the District of Oregon trial management orders we have seen, including the templates we sent you previously from other judges in this District, contemplate this exchange one week before objections are due.  We have proposed exchanging on 1/22, which is nearly two weeks before objections are due.  We do not agree to exchange them sooner.

Nike has thus far been unwilling to make any compromise. See above reply for other reasons why this proposal is not consistent with cooperation and transparency.  Nor does it seek to address the important problems Plaintiffs identify with Nike's 1/22 proposal, which, again, are:

First, the Parties are going to be very busy from 1/22 through 1/27 on wrapping up PTO and jury instructions, two very big joint filings due on 1/27. That leaves four days four exhibits and witnesses. Second, exhibits and witnesses are the two areas where there will be the biggest disputes.  Third, resolving as many disputes as possible ahead of the filing is critical because witnesses, the scope of their

testimony, and the admissibility (and weight) of exhibits will have the biggest impact on both trial preparation and the amount of trial time needed.

      b. Nike omits any date for the parties to exchange proposed objections regarding exhibits, witnesses, and witness testimony. This is important for the reasons discussed above, including to resolve as many issues as possible before pretrial conference. <span style="color:red">I do not recall either side raising this issue during our conferral call, but in our experience, parties do not exchange witness/exhibit objections in writing before filing them with the Court. We propose submitting our objections to the Court on the Court deadline. Once we review the other side's objections, we are certainly willing to confer, and if we are able to resolve any of the objections, we can inform the Court that the objections have been addressed and resolved by the parties.</span>

We raised this in writing several times, beginning in Plaintiffs' November 26 letter, and we raised it in our most recent call. Nike's response, again, shows an unwillingness to compromise. As we have described several times now, Nike's proposal is not productive because it precludes the Parties from reaching agreement on objections and otherwise complying with the JTMO.

      c. Nike omits exchanging rebuttal witnesses and exhibits, which Plaintiffs have proposed including on several occasions. During the call, Nike said it would consider this. Did you inadvertently omit? <span style="color:red">The Court order does not mention rebuttal witnesses/exhibits, and I don't recall you raising this topic during our conferral call earlier this week. That said, we are willing to exchange them and propose doing so on January 29. (This does not include impeachment witnesses/exhibits, which are handled separately in the trial management order as discussed below.)</span>

We raised this in writing several times, beginning in Plaintiffs' November 26 letter, and we raised it in our most recent call. January 29 is not sufficient time for the Parties to meet and confer, incorporate it into their determination of time for trial, and file MILs. This is not conducive to good faith meet and confer, the pretrial process, and it will cause unnecessary and increased burdens on the Court at the pretrial conference and trial and the jury at the trial.

3. Also regarding exhibits, the JTMO does not explicitly exclude impeachment only exhibits. We wanted to confirm that, like Plaintiffs, Nike understands that all exhibits must be included, including impeachment only exhibits. <span style="color:red">This is another issue that you did not raise in our conferral call, but I am happy to address it here. We disagree with your reading of the trial management order. Page 5 of the Order contemplates that in the "third wave" of pre-trial submissions, the parties will submit impeachment only exhibits/witnesses to the Court only, not the other party. (Per the Order, they are presented to the Court in a sealed envelope and a copy is delivered to the "Court only.") We therefore do not think the Court contemplates that the parties would exchange impeachment exhibits/witness lists.</span>

We raised this in writing several times, beginning in Plaintiffs' November 26 letter, and we raised it in our most recent call. While the JTMO may work in most cases, here, Nike has been less than forthcoming regarding discovery.

For impeachment, will Nike commit to using only those documents, witnesses, and testimony produced or disclosed in response to discovery requests prior to the discovery deadline?

4. Regarding the exchange of jury instructions, we propose going back to 1/10 because that is another joint filing that is critical, there is a lot otherwise going on in January, and time for serious consideration and meet and confer is very important. We have proposed 1/15 for this date and you are now suggesting 1/10. While we do not see the benefit of exchanging earlier, as a compromise, we propose exchanging jury instructions on 1/13.

Fine.

5. Related to note 4, Nike omits a date for exchanging objections and alternative proposals regarding jury instructions. We proposed 1/15, you had previously proposed 1/17. How about we say 1/16? I don't recall a specific date being discussed for this during our conferral call. We suggest that we can discuss any objections or alternative proposals during the conferral call we have agreed to hold on 1/23. To the extent we are unable to agree, we will then be able to present our objections and alternative proposals to the Court in the joint 1/27 filing.

We raised this in writing several times, beginning in Plaintiffs' November 26 letter, and we raised it in our most recent call. This is not conducive to following the JTMO and effectively meeting and conferring because there will probably be lots of objections for Nike, we will spend the whole call just listening to what Nike objects to and confirming we are writing it down properly. It precludes the Parties from consideration prior to the call and otherwise reduces the chances of the Parties resolving disagreements prior to the pretrial conference.

6. Regarding exchange of proposed voir dire, we proposed 1/15, Nike proposes 1/22. How about Friday, 1/17? We do not see the benefit of exchanging proposed voir dire questions so early. Exchanging on 1/22 gives the parties plenty of time to review the other side's proposed questions and confer before the court filing is due on 2/3. We have phone calls scheduled with you to confer on both 1/30 and 1/31, which will give the parties an opportunity to confer on the proposed voir dire questions. We believe our proposed date of 1/22 gives plenty of time both before the scheduled conferral calls and before the filing deadline to try to resolve any disputes. Nor do we think moving up the deadline is helpful, as the voir dire questions posed by the other side are not important to framing your case for trial.

We do not understand the justification for delaying this item too. Again, providing sufficient time to exchange, consider, and meet and confer is in the interests of the pretrial process, the trial, and meeting and conferring.

7. Regarding exchange of deposition testimony, we are okay with your request for doing it on 1/17. But Nike omits having the parties exchange any objections to this deposition testimony so that the parties can most effectively meet and confer and resolve any issues ahead of the pretrial conference. Was this an inadvertent omission? If not, what do you propose? You did not raise this topic during our conferral call. That said, we propose exchanging objections on 1/29. This will give us time to confer on 1/30 and 1/31 as necessary and to prepare the joint filing due on 2/3.

We raised this in writing several times, beginning in Plaintiffs' November 26 letter, and we raised it in our most recent call. This is another proposal from Nike that short circuits meaningful good faith meet and confer.

8. Regarding the exchange of exhibit lists, you helpfully raised this on the call and we thought it was a good proposal. We agree. We also think it would be good to agree on a format to prove these in

so the Parties can each easily combine and de-dupe.  In my last email, I had proposed a means for exchanging exhibit lists to include an exhibit number and then both a Bates range and a neutral document descriptor.  We are still waiting for your response to our proposed format.

We said "we agree" in the response that you quote from us above.


Thank you,
Byron


**From:** Rosenbaum, Laura E. <laura.rosenbaum@stoel.com>
**Sent:** Monday, December 30, 2024 10:08 AM
**To:** Byron Goldstein <brgoldstein@gbdhlegal.com>; Davis, Felicia A. <feliciadavis@paulhastings.com>; James Kan <jkan@gbdhlegal.com>; Laura Salerno Owens <laurasalerno@markowitzherbold.com>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Tapper, Alyssa <alyssatapper@paulhastings.com>; Jackson, Lindsey C. <lindseyjackson@paulhastings.com>; Featherstun, Brian <brianfeatherstun@paulhastings.com>
**Subject:** RE: Cahill pre-trial deadlines

Byron,
We would like to work with plaintiffs to make this pretrial exchange go as smoothly as possible and to allow the parties adequate time to confer on issues where we may be able to reach a resolution. At the same time, we are mindful that trial does not start until March, and many of the joint filings are not due until February 3.  We anticipate using time over the next month to prepare a trial plan that is as efficient and as streamlined as possible given the numerous plaintiffs and all of the individual witnesses who will need to testify with respect to each; moving pre-trial deadlines up too early in January takes away from the time needed to develop trial strategy and ultimately will not facilitate an efficient trial.  We believe time is better spent by the parties up front planning – for example which witnesses and exhibits they actually plan to call and use – rather than exchanging lists so early that they turn out to be unnecessarily overinclusive or inaccurate.

With that in mind, here is our response (in red) to the questions you had outlined below (in black):

1. Regarding language for witness statements, we propose the following, which is based Judge Hernandez's PTO and is designed to meet the goals witness statements are designed to meet, including making it possible for the parties and the Court to estimate how long witness testimony will take, allowing the parties to meet and confer on any objections to testimony prior to trial, and allowing the Court and the parties to resolve any objections to testimony prior to trial.

   "Include the name and occupation, the estimated length of direction examination, and the substance of the testimony.  Do not say, 'The witness will testify about the accident.' Say, 'the witness will testify that the defendant ran the red light and was going an estimated 30 miles per hour.'"

We agree that we should try to reach agreement on the content of what we exchange in our witness statements.  We went back and reviewed the Court's order and confirmed that Judge Baggio does not

call for detailed witness statements, only a list of the witness names and occupations.  We are willing to include, as you suggest above, the estimated length of examination and a general statement of the topics of testimony, because both are useful for the parties to plan the trial schedule and to identify potential objections to the witnesses proffered by the other side.  However, we do not agree to providing the level of detail in Judge Hernandez's example above, as Judge Baggio's trial management order in this case does not contemplate a similar level of detail.   Among other issues, Judge Hernandez's pre-trial order contemplates plaintiffs first providing their witness statements and then defendant providing witness statements in response; because that type of exchange (in which plaintiffs provide their statements first) is not contemplated by Judge Baggio's order, it is not reasonable to expect defendant to provide detailed witness statements of the type you contemplate above.

We suggest that in addition to name, occupation, and length of testimony, we exchange the general topics of testimony (e.g. "The witness will testify about the accident") but not the additional specifics in the example you provided above.

2. Regarding when the Parties will exchange exhibits, witnesses, and witness statements, as we explained during the meet and confer discussion, 1/22 is not workable for several reasons. First, the Parties are going to be very busy from 1/22 through 1/27 on wrapping up PTO and jury instructions, two very big joint filings due on 1/27. That leaves four days four exhibits and witnesses.  Second, exhibits and witnesses are the two areas where there will be the biggest disputes.  Third, resolving as many disputes as possible ahead of the filing is critical because witnesses, the scope of their testimony, and the admissibility (and weight) of exhibits will have the biggest impact on both trial preparation and the amount of trial time needed.

   a. In an effort to compromise, we propose 1/9 for these exchanges.  As noted above, we do not think exchanging witness and exhibit lists so far ahead of trial is beneficial, nor is it anticipated by the Court.  As we noted previously, most of the District of Oregon trial management orders we have seen, including the templates we sent you previously from other judges in this District, contemplate this exchange one week before objections are due.  We have proposed exchanging on 1/22, which is nearly two weeks before objections are due.  We do not agree to exchange them sooner.

   b. Nike omits any date for the parties to exchange proposed objections regarding exhibits, witnesses, and witness testimony. This is important for the reasons discussed above, including to resolve as many issues as possible before pretrial conference.  I do not recall either side raising this issue during our conferral call, but in our experience, parties do not exchange witness/exhibit objections in writing before filing them with the Court.  We propose submitting our objections to the Court on the Court deadline.  Once we review the other side's objections, we are certainly willing to confer, and if we are able to resolve any of the objections, we can inform the Court that the objections have been addressed and resolved by the parties.

   c. Nike omits exchanging rebuttal witnesses and exhibits, which Plaintiffs have proposed including on several occasions. During the call, Nike said it would consider this. Did you inadvertently omit?  The Court order does not mention rebuttal witnesses/exhibits, and I don't recall you raising this topic during our conferral call earlier this week.  That said, we are willing to exchange them and propose doing so on January 29.  (This does not include impeachment witnesses/exhibits, which are handled separately in the trial management

order as discussed below.)

3. Also regarding exhibits, the JTMO does not explicitly exclude impeachment only exhibits. We wanted to confirm that, like Plaintiffs, Nike understands that all exhibits must be included, including impeachment only exhibits. This is another issue that you did not raise in our conferral call, but I am happy to address it here. We disagree with your reading of the trial management order. Page 5 of the Order contemplates that in the "third wave" of pre-trial submissions, the parties will submit impeachment only exhibits/witnesses to the Court only, not the other party. (Per the Order, they are presented to the Court in a sealed envelope and a copy is delivered to the "Court only".) We therefore do not think the Court contemplates that the parties would exchange impeachment exhibits/witness lists.

4. Regarding the exchange of jury instructions, we propose going back to 1/10 because that is another joint filing that is critical, there is a lot otherwise going on in January, and time for serious consideration and meet and confer is very important. We have proposed 1/15 for this date and you are now suggesting 1/10. While we do not see the benefit of exchanging earlier, as a compromise, we propose exchanging jury instructions on 1/13.

5. Related to note 4, Nike omits a date for exchanging objections and alternative proposals regarding jury instructions. We proposed 1/15, you had previously proposed 1/17. How about we say 1/16? I don't recall a specific date being discussed for this during our conferral call. We suggest that we can discuss any objections or alternative proposals during the conferral call we have agreed to hold on 1/23. To the extent we are unable to agree, we will then be able to present our objections and alternative proposals to the Court in the joint 1/27 filing.

6. Regarding exchange of proposed voir dire, we proposed 1/15, Nike proposes 1/22. How about Friday, 1/17? We do not see the benefit of exchanging proposed voir dire questions so early. Exchanging on 1/22 gives the parties plenty of time to review the other side's proposed questions and confer before the court filing is due on 2/3. We have phone calls scheduled with you to confer on both 1/30 and 1/31, which will give the parties an opportunity to confer on the proposed voir dire questions. We believe our proposed date of 1/22 gives plenty of time both before the scheduled conferral calls and before the filing deadline to try to resolve any disputes. Nor do we think moving up the deadline is helpful, as the voir dire questions posed by the other side are not important to framing your case for trial.

7. Regarding exchange of deposition testimony, we are okay with your request for doing it on 1/17. But Nike omits having the parties exchange any objections to this deposition testimony so that the parties can most effectively meet and confer and resolve any issues ahead of the pretrial conference. Was this an inadvertent omission? If not, what do you propose? You did not raise this topic during our conferral call. That said, we propose exchanging objections on 1/29. This will give us time to confer on 1/30 and 1/31 as necessary and to prepare the joint filing due on 2/3.

8. Regarding the exchange of exhibit lists, you helpfully raised this on the call and we thought it was a good proposal. We agree. We also think it would be good to agree on a format to prove these in so the Parties can each easily combine and de-dupe. In my last email, I had proposed a means for exchanging exhibit lists to include an exhibit number and then both a Bates range and a neutral document descriptor. We are still waiting for your response to our proposed format.

We look forward to discussing these issues with you on Monday at 1:15, in the hopes that we can reach a final resolution of these issues and turn our attention to the pre-trial filings themselves.

Thanks,
Laura

**Laura Rosenbaum** | Stoel Rives LLP | Partner
Direct: (503) 294-9642 | Mobile: (503) 201-7278

---

**From:** Rosenbaum, Laura E.
**Sent:** Friday, December 27, 2024 3:44 PM
**To:** Byron Goldstein <brgoldstein@gbdhlegal.com>; Davis, Felicia A. <feliciadavis@paulhastings.com>; James Kan <jkan@gbdhlegal.com>; Laura Salerno Owens <laurasalerno@markowitzherbold.com>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Tapper, Alyssa <alyssatapper@paulhastings.com>; Jackson, Lindsey C. <lindseyjackson@paulhastings.com>; Featherstun, Brian <brianfeatherstun@paulhastings.com>
**Subject:** RE: Cahill pre-trial deadlines

Hi Byron,
I am out of the office today due to the holidays, but I will respond to your email below over the weekend so that we can work toward resolving these deadlines. Are you available for a conferral call on Monday? We are free on our side any time after 1pm on Monday.
Laura

**Laura Rosenbaum** | Stoel Rives LLP | Partner
Direct: (503) 294-9642 | Mobile: (503) 201-7278

---

**From:** Byron Goldstein <brgoldstein@gbdhlegal.com>
**Sent:** Thursday, December 26, 2024 4:47 PM
**To:** Rosenbaum, Laura E. <laura.rosenbaum@stoel.com>; Davis, Felicia A. <feliciadavis@paulhastings.com>; James Kan <jkan@gbdhlegal.com>; Laura Salerno Owens <laurasalerno@markowitzherbold.com>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Tapper, Alyssa <alyssatapper@paulhastings.com>; Jackson, Lindsey C. <lindseyjackson@paulhastings.com>; Featherstun, Brian <brianfeatherstun@paulhastings.com>
**Subject:** RE: Cahill pre-trial deadlines

Laura,

Thank you for sending this revised proposed pre-trial calendar. We see the Murphy 1/7 deposition has a question mark. We confirmed that date and are confirming again.

While some of the calendar accurately reflects some of the meet and confer discussions the Parties have thus far had, key components, unfortunately, do not. Below is a table showing Nike's current proposal following Plaintiffs' second proposal and the meet and confer exchange. The parentheses under Nike's current proposal states what, if any, changes Nike made following the meet and confer from its second

proposal. As you can see from this table, since Nike's second proposal and the parties' meet and confer discussion, Nike has moved further away from compromising on several critical steps towards complying with the JTMO.

| Action # | Actions to comply with JTMO | Plaintiffs' 2d proposal | Nike's 3d proposal (changes from Nike's second proposal) | JTMO due date |
|---|---|---|---|---|
| 1. | Parties exchange claims, defenses, and/or affirmative defenses that they will pursue at trial. | 12/24 | 1/10 (no change because LR 16-5 always required to do so no later than this date) | 1/27 |
| 2. | Parties to exchange proposed jury instructions | 1/6 | 1/15 (changed from 1/10) | 1/27 |
| 3. | Parties to exchange their proposed list of exhibits, list of witnesses, and witness statements for each witness in their proposed list of witnesses. | 1/6 | 1/22 (no change) | 2/3 |
| 4. | Parties to exchange any proposed objections and alternative proposals regarding jury instructions. | 1/15 | none (changed by deleting 1/17) | 1/27 |
| 5. | Parties to exchange any proposed objections regarding any of the opposing party's exhibits, witnesses, or witness testimony. | 1/15 | none | 2/3 |
| 6. | Parties to exchange their lists of rebuttal witnesses and exhibits. | 1/15 | None (change from open to doing so). | 2/3 |
| 7. | Parties to exchange proposed neutral statements | 1/10 | 1/29 (changed from unclear position) | 2/3 |
| 8. | Parties to exchange voir dire questions | 1/15 | 1/22 (no change) | 2/3 |
| 9. | Parties to exchange testimony to be used instead of live testimony. | 1/15 | 1/17 (changed from open to 1/15) | 2/3 |
| 10. | Parties to engage in multiple meet and confer discussions regarding jury instructions, verdict forms, exhibits, and witnesses. | 1/13 - 23 | 1/23, 1/30, 1/31 (changed from 1/20 week) | |
| 11. | Each party to provide written responses to neutral statement of the case and proposed voir dire questions proposed by opposing party. | 1/22 | Nike omits (changed from 1/22) | 2/3 |
| 12. | Parties to exchange any objections to proposed deposition testimony to be used instead of live testimony. | 1/22 | Nike omits | 2/3 |

Some notes and questions below:

1. Regarding language for witness statements, we propose the following, which is based Judge Hernandez's PTO and is designed to meet the goals witness statements are designed to meet, including making it possible for the parties and the Court to estimate how long witness testimony will take, allowing the parties to meet and confer on any objections to testimony prior to trial, and allowing the Court and the parties to resolve any objections to testimony prior to trial.

"Include the name and occupation, the estimated length of direction examination, and the substance of the testimony. Do not say, 'The witness will testify about the accident.' Say, 'the witness will testify that the defendant ran the red light and was going an estimated 30 miles per hour.'"

2. Regarding when the Parties will exchange exhibits, witnesses, and witness statements, as we explained during the meet and confer discussion, 1/22 is not workable for several reasons. First, the Parties are going to be very busy from 1/22 through 1/27 on wrapping up PTO and jury instructions, two very big joint filings due on 1/27. That leaves four days four exhibits and witnesses. Second, exhibits and witnesses are the two areas where there will be the biggest disputes. Third, resolving as many disputes as possible ahead of the filing is critical because witnesses, the scope of their testimony, and the admissibility (and weight) of exhibits will have the biggest impact on both trial preparation and the amount of trial time needed.

a. In an effort to compromise, we propose 1/9 for these exchanges.

b. Nike omits any date for the parties to exchange proposed objections regarding exhibits, witnesses, and witness testimony. This is important for the reasons discussed above, including to resolve as many issues as possible before pretrial conference.

c. Nike omits exchanging rebuttal witnesses and exhibits, which Plaintiffs have proposed including on several occasions. During the call, Nike said it would consider this. Did you inadvertently omit?

3. Also regarding exhibits, the JTMO does not explicitly exclude impeachment only exhibits. We wanted to confirm that, like Plaintiffs, Nike understands that all exhibits must be included, including impeachment only exhibits.

4. Regarding the exchange of jury instructions, we propose going back to 1/10 because that is another joint filing that is critical, there is a lot otherwise going on in January, and time for serious consideration and meet and confer is very important.

5. Related to note 4, Nike omits a date for exchanging objections and alternative proposals regarding jury instructions. We proposed 1/15, you had previously proposed 1/17. How about we say 1/16?

6. Regarding exchange of proposed voir dire, we proposed 1/15, Nike proposes 1/22. How about Friday, 1/17?

7. Regarding exchange of deposition testimony, we are okay with your request for doing it on 1/17. But Nike omits having the parties exchange any objections to this deposition testimony so that the parties can most effectively meet and confer and resolve any issues ahead of the pretrial conference. Was this an inadvertent omission? If not, what do you propose?

8. Regarding the exchange of exhibit lists, you helpfully raised this on the call and we thought it was a good proposal. We agree. We also think it would be good to agree on a format to prove these in so the Parties can each easily combine and de-dupe.

Can we have a call tomorrow to discuss and finalize? After 11:15am works for us.

Thanks,

Byron

---

**From:** Rosenbaum, Laura E. <laura.rosenbaum@stoel.com>
**Sent:** Thursday, December 26, 2024 2:25 PM
**To:** Byron Goldstein <brgoldstein@gbdhlegal.com>; Davis, Felicia A. <feliciadavis@paulhastings.com>; James Kan <jkan@gbdhlegal.com>; Laura Salerno Owens <laurasalerno@markowitzherbold.com>
**Cc:** Prince, Daniel <danielprince@paulhastings.com>; Tapper, Alyssa <alyssatapper@paulhastings.com>; Jackson, Lindsey C. <lindseyjackson@paulhastings.com>; Featherstun, Brian <brianfeatherstun@paulhastings.com>
**Subject:** Cahill pre-trial deadlines

Byron,

I am attaching a revised proposed pre-trial calendar, reflecting our conferral discussion earlier this week.   If this does not accurately reflect our discussion, please let me know.  A few notes:

- During our call, we had discussed the possibility of depo designation exchange on January 15.  In this calendar, we propose moving that to January 17, so that it doesn't fall on the same day as jury instruction exchange.  Please let us know if that works for you.

- You will see on the calendar that we continue to propose January 22 for the exchange of witness statements and exhibit lists.  This is consistent with standard practice in Oregon federal court.  (See, for example, the template pre-trial schedules of Judge's McShane and Kasubhai, both of whom have proposed schedules posted on their judge's webpage and both of whom have defendants produce witness statements and exhibit lists one week before motions in limine and objections are due.  In our schedule, we are proposing exchange on January 22, which is nearly two weeks before those motion/objection deadlines on February 3.  We think that gives both sides sufficient time to review and respond to the other side's proposals.  This deadline is already more than a month before the pre-trial conference, and any earlier is too far before trial to be reasonable.

- You stated during conferral that you will make a proposal regarding the level of detail for witness statements, so that we can review that and confer before consulting the court on its preferences.  We look forward to receiving that proposal from you.

- We did not discuss on our call how we will exchange exhibit lists.  We propose that we exchange a list of exhibits that identifies exhibits both by Bates range and by a neutral document description (e.g. "Nike 0001-0004, January 1, 2025 letter") so that when we pull the other side's exhibits, we can be sure we are identifying the correct document.   Please confirm whether that approach works for you.

- Finally, we are continuing to consider your proposal that the parties prepare a joint pre-trial juror questionnaire.  We will get back to you on that issue, as we think we have some additional time to reach an agreement on that.

Thanks,

Laura

**Laura Rosenbaum** | Partner
**STOEL RIVES LLP** | 760 SW Ninth Ave, Suite 3000 | Portland, OR 97205
Direct: (503) 294-9642 | Mobile: (503) 201-7278
laura.rosenbaum@stoel.com | Bio | vCard | www.stoel.com



This email may contain material that is confidential, privileged, and/or attorney work product for the sole use of the intended recipient. Any unauthorized review, use, or distribution is prohibited and may be unlawful.

# EXHIBIT 40

**From:** **James Kan** jkan@dhkl.law 📎
**Subject:** Cahill et al. v. Nike, Inc., No. 3:18-cv-01477-AB - joint email request
**Date:** February 10, 2025 at 9:59 AM
**To:** Jennifer Paget Jennifer_Paget@ord.uscourts.gov, baggio_crd@ord.uscourts.gov
**Cc:** Byron Goldstein brgoldstein@dhkl.law, Laura Salerno Owens laurasalerno@markowitzherbold.com, Brian Denlinger
bd@ackermanntilajef.com, es@ackermanntilajef.com, Barry Goldstein bgoldstein@dhkl.law, Laura Ho lho@dhkl.law,
feliciadavis@paulhastings.com, Prince, Daniel danielprince@paulhastings.com, lindseyjackson@paulhastings.com,
Tapper, Alyssa alyssatapper@paulhastings.com, Kathryn Roberts kathrynroberts@markowitzherbold.com,
cja@ackermanntilajef.com, india Bodien india@indialinbodienlaw.com, laura.rosenbaum@stoel.com, James Kan jkan@dhkl.law,
Kelsie Crippen kelsiecrippen@markowitzherbold.com

Dear Judge Baggio and Courtroom Deputy Paget:

The Parties wish to jointly inform the Court that we have reached a tentative agreement to
resolve the case. The Parties would like to keep the fact of settlement confidential until they
can reduce all of the terms to a final, written agreement. However, subject to the Court's
approval, the Parties propose that the current filing, hearing, and trial deadlines be taken off
calendar, including the Parties' Monday, February 10 pretrial filing deadlines, and the Friday,
February 14 hearing on Plaintiffs' motion to strike Defendant's expert witness. The Parties are
happy to provide more information should the Court request it.

The Parties further request that the Court set a telephonic status conference at the Court's
convenience to discuss next steps.

I confirm that I have conferred with Nike's counsel (cc'ed above) and that they join this
request.

We look forward to your response.  Thank you.

James

James Kan
(pronouns: he/him)
Goldstein, Borgen, Dardarian & Ho
155 Grand Avenue, Suite 900
Oakland, CA 94612
(510) 763-9800



Please Note:
The information in this E-mail message is legally privileged and confidential information intended only
for the use of the addressee(s) named above. If you, the reader of this message, are not the intended
recipient, you are hereby notified that you should not further disseminate, distribute, or forward this E-
mail message. If you have received this E-mail in error, please notify the sender as soon as possible. In
addition, please delete the erroneously received message from any device/media where the message
is stored.