**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
**Kelsie G. Crippen, OSB #193454**
KelsieCrippen@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Byron Goldstein** (admitted *pro hac vice*)
byron@goldsteinbrowne.com
**Barry Goldstein**, Of Counsel (admitted *pro hac vice*)
barry@goldsteinbrowne.com
GOLDSTEIN BROWNE, PC
1111 Broadway 3rd Floor, Office 04-117
Oakland, CA 94607
Telephone: (510) 584-9020

Counsel for Plaintiffs
[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| KELLY CAHILL, et al., individually and on behalf of others similarly situated, | Case No. 3:18-cv-01477-AB |
| Plaintiffs, | **PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO FILE A RENEWED MOTION FOR CLASS CERTIFICATION** |
| vs. | |
| NIKE, INC., an Oregon Corporation, | **FILED UNDER SEAL** |
| Defendant. | **ORAL ARGUMENT REQUESTED** |

**Laura L. Ho** (admitted *pro hac vice*)
lho@dhkl.law
**James Kan** (admitted *pro hac vice*)
jkan@dhkl.law
**Katharine F. Trabucco** (admitted *pro hac vice*)
ktrabucco@dhkl.law
DARDARIAN HO KAN & LEE
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800 | Fax: (510) 835-1417


**Craig Ackerman** (admitted *pro hac vice*)
cja@ackermanntilajef.com
**Brian Denlinger** (admitted *pro hac vice*)
bd@ackermanntilajef.com
**Erika Smolyar** (admitted *pro hac vice*)
es@ ackermanntilajef.com
ACKERMANN & TILAJEF PC
315 S Beverly Drive, Suite 504
Beverly Hills, CA 90212
Telephone: (310) 277-0614 | Fax: (310) 277-0635

## <u>TABLE OF CONTENTS</u>

**Page**

MEMORANDUM OF LAW ........................................................................................................1

I.    INTRODUCTION ........................................................................................................1

II.   THE CHANGED CIRCUMSTANCES HERE JUSTIFY A RENEWED
      MOTION FOR CLASS CERTIFICATION. ...........................................................3

      A.    Nike's Repeated Statement that this Court Should Approve a Class
            Settlement is a Changed Circumstance Because it is an Admission that
            Commonality is Now Satisfied. ......................................................................4

      B.    New Evidence, Previously Concealed by Nike, Also Warrants Granting
            the Motion for Leave to File a Renewed Class Certification Motion. ...................5

            1.    The New Starfish-Related Evidence Supports Renewed
                  Consideration of the Class Pattern or Practice Claim. ...................5

            2.    The New Prior Pay Evidence Supports Renewed Consideration of
                  Class Certification for the Disparate Impact Claim. ..................14

                  a.    The New Evidence Shows Commonality on the Disparate
                        Impact Claim. .....................................................................14

                  b.    Nike's Justification for Choosing Not to Identify its
                        Declarants is Based on a Misstatement of Disparate
                        Impact's Elements. ..........................................................18

II.   NIKE'S DILIGENCE ARGUMENT IS CONTRARY TO PLAINTIFF'S
      PERSISTENT, YEARS-LONG EFFORTS. .........................................................20

III.  NIKE'S REMAINING ARGUMENTS IMPROPERLY ARGUE THE MERITS. ..........26

IV.   CONCLUSION ..........................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................................................3

*Bouman v. Block*,
  940 F.2d 1211 (9th Cir. 1991) .........................................................................17, 18

*Briseno v. ConAgra Foods, Inc.*,
  844 F.3d 1121 (9th Cir. 2017) ...............................................................................4

*Brown v. Nucor Corp.*,
  785 F.3d 895 (4th Cir. 2015) ..........................................................................11, 13

*Buchanan v. Tata Consultancy Servs., Ltd.*,
  2017 WL 6611653 (N.D. Cal. Dec. 27, 2017) .......................................................27

*Cahill v. Nike, Inc.*,
  No. 3:18-CV-1477-JR, 2019 WL 2176916 (D. Or. May 16, 2019) ........................11

*Cahill v. Nike, Inc.*,
  No. 3:18-CV-1477-JR, 2019 WL 2179575 (D. Or. Feb. 26, 2019) ........................11

*Chen-Oster v. Goldman, Sachs & Co.*,
  325 F.R.D. 55 (S.D.N.Y. 2018) ..............................................................................13

*Coleman v. United Servs. Auto. Ass'n*,
  No. 3:21-CV-00217-RSH-KSC, 2023 WL 11960598 (S.D. Cal. June 26,
  2023) .......................................................................................................................26

*Computer Task Grp., Inc. v. Brotby*,
  364 F.3d 1112 (9th Cir. 2004) ...............................................................................20

*Davidson v. O'Reilly Auto Enters., LLC*,
  968 F.3d 955 (9th Cir. 2020) ..............................................................................2, 3

*Diaz v. Am. Tel. & Tel.*,
  752 F.2d 1356 (9th Cir. 1985) ...............................................................................12

*Dunbar v. Walt Disney Co.*,
  No. CV 22-1075-DMG (JCX), 2022 WL 18357775 (C.D. Cal. July 25, 2022) .....19

*E.E.O.C. v. Farmer Bros. Co.*,
  31 F.3d 891 (9th Cir. 1994) ...................................................................................13

*E.E.O.C. v. Inland Marine Indus.*,
    729 F.2d 1229 (9th Cir. 1984) ........................................................................19

*Freyd v. Univ. of Oregon*,
    990 F.3d 1211 (9th Cir. 2021) ......................................................................19

*Gay v. Waiters' & Dairy Lunchmen's Union*,
    694 F.2d 531 (9th Cir. 1982) ........................................................................14

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ........................................................................................2

*Heyne v. Caruso*,
    69 F.3d 1475 (9th Cir. 1995) ........................................................................13

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) ..........................................................................4

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977) ..................................................................................6, 14

*Microsoft Corp. v. Baker*,
    582 U.S. 23 (2017) ..........................................................................................2

*Misuraca v. Washington Cnty. Det. Ctr./Jail*,
    No. 3:21-CV-00846-IM, 2024 WL 3226245 (D. Or. June 28, 2024) ...........2

*Moussouris v. Microsoft Corp.*,
    No. 2:15-cv-01483-JLR, 2018 WL 3328418 (W.D. Wash. June 25, 2018) ...........17

*Nash v. Horizon Freight Sys., Inc.*,
    No. 19-cv-01883-VC, 2020 WL 7640878 (N.D. Cal. Dec. 23, 2020) ...........20

*Nealey v. Transportacion Maritima Mexicana, S. A.*,
    662 F.2d 1275 (9th Cir. 1980) ......................................................................25

*Obrey v. Johnson*,
    400 F.3d 691 (9th Cir. 2005) ........................................................................13

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651 (9th Cir. 2022) ..........................................................................6

*Parra v. Bashas', Inc.*,
    291 F.R.D. 360 (D. Ariz. 2013) ....................................................................17

*Plata v. Brown*,
    754 F.3d 1070 (9th Cir. 2014) ........................................................................2

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)................................................................12, 14

*Sidibe v. Sutter Health*,
    103 F.4th 675 (9th Cir. 2024) ................................................20

*Stender v. Lucky Stores, Inc.*,
    803 F. Supp. 259 (N.D. Cal. 1992) .........................................5, 14

*Stockwell v. City & Cnty. of San Francisco*,
    749 F.3d 1107 (9th Cir. 2014) ................................................19

*Story v. Midland Funding LLC*,
    No. 3:15-CV-0194-AC, 2016 WL 5868077 (D. Or. Oct. 7, 2016)..........26

**Rules**

Fed. R. Civ. P.
    23................................................................................2, 3, 4, 5
    23(b)(3) .......................................................................26
    23(c)(1) .......................................................................2
    23(c)(1)(C) ...................................................................3
    23(f)............................................................................2
    30(b)(6) .......................................................................23
    34................................................................................25
    34(b)(2)(C) ...................................................................25

Fed. R. Evid.
    401..............................................................................14

## MEMORANDUM OF LAW

### I.    INTRODUCTION

Nike does not dispute changed circumstances warrant leave to file a renewed class certification motion. It merely disputes that the circumstances have changed. Nike is mistaken.

First, the court initially denied class certification of the disparate impact claim based on the record before it because it determined there was insufficient evidence to infer a policy or practice of requiring prior pay. The evidence Nike withheld until after class certification, however, contains an admission from the employees responsible for creating and implementing pay practices across Nike World Headquarters that prior pay was "requisite information."

Second, in denying class certification on the pattern or practice claim, the initial decision found insufficient evidence to support "Plaintiffs' assessment" that the Starfish-related complaints forced Nike to acknowledge its pattern of discrimination against women. This decision afforded the Starfish-related evidence little weight after Nike assured the Court that the company knew little about Starfish, including whether higher-level women were involved or who created it. Based on these assurances, Nike asserted that none of its actions or admissions in 2018 were in response to Starfish-related complaints or investigations. But the evidence that Nike withheld shows: Nine of the most powerful women at Nike created Starfish after determining that they needed to take extraordinary actions to address Nike's longstanding pattern of discriminating and condoning discrimination against women. This effort resulted in these women and many others providing evidence to Nike about this pattern of discrimination. The changed circumstances have forced Nike to concede that this evidence forced it to discharge high-level executives and admit to its Human Resources failures. This new evidence—from Nike executives—provides what the court previously believed was missing: classwide evidence on which a jury could rely to bolster the inference, already exceedingly strong based on statistical evidence, that the pay disparity was a result of discrimination.

Indeed, Nike itself apparently recognized that commonality is now satisfied—repeatedly stating it will seek approval of an alleged class settlement. Unable to convincingly dispute

changed circumstances, Nike urges this Court to deny leave by deciding the merits of a yet-to-be-filed class certification motion. It dedicates most of its brief to these arguments, but Nike itself urged this Court to require this motion for leave before addressing the merits of class certification, and the Court ruled that Plaintiff must first seek leave.[1] Regardless, Nike's merits-based arguments are contrary to the record and certainly do not show that the claims cannot be resolved using classwide evidence.

Contrary to Nike's characterization, this motion is not "challenging" or asking for an "undoing" of the initial class certification decision and "the Ninth Circuit's denial of Rule 23(f) review."[2] This motion simply asks if Plaintiff is "free to renew the motion after obtaining further evidence in pre-trial discovery."[3] And the proposed renewed motion for class certification will simply argue that the Rule 23 criteria are satisfied based on the updated, complete record.[4] Granting leave in these circumstances, where the evidence should have been disclosed to Plaintiff prior to the initial class certification motion, encourages candor to the Court and discourages gamesmanship in discovery because it refuses to reward Nike for its recalcitrance in discovery and lack of transparency to the Court and Plaintiff.[5]

---

[1] *See* Dkt. 650 at 19:7-12; Dkt. 651.

[2] Declining a Rule 23(f) petition does not indicate a view on the merits of class certification because "Courts of appeals wield 'unfettered discretion' under Rule 23(f)," and it does not preclude the district court from subsequently certifying the class. *Microsoft Corp. v. Baker*, 582 U.S. 23, 31 (2017) (emphasizing that, after denial of a Rule 23(f) petition, "the District Court could later reverse course and certify the proposed class.") (citing Rule 23(c)(1)(C)).

[3] *Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 96-65 (9th Cir. 2020) (citing 23(c)(1)(C)) (additional citation omitted).

[4] Granting leave applies Rule 23's "flexibility," which was built in because it "enhances the usefulness of the class-action device …." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982). This design is clear because Rule 23 simultaneously provides that an "order whether to certify" should be at "an early practicable time" while also providing that such an "order" can be "altered or amended before final judgment." Rule 23(c)(1).

[5] After all, the "purpose of discovery is to remove surprise from trial preparation so the parties can obtain evidence necessary to evaluate and resolve their dispute." *Misuraca v. Washington Cnty. Det. Ctr./Jail*, No. 3:21-CV-00846-IM, 2024 WL 3226245, at *2 (D. Or. June 28, 2024) (citation and internal quotations omitted). Indeed, as this litigation has demonstrated, "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Plata v. Brown*, 754 F.3d 1070, 1078 (9th Cir. 2014) (citation omitted).

Nike urges this Court to disregard the merits of both this motion for leave and a proposed renewed motion for class certification because this case was filed seven years ago. Yet this duration is not evidence of some alleged undue delay by Plaintiff; it is evidence of how deeply and insistently Nike—the party with access to the evidence—buried proof of its discrimination. Courts remedy discrimination, not reward those who conceal it.

But Nike still claims that Plaintiff was not diligent even though it does not seriously deny that all the new evidence was requested in March 2019, that Plaintiff made numerous meet and confer efforts, and that Plaintiff repeatedly sought court intervention to obtain the new evidence. The Court found only one party "recalcitrant in responding to discovery requests," lacking "transparency" in discovery, and with "certainly some deficient production."[6] That party was Nike. It should not benefit from the misconduct that the Court condemned. Nor should Nike's conduct prevent the putative class from addressing the merits of their class discrimination claims.

## II.   THE CHANGED CIRCUMSTANCES HERE JUSTIFY A RENEWED MOTION FOR CLASS CERTIFICATION.

Rulings on motions for class certifications "are not frozen once made." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 479 n.9 (2013). Instead, Rule 23(c)(1)(C) expressly "empowers district courts to alter or amend class-certification orders based on circumstances developing as the case unfolds." *Id.* (citation omitted and cleaned up). The Ninth Circuit unequivocally stated this means: a plaintiff is "free to renew the motion after obtaining further evidence in pre-trial discovery." *Davidson*, 968 F.3d at 964–65 (citing Rule 23(c)(1)(C)) (additional citation omitted). Here, circumstances changed after "obtaining further evidence."

Unable to seriously dispute the changed circumstances, Nike resorts to claims that Plaintiff was not diligent. But this cannot be squared with the litigation record, as described below, which reveals Plaintiff made persistent efforts over years to obtain the new evidence. In any event, courts should not "interpose an additional hurdle into the class certification process delineated in [Rule 23]" because the Supreme Court "counsels in favor of hewing closely to the

---

[6] Dkt. 111 at 9; Dkt. 521 at 15.

text of Rule 23." *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017). This Court should thus provide Plaintiff with the opportunity to use the updated record in support of class certification instead of rewarding Nike for its discovery misconduct.

**A.**     **Nike's Repeated Statement that this Court Should Approve a Class Settlement is a Changed Circumstance Because it is an Admission that Commonality is Now Satisfied.**

The first changed circumstance is that Nike—by repeatedly stating that this Court should approve an alleged class settlement—itself recognized that commonality is now satisfied.[7] Nike insists its repeated representation "says nothing about commonality for class certification purposes" because "'the criteria for class certification are applied differently in litigation classes and settlement classes.'" Dkt. 661 at 40 (quoting *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556-57 (9th Cir. 2019)). But Nike omits what *In re Hyundai* says next: the only "difference between litigation and settlement classes" is that a settlement class does not require the court to consider subsection "23(b)(3)(D)," manageability, because "the proposal is that there be no trial." *Id.* at 557. But "other specifications of the Rule," such as commonality, are "of vital importance" in the settlement context and thus require, in comparison to the litigation context, "undiluted, even heightened, attention." *Id.* at 557-58. Changed circumstances thus include Nike's concession that commonality and Rule 23's "other specifications" are satisfied, which contrasts with Nike's opposition to the initial motion for class certification. This alone demonstrates changed circumstances warranting a renewed motion for class certification. *See* Dkt. 652 at 37.[8]

---

[7] Nike repeatedly stated to this Court that it would seek to enforce an alleged class settlement. *See* Dkt. 644 at 2 (Nike stating "the Parties did reach a settlement of the putative class claims .... Nike intends to move to enforce that agreement so that participating individuals can receive the benefits of that settlement."); Dkt. 650 at 10:4-12, 13:1-2 (during Court conference, Nike stating, "we did reach a resolution of the putative class claims" and it would seek "to try to enforce the settlement agreement"); Dkt. 649 (Nike stating it will file a "motion to enforce a settlement of the putative class claims.").

[8] If Nike did not believe there were changed circumstances for commonality, then it was representing to this Court that it would bring a motion it believed was frivolous.

**B.    New Evidence, Previously Concealed by Nike, Also Warrants Granting the Motion for Leave to File a Renewed Class Certification Motion.**

The initial class certification order, as Nike recognizes, declined certification because it found the evidence insufficient at the time to show commonality was satisfied. *See* Dkt. 652 at 8, 11-14; *see also, e.g.*, Dkt. 661 at 7, 26 (Nike stating that this decision "turned in large part on employee declarations"). After "obtaining further evidence," Plaintiff seeks the opportunity to use the updated record to show Rule 23's prerequisites are met. Nike contends there is no new evidence, and, if there is, then it is immaterial. And, if it is, Nike then argues that each piece of evidence is alone insufficient to prove commonality or the merits of the class claims. But this is neither how evidence nor commonality operates. The Court should grant this motion to consider the updated, full record with the new evidence.[9]

**1.    The New Starfish-Related Evidence Supports Renewed Consideration of the Class Pattern or Practice Claim.**

With the new evidence, the updated record can prove that the Starfish work forced Nike itself to recognize its pattern of discrimination and condoning discrimination against women. This forced recognition included Nike's determination that responsibility for this pattern of discrimination lay with its second highest executive in the company and "heir apparent to the CEO role," other top executives at Nike World Headquarters, and its centralized human resources function overseeing all efforts to prevent and remediate discrimination.[10]

---

[9] Though Nike protests that the existing record is irrelevant to changed circumstances, it is well-established that the Court must view the new evidence in tandem with the existing record to determine if the full effect of the record shows that common questions are capable of classwide resolution at trial. *See, e.g.*, *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 319 (N.D. Cal. 1992) ("Proof of discriminatory intent may be direct, circumstantial, or may be inferred from statistical evidence," and "all evidence that a plaintiff presents can contribute to this inference, and should therefore be considered as cumulative.") (quoting *Segar v. Smith*, 738 F.2d at 1249, 1278 (D.C. Cir. 1984)) (additional citations omitted).

[10] Nike executives, as Nike's Chief Human Resources Officer admits, "manage broad teams, recognize and promote our internal talent, hire in larger volume, and are charged with leading the tone for our culture," and they "serve as role models." Email from Monique Matheson to Nike

In the initial class certification motion, Plaintiff relied on a combination of statistical and other evidence to show that the liability question—whether Nike's pattern of discrimination was its "regular rather than the unusual practice"—was capable of classwide resolution. *See* Dkt. 652 at 14, 24.[11] This statistical evidence demonstrates Nike paid women over $11,360 less per year than similarly situated men and that there is a less than one in one billion chance that this disparity arises from anything but discrimination. *See* Dkt. 146 at 57-58; Dkt. 149-1 at 55, Table 2, Col. 2, Panel C.[12] Plaintiff sought to support this statistical evidence with evidence from Starfish, arguing that "Nike's reactions to the Starfish Survey" showed Nike was forced to recognize its pattern of discrimination. Dkt. 146 at 58. It further showed, Plaintiff argued, that Nike refused to address known discrimination. *Id.* at 59.

The court initially denied certification because it found the statistical evidence, standing alone, was insufficient and that "Plaintiffs' assessment of Nike's response to the Starfish Survey" did not fill the gap because the supporting record was insufficient. *See* Dkt. 310 at 53. Based on Nike's statements (and the absence of the new evidence later uncovered), the Court determined

---

Employees re "Representation & Pay Equity Commitments", Declaration of Byron Goldstein in Support of Reply ("Goldstein Decl."), ¶ 2, Exhibit A at 1.

[11] Nike asserts that a pattern or practice claim requires a plaintiff to show discrimination was both "the regular rather than the unusual practice" and its "standard operating procedure." Dkt. 661 at 26. But these are synonymous phrases describing the same standard, not two different elements. *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). And, contrary to Nike's suggestions, plaintiffs are "not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." *Id.* at 360.

[12] Although Nike opposed addressing the merits of class certification in this motion, Nike argues that Plaintiff's statistical evidence is alone insufficient to satisfy commonality or the merits. *See e.g.*, Dkt. 661 at 13 n.3. But the decision stated that the statistical evidence only had "some bearing on" its commonality analysis because it only "becomes more useful … once the … standard operating procedure is identified." Dkt. 310 at 24 n.13. And the statistical evidence is more persuasive now than in 2023 because statistical evidence must be considered in combination with the other evidence and the other evidence is stronger. *See* Dkt. 652 at 23-36.

Regardless, Nike's arguments will be shown insufficient to defeat commonality. If expert evidence is admissible, the district court is prohibited from denying commonality based on its evaluation of the evidence's persuasiveness because "it is for the jury, not the court, to decide the persuasiveness of [this evidence]." *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 678 (9th Cir. 2022). Here, the statistical evidence is unquestionably admissible. *See* Dkt. 652 at 14 n. 14, 29 n. 27.

that Nike did not know who created Starfish and that Nike responsibly addressed any alleged discrimination, as opposed to failing to address known discrimination. *See* Dkt. 652 at 16-18; *see also, e.g.*, Dkt. 310 at 19 n.9 ("Nike's Human Resources Chief doesn't know who created the survey or who completed it") (citing Matheson deposition). The Court therefore decided that "Plaintiffs' assessment" was merely "Plaintiffs' assessment."

But the new evidence demonstrates that it was Nike's assessment. The new evidence shows the Starfish complaints and investigations indeed forced Nike to recognize its pattern of discrimination and condoning discrimination against women. This new evidence shows, in contrast to the record in 2022, that it was Nike's own executives, who determined based on their extensive experience at Nike, that Nike would continue its pattern of discrimination and refusal to address known discrimination unless they took the extraordinary actions—unheard of in any other large company—through the work that they titled "Project Starfish." Dkt. 652 at 15-16, 21-31.

They undertook this courageous, "unofficial" work because discrimination at Nike was normalized, and Nike's "official" channels for addressing discrimination instead condoned it. The fact that nine of the most powerful women at Nike knew that Nike would refuse to act if they alone urged it do so or if they went through Nike's official channels further shows that the class, all of whom were in levels below executives, stood little chance. This new evidence further shows that these Nike executives found a pattern of discrimination at Nike, and the Starfish work resulted in these executives and many other women reporting this discrimination to the very top of Nike. Nike could, finally, no longer ignore its pattern of discrimination. *See* Dkt. 652 at 15-16, 21-31.

While the initial class certification's factual findings afforded little weight to Starfish based on the record at the time, the current record stands in stark contrast. Indeed, Nike abandons most of its representations made in opposition to the initial motion for class certification—relied on by the court in denying the initial class certification motion—that it doesn't know who created Starfish and Starfish wasn't about discrimination anyway. *See* Dkt. 652 at 16-17; *see*

*generally* Dkt. 661. Despite this, Nike still urges the Court to find that there is "nothing new." Nike now urges this Court to determine that the Starfish-related evidence is entitled to little weight because, Nike claims, "[t]he women [involved] were not NIKE executives …." Dkt. 661 at 29.[13]

That's just not true. Nike knows they were executives, because its own documents say so. Eight out of the nine women who created Starfish were Nike Vice Presidents at job level E7 or above, a level Nike itself repeatedly confirmed are its executives. *See, e.g.*, Dkt. 653, Ex. 30 at 15; *id.*, Ex. 33 at 19, 32; "Nike Job Architecture," Declaration of Byron Goldstein in Support of Reply ("Goldstein Decl."), ¶ 3, Exhibit B at 5-7; Dkt. 285-8 at 1; *see also* Goldstein Decl., ¶ 4, Exhibit C (Long Dep. 13:20-14:3) (longtime former senior director throughout Nike World Headquarters testifying that Nike considers vice presidents and above to be its executives). And Nike states these eight women were vice presidents, with the ninth a Senior Director, one level below vice president. *See* "Brand Marketing Team & Talent Executive Summary," Goldstein Decl., ¶ 5, Exhibit D at 4; "Consumer Marketplace (+CAT & MERCH)," Goldstein Decl., ¶ 6, Exhibit E, at ███ 19, 26-███████ Goldstein Decl., ¶ 7, Exhibit F (Strong Dep. 22:8-20).[14] Nike documents further demonstrate their long Nike tenures, with a combined 150+ years of experience at Nike. *See* Dkt. 665 at 30-31.

This new evidence demonstrates changed circumstances because the updated record can prove that the Starfish effort forced Nike itself to recognize its pattern of discrimination and condoning discrimination against women—a common question of fact relevant to the ultimate liability question. Since Nike assured the Court in 2022 that Starfish was a collection of complaints from unknown men or women that was not about discrimination, Nike could previously claim that its 2018 actions and admissions were not in response to the Starfish. There

---

[13] Plaintiff stated that eight of the nine were executives, with the ninth women a Senior Director, which is the job level immediately below Nike executives. Dkt. 652 at 15 n. 11.

[14] Plaintiff previously identified Nike-produced documents demonstrating these women were Nike executives, which Plaintiff cited to in the Motion for Leave. *See* Dkt. 652 at 15 n.11 (citing Dkt. 511-2 (listing Nike-produced documents and testimony)).

is a wide gap between this old record and the updated record showing nine of the most powerful women at Nike, with a combined 150+ years of experience at Nike, created and led Starfish to address Nike's pattern of discrimination against women.

Similarly, the 2022 record led the Court to reject Plaintiff's argument that Nike failed to address known discrimination and instead find Nike responsibly addressed discrimination. In contrast, the updated record shows Nike's centralized, "official" human resources function responsible for addressing and remediating discrimination instead condoned discrimination. The Nike executives leading Starfish found—based on their experiences, what they witnessed, and the complaints they collected—that there was "no trust in HR/ER if you report." Dkt. 652 at 15.[15] The 2022 record contained no such evidence.

Nor did it contain the new evidence showing that the Nike executives who were charged with preventing and remediating discrimination instead condoned it. This evidence concerns ████████████ report of a very serious complaint of sex discrimination to Nike's Chief Human Resources Officer (Monique Matheson) and General Counsel (Hilary Krane), which they disregarded for over a year until ████████ considered going public. Dkt. 652 at 25-26 & n. 20. In opposition, Nike suggests ████████ did not report this very serious complaint to Matheson and Krane. Dkt. 661 at 31 (Nike asserting the evidence "fail[s] to demonstrate that Ms. Matheson and Ms. Krane spoke with the complainant or what occurred afterward *if they did*, let alone demonstrate that they condoned discrimination.") (emphasis added).

Yet Nike admitted to this Court that ████████ "submitted internal concerns to NIKE," which this Court relied on. *See* Dkt. 615 at 12-13 (quoting Dkt. 583). And, with respect to

---

[15] Nike attacks the weight of the "Project Starfish" presentation reflecting this finding of "no trust in HR/ER if you report" by stating that Graham testified "there were a few themes" that she "did not agree with." *See* Dkt. 661 at 31. But this is misleading because Graham testified that "these themes were very much tied these questionnaires … that we reviewed as well as discussion that we had in this process, and quite frankly discussions that we [the women involved with Starfish] had had for years." Goldstein Decl., ¶ 8, Exhibit G (Graham Dep. 138:5-13). And Nike obstructed questioning about this and the other themes these women found because it repeatedly instructed Graham not to answer questions about the themes, including with respect to the "No trust in HR/ER" theme. *Id.* (Graham Dep. 94:11-95:22, 138:16-19).

███████ complaint, this Court found: "it is known to the Court based on discovery material filed under seal that the individual in question submitted a complaint involving a very serious incident …." *Id.* at 13.

New evidence also demonstrates █████ provided this "complaint involving a very serious incident" to Matheson and Krane as part of Starfish, Krane admitted █████ made "credible allegations," █████ expressed her expectation to Matheson and Krane that they act on her complaint, and Matheson and Krane did not act for over one year. In February 2018, █████ sends an email with the subject line "Starfish," asking to schedule a meeting with Matheson and Krane. Dkt. 653, Ex. 5 at 1. The meeting is scheduled for a few days later. *See* Emails Between Matheson and █████ cc'ing Krane, Goldstein Decl., ¶ 9, Exhibit H at 2. After the meeting between these three, Krane, on behalf of herself, and Matheson emails █████ thanking her for the conversation that they "know wasn't easy" and stating they would "be in touch again." *Id.* █████ immediately responds to Matheson and Krane: "Please let me know how things progress and if I can be of any help." Email from █████ to Krane cc'ing Matheson, Goldstein Decl., ¶ 10, Exhibit I. The women met again about a month later. Goldstein Decl., ¶ 11, Exhibit J (email from Krane to █████ discussing a second meeting in March 2018). In June 2019, █████ drafts an email to Krane and Matheson:

> [He] has … assaulted another woman … A year ago I sat across from you and re lived the worst night of my life … I confided in you with the hope that steps would be taken to ensure no one else would have to experience what I did … I was not followed up with after our conversation. … I feel betrayed by you … This company does not support women … It is run by men for men to protect men and make them rich. I am ashamed and embarrassed to have spent over a decade of my life here. I plan to go public with my experience and escalate this to ensure the truth is heard.

Dkt. 653, Ex. 6 at 1-3. The next day, █████ emails subject line "URGENT" to Matheson and Krane for a call regarding their February 2018 meeting. Goldstein Decl., ¶ 9, Ex. H at 1. Krane later admits that █████ made "credible allegations" and that they did not initiate an investigation until 2019. ████████████████████████

Additional new evidence further shows Nike's failure to address known discrimination. Genevieve Long, a longtime former senior director in human resources, explained that Nike executives, provided with regular reports about employee pay, knew for years that women were paid "far below … men in the organization." Dkt. 654, ¶ 4, Ex. C (Long Dep. 26:20-29:5). Nike's criticism of this evidence from Long is that, Nike claims, Plaintiff deposed Long "without confirming it was proceeding over NIKE's objections and without the presence of the sole defendant, NIKE." Dkt. 661 at 16. But the Court rejected this exact argument: "Nike was properly noticed regarding the deposition and indeed plaintiffs accommodated Nike's counsel in rescheduling the deposition. The deponent was properly noticed and represented by counsel at the deposition." Dkt. 386 at 4. Despite all this evidence of known discrimination, Nike still failed to remedy the problem. *See* Dkt. 149-1 at 58, Table C, col. 10 (Dr. Neumark finding that the probability that women's lower pay during the first nine months of 2019, the most recent data Nike produced, resulted from chance as opposed to discrimination was one in ten million).

This new evidence thus strengthens the record showing Nike refused to address known discrimination—just the type of classwide evidence that many courts, including this Court and the Ninth Circuit, find shows common evidence in support of a pattern of discrimination. *See, e.g., Brown v. Nucor Corp.*, 785 F.3d 895, 910 (4th Cir. 2015) (finding, with respect to a pattern or practice claim alleging promotion discrimination against black employees, "alleged tolerance of discrimination from top management at the plant supports the workers' contention of a class-wide injury that affected them all" and this supports finding commonality satisfied); *Cahill v. Nike, Inc.*, No. 3:18-CV-1477-JR, 2019 WL 2179575, at *8 n.5 (D. Or. Feb. 26, 2019), *report and recommendation adopted*, No. 3:18-CV-1477-JR, 2019 WL 2176916 (D. Or. May 16, 2019) ("specific instances of defendant's knowledge of sex discrimination and protection of discriminatory practices by high-level managers ... [are] facts from which the court can infer a

discriminatory motive.") (citing *E.E.O.C. v. Inland Marine Indus.*, 729 F.2d 1229, 1235 (9th Cir. 1984)).[16]

Indeed, the new evidence revealed Nike's consciousness of guilt about its pattern of discrimination and condoning discrimination against women. Dkt. 652 at 27-29. This is classwide "affirmative evidence of guilt." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (holding, in a disparate treatment action, "that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'") (citations omitted). The 2023 decision had no such evidence. Instead, the 2022 record led the Court to credit the testimony from Matheson, "Nike's Human Resources Chief," that she "doesn't know who created the survey or who completed it." Dkt. 310 at 19 n.9.

Nike pivots, claiming, even if new evidence exists, that it is irrelevant to the class pattern or practice claim alleging that alleges Nike paid and promoted women less because they are women. *See, e.g.*, Dkt. 661 at 13, 28, 32 n.18 (Nike arguing Starfish does "not relate to pay or promotion" and that any evidence of sexual harassment is irrelevant). However, Nike's own executives who led Starfish determined that evidence from this effort is relevant to Nike's pay

---

[16] Nike also suggests that Plaintiff can only demonstrate commonality or prove a pattern or practice claim based solely on counting the number of complaints regardless of the circumstances. *See, e.g.*, Dkt. 661 at 8. Yet a "plaintiff may demonstrate an inference of discrimination in whatever manner is appropriate in the circumstances." *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1361 (9th Cir. 1985). And such a requirement would reward employers, like Nike, who its employees know condones discrimination or retaliates, because there will be fewer records of complaints.

In addition, while the number of complaints is not relevant for commonality or the merits, the more reliable evidence demonstrates that there were about 300 complaints, and the Court already found that Nike misrepresented the record by at least 50%. After representing to the Court for years that there were 30 Starfish complaints, at a minimum, the Magistrate Judge's finding that there are at least 15 additional written complaints shows Nike misrepresented the number of complaints by at least 50%. *See* Dkt. 521 at 15 (finding, in addition to the "30" representation Nike had repeatedly provided for years, in 2024, "Plaintiffs do present evidence of about 15 other unique complaints from Starfish in existence from third parties and suggest there were also oral complaints"). Strong, further, testified that she counted 300 complaints. Goldstein Decl., ¶ 7, Ex. F (Strong Dep. 86:12-20). While Nike suggests Graham disputes there were 300 Starfish-related complaints, Graham testified that she cannot dispute Strong's testimony that there were approximately 300 Starfish complaints, and she admitted that there were more than 30 Starfish complaints. Goldstein Decl., ¶ 8, Ex. G (Graham Dep. 118:18-119:1, 135:19-21, 136:3-18).

and promotion discrimination against women: they explicitly concluded, based on both the complaints these executives gathered and their own long-term experiences at Nike, that actions needed to create meaningful change included "equality in pay and promotions." Dkt. 652 at 24-25 (citing Dkt. 653, Ex. 1 at 4) (additional citations omitted). In fact, Nike acknowledged this connection to the Court: Starfish-related complaints compelled it to find that it was "necessary" for Nike "to analyze Nike's compensation and promotion practices .…" *See* Dkt. 166-2 at 73.

Further, it is well-accepted that an employer's discriminatory attitude towards a class of people (e.g., women) is "plainly relevant" to the question of whether an employer treats women worse than men in pay, promotions, hiring, terminations, or otherwise because they are women. *See, e.g.*, *Obrey v. Johnson*, 400 F.3d 691, 697 (9th Cir. 2005) (finding evidence of generally "disparaging remarks about the class of persons to which plaintiff belongs" was "plainly relevant" to a disparate treatment claim alleging the employer denied plaintiff a promotion because of his race); *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) ("Because hostility against women underlies decisions to discharge or refuse to hire women because of their gender, *evidence of sexual harassment often will be relevant* to claims of gender-based employment discrimination.") (emphasis added) (citation omitted); *Nucor Corp.*, 785 F.3d at 912 (rejecting the argument that "a racially hostile work environment" cannot support "a claim for disparate treatment in promotions decisions" because this is "divorced from reality," "justice is not blind," and "we need not avert our eyes from the broader circumstances surrounding employment decisions, and the inferences that naturally follow.").[17] Such evidence thus supports commonality for a pattern or practice claim alleging discrimination in pay and promotions. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 325 F.R.D. 55, 76-77 (S.D.N.Y. 2018) (finding common questions for a pay and promotions pattern or practice claim based on a combination of

---

[17] Exclusion of such evidence, as Nike urges, would deprive plaintiffs of crucial, well-established evidence for proving that discrimination was because of sex. *See, e.g.*, *Heyne v. Caruso*, 69 F.3d 1475, 1479-80 (9th Cir. 1995) ("Recognizing" that a reason why "evidence of the employer's discriminatory attitude in general is relevant and admissible" is that "there will seldom be eyewitness testimony as to the employer's mental processes") (cleaned up).

complaints alleging "sexual harassment," "sexualization," "verbal abuse," and failure to address known discrimination, and statistical evidence).[18]

The new Starfish-related evidence thus means that the statistical evidence and the cumulative power of all the evidence is stronger and capable of proving the liability question for the class. *See, e.g.*, *Stender*, 803 F. Supp. at 319 ("Inferences drawn from statistical proof are strongest when they are substantiated by other evidence in the case which brings 'the cold numbers convincingly to life.'") (quoting *Teamsters*, 431 U.S. at 339). After all, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. For example, if Nike is a place where the two executives in charge of preventing and remediating discrimination—its Chief Human Resources Officer (Monique Matheson) and General Counsel (Hilary Krane)—instead condoned discrimination against women, the jury can find the classwide statistical and other evidence more persuasive. *See* Dkt. 652 at 23-28. Or, if the jury finds that Nike's Chief Human Resources Officer or corporate witness were dishonest about a material fact, "the factfinder is entitled to consider [this] as affirmative evidence of guilt." *See Reeves*, 530 U.S. at 147; Dkt. 652 at 27-28.

### 2.    The New Prior Pay Evidence Supports Renewed Consideration of Class Certification for the Disparate Impact Claim.

#### a.    The New Evidence Shows Commonality on the Disparate Impact Claim.

This Court should also grant leave to renew the class certification motion on the disparate impact claim because new evidence demonstrates what was previously found missing: Nike

---

[18] Nike also pivots to another argument: even if there is new evidence and the new evidence is relevant to commonality, Nike insists this Court must still find the changed circumstances insufficient because each piece of evidence is not enough standing alone to demonstrate that Nike had a pattern of discrimination against women. *See, e.g.,* Dkt. 661 at 31 (Nike arguing that some new evidence in isolation "even if true, hardly demonstrates widespread discrimination."). But this is contrary to well-established Title VII and evidence law. *See, e.g.*, *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 554 (9th Cir. 1982) ("Even if, standing alone, each of these three types of circumstantial evidence fails to establish a prima facie case, the proper question is whether in combination they are sufficient to support an inference of intentional discrimination."). Regardless, Nike improperly skips to the end, arguing the merits of class certification and Plaintiff's claims.

admitting it required the use of prior pay. In its opposition to the initial motion for class certification, Nike assured the Court that it "never required" the use of prior pay when setting starting salaries. Dkt. 183 at 18. The Court then found commonality was not satisfied because there was "insufficient" evidence that Nike "required" prior pay's use. *See, e.g.*, Dkt. 310 at 46. But in an email Nike withheld until after class certification, the Nike employees responsible for creating and implementing pay practices across Nike World Headquarters (employees in "Total Rewards") admitted that prior pay was "requisite information" for setting starting pay across Nike World Headquarters. *See* Dkt. 652 at 31-33.

Nike's counterarguments are not persuasive, and they are more suitable for an opposition to a class certification motion, not an opposition to a request to brief the issue. For example, Nike now asserts that it "was already known and not in dispute" that "Total Rewards was *involved* in pay practices." Dkt. 661 at 37 (emphasis added). But being "involved" is not the same as "responsible for creating and implementing pay practices across Nike World Headquarters." And Nike does not and cannot claim that it "was already known and not in dispute" that Total Rewards was "responsible for" pay practices across Nike World Headquarters. Nor does Nike dispute that this new evidence shows both that Total Rewards was responsible for pay practices across Nike World Headquarters, and that it directed prior pay be "requisite information."

Rather, Nike just suggests that Plaintiff's evidence is not sufficiently persuasive because Nike did not produce the "Offer Intake Form" that was attached to the "requisite information" email. *See* Dkt. 661 at 36. Nike argues this even though the only pre-October 2017 "Offer Intake Form" it produced is dated a few months later and indisputably included "prior pay" as "requisite information." Dkt. 652 at 33. But Plaintiff and the putative class should not continue to be penalized because Nike has been "recalcitrant in responding to discovery requests" and "demonstrated a certain lack of transparency" in discovery. Dkt. 111 at 8-9; Dkt. 521 at 15. Just as Nike once represented that it did not know who created Starfish and that it did not concern gender discrimination, Nike now states it could not produce the form attached to the email "likely due to the fact that the document is nearly ten years old and predated NIKE's

preservation obligations." Dkt. 661 at 36 n.24.[19] This is another example of a recurring pattern: Nike withholds the complete record that only it possesses and then argues that the record is insufficient.[20]

Regardless, the employees that Nike made responsible for creating and implementing pay practices across Nike World Headquarters admitted that prior pay was "requisite information" for setting starting pay in an email with the subject line "Offer Intake Form," and the only pre-October 2017 "Offer Intake Form" that Nike produced indisputably includes prior pay as "requisite information." Dkt. 653, Ex. 21 at 2-3; *id.*, Ex. 22 at 6. And, as Nike concedes, the Offer Intake Form produced is from just five months later. *See* Dkt. 661 at 9. Nike should not continue to benefit from its selective, improper productions.

Nike then urges the Court to disregard the new evidence because "the Court already has found that the Offer Intake Form does 'not suggest the existence of a company-wide policy given the evidence produced through previous discovery.'" Dkt. 661 at 9 (quoting Dkt. 386 at 5) (emphasis removed). But this Court came to that conclusion in November 2023, based on Nike's assurances that it "already has complied" with Plaintiff's March 2019 RFPs and that the Offer Intake Form was not "centrally created," and without the benefit of the "requisite information" email that Nike later produced showing these assurances were false. Dkt. 378 at 4, 5 n.1; *see* Dkt. 652 at 20-21 & n.15; Dkt. 653 at 5, ¶ 22 (email produced in 2024).

In denying the initial motion for class certification, the Court accepted Nike's

---

[19] While this email is *now* from ten years ago, it was created less than two years before the complaint was filed. Indeed, the 2016 "requisite information" email was preserved when it was finally produced in 2024. And Nike should have produced this email and its attachment in 2019 because, as even Nike acknowledged, it was responsive to Plaintiff's March 2019 RFPs. *See* Sec. III, *infra*.

[20] Nike's suggestion that perhaps there was no form attached to the email at all is senseless. The email states it "attached" an "excel template" for "external offers" and the subject is "Offer Intake Form." Dkt. 653, Ex. 21 at 2-3. In response to this email, other Nike employees chimed in, offering feedback, or stating they had sent the forms to others in the company. *Id.* at 1-3 (employee stating she provided the form to "[talent acquisition] partners for their feedback," and saying "I hate to mandate formats and forms, but this level of discipline not only helps our internal processes, it helps TA [Talent Acquisition] be buttoned up on the candidate side so they only have to go to the candidate once or twice asking for information").

representation that it provided its managers with unconstrained discretion to determine starting pay. Dkt. 183 at 10; Dkt. 310 at 10. The email Nike suppressed, however, demonstrates that prior pay information was "requisite." This is classwide evidence a factfinder can rely on in finding that Nike had a company-wide policy or practice of using prior pay to set starting pay. After ceasing the practice in late 2017, Nike admitted as much, saying: "[i]n the past, we often focused on the new hire's prior salary." *See* Dkt. 158-2 at 8.

And based on the updated, more fulsome record, the Court already indicated that it is "not presently convinced" that managers had the independent discretion that Nike claims. Dkt. 579 at 5:7-11 ("Nike points out that all of the allegedly discriminatory decisions were made by different individual managers of the plaintiffs, but I'm not presently convinced that those managers had independent free rein to act outside of Nike's systems and policies in making those decisions.").[21]

Considering the full record cumulatively, as the factfinder must, it would be no great leap for the factfinder to conclude that Plaintiff's classwide evidence proves the elements of a disparate impact claim. *See Bouman v. Block*, 940 F.2d 1211, 1225 (9th Cir. 1991) (instructing that, for a disparate impact claim, "the trier of fact must consider the statistics in light of all the evidence.") (citations omitted). For example, Nike admissions—including the admission from the employees who set practices across Nike World Headquarters that prior pay was "requisite information"—that it had a practice of using prior pay until about October 2017 are consistent with the statistical evidence. The statistical evidence shows the starting pay disparity for women

---

[21] Nike's reliance on cases denying certification based on discretion misses that plaintiffs in those cases challenged the discretion itself as the practice allegedly causing a disparate impact. *See, e.g.*, *Moussouris v. Microsoft Corp.*, No. 2:15-cv-01483-JLR, 2018 WL 3328418, at *18 (W.D. Wash. June 25, 2018) (plaintiffs "unequivocally predicate their challenge on the discretion allowed," which they alleged left "evaluators [] free to weight criteria for pay and promotions in ways that were unconstrained.") (cleaned up). Here, by contrast, Plaintiff challenges a particular practice that was centrally directed, use of prior pay, as opposed to "unconstrained" discretion. *See, e.g.*, *Parra v. Bashas', Inc.*, 291 F.R.D. 360, 373-76 (D. Ariz. 2013) (nine years after the court denied certification of Title VII claims explicitly challenging the discretion allowed as a cause of pay discrimination, finding commonality satisfied and certifying the Title VII pay discrimination claim after plaintiffs' theory changed from manager discretion to a centrally-directed practice).

dropped by over 50% after Nike stopped its prior pay practice, a textbook example of the but-for causation standard for Title VII. *See* Dkt. 652 at 35.

Nike still urges this Court to decide the claim on the merits, asserting that the new evidence does not "show NIKE regularly used prior pay to set starting pay." Dkt. 661 at 37. But, again, the cumulative impact of the classwide evidence proves the opposite. For example, Nike admitted in a training presentation used across Nike World Headquarters: "In the past, we often focused on the new hires (sic) prior salary and/or the size of the increase the new hire would receive." Dkt. 653, Ex. 30 at 8. And the new evidence now demonstrates that Total Rewards employees made this "often focused" admission. Dkt. 652 at 34.[22]

**b.      Nike's Justification for Choosing Not to Identify its Declarants is Based on a Misstatement of Disparate Impact's Elements.**

Nike asserts that it can still use its declarants in any way it chooses despite choosing not to identify them as potential trial witnesses. Nike made a choice to prevent its declarants from potential examination under oath before this Court. Nike argues that its choice to not identify as potential witnesses is without consequence because Nike claims Plaintiff provides "***no authority***" for why its declarants are either excluded or entitled to little weight. Dkt. 661 at 38 (emphasis in original). But this Court exercised its authority: "**No exhibits or testimony will be received into evidence at trial … unless presented in accordance with this Order**." Dkt. 652 at 36 (quoting Dkt. 557 at 6) (emphasis in original). Nike does not directly address this Order. *See* Dkt. 661 at 38.

Instead, Nike's sole response is a misstatement of law for a disparate impact claim because it states that the elements are different for an individual disparate impact claim than a class disparate impact claim. *See* Dkt. 661 at 38. Nike contends a disparate impact claim brought by an individual only asks whether a specific practice adversely impacted the single plaintiff. *Id.* But disparate impact requires the same elements regardless of whether it is brought by a class or

---

[22] While Nike claimed ignorance of who made this admission prior to the initial motion for class certification, new evidence revealed that it was Total Rewards—the employees responsible for creating and implementing pay practices across Nike World Headquarters. *See* Dkt. 652 at 34.

an individual: a "facially neutral" employment practice that "in fact fall more harshly on one group than another." *Inland Marine Indus.*, 729 F.2d at 1233 (citation omitted); *see also, e.g.*, *Dunbar v. Walt Disney Co.*, No. CV 22-1075-DMG (JCX), 2022 WL 18357775, at *2 (C.D. Cal. July 25, 2022) (dismissing individual disparate impact claim for failure to allege "that an employment practice broadly impacts a certain group in an adverse manner—not merely a single person.") (emphasis in original).

The Ninth Circuit repeatedly confirmed the standard is the same for a disparate impact claim brought by a class and one brought by an individual: "Generally disparate impact analysis is used in a class action, but it may also form the basis of an individual claim…. In whatever procedural guise a disparate impact claim appears, … [a]bsent … a group-based disparity, the claim fails, whether it is articulated by an individual or a class." *Stockwell v. City & Cnty. of San Francisco,* 749 F.3d 1107, 1115 (9th Cir. 2014) (citations omitted); *see also, e.g., Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224-26 (9th Cir. 2021) (applying this same disparate impact standard to an individual's disparate impact claim).

This means, here, in "whatever procedural guise" through which the disparate impact claim is tried, the key question is the same: whether Nike had a practice of using prior pay that had a disproportionately adverse impact on women or whether, as Nike claims, it did not have this practice because it made its managers responsible for deciding starting pay based on whatever factors they wanted. And, as Plaintiff described in opposition to Nike's Motion to Sever and in the Joint Proposed Pretrial Order, the evidence will thus be the same regardless of whether the Court presides over a class trial or thousands of individual trials. *See* Dkt. 652 at 39. That Nike chose not to name any of its declarants as potential witnesses is thus not justified by the fact that trial was set for Plaintiff's individual disparate impact claim.

Even if Nike had sufficiently described why its noncompliance with the pretrial order is justified, its inability or refusal to produce any responsive discovery concerning these witnesses should exclude them from trial or, at a minimum, entitle them to less weight at class certification and trial than in 2023. *See* Dkt. 605 at 19, 44 (Plaintiff's Motion in Limine to exclude testimony

concerning topics on which it has failed to provide requested discovery, including with respect to Nike's declarants). Nor can Nike justify its failure to produce by insisting that Plaintiff should have deposed Nike's "happy campers,"—though courts are regularly skeptical of such witnesses—without any of the requested discovery that is necessary for impeachment or to otherwise prepare for the deposition. *See, e.g.*, *Nash v. Horizon Freight Sys., Inc.*, No. 19-cv-01883-VC, 2020 WL 7640878, at *1-2 (N.D. Cal. Dec. 23, 2020) ("Many courts have expressed skepticism about the use of these 'happy camper' declarations to defeat a motion for class certification … for good reason," including companies' "potentially significant influence over the workers" and that "declarants are relying on incomplete, or even false, information.") (collecting cases); *Computer Task Grp., Inc. v. Brotby*, 364 F.3d 1112, 1116 (9th Cir. 2004) (finding discovery produced "two years after it was requested … seriously prejudiced [plaintiff], as key depositions had already been taken."); *see also* Dkt. 606, Ex. 10 (Plaintiff's RFP No. 134 specifically requesting discovery concerning the representations Nike's declarants made, but Nike refusing to produce this discovery).

The stronger evidence, however, is Nike's admission that prior pay was required, especially in combination with the classwide statistical evidence and Nike's additional admissions. *See e.g., Sidibe v. Sutter Health*, 103 F.4th 675, 701 (9th Cir. 2024) ("Sutter's own admissions would have had more persuasive force than other evidence … the Federal Rules of Evidence recognize the value of a party's own admissions." (citation omitted)); Dkt. 652 at 34-35. Regardless, this is a question for the factfinder. Accordingly, Nike's repudiation of the declarations by failing to name any of the declarants as a witness for trial is yet another changed circumstance.

## II.    NIKE'S DILIGENCE ARGUMENT IS CONTRARY TO PLAINTIFF'S PERSISTENT, YEARS-LONG EFFORTS.

Nike insists that it did not suppress the new Starfish evidence. According to Nike, Plaintiff just did not request it. Nike claims that Plaintiff did not request Starfish evidence beyond what Nike refers to as the "Starfish questionnaires" until after the Court denied the initial

motion for class certification. In reality, Plaintiff first sought all evidence relating to Starfish in March 2019. *See* Dkt. 164-1 at 19-20, 26. Nike then withheld responsive discovery for over five years, including hundreds of documents in its possession mentioning "Starfish." *See* Dkt. 652 at 29. It did so while discovery explicitly about "Starfish" was produced by and to Nike in another matter in 2019 but not to Plaintiff in this case. *Id.* at 20 n.20.

Meanwhile, Plaintiff repeatedly tried to meet and confer with Nike to obtain the Starfish evidence and to understand what Nike was producing, what it was withholding, and how it was locating and collecting responsive discovery. *See, e.g.*, Dkt. 78 at 4 (Plaintiff reporting in June 2019: "Although Nike is not producing any documents, Nike nowhere states it is withholding documents based on an objection."); Dkt. 107 at 8 n.8 (Plaintiff still seeking this information in June 2020: "Plaintiffs continued to try to understand how Nike performed its search and review of documents in response to the Court's October 31 Order…. Plaintiffs further sought to understand the scope of Nike's search for responsive documents, including whether Nike searched e-mail accounts, if it searched internal databases…, the custodians for whom Nike searched or excluded from its searches"). Plaintiff filed no less than six requests for an order on Starfish-related discovery. *See* Dkt. 165-2, 165-3, 166-1, 166-3, 432, 511-1. The Court entered order after order compelling Nike to produce discovery related to Starfish while denying Nike's repeated requests for a protective order to prevent Starfish-related discovery. *See* Dkt. 89, 111, 130, 131, 386, 480. Thus, as Nike itself admitted to this Court earlier in the litigation: "Plaintiffs took every approach to drilling down on the Starfish issue, asking individual witnesses, NIKE itself, experts, and NIKE HR professionals." Dkt. 347 at 8 (internal quotations omitted). Still, Nike suppressed the evidence.

Despite this history, Nike now asserts that "Plaintiff did not diligently seek discovery beyond the hard-copy Starfish questionnaires before class certification" because, according to Nike, "Plaintiffs did not ask the Court for all documents or communications referencing 'Starfish,' but rather the completed questionnaires." Dkt. 661 at 14 (citing Plaintiff's June 2020 Motion to Compel). Plaintiff's June 2020 motion demonstrates otherwise. *See, e.g.*, Dkt. 166-1 at

11 ("Nike failed to produce almost all documents regarding the investigation arising out of the [Starfish] Survey."); *id.* at 12 ("Despite the importance of the Starfish Survey, … Nike … produced only two documents related to the resulting investigation."); *id.* at 13 ("Nike did not produce any documents related to the investigation arising from the Starfish Survey, including the "employee exits from this larger investigation" or Nike's actions on "the main set of complaints."); *id.* ("Nike did not produce any interview notes, documents gathered, findings, decisions, or other documents concerning the survey except for two documents concerning one of the entries in the survey."). The Court thus noted that Nike had demonstrated a "lack of transparency" in discovery and Nike's production was "deficient," including with respect to "documents ordered some nine months ago." Dkt. 111 at 9.

Indeed, Nike recognized that Plaintiff sought communications and other documents relating to Starfish, and that it was required to disclose this discovery because it reported to the Court in response to Plaintiff's June 2020 Motion to Compel:

> as to the investigation into … all other Starfish Survey complaints, the … "findings and decisions" that Plaintiffs complain are "missing," or notes … are privileged and confidential attorney communications and work-product, which are protected from disclosure. Nike's supplemental privilege logs will reflect this.

Dkt. 291-1 at 60. Plaintiff persisted to the end of the document discovery period, objecting because Nike still had not completed its production concerning Starfish and other requested discovery. *See e.g.*, Dkt. 114 at 17 n.3 (Plaintiff reporting in September 2020 that missing discovery included a lack of discovery "concerning top management's involvement in pay, promotion, … or workplace complaints," including "the lack of almost any emails produced by Nike" concerning such "involvement"). During the subsequent deposition period, as Nike admitted to the Court, Plaintiff repeatedly questioned Nike's Rule 30(b)(6) witness and Matheson about Starfish. *See* Dkt. 347 at 8. But Nike persisted in its curation, providing false and misleading testimony after withholding the responsive discovery. Dkt. 652 at 27-29.

Nike does not and cannot dispute that it chose not to produce all discovery responsive to the May 2024 order, which required Nike to produce the complete record related to Starfish.

*Compare* Dkt. 652 at 22 *with* Dkt. 661. Nor does Nike provide any explanation for why it claims unfair prejudice. *See, e.g.*, Dkt. 661 at 24 (declaring Plaintiff has "prejudic[ed] NIKE" without explanation). Instead, Nike's argument is that it can refuse to produce discovery, refuse to state whether it is withholding responsive discovery, tell the court responsive discovery does not exist, and then blame plaintiff for lack of diligence.

Next, Nike blames Plaintiff for not uncovering Melanie Strong's role creating and leading Starfish sooner. Nike argues that Plaintiff "knew about Strong" in 2021 because when Plaintiff asked Matheson whether she "heard that [Strong] had a relationship to the Starfish survey," Matheson testified: "No. I'm not familiar with, with what role she may or may not have had with the survey." *See* Dkt. 661 at 15 (citing Matheson Dep. 94:19-95:6); Dkt. 654, ¶ 8, Ex. G (Matheson Dep. 94:19-95:6).[23] In addition to this misleading testimony, Nike withheld all the new evidence showing Strong's role in Starfish, including, for example, the communications and meetings with Strong that are explicitly about "Starfish." *See, e.g.*, Dkt. 652 at 28. And in one of the only two documents that Nike had disclosed before mid-2024 that mentions Strong's name, Nike states, "we do not know who led the [Starfish] survey" and "Strong has never presented herself as being the person who was leading any effort whatsoever." Dkt. 282-3 at 4.[24] Accordingly, Plaintiff not only did not know that Strong had a role in Starfish but also that Nike affirmatively limited the record to show that she had no role. When Plaintiff finally learned the truth, Plaintiff then acted diligently to schedule Strong's deposition. *See* Dkt. 652 at 22.

Similar to the Starfish-related evidence, Nike claims Plaintiff never "sought communications relating to the Offer Intake Form" until "after class certification was denied." Dkt. 661 at 19 n.9, 35. But Plaintiff requested this discovery in March 2019, as even Nike admitted in a previous court filing, which was in response to Plaintiff's third motion to compel

---

[23] New evidence, including Nike produced documents and Strong's testimony, demonstrate Matheson's testimony was false. *See* Dkt. 652 at 27-29.

[24] The only other document that Nike produced mentioning Strong's name before May 2024 concerns a reporter's question about whether Strong planned to quit the company after some marketing campaign was killed.

discovery responsive to Plaintiff's March 2019 RFPs that explicitly sought Nike's "pre-October 2017 versions of its 'Offer Intake Form'" and "communications … related to these pre-October 2017 versions." Dkt. 349 at 3-4, 8. In its opposition, Nike recognized that Plaintiff sought this discovery because it specifically resisted producing communications related to its Offer Intake Form and represented to the Court that it produced all discovery responsive to the March 2019 RFPs seeking all discovery concerning Nike's starting pay practices. These representations include:

- "NIKE has not withheld non-privileged, responsive documents." Dkt. 354 at 5.

- "Plaintiffs now claim (falsely) that NIKE has failed to produce all pre-October 2017 versions of an Offer Intake Form and communications relating thereto." Id.

- "Plaintiffs ask this Court to compel the production of further documents in response to a four-and-a half-year-old request with which NIKE already has complied." Dkt. 378 at 4.

- Nike urged the Court to deny Plaintiff's motion based on "the facts that (i) NIKE has searched for and produced such documents in its possession, custody, and control, and (ii) NIKE's corporate witnesses confirmed the same during depositions." Dkt. 378 at 4.

- "**<u>NIKE CANNOT PRODUCE DOCUMENTS THAT DO NOT EXIST</u>**." Dkt. 378 at 4 (all emphasis in original).

Similarly, Nike states that the Court "never ordered" Nike to produce communications regarding its pre-October 2017 pay practices. Dkt. 661 at 20. But Nike knew that the Court's orders required production of communications. For example, following the Court's August 2020 Order (Dkt. 111), Nike reported to the Court: "*In compliance with the Order*, NIKE [searched for] documents related to setting starting pay prior to October 2017 and, later that month, *produced an email* from HR Communications dated September 14, 2017." Dkt. 354 at 8 (emphasis added).[25]

---

[25] Although Rule 34 required Nike to identify discovery it was withholding, it never did so. *See* Rule 34(b)(2)(C) ("An objection must state whether any responsive materials are being withheld on the basis of that objection."); *see also, e.g.*, Dkt. 350 at 48-49, 52-54, 72-74, 83-92 (Nike's objections and responses to plaintiff's first set of RFPs do not identify any responsive discovery it was withholding). Nor does Nike's Opposition dispute that Plaintiff repeatedly sought to understand whether and what Nike was withholding through "numerous meet and confer attempts." *See* Dkt. 652 at 18 and n.12.

After refusing to produce key documents when they were initially requested, when Plaintiff repeatedly met and conferred, and when Plaintiff repeatedly sought the Court's assistance, Nike now seeks to benefit from its prior misrepresentations that no further responsive discovery relating to its prior pay practice existed. The Court should not bless this attempt.

Nike then argues, regardless of Plaintiff's undeniably repeated efforts to obtain all the evidence, that the Court should deny Plaintiff the opportunity to file a renewed motion with the new evidence because Plaintiff did not depose every single one of the thousands of people named in Nike's discovery productions and did not uncover Nike's recalcitrance earlier. But even if Nike's undefined diligence requirement is applicable, it certainly does not require perfection because, as the Ninth Circuit has recognized, such a requirement would create an impossible burden that is contrary to the reality of litigation. *See, e.g.*, *Nealey v. Transportacion Maritima Mexicana, S. A*., 662 F.2d 1275, 1280 (9th Cir. 1980) ("[U]nreasonableness is not inherent in every lapse of time. In our judicial system, many delays are of an acceptable duration; others, though lengthy, may be unavoidable…Even where a plaintiff has failed to do what he might have done earlier, he may have an explanation that excuses or justifies his failure.").

Finally, Nike argues this motion is untimely because, it declares, Plaintiff "waited" a year from the October 22, 2024 order ending Plaintiff's efforts to complete discovery to file this motion. Dkt. 661 at 24. But as Nike well knows, the parties were engaged in active class settlement discussions from November 2024 through August 20, 2025, which they diligently updated the Court about. *See* Declaration of James Kan in Support of Reply, ¶ 2; *see, e.g.*, Dkt. 620, 622, 630, 637, 641. During that time, the Court vacated deadlines for pretrial filings, the pretrial conference, and the trial. Dkt. 620, 623. As soon as it became clear that settlement discussions were going to be unsuccessful, Plaintiff promptly notified the Court that she intended to file a renewed motion for class certification. *See* Dkt. 647 (doing so on September 5, 2025); *see also, e.g.*, *Story v. Midland Funding LLC*, No. 3:15-CV-0194-AC, 2016 WL 5868077, at *3 (D. Or. Oct. 7, 2016) ("Delay based on attempts to avoid 'unnecessary time and expense,' such as pursuing settlement and avoiding unnecessary motions practice, is consistent with diligence.")

(citation omitted). The parties proposed a briefing schedule, which this Court adopted, and Plaintiff filed her motion for leave to file a renewed motion for class certification on October 7, 2025 in accordance with that schedule. *See* Dkt. 649, 651, 652. Nike's argument that Plaintiff improperly waited to file this motion should be rejected.

## III.    NIKE'S REMAINING ARGUMENTS IMPROPERLY ARGUE THE MERITS.

Though Plaintiff has only moved for leave to file a renewed class certification motion, Nike urges this Court to prematurely rule on the merits of both the yet-to-be-filed renewed class certification motion and the ultimate merits of the substantive claims. *See, e.g.*, Dkt. 661 at 20 (arguing updated record cannot "overcome the volume of evidence NIKE presented at class certification"); *id.* at 34 (arguing Plaintiff's Motion for Leave "must fail given the evidence of managerial discretion"). But those arguments are improper here. *See, e.g.*, *Coleman v. United Servs. Auto. Ass'n*, No. 3:21-CV-00217-RSH-KSC, 2023 WL 11960598, at *1 (S.D. Cal. June 26, 2023) (granting a motion for leave to file renewed motion for class certification "without expressing any opinion as to whether that motion satisfies the requirement of predominance under Rule 23(b)(3).").

Nike argues that the new evidence, standing alone, cannot prove the merits of Plaintiff's claims. That argument is irrelevant twice over. First, Plaintiff is not arguing that the class can prove the merits of the class claims solely with the new evidence Nike failed to produce. She is arguing that the new evidence in combination with the existing evidence—along with Nike's own apparent recognition that commonality is satisfied—justifies this Court permitting Plaintiff to renew her class certification motion. Second, whether the class can prove the class claims on the merits is for the factfinder to decide. The question here is solely whether this Court should allow Plaintiff to demonstrate that the question is capable of classwide resolution.

Finally, Nike claims individual actions are superior for the putative class members. According to Nike, the fact that putative class members have not filed individual actions demonstrates their "indifference" to the class. Dkt. 661 at 25. Yet, as Plaintiff's renewed motion will show, the fact that putative class members have not filed their own lawsuits *supports* a

finding of superiority because a class is the only available mechanism for addressing Nike's discrimination. For example, after reading Nike's opposition, Emily Tucker, a former opt-in Plaintiff, wrote the following in an unsolicited email to Plaintiff's counsel:

> The way [Nike] describes the opt-in's opting out voluntarily and that we have moved on could not be any further from my truth. I have been watching this case very closely and was buoyed by the class element to the settlement. … From my perspective, no one brings individual claims because this is confusing, scary, and I bet pretty darn expensive. I don't know about the others, but I don't have a corporate paycheck, regardless of whether it's equitable, to fund that fight. Which is why I have been watching to see what happens as part of a class settlement, which I believe is the correct path to accountability. Thank you for continuing to fight and just know I have the docket bookmarked and I check it frequently and am cheering the effort on from the sidelines.

Email from Emily Tucker, Goldstein Decl., ¶ 13, Exhibit L; *see also, e.g.*, *Buchanan v. Tata Consultancy Servs., Ltd.*, 2017 WL 6611653, at *22 (N.D. Cal. Dec. 27, 2017) (finding superiority met given that the "substantial upfront costs of litigating a complex discrimination case against a multi-national corporate defendant" means "few potential class members could afford to undertake individual litigation.") (citation and internal quotations omitted).

## IV.    **CONCLUSION**

The Court should grant the motion to provide leave for Plaintiff to file a renewed motion for class certification.

Dated: November 12, 2025

Respectfully submitted,

GOLDSTEIN BROWNE, PC

*/s/ Byron Goldstein*
Byron Goldstein (admitted *pro hac vice*)
Barry Goldstein (admitted *pro hac vice*)
1111 Broadway 3rd Floor, 04-117
Oakland, CA 94607
Telephone: (510) 584-9020

ACKERMANN & TILAJEF, P.C.
Craig Ackerman (admitted *pro hac vice*)
cja@ackermanntilajef.com
Brian Denlinger (admitted *pro hac vice*)
bd@ackermanntilajef.com
Erika Smolyar (admitted *pro hac vice*)
es@ackermanntilajef.com
315 S Beverly Drive, Suite 504
Beverly Hills, CA 90212
Tel: (310) 277-0614 Fax: (310) 277-0635

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
David B. Markowitz, OSB #742046
Harry B. Wilson, OSB #077214
Kathryn P. Roberts, OSB #064854
Kelsie G. Crippen, OSB #193454

DARDARIAN HO KAN & LEE
Laura L. Ho (admitted *pro hac vice*)
James Kan (admitted *pro hac vice*)
Katharine F. Trabucco (admitted *pro hac vice*)

Of Attorneys for Plaintiffs