LAURA E. ROSENBAUM, OSB # 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
LINDSEY C. JACKSON, Cal. SB# 313396 (*pro hac vice*)
lindseyjackson@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Attorneys for Defendant NIKE, Inc.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| HEATHER HENDER, | Case No. 3:18-cv-01477-AB |
| Plaintiffs, | **DEFENDANT NIKE, INC.'S [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| vs. | |
| NIKE, INC., an Oregon Corporation, | |
| Defendant. | |

Pursuant to the Court's Civil Trial Management Order (ECF Nos. 702, 705), Defendant NIKE, Inc. hereby submits its Proposed Findings of Fact and Conclusions of Law for Plaintiff's disparate impact claim that will be decided by the Court.

Plaintiff asserts that before October 2017, NIKE had a practice of using prior salary to set starting pay, which she alleges had a discriminatory impact on women, including herself. Plaintiff also claims that NIKE used a standardized Performance Sharing Plan ("PSP") formula for calculating bonuses, which she alleges had a disparate impact on women. This allegation derives from Plaintiff's starting pay claim. NIKE disputes each of these allegations.

NIKE submits this alternative Proposed Findings of Fact and Conclusions of Law due to the high volume of disagreements regarding the relevance and/or accuracy of factual findings and conclusions of law contained within Plaintiff's Proposed Findings of Fact and Conclusions of Law. In addition to disputing the aforementioned allegations, NIKE also disputes the characterization of Dr. Neumark's statistics, the claim that NIKE misrepresented material facts and suppressed evidence, which feature prominently in Plaintiff's Proposed Findings of Facts and Conclusions of Law, and Plaintiff's conclusions of law.

## I. RELEVANT FINDINGS OF FACT[1]

### A. The Parties

#### 1. Plaintiff Heather Hender

1. NIKE employed Plaintiff at NIKE World Headquarters ("WHQ") from April 6, 2015 through October 12, 2020.

---

[1] Many relevant findings of fact will be testified to by trial witnesses and thus there may not be a written exhibit to which to cite.

2.	The name of Plaintiff's first job was Professional Intermediate: Manufacturing Engineering.  The job code was A0945.  This job was in what NIKE refers to as the L-Band.  It was in the Intermediate Professional Job Level.  It was in the Manufacturing Engineering Job Subfamily.  Plaintiff was in this job from April 6, 2015 through September 5, 2018.

3.	The name of Plaintiff's second job was Professional Senior: Quality Assurance. The Job Code was A1013.  This job was in what NIKE refers to as the U-Band.  It was in the Senior Professional Job Level.  It was in the Quality Assurance Job Subfamily.  Plaintiff was in this job from September 5, 2018 through February 16, 2019.

4.	The name of Plaintiff's third job was Professional Senior: Manufacturing.  The Job Code was A0946.  This job was in the U-Band.  It was in the Senior Professional Job Level. It was in the Manufacturing Engineering Job Subfamily.  Plaintiff was in this job from February 17, 2019 through October 12, 2020.

5.	Plaintiff resigned from her employment with NIKE effective October 12, 2020.

6.	Plaintiff filed an EEOC Charge on November 9, 2018, a revised EEOC Charge on April 14, 2020, and received a Right to Sue Letter prior to joining this case.

7.	Plaintiff filed a Consent to Become Party Plaintiff in Collective Action under 29 U.S.C. § 216(b) on November 19, 2018.

**B.	NIKE**

8.	NIKE is a corporation formed under the laws of Oregon.

9.	NIKE WHQ is located near Beaverton, Oregon.

10.	NIKE's principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services.

**C.  Plaintiff's Evaluations, Pay, and Promotions.**

11.  When NIKE hired Hender as an employee in April 2015, it offered her a starting salary of $78,600.

12.  Hender was promoted to a U-band level role on September 5, 2018.

13.  Hender received a "Highly Successful" rating in fiscal year 2018, and she received "Successful" ratings every other year.

**D.  NIKE's Job Architecture.**

14.  NIKE employees at WHQ are assigned to a Job Code.

15.  Job Functions are broad categories of work that can be logically grouped together based on having similar characteristics or prerequisite skills.  Exh. 35.

16.  Job Code is a combination of Job Level, Job Function, Job Family, and Job Subfamily.

17.  Historically, there have been over 1,200 different Job Codes at NIKE WHQ.  Saad R. ¶ 44.

18.  Each Job Code has its own pay range, which managers use to position new hires and manage pay for their employees.  Walker Testimony; Stuckey Testimony.[2]

19.  Even within a NIKE Job Code, work is not necessarily homogenous, as positions within the same Job Code can, and often do, involve widely varied work.

20.  Given the varied and oftentimes highly specialized nature of its employees' work, NIKE recognizes that individual managers are best suited to assess their employees' pay and performance, and to make promotion decisions, based on their team's unique goals and objectives.

---

[2] NIKE cites to various witnesses' anticipated trial testimony.

21.     NIKE delegates discretion to its thousands of managers to evaluate and make individual pay, performance, and promotion decisions for their teams.

**E.      Individual Hiring Managers Set Starting Pay By Considering A Wide Variety Of Factors.**

22.     After selecting a candidate at the conclusion of the interview process, hiring managers receive the salary range for the Job Code, prepared by NIKE's Compensation Department based on a market analysis of similar roles.  Walker Testimony.

23.     Hiring managers then determine where to place each new hire within that salary range, though they may exceed the range at their discretion.  *See id.* at 60:3-5, 411:19-412:4.

24.     Managers may consider factors such as the external market and internal equity, the applicant's relevant work experience, education and skills, and the business's financial conditions when setting an employee's starting pay.  Exh. 198; *see also* Thomas Testimony.

25.     Yet managers are also free to, and do, consider and weigh whatever factors they deem relevant to the position being hired.  *See, e.g.*, Thomas Testimony; Cahill Testimony.[3]

**F.      Nike Never Consistently Asked About Or Used Candidates' Prior Salary To Set Starting Pay.**

26.     Effective September 2017, NIKE instructed recruiters and hiring managers that they may not ask candidates about their prior salary or salary history during the recruiting or hiring process.  *See* Thomas Testimony; Exh. 17.

27.     Even before the September 2017 change, NIKE never required candidates to provide prior salary during the hiring process, nor were candidates asked about their prior salary in every instance.

---

[3] NIKE contends that Kelly Cahill should not be able to testify as a witness in this trial.  This is a subject of NIKE's Motion *in Limine* No. 1.  However, to the extent that the Court denies NIKE's Motion *in Limine* and Ms. Cahill is permitted to testify, NIKE anticipates that the admissions will come into evidence.

28. Before September 2017, NIKE's guidelines permitted inquiry into candidates' prior salary; the individual recruiter or hiring manager had discretion whether or not to ask about prior pay. Thomas Testimony.

29. An applicant's prior salary was merely a data point that hiring managers could consider, in addition to other data points such as a candidate's skills, experience, and qualifications, and the weight of each factor varied depending on the role, the candidate, and the hiring manager. Thomas Testimony.

30. Starting pay decisions were not based solely or even primarily on prior pay; in fact, they were highly individualized. Thomas Testimony.

31. NIKE recruiters and hiring managers did not consistently request or use candidates' prior pay before September 2017, and many NIKE employees were never asked about their prior salaries before receiving a job offer.

32. It would be impossible to base a candidate's starting salary on information that was not provided. The role of prior pay in setting starting pay was anything but consistent at NIKE.

33. At the time Plaintiff was hired, starting salary was determined based on the candidate's relative experience for the roles and responsibilities of the position.

34. Internal equity – *i.e.*, what others in similar positions were paid – was also a factor considered.

35. Moreover, Plaintiff's hiring managers considered Plaintiff's stated desired salary, the midpoint of such range, and her years of experience. *See, e.g.*, Exh. 263.

36. There is no evidence that Plaintiff's prior pay was used to set her starting pay.

## G.  Annual Bonuses

37.  NIKE's managers have discretion to make bonus decisions for their employees based on a range of factors leading to a variety of pay outcomes.

38.  NIKE's performance review process, Coaching for Excellence ("CFE"), is used by managers to award one of five ratings to their direct reports every year.  Heinle Testimony; Exh. 1316.

39.  Individual managers are empowered to evaluate their direct reports' performance based on criteria that managers subjectively interpret and apply to their teams' specific roles.

40.  Plaintiff's expert, Dr. Neumark, found that women receive, on average, CFE ratings "as high or higher than men."  Neumark R. ¶ 8a; pg. 40 n. 62; Table 3.

41.  PSP awards are NIKE's annual cash bonuses, awarded to employees who receive CFE ratings above "Unsatisfactory."  White Testimony.

42.  PSP awards were comprised of both "Team" and "Discretionary" components.

43.  The "Discretionary" portion of the award was determined in part by the individual employee's manager through assignment of a "Performance Modifier."

44.  Both the Team and Discretionary shares were calculated based in part on the EBIT target for the specific PSP Plan, which varied by cost center.  White Testimony; Exh. 110; Exh. 79.

45.  While the "Performance Modifier" was based on the employee's CFE rating, NIKE's guidelines presented a range from which individual managers could choose, or even exceed, in their discretion to award PSP bonuses for their employees.  White Testimony; Exh. 79; Exh. 1244.

46.  In 2019, NIKE began using one PSP plan with one company financial performance metric and individual modifiers set at 100%.  White Testimony.

47.    Plaintiff's PSP Bonuses were set by her individual managers and a team award.

48.    The team award was a fixed calculation that was related to a specific geographical area's achievement compared to its goal.

49.    Managers could exercise their discretion in adjusting Plaintiff's PSP Bonuses based on her performance in her roles, her experience, and her growth in that position.  For example, Plaintiff's PSP Bonuses varied year-to-year based both on the weighted achievement of her division and her CFE Ratings.  *See, e.g.*, Exh. 97, 100, 1370, 1373.

50.    The discretionary award is determined in the individual manager's discretion based on, for example, performance, growth, and experience in the particular role.

### H.    Plaintiff's Job Codes And Alleged Comparators.

#### 1.    Job Code A0945

51.    One of Plaintiff's job codes was A0945.

52.    There were approximately 65 other NIKE employees assigned to job code A0945 from 2015 to 2018.  While those individuals were in the same job code, they were in different and distinct positions with dissimilar titles.

53.    When Plaintiff was hired as an Engineer II, she was on a team with around four other engineers managed by Mike Pfluger.  Pfluger Testimony.

54.    Plaintiff was a Process Engineer.  Each Engineer had varying degrees of experience in engineering, as well as within NIKE itself.  Moreover, the job each Engineer performed varied based on which manufacturing process or product he or she was assigned to.  Pfluger Testimony.

#### 2.    Job Code A1013

55.    Plaintiff was assigned to job code A1013 from approximately 2018 to 2019.

56.     There were approximately 43 other NIKE employees assigned to job code A1013 from 2018 to 2019.  While those individuals were in the same job code, they were in different and distinct positions with dissimilar titles.

57.     The roles and responsibilities of these roles vary from position to position.  While each is classified as a senior engineer position, each role is focused on a particular function or product, and the depth of skill needed is different in each specific field.  Ponganis Testimony.

### 3.     Job Code A0946

58.     Plaintiff was assigned to Job Code A0946 from 2019 to her voluntary resignation in 2020.  There were hundreds of other NIKE employees assigned to job code A0946 from 2012 to 2020.  While those individuals were assigned to the same job code, they were in different and distinct positions with dissimilar titles.

59.     Each of these positions involve different roles, responsibilities, and skill sets. Ponganis Testimony; Stowell Testimony.

### I.     **Plaintiff's Statistical Analysis Does Not Demonstrate A Connection Between The Use Of Prior Pay And Any Disparate Impact.**

60.     NIKE does not collect or retain data on employees' prior pay; accordingly, neither Dr. Neumark nor Dr. Saad had access to this data point.  It thus was impossible for Dr. Neumark to analyze the relationship between prior and starting pay because he did not have prior pay data. *See* Neumark Testimony.  Therefore, although Dr. Neumark opines on NIKE's purported reliance on prior pay and its impact on the female employees, he did not analyze the relevant data necessary to support such a finding.

61.     Instead, Dr. Neumark claims to measure the impact of prior pay by analyzing starting pay data before and after September 2017, the date Plaintiff agrees NIKE ceased any inquiry into prior pay information.  Neumark R. ¶ 59.

62. Dr. Neumark opines that the data shows the difference in starting pay between men and women before September 2017 is statistically significant and negative for women, while the results after September 2017 are not significant. *Id.* at ¶¶ 59, 64.

*63.* He concludes this is consistent with the hypothesis that NIKE used prior pay to set starting pay prior to September 2017 (but not after), and that doing so harmed women. *Id.*

64. Starting pay at NIKE is driven largely by the applicant's prior experience. Thus, for a compensation analysis to accurately reflect the realities of the labor market, it must accurately account for prior relevant experience.

65. Dr. Neumark claims to have accounted for relevant prior experience by categorizing the prior experience of 6,283 different NIKE applicants into twenty "clusters," which he contends represent common types and levels of prior experience. *See* Neumark R. ¶ 62. In other words, Dr. Neumark contends that the job titles in each cluster are so similar to one another that, all else constant, employees with the same years of experience in each of the clusters should be paid the same at hire.

66. Dr. Neumark's "clustering" analysis uses a text-based computer program to group job titles that the program thinks are similar. The job titles in the resulting clusters should thus reflect similar prior experiences. However, upon inspection, they do not. Dr. Neumark implements the clustering analysis to control for prior experience in his starting salary analysis by placing the more than 15,000 different prior job titles in 20 "clusters."

67. Dr. Neumark's clustering methodology produces results that are illogical on their face. His methodology groups the following job titles as "similar work": Library Page; Deckhand; Spanish-English GED Tutor; Nanny; CEO; Handyman; Armory Chef; Journeymen;

Bank Teller; Sign Painter; Penetration Tester; Tennis Capital; Model; Master Black Belt; and Caregiver. *See* Neumark Testimony.

68. This means that all of the statistical models that use his prior experience variable assume that, all else constant, an applicant with 10 years of experience as a Nanny should be paid and leveled the same as an applicant with10 years of experience as a CEO.

69. Since the clustering technique relies on two to three word job titles, data issues like abbreviations and misspellings often result in the same job titles being assigned to different clusters. *See* Neumark Testimony; *see also* Saad R. ¶ 163 (Dr. Neumark's attempt to clean and standardize job titles with respect to abbreviations does not appear to have worked very well. The consequence of this is that even if job titles were suitable raw material for use with clustering techniques, failing to standardize words correctly would make it even more difficult for appropriate clusters to be formed by the algorithms applied to the body of job titles.").

70. The clustering analysis is seemingly unable to differentiate among various levels of work that may be within the same job family, for example, clustering Junior, Intermediate, and Senior Software Engineers together, though the job titles denote work of varying levels and complexities. *See* Neumark Testimony.

71. The analysis also does not consider the company where an applicant's prior experience occurred, for example, treating experience with a different competitor and a small startup company, or employment in a completely different industry, as equivalent.

72. "[I]t's simply not possible" to accurately account for employees' prior relevant experience with the "clusters" in his models. *Id.* 110:14-112:17.

73. Dr. Neumark also attempts to account for the varied educational backgrounds of the approximately 7,000 applicants in a common analysis, using another unreliable methodology with flawed results. *See* Neumark Testimony.

74. Recognizing that education is a legitimate factor that can impact pay, Dr. Neumark attempted to create an education variable to account for these different labor market returns. To do so, he coded level of education (*e.g.*, college degree), as well as the rank of the school based on three "top 500" world university ranking lists. *See* Neumark R. ¶¶ 112, 120.

75. But he did so without regard for NIKE's business and operations.

76. NIKE is in large part a clothing and footwear design company, yet not a single design school appears on Dr. Neumark's lists of "top schools." *See* Saad R. ¶¶ 26, 142-144; Neumark Testimony. Because design schools are "unranked" in Dr. Neumark's analysis, individuals who attended top design schools are considered the same as individuals who attended any other unranked schools – yielding unreliable results.

77. Moreover, Dr. Neumark assumes that such public rankings are relevant to NIKE and the starting pay of its employees, rather than considering the facts of the case, including the nature of the work performed or NIKE's industry. *See* Neumark Testimony.

78. Although Plaintiff and Dr. Neumark contend that his aggregated models "control" for job, the use of prior experience and education variables demonstrates why merely "controlling" for job is not enough.

79. The value of certain types and levels of education – in addition to the school attended – will vary by job.

80. The same is true of relevant education and prior experience. What is "relevant' is highly job specific.

81.     But Dr. Neumark's aggregated analysis does not account for these nuances.

## II.     <u>CONCLUSIONS OF LAW</u>

### A.     <u>Legal Standard</u>

82.     Title VII of the Civil Rights Act of 1964 and Oregon Equality Act, ORS 659A.030 prevent employment discrimination based on sex.  42 U.S.C.A. § 2000e-2; ORS 659A.030.

83.     Courts interpret ORS 659A.030 to be consistent with Title VII.  *See Ayars v. AutoZoners, LLC*, 2024 WL 167172, at *3 (D. Or. 2024) (analyzing Title VII and 659A.030 claims together because courts construe ORS 659A.939 as "identical to Title VII").

84.     The Supreme Court in *Griggs v. Duke Power Co.* determined that Title VII also applies to business practices that are neutral in motive, but discriminatory in operation, so called "disparate impact" claims.  *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-31 (1971).

85.     To establish a *prima facie* case of disparate impact, Plaintiff must "(1) identify the specific employment practices or selection criteria being challenged; (2) show disparate impact; and (3) prove causation; that is [she] must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the [adverse action at issue] because of [her] membership in a protected group."  *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990) (internal quotations marks and citation omitted).

86.     The statistical disparities "must be sufficiently substantial that they raise such an inference of causation."  *Id.*

87.     If the plaintiff meets this burden, the burden shifts to the employer to demonstrate that the challenged practice is "job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i).  If the employer does not meet this burden, the plaintiff prevails.  If the employer meets this burden, the plaintiff must show that the

employer refuses to adopt an available alternative practice that serves the employer's legitimate needs with less disparate impact. 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

**B.  Plaintiff's Disparate Impact Claim Is Predicated On Discretion; She Has Failed To Identify A Specific Employment Practice Or Policy.**

88.  Plaintiff failed to identify any specific employment practice or policy that allegedly disfavors women.

89.  How NIKE managers made pay and promotion decisions within NIKE's overall framework was up to them, though NIKE provided subjective criteria, such as "[r]elevant work experience, education and skills" or "future potential" that managers interpreted and applied differently depending on the role.

90.  "Subjective criteria, prone to different interpretations, generally do not provide common direction." *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 279 (S.D.N.Y. 2018), petition denied, 2019 WL 2498769 (2d Cir. Mar. 19, 2019) (citing *Ross v. Lockheed Martin Corp.*, 267 F. Supp. 3d 174, 198 (D.D.C. 2017) ("[T]hat all . . . supervisors used the same allegedly ill-defined numerical rubric . . . says nothing about how individual supervisors exercised what discretion was left to them.") (alterations in original); *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*, 34 F. Supp. 3d 896, 906 (N.D. Ill. 2014) ("That supervisors evaluate candidates according to specific, but subjective, factors . . . does not make the decisions produced by the process meaningfully less discretionary."); *Moussouris v. Microsoft Corp.*, 2018 WL 3328418, at *20 (W.D. Wash. June 25, 2018), *aff'd*, 799 F. App'x 459 (9th Cir. 2019) ("Microsoft's benchmarks are subjective and open to many interpretations – indeed, Microsoft designed the criteria so that managers could adapt it to various employees' roles"); *Dukes v. Wal-Mart Stores, Inc.*, 964 F. Supp. 2d 1115, 1126-27 (N.D. Cal. 2013) ("*Dukes II*").

91.     Any decisions regarding Plaintiff's starting pay and PSP bonuses were made by her particular managers based on her particular job. *See Williams v. Boeing Co.*, 2006 WL 126440, at *2 (W.D. Wash. Jan. 17, 2006) (finding plaintiffs had not proven disparate impact claim where expert's multiple pools and regression analyses did not necessarily compare promotions for similarly-situated employees because it "group[s] together employees with dissimilar circumstances who would not have been candidates for similar promotions"); *Dukes,* 564 U.S. at 355-56 ("the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's").

92.     Plaintiff asserts that unnamed NIKE executives review and approve PSP bonus amounts[4], but "mere approval or limited oversight by higher-level executives, without more, falls short of showing a sufficient common denominator." *Kassman*, 416 F. Supp. 3d at 280 (citing *Jones*, 34 F. Supp. 3d at 908).

93.     At most, the evidence shows that upper-level managers such as VPs may give final approval of bonuses in the aggregate, but "final approval in the aggregate does not show commonality in the exercise of discretion." *Id.*, at 280; *see also Dukes II*, 964 F. Supp. 2d at 1123 (plaintiffs' "definition of 'top' management is a bit slippery, which probably could not be avoided given the diversity of decisions they challenge").

94.     Further, upper-level managers do not revisit or second-guess lower-level managers' decisions. *See Moussouris*, 2018 WL 3328418, at *21 (despite final approval of pay and promotion decision, insufficient involvement from top management where they "rarely revised the recommendations made at the discretion of lower-level managers"); *Jones*, 34 F.

---

[4] *See* Plaintiff's Proposed Findings of Fact and Conclusions of Law, Finding of Fact.

Supp. 3d at 908 (no proof "senior management changed pay or promotion recommendations submitted to them for approval with any frequency").

### C. Plaintiff's Statistical Analysis Does Not Demonstrate A Connection Between The Use Of Prior Pay And Any Disparate Impact.

95. First, Dr. Neumark's aggregated analyses are insufficient to establish a companywide practice of discrimination.

96. The *Dukes* plaintiffs offered a similarly aggregated statistical study, in which regression analyses purportedly showed statistically significant disparities in pay between men and women that "can be explained only by gender discrimination." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 356 (2011) (citation omitted). In disregarding the plaintiffs' model, the Supreme Court clearly articulated the dangers of aggregated analyses, which, by their very nature, cannot establish the existence of disparities within individual units, let alone provide "the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." *Id.* at 356-57 (citation omitted). For example, a pay disparity could be attributed to a small set of stores or business units, which would be masked with an aggregated analysis, and thus is not probative of whether a "uniform, store-by-store" or unit-by-unit disparity exists. *Id.* at 357. Thus, such higher-level, aggregated statistical models cannot produce a common answer to the questions "why was I disfavored." *Id.* at 352 (emphasis in original).

97. Post-*Dukes*, statistical studies must "conform[] to the level of decision for the challenged practices." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 523 (N.D. Cal. 2012) ("*Ellis II*"); *accord Kassman*, 416 F. Supp. 3d at 282; *Moussouris*, 2018 WL 3328418, at *24. Where decisions are made at the discretion of individual managers, courts find aggregated statistics inadequate because they are "[d]erived from hundreds of employment decisions made

by myriad decision makers, at different times, under mutable procedures and guidelines, in different departments, and in different office locations, concerning employees at varying levels of experience, responsibilities, and education." *Jones*, 34 F. Supp. 3d at 909; *accord Kassman, 416 F. Supp. 3d at 282* (finding plaintiffs' aggregated statistical evidence "has the same problem as the statistical evidence in [*Dukes*]") (quoting *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896 (7th Cir. 2012); *accord Moussouris*, 2018 WL 3328418, at *24.

98.     Here the relevant level of decision-maker for the challenged practices remains at the manager level, or at most, the Manager +1 level.

99.     Despite this, Plaintiff presented zero statistical studies that are analyzed at the decision-makers' level.  In fact, Dr. Neumark did not mention decision-makers once in his Report, and he admits he never studied or modeled NIKE's processes or decision-makers at all. Neumark Testimony.

100.     The *Moussouris* court illustrated this effect:  "if Microsoft had 25 managers, 5 of whom discriminated in making pay and promotion decisions, aggregate data would show that female employees fared worse than male employees.  But 'that result would not imply that all 25 [managers] behaved similarly, so it would not demonstrate commonality.'" *Moussouris*, 2018 WL 3328418, at *24 n.20 (quoting *Bolden*, 688 F.3d at 896) (alterations in original).

101.     Accordingly, Dr. Neumark's findings of alleged disparities "may be attributable to only a small set of [NIKE managers], and cannot by itself establish the uniform, [manager-by-manager] disparity upon which the [Plaintiff's] theory of commonality depends." *Dukes*, 564 U.S. at 357.

102.     Dr. Neumark's rebuttal (that full aggregation is necessary because NIKE populations are too small in certain groups to analyze them individually) runs afoul of *Dukes*.

103. The plaintiffs in *Dukes II* made the same argument, claiming "the numbers for each store were too small to generate significant results, and so they conducted the analysis at the next highest level." *Dukes II*, 964 F. Supp. 2d at 1120. The court summarily rejected this contention, explaining that "elevating the level of analysis runs afoul of the Supreme Court's objection to Plaintiffs' old statistics: district-level disparities may or may not reflect consistent results across stores, which was the level where support managers were actually selected." *Id.*

104. There are many reliable, alternative methods for analyzing smaller populations when multiple regression is not feasible.

105. Second, Plaintiff merely offers a broad analysis of starting pay at NIKE WHQ showing a disparity and assumes the gathering of prior pay history is to blame without showing that the gathering of such information was the cause for such disparity.

106. Plaintiff cannot do so because she cannot demonstrate that prior pay was gathered or used across the statistical evidence.

107. Third, Plaintiff's expert analysis of starting pay does not show a consistent effect year by year, as one would expect to see if NIKE had a common policy of using prior pay to set starting pay. And Plaintiff presented no statistical evidence showing how any alleged prior pay practice impacted her.

**D.** **Plaintiff's Disparate Impact Claims Also Fail Because Plaintiff Did Not Show That Her Prior Pay Was Used To Her Detriment.**

108. Plaintiff's disparate impact claims fail for the independent reason that she cannot show that any alleged policy or practice impacted her personally. "Where the disparate impact doctrine has been used by the courts in individual actions rather than class actions, a plaintiff has been required to show that [she] personally [has] been the victim of discrimination by the general practice which allegedly resulted in a discriminatory impact on a protected group. *It is not*

*sufficient for an individual plaintiff to show that the employer followed a discriminatory policy without also showing that plaintiff himself was injured.*" *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 451 (10th Cir. 1981) (emphasis added). "To hold otherwise would be to allow the plaintiff to avoid the fundamental requirements for constitutional standing[.]" *Id.*; *see also Renati v. Wal-Mart Stores, Inc.*, 2019 WL 5536206, at *9 (N.D. Cal. Oct. 25, 2019) ("Their disparate impact claims related to pay also fail, because they lack standing to challenge policies that did not cause their injury."); *Jackson v. Metal Improvement Co.*, 2012 WL 8968996, at *7 (C.D. Cal. Nov. 26, 2012) ("Jackson has suffered no injury and lacks standing to pursue a disparate impact claim" because he "was not injured by any MIC hiring policy or practice – he, in fact, was hired.").

109.   Plaintiff has presented no evidence that she (or anyone else) was harmed by a challenged "policy" or "practice." Neumark Testimony; *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 576 (6th Cir. 2004) (on a disparate impact claim, "an individual plaintiff must show that the facially neutral policy resulted in discrimination that resulted in personal injury"); *Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661, 668 (7th Cir. 1997) (plaintiff lacked standing to sue under Title VII disparate impact theory where there was no evidence his injury was caused by discriminatory employment practice); *L. Tarango Trucking v. County of Contra Costa*, 181 F. Supp. 2d 1017, 1024 (N.D. Cal. 2001) ("there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant. . .").

110.   A disparate impact theory cannot be asserted by an employee who has not been personally adversely affected. *See Juardo v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987) (employee could not assert disparate impact claim to challenge English-only order because

he was fluently bilingual and could easily conform to the order); *Pottenger v. Potlatch Corp.,*

*329 F.3d 740, 749-50 (9th Cir. 2003)* (plaintiff must actually have been adversely affected by the

complained of practice).

111. Plaintiff's disparate impact theory fails because there is no evidence that her prior

pay was used to set her starting pay.

112. For the same reason, Plaintiff cannot show that the PSP awards caused her harm

because that theory is also based on Plaintiff's prior pay being used to set starting pay, which in

turn, allegedly perpetuated lower PSP awards.

113. Her PSP claim fails with her starting pay claim.

114. Plaintiff merely assumes, because some managers may have considered prior pay

when setting starting pay, that she was injured by such alleged practice.

115. But that is not enough under the law. Plaintiff had to demonstrate a causal

connection between that practice and her purported injury. She did not do so. Thus, her claims

fail.

Date:  June 8, 2026                          <u>*/s/ Daniel Prince*</u>

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LINDSEY C. JACKSON, Cal. SB# 313396 (*pro hac vice*)
lindseyjackson@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-6000
Facsimile:  (213) 627-0705

LAURA E. ROSENBAUM, OSB # 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR  97205
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Defendant NIKE, Inc.