**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kathryn P. Roberts, OSB #064854**
KathrynRoberts@MarkowitzHerbold.com
Kelsie G. Crippen, OSB #193454
KelsieCrippen@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Byron Goldstein (admitted *pro hac vice*)**
byron@goldsteinbrowne.com
**Barry Goldstein, Of Counsel (admitted *pro hac vice*)**
barry@goldsteinbrowne.com
GOLDSTEIN BROWNE, PC
1111 Broadway, Office 04-117
Oakland, CA 94607
Tel: 510-584-9020

*Attorneys for Plaintiff*

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| HEATHER HENDER,<br><br>                         Plaintiff,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>                         Defendant. | Case No. 3:18-cv-01477-AB<br><br>**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

JURISDICTION ............................................................................................................1

FINDINGS OF FACT......................................................................................................2

    I.      The Parties ...........................................................................................2

    II.    NIKE's Job Architecture and Organization ..........................................3

    III.   NIKE's Performance Rating Practice ....................................................6

    IV.   NIKE's Pre-September 2017 Starting Pay Practice................................7

    V.    NIKE's Performance Sharing Plan Annual Bonus Practice ..................11

    VI.   The Statistics ......................................................................................12

    VII.  NIKE's Misrepresentations of Material Facts and Suppression of Evidence Regarding Its Pre-September 2017 Starting Pay Practice......................17

    VIII. NIKE's Evidence for its Business Necessity and Job-Related Affirmative Defense ..............................................................................................19

    IX.   Plaintiff's Experiences .........................................................................20

CONCLUSIONS OF LAW .............................................................................................21

    I.      Legal Framework ................................................................................21

    II.    Plaintiff's Prima Facie Burden Regarding NIKE's Prior Pay Practice..................23

    III.   Plaintiff's Prima Facie Burden Regarding NIKE's PSP Practice .........26

    IV.   NIKE's Prior Pay and PSP Practices were not Justified by Business Necessity or Job-Related..................................................................28

    V.    Plaintiff is Entitled to Relief .................................................................28

Pursuant to the Civil Jury Trial Management Order (Dkts. 702 and 705), Plaintiff Heather Hender respectfully submits the following Proposed Findings of Fact and Conclusions of Law under Fed. R. Civ. P. 52(a) on Plaintiff's disparate impact claims.

That Order directed the parties to submit joint proposed findings of fact and conclusions of law. On June 4, 2026, Plaintiff sent NIKE a draft of the proposed joint findings and conclusions and asked NIKE to provide its own materials so that the parties could combine their submissions. NIKE did not provide any edits or materials in response, and did not identify to Plaintiff any of the disagreements it now cites as the basis for filing separately. On the date the joint submission was due, NIKE provided Plaintiff with its own separate version and advised that it believed the parties should file separate findings. NIKE had nearly four days to review and respond to Plaintiff's draft, while affording the parties no opportunity to submit a joint filing and providing Plaintiff no comparable opportunity to consider NIKE's proposed findings and conclusions of law. Plaintiff thus must submit the following Proposed Findings of Fact and Conclusions of Law on her own.

Plaintiff's disparate impact claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and the Oregon Equality Act, ORS 659A.030, were tried to the Court. Pursuant to Federal Rule of Civil Procedure 52(a), the Court enters the following findings of fact and conclusions of law.

Plaintiff alleges that two employment practices each had a disparate impact on women. First, she alleges that, prior to September 2017, NIKE had a practice of using the prior pay of new hires into salaried jobs at NIKE World Headquarters ("WHQ") below the level of Vice President ("Relevant Jobs") to set their starting salaries. Second, she alleges NIKE had a

**Page 1 -   PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

practice of using a standard formula for calculating annual bonuses, which NIKE refers to as its "Performance Sharing Plan" ("PSP").  Plaintiff alleges NIKE violated Title VII and the Oregon Equality Act because each practice had a disparate impact on women in the Relevant Jobs.

**JURISDICTION**

1. This Court has subject-matter jurisdiction over the disparate-impact claim under Title VII. *See* 28 U.S.C. §§ 1331 and 1343.  This Court has supplemental jurisdiction over the disparate impact claim under the Oregon Equality Act because it arises from a common nucleus of operative facts with the federal claim and is so related to the federal claim as to form part of the same case or controversy under Article III of the United States Constitution.

2. Plaintiff filed an EEOC Charge on November 9, 2018 alleging disparate impact claims on behalf of herself and "all other similarly situated female corporate employees of NIKE, Inc.," and received a Right to Sue Letter prior to joining this case.

**FINDINGS OF FACT**

**I. The Parties**

3. NIKE, Inc. is a corporation formed under the laws of Oregon.

4. NIKE World Headquarters ("WHQ") is located near Beaverton, Oregon. Dkt. 714 at 6.

5. NIKE's principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories and services. *Id.*

6. NIKE's fiscal year is from June 1 to May 31.  For example, the fiscal year ending on May 31, 2018 is referred to as Fiscal Year 2018. *Id.*

7. Plaintiff Heather Hender was employed by NIKE at NIKE World Headquarters from April 6, 2015, through October 12, 2020, when she resigned. *Id.* at 5.

## II.    NIKE's Job Architecture and Organization

8.    During the relevant period, NIKE had a "Job Architecture."

9.    NIKE's Job Architecture was its standardized system that it used to evaluate jobs, group similar jobs, and to compare jobs.

10.    NIKE's job architecture classified jobs based on two elements: "Type of Work and Level of Work."  P035 at 30; P125 at 3.

11.    These two elements were applied "consistently across all … business units[] and functions."  P035 at 30.

12.    This architecture was "consistent across the globe" and "allows [NIKE] to level jobs across the organization, regardless of the location of the role."  P125 at 3; P348 at 1.

13.    Type of Work was identified by, from broadest to most specific, Job Function, Job Family, and Job Subfamily.  P035 at 31; P125 at 10-13; P326 at 9-14.

14.    Type of Work means "the essential responsibility of a particular role." P035 at 30. Job Families "are the unique roles within a job function that can be performed at various levels based on NIKE's leveling criteria."  P035 at 31.

15.    Level of Work was identified by, from broadest to most specific, Band and Job Level.  P035 at 30, 32; P125 at 4-6.

16.    Job Level means NIKE's "grouping of the jobs with similar level of expertise, impact, experience and leadership."  P151 at 12.

17.    NIKE used a uniform set of criteria, as stated in its "Leveling Criteria," to evaluate and classify all jobs into Job Levels.  P151 at 12.

18.    The Band Levels below Vice President spell out "VALUES."  The Band Levels for the Relevant Jobs are Bands L, U, E, and S, with S-Band being the highest Band below NIKE executives.  P125 at 5-6.

**Page 3 -    PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

19. Within each Band, NIKE assigned jobs to one of ten Job Levels. The Job Levels within Bands L through S range from "entry professional" in L-Band to "senior director" in S-Band. P145 at 7; P348 at 1; P021.

20. NIKE designed its Job Architecture to arrive at a Job Code when the Level of Work and the Type of Work are combined, meaning the combination of Job Subfamily and Job Level. P035 at 30, 34; P125 at 3, 10.

21. For each Job Code, NIKE created a single job description. P209.

22. NIKE's job descriptions identified "the minimum skills required to enter the job." P209.

23. NIKE's job descriptions identified "the responsibilities, skills, and experience that are needed to perform" the job. P209.

24. NIKE had "consistent job code titles, bands across businesses, geographies …." P209.

25. NIKE described its job architecture as "very much like the Dewey decimal system at a library." P125 at 10.

26. NIKE repeatedly admitted that it believed its use and implementation of its Job Architecture was robust: "our current use of functions/families/sub-families and codes is strong," P123 at 3; and "NIKE has developed a strong job architecture," P186 at 7.

27. NIKE's job architecture "allows the business to level jobs across the organization, regardless of the location of the role, and facilitates career pathing, talent planning, and organizational design." P348 at 1.

28.     NIKE used its Job Architecture to define whether a job change was a lateral move or a promotion, set pay ranges, and apply its compensation, talent acquisition, and talent management practices.  P125 at 2, 21; P326 at 20-21; P035 at 34.

29.     NIKE defined a lateral move as "movement within same LEVEL job (e.g. L-band intermediate to L-band intermediate with a change in job code is a lateral move)."  NIKE defined a promotion as "movement to a higher LEVEL job (e.g. L-band Entry to L-Band intermediate is considered a promo)."  P289 at 3, 5.

30.     NIKE's policy was that a lateral move should not itself change an employee's compensation regardless of whether the lateral job change is across a Job Code, Job Function, Job Family, or Job Subfamily.  P289 at 5-6.

31.     NIKE relied on its job architecture to manage and evaluate employee pay.

32.     NIKE repeatedly admitted that "employees at the same level, in similar jobs with similar performance should be equitably paid."  P330 at 8; P331 at 4; P039 at 4; P158 at 6; P035 at 13; P295 at 2; P043; P040 at 6.

33.     NIKE used its Job Architecture to account for differences in jobs when analyzing pay equity.  P106 at 9-10; P208; P331 at 24-25.

34.     NIKE places all Relevant Jobs into a pay range.  P040 at 6; P123 at 16; P160.

35.     Pay ranges are "a common span of pay for people in similarly valued jobs."  P330 at 10.

36.     NIKE assigned and determined pay ranges based on its Job Architecture.  P125 at 2; P035 at 34; P040 at 6.

37.     Every job in the same job code was in the same pay range.  P040 at 6; P125 at 2; P039 at 5.

**Page 5 -    PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

38.     Pay ranges are then "used to guide pay decisions and provide a common span of pay for people in similarly valued jobs." P330 at 10.

39.     NIKE executives are in the Executive Bands, which range from E7 to E1, with the CEO at E1. The Executive Bands are above the S-Band. P215 at 12.

40.     NIKE has a Human Resources function ("HR") that is led by its Chief Human Resources Officer ("CHRO"), who reports directly to NIKE's CEO. P442 at 2; P433 at 11.

41.     NIKE HR includes one Total Rewards business unit. It also includes one Talent Acquisition business unit. The head of Total Rewards was a NIKE executive who reported directly to the CHRO. The head of Talent Acquisition was a NIKE executive who reported directly to the CHRO. P125 at 2; P225 at 2; P227 at 2.

42.     Total Rewards was responsible for implementing pay practices across NIKE WHQ. *See, e.g.*, P103; P127; P129; P130; P140; P145; P280; P285; P288; P290; P291; P296; P297.

43.     Talent Acquisition was involved in every hire for a Relevant Job. P033 at 1; P153; P0302 at 4.

44.     NIKE thus used a standardized job evaluation and organization system, which it referred to as its "job architecture," to evaluate, classify, and organize all jobs across WHQ, and to account for differences in jobs when analyzing pay equity.

### III.    NIKE's Performance Rating Practice

45.     Since at least 2015 through at least 2020, NIKE referred to its performance management process as Coaching for Excellence ("CFE"), which awarded employees one of five ratings based on manager discretion. Dkt. 714 at 6.

46.      Throughout this period, there were five possible performance ratings, from lowest to highest:  Unsatisfactory, Inconsistent, Successful, Highly Successful, Exceptional. *See, e.g.*, P162.  There was also a "Too New to Rate" rating for employees who had been at NIKE for less than three months of the fiscal year. *Id*.

47.      NIKE's CFE performance management process provided "a consistent approach to evaluating and rewarding performance." P022; P035 at 20.

48.      The definitions of these five performance ratings were the same from at least 2015 through at least 2020.  *See, e.g.*, *id.*; P040 at 6. For example, "Successful" is defined as "employee performance accomplished expected results on goals.  Overall achieved expectations." *Id.*

49.      Women at NIKE WHQ received performance ratings as high as or higher than men. This was true both on average — a higher share of women than men received the two highest ratings — and after controlling for similar jobs and worker characteristics with a multiple regression analysis. Dkt. 149-1 at 19, ¶ 33; *id.* at 56, Table 3, Panel D; *id.* at 74, Table B1.

## IV.    NIKE's Pre-September 2017 Starting Pay Practice

50.      In September 2017, NIKE made a "policy change" to prohibit the use of prior pay when setting starting salary.

51.      NIKE repeatedly admitted that this September 2017 prohibition on using prior pay for setting starting salary was a "policy change." *See* P303 (NIKE's "Comp History Policy Change" presentation); P301 at 1-2, 6 (communication with the head of NIKE Total Rewards referring to NIKE's "TA Comp History Policy Change"); P017 (NIKE's "Comp History Policy Change" document stating, "NIKE employees may no longer ask candidates or their employers questions about their compensation history"); P133 at 2 (centrally created communication to all

NIKE human resources business partners describing the prohibition on the use of prior pay as a "policy change").

52.     NIKE's September 2017 communication to all Human Resources Business Partners across WHQ stated that "interviewers can no longer ask candidates to share their current compensation or any compensation history. … This new policy also means that NIKE *may no longer*: … Record salary history in our ATS or CRM systems. … *Instead*, our conversations with candidates must focus on their compensation expectations." P133 at 2 (emphasis added).

53.     In an October 2017 email to all Talent Acquisition employees at WHQ, NIKE stated, "*we will no longer* ask candidates about their compensation history." P153 (emphasis added); P301 at 3-4.

54.     This October 2017 email also stated, "TA is solely responsible for discussing compensation expectations with candidates," and "our Total Rewards partners have created an updated Offer Intake Form to collect this information from candidates … Please use this form as you work with Total Rewards to construct offers for your roles." P153; P301 at 3-4.

55.     This October 2017 email to all WHQ Talent Acquisition employees contained a hyperlink to Total Rewards' "updated Offer Intake Form." P153; P301 at 3-4.

56.     This "updated Offer Intake Form" contained NIKE's September 2017 version of its Offer Intake Form. It also included a prior version of NIKE's Offer Intake Form, which states it was revised in March 2017. P152 at 1-5.

57.     The September 2017 version sought a candidate's "annual base salary expectations." In the March 2017 version, by contrast, this same field sought the candidate's pre-NIKE "annual base salary."  P152 at 1-4.

58. NIKE created its Offer Intake Form in 2016 to improve the efficiency of its prior-pay practice. In October 2016, a Total Rewards employee sent an email to other Total Rewards employees with the subject line, "Talent Acquisition Offer Intake Form - Internal Template." P307 at 1-2.

59. This October 2016 email from Total Rewards states, "Attached you will find two separate excel templates I have put together for Talent Acquisition to use when requesting offer recommendations - one for external offers and the other for internal offers." P307 at 2.

60. This October 2016 email from Total Rewards then states that "these intake forms will achieve the following: *Receive all of the requisite information* in one email communication; Minimize the back-and-forth between TA/HRBP/TRC/Comp; Help us store information in a more organized manner; Drastically reduce turnaround times for offers." P307 (emphasis added).

61. Total Rewards thus created an Offer Intake Form in 2016 to achieve these goals, including to "receive all of the requisite information in one email communication."

62. Because the Offer Intake Form sought prior pay and because Total Rewards admitted that the information in the Offer Intake Form was "requisite information" for developing starting pay offers, Total Rewards admitted that prior pay was "requisite information" for setting starting pay.

63. NIKE's 2016 admission that its existing practice was that prior pay was "requisite information," which it sought to make more efficient in 2016, is corroborated by many other NIKE admissions about its practice of using prior pay.

64. NIKE admitted that it "often focused on the new hire's prior salary and/or the size of the increase the new hire would receive" when setting starting pay. P295 at 8; P035 at 8.

65. This admission was in a widely-used, WHQ-wide training created by Total Rewards shortly after NIKE's September 2017 "policy change." P280; P296; P297; P295 at 8.

66. NIKE admitted that "we no longer ask new hires their prior salary or focus on the size of the increase the new hire would receive." P035 at 57.

67. Regarding "HIRING," NIKE admitted that "current practice leads to an array of pay position outcomes with often undesirable long-term consequences (Greater focus on % increase as primary decision driver)." P330 at 14; P158 at 7.

68. NIKE's Chief Human Resources Officer, Monique Matheson, admitted in 2018 that NIKE would "remove bias from critical moments of the hiring process by … eliminating the collection of candidate salary history …." P018 at 3.

69. NIKE's centrally created Sustainable Business Report, signed by its CEO in 2018, repeated this same admission that it would "remove bias from critical moments of the hiring process by … eliminating the collection of candidate salary history …." P016 at 57.

70. After NIKE stopped using prior pay in September 2017, the starting pay disparity between women and men at NIKE WHQ dropped by more than 50%. *See* Dkt. 149-2 at 95, Table D1, cols. 5-6; Dkt. 149-1 at 34 ¶ 59; *id.* at 59, cols. 5-6.

71. NIKE did not produce any policies, trainings, guidelines, or other documents or communications that it created before September 2017 that it used for or when it set starting pay prior to September 2017 except for Total Rewards' 2016 "requisite information" email and the March 2017 version of its Offer Intake Form.

72. NIKE failed to maintain or preserve, or else deleted, most of the records showing how it set starting salaries during the pre-September 2017 period.

73.     Talent Acquisition employees are told to "Recommend a competitive salary for a New Hire" based on "the Base Pay positioning guide in the [Talent Acquisition] Playbook"). In turn, pursuant to NIKE guidelines, starting pay offers should be approved by HR Business Partners and business leaders. P033 at 1-2; P302 at 7.

**V.      NIKE's Performance Sharing Plan Annual Bonus Practice**

74.     From fiscal year 2015 through at least fiscal year 2022, NIKE calculated the annual bonus for every salaried employee at NIKE WHQ below the level of Vice President using the same standardized PSP formula, consisting of five factors.

75.     The PSP bonus for every such employee was calculated with this formula: ("Time in Plan" × "Weighted Achievement" × "Fiscal Earnings" × ½ "Band Target") + ("Time in Plan" × "Weighted Achievement" × "Fiscal Earnings" × ½ "Band Target" × "Performance Modifier"). P097; P100; P522; P278.

76.     The five factors operated as follows. (1) "Time in Plan" reflected the portion of the fiscal year during which the employee was in the plan. (2) "Weighted Achievement" was set by the "plan" to which NIKE assigned the employee; every employee in a given plan received the same Weighted Achievement, and beginning in fiscal year 2019 this factor was the same for every employee company-wide. (3) "Fiscal Earnings" was the amount of salary the employee was paid during the fiscal year. (4) "Band Target" was a percentage automatically populated based on the Band into which NIKE had placed the employee's job.

77.     The fifth factor, "Performance Modifier," was applied to one-half of the PSP calculation formula and determined based on performance ratings. Through Fiscal Year 2018, NIKE provided guidelines stating the ranges to which a performance modifier should correspond for each CFE Rating. These "Performance Modifier Ranges" for each CFE Rating were the same each year through Fiscal Year 2018. P079; P110; P188.

**Page 11    PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

78.     For the performance modifier input before Fiscal Year 2019, NIKE instructed its employees to "use the guidelines provided for performance modifiers." P189.

79.     From Fiscal Year 2019 through at least Fiscal Year 2021, the performance modifier for all employees was set at 100% and all employees were placed on the same "plan." P295.

80.     As a result, from Fiscal Year 2019 through at least Fiscal Year 2021, every factor in the PSP calculation formula was centrally and automatically set for every employee, with no discretion available to or applied by anyone. *See, e.g.*, P012; P039; P111; P330.

81.     PSP awards were determined through NIKE's annual pay review process. Through Fiscal Year 2018, NIKE referred to this as its Global Performance Rewards ("GPR"), and, beginning in Fiscal Year 2019, NIKE referred to it as its "Annual Pay Review" ("APR"). For each annual GPR or APR, there were multiple levels of an Executive Review process. *See, e.g.*, P185; P041.

## VI.     The Statistics

82.     Multiple regression analysis is a well-established and accepted methodology for identifying pay discrimination in employment litigation; it can "isolate the influence of one particular factor—e.g. sex—on a dependent variable—e.g. salary." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1183 (9th Cir. 2002); *see also, e.g.*, *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1217 n.3 (9th Cir. 2021); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 685 (9th Cir. 2022) (en banc) (discussing the probative value of statistical evidence in a range of litigation contexts); Daniel L. Rubinfeld, Reference Guide on Multiple Regression, 306 n.5 (Fed. Judicial Ctr. 3d ed. 2011); ("Discrimination cases using multiple regression analysis are legion.") (collecting cases).

**Page 12     PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

83.     Multiple regression analyses can control for individual differences among employees. *See Olean*, 31 F.4th at 678 ("any categorical argument that a pooled regression model cannot control for variables relating to the individualized differences among class members must be rejected."). Multiple regression analyses can isolate the impact of an independent variable such as gender, on a dependent variable such as pay, by controlling for differences in other potentially relevant factors, such as tenure, performance ratings, education, experience, and jobs. *Id.* at 671.

84.     The results of a multiple regression analysis include a measure of "statistical significance," which means the probability that the disparity is the result of chance rather than the challenged practice. *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 1351040, at *8 (N.D. Cal. Apr. 4, 2014) (Judge Koh). A regression result is statistically significant if there is less than a five percent chance that the result was produced by chance. *Olean*, 31 F.4th at 671-72 (9th Cir. 2022). That five percent (or 0.05) level is the well-established point at which statisticians and courts treat a result as significant. *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1273 n.3 (9th Cir. 1981); *see also e.g.*, *In re High-Tech Emp. Antitrust Litig.*, 2014 WL 1351040, at *8; *Segar v. Smith*, 738 F.2d 1249, 1283 (D.C. Cir. 1984) ("results significant at or above the .05 level … are certainly sufficient to support an inference of discrimination.").

85.     The level of statistical significance is reflected in "standard deviations." If the standard deviations are 1.96, it means there is a 1 in 20 chance that the results are due to chance rather than discrimination, and thus the five percent level is met. Dkt. 149-1 at 15, ¶ 26; *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308-11, n.14 and 17 (1977) (holding that a disparity of greater than "two or three" standard deviations "would undercut the hypothesis that

decisions were being made randomly with respect to race"). The larger the standard deviations, the lower the likelihood that the results were due to chance rather than discrimination.

86. Dr. David Neumark is a labor economist with extensive experience in the use of statistical methods to evaluate employment discrimination claims.

87. Dr. Neumark performed multiple regression analyses of NIKE's compensation data produced in this litigation. NIKE produced data from July 1, 2012 through September 1, 2019. Plaintiff requested NIKE's post-September 2019 data, but Nike withheld it.

88. Dr. Neumark's regression analyses controlled for potentially non-discriminatory factors, including for jobs based on NIKE's own job architecture (the interactions of its Job Subfamilies and Job Level as well as Job Code), thereby isolating the effect of sex on compensation outcomes for similarly situated employees.

89. NIKE's Job Architecture is appropriate and the most reliable available proxy for identifying which employees were in similarly situated jobs for purposes of measuring pay disparity. NIKE designed the system for that purpose and used it internally for that purpose. NIKE cannot use and rely on its Job Architecture for business purposes and then seek to discredit its own system and admissions for litigation purposes.

90. By controlling for NIKE's own classifications, Dr. Neumark's analyses compared the compensation of women and men in jobs that NIKE itself had defined as requiring the same minimum skills, responsibilities, and experience. Dkt. 149-1 at 25-26, ¶¶ 38-39; *id.* at 29 ¶ 46; Dkt. 149-2 at 19-20, ¶¶ 30-31; *id.* at 21, Table R4 (results materially the same whether jobs are defined by job cells or job codes).

91. Dr. Neumark conducted a multiple regression analysis of starting pay set before September 2017, controlling for the jobs employees were hired into (Job Subfamily and Job

Level), age, and full-time or part-time status. He found that NIKE paid women 1.16% lower starting salaries than similarly situated men. This finding was statistically significant at 2.89 standard deviations, meaning the chance that it was due to anything other than discrimination was less than 1 in 250, far above the five percent level for statistical significance. Dkt. 149-2 at 95, Table D1, col. 5; *see also* Dkt. 149-1 at 59, Table 6, col. 5.

92. Dr. Neumark further found that after NIKE stopped its prior pay practice, the starting-pay disparity for women dropped by more than 50%. Dkt. 149-2 at 95, Table D1, cols. 5-6; *see also* Dkt. 149-1 at 59, Table 6, cols. 5-6.

93. This finding that the starting pay disparity for women dropped by over 50% after NIKE's "policy change" is evidence that NIKE had a practice of using prior pay and that this practice had a disparate impact on women's starting pay before September 2017.

94. Inferring the effect of a practice from how the relevant outcome changed when the practice changed is a standard and accepted method in labor economics, applied in a large body of research. Dkt. 149-2 at 26, ¶ 41.

95. The statistical evidence is corroborated and strengthened by NIKE's own admissions, which the Court found above, including: NIKE's contemporaneous admissions that prior pay was "requisite information," that NIKE "often focused on the new hire's prior salary," that ending the practice would "remove bias from critical moments of the hiring process," that prohibiting its use was a formal "policy change," that NIKE would no longer "carry over poor pay practices from a prior company," and that NIKE needed to make "significant investments" to address "problematic pay practices." This confirms what the statistics show: that NIKE had a practice of using prior pay, and that the practice caused women to be paid less than similarly situated men.

**Page 15 PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

96. Dr. Neumark's analyses demonstrate that NIKE's PSP bonus formula practice caused women at NIKE WHQ to be paid lower PSP bonuses than similarly situated men. Dkt. 149-1 at 55, Table 2, Col. 4, panel B.

97. Dr. Neumark's multiple regression analysis, controlling for job, performance, and other potentially nondiscriminatory factors, found a statistically significant shortfall in PSP bonuses for women. Dkt. 149-1 at 55, Table 2, Col. 4, panel B.

98. Dr. Neumark used the data NIKE produced in this litigation for his analyses. These analyses included men and women who worked at NIKE WHQ in salaried jobs in Bands L – S from August 9, 2015, through September 1, 2019 (the most recent data NIKE produced in this litigation).

99. Dr. Neumark conducted a multiple regression analysis of PSP bonuses, controlling for performance ratings, tenure, time in Job Code, age, Job Subfamilies and Job Levels, and sex. He found that NIKE paid women 3.19% less in PSP bonuses than similarly situated men. This finding was statistically significant at 5.66 standard deviations, meaning the chance that this was due to anything other than discrimination was less than 1 in 100,000. Dkt. 149-1 at 55, Table 2, Col. 4, Panel B; *see also* Dkt. 149-2 at 25, Table R6, Col. 4, Panel B.

100. Dr. Neumark further explored this by testing whether NIKE tenure, time in Job Code, or performance ratings increased or decreased the disparity and standard deviations. He began with a multiple regression analysis of PSP bonuses, controlling for the year the bonus was paid and whether an employee was full-time or part-time. Dkt. 149-1 at 56, Table 3, Col. 1, Panel B. Then, he added controls for tenure at Nike and time in Job Code to this multiple regression analysis. Adding these controls increased the PSP disparity and the standard deviations. Dkt. 149-1 at 56, Table 3, Col. 2, Panel B. This shows that tenure at NIKE and time

in Job Code do not justify the pay disparity in PSP bonuses.  Next, Dr. Neumark added a performance rating control to this second multiple regression analysis. Adding a control for performance rating increased the PSP disparity and the standard deviations. Dkt. 149-1 at 56, Table 2, Col. 4, Panel B.  This shows that performance ratings do not justify the pay disparity in PSP bonuses.  This is further confirmed by Dr. Neumark's finding that women at NIKE WHQ received performance ratings as high as or higher than similarly situated men.

## VII.   NIKE's Misrepresentations of Material Facts and Suppression of Evidence Regarding Its Pre-September 2017 Starting Pay Practice

101.    For nearly five years during this litigation, NIKE withheld the 2016 Total Rewards "requisite information" email admitting to its then-existing practice of using prior pay and showing that its Offer Intake Form was centrally created by the employees responsible for pay practices across WHQ. At the same time, NIKE repeatedly represented to the Court that the documents either did not exist or had already been produced.

102.    On October 31, 2019, the Court ordered NIKE to produce discovery showing its policies regarding "hiring," "pay," and "compensation systems."  Dkt. 89. NIKE did not produce the 2016 "requisite information" email in response to this Order.

103.    On August 7, 2020, the Court ordered NIKE to "make one final attempt at locating any such policies and if such records exist produce them to plaintiffs," specifying that if NIKE reported that no such records existed, the Court would accept that representation. Dkt. 111 at 3.  NIKE responded by representing to the Court: "NIKE has not located, nor is it aware of, any written policies regarding the collection or use of prior compensation history beyond the documents previously produced." Dkt. 350 at 112.  That representation was inaccurate.

104.    In NIKE's successful opposition to a motion in 2022, NIKE assured the Court that it "never required" the use of prior pay when setting starting salaries.  Dkt. 183 at 18.

**Page 17   PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

105.     That representation was contradicted by the 2016 "requisite information" email that NIKE later produced.

106.     In September 2023, when Plaintiff again moved to compel discovery concerning NIKE's pre-September 2017 starting pay practices, NIKE represented to the Court that Plaintiff "falsely" stated that NIKE had failed to produce all pre-September 2017 versions of the Offer Intake Form and communications relating thereto.  Dkt. 354 at 5.  NIKE further represented that "NIKE has not withheld non-privileged, responsive documents" (*id.*), and that "**<u>NIKE CANNOT PRODUCE DOCUMENTS THAT DO NOT EXIST</u>**" (Dkt. 378 at 4 (all emphasis in original)).  NIKE also told the Court that its Offer Intake Form was not "centrally created." *Id.* at 5 n.1.  These representations, too, were inaccurate.

107.     Four months after repeatedly assuring the Court in September 2023 that no such communications existed, NIKE produced the October 2016 Total Rewards email in which the unit responsible for pay practices across NIKE WHQ admitted that prior pay was "requisite information" — the very evidence NIKE had repeatedly told the Court did not exist or had already been produced.

108.     The Magistrate Judge previously found, based on NIKE's conduct during discovery, that NIKE "demonstrated a certain lack of transparency," had "some deficient production," failed to produce "documents ordered some nine months ago," and had "been recalcitrant in responding to discovery requests." Dkt. 111 at 8-9; Dkt. 521 at 15.

109.     In addition, NIKE did not produce any policies, trainings, guidelines, or other documents or communications that it created before September 2017 that it used for or when it set starting pay prior to September 2017 except for the 2016 "requisite information" email from Total Rewards and the March 2017 version of its Offer Intake Form.  For example, NIKE

withheld all pre-March 2017 versions of its Offer Intake Form, and it withheld its pre-September 2017 version of its "Hiring Process" document, which was NIKE's "guide to educate key players on their roles and responsibility when looking to hire," including with respect to setting starting pay. P033 (December 2018 version of Hiring Process, which was the only version produced); P301 (showing "hiring process" document was "updated" around October 2017).

110. NIKE failed to maintain or preserve, or else deleted, most of the records showing how it set starting salaries during the pre-September 2017 period.

111. Considered together, NIKE's repeated and incorrect representations to the Court that the prior pay practice did not exist or was not documented, its withholding of the 2016 "requisite information" admission for nearly five years, and the Court's prior findings regarding NIKE's discovery conduct constitute affirmative evidence corroborating Plaintiff's contention that NIKE in fact had a practice of using prior pay when setting starting salaries. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *United States v. Castillo*, 615 F.2d 878, 885 (9th Cir. 1980); *United States v. Gutierrez Mendez*, No. 24-1414, 2025 WL 2375214, at *1 (9th Cir. Aug. 15, 2025).

## VIII. NIKE's Evidence for its Business Necessity and Job-Related Affirmative Defense

112. NIKE conducted no validation study, impact study, job analysis, or other work in compliance with the EEOC Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. Part 1607, with respect to either its prior pay practice or its PSP bonus formula.

113. NIKE did not submit evidence showing that its prior pay practice was justified by business necessity or job-related.

114. NIKE did not submit evidence showing that its PSP practice was justified by business necessity or job-related.

**Page 19     PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## IX. Plaintiff's Experiences

115.     NIKE employed Plaintiff in three jobs.

116.     The name of Plaintiff's first job was Professional Intermediate: Manufacturing Engineering.  The Job Code was A0945. This job was in the L-Band.  It was in the Intermediate Professional Job Level.  It was in the Manufacturing Engineering Job Subfamily.  Plaintiff was in this job from April 6, 2015 through September 5, 2018. Dkt. 714 at 5.

117.     The name of Plaintiff's second job was Professional Senior: Quality Assurance. The Job Code was A1013.  This job was in the U-Band. It was in the Senior Professional Job Level.  It was in the Quality Assurance Job Subfamily.  Plaintiff was in this job from September 5, 2018 through February 16, 2019. *Id.*

118.     The name of Plaintiff's third job was Professional Senior: Manufacturing.  The Job Code was A0946.  This job was in the U-Band. It was in the Senior Professional Job Level. It was in the Manufacturing Engineering Job Subfamily.  Plaintiff was in this job from February 17, 2019 through October 12, 2020. *Id.*

119.     NIKE affirmatively sought and obtained Plaintiff's pre-NIKE compensation in 2015. P350 at 1, 4.

120.     NIKE then set Plaintiff's starting salary of $78,600 in April 2015.

121.     Plaintiff was paid a lower starting salary than similarly situated men.  *See, e.g.*, P550; P552 at 1.

122.     NIKE was unable to produce, and did not produce, evidence showing all factors used to set Plaintiff's starting salary or the starting salaries of similarly situated men, and it was unable to disclose the decision-making process for setting her starting pay.  *See* P469 at 4-5; P481 at 3-4, 8-9.

**Page 20     PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

123.    Plaintiff received a "Highly Successful" performance rating in fiscal year 2018, and a "Successful" rating in all other years during her employment. P551.

124.    Plaintiff's ratings were thus "Successful" or higher throughout her NIKE employment. She was never placed on a performance improvement plan, terminated for cause, or found to have violated any NIKE policies.

125.    Plaintiff was paid lower PSP bonuses than similarly situated men. *See, e.g.*, P552 at 2.

## CONCLUSIONS OF LAW

### I.    Legal Framework

1.    The same analysis applies to disparate impact claims under Title VII and the Oregon Equality Act. *See, e.g.*, *Dawson v. Entek Int'l*, 630 F.3d 928, 934-35 (9th Cir. 2011).

2.    Disparate impact claims concern "employment practices that are facially neutral … but that fall more harshly on one group than another …." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977). Disparate impact claims do not require a showing of discriminatory intent. *Id.* The preponderance-of-the-evidence standard applies: "A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part on behalf of a unanimous Supreme Court).

3.    Plaintiff's prima facie burden is thus to "show a facially neutral employment practice has a significantly discriminatory impact upon a group protected by Title VII." *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224-26 (9th Cir. 2021).

4.    If the plaintiff meets this burden, the burden shifts to the employer to demonstrate that the challenged practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). "Failure in this proof results in judgment

**Page 21**    **PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

for the plaintiff." *See Loiseau v. Dep't of Human Resources*, 567 F. Supp. 1211, 1214 (D. Or. 1983) (quoting *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1271 (9th Cir. 1981)).  If the employer meets this burden, the plaintiff may still prevail by showing that the employer refuses to adopt an available alternative practice that serves the employer's legitimate needs with less disparate impact. 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

5.  The Ninth Circuit has confirmed that the standard is the same for a disparate impact claim brought by an individual as one brought by a class: "Generally disparate impact analysis is used in a class action, but it may also form the basis of an individual claim…. In whatever procedural guise a disparate impact claim appears, … [a]bsent … a group-based disparity, the claim fails, whether it is articulated by an individual or a class." *Stockwell v. City & Cnty. of San Francisco,* 749 F.3d 1107, 1115 (9th Cir. 2014) (citations omitted); *see also, e.g., Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224-26 (9th Cir. 2021) (applying this same disparate impact standard to an individual's disparate impact claim); *Dunbar v. Walt Disney Co*., No. CV 22-1075-DMG (JCX), 2022 WL 18357775, at \*2 (C.D. Cal. July 25, 2022) (dismissing individual disparate impact claim for failure to allege "that an employment practice broadly impacts a certain group in an adverse manner—not merely a single person.") (emphasis in original).

6.  Title VII and the EEOC Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.4, require employers to retain personnel and employment records demonstrating the impact of selection procedures.  Where an employer has failed to retain such records, the plaintiff is entitled to an inference that the missing records would have supported the plaintiff's case. *Stender v. Lucky Stores, Inc*., 803 F. Supp. 259, 318 (N.D. Cal. 1992); *Loiseau v. Dep't of Human Resources*, 567 F. Supp. 1211, 1217 (D. Or. 1983).

**Page 22    PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

7.	In sum: (1) the Court decides whether Plaintiff has shown that a facially neutral employment practice had a significantly discriminatory impact upon women; (2) if this burden is met, the Court determines whether NIKE has shown the challenged practice was consistent with business necessity and job-related; (3) if NIKE meets this burden, the Court determines whether Plaintiff has shown a less discriminatory alternative; and (4) if NIKE does not meet its burden or Plaintiff shows a less discriminatory alternative, then NIKE is found liable for disparate impact violations. If NIKE is found liable, Plaintiff is presumptively entitled to backpay, and NIKE has the burden of overcoming this presumption. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975); *see also Smith v. City of Boston*, 460 F. Supp. 3d 51, 55-60 (D. Mass. 2020) (a court's disparate impact finding creates a rebuttable presumption that a prevailing plaintiff is entitled to back pay).

## II.	Plaintiff's Prima Facie Burden Regarding NIKE's Prior Pay Practice

8.	NIKE's practice of using prior pay when setting starting salaries before September 2017 was a facially neutral, specific employment practice.

9.	NIKE's contemporaneous admissions prove this practice by a preponderance of the evidence.  This includes the admission from NIKE's Total Rewards business unit, which was responsible for creating and implementing pay practices across NIKE WHQ, that prior pay was "requisite information" for setting starting salaries, and its creation of a standard Offer Intake Form to collect that information in a more efficient way.  NIKE admitted that, in the past, it "often focused on the new hire's prior salary," and that the September 2017 elimination of the practice was a formal "policy change" intended to "remove bias from critical moments of the hiring process." *See e.g., Sidibe v. Sutter Health*, 103 F.4th 675, 701 (9th Cir. 2024) ("Sutter's own admissions would have had more persuasive force than other evidence … the Federal Rules of Evidence recognize the value of a party's own admissions.") (citation omitted).  These

**Page 23	PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

admissions are consistent with and corroborated by Dr. Neumark's multiple regression analysis finding that the starting-pay disparity for women dropped by over 50% after NIKE announced its "policy change" prohibiting the use of prior pay.

10.     The existence of the prior pay practice is further corroborated by NIKE's litigation conduct.  NIKE's repeated representations to the Court denying the practice, including NIKE's 2020 representation that no such written policies existed beyond what had been produced; its 2022 assurance that it "never required" the use of prior pay; and its September 2023 declarations that no such documents existed were each contradicted by NIKE's later production of the 2016 Total Rewards "requisite information" email.  A factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt" (*Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 147 (2000)), and NIKE's attempt "to suppress evidence is probative of consciousness of guilt and admissible on that basis."  *United States v. Castillo*, 615 F.2d 878, 885 (9th Cir. 1980); *see also United States v. Gutierrez Mendez*, No. 24-1414, 2025 WL 2375214, at *1 (9th Cir. Aug. 15, 2025).  The Court treats NIKE's conduct accordingly.

11.     Dr. Neumark's multiple regression analysis found statistically significant disparities in starting pay for women during the period when NIKE used this practice.  *See* Dkt. 149-1 at 34 ¶ 59; *id*. at 59, cols. 5 and 6.  He further found that, after NIKE stopped using prior pay to set starting salaries, this starting-pay disparity for women dropped by over 50%. *Id.*

12.     This is a textbook example of but-for causation, Title VII's standard for causation. *Bostock v. Clayton Cnty., Ga*., 590 U.S. 644, 656 (2020). Such causation is shown if "the outcome changes" after a "change [to] one thing." *Id.* Here, the statistical evidence shows that NIKE's practice of using prior pay when setting starting salary was a but-for cause of the starting

pay discrimination against women because after NIKE stopped using this practice (a "change to one thing"), the starting pay disparity for women substantially dropped ("the outcome changes").

13. NIKE argues that Dr. Neumark's findings failed to meet Plaintiff's burden because he did not control for all potentially non-discriminatory factors. But such a criticism does not rebut Plaintiff's evidence. The "law does not require the near-impossible standard of eliminating *all* possible nondiscriminatory factors." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (citing *Bazemore*, 478 U.S. at 400); *see also, e.g., Paige v. California*, 291 F.3d 1141, 1145 (9th Cir. 2002), *as amended on denial of reh'g and reh'g en banc* (July 18, 2002) ("A plaintiff need not prove discrimination with 'scientific certainty'; he must, however, prove any such charge by a preponderance of the evidence.") (citations omitted). Even if NIKE is correct that there are measurable omitted variables, it is well-established that "a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case." *E.E.O.C. v. Gen. Tel. Co. of Nw.*, 885 F.2d 575, 579 (9th Cir. 1989) (quoting *Bazemore*, 475 U.S. at 400).

14. NIKE's assertion that other factors may explain the disparity does not rebut Dr. Neumark's testimony. The Ninth Circuit has repeatedly "recognized that a defendant may not rest an attack on an unsubstantiated assertion of error … the defendant must produce credible evidence that curing the alleged flaws would also cure the statistical disparity." *Hemmings*, 285 F.3d at 1188 (citations and internal quotations omitted). NIKE did not present statistical evidence that showed these alleged factors explain the disparity.

15. The prior pay practice thus had a significantly discriminatory impact on women.

16. Plaintiff, a woman whose starting salary NIKE set in April 2015 while it had this practice of using prior pay, is a member of the group adversely impacted by that practice.

**III. Plaintiff's Prima Facie Burden Regarding NIKE's PSP Practice**

17. NIKE's PSP bonus formula — a five-factor standardized formula applied uniformly to every salaried NIKE WHQ employee below the Vice President level — was itself a facially neutral, specific employment practice.

18. The PSP formula was a single, standardized, facially neutral practice that NIKE applied to every employee in a Relevant Job. From fiscal year 2019 through at least fiscal year 2022, every one of the five factors in the formula was automatically and centrally determined by NIKE; no individual employee or manager could modify the formula or any of its inputs. Before fiscal year 2019, all but one of the five factors were likewise automatically and centrally set.

19. The sole factor not automatically set before fiscal year 2019 (the "performance modifier") was based on the employee's CFE performance rating. Women at NIKE WHQ received performance ratings equal to or higher than those of men. Dkt. 149-1 at 20-22, ¶ 33; *id.* at 56, Table 3, Panel D; *id.* at 74, Table B1 (regression analysis showing women receive higher performance ratings than comparable men in comparable jobs). The performance modifier therefore conferred no advantage on men, and the PSP formula operated as a uniform, neutral practice across NIKE WHQ throughout the relevant period. Indeed, beginning in fiscal year 2019, NIKE set the performance modifier at 100% for all covered employees under its "One PSP" program, so that, from fiscal year 2019 forward, the performance modifier was also the same for everyone.

20. NIKE's PSP practice is distinct from the prior pay practice and may be challenged on its own terms.

21. At the same time, because the PSP used each employee's current salary earned during the fiscal year, the formula also had a disparate impact by carrying forward, perpetuating, and compounding pay disparities.

**Page 26 PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

22. The PSP practice had a significantly disparate impact on women. The statistical evidence establishes that it had a disparate impact on women. Dr. Neumark's multiple regression analysis found, when controlling for job, performance, and other potentially non-discriminatory factors, that there was a statistically significant shortfall for women in PSP bonuses. Dkt. 149-1 at 55, Table 2, Col. 4, panel B.

23. NIKE argues Dr. Neumark's findings failed to meet Plaintiff's burden because he did not control for all potentially non-discriminatory factors. But such a criticism does not rebut Plaintiff's evidence. The "law does not require the near-impossible standard of eliminating *all* possible nondiscriminatory factors." *Hemmings,* 285 F.3d at 1188 (citing *Bazemore*, 478 U.S. at 400 (1986)); *see also, e.g., Paige*, 291 F.3d at 1145 ("A plaintiff need not prove discrimination with 'scientific certainty'; he must, however, prove any such charge by a preponderance of the evidence.") (citations omitted). Even if NIKE is correct that there are measurable omitted variables, it is well-established that "a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case." *Gen. Tel. Co. of Nw.*, 885 F.2d at 579 (quoting *Bazemore*, 475 U.S. at 400).

24. NIKE's assertion that other factors may explain the disparity does not rebut Dr. Neumark's testimony. The Ninth Circuit has repeatedly "recognized that a defendant may not rest an attack on an unsubstantiated assertion of error … the defendant must produce credible evidence that curing the alleged flaws would also cure the statistical disparity." *Hemmings*, 285 F.3d at 1188 (citations and internal quotations omitted). NIKE did not present statistical evidence that showed these alleged factors explain the disparity.

25. Plaintiff, whose PSP annual bonuses throughout her employment were calculated under the PSP formula, is a member of the group adversely impacted by that practice.

**Page 27   PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**IV.** **NIKE's Prior Pay and PSP Practices were not Justified by Business Necessity or Job-Related**

26. NIKE failed to meet its burden of showing that its prior pay practice was justified by business necessity or job-related because it presented no evidence supporting either requirement.

27. Even if NIKE could demonstrate some legitimate purpose for using prior pay, the evidence shows that a less discriminatory alternative was both available and effective: eliminating its use of prior pay, which is precisely what NIKE did in September 2017. After adopting this alternative, the starting pay disparity for women dropped by more than 50%. NIKE's refusal before September 2017 to adopt this available alternative defeats any business necessity and job-related affirmative defense. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971); *Freyd*, 990 F.3d at 1224.

28. NIKE failed to meet its burden of showing that its PSP practice was justified by business necessity or job-related because it presented no evidence supporting either requirement.

29. Even if NIKE could demonstrate some legitimate purpose for its PSP practice, a less discriminatory alternative was available: calculating PSP bonuses without the "Fiscal Earnings" input.

**V.** **Plaintiff is Entitled to Relief**

30. Because Plaintiff has established her prima facie case of disparate impact and NIKE has failed to carry its burden of proving that either challenged practice is job-related and consistent with business necessity, liability for the disparate impact claims is established.

31. Plaintiff is entitled to relief under Title VII and the Oregon Equality Act. A prevailing plaintiff in a Title VII disparate impact case is presumptively entitled to back pay unless a compelling reason to deny it exists, and the employer has the burden of overcoming this

presumption. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975); *see also Smith v. City of Boston*, 460 F. Supp. 3d 51, 55-60 (D. Mass. 2020) (a court's disparate impact finding creates a rebuttable presumption that a prevailing plaintiff is entitled to back pay). No compelling reason to deny back pay exists here.

32.     Because the Court has found that NIKE's prior pay and PSP practices had a disparate impact on women, Plaintiff is presumptively entitled to back pay, and the burden rests with NIKE to rebut that presumption. The remedial inquiry now turns to Plaintiff as an individual, which is consistent with, not contrary to, the group nature of disparate-impact liability: liability asks whether women as a group were disparately impacted — which the Court has found — while the inquiry at the relief stage asks whether Plaintiff is entitled to back pay.

33.     In calculating back pay, any uncertainty must be resolved against NIKE as the party whose discrimination, failure to maintain required records, and suppression of evidence created the uncertainty. "All uncertainties should be resolved against the employer" in determining remedies under Title VII. *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1445 (9th Cir.), *modified*, 742 F.2d 520 (9th Cir. 1984). "[B]ack pay in a Title VII case need not be proven with the exactitude of lost profits in a breach of contract case … Any ambiguity in what the claimant would have received but for discrimination should be resolved against the discriminating employer." *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 799 (6th Cir. 2018) (citations omitted). This principle applies with particular force here, where NIKE failed to maintain records of how it set starting salaries and repeatedly represented to the Court that documents concerning its prior pay practice did not exist.

34.     NIKE has not rebutted the presumption that Plaintiff is entitled to back pay for the disparate impact prior pay claims. To rebut it, NIKE would have to show that its use of prior pay

did not cause Plaintiff to be paid a smaller starting salary than similarly situated men, such as Trent Waddell and Geoffrey Weston. NIKE submitted no evidence that prior pay was not used to set Plaintiff's starting salary or to set the starting salaries of similarly situated men, such as Waddell and Weston. The benefit that similarly situated men received from the use of prior pay is the obverse of the harm to Plaintiff: the elevation of similarly situated men's starting pay relative to Plaintiff is the disparity at issue for the damages determination, so NIKE's failure to show that such men did not benefit from prior pay is itself a failure to show that Plaintiff was not harmed by it. In addition, the record shows NIKE affirmatively sought Plaintiff's prior pay before setting her starting pay. P350 at 4; P083. Any remaining uncertainty about these questions must be resolved against NIKE, which failed to maintain the records that would show how it set these starting salaries. The presumption that Plaintiff is entitled to back pay therefore stands.

35. Nor has NIKE rebutted the presumption that Plaintiff is entitled to back pay for the disparate impact PSP bonus claims. NIKE did not show that Plaintiff's lower PSP bonus amounts or similarly situated men's higher PSP bonus amounts were justified by non-discriminatory factors. Additionally, NIKE's PSP bonus formula also used current salary as a direct input, which perpetuated and compounded Plaintiff's starting salary disparity in each annual PSP bonus calculation throughout her employment.

126. Plaintiff is entitled to back pay reflecting the difference between the compensation she received and the compensation she would have received absent NIKE's discriminatory practices, from the earliest date permitted by the applicable limitations period, prejudgment interest on any back pay award, and attorneys' fees and costs.

127.    Jennifer Murphy, a Certified Public Accountant licensed in Oregon, is Plaintiff's expert witness on damages. Murphy calculated Plaintiff's disparate impact damages under Title VII and Oregon state law, inclusive of lost back pay and interest. *See* January 17, 2025 Corrected Expert Report of Jennifer Murphy ("Murphy Corrected Report"); May 13, 2026 Updated Expert Report of Jennifer Murphy ("Murphy Updated Report").

36.    Plaintiff's disparate impact in prior pay damages under Title VII between August 9, 2016 and October 12, 2020 includes $4,762.30 in lost back pay and $1,550.05 in prejudgment interest (at 3.76%, which is based upon the Federal statutory guidance that the rate should be the current weekly average yield on 1-year constant maturity Treasuries compounded annually) through July 17, 2026, for a total of $6,312.36. Murphy Corrected Report, ¶¶ 35-36, 44, 46; Murphy Updated Report, ¶ 7, Schedule 1_Hender (pp. 1, 20).  Murphy calculated lost back pay damages by assuming that Plaintiff's starting salary at Nike should have been 1.16% higher than her actual starting salary, and since PSP Bonus calculations use base salary as an input, Murphy also applied a 1.16% increase to PSP Bonuses paid during the liability period.  Murphy Corrected Report, ¶¶ 35-36; *see also* Dkt. 149-2 at 95, Table D1, Col. 5 (finding -1.16% female shortfall from prior pay practice before September 2017).  Murphy calculated lost back pay for Plaintiff's disparate impact in prior pay claim based on the difference between actual pay and the adjusted pay plus 1.16% for the applicable period. *Id.*

37.    Plaintiff's disparate impact in prior pay damages under the OEA between July 25, 2016 and October 12, 2020 includes $4,878.17 in lost back pay and $3,365.70 in prejudgment interest (at 9% simple, the Oregon statutory rate) through July 17, 2026, for a total of $8,243.87. Murphy Corrected Report, ¶¶ 37-38, 45-46; Murphy Updated Report, ¶ 7, Schedule 1_Hender (pp. 1, 20).  Murphy calculated lost back pay damages under the OEA using the same

methodology as the damage calculations for the disparate impact in prior pay claim under Title VII. Murphy Corrected Report, ¶¶ 37-38.

38.     Damages under the OEA begin on July 25, 2016.  A former Plaintiff in this case, Kelly Cahill, filed a charge on July 25, 2018 alleging disparate impact claims on behalf of herself and "all other similarly situated female corporate employees of NIKE, Inc.," and received a Notice of Right to File Suit prior to joining this case.  Title VII states backpay accrues from "two years prior to the filing of a charge," not "the plaintiff's charge" or "her own charge." *See* 42 U.S.C. § 2000e-5(g)(1). The earlier charge in this case expressly alleged discrimination against similarly situated women, and class members' claims are measured against "the filing of the initial employee's charge," not each individual's own filing date. *See EEOC v. Fred Meyer Stores, Inc.*, 759 F. Supp. 3d 1084, 1090 (E.D. Wash. 2024); *see also, e.g.*, *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1136 (9th Cir. 2012) ("In Title VII … cases, federal courts have found that so long as one plaintiff timely files an administrative complaint, a class of similarly-situated plaintiffs may 'piggyback' on that complaint, thereby satisfying the exhaustion requirement.") (citations omitted).  Limiting Plaintiff's back pay period to her own later charge would give Nike a windfall from the very discrimination the earliest charge put NIKE on notice of.

39.     Plaintiff's disparate impact in bonuses damages under Title VII between August 9, 2016 and October 12, 2020 includes $1,272.03 in lost back pay and $370.13 in prejudgment interest (at 3.76%, which is based upon the Federal statutory guidance that the rate should be the current weekly average yield on 1-year constant maturity Treasuries compounded annually) through July 17, 2026, for a total of $1,642.16. Murphy Corrected Report, ¶¶ 39-40, 44, 46; Murphy Updated Report, ¶ 7, Schedule 1_Hender (pp. 1, 20). Murphy calculated lost back pay damages by assuming that Plaintiff's bonuses at Nike should have been 2.95% higher than her

actual paid bonuses, and she calculated lost back pay based on the difference between actual bonuses and the adjusted bonuses plus 2.95% for the applicable period. Murphy Corrected Report, ¶¶ 39-40; *see also* Dkt. 278-2 at 25, Table R6, Col. 5 (finding -2.95% female shortfall from PSP bonus practice).

40. Plaintiff's disparate impact in bonuses damages under the OEA between July 25, 2016 and October 12, 2020 includes $1,471.60 in lost back pay and $969.20 in prejudgment interest (at 9% simple, the Oregon statutory rate) through July 17, 2026, for a total of $2,440.80. Murphy Corrected Report, ¶¶ 41-42, 45-46; Murphy Updated Report, ¶ 7, Schedule 1_Hender (pp. 1, 20). Murphy calculated lost back pay damages under the OEA using the same methodology as the damage calculations for the disparate impact in bonuses claim under Title VII. Murphy Corrected Report, ¶¶ 41-42.

DATED: June 8, 2026                    GOLDSTEIN BROWNE, P.C.

*s/ Byron Goldstein*
Byron Goldstein (admitted *pro hac vice*)
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
1111 Broadway 3rd Floor, 04-117
Oakland, CA 94607
Telephone: (510) 584-9020

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com
David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Kathryn P. Roberts, OSB #064854
KathrynRoberts@MarkowitzHerbold.com
Kelsie G. Crippen, OSB #193454
KelsieCrippen@MarkowitzHerbold.com

ACKERMANN & TILAJEF, P.C.
Craig J. Ackermann (admitted *pro hac vice*)
cja@ackermanntilajef.com
Brian W. Denlinger (admitted *pro hac vice*)
bd@ackermanntilajef.com
Erika Smolyar (admitted *pro hac vice*)
es@ackermanntilajef.com
315 South Beverly Drive, Suite 504
Beverly Hills, CA  90212
Tel: (310) 277-0614
Fax: (310) 277-0635

DARDARIAN HO KAN & LEE
Laura L. Ho (admitted *pro hac vice)*
lho@dhkl.law
James Kan (admitted *pro hac vice)*
jkan@dhkl.law
Katharine L. Fisher (admitted *pro hac vice)*
kfisher@dhkl.law
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800
Fax: (510) 835-1417

*Attorneys for Plaintiff*

2456673.4

**Page 34    PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF
              LAW**