466

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


HEATHER HENDER,                          )
                                         )
                       Plaintiff,        )   No. 3:18-cv-01477-AB
                                         )
              vs.                        )   July 15, 2026
                                         )
NIKE, INC., an Oregon                    )   Portland, Oregon
corporation,                             )
                                         )
_____ Defendant.     )



TRANSCRIPT OF PROCEEDINGS

(Trial - Day 3)


BEFORE THE HONORABLE AMY M. BAGGIO

UNITED STATES DISTRICT COURT JUDGE


Court Reporter:              Ryan White, RMR, CRR
                             United States District Courthouse
                             1000 SW 3rd Avenue, Room 301
                             Portland, Oregon 97204
                             (503) 326-8184

APPEARANCES


For the Plaintiff:          MARKOWITZ HERBOLD PC
                            By:  LAURA R. SALERNO OWENS
                            laurasalerno@markowitzherbold.com
                            1455 SW Broadway, Suite 1900
                            Portland, Oregon 97201
                            (503) 295-3085

                            GOLDSTEIN, BORGEN, DARDARIAN & HO
                            By:  BYRON GOLDSTEIN
                            brgoldstein@gbdhlegal.com
                            155 Grand Avenue, Suite 900
                            Oakland, California 94612
                            (510) 763-9800

                            ACKERMANN & TILAJEF, PC
                            By:  BRIAN W. DENLINGER
                            bd@ackermanntilajef.com
                            2602 N. Proctor Street, Suite 205
                            Tacoma, Washington 98406
                            (563) 542-3309

                            ACKERMANN & TILAJEF, PC
                            By:  ERIKA SMOLYAR
                            es@achermanntilajef.com
                            315 S Beverly Drive, Suite 504
                            Beverly Hills, California 90212
                            (847) 454-4629

468

APPEARANCES (Continued)


For the Defendant:          STOEL RIVES LLP
                            By:  LAURA E. ROSENBAUM
                            laura.rosenbaum@stoel.com
                            760 SW 9th Avenue, Suite 3000
                            Portland, Oregon 97205
                            (503) 294-9642

                            PAUL HASTINGS LLP
                            By:  FELICIA A. DAVIS
                            feliciadavis@paulhastings.com
                            By:  DANIEL PRINCE
                            danielprince@paulhastings.com
                            By:  LINDSEY C. JACKSON
                            lindseyjackson@paulhastings.com
                            515 S Flower Street, 25th Floor
                            Los Angeles, California 90071
                            (213) 683-6169

                            PAUL HASTINGS LLP
                            By:  JENNICA K. WRAGG
                            jennicawragg@paulhastings.com
                            1999 Avenue of the Stars, 27th Floor
                            Los Angeles, California 90067
                            (310) 620-5700

                          INDEX

                                                              PAGE

July 15, 2026 - Trial Day 3

     Plaintiff's Witnesses (Continued):

          Heather Hender

                Cont. Direct Exam by Mr. Denlinger       479

                Cross-Examination by Mr. Prince          501

                Redirect Examination by Mr. Denlinger    593

                Recross-Examination by Mr. Prince        599

          Shane Walker

                Direct Examination by Mr. Goldstein      601

                Cross-Examination by Ms. Davis           670

                Redirect Examination by Mr. Goldstein    683




                        EXHIBIT INDEX

EXHIBIT                                            RECEIVED

2                                                    487

3                                                    489

4                                                    490

35                                                   603

40                                                   654

58                                                   483

123                                                  625

you called it APR.  Did I get that right?

A.    That's correct.

Q.    If we're thinking about the period from 2015 to 2020, was NIKE using a APR that entire time, or was there a change?

A.    It was not used the full time.  So there was a process from 2015 until 2019 called GPR, which was Global Performance Rewards.  And then in 2019, we changed the program to the annual pay review process.

Q.    Can you tell the jury a little bit about what changed in 2019?

A.    So a few things changed.  One, we put in place a competitive pay management process where we, centrally, on the comp team looked to make sure employees were positioned appropriately in the pay range.  So things like making sure employees were above the minimum of the pay range.  There were certain situations where the market would move faster than our pay ranges, and so we would need to make adjustments for that.

And then we also completed a pay equity analysis.  So if there were situations or issues where there were unexplained pay differences, we would take action on those during that time as well.

The other item is we also simplified the way that managers make pay decisions.  So we started everyone with a default pay increase based on their performance rating, their position, and range.  And the managers had the ability to

increase or decrease their -- the employee's pay adjustment based on looking at their experience, performance, their impact.

And then the third is that we moved to a single bonus plan across the company, other than individual bonus plans.

Q.    That sounds like a lot.  So let me take it one step at a time.

So you mentioned the competitive pay management program.  That was new in 2019?

A.    It was, yes.

Q.    Okay.  And when we're saying 2019, are you meaning NIKE's fiscal 2019, which actually starts in 2018, or do you mean calendar year 2019?

A.    Calendar year.

Q.    Thank you.

And so can you just explain and maybe speak a little bit slower, because you're a fast talker and I just want to make sure the jury understands you, what was involved in the competitive pay management program?

A.    Yeah.  So competitive pay management had three components.  We were looking to make sure that employees were above the minimum of the pay range.  We were looking to make sure that if the market moved faster for particular jobs, that we were matching that.  And so in some cases we needed to give increases.  And then we did a pay equity analysis.  And where there were unexplained pay differences or issues, we made

adjustments.

Q.   Was that the first year that NIKE had run a pay equity analysis?

A.   It was not.

Q.   Do you know what the first year NIKE ran a pay analysis was?

A.   The first year I was involved was 2018, and I believe there was one done the year before as well.

Q.   You mentioned some other changes that happened in 2019, including the merit adjustments.

Can you explain what that process was before 2019?

MR. GOLDSTEIN:   Your Honor, can we have a quick sidebar?

THE COURT:   Sure.

(Sidebar is held off the record.)

BY MS. DAVIS:

Q.   Do you remember my last question?

A.   I do not.

Q.   Okay.  I will try to remember.

I believe it related to the merit pay increases, and I think you said in 2019 there were some changes?

A.   Yes.

Q.   Can you explain what changed in 2019 and how it was different from earlier?

A.   So what changed is that we gave managers a default

in place in, say, 2015?

A.   Yes, I believe they would have been based on percent increase, so not positioning in the range.

Q.   Okay.  During your employment with NIKE, which stretched from 2016 to 2022, in addition to what you've told us today, what steps -- what other steps did NIKE take to promote pay equity?

MR. GOLDSTEIN:  Objection.  Assumes facts.

THE COURT:  If he has -- if he can answer, he can answer.

Go ahead.

THE WITNESS:  Sorry.

BY MS. DAVIS:

Q.   Sure.  Let me ask a different question.

During your employment at NIKE, from your perspective, what steps did NIKE take to promote pay equity?

A.   So I think it was kind of three-fold.  Benchmarking our roles and having the methodology documented for how we benchmarked those roles and making sure that we were looking at it in a consistent away across the company.

Second was training and making sure that mangers had the right knowledge and skills to be able to make pay decisions in an appropriate way.

And then the third was putting in place the competitive pay management process, so doing central analysis,

but then also looking at our pay equity analysis.

MS. DAVIS:  Can I confer with my colleagues for one moment?

THE COURT:  Sure.

MS. DAVIS:  Thank you.

(Discussion held off the record.)

MS. DAVIS:  No further questions.  Thank you.

THE COURT:  Thank you.

REDIRECT EXAMINATION

BY MR. GOLDSTEIN:

Q.  With regards to the pay equity you just mentioned -- well, stepping back.

Are you saying that managers have complete discretion to make any decision that they want to do?

A.  No.  I'm not saying that they can do anything they want.

Q.  Okay.

A.  Management can make discretion within guidelines within a framework.

Q.  In the guidelines; right?  They're constrained by guidelines; correct?

A.  Guidelines on a framework, yes.

Q.  Yes.

A.  And there are times where there are exceptions to

after the district court excluded evidence that the defendant used the absence of that evidence to shield itself from damage and to strike at the foundation of plaintiff's case. That is what NIKE is doing here. There is no pattern of evidence. We are great to our employees. We address concerns. We do pay equity analysis. We investigate concerns. While withholding all of that information, and we don't have access to it to challenge it.

So we believe NIKE has opened the door. At a minimum, we would request that the witness, who would testify quickly, and in MIL 6 get to testify. But NIKE has also waived privilege as to its self critical analysis, including its pay equity analysis because itself -- itself chose to open the door by touting its efforts.

THE COURT: Ms. Davis.

MS. DAVIS: So I think there are a couple of responses. One, plaintiffs are the first party that raised the pay equity analysis in this case when they showed the David Ayre email to witnesses and asked about it. It would be unfair to introduce that and then not allow us to talk about the pay equity analysis and our perspective on it.

Two, we have said nothing -- no witness has said anything in this trial that NIKE has not publicly disclosed. Obviously, if it's been publicly disclosed, it is not privileged.

of its equal opportunity efforts to prove nondiscrimination, it, quote, 'opens the door,' end quote, and waives whatever qualified privilege may have existed."

So how does what has happened fit in that framework, just briefly? What specifically has defendant done as opposed to questioning by plaintiff, but what has defendant done that's opened the door by voluntarily using evidence of equal opportunity efforts beyond the public statements of the fact of the pay equity analysis?

Help me, Mr. Goldstein.

MR. GOLDSTEIN: In this trial, during direct examination, they elicited testimony that we did a pay equity analysis in 2018, we did a pay equity analysis in 2017, we do -- and then they listed a number of other efforts to achieve pay equity. That is touting its equal opportunity -- equal employment opportunity efforts, while withholding from plaintiff the actually analyses.

THE COURT: Ms. Davis, I know you haven't had the chance to read the case. And if I can't sort this out, I might ask for two pages from each side tonight so that I can make sure I understand fully the issue. And if you want to wait to say more, that's fair, too, Ms. Davis.

MS. DAVIS: Well, I will take both opportunities to say something.

THE COURT: Okay.

C E R T I F I C A T E


I certify, by signing below, that the foregoing is a true and correct transcript of the record, taken by stenographic means, of the proceedings in the above-titled cause.  A transcript without an original signature, conformed signature, or digitally signed signature is not certified.


DATED this 15th day of July, 2026.



*// Ryan White*

RYAN WHITE
Registered Merit Reporter
Certified Realtime Reporter
Expires 9/30/2028