**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kelsie G. Crippen, OSB #193454**
KelsieCrippen@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085

**Byron Goldstein (admitted *pro hac vice*)**
Byron@goldsteinbrowne.com
**Barry Goldstein, Of Counsel (admitted *pro hac vice*)**
Barry@goldsteinbrowne.com
GOLDSTEIN BROWNE, PC
1111 Broadway, Office 04-117
Oakland, CA  94607
Telephone: (510) 584-9020

Attorneys for Plaintiff
[Additional Counsel of Record listed on the Signature Page]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| HEATHER HENDER,<br><br>             Plaintiff,<br><br>    v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>             Defendant. | Case No. 3:18-cv-01477-AB<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)** |

**Page i –**      **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

## INTRODUCTION

Although Nike appears to argue that Rules 50(a) and 52(c) apply to all three types of claims, the disparate impact claims are decided under Rule 52(c), while the other two claims are decided under Rule 50(a). Under Rule 52(c), the Court can simply "decline to render any judgment until the close of evidence." If the Court does not, Nike's motion should still be denied because the evidence proves each element. As to the other two claims, the trial made clear that Nike cannot meet the high burden imposed by Rule 50(a). Because Plaintiff has introduced evidence supporting each element of her disparate treatment and equal pay claims, and because the evidence presents disputed factual questions for the jury, Defendant's motion under Rule 50(a)(1) should be denied.

Nike's arguments rely primarily on generalized testimony that is contrary to or inconsistent with contemporaneous documents. Nike fails to address the contrary evidence, including its own admissions, which are more persuasive than its witnesses' post hoc, generalized claims. *See, e.g.*, *Sidibe v. Sutter Health*, 103 F.4th 675, 701 (9th Cir. 2024) (a party's "own admissions would have had more persuasive force than other evidence," and "[c]ontemporaneous evidence, particularly written evidence, is commonly understood to be more reliable than later recollections") (citations omitted).

## LEGAL STANDARD

Plaintiff's disparate treatment and equal pay claims are being tried to the jury and are governed by Rule 50(a); her disparate impact claims are being tried to the Court and are governed by Rule 52(c). Judgment as a matter of law under Rule 50(a) is appropriate only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The Court "may not make credibility determinations or weigh

Page 1 –    **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

the evidence," and "must draw all reasonable inferences in favor of the nonmoving party." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "The test applied is whether the evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pac. Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006). Judgment is therefore inappropriate where the evidence supports competing reasonable inferences or turns on credibility. *Wallace v. City of San Diego*, 479 F.3d 616, 624 (9th Cir. 2007).

Rule 52(c) authorizes—but does not require—the Court to enter judgment once a party has been fully heard on an issue, and expressly preserves the Court's discretion to "decline to render any judgment until the close of the evidence." Fed. R. Civ. P. 52(c).

## I.     THE RECORD DEMONSTRATES THAT THE COURT CAN FIND DISPARATE IMPACT LIABILITY

### A.     Disparate Impact's Elements

Plaintiff's prima facie burden is to "show a facially neutral employment practice has a significantly discriminatory impact upon a group protected by Title VII." *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224-26 (9th Cir. 2021). The focus is on a "group-based disparity." *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1115 (9th Cir. 2014). If the plaintiff meets this burden, the burden shifts to the employer to demonstrate that the challenged practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). "Failure in this proof results in judgment for the plaintiff." *Loiseau v. Dep't of Human Res.*, 567 F. Supp. 1211, 1214 (D. Or. 1983). If the employer meets this burden, the plaintiff may still prevail by showing the employer refuses to adopt an available alternative practice with less disparate impact. 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

Where an employer has failed to retain or produce the records that Title VII and the EEOC Uniform Guidelines, 29 C.F.R. § 1607.4, require, the plaintiff is entitled to an inference

**Page 2 –**     **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

that the missing records would have supported her case. *Stender v. Lucky Stores, Inc.*, 803 F.

Supp. 259, 318 (N.D. Cal. 1992); *Loiseau*, 567 F. Supp. at 1217. And if NIKE is found liable,

Plaintiff is presumptively entitled to backpay, with NIKE bearing the burden of overcoming that

presumption. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975); *see also Smith v. City of*

*Boston*, 460 F. Supp. 3d 51, 55-60 (D. Mass. 2020).

**B.      Nike's Invented Third Disparate Impact Element**

Nike invents an additional element: "a showing that the policy applied to her and that she

suffered injury as a result." Dkt. 796 at 7. But the primary Ninth Circuit decision Nike relies on

contains no such requirement. *Freyd* explicitly states there are "two parts" to plaintiff's prima

facie burden: "1) a specific employment practice that 2) causes a significant discriminatory

impact." 990 F.3d at 1224. And the practice in *Freyd*—retention negotiations engaged in more

often with men—was never applied to the plaintiff at all. *Id.* at 1215.

Nor do Nike's other cited cases change *Freyd*. *Pottenger* discredits Nike's misstatement:

"To make out a prima facie case of disparate impact, Pottenger must show *only* that a facially

neutral business practice had a significant adverse effect on older workers." *Pottenger v.*

*Potlatch Corp.*, 329 F.3d 740, 749 (9th Cir. 2003) (emphasis added). There, the plaintiff was

discharged before the challenged reduction-in-force even began, which is why the court found

that the practice did not apply to him. *Id.* at 749-50. And *Henderson,* whose quote Nike

misattributes to a Supreme Court decision (Dkt. 796 at 8), found no standing because the

plaintiff admitted her age had nothing to do with her treatment. *Henderson v. Nordstrom, Inc.*,

2006 WL 1148178, at 7-8 (W.D. Wash. Apr. 27, 2006).

Regardless, this Court has already defined what Plaintiff must show: application of the

practices to Plaintiff relates to her individual relief, and "Plaintiff need not submit evidence that

**Page 3 –      PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR**
**JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL**
**RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

prior pay was used to set starting pay in every instance, and Plaintiff likely need not submit evidence that her salary would have been higher had she not been asked about prior pay." Dkt. 763 at 10. As shown in Section I.E, Plaintiff makes that showing.

### C.    The Evidence Proves that Nike Had the Challenged Practices

### 1.    Nike's practice of using prior pay to set starting pay.

Nike's assertion that "[t]here is no evidence that NIKE had a company-wide policy or practice of using prior pay to set starting pay" (Dkt. 796 at 8) ignores Nike's own documents and witnesses. Nike "had *written* guidelines in 2015" on positioning new hires that "focused on the percent increase from their prior pay." Tr. 690:17-25 (Walker) (emphasis added). Nike's Total Rewards training materials admit: "In the past, we often focused on the new hire's prior salary," an approach Nike changed because it realized it "didn't want to carry over poor practices," which "could lead to people being underpaid." Ex. 295 at 8; Tr. 648:18-649:14, 649:25-650:2. Nike's pre-2017 offer intake form collected each candidate's actual "Annual Base Salary" under "Current Candidate Information"; only the post-2017 revision changed that field to salary "expectations." Ex. 582; Tr. 667:25-668:13, 1001:12-24. Nike admitted in 2019 that it had "problematic pay practices." Ex. 207 at 2.

In fall 2017, Nike admitted it made a "policy change," confirming the practice existed. Ex. 153 (Oct. 12, 2017 "Commitment to Pay Equity" email to all U.S. talent acquisition: "we recently shared that we will no longer ask candidates about their compensation history"). Nike's Chief Human Resources Officer, Monique Matheson, told every Nike employee that Nike would "[r]emove bias from critical moments of the hiring process," including by "eliminating the collection of candidate salary history." Ex. 18; Tr. 285:6-8, 397:4-16. That is an admission that the practice being eliminated had injected bias. After NIKE stopped using prior pay in

**Page 4 –**    **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

September 2017, the starting pay disparity between women and men at NIKE WHQ dropped by more than 50%.  Tr. 784:17-785:7, 790:15-791:23.

Against this record, Nike offers the generalized denials of a single witness, Shine Thomas. Dkt. 796 at 8. In 2015, Thomas was "a recruiter" working "mainly … in design"; she became global vice president of talent acquisition only in 2024. Tr. 998:22-999:6. Her denials rely on no documents and do not explain the records above. She conceded that candidates "would sometimes offer their prior pay" and talent acquisition "would note that"; that some recruiters asked before 2017; that prior pay was "one of many data points" going into an offer; and that asking about prior pay "can lead to disparities in gender." Tr. 996:14-997:2, 998:3-12, 1003:5-8, 1004:21-24. Even if Thomas's testimony is credible, it creates at most a conflict with the contemporaneous record.

### 2. Nike's common annual bonus calculation.

Nike's argument that its PSP plans "changed significantly in 2019" (Dkt. 796 at 9) is not accurate and does not respond to the practice Plaintiff challenges: throughout the statutory period, Nike calculated every eligible salaried employee's PSP bonus using the employee's base (fiscal-year) earnings. Nike's senior director of global compensation, Shelli White, testified that between fiscal years 2015 and 2018, all salaried employees in bands L through S participated in the same PSP program with the same Nike-set calculation factors, including a performance modifier tied to CFE ratings within Nike-set guideline ranges. Tr. 888:14-17, 889:1-4, 893:1-17, 894:5-12, 895:12-24, 896:5-10; Exs. 79, 100, 189. The same formula for calculating bonuses continued from fiscal year 2019 forward with the same factors as before but without any discretion for the one factor, the performance modifier, that previously had some discretion. Tr. 896:12-16, 896:25-897:11, 898:6-10; Ex. 111.

**Page 5 –**     **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

D.      **The Evidence Proves the Challenged Practices Had a Disparate Impact on Women**

1.      **Starting pay.**

Using multiple regression analyses, Dr. Neumark found Nike paid women lower starting salaries than similarly situated men and this disparity dropped by more than 50% after Nike made its "policy change. Multiple regression analysis is a well-established and accepted methodology for identifying pay discrimination in employment litigation; it can "isolate the influence of one particular factor—e.g. sex—on a dependent variable—e.g. salary." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1183 (9th Cir. 2002); *see also, e.g.*, *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1217 n.3 (9th Cir. 2021); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 685 (9th Cir. 2022) (en banc) (discussing the probative value of statistical evidence in a range of litigation contexts); Daniel L. Rubinfeld, Reference Guide on Multiple Regression, 306 n.5 (Fed. Judicial Ctr. 3d ed. 2011); ("Discrimination cases using multiple regression analysis are legion.") (collecting cases).

Dr. Neumark found "a female shortfall in starting pay relative to comparable male workers at NIKE." Tr. 784:15-16. For employees hired before September 2017—while Nike's prior-pay practices were in effect—the shortfall was 1.16 percent, statistically significant at 2.89 standard deviations (a less than 1-in-100 probability of chance). Tr. 784:17-785:7, 790:15-791:23. For employees hired after Nike ceased its prior-pay practices, the disparity fell by more than half. *Id.* This before-and-after pattern is compelling proof of causation because after Nike made its "policy change" to stop using this practice (a "change to one thing"), the starting pay disparity for women substantially dropped ("the outcome changes"). *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020); *see also, e.g., Rizo v. Yovino*, 950 F.3d 1217, 1228 (9th

**Page 6 –**      **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

Cir. 2020) (en banc) ("setting wages based on prior pay risks perpetuating the history of sex-based wage discrimination").

Nike's critiques of Dr. Neumark (Dkt. 796 at 9-10) fail. First, Dr. Neumark used Nike's own job architecture, controlling for every unique combination of job subfamily and level, which are "almost equivalent to" job code, and when he re-ran analyses using job code it "didn't make any difference;" the result was still "a statistically significant female pay shortfall." Tr. 768:4-25, 793:16-794:8, 794:19-795:2, 812:6-15. Indeed, that is how Nike designed its job architecture. Tr. 608:2-610:13; Ex. 35 at 30. Second, as to prior experience: age is a longstanding proxy for experience in labor economics, Tr. 835:9-15, and Dr. Neumark confirmed his findings with two additional analyses using actual job-application data—education, prior employers, and prior job titles—which produced the "[s]ame answer." Tr. 787:24-789:9, 857:20-858:6.

### 2.    Bonuses.

Dr. Neumark found that women received bonuses "about 3.2 percent lower" than otherwise comparable men, about $645 per woman per year, at 5.66 standard deviations, with a less than 1-in-100,000 probability of chance, controlling for, among other things, performance ratings. Tr. 792:1-793:1. His bonus model likewise contained subfamily-by-level controls "very close" to job code. Tr. 869:1-4; 794:19-795:2.

### E.    The Practices Applied to Plaintiff, Who Is Entitled to Damages

Before receiving damages, Plaintiff need only "submit additional evidence that her prior pay was used to set her starting salary," not evidence that prior pay was used "in every instance" or that "her salary would have been higher had she not been asked about prior pay." Dkt. 763 at 10. The evidence far exceeds that standard.

**Page 7 –**    **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

Nike's recruiter asked Plaintiff about her prior pay during her phone screen; she answered that she "had been on 82K" plus a bonus "that never came." Tr. 419:23-420:15. When hiring manager Michael Pfluger asked recruiter Betse Green to proceed with an offer, Ms. Green responded: "She was at 82K + bonus (that never came) at ViaOptronics. She was looking for $70-$80K - the mid for this position is 78,600.0." Ex. 263. Pfluger replied to that very email' that Nike produced, setting her pay $3,400 below her prior pay. Ex. 263; Tr. 1097:1-24, 1111:4-7. Pfluger admitted he knew Hender's prior pay from Ms. Green when he set her starting pay. Tr. 1099:12-14; 1110:14-20. His denial that it had "any influence" is, at most, a credibility question, especially given that it is 11 years later and contradicted by the contemporaneous record, in which her prior pay was one of only two candidate-specific facts in the email that set her salary. *See Reeves*, 530 U.S. at 150. Meanwhile, Mr. Waddell's prior pay was over $90,000 because he took "a pay cut" to join Nike, and Nike started him at $90,000 plus a $10,000 signing bonus. Tr. 1048:10-11; Ex. 555; Ex. 561.

As for bonuses, it is undisputed that the same formula applied to Hender: her FY18 pay statement shows the very same formula that applied to all employees. Ex. 100; Tr. 890:1-10. The only discretionary input identified was exercised in her favor; Ms. Mei moved her performance modifier up to 105 percent based on her "Highly Successful" rating. Tr. 1175:11-21. Discretion, therefore, cannot explain any bonus shortfall; the formula transmitted Hender's depressed base pay into every bonus she received. Tr. 587:10-588:14. Accordingly, Plaintiff is presumptively entitled to backpay. *Albemarle*, 422 U.S. at 421.[1]

---

[1] Further, Nike's insistence that Hender prove a quantified economic loss caused by each challenged practice conflates liability with remedy and misconceives the injury Title VII redresses. In *Connecticut v. Teal*, 457 U.S. 440 (1982), the Supreme Court held that an individual employee may challenge a specific employment practice that operates as a discriminatory barrier to her protected group regardless of the employer's "bottom line," because

**Page 8 –** **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

## II. NIKE CANNOT MEET ITS HEAVY BURDEN TO OBTAIN JUDGMENT ON PLAINTIFF'S DISPARATE TREATMENT CLAIMS

Plaintiff's prima facie burden in this motion "is not onerous," it "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)) (cleaned up). And this Court has ruled that Nike "may not argue that Plaintiff must identify a specific decisionmaker possessing discriminatory animus." Dkt. 763 at 6.

### A. A Reasonable Jury Could Find Hender Similarly Situated to Waddell

Hender and Waddell started at Nike in the identical job code (A0945), position (Engineer II), job level (Intermediate Professional), and job subfamily (Manufacturing Engineering). Ex. 555. Under Nike's own job architecture, "[t]ype of work plus level of work equals job code," Tr. 609:19-610:1 (Walker); each job code has exactly one pay range, which "drives" pay, Tr. 612:9-17, 613:12-14; and Nike itself defines "internal equity" as "pay compared to other NIKE

---

Title VII guarantees the "individual respondents the opportunity to compete equally," the deprivation of that opportunity, not a net financial outcome, is the injury. *Id.* at 451, 455–56. The Sixth Circuit recently applied the same principle to reject the very argument Nike advances here. In *Pickett v. City of Cleveland*, 140 F.4th 300, 311–13 (6th Cir. 2025), *petition for cert. filed*, No. 25-677, the defendant argued that disparate-impact plaintiffs lacked Article III standing because up to twenty percent of them "suffered no economic injury" traceable to the challenged practice. The court held this argument "falsely assumes that Plaintiffs' alleged injury . . . is economic in nature": the discriminatory imposition of the practice "alone is the injury," any economic harm is "auxiliary," and a statutory disparate-impact discrimination claim is itself a concrete injury in fact given its close relationship to harms traditionally recognized in American courts. *Id.* at 311–12 (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)). Although *Pickett* arose under the Fair Housing Act, its reasoning applies with full force to Title VII, from which the FHA's disparate-impact framework derives. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 533–35 (2015). Plaintiff was indisputably subjected to the challenged practices—Nike collected her prior pay, transmitted it in the very email that set her starting salary below that prior pay, and applied its common bonus formula to her—and that is all *Pottenger* requires; the quantification of her resulting losses is a question of remedy, not liability or standing.

**Page 9 –**     **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

employees in the same job code." Ex. 130; Tr. 631:6-12. Nike's argument that job code is "not determinative" asks the Court to reject Nike's own compensation system.

Moreover, Nike's claimed distinction between process engineers and automation/equipment engineers cannot support judgment either. Mei conceded the two roles sat "in the same job code" "[f]or the same level" and that the work overlapped. Tr. 1169:1-4, 1170:2-3, 1170:15-20. Stowell testified that "process engineers have the knowledge on how to program those robots … or troubleshoot issues." Tr. 1197:14-17. Waddell testified that process engineers were his daily collaborators, that Hender was "really the expert" on the Agile lines, and that she walked him through the vision system he "needed to learn" for his own position. Tr. 1049:19-21, 1059:23-1060:19. Hender's own work was automation work: she supported "high-speed automated equipment" involving "robotics and vision systems and conveyers and PLCs," and was the "acknowledged expert" who trained other engineers—including Waddell and engineers senior to her. Tr. 423:8-12, 424:19-20, 426:3-4, 497:18-498:1. Mei herself wrote that Hender "has specialized in the vision system beyond anyone in the equipment team." Ex. 5.

Nike's remaining points fare no better. "Different supervisors" is not a job-related or legitimate non-discriminatory reason, especially where Nike designed its system so that a first-level manager could not even see the salaries of A0945 employees outside his own team, Tr. 613:12-14, 618:20-619:2, and the very witnesses Nike cites each confirmed they did not decide Waddell's pay or promotions. Tr. 1111:8-14 (Pfluger); 1183:14-20 (Mei); 1198:16-1199:2 (Stowell). As for pre-Nike experience, Hender had approximately 20 years of technical experience, including roughly 10 years in engineering roles spanning automation, robotics, and vision systems, as well as a Lean Six Sigma Black Belt. Tr. 411:18-412:5, 414:18-417:2; Ex. 559. Waddell testified that he had no certifications in computer languages (Tr. 1044:7-9), and

**Page 10 –**     **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

Nike presented no evidence that he held any other certifications. At Nike, Hender authored a patent, the idea for which arose only three months into Hender's employment and for which Pfluger admitted he wanted everyone on the team to pursue, implying that Hender possessed a special skill her peers did not (Ex. 249); Waddell never secured a patent. Tr. 426:18-429:22; 1085:19-21.[2] Hender's performance ratings equaled or exceeded Waddell's in every overlapping year. Ex. 562. Nike's conclusory and contrary characterizations are jury argument, not a basis for taking the claims from the jury.

**B.      A Reasonable Jury Could Find Hender Was Qualified for Promotion Earlier**

Hender applied for the Senior Equipment Engineer II position in October 2016, when she was already "doing … senior-level work." Tr. 431:3-5; Ex. 59. Pfluger "encouraged me to apply. In fact, he tipped me off when the job came open," and the hiring manager, Chris Viehoff, said she "would be a great fit for it since I was already doing the work." Tr. 431:19-24. She met the posted qualifications, Tr. 480:16-481:11; Ex. 353, which Nike has not rebutted. Nike nonetheless told her she was "not qualified." Tr. 433:1-9. Nike then concluded that Waddell also "didn't quite meet that level of expertise," hired him anyway, "two levels down," into Hender's job code, at a starting salary $11,400 above hers, and noncompetitively promoted him to Senior Engineer in under twelve months. Tr. 1048:1-7; Exs. 555, 561, 564; Tr. 1084:20-1085:16. Hender waited 41 months for the same title. Ex. 564; Tr. 483:25-484:3.

Mei's contemporaneous statements defeat Nike's claim that Hender was not qualified sooner. Mei told Hender she "was already doing senior-level work." Tr. 434:24-435:2, 439:21-

---

[2] Dr. Neumark testified that in his experience, an employee with more years of experience, even if at different jobs, should generally earn more, and that prior management experience is mitigated when two employees start in the same job at their next job (as Hender and Waddell did). Tr. 837:13-838:22, 839:18-840:19.

**Page 11 –      PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

23. In April 2018, Mei wrote to senior management that Hender "has specialized in the vision system beyond anyone in the equipment team" and proposed a lead-and-mentor role "worthy of a Sr. Engineer title." Ex. 5. And in Hender's FY18 review, Mei wrote: "For her strong technical knowledge and leadership in the Agile space, I recommend Heather be promoted to senior engineer." Ex. 4; Tr. 558:11-14. Mei's own promotion criteria—mentoring and technical mastery, Tr. 1124:22-1125:21—describe Hender: the "most expert member of the Zoom team on our robots" (Ex. 2), with "guru status" on the robots (Ex. 3), who trained both new hires and engineers senior to her (Tr. 426:3-4, 1177:17-1178:3). When Hender finally was promoted, her duties, responsibilities, and reporting structure did not change at all because she had already been performing the senior role. Tr. 484:4-17. Pfluger's contrary opinion concerned her readiness "[c]oming in the door," Tr. 1104:15-17, 1105:9-11, years earlier.

## C.    A Reasonable Jury Could Infer that the Disparities Were Because of Sex

Discriminatory intent "may be inferred from circumstantial evidence." *Pullom v. U.S. Bakery*, 477 F. Supp. 2d 1093, 1100 (D. Or. 2007). The comparator evidence alone supports the inference: a woman with equal or better performance ratings and more experience was paid less every year than the man she trained (Tr. 1048:5-7, 1059:23-1060:19), and waited 41 months for the promotion he received in under twelve. Exs. 562, 563, 564. The statistics add more: noncompetitive promotions—roughly three-quarters of all Nike promotions, and the kind both Waddell and Hender received—showed a statistically significant 7.9 percent lower promotion rate for women, at 2.6 standard deviations, Tr. 780:9-15, and there were statistically significant female pay shortfalls "in each of the years 2015 through 2019." Tr. 878:11-25. The "calibration" meetings of higher-level managers that decided noncompetitive promotions were "[a]lmost entirely male." Tr. 437:14-438:3, 438:21-439:17.

Page 12 –    PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR
             JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL
             RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)

Nike's claimed admissions are mischaracterized. The question at Tr. 560:22-23 asked whether the promotion Hender received in September 2018 was based on her gender, not whether the denial and 41-month delay of promotion were. Hender testified she experienced "pay and promotion discrimination myself, seeing firsthand how it was different for female engineers versus male engineers." Tr. 500:10-14; *see* Tr. 485:2-8, 583:2-9. The exchange at Tr. 556:25-557:1 asked whether Mei was "sensitive to [her] feelings on expressing feedback"— manager interpersonal style, not pay, promotions, or gender. Hender explained that her individual managers "couldn't affect the situation any more than I could" because the discrimination inhered in Nike's centralized systems. Tr. 500:24-501:7.

Nike's remaining statistics (Dkt. 796 at 15) misuse the testimony of Jennifer Murphy, Plaintiff's forensic accounting and damages expert, not a Nike statistician. The job-code averages Nike quotes are raw, unadjusted averages prepared for damages calculations at counsel's request. Tr. 966:7-967:7, 973:18-974:14. And they begin at an August 1, 2015 snapshot, after Hender's starting pay had already been set. Tr. 969:15-17. Nike's averages argument conflates the different standards under disparate treatment and equal pay act. It also suggests that an employer does not discriminate unless it discriminates 100% of the time.

## III.    THE EQUAL PAY CLAIMS MUST GO TO THE JURY

Under the federal Equal Pay Act, jobs need not be identical, only "substantially equal"— and under Oregon law, work need only be "of comparable character," judged by whether it requires "substantially similar" knowledge, skill, effort, responsibility, and working conditions "regardless of job description or job title." *Freyd*, 990 F.3d at 1219-21.

The evidence in Section II.A permits a jury finding of substantially equal or comparable work: the same job code under an architecture Nike built around "type of work plus level of

**Page 13 –**    **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

work"; Nike's own witnesses' admissions that the roles overlapped; and Hender's training of Waddell on the systems he needed for his job. Waddell and Hender both worked in job code A0945. Tr. 977:1-978:14. The pay disparity is undisputed: $90,000 plus a $10,000 signing bonus versus $78,600 at hire into the same job code, a gap that grew to roughly $39,000 by fiscal year 2019, with corresponding bonus gaps. Exs. 561, 563. Once Plaintiff makes this showing, the burden shifts to Nike to prove that legitimate factors account for the *entire* differential. *Rizo*, 950 F.3d at 1228; ORS 652.220; Dkt. 763 at 11. Nike's motion does not attempt, much less carry, that burden.

## IV.    THE PUNITIVE DAMAGES QUESTION IS FOR THE JURY

Punitive damages under Title VII require a showing that the employer discriminated "in the face of a perceived risk that its actions will violate federal law"; egregious conduct is not required, and the knowledge of Nike's managerial agents, here, its CEO, CHRO, and General Counsel, is imputed to Nike. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-36, 542-43 (1999); *Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001).

A jury could readily find reckless indifference. In April 2017, Nike told all employees that "Nike has Pay Equity" (Ex. 102)—while its own Total Rewards rollup to CHRO Matheson admitted that it had "problematic pay practices" prior to 2018. Ex. 207 at 2; Tr. 687:3-16, 688:19-689:7. In February and March 2018, Starfish responses, reporting sex discrimination in pay and promotion, were delivered to CHRO Matheson and General Counsel Krane; Nike concedes receipt, Dkt. 779, and Matheson "read every one of them … multiple times." Tr. 401:3-7, 408:15-22. The responses "speak to the scale of the alleged sex discrimination problem, which is relevant to a potential award for punitive damages." Dkt. 773 at 4-5. On April 4, 2018, Matheson admitted company-wide that Nike had "failed to gain traction" and committed to

Page 14 –    **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

"remove bias" from hiring by "eliminating the collection of candidate salary history" and to study "the pace of promotions … with a strong focus on women and POC"—a study Nike never conducted, through at least January 2025. Ex. 18; Tr. 398:14-20, 407:12-15. And there is no evidence Nike ever adjusted the pay of employees, like Hender, whose starting pay had been set after prior-pay collection. Tr. 1004:25-1005:3 (Thomas: "I don't know"); Tr. 595:18-596:8.

Nike's counterarguments fail. The existence of an anti-discrimination policy (Dkt. 796 at 18) cannot establish the *Kolstad* good-faith defense. The Court had to strike Nike's testimony that it "made adjustments" following its pay-equity analyses, and found Nike "used the pay equity analyses as a shield and a sword." Tr. 715:8-21, 717:9-11, 732:11-733:9; *see* Dkt. 763 at 4-5 (Nike may not offer evidence of the "efficacy" of its anti-discrimination efforts). Nike's reliance on Ms. Daugherty proves nothing: she never met Hender and had no involvement in her pay or promotions, Tr. 350:20-351:18, and she conceded the Starfish responses contained "specific allegations made where people felt they were treated differently based on gender." Tr. 348:23-349:18. Whether Nike acted with reckless indifference is a classic jury question.

## CONCLUSION

Plaintiff respectfully requests that the Court deny Nike's Motion.

**Page 15 –**    **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE RULES 50(a) AND 52(c)**

DATED: July 19, 2026        GOLDSTEIN BROWNE, PC


/s/ *Byron Goldstein*
_____
Byron Goldstein (admitted *pro hac vice*)
byron@goldsteinbrowne.com
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
barry@golsteinbrowne.com

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com
David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Kelsie G. Crippen, OSB #193454
KelsieCrippen@MarkowitzHerbold.com

DARDARIAN, HO, KAN & LEE
Laura L. Ho (admitted *pro hac vice*)
lho@dhkl.law
James Kan (admitted *pro hac vice*)
jkan@dhkl.law
Katharine L. Fisher (admitted *pro hac vice*)
ktrabucco@dhkl.law

ACKERMANN & TILAJEF, P.C.
Craig J. Ackermann (admitted *pro hac vice*)
cja@ackermanntilajef.com
Brian Denlinger (admitted *pro hac vice*)
bd@ackermanntilajef.com
Erika Smolyar (admitted *pro hac vice*)
es@ackermanntilajef.com
315 South Beverly Drive, Suite 504
Beverly Hills, CA  90212
Tel: (310) 277-0614
Fax: (310) 277-0635

*Attorneys for Plaintiff*