LAURA E. ROSENBAUM, OSB # 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
LINDSEY C. JACKSON, Cal. SB# 313396 (*pro hac vice*)
lindseyjackson@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

Attorneys for Defendant NIKE, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| HEATHER HENDER,<br><br>Plaintiff,<br><br>vs.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-AB<br><br>**DEFENDANT NIKE, INC.'S [PROPOSED] AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL** |

## TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ..... ii

I. INTRODUCTION ..... 1

II. RELEVANT FINDINGS OF FACT ..... 2

A. The Parties. ..... 2

1. Plaintiff Heather Hender. ..... 2

2. Defendant NIKE. ..... 3

B. NIKE's Job Architecture. ..... 3

C. Individual Hiring Managers Set Starting Pay By Considering A Wide Variety Of Factors. ..... 4

D. NIKE Never Had A Policy Or Practice To Obtain A Candidate's Prior Salary And, Even When A Candidate Provided That Information, It Was Not Necessarily Used And Never Used Consistently To Set Starting Pay. ..... 5

E. Plaintiff's First Manager (Michael Pfluger) Did Not Use Her Prior Pay To Set Her Starting Salary. ..... 6

F. Annual Bonuses And Performance Ratings At NIKE. ..... 7

G. Plaintiff Failed To Demonstrate A Connection Between The Use Of Prior Pay And Any Disparate Impact As To Her. ..... 8

II. CONCLUSIONS OF LAW ..... 11

A. Legal Standard. ..... 11

B. Plaintiff Has Failed To Establish That She Has Standing To Bring Her Prior-Pay Claim Because, As The Evidence Confirmed, Her Prior Pay Was Not Used To Set Her Starting Pay At NIKE. ..... 13

C. Regardless, Plaintiff Cannot Meet Her Burden To Show That NIKE Had A Practice Or Policy That Managers Should Set Starting Pay Based On A Candidate's Prior Pay, And The Evidence Confirmed Otherwise. ..... 16

D. The Bonus-Related Aspect Of Plaintiff's Claim Fails In Tandem With The Prior-Pay Aspect, And—Moreover—Plaintiff Failed To Show A Single Bonus Practice Or Policy—Much Less, One That Existed Without Managerial Discretion. ..... 18

E. In Addition To The Foregoing, Plaintiff Failed To Meet Her Burden To Show Causation, As Her Experts Failed To Demonstrate A Connection Between Any Policy Or Practice And Any Disparate Impact. ..... 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ayars v. AutoZoners, LLC*,
No. 3:21-cv-01537-YY, 2024 WL 167172 (D. Or. Jan. 5, 2024) ........ 11

*Bacon v. Honda of Am. Mfg., Inc.*,
370 F.3d 565 (6th Cir. 2004) ........ 13

*Bolden v. Walsh Constr. Co.*,
688 F.3d 893 (7th Cir. 2012) ........ 22, 23

*Coe v. Yellow Freight Sys., Inc.*,
646 F.2d 444 (10th Cir. 1981) ........ 13

*Dawson v. Entek Int'l*,
630 F.3d 928 (9th Cir. 2011) ........ 12

*Ellis v. Costco Wholesale Corp.*,
285 F.R.D. 492 (N.D. Cal. 2012) ........ 22

*Freyd v. Univ. of Or.*,
990 F.3d 1211 (9th Cir. 2021) ........ 11

*Garay v. Lowe's Home Ctrs., LLC*,
No. 1:17-cv-00269-MC, 2017 WL 5473887 (D. Or. Nov. 14, 2017) ........ 13

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971) ........ 11

*Henderson v. Nordstrom, Inc.*,
No. C05-0022RSM, 2006 WL 1148178 (W.D. Wash. Apr. 27, 2006) ........ 12, 14

*Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*,
34 F. Supp. 3d 896 (N.D. Ill. 2014) ........ 18, 21, 22

*Jurado v. Eleven-Fifty Corp.*,
813 F.2d 1406 (9th Cir. 1987) ........ 12

*Kassman v. KPMG LLP*,
416 F. Supp. 3d 252 (S.D.N.Y. 2018) ........ 20, 21, 22

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ........ 12

*Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*,
964 F.2d 106 (2d Cir. 1992) ........ 13

*Melendez v. Ill. Bell Tel. Co.*,
79 F.3d 661 (7th Cir. 1996) ........ 13

*Moussouris v. Microsoft Corp.*,
No. C15-1483JLR, 2018 WL 3328418 (W.D. Wash. June 25, 2018), *aff'd*,
799 F. App'x 459 (9th Cir. 2019)....18, 20, 22, 23

*Paige v. California*,
291 F.3d 1141 (9th Cir. 2002)....14

*Patee v. Pac. Nw. Bell Tel. Co.*,
803 F.2d 476 (9th Cir. 1986)....14, 16

*Pelekai v. Raytheon Constructors, Inc.*,
74 F. App'x 790 (9th Cir. 2003)....12, 14

*Pottenger v. Potlatch Corp.*,
329 F.3d 740 (9th Cir. 2003)....12, 13, 16

*Richardson v. Nw. Christian Univ.*,
242 F. Supp. 3d 1132 (D. Or. 2017)....12

*Rose v. Wells Fargo & Co.*,
902 F.2d 1417 (9th Cir. 1990)....14

*Tsur v. Intel Corp.*,
648 F. Supp. 3d 1292 (D. Or. 2022)....12

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....20, 21, 22, 23

**STATUTES**

42 U.S.C. § 2000e-2 (TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (TITLE VII))....11, 12, 13

42 U.S.C. § 2000e-2(k)(1)(A)(i)....12

42 U.S.C. § 2000e-2(k)(1)(A)(ii)....13

OR. REV. STAT. ANN. § 659A.030 (OREGON EQUALITY ACT)....11

## I. INTRODUCTION

In accordance with the Court's post-trial scheduling order (ECF 838), Defendant NIKE, Inc. ("NIKE") submits its [Proposed] Amended Findings of Fact and Conclusions of Law After Trial, which incorporate the key trial evidence and testimony to assist the Court in deciding Plaintiff's disparate impact claim.

Plaintiff Heather Hender's ("Plaintiff") disparate impact claim has two components. First, Plaintiff alleges that, before October 2017, NIKE had a practice of using a candidate's prior salary ("prior pay") to set his or her starting salary at NIKE, which Plaintiff asserts had a discriminatory impact on women. Second, Plaintiff alleges that NIKE used a standardized Performance Sharing Plan ("PSP") formula for calculating bonuses, which she similarly claims had a disparate impact on women. To be clear, though, Plaintiff's bonus-related claim depends on her prior-pay claim because, as she concedes, the PSP formula and discretionary-bonus components themselves did not cause women to be paid less in bonuses. (ECF 733 at 28.) In fact, Plaintiff admits that "women receive[d] higher performance ratings than comparable men" at NIKE. (*Id.*) Accordingly, Plaintiff's bonus-related claim cannot be sustained without an adverse finding against NIKE on her prior-pay claim because Plaintiff's only theory of harm is that, "because the PSP used each employee's current salary earned during the fiscal year, the formula also had a disparate impact by carrying forward, perpetuating, and compounding pay disparities." (*Id.*)

For the reasons outlined below, Plaintiff did not meet her burden to prove her disparate impact claim by a preponderance of the evidence, and thus the Court should find against Plaintiff and in favor of NIKE on that claim.

## II. RELEVANT FINDINGS OF FACT

### A. The Parties.

#### 1. Plaintiff Heather Hender.

1. NIKE employed Plaintiff at its Air MI Facility, near NIKE World Headquarters ("WHQ"), from April 6, 2015 through October 12, 2020. (Trial Transcript ("Trial Tr.") 419, 455, 502; *see* ECF 829 at 4.)

2. After NIKE hired Plaintiff, her first job at NIKE was as a Manufacturing Engineer II. (Trial Tr. 422.) The job code was A0945. (Trial Tr. 618, 861, 976-77; Plaintiff's Exhibit ("PX")-561.) This job was in what NIKE refers to as the L-Band. (Trial Tr. 628.) Plaintiff was in this job from April 6, 2015 through September 5, 2018. (Trial Tr. 481-83; *see also* ECF 714 at 5.)

3. Effective September 6, 2018, and upon the recommendation of her then-supervisor Denise Mei, NIKE promoted Plaintiff into a new role: Senior Process Engineer I. (Trial Tr. 481-83, 566; *see* PX-58.) The job code was A1013. (PX-518.) This job was in what NIKE refers to as the U-Band. (Trial Tr. 513; PX-518.) Plaintiff was in this job from September 6, 2018 through February 16, 2019. (ECF 714 at 5.)

4. The title of Plaintiff's third job at NIKE was Professional Senior: Manufacturing. (ECF 714 at 5.) The job code was A0946. (*Id.*) This job was in the U-Band. (*Id.*) Plaintiff was in this job from February 17, 2019 through October 12, 2020. (*Id.*)

5. Plaintiff resigned from her employment with NIKE effective October 12, 2020. (ECF 829 at 4; *see* Trial Tr. 224, 499-500.)

6. Plaintiff filed an EEOC Charge on November 9, 2018, a revised EEOC Charge in 2020, and received a Right to Sue Letter prior to joining this case. (Trial Tr. 484-85, 500; *see* ECF 733 at 4.)

**2. <u>Defendant NIKE.</u>**

7. NIKE is a corporation formed under the laws of Oregon. (ECF 714 at 6.)

8. NIKE WHQ and its nearby Air MI Facility are located near Beaverton, Oregon. (ECF 714 at 6; *see* Trial Tr. 240, 502.)

9. NIKE's principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services. (ECF 714 at 6.)

**B. <u>NIKE's Job Architecture.</u>**

10. NIKE employees who work at WHQ and its Air MI Facility (like Plaintiff) are assigned to a job code, which is used "to benchmark [NIKE's] jobs to the external pay market." (Trial Tr. 678-79.)

11. Each job code is associated with a pay range, which managers use to position new hires and manage pay for their employees. (Trial Tr. 612, 680, 691.) Within each job code (and associated salary range), managers at NIKE had discretion and flexibility to set each employee's pay within that salary range based on an employee's "experience, . . . knowledge and skills." (Trial Tr. 613.)

12. Within a NIKE job code, work is not necessarily homogenous. There are multiple positions within each job code. (Trial Tr. 679, 691 (noting that there can be five positions linked to one job code).) And positions within the same job code can, and often do, involve widely varied work. (Trial Tr. 1170-71 ("They do not do the same job. They have different job descriptions and different titles.").)

13. Given the varied and oftentimes highly specialized nature of its employees' work, NIKE recognizes that individual managers are best suited to assess their employees' pay and

performance, and to make promotion decisions, based on their team's unique goals and objectives. (Trial Tr. 679, 683-84, 895-96.)

### C. <u>Individual Hiring Managers Set Starting Pay By Considering A Wide Variety Of Factors.</u>

14. After selecting a candidate at the conclusion of the interview process, hiring managers receive the salary range for the applicable role, based on a market analysis of similar roles. (*See* Trial Tr. 671-72.)

15. Hiring managers then determine where to place each new hire within that salary range, though they may go outside the range if warranted based on various factors and possible additional approvals. (Trial Tr. 671-72, 994 ("The person making the decision about starting pay is the hiring manager.").)

16. Managers may consider several factors, such as the external market and internal equity, the applicant's relevant work experience, education and skills, and the business's financial conditions when setting an employee's starting pay. (Trial Tr. 996 ("The recruiter and the manager would discuss factors to consider, and they were always around skills and experiences and qualifications. And the sorts of experiences someone would bring, the sorts of experiences they didn't have, the makeup of the team. It was all nuanced . . . I guess every single position had a nuanced approach to that conversation.").)

17. Yet managers are also free to, and do, consider and weigh whatever factors they deem relevant to the position being hired. (Trial Tr. 994-96.)

**D. <u>NIKE Never Had A Policy Or Practice To Obtain A Candidate's Prior Salary And, Even When A Candidate Provided That Information, It Was Not Necessarily Used And Never Used Consistently To Set Starting Pay.</u>**

18. Effective September 2017, based on a new Oregon law, NIKE instructed recruiters and hiring managers not to ask candidates about their prior salary or salary history during the recruiting or hiring process. (Trial Tr. 672, 911, 997-98.)

19. Even before the September 2017 change, however, NIKE never required candidates to provide prior salary during the hiring process, nor were candidates asked about their prior salary in every instance. (Trial Tr. 672 ("There was no policy in place [about prior pay]. There w[ere] likely situations where managers asked the question or recruiters asked that question. And so it was a data point, potentially, they had access to, but there was no policy that you should use that in determining a candidate's salary at NIKE. Q. Was there any requirement that a manager or a talent acquisition recruiter ask a candidate about their prior pay? A. No.").)

20. In fact, NIKE never had a policy or practice requiring that candidates be asked about prior pay. (Trial Tr. 991 ("Q. In 2015, did NIKE have a policy of using a new hire's prior pay to set their starting pay? A. No. We did not have a policy. Q. In 2015 did NIKE have a practice of using a new hire's prior pay to set their starting pay? A. No, we don't have that practice."); Trial Tr. 995 ("We did not have a policy of using prior pay to set starting pay. . . . We did not have a practice of using prior pay to set starting pay."); Trial Tr. 1008 ("And . . . each offer was unique and nuanced, so there wasn't a practice of asking for prior pay. And our goal was to be as competitive as possible to the market and our goal was to hire top talent.").)

21. At most, when an applicant chose to provide prior salary information, it was a single datapoint that, before 2017, hiring managers could consider, in addition to other data points, such as a candidate's skills, experience, and qualifications, and the weight of each factor varied

depending on the role, the candidate, and the hiring manager. (Trial Tr. 998 ("Q. Now, before the law changed, so before 2017, were managers and talent acquisition individuals permitted to consider prior pay as a possible data point? A. It's . . . a data point that sometimes a candidate would offer. Sometimes a candidate wouldn't offer. So I would say there's so many data points that go into an offer, so it was one of many data points. Q. But was it a required data point? A. It was not a required data point.").) There was no consistent practice about candidates providing such information, let alone how managers considered it, if at all. (Trial Tr. 1008.)

22. In fact, before 2017, starting pay decisions were based largely, if not exclusively, on factors unrelated to a candidate's prior salary. (Trial Tr. 998; *see also* Trial Tr. 996 ("The recruiter and the manager would discuss factors to consider, and they were always around skills and experiences and qualifications. And the sorts of experiences someone would bring, the sorts of experiences they didn't have, the makeup of the team. It was all nuanced and all individually—I guess every single position had a nuanced approach to that conversation.").)

23. Plaintiff failed to show that NIKE ever had a policy or practice of obtaining and using candidates' prior pay to set their starting salaries, and her arguments do not show any such policy or practice by a preponderance of the evidence.

### E. **Plaintiff's First Manager (Michael Pfluger) Did Not Use Her Prior Pay To Set Her Starting Salary.**

24. When NIKE hired Plaintiff as an employee in April 2015, her hiring manager, Michael Pfluger, offered her a starting salary of $78,600, which was the mid-point of the salary range associated with her job code and role. (Trial Tr. 422; PX-263.)

25. Plaintiff's starting salary of $78,600 was also near the top of the $70,000-$80,000 salary range that she requested. (PX-263.)

26. Plaintiff provided her prior pay ($82,000) when she applied to work at NIKE. (PX-263; PX-350.)

27. While Plaintiff's prior pay information was passed along to Mr. Pfluger, he did not use that information in setting Plaintiff's starting salary. (PX-263; Trial Tr. 1099 ("Q. Okay. Now, obviously, you knew Ms. Hender's pay at her prior employer from Ms. Green; correct? A. Correct. Q. Did that have any influence on your decision of what Ms. Hender's starting pay should be? A. No, it did not.").)

28. Rather, "[g]iven her years of experience," Mr. Pfluger chose to offer Plaintiff the mid-point of the range associated with her job—$78,600—which he testified was "fairly typical." (Trial Tr. 1097 ("We felt she brought in some good qualifications for the position, and it's fairly typical to start someone at a midpoint of the salary range for a given position."); Trial Tr. 1098-99 ("Q. You said that it was typical to start a candidate at the midpoint of the salary range. Was that your testimony? A. Correct. Q. Did you sometimes start candidates higher in the salary range? A. Only if they brought in a skill set that would be directly applicable to the type of work that they were expected to perform.").)

29. Plaintiff provided no evidence that Plaintiff's prior pay was used (or played any role) in Mr. Pfluger's decision about how to set her starting pay.

**F. <u>Annual Bonuses And Performance Ratings At NIKE.</u>**

30. Since at least 2015 through at least 2020, NIKE referred to its performance management process as Coaching For Excellence ("CFE"), which awarded employees one of five ratings based on manager discretion. (ECF 714 at 6; *see also* PX-2; Trial Tr. 1101, 1136.)

31. Plaintiff Hender received a "Highly Successful" rating in fiscal year 2018, and she received "Successful" ratings every other year during her employment with NIKE. (Trial Tr. 488-

92.) "Successful" ratings are a "solid rating" and "what most employees are getting." (Trial Tr. 1141 (noting that getting rated "successful" means "you did your job, which is what you should be doing").)

32. From at least Fiscal Year 2015 until Fiscal Year 2019, PSP awards were comprised of both "Team" and "Discretionary" components. (Trial Tr. 888-90.) The "Discretionary" portion of the award was determined in part by the individual employee's manager through assignment of a "Performance Modifier." (Trial Tr. 895-96.) While the "Performance Modifier" was based on the employee's CFE rating, NIKE's guidelines presented a range from which individual managers could choose in their discretion to award PSP bonuses for their employees. (Trial Tr. 895-96.)

33. In Fiscal Year 2019, NIKE began using one PSP plan with one company financial performance metric, but managers retained discretion over whether individual employees received a bonus. Specifically, managers—who assigned ratings each year based on an employee's performance—could cause an employee's bonus to be reduced or eliminated if an employee was rated below "Successful." (Trial Tr. 896.)

34. Plaintiff's bonus claim depends on her prior-pay claim. As Plaintiff concedes, the PSP formula and discretionary-bonus components themselves did not cause women to be paid less in bonuses. (ECF 733 at 28 (recognizing that "women receive[d] higher performance ratings than comparable men" at NIKE).)

### G. Plaintiff Failed To Demonstrate A Connection Between The Use Of Prior Pay And Any Disparate Impact As To Her.

35. One of Plaintiff's experts, Jennifer Murphy, provided various damages calculations, but she admitted that Plaintiff was not paid less than the average male peer at hire. Plaintiff was hired at a mid-point salary of $78,600, and Ms. Murphy conceded that Plaintiff's starting pay was ***higher*** than the average pay for men in her job code ($75,162). (Trial Tr. 968.)

36. In fact, Ms. Murphy testified that, throughout the time Plaintiff was employed in her initial job code (April 6, 2015 through September 5, 2018), she was paid more than the average male in that job code. (Trial Tr. 968-69.) And during her time in that job code, Plaintiff received larger pay increases than the average male in that job code. (Trial Tr. 970-72.)

37. Given these facts, Ms. Murphy confirmed that Plaintiff had no damages from the date of hire through September 2018, when she was promoted to a U-band role. (Trial Tr. 972 ("My damage calculation reflects no damages during that time frame.").) In sum, no evidence suggested that Plaintiff's salary was below that of the average male in her job code when she started working at NIKE (in fact, it was higher), and it was not until September 2018—roughly 3.5 years after her starting salary was set—that Ms. Murphy stated Plaintiff began to receive less than the average male in her job code. (Trial Tr. 972-73.)

38. Plaintiff's other expert, Dr. Neumark, attempted to opine on whether NIKE underpaid women at hire by analyzing starting pay data before and after September 2017, the date everyone agrees that no prior pay information was collected or used at NIKE under Oregon law. (Trial Tr. 784-86.)

39. But Dr. Neumark admitted that he never studied whether women hired into specific job codes (like the A0945 job code that Plaintiff was hired into) were paid less than comparable men at NIKE. (Trial Tr. 861; *see* Trial Tr. 820-24.) Indeed, his starting pay analysis did not control for job code at all. (Trial Tr. 854-58, 861-69.) And Dr. Neumark admitted that he could not "draw a direct conclusion" about whether NIKE used Plaintiff's prior pay to set her starting pay. (Trial Tr. 861.)

40. Dr. Neumark also admitted that his analysis regarding starting pay did not control for an employee's relevant prior work experience. (Trial Tr. 859.) While he attempted to control

for this important factor by using "age" as a proxy for experience, that attempt did not account for differences, in—for example—where the candidate previously worked, whether the candidate left the workforce for any period of time, the type of experience the candidate had, or the level of experience the candidate had. (Trial Tr. 859-60.) Nor did Dr. Neumark control for a candidate's level of education.[1] (Trial Tr. 860.)

41. Dr. Neumark's attempt to account for relevant experience by categorizing thousands of employees into 20 "clusters" demonstrates another shortcoming with his analysis. To accomplish this, he used a "large language model" to create the clusters based on job titles. (Trial Tr. 864-65.) But attempting to place thousands of distinct job titles into 20 "clusters" does not suggest that the individuals captured in each cluster are sufficiently similar; indeed, in one of his clusters, "client accountant" was put in the same cluster as "vice president of supply chain strategy." (Trial Tr. 866 (Dr. Neumark admitting that "[t]his is not a perfect strategy").)

42. Similarly, as to Dr. Neumark's bonus-related analysis, he did not analyze Plaintiff's specific outcomes and, instead, focused on "aggregate statistical patterns." (Trial Tr. 869.) In fact, Dr. Neumark could not say whether Plaintiff's job code was included in his analysis. (Trial Tr. 874

---

[1] The following hypothetical example demonstrates the flaw in Dr. Neumark's attempt to control for experience with an "age" proxy. Assume Plaintiff and "John Doe" were the same age and graduated high school at the same time. Plaintiff testified that she worked for several years before obtaining her engineering degree at age 35 and beginning work as a degreed engineer. (Trial Tr. 411, 524-29.) "John Doe" went straight to college, obtained his engineering degree at age 22, and worked in engineering from that point forward. When Plaintiff applied to NIKE at age 44, she had 9 years of relevant experience as a degreed engineer, but "John Doe"—had he applied at the same time—would have had 22 years of relevant experience. Despite this substantial difference in relevant engineering experience, Dr. Neumark's "age" proxy would assume that Plaintiff and "John Doe" should be paid the same. But paying someone with 22 years of experience more than someone with 9 years of such experience is not discriminatory; in fact, paying those two candidates the same would make little sense. Given that Dr. Neumark's "age" proxy is unreliable to control for experience, his starting pay analyses do not establish, by a preponderance of the evidence, that any alleged starting pay practice had a statistically significant and adverse impact on women compared to men in the same job code.

("I did not look at her circumstances in particular.").) And, like his other analyses, Dr. Neumark did not control for job code in his bonus analysis and thus he does not know whether women received lower bonuses than men in the same job code. (Trial Tr. 869.)

43. These deficiencies in Dr. Neumark's analysis prevent his opinions from showing the requisite causation between any alleged practice and pay detriment to women at NIKE.

## III. CONCLUSIONS OF LAW

### A. Legal Standard.

44. Title VII of the Civil Rights Act of 1964 and Oregon Equality Act prevent employment discrimination based on race or sex. 42 U.S.C. § 2000e-2; Or. Rev. Stat. Ann. § 659A.030.

45. Courts interpret Or. Rev. Stat. Ann. § 659A.030 to be consistent with Title VII. *See Ayars v. AutoZoners, LLC*, No. 3:21-cv-01537-YY, 2024 WL 167172, at *3 (D. Or. Jan. 5, 2024) (analyzing Title VII and Or. Rev. Stat. Ann. § 659A.030 claims together because courts construe Or. Rev. Stat. Ann. § 659A.030 as "identical to Title VII") (citation omitted).

46. The Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) determined that Title VII also applies to business practices that are neutral in motive, but discriminatory in operation, so called "disparate impact" claims. *Id.* at 430-31.

47. A plaintiff asserting a disparate impact claim under Title VII must establish three elements by a preponderance of the evidence: (1) a specific, facially neutral employment practice; (2) that the practice caused a significant adverse impact on a protected group; and (3) a causal connection between the practice and the statistical disparity. *See Freyd v. Univ. of Or.*, 990 F.3d 1211, 1224 (9th Cir. 2021).

48. To have standing to assert such a claim, however, a plaintiff must show that she was personally affected by the alleged practice in an adverse way. *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 750 (9th Cir. 2003) ("To bring a disparate impact claim, [the plaintiff] must show that he was subject to the particular employment practice with the alleged disparate impact."); *Henderson v. Nordstrom, Inc.*, No. C05-0022RSM, 2006 WL 1148178, at *7 (W.D. Wash. Apr. 27, 2006) ("In order to have standing to bring a disparate impact claim, a plaintiff must have suffered actual injury as a result of the complained-of conduct.") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see also* *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987) (employee could not assert disparate impact claim to challenge English-only order because he "was fluently bilingual and could easily conform to the order"). In fact, the Ninth Circuit has made clear that a plaintiff under Title VII must have standing—which requires that "the plaintiff must have suffered an injury in fact"—to bring a disparate impact claim. *See, e.g.*, *Pelekai v. Raytheon Constructors, Inc.*, 74 F. App'x 790, 791 (9th Cir. 2003) (affirming a grant of summary judgment because the plaintiff "was in fact injured" by the policy at issue).

49. Disparate impact claims under Oregon law are analyzed under the same standard. *Tsur v. Intel Corp.*, 648 F. Supp. 3d 1292, 1310-11 (D. Or. 2022); *Richardson v. Nw. Christian Univ.*, 242 F. Supp. 3d 1132, 1146-47 (D. Or. 2017) (citing *Dawson v. Entek Int'l*, 630 F.3d 928, 934 (9th Cir. 2011)).

50. If the plaintiff meets this burden, the burden shifts to the employer to demonstrate that the challenged practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). If the employer does not meet this burden, the plaintiff prevails. If the employer meets this burden, the plaintiff must show that the employer

refused to adopt an available alternative practice that serves the employer's legitimate needs with less disparate impact. 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

### B. Plaintiff Has Failed To Establish That She Has Standing To Bring Her Prior-Pay Claim Because, As The Evidence Confirmed, Her Prior Pay Was Not Used To Set Her Starting Pay At NIKE.

51. As noted, "[t]o bring a disparate impact claim, [a plaintiff] must show that ***[s]he was subject*** to the particular employment practice with the alleged disparate impact." *Pottenger*, 329 F.3d at 750 (emphasis added); *see also* *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 577 (6th Cir. 2004) ("[A]n individual plaintiff arguing a disparate impact theory must show that the challenged policy ***directly disadvantaged [her]*** in some fashion[.]") (emphasis added); *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co*., 964 F.2d 106, 115 (2d Cir. 1992) (noting that a plaintiff must further demonstrate that the challenged practice adversely affected her by excluding her, as a member of a protected group, from a job, promotion, or other employment opportunity).

52. This is also a fundamental requirement for Article III standing. *See, e.g.*, *Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996) ("In order for an individual plaintiff to have constitutional standing to bring a Title VII action, ***[s]he must show that [s]he was personally injured*** by the defendant's alleged discrimination and that h[er] injury will likely be redressed by the requested relief.") (emphasis added); *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 451 (10th Cir. 1981) ("It is not sufficient for an individual plaintiff to show that the employer followed a discriminatory policy without also showing that plaintiff [her]self was injured."); *Garay v. Lowe's Home Ctrs., LLC*, No. 1:17-cv-00269-MC, 2017 WL 5473887, at *2 (D. Or. Nov. 14, 2017) ("A disparate impact plaintiff must also show 'that [s]he was subject to the particular employment practice with the alleged disparate impact.'") (quoting *Pottenger*, 329 F.3d at 749-50).

53. If a plaintiff was not, in fact, injured by an alleged practice or policy that adversely affected a group, then she cannot satisfy Article III's standing requirement to bring such a claim, as standing requires an "injury in fact." *See, e.g.*, *Pelekai*, 74 F. App'x at 791; *see also* *Paige v. California*, 291 F.3d 1141, 1146 (9th Cir. 2002) ("[T]he district court held that the plaintiffs may only challenge the aspects of the promotional process *that adversely affect them*[.]") (emphasis in original); *Henderson*, 2006 WL 1148178, at *7 ("Therefore, while a defendant may have a policy that results in a disparate impact, a plaintiff does not have standing to challenge that policy unless the policy actually affected her."); *cf.* *Patee v. Pac. Nw. Bell Tel. Co.*, 803 F.2d 476, 477 (9th Cir. 1986).[2]

54. Plaintiff here failed to show that she was injured by any alleged practice regarding prior pay, and thus she lacks standing to prevail on her claim as it relates to the use of prior pay to set starting pay. While there is no dispute that Plaintiff provided her prior pay information to a recruiter during her hiring process with NIKE (PX-263), she did not know what, if anything, was done with that datapoint (Trial Tr. 419-20). And the trial record confirmed that this information did not factor into her starting pay at NIKE.

55. Specifically, Mr. Pfluger—who hired Plaintiff and had discretion to set her starting salary—testified that he set her starting pay at the mid-point of the applicable range—which was a "fairly typical" practice for him, given her qualifications. (Trial Tr. 1097 ("We felt she brought in some good qualifications for the position, and it's fairly typical to start someone at a midpoint

[2] Whether analyzed in terms of standing (or under the "causation" element of a disparate-impact claim), which requires a plaintiff to show that "the practice in question . . . caused the exclusion of applicants . . . because of their membership in a protected group," *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990) (quotation marks and citation omitted), the result is the same: Because Plaintiff has not met her burden to show that that her prior pay was used to set her starting salary, she cannot prevail on her disparate-impact claim.

of the salary range for a given position."); Trial Tr. 1098-99 ("Q. You said that it was typical to start a candidate at the midpoint of the salary range. Was that your testimony? A. Correct. Q. Did you sometimes start candidates higher in the salary range? A. Only if they brought in a skill set that would be directly applicable to the type of work that they were expected to perform.").)

56. But more importantly, Mr. Pfluger made clear that, while he knew Plaintiff's prior pay information, he did not use it to set her starting pay at NIKE, and it had no influence on his starting pay decision. (Trial Tr. 1099 ("Q. Okay. Now, obviously, you knew Ms. Hender's pay at her prior employer from Ms. Green; correct? A. Correct. Q. Did that have any influence on your decision of what Ms. Hender's starting pay should be? A. No, it did not.").) Plaintiff presented no evidence to the contrary.

57. The documentary evidence supports Mr. Pfluger's testimony. In particular, in a contemporaneous email, Mr. Pfluger specifically referenced reliance on Plaintiff's "years of experience" in making his decision to set her starting salary at the "mid" point; he never referenced Plaintiff's prior pay. (PX-263 ("Given her years of experience, I'm fine with offering the mid as starting salary.").)

58. Moreover, the evidence showed that Plaintiff's starting salary at NIKE ($78,600) was ***less than*** her reported prior pay ($82,000). (Trial Tr. 1097.) Plaintiff proffered at trial the theory that NIKE often focused on "percent increases" during key moments—"like promotions or with hiring"—but Plaintiff's situation does not fit that narrative (her pay decreased at hire), which further rebuts the notion that Plaintiff's prior pay factored into her starting salary. (Trial Tr. 644; *see* Trial Tr. 1256.) In fact, that Plaintiff received the "mid" point of her applicable salary range at NIKE, which was less than her prior pay, further bolster's Mr. Pfluger's testimony that her starting salary was based on her "years of experience"—not her prior pay.

59. Because there is no evidence in the record that Plaintiff's starting salary was based on her prior pay or that her starting pay would have been different (let alone, higher) had Mr. Pfluger not known Plaintiff's prior pay, Plaintiff lacks standing to assert a disparate impact claim based on prior pay. *See Patee*, 803 F.2d at 477-79; *see Pottenger*, 329 F.3d at 749.

**C. Regardless, Plaintiff Cannot Meet Her Burden To Show That NIKE Had A Practice Or Policy That Managers Should Set Starting Pay Based On A Candidate's Prior Pay, And The Evidence Confirmed Otherwise.**

60. Plaintiff failed to identify any specific employment practice or policy about prior pay that allegedly disfavors women—meaning that she failed to show a required element of this claim. *Pottenger*, 329 F.3d at 750 ("To bring a disparate impact claim, [the plaintiff] must show that [s]he was subject to the particular employment practice with the alleged disparate impact.").

61. In fact, the trial record is replete with confirmation that NIKE never had a specific practice of asking candidates about their prior pay. While NIKE instituted a practice and policy of ***not*** asking about prior pay in 2017 when Oregon law began prohibiting that practice, the trial record confirms that no other practice or policy was ever in place. (Trial Tr. 672, 911, 995-98.)

62. Specifically, multiple witnesses testified directly that no such practice ever existed. Shane Walker, a former senior director on NIKE's compensation team said the following in response to a question about whether NIKE ever had a practice of using prior pay to set starting pay: "No. There was no policy in place [about prior pay]. There w[ere] likely situations where managers asked the question or recruiters asked that question. And so it was a data point, potentially, they had access to, but there was no policy that you should use that in determining a candidate's salary at NIKE." (Trial Tr. 672.) And while Plaintiff tried to undermine this testimony based on Mr. Walker later stating that a "policy" would be written "most of the time," (Trial Tr. 689), that does not change the fact that Mr. Walker confirmed in a more colloquial fashion that

there was never "any ***requirement*** that a manager or a talent acquisition recruiter ask a candidate about their prior pay, (Trial Tr. 672 (emphasis added); *see also* Trial Tr. 998 (confirming that a candidate's prior pay was never a "required data point")).

63. Mr. Walker's testimony was not alone on this point. Shine Thomas, NIKE's former global vice president of talent acquisition, confirmed Mr. Walker's testimony—repeatedly. She said both that NIKE "did not have a policy" and did not "have a practice" of "using a new hire's prior pay to set their starting pay." (Trial Tr. 991, 995, 997.) And, if there were any doubt about her testimony, Ms. Thomas confirmed those key facts: "We did not have a policy of using prior pay to set starting pay. . . . We did not have a practice of using prior pay to set starting pay." (Trial Tr. 995.)

64. This testimony about the fact that NIKE never had a practice or policy to obtain or use prior pay information was further bolstered by other testimony about NIKE's hiring process, which focused on the "unique and nuanced" decision-making process for each hire. As Ms. Thomas stated, "each offer was unique and nuanced, so there wasn't a practice of asking for prior pay. And our goal was to be as competitive as possible to the market and our goal was to hire top talent." (Trial Tr. 1008.) Indeed, managers at NIKE set starting salaries based on a candidate's skills, experiences, and qualifications. (Trial Tr. 996.)

65. As Ms. Thomas summed up: "The recruiter and the manager would discuss factors to consider, and they were always around skills and experiences and qualifications. And the sorts of experiences someone would bring, the sorts of experiences they didn't have, the makeup of the team. It was all nuanced and all individually—I guess every single position had a nuanced approach to that conversation." (Trial Tr. 996.)

66. The evidence thus showed that starting pay decisions were discretionary and made by managers based on a variety of factors. No uniform practice related to obtaining or considering prior pay existed and, even if that information was sometimes provided (or even considered—in cases other than Plaintiff's), it was but one datapoint in a larger discretionary process. (Trial Tr. 672 ("There was likely situations where managers asked the question or recruiters asked that question. And so it was a data point, potentially, they had access to, but there was no policy that you should use that in determining a candidate's salary at NIKE.").)

67. Based on the facts here, Plaintiff has failed to meet her burden to show that NIKE had a practice or policy about prior pay necessary for her to prevail on her disparate impact claim. *See, e.g.*, *Jones v. Nat'l Council of Young Men's Christian Ass'ns of the U.S.*, 34 F. Supp. 3d 896, 906 (N.D. Ill. 2014) ("That supervisors evaluate candidates according to specific, but subjective, factors . . . does not make the decisions produced by the process meaningfully less discretionary."); *see also* *Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2018 WL 3328418, at *20 (W.D. Wash. June 25, 2018), *aff'd*, 799 F. App'x 459 (9th Cir. 2019) ("Microsoft's benchmarks are subjective and open to many interpretations—indeed, Microsoft designed the criteria so that managers could adapt it to various employees' roles").

**D. The Bonus-Related Aspect Of Plaintiff's Claim Fails In Tandem With The Prior-Pay Aspect, And—Moreover—Plaintiff Failed To Show A Single Bonus Practice Or Policy—Much Less, One That Existed Without Managerial Discretion.**

68. As noted, the bonus-related aspect of Plaintiff's claim depends on the prior-pay aspect of her claim because, as she concedes, the PSP formula and discretionary-bonus components themselves did not cause women to be paid less in bonuses. (ECF 733 at 28.) Because the prior-pay aspect of Plaintiff's claim fails for reasons already explained, the bonus-related aspect of her claim fails in tandem because Plaintiff's theory is limited to the following: "because

the PSP used each employee's current salary earned during the fiscal year, the formula also had a disparate impact by carrying forward, perpetuating, and compounding pay disparities." (*Id.*)

69. In any event, the evidence showed that NIKE did not have one common PSP bonus plan policy throughout the statutory period, and regardless, managers retained discretion regarding bonuses throughout—meaning no single common policy or practice existed as regards bonuses.

70. Before Fiscal Year 2019, each employee's PSP bonus depended, in part, on their individual plan and the employee's performance, and was subject to modification at the manager's discretion. (Trial Tr. 895-96; *see* PX-189; *see also* Trial Tr. 677-80 ("So up until 2019, there were, I think, a hundred plus bonus plans across the organization. And so in 2019, we moved to a single company-based performance . . . .").) For bonuses paid in Fiscal Year 2019 and later, NIKE used one PSP plan with one company financial performance metric and no managerial discretion, although bonus amounts could be reduced or eliminated if an employee was rated below Successful. (Trial Tr. 896.) Put simply, NIKE's bonus policy changed during the statutory period and, in every iteration of the bonus plan, managers had discretion to increase or decrease bonuses based on an employee's performance.

71. In addition, before Fiscal Year 2019, bonuses explicitly had a discretionary component that a manager could adjust called a "performance modifier." (Trial Tr. 1174.) And Plaintiff's manager(s) showed that they could (and did) use this discretionary component to benefit her. For example, in 2018, Plaintiff's second manager, Denise Mei, increased Plaintiff's performance modifier to 105%. (Trial Tr. 1175; PX-100.)

72. Once the bonus plan changed in Fiscal Year 2019 such that NIKE used one PSP plan with one company financial performance metric, managers still retained discretion to affect an employee's bonus. Specifically, managers—who assigned ratings each year based on an

employee's performance—could cause an employee's bonus to be reduced or eliminated if an employee was rated below Successful. (Trial Tr. 896.) And those CFE ratings were discretionary. (Trial Tr. 896-98.)

73. "Subjective criteria, prone to different interpretations, generally do not provide common direction." *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 279 (S.D.N.Y. 2018). And any decisions regarding Plaintiff's bonuses were made by her particular managers based on her particular job. *See* *Moussouris*, 2018 WL 3328418, at *19-21 (noting that the use of common criteria for pay determinations was insufficient given the discretion of managers to make decisions within the framework); *see also* *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355-56 (2011) ("the invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's").

74. Finally, any claim by Plaintiff that unnamed NIKE executives review and approve PSP bonus amounts does not undermine the conclusion that Plaintiff cannot prevail on her disparate impact claim because "mere approval or limited oversight by higher-level executives, without more, falls short of showing a sufficient common denominator." *Kassman*, 416 F. Supp. 3d at 280 (citing *Jones*, 34 F. Supp. 3d at 908). At most, the evidence shows that upper-level managers such as VPs may give final approval of bonuses in the aggregate, but "final approval in the aggregate does not show commonality in the exercise of discretion." *Id.* at 280.

**E. In Addition To The Foregoing, Plaintiff Failed To Meet Her Burden To Show Causation, As Her Experts Failed To Demonstrate A Connection Between Any Policy Or Practice And Any Disparate Impact.**

75. As noted, Ms. Murphy conceded that Plaintiff was not underpaid relative to the average male employee in her job code when she started working at NIKE. In fact, she was paid more. (Trial Tr. 968.) Plaintiff thus failed to show any damage based on her starting pay; in fact,

Ms. Murphy's damage calculations as to Plaintiff did not begin until after Plaintiff was promoted into the U-Band in September 2018—nearly 3.5 years after she was hired and her starting salary was set. (Trial Tr. 968-73.) Put simply, there is no causal connection between any alleged prior pay policy or practice and any harm to Plaintiff.

76. Moreover, Dr. Neumark's aggregated analyses are insufficient to establish a companywide practice of discrimination based on prior pay (or bonuses).

77. The *Dukes* plaintiffs offered a similarly aggregated statistical study, in which regression analyses purportedly showed statistically significant disparities in pay between men and women that "can be explained only by gender discrimination." *Dukes*, 564 U.S. at 356 (citation omitted). In disregarding the plaintiffs' model, the Supreme Court outlined the dangers of aggregated analyses, which, by their very nature, cannot establish the existence of disparities within individual units, let alone provide "the inference that a company-wide policy of discrimination is implemented by discretionary decisions at the store and district level." *Id.* at 356-57 (citation omitted). For example, a pay disparity could be attributed to a small set of stores or business units, which would be masked with an aggregated analysis, and thus is not probative of whether a "uniform, store-by-store" or unit-by-unit disparity exists. *Id.* at 357. Thus, such higher-level, aggregated statistical models cannot produce a common answer to the questions "*why was I disfavored*." *Id.* at 352 (emphasis in original).

78. Post-*Dukes*, statistical studies must "conform[] to the level of decision for the challenged practices." *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 523 (N.D. Cal. 2012); *see also* *Kassman*, 416 F. Supp. 3d at 282; *Moussouris*, 2018 WL 3328418, at *24. Where decisions are made at the discretion of individual managers, courts find aggregated statistics inadequate because they are "[d]erived from hundreds of employment decisions made by myriad

decision makers, at different times, under mutable procedures and guidelines, in different departments, and in different office locations, concerning employees at varying levels of experience, responsibilities, and education." *Jones*, 34 F. Supp. 3d at 909; *see* *Kassman*, 416 F. Supp. 3d at 282 (finding plaintiffs' aggregated statistical evidence "has the same problem as the statistical evidence in [*Dukes*]" (quoting *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 896 (7th Cir. 2012)); *see also* *Moussouris*, 2018 WL 3328418, at *24.

79. Here the relevant level of decision-maker for the challenged practices remains at the manager level, or at most, the Manager +1 level. (Trial Tr. 998; *see* Trial Tr. 1095, 1124-25, 1148-49.)

80. Despite this, Plaintiff presented zero statistical studies that are analyzed at the decision-maker level. In fact, Dr. Neumark did not mention the decision-makers in his analyses, and, while he admitted that evidence "from the actual managers who made the decisions" could be relevant, he did not analyze that factor or "know enough about that side of things" to opine about it in his analyses. (Trial Tr. 846.)

81. The *Moussouris* court illustrated the problem with such an approach: "if Microsoft had 25 managers, 5 of whom discriminated in making pay and promotion decisions, aggregate data would show that female employees fared worse than male employees. But 'that result would not imply that all 25 [managers] behaved similarly, so it would not demonstrate commonality.'" *Moussouris*, 2018 WL 3328418, at *24 n.20 (quoting *Bolden*, 688 F.3d at 896) (alterations in original). Accordingly, Dr. Neumark's findings of alleged disparities "may be attributable to only a small set of [NIKE managers], and cannot by itself establish the uniform, [manager-by-manager] disparity upon which the [Plaintiff's] theory of commonality depends." *Dukes*, 564 U.S. at 357.

82. Beyond this fundamental flaw, Dr. Neumark's analysis suffers from two additional key defects that prevent Plaintiff from meeting her burden to show the requisite causation.

83. First, Dr. Neumark admitted that he did not account for job code in his starting pay analysis or his bonus analysis. (*See* Trial Tr. 857-74.) Considering that Plaintiff has proposed that a "job code" is the comparator group to identify employees performing substantially equal or comparable work, this shortcoming is critical.

84. Second, as it relates to starting pay, other than an individual's age, Dr. Neumark failed to account for an individual's prior experience at the time of hire, which he agreed "would be a legitimate factor that could explain starting pay." (Trial Tr. 859.) Dr. Neumark's starting pay analyses fail to account for any differences in experience an individual brought to NIKE, other than their age, such as their prior employer, level or type of prior experience, or specific expertise or skills an individual might bring to the role. (Trial Tr. at 859-60.)

85. In light of these fundamental shortcomings, Dr. Neumark's analyses are unreliable and fail to show a statistically significant shortfall in either starting pay or bonuses for women at NIKE. Plaintiff had to demonstrate a causal connection between a practice at NIKE and her purported injury. She did not do so. Thus, her clams fail.

Date: September 8, 2026

*/s/ Felicia A. Davis*

DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
LINDSEY C. JACKSON, Cal. SB# 313396 (*pro hac vice*)
lindseyjackson@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Telephone: (213) 683-6000
Facsimile: (213) 627-0705

LAURA E. ROSENBAUM, OSB # 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Attorneys for Defendant NIKE, Inc.