LAURA ROSENBAUM, OSB No. 110061
laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

FELICIA A. DAVIS, Cal. SB# 266523 (*pro hac vice*)
feliciadavis@paulhastings.com
DANIEL PRINCE, Cal. SB# 237112 (*pro hac vice*)
danielprince@paulhastings.com
LINDSEY C. JACKSON, Cal. SB# 313396 (*pro hac vice*)
lindseyjackson@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, 25th Floor
Los Angeles, CA 90071
Tel: (213) 683-6000
Fax: (213) 627-0705

Attorneys for Defendant NIKE, Inc.

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| HEATHER HENDER,<br><br>Plaintiff,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No.: 3:18-cv-01477-AB<br><br>**DEFENDANT NIKE, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFF HEATHER HENDER'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

**TABLE OF CONTENTS**

**Page**


I. INTRODUCTION ........................................ 1

II. ARGUMENT ........................................ 4

A. Plaintiff Lacks Standing To Pursue Her Disparate Impact Claim ........................................ 4

1. Ninth Circuit Precedent And Uniform Case Law From Other Circuits Require That Plaintiffs Be Subject To—And Thus, Harmed By—An Alleged Practice Or Policy To Have Standing. ........................................ 4

2. The Evidence Confirms That Plaintiff Was Not Subjected To Any Alleged Prior-Pay Practice Or Policy. ........................................ 7

3. Plaintiff's Cited Authorities Miss The Mark ........................................ 10

B. Even If Plaintiff Has Standing, She Still Cannot Show A Policy Or Practice About Prior Pay. ........................................ 11

C. Without A Valid Prior-Pay Claim, Plaintiff's Bonus Claim Necessarily Fails. ........................................ 15

D. Nothing The Jury Decided Restricts This Court In Resolving The Disparate Impact Claim. ........................................ 17

E. Plaintiff Cannot Show The Requisite Causation Necessary To Sustain Her Disparate Impact Claim. ........................................ 19

III. CONCLUSION ........................................ 20

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bacon v. Honda of Am. Mfg., Inc.*,
370 F.3d 565 (6th Cir. 2004) .......... 6

*Coe v. Yellow Freight Sys., Inc.*,
646 F.2d 444 (10th Cir. 1981) .......... 5, 6

*Dressler v. Martinez*,
No. 04-5188, 2005 WL 79038 (D.C. Cir. Jan. 12, 2005) .......... 6

*Farrell v. Butler Univ.*,
421 F.3d 609 (7th Cir. 2005) .......... 6

*Freyd v. University of Oregon*,
990 F.3d 1211 (9th Cir. 2021) .......... 10, 17

*Henderson v. Nordstrom, Inc.*,
No. C05-0022RSM, 2006 WL 1148178 (W.D. Wash. Apr. 27, 2006) .......... 5

*Ingle v. Circuit City*,
408 F.3d 592 (9th Cir. 2005) .......... 13

*Kassman v. KPMG LLP*,
416 F. Supp. 3d 252 (S.D.N.Y. 2018) .......... 16

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 5

*Manley v. Invesco*,
555 F. App'x 344 (5th Cir. 2014) .......... 6

*Miller v. Fairchild Indus., Inc.*,
885 F.2d 498 (9th Cir. 1989) .......... 17

*Moussouris v. Microsoft Corp.*,
No. C15-1483JLR, 2018 WL 3328418 (W.D. Wash. June 25, 2018), *aff'd*,
799 F. App'x 459 (9th Cir. 2019) .......... 16

*Paige v. California*,
291 F.3d 1141 (9th Cir. 2002) .......... 5

*Pelekai v. Raytheon Constructors, Inc.*,
74 F. App'x 790 (9th Cir. 2003) .......... 5

*Pottenger v. Potlatch Corp.*,
329 F.3d 740 (9th Cir. 2003) .......... 4, 5

*Renati v. Wal-Mart Stores, Inc.*,
No. 19-cv-02525-CRB, 2019 WL 5536206 (N.D. Cal. Oct. 25, 2019) .......... 5

*Rose v. Wells Fargo & Co.*,
902 F.2d 1417 (9th Cir. 1990) ........ 19

*Sanchez v. City of Santa Ana*,
928 F. Supp. 1494 (C.D. Cal. 1995) ........ 4

*Stockwell v. City & County of San Francisco*,
749 F.3d 1107 (9th Cir. 2014) ........ 10, 11

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ........ 16

**STATUTES**

29 U.S.C. § 206(d) (EQUAL PAY ACT) ........ 3, 17, 18

42 U.S.C. § 2000e-2 (TITLE VII) ........ 5, 6, 15

29 U.S.C. § 621 (AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA)) ........ 5, 6

**RULES**

FED. R. CIV. P. 50(b) ........ 19

FED. R. CIV. P. 59 ........ 19

**CONSTITUTIONAL PROVISIONS**

U.S. CONST., amend VII ........ 17, 19

**OTHER AUTHORITIES**

NINTH CIRCUIT PATTERN (Civil) JURY INSTRUCTIONS § 11.4 ........ 6

NINTH CIRCUIT PATTERN (Civil) JURY INSTRUCTIONS Ch. 11 (intro. cmt.) ........ 6

# I. INTRODUCTION

This Court should reject Plaintiff Heather Hender's ("Plaintiff" or "Hender") Proposed Findings of Fact and Conclusions of Law (ECF 840, "FOF" and "COL," respectively) for her disparate impact claim; instead, it should adopt those proposed by Defendant NIKE, Inc. ("NIKE") (ECF 839).

There is no dispute that the NIKE manager who hired Ms. Hender and set her starting salary, Michael Pfluger ("Mr. Pfluger"), testified without equivocation that Plaintiff's prior pay had no influence on her starting salary. Instead, Mr. Pfluger, acting with the discretion afforded to NIKE's hiring managers, offered Plaintiff the mid-point of the starting salary range for her job based on her experience, consistent with his standard approach. (Trial Tr. at 1097:11-13.) Because Plaintiff was not subjected to any prior-pay policy or practice at NIKE, she has no standing to bring a disparate impact claim on that basis under established law.

Even if Plaintiff could overcome that threshold deficiency, she cannot change that the overwhelming evidence confirmed that NIKE never had a policy or practice requiring the use of prior pay in setting starting salaries. Her efforts to do so rely on vague and generic statements in a couple of post-2017 presentations, which cannot overcome the consistent trial testimony that NIKE never had a policy or practice of using prior pay to set starting salaries. (Trial Tr. at 991:5-10 ("Q. In 2015, did NIKE have a policy of using a new hire's prior pay to set their starting pay? A. No. We did not have a policy. Q. In 2015 did NIKE have a practice of using a new hire's prior pay to set their starting pay? A. No, we don't have that practice[.]"); Trial Tr. at 995:3-17 ("We did not have a policy of using prior pay to set starting pay. . . . We did not have a practice of using prior pay to set starting pay."); *see* Trial Tr. at 672:5-12.) The best Plaintiff can do is show that, before 2017, NIKE sometimes received prior-pay information for applicants, and that such information was sometimes used as a

"data point." (Trial Tr. at 998:3-11.)[1] But because NIKE never had a requirement nor a consistent practice or policy to use prior-pay information to set starting salaries, Plaintiff is not entitled to any relief on this claim.

Without a viable prior-pay claim, Plaintiff's bonus-related claim fails in tandem because, as she concedes, the Performance Sharing Plan ("PSP") formula and discretionary-bonus components themselves did not cause women to be paid less in bonuses. (ECF 733 at 28; *see* Hender Proposed FOF ¶ 61 ("Because Fiscal Earnings entered the PSP formula as a multiple on both halves of the formula, every eligible employee's PSP bonus rose or fell with the employees' base salary. The PSP formula thus carried any disparity in base pay into each year's annual bonus in every year the disparity existed.").)

The Court need not address anything more to resolve Plaintiff's disparate impact claim, which would not increase any damages award for Plaintiff given that the entire period of this claim is subsumed within her disparate treatment claim. But, in the apparent hope of getting additional findings for use in any upcoming appeal or cross-appeal, Plaintiff seeks ***35 pages of findings and conclusions and invites this Court to delve into unnecessary and, in some cases, inappropriate issues far beyond the scope of the trial record or supported by it***. This Court should reject that invitation.

That said, NIKE addresses each of Plaintiff's main proposed findings of fact and conclusions of law, and it details the five central reasons (including those highlighted above) why Plaintiff cannot succeed on her disparate impact claim:

---

[1] Notably, this evidence is consistent with what the Court previously found in denying class certification earlier in this case. (ECF 310 at 42 ("While prior salary may have been a permissible data point, every offer was unique. In other words, hiring managers were given discretion to set starting pay, within a guideline range, using whatever factors they deemed relevant which may or may not include prior pay history. Use of such a discretionary system requires an individualized assessment as to whether the consideration of prior pay resulted in a disparate impact on the starting pay for women."); *see* ECF 335.)

- *Lack of Standing*. As Plaintiff concedes, Ninth Circuit law—and the law of every other sister circuit to address the question—requires an individual disparate impact plaintiff to have been "subject to" the challenged practice. Plaintiff was not, as Mr. Pfluger confirmed.

- *No Prior-Pay Practice or Policy*. Setting aside the threshold standing issue, Plaintiff has failed to show that NIKE had any policy or practice of using prior pay to set starting salaries when she was hired in 2015. The consistent testimony at trial confirmed this point. Plaintiff cannot overcome that testimony by referencing vague statements and notes from presentations not given until 2018, and her (already denied) request for an "adverse inference" is inappropriate and baseless, and it only serves to confirm that she is grasping at straws.

- *Plaintiff's Bonus Claim Falls with Her Prior-Pay Claim*. In addition to failing on discretionary grounds, Plaintiff concedes that her bonus claim is dependent on the success of her prior-pay theory, which fails for reasons already stated.

- *No Implied Finding by the Jury*. Although irrelevant to and unnecessary to resolve this claim, Plaintiff wrongly asks this Court to find itself bound by a purported implied jury finding that every job in the same job code required substantially equal work for every job code at NIKE. (*See* Hender Proposed COL ¶¶ 18-20.) The jury's verdict in no way supports (much less, binds this Court to make) that expansive finding, as Plaintiff's Equal Pay Act claims covered just two job codes that Plaintiff was in from 2018 to 2020. The jury never was asked (and did not make) any finding about Plaintiff's initial job code (A0945) because everyone agreed she was paid ***more*** than the average man in the A0945 job code, and thus Plaintiff did not "make an Equal Pay Act claim for that period." (Trial Tr. 1332.) And the trial did not concern any other job codes.

- *Plaintiff Fails To Show the Requisite Causation*. Because Plaintiff was never subject to any alleged prior-pay policy and because Plaintiff's statistical analyses suffer from

critical deficiencies, she has failed to meet her burden to show the requisite causation.

For these reasons, this Court should reject Plaintiff's Proposed Findings of Fact and Conclusions of Law, adopt NIKE's Proposed Findings of Fact and Conclusions of Law, and enter judgment for NIKE on Plaintiff's disparate impact claim.

## II. ARGUMENT

### A. Plaintiff Lacks Standing To Pursue Her Disparate Impact Claim.

Plaintiff claims that she can sustain a disparate impact claim based solely on a contention that she was "a member of the group" that was purportedly disparately impacted by an alleged policy or practice. (Hender Proposed COL ¶ 30.) That is wrong, and Plaintiff walks back that untenable position a few lines later. In fact, in trying to distinguish the case law NIKE has cited on this issue, Plaintiff concedes that "[t]he authorities NIKE invokes require . . . that the plaintiff be ***subject to*** the challenged practice." (Hender Proposed COL ¶ 30 (emphasis added).) NIKE agrees. The problem for Plaintiff, though, is that the record confirms she was ***never*** subjected to any such practice. Plaintiff lacks standing to pursue this claim.

#### 1. Ninth Circuit Precedent And Uniform Case Law From Other Circuits Require That Plaintiffs Be Subject To—And Thus, Harmed By—An Alleged Practice Or Policy To Have Standing.

For disparate impact claims asserted on an individual basis, courts require a plaintiff to show that she has been the victim of discrimination by the general practice that allegedly resulted in a discriminatory impact on a particular protected group. *See, e.g.*, *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 750 (9th Cir. 2003) ("To bring a disparate impact claim, [plaintiff] must show that [s]he was subject to the particular employment practice with the alleged disparate impact. Because [plaintiff] was not formally or functionally subject to the [challenged practice], h[er] disparate impact claim cannot survive summary judgment."); *Sanchez v. City of Santa Ana*, 928 F. Supp. 1494, 1505 (C.D.

Cal. 1995) ("To maintain a claim for disparate impact in individual actions such as this, a plaintiff must prove that the specific employment practice challenged caused injury ***to h[er]***.") (emphasis added); *see also* *Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 451 (10th Cir. 1981) ("[O]ur primary inquiry is whether [the] company discriminated and whether [the employee] was shown to have been discriminated against. . . . To hold otherwise would be to allow the plaintiff to avoid the fundamental requirements for constitutional standing[.]") (citation omitted). Put simply, it is insufficient for an individual plaintiff to show that an employer engaged in an allegedly discriminatory practice without also showing that the plaintiff was injured by the same policy. *Renati v. Wal-Mart Stores, Inc.*, No. 19-cv-02525-CRB, 2019 WL 5536206, at *9 (N.D. Cal. Oct. 25, 2019) (holding that plaintiffs "lack[ed] standing to challenge policies that did not cause their injury").

The Ninth Circuit and district courts in this Circuit have consistently insisted on this fundamental requirement. *See, e.g.*, *Pottenger*, 329 F.3d at 750; *Paige v. California*, 291 F.3d 1141, 1146 (9th Cir. 2002) ("[T]he district court held that the plaintiffs may only challenge the aspects of the promotional process *that adversely affect them,* and that a closed promotional process causes them no injury.") (emphasis in original); *Henderson v. Nordstrom, Inc.*, No. C05-0022RSM, 2006 WL 1148178, at *7 (W.D. Wash. Apr. 27, 2006) ("In order to have standing to bring a disparate impact claim, a plaintiff must have suffered actual injury as a result of the complained-of conduct.") (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *cf.* *Pelekai v. Raytheon Constructors, Inc.*, 74 F. App'x 790, 791 (9th Cir. 2003) (affirming summary judgment because the plaintiff "was in fact injured" by the policy at issue).

That is why it is not surprising that the Ninth Circuit—even though it does not have a specific pattern jury instruction for disparate impact claims under Title VII—has specified for age-related disparate impact claims under the Age Discrimination in Employment Act ("ADEA") that a plaintiff

must prove that "the defendant['s] . . . practice . . . resulted in the plaintiff . . . being [discharged] [not hired] [not promoted] [demoted] [state other adverse action]." Ninth Circuit Pattern (Civil) Jury Instructions § 11.4. And given the substantial similarities between disparate impact claims based on Title VII and the ADEA, that pattern instruction recommends that, "[o]n issues when the ADEA and Title VII are in substantial accord, appropriately modified Title VII instructions should be given, as cross-referenced in this chapter." *See id.*, Ch. 11 (intro. cmt.).

This fundamental standing requirement is not unique to the Ninth Circuit. In fact, ***every*** circuit to address this issue specifically has reached the same conclusion. *See, e.g.*, *Farrell v. Butler Univ.*, 421 F.3d 609, 617 (7th Cir. 2005) ("To have standing to bring a disparate impact claim [under Title VII], a plaintiff must show that she was personally injured by the defendant's alleged discriminatory practice."); *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 576-77 (6th Cir. 2004) ("[A]n individual plaintiff arguing a disparate impact theory must show that the challenged policy directly disadvantaged [her] in some fashion."); *Coe*, 646 F.2d at 451 ("[A] plaintiff has been required to show that he personally has been the victim of discrimination by the general practice which allegedly resulted in a discriminatory impact on a protected group."); *see also* *Manley v. Invesco*, 555 F. App'x 344, 348 (5th Cir. 2014) (finding a lack of standing where a plaintiff challenged the alleged disparate impact of a policy not to refer applicants with criminal records where his application was rejected for a different reason); *Dressler v. Martinez*, No. 04-5188, 2005 WL 79038, at *1 (D.C. Cir. Jan. 12, 2005) (finding that a plaintiff lacked standing to challenge alleged disparate impact of minimum educational requirements where he was disqualified due to "his failure to submit the proof of educational attainments"—not his "failure to meet the [] requirements").

The authority requiring Plaintiff to show that she was harmed by the alleged policy is overwhelming. The problem for Plaintiff is that she cannot make that showing on this record.

### 2. **<u>The Evidence Confirms That Plaintiff Was Not Subjected To Any Alleged Prior-Pay Practice Or Policy.</u>**

The trial evidence demonstrates that Plaintiff was not "subject to" any alleged practice of using prior pay to set her starting salary. Mr. Pfluger confirmed that fact without equivocation, and his testimony is the only specific evidence as to whether Plaintiff personally was "subject to" or harmed by any alleged prior-pay practice at NIKE.

Mr. Pfluger made clear at trial that he did not use Plaintiff's prior pay to set her starting salary at NIKE. (Trial Tr. 1099:12-17 ("Q. Okay. Now, obviously, you knew Ms. Hender's pay at her prior employer from Ms. Green; correct? A. Correct. Q. Did that have any influence on your decision of what Ms. Hender's starting pay should be? A. No, it did not.").) Instead, "[g]iven her years of experience," Mr. Pfluger chose to offer Plaintiff the mid-point of the salary range associated with her position—$78,600—which he testified was his standard practice unless the situation warranted a different approach. (Trial Tr. 1097:11-13 ("We felt she brought in some good qualifications for the position, and it's fairly typical to start someone at a midpoint of the salary range for a given position.").) In fact, Mr. Pfluger confirmed that he generally went above the mid-point starting salary "[o]nly" when a candidate "brought in a skill set that would be directly applicable to the type of work that they were expected to perform"—a metric that Plaintiff did not meet. (Trial Tr. 1098:18-25, 1099:1-7.)

Plaintiff recognizes Mr. Pfluger's clear testimony (Hender Proposed FOF ¶ 79; Hender Proposed COL ¶ 46), but asks this Court to effectively ignore it. Plaintiff's arguments fail.

*<u>First</u>*, Plaintiff speculates that Mr. Pfluger may have misremembered the circumstances surrounding his decision in setting Plaintiff's starting salary. (Hender Proposed FOF ¶ 79 (claiming that "[t]his recollection was offered more than eleven years after the fact").) Nothing supports that view, which—in any event—is contradicted by Mr. Pfluger's actual testimony as well as by a

contemporaneous email, in which Mr. Pfluger wrote that, "[g]iven her years of experience, I'm fine with offering the mid[-point] as starting salary." (PX-263.) Mr. Pfluger did not guess or equivocate; he was certain that he did not rely on Plaintiff's prior pay in setting her starting salary at NIKE, and his contemporaneous email supports that testimony. (Trial Tr. at 1099:12-17 ("Q. Did [prior pay] have any influence on your decision of what Ms. Hender's starting pay should be? A. No, it did not.").)

*Second*, Plaintiff claims that the "contemporaneous record"—including "NIKE's 2015 guidelines"—undermine Mr. Pfluger's testimony, which she notes "says nothing about how NIKE set the starting salaries of [Trent] Waddell or other men to whom Plaintiff's pay is compared." (Hender Proposed FOF ¶ 79.) Plaintiff is wrong.

As to Plaintiff's claim about NIKE's alleged "2015 guidelines," the documents do not support her position, and they in no way contradict Mr. Pfluger's testimony. For example, Plaintiff cites PX-295, which says that NIKE "often" focused on a new hire's prior salary "and/or the size of the increase the new hire would receive," but it never suggests that NIKE had a requirement or practice to set an employee's starting salary based upon their prior pay. And it similarly does not suggest that Mr. Pfluger based his starting salary determination—or even considered—Plaintiff's prior pay when making such determination. At most, PX-295 is consistent with the other evidence at trial that some managers considered prior pay as a "data point." (Trial Tr. at 672:5-12 ("There was likely situations where managers asked the question or recruiters asked that question. And so it was a data point, potentially, they had access to, but there was no policy that you should use that in determining a candidate's salary at NIKE.").) The same is true of PX-158. While that document suggests that some managers may have based starting salary amounts on a new hire's prior pay, it in no way suggests that Mr. Pfluger did so with respect to Plaintiff's starting salary or that NIKE had a policy or practice

requiring that approach.

Plaintiff relatedly argues that NIKE failed to rebut the presumption that Plaintiff is entitled to back pay because NIKE failed to show that its purported prior-pay practice did not disadvantage Plaintiff "relative to similarly situated men, such as Waddell[.]" (Hender Proposed COL ¶ 46.) Setting aside the fact that there is no such "presumption," and Plaintiff has the burden to show standing, Plaintiff ignores Waddell's testimony, which establishes that he and Plaintiff were not similarly situated at hire. Plaintiff's argument to the contrary ignores several factors.

For one, Waddell joined NIKE two years after Plaintiff. (Trial Tr. at 1046:19-21.) Plaintiff fails to consider any inflationary considerations or other changes in starting salaries over the course of two years. For another, Waddell had more success in his past jobs and started with much more relevant experience than Plaintiff. Specifically, Waddell testified extensively about his pre-NIKE experience, outlining his prior experience at Frito-Lay and how such experience allowed him to thrive at NIKE. (Trial Tr. at 1047:16-20; *see* Trial Tr. at 1046:10-18 ("Q. Were you promoted fairly quickly within the Frito-Lay system? A. Yes, I was."); *see generally* Trial Tr. 1042-1048.) Finally, Waddell testified that his and Plaintiff's starting jobs at NIKE were not comparable, as he was an automation engineer, while she was a process engineer. Waddell testified that the automation and process engineering groups "were not" the same (Trial Tr. at 1061:18-20), explained the functional differences in each group's responsibilities, and stated that it was not possible to do an "apples-to-apples" comparison between the two groups. (Trial Tr. at 1062:9-1063:5 (explaining the "fundamentally different tasks and responsibilities" of process and automation engineers).)

But perhaps most importantly, there is no evidence that any alleged prior-pay policy was applied to Waddell either. As Plaintiff notes, Waddell's starting salary (like Plaintiff's who, as Mr. Pfluger testified, was not subject to any alleged prior-pay practice) was lower than his prior pay—

thereby casting further doubt on the reliability of Plaintiff's contention that NIKE's alleged prior-pay practice operated, at least in part, based on a "percentage increase" over prior pay. (Hender Proposed FOF ¶ 24.) Nor did Plaintiff solicit any evidence at trial regarding how Mr. Waddell's starting pay was set and whether, or not, it was based on his prior pay. Plaintiff's attempt to claim some injury based on Waddell's experience thus fails on a host of metrics—including that there is no basis to suggest that any alleged prior-pay practice was applied to Waddell. If anything, the evidence suggests that, like Plaintiff, the manager who hired Waddell did not set his starting salary based on prior pay.

### 3. Plaintiff's Cited Authorities Miss The Mark.

Plaintiff's suggestion that this Court should ignore her failure to show that any alleged policy or practice was applied to her gets the analysis backward, as Plaintiff's own case citations confirm. (*See* Hender Proposed COL ¶ 4.) For example, in *Freyd v. University of Oregon*, 990 F.3d 1211 (9th Cir. 2021), the only reason the plaintiff could bring an individual disparate impact claim to begin with was because she ***was*** disadvantaged by the fact that the University "award[ed] retention raises" to certain faculty members "without also increasing the salaries of other professors of comparable merit and seniority" (which included her). *Id.* at 1224. There, the plaintiff's theory was that, because "female faculty members, for a variety of reasons related to gender, [were] less willing to move and thus less likely to entertain overtures from another institution," she and other women had been disadvantaged by the University failing to offer retention raises to all similarly situated faculty (including her) when it offered them to (primarily male) professors who entertained overtures from other institutions. *Id.* There was no question that the *Freyd* plaintiff had been harmed by this policy because she "never engaged in a retention negotiation nor received a retention raise." *Id.* at 1215. Thus, she (unlike Plaintiff) had been harmed and had standing.

The same analysis applies to *Stockwell v. City & County of San Francisco*, 749 F.3d 1107 (9th

Cir. 2014), which concerned an interlocutory appeal regarding class certification. There, several police officers over the age of 40 performed well enough on an examination to be considered for a promotion, and the officers alleged that a newer policy abandoning reliance on examination results resulted in a disparate impact based on age. *Id.* at 1115. In *Stockwell*, officers had standing only if they were over 40 and "otherwise eligible"—*i.e.*, they had the requisite examination score to qualify for the promotion. *Id.* Applying *Stockwell* here, Plaintiff had to show not only that she is female, but also that the alleged prior-pay practice was applied to her such that she was allegedly harmed. But Plaintiff failed to do so: the alleged prior-pay policy was not applied to her, and thus it did not cause her harm. Indeed, the undisputed fact that she was paid more than the average male employee in her starting job code belies the notion that an alleged policy that purportedly harmed women applied to her at all. (Trial Tr. at 968:16-24 ("Q. So you would agree that Ms. Hender made more than some of the men in her job code; correct? A. Correct. Q. And, in fact, the average pay for men in her job code was $75,162; correct? A. Yes. Q. So you would agree that she made more than the average male in her job code at this time; correct? A. Yes.").)

For these reasons, Plaintiff lacks standing to pursue her prior-pay claim.

### B. Even If Plaintiff Has Standing, She Still Cannot Show A Policy Or Practice About Prior Pay.

Many of Plaintiff's arguments that NIKE allegedly maintained a prior-pay policy or practice focus on exhibits already discussed with regard to Mr. Pfluger's uncontradicted testimony that he did not use prior pay to set Plaintiff's starting salary. As explained, none of those documents suggests that NIKE ever had a practice or policy of requiring the use of prior pay to set starting salaries. Here are the facts:

At trial, the evidence showed that, before 2017, NIKE sometimes received prior-pay information for applicants, and that such information was sometimes used as a "data point." (Trial Tr.

at 998:3-11.) But NIKE never had a requirement nor any policy on prior pay before Oregon law changed in 2017 and statutorily prevented its use. (Trial Tr. at 998:3-11 ("Q. Now, before the law changed, so before 2017, were managers and talent acquisition individuals permitted to consider prior pay as a possible data point? A. It's . . . a data point that sometimes a candidate would offer. Sometimes a candidate wouldn't offer. So I would say there's so many data points that go into an offer, so it was one of many data points. Q. But was it a required data point? A. It was not a required data point.").) Multiple witnesses—in addition to Mr. Pfluger (Trial Tr. at 1099:15-17)—confirmed that NIKE never had a policy or practice requiring the use of prior pay to set salaries.

*First*, Shine Thomas confirmed (three times) that NIKE never had a policy or practice requiring the use of prior pay to set starting salaries. (Trial Tr. at 991:5-10 ("Q. In 2015, did NIKE have a policy of using a new hire's prior pay to set their starting pay? A. No. We did not have a policy. Q. In 2015 did NIKE have a practice of using a new hire's prior pay to set their starting pay? A. No, we don't have that practice[.]"); Trial Tr. at 995:3-17 ("We did not have a policy of using prior pay to set starting pay. . . . We did not have a practice of using prior pay to set starting pay."); Trial Tr. at 1008:7-25 ("And . . . each offer was unique and nuanced, so there wasn't a practice of asking for prior pay. And our goal was to be as competitive as possible to the market, and our goal was to hire top talent.").)

*Second*, Shane Walker, a former Senior Director on NIKE's compensation team, similarly said the following in response to a question about whether NIKE ever had a practice of using prior pay to set starting salaries: "No. There was no policy in place [about prior pay]. There w[ere] likely situations where managers asked the question or recruiters asked that question. And so it was a data point, potentially, they had access to, but there was no policy that you should use that in determining a candidate's salary at NIKE." (Trial Tr. at 672:5-12.) Although Plaintiff attempts to undermine

Mr. Walker's testimony based on his later statement that a "policy" would be written "most of the time," (Hender Proposed FOF ¶ 34 (citing Trial Tr. at 689:11-690:6)), that argument does not change the fact that Mr. Walker confirmed that there was never any ***requirement*** that a candidate give their prior-pay information. (Trial Tr. at 672:13-15 ("Q. Was there any requirement that a manager or a talent acquisition recruiter ask a candidate about their prior pay? A. No.").)

None of Plaintiff's cited evidence contradicts the fact that NIKE never maintained a policy or practice of using prior pay to set starting salaries. At most, and as explained above, these documents show only that ***some*** managers at NIKE—at some point "in the past"—referenced what an individual previously was making in order to set a new salary, whether that be for an applicant joining NIKE or following an internal promotion. (PX-295; *see also* PX-35; PX-158.) But such vague and inconclusive references fall far short of showing that a prior-pay policy or practice existed at NIKE.

Perhaps recognizing that the evidence does not show a prior-pay policy or practice at NIKE, Plaintiff improperly asks this Court to adopt an "adverse inference" based on unsupported allegations concerning NIKE's purported failure to preserve and produce pre-September 2017 starting pay records. (Hender Proposed FOF ¶¶ 38-52, Hender Proposed COL ¶¶ 31-36.) This Court has already denied Plaintiff's requests in that regard—both pre-trial (ECF 763), and then again at trial (Trial Tr. at 1295:19 ("I am not giving an adverse inference instruction.")).[2] There simply is no basis for this

[2] While Plaintiff's spoliation allegations are false, they are not new. The full case record demonstrates that this Court has considered and rejected Plaintiff's spoliation allegations several times over. For example, this Court denied, in relevant part, Plaintiff's Motion to Compel regarding Starfish survey documents. (ECF 521 at 14-15.) The Court correctly observed that "Plaintiffs offer conjecture and speculation to arrive at their conclusion that Nike has possession and control of the 270 purported additional survey hardcopies." (ECF 521 at 14-15). Moreover, Plaintiff raised these same arguments about prior-pay policies in her Motion for Leave to File a Renewed Motion for Class Certification (*see* ECF 661 at 19-20). This Court denied that motion. (ECF 676). Plaintiff has provided no valid reason for this Court to revisit its multiple prior rulings, and it should decline to do so.

Court to reconsider those decisions, which arguably constitute law of the case—especially when Plaintiff relies on nothing that this Court has not already seen or heard. *See Ingle v. Circuit City*, 408 F.3d 592, 594 (9th Cir. 2005) (discussing law-of-the-case doctrine generally). Regardless, Plaintiff should not be permitted to rely (as she attempts to do) on purported evidence that never was admitted at trial, when this Court confirmed that it would not "separately try Plaintiff's court and jury claims." (ECF 763 at 2.)[3] In sum, Plaintiff's belabored request is baseless, as this Court has already found.

Plaintiff's entire argument is based on the fact that Mr. Walker testified that "[t]here was guidance provided" in 2015 about "how to position people on hire" (Trial Tr. at 690:12-22), but NIKE never produced any such "guidance." Mr. Walker's testimony, however, is not as clear-cut as Plaintiff suggests, especially considering he did not work at NIKE in 2015. Although Plaintiff's counsel discussed with Mr. Walker notes and presentations from 2018 discussing how certain factors were "often" considered before 2017 in certain pay decisions (PX-295; Trial Tr. at 690:12-16), it is far from clear that Mr. Walker testified that 2015 guidance documents containing information about the use of prior pay existed, or that there was any common practice to use prior pay to set starting pay. Rather, taken in context, Mr. Walker's testimony suggests that any knowledge about the existence of any such guidance stemmed from the subsequent presentations that vaguely referred to some (inconsistent) instances of using prior pay in the past—not from his knowledge, whether personal or otherwise, about the existence of written documentation from 2015. (Trial Tr. at 690:7-22; *see* PX-158; PX-295.)

In any event, even construing Mr. Walker's testimony as Plaintiff does, Plaintiff has not shown

---

[3] Beyond various orders, Plaintiff relies on (and thus, asks this Court to consider) several prior filings outside the actual trial record in making this argument, including: (1) a declaration with exhibits filed by Plaintiff in January 2022 (ECF 166 (unsealed version at ECF 291-2); (2) a motion to compel filed by Plaintiff in September 2023 (ECF 349); (3) a declaration with exhibits filed by Plaintiff in September 2023 (ECF 350); (4) a response filed by NIKE in September 2023 (ECF 354); (5) a declaration with exhibits filed by NIKE in September 2023 (ECF 355); and (6) a response filed by NIKE in December 2023 (ECF 395). (*See* Hender Proposed FOF ¶¶ 38-52.)

anything that would justify an "adverse inference" or finding of spoliation here. Put simply, Plaintiff complains about NIKE's purported failure to retain documents from a period spanning years before this lawsuit was filed and Plaintiff joined it. (Trial Tr. at 1235:12-18 ("[A]ll of the issues that they raised in their motion for an [adverse-inference] instruction relates to evidence from 2017 and earlier, which is before this litigation was filed. So there were no litigation hold obligations in place.").) But NIKE had no preservation obligations at that time vis-à-vis Plaintiff.

To try and bridge this gulf of time between 2015 and 2018, Plaintiff claims NIKE was on notice about such allegations based on a declaration, in which NIKE noted that it received complaints in late 2015 and early 2016 from: (1) an employee asserting race and gender claims, alleging that she had been "discriminated against under Title VII because she had been paid less than her White male counterpart;" and (2) a former employee "alleging, *inter alia*, age discrimination," to suggest that NIKE had a duty to preserve by late 2015. (ECF 291-2 at 105-06; *see* Hender Proposed FOF ¶ 49.) But these two complaints (both of which are quite distinct from Plaintiff's specific claims here) would not have put NIKE on notice to preserve any and all documents about NIKE's "pay practices" generally—much less, any documents specific to Plaintiff's prior-pay claim here.

In sum, to the extent this issue is even proper to raise (again) at this juncture, Plaintiff has not shown (and cannot show) that NIKE had an obligation to preserve documents related to this litigation in 2015—three years prior to this lawsuit's filing. The Court should again reject Plaintiff's request for an "adverse inference."

**C. <u>Without A Valid Prior-Pay Claim, Plaintiff's Bonus Claim Necessarily Fails.</u>**

Plaintiff wrongly asserts that NIKE's practices associated with awarding employee bonuses caused a disparate impact. While Plaintiff's bonus claim fails for a host of reasons, she concedes that it is contingent on the success of her prior-pay claim. (Hender Proposed FOF ¶ 61 ("Because Fiscal

Earnings entered the PSP formula as a multiple on both halves of the formula, every eligible employee's PSP bonus rose or fell with the employees' base salary. The PSP formula thus carried any disparity in base pay into each year's annual bonus in every year the disparity existed.").) Although Plaintiff later resists this conclusion (Hender Proposed COL ¶ 39), as a matter of logic, if her starting salary was not lower than it should have been based on her prior pay (and it was not—it was higher than the average man in her starting job code), then Plaintiff cannot show any harm based on the bonus formula. In fact, because it is undisputed that Plaintiff was paid more than the average male in her job code during her first several years at NIKE, she likely received a ***larger*** bonus during those years than the average male. And it is undisputed that "women receive[d] higher performance ratings than comparable men" at NIKE, which composed the discretionary component of NIKE's bonus plans. (ECF 733 at 28.)

Even setting this reality aside, the fact remains that all bonus policies during the relevant timeframes had more than sufficient discretion at the manager level, such that Plaintiff cannot show an actionable policy or practice. "Subjective criteria, prone to different interpretations, generally do not provide common direction." *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 279 (S.D.N.Y. 2018); *Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2018 WL 3328418, at *19-21 (W.D. Wash. June 25, 2018), *aff'd*, 799 F. App'x 459 (9th Cir. 2019) (noting that the use of common criteria for pay determinations was insufficient given the managerial discretion to make decisions within the framework); *see also* *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 355-56 (2011) ("'[T]he invalidity of one manager's use of discretion will do nothing to demonstrate the invalidity of another's.'") (citation omitted).

Plaintiff thus cannot prevail on her bonus claim either.

### D. <u>Nothing The Jury Decided Restricts This Court In Resolving The Disparate Impact Claim.</u>

Even though it is irrelevant to her disparate impact claim, Plaintiff argues that one issue was necessarily decided by the jury such that it binds this Court: that jobs in the same job code required substantially equal work for every job code at NIKE World Headquarters ("WHQ"). (Hender Proposed COL ¶¶ 18-20.) Plaintiff bases this contention on the fact that the jury found in her favor on the Equal Pay Act claims and awarded her $19,739.52 on the Federal Equal Pay Act claim. (Hender Proposed COL ¶ 19.) While the Seventh Amendment dictates that courts generally may not revisit a jury's explicit or implicit factual findings in making subsequent rulings (*see* Hender Proposed COL ¶ 19 (citing *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 507 (9th Cir. 1989)), this Court need not address this issue because it is unnecessary to resolve the disparate impact claim, and, regardless, Plaintiff's contention fails based on the specific facts here.

*<u>First</u>*, the Court need not address the Seventh Amendment issue to resolve the disparate impact claim because no element requires this Court to analyze whether jobs within job codes require similar knowledge, effort, and skill. Even if Plaintiff has standing, this Court need only address: (1) whether NIKE had a prior practice or policy about using prior pay to set starting salaries; and, if so, (2) whether that practice caused a significant adverse impact on Plaintiff, as demonstrated by (3) a causal connection between the practice and the statistical disparity. *See* *Freyd*, 990 F.3d at 1224. The Court need make no finding about whether jobs within the same job code required substantially equal work—especially for every single job code at NIKE (of which there are hundreds).

Plaintiff may try to suggest the relevance of this proposed finding by noting that NIKE asked for a finding that work done within NIKE's job codes "is not necessarily homogenous" and can involve different work. (ECF 839 at 3.) But, far from asking this Court to make a finding in tension with any fact found by the jury at trial, the only reason NIKE suggested that proposed finding is to provide

background for why NIKE gives managers discretion to set pay, performance, and promotion decisions—a fact that Plaintiff does not appear to dispute.

*Second*, even if the job-code issue were critical to Plaintiff's disparate impact claim (it is not), the Court would not need to address the issue because it can (and should) reject that claim on unrelated grounds already mentioned: (1) Plaintiff lacks standing; and (2) the evidence confirms that NIKE never had such a policy or practice. Plaintiff apparently wants this finding to bolster her expert's analyses. (*See* Hender Proposed COL ¶ 22.) But the Court need not even reach those expert issues to resolve this claim.

*Third*, Plaintiff's request is wrong on the facts, as the jury necessarily would have found only that two job codes (at most) were "of a comparable character." (ECF 829 at 17.) That is the case because the relevant analysis at trial focused only on the two job codes that Plaintiff was in between September 2018 and October 2020 (A1013 and A0946). (Trial Tr. at 1332:14-18 ("That's why Ms. Hender is not making an Equal Pay Act claim for [the period of April 2015 to September 2018]. Her Equal Pay Act Claims are only for the period of September of 2018 to October of 2020.").) Accordingly, the jury was never asked to make a finding that jobs in the same job code required substantially equal work for every job code at WHQ—including for Plaintiff's initial job code. (*See* ECF 829 at 14-15 (jury instructions specifically limiting disparate treatment claims to a time frame of November 19, 2017 to October 12, 2020).)

That the jury made no finding as to Plaintiff's initial job code at NIKE is critical because Plaintiff's disparate impact claim focuses on NIKE's alleged use of prior pay to set ***starting*** salaries. Because Plaintiff was paid ***more*** than men in her starting job code on average, her Equal Pay Act claims did not address that job code nor her pay while in that job code. Plaintiff's request for such a broad finding—especially one that is unrelated to the disparate impact claim itself—is improper and

incorrect, and the Court should not countenance it.

*Finally*, even if this Court agrees with Plaintiff on the Seventh Amendment issue, because judgment has not yet been entered on the jury claims, NIKE has not had the opportunity to file its Federal Rule of Civil Procedure 50(b) motion for judgment as a matter of law and Rule 59 motion for a new trial. *See* Fed. R. Civ. P. 50(b), 59. In response to these forthcoming motions, this Court could hold that the jury's answers on which Plaintiff's argument relies are not supported by sufficient evidence or that a new trial is warranted. In that situation, Plaintiff's attempt to argue that this Court is bound by a jury finding would further fall apart.

### E. Plaintiff Cannot Show The Requisite Causation Necessary To Sustain Her Disparate Impact Claim.

As noted in NIKE's Proposed Findings of Fact and Conclusions of Law, some courts address the standing arguments NIKE sets forth herein as part of the causation analysis. (ECF 839 at 14 n.2 (citing *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990).) Should this Court deem it appropriate to address this issue in connection with the causation analysis, Plaintiff cannot meet the causation element of her disparate impact claim. The reason is simple: the evidence shows that Plaintiff was not underpaid relative to the average male employee in her job code when she started working at NIKE. She was paid more. (Trial Tr. at 968:16-21.) This fact confirms that Plaintiff was not "subject to" any purported prior-pay policy or practice. Moreover, it confirms that there is no causal connection between any such policy and any harm to Plaintiff.

Even setting that fundamental issue aside, NIKE explained in its Proposed Findings of Fact and Conclusions of Law the critical shortcomings of Dr. Neumark's aggregated regression analyses. (ECF 839 at 8-11, 20-23.) Most notably, Dr. Neumark: (1) did not analyze alleged inequities in pay by job code (*see* Trial Tr. 857-74); and (2) used "age" as a proxy to control for an individual's prior experience at the time of hire—which fails to account for the reality of many situations, including

Plaintiff's (Trial Tr. at 859-60). Due to these shortcomings, to the extent this Court finds it necessary to address Plaintiff's expert analyses, Plaintiff cannot demonstrate their reliability in showing a statistically significant shortfall in either starting pay or bonuses.

## III. CONCLUSION

For these reasons, NIKE respectfully requests that the Court adopt NIKE's proposed findings of fact and conclusions of law (ECF 839), reject Plaintiff's (ECF 840), and enter judgment in NIKE's favor on Plaintiff's disparate impact claim.

Respectfully submitted

Dated: October 6, 2026

*/s/ Felicia A. Davis*

Felicia A. Davis (*pro hac vice*)
feliciadavis@paulhastings.com
Daniel Prince (*pro hac vice*)
danielprince@paulhastings.com
Lindsey C. Jackson (*pro hac vice*)
lindseyjackson@paulhastings.com
PAUL HASTINGS LLP
515 South Flower Street, Twenty-Fifth Floor
Los Angeles, CA 90071-2228
Tel: (213) 683-6000
Fax: (213) 627-0705

Laura Rosenbaum, OSB No. 110061
Laura.rosenbaum@stoel.com
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205
Tel: (503) 224-3380
Fax: (503) 220-2480

***Attorneys for Defendant NIKE, Inc.***