**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kelsie G. Crippen, OSB #193454**
KelsieCrippen@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085

**Byron Goldstein (admitted *pro hac vice*)**
Byron@goldsteinbrowne.com
**Barry Goldstein, Of Counsel (admitted *pro hac vice*)**
Barry@goldsteinbrowne.com
**GOLDSTEIN BROWNE, PC**
1111 Broadway, Office 04-117
Oakland, CA 94607
Telephone: (510) 584-9020

Attorneys for Plaintiff
[Additional Counsel of Record listed on the Signature Page]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

HEATHER HENDER,

Plaintiff,

v.

NIKE, INC., an Oregon Corporation,

Defendant.

Case No. 3:18-cv-01477-AB

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (DKT. 839)**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

I. THE PSP PRACTICE INDEPENDENTLY CAUSED A DISPARATE IMPACT ..... 3

A. NIKE's "fails in tandem" argument mischaracterizes Plaintiff's PSP practice challenge. ..... 3

B. The PSP formula was an employment practice. ..... 3

C. The PSP formula caused a significant disparate impact on women. ..... 5

D. Dr. Neumark accounted for job code. ..... 6

E. NIKE's disaggregation arguments are contrary to the record and the law. ..... 7

II. THE COURT MUST DECIDE THE ELEMENTS OF THE DISPARATE IMPACT CLAIM BEFORE NIKE'S "STANDING" ARGUMENT ON THE PRIOR PAY CLAIM ..... 10

A. The Court twice declined to substitute the NIKE-created element for the actual elements of Plaintiff's prima facie burden. ..... 11

B. Deciding NIKE's "standing" argument first would strip the liability findings of their force, ignore half of the injury, and misapply the law of standing. ..... 12

III. NIKE'S PRIOR-PAY PRACTICE HAD A DISPARATE IMPACT ON WOMEN ..... 13

A. NIKE had a practice of using prior pay when setting starting salaries. ..... 13

1. NIKE relies on two witnesses' conclusory denials. ..... 13

2. The trial record proves the practice. ..... 14

B. The prior-pay practice caused a significant disparate impact on women. ..... 18

1. Dr. Neumark's results, and what NIKE does not dispute. ..... 18

2. Dr. Neumark accounted for experience and education in three ways, while NIKE offered no contrary evidence. ..... 19

IV. ARTICLE III IS SATISFIED, AS NIKE'S AUTHORITIES CONFIRM ..... 20

A. Article III is satisfied. ..... 20

B. NIKE's authorities confirm that Plaintiff has standing. ..... 23

V. PLAINTIFF SUBMITTED THE ADDITIONAL EVIDENCE THE PRETRIAL RULING REQUIRES ..... 25

A. NIKE used Plaintiff's prior pay when setting her starting salary. ............26

B. Even if Pfluger were credited, NIKE does not rebut the inference that it used Waddell's and the other similarly situated men's prior pay. ..........30

C. NIKE's "no damages" argument conflates the calculations and standards of two different claims. ..........32

VI. NIKE MAY NOT RELY ON THE GAPS IN ITS OWN RECORDS ..........33

VII. NIKE DID NOT ATTEMPT TO PROVE ITS AFFIRMATIVE DEFENSE OR REBUT THE REMEDY ..........34

CONCLUSION ..........35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975)....................26, 32

*Ass'n of Irritated Residents v. EPA*,
10 F.4th 937 (9th Cir. 2021)....................21

*Bacon v. Honda of Am. Mfg.*,
370 F.3d 565 (6th Cir. 2004)....................11, 24

*Bolden v. Walsh Constr. Co.*,
688 F.3d 893 (7th Cir. 2012)....................9, 10

*Bowen v. Energizer Holdings, Inc.*,
118 F.4th 1134 (9th Cir. 2024)....................13

*Boyd v. Ozark Air Lines, Inc.*,
568 F.2d 50 (8th Cir. 1977)....................31

*Chen-Oster v. Goldman, Sachs & Co.*,
No. 10 Civ. 6950 (AT) (RWL), 2022 WL 814074 (S.D.N.Y. Mar. 17, 2022)....................7

*Chin v. Port Auth. of N.Y. & N.J.*,
685 F.3d 135 (2d Cir. 2012)....................31

*Coe v. Yellow Freight System, Inc.*,
646 F.2d 444 (10th Cir. 1981)....................11, 24

*Connecticut v. Teal*,
457 U.S. 440 (1982)....................22

*Domingo v. New England Fish Co.*,
727 F.2d 1429 (9th Cir. 1984)....................32

*EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*,
186 F.3d 110 (2d Cir. 1999)....................32

*Ellis v. Costco Wholesale Corp.*,
285 F.R.D. 492 (N.D. Cal. 2012)....................7

*Franks v. Bowman Transp. Co.*,
424 U.S. 747 (1976)....................31

*Freyd v. University of Oregon*,
990 F.3d 1211 (9th Cir. 2021) ........................................................................11, 30

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000)..........................................................................................20

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) ..........................................................8, 9, 17, 19, 20

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977).....................................................................12, 17, 26, 31, 32

*Isabel v. City of Memphis*,
404 F.3d 404 (6th Cir. 2005) ............................................................................31

*Jurado v. Eleven-Fifty Corp.*,
813 F.2d 1406 (9th Cir. 1987) ..........................................................................23

*Karlo v. Pittsburgh Glass Works, LLC*,
849 F.3d 61 (3d Cir. 2017)................................................................................21

*Kassman v. KPMG LLP*,
416 F. Supp. 3d 252 (S.D.N.Y. 2018)..................................................................9

*Klamath Tribes v. United States Bureau of Reclamation*,
No. 1:21-CV-00556-CL, 2024 WL 471977 (D. Or. Feb. 7, 2024).........................20

*Lewis v. City of Chicago*,
560 U.S. 205 (2010)...................................................................12, 21, 30, 34

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)..........................................................................................20

*Liberles v. County of Cook*,
709 F.2d 1122 (7th Cir. 1983) ..........................................................................32

*Lorance v. AT&T Techs., Inc.*,
490 U.S. 900 (1989)..........................................................................................26

*Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*,
964 F.2d 106 (2d Cir. 1992)..............................................................................24

*Mecinas v. Hobbs*,
30 F.4th 890 (9th Cir. 2022) .......................................................................13, 22

*Melendez v. Illinois Bell Telephone Co.*,
79 F.3d 661 (7th Cir. 1996) ........................................................................24, 29

*Moussouris v. Microsoft Corp.*,
No. C15-1483JLR, 2018 WL 3328418 (W.D. Wash. June 25, 2018), *aff'd*,
799 F. App'x 459 (9th Cir. 2019) ....................................................................................9, 10

*Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993)...................................................................................................20, 21, 22

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) ...........................................................................9

*Paige v. California*,
291 F.3d 1141 (9th Cir. 2002) ..................................................................................7, 23

*Patee v. Pacific Northwest Bell Tel. Co.*,
803 F.2d 476 (9th Cir. 1986) .........................................................................................24

*Pelekai v. Raytheon Constructors, Inc.*,
74 F. App'x 790 (9th Cir. 2003) .....................................................................................23

*Pottenger v. Potlatch Corp.*,
329 F.3d 740 (9th Cir. 2003) .....................................................................................23, 24

*Rizo v. Yovino*,
950 F.3d 1217 (9th Cir. 2020) (en banc) .......................................................................18

*Rose v. Wells Fargo & Co.*,
902 F.2d 1417 (9th Cir. 1990) ...........................................................................5, 8, 11, 18

*Santana v. City & County of Denver*,
488 F.3d 860 (10th Cir. 2007) .......................................................................................24

*Scott v. Pasadena Unified Sch. Dist.*,
306 F.3d 646 (9th Cir. 2002) .........................................................................................23

*Sidibe v. Sutter Health*,
103 F.4th 675 (9th Cir. 2024) .........................................................................................13

*Sledge v. J.P. Stevens & Co.*,
585 F.2d 625 (4th Cir. 1978) .........................................................................................31

*Smith v. City of Boston*,
460 F. Supp. 3d 51 (D. Mass. 2020) .........................................................................26, 32

*Stockwell v. City & County of San Francisco*,
749 F.3d 1107 (9th Cir. 2014) .......................................................................................12

*Terry v. City of San Diego*,
No. 06-cv-1459-MMA (CAB), 2012 WL 216591 (S.D. Cal. Jan. 24, 2012) ....................22, 35

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)....................................................................................................20

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)......................................................................................................9

*Uzuegbunam v. Preczewski*,
592 U.S. 279 (2021)....................................................................................................22

*Victory Carriers, Inc. v. Stockton Stevedoring Co.*,
388 F.2d 955 (9th Cir. 1968) ......................................................................................15

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..................................................................................................8, 9

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989)....................................................................................................29

*Warth v. Seldin*,
422 U.S. 490 (1975)....................................................................................................22

*Watson v. Fort Worth Bank & Tr.*,
487 U.S. 977 (1988).......................................................................................3, 8, 10, 29

**Statutes**

42 U.S.C. § 2000e-2(k)(1)(A)(i) ..................................................................3, 12, 14

42 U.S.C. § 2000e-5.....................................................................................................23

42 U.S.C. § 2000e(b) ...................................................................................................14

**Rules**

Fed. R. Civ. P. 33(c) ....................................................................................................15

Fed. R. Civ. P. 52 ...................................................................................................11, 15

Fed. R. Evid. 201 .........................................................................................................33

Fed. R. Evid. 801(d)(2) ................................................................................................15

## INTRODUCTION[1]

NIKE asks this Court to adopt conclusory assertions based on a sliver or mischaracterization of the record. It begins by asserting that Plaintiff's "only theory" for challenging the Performance Sharing Plan ("PSP") bonus practice is based on her prior pay disparate impact claim. But this disregards the theory Plaintiff set forth in the Pretrial Order and at trial: Plaintiff's challenge to the PSP practice, the same formula used for all employees, is independent of the prior-pay practice.

NIKE next asks the Court to decide the prior pay disparate impact claim under a standard not in the statute, based just on what one participant in its hiring process now recalls of his state of mind 11 years ago. Title VII, the Ninth Circuit, and this Court's pretrial ruling make clear that the question for liability is whether a practice had a disparate impact on a group, not on a single individual (Parts II-III). The Court placed the question of whether NIKE's practice was used in setting Plaintiff's starting salary after liability, where it is decided on the whole record rather than one witness's recollection (Part V). Although NIKE labels this argument "standing," it is not one: NIKE seeks judgment on the merits, not dismissal for want of jurisdiction. Article III is satisfied in any event: NIKE had a practice of using prior pay that had a disparate impact on women hired at NIKE World Headquarters ("WHQ");[2] NIKE sought and recorded Plaintiff's prior pay; it was the first data point in a discussion about setting her starting salary; and a

---

[1] Citations to "FOF" and "COL" are to Plaintiff Heather Hender's Proposed Findings of Fact and Conclusions of Law (Dkt. 840) unless preceded by "NIKE."

[2] NIKE's first proposed finding contends Plaintiff worked "at its Air MI Facility, near NIKE World Headquarters" (NIKE FOF ¶ 1), but the parties stipulated, and the Court instructed the jury to accept as proved, that NIKE employed Plaintiff "at NIKE World Headquarters." Dkt. 742 at 5 (Agreed Fact A.1); Dkt. 829 at 4.

similarly situated man, Trent Waddell, hired into the same job with a quarter of her experience and higher prior pay, started $11,400 above her (Part IV).

Based solely on the conclusory testimony of two witnesses, Shane Walker and Shine Thomas, NIKE then urges the Court to find that it did not have a practice of using prior pay when setting starting salaries. Yet after Walker provided the testimony on which NIKE relies, he admitted that NIKE had written guidelines that focused on prior pay when setting starting salaries. And Thomas' unsupported denial cannot overcome the cumulative record: Walker's testimony about those guidelines, NIKE's admissions (*e.g.*, "often focused" on prior pay), its contemporaneous documents, and the more-than-50% drop in the starting pay disparity against women after NIKE's self-described September 2017 "policy change."

NIKE's final contention is that Plaintiff cannot show each practice caused the disparate impact. NIKE, however, does not dispute the data, the disparities against women, the 50% drop in the disparity after NIKE's "policy change," or the significance levels. Nor did it provide any evidence showing that the disparities are explained by legitimate, potentially non-discriminatory factors. NIKE's critiques of the regression's controls were answered at trial (Parts I.D-E, III.B). It mischaracterizes Murphy's testimony, which concerned a different comparison under a different claim (the Equal Pay Act), not the disparate impact claim (Part V.C).

NIKE proposes no findings on remedy or business necessity (Part VII). Nor does it mention the jury's verdict. NIKE tried the case as one "about the decisions made by Mr. Pfluger, Ms. Mei, and Mr. Stowell" (Tr. 1358:8-9), told the jury that the Seventh Amendment "restricts the Court's power to second-guess the conclusions that you reach" (Tr. 1405:2-6), and lost on every question (Dkt. 826). It now asks the Court to decide the disparate impact claim on the same premise, with proposed findings on the very points — that her first-level managers decided

her pay, for non-discriminatory reasons and not based on her prior pay — that it argued to the jury without success. COL ¶¶ 16-22.

## I. THE PSP PRACTICE INDEPENDENTLY CAUSED A DISPARATE IMPACT

### A. NIKE's "fails in tandem" argument mischaracterizes Plaintiff's PSP practice challenge.

NIKE argues that the PSP disparate impact claim fails because "Plaintiff's only theory of harm" is that the formula carried forward starting-pay disparities, and NIKE is entitled to prevail on the prior-pay claim. NIKE FOF at 1, ¶ 34; NIKE COL ¶ 68 (citing Dkt. 733 at 28). In the filing NIKE relies on, however, Plaintiff's theory is that the PSP practice is "distinct from the prior pay practice and may be challenged on its own terms." Dkt. 733 at 28; *see also* Dkt. 742 at 9, 11; Dkt. 840 at 7.

### B. The PSP formula was an employment practice.

NIKE argues that the PSP formula was not an employment practice for two reasons: (i) "the evidence showed that NIKE did not have one common PSP bonus plan policy throughout the statutory period," and (ii) "managers retained discretion regarding bonuses throughout." NIKE COL ¶ 69. To begin, Title VII does not require that the practice be exactly the same in every way at all times or be entirely free of discretion; it asks whether the employer "uses a particular employment practice," 42 U.S.C. § 2000e-2(k)(1)(A)(i). And the Supreme Court rejected the argument that managerial discretion means an employer is immune from disparate impact liability. *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990 (1988) (disparate impact is "no less applicable to subjective employment criteria than to objective or standardized tests").

In any event, NIKE's documents and witnesses show that, from Fiscal Year 2015 through Fiscal Year 2021, NIKE calculated every eligible salaried employee's bonus with the same five factors in the same formula: Time in Plan, Weighted Achievement, Band Target, Fiscal

Earnings, and the Performance Modifier. FOF ¶¶ 55-58; Tr. 888:5-17; 889:1-4; 889:6-890:10; 892:16-25; 893:1-17; 894:14-19; 897:5-11; Ex. 100; Ex. 111 at 2-3. The "Team" and "Discretionary" components NIKE references (NIKE FOF ¶ 32) are just the two halves of that one formula: each multiplied the same four NIKE-set inputs, and only the "Discretionary" half also had the Performance Modifier, which was based on performance ratings. Ex. 100; Ex. 79 at 2; Ex. 189 at 1, 3; Tr. 888:18-21; 890:4-10; 895:12-24; 896:5-10; FOF ¶ 59. Before Fiscal Year 2019, every factor but the Performance Modifier was set automatically by NIKE, and NIKE confined that factor to half the formula. Tr. 892:11-15; 893:12-894:12; 895:17-24; FOF ¶¶ 58-59.

Beginning in Fiscal Year 2019, every factor, including the Performance Modifier, was automatically set by NIKE. Tr. 896:12-897:11; 898:6-10, 16-23; 614:13-19; Ex. 111 at 2; Ex. 207 at 15; Ex. 295 at 11, 16; FOF ¶ 60. NIKE claims there is one qualification — that an Unsatisfactory rating made an employee ineligible and an Inconsistent rating reduced the bonus (NIKE COL ¶ 72; Tr. 896:21-24) — but, even if so, that was equally true before Fiscal Year 2019. Ex. 79 at 2; Ex. 189 at 1. And NIKE's contemporaneous written documents show that there was zero discretion involved in any factor. Ex. 35 at 24 ("All employees have a 100% individual modifier, that is not adjusted"); Ex. 295 at 11 ("Managers will no longer make recommendations to increase or decrease the PSP Award.").

NIKE's reference to a "hundred plus bonus plans across the organization" (NIKE COL ¶ 70; Tr. 677:23-678:4) does not help it. Walker was describing plans across all of NIKE's "about 70,000 employees," not WHQ. Tr. 677:23-24; 679:9-10. NIKE identifies no material difference among WHQ employees; the plan only concerned one input, Weighted Achievement, which NIKE set automatically and identically for everyone in a plan (Ex. 79 at 1-2; Ex. 189 at 2-

3; Ex. 295 at 16; Tr. 893:19-894:12; FOF ¶ 58); and NIKE neither contends nor offers evidence that the plan explained any part of the bonus disparity.

**C. The PSP formula caused a significant disparate impact on women.**

Dr. Neumark's regression analysis of PSP bonuses, which holds constant job (Job Subfamily and Job Level), performance rating, year, tenure, time in job code, and full-time or part-time status, found that women at WHQ were paid about 3.2% less in PSP bonuses than otherwise comparable men at 5.66 standard deviations, a disparity with less than a one-in-100,000 chance of arising just by chance. Tr. 792:1-22; 739:4-18; FOF ¶ 70; COL ¶ 40. That shows causation: "statistical evidence of a kind and degree sufficient to show that the practice in question has caused" the disparity. Dkt. 763 at 10 (§ IV.B) (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990)). A disparity that remains after legitimate factors are accounted for is from the practice. COL ¶¶ 12, 37, 40. NIKE offered no expert or other contrary evidence, and, apart from its job-code argument (Part I.D), does not dispute the data, the disparity against women, or its significance level. Its objection that Dr. Neumark "focused on 'aggregate statistical patterns'" rather than Plaintiff's own bonuses (NIKE FOF ¶ 42) just describes what the statute requires. Dkt. 763 at 9 (§ IV.A); Part II.A.

NIKE argues that Plaintiff "concedes" that the PSP formula did not cause a disparate impact because "women received higher performance ratings than comparable men" (NIKE FOF ¶ 34), but that fact proves the opposite: a discretionary input that favored women is not the source of a disparity against women, which is confirmed by the regression's result when ratings are held constant. Tr. 792:23-793:1 (ratings were "a control in the model, and I'm still finding women are paid less."); 765:5-767:10; 807:16-21; 896:12-897:11; Ex. 295 at 11, 16; FOF ¶¶ 59-60, 70; COL ¶ 38. NIKE's sole example — Plaintiff's increased Performance Modifier for a

"Highly Successful" rating (NIKE COL ¶ 71) — shows this: she was still paid lower PSP bonuses than similarly situated men. FOF ¶ 80; Ex. 563 at 2; Tr. 962:8-20.

**D. Dr. Neumark accounted for job code.**

NIKE's assertion that "Dr. Neumark admitted that he did not account for job code in his starting pay analysis or his bonus analysis" (NIKE COL ¶ 83) is wrong for two reasons. First, Dr. Neumark conducted regressions accounting for job code, and this "didn't make any difference": the result "was pointing in the same direction, a . . . statistically significant female pay shortfall." Tr. 794:19-795:2; 812:6-13; 842:13-18. Second, his control for the interaction of Job Subfamily and Job Level is what NIKE did – it mapped each combination of these two classifications to a job code – and the combination of these two is almost the same as job code in NIKE's data. Tr. 794:2-6; 869:1-4; 854:21-23; FOF ¶¶ 12, 17, 64.

NIKE's proposed finding that work within a job code is "widely varied" (NIKE FOF ¶ 12) is the "ZIP Code" argument it made to the jury (Tr. 1361:9-1362:7), which the jury rejected when it found that NIKE paid Plaintiff less than men in jobs requiring substantially equal work. Dkt. 826 at 1-3 (Questions 1, 4, 6). The jury necessarily determined that the jobs within Plaintiff's job codes required substantially equal work, and because the only affirmative evidence of equal work was NIKE's WHQ-wide Job Architecture, and nothing rebutted this WHQ-wide application by showing it operated differently for other job codes, the jury implicitly found that NIKE's job codes group substantially equal jobs across WHQ. COL ¶¶ 16-22; FOF ¶¶ 18-21, 64.

NIKE also claims that Dr. Neumark "could not say whether Plaintiff's job code was included in his analysis" (NIKE FOF ¶ 42), but her job codes are in the data he analyzed (Tr. 824:6-9 ("They're in all the data"); 819:21-23; 876:2-4; Ex. 555 (Dr. Neumark confirming Plaintiff's job code from the data he used, Tr. 739:22-741:21)), and her Job Subfamilies fall

within the Manufacturing & Sourcing function included in every analysis. Tr. 783:14-22; Ex. 145 at 20; Dkt. 742 at 5.

**E. NIKE's disaggregation arguments are contrary to the record and the law.**

NIKE argues that Dr. Neumark was required to disaggregate the data because, it claims, its lower-level managers had broad discretion over pay decisions. NIKE COL ¶¶ 76-81.[3] That position is contrary to the evidence at trial and the caselaw.

First, the undisputed expert testimony at trial was that using the full dataset with detailed controls "is how labor economists study discrimination," and that disaggregating the data into small cells, as NIKE urges, "is not what labor economists do" and produces "really tiny samples and some very imprecise results." Tr. 793:16-794:12; 871:4-7, 13-15. Courts say the same. In the Ninth Circuit, aggregated data "may be used where it is more probative than subdivided data," particularly "where small sample size may distort the statistical analysis," and a plaintiff "should not be required to disaggregate the data into subgroups which are smaller than the groups which may be presumed to have been similarly situated and affected by common policies." *Paige v. California*, 291 F.3d 1141, 1148-49 (9th Cir. 2002) (citations and internal quotations omitted). And "[e]xperts should avoid disaggregation when it would reduce the sample size to the point where statistical modeling is ineffective." *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 Civ. 6950 (AT) (RWL), 2022 WL 814074, at *12 (S.D.N.Y. Mar. 17, 2022) (excluding the employer's business-unit-level models as "methodologically unsound"); *see Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 522-23 (N.D. Cal. 2012) (cited at NIKE COL ¶ 78) (rejecting

[3] Even NIKE doubts the factual premise of its argument — that first-level managers had broad decision-making power — because it states that decisions are made at "the manager level, *or* at most, the Manager +1 level" (NIKE COL ¶ 79 (emphasis added)) and concedes that pay ranges constrained them (NIKE FOF ¶¶ 14-15).

region-by-region analyses as samples "so small . . . that it would be difficult to attach much importance to the lack of statistical significance"). NIKE called no expert and ran no analysis at any level; its assertion that a manager-level study would have shown something different is thus an "unsubstantiated assertion of error." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002) (citation and internal quotation omitted).

Second, NIKE's authorities did not create the rule it urges this Court to adopt; in each, the plaintiffs offered statistics to prove that delegating discretion was itself the specific employment practice — a theory Plaintiff does not advance — and, in contrast to this case, none proved a specific employment practice on the merits. FOF ¶¶ 22-23, 55-61; COL ¶ 28; Parts I.B, III.A.

NIKE's argument is based on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), and some of the cases applying *Dukes*. NIKE COL ¶ 77. There, the plaintiffs, on behalf of 1.5 million women across 3,400 stores, challenged "the discretion exercised by their local supervisors over pay and promotion matters." 564 U.S. at 342. The statistics failed for want of an identified practice, not for want of disaggregation: the Court found they "identified no 'specific employment practice'" because they challenged delegated discretion itself, without a "common mode of exercising discretion," and their statistics could thus not alone prove that the delegated discretion was a specific employment practice and the source of the impact. *Id.* at 356-57. Here, the practices are identified and proved by NIKE's own documents and admissions, independent of the statistics (Parts I.B, III.A), and the statistics then show that the practice "caused" the disparity. Dkt. 763 at 10 (§ IV.B) (quoting *Rose*, 902 F.2d at 1424); *Watson*, 487 U.S. at 994 (plurality opinion); Part III.B.1. NIKE's quoted *Dukes* passage, that regional disparities do not establish store-level ones (564 U.S. at 356-57; NIKE COL ¶ 77), concerned a "practice" that

existed only in each store's exercise of discretion and so had to be proved store by store. NIKE's practices were set once, for all of WHQ (FOF ¶¶ 22-23, 56). And *Dukes* sets no categorical rule for statistical proof, which, "like all evidence," is judged by "the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-55, 457 (2016).

NIKE's argument against the statistical evidence is categorical: aggregated analyses, it says, "by their very nature," cannot be used, and are "insufficient to establish a companywide practice." NIKE COL ¶¶ 76-77. The Ninth Circuit, however, rejected that position: "any categorical argument that a pooled regression model cannot control for variables relating to the individualized differences among class members must be rejected." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 677 (9th Cir. 2022) (en banc); *id.* at 677 n.23 (citing *Hemmings*, 285 F.3d at 1188-89). And NIKE's own pay-equity methodology is a WHQ-wide multiple regression that "accounts for" the same kinds of factors Dr. Neumark used. FOF ¶ 65; Ex. 331 at 24-25; Tr. 686:2-12.

The other decisions NIKE relies on for its categorical rule – *Moussouris, Kassman,* and *Bolden* – are, like *Dukes*, not decisions on the merits, and each involved plaintiffs who sought to prove that it was broad discretion provided to lower-level managers that caused a disparate impact. *Moussouris v. Microsoft Corp.*, No. C15-1483JLR, 2018 WL 3328418, at *23 (W.D. Wash. June 25, 2018) ("Plaintiffs challenge Microsoft's policy of allowing discretion by lower-level managers"), *aff'd*, 799 F. App'x 459 (9th Cir. 2019); *Kassman v. KPMG LLP*, 416 F. Supp. 3d 252, 277-78 (S.D.N.Y. 2018); *Bolden v. Walsh Constr. Co.*, 688 F.3d 893, 895-98 (7th Cir. 2012) (policies "afford[ed] discretion to each site's superintendent" across 262 sites, and plaintiff's expert "did not attempt to control for variables other than race"). The hypothetical

NIKE borrows from *Moussouris* (twenty-five managers, five of whom "discriminated" (NIKE COL ¶ 81)) describes that theory, not Plaintiff's. And *Bolden* itself distinguished that theory from one where there is "a single policy spanning all sites," 688 F.3d at 898, which each of Plaintiff's two practices, created by Total Rewards for all of WHQ, is.

NIKE's rule — that only disaggregated analyses can prove impact whenever the employer asserts that some discretion was involved — would let any employer insulate itself from disparate impact liability by asserting that some discretion was involved somewhere, because the resulting small samples would defeat statistical significance regardless of the practice's actual effect. *See Watson*, 487 U.S. at 989-90 (rejecting a rule that would allow employers "so easily to insulate themselves from liability" by adding some subjectivity); Tr. 793:16-794:12; 871:4-7, 13-15. The record and the caselaw reject it.

## II. THE COURT MUST DECIDE THE ELEMENTS OF THE DISPARATE IMPACT CLAIM BEFORE NIKE'S "STANDING" ARGUMENT ON THE PRIOR PAY CLAIM

For the prior pay claim, NIKE asks the Court to enter judgment for it without reaching the elements of a disparate impact claim or nearly all the relevant trial evidence. NIKE states the elements correctly, but then adds one: "a plaintiff must show that she was personally affected by the alleged practice in an adverse way." NIKE COL ¶¶ 47-48; *see id.* ¶ 60. NIKE then urges the Court to apply this new standard in place of the correct elements, and to decide the disparate impact claim under it by asking what one participant in its hiring process now says his state of mind was 11 years ago. NIKE FOF ¶¶ 24-29; NIKE COL ¶¶ 51-59. The Court has twice declined to apply that standard or decide whether Plaintiff was within the practice ahead of the elements.

**A. The Court twice declined to substitute the NIKE-created element for the actual elements of Plaintiff's prima facie burden.**

In response to the parties' dispute over whether Plaintiff must prove "a disparate impact on women," as she contends, "or on her employment," as NIKE contends, the Court ruled that it is "a disparate impact on women." Dkt. 763 at 9. The Court further ruled that Plaintiff is not required to prove "that prior pay was used to set starting salary in every instance," because the extent of use "is likely incorporated into Plaintiff's causation showing," which the Court defined by the statistical standard in *Rose*. *Id.* at 10 (§ IV.B) (quoting *Rose*, 902 F.2d at 1424). And the Court placed the individualized showing NIKE proposed (i.e., "additional evidence that her prior pay was used to set her starting salary") "before receiving damages," after liability. *Id.* (§ IV.C). The cases the Court cited for that damages-stage showing, *Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 577 (6th Cir. 2004) and *Coe v. Yellow Freight System, Inc.*, 646 F.2d 444, 451 (10th Cir. 1981), are the cases NIKE relied on then and that it now cites for "standing." NIKE COL ¶¶ 51-52. The Order thus separates the group-based liability inquiry (§§ IV.A-B) from the individual remedial inquiry (§ IV.C); NIKE's submission collapses them.

NIKE proposed the same element at the close of evidence in arguing its Rule 52 motion, telling the Court that "the inquiry should stop" at Pfluger's testimony. Tr. 1242:3-21. Plaintiff countered that the prima facie burden has "*two parts*": which are "1) a specific employment practice that 2) causes a significant discriminatory impact," *Freyd v. University of Oregon*, 990 F.3d 1211, 1224 (9th Cir. 2021) (citation omitted) (emphasis added); Dkt. 802 at 4-5. The Court, having "weighted the evidence against the preponderance of the evidence standard," declined to enter judgment. Tr. 1270:10-11, 1270:17-1271:1. The Court was right both times: "the plaintiff wins simply by showing the stated elements," which are that "an employer 'uses' an 'employment practice' that 'causes a disparate impact,'" *Lewis v. City of Chicago*, 560 U.S. 205,

213 (2010) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)), and "[a]bsent such a group-based disparity, the claim fails." *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1115 (9th Cir. 2014). NIKE now proposes the element a third time, relabeled "standing," without addressing either ruling. NIKE COL ¶ 48.

**B. Deciding NIKE's "standing" argument first would strip the liability findings of their force, ignore half of the injury, and misapply the law of standing.**

The order of decision matters for three reasons.

First, the evidence for liability and the liability findings are themselves evidence in support of the individual question. Once a practice and its impact are proved, there is "an inference that any particular employment decision … was made in pursuit of that policy," and the employee need only show that she "was a potential victim of the proved discrimination"; the burden then shifts to the employer to prove that decisions were made "for lawful reasons." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 362 (1977); Part V. NIKE's sequence would have the Court decide the claim on one manager's 11-year-old recollection before the practice is found and its impact determined, discarding the proof the law carries forward to the individual question, findings whose force "does not dissipate at the remedial stage…." *Teamsters*, 431 U.S. at 361-62.

Second, NIKE's approach answers only half of the question. The injury to Plaintiff is comparative: she was paid less than at least one similarly situated man, Trent Waddell, because of NIKE's practice. FOF ¶¶ 7, 78. A prior pay practice can produce that gap by anchoring her starting salary to her prior pay, his to his, or both, and whether it did is inferred from the findings NIKE would have the Court skip: the practice (Part III.A), its impact (Part III.B), and its application to both hires (Parts V.A-B). Pfluger's testimony, even if credited, speaks to Plaintiff's side alone; NIKE offered nothing on Waddell's side to rebut the inference. Part V.B.

Third, the law of standing does not call for NIKE's sequence. According to NIKE, its Article III contention concerns the "causation" element of the claim. NIKE COL ¶ 53 n.2. A jurisdictional fact intertwined with the merits is decided with the merits, not ahead of them: if a standing question "is intertwined with an element of the merits of the plaintiff's claim," the court "must leave the resolution of material factual disputes to the trier of fact…." *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1143-44, 1149 (9th Cir. 2024) (citations and internal quotations omitted); *Mecinas v. Hobbs*, 30 F.4th 890, 896 & n.2, 903 n.8 (9th Cir. 2022) (whether the practice had any effect on the plaintiffs was "unquestionably an issue intertwined with the merits," which the district court "was not permitted to resolve" as a threshold matter).

The individual question, therefore, is answered after liability and on the full record.

## III. NIKE'S PRIOR-PAY PRACTICE HAD A DISPARATE IMPACT ON WOMEN

### A. NIKE had a practice of using prior pay when setting starting salaries.

NIKE rests entirely on two employees' conclusory denials that NIKE had a practice of using prior pay to set starting salaries; it omits any mention of the contemporaneous written evidence, its admissions, and the greater-than-50% drop in the starting pay disparity against women after its policy change. NIKE FOF ¶¶ 18-23; NIKE COL ¶¶ 60-67. The record shows that those denials cannot be credited. *See Sidibe v. Sutter Health*, 103 F.4th 675, 701 (9th Cir. 2024) (contemporaneous, written evidence "is commonly understood to be more reliable than later recollections," and a party's "own admissions" carry "more persuasive force than other evidence."); COL ¶ 24; FOF ¶¶ 34-36.

#### 1. NIKE relies on two witnesses' conclusory denials.

NIKE's evidence is the testimony of two witnesses. First, Walker, asked by NIKE's counsel whether NIKE "ever ha[d] a policy requiring the use of an applicant's prior pay," answered that "[t]here was no policy in place." Tr. 672:5-15. Then, on cross-examination,

Walker testified to what he meant by "policy": something "written" that requires "consequences" for noncompliance. Tr. 689:11-690:6. And then he admitted that NIKE had written guidelines for setting starting pay in 2015 that focused on prior pay. Tr. 690:9-25; Part III.A.2. Title VII reaches any "particular employment practice" that an employer "uses," 42 U.S.C. § 2000e-2(k)(1)(A)(i); the practice need not be written, enforced by discipline, or applied in every instance (Dkt. 763 at 10 (§ IV.B)), and it does not cease to be NIKE's because hiring managers may have had some discretion in the process. Part I.E; *see* 42 U.S.C. § 2000e(b) ("employer" includes "any agent of such a person"); Dkt. 829 at 10 (Instruction No. 8). NIKE's argument that no "requirement" existed (NIKE COL ¶ 62) answers a question the statute does not ask, and NIKE's own word for how often it focused on prior pay — "often" — describes a practice. Ex. 295 at 8.

Second, Thomas denied that NIKE had a "policy," "practice," or "guidelines" about prior pay (Tr. 995:3-24), but when asked what this assertion was based on, she could point only to "the general practice of recruiting" (Tr. 1009:11-16). She also worked in only one part of NIKE's business in 2015 and did not lead Talent Acquisition until 2024. Tr. 987:21-25; 998:22-999:6. Thomas' testimony that NIKE had no "guideline" is contradicted by Walker, who owned the pay programs in Total Rewards, the unit that created and implemented them and where Thomas did not work. Tr. 601:25-602:16; 913:18-20; FOF ¶ 22. And she contradicted her blanket denials when conceding that some recruiters gathered prior pay and that it was a data point in an offer. Tr. 996:14-997:2; 998:3-11; FOF ¶ 35.

**2. The trial record proves the practice.**

Walker, the senior director who "own[ed] the design and implementation of all the company's broad-base base pay programs" (Tr. 601:25-602:4), admitted that NIKE "had written guidelines in 2015 about how to position people on hire" that "focused on the percent increase

from their prior pay." Tr. 690:20-25; *see* Tr. 681:25-682:3; FOF ¶¶ 24, 42. NIKE did not impeach or qualify his later confirmation that the guidelines were written and concerned positioning "on hire." The guidelines governed a process that HR owned. Total Rewards was responsible for creating and implementing pay practices across WHQ. FOF ¶ 22. Melanie Strong, a longtime former NIKE VP, testified that setting pay for new hires "was owned by HR," with hiring managers only "part of the process." Tr. 316:12-18. When Walker created a version of the Offer Intake Form, it was "based on conversations with the recruiting team, HR business partners on what information they would need to make an offer" (Tr. 660:24-661:3), not with hiring managers. Recruiters were told to "use this form as you work with Total Rewards to construct offers." Ex. 153. NIKE's Hiring Process guide, setting forth the "roles and responsibilities" of those involved in hiring and setting starting salaries, shows that Talent Acquisition only "[r]eview[ed] compensation information with Hiring Manager" and it was the HR Business Partner and business leaders who approved the offer. Ex. 33 at 1-2; FOF ¶¶ 25-26.

Before September 2017, NIKE's Offer Intake Form sought the candidate's pre-NIKE "annual base salary." Ex. 582 at 3, 6 (form revised March 2017); FOF ¶ 29.[4] In September 2017, NIKE made a "policy change." Tr. 666:16-19; 911:10-13; 912:7-15; FOF ¶ 27. To implement

[4] In 2016, Total Rewards circulated the Offer Intake Form's templates and described the information they collected, including prior pay, as "requisite information" for developing offers. Ex. 307 at 2; FOF ¶ 46 n.3. Exhibit 307 and the other exhibits identified in FOF ¶ 27 n.2 that Plaintiff asks the Court to receive for the claims tried to the Court are stipulated exhibits, meaning they "may be received without objection" (Dkt. 702 at 4; Dkt. 761 at 26, 70, 86). The Court declined to receive them during the jury phase (Dkt. 798; Dkt. 807) because "[a] witness would need to identify the exhibit and explain its relevance to the jury" (Tr. 1074:6-10), which does not apply to findings under Rule 52(a). Each is a statement of a party opponent, Fed. R. Evid. 801(d)(2), and corroborates a finding the admitted evidence independently supports. Plaintiff makes the same request for NIKE's discovery responses cited in Part V (Exs. 469, 481, and 531), which are also NIKE's own statements. Fed. R. Civ. P. 33(c); Fed. R. Evid. 801(d)(2); *Victory Carriers, Inc. v. Stockton Stevedoring Co.*, 388 F.2d 955, 958-59 (9th Cir. 1968).

this, NIKE told all Talent Acquisition employees that "we will no longer ask candidates about their compensation history" (Ex. 153; Tr. 999:20-24; FOF ¶ 28), and it replaced this form's prior-pay field with "annual base salary expectations." Ex. 582 at 1; FOF ¶ 29.

NIKE repeatedly admitted to this practice. Walker and NIKE's compensation leadership team drafted a presentation admitting, "[i]n the past, we often focused on the new hires [sic] prior salary and/or the size of the increase the new hire would receive." Ex. 295 at 8; Tr. 645:19-646:9; 681:11-14. NIKE's compensation leaders also authored another training that stated, "we no longer ask new hires their prior salary or focus on the size of the increase." Ex. 35 at 57; Tr. 603:7-15. In a third training, introduced by NIKE's Chief Human Resources Officer, Monique Matheson, and drafted by Walker and the compensation leadership, NIKE admitted that "[m]any companies, including Nike, have approached pay increases during key moments (like promotions or with hiring) primarily focused on 'percent increase,'" and that NIKE planned to "move past *this practice*." Ex. 158 at 7 (emphasis added); Tr. 641:21-643:14; 644:4-19. And Matheson told every employee that NIKE was "eliminating the collection of candidate salary history" to "remove bias from critical moments of the hiring process." Ex. 18 at 1, 3.

NIKE's witnesses and the statistics show the practice at work. In addition to Matheson's "remove bias" admission, Thomas agreed that asking about prior pay "can lead to disparities in gender" (Tr. 1004:21-24), and Total Rewards described NIKE's prior practices as "problematic." Tr. 689:1-7; Ex. 207 at 2; FOF ¶¶ 30-32. After NIKE stopped using prior pay in September 2017, the starting pay disparity between women and men at WHQ fell by more than 50%. FOF ¶¶ 33, 66-68; Part III.B.1. The Court should find that NIKE used this practice as proposed. FOF ¶ 37; COL ¶¶ 23-24.

NIKE's proposed findings that there was "no consistent practice about candidates providing such information, let alone how managers considered it, if at all" (NIKE FOF ¶ 21), and that prior pay was considered, if ever, "in cases other than Plaintiff's" (NIKE COL ¶ 66), rest on the absence of records only NIKE held. FOF ¶¶ 45-46, 52. NIKE did not produce the prior pay data it collected. *See* Dkt. 310 at 43-44 & n.21 (finding that "prior pay data for either men or women employed at Nike was unavailable ….") . A party may not withhold or fail to preserve records and then wield the resulting silence as proof. COL ¶ 32; *Teamsters*, 431 U.S. at 359 n.45; Parts V-VI.

NIKE may try to benefit from these gaps in two ways. First, it may say the Court should disregard the Hiring Process guide because the version in evidence was updated in 2018. Ex. 33 at 2; Tr. 1006:16-20. But that version is not the only one: NIKE updated the guide when it made its prior pay "policy change" — its October 2017 email to all recruiters linked to that version — and a pre-October 2017 version existed, but NIKE produced neither. Ex. 153 ("now reflect this practice"); Tr. 1001:2-9; 1007:13-25. NIKE may not exploit a gap of its own making, and, in any event, the practice is proved without the guide. Second, NIKE may say that Dr. Neumark's post-September 2017 estimate is not statistically significant, but that too is of NIKE's making: Dr. Neumark analyzed all the data NIKE produced, which ended on September 1, 2019 (Tr. 785:20-21; 848:12-849:1; 876:2-4; *see Hemmings*, 285 F.3d at 1188 (plaintiffs' expert "used the best available data" from the employer) (citation omitted)), and because, as the undisputed expert testimony showed, a larger sample produces more standard deviations for the same disparity, all else equal (Tr. 786:17-787:11), it is NIKE's failure to produce data after September 2019, not Dr. Neumark's model, that makes significance harder to show. *See Hemmings*, 285 F.3d at 1188-

89 (employer that believed missing information would explain the disparity "should have provided" it); COL ¶ 32.

**B. The prior-pay practice caused a significant disparate impact on women.**

The Court described the causation showing by quoting *Rose*: "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." Dkt. 763 at 10 (§ IV.B) (quoting *Rose*, 902 F.2d at 1424). Dr. Neumark supplied it. NIKE offered no expert, which it argued to the jury did not make a difference (Tr. 1371:11-13), and its brief's arguments against Dr. Neumark's analysis (NIKE FOF ¶¶ 38-43; NIKE COL ¶¶ 82-85) misdescribe the testimony at each step. Its job code and disaggregation arguments fail for the reasons given in Parts I.D-E; the results, and the one argument specific to starting pay, follow.

**1. Dr. Neumark's results, and what NIKE does not dispute.**

For employees hired before September 2017, while NIKE used prior pay when setting starting salaries, women's starting salaries were 1.16% lower than those of comparable men, at 2.89 standard deviations — a result with less than a one-in-a-hundred chance of arising just by chance. Tr. 790:15-791:20. After NIKE's "policy change," by contrast, the disparity against women in starting salaries dropped by more than 50%. Tr. 784:24-785:7; 791:11-23. Dr. Neumark's two robustness checks were consistent with these results. Tr. 789:10-21; FOF ¶¶ 66-69.

NIKE's proposed findings do not dispute these results. They concede that September 2017 is "the date everyone agrees that no prior pay information was collected or used at NIKE." NIKE FOF ¶ 38. NIKE's witnesses agreed that asking about prior pay "can lead to disparities in gender" (Tr. 1004:21-24), and that using prior pay could lead to new hires being underpaid or overpaid (Tr. 649:24-650:9; FOF ¶¶ 31-32). And NIKE eliminated the practice in order to

"remove bias." Ex. 18 at 3. The en banc Ninth Circuit recognized the same mechanism: "prior pay may carry with it the effects of sex-based pay discrimination…." *Rizo v. Yovino*, 950 F.3d 1217, 1228-29 (9th Cir. 2020) (en banc) (Equal Pay Act). When an employer stops a practice and the disparity associated with it falls by more than half, the practice caused the disparity. COL ¶ 26.

NIKE's answer is to suggest that experience or education explains the disparity. But an employer that attacks a regression for omitted variables "must produce credible evidence that curing the alleged flaws would also cure the statistical disparity" (*Hemmings*, 285 F.3d at 1188 (internal quotations and citations omitted); COL ¶¶ 13, 27; FOF ¶ 72), and NIKE produced none. Its assertion that the evidence "fail[s] to show a statistically significant shortfall" (NIKE COL ¶ 85; *see* NIKE FOF ¶ 40 n.1) rests on the same job code and experience arguments (Parts I.D, III.B.2); it does not dispute the significance of the results themselves.

**2. Dr. Neumark accounted for experience and education in three ways, while NIKE offered no contrary evidence.**

NIKE contends that the Court must reject Dr. Neumark's starting pay findings because, it claims, he accounted for experience only through age. NIKE FOF ¶¶ 40-41 & n.1; NIKE COL ¶ 84. Dr. Neumark, however, accounted for pre-NIKE experience in "three different ways," and all three "point in the same direction": a statistically significant starting-pay shortfall for women hired before September 2017, and a substantial decrease after it. Tr. 857:20-858:6; 789:2-21; 865:5-7; FOF ¶ 68.

First, Dr. Neumark, qualified as an expert without objection (Tr. 736:19-23), explained that "age is a proxy for prior experience" and that labor economists have long used it that way. Tr. 834:19-835:15; 761:22-762:2; 859:11-15; FOF ¶ 66. NIKE presented no expert testimony disputing this. In fact, NIKE's own pay-equity model likewise uses "age" as a factor. Ex. 331 at

24-25; Tr. 686:2-12; FOF ¶ 65. Second and third, Dr. Neumark ran two robustness checks using education and prior-job information from NIKE's application data, and each confirmed the primary result. Tr. 857:24-858:6; 788:1-789:21; 862:19-23 (additional analyses "[d]idn't change the qualitative conclusion"); FOF ¶ 68. NIKE attacks only one of these two checks, the clustering of job titles (NIKE FOF ¶ 41), which Dr. Neumark explained is "one of three things I do" that "all lead to the same answer" (Tr. 865:6-7; 868:16-18). Nor does NIKE's critique reach the model's job controls, which Dr. Neumark explained "probably wipe out a lot of" the differences in skills NIKE speculates about, because people with different types of experience are not hired into the same Job Subfamily and Level. Tr. 860:5-15, 22-25. NIKE's footnoted hypothetical (NIKE FOF ¶ 40 n.1) is argument, not evidence (Tr. 875:8-14), and NIKE offered no evidence that it would explain the disparity. *See Hemmings*, 285 F.3d at 1188.

## IV. ARTICLE III IS SATISFIED, AS NIKE'S AUTHORITIES CONFIRM

### A. Article III is satisfied.

Standing requires an injury in fact that is fairly traceable to the defendant's challenged action and likely to be redressed by a favorable decision. *Klamath Tribes v. United States Bureau of Reclamation*, No. 1:21-CV-00556-CL, 2024 WL 471977, at *1 (D. Or. Feb. 7, 2024) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

Here, the injury in fact is the lower starting salary and the lower annual bonuses. FOF ¶¶ 7, 77-78, 80; Exs. 555, 559, 561, 563 at 2; Tr. 422:5-13; 1048:8-11; *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("monetary harms").

The second element requires only that "the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court…." *Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663-64 (1993) (citation and internal quotations omitted). It does not

require proximate causation, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014), or certainty: the links in the chain of causation need only be "not hypothetical or tenuous" and "plausible," and "[n]either part of the test demands absolute certainty…." *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943-44 (9th Cir. 2021) (internal quotations and brackets omitted). Nor must a plaintiff subjected to a discriminatory practice prove that she would have obtained the benefit absent the practice. *Associated General Contractors*, 508 U.S. at 664-66; Dkt. 763 at 10 (§ IV.C) (Plaintiff "likely need not submit evidence that her salary would have been higher had she not been asked about prior pay").

Here, NIKE had a practice of using prior pay when setting starting salaries that had a disparate impact on women. Part III. While it had this practice, NIKE sought Plaintiff's prior pay, recorded it, and used it in the process of setting her starting salary. Ex. 263; Tr. 419:19-420:8; Part V.A. The same practice was in force when NIKE hired a similarly situated man into the same job with a quarter of her experience and higher prior pay, at $11,400 more than Plaintiff. Exs. 555, 559, 561; Tr. 1048:8-11; Part V.B. The two starting salaries track the two prior pays, not the two resumes. That is the practice producing the disparity on both sides of her comparison, as it did for women's starting salaries overall (Part III.B), and the chain runs entirely through NIKE. NIKE's only answer is one manager's account of his own state of mind, but a disparate impact claim does not inquire into that. *Lewis*, 560 U.S. at 215 (disparate impact claims are "claims that do not require discriminatory intent"); *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 85 (3d Cir. 2017) (disparate impact claims "do not inquire into the employer's state of mind"; plaintiffs "are not required to prove that any particular psychological mechanism caused the disparity in question"). Article III asks whether NIKE's practice was in the process

that produced the starting salary, not whether one of the employees involved admits, 11 years later, to having consciously relied on it.

Traceability is also met on a second, independent ground. When a practice denies a plaintiff "the *opportunity* to compete equally," *Connecticut v. Teal*, 457 U.S. 440, 451 (1982) (emphasis in original), the injury is "the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit," from which traceability follows, and no showing that the outcome would have been different is required. *Associated General Contractors*, 508 U.S. at 666 & n.5; *see also Mecinas*, 30 F.4th at 898-99; *Terry v. City of San Diego*, No. 06-cv-1459-MMA (CAB), 2012 WL 216591, at *1-2, *5 (S.D. Cal. Jan. 24, 2012) (rejecting the employer's argument that the plaintiff lacked standing because she "was not disadvantaged by the alleged discrimination," and entering judgment for her on her disparate impact claim). NIKE concedes this second ground: it obtained Plaintiff's prior pay and it was within the process of setting her starting salary. NIKE FOF ¶¶ 26-27; FOF ¶¶ 76-77.

Redressability is met because awarding back pay redresses the injury. *Uzuegbunam v. Preczewski*, 592 U.S. 279, 292-93 (2021) (a claim for damages, even nominal damages, for "a completed violation of a legal right" "satisfies the redressability element of standing"); *Terry*, 2012 WL 216591, at *2; Tr. 937:1-22; COL ¶ 50.

That is the whole of the Article III inquiry, which "in no way depends on the merits of the plaintiff's contention that particular conduct is illegal…." *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (citation omitted). What NIKE disputes is the merits, as its request for judgment on the merits confirms, Dkt. 839 at 1; and even if its contention were a jurisdictional fact, it is intertwined with the merits (Part II.B) and belongs at the remedial stage, where Part V answers it. Dkt. 763 at 10 (§ IV.C).

**B. NIKE's authorities confirm that Plaintiff has standing.**

NIKE's Ninth Circuit authorities ask for nothing more to establish Article III standing. Being processed through the practice is the "formal[] or functional[]" subjection that *Pottenger* requires and that the plaintiff there lacked because he was fired before the challenged reduction in force began, outside its process. *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749-50 (9th Cir. 2003). *Jurado* involved a plaintiff who "was fluently bilingual and could easily conform" to an English-only rule and therefore was outside the group that the practice potentially disadvantaged. *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987). Measured by *Pottenger* and *Jurado*, Plaintiff has standing because she was within the practice's operation and the group it disadvantaged: NIKE had the practice for all of WHQ before September 2017 and it fell more harshly on women (Part III); and NIKE hired Plaintiff at WHQ in April 2015, while the practice was in force (Dkt. 742 at 5; FOF ¶ 74). NIKE also sought her prior pay and used it in the process of setting her starting salary. Ex. 263; Tr. 419:19-420:8; NIKE FOF ¶¶ 26-27; Part V.A.

NIKE describes the opposite of what *Pelekai v. Raytheon Constructors, Inc.*, 74 F. App'x 790 (9th Cir. 2003) held (NIKE COL ¶ 48). In reversing the district court's ruling that the plaintiff lacked standing for his disparate impact claim, the Ninth Circuit held that the plaintiff "need only show that but for the challenged policy, he would have been considered on an equal basis with other applicants." *Id.* at 791 (citing *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 657 (9th Cir. 2002)). It then affirmed summary judgment on the merits because he did not show a disparate impact on his group. *Id.* at 791-92.[5] The passage NIKE quotes from *Paige*, 291 F.3d at 1146, describes a district court ruling "which plaintiffs d[id] not contest on appeal"; the

[5] The district court decisions that NIKE cites (NIKE COL ¶¶ 48, 52-53) just re-quote *Pottenger* and add nothing to it.

Ninth Circuit then approved the aggregation of statistical data "where it is more probative than subdivided data." *Id.* at 1148; COL ¶ 14. And *Patee v. Pacific Northwest Bell Tel. Co.*, 803 F.2d 476, 477 (9th Cir. 1986) (NIKE COL ¶ 59) concerned whether men paid identically to women were "person[s] claiming to be aggrieved" under 42 U.S.C. § 2000e-5.

NIKE's remaining authorities add nothing to *Pottenger*. In *Coe*, the plaintiff could not challenge a transfer policy because no position existed for which he was qualified, 646 F.2d at 451, and in *Bacon* the requirements the plaintiffs challenged never operated against them — their attendance was sufficient, their transfers were their own requests, and Bacon passed the test he took — so the policies could not have disadvantaged them, 370 F.3d at 577-79; in each case, the plaintiff was thus outside the practice or the group it could affect. The Tenth Circuit reads *Coe* that way. *See Santana v. City & County of Denver*, 488 F.3d 860, 866-67 (10th Cir. 2007) (plaintiff who "undisputedly met the minimum qualifications" and was passed over through the challenged process "meets the standing requirements as set forth in *Coe*"). In *Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 115 (2d Cir. 1992), disparate impact was unavailable because the only "practice" identified concerned just the plaintiff's own discharge and the eight discharges in total were too few for "the sort of statistical analysis frequently employed in disparate impact cases." *Id.* at 108, 115. What was missing there, group-wide practices and group-wide statistics, is present here. Part III.

*Melendez v. Illinois Bell Telephone Co.*, 79 F.3d 661 (7th Cir. 1996), which NIKE cites for the Article III standing requirement (NIKE COL ¶ 52), rejected the employer's standing challenge and affirmed a disparate impact judgment for a plaintiff subject to the challenged test. *Id.* at 667-69. It also shows how the requirement is met: either by showing that she was qualified, removing "the obvious reason" for the result, or by direct evidence that the practice

disadvantaged her. *Id.* at 668. Here, Plaintiff has shown both: NIKE hired her because "we felt she was qualified and was the best candidate" and led with her prior pay in constructing her offer. Tr. 1095:10-12; Part V.A. None of NIKE's authorities asks about the employer's state of mind.

## V. PLAINTIFF SUBMITTED THE ADDITIONAL EVIDENCE THE PRETRIAL RULING REQUIRES

The parties presented this dispute to the Court:

> If Plaintiff meets her prima facie burden and NIKE does not prove the practice is job-related and consistent with business necessity, its affirmative defenses, is Plaintiff, as Plaintiff contends, presumptively entitled to back pay? Or, as NIKE contends, must Plaintiff then submit additional evidence that proves the following before receiving damages: (i) that prior pay was used to set starting pay in every instance or (ii) her prior pay was not only asked about, but also used to set her starting salary, and that her salary would have been higher had she not been asked about her prior pay.

Dkt. 763 at 10 (§ IV.C). The Court ruled that "Plaintiff must submit additional evidence that she was personally injured by the practice in question," which "means" the following:

> before receiving damages, Plaintiff must submit additional evidence that her prior pay was used to set her starting salary. Plaintiff need not submit evidence that prior pay was used to set starting pay in every instance, and Plaintiff likely need not submit evidence that her salary would have been higher had she not been asked about prior pay.

*Id*.

The same facts that make her injury traceable (Part IV.A) are the "additional evidence" that § IV.C requires: "evidence that her prior pay was used to set her starting salary." The ruling is not about an employee's state of mind, which a disparate impact claim does not examine (Part IV.A), and it does not require proof that her salary "would have been higher" (Dkt. 763 at 10 (§ IV.C)), which disposes of NIKE's demand for evidence that her pay "would have been different (let alone, higher)." NIKE COL ¶ 59.

Once that showing is made, well-established Title VII law applies: an employee subject to a proved practice is "a potential victim of the proved discrimination," and the burden of showing that she was paid less for lawful reasons "then rests on the employer," *Teamsters*, 431 U.S. at 362, with back pay the presumptive remedy. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420-21 & n.12 (1975); COL ¶¶ 7, 44-46.[6] NIKE, therefore, had to account for Waddell's starting salary as well as Plaintiff's, and it offered nothing on his (Part V.B).

Plaintiff maintains that, once liability is found and she shows she was subject to the practice, this burden shift governs without more: NIKE must prove that her starting salary was lower than Waddell's and other similarly situated men's for lawful reasons, because the employer that followed the practice is "a proved wrongdoer" who is the source of any uncertainty. *Teamsters*, 431 U.S. at 359 n.45; COL ¶ 46; Part V.B. Regardless, the record satisfies § IV.C (Part IV.A); Pfluger's 11-year-old recollection does not overcome this record (Part V.A); the practice set a higher starting salary for a similarly situated man (Part V.B); and NIKE's "no damages" argument describes the wrong calculation (Part V.C).

**A. NIKE used Plaintiff's prior pay when setting her starting salary.**

Plaintiff's prior pay was used when setting her starting salary. Part IV.A. And the "user" of Plaintiff's prior pay was NIKE. Total Rewards was responsible for pay practices across WHQ (FOF ¶ 22), and starting pay "was owned by HR," with hiring managers "part of the process." Tr. 316:12-18. Talent Acquisition "[a]ssess[ed] candidates' compensation expectations" and

[6] The "would have been higher" showing NIKE demands is also contrary to Title VII law: "the diminished opportunity for employment is a distinct and 'concrete injury,'" and requiring proof that she "would in fact have been promoted – not simply that [she] could have been" would deny the make-whole relief *Albemarle* requires. *Smith v. City of Boston*, 460 F. Supp. 3d 51, 59 (D. Mass. 2020) (quoting *Lorance v. AT&T Techs., Inc.*, 490 U.S. 900, 907 n.3 (1989)); *see Albemarle*, 422 U.S. at 421-23.

constructed offers with Total Rewards from a form that collected the candidate's current salary and sought only the hiring manager's "viewpoint," then routed them to the HR Business Partner and "business leaders for offer approval." Ex. 33 at 1-2; Ex. 153; Ex. 582 at 6-8; Part III.A.2. Plaintiff's offer was constructed that way. Talent Acquisition asked for and recorded her prior pay, and then wrote to Pfluger: "Great news! She was at 82K + bonus (that never came) at ViaOptronics. She was looking for $70-$80K – the mid for this position is 78,600. Let me know what you'd like to offer…." Ex. 263; Tr. 1097:1-4. Nineteen minutes later, Pfluger accepted the only specific starting salary Talent Acquisition stated. Ex. 263; Tr. 1097:20-24. Pfluger's answer that the prior pay had no "influence" on his decision (Tr. 1099:15-17) describes his agreement to "the mid"; it cannot describe how Talent Acquisition arrived at the mid, and Pfluger was unaware of "any other communications there were regarding Ms. Hender's prior pay or starting salary." Tr. 1111:4-7. Asked by the Court about that email at the close of evidence, NIKE argued that the email showed only "that someone asked Ms. Hender about the prior pay." Tr. 1209:14-17.

Pfluger's recollection does not rebut that showing, for three reasons. First, "no influence" is a claim about the absence of anchoring, and NIKE's own account of the practice explains why a manager's say-so cannot establish it. NIKE eliminated the collection of salary history to "remove bias from critical moments of the hiring process" (Ex. 18 at 3), and its witness agreed that asking about prior pay "can lead to disparities in gender" (Part III.B.1). NIKE cannot rest a finding of non-use on a manager's belief that it did not affect him.

Second, NIKE's alleged lawful reasons do not withstand the record. NIKE says it set Plaintiff's starting pay on her "years of experience," not her prior pay. NIKE FOF ¶ 28; NIKE COL ¶ 57. But Ex. 263 says only that Pfluger was "fine with offering the mid" given her

experience — why the offer did not go above the mid, not how the mid became the offer. And NIKE set Waddell's starting pay, in the same job code, $11,400 higher than Plaintiff's, with a quarter of her experience and higher prior pay (Part V.B). Experience cannot explain a gap that runs against it; prior pay can. NIKE made the same argument to the jury — that it set her pay on her background and experience, and not with prior pay (Tr. 1374:21-24; 1375:17-1376:10) — and then the jury found for Plaintiff on every claim. Dkt. 826.

NIKE's argument that her pay "decreased at hire" and therefore prior pay could not have been used (NIKE COL ¶ 58) mistakes the practice: NIKE's own description of it is a focus on "the new hires [sic] prior salary and/or the size of the increase" (Ex. 295 at 8). An offer set below prior pay uses prior pay no less than one set above it. Waddell, whose prior pay was higher, also took a pay cut but to a starting salary that was $11,400 above Plaintiff's (Part V.B).

Third, the testimony itself carries little weight. Pfluger's recollection of a routine offer was given more than 11 years after the fact, in a case in which NIKE had denied for years that the practice existed; it conflicts with the guidelines then in effect (Tr. 690:20-25), and Pfluger did not know what else was said about Plaintiff's starting salary. Tr. 1111:4-7. NIKE, moreover, produced no contemporaneous record of how it set Plaintiff's starting salary other than Ex. 263, no record of how it set Waddell's (Ex. 531 at 18-19), and neither the pre-2017 written guidelines, the pre-2017 Hiring Process guide, nor the prior-pay data it collected, though Title VII required it to maintain its records. FOF ¶¶ 44-46; COL ¶ 32; Part VI.[7] The rule NIKE proposes — that an

[7] NIKE itself would not describe the process before trial. Asked by interrogatory to "[d]escribe the decision-making process for Hender's starting salary," NIKE gave no description, objecting that the information would have to come "from hiring managers and other individuals who made such decisions in 2015 and who may no longer be employed at NIKE or remember the circumstances." Ex. 481 at 3-4, 9 (Interrogatory No. 19; dated March 14, 2024); Ex. 469 at 7; *see* n.4, *supra*. Pfluger was at NIKE until April 2026 (Tr. 1094:10-11; 1114:20-24), so as to him

employer which kept insufficient records of how it set pay may defeat a disparate impact claim with post hoc testimony — would insulate the practice from review as surely as the rule *Watson* rejected, 487 U.S. at 990, and reward the non-retention of the very records *Wards Cove* treated as the counterweight to a plaintiff's causation burden. COL ¶ 32 (citing *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657-58 (1989)).

Pfluger's memory, moreover, was thin on everything but this denial. He could not recall any other communication with the recruiter about Plaintiff's starting pay or whether he discussed her prior pay during the interview. Tr. 1098:4-8, 12-14. He did not recall telling Plaintiff to apply for a promotion (Tr. 1104:12-14), and could not say whether he took part in the calibration meetings on Waddell's promotions. Tr. 1115:19-23. His answers were firm only on the denials — no "influence" from the prior pay he was given, and nothing because of her gender. Tr. 1099:12-17; 1106:23-1107:7, 18-21. A memory that had faded on the events but held firm on the conclusions NIKE needed for trial is post hoc justification, not recollection. In *Melendez* the employer's witness likewise testified that the practice made no difference, and the finding that this was "an ex post facto justification" was upheld "[a]fter reviewing the entire record…." 79 F.3d at 668 & n.7. The jury here heard the same denial, and then found that NIKE paid Plaintiff less because of her sex. Dkt. 826 at 4 (Question 9). In any event, intent or state of mind is not the question here. *Lewis*, 560 U.S. at 215; Part IV.A. Nor is it an answer that Dr. Neumark drew no "direct conclusion" about her offer (NIKE FOF ¶ 39; Tr. 861:13-16): the statistics prove the practice's disparate impact on women, and this makes it "more likely the same explanation applies" to her. Tr. 821:11-14.

---

the objection could only have been memory — the memory on which NIKE now asks the Court to decide the question.

**B. Even if Pfluger were credited, NIKE does not rebut the inference that it used Waddell's and the other similarly situated men's prior pay.**

The practice operated on Plaintiff if NIKE either used prior pay in setting her starting salary or a similarly situated man's because the gap can be produced from either side. Part II.B; FOF ¶¶ 7, 78. Pfluger's testimony speaks to, at most, only one side of the comparison. That is the structure of *Freyd*: the retention-raise practice injured the plaintiff through the salaries of the men she was compared against — she had "never engaged in a retention negotiation nor received a retention raise," 990 F.3d at 1215 — and the resulting group-wide disparity could meet her prima facie burden. *Id.* at 1224-26, 1228. Here, the practice reached both sides of the comparison: Plaintiff's and Waddell's starting salaries were both set while NIKE followed it.

NIKE hired Waddell into Plaintiff's job code in February 2017, inside the practice period, at $90,000 plus a $10,000 signing bonus. Exs. 555, 561. His prior pay was higher than $90,000, so he, like Plaintiff, took a pay cut (Tr. 1048:8-11; 1366:1-3 (closing argument)), and he had about five years of pre-NIKE experience to Plaintiff's twenty. Ex. 559. Pfluger did not set his pay. Tr. 1111:8-13; FOF ¶ 78. Both hires were paid below their prior pay, and the one with the higher prior pay and a quarter of the experience received $11,400 more, plus a $10,000 bonus. The gap tracks the prior-pay gap and runs opposite to the experience gap. That is the practice's mechanism. Walker agreed that using prior pay could leave a new hire "underpaid" or "overpaid" (Tr. 649:24-650:9), as both starting pay decisions in evidence show. NIKE argued to the jury that Waddell was not comparable (Tr. 1379:23-25; 1377:17-1378:15), and the jury found for Plaintiff on both claims that required a similarly situated man to be treated more favorably. Dkt. 826 at 4-5 (Questions 9, 12); Dkt. 829 at 14-15.

NIKE's proposed findings do not mention Waddell. Plaintiff's pretrial contention put NIKE on notice that it "did not produce evidence showing all factors used for setting Plaintiff's

and similarly situated men's starting salaries" (Dkt. 742 at 12 (Pl. ¶ 11)). NIKE, which has the records and employed everyone involved in setting Waddell's starting salary, called one witness about one offer. NIKE told the jury it had no "obligation" to call Waddell's managers: "They could have called his managers. They didn't." Tr. 1405:19-21. The records that would show what prior pay the men reported, and what was done with it, are NIKE's; it did not produce them (FOF ¶¶ 45-46, 52; COL ¶ 32; Part VI), and it produced no documents at all on how Waddell's $90,000 was set, although Plaintiff requested them. Ex. 531 at 18-19 (Request No. 92); *see* n.4, *supra*.

Two presumptions follow from the liability findings. Under *Teamsters*, once the employee shows she was subject to the proved practice, the employer must prove that the decision was made "for lawful reasons," 431 U.S. at 361-62; *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 772-73 (1976), and every court of appeals to decide whether that rule applies after a disparate impact finding has held that it does.[8] Under *Albemarle*, back pay is the presumptive remedy, 422 U.S. at 421, and because the employer's practice is "the source of the uncertainty" about what the employee would have earned, that uncertainty is resolved against it. *EEOC v. Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 122-23 (2d Cir. 1999); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1445 (9th Cir. 1984); *Liberles v. County of Cook*, 709 F.2d 1122, 1136 (7th Cir. 1983) (the presumption favoring back pay "can seldom be overcome"); *Smith*, 460 F. Supp. 3d at 58 & n.2 (a disparate impact plaintiff seeking

---

[8] *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151-52 (2d Cir. 2012) (plaintiff "need only show" she "was a potential victim of the proved discrimination," and "the employer bears the burden of persuading the trier of fact that its decision was made for lawful reasons") (quoting *Teamsters*, 431 U.S. at 362) (internal quotations omitted); *Isabel v. City of Memphis*, 404 F.3d 404, 414-15 (6th Cir. 2005); *Sledge v. J.P. Stevens & Co.*, 585 F.2d 625, 635, 637 (4th Cir. 1978); *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 53 (8th Cir. 1977) (individual disparate impact plaintiff) (citing *Teamsters*, 431 U.S. at 359 n.45).

back pay relies on "the combination" of these two presumptions); COL ¶¶ 7, 44-46. Both operate here: the burden of showing that Plaintiff's starting salary and Waddell's were set for reasons other than the practice is NIKE's, and any uncertainties about the extent of damages are resolved against it. NIKE's evidence does not carry that burden. Pfluger's denial does not show how Plaintiff would have fared absent the practice, *see Smith*, 460 F. Supp. 3d at 60-61, and NIKE offered nothing at all on Waddell's side. An employer that explains only why she received her starting salary, and nothing about why he received his, has not explained the disparity between them. Even if the Court keeps the burden with Plaintiff under § IV.C, she carries it (Parts IV.A, V.A).

**C. NIKE's "no damages" argument conflates the calculations and standards of two different claims.**

NIKE contends that Murphy "confirmed that Plaintiff had no damages from the date of hire through September 2018" and "conceded that Plaintiff was not underpaid relative to the average male employee in her job code when she started." NIKE FOF ¶¶ 35-37; NIKE COL ¶ 75 (citing Tr. 968-73). That mischaracterizes the testimony, which concerned a different claim under a different standard: the Equal Pay Act comparison of Plaintiff's pay to the average pay of men in her job code, and Murphy's answer that that calculation "reflects no damages" was for the EPA claim for that period. Tr. 931:1-17; 967:8-22; 968:2-8; 969:13-15; 972:3-9. A disparate impact claim concerns the impact of a practice. Its damages calculation is thus different: it applies to her the disparity in compensation between women and comparable men that Dr. Neumark found after accounting for potentially legitimate factors, which is what isolates the practice's effect, and NIKE does not address it. Tr. 937:1-22; COL ¶ 50; Part III.B.1.

## VI. NIKE MAY NOT RELY ON THE GAPS IN ITS OWN RECORDS

NIKE's submission does not address Plaintiff's arguments about its failure to preserve or produce its pre-September 2017 starting pay records or its representations to the Court about them. FOF ¶¶ 38-52; COL ¶¶ 31-36. It may still try to argue the following.[9]

First, NIKE may say that the Court decided this question before trial, but those rulings were "preliminary and subject to reconsideration during the course of trial" (Dkt. 763 at 2 (§ III)). Walker's testimony that NIKE had written guidelines focused on prior pay was heard for the first time at trial, and it was after NIKE had assured the Court that it had conducted a search for such records with Walker that found none. FOF ¶¶ 40-42. The Court declined an adverse inference jury instruction but stated that it may be "actually just relevant to the Court claims." Tr. 1278:3-10; 1295:19. Nor was NIKE's guidelines assurance the only pretrial representation about its managers' authority that the trial record contradicted: NIKE told the Court that its managers made the pay and promotion decisions and that noncompetitive promotions had "typically no documents associated with them" (Dkt. 725 at 21, 24; Dkt. 732 ¶¶ 20-21, 89; Dkt. 748 at 10); yet its witness then described a formal, documented calibration process in which first-level managers did not make the decisions. Tr. 1126:11-23; 1151:5-1152:23; 1182:8-1183:11; 1183:21-1184:4; Dkt. 804 at 3.

Second, NIKE argued that the missing documents predate this action, so "there were no litigation hold obligations in place." Tr. 1235:15-18; 1282:19-22. The duty to preserve attaches when litigation is reasonably anticipated (COL ¶ 31), and NIKE persuaded the Court to deny Plaintiff its own pay analyses by representing that it anticipated litigation about its pay practices

[9] Plaintiff asks the Court to take judicial notice, under Fed. R. Evid. 201, of NIKE's filings and representations cited in this Part and in FOF ¶¶ 39-50, for the fact that the statements were made. COL ¶ 34.

in late 2015 and early 2016. FOF ¶ 49. It withheld the retention policies on which its argument relies. FOF ¶¶ 47-48. And its 2019 recording of a key training, which it told the Court it could not locate, was made after this case was filed. FOF ¶ 50. Title VII also independently required NIKE to preserve its records regardless of litigation. COL ¶ 32. The Court should draw the inference described in COL ¶ 36 and decline to draw any inference in NIKE's favor from the absence of contemporaneous starting-pay records. FOF ¶ 52.

## VII. NIKE DID NOT ATTEMPT TO PROVE ITS AFFIRMATIVE DEFENSE OR REBUT THE REMEDY

NIKE recites its affirmative defense burden (NIKE COL ¶ 50) but says nothing more about it. Liability follows from the prima facie case: "[u]nless and until the defendant pleads and proves a business-necessity defense, the plaintiff wins simply by showing the stated elements." *Lewis*, 560 U.S. at 213; COL ¶¶ 5-6. NIKE has therefore waived the defense and failed to carry its burden on it. FOF ¶ 81; COL ¶¶ 41-42.

NIKE proposes no findings on remedy and offers no alternative to Murphy's calculations (COL ¶¶ 48-53), which were received without objection to her qualifications. Tr. 919:20-920:3, 921:20-24. Two points follow from NIKE's other arguments. First, the PSP back pay does not depend on the prior pay claim: the formula was applied to her bonus every year, and the shortfall it produced was measured against comparable men. COL ¶¶ 47, 50. Second, liability does not depend on the remedial question: even if the Court concludes that Plaintiff has not made the § IV.C showing, it should enter the findings and conclusions that NIKE's prior pay practice had a disparate impact on women and was not justified by business necessity. COL ¶¶ 23-30, 41-43; *see Terry*, 2012 WL 216591, at *3, *5 (judgment for the plaintiff on her disparate impact claim, with nominal back pay of $1, after the jury found no economic damages).

## CONCLUSION

The Court should adopt Plaintiff's Proposed Findings of Fact and Conclusions of Law (Dkt. 840) and decline to adopt NIKE's (Dkt. 839).

DATED: October 6, 2026

GOLDSTEIN BROWNE, PC

*/s/ Byron Goldstein*
Byron Goldstein (admitted *pro hac vice)*
byron@goldsteinbrowne.com
Barry Goldstein, Of Counsel (admitted *pro hac vice)*
barry@goldsteinbrowne.com

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com
David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Kelsie G. Crippen, OSB #193454
KelsieCrippen@MarkowitzHerbold.com

DARDARIAN, HO, KAN & LEE
Laura L. Ho (admitted *pro hac vice)*
lho@dhkl.law
James Kan (admitted *pro hac vice)*
jkan@dhkl.law
Katharine L. Trabucco (admitted *pro hac vice)*

ktrabucco@dhkl.law

ACKERMANN & TILAJEF, P.C.
Craig J. Ackermann (admitted *pro hac vice*)
cja@ackermanntilajef.com
Brian Denlinger (admitted *pro hac vice)*
bd@ackermanntilajef.com
Erika Smolyar (admitted *pro hac vice*)
es@ackermanntilajef.com
315 South Beverly Drive, Suite 504
Beverly Hills, CA 90212
Tel: (310) 277-0614
Fax: (310) 277-0635

*Attorneys for Plaintiff*

2497764.1