**Laura Salerno Owens, OSB #076230**
LauraSalerno@MarkowitzHerbold.com
**David B. Markowitz, OSB #742046**
DavidMarkowitz@MarkowitzHerbold.com
**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Kelsie G. Crippen**, OSB #193454
KelsieCrippen@MarkowitzHerbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085 | Fax: (503) 323-9105

**Byron Goldstein (admitted *pro hac vice*)**
byron@goldsteinbrowne.com
**Barry Goldstein, Of Counsel (admitted *pro hac vice*)**
barry@goldsteinbrowne.com
GOLDSTEIN BROWNE, PC
1111 Broadway, Suite 300
Oakland, CA 94607
Tel: 510-584-9020

*Attorneys for Plaintiff*

[Additional Counsel of Record listed on the Signature page]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| HEATHER HENDER,<br>Plaintiff,<br><br>v.<br><br>NIKE, INC., an Oregon Corporation,<br><br>Defendant. | Case No. 3:18-cv-01477-AB<br><br>**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**PUBLIC VERSION OF DKT. 840** |

# TABLE OF CONTENTS

**Page**


BACKGROUND ..... 1

FINDINGS OF FACT ..... 1

- I. Jurisdiction ..... 1
- II. The Parties ..... 2
- III. The Jury's Verdict ..... 2
- IV. NIKE's Job Architecture ..... 3
- V. The Equal-Work Evidence and Arguments Before the Jury ..... 5
- VI. NIKE's Pay Practices ..... 6
  - A. NIKE's Practice of Using Prior Pay when Setting Starting Pay ..... 7
  - B. NIKE's Failure to Preserve or Produce, and Misrepresentations About, Its Pre-September 2017 Starting Pay Records ..... 10
  - C. NIKE's Performance Ratings ..... 14
  - D. NIKE's Performance Sharing Plan Annual Bonus Practice ..... 14
- VII. The Statistical Evidence ..... 16
- VIII. NIKE Applied Both Practices to Plaintiff ..... 19
- IX. NIKE's Evidence for its Business Necessity and Job-Related Affirmative Defense ..... 20

CONCLUSIONS OF LAW ..... 21

- I. Legal Framework ..... 21
  - A. Disparate Impact's Legal Standards ..... 21
  - B. Statistical Proof ..... 22
  - C. The Jury's Findings on Common Facts ..... 24
- II. Plaintiff's Prima Facie Burden Regarding NIKE's Prior Pay Practice ..... 26
- III. NIKE's Failure to Maintain Records and Misrepresentations Further Support the Court's Prior Pay Conclusions ..... 29
- IV. Plaintiff's Prima Facie Burden Regarding NIKE's PSP Bonus Practice ..... 31
- V. NIKE's Prior Pay and PSP Bonus Practices Were Not Justified by Business Necessity or Job-Related ..... 31
- VI. Plaintiff is Entitled to Relief ..... 32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975)....22, 32

*Bazemore v. Friday*,
478 U.S. 385 (1986)....21

*Bostock v. Clayton Cnty., Ga.*,
590 U.S. 644 (2020)....27

*Caudle v. Bristow Optical Co.*,
224 F.3d 1014 (9th Cir. 2000)....35

*Chen-Oster v. Goldman, Sachs & Co.*,
114 F. Supp. 3d 110 (S.D.N.Y. 2015)....24

*Chew v. Gates*,
27 F.3d 1432 (9th Cir. 1994)....26

*Chin v. Port Auth. of New York & New Jersey*,
685 F.3d 135 (2d Cir. 2012)....22

*Connecticut v. Teal*,
457 U.S. 440 (1982)....29

*Contreras v. City of Los Angeles*,
656 F.2d 1267 (9th Cir. 1981)....22, 23

*Cumming v. Nipping*,
337 Or. App. 545 (2025)....34

*Domingo v. New England Fish Co.*,
727 F.2d 1429 (9th Cir.), *modified*, 742 F.2d 520 (9th Cir. 1984)....32

*E.E.O.C. v. Gen. Tel. Co. of Nw.*,
885 F.2d 575 (9th Cir. 1989)....24

*Eldredge v. Carpenters 46 N. California Ctys. Joint Apprenticeship & Training Comm.*,
833 F.2d 1334 (9th Cir. 1987)....21

*Freyd v. Univ. of Oregon*,
990 F.3d 1211 (9th Cir. 2021)....21, 22, 23, 28

*Glover v. BIC Corp.*,
6 F.3d 1318 (9th Cir. 1993) ....................29

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) ....................22, 23, 24, 27

*Int'l Bhd. of Teamsters v. United States*,
431 U.S. 324 (1977)....................21

*Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*,
No. 3:12-cv-1058-SI, 2018 WL 6305665 (D. Or. Dec. 3, 2018)....................29

*Ivie v. AstraZeneca Pharms. LP*,
No. 21-35978, 2023 WL 3563007 (9th Cir. May 19, 2023)....................32

*Jurado v. Eleven-Fifty Corp.*,
813 F.2d 1406 (9th Cir. 1987) ....................28

*Kraszewski v. State Farm Gen. Ins. Co.*,
912 F.2d 1182 (9th Cir. 1990) ....................32

*L.A. Police Protective League v. Gates*,
995 F.2d 1469 (9th Cir. 1993) ....................24, 26, 27

*Loiseau v. Dep't of Human Res. of State of Or.*,
567 F. Supp. 1211 (D. Or. 1983) ....................22, 29

*Mathis v. Housing Auth. of Umatilla Cnty.*,
242 F. Supp. 2d 777 (D. Or. 2002) ....................35

*Miller v. Fairchild Indus., Inc.*,
885 F.2d 498 (9th Cir. 1989) ....................24

*Nakashima v. Or. State Bd. Of Educ.*,
344 Or. 497 (2008)....................21

*Nichols v. Frank*,
771 F. Supp. 1075 (D. Or. 1991) ....................35

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) (en banc) ....................22, 23

*Palmer v. Cognizant Tech. Sols. Corp.*,
No. CV 17-6848-DMG (Ex), 2025 WL 3496682 (C.D. Cal. Dec. 5, 2025)....................1, 23, 25

*Pottenger v. Potlatch Corp.*,
329 F.3d 740 (9th Cir. 2003) ....................28

*In re Premera Blue Cross Customer Data Sec. Breach Litig.*,
No. 3:15-md-2633-SI, 2018 WL 5786206 (D. Or. Nov. 5, 2018)..........29

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)..........30

*Sidibe v. Sutter Health*,
103 F.4th 675 (9th Cir. 2024)..........10, 27

*Siskiyou Buckle Co. v. GameWear, Inc.*,
Civ. No. 09-3073-CL, 2011 WL 13248530 (D. Or. Nov. 3, 2011)..........29

*Smith v. City of Boston*,
460 F. Supp. 3d 51 (D. Mass. 2020)..........22

*Stender v. Lucky Stores, Inc.*,
803 F. Supp. 259 (N.D. Cal. 1992)..........23, 29

*Stockwell v. City & Cnty. of San Francisco*,
749 F.3d 1107 (9th Cir. 2014)..........21, 28

*Terry v. City of San Diego*,
No. 06-cv-1459-MMA (CAB), 2012 WL 216591 (S.D. Cal. Jan. 24, 2012)..........25

*Teutscher v. Woodson*,
835 F.3d 936 (9th Cir. 2016)..........24, 25

*Thompson v. Sawyer*,
678 F.2d 257 (D.C. Cir. 1982)..........35

*United States v. Castillo*,
615 F.2d 878 (9th Cir. 1980)..........30

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..........28

*Wards Cove Packing Co. v. Atonio*,
490 U.S. 642 (1989), *superseded by statute on other grounds*, Civil..........29

*Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.*,
106 F.3d 894 (9th Cir. 1997)..........25, 26

*Wilson v. Smurfit Newsprint Corp.*,
197 Or. App. 648 (2005)..........34

*Yela Fiduciary Servs., LLC v. Benton Cnty.*,
No. 6:20-cv-01925-MK, 2022 WL 17666400 (D. Or. Dec. 14, 2022)..........30

**Statutes**

28 U.S.C. §§ 1331 and 1343 ....................1

28 U.S.C. § 1367(a) ....................1

42 U.S.C. § 2000e-2(a)(2)....................29

42 U.S.C. § 2000e-2(k)(1)(A)(i) ....................21, 27

42 U.S.C. § 2000e-2(k)(1)(A)(ii)....................22

Civil Rights Act of 1964 Title VII, 42 U.S.C. §§ 2000e *et seq.* ....................1, 2, 21, 28, 29, 32, 33, 34

Federal Equal Pay Act, 29 U.S.C. § 206(d) ....................1, 2, 5, 26

Oregon Equality Act ....................1, 2, 21, 32, 33, 34

ORS 82.010(1)(a)....................34, 35

Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 ....................29

**Rules**

Fed. R. Civ. P. 49(a) ....................2

Fed. R. Civ. P. 52(a) ....................1, 25

Fed. R. Evid. 201(c)(2) ....................30

Fed. R. Evid. 801(d)(2) ....................8, 30

L.R. 16-5 ....................32

Rule 52 ....................25

**Other Authorities**

Daniel L. Rubinfeld, *Reference Guide on Multiple Regression* (Fed. Judicial Ctr. 3d ed. 2011) ....................22

Pursuant to Dkt. 838, Plaintiff Heather Hender respectfully submits the following Proposed Findings of Fact and Conclusions of Law on her disparate impact claims.

## BACKGROUND

Plaintiff's claims were tried July 13-22, 2026. The disparate impact claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), and the Oregon Equality Act, ORS 659A.030 ("OEA"), were tried to the Court. The disparate treatment claims under the same statutes, and her equal pay claims under the Federal Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), and the Oregon Equal Pay Act, ORS 652.220, were tried to a jury, which found for Plaintiff on each claim. Dkt. 826.

Plaintiff's disparate impact claims challenge two separate employment practices as having a disparate impact on women employed by NIKE at its World Headquarters ("WHQ") in salaried jobs below Vice President. First, NIKE's practice, before September 2017, of using new hires' prior pay when setting starting salaries. Second, NIKE's use of a standard formula to calculate annual "Performance Sharing Plan" ("PSP") bonuses.

Having reviewed the evidence and the arguments of counsel, the Court enters the following findings of fact and conclusions of law under Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT[1]

### I. Jurisdiction

1. This Court has subject-matter jurisdiction over the disparate impact claims under Title VII. *See* 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the Oregon Equality Act claims under 28 U.S.C. § 1367(a).

[1] "To the extent any of the Court's findings of fact may be considered conclusions of law or vice versa, they are so deemed." *Palmer v. Cognizant Tech. Sols. Corp.*, No. CV 17-6848-DMG (Ex), 2025 WL 3496682, at *2 n.4 (C.D. Cal. Dec. 5, 2025)

2. Plaintiff filed an EEOC Charge on November 9, 2018, a revised EEOC Charge on April 14, 2020, and received a Right to Sue Letter prior to joining this case. Dkt. 742 at 5.

## II. The Parties

3. NIKE, Inc. is a corporation formed under the laws of Oregon, and its World Headquarters is located near Beaverton, Oregon. Dkt. 742 at 6.

4. Plaintiff Heather Hender was employed by NIKE in a salaried job below the level of Vice President at WHQ from April 6, 2015 through October 12, 2020. *Id.* at 5.

## III. The Jury's Verdict

5. The jury reached a unanimous verdict for Plaintiff on her disparate treatment and equal pay claims, answering every question it reached in Plaintiff's favor. Dkt. 826. The verdict is a special verdict under Fed. R. Civ. P. 49(a), with written findings on discrete questions. Question 1, for example, asked whether "NIKE paid her less than male employees in jobs requiring substantially equal work." Dkt. 826 at 1.

6. By answering Question 1 "Yes," the jury found that NIKE paid Plaintiff less than men in jobs requiring substantially equal work. Dkt. 826 at 1. By also answering "No" to Question 2 (NIKE's EPA affirmative defense) and finding willfulness in response to Question 3, the jury found a willful EPA violation and awarded Plaintiff $19,739.52 in backpay. Dkt. 826 at 2; Tr. 1476:5-9. That amount is within thirty cents of the back pay figure Plaintiff requested for a willful violation, which was based on the comparison Plaintiff's damages expert, Jennifer Murphy, made between Plaintiff's pay and the average pay of the men in her job code. Tr. 931:4-932:17; 1331:13-15; 1423:9-11.

7. By answering "Yes" to Question 9, the jury found that NIKE paid Plaintiff less because of her sex in violation of Title VII and the OEA. Dkt. 826 at 4. These claims required proof that "a similarly situated male employee was treated more favorably." Dkt. 829 at 14.

Plaintiff compared herself to Trent Waddell, who was hired into the same job code as Plaintiff, and relied on NIKE's WHQ-wide Job Architecture to establish that he was similarly situated. Tr. 221:8-15; 1329:1-18, 1330:4-7; 1334:11-1336:15; 1417:22-1418:22; Exs. 555, 561, 563.

## IV. NIKE's Job Architecture

8. NIKE identified similar jobs by job code. Tr. 693:20-694:1. NIKE did this for Plaintiff's and all other WHQ jobs through its Job Architecture, a WHQ-wide system. *Id.*; Tr. 610:17-19, 655:5-11; 902:4-9; Ex. 209; Ex. 35 at 30 (the Job Architecture's elements "should be applied consistently across all geos, business units, and functions"); Ex. 125 at 3, 10. NIKE's Job Architecture was based on two elements: "Type of Work and Level of Work." Ex. 35 at 30; Ex. 125 at 3; 607:9-12; 610:4-19.

9. Type of Work identified "the essential responsibilities of a particular role." Ex. 35 at 30; Tr. 610:21-24. NIKE labelled its Type of Work categories, from broadest to most specific, Job Function, Job Family, and Job Subfamily. Ex. 35 at 31; Ex. 125 at 10-13; Tr. 608:8-16; 609:1-14; 610:21-24; 691:24-692:6.

10. NIKE used Level of Work to evaluate and organize jobs based on "complexity," "scope," "autonomy," and "responsibility." Tr. 606:22-607:5. NIKE labelled its Level of Work categories, from broadest to most specific, Band and Job Level. Ex. 35 at 30, 32; Ex. 125 at 4-6; Tr. 611:1-5; 692:7-11. The Bands below Vice President spelled "Values," with S-Band the highest of these Bands. Tr. 626:22-627:14; Ex. 125 at 6. The salaried jobs were in Bands L through S, which together contained ten Job Levels that "divide the level of work" and are the "most precise" measure of Level of Work. Ex. 125 at 5-7; Ex. 145 at 7; Ex. 35 at 32-33; Tr. 609:12-16; 627:19-21; 888:14-17. Each Job Level is a "grouping of the jobs with similar level of expertise, impact, experience and leadership." Ex. 151 at 12; Ex. 35 at 33; Tr. 611:1-5; 659:12-15; 692:7-11.

11. To determine a job's level, NIKE used a uniform, "standardized" set of criteria titled "Leveling Criteria" to evaluate and classify all jobs into Job Levels. Ex. 151 at 12; Tr. 659:8-24.

12. NIKE designed its Job Architecture so that each combination of a particular Level of Work and a particular Type of Work resulted in a job code. Tr. 609:19-610:1; Ex. 35 at 30, 34; Ex. 125 at 3, 10. Job code is an "identifier for an individual job type." Tr. 656:6-11; Ex. 40 at 6. NIKE had "consistent job codes, titles, and bands across businesses, geographies and affiliates." Ex. 209.

13. For each job code, there was a single job description that identified "the minimum skills required to enter the job" and "the responsibilities, skills, and experience that are needed to perform" the job. Tr. 902:4-903:14; Ex. 209. First-level managers could not change these job descriptions. Tr. 915:14-25.

14. NIKE placed every salaried job at WHQ within a pay range established by Total Rewards, which is NIKE's compensation unit, based on NIKE's Job Architecture, and every job within the same job code was in the same pay range. Ex. 40 at 6; Ex. 123 at 16; Ex. 125 at 2; Ex. 35 at 34-35; Tr. 612:15-613:14, 656:7-11; 906:9-24.

15. Job codes "drive many of the element of total rewards [sic]," including pay ranges and annual bonus targets. Ex. 125 at 2; Ex. 35 at 34; Tr. 611:13-23.

16. NIKE used its Job Architecture to distinguish lateral moves from promotions: a lateral move was "within same LEVEL job" even if it was to a different job code, and a promotion was "to a higher LEVEL job." Ex. 289 at 3, 5-6; Tr. 634:13-19; 635:4-17.

17. NIKE used its Job Architecture to evaluate pay equity. It used Type of Work and Level of Work to "account for" differences in jobs. Ex. 331 at 24; Tr. 693:10-23. NIKE

repeatedly acknowledged that "employees at the same level in similar jobs with similar performance should be equitably paid" (Ex. 35 at 13; Ex. 331 at 4; Ex. 158 at 6; Ex. 295 at 2; Ex. 40 at 6; Tr. 604:24-605:22), and similar jobs meant the combination of Level of Work and Type of Work, which equaled a job code (Tr. 606:22-607:17; 609:22-610:1). NIKE defined "Internal Equity" as "pay compared to other Nike employees in same job code" (Ex. 130 at 8), and Total Rewards' "Fair Pay Tool" identified the "peers performing the same job" as those in the same job code (Ex. 208 at 1, 3-5; Tr. 653:10-22).

18. No witness testified, and no exhibit showed, that NIKE's Job Architecture operated differently for Plaintiff's job codes than for any other job code at WHQ.

19. On this record, the Court finds that NIKE, through its Job Architecture, identified similar jobs and grouped them within the same job code, and that it did so for every salaried job at WHQ. This finding rests on NIKE's own descriptions of a system it designed for that purpose and its reliance on that system. NIKE cannot rely on its Job Architecture for those business purposes and then discredit it for litigation. The Court makes these findings based solely on the trial record.

## V. The Equal-Work Evidence and Arguments Before the Jury

20. From the opening statement forward, Plaintiff tried the EPA's equal-work element on NIKE's Job Architecture. *E.g.*, Tr. 221:10-13; 1330:4-11; 1331:23-25. Plaintiff argued Questions 1 and 6 to the jury in the same terms. Tr. 1335:1-1336:23. NIKE disputed that its Job Architecture identified substantially equal jobs by job code, arguing to the jury that its job codes were merely like ZIP codes. Tr. 1360:14-1362:23.

21. The comparative pay evidence before the jury on the EPA claim was Murphy's comparison of Plaintiff's pay with the average pay of the men in her job code. Tr. 931:4-932:17. Closing argument put the willful and non-willful figures from that comparison before the jury

and framed liability as turning on whether Plaintiff was "paid less than the average of men in her position." FOF ¶ 6; Tr. 1331:13-25; 1423:9-11. The only affirmative evidence that the jobs within Plaintiff's job codes required substantially equal work was NIKE's WHQ-wide Job Architecture evidence set out in Section IV, *supra*. NIKE's contrary evidence, that employees in the same job code were not in substantially equal jobs, was directed at Plaintiff's job codes; NIKE offered no evidence that its Job Architecture was not WHQ-wide or that it operated differently for any other job code. *See* Tr. 1360:14-1367:15.

## VI. NIKE's Pay Practices

22. NIKE's Total Rewards unit was responsible for creating and implementing pay practices across WHQ. Shane Walker, NIKE's senior director of broad-based compensation, "own[ed] the design and implementation of all the company's broad-base base pay programs," including "how we set our pay ranges" and the pay review process, and Total Rewards was the source of NIKE's pay practices and changes to them. Tr. 601:25-602:19, 620:1-22; 913:18-20; Ex. 280. Total Rewards created the written trainings and guidelines on NIKE's compensation practices and its Job Architecture. Tr. 603:13-15, 607:9-610:19; 623:13-15; 654:20-655:8; 903:16-24. NIKE ran centralized pay-equity analyses, and any pay-equity adjustments were "centralized decisions at NIKE." Tr. 685:5-7. NIKE Human Resources ("HR") included a Talent Acquisition business unit, which was involved in every hire into a salaried job at WHQ. Ex. 33 at 1; Ex. 153.

23. NIKE determined annual pay increases and PSP bonuses during a company-wide annual pay review (Global Performance Rewards through Fiscal Year 2018, the Annual Pay Review thereafter). Tr. 614:6-19; 673:4-8; Ex. 35 at 64; Ex. 207 at 3, 15; Ex. 295 at 11; Ex. 331 at 32. This review included several levels of executive review after the initial recommendations,

and a purpose of this review was "to ensure equitable rewards for NIKE's employees." Tr. 615:10-617:2; Ex. 35 at 64.

**A. NIKE's Practice of Using Prior Pay when Setting Starting Pay**

24. NIKE had written guidelines, at least as early as 2015, for setting new hires' starting pay that focused on the percentage increase over their prior pay. Tr. 690:20-25; FOF ¶ 42.

25. NIKE HR was responsible for setting the starting salaries for new hires. Melanie Strong, a former NIKE vice president and longtime employee, testified that responsibility for setting pay for new hires "was owned by HR," with hiring managers only "part of the process." Tr. 316:12-18. Walker created a version of NIKE's Offer Intake Form "based on conversations with the recruiting team, HR business partners on what information they would need to make an offer to a candidate." Tr. 660:22-661:3. Recruiters were told to "work with Total Rewards to construct offers for your roles." Ex. 153.

26. Under NIKE's Hiring Process guide, Talent Acquisition "[r]eview[s] compensation information with [the] Hiring Manager," and starting pay offers are routed to HR Business Partners and business leaders for approval. Ex. 33 at 1-2.

27. In September 2017, NIKE made a "policy change" to prohibit the use of prior pay when setting starting salary. Tr. 666:16-19, 911:10-13, 912:7-15.[2]

---

[2] NIKE's September 2017 communication to all HR Business Partners stated that "interviewers can no longer ask candidates to share their current compensation or any compensation history. … *Instead*, our conversations with candidates must focus on their compensation expectations." Ex. 133 at 2 (emphasis added).

Exhibits 133, 307, and 350, each cited in these findings, were fully stipulated exhibits that "may be received without objection" (Dkt. 702 at 4), were listed on Plaintiff's exhibit list (Dkt. 761 at 26, 70, 86), and were the subject of Plaintiff's motion to admit them for the disparate impact claims only (Dkt. 798). The Court denied that motion under the procedure governing jury evidence (Tr. 1074:2–10; Dkt. 807), and NIKE has been heard on the request (Dkt. 805).

28. On October 12, 2017, a Senior Director in Talent Acquisition emailed the entire U.S. Talent Acquisition team: "we recently shared that we will no longer ask candidates about their compensation history." Ex. 153; Tr. 999:20-24. That email added, "Total Rewards partners have created an updated Offer Intake Form to collect this information," that recruiters should "use this form as you work with Total Rewards to construct offers," and that NIKE's "hiring … resources on the HR Website … now reflect this practice." Ex. 153; Tr. 1001:10-21.

29. The "updated Offer Intake Form" NIKE circulated (Ex. 582) contains NIKE's September 2017 version (Ex. 582 at 1-2; Tr. 666:16-19) and the prior version it replaced, which states it was revised in March 2017 (*id.* at 3-8). Under the "Current Candidate Information" heading, the September 2017 version sought a candidate's "annual base salary expectations," whereas the March 2017 version, in the same field, sought the candidate's pre-NIKE "annual base salary." *Compare* Ex. 582 at 1 *with id*. at 3.

30. NIKE's Total Rewards leadership repeatedly admitted to the prior pay practice in WHQ-wide trainings it created after NIKE's policy change. It admitted that, "[i]n the past, we *often* focused on the new hire's prior salary and/or the size of the increase the new hire would receive." Ex. 295 at 8 (emphasis added); Tr. 645:19-646:9; 655:5-11. The Managing Pay at NIKE training stated that "we no longer ask new hires their prior salary or focus on the size of the increase the new hire would receive." Ex. 35 at 57; Tr. 603:7-24; 620:11-22; Ex. 280. A third training, created by NIKE's compensation leadership and introduced by its Chief Human Resources Officer, Monique Matheson, admitted: "Many companies, *including Nike*, have

---

Because the exhibits were timely disclosed, listed, and stipulated, and receiving them re-examines nothing the jury decided, the Court receives them for the disparate impact claims; each is a statement of a party opponent. Fed. R. Evid. 801(d)(2). The findings in this decision rest on the trial testimony and previously admitted exhibits; where one of these three exhibits is cited, it corroborates a finding the trial record independently supports.

approached pay increases during key moments (like promotions or with *hiring*) *primarily focused on 'percent increase*,'" and that NIKE planned to "move past this practice." Ex. 158 at 7 (emphasis added); Tr. 641:9-642:16; 643:25-644:13.

31. Matheson's April 2018 email to all NIKE employees admitted that NIKE sought to "remove bias from critical moments of the hiring process by … eliminating the collection of candidate salary history." Ex. 18 at 3; Tr. 397:1-15; *see* Tr. 283:10-11. In July 2019, Total Rewards admitted that NIKE had previously had "problematic pay practices." Ex. 207 at 2; Tr. 636:18-637:18; 687:3-11; 688:5-689:7. And NIKE's talent acquisition witness, Shine Thomas, testified that it was not "a best practice in hiring to ask about prior pay" and that "it can lead to disparities in gender." Tr. 1003:5-12; 1004:21-24.

32. Walker agreed that using prior pay could lead to new hires being underpaid or overpaid. Tr. 649:24-650:9.

33. After NIKE stopped using prior pay in September 2017, the starting pay disparity between women and men at WHQ fell by more than half. FOF ¶¶ 66-68.

34. NIKE's trial defense relied on some generalized testimony from Walker and Thomas. Walker testified that NIKE did not have a "policy" requiring the use of prior pay. Tr. 672:5-12. But Walker defined a "policy" as a written directive enforced by discipline (Tr. 689:11-690:6), and a practice need not be written and backed by discipline to be a practice. And "often"—NIKE's own word for how frequently it focused on prior pay—describes a practice. Walker himself, moreover, admitted that NIKE had written guidelines in 2015 that focused on prior pay. FOF ¶¶ 24, 42.

35. Thomas testified that NIKE did not have a policy or practice of using prior pay. Tr. 995:16-24, 997:21-22. Thomas's categorical denials lack foundation: in 2015, she was a

recruiter for design employees only; she did not lead talent acquisition until 2024; and when asked how she knew prior pay was not used, she could offer nothing beyond "the general practice of recruiting." Tr. 987:21-25; 990:3-991:4; 998:22-999:6; 991:22-25; 1009:8-16. Her denials are also contradicted by NIKE's contemporaneous admissions. FOF ¶¶ 28-31. Walker's testimony that NIKE had written guidelines in 2015 that focused on prior pay (FOF ¶ 42) also contradicts her. Thomas also contradicted her blanket denials, testifying that there were recruiters who sought prior pay before 2017, that they would record it, and that prior pay was a data point. Tr. 996:14-997:2; 998:3-11.

36. Considering Walker's and Thomas's testimony in light of the entire record, the Court credits NIKE's admissions in contemporaneous, WHQ-wide documents over their generalized, after-the-fact recollections offered years later. *See Sidibe v. Sutter Health*, 103 F.4th 675, 701 (9th Cir. 2024) ("[c]ontemporaneous evidence, particularly written evidence, is commonly understood to be more reliable than later recollections"); COL ¶ 24.

37. The Court accordingly finds that NIKE had a practice of using prior pay when setting starting pay before September 2017.

### B. NIKE's Failure to Preserve or Produce, and Misrepresentations About, Its Pre-September 2017 Starting Pay Records

38. The Court declined to give the jury the permissive adverse-inference instruction Plaintiff requested (Dkt. 804; Tr. 1295:19), observing that the pre-September 2017 starting pay documents might be "actually just relevant to the Court claims." Tr. 1278:6-9. Sitting as the factfinder on those claims, the Court now makes the following findings.

39. On October 31, 2019, the Court ordered NIKE to produce discovery showing its policies regarding "hiring," "pay," and "compensation systems." Dkt. 89. On August 10, 2020, the Court ordered NIKE to "make one final attempt at locating [prior pay] policies and if such

records exist produce them to plaintiffs," and, if NIKE reported that no such records existed, the Court would accept that representation. Dkt. 111 at 3. NIKE then represented: "Nike has not located, nor is it aware of, any written policies regarding the collection or use of prior compensation history beyond the documents previously produced." Dkt. 350 at 112.

40. Opposing Plaintiff's September 2023 motion to compel discovery of its pre-September 2017 starting pay practices, NIKE represented that it had withheld no responsive discovery, never had a policy of using prior pay, and accused Plaintiff of "falsely" asserting that NIKE was withholding pre-policy change versions of its Offer Intake Form and related communications. Dkt. 354 at 5; Dkt. 378 at 4; Dkt. 395 at 4. NIKE further represented to the Court that it had worked with Walker "to search for process guidelines and instructions on initial salary setting … without limitation by date." Dkt. 355 at 3 ¶ 6; Dkt. 354 at 7. The Court denied the motion to compel in reliance on NIKE's representations. Dkt. 386 at 4-5.

41. NIKE maintained this position up to trial. In the Pretrial Order, NIKE asserted that it never had instructions about using prior pay when setting starting pay. Dkt. 742 at 13.

42. At trial, Walker testified that NIKE did have written guidelines in 2015 about how to position people on hire that "focused on the percent increase from their prior pay." Tr. 690:20-25; 681:25-682:3.

43. Three days after Walker's testimony, NIKE maintained its position, asserting to the Court that there was "no evidence" of any such practice and that it never issued instructions to use prior pay. Dkt. 796 at 8.

44. NIKE never produced the 2015 written guidelines, never disclosed their existence before trial, and affirmatively represented the opposite to this Court. FOF ¶¶ 39-41, 43.

45. NIKE also did not produce the pre-September 2017 version of its "Hiring Process" guide (FOF ¶ 26), which it updated when it changed its prior pay policy in September 2017; the only version NIKE produced was updated on December 13, 2018. Ex. 33 at 1-2; Ex. 153; Tr. 1006:8-20, 1007:13-25.

46. On this record, the Court finds that NIKE failed to maintain or preserve, or else deleted, records showing its starting pay practices before September 2017. FOF ¶¶ 42-45.[3]

47. NIKE's response to Plaintiff's motion for a permissive adverse inference instruction was that the documents predate this litigation, so "there were no litigation hold obligations in place." Tr. 1235:15-18. NIKE introduced no evidence showing that its retention policies would have resulted in these written guidelines being destroyed.

48. Plaintiff repeatedly sought NIKE's retention policies, but NIKE refused to produce them, and the Court declined to order their production based on NIKE's representations. Dkt. 111 at 3, 8-9; Dkt. 349; Dkt. 354 at 13; Dkt. 386 at 4-6; Dkt. 405; Tr. 1256:8-11. Having successfully withheld this discovery, NIKE cannot now ask the Court to find that its retention policies justify its failure to produce responsive, relevant evidence.

49. NIKE also represented to the Court that it anticipated litigation related to its pay practices in late 2015 and early 2016, and the Court relied on those representations in denying Plaintiff access to NIKE's pay equity analyses. Dkt. 166-2 at 105-06 (filed under seal; public

[3] NIKE's representation that it withheld no communications related to its Offer Intake Form (Dkt. 354 at 5) was also contradicted by Exhibit 307 (not admitted during the trial but received for the reasons in n.2, *supra*), an October 2016 Total Rewards email circulating the form's internal templates, which NIKE produced in January 2024, four months after the Court denied the motion to compel in reliance on that representation. Ex. 307; Dkt. 653 at 5 ¶ 22. The email describes the information the form collected, which included prior pay (Ex. 582 at 3), as "requisite information" for developing offers, contrary to NIKE's assurances that it was not withholding any communications related to its Offer Intake Form. *See* FOF ¶ 40; Dkt. 354 at 5; Dkt. 378 at 4; Dkt. 395 at 4.

version at Dkt. 291-2); *id*. at 56, 72, 256; Dkt. 117 at 2-3, 9. It is thus established that NIKE had a duty to preserve by late 2015. *See* COL ¶ 31.

50. NIKE filmed one of its key WHQ-wide trainings about its pay practices and Job Architecture in 2019. Tr. 603:7-24; 619:10-620:22; 633:18-634:4; Ex. 35; Ex. 280. The recordings would have captured what further instructions were provided by NIKE's compensation leaders because presenters "would not have read verbatim" from the slides. Tr. 604:3-13. Plaintiff requested the videos in discovery, and NIKE reported to the Court that it was "unable to locate any responsive videos." Dkt. 468 at 6; Dkt. 752 at 4, 6. Because NIKE filmed the training in 2019, after this action was filed, it indisputably had a duty to preserve the video, and thus the Court finds that NIKE failed to preserve or withheld it. *See* COL ¶ 36.

51. The written starting pay guidelines and the other pre-September 2017 starting pay documents that NIKE failed to preserve or produce concerned the very practice at issue, and the admitted evidence shows that practice was to use prior pay. FOF ¶¶ 27-32.

52. Conversely, the Court draws no inference in NIKE's favor from the absence of contemporaneous starting pay records. NIKE's "no evidence" arguments rest on an incomplete record of its own making, filled at trial with post hoc witness accounts that Plaintiff could not test against the records NIKE did not produce. A party may not withhold or fail to preserve records and then wield the resulting silence as proof.

**C. NIKE's Performance Ratings**

53. From at least 2015 through at least 2020, NIKE's performance management process, Coaching for Excellence ("CFE"), provided "a consistent approach to evaluating and rewarding performance" for all employees at WHQ. Dkt. 742 at 6; Ex. 35 at 20; Ex. 162; Ex. 40 at 6; Tr. 655:12-22; 885:4-9, 885:20-886:13.

54. Under CFE, each employee received one of five ratings, from lowest to highest: Unsatisfactory, Inconsistent, Successful, Highly Successful, and Exceptional, and the definitions of these ratings did not change during that period. Ex. 40 at 6; Ex. 162; Exs. 1363 at 6-7, 1413 at 5; Tr. 655:23-656:4; 886:14-887:3.

**D. NIKE's Performance Sharing Plan Annual Bonus Practice**

55. From Fiscal Year 2015 through at least Fiscal Year 2021, NIKE calculated the annual bonus for every eligible salaried employee at WHQ using the same standardized PSP formula, which consisted of five factors. Tr. 888:5-17, 889:1-4, 892:21-25; 611:24-612:7; Ex. 79 at 1-2; Ex. 100. PSP eligibility was defined by uniform plan-wide rules, not individual decisions. Ex. 79 at 1-2; Ex. 111 at 2-3; Ex. 189 at 1-3.

56. Total Rewards designed and implemented the PSP centrally and applied it across WHQ. FOF ¶ 22; Tr. 655:5-11.

57. The PSP bonus for every such employee was calculated with this formula: ("Time in Plan" × "Weighted Achievement" × "Fiscal Earnings" × ½ "Band Target") + ("Time in Plan" × "Weighted Achievement" × "Fiscal Earnings" × ½ "Band Target" × "Performance Modifier"). Tr. 889:6-890:10, 893:1-17; Ex. 100.

58. The five factors operated as follows. (1) "Time in Plan" reflected the portion of the fiscal year during which the employee was in the plan. Tr. 893:19-21. (2) "Weighted Achievement" was set by the "plan" to which NIKE assigned the employee; every employee in a given plan received the same Weighted Achievement. Tr. 893:22-24, 896:12-897:11; Ex. 295 at 11, 16. (3) "Fiscal Earnings" was the amount of salary the employee was paid during the fiscal year. Tr. 890:1-10, 892:11-15, 892:21-25; Ex. 189 at 3. (4) "Band Target" was a percentage automatically populated based on the Band into which NIKE had placed the employee's job.

Every employee in the same Band had the same Band Target. Ex. 79 at 2; Ex. 111 at 3; Ex. 189 at 1; Tr. 893:25-894:3; 613:20-614:2.

59. The fifth factor, "Performance Modifier," was applied to one-half of the PSP formula and was determined based on performance ratings through Fiscal Year 2018. NIKE provided guidelines stating the ranges to which a performance modifier should correspond for each CFE rating, instructed managers to "use the guidelines provided for performance modifiers," and kept these ranges the same each year. Ex. 79 at 2; Ex. 189 at 1, 3; Tr. 683:14-684:15; 894:14-17, 895:12-24; *see also* Ex. 162 at 2 (the CFE rating "drives decisions on Merit, PSP, and Stock Option awards"); Tr. 887:4-11.

60. From Fiscal Year 2019 through at least Fiscal Year 2021, NIKE set the performance modifier for all employees at 100% and placed all employees on the same "plan," so that every factor in the PSP formula was centrally and automatically set for every employee, with no discretion available to or applied by anyone. Ex. 295 at 11, 16; Ex. 111 at 2; Tr. 898:6-10; Tr. 898:16-23; Ex. 207 at 15; Tr. 893:12-17, 894:5-12, 896:12-897:11; Tr. 614:13-19.

61. Because "Fiscal Earnings" entered the PSP formula as a multiplier on both halves of the formula, every eligible employee's PSP bonus rose or fell with the employee's base salary. The PSP formula thus carried any disparity in base pay into each year's annual bonus in every year the disparity persisted. Ex. 100; Tr. 890:1-10, 892:11-15, 892:21-25, 889:6-890:10.

## VII. The Statistical Evidence

62. Dr. David Neumark is a labor economist with extensive experience using statistical methods to evaluate employment discrimination claims. Tr. 736:4-8 (hundreds of peer-reviewed papers), 876:5-11 (qualified as an expert roughly ten times in pay discrimination cases). The Court found Dr. Neumark to be an expert in economics, without objection from NIKE. Tr. 736:19-23.

63. Dr. Neumark performed multiple regression analyses of NIKE's compensation data produced in this litigation. His analyses used "exclusively data provided by NIKE," including each employee's pay, gender, jobs as classified by NIKE's Job Architecture, and NIKE's own performance ratings. Tr. 737:12-13, 737:21-738:6, 738:14-16, 768:2-9. The data were limited to NIKE's salaried employees at WHQ in Bands L through S. Tr. 739:6-8, 14-16; 774:7-18. Dr. Neumark analyzed all the data NIKE produced, which ran from 2012 through September 1, 2019. Tr. 737:12-20; 785:15-21; 786:2-8. His starting pay analysis covered hires from 2012 through September 1, 2019 and compared those hired before September 2017 with those hired after. Tr. 784:17-785:1; 785:15-21. His PSP analysis covered 2015 through 2019. Tr. 792:14-17.

64. Dr. Neumark's regressions controlled for potentially non-discriminatory factors and identified similarly situated employees using NIKE's Job Architecture: the interaction of Job Subfamily and Job Level, with robustness analyses using job code itself. Tr. 754:10-18; 765:2-4; 768:2-769:25; 787:12-22; 792:14-22. By NIKE's design, Job Subfamily plus Job Level equals a job code (FOF ¶¶ 12, 17), Dr. Neumark confirmed that a subfamily-by-level pair is "almost the same thing in the data" as a job code, and that substituting job code "didn't make any difference" to his results. Tr. 793:16-794:8; 794:14-795:2; 812:6-13; 842:13-18. A regression model with detailed controls of this kind "is how labor economists study discrimination." Tr. 770:9-25; 793:16-794:1. The unit of comparison is therefore the one the Court found valid, and that the jury necessarily credited in reaching its verdict. FOF ¶¶ 8-20; COL ¶¶ 16-22.

65. NIKE agrees that measuring pay equity "requires a sophisticated statistical analysis … such as … a multiple regression analysis," which "must account for factors such as performance, Job Function / Type of Work, Tenure at Nike and in role, location, Job Level, and

Band to predict pay." Tr. 686:2-12; Ex. 331 at 24. NIKE also used age as a factor in its pay equity analysis. Ex. 331 at 25.

66. Dr. Neumark conducted a multiple regression analysis of starting pay set before September 2017, controlling for the jobs employees were hired into (Job Subfamily and Job Level), age, and full-time or part-time status. Tr. 787:12-22; 761:19-762:2; 834:17-835:15 (Dr. Neumark explaining that "age is a proxy for prior experience" and describing labor economists' longstanding use of age for this purpose).

67. He found that NIKE paid women starting salaries 1.16% lower than those of similarly situated men. This finding was statistically significant at 2.89 standard deviations, corresponding to a less than 1-in-100 chance that a disparity this large would occur by chance. Tr. 790:15-791:10; 791:18-20.

68. Dr. Neumark further found that after NIKE stopped its prior pay practice in September 2017, the starting pay disparity for women dropped by more than half. Tr. 784:17-785:7; 789:13-21; 791:11-23. Two robustness checks using the education and prior-job information in NIKE's application data confirmed both the pre-September 2017 disparity and its subsequent drop. Tr. 787:24-789:21.

69. The Court finds that this drop is evidence both that NIKE had a practice of using prior pay before September 2017 and that the practice had a disparate impact on the women hired while it was in place. FOF ¶¶ 27, 33.

70. Dr. Neumark also performed a multiple regression analysis of PSP bonuses, controlling for job (Job Subfamilies and Job Levels), performance rating, year, tenure, time in job code, and full-time or part-time status. Tr. 792:14-22. He found that women at WHQ were paid about 3.2% less in PSP bonuses than "otherwise comparable men," approximately $645 per

woman per year. Tr. 792:3-9; 739:4-18. The disparity was statistically significant at 5.66 standard deviations, corresponding to a less than 1-in-100,000 chance that such a large disparity would occur by chance. Tr. 792:9-13. Performance does not explain the disparity because Dr. Neumark controlled for it and because women at WHQ received performance ratings as high as or higher than men. Tr. 765:7-767:12; 807:16-21; 792:23-793:1.

71. NIKE argues that Dr. Neumark should have disaggregated the data by job code and run separate regressions for each job code. But running separate regressions for each job code "leads you to some really tiny samples and some very imprecise results," and "is not what labor economists do when they are studying data to infer whether the data are consistent with discrimination or not." Tr. 793:16-794:12.

72. NIKE did not offer any expert testimony disputing any of Dr. Neumark's findings. NIKE did not present any evidence showing that some uncontrolled-for factors explain the disparities.

73. The Court finds Dr. Neumark credible and his methodology reliable, and credits his testimony and analyses in full.

## VIII. NIKE Applied Both Practices to Plaintiff

74. NIKE hired Plaintiff on April 6, 2015 into job code A0945 (L-Band). She held that job through September 5, 2018, when she was promoted into a U-Band job code; held that job through February 16, 2019, when she was laterally moved to another U-Band job code; and held that job until she resigned on October 12, 2020. Each job was salaried. Dkt. 742 at 5.

75. Plaintiff had about 20 years of pre-NIKE technical and engineering experience, including about 10 years in engineering roles. Tr. 416:11-14, 416:25-417:2; Ex. 559 at 1.

76. Before NIKE set Plaintiff's starting pay, NIKE affirmatively sought and obtained Plaintiff's pre-NIKE compensation, which was $82,000, and recorded it. Tr. 419:19-420:15; 420:17-422:4.[4]

77. In March 2015, when Plaintiff's offer was being set, Talent Acquisition sent her hiring manager, Michael Pfluger, an email that led with her prior pay: "Great news! She was at 82K + bonus (that never came) at ViaOptronics." Ex. 263 at 1. It then said Plaintiff was "looking for $70-$80K – the mid for this position is 78,600. Let me know what you'd like to offer and when you'd like her to start." *Id.*; Tr. 1096:23-1097:4. Nineteen minutes later, Pfluger accepted the midpoint Talent Acquisition had identified: "Given her years of experience, I'm fine with offering the mid as starting salary." Ex. 263 at 1; Tr. 1097:16-24. NIKE set Plaintiff's starting salary at $78,600, which was $3,400 below her prior pay. Ex. 561; Tr. 422:5-13.

78. Less than two years later, in February 2017, NIKE hired Trent Waddell, a similarly situated man (FOF ¶ 7), into the same job code, A0945, at a $90,000 starting salary with a $10,000 signing bonus. Exs. 555, 561. Waddell's pre-NIKE compensation was higher than $90,000. Tr. 1048:8-11. Waddell had about five years of pre-NIKE work experience, roughly a quarter of Plaintiff's. Ex. 559. NIKE thus paid a man with about a quarter of the pre-NIKE experience a starting salary $11,400 higher than Plaintiff's, plus a signing bonus, for the same job. Pfluger did not set Waddell's pay. Tr. 1111:8-13.

79. NIKE presented testimony from Pfluger that, although Talent Acquisition provided him with Plaintiff's prior pay, it did not influence his decision on her starting pay. Tr. 1099:12-17. This recollection was offered more than eleven years after the fact, concerned a

[4] Ex. 350 at 4. This exhibit was not admitted at trial, but it is admitted for the reasons discussed above. *See* n.2, *supra*.

single offer, and came from a witness who did not know what other communications occurred regarding Plaintiff's prior pay or starting salary. Tr. 1111:4-7. The Court gives it little weight in light of the contemporaneous record. FOF ¶ 76; *see* FOF ¶ 36; COL ¶ 24. It is also at odds with NIKE's 2015 guidelines. FOF ¶ 24. And it says nothing about how NIKE set the starting salaries of Waddell or the other men to whom Plaintiff's pay is compared. *See* COL ¶ 46.

80. Plaintiff received a "Highly Successful" performance rating in Fiscal Year 2018 and a "Successful" rating in every other year (Ex. 562; Ex. 1363 at 7; Tr. 492:10-13). She received a PSP bonus every year under NIKE's PSP formula. Tr. 587:13-588:14; Ex. 563 at 2; FOF ¶¶ 55-57. And she was paid lower PSP bonuses than similarly situated men (Ex. 563 at 2; Tr. 962:8-20).

## IX. NIKE's Evidence for its Business Necessity and Job-Related Affirmative Defense

81. NIKE did not seek to meet its affirmative defense for the disparate impact claims because it did not present evidence that either of the challenged practices was consistent with business necessity and job-related.

# CONCLUSIONS OF LAW

## I. Legal Framework

### A. Disparate Impact's Legal Standards

1. The same disparate impact standards apply to Title VII and the OEA. *Nakashima v. Or. State Bd. Of Educ.*, 344 Or. 497, 510 (2008).

2. Disparate impact claims concern "employment practices that are facially neutral … but that fall more harshly on one group than another …." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

3. The preponderance-of-the-evidence burden applies to disparate impact claims, and a plaintiff "need not prove discrimination with scientific certainty." *Eldredge v. Carpenters*

*46 N. California Ctys. Joint Apprenticeship & Training Comm.*, 833 F.2d 1334, 1338 (9th Cir. 1987) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J., concurring in part on behalf of a unanimous Supreme Court)).

4. Plaintiff's prima facie burden is to "show that a facially neutral employment practice has a significantly discriminatory impact upon a group protected by Title VII." *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224-26 (9th Cir. 2021). The plaintiff must demonstrate a statistical disparity against the protected group (i.e., women), not her individually, from the challenged practice. *Id.*; *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1115 (9th Cir. 2014) ("Absent such a group-based disparity, the claim fails, whether it is articulated by an individual or a class.").

5. If the plaintiff meets this burden, the burden shifts to the employer to demonstrate that the challenged practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). "Failure in this proof results in judgment for the plaintiff." *Loiseau v. Dep't of Human Res. of State of Or.*, 567 F. Supp. 1211, 1214 (D. Or. 1983) (quoting *Contreras v. City of Los Angeles*, 656 F.2d 1267, 1271 (9th Cir. 1981)).

6. Liability thus turns on three questions: (1) whether Plaintiff has shown by a preponderance of the evidence that a facially neutral employment practice had a significantly discriminatory impact on women; (2) if so, whether NIKE has shown that the practice is job-related and consistent with business necessity; and (3) if NIKE has made that showing, whether Plaintiff has shown a less discriminatory alternative, 42 U.S.C. § 2000e-2(k)(1)(A)(ii). Plaintiff prevails if the Court answers question (1), and either question (2) or question (3), in her favor.

7. Once liability is established, Plaintiff is presumptively entitled to back pay unless a compelling reason to deny it exists, and NIKE has the burden of overcoming this presumption.

*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975); *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 151-52 (2d Cir. 2012); *Smith v. City of Boston*, 460 F. Supp. 3d 51, 55-60 (D. Mass. 2020).

**B. Statistical Proof**

8. Multiple regression analysis is a well-established and accepted methodology for identifying pay discrimination in employment litigation; it can "isolate the influence of one particular factor—e.g. sex—on a dependent variable—e.g. salary." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1183 n.9 (9th Cir. 2002); *see also, e.g.*, *Freyd*, 990 F.3d at 1217 n.3; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 685 (9th Cir. 2022) (en banc); Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, 306 n.5 (Fed. Judicial Ctr. 3d ed. 2011) ("Discrimination cases using multiple regression analysis are legion.") (collecting cases).

9. Multiple regression analyses can control for individual differences among employees. *See, e.g.*, *Olean*, 31 F.4th at 677 ("any categorical argument that a pooled regression model cannot control for variables relating to the individualized differences among class members must be rejected."); *id.* at 671.

10. A regression result is statistically significant when the disparity it shows is unlikely to be the product of chance, which is when there is less than a 5% probability (one chance in twenty) that a disparity as large as the one observed would appear if the factor being tested had no effect. *Olean*, 31 F.4th at 671-72; *Contreras*, 656 F.2d at 1273 n.3.

11. Significance is commonly expressed in standard deviations: about 1.96 standard deviations corresponds to the 5% level, and the larger the disparity in standard deviations, the less likely it is the product of chance. *See, e.g., Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259,

296 (N.D. Cal. 1992) (3.08 standard deviations corresponds to one chance in 500); Tr. 760:12-761:1, 764:16-22, 767:11-20.

12. A statistically significant disparity in a regression that controls for legitimate pay factors is evidence that the challenged practice caused the disparity. For a plaintiff relying on statistical evidence to establish a prima facie case, "the statistical disparities must be sufficiently substantial that they raise such an inference of causation." *Freyd*, 990 F.3d at 1224 (citations omitted). A statistically significant result built on "appropriate . . . explanatory variables" means that the sex-based disparity remaining after legitimate factors are accounted for is not attributable to chance, and that showing raises the inference of causation the prima facie case requires. *Olean*, 31 F.4th at 671; *Freyd*, 990 F.3d at 1226 (regression "conducted at a markedly high level of statistical significance" supported a prima facie case of disparate impact in pay); *Palmer*, 2025 WL 3496682, at *7; *see also Hemmings*, 285 F.3d at 1183 n.9, 1188.

13. A regression need not include every conceivable variable. The "law does not require the near-impossible standard of eliminating *all* possible nondiscriminatory factors," *Hemmings*, 285 F.3d at 1188 (citation omitted), and "a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case." *E.E.O.C. v. Gen. Tel. Co. of Nw.*, 885 F.2d 575, 579 (9th Cir. 1989) (citation omitted). A defendant that attacks a regression for omitted variables "may not rest an attack on an unsubstantiated assertion of error;" it "must produce credible evidence that curing the alleged flaws would also cure the statistical disparity." *Hemmings*, 285 F.3d at 1188 (citations and internal quotation marks omitted).

14. Nor must a plaintiff disaggregate the data into subgroups smaller than the group allegedly subject to the challenged practice. Aggregated data "may be used where it is more probative than subdivided data," and aggregation is "particularly appropriate where small sample

size may distort the statistical analysis." *Paige*, 291 F.3d at 1148 (citation omitted); *see also, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 120-21 (S.D.N.Y. 2015) (pooling across business units "fully supportable" where disaggregation would produce small samples).

15. Dr. Neumark's analyses are regressions of this kind. Using NIKE's data, they identify similarly situated employees by the job classifications NIKE itself uses for that purpose, and control for other potentially nondiscriminatory factors. They report each result with its statistical significance, and they were confirmed by robustness checks. FOF ¶¶ 62-73.

**C. The Jury's Findings on Common Facts**

16. Because Plaintiff's jury-tried claims and her disparate impact claims rest on common facts, "the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations." *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 507 (9th Cir. 1989); *accord Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) (court "must abide by the jury's findings of fact in making any subsequent rulings"); *L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) ("LAPPL"). The Court must follow those determinations in deciding "both liability and relief" on the claims tried to the Court. *Teutscher*, 835 F.3d at 944; Tr. 1405:2-9 (NIKE's closing argument to the jury stating that the Court cannot second-guess the jury's findings).

17. The Court presumes the jury followed the instructions and gives effect to the facts "necessarily determined" by the jury's answers. *Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 901 (9th Cir. 1997). The Court may consult the entire trial record to determine what the jury decided. *Teutscher*, 835 F.3d at 951 n.12. Courts apply this framework when making Rule 52 findings on disparate impact claims after a jury verdict on parallel discrimination claims. *See Palmer*, 2025 WL 3496682, at *5 ("The Court is

bound by the jury's implicit findings."); *Terry v. City of San Diego*, No. 06-cv-1459-MMA (CAB), 2012 WL 216591, at *2 (S.D. Cal. Jan. 24, 2012).

18. The Court has found, on its own weighing of the trial evidence, that NIKE's Job Architecture identified similar jobs and grouped them within the same job code for every job at WHQ. FOF ¶¶ 8-18. Those findings stand independently under Rule 52(a).

19. In addition, the jury necessarily determined the same facts. Dkt. 826 at 1-3, Questions 1, 4, and 6. The facts are therefore established twice over: as the Court's own findings of fact, and as jury determinations that the Seventh Amendment requires the Court to follow. *Cf. Palmer*, 2025 WL 3496682, at *7 ("Not only is the Court bound by the jury's implicit findings, the evidence at trial overwhelmingly supports that conclusion.").

20. The record afforded the jury no other route to its verdict: Plaintiff tried the equal-work element on NIKE's Job Architecture, and the only affirmative evidence that the jobs in her job codes required substantially equal work was NIKE's WHQ-wide architecture. FOF ¶¶ 20-21. By finding that NIKE paid Plaintiff less than men in jobs requiring substantially equal work (Dkt. 826 at 1, 3, Questions 1 and 6), the jury therefore necessarily determined that the jobs NIKE grouped within Plaintiff's job codes required substantially equal work. And because the only way the jury could have found this is through the WHQ-wide evidence of NIKE's Job Architecture, the jury implicitly found that NIKE identified substantially equal jobs by job code across WHQ.

21. The jury's Question 4 award confirms the comparison the jury adopted: a Federal EPA back pay award of $19,739.52 is possible only if the jury adopted Murphy's same-job-code-group calculation. FOF ¶¶ 6, 21. Where the sole evidentiary route to the verdict runs through a fact, that fact is one "rational jurors must necessarily have determined," and it is established.

*Chew v. Gates*, 27 F.3d 1432, 1438 (9th Cir. 1994); *Westinghouse*, 106 F.3d at 901 (the court "is allowed to draw necessary inferences" from the verdict).

22. The contrary finding NIKE proposes, that jobs sharing a code were "different and distinct positions" involving "widely varied work" (Dkt. 732, FOF ¶¶ 19, 51-59), cannot be reconciled with the verdict. NIKE's defense was limited to Plaintiff's job codes and did not challenge the WHQ-wide Job Architecture itself (FOF ¶¶ 18, 21; Tr. 1360:14-1367:15), so the record supplies no basis for finding that the architecture reliably groups similar jobs in Plaintiff's codes but not in others, and the jury in any event rejected NIKE's account. The Court may not make findings contrary to the verdict, *LAPPL*, 995 F.2d at 1473, and in any event declines on its own weighing of the record to adopt NIKE's proposed findings. These determinations resolve NIKE's challenge to Plaintiff's statistical showing based on the job controls. FOF ¶ 64.

## II. Plaintiff's Prima Facie Burden Regarding NIKE's Prior Pay Practice

23. NIKE's practice of using prior pay when setting starting salaries before September 2017 was a facially neutral, specific employment practice.

24. NIKE's contemporaneous admissions prove this practice by a preponderance of the evidence. FOF ¶¶ 27-31. NIKE's standard Offer Intake Form sought each candidate's prior compensation; NIKE admitted that, in the past, it "often focused on the new hire's prior salary," and that the September 2017 elimination of the practice was a formal "policy change." *Id.* Party admissions and contemporaneous written materials are the most reliable evidence of its practices. *Sidibe*, 103 F.4th at 701 (a party's "own admissions" have "more persuasive force than other evidence," and "[c]ontemporaneous evidence, particularly written evidence, is commonly understood to be more reliable than later recollections"); FOF ¶ 36.

25. Dr. Neumark's multiple regression analysis found that women hired before September 2017, while NIKE used prior pay, were paid starting salaries 1.16% lower than

similarly situated men. The disparity is statistically significant at 2.89 standard deviations. FOF ¶¶ 66-67.

26. Title VII's disparate impact provision asks whether the employer "uses a particular employment practice that causes a disparate impact." 42 U.S.C. § 2000e-2(k)(1)(A)(i). The before-and-after comparison answers that question directly. Causation is shown when "the outcome changes" after a "change [to] one thing." *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 656 (2020). NIKE eliminated the practice, and the outcome changed: the starting pay disparity for women fell by more than half. FOF ¶ 68. That is evidence that the practice caused the disparity.

27. NIKE argues that Dr. Neumark did not control for all potentially non-discriminatory factors. The law does not require that (COL ¶ 13), and NIKE presented no expert testimony or other evidence showing an alleged omitted variable explains the disparities. NIKE has thus not made the required showing. *Hemmings*, 285 F.3d at 1188; FOF ¶ 72. And when Dr. Neumark added the actual education and prior-job information from NIKE's own application data, the disparity persisted. FOF ¶ 68. NIKE's own pay-equity methodology, moreover, is a multiple regression that controls for the same kinds of factors, including age. FOF ¶ 65.

28. NIKE's reliance on *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), is misplaced. *Dukes* involved a challenge to delegated, unguided discretion, a "policy" of having no uniform policy. *Id.* at 355-57. Plaintiff challenges two WHQ-wide practices, a prior-pay starting salary practice and the annual bonus practice. FOF ¶¶ 22-23, 55-61. The only expert testimony confirms that job-code-by-job-code regressions would produce tiny samples and imprecise results. FOF ¶ 71; Tr. 871:4-7; COL ¶ 14.

29. The prior pay practice had a significantly discriminatory impact on women. NIKE's contrary evidence has been considered, and, on the Court's weighing of the record, it does not overcome the evidence Plaintiff offered to meet her prima facie burden. FOF ¶¶ 34-36. Pfluger's denial (FOF ¶ 79), even if fully credited, does not bear on the practice's existence or its impact on women as a group and thus could not defeat the prima facie showing; at most, it is for the remedial stage, where NIKE bears the burden. COL ¶¶ 44-47, *infra*.

30. Plaintiff is a member of the group disparately impacted by that practice: NIKE set her starting salary in 2015, while it had this practice. FOF ¶¶ 74, 76-77. NIKE's contention that Plaintiff "lacks standing" to assert the disparate impact claims (Dkt. 732, COL ¶¶ 108-115) fails. The prima facie showing is group-based "[i]n whatever procedural guise" the claim appears, *Stockwell*, 749 F.3d at 1115, and *Freyd* applied that framework to an individual plaintiff's pay claims, 990 F.3d at 1224-26. The authorities NIKE invokes require only that the plaintiff be subject to the challenged practice. *See Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987) (fluently bilingual plaintiff could not be adversely affected by an English-only rule); *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 749-50 (9th Cir. 2003). Title VII reaches practices that "deprive or tend to deprive any individual of employment opportunities." 42 U.S.C. § 2000e-2(a)(2); *Connecticut v. Teal*, 457 U.S. 440, 448 (1982).

## III. NIKE's Failure to Maintain Records and Misrepresentations Further Support the Court's Prior Pay Conclusions

31. Sitting as the finder of fact, the Court may draw a permissive inference that evidence a party failed to preserve or produce would have been unfavorable to that party; a finding of bad faith is not required. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993); *Siskiyou Buckle Co. v. GameWear, Inc.*, Civ. No. 09-3073-CL, 2011 WL 13248530, at *7 (D. Or. Nov. 3, 2011). The duty to preserve attaches when litigation is reasonably anticipated, not when

it is filed. *Cf. Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*, No. 3:12-cv-1058-SI, 2018 WL 6305665, at *6 (D. Or. Dec. 3, 2018) (a "litigation hold should have been in place, at a minimum, by" the date the action was filed).

32. Title VII and the EEOC regulations require the employer to retain records, and where the employer fails to do so, the plaintiff is entitled to an inference that the missing records would have supported her case. *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 318 (N.D. Cal. 1992); *Loiseau v. Dep't of Human Res. of State of Or.*, 567 F. Supp. 1211, 1217 (D. Or. 1983); *see also Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657-58 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (employers must "maintain ... records or other information which will disclose the impact which its tests and other selection procedures have upon employment opportunities ….") (citation omitted).

33. A court may also inform itself of a party's failure to preserve or produce material information, permit argument on the implications, and preclude the party from exploiting the gaps it created. *In re Premera Blue Cross Customer Data Sec. Breach Litig.*, No. 3:15-md-2633-SI, 2018 WL 5786206, at *2-3 (D. Or. Nov. 5, 2018); *Yela Fiduciary Servs., LLC v. Benton Cnty.*, No. 6:20-cv-01925-MK, 2022 WL 17666400, at *9 (D. Or. Dec. 14, 2022).

34. The Court takes judicial notice of NIKE's statements in its filings and representations in this action, which are offered to show that the statements were made, not for their truth. Fed. R. Evid. 201(c)(2). They are also statements of a party opponent. Fed. R. Evid. 801(d)(2).

35. NIKE's misrepresentations are also affirmative evidence. NIKE represented that it had not located and was not aware of any written policies on the use of prior pay, and asserted that it never had instructions to use prior pay (FOF ¶¶ 39, 41), but its employees contradicted

those representations at trial (FOF ¶ 42).[5] The Court treats these misrepresentations about a material fact as affirmative evidence that the practice existed. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (factfinder may treat "a party's dishonesty about a material fact as affirmative evidence of guilt"); *United States v. Castillo*, 615 F.2d 878, 885 (9th Cir. 1980) (attempts "to suppress evidence" are "probative of consciousness of guilt").

36. Applying these principles, and on the facts found in FOF ¶¶ 39-52, the Court draws the permissive inference that the written starting pay guidelines and the other pre-September 2017 starting pay records that NIKE failed to preserve or produce would have been evidence that NIKE had a practice of using prior pay when setting starting salaries. FOF ¶ 51. The Court likewise draws the permissive inference that the 2019 training video that NIKE filmed during this litigation and failed to preserve or produce (FOF ¶ 50) would have been unfavorable to NIKE with respect to the challenged pay practices and its Job Architecture. These inferences independently support the Court's conclusion in Section II that the practice existed, which the Court would reach on the trial record alone.

## IV. Plaintiff's Prima Facie Burden Regarding NIKE's PSP Bonus Practice

37. NIKE's practice of using its PSP formula for annual bonuses was a facially neutral, specific employment practice. FOF ¶¶ 55-61. Every factor was centrally and automatically set from Fiscal Year 2019 on, and all but one (the performance modifier) before then. FOF ¶¶ 58-60.

38. The sole factor not automatically set before Fiscal Year 2019, the performance modifier, was based on the employee's CFE performance rating, and women at WHQ received

[5] *See* FOF ¶ 46 n.3.

performance ratings equal to or higher than those of men. FOF ¶¶ 54, 59, 70. The performance modifier therefore cannot explain the disparity in any year. FOF ¶¶ 59-60, 70.

39. NIKE's PSP bonus practice is distinct from the prior pay practice, may be challenged on its own terms, and does not depend on Plaintiff's prior pay showing. FOF ¶¶ 61, 70.

40. The PSP bonus practice had a significantly disparate impact on women. Dr. Neumark's multiple regression analysis, controlling for job, performance rating, year, tenure, time in job code, and full-time or part-time status, found that women at WHQ were paid about 3.2% less in PSP bonuses than otherwise comparable men, a disparity significant at 5.66 standard deviations. FOF ¶¶ 64, 70. For the reasons stated in COL ¶¶ 27 and 28, NIKE's criticisms of the controls and of the WHQ-wide analysis fail.

## V. NIKE's Prior Pay and PSP Bonus Practices Were Not Justified by Business Necessity or Job-Related

41. NIKE failed to meet its burden of showing that either its prior pay practice or its PSP bonus practice was job-related or justified by business necessity. It presented no evidence supporting either requirement for either practice, and its own proposed findings of fact and conclusions of law filed shortly before trial did not contend otherwise. FOF ¶ 81; *see generally* Dkt. 732.

42. In addition, NIKE waived this affirmative defense because it did not assert it in the Final Pretrial Order, which amends the pleadings and controls the course of this action. Dkt. 742 at 12–15 (NIKE's Contentions ¶¶ 1–10); *see also id.* at 30; L.R. 16-5(d). Because a defendant "must enumerate its defenses in a pretrial order," NIKE waived, or at a minimum forfeited, that defense. *Ivie v. AstraZeneca Pharms. LP*, No. 21-35978, 2023 WL 3563007, at *1–2 (9th Cir. May 19, 2023) (applying D. Or. L.R. 16-5) (citation omitted).

## VI. Plaintiff is Entitled to Relief

43. Because Plaintiff has established her prima facie case of disparate impact and NIKE has failed to carry its burden of proving that either challenged practice is job-related and consistent with business necessity, liability for the disparate impact claims is established.

44. Plaintiff is presumptively entitled to back pay under Title VII and the OEA (COL ¶ 7), and no compelling reason to deny it exists here. Back pay serves Title VII's purpose "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle*, 422 U.S. at 418-21 (citation omitted); *Kraszewski v. State Farm Gen. Ins. Co.*, 912 F.2d 1182, 1184-86 (9th Cir. 1990).

45. In calculating back pay, "[a]ll uncertainties should be resolved against the employer," *Domingo v. New England Fish Co*., 727 F.2d 1429, 1445 (9th Cir.), *modified*, 742 F.2d 520 (9th Cir. 1984), and especially so here, where NIKE's discrimination, failure to maintain required records, and suppression of evidence created the uncertainty. FOF ¶¶ 46-52.

46. NIKE has not rebutted the presumption that Plaintiff is entitled to back pay on the prior pay claims. NIKE bears the burden of showing that its practice did not disadvantage her relative to similarly situated men, such as Waddell, whom NIKE paid a higher starting salary despite his lesser experience. FOF ¶ 78. NIKE's only evidence on that question is Pfluger's denial, to which the Court has given little weight (FOF ¶ 79) and which, even fully credited, says nothing about how NIKE set the starting salary of Waddell, whose pre-NIKE pay was higher than his NIKE starting pay (FOF ¶ 78), or of any other similarly situated man, on which NIKE offered no evidence at all. Because the disparity at issue is the gap between Plaintiff's starting pay and that of similarly situated men, NIKE's failure to show that those men did not benefit from the practice is a failure to show that Plaintiff was not harmed by it. The record, moreover,

shows that NIKE had a practice of using prior pay, and it affirmatively sought Plaintiff's prior pay before setting her starting pay. FOF ¶ 78. The presumption therefore stands.

47. Nor has NIKE rebutted the presumption that Plaintiff is entitled to back pay for the disparate impact PSP bonus claims. NIKE did not show that Plaintiff's lower PSP bonus amounts or similarly situated men's higher PSP bonus amounts were justified by non-discriminatory factors.

48. Plaintiff is entitled to back pay reflecting the difference between the compensation she received and the compensation she would have received absent NIKE's discriminatory practices, from the earliest date permitted by the applicable limitations period, prejudgment interest on any back pay award, and attorneys' fees and costs.

49. The Court found Jennifer Murphy, a Certified Public Accountant, to be an expert in forensic accounting and economic damages, without objection from NIKE. Tr. 919:20-920:3; 921:20-24. Murphy calculated Plaintiff's disparate impact back pay and prejudgment interest under Title VII and the OEA through July 17, 2026, and the Court makes the following findings regarding those calculations. Tr. 936:24-939:19.

50. For the prior pay claim, Murphy assumed that Plaintiff's starting salary should have been 1.16% higher, consistent with Dr. Neumark's finding (FOF ¶ 67); applied the same 1.16% increase to the PSP bonuses paid during the liability period, because the PSP formula uses base salary as an input (FOF ¶ 61); and calculated lost back pay as the difference between Plaintiff's actual and adjusted pay. Tr. 936:24-937:18. For the PSP bonus claim, she assumed that Plaintiff's bonuses should have been 2.95%[6] higher, consistent with Dr. Neumark's finding

[6] Dr. Neumark presented an approximately 3.2% PSP shortfall at trial (Tr. 792:3-13; FOF ¶ 70); Murphy was instructed to assume a 2.95% difference (Tr. 938:1-6). The difference is immaterial

(FOF ¶ 70), and calculated the difference. Tr. 938:1-6. Prejudgment interest is computed at 3.97% (the then-current rate based on the one-year Treasury yield), compounded annually, on the Title VII calculations, and at Oregon's statutory 9% simple rate on the OEA calculations, which "is not a matter of judicial discretion" once back pay is determined. Tr. 938:22-939:12; ORS 82.010(1)(a); *Cumming v. Nipping*, 337 Or. App. 545, 550 (2025); *Wilson v. Smurfit Newsprint Corp.*, 197 Or. App. 648, 673-74 (2005). The Court finds that the resulting amounts of lost back pay and prejudgment interest through July 17, 2026 are as follows (Tr. 937:19-22; 938:8-10):

| **Claim** | **Title VII** | **Oregon Equality Act** |
|---|---:|---:|
| Disparate impact—prior pay | $6,069.08 | $7,533.30 |
| Disparate impact—PSP bonuses | $1,666.04 | $2,062.58 |
| Total | $7,735.12 | $9,595.88 |

51. Plaintiff may not recover twice for the same loss. The Title VII and OEA calculations above measure the same lost compensation over overlapping periods and differ only in the back pay start date and the applicable prejudgment-interest rules. Tr. 932:22-933:2; 934:20-22; 937:1-5. The Court therefore awards the greater, OEA-based amounts — $7,533.30 on the prior pay claim and $2,062.58 on the PSP bonus claim, for a total of $9,595.88 through July 17, 2026 (Tr. 937:21-22; 938:8-10), with interest continuing to accrue thereafter until entry of judgment. The Court holds, in the alternative, that Plaintiff would be entitled to the Title VII-based amounts shown above if the OEA-based award were unavailable. See Dkt. 835 at 12-13; Dkt. 836. Plaintiff will submit updated interest calculations with the proposed form of judgment.

to liability, and the smaller assumption is conservative: it reduces, and cannot overstate, Plaintiff's recovery.

*See* ORS 82.010(1)(a); *Nichols v. Frank*, 771 F. Supp. 1075, 1080 (D. Or. 1991) (calculating prejudgment interest "through the date of the judgment").

52. The disparate impact awards are likewise not duplicative of the damages to be awarded on the jury-tried claims. Those damages remedy NIKE's intentional discrimination, and the Parties' submissions on them expressly excluded the disparate impact claims (Dkt. 835 at 5, 12-13; Dkt. 836 at 5; Tr. 934:7-935:16). The disparate impact awards remedy a different injury on a different measure — the shortfalls attributable to NIKE's facially neutral practices — and distinct remedies for distinct injuries are not a double recovery. *Cf. Thompson v. Sawyer*, 678 F.2d 257, 263, 293 (D.C. Cir. 1982); *Mathis v. Housing Auth. of Umatilla Cnty.*, 242 F. Supp. 2d 777, 790 (D. Or. 2002). To the extent any portion of the disparate impact back pay compensates the same dollars of lost compensation for the same months as the jury-claim award, the judgment will offset that overlap. *See Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1023 (9th Cir. 2000).

53. The Court therefore awards Plaintiff back pay and prejudgment interest on her disparate impact claims in the amounts set forth above, and will enter judgment accordingly.

DATED: September 8, 2026

GOLDSTEIN BROWNE, P.C.

*s/ Byron Goldstein*
Byron Goldstein (admitted *pro hac vice)*
Barry Goldstein, Of Counsel (admitted *pro hac vice*)
1111 Broadway, Suite 300
Oakland, CA 94607
Telephone: (510) 584-9020

MARKOWITZ HERBOLD PC
Laura Salerno Owens, OSB #076230
LauraSalerno@MarkowitzHerbold.com
David B. Markowitz, OSB #742046
DavidMarkowitz@MarkowitzHerbold.com
Harry B. Wilson, OSB #077214
HarryWilson@MarkowitzHerbold.com
Kelsie G. Crippen, OSB #193454
KelsieCrippen@MarkowitzHerbold.com

ACKERMANN & TILAJEF, P.C.
Craig J. Ackermann (admitted *pro hac vice*)
cja@ackermanntilajef.com
Brian W. Denlinger (admitted *pro hac vice*)
bd@ackermanntilajef.com
Erika Smolyar (admitted *pro hac vice*)
es@ackermanntilajef.com
315 South Beverly Drive, Suite 504
Beverly Hills, CA 90212
Tel: (310) 277-0614
Fax: (310) 277-0635

DARDARIAN HO KAN & LEE
Laura L. Ho (admitted *pro hac vice)*
lho@dhkl.law
James Kan (admitted *pro hac vice)*
jkan@dhkl.law
Katharine L. Fisher (admitted *pro hac vice)*
kfisher@dhkl.law
155 Grand Avenue, Suite 900
Oakland, CA 94612
Telephone: (510) 763-9800
Fax: (510) 835-1417

*Attorneys for Plaintiff*